# Exhibit G



Matthew Thurston

v.

Progressive Casualty Insurance Company
and United Financial Casualty Company

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Case No. 1:22-cv-00375-NT

Expert Report of Marc Spizzirri
April 15, 2024

**B | RILEY** *Advisory Services*

## <u>Table of Contents</u>

I.      Introduction..................................................................................................... 3

II.     Professional Background ................................................................................ 3

III.    Overview of the Litigation............................................................................... 5

IV.    Scope of Work ................................................................................................ 5

V.     Opinions About the Used Car Industry .......................................................... 6

VI.    Market Research ........................................................................................... 19

VII.   Conclusions .................................................................................................. 24

## I.    INTRODUCTION

1.    GlassRatner Advisory & Capital Group, LLC d/b/a B. Riley Advisory Services ("B. Riley Advisory Services") was retained by King & Spalding LLP, a Professional Corporation, ("Counsel") on behalf of Progressive Casualty Insurance Company and United Financial Casualty Company (together, "Defendant" or "Progressive"). We were retained to provide consulting services relating to industry practices specific to the used car industry.

2.    To perform this engagement, I relied on other B. Riley Advisory Services professionals with experience in financial analysis, economic damages, business valuation, and forensic accounting, all of whom worked under my direct supervision and control.  I have used the work of the team to support my review of information related to this matter, but the opinions presented are my own.

3.    Any minor differences in amounts calculated or referenced in supporting documentation or Schedules and Tables to this report are due to rounding.

4.    This report is issued for purposes of the above captioned lawsuit (the "Litigation") and is not to be used for any other purpose.

5.    I hereby reserve the right to revise and/or supplement my analysis, opinions and this report to the extent additional relevant information becomes available to me.

## II.    PROFESSIONAL BACKGROUND

6.    I have actively worked in the automotive sales industry since 1979.  I have been employed by franchised auto dealers from 1979 through 1992 and served in every capacity within a dealership with a particular focus in the sales departments. These jobs included salesperson, sales team captain, closer, finance department writer, inventory manager, finance department manager, sales manager, used car manager, general sales manager, general manager and President of a large automotive group.

7.    From 1992 through 2016, I was an active managing dealer/operator in the largest automotive market in the Country, Los Angeles Metro. I owned four Ford dealerships, a Toyota dealership, a Honda dealership, a Nissan dealership, Indian and Triumph motorcycle dealerships, and a classic cars dealership.

8.    I served as a Ford National Dealer Council President, President of the Southern California Ford Dealers advertising association and Chairman of the Ford Consumer Appeals Board.

9.    I have received the Chairman's Award recognition from Ford Motor Company and also became one of their "Top Hundred" Ford Dealerships.  I was also recognized by Honda and Toyota, receiving their Top Awards.

10.    I have performed the duties of a Court-appointed receiver along with two other partners, Senior Managing Directors at B. Riley Advisory, in more than a dozen dealerships in the last five years.

11.    I have also performed as an interim General Manager and Chief Restructuring Officer (CRO) for dealerships in the past four years.

12.    During the last five years, I have been retained to advise dealerships regarding operations, to consult with private equity firms regarding their investments within the franchise dealership marketplace, and to perform dealership valuations.

13.    I have advised REITs in the automotive space and have also built out dealership real estate for 12 dealerships.

14.    While serving as receiver, CRO, and/or interim manager during the last four years, I have supervised and facilitated the sale of over 2,000 vehicles.

15.    I have been involved in dozens of automotive buy/sell transactions and have built dealerships from the ground up.

16.    I frequently provide written commentary in Automotive News magazine and Automotive Buy/Sell Report.

17.    I was a licensed California Dealer for more than 30 years.

18.    I am a Senior Managing Director with B. Riley Advisory Services, leading the retail automotive team.

19.    A listing of expert testimony that I provided during the past four years and a listing of publications authored and co-authored by me during the past 10 years is summarized and attached as Appendix 1.

20.    My opinion is based upon my own experiences as well as an analysis derived from other industry participants, reliable industry statistics, and industry specific intelligence relating to customary business practices and trends. A list of the publications and data relied upon is attached as Appendix 2.

21.    I have also reached out to other industry professionals from my contact database to research and validate my opinions.

22.    The hourly rates charged by B. Riley Advisory Services for professional services in this matter range from $350 to $695, and my time has been billed at $695 per hour. B. Riley Advisory Services' compensation is not contingent upon the outcome of this matter.

23.    I co-led the receivership of The Momentum Auto Group which was recognized by The M&A Advisor as the Distressed M&A Deal of the Year between $25M and $50M.

4

### III.    OVERVIEW OF THE LITIGATION

24.    Plaintiff Matthew Thurston ("Plaintiff") sustained physical damage to a 2012 Volvo XC70 (the "Volvo"). The vehicle was deemed to be a total loss. Plaintiff's insurer, United Financial Casualty Company ("UFCC") agreed to cover the loss under Plaintiff's insurance policy.

25.    Pursuant to the terms of its Maine contract, UFCC elected to cover the loss by paying the owner of the Volvo up to the actual cash value ("ACV").

26.    To determine the ACV of the Volvo, UFCC utilized a valuation software provided by Mitchell International, Inc. (the "Mitchell Software").

27.    According to the First Amended Complaint ("FAC"), Plaintiff claims that the method Progressive used to determine ACV was improper. My understanding is that Plaintiff's primary concern is that the "Projected Sold Adjustment" or "PSA" that is sometimes applied by the Mitchell Software is statistically invalid and contrary to the modern used car market and, as a result, it is not an appropriate deduction from the market-derived data for comparable listings for sale of the same brand, model, and year of a total-loss vehicle.

28.    The Mitchell Software generates a vehicle's value based on an analysis of comparable vehicles advertised for sale or recently sold in the local market area in which the total-loss vehicle was garaged. The Mitchell Software analyzes the advertised asking price and the actual sold price (when that information is available) of comparable vehicles. The Mitchell Software then makes various adjustments to those prices, such as adjustments for trim level, mileage, and optional equipment.  The Mitchell Software applies a PSA only to vehicles that are advertised for sale (as opposed to the those that have sold).  The PSA is based on the historical price negotiating behavior between buyers and sellers of similar vehicles. These adjustments are intended to reflect consumer purchasing behavior and are calculated by analyzing the difference between vehicle list prices and sales prices for similar vehicles over the preceding six-month period. The sales price data is provided by J.D. Power and is matched to advertised prices using Vehicle Identification Numbers ("VIN") numbers provided by Mitchell.

29.    The Mitchell Software then averages the adjusted values of the comparable vehicles to determine the loss vehicle's base value.  Characteristics specific to the vehicle, such as condition, are then assessed and adjustments are applied to that base value prior to the Mitchell Software arriving at ACV for a specific vehicle.

### IV.    SCOPE OF WORK

30.    B. Riley Advisory Services was retained to provide expert advice regarding whether the Mitchell Software's application of a PSA is consistent with market conditions prevailing in the United States Auto Industry.

## V.    OPINIONS ABOUT THE USED CAR INDUSTRY

31.    In the First Amended Complaint, Plaintiff claims that the PSA is improper because it is a "reduction in the market value of a vehicle's list price based on a supposed downward price pressure[.]" ¶ 42. Specifically, Plaintiff claims the PSA "has no rational basis" and is "especially [improper] in the current market, where used cars are only available at a significant premium[.]" ¶ 42.

32.    Because Mitchell only applies the PSA to list prices, and not to sold prices, the relevant inquiry here is whether the advertised or list price (I use these terms interchangeably) always represents market value.  The simple answer is no.

33.    There exists countless publications and other reference materials (many cited later in this report) acknowledging that used cars frequently sell for below their advertised price, that consumer negotiation is an expected behavior that leads to used-car transactions where the vehicle sells for below its list price, and that the final sales price of a vehicle is the best indicatory of market value.

34.    The following topics explain why Plaintiff's premise does not accurately reflect dealer practices in the used car industry.

**A.    Consumer negotiation is an expected part of most of used car transactions.**

35.    Experts in the industry follow the premise that negotiation is present in most all used car transactions. In my opinion, to make a determination of value that is based solely upon the list price of a vehicle, and that disregards the industry standard behavior of negotiating a discount, would be inaccurate.

36.    For example, when Consumer Reports instructs buyers about how to purchase a used vehicle, it suggests that the consumer should "begin by making an offer that is realistic but 15% to 25% lower than this figure. Name your offer and wait until the person you're negotiating with responds."[1]

37.    In a Consumer Reports article written by acclaimed automotive journalist Mark Rectin, "Those who used the asking price as a starting-off point for negotiations often ended up with a lower purchase price, whether buying from a franchised new-car dealer, an independent used-car dealer, or a private party." The article goes on to say that "70% of used car buyers haggled over the price, succeeding in 83% of

---

[1] "Negotiate a car effectively, Don't settle for a price that may not be fair" Consumer Reports, available at: https://www.consumerreports.org/cro/2012/12/negotiate-effectively/index.htm#:~:text=Based%20on%20your%20pricing%20homework,you're%20negotiating%20with%20responds

the time."[2] And the reported savings for being a savvy negotiator were impressive. The median was $900, or 8%, less than the asking price. The article then explains that 68% of the consumers that merely asked for a better price were successful.

38.    In 2017, the Journal of Business Research studied the interactions of customers persuasion knowledge and salesperson negotiation strategies and their impact on price outcomes.[3] Using dyadic data specifically from the automotive industry the study determined that price outcomes were influenced by the customers knowledge of the marketplace. With access to the internet, mobile applications, and a vast online social network to compare product and pricing information the more informed customer was able to negotiate a greater price concession. After evaluating different levels of consumer knowledge weighed against different sales strategies employed by car salespeople, the study concluded that, "buyers typically do not accept the initial value proposition by agreeing to move forward with a specific seller at the point of the first offer. Thus, the salespeople enter negotiations aware that they must move a buyer through each step, which requires negotiations and conversations that potentially involve conflict and serious objections." The study also determined that the greater the customer's knowledge the greater price concession they negotiated. "Customers who are increasingly armed with information, price, and persuasions awareness are better equipped than ever to negotiate in business to consumer sale negotiations."

39.    Similarly, in 2019, a study performed by MAXDigital showed that 65% of dealers negotiate more than $500 off the listed vehicle price.[4] This study leads to the conclusion that customers are conditioned to ask for some discount, given that discounts have been historically available.

40.    A 2022 article by Carchex[5] says, "Car buyers and salespeople have been negotiating and haggling over car prices for decades—and this is unlikely to change anytime soon. Car shoppers and salespeople will likely continue to make counteroffers for the foreseeable future."

---

[2] "Why Haggling for Your Next Car Really Pays" Consumer Reports, available at: https://www.consumerreports.org/used-car-buying/why-haggling-for-your-next-car-really-pays/

[3] "Let's Make a Deal:" Price Outcomes and the Interaction of Customer Persuasion Knowledge and Salesperson, Negotiation Strategies," Journal of Business Research. (available by purchase only and produced upon request)

[4] "MAXDigital Dealer Insights: Missing Profit Opportunities Uncovered. 2019 MAXDigital Dealership Profitability Study" at page 7, available at: MaxDigital-DealerInsights_Uncovering MissingOpportunitiesForProfits-Digital.pdf

[5] "How to Negotiate Car Prices" CarChex.com, available at: https://www.carchex.com/content/how-to-negotiate-car-prices

41.    Geoff Cudd, a serial entrepreneur and business consultant, assembled a team of auto industry experts and started an advisory service. In May of 2023, he published the article saying that "depending on some factors a dealership may come down at least five percent off of the asking price. But if you negotiate properly, you can get up to 15% off."[6] Cudd starts by acknowledging that "Dealerships face the daunting challenge of pricing each car to optimize profitability without alienating potential buyers." The advice provided confirms that negotiation plays a significant role in the used car sales, that the dealer pricing anticipates a negotiation leading to a discount and can "create an unpredictable environment for buyers."

42.    Likewise, discounts from list price on used vehicles have been a time-honored practice since the first dealer's license was issued.

43.    In his blog *"Like I See It"*, Dale Pollak, the Founder and CEO of vAuto drives home this point. On April 7, 2023, Mr. Pollak explained that even dealers who use data-driven pricing tools, like vAuto, do not always follow the program's recommendations: "The analysis revealed that Platinum and Gold vehicles leave dealer inventories all the time for substantially less than the retail prices ProfitTime GPS recommends for the cars." Mr. Pollak reasoned that this was because "these vehicles were either priced less than their individual price recommendations or they were priced right and someone, often a manager, approved a substantial discount at the desk to sell the car."[7]

44.    In July of 2023, Money magazine published a summary of their research regarding the presence of "one-price" selling.[8] They state: "Going forward, experts expect no-haggle options to exist alongside traditional car buying processes, which won't go away completely any time soon. While spending four hours at a dealership isn't fun, shopping in-person with a salesperson does appeal to a large number of buyers, experts say." They also quoted Tim Mullins, vice-president of Capital One Auto Financing, who reached the same conclusions as my market research. Mullins says, "Most of the consumers, they want to go into the dealership, they want to stare someone in the eye and they want to touch and feel a car[.]"

45.    Confirming that negotiation remains commonplace even in today's market, in September of 2023, US News & World Report wrote an article offering tips to negotiate saying, "In the end, you'll likely pay a bit more than you wanted to spend,

---

[6] "How Much Will a Dealership Come Down on the Price of a Used Car" available at: https://www.findthebestcarprice.com/dealership-come-down-price-used-car/

[7] "ProfitTime GPS in Practice Knowing When It's Right to 'Roll the Car'" Like I See It, available at: https://www.dalepollak.com/2023/04/profittime-gps-in-practice-knowing-when-its-right-to-roll-the-car/

[8] "Can You Still Haggle for a New Car? How the Auto Market Is Changing" Money, available at: https://money.com/haggling-car-dealership-is-disappearing/

and the dealership will accept a bit less than they wanted to get for the sale. That's how negotiation works."[9]

46. Also in September of 2023, Carfax acknowledges that "negotiating a car's sales price is a source of anxiety…" and prepares the consumer with strategies necessary "to negotiate the best deal on your next car."[10] Among the best practices offered, Carfax experts suggest that "when making your initial offer, start with a bid lower than the final amount you're willing to pay. This leaves room for the salesperson to make a counteroffer."

47. In the 2024 Cox Car-Buyer Journey Study, Vanessa Ton, Senior Manager of Research and Market Intelligence at Cox Automotive represented that dealer's willingness to negotiate on pricing helped customers to have a better experience.[11]

48. There is simply no truth in the argument that used-car dealers nationwide uniformly refuse to sell a car for lower than the advertised price or, as Plaintiff claims, that used cars are "only available at a significant premium." FAC, ¶ 42.

**B.    The "one-price without negotiation model," while present in the marketplace, does not represent the industry standard of dealer pricing strategies.**

49. "One-Price" selling in the automotive industry refers to the practice of selling a vehicle at the advertised price and not accepting any negotiations of that price with the vehicle sale process.  This process may also be referred to as "no haggle," "upfront," or "value" pricing.  Regardless of what it is called, this dealership model requires that a vehicle is sold at a set price that is non-negotiable.

50. Notwithstanding the fact that there are some dealers who market themselves as "one-price" dealers, this practice represents a small minority of used-car dealers. Moreover, not all dealers that market as "one-price" follow a strict adherence to this claim.

51. So while there are certainly some used car transactions where a vehicle's list price will be the same as its final sales price, this is not the norm in the used-car industry.

---

[9] "Tips for Negotiating With a Car Dealer" available at: https://cars.usnews.com/cars-trucks/advice/tips-for-negotiating-at-a-car-dealership

[10] "How to Negotiate a Car Price in 4 Steps" available at: https://www.carfax.com/blog/how-to-negotiate-car-price

[11] "Car-Buyer Journey Study Reveals 5 New Consumer Behavior Trends - What Actions Dealers Should Take" available at: https://event.webcasts.com/starthere.jsp?ei=1654191&tpkey=90f45 48395&sti=email&utm_source=Sailthru&utm_medium=email&utm_campaign=Webinars-Multi-OD-022324&utm_term=Promote-Webinars

52. One-price marketing has been around since at least the 1990s. For example, General Motors' failed Saturn experiment employed a one-price philosophy in an effort to combat low-cost foreign imports. "In a Saturn store, the sticker price was the final price. And Saturn retailers could confidently adhere to the policy because they knew the customer wasn't going to find the same new car for $100 less a few blocks or miles away."[12] The first Saturn was sold in 1990 and GM invested about $5 billion in Saturn. Sales peaked in 1994, but it was later reported that GM was losing nearly $3,000 per car, such that GM tried to sell the brand in 2008[13], and ultimately scrapped the Saturn brand altogether by halting production in 2009.[14] This is a prime illustration showing that the one-price model, even for a franchise dealer, has a history of being unsuccessful.

53. Earlier this year, on January 22, 2024, online dealer Vroom, another one-price experiment, halted all purchases and sales of used vehicles too.[15] Emerging in 2020 as a successful competitor to Carvana, based on the current state of the market, Vroom is now shutting down its online used car operations and shifting its focus to auto financing and AI-powered analytics.[16]

54. Over the years, there have been many studies evaluating ways to improve the showroom experience. It is objectively agreed that the car buying process needs to improve to appease the next generation of car buyers. Although "one-price" has provided an alternative, it has proven to fail as a solution. Customers still want to negotiate to the point where they believe that they are getting a fair price. The "one-price" mantra, delivered by those that brand themselves as a "no haggle" dealership, consists of the salesperson explaining to the customer that the dealership has value priced the car to provide the best price available, so there is no reason to negotiate. It is not a mystery why this process has a long history of failure and only represents a small minority of transactions.

55. The market has demonstrated that there exists a small place for the "one-price" practice, however, most consumers expect to and would rather negotiate from the

---

[12] "Saturn's Implosion Provides A Bevy Of Lessons" Forbes, available at: https://www.forbes.com/2009/10/29/gm-saturn-failure-entrepreneurs-management-wharton.html?sh=45e8cd2816e2

[13] "GM's Failed Saturn Brand Goes On The Block" CBS News, available at: https://www.cbsnews.com/news/gms-failed-saturn-brand-goes-on-the-block/

[14] "Why Saturn Was Destined to Fail" Harvard Business Review, available at: https://hbr.org/2009/10/weep-not-for-saturn-the-brand

[15] "Vroom Announcement" available at: https://www.vroom.com/sell/sitemsg

[16] "Vroom hits the brakes on its online used car business to go full throttle on auto financing and AI" Yahoo News, available at: https://news.yahoo.com/vroom-hits-brakes-online-used-161525753.html

advertised price, to provide some assurance that they paid a fair price. The Journal of Business Research stated that "…car shoppers want to get the 'rock bottom' lowest price…."and continued, "Customers who are increasingly armed with information, price, and persuasions awareness are better equipped than ever to negotiate in business to consumer sale negotiations. In addition, the practice of negotiating is becoming accepted, and even desired, by consumers."[17]

56.    For example, CDK, a leading provider of data and technology to nearly 15,000 dealer locations, publishes an online newsletter and blog with relevant industry information to support their large dealer network. With access to so many dealers, CDK is in a unique position to track dealer sales and marketing trends. In a 2023 retailing discussion relating to one-price marketing, CDK recognizes some of the benefits of one-price marketing and suggests that dealerships think about making the switch. However, it also makes clear that shifting operations to a "one-price store" is "one of the biggest topics in the industry . . . this model has been around for nearly 20 years. Yet, few dealerships have adopted it even as this model is more relevant now than ever before."[18]

57.    Capital One published an article in August 2023 titled, "What to Know About Buying From No-Haggle Car Dealerships."[19] This article explains the benefits of one price dealerships and suggests that the market is shifting toward no haggle experiences. The author is careful to point out some of the drawbacks of this process, which explains why one-price is not widely accepted. He states that the one-price option "can be less appealing to those that look for the best deal" and the buyer "might wonder if you (the buyer) paid a premium to avoid negotiation." He also warns that, "Even if the price of your car isn't negotiable, you might also still have to deal with discussing interest rate terms, extended warranties, and GAP insurance. So, you won't completely avoid negotiating."

58.    Existing third-party websites using "one-price" – such as CarMax, Enterprise, and Carvana – represent a small portion of the used car marketplace.  CarMax is the sales leader in this group had sales fall to 3.7% of the retail car market for vehicles under 10 years old, with net income in the most recent quarter dropping 27% from

---

[17] "Let's Make a Deal:" Price Outcomes and the Interaction of Customer Persuasion Knowledge and Salesperson, Negotiation Strategies," Journal of Business Research.

[18] "Is One-Price Right for Your Dealership? 5 Reasons to Say Yes." available at: https://www.cdkglobal.com/insights/one-price-right-your-dealership-5-reasons-say-yes

[19] "What to Know About Buying From No-Haggle Car Dealerships" available at: https://www.capitalone.com/cars/learn/managing-your-money-wisely/what-to-know-about-buying-from-nohaggle-car-dealerships/2478

the same time a year ago[20] and overall sales declining 12.6% in the last fiscal year.[21]

59.    These "no-haggle" dealers go to great effort to separate themselves from the traditional showroom experience and to establish a brand. CarMax spent approximately $600M in the last two years promoting that its "'no-haggle' prices transformed car buying and selling from a stressful, dreaded event into the honest, straightforward experience people deserve."[22] If such a sales policy was commonplace, however, there would be no need for one-price dealers to spend hundreds of millions of dollars trying to differentiate themselves on this basis. Even though CarMax is arguably the most well-known one-price dealer in today's market, its revenue for the twelve months ending November 30, 2023 experienced a 15.85% decline year-over-year.[23] And this is true for CarMax even though automotive sales were up 12.3% overall in 2023.[24]

60.    In March 2022, Tom McParland of Jalopnik wrote, "retailers like CarMax and other similar outfits who have become synonymous with the 'no haggle' approach don't often have the best prices. That is because CarMax leans on their marketing and showroom experience to sell cars…" He continues, "not to say that you shouldn't ask for additional discounts, but… the only way to be sure if that 'no haggle' price is a good one is to shop around and compare."[25]

61.    Lending Tree, in November 2022, advised customers on the pros and cons of no-haggle car buying. The article refers to the "traditional dealership" as the dealership where consumers can "expect to negotiate" the price and warns that "The price for

---

[20] "CarMax Q4 net income falls 27% to $50M; revenue slips 1.7%" available at: https://www.autonews.com/dealers/carmax-q4-earnings-net-income-falls-27-revenue-down-17

[21] "CarMax Reports Fourth Quarter and Fiscal Year 2023 Results" CARMAX.com, available at: https://investors.carmax.com/news-and-events/news/news-details/2023/CarMax-Reports-Fourth-Quarter-and-Fiscal-Year-2023-Results/

[22] "CarMax Reports Third Quarter Fiscal 2022 Results" CARMAX.com, available at: https://investors.carmax.com/news-and-events/news/news-details/2021/CarMax-Reports-Third-Quarter-Fiscal-2022-Results/default.aspx

[23] "CarMax Revenue 2010-2023" available at: https://www.macrotrends.net/stocks/charts/KMX/carmax/revenue#

[24] "USA – Automotive Sales volume, 2023" available at: https://www.marklines.com/en/statistics/flash_sales/automotive-sales-in-usa-by-month

[25] "Here's The Problem With Those 'No Haggle' Dealerships", available at: https://jalopnik.com/heres-the-problem-with-those-no-haggle-dealerships-1819136476

a car at a no-haggle dealership is likely to be higher than the price of the same car at a traditional dealership [because] convenience comes at a premium."[26]

62. U.S. News offered tips for negotiating with a car dealer, "Some dealerships and brands have developed no-haggle pricing. The price on the window is the price of the car, they say. In most cases, you'll still need to negotiate the value of your trade, the cost of financing and the price of any add-ons."[27]  This supports that even the dealerships that try to distinguish their brand by using "no-haggle" marketing still plan for negotiation to take place.

63. Notably, independent sellers account for 45% of the total used car market[28] and, in my experience, virtually no independent (non-franchised) used car dealers employ a one-price strategy.

**C.   Determining the market value of a used car is subjective process that is impacted by many variables because no two used cars are exactly alike.**

64. Setting the value of a used vehicle is a subjective process largely determined by the opinion of the individual appraiser or dealer, based on the data available in that specific market, as well as the appraiser's personal experiences with that specific make and model vehicle and the vehicle's condition.

65. Subjective scoring or rating plays a significant part in determining the market value.

66. When industry software reports values and auction selling prices, it collects important data such as make, model, year, mileage, previous damage, color, and overall condition.  The overall condition is determined by an individual appraiser that applies his or her own subjective standards and then assigns a numerical value. It is unlikely that two individual appraisers, evaluating the same car, will arrive at the same exact numerical value.

67. The current available used car software and data reporting services can partially bridge the gap when comparing two used cars, but a gap will always remain.  As advanced and sophisticated as the used car software currently is, there remains a

---

[26] "Is No-Haggle Car Buying a Good Idea?" available at: https://www.lendingtree.com/auto/no-haggle-car-buying/#:~:text=With%20traditional%20dealerships%2C%20you%20expect, dealer%20paid%20for%20the%20ca

[27] "Tips for Negotiating With a Car Dealer" available at: https://cars.usnews.com/cars-trucks/advice/tips-for-negotiating-at-a-car-dealership

[28] "Commentary: Independent Dealers are Poised to Thrive as Driving Force in Recovery" Cox Automotive, available at: https://www.coxautoinc.com/market-insights/commentary-independent-dealers-are-poised-to-thrive-as-driving- force-in-recovery/

significant level of subjectivity in determining a final value.

68.    There is an inescapable element of intuition and business instinct applied in condition report scoring assessments, adjustments for miles, color differences, ownership history, service and accident history and anticipated reconditioning costs to list just a few variables impacting a used vehicle's value.

69.    Not only is every used vehicle different and every dealer's valuation different but each dealer has many other variables to consider when pricing the vehicle for sale. As such, to rely solely upon listed advertised prices to value a vehicle is, at best, an imprecise and unreliable methodology. Dealer pricing is influenced by many variables, including:

- Level of used car inventory
- Level of new car inventory
- Current cash flow
- Age of inventory
- Flooring line utilization
- Fixed expense burden
- Variable expense structure
- Inventory mix
- Current market trends
- Profit margin expectations
- Subjective standards relating to the vehicles condition.

70.    For example, with respect to trading in a used vehicle, Consumer Reports advises, "There's no such thing as exact pricing when it comes to a used car trade-in value. The exact appraisal amount will change based on local market conditions, the dealer's inventory, and their ability to resell the car. To understand the value of your car, take it to multiple used car lots to see what they will give you for it. This will help you understand the high- and low-end values for your car."[29]

**D.    The market value of a front-line used vehicle that is advertised for sale on dealership's lot is almost always greater than the market value of a used vehicle owned by a consumer.**

71.    There are several reasons why the same used vehicle would be worth more on a dealership's lot than in a private party's driveway.

72.    **Reconditioning and Repairs**: Dealers typically recondition cars and price used vehicles to recover costs and make a profit, leading to higher advertised sales prices than an individual could achieve for a total-loss vehicle either through a

---

[29] "What's your car worth?" Consumer Reports Car Value Estimator, available at: https://www.consumerreports.org/cars/car-value-estimator/

private sale or trade-in. The process of reconditioning and repairing create an increase in actual and perceived value and justify a higher price.[30] According to the CEO of vAuto, an average of $1,112 was spent per vehicle to recondition used cars. If the car was a "certified pre-owned" vehicle dealers added another $369.[31] CarEdge, a company dedicated to informing consumers about the retail car business, stated that "Dealers love to get used vehicles 'retail ready' because it allows them to increase the amount of revenue they produce. As a round number you can estimate with, a dealer will spend $1,500 (and sometimes a lot more, especially if it's a more expensive brand, or a certified pre-owned unit) to recondition a used vehicle."[32] Reconditioning a used vehicle adds to its value, therefore, the list price of a front-line used vehicle on a dealer's lot is going to be more valuable than the used, total loss vehicle that has not been reconditioned.

73.   **Warranty and Guarantee:** It is common for used-car dealers to offer some level of express written warranty on the vehicles that they sell. If a used car does not come with an express written warranty, when buying from a dealer the vehicle may still be covered with implied warranties. Common implied warranties include a "warranty of merchantability" and a "warranty of fitness for a particular purpose." The assurance of some warranty adds value and is a contributing factor as to why advertised vehicles on a dealer's lot are advertised for more and worth more than a substantially comparable vehicle driving down the road prior to a total loss.

74.   **Trust and Reputation:** Dealerships typically enjoy an established reputation in the automotive community, which can lead buyers to feel more confident about purchasing from them. This trust can justify a higher price for the same vehicle compared to the total loss vehicle.

75.   **Vehicle History and Inspection:** Dealers will typically share the vehicle history report, as each dealer has investigated the history before they place the vehicle for sale. In almost every state the US Department of Justice requires dealers to provide a National Motor Vehicle Title Information System (NMVTIS) report.  This program is designed to protect consumers from fraud or safety issues. It also provides the consumer security that the title for the vehicle is clean and

---

[30] "What Is Automotive Reconditioning and How Does It Work?" available at: https://www.acvauctions.com/blog/auto-reconditioning-for-dealerships

[31] "A Dealer's Guide To Improving Reconditioning Expenses" available at: https://www.dalepollak.com/2014/02/dealers-guide-improving-reconditioning-expenses/

[32] "How Much Do Dealers Pay for Used Cars?" available at: https://caredge.com/guides/how-much-do-dealers-pay-for-used-cars

transferrable.[33] Within the normal course of business, the dealer will typically do a thorough inspection, assuring the buyer of the car's condition and history.

76. **Recall Items:** Dealers are responsible for making certain that all recall items (safety and quality) are completed prior to transferring ownership. According to the National Traffic Safety Administration, automakers have issued no fewer than 300 separate vehicle recalls for safety-related items in 2022. This is down from 406 recall campaigns conducted during 2021.[34] There is no assurance that a safety recall was performed on the total loss cars, which is another reason that total loss vehicles have a lesser value than the inspected, reconditioned and likely warrantied vehicle on the dealer lot.

77. **Certified Pre-Owned:** Dealers also sell some used vehicles as Certified Pre-Owned or CPO.  CPO vehicles can only be sold by a dealer who sells the same automaker's new vehicles.  They are lightly used, are usually no more than a few years old, and have low mileage with a zero history of accidents.  In essence, they are "like new" vehicles. CPO certification means the manufacturer has fully inspected the car, refurbished it, and determined that the vehicle is in such great shape that they can guarantee it under warranty.  Due to the warranty protection, the advertised price of these cars will significantly raise the average list price of cars of similar make, model, condition, and miles.[35]  Consumer Reports counsels used car buyers, "your best bet is to buy a model with a good history of reliability or consider a certified pre-owned vehicle, which will often come with some type of warranty."[36]

78. Overall, the added benefits and services provided by dealerships, along with their reputation and market position, can justify a higher price for the same used car.

79. The term "actual cash value" is used within most every dealership to define the value of the consumer's trade-in vehicle to the dealership. It specifically represents the price paid or the allowance given to a consumer when they trade a used vehicle as part of a purchase. ACV represents to a dealer the amount of money that a seller could reasonably expect to receive for that specific make and model, in its current condition, with its current miles, in the current marketplace, sold without

---

[33] "Consumers Don't Be Fooled. Protect Yourself" National Motor Vehicle Title Information System, U.S. Department of Justice, available at: https://vehiclehistory.bja.ojp.gov/

[34] "Automakers With The Most And Fewest Recalls In 2022" Forbes.com available at: https://www.forbes.com/ sites/ jimgorzelany/2022/12/30/automakers-with-the-most-and-fewest-recalls-in-2022/?sh=6bec9a377cb9

[35] "Guides and Tips: Certified Pre-Owned vs. Used Cars" Driveway, available at: https://www.driveway.com/ learn/buying/certified-pre-owned-vs-used-cars?gclid=CjwKCAjwzuqgBhAcEiw Adj5dRs-iyc4O5d5oD-8rxp50ydeG01eBoO9ViAQDcUQkmiprz2qeYMRF2BoCZX0QAvD_BwE

[36] "How to Buy a Used Car Now" Consumer Reports, available at: https://www.consumerreports.org/cars/buying-a-car/how-to-buy-a-used-car-a5221672417/

any warranties or representations relating to quality or durability if they were to sell the vehicle in an arm's length transaction.

80.    The dealership's ACV is what the dealership will use as their initial cost when they inventory the vehicle.  The reason that the ACV paid by the dealer for a vehicle is less than what the dealer hopes to ultimately sell the vehicle for is due to the additional expense incurred by the dealer to increase the value of the vehicle combined with the dealer's profit expectation. Each dealer may handle this differently; however, the dealers are likely to incur some or all of the following expenses in between acquiring a vehicle and reselling that vehicle to a consumer in addition to their fixed expenses such as rent, personnel, utilities, etc.:

  1. Reconditioning costs
  2. Advertising costs
  3. Commissions
  4. Warranty expense
  5. Auction fees
  6. Transportation expense
  7. Interest expense.
  8. Certified Pre-Owned Certification

81.    Therefore, the advertised price represents an aspirational target by the dealer that is generally greater than ACV.

**E.    Market value of a used vehicle is best determined by the final selling price negotiated between the dealer and the customer.**

82.    Sales at prices below the advertised price are driven by the longstanding practice the used auto industry of dealers pricing vehicles above the amount at which the dealer is willing to sell the car to allow room for the customary and expected negotiation process with customers. As a result, the sales price—and not the list price—of a vehicle remains the best indicator of that vehicle's market value.

83.    Consumer sites offering advice on how to determine the value of a used vehicle frequently refer consumers to review websites such as Edmunds, Kelley Blue Book ("KBB"), NADA and J.D. Power. In each of these cases, these websites use transactional data that determines sales prices to reach a determination of value. For example, Edmunds states that they use "recent data in your area … from a variety of sources, including dealer transactions[.]"[37] KBB asserts that they

---

[37] "How much is my car worth: Instant used car value and trade in value" Edmunds.com, available at: www.edmunds.com/appraisal

"leverage massive amounts of data, including actual transactions - then adjust for local market conditions and seasonal trends."[38]

84.  Recent commentary from Dale Pollak drives this point home. As recently as June 7, 2023, Mr. Pollak noted that "on average" dealers using vAuto "are pricing their Bronze vehicles [the least desirable vehicles in a dealer's inventory] about $1,000 higher than the system recommends."[39] He continues to say that in June 2023, the overall pricing alignment for Bronze vehicles between what the system recommends and what the vehicles is listed for "fell to 26 percent—the lowest level [he's] seen in recent memory." In this sense, Pollak is acknowledging that most dealers price used vehicles above the market price. The obvious explanation for why this happens is to account for the consumer negotiation while still allowing the dealer to make a profit.

85.  And in a training manual produced by the IRS to be used as a guideline for its auditors of the used car industry states, "The ultimate determination of the sales price (of a used vehicle) will depend on a number of factors.  The initial 'sales price' (asking or list price) established by the dealer is rarely the final sales price."[40]

86.  List prices can change daily as market conditions, inventory levels, cash flows, dealer strategies or any of a myriad of additional factors can weigh in to impact the dealer's subjective standard for setting a list price. The most sophisticated software is at best, unreliable source as to assess a present or future value. As evidenced by the comments made by vAuto dealers listed in my Market Research below, it is common to change list prices continually until a sale is made. These price adjustments are just another example of the negotiating process inherent in the retail used car business. Market price is best determined by the interactions of buyers and sellers and ultimately driven by selling prices, not listing prices.

**F.    The Mitchell Software, including the use of PSAs based on consumer behavior, applies a reliable, transparent, fact-based, and predictably straightforward methodology that is consistent with industry standards used for estimating the market value of a used car.**

87.  By combining years of experience within the used car industry, my review of industry data and publications. and my observations of the standard practices

---

[38] "About Kelley Blue Book ® Values" Kelley Blue Book, available at: https://www.kbb.com/whats-my-car-worth/

[39] "A Root Cause for Two Troubling Used Vehicle Trends" vAuto.com, available at: https://www.vauto.com/learning-center/blog-dale-pollak-all/a-root-cause-for-two-troubling-used-vehicle-trends

[40] "Market Segment Specialization Program. Independent Used Car Dealers, Training 3147-106 (Rev 08-2002) TPDS No. 84219B" US Department of the Treasury, available at: https://www.obspllc.com/Files/ATG%20 Dealerships.pdf

applied in the retail used-car market, it is my opinion that the Mitchell Software applies an accurate and reliable methodology for estimating the ACV of total-loss vehicles.

88.    In particular, by reflecting the negotiation process that has been present in the car buying experience since its inception, the Mitchell Software's application of a PSA is reasonable and consistent with common sales practices in the used-car industry. Since most used cars sold involve a negotiation process, it is logical to conclude that reliance solely on the list price to determine ACV would be inaccurate.

89.    The application of the PSA, which represents common industry behavior based an analysis comparing list and sold price data, is a reliable component to consider when assessing ACV.

## VI.    MARKET RESEARCH

90.    To validate the opinions described above, I conducted my own market research. My hypothesis is that negotiations in a used car transaction remain an expected and integral aspect of most used car transactions. The basis of the research was to measure the willingness of dealers to negotiate down from the advertised price of used cars.  By this research, I derived further insights into dealers' practices regarding used vehicle pricing directly from the dealer population.

91.    To keep the research process uncomplicated and to help produce reliable information, I formulated a simple protocol.  The primary question was whether the dealer negotiated from the advertised selling price. Care was taken to make the questions unambiguous and dispassionate to a specific response and to direct the questions to the target audience consisting of dealers and dealer personnel that deal directly with the consumer. I employed multiple methodologies in conducting the research to mitigate a format bias and to further validate the conclusions gathered.

92.    Data was collected from 622 dealerships. The research results confirmed what was evident to me based on my experience and other available evidence:

- **Most dealerships are not a "one-price" or "no haggle" dealership.**

- **Of the dealers contacted, 76% said they negotiate on the price of used cars.**

- **This supports that the "advertised price" on used cars is regularly not the same as the actual sale price.**

19

93.    Physical questioning of dealership groups during the annual NADA Convention 2022 was conducted in Las Vegas from March 10–13, 2022 where many dealers and dealership management personnel gather from across the country to discuss the current trends and events in the industry.  (Figure 1)



Figure 1: Percentage of NADA group following "One-Price" policy

94.    Direct contact with dealership personnel was conducted via telephonic conversations and email communications to engage in used vehicle negotiations regarding a specific vehicle listed on their website.   (Figure 2)

**Figure 2: Percentage of Phone/email group following "One-Price" policy**



95.    Figure 3 charts the compilation of all the dealer's opinions.



Figure 3: Percentage of 622 Dealerships following "One-Price" policy

96.    Additionally, on vAuto's website, where they market dealership pricing products, there is a section titled "Success Stories."[41] Under this section, vAuto has compiled 19 prominent dealers that use the vAuto software, and some were willing to give video testimonials to the product.  It is presented to viewers that these dealerships are more successful and profitable because of the vAuto software.

97.    I performed similar research on these 19 dealerships to learn about their willingness to negotiate during the sale process and discounts that can be offered. The following is a summary of what I learned.  A detailed breakdown of this market research of vAuto dealers is included as Appendix 3 to this report.

98.    I discovered that of the 19 dealers showcased, 15 were willing to freely negotiate over the phone, email, or text without even requiring a visit to the dealership. Also, 3 of the 19 alluded to the fact that some negotiation would be possible during the transaction.  Just 1 of the 19 dealers claimed that that dealership would not be willing to negotiate on any part of the transaction. I also learned that these dealers change their advertised price regularly based on their own, individual operating philosophy.  This further demonstrates market price instability and the arbitrary

---

[41] "Success Stories" vAuto.com, available at: https://www.vauto.com/success-stories/

nature of the advertised prices, thus confirming that the advertised price does not set the market value.



99.    Some of the 19 dealers add a video where they detail their experiences with the vAuto software.  A review of these videos further supports the opinion that pricing and market value of a used vehicle is subjective. In fact, used car values are part of a dynamic marketplace that are in constant flux. Dealers using vAuto or other competitive pricing software merely consider the data provided to formulate their own individual pricing strategy based on their own unique operating philosophy.

100.    For example, Jim Blickle, from Performance Toyota, demonstrated in his video[42] that the market is constantly evolving by sharing that he regularly changes his advertised prices.

101.    He asserts that he has had success by re-pricing inventory regularly. He celebrates that he raised the prices of aged units to produce a greater gross profit.  When Performance Toyota was contacted, they acknowledged that they will freely consider a lower price than the advertised price and offered an immediate $500 discount.

102.    Gary Wexler, from Honda of Downtown Chicago, in his video[43], claims that he re-priced some of his advertised prices by as much $3,000. Following the suggested vAuto process, Mr. Wexler would use the software to determine how much he

---

[42] "Testimonial | Jim Blickle, Performance Toyota" available at: https://www.youtube.com/watch?v=fyDoWHIvfsA

[43] "ProfitTime Testimonial Gary Wexler" available at: https://www.youtube.com/watch?v=6pemEVxwPjM&t=2s

should pay for the vehicle at acquisition and what price he should then advertise the vehicle for sale. After receiving a new recommended pricing range from vAuto, Mr. Wexler is left to determine on his own as to "where I land." This process confirms that: (1) used car market pricing is in constant state of flux; (2) there is no set market price; (3) vAuto only provides a recommendation, not an exact price. When asked about a willingness to negotiate price, this dealership said yes, and volunteered a $1,000 discount as a first offer.

103.    Jason Frampton, representing the Ken Garff Automotive Group, stated that the vAuto software provided a "general idea as how to price cars."[44] Not an exact science. And that even when using vAuto there are certain cars they will price above the market price. The Ken Garff Group not only volunteered that they would discount from the advertised priced, they also offered a $500 discount to start.

104.    James Mason, from Stevens Toyota, acknowledged that with the vAuto software he didn't have to guess as much as to pricing. The final pricing decision, however, reflects the company's "aggressive" pricing strategy. James credited changes in advertised prices for an increase in profitability.[45] This dealership offered to reduce the list price when asked.

## VII.    PROBLEMS WITH JOSEPH D. JESSER'S OPINIONS

105.    Mr. Jesser's report is based on flawed assumptions, that lead to his unsupported conclusion that the application of the Projected Sold Adjustment used in the Mitchell methodology is not a valid tool to be used in determining a vehicle's value.

106.    Mr. Jesser offers a summary detailing his experience as a personal-property appraiser. Report at 1-2. Notwithstanding this experience with personal property appraisals, what is conspicuously absent from his summary is any evidence of his experience in selling used cars, preparing internet advertisements for used cars, purchasing used vehicles to sell, owning or operating a retail used car operation or even any evidence of what price a vehicle sold for relative to his appraisal.

107.    As a result, it is no surprise that Mr. Jesser's opinion that "…Appraisers cannot assume that a vehicle will sell for anything other than its advertised price" is flawed.

108.    Mr. Jesser starts with the premise that used cars are "typically" sold at list price and that using that list price is a reliable methodology for determining value. He offers, "my understanding of the modern used-car market is that Internet prices

---

[44] "Ken Garff Automotive Group - Jason Frampton Testimonial Video | vAuto" available at: https://www.youtube.com/watch?v=dSV2_EMrsB0

[45] "Testimonial | James Mason, Steven Toyota" available at: https://www.youtube.com/watch?v=EdEQLwNN0Ns&embeds_euri=https%3A%2F%2Fwww.vauto.com%2F&feature=emb_logo

often reflect a no-hassle price…" (Report at 6) As this report has conveyed, this is a misstatement concerning common industry practice.

109.    Mr. Jesser then describes what he believes is an acceptable appraisal methodology. He takes into consideration variables such as: make, model, trim level, miles, equipment, condition, and geographic market. However, by using only the advertised price as the primary basis for value, Mr. Jesser fails to allow for the discrepancies resulting from the typical dealer pricing and negotiating behavior described throughout this report.

110.    Moreover, if as Mr. Jesser opines, there exists no "hard objective data available to an appraiser to support the opinion that a particular comp would sell on a particular day for anything other than the Internet price," then the converse of this statement must also be true. That is, that there is no hard evidence that the Internet price was actually met. As discussed, most used car transactions result in a negotiation from the listed advertised price. The best hard evidence available to provide a reliable determination of value, would be the actual selling price. The price that is negotiated by an arm's length transaction between a willing and able buyer and seller.

111.    Further, Mr. Jesser's claim fails to acknowledge what he writes in his report: that a "take-price" adjustment—made when the dealer will accept an amount other than the advertised price—is an acceptable aspect of appraisal (even though he may not use it himself). Report at 6. Take Price adjustments to list prices best represent the market value of the car and validate the basis for Mitchell's Projected Sold Adjustment.

112.    Mr. Jesser lacks the experience to speak with authority to the daily practices of setting a list price for used cars, creating an advertising strategy for the sale of used cars, or negotiating with a customer to establish a discounted selling price. Instead of applying industry standards to support his thesis, he started with the goal of discrediting the projected sold adjustment methodology and then attempted find a way to back into a rationale to support that thesis. By applying the flawed assumptions listed above, he failed to accomplish his goal.

## VIII.    CONCLUSIONS

113.    **No two used car transactions are the same.** Countless variables exist in determining a used car value.  All parties agree that pricing software exists to allow used vehicle dealerships to stay abreast of the currently listed vehicles for sale.  This data, although helpful as a factor in assessing used car values, cannot be entirely precise for many reasons, including the fact that no two cars are identical.  And further, it is not entirely dispositive as a predictive indicator for determining the value fluctuations in a market in flux.  There is an inescapable element of discretion and subjectivity involved in determining each used car's value.

24

114. **Each dealer applies their own strategies to determine a list price.** The dynamics created in the marketplace in 2020 through 2023 by inventory shortages and supply chain disruptions were not present in 2012 through 2019. These dynamics changed selling and pricing practices and disrupted industry norms. To pronounce that there exists an industry standard of behavior that applies holistically to the used car industry from 2012 to present is invalid. Every situation is different, every dealership is different, every used car is different, and ultimately, every transaction is different.

115. **A comparable used vehicle available for sale on the frontline of a dealership has a greater value that the average total-loss vehicle.** The dealership's initial determination of actual cash value is found using whatever data is available to assess how comparable vehicles have been transacted in the marketplace. The dealer then compares the similar vehicles to identify distinguishable characteristics between the car they are valuing and those that they reviewed in the market. Variables including, but not limited to:

    - mileage
    - condition
    - color
    - estimated reconditioning costs
    - auction fees
    - transportation costs
    - desired profit margin
    - cost of warranty

116. **Dealers' compliance with industry pricing software is limited.** Dale Pollak, founder and CEO of vAuto, explains that 75% of his subscribers do not price Bronze vehicles in alignment with the software's recommendation.[46]

117. **Market value of a used vehicle is best determined by the final selling price negotiated between the dealer and the customer.** Due to the frequency of discounts present in a used car transaction, the dealer's listed price of a used car is not correlative to the market value of the vehicle.

118. **The Mitchell Software's "Projected Sold Adjustment" is a reasonable adjustment to consider when determining the ACV of a total-loss vehicle.** This process reflects typical consumer behavior in used car transactions.

---

[46] "A Root Cause for Two Troubling Used Vehicle Trends" vAuto.com, available at: https://www.vauto.com/learning-center/blog-dale-pollak-all/a-root-cause-for-two-troubling-used-vehicle-trends

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this 12th day of April 2024.

Marc Spizzirri

**Appendix 1**

# B | RILEY Advisory Services

**Marc Spizzirri**

**Testimony Experience & Publications**
***As of April 2024***

## Testimony Experience

1.  Matter:      *PONTUS MAG FAIRFIELD, LLC, et al. v. Barber Props.*
    Court:       US District Court for the Southern District of California
    Date:        *November 17, 2020*
    Case No.:    Jams No. 1130009285

2.  Matter:      *OC Autosource, Inc. v. Floorit Financial Inc.*
    Court:       Superior Court of the State of California for the County of Orange, Central Justice Center
    Date:        *June 1, 2018*
    Case No.:    30-2018-00996671

3.  Matter:      *Volino, et al. v. Progressive Casualty Ins. Co., et al.*
    Court:       U.S. District Court for the Southern District of New York
    Date:        *May 6, 2022*
    Case No.:    1:21-cv-06243

4.  Matter:      *Drummond, et al. v. Progressive Specialty Ins. Co., et al.*
    Court:       U.S. District Court for the Eastern District of Pennsylvania
    Date:        *November 7, 2022*
    Case No.:    5:21-cv-04479

5.  Matter:      *Freeman v. Progressive Direct Ins. Co.*
    Court:       U.S. District Court for the District of South Carolina
    Date:        *November 4, 2022*
    Case No.:    1:21-cv-3798

6.  Matter:      *Brown v. Progressive Mountain Ins. Co.*
    Court:       U.S. District Court for the Northern District of Georgia
    Date:        *April 21, 2023*
    Case No.     3:21-cv-00175

7.  Matter:      *Costello v. Mountain Laurel Assurance Co.*
    Court:       U.S. District Court for the Eastern of Tennessee
    Date:        *May 12, 2023*
    Case No.     2:22-cv-0035

8.  Matter:      *Davenport, et al. v. Progressive Direct Ins. Co., et al.*
    Court:       Court of Common Pleas, Cuyahoga County, Ohio
    Date:        *June 16, 2023*
    Case No.:    CV 22 961647

9.    Matter:    *Jones, et al. v. Progressive Universal Ins. Co., et al.*
       Court:    U.S. District Court for the Eastern District of Wisconsin
       Date:    *June 23, 2023*
       Case No.:    22-cv-364-pp

10.    Matter:    *Bartee, et al. v. Progressive Advanced Ins. Co., et al.*
       Court:    U.S. District Court for the Eastern District of Missouri
       Date:    *July 13, 2023*
       Case No.:    4:22-cv-00342

11.    Matter:    *Curran v. Progressive Direct Ins. Co.*
       Court:    U.S. District Court for the District of Colorado
       Date:    *August 22, 2023*
       Case No.:    1:22-cv-00878

12.    Matter:    *Ambrosio, et al. v. Progressive Preferred Ins. Co., et al.*
       Court:    U.S. District Court for the District of Arizona
       Date:    *August 25, 2023*
       Case No.:    2:22-CV-00342

13.    Matter:    *Reynolds, et al. v. Progressive Direct Ins. Co., et al.*
       Court:    U.S. District Court for the Northern District of Alabama
       Date:    *September 19, 2023*
       Case No.:    5:22-cv-00503

14.    Matter:    *Kroeger v. Progressive Universal Ins. Co.,*
       Court:    U.S. District Court for the Southern District of Iowa
       Date:    *September 22, 2023*
       Case No.:    4:22-cv-00104

15.    Matter:    *Vantree, et al. v. Progressive Gulf Ins. Co., et al.*
       Court:    U.S. District Court for the Northern District of Mississippi
       Date:    *September 26, 2023*
       Case No.:    4:22-cv-00070

16.    Matter:    *Schroeder, et al. v. Progressive Paloverde Ins. Co., et al.*
       Court:    U.S. District Court for the Southern District of Indiana
       Date:    *October 24, 2023*
       Case No.:    1:22-cv-00946

17.    Matter:    *Henson, et al. v. Progressive Premier Ins. Co., et al.*
       Court:    U.S. District Court for the Eastern District of North Carolina
       Date:    *November 15, 2023*
       Case No.:    5:22-cv-182-M

18.  Matter:      *Grady, et al. v. Progressive Direct Ins. Co., et al.*
     Court:       U.S. District Court for the District of Minnesota
     Date:        *December 1, 2023*
     Case No.:    0:22-cv-00866

19.  Matter:      *Castro v. Texas Farm Bureau Underwriters*
     Court:       District Court of Tarrant County, Texas
                  342nd Judicial District Court
     Date:        *January 5, 2024*
     Cause No.:   342-335023-22

20.  Matter:      *Sibert v. Progressive Select Ins. Co., et al.*
     Court:       U.S. District Court for the District of Maryland
     Date:        *January 19, 2024*
     Case No.:    22-cv-01179

21.  Matter:      *Holmes, et al. v. Progressive Universal Ins. Co., et al.*
     Court:       U.S. District Court for the Northern District of Illinois
     Date:        *January 26, 2024*
     Case No.:    1:22-cv-00894

22.  Matter:      *Watson v. Progressive Direct Ins. Co.,*
     Court:       U.S. District Court for the Eastern District of Kentucky
     Date:        *March 15, 2024*
     Case No.:    5:22-cv-00203

23.  Matter:      *Knight v. Progressive Direct Ins. Co.,*
     Court:       U.S. District Court for the Eastern District of Arkansas
     Date:        *March 22, 2024*
     Case No.:    3:22-cv-00203

## Publications

1.  Name:    Ask yourself these questions when thinking of acquiring
             more dealerships
    Date:    *August 28, 2019*

2.  Name:    Millennials offer dealerships the chance to transform the
             car-buying customer experience
    Date:    *April 10, 2019*

3.  Name:    Resilient dealers aid nation's recovery
    Date:    *December 7, 2020*

4.    Name:        Unintended consequences of virus-related cutbacks at dealerships
      Date:        *July 27, 2020*

5.    Name:        Joint Effort needed to face new normal.
      Date:        *April 27, 2020*

6.    Name:        Automakers, dealers will weather gloomy economic forecast
      Date:        *July 11, 2023*

7.    Name:        Can Manufacturers and the Dealer Body Survive the Uncertain EV Revolution?
      Date:        *December 2023*

# MARC SPIZZIRRI
## SENIOR MANAGING DIRECTOR

mspizzirri@brileyfin.com
(949) 922-1006
vCard



Marc Spizzirri, a highly accomplished Senior Executive and Entrepreneur in the Irvine office, brings more than 30 years of success in a diverse range of businesses with an emphasis on retail automotive, commercial real estate and education. He leverages vast experience in business startups, business turnarounds, M&A transactions with an emphasis on automotive, cash flow and P&L management, business development and process planning, crisis management, corporate valuations, negotiations and dispute resolution and staff development. Marc is a versatile leader with a comprehensive business skill set who can help established companies going through change, growth, and expansion, as well as create national brands and expand operations on a national scale.

Through his career Marc has held leadership positions in automotive dealerships since 1987. He learned the retail automotive business by working in every department on his way to becoming a general manager in 1987, President of a multi-franchise automotive group in 1990 and acquiring his first franchised dealership in 1992. Marc went on to own seven franchised automotive dealerships, two motorcycle franchises and an internationally recognized classic car dealership with total annual sales reaching $400 million. Franchises included Ford, Toyota, Honda, Nissan, Indian Motorcycle and Triumph. He achieved President's and Chairman's Awards from the automotive manufactures and grew his first dealership into a Top 100 Ford dealership. Marc served as Ford Dealer Council Chairman and Board Member, President and Board Member of the Southern California Ford Dealers Association and sat on the Ford Customer Appeals Board.

After selling his dealerships and before joining B. Riley Advisory Services (formerly GlassRatner), Marc served as President of a business consulting service. He has worked with a diverse group of businesses to help achieve specific business goals and establish a culture of sustainable success. He was tasked with responsibilities that include preparing businesses for sale, entitling real estate for development, mediation and conflict resolution, building a corporate culture, developing a National brand, creating an effective leadership team, business valuations, business plan development and business turnaround.

In addition to his executive career, Marc co-founded two highly successful private Catholic schools, produced a feature film, served as an advisor to a prominent film school, managed a local real estate development company and served as a publisher and contributing editor for a national newspaper. Marc earned BSL and JD degrees. He attended Thomas Jefferson School of Law and the University of Pittsburgh.

Marc has served on a number of non-profit boards, serving as a Regent to the Boys and Girls Club, a co-founder of the LA Intercity Games, Hollenbeck Police Business Council, Orange County Sheriff Commission, University of Notre Dame President Council, Dana Point Youth Baseball and sat as Trustee for the two private schools he co-founded. Throughout his career, Marc has earned an impressive number of awards and recognitions from National, State and local civic leaders, he was an Ernst & Young "Entrepreneur of the Year" finalist, and the recipient of The Passkey's Foundation "Ethics in Business" Award.

### Specialties:
Real Estate
Valuation
Interim Management
Turnarounds/Restructurings
M&A
Crisis Management
Principal Investments/
Financings

### Industries:
Automotive
Real Estate
Retail
Education
Film

**B | RILEY** *Advisory Services*
a B. Riley Financial company

**Appendix 3**

# B | R I L E Y® *Advisory Services*

**Marc Spizzirri**

**Market Research on vAuto
"Success Stories" Dealers**

## HONDA OF DOWNTOWN CHICAGO,
### Chicago, Illinois



**Gary Wexler**
Owner

## KEN GARFF AUTOMOTIVE GROUP
### Ogden, UT



**Jason Frampton**
Owner

2020 Honda Odyssey
# $35,000

Will you consider a price lower than the advertised/listed price?
# YES

If I agree to purchase today, what type of discount can I expect?
# $1,000

Salesperson
**Wilfredo**
773-405-9491

2011 Subaru WRX
# $25,795

Will you consider a price lower than the advertised/listed price?
# YES

If I agree to purchase today, what type of discount can I expect?
# $500

Salesperson
**Marna**
801-528-6020

💬 **TEXT MESSAGES**    NEGOTIATES







💬 **TEXT MESSAGES**    NEGOTIATES





## KUNI AUTOMOTIVE GROUP
Beaverton, OR



TEXT MESSAGES





**2020 Audi S5**

**$42,782**

Will you consider a price lower than the advertised/listed price?

**YES**

If I agree to purchase today, what type of discount can I expect?

**$1,000**

Salesperson
Nick
503-928-5670



## WALSER AUTOMOTIVE GROUP
Bloomington, MN

E-MAIL



**2022 Toyota Supra**

**$55,998**

Will you consider a price lower than the advertised/listed price?

**NO**

Is Trade-In Price Negotiable?

**NO**



Salesperson
Josh
jpronschinske
@drivewalsertoyota.com

## PERFORMANCE TOYOTA
Sinking Spring, PA



**Jim Blickle**
Owner



NEGOTIATES

2022 Toyota Highlander

**$45,949**

Will you consider a price lower than the advertised/listed price?

**YES**

If I agree to purchase today, what type of discount can I expect?

**$500**

Salesperson
Dalana
484-339-4809

## STEVEN TOYOTA
Harrisonburg, VA



**James Mason**
Owner

NEGOTIATES

2017 Toyota 4Runner

**$37,375**

Will you consider a price lower than the advertised/listed price?

**YES**

If I agree to purchase today, what type of discount can I expect?

**$200-$300**

Salesperson
Bethany
540-726-0570

## RON TONKIN FAMILY OF DEALERSHIPS
Gresham, OR



**Ed Tonkin**
Owner



NEGOTIATES

2019 Subaru Crosstek

**$25,999**

Will you consider a price lower than the advertised/listed price?

**YES**

If I agree to purchase today, what type of discount can I expect?

**$500**

Salesperson
Marko
971-940-1502

## AUTO HAUS ON VELP
Green Bay, WI



**Bradley Berndt**
Owner



PARTIALLY NEGOTIATES

2020 Dodge Durango

**$37,657**

Will you consider a price lower than the advertised/listed price?

**NO**

Is Trade-In Price Negotiable?

**YES**

Salesperson
Steele
877-773-6525

## KOCOUREK AUTO GROUP
Wausau, WI



**Keith Kocourek**
Owner



2020 Cadillac xt4
**$34,059**

Will you consider **a price lower than the** advertised/listed price?

**YES**

If I agree to purchase today, what type of discount can I expect?

**$100-$200**

Salesperson
Christina
715-298-7283

## TASCA FORD LINCOLN MERCURY
Arlington Heights, IL



**James Mason**
Owner



2019 Ford 150
**$37,375**

Will you consider **a price lower than the** advertised/listed price?

**YES**

If I agree to purchase today, what type of discount can I expect?

**$500**

Salesperson
Aron
401-681-1300

## DEL GRANDE DEALER GROUP
San Jose, CA



**Shaun Del Grande**
Owner



2019 Cadillac xt4
**$30,990**

Will you consider **a price lower than the** advertised/listed price?

**NO**

Is Trade-In Price Negotiable?

**YES**

Salesperson
Derek
408-840-2320

## TOYOTA SUNNYVALE
Sunnyvale, CA



**Adam Simms**
Owner



2021 Toyota Tundra
**$41,291**

Will you consider **a price lower than the** advertised/listed price?

**NO**

Is Trade-In Price Negotiable?

**YES**

Salesperson
James
408-245-6640

## SPITZER AUTOMOTIVE GROUP
Homestead, FL



**Alison Spitzer**
Owner



2021 Dodge Charger
**$31,990**

| Will you consider a price lower than the advertised/listed price? | If I agree to purchase today, what type of discount can I expect? | Salesperson Jesse 786-738-9042 |
| --- | --- | --- |
| **YES** | **$500** | |

## MIKE SHAW AUTOMOTIVE GROUP
Thornton, CO



**Mike Shaw**
Owner



2020 Subaru Forester
**$35,126**

| Will you consider a price lower than the advertised/listed price? | If I agree to purchase today, what type of discount can I expect? | Salesperson Alex 720-513-7815 |
| --- | --- | --- |
| **YES** | **$500** | |

## KELLEY AUTOMOTIVE GROUP
Fort Wayne, IN



**Tom Kelley**
Owner



2022 Dodge Challenger
**$41,995**

| Will you consider a price lower than the advertised/listed price? | If I agree to purchase today, what type of discount can I expect? | Salesperson Nick 260-434-4611 |
| --- | --- | --- |
| **YES** | **$1,000** | |

## GERMAIN MOTOR COMPANY
Surprise, AZ



**John Malishenko**
Owner



2019 Honda Passport
**$34,995**

| Will you consider a price lower than the advertised/listed price? | If I agree to purchase today, what type of discount can I expect? | Salesperson DJ 602-671-3023 |
| --- | --- | --- |
| **YES** | **$1,500** | |









