# Exhibit H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MATTHEW THURSTON, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PROGRESSIVE CASUALTY INSURANCE COMPANY and UNITED FINANCIAL CASUALTY COMPANY,<br><br>Defendants. | Docket No. 1:22-cv-00375-NT<br><br>**JURY TRIAL DEMANDED** |

### DECLARATION OF JOHN RETTON

Pursuant to 28 U.S.C. § 1746, I, John Retton, hereby depose and state as follows:

1. I am a Claims Director for Progressive Casualty Insurance Company and its affiliates, including United Financial Casualty Company (hereinafter, "Defendants"). I make this declaration based on my own knowledge and in support of Defendants' Response in Opposition to Plaintiff's Motion for Class Certification.

2. I have been employed by Progressive Casualty Insurance Company for approximately 33 years, and I have held my current position for approximately 23 years.

3. Defendants license a product from Mitchell International, Inc. ("Mitchell") called WorkCenter Total Loss ("the Mitchell Software"), which is used to assist in estimating the actual cash value of total-loss vehicles. In my role as Claims Process Director, I oversee Defendants' use of the Mitchell Software.

4. One way in which the Mitchell Software can estimate ACV is through the use of comparable vehicle valuation reports. In comparable vehicle valuation reports, similar vehicles are

1

vehicles of the same year, make, and model that have either recently sold or were recently listed for sale at area dealerships. For some vehicles that are listed for sale at dealerships, Mitchell applies a "projected sold adjustment" or "PSA" to the advertised price to estimate the amount for which that vehicle is likely to sell after negotiation. Mitchell does not apply a PSA to comparable vehicles listed for sale at dealerships that are known to be "no-haggle" or "one-price," where price negotiation does not occur. And for comparable vehicles that recently sold, where Mitchell already knows the sold price, no PSA is necessary. Thus, no PSA would be included in a valuation report where all comparable vehicles were either recently sold or listed for sale at a no-haggle dealership.

5. Defendants do not possess aggregate data reflecting information specific to the comparable vehicles used in valuation reports to calculate the base value for a loss vehicle, such as the list or sold prices, or the PSAs applied in the report (if any).

6. Defendants have never possessed or retained such detailed data. Even for Defendants, manually locating the valuation report in the insured's claim file and reviewing it is the only way to discern: (a) how many comparable vehicles were identified for a given valuation report, (b) whether the comparable vehicles had already sold or were listed for sale at the time of the report, (c) whether the comparable vehicles listed for sale were available at a no-haggle dealership, (d) whether a projected sold adjustment was applied in a given report, or (e) the amount of any projected sold adjustment applied.

7. Settlement offers, without payment, are not reflected in Defendants' claims data. The only way to determine whether an offer to settle was made to an insured, but not accepted, is to review the insured's entire claim file.

8. As part of this case, I reviewed a sampling of 25 complete claim files from the data produced to Plaintiff in this case at PGR_THURSTON_0001192, which identified all first-party

2

UFCC total-loss claims in Maine during the putative class period for which a valuation report was generated using the Mitchell Software where a PSA may have been applied. The complete claim files for those 25 claims sampled were also produced at PGR_THURSTON_0001193–PGR_THURSTON_0007510 (the "Sample").

9. The complete claim file is comprised of several documents, including the claim file notes, adjuster's notes, valuation report(s), titling and ownership documents, communications with the insured, and various repair, towing, and estimate records. The claim file notes alone often span dozens to hundreds of pages and document everything from third-party claims to medical claims to Defendants' subrogation efforts. It takes approximately one hour simply to collect—not even to review—two to three complete claim files.

10. For twelve claims in the Sample, multiple valuation reports were generated—some as few as two and others as many as ten—and a detailed review of the claim file would be required to determine which, if any, valuation report formed the basis of UFCC's settlement offer to the insured.

11. For six claims in the Sample, no PSA was applied to the valuation report.

12. For one claim in the Sample, although a valuation report was prepared, the claim was not settled based on the valuation report, but rather, based on the "Stated Amount" of the vehicle selected by the insured on his Declarations page, as permitted by the policy.

13. For three claims in the Sample, the insured or third-party in interest (like the lienholder) negotiated with UFCC to reach a settlement amount that was different from the valuation report estimate. This includes opting to have the vehicle appraised by an independent appraiser.

3

14. For twelve claims in the Sample, the insured did not receive any compensation from Defendants because the payment was owed to a lienholder or lessor.

15. For seven claims in the Sample, the named insured was not the sole legal owner of the loss vehicle and therefore was not entitled to some or all of the settlement payment.

16. For seven claims in the Sample, the insured had Guaranteed Asset Protection or "GAP" coverage provided by either Defendants or a third party insurer, which paid all of part of the difference between the value of the totaled vehicle and the amount the insured owed on the vehicle to his or her lienholder.

17. For one claim in the Sample, UFCC's adjuster could not determine the loss vehicle's true mileage, and used an estimated mileage based on the insured's representations and vehicle service records, which may have caused the vehicle to be overvalued.

18. None of the facts described in Paragraphs 10 through 17 would be discernible from a review of claims data only. Only a manual review of the entire claims file would reveal these circumstances, which are often unique to each individual claim.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 12, 2024.

/s/ John Retton
John Retton