## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

MATTHEW THURSTON,                )    Docket No. 1:22-cv-00375-NT
                                 )
          Plaintiff,             )    Judge Nancy Torresen
                                 )
    v.                           )    Magistrate Judge Karen Frink Wolf
                                 )
PROGRESSIVE CASUALTY             )
INSURANCE COMPANY, et al.,       )
                                 )
          Defendants.            )

---

## PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

---

John Z. Steed, Esq. (Bar No. 5399)
Island Justice
P.O. Box 711 / 40 School Street
Stonington, ME 04681
(207) 200-7077
john@islandjusticelaw.com

Scott C. Borison (MD Bar No. 22596)*
Borison Firm LLC.
1400 S. Charles St.
Baltimore MD 21230
Telephone: (301) 620-1016
scott@borisonfirm.com

Ronald I. Frederick (OH Bar No. 0063609)*
Brian E. Roof (OH Bar No. 0071451)*
Frederick & Berler LLC
767 E. 185th Street
Cleveland, Ohio 44119
(216) 502-1055 (phone)
(216) 609-0750 (fax)
ronf@clevelandconsumerlaw.com
brianr@clevelandconsumerlaw.com

*Counsel for Plaintiff Matthew Thurston*

* Admitted *pro hac vice*

Thomas S. Marjerison (Bar No. 7836)
Norman, Hanson & DeTroy, LLC
Two Canal Plaza P.O. Box 4600
Portland, ME 04112
Phone: 207-774-7000
tmarjerison@nhdlaw.com

Allison Hill White*
James Matthew Brigman*
Jeffrey S. Cashdan*
Zachary A, McEntyre*
King & Spalding LLP
1180 Peachtree Street, NE, Ste. 1600
Atlanta, GA 30309
Phone: 404-572-2440/Fax: 404-572-5140
awhite@kslw.com
mbrigman@kslw.com
jcashdan@kslw.com
zmcentyre@kslw.com

Julia Barrett*
King & Spalding LLP
500 W. 2nd St., Ste. 1800 Austin, TX 78701
Phone: 512-457-2000/Fax: 512-457-2100
jbarrett@kslw.com

*Counsel for Progressive Casualty Insurance Company & United Financial Casualty Co.*

## TABLE OF CONTENTS

TABLE OF AUTHORITES ..................................................................................................iii

I.      **INTRODUCTION** ......................................................................................1

II.     **RELEVEANT FACTS** .............................................................................3

    A.  FACTS PERTAINING TO MR. THURSTON. ....................................3

    B.  FACTS PERTAINING TO MS. BRIDGES. ..........................................6

    C.  FACTS PERTAINING TO MS. MCDONALD .......................................6

    D.  FACTS PERTAINING TO THE CLASS ...............................................7

III.   **LAW AND ANALYSIS** ............................................................................8

    A.  **CLASS CERTIFICATION STANDARD UNDER FED. R. CIV. P. 23** ...............................................................................................8

        1.   NUMEROSITY ............................................................................10

        2.   IDENTIFIABILITY/ASCERTAINABILITY ...........................11

        3.   COMMONALITY ........................................................................13

        4.   TYPICALITY ...............................................................................14

        5.   ADEQUACY OF REPRESENTATION ....................................14

        6.   PREDOMINANCE ......................................................................16

        7.   SUPERIORITY ............................................................................20

IV.   **CONCLUSION** ........................................................................................22

CERTIFICATE OF SERVICE ........................................................................................24

<u>**TABLE OF AUTHORITIES**</u>

**Cases**                                                                                               **Page**

*Amchem Products v. Windsor*,
    521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)......................... 14, 15

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
    568 U.S. 455, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013)................................10

*Brown v. Progressive Mountain Ins. Co.*,
    N.D. Ga. No. 3:21-cv-175-TCB, 2023 WL 7219499 (August 3, 2023).........................12, 18, 21

*Chadwick v. State Farm Mut. Auto. Ins. Co.*,
    E.D. Ark. No. 4:21-cv-1161-DPM, 2024 WL 1156944 (March 18, 2024). ...............19

*Clark v. City of New York*,
    S.D.N.Y. No. 18 Civ. 2334, 2021 WL 603046 (Feb. 16, 2021). ..............................20

*Clippinger v. State Farm Mut. Auto. Ins. Co.*,
    W.D. Tenn. No. 2:20-cv-02482-TLP-cgc, 2023 WL 7213796 (August 25, 2023). .................19

*Collazo v. Calderon*,
    212 F.R.D. 437 (D. P.R. 2002). ...............................................................8, 9

*Costello v. Mountain Laurel Assurance Company*,
    E.D. Tennessee No. 2:22-CV-35, 2024 WL 239849 (Jan. 22, 2024). ........................18

*Curran v. Progressive Direct Insurance Company*,
    345 F.R.D. 498 (D. Colo. 2023) ..........................................................12, 16, 18

*Drummond v. Progressive Specialty Insurance Company*,
    E.D. PA No. 21-4479, 2023 WL 5181596 (Aug. 11, 2023). ................................. 18, 22

*Dubose v. Harris*,
    434 F.Supp. 227 (D. Conn. 1977). ...........................................................8

*Duhaime v. John Hancock Mutual Life Ins. Co.*,
    177 F.R.D. 54 (D. Mass. 1997).................................................................15

*Freeman v. Progressive Direct Ins. Co.*,
    D. S.C. No. 1:21-cv-03798-DCC, 2024 WL 2044782 (May 8, 2024).........................19

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2nd Cir. 1992)....................................................................14

*In re New Motor Vehicles Canadian Export Antitrust Litigation*,
    522 F.3d 6 (1st Cir. 2008)................................................................................13

*In re Nexium Antitrust Litigation*,
    777 F.3d 9 (1st Cir. 2015)..................................................... 9, 10, 15, 16, 17

*In re Nexium (Esomeprazole) Antitrust Litigation*,
    296 F.R.D. 47 (D. Mass. 2013)........................................................................14

*In re PolyMedica Corp. Securities Litigation*,
    432 F.3d 1 (1st Cir. 2005)................................................................................10

*J.B. ex rel. Hart v. Valdez*,
    186 F.3d 1280 (10th Cir. 1999)........................................................................10

*Jama v. State Farm Mut. Auto. Ins. Co.*,
    __F.4th__, 2024 WL 3853695 (9th Cir. 2024)................................................ 19, 20

*Matamoros v. Starbucks Corp.*,
    699 F.3d 129 (1st Cir. 2012). ..........................................................................15

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015)............................................................................11

*Reynolds v. Progressive Direct Ins. Co.*,
    346 F.R.D. 120 (N.D. Ala. 2024). ....................................................................18

*Schroeder v. Progressive Paloverde Insurance Company*,
    S.D. Ind. No. 1:22-cv-00946, __F.Supp.3d__, 2024 WL 308330
    (Jan. 26, 2024). ....................................................................10, 11, 18, 20

*Sherman v. Trinity Teen Solutions, Inc.*,
    84 F.4th 1182 (10th Cir. 2023)........................................................................16

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
    323 F.3d 32 (1st Cir. 2003).......................................................................14, 17

*Southern States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*,
    241 F.R.D. 85 (D. Mass. 2007).......................................................................13

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016)....................................16

*Volino v. Progressive Casualty Insurance Company*,
    S.D.N.Y. Nos. 21 Civ. 6243 & 22 Civ. 1714, 2023 WL 2532836
    (March 16, 2023)...........................................................9, 10, 12, 14, 17, 18, 20

iv

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011)......................................................... 10, 13

**Rules/Statues**

5 M.R.S § 207.............................................................................................................................. 2, 3, 13

7A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane,
*Federal Practice and Procedure* § 1763 (3d ed. 2005)....................................................................13

24-A M.R.S. §§ 2436-A(1)(A) ..................................................................................................... 2, 3, 13

24-A M.R.S. §§ 2436-A(1)(E) ..................................................................................................... 2, 3, 13

Fed. R. Civ. P. 23(b)(3).................................................................................................................*passim*

Pursuant to Fed. R. Civ. P. 23, Plaintiffs Matthew Thurston ("Mr. Thurston"), Genevieve McDonald ("Ms. McDonald"), and Katherine Bridges ("Ms. Bridges" and collectively with Mr. Thurston and Ms. McDonald, "Plaintiffs"), on behalf of themselves and all those similarly situated, respectfully move this Honorable Court for certification of a class of similarly situated persons that Defendants Progressive Casualty Insurance Company ("Progressive") and United Financial Casualty Company. ("UFCC" and collectively with Progressive, "Defendants") unlawfully treated them the same in determining the actual cash value of their total-loss vehicles. In violation of two Maine statutes (the Unfair Settlement Practices Act and the Unfair Trade Practices Act), Defendants deducted a software-generated "projected sold adjustment" from the total-loss payments due to Plaintiffs and the class members under their policies.

## I.    INTRODUCTION

Defendants routinely use a software program to determine the actual cash values ("ACV") of their insureds' total-loss vehicles.[1] This arbitrary and subjective software deducts a "projected sold adjustment" ("PSA") from the ACV that reduces the amount that Defendants are required to pay their insured under the policy in violation of Maine law. The PSA is supposedly meant to reflect an amount that consumers could negotiate off an advertised price. The PSA, however, is based on subjective and arbitrary criteria, and its use violates industry standards and Maine statutory law. The PSA harms consumers and enriches the Defendants at consumers' expense.

This class action can be resolved in one single stroke by determining whether Defendants' software created PSA deduction from the ACV of their insureds' total-loss vehicles violates the Unfair Claims Settlement Practices Act ("UCSPA") and/or the Unfair Trade Practices Act ("UTPA"). It is

---

[1] UFCC's response to Interrogatory No. 2 states: "UFCC answers that WorkCenter Total Loss is a software program that generates valuation reports, often without the need to communicate with a representative of or 'persons at' Mitchell." (UFCC Answers to Second Interrogatories, attached hereto as Ex. 1.)

that simple. If the use of the PSA violates the UCSPA and/or the UTPA, then Plaintiffs and the class win. If the use of PSA does not violate the UCSPA and the UTPA, then Plaintiffs and the class lose.

Courts in eight cases involving similar PSA class actions against Progressive entities have answered this simple question in the affirmative and held that claims based on the PSA deduction met the class certification requirements ("Progressive Cases"). In addition, there are three State Farm cases that agree. This case is no different.

If a Defendants' insured is involved in a car accident resulting in the "total loss" of her vehicle, Defendants are contractually obligated to pay the insured the vehicle's ACV. But in breach of this contractual obligation to pay the ACV and in violation of the UCSPA and UTPA, Defendants uniformly use a software created PSA to reduce the ACV and misrepresent this arbitrary and subjective number as a valid settlement offer to the insured for her total-loss vehicle.

Like the Progressive Cases, this Court can determine Plaintiffs' class claims under a limited set of common evidence (i.e., Defendants' standard practice of using a software created PSA to reduce the ACV of total-loss vehicles) such that common issues predominate. There is no need to make individual inquiries since Defendants' used the same software that automatically creates a PSA when calculating the ACV of their insureds' vehicles.

Here, Defendants' standard business practice of automatically deducting a software generated PSA from the amounts they owed their insureds violates two Maine statutes: (1) UCSPA, 24-A M.R.S. §§ 2436-A(1)(A) ("knowingly misrepresenting to an insured pertinent facts or policy provisions relating to the coverage at issue") and A(1)(E) ("Without just cause, failing to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear"); and (2) UTPA, 5 M.R.S § 207 (prohibiting unfair and deceptive trade acts or practices). Plaintiffs initiated this class action to redress these violations and seek recovery of damages for the class members. Each statutory section provides a common issue that predominates over any individual issue.

2

For 24-A M.R.S. § 2436-A(1)(A), the common issue is whether Defendants' routine use of a software created PSA to reduce the ACV offered to their insureds for settlement of their claims misrepresents pertinent facts or policy provisions relating to the ACV payment required under the policies. Under Section 2436-A(1)(E), the common issue is whether Defendants' regular use of a PSA to reduce their offered ACV settlement is dilatory, unfair, and inequitable settlements of claims under the policies. Regarding 5 M.R.S. § 207, the common question is whether Defendants' standard utilization of the software created PSA that reduces the ACV they owe their insureds is a deceptive act or practice.

These claims turn on one overarching question of fact, which can be determined in a single adjudication for the entire class – whether Defendants' standard business practice of using a software developed PSA unlawfully reduces the ACV for total-loss vehicles that Defendants are required to pay under the policies. Because Plaintiffs satisfy the Fed. R Civ. P. 23(a) and (b)(3) requirements, Plaintiffs' class should be certified as a class action.

## II.    RELEVANT FACTS

### A.    FACTS PERTAINING TO MR. THURSTON

Mr. Thurston was in a motor vehicle collision that resulted in the "total loss" of his vehicle. (Second Amended Complaint ("SAC"), ¶¶ 5, 27, Dkt. No. 76; Answer, ¶ 27, Dkt. No. 83.) Mr. Thurston purchased an auto insurance policy from Defendants, wherein Defendants promised to pay him the ACV of his vehicle in the event of a such loss. (SAC, ¶¶ 1, 4, 31, Dkt. No. 76; Answer, ¶ 31, Dkt. No. 83.) After his accident, Mr. Thurston made a claim for coverage. (SAC, ¶¶ 32-33, Dkt. No. 76; Answer ¶ 33, Dkt. No. 83; Thurston Depo.[2], 51:14-52:1, cited pages attached hereto as Ex. 2.) Mr. Thurston's policy relating to collision applied to other vehicles in which he had the option to elect to

---

[2] *See* Transcript of the Deposition of Matthew Thurston taken on January 22, 2024, that has been contemporaneously filed with this motion.

add a new vehicle within 30 days of obtaining the vehicle. (SAC, ¶ 32, Dkt. No. 76; Kyle Mayer Depo.[3], 27:6-28:1 and Ex. 2 thereto, cited pages attached hereto as Ex. 3.) Mr. Thurston exercised that option by seeking coverage for the total loss of his vehicle. (Thurston Depo., 55:24-56:16, Ex. 2 hereto.)

In response to this claim, UFCC covered Mr. Thurston's claim and declared the vehicle a total loss. (SAC, ¶ 34, Dkt. No. 76; Answer, ¶ 34, Dkt. No. 83; Thurston Depo., 57:19-21; 58:20-60:7, Ex. 2 hereto; Mayer Depo., 27:23-28:1; 28:21-24, Ex. 3 hereto.) To determine the ACV of Mr. Thurston's total-loss vehicle, Defendants produced a Vehicle Valuation Report ("VVR") (SAC, ¶ 51, Ex. A thereto, Dkt. No. 76; Answer, ¶ 51, Dkt. No. 83; Thurston Depo., 64:14-20, Ex. 4 thereto, Ex. 2 hereto) written by their subcontractor, Mitchell International, Inc. ("Mitchell"). (SAC, ¶¶ 10-11, Dkt. No. 76; Thurston Depo., 64:21-65:1, Ex. 4 thereto, Ex. 2 hereto.) The VVR contained a "Settlement Value" that factored in Mitchell's computer-generated PSA. (SAC, ¶¶ 10-11, 57-58 and Ex. A thereto, pp. 5-6, Dkt. No. 76.) The PSA reduced this "valuation" by $454.[4] (SAC, Ex. A thereto, Dkt. No. 76.)

Initially, the Mitchell software performed an accurate appraisal of the ACV of his vehicle by averaging the advertised price of several similar or comparable vehicles of the same year, make, and model as his vehicle in the relevant geographic market adjusted by objective criteria, such as differences in equipment, mileage, and the like, as is customary in the appraisal trade. (SAC, ¶¶ 55-56; Answer, ¶¶ 55-56, Dkt. No. 76; Jason Merritt's Initial Expert Report ("Merritt Report"), pp. 2-4 and 7, attached hereto as Ex. 4.)[5] Defendants deviated, however, when the Mitchell software created a

---

[3] *See* Transcript of the Deposition of Kyle Mayer taken on January 24, 2024, that has been contemporaneously filed with this motion.

[4] The $454 is the average PSA taken off the three comparable vehicles. ($398 + $537 + $427 = $1,362; $1,362/3 = $454). (*See* Retton Depo., Ex. 10, PGR_Thurston_0000300 – 000301, Dkt. No. 46.)

[5] Plaintiffs currently rely on Mr. Merritt's initial expert report, dated June 27, 2024, but they will supplement with his updated expert report, which is due October 17, 2024.

PSA to reduce the accurate and objective valuation by $454 to reach the ACV settlement value offered to Mr. Thurston. (SAC, ¶¶ 56-57, Dkt. No. 76, Merritt Report, pp. 4 and 7, Ex. 4 hereto.)

Specifically, the Merritt Report states that but for applying the PSA to determine the ACV, Defendants (through the Mitchell software) followed the comparable methodology to determine the ACV:

- "Mitchell did follow a comparable methodology except for the application of the PSA deduction, and all information necessary to provide a sound opinion on the ACV of Plaintiff's vehicle is contained in the Report. Specifically, to determine the ACV of Plaintiff's loss vehicle using the Mitchell Valuation report, you add the PSA back to the adjusted price of each comparable vehicle to get a revised "Base Value," and then apply whatever adjustments, if any, were made in the reports for condition, prior damage, aftermarket parts, or refurbishment."

- "Absent the PSA, the Mitchell methodology provides a sound determination of ACV, consistent with the comp methodology commonly used by appraisers. So, the Mitchell report can be used to determine the ACV of Plaintiff's loss vehicle (or any other loss vehicle) by simply backing out the PSA [from the Mitchell VVR]."

(Mitchell Report, p. 7, Ex. 4 hereto.) Mitchell's own methodology used by Defendants provides the means to determine the true ACV and the class damages by removing the PSA from the ACV calculation. *Id.* ("From there, the Market Value can be recalculated using that revised Based Value and the adjustments for condition, prior damage, aftermarket parts, or refurbishments <u>already determined by Mitchell. Indeed, this proposed methodology [of determining the true ACV minus the PSA] is consistent with the methodology</u>.") *Id.* (emphasis added).

The PSA is supposedly meant to reflect an amount that consumers could negotiate off an advertised price. (SAC, ¶¶ 61-62, Dkt. No. 76.) In truth, however, the PSA is based on subjective and arbitrary criteria, and its use violates industry standards. (*Id.*, ¶¶ 38-40, 43-45; Merritt Report, pp. 4-6, Ex. 4 hereto.) Especially in the current environment of limited vehicle availability and used cars selling for a premium, a "PSA" cannot be rationally justified. (SAC, ¶ 64, Dkt. No. 76; Merritt Report, p. 5, Ex. 4 hereto.) Defendants included the PSAs in the VVRs solely to mislead Plaintiffs and class

5

members and to induce them to accept a reduced settlement offer for their total-loss vehicles. (SAC, ¶¶ 58-62 and Exs. A-C thereto, Dkt. No. 76.)

Mr. Thurston sued Defendants because "[his] car was unfairly valued due the projected sold adjustment." (Thurston Depo., 30:13-19; *see also* 35:13-23; 73:4-9, Ex. 2 hereto.) Two additional named plaintiffs, Ms. Bridges and Ms. McDonald, have joined Mr. Thurston in the Second Amended Complaint. The focus of this lawsuit is exclusively on Defendants' use of the PSA to reduce the ACV; not on any other factor in the Mitchell VVR. (*Id.*, 76:24-77:4; 101:14-24; 103:20-104:9; 106:2-11; 106:16-19; Merritt Report, pp. 4, 7, Ex. 4 hereto.) The factual analysis is that straightforward.

### B.    FACTS PERTAINING TO MS. BRIDGES

Ms. Bridge's vehicle was in a single-car collision that resulted in it being a total loss. (SAC, ¶¶ 1, 6, 37, 42 and Ex. B thereto, Dkt. No. 76; Answer, ¶¶ 6, 37, 42, Dkt. No. 83.) At the time, Ms. Bridges had an auto insurance policy with Defendants that covered her total-loss vehicle. (SAC, ¶¶ 6, 39, Dkt. No. 76; Answer, ¶¶ 6, 39, Dkt. No. 83.) Subsequently, Ms. Bridges made a claim for coverage to Defendants under her policy, which Defendants approved. (SAC, ¶¶ 41-42, Dkt. No. 76; Answer, ¶¶ 41-42, Dkt. No. 83.) Ms. Bridges accepted Defendants' settlement offer. (SAC, ¶ 43, Dkt. No. 76; Answer, ¶ 43, Dkt. No. 83.) Like with Mr. Thurston's offer, Defendants' offer to Ms. Bridges, reduced the ACV of Ms. Bridges total-loss vehicle by an arbitrary and subjective PSA figure.

### C.    FACTS PERTAINING TO MS. MCDONALD

Ms. McDonald's vehicle was also totaled in a car accident. (SAC, ¶¶ 7, 45, Dkt. No. 76; Answer, ¶¶ 7, 45, Dkt. No. 83.) Ms. McDonald had an auto insurance policy with Defendants. (SAC, ¶¶ 1, 7, Dkt. No. 76; Answer, ¶ 7, Dkt. No. 83.) After the accident, Ms. McDonald made a claim under her policy to Defendants for her total-loss vehicle. (SAC, ¶ 47 and Ex. C thereto, Dkt. No. 76; Answer, ¶ 47, Dkt. No. 83.) Ms. McDonald then accepted Defendants' settlement offer, which, like Mr. Thurston

and Ms. Bridges' ACV offers, reduced the ACV of Ms. McDonald's total-loss vehicle by an arbitrary and subjective PSA figure. (SAC, ¶¶ 48-49, Dkt. No. 76; Answer, ¶ 48, Dkt. No. 83.)

### D.    FACTS PERTAINING TO THE CLASS

Defendants represent the PSA to be an objective "adjustment to consumer purchasing behavior (negotiating a different price than the listed price)." (SAC, Exs. A-C thereto, Dkt. No. 76.) In truth, however, it is a deduction that intentionally and arbitrarily reduces the true ACV of their insureds' vehicles through a software created PSA. The PSA theory of negotiated prices is also skewed because it excludes sale prices of vehicles from a large pool of sales locations where research indicates the sellers do not negotiate at all, such as CarMax. (*See* Retton Depo.[6], 62:25-63:6; Ex. 3 thereto, e.g., PGR_Thurston_0001161, 0001178, Dkt. No. 46.)

Defendants' methodology is also limited to vehicles that Mitchell is able to obtain data listing a different list price and sales price. The PSA thus excludes from its calculation every instance where a vehicle sells at the price advertised. Obviously, the inclusion of this data would result in reducing if not eliminating the PSA. So, the PSA methodology of excluding such data arbitrarily skews the PSA to an inaccurately and unfairly large number, thus lowering the ACV settlement offer and payment to their insureds.

To determine the ACV of a "total loss" vehicle, Defendants begin with a normative valuation procedure using three or so recently advertised comparable used vehicles, which is generally called the comparable or comp method. (SAC, Exs. A-C thereto, Dkt. No. 76; Answer, ¶¶ 55-56, Dkt. No. 83; Merritt Report, pp. 2-4, 7, Ex. 4 hereto.) This comparison results in an industry-standard fair market valuation. (SAC, ¶¶ 66-67, Dkt. No. 76; Merritt Report, p. 4, Ex. 4 hereto.) Plaintiffs do not dispute the ACV produced by this method. The Plaintiffs, however, dispute the next step of Defendants'

---

[6] John Retton's deposition transcript has been previously filed under seal with the original, but now terminated, Motion for Class Certification. Plaintiffs reserve the right to unseal nonconfidential portions of this deposition transcript and its exhibits. (Dkt. No. 46.)

standard practice, which is to apply the software created PSA to reduce the ACV of a total-loss claim.

More importantly, Defendants cannot turn it off:

> Q Well, in particular, I guess the question is -- so does the Mitchell process allow you
>    to turn off the projected sold adjustment?
>        MR. BRIGMAN: I object to the form.
>
> A I don't recall being allowed to just turn off the projected sold.
> Q So that comes with the package?
> A My understanding is it's just part of the J.D. Power methodology.

(Retton Depo., 13:22-14:5, Dkt. No. 46; *see also* Merritt Report, pp. 5-7, Ex. 4 hereto.)

Thus, Defendants' standard practice applies an arbitrary software generated PSA to reduce the ACV of a total-loss vehicle. Defendants deflate its otherwise proper ACV (by what it has obviously determined to be a significant amount, or it would not be using the PSA) to settle claims with insureds for less than required under their policies and in violation of Maine law.

Based on these common set of facts, the class is defined as:

> All persons who were insured by the Defendant[s] in the State of Maine, for personal
> or family use of a vehicle, in the six years preceding the filing of the original Complaint,
> and Defendant[s] determined that the vehicle was a total loss and based its claim
> payment offer on a Valuation Report obtained by Defendant[s] from Mitchell
> International, Inc. where the projected sold adjustment was applied to at least one
> comparable vehicle (the "Class").

## III.  LAW AND ANALYSIS

### A.    CLASS CERTIFICATION STANDARD UNDER FED. R. CIV. P. 23

A court analyzes and determines whether a class should be certified as a class action under Fed. R. Civ. P. 23. The purpose of a class action "is to enable representative parties to litigate in a single lawsuit legal questions common to a class of persons." *Dubose v. Harris*, 434 F.Supp. 227, 230 (D. Conn. 1977). So, when a defendant acts unlawfully by its use of standardized conduct and practice class certification fulfills Rule 23's purpose. *See e.g.*, *Collazo v. Calderon*, 212 F.R.D. 437, 442 (D. P.R. 2002) ("Where a common question of law refers to standardized conduct by defendants toward

members of the putative class, a common nucleus of operative fact is typically presented, and the commonality requirement is usually met.").

That is exactly the case here regarding Defendants' standard conduct and practice of using a software generated PSA to reduce the total-loss vehicle's ACV that Defendants must pay their insureds under their respective policies. Plus, Plaintiffs satisfy the requirements of Rule 23.

The relevant Fed. R. Civ. P. 23 requirements are as follows:

(a) **Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:
*** 
(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

In addition, some courts view whether a class is identifiable or ascertainable as a requirement of the Rule. *See, e.g.*, *Volino v. Progressive Cas. Ins. Co.*, S.D.N.Y. Nos. 21 Civ. 6243 & 22 Civ. 1714, 2023 WL 2532836 *5 (March 16, 2023).

A district court also must undertake a "rigorous analysis" of whether plaintiffs have satisfied the requirement of this Rule:

To certify a 23(b)(3) class, the district court must undertake a 'rigorous analysis' to determine whether plaintiffs met the four threshold requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3)'s two additional prerequisites.

*In re Nexium Antitrust Litig.*, 777 F.3d 9, 18-19 (1st Cir. 2015) (citations omitted). The rigorous analysis "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011).

In a post *Dukes* decision, however, the Supreme Court rejected the defendant's contention, "that to meet the predominance requirement, Connecticut Retirement must do more than plausibly *plead* that Amgen's alleged misrepresentations and misleading omissions materially affected Amgen's stock price." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013) (emphasis in original). In fact, a court may properly consider the allegations in a complaint as true. *See In re PolyMedica Corp. Securities Litig.*, 432 F.3d 1, 5 (1st Cir. 2005), citing *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1290, fn. 7 (10th Cir. 1999) ("when deciding a motion for class certification, the district court should accept the allegations contained in the complaint as true").

The *Amgen* Court further concluded that a "rigorous analysis" does not mandate inquiry into the merits of the claims unless it is necessary to evaluate whether Rule 23 requirements are satisfied:

> Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. <u>Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.</u> See *id.*, at [351], n. 6, 131 S.Ct., at 2552, n. 6 (a district court has no " 'authority to conduct a preliminary inquiry into the merits of a suit'" at class certification unless it is necessary "to determine the propriety of certification" (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974))).

*Amgen*, 568 U.S. at 466 (emphasis added).

## 1.    NUMEROSITY

A class is presumed numerous when it consists of at least 40 members. *Volino,* 2023 WL 2532836, *6; *see also Schroeder v. Progressive Paloverde Ins. Co.*, S.D. Ind. No. 1:22-cv-00946, __F.Supp.3d__, 2024 WL 308330, *6 (Jan. 26, 2024). Here, Defendants' representative testified to the numerosity of the class, stating that there were "6,436 first-party total loss claims under the automobile

insurance policies issued in the state of Maine for which a Mitchell valuation report was generated." (Declaration of Michael D. Silver, Document 1-6, PageID #: 55.) Moreover, each of these insureds should be a member of the Class because the PSA in the Mitchell valuation cannot be turned off because "it's just part of the J.D. Power methodology." (Retton Depo., 13:22-14:5, Dkt. No. 46.) Further, Progressive stipulated to numerosity. Plaintiffs satisfy the numerosity requirement for class certification.

## 2.    IDENTIFIABILITY/ASCERTAINABILITY

While the First Circuit does not appear to require proving identifiability/ascertainability as a discrete Rule 23 requirement, the Class here is readily identifiable/ascertainable. To be ascertainable, a class definition must be precise, objective, and not defined in terms of the merits (e.g., all victims of defendants' violation of a particular law). *Schroeder,* 2024 WL 308330, at *6, citing *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659-60 (7th Cir. 2015).

The Class meets this requirement as it is defined as follows:

> All persons who were insured by the Defendant[s] in the State of Maine, for personal or family use of a vehicle, in the six years preceding the filing of the original Complaint, and Defendant[s] determined that the vehicle was a total loss and based its claim payment offer on a Valuation Report obtained by Defendant[s] from Mitchell International, Inc. where the projected sold adjustment was applied to at least one comparable vehicle.

This definition is precise and objective, and it is not articulated in terms of the merits.

This Class is based on simple, straightforward, and objective criteria readily determinable from information easily accessible to Defendants in their files. Indeed, Defendants concede this in Mr. Silver's Declaration:

> Based on my review of data that is reasonably accessible, in the period beginning October 24, 2016, through October 27, 2022, Progressive Casualty and UFCC have settled 6,436 first-party total loss claims under the automobile insurance policies issued in the state of Maine for which a Mitchell valuation report was generated.

11

(Dkt. No. 1-6, Page ID #: 55.) In addition, Defendants admit in their Answer that: "UFCC maintains Vehicle Valuation Reports and other records relating to the adjustment of total-loss insurance claims in Maine." (Answer, ¶ 72, Dkt. No. 83.)

With minimal effort, Defendants have already identified the universe of potential class members. These insureds should be members of the class because the PSA is systematically applied to Defendants' valuation reports for all total-loss claims. (Retton Depo., 13:22-14:5, Dkt. No. 46.)

Nevertheless, if determining how many of these potential 6,436 class members are in fact a class member is necessary, which it is not, it would simply be a matter of searching the respective claim file to see whether the valuation report includes a PSA. This wholly ministerial task could be easily performed through an electronic database search, or – in the unlikely situation that Defendants do not have electronically stored information – manually in a matter of minutes by opening the claim file and merely scanning the report. No more elaborate, or administratively complex, means is required to identify class members. *See Brown v. Progressive Mountain Ins. Co.*, N.D. Ga. No. 3:21-cv-175-TCB, 2023 WL 7219499, *3 (August 3, 2023) ("'An identifiable class exists if its members can be ascertained by reference to objective criteria' * * * Here, the putative class's membership is 'capable of determination,' which is all that is required for a finding of ascertainability.") (citations omitted).

Further, any issue that Defendants may have with determining the class members is their burden and should not preclude class certification. *See Curran v. Progressive Direct Ins. Co.*, 345 F.R.D. 498, 510 (D. Colo. 2023) ("'Progressive's own recordkeeping choices might increase [its] own burden in discovery, but that is no reason to deny class certification.'") (quoting *Volino*, 2023 WL 2532836, *10 fn.1.); *Brown*, 2023 WL 7219499, *11. Running reports or reviewing documents will adequately ascertain the Class members.

Plaintiffs satisfy the identifiability/ascertainability element for class certification.

### 3.    COMMONALITY

"Rule 23(a)'s requirement of commonality is a low bar, and courts have generally given it a 'permissive application.'" *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 19 (1st Cir. 2008), citing 7A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 1763, at 221 (3d ed. 2005). Indeed, commonality "is a low hurdle." *Southern States Police Benevolent Ass'n v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 87 (D. Mass. 2007). The common contention "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.

This case presents a limited number of factual and legal issues, and each of these is common to the class and provides an answer that resolves the class claims. These include:

- Do Defendants present ACVs to their insureds that include a deduction based on software created PSAs?

- Do Defendants' ACV settlement offers reduced by the software generated PSAs misrepresent pertinent facts and/or policy provisions relating to ACVs coverage required under the policies in violation of 24-A M.R.S. § 2436-A(1)(A)?

- Do Defendants fail to effectuate the prompt, fair, and/or equitable settlement of claims submitted by offering settlements that include ACVs reduced by the software developed PSAs in violation of 24-A M.R.S. § 2436-A(1)(E)?

- Is Defendants' use of the software created PSAs to reduce the ACVs required under the policies an unfair and/or deceptive act and/or practice, constituting a violation of 5 M.R.S § 207?

These issues can be resolved by reference to a limited set of common evidence (i.e., Defendants' standard practice of applying software created PSAs to reduce the ACVs of total-loss vehicles). A class-wide proceeding also will generate the common answers of "yes" or "no" to these questions for the entire class and resolve the litigation of the claims in a single stroke. The commonality requirement is met.

### 4.    TYPICALITY

Typicality "is satisfied when each class member's claim arises from [the] same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Volino,* 2023 WL 2532836, *6, citing *In re Drexel Burnham Lambert Grp., Inc.,* 960 F.2d 285, 291 (2nd Cir. 1992) (concluding that "slight factual differences [do] not defeat typicality.").

Plaintiffs' claims are typical. Like every member of the Class, they were entitled to the full ACV of their total-loss vehicle as required under their policies. Instead, Defendants offered them something less (just like each member of the Class) than the true ACV of their total-loss vehicles. Defendants offered Plaintiffs and the class members less than the full ACV when they used the PSA to reduce the true ACV.

Plaintiffs seek damages for themselves and other class members in an amount equal to the PSA used to lower Defendants' valuation of their vehicles. (*See* Merritt Report, p. 7.) That the amount or impact of the PSA varies among class members is of no consequence. A difference in damages does not defeat certification. *Smilow v. Sw. Bell Mobile Sys., Inc.,* 323 F.3d 32, 39-40 (1st Cir. 2003).

Furthermore, in this case, no complexity or mini-trial would be involved in determining the amount of the PSA for each class member. Rather, Defendants need merely perform the ministerial task of simply removing the PSA amount to show each class members' damages. (Merritt Report, p. 7, Ex. 4 hereto.)

Plaintiffs meet the typicality requirement for class certification.

### 5.    ADEQUACY OF REPRESENTATION

Adequacy of representation asks two questions: (1) whether the representative parties, Plaintiffs, will "fairly and adequately protect the interests of the class" and (2) whether class counsel is "qualified, experienced and able to vigorously conduct the proposed litigation." *In re Nexium (Esomeprazole) Antitrust Litig.,* 296 F.R.D. 47, 53 (D. Mass. 2013); *see also Amchem Products v.*

14

*Windsor*, 521 U.S. 591, 626, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (courts examine whether representative's interests are antagonistic to or in conflict with those of the class members.). Where, as here, the injuries suffered by the named plaintiffs are the same as the class, the adequacy requirement is usually satisfied. *Duhaime v. John Hancock Mutual Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997).[7] Plaintiffs satisfy both prongs of the "adequacy" test.

First, Plaintiffs have no conflict of interest and no interest antagonistic to the class's interests. (Thurston Depo., 107:5-15; 109:6-22, Ex. 2 hereto.) Moreover, to date, they have fulfilled their role as the class representatives, including active participation in discovery, responding to discovery requests, providing documents, and giving (or will give) deposition testimony.[8] And they have every intention of continuing to do so.

As evidenced from their attached declarations, Plaintiffs understand the claims at issue and desire to serve the interests of the class. (Plaintiffs' Declarations, attached hereto as Exs. 5-7.) Mr. Thurston's testimony corroborates his declaration. (Thurston Dep., 30:13-19; 35:13-23; 73:4-9; 99:25-100:2; 103:20-104:9; 106:2-11, Ex. 2 hereto.) Accordingly, Plaintiffs have established their adequacy of representation.

Likewise, Plaintiffs have retained highly qualified and experienced counsel to represent them and the class in this matter. Indeed, Plaintiffs' counsel have vigorously conducted this litigation to date, and their counsel intend to continue to do so. Counsel are experienced in class action litigation in general, and consumer class action litigation in particular.

Scott Borison has been certified as class counsel in cases under both state and federal law by

---

[7] Courts reject speculative challenges to adequacy. *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138-39 (1st Cir. 2012) (rejecting hypothetical challenge to adequacy based upon job title change created no "intractable conflict" capable of defeating adequacy); *In re Nexium Antitrust Litig.*, 777 F.3d at 21.

[8] At the time of filing this Amended Motion for Class Certification, Defendants have not deposed Ms. McDonald and Ms. Bridges. Their depositions are scheduled for September 19, 2024.

numerous courts throughout the country, and he has tried class actions and represented consumers in many published decisions. (Borison Declaration, attached hereto as Ex. 8.) Similarly, Ronald I. Frederick is a senior consumer law litigator who has been published and has presented numerous continuing legal education courses; and he too has served as class counsel in dozens of consumer litigation class actions. (Frederick Declaration, attached hereto as Ex. 9.) John Steed also is a consumer law attorney. Although he has more limited experience with class action cases, he has associated with experienced co-counsel in this matter, Attorneys Borison and Frederick, and he will competently perform in the role as local counsel where he is well-experienced. (Steed Declaration, attached hereto as Ex. 10.) Finally, Brian Roof is a consumer lawyer who has class action experience and experience suing insurance companies on behalf of insureds. (Roof Declaration, attached hereto as Ex. 11.)

Based on the foregoing, the adequacy factor is satisfied.

### 6.    PREDOMINANCE

Under Rule 23(b)(3), the Court must first "find[ ] that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "While [the commonality requirement in] Rule 23(a)(2) requires only that the class share at least one common question of law or fact, Rule 23(b)(3) 'calls upon courts to give careful scrutiny to the relation between common and individual questions in a case.'" *Curran*, 345 F.R.D. at 507, quoting *Sherman v. Trinity Teen Solutions, Inc.*, 84 F.4th 1182, 1194 (10th Cir. 2023), quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S.Ct. 1036, 1045, 194 L.Ed.2d 124 (2016). "However, a finding 'that determining damages would necessitate individualized inquiries...cannot alone sustain the...conclusion that [a] proposed class fails Rule 23(b)(3)'s predominance requirement.'" *Id.* at 507, quoting *Sherman*, 84 F.4th at 1195.

The First Circuit agrees that individual calculation of damages does not defeat a finding that common issues predominate: "'Where...common questions predominate regarding liability, then

courts generally find the predominance requirement to be satisfied even if individual damages issues remain.' *Smilow,* 323 F.3d at 40; *Newberg, supra,* § 4:54 (It is a 'black letter rule...that individual damage calculations generally do not defeat a finding that common issues predominate....')." *In re Nexium Antitrust Litig.,* 777 F.3d at 18.

Here, the common questions of law and fact detailed in the "Commonality" section *supra* predominate this litigation. Indeed, these common questions involving the issue of whether Defendants applying a PSA to reduce the ACV of total-loss vehicles violate state law are the only questions for determination in this matter. They predominate, and no material individual issues exist.

Even the issues of whether class members suffered damages, and the measure of those damages are issues common to the class as they can all be determined by removing the PSA in calculating the ACV for each class member. (Merritt Report, p. 7, Ex. 4 hereto.) In fact, class damages can be determined by using just the Mitchell VVR. (*Id.*) Once the common liability issues are resolved, determining the amount owed to individual members becomes an objective and administrative function of merely recalculating the ACV using the Mitchell VVR but without the PSA. (*Id.*)

In the very similar Progressive Cases, eight courts found that plaintiffs have satisfied the predominance requirement and certified the classes. The Progressive Cases established that the issue of the Progressive entities' application of a PSA to reduce the ACV of total-loss vehicles, as is the case here, predominates:

- *Volino,* 2023 WL 2532836, *8. ("<u>Plaintiffs' complaint is not that the specific PSA applied to any specific comparable vehicle guessed wrong in hindsight, but that no PSA should have been applied in the first instance, because the data itself is manipulated.</u> Whether applying the PSA was a legitimate methodology, and whether Progressive misled insureds about it, does not depend on whether the PSA's predictions occasionally came true. * * * <u>If the factfinder accepts Plaintiffs' evidence on the state of the market, then simply recalculating the valuation using Progressive's methodology without the PSA will accurately value each class member's vehicle.</u>") (emphasis added).

17

- *Curran*, 345 F.R.D. at 508 ("[T]the valuation of damages presents a common question not simply because Plaintiff wants a jury to conclude that the PSA does not represent ACV, but because Plaintiff wants a jury to conclude that omitting the PSA from each valuation produced by Mitchell *would* represent ACV. * * * What matters at this stage is that a jury finding in Plaintiff's favor would do so based on common issues about the PSA's accuracy with respect to assessing ACV." (underline emphasis added and italics emphasis in original) (citing *Volino*).

- *Brown*, 2023 WL 7219499, *7 (common proof will predominate and answer the questions of whether (1) the PSA is a proper part of Progressive's uniform method of calculating the ACV; and (2) the PSA is invalid, in conflict with market forces and empirical evidence, and not a proper element in calculating the ACV).

- *Drummond v. Progressive Specialty Ins. Co.,* E.D. Pa No. 21-4479, 2023 WL 5181596, *10 (Aug. 11, 2023) ("Progressive's argument, however, misunderstands the putative plaintiffs' core claim. The putative plaintiffs do not challenge the price for which PSAs predict each car will sell; rather, they challenge the application of PSAs altogether. The putative plaintiffs' argument, properly understood, is that ACV should not be calculated based on projected sale prices, which is what applying PSAs does. Progressive maintains that PSAs are legitimate. The putative plaintiffs maintain they are inaccurate because they misrepresent current market behavior. It is this dispute, not the individual projected sale price of each vehicle, that is at the center of this action.") (emphasis added).

- *Schroeder*, 2024 WL 308330, *12 ("The Court acknowledges that there are differences in circumstances of each class member's claims under the policy – they have different vehicles, each a different age with different mileage and features. This might be a problem if the common issue Ms. Schroeder had identified was whether Progressive had paid ACV to putative class members. But instead, the common issue here is whether Progressive's use of the PSAs to determine the ACV violated the Policy. This issue predominates over this litigation and any individualized issues that exist.) (citing *Drummond*, 2023 WL 5181596, *10-11) (emphasis added).

- *Reynolds v. Progressive Direct Ins. Co.*, 346 F.R.D. 120, 134 (N.D. Ala. 2024) ("The issue is not, as Progressive suggests, whether a correctly calculated PSA yielded an incorrect ACV; Reynolds and Penn object to the methodological validity of the PSA itself. Progressive promised to determine ACV by 'the market value, age, and condition of the vehicle at the time the loss occurs,' * * * but if Reynolds and Penn are right, then Progressive determines ACV not by market value, but by 'an artificial, downwardly skewed, and deflated 'market' of its own invention.'") (emphasis added).

- *Costello v. Mountain Laurel Assur. Co.*, E.D. Tenn. No. 2:22-CV-35, 2024 WL 239849, *6 (Jan. 22, 2024) ("Thus, the predominant question in this matter is whether application of the PSA to the comparable vehicles used to obtain the ACV for total loss vehicles resulted in a breach of Defendant's contract with insureds. Assuming the answer to

18

this question is yes, damages may differ among the class members, but this does not defeat predominance.").

- *Freeman v. Progressive Direct Ins. Co.,* D. S.C. No. 1:21-cv-03798-DCC, 2024 WL 2044782, *15 (May 8, 2024) ("However, the Court finds that the common questions of law and fact predominate this litigation. Here, the proposed class suffered the same alleged injury—the improper valuation of their totaled vehicles through the application of PSAs. * * * <u>The evaluation of these issues does not require individualized litigation as argued by Defendant. The Court further finds that the evidence common to the class will be presented to establish whether the use of PSAs violates the policies of the proposed class members</u>.") (emphasis added).

Likewise, courts involving State Farm applying the same type of "PSA" methodology to the valuation of total-loss vehicles have found that plaintiffs satisfied the predominance element and certified the classes. *See Clippinger v. State Farm Mut. Auto. Ins. Co.*, W.D. Tenn. No. 2:20-cv-02482-TLP-cgc, 2023 WL 7213796, *14 (August 25, 2023) ("[T]he Court finds that Plaintiff has common proof that the TNA [PSA] is invalid and should not have been used in State Farm's total loss valuations. And the Court finds that Plaintiff has provided common proof of 'actual cash value' via State Farm's own calculations using the Audatex [Mitchell] reports absent the TNA [PSA]."); *Chadwick v. State Farm Mut. Auto. Ins. Co.*, E.D. Ark. No. 4:21-cv-1161-DPM, 2024 WL 1156944, *3-4 (March 18, 2024).

More importantly, the Ninth Circuit reversed a district court decision that held to the contrary. *Jama v. State Farm Mut. Auto. Ins. Co.*, __F.4th__, 2024 WL 3853695, at *6-7 (9th Cir. 2024). ("But Plaintiffs contend that Washington law flatly prohibits any negotiation adjustment; and if Plaintiffs are correct about that legal issue, then each Plaintiff suffered damages equal to the amount of the negotiation adjustment that State Farm made. * * *All members of the negotiation class in this case, however, received less than they were owed in the exact amount of the impermissible negotiation deduction. As to the proposed negotiation class in this case, we therefore conclude that class members could measure their injuries on a class-wide basis by adding back to the value of their vehicles as calculated in the Autosource reports the amount of the unlawful negotiation discount.").

19

These Progressive Cases and State Farm cases are aligned with the case at bar. The predominant issue here is whether using PSAs to reduce ACVs violates the UCSPA and the UTPA, which is similar to whether applying PSAs to reduce ACVs violates the applicable policies or other state law. In both, the issue of Defendants' standardized use of the PSA predominates the litigation and outweighs any individualized issues. *See e.g., Schroeder*, 2024 WL 308330, *12.

The same is true for damages. The damages theory (PSAs decreasing ACVs) mirrors the liability theory – the use of the PSAs unjustifiably reduces the payouts to class members, causing the members' financial harm. *See Jama*, 2024 WL 3853695, *10; *Volino*, 2023 WL 2532836, *10.

Plaintiffs satisfy the predominance requirement for class certification.

### 7.    SUPERIORITY

Fed. R. Civ. P. 23(b)(3) requires Plaintiffs to demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating" this controversy. The Rule lists four considerations for this evaluation:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). In sum, "a class action is superior where potential class members are aggrieved by the same policies and the damages suffered are small relative to the expense and burden of individual litigation." *Volino,* 2023 WL 2532836, * 11, quoting *Clark v. City of New York*, S.D.N.Y. No. 18 Civ. 2334, 2021 WL 603046, *6 (Feb. 16, 2021). Here, all four considerations of Rule 23(b)(3) dictate a finding of superiority.

Initially, individual class members would have little interest in pursuing separate actions because of the small amounts of potential damages available to each class member for violations (likely

less than a $1,000 per class member). Additionally, in most instances, the class members are unaware of the illegitimate nature of the PSA, or in communications from Defendants that they even used the PSA. (*See* Jacob Eckert Depo.[9], 43:1-11; 44:24-45:24, cited pages attached hereto as Ex. 12.) After all, Defendants' business model is inherently deceptive so that their victims do not know that they are being duped.

To the extent class members are aware of their claims, many of the potential class members simply may not have the money to bring an individual action against Defendants for their unlawful conduct. Because of these financial barriers, many of the class members are either resigned to doing nothing or perceive that their individual damages are in amounts that are too small to justify the expense of separate lawsuits.

Also, even if there is an opportunity to recover attorney's fees, the small damage awards still would make the cases not worth pursuing individually. *See Brown*, 2023 WL 7219499, *10. But if their damages are aggregated, the amount at issue makes litigation feasible. These economic realities satisfy the first consideration.

Defendants further tried to raise an additional barrier to anyone bringing an individual action. Defendants claim that a costly appraisal process is required before suit. Defendants previously raised this argument in this case. The Court rejected it. (Dkt. No. 22, pp. 8-11.) But many insureds would not know that an appraisal is not a legal barrier to their PSA claims.

Moving to the second consideration, Plaintiffs and their counsel know of no competing litigation in Maine.

---

[9] *See* Transcript of the Deposition of Jacob Eckert taken on January 22, 2024, that has been contemporaneously filed with this motion.

21

Regarding the third consideration, a class action is ideal for addressing alleged recurring malfeasance because it assists the court to avoid duplicating its time and effort and conserving its resources. Hence, concentrating litigation would serve the interests of judicial economy.

Regarding the fourth element, given the straightforward nature of the Class claims, and the limited number of those claims and issues to be determined, no difficulties exist, beyond those typical of any class action, to manage his class action. Indeed, because this case revolves around specific and limited violations, no class management problems are foreseeable or likely.

Finally, there is no need for "mini-trials" because it is only the Defendants' standard practice of using computer generated PSAs at issue. The Progressive Cases concur that this class action would not turn into "mini-trials." *See e.g., Drummond*, 2023 WL 5181596, *12 (rejecting "mini-trial" argument). Thus, all four superiority considerations weigh in favor of class certification.

## IV.    **CONCLUSION**

Based on the foregoing, not only have Plaintiffs satisfied the Rule 23 requirements for class certification, but certification also serves the purposes of the Rule. The case involves Defendants' standardized conduct and practice of using a computer created PSA to reduce the ACV which harms Defendants' insureds who may not be able to bring their own claims. Moreover, per the Progressive Cases and the State Farm cases, the overwhelming weight of authority favors granting class certification here. Plaintiffs' Amended Motion for Class Certification should be granted.

Respectfully submitted,

/s/ *John Z. Steed*
John Z. Steed, Esq. (Bar No. 5399)
Island Justice
P.O. Box 711 / 40 School Street
Stonington, ME 04681
(207) 200-7077
john@islandjusticelaw.com

/s/ *Scott C. Borison*
Scott C. Borison (MD Bar No. 22596)*
Borison Firm LLC.
1400 S. Charles St.
Baltimore MD 21230
Telephone: (301) 620-1016
scott@borisonfirm.com

/s/ *Ronald I. Frederick*
Ronald I. Frederick (OH Bar No. 0063609)*
Brian E. Roof (OH Bar No. 0071451)*
Frederick & Berler LLC
767 E. 185th Street
Cleveland, Ohio 44119
(216) 502-1055 (phone)
(216) 609-0750 (fax)
ronf@clevelandconsumerlaw.com
brianr@clevelandconsumerlaw.com

*Counsel for Plaintiffs*

* Admitted *pro hac vice*

23

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of September 2024 a copy of the foregoing was filed electronically. Notice of this filing will be sent to all counsel of record for the parties by operation of this Court's CM/ECF electronic filing system. Parties may access this filing through the Court's system.

/s/ *Ronald I. Frederick*
Ronald I. Frederick (OH Bar No. 0063609)*
Frederick & Berler LLC

*Counsel for Plaintiffs*

* Admitted *pro hac vice*