# Exhibit 4

## EXPERT REPORT OF JASON MERRITT

I, Jason Merritt, pursuant to Feder Rule of Civil Procedure 26 declares as follows:

## DECLARATION

This Report is based on my personal knowledge and, if called to testify on the matters set forth herein, I could and would do so competently.

## INTRODUCTION

My name is Jason Merritt, and I am a professional personal-property appraiser who has been retained by the Plaintiff in this case. My credentials and professional experience are described in my curriculum vitae attached to this report as **Exhibit A**.

Pertinent to this report, and as reflected in my curriculum vitae, I am the owner of East Coast Auto Appraisers, LLC. I am certified through the Bureau of Certified Auto Appraisers and the American Society of Certified Auto Appraisers, to appraise vehicles, including total losses. I have appraised over a thousand vehicles to determine their actual cash value. These appraisals include hundreds of appraisals where I was hired to determine the value of a totaled vehicle. As owner of Merritt's Automotive, LLC, I appraised vehicles daily for the purpose of determining the fair market value. Additionally, I have performed hundreds of appraisals for the Timbrook Automotive Organization, which includes franchise dealerships for Chevrolet, Buick, GMC, Kia, Nissan, Ford, Chrysler, Dodge, Jeep, and Honda. The purpose of these appraisals was to determine the fair market value of vehicles offered for trade in or that were newly acquired by the Timbrook Automotive Organization.

Before entering the private sector, I served in the Maryland State Police for 28 years. During those years, I received advanced training in accident investigations. In 1998, I was assigned to the C31 Narcotics Unit of the Maryland State Police. Part of my duties in that unit were

acquiring and maintaining the unit's vehicles.

**SCOPE OF WORK**

I have been hired by the Plaintiffs in this case to offer opinions on the following topics:

- Description of what an appraisal is;

- Explanation of how to use the comparable methodology to appraise a vehicle's actual cash value;

- Explanation of whether Mitchel's use of a "Projected Sold Adjustment" ("PSA") to the comparable vehicles used to generate ACV values is appropriate when appraising a vehicle using a comparable methodology.

The facts and data that I have considered to arrive at my opinions are listed in **Exhibit B.**

**OPINIONS**

    **A. Overview of Using a Comparable Methodology to Determine the Pre-Loss Actual Cash Value of an Automobile.**

An *appraisal* is an opinion of value. While there is no single methodology to arrive at a proper opinion as to a loss vehicle's actual cash value ("ACV"), there are generally accepted methodologies that must be followed to render a sound opinion as to ACV. One such methodology-applicable to standard motor vehicles, as opposed to, for example, antique cars or specialized vehicles-is the comparable methodology, more frequently called the "comp" methodology.

Generally, the comp methodology for determining ACV involves finding vehicles for sale, or recently sold, within a certain geographic area that are similar, or "comparable," to the vehicle being valued. Typically, these comps are selected from Internet advertisements. Once the comps are chosen, differences in observed and verifiable features (such as options, mileage, trim level, and condition) between the loss vehicle and the comps are documented. Normally, information concerning options, mileage, trim level, and condition are taken from the Internet advertisement

for the vehicle, and these characteristics are taken at face value unless there is some specific and documented reason for questioning the accuracy of the listing. Sometimes a vehicle listing does not include options, but these could be determined using a VIN decoder. The point is that there must be a specific reason, grounded in evidence, for varying from the information provided in an Internet advertisement for a particular vehicle. Differences between vehicles in observed and documented characteristics result in price adjustments from the list price of the comparable vehicles.

I have reviewed the Mitchell Vehicle Valuation Report prepared for Plaintiff. Having reviewed the reports it also appears that Mitchell largely followed the Comparable methodology, documenting all differences, if any, in mileage, options, trim level, loss vehicle condition, etc., and making monetary adjustments based on those documented differences.

When adjusting for the condition of a vehicle, the common procedure is to adjust the condition of a loss vehicle by comparing it to the normal or typical condition of similar vehicles. Ideally, you would search for comparable vehicles in nearly identical condition to the loss vehicle, but this usually isn't practical. Mitchell followed customary condition-adjustment standards by comparing the loss vehicle to normal condition. Specifically, in the Report, Mitchell documented an inspection of 13 components of Plaintiff's loss vehicle. These components are assigned a numerical rating of 1 to 5. Each component is compared to a "Typical Vehicle Condition," which was assigned a numerical rating of 3.00. So, based on whether the "Overall Condition" of the loss vehicle rated above or below the typical 3.00, Mitchell adjusted the base value of the loss vehicle to reflect that it was in better or worse condition than "typical." As for the condition of the comparable vehicles, it would be improper to assume they were in anything other than typical

condition without either inspecting the vehicle or having documentation showing the comparable vehicle was in better or worse than typical condition.

Because conducting physical inspections of comparable vehicles is often impractical, appraisers usually set the condition of the comparable vehicles as "average" or "typical" and make no monetary adjustment to the comparable vehicle, which is what Mitchell did in the Comparable Vehicles section of the Report. Once the average price is established—the average of the comparable vehicles' prices, adjusted for any differences in mileage and equipment—the average price is adjusted upward or downward if the insured vehicle is in better or worse than typical condition and kept the same if it is in typical condition.

Generally, Mitchell's methodology is consistent with the comparable methodology routinely applied by appraisers and is capable of producing a correct or sound appraisal of ACV. Mitchell deviated from the comp methodology, however, by applying a PSA deduction to the Internet prices of the specific comparable vehicles advertised for sale.

### B. Mitchell's Application of a Projected Sold Adjustment is Inconsistent with Appraisal Standards and the Comparable Methodology.

As with mileage, options, and equipment, appraisers must base their opinions about a specific comparable vehicle's price on hard data. The hard data appropriate for this is typically the Internet price of the comp. This is true for several reasons.

*First*, the Internet price is often the only data point concerning what a particular vehicle listed with a particular seller would sell for at the time of valuation. When determining ACV, the objective is to determine the value of that vehicle at a particular point in time. The Internet price listed for sale is the only evidence available for determining what a particular comparable vehicle offered for sale by a particular dealer would sell for on a particular day. Moreover, using the Internet price provides an objective criterion for determining what the comparable vehicle would

sell for on a particular day to a buyer purchasing a vehicle outright, without providing a trade in, financing the purchase through the dealership or buying optional warranties or service plans. These additional profit opportunities for the dealer might result in what may look like a lower sales price but does not reflect a change in the market value of that car or that the dealer would have accepted anything other than the list price had the buyer offered cash for the vehicle, without the opportunity to make up the difference or make even more profit related to a trade-in vehicle, financing of the purchase, or selling warranties, service plans, or other products. For this reason, while it is not necessarily invalid to use a reported sale price of a comparable vehicle, it is generally better to use a list price, unless the appraiser is able to confirm the reported sale price is not the result of a special discount and does not reflect ancillary items relating to the purchase.

*Second*, appraisal standards do not permit arbitrarily deducting the advertised price of a vehicle based on projections of what that vehicle might ultimately sell for. Again, there is no hard data available to an appraiser to support an opinion that a particular comp would sell on a particular day for anything other than the Internet price. It would be arbitrary to assign a different sales price to any particular vehicle chosen for comparison purposes.

Using the advertised price as the price for a comparable vehicle is especially important when the advertisement comes from an Internet source. It is my understanding that Mitchell uses only Internet listings for locating comparable vehicles. Consistent with Mitchell's "Position on Internet Pricing," my understanding of the modern used-car market is that Internet prices often reflect a no-hassle price and that dealers price their inventory competitively to move inventory and sell more vehicles. This is another reason appraisers cannot assume a vehicle will sell for anything other than its advertised price.

While I do not, there are some appraisers who make a "take-price" adjustment to the Internet price of comparable vehicles. This adjustment is made only after speaking with the specific car dealership offering that particular vehicle for sale to determine whether the dealer would take anything other than the advertised price of the specific vehicle. The adjustment is specific to a particular vehicle from a particular dealer, and the recipient of the appraisal would know that dealer stated it would take a specified cash price on that day for that particular comparable vehicle. As with other adjustments, a "take-price" adjustment would be based on data specific to a comp vehicle. In my experience, it is difficult to getting dealers to disclose the sold amount of vehicles, much less to provide sufficient information about the back end of the sale (trade in, financing, warranties or auxiliary products, special discounts, etc.) to put the sold amount in a useful context.

Based on my understanding of the Mitchell PSA methodology, it is not an appropriate basis for adjusting the list price. First, it is not information about the particular comp in question – no effort is made to contact the specific dealer about whether it will sell the specific comp for less than advertised at the time of the valuation. Second, no effort is made to account for the other profit centers and considerations discussed above—like trade ins, in-house financing, warranties, service plans, special discounts—that impact recorded sales amounts but not ACV. Without accounting for those factors, the data is not helpful. Third, it is my understanding based on conversations with counsel that Mitchell does not consider all the transactions. More specifically, Mitchell does not consider transactions where the vehicle sold for the advertised price and has never considered transactions where the vehicle sold for more. Even setting aside the other problems with attempting to predict what a particular comp will ultimately sell for, I would not

rely on Mitchell's PSA calculations because excluding this data slants toward lower values and is not objective.

### C. Absent the PSA Deduction, the Mitchell Methodology Provides a Sound Determination of ACV.

Overall, while it is unlikely I would have, starting from scratch, selected the exact comparable vehicles used in the report and appraisers generally do not select precisely the same vehicles to use for comparison purposes, Mitchell did follow a comparable methodology except for the application of the PSA deduction, and all information necessary to provide a sound opinion on the ACV of Plaintiff's vehicle is contained in the Report. Specifically, to determine the ACV of Plaintiff's loss vehicle using the Mitchell Valuation report, you add the PSA back to the adjusted price of each comparable vehicle to get a revised "Base Value," and then apply whatever adjustments, if any, were made in the reports for condition, prior damage, aftermarket parts, or refurbishment.

Absent the PSA, the Mitchell methodology provides a sound determination of ACV, consistent with the comp methodology commonly used by appraisers. So, the Mitchell report can be used to determine the ACV of Plaintiff's loss vehicle (or any other loss vehicle) by simply backing out the PSA. To arrive at a sound appraisal of ACV using a Mitchell report, you would line-item out each PSA applied to a comp, recalculate the "Adjusted Price" of each comparable vehicle to which a PSA was applied, and then recalculate the average of the Adjusted Prices to arrive at a revised "Base Value." From there, the Market Value can be recalculated using that revised Base Value and the adjustments for condition, prior damage, aftermarket parts, or refurbishment already determined by Mitchell. Indeed, this proposed methodology is consistent with the methodology.

To appraise the ACV of Plaintiff Thurston's loss vehicle using his Mitchell report, I backed out each PSA and then recalculated the Market Value. Specifically, I added $398.00 to the $11,764.92 adjusted price of the first comp, resulting in a revised adjusted price of $12,162.92. I added $537.00 to the $14,712.02 adjusted price of the second comp, resulting in a revised adjusted price of $15,249.02. I added $427.00 to the $13,218.45 adjusted price of the third comp, resulting in a revised adjusted price of $13,645.45. I then took the sum of the revised adjusted prices ($41,057.39) and divided that number by three to get a recalculated Base Value of $13,685.80. This is the amount the Base Value would have been had Mitchell not applied Projected Sold Adjustments. Mitchell also applied a negative condition adjustment of $462.43, by applying a .03% condition adjustment percentage to the original Base Value of $1,3231.80. Applying that same .03% negative condition adjustment percentage to the recalculated Base Value results in a negative condition adjustment of $410.57, which results in a Market Value of **$13,275.23** ($13,685.80 - $401.57), which is a sound appraisal of the ACV of Plaintiff Thurston's loss vehicle.

I hold the above opinions to a reasonable degree of professional certainty.

My opinions are based upon the information available to me currently. If there is additional information obtained or confirmed, my opinion may change to account for the new information or confirmation of information.

**COMPENSATION**

I am being paid $650 per hour for my work in this case.

I declare under penalty of perjury that the foregoing is true and correct.

_Jason W. Merritt_
JASON MERRITT

06-27-2024
DATE

8





# Jason W. Merritt

jason@eastcoastautoappraisers.com

Resume of experience and knowledge.

**Merritt's Alignment Service**                                                                                       January 1986-Oct 1987

Authorized Maryland State Inspections mechanic. Certified and Licensed to perform safety inspections for the state of Maryland. Certified in passenger cars. Light duty trucks, and light duty trailers. Certified as the youngest mechanic by the state of Maryland to perform safety inspections.

During this tenure multiple safety inspections were conducted. The Maryland State Inspection procedure is one of the most detailed and thorough state inspection process.

**Maryland State Police**                                                                                                     Oct 1987- June 2015

October 1987- Entered the Maryland State Police as a Cadet. Served in the Commercial Vehicle Enforcement Unit. During this time, I was certified federally as a Level 1 Inspector for Commercial Vehicles. Level 1 inspections are the level of inspections set forth on the Federal Motor Carrier Safety Standards and are certified at the Federal Level. At that same time, I received Hazard Materials Certification and training. I was the first Cadet in the state of Maryland to be certified to conduct Level 1 inspections of commercial vehicles. I conducted accident investigations for the safety equipment of commercial vehicles. I performed more than 1000 inspections during this tenure.

March 1990- Entered the Maryland State Police Training Academy

August 1990- Graduated the Police Academy and was certified as Police Officer by the Maryland Police Training Commission. Was instructed and certified to conduct accident investigations. During this Academy training many hours were dedicated to Accident Investigations.

August 1990- December 1991 Assigned to Road Patrol at the Frederick Barracks. I was assigned Road Patrol and later certified in RADAR, VASCAR, Standardized Field Sobriety, and Criminal Investigations. Conducted traffic accident investigations as well as Criminal Investigations and handled calls for service in Frederick County. I was nominated for the Maryland State Police Trooper of the Year in 1990. I received a Superintendents Commendation for a criminal investigation in Frederick County. I also received a Governors Citation.

During an accident investigation in a neighboring county, I was able to identify the make model and year of a vehicle involved in a fatal hit and run motor vehicle accident, by recovering a small piece of trim belonging to the suspect vehicle. That small piece of trim resulted in the conviction of the driver.

May 1992-November 1992 Easton Barrack

Assigned to the road patrol in Talbot County, MD. I was responsible for calls for service as well as Criminal Investigations. During that time, I handled numerous high-level Criminal Investigations for multiple thefts as well as assaults and fatal accidents.

November 1991-October 1995

Re-assigned to the Frederick Barrack

Assigned to Road Patrol where I again was responsible for calls for service in the County. During this time, I continued training for Criminal Investigation as well as Narcotics Investigation. I was recognized for outstanding performance in Driving While Intoxicated Arrests as well as Narcotics Arrests. I received commendations for several investigations including a homicide investigation.

Received training in Advanced Accident Investigations. I conducted numerous Advanced Accident Investigations to include multiple Motor Vehicle Accident Death Investigations.

October 1995- March 1998

Assigned to the Cumberland Barrack in Allegany County, MD

Was assigned Road Patrol and calls for service.  During this time, I was awarded the Cumberland Barrack Trooper of the Year as well as the Cumberland Optimist Law Enforcement Officer of the Year. I received a Superintendents Commination for a Criminal Investigation that resulted in an arrest of an individual that committed more than 30 Breaking and Entering's into homes in the Tri-State area. He was later sentenced to more than 20 years in prison.

March 1998- June 2015

Assigned to the Criminal Enforcement Division, Columbia, Maryland

I was assigned to the C3I Narcotics Unit. This is a multi-jurisdictional Unit that is comprised with multiple agencies and is supervised by the Maryland State Police. During this time as a Narcotics Investigator, I have received many commendations and awards for service.

I have conducted and assisted with more than 4500 investigations and conducted more than 3500 arrests. I have been the author of and assisted with more than 800 Search and Seizure Warrants.

The C3I Narcotics Unit has received numerous awards and recognitions for Outstanding Performance in Narcotics Investigations. While in this capacity I have worked with multiple agencies to include but not limited to the FBI, DEA, ATF, FDA, and Multiple Police Departments throughout Maryland, West Virginia, Virginia, California, Colorado, and Pennsylvania. I have previously been deputized federally with the DEA and the FBI on case specific investigations.

I have worked in a covert capacity for undercover investigations and I have managed more than 1000 criminal informants as well as held caseloads of more than 30 cases at a time. I have been recognized as an Expert in the Field of Narcotics in several counties in Maryland.  I also teach in the subjects of narcotics, Interview and Interrogation, Confidential Informants, as well as 4th Amendment Law.

I have been leading investigator on numerous large-scale investigations for racketeering, RICO Federal Investigations. I have conducted homicide investigations as well as crimes against persons.

I have conducted numerous investigations for trafficking of drugs in motor vehicles and received additional training in the concealment and custom production of drugs in compartments of vehicles.

I was responsible for the recovery and the inspections of vehicles that were seized. I was also responsible for the marketing and sales of those seized vehicles.

Training;

Maryland State Police

Police Academy, Yearly Training to maintain my certification as a Police Officer.

Criminal Investigations

Advanced Criminal investigations.

Narcotics Investigator

2

DEA Investigators School

Interview and Interrogation

Criminal Informants

Numerous other Narcotics Investigators Trainings throughout the country.

Mobile Forensics Certification

Drug Diversion Training

I retired from the Maryland State Police in June 2015

**June 2015-August 2016 Merritt's Automotive LLC**
I acquired and assumed a family business in the automotive industry. I was certified through the State of Maryland for automotive inspections. I was again certified by the state of Maryland and the Maryland State Police to conduct Safety Inspections for the state. I was again certified to conduct safety inspections on Passenger Vehicles including light duty trucks, and trailers. During this time, I conducted several hundred inspections.

**August 2016 – June 2019   Timbrook Automotive**
I joined the Timbrook Automotive Organization to assist and direct the opening of a motorcycle dealership in Winchester, VA. I assisted in the establishment of that business in the state of Virginia that included permitting licensing etc. I established an online presence and supervised all departments of the dealership from sales to service and marketing. I was responsible for management of employees as well as hiring. I was also responsible and assisted with the discipline of employees and customer relations.
I was the manager of the service department to include the overseeing of the mechanical work performed.
I established and conducted appraisals for the banking industry and received training through Honda USA for safety standards as well as mechanical and technological advances.
I performed many used vehicle appraisals for the Timbrook Automotive Corporation during this tenue. I conducted appraisals on motorcycles, boats, campers, trailers, classic and salvage title vehicles.

**June 2019- Present T3 Intelligence Services**
I am an owner and partner of this security and private investigation firm. I conduct investigations on criminal as well as civil.
I have been involved with the insurance industry and have been involved in active investigations with Insurance fraud as well as Workman's Comp fraud.
I have conducted Accident Investigations and reviews.
I am a licensed and certified Private Detective through the Maryland State Police. I also carry a Security Firm License.
I have more than 9 employees that provide security services as well as Executive Protection details. Some are full time employed and are holding security from areas in Allegany County, MD.

**April 2020- Present East Coast Auto Appraisers LLC**

Owner and operator of this business. I hold a certification through the Bureau of Certified Auto Appraisers located in Houston Texas. This certification has requirements that include training as well as experience in the fields of Total Loss, Loss of Use, Depreciation Value, Actual Cash Value and Classic Values. The certification standards include the knowledge and identification of vehicles that have been damaged through accidents or the elements.
These appraisals detail any damage to the structure of a vehicle, and I am trained and experienced in the detection of repairs or current damage to frames and subframe systems of vehicles.
I have conducted many classic and antique vehicle appraisals as well as sales.
I promote and manage this business as it is a startup business. This business is targeting the east coast and I now have appraisers in the Maryland tri-state area plans for other locations along the coast.

Current member of:
B.O.C.A.A. Bureau of Certified Auto Appraisers (Certified Auto Appraiser)
ASCAA American Society of Certified Auto Appraisers (Certified Auto Appraiser)
NADA JD Power
Appraisal Institute (National USPAP Course)
Hemmings Auto

3

**Prior Testimony** (Pending currently)
- *Volino, et al. v. Progressive Casualty Ins. Co., et al.*, No. 1:21-cv-06243-LGS
- *Drummond, et al. v. Progressive Specialty Ins. Co., et al.*, No. 21-4479
- *Freeman v. Progressive Direct Ins. Co.*, No. 1:21-cv-03798-DCC10
- *Chadwick v. State Farm Mutual Automobile Ins. Co.*, No. 4:21-cv-1164-DPM
- *Wiggins, et al. v. State Farm Mutual Automobile Ins. Co., et al.*, No. 8:21-cv-03803-DCC
- *Clippinger v. State Farm Mutual Automobile Ins. Co., et al.*, No. 2:20-cv-02482-TLP-cgc
- *Costello v. Mountain Laurel Assurance Co.*, No. 2:22-cv-0035-TAV-CRW
- *Brown, et al. v. Progressive Mountain Ins. Co., et al.*, No. 3:21-cv-00175-TCB
- *Bartee, et al. v. Progressive Advanced Ins. Co., et al.*, No. 4:22-cv-00342
- *Curran v. Progressive Direct Ins. Co.*, No. 1:22-cv-00878-RM
- *Querette v. GEICO Idemnity Co., et al.*, No. 50-2022-SC-020310
- *Vantree, et al. v. Progressive Gulf Ins. Co., et al.*, No. 4: 22-cv-00070-DMB-JMV
- *Reynolds, et al. v. Progressive Direct Ins., et al.*, No. 5:22-cv-503-RDP
- *Ambrosio, et al. v. Progressive Preferred Ins. Co.*, No. 2:22-cv-00342-PHX-SMB
- *Kroeger v. Progressive Universal Ins. Co.*, No. 4:22-cv-00104-SHL-HCA
- *Holmes, et al. v. Progressive Universal Ins. Co.*, No. 1:22-cv-00894
- *Henson, et al. v. Progressive Premier Insurance Co.*, Case No. 5:22-cv-182-M
- *Sibert v. Progressive Select Ins. Co.,* Case No. 1:22-cv-01179-LKG
- *Shaheed, Ameera & Dickerson Earl v. City Of Wilmington, Et Al C.A. No. 21-01333 CFC*
- *Koch, Dillon v. Progressive Direct Ins. Co., Case 1:23-cv-00118-JB-GJF*
- *Taxer, David et al. v. Progressive Universal & Progressive Classic Ins. Co. Case No. 3 :22-cv-01255-HZ*
- *Jones, Kierra et al. V. Palisades Ins Co. Et al., D.N.J., Case No. 2:22-cv-05156-EP-ESK*
- *Shams, Tanzim v. American Select Ins Co. Case No. 23: CV 732*
- *Watson, Melissa et al. v. Progressive Direct Ins. Co. Case No. 5:22-cv-0203-DCR*



4

# Facts and Data Considered by Jason Merritt in Forming His Opinions

1. Complaint
2. Mitchel Vehicle Valuation
3. Policy Contract – 9611 (09-16)
4. Nada Report
5. Deposition transcripts of Kyle Mayer and John Retton