# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

MATTHEW THURSTON, KATHERINE
BRIDGES, and GENEVIEVE
MCDONALD, individually and on behalf of
others similarly situated,

               Plaintiffs,

v.

PROGRESSIVE CASUALTY
INSURANCE COMPANY and UNITED
FINANCIAL CASUALTY COMPANY,

          Defendants.

Docket No. 1:22-cv-00375-NT

**EVIDENTIARY HEARING
REQUESTED**

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.      INTRODUCTION.................................................................................................... 1

II.     BACKGROUND ...................................................................................................... 3

    A.    UFCC's Claims Settlement Process......................................................... 3

    B.    The Mitchell Software and the Projected Sold Adjustment....................... 5

    C.    Plaintiffs' Total-Loss Claims ................................................................... 7

        1.    Matthew Thurston.......................................................................... 7

        2.    Genevieve McDonald ...................................................................... 8

        3.    Katherine Bridges .......................................................................... 8

III.    ARGUMENT AND CITATION TO AUTHORITY ...................................................... 9

    A.    Plaintiffs Rely on the Wrong Legal Standard ........................................... 9

    B.    Individualized Questions Regarding the Accuracy and Fairness of Each
        Insured's Settlement Offer Will Predominate........................................... 11

        1.    Determining the ACV of Each Total-Loss Vehicle Is Critical for
            Liability and Article III Standing................................................. 11

        2.    Plaintiffs Offer No Common Proof of Undervaluation ........................... 13

        3.    Other Individualized Evidence Is Required to Prove Injury................... 18

    C.    Plaintiffs' Purportedly Common Questions Are Not Common, and Are
        Overwhelmed by Individual Issues........................................................... 19

        1.    Plaintiffs' UCSPA Claims Hinge on Numerous Individualized
            Questions...................................................................................... 20

        2.    Plaintiffs' UTPA Claims Inject More Individualized Questions............. 23

    D.    Plaintiffs Fail to Demonstrate Ascertainability....................................... 25

    E.    Plaintiffs Are Not Adequate Class Representatives Because They Have
        Conflicting Interests with The Putative Class........................................... 26

    F.    Plaintiffs Rely on Out-of-Circuit Decisions Going Against the Weight of
        Appellate Authority .................................................................................. 27

IV.     CONCLUSION ...................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ambrosio v. Progressive Preferred Ins. Co.*,
No. CV-22-00342-PHX-SMB, 2024 WL 915184 (D. Ariz. Mar. 4, 2024)............................16

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...........................................................................................................26

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)...........................................................................................................10

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018).............................................................................................11, 17

*Baker v. State Farm Mut. Auto. Ins. Co.*,
No. 21-14197, 2022 WL 3452469 (11th Cir. Aug. 18, 2022) ...........................................15, 30

*Bourque v. State Farm Mut. Auto. Ins. Co.*,
89 F.4th 525 (5th Cir. 2023) .............................................................................................16

*Brown v. Progressive Mountain Ins. Co.*,
No. 3:21-cv-00175, 2023 WL 7219499 (N.D. Ga. Aug. 3, 2023)....................................28, 29

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)......................................................................................................9, 10, 29

*Cook v. USAA Casualty Ins. Co.*,
No. 1:16-cv-00207-JCN, 2020 WL 556394 (D. Me. Feb. 4, 2020)......................................11

*Crosby v. Social Sec. Admin.*,
796 F.2d 576 (1st Cir. 1986)..............................................................................................25

*Curran v. Progressive Direct Ins. Co.*,
345 F.R.D. 498 (D. Colo. Dec. 18, 2023) .......................................................................28, 29

*Curtis v. Allstate Ins. Co.*,
2002 ME 9, 787 A.2d 760 (Me. 2002)...............................................................................21

*Curtis v. Progressive N. Ins. Co.*,
No. CIV-17-1076-PRW, 2020 WL 2461482 (W.D. Okla. May 12, 2020) ............................13

*Drummond v. Progressive Specialty Ins. Co.*,
No. CV 21-4479, 2023 WL 5181596 (E.D. Pa. Aug. 11, 2023)............................................28

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)................................................................10

*Forcucci v. U.S. Fidelity & Guaranty Co.*,
   817 F. Supp. 195 (D. Mass. 1993) ..........................................23

*Freeman v. Progressive Direct Ins. Co.*,
   No. 1:21-cv-03798-DCC, 2024 WL 2044782 (D.S.C. May 8, 2024)....................28

*Gladu v. Fitzpatrick*,
   No. 1:18-CV-00274-GZS, 2018 WL 4489456 (D. Me. Sept. 19, 2018) ...............10

*Glynn v. Maine Oxy-Acetylene Supply Co.*,
   No. 2:19-CV-00176-NT, 2020 WL 6528072 (D. Me. Nov. 5, 2020)....................9

*GxG Mgmt., LLC v. Young Bros. & Co.*,
   457 F. Supp. 2d 47 (D. Me. 2006) ..........................................24

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)................................................................10

*Henson v. Progressive Premier Ins. Co. of Illinois*,
   No. 5:22-CV-00182-M, 2024 WL 3051264 (E.D.N.C. June 10, 2024) .............12, 16

*Jama v. State Farm Mutual Auto. Ins. Co.*,
   113 F.4th 924 (9th Cir. 2024) .............................................29, 30

*James v. GMAC Mtg. LLC*,
   772 F. Supp. 2d 307 (D. Me. 2011) ..........................................24

*Hoglund ex rel. Johnson v. DaimlerChrysler Corp.*,
   102 F. Supp. 2d 30 (D. Me. 2000) ..........................................19

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
   634 F.3d 883 (7th Cir. 2011) ............................................2, 15, 30

*Kroeger v. Progressive Universal Ins. Co.*,
   No. 4:22-cv-00104, 2023 WL 9059523 (S.D. Iowa Nov. 20, 2023) ...............16, 21

*Lara v. First Nat'l Ins. Co. of Am.*,
   25 F.4th 1134 (9th Cir. 2022) .......................................... *passim*

*Larsen v. Vizio, Inc.*,
   No. SACV1401865CJCJCGX, 2017 WL 11633132 (C.D. Cal. Apr. 27, 2017)....................24

*Lewis v. Geico*,
   98 F.4th 452 (3d Cir. 2024) ..............................................12

*In re Light Cigarettes Mktg. Sales Pracs. Litig.*,
    271 F.R.D. 402 (D. Me. 2010) ................................................................25

*Millett v. Atl. Richfield Co.*,
    No. CIV.A. CV-98-555, 2000 WL 359979 (Me. Super. Mar. 2, 2000) ...............................24

*Nafar v. Hollywood Tanning Sys., Inc.*,
    339 F. App'x 216 (3d Cir. 2009) ................................................................27

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
    522 F.3d 6 (1st Cir. 2008) ................................................................11

*In re Nexium Antitrust Litig.*,
    777 F.3d 9 (1st Cir. 2015) ................................................................9, 25

*Organogenesis Sec. Litig.*,
    241 F.R.D. 397 (D. Mass. 2007) ................................................................1

*Parent/Pro. Advoc. League v. City of Springfield*,
    934 F.3d 13 (1st Cir. 2019) ................................................................19

*In re PolyMedica Corp. Securities Litig.*,
    432 F.3d 1 (1st Cir. 2005) ................................................................10

*Progressive Direct Ins. Co. v. Freeman*,
    No. 24-177 (4th Cir. 2024) ................................................................29

*Progressive Paloverde Ins. Co. v. Schroeder*,
    No. 24-8003 (7th Cir. 2024) ................................................................29

*Progressive Specialty Ins. Co. v. Drummond*,
    No. 23-8035 (3d Cir. 2024) ................................................................29

*Raposo v. Garelick Farm, LLC*,
    293 F.R.D. 52 (D. Mass. 2013) ................................................................20

*In re Relafen Antitrust Litig.*,
    225 F.R.D. 14 (D. Mass. 2004) ................................................................27

*Reynolds v. Progressive Direct Ins. Co.*,
    346 F.R.D. 120 (N.D. Ala. 2024) ................................................................28

*Richardson v. Progressive Am. Ins. Co.*,
    No. 2:18-CV-715-ftm-99MRM, 2022 WL 154426 (M.D. Fla. Jan. 18, 2022) ......................13

*Sampson v. United Servs. Auto. Ass'n*,
    83 F.4th 414 (5th Cir. 2023) ................................................................. *passim*

*Sanford v. Nat'l Ass'n for the Self-Employed, Inc.*,
    264 F.R.D. 11 (D. Me. 2010) ................................................................24

*Saucier v. Allstate Ins. Co.*,
    1999 ME 197, 742 A.2d 482 (Me. 1999) ...............................................21

*Schroeder v. Progressive Paloverde Ins. Co.*,
    713 F. Supp. 3d 523 (S.D. Ind. 2024) ..................................................28

*In re State Farm Fire & Cas. Co.*,
    872 F.3d 567 (8th Cir. 2017) .........................................................15, 30

*State v. Weinschenk*,
    2005 ME 28, 868 A.2d 200 ...................................................................23

*Swack v. Credit Suisse First Boston*,
    230 F.R.D. 250 (D. Mass. 2005) ..........................................................19

*Sweet v. Breivogel*,
    2019 ME 18, 201 A.3d 1215 .................................................................12

*Tarrify Properties, LLC v. Cuyahoga Cnty., Ohio*,
    37 F.4th 1101 (6th Cir. 2022) ..............................................................15

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ..............................................................................12

*Tungate v. MacLean-Stevens Studios, Inc.*,
    1998 ME 162, 714 A.2d 792 .................................................................12

*Volino v. Progressive Cas. Ins. Co.*,
    No. 21-cv-06243, 2023 WL 2532836 (S.D.N.Y. Mar. 16, 2023) .....................................28, 29

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .............................................................. *passim*

**Statutes**

5 M.R.S. § 205 *et seq.* ...............................................................................1

24-A M.R.S. § 2436-A ................................................................. *passim*

24-A M.R.S. § 3004-A .................................................................................1

**Rules**

Fed. R. Civ. P. 23 ....................................................................... *passim*

Defendant Progressive Casualty Insurance Company ("Progressive Casualty") and Defendant United Financial Casualty Company ("UFCC" or "Progressive")[1] (together, "Defendants") submit this response in opposition to Plaintiffs' Amended Motion for Class Certification, Dkt. 89 ("Motion" or "Mot.").

## I.    INTRODUCTION

Plaintiffs are UFCC insureds whose vehicles were damaged in accidents and determined to be total losses. In such situations, UFCC usually pays its insureds the actual cash value ("ACV") of the vehicle in the moments before the loss. Plaintiffs' theory is that the software UFCC typically uses to estimate ACV—Mitchell International, Inc.'s WorkCenter Total Loss (the "Mitchell Software")—generates inaccurate and unfair estimates of ACV in violation of two Maine statutes: the Unfair Claim Settlement Practices Act, 24-A M.R.S. § 2436-A (the "UCSPA") and the Unfair Trade Practices Act, 5 M.R.S. § 205 *et seq*. (the "UTPA"). *See* Mot. at 6–7; Dkt. 76, Second Am. Compl. ("SAC") ¶¶ 78–79, 82.

The Mitchell Software bases its valuations on an analysis of comparable vehicles sold or listed for sale in the local market. For comparable vehicles that are listed for sale, Mitchell sometimes adjusts the advertised price based on data indicating that similar vehicles are likely to sell for less than the dealer's advertised price. Plaintiffs argue that this adjustment—called the Projected Sold Adjustment ("PSA")—results in underpayment of claims and thus violates the UCSPA and UTPA. Relying on these allegations, Plaintiffs move to certify a state-wide class of

---

[1] UFCC is an insurance company ultimately owned by The Progressive Corporation that underwrites auto insurance policies in Maine on behalf of the Progressive brand. Dkt. 6 ¶ 1. The Progressive Corporation has other subsidiaries that provide auto insurance, including Progressive Casualty Insurance Company. Dkt. 6 ¶ 2. However, there is no evidence that Progressive Casualty—a separate insurance company—insured the Plaintiffs or adjusted or paid their claims. Ex. A, Plaintiffs' Declarations Pages. Thus, Plaintiffs lack standing to assert claims against Progressive Casualty and cannot represent a class of Progressive Casualty insureds. *See, e.g.*, *Organogenesis Sec. Litig.*, 241 F.R.D. 397, 404 (D. Mass. 2007) (holding class representative who lacked standing to assert claims against one of multiple defendants does not "gain standing by virtue of casting his claim as a class action").

all persons insured by UFCC whose "vehicle was a total loss" and whose settlement "offer [was based] on a Valuation Report obtained by Defendants from Mitchell [] where the projected sold adjustment was applied to at least one comparable vehicle." Mot. at 13.

As Plaintiffs' Motion makes clear, this case hinges on Plaintiffs' ability to show that UFCC undervalued their vehicles. *See, e.g.*, Mot. at 6 (claiming the PSA "reduces the amount that Defendants are required to pay" under their policies). Whether the PSA actually caused UFCC to pay less than ACV for any insured's vehicle is the predominating issue in this case, and it is inherently individualized. As both sides' appraisal experts agree, estimating ACV is a vehicle-specific process that requires an assessment of numerous factors. Individualized evidence—including valuations reached by other recognized vehicle valuation sources—must be considered by the jury to determine whether UFCC underpaid any given insured. This is why several appellate courts have held that where claims turn on "looking into the actual pre-accident value of the car" for every class member, "common questions do not predominate." *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022); *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 420 (5th Cir. 2023) (identifying "an explosion of predominance issues" in a car valuation class action "because [the insurer] has the due process right to argue, for each individual plaintiff, that [ACV] should be determined by a different legally permissible method"); *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 890 (7th Cir. 2011) ("If a given policyholder was fully compensated for the damage … then [the insurer] will have satisfied its contractual obligation *regardless* of" the "standard [used] to assess the damage.").

The only evidence Plaintiffs submit to attempt to satisfy their burden under Rule 23 is an expert report from Maryland-based appraiser, Jason Merritt, who claims that the PSA violates "appraisal standards" and should be excised from insureds' valuation reports to arrive at a "proper"

assessment of ACV. Merritt's flawed opinion is not a sufficient basis to certify a class. As an initial matter, neither UFCC's policy nor Maine law require UFCC to use any specific methodology or "appraisal standards" to estimate ACV. The purported violation of Merritt's standards thus will not drive resolution of Plaintiffs' claims. But even more importantly, Merritt and UFCC's appraisal expert, Dave Kinney, agree that there are numerous acceptable ways to value used vehicles such that good faith appraisals will almost always result in different dollar amounts. Merritt concedes that ACV is a range of values, not a single dollar amount. Thus, a jury would thus have to consider evidence of the value of each total-loss vehicle to assess whether UFCC's estimate using the Mitchell Software—notwithstanding the inclusion of PSAs—was a fair estimate. Plaintiffs have otherwise failed to submit any evidence demonstrating that the PSA is categorically unfair, or uniformly results in underpayment. Indeed, Plaintiffs do not have any evidence at all to support their allegations regarding the PSA.

At bottom, Plaintiffs' claims will come down to whether UFCC's valuation of each insured's total-loss vehicle was fair and accurate. Those claims cannot be adjudicated on a classwide basis. Because Plaintiffs have fallen far short of meeting their burden to show, with evidence, that class certification is appropriate under Rule 23, their Motion should be denied.

## II.    BACKGROUND

### A.    UFCC's Claims Settlement Process

Under its Maine auto policy, UFCC promises to pay for the loss up to the vehicle's "actual cash value," defined as "replacement cost at the time the loss occurs, less the value of its physical depreciation as determined by standard business practices." Dkt. 12-2, Policy at 26; *see also* 24-A M.R.S. § 3004-A. In Maine, UFCC adjusters often use the Mitchell Software to estimate the ACV of totaled vehicles. Dkt. 58-8, Retton Decl. ¶ 3. To evaluate a claim, the adjuster visually inspects each total-loss vehicle to determine its unique mileage, equipment, and pre-loss condition. Ex. B,

3

Green Dep. 13:4-15. When the adjuster inputs this information, the Mitchell Software yields a vehicle valuation report. Ex. C, Fries Dep. 29:15–30:8.

After reviewing the report for accuracy, adjusters typically calculate a settlement offer using the Mitchell-estimated value, taxes, and deductible. *See, e.g.*, Ex. D, Mitchell WCTL Market Survey at 4; Ex. E, Total Loss Best Practices at 4. Pursuant to UFCC's Policy, the settlement payment is "made according to [the insured's] interest and the interest of any lienholder shown on the declarations page." Dkt. 12-2, Policy at 27. As a result, offers are typically made to the titled owner, which is not necessarily the named insured. *See* Ex. F, Mayer Dep. 58:19–59:10 (describing settlement discussions with vehicle owner Scott Thurston, where Matthew Thurston was the insured). While owners are generally satisfied with the initial offer and accept it, some dispute the value and negotiations ensue. Ex. B, Green Dep. 37:20–39:1; Dkt. 58-8, Retton Decl. ¶ 13. Adjusters may make changes to condition ratings to increase the ultimate value; allow the vehicle owner to submit additional comparable vehicles for consideration; request a different type of valuation report not at issue in this case; offer the vehicle owner an additional sum or waive the deductible; or they may hire a third-party appraiser consistent with the Policy's appraisal provision. *Id.*; Ex. B, Green Dep. 37:20–41:5; Ex. C, Fries Dep. 45:11-20. These are some of the many reasons UFCC may have paid more on a claim than is reflected on the Mitchell valuation. Dkt. 58-8, Retton Decl. ¶¶ 11–13 (providing examples of claims that did not settle based on a Mitchell value with a PSA); Ex. C, Fries Dep. 32:11–33:17.

While UFCC maintains data reflecting the claims for which a Mitchell vehicle valuation report was generated, the fact that a report was generated does not mean: (1) the Mitchell report included a PSA; (2) the Mitchell report was the basis of a settlement offer; or (3) the Mitchell report was the basis of the claim payment. Dkt. 58-8, Retton Decl. ¶¶ 5–7, 11–13. The only way

to determine whether UFCC paid a claim based on a Mitchell value with a PSA is to manually review the claim notes for each total loss claim—which can span hundreds of pages—and make factual findings regarding the basis for any final settlement payment. *Id.*

### B.     The Mitchell Software and the Projected Sold Adjustment

The Mitchell Software and methodology were developed by Mitchell and J.D. Power, two leading providers of automotive industry analytics. Ex. G, Am. Kroell Decl. ¶¶ 4, 8–10; Dkt. 59-3, Walker Rpt. ¶ 11. The first step of the methodology is to identify comparable vehicles (vehicles the same year, make, and model as the total-loss vehicle) that were either recently listed for sale or sold in the area. Ex. G, Am. Kroell Decl. ¶ 5; Dkt. 59-3, Walker Rpt. ¶ 13. Plaintiffs state in their Motion that the Mitchell Software then applies the PSA "systematically" to "all total-loss claims," Mot. at 17, but that is incorrect. If the comparable vehicle recently sold or is listed for sale at a "no haggle" or "one price" dealership, the Mitchell Software does not apply a PSA. Ex. G, Am. Kroell Decl. ¶ 7; Ex. H, Sample Valuation Reports (showing no PSAs). Only if the comparable vehicle is listed for sale at a traditional dealership, where negotiation is common, is a PSA applied to estimate the vehicle's true market value. Ex. Y, Am. Spizzirri Rpt. ¶ 34 (reliance on list price of a vehicle "disregards the industry standard behavior of negotiating a discount" and would be inaccurate).

The values of each comparable vehicle are then adjusted for differences in mileage and equipment as compared to the loss vehicle, and the adjusted values are averaged to yield a "base value." Dkt. 59-3, Walker Rpt. ¶ 13. The base value is an estimate of the cost to purchase a vehicle of the same year, make, and model, with the same mileage and features, in typical condition. *Id.* ¶¶ 13, 21. The Mitchell Software then adjusts the base value to account for the pre-loss condition of the totaled vehicle, which yields an estimated market value. *Id.* ¶ 13.

Plaintiffs' Motion repeatedly mischaracterizes the PSA as an after-the-fact deduction made by UFCC "to reduce the ACVs of total-loss vehicles." *See, e.g.*, Mot. at 18. That is wrong. PSAs are an integral part of Mitchell's methodology to estimate ACV. Ex. G, Am. Kroell Decl. ¶¶ 15, 18–20; Dkt. 76-2, Bridges Valuation at 12 (describing methodology). Plaintiffs also describe the PSA as "based on subjective and arbitrary criteria," but there is no evidence to support that allegation. *See* Mot. at 10 (citing SAC and Dkt. 89-4, Merritt Rpt.); *but see* Ex. I, Merritt Dep. 83:16–85:19 (conceding he does not know how the PSA is calculated or what data it relies on). Contrary to Plaintiffs' assertions, the PSA is based on a statistical analysis of historical data. Ex. G, Am. Kroell Decl. ¶¶ 7–14.

To calculate the PSA, Mitchell and J.D. Power use (1) data from Mitchell's database of advertised prices with (2) point-of-sale transaction data from J.D. Power's ███████████

███████████████████████████████████████████████████████████

███████████████ *See* Ex. G, Am. Kroell Decl. ¶¶ 8–12.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████. *Id.* ¶¶ 12–14; Dkt. 59-3, Walker Rpt. ¶¶ 32–33 (███████████

███████████████████████████████████████████████████████████

███). In other words, ████████████████████████████████████████

███████████████████████████████████ *Id.*; Ex. G, Am. Kroell Decl. ¶ 12.[2]

---

[2] Plaintiffs' assertions that the PSA calculations are "skewed" are not supported by evidence. *See* Mot. at 12 (citing Retton Dep. 62:25–63:6 and Ex. 3 at PGR_THURSTON_0001161, 0001178). The cited testimony and Mitchell document explain that a PSA is not applied to the list prices of comparable vehicles for sale at "no-haggle" dealerships such as CarMax. This makes sense: those vehicles are expected to sell at list price, so there is no need to project a sales price. Plaintiffs' evidence speaks only to when the PSA is applied, not how it is calculated.

### C.    Plaintiffs' Total-Loss Claims

#### 1.    *Matthew Thurston*

In January 2022, Plaintiff Thurston wrecked his parents' 2012 Volvo XC70. *See* SAC ¶¶ 27–30; Dkt. 58-2, M. Thurston Dep. 39:17–40:16. Because Thurston did not own the Volvo, it was not listed as a covered vehicle on his Policy with UFCC. Dkt. 58-2, M. Thurston Dep. 38:5-9, 39:7-18, 40:17-25, 41:7–43:1, 52:12–53:5. Thurston nonetheless filed a claim with UFCC, representing that his parents' coverage through State Farm had lapsed.[3] *Id*. at 46:14-24, 56:20–57:6; Dkt. 46-8, Claim Notes at PGR_THURSTON_0000104. Based on that representation, UFCC covered the claim. Dkt. 58-3, Mayer Dep. 23:7–24:5, 81:6–82:1, 82:13-19; *see also* Dkt. 46-8, Claim Notes at PGR_THURSTON_0000109.

After determining the Volvo was a total loss, a UFCC adjuster prepared a Mitchell valuation report that estimated the pre-loss ACV was $12,824.37. *See* Dkt. 46-7, Thurston Valuation at 1. UFCC made a settlement offer to Thurston's father, who rejected the offer because he believed the Mitchell value was too low in comparison to Kelley Blue Book ("KBB") values and a quote he obtained by calling a dealer in Baton Rouge. Ex. J, Email Correspondence at 3-4 (writing "[the dealer] informed me that if he had my vehicle on his lot, he would put a price on the vehicle of $17,900 and that $16,500 would be the low end of the offers that he would consider"). Thurston hired counsel, refused an independent appraisal, and then filed the instant lawsuit. *See* Dkt. 46-8, Claim Notes at PGR_THURSTON_0000117–19. UFCC sent Thurston's counsel a check for the undisputed amount, made out to Thurston's father, Dkt. 58-4, but Thurston's father testified that he did not know if he ever received or cashed the check. *See* Ex. K, S. Thurston Dep. 55:18–58:9.

---

[3] Discovery in this litigation later revealed that Thurston's parents did, in fact, have insurance coverage for the Volvo through State Farm at the time of the loss. Dkt. 58-2, M. Thurston Dep. 41:1-6, 43:17–47:6.

### 2.      *Genevieve McDonald*

In February 2019, Plaintiff Genevieve McDonald totaled her 2009 Volkswagen Passat. Dkt. 76-3, McDonald Valuation at 1. After a UFCC adjuster inspected the Passat and rated its condition, the Mitchell Software calculated a base value of $5,408.75 and a downward condition adjustment of $1,110.38, for a total market value of $4,298.37. *Id.* at 1, 3. When the adjuster presented this value to McDonald, she accepted and expressed relief that the amount was "honestly more than she thought it would be worth" and stated she was "glad to be out from under this 8k loan on a car worth half of that[.]" Ex. L, McDonald Claim Notes Excerpt; *see also* Ex. M, McDonald Dep. 116:4-20. McDonald remained satisfied with her settlement for four years—until she saw a Facebook post from Plaintiffs' counsel seeking out UFCC insureds to join Thurston's lawsuit. Ex. M, McDonald Dep. 31:22–32:5, 119:25–120:5; Ex. N, Facebook Post.

At the time of the loss, McDonald owed her lienholder more than $8,200 on the Passat. Ex. O, Letter of Guarantee. Because UFCC's Policy requires payment according to interest, UFCC paid the entire settlement amount of $4,034.78 to McDonald's lienholder. Ex. P, Remittance. McDonald was responsible for the remaining balance, but her lienholder ultimately agreed to charge off the outstanding balance for a one-time payment of $2,500.00. Ex. M, McDonald Dep. 130:7-24; Ex. Q, Lienholder Settlement Offer. Thus, even if UFCC had estimated a higher value for McDonald's Passat, that money would have been owed to the lienholder—not McDonald.

### 3.      *Katherine Bridges*

In September 2023, Plaintiff Katherine Bridges wrecked her 2020 Kia Telluride, which caught fire, resulting in a total loss. Ex. R, Bridges Dep. 24:18-19, 45:7-9. The Mitchell Software calculated a base value for Bridges' car of $33,731.80. Dkt. 76-2, Bridges Valuation at 1. Bridges did not raise any concerns with this valuation. Ex. R, Bridges Dep. 20:13-18.

Because the Telluride was a total burn, the adjuster could not inspect the pre-loss condition and did not apply a condition adjustment. Dkt. 76-2, Bridges Valuation at 1, 5. The odometer was inoperable, so the adjuster input an estimated mileage of 83,411. *Id.* at 1; Ex. R, Bridges Dep. 56:24–57:15. However, Bridges later testified—and her service records confirmed—that the Telluride had reached 84,432 miles weeks before the loss. Ex. R, Bridges Dep. 57:16–60:16. The erroneous mileage estimate caused Mitchell to miscalculate mileage adjustments that were overly generous to Bridges. Ex. S, Suppl. Walker Rpt. ¶ 6. Additionally, Bridges' Telluride had an optional "Towing Package" annotated by the Mitchell Software as including a "Tow Hitch w/Harness." Dkt. 76-2, Bridges Valuation at 4. However, the "Tow Hitch w/ Harness" was also noted as a standalone option. *Id.* This resulted in duplicative upward equipment adjustments for the tow hitch and overvalued her vehicle by $417.07. *Id.* at 6–11; Ex. S, Suppl. Walker Rpt. ¶ 7.

## III.    ARGUMENT AND CITATION TO AUTHORITY

### A.    Plaintiffs Rely on the Wrong Legal Standard

Plaintiffs rely on outdated legal authority to argue that class certification may be premised on allegations. But "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). And departure from the usual rule requires a putative class representative to "affirmatively demonstrate" that he has met all requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 18 (1st Cir. 2015). The proposed class must also satisfy at least one provision of Rule 23(b). *Glynn v. Maine Oxy-Acetylene Supply Co.*, No. 2:19-CV-00176-NT, 2020 WL 6528072, at *2 (D. Me. Nov. 5, 2020). Here, Plaintiffs seek certification under Rule 23(b)(3), requiring that "questions of law or fact common to class members predominate over any questions affecting only individual members."

Class certification is proper only if "the trial court is satisfied, after a rigorous analysis" that the Rule 23 requirements are met. *Dukes*, 564 U.S. at 350–51. A rigorous analysis "will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351.

Plaintiffs' Motion asserts that for purposes of class certification, this Court may "consider the allegations in a complaint as true." Mot. at 15 (citing *In re PolyMedica Corp. Securities Litig.*, 432 F.3d 1, 5 (1st Cir. 2005)). That is wrong. "Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. Instead, "plaintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275–76 (2014) (emphasis in original). The *PolyMedica* decision Plaintiffs cite pre-dates *Dukes* and applies the standard the Supreme Court later recognized as an "obsolete view." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 480 n.10 (2013). Since *Dukes*, the Supreme Court has made clear that a putative class action plaintiff must satisfy Rule 23's requirements with evidence, not mere allegations. *Comcast*, 569 U.S. at 33–34; *see also Gladu v. Fitzpatrick*, No. 1:18-CV-00274-GZS, 2018 WL 4489456, at *3 (D. Me. Sept. 19, 2018) ("The movant must be prepared to prove that each of the Rule 23(a) requirements is met 'in fact,' and must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).").[4] This, alone, is fatal to Plaintiffs' Motion because Plaintiffs—relying on the improper standard—have failed to present any evidence demonstrating compliance with Rule 23.

---

[4] Plaintiffs also rely on *Amgen* for the proposition that the Supreme Court "rejected" that predominance must be shown through evidence. But in *Amgen*, the Court rejected the argument that certification "must be denied unless" plaintiff "proves materiality." Materiality is not a Rule 23 requirement, it was an element of the plaintiffs' claim.

10

**B.      Individualized Questions Regarding the Accuracy and Fairness of Each Insured's Settlement Offer Will Predominate**

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). As the First Circuit has explained, courts must "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008). In assessing predominance, district courts must determine whether "any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.'" *In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018). Inefficiency cannot be eliminated by "presuming to do away with the rights a party would customarily have to raise plausible individual challenges." *Id.* at 52.

At the core of Plaintiffs' claims is the allegation that UFCC undervalued their total-loss vehicles through application of the PSA. SAC ¶ 9 ("Rather than pay Plaintiffs the value of their vehicles, Progressive instead chooses to conspire with another company and not pay Plaintiffs what they were owed."); Mot. at 6, 13 (the PSA "reduces the amount that Defendants are required to pay their insured under the policy in violation of Maine law," and "Defendants deflate" valuations "to settle claims with insureds for less than required"). UFCC's liability under the UCSPA and UTPA as well as Plaintiffs' Article III standing all hinge on whether UFCC's estimates of ACV were accurate and fair. This is the predominant issue in the case, and Plaintiffs have failed to show that it can be resolved on a classwide basis without the case devolving into thousands of mini-trials on the specifics of each putative class member's total loss settlement.

*1.      Determining the ACV of Each Total-Loss Vehicle Is Critical for Liability and Article III Standing*

To succeed on their claims at trial, Plaintiffs will have to prove that UFCC paid less than

11

ACV for their totaled vehicles. This is because Maine law does not recognize a UCSPA claim where the insurer promptly pays the benefits owed under the policy. *Cook v. USAA Casualty Ins. Co.*, No. 1:16-cv-00207-JCN, 2020 WL 556394, at *12 (D. Me. Feb. 4, 2020) (granting summary judgment to insurer on a UCSPA claim where "the uncontested evidence shows that Defendant promptly responded to Plaintiff's communications and remitted payments on the basis of actual cash value, as required by the policy"); *see also* 24-A M.R.S. § 2436-A (limiting claims to a "person ***injured*** by any of the following actions…" (emphasis added)). And the "plain language of the [UTPA] denies relief for plaintiffs who do not demonstrate injury from the alleged deceptive or unfair practice." *Tungate v. MacLean-Stevens Studios, Inc.*, 1998 ME 162, ¶ 13, 714 A.2d 792, 798; *see also* 5 M.R.S. § 213(1) (affording right of action to those who "suffer[] any loss of money or property, real or personal, as a result of" an unfair or deceptive practice); *Sweet v. Breivogel*, 2019 ME 18, ¶ 21, 201 A.3d 1215, 1221 ("To recover under the UTPA, a party must demonstrate 'a loss of money or property as a result of a [UTPA] violation….' In other words … [plaintiffs] must demonstrate that they did not receive the value that should have been conferred.").

Whether UFCC underpaid Plaintiffs' claims is also critical to the threshold issue of standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Lewis v. Geico*, 98 F.4th 452, 460–61 (3d Cir. 2024) (vacating class certification of claims challenging condition adjustments in total-loss valuations because, even though the challenged adjustment "reduced" the plaintiffs' valuations, other adjustments cancelled out the reduction such that the plaintiffs had not suffered any financial injury). In this case, UFCC owes each insured up to the ACV of their vehicle. Thus, proving that Plaintiffs were injured requires proof that the amount UFCC offered—and ultimately paid—was less than ACV. *See, e.g.*, *Henson v. Progressive Premier Ins. Co. of Illinois*, No. 5:22-CV-00182-M, 2024 WL 3051264, at *11 (E.D.N.C. June 10, 2024) (denying class

certification for lack of predominance because "due process requires that Progressive have the opportunity to argue in support of" different methods of determining ACV," which entails a "protracted series of mini-trials for each vehicle"). Plaintiffs do not explain how they can make this showing on a class-wide basis.

### 2.    *Plaintiffs Offer No Common Proof of Undervaluation*

Plaintiffs' Motion asks the Court to assume that the PSA reduces ACV for every total-loss claim. *See* Mot. at 22 (arguing the issue is whether "Defendants applying a PSA to reduce the ACV of total-loss vehicles violate[s] state law."). But there is no evidence supporting the assumption that application of a PSA always results in a value less than ACV.

The only evidence Plaintiffs submit in support of their Motion is the report of their appraisal expert, Jason Merritt. Relying on Merritt, Plaintiffs argue the jury could determine "the true ACV" of Plaintiffs' vehicles by simply subtracting the amount of the PSAs applied in each Mitchell valuation for every insured. *See* Mot. at 10. This theory is based solely on Merritt's testimony that the PSA does not comport with "the comp methodology commonly used by appraisers."[5] Dkt. 89-4, Merritt Rpt. at 7. But whether the PSA complies with appraisal standards is irrelevant to the elements of Plaintiffs' causes of action. Even if the PSA violated some appraisal standard, that would "not . . . prove that the putative class members were underpaid." *Richardson v. Progressive Am. Ins. Co.*, No. 2:18-CV-715-ftm-99MRM, 2022 WL 154426, at *23 (M.D. Fla. Jan. 18, 2022) (denying class certification in case challenging Progressive's use of the Mitchell methodology); *Curtis v. Progressive N. Ins. Co.*, No. CIV-17-1076-PRW, 2020 WL 2461482,

---

[5] Merritt's assertion that the PSA can simply be "backed out" of the Mitchell methodology to reach ACV is wrong. Mitchell's representative testified that ███████████████████████████████████████████████████████████. Ex. G, Am. Kroell Decl. ¶¶ 15–21. This is compounded by the fact that Merritt does not propose a method for doing so that can be applied classwide without assessing every class member's valuation report.

at *3 (W.D. Okla. May 12, 2020) (denying class certification, finding that "the answer to the question of whether Progressive's use of the [Mitchell Software] violated law or contract will not result in a common answer for the purported class, and will require an in-depth look at specific claims, which contravenes the purpose of class litigation").

Critically, Merritt admits that there is no single "true ACV"; there are many valid ways to estimate ACV, meaning that acceptable estimates of ACV will exist within a range. Ex. I, Merritt Dep. 82:13–83:11 (testifying "if two appraisers would use two different or three different comparables or – they would come up with a different number, possibly, and that would be acceptable" and there is "acceptability" of ACV estimates "within a range"); Ex. T, Suppl. Merritt Rpt. at 2 (explaining "there is no single methodology to arrive at a proper opinion as to a loss vehicle's actual cash value."). On this point, the parties agree. Defendants' expert David Kinney— a professional automobile appraiser with five decades of experience—confirms that there are no uniform rules for performing an appraisal of a total-loss vehicle. *See* Ex. U, Am. Kinney Rpt. at 3, 6–7. Instead, there are many methods available to estimate ACV, which results in "a range of good faith estimates of value for any given vehicle." *Id.* at 6. Kinney further explains that it is highly unlikely that two appraisers would reach the same opinion of value, even with respect to the same used vehicle. *Id.* So even if the PSA does not conform with Merritt's preferred methodology, that does not mean that application of a PSA caused an estimate to be unfair or outside the range of acceptable values for that specific vehicle. *Id.* at 7–8. That can only be determined by evidence unique to each vehicle—including other valuations of the vehicle in question to test the accuracy of UFCC's valuation.

Moreover, by Merritt's own standards, simply deducting the PSA from the Mitchell report without individually assessing each vehicle would not yield a valid opinion of ACV. Merritt

concedes ████████████████████████████████████████████████
████████████████████████████████. Ex. I, Merritt Dep. 47:18–48:10, 107:3–108:21. To try and

avoid the individualized process of assessing a vehicle's ACV, Merritt purports to rely on

Plaintiffs' Mitchell reports as an accurate estimate of ACV—after removal of the PSA. But Merritt

admits he did nothing to verify the accuracy of any of the reports' contents. *Id.* at 127:15–131:14,

151:6–153:1 (testifying that he did not confirm the condition, equipment, or mileage for the loss

vehicles or comparable vehicles or the list prices for the comparable vehicles), 161:13-19

(testifying that the entirety of his analysis was to remove the PSA and come up with a new

number). And as Merritt himself explained, appraisers must "██████████████████████

██████████████████████████████████████████████████████████

██████████████████" *Id.* at 43:3–44:6. So Merritt himself admits that his own conclusions are

not reliable because he did nothing to actually assess whether the Mitchell valuation, without the

PSA, is an accurate estimate of the ACV of any vehicle.

As the Ninth Circuit recognized, individualized issues predominate where plaintiffs'

claims require "looking into the actual pre-accident value of the car and then comparing that with

what each person was offered, to see if the offer was less than actual cash value." *Lara*, 25 F.4th

at 1139 ("Because this would be an involved inquiry for each person, common questions do not

predominate."). Numerous courts of appeal have agreed: class certification is improper when the

jury would need to consider conflicting estimates of ACV for each insured's property. *See, e.g.*,

*Sampson*, 83 F.4th at 419–23; *In re State Farm Fire & Cas. Co.*, 872 F.3d 567, 577 (8th Cir. 2017)

("*LaBrier*") (reversing class certification because whether defendant's methodology produced an

"unreasonable estimate of the actual cash value" of damaged property "may only be determined

based on all the facts surrounding a particular insured's … loss"); *Kartman*, 634 F.3d at 888–91

(class certification improper where "each [insured's] claim of underpayment required individualized determination on the merits").[6]

The Fifth Circuit's decision in *Sampson* is instructive. There, plaintiffs challenged an insurance company's valuation methodology, claiming it was required to calculate ACV using the NADA Guide. *Id.* at 417. The Court of Appeals reversed, holding that plaintiffs' theory "creat[ed] an explosion of predominance issues because [the insurance company] has the due process right to argue, for each individual plaintiff, that [ACV] should be determined by a different legally permissible method." *Id.* at 420, 423; *see also Bourque v. State Farm Mut. Auto. Ins. Co.*, 89 F.4th 525, 528 (5th Cir. 2023) (holding class certification was improper where plaintiff's proposed methodology was "just one of many statutorily acceptable methods for calculating ACV").

Likewise, Plaintiffs here seek to certify a class of insureds whose claims were valued using the Mitchell Software and a PSA was applied. Plaintiffs contend UFCC was required to calculate ACV using the Mitchell Software, but without the PSAs. *See* Mot. at 10, 12 (claiming that damages are "equal to the PSA"). Like the insurer in *Sampson*, UFCC has the due process right to argue, for each putative class member, that its valuation was in line with—or exceeded—other legally permissible methods of valuation in Maine. *Henson*, 2024 WL 3051264, at *11 ("[T]here are any number of permissible methods for Progressive to present proof of ACV, and due process requires that they have the opportunity to argue in support of those different methods."); *Ambrosio v. Progressive Preferred Ins. Co*., No. CV-22-00342-PHX-SMB, 2024 WL 915184, at *8 (D. Ariz. Mar. 4, 2024), *perm. app. granted*, No. 24-1633 (9th Cir. Apr. 26, 2024) (denying class

---

[6] *See also Tarrify Properties, LLC v. Cuyahoga Cnty., Ohio*, 37 F.4th 1101, 1106 (6th Cir. 2022) (determining the "fair market value" of property is an "individualized, fact-intensive, and adversarial process"); *Baker v. State Farm Mut. Auto. Ins. Co.*, No. 21-14197, 2022 WL 3452469, at *4 (11th Cir. Aug. 18, 2022) ("[T]he answer to the central liability question—whether [the insurer] … accurately assess[es] diminished value claims … requires a finding that *each* putative class member received a lower reimbursement for his diminished value claim than the contract entitled him to. These are individualized inquiries." (emphasis in original)).

certification on predominance grounds and agreeing that the "question of whether using a PSA violated the policy" would require "thousands of mini trials surrounding valuation"); *Kroeger v. Progressive Universal Ins. Co.*, No. 4:22-cv-00104, 2023 WL 9059523, at *6 (S.D. Iowa Nov. 20, 2023) (denying class certification on predominance grounds and explaining that "Progressive's use of the Projected Sold Adjustment, standing alone, does not mean there has (or has not) been a breach in any particular case of Progressive's contractual duty" to pay ACV).

"Maine law does not require any specific method for establishing the value, and companies may use (singly or any combination of) published valuation guides, market surveys, or independent valuation services" in estimating vehicle values. Ex. V, Maine Bureau of Ins., Auto Claims FAQs at 6. A bulletin from the Bureau of Insurance reiterates to insureds that "several factors affect the ACV" of a vehicle, and ACV estimates can be procured from third-party sources like the "National Automobile Dealers Association (NADA) Guide" or "market value companies" that "provide sales comparisons of similar vehicles in your area." Ex. W, Maine Bureau of Ins., Making the Claims Process Easier at 3. At trial, UFCC will put in evidence of other permissible valuations for each putative class member's vehicle to prove that its valuation—even with the PSA—did not result in underpayment. Consider Plaintiff Bridges' vehicle as an example: the Mitchell value (which included PSAs) was still greater than the NADA and KBB values for the same vehicle. Ex. S, Suppl. Walker Rpt. ¶ 9. This evidence of other permissible values for every putative class member's vehicle creates the "explosion of predominance issues" the *Sampson* court identified.

UFCC will also offer individualized evidence showing that it may have overvalued an individual claim due to some other aspect of the valuation, offsetting any alleged injury from the PSA. *See In re Asacol*, 907 F.3d at 51–52 (holding predominance cannot be satisfied by "presuming to do away with the rights a party would customarily have to raise plausible individual

17

challenges.”). Bridges' claim is illustrative on this point as well. UFCC's assumption regarding the mileage on Bridges' vehicle worked in her favor, as did double-crediting her tow hitch. Ex. S, Suppl. Walker Rpt. ¶¶ 6–7; Ex. I, Merritt Dep. 149:2–150:13 (testifying that inputting the wrong mileage would "change the value of the appraisal"). UFCC's expert economist, Dr. Walker, offers unrebutted testimony that Mitchell valuations rest on multiple assumptions that favor insureds. Dkt. 59-3, Walker Rpt. ¶¶ 30, 66 (assumption that dealer vehicles are in typical condition does not account for dealer reconditioning; assumption that no-haggle dealerships will sell for list price does not account for price reductions over time). All of these factors must be weighed on an individual claim-by-claim basis to assess whether any insured was paid less than they were owed, as even Merritt concedes. *See* Ex. I, Merritt Dep. 47:18–48:10 (testifying that "███████████████ ███████████████████████████████████").

### 3. *Other Individualized Evidence Is Required to Prove Injury*

Even if Plaintiffs show that UFCC undervalued a given vehicle due to a PSA, that still does not suffice to prove liability. Because the class includes insureds who were merely offered a payment based on the allegedly inaccurate Mitchell valuation, Plaintiffs must also prove that UFCC actually ***paid*** each class member based on that value. If UFCC paid the insured a higher amount after negotiation, or due to a different Mitchell report without a PSA, that insured has not been injured by application of a PSA. This showing will require documentation specific to each claim. Plaintiffs must also prove—again, with documentation specific to each claim—that payment was made to the insured, rather than a third-party owner. When the insured is not a legal owner of the loss vehicle, as was the case with Plaintiff Thurston and others in the 25 sample claims, the insured is not entitled to the settlement proceeds. Dkt. 58-8, Retton Decl. ¶ 15; Dkt. 12-2, Policy at 27 ("Payment … will be made according to your interest and the interest of any

lienholder…"). In that scenario, underpayment cannot cause injury to the insured.

Consider the evidence necessary to make these determinations just for Plaintiff Thurston. Documents and testimony indicate that Thurston's parents legally owned the Volvo at the time of the loss, *Supra* II.C.1, though Plaintiffs seem to dispute ownership. *See* Dkt. 71 at 2–3. Documents also show that UFCC issued a check for the undisputed amount to Thurston's father, but testimony suggests he did not cash the check. *Supra* II.C.1. The jury will therefore have to resolve factual issues specific to Plaintiff Thurston to determine whether he was injured by application of a PSA and whether he can even assert claims under the UTPA or UCSPA.[7] *See Hoglund ex rel. Johnson v. DaimlerChrysler Corp.*, 102 F. Supp. 2d 30, 32 (D. Me. 2000) (dismissing UTPA claims brought against seller by son related to vehicle purchased by his parents); 24-A M.R.S. § 2436-A (limiting actions to a "person injured" by their own insurer). These issues are emblematic of the individual issues that will exist among putative class members—and will predominate at trial.

## C.    Plaintiffs' Purportedly Common Questions Are Not Common, and Are Overwhelmed by Individual Issues

The commonality requirement necessitates that a plaintiff prove "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy commonality, a plaintiff's claims must "depend upon a common contention…of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. This requirement is not met merely through "the raising of common 'questions'—even in droves—but rather, [through] the capacity of a class-wide proceeding to generate common ***answers*** apt to drive the resolution of the litigation." *Id.* (emphasis added); *see also Parent/Pro. Advoc. League v. City*

---

[7] For the same reasons, Thurston cannot satisfy the typicality requirement of Rule 23. *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 260 (D. Mass. 2005) ("[W]here a named plaintiff may be subject to unique defenses that would divert attention from the common claims of the class, that plaintiff cannot be considered typical of the class.").

   
*of Springfield*, 934 F.3d 13, 28 (1st Cir. 2019).

Plaintiffs identify four purportedly common questions. The first question asks, "Do Defendants present ACVs to their insureds that include a deduction based on software created PSAs?" That question, however, will not "drive the resolution" of any claim in this case. Neither the policy nor Maine law contain any prohibition on applying PSAs. So determining whether a PSA has been applied will not resolve any issue driving resolution of Plaintiffs' claims. Moreover, even if relevant, the evidence shows the answer to this question is "sometimes," as many Mitchell reports do not include PSAs and UFCC sometimes uses other methods to determine ACV. *Supra* II.A–B; Ex. H, Sample Valuation Reports. There is thus no common answer to this question.

Plaintiffs' other three purportedly common questions simply ask whether UFCC's application of PSAs constitutes a violation of the UCSPA or UTPA. Whether UFCC's conduct violates the law is not a common question. *Dukes*, 564 U.S. at 349–50 ("Commonality requires . . . that the class members have suffered the same injury ... [not] merely that they have all suffered a violation of the same provision of law."). The key inquiry for commonality is whether the elements of Plaintiffs' claims are subject to common proof. *See Raposo v. Garelick Farm, LLC*, 293 F.R.D. 52, 55 (D. Mass. 2013) (commonality requirement is met when "questions that go to the heart of the elements of the cause of action" will "each be answered either 'yes' or 'no' for the entire class" and "the answers will not vary by individual class member"). Here, Plaintiffs' claims are not.

### 1. *Plaintiffs' UCSPA Claims Hinge on Numerous Individualized Questions*

With respect to their UCSPA claim, Plaintiffs contend the first common question is: "Do Defendants' ACV settlement offers reduced by the software[-]generated PSAs misrepresent pertinent facts and/or policy provisions related to ACVs [sic] coverage required under the policies in violation of 24-A M.R.S. § 2436-A(1)(A)?" But Plaintiffs do not explain how they purport to

answer that question with evidence that is common to the class. Nor could they.

As the Court acknowledged in its order on Defendants' motion to dismiss, "[t]o establish a knowing misrepresentation, a plaintiff must provide evidence demonstrating something more than a mere dispute between the insurer and insured as to the meaning of certain policy language." Dkt. 22 at 12 (quoting *Curtis v. Allstate Ins. Co.*, 2002 ME 9, ¶ 24, 787 A.2d 760 (Me. 2002)). Rather, "[k]nowing misrepresentation means to be aware that you are misrepresenting something. In other words, you know the policy says one thing and means one thing but you tell the insured something else." *Saucier v. Allstate Ins. Co.*, 1999 ME 197, ¶ 21, 742 A.2d 482, 489 (Me. 1999).

Here, Plaintiffs have no evidence whatsoever that UFCC knew (or even suspected) that Mitchell valuations with PSAs uniformly undervalued vehicles.[8] Indeed, Plaintiffs have no evidence of uniform undervaluation at all. As discussed above, whether any Mitchell valuation with a PSA misrepresented the ACV of a given vehicle is an inherently individualized question that cannot be answered on a class-wide basis. *See, e.g.*, *Lara*, 25 F.4th at 1139; *Kroeger*, 2023 WL 9059523, at *7–8 (concluding undervaluation of "one claim brought by one policyholder (Kroeger) will not shed light on—much less conclusively answer" whether any other claim was undervalued). Even if Plaintiffs could prove that a particular vehicle was undervalued, they would also be required to prove that the UFCC adjuster who made the settlement offer knew it was inaccurately low. This would necessarily require evidence specific to each UFCC adjuster and each total-loss claim. Thus, whether UFCC made a knowing misrepresentation regarding ACV is not a common question: the answer depends on the facts of each putative class member's claim.

---

[8] In its motion to dismiss order, the Court allowed this claim to proceed based, in part, on allegations that Defendants "conspired" and "coordinated" with Mitchell to arbitrarily reduce total-loss values, and because "[i]nsurers are 'responsible for the actions of all their representatives.'" Dkt. 22 at 13–14 (quoting *Saucier*, 1999 ME 197, ¶ 20). However, Plaintiffs have no evidence of any such conspiracy, nor is there evidence that Mitchell had knowledge of undervaluation that could be imputed to UFCC.

Plaintiffs' next attempt at articulating a common question fails for similar reasons. Plaintiffs ask, "Do Defendants fail to effectuate the prompt, fair, and/or equitable settlement of claims submitted by offering settlements that include ACVs reduced by the software developed PSAs in violation of 24-A M.R.S. § 2436-A(1)(E)?" This question is facially individualized. As both experts agree, whether a settlement offer is "fair" or "equitable" depends on how closely it aligns with other estimates of the loss vehicle's ACV. *See, e.g.*, Ex. X, Merritt *Drummond* Dep. 17:12-17 ("The opinion of ACV being correct would mostly be confirmed with other appraisals"); Ex. U, Am. Kinney Rpt. at 8 ("Only by considering all the available evidence and sources of vehicle valuations would it be possible to draw a conclusion as to whether Mitchell's software resulted in the undervaluation of any particular vehicle"). Consider McDonald's vehicle. The pre-condition-adjusted value estimated by Mitchell was $5,408.75; the NADA Clean Retail Value was lower at $5,075; and the KBB value was slightly higher at $5,509. *See* Ex. S, Suppl. Walker Rpt. ¶ 14. While Plaintiffs contend the base value of McDonald's vehicle should have been $5,918.15, *see* Ex. T, Suppl. Merritt Rpt. at 9, a jury must consider evidence of these other valuations to assess whether UFCC's offer was somehow unfair or inequitable. Similar evidence would be necessary for each insured's vehicle, which will cause vehicle-specific valuation issues to predominate.

Moreover, Plaintiffs' purportedly "common" question ignores a critical element of their UCSPA claim. To prevail, Plaintiffs must prove that UFCC acted "without just cause," meaning "it refuse[d] to settle claims without a reasonable basis to contest liability, the amount of any damages or the extent of any injuries claimed." 24-A M.R.S. § 2436-A(2). In allowing this claim to proceed past the pleading stage, this Court relied, in part, on an inference that Plaintiff Thurston made a demand for additional damages that UFCC refused to cover. *See* Dkt. 22 at 15. However, Plaintiffs McDonald and Bridges testified that they did not dispute UFCC's valuations and instead

accepted UFCC's settlement offers without any demands for additional damages. *See, e.g.*, Ex. M, McDonald Dep. 116:4–117:21; Ex. R, Bridges Dep. 20:13-18. UFCC could not have "refused to settle" or "contested" a demand that was never made. Whether any putative class member demanded a higher amount, whether UFCC refused to settle for that amount, and whether UFCC's basis for any such refusal was "reasonable" are questions that can only be answered by considering the unique facts and circumstances of each insured's claim. *Cf. Forcucci v. U.S. Fidelity & Guaranty Co.*, 817 F. Supp. 195, 201–02 (D. Mass. 1993) (recommending the grant of summary judgment for insurer on unfair claim settlement practices claim under Massachusetts law after analyzing amount and timing of insurer's settlement offer in relation to its internal valuation, plaintiff's demand, and arbitrator's award).

### 2.    *Plaintiffs' UTPA Claims Inject More Individualized Questions*

Plaintiffs' final "common question" asks, "Is Defendants' use of the software created PSAs to reduce the ACVs required under the policies an unfair and/or deceptive act and/or practice, constituting a violation of 5 M.R.S. § 207?" Mot. at 18. Again, this simply asks whether UFCC violated the law, which is not a proper common question for purposes of Rule 23. *Dukes*, 564 U.S. at 349–50. Plaintiffs fail to explain how they intend to prove an unfair or deceptive practice with common evidence. And proving a UTPA violation—under either the unfairness or deceptiveness prongs—will necessarily require individualized proof.

First, whether the PSA is "unfair" turns on evidence specific to each consumer. The Law Court has stated that "[t]o justify a finding of unfairness, the act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition." *State v. Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200, 206. First, whether a consumer has been "injured"

by the PSA requires a finding of underpayment, which is not a common question for all the reasons set forth above. *Supra* III.B.2–3. Additionally, there is no common answer to whether the alleged harm caused by the PSA was "reasonably avoidable by consumers." In determining whether an alleged harm is reasonably avoidable, courts consider whether the harm is noticeable before "substantial harm ha[s] already been inflicted." *James v. GMAC Mtg. LLC*, 772 F. Supp. 2d 307, 323 (D. Me. 2011). For those putative class members who were given their Mitchell reports—as all three Plaintiffs were—the effect of the PSA was apparent from the face of the report. Indeed, some putative class members likely avoided any impact from the PSA by negotiating or demanding appraisal. *See* Dkt. 58-8, Retton Decl. ¶¶ 12–13.

Plaintiffs' UTPA claim is also not susceptible to classwide proof because "it is not possible for members of the class to prove that deceptive or misleading statements caused them damage unless they show that they relied on the statements." *Sanford v. Nat'l Ass'n for the Self-Employed, Inc.*, 264 F.R.D. 11, 16 (D. Me. 2010); *see also GxG Mgmt., LLC v. Young Bros. & Co.*, 457 F. Supp. 2d 47, 50–51 (D. Me. 2006) (granting summary judgment on UTPA claim where plaintiff could not show evidence of detrimental reliance). Whether any class member relied on the allegedly deceptive adjustment depends on individual circumstances, rendering the question of whether the PSA is deceptive incapable of generating a common answer. *See, e.g.*, *Millett v. Atl. Richfield Co.*, No. CIV.A. CV-98-555, 2000 WL 359979, at *12–13 (Me. Super. Mar. 2, 2000) (holding "class certification is inappropriate in cases where individualized proof of reliance is required" and that "causation is an individual issue which will have to be tried separately for each plaintiff in order for him or her to prevail on their claims of … violation of the [UTPA]"); *Larsen v. Vizio, Inc.*, No. SACV1401865CJCJCGX, 2017 WL 11633132, at *8 (C.D. Cal. Apr. 27, 2017) (interpreting Maine law and denying class certification because "individual issues regarding

reliance will predominate for this cause of action under the Maine UTPA"); *In re Light Cigarettes Mktg. Sales Pracs. Litig.*, 271 F.R.D. 402, 416 (D. Me. 2010) ("Whether the class members were damaged because of the Defendants' misrepresentations is an individual inquiry that cannot be proven on a class-wide basis.").

For these reasons, Plaintiffs have failed to identify any common question at all, and individual issues will predominate in adjudicating liability on Plaintiffs' claims.

### D.      Plaintiffs Fail to Demonstrate Ascertainability

The First Circuit has held that there is an implied requirement in Rule 23(a) that the class definition "be 'definite,' that is, the standards must allow the class members to be ascertainable." *In re Nexium*, 777 F.3d at 19; *see also Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986) (the "description of [a] class must be sufficiently definite so that it is administratively feasible to determine whether a particular individual is a member"). Plaintiffs have failed to prove that the proposed class is ascertainable.

Plaintiffs assert that Defendants "have already identified the universe of potential class members," pointing to the Declaration of Michael Silver filed in support of removal, which states that Defendants "settled 6,436 first-party total loss claims under automobile insurance policies issued in the state of Maine for which a Mitchell valuation report was generated." Dkt. 1-6, Silver Decl. ¶ 4. But Silver's "universe" of claims is overinclusive: it includes claims where the Mitchell report does not have a PSA. Indeed, in a sample of just 25 claims, 6 claims (24%) had Mitchell valuation reports that did not include a PSA and thus would not be included in the class. Ex. H, Sample Valuation Reports. Plaintiffs speculate that they could easily identify these claims by reviewing the Mitchell reports, but they offer no evidence that obtaining and reviewing Mitchell valuation reports for more than 6,000 claims would be feasible. Silver's "universe" is also

underinclusive because it is limited to claims that were "settled," and therefore excludes claims like Plaintiff Thurston's where a settlement was offered, but not accepted.

Plaintiffs also overlook entirely other factors that will come into play in determining class membership, which cannot be accomplished by a formulaic review of records. Plaintiffs define the class as all insureds with a total-loss claim where UFCC "based its claim payment offer" on a Mitchell valuation report that included a PSA. But determining whether an offer was a "based on" a Mitchell report necessarily requires resolution of disputed factual issues. For example, some insureds were offered settlements based on a different policy limit or an alternative valuation—even though a Mitchell report may have been generated. Dkt. 58-8, Retton Decl. ¶¶ 12–13. For some claims, UFCC makes multiple offers based on negotiations with the insured. *Id*. ¶¶ 10, 13. For other claims, UFCC does not make an offer to its insured at all, but to a third-party owner of the loss vehicle. Ex. F, Mayer Dep. 58:19–59:10 (discussing settlement with Thurston's father). The finder of fact would need to review each claim file—which is comprised of dozens of documents totaling hundreds of pages—to decide whether UFCC made an offer at all, to whom it was made, and whether it was "based on" a Mitchell report with a PSA. Dkt. 58-8, Retton Decl. ¶¶ 6–7, 9, 18. Thus, class membership is not based entirely on objective criteria. Plaintiffs have failed to put forward any evidence that the class is ascertainable.

**E.      Plaintiffs Are Not Adequate Class Representatives Because They Have Conflicting Interests with The Putative Class**

The adequacy requirement demands that the named plaintiffs fairly and adequately represent the interest of the class, focusing on "conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). At least one fundamental conflict arises here because Plaintiffs purport to waive claims stemming from aspects of UFCC's valuation process other than the PSA. Specifically, Bridges had recently put

new tires on her car, worth about $1,200. Ex. R, Bridges Dep. 69:15–70:2, 75:25–76:2. Bridges

testified that she told UFCC about the new tires, but they were not accounted for in her valuation.

*Id.* at 69:15–70:2. However, Bridges explained she is not challenging UFCC's failure to account

for the tires. *Id.* at 75:17-23. But the new tires alone were worth more her claimed damages from

the PSA, which are only $771.33. *See* Ex. T, Suppl. Merritt Rpt. at 9.

Bridges' waived claim is emblematic of the sort of valuable claims waived under the

artificially constructed PSA challenge. Plaintiffs' tactical decision to accept all aspects of the

Mitchell methodology to contest only the PSA could have serious adverse consequences for absent

class members, many of whom may dispute aspects of their valuation other than the PSA. *See,

e.g.*, Dkt. 58-8, Retton Decl. ¶ 13. These claims can be valuable: disputes as to condition

adjustments alone can be thousands of dollars. *See* Ex. S, Suppl. Walker Rpt. ¶ 14 n.26. Yet

Plaintiffs would walk away from these claims—not only for themselves, but also for putative class

members. This could foreclose the putative class members' ability to individually pursue those

claims, all because Plaintiffs (or their counsel) perceive that it could ease their path to certification.

This decision renders Plaintiffs inadequate representatives. *See In re Relafen Antitrust Litig.*, 225

F.R.D. 14, 28 (D. Mass. 2004) (denying certification where lead plaintiffs' waiver of statutory

claims "necessarily casts doubt on the named plaintiffs' fitness to represent class members who

might prefer to pursue statutory or punitive remedies individually"); *Nafar v. Hollywood Tanning

Sys., Inc.*, 339 F. App'x 216, 225 (3d Cir. 2009) (vacating class certification and remanding for

consideration of whether absent class members' claims would be barred by *res judicata*).

F.     **Plaintiffs Rely on Out-of-Circuit Decisions Going Against the Weight of Appellate
       Authority**

Plaintiffs do not meaningfully address the weight of appellate authority holding that class

certification is improper when the jury would need to consider each vehicle and weigh conflicting

estimates of ACV. Instead, they primarily rely on district court cases from one side of a growing split concerning class certification in actions challenging the PSA. *See* Mot. at 22–24 (citing the "Progressive Cases").[9] Plaintiffs' reliance on these cases is misplaced for several reasons.

*First*, the plaintiffs in the Progressive Cases primarily assert breach-of-contract claims alleging Progressive failed to pay ACV, which the insurance policies defined in terms of "market value." Those insurance policies are different than UFCC's Maine policy. *Supra* II.A (describing the Policy's definition of ACV in terms of "replacement cost"). The plaintiffs in the Progressive Cases argued that Progressive failed to follow the "formula" prescribed in the policy because the PSA was not representative of the relevant used car markets. *See, e.g.*, *Reynolds*, 346 F.R.D. at 136 (granting class certification because "Progressive's Policy specifies the method for calculating ACV: 'the market value, age, and condition of the vehicle at the time the loss occurs'"). Here, Plaintiffs have not alleged UFCC failed to comply with any formula. Nor could they: neither the Policy nor Maine law lay out a formula for determining ACV. *Supra* III.B.2. Further, the plaintiffs in the Progressive Cases introduced numerous experts and third-party data which they proposed to use to prove that the PSA is contrary to the used car market. Plaintiffs here have no such evidence.

*Second*, the plaintiffs in the Progressive Cases sought to certify much narrower classes of insureds whose claims were settled and paid pursuant to specific types of Mitchell valuation reports that included a PSA. *See, e.g.*, *Brown*, 2023 WL 7219499, at *11 (defining class to include insureds with total losses where defendant "based its claim payment on an Instant Report from

---

[9] *Volino v. Progressive Cas. Ins. Co.*, No. 21-cv-06243, 2023 WL 2532836 (S.D.N.Y. Mar. 16, 2023*); Brown v. Progressive Mountain Ins. Co.*, No. 3:21-cv-00175, 2023 WL 7219499 (N.D. Ga. Aug. 3, 2023); *Drummond v. Progressive Specialty Ins. Co.*, No. CV 21-4479, 2023 WL 5181596 (E.D. Pa. Aug. 11, 2023), *perm. app. granted*, No. 23-8035 (3d Cir. Feb. 8, 2024); *Curran v. Progressive Direct Ins. Co.*, 345 F.R.D. 498 (D. Colo. Dec. 18, 2023); *Schroeder v. Progressive Paloverde Ins. Co.*, 713 F. Supp. 3d 523 (S.D. Ind. 2024), *perm. app. granted*, No. 24-8003 (7th Cir. Apr. 8, 2024); *Freeman v. Progressive Direct Ins. Co.*, No. 1:21-cv-03798-DCC, 2024 WL 2044782 (D.S.C. May 8, 2024), *perm. app. granted*, No. 24-177 (4th Cir. July 24, 2024); and *Reynolds v. Progressive Direct Ins. Co.*, 346 F.R.D. 120, 134 (N.D. Ala. 2024).

Mitchell where a Projected Sold Adjustment was applied"). In some of the Progressive Cases, the classes were even narrower, including only those insureds who actually "received compensation" from the defendants pursuant to a Mitchell valuation report with a PSA. *See, e.g.*, *Volino*, 2023 WL 2532836, at *12 (certifying class of insureds who "received compensation for the total loss"). And the plaintiffs in the Progressive Cases had an expert who claimed to be able to efficiently identify class members. *Id.* at *6. Plaintiffs here lack any evidence at all.

*Third*, the Progressive Cases do not involve the individualized issues raised here under the UCSPA and UTPA. Unlike the Plaintiffs in this case, the plaintiffs in the Progressive Cases did not have to prove that the defendants knew each settlement offer was a misrepresentation of ACV; that each class member demanded additional amounts; that each ACV estimate was "without just cause"; or that each class member relied on any deceptive statement. *Supra* III.C.

Nonetheless, the decisions on Plaintiffs' side of the split were wrongly decided, at odds with appellate authority (noted above), and in many cases presently under review.[10] Plaintiffs' Motion fails to mention that three of the Progressive Cases are currently under discretionary, interlocutory review in the Third, Fourth, and Seventh Circuits. *Progressive Specialty Ins. Co. v. Drummond*, No. 23-8035 (3d Cir. 2024); *Progressive Paloverde Ins. Co. v. Schroeder*, No. 24-8003 (7th Cir. 2024); *Progressive Direct Ins. Co. v. Freeman*, No. 24-177 (4th Cir. 2024).

Plaintiffs also rely on *Jama v. State Farm Mutual Auto. Ins. Co.*, 113 F.4th 924 (9th Cir. 2024). But *Jama* is inapplicable here. In *Jama,* the Ninth Circuit held that class certification is

---

[10] In *Curran*, the court incorrectly found—as Plaintiffs argue here—that for purposes of class certification, it must "accept the substantive allegations of the complaint as true." 345 F.R.D. at 503. The other courts that have certified classes accepted the plaintiffs' theory of the case—which differs from Plaintiffs' theory here—without probing whether the policy or evidence could support that theory. *See, e.g.*, *Volino*, 2023 WL 2532836, at *8 (deferring to the plaintiffs' bare allegation that their claims turned on whether "applying the PSA was a legitimate methodology"); *Brown*, 2023 WL 7219499, at *8 (same). Likewise, the *Brown* decision relied heavily on the certification order reversed by *Sampson*. *Id.* These are not examples of the "rigorous analysis" that the Supreme Court requires. *Comcast*, 569 U.S. at 27–28.

proper where insureds challenge an adjustment that state law "entirely forbids." *Id.* at 935 (discussing a Washington total loss regulation that "explicitly laid out" the permissible deductions). In other words, class certification was premised on a straightforward legal question. But Maine law has no blanket prohibition on negotiation adjustments. Thus, there is no straightforward, common legal question that will drive resolution of Plaintiffs' claims. Ultimately, *Jama* affirmed *Lara*'s holding, that when a claim requires proof that each class member "received less than the[ir] vehicle's pre-crash '[ACV],'" common issues do not predominate if individualized inquiries might show that the insurer still "accurately approximated or overestimated" the value of class members' vehicles. *Jama*, 113 F.4th at 930 (citing *Lara*, 25 F.4th at 1139).

As in *Lara*, *Sampson*, *LaBrier*, *Baker*, and *Kartman*, the pivotal question that must be answered here is: Did UFCC pay each insured an amount that reflects a fair estimate of ACV? As these and other courts recognize, there is no way to answer that question with common evidence. Because the value of each car is an individualized issue that predominates over all others, Rule 23(b)(3) bars class certification.

## IV.   CONCLUSION

For these reasons, Plaintiffs' Amended Motion for Class Certification should be denied.

DATED: November 7, 2024.

Respectfully submitted by,

 /s/ Jeffrey S. Cashdan
Jeffrey S. Cashdan*
jcashdan@kslaw.com
Zachary A. McEntyre*
zmcentyre@kslaw.com
J. Matthew Brigman*
mbrigman@kslaw.com

Allison Hill White*
awhite@kslaw.com
Allexia Bowman Roberts*
aroberts@kslaw.com
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
P: (404) 572-4600

Julia Barrett Bates*
jbates@kslaw.com
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, Texas 78701
P: (512) 457-2000

Thomas S. Marjerison
Bar No. 7836
tmarjerison@nhdlaw.com
**NORMAN, HANSON & DETROY, LLC**
2 Canal Plaza
P.O. Box 4600
Portland, Maine 04112
P: (207) 774-7000

*Counsel for Defendants*

*Admitted *pro hac vice*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 7th day of November 2024, a true and correct copy of Defendants' Response in Opposition to Plaintiffs' Amended Motion for Class Certification was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all attorneys of record.

<u>*/s/ Jeffrey S. Cashdan*</u>
Jeffrey S. Cashdan

*Counsel for Defendants*