# Exhibit B

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF MAINE

 3      _____

 4      MATTHEW THURSTON, individually

 5      and on behalf of others

 6      similarly situated,

 7              Plaintiff,

 8         v.                                    Docket No.

 9      PROGRESSIVE CASUALTY INSURANCE            1:22-cv-00375-NT

10      COMPANY and UNITED FINANCIAL

11      CASUALTY COMPANY

12              Defendants.

13      _____

14           AUDIOVISUAL DEPOSITION OF JUSTIN GREEN

15      DATE:          October 2, 2024

16      TIME:          2:07 p.m., Eastern Time

17      LOCATION:      Zoom

18      REPORTED BY:   Alyssa Turner, Remote Notary Public

19      JOB No.:       14345

20

21

22

23

24

25
```

 1   and it would not be a totaled vehicle, so I would be
 2   doing a full estimate on it and getting it sent to a
 3   shop.
 4        Q    How do you -- and -- okay.  So now I'm going
 5   to walk through the process of how you estimate the
 6   value of a total loss.  That's a regular part of your
 7   job, right?
 8        A    I collect the information from the vehicle,
 9   submit it to a third party, Mitchell, and they provide
10   me with the total loss figures.
11        Q    What information do you collect from the
12   vehicle?
13        A    The VIN number, the mileage, if it's
14   available.  I review the options, the condition of the
15   vehicle, that stuff.
16        Q    Where do you get the VIN number on a
17   vehicle?
18        A    VIN number is typically going to be in the
19   driver-side door or up by the windshield.  It would be
20   something that is usually in those two locations.
21        Q    So you say you collect the VIN number and
22   submit it to Mitchell.  Is there a piece of software
23   you use?
24        A    The VIN is -- it's -- well, first, we would
25   confirm that it matches up with the VIN in the claim,

 1  for.

 2      Q    Can you eliminate the projected sold
 3  adjustment from these calculations, if you want to?

 4      A    I know that we can go through and run
 5  different reports, as well as do some negotiating with
 6  a customer, but to just remove the projected sold
 7  adjustment, I do not believe that I can just remove
 8  it.  Typically, if we get to that point, we would try
 9  to find another way to get a agreement on a value.

10      Q    So you don't have an option to not use the
11  PSA, right?

12      A    To just go in and remove it from the report?
13  No.  I do not have that ability, as I don't have
14  control over the reports.  They're supplied by a third
15  party.

16      Q    But you said there were other ways to change
17  the number -- the price of a vehicle, right, or the
18  total loss number?

19      A    Uh-hm.  Yes.

20      Q    And you said -- well, you talked about in
21  general that you, you know, can negotiate with
22  customers about the value of a vehicle?

23      A    It's claim specific and vehicle specific.
24  There's not a set number or a set in -- you know,
25  particular instance where I could tell you this is

```
 1   exactly what we settle on.  It all depends on the
 2   claim and the situations behind it.
 3        Q    Sure.  But you do negotiate with customers?
 4        A    It has happened before.
 5        Q    Have you been trained on what to do when a
 6   customer starts trying to negotiate the number with
 7   you?
 8        A    If a customer does not agree on a total loss
 9   and feels their vehicle's value is worth more, I walk
10   them through the process as to how -- what the total
11   loss dispute process is for -- in the state of Maine.
12   We go down all those options before just doing a
13   straight negotiation.
14        Q    Okay.  But once you've -- once you've gone
15   through -- so what do you mean you go through all --
16   so, like, if we just start on -- do you -- so is the
17   first step for you to explain the report and how you
18   arrived at the number you arrived at?
19        A    My first step is to let them know about the
20   value and to explain to them that this is from a third
21   neutral party that uses data that they collect to be
22   able to come up with a accurate value, therefore a
23   trusted resource that we use.  So that's what I
24   explain to them first.
25        Q    Is that often a successful, sort of, first
```

```
 1   approach?
 2       A    Yes.
 3       Q    And then if that's not successful, what's
 4   the next step you're trained to do to, kind of, help?
 5       A    It really is claim specific, but the typical
 6   total loss dispute process in the state of Maine is
 7   that the owner of the vehicle would send in Internet
 8   links to dealer listings of the same year, make, and
 9   model within the same distance that Mitchell Total
10   Loss used for a distance away from their ZIP code.
11            So, for instance, if Mitchell used 75 miles,
12   they would have to send in links to vehicles for sale
13   at dealerships within 75 miles.  And if it was 200,
14   it'd be 200.  So they would send those in.  We would
15   then take those links that they sent to us, send them
16   to Mitchell Total Loss, and see if they can be
17   considered to adjust the value.
18       Q    Are there other processes you can offer to
19   customers if they -- there aren't a lot of comparable
20   vehicles or they have another method of evaluating
21   their vehicle that they want to use?
22       A    We can set up -- in the state of Maine, at
23   least, we can set up one of two things.  We can offer
24   them that we can find exact-match vehicles, so there
25   would be no adjustments for any different options.  So
```

 1   everything on there would be the exact same build,
 2   mileage -- obviously, you can't get exact match.
 3   That's nearly impossible.  But they would be exact-
 4   match options.
 5          And we also offer dealer quotes.  So,
 6   basically, we would send this to Mitchell Total Loss
 7   requesting dealer quotes.  They then call dealerships
 8   and ask what they would list the vehicle for in this
 9   current condition with these options.  And then they
10   would base the value off of that.
11     Q    So in each instance, sort of, Mitchell is
12   providing the report that you're using to discuss the
13   value of the vehicle with the customer?
14     A    Mitchell does supply the comparable vehicles
15   and the reports for us, but it is all based off of
16   information that we would have to supply to them, as -
17   - if the information that's supplied to them is not
18   accurate, it's not going to be an accurate report or
19   value.
20     Q    And how often does that happen, that a
21   customer submits their own comparable vehicles to try
22   to negotiate the total loss value of their vehicle?
23     A    I wouldn't be able to give an exact answer
24   as to how often?
25     Q    Does it happen many times a month, do you

```
 1   think, with you?
 2       A    Depends.  Sometimes I have people submit
 3   some, sometimes I don't.  It's an exact number or
 4   often.  I wouldn't be able to answer that.  It just --
 5   it has happened in the past.
 6       Q    But you don't know how many times?
 7       A    No.  I would not be able to give you a
 8   amount of times that people have submitted comparable
 9   vehicles to me.
10       Q    You also mentioned running different
11   reports.  What did you mean by another way to get at a
12   different vehicle evaluation would be to run different
13   reports?
14       A    That's the -- the dealer quotes and the
15   exact match -
16       Q    Okay.
17       A    -- which I mentioned.  Yeah.
18       Q    Do you have any training on what to say when
19   customers question the projected sold adjustment?
20       A    I explain to them based -- that it is based
21   off of how when you go to a dealership, you're
22   typically going to negotiate the vehicle's value --
23   the vehicle's sale price lower than what it is listed
24   for, and if they still have questions about it, I also
25   direct them to the final page of the report --  that
```

```
 1                CERTIFICATE OF NOTARY PUBLIC

 2            I, ALYSSA TURNER, A Remote Online Notary of

 3    the State of TEXAS, duly authorized to administer

 4    oaths, do hereby certify:

 5            That I am a disinterested person herein;

 6    that the witness,  JUSTIN GREEN, named in the

 7    foregoing deposition, was by me duly sworn to testify

 8    the truth, the whole truth, and nothing but the truth;

 9    that the deposition was reported by me, ALYSSA TURNER,

10    and is a true and correct record of the testimony so

11    given.

12            IN WITNESS WHEREOF, I hereby certify this

13    transcript at my office in the County of Hunt, State

14    of Texas, this 2nd day of October, 2024.

15                                        [signature: Alyssa Turner]

16

17                                        ALYSSA TURNER

18                    Remote Online Notary Public in and for the

19                                        State of Texas

20

21

22

23

24

25
```

```
 1                   CERTIFICATE OF TRANSCRIBER

 2              I, KIMBERLY JONES, do hereby certify that

 3    this transcript was prepared from the digital audio

 4    recording of the foregoing proceeding, that said

 5    transcript is a true and accurate record of the

 6    proceedings to the best of my knowledge, skills, and

 7    ability; that I am neither counsel for, related to,

 8    nor employed by any of the parties to the action in

 9    which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13                                         Kim Jones
14
15                                         KIMBERLY JONES
16                              CERTIFIED ELECTRONIC TRANSCRIBER
17                                         AAERT CET #1411
18
19
20
21
22
23
24
25
```