# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MATTHEW THURSTON, KATHERINE BRIDGES, and GENEVIEVE MCDONALD, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>PROGRESSIVE CASUALTY INSURANCE COMPANY and UNITED FINANCIAL CASUALTY COMPANY,<br><br>Defendants. | Docket No. 1:22-cv-00375-NT |

## DEFENDANTS' MOTION TO EXCLUDE
## THE REPORT AND TESTIMONY OF JASON MERRITT

# INTRODUCTION

Plaintiffs seek to offer the testimony of appraiser Jason Merritt that the Projected Sold Adjustment ("PSA"), an element of Mitchell's WorkCenter Total Loss ("WCTL") vehicle valuation software, is "inconsistent with" appraisal standards. Yet Merritt offers no methodology, or any support whatsoever, in support of that conclusion. Despite having offered this opinion in multiple cases against different insurance companies that use the same or a similar methodology, Merritt cannot identify a single appraisal rule or guideline that the PSA violates. Merritt also disclaims expertise in accepted appraisal standards, like the Uniform Standards of Professional Appraisal Practice ("USPAP"), which directly refute his opinion that it is more appropriate to use the "list" or advertised prices of comparable vehicles when conducting an appraisal. Instead, Merritt unapologetically relies on his own set of unwritten standards. This is exactly the kind of subjective and unverifiable *ipse dixit* that Rule 702 forbids.

But that is not all. Merritt also purports to rely on dealership sales practices and his "understanding" of the data that is used to calculated PSAs to opine that application of a PSA is improper. But Merritt does not have any experience or expertise regarding dealership's sales practices. And there is no evidence of dealership sales practices or the PSA data in the record. Merritt's wholly unsupported statements do not serve as a reliable basis for his opinion regarding the PSA.

Merritt further concludes that the actual cash value ("ACV") of Plaintiffs' vehicles can be determined by "simply backing out" the PSA from Mitchell's WCTL reports. This opinion is unreliable and will not assist a jury for a host of reasons. Merritt has no familiarity with the WCTL methodology, much less the details of how the PSA is calculated or applied. Merritt also failed to verify the contents of Plaintiffs' WCTL reports to make sure that they did, in fact, reflect a reliable

1

estimate. Making matters worse, Merritt deliberately ignored evidence from Mitchell which proves that the ACV of Plaintiffs' vehicles cannot be determined by simply removing the PSA from their WCTL reports.

Perhaps most notably, Merritt deviated from his own typical appraisal methodology in forming his opinions in this case. Merritt's typical approach for appraising vehicles requires an individualized review of vehicle-specific factors, combined with his own judgment, as to how such factors—such as condition, mileage, and equipment, among others—impact a vehicle's market value. Merritt did not attempt that process here. In other words, Merritt failed to do the one thing that he is qualified to do and typically does in his profession: appraise Plaintiffs' vehicles. This failure renders Merritt's speculative and wholly unsupported opinion that ACV can be determined by simply removing PSAs from WCTL reports subject to exclusion.

Merritt's report and testimony should accordingly be excluded.

## **BACKGROUND**

### I.     **Merritt's Background and Qualifications**

Merritt's full-time job is providing security and private investigation services through an organization called T3 Intelligence Services. Ex. A, Merritt Dep. Tr. 73:8-17. Merritt founded East Coast Auto Appraisers, LLC in April 2020, as a part-time endeavor, and obtained his first certification to prepare appraisals one month later. Ex. A, Merritt Dep. Tr. at 73:8-17; Ex. B, Merritt *Volino* Dep. Tr. 41:24–42:19.[1] Merritt receives over 75% of his income from T3, and almost all of the income he receives through his appraisal business is from testifying for plaintiffs in cases against insurance companies. Ex. A, Merritt Dep. Tr. 71:22-72:4 ("Most all the income

---

[1] Merritt issued nearly identical reports and opinions in several other cases challenging Progressive's use of the PSA. Merritt testified that his testimony there is substantively the same as his testimony here. *See* Ex. A, Merritt Dep. Tr. 146:3-11.

2

from East Coast is part of litigation."); 74:8-13 (75% of income is from T3).

His certification was first issued by a for-profit company called the "Bureau of Certified Auto Appraisers" ("BCAA"). *See* Dkt. 94-20, Supp. Merritt Rpt. at 1. Merritt testified that BCAA does not have any written appraisal standards, and any standards he applies are the result of his own experiences and informal conversations with other appraisers. *See* Ex. A, Merritt Dep. Tr. 99:7-19; Ex. C, Merritt *Ambrosio* Dep. Tr. 14:10–15:12, 22:21–23:4; Ex. D, Merritt *Freeman* Dep. Tr. 160:19–162:16. Merritt has not read any published materials regarding auto appraisals. Ex. E, Merritt *Brown* Dep. Tr. 53:1–54:18. Further, Merritt has no documents reflecting the "appraisal standards or other professional standards" on which he relied for his opinions. *Id.* at 76:6–77:8. Since Merritt began issuing materially identical opinions in cases challenging the PSA, he took two additional online appraisal courses. Ex. A, Merritt Dep. Tr. 26:20-27-7; 100:16-22.

Merritt has never used WCTL, does not understand how the WCTL methodology operates, and made incorrect assumptions regarding the data on which WCTL relies. *See* Ex. A, Merritt Dep. Tr. 83:16-20 (testifying his understanding of WCTL is limited to the consumer-facing valuation report); Ex. B, Merritt *Volino* Dep. Tr. 101:19–102:11 (admitting his understanding of the data is based on a "guess").

## II.     Merritt's Report and Proposed Testimony

Merritt submitted an expert report opining that the application of the PSA in Mitchell's WCTL methodology is inconsistent with appraisal standards. Dkt. 94-20, Merritt Rpt. at 4-7. Merritt further concludes that once the PSA is removed, Mitchell's WCTL methodology is otherwise "consistent with the comparable methodology routinely applied by appraisers." *Id.* at 5.

Merritt's opinion that the PSA is inconsistent with appraisal standards is based on his view that the "Internet price is often the only data point concerning what a particular vehicle listed with a particular seller would sell for at the time of valuation." *Id.* at 5. Per Merritt, "appraisal standards

3

do not permit arbitrarily deducting the advertised price of a vehicle based on projections of what that vehicle might ultimately sell for." *Id.* at 6. Merritt claims that Internet prices often reflect no-haggle prices as "another reason appraisers cannot assume a vehicle will sell for anything other than its advertised price." *Id.* at 7. But at the same time, Merritt recognizes that some appraisers make "take-price" adjustments to account for the fact that used vehicles sometimes sell for less than the advertised internet price. *Id.* at 7. Merritt also concedes that some appraisal standards permit reducing an advertised price based on a projection of what it might sell for. Ex. D, Merritt *Freeman* Dep. Tr. 162:17–163:21.

Merritt's disagreement with the PSA is also based on his contention that reported sales prices do not reflect the actual cash value of a vehicle because "additional profit opportunities for the dealer"—i.e., financing, selling warranties, or trade-ins—"might result in what may look like a lower sales price but does not reflect a change in the market value of the car." Dkt. 94-20, Merritt Rpt. at 6. However, Merritt does not purport to have any relevant experience working at a dealership or in the car dealership industry. Similarly, Merritt's criticism of the PSA appears to flow from his "understanding based on conversations with counsel" that certain transactions are not considered by Mitchell in connection with calculating PSAs. *Id.* at 7-8. But there is no evidence in the record regarding how PSAs are calculated or what transactions or data is used in connection with calculating PSAs.

Merritt's agreement with the remainder of the WCTL methodology is based solely on his review of the WCTL report prepared for Plaintiffs' vehicles, which includes a short, single page description of the methodology to give insureds a general understanding of the process. *See, e.g.*, Dkt. 86-3 (Thurston's WCTL report). Merritt does not otherwise claim to have any familiarity with the WCTL methodology, including how the software operates or how the underlying data

4

generates total-loss estimates. *See* Ex. A, Merritt Dep. Tr. 83:16-20. Merritt merely assumes that everything else in every WCTL report—except the PSA—is accurate. *See* Ex. A, Merritt Dep. Tr. 115:6 ("I did accept that and just removed the PSA.").

Merritt also opines that calculating the ACV of each putative class member's vehicle is as simple as "backing out" (or removing) the PSA from their WCTL reports, and then recalculating the average of the comparable vehicle prices. Ex. A, Merritt Dep. Tr. 114:14-115:12; Dkt. 94-20, Merritt Rpt. at 8-9. Merritt confirmed that he does not actually know if other adjustments to the WCTL valuation need to be made if the PSA is removed. Ex. A, Merritt Dep. Tr. 96:4-11 ("Q. Do you know whether doing it the way you did it is correct? A. I do not."). And Merritt did not conduct an independent appraisal of Plaintiffs' vehicles, using his own methods, to determine their value or verify the accuracy of Progressive's valuations. Dkt. 94-20, Merritt Rpt. at 3 (defining his scope of work to include a description of "what an appraisal is;" "how to use the comparable methodology[;]" and explain whether Mitchell's use of a PSA is appropriate); Ex. A, Merritt Dep. Tr. 41:22-42:2 ("Q. And did you do an appraisal like this for any of the plaintiffs in this case? A. I did not."). Merritt also did not investigate whether any other aspect of WCTL reports may have been accurate or inaccurate. Ex. A, Merritt Dep. Tr. 127:20-128:3, 129:18-130:6; Ex. C, Merritt *Ambrosio* Dep. Tr. 130:12–131:10, 159:12–166:15.

## **LEGAL STANDARD AND ARGUMENT**

A federal district court judge must play "a gatekeeping role" when considering the admissibility of expert testimony or evidence. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592, 597 (1993). Because "expert evidence can be both powerful and quite misleading," *Daubert*, 509 U.S. at 595, district courts must determine the admissibility of expert testimony as a preliminary matter under Federal Rule of Evidence 104(a). *Id.* at 592. Federal Rule of Evidence

702 is "the primary locus" of a district court's discharge of its gatekeeping responsibility. *Daubert*, 509 U.S. at 589. Expert testimony is admissible under Rule 702 only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The Supreme Court's decision in *Daubert* identified two critical components to Rule 702 relevant here.

*First*, to be admissible, an expert's testimony must be based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. This requirement "establishes a standard of evidentiary reliability" or "trustworthiness." *Daubert*, 509 U.S. at 589–90 & n.9.

*Second*, an expert's testimony must be "not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 562 U.S. 137, 147 (1999). This means that the testimony must be based on something more than "conjecture, hypothesis, subjective belief, or unsupported speculation." *Cavallo*, 892 F. Supp. at 760–61 (internal quotations omitted); Because "conclusions and methodologies are not entirely distinct from one another," expert opinions may not be "connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

I.   **Merritt's Opinion on the Validity of the PSA Lacks Any Indicia of Reliability.**

  A.  **Merritt's opinion is not based on any verifiable methodology, standards, or data.**

Despite opining that the PSA is inconsistent with "appraisal standards," Merritt does not cite to any actual standards, rules, guidelines, industry sources, trade publications, or data, in support of his opinion. *See generally* Dkt. 94-20, Merritt Rpt. Rather, Merritt contends he is applying his own subjective standards, which are not written down anywhere and were learned

6

through word-of-mouth. Ex. C, Merritt *Ambrosio* Dep. Tr. 14:10–15:12; Ex. D, Merritt *Freeman* Dep. Tr. 160:19–161:16; Ex. E, Merritt *Brown* Dep. Tr. 23:12–14 ("Q. Are there any written standards on which you rely for purposes of conducting appraisals? A. No."). In other words, they are unverifiable and untestable, in violation of one of the central tenets of *Daubert*.

When asked to produce documents evidencing the appraisal standards upon which he relied for his opinions and conclusions, Merritt confirmed that no such documents exist. Ex. C, Merritt *Ambrosio* Dep. Tr. 22:21–23:4; Ex. E, Merritt *Brown* Dep. Tr. 76:6–77:8; *but see* Ex. F, Merritt *Davenport* Dep. Tr. 23:4–26:13 (stating that the BCAA may have standards, but he does not have them and did not review them; his opinions are based on his three years of experience instead). When asked what data he relied on to form his opinions, Merritt replied "my own." Ex. D, Merritt *Freeman* Dep. Tr. 27:16–18. Merritt said he is not aware of any articles, journals, or other authorities supporting his opinions. *Id.* at 37:20–38:5, 158:18–159:18. According to Merritt, his appraisal methodology is just "common sense." *Id.* at 192:3–19 (explaining that he thinks Mitchell's other adjustments are acceptable without data because he "see[s] a lot of these and they will seem fair").

The closest Merritt comes to identifying any appraisal standard is a passing reference to the Uniform Standards of Professional Appraisal Practice ("USPAP") in his deposition, and only after Defendants' appraisal expert David Kinney identified USPAP as "the best set of guidelines for appraisals currently available." Dkt. 94-21 at 6-7. Merritt, however, could not identify any USPAP standards and expressly disclaimed any expertise with them. Ex. A, Merritt Dep. Tr. 99:11-100:15 (Q. Are you an expert in USPAP? A. I am not."). Indeed, Merritt has repeatedly disclaimed any knowledge of USPAP standards and even testified that he believed that they do not apply to automobiles. Ex. E, Merritt *Brown* Dep. Tr. 20:6-15 (testifying USPAP standards are for

7

real property and that he does not purport to prepare appraisals in conformity with them).

Witnesses cannot merely rely on their own *ipse dixit* or unsupported say-so as the basis for expert testimony. *See Joiner*, 522 U.S. at 146; *see also Doucette v. Jacobs*, 106 F.4th 156, 169 (1st Cir. 2024) (affirming the exclusion of expert testimony because the court is "well-justified" in prohibiting testimony based on the expert's own ipse dixit); *United States v. Raymond*, 700 F. Supp. 2d 142, 147 (D. Me. 2010) (excluding expert because "[a]ll that I have on this record is the expert's ipse dixit"). By relying solely on his own self-proclaimed standards, that is precisely what Merritt is doing here. His opinions should be excluded accordingly.

Merritt's failure to precisely identify any appraisal standards supporting his opinion is particularly problematic because published appraisal standards do exist. USPAP was adopted by Congress in 1989 and contains standards for all types of appraisal services.[2] "It represents a logical starting point when considering acceptance within the appraisal community." *See* Sofia Adrogue and Alan Ratliff, *Kicking the Tires After Kumho: The Bottom Line on Admitting Financial Expert Testimony*, 37 HOUS. L. REV. 431, 508 (2000). Even Merritt's certifying organization, BCAA, states in its training materials that "USPAP reflects the current standards of the appraisal profession." Ex. C, Merritt *Ambrosio* Dep. Tr. 40:15–41:7. Merritt's BCAA certificate also mentions the USPAP standards: "Jason Merritt has complied with the requirements of USPAP [s]tandard for BCAA Certification of Auto Appraisers." Dkt. 94-20, Merritt Rpt. at 15. Yet when asked, Merritt could not identify a single USPAP standard.[3] *See* Ex. E, Merritt *Brown* Dep. Tr.

---

[2] The Appraisal Foundation, https://www.appraisalfoundation.org/imis/taf/standards/q_as/taf/qas.aspx.

[3] Despite this testimony, in a case pending in South Carolina, *Wiggins, et al. v. State Farm Mut. Ins. Co., et al.*, No. 8:21-cv-03803-DCC (D.S.C.) ("*Wiggins*"), Merritt submitted an appraisal that included language claiming it complied with USPAP. *See Wiggins*, ECF 49-1 at 15 ("Certification of Credibility"). This likely resulted from Merritt's use of a pre-printed form for appraisals that he purchased online. Ex. E, Merritt *Brown* Dep. Tr. 109:3–11 (describing his use of templates).

20:2–23:9. In fact, in recent cases where Merritt has issued identical opinions, Merritt testified that he is unfamiliar with such standards and assumes, without any basis, that they do not apply to automobiles. Ex. C, Merritt *Ambrosio* Dep. Tr. 23:20–24:3 ("Q: What I'm asking is, are you offering any opinions or conclusions in any of these matters as to whether the projected sold adjustment complies with the [USPAP]? A: Again, no, because it did not apply."); *see also* Ex. G, Merritt *Knight* Dep. Tr. 50:10–51:18 ("Q. Has anyone from USPAP told you that USPAP does not apply to auto appraisals? A. Officially from USPAP, no, I've not spoken to anybody.").

Merritt's failure to apply the governing USPAP standards and admission that he is not an expert in USPAP is inexcusable, and only underscores the lack of reliability in Merritt's *ipse dixit* opinions regarding the PSA. *See Davis v. Carroll*, 937 F. Supp. 2d 390, 416 (S.D.N.Y. 2013) (excluding appraisal expert who could not "actually apply any of the well-established methods—[Appraisers Association of America], [American Society of Appraisers], or USPAP").

**B. Merritt's opinion assumes facts that are not in evidence regarding the PSA.**

Aside from the vague "standards" Merritt fails to identify, the only other bases for Merritt's disagreement with the PSA are: (1) unsupported statements regarding dealer's sales practices, and (2) Merritt's claimed "understanding" of the data that is used to calculate the PSA. Dkt. 94-20, Merritt Rpt. at 6-8 Presumably, those statements are copied from Merritt's reports from other cases, because there is no evidence supporting either statement in this case.

As to the first, Merritt is not a dealer and does not claim to have any relevant dealership experience. Merritt makes clear that his opinions regarding dealer's sales practices are based on his limited personal experience working at a Virginia motorcycle dealership and that he cannot say whether they are true at other dealerships, including any in Maine. Ex. A, Merritt Dep. Tr. 54:10-55:19. Merritt even testified that every dealer has its own different business strategy and profit

9

margin in ways relevant to his opinions, *id*. 68:5-69:5, and that he did nothing to verify whether his opinions on dealership practices are true here. *Id*. 67:15-68:4, 102:10-20.

Merritt's statements regarding the data underlying the PSA, based solely on "[his] understanding based on conversations with counsel," are even more improper—and should be excluded entirely. Dkt. 94-20, Merritt Rpt. at 6-7; Ex. A, Merritt Dep. Tr. 84:3-94:18. As an initial matter, it is not proper expert testimony for a witness to merely repeat what counsel told them. *See e.g.*, *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461, 469 (D. Mass. 2017) ("An expert is responsible for ensuring that his opinion is based on reliable data; he may not blindly rely on his client's representations."); *CASHMAN DREDGING AND MARINE CONTRACTING CO., LLC, v. FRANK BELESIMO & CALLAN MARINE, LTD.,* No. 21-CV-11398-DJC, 2024 WL 4894639, at *18 (D. Mass. Nov. 26, 2024) (excluding expert who blindly relies on representations from client or counsel). Even worse, Merritt testified that his "understanding" of the data comes from unidentified lawyers in other unidentified cases. Ex. A, Merritt Dep. Tr. 89:5-15.

Merritt admits that he has never even seen the data on which he purports to opine. *Id.* at 91:2-6. Nothing in Merritt's reliance materials involves the data underlying the PSA. Dkt. 94-20, Merritt Rpt. at 16. And for the conclusions he draws, Merritt makes clear that he does not know for what period they could have been true, Ex. A, Merritt Dep. Tr. 90:17-18, whether they are currently the case, *id*. 91:14-16, or even whether they apply to all or just some vehicles, *id*. 90:22-91:3. Indeed, Merritt expressly disclaimed his ability to opine on his identification of any potential data issues or their impact. Ex. A, Merritt Dep. Tr. 94:12-15 ("Q. Have you done any analysis of the data to quantify the impact of the data exclusion decisions that Mitchell might apply? A. I have not."); *id*. 94:16-18 (Q. Are you able to offer an expert opinion on this issue? A. I have not."). Merritt's opinions regarding the data underlying the PSA should be excluded, and they certainly

10

cannot form a reliable basis for his opinion regarding the validity of the PSA. *See Carrozza v. CVS Pharmacy, Inc.,* 391 F. Supp. 3d 136, 145 (D. Mass. 2019), *aff'd*, 992 F.3d 44 (1st Cir. 2021)) ("A witness who has no relevant expertise or familiarity with a subject matter may not, however, simply parrot the conclusions of an expert who does. At a minimum, to allow such testimony would effectively permit a party to evade the disclosure requirements of Rule 26 and would preclude meaningful cross-examination.").

### II. Merritt's Opinion that the PSA Can Be "Backed Out" of Plaintiffs' WCTL Reports Is Unreliable and Not Helpful to the Trier of Fact.

Merritt also opines that the PSA simply can be "backed out" of the WCTL valuation reports to arrive at the true ACV of Plaintiffs' vehicles. Dkt. 94-20, Merritt Rpt. at 8. This opinion is unreliable and will not assist the jury in deciding the case.

To begin, Merritt's opinions regarding the WCTL methodology and PSA are based on nothing more than speculation. Merritt does not claim to have any familiarity with WCTL—much less the details of how the PSA is calculated and applied to estimate ACV. Ex. A, Merritt Dep. Tr. 84:3-10 (testifying he does not know what data is used to calculate the PSA); Ex. D, Merritt *Freeman* Dep. Tr. 18:1–22 ("Q: Okay. What is the projected sold adjustment, or PSA? A: Projected sold adjustment? It is a valuation, I believe, that some of those reports place on a vehicle. I'm not really sure how they come up with that."). Merritt does not claim to have ever used WCTL or have any knowledge regarding how the methodology operates or the data it relies on. Ex. A, Merritt Dep. Tr. 84:3-10; Ex. B, Merritt *Volino* Dep. Tr. 101:19–102:11. Merritt accordingly cannot formulate a reliable opinion regarding how to reach the "true" ACV of a vehicle using WCTL's methodology.

Merritt's opinions are also unreliable because he admitted that he did not do any work to verify any aspect of the WCTL report for Plaintiffs' vehicles. Ex. A, Merritt Dep. Tr. 116:3-7;

11

127:20-128:3; 129:18-130:6 (testifying he did not verify the accuracy of any other aspects of the WCTL reports); Ex. D, Merritt *Freeman* Dep. Tr. 148:6–152:19 (Merritt testifying that the most he did was "just reviewed [the vehicle valuation reports and] tried to do the best appraisal [he] could do"). This is particularly troubling because Merritt testified that appraisers should not just accept the validity of another appraiser's report. *See* Dkt. 94-20, Merritt Rpt. at 4–7 (explaining that appraisers must rely on hard data). Indeed, in a recent appraisal certification examination, Merritt was asked what an appraiser should do if presented with an appraisal containing errors. Ex. A, Merritt Dep. Tr. 43:7-44:6. Merritt explained that an appraiser must "independently verify the information we use on any Appraisal Report[,]" and that an appraiser cannot use another appraisal if they believe it is flawed. *Id*. Merritt has also testified that it would be "foolish" to assume every WCTL report is accurate as to the vehicle options. Ex. C, Merritt *Ambrosio* Dep. Tr. 82:21–83:8. Yet that is exactly what Merritt does here: Merritt simply assumes every aspect of every WCTL is accurate without conducting any confirmatory appraisal.

Merritt's opinion falls apart under scrutiny. For many total-loss claims—including Mr. Thurston's, Progressive obtains multiple WCTL valuation reports, each reflecting different estimates of ACV. Which of those reports properly reflects the ACV of the vehicle? Merritt does not know because he would assume that every WCTL report (minus the PSA) reflects an appropriate estimate of ACV. In fact, even when the multiple versions of WCTL reports range in $500 from version to version, Merritt testified he "would be comfortable with any three of these reports" because "all three reports are good." Ex. H, Merritt *Sibert* Dep. Tr. 34:8-35:10; 37:3-38:23. When presented with the three versions of Mr. Thurston's WCTL report with different estimates, Merritt testified that he "ha[s] no opinion" on which one resulted in an accurate ACV. Ex. A, Merritt Dep. Tr. 137:8-138:3. That is not a reliable opinion regarding the ACV of any class

12

member's vehicle. And it is certainly not an opinion that could serve as a reliable measure of damages for any class member.

Merritt recently submitted a declaration and appraisal in the *Querette v. Geico* matter, pending in Palm Beach County (No. 50-2022-SC-020310-XXXX-MB) that illuminates the flaws in Merritt's opinions here. In that case, Merritt did not simply accept GEICO's valuation report. Ex. A, Merritt Dep. Tr. 108:12-16. Rather, he ran a CARFAX report for each of the comparable vehicles and removed one because it had a history of damage. Ex. I, Querette Report at 6. He also made adjustments to the condition adjustment based on an independent review of photos of the loss vehicle. *Id*. at 6-7. Merritt's failure to conduct a similar analysis in this case demonstrates the unreliability of his opinions and that they are entirely litigation-driven and devoid of any guiding principles. Ex. C, Merritt *Ambrosio* Dep. Tr. at 94:16–20 (testifying that he is "here to litigate the projected sale amount [*sic*]").

Merritt's assumptions about the accuracy of WCTL is further undermined by his typical appraisal practices. Merritt testified that if the difference between the asking price and sold price of a potential comparable vehicle is too large, he would reject the use of that comparable vehicle as part of his own appraisal. Ex. F, Merritt *Davenport* Dep. Tr. 40:17–41:5. But Merritt did not conduct any analysis of the comparable vehicles reflected in Plaintiffs' WCTL reports and does not have access to dealer sales data that would allow him to determine whether the price at which those comparable vehicles sold was significant enough to exclude it as a comparable under his methodology. *Id.* at 45:23–46:22; *see also* Ex. G, Merritt *Knight* Dep. Tr. 29:10–25.

Indeed, Merritt's deviation from his typical practices is even more stark. On his website, Merritt states that his company "follows a detailed, comprehensive process when conducting an appraisal." Ex. J, Merritt *Volino* Dep., Ex. 17; *see also* Ex. B, Merritt *Volino* Dep. Tr. 47:2–67:10

13

(describing his personal appraisal methods). Merritt testified that an average appraisal takes him a couple of days, *id.* at 53:8–12, but he can spend up to two weeks appraising a single vehicle, *id.* at 53:3–17. Merritt first assesses the local supply and demand of the specific make and model of the vehicle, *id.* at 48:15–19; searches for comparable vehicles he deems most similar to the loss vehicle, *id.* at 63:20–64:16; and performs an in-person review of the vehicle whenever possible, *id.* at 162:16–163:11 (explaining that he didn't do appraisals much in 2020 due to his limited ability to inspect vehicles in-person). Merritt also prefers to speak with the owner to understand the vehicle's history. *Id.* at 58:9–22. And in certain instances, he conducts a full historical analysis, including tracking down past owners to determine how many owners it has had, what it was used for, if it had been painted or wrecked in the past, whether it stayed within a single family, and whether it was stored in a garage. *Id.* at 58:23–59:16. Merritt did none of that here. Ex. A, Merritt Dep. Tr. 41:22-42:2 ("Q. And did you do an appraisal like this for any of the plaintiffs in this case? A. I did not."). Ex. D, Merritt *Freeman* Dep. Tr. 150:2–151:2 (explaining his typical approach of appraising vehicles, that he did not take that approach in this case, and instead "just reviewed [the single vehicle valuation report and] tried to do the best appraisal [he] could do").[4]

Because Merritt has a methodology he typically uses and chose not to apply that methodology here, or to otherwise take any steps to confirm the accuracy of any aspect of Mitchell's valuation of plaintiffs' vehicles, Merritt's litigation-driven conclusion regarding the ACV of Plaintiffs' vehicles should be excluded. *See Earley Info. Sci., Inc. v. Omega Eng'g, Inc.*,

---

[4] In *Wiggins*, Merritt submitted an appraisal that further details process he normally undertakes, including reviewing "several nationally recognized valuation guides" to "determine[] what the fair market value of the vehicle in scope is worth." *Wiggins*, ECF 49-1 at 5. Merritt explained that researching valuation guides "is a good starting point to determine if a buyer/seller should buy/sell a vehicle for more/less than what it is worth or vice versa." *Id.* Merritt also "contacted local dealers and private sellers" and determined "what the current market is doing." *Id.* at 5.

575 F. Supp. 3d 242, 248 (D. Mass. 2021) (excluding expert whose "approach appears to have been created solely for the purpose of this litigation").

Merritt also deliberately ignores evidence contrary to his opinion. As Mitchell's corporate representative explained under oath, simply "backing out" the PSA would not work because, ███ ███████████████████████████████████████████████████████████████████████████████. Dkt. 95-4, Kroell Decl. ¶¶ 15–21. ████████████████████████████████████ *Id.* Merritt simply ignores this undisputed testimony and has totally abdicated any responsibility to confirm that the WCTL output is otherwise reliable. In fact, Merritt refused to stand by his proposed method of removing the impact of the PSA on Plaintiffs' valuations in his deposition. Ex. A, Merritt Dep. Tr. 96:2-6 ("Q. Do you know whether doing it the way you did it is correct? A. I do not."); 96:7-11 ("Q. Are you offering an opinion in this case that the way you have calculated the impact on the condition adjustment from removing the PSA is correct? A. I am not."). Merritt's conclusion is thus entirely unreliable and unhelpful to the trier of fact. *See Zeolla v. Ford Motor Co.*, No. CIV.A. 09-40106-FDS, 2013 WL 308968, at *9 (D. Mass. Jan. 24, 2013) (excluding expert testimony that ignored unfavorable record evidence).

### III.   CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court exclude the report and testimony of Jason Merritt.

DATED: January 3, 2025.

                    Respectfully submitted by,
                    */s/ Jeffrey S. Cashdan*
                    Jeffrey S. Cashdan*
                    jcashdan@kslaw.com
                    Zachary A. McEntyre*
                    zmcentyre@kslaw.com
                    J. Matthew Brigman*
                    mbrigman@kslaw.com

Allison Hill White*
awhite@kslaw.com
Allexia Bowman Roberts*
aroberts@kslaw.com
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
P: (404) 572-4600

Julia Barrett Bates*
jbates@kslaw.com
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, Texas 78701
P: (512) 457-2000

Thomas S. Marjerison
Bar No. 7836
tmarjerison@nhdlaw.com
**NORMAN, HANSON & DETROY, LLC**
2 Canal Plaza
P.O. Box 4600
Portland, Maine 04112
P: (207) 774-7000

*Counsel for Defendants*

*Admitted *pro hac vice*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of January 2025, a true and correct copy the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all attorneys of record.

*/s/ Jeffrey S. Cashdan*
Jeffrey S. Cashdan

*Counsel for Defendants*