Matthew Thurston                                January 22, 2024
Multiple Plaintiffs v. Progressive

Page 1

1                   UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MAINE
2

3

     * * * * * * * * * * * * * * * * *
4                                        *

     MATTHEW THURSTON,                   *
5    individually and on behalf of       * No.
     others similarly situated,          * 1:22-cv-00375-NT
6                                        *

                     Plaintiff,          *
7    V.                                  *
                                         *
8    PROGRESSIVE CASUALTY                *
     INSURANCE COMPANY and UNITED        *
9    FINANCIAL CASUALTY COMPANY,         *
                                         *
10                   Defendants.         *
                                         *
11   * * * * * * * * * * * * * * * * *
12

13   VIDEOTAPED DEPOSITION OF MATTHEW THURSTON,

14   Deposition taken at Norman Hanson Detroy, Two Canal

15

16   Plaza, Portland, Maine, on Monday, January 22, 2024,

17

18   commencing at 10:48 a.m.

19

20

21

22

23

24   Court Reporter:

25   Pamela J. Carle, LCR, RPR, CRR

Matthew Thurston                                                      January 22, 2024
Multiple Plaintiffs v. Progressive

Page 2

```
 1          APPEARANCES
 2
      For the Plaintiff:
 3
         FREDERICK & BERLER, LLC
 4       767 East 185th Street
         Cleveland, Ohio 44119
 5       By: Ronald Ira Frederick, Esq.
            filings@clevelandconsumerlaw.com
 6          and
         ISLAND JUSTICE
 7       P.O. Box 771
         Stonington, Maine 04681
 8       By: John Steed, Esq. (Via telephone)
            john@islandjusticelaw.com
 9          and
         BORISON FIRM, LLC
10       5830 E. Second Street #95943
         Casper, WY 82609
11       By: Scott C. Borison, Esq. (Via telephone)
            scott@borisonfirm.com
12
13
      For the Defendants:
14
         KING & SPALDING
15       1180 Peachtree Street, NE, Suite 1600
         Atlanta, Georgia 30309
16       By: Allison Hill White, Esq.
            404.572.4600
17          awhite@kslaw.com
18
      Videographer:
19
         Leigh Doran
20
21
22
23
24
25
```

Page 3

```
 1            I N D E X
      WITNESS:   MATTHEW THURSTON
 2    EXAMINATION:           PAGE
      By Ms. White              6
 3
 4
 5
 6
      EXHIBITS FOR IDENTIFICATION:
 7
      M. THURSTON    DESCRIPTION        PAGE
 8
      Exhibit 1   Application for insurance    31
 9
      Exhibit 2   Declarations page            43
10
      Exhibit 3   Renewal declarations page    46
11
      Exhibit 4   Vehicle valuation report     64
12
      Exhibit 5   3/15/22 Steed letter         81
13
      Exhibit 6   First Amended Class Action   98
14              Complaint
15    Exhibit 7   March 2023 Progressive letter  110
16    Exhibit 8   Answers to Interrogatories   122
17
      (*Reporter's Note: Exhibits retained by Attorney White.)
18
19
20
21
22
23
24
25
```

Page 4

```
 1          THE VIDEOGRAPHER:  Good morning.  We
 2    are going on the record.  The time is
 3    approximately 10:47 a.m.  Today is Monday, January
 4    22, 2024.  Please note that the microphones are
 5    sensitive and may pick up whispering and private
 6    conversations.  Please mute your phones at this
 7    time.  Audio and video recording will continue to
 8    take place unless all parties agree to go off the
 9    record.
10          This is media unit one of the video
11    recorded deposition of Matthew Thurston, in the
12    matter of Matthew Thurston versus Progressive
13    Casualty Insurance Company and United Financial
14    Casualty Company, filed in the United States
15    District Court for the District of Main, docket
16    No. 122-cv-00375-NT.
17          The location of the deposition is
18    Norman, Hanson & DeTroy, 20 Canal Plaza, Portland,
19    Maine, 04112.  My name is Leigh Doran,
20    representing Veritext, and I am the videographer.
21    The court reporter is Pam Carle from the firm G&F
22    Reporting.
23          I am not authorized to administer an
24    oath, I am not related to any party in this
25    action, nor am I financially interested in the
```

Page 5

```
 1    outcome.  If there are any objections to
 2    proceeding, please state them at the time or your
 3    appearance.
 4          Counsel and all present, including
 5    remotely, will now state their appearances and
 6    affiliations for the record, beginning with the
 7    noticing attorney.
 8          MS. WHITE:  Allison White with King &
 9    Spalding for the defendants.
10          MR. FREDERICK:  Ronald Frederick with
11    Frederick & Berler, LLC for Mr. Thurston.
12          John, you need to unmute, or I can do
13    you.  Well, Scott Borison will be joining us
14    remotely with the Borison Law Firm, also for
15    Mr. Thurston.
16          MR. STEED:  And this is John Steed of
17    Island Justice, for Mr. Thurston.
18          THE VIDEOGRAPHER:  Will the court
19    reporter please swear in the witness, and then
20    counsel may proceed.  Thank you.
21          MATTHEW THURSTON,
22          having been duly sworn,
23          was deposed and testified
24          as follows:
25          EXAMINATION
```

2 (Pages 2 - 5)

Page 6

1  BY MS. WHITE:
2      Q.   Good morning, Mr. Thurston.
3      A.   Good morning.
4      Q.   I'm Allison White, and I represent the
5  defendants in this case, Progressive Casualty
6  Insurance Company and United Financial Casualty
7  Company.  If I used term UFCC throughout this
8  deposition, will you understand that I'm referring
9  to United Financial Casualty Company?
10     A.   Yes, ma'am.
11     Q.   So I'll be asking you questions today,
12 but before we get started I wanted to go over some
13 ground rules that will help things run smoothly.
14          The court reporter is taking down
15 everything we say, so it's important that we do
16 our best not to talk over each other, and to
17 answer the questions verbally instead of a head
18 nod or a head shake; a yes or no.
19          If you don't understand a question that
20 I ask, please let me know and I'm happy to
21 rephrase.  If you answer the question, I'll assume
22 that you understood it.  Is that fair?
23     A.   Yes, ma'am.
24     Q.   If I use a term or abbreviation that
25 you don't understand, please just let me know, and

Page 7

1  I'll clarify.
2      A.   Yes, ma'am.
3      Q.   Your lawyer might object to some of my
4  questions, but you still have to answer unless he
5  specifically tells you not to answer.
6      A.   Yes, ma'am.
7      Q.   But just to be clear, at no time today
8  will I be asking you to disclose the content of
9  any communications that you've had with your
10 lawyers.
11     A.   Yes, ma'am.
12     Q.   I'll plan to take a break in about an
13 hour, but if you need a break at any point before
14 that, just let me know.  All I ask is that if I
15 have a question pending, that you answer the
16 question before we take the break.
17     A.   Thank you.
18     Q.   All right.  Are you taking any
19 medications that would affect your ability to
20 understand questions and respond accurately?
21     A.   I am not.
22     Q.   Is there any other reason that your
23 memory may be impaired or that you believe will
24 impact your ability to testify accurately or to
25 proceed with the deposition today?

Page 8

1      A.   I do not.
2      Q.   Could you please state your name for
3  the record.
4      A.   Matthew Thurston, M-A-T-T-H-E-W,
5  T-H-U-R-S-T-O-N.
6      Q.   Have you ever gone by any other names?
7      A.   No.  Well, Matt.
8      Q.   What is your date of birth and place of
9  birth?
10     A.   I was born in Baton Rouge, Louisiana on
11 June 7, 1990.
12     Q.   What are your parents' names?
13     A.   Scott -- or technically Robert Scott
14 Thurston, and Joann Thurston.
15     Q.   And where do they live?
16     A.   They reside in Baton Rouge, Louisiana.
17     Q.   Do they have any other homes?
18     A.   They own a home on Little Deer Isle in
19 Maine.
20     Q.   And is Little Deer Isle where you live?
21     A.   I live on Deer Isle.
22     Q.   Oh, okay.  When did you last reside
23 with your parents?
24     A.   I lived with them for a couple of
25 months before I moved to Maine -- well, before I

Page 9

1  moved to New Orleans before I moved to Maine.  I
2  think that was 2015.
3      Q.   And since that time you've lived on
4  your own?
5      A.   Yes.  Yes.
6      Q.   What's your marital status?
7      A.   Married.
8      Q.   And what's your spouse's name?
9      A.   Catherine Thurston.
10     Q.   And when were you married?
11     A.   Legally September 15th, 2018.  I say
12 legally because our ceremony was actually the week
13 before, but we forgot to get a marriage license.
14     Q.   Okay.
15     A.   And I think I have that date correct.
16     Q.   Okay.  So what is the anniversary that
17 you celebrate?
18     A.   September 9th.
19     Q.   Before your marriage to Catherine --
20          MR. FREDERICK:  Can we go off the
21 record for a moment?  That's my dog's vet.
22          MS. WHITE:  Sure.
23          THE VIDEOGRAPHER:  Stand by.  The time
24 is approximately 10:54 a.m., we're going off the
25 record.

3 (Pages 6 - 9)

Page 10

1      (Recess taken.)
2      THE VIDEOGRAPHER:  The time is
3  approximately 10:56 a.m., we're going back on the
4  record.
5  BY MS. WHITE:
6      Q.    Before your marriage to Catherine, had
7  you ever been married before?
8      A.    No.
9      Q.    Do you have any children?
10     A.    Yes.
11     Q.    How many?
12     A.    Two.
13     Q.    How old are they?
14     A.    Caroline will turn three on March 5th,
15  and Robert will turn two on April 26th of this
16  year.
17     Q.    What is your current address?
18     A.    1193 Sunshine Road, Deer Isle, Maine,
19  04627.
20     Q.    Do you own or rent that home?
21     A.    Own.
22     Q.    How long have you lived there?
23     A.    Since 2016.  December of 2016, roughly.
24     Q.    And do Catherine, Caroline and Robert
25  all live there with you?

Page 11

1      A.    They do.
2      Q.    Anybody else live there?
3      A.    No.
4      Q.    Since December 2016, has anybody other
5  than your wife and children lived there?
6      A.    There was a girl that lived there with
7  me for a couple months.
8      Q.    And what was her name?
9      A.    Rachel Raymond, I think.  We didn't
10  have a lot of contact.
11     Q.    And when did she move out?
12     A.    I don't know, July 2017.  She moved in
13  in maybe May, if that.
14     Q.    Before you lived on Sunshine Road, what
15  was your address?
16     A.    I honestly don't remember, I lived in
17  New Orleans for about six months.
18     Q.    So you lived in New Orleans, was that
19  in 2016?
20     A.    Yes, I think I moved down there at the
21  end of 2015.
22     Q.    And before you lived in New Orleans,
23  where did you live?
24     A.    I lived with my parents in Baton Rouge
25  for a month, maybe two.  Prior to that I lived in

Page 12

1  Denver, Colorado.
2      Q.    So you lived in Denver up until maybe
3  early 2015?
4      A.    I think August of 2015.
5      Q.    How long did you live in Denver?
6      A.    Only about -- I think I moved in at the
7  beginning of 2015, the first week of 2015.
8      Q.    Before you lived in Denver, where did
9  you live?
10     A.    The -- I lived in Brooksville, Maine
11  for the -- mostly the summer into the fall of 2014.
12     Q.    Before you lived in Brooksville, Maine,
13  where did you live?
14     A.    Avon, Colorado.
15     Q.    How long did you live in Avon?
16     A.    One and a half years.
17     Q.    All right, so at this point we're
18  probably back to 2013, 2012?
19     A.    Yeah.
20     Q.    Okay.  All right, so you own your home
21  on Sunshine Road.  Do you own any other
22  properties?
23     A.    Yes.
24     Q.    What other properties?
25     A.    I own a house in Ellsworth, Maine.

Page 13

1      Q.    Anything else?
2      A.    I own a house in Brooksville, Maine.
3      Q.    Any others?
4      A.    And my wife owns a house, I think it
5  would only be considered her house, I'm not a
6  lawyer, and that's in Orland, Maine.
7      Q.    And these other homes that you own --
8      A.    I also own a piece of land, sorry, in
9  Brooklin, Maine.
10     Q.    Brookland?
11     A.    Brooklin.  It with an I instead of a Y,
12  though.
13     Q.    Okay.  Are those all the other
14  properties that you own?
15     A.    Yes.
16     Q.    The house in Ellsworth, do you use that
17  or do you rent it out?
18     A.    It's primarily used as a rental.
19     Q.    Is it a long-term rental or short term?
20     A.    Short-term rental.
21     Q.    So like a vacation rental?
22     A.    Yes.
23     Q.    And what about the home in Brooksville?
24     A.    It needs some work.
25     Q.    Are you renting it out?  Are you using

4 (Pages 10 - 13)

Matthew Thurston                                                    January 22, 2024
Multiple Plaintiffs v. Progressive

Page 14

1    it?
2        A.    No.
3        Q.    So it's just sitting vacant?
4        A.    Yes.
5        Q.    How long have you owned that home?
6        A.    Either 2019 or 2020, I believe.
7        Q.    And did you purchase that home with the
8    intent to live there?
9        A.    No.
10       Q.    Did you purchase it with the intent
11   that it would be a rental property?
12       A.    Yes.
13       Q.    The land in Brooklin, Maine.
14       A.    Yes.
15       Q.    When did you purchase that?
16       A.    March or April, I believe, of last
17   year.
18       Q.    So 2023?
19       A.    Yes, ma'am.
20       Q.    And it's a vacant lot?
21       A.    Yes.
22       Q.    Do you intend to build something there?
23       A.    Yes.
24       Q.    Would that be a rental or a home for
25   you to live in?

Page 15

1        A.    A home for us to live in.
2        Q.    Do you own any businesses?
3        A.    Yes.
4        Q.    What business?
5        A.    MW Thurston, LLC.
6        Q.    And what is the purpose of that
7    business?
8        A.    HVAC, as well as real estate.
9        Q.    Do you have any employees?
10       A.    No.
11       Q.    Do you own any other businesses?
12       A.    No.
13       Q.    Does MW Thurston, LLC own any real
14   property?
15       A.    No.
16       Q.    I'm going to talk a little bit about
17   your education.  What year did you graduate high
18   school?
19       A.    2008.
20       Q.    And do you have a college degree?
21       A.    I have an associate's degree.
22       Q.    And where did you get that?
23       A.    Johnson & Wales University, Denver.
24       Q.    And is that a culinary school?
25       A.    My degree is in culinary arts, yes.

Page 16

1              MR. FREDERICK:  How did you know that?
2              MS. WHITE:  I've known people to go
3    there for culinary.
4              MR. FREDERICK:  Okay.
5              THE WITNESS:  They have campuses in
6    Charlestown.
7              MS. WHITE:  That's probably why.
8              THE WITNESS:  Providence.
9    BY MS. WHITE:
10       Q.    All right.  Any other degrees other
11   than the culinary degree?
12       A.    No.
13       Q.    Do you have any certifications or
14   licenses of a professional capacity?
15       A.    Yes.
16       Q.    What kind?
17       A.    I have my associated broker license for
18   real estate in the state of Maine, and I have my --
19   I think it's EPA 608, which is a refrigerant
20   handling certification.
21       Q.    Did you say EPA 608?
22       A.    Yes, ma'am.
23       Q.    All right.  So I assume that because
24   you have a real estate broker's license, did you
25   go through any sort of training for that?

Page 17

1        A.    Yes, I took the required classes.
2        Q.    Where did you take those?
3        A.    Online.  I can't think of the name of
4    the company.  I think there's only two in the state
5    of Maine, though.
6        Q.    And what about your EPA 608
7    certification, was there any training for that?
8        A.    There was -- I'm not sure if there was
9    a course required online, or if I was just able to
10   take the test.
11       Q.    Have you attended any vocational
12   courses for HVAC?
13       A.    I took a mini split installation class
14   online, I think that was held by Samsung.
15       Q.    And you said mini split?
16       A.    Yes.
17       Q.    Have you ever had a professional
18   license or certification revoked?
19       A.    No.
20       Q.    What about suspended?
21       A.    No.
22       Q.    I assume you have a driver's license,
23   correct?
24       A.    I do.
25       Q.    And is it a Maine driver's license?

5 (Pages 14 - 17)

Matthew Thurston                                                    January 22, 2024
Multiple Plaintiffs v. Progressive

Page 18

1     A.    Yes.
2     Q.    Have you ever had a driver's license
3  revoked?
4     A.    No.
5     Q.    Have you ever had a driver's license
6  suspended?
7     A.    I have not.
8     Q.    Are you currently employed?
9     A.    Self-employed.
10    Q.    And are you self-employed through MW
11  Thurston, LLC?
12    A.    Yes, ma'am.
13    Q.    And what type of work do you do?
14    A.    HVAC and real estate, as well as
15  running the rental properties that we own.
16    Q.    Real estate, do you represent buyers
17  who are buying homes?
18    A.    Yes.
19    Q.    And do you also represent sellers who
20  are selling their homes?
21    A.    Yes.
22    Q.    Do you do any commercial real estate?
23    A.    I have not.
24    Q.    You said that you run the rental
25  properties. Are you just speaking of your own

Page 19

1  rental properties?
2     A.    Yes.
3     Q.    And do you do HVAC work for homes that
4  are not your rental properties?
5     A.    Yes.
6     Q.    When did your employment with your
7  business begin?
8     A.    I -- I created the LLC in the spring of
9  2018, I believe. I was not doing HVAC or real
10  estate at that time, though.
11    Q.    What was your intent when you created
12  the LLC?
13    A.    I owned a restaurant, or I was starting
14  a restaurant at the time.
15    Q.    Where was the restaurant?
16    A.    Blue Hill, Maine.
17    Q.    So did you ultimately open a
18  restaurant?
19    A.    I did.
20    Q.    What was it called?
21    A.    It was called The Thurston Co., as in
22  company.
23    Q.    And is The Thurston Co. still in
24  business?
25    A.    It is not.

Page 20

1     Q.    When did it shut down?
2     A.    November 2020.
3     Q.    Is that because of the pandemic?
4     A.    That was a contributing factor.
5     Q.    All right. So before you created the
6  LLC and opened a restaurant, what did you do?
7     A.    I worked in restaurants.
8     Q.    What restaurants did you work in?
9     A.    In reverse chronological order,
10  Aragosta is where I worked before I opened my
11  restaurant. Before that, Satsuma in New Orleans.
12    Q.    Is it S-A-T-S-U-M-A?
13    A.    That sounds about right. Spelling is
14  not my strong suit.
15    Q.    And was Aragosta in Maine?
16    A.    Yes. Stonington at the time. I
17  believe it's now located in Deer Isle.
18    Q.    And in those restaurants was your role
19  a chef?
20    A.    Yes.
21    Q.    Did you do anything else?
22    A.    No.
23    Q.    How many hours a week do you presently
24  work?
25    A.    Depends on the week.

Page 21

1     Q.    Could you give me a range?
2     A.    Anywhere from zero to 70.
3     Q.    Okay.
4     A.    Maybe more.
5     Q.    Do you travel for work?
6     A.    Within the local region. I don't
7  travel much outside of the county that I live in.
8     Q.    Have you ever been let go from any job?
9     A.    Possibly from Boulder Subs.
10    Q.    Where is -- is that in Boulder,
11  Colorado?
12    A.    That was in Boulder, Colorado.
13    Q.    And when you say possibly, was it
14  unclear?
15    A.    I can't remember if I quit or was
16  fired.
17    Q.    How long ago was that?
18    A.    2010, maybe 2011, '12. I don't know,
19  somewhere in there.
20    Q.    Since then have you ever been let go of
21  any job?
22    A.    I have not.
23    Q.    Have you ever worked as a rideshare
24  driver?
25    A.    No.

6 (Pages 18 - 21)

Matthew Thurston                                    January 22, 2024
Multiple Plaintiffs v. Progressive

Page 22

1    Q.    Have you ever worked for a delivery
2    company?
3    A.    Boulder Subs. I mean, that was -- I
4    guess it's not a delivery company, it's a sandwich
5    company that delivers sandwiches.
6    Q.    You've never worked for like DoorDash
7    or Uber Eats or anything?
8    A.    No.
9    Q.    I'm going to ask you a series of
10   questions about your former employment; it's a
11   long list, please bear with me.
12         Since high school, have you been
13   employed by any insurance company?
14   A.    No.
15   Q.    Any insurance related company, like an
16   insurance broker?
17   A.    No.
18   Q.    Have you ever been employed by a state
19   department of insurance?
20   A.    No.
21   Q.    A car dealer?
22   A.    No.
23   Q.    A car repair shop?
24   A.    No.
25   Q.    Any company that provides auto

Page 23

1    valuations, such as NADA or Kelley Blue Book?
2    A.    No.
3    Q.    Any car rental companies?
4    A.    No.
5    Q.    A department of motor vehicles for any
6    state?
7    A.    No.
8    Q.    Any automobile manufacturer?
9    A.    No.
10   Q.    Do you have any work experience in
11   software?
12   A.    No.
13   Q.    Data aggregation?
14   A.    No.
15   Q.    Do you have any work experience that
16   involves determining values of used cars?
17   A.    No.
18   Q.    Do you have any legal training?
19   A.    No.
20   Q.    I'm done with the list.
21         MR. FREDERICK:    It wasn't that long.
22         MS. WHITE:    Yeah, it seems pretty
23   random to a lot of people when you're asking those
24   questions, they look at you like, what in the
25   world?

Page 24

1    BY MS. WHITE:
2    Q.    Okay. Have you ever been deposed
3    before?
4    A.    No.
5    Q.    Have you ever testified in court
6    before?
7    A.    I have not.
8    Q.    Have you ever been a party to another
9    lawsuit?
10   A.    I have not. Maybe I've agreed to join
11   a class and gotten like 14 cents back, but not --
12   not --
13   Q.    Okay, so you think you may have been a
14   class member in a class action lawsuit?
15   A.    I may have.
16   Q.    Do you recall any particular class
17   action defendants?
18   A.    No.
19   Q.    Have you ever had a business that was a
20   plaintiff or defendant in a lawsuit?
21   A.    No.
22   Q.    Have you otherwise ever testified under
23   oath?
24   A.    No.
25   Q.    Have you been convicted of any crimes?

Page 25

1          MR. FREDERICK:    Objection. You can ask
2    about felonies within ten years, and misdemeanors
3    involving dishonesty within ten years.
4          MS. WHITE:    Are you telling him not to
5    answer?
6          MR. FREDERICK:    Well, if there are any,
7    but I believe that's the limit of what's
8    admissible.
9          But you can go ahead and answer.
10   A.    I was convicted of a class E crime in
11   2016, I believe.
12   BY MS. WHITE:
13   Q.    What do you mean by class E crime?
14   A.    The State of Maine doesn't use the
15   terms felony or misdemeanor, to the best of my
16   knowledge, they classify their crimes with a
17   letter. I don't -- that's my understanding, I'm
18   not a lawyer.
19         MR. FREDERICK:    You might want to
20   explain what it is.
21   BY MS. WHITE:
22   Q.    Yeah, that would be great. What was it
23   for?
24   A.    It was for leaving the scene of an
25   accident, or failure to report an accident.

7 (Pages 22 - 25)

Matthew Thurston                                    January 22, 2024
Multiple Plaintiffs v. Progressive

Page 26

1    Q.   And what was the punishment for that
2  crime?
3    A.   A fine.
4    Q.   Any other crimes?
5    A.   No.
6    Q.   Have you ever filed for bankruptcy?
7    A.   I have not.
8    Q.   All right.  What did you do to prepare
9  for your deposition today?
10    A.   I looked, familiarized myself with
11  e-mails between myself and Kyle, and I spoke with
12  my lawyers.
13    Q.   Which lawyers did you meet with?
14    A.   I met with John Steed, Scott Borison
15  and Ron.
16    Q.   I'm not going to ask you any questions
17  about what you guys talked about, so if I've asked
18  you something and you feel like it causes you to
19  say what you talked about, I don't want to know
20  that.
21       All right, so you met with John, Scott
22  and Ron.  Was anyone else present for those
23  meetings?
24    A.   Yes, there was a woman present on one
25  of the calls.

Page 27

1    Q.   And is she a woman who worked for John,
2  Scott or Ron?
3    A.   I believe so.
4    Q.   Do you recall her name?
5    A.   I don't.
6       MR. FREDERICK:  I believe it was my
7  wife, Jacqueline, who's a lawyer in the firm.
8  BY MS. WHITE:
9    Q.   How many times did you meet with your
10  lawyers to prepare for your deposition?
11    A.   Specifically to prepare for the
12  deposition?
13    Q.   Uh-hum.
14    A.   Three times, I believe.
15    Q.   When were these three meetings?
16    A.   Let's see, Wednesday of last week,
17  Friday of last week, and then briefly this morning.
18    Q.   Before preparing for your deposition,
19  how many times had you met with Mr. Frederick?
20    A.   We had spoken on the phone one time.
21    Q.   What about Mr. Borison?
22    A.   We had spoken on the phone one time.
23    Q.   And what about Mr. Steed?
24    A.   We've spoken on the phone a number of
25  times over the last two years.

Page 28

1    Q.   Did your lawyers give you any documents
2  to look at or review to help get ready for the
3  deposition?
4    A.   They did not.
5    Q.   Has anybody other than your lawyers
6  given you advice on what to say or not to say
7  today?
8    A.   No.
9    Q.   Did you speak with anybody else about
10  this deposition?
11    A.   I did not.
12    Q.   Have you spoken with either of your
13  parents about your deposition?
14    A.   No.
15    Q.   Did you speak with either of your
16  parents about their depositions?
17    A.   I did.
18    Q.   And what did you discuss?
19    A.   My dad told me it took three hours, and
20  he mentioned audio recording that was played for
21  him, and I believe that was the extent of the
22  conversation.
23       MR. FREDERICK:  Was that you?
24       MS. WHITE:  It was me.  For the record,
25  it was three hours total, both parents, but.

Page 29

1       THE WITNESS:  I'm sure my dad was eager
2  to get to bridge or something.
3       MS. WHITE:  I don't think it was his
4  favorite thing to do.
5  BY MS. WHITE:
6    Q.   Okay, so I want to talk more
7  specifically about the lawsuit here.  Why are you
8  suing UFCC in this case, in your own words?
9    A.   I don't know who UFCC is.
10    Q.   Okay.  So at the beginning --
11    A.   I do know you mentioned who they are,
12  but, I mean, Progressive is the only company I've
13  dealt with directly -- or that I've -- or the name
14  Progressive is the only people that I've known I've
15  dealt with.
16    Q.   Okay.  Okay, so if I call UFCC
17  Progressive, that is a trade name that they use.
18    A.   Okay.
19    Q.   Would that make it easier for you if I
20  just say Progressive?
21    A.   If that -- I thought you had explained
22  them as two separate entities.  If they are the
23  same entity you can call them UFCC, and I can
24  understand that.
25    Q.   So there are two separate entities and

8 (Pages 26 - 29)

Veritext Legal Solutions
800.808.4958                                    770.343.9696

Matthew Thurston                                          January 22, 2024
Multiple Plaintiffs v. Progressive

Page 30

1 they are both in the Progressive umbrella.
2      A.    Yes, ma'am.
3      Q.    And we can get to it later, but your
4 insurer is UFCC, but you probably dealt with them
5 as Progressive.
6      A.    Yes.
7      Q.    So I'll use the term Progressive, to
8 keep it simple.  When I say Progressive I'm
9 referring to UFCC; we may talk later about
10 Progressive Casualty Insurance Company, and that
11 will be separate.
12      A.    Okay.
13      Q.    And why are you suing Progressive in
14 this case?
15      A.    Because I felt like my car was unfairly
16 valued due to the projected sales adjustment.
17      Q.    Okay.  Why are you suing Progressive
18 Casualty Insurance Company in this case?
19      A.    For the same reason.
20      Q.    Do you understand that United Financial
21 Casualty Company is the entity that issued your
22 insurance policy?
23      A.    I understand you saying that right now,
24 but to me there was no distinction at any other
25 time.

Page 31

1      Q.    Okay.  I'm going to show you a
2 document -- that's not it.
3      MS. WHITE:  This will be Exhibit 1.
4 (Thurston Exhibit 1 was marked for identification.)
5 BY MS. WHITE:
6      Q.    All right, I'm showing you a document
7 that's marked as Exhibit 1.  Do you recognize this
8 document?
9      A.    Yes.
10      Q.    And what is it?
11      A.    It's -- I guess it's an application for
12 insurance, by the top of the page.  It describes
13 what coverage I have, or I guess was applying for
14 on a vehicle.
15      Q.    And you see on the top there it's dated
16 February 21, 2017?
17      A.    Yes.
18      Q.    Is that when you first applied for
19 insurance with Progressive?
20      A.    I don't believe so.  I believe I had
21 Progressive significantly before that, but I may be
22 mistaken.
23      Q.    Did you have your own policy with
24 Progressive before that?
25      A.    Yes, it would have been my own policy.

Page 32

1      Q.    Okay.  All right, we'll look into that.
2 Do you see at the top where it says insurance
3 company, United Financial Casualty Company?
4      A.    Yes.
5      Q.    Okay, so do you understand that to mean
6 that the specific insurance company owned by
7 Progressive that insured you is United Financial
8 Casualty Company?
9      A.    Yes.
10      Q.    And can you remind me why you sued
11 Progressive Casualty Insurance Company?
12      A.    That's something I discussed with my
13 lawyers.
14      Q.    Don't tell me what you talked about
15 with your lawyers, but is it your understanding
16 that the Progressive trade name is Progressive
17 Casualty, is that why you named them?
18      MR. FREDERICK:  Objection.  Anything
19 that he learned about that would have come through
20 his lawyers.
21      MS. WHITE:  Okay.
22 BY MS. WHITE:
23      Q.    So sitting here, your own independent
24 knowledge, separate from what you've discussed
25 with your lawyers, do you have any understanding

Page 33

1 of why you sued Progressive Casualty?
2      A.    Because Progressive -- Progressive
3 versus United Financial Casualty I -- there was no
4 distinction in my mind before speaking with my
5 lawyers.
6      Q.    Okay.  And do you believe that you've
7 ever had insurance issued by Progressive Casualty
8 Insurance Company?
9      A.    I -- I'm not sure.
10      Q.    Okay.  All right, so in general you
11 said you sued Progressive because you felt like
12 your car was unfairly valued due to the projected
13 sold adjustment.  Any other reasons you sued
14 Progressive?
15      A.    I'm not sure of the extent of my harms,
16 but.
17      Q.    When did you decide to file a lawsuit
18 against Progressive?
19      A.    I first discussed seeking legal advice
20 sometime in February of 2022.
21      Q.    Okay.
22      A.    That's the year of the accident.
23      Q.    So you sought legal advice in February
24 of '22.  At what point did you decide, without
25 telling me what you and your lawyers talked about,

9 (Pages 30 - 33)

Matthew Thurston                                                January 22, 2024
Multiple Plaintiffs v. Progressive

Page 34

1    that you wanted to file a lawsuit?
2        A.    I can't remember specifically.
3        Q.    What was your goal when you hired a
4    lawyer?
5        A.    My goal when I first hired a lawyer was
6    to get advice on how to receive fair compensation
7    for my vehicle.
8        Q.    So when you first hired a lawyer, were
9    you hoping to settle your claim with Progressive?
10           MR. FREDERICK:  Objection, asked and
11   answered, and that would get into attorney-client
12   privilege.
13           MS. WHITE:  Well, before he hired his
14   lawyer.
15   BY MS. WHITE:
16       Q.    You said you were just trying to get
17   advice on fair compensation, and I just wanted to
18   clarify.  Does that mean that you just wanted to
19   resolve your claim with Progressive at that time?
20           Before you talked to your lawyers,
21   before they told you anything, I just want to
22   understand what your goals were at that time.
23       A.    My goals at that time were to find a
24   way to be fairly compensated for my vehicle.
25       Q.    What legal claims are you asserting

Page 35

1    against Progressive in this case?
2        A.    I couldn't be sure of the exact legal
3    claims, that's why I have legal representation.
4        Q.    Are you claiming that Progressive
5    breached your insurance policy?
6        A.    I'm claiming that I wasn't offered fair
7    compensation.
8        Q.    And what exactly are you claiming that
9    Progressive did wrong?
10       A.    They didn't offer me fair compensation
11   for my vehicle, in particular, the projected sales
12   adjustment that they made to the vehicle.
13       Q.    Is the projected sold adjustment, in
14   your view, the reason that you weren't offered
15   fair compensation, or is that one of the reasons
16   you weren't offered fair compensation?
17       A.    It's a reason.
18       Q.    So sitting here today, do you
19   understand what claims you've asserted against
20   Progressive in your complaint?
21       A.    I understand that I've asserted that
22   they haven't offered me fair compensation due to
23   the projected sold adjustment.
24       Q.    And what relief are you seeking from
25   Progressive?

Page 36

1        A.    Fair compensation for myself and the
2    entire class of people who've been harmed.
3            MR. FREDERICK:  When it's convenient,
4    can we take a break?
5            MS. WHITE:  Yes, can we go a little bit
6    longer?
7            MR. FREDERICK:  Sure.  That's why I say
8    when it's convenient as opposed to I need one now.
9            MS. WHITE:  Yes.
10   BY MS. WHITE:
11       Q.    So from Progressive, when I say
12   Progressive I mean United Financial Casualty
13   Company, you are seeking fair compensation for
14   yourself and class.  Are you seeking anything
15   different from Progressive Casualty Insurance
16   Company?
17       A.    I'd have to ask my lawyers.
18       Q.    Do you recall when you first signed up
19   for insurance with Progressive?
20       A.    I believe it was when I was living in
21   Colorado in maybe 2011.
22       Q.    And is February 21st, 2017 when you
23   first applied for insurance with Progressive in
24   the state of Maine?
25       A.    Probably.

Page 37

1        Q.    Okay.  Did you have insurance with
2    Progressive when you lived in Louisiana?
3        A.    I believe I did.
4        Q.    Do you recall applying for insurance
5    when you moved from Colorado to Louisiana?
6        A.    I don't have a specific recollection,
7    but I believe I transferred the -- my insurance
8    from Colorado to Louisiana.
9        Q.    So is it fair to say that the first
10   time that you applied for a Maine auto policy with
11   Progressive was February 21, 2017?
12       A.    I think that's likely.
13       Q.    And you were the only person on the
14   policy at the time, is that right?
15       A.    Yes, ma'am.
16       Q.    And when you first applied for a Maine
17   policy with Progressive, was the only vehicle the
18   2000 Subaru Impreza?
19       A.    Yes, ma'am.
20       Q.    All right, the total loss vehicle
21   that's at issue in this case is a 2012 Volvo XC70,
22   is that right?
23       A.    Yes, ma'am.
24       Q.    Is it okay if I call that car the Volvo
25   for the rest of the deposition?

10 (Pages 34 - 37)

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

Page 38

1    A.    Yes.
2          MR. FREDERICK:  You can't do that in
3    our house because we have two Volvos.
4    BY MS. WHITE:
5    Q.    And did you ever add the Volvo to your
6    Progressive insurance policy in Maine?
7    A.    I had not.
8    Q.    Why not?
9    A.    Because I hadn't gotten to it.
10         MS. WHITE:  Okay, we can take a break
11   now.
12         THE VIDEOGRAPHER:  The time is
13   approximately 11:36 a.m., we're going off the
14   record.
15         (Recess taken.)
16         THE VIDEOGRAPHER:  The time is
17   approximately 12:O2 p.m.  We're back on the
18   record.
19   BY MS. WHITE:
20   Q.    All right, before we took a break we
21   were talking about the Volvo.  Who purchased the
22   Volvo?
23   A.    My parents.
24   Q.    Do you know where they purchased it?
25   A.    I -- no.

Page 39

1    Q.    Was it a dealership in Baton Rouge?
2    A.    I don't know where they purchased it.
3    Q.    Do you know when they purchased it?
4    A.    I believe it was purchased new.
5    Q.    And it was a 2012 model?
6    A.    Yes, ma'am.
7    Q.    Who was on the title?
8    A.    Just my mom, I believe.
9    Q.    So just Joann?
10   A.    Yeah.
11   Q.    And who was on the vehicle
12   registration?
13   A.    No idea.
14   Q.    Was the Volvo financed?
15   A.    I didn't purchase the Volvo, I don't
16   know.
17   Q.    Who primarily drove the Volvo?
18   A.    My mom.
19   Q.    And at what point did you begin driving
20   it?
21   A.    When I picked it up from Baton Rouge
22   early 2022.
23   Q.    Is that January 2022?
24   A.    Yes, ma'am.
25   Q.    Why did you pick up the Volvo in early

Page 40

1    2022?
2    A.    My parents were giving it to me.
3    Q.    And why did they give it to you?
4    A.    I wanted a safer car to drive.
5    Q.    Did you intend to drive the Volvo for
6    the winter or indefinitely?
7    A.    Indefinitely.
8    Q.    And when you say you picked it up, what
9    do you mean by that?
10   A.    I mean I flew to Louisiana and got in
11   the car and drove back to Maine.
12   Q.    How long did it take you to go from
13   Louisiana to Maine?
14   A.    I drove two days to south of Boston to
15   where Cate has family, and we stayed there for
16   another few days, I think.
17   Q.    Did you understand when you took the
18   Volvo that you were supposed to become the owner
19   of the vehicle?
20   A.    Yes.
21   Q.    Did your parents advise that you needed
22   to get your own insurance?
23   A.    Yes.
24   Q.    And why didn't you do that?
25   A.    I had not gotten to it.

Page 41

1    Q.    Was it your understanding at the time
2    that you picked it up that it still had insurance
3    through your parents' policy?
4    A.    Yes.
5    Q.    And your parents had State Farm, right?
6    A.    Yes.
7    Q.    Did your parents sign the title over to
8    you when you picked it up?
9    A.    They did not.
10   Q.    Why not?
11   A.    They weren't in town when I picked it
12   up.
13   Q.    Where was the title at the time you
14   picked up the car?
15   A.    Louisiana.
16   Q.    Did you ever receive the title?
17   A.    Yes.
18   Q.    When was that?
19   A.    After the accident.
20   Q.    So after the accident, how did you
21   receive the title?
22   A.    Federal Express, I believe.
23   Q.    Do you have the title now?
24   A.    I hope so.
25   Q.    Are you supposed to have the title now?

11 (Pages 38 - 41)

Matthew Thurston                                                    January 22, 2024
Multiple Plaintiffs v. Progressive

Page 42

1       A.    Yes.
2       Q.    Okay.  Do you recall when you received
3   the title from your parents?
4       A.    I don't.
5       Q.    Do you know if it was a week after the
6   accident, a month after the accident?
7       A.    Probably in -- well, no, I don't
8   recall.
9       Q.    At the time of the accident you didn't
10  have the title in hand to the Volvo, correct?
11      A.    Correct.
12      Q.    Was it your plan to register the Volvo
13  in Maine in your name?
14      A.    Yes.
15      Q.    And did you plan to put the Volvo on
16  your Progressive insurance policy?
17      A.    Yes.
18      Q.    When did you plan to do that?
19      A.    I didn't have a specific date in mind.
20      Q.    Did you understand that you would need
21  the title to be able to register the vehicle in
22  your name?
23      A.    Yes.
24      Q.    And you didn't receive the title from
25  your parents until after the accident?

Page 43

1       A.    Correct.
2   (Thurston Exhibit 2 was marked for identification.)
3   BY MS. WHITE:
4       Q.    All right, I am showing you a document
5   marked as Exhibit 2, and it's Bates labeled
6   Thurston 007.  Do you recognize this document?
7       A.    It looks -- no.
8       Q.    Do you understand, based on that Bates
9   label, it was a document that you provided in this
10  case?
11      A.    Based on what?
12      Q.    The Bates label, Thurston 007.
13      A.    Oh.  Okay.
14      Q.    So this is a document that you
15  provided.
16      A.    Okay.
17      Q.    Is this a document that you provided to
18  your lawyers to produce?
19      A.    Yes, I -- I think I forwarded it from
20  my parents.
21      Q.    Okay.  And do you see on the top right
22  it says declarations page?
23      A.    Yes, ma'am.
24      Q.    And on the left it says State Farm?
25      A.    Yes, ma'am.

Page 44

1       Q.    And the named insureds are Robert S.
2   and Joann M. Thurston.  Those are your parents,
3   right?
4       A.    Yes, ma'am.
5       Q.    If you look at the top right it says
6   policy period, January 1st, 2022 to July 21, 2022,
7   do you see that?
8       A.    Yes.
9       Q.    And the accident with the Volvo
10  happened on January 21st, 2022, correct?
11      A.    Yes, ma'am.
12      Q.    Do you see about a third of the way
13  down the page that it lists the 2012 Volvo XC70?
14      A.    Yes, ma'am.
15      Q.    And that's the same Volvo we've been
16  talking about, right?
17      A.    Yes, ma'am.
18      Q.    And do you see at the very bottom of
19  the page it says prepared February 9, 2022?
20      A.    Yes.
21      Q.    MR. FREDERICK:  Where is that?
22          MS. WHITE:  At the very bottom of the
23  page.
24          MR. FREDERICK:  Thank you.
25  BY MS. WHITE:

Page 45

1       Q.    So according to this document, as of
2   February 9, 2022 your parents still had insurance
3   coverage with State Farm on the Volvo, correct?
4       A.    Yes, that's what that means.
5       Q.    Do you know why they didn't cancel
6   their insurance when they gave you the Volvo in
7   January?
8       A.    I believe their insurance was -- no, I
9   don't know why they didn't.
10      Q.    So according to this document, as of
11  January 21, 2022, which is the day of your
12  accident, the Volvo was still covered under your
13  parents' State Farm auto insurance, correct?
14      A.    Yes, ma'am.
15      Q.    Did you file a claim with State Farm?
16      A.    I talked to State Farm.  I don't
17  believe I filed a claim.
18      Q.    When you say you talked to State Farm,
19  who did you talk to?
20      A.    I'm not sure.
21      Q.    Did you talk to State Farm the company,
22  or did you talk to the State Farm agent?
23      A.    Presumably an agent, I don't know.
24      Q.    Did you talk to Sam Daily who's listed
25  here as your parents' State Farm agent?

                                                    12 (Pages 42 - 45)

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

Page 46

1    A.    Once again, I don't recall.
2    Q.    Were you aware that your parents still
3 had insurance on the Volvo as of the date of the
4 accident?
5    A.    I think there was some confusion to
6 that fact.
7    Q.    What was your understanding at the
8 time?
9    A.    My understanding was that their
10 insurance had expired the day before the accident.
11    Q.    And where did that understanding come
12 from?
13    A.    Texts with my mother.
14    Q.    And did your parents tell you that they
15 talked to State Farm about the accident?
16    A.    Yes.
17    Q.    Did your parents file a claim with
18 State Farm?
19    A.    I don't know.
20    Q.    So it was your parents' understanding
21 from their conversations with State Farm that
22 there was no coverage on the Volvo as of the date
23 of the accident?
24    A.    That was my understanding.
25 (Thurston Exhibit 3 was marked for identification.)

Page 47

1 BY MS. WHITE:
2    Q.    Knowing now that your parents had
3 coverage through State Farm for the Volvo, if you
4 had known that back in 2022, would you have filed
5 a claim with State Farm?
6    A.    I don't know.
7    Q.    I'm showing you a document that we will
8 mark as Exhibit 3. Have you seen this document
9 before?
10    A.    Presumably.
11    Q.    And is this your renewal declarations
12 page with Progressive?
13    A.    Yes.
14    Q.    All right, and there are three
15 vehicles. If you start at the bottom of the first
16 page and go on to the next page there are three
17 vehicles listed there, a 2000 Subaru, a 2016
18 Hyundai Tucson, and a 2016 Honda CRV, right?
19    A.    Yes.
20    Q.    And the Volvo wasn't covered under your
21 policy, right?
22    A.    It was not listed on my policy.
23    Q.    And you hadn't added the Volvo to your
24 policy before the accident, did you?
25    A.    Correct.

Page 48

1    Q.    Did you add the Volvo to your policy
2 after the accident?
3    A.    I -- I think the agent may have or
4 something. I don't know how all that worked.
5    Q.    All right, so the accident happened
6 January 21, 2022, is that right?
7    A.    Yes.
8    Q.    Can you explain what happened in the
9 accident?
10    A.    I was driving down the road. A vehicle
11 turned in front of me into the Sedgwick Elementary
12 School. I noticed them turning, and braked and
13 turned to avoid hitting them.
14    Q.    And did you hit the other vehicle?
15    A.    I did not.
16    Q.    Did you hit anything?
17    A.    I hit a tree.
18    Q.    Was anybody else in the vehicle with
19 you?
20    A.    My daughter.
21    Q.    Was anybody hurt in the accident?
22    A.    No.
23    Q.    What was the damage to the Volvo?
24    A.    My airbag deployed. There was damage
25 to the front.

Page 49

1    Q.    And there was a police report, right?
2    A.    Yes.
3    Q.    And the police report said that you
4 were not at fault, the other driver was at fault,
5 is that right?
6    A.    I haven't seen the police report.
7    Q.    Okay.
8    A.    But that was my understanding.
9    Q.    Your understanding is that the other
10 driver was at fault.
11         Did you get the other driver's
12 insurance information?
13    A.    I think so, or it was supposed to be on
14 the police report. I'm not sure of the exact
15 sequence.
16    Q.    Did you report the claim to the other
17 driver's insurance company?
18    A.    I did not.
19    Q.    You did not.
20    A.    I don't think. I ...
21    Q.    I'm not trying to trick you here.
22    A.    Yeah. I mean --
23    Q.    Sorry, I'm not trying to trick you. I
24 can find a document shortly.
25    A.    Okay.

13 (Pages 46 - 49)

Matthew Thurston                                                        January 22, 2024
Multiple Plaintiffs v. Progressive

Page 50

1      Q.   If I told you that the other driver had
2   GEICO insurance --
3      A.   That sounds familiar.
4      Q.   -- would that refresh your memory?
5      A.   I do remember them having GEICO
6   insurance.
7      Q.   You just don't remember if you filed a
8   claim with GEICO?
9      A.   I don't believe I did, but. I -- I'll
10  just shut up.
11     Q.   We'll get through -- I'll get to some
12  documents later.
13         Did you report the claim to State Farm?
14     A.   Yes. Or report the claim? I'm sorry.
15     Q.   Yes. Did you file a claim with State
16  Farm right after the accident?
17     A.   I did not. The accident was reported
18  to GEICO. I don't know if that counts as a claim
19  or not.
20     Q.   Who reported to GEICO --
21         THE WITNESS:  Did I say GEICO?
22         MR. FREDERICK:  You did say GEICO.
23     A.   Sorry, the accident was reported to
24  State Farm. My apologies.
25  BY MS. WHITE:

Page 51

1      Q.   Did your parents report it to State
2   Farm?
3      A.   I believe so.
4      Q.   And did State Farm tell you the claim
5   would be covered?
6      A.   They didn't tell me that.
7      Q.   Did State Farm inform your parents of
8   the coverage decision?
9      A.   I don't know.
10     Q.   Did you ever talk to anybody at State
11  Farm about your claim?
12     A.   I talked to somebody at State Farm at
13  one point. No recollection of who.
14     Q.   When did you report the claim to
15  Progressive?
16     A.   I don't remember what day.
17     Q.   Was it the day of the accident or
18  later?
19     A.   I believe it might have been the next
20  day, but I don't remember specifically.
21     Q.   And why did you decide to report the
22  claim to Progressive if it wasn't your fault?
23     A.   I called Progressive to ask if I should
24  report the claim to them or if I should go through
25  the other insurance, and that led me to -- they

Page 52

1   seemed to just have me file the claim with them.
2          MS. WHITE:  All right, I think we can
3   go off the record.
4          THE VIDEOGRAPHER:  Stand by. The time
5   is approximately 12:23 p.m., and we're going off
6   the record.
7          (Recess taken.)
8          THE VIDEOGRAPHER:  The time is
9   approximately 1:02 p.m., and we're back on the
10  record.
11  BY MS. WHITE:
12     Q.   Mr. Thurston, I want to play you an
13  audio file.
14         (Audio played.)
15  BY MS. WHITE:
16     Q.   Did you recognize the voice on that
17  recording?
18     A.   My own.
19     Q.   And is that you that said I was driving
20  somebody else's vehicle and got into an accident?
21     A.   Yes.
22     Q.   Were you referring to the Volvo?
23     A.   Yes.
24     Q.   And why did you say that you were
25  driving someone else's vehicle?

Page 53

1      A.   I thought that's what the ownership
2   was, since I had not completed a transfer of title.
3      Q.   So you were referring to legally it was
4   still your parents' vehicle?
5      A.   That -- yes.
6      Q.   Okay. I want to play you another audio
7   file. It's going to take me a second to get to
8   the right spot.
9          MR. FREDERICK:  Can you identify that
10  for me, which you provided it to us?
11         MS. WHITE:  Yes. That -- the one that
12  I've just played was Bates labeled
13  PGR_Thurston_0000097.
14         MR. FREDERICK:  00 --
15         MS. WHITE:  A bunch of zeros and ends
16  in 97. And the one I'm going to play is
17  PGR_Thurston_0000098. All right?
18         MR. FREDERICK:  Yup.
19         (Audio played.)
20  BY MS. WHITE:
21     Q.   Okay, and was that you talking on that
22  audio recording?
23     A.   It was.
24     Q.   You stated in that audio recording that
25  you were driving -- you had driven the car to

14 (Pages 50 - 53)

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

Page 54

1    Maine for them, meaning your parents.  Why did you
2    say you had driven the car to Maine for them?
3        A.    I'm not sure.
4        Q.    You said that your parents weren't
5    planning on using the car for the next four
6    months.  Were they planning on using it again in
7    four months?
8        A.    No.
9        Q.    So why did you tell Progressive that
10    you were only using the car until your parents
11    would use it again in four months?
12        A.    Did I say that?
13        Q.    You said you had driven that car to
14    Maine for them, they weren't planning on using it
15    for the next four months.  Can you explain why you
16    told Progressive this?
17        A.    No.
18        Q.    Did you plan to get your wife's CRV
19    repaired?
20        A.    Yes, it was in the shop.
21        Q.    And did you also plan to keep the
22    Volvo?
23        A.    Yes.
24        Q.    Did you plan to add the Volvo to your
25    Progressive policy, or replace one of your other

Page 55

1    vehicles with the Volvo?
2        A.    I planned to add it to my policy.  I
3    also intended to get rid the Subaru at some point.
4        Q.    So given that the Volvo was not added
5    to your policy, do you recall why Progressive
6    decided to cover your claim?
7        A.    No.
8        Q.    Did you ever transfer the Volvo's title
9    from your mom to you?
10        A.    No.
11        Q.    Do you have any documentation to show
12    that you became the owner of the Volvo?
13        A.    Yes.
14        Q.    And what documentation is that?
15        A.    Texts between my dad and I.
16        Q.    Legally, was your dad the owner of the
17    title?
18        A.    I don't know the legal status of
19    ownership of marital assets in Louisiana.
20        Q.    So it's your contention that you became
21    the owner of the Volvo, and the documentation is
22    just the text messages with your dad?
23        A.    Yes.
24        Q.    Did you ever pay any additional
25    premiums to Progressive to add coverage for the

Page 56

1    Volvo to your policy?
2        A.    I did not.  Well, I'm not -- I think
3    Kyle added it to my policy at some point, and I may
4    have been charged a premium after the accident.
5        Q.    When you say Kyle, are you referring to
6    a Progressive employee?
7        A.    Yes.
8        Q.    So you think Kyle added the Volvo to
9    your policy?
10        A.    Something like that happened.
11        Q.    And you may have paid some additional
12    premium for the Volvo?
13        A.    Yes.
14        Q.    Who mainly handled the claim with
15    Progressive, was it you or your parents?
16        A.    Myself.
17        Q.    Do you remember who at Progressive you
18    talked to about the claim?
19        A.    Kyle Mayer is the only name I remember.
20        Q.    Did you ever receive a denial letter
21    from State Farm that they would not cover the
22    claim?
23        A.    I did not.
24        Q.    Do you know if State Farm ever
25    inspected the Volvo?

Page 57

1        A.    I do not know.
2        Q.    Did GEICO ever inspect the Volvo?
3        A.    I do not know.
4        Q.    Did GEICO ever offer to cover the
5    claim?
6        A.    I do not know.
7        Q.    Progressive inspected the Volvo as part
8    of your claim, correct?
9        A.    I think a representative they hired
10    inspected the Volvo.
11        Q.    Were you present for the inspection?
12        A.    I was not.
13        Q.    Do you recall when the inspection
14    occurred?
15        A.    I do not.
16        Q.    Do you recall the name of the person
17    who inspected your vehicle?
18        A.    No.
19        Q.    And Progressive determined that the
20    Volvo was a total loss, is that right?
21        A.    That is correct.
22        Q.    And what does total loss mean to you?
23        A.    It means that the insurance company is
24    not willing to cover the cost of repair.
25        Q.    And is that because the cost of repair

15 (Pages 54 - 57)

Page 58

1    is more than the car is worth?
2        A.    No.
3        Q.    So in a total loss, what do you believe
4    Progressive is supposed to pay, if not the cost to
5    repair?
6        A.    In a total loss?
7        Q.    Uh-hum.
8        A.    They're supposed to pay the actual cash
9    value.
10       Q.    Do you disagree with Progressive's
11   determination that the Volvo was a total loss?
12       A.    I don't have an opinion on that.
13       Q.    Do you think Progressive should have
14   paid for the repairs to the Volvo?
15       A.    I don't have an opinion on that.
16       Q.    Is part of your lawsuit that
17   Progressive wrongly determined that the Volvo was
18   a total loss?
19       A.    No.
20       Q.    Did you want Progressive to repair the
21   Volvo?
22       A.    Initially we did ask if that was a
23   possibility.
24       Q.    And what did Progressive say?
25       A.    No.

Page 59

1        Q.    Do you recall how much the repairs for
2    the Volvo were estimated to be?
3        A.    I think it was in the neighborhood of
4    $10,000.  Actually, the repairs were 8,800, maybe,
5    and part of that was towing and storage fees.
6        Q.    Did Progressive ever talk to you about
7    retaining the salvaged vehicle?
8        A.    Yes, they did tell me how much my
9    payout would be reduced by if I chose to do that.
10       Q.    And what did you decide?
11       A.    We decided not to retain the salvaged
12   vehicle.
13       Q.    If Progressive had valued the Volvo
14   higher, the actual cash value of the Volvo, do you
15   know if it still would have been considered a
16   total loss?
17       A.    That determination was made by
18   Progressive.
19       Q.    Do you remember how long it took from
20   the time that you filed the claim with Progressive
21   for them to tell you what the value of the Volvo
22   would be?
23       A.    Approximately a month.
24       Q.    Did Progressive make a settlement offer
25   to you?

Page 60

1        A.    I guess so.
2        Q.    And when was that?
3        A.    When they provided me with the value of
4    the vehicle.
5        Q.    And who at Progressive made that offer?
6        A.    Kyle was the only person I remember
7    communicating with.
8        Q.    Do you recall what Progressive
9    determined the actual cash value of the Volvo to
10   be?
11       A.    12,000 something.
12       Q.    How did Progressive calculate that
13   actual cash value?
14       A.    They hired a company to do it for them.
15       Q.    What company did they hire?
16       A.    I can't remember.
17       Q.    How do you think Progressive should
18   determine the actual cash value of totaled
19   vehicles like the Volvo?
20       A.    I don't know.
21       Q.    Do you think that Progressive should
22   not have hired the company to estimate the actual
23   cash value of your Volvo?
24       A.    No.
25           MR. FREDERICK:  Just objection to the

Page 61

1    form.  He already answered, so.
2    BY MS. WHITE:
3        Q.    You testified that Progressive hired
4    another company to calculate the actual cash
5    value.  Do you think that Progressive should not
6    have hired that company to determine actual cash
7    value?
8            MR. FREDERICK:  Objection to the form.
9    Go ahead and answer.
10       A.    No.
11   BY MS. WHITE:
12       Q.    What do you think Progressive should
13   have done differently in estimating the actual
14   cash value of your Volvo?
15       A.    Not included a projected sales
16   adjustment, or sold adjustment.
17       Q.    You think Progressive should not have
18   included the projected sold adjustment.  Anything
19   else?
20       A.    Looking at the estimate, there were a
21   number of items I disagreed with.
22       Q.    And you rejected Progressive's
23   settlement offer, correct?
24       A.    I chose to retain counsel.
25       Q.    Aside from hiring a third-party company

16 (Pages 58 - 61)

Page 62

1 to estimate the actual cash value, are there other
2 ways Progressive could have determined the actual
3 cash value of your Volvo?
4    A.   Yes.
5    Q.   And what ways are those?
6    A.   I don't know.
7    Q.   In determining actual cash value, do
8 you think it makes sense to look at the sale price
9 of comparable vehicles?
10    A.   Yes.
11    Q.   And would you look at vehicles of the
12 same year, make and model?
13    A.   Yes.
14    Q.   In determining actual cash value, would
15 you take a vehicle's condition into account?
16    A.   Yes.
17    Q.   How would you determine the condition
18 of an automobile?
19    A.   I'd have someone look at it.
20    Q.   Do you think it makes sense to inspect
21 a vehicle in person to determine its condition?
22    A.   Yes.
23    Q.   In determining the actual cash value of
24 a vehicle, would you want to know whether the
25 vehicle had a salvage title?

Page 63

1    A.   I'm not sure.
2    Q.   In determining actual cash value, do
3 you think it makes sense to consider the vehicle's
4 mileage?
5    A.   Yes.
6    Q.   You believe that Progressive should
7 have offered you more for the Volvo, right?
8    A.   Yes.
9    Q.   And why do you think they should have
10 offered you more?
11    A.   I didn't think their offer reflected
12 the actual cash value.
13    Q.   And what's the basis for that belief?
14    A.   Well, the projected sales, sold
15 adjustment seemed to be arbitrary, and other
16 determinations of value that I saw did not match
17 with Progressive's offer.
18    Q.   What other determinations of value are
19 you referring to?
20    A.   I looked at values from Kelley Blue
21 Book. I spoke with -- or I think my father spoke
22 with a car dealer who then sent me what he would
23 value the car at, and he was local to Louisiana.
24 And I looked at how adjustments were made to the
25 vehicles which Progressive had provided to me.

Page 64

1    Q.   Did you look anywhere else to determine
2 what the Volvo was worth?
3    A.   Not that I remember specifically.
4    Q.   What car dealer did your father speak
5 with?
6    A.   I don't remember his name.
7    Q.   And you said that he sent you what he
8 would value the vehicle at?
9    A.   Yes, ma'am.
10    Q.   Was that in an e-mail?
11    A.   I believe so.
12 (Thurston Exhibit 4 was marked for identification.)
13 BY MS. WHITE:
14    Q.   All right, I'm showing you a document
15 marked as Exhibit 4. Have you seen this document
16 before?
17    A.   Yes.
18    Q.   Is this the vehicle valuation report
19 that Progressive provided you for the Volvo?
20    A.   Yes.
21    Q.   Do you see in the bottom right corner
22 it says Mitchell WorkCenter total loss?
23    A.   Yes.
24    Q.   Is it your understanding that this
25 report was prepared by Mitchell?

Page 65

1    A.   Yes.
2       MR. FREDERICK:  And just for the
3 record, we're looking at document Bates number
4 000296 and through 302.
5       MS. WHITE:  All right.
6       MR. FREDERICK:  That's also for John
7 and Scott to find as well.
8       MS. WHITE:  Understood.  We are looking
9 at the vehicle valuation report.
10 BY MS. WHITE:
11    Q.   All right, so the claim number on this
12 vehicle valuation report is 22-5056549.  Do you
13 see that?
14    A.   Yes.
15    Q.   And the report is dated February 17,
16 2022.  Do you see that?
17    A.   Yes.
18    Q.   If you look at the section titled
19 vehicle information, does everything in that
20 section accurately describe the Volvo?
21    A.   I'm not sure.
22    Q.   Was it a 2012 Volvo XC70 four-door
23 wagon, 3.2 liter engine, 6 cylinder gas, automatic
24 forward wheel drive -- or front-wheel drive?
25    A.   As far as I know.

17 (Pages 62 - 65)

January 22, 2024

Page 66

1    Q.    And did the Volvo at the time of the
2  accident have 55,374 miles?
3    A.    That seems about right.
4    Q.    If you look in the next section titled
5  valuation summary, do you see where it says --
6    A.    Well --
7    Q.    Just the next section down on the page.
8    A.    Okay.  Well, the vehicle information,
9  it seems to state the license plate of Maine,
10  unless I'm misunderstanding that, but it was still
11  plated in Louisiana.
12    Q.    Okay.  So that part isn't correct, got
13  it.  The section that says location under vehicle
14  information, it says LA 70809.  Is that your
15  parents' ZIP code?
16    A.    Yes.
17    Q.    And at the time of the accident the
18  owner was Scott Thurston in Baton Rouge,
19  Louisiana, 70809?
20    A.    I'm not -- I can't determine what the
21  ownership was.
22    Q.    Did you disagree with Progressive's use
23  of your parents' Louisiana ZIP code for purposes
24  of this valuation report?
25    A.    I'm not sure.  I believe I discussed it

Page 67

1  with Kyle.  I don't know, though.
2    Q.    Did you ask Progressive to use your ZIP
3  code instead?
4    A.    I'm not sure if I did or not.
5    Q.    All right, let's look at the next
6  section, it says valuation summary.  Do you see
7  where it says base value $13,231.80?
8    A.    Yes.
9    Q.    Do you believe Progressive incorrectly
10  calculated the base value of the Volvo?
11    A.    I don't know.
12    Q.    As part of this lawsuit, are you
13  challenging Progressive's calculation of the base
14  value?
15    A.    I'm not.
16    Q.    The next line down says condition, and
17  there is a negative $462.43.  Do you see that?
18    A.    I do.
19    Q.    Do you believe that Progressive
20  incorrectly calculated the condition adjustment?
21    A.    I'm not sure.
22    Q.    As part of this lawsuit, are you
23  challenging the condition adjustment?
24    A.    I'm not.
25    Q.    Two lines down there is an adjustment

Page 68

1  for aftermarket parts, and it shows that
2  Progressive added $55.  Do you see that?
3    A.    I do.
4    Q.    Do you believe Progressive incorrectly
5  calculated the aftermarket parts?
6    A.    I don't know.
7    Q.    All right.  The final market value,
8  according to this valuation report, is $12,824.37.
9  Do you see that?
10    A.    I do.
11    Q.    Do you believe Progressive incorrectly
12  calculated the market value of the Volvo?
13    A.    I do.
14    Q.    How so?
15    A.    Well, we've already discussed it.
16  Didn't I already answer that?
17    Q.    Well, specific to this report, why do
18  you believe the market value is incorrect?
19    A.    Because the projected sold adjustment
20  is applied to the vehicle.
21    Q.    Is that it?
22    A.    And, as we discussed, other
23  determinations of value didn't seem to line up with
24  it.
25    Q.    Okay.  All right, I'm going to look at

Page 69

1  the next page.  It says loss vehicle detail.  So
2  on page 2 and spilling over into page 3 there is a
3  list of equipment.  And I'll give you a second to
4  read through it, but my question is going to be,
5  did the Volvo have all the features that were
6  listed here?
7    A.    I couldn't be sure.
8    Q.    Did you review this report at the time
9  you received it?
10    A.    Yes.
11    Q.    Was there anything listed here that you
12  didn't think the Volvo had?
13    A.    Nothing stood out to me.
14    Q.    Did the Volvo have any options or
15  packages that are not listed here?
16    A.    I don't know.
17    Q.    So on pages 2 and 3 it lists standard
18  equipment, it doesn't list any options or
19  packages.  So would you agree that the Volvo was
20  the base model?
21    A.    I don't know.
22    Q.    All right, if you look down on page 3
23  under loss vehicle base value it shows regional
24  comparable vehicle information, and there are
25  three vehicles listed here.  And the first two are

18 (Pages 66 - 69)

Page 70

1    Volvo XC70 Premier Plus, and then the third one is
2    a Volvo XC70 Premier.  Was your parents' Volvo a
3    Premier or Premier Plus trim?
4        A.   I don't know.
5        Q.   Did you ever tell Progressive that the
6    trim was incorrect on this valuation report?
7        A.   I'm not sure.
8        Q.   All right, you can go over to page 4 of
9    the valuation report.  Do you see where it says
10   condition adjustments?
11       A.   Yes.
12       Q.   All right.  So on that top line it says
13   typical vehicle condition 3.00, but overall
14   condition for your parents' Volvo was a 2.65.  Do
15   you see that?
16       A.   I do.
17       Q.   Do you agree with that rating?
18       A.   I'm not sure.
19       Q.   All right.  If you look at the category
20   for the headliner, that is rated a 2, and the
21   comments say that there were some stains.  Would
22   you agree that there were stains on the headliner
23   of the vehicle?
24       A.   Not to my memory, but.
25       Q.   Did you tell Progressive that you

Page 71

1    disagreed with the assessment that there were
2    stains on the headliner?
3        A.   Not to my memory.
4        Q.   If you look down to the category that
5    says doors and interior panels, that's also rated
6    a 2, and the comments say greater than three
7    gouges.  Do you recall there being more than three
8    gouges on the doors and interior panels?
9        A.   I don't recall that.
10       Q.   Do you recall telling Progressive that
11   you disagreed with their assessment that there
12   were more than three gouges on the doors and
13   panels?
14       A.   Not to my memory.
15       Q.   If you look down to the body, that is
16   rated a 2, and it says crease in right rear door.
17   Do you agree with that assessment?
18       A.   I don't remember a crease.
19       Q.   Did you tell Progressive that you
20   didn't remember there being a crease in the right
21   rear door?
22       A.   I don't believe so.
23       Q.   If you look at the category labeled
24   paint, that also says 2, and it says numerous
25   small scratches.  Do you agree with that

Page 72

1    assessment?
2        A.   Sure.
3        Q.   The next section says aftermarket parts
4    and OEM equipment adjustments.  Do you see where
5    it adds $55 for all-weather floor mats?
6        A.   I do.
7        Q.   And it says two rows.  Were there more
8    than two rows of all-weather floor mats in the
9    Volvo?
10       A.   No.
11       Q.   Do you think more should have been
12   added for the floor mats?
13       A.   I don't know.
14       Q.   Are there any other aftermarket parts
15   that were in the Volvo or on the Volvo that are
16   missing from this report?
17       A.   I don't think so.
18       Q.   All right.  On the next page, page 5,
19   we see the specifics of each of the comparable
20   vehicles that were used in this report.
21   Comparable vehicle one shows a list price of
22   $11,569.  Do you see that?  It's the very top line
23   on the page.
24       A.   Oh, yeah, sorry.  Yup.
25       Q.   Do you understand that the list price

Page 73

1    means the price for which that vehicle was
2    advertised for sale?
3        A.   I do.
4        Q.   And there are several adjustments here,
5    the first being the projected sold adjustment.  Do
6    you agree with that adjustment, $398?
7        A.   I don't.
8        Q.   Why not?
9        A.   I don't understand the basis for it.
10       Q.   Let's look at the last page of the
11   report, page 7.  Do you see at the top where it
12   says vehicle valuation methodology explanation?
13       A.   I do.
14       Q.   And if you look under step 2, adjust
15   comparable vehicles, that first bullet point, do
16   you see the projected sold adjustment bullet
17   point?
18       A.   I do.
19       Q.   And it's described as an adjustment to
20   reflect consumer purchasing behavior, negotiating
21   a different price than the listed price.  Do you
22   see that?
23       A.   I do.
24       Q.   So based on that explanation, do you
25   understand the purpose of the projected sold

19 (Pages 70 - 73)

Matthew Thurston
Multiple Plaintiffs v. Progressive                                    January 22, 2024

Page 74

1  adjustment?
2      A.   I don't.  I mean, I understand the idea
3  behind it.
4      Q.   Okay.  So understanding the idea behind
5  it, what is your understanding of the idea?
6      A.   Progressive seems to assume that all
7  prices are negotiated.
8      Q.   And do you believe that used car prices
9  are never negotiated?
10      A.   No.
11      Q.   Do you believe that used car prices are
12  sometimes negotiated?
13      A.   Yes.
14      Q.   So is your disagreement with the
15  projected sold adjustment, is it your
16  understanding that because all used vehicle
17  purchases are not negotiated, the projected sold
18  adjustment is improper?
19      A.   No.
20      Q.   Okay, so what is your view on why the
21  projected sold adjustment is improper?
22      A.   It makes a baseless assumption.
23      Q.   And when you say it's a baseless
24  assumption, what do you mean by that?
25      A.   It's a number pulled out of thin air,

Page 75

1  assuming, and applied to that vehicle.
2      Q.   Do you know how Mitchell calculates the
3  projected sold adjustment?
4      A.   I don't.
5      Q.   So when you say that it's a number
6  pulled out of thin air, you actually don't know
7  how they come up with that number, right?
8      A.   I don't.
9      Q.   The next adjustment for comparable
10  vehicle 1 is the vehicle configuration adjustment,
11  and that is negative $1,264.41.  Do you see that?
12      A.   I do.
13      Q.   Do you agree with that adjustment?
14      A.   I'm not sure.
15           MR. FREDERICK:  Where are we looking
16  again?
17           MS. WHITE:  We're still on page 5,
18  comparable vehicle 1.
19           MR. FREDERICK:  I thought we were on 7
20  before.  Okay.
21  BY MS. WHITE:
22      Q.   Do you understand the purpose of the
23  vehicle configuration adjustment?
24      A.   I do.
25      Q.   And what's your understanding of that

Page 76

1  one?
2      A.   It's to adjust for vehicles with
3  different features.
4      Q.   And do you agree that there were
5  differences in the features between comparable
6  vehicle 1 and your parents' Volvo?
7      A.   Yes.
8      Q.   And what were those differences?
9      A.   I don't know exactly.
10      Q.   All right, the next adjustment listed
11  there is mileage, and it adds $2,364.71.  Do you
12  see that?
13      A.   I do.
14      Q.   Do you disagree with that adjustment?
15      A.   I'm not sure.
16      Q.   Do you think that the mileage
17  adjustment should have been higher?
18      A.   I don't know.
19      Q.   All right.  The next line beyond says
20  equipment, and there are two equipment
21  adjustments, one for $295.92 and one for $210.46.
22  Do you disagree with those equipment adjustments?
23      A.   No.
24      Q.   So for comparable vehicle 1, is it your
25  contention that the only issue is the projected

Page 77

1  sold adjustment and the other adjustments are
2  fine?
3      A.   That's the only reason I brought this
4  case.
5      Q.   All right.  For comparable vehicle 2,
6  do you see where the list price there is $15,991?
7      A.   I do.
8      Q.   And the projected sold adjustment there
9  is a negative $537.  Do you disagree with that
10  projected sold adjustment?
11      A.   Yes.
12      Q.   Did you ever contact Jack Ingram
13  Motors, the dealership that listed comparable
14  vehicle 2?
15      A.   I did not.
16      Q.   So you don't know whether they would
17  have accepted $537 less than the list price for
18  that vehicle?
19      A.   I do not.
20      Q.   So what is the basis of your
21  disagreement with that projected sold adjustment?
22      A.   The same as my disagreement with the
23  previous one.
24      Q.   And can you explain again what your
25  disagreement is?

20 (Pages 74 - 77)

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

Page 78

1    A.    Arbitrarily applied, pulled out of thin
2    air, I think is what I stated.
3    Q.    But you also stated you don't know how
4    it was calculated?
5    A.    That is correct.
6    Q.    Do you believe that a consumer could
7    not have negotiated $537 off of the list price of
8    comparable vehicle 2?
9    A.    I don't know.  I'm not Jack Ingram.
10   Q.    If, in fact, comparable vehicle 2 sold
11   for 15,000 even, would you still disagree with the
12   projected sold adjustment?
13   A.    Yes.
14   Q.    And why is that?
15   A.    Because it was applied without that
16   basis.
17   Q.    Because it was applied without what
18   basis?
19   A.    Arbitrarily applied, just as an
20   assumption.
21   Q.    So you would disagree with the
22   projected sold adjustment, even if it turned out
23   that the projected sold adjustment overestimated
24   the price for which that vehicle would sell?
25   A.    Yes.

Page 79

1    Q.    Do you think that the Volvo would have
2    been valued higher had Mitchell used an actual
3    sales price, say $15,000, for comparable vehicle
4    2?
5          MR. FREDERICK:  Objection, calls for
6    speculation.  Go ahead and answer.
7    A.    Could you repeat the question?
8    BY MS. WHITE:
9    Q.    Sure.  So assuming that comparable
10   vehicle 2 actually sold for $15,000, so $991 less
11   than it was listed for.
12   A.    Uh-hum.
13   Q.    If Mitchell had used the actual sold
14   price of $15,000, is it your understanding that
15   the Volvo would have been valued lower?
16         MR. FREDERICK:  Objection, calls for
17   speculation, assumes facts not in evidence.  Go
18   ahead and answer.
19   A.    I mean, all things being the same, yes,
20   Mitchell would have valued it lower.
21   BY MS. WHITE:
22   Q.    Would you have any objection if
23   Progressive only relied on actual sold prices?
24   A.    I -- there wouldn't be a projected sold
25   adjustment to object to, is that correct?

Page 80

1    Q.    Correct.
2    A.    Is that what you're saying?
3    Q.    Correct.
4    A.    Then I would not have an objection with
5    the projected sold adjustment.
6    Q.    All right.  So for comparable vehicle 2
7    there's also a vehicle configuration adjustment
8    and a mileage adjustment.  Do you disagree with
9    either of those adjustments?
10   A.    I'm not sure.
11   Q.    All right.  For comparable vehicle 3,
12   do you see at the top that the list price was
13   $12,700?
14   A.    I do.
15   Q.    And did you contact Hendrick Subaru
16   about comparable vehicle No. 3?
17   A.    I did not.
18   Q.    Do you disagree with the projected sold
19   adjustment of negative $427 that was applied to
20   comparable vehicle 3?
21   A.    I do.
22   Q.    Do you believe that a consumer could
23   not have negotiated $427 off of the list price of
24   comparable vehicle 3?
25   A.    I don't know, I'm not Hendrick Subaru.

Page 81

1    Q.    Did you tell Progressive that you
2    disagreed with their valuation?
3    A.    Yes.
4    Q.    And can you summarize the reasons that
5    you gave to Progressive for why you disagreed?
6    A.    Yes.  I told Progressive that other
7    determinations of value such as Blue Book, Kelley
8    Blue Book, did not match up with their valuation.
9    The dealer that I contacted had a significantly
10   different valuation for the vehicle, and the
11   mileage adjustments didn't seem to be applied
12   uniformly.
13   (Thurston Exhibit 5 was marked for identification.)
14         MR. FREDERICK:  When you're ready for a
15   break.
16         MS. WHITE:  After we do this exhibit.
17         MR. FREDERICK:  I just need to run to
18   the bathroom.
19         MS. WHITE:  Okay, we can take a short
20   bathroom break.
21         THE VIDEOGRAPHER:  The time is 1:51, we
22   are going off the record.
23         (Recess taken.)
24         THE VIDEOGRAPHER:  The time is
25   approximately 2:04 p.m., and we're back on the

21 (Pages 78 - 81)

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

Page 82

1    record.
2    BY MS. WHITE:
3        Q.    All right, I'm showing you a document
4    marked as Exhibit 5.  Have you seen this document
5    before?
6        A.    Yes, I believe so.
7        Q.    And this is a letter that Progressive
8    received from your attorney, John Steed, in March
9    2022, and it's Bates labeled PGR_Thurston_0000126.
10   And you see that it was sent on March 15, 2022?
11       A.    Yes.
12       Q.    And the valuation report we just looked
13   at was on February 17, 2022, so this is about a
14   month later, right?
15       A.    Correct.
16       Q.    So attached to the back of this letter
17   there are several e-mails, and they're not
18   necessarily in chronological order, so I'm going
19   to point you to the first in time, which is on the
20   page which ends in 129.  And the date of the
21   e-mail is February 21st, 2022 at 3:37 p.m., and
22   it's from you to Kyle Mayer.  Do you see that?
23       A.    I do.
24       Q.    Is this an e-mail that you sent to Kyle
25   Mayer?

Page 83

1        A.    Yes.
2        Q.    Okay.  It looks like you had a few
3    concerns with the valuation report, and the first
4    being that the comparable vehicle selected had
5    higher mileage than the Volvo, is that right?
6        A.    Yes.
7        Q.    And do you believe that Mitchell should
8    have used different comparable vehicles to
9    determine the value of your parents' Volvo?
10       A.    Not necessarily.
11       Q.    So you're not disputing the use of
12   those comparable vehicles because they had
13   significantly higher mileage?
14       A.    No.
15       Q.    And it appears you wanted an
16   explanation for how the mileage adjustment was
17   calculated, correct?
18       A.    I'm not sure if I asked for an
19   explanation, I just put forth my -- what I noticed.
20       Q.    Okay.  And it was your understanding
21   that you had a certain number of cents per mile?
22       A.    There -- I mean, if you take the
23   mileage and the number of dollars, you come up with
24   cents per mile.
25       Q.    Has anyone at Progressive ever

Page 84

1    explained to you how the mileage adjustment was
2    calculated?
3        A.    They didn't.
4        Q.    And to date, do you understand how the
5    mileage adjustment was calculated?
6        A.    I don't.
7        Q.    Earlier when we went through your
8    report, you said you didn't know if you were
9    challenging the mileage adjustment or not.
10       A.    I know I'm not challenging it in this
11   case.
12       Q.    Okay.  So in this February 21st, 2022
13   e-mail to Kyle Mayer, you pointed out some
14   discrepancies in the mileage adjustment as you
15   understood it, but you are no longer challenging
16   the mile adjustment, is that right?
17       A.    I am not challenging the mile
18   adjustment in this case.
19       Q.    Okay.  You also stated that the
20   valuation report for the Volvo didn't include all
21   the features that you believe it had, right?
22       A.    I did state that.
23       Q.    So you said in this e-mail, my vehicle
24   has added options which brought its MSRP above
25   37,000, about equal to a Premium Plus model.  What

Page 85

1    options are those?
2        A.    I'm not sure I was correct about that.
3    I was basing it off of my dad's recollection of the
4    MSRP.
5        Q.    Okay.  So sitting here today, are you
6    aware of any options that the Volvo had?
7        A.    Not that I can remember off the top of
8    my head.
9        Q.    And your understanding that the MSRP
10   was above 37,000, did that come from your father?
11       A.    Yes.
12       Q.    Since you sent this e-mail, have you
13   figured out why the MSRP was so much higher?
14       A.    I'm not sure what the MSRP was.  I
15   think that was based off his recollection.
16       Q.    Okay.  Was your parents' Volvo a
17   Premium Plus model?
18       A.    I don't know.
19       Q.    All right, the next concern you raise
20   is that the comparable vehicles are assumed to be
21   in perfect condition.  Did you try to look up
22   those listings that were in the report to confirm
23   the condition?
24       A.    I believe I tried to Google them and
25   was unable to find the listings.

22 (Pages 82 - 85)

Page 86

1    Q.   Did you contact any of the dealers
2  where those vehicles were listed?
3    A.   I did not.
4    Q.   Are you still challenging the
5  assumption that the vehicles listed in the
6  valuation report were in typical condition?
7    A.   I'm not.
8    Q.   All right.  And then it says you also
9  looked at the Kelley Blue Book private party value
10  for the vehicle, correct?
11    A.   Correct.
12    Q.   And if you flip over to the next page
13  ending in 130, the Blue Book value of my vehicle
14  was 17,641.  Do you see that?
15    A.   I do.
16    Q.   And how did you determine that Blue
17  Book value?
18    A.   By using Kelley Blue Book's Web site.
19    Q.   Okay.  If you flip over to the page
20  that ends in 140 there is what appears to be a
21  Kelley Blue Book report, and it's for a 2012 Volvo
22  XC70 with a mileage of 55,374.
23        Is this the Kelley Blue Book report
24  that you pulled for your parents' Volvo?
25    A.   Yes.  It seems to be.

Page 87

1    Q.   So can you walk me through how you
2  obtained this Kelley Blue Book report?
3    A.   I went on to Kelley Blue Book's Web
4  site, and I assume -- I had the VIN, so I probably
5  put the VIN into the Web site.
6    Q.   All right.  So if we flip -- so this
7  says, the first page, Kelley Blue Book, the
8  private party range is from $16,503 to $18,778, do
9  you see that?
10    A.   I do.
11    Q.   And then the middle of that range is
12  17,641.  Is that where you got the number that was
13  in your e-mail?
14    A.   Yes.  That's the same number, right?
15  Yeah.
16    Q.   Okay.  I don't see the VIN number
17  anywhere on this Kelley Blue Book report.  Do you
18  recall whether you actually entered the VIN
19  number, or if you just selected the options and
20  trim level that you believed the Volvo had?
21    A.   I don't recall.
22    Q.   If you flip over one page it says your
23  configured options.  And it says a check mark
24  means options that you added while configuring
25  this car.

Page 88

1        So I want to look under comfort and
2  convenience.  It says power liftgate release.  Did
3  you select that option in Kelley Blue Book's
4  system?
5    A.   Yes.
6    Q.   And did your parents' Volvo have a
7  power liftgate release?
8    A.   I believe so.
9    Q.   So if we look back at the valuation
10  report the Progressive provided you, was a power
11  liftgate release listed as an option that your
12  parents' Volvo had?
13    A.   There's a lot here.  Do you know the
14  answer to that already?
15    Q.   Well, I haven't found it.
16    A.   Okay.
17    Q.   But I could be wrong, so I'm asking
18  you.
19    A.   I'm not seeing it here.
20    Q.   And did you tell Progressive that that
21  was an option the vehicle had that they should
22  have accounted for in the Mitchell report?
23    A.   I did not.
24    Q.   All right.  Still looking at the Kelley
25  Blue Book report that you pulled, under seats it

Page 89

1  says leather heated seats.  Those are options you
2  selected, is that right?
3    A.   That's correct.
4    Q.   And did your parents' Volvo have
5  leather heated seats?
6    A.   It did.
7    Q.   It did?
8    A.   Yes, I believe so.
9    Q.   And if you look back at the valuation
10  report from Mitchell, do you see leather heated
11  seats here?
12    A.   I don't see seats of any kind, unless
13  I'm missing them.
14    Q.   Under interior I see power driver's
15  seat with adjustable lumbar three-position memory?
16    A.   Okay.  But it doesn't say they're cloth
17  on it, is that right?  Does it say cloth or
18  leather?
19    Q.   Doesn't say that it's leather, and
20  didn't say heated.
21    A.   Okay.
22    Q.   Did you ever point out to Progressive
23  that the valuation report they provided didn't
24  account for the leather heated seats?
25    A.   I didn't.

23 (Pages 86 - 89)

Matthew Thurston
January 22, 2024
Multiple Plaintiffs v. Progressive

Page 90

1    Q.    And do you know when you pulled this
2  Kelley Blue Book report what trim level you
3  selected?
4    A.    I believe I selected the base trim.  I
5  think it would say on the top if I had selected
6  Premium or Premium Plus.
7    Q.    Okay.  And when you pulled the Kelley
8  Blue Book report, what did you indicate was the
9  condition of your parents' Volvo?
10    A.    I believe I chose good.  I'm not sure
11  if it says here or not.
12    Q.    I'm just not seeing that on the report.
13    A.    Yeah.  I don't see it on their either.
14  Possibly I chose -- looking at their glossary of
15  terms, there's excellent and very good and good.  I
16  may have chosen very good, I may have chosen good.
17    Q.    Do you think that very good aligns with
18  the condition that Progressive assessed of your
19  parents' Volvo?
20    A.    Yes.
21    Q.    All right, the definition of good,
22  according to Kelley Blue Book, says its paint and
23  body work may require minor touchups with
24  repairable cosmetic defects.  There are minor body
25  scratches or dings, and minor interior blemishes,

Page 91

1  but no rust.
2        Do you think that that accurately
3  describes the condition in the valuation report
4  that discusses a crease in the right rear door and
5  numerous small scratches in paint?
6    A.    I think that could apply.
7    Q.    Kelley Blue Book says that fair
8  condition means the paint, body and/or interior
9  may need professional servicing.
10        Do you think professional servicing
11  would be required to repair the scratches in the
12  paint, the crease in the rear door, and the three
13  gouges on the interior panels?
14    A.    I think a professional, or somebody not
15  professional, could fix things, paint chips.
16    Q.    You think somebody who's not a
17  professional could fix the interior gouges and the
18  crease in the rear door?
19    A.    Yeah.
20    Q.    But we don't know which condition you
21  chose for this private party value of 17,641, do
22  we?
23    A.    We don't.  Not from this.
24    Q.    And it's your opinion that you probably
25  selected good or very good, based on your opinion

Page 92

1  of the vehicle's condition, right?
2    A.    Yes.
3    Q.    Okay.  Did you also pull a Kelley Blue
4  Book report that assumed the vehicle was in fair
5  condition?
6    A.    Not to my memory.
7    Q.    But if Progressive's assessment of the
8  vehicle aligned with fair condition, would you
9  agree that these are not apples to apples
10  comparisons?
11    A.    Could you repeat that question one more
12  time?  I'm sorry.
13    Q.    Sure.  So you're not sure whether this
14  Kelley Blue Book value of $17,641 is based on good
15  condition or very good condition, but would you
16  agree that if Progressive's valuation was based on
17  a condition assessment that aligned with fair,
18  that this Kelley Blue Book report would not be an
19  apples to apples comparison to Progressive's
20  valuation report?
21    A.    Yes.
22    Q.    I want to look back at the e-mail from
23  you to Kyle Mayer, and I'm looking at the page
24  that ends in Bates number 130.
25    A.    Okay.

Page 93

1    Q.    All right.  So the last substantive
2  paragraph of this e-mail says, I also was in
3  contact with a local Baton Rouge car dealer.  He
4  informed me that if he had my vehicle on his lot,
5  he would put a list price on my vehicle of 17,900,
6  and that 16,500 would be the low end of offers
7  that he would consider.  Do you see that?
8    A.    I do.
9        MR. FREDERICK:  I just have to sneeze.
10  BY MS. WHITE:
11    Q.    Do you recall the name of the dealer
12  that you spoke with in Baton Rouge?
13    A.    I don't.
14    Q.    Do you think it's common for dealers to
15  accept a value that is less than the list price?
16    A.    I don't know.
17    Q.    But the dealer that you talked to
18  indicated that he would accept less than the list
19  price for a vehicle, is that right?
20    A.    He indicated he would consider.
21    Q.    So if he's saying he would consider an
22  offer of 16,500, is it fair to assume he would
23  accept an offer of, say, 17,500?
24    A.    Depends on the circumstances, I would
25  guess.

24 (Pages 90 - 93)

Matthew Thurston
January 22, 2024
Multiple Plaintiffs v. Progressive

Page 94

1    Q.    Do you think the price for which a
2    vehicle actually sells is the best indicator of
3    its market value?
4    A.    Yes.
5    Q.    Do you think the price for which a
6    vehicle actually sells is a better indicator of
7    market value than the price for which it's listed
8    for sale?
9    A.    Yes.
10    Q.    All right.  And I apologize that these
11    e-mails are kind of out of order, but if you look
12    at the page ending in 128, about the middle of the
13    way down the page there is an e-mail dated
14    February 22nd, 2022 at 8:23 a.m. from Kyle Mayer.
15    And in that e-mail he explained that
16    Progressive doesn't use Kelley Blue Book values,
17    but he says, if you wish to provide documented
18    information supporting the increase in value to
19    the car, please provide dealer comparisons
20    outlined on page 7; dealer listings same number
21    and year, with VIN number included, and the
22    listing and mileage.  Do you see that?
23    A.    I do.
24    Q.    Did you send any comparable vehicles to
25    Kyle?

Page 95

1    A.    No.
2    Q.    Why not?
3    A.    I felt that I had made an argument
4    without using -- with using the comparable vehicles
5    he provided.
6    Q.    Did you search for any comparable
7    vehicles?
8    A.    I'm not sure.
9    Q.    Your e-mail to Kyle Mayer laying out
10    all of your issues with the Mitchell valuation
11    report, it doesn't mention the projected sold
12    adjustment, does it?
13    A.    Not specifically.
14    Q.    Why wasn't that included in your
15    e-mail?
16    A.    I didn't know how to attack it.
17    Q.    Did you disagree with the projected
18    sold adjustment at that time?
19    A.    Yes.
20    Q.    All right.  In Kyle's February 22nd
21    e-mail he also asked you about moving the vehicle
22    so that the fees would stop accruing with the
23    repair shop.  Do you remember that?
24    A.    Yes.
25    Q.    And you told Kyle that Progressive

Page 96

1    could relocate the Volvo, correct?
2    A.    Correct.
3    Q.    Where is the Volvo now?
4    A.    I have no f-ing idea.
5    Q.    All right.  Do you have any other
6    e-mails or messages with Progressive from the end
7    of February to the date of this letter, March
8    15th?
9    A.    I -- I believe my last e-mail to
10    Progressive about this was saying that I had hired
11    an attorney.
12    Q.    Do you recall the date that you engaged
13    Mr. Steed?
14    A.    Not exactly.
15    Q.    And I understand from his letter, this
16    is page 1 of Exhibit 5, that you paid him a
17    nonrefundable retainer of $2,500, is that correct?
18    A.    I think we discussed that.
19    Q.    Did you actually pay him $2,500?
20    A.    I don't believe so.
21    Q.    To date have you paid Mr. Steed
22    anything for his services?
23    A.    I have not.
24    Q.    Are you aware that in response to
25    Mr. Steed's letter that Progressive invited him to

Page 97

1    submit other comparable vehicles to be considered?
2    A.    I'm not sure.
3    Q.    Do you know if Mr. Steed did submit
4    other comparable vehicles?
5    A.    I don't know.
6    Q.    Were you aware that in response to this
7    letter Progressive demanded a third-party
8    appraisal of the value of the Volvo?
9    A.    I'm not sure.
10    Q.    Do you know whether you or Mr. Steed
11    ever hired a third-party appraiser?
12    A.    I did not.
13    Q.    Do you believe that an appraisal by a
14    third party of the Volvo would have resulted in a
15    higher value than what the Mitchell valuation
16    report gave?
17    A.    I do.
18    Q.    Why didn't you do that?
19    A.    I had trouble finding an appraiser
20    located near me.
21    Q.    How did you search for appraisers?
22    A.    Google.
23    Q.    At what point did you search for an
24    appraiser?
25    A.    I think between receiving a valuation

25 (Pages 94 - 97)

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

Page 98

1 for the car and contacting Mr. Steed.
2     Q.    So you understood that a third-party
3 appraisal was an option, correct?
4     A.    I did.
5     Q.    And was having trouble locating an
6 appraiser in the area the only reason you didn't
7 go that route?
8     A.    No.
9     Q.    Why didn't you proceed with the
10 appraisal process?
11     A.    I thought seeking counsel first was in
12 my best interest.
13     Q.    When you were searching for an
14 appraiser, did you speak with any appraisers?
15     A.    I don't believe so.
16 (Thurston Exhibit 6 was marked for identification.)
17 BY MS. WHITE:
18     Q.    All right, so instead of pursuing
19 appraisal, you filed a complaint, started a
20 lawsuit against Progressive, is that right?
21     A.    I retained counsel.
22     Q.    And after you retained counsel you
23 filed a lawsuit against Progressive?
24     A.    Yes.
25     Q.    And I'm showing you a document that's

Page 99

1 been marked as Exhibit 6. Have you seen this
2 document before?
3     A.    I think so.
4     Q.    What is it?
5     A.    It's the lawsuit that we filed.
6     Q.    Do you see at the top there it says
7 First Amended Class Action Complaint?
8     A.    Yes.
9     Q.    Do you understand that amended means
10 the original complaint that was filed has been
11 changed?
12     A.    Yes.
13     Q.    Did you see a copy of the original
14 complaint before it was filed?
15     A.    I'm not sure.
16     Q.    Do you know what was amended?
17     A.    I don't.
18     Q.    Did you authorize your attorneys to
19 file each version of the complaint on your behalf?
20         MR. FREDERICK:  I'll object to that,
21 since that would deal with attorney-client
22 privilege.
23         MS. WHITE:  Well, it goes to adequacy.
24 BY MS. WHITE:
25     Q.    Did you authorize the filing of each

Page 100

1 version of the complaint?
2     A.    Yes.
3     Q.    To your knowledge, is everything in the
4 complaint true and accurate?
5     A.    As far as I know.
6     Q.    All right, let's look at paragraph 3.
7 It says, as part of the sale, Progressive promised
8 that it would pay him the value of his car if it
9 were damaged in an accident.
10         What sale are you referring to here?
11     A.    I don't know.
12     Q.    You said earlier that you never added
13 the Volvo to your insurance policy with
14 Progressive, correct?
15     A.    Correct.  Well, with clarification.
16     Q.    I'm sorry?
17     A.    I think it was added after the
18 accident, right?
19     Q.    Okay.  You stated Progressive promised
20 you when it sold you your insurance policy that it
21 would pay you the value of the Volvo if it were
22 damaged in an accident?
23     A.    I would need my attorneys to answer
24 that for me.
25     Q.    Let's look at paragraph 7.  That one

Page 101

1 says, rather than pay plaintiff the value of his
2 car, Progressive instead chooses to conspire with
3 another company and not pay plaintiff what he is
4 owed.
5         What do you mean by conspire with
6 another company?
7     A.    I would have to have my attorneys
8 answer that for me.
9     Q.    So based on your own personal
10 knowledge, you don't know what is meant by
11 Progressive chooses to conspire with another
12 company?
13     A.    I don't.
14     Q.    Let's look at paragraph 20.  That one
15 says, Progressive unfairly and systematically
16 lowers the value of total loss claims it is
17 supposed to pay in Maine.
18         How do you contend that Progressive
19 unfairly and systematically lowers the value of
20 total loss claims it's supposed to pay in Maine?
21     A.    By applying the projected sales
22 adjustment to the estimate.
23     Q.    Any other adjustments?
24     A.    No.
25     Q.    Paragraph 25 of the complaint says, at

26 (Pages 98 - 101)

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

Page 102

1  the time of the collision, the vehicle was in the
2  process of being transferred from Scott Thurston,
3  the plaintiff's father, to the plaintiff.
4      Q.   What do you mean by in the process?
5      A.   I hadn't received the title yet.
6      Q.   So at the time of the accident, the
7  only thing that you had done was pick the vehicle
8  up from your parents' house, correct?
9      A.   The only thing -- I don't understand
10 the question.
11     Q.   The only thing in the process of being
12 transferred.  I want to understand exactly what
13 you mean by in the process of being transferred.
14     A.   We had physically transferred the
15 vehicle to my possession and agreed on a price for
16 the vehicle.
17     Q.   What was the price for the vehicle?
18     A.   It was a gift, zero dollars.
19     Q.   But at the time of the accident, you
20 didn't have the title to the vehicle, correct?
21     A.   Correct.
22     Q.   Let's look at paragraph 37.  It says,
23 the report then deviates from the advertised
24 prices of comparable vehicles by claiming to
25 adjust those advertised prices to account for

Page 103

1  differences in equipment, mileage and vehicle
2  configuration to create a base value for the
3  vehicle being appraised.
4      Is this lawsuit challenging the way
5  that Progressive adjusted for equipment, mileage
6  and vehicle configuration?
7      A.   No.
8      MR. FREDERICK:  Hang on one second.
9  They lost their connection.  So can we go off the
10 record for a second and figure out how to get that
11 back?
12     THE VIDEOGRAPHER:  The time is
13 approximately 2:37 p.m.  We're going off the
14 record, stand by.
15     (Recess taken.)
16     THE VIDEOGRAPHER:  The time is
17 approximately 2:39 p.m., and we're back on the
18 record.
19 BY MS. WHITE:
20     Q.   Before we went off the record we were
21 looking at paragraph 37 that says, the report
22 deviates by claiming to adjust advertised prices
23 to account for differences in equipment, mileage
24 and vehicle configuration.
25     Is this lawsuit challenging the way

Page 104

1  that Progressive adjusted for equipment, mileage
2  and vehicle configuration?
3      A.   No.
4      Q.   Is it challenging the way in which
5  comparable vehicles were selected?
6      A.   No.
7      Q.   So you said earlier that you're only
8  challenging the projected sold adjustment, right?
9      A.   Yes.
10     Q.   If Progressive only relied on actual
11 sold prices and didn't apply a projected sold
12 adjustment, do you think that would be fair?
13     A.   I'd have to talk to a lawyer.
14     Q.   Do you think an adjustment for
15 negotiation is appropriate in theory?
16     A.   I'm not sure.
17     Q.   Are you disputing the way that the
18 projected sold adjustment was calculated in this
19 case, or are you disputing the application of a
20 projected sold adjustment at all?
21     A.   I'd have to talk to a lawyer.
22     Q.   Is your claim that not enough
23 information was provided for you to understand the
24 projected sold adjustment?
25     A.   No.

Page 105

1      Q.   So you concede that you understood what
2  the projected sold adjustment was for, you just
3  disagree with it, correct?
4      A.   I'm just saying that's not my claim.
5      Q.   So your claim is not that Progressive
6  failed to provide you sufficient information about
7  the projected sold adjustment to understand it?
8      A.   No.
9      Q.   Paragraph 43 of the complaint says,
10 Progressive projected sold adjustment are also
11 contrary to appraisal standards.
12     What appraisal standards are you
13 referring to here?
14     A.   I'd have to consult with a lawyer.
15     Q.   Do you have any personal knowledge of
16 appraisal standards?
17     A.   Not in vehicles.
18     MR. FREDERICK:  Scott?
19     MR. BORISON:  Yes.
20     MR. FREDERICK:  So you just came in?
21     MR. BORISON:  Yeah.
22     MR. FREDERICK:  John?  John?
23     MR. STEED:  Yeah.  I was on mute.
24     MR. FREDERICK:  Okay, we're all set.
25 It just beeped again.

27 (Pages 102 - 105)

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

Page 106

1 BY MS. WHITE:
2      Q.   All right.  Paragraph 46 says,
3 plaintiff and each member of the class were
4 damaged by Progressive's failure to pay the true
5 value of their cars by its use of the adjustments
6 discussed above that were not proper methodologies
7 or appraisal standards.
8           Is this lawsuit challenging use of
9 Mitchell's WorkCenter total loss system?
10     A.   We're just challenging the projected
11 sales adjustment.
12     Q.   So when the complaint says you said the
13 adjustments plural, is that referring only to the
14 projected sold adjustments?
15     A.   I'd have to talk with a lawyer.
16     Q.   Is your lawsuit challenging the
17 comparable methodology comparing vehicles of the
18 same year, make and model?
19     A.   It's not.
20     Q.   Are there any claims in your lawsuit
21 that Progressive didn't provide you enough
22 information?
23     A.   I'd have to talk to my lawyer.
24     Q.   I think we discussed earlier that
25 you're challenging the application of the

Page 107

1 projected sold adjustment, but you are not
2 challenging the information provided about the
3 projected sold adjustment, is that right?
4      A.   I'd have to talk to my lawyer.
5      Q.   Why are you suing Progressive in a
6 class action as opposed to individually?
7      A.   Because I want to stand up for the
8 rights of everyone that was harmed in the same way
9 I was.
10     Q.   Do you know what it means to be a class
11 representative?
12     A.   Yes.
13     Q.   What does that mean to you?
14     A.   It means I direct the lawyers and stand
15 up for the rights of the whole class.
16     Q.   Was it your idea to file this lawsuit
17 as a class action?
18     A.   That was something I discussed with my
19 lawyers.
20     Q.   How do you stay up to date about what's
21 happening in the case?
22     A.   I talk to my lawyers.
23     Q.   How did you meet your lawyers?
24     A.   I met John because he's part of the
25 community in Deer Island and Stonington and Blue

Page 108

1 Hill, and he introduced me to Ron and Scott.
2      Q.   So when you disagreed with
3 Progressive's offer, did you reach out to John to
4 help you with that?
5      A.   Yes.
6      Q.   Have you ever been represented by John
7 in any matter before this lawsuit?
8      A.   I have not.
9      Q.   Did you investigate any of your lawyers
10 before retaining them in this case?
11     A.   Could you explain what you mean by
12 investigate?
13     Q.   Sure.  Did you do any research on any
14 of your lawyers before you hired them?
15     A.   Not explicitly.
16     Q.   Did you implicitly research your
17 lawyers before you hired them?
18     A.   Maybe I don't know exactly what -- I
19 hired John because I knew of him through the
20 community and people who had good experiences using
21 John.  I did not explicitly look up reviews on John
22 or anything of that sort.
23     Q.   Okay.  Did you do any research on
24 Mr. Frederick before you hired him?
25     A.   I did not.

Page 109

1      Q.   What about Mr. Borison?
2      A.   I did not.
3      Q.   If this case proceeds to trial, are you
4 willing to go to court and testify?
5      A.   I am.
6      Q.   What are you seeking for yourself from
7 Progressive in this lawsuit?
8      A.   I'm seeking for everyone in the class
9 to be rightly compensated.
10     Q.   Okay, so setting aside what you're
11 seeking for the class, what do you personally hope
12 to recover in this lawsuit?
13     A.   I have no personal goals from this
14 lawsuit, I just want to see the class fairly
15 compensated.
16     Q.   Are you not seeking money as part of
17 this lawsuit?
18     A.   My priority is that the class as a
19 whole is compensated.
20     Q.   Is it your testimony that you are not
21 seeking damages in this lawsuit?
22     A.   I am seeking damages for the class.
23     Q.   Can you describe how your damages
24 should be calculated?
25     A.   I'd have to discuss that with a lawyer.

28 (Pages 106 - 109)

Matthew Thurston                                          January 22, 2024
Multiple Plaintiffs v. Progressive

Page 110

1    Q.    Are you seeking the same damages for
2  every member of the class?
3    A.    I'd have to discuss that with a lawyer.
4  (Thurston Exhibit 7 was marked for identification.)
5  BY MS. WHITE:
6    Q.    All right, I'm showing you a document
7  marked as Exhibit 7.  Do you recognize this
8  document?
9        MS. WHITE:  For the record, it is Bates
10  Thurston 057.
11        THE WITNESS:  Does that mean I produced
12  it?
13        MS. WHITE:  Yes.
14        MR. FREDERICK:  Well, your lawyers did
15  to produce it and send on.
16    A.    What date is this?  March 21st.  Yes, I
17  guess I've seen this before.
18  BY MS. WHITE:
19    Q.    And is this your letter that
20  Progressive's counsel sent to your attorney in
21  March 2023?
22    A.    I guess so.
23    Q.    And in the letter Progressive asks you
24  to hire your own appraiser, right?
25    A.    Yes.

Page 111

1    Q.    And you didn't hire an appraiser, is
2  that right?
3    A.    That's correct.
4    Q.    And in that second paragraph it says,
5  In the meantime, I am enclosing a check for the
6  undisputed amount for $9,520.89.  This amount
7  reflects the actual cash value of $13,179.89 minus
8  the salvage value of $3,659.
9        And if you look at the back, there's an
10  advice for payment.  It says the payee is Scott
11  Thurston.  Did you or your father accept this
12  payment for $9,520.89?
13    A.    I did not.
14    Q.    Did you ever talk to your father about
15  this check?
16    A.    I did not.
17    Q.    Do you know if he received it?
18    A.    I do not.
19    Q.    Were you aware that your lawyers had
20  received this check?
21    A.    I'm not sure.
22    Q.    To date, have you received the
23  $9,520.89?
24    A.    I have not.
25    Q.    Does your claim for damages take into

Page 112

1  consideration the amount that Progressive has
2  already tried to pay your father?
3    A.    I'd have to discuss that with my
4  lawyers.
5    Q.    All right, I'm going to shift topics a
6  little bit.
7        Do you recall when you started driving?
8    A.    Period?  When I -- that's the end of
9  the question?
10    Q.    What age, or a year?
11    A.    When I was 15, 14.
12    Q.    And have you been driving ever since?
13    A.    Yes.
14    Q.    Have there ever been any gaps or
15  periods of time where you didn't drive?
16    A.    Yes.
17        MR. FREDERICK:  For how long?
18  BY MS. WHITE:
19    Q.    Like have you ever had a license
20  suspended or had a year when you didn't need a car
21  because you were living in a city?
22        MR. FREDERICK:  Not like a week when I
23  was on vacation.
24    A.    Or like an hour when I'm sitting here,
25  or six, whatever we're at?

Page 113

1    Q.    Any significant gaps in your driving
2  history?
3    A.    No.
4        MR. FREDERICK:  Mine was when I was
5  grounded as a kid.
6  BY MS. WHITE:
7    Q.    How many cars have you owned?  A
8  ballpark is fine.
9    A.    Oh, I don't know.  Fiveish, plus a
10  motorcycle, something like that.
11    Q.    Let's start with the 2000 Subaru which
12  was listed on your declarations page.
13    A.    Yup.
14    Q.    When did you buy that car?
15    A.    March of 2011, I believe.
16    Q.    Did you buy -- I assume you bought it
17  used if it was a 2000, is that right?
18    A.    That's right.
19        MR. FREDERICK:  Or he got a really good
20  deal because it was sitting for years.
21  BY MS. WHITE:
22    Q.    Where did you buy it?
23    A.    Boulder Nissan.
24    Q.    Did you finance it?
25    A.    I did not.

29 (Pages 110 - 113)

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

Page 114

1    Q.    You paid with cash?
2    A.    Yes.
3    Q.    Was the purchase made in your name?
4    A.    Yes.
5    Q.    Was anybody else on the title?
6    A.    No.
7    Q.    How did you find out about that Subaru?
8    A.    I can't remember.
9    Q.    Did you do any online research for
10   Subarus before you purchased that one?
11   A.    Not that I can remember.
12   Q.    Were you in the market for a Subaru
13   specifically?
14   A.    Yes. Well.
15   Q.    Did you look at other Subarus at the
16   time that you were searching?
17   A.    Not in person.
18   Q.    Was the dealer where you purchased the
19   Subaru, Boulder Nissan, close to where you lived
20   at the time?
21   A.    Yes.
22   Q.    Did you know that they had a Subaru
23   available when you went to that dealership?
24   A.    Yes.
25   Q.    Did you look at an advertisement for

Page 115

1    the Subaru before you went to the dealership?
2    A.    Yes.
3    Q.    And what was the advertised price for
4    the Subaru?
5    A.    I can't recall.
6    Q.    Do you recall how much you paid for the
7    Subaru?
8    A.    No.
9    Q.    Do you recall whether you were able to
10   negotiate off the advertised price?
11   A.    I don't believe so.
12   Q.    What did you do to determine whether
13   you were paying a fair price for the Subaru?
14   A.    I can't remember.
15   Q.    Did you trade in a vehicle for the
16   Subaru?
17   A.    I did not.
18   Q.    Did you have any accidents while you
19   owned the Subaru?
20   A.    Not in the Subaru.
21   Q.    What accidents have you had?
22   A.    The Volvo.
23   Q.    Any others?
24   A.    Yup. I -- where I left the scene of an
25   accident.

Page 116

1    Q.    What vehicle were you driving?
2    A.    My grandmother's Honda CRV, I think.
3    Q.    All right, so you bought the Subaru in
4    2012. Have you purchased any vehicles since the
5    Subaru?
6    A.    Yes.
7    Q.    All right, what vehicles were those?
8    A.    The Hyundai that's on my policy, though
9    I purchased that in conjunction with my mom.
10   Q.    Is that the Hyundai Tucson?
11   A.    Yes.
12   Q.    When did you buy that car?
13   A.    Spring of '17.
14   Q.    What year model is the Hyundai?
15   A.    2016.
16   Q.    When you bought the Tucson, was it
17   considered new or used?
18   A.    Used.
19   Q.    Where did you buy it?
20   A.    In Baton Rouge.
21   Q.    Do you recall the name of the
22   dealership?
23   A.    Not -- I can't be sure.
24   Q.    Was it a dealership?
25   A.    Yes.

Page 117

1    Q.    Did you finance the Hyundai Tucson?
2    A.    I did not.
3    Q.    You paid with cash?
4    A.    My mom paid the bill.
5    Q.    Did your mom pay the entire purchase
6    price or just a portion of it?
7    A.    The entire.
8    Q.    Was the title in your name?
9    A.    It's in both of our names.
10   Q.    Was it purchased with the intent that
11   it would be your car?
12   A.    Yes.
13   Q.    Were you specifically in the market for
14   a Hyundai Tucson?
15   A.    No.
16   Q.    What were you looking for?
17   A.    A vehicle with all-wheel drive.
18   Q.    And why was that important?
19   A.    Because I would be having it in Maine.
20   Q.    And your Subaru did not have all wheel
21   drive?
22   A.    It did. This was not to replace the
23   Subaru, it was an additional vehicle.
24   Q.    How did you find out about the Hyundai
25   Tucson?

30 (Pages 114 - 117)

Page 118

1    A.    I think I saw it online.
2    Q.    And where did you look online for
3    vehicles?
4    A.    Cars.com.
5    Q.    Did you go to other dealerships before
6    you went to the dealership with the Hyundai
7    Tucson?
8    A.    I don't remember.
9    Q.    Around the time that you purchased the
10   Hyundai Tucson, did you drive other vehicles, test
11   drive other vehicles?
12   A.    I don't think so.
13   Q.    Did you shop around online for similar
14   vehicles?
15   A.    Yes.
16   Q.    What similar vehicles were you
17   considering?
18   A.    I don't know specifically.
19   Q.    What was the advertised price for the
20   Tucson?
21   A.    I don't know.
22   Q.    Do you recall what you paid for it?
23   A.    I don't.
24   Q.    Do you recall whether you were able to
25   negotiate off the advertised price?

Page 119

1    A.    I think we paid full price for it.
2    Q.    You think you paid full price?
3    A.    Yes.
4    Q.    Did you do any research to determine
5    whether you were paying a fair price?
6    A.    I don't think so.
7    Q.    Did you trade in another vehicle for
8    the Tucson?
9    A.    We did not.
10   Q.    Has the Tucson ever been in an
11   accident?
12   A.    It has not.
13   Q.    Have you purchased any vehicles since
14   the Tucson?
15   A.    Yes.
16   Q.    And what was that?
17   A.    I don't know if my wife's vehicle
18   counts, we just paid off her loan.  She -- or her
19   lease, I mean.  She had leased the vehicle before
20   we were together.
21   Q.    Other than your wife's vehicle that she
22   leased before you were together, have you
23   purchased any other vehicles?
24   A.    Yes.
25   Q.    And what are those?

Page 120

1    A.    2008 GMC Sierra 1500 work truck.
2    Q.    And when did you buy that?
3    A.    I think March of last year.
4    Q.    Where did you buy it?
5    A.    From Jerry Hensler.  Actually, sorry,
6    from Sheri Hensler.
7    Q.    So did you buy it from an individual
8    seller?
9    A.    Yes.
10   Q.    Did you pay cash for it?
11   A.    Yes.
12   Q.    And is the title in your name?
13   A.    Yes.
14   Q.    How did you find out about the GMC
15   Sierra?
16   A.    From my neighbor.
17   Q.    Were you in the market for a work truck
18   specifically?
19   A.    No.
20   Q.    Were you shopping around online for
21   another vehicle?
22   A.    Occasionally.
23   Q.    Where did you look when you shopped
24   around online?
25   A.    Facebook Marketplace, primarily.

Page 121

1    Q.    And what were you looking for?
2    A.    Something cheap.
3    Q.    And did you intend that whatever
4    vehicle you purchased would be used for work
5    purposes?
6    A.    Work and personal.
7    Q.    Was the GMC Sierra advertised anywhere
8    for sale?
9    A.    I think my neighbor might have made a
10   post saying that her mom was trying to sell the
11   truck on Facebook, but I don't think she advertised
12   it with a price or anywhere other than just a
13   generic Facebook post.
14   Q.    How much did you pay for it?
15   A.    3,500, I believe.
16   Q.    All right, are there any other vehicles
17   that you've purchased in the last ten years?
18   A.    Ten years?  No.
19   Q.    Have all the cars you've purchased been
20   insured?
21   A.    Yes.
22   Q.    Who was your insurance provider before
23   Progressive?
24   A.    I think I had GEICO before Progressive.
25   Q.    Do you recall when you had GEICO?

31 (Pages 118 - 121)

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

Page 122

1    A.    I think I switched when I bought the
2    Subaru in 2011.
3    Q.    So the Subaru, the Tucson were both
4    insured by Progressive?
5    A.    Yes.
6    Q.    What about the GMC Sierra?
7    A.    It's also insured by Progressive.
8    Q.    Are you still currently insured by
9    Progressive?
10   A.    I am.
11   Q.    Why?
12   A.    That's a darn good question. Because I
13   haven't bothered to change it.
14   Q.    Other than the accident that happened
15   on January 21st, 2022, have you ever filed another
16   claim for damage to a vehicle with any insurance
17   company?
18   A.    No.
19          MR. FREDERICK: Is that the last page?
20          MS. WHITE: Almost.
21   (Thurston Exhibit 8 was marked for identification.)
22   BY MS. WHITE:
23   Q.    Let's look at -- I'm showing you a
24   document marked as Exhibit 8. Do you recognize
25   this document?

Page 123

1    A.    Yes.
2    Q.    And what is it?
3    A.    It's the answers to the interrogatory
4    questions.
5    Q.    And to the best of your knowledge, is
6    the information reflected in these interrogatory
7    responses true and accurate?
8    A.    Yes.
9    Q.    All right, and do you understand that
10   if there's any information that we discussed today
11   that's inconsistent with your answers here, then
12   you have a duty to amend or supplement them?
13   A.    Yes, ma'am.
14          MS. WHITE: I would just ask that we
15   get verified interrogatory responses. These are
16   not verified. We ask that you supplement to
17   provide verified responses.
18          MR. FREDERICK: Okay. We'll get those
19   right away.
20   BY MS. WHITE:
21   Q.    Do you have a fee agreement with your
22   lawyers in this case?
23   A.    That's something we've discussed.
24   Q.    Is there a written contract between you
25   and your lawyers?

Page 124

1    A.    Yes.
2    Q.    Is it a contingency agreement?
3          THE WITNESS: Am I allowed to answer
4    that?
5          MR. FREDERICK: No. Anything,
6    communication, if there's a fee agreement, it
7    would be dealt with at a hearing for fees.
8          MS. WHITE: No, we asked him to produce
9    it and he didn't, and it's not privileged at all.
10          MR. FREDERICK: Well, we're not
11   producing it, so.
12          MS. WHITE: So I'm going to ask
13   questions about it because you didn't produce it,
14   and that's not privileged.
15          MR. FREDERICK: It is privileged, it's
16   communication --
17          MS. WHITE: It's definitely not
18   privileged.
19          MR. FREDERICK: Well, we're going to
20   ask you to move it along. If you want to take it
21   up with the judge, you may do so.
22          MS. WHITE: So John actually went
23   through this at the last deposition about
24   engagement letters, and ultimately -- we were
25   going to call the judge, and he ultimately

Page 125

1    conceded the engagement letter is not privileged.
2    In a lot of these cases --
3          MR. FREDERICK: John, is that accurate?
4          MR. STEED: I don't think that's
5    accurate. I think there were some questions about
6    whose idea it was for Scott Thurston to engage
7    counsel, and I objected to that, and then we
8    relented because I don't think it mattered in that
9    particular instance.
10         But I don't think there was really a
11   determination on the admissibility. I think we
12   just sent a letter in opposition -- you know,
13   we're still disputing the issue of questions and
14   producing the fee --
15          COURT REPORTER: I'm sorry, you're
16   going to have to speak up a little.
17          MR. STEED: Sorry about that. Do you
18   want me to just start over?
19          COURT REPORTER: No. You said you were
20   disputing the issue of questions and producing
21   something.
22          MR. STEED: Fee agreement and --
23          MR. FREDERICK: You fell out again.
24          MR. STEED: I think it's a topic for a
25   conference with the judge.

32 (Pages 122 - 125)

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

Page 126

1          MS. WHITE:  Do you want us to call the
2    judge now, so we can ask the judge?  I have about
3    three questions that are pretty high level, all of
4    which are relevant to adequacy and will come up in
5    this case at some point.
6          My question are is it a contingency
7    agreement, what is your understanding of a
8    contingency agreement, does the fee agreement
9    require you to pay any litigation costs or
10   expenses, and are there any other financial
11   commitments you've made to this case.  I think
12   you'd agree, all of those go to adequacy.
13         MR. FREDERICK:  We can address -- can I
14   see those?
15         MS. WHITE:  No.
16         MR. FREDERICK:  Give me the first one?
17         MS. WHITE:  Is it a contingency
18   agreement?
19         MR. FREDERICK:  We'll stipulate it's a
20   contingency agreement.
21         MS. WHITE:  Well, I need to know his
22   understanding of his agreement with the lawyers.
23         MR. FREDERICK:  Okay.  Go ahead.
24         MR. WHITE:  That's why it goes to
25   adequacy.

Page 127

1    BY MS. WHITE:
2          Q.    Is your fee agreement with your lawyers
3    a contingency agreement?
4          A.    Yes.
5          Q.    What is your understanding of a
6    contingency fee agreement?
7          A.    My understanding is that their
8    compensation is contingent on the case resulting in
9    compensation to the class.
10         Q.    And does the fee agreement require you
11   to pay any litigation cost or expenses?
12         A.    No.
13         Q.    Have you paid any of the litigation
14   cost or expenses incurred to date?
15         A.    I have not.
16         Q.    Have you made any other financial
17   commitments to this case?
18         A.    I drove three hours to be here today
19   and gave up the whole day.
20         MR. FREDERICK:  I was going to say,
21   other than that.
22   BY MS. WHITE:
23         Q.    Okay.  If you lose the case, who will
24   be responsible for the costs and expenses?
25         A.    For my costs or expenses?

Page 128

1          Q.    For all the costs and expenses in the
2    case, the court reporter's --
3          MR. FREDERICK:  Other than driving
4    down --
5    BY MS. WHITE:
6          Q.    Like the court report's fee, the
7    videographer's fee, Ron's travel, who will be
8    responsible for those costs and expenses?
9          A.    I believe they will.
10         Q.    If a class is certified by the court in
11   this case and your current lawyers withdraw, or if
12   they're unable to continue for any reason, are you
13   prepared to hire and pay new counsel for
14   responsibility for the case?
15         MS. WHITE:  That's a question --
16         MR. FREDERICK:  I understand.  I'm
17   contemplating on whether to object, because it
18   assumes a huge thing, but.  Sure, go ahead.
19         A.    What does it mean to be prepared to?
20   BY MS. WHITE:
21         Q.    Would you hire and pay new counsel to
22   take over the case if your current lawyers
23   withdraw?
24         MR. FREDERICK:  And I'll object to the
25   fact that it assumes a hypothetical that he could

Page 129

1    not find another firm anywhere in the United
2    States that would take this on a contingency
3    basis, since other cases filed against Progressive
4    for the same conduct have --
5          MS. WHITE:  I don't need you to
6    testify, Ron.  I'm just asking him a question.
7    I'm not asking him to assume that no other lawyer
8    in the United States would take it.
9          MR. FREDERICK:  Okay.
10   BY MS. WHITE:
11         Q.    I'm asking if for some reason Ron and
12   Scott and John withdrew, would you hire other
13   lawyers to take over this case?
14         A.    I'm sorry to -- could you just define
15   hire?
16         Q.    Engage.
17         A.    Yes.
18         Q.    Does that make it -- okay.
19         MS. WHITE:  All right, we can take a
20   short five-minute break.  I just want to review my
21   notes.
22         MR. FREDERICK:  Okay.
23         THE VIDEOGRAPHER:  The time is
24   approximately 3:14 p.m.  We're going off the
25   record.

33 (Pages 126 - 129)

Matthew Thurston
January 22, 2024
Multiple Plaintiffs v. Progressive

Page 130

1      (Recess taken.)
2      THE VIDEOGRAPHER:  The time is
3  approximately 3:16 p.m., and we're back on the
4  record.
5  BY MS. WHITE:
6      Q.    You testified earlier that one of the
7  valuations for the Volvo was from a Baton Rouge
8  dealer, and that he sent you an e-mail.  Have you
9  produced that e-mail in this case?
10     A.    No.  I'm not sure if he sent me an
11 e-mail or my father an e-mail, and he relayed the
12 information to me.
13     Q.    What have you done to search for that
14 e-mail?
15     A.    Not much, if anything.
16     Q.    Okay.  You did produce a Route 1
17 valuation?
18     A.    Yes.
19     Q.    And was that provided to you by the
20 Baton Rouge dealer that you mentioned?
21     A.    Yes, either directly or through my dad,
22 I can't remember which.
23     Q.    Okay.  I don't know that we need to
24 introduce this as an exhibit, but this is what we
25 received.  We would just ask if you have an

Page 131

1  ability to provide a more legible copy of that
2  valuation, the Route 1 valuation.
3      A.    I think I can do that.
4      Q.    Yeah, we couldn't read it.  We would
5  also ask that you search for the e-mail from the
6  dealer.
7      A.    Okay.
8      MS. WHITE:  No further questions.
9      MR. FREDERICK:  Okay.  We'll read.  I
10 don't know what the custom is here, but I guess
11 we'll sign as well.
12     THE VIDEOGRAPHER:  Do all parties agree
13 to go off the record?
14     MR. FREDERICK:  Yes.
15     THE VIDEOGRAPHER:  The time is
16 approximately 3:18 p.m., and we're going off the
17 record.
18     (The deposition was concluded at 3:18 p.m.)
19     MR. FREDERICK:  How does it work here?
20     COURT REPORTER:  Normally, if you order
21 a copy of the transcript, since you're
22 representing him, you would let him read it
23 somehow and have him sign it.
24     MR. FREDERICK:  Right.  So in Ohio, if
25 it gets ordered and he says he reads, then he gets

Page 132

1  a chance to read it before it's final.
2      You're going to order it anyway, right
3  Allison?
4      MS. WHITE:  Yes.
5      COURT REPORTER:  So what happens is
6  that the transcript will be produced, and then he
7  has 30 days -- this is our rules here up here --
8      MR. FREDERICK:  That's okay.  I've been
9  to a all kinds of different places and it's a
10 little different.
11     COURT REPORTER:  He has 30 days from
12 your receipt of it to make corrections, otherwise
13 it is deemed correct.
14     MR. FREDERICK:  Okay, so you'll send
15 him a PDF of it, or he comes down here?
16     COURT REPORTER:  Normally I send it to
17 you, and you send it to him.
18     MR. FREDERICK:  Okay.  Either way.  I'm
19 sure we're both going to order it

Page 133

1            CERTIFICATE
2      I, Pamela J. Carle, Registered
3  Professional Reporter, do hereby certify that the
4  foregoing is a true and accurate transcript of my
5  stenographic notes of the deposition of MATTHEW
6  THURSTON, who was first duly sworn, taken at the
7  place and on the date hereinbefore set forth, and
8  that reading and signing of the transcript was
9  requested.
10     I further certify that I am neither
11 attorney nor counsel for, nor related to or
12 employed by any of the parties to the action in
13 which this deposition was taken, and further that
14 I am not a relative or employee of any attorney or
15 counsel employed in this case nor am I financially
16 interested in this action.
17
18     THE FOREGOING CERTIFICATION OF THIS
  TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
19 THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
  CONTROL AND/OR DIRECTION OF THE CERTIFYING
  REPORTER.
20
21
22
23
   _____
   Pamela J. Carle, LCR, RPR, CRR
24
25

34 (Pages 130 - 133)

Matthew Thurston                                    January 22, 2024
Multiple Plaintiffs v. Progressive

Page 134

1  Matthew Thurston c/o
   Ronald Ira Frederick, Esq.
2  filings@clevelandconsumerlaw.com
3          February 6th, 2024
4  RE: Thurston, Matthew v. Progressive Casualty Ins. Co., Et Al.
5     1/22/2024, Matthew Thurston (#6393263)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 litsup-ga@veritext.com
16  Return completed errata within 30 days from
17 receipt of testimony.
18   If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 135

1  Thurston, Matthew v. Progressive Casualty Ins. Co., Et Al.
2  Matthew Thurston (#6393263)
3     E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Matthew Thurston            Date
25

Page 136

1  Thurston, Matthew v. Progressive Casualty Ins. Co., Et Al.
2  Matthew Thurston (#6393263)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Matthew Thurston, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____  _____
12 Matthew Thurston            Date
13 *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15 _____ DAY OF _____, 20___.
16
17
18        _____
19 NOTARY PUBLIC
20
21
22
23
24
25

35 (Pages 134 - 136)

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

[& - 22-5056549]

Page 1

| & | | | |
|---|---|---|---|
| **&**  2:3,14 4:18 5:8,11 15:23 | **11:36**  38:13 | **185th**  2:4 | **2016**  10:23,23 11:4,19 25:11 |

**&**  2:3,14 4:18
  5:8,11 15:23

**0**

**00**  53:14
**0000097**  53:13
**0000098**  53:17
**0000126**  82:9
**000296**  65:4
**00375**  1:5 4:16
**007**  43:6,12
**04112**  4:19
**04627**  10:19
**04681**  2:7
**057**  110:10

**1**

**1**  3:8 31:3,4,7
  52:9 75:10,18
  76:6,24 96:16
  130:16 131:2
**1,264.41.**  75:11
**1/22/2024**
  134:5
**10,000**  59:4
**10411**  133:23
**10:47**  4:3
**10:48**  1:18
**10:54**  9:24
**10:56**  10:3
**11,569**  72:22
**110**  3:15
**1180**  2:15
**1193**  10:18

**11:36**  38:13
**12**  21:18 38:17
**12,000**  60:11
**12,700**  80:13
**12,824.37.**  68:8
**122**  3:16 4:16
**128**  94:12
**129**  82:20
**12:23**  52:5
**13,179.89**  111:7
**13,231.80**  67:7
**130**  86:13
  92:24
**14**  24:11
  112:11
**140**  86:20
**15**  82:10
  112:11
**15,000**  78:11
  79:3,10,14
**15,991**  77:6
**1500**  120:1
**15th**  9:11 96:8
**16,500**  93:6,22
**16,503**  87:8
**1600**  2:15
**17**  65:15 82:13
  116:13
**17,500**  93:23
**17,641**  86:14
  87:12 91:21
  92:14
**17,900**  93:5
**18,778**  87:8

**185th**  2:4
**1990**  8:11
**1:22**  1:5
**1:51**  81:21
**1st**  44:6

**2**

**2**  3:9 43:2,5
  69:2,17 70:20
  71:6,16,24
  73:14 77:5,14
  78:8,10 79:4
  79:10 80:6
**2,364.71.**  76:11
**2,500**  96:17,19
**2.65.**  70:14
**20**  4:18 101:14
  136:15
**2000**  37:18
  47:17 113:11
  113:17
**2008**  15:19
  120:1
**2010**  21:18
**2011**  21:18
  36:21 113:15
  122:2
**2012**  12:18
  37:21 39:5
  44:13 65:22
  86:21 116:4
**2013**  12:18
**2014**  12:11
**2015**  9:2 11:21
  12:3,4,7,7

**2016**  10:23,23
  11:4,19 25:11
  47:17,18
  116:15
**2017**  11:12
  31:16 36:22
  37:11
**2018**  9:11 19:9
**2019**  14:6
**2020**  14:6 20:2
**2022**  33:20
  39:22,23 40:1
  44:6,6,10,19
  45:2,11 47:4
  48:6 65:16
  82:9,10,13,21
  84:12 94:14
  122:15
**2023**  3:15
  14:18 110:21
**2024**  1:16 4:4
  134:3
**21**  31:16 37:11
  44:6 45:11
  48:6
**210.46.**  76:21
**21st**  36:22
  44:10 82:21
  84:12 110:16
  122:15
**22**  1:16 4:4
  33:24
**22-5056549**
  65:12

**22nd**  94:14
95:20
**25**  101:25
**26th**  10:15
**295.92**  76:21
**2:04**  81:25
**2:37**  103:13
**2:39**  103:17

**3**

**3**  3:10 46:25
47:8 69:2,17
69:22 80:11,16
80:20,24 100:6
**3,500**  121:15
**3,659**  111:8
**3.00**  70:13
**3.2**  65:23
**3/15/22**  3:12
**30**  132:7,11
134:16
**302**  65:4
**30309**  2:15
**31**  3:8
**37**  102:22
103:21
**37,000**  84:25
85:10
**398**  73:6
**3:14**  129:24
**3:16**  130:3
**3:18**  131:16,18
**3:37**  82:21

**4**

**4**  3:11 64:12,15
70:8
**404.572.4600**
2:16
**427**  80:19,23
**43**  3:9 105:9
**44119**  2:4
**46**  3:10 106:2
**462.43.**  67:17

**5**

**5**  3:12 72:18
75:17 81:13
82:4 96:16
**537**  77:9,17
78:7
**55**  68:2 72:5
**55,374**  66:2
86:22
**5830**  2:10
**5th**  10:14

**6**

**6**  3:2,13 65:23
98:16 99:1
**608**  16:19,21
17:6
**6393263**  134:5
135:2 136:2
**64**  3:11
**6th**  134:3

**7**

**7**  3:15 8:11
73:11 75:19
94:20 100:25

110:4,7
**70**  21:2
**70809**  66:14,19
**767**  2:4
**771**  2:7

**8**

**8**  3:16 122:21
122:24
**8,800**  59:4
**81**  3:12
**82609**  2:10
**8:23**  94:14

**9**

**9**  44:19 45:2
**9,520.89**  111:12
111:23
**9,520.89.**  111:6
**95943**  2:10
**97**  53:16
**98**  3:13
**991**  79:10
**9th**  9:18

**a**

**a.m.**  1:18 4:3
9:24 10:3
38:13 94:14
**abbreviation**
6:24
**ability**  7:19,24
131:1
**able**  17:9 42:21
115:9 118:24
**above**  84:24
85:10 106:6

134:6 136:7
**accept**  93:15,18
93:23 111:11
**accepted**  77:17
**accident**  25:25
25:25 33:22
41:19,20 42:6
42:6,9,25 44:9
45:12 46:4,10
46:15,23 47:24
48:2,5,9,21
50:16,17,23
51:17 52:20
56:4 66:2,17
100:9,18,22
102:6,19
115:25 119:11
122:14
**accidents**
115:18,21
**account**  62:15
89:24 102:25
103:23
**accounted**
88:22
**accruing**  95:22
**accuracy**  134:9
**accurate**  100:4
123:7 125:3,5
133:4
**accurately**  7:20
7:24 65:20
91:2
**acknowledge...**
136:3

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

**[acknowledgment - answer]**                                                    Page 3

acknowledg...
  134:12
**action**  3:13
  4:25 24:14,17
  99:7 107:6,17
  133:12,16
**actual**  58:8
  59:14 60:9,13
  60:18,22 61:4
  61:6,13 62:1,2
  62:7,14,23
  63:2,12 79:2
  79:13,23
  104:10 111:7
**actually**  9:12
  59:4 75:6
  79:10 87:18
  94:2,6 96:19
  120:5 124:22
**add**  38:5 48:1
  54:24 55:2,25
**added**  47:23
  55:4 56:3,8
  68:2 72:12
  84:24 87:24
  100:12,17
**additional**
  55:24 56:11
  117:23
**additions**  136:6
**address**  10:17
  11:15 126:13
**adds**  72:5
  76:11

**adequacy**
  99:23 126:4,12
  126:25
**adjust**  73:14
  76:2 102:25
  103:22
**adjustable**
  89:15
**adjusted**  103:5
  104:1
**adjustment**
  30:16 33:13
  35:12,13,23
  61:16,16,18
  63:15 67:20,23
  67:25 68:19
  73:5,6,16,19
  74:1,15,18,21
  75:3,9,10,13,23
  76:10,14,17
  77:1,8,10,21
  78:12,22,23
  79:25 80:5,7,8
  80:19 83:16
  84:1,5,9,14,16
  84:18 95:12,18
  101:22 104:8
  104:12,14,18
  104:20,24
  105:2,7,10
  106:11 107:1,3
**adjustments**
  63:24 70:10
  72:4 73:4
  76:21,22 77:1

  80:9 81:11
  101:23 106:5
  106:13,14
**administer**
  4:23
**admissibility**
  125:11
**admissible**  25:8
**advertised**  73:2
  102:23,25
  103:22 115:3
  115:10 118:19
  118:25 121:7
  121:11
**advertisement**
  114:25
**advice**  28:6
  33:19,23 34:6
  34:17 111:10
**advise**  40:21
**affect**  7:19
**affiliations**  5:6
**aftermarket**
  68:1,5 72:3,14
**age**  112:10
**agent**  45:22,23
  45:25 48:3
**aggregation**
  23:13
**ago**  21:17
**agree**  4:8 69:19
  70:17,22 71:17
  71:25 73:6
  75:13 76:4
  92:9,16 126:12

  131:12
**agreed**  24:10
  102:15
**agreement**
  123:21 124:2,6
  125:22 126:7,8
  126:8,18,20,22
  127:2,3,6,10
**ahead**  25:9
  61:9 79:6,18
  126:23 128:18
**air**  74:25 75:6
  78:2
**airbag**  48:24
**al**  134:4 135:1
  136:1
**aligned**  92:8,17
**aligns**  90:17
**allison**  2:16 5:8
  6:4 132:3
**allotted**  134:19
**allowed**  124:3
**amend**  123:12
**amended**  3:13
  99:7,9,16
**amount**  111:6,6
  112:1
**anniversary**
  9:16
**answer**  6:17,21
  7:4,5,15 25:5,9
  61:9 68:16
  79:6,18 88:14
  100:23 101:8
  124:3

**[answered - awhite]** Page 4

**answered**
34:11 61:1
**answers** 3:16
123:3,11
**anybody** 11:2,4
28:5,9 48:18
48:21 51:10
114:5
**anyway** 132:2
**apologies** 50:24
**apologize** 94:10
**appearance** 5:3
**appearances**
2:1 5:5
**appears** 83:15
86:20
**appended**
136:7
**apples** 92:9,9
92:19,19
**applicable**
134:8
**application** 3:8
31:11 104:19
106:25
**applied** 31:18
36:23 37:10,16
68:20 75:1
78:1,15,17,19
80:19 81:11
**apply** 91:6
104:11 133:18
**applying** 31:13
37:4 101:21

**appraisal** 97:8
97:13 98:3,10
98:19 105:11
105:12,16
106:7
**appraised**
103:3
**appraiser**
97:11,19,24
98:6,14 110:24
111:1
**appraisers**
97:21 98:14
**appropriate**
104:15
**approximately**
4:3 9:24 10:3
38:13,17 52:5
52:9 59:23
81:25 103:13
103:17 129:24
130:3 131:16
**april** 10:15
14:16
**aragosta** 20:10
20:15
**arbitrarily**
78:1,19
**arbitrary** 63:15
**area** 98:6
**argument** 95:3
**arts** 15:25
**aside** 61:25
109:10

**asked** 26:17
34:10 83:18
95:21 124:8
**asking** 6:11 7:8
23:23 88:17
129:6,7,11
**asks** 110:23
**asserted** 35:19
35:21
**asserting** 34:25
**assessed** 90:18
**assessment**
71:1,11,17
72:1 92:7,17
**assets** 55:19
**associate's**
15:21
**associated**
16:17
**assume** 6:21
16:23 17:22
74:6 87:4
93:22 113:16
129:7
**assumed** 85:20
92:4
**assumes** 79:17
128:18,25
**assuming** 75:1
79:9
**assumption**
74:22,24 78:20
86:5
**atlanta** 2:15

**attached** 82:16
134:11
**attack** 95:16
**attended** 17:11
**attorney** 3:17
5:7 34:11 82:8
96:11 99:21
110:20 133:11
133:14 134:13
**attorneys** 99:18
100:23 101:7
**audio** 4:7 28:20
52:13,14 53:6
53:19,22,24
**august** 12:4
**authorize**
99:18,25
**authorized**
4:23
**auto** 22:25
37:10 45:13
**automatic**
65:23
**automobile**
23:8 62:18
**available**
114:23 134:6
**avoid** 48:13
**avon** 12:14,15
**aware** 46:2
85:6 96:24
97:6 111:19
**awhite** 2:17

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

**[back - brooksville]**

Page 5

| **b** | 116:20 130:7 | **best** 6:16 25:15 | 105:21 109:1 |
|---|---|---|---|
| **back** 10:3 | 130:20 | 94:2 98:12 | **borisonfirm.c...** |
| 12:18 24:11 | **bear** 22:11 | 123:5 | 2:11 |
| 38:17 40:11 | **beeped** 105:25 | **better** 94:6 | **born** 8:10 |
| 47:4 52:9 | **beginning** 5:6 | **beyond** 76:19 | **boston** 40:14 |
| 81:25 82:16 | 12:7 29:10 | **bill** 117:4 | **bothered** |
| 88:9 89:9 | **behalf** 1:5 | **birth** 8:8,9 | 122:13 |
| 92:22 103:11 | 99:19 | **bit** 15:16 36:5 | **bottom** 44:18 |
| 103:17 111:9 | **behavior** 73:20 | 112:6 | 44:22 47:15 |
| 130:3 | **belief** 63:13 | **blemishes** | 64:21 |
| **ballpark** 113:8 | **believe** 7:23 | 90:25 | **bought** 113:16 |

**back** 10:3
12:18 24:11
38:17 40:11
47:4 52:9
81:25 82:16
88:9 89:9
92:22 103:11
103:17 111:9
130:3
**ballpark** 113:8
**bankruptcy**
26:6
**base** 67:7,10,13
69:20,23 90:4
103:2
**based** 43:8,11
73:24 85:15
91:25 92:14,16
101:9
**baseless** 74:22
74:23
**basing** 85:3
**basis** 63:13
73:9 77:20
78:16,18 129:3
**bates** 43:5,8,12
53:12 65:3
82:9 92:24
110:9
**bathroom**
81:18,20
**baton** 8:10,16
11:24 39:1,21
66:18 93:3,12

116:20 130:7
130:20
**bear** 22:11
**beeped** 105:25
**beginning** 5:6
12:7 29:10
**behalf** 1:5
99:19
**behavior** 73:20
**belief** 63:13
**believe** 7:23
14:6,16 19:9
20:17 25:7,11
27:3,6,14
28:21 31:20,20
33:6 36:20
37:3,7 39:4,8
41:22 45:8,17
50:9 51:3,19
58:3 63:6
64:11 66:25
67:9,19 68:4
68:11,18 71:22
74:8,11 78:6
80:22 82:6
83:7 84:21
85:24 88:8
89:8 90:4,10
96:9,20 97:13
98:15 113:15
115:11 121:15
128:9
**believed** 87:20
**berler** 2:3 5:11

**best** 6:16 25:15
94:2 98:12
123:5
**better** 94:6
**beyond** 76:19
**bill** 117:4
**birth** 8:8,9
**bit** 15:16 36:5
112:6
**blemishes**
90:25
**blue** 19:16 23:1
63:20 81:7,8
86:9,13,16,18
86:21,23 87:2
87:3,7,17 88:3
88:25 90:2,8
90:22 91:7
92:3,14,18
94:16 107:25
**body** 71:15
90:23,24 91:8
**book** 23:1
63:21 81:7,8
86:9,13,17,21
86:23 87:2,7
87:17 88:25
90:2,8,22 91:7
92:4,14,18
94:16
**book's** 86:18
87:3 88:3
**borison** 2:9,11
5:13,14 26:14
27:21 105:19

105:21 109:1
**borisonfirm.c...**
2:11
**born** 8:10
**boston** 40:14
**bothered**
122:13
**bottom** 44:18
44:22 47:15
64:21
**bought** 113:16
116:3,16 122:1
**boulder** 21:9
21:10,12 22:3
113:23 114:19
**box** 2:7
**braked** 48:12
**breached** 35:5
**break** 7:12,13
7:16 36:4
38:10,20 81:15
81:20 129:20
**bridge** 29:2
**briefly** 27:17
**broker** 16:17
22:16
**broker's** 16:24
**brookland**
13:10
**brooklin** 13:9
13:11 14:13
**brooksville**
12:10,12 13:2
13:23

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

[brought - chose]

Page 6

**brought** 77:3
84:24
**build** 14:22
**bullet** 73:15,16
**bunch** 53:15
**business** 15:4,7
19:7,24 24:19
**businesses** 15:2
15:11
**buy** 113:14,16
113:22 116:12
116:19 120:2,4
120:7
**buyers** 18:16
**buying** 18:17

**c**

**c** 2:11 134:1
**calculate** 60:12
61:4
**calculated**
67:10,20 68:5
68:12 78:4
83:17 84:2,5
104:18 109:24
**calculates** 75:2
**calculation**
67:13
**call** 29:16,23
37:24 124:25
126:1
**called** 19:20,21
51:23
**calls** 26:25 79:5
79:16

**campuses** 16:5
**canal** 1:14 4:18
**cancel** 45:5
**capacity** 16:14
**car** 22:21,23
23:3 30:15
33:12 37:24
40:4,11 41:14
53:25 54:2,5
54:10,13 58:1
63:22,23 64:4
74:8,11 87:25
93:3 94:19
98:1 100:8
101:2 112:20
113:14 116:12
117:11
**carle** 1:25 4:21
133:2,23
**caroline** 10:14
10:24
**cars** 23:16
106:5 113:7
121:19
**cars.com.** 118:4
**case** 6:5 29:8
30:14,18 35:1
37:21 43:10
77:4 84:11,18
104:19 107:21
108:10 109:3
123:22 126:5
126:11 127:8
127:17,23
128:2,11,14,22

129:13 130:9
133:15
**cases** 125:2
129:3
**cash** 58:8 59:14
60:9,13,18,23
61:4,6,14 62:1
62:3,7,14,23
63:2,12 111:7
114:1 117:3
120:10
**casper** 2:10
**casualty** 1:8,9
4:13,14 6:5,6,9
30:10,18,21
32:3,8,11,17
33:1,3,7 36:12
36:15 134:4
135:1 136:1
**cate** 40:15
**category** 70:19
71:4,23
**catherine** 9:9
9:19 10:6,24
**causes** 26:18
**celebrate** 9:17
**cents** 24:11
83:21,24
**ceremony** 9:12
**certain** 83:21
**certificate**
133:1
**certification**
16:20 17:7,18
133:18

**certifications**
16:13
**certified**
128:10
**certify** 133:3,10
**certifying**
133:19
**challenging**
67:13,23 84:9
84:10,15,17
86:4 103:4,25
104:4,8 106:8
106:10,16,25
107:2
**chance** 132:1
**change** 122:13
135:4,7,10,13
135:16,19
**changed** 99:11
**changes** 134:10
136:6
**charged** 56:4
**charlestown**
16:6
**cheap** 121:2
**check** 87:23
111:5,15,20
**chef** 20:19
**children** 10:9
11:5
**chips** 91:15
**chooses** 101:2
101:11
**chose** 59:9
61:24 90:10,14

Case 1:22-cv-00375-NT    Document 120-10    Filed 01/10/25    Page 42 of 156    PageID
#: 3997

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

**[chose - condition]**                                                                    Page 7

91:21
**chosen** 90:16
90:16
**chronological**
20:9 82:18
**circumstances**
93:24
**city** 112:21
**claim** 34:9,19
45:15,17 46:17
47:5 49:16
50:8,13,14,15
50:18 51:4,11
51:14,22,24
52:1 55:6
56:14,18,22
57:5,8 59:20
65:11 104:22
105:4,5 111:25
122:16
**claiming** 35:4,6
35:8 102:24
103:22
**claims** 34:25
35:3,19 101:16
101:20 106:20
**clarification**
100:15
**clarify** 7:1
34:18
**class** 3:13
17:13 24:11,14
24:14,16 25:10
25:13 36:2,14
99:7 106:3

107:6,10,15,17
109:8,11,14,18
109:22 110:2
127:9 128:10
**classes** 17:1
**classify** 25:16
**clear** 7:7
**cleveland** 2:4
**clevelandcon...**
2:5 134:2
**client** 34:11
99:21
**close** 114:19
**cloth** 89:16,17
**code** 66:15,23
67:3
**college** 15:20
**collision** 102:1
**colorado** 12:1
12:14 21:11,12
36:21 37:5,8
**come** 32:19
46:11 75:7
83:23 85:10
126:4
**comes** 132:15
**comfort** 88:1
**commencing**
1:18
**comments**
70:21 71:6
**commercial**
18:22
**commitments**
126:11 127:17

**common** 93:14
**communicating**
60:7
**communication**
124:6,16
**communicati...**
7:9
**community**
107:25 108:20
**companies** 23:3
**company** 1:8,9
4:13,14 6:6,7,9
17:4 19:22
22:2,4,5,13,15
22:25 29:12
30:10,18,21
32:3,3,6,8,11
33:8 36:13,16
45:21 49:17
57:23 60:14,15
60:22 61:4,6
61:25 101:3,6
101:12 122:17
**comparable**
62:9 69:24
72:19,21 73:15
75:9,18 76:5
76:24 77:5,13
78:8,10 79:3,9
80:6,11,16,20
80:24 83:4,8
83:12 85:20
94:24 95:4,6
97:1,4 102:24
104:5 106:17

**comparing**
106:17
**comparison**
92:19
**comparisons**
92:10 94:19
**compensated**
34:24 109:9,15
109:19
**compensation**
34:6,17 35:7
35:10,15,16,22
36:1,13 127:8
127:9
**complaint** 3:14
35:20 98:19
99:7,10,14,19
100:1,4 101:25
105:9 106:12
**complete** 136:8
**completed** 53:2
134:16
**concede** 105:1
**conceded** 125:1
**concern** 85:19
**concerns** 83:3
**concluded**
131:18
**condition** 62:15
62:17,21 67:16
67:20,23 70:10
70:13,14 85:21
85:23 86:6
90:9,18 91:3,8
91:20 92:1,5,8

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

**[condition - culinary]**                                                    Page 8

92:15,15,17
**conduct**  129:4
**conference**
    125:25
**configuration**
    75:10,23 80:7
    103:2,6,24
    104:2
**configured**
    87:23
**configuring**
    87:24
**confirm**  85:22
**confusion**  46:5
**conjunction**
    116:9
**connection**
    103:9
**consider**  63:3
    93:7,20,21
**consideration**
    112:1
**considered**
    13:5 59:15
    97:1 116:17
**considering**
    118:17
**conspire**  101:2
    101:5,11
**consult**  105:14
**consumer**
    73:20 78:6
    80:22
**contact**  11:10
    77:12 80:15

86:1 93:3
**contacted**  81:9
**contacting**  98:1
**contemplating**
    128:17
**contend**  101:18
**content**  7:8
**contention**
    55:20 76:25
**contingency**
    124:2 126:6,8
    126:17,20
    127:3,6 129:2
**contingent**
    127:8
**continue**  4:7
    128:12
**contract**
    123:24
**contrary**
    105:11
**contributing**
    20:4
**control**  133:19
**convenience**
    88:2
**convenient**
    36:3,8
**conversation**
    28:22
**conversations**
    4:6 46:21
**convicted**
    24:25 25:10

**copies**  134:14
**copy**  99:13
    131:1,21
**corner**  64:21
**correct**  9:15
    17:23 42:10,11
    43:1 44:10
    45:3,13 47:25
    57:8,21 61:23
    66:12 78:5
    79:25 80:1,3
    82:15 83:17
    85:2 86:10,11
    89:3 96:1,2,17
    98:3 100:14,15
    102:8,20,21
    105:3 111:3
    132:13 136:8
**corrections**
    132:12 136:6
**cosmetic**  90:24
**cost**  57:24,25
    58:4 127:11,14
**costs**  126:9
    127:24,25
    128:1,8
**counsel**  5:4,20
    61:24 98:11,21
    98:22 110:20
    125:7 128:13
    128:21 133:11
    133:15 134:14
**counts**  50:18
    119:18

**county**  21:7
**couple**  8:24
    11:7
**course**  17:9
**courses**  17:12
**court**  1:1,24
    4:15,21 5:18
    6:14 24:5
    109:4 125:15
    125:19 128:2,6
    128:10 131:20
    132:5,11,16
**cover**  55:6
    56:21 57:4,24
**coverage**  31:13
    45:3 46:22
    47:3 51:8
    55:25
**covered**  45:12
    47:20 51:5
**crease**  71:16,18
    71:20 91:4,12
    91:18
**create**  103:2
**created**  19:8,11
    20:5
**crime**  25:10,13
    26:2
**crimes**  24:25
    25:16 26:4
**crr**  1:25 133:23
**crv**  47:18 54:18
    116:2
**culinary**  15:24
    15:25 16:3,11

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

**[current - determined]**

| | | | |
|---|---|---|---|
| **current**  10:17 128:11,22 | **day**  45:11 46:10 51:16,17 51:20 127:19 136:15 | **declare**  136:4 | **deposing** 134:13 |
| **currently**  18:8 122:8 | | **deemed**  132:13 136:6 | **deposition**  1:13 1:14 4:11,17 |
| **custom**  131:10 | **days**  40:14,16 132:7,11 134:16 | **deer**  8:18,20,21 10:18 20:17 107:25 | 6:8 7:25 26:9 27:10,12,18 28:3,10,13 |
| **cv**  1:5 4:16 | | **defects**  90:24 | 37:25 124:23 131:18 133:5 |
| **cylinder**  65:23 | **deal**  99:21 113:20 | **defendant** 24:20 | 133:13 |
| **d** | **dealer**  22:21 63:22 64:4 81:9 93:3,11 93:17 94:19,20 114:18 130:8 130:20 131:6 | **defendants** 1:10 2:13 5:9 6:5 24:17 | **depositions** 28:16 |
| **d**  3:1 | | **define**  129:14 | **describe**  65:20 109:23 |
| **dad**  28:19 29:1 55:15,16,22 130:21 | | **definitely** 124:17 | **described** 73:19 |
| **dad's**  85:3 | **dealers**  86:1 93:14 | **definition** 90:21 | **describes**  31:12 91:3 |
| **daily**  45:24 | **dealership**  39:1 77:13 114:23 115:1 116:22 116:24 118:6 | **degree**  15:20 15:21,25 16:11 | **description**  3:7 |
| **damage**  48:23 48:24 122:16 | | **degrees**  16:10 | **detail**  69:1 |
| **damaged**  100:9 100:22 106:4 | | **delivers**  22:5 | **determination** 58:11 59:17 125:11 |
| **damages** 109:21,22,23 110:1 111:25 | **dealerships** 118:5 | **delivery**  22:1,4 | **determinations** 63:16,18 68:23 81:7 |
| **darn**  122:12 | **dealt**  29:13,15 30:4 124:7 | **demanded**  97:7 | **determine** 60:18 61:6 |
| **data**  23:13 | **december** 10:23 11:4 | **denial**  56:20 | 62:17,21 64:1 66:20 83:9 |
| **date**  8:8 9:15 42:19 46:3,22 82:20 84:4 96:7,12,21 107:20 110:16 111:22 127:14 133:7 135:24 136:12 | **decide**  33:17,24 51:21 59:10 | **denver**  12:1,2,5 12:8 15:23 | 86:16 115:12 119:4 |
| | **decided**  55:6 59:11 | **department** 22:19 23:5 | **determined** 57:19 58:17 60:9 62:2 |
| | **decision**  51:8 | **depends**  20:25 93:24 | |
| | **declarations** 3:9,10 43:22 47:11 113:12 | **deployed**  48:24 | |
| **dated**  31:15 65:15 94:13 | | **deponent** 134:13 136:3 | |
| **daughter**  48:20 | | **deposed**  5:23 24:2 | |

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

**[determining - ellsworth]**                                                Page 10

**determining**
23:16 62:7,14
62:23 63:2
**detroy** 1:14
4:18
**deviates** 102:23
103:22
**differences**
76:5,8 103:1
103:23
**different** 36:15
73:21 76:3
81:10 83:8
132:9,10
**differently**
61:13
**dings** 90:25
**direct** 107:14
133:19
**direction**
133:19
**directly** 29:13
130:21
**disagree** 58:10
66:22 76:14,22
77:9 78:11,21
80:8,18 95:17
105:3
**disagreed**
61:21 71:1,11
81:2,5 108:2
**disagreement**
74:14 77:21,22
77:25

**disclose** 7:8
**discrepancies**
84:14
**discuss** 28:18
109:25 110:3
112:3
**discussed** 32:12
32:24 33:19
66:25 68:15,22
96:18 106:6,24
107:18 123:10
123:23
**discusses** 91:4
**dishonesty** 25:3
**disputing** 83:11
104:17,19
125:13,20
**distinction**
30:24 33:4
**district** 1:1,1
4:15,15
**docket** 4:15
**document** 31:2
31:6,8 43:4,6,9
43:14,17 45:1
45:10 47:7,8
49:24 64:14,15
65:3 82:3,4
98:25 99:2
110:6,8 122:24
122:25
**documentation**
55:11,14,21
**documented**
94:17

**documents**
28:1 50:12
**dog's** 9:21
**doing** 19:9
**dollars** 83:23
102:18
**door** 65:22
71:16,21 91:4
91:12,18
**doordash** 22:6
**doors** 71:5,8,12
**doran** 2:19
4:19
**drive** 40:4,5
65:24,24
112:15 117:17
117:21 118:10
118:11
**driven** 53:25
54:2,13
**driver** 21:24
49:4,10 50:1
**driver's** 17:22
17:25 18:2,5
49:11,17 89:14
**driving** 39:19
48:10 52:19,25
53:25 112:7,12
113:1 116:1
128:3
**drove** 39:17
40:11,14
127:18
**due** 30:16
33:12 35:22

**duly** 5:22 133:6
**duty** 123:12

**e**

**e** 2:10 3:1 8:4
25:10,13 26:11
64:10 82:17,21
82:24 84:13,23
85:12 87:13
92:22 93:2
94:11,13,15
95:9,15,21
96:6,9 130:8,9
130:11,11,14
131:5 135:3,3
135:3
**eager** 29:1
**earlier** 84:7
100:12 104:7
106:24 130:6
**early** 12:3
39:22,25
**easier** 29:19
**east** 2:4
**eats** 22:7
**education**
15:17
**either** 14:6
28:12,15 80:9
90:13 130:21
132:18
**elementary**
48:11
**ellsworth** 12:25
13:16

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

**[else's - fault]**

Page 11

| else's 52:20,25 | errata 134:11 | exhibits 3:6,17 | fails 134:18 |
|---|---|---|---|

else's 52:20,25
employed 18:8
  18:9,10 22:13
  22:18 133:12
  133:15
employee 56:6
  133:14
employees 15:9
employment
  19:6 22:10
enclosing 111:5
ends 53:15
  82:20 86:20
  92:24
engage 125:6
  129:16
engaged 96:12
engagement
  124:24 125:1
engine 65:23
entered 87:18
entire 36:2
  117:5,7
entities 29:22
  29:25
entity 29:23
  30:21
epa 16:19,21
  17:6
equal 84:25
equipment
  69:3,18 72:4
  76:20,20,22
  103:1,5,23
  104:1

errata 134:11
  134:13,16
esq 2:5,8,11,16
  134:1
estate 15:8
  16:18,24 18:14
  18:16,22 19:10
estimate 60:22
  61:20 62:1
  101:22
estimated 59:2
estimating
  61:13
et 134:4 135:1
  136:1
evidence 79:17
exact 35:2
  49:14
exactly 35:8
  76:9 96:14
  102:12 108:18
examination
  3:2 5:25
excellent 90:15
exhibit 3:8,9,10
  3:11,12,13,15
  3:16 31:3,4,7
  43:2,5 46:25
  47:8 64:12,15
  81:13,16 82:4
  96:16 98:16
  99:1 110:4,7
  122:21,24
  130:24

exhibits 3:6,17
expenses
  126:10 127:11
  127:14,24,25
  128:1,8
experience
  23:10,15
experiences
  108:20
expired 46:10
explain 25:20
  48:8 54:15
  77:24 108:11
explained
  29:21 84:1
  94:15
explanation
  73:12,24 83:16
  83:19
explicitly
  108:15,21
express 41:22
extent 28:21
  33:15

**f**

f 96:4
facebook
  120:25 121:11
  121:13
fact 46:6 78:10
  128:25
factor 20:4
facts 79:17
failed 105:6

fails 134:18
failure 25:25
  106:4
fair 6:22 34:6
  34:17 35:6,10
  35:15,16,22
  36:1,13 37:9
  91:7 92:4,8,17
  93:22 104:12
  115:13 119:5
fairly 34:24
  109:14
fall 12:11
familiar 50:3
familiarized
  26:10
family 40:15
far 65:25 100:5
farm 41:5
  43:24 45:3,13
  45:15,16,18,21
  45:22,25 46:15
  46:18,21 47:3
  47:5 50:13,16
  50:24 51:2,4,7
  51:11,12 56:21
  56:24
father 63:21
  64:4 85:10
  102:3 111:11
  111:14 112:2
  130:11
fault 49:4,4,10
  51:22

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

**[favorite - general]**

Page 12

| | | | |
|---|---|---|---|
| **favorite** 29:4 | 99:10,14 | 98:11 99:7 | 79:16 81:14,17 |
| **features** 69:5 | 122:15 129:3 | 126:16 133:6 | 93:9 99:20 |
| 76:3,5 84:21 | **filing** 99:25 | **five** 129:20 | 103:8 105:18 |
| **february** 31:16 | **filings** 2:5 | **fivesih** 113:9 | 105:20,22,24 |
| 33:20,23 36:22 | 134:2 | **fix** 91:15,17 | 108:24 110:14 |
| 37:11 44:19 | **final** 68:7 132:1 | **flew** 40:10 | 112:17,22 |
| 45:2 65:15 | **finance** 113:24 | **flip** 86:12,19 | 113:4,19 |
| 82:13,21 84:12 | 117:1 | 87:6,22 | 122:19 123:18 |
| 94:14 95:20 | **financed** 39:14 | **floor** 72:5,8,12 | 124:5,10,15,19 |
| 96:7 134:3 | **financial** 1:9 | **follows** 5:24 | 125:3,23 |
| **federal** 41:22 | 4:13 6:6,9 | **foregoing** | 126:13,16,19 |
| **fee** 123:21 | 30:20 32:3,7 | 133:4,18 136:5 | 126:23 127:20 |
| 124:6 125:14 | 33:3 36:12 | **forgot** 9:13 | 128:3,16,24 |
| 125:22 126:8 | 126:10 127:16 | **form** 61:1,8 | 129:9,22 131:9 |
| 127:2,6,10 | **financially** 4:25 | **former** 22:10 | 131:14,19,24 |
| 128:6,7 | 133:15 | **forth** 83:19 | 132:8,14,18 |
| **feel** 26:18 | **find** 34:23 | 133:7 | 134:1 |
| **fees** 59:5 95:22 | 49:24 65:7 | **forward** 65:24 | **friday** 27:17 |
| 124:7 | 85:25 114:7 | **forwarded** | **front** 48:11,25 |
| **fell** 125:23 | 117:24 120:14 | 43:19 | 65:24 |
| **felonies** 25:2 | 129:1 | **found** 88:15 | **full** 119:1,2 |
| **felony** 25:15 | **finding** 97:19 | **four** 54:5,7,11 | **further** 131:8 |
| **felt** 30:15 33:11 | **fine** 26:3 77:2 | 54:15 65:22 | 133:10,13 |
| 95:3 | 113:8 | **frederick** 2:3,5 | |
| **figure** 103:10 | **fired** 21:16 | 5:10,10,11 | **g** |
| **figured** 85:13 | **firm** 2:9 4:21 | 9:20 16:1,4 | **g&f** 4:21 |
| **file** 33:17 34:1 | 5:14 27:7 | 23:21 25:1,6 | **ga** 134:15 |
| 45:15 46:17 | 129:1 | 25:19 27:6,19 | **gaps** 112:14 |
| 50:15 52:1,13 | **first** 3:13 12:7 | 28:23 32:18 | 113:1 |
| 53:7 99:19 | 31:18 33:19 | 34:10 36:3,7 | **gas** 65:23 |
| 107:16 | 34:5,8 36:18 | 38:2 44:21,24 | **geico** 50:2,5,8 |
| **filed** 4:14 26:6 | 36:23 37:9,16 | 50:22 53:9,14 | 50:18,20,21,22 |
| 45:17 47:4 | 47:15 69:25 | 53:18 60:25 | 57:2,4 121:24 |
| 50:7 59:20 | 73:5,15 82:19 | 61:8 65:2,6 | 121:25 |
| 98:19,23 99:5 | 83:3 87:7 | 75:15,19 79:5 | **general** 33:10 |

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

**[generic - hour]**

Page 13

| | | | |
|---|---|---|---|
| **generic** 121:13 | 81:22 82:18 | **hand** 42:10 | **higher** 59:14 |
| **georgia** 2:15 | 103:13 112:5 | **handled** 56:14 | 76:17 79:2 |
| **gift** 102:18 | 124:12,19,25 | **handling** 16:20 | 83:5,13 85:13 |
| **girl** 11:6 | 125:16 127:20 | **hang** 103:8 | 97:15 |
| **give** 21:1 28:1 | 129:24 131:16 | **hanson** 1:14 | **hill** 2:16 19:16 |
| 40:3 69:3 | 132:2,19 | 4:18 | 108:1 |
| 126:16 | **good** 4:1 6:2,3 | **happened** | **hire** 60:15 |
| **given** 28:6 55:4 | 90:10,15,15,16 | 44:10 48:5,8 | 110:24 111:1 |
| 136:9 | 90:16,17,21 | 56:10 122:14 | 128:13,21 |
| **giving** 40:2 | 91:25,25 92:14 | **happening** | 129:12,15 |
| **glossary** 90:14 | 92:15 108:20 | 107:21 | **hired** 34:3,5,8 |
| **gmc** 120:1,14 | 113:19 122:12 | **happens** 132:5 | 34:13 57:9 |
| 121:7 122:6 | **google** 85:24 | **happy** 6:20 | 60:14,22 61:3 |
| **go** 4:8 6:12 | 97:22 | **harmed** 36:2 | 61:6 96:10 |
| 9:20 16:2,25 | **gotten** 24:11 | 107:8 | 97:11 108:14 |
| 21:8,20 25:9 | 38:9 40:25 | **harms** 33:15 | 108:17,19,24 |
| 36:5 40:12 | **gouges** 71:7,8 | **head** 6:17,18 | **hiring** 61:25 |
| 47:16 51:24 | 71:12 91:13,17 | 85:8 | **history** 113:2 |
| 52:3 61:9 70:8 | **graduate** 15:17 | **headliner** | **hit** 48:14,16,17 |
| 79:6,17 98:7 | **grandmother's** | 70:20,22 71:2 | **hitting** 48:13 |
| 103:9 109:4 | 116:2 | **hearing** 124:7 | **home** 8:18 |
| 118:5 126:12 | **great** 25:22 | **heated** 89:1,5 | 10:20 12:20 |
| 126:23 128:18 | **greater** 71:6 | 89:10,20,24 | 13:23 14:5,7 |
| 131:13 | **ground** 6:13 | **held** 17:14 | 14:24 15:1 |
| **goal** 34:3,5 | **grounded** | **help** 6:13 28:2 | **homes** 8:17 |
| **goals** 34:22,23 | 113:5 | 108:4 | 13:7 18:17,20 |
| 109:13 | **guess** 22:4 | **hendrick** 80:15 | 19:3 |
| **goes** 99:23 | 31:11,13 60:1 | 80:25 | **honda** 47:18 |
| 126:24 | 93:25 110:17 | **hensler** 120:5,6 | 116:2 |
| **going** 4:2 9:24 | 110:22 131:10 | **hereinbefore** | **honestly** 11:16 |
| 10:3 15:16 | **guys** 26:17 | 133:7 | **hope** 41:24 |
| 22:9 26:16 | | **hereto** 136:7 | 109:11 |
| 31:1 38:13 | **h** | **high** 15:17 | **hoping** 34:9 |
| 52:5 53:7,16 | **h** 8:4,5 135:3 | 22:12 126:3 | **hour** 7:13 |
| 68:25 69:4 | **half** 12:16 | | 112:24 |

**[hours - islandjusticelaw.com]**                                      Page 14

| | | | |
|---|---|---|---|
| **hours**  20:23 | **impreza**  37:18 | 94:18 104:23 | 121:22 122:16 |
| 28:19,25 | **improper**  74:18 | 105:6 106:22 | **insured**  32:7 |
| 127:18 | 74:21 | 107:2 123:6,10 | 121:20 122:4,7 |
| **house**  12:25 | **include**  84:20 | 130:12 | 122:8 |
| 13:2,4,5,16 | **included**  61:15 | **informed**  93:4 | **insureds**  44:1 |
| 38:3 102:8 | 61:18 94:21 | **ing**  96:4 | **insurer**  30:4 |
| **huge**  128:18 | 95:14 | **ingram**  77:12 | **intend**  14:22 |
| **hum**  27:13 58:7 | **including**  5:4 | 78:9 | 40:5 121:3 |
| 79:12 | **inconsistent** | **initially**  58:22 | **intended**  55:3 |
| **hurt**  48:21 | 123:11 | **ins**  134:4 135:1 | **intent**  14:8,10 |
| **hvac**  15:8 | **incorrect**  68:18 | 136:1 | 19:11 117:10 |
| 17:12 18:14 | 70:6 | **inspect**  57:2 | **interest**  98:12 |
| 19:3,9 | **incorrectly** | 62:20 | **interested**  4:25 |
| **hypothetical** | 67:9,20 68:4 | **inspected**  56:25 | 133:16 |
| 128:25 | 68:11 | 57:7,10,17 | **interior**  71:5,8 |
| **hyundai**  47:18 | **increase**  94:18 | **inspection** | 89:14 90:25 |
| 116:8,10,14 | **incurred** | 57:11,13 | 91:8,13,17 |
| 117:1,14,24 | 127:14 | **installation** | **interrogatories** |
| 118:6,10 | **indefinitely** | 17:13 | 3:16 |
| | 40:6,7 | **instance**  125:9 | **interrogatory** |
| **i** | **independent** | **insurance**  1:8 | 123:3,6,15 |
| | 32:23 | 3:8 4:13 6:6 | **introduce** |
| **idea**  39:13 74:2 | **indicate**  90:8 | 22:13,15,16,19 | 130:24 |
| 74:4,5 96:4 | **indicated**  93:18 | 30:10,18,22 | **introduced** |
| 107:16 125:6 | 93:20 | 31:12,19 32:2 | 108:1 |
| **identification** | **indicator**  94:2 | 32:6,11 33:7,8 | **investigate** |
| 3:6 31:4 43:2 | 94:6 | 35:5 36:15,19 | 108:9,12 |
| 46:25 64:12 | **individual** | 36:23 37:1,4,7 | **invited**  96:25 |
| 81:13 98:16 | 120:7 | 38:6 40:22 | **involves**  23:16 |
| 110:4 122:21 | **individually** | 41:2 42:16 | **involving**  25:3 |
| **identify**  53:9 | 1:5 107:6 | 45:2,6,8,13 | **ira**  2:5 134:1 |
| **impact**  7:24 | **inform**  51:7 | 46:3,10 49:12 | **island**  2:6 5:17 |
| **impaired**  7:23 | **information** | 49:17 50:2,6 | 107:25 |
| **implicitly** | 49:12 65:19 | 51:25 57:23 | **islandjusticel...** |
| 108:16 | 66:8,14 69:24 | 100:13,20 | 2:8 |
| **important**  6:15 | | | |
| 117:18 | | | |

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

[isle - lawyers]                                                                                    Page 15

**isle** 8:18,20,21
  10:18 20:17
**issue** 37:21
  76:25 125:13
  125:20
**issued** 30:21
  33:7
**issues** 95:10
**items** 61:21

**j**

**j** 1:25 133:2,23
**jack** 77:12 78:9
**jacqueline** 27:7
**january** 1:16
  4:3 39:23 44:6
  44:10 45:7,11
  48:6 122:15
**jerry** 120:5
**joann** 8:14 39:9
  44:2
**job** 21:8,21
**john** 2:8,8 5:12
  5:16 26:14,21
  27:1 65:6 82:8
  105:22,22
  107:24 108:3,6
  108:19,21,21
  124:22 125:3
  129:12
**johnson** 15:23
**join** 24:10
**joining** 5:13
**judge** 124:21
  124:25 125:25
  126:2,2

**july** 11:12 44:6
**june** 8:11
**justice** 2:6 5:17

**k**

**keep** 30:8 54:21
**kelley** 23:1
  63:20 81:7
  86:9,18,21,23
  87:2,3,7,17
  88:3,24 90:2,7
  90:22 91:7
  92:3,14,18
  94:16
**kid** 113:5
**kind** 16:16
  89:12 94:11
**kinds** 132:9
**king** 2:14 5:8
**knew** 108:19
**know** 6:20,25
  7:14 11:12
  16:1 21:18
  26:19 29:9,11
  38:24 39:2,3
  39:16 42:5
  45:5,9,23
  46:19 47:6
  48:4 50:18
  51:9 55:18
  56:24 57:1,3,6
  59:15 60:20
  62:6,24 65:25
  67:1,11 68:6
  69:16,21 70:4
  72:13 75:2,6

76:9,18 77:16
78:3,9 80:25
84:8,10 85:18
88:13 90:1
91:20 93:16
95:16 97:3,5
97:10 99:16
100:5,11
101:10 107:10
108:18 111:17
113:9 114:22
118:18,21
119:17 125:12
126:21 130:23
131:10
**knowing** 47:2
**knowledge**
  25:16 32:24
  100:3 101:10
  105:15 123:5
**known** 16:2
  29:14 47:4
**kslaw.com** 2:17
**kyle** 26:11 56:3
  56:5,8,19 60:6
  67:1 82:22,24
  84:13 92:23
  94:14,25 95:9
  95:25
**kyle's** 95:20

**l**

**la** 66:14
**label** 43:9,12
**labeled** 43:5
  53:12 71:23

82:9
**land** 13:8 14:13
**law** 5:14
**lawsuit** 24:9,14
  24:20 29:7
  33:17 34:1
  58:16 67:12,22
  98:20,23 99:5
  103:4,25 106:8
  106:16,20
  107:16 108:7
  109:7,12,14,17
  109:21
**lawyer** 7:3 13:6
  25:18 27:7
  34:4,5,8,14
  104:13,21
  105:14 106:15
  106:23 107:4
  109:25 110:3
  129:7
**lawyers** 7:10
  26:12,13 27:10
  28:1,5 32:13
  32:15,20,25
  33:5,25 34:20
  36:17 43:18
  107:14,19,22
  107:23 108:9
  108:14,17
  110:14 111:19
  112:4 123:22
  123:25 126:22
  127:2 128:11
  128:22 129:13

**[laying - lot]**                                                    Page 16

| | | | |
|---|---|---|---|
| **laying** 95:9 | **licenses** 16:14 | 132:10 | 62:11,19 64:1 |
| **lcr** 1:25 133:23 | **liftgate** 88:2,7 | **live** 8:15,20,21 | 65:18 66:4 |
| **learned** 32:19 | 88:11 | 10:25 11:2,23 | 67:5 68:25 |
| **lease** 119:19 | **likely** 37:12 | 12:5,9,13,15 | 69:22 70:19 |
| **leased** 119:19 | **limit** 25:7 | 14:8,25 15:1 | 71:4,15,23 |
| 119:22 | **line** 67:16 | 21:7 | 73:10,14 85:21 |
| **leather** 89:1,5 | 68:23 70:12 | **lived** 8:24 9:3 | 88:1,9 89:9 |
| 89:10,18,19,24 | 72:22 76:19 | 10:22 11:5,6 | 92:22 94:11 |
| **leaving** 25:24 | 135:4,7,10,13 | 11:14,16,18,22 | 100:6,25 |
| **led** 51:25 | 135:16,19 | 11:24,25 12:2 | 101:14 102:22 |
| **left** 43:24 | **lines** 67:25 | 12:8,10,12 | 108:21 111:9 |
| 115:24 | **list** 22:11 23:20 | 37:2 114:19 | 114:15,25 |
| **legal** 23:18 | 69:3,18 72:21 | **living** 36:20 | 118:2 120:23 |
| 33:19,23 34:25 | 72:25 77:6,17 | 112:21 | 122:23 |
| 35:2,3 55:18 | 78:7 80:12,23 | **llc** 2:3,9 5:11 | **looked** 26:10 |
| 134:23 | 93:5,15,18 | 15:5,13 18:11 | 63:20,24 82:12 |
| **legally** 9:11,12 | **listed** 45:24 | 19:8,12 20:6 | 86:9 |
| 53:3 55:16 | 47:17,22 69:6 | **loan** 119:18 | **looking** 61:20 |
| **legible** 131:1 | 69:11,15,25 | **local** 21:6 | 65:3,8 75:15 |
| **leigh** 2:19 4:19 | 73:21 76:10 | 63:23 93:3 | 88:24 90:14 |
| **letter** 3:12,15 | 77:13 79:11 | **located** 20:17 | 92:23 103:21 |
| 25:17 56:20 | 86:2,5 88:11 | 97:20 | 117:16 121:1 |
| 82:7,16 96:7 | 94:7 113:12 | **locating** 98:5 | **looks** 43:7 83:2 |
| 96:15,25 97:7 | **listing** 94:22 | **location** 4:17 | **lose** 127:23 |
| 110:19,23 | **listings** 85:22 | 66:13 | **loss** 37:20 |
| 125:1,12 | 85:25 94:20 | **long** 10:22 12:5 | 57:20,22 58:3 |
| **letters** 124:24 | **lists** 44:13 | 12:15 13:19 | 58:6,11,18 |
| **level** 87:20 90:2 | 69:17 | 14:5 21:17 | 59:16 64:22 |
| 126:3 | **liter** 65:23 | 22:11 23:21 | 69:1,23 101:16 |
| **license** 9:13 | **litigation** 126:9 | 40:12 59:19 | 101:20 106:9 |
| 16:17,24 17:18 | 127:11,13 | 112:17 | **lost** 103:9 |
| 17:22,25 18:2 | **litsup** 134:15 | **longer** 36:6 | **lot** 11:10 14:20 |
| 18:5 66:9 | **little** 8:18,20 | 84:15 | 23:23 88:13 |
| 112:19 | 15:16 36:5 | **look** 23:24 28:2 | 93:4 125:2 |
| | 112:6 125:16 | 32:1 44:5 62:8 | |

Case 1:22-cv-00375-NT    Document 120-10    Filed 01/10/25    Page 52 of 156    PageID

Matthew Thurston
#: 3937
Multiple Plaintiffs v. Progressive

January 22, 2024

[louisiana - mentioned]

Page 17

**louisiana** 8:10
8:16 37:2,5,8
40:10,13 41:15
55:19 63:23
66:11,19,23
**low** 93:6
**lower** 79:15,20
**lowers** 101:16
101:19
**lumbar** 89:15

**m**

**m** 3:7 8:4 20:12
44:2
**ma'am** 6:10,23
7:2,6,11 14:19
16:22 18:12
30:2 37:15,19
37:23 39:6,24
43:23,25 44:4
44:11,14,17
45:14 64:9
123:13
**made** 35:12
59:17 60:5
63:24 95:3
114:3 121:9
126:11 127:16
136:5
**mail** 64:10
82:21,24 84:13
84:23 85:12
87:13 92:22
93:2 94:13,15
95:9,15,21
96:9 130:8,9

130:11,11,14
131:5
**mails** 26:11
82:17 94:11
96:6
**main** 4:15
**maine** 1:1,16
2:7 4:19 8:19
8:25 9:1 10:18
12:10,12,25
13:2,6,9 14:13
16:18 17:5,25
19:16 20:15
25:14 36:24
37:10,16 38:6
40:11,13 42:13
54:1,2,14 66:9
101:17,20
117:19
**make** 29:19
59:24 62:12
106:18 129:18
132:12
**makes** 62:8,20
63:3 74:22
**manufacturer**
23:8
**march** 3:15
10:14 14:16
82:8,10 96:7
110:16,21
113:15 120:3
**marital** 9:6
55:19

**mark** 47:8
87:23
**marked** 31:4,7
43:2,5 46:25
64:12,15 81:13
82:4 98:16
99:1 110:4,7
122:21,24
**market** 68:7,12
68:18 94:3,7
114:12 117:13
120:17
**marketplace**
120:25
**marriage** 9:13
9:19 10:6
**married** 9:7,10
10:7
**match** 63:16
81:8
**mats** 72:5,8,12
**matt** 8:7
**matter** 4:12
108:7
**mattered** 125:8
**matthew** 1:4,13
3:1 4:11,12
5:21 8:4 133:5
134:1,4,5
135:1,2,24
136:1,2,4,12
**mayer** 56:19
82:22,25 84:13
92:23 94:14
95:9

**mean** 22:3
25:13 29:12
32:5 34:18
36:12 40:9,10
49:22 57:22
74:2,24 79:19
83:22 101:5
102:4,13
107:13 108:11
110:11 119:19
128:19
**meaning** 54:1
**means** 45:4
57:23 73:1
87:24 91:8
99:9 107:10,14
133:19
**meant** 101:10
**media** 4:10
**medications**
7:19
**meet** 26:13
27:9 107:23
**meetings** 26:23
27:15
**member** 24:14
106:3 110:2
**memory** 7:23
50:4 70:24
71:3,14 89:15
92:6
**mention** 95:11
**mentioned**
28:20 29:11
130:20

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

**[messages - nissan]**                                    Page 18

**messages** 55:22
96:6
**met** 26:14,21
27:19 107:24
**methodologies**
106:6
**methodology**
73:12 106:17
**microphones**
4:4
**middle** 87:11
94:12
**mile** 83:21,24
84:16,17
**mileage** 63:4
76:11,16 80:8
81:11 83:5,13
83:16,23 84:1
84:5,9,14
86:22 94:22
103:1,5,23
104:1
**miles** 66:2
**mind** 33:4
42:19
**mine** 113:4
**mini** 17:13,15
**minor** 90:23,24
90:25
**minus** 111:7
**minute** 129:20
**misdemeanor**
25:15
**misdemeanors**
25:2

**missing** 72:16
89:13
**mistaken** 31:22
**misunderstan...**
66:10
**mitchell** 64:22
64:25 75:2
79:2,13,20
83:7 88:22
89:10 95:10
97:15
**mitchell's**
106:9
**model** 39:5
62:12 69:20
84:25 85:17
106:18 116:14
**mom** 39:8,18
55:9 116:9
117:4,5 121:10
**moment** 9:21
**monday** 1:16
4:3
**money** 109:16
**month** 11:25
42:6 59:23
82:14
**months** 8:25
11:7,17 54:6,7
54:11,15
**morning** 4:1
6:2,3 27:17
**mother** 46:13
**motor** 23:5

**motorcycle**
113:10
**motors** 77:13
**move** 11:11
124:20
**moved** 8:25 9:1
9:1 11:12,20
12:6 37:5
**moving** 95:21
**msrp** 84:24
85:4,9,13,14
**mute** 4:6
105:23
**mw** 15:5,13
18:10

**n**

**n** 3:1 8:5
**nada** 23:1
**name** 4:19 8:2
9:8 11:8 17:3
27:4 29:13,17
32:16 42:13,22
56:19 57:16
64:6 93:11
114:3 116:21
117:8 120:12
**named** 32:17
44:1
**names** 8:6,12
117:9
**ne** 2:15
**near** 97:20
**necessarily**
82:18 83:10

**necessary**
136:6
**need** 5:12 7:13
36:8 42:20
81:17 91:9
100:23 112:20
126:21 129:5
130:23
**needed** 40:21
**needs** 13:24
**negative** 67:17
75:11 77:9
80:19
**negotiate**
115:10 118:25
**negotiated** 74:7
74:9,12,17
78:7 80:23
**negotiating**
73:20
**negotiation**
104:15
**neighbor**
120:16 121:9
**neighborhood**
59:3
**neither** 133:10
**never** 22:6 74:9
100:12
**new** 9:1 11:17
11:18,22 20:11
39:4 116:17
128:13,21
**nissan** 113:23
114:19

Matthew Thurston
Multiple Plaintiffs v. Progressive
January 22, 2024

**[nod - owner]**                                                          Page 19

| | | | |
|---|---|---|---|
| **nod** 6:18 | **objected** 125:7 | 53:6,21 66:8 | 87:23,24 89:1 |
| **nonrefundable** | **objection** 25:1 | 66:12 68:25 | **order** 20:9 |
| 96:17 | 32:18 34:10 | 74:4,20 75:20 | 82:18 94:11 |
| **normally** | 60:25 61:8 | 81:19 83:2,20 | 131:20 132:2 |
| 131:20 132:16 | 79:5,16,22 | 84:12,19 85:5 | 132:19 |
| **norman** 1:14 | 80:4 | 85:16 86:19 | **ordered** 131:25 |
| 4:18 | **objections** 5:1 | 87:16 88:16 | **original** 99:10 |
| **notary** 136:13 | **obtained** 87:2 | 89:16,21 90:7 | 99:13 |
| 136:19 | **occasionally** | 92:3,25 100:19 | **orland** 13:6 |
| **note** 3:17 4:4 | 120:22 | 105:24 108:23 | **orleans** 9:1 |
| 134:10 | **occurred** 57:14 | 109:10 123:18 | 11:17,18,22 |
| **noted** 136:7 | **oem** 72:4 | 126:23 127:23 | 20:11 |
| **notes** 129:21 | **offer** 35:10 | 129:9,18,22 | **outcome** 5:1 |
| 133:5 | 57:4 59:24 | 130:16,23 | **outlined** 94:20 |
| **noticed** 48:12 | 60:5 61:23 | 131:7,9 132:8 | **outside** 21:7 |
| 83:19 | 63:11,17 93:22 | 132:14,18 | **overall** 70:13 |
| **noticing** 5:7 | 93:23 108:3 | **old** 10:13 | **overestimated** |
| **november** 20:2 | **offered** 35:6,14 | **once** 46:1 | 78:23 |
| **nt** 1:5 4:16 | 35:16,22 63:7 | **online** 17:3,9 | **owed** 101:4 |
| **number** 27:24 | 63:10 | 17:14 114:9 | **own** 8:18 9:4 |
| 61:21 65:3,11 | **offers** 93:6 | 118:1,2,13 | 10:20,21 12:20 |
| 74:25 75:5,7 | **oh** 8:22 43:13 | 120:20,24 | 12:21,25 13:2 |
| 83:21,23 87:12 | 72:24 113:9 | **open** 19:17 | 13:7,8,14 15:2 |
| 87:14,16,19 | **ohio** 2:4 131:24 | **opened** 20:6,10 | 15:11,13 18:15 |
| 92:24 94:20,21 | **okay** 8:22 9:14 | **opinion** 58:12 | 18:25 29:8 |
| **numerous** | 9:16 12:20 | 58:15 91:24,25 | 31:23,25 32:23 |
| 71:24 91:5 | 13:13 16:4 | **opposed** 36:8 | 40:22 52:18 |
| | 21:3 24:2,13 | 107:6 | 101:9 110:24 |
| **o** | 29:6,10,16,16 | **opposition** | **owned** 14:5 |
| | 29:18 30:12,17 | 125:12 | 19:13 32:6 |
| **o** 8:5 134:1 | 31:1 32:1,5,21 | **option** 88:3,11 | 113:7 115:19 |
| **o2** 38:17 52:9 | 33:6,10,21 | 88:21 98:3 | **owner** 40:18 |
| **oath** 4:24 24:23 | 37:1,24 38:10 | **options** 69:14 | 55:12,16,21 |
| **object** 7:3 | 42:2 43:13,16 | 69:18 84:24 | 66:18 |
| 79:25 99:20 | 43:21 49:7,25 | 85:1,6 87:19 | |
| 128:17,24 | | | |

**[ownership - plan]**                                                    Page 20

**ownership** 53:1
55:19 66:21
**owns** 13:4

**p**

**p.m.** 38:17 52:5
52:9 81:25
82:21 103:13
103:17 129:24
130:3 131:16
131:18
**p.o.** 2:7
**packages** 69:15
69:19
**page** 3:2,7,9,10
31:12 43:22
44:13,19,23
47:12,16,16
66:7 69:1,2,2
69:22 70:8
72:18,18,23
73:10,11 75:17
82:20 86:12,19
87:7,22 92:23
94:12,13,20
96:16 113:12
122:19 135:4,7
135:10,13,16
135:19
**pages** 69:17
**paid** 56:11
58:14 96:16,21
114:1 115:6
117:3,4 118:22
119:1,2,18
127:13

**paint** 71:24
90:22 91:5,8
91:12,15
**pam** 4:21
**pamela** 1:25
133:2,23
**pandemic** 20:3
**panels** 71:5,8
71:13 91:13
**paragraph**
93:2 100:6,25
101:14,25
102:22 103:21
105:9 106:2
111:4
**parents** 8:12,23
11:24 28:13,16
28:25 38:23
40:2,21 41:3,5
41:7 42:3,25
43:20 44:2
45:2,13,25
46:2,14,17,20
47:2 51:1,7
53:4 54:1,4,10
56:15 66:15,23
70:2,14 76:6
83:9 85:16
86:24 88:6,12
89:4 90:9,19
102:8
**part** 57:7 58:16
59:5 66:12
67:12,22 100:7
107:24 109:16

**particular**
24:16 35:11
125:9
**parties** 4:8
131:12 133:12
**parts** 68:1,5
72:3,14
**party** 4:24 24:8
61:25 86:9
87:8 91:21
97:7,11,14
98:2
**pay** 55:24 58:4
58:8 96:19
100:8,21 101:1
101:3,17,20
106:4 112:2
117:5 120:10
121:14 126:9
127:11 128:13
128:21
**payee** 111:10
**paying** 115:13
119:5
**payment**
111:10,12
**payout** 59:9
**pdf** 132:15
**peachtree** 2:15
**pending** 7:15
**people** 16:2
23:23 29:14
36:2 108:20
**perfect** 85:21

**period** 44:6
112:8
**periods** 112:15
**person** 37:13
57:16 60:6
62:21 114:17
**personal** 101:9
105:15 109:13
121:6
**personally**
109:11
**pgr** 53:13,17
82:9
**phone** 27:20,22
27:24
**phones** 4:6
**physically**
102:14
**pick** 4:5 39:25
102:7
**picked** 39:21
40:8 41:2,8,11
41:14
**piece** 13:8
**place** 4:8 8:8
133:7
**places** 132:9
**plaintiff** 1:6 2:2
24:20 101:1,3
102:3 106:3
**plaintiff's**
102:3
**plan** 7:12 42:12
42:15,18 54:18
54:21,24

**[planned - progressive]**                                                     Page 21

| | | | |
|---|---|---|---|
| **planned** 55:2 | 55:2,5 56:1,3,9 | **pretty** 23:22 | 87:4 91:24 |
| **planning** 54:5 | 100:13,20 | 126:3 | **proceed** 5:20 |
| 54:6,14 | 116:8 | **previous** 77:23 | 7:25 98:9 |
| **plate** 66:9 | **portion** 117:6 | **price** 62:8 | **proceeding** 5:2 |
| **plated** 66:11 | **portland** 1:16 | 72:21,25 73:1 | **proceeds** 109:3 |
| **play** 52:12 53:6 | 4:18 | 73:21,21 77:6 | **process** 98:10 |
| 53:16 | **position** 89:15 | 77:17 78:7,24 | 102:2,4,11,13 |
| **played** 28:20 | **possession** | 79:3,14 80:12 | **produce** 43:18 |
| 52:14 53:12,19 | 102:15 | 80:23 93:5,15 | 110:15 124:8 |
| **plaza** 1:16 4:18 | **possibility** | 93:19 94:1,5,7 | 124:13 130:16 |
| **please** 4:4,6 5:2 | 58:23 | 102:15,17 | **produced** |
| 5:19 6:20,25 | **possibly** 21:9 | 115:3,10,13 | 110:11 130:9 |
| 8:2 22:11 | 21:13 90:14 | 117:6 118:19 | 132:6 |
| 94:19 | **post** 121:10,13 | 118:25 119:1,2 | **producing** |
| **plural** 106:13 | **power** 88:2,7 | 119:5 121:12 | 124:11 125:14 |
| **plus** 70:1,3 | 88:10 89:14 | **prices** 74:7,8 | 125:20 |
| 84:25 85:17 | **premier** 70:1,2 | 74:11 79:23 | **professional** |
| 90:6 113:9 | 70:3,3 | 102:24,25 | 16:14 17:17 |
| **point** 7:13 | **premium** 56:4 | 103:22 104:11 | 91:9,10,14,15 |
| 12:17 33:24 | 56:12 84:25 | **primarily** | 91:17 133:3 |
| 39:19 51:13 | 85:17 90:6,6 | 13:18 39:17 | **progressive** 1:8 |
| 55:3 56:3 | **premiums** | 120:25 | 3:15 4:12 6:5 |
| 73:15,17 82:19 | 55:25 | **prior** 11:25 | 29:12,14,17,20 |
| 89:22 97:23 | **prepare** 26:8 | **priority** 109:18 | 30:1,5,7,8,10 |
| 126:5 | 27:10,11 | **private** 4:5 | 30:13,17 31:19 |
| **pointed** 84:13 | **prepared** 44:19 | 86:9 87:8 | 31:21,24 32:7 |
| **police** 49:1,3,6 | 64:25 128:13 | 91:21 | 32:11,16,16 |
| 49:14 | 128:19 | **privilege** 34:12 | 33:1,2,2,7,11 |
| **policy** 30:22 | **preparing** | 99:22 | 33:14,18 34:9 |
| 31:23,25 35:5 | 27:18 | **privileged** | 34:19 35:1,4,9 |
| 37:10,14,17 | **present** 5:4 | 124:9,14,15,18 | 35:20,25 36:11 |
| 38:6 41:3 | 26:22,24 57:11 | 125:1 | 36:12,15,19,23 |
| 42:16 44:6 | **presently** 20:23 | **probably** 12:18 | 37:2,11,17 |
| 47:21,22,24 | **presumably** | 16:7 30:4 | 38:6 42:16 |
| 48:1 54:25 | 45:23 47:10 | 36:25 42:7 | 47:12 51:15,22 |

Matthew Thurston
Multiple Plaintiffs v. Progressive                                      January 22, 2024

**[progressive - read]**                                                   Page 22

| | | | |
|---|---|---|---|
| 51:23 54:9,16 | 67:13 92:7,16 | 64:19 88:10 | **pursuing** 98:18 |
| 54:25 55:5,25 | 92:19 106:4 | 89:23 95:5 | **put** 42:15 83:19 |
| 56:6,15,17 | 108:3 110:20 | 104:23 107:2 | 87:5 93:5 |
| 57:7,19 58:4 | **projected** | 130:19 | |
| 58:13,17,20,24 | 30:16 33:12 | **providence** | **q** |
| 59:6,13,18,20 | 35:11,13,23 | 16:8 | **question** 6:19 |
| 59:24 60:5,8 | 61:15,18 63:14 | **provider** | 6:21 7:15,16 |
| 60:12,17,21 | 68:19 73:5,16 | 121:22 | 69:4 79:7 |
| 61:3,5,12,17 | 73:25 74:15,17 | **provides** 22:25 | 92:11 102:10 |
| 62:2 63:6,25 | 74:21 75:3 | **public** 136:19 | 112:9 122:12 |
| 64:19 67:2,9 | 76:25 77:8,10 | **pull** 92:3 | 126:6 128:15 |
| 67:19 68:2,4 | 77:21 78:12,22 | **pulled** 74:25 | 129:6 |
| 68:11 70:5,25 | 78:23 79:24 | 75:6 78:1 | **questions** 6:11 |
| 71:10,19 74:6 | 80:5,18 95:11 | 86:24 88:25 | 6:17 7:4,20 |
| 79:23 81:1,5,6 | 95:17 101:21 | 90:1,7 | 22:10 23:24 |
| 82:7 83:25 | 104:8,11,18,20 | **punishment** | 26:16 123:4 |
| 88:10,20 89:22 | 104:24 105:2,7 | 26:1 | 124:13 125:5 |
| 90:18 94:16 | 105:10 106:10 | **purchase** 14:7 | 125:13,20 |
| 95:25 96:6,10 | 106:14 107:1,3 | 14:10,15 39:15 | 126:3 131:8 |
| 96:25 97:7 | **promised** 100:7 | 114:3 117:5 | **quit** 21:15 |
| 98:20,23 100:7 | 100:19 | **purchased** | |
| 100:14,19 | **proper** 106:6 | 38:21,24 39:2 | **r** |
| 101:2,11,15,18 | **properties** | 39:3,4 114:10 | **r** 8:5 135:3,3 |
| 103:5 104:1,10 | 12:22,24 13:14 | 114:18 116:4,9 | **rachel** 11:9 |
| 105:5,10 | 18:15,25 19:1 | 117:10 118:9 | **raise** 85:19 |
| 106:21 107:5 | 19:4 | 119:13,23 | **random** 23:23 |
| 109:7 110:23 | **property** 14:11 | 121:4,17,19 | **range** 21:1 87:8 |
| 112:1 121:23 | 15:14 | **purchases** | 87:11 |
| 121:24 122:4,7 | **provide** 94:17 | 74:17 | **rated** 70:20 |
| 122:9 129:3 | 94:19 105:6 | **purchasing** | 71:5,16 |
| 134:4 135:1 | 106:21 123:17 | 73:20 | **rather** 101:1 |
| 136:1 | 131:1 | **purpose** 15:6 | **rating** 70:17 |
| **progressive's** | **provided** 43:9 | 73:25 75:22 | **raymond** 11:9 |
| 58:10 61:22 | 43:15,17 53:10 | **purposes** 66:23 | **reach** 108:3 |
| 63:17 66:22 | 60:3 63:25 | 121:5 | **read** 69:4 131:4 |
| | | | 131:9,22 132:1 |

Matthew Thurston
Multiple Plaintiffs v. Progressive

**[read - repeat]**                                                                                      Page 23

134:9 136:5
**reading** 133:8
**reads** 131:25
**ready** 28:2
  81:14
**real** 15:8,13
  16:18,24 18:14
  18:16,22 19:9
**really** 113:19
  125:10
**rear** 71:16,21
  91:4,12,18
**reason** 7:22
  30:19 35:14,17
  77:3 98:6
  128:12 129:11
  134:11 135:6,9
  135:12,15,18
  135:21
**reasons** 33:13
  35:15 81:4
**recall** 24:16
  27:4 36:18
  37:4 42:2,8
  46:1 55:5
  57:13,16 59:1
  60:8 71:7,9,10
  87:18,21 93:11
  96:12 112:7
  115:5,6,9
  116:21 118:22
  118:24 121:25
**receipt** 132:12
  134:17

**receive** 34:6
  41:16,21 42:24
  56:20
**received** 42:2
  69:9 82:8
  102:5 111:17
  111:20,22
  130:25
**receiving** 97:25
**recess** 10:1
  38:15 52:7
  81:23 103:15
  130:1
**recognize** 31:7
  43:6 52:16
  110:7 122:24
**recollection**
  37:6 51:13
  85:3,15
**record** 4:2,9
  5:6 8:3 9:21,25
  10:4 28:24
  38:14,18 52:3
  52:6,10 65:3
  81:22 82:1
  103:10,14,18
  103:20 110:9
  129:25 130:4
  131:13,17
**recorded** 4:11
**recording** 4:7
  28:20 52:17
  53:22,24
**recover** 109:12

**reduced** 59:9
**referenced**
  134:6
**referring** 6:8
  30:9 52:22
  53:3 56:5
  63:19 100:10
  105:13 106:13
**reflect** 73:20
**reflected** 63:11
  123:6
**reflects** 111:7
**refresh** 50:4
**refrigerant**
  16:19
**region** 21:6
**regional** 69:23
**register** 42:12
  42:21
**registered**
  133:2
**registration**
  39:12
**rejected** 61:22
**related** 4:24
  22:15 133:11
**relative** 133:14
**relayed** 130:11
**release** 88:2,7
  88:11
**relented** 125:8
**relevant** 126:4
**relied** 79:23
  104:10

**relief** 35:24
**relocate** 96:1
**remember**
  11:16 21:15
  34:2 50:5,7
  51:16,20 56:17
  56:19 59:19
  60:6,16 64:3,6
  71:18,20 85:7
  95:23 114:8,11
  115:14 118:8
  130:22
**remind** 32:10
**remotely** 5:5,14
**renewal** 3:10
  47:11
**rent** 10:20
  13:17
**rental** 13:18,19
  13:20,21 14:11
  14:24 18:15,24
  19:1,4 23:3
**renting** 13:25
**repair** 22:23
  57:24,25 58:5
  58:20 91:11
  95:23
**repairable**
  90:24
**repaired** 54:19
**repairs** 58:14
  59:1,4
**repeat** 79:7
  92:11

Matthew Thurston                                                    January 22, 2024
Multiple Plaintiffs v. Progressive

**[rephrase - robert]**                                                    Page 24

| | | | |
|---|---|---|---|
| **rephrase** 6:21 | **reporting** 4:22 | **restaurant** | 47:14,18,21 |
| **replace** 54:25 | **represent** 6:4 | 19:13,14,15,18 | 48:5,6 49:1,5 |
| 117:22 | 18:16,19 | 20:6,11 | 50:16 52:2 |
| **report** 3:11 | **representation** | **restaurants** | 53:8,17 57:20 |
| 25:25 49:1,3,6 | 35:3 | 20:7,8,18 | 63:7 64:14,21 |
| 49:14,16 50:13 | **representative** | **resulted** 97:14 | 65:5,11 66:3 |
| 50:14 51:1,14 | 57:9 107:11 | **resulting** 127:8 | 67:5 68:7,25 |
| 51:21,24 64:18 | **represented** | **retain** 59:11 | 69:22 70:8,12 |
| 64:25 65:9,12 | 108:6 | 61:24 | 70:19 71:16,20 |
| 65:15 66:24 | **representing** | **retained** 3:17 | 72:18 75:7 |
| 68:8,17 69:8 | 4:20 131:22 | 98:21,22 | 76:10,19 77:5 |
| 70:6,9 72:16 | **reproduction** | **retainer** 96:17 | 80:6,11 82:3 |
| 72:20 73:11 | 133:18 | **retaining** 59:7 | 82:14 83:5 |
| 82:12 83:3 | **requested** | 108:10 | 84:16,21 85:19 |
| 84:8,20 85:22 | 133:9 | **return** 134:13 | 86:8 87:6,14 |
| 86:6,21,23 | **require** 90:23 | 134:16 | 88:24 89:2,17 |
| 87:2,17 88:10 | 126:9 127:10 | **reverse** 20:9 | 90:21 91:4 |
| 88:22,25 89:10 | **required** 17:1,9 | **review** 28:2 | 92:1 93:1,19 |
| 89:23 90:2,8 | 91:11 136:13 | 69:8 129:20 | 94:10 95:20 |
| 90:12 91:3 | **research** | 134:7 | 96:5 98:18,20 |
| 92:4,18,20 | 108:13,16,23 | **reviews** 108:21 | 100:6,18 104:8 |
| 95:11 97:16 | 114:9 119:4 | **revoked** 17:18 | 106:2 107:3 |
| 102:23 103:21 | **reside** 8:16,22 | 18:3 | 110:6,24 111:2 |
| **report's** 128:6 | **resolve** 34:19 | **rid** 55:3 | 112:5 113:17 |
| **reported** 50:17 | **respond** 7:20 | **rideshare** | 113:18 116:3,7 |
| 50:20,23 | **response** 96:24 | 21:23 | 121:16 123:9 |
| **reporter** 1:24 | 97:6 | **right** 7:18 | 123:19 129:19 |
| 4:21 5:19 6:14 | **responses** | 12:17,20 16:10 | 131:24 132:2 |
| 125:15,19 | 123:7,15,17 | 16:23 20:5,13 | **rightly** 109:9 |
| 131:20 132:5 | **responsibility** | 26:8,21 30:23 | **rights** 107:8,15 |
| 132:11,16 | 128:14 | 31:6 32:1 | **road** 10:18 |
| 133:3,20 | **responsible** | 33:10 37:14,20 | 11:14 12:21 |
| **reporter's** 3:17 | 127:24 128:8 | 37:22 38:20 | 48:10 |
| 128:2 | **rest** 37:25 | 41:5 43:4,21 | **robert** 8:13 |
| | | 44:3,5,16 | 10:15,24 44:1 |

Matthew Thurston
Multiple Plaintiffs v. Progressive                                          January 22, 2024

**[role - sell]**                                                                Page 25

| | | | |
|---|---|---|---|
| **role** 20:18 | **salvage** 62:25 | **scene** 25:24 | 72:4,19,22 |
| **ron** 26:15,22 | 111:8 | 115:24 | 73:11,16,22 |
| 27:2 108:1 | **salvaged** 59:7 | **school** 15:18,24 | 75:11 76:12 |
| 129:6,11 | 59:11 | 22:12 48:12 | 77:6 80:12 |
| **ron's** 128:7 | **sam** 45:24 | **scott** 2:11,11 | 82:10,22 86:14 |
| **ronald** 2:5 5:10 | **samsung** 17:14 | 5:13 8:13,13 | 87:9,16 89:10 |
| 134:1 | **sandwich** 22:4 | 26:14,21 27:2 | 89:12,14 90:13 |
| **rouge** 8:10,16 | **sandwiches** | 65:7 66:18 | 93:7 94:22 |
| 11:24 39:1,21 | 22:5 | 102:2 105:18 | 99:6,13 109:14 |
| 66:18 93:3,12 | **satsuma** 20:11 | 108:1 111:10 | 126:14 |
| 116:20 130:7 | **saw** 63:16 | 125:6 129:12 | **seeing** 88:19 |
| 130:20 | 118:1 | **scratches** 71:25 | 90:12 |
| **roughly** 10:23 | **saying** 30:23 | 90:25 91:5,11 | **seeking** 33:19 |
| **route** 98:7 | 80:2 93:21 | **search** 95:6 | 35:24 36:13,14 |
| 130:16 131:2 | 96:10 105:4 | 97:21,23 | 98:11 109:6,8 |
| **rows** 72:7,8 | 121:10 | 130:13 131:5 | 109:11,16,21 |
| **rpr** 1:25 133:23 | **says** 32:2 43:22 | **searching** | 109:22 110:1 |
| **rules** 6:13 | 43:24 44:5,19 | 98:13 114:16 | **seem** 68:23 |
| 132:7 | 64:22 66:5,13 | **seat** 89:15 | 81:11 |
| **run** 6:13 18:24 | 66:14 67:6,7 | **seats** 88:25 | **seemed** 52:1 |
| 81:17 | 67:16 69:1 | 89:1,5,11,12,24 | 63:15 |
| **running** 18:15 | 70:9,12 71:5 | **second** 2:10 | **seems** 23:22 |
| **rust** 91:1 | 71:16,24,24 | 53:7 69:3 | 66:3,9 74:6 |
| | 72:3,7 73:12 | 103:8,10 111:4 | 86:25 |
| **s** | 76:19 86:8 | **section** 65:18 | **seen** 47:8 49:6 |
| **s** 8:5 20:12,12 | 87:7,22,23 | 65:20 66:4,7 | 64:15 82:4 |
| 44:1 135:3 | 88:2 89:1 | 66:13 67:6 | 99:1 110:17 |
| **safer** 40:4 | 90:11,22 91:7 | 72:3 | **select** 88:3 |
| **sale** 62:8 73:2 | 93:2 94:17 | **sedgwick** 48:11 | **selected** 83:4 |
| 94:8 100:7,10 | 99:6 100:7 | **see** 27:16 31:15 | 87:19 89:2 |
| 121:8 | 101:1,15,25 | 32:2 43:21 | 90:3,4,5 91:25 |
| **sales** 30:16 | 102:22 103:21 | 44:7,12,18 | 104:5 |
| 35:11 61:15 | 105:9 106:2,12 | 64:21 65:13,16 | **self** 18:9,10 |
| 63:14 79:3 | 111:4,10 | 66:5 67:6,17 | **sell** 78:24 |
| 101:21 106:11 | 131:25 | 68:2,9 70:9,15 | 121:10 |

**[seller - specifically]**                                              Page 26

| | | | |
|---|---|---|---|
| **seller** 120:8 | **sheet** 134:11 | **significantly** | 105:2,7,10 |
| **sellers** 18:19 | **sheri** 120:6 | 31:21 81:9 | 106:14 107:1,3 |
| **selling** 18:20 | **shift** 112:5 | 83:13 | **solutions** |
| **sells** 94:2,6 | **shop** 22:23 | **signing** 133:8 | 134:23 |
| **send** 94:24 | 54:20 95:23 | **similar** 118:13 | **somebody** |
| 110:15 132:14 | 118:13 | 118:16 | 51:12 52:20 |
| 132:16,17 | **shopped** | **similarly** 1:5 | 91:14,16 |
| **sense** 62:8,20 | 120:23 | **simple** 30:8 | **sorry** 13:8 |
| 63:3 | **shopping** | **site** 86:18 87:4 | 49:23 50:14,23 |
| **sensitive** 4:5 | 120:20 | 87:5 | 72:24 92:12 |
| **sent** 63:22 64:7 | **short** 13:19,20 | **sitting** 14:3 | 100:16 120:5 |
| 82:10,24 85:12 | 81:19 129:20 | 32:23 35:18 | 125:15,17 |
| 110:20 125:12 | **shortly** 49:24 | 85:5 112:24 | 129:14 |
| 130:8,10 | **show** 31:1 | 113:20 | **sort** 16:25 |
| 134:14 | 55:11 | **situated** 1:5 | 108:22 |
| **separate** 29:22 | **showing** 31:6 | **six** 11:17 | **sought** 33:23 |
| 29:25 30:11 | 43:4 47:7 | 112:25 | **sounds** 20:13 |
| 32:24 | 64:14 82:3 | **small** 71:25 | 50:3 |
| **september** 9:11 | 98:25 110:6 | 91:5 | **south** 40:14 |
| 9:18 | 122:23 | **smoothly** 6:13 | **spalding** 2:14 |
| **sequence** 49:15 | **shows** 68:1 | **sneeze** 93:9 | 5:9 |
| **series** 22:9 | 69:23 72:21 | **software** 23:11 | **speak** 28:9,15 |
| **services** 96:22 | **shut** 20:1 50:10 | **sold** 33:13 | 64:4 98:14 |
| **servicing** 91:9 | **sierra** 120:1,15 | 35:13,23 61:16 | 125:16 |
| 91:10 | 121:7 122:6 | 61:18 63:14 | **speaking** 18:25 |
| **set** 105:24 | **sign** 41:7 | 68:19 73:5,16 | 33:4 |
| 133:7 | 131:11,23 | 73:25 74:15,17 | **specific** 32:6 |
| **setting** 109:10 | 134:12 | 74:21 75:3 | 37:6 42:19 |
| **settle** 34:9 | **signature** | 77:1,8,10,21 | 68:17 |
| **settlement** | 133:23 | 78:10,12,22,23 | **specifically** 7:5 |
| 59:24 61:23 | **signed** 36:18 | 79:10,13,23,24 | 27:11 29:7 |
| **several** 73:4 | 134:19 | 80:5,18 95:11 | 34:2 51:20 |
| 82:17 | **significant** | 95:18 100:20 | 64:3 95:13 |
| **shake** 6:18 | 113:1 | 104:8,11,11,18 | 114:13 117:13 |
| | | 104:20,24 | 118:18 120:18 |

Matthew Thurston
Multiple Plaintiffs v. Progressive                                    January 22, 2024

**[specifics - systematically]**                                           Page 27

specifics  72:19
speculation
  79:6,17
spelling  20:13
spilling  69:2
split  17:13,15
spoke  26:11
  63:21,21 93:12
spoken  27:20
  27:22,24 28:12
spot  53:8
spouse's  9:8
spring  19:8
  116:13
stains  70:21,22
  71:2
stand  9:23 52:4
  103:14 107:7
  107:14
standard  69:17
standards
  105:11,12,16
  106:7
start  47:15
  113:11 125:18
started  6:12
  98:19 112:7
starting  19:13
state  5:2,5 8:2
  16:18 17:4
  22:18 23:6
  25:14 36:24
  41:5 43:24
  45:3,13,15,16
  45:18,21,22,25

46:15,18,21
47:3,5 50:13
50:15,24 51:1
51:4,7,10,12
56:21,24 66:9
84:22
stated  53:24
  78:2,3 84:19
  100:19
states  1:1 4:14
  129:2,8
status  9:6
  55:18
stay  107:20
stayed  40:15
steed  2:8 3:12
  5:16,16 26:14
  27:23 82:8
  96:13,21 97:3
  97:10 98:1
  105:23 125:4
  125:17,22,24
steed's  96:25
stenographic
  133:5
step  73:14
stipulate
  126:19
stonington  2:7
  20:16 107:25
stood  69:13
stop  95:22
storage  59:5
street  2:4,10,15

strong  20:14
subaru  37:18
  47:17 55:3
  80:15,25
  113:11 114:7
  114:12,19,22
  115:1,4,7,13,16
  115:19,20
  116:3,5 117:20
  117:23 122:2,3
subarus  114:10
  114:15
submit  97:1,3
subs  21:9 22:3
subscribed
  136:14
substantive
  93:1
sued  32:10 33:1
  33:11,13
sufficient  105:6
suing  29:8
  30:13,17 107:5
suit  20:14
suite  2:15
summarize
  81:4
summary  66:5
  67:6
summer  12:11
sunshine  10:18
  11:14 12:21
supplement
  123:12,16

supporting
  94:18
supposed  40:18
  41:25 49:13
  58:4,8 101:17
  101:20
sure  9:22 17:8
  29:1 33:9,15
  35:2 36:7
  45:20 49:14
  54:3 63:1
  65:21 66:25
  67:4,21 69:7
  70:7,18 72:2
  75:14 76:15
  79:9 80:10
  83:18 85:2,14
  90:10 92:13,13
  95:8 97:2,9
  99:15 104:16
  108:13 111:21
  116:23 128:18
  130:10 132:19
suspended
  17:20 18:6
  112:20
swear  5:19
switched  122:1
sworn  5:22
  133:6 136:14
system  88:4
  106:9
systematically
  101:15,19

Matthew Thurston
Multiple Plaintiffs v. Progressive

January 22, 2024

**[t - time]**

| t | | | |
|---|---|---|---|
| **t** 8:4,4,5,5 20:12 135:3,3 | **tell** 32:14 46:14 51:4,6 54:9 59:8,21 70:5 70:25 71:19 81:1 88:20 | 128:18 | 98:2 |

**t** 8:4,4,5,5
20:12 135:3,3
**take** 4:8 7:12
7:16 17:2,10
36:4 38:10
40:12 53:7
62:15 81:19
83:22 111:25
124:20 128:22
129:2,8,13,19
**taken** 1:14 10:1
38:15 52:7
81:23 103:15
130:1 133:6,13
**talk** 6:16 15:16
29:6 30:9
45:19,21,22,24
51:10 59:6
104:13,21
106:15,23
107:4,22
111:14
**talked** 26:17,19
32:14 33:25
34:20 45:16,18
46:15 51:12
56:18 93:17
**talking** 38:21
44:16 53:21
**technically**
8:13
**telephone** 2:8
2:11

**tell** 32:14 46:14
51:4,6 54:9
59:8,21 70:5
70:25 71:19
81:1 88:20
**telling** 25:4
33:25 71:10
**tells** 7:5
**ten** 25:2,3
121:17,18
**term** 6:7,24
13:19,19,20
30:7
**terms** 25:15
90:15
**test** 17:10
118:10
**testified** 5:23
24:5,22 61:3
130:6
**testify** 7:24
109:4 129:6
**testimony**
109:20 134:9
134:17 136:8
**text** 55:22
**texts** 46:13
55:15
**thank** 5:20 7:17
44:24
**theory** 104:15
**thin** 74:25 75:6
78:1
**thing** 29:4
102:7,9,11

128:18
**things** 6:13
79:19 91:15
**think** 9:2,15
11:9,20 12:4,6
13:4 16:19
17:3,4,14
24:13 29:3
37:12 40:16
43:19 46:5
48:3 49:13,20
52:2 56:2,8
57:9 58:13
59:3 60:17,21
61:5,12,17
62:8,20 63:3,9
63:11,21 69:12
72:11,17 76:16
78:2 79:1
85:15 90:5,17
91:2,6,10,14,16
93:14 94:1,5
96:18 97:25
99:3 100:17
104:12,14
106:24 116:2
118:1,12 119:1
119:2,6 120:3
121:9,11,24
122:1 125:4,5
125:8,10,11,24
126:11 131:3
**third** 44:12
61:25 70:1
97:7,11,14

98:2
**thought** 29:21
53:1 75:19
98:11
**three** 10:14
27:14,15 28:19
28:25 47:14,16
69:25 71:6,7
71:12 89:15
91:12 126:3
127:18
**thurston** 1:4,13
3:1,7 4:11,12
5:11,15,17,21
6:2 8:4,14,14
9:9 15:5,13
18:11 19:21,23
31:4 43:2,6,12
44:2 46:25
52:12 53:13,17
64:12 66:18
81:13 82:9
98:16 102:2
110:4,10
111:11 122:21
125:6 133:6
134:1,4,5
135:1,2,24
136:1,2,4,12
**time** 4:2,7 5:2
7:7 9:3,23 10:2
19:10,14 20:16
27:20,22 30:25
34:19,22,23
37:10,14 38:12

**[time - understand]**                                                      Page 29

38:16 41:1,13
42:9 46:8 52:4
52:8 59:20
66:1,17 69:8
81:21,24 82:19
92:12 95:18
102:1,6,19
103:12,16
112:15 114:16
114:20 118:9
129:23 130:2
131:15 134:18
**timeframe**
134:8
**times**  27:9,14
27:19,25
**title**  39:7 41:7
41:13,16,21,23
41:25 42:3,10
42:21,24 53:2
55:8,17 62:25
102:5,20 114:5
117:8 120:12
**titled**  65:18
66:4
**today**  4:3 6:11
7:7,25 26:9
28:7 35:18
85:5 123:10
127:18
**together**
119:20,22
**told**  28:19
34:21 50:1
54:16 81:6

95:25
**took**  17:1,13
28:19 38:20
40:17 59:19
**top**  31:12,15
32:2 43:21
44:5 70:12
72:22 73:11
80:12 85:7
90:5 99:6
**topic**  125:24
**topics**  112:5
**total**  28:25
37:20 57:20,22
58:3,6,11,18
59:16 64:22
101:16,20
106:9
**totaled**  60:18
**touchups**  90:23
**towing**  59:5
**town**  41:11
**trade**  29:17
32:16 115:15
119:7
**training**  16:25
17:7 23:18
**transcript**
131:21 132:6
133:4,8,18
134:6,19 136:5
136:8
**transfer**  53:2
55:8

**transferred**
37:7 102:2,12
102:13,14
**travel**  21:5,7
128:7
**tree**  48:17
**trial**  109:3
**trick**  49:21,23
**tried**  85:24
112:2
**trim**  70:3,6
87:20 90:2,4
**trouble**  97:19
98:5
**truck**  120:1,17
121:11
**true**  100:4
106:4 123:7
133:4 136:8
**try**  85:21
**trying**  34:16
49:21,23
121:10
**tucson**  47:18
116:10,16
117:1,14,25
118:7,10,20
119:8,10,14
122:3
**turn**  10:14,15
**turned**  48:11
48:13 78:22
**turning**  48:12
**two**  1:14 10:12
10:15 11:25

17:4 27:25
29:22,25 38:3
40:14 67:25
69:25 72:7,8
76:20
**type**  18:13
**typical**  70:13
86:6

**u**

**u**  8:5 20:12
**uber**  22:7
**ufcc**  6:7 29:8,9
29:16,23 30:4
30:9
**uh**  27:13 58:7
79:12
**ultimately**
19:17 124:24
124:25
**umbrella**  30:1
**unable**  85:25
128:12
**unclear**  21:14
**under**  24:22
45:12 47:20
66:13 69:23
73:14 88:1,25
89:14 133:19
**understand**  6:8
6:19,25 7:20
29:24 30:20,23
32:5 34:22
35:19,21 40:17
42:20 43:8
72:25 73:9,25

74:2 75:22
84:4 96:15
99:9 102:9,12
104:23 105:7
123:9 128:16
**understanding**
25:17 32:15,25
41:1 46:7,9,11
46:20,24 49:8
49:9 64:24
74:4,5,16
75:25 79:14
83:20 85:9
126:7,22 127:5
127:7
**understood**
6:22 65:8
84:15 98:2
105:1
**undisputed**
111:6
**unfairly**  30:15
33:12 101:15
101:19
**uniformly**
81:12
**unit**  4:10
**united**  1:1,8
4:13,14 6:6,9
30:20 32:3,7
33:3 36:12
129:1,8
**university**
15:23

**unmute**  5:12
**use**  6:24 13:16
25:14 29:17
30:7 54:11
66:22 67:2
83:11 94:16
106:5,8
**used**  6:7 13:18
23:16 72:20
74:8,11,16
79:2,13 83:8
113:17 116:17
116:18 121:4
134:19
**using**  13:25
54:5,6,10,14
86:18 95:4,4
108:20

**v**

**v**  1:7 134:4
135:1 136:1
**vacant**  14:3,20
**vacation**  13:21
112:23
**valuation**  3:11
64:18 65:9,12
66:5,24 67:6
68:8 70:6,9
73:12 81:2,8
81:10 82:12
83:3 84:20
86:6 88:9 89:9
89:23 91:3
92:16,20 95:10
97:15,25

130:17 131:2,2
**valuations**  23:1
130:7
**value**  58:9
59:14,21 60:3
60:9,13,18,23
61:5,7,14 62:1
62:3,7,14,23
63:2,12,16,18
63:23 64:8
67:7,10,14
68:7,12,18,23
69:23 81:7
83:9 86:9,13
86:17 91:21
92:14 93:15
94:3,7,18 97:8
97:15 100:8,21
101:1,16,19
103:2 106:5
111:7,8
**valued**  30:16
33:12 59:13
79:2,15,20
**values**  23:16
63:20 94:16
**vehicle**  3:11
31:14 34:7,24
35:11,12 37:17
37:20 39:11
40:19 42:21
48:10,14,18
52:20,25 53:4
57:17 59:7,12
60:4 62:21,24

62:25 64:8,18
65:9,12,19
66:8,13 68:20
69:1,23,24
70:13,23 72:21
73:1,12 74:16
75:1,10,10,18
75:23 76:6,24
77:5,14,18
78:8,10,24
79:3,10 80:6,7
80:11,16,20,24
81:10 83:4
84:23 86:10,13
88:21 92:4,8
93:4,5,19 94:2
94:6 95:21
102:1,7,15,16
102:17,20
103:1,3,6,24
104:2 115:15
116:1 117:17
117:23 119:7
119:17,19,21
120:21 121:4
122:16
**vehicle's**  62:15
63:3 92:1
**vehicles**  23:5
47:15,17 55:1
60:19 62:9,11
63:25 69:25
72:20 73:15
76:2 83:8,12
85:20 86:2,5

**[vehicles - white]**                                                    Page 31

94:24 95:4,7
97:1,4 102:24
104:5 105:17
106:17 116:4,7
118:3,10,11,14
118:16 119:13
119:23 121:16
**verbally**  6:17
**verified**  123:15
123:16,17
**verify**  134:9
**veritext**  4:20
134:14,23
**veritext.com**
134:15
**version**  99:19
100:1
**versus**  4:12
33:3
**vet**  9:21
**video**  4:7,10
**videographer**
2:18 4:1,20
5:18 9:23 10:2
38:12,16 52:4
52:8 81:21,24
103:12,16
129:23 130:2
131:12,15
**videographer's**
128:7
**videotaped**
1:13
**view**  35:14
74:20

**vin**  87:4,5,16
87:18 94:21
**vocational**
17:11
**voice**  52:16
**volvo**  37:21,24
38:5,21,22
39:14,15,17,25
40:5,18 42:10
42:12,15 44:9
44:13,15 45:3
45:6,12 46:3
46:22 47:3,20
47:23 48:1,23
52:22 54:22,24
55:1,4,12,21
56:1,8,12,25
57:2,7,10,20
58:11,14,17,21
59:2,13,14,21
60:9,19,23
61:14 62:3
63:7 64:2,19
65:20,22 66:1
67:10 68:12
69:5,12,14,19
70:1,2,2,14
72:9,15,15
76:6 79:1,15
83:5,9 84:20
85:6,16 86:21
86:24 87:20
88:6,12 89:4
90:9,19 96:1,3
97:8,14 100:13

100:21 115:22
130:7
**volvo's**  55:8
**volvos**  38:3

| w |
|---|

**w**  8:4
**wagon**  65:23
**wales**  15:23
**walk**  87:1
**want**  25:19
26:19 29:6
34:21 52:12
53:6 58:20
62:24 88:1
92:22 102:12
107:7 109:14
124:20 125:18
126:1 129:20
**wanted**  6:12
34:1,17,18
40:4 83:15
**way**  34:24
44:12 94:13
103:4,25 104:4
104:17 107:8
132:18
**ways**  62:2,5
**we've**  27:24
44:15 68:15
123:23
**weather**  72:5,8
**web**  86:18 87:3
87:5
**wednesday**
27:16

**week**  9:12 12:7
20:23,25 27:16
27:17 42:5
112:22
**went**  84:7 87:3
103:20 114:23
115:1 118:6
124:22
**wheel**  65:24,24
117:17,20
**whispering**  4:5
**white**  2:16 3:2
3:17 5:8,8 6:1
6:4 9:22 10:5
16:2,7,9 23:22
24:1 25:4,12
25:21 27:8
28:24 29:3,5
31:3,5 32:21
32:22 34:13,15
36:5,9,10 38:4
38:10,19 43:3
44:22,25 47:1
50:25 52:2,11
52:15 53:11,15
53:20 61:2,11
64:13 65:5,8
65:10 75:17,21
79:8,21 81:16
81:19 82:2
93:10 98:17
99:23,24
103:19 106:1
110:5,9,13,18
112:18 113:6

**[white - zip]**                                                    Page 32

113:21 122:20
122:22 123:14
123:20 124:8
124:12,17,22
126:1,15,17,21
126:24 127:1
127:22 128:5
128:15,20
129:5,10,19
130:5 131:8
132:4
**who've**  36:2
**wife**  11:5 13:4
27:7
**wife's**  54:18
119:17,21
**willing**  57:24
109:4
**winter**  40:6
**wish**  94:17
**withdraw**
128:11,23
**withdrew**
129:12
**witness**  3:1
5:19 16:5,8
29:1 50:21
110:11 124:3
134:8,10,12,18
**woman**  26:24
27:1
**words**  29:8
**work**  13:24
18:13 19:3
20:8,24 21:5

23:10,15 90:23
120:1,17 121:4
121:6 131:19
**workcenter**
64:22 106:9
**worked**  20:7,10
21:23 22:1,6
27:1 48:4
**world**  23:25
**worth**  58:1
64:2
**written**  123:24
**wrong**  35:9
88:17
**wrongly**  58:17
**wy**  2:10

**x**

**x**  3:1
**xc70**  37:21
44:13 65:22
70:1,2 86:22

**y**

**y**  13:11
**yeah**  12:19
23:22 25:22
39:10 49:22
72:24 87:15
90:13 91:19
105:21,23
131:4
**year**  10:16
14:17 15:17
33:22 62:12
94:21 106:18

112:10,20
116:14 120:3
**years**  12:16
25:2,3 27:25
113:20 121:17
121:18
**yup**  53:18
72:24 113:13
115:24

**z**

**zero**  21:2
102:18
**zeros**  53:15
**zip**  66:15,23
67:2

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Application for Insurance
## Please review and sign where indicated



**Policyholder:**
**Matthew Thurston**
February 21, 2017

## Policy and premium information

| | |
|---|---|
| Insurance company: | United Financial Casualty Company<br>PO Box 31260<br>Tampa, FL 33631 |
| Named insured: | Matthew Thurston<br>1193 Sunshine Rd<br>Deer Isle, ME 04627<br>Home: 1-225-278-3442 |
| Financial responsibility vendor: | EXPERIAN<br>1-888-397-3742 |
| Policy period: | Feb 21, 2017 - Aug 21, 2017 |
| Effective date and time: | Feb 21, 2017 at : P.M. ET |
| Total policy premium: | $137.00 |
| Initial payment required: | $137.00 |
| Initial payment received: | $0.00 |
| Payment plan: | 1 payment |

EXHIBIT ___1___
WIT: _____
DATE: _1/22/24_
Pamela Carle, RPR, CRR

## Drivers and resident relatives

You, your spouse and all resident relatives 15 years of age or older, all regular drivers of the vehicles described in this application, and all children who live away from home who drive these vehicles, even occasionally, are listed below.

| Name | Date of birth | Sex | Marital status | Relationship |
|---|---|---|---|---|
| Matthew Thurston | Jun 7, 1990 | Male | Single | Insured |

Driver status: Rated
Education level: College degree
Occupation: Chef

## Outline of coverage

**2000 SUBARU IMPREZA STATION WAGON**
VIN: **JF1GF4853YG802541**
Garaging ZIP Code: 04627
Primary use of the vehicle: Commute
Number of years owned/leased when policy started or vehicle added: 5 yrs or more
This vehicle is currently enrolled in the Snapshot<sup>SM</sup> Program.

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $127 |
|   Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
|   Property Damage Liability | $25,000 each accident | | |
| Uninsured/Underinsured Motorist | $50,000 each person/$100,000 each accident | | 5 |
| Medical Payments | $2,000 each person | | 5 |
| **Total 6 month policy premium, with paid in full discount** | | | **$137.00** |

## Premium discounts

Policy

Multi-Policy, Paid in Full, Continuous Insurance: Diamond, Online Quote, Paperless, Home Owner, Online Signature - First Policy Period Only and Five-Year Accident Free

PGR_THURSTON_0000566

Matthew Thurston

| Vehicle | |
|---|---|
| 2000 SUBARU IMPREZA | Snapshot Participation |

## Driving history

Please review the following information carefully because driving history is used to determine your premium. All accidents are considered at-fault and over any applicable payment threshold unless we receive additional information from you or another source that proves otherwise. We obtain driving and claims history from one or more of the following sources:

- Your application (APP)

- Progressive claims history (PROG)

- Motor Vehicle Reports and/or court data (MVR) - provided by a consumer reporting agency

- Comprehensive Loss Underwriting Exchange (CLUE) - provided by a consumer reporting agency

| Driver and Description | Date | Source/Consumer reporting agency |
|---|---|---|
| Matthew Thurston | | |
| failure to report an accident | Jul 31, 2016 | APP |
| Matthew Thurston | | |
| not at fault accident | Jul 31, 2016 | APP |

## Risk and tier information

| | |
|---|---|
| Prior insurance: | Yes |
| Prior insurance carrier: | Progressive Insurance Company |
| Policy number: | 909567460 |
| Bodily injury limits: | State Minimum Limits |
| Comprehensive claims: | 00 |
| Not-at-fault accidents: | 00 |

## Uninsured/Underinsured Motorist Coverage Notice

You may purchase Uninsured/Underinsured Motorist Coverage for bodily injury with coverage limits less than the coverage limits you have selected for bodily injury liability coverage only if you expressly reject the option to purchase Uninsured/Underinsured Motorist Coverage in an amount equal to your limits of bodily injury liability coverage.

You may not purchase Uninsured/Underinsured Motorist Coverage with limits less than $50,000 each person/$100,000 each accident.

Matthew Thurston

## Application agreement

### Verification of content

I declare that the statements contained herein are true to the best of my knowledge and belief and do agree to pay any surcharges applicable under the Company rules which are necessitated by inaccurate statements. I declare that no persons other than those listed in this application regularly operate the vehicle(s) described in this application. I declare that none of the vehicles listed in this application will be used to carry persons or property for compensation or a fee, or for retail or wholesale delivery, including, but not limited to, the pickup, transport, or delivery of magazines, newspapers, mail, or food.

### Notice of information practices

I understand that to calculate an accurate price for my insurance, the Company may obtain information from third parties, such as consumer reporting agencies that provide driving, claims and credit histories. The Company may use a credit-based insurance score based on the information contained in the credit history. The Company or its affiliates may obtain new or updated information to calculate my renewal premium or service my insurance. I may access information about me and correct it if inaccurate. In some cases, the law permits the Company to disclose the information it collects without authorization. However, the Company will not share personal information with nonaffiliated companies for their marketing purposes without consent. Complete details are in the Company's Privacy Policy, which will be provided with this insurance policy and upon request.

### Fraud warning

It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

## Acknowledgement and agreement

- If I make my initial payment by electronic funds transfer, check, draft, or other remittance, and if the transfer, check, draft, or other remittance is not honored by the financial institution, this policy shall be subject to cancellation.
- If I make my initial payment by credit card, and if the Company is unable to collect my initial payment from the card issuer, this policy shall be subject to cancellation. I also understand that if I authorize a credit card transaction for any payment other than the initial payment, this policy will be subject to cancellation for nonpayment of premium if the Company is unable to collect payment from the card issuer. The Company is deemed "unable to collect" in the following instances: (1) when I reach my credit limit on my credit card and the card issuer refuses the charge; (2) when the card issuer cancels or revokes my credit card; or (3) when the card issuer does not pay the Company, for any reason whatsoever, upon the Company's request.
- I acknowledge that insurance prices and products are different when purchased directly from Progressive or through agents/brokers.
- The Company may obtain information, including vehicle history information, from third parties. I understand that this information may affect my policy premium or could result in a policy declination, cancellation, or nonrenewal.

Matthew Thurston

**Other charges**

I agree to pay the installment fees shown on my billing statement that become due during the policy term and each renewal policy term in accordance with the payment plan I have selected. I understand that the amount of these fees may change upon policy renewal or if I change my payment plan. Any change in the amount of installment fees will be reflected on my payment schedule.

I understand that a returned payment fee of $20.00 will be assessed to the balance due on my policy if any check offered in payment is not honored by my bank or other financial institution. Imposition of such charge shall not deem the Company to have accepted the check unconditionally.

I agree to pay a late fee of $10.00 when the payment for the minimum amount due is not received or postmarked by the premium due date. The amount of this fee may change upon policy renewal.

Note: You may be eligible for a lower rate in the Maine Auto Insurance Plan.

I represent that no covered vehicle will be equipped with a snowplow.

**Applicant signature**

I represent that I, Matthew Thurston, am the person identified as the named insured and the first driver in the Drivers and resident relatives section of this application. I acknowledge and agree to the statements contained within this application.

I also acknowledge and agree that by typing my name in the designated boxes on the screen below this form and clicking "Continue", I am electronically signing this application, which will have the same legal effect as the execution of this document by a written signature and shall be valid evidence of my intent and agreement to be bound by its terms.

I understand that my name already appears in the signature line below because I chose to electronically sign this application.

**Signature of named insured**                                        **Date**

X Matthew Thurston ........................................................    February 21, 2017

Form 4905 ME (10/15)

PGR_THURSTON_0000569

PROGRESSIVE
P.O. BOX 31260
TAMPA, FL 33631



MATTHEW THURSTON
CATHERINE D WENTWORTH
1193 SUNSHINE RD
DEER ISLE, ME 04627

**Policy Number: 913586280**
Underwritten by:
United Financial Casualty Company
July 22, 2020
Policy Period: Aug 24, 2020 - Feb 24, 2021
Page 1 of 3

**progressive.com**
**Online Service**
Make payments, check billing activity, update
policy information or check status of a claim.

**1-800-776-4737**
For customer service and claims service,
24 hours a day, 7 days a week.

# Auto Insurance Coverage Summary
## This is your Renewal Declarations Page

The coverages, limits and policy period shown apply only if you pay for this policy to renew.

Your coverage begins on August 24, 2020 at 12:01 a.m.  This policy expires on February 24, 2021 at 12:01 a.m.

Your insurance policy and any policy endorsements contain a full explanation of your coverage.  The policy limits shown for a vehicle may not be combined with the limits for the same coverage on another vehicle.  The policy contract is form 9611D ME (09/16).  The contract is modified by forms 4884 (10/08) and A265 ME (01/19).

## Drivers and resident relatives

| | Additional information |
|---|---|
| Matthew Thurston | Named insured |
| Catherine D Wentworth | Named insured |

## Outline of coverage



**2000 SUBARU IMPREZA STATION WAGON**
VIN: **JF1GF4853YG802541**
Garaging ZIP Code: 04627
Primary use of the vehicle:  Commute

Length of vehicle ownership when policy started or vehicle added: 5 years or more
This vehicle is currently enrolled in the Snapshot ℠ Program.

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $74 |
|   Bodily Injury Liability | $100,000 each person/$300,000 each accident | | |
|   Property Damage Liability | $100,000 each accident | | |
| Uninsured/Underinsured Motorist | $100,000 each person/$300,000 each accident | | 5 |
| Medical Payments | $2,000 each person | | 5 |
| Total premium for 2000 SUBARU | | | **$84** |

Form 6489 ME (07/17)


Continued

Policy Number: 913586280
Matthew Thurston
Catherine D Wentworth
Page 2 of 3

**2016 HYUNDAI TUCSON 4 DOOR WAGON**
VIN: **KM8J3CA40GU038308**
Garaging ZIP Code: 04627
Primary use of the vehicle: Pleasure
Length of vehicle ownership when policy started or vehicle added: At least 1 month but less than 1 year

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $94 |
| Bodily Injury Liability | $100,000 each person/$300,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Uninsured/Underinsured Motorist | $100,000 each person/$300,000 each accident | | 7 |
| Medical Payments | $2,000 each person | | 6 |
| Comprehensive | Actual Cash Value | $2,000 | 22 |
| Collision | Actual Cash Value | $2,000 | 80 |
| Total premium for 2016 HYUNDAI | | | **$209** |

**2016 HONDA CR-V 4 DOOR WAGON**
VIN: **2HKRM4H73GH718207**
Garaging ZIP Code: 04627
Primary use of the vehicle: Commute
Length of vehicle ownership when policy started or vehicle added: At least 1 year but less than 3 years

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $99 |
| Bodily Injury Liability | $100,000 each person/$300,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Uninsured/Underinsured Motorist | $100,000 each person/$300,000 each accident | | 7 |
| Medical Payments | $2,000 each person | | 6 |
| Comprehensive | Actual Cash Value | $1,000 | 29 |
| Collision | Actual Cash Value | $1,000 | 82 |
| Total premium for 2016 HONDA | | | **$223** |
| **Total 6 month policy premium** | | | **$516.00** |
| Discount if paid in full | | | -100.00 |
| **Total 6 month policy premium if paid in full** | | | **$416.00** |

## Premium discounts

| Policy | |
|---|---|
| 913586280 | Multi-Policy, Home Owner, Online Quote, Multi-Car, Continuous Insurance: Diamond, Paperless and Three-Year Safe Driving |

| Vehicle | |
|---|---|
| 2000 SUBARU IMPREZA | Snapshot Driving |

## Lienholder and additional interest information

| Vehicle | Lienholder | Additional interest |
|---|---|---|
| 2016 HONDA CR-V 2HKRM4H73GH718207 | Honda Lease Trust Torrance, CA 90503 | Honda Lease Trust Torrance, CA 90503 |

Form 6489 ME (07/17)


Continued

Policy Number: 913586280
Matthew Thurston
Catherine D Wentworth
Page 3 of 3

**Company officers**

*Patricia H. Coradi*

Secretary

Form 6489 ME (07/17)

PGR_THURSTON_0000845

PROGRESSIVE
P.O. BOX 31260
TAMPA, FL 33631



**Policy Number: 913586280**
Underwritten by:
United Financial Casualty Company
July 22, 2020
Policy Period:  Aug 24, 2020 - Feb 24, 2021
Page 1 of  3

MATTHEW THURSTON
CATHERINE D WENTWORTH
1193 SUNSHINE RD
DEER ISLE, ME 04627

**progressive.com**
**Online Service**
Make payments, check billing activity, update
policy information or check status of a claim.

**1-800-776-4737**
For customer service and claims service,
24 hours a day, 7 days a week.

# Auto Insurance Coverage Summary
## This is your Renewal Declarations Page

The coverages, limits and policy period shown apply only if you pay for this policy to renew.

Your coverage begins on August 24, 2020 at 12:01 a.m.  This policy expires on February 24, 2021 at 12:01 a.m.

Your insurance policy and any policy endorsements contain a full explanation of your coverage.  The policy limits shown for a vehicle may not be combined with the limits for the same coverage on another vehicle.  The policy contract is form 9611D ME (09/16).  The contract is modified by forms 4884 (10/08) and A265 ME (01/19).

## Drivers and resident relatives

| | Additional information |
|---|---|
| Matthew Thurston | Named insured |
| Catherine D Wentworth | Named insured |



## Outline of coverage

**2000 SUBARU IMPREZA STATION WAGON**
VIN: **JF1GF4853YG802541**
Garaging ZIP Code: 04627
Primary use of the vehicle:  Commute
Length of vehicle ownership when policy started or vehicle added: 5 years or more
This vehicle is currently enrolled in the Snapshot ℠ Program.

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $74 |
|   Bodily Injury Liability | $100,000 each person/$300,000 each accident | | |
|   Property Damage Liability | $100,000 each accident | | |
| Uninsured/Underinsured Motorist | $100,000 each person/$300,000 each accident | | 5 |
| Medical Payments | $2,000 each person | | 5 |
| Total premium for 2000 SUBARU | | | **$84** |

Form 6489 ME (07/17)


Continued

Policy Number: 913586280
Matthew Thurston
Catherine D Wentworth
Page 2 of 3

### 2016 HYUNDAI TUCSON 4 DOOR WAGON
VIN: **KM8J3CA40GU038308**
Garaging ZIP Code: 04627
Primary use of the vehicle: Pleasure

Length of vehicle ownership when policy started or vehicle added: At least 1 month but less than 1 year

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $94 |
| Bodily Injury Liability | $100,000 each person/$300,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Uninsured/Underinsured Motorist | $100,000 each person/$300,000 each accident | | 7 |
| Medical Payments | $2,000 each person | | 6 |
| Comprehensive | Actual Cash Value | $2,000 | 22 |
| Collision | Actual Cash Value | $2,000 | 80 |
| Total premium for 2016 HYUNDAI | | | **$209** |

### 2016 HONDA CR-V 4 DOOR WAGON
VIN: **2HKRM4H73GH718207**
Garaging ZIP Code: 04627
Primary use of the vehicle: Commute

Length of vehicle ownership when policy started or vehicle added: At least 1 year but less than 3 years

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $99 |
| Bodily Injury Liability | $100,000 each person/$300,000 each accident | | |
| Property Damage Liability | $100,000 each accident | | |
| Uninsured/Underinsured Motorist | $100,000 each person/$300,000 each accident | | 7 |
| Medical Payments | $2,000 each person | | 6 |
| Comprehensive | Actual Cash Value | $1,000 | 29 |
| Collision | Actual Cash Value | $1,000 | 82 |
| Total premium for 2016 HONDA | | | **$223** |
| **Total 6 month policy premium** | | | **$516.00** |
| Discount if paid in full | | | -100.00 |
| **Total 6 month policy premium if paid in full** | | | **$416.00** |

## Premium discounts

| Policy | |
|---|---|
| 913586280 | Multi-Policy, Home Owner, Online Quote, Multi-Car, Continuous Insurance: Diamond, Paperless and Three-Year Safe Driving |

| Vehicle | |
|---|---|
| 2000 SUBARU IMPREZA | Snapshot Driving |

## Lienholder and additional interest information

| Vehicle | Lienholder | Additional interest |
|---|---|---|
| 2016 HONDA CR-V 2HKRM4H73GH718207 | Honda Lease Trust Torrance, CA 90503 | Honda Lease Trust Torrance, CA 90503 |

Form 6489 ME (07/17)


Continued

PGR_THURSTON_0000844

Policy Number: 913586280
Matthew Thurston
Catherine D Wentworth
Page 3 of 3

**Company officers**

*Patricia W. Connor*

Secretary

Form 6489 ME (07/17)

PGR_THURSTON_0000845

# Vehicle Valuation Report



Prepared For  Progressive Group of Insurance Companies   (800) 321-9843

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 22-5056549-01 | | UNKNOWN | SCOTT THURSTON 2304 FAIRWAY DR BATON ROUGE, LA 70809 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 01/21/2022 | 01/25/2022 | 02/17/2022 | 1014377008 | 4 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2012 | Volvo | XC70  4 Door Wagon 3.2L 6 Cyl Gas A FWD | LA 70809 | 55,374 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Twilight Bronze Metallic | WDD885, Maine | YV4952BL2C1140915 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $13,231.80 |
| Condition - | $462.43 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $55.00 |
| Refurbishment | $0.00 |
| Market Value = | $12,824.37 |

**EXHIBIT** 4
WIT: _____
DATE: 1/22/24
Pamela Carle, RPR, CRR

## Settlement Value:
## $12,824.37

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Settlement Value = | $12,824.37 |

**J.D. POWER**


Mitchell WorkCenter™
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved

# Loss Vehicle Detail

Loss vehicle: 2012 Volvo XC70 | 4 Door Wagon | 3.2L 6 Cyl Gas A FWD

## Standard Equipment

### Exterior

| | |
|---|---|
| 16" "CECINO" alloy wheels | Aluminum roof rails w/"XC" logo |
| Body-side protective lower cladding | Front fog lights |
| P215/65R16 all-season tires | Pwr heated mirrors w/memory, puddle lights, integrated turn signals |
| Rear fog light w/auto-off | Rear wiper/washer -inc: automatic function in reverse when front wipers on |
| Safe approach & home safe security lighting | Variable intermittent wipers |
| Volvo Sensus w/integrated 7" color display | |

### Interior

| | |
|---|---|
| "XC" door stitching | "XC" front/rear/cargo textile floor mats |
| 40/20/40 flat-folding rear bench -inc: (3) manual-fold rear head restraints | AM/FM stereo w/CD/MP3/WMA player -inc: HD Radio, 160-watt amp, (8) speakers, USB input, iPod connection |
| Auto-dimming rearview mirror | Bluetooth |
| Central pwr door locks, fuel filler | Cross avenue aluminum inlays |
| Cruise control | Dual illuminated visor vanity mirrors |
| Dual-zone electronic climate control (ECC) w/rear seat vents | Flat-folding front passenger seat |
| Front center armrest | Front door storage pockets |
| Front reclining bucket seats w/adjustable head restraints | Front/rear reading lamps |
| Ignition immobilizer | Illuminated lockable glove box |
| Intelligent driver info system (IDIS) | Interior cabin light delay feature |
| Leather shift knob -inc: aluminum inlay | Leather-wrapped steering wheel w/illuminated cruise & audio controls -inc: aluminum inlay |
| Lockable underfloor storage in cargo area | Outside temp gauge |
| Pollen filter | Pwr driver seat w/adjustable lumbar, 3-position memory |
| Pwr windows -inc: front auto-up/down, anti-trap feature | Rear window defroster w/timer |
| Remote keyless entry | Security alarm system |
| SIRIUS satellite radio w/6-month subscription | T-Tec cloth seating surfaces w/"XC" stitching |
| Tilt/telescopic steering column | Trip computer |

### Mechanical

| | |
|---|---|
| Front wheel drive | Front/rear skid plates |
| Front/rear stabilizer bars | MacPherson strut front suspension |
| Multi-link independent rear suspension | Pwr 4-wheel disc brakes |
| Pwr parking brake w/auto release | Pwr rack & pinion steering |

### Safety

Claim # 22-5056549-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 2

| | |
|---|---|
| 3-point seat belts -inc: pretensioners, front height adjustable anchors | 4-wheel anti-lock braking system (ABS) -inc: electronic brake distribution (EBD), hydraulic brake assist (HBA), ready alert brakes (RAB), fading brake support (FBS) |
| Anti-submarine seats | Child safety rear door locks |
| Collapsible steering column | Daytime running lights |
| Driver/front passenger dual stage airbags -inc: front passenger cutoff switch | Driver/front passenger whiplash protection seating system (WHIPS) |
| Dynamic stability & traction control (DSTC) | ISOFIX child seat attachments -inc: top tether anchors |
| Rear window deactivation | Side impact protection system (SIPS) -inc: driver/front passenger side-impact airbags, front/rear side inflatable curtains (IC) |
| Tire pressure monitoring system | |

# Loss Vehicle Base Value

Loss vehicle: 2012 Volvo XC70 |  4 Door Wagon | 3.2L 6 Cyl Gas A FWD

### Regional Comparable Vehicle Information

Search Radius used for this valuation: 350 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 113,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2NORMAL GAS A 2WD | 125,000 | 77015 | 249 miles | $11,569.00 List Price | $11,764.92 |
| 2 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2NORMAL GAS A 2WD | 82,089 | 36117 | 322 miles | $15,991.00 List Price | $14,712.02 |
| 3 | 2012 VOLVO XC70 PREMIER 4D WGN 6 3.2NORMAL GAS A 2WD | 105,350 | 35244 | 323 miles | $12,700.00 List Price | $13,218.45 |
| | | | | | **Base Value:** | **$13,231.80** |

# Loss Vehicle Adjustments

Loss vehicle: 2012 Volvo XC70 |  4 Door Wagon | 3.2L 6 Cyl Gas A FWD



## Condition Adjustments

Condition Adjustment: -$462.43        Overall Condition: 2.65-Good        Typical Vehicle Condition: 3.00

| Category | Condition | Condition $ | Comments |
|---|---|---|---|
| **Interior** | | | |
| DASH/CONSOLE | 3 Good | $0.00 | |
| HEADLINER | 2 Fair | $23.12 | some stains |
| CARPET | 3 Good | $0.00 | |
| GLASS | 3 Good | $0.00 | |
| DOORS/INTERIOR PANELS | 2 Fair | -$46.24 | greater then 3 gouges |
| SEATS | 3 Good | $0.00 | |
| **Exterior** | | | |
| TRIM | 3 Good | $0.00 | |
| BODY | 2 Fair | -$277.46 | crease in right rear door |
| PAINT | 2 Fair | -$115.61 | numerous small scratches |
| VINYL/CONVERTIBLE TOP | Typical | $0.00 | |
| **Mechanical** | | | |
| ENGINE | 3 Good | $0.00 | |
| TRANSMISSION | 3 Good | $0.00 | |
| **Tire** | 3 Good | $0.00 | |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| INTERIOR | FLOOR MATS (ALL-WEATHER) - 2 ROWS | INSTANT QUOTE | | | $55.00 |

# Regional Comparable Vehicles

Loss vehicle: 2012 Volvo XC70 | 4 Door Wagon | 3.2L 6 Cyl Gas A FWD


Mitchell **WorkCenter**
**Total Loss**

PGR_THURSTON_0000299

### 1   2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2 NORMAL GAS A2WD      List Price: **$11,569.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| YV4952BLXC1143836 | MBEdeG1A | 10/05/2021 | 77015 | 249 miles |

Source

DEALER WEB LISTING - AUTOTRADER.COM

PRIVATE OWNER VIA TRED.COM

APPOINTMENT ONLY

HOUSTON TX 77015

206-471-6212

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$398.00 |
| Vehicle Configuration Adjustment | | | -$1,264.41 |
| Mileage | 55,374 | 125,000 | $2,364.71 |
| Equipment | | | |
|    CLIMATE PKG | No | Yes | -$295.92 |
|    BLIND SPOT INFORMATION SYSTEM (BLIS) | No | Yes | -$210.46 |
| | | Total Adjustments: | $195.92 |
| | | **Adjusted Price:** | **$11,764.92** |

Comparable Vehicle Package Details

CLIMATE PKG

Comparable Vehicle Option Details

BLIND SPOT INFORMATION SYSTEM (BLIS)

### 2   2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2 NORMAL GAS A2WD      List Price: **$15,991.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| YV4952BL1C1142834 | VV2231A | 11/03/2021 | 36117 | 322 miles |

Source

DEALER WEB LISTING - CARS.COM

JACK INGRAM MOTORS

235 EASTERN BLVD

MONTGOMERY AL 36117

334-277-5700

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$537.00 |
| Vehicle Configuration Adjustment | | | -$1,749.19 |
| Mileage | 55,374 | 82,089 | $1,007.21 |
| | | Total Adjustments: | -$1,278.98 |
| | | **Adjusted Price:** | **$14,712.02** |

| 3 | 2012 VOLVO XC70 PREMIER 4D WGN 6 3.2 NORMAL GAS A2WD | | | | List Price: **$12,700.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| YV4952BL9C1125148 | M76456A | 02/02/2022 | 35244 | 323 miles |

Source

DEALER WEB LISTING - VAST.COM

HENDRICKSUBARU USED

2929 JOHN HAWKINS PARKWAY

HOOVER AL 35244

770-232-0099

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$427.00 |
| Vehicle Configuration Adjustment | | | -$892.27 |
| Mileage | 55,374 | 105,350 | $1,837.72 |
| | | Total Adjustments: | $518.45 |
| | | **Adjusted Price:** | **$13,218.45** |

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2012 Volvo XC70 | 4 Door Wagon 3.2L 6 Cyl Gas  FWD | $32,950.00 |
| 2012 VOLVO XC70 PREMIER PLUS | 4D WGN 6 3.2 NORMAL GAS A 2WD | $37,750.00 |
| 2012 VOLVO XC70 PREMIER | 4D WGN 6 3.2 NORMAL GAS A 2WD | $35,900.00 |

Claim # 22-5056549-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 6

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).
- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).
- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.
- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.



PGR_THURSTON_0000302

EXHIBIT ___5___
WIT: _____
DATE: _1/22/24_
Pamela Carle, RPR, CRR

# ELLEN S. BEST, ATTORNEY AT LAW

36 MAIN STREET
P.O. BOX 386 • BLUE HILL ME 04614
TELEPHONE: 207-374-2573 • Fax: 207-374-5163

Ellen S. Best
ebest@ellenbestlaw.com

John Z. Steed
jsteed@ellenbestlaw.com

March 15, 2022

Received By A.M.

MAR 22 2022

Progressive Corporation
6300 Wilson Mills Road
Mayfield Village, OH 44143

CORP. CLAIMS MAIL

RE: Matthew Thurston - Claim #22-5056549-01

Dear Sir or Madam:

I am writing on behalf of my client, Matthew Thurston, to inform you that I represent him and to offer to settle potential claims under the Maine Unfair Trade Practices Act and for violation of the Unfair Settlement Practices section of the Maine Insurance Code (24-A M.R.S. § 2436-A).

Matthew is your insured, and you are obligated to pay him for the total loss on his Volvo XC70. I do not believe that is in dispute. The fair market value of that vehicle is $17,250.00, as outlined in Matthew's well-reasoned email to Kyle Mayer (copied here) dated February 21, 2022, at 3:37 p.m., enclosed, with its attachments, as Exhibit A. However, you have only offered to pay him $12,428.37—significantly less than Matthew's well-reasoned number. Because of this, he has been forced to hire counsel at a non-refundable cost of $2,500. I believe your actions in this case constitute unfair or deceptive trade practices as defined by the Unfair Trade Practices Act because you have a duty to pay him the fair market value of his vehicle but have chosen, instead, to offer significantly less than the fair market value he is entitled to receive. This has caused him financial harm in that he has had to hire an attorney and that he has been denied use of the money to which he is entitled and the use of his vehicle, something to which he is also entitled.

I can offer to settle claims under the Maine Unfair Trade Practices Act for payment of $21,750.00, which is the fair market value of the vehicle plus the $2,500.00 in legal fees he had to pay to get help with the problem, plus $2,000.00 for loss of use of a vehicle for two months.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

Progressive Corporation
March 15, 2022
Page 2

     I believe, for the same reasons as outlined above, that you have also violated 24-A M.R.S. § 2436-A by refusing to pay the reasonable value of the vehicle and can offer to settle both claims for the same payment of $21,750.00.

Respectfully,

John Z. Steed

JZS:mf
Enclosure

cc:  Kyle Mayer

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

3/16/22, 2:47 PM                           Ellen Best Law Mail - Re: [EXTERNAL] Re: Vehicle Storage

 **Gmail**                                    John Steed <jsteed@ellenbestlaw.com>

# Re: [EXTERNAL] Re: Vehicle Storage
6 messages

**Matthew Thurston** <thurstonmatthew@gmail.com>                     Tue, Feb 22, 2022 at 10:43 AM
To: Kyle Mayer <Kyle_Mayer@progressive.com>
Cc: "STHURSTON2003@YAHOO.COM" <STHURSTON2003@yahoo.com>, Nicholas Kimball
<NICHOLAS_KIMBALL@progressive.com>, JSteed@ellenbestlaw.com

Kyle,

   You are welcome to move the vehicle wherever you would like at your expense. If you would like to leave it on our
property, use the below address. If you would prefer to have it moved to a salvage yard, that is fine too.

   402 Varnumville Rd, Brooksville ME, 04617

   In regards to valuation, we will be in touch once we have had a chance to consult with our attorney, as I have provided
documented evidence to why your valuation does not reflect the ACV of the vehicle.

Best
   Matt

> On Feb 22, 2022, at 8:23 AM, Kyle Mayer <Kyle_Mayer@progressive.com> wrote:
>
> Hello Matt,
>
> Regarding moving your vehicle, I would just like to have it moved out of the shop location and to your
> property of that of your parents. I'd like to do this as a courtesy to the shop so that they can free up
> some space.
>
> Regarding the valuation, we don't actually use KBB values to evaluate the vehicle. If you wish to provide
> documented information supporting the increase in value to the car, please provide dealer comparisons
> outlined on page 7 (Dealer listings, Same model and year, with VIN# included in the listing, mileage).
>
> Thank you,
>
> **Kyle Mayer**
>
> Claims Generalist
> 40 Commerce Court
> Newington, CT 06111
> Phone: 860-616-6796
> Fax: 833-905-1750
> Kyle_mayer@progressive.com
> Office Hours: Monday-Friday, 8am-5pm

<div style="float:right; border:2px solid black; text-align:center;">
EXHIBIT<br/>
**A**<br/>
ALL-STATE LEGAL®
</div>

> Confidentiality Notice: This e-mail, including any attachments, may contain confidential and
> privileged information for the sole and exclusive use of the intended recipient (s). Any review,
> use, distribution or disclosure by others is strictly prohibited. If you are not the intended

*41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT*

PGR_THURSTON_0000128

recipient (or authorized to receive information for the recipient), please contact the sender by
reply e-mail and delete all copies of this message. All correspondence (including any e-mail) we
receive from you may become part of your permanent claims file. If you request a reply to this
e-mail, we may respond by e-mail or by phone.

**From:** Matthew Thurston <thurstonmatthew@gmail.com>
**Sent:** Monday, February 21, 2022 3:37 PM
**To:** Kyle Mayer <Kyle_Mayer@progressive.com>
**Subject:** [EXTERNAL] Re: Vehicle Storage

Hi Kyle,
Claim # 22-5056549-01

   Since I have been unable to connect with you via phone today, I am sending this email instead. In
regards to the letter you emailed concerning the storage of the vehicle, you are welcome to move the
vehicle wherever you would like to mitigate the storage fees. I do not believe we discussed that on
Thursday 2/17 as you did not remember where the vehicle currently was located.

   In regards to the settlement offer for the vehicle,

The settlement offer presented by Progressive seems to be far outside of the range of any other
determination of value for the vehicle.

The three vehicles presented as comparable all have significantly higher mileage than my vehicle, and
the appraisal relies heavily on adjusting the vehicles value based on mileage. For that adjustment the
number which is used is between 3.4 and 3.8 cents/mile. There is no explanation why this number was
chosen.   I compared the comparison vehicles to each other. I adjusted those vehicles values, based off
of the adjustment values stated in the appraisal. I then determined how their mileage effected their list
price. All of the vehicles list prices varied compared to the others at a rate of **10.22- 10.46 cents/mile.**

   **If the average of these was used, it would give an adjusted vehicle value of my vehicle at
$16,542.56.  (See attached) This is WITHOUT changing your vehicle configuration adjustments.**

Furthermore, the appraisal adjusts the value of the vehicle based off of trim level, but it does not
describe what differences in actual features exist. My vehicle has added options which brought its MSRP
above 37,000, about equal to a premium plus model.

The comparison vehicles are also assumed to be in perfect condition, but there seems to be no way to
verify this, as the listings are no longer available to the public. It seems unlikely that these vehicles are
all in perfect condition. If you have these listing to share, I would appreciate seeing them.

In addition to this, Kelley Blue Book states the private party value for each of these vehicles below the
price they were listed at. But for some reason the settlement claims my vehicle is worth nearly $5000
less than the private party blue book value. It seems unlikely that Kelley Blue Book would be able to do

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000129

a good job predicting that value of these comparison vehicles but it would be so wildly far off in predicting the value of my vehicle.   (See Attached)

**Blue Book Value of my vehicle 17641**


I also was in contact with a local (Baton Rouge) car dealer. He informed me that if he had my vehicle on his lot, he would put a list price on the vehicle of $17,900 and that $16,500 would be the low end of offers that he would consider. He based this valuation on the Route One valuation of the vehicle that came in at $15050, without all options selected. He explained this valuation was always less than any a dealer will sell a vehicle for.  (See attached)

**Dealer Valuation of my Vehicle $17250**


**We find no evidence that supports a vehicle value below $16,500, and that a fair market value is $17,250.**


Looking forward to hearing from you.


Best
  Matt Thurston
<image001.png>



On Feb 21, 2022, at 10:38 AM, Kyle Mayer <Kyle_Mayer@progressive.com> wrote:

Hello Matt,

Please see the attached letter regarding your vehicle.

Thank you,

# Kyle Mayer

Claims Generalist
40 Commerce Court
Newington, CT 06111
Phone: 860-616-6796
Fax: 833-905-1750
Kyle_mayer@progressive.com
Office Hours: Monday-Friday. 8am-5pm

Confidentiality Notice: This e-mail, including any attachments, may contain confidential and privileged information for the sole and exclusive use of the intended recipient (s). Any review, use, distribution or disclosure by others is strictly

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000130

prohibited. If you are not the intended recipient (or authorized to receive
information for the recipient), please contact the sender by reply e-mail and delete
all copies of this message. All correspondence (including any e-mail) we receive
from you may become part of your permanent claims file. If you request a reply to
this e-mail, we may respond by e-mail or by phone.

<22-5056549_2-21-2022_Total Loss_Free-form.pdf>

---

**Kyle Mayer** <Kyle_Mayer@progressive.com>                    Tue, Feb 22, 2022 at 10:45 AM
To: Matthew Thurston <thurstonmatthew@gmail.com>
Cc: "STHURSTON2003@YAHOO.COM" <STHURSTON2003@yahoo.com>, Nicholas Kimball
<NICHOLAS_KIMBALL@progressive.com>, "JSteed@ellenbestlaw.com" <JSteed@ellenbestlaw.com>

Ok, it sounds like you will not be keeping the vehicle, is that correct? Your mother or father may need to call the shop and
provide verbal release. I will check with them.

[Quoted text hidden]

---

**Scott Thurston** <sthurston2003@yahoo.com>                    Tue, Feb 22, 2022 at 11:14 AM
To: Kyle Mayer <Kyle_Mayer@progressive.com>
Cc: Matthew Thurston <thurstonmatthew@gmail.com>, Nicholas Kimball <NICHOLAS_KIMBALL@progressive.com>,
JSteed@ellenbestlaw.com

Hello Kyle,
You have my permission to move the car.
And notice that in our valuation of the car we didn't rely solely on KBB, we used YOUR comparables and your VINs to
understand the mileage adjustments and then apply them to our car.
Your offer is a wholesale number which does not approach replacement value.
S

Scott Thurston MD
225 938 7178

On Feb 22, 2022, at 7:45 AM, Kyle Mayer <Kyle_Mayer@progressive.com> wrote:

[Quoted text hidden]

---

**Kyle Mayer** <Kyle_Mayer@progressive.com>                    Fri, Feb 25, 2022 at 12:36 PM
To: Scott Thurston <sthurston2003@yahoo.com>
Cc: Matthew Thurston <thurstonmatthew@gmail.com>, Nicholas Kimball <NICHOLAS_KIMBALL@progressive.com>,
"JSteed@ellenbestlaw.com" <JSteed@ellenbestlaw.com>

Hi Scott,

Have you spoken with anyone else at Progressive about the valuation? Did you end up hiring an independent appraiser?

[Quoted text hidden]

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**Matthew Thurston** <thurstonmatthew@gmail.com>                    Fri, Feb 25, 2022 at 1:49 PM
To: JSteed@ellenbestlaw.com, Kyle Mayer <Kyle_Mayer@progressive.com>, Nicholas Kimball
<NICHOLAS_KIMBALL@progressive.com>, Scott Thurston <sthurston2003@yahoo.com>

Kyle,

My attorney will be in touch with progressive. Thank you for your time.

Matt
[Quoted text hidden]
--
*Matt Thurston*
*Sales Agent*
*The Christopher Group, LLC*
Coastal Maine Real Estate
Cell: 207-266-8312

---

**Kyle Mayer** <Kyle_Mayer@progressive.com>                    Fri, Feb 25, 2022 at 2:18 PM
To: Matthew Thurston <thurstonmatthew@gmail.com>, "JSteed@ellenbestlaw.com" <JSteed@ellenbestlaw.com>, Nicholas
Kimball <NICHOLAS_KIMBALL@progressive.com>, Scott Thurston <sthurston2003@yahoo.com>

Alright, thank you for the update.

[Quoted text hidden]

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000132

# Vehicle Valuation Report



mitchell

Prepared For  Progressive Group of Insurance Companies  (800) 321-9843

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 22-5056549-01 | | UNKNOWN | SCOTT THURSTON 2304 FAIRWAY DR BATON ROUGE, LA 70809 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 01/21/2022 | 01/25/2022 | 02/17/2022 | 1014377008 | 4 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2012 | Volvo | XC70  4 Door Wagon 3.2L 6 Cyl Gas A FWD | LA 70809 | 55,374 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Twilight Bronze Metallic | WDD885, Maine | YV4952BL2C1140915 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $13,231.80 |
| Condition - | $462.43 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $55.00 |
| Refurbishment | $0.00 |
| Market Value = | $12,824.37 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Settlement Value = | $12,824.37 |

## Settlement Value:
## $12,824.37

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**J.D. POWER**

Mitchell **WorkCenter**™
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved

# Loss Vehicle Detail

Loss vehicle: 2012 Volvo XC70 | 4 Door Wagon | 3.2L 6 Cyl Gas A FWD

## Standard Equipment

### Exterior

| | |
|---|---|
| 16" "CECINO" alloy wheels | Aluminum roof rails w/"XC" logo |
| Body-side protective lower cladding | Front fog lights |
| P215/65R16 all-season tires | Pwr heated mirrors w/memory, puddle lights, integrated turn signals |
| Rear fog light w/auto-off | Rear wiper/washer -inc: automatic function in reverse when front wipers on |
| Safe approach & home safe security lighting | Variable intermittent wipers |
| Volvo Sensus w/integrated 7" color display | |

### Interior

| | |
|---|---|
| "XC" door stitching | "XC" front/rear/cargo textile floor mats |
| 40/20/40 flat-folding rear bench -inc: (3) manual-fold rear head restraints | AM/FM stereo w/CD/MP3/WMA player -inc: HD Radio, 160-watt amp, (8) speakers, USB input, iPod connection |
| Auto-dimming rearview mirror | Bluetooth |
| Central pwr door locks, fuel filler | Cross avenue aluminum inlays |
| Cruise control | Dual illuminated visor vanity mirrors |
| Dual-zone electronic climate control (ECC) w/rear seat vents | Flat-folding front passenger seat |
| Front center armrest | Front door storage pockets |
| Front reclining bucket seats w/adjustable head restraints | Front/rear reading lamps |
| Ignition immobilizer | Illuminated lockable glove box |
| Intelligent driver info system (IDIS) | Interior cabin light delay feature |
| Leather shift knob -inc: aluminum inlay | Leather-wrapped steering wheel w/illuminated cruise & audio controls -inc: aluminum inlay |
| Lockable underfloor storage in cargo area | Outside temp gauge |
| Pollen filter | Pwr driver seat w/adjustable lumbar, 3-position memory |
| Pwr windows -inc: front auto-up/down, anti-trap feature | Rear window defroster w/timer |
| Remote keyless entry | Security alarm system |
| SIRIUS satellite radio w/6-month subscription | T-Tec cloth seating surfaces w/"XC" stitching |
| Tilt/telescopic steering column | Trip computer |

### Mechanical

| | |
|---|---|
| Front wheel drive | Front/rear skid plates |
| Front/rear stabilizer bars | MacPherson strut front suspension |
| Multi-link independent rear suspension | Pwr 4-wheel disc brakes |
| Pwr parking brake w/auto release | Pwr rack & pinion steering |

### Safety

🌓 Mitchell WorkCenter™
Total Loss

Claim # 22-5056549-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 2

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

| 3-point seat belts -inc: pretensioners, front height adjustable anchors | 4-wheel anti-lock braking system (ABS) -inc: electronic brake distribution (EBD), hydraulic brake assist (HBA), ready alert brakes (RAB), fading brake support (FBS) |
| Anti-submarine seats | Child safety rear door locks |
| Collapsible steering column | Daytime running lights |
| Driver/front passenger dual stage airbags -inc: front passenger cutoff switch | Driver/front passenger whiplash protection seating system (WHIPS) |
| Dynamic stability & traction control (DSTC) | ISOFIX child seat attachments -inc: top tether anchors |
| Rear window deactivation | Side impact protection system (SIPS) -inc: driver/front passenger side-impact airbags, front/rear side inflatable curtains (IC) |
| Tire pressure monitoring system | |

# Loss Vehicle Base Value

Loss vehicle: 2012 Volvo XC70 |  4 Door Wagon | 3.2L 6 Cyl Gas A FWD

## Regional Comparable Vehicle Information

Search Radius used for this valuation: 350 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 113,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2NORMAL GAS A 2WD | 125,000 | 77015 | 249 miles | $11,569.00 List Price | $11,764.92 |
| 2 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2NORMAL GAS A 2WD | 82,089 | 36117 | 322 miles | $15,991.00 List Price | $14,712.02 |
| 3 | 2012 VOLVO XC70 PREMIER 4D WGN 6 3.2NORMAL GAS A 2WD | 105,350 | 35244 | 323 miles | $12,700.00 List Price | $13,218.45 |
| | | | | | Base Value: | $13,231.80 |

# Loss Vehicle Adjustments

Loss vehicle: 2012 Volvo XC70 |  4 Door Wagon | 3.2L 6 Cyl Gas A FWD

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

(ⓜ) **Mitchell WorkCenter**
Total Loss

## Condition Adjustments

Condition Adjustment: -$462.43          Overall Condition: 2.65-Good          Typical Vehicle Condition: 3.00

| Category | Condition | Condition $ | Comments |
|---|---|---|---|
| Interior | | | |
| DASH/CONSOLE | 3 Good | $0.00 | |
| HEADLINER | 2 Fair | -$23.12 | some stains |
| CARPET | 3 Good | $0.00 | |
| GLASS | 3 Good | $0.00 | |
| DOORS/INTERIOR PANELS | 2 Fair | -$46.24 | greater then 3 gouges |
| SEATS | 3 Good | $0.00 | |
| Exterior | | | |
| TRIM | 3 Good | $0.00 | |
| BODY | 2 Fair | -$277.46 | crease in right rear door |
| PAINT | 2 Fair | -$115.61 | numerous small scratches |
| VINYL/CONVERTIBLE TOP | Typical | $0.00 | |
| Mechanical | | | |
| ENGINE | 3 Good | $0.00 | |
| TRANSMISSION | 3 Good | $0.00 | |
| Tire | 3 Good | $0.00 | |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| INTERIOR | FLOOR MATS (ALL-WEATHER) - 2 ROWS | INSTANT QUOTE | | | $55.00 |

## Regional Comparable Vehicles

Loss vehicle: 2012 Volvo XC70 | 4 Door Wagon | 3.2L 6 Cyl Gas A FWD

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

Mitchell WorkCenter
Total Loss

## 1 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2 NORMAL GAS A2WD

**List Price: $11,569.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| YV4952BLXC1143836 | MBEdeG1A | 10/05/2021 | 77015 | 249 miles |

Source

DEALER WEB LISTING -
AUTOTRADER.COM

PRIVATE OWNER VIA TRED.COM

APPOINTMENT ONLY

HOUSTON TX 77015

206-471-6212

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Projected Sold Adjustment | | | -$398.00 |
| Vehicle Configuration Adjustment | | | -$1,264.41 |
| Mileage | 55,374 | 125,000 | $2,364.71 |
| **Equipment** | | | |
| CLIMATE PKG | No | Yes | -$295.92 |
| BLIND SPOT INFORMATION SYSTEM (BLIS) | No | Yes | -$210.46 |
| | | Total Adjustments: | $195.92 |
| | | **Adjusted Price:** | **$11,764.92** |

Comparable Vehicle Package Details

CLIMATE PKG

Comparable Vehicle Option Details

BLIND SPOT INFORMATION SYSTEM (BLIS)

## 2 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2 NORMAL GAS A2WD

**List Price: $15,991.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| YV4952BL1C1142834 | VV2231A | 11/03/2021 | 36117 | 322 miles |

Source

DEALER WEB LISTING - CARS.COM

JACK INGRAM MOTORS

235 EASTERN BLVD

MONTGOMERY AL 36117

334-277-5700

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Projected Sold Adjustment | | | -$537.00 |
| Vehicle Configuration Adjustment | | | -$1,749.19 |
| Mileage | 55,374 | 82,089 | $1,007.21 |
| | | Total Adjustments: | -$1,278.98 |
| | | **Adjusted Price:** | **$14,712.02** |

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

Mitchell WorkCenter
Total Loss

PGR_THURSTON_0000137

**3** **2012 VOLVO XC70 PREMIER 4D WGN 6 3.2 NORMAL GAS A2WD**    List Price: **$12,700.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| YV4952BL9C1125148 | M76456A | 02/02/2022 | 35244 | 323 miles |

Source
DEALER WEB LISTING - VAST.COM
HENDRICKSUBARU USED
2929 JOHN HAWKINS PARKWAY
HOOVER AL 35244
770-232-0099

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$427.00 |
| Vehicle Configuration Adjustment | | | -$892.27 |
| Mileage | 55,374 | 105,350 | $1,837.72 |
| | | Total Adjustments: | $518.45 |
| | | **Adjusted Price:** | **$13,218.45** |

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2012 Volvo XC70 | 4 Door Wagon 3.2L 6 Cyl Gas  FWD | $32,950.00 |
| 2012 VOLVO XC70 PREMIER PLUS | 4D WGN 6 3.2 NORMAL GAS A 2WD | $37,750.00 |
| 2012 VOLVO XC70 PREMIER | 4D WGN 6 3.2 NORMAL GAS A 2WD | $35,900.00 |

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

Mitchell WorkCenter
Total Loss

PGR_THURSTON_0000138

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).
- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).
- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.
- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

Mitchell WorkCenter
Total Loss

Claim # 22-5056549-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 7

**Kelley Blue Book**
THE TRUSTED RESOURCE

## 2012 Volvo XC70
## Pricing Report
**Style**: 3.2 Wagon 4D
**Mileage**: 55,374
**KBB.com Consumer Rating**: 4.7/5

## Vehicle Highlights

Fuel Economy: City 19/Hwy 25/Comb 21 MPG

Engine: 6-Cyl, 3.2 Liter

Transmission: Automatic, 6-Spd Geartronic

Drivetrain: FWD

Country of Assembly: Sweden

Country of Origin: Sweden

EPA Class: Midsize Station Wagons

Max Seating: 5

Doors: 4

Body Style: Wagon

## Sell to Private Party



Private Party Range
**$16,503 - $18,778**
Private Party Value
**$17,641**

Valid for **ZIP code 70809** through **02/17/2022**

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

# Your Configured Options

Our pre-selected options, based on typical equipment for this car.

✓ Options that you added while configuring this car.

**Exterior Color**
✓ Beige

**Wheels and Tires**
Alloy Wheels

**Entertainment and Instrumentation**
CD/MP3 (Single Disc)

AM/FM Stereo

Sirius Satellite

Bluetooth Wireless

Volvo Sensus

**Engine**
6-Cyl, 3.2 Liter

**Transmission**
Automatic, 6-Spd

Geartronic

**Drivetrain**
✓ FWD

**Braking and Traction**
ABS (4-Wheel)

Hill Descent Control

Traction Control

Stability Control

**Comfort and Convenience**
Air Conditioning

Power Windows

Power Door Locks

Cruise Control

Keyless Entry

✓ Power Liftgate Release

Alarm System

**Steering**
Power Steering

Tilt Wheel

**Seats**
Power Seat

✓ Leather

✓ Heated Seats

**Roof and Glass**
Moon Roof

**Safety and Security**
Dual Air Bags

Side Air Bags

F&R Head Curtain Air Bags

**Lighting**
Daytime Running Lights

**Exterior**
Fog Lights

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

# Glossary of Terms

**Kelley Blue Book® Trade-In Value** - This is the amount you can expect to receive when you trade in your car to a dealer. This value is determined based on the style, condition, mileage and options indicated.

**Trade-In Range** - The Trade-In Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week based on the style, condition, mileage and options of your vehicle when you trade it in to a dealer. However, every dealer is dierent and values are not guaranteed.

## Tip:

**It's crucial to know your car's true condition when you sell it, so that you can price it appropriately. Consider having your mechanic give you an objective report.**

**Kelley Blue Book® Private Party Value** - This is the starting point for negotiation of a used-car sale between a private buyer and seller. This is an "as is" value that does not include any warranties. The nal price depends on the car's actual condition and local market factors.

**Private Party Range** - The Private Party Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week for a vehicle with stated mileage in the selected condition and configured with your selected options, excluding taxes, title and fees when selling to a private party.

**Excellent Condition** - 3% of all cars we value. This car looks new and is in excellent mechanical condition. It has never had paint or bodywork and has an interior and body free of wear and visible defects. The car is rust-free and does not need reconditioning. Its clean engine compartment is free of fluid leaks. It also has a clean title history, has complete and verifiable service records and will pass safety and smog inspection.

**Very Good Condition** - 23% of all cars we value. This car has minor wear or visible defects on the body and interior but is in excellent mechanical condition, requiring only minimal reconditioning. It has little to no paint and bodywork and is free of rust. Its clean engine compartment is free of fluid leaks. The tires match and have 75% or more of tread. It also has a clean title history, with most service records available, and will pass safety and smog inspection.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**Good Condition** - 34% of all cars we value. This car is in good mechanical condition but may need some reconditioning. Its paint and bodywork may require minor touch-ups, with repairable cosmetic defects, and its engine compartment may have minor leaks. There are minor body scratches or dings and minor interior blemishes, but no rust. The tires match and have 50% or more of tread. It also has a clean title history, with some service records available, and will pass safety and smog inspection.

**Fair Condition** - 18% of all cars we value. This car has some mechanical or cosmetic defects and needs servicing, but is still in safe running condition and has a clean title history. The paint, body and/or interior may need professional servicing. The tires may need replacing and there may be some repairable rust damage.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

© 1995-2022 Kelley Blue Book Co.®, Inc. All rights reserved.

© 2022 Kelley Blue Book Co., Inc. All rights reserved. 2/17/2022-2/17/2022 Edition for LA 70809. The specific information required to determine the value for this particular vehicle was supplied by the person generating this report. Vehicle valuations are opinions and may vary from vehicle to vehicle. Actual valuations will vary based upon market conditions, specifications, vehicle condition or other particular circumstances pertinent to this particular vehicle or the transaction or the parties to the transaction. This report is intended for the individual use of the person generating this report only and shall not be sold or transmitted to another party. Kelley Blue Book assumes no responsibility for errors or omissions. (v.2020226)

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**Kelley Blue Book**
THE TRUSTED RESOURCE

## 2012 Volvo XC70
## Pricing Report

**Style:** 3.2 Wagon 4D

**Mileage:** 105,350

**KBB.com Consumer Rating:** 4.7/5

## Vehicle Highlights

Fuel Economy: City 19/Hwy 25/Comb 21 MPG

Engine: 6-Cyl, 3.2 Liter

Transmission: Automatic, 6-Spd Geartronic

Drivetrain: FWD

Country of Assembly: Sweden

Country of Origin: Sweden

EPA Class: Midsize Station Wagons

Max Seating: 5

Doors: 4

Body Style: Wagon

## Sell to Private Party



Private Party Range
**$10,815 - $13,090**
Private Party Value
**$11,953**

Valid for **ZIP code 70809** through **02/17/2022**

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000145

# Your Configured Options

Our pre-selected options, based on typical equipment for this car.

✓ Options that you added while configuring this car.

**Exterior Color**
✓ Beige

**Wheels and Tires**
Alloy Wheels

**Entertainment and Instrumentation**
CD/MP3 (Single Disc)

AM/FM Stereo

Sirius Satellite

Bluetooth Wireless

Volvo Sensus

**Engine**
6-Cyl, 3.2 Liter

**Transmission**
Automatic, 6-Spd

Geartronic

**Drivetrain**
✓ FWD

**Braking and Traction**
ABS (4-Wheel)

Hill Descent Control

Traction Control

Stability Control

**Comfort and Convenience**
Air Conditioning

Power Windows

Power Door Locks

Cruise Control

Keyless Entry

✓ Keyless Start

✓ Power Liftgate Release

Alarm System

**Steering**
Power Steering

Tilt Wheel

**Seats**
✓ Dual Power Seats

✓ Leather

**Roof and Glass**
Moon Roof

**Safety and Security**
Dual Air Bags

Side Air Bags

F&R Head Curtain Air Bags

✓ F&R Parking Sensors

PGR_THURSTON_0000146

**Lighting**
Daytime Running Lights

**Accessory Packages**
✓ Premier Plus Pkg

**Exterior**
Fog Lights

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

# Glossary of Terms

**Kelley Blue Book® Trade-In Value** - This is the amount you can expect to receive when you trade in your car to a dealer. This value is determined based on the style, condition, mileage and options indicated.

**Trade-In Range** - The Trade-In Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week based on the style, condition, mileage and options of your vehicle when you trade it in to a dealer. However, every dealer is dierent and values are not guaranteed.

## Tip:

**It's crucial to know your car's true condition when you sell it, so that you can price it appropriately. Consider having your mechanic give you an objective report.**

**Kelley Blue Book® Private Party Value** - This is the starting point for negotiation of a used-car sale between a private buyer and seller. This is an "as is" value that does not include any warranties. The nal price depends on the car's actual condition and local market factors.

**Private Party Range** - The Private Party Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week for a vehicle with stated mileage in the selected condition and configured with your selected options, excluding taxes, title and fees when selling to a private party.

**Excellent Condition** - 3% of all cars we value. This car looks new and is in excellent mechanical condition. It has never had paint or bodywork and has an interior and body free of wear and visible defects. The car is rust-free and does not need reconditioning. Its clean engine compartment is free of fluid leaks. It also has a clean title history, has complete and verifiable service records and will pass safety and smog inspection.

**Very Good Condition** - 23% of all cars we value. This car has minor wear or visible defects on the body and interior but is in excellent mechanical condition, requiring only minimal reconditioning. It has little to no paint and bodywork and is free of rust. Its clean engine compartment is free of fluid leaks. The tires match and have 75% or more of tread. It also has a clean title history, with most service records available, and will pass safety and smog inspection.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**Good Condition** - 36% of all cars we value. This car is above average, reliable and accident free but may need some reconditioning. Its paint and bodywork may require minor touch-ups, with repairable cosmetic defects, and its engine compartment may have minor leaks. There are minor body scratches or dings and minor interior blemishes, but no rust. The tires match and have 50% or more of tread. It also has a clean title history, with some service records available, and will pass safety and smog inspection.

**Fair Condition** - 18% of all cars we value. This car has some mechanical or cosmetic defects and needs servicing, but is still in safe running condition and has a clean title history. The paint, body and/or interior may need professional servicing. The tires may need replacing and there may be some repairable rust damage.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000149

© 1995-2022 Kelley Blue Book Co., Inc. All rights reserved.

© 2022 Kelley Blue Book Co., Inc. All rights reserved. 2/17/2022-2/17/2022 Edition for LA 70809. The specific information required to determine the value for this particular vehicle was supplied by the person generating this report. Vehicle valuations are opinions and may vary from vehicle to vehicle. Actual valuations will vary based upon market conditions, specifications, vehicle condition or other particular circumstances pertinent to this particular vehicle or the transaction or the parties to the transaction. This report is intended for the individual use of the person generating this report only and shall not be sold or transmitted to another party. Kelley Blue Book assumes no responsibility for errors or omissions. (v.2020226)

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

# Kelley Blue Book
### THE TRUSTED RESOURCE

## 2012 Volvo XC70
## Pricing Report
**Style:** 3.2 Wagon 4D

**Mileage:** 82,089

**KBB.com Consumer Rating:** 4.7/5

## Vehicle Highlights
Fuel Economy: City 19/Hwy 25/Comb 21 MPG

Engine: 6-Cyl, 3.2 Liter

Transmission: Automatic, 6-Spd Geartronic

Drivetrain: FWD

Country of Assembly: Sweden

Country of Origin: Sweden

EPA Class: Midsize Station Wagons

Max Seating: 5

Doors: 4

Body Style: Wagon

## Sell to Private Party



Private Party Range
**$13,331 - $15,606**
Private Party Value
**$14,469**

Valid for **ZIP code 70809** through **02/17/2022**

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000151

# Your Configured Options

Our pre-selected options, based on typical equipment for this car.

✓ Options that you added while configuring this car.

**Exterior Color**
✓ Beige

**Wheels and Tires**
Alloy Wheels

**Entertainment and Instrumentation**
CD/MP3 (Single Disc)

AM/FM Stereo

Sirius Satellite

Bluetooth Wireless

Volvo Sensus

**Engine**
6-Cyl, 3.2 Liter

**Transmission**
Automatic, 6-Spd

Geartronic

**Drivetrain**
✓ FWD

**Braking and Traction**
ABS (4-Wheel)

Hill Descent Control

Traction Control

Stability Control

**Comfort and Convenience**
Air Conditioning

Power Windows

Power Door Locks

Cruise Control

Keyless Entry

✓ Keyless Start

✓ Power Liftgate Release

Alarm System

**Steering**
Power Steering

Tilt Wheel

**Seats**
✓ Dual Power Seats

✓ Leather

**Roof and Glass**
Moon Roof

**Safety and Security**
Dual Air Bags

Side Air Bags

F&R Head Curtain Air Bags

✓ F&R Parking Sensors

PGR_THURSTON_0000152

**Lighting**
Daytime Running
Lights

**Accessory
Packages**
✓ Premier Plus Pkg

**Exterior**
Fog Lights

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

# Glossary of Terms

**Kelley Blue Book® Trade-In Value** - This is the amount you can expect to receive when you trade in your car to a dealer. This value is determined based on the style, condition, mileage and options indicated.

**Trade-In Range** - The Trade-In Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week based on the style, condition, mileage and options of your vehicle when you trade it in to a dealer. However, every dealer is dierent and values are not guaranteed.

**Tip:**

**It's crucial to know your car's true condition when you sell it, so that you can price it appropriately. Consider having your mechanic give you an objective report.**

**Kelley Blue Book® Private Party Value** - This is the starting point for negotiation of a used-car sale between a private buyer and seller. This is an "as is" value that does not include any warranties. The nal price depends on the car's actual condition and local market factors.

**Private Party Range** - The Private Party Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week for a vehicle with stated mileage in the selected condition and configured with your selected options, excluding taxes, title and fees when selling to a private party.

**Excellent Condition** - 3% of all cars we value. This car looks new and is in excellent mechanical condition. It has never had paint or bodywork and has an interior and body free of wear and visible defects. The car is rust-free and does not need reconditioning. Its clean engine compartment is free of fluid leaks. It also has a clean title history, has complete and verifiable service records and will pass safety and smog inspection.

**Very Good Condition** - 23% of all cars we value. This car has minor wear or visible defects on the body and interior but is in excellent mechanical condition, requiring only minimal reconditioning. It has little to no paint and bodywork and is free of rust. Its clean engine compartment is free of fluid leaks. The tires match and have 75% or more of tread. It also has a clean title history, with most service records available, and will pass safety and smog inspection.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000154

**Good Condition** - of all cars we value, this car is free of major mechanical problems but may need some reconditioning. Its paint and bodywork may require minor touch-ups, with repairable cosmetic defects, and its engine compartment may have minor leaks. There are minor body scratches or dings and minor interior blemishes, but no rust. The tires match and have 50% or more of tread. It also has a clean title history, with some service records available, and will pass safety and smog inspection.

**Fair Condition** - 18% of all cars we value. This car has some mechanical or cosmetic defects and needs servicing, but is still in safe running condition and has a clean title history. The paint, body and/or interior may need professional servicing. The tires may need replacing and there may be some repairable rust damage.

© 1995-2022 Kelley Blue Book Co.®, Inc. All rights reserved.

© 2022 Kelley Blue Book Co., Inc. All rights reserved. 2/17/2022-2/17/2022 Edition for LA 70809. The specific information required to determine the value for this particular vehicle was supplied by the person generating this report. Vehicle valuations are opinions and may vary from vehicle to vehicle. Actual valuations will vary based upon market conditions, specifications, vehicle condition or other particular circumstances pertinent to this particular vehicle or the transaction or the parties to the transaction. This report is intended for the individual use of the person generating this report only and shall not be sold or transmitted to another party. Kelley Blue Book assumes no responsibility for errors or omissions. (v.2020226)

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

# Kelley Blue Book
### THE TRUSTED RESOURCE

## 2012 Volvo XC70
## Pricing Report
**Style:** 3.2 Wagon 4D

**Mileage:** 125,000

**KBB.com Consumer Rating:** 4.7/5

## Vehicle Highlights

Fuel Economy: City 19/Hwy 25/Comb 21 MPG

Engine: 6-Cyl, 3.2 Liter

Transmission: Automatic, 6-Spd Geartronic

Drivetrain: FWD

Country of Assembly: Sweden

Country of Origin: Sweden

EPA Class: Midsize Station Wagons

Max Seating: 5

Doors: 4

Body Style: Wagon

## Sell to Private Party



Private Party Range
**$9,036 - $11,311**
Private Party Value
**$10,174**

Valid for **ZIP code 70809** through **02/17/2022**

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000157

# Your Configured Options

Our pre-selected options, based on typical equipment for this car.

✓ Options that you added while configuring this car.

**Exterior Color**
✓ Beige

**Wheels and Tires**
Alloy Wheels

**Entertainment and Instrumentation**
CD/MP3 (Single Disc)

AM/FM Stereo

Sirius Satellite

Bluetooth Wireless

Volvo Sensus

**Engine**
6-Cyl, 3.2 Liter

**Transmission**
Automatic, 6-Spd

Geartronic

**Drivetrain**
✓ FWD

**Braking and Traction**
ABS (4-Wheel)

Hill Descent Control

Traction Control

Stability Control

**Comfort and Convenience**
Air Conditioning

Power Windows

Power Door Locks

Cruise Control

Keyless Entry

✓ Keyless Start

✓ Power Liftgate Release

Alarm System

**Steering**
Power Steering

Tilt Wheel

**Seats**
✓ Dual Power Seats

✓ Leather

✓ Heated Seats

**Roof and Glass**
Moon Roof

**Safety and Security**
Dual Air Bags

Side Air Bags

F&R Head Curtain Air Bags

✓ F&R Parking Sensors

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000158

**Lighting**
Daytime Running
Lights

**Accessory
Packages**
✓ BLIS

✓ Premier Plus Pkg

**Exterior**
Fog Lights

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

# Glossary of Terms

**Kelley Blue Book® Trade-In Value** - This is the amount you can expect to receive when you trade in your car to a dealer. This value is determined based on the style, condition, mileage and options indicated.

**Trade-In Range** - The Trade-In Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week based on the style, condition, mileage and options of your vehicle when you trade it in to a dealer. However, every dealer is dierent and values are not guaranteed.

## Tip:

**It's crucial to know your car's true condition when you sell it, so that you can price it appropriately. Consider having your mechanic give you an objective report.**

**Kelley Blue Book® Private Party Value** - This is the starting point for negotiation of a used-car sale between a private buyer and seller. This is an "as is" value that does not include any warranties. The nal price depends on the car's actual condition and local market factors.

**Private Party Range** - The Private Party Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week for a vehicle with stated mileage in the selected condition and configured with your selected options, excluding taxes, title and fees when selling to a private party.

**Excellent Condition** - 3% of all cars we value. This car looks new and is in excellent mechanical condition. It has never had paint or bodywork and has an interior and body free of wear and visible defects. The car is rust-free and does not need reconditioning. Its clean engine compartment is free of fluid leaks. It also has a clean title history, has complete and verifiable service records and will pass safety and smog inspection.

**Very Good Condition** - 23% of all cars we value. This car has minor wear or visible defects on the body and interior but is in excellent mechanical condition, requiring only minimal reconditioning. It has little to no paint and bodywork and is free of rust. Its clean engine compartment is free of fluid leaks. The tires match and have 75% or more of tread. It also has a clean title history, with most service records available, and will pass safety and smog inspection.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000160

**Good Condition** - 24% of all cars we value. This car is mechanically sound but may need some reconditioning. Its paint and bodywork may require minor touch-ups, with repairable cosmetic defects, and its engine compartment may have minor leaks. There are minor body scratches or dings and minor interior blemishes, but no rust. The tires match and have 50% or more of tread. It also has a clean title history, with some service records available, and will pass safety and smog inspection.

**Fair Condition** - 18% of all cars we value. This car has some mechanical or cosmetic defects and needs servicing, but is still in safe running condition and has a clean title history. The paint, body and/or interior may need professional servicing. The tires may need replacing and there may be some repairable rust damage.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000161

© 1995-2022 Kelley Blue Book Co., Inc. All rights reserved.

© 2022 Kelley Blue Book Co., Inc. All rights reserved. 2/17/2022-2/17/2022 Edition for LA 70809. The specific information required to determine the value for this particular vehicle was supplied by the person generating this report. Vehicle valuations are opinions and may vary from vehicle to vehicle. Actual valuations will vary based upon market conditions, specifications, vehicle condition or other particular circumstances pertinent to this particular vehicle or the transaction or the parties to the transaction. This report is intended for the individual use of the person generating this report only and shall not be sold or transmitted to another party. Kelley Blue Book assumes no responsibility for errors or omissions. (v.2020226)

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

|  |  | List |
|---|---|---|
| 1 | YV4952BLXC1143836 | 11,569.00 |
| 2 | YV4952BL1C1142834 | 15,991.00 |
| 3 | YV4952BL9C1125148 | 12,700.00 |

| | Difference in List Price |
|---|---|
| 1 Vs 2 | 4,443.60 |
| 1 Vs 3 | 2,009.52 |
| 2 Vs 3 | 2,434.08 |

Subject Vehicle Milage            55374

Subject vs
1
2
3

Quoted Adjusted Value

| 1 | 11,764.92 | 2364.71 |
| 2 | 14,712.02 | 1,007.21 |
| 3 | 13,218.45 | 1,837.72 |

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

| Value of Options | Miles | Adjusted Value |
|---|---|---|
| 1770.79 | 125000 | 9,798.21 |
| 1749.19 | 82,089 | 14,241.81 |
| 892.27 | 105,350 | 11,807.73 |

Difference in Miles

42,911

19,650

23,261

69626
26,715
49,976

Corrected Adjusted Value

| 7205.400274 | 16,605.61 |
|---|---|
| 2764.660735 | 16,469.47 |
| 5171.876657 | 16,552.61 |

16542.56256

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000164

ə

Dollars/ Mile

0.1035538673

0.1022656489

0.1046421048

0.103487207

| | Offered Dollar |
|---|---|
| 7205.400274 | 0.0339630310 |
| 2764.660735 | 0.0377020400 |
| 5171.876657 | 0.0367720505 |

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000165

3/16/22, 2:45 PM

RouteOne

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000166

STATE OF MAINE                                    SUPERIOR COURT
COUNTY OF HANCOCK, ss                             Docket No. CV-2022-

MATTHEW THURSTON,                          )
Individually and on behalf of others similarly   )
situated                                   )
                                           )      FIRST AMENDED
        Plaintiff,                         )      CLASS ACTION COMPLAINT
                                           )
        v.                                 )
                                           )
PROGRESSIVE CASUALTY INSURANCE             )
    COMPANY                                )
                                           )      EXHIBIT       6
        and                                )      WIT:_____
                                           )      DATE:  1/22/24
UNITIED FINANCIAL CASUALTY CO.             )      Pamela Carle, RPR, CRR
                                           )
        Defendants                         )

    NOW COMES the Plaintiff, Matthew Thurston, by and through counsel, and makes the
following Complaint individually, and on behalf of a class of persons defined below, against the
Defendants.

                        **INTRODUCTION**

1. The Plaintiff, Matthew Thurston, was sold an auto insurance policy by "Progressive."

2. The commonly known PROGRESSIVE trademark is registered to Progressive Casualty
   Insurance Company. However, the Plaintiff's policy is underwritten by United Financial
   Casualty Co. The Defendants will be referred to throughout this Complaint as either
   "Defendant," "Defendants," or "Progressive."

3. As part of the sale, Progressive promised that it would pay him the value of his car if it were
   damaged in an accident.

4. Based on the promises, Plaintiff bought the policy and premiums for an auto insurance
   policy from Progressive.

5. On or around January 21, 2022, Plaintiff's car, that was covered by the policy was "totaled" in a motor vehicle collision.

6. When it came time for Progressive to honor the promises made in the policy it sold to Plaintiff, Progressive did not live up to its promises.

7. Rather than pay Plaintiff the value of his car, Progressive instead chooses to conspire with another company and not pay Plaintiff what he is owed.

8. Progressive hired another company, Mitchell, to appraise Plaintiff's total loss claims. Mitchell systematically, and without any reasonable justification, depresses the appraised value of all total loss vehicles or coordination with Progressive.

9. Rather than pay Plaintiff fair value for his car, Progressive relied on Mitchell's systemic depressed value.

10. Instead of Progressive paying fair value as promised to Plaintiff and all other similarly situated Mainers, Defendant shorts them and they receive less than what they were promised.

## PARITIES AND VENUE

11. The Plaintiff, Matthew Thurston, is a resident on Hancock County, Maine, and has a Progressive Auto Policy which he purchased in Maine.

12. This action is also asserted on behalf of a class consisting of the following:

All persons who were insured by the Defendant in the State of Maine, for personal or family use of a vehicle, in the six years preceding the filing of this Complaint, who were paid or offered compensation for a total loss on their vehicle and the offer was reduced based on a Valuation Report obtained by Defendant that included a projected sold adjustment ("the Class").

13. Defendant, Progressive Casualty Insurance Company, has its corporate headquarters located at 6300 Wilson Mills Rd, Mayfield Village, OH 44143.

14. Defendant United Financial Casualty Co. has its corporate headquarters located at 6300 Wilson Mills Rd, Mayfield Village, OH 44143.

15. Progressive Casualty Insurance Company and United Financial Casualty Co., are, for all practical purposes, part of the Progressive Group of Insurance Companies.

16. According to its website, Progressive conducts business in Maine and throughout the country under the brand Progressive or the Progressive Group of Insurance Companies.

17. Progressive's website attempts to convey a sense that Progressive can be trusted and that it works hard on behalf of its customers. To enter the auto insurance section of Progressive's website, one clicks on a link that says, *"buckle up with protection you can rely on."*

18. Thurston never got the protection promised.

19. Progressive also tells customers that, with Progressive, they get *"superior claims service"* and that Progressive will *"support you every step of the way,"* and tells potential customers to *"join us today and experience why we're one of the best insurance companies."*

20. After making these promises, Progressive unfairly and systematically lowers the value of total loss claims it is supposed to pay in Maine.

21. Its annual report states that one of Progressive's four core values is integrity, stating *"[w]e revere honesty and adhere to high ethical standards to gain the trust and confidence of our customers. We value transparency, encourage disclosing bad news, and welcome disagreement."*

22. Mr. Thurston's example, as summarized in this Complaint, is but one of many hundreds, if not thousands, of such instances where consumers in Maine are getting less than they are owed by Progressive for a total loss vehicle.

Case 1:22-cv-00375-NT   Document 120-10   Filed 01/10/25   Page 134 of 156
Case 1:22-cv-00375-NT   Document 41 Filed 04/06/30/22   Page 4 of 18   PageID #: 35
PageID #: 1068

## FACTS

23. On January 21, 2022, the Plaintiff's vehicle was badly damaged in a collision.

24. The vehicle was a 2012 Volvo XC70 with VIN #YV4952BL2C1140915.

25. At the time of the collision, the vehicle was in the process of being transferred from Scott
    Thurston, the Plaintiff's father, to the Plaintiff.

26. Scott Thurston gave his son the vehicle on or around January 5, 2022, in Louisiana, and
    Matthew drove the car to Maine shortly thereafter.

27. At the time of the collision, the Plaintiff had auto insurance from Progressive.

28. Progressive is obligated to pay for damage to the vehicle under the Plaintiff's collision policy
    because the Defendant had an existing collision policy with Progressive for other vehicles,
    and, consistent with his contract with Progressive, had the option to elect to add any new
    vehicle within thirty (30) days of obtaining the new vehicle.

29. Plaintiff made a claim for the damage to the Volvo or around January 25, 2022, and added
    the vehicle to the policy at the same time, which was within the 30-day "grace period" for
    adding a new vehicle.

30. Progressive accepted the claim and declared the Plaintiffs' vehicle to be a "total loss" and
    offered to pay the Plaintiff what it claimed was the actual cash value of the vehicle.

31. Progressive's offer to pay the Plaintiff for the vehicle was less than the full value it had
    promised to pay.

32. Plaintiff's situation was not unique because Progressive's standard practice systemically
    reduces its offer to pay to less than the value of total loss vehicles without any reasonable or
    rational basis.

33. Progressive's standard practice involves obtaining a "Vehicle Valuation Report" ("Valuation Report") from the Defendant's contractor, often if not always Mitchell, and then using the Valuation Report provided by Mitchell (or others) to offer Maine consumers less than the value of their total loss vehicle.

34. Progressive provided a Valuation Report for the Plaintiff on or around February 17, 2022. *See* Exhibit A.

35. On information and belief, the Valuation Reports related to total-loss vehicles used by Progressive during the relevant period in Maine followed the same standard practice that provided Plaintiff and others an offer to pay that relied on the use of "Valuation Reports".

36. These Valuation Reports start with a list of comparable used vehicles, normally of the same year, and make and model as the vehicle being appraised. The reports base the value of the vehicle to be appraised upon the advertised prices for comparable vehicles. The report uses those advertised prices to create a model of the value of the total loss vehicle.

37. The report then deviates from the advertised prices of comparable vehicles by claiming to adjust those advertised prices to account for differences in equipment, mileage, and vehicle configuration to create a base value for the vehicle being appraised.

38. The Valuation Reports also include a "Projected Sold Adjustment" for each of the comparable vehicles used in the Valuation Report. These Projected Sold Adjustments are, invariably, a downward adjustment in the value of the comparable vehicles. In the report used to determine the value of the Plaintiff's vehicle, Mitchell applied Projected Sold Adjustments of -$398.00, -$537.00, and -$427.00 to the three vehicles used as comparable vehicles in the Valuation Report. See Exhibit A, pp 5-6.

39. Progressive's Projected Sold Adjustments are used for arbitrary downward adjustments to its offers to pay the values of the comparable vehicles. The result of the adjustment is that the

alleged value of each comparable vehicle used to determine the value of the vehicle being
appraised, are lower. This, in turn, is used to lower the purported value of the vehicle being
appraised. This leads to consumers being offered, and receiving, less for their vehicle than
they are entitled to.

40. The Projected Sold Adjustments are simply used to reduce the amount Progressive pays to
consumers.

41. Progressive begins the process of making offers for loss vehicles using the comparative
appraisal methodology outlined above, and then seeks further reductions in the value of total
loss vehicles, by adding the bogus "Projected Sold Adjustment" into the comparable vehicles
in every Valuation Report.

42. A reduction in the market value of a vehicle's list price based on supposed downward price
pressure, especially in the current market, where used cars are only available at a significant
premium has no rational basis.

43. Progressive's Projected Sold Adjustments are also contrary to appraisal standards. There are
several generally recognized and acceptable methodologies for determining actual cash value,
including use of comparable vehicles.

44. Appraisers customarily use advertised prices to determine the value of comparable vehicles,
and only make adjustments based on observed and verifiable data; reasonable appraisal
standards do not permit arbitrary adjustments from the advertised price based upon
undocumented and unverifiable assumptions that vehicles tend to sell below list price.

45. The impropriety and arbitrariness of Progressive's Projected Sold Adjustments are further
demonstrated by the fact that Mitchell's primary competitor in providing automated
valuation reports to insurance companies—CCC Intelligent Solutions—does not apply
projected sold adjustments in this manner. Instead, CCC Intelligent Solutions uses list prices

46. Plaintiff and each member of the class ("the Class") were damaged by Progressive's failure to pay the true value of their cars by its use of the adjustments discussed above that were not proper methodologies or appraisal standards.

47. Were it not for Defendant's deceptive and improper adjustments, the Plaintiff, and other similarly situated consumers in Maine, would have received a greater amount for their total loss vehicles from Progressive.

## CLASS ALLEGATIONS

48. The Plaintiff hereby repeats and realleges the claims in each of the proceeding paragraphs.

49. The Defendant treated the Plaintiff the same way it treats all consumers in Maine whose vehicles it determines to be a total loss.

50. On information and belief, the Defendant, or its agent Mitchell, maintains records containing the Valuation Reports and the financial transactions connected to each total loss vehicle for which Progressive was obliged to pay a claim, in Maine, during the applicable period, and such records would be admissible as evidence in any trial or proceeding as statements of a party opponent.

51. These records would show the amounts of the "Projected Sold Adjustments" that Progressive made to the values of the cars of Plaintiff and the other class members.

52. The records would identify all potential class members by name.

53. On information and belief, the joinder of all persons who meet the class definition in a single proceeding would be impracticable.

54. The claims asserted on behalf of the Plaintiff and the Class present the following issue of fact and law that can and should be combined into a single action:

a.  Whether the Defendant, by applying a Projected Sold Adjustment for all total loss vehicles, in Maine, during the relevant time period, has violated 24-A M.R.S. § 2436-A(1)(A) by "knowingly misrepresenting to an insured pertinent facts. . . . related to the coverage at issue;"

b.  Whether the Defendant, by applying a Projected Sold Adjustment to all total loss vehicles, in Maine, during the relevant time period, has violated 24-A M.R.S. § 2436-A(1)(E) by "failing to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear;"

c.  Whether the Defendant, by applying a Projected Sold Adjustment to all total loss vehicles, in Maine, during the relevant time period, engaged in unfair or deceptive trade practices, in violation of 5 M.R.S. § 207;

d.  If the Defendant is liable, what is the amount of damages due from them to the Class;

e.  If the Defendant is liable under the Unfair Trade Practices Act, what injunctive or equitable relief to impose upon the Defendant under 5 M.R.S. § 213(1);

f.  If the Defendant is liable for conversion, what injunctive relief to impose;

g.  If the Defendant is liable for conversion, whether the Defendant acted with Malice toward the Plaintiff and the Class;

h.  If the Defendant is liable for conversion, and acted with malice toward the Plaintiff and the Class, the amount of punitive damages to impose.

WHEREFORE, the Plaintiff asks this Honorable Court to:

a.  Certify a class of persons, appoint the Plaintiff as class representative and his counsel as Class counsel as to all of the following Counts.

## COUNT I - 24-A M.R.S. § 2436-A – Unfair Claim Settlement Practices

55. The Plaintiff hereby repeats and realleges the claims in each of the proceeding paragraphs.

56. By offering the Plaintiff, and the Class, less than the full market value of his vehicle, by inserting Projected Sold Adjustments into its Valuation Reports, the Defendant has violated 24-A M.R.S. § 2436-A(1)(A) by "knowingly misrepresenting to an insured pertinent information related to the coverage at issue."

57. By offering the Plaintiff and the Class less than the full market value of his vehicle, by inserting Projected Sold Adjustments into its Valuation Reports, the Defendant has violated 24-A M.R.S. § 2436-A(1)(E) by "[w]ithout just cause, failing to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear."

WHEREFORE, the Plaintiff asks this Honorable Court to:

    a.  Find that the Defendant has violated 24-A § 2436-A;

    b.  Determine the amount of damages to the Plaintiff and the Class;

    c.  Impose interest at the rated of 18% per year from the time the claim should have been paid on any damages;

    d.  Enter judgment against the Defendant; and

    e.  Award the Plaintiff and the Class their reasonable attorneys' fees and costs.

## COUNT II – 5 M.R.S. § 205-A – Maine Unfair Trade Practices Act

58. The Plaintiff hereby repeats and realleges the claims in each of the proceeding paragraphs.

59. The Plaintiff and the Class purchased the auto insurance policy at question primarily for personal or family use.

60. The Defendant's actions to the Plaintiff and the Class, as alleged in this Complaint, are unfair and deceptive trade practices prohibited by 5 M.R.S. § 207.

61. The Defendant's action toward the Plaintiff and the Class, as alleged in this Complaint, are not authorized, permitted or required by a state or federal agency or by applicable law, rule or regulation or other regulatory approval.

62. The Plaintiff and the Class have suffered a loss of money and/or personal property because of the Defendant's unfair and/or deceptive acts.

WHEREFORE, the Plaintiff asks this Honorable Court to:

    a.   Find that the Defendant has violated 5 M.R.S. § 207;

    b.   Determine the amount of damages to the Plaintiff and the Class;

    c.   Award the Plaintiff and the Class their reasonable attorneys' fees and costs;

    d.   Enjoin the Defendant from engaging in such unfair and deceptive trade practices in the future anywhere in the State of Maine;

    e.   Enter judgment against the Defendant; and

    f.   Impose whatever other remedies the Court deems just and equitable.

## COUNT III – CONVERSION

63. The Plaintiff hereby repeats and realleges the claims in each of the proceeding paragraphs.

64. The Plaintiff, and the Class, by filing a claim with Progressive, made demand for the money they were entitled to under their policy; they had an interest in payment of the full value of their vehicle.

65. Progressive refused to pay the Plaintiff and the Class the money they were entitled to pursuant to their respective claims.

66. Progressive has exercised dominion and control over property of the Plaintiff and the class members.

67. Progressive's actions in denying their policyholders the money they were entitled to when they filed claims, as described in the Complaint, were undertaken with actual or implied malice toward Plaintiff and the Class.

WHEREFORE, the Plaintiff asks this Honorable Court to:

    a.  Find that the Defendant has converted the Plaintiff's and the Class's property;

    b.  Find that the Defendant converted the Plaintiff's and the Class's property with actual or implied malice;

    c.  Determine the amount of damages to be paid to the Plaintiff and the Class;

    d.  Determine the amount of punitive damages, to be paid by the Defendant;

    e.  Enjoin the Defendant from engaging in similar activities in the future anywhere in the State of Maine;

    f.  Enter judgment against the Defendant; and

    g.  Impose whatever other remedies the Court deems just and equitable.

Respectfully Submitted,

Dated: October 24, 2022

John Z. Steed, Esq., Bar #5399
Island Justice
P.O. Box 711 // 40 School Street
Stonington, ME 04681
(207) 200-7077
john@islandjusticelaw.com

# Vehicle Valuation Report

Prepared for: Progressive Group of Insurance Companies (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 22-5056549-01 | | UNKNOWN | SCOTT THURSTON 2304 FAIRWAY DR BATON ROUGE, LA 70809 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 01/21/2022 | 01/25/2022 | 02/17/2022 | 1014377008 | 4 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2012 | Volvo | XC70 4 Door Wagon 3.2L 6 Cyl Gas A FWD | LA 70809 | 55,374 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Twilight Bronze Metallic | WDD885, Maine | YV4952BL2C1140915 | No |

## Valuation Summary

**Loss Vehicle Adjustments**
Adjustments specific to your vehicle

|  |  |  |
|---|---|---|
| Base Value = | $13,231.80 | |
| Condition – | $462.43 | |
| Prior Damage – | $0.00 | |
| Aftermarket Parts + | $55.00 | |
| Refurbishment – | $0.00 | |
| Market Value = | $12,824.37 | |

### Settlement Value:
## $12,824.37

**Settlement Adjustments**
Adjustments specific to your policy

| Settlement Value = | $12,824.37 |
|---|---|



J.D. POWER

# Loss Vehicle Detail

Loss vehicle: 2012 Volvo XC70 | 4 Door Wagon | 3.2L 6 Cyl Gas A FWD

## Standard Equipment

### Exterior

| | |
|---|---|
| 16" "CECINO" alloy wheels | Aluminum roof rails w/"XC" logo |
| Body-side protective lower cladding | Front fog lights |
| P215/65R16 all-season tires | Pwr heated mirrors w/memory, puddle lights, integrated turn signals |
| Rear fog light w/auto-off | Rear wiper/washer -inc: automatic function in reverse when front wipers on |
| Safe approach & home safe security lighting | Variable intermittent wipers |
| Volvo Sensus w/integrated 7" color display | |

### Interior

| | |
|---|---|
| "XC" door stitching | "XC" front/rear/cargo textile floor mats |
| 40/20/40 flat-folding rear bench -inc: (3) manual-fold rear head restraints | AM/FM stereo w/CD/MP3/WMA player -inc: HD Radio, 160-watt amp, (8) speakers, USB input, iPod connection |
| Auto-dimming rearview mirror | Bluetooth |
| Central pwr door locks, fuel filler | Cross avenue aluminum inlays |
| Cruise control | Dual illuminated visor vanity mirrors |
| Dual-zone electronic climate control (ECC) w/rear seat vents | Flat-folding front passenger seat |
| Front center armrest | Front door storage pockets |
| Front reclining bucket seats w/adjustable head restraints | Front/rear reading lamps |
| Ignition immobilizer | Illuminated lockable glove box |
| Intelligent driver info system (IDIS) | Interior cabin light delay feature |
| Leather shift knob -inc: aluminum inlay | Leather-wrapped steering wheel w/illuminated cruise & audio controls -inc: aluminum inlay |
| Lockable underfloor storage in cargo area | Outside temp gauge |
| Pollen filter | Pwr driver seat w/adjustable lumbar, 3-position memory |
| Pwr windows -inc: front auto-up/down, anti-trap feature | Rear window defroster w/timer |
| Remote keyless entry | Security alarm system |
| SIRIUS satellite radio w/6-month subscription | T-Tec cloth seating surfaces w/"XC" stitching |
| Tilt/telescopic steering column | Trip computer |

### Mechanical

| | |
|---|---|
| Front wheel drive | Front/rear skid plates |
| Front/rear stabilizer bars | MacPherson strut front suspension |
| Multi-link independent rear suspension | Pwr 4-wheel disc brakes |
| Pwr parking brake w/auto release | Pwr rack & pinion steering |

### Safety

| | |
|---|---|
| 3-point seat belts -Inc: pretensioners, front height adjustable anchors | 4-wheel anti-lock braking system (ABS) -Inc: electronic brake distribution (EBD), hydraulic brake assist (HBA), ready alert brakes (RAB), fading brake support (FBS) |
| Anti-submarine seats | Child safety rear door locks |
| Collapsible steering column | Daytime running lights |
| Driver/front passenger dual stage airbags -Inc: front passenger cutoff switch | Driver/front passenger whiplash protection seating system (WHIPS) |
| Dynamic stability & traction control (DSTC) | ISOFIX child seat attachments -Inc: top tether anchors |
| Rear window deactivation | Side impact protection system (SIPS) -Inc: driver/front passenger side-impact airbags, front/rear side inflatable curtains (IC) |
| Tire pressure monitoring system | |

# Loss Vehicle Base Value

Loss vehicle:  2012 Volvo XC70 |  4 Door Wagon | 3.2L 6 Cyl Gas A FWD

## Regional Comparable Vehicle Information

Search Radius used for this valuation: 350 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 113,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2NORMAL GAS A 2WD | 125,000 | 77015 | 249 miles | $11,569.00 List Price | $11,764.92 |
| 2 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2NORMAL GAS A 2WD | 82,089 | 36117 | 322 miles | $15,991.00 List Price | $14,712.02 |
| 3 | 2012 VOLVO XC70 PREMIER 4D WGN 6 3.2NORMAL GAS A 2WD | 105,350 | 35244 | 323 miles | $12,700.00 List Price | $13,218.45 |

|  |  |
|---|---|
| **Base Value:** | **$13,231.80** |

# Loss Vehicle Adjustments

Loss vehicle:  2012 Volvo XC70 |  4 Door Wagon | 3.2L 6 Cyl Gas A FWD

## Condition Adjustments

| Condition Adjustment: -$462.43 | | Overall Condition: 2.65-Good | | Typical Vehicle Condition: 3.00 |
|---|---|---|---|---|

| Category | Condition | Condition $ | Comments |
|---|---|---|---|
| DASH/CONSOLE | 3 Good | $0.00 | |
| HEADLINER | 2 Fair | -$23.12 | some stains |
| CARPET | 3 Good | $0.00 | |
| GLASS | 3 Good | $0.00 | |
| DOORS/INTERIOR PANELS | 2 Fair | -$46.24 | greater then 3 gouges |
| SEATS | 3 Good | $0.00 | |
| TRIM | 3 Good | $0.00 | |
| BODY | 2 Fair | -$277.46 | crease in right rear door |
| PAINT | 2 Fair | -$115.61 | numerous small scratches |
| VINYL/CONVERTIBLE TOP | Typical | $0.00 | |
| ENGINE | 3 Good | $0.00 | |
| TRANSMISSION | 3 Good | $0.00 | |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| INTERIOR | FLOOR MATS (ALL-WEATHER) - 2 ROWS | INSTANT QUOTE | | | $55.00 |

# Regional Comparable Vehicles

Loss vehicle: 2012 Volvo XC70 | 4 Door Wagon | 3.2L 6 Cyl Gas A FWD

Claim # 22-5056549-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 4

## 1  2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2 NORMAL GAS A2WD        List Price: $11,569.00

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| YV4952BLXC1143836 | MBEdeG1A | 10/05/2021 | 77015 | 249 miles |

Source:

DEALER WEB LISTING
AUTOTRADER.COM

PRIVATE OWNER VIA TRED.COM

APPOINTMENT ONLY

HOUSTON TX 77015

206-471-6212

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$398.00 |
| Vehicle Configuration Adjustment | | | -$1,264.41 |
| Mileage | 55,374 | 125,000 | -$2,364.71 |
| Equipment | | | |
| CLIMATE PKG | No | Yes | -$295.92 |
| BLIND SPOT INFORMATION SYSTEM (BLIS) | No | Yes | -$210.46 |
| | | Total Adjustments: | $195.92 |
| | | Adjusted Price: | $11,764.92 |

Comparable Vehicle Package Details

CLIMATE PKG

Comparable Vehicle Option Details

BLIND SPOT INFORMATION SYSTEM (BLIS)

## 2  2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2 NORMAL GAS A2WD        List Price: $15,991.00

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| YV4952BL1C1142834 | VV2231A | 11/03/2021 | 36117 | 322 miles |

Source:

DEALER WEB LISTING - CARS.COM

JACK INGRAM MOTORS

235 EASTERN BLVD

MONTGOMERY AL 36117

334-277-5700

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$537.00 |
| Vehicle Configuration Adjustment | | | -$1,749.19 |
| Mileage | 55,374 | 82,089 | $1,007.21 |
| | | Total Adjustments: | -$1,278.98 |
| | | Adjusted Price: | $14,712.02 |

Mitchell WorkCenter
Total Loss

| 3 | 2012 VOLVO XC70 PREMIER 4D WGN 6 3.2 NORMAL GAS A2WD | | | | List Price: $12,700.00 |
|---|---|---|---|---|---|

| VIN | Stock No | | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|---|
| YV4952BL9C1125148 | M76456A | | 02/02/2022 | 35244 | 323 miles |

**Source**

DEALER WEB LISTING - VAST.COM
HENDRICKSUBARU USED
2929 JOHN HAWKINS PARKWAY
HOOVER AL 35244
770-232-0099

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$427.00 |
| Vehicle Configuration Adjustment | | | -$892.27 |
| Mileage | 55,374 | 105,350 | $1,837.72 |
| | | Total Adjustments: | $518.45 |
| | | **Adjusted Price:** | **$13,218.45** |

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2012 Volvo XC70 | 4 Door Wagon 3.2L 6 Cyl Gas  FWD | $32,950.00 |
| 2012 VOLVO XC70 PREMIER PLUS | 4D WGN 6 3.2 NORMAL GAS A 2WD | $37,750.00 |
| 2012 VOLVO XC70 PREMIER | 4D WGN 6 3.2 NORMAL GAS A 2WD | $35,900.00 |

Mitchell WorkCenter
Total Loss

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

### Step 1 - Locate Comparable Vehicles

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

### Step 2 - Adjust Comparable Vehicles

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).
- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).
- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.
- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

### Step 3 - Calculate Base Vehicle Value

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

### Step 4 - Calculate Loss Vehicle Adjustments

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

### Step 5 - Calculate the Market Value

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

# KING & SPALDING

King & Spalding LLP
1180 Peachtree Street N.E. Ste. 1600
Atlanta, GA 30309-3521
Tel: +1 404 572 4600
Fax: +1 404 572 5100
www.kslaw.com

Zachary A. McEntyre
Partner
Direct Dial: +1 404 572 4636
Direct Fax: +1 404 572 5100
zmcentyre@kslaw.com

March 21, 2023

**VIA U.S. MAIL**

John Z. Steed
Island Justice Law
P.O. Box 771
Stonington, Maine 04681

     Re:   Matthew Thurston

Dear Mr. Steed:

    I write to follow up on UFCC's prior demands to resolve Matthew Thurston's insurance claim via appraisal, as required by the insurance policy. As explained in my August 10, 2022 letter, UFCC hired an appraiser, and Mr. Thurston's compliance with the appraisal provision is a condition precedent to suit. It is our understanding, however, that you have not hired an appraiser. In light of UFCC's motion to dismiss Mr. Thurston's lawsuit, we invite you to reconsider your position on appraisal. Please let us know as soon as possible of your selected appraiser.

    In the meantime, I am enclosing a check for the undisputed amount of $9,520.89. This amount reflects the actual cash value of $13,179.89, minus the salvage value of $3,659.00. If Mr. Thurston wishes to retain the salvage vehicle, please let us know and UFCC can make towing arrangements. If Mr. Thurston prefers not to retain the vehicle, UFCC can issue the salvage value to him. Should Mr. Thurston wish to proceed with this option, he will need to provide UFCC with all necessary documentation to sell the salvage vehicle, including the vehicle's title.

                          Sincerely,

                          Zachary A. McEntyre
                          Partner

EXHIBIT 7
WIT:
DATE: 1/28/24
Pamela Carle, RPR, CRR

Progressive
PO Box 2930
Clinton, IA 52733-2930



Page 1 of 1

SCOTT THURSTON
2304 FAIRWAY DR
BATON ROUGE, LA 70809

| ADVICE FOR PAYMENT 2783590705 | |
|---|---|
| **Payee:**<br>SCOTT THURSTON | |
| | **Payment Date** | 03/15/2023 |
| | **Total Payment Amount** | $9,520.89 |
| | **Total Number of Invoices** | 1 |
| If you have any questions regarding this payment, please call us at 1-800-274-4499. | |

| Details | | | | | |
|---|---|---|---|---|---|
| **Claim Number:**<br>225056549 | **Name:**<br>THURSTON, SCOTT | **Date of Loss:**<br>01/21/2022 | **Invoice Number:**<br>108934146 | **Company:**<br>United Financial Casualty Company | |

| Type | Description | *Coverage | Reference | Identifier | Service Dates | Deductible | Payment Amount |
|---|---|---|---|---|---|---|---|
| Total Loss | Owner Retains Salvage | COLL | N/A | 12 VOLVO XC70<br>140915 | N/A | $1,000.00 | $9,520.89 |

| **Total Payment Amount** | $9,520.89 |
|---|---|

**\*Full Description of Coverage:**
COLL          -   Collision

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

MATTHEW THURSTON, individually and
on behalf of others similarly situated,

       Plaintiff,

v.

PROGRESSIVE CASUALTY INSURANCE
COMPANY and UNITED FINANCIAL
CASUALTY COMPANY,

       Defendants.

Docket No. 1:22-cv-00375-NT

EXHIBIT 8
WIT:
DATE: 1/22/24
Pamela Carle, RPR, CRR

<u>**PLAINTIFF THURSTON'S ANSWERS TO DEFENDANT UNITED FINANCIAL CASUALTY COMPANY'S FIRST SET OF INTERROGATORIES**</u>

      NOW COMES Plaintiff Matthew Thurston ("Plaintiff" or "Mr. Thurston"), by and through undersigned counsel, hereby submits his answers to Defendant United Financial Casualty Company's First Set of Interrogatories.

      Mr. Thurston is providing answers consistent with the applicable provisions of the Federal Rules of Civil Procedure and subject to the limitations on discovery including relevancy, privileges or otherwise not subject to disclosure. Mr. Thurston reserves the right to amend and/or supplement his responses if additional information is obtained.

      In accordance with the above, Mr. Thurston submits the answers to Defendant's First Set of Interrogatories.

**INTERROGATORIES**

<u>INTERROGATORY NO. 1:</u> Identify all person(s) whom You have interviewed in connection with this case. If You obtained any written or oral statements from any of those persons, please identify the person(s) who provided the statement and the dates of the statement.

1

ANSWER:    Robert S. Thurston on November 08, 2023. See (Thurston001). Discovery is
ongoing.

INTERROGATORY NO. 2: Identify and describe all actions You took to verify the deductions
and adjustments reflected on the Mitchell Report, including but not limited to any communications
with the sellers of the comparable vehicles reflected in the Mitchell Report.

ANSWER:    I did not have any communications with the sellers of the vehicle. The main step I
took was to compare the reports provided by Progressive. Mine had comparatively
low mileage. I talked to Kyle Mayer about it. I also tried to talk to Volvo about the
original market value of my Volvo, but they were not able to provide information
with the options chosen. I then decided to seek legal assistance.

INTERROGATORY NO. 3: Have You (or your attorneys) communicated with persons who may
be members of the Purported Class? If so, describe each such communication, including (but not
limited to) the identity of the person(s) with whom You communicated, the date of the
communication(s), and the nature of the communication(s).

ANSWER:    No

INTERROGATORY NO. 4: Explain in detail the procedure(s) You propose for identifying
persons whose automotive total-loss claims UFCC undervalued as a result of its use of a Projected
Sold Adjustment in connection with the valuation of those persons' claims.

ANSWER:    That is for my attorney to answer. I don't know.

INTERROGATORY NO. 5: Describe in detail Your damages, how Your damages should be
calculated, and how You contend the damages should be calculated for each member of the
Purported Class.

ANSWER:    I've suffered because I have had no compensation for my damaged vehicle for over
a year and half. I had to find another vehicle and pay for it without having been
compensated. Lots of stress and aggravation having to fight about the determined
value to reach a fair evaluation and to file this suit.

2

Progressive's advertising led me to believe they would take care of me after the accident and treat me fairly. They were only looking out for themselves rather than taking care of their customer. Any other damages, my attorney would know for their violations of the law. I am not an attorney.

INTERROGATORY NO. 6: Identify the date on which You retained counsel in connection with the settlement of Your Claim and/or to represent You in this lawsuit.

ANSWER:    Around February 2022

INTERROGATORY NO. 7: Other than the Claim, have You ever submitted a claim to an insurance company for property damage to an automobile? If so, provide the basis for the claim(s), provide the date(s) on which the claim(s) was submitted, identify the insurance company to which the claim(s) was submitted, identify the counsel representing You in connection with the claim(s) (if any), and describe in detail how the claim was resolved.

ANSWER:    Never

INTERROGATORY NO. 8: Identify how and when You came to learn of the law firms Island Justice, Frederick & Berler, LLC and Borison Firm, LLC.

ANSWER:    I set forth above when I first spoke to an attorney. Beyond that OBJECTION. Communications between Plaintiff and counsel are privileged and communications between and among co-counsel regarding the suit are the mental impressions and work-product of attorneys, pursuant to *Hickman v. Taylor*, 329 U.S. at 510-11, 67 S.Ct. 385. Civ. R. 26(b)(1) and (3), extends to documents and other tangible things. *United States v. Textron Inc. & Subsidiaries*, 577 F.3d 21, 27 (1st Cir. 2009).

INTERROGATORY NO. 9: Identify each vehicle You have purchased in the prior ten (10) years and for each provide the seller of the vehicle, the list price of the vehicle, and the price You actually paid for the vehicle.

ANSWER:    OBJECTION as to relevancy and otherwise beyond the scope of discovery. Federal Rule of Civil Procedure 26(b)(1). This action is about Defendants' practices in evaluating vehicle loss claims for its insureds. As such, information on prior vehicles purchased by Plaintiff for which he did not submit a claim to Defendants

3

has no bearing on any claim or defense in this action. Without waiving this objection, Plaintiff states the following:

2000 Subaru Impreza – March 30, 2012, I don't recall but I believe I paid 7 or 8,000 for it. I sold this last spring.

2016 Hyundai Tucson – I purchased with my mom in the spring of 2017. I don't remember what we paid.

2008 GMC Sierra – I bought that in March 2023. I paid $3,500.

INTERROGATORY NO. 10: For each vehicle identified in response to Interrogatory No. 10, list whether the vehicle was financed, leased, or purchased with cash.

ANSWER:   All purchased with cash

INTERROGATORY NO. 11: Identify any damage the Vehicle sustained at any time prior to the January 21, 2022 motor vehicle accident referenced in the Complaint, and state whether any such damage was repaired prior to that accident.

ANSWER:   None that I am aware of.

INTERROGATORY NO. 12: Describe in detail who was driving and who was a passenger in the Vehicle at the time of the January 21, 2022, motor vehicle accident referenced the Complaint.

ANSWER:   I was driving, with my daughter, who was 6 months old, in the backseat.

INTERROGATORY NO. 13: Identify the owner of the Vehicle on the date of the loss, January 21, 2022.

ANSWER:   My parents.

INTERROGATORY NO. 14: Identify the date, if ever, on which ownership of the Vehicle was transferred to Plaintiff.

ANSWER:   It did not.

4

Respectfully submitted,

*/s/Ronald I. Frederick*
Ronald I. Frederick *
**Frederick & Berler, LLC**
767 East 185th Street
Cleveland, Ohio 44119
(216) 502-1055 (phone)
(216) 609-0750 (fax)
ronf@clevelandconsumerlaw.com

*/s/John Z. Steed*
John Z. Steed, Esq. #5399
**Island Justice**
P.O. Box 771
Stonington, ME 04681
(207) 200-7077
john@islandjusticelaw.com

*/s/ Scott C. Borison*
Scott C. Borison, Esq.*
**Borison Firm, LLC**
1900 S. Norfolk St. Suite 350
San Mateo, CA 94403
(301) 620-1016
Scott@borisonfirm.com

*Attorneys for Plaintiff Matthew Thurston*

*\*Admitted Pro Hac Vice*

5

## CERTIFICATE OF SERVICE

I certify that on November 17, 2023, a copy of the foregoing was served via electronic mail

on all counsel of record.

Thomas S. Marjerison, Esq.
**NORMAN, HANSON & DeTROY, LLC**
2 Canal Plaza
P.O. Box 4600
Portland, ME 04112
tmarjerison@nhdlaw.com

Jeffrey S. Cashdan
Zachary A. McEntyre
J. Matthew Brigman
Allison Hill White
**KING & SPALDING LLP**
1180 Peachtree St. NE
Atlanta, Georgia 30309
jcashdan@kslaw.com
zmcentyre@kslaw.com
mbrigman@kslaw.com
awhite@kslaw.com

Julia C. Barrett
**KING & SPALDING LLP**
500 W. 2nd Street, Suite 1800
Austin, Texas 78701
jbarrett@kslaw.com

*Counsel for Defendant United Financial Casualty Company*

/s/Ronald I. Frederick
Ronald I. Frederick (0063609)
**Frederick & Berler, LLC**
*Counsel for Plaintiff Mr. Thurston*

6