Page 1

1            UNITED STATES DISTRICT COURT
                   DISTRICT OF MAINE
2

3

         MATTHEW THURSTON,            )
4        GENEVIEVE MCDONALD, and      )
         KATHERINE BRIDGES,           )
5        individually and on          )
         behalf of the others         )
6        similarly situated,          )
                                      )
7        Plaintiffs,                  )
                                      ) Docket No:
8            vs.                      ) 1:22-cv-000375-NT
                                      )
9        PROGRESSIVE CASUALTY         )
         INSURANCE COMPANY and        )
10       UNITED FINANCIAL             )
         CASUALTY COMPANY,            )
11                                    )
         Defendants.                  )
12

13               VIDEO DEPOSITION OF:
14                 GENEVIEVE MCDONALD
15        Taken before Leslie Gilmore-Miller, RPR,
16      Notary Public in and for the State of Maine,
17      pursuant to notice, at the offices of
18      Eaton Peabody, 80 Exchange Street, Bangor,
19      Maine, on September 19, 2024, commencing at
20      10:16 a.m.
21

22

23

24

25            Leslie Gilmore-Miller, RPR

Genevieve McDonald                                        September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 2

1          A P P E A R A N C E S
2
      For the Plaintiff:
3
        Brian E. Roof, Esq.
4       FREDERICK & BERLER, LLC
        767 East 185th Street
5       Cleveland, Ohio 44119
        (216) 502.1055
6       brianr@clevelandconsumerlaw.com
7       John Z. Steed, Esq.
        ISLAND JUSTICE
8       P.O. Box 771
        Stonington, Maine 04681
9       (207) 200.7077
        john@islandjusticelaw.com
10
11    For the Defendant:
12      Allison Hill White, Esq.
        KING & SPALDING, LLP
13      1180 Peachtree Street, NE
14      Atlanta, Georgia 30309
15      (404) 572.4600
16      awhite@kslaw.com
17
18
19
20    Also Present:
21
22      Francis Herrero, Videographer
23      Veritext
24
25      Katherine Bridges

Page 3

1          I N D E X
2    THE DEPONENT: GENEVIEVE MCDONALD        Page
     EXAMINATION BY ATTY. WHITE:                7
3
4
5          E X H I B I T S
6    Description                            Page
     (Deposition Exhibit 1 was             26
7    referenced for identification.)
     Private Message Thread Between Genevieve
8    McDonald and Katherine Bridges
     (Deposition Exhibit 2 was             44
9    referenced for identification.)
     Auto Insurance Coverage Summary
10   (Deposition Exhibit 3 was             53
     referenced for identification.)
11   Chrysler Capital Advice For Payment
     (Deposition Exhibit 4 was             56
12   referenced for identification.)
     Print Settlement Summary
13   (Deposition Exhibit 5 was             80
     referenced for identification.)
14   Retail Installment Sale Contract
     (Deposition Exhibit 6 was             83
15   referenced for identification.)
     Darling's Response To Subpoena
16   (Deposition Exhibit 7 was             88
     referenced for identification.)
17   Vehicle Valuation Report
     (Deposition Exhibit 8 was             106
18   referenced for identification.)
     Claim Notes With Redactions
19   (Deposition Exhibit 9 was             108
     referenced for identification.)
20   Maine Auto Policy From Progressive
     (Deposition Exhibit 10 was            113
21   referenced for identification.)
     Second Amended Class Action Complaint
22   (Deposition Exhibit 11 was            123
     referenced for identification.)
23   Plaintiff Genevieve McDonald's Amended
     Responses and Objections To Defendant
24   United Financial Casual Company's First
     Set of Requests For Production
25   (Deposition Exhibit 12 was            138
     referenced for identification.)

Page 4

1    Plaintiff Genevieve McDonald's Amended
     Responses and Objections To Defendant
2    United Financial Casual Company's First
     Set of Interrogatories
3
4       (Exhibits contained in original and copies.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          S T I P U L A T I O N
2       It is hereby agreed by and between the
3    parties that signature is not waived.
4                * * * * *
5       TRANSCRIPT OF PROCEEDINGS
6                * * * * *
7       THE VIDEOGRAPHER: Good morning. We are
8    going on the record at 10:16 a.m., Thursday
9    September 19th. Please note that this
10   deposition is being conducted virtually.
11   Quality of recording depends on the quality of
12   camera and Internet connection of
13   participants.
14      What is seen from the witness and heard
15   onscreen is what will be recorded. Audio and
16   video recording will continue to take place
17   unless all parties agree to go off the record.
18      This is Media Unit 1 of the
19   video-recorded deposition of Genevieve
20   McDonald taken by counsel for plaintiff in the
21   matter of Matthew Thurston, et. al vs.
22   Progressive Casualty Insurance Company, et
23   al., filed in the United States District Court
24   for the District of Maine, Docket No.
25   1:22-cv-00375-NT.

2 (Pages 2 - 5)

Genevieve McDonald                                      September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 6

1    The location is 80 Exchange Street,
2    Bangor, Maine, 04401, and is, also, being
3    conducted remotely using virtual technology.
4    My name is Francis Herrero representing
5    Veritext. I'm the videographer. The court
6    reporter is Leslie Miller from the firm
7    Veritext. I'm not related to any party in
8    this action, nor am I financially-interested
9    in the outcome. If there are any objections
10   to proceeding, please state them at the time
11   of your appearance.
12   Counsel and all present, including
13   remotely, will now state their appearances and
14   affiliations for the record beginning with the
15   noticing attorney.
16   MS. WHITE: Allison White with King &
17   Spalding for the defendants.
18   MR. ROOF: Brian Roof with Frederick &
19   Berler representing plaintiff.
20   MR. STEED: John Steed with Island
21   Justice for the plaintiffs.
22   THE VIDEOGRAPHER: Will the court
23   reporter please swear in the witness and then
24   counsel may proceed.
25                    * * * * *

Page 7

1    GENEVIEVE MCDONALD, having been duly sworn by the
2    Notary Public, was deposed and testified as
3    follows:
4                    * * * * *
5                    EXAMINATION
6    BY MS. WHITE:
7    Q. Good morning, Ms. McDonald.
8    A. Good morning.
9    Q. So I'm Allison White; and I represent the
10   defendants in this case, which are Progressive
11   Casualty Insurance Company and United
12   Financial Casualty Company.
13   If I use the term UFCC throughout the
14   deposition, will you understand that I mean
15   United Financial Casualty Company?
16   A. Yes.
17   Q. Thank you.
18   A. May I make note of that?
19   Q. Yes. Just saves me time.
20   Have you ever been deposed before?
21   A. I have not.
22   Q. Well, I'll go over some ground rules to make
23   things run smoothly today.
24   The court reporter is taking down
25   everything we say. So it's really important

Page 8

1    that we give verbal answers; yes or no,
2    instead of the head nod or a head shake.
3    If you don't understand a question that I
4    ask you, just let me know and I'm happy to
5    rephrase. If you don't say otherwise, I will
6    assume that understood my question.
7    Is that fair?
8    A. Yes.
9    Q. Your lawyer might object to some of my
10   questions, but you still have to answer unless
11   he specifically instructs you not to answer
12   the question.
13   We will take a short break in about an
14   hour; but if you need a break at any point
15   before that, just let me know and I'm happy to
16   go off the record. My only request is that if
17   I've asked you a question, that you answer the
18   question before we take a break.
19   All right. Is there any reason today
20   that your memory might be impaired or that you
21   believe will impact your ability to testify
22   accurately?
23   A. No.
24   Q. Do you have any questions before we get
25   started?

Page 9

1    A. No.
2    Q. All right. Could you please state and spell
3    your name for the record?
4    A. Genevieve McDonald, G-e-n-e-v-i-e-v-e,
5    McDonald M-c-D-o-n-a-l-d.
6    Q. And have you ever gone by any other names?
7    A. I have. My maiden name is Kurilec,
8    K-u-r-i-l-e-c.
9    Q. And what is your date of birth and place of
10   birth?
11   A. 11/30/1982; Bar Harbor, Maine.
12   Q. What is your marital status?
13   A. Married.
14   Q. And what is your spouse's name?
15   A. Corey McDonald.
16   Q. When did you get married?
17   A. 9/8/2012.
18   Q. Had you ever been married before?
19   A. No.
20   Q. Do you have any children?
21   A. Yes.
22   Q. How old are they?
23   A. Six. They are twins. I have two daughters.
24   Q. What is your current address?
25   A. 22 McDonald Lane, Stonington, Maine, 04681;

3 (Pages 6 - 9)

Genevive McDonald                                September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 10

1     P.O. Box 253, Stonington, Maine, 04681.
2   Q. And do you own or rent your home?
3   A. Own.
4   Q. How long have you lived there?
5   A. Three years -- three or four years.
6   Q. And do your husband and children live with
7       there with you?
8   A. They do, yes.
9   Q. Does anyone else live there with you?
10  A. No.
11  Q. Where did you live before you lived at 22
12      McDonald Lane?
13  A. 129 North Main Street, Stonington, Maine,
14      04681.
15  Q. And how long did you live at 129 North Main
16      Street?
17  A. Approximately ten years.
18  Q. And did you own or rent that home?
19  A. Rent.
20  Q. And who lived there with you?
21  A. Corey McDonald and my two daughters.
22  Q. Anybody else?
23  A. No.
24  Q. Do you own any real estate other than your
25      home?

Page 11

1   A. No.
2   Q. Do you own any businesses?
3   A. No.
4   Q. Okay. I want to talk a little bit about your
5       education.
6         Did you graduate high school?
7   A. No, I have a general equivalency diploma.
8   Q. When did you get your GED?
9   A. I don't remember at this time.
10  Q. Do you remember about how old you were?
11  A. Eighteen.
12  Q. Do you have any college education?
13  A. I do.
14  Q. Can you tell me from where?
15  A. I'm a summa cum lade graduate of the
16      University of Maine, Orono.
17  Q. University of Maine what?
18  A. Orono.
19  Q. Is that O-r-o-n-o?
20  A. Yes.
21  Q. Okay. And what is your degree in?
22  A. University studies with a minor in Maine
23      studies.
24  Q. And I apologize if you said this. What year
25      did you graduate?

Page 12

1   A. 2018.
2   Q. Do you have any postgraduate education?
3   A. I do not.
4   Q. Have you taken any other courses or training
5       other than your college degree?
6   A. Yes. I took a course on lobbying.
7   Q. And where did you take that course?
8   A. The University of Maine, Orono.
9   Q. Do you have any certifications or licenses?
10  A. I do.
11  Q. What are those?
12  A. I have a Class II Maine Lobster License and I
13      have a U.S. Coast Guard certification in
14      Safety Training.
15  Q. A Class II lobster license?
16  A. Correct.
17  Q. And what does that allow you to do?
18  A. It allows me to operate as a commercial
19      fishing boat captain in the state of Maine.
20  Q. Have you ever had a professional license
21      revoked?
22  A. No.
23  Q. Do you have a driver's license?
24  A. Yes.
25  Q. Have you ever had your driver's license

Page 13

1       suspended?
2   A. Yes.
3   Q. When was that?
4   A. Approximately 2000 or 2001.
5   Q. And why was it suspended?
6   A. Operating under the influence.
7   Q. And when was your license reinstated?
8   A. I don't recall at this time.
9   Q. Was it around the same time period, 2000,
10      2001?
11  A. Yes.
12  Q. Was it suspended for less than a year?
13  A. Yes.
14  Q. Okay. All right. Other than one incident in
15      2000, 2001, have you ever had your driver's
16      license suspended?
17  A. Yes.
18  Q. All right. When was that?
19  A. I had an administered suspension approximately
20      2003.
21  Q. And why was it suspended then?
22  A. For -- it was an administrative suspension for
23      refusing to take a breathalyzer.
24  Q. And how long was it suspended?
25  A. I don't recall at this time.

4 (Pages 10 - 13)

Genevieve McDonald                                     September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 14

1   Q.  All right.  Any other driver's license
2       suspensions?
3   A.  No.
4   Q.  All right.  Are you currently employed?
5   A.  Yes.
6   Q.  And what is your job?
7   A.  I'm Senior Policy Advisor for Preti
8       Strategies.
9   Q.  And how long have you been with Preti
10      Strategies?
11  A.  Between two and three years.
12  Q.  How many hours a week do you presently work?
13  A.  Forty-plus.
14  Q.  And where is Preti Strategies located?
15  A.  We have offices located in Portland, Boston,
16      Augusta, and Concord, New Hampshire.
17  Q.  What one do you work out of?
18  A.  Portland and Augusta.
19  Q.  How far of a drive is that for you to get to
20      Augusta?
21  A.  Two-and-a-half hours.
22  Q.  What about Portland?
23  A.  Three hours; three hours and 15 minutes.
24  Q.  And how often do you go into the office?
25  A.  Very intermittently.  I mostly work remotely.

Page 15

1   Q.  All right.  So before you became a Senior
2       Policy Advisor at Preti Strategies, what did
3       you do for employment?
4   A.  I'm a former member of the Maine House of
5       Representatives.
6   Q.  And how long were you a representative?
7   A.  Two terms, four years.
8   Q.  And what years were those?
9   A.  Don't recall at this time, which is
10      embarrassing because I should.
11  Q.  All right.  So if you've been with Preti for
12      two to three years, were you in the Maine
13      House of Representatives in 2021?
14  A.  I was elected in 2018.  I left in 2022.  My
15      apologies.
16  Q.  And the Maine House of Representatives, where
17      is that located?
18  A.  Augusta, Maine.
19  Q.  And when the legislature was in session, were
20      you there every day?
21  A.  No.
22  Q.  How often did you go in?
23  A.  It varied depending on what the schedule was.
24      At least twice a week for part of the year.
25  Q.  When is the legislature in session?

Page 16

1   A.  The first session of the Maine Legislature
2       runs from January to June.  The second
3       session, or second year, of the Maine
4       Legislature runs from January to April.
5   Q.  Can you explain that?
6   A.  Sure.  Our legislature is only in session in
7       meeting in the State House during those
8       months.
9   Q.  Okay.
10  A.  We do not meet.
11  Q.  So you don't meet from July to December?
12  A.  Correct.
13  Q.  Okay.  Were you on any committees when you
14      were a representative?
15  A.  Yes.
16  Q.  What committees were you on?
17  A.  I served on the Marine Resources Committee.  I
18      also served as the House Chair of the
19      Government Oversight Committee.
20  Q.  All right.  You said you left in 2022.  Why
21      did you leave?
22  A.  Because I could not afford to remain in
23      office.  Legislative salary is approximately
24      $14,000 a year.
25  Q.  And while you were serving as a

Page 17

1       representative, did you have any other jobs?
2   A.  I did.
3   Q.  And what were those?
4   A.  During the time I was elected and previously,
5       I was a commercial lobster boat captain.
6   Q.  And is that a year-round job?
7   A.  No.  Well, it depends.  No, not as a captain.
8       Some years I was a sternman for a boat that
9       works offshore, so I was crew.  So the
10      industry is year-round; however, my position
11      was not always year-round.
12  Q.  Okay.  When you were serving as captain, what
13      months did you work?
14  A.  Approximately, May to the end of October or
15      the end of November depending on weather.
16  Q.  And when you are a sternman, what months would
17      that be?
18  A.  The months in-between.  So November to the
19      following spring to whatever point I decided
20      to put my own boat in the water.
21  Q.  Okay.  So while you were serving in the House
22      of Representatives from January to June, then
23      and when the legislature was not in session,
24      you were a lobster boat captain?
25  A.  Yes.

5 (Pages 14 - 17)

Genevieve McDonald                                      September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 18

1  Q. Were you also a lobster boat captain when the
2     legislature was in session?
3  A. Very limited.
4  Q. Okay.
5  A. Once you're a captain, you're never not a
6     captain.
7  Q. Okay.  All right.  So before you were in the
8     Maine House of representatives, what was your
9     occupation?
10 A. Commercial lobster boat captain.
11 Q. How long have you been doing that?
12 A. Approximately 15 to 20 years.
13 Q. And was that your only employment at the time?
14 A. It was not.
15 Q. What else did you do?
16 A. I supplemented my income by working as a
17    substitute teacher.  I have also held a few
18    different short-term retail jobs over time.
19 Q. Had you ever worked as a rideshare driver?
20 A. No.
21 Q. I'm going to ask you a series of questions
22    about your work history and they may seem
23    random.  Please just bear with me.
24 A. Okay.
25 Q. Since high school, have you been employed by

Page 19

1     any insurance company?
2  A. No.
3  Q. Have you been employed by any other
4     insurance-related company?
5  A. No.
6  Q. Have you been employed by a car dealer?
7  A. No.
8  Q. Have you been employed by a car repair shop?
9  A. Somewhat.  I worked at Downeast -- oh, sorry.
10    Island Fish & Gear in my capacity of working
11    around the fishing industry; however, Island
12    Fish & Gear is also a NAPA Auto Parts dealer.
13 Q. While working for Island Fish & Gear, did you
14    gain knowledge of auto parts?
15 A. Yes.
16 Q. Okay.  Do you have any work experience that
17    involves determining the values of used cars?
18       (The reporter interjected.)
19 A. No.
20    BY MS. WHITE:
21 Q. Have you ever worked for a company that
22    provides auto valuations?
23 A. No.
24 Q. Have you ever worked for a car rental company?
25 A. No.

Page 20

1  Q. Have you worked for a Department of Motor
2     Vehicles for any state?
3  A. No.
4  Q. Have ever worked for an automobile
5     manufacturer?
6  A. No.
7  Q. Do you have any work experience with data
8     aggregation software?
9  A. No.
10 Q. Do you have any formal legal training?
11 A. No.
12 Q. Okay.  I'm done with that series.
13       All right.  And you said you've never
14    been deposed before, right?
15 A. Correct.
16 Q. Okay.  Have you ever testified in court
17    before?
18 A. Yes.
19 Q. When was that?
20 A. I participated in Family Court as a child
21    during my parents' divorce many years ago.
22 Q. Okay.  Other than testifying in Family Court,
23    have you testified in court other than that?
24 A. No.
25 Q. Have you ever been a party to another lawsuit?

Page 21

1  A. No.
2  Q. Have you ever owned a business that was a
3     plaintiff or defendant in a lawsuit?
4  A. No.
5  Q. All right.  Other than Family Court when you
6     were little, have you ever testified under
7     oath?
8  A. No.
9  Q. Have you been convicted of any crimes?
10       MR. ROOF:  Objection.
11       Just for the past ten years.  You can go
12    ahead.
13       Did you answer?
14    BY MS. WHITE:
15 Q. Have you been convicted of any crimes?
16       MR. ROOF:  Past ten years.
17    BY MS. WHITE:
18 Q. At all.
19 A. Yes.
20 Q. Okay.
21 A. And I can't recall if it was more or less than
22    ten years ago.  I have been convicted of
23    leaving the scene of an accident.
24 Q. All right.  And can you tell me the
25    circumstances surrounding that conviction?

6 (Pages 18 - 21)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 22

1   A. Yes.  I was in an accident.  I left the scene.
2      I did report it myself, but it was two or
3      three hours later.
4   Q. Okay.  And what was the punishment for that
5      conviction?
6         MR. ROOF:  Objection.
7   A. I don't recall at this time.  I believe it may
8      have been a fine.
9   BY MS. WHITE:
10  Q. Okay.  And were you driving at the time of
11     this accident?
12  A. Yes.
13  Q. What were you driving?
14  A. It was my boss's truck.  I cannot remember the
15     make, model, or year.
16  Q. Were any other vehicles involved?
17  A. No.
18  Q. All right.  Have you been convicted of any
19     other crimes?
20  A. No.
21        MR. ROOF:  Objection to that.  For ten
22     years.
23        MS. WHITE:  You can object, but she still
24     has to answer.
25        MR. ROOF:  That's fine.  I just want it

Page 23

1      for the record.  That's fine.
2   A. A correction, though.  I do have that OUI that
3      I referenced earlier.
4   BY MS. WHITE:
5   Q. Okay.  And that was in 2000 or 2001, right?
6   A. Yes, it was a very long time ago.
7   Q. And did you serve any time in jail for that?
8   A. No.
9   Q. All right.  So other than the leaving the
10     scene of the accident and the operating under
11     the influence, have you been convicted of any
12     other crimes?
13  A. No.
14  Q. Have you ever filed for bankruptcy?
15  A. No.
16  Q. What did you do to prepare for your deposition
17     today?
18  A. I met with my attorneys.  We shared email
19     communication.  We had a phone call.
20  Q. Okay.  When you say you met with your
21     attorneys, when was that?
22  A. Yesterday.
23  Q. And who was present?
24  A. Mr. Roof and Mr. Steed.
25  Q. Anybody else?

Page 24

1   A. No.
2   Q. And you said there was a phone call.  When was
3      that?
4   A. I don't recall at this time.
5   Q. Was it last week; was it a month ago?
6   A. It was approximately a month ago.
7   Q. And who was on that phone call?
8   A. Mr. Roof, Mr. Steed; and I don't recall who
9      else was there.  I couldn't see the
10     participants, although I'm sure -- certain
11     they identified themselves.
12  Q. The other person on this phone call, do you
13     recall whether it was someone employed by one
14     of your attorneys.
15  A. Yes, it was counsel.
16  Q. How many times had you met your lawyers before
17     today's deposition?
18        MR. ROOF:  Objection.
19  A. Mr. Steed and I live in the same community, so
20     we have met numerous times.  This is the first
21     time that I have met Mr. Roof in person.
22  BY MS. WHITE:
23  Q. Okay.  Did your lawyers give you any documents
24     to look at to get ready for your deposition?
25  A. Yes.

Page 25

1   Q. Do you know if the documents you looked at
2      were produced in this litigation?
3   A. Yes.
4   Q. Did you look at any documents that had not
5      been produced in this litigation?
6   A. No.
7   Q. Has anyone other than your lawyers given you
8      advice on what to say or not to say today?
9   A. No.
10  Q. Did you talk to Kate Bridges about this
11     deposition?
12  A. Briefly.
13  Q. And what did you talk about?
14  A. Oh, correction.  Not about this definition --
15     or deposition, sorry.
16  Q. Okay.  But you knew Kate Bridges prior to this
17     case?
18  A. I do, yes.
19  Q. How do you know her?
20  A. We live in neighboring communities.
21  Q. And have you discussed this case with Ms.
22     Bridges?
23  A. Very briefly in the documentation that I
24     provided, which was approximately five
25     sentences shared via social media.

7 (Pages 22 - 25)

Genevieve McDonald                                                          September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 26

1  Q. Okay. Let's look at that.
2      (Deposition Exhibit Number 1 was
3      referenced for identification.)
4  BY MS. WHITE:
5  Q. I'm showing you a document marked Exhibit 1.
6      Do you recognize this document?
7  A. I do, yes.
8      MR. ROOF: Just the objection that this
9  is not the full document that was produced.
10     MS. WHITE: I believe it was. Were there
11  additional pages?
12     MR. ROOF: Yes.
13     MS. WHITE: Oh, let me look. I only have
14  the one-page document. Are you referring to
15  Ms. McDonald's entire production produced as a
16  giant PDF?
17     MR. ROOF: No. Well, it's in -- in
18  there.
19     THE DEPONENT: Pardon me. But while you
20  debate this, I'm going to step out very
21  briefly. I need to use the restroom.
22     THE VIDEOGRAPHER: And we are now going
23  off the record. The time is 10:42, end of
24  Media 1.
25     (A recess was taken.)

Page 27

1      THE VIDEOGRAPHER: All right. This is
2  the -- going back on the record -- this is the
3  beginning of Media 2, and the time is 10:44
4  a.m.
5      MS. WHITE: Okay. Before we went off the
6  record, Mr. Roof had objected to this document
7  as being incomplete. We went off the record
8  and I believe we resolved that issue to the
9  document.
10     MR. ROOF: Correct.
11     MS. WHITE: Okay. Thank you.
12  BY MS. WHITE:
13  Q. Have you seen this document before?
14  A. Yes.
15  Q. And what is it?
16  A. It is a private message I received from Kate
17     Bridges.
18  Q. Okay. And do you see at the top there's a big
19     black box?
20  A. Yes.
21  Q. What was redacted from that?
22     MR. ROOF: Objection. Instruct you not
23  to --
24  A. I did not do --
25     (The reporter interjected.)

Page 28

1      MR. ROOF: Repeat the question again,
2  please.
3  BY MS. WHITE:
4  Q. What was redacted?
5      MR. ROOF: Yeah, objection. You can go
6  ahead and answer, if you recall.
7  A. I did not do the redaction.
8      BY MS. WHITE:
9  Q. Do you recall what those messages were about?
10  A. Yes. I produced this document and I shared
11     the complete picture so that all could see
12     that the previous and post conversation to
13     this comment were not pertinent to the case.
14  Q. Okay. What were they about?
15  A. Rabbits.
16  Q. Okay. You mentioned that you had produced a
17     document showing communications with Ms.
18     Bridges and they were about five sentences.
19      Are there some additional sentences that
20     have been redacted that relate to this case?
21  A. No.
22  Q. Okay. You can set that aside.
23      All right. Have you ever spoken with the
24     Thurstons about this case?
25  A. No.

Page 29

1  Q. Do you know Matthew Thurston?
2  A. I do.
3  Q. How do you know him?
4  A. He lives in a neighboring community. We are
5     in Maine. I know everyone.
6  Q. Yeah. I was just about to ask that.
7  A. I was in office twice.
8  Q. Everybody lives near you. Okay.
9      Do you know Mr. Thurston's parents?
10  A. I do not.
11  Q. And have you spoken with Mr. Thurston about
12     your deposition?
13  A. No.
14  Q. Have you spoken with Mr. Thurston or his wife
15     about the case more generally?
16  A. No.
17  Q. Okay. Other than the people I've specifically
18     asked you about, have you spoken with anybody
19     else about this deposition?
20  A. No.
21  Q. When did you decide to join this lawsuit?
22  A. I don't recall at this time.
23  Q. Was it a year ago; was it two years ago?
24  A. Approximately a year ago.
25  Q. And what prompted you to join this lawsuit?

8 (Pages 26 - 29)

Genevieve McDonald                                          September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 30

1   A. Mr. Steed posted on social media.
2   Q. And what did he post?
3   A. If anybody had had a vehicle that was totaled
4      while they had Progressive as their insurance
5      company.
6   Q. And did you respond to that post?
7   A. Yes.
8   Q. What did you say?
9   A. I had had -- I met the criteria. Like, it's
10     not a verbatim response.
11  Q. And what happened after that?
12  A. He contacted me.
13  Q. And what did Mr. Steed tell you about why he
14     was looking for people who had Progressive
15     Insurance?
16        MR. ROOF: Objection. Instruct you not
17  to answer. Attorney/client privilege.
18        MS. WHITE: Is this before she retained
19  him as an attorney?
20        MR. ROOF: No. Once you start
21  communicating with the attorney, the
22  attorney/client relationship begins; and you
23  could still have attorney/client relationship
24  even before you sign an engagement letter.
25        MS. WHITE: Well, she responded to his

Page 31

1      Facebook post and said I meet the criteria.
2      BY MS. WHITE:
3   Q. At what point did you understand that there
4      was a legal case involved?
5   A. Soon thereafter.
6   Q. Okay. So Mr. Steed contacted you and that's
7      when you first learned that there was a
8      lawsuit?
9   A. Yes.
10  Q. What was your goal when you hired Mr. Steed?
11        MR. ROOF: Objection. Form.
12        BY MS. WHITE:
13  Q. What was your goal in joining this litigation;
14     what do you have to gain?
15        MR. ROOF: Objection. Form.
16        BY MS. WHITE:
17  Q. You can still answer.
18        MR. ROOF: Yeah, you can still answer.
19  A. Thank you for the clarification.
20        To represent my interests and also
21     similarly-situated class members.
22  Q. Before you saw Mr. Steed's Facebook post, did
23     you have any concerns about your total loss
24     claim with UFCC?
25  A. I don't remember at this time.

Page 32

1   Q. When did you decide to hire Mr. Steed?
2   A. When I met the criteria of his search.
3   Q. So the very first time that he contacted you
4      after you responded to his Facebook post?
5   A. Yes.
6   Q. Okay. And you said that you knew Mr. Steed
7      beforehand because he was a member of your
8      community. More specifically than that, when
9      did you first meet Mr. Steed?
10  A. Oh, twenty years ago.
11  Q. And have you ever worked with Mr. Steed on any
12     other matters?
13  A. Yes.
14  Q. What were those?
15  A. My -- I purchased my home through a
16     rent-to-own agreement and he drafted the
17     contract.
18  Q. Okay. Anything else?
19  A. No.
20  Q. In your own words, why are you suing UFCC in
21     this case?
22  A. Because I received an unfair settlement based
23     on a flawed formula.
24  Q. Okay. And what is the flaw in that formula?
25  A. Use of the projected sold adjustments.

Page 33

1   Q. And what about that is flawed?
2   A. It assumes consumer behavior that was not true
3      for me and, in likelihood, is not true for
4      many other people.
5   Q. Do you think the projected sold adjustment is
6      okay to use for consumers who do negotiate on
7      these vehicles?
8        MR. ROOF: Objection. Form.
9   A. I don't know at this time.
10        BY MS. WHITE:
11  Q. You say assumes consumer behavior. What
12     consumer behavior are you referring to?
13  A. It assumes the consumers negotiate the price
14     of their vehicle when they purchase the
15     vehicle.
16  Q. And you say that wasn't true for you, that you
17     don't negotiate price when you purchase a
18     vehicle?
19  A. Correct.
20  Q. Okay. Why are you suing Progressive Casualty
21     in this case?
22  A. Because Progressive was my insurance company
23     at the time I experienced a total loss.
24  Q. Do you understand that UFCC is the entity you
25     had insurance with?

9 (Pages 30 - 33)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 34

1  A. No.
2  Q. Okay. What makes you believe that Progressive
3     Casualty was your insurer?
4  A. Because I purchased my insurance through
5     Progressive. The website is labeled
6     Progressive. Everyone I worked with, to my
7     recollection, identified themselves as
8     representing Progressive.
9  Q. Do you believe that your insurance policy was
10    with Progressive Casualty Insurance Company?
11 A. I believed my insurance policy was with
12    Progressive.
13 Q. Do you know what legal claims you're asserting
14    in this case?
15       MR. ROOF: Objection. Form.
16    BY MS. WHITE:
17 Q. What legal claims are you asserting in this
18    case?
19 A. I have reviewed --
20       MR. ROOF: Objection. Form.
21 A. -- I have reviewed the complaint. I wouldn't
22    dare try to list them off without the
23    documentation in front of me. I do not want
24    to take a guess at the language under oath.
25    BY MS. WHITE:

Page 35

1  Q. What exactly are you claiming that
2     Progressive, or UFCC, did wrong that violated
3     the law?
4  A. That their use of the projected sold
5     adjustments resulted in a reduced settlement.
6     I do know not where that falls within statute.
7  Q. Are you claiming that Progressive, or UFCC,
8     breached your insurance policy?
9        MR. ROOF: Objection to form. Calls for
10    a legal conclusion.
11 A. I will defer to my own attorney.
12    BY MS. WHITE:
13 Q. Okay. So you're not -- do you not know
14    whether you have a claim that UFCC breached
15    your insurance policy?
16 A. So I don't know if was it UFCC because it is
17    my understanding that my insurance policy was
18    with Progressive.
19 Q. Okay.
20 A. I'm not going to guess at the --
21 Q. Understood. Do you have a claim that your
22    insurance company breached the insurance
23    policy?
24 A. Yes, that is my understanding.
25 Q. And aside from that, you don't know what your

Page 36

1     other claims are?
2  A. I would not dare to try to list off the legal
3     language without being able to review the
4     documents.
5  Q. Okay. We'll get to that later.
6  A. Thank you.
7  Q. What relief are you seeking from this lawsuit?
8  A. Fair settlement for the value of my vehicle,
9     that it was a total loss. Fair compensation.
10 Q. And what amount would have been a fair
11    settlement for your total loss?
12 A. I do not --
13       MR. ROOF: Objection.
14 A. -- I do not know. I am not -- a valuator of
15    value of vehicles is not within my area of
16    expertise.
17    BY MS. WHITE:
18 Q. Okay. Are you aware that the complaint named
19    both Progressive Casualty Insurance Company
20    and UFCC?
21 A. Yes.
22 Q. Are you seeking different relief from each
23    entity?
24 A. I defer --
25       MR. ROOF: Objection.

Page 37

1  A. -- I defer to my attorney.
2     BY MS. WHITE:
3  Q. Do you recall when you first signed up for
4     insurance with Progressive?
5  A. I do not. It was many years ago.
6  Q. All right. As I understand it, Progressive's
7     records suggest that you had a policy from
8     2011 until 2020.
9        Does that sound right?
10 A. It does.
11 Q. Okay. Do you recall why you decided to leave
12    Progressive in 2020?
13 A. Yes.
14 Q. Why?
15 A. I switched to a competitor with a lower rate.
16 Q. And what company did you go to?
17 A. GEICO.
18 Q. All right. And then you switched back to
19    Progressive in 2022; is that right?
20 A. Yes.
21 Q. Why did you switch back?
22 A. Progressive has better customer service and is
23    responsive -- more responsive in a timely
24    fashion to claims.
25 Q. So did you have a claim with GEICO and you

10 (Pages 34 - 37)

Genevieve McDonald                                          September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 38

1    were unsatisfied with the customer service?
2    A. Yes.
3        MR. ROOF: Objection.
4    A. Yes.
5        BY MS. WHITE:
6    Q. I will write that down.
7        Did you have a claim with GEICO?
8    A. Yes.
9    Q. Were you satisfied with their customer
10       service?
11   A. No.
12   Q. What was wrong with GEICO's customer service?
13   A. They were slow to respond.
14   Q. Did GEICO pay your claim?
15   A. Yes.
16   Q. What kind of claim was it?
17   A. Total loss vehicle.
18   Q. And how did GEICO value your total loss?
19   A. I do not know at this time.
20   Q. Did GEICO give you a valuation report?
21   A. I do not know at this time.
22   Q. So you don't know whether GEICO applied a
23       projected sold adjustment?
24   A. I don't know at this time.
25       (The reporter interjected.)

Page 39

1        BY MS. WHITE:
2    Q. All right. Have you filed a lawsuit against
3        GEICO related to the valuation of your total
4        loss?
5    A. No.
6    Q. Why not?
7    A. They paid the complete value of my vehicle.
8        There may have even been additional funds in
9        the settlement.
10   Q. What do you mean by there may have been
11       additional funds?
12   A. I don't recall if we received additional funds
13       beyond the payoff for the vehicle. It is a
14       possibility.
15   Q. When you said they paid the complete value,
16       what does that mean to you?
17   A. We no longer owed any money to the lienholder.
18       It should be noted that I was not the driver
19       or with the vehicle, to my knowledge, this
20       particular claim is limited. It was my
21       husband.
22   Q. Okay. Okay. So it's your view that GEICO
23       paid the complete value for that total loss
24       because they paid off the loan on the vehicle?
25   A. That is my understanding.

Page 40

1    Q. Okay. And is it your view that Progressive
2        underpaid your total lost claim because it did
3        not pay off the loan on your vehicle?
4        MR. ROOF: Objection.
5    A. No. But can you also repeat the question.
6        BY MS. WHITE:
7    Q. Yeah, I'll get back in. I think it was -- it
8        was compound, anyways.
9        Is it your view that Progressive didn't
10       pay enough on your total lost claim because
11       the payment didn't pay off your loan?
12   A. No.
13       MR. ROOF: Objection.
14       BY MS. WHITE:
15   Q. But it's your view that GEICO paid the
16       complete value of that total loss because it
17       paid off the loan?
18   A. I have not investigated the GEICO claim. I
19       didn't look into it. I didn't review the
20       documentation. I have limited knowledge of
21       it. I don't have an opinion of the GEICO
22       claim, frankly, and, certainly, not in
23       comparison to Progressive. These are two very
24       separate issues in my mind.
25       I was not involved in one of these

Page 41

1    claims. I am just reporting as a fact that in
2    that particular settlement it paid off the
3    total owed on the vehicle.
4        They were also very different years. One
5    of these events occurred more recently than
6    the other and so the market conditions have
7    changed.
8    Q. Okay.
9    A. I don't know what type of valuation GEICO
10   uses.
11   Q. Okay. All right. And you're still insured
12       with Progressive today, right?
13   A. Yes. I don't believe that you have to leave a
14       company to encourage them to adopt better
15       business practices.
16   Q. Don't worry. I'm not criticizing you for
17       staying.
18       All right. The lost vehicle that's at
19       issue in this case is the 2009 Volkswagon
20       Passat. Is that correct?
21   A. Correct.
22   Q. Is that okay if I just refer to that car as
23       the Passat for the rest of the deposition?
24   A. I would prefer the Volkswagon because that's
25       how I always refer to it.

11 (Pages 38 - 41)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 42

1   Q. Okay. I will try to do that.
2   A. I will be able to identify it either way, so
3       whichever works for you.
4   Q. All right. So the Volkswagon was totaled
5       under your first policy with Progressive.
6       Right?
7   A. I don't know if that was my first policy ever.
8   Q. Okay.
9   A. But it was totalled while under a Progressive
10      policy.
11  Q. Okay. So when I say first policy, I'm
12      picturing the policy that you just started in
13      2022; and then there was a prior time with
14      Progressive from 2011 to 2020.
15  A. Understood, so yes.
16  Q. Okay. Do you recall when you purchased the
17      Volkswagon?
18  A. It was, I believe, 2013.
19  Q. And where did you purchase it?
20  A. Darling's in Ellsworth, Maine.
21  Q. Is that Darling's Auto Mall?
22  A. Yes, I believe so.
23  Q. And was it used?
24  A. Yes.
25  Q. Who purchased the Volkswagon?

Page 43

1   A. I purchased it. My husband was a co-signer.
2   Q. All right. Was your husband present when it
3       was purchased?
4   A. He was not present. He came in after and
5       signed the paperwork, like, with every vehicle
6       we have ever purchased.
7   Q. So you go to the dealership and decide on the
8       car that you want and discuss the details and
9       he comes later and signs the paperwork?
10  A. Yeah.
11      MR. ROOF: Objection.
12  BY MS. WHITE:
13  Q. So the Volkswagon was in both you and your
14      husband's name?
15  A. Yes.
16  Q. It was financed, right?
17  A. Yes.
18  Q. And both of your names are on the loan?
19  A. Yes, I believe so.
20  Q. Okay. The Volkswagon, who primarily drove
21      that vehicle?
22  A. Me.
23  Q. Did anyone else ever drive it?
24  A. My husband.
25  Q. How often?

Page 44

1   A. Barely.
2       (Deposition Exhibit Number 2 was
3       referenced for identification.)
4   BY MS. WHITE:
5   Q. All right. I'm showing you a document that's
6       been marked as Exhibit 2.
7       Have you seen this document before?
8   A. Yes.
9   Q. And what is it?
10  A. It appears to be the policy at the time I
11      owned the Volkswagon.
12  Q. Okay. In the upper left corner, it has your
13      name and your former address. Right?
14  A. Correct.
15  Q. Okay. And in the upper right corner, right
16      underneath the policy number, it says:
17      Underwritten by United Financial Casualty
18      Company.
19      Do you see that?
20  A. Yes.
21  Q. Do you understand that to mean that your
22      specific underwriter was United Financial
23      Casualty Company?
24      MR. ROOF: Objection. I did not know
25      what an underwriter is.

Page 45

1   BY MS. WHITE:
2   Q. Okay. Do you see where it says, policy period
3       January 24th, 2019 through July 24th, 2019?
4   A. Yes.
5   Q. And that's the period of time that you had the
6       total loss; is that correct?
7   A. Yes.
8   Q. All right. If you look just below that on the
9       page where it says, outline of coverage.
10      All right. It shows policy coverage
11      selections for the 2009 Volkswagon.
12      Do you see where it says comprehensive,
13      and just to the right of that it says actual
14      cash value and then $500 deductible?
15  A. Yes.
16  Q. What does the term actual cash value mean to
17      you?
18      MR. ROOF: Objection.
19  A. I don't know at this time.
20  BY MS. WHITE:
21  Q. So what did you understand your coverage with
22      Progressive would be?
23  A. Full coverage that would cover the loss of my
24      vehicle. That would not just cover -- if I
25      were to get into an accident, it wouldn't just

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 46

1    cover damage to the other vehicle if there
2    were one; but it would also cover damage to
3    mine.  Otherwise, known as full coverage
4    insurance which I needed for my financier.
5    Q.  Okay.  And did you understand from your
6       declarations page that if you were in an
7       accident, that after you paid the first $500
8       that Progressive would pay for the rest of the
9       damage?
10   A.  That is my understanding of what a deductible
11      is.
12   Q.  Okay.  All right.  If you look at the next
13      page, there's another vehicle listed there, a
14      2008 Toyota Tundra.
15         Whose vehicle was that?
16   A.  It would have been co-owned by my husband and
17      I; but he was the primary driver of that
18      vehicle.
19   Q.  All right.  I understand that on or about
20      February 28th, 2019, you were in a car
21      accident in the Volkswagon.  Right?
22   A.  Yes.
23   Q.  Can you explain to me what happened?
24   A.  I hit another vehicle in a parking lot.
25   Q.  What parking lot?

Page 47

1    A.  Hannaford, I believe, in Rockland, Maine.
2    Q.  And was anybody in the car with you?
3    A.  No.
4          Are we done with this document?
5    Q.  You can set it aside for now.
6          How many people were in the other
7       vehicle?
8    A.  I don't remember at this time.
9    Q.  Was anyone hurt in the accident?
10   A.  Not that I'm aware of.
11   Q.  Okay.  What was the damage to your vehicle?
12   A.  I don't recall the exact nature of the damage,
13      but it was to the front end.
14   Q.  Were you given a citation for that accident?
15   A.  No.
16   Q.  Were you found to be at fault?
17   A.  Yes.
18   Q.  Were you able to drive away from the accident?
19   A.  Maybe, but I didn't try.  I had it towed.
20   Q.  All right.  And you called Progressive the
21      next day to file a claim.  Correct?
22   A.  I don't remember at this time; but that sounds
23      like it could be accurate.
24   Q.  Okay.  After you reported the claim, did
25      Progressive or UFCC inspect the vehicle?

Page 48

1    A.  I don't know at this time.
2    Q.  So if they did, you weren't there?
3    A.  Correct.  It was towed away.
4    Q.  Okay.
5    A.  I did go collect my things out of it; but
6       beyond that, no one had no additional
7       interactions with the vehicle.
8    Q.  Where was it towed to?
9    A.  I don't know.  It was not -- not a local
10      community.  I'm not sure.
11   Q.  Okay.  Did you ever talk to a Progressive
12      employee about the inspection of your vehicle?
13   A.  I don't know.  I don't recall at this time.
14   Q.  Do you recall that UFCC determined your
15      Volkswagon was a total loss?
16   A.  I don't --
17         MR. ROOF:  Objection.  Form.
18   A.  I don't recall the nature of our
19      communications; but I do know at some point it
20      was determined it was a total loss.
21      BY MS. WHITE:
22   Q.  And what does total loss mean to you?
23   A.  That it cannot be -- that the vehicle was
24      deemed to be too damaged to be repaired.
25   Q.  Do you disagree with UFCC's determination that

Page 49

1    the Volkswagon was a total loss?
2    A.  I have no expertise in evaluating damage to
3       vehicles.
4    Q.  So you were fine with Progressive's decision
5       to total the vehicle?
6    A.  Yes.
7    Q.  Okay.  Do you know whether the Volkswagon was
8       close to being reparable?
9    A.  I do not.
10         MR. ROOF:  Objection.
11   A.  At this time.
12      BY MS. WHITE:
13   Q.  Did you ask UFCC to total the Volkswagon?
14   A.  No.  Not to my knowledge, and not to my
15      recollection at this time.
16   Q.  Did UFCC ever talk to you about retaining
17      salvage?
18   A.  I, at no point, was under the impression that
19      I was talking to UFCC.  I don't recollect the
20      details of any of our communication.  This was
21      a pandemic and two kids ago.
22   Q.  Okay.  But this accident took place in 2019,
23      correct?
24   A.  Correct.  I have six-year-old twin daughters,
25      a job in corporate America, have served in

13 (Pages 46 - 49)

Genevieve McDonald                                                   September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 50

1  office through a global pandemic since. My
2  details about an accident that happened in
3  2019 are very sparse. I do not have the
4  capacity to think, remember, or work on
5  something that happened that long ago. My
6  apologizes. The mental capacity, I should
7  say.
8  Q. Okay. I'm going to rephrase my questions as
9  Progressive because that's how you understand
10  your insurer to be Progressive.
11  A. Thank you.
12  Q. For the record, your insurance company was not
13  Progressive; it was UFCC, but I will call them
14  Progressive to make this easier.
15  A. Thank you.
16  MR. ROOF: Objection to that statement.
17  MS. WHITE: The declarations page clearly
18  shows the insurer is UFCC; and if I keep
19  saying UFCC, she's going to get confused. So
20  I'm just, for ease of reference, I'm going to
21  call them Progressive.
22  MR. ROOF: I'm fine with that. I'm just
23  objecting to your statement.
24  BY MS. WHITE:
25  Q. All right. So do you recall whether

Page 51

1  Progressive ever talked to you about retaining
2  salvage?
3  A. I do not recall at this time.
4  Q. Were you satisfied with the way Progressive
5  handled your claim?
6  MR. ROOF: Objection.
7  A. I do not remember at this time.
8  BY MS. WHITE:
9  Q. Do you remember challenging Progressive's
10  valuation of your Volkswagon?
11  A. I do not.
12  Q. Did you ever express any concerns to
13  Progressive about the claim process?
14  A. I don't remember at this time.
15  Q. How did Progressive make a settlement offer to
16  you?
17  A. I don't remember at this time.
18  Q. You don't remember whether it was an email or
19  a phone call?
20  A. I do not, unfortunately, remember at this
21  time.
22  Q. Do you recall whether you immediately accepted
23  the settlement offer?
24  A. I do not remember at this time. I believe I
25  did accept whatever they offered.

Page 52

1  Q. Did you ask for more information about how
2  Progressive came out with their settlement
3  amount?
4  A. I don't remember at this time, but I doubt it.
5  Q. Did you understand at the time that by
6  accepting payment from Progressive for the
7  total loss, the claim was closed and settled?
8  MR. ROOF: Objection.
9  A. Yes. I understand that once you have received
10  payment that you no longer have a vehicle, so
11  it makes sense that it would be closed.
12  BY MS. WHITE:
13  Q. And you signed the title to the Volkswagon
14  over to Progressive, right?
15  A. I don't remember at this time.
16  Q. You said earlier the Volkswagon was financed,
17  correct?
18  A. Yes.
19  Q. And were you still making payments on the
20  Volkswagon when it was totaled?
21  A. Yes.
22  Q. Do you recall how much was left to pay off?
23  A. I do not recall the exact dollar figure at
24  this time.
25  Q. Were you up-to-date on your payments?

Page 53

1  A. I don't recall if I was up-to-date on my
2  payments at this time.
3  Q. So when Progressive issued the check to settle
4  the claim, was that sent to you or to your
5  lienholder?
6  A. I believe it was sent to the lienholder.
7  Q. And was your lienholder Chrysler Capital?
8  A. Yes.
9  (Deposition Exhibit Number 3 was
10  referenced for identification.)
11  BY MS. WHITE:
12  Q. All right. I am showing you a document that
13  has been marked as Exhibit 3.
14  Have you seen this document before?
15  A. I don't remember if I have seen this document
16  before this time.
17  MS. WHITE: Okay. I'll note, for the
18  record, this is a document that the defendants
19  produced. The Bates Number is
20  PGR_Thurston_0008234.
21  BY MS. WHITE:
22  Q. Do you see in the middle at the top of the
23  page where it says advice for payment?
24  A. Yes.
25  Q. Okay. And you see this address to Chrysler

14 (Pages 50 - 53)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 54

1    Capital?
2    A. Yes.
3    Q. And if you look down in the details section,
4       it has your name. It says, date of loss
5       February 28, 2019; and it identifies the 2009
6       Volkswagon Passat?
7    A. Yes.
8    Q. All right. Do you understand this to be the
9       check that Progressive issued to Chrysler
10      Capital for your total loss?
11          MR. ROOF: Objection. Foundation.
12   A. This doesn't appear to be a check; but, I
13      mean, I -- yeah, maybe. I don't know. Checks
14      come in check form.
15      BY MS. WHITE:
16   Q. Yes, a check stub.
17   A. Yes.
18   Q. Okay. Advice for payment. I'm trying to keep
19      it simple here.
20   A. Sorry. I don't know what advice for payment
21      means.
22   Q. Okay. That's why I was trying to call it a
23      check, but okay.
24          So is it your understanding that
25      Progressive paid Chrysler Capital $4,034.78

Page 55

1       for your total loss of your Volkswagon?
2    A. I don't remember the exact figure. I'm not
3       contesting that this is the amount that was
4       paid.
5    Q. Okay. Okay. No reason to doubt that this is
6       what Progressive paid?
7    A. There os no reason for me to doubt that.
8    Q. Okay. And then I just want to point your
9       attention where it says company. You see
10      where it says United Financial Casualty
11      Company?
12   A. I do.
13   Q. All right. And do you understand that to mean
14      the company that made this payment was United
15      Financial Casualty Company?
16          MR. ROOF: Objection. Foundation.
17   A. I understand that as of today. What would
18      have caught my eye where it says, in large
19      letters at the top, Progressive.
20      BY MS. WHITE:
21   Q. Are you familiar with the concept of a trade
22      name?
23   A. Yes, vaguely.
24   Q. Okay. Do you understand that United Financial
25      Casualty Company's trade name was Progressive?

Page 56

1          MR. ROOF: Objection.
2    A. I don't know how that differentiates the two
3       names. I don't understand the relationship
4       between the two names.
5       BY MS. WHITE:
6    Q. Okay. I'll keep calling it Progressive to
7       eliminate any confusion.
8          All right. Did you ever get a check from
9       Progressive for total loss of the Volkswagon?
10   A. I don't remember at this time. I do not
11      believe that I received any funds as a result
12      of this settlement.
13   Q. I'm showing you a document that's been marked
14      as Exhibit 4. Have you seen that document
15      before?
16          (Deposition Exhibit Number 4 was
17          referenced for identification.)
18   A. I don't believe I've seen this document before
19      and this document is in such small type that I
20      can't read it.
21      BY MS. WHITE:
22   Q. Do you wear glasses?
23   A. I do. I have contacts in; but they are not up
24      to my current prescription.
25   Q. Mm-hmm.

Page 57

1    A. This is font size 4. This is very, very tiny
2       type.
3    Q. Okay. Can you read the larger font at the top
4       that says settlement summary?
5    A. I can.
6    Q. Okay. Do you recall whether Progressive sent
7       you this settlement summary at the time that
8       you settled your claim?
9    A. I don't remember at this time.
10   Q. Okay. All right. Well, if you can't read it
11      we'll skip this one, and I think I may be able
12      to get the same information from a different
13      document.
14          (A discussion was held off the record.)
15          THE VIDEOGRAPHER: This is the end of
16      Media 2. We're going off the record. The
17      time 11:22. Stand by.
18          (A recess was taken.)
19          THE VIDEOGRAPHER: And this is the
20      beginning of Media 3. We are back on the
21      record. It is 11:36 a.m.
22      BY MS. WHITE:
23   Q. All right. So we were talking earlier about
24      your settlement from Progressive for the
25      Volkswagon; and you believe that the amount

15 (Pages 54 - 57)

Genevieve McDonald                                           September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 58

1    Progressive paid was too low, right?
2    A. Yes.
3    Q. And why do you think it was too low?
4    A. Because it utilized the projected sold
5       adjustment.
6    Q. How did Progressive calculate your settlement
7       amount?
8          MR. ROOF: Objection. Foundation.
9    A. I do not know at this time.
10      BY MS. WHITE:
11   Q. How do you think Progressive should have
12      determined your settlement amount?
13         MR. ROOF: Objection. Foundation. Form.
14   A. I do not know.
15      BY MS. WHITE:
16   Q. All right. I'm going to shift topics a little
17      bit and we'll come back later with a different
18      document to this specific settlement.
19         All right. Now, I want to talk about
20      your history with cars.
21         Do you recall when you started driving?
22   A. I do not recall. I was approximately 18.
23   Q. And have you been driving ever since other --
24      other than the gaps that we discussed earlier?
25   A. Yes.

Page 59

1    Q. All right. I'm going to talk about the cars
2       you've purchased in the last ten years. So
3       you recently responded to an interrogatory and
4       listed several vehicles.
5    A. Yes.
6    Q. Can we start with the GMC Acadia?
7    A. Yes.
8    Q. When did you buy that car?
9    A. I do not recall the exact date.
10   Q. Do you recall what months or year you bought
11      it?
12   A. I do not.
13   Q. It was pre Pandemic or post Pandemic?
14   A. I believe it was post Pandemic during the
15      Pandemic. It was in the last few years. It
16      was relatively recently.
17   Q. Okay. And who was the primary driver for the
18      Acadia?
19   A. I was.
20   Q. And were you and your husband both on the
21      title for that vehicle?
22   A. Yes, I believe so.
23   Q. Did you buy it new or used?
24   A. Used.
25   Q. Did you finance or pay with cash?

Page 60

1    A. Finance.
2    Q. Where did you buy it?
3    A. Varney's GMC in Bangor, Maine.
4    Q. Did you trade in another vehicle for the
5       Acadia?
6    A. I don't recall at this time. I do not believe
7       so.
8    Q. Had you ever purchased a vehicle from Varney's
9       before?
10   A. No.
11   Q. How did you find out about that car?
12   A. I went to the dealership and looked to see
13      what they had on the lot.
14   Q. And is Varney's close to where you live?
15   A. No.
16   Q. What made you go there?
17   A. So we only have two GMC dealers in my area.
18      One is Darling's. The other is Varney's GMC,
19      which had come recommended from a friend who
20      purchased a vehicle there. Bangor is
21      considered relatively close here in rural
22      Maine even though it's actually not.
23   Q. So did you know that you wanted a GMC?
24   A. Yes. I specifically wanted an GMC Acadia
25      because my sister owned one and enjoyed it.

Page 61

1    Q. Did you look online for any GMC Acadias in
2       your area?
3    A. I did not.
4    Q. Other than knowing that you wanted a GMC
5       Acadia, did you have any other parameters for
6       your car search?
7    A. No.
8    Q. Did you have you a budget?
9    A. I must have, yes.
10   Q. Do you recall what your budget was?
11   A. I do not.
12   Q. What was the advertised price for the Acadia?
13   A. I do not remember at this time.
14   Q. What did you pay for the Acadia?
15   A. I do not remember at this time.
16   Q. Did you do anything to determine whether you
17      were paying a fair price?
18   A. I did not. I -- vehicles were in great
19      shortage at this time and some lots, frankly,
20      didn't have vehicles at all. It was very,
21      very slim pickings on what was available for
22      used cars.
23   Q. So you found a GMC Acadia available and you
24      just purchased it without doing any research?
25   A. Yes.

16 (Pages 58 - 61)

Page 62

1      MR. ROOF: Objection.
2    BY MS. WHITE:
3    Q. And did you buy the Acadia the same day that
4      you first looked at it?
5    A. Yes. The completed -- it may have been
6      completed within days, because my husband
7      would have come up later to sign the
8      paperwork. So it may not have been that exact
9      day, but it was -- I would have made my
10     purchase agreement that day.
11   Q. Okay. And what happened to the Acadia?
12   A. I traded it in.
13   Q. And what did you trade it in for?
14   A. A 2019 GMC Yukon.
15   Q. Okay. And where did you buy the 2019 GMC
16     Yukon?
17   A. I don't recall the exact date. It was
18     approximately two years ago.
19   Q. Where did you buy it?
20   A. Varney's GMC.
21   Q. And the Yukon, is that the vehicle that you
22     primarily drive?
23   A. Yes.
24   Q. Were you the primary purchaser?
25   A. Yes.

Page 63

1    Q. And is your husband also listed on that
2      vehicle?
3    A. Yes.
4    Q. The Yukon was used, right?
5    A. Yes.
6    Q. Did you finance or pay cash?
7    A. Financed.
8    Q. And you traded in the Acadia --
9    A. Yes.
10   Q. -- towards the Yukon?
11   A. Yes.
12   Q. Did you work with the same salesperson at
13     Varney's that you did when you bought the
14     Acadia?
15   A. No.
16   Q. You work with somebody different?
17   A. Yes.
18   Q. How did you find out about the Yukon?
19   A. I went to the dealership and looked to see
20     what was on the lot.
21   Q. And did you browse online on their website to
22     see what inventory they had?
23   A. No.
24   Q. Did you look at any other dealerships for a
25     Yukon?

Page 64

1    A. No.
2    Q. Were you specifically in the market for a
3      Yukon?
4    A. Yes.
5    Q. Did you consider any other vehicles that were
6      similar?
7    A. No.
8    Q. Did you have any parameters around your search
9      when you bought the Yukon?
10   A. Yes.
11   Q. What were your parameters?
12   A. I wanted it be black and I wanted it to have
13     leather seats because of ice cream spills from
14     my kids. Easier to clean.
15   Q. Understood. Did you have a budget?
16   A. Yes, but it was more generous.
17   Q. And what was your budget?
18   A. I don't recall the exact number.
19   Q. What was the advertised price for the Yukon?
20   A. I don't remember at this time.
21   Q. And what was the purchase price for the Yukon?
22   A. I don't remember at this time. I do remember,
23     however, that I tried to negotiate with the
24     salesmen and he laughed at me. He said
25     whatever it was listed for I paid. Again,

Page 65

1      vehicles were in short supply. He told me he
2      would sell to the next person that walked onto
3      the lot.
4    Q. So this was around early 2022 or --
5    A. Yes, it may have been '21; '21 or '22. I do
6      not recall the exact purchase date.
7    Q. And what made you try to negotiate?
8    A. Because I felt like I ought to. I finally had
9      some buying power, which I did not have
10     previously. My income was a little better
11     than previous purchases; and I felt as though
12     I ought to try to negotiate, but was unable to
13     due to market conditions.
14   Q. Do you think if you had had the same buying
15     power back in 2013, you would have been able
16     to negotiate?
17       MR. ROOF: Objection.
18   A. If I had -- if I had the same buying power
19     back in 2013, I wouldn't have bought a 2019
20     Volkswagon or a 2009. I don't know.
21   BY MS. WHITE:
22   Q. All right. And did the salesperson at
23     Varney's tell you that they never negotiate?
24   A. They did not tell me that they never
25     negotiated. Never negotiate.

17 (Pages 62 - 65)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 66

1    Q. Do they tell you they just wouldn't negotiate
2       on that Yukon?
3    A. They told me they didn't have to negotiate in
4       the current market.
5    Q. Who is the salesperson you worked with?
6    A. I don't recall his name and I'm not going
7       remember it because I'm not going to use him
8       again.
9    Q. Did you have a bad experience?
10   A. He was just rude.
11   Q. All right. And the Yukon is the car that
12      you're currently driving, right?
13   A. Yes.
14   Q. When you went to Varney's and you found the
15      Yukon, did you buy it the same day?
16   A. I would have completed my portion of the
17      paperwork that day. My husband probably
18      completed it the next day.
19   Q. Okay.
20   A. So yes.
21   Q. And I apologize if I already asked this. How
22      much did you pay for the Yukon?
23   A. I don't remember at this time.
24   Q. All right. So right now you have the Yukon.
25      Before that you had the Acadia.

Page 67

1          What did you have before the Acadia?
2    A. I had a used Hyundai Santa Fe.
3    Q. Is that the 2007 Hyundai Santa Fe you listed
4       in your interrogatories?
5    A. I don't have it here, but yes. That sounds
6       accurate.
7    Q. Okay. All right. When did you buy the Santa
8       Fe?
9    A. I bought it March of 2013, I believe. I
10      bought it to the replace the Volkswagon.
11   Q. And where did you buy it?
12   A. From a backyard mechanic.
13   Q. And where is this backyard mechanic located?
14   A. Stonington, Maine.
15   Q. Did you pay cash for the Santa Fe?
16   A. Yes.
17   Q. How much did you pay?
18   A. I believe it was around $5,000.
19   Q. How did you find out about the Santa Fe?
20   A. It was next to the road with a For Sale sign
21      on it.
22   Q. Did you look at any dealerships for vehicles
23      when you were in the market for Santa Fe?
24   A. No.
25   Q. Did you shop online for vehicles?

Page 68

1    A. No.
2    Q. You stated the Santa Fe was just sitting next
3       to the road with a For Sale sign. Was there a
4       price on it?
5    A. I don't remember at this time.
6    Q. Did you do anything to determine whether you
7       were paying a fair price?
8         MR. ROOF: Objection.
9    A. No.
10        BY MS. WHITE:
11   Q. Did you ask for a CARFAX report?
12   A. No, I needed a vehicle immediately.
13   Q. So from the time that you saw the Santa Fe to
14      the time you purchased, was that the same day?
15   A. Yes.
16   Q. All right. So before the Santa Fe is when you
17      had the Volkswagon?
18   A. Yes.
19   Q. And you had driven the Volkswagon continuously
20      since 2013; is that right?
21   A. Yes, since the purchase date.
22   Q. Okay. You also listed in your interrogatory
23      responses a 2008 Toyota Tundra and a 2018
24      Dodge Ram.
25         Are those vehicles that you drove?

Page 69

1    A. They're my husband's vehicles, which I
2       occasionally drove, and was a cosigner of.
3    Q. Were you there when he bought those vehicles?
4    A. I bought those vehicles and he came up and
5       cosigned later.
6    Q. Okay.
7    A. There is a trend here; however, I was not the
8       primary driver.
9    Q. Okay. All right. Let's talk about the Toyota
10      Tundra.
11   A. Yes.
12   Q. When did you buy that car?
13   A. I don't recall the date. It was after the
14      Volkswagon.
15   Q. Okay. So at some point after 2013, but before
16      2019?
17   A. Yes.
18   Q. Okay. And where did you buy the Toyota
19      Tundra?
20   A. Darling's Auto Mall in Ellsworth, Maine.
21   Q. And did you buy that one from the same dealer
22      who sold you the Volkswagon?
23   A. Yes.
24   Q. Who was that dealer?
25   A. Darling's.

18 (Pages 66 - 69)

Genevieve McDonald                                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 70

1  Q. Did you buy from the same salesperson?
2  A. I don't recall. I believe so, but maybe.
3  Q. All right. I'm assuming that the Tundra was
4     used, right?
5  A. Yes.
6  Q. Was it financed or did you pay with cash?
7  A. It was financed.
8  Q. Did you trade in another vehicle for the
9     Tundra?
10 A. No, I don't believe so.
11 Q. How did you find out about the Tundra?
12 A. I went to the dealership and looked to see
13    what they had.
14 Q. And what were you looking for?
15 A. A Toyota Tundra.
16 Q. Were you considering any other types of
17    trucks?
18 A. I don't remember at this time.
19 Q. Did you have any parameters around what you
20    were looking for?
21 A. I don't remember at this time. I don't
22    believe so other than a truck. So yes. I
23    wanted it to be -- he -- he wanted it to be a
24    truck.
25 Q. Okay. All right. What was the advertised

Page 71

1     price for the Tundra?
2  A. I don't remember at this time.
3  Q. And what did you pay for the Tundra?
4  A. I don't remember at this time.
5  Q. Did you do anything to determine whether you
6     were paying a fair price?
7  A. No.
8        MR. ROOF: Objection.
9     BY MS. WHITE:
10 Q. And you said you went to the dealership and
11    saw the Tundra. Did you buy it the same day?
12 A. Yes. With the same -- I'm sure I signed my
13    paperwork first and then he signed within a
14    day.
15 Q. Okay. All right. What happened to the Toyota
16    Tundra?
17 A. I believe we traded it in.
18 Q. And what did you trade it in for?
19 A. A Dodge Ram.
20 Q. Is that the 2019 Dodge Ram?
21 A. No. The 2019 is what he's driving now. There
22    should be another vehicle listed. He's had
23    two Dodge Rams.
24 Q. Okay.
25 A. I think there was a -- I don't remember the

Page 72

1     exact year. It may have been a 2017, but
2     there was -- there are two Dodge rams.
3  Q. Were they different colors?
4  A. Yes.
5  Q. Okay.
6  A. The white Dodge Ram. We traded in for the
7     white Dodge Ram.
8  Q. Okay. It might be more helpful if I call it
9     the white Dodge Ram.
10 A. Yes. I don't remember the years other than
11    what we're driving currently.
12 Q. That's fine.
13       Okay. So you traded in the Tundra for
14    the white Dodge Ram?
15 A. Yes.
16 Q. Where did you buy the white Dodge Ram?
17 A. Quirk in Bangor, Maine.
18 Q. And which Quirk dealership?
19 A. The Dodge -- Quirk Dodge Chrysler something.
20 Q. Chrysler Dodge Jeep?
21 A. Yeah, yeah.
22 Q. All right. Do you recall what year you traded
23    in the Tundra for the white Dodge?
24 A. I do not.
25 Q. Is it before or after your daughters were

Page 73

1     born?
2  A. It was after they were born, so after 2018.
3  Q. Okay. Sorry. That's how I remember years.
4  A. Okay. That's a great --
5  Q. Okay. So if it was after 2018, it would have
6     been used, right?
7  A. Okay.
8  Q. And did you finance it?
9  A. Financed.
10 Q. Had you ever purchased a vehicle from Quirk
11    before?
12 A. No.
13 Q. What made you go there?
14 A. They are a Dodge Ram dealer and he wanted a
15    Dodge Ram.
16 Q. Okay.
17 A. And they are the closest Dodge Ram dealer to
18    our home.
19 Q. All right. Did you or your husband have any
20    more specific parameters other than a Dodge
21    Ram?
22 A. No. Well, yes. He would have preferred a
23    Toyota Tundra, but they had no trucks on the
24    lot. So a Dodge Ram was his second choice.
25 Q. All right. So did you go to a Toyota

19 (Pages 70 - 73)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 74

1    dealership first?
2    A. I believe I called Downeast Toyota because
3       that is where we had the Toyota Tundra owned
4       previously serviced and they confirmed there
5       were no Tundras on the lot.
6    Q. Okay. Did you go to any other dealerships?
7    A. No.
8    Q. What was the advertised price for the white
9       Dodge Ram?
10   A. I don't remember at this time.
11   Q. And how much did you pay for the white Dodge
12      Ram?
13   A. I don't remember at this time.
14   Q. Did you do any Internet research to determine
15      whether you were paying a fair price?
16         MR. ROOF: Objection.
17   A. I did not.
18      BY MS. WHITE:
19   Q. Did you ask for the CARFAX report?
20   A. I did not.
21   Q. Did you buy the white Dodge Ram the same day
22      that you went to see it?
23   A. Yes. In that case, I believe the salesman met
24      Corey halfway so that he also signed that day.
25   Q. Okay. What happened to the 2017 -- or the

Page 75

1    white Dodge Ram?
2    A. Corey McDonald totaled it.
3    Q. And who was your insurer at the time?
4    A. GEICO.
5    Q. And this is the total loss claim we talked
6       about earlier, right?
7    A. Yes.
8    Q. Do you recall when that accident was?
9    A. It was December. I believe it may have been
10      2022.
11   Q. All right. And so after your husband totaled
12      the white Dodge Ram, is that when he bought
13      the 2019 Dodge Ram?
14   A. Yes.
15   Q. And what color is that one?
16   A. It is bronze, silver.
17   Q. Okay.
18   A. Weird metallic color.
19   Q. Okay. All right. And where did you buy that
20      one?
21   A. Quirk.
22   Q. Did you use the same salesperson?
23   A. Yes.
24   Q. Did he drive halfway to meet you this time?
25   A. He was very nice.

Page 76

1    Q. All right. And were you specifically in the
2       market for Dodge Ram at that point?
3    A. Yes.
4    Q. Any other parameters?
5    A. No.
6    Q. What was the advertised price?
7    A. I don't remember this time.
8    Q. What was the purchase price?
9    A. I don't remember at this time.
10   Q. Did you think that you were paying a fair
11      price for the Dodge Ram?
12         MR. ROOF: Objection.
13   A. I don't know at this time.
14      BY MS. WHITE:
15   Q. Did you look on the Internet to see what other
16      Dodge Rams were selling for?
17   A. I did not. I looked at what they had
18      available on the lot.
19   Q. All right. So from the time that you first
20      saw the bronze Dodge Ram to the time you
21      purchased it, was that all in the same day?
22   A. Yes. I think it's considered same day.
23   Q. Okay. But the 2019 is the bronze or silver
24      one?
25   A. Yes.

Page 77

1    Q. Okay. All right. Are there any other
2       vehicles you've owned or purchased in the last
3       ten years?
4    A. No.
5    Q. Okay. Have you ever negotiated the price of
6       any used car that you've purchased?
7    A. No. I've never had the buying power to
8       negotiate, unfortunately.
9    Q. And has your husband ever gone to try to
10      negotiate the purchase of a vehicle?
11   A. No. My husband has never gone to the
12      dealership except to sign his name and
13      sometimes not all the way to the dealership.
14   Q. Okay. Do you think it's appropriate to
15      negotiate the price of a used car?
16   A. Yes.
17         MR. ROOF: Objection to form.
18      BY MS. WHITE:
19   Q. Have all the cars you've purchased been
20      insured?
21   A. Yes.
22   Q. Do you recall who your insurance provider was
23      back before you went with Progressive?
24   A. I do not. I thought it was always Progressive
25      in my recollection.

20 (Pages 74 - 77)

Page 78

1  Q. Okay. My records say 2011 was the beginning,
2     but --
3  A. I don't remember --
4  Q. Okay.
5  A. -- who we used previously -- who I used
6     previously.
7  Q. All right. So other than the total loss of
8     the Volkswagon, have you had any other total
9     losses?
10 A. No. Not to my recollection.
11 Q. And what about your husband's vehicles?
12 A. The Dodge Ram, the white Dodge Ram.
13 Q. Okay. So other than those two, no other total
14    losses?
15 A. No, not to my recollection.
16 Q. Okay. All right. Other than those total loss
17    claims, have you ever filed any other claim
18    with an insurance company for damage to a
19    vehicle?
20 A. Yes.
21 Q. Okay. What's the most recent?
22 A. Of mine or my husband's?
23 Q. Of yours.
24 A. Of mine. I damaged my 2019 Yukon. It was
25    last year.

Page 79

1     (Knock at the door.)
2        MS. WHITE: We don't have to answer it.
3     She is letting us know lunch is here.
4  A. I don't recollect the exact date. I believe
5     it was last fall or last early winter.
6     BY MS. WHITE:
7  Q. And what happened?
8  A. I struck a steel I-Beam in a parking garage
9     and now use surface parking.
10 Q. And what was the damage to the car?
11 A. It was to the front end.
12 Q. Who's your insurance company?
13 A. Progressive.
14 Q. And did Progressive pay the claim?
15 A. Yes.
16 Q. And does this lawsuit have anything to do with
17    that claim?
18 A. No.
19 Q. And was the damage repaired?
20 A. Yes.
21 Q. Who did the repairs?
22 A. Moody's Collision in Ellsworth, Maine.
23    MS. WHITE: Okay. This might be a good
24    place to take a break since lunch is here. We
25    can go off the record.

Page 80

1        THE VIDEOGRAPHER: This is the end of
2     Media 3. The time is 12:02 p.m. stand by.
3        (A recess was taken.)
4        THE VIDEOGRAPHER: And we are back on the
5     record. This is the beginning of Media 4 and
6     the time is 12:29 p.m.
7        (Deposition Exhibit Number 5 was
8     referenced for identification.)
9  BY MS. WHITE:
10 Q. All right. I am showing you a document marked
11    as Exhibit 5. Have you seen this document
12    before?
13 A. This document is also printed in a really
14    small font. I believe so, but I can't read
15    the document.
16 Q. Okay. Can you read up at the top where it has
17    buyer name and address, Genevieve Kurilec?
18 A. Yes, I do recognize my own name.
19 Q. Okay. And then Corey McDonald as the
20    co-buyer?
21 A. Yes.
22 Q. And to the right of that it says creditor
23    Darlings Auto Mall?
24 A. Yes.
25 Q. If you look just below that, you see the line

Page 81

1     that says used 2009 Volkswag Passat?
2  A. Yes.
3  Q. Do you understand this to be the retail
4     installment sale contract from your purchase
5     of the Passat?
6  A. Yes. It is listed at the very top of the
7     page.
8  Q. All right. I believe earlier I had asked you
9     how much you paid for the Volkswagon and you
10    didn't remember.
11 A. Correct.
12 Q. If you look in the block that says itemization
13    of amount financed, do you see where it says
14    cash price, including $869.30 sales tax; and
15    to the right of that, it says 16,857.30?
16 A. Yes.
17    MR. ROOF: I'm sorry. Where is that?
18    MS. WHITE: Right here. (Indicating.)
19    MR. ROOF: Okay. Got it. Thank you.
20 By MS. WHITE:
21 Q. So based on this document, would you agree
22    that the purchase price, if we included the
23    sales tax of the Volkswagon, was $16,857.30?
24 A. I'm not -- not sure. Sorry. I don't know how
25    to read this. I don't know how to -- one, the

21 (Pages 78 - 81)

Genevieve McDonald                                          September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 82

1  numbers are hard to read; and, two, I'm not
2  sure how to -- how -- I'm not sure which line
3  adds things together.
4  Q. So number one says, cash price including
5    vehicle sales tax?
6  A. And the number next to that is the cash price
7    and the sales tax together.
8  Q. So those added together are $16,857.30?
9  A. Yes.
10 Q. So is it fair to say that's how much you paid
11   for the Volkswagon?
12     MR. ROOF: Objection.
13 A. Honestly, I don't know because I -- I can't
14   see it very well.
15 BY MS. WHITE:
16 Q. Unfortunately, this is a document that we did
17   not produce that your lender produced to us
18   and it did not come in a better format.
19 A. I'm going to respond I don't know at this
20   time, because I don't know how to add the
21   numbers together and I can't see them that
22   well, unfortunately.
23 Q. So if we deduct out the tax, does $15,998
24   sound right to you?
25 A. I don't remember at this time what I paid for

Page 83

1  the vehicle.
2  Q. Okay. We can set that aside.
3     (Deposition Exhibit Number 6 was
4     referenced for identification.)
5  BY MS. WHITE:
6  Q. I'm going to show you a document -- all right.
7     Were you aware that Progressive sent a
8    subpoena for documents to Darling's Auto Mall
9    in this case requesting documents related to
10   the Volkswagon?
11 A. Yes.
12 Q. Okay. And Darling's contacted you, correct?
13 A. No.
14 Q. It's our understanding from Darling's that
15   they contacted you or your attorney to get
16   permission to release the documents?
17 A. They did not contact me. I'm not aware of
18   whether or not they contacted my counsel.
19 Q. Okay.
20     MR. STEED: That was the release.
21     THE DEPONENT: That came from you, not
22   Darling's.
23 A. Yes, I did sign a release if that's where
24   we're --
25 BY MS. WHITE:

Page 84

1  Q. Okay. All right. So what we're looking at
2    here is Darling's response to our subpoena. I
3    want to point you to Darling's, the page that
4    ends in 7; and Darling's represented that
5    these are screen shots from their internal
6    system related to the purchase of your
7    Volkswagon.
8       Do you see at the top on the left where
9    it says sale price $16,999?
10 A. Yes.
11 Q. And below that, it says discount other,
12   $1,011.
13 A. Yes.
14 Q. Do you recall getting a discount on the
15   Volkswagon?
16 A. I do not recall it at this time.
17 Q. And you see where it says -- it says total
18   sale $15,988?
19 A. Yes.
20 Q. So based on these documents, is it fair to say
21   the you -- the purchase price of the
22   Volkswagon was $15,998?
23     MR. ROOF: Objection.
24 A. I don't know how to interpret these documents,
25   so I don't know at this time.

Page 85

1  BY MS. WHITE:
2  Q. Okay.
3  A. I see there are additional numbers on the
4    page.
5  Q. Number that says total sale. It says $15,988.
6  A. Yes. And there are also numbers below that,
7    and I don't know how they are quantified in
8    this. The large number is just the total --
9    the payment.
10 Q. Okay. Do you recall whether the Volkswagon
11   was advertised for $16,999?
12 A. I do not recall what it was advertised as at
13   this time.
14 Q. All right. When you bought the Volkswagon,
15   did you also buy GAP coverage?
16 A. I did, yes.
17 Q. And what is GAG coverage?
18 A. GAP coverage is supposed to cover what you
19   financed and the payoff, I believe. That's my
20   understanding.
21 Q. Do you mean the difference between your payoff
22   and what is paid out if it's totalled?
23 A. I mean if the vehicle is totaled, GAP coverage
24   is what you owed if there is a discrepancy
25   between the settlement and what is owed on the

22 (Pages 82 - 85)

Genevieve McDonald                                      September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 86

1     vehicle --
2   Q. Okay.
3   A. -- is my understanding of what GAP is.
4   Q. And why did you purchase GAP coverage?
5   A. In case that happens where the vehicle was
6      totaled and I still owed money to the
7      financier.
8   Q. When your Volkswagon was totaled, did you file
9      a claim with your GAP insurance provider?
10  A. I believe I did. I contacted them. I don't
11     know if it was a filing.
12  Q. And how did you contact them?
13  A. By phone.
14  Q. And did they request any documents from you?
15  A. I don't remember at this time.
16  Q. Did GAP pay the balance on your loan?
17  A. No.
18  Q. Did they pay anything?
19  A. I don't remember at this time. I do not
20     believe they did.
21  Q. You don't believe they paid anything?
22  A. I don't.
23  Q. Okay.
24  A. What I recollect from my phone call with them
25     is that I no longer had coverage at the time

Page 87

1      of this incident. It did not extend
2      throughout my entire finance period, maybe was
3      the correct term; but I was not covered by GAP
4      at the time of this incident because I
5      remember being very disappointed by that news.
6      It is also the reason that I have not bought
7      another vehicle from Darling's.
8   Q. Okay.
9   A. The Toyota was purchased before this accident.
10  Q. Okay. So after the total loss of the
11     Volkswagon and after Progressive paid, did you
12     still owe a balance to your lienholder?
13  A. Yes.
14  Q. Do you recall how much you owed?
15  A. I do not recall the exact figure.
16  Q. Did you negotiate on the remaining balance of
17     the Volkswagon?
18  A. With the financier?
19  Q. Yes?
20  A. I did try.
21  Q. And what was the result of that?
22  A. I don't remember; but I wasn't satisfied with
23     it or able to pay it.
24  Q. So did you ever settle out that loan?
25  A. I did pay it in full eventually.

Page 88

1   Q. Okay.
2   A. Multiple years later.
3   Q. Okay.
4         (Deposition Exhibit Number 7 was
5         referenced for identification.)
6      BY MS. WHITE:
7   Q. All right. I'm showing you a document marked
8      as Exhibit 7. Have you seen this document
9      before?
10  A. Yes.
11  Q. When did you see it?
12  A. I was sent to it by -- counsel sent it to me
13     to review.
14  Q. Did you see this document in 2019?
15  A. I do not recall at this time.
16  Q. So is the first time that you recall seeing
17     this document after you joined this lawsuit?
18  A. It was last night.
19  Q. First time you saw it was last night?
20  A. The first time I recall seeing it was last
21     night.
22  Q. Okay. All right. I want to look at this
23     section -- well, sorry. I'm going to back up
24     for a second.
25         Is this the vehicle valuation report for

Page 89

1      your Volkswagon Passat that was totaled?
2         MR. ROOF: Objection. Foundation.
3   A. It appears so.
4      BY MS. WHITE:
5   Q. All right. And do you see where it says
6      valuation report date, March 6, 2019?
7   A. No. But I'm not doubting it's on here. Oh,
8      yes. Right there.
9   Q. Okay. So this was -- this report is dated
10     shortly after your total loss of the
11     Volkswagon, right?
12  A. Yes.
13  Q. All right. It has your name on the top?
14  A. It does.
15  Q. And it says, under vehicle information, 2009
16     Volkswagon Passat, comfort four-door sedan?
17  A. Yes.
18  Q. And is that section -- this is vehicle
19     information -- that all accurate; does that
20     accurately described your Volkswagon?
21  A. It does accurately describe my Volkswagon.
22     The only possible error is that I'm not sure
23     if my last name was McDonald yet, but that's
24     really neither hand nor there.
25  Q. So in 2019 was your last name McDonald?

23 (Pages 86 - 89)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 90

1  A. It may have been -- must have been. It's not
2     an inaccuracy.
3  Q. Okay. So the mileage on your Volkswagon at
4     the time that it was totaled 113,343 miles?
5  A. I don't recall what the mileage is, but I have
6     no reason to dispute that.
7  Q. All right. Do you see in the bottom
8     right-hand corner, it says, Mitchell
9     WorkCenter Total Loss?
10 A. Yes.
11 Q. And what do you understand Michell WorkCenter
12    Total Loss to be?
13 A. I do not know at this time.
14 Q. Okay. Who do you think prepared this
15    document?
16 A. I --
17    MR. ROOF: Objection.
18 A. -- do not know at this time. Either J.D.
19    Power or Mitchell Work Center because those
20    are the names on the bottom.
21 BY MS. WHITE:
22 Q. Okay. So --
23 A. Oh, Mitchell. It says in the top right
24    corner.
25 Q. So is it your understanding that Progressive

Page 91

1     didn't prepare this document?
2  A. It says prepared for. So it would be my
3     understanding it was not prepared by.
4  Q. Okay. All right. I want to look at the part
5     that says settlement value, the big bolded
6     numbers. It says $4,034.78.
7        Do you see that?
8  A. Yes.
9  Q. And that's the same amount that we looked at
10    earlier on Exhibit 3, the amount that
11    Progressive paid to Chrysler Capital.
12       Right?
13 A. Yes.
14    MR. ROOF: Objection.
15 BY MS. WHITE:
16 Q. Okay. So --
17    (The reporter interjected.)
18    MS. WHITE: What's the basis for the
19    objection?
20    MR. ROOF: She doesn't have a foundation
21    of those two what the amount -- she testified
22    earlier she didn't know what the amount was
23    that was paid to Chrysler and she doesn't know
24    anything about this document.
25    MS. WHITE: I just asked her if that

Page 92

1     matched the amount that was on this document
2     that was paid to Chrysler.
3        MR. ROOF: Okay.
4     BY MS. WHITE:
5  Q. Okay. Do you have any reason to dispute that
6     the entire settlement amount for your -- the
7     total loss of your Volkswagon was $4,034.78?
8  A. To dispute that the total loss is this number?
9  Q. That the total settlement amount was
10    $4,034.78?
11 A. No.
12 Q. So I think earlier you said that you couldn't
13    remember whether you got a check from
14    Progressive. Is it now your testimony that
15    you did not get a check from Progressive, that
16    the entire amount went to Chrysler?
17 A. It was my understanding based on the
18    documentation provided today that the
19    settlement was sent to Chrysler Capital, who
20    was the lienholder at the time of the
21    incident.
22 Q. Okay. All right. I'm going to look at the
23    valuation report, Exhibit 7. Just to the left
24    of that big bolded settlement value, there's
25    several numbers listed here that are added up.

Page 93

1        Do you see where it says base value?
2  A. Yes.
3  Q. Is it your understanding that the base value,
4     the condition, prior damage, the aftermarket
5     parts, and refurbishment were all added up to
6     get a market value?
7        MR. ROOF: Objection.
8  A. That is not my understanding. I have limited
9     knowledge on --
10    BY MS. WHITE:
11 Q. Okay.
12 A. -- this portion of insurance or automotive
13    industry business.
14 Q. Okay. So --
15 A. It's, also, not clear to me if this is
16    deduction or an addition. It appears that
17    there is a base value number. The condition
18    is deducted and then results in the market
19    value number.
20 Q. Okay. So your view is that the settlement
21    amount was too low, right?
22 A. Yes.
23 Q. So I just want to drill down more specifically
24    about your challenges to that settlement
25    amount.

24 (Pages 90 - 93)

Genevieve McDonald                                September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 94

1      Are you challenging the base value --
2  A.  Yes.
3  Q.  -- $5,000?
4  A.  Yes.
5  Q.  Okay.  And why do you think that number is too
6      low?
7  A.  Because it includes use of the projective sold
8      adjustment.
9  Q.  Okay.  And what about the condition
10     adjustment?
11 A.  I'm not challenging the condition adjustment.
12 Q.  And what about the market value; are you
13     challenging that amount?
14 A.  Yes.  Excuse me.  Sorry.  Yes.
15 Q.  And why are you challenging that amount?
16 A.  Because it includes use of the base value
17     which utilizes the productive sold adjustment.
18 Q.  And are you challenging the tax calculation
19     here, the $236.41?
20 A.  I don't know.  I would have to understand
21     better how that's applied.  I don't believe
22     so.
23 Q.  And then do you see where it says deductible
24     and it subtracts $500?
25 A.  Yes.

Page 95

1  Q.  Do you despite the deductible that was applied
2      here?
3  A.  No.
4  Q.  And you don't remember whether you received
5      this back in 2019 or not?
6  A.  I do not remember at this time.
7  Q.  If you had reviewed this in detail, would you
8      remember it?
9      MR. ROOF:  Objection.
10 A.  I do not believe that I would have remembered
11     it.  I did not expect to revisit this.
12     BY MS. WHITE:
13 Q.  All right.  If you look at page 2, it says,
14     Lost Vehicle Detail and it lists a lot of
15     standard equipment.  Was there any standard
16     equipment that was broken or missing from your
17     Volkswagon at the time of the loss?
18 A.  Not to my memory at this time, no.
19 Q.  And if you flip the page to page 3, it lists
20     Optional Equipment.  And there's a spoiler and
21     rear side airbags.
22     Did your Volkswagon have a spoiler and
23     rear side airbags?
24 A.  I don't remember at this time, but I'm not
25     disputing that it did.

Page 96

1  Q.  Was there anything that your Volkswagon had,
2      any options or packages, that were not
3      accounted for here?
4  A.  Not that I'm aware of.
5  Q.  All right.  If you look just below that on
6      page 3, it says regional comparable vehicle
7      information and there are five vehicles
8      listed.
9      Do you believe that Mitchell improperly
10     selected comparable vehicles?
11 A.  I don't know at this time.
12 Q.  Are you challenging Mitchell's selection of
13     comparable vehicles?
14 A.  No.
15 Q.  All right.  If we flip over to page 4, they're
16     condition adjustments.  Your carpet is rated a
17     2 for fair.
18     Do you see that?
19 A.  I do.
20 Q.  And it says significant wear.  Did the carpet
21     of your Volkswagon have significant wear?
22 A.  I don't remember at this time.
23 Q.  All right.  Below that it says the seats were
24     rated a 2 and it says multiple small cuts on
25     driver seat.

Page 97

1      Did your Volkswagon have multiple small
2      cuts on the driver's side?
3  A.  I don't remember at this time.
4  Q.  Do you remember whether your Volkswagon had
5      right rear bumper large impact?
6  A.  I do remember at this time.
7  Q.  Did your Volkswagon have rust on the hood and
8      the rear quarter panel?
9  A.  I don't remember at this time.
10 Q.  Did your Volkswagon have an obvious leak on
11     the side of the oil pan?
12 A.  I don't know at this time.
13 Q.  And did your Volkswagon have bald tires?
14 A.  I don't remember at this time.
15 Q.  So do you agree with all these condition
16     ratings here?
17     MR. ROOF:  Objection.
18 A.  I am not.  I'm not challenge the condition
19     ratings.  I can't agree with them because I
20     don't recall if these -- this was the
21     condition of the Volkswagon.  However, I'm not
22     challenging it.
23     BY MS. WHITE:
24 Q.  Okay.  All right.  I want to flip over to page
25     5 and the first two comparable vehicles are

25 (Pages 94 - 97)

Genevieve McDonald                                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 98

1    listed.
2        All right.  The first one has a list
3    price of $5,995.  Do you see that?
4    A. Yes.
5    Q. Do you think that this comparable vehicle was
6        improper to use to determine the value of your
7        Volkswagon?
8            MR. ROOF:  Objection.  Form.
9    A. Yes.
10            BY MS. WHITE:
11    Q. Do you think it was improper to use this
12        comparable vehicle?
13    A. Not the vehicle, but the valuation.
14    Q. Okay.  And what aspect of the valuation?
15    A. Because it includes the projected sold
16        adjustment for the valuation of the vehicle.
17    Q. All right.  So what number do you think should
18        have been used?
19            MR. ROOF:  Objection.  Foundation.  Form.
20    A. I'll defer to the expert.  I'm not familiar
21        with how insurance claims or adjustments are
22        evaluated.  This is beyond my area of
23        expertise.
24            BY MS. WHITE:
25    Q. What's your understanding of the projected

Page 99

1    sold adjustment?
2    A. That is a deduction that is applied to the
3        value of vehicle by the insurance company
4        based on consumer habits that are not true in
5        all cases.
6    Q. Do you know how it's calculated?
7    A. I do not at this time.
8    Q. Would that matter to you?
9    A. Yes, it might.
10            MR. ROOF:  Objection to that question.
11            BY MS. WHITE:
12    Q. Do you think that some people negotiate when
13        they buy used cars?
14            MR. ROOF:  Objection.  Foundation.
15    A. I don't want to speculate on other consumer's
16        habits.  I do not think that all consumers are
17        able to negotiate particularly in this
18        economy.
19            BY MS. WHITE:
20    Q. Do you think the projected sold adjustment is
21        improper because of the way that it's
22        calculated?
23            MR. ROOF:  Objection.  Foundation.
24    A. I think that the projected sold adjustment is
25        improper because it makes assumptions about

Page 100

1    consumer habits.
2            BY MS. WHITE:
3    Q. Okay.  Do you think that a projected sold
4        adjustment would be improper if applied to a
5        consumer who regularly negotiates on the
6        purchase of used cars?
7            MR. ROOF:  Objection.  Foundation.
8    A. I don't know at this time.
9            BY MS. WHITE:
10    Q. So I want to get a better understanding of
11        what exactly your claims are and what the
12        issue is with projected sold adjustment.
13        I understand you think it's improper
14        because you don't negotiate.  Do you think it
15        is always improper in every situation?
16    A. Yes, because insurance companies are going to
17        pick a formula; and so I assume, and this is
18        an assumption on my part, that the projected
19        sold adjustment is used by Progressive on all
20        claims; and I think that that is improper when
21        however many consumers, be it all, most, or
22        some don't negotiate.
23    Q. Okay.  Do you think that Progressive would be
24        wrong to use the sold prices of comparable
25        vehicles?

Page 101

1            MR. ROOF:  Objection.
2    A. I will defer to the experts on what other
3        processes would be an improvement over this
4        one.
5            BY MS. WHITE:
6    Q. So you do you think Progressive should have
7        used the list price of comparable vehicle
8        number one, the $5,995, adjusted only for
9        mileage and equipment?
10    A. Again, I'll defer to the experts to what the
11        correct or proper formula should be.
12    Q. In 2019, did you read the description of the
13        projected sold adjustment on the last page of
14        this document?
15    A. I don't --
16            MR. ROOF:  Objection.  Foundations.
17    A. -- I don't recall at this time.
18            BY MS. WHITE:
19    Q. Okay.  Let's look at page 8.  All right.  Do
20        you see at the top it says, Vehicle Valuation
21        Methodology Explanation?
22    A. Yes.
23    Q. Do you recall reading this -- this page before
24        yesterday?
25    A. I do not recall reading this before yesterday.

26 (Pages 98 - 101)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 102

1  Q. Okay. If you look at step 2, the first bullet
2     point under step 2, it says, projected sold
3     adjustment. An adjustment to reflect consumer
4     purchasing behavior. Negotiating a different
5     price than the listed price.
6        Do you understand that description?
7  A. Yes.
8  Q. Did you -- would you have any questions about
9     what the projected sold adjustment is after
10    reading that description?
11 A. No.
12 Q. Did you raise any questions or concerns about
13    the valuation of your Volkswagon to
14    Progressive?
15 A. Yes.
16 Q. And what were those questions or concerns?
17 A. Oh, did I raise any? I thought you said do I
18    raise any. Did I; I don't recall if I raised
19    any at this time.
20 Q. Did you have the opportunity to ask questions
21    at the time you settled your claim?
22 A. I don't recall the communication I have with
23    Progressive at this time.
24 Q. Did Progressive tell you anything about the
25    projected sold adjustment outside of what's

Page 103

1     written here?
2  A. I do not recall at this time.
3  Q. All right. So looking back at comparable
4     number 1. The next adjustment under projected
5     sold adjustments is mileage and deducts
6     $350.16.
7        Do you agree with that adjustment?
8  A. Can you point me to the right page, please.
9  Q. Page 5.
10 A. And can you repeat the question.
11 Q. Sure. This first comparable vehicle. The
12    next adjustment right under projected sold
13    adjustment says mileage, and it's negative
14    $350.14.
15       Do you disagree with that adjustment?
16 A. I don't know how to value mileage, so I'll
17    defer to the expert. I'm not disputing the
18    mileage.
19 Q. All right. Just below that there is an
20    equipment adjustment for a lip spoiler and it
21    adds $64.05.
22       Do you dispute the amount of that
23    adjustment?
24 A. I don't have any knowledge about how to value
25    equipment. So I'll defer to the expert.

Page 104

1  Q. Do you see how on comparable vehicle one, it
2     says source. Dealer Web listing, cars.com;
3     and then it lists Mike's Import?
4  A. Yes.
5  Q. Is it your understanding that the dealership
6     where comparable vehicle number one was
7     offered for sale?
8        MR. ROOF: Objection.
9  A. Yes, it appears to be a dealership.
10    BY MS. WHITE:
11 Q. Did you ever contact Mike's Import or any of
12    the dealers listed in this report?
13 A. No.
14 Q. Have you ever shopped at any of the dealers
15    listed in this report?
16 A. No. None of them are located in the state of
17    Maine.
18 Q. Are you challenging the use of comparable
19    vehicles outside the state of Maine?
20 A. No, but I certainly wouldn't have shopped
21    there.
22 Q. Did you do any independent research at the
23    time you settled your claim on the Volkswagon
24    to determine how much it was worth?
25 A. No.

Page 105

1  Q. Why not?
2  A. I was a very busy person the end of -- end of
3     February beginning of March 2019. I was in
4     office. I had two less than one-year-olds.
5     This happened when I was at a conference. It
6     was an extraordinarily busy time in my life.
7  Q. All right. I'm going to back up a little bit
8     and ask about the condition of the back bumper
9     of the Volkswagon at the time of the loss.
10       It said -- we can flip back to that page
11    if you want. Page 4. It says, right rear
12    bumper large impact and cracked.
13       Did you have another insurance claim
14    shortly before the total loss related to the
15    bumper damage?
16 A. No, not that I recall or I'm aware of.
17    Progressive would have been the insurer had I
18    made a claim.
19 Q. Do you recall an accident where someone else
20    was at fault?
21 A. No.
22 Q. No. Did you have the claim with Hanover
23    Insurance?
24 A. Not to my recollection at this time.
25 Q. Okay.

27 (Pages 102 - 105)

Genevieve McDonald                                                September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 106

1    MS. WHITE:  Can we go off the record for
2  just a second.
3    THE VIDEOGRAPHER:  This is the end of
4  Media 4.  We are going off the record at 1:01
5  p.m.  stand by.
6    (A discussion was held off the record.)
7    THE VIDEOGRAPHER:  We are back on the
8  record.  This is the beginning of Media 5.
9  The time is 1:04 p.m.
10  BY MS. WHITE:
11  Q. I'm going to show you a document marked as
12    Exhibit 8.
13    (Deposition Exhibit Number 8 was
14    referenced for identification.)
15  BY MS. WHITE:
16  Q. Have you ever seen this document before?
17  A. No, I don't believe so.
18  Q. All right.  I'll represent to you that these
19    are Progressive's claim notes that were
20    produced in this litigation.
21  A. Thank you.
22  Q. I only want to ask you about the page that
23    ends in 8073, which I put a little flag on.  I
24    want to point your attention to the very last
25    entry on the page.  It's dated March 1st,

Page 107

1  2019.
2  A. Sorry.  I don't see the date.  Can you repeat
3    what you just said.
4  Q. Sure.  The last entry has --
5  A. Oh, right here.  Sorry, yes.
6  Q. Uh-huh.
7  A. I'm with you.
8  Q. All right.  And within that entry there is a
9    note that says UPD, which stands for
10    unrepaired prior damage.  Pass side rear
11    quarter panel was hit last week when parked.
12    Has claim with Hanover Insurance.  Not hear
13    from them for estimate.
14    Does that ring any bells for you?
15  A. It doesn't.  I'm not -- I'm not disputing it,
16    but I don't remember it.
17  Q. Okay.
18    MR. ROOF:  Can we go off the record.
19    MS. WHITE:  Sure.
20    THE VIDEOGRAPHER:  This is end of Media
21    5.  We are going off the record.  The time is
22    1:06 p.m.  Stand by.
23    (A discussion was held off the record.)
24    THE VIDEOGRAPHER:  And this is the
25    beginning of Media 6.  We are back on the

Page 108

1  record.  The time is 1:07 p.m.
2    BY MS. WHITE:
3  Q. Okay.  So you don't recall somebody else
4    hitting you in the rear of your Volkswagon?
5  A. I do not.
6  Q. Okay.  And you don't recall filing a claim
7    with Hanover Insurance?
8  A. I do not.
9  Q. Okay.  That's all for that exhibit.
10    MS. WHITE:  And I'll just note, for the
11    record, that counsel has agreed we will
12    replace this document with a redacted version
13    to conceal a third-party's private health
14    information.
15    MR. ROOF:  Agreed.
16    MS. WHITE:  Thank you.
17    (Deposition Exhibit Number 9 was
18    referenced for identification.)
19  BY MS. WHITE:
20  Q. All right.  I'm showing you an exhibit marked
21    Exhibit 9.  Have you seen this document
22    before?
23  A. I do not recall if I've seen this document
24    before.
25  Q. Do you know what it is?

Page 109

1  A. It says on the front it is my Maine Auto
2    Policy from Progressive.
3  Q. Have you seen this document at the time the
4    Volkswagon was in an accident?
5  A. There's absolutely no way I read a 28-page
6    before or after the accident.
7  Q. Okay.  I want to look at the page that ends in
8    501, and I'll give you a moment to read the
9    section with the heading, Appraisal.  I'll
10    just give you a minute to read it.
11  A. (Reads document.)  Okay.
12  Q. All right.  What's your understanding of that
13    paragraph?
14  A. That there is an opportunity to challenge the
15    appraisal.
16  Q. And did you demand an appraisal for the
17    Volkswagon?
18  A. I did not.
19  Q. Why not?
20  A. I did not know that this was an option.
21  Q. Had you known it was an option, would you have
22    requested an appraisal?
23    MR. ROOF:  Objection.
24  A. I'm not going to speculate on what my behavior
25    may have been at that time.

28 (Pages 106 - 109)

Genevieve McDonald                                         September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 110

1    BY MS. WHITE:
2    Q. Do you believe that an appraisal of the
3       Volkswagon would have resulted in a higher
4       valuation than what the Mitchell valuation
5       report gave?
6          MR. ROOF: Objection.
7    A. I will defer to the experts on the -- how
8       to -- how appraisals or done and how
9       evaluations are reached.
10   BY MS. WHITE:
11   Q. So you don't know whether an appraisal would
12      have been higher or lower?
13         MR. ROOF: Objection.
14   A. It would depend on the formula that was used.
15      So just because it did not contain the
16      projected sold adjustment doesn't mean it
17      wouldn't have contained some other problematic
18      element.
19   BY MS. WHITE:
20   Q. But you don't know whether the bottom line
21      number would be higher or lower if there were
22      an appraisal?
23   A. I will defer to the experts.
24   Q. All right. You can flip over to page 504. At
25      the very bottom of the page there's a heading,

Page 111

1       Settlement of Claims.
2          Do you see that?
3    A. Yes.
4    Q. I'll give you a moment to review that
5       paragraph.
6    A. Yes.
7    Q. Okay. Is what your understanding of that
8       paragraph?
9          MR. ROOF: Objection.
10   A. It is a very general description of settlement
11      of claims.
12   BY MS. WHITE:
13   Q. Okay. Do you understand this to say
14      Progressive can use an estimating system?
15   A. It uses the word may. They may use an
16      estimating system.
17   Q. Okay.
18   A. It does not outline what the estimating system
19      is.
20   Q. Okay. And is it your position that Mitchell's
21      WorkCenter Total Loss is not an estimating
22      system?
23         MR. ROOF: Objection. Foundation.
24   A. I will defer to the experts on whether it
25      would be considered an estimating system.

Page 112

1    BY MS. WHITE:
2    Q. Okay. I'm just trying to get an understanding
3       of what your claims are.
4          Are you claiming that Progressive was not
5       permitted to use Mitchell's WorkCenter Total
6       Loss System to value cars?
7    A. I will defer to the experts on what -- how the
8       appraisal process and estimating process
9       works.
10   Q. Okay. But you, as the plaintiff, are
11      asserting the claims. So I want to understand
12      from you what your claims are.
13         Are you claiming that Progressive should
14      not be allowed to use Mitchell to value total
15      loss vehicles?
16   A. I am claiming that the element, that report
17      they use, the projected sold adjustment should
18      not be used.
19   Q. Okay.
20   A. And results in unfair competition.
21   Q. Okay. So you're claiming it is okay for
22      Progressive to use Mitchell's WorkCenter Total
23      Loss just not with the projected sold
24      adjustment?
25   A. I'm going to defer to the experts on that one.

Page 113

1    Q. Okay. I am going to go the next exhibit.
2          (Deposition Exhibit Number 10 was
3          referenced for identification.)
4    BY MS. WHITE:
5    Q. Showing you a document that's marked as
6       Exhibit 10.
7          Do you recognize this document?
8    A. I do.
9    Q. And what is it?
10   A. It is the complaint.
11   Q. Did you see a copy of this document before it
12      was filed?
13   A. I don't know at this time.
14   Q. Did you authorize your attorneys to file this
15      document on your behalf?
16   A. Yes.
17   Q. To your knowledge, is everything in this
18      document true and accurate?
19   A. There is an error.
20   Q. Okay. What's the error?
21   A. The error is item number 7. It was not a
22      single vehicle accident.
23   Q. Got it. Anything else?
24   A. No.
25   Q. I'm going to look at paragraph 3. It's on the

29 (Pages 110 - 113)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 114

1    front page.  It says:  As part of the sale,
2    Progressive promised that it would pay the
3    plaintiff's the value of plaintiff's vehicles
4    that they were damaged in an accident.
5         As part of the sale of what; what sale
6    are you referring to here?
7    A. I'm going to defer to my attorney.
8    Q. Did Progressive make any representations to
9    you when you purchased your car insurance
10   policy about how it would determine the value
11   of total lost vehicles?
12   A. I don't recall at this time.
13   Q. Let's look at paragraph 9.  That one says,
14   rather than pay plaintiffs the value of their
15   vehicles, Progressive, instead, chooses to
16   conspire with another company and not pay
17   plaintiffs what they were owed.
18        What company -- what other company are
19   you referring to here?
20   A. I will defer to my attorney.
21   Q. Okay.  So you don't know who Progressive
22   conspired with?
23   A. I wouldn't want to speculate.
24   Q. Okay.  All right.  Let's look at paragraph 12.
25   It says, instead of Progressive paying fair

Page 115

1    value as promised to plaintiffs and all other
2    similarly situated Mainers, defendant shorts
3    them and they receive less than what they were
4    promised.
5         Which defendant are you referring to
6    there, UFCC or Progressive Casualty?
7    A. I don't want to speculate on which company is
8    which.  It is my understanding that is
9    Progressive that I purchase insurance from and
10   that I have coverage from during the time of
11   this accident.  I will defer to counsel.
12   Q. And did you ever tell Progressive that you
13   didn't think the value they paid was fair?
14   A. I don't recall at this time.
15   Q. All right.
16        MS. WHITE:  I'm actually going to give
17   back to you Exhibit 8.  I'm going to give this
18   to you first since we only have one copy,
19   Brian.
20        MR. ROOF:  Oh, is this the --
21        MS. WHITE:  Yeah.  I'm going to have you
22   look at that first before I go back to it.
23   It's this last entry on the page.
24   BY MS. WHITE:
25   Q. I want to direct you to go back on Exhibit 8

Page 116

1    and the page ending in 8080.  If you can look
2    at that very last entry on the page.
3    A. Yes.
4    Q. There's some notes about -- from Michael Fries
5    about a discussion he had with you about the
6    settlement offer; and it says, yes.  Went over
7    WCTL eval details.  She accepts value and said
8    it's honestly more than she thought it would
9    be worth.  She's glad to be out from under
10   this 8K loan on a car worth half of that; so
11   she was ready for a new car, anyway, so will
12   end up working out.
13        These are notes that Progressive's
14   representative put in the system.  Did you say
15   those things to him?
16   A. I don't recall, but I don't dispute them.
17   Q. Okay.  So at the time, you told Progressive
18   that the offer was more than you thought it
19   would be, right?
20   A. Correct.
21   Q. But now you think that you were shorted?
22   A. At the time I didn't understand how -- the
23   funding formula.  I didn't know what projected
24   sold adjustment was or how Progressive reached
25   the actual cash value number.

Page 117

1         I'm not qualified to evaluate the worth
2    of vehicles; and it appears at this point, I
3    thought my GAP insurance would cover the
4    difference, which it did not, which is really
5    neither hand nor there, as far as the formula
6    that was used; but I wasn't aware of the
7    flawed process that Progressive uses when I
8    made this comment.  I didn't love that car,
9    so --
10   Q. So did Mr. Fries go over the WorkCenter Total
11   Loss evaluation with you?
12   A. I don't recall at this time.  He was very
13   polite.  I do remember that.
14   Q. So after you found out that your GAP insurance
15   wasn't going to pay off the remainder of your
16   loan, did you back to Progressive and tell
17   them they should pay more money on your
18   Volkswagon?
19   A. I don't recall at this time.  I don't believe
20   I knew that there was an opportunity to try to
21   challenge the settlement number.
22   Q. Okay.  All right.  And on the very next page,
23   I believe, it says Michael sent you an email
24   to Genevieve207@gmail.com.
25        Is that your email address?

30 (Pages 114 - 117)

Page 118

1  A. It is my address.
2  Q. And it looks like he provided the report, the
3     valuation report?
4  A. It does.
5  Q. Do you recall receiving an email of the
6     valuation report?
7  A. I do not, but I don't dispute that it
8     happened.
9  Q. Okay. And Mr. Fries gave his number for any
10    questions, right?
11 A. Yes.
12 Q. Did you ever reach out to him about the value
13    of your Volkswagon?
14 A. I don't recall if I did at this time.
15 Q. Okay. That's all with that exhibit. Thank
16    you.
17       All right. I want to go back to the
18    complaint, paragraph 56, which is on page 7.
19       All right. That one says, the report
20    then deviates from the advertised prices of
21    comparable vehicles by claiming to adjust
22    those advertised prices to account for
23    differences in equipment, mileage, and vehicle
24    configuration to create a base value for the
25    vehicle being appraised.

Page 119

1        Is this lawsuit challenging the
2     adjustments for equipment, mileage, and
3     vehicle configuration?
4        MR. ROOF: Objection.
5  A. Not to my understanding.
6        BY MS. WHITE:
7  Q. Okay. Then why does this allegation say that
8     it deviates by claiming to adjust those
9     advertised prices?
10 A. I will defer to counsel for that explanation.
11 Q. Okay. All right. I think you can set the
12    contract aside.
13       So why are you suing Progressive in a
14    class action and not individually?
15 A. Because I cannot afford to pursue this
16    individually.
17 Q. Do you know what it means to be a class
18    representative?
19 A. Yes.
20 Q. What does it mean to you?
21 A. It means that I am representing my own
22    interests and also those Maine residents who
23    were similarly situated or class members who
24    are similarly situated.
25 Q. Before you saw Mr. Steed's Facebook post, had

Page 120

1     you ever considered suing Progressive over
2     your total loss?
3  A. I had not.
4  Q. I'm sorry?
5  A. I had not.
6  Q. Why did you decide to join this class action?
7  A. Because I did not -- the reason that I had not
8     considered is because I could not afford to
9     pursue it.
10 Q. Did you think that your claim had been
11    underpaid before you saw Mr. Steed's Facebook
12    post?
13 A. I don't know at this time. It may have
14    crossed my mind.
15 Q. But you never told Progressive that you
16    thought your claim had been underpaid?
17 A. I didn't -- I don't belive that I realized
18    there was any recourse other than pursuing
19    litigation which I knew that I couldn't
20    afford.
21 Q. Did you investigate any of the lawyers before
22    retaining them in this case?
23 A. No.
24 Q. Who are the lawyers representing you in this
25    case?

Page 121

1  A. To my understanding, they are Mr. Roof and Mr.
2     Steed; and I believe that Mr. Roof has a
3     colleague.
4  Q. Any other firms?
5  A. Not to my knowledge.
6  Q. If this case proceeds to trial, are you
7     willing to go to court and testify?
8  A. Yes.
9  Q. What are you seeking for yourself in this
10    lawsuit?
11       MR. ROOF: Objection.
12 A. Damages. Fair compensation for my total loss;
13    and I will defer to my counsel if there was
14    additional information.
15       BY MS. WHITE:
16 Q. How much are you seeking?
17 A. I will defer to counsel.
18 Q. Can you describe how your damages should be
19    calculated?
20       MR. ROOF: Objection.
21 A. I cannot. I'll defer to the experts and
22    counsel.
23       BY MS. WHITE:
24 Q. Would you agree that because you and your
25    husband jointly own the Volkswagon that any

31 (Pages 118 - 121)

Genevieve McDonald                                          September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 122

1    money recovered from this lawsuit would be
2    jointly given to you and your husband?
3         MR. ROOF: Objection.
4    A. I don't know at this time. If he's nice,
5    maybe I'll share it with him.
6         THE DEPONENT: I should say, for the
7    record -- transcriber, that was a joke.
8    BY MS. WHITE:
9    Q. Do you recall searching through and collecting
10   your own documents for this case?
11   A. Yes.
12   Q. And what did you do to search for documents?
13   A. I searched through my filing cabinet hard
14   files. I knew I didn't have any digital files
15   because I had to switch computers. I searched
16   my email accounts and my iPhone.
17   Q. And do you store any files in the Cloud?
18   A. I do, yes.
19   Q. Google Drive or an iCloud account?
20   A. Yes.
21   Q. Did you search those accounts?
22   A. Yes. I don't -- I didn't retain any digital
23   files for this. I store documents in the
24   Cloud for work-related items, not personal
25   items.

Page 123

1    Q. Okay.
2         (Deposition Exhibit Number 11 was
3         referenced for identification.)
4    BY MS. WHITE:
5    Q. I'm showing you a document marked as Exhibit
6    11. Have you seen this document before?
7    A. Yes.
8    Q. What is it?
9    A. It's my objections to the production of
10   documents. Let's see. It is my Amended
11   Responses and Objection to Defendant's First
12   Set of Requests For Production of Documents.
13   Q. Okay. I want to look at request for
14   production of 16, which is on page 6.
15   A. Yes.
16   Q. Okay. So in request 16, you're asked to
17   produce all documents related to any damage to
18   the vehicle, meaning the Volkswagon, prior to
19   the date you filed the claim.
20        And in your response at the very end of
21   the next page, it says, subject to and without
22   waving these objections, Ms. McDonald does not
23   have responsive documents at this time.
24        What did you do to search for documents
25   responsive to that request?

Page 124

1         MR. ROOF: Objection. That's not the
2    complete answer.
3    A. Well, I answered the question in my previous
4    response. I searched my hard files. I knew
5    that I didn't have any digital files. I
6    looked through my email accounts and I looked
7    through key search words.
8    Q. What search words did you use?
9    A. Progressive. Volkswagon. I believe those
10   were the only two. If it didn't come up on
11   either of those hits, then I --
12   Q. Did you search --
13   A. -- don't know what else I would use. Claim.
14   Q. Did you search the word Hanover?
15   A. I did not.
16   Q. After reading the claim note today, it says
17   there was a claim with Hanover Insurance.
18   Would you be willing to go back and search for
19   documents related to Hanover Insurance?
20        MR. ROOF: Objection. That's not fair to
21   answer.
22        MS. WHITE: Well, it would be responsive
23   when she says they don't exist.
24        MR. ROOF: She can -- we'll take it under
25   advisement and she'll search.

Page 125

1    BY MS. WHITE:
2    Q. Okay. All right. I'm going to look at
3    Request Number 33 on page 12.
4         MR. ROOF: Pardon me, which number?
5         MS. WHITE: Request Number 33. It's on
6    page 12.
7    BY MS. WHITE:
8    Q. All right. In this request you were asked to
9    produce all documents related to the purchase
10   of any other vehicles you've purchased in the
11   last ten years, including advertisements and
12   sales contracts.
13        What did you search for documents
14   responsive to this request?
15   A. I did not look at any advertisements, so I
16   knew that I didn't have any advertisements. I
17   don't know why anybody would still possess
18   copies of advertisements of any vehicle
19   they've ever purchased, particularly going
20   back ten years; and I don't have any sales
21   contracts. I did look through my hard files
22   and digital files.
23   Q. Okay. What did you do to look for documents
24   related to the purchase of the vehicle that
25   you drive now, the Yukon?

32 (Pages 122 - 125)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 126

1  A. The purchase of the vehicle I have now.  I
2     didn't -- I looked through my hard copy files
3     and digital files.
4  Q. Okay.  Did you look in the glove box of your
5     Yukon?
6  A. I did not look in the glove box of my Yukon
7     because I know that I don't retain it because
8     I like to be able to find my registration and
9     insurance card quickly if I need to hand it
10    over; and so I don't retain those documents
11    because I know if I really need them, I could
12    possibly contact the dealership and they would
13    have them.
14 Q. Okay.  Did you contact the dealership and get
15    them?
16 A. No.
17 Q. Are you still making payments on the Yukon?
18 A. Yes.
19 Q. Do you pay -- make your payment online?
20 A. I make my payment -- it's automatically
21    deducted.
22 Q. Who's your lender?
23 A. It is Bangor Federal Credit Union.
24 Q. Did you contact Bangor Federal Credit Union to
25    ask for documents related to the purchase of

Page 127

1     your Yukon?
2        MR. ROOF:  Objection.
3  A. No, because my Yukon is not the vehicle in
4     question.
5     BY MS. WHITE:
6  Q. So because you don't think they're relevant,
7     you didn't search for documents related to the
8     Yukon?
9        MR. ROOF:  Objection.  That's not what
10    she testified to.
11 A. In my response, I'm objecting to this request.
12    It's overly broad and unduly burdensome.  So
13    my current vehicle, having to make additional
14    efforts to quantify something for a vehicle
15    that is not the vehicle in question --
16    BY MS. WHITE:
17 Q. Okay.
18 A. -- seems overly broad and burdensome.
19       MR. ROOF:  She doesn't have an obligation
20    to go ask.
21 A. I did not have any documentation in my
22    possession.
23    BY MS. WHITE:
24 Q. Okay.  The Yukon you got within the last three
25    years, right?

Page 128

1  A. I believe so, yes.
2  Q. So you're still making payments on it; but you
3     don't have your loan contract?
4  A. I do not.
5  Q. Okay.  When you signed that, would you have
6     gotten a digital copy of it or just a paper
7     copy?
8  A. I don't recall if I would have received a
9     digital copy.  When I signed what; what are
10    you specifically --
11 Q. When you signed the documents to purchase your
12    Yukon.
13 A. I believe it was just a paper copy.
14 Q. Okay.  And you don't know where the paper copy
15    might be?
16 A. I probably tossed it.  The only documents that
17    I retain are either related to the birth of my
18    children or for tax purposes and it doesn't
19    fit either.
20 Q. And what about the vehicle that your husband
21    drives now, did you do anything to look for
22    the purchase documents related to the Dodge
23    Ram?
24 A. Again --
25       MR. ROOF:  Objection.

Page 129

1  A. -- I did not retain any documents in my
2     possession.  I only received them as hard
3     copies and I don't retain them.
4     BY MS. WHITE:
5  Q. All right.  Let's look at request number 34.
6     It asks for all documents and correspondence
7     exchanged between you and anyone acting on
8     your behalf with any lienholder regarding your
9     vehicle meaning the Volkswagon.
10       What did you do to search for documents
11    responsive to that request?
12       MR. ROOF:  Objection.  Asked and
13    answered.
14       MS. WHITE:  No, that's a different one.
15       MR. ROOF:  She testified many times what
16    she did to search.
17       MS. WHITE:  I'm asking specifically what
18    she did to search for documents responsive to
19    this request.
20       MR. ROOF:  She's answered what she did to
21    search for all documents.
22 A. I searched my hard copies.  I knew I didn't
23    have any digital copies.  I searched my email
24    and searched my iPhone.
25    BY MS. WHITE:

33 (Pages 126 - 129)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 130

1   Q. Okay. What did you search your email and
2      iPhone for?
3   A. Chrysler Capital. It was like the search word
4      I used.
5   Q. You got no results for Chrysler Capital?
6   A. I did not.
7   Q. It's our understanding from counsel that
8      Chrysler Capital reached out to you after we
9      issued a subpoena?
10  A. Yes.
11  Q. And is that the first communication you'd had
12     with Chrysler Capital?
13  A. In many, many years, yes. Well, not many,
14     many years. Three or four. Whatever we're
15     talking about there. Since 2019, yes.
16  Q. Okay.
17  A. Or no. 2021, I believe, is the last time they
18     contacted me in an effort to reach a
19     settlement.
20  Q. Okay. Did they ever send you letters?
21  A. I did receive a letter in, I believe it's,
22     2021, which I did not retain; but have
23     received this part of this. I think maybe
24     it's a result of your subpoena request.
25  Q. Okay.

Page 131

1   A. I have seen some documents as part of this
2      case that came from Chrysler Capital. I did
3      not retain any of those documents myself.
4   Q. Okay. Request for production Number 35. It
5      asks for all documents and correspondence
6      exchange between you and anyone acting on your
7      behalf with GAP insurance provider regarding
8      your vehicle.
9         What did you do to search for
10        correspondence with your GAP insurance?
11        MR. ROOF: Objection.
12  A. I looked through my hard files. I looked
13     through my digital files. I did retain any
14     records. I searched my email for GAP
15     insurance. The term GAP insurance. I didn't
16     find anything. I do remember contacting them
17     via phone. I think the only interaction I
18     ever had with them directly was after the
19     accident; and I do remember giving them a
20     phone call so I didn't expect to find any
21     records and I didn't.
22        BY MS. WHITE:
23  Q. Did you search the name of the GAP insurance
24     provider?
25  A. No, because I didn't know it until last night

Page 132

1      when I reviewed the information that came from
2      Darling's that contained the name.
3   Q. Okay.
4         MS. WHITE: We would ask that she conduct
5      another search for that specific name.
6         MR. ROOF: We'll take it under
7      advisement.
8   A. I tried last night and did not find anything.
9         BY MS. WHITE:
10  Q. Okay.
11        MS. WHITE: We can go off the record.
12        THE VIDEOGRAPHER: Okay. This is end of
13     media 6. Going off the record, the time is
14     1:36 p.m. Stand by. And we are off the
15     record.
16        (A recess was taken.)
17        THE VIDEOGRAPHER: This is the beginning
18     of Media 7. The time is 1:39 -- 1:38 p.m. We
19     are back on the record.
20        MS. WHITE: So I just wanted to note, for
21     the record, we just received in an email a
22     moment ago documents in response to a subpoena
23     to Hanover Insurance related to prior damage
24     to the Volkswagon.
25        I haven't had a chance to get the files

Page 133

1      open and I don't have a way to print them. So
2      after we've had a chance to look at those, we
3      may have more questions for Ms. McDonald.
4         MR. ROOF: We'll hold that -- we'll
5      reserve our objection on that to hold this
6      open because they had plenty of time to
7      subpoena Hanover; and she did -- Ms. White did
8      accuse Ms. McDonald of not conducting a proper
9      search, which is not true at all.
10        She explained in detail the areas that
11     she searched and the search terms; and she
12     produced the documents that she had. She even
13     went back last night when she found out what
14     the GAP insurer was and did a search for the
15     GAP insurer last night when we finally got
16     documents on that from their late subpoena in
17     which we got documents the day before the
18     deposition on -- from Darling's that they
19     requested late, and they had plenty of
20     opportunity to do that.
21        So she completed an adequate -- more than
22     adequate search especially when you consider
23     that these document requests are completely
24     irrelevant to the case and we stand by the
25     objections; and she did not know that she had

34 (Pages 130 - 133)

Genevieve McDonald                                          September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 134

1  a Hanover claim, as she testified here today.
2       So there was no need or reason for her to
3  search for Hanover because she did not know
4  about such a claim. She did not know about
5  being rear-ended. Those are her -- that's her
6  testimony and her recollection. So, of
7  course, she would not have searched for
8  Hanover. So there's no need to hold open this
9  deposition.
10      MS. WHITE: It's defendant's position
11 that she now knows about Hanover, that she
12 should conduct a search. She also testified
13 that she did not retain documents related to
14 the purchase of her Yukon because she can
15 easily call the dealership and ask for those
16 and she did not do that. So we would ask that
17 she go back and call the dealership and ask
18 for those purchase documents.
19      MR. ROOF: That's not in her possession,
20 custody, or control.
21      MS. WHITE: Well, she testified the
22 reason she got rid of the documents is because
23 she could easily get them. So they are in her
24 control. She testified to it.
25      MR. ROOF: She's not -- she's not going

Page 135

1  to call and ask for documents that aren't in
2  her possession, custody, and control. She has
3  searched for those. If they want to subpoena
4  the documents for the Yukon, go ahead.
5       MS. WHITE: Well, we didn't know where
6  she bought the Yukon because she didn't
7  respond to our interrogatories fully.
8       MR. ROOF: She did, to the extent of our
9  knowledge, and that's what we put in the
10 interrogatory. Responses to the --
11      MS. WHITE: The interrogatories were
12 served on Tuesday; and she said she doesn't
13 remember where she purchased vehicles. She
14 does remember where she purchased vehicles.
15 She testified to it today.
16      MR. ROOF: She remembered now.
17      MS. WHITE: So had we had that
18 information, we could have subpoenaed those
19 dealerships. We didn't have that information
20 until Tuesday, or until today, that I learn
21 where she actually purchased these vehicles.
22      MR. ROOF: She didn't recall at that
23 time.
24      MS. WHITE: She didn't recall two days
25 ago, but she recalled today.

Page 136

1       MR. ROOF: That's her testimony.
2       MS. WHITE: Okay. Well, we are going to
3  hold the deposition open because we feel like
4  there are documents that we still don't have.
5  This is not the first case of its kind and
6  I've never had this many issues getting people
7  to look for documents especially after
8  fighting to get into the case.
9       So there are additional documents I would
10 like to ask about and I will -- I will agree
11 if we have to resume the deposition to do it
12 virtually.
13      MR. ROOF: It will be at your cost.
14      MS. WHITE: No.
15      MR. ROOF: Yes, it will be.
16 BY MS. WHITE:
17 Q. Okay. Ms. McDonald, do you have a fee
18    agreement with your lawyers in this case?
19 A. I believe so.
20 Q. And what are the terms of that fee agreement?
21 A. I believe it's a contingency fee.
22 Q. And what is a contingency fee?
23 A. It is an agreement where counsel does not
24    receive payment if they are not able to reach
25    a settlement.

Page 137

1  Q. Does it require that you pay them any kind of
2     retainer?
3  A. I don't believe so, no. By retainer, can you
4     define what you mean by retainer?
5  Q. Money that you pay upfront.
6  A. No.
7  Q. Does the fee agreement require you to pay any
8     litigation costs or expenses?
9  A. I will defer to counsel.
10 Q. Who signed the fee agreement?
11 A. I did.
12 Q. So do you understand whether you're obligated
13    to pay litigation costs and expenses?
14 A. I would not hazard to take a guess at language
15    I do not have before me to review.
16 Q. Well, I would love to put -- put it in front
17    of you, but your lawyers refuse to produce it.
18 A. Then I will defer to counsel.
19      MR. ROOF: It's the same as the others.
20 BY MS. WHITE:
21 Q. If you lose this case, who will be responsible
22    for all the costs and expenses?
23 A. I don't know at this time. I don't recall at
24    this time.
25 Q. If a class is certified by the Court in this

35 (Pages 134 - 137)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 138

1   this case and your current lawyers withdraw,
2   are you prepared to hire and pay new counsel
3   to assume responsibility for the case?
4   A. I don't know at this time, but I believe so.
5       (Deposition Exhibit Number 12 was
6       referenced for identification.)
7   BY MS. WHITE:
8   Q. I'm showing you a document marked as Exhibit
9       12. Have you seen this document before?
10  A. Isn't this the document you just provided me?
11  Q. No.
12  A. I'm sure I have, but it seems very similar to
13      the first document.
14  Q. Do you see at the top where it says, Plaintiff
15      Genevieve McDonald's Amended Responses and
16      Objections to defendant United Financial
17      Casualty Company's First Set of
18      Interrogatories?
19  A. Yes.
20  Q. And --
21  A. Yes. I see the difference between the two
22      documents now.
23  Q. Have you reviewed this document before?
24  A. I have.
25      MS. WHITE: I would note that it's not

Page 139

1   verified. I would ask that you serve a
2   verified version of these interrogatory
3   responses.
4       MR. ROOF: Sure. You can also ask her.
5       MS. WHITE: I can; but your obligation
6   under the rules is to serve verified
7   interrogatory responses.
8       MR. ROOF: And she verified her first
9   one. It will be the same verification.
10      MS. WHITE: Okay. You can verify these
11  with the amended responses.
12      MR. ROOF: That's fine.
13      MS. WHITE: Thank you.
14  BY MS WHITE:
15  Q. All right. Is -- to the best of your
16      knowledge, is all the information included in
17      these interrogatory responses true and
18      accurate?
19  A. Yes.
20      MR. ROOF: That' what you just verified,
21      the responses.
22  A. Yeah.
23      BY MS. WHITE:
24  Q. All right. I'm going to look at Interrogatory
25      Number 9. All right. That one asks you to

Page 140

1   identify each vehicle you've purchased in the
2   prior ten years and for each provide the
3   seller of the vehicle, the list price of the
4   vehicle, and the price you actually paid for
5   the vehicle; and you listed several vehicles
6   here.
7       But at the very end, you say, Ms.
8   McDonald does not recall at this time any of
9   the details, the list and purchase prices of
10  these vehicles; and you also didn't provide
11  where they were purchased.
12      We would ask that you amend your
13  interrogatory response to reflect where each
14  of these vehicles was purchased.
15      MR. ROOF: She answered them in this
16  deposition. We're not going to redo an
17  interrogatory response so it satisfies your
18  belief of what needs to be done. It's on the
19  record under sworn deposition where she swore
20  to tell the truth; and she answered those
21  questions. We're not going to do paperwork
22  for your sake of paperwork.
23      MS. WHITE: Well, the interrogatory
24  responses are incomplete.
25      MR. ROOF: No, they're not. She just

Page 141

1   completed them.
2       MS. WHITE: That's -- her testifying is
3   different from me getting a clean
4   interrogatory response. We asked for it in
5   writing.
6       MR. ROOF: Her testimony is what will be
7   in the interrogatory. So we don't need to
8   duplicate --
9       MS. WHITE: But you have a duty to
10  supplement your interrogatory responses.
11      MR. ROOF: She just supp -- she just
12  supplemented them.
13      MS. WHITE: No. That is not
14  supplementing.
15      MR. ROOF: She is --
16      MS. WHITE: You have to amend your
17  responses.
18      MR. ROOF. We're not playing your games
19  of doing paperwork --
20      MS. WHITE: It's not a game.
21      MR. ROOF: -- paperwork for the sake of
22  paperwork. She just testified to it.
23      MS. WHITE: Well, if you had done it
24  right the first time, you wouldn't have to
25  amend.

36 (Pages 138 - 141)

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 142

1    MR. ROOF:  No, we did it right.
2    MS. WHITE:  She remembered exactly where
3  she bought every vehicle and none of this is
4  provided in writing; and we asked the
5  questions in writing.
6    MR. ROOF:  And maybe she remembered after
7  discussions that -- where she got them from.
8  A.  I can provide some clarity.
9    Does that -- I looked it up between when
10  this was filed and today so that I can answer
11  at my deposition and we did not have to amend
12  this document.
13  BY MS. WHITE:
14  Q.  So why didn't you look it up before you
15    responded to interrogatories?
16  A.  Because one of them I only discovered by
17    looking through an old social media post.  I
18    went to look to see if I could find any of the
19    information that I wasn't able to provide and
20    the only thing I did was find was a photograph
21    of my GMC Acadia with a Varney front plate, so
22    I knew it came from Varney's.
23    MR. ROOF:  Okay.  We will update and we
24  will refer to her deposition testimony.
25    We will update Interrogatory Number 9.

Page 143

1  Number 9, compromise, by referring to her
2  deposition testimony.
3    MR. STEED:  I guess I shouldn't have
4  stepped out of the room.
5    MS. WHITE:  I believe I'm, also, done.  I
6  want to quickly look at my notes before I go
7  off the record.
8    (Pause.)  That's everything for now; but
9  we are holding open the deposition until we
10  receive the remaining documents.
11    MR. ROOF:  We object to holding it open
12  and having to call third parties for
13  documents.
14    MS. WHITE:  Noted.
15    THE VIDEOGRAPHER:  And we are off the
16  record at 1:50 p.m. and this concludes today's
17  testimony given by Genevieve McDonald.  The
18  total number of media used was 7 and will be
19  retained by Veritext.  Stand by.
20    (A discussion was held off the record.)
21    MR. ROOF:  We will request a read and
22  have an order -- transcript order for her to
23  read.
24    MS. WHITE:  We have a standing order with
25  Veritext.

Page 144

1    * * * * *
2    (The deposition was concluded at 1:51
3  p.m.)

Page 145

1    STATE OF MAINE
2    I, Leslie Gilmore-Miller, a Notary Public in
3  and for the State of Maine, do hereby certify that
4  pursuant to notice there came before me on
5  September 19, 2024, the following-named person to
6  wit:  GENEVIEVE MCDONALD, who was duly sworn to
7  testify to the truth and nothing but the truth;
8  that she was thereupon carefully examined upon her
9  oath and her examination reduced to writing under
10  my supervision; that this deposition is a true
11  record of the testimony given by the witness.
12    I further certify that I am neither attorney
13  nor counsel for, nor related to, nor employed by
14  any of the parties to the action in which this
15  deposition is taken, and further, that I am not a
16  relative or employee of any attorney or counsel
17  employed by the parties hereto, or financially
18  interested in this action.
19    IN WITNESS WHEREOF, I have hereunto set my
20  hand this 7th day of October, 2024.
21
22
23
24    Leslie Gilmore-Miller
  My Commission Expires
25  October 7, 2029

37 (Pages 142 - 145)

Genevieve McDonald                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

Page 146

1  Brian Roof
2  brianr@clevelandconsumerlaw.com
3          October 9, 2024
4  RE:  Thurston, Matthew v. Progressive Casualty Insurance
5    9/19/2024, Genevieve McDonald (#6891284)
6    The above-referenced transcript is available for
7  review.
8      Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-southeast@veritext.com
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions
24
25

Page 147

1  Thurston, Matthew v. Progressive Casualty Insurance
2  Genevieve McDonald (#6891284)
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Genevieve McDonald              Date
25

Page 148

1  Thurston, Matthew v. Progressive Casualty Insurance
2  Genevieve McDonald (#6891284)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Genevieve McDonald, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Genevieve McDonald              Date
13  *If notary is required
14      SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

38 (Pages 146 - 148)

Genevieve McDonald
September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[& - 350.16.]**

Page 1

| & | | | |
|---|---|---|---|

**&**

**&** 2:4,12 6:16 6:18 19:10,12 19:13

**0**

**000375** 1:8
**0008234** 53:20
**00375** 5:25
**04401** 6:2
**04681** 2:8 9:25 10:1,14

**1**

**1** 3:6 5:18 26:2 26:5,24 103:4
**1,011** 84:12
**10** 3:20 113:2,6
**10411** 145:23
**106** 3:17
**108** 3:19
**10:42** 26:23
**11** 3:22 123:2,6
**11/30/1982** 9:11
**113** 3:20
**113,343** 90:4
**1180** 2:13
**11:22** 57:17
**11:36** 57:21
**12** 3:25 114:24 125:3,6 138:5 138:9
**123** 3:22
**129** 10:13,15

**12:02** 80:2
**12:29** 80:6
**138** 3:25
**14,000** 16:24
**15** 14:23 18:12
**15,988** 84:18 85:5
**15,998** 82:23 84:22
**16** 123:14,16
**16,857.30** 81:15 81:23 82:8
**16,999** 84:9 85:11
**18** 58:22
**185th** 2:4
**19** 1:19 145:5
**19th** 5:9
**1:04** 106:9
**1:06** 107:22
**1:07** 108:1
**1:22** 1:8 5:25
**1:36** 132:14
**1:38** 132:18
**1:39** 132:18
**1:50** 143:16
**1st** 106:25

**2**

**2** 3:8 27:3 44:2 44:6 57:16 95:13 96:17,24 102:1,2
**20** 18:12 148:15

**200.7077** 2:9
**2000** 13:4,9,15 23:5
**2001** 13:4,10,15 23:5
**2003** 13:20
**2007** 67:3
**2008** 46:14 68:23
**2009** 41:19 45:11 54:5 65:20 81:1 89:15
**2011** 37:8 42:14 78:1
**2013** 42:18 65:15,19 67:9 68:20 69:15
**2017** 72:1 74:25
**2018** 12:1 15:14 68:23 73:2,5
**2019** 45:3,3 46:20 49:22 50:3 54:5 62:14,15 65:19 69:16 71:20,21 75:13 76:23 78:24 88:14 89:6,25 95:5 101:12 105:3 107:1 130:15
**2020** 37:8,12 42:14

**2021** 15:13 130:17,22
**2022** 15:14 16:20 37:19 42:13 65:4 75:10
**2024** 1:19 145:5,20 146:3
**2029** 145:25
**207** 2:9
**21** 65:5,5
**216** 2:5
**22** 9:25 10:11 65:5
**236.41** 94:19
**24th** 45:3,3
**253** 10:1
**26** 3:6
**28** 54:5 109:5
**28th** 46:20

**3**

**3** 3:10 53:9,13 57:20 80:2 91:10 95:19 96:6 113:25
**30** 146:17
**30309** 2:14
**33** 125:3,5
**34** 129:5
**35** 131:4
**350.14.** 103:14
**350.16.** 103:6

Genevieve McDonald
September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

[4 - address]

Page 2

| 4 | 7 |
|---|---|
| **4**  3:11 56:14,16 57:1 80:5 96:15 105:11 106:4 | **7**  3:2,16 84:4 88:4,8 92:23 113:21 118:18 132:18 143:18 145:25 |
| **4,034.78**  54:25 92:7,10 | |
| **4,034.78.**  91:6 | **767**  2:4 |
| **404**  2:15 | **771**  2:8 |
| **44**  3:8 | **7th**  145:20 |
| **44119**  2:5 | |

| 5 | 8 |
|---|---|
| **5**  3:13 80:7,11 97:25 103:9 106:8 107:21 | **8**  3:17 101:19 106:12,13 115:17,25 |
| **5,000**  67:18 94:3 | **80**  1:18 3:13 6:1 |
| **5,995**  98:3 101:8 | **8073**  106:23 |
| **500**  45:14 46:7 94:24 | **8080**  116:1 |
| | **83**  3:14 |
| **501**  109:8 | **869.30**  81:14 |
| **502.1055**  2:5 | **88**  3:16 |
| **504**  110:24 | **8k**  116:10 |
| **53**  3:10 | |

| 6 | 9 |
|---|---|
| **56**  3:11 118:18 | **9**  3:19 108:17 108:21 114:13 139:25 142:25 143:1 146:3 |
| **572.4600**  2:15 | |

| 6 | |
|---|---|
| **6**  3:14 83:3 89:6 107:25 123:14 132:13 | **9/19/2024**  146:5 |
| **64.05.**  103:21 | **9/8/2012**  9:17 |
| **6891284**  146:5 147:2 148:2 | |

| | a |
|---|---|
| | **a.m.**  1:20 5:8 27:4 57:21 |
| | **ability**  8:21 |

**able**  36:3 42:2 47:18 57:11 65:15 87:23 99:17 126:8 136:24 142:19

**above**  146:6 148:7

**absolutely** 109:5

**acadia**  59:6,18 60:5,24 61:5 61:12,14,23 62:3,11 63:8 63:14 66:25 67:1 142:21

**acadias**  61:1

**accept**  51:25

**accepted**  51:22

**accepting**  52:6

**accepts**  116:7

**accident**  21:23 22:1,11 23:10 45:25 46:7,21 47:9,14,18 49:22 50:2 75:8 87:9 105:19 109:4,6 113:22 114:4 115:11 131:19

**account**  118:22 122:19

**accounted**  96:3

**accounts** 122:16,21 124:6

**accuracy**  146:9

**accurate**  47:23 67:6 89:19 113:18 139:18

**accurately**  8:22 89:20,21

**accuse**  133:8

**acknowledge...** 148:3

**acknowledg...** 146:12

**acting**  129:7 131:6

**action**  3:21 6:8 119:14 120:6 145:14,18

**actual**  45:13,16 116:25

**actually**  60:22 115:16 135:21 140:4

**add**  82:20

**added**  82:8 92:25 93:5

**addition**  93:16

**additional** 26:11 28:19 39:8,11,12 48:6 85:3 121:14 127:13 136:9

**additions** 148:6

**address**  9:24 44:13 53:25 80:17 117:25

**[address - appraisal]**                                                    Page 3

118:1
**adds** 82:3
103:21
**adequate**
133:21,22
**adjust** 118:21
119:8
**adjusted** 101:8
**adjustment**
33:5 38:23
58:5 94:8,10
94:11,17 98:16
99:1,20,24
100:4,12,19
101:13 102:3,3
102:9,25 103:4
103:7,12,13,15
103:20,23
110:16 112:17
112:24 116:24
**adjustments**
32:25 35:5
96:16 98:21
103:5 119:2
**administered**
13:19
**administrative**
13:22
**adopt** 41:14
**advertised**
61:12 64:19
70:25 74:8
76:6 85:11,12
118:20,22
119:9

**advertisements**
125:11,15,16
125:18
**advice** 3:11
25:8 53:23
54:18,20
**advisement**
124:25 132:7
**advisor** 14:7
15:2
**affiliations**
6:14
**afford** 16:22
119:15 120:8
120:20
**aftermarket**
93:4
**aggregation**
20:8
**ago** 20:21
21:22 23:6
24:5,6 29:23
29:23,24 32:10
37:5 49:21
50:5 62:18
132:22 135:25
**agree** 5:17
81:21 97:15,19
103:7 121:24
136:10
**agreed** 5:2
108:11,15
**agreement**
32:16 62:10
136:18,20,23

137:7,10
**ahead** 21:12
28:6 135:4
**airbags** 95:21
95:23
**al** 5:21,23
**allegation**
119:7
**allison** 2:12
6:16 7:9
**allotted** 146:20
**allow** 12:17
**allowed** 112:14
**allows** 12:18
**amend** 140:12
141:16,25
142:11
**amended** 3:21
3:23 4:1
123:10 138:15
139:11
**america** 49:25
**amount** 36:10
52:3 55:3
57:25 58:7,12
81:13 91:9,10
91:21,22 92:1
92:6,9,16
93:21,25 94:13
94:15 103:22
**answer** 8:10,11
8:17 21:13
22:24 28:6
30:17 31:17,18
79:2 124:2,21

142:10
**answered**
124:3 129:13
129:20 140:15
140:20
**answers** 8:1
**anybody** 10:22
23:25 29:18
30:3 47:2
125:17
**anyway** 116:11
**anyways** 40:8
**apologies** 15:15
**apologize** 11:24
66:21
**apologizes** 50:6
**appear** 54:12
**appearance**
6:11
**appearances**
6:13
**appears** 44:10
89:3 93:16
104:9 117:2
**appended**
148:7
**applicable**
146:8
**applied** 38:22
94:21 95:1
99:2 100:4
**appraisal** 109:9
109:15,16,22
110:2,11,22
112:8

Case 1:22-cv-00375-NT    Document 120-12    Filed 01/10/25    Page 42 of 239    PageID
Genevieve McDonald
#: 4226
September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

[appraisals - believe]                                                        Page 4

**appraisals**
110:8
**appraised**
118:25
**appropriate**
77:14
**approximately**
10:17 13:4,19
16:23 17:14
18:12 24:6
25:24 29:24
58:22 62:18
**april** 16:4
**area** 36:15
60:17 61:2
98:22
**areas** 133:10
**aside** 28:22
35:25 47:5
83:2 119:12
**asked** 8:17
29:18 66:21
81:8 91:25
123:16 125:8
129:12 141:4
142:4
**asking** 129:17
**asks** 129:6
131:5 139:25
**aspect** 98:14
**asserting** 34:13
34:17 112:11
**assume** 8:6
100:17 138:3

**assumes** 33:2
33:11,13
**assuming** 70:3
**assumption**
100:18
**assumptions**
99:25
**atlanta** 2:14
**attached**
146:11
**attention** 55:9
106:24
**attorney** 6:15
30:17,19,21,22
30:23 35:11
37:1 83:15
114:7,20
145:12,16
146:13
**attorneys** 23:18
23:21 24:14
113:14
**atty** 3:2
**audio** 5:15
**augusta** 14:16
14:18,20 15:18
**authorize**
113:14
**auto** 3:9,20
19:12,14,22
42:21 69:20
80:23 83:8
109:1
**automatically**
126:20

**automobile**
20:4
**automotive**
93:12
**available** 61:21
61:23 76:18
146:6
**aware** 36:18
47:10 83:7,17
96:4 105:16
117:6
**awhite** 2:16

**b**

**b** 3:5
**back** 27:2
37:18,21 40:7
57:20 58:17
65:15,19 77:23
80:4 88:23
95:5 103:3
105:7,8,10
106:7 107:25
115:17,22,25
117:16 118:17
124:18 125:20
132:19 133:13
134:17
**backyard**
67:12,13
**bad** 66:9
**balance** 86:16
87:12,16
**bald** 97:13
**bangor** 1:18
6:2 60:3,20

72:17 126:23
126:24
**bankruptcy**
23:14
**bar** 9:11
**barely** 44:1
**base** 93:1,3,17
94:1,16 118:24
**based** 32:22
81:21 84:20
92:17 99:4
**basis** 91:18
**bates** 53:19
**beam** 79:8
**bear** 18:23
**beginning** 6:14
27:3 57:20
78:1 80:5
105:3 106:8
107:25 132:17
**begins** 30:22
**behalf** 1:5
113:15 129:8
131:7
**behavior** 33:2
33:11,12 102:4
109:24
**belief** 140:18
**believe** 8:21
22:7 26:10
27:8 34:2,9
41:13 42:18,22
43:19 47:1
51:24 53:6
56:11,18 57:25

Genevieve McDonald #: 1227                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[believe - card]**                                                    Page 5

59:14,22 60:6
67:9,18 70:2
70:10,22 71:17
74:2,23 75:9
79:4 80:14
81:8 85:19
86:10,20,21
94:21 95:10
96:9 106:17
110:2 117:19
117:23 121:2
124:9 128:1,13
130:17,21
136:19,21
137:3 138:4
143:5
**believed**  34:11
**belive**  120:17
**bells**  107:14
**berler**  2:4 6:19
**best**  139:15
**better**  37:22
41:14 65:10
82:18 94:21
100:10
**beyond**  39:13
48:6 98:22
**big**  27:18 91:5
92:24
**birth**  9:9,10
128:17
**bit**  11:4 58:17
105:7
**black**  27:19
64:12

**block**  81:12
**boat**  12:19 17:5
17:8,20,24
18:1,10
**bolded**  91:5
92:24
**born**  73:1,2
**boss's**  22:14
**boston**  14:15
**bottom**  90:7,20
110:20,25
**bought**  59:10
63:13 64:9
65:19 67:9,10
69:3,4 75:12
85:14 87:6
135:6 142:3
**box**  2:8 10:1
27:19 126:4,6
**breached**  35:8
35:14,22
**break**  8:13,14
8:18 79:24
**breathalyzer**
13:23
**brian**  2:3 6:18
115:19 146:1
**brianr**  2:6
146:2
**bridges**  1:4
2:25 3:8 25:10
25:16,22 27:17
28:18
**briefly**  25:12
25:23 26:21

**broad**  127:12
127:18
**broken**  95:16
**bronze**  75:16
76:20,23
**browse**  63:21
**budget**  61:8,10
64:15,17
**bullet**  102:1
**bumper**  97:5
105:8,12,15
**burdensome**
127:12,18
**business**  21:2
41:15 93:13
**businesses**  11:2
**busy**  105:2,6
**buy**  59:8,23
60:2 62:3,15
62:19 66:15
67:7,11 69:12
69:18,21 70:1
71:11 72:16
74:21 75:19
85:15 99:13
**buyer**  80:17,20
**buying**  65:9,14
65:18 77:7

**c**

**c**  2:1 9:5,8
**cabinet**  122:13
**calculate**  58:6
**calculated**  99:6
99:22 121:19

**calculation**
94:18
**call**  23:19 24:2
24:7,12 50:13
50:21 51:19
54:22 72:8
86:24 131:20
134:15,17
135:1 143:12
**called**  47:20
74:2
**calling**  56:6
**calls**  35:9
**camera**  5:12
**capacity**  19:10
50:4,6
**capital**  3:11
53:7 54:1,10
54:25 91:11
92:19 130:3,5
130:8,12 131:2
**captain**  12:19
17:5,7,12,24
18:1,5,6,10
**car**  19:6,8,24
41:22 43:8
46:20 47:2
59:8 60:11
61:6 66:11
69:12 77:6,15
79:10 114:9
116:10,11
117:8
**card**  126:9

Genevieve McDonald                                          September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[carefully - collecting]**                                        Page 6

**carefully** 145:8
**carfax** 68:11
    74:19
**carpet** 96:16,20
**cars** 19:17
    58:20 59:1
    61:22 77:19
    99:13 100:6
    112:6
**cars.com** 104:2
**case** 7:10 25:17
    25:21 28:13,20
    28:24 29:15
    31:4 32:21
    33:21 34:14,18
    41:19 74:23
    83:9 86:5
    120:22,25
    121:6 122:10
    131:2 133:24
    136:5,8,18
    137:21 138:1,3
**cases** 99:5
**cash** 45:14,16
    59:25 63:6
    67:15 70:6
    81:14 82:4,6
    116:25
**casual** 3:24 4:2
**casualty** 1:9,10
    5:22 7:11,12
    7:15 33:20
    34:3,10 36:19
    44:17,23 55:10
    55:15,25 115:6

138:17 146:4
    147:1 148:1
**caught** 55:18
**center** 90:19
**certain** 24:10
**certainly** 40:22
    104:20
**certification**
    12:13
**certifications**
    12:9
**certified**
    137:25
**certify** 145:3,12
**chair** 16:18
**challenge** 97:18
    109:14 117:21
**challenges**
    93:24
**challenging**
    51:9 94:1,11
    94:13,15,18
    96:12 97:22
    104:18 119:1
**chance** 132:25
    133:2
**change** 147:4,7
    147:10,13,16
    147:19
**changed** 41:7
**changes** 146:10
    148:6
**check** 53:3 54:9
    54:12,14,16,23
    56:8 92:13,15

**checks** 54:13
**child** 20:20
**children** 9:20
    10:6 128:18
**choice** 73:24
**chooses** 114:15
**chrysler** 3:11
    53:7,25 54:9
    54:25 72:19,20
    91:11,23 92:2
    92:16,19 130:3
    130:5,8,12
    131:2
**circumstances**
    21:25
**citation** 47:14
**claim** 3:18
    31:24 35:14,21
    37:25 38:7,14
    38:16 39:20
    40:2,10,18,22
    47:21,24 51:5
    51:13 52:7
    53:4 57:8 75:5
    78:17 79:14,17
    86:9 102:21
    104:23 105:13
    105:18,22
    106:19 107:12
    108:6 120:10
    120:16 123:19
    124:13,16,17
    134:1,4
**claiming** 35:1,7
    112:4,13,16,21

118:21 119:8
**claims** 34:13,17
    36:1 37:24
    41:1 78:17
    98:21 100:11
    100:20 111:1
    111:11 112:3
    112:11,12
**clarification**
    31:19
**clarity** 142:8
**class** 3:21
    12:12,15 31:21
    119:14,17,23
    120:6 137:25
**clean** 64:14
    141:3
**clear** 93:15
**clearly** 50:17
**cleveland** 2:5
**clevelandcon...**
    2:6 146:2
**client** 30:17,22
    30:23
**close** 49:8
    60:14,21
**closed** 52:7,11
**closest** 73:17
**cloud** 122:17
    122:24
**coast** 12:13
**colleague** 121:3
**collect** 48:5
**collecting**
    122:9

Genevieve McDonald
Thurston, Matthew Vs. Progressive Casualty Insurance
September 19, 2024

**[college - consumers]**                                                        Page 7

| | | | |
|---|---|---|---|
| **college** 11:12 12:5 | 32:8 48:10 | 113:10 118:18 | **conditions** 41:6 65:13 |
| **collision** 79:22 | **companies** 100:16 | **complete** 28:11 39:7,15,23 | **conduct** 132:4 134:12 |
| **color** 75:15,18 | **company** 1:9 | 40:16 124:2 | **conducted** 5:10 |
| **colors** 72:3 | 1:10 5:22 7:11 | 148:8 | 6:3 |
| **come** 54:14 | 7:12,15 19:1,4 | **completed** 62:5 | **conducting** |
| 58:17 60:19 | 19:21,24 30:5 | 62:6 66:16,18 | 133:8 |
| 62:7 82:18 | 33:22 34:10 | 133:21 141:1 | **conference** |
| 124:10 | 35:22 36:19 | 146:17 | 105:5 |
| **comes** 43:9 | 37:16 41:14 | **completely** | **configuration** |
| **comfort** 89:16 | 44:18,23 50:12 | 133:23 | 118:24 119:3 |
| **commencing** | 55:9,11,14,15 | **compound** 40:8 | **confirmed** 74:4 |
| 1:19 | 78:18 79:12 | **comprehensive** | **confused** 50:19 |
| **comment** 28:13 | 99:3 114:16,18 | 45:12 | **confusion** 56:7 |
| 117:8 | 114:18 115:7 | **compromise** | **connection** |
| **commercial** | **company's** | 143:1 | 5:12 |
| 12:18 17:5 | 3:24 4:2 55:25 | **computers** | **consider** 64:5 |
| 18:10 | 138:17 | 122:15 | 133:22 |
| **commission** | **comparable** | **conceal** 108:13 | **considered** |
| 145:24 | 96:6,10,13 | **concept** 55:21 | 60:21 76:22 |
| **committee** | 97:25 98:5,12 | **concerns** 31:23 | 111:25 120:1,8 |
| 16:17,19 | 100:24 101:7 | 51:12 102:12 | **considering** |
| **committees** | 103:3,11 104:1 | 102:16 | 70:16 |
| 16:13,16 | 104:6,18 | **concluded** | **conspire** |
| **communicating** | 118:21 | 144:2 | 114:16 |
| 30:21 | **comparison** | **concludes** | **conspired** |
| **communication** | 40:23 | 143:16 | 114:22 |
| 23:19 49:20 | **compensation** | **conclusion** | **consumer** 33:2 |
| 102:22 130:11 | 36:9 121:12 | 35:10 | 33:11,12 99:4 |
| **communicati...** | **competition** | **concord** 14:16 | 100:1,5 102:3 |
| 28:17 48:19 | 112:20 | **condition** 93:4 | **consumer's** |
| **communities** | **competitor** | 93:17 94:9,11 | 99:15 |
| 25:20 | 37:15 | 96:16 97:15,18 | **consumers** 33:6 |
| **community** | **complaint** 3:21 | 97:21 105:8 | 33:13 99:16 |
| 24:19 29:4 | 34:21 36:18 | | |

**[consumers - darling's]**                                             Page 8

100:21
**contact** 83:17
86:12 104:11
126:12,14,24
**contacted**
30:12 31:6
32:3 83:12,15
83:18 86:10
130:18
**contacting**
131:16
**contacts** 56:23
**contain** 110:15
**contained** 4:4
110:17 132:2
**contesting** 55:3
**contingency**
136:21,22
**continue** 5:16
**continuously**
68:19
**contract** 3:14
32:17 81:4
119:12 128:3
**contracts**
125:12,21
**control** 134:20
134:24 135:2
**conversation**
28:12
**convicted** 21:9
21:15,22 22:18
23:11
**conviction**
21:25 22:5

**copies** 4:4
125:18 129:3
129:22,23
146:14
**copy** 113:11
115:18 126:2
128:6,7,9,13,14
**corey** 9:15
10:21 74:24
75:2 80:19
**corner** 44:12
44:15 90:8,24
**corporate**
49:25
**correct** 12:16
16:12 20:15
27:10 33:19
41:20,21 44:14
45:6 47:21
48:3 49:23,24
52:17 81:11
83:12 87:3
101:11 116:20
148:8
**correction** 23:2
25:14
**corrections**
148:6
**corresponden...**
129:6 131:5,10
**cosigned** 69:5
**cosigner** 69:2
**cost** 136:13
**costs** 137:8,13
137:22

**counsel** 5:20
6:12,24 24:15
83:18 88:12
108:11 115:11
119:10 121:13
121:17,22
130:7 136:23
137:9,18 138:2
145:13,16
146:14
**course** 12:6,7
134:7
**courses** 12:4
**court** 1:1 5:23
6:5,22 7:24
20:16,20,22,23
21:5 121:7
137:25
**cover** 45:23,24
46:1,2 85:18
117:3
**coverage** 3:9
45:9,10,21,23
46:3 85:15,17
85:18,23 86:4
86:25 115:10
**covered** 87:3
**cracked** 105:12
**cream** 64:13
**create** 118:24
**credit** 126:23
126:24
**creditor** 80:22
**crew** 17:9

**crimes** 21:9,15
22:19 23:12
**criteria** 30:9
31:1 32:2
**criticizing**
41:16
**crossed** 120:14
**cs** 146:15
**cum** 11:15
**current** 9:24
56:24 66:4
127:13 138:1
**currently** 14:4
66:12 72:11
**custody** 134:20
135:2
**customer** 37:22
38:1,9,12
**cuts** 96:24 97:2
**cv** 1:8 5:25

**d**

**d** 3:1 9:5,5
**damage** 46:1,2
46:9 47:11,12
49:2 78:18
79:10,19 93:4
105:15 107:10
123:17 132:23
**damaged** 48:24
78:24 114:4
**damages**
121:12,18
**dare** 34:22 36:2
**darling's** 3:15
42:20,21 60:18

**[darling's - details]**                                    Page 9

69:20,25 83:8
83:12,14,22
84:2,3,4 87:7
132:2 133:18
**darlings** 80:23
**data** 20:7
**date** 9:9 52:25
53:1 54:4 59:9
62:17 65:6
68:21 69:13
79:4 89:6
107:2 123:19
147:24 148:12
**dated** 89:9
106:25
**daughters** 9:23
10:21 49:24
72:25
**day** 15:20
47:21 62:3,9
62:10 66:15,17
66:18 68:14
71:11,14 74:21
74:24 76:21
133:17 145:20
148:15
**days** 62:6
135:24 146:17
**dealer** 19:6,12
69:21,24 73:14
73:17 104:2
**dealers** 60:17
104:12,14
**dealership** 43:7
60:12 63:19

70:12 71:10
72:18 74:1
77:12,13 104:5
104:9 126:12
126:14 134:15
134:17
**dealerships**
63:24 67:22
74:6 135:19
**debate** 26:20
**december**
16:11 75:9
**decide** 29:21
32:1 43:7
120:6
**decided** 17:19
37:11
**decision** 49:4
**declarations**
46:6 50:17
**declare** 148:4
**deduct** 82:23
**deducted** 93:18
126:21
**deductible**
45:14 46:10
94:23 95:1
**deduction**
93:16 99:2
**deducts** 103:5
**deemed** 48:24
148:6
**defendant** 2:11
3:23 4:1 21:3
115:2,5 138:16

**defendant's**
123:11 134:10
**defendants**
1:11 6:17 7:10
53:18
**defer** 35:11
36:24 37:1
98:20 101:2,10
103:17,25
110:7,23
111:24 112:7
112:25 114:7
114:20 115:11
119:10 121:13
121:17,21
137:9,18
**define** 137:4
**definition**
25:14
**degree** 11:21
12:5
**demand** 109:16
**department**
20:1
**depend** 110:14
**depending**
15:23 17:15
**depends** 5:11
17:7
**deponent** 3:2
26:19 83:21
122:6 146:13
148:3
**deposed** 7:2,20
20:14

**deposing**
146:13
**deposition** 1:13
3:6,8,10,11,13
3:14,16,17,19
3:20,22,25
5:10,19 7:14
23:16 24:17,24
25:11,15 26:2
29:12,19 41:23
44:2 53:9
56:16 80:7
83:3 88:4
106:13 108:17
113:2 123:2
133:18 134:9
136:3,11 138:5
140:16,19
142:11,24
143:2,9 144:2
145:10,15
**describe** 89:21
121:18
**described**
89:20
**description** 3:6
101:12 102:6
102:10 111:10
**despite** 95:1
**detail** 95:7,14
133:10
**details** 43:8
49:20 50:2
54:3 116:7
140:9

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[determination - driver]**                                    Page 10

| | | | |
|---|---|---|---|
| **determination** 48:25 | **disagree** 48:25 103:15 | 57:13 58:18 80:10,11,13,15 | 135:1,4 136:4 136:7,9 138:22 |
| **determine** 61:16 68:6 71:5 74:14 98:6 104:24 114:10 | **disappointed** 87:5 **discount** 84:11 84:14 **discovered** 142:16 | 81:21 82:16 83:6 88:7,8,14 88:17 90:15 91:1,24 92:1 101:14 106:11 | 143:10,13 **dodge** 68:24 71:19,20,23 72:2,6,7,9,14 72:16,19,19,20 |
| **determined** 48:14,20 58:12 | **discrepancy** 85:24 | 106:16 108:12 108:21,23 | 72:23 73:14,15 73:17,20,24 |
| **determining** 19:17 | **discuss** 43:8 **discussed** 25:21 | 109:3,11 113:5 113:7,11,15,18 | 74:9,11,21 75:1,12,13 |
| **deviates** 118:20 119:8 | 58:24 **discussion** | 123:5,6 133:23 138:8,9,10,13 | 76:2,11,16,20 78:12,12 |
| **difference** 85:21 117:4 138:21 | 57:14 106:6 107:23 116:5 143:20 | 138:23 142:12 **documentation** 25:23 34:23 | 128:22 **doing** 18:11 61:24 141:19 |
| **differences** 118:23 | **discussions** 142:7 | 40:20 92:18 127:21 | **dollar** 52:23 **door** 79:1 |
| **different** 18:18 36:22 41:4 57:12 58:17 63:16 72:3 102:4 129:14 141:3 | **dispute** 90:6 92:5,8 103:22 116:16 118:7 **disputing** 95:25 103:17 107:15 | **documents** 24:23 25:1,4 36:4 83:8,9,16 84:20,24 86:14 122:10,12,23 123:10,12,17 | 89:16 **doubt** 52:4 55:5,7 **doubting** 89:7 **downeast** 19:9 74:2 |
| **differentiates** 56:2 | **district** 1:1,1 5:23,24 | 123:23,24 124:19 125:9 | **drafted** 32:16 **drill** 93:23 |
| **digital** 122:14 122:22 124:5 125:22 126:3 128:6,9 129:23 131:13 | **divorce** 20:21 **docket** 1:7 5:24 **document** 26:5 26:6,9,14 27:6 27:9,13 28:10 | 125:13,23 126:10,25 127:7 128:11 128:16,22 129:1,6,10,18 129:21 131:1,3 | **drive** 14:19 43:23 47:18 62:22 75:24 122:19 125:25 **driven** 68:19 |
| **diploma** 11:7 **direct** 115:25 **directly** 131:18 | 28:17 44:5,7 47:4 53:12,14 53:15,18 56:13 56:14,18,19 | 131:5 132:22 133:12,16,17 134:13,18,22 | **driver** 18:19 39:18 46:17 59:17 69:8 96:25 |

**[driver's - exhibit]**                                                    Page 11

**driver's** 12:23
12:25 13:15
14:1 97:2
**drives** 128:21
**driving** 22:10
22:13 58:21,23
66:12 71:21
72:11
**drove** 43:20
68:25 69:2
**due** 65:13
**duly** 7:1 145:6
**duplicate** 141:8
**duty** 141:9

**e**

**e** 2:1,1,3 3:1,5
9:4,4,4,4,8
147:3,3,3
**earlier** 23:3
52:16 57:23
58:24 75:6
81:8 91:10,22
92:12
**early** 65:4 79:5
**ease** 50:20
**easier** 50:14
64:14
**easily** 134:15
134:23
**east** 2:4
**eaton** 1:18
**economy** 99:18
**education** 11:5
11:12 12:2

**effort** 130:18
**efforts** 127:14
**eighteen** 11:11
**either** 42:2
90:18 124:11
128:17,19
**elected** 15:14
17:4
**element** 110:18
112:16
**eliminate** 56:7
**ellsworth** 42:20
69:20 79:22
**email** 23:18
51:18 117:23
117:25 118:5
122:16 124:6
129:23 130:1
131:14 132:21
**embarrassing**
15:10
**employed** 14:4
18:25 19:3,6,8
24:13 145:13
145:17
**employee** 48:12
145:16
**employment**
15:3 18:13
**encourage**
41:14
**ended** 134:5
**ends** 84:4
106:23 109:7

**engagement**
30:24
**enjoyed** 60:25
**entire** 26:15
87:2 92:6,16
**entity** 33:24
36:23
**entry** 106:25
107:4,8 115:23
116:2
**equipment**
95:15,16,20
101:9 103:20
103:25 118:23
119:2
**equivalency**
11:7
**errata** 146:11
146:13,17
**error** 89:22
113:19,20,21
**especially**
133:22 136:7
**esq** 2:3,7,12
**estate** 10:24
**estimate**
107:13
**estimating**
111:14,16,18
111:21,25
112:8
**et** 5:21,22
**eval** 116:7
**evaluate** 117:1

**evaluated**
98:22
**evaluating** 49:2
**evaluation**
117:11
**evaluations**
110:9
**events** 41:5
**eventually**
87:25
**everybody** 29:8
**exact** 47:12
52:23 55:2
59:9 62:8,17
64:18 65:6
72:1 79:4
87:15
**exactly** 35:1
100:11 142:2
**examination**
3:2 7:5 145:9
**examined**
145:8
**except** 77:12
**exchange** 1:18
6:1 131:6
**exchanged**
129:7
**excuse** 94:14
**exhibit** 3:6,8,10
3:11,13,14,16
3:17,19,20,22
3:25 26:2,5
44:2,6 53:9,13
56:14,16 80:7

Genevieve McDonald                                          September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[exhibit - first]**                                              Page 12

80:11 83:3
88:4,8 91:10
92:23 106:12
106:13 108:9
108:17,20,21
113:1,2,6
115:17,25
118:15 123:2,5
138:5,8
**exhibits** 4:4
**exist** 124:23
**expect** 95:11
131:20
**expenses** 137:8
137:13,22
**experience**
19:16 20:7
66:9
**experienced**
33:23
**expert** 98:20
103:17,25
**expertise** 36:16
49:2 98:23
**experts** 101:2
101:10 110:7
110:23 111:24
112:7,25
121:21
**expires** 145:24
**explain** 16:5
46:23
**explained**
133:10

**explanation**
101:21 119:10
**express** 51:12
**extend** 87:1
**extent** 135:8
**extraordinarily**
105:6
**eye** 55:18

**f**

**facebook** 31:1
31:22 32:4
119:25 120:11
**fact** 41:1
**fails** 146:19
**fair** 8:7 36:8,9
36:10 61:17
68:7 71:6
74:15 76:10
82:10 84:20
96:17 114:25
115:13 121:12
124:20
**fall** 79:5
**falls** 35:6
**familiar** 55:21
98:20
**family** 20:20,22
21:5
**far** 14:19 117:5
**fashion** 37:24
**fault** 47:16
105:20
**fe** 67:2,3,8,15
67:19,23 68:2
68:13,16

**february** 46:20
54:5 105:3
**federal** 126:23
126:24
**fee** 136:17,20
136:21,22
137:7,10
**feel** 136:3
**felt** 65:8,11
**fighting** 136:8
**figure** 52:23
55:2 87:15
**file** 47:21 86:8
113:14
**filed** 5:23 23:14
39:2 78:17
113:12 123:19
142:10
**files** 122:14,14
122:17,23
124:4,5 125:21
125:22 126:2,3
131:12,13
132:25
**filing** 86:11
108:6 122:13
**finally** 65:8
133:15
**finance** 59:25
60:1 63:6 73:8
87:2
**financed** 43:16
52:16 63:7
70:6,7 73:9
81:13 85:19

**financial** 1:10
3:24 4:2 7:12
7:15 44:17,22
55:10,15,24
138:16
**financially** 6:8
145:17
**financier** 46:4
86:7 87:18
**find** 60:11
63:18 67:19
70:11 126:8
131:16,20
132:8 142:18
142:20
**fine** 22:8,25
23:1 49:4
50:22 72:12
139:12
**firm** 6:6
**firms** 121:4
**first** 3:24 4:2
16:1 24:20
31:7 32:3,9
37:3 42:5,7,11
46:7 62:4
71:13 74:1
76:19 88:16,19
88:20 97:25
98:2 102:1
103:11 115:18
115:22 123:11
130:11 136:5
138:13,17
139:8 141:24

Genevieve McDonald                                           September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[fish - go]**                                                    Page 13

| | | | |
|---|---|---|---|
| **fish** 19:10,12 | **forty** 14:13 | **g** | 147:2,24 148:2 |
| 19:13 | **found** 47:16 | **g** 9:4 | 148:4,12 |
| **fishing** 12:19 | 61:23 66:14 | **gag** 85:17 | **genevieve207** |
| 19:11 | 117:14 133:13 | **gain** 19:14 | 117:24 |
| **fit** 128:19 | **foundation** | 31:14 | **georgia** 2:14 |
| **five** 25:24 | 54:11 55:16 | **game** 141:20 | **getting** 84:14 |
| 28:18 96:7 | 58:8,13 89:2 | **games** 141:18 | 136:6 141:3 |
| **flag** 106:23 | 91:20 98:19 | **gap** 85:15,18 | **giant** 26:16 |
| **flaw** 32:24 | 99:14,23 100:7 | 85:23 86:3,4,9 | **gilmore** 1:15,25 |
| **flawed** 32:23 | 111:23 | 86:16 87:3 | 145:2,24 |
| 33:1 117:7 | **foundations** | 117:3,14 131:7 | **give** 8:1 24:23 |
| **flip** 95:19 96:15 | 101:16 | 131:10,14,15 | 38:20 109:8,10 |
| 97:24 105:10 | **four** 10:5 15:7 | 131:23 133:14 | 111:4 115:16 |
| 110:24 | 89:16 130:14 | 133:15 | 115:17 |
| **following** 17:19 | **francis** 2:22 6:4 | **gaps** 58:24 | **given** 25:7 |
| 145:5 | **frankly** 40:22 | **garage** 79:8 | 47:14 122:2 |
| **follows** 7:3 | 61:19 | **gear** 19:10,12 | 143:17 145:11 |
| **font** 57:1,3 | **frederick** 2:4 | 19:13 | 148:9 |
| 80:14 | 6:18 | **ged** 11:8 | **giving** 131:19 |
| **foregoing** | **friend** 60:19 | **geico** 37:17,25 | **glad** 116:9 |
| 148:5 | **fries** 116:4 | 38:7,14,18,20 | **glasses** 56:22 |
| **form** 31:11,15 | 117:10 118:9 | 38:22 39:3,22 | **global** 50:1 |
| 33:8 34:15,20 | **front** 34:23 | 40:15,18,21 | **glove** 126:4,6 |
| 35:9 48:17 | 47:13 79:11 | 41:9 75:4 | **gmail.com.** |
| 54:14 58:13 | 109:1 114:1 | **geico's** 38:12 | 117:24 |
| 77:17 98:8,19 | 137:16 142:21 | **general** 11:7 | **gmc** 59:6 60:3 |
| **formal** 20:10 | **full** 26:9 45:23 | 111:10 | 60:17,18,23,24 |
| **format** 82:18 | 46:3 87:25 | **generally** 29:15 | 61:1,4,23 |
| **former** 15:4 | **fully** 135:7 | **generous** 64:16 | 62:14,15,20 |
| 44:13 | **funding** 116:23 | **genevieve** 1:4 | 142:21 |
| **formula** 32:23 | **funds** 39:8,11 | 1:14 3:2,7,23 | **go** 5:17 7:22 |
| 32:24 100:17 | 39:12 56:11 | 4:1 5:19 7:1 | 8:16 14:24 |
| 101:11 110:14 | **further** 145:12 | 9:4 80:17 | 15:22 21:11 |
| 116:23 117:5 | 145:15 | 138:15 143:17 | 28:5 37:16 |
| | | 145:6 146:5 | 43:7 48:5 |

[go - hyundai]                                                      Page 14

60:16 73:13,25
74:6 79:25
106:1 107:18
113:1 115:22
115:25 117:10
118:17 121:7
124:18 127:20
132:11 134:17
135:4 143:6
**goal** 31:10,13
**going** 5:8 18:21
26:20,22 27:2
35:20 50:8,19
50:20 57:16
58:16 59:1
66:6,7 82:19
83:6 88:23
92:22 100:16
105:7 106:4,11
107:21 109:24
112:25 113:1
113:25 114:7
115:16,17,21
117:15 125:2
125:19 132:13
134:25 136:2
139:24 140:16
140:21
**good** 5:7 7:7,8
79:23
**google** 122:19
**gotten** 128:6
**government**
16:19

**graduate** 11:6
11:15,25
**great** 61:18
73:4
**ground** 7:22
**guard** 12:13
**guess** 34:24
35:20 137:14
143:3

### h

**h** 3:5 147:3
**habits** 99:4,16
100:1
**half** 14:21
116:10
**halfway** 74:24
75:24
**hampshire**
14:16
**hand** 89:24
90:8 117:5
126:9 145:20
**handled** 51:5
**hannaford** 47:1
**hanover** 105:22
107:12 108:7
124:14,17,19
132:23 133:7
134:1,3,8,11
**happened**
30:11 46:23
50:2,5 62:11
71:15 74:25
79:7 105:5
118:8

**happens** 86:5
**happy** 8:4,15
**harbor** 9:11
**hard** 82:1
122:13 124:4
125:21 126:2
129:2,22
131:12
**hazard** 137:14
**head** 8:2,2
**heading** 109:9
110:25
**health** 108:13
**hear** 107:12
**heard** 5:14
**held** 18:17
57:14 106:6
107:23 143:20
**helpful** 72:8
**hereto** 145:17
148:7
**hereunto**
145:19
**herrero** 2:22
6:4
**high** 11:6 18:25
**higher** 110:3,12
110:21
**hill** 2:12
**hire** 32:1 138:2
**hired** 31:10
**history** 18:22
58:20
**hit** 46:24
107:11

**hits** 124:11
**hitting** 108:4
**hmm** 56:25
**hold** 133:4,5
134:8 136:3
**holding** 143:9
143:11
**home** 10:2,18
10:25 32:15
73:18
**honestly** 82:13
116:8
**hood** 97:7
**hour** 8:14
**hours** 14:12,21
14:23,23 22:3
**house** 15:4,13
15:16 16:7,18
17:21 18:8
**huh** 107:6
**hurt** 47:9
**husband** 10:6
39:21 43:1,2
43:24 46:16
59:20 62:6
63:1 66:17
73:19 75:11
77:9,11 121:25
122:2 128:20
**husband's**
43:14 69:1
78:11,22
**hyundai** 67:2,3

Case 1:22-cv-00375-NT    Document 120-12    Filed 01/10/25    Page 53 of 239    PageID
#: 1237

Genevieve McDonald
Thurston, Matthew Vs. Progressive Casualty Insurance

September 19, 2024

[ice - investigated]                                                    Page 15

| i | | | |
|---|---|---|---|
| **ice**  64:13 | **improvement** 101:3 | **inspect**  47:25 | **interaction** 131:17 |
| **icloud**  122:19 | **inaccuracy** 90:2 | **inspection** 48:12 | **interactions** 48:7 |
| **identification** 3:7,9,10,12,13 3:15,16,18,19 3:21,22,25 26:3 44:3 53:10 56:17 80:8 83:4 88:5 106:14 108:18 113:3 123:3 138:6 | **incident**  13:14 87:1,4 92:21 | **installment** 3:14 81:4 | **interested**  6:8 145:18 |
| | **included**  81:22 139:16 | **instruct**  27:22 30:16 | **interests**  31:20 119:22 |
| | **includes**  94:7 94:16 98:15 | **instructs**  8:11 | **interjected** 19:18 27:25 38:25 91:17 |
| | **including**  6:12 81:14 82:4 125:11 | **insurance**  1:9 3:9 5:22 7:11 19:1,4 30:4,15 33:22,25 34:4 34:9,10,11 35:8,15,17,22 35:22 36:19 37:4 46:4 50:12 77:22 78:18 79:12 86:9 93:12 98:21 99:3 100:16 105:13 105:23 107:12 108:7 114:9 115:9 117:3,14 124:17,19 126:9 131:7,10 131:15,15,23 132:23 146:4 147:1 148:1 | **intermittently** 14:25 |
| | **income**  18:16 65:10 | | **internal**  84:5 |
| **identified** 24:11 34:7 | **incomplete** 27:7 140:24 | | **internet**  5:12 74:14 76:15 |
| **identifies**  54:5 | **independent** 104:22 | | **interpret**  84:24 |
| **identify**  42:2 140:1 | **indicating** 81:18 | | **interrogatories** 4:2 67:4 135:7 135:11 138:18 142:15 |
| **ii**  12:12,15 | **individually** 1:5 119:14,16 | | **interrogatory** 59:3 68:22 135:10 139:2,7 139:17,24 140:13,17,23 141:4,7,10 142:25 |
| **immediately** 51:22 68:12 | **industry**  17:10 19:11 93:13 | | |
| **impact**  8:21 97:5 105:12 | **influence**  13:6 23:11 | | |
| **impaired**  8:20 | **information** 52:1 57:12 89:15,19 96:7 108:14 121:14 132:1 135:18 135:19 139:16 142:19 | **insured**  41:11 77:20 | **inventory** 63:22 |
| **import**  104:3 104:11 | | **insurer**  34:3 50:10,18 75:3 105:17 133:14 133:15 | **investigate** 120:21 |
| **important**  7:25 | | | **investigated** 40:18 |
| **impression** 49:18 | | | |
| **improper**  98:6 98:11 99:21,25 100:4,13,15,20 | | | |
| **improperly** 96:9 | | | |

[involved - leave]                                                                    Page 16

**involved**  22:16
    31:4 40:25
**involves**  19:17
**iphone**  122:16
    129:24 130:2
**irrelevant**
    133:24
**island**  2:7 6:20
    19:10,11,13
**islandjusticel...**
    2:9
**issue**  27:8
    41:19 100:12
**issued**  53:3
    54:9 130:9
**issues**  40:24
    136:6
**item**  113:21
**itemization**
    81:12
**items**  122:24,25

**j**

**j.d.**  90:18
**jail**  23:7
**january**  16:2,4
    17:22 45:3
**jeep**  72:20
**job**  14:6 17:6
    49:25
**jobs**  17:1 18:18
**john**  2:7,9 6:20
**join**  29:21,25
    120:6
**joined**  88:17

**joining**  31:13
**jointly**  121:25
    122:2
**joke**  122:7
**july**  16:11 45:3
**june**  16:2 17:22
**justice**  2:7 6:21

**k**

**k**  9:8
**kate**  25:10,16
    27:16
**katherine**  1:4
    2:25 3:8
**keep**  50:18
    54:18 56:6
**key**  124:7
**kids**  49:21
    64:14
**kind**  38:16
    136:5 137:1
**king**  2:12 6:16
**knew**  25:16
    32:6 117:20
    120:19 122:14
    124:4 125:16
    129:22 142:22
**knock**  79:1
**know**  8:4,15
    25:1,19 29:1,3
    29:5,9 33:9
    34:13 35:6,13
    35:16,25 36:14
    38:19,21,22,24
    41:9 42:7
    44:24 45:19

48:1,9,13,19
49:7 54:13,20
56:2 58:9,14
60:23 65:20
76:13 79:3
81:24,25 82:13
82:19,20 84:24
84:25 85:7
86:11 90:13,18
91:22,23 94:20
96:11 97:12
99:6 100:8
103:16 108:25
109:20 110:11
110:20 113:13
114:21 116:23
119:17 120:13
122:4 124:13
125:17 126:7
126:11 128:14
131:25 133:25
134:3,4 135:5
137:23 138:4
**knowing**  61:4
**knowledge**
    19:10,14 39:19
    40:20 49:14
    93:9 103:24
    113:17 121:5
    135:9 139:16
**known**  46:3
    109:21
**knows**  134:11
**kslaw.com**  2:16

**kurilec**  9:7
    80:17

**l**

**l**  5:1 9:5,8
**labeled**  34:5
**lade**  11:15
**lane**  9:25 10:12
**language**  34:24
    36:3 137:14
**large**  55:18
    85:8 97:5
    105:12
**larger**  57:3
**late**  133:16,19
**laughed**  64:24
**law**  35:3
**lawsuit**  20:25
    21:3 29:21,25
    31:8 36:7 39:2
    79:16 88:17
    119:1 121:10
    122:1
**lawyer**  8:9
**lawyers**  24:16
    24:23 25:7
    120:21,24
    136:18 137:17
    138:1
**leak**  97:10
**learn**  135:20
**learned**  31:7
**leather**  64:13
**leave**  16:21
    37:11 41:13

**[leaving - loss]**                                                    Page 17

| | | | |
|---|---|---|---|
| **leaving** 21:23 | **likelihood** 33:3 | **lives** 29:4,8 | 114:13,24 |
| 23:9 | **limited** 18:3 | **llc** 2:4 | 115:22 116:1 |
| **left** 15:14 16:20 | 39:20 40:20 | **llp** 2:12 | 123:13 125:2 |
| 22:1 44:12 | 93:8 | **loan** 39:24 40:3 | 125:15,21,23 |
| 52:22 84:8 | **line** 80:25 82:2 | 40:11,17 43:18 | 126:4,6 128:21 |
| 92:23 | 110:20 147:4,7 | 86:16 87:24 | 129:5 133:2 |
| **legal** 20:10 | 147:10,13,16 | 116:10 117:16 | 136:7 139:24 |
| 31:4 34:13,17 | 147:19 | 128:3 | 142:14,18 |
| 35:10 36:2 | **lip** 103:20 | **lobbying** 12:6 | 143:6 |
| 146:23 | **list** 34:22 36:2 | **lobster** 12:12 | **looked** 25:1 |
| **legislative** | 98:2 101:7 | 12:15 17:5,24 | 60:12 62:4 |
| 16:23 | 140:3,9 | 18:1,10 | 63:19 70:12 |
| **legislature** | **listed** 46:13 | **local** 48:9 | 76:17 91:9 |
| 15:19,25 16:1 | 59:4 63:1 | **locally** 29:7 | 124:6,6 126:2 |
| 16:4,6 17:23 | 64:25 67:3 | **located** 14:14 | 131:12,12 |
| 18:2 | 68:22 71:22 | 14:15 15:17 | 142:9 |
| **lender** 82:17 | 81:6 92:25 | 67:13 104:16 | **looking** 30:14 |
| 126:22 | 96:8 98:1 | **location** 6:1 | 70:14,20 84:1 |
| **leslie** 1:15,25 | 102:5 104:12 | **long** 10:4,15 | 103:3 142:17 |
| 6:6 145:2,24 | 104:15 140:5 | 13:24 14:9 | **looks** 118:2 |
| **letter** 30:24 | **listing** 104:2 | 15:6 18:11 | **lose** 137:21 |
| 130:21 | **lists** 95:14,19 | 23:6 50:5 | **loss** 31:23 |
| **letters** 55:19 | 104:3 | **longer** 39:17 | 33:23 36:9,11 |
| 130:20 | **litigation** 25:2 | 52:10 86:25 | 38:17,18 39:4 |
| **letting** 79:3 | 25:5 31:13 | **look** 24:24 25:4 | 39:23 40:16 |
| **license** 12:12 | 106:20 120:19 | 26:1,13 40:19 | 45:6,23 48:15 |
| 12:15,20,23,25 | 137:8,13 | 45:8 46:12 | 48:20,22 49:1 |
| 13:7,16 14:1 | **little** 11:4 21:6 | 54:3 61:1 | 52:7 54:4,10 |
| **licenses** 12:9 | 58:16 65:10 | 63:24 67:22 | 55:1 56:9 75:5 |
| **lienholder** | 105:7 106:23 | 76:15 80:25 | 78:7,16 87:10 |
| 39:17 53:5,6,7 | **live** 10:6,9,11 | 81:12 88:22 | 89:10 90:9,12 |
| 87:12 92:20 | 10:15 24:19 | 91:4 92:22 | 92:7,8 95:17 |
| 129:8 | 25:20 60:14 | 95:13 96:5 | 105:9,14 |
| **life** 105:6 | **lived** 10:4,11 | 101:19 102:1 | 111:21 112:6 |
| | 10:20 | 109:7 113:25 | 112:15,23 |

**[loss - met]**

117:11 120:2
121:12
**losses** 78:9,14
**lost** 40:2,10
41:18 95:14
114:11
**lot** 46:24,25
60:13 63:20
65:3 73:24
74:5 76:18
95:14
**lots** 61:19
**love** 117:8
137:16
**low** 58:1,3
93:21 94:6
**lower** 37:15
110:12,21
**lunch** 79:3,24

**m**

**m** 9:5
**made** 55:14
60:16 62:9
65:7 73:13
105:18 117:8
148:5
**maiden** 9:7
**main** 10:13,15
**maine** 1:1,16
1:19 2:8 3:20
5:24 6:2 9:11
9:25 10:1,13
11:16,17,22
12:8,12,19
15:4,12,16,18

16:1,3 18:8
29:5 42:20
47:1 60:3,22
67:14 69:20
72:17 79:22
104:17,19
109:1 119:22
145:1,3
**mainers** 115:2
**make** 7:18,22
22:15 50:14
51:15 114:8
126:19,20
127:13
**makes** 34:2
52:11 99:25
**making** 52:19
126:17 128:2
**mall** 42:21
69:20 80:23
83:8
**manufacturer**
20:5
**march** 67:9
89:6 105:3
106:25
**marine** 16:17
**marital** 9:12
**marked** 26:5
44:6 53:13
56:13 80:10
88:7 106:11
108:20 113:5
123:5 138:8

**market** 41:6
64:2 65:13
66:4 67:23
76:2 93:6,18
94:12
**married** 9:13
9:16,18
**matched** 92:1
**matter** 5:21
99:8
**matters** 32:12
**matthew** 1:3
5:21 29:1
146:4 147:1
148:1
**mcdonald** 1:4
1:14 3:2,8 5:20
7:1,7 9:4,5,15
9:25 10:12,21
75:2 80:19
89:23,25
123:22 133:3,8
136:17 140:8
143:17 145:6
146:5 147:2,24
148:2,4,12
**mcdonald's**
3:23 4:1 26:15
138:15
**mean** 7:14
39:10,16 44:21
45:16 48:22
54:13 55:13
85:21,23
110:16 119:20

137:4
**meaning**
123:18 129:9
**means** 54:21
119:17,21
**mechanic** 67:12
67:13
**media** 5:18
25:25 26:24
27:3 30:1
57:16,20 80:2
80:5 106:4,8
107:20,25
132:13,18
142:17 143:18
**meet** 16:10,11
31:1 32:9
75:24
**meeting** 16:7
**member** 15:4
32:7
**members** 31:21
119:23
**memory** 8:20
95:18
**mental** 50:6
**mentioned**
28:16
**message** 3:7
27:16
**messages** 28:9
**met** 23:18,20
24:16,20,21
30:9 32:2
74:23

Case 1:22-cv-00375-NT    Document 120-12    Filed 01/10/25    Page 57 of 239    PageID
#: 1241
Genevieve McDonald    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

[metallic - number]    Page 19

metallic  75:18
methodology
  101:21
michael  116:4
  117:23
michell  90:11
middle  53:22
mike's  104:3,11
mileage  90:3,5
  101:9 103:5,13
  103:16,18
  118:23 119:2
miles  90:4
miller  1:15,25
  6:6 145:2,24
mind  40:24
  120:14
mine  46:3
  78:22,24
minor  11:22
minute  109:10
minutes  14:23
missing  95:16
mitchell  90:8
  90:19,23 96:9
  110:4 112:14
mitchell's
  96:12 111:20
  112:5,22
mm  56:25
model  22:15
moment  109:8
  111:4 132:22
money  39:17
  86:6 117:17

122:1 137:5
month  24:5,6
months  16:8
  17:13,16,18
  59:10
moody's  79:22
morning  5:7
  7:7,8
motor  20:1
multiple  88:2
  96:24 97:1

n

n  2:1 3:1 5:1
  9:4,5 11:19
name  6:4 9:3,7
  9:14 43:14
  44:13 54:4
  55:22,25 66:6
  77:12 80:17,18
  89:13,23,25
  131:23 132:2,5
named  36:18
  145:5
names  9:6
  43:18 56:3,4
  90:20
napa  19:12
nature  47:12
  48:18
ne  2:13
near  29:8
necessary
  148:6
need  8:14 26:21
  126:9,11 134:2

134:8 141:7
needed  46:4
  68:12
needs  140:18
negative
  103:13
negotiate  33:6
  33:13,17 64:23
  65:7,12,16,23
  65:25 66:1,3
  77:8,10,15
  87:16 99:12,17
  100:14,22
negotiated
  65:25 77:5
negotiates
  100:5
negotiating
  102:4
neighboring
  25:20 29:4
neither  89:24
  117:5 145:12
never  18:5
  20:13 65:23,24
  65:25 77:7,11
  120:15 136:6
new  14:16
  59:23 116:11
  138:2
news  87:5
nice  75:25
  122:4
night  88:18,19
  88:21 131:25

132:8 133:13
  133:15
nod  8:2
north  10:13,15
notary  1:16 7:2
  145:2 148:13
  148:19
note  5:9 7:18
  53:17 107:9
  108:10 124:16
  132:20 138:25
  146:10
noted  39:18
  143:14 148:7
notes  3:18
  106:19 116:4
  116:13 143:6
notice  1:17
  145:4
noticing  6:15
november
  17:15,18
nt  1:8 5:25
number  26:2
  44:2,16 53:9
  53:19 56:16
  64:18 80:7
  82:4,6 83:3
  85:5,8 88:4
  92:8 93:17,19
  94:5 98:17
  101:8 103:4
  104:6 106:13
  108:17 110:21
  113:2,21

Genevieve McDonald
Thurston, Matthew Vs. Progressive Casualty Insurance

September 19, 2024

**[number - okay]**

Page 20

116:25 117:21
118:9 123:2
125:3,4,5
129:5 131:4
138:5 139:25
142:25 143:1
143:18
**numbers**  82:1
82:21 85:3,6
91:6 92:25
**numerous**
24:20

**o**

**o**  5:1 9:5 11:19
11:19,19
**oath**  21:7 34:24
145:9
**object**  8:9
22:23 143:11
**objected**  27:6
**objecting**  50:23
127:11
**objection**  21:10
22:6,21 24:18
26:8 27:22
28:5 30:16
31:11,15 33:8
34:15,20 35:9
36:13,25 38:3
40:4,13 43:11
44:24 45:18
48:17 49:10
50:16 51:6
52:8 54:11
55:16 56:1

58:8,13 62:1
65:17 68:8
71:8 74:16
76:12 77:17
82:12 84:23
89:2 90:17
91:14,19 93:7
95:9 97:17
98:8,19 99:10
99:14,23 100:7
101:1,16 104:8
109:23 110:6
110:13 111:9
111:23 119:4
121:11,20
122:3 123:11
124:1,20 127:2
127:9 128:25
129:12 131:11
133:5
**objections**  3:23
4:1 6:9 123:9
123:22 133:25
138:16
**obligated**
137:12
**obligation**
127:19 139:5
**obvious**  97:10
**occasionally**
69:2
**occupation**
18:9
**occurred**  41:5

**october**  17:14
145:20,25
146:3
**offer**  51:15,23
116:6,18
**offered**  51:25
104:7
**office**  14:24
16:23 29:7
50:1 105:4
**offices**  1:17
14:15
**offshore**  17:9
**oh**  19:9 25:14
26:13 32:10
89:7 90:23
102:17 107:5
115:20
**ohio**  2:5
**oil**  97:11
**okay**  11:4,21
13:14 16:9,13
17:12,21 18:4
18:7,24 19:16
20:12,16,22
21:20 22:4,10
23:5,20 24:23
25:16 26:1
27:5,11,18
28:14,16,22
29:8,17 31:6
32:6,18,24
33:6,20 34:2
35:13,19 36:5
36:18 37:11

39:22,22 40:1
41:8,11,22
42:1,8,11,16
43:20 44:12,15
45:2 46:5,12
47:11,24 48:4
48:11 49:7,22
50:8 53:17,25
54:18,22,23
55:5,5,8,24
56:6 57:3,6,10
59:17 62:11,15
66:19 67:7
68:22 69:6,9
69:15,18 70:25
71:15,24 72:5
72:8,13 73:3,4
73:5,7,16 74:6
74:25 75:17,19
76:23 77:1,5
77:14 78:1,4
78:13,16,21
79:23 80:16,19
81:19 83:2,12
83:19 84:1
85:2,10 86:2
86:23 87:8,10
88:1,3,22 89:9
90:3,14,22
91:4,16 92:3,5
92:22 93:11,14
93:20 94:5,9
97:24 98:14
100:3,23
101:19 102:1

**[okay - parents]**                                                    Page 21

105:25 107:17
108:3,6,9
109:7,11 111:7
111:13,17,20
112:2,10,19,21
112:21 113:1
113:20 114:21
114:24 116:17
117:22 118:9
118:15 119:7
119:11 123:1
123:13,16
125:2,23 126:4
126:14 127:17
127:24 128:5
128:14 130:1
130:16,20,25
131:4 132:3,10
132:12 136:2
136:17 139:10
142:23
**old** 9:22 11:10
49:24 142:17
**olds** 105:4
**once** 18:5 30:20
52:9
**online** 61:1
63:21 67:25
126:19
**onscreen** 5:15
**open** 133:1,6
134:8 136:3
143:9,11
**operate** 12:18

**operating** 13:6
23:10
**opinion** 40:21
**opportunity**
102:20 109:14
117:20 133:20
**option** 109:20
109:21
**optional** 95:20
**options** 96:2
**order** 143:22
143:22,24
**original** 4:4
**orono** 11:16,18
12:8
**os** 55:7
**ought** 65:8,12
**oui** 23:2
**outcome** 6:9
**outline** 45:9
111:18
**outside** 102:25
104:19
**overly** 127:12
127:18
**oversight** 16:19
**owe** 87:12
**owed** 39:17
41:3 85:24,25
86:6 87:14
114:17
**own** 10:2,3,18
10:24 11:2
17:20 32:16,20
35:11 80:18

119:21 121:25
122:10
**owned** 21:2
44:11 46:16
60:25 74:3
77:2

**p**

**p** 2:1,1 5:1
**p.m.** 80:2,6
106:5,9 107:22
108:1 132:14
132:18 143:16
144:3
**p.o.** 2:8 10:1
**packages** 96:2
**page** 3:2,6
26:14 45:9
46:6,13 50:17
53:23 81:7
84:3 85:4
95:13,19,19
96:6,15 97:24
101:13,19,23
103:8,9 105:10
105:11 106:22
106:25 109:5,7
110:24,25
114:1 115:23
116:1,2 117:22
118:18 123:14
123:21 125:3,6
147:4,7,10,13
147:16,19
**pages** 26:11

**paid** 39:7,15,23
39:24 40:15,17
41:2 46:7
54:25 55:4,6
58:1 64:25
81:9 82:10,25
85:22 86:21
87:11 91:11,23
92:2 115:13
140:4
**pan** 97:11
**pandemic**
49:21 50:1
59:13,13,14,15
**panel** 97:8
107:11
**paper** 128:6,13
128:14
**paperwork**
43:5,9 62:8
66:17 71:13
140:21,22
141:19,21,22
**paragraph**
109:13 111:5,8
113:25 114:13
114:24 118:18
**parameters**
61:5 64:8,11
70:19 73:20
76:4
**pardon** 26:19
125:4
**parents** 20:21
29:9

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[parked - posted]**                                                    Page 22

| | | | |
|---|---|---|---|
| **parked**  107:11 | 87:25 114:2,14 | 105:2 145:5 | 48:19 49:18 |
| **parking**  46:24 | 114:16 117:15 | **personal** | 55:8 69:15 |
| 46:25 79:8,9 | 117:17 126:19 | 122:24 | 76:2 84:3 |
| **part**  15:24 91:4 | 137:1,5,7,13 | **pertinent**  28:13 | 102:2 103:8 |
| 100:18 114:1,5 | 138:2 | **pgr**  53:20 | 106:24 117:2 |
| 130:23 131:1 | **paying**  61:17 | **phone**  23:19 | **policy**  3:20 |
| **participants** | 68:7 71:6 | 24:2,7,12 | 14:7 15:2 34:9 |
| 5:13 24:10 | 74:15 76:10 | 51:19 86:13,24 | 34:11 35:8,15 |
| **participated** | 114:25 | 131:17,20 | 35:17,23 37:7 |
| 20:20 | **payment**  3:11 | **photograph** | 42:5,7,10,11,12 |
| **particular** | 40:11 52:6,10 | 142:20 | 44:10,16 45:2 |
| 39:20 41:2 | 53:23 54:18,20 | **pick**  100:17 | 45:10 109:2 |
| **particularly** | 55:14 85:9 | **pickings**  61:21 | 114:10 |
| 99:17 125:19 | 126:19,20 | **picture**  28:11 | **polite**  117:13 |
| **parties**  5:3,17 | 136:24 | **picturing**  42:12 | **portion**  66:16 |
| 143:12 145:14 | **payments** | **place**  5:16 9:9 | 93:12 |
| 145:17 | 52:19,25 53:2 | 49:22 79:24 | **portland**  14:15 |
| **parts**  19:12,14 | 126:17 128:2 | **plaintiff**  2:2 | 14:18,22 |
| 93:5 | **payoff**  39:13 | 3:23 4:1 5:20 | **position**  17:10 |
| **party**  6:7 20:25 | 85:19,21 | 6:19 21:3 | 111:20 134:10 |
| **party's**  108:13 | **pdf**  26:16 | 112:10 138:14 | **possess**  125:17 |
| **pass**  107:10 | **peabody**  1:18 | **plaintiff's** | **possession** |
| **passat**  41:20,23 | **peachtree**  2:13 | 114:3,3 | 127:22 129:2 |
| 54:6 81:1,5 | **people**  29:17 | **plaintiffs**  1:7 | 134:19 135:2 |
| 89:1,16 | 30:14 33:4 | 6:21 114:14,17 | **possibility** |
| **past**  21:11,16 | 47:6 99:12 | 115:1 | 39:14 |
| **pause**  143:8 | 136:6 | **plate**  142:21 | **possible**  89:22 |
| **pay**  38:14 40:3 | **period**  13:9 | **playing**  141:18 | **possibly**  126:12 |
| 40:10,11 46:8 | 45:2,5 87:2 | **please**  5:9 6:10 | **post**  28:12 30:2 |
| 52:22 59:25 | **permission** | 6:23 9:2 18:23 | 30:6 31:1,22 |
| 61:14 63:6 | 83:16 | 28:2 103:8 | 32:4 59:13,14 |
| 66:22 67:15,17 | **permitted** | **plenty**  133:6,19 | 119:25 120:12 |
| 70:6 71:3 | 112:5 | **plus**  14:13 | 142:17 |
| 74:11 79:14 | **person**  24:12 | **point**  8:14 | **posted**  30:1 |
| 86:16,18 87:23 | 24:21 65:2 | 17:19 31:3 | |

Case 1:22-cv-00375-NT    Document 120-12    Filed 01/10/25    Page 61 of 239    PageID #: 2245
Genevieve McDonald
Thurston, Matthew Vs. Progressive Casualty Insurance
September 19, 2024

[postgraduate - promised]                                                    Page 23

postgraduate
  12:2
power  65:9,15
  65:18 77:7
  90:19
practices  41:15
pre  59:13
prefer  41:24
preferred
  73:22
prepare  23:16
  91:1
prepared  90:14
  91:2,3 138:2
prescription
  56:24
present  2:20
  6:12 23:23
  43:2,4
presently  14:12
preti  14:7,9,14
  15:2,11
previous  28:12
  65:11 124:3
previously  17:4
  65:10 74:4
  78:5,6
price  33:13,17
  61:12,17 64:19
  64:21 68:4,7
  71:1,6 74:8,15
  76:6,8,11 77:5
  77:15 81:14,22
  82:4,6 84:9,21
  98:3 101:7

102:5,5 140:3
  140:4
prices  100:24
  118:20,22
  119:9 140:9
primarily
  43:20 62:22
primary  46:17
  59:17 62:24
  69:8
print  3:12
  133:1
printed  80:13
prior  25:16
  42:13 93:4
  107:10 123:18
  132:23 140:2
private  3:7
  27:16 108:13
privilege  30:17
probably  66:17
  128:16
problematic
  110:17
proceed  6:24
proceeding
  6:10
proceedings
  5:5
proceeds  121:6
process  51:13
  112:8,8 117:7
processes  101:3
produce  82:17
  123:17 125:9

137:17
produced  25:2
  25:5 26:9,15
  28:10,16 53:19
  82:17 106:20
  133:12
production
  3:24 26:15
  123:9,12,14
  131:4
productive
  94:17
professional
  12:20
progressive  1:9
  3:20 5:22 7:10
  30:4,14 33:20
  33:22 34:2,5,6
  34:8,10,12
  35:2,7,18
  36:19 37:4,12
  37:19,22 40:1
  40:9,23 41:12
  42:5,9,14
  45:22 46:8
  47:20,25 48:11
  50:9,10,13,14
  50:21 51:1,4
  51:13,15 52:2
  52:6,14 53:3
  54:9,25 55:6
  55:19,25 56:6
  56:9 57:6,24
  58:1,6,11
  77:23,24 79:13

79:14 83:7
  87:11 90:25
  91:11 92:14,15
  100:19,23
  101:6 102:14
  102:23,24
  105:17 109:2
  111:14 112:4
  112:13,22
  114:2,8,15,21
  114:25 115:6,9
  115:12 116:17
  116:24 117:7
  117:16 119:13
  120:1,15 124:9
  146:4 147:1
  148:1
progressive's
  37:6 49:4 51:9
  106:19 116:13
projected
  32:25 33:5
  35:4 38:23
  58:4 98:15,25
  99:20,24 100:3
  100:12,18
  101:13 102:2,9
  102:25 103:4
  103:12 110:16
  112:17,23
  116:23
projective  94:7
promised  114:2
  115:1,4

Case 1:22-cv-00375-NT    Document 120-12    Filed 01/10/25    Page 62 of 239    PageID
Genevieve McDonald
Thurston, Matthew Vs. Progressive Casualty Insurance
#: 4246    September 19, 2024

[prompted - reason]    Page 24

**prompted**
29:25
**proper**  101:11
133:8
**provide**  140:2
140:10 142:8
142:19
**provided**  25:24
92:18 118:2
138:10 142:4
**provider**  77:22
86:9 131:7,24
**provides**  19:22
**public**  1:16 7:2
145:2 148:19
**punishment**
22:4
**purchase**  33:14
33:17 42:19
62:10 64:21
65:6 68:21
76:8 77:10
81:4,22 84:6
84:21 86:4
100:6 115:9
125:9,24 126:1
126:25 128:11
128:22 134:14
134:18 140:9
**purchased**
32:15 34:4
42:16,25 43:1
43:3,6 59:2
60:8,20 61:24
68:14 73:10

76:21 77:2,6
77:19 87:9
114:9 125:10
125:19 135:13
135:14,21
140:1,11,14
**purchaser**
62:24
**purchases**
65:11
**purchasing**
102:4
**purposes**
128:18
**pursuant**  1:17
145:4
**pursue**  119:15
120:9
**pursuing**
120:18
**put**  17:20
106:23 116:14
135:9 137:16
137:16

### q

**qualified**  117:1
**quality**  5:11,11
**quantified**  85:7
**quantify**
127:14
**quarter**  97:8
107:11
**question**  8:3,6
8:12,17,18
28:1 40:5

99:10 103:10
124:3 127:4,15
**questions**  8:10
8:24 18:21
50:8 102:8,12
102:16,20
118:10 133:3
140:21 142:5
**quickly**  126:9
143:6
**quirk**  72:17,18
72:19 73:10
75:21

### r

**r**  2:1 9:8 11:19
147:3,3
**rabbits**  28:15
**raise**  102:12,17
102:18
**raised**  102:18
**ram**  68:24
71:19,20 72:6
72:7,9,14,16
73:14,15,17,21
73:24 74:9,12
74:21 75:1,12
75:13 76:2,11
76:20 78:12,12
128:23
**rams**  71:23
72:2 76:16
**random**  18:23
**rate**  37:15
**rated**  96:16,24

**rather**  114:14
**ratings**  97:16
97:19
**reach**  118:12
130:18 136:24
**reached**  110:9
116:24 130:8
**read**  56:20 57:3
57:10 80:14,16
81:25 82:1
101:12 109:5,8
109:10 143:21
143:23 146:9
148:5
**reading**  101:23
101:25 102:10
124:16
**reads**  109:11
**ready**  24:24
116:11
**real**  10:24
**realized**  120:17
**really**  7:25
80:13 89:24
117:4 126:11
**rear**  95:21,23
97:5,8 105:11
107:10 108:4
134:5
**reason**  8:19
55:5,7 87:6
90:6 92:5
120:7 134:2,22
146:11 147:6,9
147:12,15,18

**[reason - release]** Page 25

147:21
**recall**  13:8,25
15:9 21:21
22:7 24:4,8,13
28:6,9 29:22
37:3,11 39:12
42:16 47:12
48:13,14,18
50:25 51:3,22
52:22,23 53:1
57:6 58:21,22
59:9,10 60:6
61:10 62:17
64:18 65:6
66:6 69:13
70:2 72:22
75:8 77:22
84:14,16 85:10
85:12 87:14,15
88:15,16,20
90:5 97:20
101:17,23,25
102:18,22
103:2 105:16
105:19 108:3,6
108:23 114:12
115:14 116:16
117:12,19
118:5,14 122:9
128:8 135:22
135:24 137:23
140:8
**recalled**  135:25
**receipt**  146:18

**receive**  115:3
130:21 136:24
143:10
**received**  27:16
32:22 39:12
52:9 56:11
95:4 128:8
129:2 130:23
132:21
**receiving**  118:5
**recent**  78:21
**recently**  41:5
59:3,16
**recess**  26:25
57:18 80:3
132:16
**recognize**  26:6
80:18 113:7
**recollect**  49:19
79:4 86:24
**recollection**
34:7 49:15
77:25 78:10,15
105:24 134:6
**recommended**
60:19
**record**  5:8,17
6:14 8:16 9:3
23:1 26:23
27:2,6,7 50:12
53:18 57:14,16
57:21 79:25
80:5 106:1,4,6
106:8 107:18
107:21,23

108:1,11 122:7
132:11,13,15
132:19,21
140:19 143:7
143:16,20
145:11
**recorded**  5:15
5:19
**recording**  5:11
5:16
**records**  37:7
78:1 131:14,21
**recourse**
120:18
**recovered**
122:1
**redacted**  27:21
28:4,20 108:12
**redaction**  28:7
**redactions**  3:18
**redo**  140:16
**reduced**  35:5
145:9
**refer**  41:22,25
142:24
**reference**  50:20
**referenced**  3:7
3:9,10,12,13,15
3:16,18,19,21
3:22,25 23:3
26:3 44:3
53:10 56:17
80:8 83:4 88:5
106:14 108:18
113:3 123:3

138:6 146:6
**referring**  26:14
33:12 114:6,19
115:5 143:1
**reflect**  102:3
140:13
**refurbishment**
93:5
**refuse**  137:17
**refusing**  13:23
**regarding**
129:8 131:7
**regional**  96:6
**registration**
126:8
**regularly**  100:5
**reinstated**  13:7
**relate**  28:20
**related**  6:7 19:4
39:3 83:9 84:6
105:14 122:24
123:17 124:19
125:9,24
126:25 127:7
128:17,22
132:23 134:13
145:13
**relationship**
30:22,23 56:3
**relative**  145:16
**relatively**  59:16
60:21
**release**  83:16
83:20,23

Genevieve McDonald
Thurston, Matthew Vs. Progressive Casualty Insurance    September 19, 2024

**[relevant - resulted]**                                                    Page 26

| | | | |
|---|---|---|---|
| **relevant** 127:6 | **rent** 10:2,18,19 | 17:1 116:14 | **respond** 30:6 |
| **relief** 36:7,22 | 32:16 | 119:18 | 38:13 82:19 |
| **remain** 16:22 | **rental** 19:24 | **representatives** | 135:7 |
| **remainder** | **repair** 19:8 | 15:5,13,16 | **responded** |
| 117:15 | **repaired** 48:24 | 17:22 18:8 | 30:25 32:4 |
| **remaining** | 79:19 | **represented** | 59:3 142:15 |
| 87:16 143:10 | **repairs** 79:21 | 84:4 | **response** 3:15 |
| **remember** 11:9 | **reparable** 49:8 | **representing** | 30:10 84:2 |
| 11:10 22:14 | **repeat** 28:1 | 6:4,19 34:8 | 123:20 124:4 |
| 31:25 47:8,22 | 40:5 103:10 | 119:21 120:24 | 127:11 132:22 |
| 50:4 51:7,9,14 | 107:2 | **request** 8:16 | 140:13,17 |
| 51:17,18,20,24 | **rephrase** 8:5 | 86:14 123:13 | 141:4 |
| 52:4,15 53:15 | 50:8 | 123:16,25 | **responses** 3:23 |
| 55:2 56:10 | **replace** 67:10 | 125:3,5,8,14 | 4:1 68:23 |
| 57:9 61:13,15 | 108:12 | 127:11 129:5 | 123:11 135:10 |
| 64:20,22,22 | **report** 3:17 | 129:11,19 | 138:15 139:3,7 |
| 66:7,23 68:5 | 22:2 38:20 | 130:24 131:4 | 139:11,17,21 |
| 70:18,21 71:2 | 68:11 74:19 | 143:21 | 140:24 141:10 |
| 71:4,25 72:10 | 88:25 89:6,9 | **requested** | 141:17 |
| 73:3 74:10,13 | 92:23 104:12 | 109:22 133:19 | **responsibility** |
| 76:7,9 78:3 | 104:15 110:5 | **requesting** 83:9 | 138:3 |
| 81:10 82:25 | 112:16 118:2,3 | **requests** 3:24 | **responsible** |
| 86:15,19 87:5 | 118:6,19 | 123:12 133:23 | 137:21 |
| 87:22 92:13 | **reported** 47:24 | **require** 137:1,7 | **responsive** |
| 95:4,6,8,24 | **reporter** 6:6,23 | **required** | 37:23,23 |
| 96:22 97:3,4,6 | 7:24 19:18 | 148:13 | 123:23,25 |
| 97:9,14 107:16 | 27:25 38:25 | **research** 61:24 | 124:22 125:14 |
| 117:13 131:16 | 91:17 | 74:14 104:22 | 129:11,18 |
| 131:19 135:13 | **reporting** 41:1 | **reserve** 133:5 | **rest** 41:23 46:8 |
| 135:14 | **represent** 7:9 | **residents** | **restroom** 26:21 |
| **remembered** | 31:20 106:18 | 119:22 | **result** 56:11 |
| 95:10 135:16 | **representations** | **resolved** 27:8 | 87:21 130:24 |
| 142:2,6 | 114:8 | **resources** | **resulted** 35:5 |
| **remotely** 6:3,13 | **representative** | 16:17 | 110:3 |
| 14:25 | 15:6 16:14 | | |

| | | | |
|---|---|---|---|
| **results** 93:18 | 21:24 22:18 | 103:3,8,12,19 | 71:8 74:16 |
| 112:20 130:5 | 23:5,9 27:1 | 105:7,11 | 76:12 77:17 |
| **resume** 136:11 | 28:23 37:6,9 | 106:18 107:5,8 | 81:17,19 82:12 |
| **retail** 3:14 | 37:18,19 39:2 | 108:20 109:12 | 84:23 89:2 |
| 18:18 81:3 | 41:11,12,18 | 110:24 114:24 | 90:17 91:14,20 |
| **retain** 122:22 | 42:4,6 43:2,16 | 115:15 116:19 | 92:3 93:7 95:9 |
| 126:7,10 | 44:5,13,15,15 | 117:22 118:10 | 97:17 98:8,19 |
| 128:17 129:1,3 | 45:8,10,13 | 118:17,19 | 99:10,14,23 |
| 130:22 131:3 | 46:12,19,21 | 119:11 125:2,8 | 100:7 101:1,16 |
| 131:13 134:13 | 47:20 50:25 | 127:25 129:5 | 104:8 107:18 |
| **retained** 30:18 | 52:14 53:12 | 139:15,24,25 | 108:15 109:23 |
| 143:19 | 54:8 55:13 | 141:24 142:1 | 110:6,13 111:9 |
| **retainer** 137:2 | 56:8 57:10,23 | **ring** 107:14 | 111:23 115:20 |
| 137:3,4 | 58:1,16,19 | **road** 67:20 | 119:4 121:1,2 |
| **retaining** 49:16 | 59:1 63:4 | 68:3 | 121:11,20 |
| 51:1 120:22 | 65:22 66:11,12 | **rockland** 47:1 | 122:3 124:1,20 |
| **return** 146:13 | 66:24,24 67:7 | **roof** 2:3 6:18 | 124:24 125:4 |
| 146:17 | 68:16,20 69:9 | 6:18 21:10,16 | 127:2,9,19 |
| **review** 36:3 | 70:3,4,25 | 22:6,21,25 | 128:25 129:12 |
| 40:19 88:13 | 71:15 72:22 | 23:24 24:8,18 | 129:15,20 |
| 111:4 137:15 | 73:6,19,25 | 24:21 26:8,12 | 131:11 132:6 |
| 146:7 | 75:6,11,19 | 26:17 27:6,10 | 133:4 134:19 |
| **reviewed** 34:19 | 76:1,19 77:1 | 27:22 28:1,5 | 134:25 135:8 |
| 34:21 95:7 | 78:7,16 80:10 | 30:16,20 31:11 | 135:16,22 |
| 132:1 138:23 | 80:22 81:8,15 | 31:15,18 33:8 | 136:1,13,15 |
| **revisit** 95:11 | 81:18 82:24 | 34:15,20 35:9 | 137:19 139:4,8 |
| **revoked** 12:21 | 83:6 84:1 | 36:13,25 38:3 | 139:12,20 |
| **rid** 134:22 | 85:14 88:7,22 | 40:4,13 43:11 | 140:15,25 |
| **rideshare** | 89:5,8,11,13 | 44:24 45:18 | 141:6,11,15,18 |
| 18:19 | 90:7,8,23 91:4 | 48:17 49:10 | 141:21 142:1,6 |
| **right** 8:19 9:2 | 91:12 92:22 | 50:16,22 51:6 | 142:23 143:11 |
| 13:14,18 14:1 | 93:21 95:13 | 52:8 54:11 | 143:21 146:1 |
| 14:4 15:1,11 | 96:5,15,23 | 55:16 56:1 | **room** 143:4 |
| 16:20 18:7 | 97:5,24 98:2 | 58:8,13 62:1 | **round** 17:6,10 |
| 20:13,14 21:5 | 98:17 101:19 | 65:17 68:8 | 17:11 |

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[rpr - send]**                                                        Page 28

| | | | |
|---|---|---|---|
| **rpr** 1:15,25 | **satisfied** 38:9 | **screen** 84:5 | 60:12 63:19,22 |
| **rude** 66:10 | 51:4 87:22 | **search** 32:2 | 70:12 74:22 |
| **rules** 7:22 | **satisfies** 140:17 | 61:6 64:8 | 76:15 80:25 |
| 139:6 | **saves** 7:19 | 122:12,21 | 81:13 82:14,21 |
| **run** 7:23 | **saw** 31:22 | 123:24 124:7,8 | 84:8,17 85:3 |
| **runs** 16:2,4 | 68:13 71:11 | 124:12,14,18 | 88:11,14 89:5 |
| **rural** 60:21 | 76:20 88:19 | 124:25 125:13 | 90:7 91:7 93:1 |
| **rust** 97:7 | 119:25 120:11 | 127:7 129:10 | 94:23 96:18 |
| **s** | **saying** 50:19 | 129:16,18,21 | 98:3 101:20 |
| | **says** 44:16 45:2 | 130:1,3 131:9 | 104:1 107:2 |
| **s** 2:1 3:5 5:1 | 45:9,12,13 | 131:23 132:5 | 111:2 113:11 |
| 147:3 | 53:23 54:4 | 133:9,11,14,22 | 123:10 138:14 |
| **safety** 12:14 | 55:9,10,18 | 134:3,12 | 138:21 142:18 |
| **sake** 140:22 | 57:4 80:22 | **searched** | **seeing** 88:16,20 |
| 141:21 | 81:1,12,13,15 | 122:13,15 | **seeking** 36:7,22 |
| **salary** 16:23 | 82:4 84:9,11 | 124:4 129:22 | 121:9,16 |
| **sale** 3:14 67:20 | 84:17,17 85:5 | 129:23,24 | **seem** 18:22 |
| 68:3 81:4 84:9 | 85:5 89:5,15 | 131:14 133:11 | **seems** 127:18 |
| 84:18 85:5 | 90:8,23 91:2,5 | 134:7 135:3 | 138:12 |
| 104:7 114:1,5 | 91:6 93:1 | **searching** | **seen** 5:14 27:13 |
| 114:5 | 94:23 95:13 | 122:9 | 44:7 53:14,15 |
| **sales** 81:14,23 | 96:6,20,23,24 | **seat** 96:25 | 56:14,18 80:11 |
| 82:5,7 125:12 | 101:20 102:2 | **seats** 64:13 | 88:8 106:16 |
| 125:20 | 103:13 104:2 | 96:23 | 108:21,23 |
| **salesman** 74:23 | 105:11 107:9 | **second** 3:21 | 109:3 123:6 |
| **salesmen** 64:24 | 109:1 114:1,13 | 16:2,3 73:24 | 131:1 138:9 |
| **salesperson** | 114:25 116:6 | 88:24 106:2 | **selected** 96:10 |
| 63:12 65:22 | 117:23 118:19 | **section** 54:3 | **selection** 96:12 |
| 66:5 70:1 | 123:21 124:16 | 88:23 89:18 | **selections** |
| 75:22 | 124:23 138:14 | 109:9 | 45:11 |
| **salvage** 49:17 | **scene** 21:23 | **sedan** 89:16 | **sell** 65:2 |
| 51:2 | 22:1 23:10 | **see** 24:9 27:18 | **seller** 140:3 |
| **santa** 67:2,3,7 | **schedule** 15:23 | 28:11 44:19 | **selling** 76:16 |
| 67:15,19,23 | **school** 11:6 | 45:2,12 53:22 | **send** 130:20 |
| 68:2,13,16 | 18:25 | 53:25 55:9 | |

Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

[senior - solutions]                                              Page 29

| | | | |
|---|---|---|---|
| **senior** 14:7 | 104:23 | **show** 83:6 | **simple** 54:19 |
| 15:1 | **settlement** 3:12 | 106:11 | **single** 113:22 |
| **sense** 52:11 | 32:22 35:5 | **showing** 26:5 | **sister** 60:25 |
| **sent** 53:4,6 57:6 | 36:8,11 39:9 | 28:17 44:5 | **sitting** 68:2 |
| 83:7 88:12,12 | 41:2 51:15,23 | 53:12 56:13 | **situated** 1:6 |
| 92:19 117:23 | 52:2 56:12 | 80:10 88:7 | 31:21 115:2 |
| 146:14 | 57:4,7,24 58:6 | 108:20 113:5 | 119:23,24 |
| **sentences** 25:25 | 58:12,18 85:25 | 123:5 138:8 | **situation** |
| 28:18,19 | 91:5 92:6,9,19 | **shows** 45:10 | 100:15 |
| **separate** 40:24 | 92:24 93:20,24 | 50:18 | **six** 9:23 49:24 |
| **september** 1:19 | 111:1,10 116:6 | **side** 95:21,23 | **size** 57:1 |
| 5:9 145:5 | 117:21 130:19 | 97:2,11 107:10 | **skip** 57:11 |
| **series** 18:21 | 136:25 | **sign** 30:24 62:7 | **slim** 61:21 |
| 20:12 | **several** 59:4 | 67:20 68:3 | **slow** 38:13 |
| **serve** 23:7 | 92:25 140:5 | 77:12 83:23 | **small** 56:19 |
| 139:1,6 | **shake** 8:2 | 146:12 | 80:14 96:24 |
| **served** 16:17,18 | **share** 122:5 | **signature** 5:3 | 97:1 |
| 49:25 135:12 | **shared** 23:18 | 145:23 | **smoothly** 7:23 |
| **service** 37:22 | 25:25 28:10 | **signed** 37:3 | **social** 25:25 |
| 38:1,10,12 | **she'll** 124:25 | 43:5 52:13 | 30:1 142:17 |
| **serviced** 74:4 | **sheet** 146:11 | 71:12,13 74:24 | **software** 20:8 |
| **serving** 16:25 | **shift** 58:16 | 128:5,9,11 | **sold** 32:25 33:5 |
| 17:12,21 | **shop** 19:8 | 137:10 146:20 | 35:4 38:23 |
| **session** 15:19 | 67:25 | **signer** 43:1 | 58:4 69:22 |
| 15:25 16:1,3,6 | **shopped** | **significant** | 94:7,17 98:15 |
| 17:23 18:2 | 104:14,20 | 96:20,21 | 99:1,20,24 |
| **set** 3:24 4:2 | **short** 8:13 | **signs** 43:9 | 100:3,12,19,24 |
| 28:22 47:5 | 18:18 65:1 | **silver** 75:16 | 101:13 102:2,9 |
| 83:2 119:11 | **shortage** 61:19 | 76:22,23 | 102:25 103:5 |
| 123:12 138:17 | **shorted** 116:21 | **similar** 64:6 | 103:12 110:16 |
| 145:19 | **shortly** 89:10 | 138:12 | 112:17,23 |
| **settle** 53:3 | 105:14 | **similarly** 1:6 | 116:24 |
| 87:24 | **shorts** 115:2 | 31:21 115:2 | **solutions** |
| **settled** 52:7 | **shots** 84:5 | 119:23,24 | 146:23 |
| 57:8 102:21 | | | |

Genevieve McDonald
September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[somebody - suspensions]**    Page 30

**somebody**
63:16 108:3
**somewhat** 19:9
**soon** 31:5
**sorry** 19:9
25:15 54:20
73:3 81:17,24
88:23 94:14
107:2,5 120:4
**sound** 37:9
82:24
**sounds** 47:22
67:5
**source** 104:2
**southeast**
146:15
**spalding** 2:12
6:17
**sparse** 50:3
**specific** 44:22
58:18 73:20
132:5
**specifically**
8:11 29:17
32:8 60:24
64:2 76:1
93:23 128:10
129:17
**speculate** 99:15
109:24 114:23
115:7
**spell** 9:2
**spills** 64:13
**spoiler** 95:20
95:22 103:20

**spoken** 28:23
29:11,14,18
**spouse's** 9:14
**spring** 17:19
**stand** 57:17
80:2 106:5
107:22 132:14
133:24 143:19
**standard** 95:15
95:15
**standing**
143:24
**stands** 107:9
**start** 30:20
59:6
**started** 8:25
42:12 58:21
**state** 1:16 6:10
6:13 9:2 12:19
16:7 20:2
104:16,19
145:1,3
**stated** 68:2
**statement**
50:16,23
**states** 1:1 5:23
**status** 9:12
**statute** 35:6
**staying** 41:17
**steed** 2:7 6:20
6:20 23:24
24:8,19 30:1
30:13 31:6,10
32:1,6,9,11
83:20 121:2

143:3
**steed's** 31:22
119:25 120:11
**steel** 79:8
**step** 26:20
102:1,2
**stepped** 143:4
**sternman** 17:8
17:16
**stonington** 2:8
9:25 10:1,13
67:14
**store** 122:17,23
**strategies** 14:8
14:10,14 15:2
**street** 1:18 2:4
2:13 6:1 10:13
10:16
**struck** 79:8
**stub** 54:16
**studies** 11:22
11:23
**subject** 123:21
**subpoena** 3:15
83:8 84:2
130:9,24
132:22 133:7
133:16 135:3
**subpoenaed**
135:18
**subscribed**
148:14
**substitute**
18:17

**subtracts** 94:24
**suggest** 37:7
**suing** 32:20
33:20 119:13
120:1
**summa** 11:15
**summary** 3:9
3:12 57:4,7
**supervision**
145:10
**supp** 141:11
**supplement**
141:10
**supplemented**
18:16 141:12
**supplementing**
141:14
**supply** 65:1
**supposed** 85:18
**sure** 16:6 24:10
48:10 71:12
81:24 82:2,2
89:22 103:11
107:4,19
138:12 139:4
**surface** 79:9
**surrounding**
21:25
**suspended** 13:1
13:5,12,16,21
13:24
**suspension**
13:19,22
**suspensions**
14:2

[swear - time]                                                    Page 31

swear  6:23
switch  37:21
  122:15
switched  37:15
  37:18
swore  140:19
sworn  7:1
  140:19 145:6
  148:14
system  84:6
  111:14,16,18
  111:22,25
  112:6 116:14

**t**

t  3:5 5:1,1
  147:3,3
take  5:16 8:13
  8:18 12:7
  13:23 34:24
  79:24 124:24
  132:6 137:14
taken  1:15 5:20
  12:4 26:25
  57:18 80:3
  132:16 145:15
talk  11:4 25:10
  25:13 48:11
  49:16 58:19
  59:1 69:9
talked  51:1
  75:5
talking  49:19
  57:23 130:15
tax  81:14,23
  82:5,7,23

94:18 128:18
teacher  18:17
technology  6:3
tell  11:14 21:24
  30:13 65:23,24
  66:1 102:24
  115:12 117:16
  140:20
ten  10:17 21:11
  21:16,22 22:21
  59:2 77:3
  125:11,20
  140:2
term  7:13
  18:18 45:16
  87:3 131:15
terms  15:7
  133:11 136:20
testified  7:2
  20:16,23 21:6
  91:21 127:10
  129:15 134:1
  134:12,21,24
  135:15 141:22
testify  8:21
  121:7 145:7
testifying  20:22
  141:2
testimony
  92:14 134:6
  136:1 141:6
  142:24 143:2
  143:17 145:11
  146:9,18 148:8

thank  7:17
  27:11 31:19
  36:6 50:11,15
  81:19 106:21
  108:16 118:15
  139:13
thing  142:20
things  7:23
  48:5 82:3
  116:15
think  33:5 40:7
  50:4 57:11
  58:3,11 65:14
  71:25 76:10,22
  77:14 90:14
  92:12 94:5
  98:5,11,17
  99:12,16,20,24
  100:3,13,14,20
  100:23 101:6
  115:13 116:21
  119:11 120:10
  127:6 130:23
  131:17
third  108:13
  143:12
thought  77:24
  102:17 116:8
  116:18 117:3
  120:16
thread  3:7
three  10:5,5
  14:11,23,23
  15:12 22:3
  127:24 130:14

thursday  5:8
thurston  1:3
  5:21 29:1,11
  29:14 53:20
  146:4 147:1
  148:1
thurston's  29:9
thurstons
  28:24
time  6:10 7:19
  11:9 13:8,9,25
  15:9 17:4
  18:13,18 22:7
  22:10 23:6,7
  24:4,21 26:23
  27:3 29:22
  31:25 32:3
  33:9,23 38:19
  38:21,24 42:13
  44:10 45:5,19
  47:8,22 48:1
  48:13 49:11,15
  51:3,7,14,17,21
  51:24 52:4,5
  52:15,24 53:2
  53:16 56:10
  57:7,9,17 58:9
  60:6 61:13,15
  61:19 64:20,22
  66:23 68:5,13
  68:14 70:18,21
  71:2,4 74:10
  74:13 75:3,24
  76:7,9,13,19,20
  80:2,6 82:20

Genevieve McDonald
Thurston, Matthew Vs. Progressive Casualty Insurance
September 19, 2024

**[time - twice]**

Page 32

82:25 84:16,25
85:13 86:15,19
86:25 87:4
88:15,16,19,20
90:4,13,18
92:20 95:6,17
95:18,24 96:11
96:22 97:3,6,9
97:12,14 99:7
100:8 101:17
102:19,21,23
103:2 104:23
105:6,9,24
106:9 107:21
108:1 109:3,25
113:13 114:12
115:10,14
116:17,22
117:12,19
118:14 120:13
122:4 123:23
130:17 132:13
132:18 133:6
135:23 137:23
137:24 138:4
140:8 141:24
146:19
**timeframe**
146:8
**timely**  37:23
**times**  24:16,20
129:15
**tiny**  57:1
**tires**  97:13

**title**  52:13
59:21
**today**  7:23 8:19
23:17 25:8
41:12 55:17
92:18 124:16
134:1 135:15
135:20,25
142:10
**today's**  24:17
143:16
**together**  82:3,7
82:8,21
**told**  65:1 66:3
116:17 120:15
**took**  12:6 49:22
**top**  27:18 53:22
55:19 57:3
80:16 81:6
84:8 89:13
90:23 101:20
138:14
**topics**  58:16
**tossed**  128:16
**total**  31:23
33:23 36:9,11
38:17,18 39:3
39:23 40:2,10
40:16 41:3
45:6 48:15,20
48:22 49:1,5
49:13 52:7
54:10 55:1
56:9 75:5 78:7
78:8,13,16

84:17 85:5,8
87:10 89:10
90:9,12 92:7,8
92:9 105:14
111:21 112:5
112:14,22
114:11 117:10
120:2 121:12
143:18
**totaled**  30:3
42:4 52:20
75:2,11 85:23
86:6,8 89:1
90:4
**totalled**  42:9
85:22
**towards**  63:10
**towed**  47:19
48:3,8
**toyota**  46:14
68:23 69:9,18
70:15 71:15
73:23,25 74:2
74:3 87:9
**trade**  55:21,25
60:4 62:13
70:8 71:18
**traded**  62:12
63:8 71:17
72:6,13,22
**training**  12:4
12:14 20:10
**transcriber**
122:7

**transcript**  5:5
143:22 146:6
146:20 148:5,8
**trend**  69:7
**trial**  121:6
**tried**  64:23
132:8
**truck**  22:14
70:22,24
**trucks**  70:17
73:23
**true**  33:2,3,16
99:4 113:18
133:9 139:17
145:10 148:8
**truth**  140:20
145:7,7
**try**  34:22 36:2
42:1 47:19
65:7,12 77:9
87:20 117:20
**trying**  54:18,22
112:2
**tuesday**  135:12
135:20
**tundra**  46:14
68:23 69:10,19
70:3,9,11,15
71:1,3,11,16
72:13,23 73:23
74:3
**tundras**  74:5
**twenty**  32:10
**twice**  15:24

Genevieve McDonald
Thurston, Matthew Vs. Progressive Casualty Insurance
September 19, 2024

[twin - valuator]                                                                Page 33

twin   49:24
twins   9:23
two   9:23 10:21
    14:11,21 15:7
    15:12 22:2
    29:23 40:23
    49:21 56:2,4
    60:17 62:18
    71:23 72:2
    78:13 82:1
    91:21 97:25
    105:4 124:10
    135:24 138:21
type   41:9 56:19
    57:2
types   70:16

**u**

u   5:1 9:8
u.s.   12:13
ufcc   7:13 31:24
    32:20 33:24
    35:2,7,14,16
    36:20 47:25
    48:14 49:13,16
    49:19 50:13,18
    50:19 115:6
ufcc's   48:25
uh   107:6
unable   65:12
under   13:6
    21:6 23:10
    34:24 42:5,9
    49:18 89:15
    102:2 103:4,12
    116:9 124:24

132:6 139:6
    140:19 145:9
underneath
    44:16
underpaid   40:2
    120:11,16
understand
    7:14 8:3 31:3
    33:24 37:6
    44:21 45:21
    46:5,19 50:9
    52:5,9 54:8
    55:13,17,24
    56:3 81:3
    90:11 94:20
    100:13 102:6
    111:13 112:11
    116:22 137:12
understanding
    35:17,24 39:25
    46:10 54:24
    83:14 85:20
    86:3 90:25
    91:3 92:17
    93:3,8 98:25
    100:10 104:5
    109:12 111:7
    112:2 115:8
    119:5 121:1
    130:7
understood   8:6
    35:21 42:15
    64:15
underwriter
    44:22,25

underwritten
    44:17
unduly   127:12
unfair   32:22
    112:20
unfortunately
    51:20 77:8
    82:16,22
union   126:23
    126:24
unit   5:18
united   1:1,10
    3:24 4:2 5:23
    7:11,15 44:17
    44:22 55:10,14
    55:24 138:16
university
    11:16,17,22
    12:8
unrepaired
    107:10
unsatisfied
    38:1
upd   107:9
update   142:23
    142:25
upfront   137:5
upper   44:12,15
use   7:13 26:21
    32:25 33:6
    35:4 66:7
    75:22 79:9
    94:7,16 98:6
    98:11 100:24
    104:18 111:14

111:15 112:5
    112:14,17,22
    124:8,13
used   19:17
    42:23 59:23,24
    61:22 63:4
    67:2 70:4 73:6
    77:6,15 78:5,5
    81:1 98:18
    99:13 100:6,19
    101:7 110:14
    112:18 117:6
    130:4 143:18
    146:20
uses   41:10
    111:15 117:7
using   6:3
utilized   58:4
utilizes   94:17

**v**

v   9:4,4 146:4
    147:1 148:1
vaguely   55:23
valuation   3:17
    38:20 39:3
    41:9 51:10
    88:25 89:6
    92:23 98:13,14
    98:16 101:20
    102:13 110:4,4
    118:3,6
valuations
    19:22
valuator   36:14

Case 1:22-cv-00375-NT    Document 120-12    Filed 01/10/25    Page 72 of 239    PageID
#: 4286
Genevieve McDonald                                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

[value - want]                                                        Page 34

**value** 36:8,15
  38:18 39:7,15
  39:23 40:16
  45:14,16 91:5
  92:24 93:1,3,6
  93:17,19 94:1
  94:12,16 98:6
  99:3 103:16,24
  112:6,14 114:3
  114:10,14
  115:1,13 116:7
  116:25 118:12
  118:24
**values** 19:17
**varied** 15:23
**varney** 142:21
**varney's** 60:3,8
  60:14,18 62:20
  63:13 65:23
  66:14 142:22
**vehicle** 3:17
  30:3 33:14,15
  33:18 36:8
  38:17 39:7,13
  39:19,24 40:3
  41:3,18 43:5
  43:21 45:24
  46:1,13,15,18
  46:24 47:7,11
  47:25 48:7,12
  48:23 49:5
  52:10 59:21
  60:4,8,20
  62:21 63:2
  68:12 70:8

71:22 73:10
77:10 78:19
82:5 83:1
85:23 86:1,5
87:7 88:25
89:15,18 95:14
96:6 98:5,12
98:13,16 99:3
101:7,20
103:11 104:1,6
113:22 118:23
118:25 119:3
123:18 125:18
125:24 126:1
127:3,13,14,15
128:20 129:9
131:8 140:1,3
140:4,5 142:3
**vehicles** 20:2
22:16 33:7
36:15 49:3
59:4 61:18,20
64:5 65:1
67:22,25 68:25
69:1,3,4 77:2
78:11 96:7,10
96:13 97:25
100:25 104:19
112:15 114:3
114:11,15
117:2 118:21
125:10 135:13
135:14,21
140:5,10,14

**verbal** 8:1
**verbatim** 30:10
**verification**
  139:9
**verified** 139:1,2
  139:6,8,20
**verify** 139:10
  146:9
**veritext** 2:23
  6:5,7 143:19
  143:25 146:14
  146:23
**veritext.com**
  146:15
**version** 108:12
  139:2
**video** 1:13 5:16
  5:19
**videographer**
  2:22 5:7 6:5,22
  26:22 27:1
  57:15,19 80:1
  80:4 106:3,7
  107:20,24
  132:12,17
  143:15
**view** 39:22 40:1
  40:9,15 93:20
**violated** 35:2
**virtual** 6:3
**virtually** 5:10
  136:12
**volkswag** 81:1
**volkswagon**
  41:19,24 42:4

42:17,25 43:13
43:20 44:11
45:11 46:21
48:15 49:1,7
49:13 51:10
52:13,16,20
54:6 55:1 56:9
57:25 65:20
67:10 68:17,19
69:14,22 78:8
81:9,23 82:11
83:10 84:7,15
84:22 85:10,14
86:8 87:11,17
89:1,11,16,20
89:21 90:3
92:7 95:17,22
96:1,21 97:1,4
97:7,10,13,21
98:7 102:13
104:23 105:9
108:4 109:4,17
110:3 117:18
118:13 121:25
123:18 124:9
129:9 132:24
**vs** 1:8 5:21

**w**

**waived** 5:3
**walked** 65:2
**want** 11:4
  22:25 34:23
  43:8 55:8
  58:19 84:3
  88:22 91:4

Genevieve McDonald
September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[want - worth]**                                              Page 35

| | | | |
|---|---|---|---|
| 93:23 97:24 | 116:6 133:13 | 90:21 91:15,18 | **wife**   29:14 |
| 99:15 100:10 | 142:18 | 91:25 92:4 | **willing**   121:7 |
| 105:11 106:22 | **whereof**   145:19 | 93:10 95:12 | 124:18 |
| 106:24 109:7 | **whichever**   42:3 | 97:23 98:10,24 | **winter**   79:5 |
| 112:11 114:23 | **white**   2:12 3:2 | 99:11,19 100:2 | **wit**   145:6 |
| 115:7,25 | 6:16,16 7:6,9 | 100:9 101:5,18 | **withdraw** |
| 118:17 123:13 | 19:20 21:14,17 | 104:10 106:1 | 138:1 |
| 135:3 143:6 | 22:9,23 23:4 | 106:10,15 | **witness**   5:14 |
| **wanted**   60:23 | 24:22 26:4,10 | 107:19 108:2 | 6:23 145:11,19 |
| 60:24 61:4 | 26:13 27:5,11 | 108:10,16,19 | 146:8,10,12,19 |
| 64:12,12 70:23 | 27:12 28:3,8 | 110:1,10,19 | **word**   111:15 |
| 70:23 73:14 | 30:18,25 31:2 | 111:12 112:1 | 124:14 130:3 |
| 132:20 | 31:12,16 33:10 | 113:4 115:16 | **words**   32:20 |
| **water**   17:20 | 34:16,25 35:12 | 115:21,24 | 124:7,8 |
| **waving**   123:22 | 36:17 37:2 | 119:6 121:15 | **work**   14:12,17 |
| **way**   42:2 51:4 | 38:5 39:1 40:6 | 121:23 122:8 | 14:25 17:13 |
| 77:13 99:21 | 40:14 43:12 | 123:4 124:22 | 18:22 19:16 |
| 109:5 133:1 | 44:4 45:1,20 | 125:1,5,7 | 20:7 50:4 |
| **wctl**   116:7 | 48:21 49:12 | 127:5,16,23 | 63:12,16 90:19 |
| **we've**   133:2 | 50:17,24 51:8 | 129:4,14,17,25 | 122:24 |
| **wear**   56:22 | 52:12 53:11,17 | 131:22 132:4,9 | **workcenter** |
| 96:20,21 | 53:21 54:15 | 132:11,20 | 90:9,11 111:21 |
| **weather**   17:15 | 55:20 56:5,21 | 133:7 134:10 | 112:5,22 |
| **web**   104:2 | 57:22 58:10,15 | 134:21 135:5 | 117:10 |
| **website**   34:5 | 62:2 65:21 | 135:11,17,24 | **worked**   18:19 |
| 63:21 | 68:10 71:9 | 136:2,14,16 | 19:9,21,24 |
| **week**   14:12 | 72:6,7,9,14,16 | 137:20 138:7 | 20:1,4 32:11 |
| 15:24 24:5 | 72:23 74:8,11 | 138:25 139:5 | 34:6 66:5 |
| 107:11 | 74:18,21 75:1 | 139:10,13,14 | **working**   18:16 |
| **weird**   75:18 | 75:12 76:14 | 139:23 140:23 | 19:13 116:12 |
| **went**   27:5,7 | 77:18 78:12 | 141:2,9,13,16 | **works**   17:9 |
| 60:12 63:19 | 79:2,6,23 80:9 | 141:20,23 | 42:3 112:9 |
| 66:14 70:12 | 81:18,20 82:15 | 142:2,13 143:5 | **worry**   41:16 |
| 71:10 74:22 | 83:5,25 85:1 | 143:14,24 | **worth**   104:24 |
| 77:23 92:16 | 88:6 89:4 | | 116:9,10 117:1 |

Genevieve McDonald                    September 19, 2024
Thurston, Matthew Vs. Progressive Casualty Insurance

**[write - z]**                                        Page 36

**write**  38:6
**writing**  141:5
  142:4,5 145:9
**written**  103:1
**wrong**  35:2
  38:12 100:24

| **x** |
**x**  3:1,5

| **y** |
**yeah**  28:5 29:6
  31:18 40:7
  43:10 54:13
  72:21,21
  115:21 139:22
**year**  11:24
  13:12 15:24
  16:3,24 17:6
  17:10,11 22:15
  29:23,24 49:24
  59:10 72:1,22
  78:25 105:4
**years**  10:5,5,17
  14:11 15:7,8
  15:12 17:8
  18:12 20:21
  21:11,16,22
  22:22 29:23
  32:10 37:5
  41:4 59:2,15
  62:18 72:10
  73:3 77:3 88:2
  125:11,20
  127:25 130:13
  130:14 140:2

**yesterday**
  23:22 101:24
  101:25
**yukon**  62:14,16
  62:21 63:4,10
  63:18,25 64:3
  64:9,19,21
  66:2,11,15,22
  66:24 78:24
  125:25 126:5,6
  126:17 127:1,3
  127:8,24
  128:12 134:14
  135:4,6

| **z** |
**z**  2:7

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

DEPOSITION
EXHIBIT
1
9/19/24  G.M.

 **Kate Bridges** 



MAR 20 AT 8:07 PM

Holy shit you and I are both working
with John Steed on the Progressive
suit

 I wondered who the main person waa



McDonald_000013

PROGRESSIVE
P.O. BOX 31260
TAMPA, FL 33631

**PROGRESSIVE**
DIRECT Auto

**Policy Number: 22233881**

Underwritten by:
United Financial Casualty Company
December 24, 2018
Policy Period: Jan 24, 2019 - Jul 24, 2019
Page 1 of 2

GENEVIEVE L MCDONALD
129 N MAIN ST
STONINGTON, ME 04681

**progressive.com**
**Online Service**
Make payments, check billing activity, update
policy information or check status of a claim.

# Auto Insurance
# Coverage Summary
## This is your Renewal
## Declarations Page

**1-800-776-4737**
For customer service and claims service,
24 hours a day, 7 days a week.

The coverages, limits and policy period shown apply only if you pay for this policy to renew.

Your coverage begins on January 24, 2019 at 12:01 a.m. This policy expires on July 24, 2019 at 12:01 a.m.

Your insurance policy and any policy endorsements contain a full explanation of your coverage. The policy limits shown for a vehicle may not be combined with the limits for the same coverage on another vehicle. The policy contract is form 9611D ME (09/16). The contract is modified by form 4884 (10/08).

## Drivers and resident relatives

| | Additional information |
|---|---|
| Genevieve L McDonald | Named insured |
| Cory B Mcdonald | SR22 driver filing |

## Outline of coverage

**2009 VOLKSWAGEN PASSAT 4 DOOR SEDAN**
VIN: **WVWJK73C19PD47779**
Garaging ZIP Code: 04681
Primary use of the vehicle: Commute

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $246 |
| Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
| Property Damage Liability | $25,000 each accident | | |
| Uninsured/Underinsured Motorist | $50,000 each person/$100,000 each accident | | 13 |
| Medical Payments | $2,000 each person | | 16 |
| Comprehensive | Actual Cash Value | $500 | 62 |
| Collision | Actual Cash Value | $500 | 379 |
| Total premium for 2009 VOLKSWAGEN | | | **$716** |

PGR_THURSTON_0009231

**2008 TOYOTA TUNDRA CREW PICKUP**
VIN: **5TBBT54168S464900**
Garaging ZIP Code: 04681
Primary use of the vehicle: Commute

| | Limits | Deductible | Premium |
|---|---|---|---|
| Liability To Others | | | $302 |
| Bodily Injury Liability | $50,000 each person/$100,000 each accident | | |
| Property Damage Liability | $25,000 each accident | | |
| Uninsured/Underinsured Motorist | $50,000 each person/$100,000 each accident | | 14 |
| Medical Payments | $2,000 each person | | 14 |
| Comprehensive | Actual Cash Value | $500 | 152 |
| Comprehensive Window Glass | | $0 glass | |
| Collision | Actual Cash Value | $500 | 350 |
| Total premium for 2008 TOYOTA | | | **$832** |
| **Subtotal policy premium** | | | **$1,548.00** |
| SR22 driver filing fee | | | 25.00 |
| **Total 6 month policy premium and fees** | | | **$1,573.00** |

## Premium discounts

Policy

22233881

Electronic Funds Transfer (EFT), Home Owner, Online Quote, Multi-Car, Continuous Insurance, Diamond and Paperless

## Lienholder information

| **Vehicle** | **Lienholder** |
|---|---|
| 2009 VOLKSWAGEN PASSAT | CHRYSLER CAPITAL |
| WVWJK73C19PD47779 | CARMEL, IN 46082 |
| | |
| 2008 TOYOTA TUNDRA | Down East CU |
| 5TBBT54168S464900 | Baileyville, ME 04694 |

## Company officers

*Patricia M Commuter*

Secretary

Form 6489 ME (07/17)

PGR_THURSTON_0009232

Progressive
P.O. Box 512926
Los Angeles, CA 90051

*PROGRESSIVE*®

Page 1 of 1



DEPOSITION
EXHIBIT
3
9-19-24 G.M.

CHRYSLER CAPITAL
1010 W MOCKINGBIRD LN STE 100
DALLAS, TX 75247-5126

| ADVICE FOR PAYMENT 2778222386 | | |
|---|---|---|
| **Payee:** CHRYSLER CAPITAL | **Payment Date** | 03/20/2019 |
| | **Total Payment Amount** | $4,034.78 |
| | **Total Number of Invoices** | 1 |

If you have any questions regarding this payment, please call us at 1-800-274-4499.

| Details | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Claim Number:** 192813486 | **Name:** MCDONALD, GENEVIEVE L | | **Date of Loss:** 02/28/2019 | **Invoice Number:** 57049251 | **Company:** United Financial Casualty Company | | | |
| **Type** | **Description** | **\*Coverage** | **Reference** | **Identifier** | | **Service Dates** | **Deductible** | **Payment Amount** |
| Total Loss | Progressive Obtains Salvage | COLL | N/A | 09 VOLKSWAGEN PASSAT 047779 | | N/A | $500.00 | $4,034.78 |

| **Total Payment Amount** | $4,034.78 |
|---|---|

**\*Full Description of Coverage:**

COLL       -   Collision

Form Z845 (07/16)                    Issuing Rep: A103812

PGR_THURSTON_0008234

Print Settlement Summary

Progressive Group of Insurance Companies

DEPOSITION EXHIBIT 4

9-19-24 G.M.

PENGAD 800-631-6989

## Settlement Summary

### Claim Information

| | |
|---|---|
| Claim Number: 19-2513486-01 | Coverage Type of Loss: Collision |
| Policy Number: | Loss Date: 02/25/2019 |
| Owner : MCDONALD, GENEVIEVE | Reported Date: 02/25/2019 |
| | Valuation Report ID: 1006711548 |

### Vehicle Information

| | |
|---|---|
| Loss Vehicle: 2009 Volkswagen Passat Komfort 4 Door Sedan 2.0L 4 Cyl Gas Turbocharged AFWD | Location: ME 04981 |
| VIN: WVWJK73C19P017779 | Exterior Color: |
| Mileage: 133,343 miles | License Plate: |
| Title History: No | Title History Comments: |

### Loan Information

| Loan Information | | Payment Information | |
|---|---|---|---|
| Lien Holder Payoff: | $5,220.31 | Lien Holder Payment(s): | $4,934.78 |
| Loan/Lease Payoff Coverage: | $0.00 | Net to Owner: | $0.00 |

### Settlement

| | |
|---|---|
| Stated Amount: | $0.00 |
| Actual Cash Value: | $4,298.37 |
| Base Value | $5,405.75 |
| Title History Adjustment: | -$0.00 |
| Refurbishment Adjustments: | $0.00 |
| After Market Parts Adjustment: | $0.00 |
| Condition Adjustment: | -$1,110.38 |
| Prior Damage Adjustment: | -$0.00 |
| Market Value: | $ 4,295.37 |
| Settlement Adjustment(Pre-Tax): | $0.00 |
| Fees: | $0.00 |
| Taxes: | $239.41 |
| Company Obtains: | $0.00 |
| Net Settlement: | $4,534.78 |
| Settlement Adjustment(Post-Tax): | $0.00 |
| Deductible: | -$500.00 |
| Other Adjustments: | $ 9.00 |
| Total Settlement: | $4,034.78 |

**Adjuster License #:**

**Comments:**

PGR_THURSTON_0008146

RETAIL INSTALLMENT SALE CONTRACT
SIMPLE FINANCE CHARGE

DEPOSITION
EXHIBIT
5
9-19-24 G.M.
PENGAD 800-631-6989

| Buyer Name and Address (including County and Zip Code) | Co-Buyer Name and Address (including County and Zip Code) | Creditor-Seller (Name and Address) |
|---|---|---|
| GENEVIEVE L KURILEC<br>179 N MAIN ST<br><br>STONINGTON ME 04681 | CORY B MCDONALD<br>129 N MAIN ST<br>STONINGTON ME 04681 | DARLING'S AUTOMALL<br>16 KINGSLAND CROSSING<br>ELLSWORTH, ME<br>04605 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-in-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| USED | 2009 | VOLKSWAGE PASSAT | WVWJK73C19P047779 | ☒ personal, family or household<br>☐ business<br>☐ agricultural |

## TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid after you have made all payments as scheduled | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 1700.00 |
|---|---|---|---|---|
| 18.00 % | $ 10328.00 | $ 17389.30 | $ 27717.30 | $ 29417.30 |

**Your Payment Schedule Will Be:**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 66 | 419.96 | Monthly beginning 09/02/2013 |

Or As Follows:

**Late Charge.** If a payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late. The charge will not exceed $10 if you bought the vehicle primarily for personal, family, or household use.

**Prepayment.** If you pay off all your debt early, you will not have to pay a penalty.

**Security Interest.** You are giving a security interest in the vehicle being purchased.

**Additional Information.** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

### ITEMIZATION OF AMOUNT FINANCED.

| 1 Cash Price (including $ _____ N/A refunds service contract and $ _____ ) | | $ 16857.30 (1) |
|---|---|---|
| 2 Total Downpayment = | | |
| Trade-in<br>(Year)  (Make)  (Model) | N/A | |
| Gross Trade-in Allowance | $ N/A | |
| Less Pay Off Made By Seller | $ N/A | |
| Equals Net Trade In | $ N/A | |
| + Cash | $ 1700.00 | |
| + Other | $ N/A | |
| + Other N/A | $ N/A | |
| (If total downpayment is negative, enter "0" and see ¶(1) below) | | $ 1700.00 (2) |
| 3 Unpaid Balance of Cash Price (1 minus 2) | | $ 15157.30 (3) |
| 4 Other Charges Including Amounts Paid to Others on Your Behalf (Seller may keep part of these amounts) | | |
| A Cost of Optional Credit Insurance Paid to Insurance Company or Companies | | |
| Life | $ N/A | |
| Disability | $ N/A | $ N/A |
| B Vendor's Single Interest Insurance Paid to Insurance Company | | $ N/A |
| C Other Optional Insurance Paid to Insurance Company or Companies | | $ N/A |
| D Optional Gap Contract | | $ 799.00 |
| E Official Fees Paid to Government Agencies | | |
| $ N/A | $ N/A | $ N/A |
| $ N/A | $ N/A | $ N/A |
| $ N/A | $ N/A | $ N/A |
| F Government Taxes Not Included in Cash Price | | $ N/A |
| G Government License and/or Registration Fees | | $ N/A |
| ARBITRATIO TEMP TAG | | $ 2.00 |
| H Government Certificate of Title Fees | | $ 33.00 |
| I Other Charges (Seller must identify who is paid and describe purpose) | | |
| to _____ N/A for Prior Credit or Lease Balance | | $ N/A |
| to DARLING'S AUTOMAL DOC FEE | | $ 399.00 |
| to WARRANTY SOLUTION SERVICE CONTRACT | | $ 999.00 |
| to _____ N/A | $ N/A | |
| to _____ N/A | $ N/A | |
| to _____ N/A | $ N/A | |
| Total Other Charges and Amounts Paid to Others on Your Behalf | | $ 2232.00 (4) |
| 5 Amount Financed (3 + 4) | | $ 17389.30 (5) |

**OPTION: [ ]** You pay no finance charge if the Amount Financed, item 5, is paid in full on or before _____ Year _____ SELLER'S INITIALS _____

☐ If this box is checked, the following late charge applies to vehicles purchased primarily for business or agricultural use:

If a payment is not received in full within _____ days after it is due, you will pay a late charge of $ _____ % of the part of the payment that is late, whichever is less. If this box is not checked, the late charge on the "Federal Truth-in-Lending Disclosures" still applies.

**OPTIONAL GAP CONTRACT.** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 4D of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term 66 Mos. AHIS GAP

Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X _Genevieve Kurilec_  X _B McDonald_

### Insurance

**Insurance.** You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest Insurance is required is checked below.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the insurance you want and sign below:

**Optional Credit Insurance**
☐ Credit Life ☐ Buyer ☐ Co-Buyer ☐ Both
Term N/A
☐ Credit Disability (Buyer Only)
Term N/A

Premium:
Credit Life $ N/A
Credit Disability $ N/A
Insurance Company Name N/A
Home Office Address N/A

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay off all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments.

**Other Optional Insurance**
☐ _____ N/A N/A
Type of Insurance Term
Premium $ N/A
Insurance Company Name N/A
Home Office Address N/A
☐ N/A N/A
Type of Insurance Term
Premium $ N/A
Insurance Company Name N/A
Home Office Address N/A

Other optional insurance is not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost.

☐ I want the insurance checked above.

X _____ Buyer Signature _____ Date
X _____ Co-Buyer Signature _____ Date

**THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE.**

☐ **VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance).** If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. You may discuss the insurance company through which the VSI insurance is obtained, if you want to purchase VSI insurance through the Creditor, the cost of this insurance is $ N/A and is also shown in Item 4B of the Itemization of Amount Financed. The coverage is for the initial term of the contract.

**Returned Check Charge:** You agree to pay us the charges permitted under applicable law, including bank fees and mailing costs, if any check you give us is dishonored.

## NO COOLING OFF PERIOD

State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.

**The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.**

HOW THIS CONTRACT CAN BE CHANGED. This contract contains the entire agreement between you and us relating to this contract and we must sign it. No oral changes are binding. Buyer Signs X _____ Co-Buyer Signs X _____
If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

See back for other important agreements.

**NOTICE TO CONSUMER: 1.** Do not sign this agreement before you read it.
**2.** You are entitled to a copy of this agreement.

You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You agree that you received a completely filled-in copy when you signed it.

Buyer Signs X _Genevieve Kurilec_ Date _07/19/13_  Co-Buyer Signs X _B McDonald_ Date _07/19/13_

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner _____ N/A AUTOMALL _____ Address _____
Seller signs X _____ 07/19/13 by X _____ Title _____

Seller assigns its interest in this contract to **CHRYSLER CAPITAL** (Assignee) under the terms of Seller's agreement(s) with Assignee.
☐ Assigned with recourse    ☒ Assigned without recourse    ☐ Assigned with limited recourse

**DARLING'S AUTOMALL**
By _____ Title _____

ORIGINAL THURSTON_SANTANDER_0000003

a. **How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.

b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

d. **You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time without penalty. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

e. **You have the right to refinance a balloon payment.** A balloon payment is a final scheduled payment that is substantially greater than the other periodic payments. You have the right to enter into a new written agreement to refinance a balloon payment. If you qualify under our reasonable credit standards, and vehicle value is high enough compared to the amount to be refinanced. The refinancing terms will be the same as those we generally offer at the time of refinancing. The monthly payments under the new agreement will fully amortize the balloon payment. The monthly payments under the new agreement will be no greater than the average of your regular monthly payments under this contract (excluding the balloon payment). If the payment schedule of this contract includes a payment (other than a balloon payment) that is not substantially equal to all other payments in amount or time between consecutive payments, you may at any time change the payment and time between consecutive payments to the average of all scheduled payments and times. You may do so without further cost or obligation. This provision does not apply if you bought the vehicle primarily for business, commercial, or agricultural purposes or if you have signed a separate written agreement adjusting the payment schedule to your seasonal or intermittent income.

## 2. YOUR OTHER PROMISES TO US

a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

c. **Security Interest.**
You give us a security interest in:
- The vehicle and all parts or goods put on it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

d. **Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the cost of the insurance and a finance charge at the Annual Percentage Rate shown on the front of this contract. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

3. **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

a. **You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment does not excuse your late payment or mean that you may keep making late payments. If you pay late, we may also take the steps described below.

b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe at once after we give you notice the law requires.
You do not pay any payment on time; or
You give materially false, incomplete, or misleading information on a credit application, you start a proceeding in bankruptcy or one is started against you or your property, or you break any agreements in this contract, except that if you bought the vehicle primarily for personal, family or household purposes, we will only treat these events as defaults if they significantly impair the prospect of payment, performance, or realization of the collateral.
The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

c. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you after we give you any notice the law requires. We may only take the vehicle if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we will notify you and make the items available to you. If you do not ask for these items back, we may dispose of them as the law allows.

d. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.

e. **We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.
We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us unless the law provides otherwise. If you do not pay this amount when we ask, we may charge you interest at the Annual Percentage Rate shown on the front of this contract.

f. **What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

4. **WARRANTIES SELLER DISCLAIMS**
The following paragraph does not affect any warranties covering the vehicle that the vehicle manufacturer may provide. It does not apply at all if you bought the vehicle primarily for personal, family, or household use.
Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.

5. **Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
Spanish Translation: Guía para compradores de vehículos usados. La información que se ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

6. **Applicable Law.**
Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Form No. 553-ME 9/98

THURSTON_SANTANDER_0000004





CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER



**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

THURSTON_DARLINGS_0000003



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

THURSTON_DARLINGS_0000005



CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER



**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**



**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

THURSTON_DARLINGS_0000008



**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

THURSTON_DARLINGS_0000009

Lease#5
Buy/Print/PaymentDetail

Darling's Ford VW Audi
**Payment Detail**
Payment Calc. Screen and Disclosure Info (For Purchase)

Page: 1
Date: 09-16-24, 1:23 pm
User: GCASSIDY

**Purchaser:** 45739    KURILEC,GENEVIEVE        **Lender:** CHRY-CAP
**Cust ID:** 576548    129 N Main St
Stonington ,ME 04681

**Stock #:** 592788A

**Year:** 2009    **Make:** VW    **Model:** PASSV    **Body:** SD

| | | | |
|---|---|---|---|
| Sales Date: | 07/19/2013 | | |
| Sales Price: | 15,988.00 | | |
| Trade Allow: | 0.00 - | **Interest Rate:** | 18.00 |
| TradePayoff: | 0.00 | | |
| Admin Fee: | 0.00 | **Payment Frequency:** | Monthly Payments |
| Title/Misc. Fees: | 0.00 | **Number of Payments:** | 66 |
| License Fee: | 0.00 | **Days to 1st Pmnt:** | 0 |
| Warranty : | 999.00 | **First Payment Date:** | 07/19/2013 |
| Misc Fees: | 0.00 | | |
| Loan Fees: | 0.00 | **Payment:** | 66    419.96 |
| GAP or DCA: | 799.00 | | |
| CLAH: | 0.00 | | |
| Sales Tax: | 0.00 | | |
| Other Sales Tax: | 0.00 | | |
| Gross Sale: | 17,786.00 | | |
| Cash Down: | 1,700.00 - | | |
| Rebate: | 0.00 - | | |
| Amount Due: | 16,086.00 | | |

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

THURSTON_DARLINGS_0000010

rItemizations

Darling's Ford VW/Audi

## Itemizations

| Deal # | Guest | | | Type | Stock # | Year | Make | Model | | Loc |
|--------|-------|--|--|------|---------|------|------|-------|--|-----|
| 45739 | Kurilec, Genevieve | | | Used | 592788A | 2009 | VW | PASSV | | 3 |

Itemizations by Department :

| Dept | Add Type | Description | Code | Cost | Sale | Other | Duebill Disclose | Cost to Veh | Gross |
|------|----------|-------------|------|------|------|-------|------------------|-------------|-------|
| Finance | GAP/DCA | AHIS GAP | | 799.00 | 799.00 | 0.00 | | N/A | 0.00 |
| | | Notes: | | | | | | | |
| Finance | Svc Cont | WARRANTY SOLUTIONS WAVSC | | 719.00 | 999.00 | 0.00 | | Posted | 280.00 |
| | | Notes: | | | | | | | |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

THURSTON_DARLINGS_0000011

# Vehicle Valuation Report



Prepared For   Progressive Group of Insurance Companies   (800) 321-9843

DEPOSITION EXHIBIT
9-19-24 G.M.

mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 19-2813486-01 | | COLLISION | GENEVIEVE MCDONALD 129 N MAIN ST STONINGTON, ME 04681 +1-207-2665113 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 02/28/2019 | 02/28/2019 | 03/06/2019 | 1008711549 | 1 |

## Vehicle Information

| Year | Make | Model | | Location | Mileage |
|---|---|---|---|---|---|
| 2009 | Volkswagen | Passat Komfort 4 Door Sedan 2.0L 4 Cyl Gas Turbocharged A FWD | | ME 04681 | 113,343 miles |

| Ext Color | License | | VIN | Title History |
|---|---|---|---|---|
| | | | WVWJK73C19P047779 | No |

## Valuation Summary

### Loss Vehicle Adjustments

Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $5,408.75 |
| Condition - | $1,110.38 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| **Market Value =** | **$4,298.37** |

### Settlement Adjustments

Adjustments specific to your policy

| | |
|---|---|
| (5.500%) Tax + | $236.41 |
| Deductible - | $500.00 |
| **Settlement Value =** | **$4,034.78** |

# Settlement Value:
# $4,034.78

**J.D. POWER**

Mitchell **WorkCenter**
**Total Loss**
© 2018 Mitchell International, Inc. All Rights Reserved.

PGR_THURSTON_0008147

# Loss Vehicle Detail

Loss vehicle: 2009 Volkswagen Passat | Komfort 4 Door Sedan | 2.0L 4 Cyl Gas Turbocharged A FWD

## Standard Equipment

### Exterior

| | |
|---|---|
| 17" x 7" "Monte Carlo" alloy wheels w/anti-theft wheel locks | 2-speed adjustable intermittent wipers w/heated washer nozzles |
| Body-color bumpers | Body-color door handles |
| Body-color heated pwr side mirrors w/integrated LED turn signals | Chrome grille |
| Full-size spare tire | Halogen headlights |
| LED taillights | P235/45HR17 all-season tires |
| Pwr tilt/slide sunroof -inc: tinted glass, sunshade, pinch protection | |

### Interior

| | |
|---|---|
| (2) front & (2) rear reading lights | (3) pwr outlets |
| 3-spoke leather-wrapped multi-function steering wheel w/Tiptronic controls, height-adjustable telescopic steering column | 60/40 split folding rear seat -inc: adjustable headrests, folding center armrest w/storage, integrated cupholders |
| AM/FM stereo w/6-disc in-dash CD changer -inc: MP3 playback, (8) speakers, auxiliary input jack, Sirius satellite radio w/3-month service | Audible/visible anti-theft vehicle alarm system |
| Brushed stainless interior trim | Cargo area -inc: trunk storage dividers, (2) tie-down hooks, light |
| Center console & footwell ambient lighting | Center console w/(2) cupholders |
| Central pwr locking system -inc: speed-sensitive automatic locking, selective unlocking | Climatic single-zone air conditioning w/pollen & odor filter |
| Cruise control | Double sliding sunvisors for driver & front passenger w/illuminated vanity mirrors |
| Front center armrest w/integrated storage box | Front seatback storage pockets |
| Front/rear floor mats | Immobilizer III theft-deterrent system |
| Integrated roof/window diversity antenna | Leather-wrapped shift knob |
| Leatherette heated front bucket seats w/12-way pwr driver & 8-way manual passenger seat adjusters, 4-way pwr driver lumbar | Manual rear & side sunshades |
| Multi-function trip computer w/digital compass, temp display | Pwr windows -inc: front windows w/driver 1-touch up/down feature, pinch protection |
| Rear heating/air conditioning ducts | Rear window defroster |
| Remote keyless entry w/trunk release & panic button | Remote trunk/fuel door releases located on drivers door |

### Mechanical

| | |
|---|---|
| Auto disc-wiping brake feature | Dual exhaust pipes |
| Electro-mechanical dual-pinion pwr steering | Electronic differential lock |
| Front MacPherson suspension w/triangular wishbones, stabilizer bar | Front wheel drive |
| Pwr 4-wheel disc brakes w/vented front, solid rear rotors | Rear four-link suspension w/stabilizer bar |

### Safety

| | |
|---|---|
| 4-wheel anti-lock braking system (ABS) | Anti-intrusion door beams |
| Child safety locks on rear doors | Collapsible steering column |
| Daytime running lights | Driver & front passenger airbags |


**Mitchell WorkCenter**
Total Loss

PGR_THURSTON_0008148

| Driver & front passenger side-impact airbags | Driver controlled window lockout |
|---|---|
| Dual note horn | Electronic stabilization program (ESP) w/anti-slip regulation (ASR), brake assist |
| Front 3-point height-adjustable safety belts w/load limiters, pretensioners | Front/rear head curtain airbags |
| Front/rear side curtain airbags | Internal emergency release trunk handle w/location reflector |
| Lower anchors & tethers for children, rear outboard seating positions (LATCH) | Passenger airbag cutoff |
| Rear 3-point safety belts w/outboard position load limiters | Tire-pressure monitoring system |

## Optional Equipment

LIP SPOILER                                          REAR SIDE AIRBAGS

*DIO/PIO =   Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle:  2009 Volkswagen Passat | Komfort 4 Door Sedan | 2.0L 4 Cyl Gas Turbocharged A FWD

## Regional Comparable Vehicle Information

Search Radius used for this valuation: 200 miles from loss vehicle zip/postal code.
Typical Mileage for this vehicle: 116,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2009 VOLKSWAGEN PASSAT KOMFORT 4D SDN 4 2TURBO GAS A 2WD | 97,049 | 03106 | 158 miles | $5,995.00 List Price | $5,292.05 |
| 2 | 2009 VOLKSWAGEN PASSAT KOMFORT 4D SDN 4 2TURBO GAS A 2WD | 132,000 | 01970 | 161 miles | $5,500.00 List Price | $5,544.09 |
| 3 | 2009 VOLKSWAGEN PASSAT KOMFORT 4D SDN 4 2TURBO GAS A 2WD | 47,314 | 02190 | 180 miles | $6,995.00 List Price | $5,269.23 |
| 4 | 2009 VOLKSWAGEN PASSAT KOMFORT 4D SDN 4 2TURBO GAS A 2WD | 109,695 | 02382 | 185 miles | $5,995.00 List Price | $5,495.66 |
| 5 | 2009 VOLKSWAGEN PASSAT KOMFORT 4D SDN 4 2TURBO GAS A 2WD | 64,180 | 02382 | 185 miles | $6,995.00 List Price | $5,442.72 |

Base Value:    $5,408.75

# Loss Vehicle Adjustments

Loss vehicle:  2009 Volkswagen Passat | Komfort 4 Door Sedan | 2.0L 4 Cyl Gas Turbocharged A FWD

## Condition Adjustments

Condition Adjustment  -$1,110.38          Overall Condition  2.09-Fair          Typical Vehicle Condition:  3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| CARPET | 2 Fair | significant wear |
| DASH/CONSOLE | 3 Good | |
| DOORS/INTERIOR PANELS | 3 Good | |
| HEADLINER | 3 Good | |
| GLASS | 3 Good | |
| SEATS | 2 Fair | multipe small cuts on driver seat |
| **Exterior** | | |
| PAINT | 3 Good | |
| TRIM | 2 Fair | right rear bumper large impact and cracked |
| BODY | 2 Fair | rust more than 2 panels...hood, both rear quarter panels |
| VINYL/CONVERTIBLE TOP | Typical | |
| **Mechanical** | | |
| TRANSMISSION | 3 Good | |
| ENGINE | 1 Poor | obvious leak/wet discharge on side of oil pan |
| Tire | 1 Poor | all four tires bald 0/32 tread depth |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## Regional Comparable Vehicles

Loss vehicle:  2009 Volkswagen Passat | Komfort 4 Door Sedan | 2.0L 4 Cyl Gas Turbocharged A FWD


PGR_THURSTON_0008150

## 1 2009 VOLKSWAGEN PASSAT KOMFORT 4D SDN 4 2 TURBO GAS A2WD

**List Price: $5,995.00**

| VIN | Stock No. | Listing Date | ZIP Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| WVWJK73C89P049965 | 09 2.0T KOMFORT 97 | 11/27/2018 | 03106 | 158 miles |

Source:

DEALER WEB LISTING - CARS.COM
MIKE'S IMPORT A/S OF HOOKSETT
196 LONDONDERRY TURNPIKE
HOOKSETT NH 03106
603-627-5800

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$485.00 |
| Mileage | 113,343 | 97,049 | -$350.14 |
| Equipment | | | |
| LIP SPOILER | Yes | No | $64.05 |
| REAR SIDE AIRBAGS | Yes | No | $68.14 |
| | | Total Adjustments: | -$702.95 |
| | | **Adjusted Price:** | **$5,292.05** |

## 2 2009 VOLKSWAGEN PASSAT KOMFORT 4D SDN 4 2 TURBO GAS A2WD

**List Price: $5,500.00**

| VIN | Stock No. | Listing Date | ZIP Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| WVWJK73CX9P050003 | 101115 | 11/05/2018 | 01970 | 161 miles |

Source:

DEALER WEB LISTING - CARS.COM
CARFIVE
296 HIGHLAND AVE
SALEM MA 01970
978-306-7109

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$445.00 |
| Mileage | 113,343 | 132,000 | $367.81 |
| Equipment | | | |
| LIP SPOILER | Yes | No | $58.76 |
| REAR SIDE AIRBAGS | Yes | No | $62.52 |
| | | Total Adjustments: | $44.09 |
| | | **Adjusted Price:** | **$5,544.09** |

## 3   2009 VOLKSWAGEN PASSAT KOMFORT 4D SDN 4 2 TURBO GAS A2WD     List Price: $6,995.00

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| WVWJK73C09E012968 | 02863 | 11/13/2018 | 02190 | 180 miles |

Source:

DEALER WEB LISTING - CARS.COM
777 AUTO LLC
1076 MAIN ST
WEYMOUTH MA 02190
781-340-0877

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$566.00 |
| Mileage | 113,343 | 47,314 | -$1,314.02 |
| Equipment | | | |
| LIP SPOILER | Yes | No | $74.74 |
| REAR SIDE AIRBAGS | Yes | No | $79.51 |

Total Adjustments:   -$1,725.77
Adjusted Price:   $5,269.23

## 4   2009 VOLKSWAGEN PASSAT KOMFORT 4D SDN 4 2 TURBO GAS A2WD     List Price: $5,995.00

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| WVWJK73C99P049831 | NAVIGATION MINT | 12/09/2018 | 02382 | 185 miles |

Source:

DEALER WEB LISTING -
AUTOTRADER.COM
AUTO SALES EXPRESS
960 TEMPLE ST
WHITMAN MA 02382
508-507-9227

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$485.00 |
| Mileage | 113,343 | 109,695 | -$78.39 |
| Equipment | | | |
| LIP SPOILER | Yes | No | $64.05 |

Total Adjustments:   -$499.34
Adjusted Price:   $5,495.66

Comparable Vehicle Detail

REAR SIDE AIRBAGS



Mitchell **WorkCenter**
Total Loss

**5** **2009 VOLKSWAGEN PASSAT KOMFORT 4D SDN 4 2 TURBO GAS A2WD**

List Price: **$6,995.00**

| VIN | Stock No. | Listing Date | ZIP Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| WVWJK73C29P018064 | 64k LOW MILES | 01/19/2019 | 02382 | 185 miles |

Source

DEALER WEB LISTING -
AUTOTRADER.COM
AUTO SALES EXPRESS
960 TEMPLE ST
WHITMAN MA 02382
508-507-9227

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$566.00 |
| Mileage | 113,343 | 64,180 | -$1,061.02 |
| Equipment | | | |
| LIP SPOILER | Yes | No | $74.74 |

|  |  |
|---|---|
| Total Adjustments: | -$1,552.28 |
| **Adjusted Price:** | **$5,442.72** |

Optional Equipment Not Considered

REAR SIDE AIRBAGS

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2009 Volkswagen Passat Komfort | 4 Door Sedan 2.0L 4 Cyl Gas Turbocharged  FWD | $28,300.00 |



# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

### Step 1 - Locate Comparable Vehicles

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

### Step 2 - Adjust Comparable Vehicles

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

### Step 3 - Calculate Base Vehicle Value

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

### Step 4 - Calculate Loss Vehicle Adjustments

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

### Step 5 - Calculate the Market Value

The Market Value is calculated by applying the loss vehicle adjustments to the base value.


Mitchell **WorkCenter**
Total Loss

Claim # 19-2813486-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 8

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

## Claim Notes for 19-2813486

**EXHIBIT**

8

**Claims Processor**
CARS **02/28/2019 02:41 PM ET**
A126006 XFERRED TO CARS RECOMMENDED ORG 30277 AT 02:41:31 PM ET. ZIPCODE 04681
ENTERED FOR INSURED PARTY GENEVIEVE L. MCDONALD.

**Claims Processor**
CARS **02/28/2019 02:41 PM ET**
CLRU CLAIM NOT QUALIFIED FOR CCU HANDLING:VEHICLE COUNT NOT QUALIFIED|INJURY
TYPE NOT QUALIFIED

**Claims Processor**
CARS **02/28/2019 02:41 PM ET**
PARTY Redacted - PII IS A MINOR.

**Claims Processor**
CARS **02/28/2019 02:41 PM ET**
-->REPT BY: REBECCA DRISCOLL CLAIMANT DRIVER Redacted - PII CELLULAR.
-->REPT VIA: CLRU BY A126006.
-->FOL: ACCIDENT | INTERSECTION | CV RAN STOP SIGN AND COLLIDED WITH IV
-->VEH INFO: 10 KIA FORTE
-        VEHICLE TYPE: PASSENGER AUTO.
-        VEHICLE DRIVEABLE: NO.
-->VEH INFO: 09 VOLKSWAGEN PASSAT
-        VEHICLE TYPE: PASSENGER AUTO.
-        VEHICLE DRIVEABLE: NO.
-->INJ INFO: YES.
-        CLAIMANT DRIVER, REBECCA DRISCOLL, Redacted - PII
Redacted - PII
-        CLAIMANT DRIVER, REBECCA DRISCOLL, TRANSPORTED BY FRIEND/RELATIVE
Redacted - PII
-        CLAIMANT GUEST PASSENGER, SHAYANNE YOUNG Redacted - PII
        Redacted - PII
-        CLAIMANT GUEST PASSENGER, SHAYANNE YOUNG, TRANSPORTED BY
FRIEND/RELATIVE TO

**Claims Processor**
CARS **02/28/2019 02:41 PM ET**
CALL ROUTING REFERENCE #: 441694/152729

**Claims Processor**
CARS **02/28/2019 02:41 PM ET**
CALLER EXPECTATIONS: END OF NEXT BUSINESS DAY
    CONTACT INFO: REBECCA DRISCOLL: Redacted - PII - CELLULAR

**File Intervention**
Tina Altieri (TMR0026) **02/28/2019 02:46 PM ET**
CLAIM ACCEPTED BY ORG 30277

**File Intervention**
Tina Altieri (TMR0026) **02/28/2019 02:47 PM ET**
CLAIM TRANSFERRED TO ORG 32198
SR AX W/ CGP INJ

**File Intervention**

PGR_THURSTON_0008068

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Michael C. Vicino (MCV0002)** **02/28/2019 02:49 PM ET**
ASSIGNED CLAIM TO A103812

**Injury Evaluation**
**Michael R. Waites (A103812)** **02/28/2019 02:55 PM ET**
**BI NEW CLAIM**
COVERAGE: MAINE REGS
LIABILITY: COD STATES IV RAN STOP SIGN HIT - CV POI - FRONT RT FENDER, RT
FRONT DOOR.
INJURIES CLAIMED: COD Redacted - PII
DAMAGE ASSESSMENT:
LIMITS ISSUE?: 50,100
BEST MOI TO OFFER:X
DELAY & DR LTRS:X
ISO:REBECCA DRISCOLL.
S
N - NO RESULTS FOR COD
A - NOTHING FOR COD -
P - NOTHIONG FOR COD
V - NO OTHER LOSSES.
ISO:  SHAYANNE YOUNG
S
N - 12/23/2011 Redacted - PII
A - NOTHING FOR CGP
P - NOTHING FOR CGP
V - NO OTHER LOSSES.
MEDICARE:
SET RESERVE: 5000
FNOL - PER CDO - IV WAS IN PARKINGLOT - IV RAN A STOP SIGN - STRUCK CV -
TO DO:

**Coverage**
**Michael R. Waites (A103812)** **02/28/2019 02:58 PM ET**
MANUAL CVQ ADDED

**Damages**
**Michael R. Waites (A103812)** **02/28/2019 03:02 PM ET**
PD EXPOSURE OPENED ON 10 KIA FORTE

**Damages**
**Michael R. Waites (A103812)** **02/28/2019 03:03 PM ET**
BI EXPOSURE OPENED ON REBECCA DRISCOLL

**Damages**
**Michael R. Waites (A103812)** **02/28/2019 03:05 PM ET**
CHECKED MAINE.GOV - PR NOT AVAIL.

**Damages**
**Michael R. Waites (A103812)** **02/28/2019 03:06 PM ET**
INJURY UPDATED FOR Redacted - PII  LEVEL: NONE

**Damages**
**Michael R. Waites (A103812)** **02/28/2019 03:07 PM ET**
INJURY UPDATED FOR LAURENCE BUTTERFIELD  LEVEL: NONE

**Damages**

PGR_THURSTON_0008069

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

Michael R. Waites (A103812) **02/28/2019 03:08 PM ET**
BI EXPOSURE OPENED ON SHAYANNE YOUNG

**Damages**
Michael R. Waites (A103812) **02/28/2019 03:33 PM ET**
OBC TO NOD - NO ASNWER - LVM.
TEXTED
EMAILED.

**Contact Information**
Michael R. Waites (A103812) **02/28/2019 03:38 PM ET**
FROM: MICHAEL R WAITES
SENT: THURSDAY, FEBRUARY 28, 2019 3:38 PM
TO: 'GENEVIEVE207@GMAIL.COM' <GENEVIEVE207@GMAIL.COM>
SUBJECT: PROGRESSIVE CLAIM 19-2813486
HELLO GENEVIEVE,
I WAS HOPING TO SPEAK WITH YOU ABOUT A CLAIM THAT HAD BEEN REPORTED TO US.  IS
THERE A CONVENIENT TIME FOR US TO SPEAK?
BEST REGARDS,
MICHAEL WAITES
CLAIM GENERALIST INTERMEDIATE
43 CONSTITUTION DRIVE #203
BEDFORD NH 03110
603-637-4849 EMAIL MWAITES1@PROGRESSIVE.COM
800-PROGRESSIVE (800-776-4737)
FAX 603-637-9847
MY HOURS OF AVAILABILITY: MONDAY THROUGH FRIDAY 8AM-4:45PM

**Liability**
Michael R. Waites (A103812) **02/28/2019 03:47 PM ET**
CLAIMANT RECORDED INTERVIEW
PARTY: CLAIMANT -
WHAT I DID: R/S -  HAD LEFT SUBWAY - ON WAY TO DROP FIANCE AT AUTO SHOP -
DRIVING ABOUT 10MPH - IV WAS LEAVING HANAOFRD PARKING LOT - DIDN'T SEE IV
UNTIL AFTER LOSS.
CV POI - FRONT CONRER PANEL, PASS SIDE DOOR.
IV POI - FRONT END. -
POLICE SHOWED UP - ROCKLAND - NO TIX ISSUED.
NO WITNESSES GAVE ANY INFO.
COD TOOK PHOTOS AT THE SCNEE.
NO IGPS
ID NOT INJURED.
ANALYSIS OF DUTIES: IV AF FOR IMPROPER LOOKOUT
WHAT I NEED TO DO: ID R/S, SCENE REVIEW.

**Injury Evaluation**
Michael R. Waites (A103812) **02/28/2019 03:58 PM ET**
IPC OR CCT?: CCT
COMPLETED WITH:  REBECCA DRISCOLL
PHYSICAL DESCRIPTION:
INJURY:

# Redacted - PII

EMPLOYED? LOST WAGES CLAIMED:  NO WAGE CLAIM - CURRENTLY UNEMPLOYED.

PGR_THURSTON_0008070

# Redacted - PII

OUT OF POCKET EXPENSES: NO OOP YET.
MED AUTH SIGNED: MAILED.
WAGE AUTH SIGNED: MEDICARE?:NO
MEDICAID?: Redacted - PII
TSO APPROPRIATE?X
IPC OFFERED:X
ADLS: X
CONCERNS/HOW TO RESOLVE:NO CONCERNS -
CREDIBILITY: WELL SPOKEN - SEEMS CREDIBL E.
DOMINANT HAND?: LEFT HANDED.
NOTES: REV'D CLAIM - LIAB PENDING A/TT/ - NOT ABLE TO MAKE OFFER - SAME IS ON
Redacted - PII DOESN'T WANT TO USE MEDPAY B/C NO DED. NO DUAL OPENED AT/T/.
FOLLOW UP COMMITMENTS MADE: 2 WKS ON BI - SOONER IF /WHEN LIAB CLEAR.

**Damages**
Michael R. Waites (A103812) **02/28/2019 04:15 PM ET**
REV'D CLAIM
ADVSIED OF MY CONCERN THAT CV IS TOTAL DUE TO MAKE MODEL YR - NON DRIVE.
CV IS CURRENTLY AT O'REILY'S AUTO - WHERE HER FIANCE WORKS.
SAME ASKED IF SHE HAS THEM LOOK AT VEH - CAN WE REIMB HER, ADVISED UNABLE TO
COMMIT TO ANYTHIGN AT/T/ AS LIAB PENDING - ADVSIED IF LIAB CLEAR - WE WOULD
LIKELY MOVE TO B/S OR COPART FOR APPRAISAL ,SO NOT NECESSARY THEY LOOK AT FOR
CLAIM - SAID I CAN'T ADVISE EHR AT TIME.
SAME WILL LIKELY MOVE CV TO HER HOUSE
WILL TXT PHOTOS BACK FOR REVIEW.
ROI -  Redacted - PII  -HER SON.

**Damages**
Michael R. Waites (A103812) **02/28/2019 04:18 PM ET**
OBC TO CG LARRY BUTTERFIELD - NO ASNWER - LVM - PLS CALL - ROI

**Contact Information**
Michael R. Waites (A103812) **02/28/2019 04:23 PM ET**
FROM: MICHAEL R WAITES
SENT: THURSDAY, FEBRUARY 28, 2019 4:23 PM
TO: Redacted - PII
SUBJECT: PROGRESSIVE CLAIM 19-2813486
HELLO REBECCA,
THANKS FOR REVIEWING YOUR CLAIM WITH ME.  MY CONTACT INFO CAN BE FOUND BELOW.
PLEASE FEEL FREE TO CALL ME IF YOU HAVE ANY QUESTIONS OR CONCERNS.
BEST REGARDS,
MICHAEL WAITES
CLAIM GENERALIST INTERMEDIATE
43 CONSTITUTION DRIVE #203
BEDFORD NH 03110
603-637-4849 EMAIL MWAITES1@PROGRESSIVE.COM
800-PROGRESSIVE (800-776-4737)
FAX 603-637-9847
MY HOURS OF AVAILABILITY: MONDAY THROUGH FRIDAY 8AM-4:45PM

**Liability**
Michael R. Waites (A103812) **02/28/2019 04:25 PM ET**
SCENE INVESTIGATION

PGR_THURSTON_0008071

**Claim #:** 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

WHAT I DID: SCENE INVEST
CV WOULD HAVE BEEN TRAVELING ON THROUGHWAY IN PARKING LOT, TORWARD STOP SIGN.
IV WOULD HAVE BEEN EXITING A PARKING ALLEY
ANALYSIS OF DUTIES: CD WAS ON MAIN THROUGHWAY AND WOULD HAVE HAD ROW.
WHAT I NEED TO DO: ID R/S - VEH DMG REVIEW.

**Damages**
SYSTEM **02/28/2019 04:26 PM ET**
ESIGN SIGNATURE COMPLETE
SIGNED BY: REBECCA DRISCOLL
DOCUMENT(S) RECEIVED: REQUEST FOR MEDICAL AUTHORIZATION

**Injury Evaluation**
Michael R. Waites (A103812) **02/28/2019 04:31 PM ET**
IPC OR CCT?: CCT
COMPLETED WITH: SHAYANNE BUTTERFIELD
PHYSICAL DESCRIPTION:
INJURY:

# Redacted - PII

EMPLOYED? LOST WAGES CLAIMED: NO WAGES LOST.
CAUSATION CONCERNS: NO CONCERNS.

# Redacted - PII

OUT OF POCKET EXPENSES: NO OOP.
MED AUTH SIGNED: OFFERED ESIG - DECLINED - MAILED.
WAGE AUTH SIGNED: MEDICARE?: NO
Redacted - PII
TSO APPROPRIATE? ADVISED WOULD BE LOOKING AT 500.00 SAME DOESN'T WANT TO
SETTLE AT/T/.
IPC OFFERED: NOT NEEDED A/T/T.
ADLS: X
CONCERNS/HOW TO RESOLVE:SMAE DOESN'T WANT TO USE - COD'S MEDPAY - WANTS TO GO
THROUGH PASSAT POLICY . REVIEWED COLLATERAL SOURCE.
CREDIBILITY: WELL SPOKEN - CREDIBLE.
DOMINANT HAND?:RT
NOTES: SAME WANTS TO WAIT AND GO THROUGH ND'S POLICY - ADVISED THAT MEDPAY
AVAIL AS WELL ON COD'S POLICY - BI F/U - 2 WEEKS.
FOLLOW UP COMMITMENTS MADE: BI F/U - 2 WEEKS.

**Damages**
Michael R. Waites (A103812) **02/28/2019 04:46 PM ET**
INJURY UPDATED FOR SANTINNA YOUNG LEVEL: NONE

**Coverage**
Michael R. Waites (A103812) **02/28/2019 04:51 PM ET**
Resolved Coverage Issue Note:
* ANOTHER LOSS EXISTS FOR THIS POLICY
REV'D PRIOR LOSSES
IV STRUCK PARKED CV 2018
GLASS CLAIM 2016
IV BACKED UP INTO DUMPSTER 2014

**Claim #:** 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

VEH'S WERE REPAIRED.
NO OVER\LAPPING DMG
NO SIU INVOLVMEENT
NO TRENDS.

**To Do**
Michael R. Waites (A103812) **02/28/2019 04:52 PM ET**
COVG
- MAINE REGS
LIAB
- MAINE PR AVAIL?
- NOD R/S - AGGRESSIVE CONTACT.
- VEH DMG REVIEW.
INJ

## Redacted - PII

DMG
- CV09
- IV09

**Contact Information**
Michael R. Waites (A103812) **03/01/2019 08:17 AM ET**
FROM: GENEVIEVE MCDONALD <GENEVIEVE207@GMAIL.COM>
SENT: THURSDAY, FEBRUARY 28, 2019 7:41 PM
TO: MICHAEL R WAITES <MICHAEL_R_WAITES@PROGRESSIVE.COM>
SUBJECT: [EXTERNAL] RE: PROGRESSIVE CLAIM 19-2813486
HELLO MICHEAL,
SORRY WE WERENT ABLE TO CONNECT THIS EVENING. I WAS ON MY WAY TO AN EVENT
WHEN THE ACCIDENT OCCURRED AND WAS SPIRITED AWAY JUST IN TIME TO FULFILL MY
OBLIGATIONS.
I WILL BE AVAILABLE ANYTIME TOMORROW AND WILL CALL FIRST THING IN THE MORNING.
THANK YOU FOR YOUR PATIENCE.
CHEERS,
GENEVIEVE

**Damages**
Michael R. Waites (A103812) **03/01/2019 08:34 AM ET**
CHECKED MAINE.GOV - NO PR AVAIL.

**Liability**
Michael R. Waites (A103812) **03/01/2019 09:28 AM ET**
INSURED RECORDED INTERVIEW
PARTY: INSURED -
WHAT I DID: R/S - IV WAS IN HANNAFORD PARKING LOT - CLEAR - COMING FROM
HANAFORD PARKING LOT - HEADING TOWARD MAIN ROADDWAY - LOOKED LEFT - DIDN'T SEE
ANYONE - LOOKED RT - EXITING ALLEY - FROM PAKRING LOT - DIDN'T SEE ACCIDENT
UNTIL -
IV POI - FRONT END DS QUARTER PANEL -
UPD PASS SIDE REAR QUARTER PANEL - WAS HIT LAST WEEK WHEN PARKED- HAS CLAIM
WITH HANOVER INSURANCE. - NOT HEAR FROM THEM. FOR ESTIMATE -
IV - NON DRIVE.
CV POI - PASS SIDE FRONT DOOR.
NO IGPS
3 CGPS - NO APPEARED INJURED AT THE SCENEE
ROCKLAND POLICE ISSUED.

PGR_THURSTON_0008073

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

NO TICKETS ISSUED.
NO WITNESSSES.
TOOK PHOTOS AT THE SCENE.
ANALYSIS OF DUTIES: ID AF FOR FTYROW.  CV HAD ALREADY TAKEN CONTROL OF ROADWAY
AND IX.
WHAT I NEED TO DO:

**Total Loss**
Michael R. Waites (A103812) **03/01/2019 09:46 AM ET**
REV'D CLAIM
AGREES THINKS IV IS A TOTAL LOSS.
FINCANCES W/ CHRYSLER -  OWES ABOUT - 10,000 LEFT.  HAS GAP -
WILL EMPTY IV OUT , EMPTY AND RLS, BY EOD 3/2.
WILL CALL ME TO SETUP COPART WHEN COMPLETE.
U/S AF FOR ACCIDENT
REV'D COVERAGES.
ADVISED OF 1800 PROG
USED GRT.
FROM: MICHAEL R WAITES
SENT: FRIDAY, MARCH 01, 2019 11:28 AM
TO: 'GENEVIEVE207@GMAIL.COM' <GENEVIEVE207@GMAIL.COM>
SUBJECT: PROGRESSIVE CLAIM 19-2813486
HELLO GENEVIEVE,
THANKS FOR REVIEWING YOUR CLAIM WITH ME TODAY.  I TRIED TO RUN A TITLE SEARCH
FOR YOUR VEHICLE IN THE MAINE DATABASE BUT UNFORTUNATELY I COULDNT FIND IN
THE SYSTEM.  I JUST WANTED TO CONFIRM, IS THE VEHICLE TITLED IN MAINE?  IS
THE VIN# WVWJK73C19PD47779?  I JUST WANT TO MAKE SURE I GET IT CORRECT FOR
YOUR PAPERWORK.
THANKS,
MICHAEL WAITES
CLAIM GENERALIST INTERMEDIATE
43 CONSTITUTION DRIVE #203

**Liability**
Michael R. Waites (A103812) **03/01/2019 10:02 AM ET**
VEHICLE DAMAGE REVIEW
WHAT I DID:  VEHICLE DAMAGE REVIEW
ANALYSIS OF DUTIES:  DAMAGES ARE CONSISTEND WITH FOL -  CV WAS ALREADY IN
ROADWAY WHEN IV ENTERED AND STRUCK. CV.
WHAT I NEED TO DO:  CODE LIAB.

**Liability**
Michael R. Waites (A103812) **03/01/2019 10:11 AM ET**
VEHICLE TRAFFIC LAW REVIEW
WHAT I DID:  CHECKED MAINE STATUTES - COULDN'T FIND STATUTE THAT WOULD AFFECT
THIS CLAIM.
ANALYSIS OF DUTIES:
WHAT I NEED TO DO:

**Liability**
Michael R. Waites (A103812) **03/01/2019 10:15 AM ET**
LIABILITY RANGE DETERMINED
FOL: IV PULLED FROM ALLEY IN PARKING LOT AND STRUCK CV IN ROAD WAY
ANALYSIS OF INVESTIGATION:    COD R/S
NOD R/S
SCENE REVIEW
VEH DMG REVIEW

PGR_THURSTON_0008074

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

NOD R/S AND COD R/S CONFIRM - CV WAS DRIGING ON ROADWAY TO LEAVE PARKING LOT.
IV WAS EXITING PARKING LOT ON ROADWAY AND STRUCK CV
ID ADMITS NEVER SAW CV UNTIL LOSS.
DMG REVIEW CONFIRMS SAME
SCENE REVIEW SHOWS CV WOULD HAVE HAD ROW.
100 ON NOD FOR IMPROPER LOOKOUT AND FTYROW.

**Liability**
Michael R. Waites (A103812) **03/01/2019 10:16 AM ET**
LIABILITY COMPLETE
RESOLUTION SUMMARY:  COD WANTS TO REPAIR THROUG PROG.

**Rental**
Michael R. Waites (A103812) **03/01/2019 10:44 AM ET**
TICKET NUMBER:
RESERVATION NUMBER: 478560
(1089)  (207) 594-9093
ENTERPRISE RENT-A-CAR
11 DEXTER ST EXT
THOMASTON, ME   04861-3214
WARM - XFER TO ZACH - AT ERAC.
ADVISED RENTAL GOOD 3 DAYS POST SETTLEMENT "CALL/OFFER"
U/S SAME.

**Damages**
Michael R. Waites (A103812) **03/01/2019 10:46 AM ET**
OBC TO STEVE AT CAMDEN EXXON - 207-542-6265.
SAME OUT OF OFFICE NOW - SAID TO TRY BACK TO GET STORAGE CHARGES.

**Injury Evaluation**
Michael R. Waites (A103812) **03/01/2019 10:48 AM ET**

# Redacted - PII

**Injury Evaluation**
Michael R. Waites (A103812) **03/01/2019 10:51 AM ET**
USED GRT - COD THINKS CV IS A TOTAL LOSS- ACCEPTED DTL -
SETUP COPART.
SETUP RENTLA
ADVISED OF 1800PROG
CD HAS TITLE. -

**Rental**
Caitlyn P. Griffin (A085282) **03/01/2019 11:05 AM ET**
IBC FROM ERAC
- ERAC NEEDED THE CDW APPROVED FOR THE COD. ASKED IF HAVE THE DEC PAGE. ERAC
SAID THAT A103812 HAS THE DEC PAGE. WENT TO PLACE ERAC ON HOLD AND HEARD A
LOUD DIAL TONE, COULD SEE THE CALL BUT THE ARROW WAS A WHEEL SPINNING. PHONE
STOPPED WORKING.
- LET A103812 WHO PUT CDW THRU AGAIN. ARMS DIDN'T TAKE THE FIRST TIME HE DID
IT.

**Coverage**
Michael R. Waites (A103812) **03/01/2019 11:10 AM ET**

PGR_THURSTON_0008075

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

Resolved Coverage Issue Note:
MAINE REGS
ME:
1. PERMISSION TO RECORD - Y
2. LIABILITY DENIALS CITE SPECIFIC REASON FOR DENIAL - NA
3. WAS RENTAL OFFERED TO CLAIMANTS WHERE COVERAGE IN ORDER - YES IN RNETAL
4. LINE COVERAGE LISTED ON ALL 1ST PARTY PAYMENT DRAFTS -Y

**Total Loss**
Michael R. Waites (A103812) **03/01/2019 11:16 AM ET**
RAN TILTE SEARCH THROUGH MAINE RECORD REQUEST SERVICE
ZERO RESULTS.

**Damages**
Michael R. Waites (A103812) **03/01/2019 11:17 AM ET**
OBC TO COD - NO ANSWER - LVM- PLS CALL ME WHEN CV IS READY FOR PIKCUP.

**To Do**
Michael R. Waites (A103812) **03/01/2019 11:22 AM ET**
IN L

Redacted - PII

DMG
- IV TOTAL
  - ND WILL EMPTY IV OUT THIS WEEKEND.
  - SEED TOW/STORAGE FROM EXON - STEVE - 207-542-6265
  - F/U W/ND ON MONDAY - SETUP COPART
  - GET PAYOUT INFO FROM LH
  - FIND OUT WHO IS ON TITLE - NOT SHOWING UP IN MAINE PAGE
  - EMAIL OUT TDE - CONFIRM IV TITLED IN MAINE.
  - SETUP IV09
- CV TOTAL
  - COD IS IN RENTAL
  - COD HAS TITLE - WILL MAIL IN.
  - CV AT O'RELIY AUTO - HER FIANCE WORKS THERE.
  - COD WILL EMPTY CV AND CALL WHEN READY FOR PICKUP
  - SETUP COPART WHEN EMPTY AND READY FOR PICKUP.
  - SETUP CV09 AT COPART.

**Damages**
Michael R. Waites (A103812) **03/01/2019 02:37 PM ET**
IBC FROM COD - SAID THAT IV EMPTIED AND RELEASED. CLEAR TO SETUP COPART.

**Total Loss**
Michael R. Waites (A103812) **03/01/2019 02:43 PM ET**
LOT # 29035679  ASSIGNMENT DATE 03/01/2019
LOCATION ASSIGNED ME - LYMAN (YARD 90)
136 KENNEBUNK POND ROAD
LYMAN ME 04002
UNITED STATES  TITLE PROCESSING LOCATION      COPART AUTO AUCTIONS
PO BOX 819
ALFRED ME 04002
UNITED STATES
LOCATION ASSIGNED PHONE # (207) 499-7255 TITLE PROCESSING PHONE # (207)
499-7255
FAX # (207) 499-7081

PGR_THURSTON_0008076

SELLER P809 - PROGRESSIVE - NH - MANCHESTER ADJUSTER MICHAEL WAITES
CLAIM # 19-2813486 SELLER REFERENCE #
VEHICLE TYPE INSPECTION
DESCRIPTION 2010 KIA FORTE VIN KNAFU4A28A5311411
LOSS DATE 02/28/2019
INSURED REBECCA DRISCOLL OWNER REBECCA DRISCOLL
ESTIMATED ADVANCE CHARGES $0.00
COMMENTS

**Damages**
Michael R. Waites (A103812) **03/01/2019 02:44 PM ET**
OBC TO CG BUTTERFIELD - NO ASNWER- LMV.

**Damages**
Michael R. Waites (A103812) **03/01/2019 02:50 PM ET**
OBC TO O'REILLY AUTO - 207-593-1632 - SPOKE W/ LARRY - ROI - STATED BACK A
LITTLE ACHY - BUT FEELIG FINE - SAME SAID DOES NOT WISH TO PRESENT A BI CLAIM
- AVISD OF SOL.
CONFIRMED CV EMPTIED AND READY TO GO.
3WAY CALL TO  COPART.
COPART IS HAVIG A PHONE ISSUE - UNABLE TO COMPLETE 3WAY CALL.

**Damages**
Michael R. Waites (A103812) **03/04/2019 11:37 AM ET**
OBC TO STEVE @ EXON - ON ROAD - SAID TO TRY BACK IN 30 MIN.

**Total Loss**
Michael R. Waites (A103812) **03/04/2019 11:46 AM ET**
CTA OR TITLE INFORMATION
CTA OR TITLE NUMBER: P933990    PENDING CTA: NO
STATUS: ACTIVE ENTERED DATE: 08/20/13 ISSUE DATE: 08/28/13
VEHICLE INFORMATION
YEAR: 2009 MAKE: VOLK MODEL: PASSAT
MSRP: 27610 IMPORT: N BODY TYPE: 4D
MILEAGE 56480 CONDITION: USED PURCHASE DATE: 07/19/13
MILEAGE TYPE: ACTUAL MILES/KM: MILES ODOMETER CHGD:
OWNER INFORMATION
1ST OWNER INFORMATION
LAST NAME: KURILEC
FIRST NAME: GENEVIEVE
MIDDLE INITIAL: L
SUFFIX:
2ND OWNER INFORMATION
LAST NAME: MCDONALD
FIRST NAME: CORY
MIDDLE INITIAL: B
SUFFIX:
DBA:    JOINT OWNERSHIP: Y
ADDRESS INFORMATION
ADDRESS: 129 N MAIN ST
CITY/STATE/ZIP: STONINGTON, ME 04681
LIEN INFORMATION
1ST LIEN INFORMATION
LIEN DATE: 07/19/13  ADDRESS: PO BOX 961272
LIEN RELEASE DATE:  CITY/TOWN: FORT WORTH
NAME ON LIEN: CHRYSLER CAPITAL  STATE: TX
  ZIP CODE: 76161

PGR_THURSTON_0008077

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Total Loss**
Michael R. Waites (A103812) **03/04/2019 12:31 PM ET**
EMAILED TDE TO ND

**Total Loss**
Michael R. Waites (A103812) **03/04/2019 12:32 PM ET**
EXXON
TOW : 350
STORAGE: 50/DAY - SINCE 2/28/19
EMPTIED/RELEASED.
CAMDEN EXXON -
314 WEST ST
ROCKPORT -

**Total Loss**
Michael R. Waites (A103812) **03/04/2019 12:39 PM ET**
LOT # 29177569  ASSIGNMENT DATE 03/04/2019
LOCATION ASSIGNED ME - LYMAN (YARD 90)
136 KENNEBUNK POND ROAD
LYMAN ME 04002
UNITED STATES  TITLE PROCESSING LOCATION        COPART AUTO AUCTIONS
PO BOX 819
ALFRED ME 04002
UNITED STATES
LOCATION ASSIGNED PHONE # (207) 499-7255 TITLE PROCESSING PHONE # (207)
499-7255
FAX # (207) 499-7081
SELLER P809 - PROGRESSIVE - NH - MANCHESTER ADJUSTER MICHAEL WAITES
CLAIM # 19-2813486 SELLER REFERENCE # 0/7 = 3/7 @ 224
VEHICLE TYPE INSPECTION
DESCRIPTION 2009 VOLKSWAGEN PASSAT TUR VIN   WVWJK73C19P047779
LOSS DATE 02/28/2019
INSURED GENEVIEVE DRISCOLL OWNER GENEVIEVE DRISCOLL
ESTIMATED ADVANCE CHARGES $400.00
COMMENTS

**Damages**
Michael R. Waites (A103812) **03/04/2019 12:47 PM ET**
3WAY CALL TO SHOP: W/  JESS - COPART - APPROVED TOW.
APPROVED TOW BILLS.

**Damages**
Michael R. Waites (A103812) **03/04/2019 12:49 PM ET**
SETUP IV09

**Total Loss**
Michael R. Waites (A103812) **03/04/2019 12:51 PM ET**
CHRYSLER CAPITAL
855-563-5635
10 DAY PAY OFF: 8,220.31
PERDIEM:
GOOD THROUGH: 3/18/2019
MAIL PAYMENT TO:
PO BOX 660443
DALLAS TX
75265

PGR_THURSTON_0008078

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

SETTLEMENT SUMMARY
LETTER OF TTL
EVALUATION -
EMAIL CLAIMS@CHRYSLERCAPITAL.COM

**Total Loss**
Michael R. Waites (A103812) **03/04/2019 01:09 PM ET**
REVIEWED COPART PAGE - CV EMPTIED / RELEASED- NO CHARGES - ON ROAD HAZARD.

**To Do**
Michael R. Waites (A103812) **03/04/2019 01:10 PM ET**
INJ

Redacted - PII

DMG
- IV TOTAL
   - WAITING ON TDE - EMAILED POAS
   - SEND LOG REQUEST / REMIND CHRYSLER
   - SETUP IV09
- CV TOTAL
   - COD IS IN RENTAL
   - COD HAS TITLE - WILL MAIL IN.
   - CV AT O'RELIY AUTO - HER FIANCE WORKS THERE.
   - COD WILL EMPTY CV AND CALL WHEN READY FOR PICKUP
   - SETUP COPART WHEN EMPTY AND READY FOR PICKUP.
   - SETUP CV09 AT COPART.

**Injury Evaluation**
Michael R. Waites (A103812) **03/04/2019 04:47 PM ET**
NEW PARTY ADDED TO CLAIM: PEN BAY MEDICAL CENTER
MAILED EVAL REQUEST FOR COD DRISCOLL

**Total Loss**
Michael R. Waites (A103812) **03/05/2019 09:29 AM ET**
CHECKED COPART - CV
*AUTO: DRIVER AC PROVOS DISPATCHED FOR PICKUP ON 03/06/19.
CHECKED COPART - IV
*AUTO: DRIVER AC PROVOS DISPATCHED FOR PICKUP ON 03/05/19.

**Rental**
Michael R. Waites (A103812) **03/05/2019 11:40 AM ET**
IBC FROM COD - ASKED ABOUT RENTAL - ADVSIED WE HAVE STILL NOT LOOKED AT CV YET
- RE- ADVSIED THAT RENTAL IS GOOD FOR 3 DAYS POST SETTLMEENT OFFER.
SAME SAID SHE IS GOING TO BABY SHOWER THIS WEEKEND. - ADVSIED I WOULDN'T MAKE
HER RETURN RNETLA ON A SUNDAY - WOULD EXTEND THROUGH MONDAY - IF WEEKEND
RENTAL RETURN COMES UP.

**Damages**
Michael R. Waites (A103812) **03/06/2019 08:29 AM ET**
CHECKED COPART SITE:
IV AT COPART
CV AT COPART

**Total Loss**
Michael J. Fries (MJF0020) **03/06/2019 11:55 AM ET**
IV TITLE

Page [PAGE] of [NUMPAGES]

---------

CTA OR TITLE INFORMATION
CTA OR TITLE NUMBER:    P933990                        PENDING CTA:    NO
STATUS: ACTIVE   ENTERED DATE:   08/20/13           ISSUE DATE:      08/28/13
VEHICLE INFORMATION
YEAR:     2009      MAKE:   VOLK      MODEL: PASSAT
MSRP:   27610    IMPORT:N        BODY TYPE:      4D
MILEAGE          56480   CONDITION:        USED    PURCHASE DATE: 07/19/13
MILEAGE TYPE:   ACTUAL MILES/KM:       MILES    ODOMETER CHGD:
OWNER INFORMATION
1ST OWNER INFORMATION
LAST NAME:      KURILEC
FIRST NAME:     GENEVIEVE
MIDDLE INITIAL:  L
SUFFIX:
2ND OWNER INFORMATION
LAST NAME:      MCDONALD
FIRST NAME:     CORY
MIDDLE INITIAL:  B
SUFFIX:
DBA:                         JOINT OWNERSHIP:        Y
ADDRESS INFORMATION
ADDRESS:        129 N MAIN ST
CITY/STATE/ZIP:  STONINGTON, ME 04681
LIEN INFORMATION
1ST LIEN INFORMATION
LIEN DATE:       07/19/13       ADDRESS:      PO BOX 961272
LIEN RELEASE DATE:             CITY/TOWN:     FORT WORTH
NAME ON LIEN:   CHRYSLER CAPITAL      STATE:   TX
                   ZIP CODE:        76161

**Coverage**
Michael J. Fries (MJF0020) **03/06/2019 12:25 PM ET**
Resolved Coverage Issue Note:
ANOTHER LOSS EXISTS FOR VIN # WVWJK73C19P047779
1 PRIOR CLM FROM '14, DMG TO REAR.  NO ISSUES OR OVERLAP.  NOTES IN PRIOR CLM
INDICATE BACK GLASS NEEDED RR AND ITS FINE NOW.  EVIDENT THIS DMG WAS
REPAIRED.

**Total Loss**
Michael J. Fries (MJF0020) **03/06/2019 01:04 PM ET**
**** TOTAL LOSS/ WARM HANDOFF TO F/O ****
---VEHICLE:  09 VW PASSAT
AUTHED SETTLEMENT AMOUNT: 4,534.78
-DEDUCT: 500
TOTAL SETTLEMENT: 4,034.78
---CONTACTED CUSTOMER MADE T/L OFFER: YES- WENT OVER WCTL EVAL DETAILS, SHE
ACCEPTS VALUE SAID ITS HONESTLY MORE THAN SHE THOUGHT IT WOULD BE WORTH.  SHE
HAS GAP ON LOAN THAT CAN TAKE CARE OF DIFF SHE SAID.  SHES GLAD TO BE OUT
FROM UNDER THIS 8K LOAN ON A CAR WORTH HALF OF THAT, SHE WAS READY FOR A NEW
CAR ANYWAY SO WILL END UP WORKING OUT.  SHE SAID HUSB GOT HIS POA NOTARIZED
AND SHES GETTING HERS DONE.
---EMAILED WCTL & SETTLEMENT REPORT: YES
---PLAN FOR TDE: F/O ALREADY HAS IN PROCESS
-LIEN: F/O CONFIRMED PAYOFF
-TITLE: WITH L/H
-POA: NEED FROM NOD AND HUSB

PGR_THURSTON_0008080

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

---SECURED PERMISSION TO MOVE: ALREADY AT COPART
---EXPECTATION SET AROUND RENTAL: NROP
---WARM HANDOFF TO F/O: SKYPE & DIARY
---F/O TO DO:
-OBTAIN POAS AND LOG TO ISSUE PMT
-FWD DOCS TO NSU
-ASST NOD WITH GAP CLAIM AS NEEDED
-----

FROM: MICHAEL J FRIES
SENT: WEDNESDAY, MARCH 06, 2019 1:01 PM
TO: 'GENEVIEVE207@GMAIL.COM' <GENEVIEVE207@GMAIL.COM>
CC: MICHAEL R WAITES <MICHAEL_R_WAITES@PROGRESSIVE.COM>
SUBJECT: YOUR PROGRESSIVE CLAIM: 19-2813486
HELLO GENEVIEVE,
THANK YOU FOR TAKING A MINUTE TO REVIEW YOUR CLAIM WITH ME TODAY. IVE
ATTACHED A COPY OF THE VALUATION REPORT THAT OUTLINES HOW WE DETERMINED THE
MARKET VALUE FOR YOUR CAR, ALONG WITH YOUR TOTAL LOSS SETTLEMENT SUMMARY.
PLEASE FEEL FREE TO CALL ME IF YOU HAVE QUESTIONS ABOUT THIS INFORMATION.
THE ADJUSTER HANDLING YOUR CLAIM, MICHAEL WAITES (603-637-4849), WILL BE
FOLLOWING UP WITH YOU FOR THE NECESSARY PAPERWORK NEEDED TO GET PAYMENT ISSUED
TO YOUR BANK AS TIMELY AS POSSIBLE. WE CAN ASSIST WITH YOUR GAP CLAIM AS
NEEDED AS WELL BY FORWARDING YOUR BANK ANY DOCUMENTS THEY MAY REQUIRE FROM US
TO PROCESS THAT PORTION OF THINGS FOR YOUR LOAN PAYOFF.
THANK YOU FOR CHOOSING PROGRESSIVE!
MIKE FRIES
SENIOR MULTILINE REPRESENTATIVE
PROGRESSIVE
600 SABLE OAKS DR, SUITE 180
SOUTH PORTLAND, ME 04106
CELL# 207-720-0910
FAX# 207-253-1786
EMAIL: MFRIES1@PROGRESSIVE.COM
MY HOURS OF AVAILABILITY: MON-FRI 8AM-4:45PM

**Total Loss**
Michael R. Waites (A103812) **03/06/2019 04:49 PM ET**
FROM: MICHAEL R WAITES
SENT: WEDNESDAY, MARCH 06, 2019 4:49 PM
TO: 'CLAIMS@CHRYSLERCAPITAL.COM' <CLAIMS@CHRYSLERCAPITAL.COM>
CC: 'GENEVIEVE207@GMAIL.COM' <GENEVIEVE207@GMAIL.COM>
SUBJECT: LETTER OF GUARANTEE REQUEST
PLEASE SEE THE ATTACHED DOCUMENTS FOR A LETTER OF GUARANTEE REQUEST FOR THE
2009 VOLKSWAGEN PASSAT BELONGING TO GENEVIEVE MCDONALD
MICHAEL WAITES
CLAIM GENERALIST INTERMEDIATE
43 CONSTITUTION DRIVE #203
BEDFORD NH 03110
603-637-4849 EMAIL MWAITES1@PROGRESSIVE.COM
800-PROGRESSIVE (800-776-4737)
FAX 603-637-9847
MY HOURS OF AVAILABILITY: MONDAY THROUGH FRIDAY 8AM-4:45PM

**Damages**
Michael R. Waites (A103812) **03/07/2019 11:46 AM ET**
OBC TO NOD - NO ANSWER- LVM.

**To Do**

PGR_THURSTON_0008081

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

Michael R. Waites (A103812) **03/07/2019 11:48 AM ET**
INJ

Redacted - PII

DMG
- IV TOTAL
  - WAITING ON TDE - EMAILED POAS
  - SEND LOG REQUEST / REMIND CHRYSLER
- CV TOTAL
  - COD IS IN RENTAL
  - COD HAS TITLE - WILL MAIL IN.
  -CV APPRASIAL COMPLETE??

**Total Loss**
Troy A. Cobb (A089410) **03/07/2019 01:59 PM ET**
CV T/L:
-CV IS REG IN VT
-CO LIVES IN MAINE
-ATT RAN CV VALUATION USING MAINE T/L PROCEDURES / IF CO IS BUYING REPLACEMENT
VEH IN MAINE, WOULD USE MAINE T/L PROCESS

------
-P/C TO COD
-WENT OVER DAMAGES AND ADSD CV IS A T/L
-CONFIRMED COD LIVES IN MAINE NOW, WILL BUY REPLACEMENT VEH IN MAINE
-COD JUST HASN'T HAD A CHANCE TO SWTICH CV REG AND HER LIC TO MAINE YET
-ADSD REASON FOR QUESTIONS IS TO DETERMINE T/L PROCESS DUE TO DIFF IN STATE
T/L PROCEDURES AND TAXES
-ADSD SINCE LIVING IN MAINE NOW, AND WILL BE BUYING REPLACEMENT VEH IN MAINE
MAKES MORE SENSE TO USE MAINE
-WENT OVER T/L VALUATION PROCESS - MADE OFFER - COD ACCEPTED
-COD STD SHE JUST BOUGHT 4 NEW TIRES
-SHE DODSN'T HAVE INVOICE W/ HER, BUT BOUGHT THEM FROM VIP IN ROCKLAND
-ADSD I CAN CALL OVER THERE AND DEPENDING ON HOW MANY MILES / WHEN THEY WERE
PUT ON IT COULD ADD VALUE
-ADSD I'LL CB ONCE I GET THAT INFO W/ SETTLEMENT AMOUNT AND IF IT INCREASED
VALUE.

**Total Loss**
Troy A. Cobb (A089410) **03/07/2019 02:06 PM ET**
P/C TO VIP IN ROCKLAND, SW KEN
-CONFIRMED 4 NEW TIRES PUT ON ON 11/16/18 AT 160,526 MILES
-THANKED
***
-UPDATED VALUATION TO INC 4 NEW TIRES W/ JUST OVER 91 DAYS ON THEM

**Total Loss**
Troy A. Cobb (A089410) **03/07/2019 02:07 PM ET**
CV T/L AUTH FOR FOLLOWING:
ACTUAL CASH VALUE: $3,887.60
BASE VALUE: $4,279.87
TITLE HISTORY ADJUSTMENT: -$0.00
REFURBISHMENT ADJUSTMENTS: $0.00
AFTER MARKET PARTS ADJUSTMENT: $125.00
CONDITION ADJUSTMENT: -$517.27
PRIOR DAMAGE ADJUSTMENT: -$0.00
MARKET VALUE: $ 3,887.60

PGR_THURSTON_0008082

SETTLEMENT ADJUSTMENT(PRE-TAX): $0.00
FEES: $0.00
TAXES: $213.82
COMPANY OBTAINS: $0.00
NET SETTLEMENT: $4,101.42
SETTLEMENT ADJUSTMENT(POST-TAX): $0.00
DEDUCTIBLE: -$0.00
OTHER ADJUSTMENTS: $ 0.00
TOTAL SETTLEMENT: $4,101.42

**Total Loss**
Troy A. Cobb (A089410) **03/07/2019 02:39 PM ET**
OBC - COD
-ADSD I CALLED VIP / ADDED TIRES TO VALUATION
-MADE NEW OFFER - COD ACCEPTED
-RENTAL - SET LAST DAY FOR MONDAY
-TDE: HER FIANCE HAS TITLE AND CAN GO TO OFFICE IN SOPO FOR TDE / SHE HAS
ALREADY SIGNED TITLE
-SAME STD THAT SHE WILL CALL ME BACK IN A FEW AS SHE WANTS TO CALL HER FIANCE
TO MAKE SURE TIME AND MONDAY WORKS FOR TDE
-ADSD NO PROBLEM - WILL S/U ONCE WE HEAR BACK

**Rental**
Troy A. Cobb (A089410) **03/07/2019 02:40 PM ET**
YOU JUST SET THE LAST DAY OF RENTAL FOR DRISCOLL, REBECCA.
3/7/19
1:38 PM COBB, TROY
AUTHORIZATION CHANGED BY COBB, TROY AT 2:38 PM.
EXTENDED 3 DAYS UP TO $25.99/DAY.
LAST AUTHORIZED DAY WILL BE 3/11/19.
LAST DAY OF RENTAL SET BY COBB, TROY AT 2:38 PM.
LAST DAY SET --SETTLEMENT MADE

**Total Loss**
Troy A. Cobb (A089410) **03/07/2019 02:42 PM ET**
IBC - COD
-SS SHE CAN GO TO THE OFFICE MONDAY FOR TDE
-ASKED ROUGH TIME FRAME
-SS RIGHT AROUND 10AM
-ADSD WE'LL HAVE CHECK THERE FOR HER
-ADSD I'LL EMAIL UPDATED COPIES OF VALUATION AND SETTLEMENT REPORTS NOW, WHICH
WILL ALSO HAVE OFFICE ADDRESS IN EMAIL
-CONFIRMED NO Q/C ATT

**Total Loss**
Troy A. Cobb (A089410) **03/07/2019 02:45 PM ET**
FROM: TROY A COBB
SENT: THURSDAY, MARCH 07, 2019 2:45 PM
TO: 'RLDRISCOLL@YAHOO.COM' <RLDRISCOLL@YAHOO.COM>
SUBJECT: YOUR PROGRESSIVE CLAIM: 19-2813486-02
DEAR MS. DRISCOLL,
THANK YOU FOR TALKING WITH ME TODAY ABOUT THE CLAIM.
PLEASE REVIEW THE ATTACHED VALUATION AND SETTLEMENT REPORTS I COMPLETED TO
HELP DETERMINE THE VALUE OF YOUR KIA FORTE.
WE WILL HAVE THE PAYMENT FOR YOUR VEHICLES SETTLEMENT AMOUNT WAITING AT OUR
SOUTH PORTLAND OFFICE (ADDRESS BELOW) FOR YOU MONDAY MORNING AROUND 10AM.
PLEASE BRING WITH YOU THE TITLE TO THE VEHICLE. PROGRESSIVE HAS AUTHORIZED

PGR_THURSTON_0008083

YOUR RENTAL VEHICLE THROUGH MONDAY 3/11.
PLEASE CONTACT ME IF YOU HAVE ANY QUESTIONS. YOUR CLAIM NUMBER IS:
19-2813486-02
SINCERELY,
TROY COBB
SENIOR MULTILINE CLAIMS REPRESENTATIVE
PROGRESSIVE
600 SABLE OAKS DRIVE SUITE 180
SOUTH PORTLAND ME 04106
PHONE# 207-210-5455
FAX# 207-253-1786
TOLL FREE 1-800-776-4737
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF YOUR PERMANENT CLAIMS FILE. IF YOU REQUEST A REPLY TO THIS E-MAIL, WE MAY
RESPOND BY E-MAIL OR BY PHONE.

**Total Loss**
Troy A. Cobb (A089410) **03/07/2019 02:45 PM ET**
DIARY AND LYNC TO F/O AS FYI ON BELOW
-T/L OFFER MADE AND ACCEPTED
-LAST DAY RENTAL SET FOR 3/11
-TO DO: S/U TDE AT SOPO OFFICE FOR 10AM ON 3/11

**Total Loss**
Michael R. Waites (A103812) **03/07/2019 04:11 PM ET**
PRINTED OUT CHECK AT SOPO FOR CD.
SETUP APPT IN TDE SCHEDULER
EMAILED REMITTANCE AND NSU FORM TO ADMIN.
LDOR IS 3/11/19 @ 10AM -
OBC TO COD AND CONFIRMD SAME.

**Total Loss**
Michael R. Waites (A103812) **03/07/2019 04:17 PM ET**
FROM: MICHAEL R WAITES
SENT: THURSDAY, MARCH 07, 2019 4:17 PM
TO: 'RLDRISCOLL@YAHOO.COM' <RLDRISCOLL@YAHOO.COM>
SUBJECT: PROGRESSIVE CLAIM 19-2813486
HI REBECCA,
YOUR CHECK IS AT THE SOUTH PORTLAND OFFICE
THEIR ADDRESS IS.
600 SABLE OAKS DRIVE
SUITE 180
SOUTH PORTLAND MAINE, 04106
YOUR APPOINTMENT IS AT 10AM ON 3/11.
FEEL FREE TO CALL IF YOU HAVE ANY QUESTIONS.
PLEASE BRING YOUR ID AND THE TITLE.
BEST,
MICHAEL WAITES

**To Do**
Michael R. Waites (A103812) **03/07/2019 04:17 PM ET**
INJ

Redacted - PII

DMG
-- IV TOTAL

PGR_THURSTON_0008084

- WAITING ON TDE – EMAILED POAS
- SEND LOG REQUEST / REMIND CHRYSLER
- CV TOTAL
  - COD IS IN RENTAL - LDOR 3/11
  - COD HAS TITLE - BRING TO SOPO - 3/11 @10AM

**Total Loss**
Michael R. Waites (A103812) **03/08/2019 01:14 PM ET**
OBC TO CHRYSLER CAPITAL - 855-563-5635 - SPOKE TO DASHAWN - AKSED FOR STATUS
OF LETTER OF GUARANTEE.
SAID HE DIDN'T SEE ANY NOTES – ON THE LOG
TRANSFERRED TO INSURANCE DEPARMENT.

**Total Loss**
Michael R. Waites (A103812) **03/08/2019 01:17 PM ET**
RECIEVED COPIES OF POAS FOR NOD AND CO-OWNER
JUST NEED LOG AND CLEAR FOR PAYEMENT.
SPKE TO CAROL - SAID SHE SUBMITTED THIS.   CAN TAKE UP TO 3DAYS - WILL EMAIL
OR FAX OVER LOG.

**Damages**
Michael R. Waites (A103812) **03/08/2019 01:29 PM ET**
FROM: MICHAEL R WAITES
SENT: FRIDAY, MARCH 08, 2019 1:29 PM
TO: 'GENEVIEVE MCDONALD' <GENEVIEVE207@GMAIL.COM>
SUBJECT: RE: [EXTERNAL] RE: LETTER OF GUARANTEE REQUEST
THANKS GENEVIEVE,
I APPRECIATE IT.   I AM JUST WAITING FOR A LETTER OF GUARANTEE FROM CHRYSLER.
I SENT THEM ALL THE NECESSARY DOCUMENTS FOR THE GAP CLAIM AS WELL.   THEY TOLD
ME TO PLEASE ALLOW UP TO 3 BUSINESS DAYS TO GET THE LETTER OF GUARANTEE.  ONCE
WE HAVE THAT,  WELL GET A PAYMENT OUT TO THEM.
HAVE A GOOD WEEKEND.
BEST,
MIKE
FROM: GENEVIEVE MCDONALD <GENEVIEVE207@GMAIL.COM>
SENT: FRIDAY, MARCH 08, 2019 10:42 AM
TO: MICHAEL R WAITES <MICHAEL_R_WAITES@PROGRESSIVE.COM>
SUBJECT: RE: [EXTERNAL] RE: LETTER OF GUARANTEE REQUEST
PAPERWORK FOR YOU, AND I STUCK THE HARD COPIES IN THE MAIL.
CHEERS,
GENEVIEVE

**To Do**
Michael R. Waites (A103812) **03/08/2019 01:29 PM ET**
INJ

> Redacted - PII

DMG
- IV TOTAL
  - LOG IN FROM CHRYSLER
- CV TOTAL
  - COD IS IN RENTAL - LDOR 3/11
  - COD HAS TITLE - BRING TO SOPO - 3/11 @10AM

**Claims Processor**
Kaila E. Rowan (A128018) **03/11/2019 01:08 PM ET**
****TOTAL LOSS MEETING****

PGR_THURSTON_0008085

**Claim #:** 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

PARTY: COD
VEHICLE: CV
DATE CUSTOMER SIGNED TOTAL LOSS PAPERWORK: 03/11/2019
DOCS SIGNED/OBTAINED FROM CUST: TITLE
***COPIES OF TOTAL LOSS PAPERWORK PROVIDED TO CUSTOMER (YES, NO, N/A): Y–
TITLE/CK
REMIT ADVICE GIVEN TO CUSTOMER: Y
-------------
DATE DOCS MAILED TO NSU: 03/12/2019
FEDEX ROUTING #: TBD

**Total Loss**
Michael R. Waites (A103812) **03/11/2019 04:52 PM ET**
RECIEVED LOG FROM CHRYSELR CAPITAL FOR IV.
CLEAR TO ISSUE PAYMENT AND CLOSE COLL.
-UPLOADED LOG TO EFF
- ISSUED PAYMENT.

**Injury Evaluation**
Michael R. Waites (A103812) **03/11/2019 05:01 PM ET**
FROM: MICHAEL R WAITES
SENT: MONDAY, MARCH 11, 2019 5:01 PM
TO: 'GENEVIEVE MCDONALD' <GENEVIEVE207@GMAIL.COM>
SUBJECT: PROGRESSIVE CLAIM 19-2813486
HI GENEVIEVE,
I JUST WANTED TO UPDATE YOU.  I RECEIVED A LETTER OF GUARANTEE FROM CHRYSLER
TODAY  I WENT AHEAD AND ISSUED PAYMENT TO THEM.
BEST,
MICHAEL WAITES
CLAIM GENERALIST INTERMEDIATE
43 CONSTITUTION DRIVE #203
BEDFORD NH 03110
603-637-4849 EMAIL MWAITES1@PROGRESSIVE.COM
800-PROGRESSIVE (800-776-4737)
FAX 603-637-9847
MY HOURS OF AVAILABILITY: MONDAY THROUGH FRIDAY 8AM-4:45PM

**To Do**
Michael R. Waites (A103812) **03/11/2019 05:02 PM ET**
INJ

Redacted - PII

DMG
 - IV POAS IN?
 - PD CLOSED - RENTAL PAID?

**Claims Processor**
Kaila E. Rowan (A128018) **03/12/2019 04:02 PM ET**
TITLE FOR COD MAILED TO NSU: 7746 8293 5121

**Salvage**
Jamilla Cowsette (JXC0237) **03/14/2019 10:17 AM ET**
**** NSU ****
REC'D CV VT LIEN FREE TITLE SIGNED BY REBECCA DRISCOLL.
MAILED TITLE/EST TO VENDOR. SAL TITLE. SOLD DY SET.
LYMAN: 774689283081

PGR_THURSTON_0008086

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Salvage**
Jamilla Cowsette (JXC0237) **03/14/2019 10:20 AM ET**
\*\*\*NSU\*\*\*
WORKING IV TL. CONFIRMED VEH @ VENDOR/UPDATED SS.
SKYPE, EMAIL & DIARY HA FOR POA'S PER HIS 3/8/19 NOTE.
DY SALVLR FOR TITLE. FU DY SET.

**Damages**
Michael R. Waites (A103812) **03/14/2019 11:06 AM ET**
AKNOWLEDGED SALVAGE NOTE - STILL WAITING ON ORIGINAL POAS - WILL SEND IN WHEN
RECEIVED.

**Injury Evaluation**
Michael R. Waites (A103812) **03/14/2019 12:47 PM ET**
ISSUED COPY FEE CHECK TO SHARECARE- INVOICE UPLOADED TO EFF.

**Total Loss**
Michael R. Waites (A103812) **03/14/2019 01:14 PM ET**
RECIEVED ORIGINAL POAS FOR IV PASSAT - SENT TO NSU.

**To Do**
Michael R. Waites (A103812) **03/14/2019 01:16 PM ET**
INJ

Redacted - PII

**Injury Evaluation**
Michael R. Waites (A103812) **03/15/2019 12:56 PM ET**
BI FOLLOW UP CALL: REBECCA DRISCOLL

# Redacted - PII

**Injury Evaluation**
Michael R. Waites (A103812) **03/15/2019 01:04 PM ET**
REQUESTED DUAL FOR MEDPAY
THANKS FOR SUBMITTING YOUR REQUEST. ALL REQUESTS WILL BE PROCESSED IN THE
ORDER THEY ARE RECEIVED. WE WILL DO OUR BEST TO HANDLE ALL REQUESTS WITHIN 24
HOURS M-F. IF YOU HAVE ANY QUESTIONS, PLEASE E-MAIL NLSS_SUPPORT.

**Injury Evaluation**
Michael R. Waites (A103812) **03/15/2019 01:06 PM ET**

PGR_THURSTON_0008087

BI FOLLOW UP CALL:SHAYANNE -

**Redacted - PII**

**To Do**
Michael R. Waites (A103812) **03/15/2019 01:11 PM ET**
INJ

**Redacted - PII**

**Claims Processor**
Nancy A. LaFreniere (A094600) **03/15/2019 03:53 PM ET**
IV POA'S SENT TO NSU
- FED EX 7746 8478 8523

**Coverage**
Jake Nader (A095225) **03/18/2019 08:23 AM ET**
*************
DUAL 19-3617258
*************

**Salvage**
Cody A. Winfield (A132489) **03/19/2019 04:54 PM ET**
***NSU MAIL***
IV
CREATED HCF - ME
DOCS RECVD: POA'S/ODOM

**Total Loss**
Michael R. Waites (A103812) **03/20/2019 10:07 AM ET**
IBC FROM NOD - SAID THAT LH STILL HAS NOT REVCEIVED CHECK - WOULD LIKE ME TO
CALL TO FIND OUT WHAT'S UP.

**Total Loss**
Michael R. Waites (A103812) **03/20/2019 10:10 AM ET**
OBC TO CHRYSLER CAPITAL - SPKE TO DJ - CONFIMRED PAYMENT NOT RECEIVED
ADVISED ISSUING STOP PAY ON ORIGINAL CHECK -ADVISED TO NOTE ACCOUNT ON SMAE
ADVISED FEDEXING NEW PAYMENT - GAVE TRACKING #
1010 WEST MOCKINGBIRD LANE
SUITE 100
DALLAS TX
75247
FEDEXED DUP PAYMETN - 8146 6867 9398

PGR_THURSTON_0008088

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Injury Evaluation**
Michael R. Waites (A103812) **03/28/2019 01:47 PM ET**
NEW PARTY ADDED TO CLAIM:⌐ ‒ ‒ ‒ ‒ Redacted - PII ‒ ‒ ‒ ‒ ⌐
SENT EVAL REQUEST FOR CG YOUNG

**Injury Evaluation**
Michael R. Waites (A103812) **03/28/2019 01:49 PM ET**
RECEIVED HIPA FORM FOR CG YOUNG - UPLOADED TO EFF.

**Salvage**
Jamilla Cowsette (JXC0237) **03/28/2019 04:15 PM ET**
**NSU IV***
REC'D ME POA SIGNED BY GENEVIEVE KURILEC AND CORY MCDONALD,
LISTED OWNERS PER CTA. CONFIRMED VEH @ VENDOR/UPDATED SS.
DY SALVLR FOR TITLE. HCF TO ME OPEN. FU DY SET

**Injury Evaluation**
Michael R. Waites (A103812) **03/29/2019 09:57 AM ET**
BI FOLLOW UP CALL: SHAYANNE
NO ANSWER- NO VMBOX SETUP.

**Injury Evaluation**
Michael R. Waites (A103812) **03/29/2019 10:05 AM ET**
BI FOLLOW UP CALL: REBECCA DRISCOLL

# Redacted - PII

**Salvage**
Cody A. Winfield (A132489) **04/08/2019 09:33 AM ET**
***NSU MAIL***
IV
DOCS RECVD: TITLE W/LR
DOCS MERGED W/ ORIGINAL HCF CREATED

**Salvage**
Warren C. Serrani (A100486) **04/08/2019 11:13 AM ET**
***NSU IV***
RECD TITLE FOR GENEVIEVE KURILEC AND CORY MCDONALD F/LH - POAS MERGED
MAILED DOCS AND EMAILED ESTIMATE TO COPART
TITLE TYPE REQUESTED**********SALVAGE*********
RESET F/U DIARY TO SOLD DIARY-AWAITING SALE OF VEHICLE
COPART LYMAN FEDEX TRACKING#   774869296968

**Injury Evaluation**
Michael R. Waites (A103812) **04/10/2019 09:06 AM ET**
RECEIVVED MED RECORDS FOR COD DRISCOLL - PUT IN HF

Page [PAGE] of [NUMPAGES]

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Injury Evaluation**
Michael R. Waites (A103812) **04/12/2019 09:37 AM ET**
AKNOWLEDGED DUAL MEDPAY SUBRO DEMAND.  SIGNED FORM UPLOADED TO DUAL

**Injury Evaluation**
Michael R. Waites (A103812) **04/12/2019 10:53 AM ET**
BI FOLLOW UP CALL: REBECCA DRISCOLL
NO ANSWER - LVM.

**Injury Evaluation**
Michael R. Waites (A103812) **04/12/2019 10:54 AM ET**
BI FOLLOW UP CALL: SHAYANNE YOUNG
NO VMBOX SETUP -
SENT CTC REQ LETTER.

**Injury Evaluation**
Michael R. Waites (A103812) **04/12/2019 10:59 AM ET**
BI NEGOTIATION FOR: YOUNG, SHAYANNE          L/COV: BI
EVALUATION RANGE LOW:     500 HIGH:    1000
TSO BIE
BIE PARTY: SHAYANNE YOUNG

# Redacted - PII

**To Do**
Michael R. Waites (A103812) **04/12/2019 10:59 AM ET**
INJ

## Redacted - PII

**Claims Cash Processing**
Blue Prism Diary (ZBLPM02P) **04/12/2019 12:49 PM ET**
*** NSU ***
PROCESSED PROCEEDS 2010 KIA FORTE EX
SALVAGE CLOSED

**Injury Evaluation**
Michael R. Waites (A103812) **04/18/2019 04:21 PM ET**
BI FOLLOW UP CALL: SHAYANNE YOUNG
NO VMBOX SETUP -

**Injury Evaluation**
Michael R. Waites (A103812) **04/18/2019 04:26 PM ET**
RECEIVED COPY INVOICE FOR SHARECARE FOR SHAYANNE YOUNG
UPLAODED INOVICE TO EFF
ISSUED PAYMENT.

**Injury Evaluation**
Michael R. Waites (A103812) **04/22/2019 09:25 AM ET**
BI FOLLOW UP CALL: SHAYANNE

PGR_THURSTON_0008090

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Redacted - PII**

**Injury Evaluation**
Michael R. Waites (A103812) **04/25/2019 10:05 AM ET**
IBC FROM COD DRISCOLL - WANTS TO KNOW WHY MEDPAY - INSURANCE -

**Injury Evaluation**
Michael R. Waites (A103812) **04/25/2019 10:15 AM ET**
BI FOLLOW UP CALL: REBECCA DRISCOLL -

**Redacted - PII**

**Claims Cash Processing**
Blue Prism Diary (ZBLPM02P) **05/03/2019 11:44 AM ET**
*** NSU ***
PROCESSED PROCEEDS 2009 VOLK PASSAT TUR
SALVAGE CLOSED

**Injury Evaluation**
Michael R. Waites (A103812) **05/09/2019 02:20 PM ET**
EVALUATED MEDS THAT CAME IN FOR CG YOUNG
PEN BAY MED CENTER

**Redacted - PII**

Page [PAGE] of [NUMPAGES]

PGR_THURSTON_0008091

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Redacted - PII**

**Injury Evaluation**
Michael R. Waites (A103812) **05/09/2019 02:33 PM ET**
BI NEGOTIATION FOR: YOUNG, SHAYANNE        L/COV: BI
OFFER    AMOUNT:    500 IN PERS NEG= N

**Injury Evaluation**
Michael R. Waites (A103812) **05/09/2019 02:34 PM ET**
BI NEGOTIATION FOR: YOUNG, SHAYANNE        L/COV: BI
SETTLEMENT AMOUNT:   500

**Redacted - PII**

**Coverage**
Michael R. Waites (A103812) **05/09/2019 02:35 PM ET**
Resolved Coverage Issue Note:
ANOTHER LOSS EXISTS FOR VIN # KNAFU4A28A5311411
DOES NTO AFFECT BI CLAIMS.

**Injury Evaluation**
Michael R. Waites (A103812) **05/09/2019 02:51 PM ET**
ASKNOWLEDGED SUBRO DEMAND FROM DUAL FOR MEDPAY FOR CG YOUNG - WILL HONOR SUBRO
DEMAND WHEN BI CHECK CSASHED OR RLS RETURNED.

**Injury Evaluation**
Michael R. Waites (A103812) **05/09/2019 03:02 PM ET**
REVIEWED MED NOTES FOR COD DRISCOLL
PEN BAY -
==============

**Redacted - PII**

**Injury Evaluation**
Michael R. Waites (A103812) **05/09/2019 03:06 PM ET**
BI FOLLOW UP CALL: REBECCA DRISCOLL
PHONE PICKED UP - AND HUNG UP.

**To Do**
Michael R. Waites (A103812) **05/09/2019 03:07 PM ET**
INJ

**Redacted - PII**

**Injury Evaluation**
Michael R. Waites (A103812) **05/13/2019 02:28 PM ET**

Page [PAGE] of [NUMPAGES]

PGR_THURSTON_0008092

**Claim #:** 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

IBVM FROM COD DRISCOLL - SAID CALLING TO REVIEW BI CLAIM - SHE SAID SHE'S
WORKING TODAY - PLS CALL TOMORROW.
PUT ON DY FOR SAME.

**Injury Evaluation**
Michael R. Waites (A103812) **05/14/2019 12:37 PM ET**
BI FOLLOW UP CALL:  REBECCA DRISCOLL -

# Redacted - PII

**Injury Evaluation**
Michael R. Waites (A103812) **05/14/2019 01:54 PM ET**
OBC TO[          Redacted - PII          ]- LEFT MSG FOR PENBAY PT - NEED UPDATED
BILLS/ NOTES.

**Injury Evaluation**
Michael R. Waites (A103812) **05/20/2019 09:16 AM ET**
RECEIVED SIGNED BI RLS FROM CG YOUNG - ISSUED BI SUBRO PAYMENT TO DUAL. CLOSED
BI.
-UPLOADED RLS TO EFF.

**Injury Evaluation**
Michael R. Waites (A103812) **05/21/2019 11:23 AM ET**
IBVM FORM ANGELA FOSS@[          Redacted - PII          ]- STATED WANTS TO ASSIST.
PLS CALL TO REVIEW -
OBC 207-396-8603 - NO ANSWER - LVM

**To Do**
Michael R. Waites (A103812) **05/21/2019 11:26 AM ET**
INJ

# Redacted - PII

**Injury Evaluation**
Michael R. Waites (A103812) **05/28/2019 02:36 PM ET**
BI FOLLOW UP CALL:  REBECCA DRISCOLL -
NO ANSWER- BUSY

# Redacted - PII

PGR_THURSTON_0008093

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Injury Evaluation**
Michael R. Waites (A103812) **06/04/2019 04:29 PM ET**
BI FOLLOW UP CALL: REBECCA DRISCOLL
NO ASNWER - LVM.

**To Do**
Michael R. Waites (A103812) **06/04/2019 04:30 PM ET**
INJ

# Redacted - PII

**Damages**
Michael R. Waites (A103812) **06/13/2019 02:38 PM ET**
IBC FROM CHRYSLER - NEEDS DEC PAGE FOR GAP CLAIM.
DEC PAGE
POLICE REPORT.
CLAIMS@CHRYSLERCAPITAL.COM
ATTN:
3063035
SENT SAME.

**Injury Evaluation**
Michael R. Waites (A103812) **07/12/2019 04:19 PM ET**
BI FOLLOW UP CALL: REBECCA DRISCOLL -

# Redacted - PII

**Injury Evaluation**
Michael R. Waites (A103812) **07/15/2019 03:18 PM ET**
IBC FROM COD - STATED THAT SHE ASKED PROVIDER TO SEND ME ALL BILLS AND EVAL
NOTES. SAID I WOULD F/U IN 2 WEEKS IF NOTHING RECEIVED.

**Injury Evaluation**
Michael R. Waites (A103812) **07/16/2019 10:39 AM ET**
IBC FROM REBECCA DRISCOLL - THEY REFUSE TO BILL OUT 3RD PARTIES.

**Injury Evaluation**
Michael R. Waites (A103812) **08/07/2019 02:52 PM ET**
OBC TO REBECCA - SAME SAID SHE JUST RECEIVED ALL MEDS - WILL EMAIL THEM TO ME
SO WE CAN RSOLVE CALIM -

**Injury Evaluation**
Michael R. Waites (A103812) **08/07/2019 02:52 PM ET**
FROM: MICHAEL R WAITES
SENT: WEDNESDAY, AUGUST 07, 2019 2:53 PM
TO: 'REBECCA DRISCOLL' [ **Redacted - PII** ]
SUBJECT: PROGRESSIVE CLAIM 19-2813486
HI REBECCA,
PLEASE EMAIL ME ANYTHING YOUD LIKE US TO CONSIDER FOR YOUR INJURY CLAIM.
BEST,

Page [PAGE] of [NUMPAGES]

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

MICHAEL WAITES
CLAIM GENERALIST INTERMEDIATE
43 CONSTITUTION DRIVE #203
BEDFORD NH 03110
603-637-4849 EMAIL MWAITES1@PROGRESSIVE.COM
800-PROGRESSIVE (800-776-4737)
FAX 603-637-9847
MY HOURS OF AVAILABILITY: MONDAY THROUGH FRIDAY 8AM-4:45PM

**Injury Evaluation**
Michael R. Waites (A103812) **08/16/2019 04:50 PM ET**
FROM: REBECCA DRISCOLL     Redacted - PII
SENT: THURSDAY, AUGUST 15, 2019 11:15 AM
TO: MICHAEL R WAITES <MICHAEL_R_WAITES@PROGRESSIVE.COM>
SUBJECT: [EXTERNAL] PROGRESSIVE CLAIM 19-2813486

# Redacted - PII

**Injury Evaluation**
Michael R. Waites (A103812) **08/16/2019 04:52 PM ET**
FROM: MICHAEL R WAITES
SENT: FRIDAY, AUGUST 16, 2019 4:52 PM
TO: 'REBECCA DRISCOLL' <RLDRISCOLL@YAHOO.COM>
SUBJECT: RE: [EXTERNAL] PROGRESSIVE CLAIM 19-2813486
HI ,
THANKS FOR SENDING THOSE MEDICAL BILLS. IN ORDER TO RESOLVE YOUR MEDICAL
BILLS, I WOULD NEED HEALTH INSURANCE CLAIM FORMS. THEY ARE RED AND WHITE
FORMS ALSO KNOWN AS HCFA FORMS.
IS THERE ANY WAY YOU CAN TRY AND GET AHOLD OF THESE AND SEND THEM TO US FOR
REVIEW?
THANKS,
MIKE

**Injury Evaluation**
Michael R. Waites (A103812) **08/21/2019 03:45 PM ET**
BI FOLLOW UP CALL: NO ANSWER - LVM .

**Injury Evaluation**
Michael R. Waites (A103812) **09/05/2019 04:49 PM ET**
BI FOLLOW UP CALL: NO ANSWER - LVM

**Injury Evaluation**
Michael R. Waites (A103812) **09/20/2019 01:13 PM ET**
SPOKE TO COD DRISCOLL
SHE

# Redacted - PII

Page [PAGE] of [NUMPAGES]

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

## Redacted - PII

**In Person**
Michael R. Waites (A103812) **09/20/2019 01:17 PM ET**
OBC TO ANGELA FOSS @ [Redacted - PII]
- ADVISED I'M LOOKING FOR MED NOTES / BILLING FOR COD . REQ CALL BACK.

**Injury Evaluation**
Michael R. Waites (A103812) **09/23/2019 10:20 AM ET**
IBC FROM ANGELA FOSS - SAID I WOULD NEED TO SPEAK TO [Redacted - PII] PATIENT
FINANCIAL SERVICES.
866-804-2499
TRANSFERRD TO SAEM - SHWING 20 MIN WAIT.  DISCONNECTED.

**Injury Evaluation**
Michael R. Waites (A103812) **10/03/2019 03:50 PM ET**
OBC TO REBECCA - ADVISED HAVING ISSUES GETTING MEDS
SHE WILL TRY THEM HERSELF.
FROM: MICHAEL R WAITES
SENT: THURSDAY, OCTOBER 03, 2019 3:53 PM
TO: [Redacted - PII]
SUBJECT: 19-2813486
HELLO REBECCA,
THE NUMBER FOR PATIENT FINANCIAL SERVICES IS 866-804-2499
MICHAEL WAITES
CLAIM GENERALIST INTERMEDIATE
43 CONSTITUTION DRIVE #203
BEDFORD NH 03110
603-637-4849 EMAIL MWAITES1@PROGRESSIVE.COM
800-PROGRESSIVE (800-776-4737)
FAX 603-637-9847
MY HOURS OF AVAILABILITY: MONDAY THROUGH FRIDAY 8AM-4:45PM

**Injury Evaluation**
Michael R. Waites (A103812) **10/09/2019 05:41 PM ET**

## Redacted - PII

**File Review**
Amy K. Demas (A085047) **10/09/2019 07:55 PM ET**
REV'D FOR PENDING BI- DAY 223
 - HAVING ISSUES GETTING RECORDS FROM PROVIDERS
 - CONF IF COD HAS A DEMAND THAT SAME LOOKING TO SETTLE FOR
 - IF NOT, COMPL MANUAL EVAL BASED ON DISABILITY RANGE/KNOWN INFO AND PRESENT
   OFFER

PGR_THURSTON_0008096

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

- IF IMPEDIMENT FOR RESOLUTION IS THE RECORDS, COMPL 3/W/C W/ PROVIDER AND
CONF IF SAME WILL ASSIST W/ RECORDS IF CUTOMER ON THE LINE

**Injury Evaluation**
Michael R. Waites (A103812) **10/17/2019 05:37 PM ET**

# Redacted - PII

**Injury Evaluation**
Michael R. Waites (A103812) **11/12/2019 01:42 PM ET**
BI NEGOTIATION FOR: DRISCOLL, REBECCA        L/COV: BI
EVALUATION RANGE LOW:    750 HIGH:    1500
TSO BIE
BIE PARTY: REBECCA DRISCOLL

# Redacted - PII

**Injury Evaluation**
Michael R. Waites (A103812) **11/12/2019 01:56 PM ET**
BI NEGOTIATION FOR: DRISCOLL, REBECCA        L/COV: BI
OFFER    AMOUNT:    750 IN PERS NEG= N
OFFERED  750.00

# Redacted - PII

**Injury Evaluation**
Michael R. Waites (A103812) **11/18/2019 08:09 AM ET**
**INJURY TRANSFER TEMPLATE**

# Redacted - PII

**Contact Information**
Michael R. Waites (A103812) **11/18/2019 08:12 AM ET**
ADDED ATTORNEY DAIVD MILLER TO PARTY: DRISCOLL, REBECCA

**File Intervention**
Michael R. Waites (A103812) **11/18/2019 08:13 AM ET**
TRANSFERRED FEATURE 3 TO ORG 34395 - MA CAS RU

Page [PAGE] of [NUMPAGES]

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**File Intervention**
Tina Altieri (TMR0026) **11/18/2019 09:00 AM ET**
BI ON REBECCA DRISCOLL TRANSFERRED FROM 34395 TO 31708

**File Intervention**
Tina Altieri (TMR0026) **11/18/2019 09:00 AM ET**
EXPOSURE(S) ASSIGNED TO KMR0005

**File Review**
Karen M. Richard (KMR0005) **11/18/2019 10:48 AM ET**
INITIAL REVIEW - BI
COVERAGE:
- ME -15 POLICY / ME LOSS
- 50 / 100 BI POLICY LIMITS
- CVG RESOLVED
==
LIABILITY:
- LIAB ADVERSE NI
- POI SUPPS CV HAD CONTROL OF THE LANE
- NI SAID LOOKED LFT THEN RT
APPEARS DIDNT LOOK LFT AGAIN TO SEE CV
- AGREE NI A/F FOR LOSS
==
VEH DMGS:
- IV - LFT FRNT CORNER
- CV - RT RR OF FNDR & FRNT OF DOOR
==
CODING:
- CODED
==
ALL EXPOSURES IDENTIFIED?:
- YES
==
RESERVES:
- SET AT $10K
==
INJURY ISSUES AND CAUSATION:

**Redacted - PII**

==
COMPLIANT W/ REGULATIONS?
- YES
==
- WILL SND LTR TO NI RE: CHANGE OF ADJ
- WILL CT ATTY FOR UPDATE & DX CASE
WILL NEED PMH BASED ON SIGN C/O LBP PRE-AX
WILL SND ATTY ACK LTR

**Contact Information**
Karen M. Richard (KMR0005) **11/18/2019 11:14 AM ET**
OBC TO ATTY OFFICE

PGR_THURSTON_0008098

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

- XFRD TO CASE MNGR JENNIFER
- LMTCMB TO DX CASE

**Contact Information**
Michael R. Waites (A103812) **11/19/2019 08:34 AM ET**
SENT HF TO KMR

**Claims Processor**
Nancy A. LaFreniere (A094600) **11/20/2019 03:14 PM ET**
HF SENT TO KAREN RICHARD
- FEDEX 777038632006

**Contact Information**
Karen M. Richard (KMR0005) **12/06/2019 02:21 PM ET**
OBC TO ATTY OFFICE
- LM FOR JENNIFER TO CMB TO DX
-------
ISSUES:
- SIGN PMH
NEED PMH TO ESTABLISH BASELINE

**Redacted - PII**

**Damages**
Michael R. Waites (A103812) **12/16/2019 09:25 AM ET**
IBC FROM NOD - SMAE SAID SHE RECEIVED LOR FROM JOE BORNSTEIN OFFICE.
ADVISED THAT ONE OF CLAIMANTES RETAINED ATTY - JUST NOTIFICATION LETTER.
ADVSEDI WE ARE WORKIGN TO RESOLVE THIS CLAIM W/ ATTY
ADVISD IF EVER RECEIVES SUIT LETTER TO NOTIFY US, BUT DOESN'T APEAR GOING THAT
WAY A/TT/
SAME THANKED FOR REVIEW.

**Contact Information**
Karen M. Richard (KMR0005) **12/19/2019 03:50 PM ET**
IBC FRM JENNIFER – RET'ING MY CALL
- DX'D ISSUES
- WILL NEED PMH TO ESTABLISH BASELINE

**Redacted - PII**

----
DX'D L/O/W
ADVSD SAW SHE UNEMPLOYED BUT NOTES INDICATE L/O/W CLM??
- SHE THINKS CD WAS HIRED RIGHT BEFORE AX AT PIZZA HUT
THINKS SHE MISSED SOME TIME FRM WRK DUE TO THE AX
SHE AHSNT RQSTD L/O/W ATT
- THANKED FOR CLARIFICATION

**Contact Information**
Karen M. Richard (KMR0005) **01/17/2020 05:28 PM ET**
OBC TO ATTY FOR UPDATE
- LM FOR JENNIER RQSTING CB W/ UPDATE
- CNFRM INJS, TXMNT, L/O/W CLARIFICATION, SPECIALS TO DATE
WANT TO CNFRM RQSTING PMH AS WELL

PGR_THURSTON_0008099

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Claims Processor**
Lynn Marie Gurkey (TUSRB46) **01/28/2020 12:59 PM ET**
CALL CENTER: CLRU CLEVELAND
CALLER'S NAME/RELATIONSHIP TO CLAIM: LORI FROM PROVIDER'S OFFICE
CALL BACK PHONE NUMBER: 207-301-5900
EXPECTATIONS: NEXT TIME CLAIM REP IS IN THE OFFICE
REASON FOR CALL: REBECCA DRISCOLL NEEDS [Redacted - PII] COVERAGE QUESTIONS - REFER TO
REP, PROVIDED THE REP'S INFO

**File Review**
Karen M. Richard (KMR0005) **01/28/2020 03:05 PM ET**
REVD NOTE BELOW
- I AM BI REP - I WOULDNT AUTH AN MRI
- NOTED THAT CD IS ALSO PROG INSD
-----
OBC OT LORI
GOT VM - LMTCMB

**Contact Information**
Karen M. Richard (KMR0005) **01/29/2020 08:14 AM ET**
IBC FRM LORI

# Redacted - PII

**File Review**
Karen M. Richard (KMR0005) **02/05/2020 11:16 AM ET**
REVD A/I
IS A MED BILL & RPT
PRINTED & PLACED IN H/F

**Contact Information**
Karen M. Richard (KMR0005) **02/20/2020 02:27 PM ET**
OBC TO ATTY OFFICE
- XFRD TO JENNIFERS VM
- LM RQSTING CB

## Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **03/19/2020 04:09 PM ET**
OBC TO ATTY OFFICE
ADVSD LOOKING FOR UPDATE, WOULD LIKE TO DX CASES
ADVSD NEED TO JENN - SHE'LL BE MOST FAMILAR W/ STATUS
- LM FOR JENN

## Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **04/22/2020 11:48 AM ET**
OBC TO ATTY OFFICE
- NEED TO S/W JENN
- XFRD TO HER VM

PGR_THURSTON_0008100

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

- LMTCMB W/ UDPATE
REMINDED NEED PMH

**File Review**
Karen M. Richard (KMR0005) **05/11/2020 09:52 AM ET**
CURRENT IMPEDIMENT:
- URBI OFFER
- PENDING ATTY DEMAND
WHAT I DID TO OVERCOME TODAY:
- N/A - PENDING DEMAND
- HAVE MADE RECENT ATTMPTS FOR UPDATE ON DMND STATUS
NEXT STEPS:
- DEMAND, EVAL, RESOLVE

**Contact Information**
Karen M. Richard (KMR0005) **05/26/2020 04:08 PM ET**
OBC TO ATTY OFFICE FOR STATUS OF DEMAND
- S/W DAWN
SHE'LL TAKE A MSSG & SEND HER AN EMAIL
- WAS ALSO XFRD TO HER VM

**Redacted - PII**

**Contact Information**
Karen M. Richard (KMR0005) **07/20/2020 04:37 PM ET**
OBC TO ATTY OFFICE
- XFRD TO PARA VM
- LMTCMB RE: STATUS
WILL DEMAND W/ PMH BE COMING SOON?
====
FROM: KAREN M RICHARD
SENT: MONDAY, JULY 20, 2020 4:43 PM
TO: JRICHARDSON@JOEBORNSTEIN.COM
SUBJECT: YOUR CLIENT: REBECCA DRISCOLL, PROGRESSIVE CLAIM # 19-2813486
HI JENNIFER~

# Redacted - PII

KIND REGARDS,
KAREN
KAREN M. RICHARD
PROGRESSIVE ~ CASUALTY CLAIMS SPECIALIST
150 WATER TOWER CIRCLE ~ SUITE 201 ~ COLCHESTER, VT 05446
OFFICE: 802-497-6342 ~ TOLL FREE: 1-800-PROGRESSIVE ~ FAX: 802-655-2935
EMAIL: KAREN_RICHARD@PROGRESSIVE.COM
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF OUR PERMANENT CLAIM FILE. IF YOU REQUEST A REPLY, WE MAY RESPOND VIA
E-MAIL, PHONE OR MAIL. NOTE: ALL TIME SENSITIVE REQUESTS SHOULD BE SENT VIA
FACSIMILE & OR U.S. MAIL.
DEMANDS MUST BE MAILED OR FAXED TO MY OFFICE TO ENSURE A TIMELY RESPONSE.

**Contact Information**
Karen M. Richard (KMR0005) **08/07/2020 10:44 AM ET**

PGR_THURSTON_0008101

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

IBE FRM ATTY OFFICE

## Redacted - PII

=====

FROM: RICHARDSON, JENNIFER <JRICHARDSON@JOEBORNSTEIN.COM>
SENT: THURSDAY, AUGUST 06, 2020 8:44 AM
TO: KAREN M RICHARD <KAREN_RICHARD@PROGRESSIVE.COM>
SUBJECT: [EXTERNAL] RE: YOUR CLIENT: REBECCA DRISCOLL, PROGRESSIVE CLAIM #
19-2813486
HI KAREN,

## Redacted - PII

**File Review**
Karen M. Richard (KMR0005) **08/18/2020 08:24 AM ET**
REVD A/I
- IS PCP BILL, RPT

**File Review**
Karen M. Richard (KMR0005) **08/21/2020 08:32 AM ET**
REVD A/I
THEY ARE ADDL MED BILLS

**Contact Information**
Karen M. Richard (KMR0005) **09/03/2020 05:48 PM ET**
OBE TO ATTY OFFICE FOR UPDATE
-----
FROM: KAREN M RICHARD
SENT: THURSDAY, SEPTEMBER 03, 2020 5:49 PM
TO: 'JRICHARDSON@JOEBORNSTEIN.COM' <JRICHARDSON@JOEBORNSTEIN.COM>
SUBJECT: YOUR CLIENT: REBECCA DRISCOLL, PROGRESSIVE CLAIM#: 19-2813486
JENNIFER,

# Redacted - PII

DEMAND.
BEST,
KAREN
KAREN M. RICHARD
PROGRESSIVE ~ CASUALTY CLAIMS SPECIALIST
150 WATER TOWER CIRCLE ~ SUITE 201 ~ COLCHESTER, VT 05446
OFFICE: 802-497-6342 ~ TOLL FREE: 1-800-PROGRESSIVE ~ FAX: 833-905-1750
EMAIL: KAREN_RICHARD@PROGRESSIVE.COM
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF OUR PERMANENT CLAIM FILE. IF YOU REQUEST A REPLY, WE MAY RESPOND VIA
E-MAIL, PHONE OR MAIL.

**Contact Information**
Karen M. Richard (KMR0005) **10/06/2020 12:07 PM ET**
OBC TO ATTY OFFICE
- WAS ADVSD PARA NOT AVX - LMTCMB
-----

PGR_THURSTON_0008102

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

> ### Redacted - PII

**Cash Management**
Karen M. Richard (KMR0005) **10/23/2020 10:34 AM ET**
REVD RESERVE
- CURRENTLY AT $15K

> # Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **11/04/2020 02:32 PM ET**
OBC TO ATTY FOR UPDATE
- XFRD TO VM

> ### Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **12/03/2020 02:31 PM ET**
OBC TO ATTY OFFICE FOR UPDATE
- S/W JEN

> # Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **01/21/2021 04:32 PM ET**
OBC TO ATTY OFFICE
- NEED UPDATE
- S/W DAWN
NEED TO S/W LINDSEY
UPDATED CT INFO
XFRD TO VM
LMTCMB - NEED UPDATE

**Contact Information**
Karen M. Richard (KMR0005) **01/28/2021 10:53 AM ET**
RECD VMM FRM LINDSEY
- SHE ADVSD SHES NEW TO THIS CASE

> # Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **02/23/2021 09:47 PM ET**
OBE TO ATTY OFFICE FOR UPDATE
-----
FROM: KAREN M RICHARD

PGR_THURSTON_0008103

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

SENT: TUESDAY, FEBRUARY 23, 2021 9:47 PM
TO: LCOSTA@JOEBORNSTEIN.COM
SUBJECT: YOUR CLIENT: REBECCA DRISCOLL, PROGRESSIVE CLAIM#: 19-2813486
LINDSEY,

# Redacted - PII

REGARDS,
KAREN
KAREN M. RICHARD
PROGRESSIVE ~ CASUALTY CLAIMS SPECIALIST
150 WATER TOWER CIRCLE ~ SUITE 201 ~ COLCHESTER, VT 05446
OFFICE: 802-497-6342 ~ TOLL FREE: 1-800-PROGRESSIVE ~ FAX: 833-905-1750
EMAIL: KAREN_RICHARD@PROGRESSIVE.COM
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF OUR PERMANENT CLAIM FILE.  IF YOU REQUEST A REPLY, WE MAY RESPOND VIA
E-MAIL, PHONE OR MAIL.

**Contact Information**
Karen M. Richard (KMR0005) **03/22/2021 02:31 PM ET**
OBC TO ATTY OFFICE
- S/W LINDSEY

# Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **04/20/2021 11:01 PM ET**
SENT LTR RQSTING UPDATE

**Contact Information**
Karen M. Richard (KMR0005) **05/12/2021 11:37 AM ET**
OBC TO ATTY CASE MNGR
GOT VM
LMTCMB
ADVSD NEED UDPATE AS ITS BEEN A WHILE
Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **06/07/2021 12:13 PM ET**
OBC TO ATTY PARA FOR UPDATE
- GOT VM

# Redacted - PII

-----
FROM: KAREN M RICHARD

PGR_THURSTON_0008104

**Claim #:** 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

SENT: MONDAY, JUNE 07, 2021 12:14 PM
TO: 'LCOSTA@JOEBORNSTEIN.COM' <LCOSTA@JOEBORNSTEIN.COM>
SUBJECT: YOUR CLIENT: REBECCA DRISCOLL, PROGRESSIVE CLAIM#: 19-2813486
LINDSEY,

# Redacted - PII

REGARDS,
KAREN
KAREN M. RICHARD
PROGRESSIVE ~ CASUALTY CLAIMS SPECIALIST
150 WATER TOWER CIRCLE ~ SUITE 201 ~ COLCHESTER, VT 05446
OFFICE: 802-497-6342 ~ TOLL FREE: 1-800-PROGRESSIVE ~ FAX: 833-905-1750
EMAIL: KAREN_RICHARD@PROGRESSIVE.COM
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF OUR PERMANENT CLAIM FILE.  IF YOU REQUEST A REPLY, WE MAY RESPOND VIA
E-MAIL, PHONE OR MAIL.

**File Review**
Karen M. Richard (KMR0005) **06/07/2021 12:15 PM ET**

# Redacted - PII

**Claims Processor**
Karen M. Richard (KMR0005) **06/07/2021 12:17 PM ET**
PARTY:
- CD
1ST FOLLOW UP DATE:
- 7/7/2021
WHO TO CALL/ASK FOR:
- LINDSEY
WHAT TO ASK FOR:
- DEMAND W/ COMPL PRIOR MEDICAL HISTORY

**Contact Information**
Karen M. Richard (KMR0005) **06/10/2021 01:13 PM ET**
IBE FRM ATTY
NEW CASE MNGR
----
FROM: ACKLEY, KATIE <KACKLEY@JOEBORNSTEIN.COM>
SENT: THURSDAY, JUNE 10, 2021 1:12 PM
TO: KAREN M RICHARD <KAREN_RICHARD@PROGRESSIVE.COM>
SUBJECT: [EXTERNAL] YOUR CLIENT: REBECCA DRISCOLL, PROGRESSIVE CLAIM#:
19-2813486
HI KAREN,
I AM THE NEW CASE MANAGER HANDLING THE CLAIM FOR MS. DRISCOLL. I HAVE BEEN
UNABLE TO REACH OUR CLIENT FOR AN UPDATE. AS SOON AS I HEAR FROM HER I WILL
LET YOU KNOW THE STATUS OF HER CARE.
THANK YOU!

PGR_THURSTON_0008105

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Claims Processor**
Julia Marshall (A094696) **07/09/2021 12:26 PM ET**
** INTERIM CALL **
INJURED PARTY: REBECCA DRISCOLL
INTERIM CALL STATUS:  UNKNOWN X1
NAME OF WHO YOU SPOKE WITH: N/A
DETAILED CALL SUMMARY: LEFT VMM FOR KATIE ACKLEY, RCB TO KMR W/ UPDATE ON
TREATMENT/DEMAND STATUS
EXPECTATIONS SET: CB NEXT MONTH IF NO UPDATE REC'D PRIOR
NEXT F/U DATE IN SHAREPOINT: WEEK OF 8/16
DY TO REP?: N

**File Review**
Karen M. Richard (KMR0005) **07/19/2021 10:04 AM ET**
RECD EMAIL WHILE ON ETB FRM ATTY PARA
- HASNT S/W CD RECENTLY
-----
FROM: ACKLEY, KATIE <KACKLEY@JOEBORNSTEIN.COM>
SENT: FRIDAY, JULY 09, 2021 4:30 PM
TO: KAREN M RICHARD <KAREN_RICHARD@PROGRESSIVE.COM>
SUBJECT: [EXTERNAL] 19-2813486
RE; REBECCA DRISCOLL
HELLO KAREN,
I HAVE BEEN UNABLE TO REACH MS. DRISCOLL FOR A COUPLE OF MONTHS NOW. I WILL
CONTINUE TO REACH OUT AND WILL SHARE AN UPDATE AS SOON AS I HAVE ONE.
THANK YOU!

**Claims Processor**
Julia Marshall (A094696) **08/19/2021 04:07 PM ET**
** INTERIM CALL **
INJURED PARTY: REBECCA DRISCOLL
INTERIM CALL STATUS:  UNKNOWN X1
NAME OF WHO YOU SPOKE WITH: N/A
DETAILED CALL SUMMARY: LEFT VMM FOR KATIE ACKLEY, RCB TO KMR W/ UPDATE ON
TREATMENT/DEMAND STATUS
EXPECTATIONS SET: CB NEXT MONTH IF NO UPDATE REC'D PRIOR
NEXT F/U DATE IN SHAREPOINT: WEEK OF 9/20
DY TO REP?: N

**Contact Information**
Karen M. Richard (KMR0005) **09/01/2021 05:57 PM ET**
IBE FRM ATTY FIRM
NO LONGER REPPING CD
- UPLOADED LTR
----
FROM: ACKLEY, KATIE <KACKLEY@JOEBORNSTEIN.COM>
SENT: WEDNESDAY, SEPTEMBER 01, 2021 11:24 AM
TO: KAREN M RICHARD <KAREN_RICHARD@PROGRESSIVE.COM>
SUBJECT: [EXTERNAL] 19-2813486 - REBECCA DRISCOLL
HI KAREN,
PLEASE FIND ATTACHED OUT LETTER CONFIRMING THAT WE ARE NO LONGER REPRESENTING
MS. DRISCOLL.
THANK YOU

**File Review**

PGR_THURSTON_0008106

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

Karen M. Richard (KMR0005) **09/01/2021 06:00 PM ET**
REMOVED ATTY INFO

**Contact Information**
Karen M. Richard (KMR0005) **09/01/2021 06:05 PM ET**
OBC TO CD
# IS DISCONNECTED
-----
SENT EMAIL
FROM: KAREN M RICHARD
SENT: WEDNESDAY, SEPTEMBER 01, 2021 6:05 PM
TO: [ Redacted - PII ]
SUBJECT: PROGRESSIVE CLAIM#: 19-2813486, DATE OF ACCIDENT: 2/28/2019
MS. DRISCOLL,
I AM IN RECEIPT OF A LETTER THE LAW OFFICE OF JOE BORNSTEIN INDICATING THEY
ARE NO LONGER REPRESENTING YOU REGARDING THE ACCIDENT YOU WERE INVOLVED IN ON
2/28/2019.
PLEASE CONTACT ME SO WE CAN DISCUSS YOUR INJURY CLAIM FURTHER.
IF YOU HAVE RETAINED A NEW ATTORNEY, PLEASE FORWARD MY INFORMATION TO THEM AS
WELL AS FORWARDING THEIR INFORMATION TO ME.
THANK YOU IN ADVANCE.
I LOOK FORWARD TO SPEAKING WITH YOU.
SINCERELY,
KAREN
KAREN M. RICHARD
PROGRESSIVE ~ CASUALTY CLAIMS SPECIALIST
150 WATER TOWER CIRCLE ~ SUITE 201 ~ COLCHESTER, VT 05446
OFFICE: 802-497-6342 ~ TOLL FREE: 1-800-PROGRESSIVE ~ FAX: 833-905-1750
EMAIL: KAREN_RICHARD@PROGRESSIVE.COM
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF OUR PERMANENT CLAIM FILE. IF YOU REQUEST A REPLY, WE MAY RESPOND VIA
E-MAIL, PHONE OR MAIL.

**To Do**
Karen M. Richard (KMR0005) **09/01/2021 06:07 PM ET**
- S/W CD

# Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **09/02/2021 05:28 PM ET**
ATTY NO LONGER W THE

**Contact Information**
Karen M. Richard (KMR0005) **09/02/2021 05:33 PM ET**
RECD IBE FRM CD
CB & S/W SAME
-----
FROM: [ Redacted - PII ]
SENT: WEDNESDAY, SEPTEMBER 01, 2021 7:44 PM
TO: KAREN M RICHARD <KAREN_RICHARD@PROGRESSIVE.COM>
SUBJECT: [EXTERNAL] HOW CAN I HELP YOU
HELLO THERE SORRY THIS IS THE FIRST I AM HEARING ABOUT THIS, FEEL FREE TO GIVE
ME A CALL AT [ Redacted - PII ]
SENT FROM YAHOO MAIL ON ANDROID

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

=====
S/W CD

# Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **09/03/2021 05:30 PM ET**
S/W ATTY BLAIR JONES TODAY ON DIFF CLM
- ADVSD I RECD LTR NO LONGER REPPING
ADVSD I S/W CD Y'DAY & SHE STATED SHE STILL WANTS FIRM TO REP HER
SHE PLANS ON CALLING FIRM ASAP

Redacted - PII

- ATTY ADVSD IF SHE CALLS THE FIRM THEY'LL SEE WHAT HAPPENS
THANKED FOR THE INFO
- ATTY ACTUALLY ADVSD THE CD NAME WASNT FAMILIAR
ADVSD B/C IT WAS DAVID MILLERS CLM THEN BECAME HIS

**Contact Information**
Karen M. Richard (KMR0005) **09/23/2021 12:46 PM ET**
OBC TO CD AS NO CT FRM ATTY YET
- GOT VM - LMTCMB
----
ALSO SENT CT LTR

**Claims Processor**
Emily Azera (A116741) **10/18/2021 04:10 PM ET**
*******RVW OF ARBI INTERM CALL TASK, NO LONGER ATTY REPPED. DELETED SAME****

**Contact Information**
Karen M. Richard (KMR0005) **10/20/2021 10:17 AM ET**
OBC TO CD
- ADVSD WHY IM CALLING
NO NEW LOR ON FILE
CD SAID SHE JUST DOESNT U/S AS THOUGHT SHE HAD AN ATTY
SAID SHE HAD CALLED THEM BACK

# Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **10/28/2021 05:25 PM ET**
OBC TO CD
GOT VM
LMTCB
- LOOKING TO SEE IF SHE HAS S/W ATTY

PGR_THURSTON_0008108

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

ADVSD I HAVENT RECD A LOR FRM ANYONE
- ADVSD IF NOT RETAINING AN ATTY I'D LIKE TO S/W HER & RVW THE PROCESS

**Contact Information**
Karen M. Richard (KMR0005) **11/18/2021 09:53 AM ET**
OBC TO CD
- FEMALE ANSWERED
SAID CD LEFT HER PH BUT WILL HAVE CD CMB LATER TODAY
FEMALE DID NOT RELAY WHO SHE WAS - SAID WILL GIVE CD THE MSSG

**File Review**
Karen M. Richard (KMR0005) **11/18/2021 09:53 AM ET**
REVD
- CD HAS STATED SHE THOUGHT SHE WAS ATTY REPPED

Redacted - PII

- CD STATED SHE HAS A LOT GOING ON IN HER PERS LIFE
------
ATT WILL MOVE NXT F/U TO MID-JAN DUE TO UPCOMING HOLIDAYS
CD HAS MY PH#, KNOWS IM F/U AS WAS SENT NO LONGER BEING REPPED LTR
- IF CD CB WILL DX BI CLM, OPTIONS, AUTHS, ETC

**Contact Information**
Karen M. Richard (KMR0005) **01/13/2022 09:34 AM ET**
OBC TO CD
GOT VM
LMTCMB

# Redacted - PII

ADVSD IF HAS RETAINED A NEW ATTY TO CMB W/ THAT INFO
- SENT LTR BY EFF

**Contact Information**
Karen M. Richard (KMR0005) **01/18/2022 10:07 AM ET**
IBC FRM CD
VERY BAD CONNECTION
I CALLED BACK & S/W SAME
-----
- CD ADVSD SHE TRIED CALLING ATTYS OFFICE BUT THEY HAVENT CALLED BACK
SHE ADVSD SHE WANTS TO GET CLM MOVING FRWRD
- I OBTAINED DETAILED INTAKE

# Redacted - PII

-----
INITIAL INTAKE
*****************
PARTY:
-CD
--
INJURY/TXMNT:

# Redacted - PII

PGR_THURSTON_0008109

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

# Redacted - PII

EXPECTED LIENS (MEDICARE/WC/MP/PIP):
M/P OR PIP?
-UNK IF M/P PD ANY BILLS
*

HEALTH INSURANCE:
Redacted - PII
*

MEDICARE OR MAP?:
-NO
MBI#:
-N/A
RQST COPY OF MEDICARE CARD:
-N/A
*

PGR_THURSTON_0008110

**Redacted - PII**

--

PRIORS (SNAPV SHOULD BE FULLY ANALYZED):
-UNK EXACTLY WHEN DIAG'D W/ DDD - KNOWS HAD HERNIATION DIAG IN 2018 IN VT
--

CRITICAL INFO UPDATED IN SCREEN (SSN/DOB/ADDY/MARRIED) (Y/N):
-UPDATED
--

RESERVE RECOMMENDATION & WHY:
-KEEPING RESERVE AT $25K FOR NOW

**Damages**
SYSTEM **01/19/2022 09:00 PM ET**
ESIGN SIGNATURE COMPLETE
SIGNED BY: REBECCA DRISCOLL
DOCUMENT(S) RECEIVED: REQUEST FOR MEDICAL AUTHORIZATION, REQUEST FOR
VERIFICATION OF EMPLOYMENT

**File Review**
Karen M. Richard (KMR0005) **01/20/2022 08:37 AM ET**
REVD A/I
- IS THE ESIGNED MED AUTH
- WILL SUBMIT RQST FOR MEDS

**Claims Processor**
Karen M. Richard (KMR0005) **01/20/2022 08:37 AM ET**
***ORDER MEDICAL BILLS AND RECORDS***
MEDS?:
-YES
DATE RANGE:
-2/28/2014 TO PRESENT
BILLS?:
-YES
DATE RANGE:
-2/28/2019 TO PRESENT
MED AUTH UPLOADED IN EFF:
-YES
PATIENT'S NAME:
-REBECCA DRISCOLL
FOLLOW UP REQUEST? (2ND, 3RD FOLLOW UP?):
-INIT RQST

PROVIDER NAME:

**Redacted - PII**

PROVIDER NAME:

**Redacted - PII**

PGR_THURSTON_0008111

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

PROVIDER NAME:

# Redacted - PII

PROVIDER NAME:

# Redacted - PII

**Contact Information**

Karen M. Richard (KMR0005) **01/20/2022 08:47 AM** ET
SENT EMAIL TO CD RQSTING CT INFO FOR L/O/W INFO

-----

FROM: KAREN M RICHARD
SENT: THURSDAY, JANUARY 20, 2022 8:47 AM
TO: [ Redacted - PII ]
SUBJECT: PROGRESSIVE CLAIM#: 19-2813486
HI REBECCA,
THANK YOU FOR RETURNING THE MEDICAL AND WAGE AUTHORIZATION FORMS SO QUICKLY.
I'VE REQUESTED YOUR MEDICAL DOCUMENTATION FROM THE PROVIDERS LISTED.
IN ORDER FOR ME TO FOLLOW UP REGARDING LOST WAGES, I NEED TO KNOW WHO THE
MANAGER OR HUMAN RESOURCE REPRESENTATIVE IS AT THE DOLLAR GENERAL LOCATION
WHERE YOU WORKED. PLEASE FORWARD THEIR NAME, PHONE AND ADDRESS TO ME AT YOUR
EARLIEST CONVENIENCE.
THANK YOU.
SINCERELY,
KAREN
KAREN M. RICHARD
PROGRESSIVE ~ CASUALTY CLAIMS SPECIALIST
150 WATER TOWER CIRCLE ~ SUITE 201 ~ COLCHESTER, VT 05446
OFFICE: 802-497-6342 ~ TOLL FREE: 1-800-PROGRESSIVE ~ FAX: 833-905-1750
EMAIL: KAREN_RICHARD@PROGRESSIVE.COM
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF OUR PERMANENT CLAIM FILE. IF YOU REQUEST A REPLY, WE MAY RESPOND VIA
E-MAIL, PHONE OR MAIL.

**Claims Processor**
Dae S. Kim (A114499) **01/21/2022 10:07 AM** ET
MED REQUEST

MEDICAL RECORDS AND BILLS REQUEST LETTER MAILED TO THE FOLLOWING IN
REGARDS TO COD REBECCA DRISCOLL

PROVIDER NAME:

# Redacted - PII

PGR_THURSTON_0008112

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

# Redacted - PII

**Contact Information**

Karen M. Richard (KMR0005) **01/24/2022 08:35 AM ET**
IB & OB EMAIL TO CD RE: L/O/W
-----
GOOD MORNING REBECCA,
YOU CAN ALSO FORWARD CONTACT INFORMATION FOR THE MANAGER OR HUMAN RESOURCE
REPRESENTATIVE FOR PIZZA HUT IN ADDITION TO DOLLAR GENERAL.
SINCERELY,
KAREN
KAREN M. RICHARD
PROGRESSIVE ~ CASUALTY CLAIMS SPECIALIST
150 WATER TOWER CIRCLE ~ SUITE 201 ~ COLCHESTER, VT 05446
OFFICE: 802-497-6342 ~ TOLL FREE: 1-800-PROGRESSIVE ~ FAX: 833-905-1750
EMAIL: KAREN_RICHARD@PROGRESSIVE.COM
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF OUR PERMANENT CLAIM FILE.  IF YOU REQUEST A REPLY, WE MAY RESPOND VIA
E-MAIL, PHONE OR MAIL.
=====
FROM: [_____Redacted - PII_____]
SENT: FRIDAY, JANUARY 21, 2022 10:41 AM
TO: KAREN M RICHARD <KAREN_RICHARD@PROGRESSIVE.COM>
SUBJECT: [EXTERNAL] RE: PROGRESSIVE CLAIM#: 19-2813486
WELL I LOST WAGES AT PIZZA HUT AS WELL WHEN I FIRST GOT INTO MY ACCIDENT. I'M
NOT SURE WHO TO CONTACT FOR THEM. BUT I WILL LOOK FOR DOLLER GENERAL INFO AND
GET BACK TO YOU

**File Review**

Karen M. Richard (KMR0005) **02/10/2022 10:14 AM ET**
REVD
NEED L/O/W INFO
- OBC TO PIZZA HUT HQ - 502-874-8300
S/W ALISON, PAYROLL SPECIALIST THRU YUM CORPORATION
SHE ADVSD THAT CD WRKED AT A FRANCHISE, NOT A YUM CORPORATION STORE
NEED TO SPEAK DIRECTLY W/ THE COMPANY THAT OWNS THE FRANCHISES
---
- OBC TO DOLLAR GENERAL HQ - 855-275-3447
WAS DISCONNECTED WHILE ON HOLD

Page [PAGE] of [NUMPAGES]

PGR_THURSTON_0008113

**Contact Information**
Karen M. Richard (KMR0005) **02/10/2022 12:45 PM ET**
CALLED BACK TO DOLLAR GENERAL HQ - 855-275-3447
NEED TO FAX WAGE RQST
ATTN: HRSS, 615-855-5252
NEED EMPLOYEE NAME, DOB, LOCATION WHERE EMPLOYED, DATES OF EMPLOYMENT

**Contact Information**
Karen M. Richard (KMR0005) **02/10/2022 01:21 PM ET**
FROM: KAREN M RICHARD
SENT: THURSDAY, FEBRUARY 10, 2022 1:21 PM
TO: [_____Redacted - PII_____]
SUBJECT: PROGRESSIVE CLAIM#: 19-2813486
REBECCA,
I'VE REACHED OUT TO PIZZA HUT AND DOLLAR GENERAL HR DEPARTMENTS AND AM IN
NEED OF ADDITIONAL INFORMATION.
SPECIFICALLY, I NEED TO KNOW THE ADDRESS OF THE PHYSICAL LOCATIONS WHERE YOU
WORKED AS WELL AS YOUR EMPLOYMENT DATES.
PLEASE FORWARD THIS INFORMATION TO ME AT YOUR EARLIEST CONVENIENCE SO I MAY
CONTINUE TO FOLLOW UP ON ANY POSSIBLE LOST WAGES DUE TO THE ACCIDENT ON
2/28/2019.
SINCERELY,
KAREN
KAREN M. RICHARD
PROGRESSIVE ~ CASUALTY CLAIMS SPECIALIST
150 WATER TOWER CIRCLE ~ SUITE 201 ~ COLCHESTER, VT 05446
OFFICE: 802-497-6342 ~ TOLL FREE: 1-800-PROGRESSIVE ~ FAX: 833-905-1750
EMAIL: KAREN_RICHARD@PROGRESSIVE.COM
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF OUR PERMANENT CLAIM FILE. IF YOU REQUEST A REPLY, WE MAY RESPOND VIA
E-MAIL, PHONE OR MAIL.

**File Review**
Karen M. Richard (KMR0005) **02/14/2022 04:02 PM ET**
REVD
- WAITING ON L/O/W INFO
- WAITING ON MEDS
----
KMR OOO 2/18-3/2
WILL RVW W/IN 2WKS OF RETURNING

**File Review**
Karen M. Richard (KMR0005) **03/18/2022 05:51 PM ET**
- NO RESPONSE FRM CD RE: EMPLOYMENT INFO
- HAVE NOT RECD ANY MEDS YET

**Contact Information**
Karen M. Richard (KMR0005) **03/18/2022 05:52 PM ET**
SENT EMAIL TO CD RQSTING EMPLOYMENT INFO
-----
FROM: KAREN M RICHARD
SENT: FRIDAY, MARCH 18, 2022 5:51 PM
TO: [_____Redacted - PII_____]
SUBJECT: PROGRESSIVE CLAIM#: 19-2813486, DATE OF ACCIDENT: 2/28/2019
HI REBECCA,
I STILL NEED YOUR EMPLOYMENT DETAILS SO I CAN FOLLOW UP ON ANY POTENTIAL LOST

PGR_THURSTON_0008114

WAGES RELATED TO THE ACCIDENT ON 2/28/2019.
PLEASE FORWARD THE REQUESTED INFORMATION TO MY ATTENTION AT YOUR EARLIEST
CONVENIENCE.
THANK YOU.
REGARDS,
KAREN
KAREN M. RICHARD
PROGRESSIVE ~ CASUALTY CLAIMS SPECIALIST
150 WATER TOWER CIRCLE ~ SUITE 201 ~ COLCHESTER, VT 05446
OFFICE: 802-497-6342 ~ TOLL FREE: 1-800-PROGRESSIVE ~ FAX: 833-905-1750
EMAIL: KAREN_RICHARD@PROGRESSIVE.COM
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF OUR PERMANENT CLAIM FILE.  IF YOU REQUEST A REPLY, WE MAY RESPOND VIA
E-MAIL, PHONE OR MAIL.
FROM: KAREN M RICHARD
SENT: THURSDAY, FEBRUARY 10, 2022 1:21 PM
TO: ⌐ **Redacted - PII** ¬
SUBJECT: PROGRESSIVE CLAIM#: 19-2813486
REBECCA,
I'VE REACHED OUT TO PIZZA HUT AND DOLLAR GENERAL HR DEPARTMENTS AND AM IN
NEED OF ADDITIONAL INFORMATION.
SPECIFICALLY, I NEED TO KNOW THE ADDRESS OF THE PHYSICAL LOCATIONS WHERE YOU
WORKED AS WELL AS YOUR EMPLOYMENT DATES.
PLEASE FORWARD THIS INFORMATION TO ME AT YOUR EARLIEST CONVENIENCE SO I MAY
CONTINUE TO FOLLOW UP ON ANY POSSIBLE LOST WAGES DUE TO THE ACCIDENT ON
2/28/2019.
SINCERELY,
KAREN
KAREN M. RICHARD
PROGRESSIVE ~ CASUALTY CLAIMS SPECIALIST
150 WATER TOWER CIRCLE ~ SUITE 201 ~ COLCHESTER, VT 05446
OFFICE: 802-497-6342 ~ TOLL FREE: 1-800-PROGRESSIVE ~ FAX: 833-905-1750
EMAIL: KAREN_RICHARD@PROGRESSIVE.COM
ALL CORRESPONDENCE (INCLUDING ANY E-MAIL) WE RECEIVE FROM YOU MAY BECOME PART
OF OUR PERMANENT CLAIM FILE.  IF YOU REQUEST A REPLY, WE MAY RESPOND VIA
E-MAIL, PHONE OR MAIL.

**Claims Processor**
Karen M. Richard (KMR0005) **03/18/2022 06:00 PM ET**
***MEDICAL BILLS AND/OR RECORDS FOLLOW UP***
PATIENT'S NAME:
-REBECCA DRISCOLL
PROVIDER NAME:

# Redacted - PII

PGR_THURSTON_0008115

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

# Redacted - PII

**Claims Processor**
Sandy Davis (A116704) **03/21/2022 11:27 AM ET**
MED REQ F/U
F/U REQ SENT TO COD PROVIDERS

# Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **03/23/2022 01:41 PM ET**

Redacted - Pii

- ADVSD CORRECT # FOR F/U ON SAME IS
PH -> 207-301-8240
FAX -> 207-301-5294
=======
NOTED THAT ADMIN HAS SENT IN ADDL RQST TO THE FAX # LISTED ABOVE

**Contact Information**
Karen M. Richard (KMR0005) **04/11/2022 01:24 PM ET**
OBC OT CD
- GOT VM
- LM FOR CB
ADVSD SENT EMAILS - NEED SPECIFIC INFO RE: EMPLOYMENT LOCATIONS & DATES TO
OBTAIN L/O/W INFO
- ADVSD STILL WAITING ON MED INFO
- ALSO ADVSD I AM TRANSITIONING INTO A NEW ROLE & SHOULD BE HEARING FRM NEW
REP W/IN 2MNTHS - CAN ALWAYS CALL 800# & SOMEONE CAN XFR YOU TO NEW REP IF
YOU NEED ANYTHING PRIOR TO NEW REP CT

**File Review**
Karen M. Richard (KMR0005) **04/11/2022 01:28 PM ET**

PGR_THURSTON_0008116

STILL HAVE NOT RECD ANY MEDS FOR CD YET
NEED PRE & POST-AX MEDS
- WILL SUBMIT A NEW RQST FOR MEDS F/U BY ADMIN

**Claims Processor**
Karen M. Richard (KMR0005) **04/11/2022 01:29 PM ET**
***MEDICAL BILLS AND/OR RECORDS FOLLOW UP***
PATIENT'S NAME:
-REBECCA DRISCOLL

# Redacted - PII

**To Do**
Karen M. Richard (KMR0005) **04/11/2022 01:31 PM ET**
- OBTAIN CDS PMH & POST-AX TXMNT INFO
- OBTAIN L/O/W INFO AS CD STATING SHE LOST 2JOBS DUE TO MVA
NEED CD TO PROVIDE LOCATION WHERE SHE WRKED & DATES SHE WRKED
- MNTR RESERVE
- EVAL / RESOLVE

PGR_THURSTON_0008117

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**File Review**
Karen M. Richard (KMR0005) **04/11/2022 04:28 PM ET**
REVD A/I

## Redacted - PII

- TAGGED SAME
- STILL NEED MED RPTS

**File Review**
Karen M. Richard (KMR0005) **04/12/2022 02:22 PM ET**
REVD A/I
- MEDS FRM PENBAY W/ INV FOR SAME
- TAGGED SAME

**Claims Processor**
Karen M. Richard (KMR0005) **04/12/2022 02:22 PM ET**

# Redacted - PII

**Claims Processor**
Casey R. Weingarten (A163729) **04/12/2022 06:55 PM ET**

# Redacted - PII

**File Review**
Karen M. Richard (KMR0005) **04/13/2022 11:55 AM ET**
REVD
- NOTED F/U CMPL FOR MEDS

**Claims Processor**
Sandy Davis (A116704) **04/14/2022 10:28 AM ET**
Redacted - PII

PGR_THURSTON_0008118

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**File Review**
Karen M. Richard (KMR0005) **04/18/2022 03:32 PM ET**
REVD A/I

Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **04/18/2022 03:34 PM ET**
OBC TO CD
S/W SAME

# Redacted - PII

**Contact Information**
Karen M. Richard (KMR0005) **04/18/2022 03:35 PM ET**
LOCAL PRINTED A NEW MED AUTH
MAILED W/ A SASE

**To Do**
Karen M. Richard (KMR0005) **04/18/2022 03:36 PM ET**
- OBTAIN PRIOR EMPLOYER INFO
F/U ON POSS L/O/W
WHY DID CD QUIT? PAY RATE
LOSS OF JOBS RELATED TO INJ?
- OBTAIN PMH & POST-AX MEDS
- EVAL, RESOLVE

**Contact Information**
Karen M. Richard (KMR0005) **05/03/2022 10:16 AM ET**

# Redacted - PII

PGR_THURSTON_0008119

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**File Intervention**
Lisa M. Dawson (A116354) **05/05/2022 07:49 AM ET**
TRANSFERRED FEATURE 3 TO
A167957 - STEPHANIE PATE
ORG 31708 - VT CAS ARBI

**File Intervention**
Lisa M. Dawson (A116354) **05/05/2022 07:49 AM ET**
BULK FILE TRANSFER

**Contact Information**
Stephanie J. Pate (A167957) **05/09/2022 02:43 PM ET**
REV'D A/I
```
                              Redacted - PII
```

**File Review**
Stephanie J. Pate (A167957) **05/13/2022 07:20 AM ET**
INITIAL REVIEW
******************

COVERAGE:
-ME/ME
-BI 50/100
-CVQS RESOLVED
--

LIABILITY: REV'D AND AGREE, POI DO NOT INDICATE SHARED RESPONSIBILITY
--

VEH DMGS:
IV - NON-DRIVABLE, DMG TO FRONT DRIVER QP
CV - DMG TO FRONT PASS DOOR, VEH TL
--

CODING:
-WILL UPDATE
--

ALL EXPOSURES IDENTIFIED?:
-Y
--

SNAPV RESULTS:
S: 7/7/17 - WC - LIBERTY MUTUAL - PAIN WHILE LIFTING A CHILD
N: NO NEW RESULTS
A: NO MATCHING CLAIMS
P: NO NEW RESULTS
V: THIS LOSS ONLY
--

# Redacted - PII

PGR_THURSTON_0008120

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

# Redacted - PII

L/O/W:
NEED MORE INFO – SAYS 2 JOBS LOST B/C OF ACCIDENT
--
RESERVES:
APPEAR APPROPRIATE, WILL REV AS NEW INFO COMES IN
--
COMPLIANT WITH REGULATIONS:
-Y

**Contact Information**
Stephanie J. Pate (A167957) **06/08/2022 08:54 AM ET**

# Redacted - PII

**Contact Information**
Stephanie J. Pate (A167957) **06/15/2022 02:53 PM ET**
REV'D A/I, DUP Redacted - PII INVOICE, PAYMENT ISSUED 6/8

**IntelliRisk Review**
Christopher A. Gouin (A058197) **08/15/2022 03:58 PM ET**
REVIEWED UNREP BI,
-FILE WILL NEED ACTION THIS WEEK.
-CALL CLMT FOR STATUS OF TX. CONFIRM LIST OF ALL PROVIDERS AND OBTAIN ALL
RECORDS.
-APPEARS THERE IS WAGE CLAIM AS WELL. REVIEW THIS DOCUMENTATION AND CONFIRM
WITH EMPLOYER.

**Contact Information**
Autumn Nogueira (A098309) **09/06/2022 11:05 AM ET**
GYBA
=====
O/B CALL TO COD ADVISED HELPING OUT A TEAMMATE AND WANTED TO GO THROUGH HER
L/W INFO AS WELL AS TREATING PROVIDERS SO I CAN CONFIRM IF WE HAVE EVERYTHING
ON FILE
=================================
LOST WAGE/ EMPLOYER INFORMATION
=================================

PGR_THURSTON_0008121

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

PIZZA HUT
  - 190 CAMDEN STREET
    ROCKLAND MAINE
  - HOURLY RATE $14.50
  - MISSED ABOUT 2.5/3 WEEKS

-----

DOLLAR GENERAL
  - NEED TO CALL CORPORATE OFFICE TO GET L/W INFO
  - HOURLY RATE $14.50
  - MISSED ABOUT 2/3 DAYS
CD MENTIONED THESE WERE SCHEDULED FULL DAYS OFF WHERE SHED TAKE THE WHOLE DAY
FOR THE APPT, I SAID THAT THIS MAY BE HARD TO QUANTIFY IF SHE CHOSE TO MISS
AN ENTIRE DAY RATHER THAN JUST ENOUGH TIME FOR THE APPT ITSELF

# Redacted - PII

DISCONNECTED CALL

**Contact Information**
Autumn Nogueira (A098309) **09/06/2022 11:34 AM ET**
GYBA

PGR_THURSTON_0008122

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

# Redacted - PII

**Contact Information**
Autumn Nogueira (A098309) **09/06/2022 11:42 AM ET**
GYBA
=====
O/B CALL TO PIZZA HUT IN ROCKLAND MAINE 2075947330
 - ASKED TO SPEAK W/ WHOMEVER HANDLES L/W INFORMATION/VERIFICATION
 - SPOKE W/ GINGER WHO ADVISED I NEED TO SPEAK W/ THE STORE MANAGER
 - XFRD TO MANAGER SARAH WHO ADVISED THAT I WOULD NEED TO CALL 2075549521
AND I NEED TO SPEAK W/ CHRIS THOMAS
-----
O/B CALL TO CHRIS THOMAS HE ADVISED THAT THE COMPANY HAS SWITCHED HANDS
BUT HE CAN TRY AND PULL THE INFORMATION TOGETHER. HE SWAPPED FROM ONE
HR/ACCOUNTING PROGRAM FROM ONE TO ANOTHER. HE ASKED FOR ME TO SEND HIM AN
EMAIL AT: CHRIS@ADPHUT.COM - PER MEMORY CHRIS SAID HE REMEMBERS REBECCA BEING
GONE ABOUT 2 WEEKS. AGREED TO 1 WEEK F/UP. THANKED DISCONNECTED CALL

**Contact Information**

PGR_THURSTON_0008123

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

Autumn Nogueira (A098309) **09/06/2022 11:44 AM ET**
GYBA
=====
FROM: AUTUMN NOGUEIRA
SENT: TUESDAY, SEPTEMBER 6, 2022 11:44 AM
TO: 'CHRIS@ADPHUT.COM' <CHRIS@ADPHUT.COM>
SUBJECT: 19-2813486 - DRISCOLL, REBECCA
HEY CHRIS,
THANKS FOR TAKING THE TIME TO CHAT WITH ME TODAY. AS I MENTIONED I AM LOOKING
TO CONFIRM HOW MUCH TIME REBECCA MISSED AFTER THE ACCIDENT ON FEBRUARY 28,
2019. I AM LOOKING TO CONFIRM HOURS MISSED AND HOURLY RATE TO PUT TOGETHER A
FORMAL LOST WAGE CLAIM. ANY HELP YOU CAN LEND ON THIS WILL BE GREATLY
APPRECIATED.
WITH WARM REGARDS,
AUTUMN NOGUEIRA (SHE/HER)

**Contact Information**
Autumn Nogueira (A098309) **09/06/2022 11:47 AM ET**
GYBA
=====
O/B CALL TO DOLLAR GENERAL HEADQUARTERS - 6158554000
WENT THROUGH AUTOMATED SYSTEM PROMPTS
LVM ON GENERAL VMAIL - LEFT STEPHANIES C/B NUMBER

**Contact Information**
Autumn Nogueira (A098309) **09/06/2022 11:48 AM ET**
O/B CALL TO REBECCA
ADVISED IT APPEARS WE HAVE RECORDS FROM TREATING PROVIDERS
PLACING F/UP REQUEST FOR PRIORS
HAVE CALLS IN TO PIZZA HUT AND DOLLAR GENERAL TO TRY AND GET L/W INFO
SET 2 WEEK C/B EXPECTATION FROM ASSIGNED REP

**Contact Information**
Autumn Nogueira (A098309) **09/06/2022 11:51 AM ET**
***MEDICAL BILLS AND/OR RECORDS FOLLOW UP***

# Redacted - PII

**Claims Processor**
Dae S. Kim (A114499) **09/07/2022 12:53 PM ET**
***MEDICAL BILLS AND/OR RECORDS FOLLOW UP***

# Redacted - PII

**Claims Processor**
Dae S. Kim (A114499) **09/08/2022 12:07 PM ET**
***MEDICAL BILLS AND/OR RECORDS FOLLOW UP***
PATIENT'S NAME: REBECCA DRISCOLL

PGR_THURSTON_0008124

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Redacted - PII**

**Claims Processor**
Linda M. Boy (LMB0056) **09/14/2022 02:57 PM ET**
HF SENT TO F/O A167957 VIA FEDEX #777933159207

**Contact Information**
Autumn Nogueira (A098309) **10/11/2022 10:35 AM ET**
IB VMAIL FROM COD REQUESTING CALL BACK TO SEE WHAT ELSE WE NEED TO RESOLVE
HER FILE C/B NUMBER 2073901379
TEAMS AND DY TO HANDLING ADJUSTER TO C/B

**File Intervention**
Jason Michael Lariviere (JML0029) **10/19/2022 11:21 AM ET**
REVD;
-PLEASE CALL CD BACK TODAY TO DISCUSS HER CLAIM AND ANSWER HER QUESTIONS.
-APPEARS SHE WANTS TO SETTLE.
-DIARY STEPH ON SAME.

**Contact Information**
Stephanie J. Pate (A167957) **10/19/2022 04:13 PM ET**
OBC REBECCA
POC: ADV STILL PENDING PRIORS & WAGE INFO, WILL SUBMIT ADDTL FOL UP REQ FOR
PRIORS
--STTD SHE CHANGED PCPS A LOT
--HAD ER VISIT AND STEROID INJECTION W/KENNETH BORIE OR EY FOR SPELLING, IN
VT, ALSO HAD PT WITH HIM
--ADV WAITING ON LW INFO AND PRIORS
--STTD SHE ISN'T IN CTC W/PIZZA HUT ANYMORE
--ADV WILL TRY TO OBTAIN MISSING INFO, WILL FOL UP 1 MONTH OR SOONER IF INFO
COMES IN OR IF ADDTL INFO NEEDED FROM HER

**Claims Processor**
Stephanie J. Pate (A167957) **10/19/2022 04:14 PM ET**
***MEDICAL BILLS AND/OR RECORDS FOLLOW UP***
PATIENT'S NAME: REBECCA DRISCOLL

**Redacted - PII**

**Claims Processor**
Dae S. Kim (A114499) **10/20/2022 02:56 PM ET**
MED REQUEST

MEDICAL RECORDS AND BILLS REQUEST LETTER MAILED TO THE FOLLOWING IN
REGARDS TO COD REBECCA DRISCOLL

***MEDICAL BILLS AND/OR RECORDS FOLLOW UP***
PATIENT'S NAME: REBECCA DRISCOLL
**Redacted - PII**

PGR_THURSTON_0008125

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

# Redacted - PII

**Claims Processor**
Dae S. Kim (A114499) **11/03/2022 03:54 PM ET**
MED REQUEST FOLLOW UP

# Redacted - PII

FAX 802-728-2394

MED REQUEST REFAXED TO 802-728-2394

**Contact Information**
Stephanie J. Pate (A167957) **11/07/2022 08:58 AM ET**
MONITORING FOR PRIORS. STILL PENDING.

**Claims Processor**
Dae S. Kim (A114499) **11/09/2022 03:41 PM ET**
MED REQUEST

MED REQUEST REFAXED TO 802-728-2394

**Claims Processor**
Dae S. Kim (A114499) **11/22/2022 02:30 PM ET**
MED REQUEST

MED REQUEST REFAXED TO 802-728-2394

**Contact Information**
Stephanie J. Pate (A167957) **11/23/2022 08:57 AM ET**
MONITORING FOR PRIORS, NONE REC TO DATE.

**File Intervention**
Jason Michael Lariviere (JML0029) **02/06/2023 08:07 AM ET**
REVD FOR NO RECENT ACTIVITY;
-SETTLEMENT DELAYED DUE TO PRIOR MEDICAL NOTES NOT RECEIVED YET.
-NEED TO FOLLOW UP ON PRIORS, CONFIRM IF WE WILL RECEIVE THEM OR NOT.
-REVW WHAT WE HAVE FOR MEDICAL NOTES/BILLS IN FILE AND IF WE CAN COMPLETE AN
UPDATED BIE, LET'S COMPLETE AN UPDATED BIE.  LOST WAGES CLAIMED ARE 2.5-3
WEEKS AT $14.50/HOUR.  NOT A HUGE WAGE CLAIM.  AUTUMN S/W PIZZA HUT MANAGER ON
9/6/22 AND WE HAVE HIS NUMBER.  FOLLOW BACK UP WITH HIM TO SEE IF THERE IS ANY
WAY FOR HIM TO CONFIRM LOST WAGES.  IF NOT, MAYBE WE CONSIDER $500 AS NOMINAL
AMOUNT TO PUSH FORWARD.
-THIS NEEDS TO BE WORKED AS MUCH AS POSSIBLE AND THEN MAINTAIN FOLLOW UP
MONTHLY UNTIL WE CAN ACTIVELY NEGOTIATE.
-DIARY WITH ELEVATED URGENCY CHECKED AND TEAMS MESSAGE TO STEPH.

**Contact Information**
Stephanie J. Pate (A167957) **02/06/2023 04:54 PM ET**
ACK BELOW, REVIEWING EFF TO SEE IF WE HAVE ENOUGH TO COMPLETE A BIE. WILL
REACH OUT TO COD REBECCA TOMORROW.

PGR_THURSTON_0008126

**Claim #:** 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

**Contact Information**
Stephanie J. Pate (A167957) **02/07/2023 03:29 PM ET**
OBC COD REBECCA
POC: PROVIDE CLAIM UPDATE
--VM REBECCA, LEFT VM ASKING IF READY TO MOVE FWD WITH CLAIM
(BIE/NEGOTIATION), CONFIRM IF ANY OOP EXPENSES RELATED TO INJ

**Contact Information**
Stephanie J. Pate (A167957) **02/07/2023 03:39 PM ET**
IBC REBECCA
--STTD SHE IS STILL HAVING TX, BUT SHE IS CURIOUS OF WHAT THE OFFER WOULD BE
WITH WHAT WE HAVE ON FILE. READY TO MOVE FWD TOWARDS SETTLEMENT
--NO OOP, WENT THROUGH Redacted - PII FOR EVERYTHING
--ADV WILL REVIEW INFO ON FILE, SHOULD HAVE OFFER BY END OF MONTH

**File Intervention**
Jason Michael Lariviere (JML0029) **03/13/2023 10:47 AM ET**
REVD;
-EXPECTATION WAS FOR OFFER BY END OF FEBRUARY.
-PLEASE COMPLETE BIE AND MAKE OFFER TODAY/TOMORROW.
-DIARY STEPH ON SAME.

**Contact Information**
Stephanie J. Pate (A167957) **03/13/2023 06:44 PM ET**
ACK BELOW, WORKING TO COMPLETE BIE PRIOR TO ETB

**Contact Information**
Stephanie J. Pate (A167957) **03/14/2023 07:17 PM ET**
WORKING ON BIE

**Contact Information**
Stephanie J. Pate (A167957) **03/15/2023 08:06 AM ET**
OBC REBECCA, PROVIDE UPDATE, ADV MORE DOCS TO GO THROUGH THAN EXPECTED AND
LOST INTERNET LAST NIGHT, WILL HAVE OFFER WHEN RETURN FROM ETB WEEK OF 3/27
--GOT VM, LEFT MESSAGE ADV ABOVE

**Injury Evaluation**
Stephanie J. Pate (A167957) **04/07/2023 01:11 PM ET**
BI NEGOTIATION FOR: DRISCOLL, REBECCA        L/COV: BI
EVALUATION RANGE LOW:    1000 HIGH:    2500
OFFER WOULD BE FOR RELATED MEDS INCURRED THROUGH 5/22/19 DOS PLUS GENS.

**Injury Evaluation**
Stephanie J. Pate (A167957) **04/07/2023 01:11 PM ET**
--assistant manager at Pizza Hut as of 6/20/19 annual exam
--partner Larry (at TOL), 2 sons Mason 6 and Logan 4
************

**Considered INJ:**
Redacted - PII
************

**Causation:**
Moderate dmg to both pass side doors. Mechanism for lumbar s/s exists.
*************

**Considered Treatment**

# Redacted - PII

PGR_THURSTON_0008127

**Claim #:** 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019



WAGES:

--not considering any LW.

--no supports provided to indicate time missed from work. Records indicate COD was employed at Pizza Hut up

Page [PAGE] of [NUMPAGES]

PGR_THURSTON_0008128

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

through annual physical in June 2019. any loss of job is difficult to relate to loss.

*****************

Factors:

# Redacted - PII

**Contact Information**

Stephanie J. Pate (A167957) **04/07/2023 01:23 PM ET**

OBC Rebecca

POC: make offer $1,000

--sttd she did HEP on her own during gaps

--sttd also had bad separation with ex, had to go out of state for 6 months - late 2020/early 2021

--explained offer is for 1k + related medicals paid to medicaid, so tx through 5/22/19

--she is disappointed in offer, not much more than was offered in 2019

--explained basis of offer, condition returned to baseline pretty quick/hard to explain a lot of the gaps.

--sttd was hoping for at least 5k, but wants to talk with a few ppl about a demand amt

--adv will fol up middle of next week

 DRISCOLL, REBECCA

**Injury Evaluation**

Stephanie J. Pate (A167957) **04/07/2023 01:24 PM ET**

BI NEGOTIATION FOR: DRISCOLL, REBECCA        L/COV: BI

OFFER    AMOUNT:      1000 IN PERS NEG= N

**File Intervention**

Jason Michael Lariviere (JML0029) **04/30/2023 01:21 PM ET**

revd claim;

-offer made on 4/7/23.  expectation was for follow up the following week.

-diary is now past due.

-diary steph to follow up with customer and continue negotiations on Monday (tomorrow).

**Contact Information**

Stephanie J. Pate (A167957) **05/01/2023 11:26 AM ET**

Rebecca Driscoll

--sttd hoping for 5k, looking to get a new car

PGR_THURSTON_0008129

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

--adv can't really consider costs for car in BI claim, but can make an increased offer of 1700
--she asked if that is the highest she can get?
--adv can move up more
--asked about 3k
--offer 2k, would be 2k in her pocket plus we would reimburse mainecare for what they paid.
--sttd would accept 2500
--adv will agree to 2500, will send release, will need signed copy back before able to pay her.
--she will need a paper release, no printer.
--confirmed single/not married
--confirmed address, will send SASE with release but can also email me a pic back once she signs it
--offered digital payment
--paper check preferred
--adv will confirm when i get the release back and am issuing payment.

**Injury Evaluation**
Stephanie J. Pate (A167957) **05/01/2023 11:31 AM ET**
BI NEGOTIATION FOR: DRISCOLL, REBECCA    L/COV: BI
DEMAND   AMOUNT:   5000 (NO EXPIRATION DATE)

**Injury Evaluation**
Stephanie J. Pate (A167957) **05/01/2023 11:31 AM ET**
BI NEGOTIATION FOR: DRISCOLL, REBECCA    L/COV: BI
OFFER   AMOUNT:   1700 IN PERS NEG= N

**Injury Evaluation**
Stephanie J. Pate (A167957) **05/01/2023 11:31 AM ET**
BI NEGOTIATION FOR: DRISCOLL, REBECCA    L/COV: BI
DEMAND   AMOUNT:   3000 (NO EXPIRATION DATE)

**Injury Evaluation**
Stephanie J. Pate (A167957) **05/01/2023 11:32 AM ET**
BI NEGOTIATION FOR: DRISCOLL, REBECCA    L/COV: BI
OFFER   AMOUNT:   2000 IN PERS NEG= N

**Injury Evaluation**
Stephanie J. Pate (A167957) **05/01/2023 11:32 AM ET**
BI NEGOTIATION FOR: DRISCOLL, REBECCA    L/COV: BI
DEMAND   AMOUNT:   2500 (NO EXPIRATION DATE)

**Injury Evaluation**
Stephanie J. Pate (A167957) **05/01/2023 11:32 AM ET**
BI NEGOTIATION FOR: DRISCOLL, REBECCA    L/COV: BI
SETTLEMENT AMOUNT:   2500
2500+ PROGRESSIVE TO PAY MAINECARE LIEN FOR RELATED TX IF PRESENTED

**Contact Information**
Stephanie J. Pate (A167957) **05/01/2023 12:11 PM ET**
I will be working from the office tomorrow, will mail release and SASE to COD then.

**Contact Information**
Stephanie J. Pate (A167957) **05/04/2023 01:10 PM ET**
release plus letter sent via regular mail.

**Contact Information**
Stephanie J. Pate (A167957) **05/26/2023 12:39 PM ET**
OBC Rebecca
POC: adv issuing check; uploaded signed release to EFF.

PGR_THURSTON_0008130

Claim #: 19-2813486 / **Insured:** MCDONALD, GENEVIEVE L / **DOL:** 02/28/2019

--adv above, sending via reg mail
--she asked if she has to go to a specific bank to cash check, adv no requirements from us
--adv if bank needs to verify check, they can call me or dial 1-800 Progressive.

**Contact Information**
Stephanie J. Pate (A167957) **05/26/2023 12:43 PM ET**
payment issued, release on file. off diary.

**Claims Processor**
Helen J. Kemp (A168493) **02/01/2024 10:20 AM ET**
- CALL CENTER: AUSTIN CLRU
- CALLER'S NAME/RELATIONSHIP TO CLAIM: GENEVIEVE MCDONALD – ID
- CALL BACK PHONE NUMBER: 207-266-5113
- EXPECTATIONS: NEXT TIME CLAIM REP IS IN THE OFFICE
- REASON FOR CALL: SHE NEEDS A VALUATION REPORT SENT TO HER AT: GENEVIEVE207@GMAIL.COM

2009 VOLKSWAGEN PASSAT     MCDONALD, GENEVIEVE L

**Subrogation**
Michael R. Waites (A103812) **02/01/2024 10:53 AM ET**
**From:** Michael R Waites
**Sent:** Thursday, February 01, 2024 10:53 AM
**To:** GENEVIEVE207@GMAIL.COM
**Subject:** Progressive Claim 19-2813486

Hello Genevieve,

Per your request, here is a copy of your valuation report.

Best Regards,

PGR_THURSTON_0008131



DEPOSITION
EXHIBIT
9
9-19-24   G.M.

# MAINE
## AUTO POLICY



Form 9611D ME (09/16)
version 2.0



PGR_THURSTON_0000477

PGR_THURSTON_0000478

# CONTENTS

**INSURING AGREEMENT** ................................................................................. 1

**GENERAL DEFINITIONS** .............................................................................. 1

**PART I—LIABILITY TO OTHERS**
    Insuring Agreement ........................................................................................3
    Additional Definition ......................................................................................3
    Additional Payments ......................................................................................3
    Exclusions .....................................................................................................4
    Limits of Liability ...........................................................................................5
    Financial Responsibility Laws .......................................................................6
    Other Insurance ............................................................................................6
    Out-of-State Coverage ..................................................................................6

**PART II—MEDICAL PAYMENTS COVERAGE**
    Insuring Agreement ......................................................................................7
    Additional Definitions ....................................................................................7
    Exclusions .....................................................................................................7
    Limits of Liability ...........................................................................................9
    Unreasonable or Unnecessary Medical Expenses .......................................9
    Other Insurance ............................................................................................9

**PART III—UNINSURED/UNDERINSURED MOTORIST COVERAGE**
    Insuring Agreement .................................................................................... 10
    Additional Definitions .................................................................................. 10
    Exclusions ................................................................................................... 11
    Limits of Liability ......................................................................................... 12
    Other Insurance .......................................................................................... 13
    Arbitration ................................................................................................... 13

**PART IV—DAMAGE TO A VEHICLE**
    Insuring Agreement—Collision Coverage ................................................. 14
    Insuring Agreement—Comprehensive Coverage ...................................... 14
    Insuring Agreement—Additional Custom Parts or
        Equipment Coverage ............................................................................ 15
    Insuring Agreement—Rental Reimbursement Coverage ........................... 15
    Insuring Agreement—Loan/Lease Payoff Coverage ................................. 16
    Insuring Agreement—Pet Injury Coverage ............................................... 16
    Additional Definitions .................................................................................. 16
    Exclusions ................................................................................................... 17
    Limits of Liability ......................................................................................... 18
    Payment of Loss .........................................................................................20
    No Benefit to Bailee ....................................................................................20
    Loss Payable Clause ..................................................................................20
    Other Sources of Recovery .........................................................................20
    Appraisal ....................................................................................................21

PGR_THURSTON_0000479

**PART V—ROADSIDE ASSISTANCE COVERAGE**

Insuring Agreement ....................................................................................... 21
Additional Definitions .................................................................................... 21
Exclusions ..................................................................................................... 22
Unauthorized Service Provider ..................................................................... 22
Other Insurance ............................................................................................ 22

**PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS** ........................... 22

**PART VII—GENERAL PROVISIONS**

Policy Period and Territory ............................................................................ 23
Changes ........................................................................................................ 23
Duty to Report Changes ............................................................................... 24
Settlement of Claims ..................................................................................... 24
Terms of Policy Conformed to Statutes ....................................................... 25
Transfer of Interest ....................................................................................... 25
Fraud or Misrepresentation .......................................................................... 25
Payment of Premium and Fees ..................................................................... 25
Cancellation .................................................................................................. 25
Cancellation Refund ..................................................................................... 26
Nonrenewal ................................................................................................... 27
Automatic Termination .................................................................................. 27
Legal Action Against Us ................................................................................ 27
Our Rights to Recover Payment .................................................................... 27
Joint and Individual Interests ........................................................................ 28
Bankruptcy .................................................................................................... 28

PGR_THURSTON_0000480

## MAINE AUTO POLICY

### INSURING AGREEMENT

In return for **your** payment of the premium, **we** agree to insure **you** subject to all the terms, conditions and limitations of this policy. **We** will insure **you** for the coverages and the limits of liability shown on this policy's **declarations page**. **Your** policy consists of the policy contract, **your** insurance application, the **declarations page**, and all endorsements to this policy.

### GENERAL DEFINITIONS

The following definitions apply throughout the policy. Defined terms are printed in boldface type and have the same meaning whether in the singular, plural, or any other form.

1.  "**Additional auto**" means an **auto you** become the owner of during the policy period that does not permanently replace an **auto** shown on the **declarations page** if:
    a.  **we** insure all other **autos you** own;
    b.  the **additional auto** is not covered by any other insurance policy;
    c.  **you** notify **us** within 30 days of becoming the owner of the **additional auto**; and
    d.  **you** pay any additional premium due.

    An **additional auto** will have the broadest coverage **we** provide for any **auto** shown on the **declarations page**. If **you** ask **us** to insure an **additional auto** more than 30 days after **you** become the owner, any coverage **we** provide will begin at the time **you** request coverage.
2.  "**Auto**" means a land motor vehicle:
    a.  of the private passenger, pickup body, or cargo van type;
    b.  designed for operation principally upon public roads;
    c.  with at least four wheels; and
    d.  with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.

    However, "**auto**" does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.
3.  "**Auto business**" means the business of selling, leasing, repairing, parking, storing, servicing, delivering or testing vehicles.
4.  "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.
5.  "**Covered auto**" means:
    a.  any **auto** or **trailer** shown on the **declarations page** for the coverages applicable to that **auto** or **trailer**;
    b.  any **additional auto**;
    c.  any **replacement auto**; or
    d.  a **trailer** owned by **you**.
6.  "**Declarations page**" means the document showing **your** coverages, limits of liability, **covered autos**, premium, and other policy-related information. The **declarations page** may also be referred to as the Auto Insurance Coverage Summary.

PGR_THURSTON_0000481

7.   **"Occupying"** means in, on, entering of exiting.

8.   **"Personal vehicle sharing program"** means a system or process, operated by a business, organization, network, group, or individual, that facilitates the sharing of private passenger motor vehicles for use by individuals, businesses, or other entities.

9.   **"Property damage"** means physical damage to, destruction of, or loss of use of, tangible property.

10.  **"Rated resident"** means a person residing in the same household as **you** at the time of the loss who is not a **relative**, but only if that person is both:

   a.   listed in the "Drivers and household residents" section on the **declarations page**; and

   b.   not designated as either an "Excluded" or a "List Only" driver.

11.  **"Relative"** means a person residing in the same household as **you**, and related to **you** by blood, marriage or adoption, and includes a ward, stepchild, or foster child. **Your** unmarried dependent children temporarily away from home will qualify as a **relative** if they intend to continue to reside in **your** household.

12.  **"Replacement auto"** means an **auto** that permanently replaces an **auto** shown on the **declarations page**. A **replacement auto** will have the same coverage as the **auto** it replaces if the **replacement auto** is not covered by any other insurance policy. However, if the **auto** being replaced had coverage under Part IV—Damage To A Vehicle, such coverage will apply to the **replacement auto** only during the first 30 days after **you** become the owner unless **you** notify **us** within that 30-day period that **you** want **us** to extend coverage beyond the initial 30 days. If the **auto** being replaced did not have coverage under Part IV—Damage To A Vehicle, such coverage may be added, but the **replacement auto** will have no coverage under Part IV until **you** notify **us** of the **replacement auto** and ask **us** to add the coverage.

13.  **"Ride-sharing activity"** means the use of any vehicle to provide transportation of persons or property in connection with a **transportation network company** from the time a user logs on to, or signs in to, any online-enabled application, software, website or system until the time the user logs out of, or signs off of, any such online-enabled application, software, website or system, whether or not the user has accepted any passenger(s) or delivery assignment, including the time the user is on the way to pick up any passenger(s) or property, or is transporting any passenger(s) or property.

14.  **"Trailer"** means a non-motorized trailer, including a farm wagon or farm implement, designed to be towed on public roads by an **auto** and not being used:

   a.   for commercial purposes;

   b.   as an office, store, or for display purposes; or

   c.   as a passenger conveyance.

15.  **"Transportation network company"** means a corporation, partnership, sole proprietorship, or other entity that uses any online-enabled application, software, website or system to connect drivers with clients or passengers to facilitate and/or provide transportation or delivery services for compensation or a fee.

16.  **"We," "us"** and **"our"** mean the underwriting company providing the insurance, as shown on the **declarations page**.

17.  **"You"** and **"your"** mean:

   a.   a person shown as a named insured on the **declarations page**; and

2

b.    the spouse of a named insured residing in the same household at the time of the loss.

## PART I—LIABILITY TO OTHERS

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay damages for **bodily injury** and **property damage** for which an **insured person** becomes legally responsible because of an accident.

Damages include prejudgment interest awarded against an **insured person**.

**We** will settle or defend, at **our** option, any claim for damages covered by this Part I.

### ADDITIONAL DEFINITION

When used in this Part I:
"**Insured person**" means:
a.    **you**, a **relative**, or a **rated resident** with respect to an accident arising out of the ownership, maintenance or use of an **auto** or a **trailer**;
b.    any person with respect to an accident arising out of that person's use of a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**;
c.    any person or organization with respect only to vicarious liability for the acts or omissions of a person described in a. or b. above; and
d.    any "Additional Interest" shown on the **declarations page** with respect only to its liability for the acts or omissions of a person described in a. or b. above.

### ADDITIONAL PAYMENTS

In addition to **our** limit of liability, **we** will pay for an **insured person**:
1.    all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2.    interest accruing after entry of judgment, until **we** have paid, offered to pay, or deposited in court, that portion of the judgment which does not exceed **our** limit of liability. This does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured person**;
3.    the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in an amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds;
4.    up to $250 for a bail bond required because of an accident resulting in **bodily injury** or **property damage** covered under this Part I. **We** have no duty to apply for or furnish this bond; and
5.    reasonable expenses, including loss of earnings up to $200 per day, incurred at **our** request.

3

PGR_THURSTON_0000483

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-
CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART I.**

Coverage under this Part I, including **our** duty to defend, will not apply to any **insured
person** for:

1. **bodily injury** or **property damage** arising out of the ownership, maintenance or
   use of any vehicle or trailer while being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport
      or delivery of magazines, newspapers, mail or food; or
   c. for **ride-sharing activity**.
   This exclusion does not apply to shared-expense car pools;
2. any liability assumed under any contract or agreement by **you**, a **relative**, or a
   **rated resident**;
3. **bodily injury** to an employee of that **insured person** arising out of or within the
   course of employment. This exclusion does not apply to domestic employees if
   benefits are neither paid nor required to be provided under workers' compensation,
   disability benefits, or similar laws;
4. **bodily injury** or **property damage** arising out of an accident involving any vehicle
   while being maintained or used by a person while employed or engaged in any
   **auto business**. This exclusion does not apply to **you**, a **relative**, a **rated resident**,
   or an agent or employee of **you**, a **relative**, or a **rated resident**, when using a
   **covered auto**;
5. **bodily injury** or **property damage** resulting from, or sustained during practice or
   preparation for:
   a. any pre-arranged or organized racing, stunting, speed or demolition contest or
      activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or race-
      course;
6. **bodily injury** or **property damage** due to a nuclear reaction or radiation;
7. **bodily injury** or **property damage** for which insurance:
   a. is afforded under a nuclear energy liability insurance contract; or
   b. would be afforded under a nuclear energy liability insurance contract but for its
      termination upon exhaustion of its limit of liability;
8. any obligation for which the United States Government is liable under the Federal
   Tort Claims Act;
9. **bodily injury** or **property damage** caused by an intentional act of that **insured
   person**, or at the direction of that **insured person**, even if the actual injury or dam-
   age is different than that which was intended or expected;
10. **property damage** to any property owned by, rented to, being transported by, used
    by, or in the charge of that **insured person**. This exclusion does not apply to:
    a. a rented residence or a rented garage; or
    b. reasonable rental costs actually expended by the owner of an **auto** if the **auto**
       was rented to and damaged by an **insured person**, provided such rental costs
       are not covered under Part IV—Damage To A Vehicle, subject to a maximum
       of 45 days;

4

PGR_THURSTON_0000484

11. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

12. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by a **relative** or a **rated resident** or furnished or available for the regular use of a **relative** or a **rated resident**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **your** maintenance or use of such vehicle;

13. **bodily injury** or **property damage** arising out of **your**, a **relative's**, or a **rated resident's** use of a vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

14. **bodily injury** or **property damage** arising out of the use of a **covered auto** while leased or rented to others or given in exchange for any compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;

15. punitive or exemplary damages; or

16. **bodily injury** or **property damage** caused by, or reasonably expected to result from, a criminal act or omission of that **insured person**. For purposes of this exclusion:

    a. the **insured person** must be convicted of or plead guilty to the criminal act or omission; and

    b. criminal acts or omissions do not include traffic violations.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for liability coverage is the most **we** will pay regardless of the number of:

1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

If **your declarations page** shows a split limit:

1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person resulting from any one accident;
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident; and
3. the amount shown for "property damage" is the most **we** will pay for the total of all **property damage** resulting from any one accident.

The "each person" limit of liability applies to the total of all claims made for **bodily injury** to a person and all claims of others derived from such **bodily injury**, including, but not

5

limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing this limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

No one is entitled to duplicate payments for the same elements of damages.

Any payment to a person under this Part I will be reduced by any payment to that person under Part III—Uninsured/Underinsured Motorist Coverage.

**We** will not pay under this Part I any expenses paid or payable under Part II—Medical Payments Coverage.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

An **auto** and attached **trailer** are considered one **auto**. Therefore, the limits of liability will not be increased for an accident involving an **auto** that has an attached **trailer**.

### FINANCIAL RESPONSIBILITY LAWS

When **we** certify this policy as proof of financial responsibility, this policy will comply with the law to the extent required. The **insured person** must reimburse **us** if **we** make a payment that **we** would not have made if this policy was not certified as proof of financial responsibility.

### OTHER INSURANCE

If there is any other applicable liability insurance or bond, any liability insurance **we** provide will be excess over any other applicable liability insurance or bond. If more than one liability insurance policy or bond applies on an excess basis, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits.

### OUT-OF-STATE COVERAGE

If an accident to which this Part I applies occurs in any state, territory or possession of the United States of America or any province or territory of Canada, other than the one in which a **covered auto** is principally garaged, and the state, province, territory or possession has:
1. a financial responsibility or similar law requiring limits of liability for **bodily injury** or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limits; or

6

PGR_THURSTON_0000486

2. a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory or possession, this policy will provide the greater of:
   a. the required minimum amounts and types of coverage; or
   b. the limits of liability under this policy.

## PART II—MEDICAL PAYMENTS COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay the reasonable expenses incurred for necessary **medical services** received within three years from the date of a **motor vehicle** accident because of **bodily injury**:
1. sustained by an **insured person**; and
2. caused by that **motor vehicle** accident.

**We**, or someone on **our** behalf, will determine:
1. whether the expenses for **medical services** are reasonable; and
2. whether the **medical services** are necessary.

### ADDITIONAL DEFINITIONS

When used in this Part II:
1. "**Insured person**" means:
   a. **you**, a **relative**, or a **rated resident**:
      (i) while **occupying** an **auto**; or
      (ii) when struck by a **motor vehicle** or a trailer while not **occupying** a self-propelled motorized vehicle; and
   b. any other person while **occupying** a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**.
2. "**Medical services**" means medical, surgical, dental, x-ray, ambulance, hospital, professional nursing, and funeral services, and includes the cost of eyeglasses, hearing aids, pharmaceuticals, orthopedics, and prosthetic devices.
3. "**Motor vehicle**" means a land motor vehicle designed for use principally on public roads.

### EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART II.

Coverage under this Part II will not apply to **bodily injury**:
1. sustained by any person while **occupying** a **covered auto** while it is being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
   c. for **ride-sharing activity**.
   This exclusion does not apply to shared-expense car pools;

7

PGR_THURSTON_0000487

2.  arising out of an accident involving a vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you**, a **relative**, a **rated resident**, or an agent or employee of **you**, a **relative**, or a **rated resident**, when using a **covered auto**;

3.  to any person resulting from, or sustained during practice or preparation for:

    a.  any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or

    b.  any driving activity conducted on a permanent or temporary racetrack or racecourse;

4.  due to a nuclear reaction or radiation;

5.  for which insurance:

    a.  is afforded under a nuclear energy liability insurance contract; or

    b.  would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;

6.  for which the United States Government is liable under the Federal Tort Claims Act;

7.  sustained by any person while **occupying** any vehicle or trailer while located for use as a residence or premises;

8.  if workers' compensation benefits are available for the **bodily injury**;

9.  sustained by any person while **occupying** or when struck by any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

10. sustained by any person while **occupying** or when struck by any vehicle owned by a **relative** or a **rated resident** or furnished or available for the regular use of a **relative** or a **rated resident**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **you**;

11. to **you**, a **relative**, or a **rated resident,** while **occupying** any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

12. to any person while **occupying** a **covered auto** while leased or rented to others or given in exchange for any compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;

13. caused directly or indirectly by:

    a.  war (declared or undeclared) or civil war;

    b.  warlike action by any military force of any government, sovereign or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or

    c.  insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts; or

14. caused by, or reasonably expected to result from, a criminal act or omission of an **insured person**. For purposes of this exclusion:

    a.  the **insured person** must be convicted of or plead guilty to the criminal act or omission; and

    b.  criminal acts or omissions do not include traffic violations.

8

**LIMITS OF LIABILITY**

The limit of liability shown on the **declarations page** for Medical Payments Coverage is the most **we** will pay for each **insured person** injured in any one accident, regardless of the number of:

1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

No one will be entitled to duplicate payments under this policy for the same elements of damages.

Any amount payable to an **insured person** under this Part II will be reduced by any amount paid or payable for the same expense under Part I—Liability To Others or Part III—Uninsured/Underinsured Motorist Coverage.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

**UNREASONABLE OR UNNECESSARY MEDICAL EXPENSES**

If an **insured person** incurs expenses for **medical services** that **we** deem to be unreasonable or unnecessary, **we** may refuse to pay for those expenses and contest them.

If the medical service provider sues the **insured person** because **we** refuse to pay expenses for **medical services** that **we** deem to be unreasonable or unnecessary, **we** will pay any resulting defense costs, and any resulting judgment against the **insured person**, subject to the limit of liability for this coverage. **We** will choose the counsel. **We** will also pay reasonable expenses, including loss of earnings up to $200 per day, incurred at **our** request.

The **insured person** may not sue **us** for expenses for **medical services we** deem to be unreasonable or unnecessary unless the **insured person** paid the entire disputed amount to the medical service provider or the medical service provider has initiated collection activity against the **insured person** for the unreasonable or unnecessary expenses.

**OTHER INSURANCE**

If there is other applicable **auto** medical payments insurance, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for an **insured person occupy-ing** a vehicle or trailer, other than a **covered auto**, will be excess over any other **auto** insurance providing payments for **medical services**.

9

## PART III—UNINSURED/UNDERINSURED MOTORIST COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** because of **bodily injury**:
1. sustained by an **insured person**;
2. caused by an accident; and
3. arising out of the ownership, maintenance or use of an **uninsured motor vehicle**.

**We** will pay under this Part III only after the limits of liability under all applicable bodily injury liability bonds and policies have been exhausted by payment of judgments or settlements.

Any judgment or settlement for damages against an owner or operator of an **uninsured motor vehicle** that arises out of a lawsuit brought without **our** written consent is not binding on **us**.

### ADDITIONAL DEFINITIONS

When used in this Part III:
1. "**Insured person**" means:
    a. **you**, a **relative**, or a **rated resident**;
    b. any person while operating a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**;
    c. any person **occupying**, but not operating, a **covered auto**; and
    d. any person who is entitled to recover damages covered by this Part III because of **bodily injury** sustained by a person described in a., b. or c. above.
2. "**Uninsured motor vehicle**" means a land motor vehicle or trailer of any type:
    a. to which no bodily injury liability bond or policy applies at the time of the accident;
    b. to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company:
        (i) denies coverage; or
        (ii) is or becomes insolvent;
    c. to which a bodily injury liability bond or policy applies at the time of the accident, but its limit of liability for bodily injury is less than the minimum limit of liability for bodily injury specified by the financial responsibility law of the state in which the **covered auto** is principally garaged;
    d. whose owner or operator cannot be identified and which causes an accident resulting in bodily injury to an **insured person**, provided that the **insured person**, or someone on his or her behalf, reports the accident to the police or civil authority within 24 hours or as soon as practicable after the accident; or

10

PGR_THURSTON_0000490

e.  to which a bodily injury liability bond or policy applies at the time of the accident, but the sum of all applicable limits of liability for bodily injury is less than the combined sum of the applicable coverage limit for Uninsured/Underinsured Motorist Coverage shown on the **declarations page** and the coverage limits available under all other applicable uninsured or underinsured motorist coverages.

An "**uninsured motor vehicle**" does not include any vehicle or equipment:

a.  owned by **you**, a **relative**, or a **rated resident** or furnished or available for the regular use of **you**, a **relative**, or a **rated resident**;

b.  owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer that is or becomes insolvent;

c.  operated on rails or crawler treads;

d.  designed mainly for use off public roads, while not on public roads;

e.  while located for use as a residence or premises; or

f.  that is a **covered auto**.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART III.

Coverage under this Part III will not apply:

1.  to **bodily injury** sustained by any person while using or **occupying**:
    a.  a **covered auto** while being used:
        (i)   to carry persons or property for compensation or a fee;
        (ii)  for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
        (iii) for **ride-sharing activity**.
        This exclusion does not apply to shared-expense car pools; or
    b.  a motor vehicle that is owned by or available for the regular use of **you**, a **relative**, or a **rated resident**. This exclusion does not apply to a **covered auto** that is insured under this Part III;

2.  to **bodily injury** sustained by **you**, a **relative**, or a **rated resident** while using any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

3.  directly or indirectly to benefit any insurer or self-insurer under any of the following or similar laws:
    a.  workers' compensation law; or
    b.  disability benefits law;

4.  to any punitive or exemplary damages;

5.  to **bodily injury** sustained by any person if that person or the legal representative of that person settles without **our** written consent; or

6.  to **bodily injury** arising out of the use of a **covered auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**.

11

**LIMITS OF LIABILITY**

The limit of liability shown on the **declarations page** for Uninsured/Underinsured Motorist Coverage is the most **we** will pay regardless of the number of:
1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

If **your declarations page** shows a split limit:
1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person; and
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident.

The "each person" limit of liability includes the total of all claims made for **bodily injury** to an **insured person** and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing this total limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

If there is no other applicable uninsured or underinsured motorist coverage, the limits of liability under this Part III will be reduced by all sums:
1. paid because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible;
2. paid under Part I—Liability To Others; and
3. paid or payable because of **bodily injury** under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law.

If there is other applicable uninsured or underinsured motorist coverage, the total of the applicable limits of liability available under all uninsured or underinsured motorist coverages combined will be reduced by all sums:
1. paid because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible;
2. paid under Part I - Liability To Others; and
3. paid or payable because of **bodily injury** under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law.

PGR_THURSTON_0000492

**We** will not pay under this Part III any expenses paid or payable under Part II—Medical Payments Coverage.

No one will be entitled to duplicate payments for the same elements of damages.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

## OTHER INSURANCE

If there is other applicable uninsured or underinsured motorist coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide with respect to a vehicle that is not a **covered auto** will be excess over any other uninsured or underinsured motorist coverage.

## ARBITRATION

If **we** and an **insured person** cannot agree on:
1.   the legal liability of the operator or owner of an **uninsured motor vehicle**; or
2.   the amount of the damages sustained by the **insured person**;
this will be determined by arbitration if **we** and the **insured person** mutually agree to arbitration prior to the expiration of the bodily injury statute of limitations in the state in which the accident occurred.

In the event of arbitration, each party will select an arbitrator. The two arbitrators will select a third. If the two arbitrators cannot agree on a third arbitrator within 30 days, then on joint application by the **insured person** and **us**, the third arbitrator will be appointed by a court having jurisdiction.

Each party will pay the costs and fees of its arbitrator and any other expenses it incurs. The costs and fees of the third arbitrator will be shared equally.

Unless both parties agree otherwise, arbitration will take place in the county in which the **insured person** resides. Local rules of procedure and evidence will apply.

A decision agreed to by two of the arbitrators will be binding with respect to a determination of:
1.   the legal liability of the operator or owner of an **uninsured motor vehicle**; and
2.   the amount of the damages sustained by the **insured person**.
The arbitrators will have no authority to award an amount in excess of the limit of liability.

**We** and an **insured person** may agree to an alternate form of arbitration.

PGR_THURSTON_0000493

## PART IV—DAMAGE TO A VEHICLE

## INSURING AGREEMENT—COLLISION COVERAGE

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:

1.  **covered auto**, including an attached **trailer**; or
2.  **non-owned auto**;

and its **custom parts or equipment**, resulting from **collision**.

In addition, **we** will pay the reasonable cost to replace any child safety seat damaged in an accident to which this coverage applies.

## INSURING AGREEMENT—COMPREHENSIVE COVERAGE

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:

1.  **covered auto**, including an attached **trailer**; or
2.  **non-owned auto**;

and its **custom parts or equipment**, that is not caused by **collision**.

A loss not caused by **collision** includes:

1.  contact with an animal (including a bird);
2.  explosion or earthquake;
3.  fire;
4.  malicious mischief or vandalism;
5.  missiles or falling objects;
6.  riot or civil commotion;
7.  theft or larceny;
8.  windstorm, hail, water or flood; or
9.  breakage of glass not caused by **collision**.

In addition, **we** will pay for:

1.  reasonable transportation expenses incurred by **you** if a **covered auto** is stolen; and
2.  loss of use damages that **you** are legally liable to pay if a **non-owned auto** is stolen.

A combined maximum of $900, not exceeding $30 per day, will apply to these additional benefits. The additional benefit for transportation expenses will not apply if **you** purchased Rental Reimbursement Coverage for the stolen **covered auto**.

Coverage for transportation expenses and loss of use damages begins 48 hours after **you** report the theft to **us** and ends the earliest of:

1.  when the **auto** has been recovered and returned to **you** or its owner;
2.  when the **auto** has been recovered and repaired;
3.  when the **auto** has been replaced;
4.  72 hours after **we** make an offer to settle the loss if the **auto** is deemed by **us** to be a total loss; or

14

5.  if the loss is theft of a rented **non-owned auto**, 30 days after loss of use begins on the loss.

**We** must receive written proof of transportation expenses and loss of use damages.

## INSURING AGREEMENT—ADDITIONAL CUSTOM PARTS OR EQUIPMENT COVERAGE

**We** will pay for sudden, direct and accidental loss to **custom parts or equipment** on a **covered auto** for which this coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages. This coverage applies in addition to any coverage automatically provided for **custom parts or equipment** under Comprehensive Coverage or Collision Coverage.

## INSURING AGREEMENT—RENTAL REIMBURSEMENT COVERAGE

**We** will reimburse rental charges incurred when **you** rent an **auto** from a rental agency or auto repair shop due to a loss to a **covered auto** for which Rental Reimbursement Coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

Additional fees or charges for insurance, damage waivers, optional equipment, fuel, or accessories are not covered.

This coverage is limited to the each day limit shown on the **declarations page** for a maximum of 30 days.

If Rental Reimbursement Coverage applies, no other coverage under this policy for rental expenses will apply.

Rental charges will be reimbursed beginning:
1.  when the **covered auto** cannot be driven due to a loss; or
2.  if the **covered auto** can be driven, when **you** deliver the **covered auto** to an auto repair shop or one of **our** Service Centers for repairs due to the loss;
and ending the earliest of:
1.  when the **covered auto** has been returned to **you**;
2.  when the **covered auto** has been repaired;
3.  when the **covered auto** has been replaced;
4.  72 hours after **we** make an offer to settle the loss if the **covered auto** is deemed by **us** to be a total loss; or
5.  when **you** incur 30 days worth of rental charges.

**You** must provide **us** written proof of **your** rental charges to be reimbursed.

15

## INSURING AGREEMENT—LOAN/LEASE PAYOFF COVERAGE

If **you** pay the premium for this coverage, and the **covered auto** for which this coverage was purchased is deemed by **us** to be a total loss, **we** will pay, in addition to any amounts otherwise payable under this Part IV, the difference between:
1. the actual cash value of the **covered auto** at the time of the total loss; and
2. any greater amount the owner of the **covered auto** is legally obligated to pay under a written loan or lease agreement to which the **covered auto** is subject at the time of the total loss, reduced by:
   a. unpaid finance charges or refunds due to the owner for such charges;
   b. excess mileage charges or charges for wear and tear;
   c. charges for extended warranties or refunds due to the owner for extended warranties;
   d. charges for credit insurance or refunds due to the owner for credit insurance;
   e. past due payments and charges for past due payments; and
   f. collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **covered auto** at the time of the loss.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

## INSURING AGREEMENT—PET INJURY COVERAGE

If **you** have purchased Collision coverage for at least one **covered auto** under **your** policy, and if **your pet** sustains injury or death while inside a **covered auto** or **non-owned auto** at the time of a loss covered under Collision or Comprehensive coverage, **we** will provide:
1. up to $1,000 for reasonable and customary veterinary fees incurred by **you**, a **relative**, or a **rated resident** if **your pet** is injured in, or as a direct result of, the covered loss; or
2. a $1,000 death benefit if **your pet** dies in, or as a direct result of, the covered loss, less any payment **we** made toward veterinary expenses for **your pet**.

In the event of a covered loss due to the theft of a **covered auto** or **non-owned auto**, **we** will provide the death benefit provided **your pet** is inside that auto at the time of the theft and **your pet** is not recovered.

## ADDITIONAL DEFINITIONS

When used in this Part IV:
1. "**Collision**" means the upset of a vehicle or its impact with another vehicle or object.
2. "**Custom parts or equipment**" means equipment, devices, accessories, enhancements and changes, other than those that are offered by the manufacturer specifically for that **auto** model, or that are installed by the auto dealership as part

16

of the original sale of a new **auto**, that:

   a.   are permanently installed or attached; and

   b.   alter the appearance or performance of the **auto**.

3.   "**Mechanical parts**" means operational parts on a vehicle that wear out over time or have a finite useful life or duration typically shorter than the life of the vehicle as a whole. **Mechanical parts** do not include external crash parts, wheels, paint, or windshields and other glass.

4.   "**Non-owned auto**" means an **auto** that is not owned by or furnished or available for the regular use of **you**, a **relative**, or a **rated resident** while in the custody of or being operated by **you**, a **relative**, or a **rated resident** with the permission of the owner of the **auto** or the person in lawful possession of the **auto**.

5.   "**Your pet**" means any dog or cat owned by **you**, a **relative**, or a **rated resident**.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART IV.

Coverage under this Part IV will not apply for loss:

1.   to any vehicle while being used:

   a.   to carry persons or property for compensation or a fee;

   b.   for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or

   c.   for **ride-sharing activity**.

   This exclusion does not apply to shared-expense car pools;

2.   to a **non-owned auto** while being maintained or used by a person while employed or engaged in any **auto business**;

3.   to any vehicle resulting from, or sustained during practice or preparation for:

   a.   any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or

   b.   any driving activity conducted on a permanent or temporary racetrack or racecourse;

4.   to any vehicle for which insurance:

   a.   is afforded under a nuclear energy liability insurance contract; or

   b.   would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;

5.   to any vehicle caused by an intentional act committed by or at the direction of **you**, a **relative**, a **rated resident**, or the owner of a **non-owned auto**, even if the actual damage is different than that which was intended or expected. However, where a loss to a **covered auto** is caused by a named insured, this exclusion shall not apply to the extent of the legal interest of any other named insured who had no knowledge of or participation in the intentional act and did not engage in fraudulent conduct in connection with the loss;

6.   to a **covered auto** while it is leased or rented to others or given in exchange for compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;

7.   due to destruction or confiscation by governmental or civil authorities of any vehicle because **you**, any **relative**, or any **rated resident** engaged in illegal activities;

PGR_THURSTON_0000497

8.  to any vehicle that is due and confined to:
    a.  wear and tear;
    b.  freezing;
    c.  mechanical, electrical or electronic breakdown or failure; or
    d.  road damage to tires.

    This exclusion does not apply if the damage results from the theft of a vehicle;

9.  to portable equipment, devices, accessories, and any other personal effects that are not permanently installed. This includes, but is not limited to:
    a.  tapes, compact discs, cassettes, DVDs, and other recording or recorded media;
    b.  any case or other container designed for use in storing or carrying tapes, compact discs, cassettes, DVDs, or other recording or recorded media;
    c.  any device used for the detection or location of radar, laser, or other speed measuring equipment or its transmissions; and
    d.  CB radios, telephones, two-way mobile radios, DVD players, personal computers, personal digital assistants, or televisions;

10. to any vehicle for diminution of value;

11. to any vehicle caused directly or indirectly by:
    a.  war (declared or undeclared) or civil war;
    b.  warlike action by any military force of any government, sovereign, or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or
    c.  insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts; or

12. to any vehicle caused by, or reasonably expected to result from, a criminal act or omission of **you**, a **relative**, a **rated resident**, or the owner of a **non-owned auto**. For purposes of this exclusion:
    a.  the **insured person** must be convicted of or plead guilty to the criminal acts or omission; and
    b.  criminal acts or omissions do not include traffic violations.

## LIMITS OF LIABILITY

1.  The limit of liability for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** is the lowest of:
    a.  the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible;
    b.  the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;
    c.  the amount necessary to repair the damaged property to its pre-loss condition reduced by the applicable deductible; or
    d.  the Stated Amount shown on the **declarations page** for that **covered auto**.
    However, the most **we** will pay for loss to:
    a.  **custom parts or equipment** is $1,000 unless **you** purchased Additional Custom Parts or Equipment Coverage ("ACPE"). If **you** purchased ACPE, the most **we** will pay is $1,000 plus the amount of ACPE **you** purchased.
    b.  a **trailer** is the limit of liability shown on the **declarations page** for that **trailer**. If the **trailer** is not shown on the **declarations page**, the limit of liability is $500.

PGR_THURSTON_0000498

2. Payments for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** are subject to the following provisions:

   a. If coverage applies to a **non-owned auto**, **we** will provide the broadest coverage applicable to any **covered auto** shown on the **declarations page**.

   b. If **you** have elected a Stated Amount for a **covered auto**, the Stated Amount is the most **we** will pay for all loss to that **covered auto**, including its **custom parts or equipment**.

   c. Coverage for **custom parts or equipment** will not cause **our** limit of liability for loss to an **auto** under this Part IV to be increased to an amount in excess of the actual cash value of the **auto**, including its **custom parts or equipment**.

   d. In determining the amount necessary to repair damaged property to its pre-loss condition, the amount to be paid by **us**:

     (i) will not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired and the cost of repair or replacement parts and equipment, as reasonably determined by **us**. Determination of the prevailing competitive labor rates charged will be based on the rate being accepted by a willing and able repair facility providing similar services in the area where the property is to be repaired; and

     (ii) will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured or used, including, but not limited to:

       (a) original manufacturer parts or equipment; and

       (b) nonoriginal manufacturer parts or equipment.

   e. To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1., the total cost of necessary repair or replacement may be reduced by unrepaired prior damage. Unrepaired prior damage includes broken, cracked or missing parts; rust; dents; scrapes; gouges; and peeling paint. The reduction for unrepaired prior damage is the cost of labor, parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the accident and that is eliminated as a result of the repair or replacement of property damaged in the loss.

   f. To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1., an adjustment may be made for betterment or depreciation and physical condition on:

     (i) batteries;

     (ii) tires;

     (iii) engines and transmissions, if the engine has greater than 80,000 miles; and

     (iv) any other **mechanical parts** that are nonfunctioning or inoperative.

     **We** will not make an adjustment for the labor costs associated with the replacement or repair of these parts.

   g. The actual cash value of a vehicle equals its replacement cost at the time the loss occurs, less the value of its physical depreciation as determined by standard business practices.

3. **We** will not pay for loss of use of a rental vehicle for more than 30 days.

4. No deductible will apply to a loss to window glass when the glass is repaired instead of replaced.

19

PGR_THURSTON_0000499

5.  Duplicate recovery for the same elements of damages is not permitted.
6.  The following additional limits of liability apply to Pet Injury coverage:
    a.  The most **we** will pay for all damages in any one loss is a total of $1,000 re-
        gardless of the number of dogs or cats involved.
    b.  If **your pet** dies in, or as a direct result of, a covered loss, **we** will provide a
        death benefit of $1,000, less any payment **we** made toward veterinary ex-
        penses for **your pet**.
    c.  No deductible shall apply to this coverage.

## PAYMENT OF LOSS

**We** may, at **our** option:
1.  pay for the loss in money; or
2.  repair or replace the damaged or stolen property.

At **our** expense, **we** may return any recovered stolen property to **you** or to the address
shown on the **declarations page**, with payment for any damage resulting from the theft.
**We** may keep all or part of the property at the agreed or appraised value.

**We** may settle any loss with **you** or the owner or lienholder of the property.

## NO BENEFIT TO BAILEE

Coverage under this Part IV will not directly or indirectly benefit any carrier or other
bailee for hire.

## LOSS PAYABLE CLAUSE

Payment under this Part IV for a loss to a **covered auto** will be made according to
**your** interest and the interest of any lienholder shown on the **declarations page** or
designated by **you**. At **our** option, payment may be made to both jointly, or to either
separately. However, if the **covered auto** is not a total loss, **we** may make payment to
**you** and the repairer of the **auto**.

The lienholder's interest will not be protected:
1.  where fraud, misrepresentation, material omission, or intentional damage resulting
    in a denial of coverage by **us** has been committed by or at the direction of **you** or
    any person seeking coverage; or
2.  where the loss is otherwise not covered under the terms of this policy.
If this policy is cancelled, nonrenewed or voided, the interest of any lienholder under this
agreement will also terminate.

## OTHER SOURCES OF RECOVERY

If other sources of recovery also cover the loss, **we** will pay only **our** share of the loss.
**Our** share is the proportion that **our** limit of liability bears to the total of all applicable

20

PGR_THURSTON_0000500

limits. However, any insurance **we** provide for a **non-owned auto**, or **trailer** not shown on the **declarations page**, will be excess over any other collectible source of recovery including, but not limited to:

1. any coverage provided by the owner of the **non-owned auto** or **trailer**;
2. any other applicable physical damage insurance; and
3. any other source of recovery applicable to the loss.

## APPRAISAL

If **we** cannot agree with **you** on the amount of a loss, then **we** or **you** may demand an appraisal of the loss. Within 30 days of any demand for an appraisal, each party shall appoint a competent appraiser and shall notify the other party of that appraiser's identity. The appraisers will determine the amount of loss. If they fail to agree, the disagreement will be submitted to a qualified umpire chosen by the appraisers. If the two appraisers are unable to agree upon an umpire within 15 days, **we** or **you** may request that a judge of a court of record, in the county where **you** reside, select an umpire. The appraisers and umpire will determine the amount of loss. The amount of loss agreed to by both appraisers, or by one appraiser and the umpire, will be binding. **You** will pay **your** appraiser's fees and expenses. **We** will pay **our** appraiser's fees and expenses. All other expenses of the appraisal, including payment of the umpire if one is selected, will be shared equally between **us** and **you**. Neither **we** nor **you** waive any rights under this policy by agreeing to an appraisal.

## PART V—ROADSIDE ASSISTANCE COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for **our** authorized service representative to provide the following services when necessary due to a **covered emergency**:

1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement.

If a **covered disabled auto** is towed to any place other than the nearest qualified repair facility, **you** will be responsible for any additional charges incurred.

### ADDITIONAL DEFINITIONS

When used in this Part V:

1. "**Covered disabled auto**" means a **covered auto** for which this coverage has been purchased that sustains a **covered emergency**.
2. "**Covered emergency**" means a disablement that is a result of:
   a. mechanical or electrical breakdown;
   b. battery failure;
   c. insufficient supply of fuel, oil, water, or other fluid;
   d. flat tire;
   e. accidental lock-out; or
   f. entrapment in snow, mud, water or sand within 100 feet of a road or highway.

21

PGR_THURSTON_0000501

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART V.**

Coverage under this Part V will not apply to:

1. more than three **covered emergencies** for any single **covered auto** in a six-month period;
2. the cost of purchasing parts, fluid, lubricants, fuel, or replacement keys, or the labor to make replacement keys;
3. installation of products or material not related to the disablement;
4. labor not related to the disablement;
5. labor on a **covered disabled auto** for any time period in excess of 60 minutes per disablement;
6. towing or storage related to impoundment, abandonment, illegal parking, or other violations of law;
7. assistance with jacks, levelers, airbags or awnings;
8. labor or repair work performed at a service station, garage, or repair shop;
9. auto storage charges;
10. disablement that occurs on roads not regularly maintained, sand beaches, open fields, or areas designated as not passable due to construction, weather, or earth movement;
11. mounting or removing of snow tires or chains;
12. tire repair;
13. disablement that results from an intentional or willful act or action by **you**, a **relative**, or the operator of a **covered disabled auto**;
14. any **covered auto** while being used in connection with **ride-sharing activity**;
15. any **covered auto** while being used in connection with a **personal vehicle sharing program**; or
16. a trailer.

## UNAUTHORIZED SERVICE PROVIDER

When service is rendered by a provider in the business of providing roadside assistance and towing services, other than one of **our** authorized service representatives, **we** will pay only reasonable charges, as determined by **us**, for:

1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement;

which is necessary due to a **covered emergency**.

## OTHER INSURANCE

Any coverage provided under this Part V for service rendered by an unauthorized service provider will be excess over any other collectible insurance or towing protection coverage.

## PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each accident or loss even if **you** or the person seeking coverage is not

PGR_THURSTON_0000502

at fault. **You** or the person seeking coverage must provide **us** with all accident or loss information, including time, place, and how the accident or loss happened. **You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the accident or loss, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the accident, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable.

A person seeking coverage must:
1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of loss **we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you** or any other person seeking coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to the claim or suit;
5. attend hearings and trials as **we** require;
6. take reasonable steps after a loss to protect the **covered auto**, or any other vehicle for which coverage is sought, from further loss. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;
7. allow **us** to have the damaged **covered auto**, or any other damaged vehicle for which coverage is sought, inspected and appraised before its repair or disposal;
8. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require; and
9. authorize **us** to obtain medical and other records.

## PART VII—GENERAL PROVISIONS

### POLICY PERIOD AND TERRITORY

This policy applies only to accidents and losses occurring during the policy period shown on the **declarations page** and that occur within a state, territory or possession of the United States of America, or a province or territory of Canada, or while a **covered auto** is being transported between their ports.

### CHANGES

This policy contract, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, and all endorsements to this policy issued by **us**, contain all the agreements between **you** and **us**. Subject to the following, the terms of this policy may not be changed or waived except by an endorsement issued by **us**.

PGR_THURSTON_0000503

The premium for this policy is based on information **we** received from **you** and other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and to promptly notify **us** if it changes during the policy period. If this information is determined by **us** to be incorrect, incomplete, or if it changes during the policy period, **you** agree that **we** may adjust **your** policy information and premium accordingly. Changes that may result in a premium adjustment are contained in **our** rates and rules. These include, but are not limited to, **you**, a **relative**, or a **rated resident** obtaining a driver's license or operator's permit, or changes in:

1. the number, type or use classification of **covered autos**;
2. the persons who regularly operate a **covered auto**;
3. the persons of legal driving age residing in **your** household;
4. the residents in **your** household;
5. an operator's marital status;
6. **your** mailing address and **your** residence address;
7. the principal garaging address of any **covered auto**;
8. coverage, deductibles, or limits of liability; or
9. rating territory or discount eligibility.

The coverage provided in **your** policy may be changed only by the issuance of a new policy or an endorsement by **us**. However, if during the policy period **we** broaden any coverage afforded under the current edition of **your** policy without additional premium charge, that change will automatically apply to **your** policy as of the date the coverage change is implemented in **your** state.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

## DUTY TO REPORT CHANGES

**You** must promptly report to **us** all changes, including additions and deletions, in policy information. This includes, but is not limited to, changes in:

1. **your** mailing address or **your** residence address;
2. the principal garaging address of any **covered auto**;
3. the residents in **your** household;
4. the persons of legal driving age residing in **your** household;
5. the persons who regularly operate a **covered auto**;
6. an operator's marital status; or
7. the driver's license or operator's permit status of **you**, a **relative**, or a **rated resident.**

## SETTLEMENT OF CLAIMS

**We** may use estimating, appraisal, or injury evaluation systems to assist **us** in adjusting claims under this policy and to assist **us** in determining the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

24

PGR_THURSTON_0000504

## TERMS OF POLICY CONFORMED TO STATUTES

If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** residence, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** residence.

### TRANSFER OF INTEREST

The rights and duties under this policy may not be transferred to another person without **our** written consent. However, if a named insured shown on the **declarations page** dies, this policy will provide coverage until the end of the policy period for the legal representative of the named insured, while acting as such, and for persons covered under this policy on the date of the named insured's death.

### FRAUD OR MISREPRESENTATION

Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. If **you**:

1. make incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. conceal or misrepresent any material fact or circumstance; or
3. engage in fraudulent conduct;

**we** may deny coverage for an accident or loss if **you**, in connection with any requested change, or at any time during the policy period, have concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

**We** may deny coverage for an accident or loss if **you** or a person seeking coverage has concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct which materially affects **our** interests, in connection with the presentation or settlement of a claim.

### PAYMENT OF PREMIUM AND FEES

In addition to premium, fees may be charged on **your** policy. **We** may charge fees for installment payments, late payments, and other transactions. Fees may also be charged if **you** tender a check, draft, electronic funds transfer, or other type of remittance to **us** for any full or partial payment of **your** premium, and the method of such payment is returned to **us** or refused because of insufficient funds, a closed account, or a stop payment order. Payments made on **your** policy will be applied first to fees, then to premium due.

### CANCELLATION

**You** may cancel this policy during the policy period by calling or writing **us** and stating the future date **you** wish the cancellation to be effective.

PGR_THURSTON_0000505

**We** may cancel this policy during the policy period by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records.

If the policy is cancelled for nonpayment of premium, **we** will mail notice of cancellation to **you** at least 15 days before cancellation takes effect. In all other cases, **we** will mail notice of cancellation to **you** at least 25 days before the cancellation takes effect.

**We** may cancel this policy for any reason if the notice is received by the **named insured** within the first 59 days of the initial policy period.

After this policy is in effect for more than 59 days, or if this is a renewal or continuation policy, **we** may cancel only for one or more of the following reasons:
1. nonpayment of premium;
2. material misrepresentation or fraud by **you** with respect to any material fact in the procurement, continuation, change or renewal of this policy;
3. material misrepresentation or fraud in the submission of any claim under this policy;
4. loss of driving privileges through suspension, revocation or expiration of an operator's license issued to **you**, any driver in **your** household, or any regular operator of a **covered auto**, other than the first or second suspension under:
   a. Title 29-A M.R.S.A §2471(2);
   b. Title 29-A M.R.S.A §2472(2); or
   c. Title 28-A M.R.S.A §2052;
5. loss of driving privileges by **you**, a **relative**, a **rated resident**, or a principal operator of a **covered auto** through revocation of an operator's license during the policy period or if this policy is a renewal, during its policy period or the 180 days immediately preceding its effective date; or
6. violation of the terms or conditions of this policy.

A postal service certificate of mailing to the **named insured** at the insured's last known address appearing in **our** records will be sufficient proof of notice. If this policy is cancelled, coverage will not be provided as of the effective date and time shown in the notice of cancellation. For purposes of cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverages for all persons and all vehicles.

**CANCELLATION REFUND**

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation.

If this policy is cancelled, any refund due will be computed on a daily pro rata basis. However, **we** will retain a cancellation fee if this policy is cancelled at **your** request or if cancellation is for nonpayment of premium. A cancellation fee will be charged only during the initial policy period.

PGR_THURSTON_0000506

**NONRENEWAL**

If neither **we** nor one of **our** affiliates offers to renew or continue this policy, **we** will mail notice of nonrenewal to the named insured shown on the **declarations page** at the last known address appearing in **our** records. A postal service certificate of mailing to the named insured at the insured's last known address appearing in our records will be sufficient proof of notice. Notice will be mailed more than 33 days before the end of the policy period.

## AUTOMATIC TERMINATION

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

If **you** obtain other insurance on a **covered auto**, any similar insurance provided by this policy will terminate as to that **covered auto** on the effective date of the other insurance.

If a **covered auto** is sold or transferred to someone other than **you** or a **relative**, any insurance provided by this policy will terminate as to that **covered auto** on the effective date of the sale or transfer.

## LEGAL ACTION AGAINST US

**We** may not be sued unless there is full compliance with all the terms of this policy.

**We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured person under Part I to pay is finally determined either by judgment after trial against that person or by written agreement of the insured person, the claimant, and **us**. No one will have any right to make **us** a party to a lawsuit to determine the liability of an insured person.

If **we** retain salvage, **we** have no duty to preserve or otherwise retain the salvage for any purpose, including evidence for any civil or criminal proceeding.

## OUR RIGHTS TO RECOVER PAYMENT

**We** are entitled to the rights of recovery that the insured person to whom payment was made has against another, to the extent of **our** payment. That insured person may be required to sign documents related to the recovery and must do whatever else **we** require to help **us** exercise those recovery rights, and do nothing after an accident or loss to prejudice those rights.

When an insured person has been paid by **us** and also recovers from another, the amount recovered will be held by the insured person in trust for **us** and reimbursed to

27

**us** to the extent of **our** payment. If **we** are not reimbursed, **we** may pursue recovery of that amount directly against that insured person.

The following applies when **we** are seeking reimbursement from an insured person for payments **we** have made under Part II—Medical Payments Coverage:

1. the insured person will be required to sign a document agreeing to reimburse **us** out of payments made to that insured person from a liable party; and
2. **we** are responsible for a pro rata share of the attorney fees incurred by that insured person in recovering payment from a liable party.

If an insured person recovers from another without **our** written consent, and such recovery prejudices **our** right to recover payment, the insured person's right to payment under any affected coverage will no longer exist.

If **we** elect to exercise **our** rights of recovery against another, **we** will also attempt to recover any deductible incurred by an insured person under this policy unless **we** are specifically instructed by that person not to pursue the deductible. **We** have no obligation to pursue recovery against another for any loss not covered by this policy.

**We** reserve the right to compromise or settle the deductible and property damage claims against the responsible parties for less than the full amount. **We** also reserve the right to incur reasonable expenses and attorney fees in pursuit of the recovery.

If the total recovery is less than the total of **our** payment and the deductible, **we** will reduce reimbursement of the deductible based on the proportion that the actual recovery bears to the total of **our** payment and the deductible. A proportionate share of collection expenses and attorney fees incurred in connection with these recovery efforts will also reduce reimbursement of the deductible.

These provisions will be applied in accordance with state law.

## JOINT AND INDIVIDUAL INTERESTS

If there is more than one named insured on this policy, any named insured may cancel or change this policy. The action of one named insured will be binding on all persons provided coverage under this policy.

## BANKRUPTCY

The bankruptcy or insolvency of an insured person will not relieve **us** of any obligations under this policy.

PGR_THURSTON_0000508

PGR_THURSTON_0000509

PGR_THURSTON_0000510

PGR_THURSTON_0000511



9611D ME 0916



PGR_THURSTON_0000512

Case 1:22-cv-00375-NT   Document 120-12   Filed 01/10/25   Page 204 of 239
Case 1:22-cv-00375-NT   Document 76-10   Filed 03/01/24   Page 1 of 13   PageID #: 1222
PageID #: 4388

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

MATTHEW THURSTON,                      )
KATHERINE BRIDGES And                  )
GENEVIEVE MCDONALD,                    )
individually and on behalf of others   )
similarly situated,                    )
                                       )      Docket No. 1:22-cv-00375-NT
                                       )
          Plaintiffs,                  )
                                       )
     v.                                )
                                       )
PROGRESSIVE CASUALTY
INSURANCE COMPANY, et al.,

          Defendants.

---

## SECOND AMENDED CLASS ACTION COMPLAINT

---

NOW COME the Plaintiffs, Matthew Thurston, Katherine Bridges and Genevieve McDonald by and through counsel, and makes the following Complaint individually, and on behalf of a class of persons defined below, against the Defendants.

## INTRODUCTION

1. The Plaintiffs, Matthew Thurston, Katherine Bridges and Genevieve McDonald all bought auto insurance policies from "Progressive."

2. The commonly known PROGRESSIVE trademark is registered to Progressive Casualty Insurance Company. However, the Plaintiffs' policies are underwritten by United Financial Casualty Co. The Defendants will be referred to throughout this Complaint as either "Defendant," "Defendants," or "Progressive."

3. As part of the sale, Progressive promised that it would pay the Plaintiffs the value of the

Plaintiffs' vehicles if they were damaged in an accident.

4. Based on the promises, Plaintiffs bought their respective policies and paid premiums for an auto insurance policy from Progressive.

5. On or around January 21, 2022, Plaintiff Matthew Thurston's car, that was covered by the policy was "totaled" in a motor vehicle collision.

6. On or around September 28, 2023 the Plaintiff Katherine Bridges' vehicle, which was covered by her policy was totaled in a single vehicle accident.

7. On or around February 28, 2019, the Plaintiff Genevieve McDonald 's vehicle, which was covered by her policy was totaled in a single vehicle accident.

8. When it came time for Progressive to honor the promises made in the policies it sold to Thurston, Bridges and McDonald, Progressive did not live up to its promises.

9. Rather than pay Plaintiffs the value of their vehicles, Progressive instead chooses to conspire with another company and not pay Plaintiffs what they were owed.

10. Progressive hired another company, Mitchell, to provide an appraisal tool Progressive uses to perform the valuation reports Plaintiffs' total loss claims. Mitchell systematically, and without any reasonable justification, depresses the appraised value of all total loss vehicles in coordination with Progressive.

11. Rather than pay Plaintiffs fair value for their vehicles, Progressive relied on Mitchell's systemic depressed value.

12. Instead of Progressive paying fair value as promised to Plaintiffs and all other similarly situated Mainers, Defendant shorts them and they receive less than what they were promised.

## PARITIES AND VENUE

13. The Plaintiff, Matthew Thurston, is a resident of Hancock County, Maine, and has a Progressive Auto policy which he purchased in Maine.

14. The Plaintiff, Katherine Bridges, is a resident of Hancock County, Maine, and has a Progressive Auto policy which she purchased in Maine.

15. The Plaintiff, Genevieve McDonald, is a resident of Hancock County, Maine and has a Progressive Auto policy which she purchased in Maine.

16. This action is also asserted on behalf of a class consisting of the following: All persons who were insured by the Defendant in the State of Maine, for personal or family use of a vehicle, in the six years preceding the filing of the original Complaint in this matter, who were paid or offered compensation for a total loss on their vehicle and the offer was reduced based on a Valuation Report obtained by Defendant that included a projected sold adjustment ("the Class").

17. Defendant, Progressive Casualty Insurance Company, has its corporate headquarters located at 6300 Wilson Mills Rd, Mayfield Village, OH 44143.

18. Defendant United Financial Casualty Co. has its corporate headquarters located at 6300 Wilson Mills Rd, Mayfield Village, OH 44143.

19. Progressive Casualty Insurance Company and United Financial Casualty Co., are, for all practical purposes, part of the Progressive Group of Insurance Companies.

20. According to its website, Progressive conducts business in Maine and throughout the country under the brand Progressive or the Progressive Group of Insurance Companies.

21. Progressive's website attempts to convey a sense that Progressive can be trusted and that it works hard on behalf of its customers. To enter the auto insurance section of Progressive's

Case 1:22-cv-00375-NT    Document 120-12    Filed 01/10/25    Page 207 of 239
Case 1:22-cv-00375-NT    Document 76-1    Filed 03/01/24    Page 4 of 13    PageID #: 1225
PageID #: 4391

website, one clicks on a link that says, "*buckle up with protection you can rely on.*"

22. Plaintiffs never got the protection promised.

23. Progressive also tells customers that, with Progressive, they get "*superior claims service*" and that Progressive will "*support you every step of the way,*" and tells potential customers to "*join us today and experience why we're one of the best insurance companies.*"

24. After making these promises, Progressive unfairly and systematically lowers the value of total loss claims it is supposed to pay in Maine.

25. Its annual report states that one of Progressive's four core values is integrity, stating *"[w]e revere honesty and adhere to high ethical standards to gain the trust and confidence of our customers. We value transparency, encourage disclosing bad news, and welcome disagreement.*"

26. Mr. Thurston's Ms. Bridges' and Mrs. McDonalds's experiences, as summarized in this Complaint, are but a few of many thousands of such instances where consumers in Maine are getting less than they are owed by Progressive for a total loss vehicle.

## MATTHEW THURSTON'S CLAIM

27. On January 21, 2022, the Matthew Thurston's vehicle was badly damaged in a collision.

28. The vehicle was a 2012 Volvo XC70 with VIN #YV4952BL2C1140915.

29. At the time of the collision, the vehicle was in the process of being transferred from Scott Thurston, the Plaintiff's father, to the Plaintiff.

30. Scott Thurston gave his son the vehicle on or around January 5, 2022, in Louisiana, and Matthew drove the car to Maine shortly thereafter.

31. At the time of the collision, Matthew Thurston had auto insurance from Progressive.

32. Progressive is obligated to pay for damage to the vehicle under the Mr. Thurston's collision policy because Mr. Thurston had an existing collision policy with Progressive for other

Case 1:22-cv-00375-NT    Document 120-12    Filed 01/10/25    Page 208 of 239
Case 1:22-cv-00375-NT    Document 76-1    Filed 07/01/24    Page 5 of 13    PageID #: 1226
PageID #: 4392

vehicles, and, consistent with his contract with Progressive, had the option to elect to add any new vehicle within thirty (30) days of obtaining the new vehicle.

33. Mr. Thurston made a claim for the damage to the Volvo on or around January 25, 2022.

34. Progressive accepted the claim and declared Mr. Thurston's vehicle to be a "total loss" and offered to pay the Plaintiff what it claimed was the actual cash value of the vehicle.

35. Progressive's offer to pay the Mr. Thurston for the vehicle was less than the full value it had promised to pay.

36. Matthew Thurston's situation was not unique because Progressive's standard practice, as described below, systemically reduces its offer to pay to less than the value of total loss vehicles without any reasonable or rational basis.

## KATHERINE BRIDGES' CLAIM

37. On September 28 of 2023, Ms. Bridges' vehicle was badly damaged in a single vehicle collision.

38. The vehicle was a 2020 Kia Telluride with VIN # 5XYP3DHC4LG067730.

39. At the time of the collision, Ms. Bridges had auto insurance from Progressive.

40. Progressive is obligated to pay for damage to the vehicle under the under Ms. Bridges' policy.

41. Ms. Bridges made a claim for the damage to her vehicle on or around September 29, 2023.

42. Progressive accepted the claim and declared Ms. Bridges' vehicle to be a "total loss" and offered to pay the her what it claimed was the actual cash value of the vehicle as outlined in the valuation report attached as Exhibit B.

43. Ms. Bridges accepted Progressives offer and used the money Progressive paid her to purchase a used vehicle.

44. Progressive's offer to pay Ms. Bridges for her vehicle was less than the full value it had

Case 1:22-cv-00375-NT   Document 120-12   Filed 01/10/25   Page 209 of 239
Case 1:22-cv-00375-NT   Document 76   Filed 03/01/24   Page 6 of 13   PageID #: 1227
PageID #: 4393

promised to pay because Progressive's standard practice, as described below, systemically

reduces its offer to pay to less than the value of total loss vehicles without any reasonable or

rational basis.

### GENEVIEVE MCDONALD'S CLAIM

45. On February 28, 2019, Ms. McDonald's vehicle, a 2009 Volkswagen Passat with VIN #

WVWJK73C19P047779 was badly damaged in an accident.

46. Progressive was obligated to pay for damage to the vehicle under Ms. McDonald's Policy.

47. Progressive accepted the claim and declared Mrs. McDonald vehicle to be a "total loss" and

offered to pay the her what it claimed was the actual cash value of the vehicle as outlined

in the valuation report attached as Exhibit C.

48. Mrs. McDonald accepted Progressives payment.

49. Progressive's payment to Mrs. McDonald for the vehicle was less than the full value it had

promised to pay because Progressive's standard practice, as described below, systemically

reduces its offer to pay to less than the value of total loss vehicles without any reasonable or

rational basis.

### PROGRESSIVES STANDARD PRACTICE OF USING A PROJECTED SOLD
### ADJUSTMENT

50. Progressive's standard practice involves obtaining a "Vehicle Valuation Report" ("Valuation

Report") to offer Maine consumers less than the value of their total loss vehicle.

51. Progressive provided a Valuation Report for Matthew Thurston on or around February 17,

2022.

See Exhibit A.

Case 1:22-cv-00375-NT    Document 120-12    Filed 01/10/25    Page 210 of 239
Case 1:22-cv-00375-NT    Document 76   Filed 05/01/24   Page 7 of 13    PageID #: 1228
PageID #: 4594

52. Progressive provided a Valuation Report for Katherine Bridges on or around October 5, 2023.

    *See* Exhibit B.

53. Progressive Provided a Valuation Report to Genevieve McDonald on or around March 6, 2019. See Exhibit C.

54. On information and belief, the Valuation Reports related to total-loss vehicles used by Progressive during the relevant period in Maine followed the same standard practice that provided Plaintiffs and others an offer to pay that relied on the use of "Valuation Reports" similar to Exhibits A, B, and C.

55. These Valuation Reports start with a list of comparable used vehicles, normally of the same year, and make and model as the vehicle being appraised. The reports base the value of the vehicle to be appraised upon the advertised prices for comparable vehicles. The report uses those advertised prices to create a model of the value of the total loss vehicle.

56. The report then deviates from the advertised prices of comparable vehicles by claiming to adjust those advertised prices to account for differences in equipment, mileage, and vehicle configuration to create a base value for the vehicle being appraised.

57. The Valuation Reports also include a "Projected Sold Adjustment" for each of the comparable vehicles used in the Valuation Report. These Projected Sold Adjustments are, invariably, a downward adjustment in the value of the comparable vehicles.

58. In the report used to determine the value of Mr. Thurston's vehicle, Mitchell applied Projected Sold Adjustments of -$398.00, -$537.00, and -$427.00 to the three vehicles used as comparable vehicles in the Valuation Report. See Exhibit A, pp 5-6.

59. In the report used to determine the value of Ms. Bridges' vehicle, Mitchell applied Projected sold adjustments of -$830.00, -$741.00, -$720.00, -$787.00 and $-721.00 to

Case 1:22-cv-00375-NT    Document 120-12    Filed 01/10/25    Page 211 of 239
Case 1:22-cv-00375-NT    Document 76-3    Filed 03/01/24    Page 8 of 13    PageID #: 1229
PageID #: 4395

the five vehicles used as comparable vehicles in the Valuation Report. See Exhibit B, pp
6-10.

60. In the report used to determine the value of Mrs. McDonald's vehicle, the Valuation
Report applied Projected sold adjustments of -$485.00, -$445.00, -$485.00, -$566 and -
$566.00 to the five vehicles used as comparable vehicles in the Valuation Report. See
Exhibit C, pp 5-7.

61. The Projected Sold Adjustments are simply used to reduce the amount Progressive pays to
consumers.

62. Progressive's Projected Sold Adjustments are used for arbitrary downward adjustments to
its offers to pay the values of the comparable vehicles. The result of the adjustment is that
the alleged value of each comparable vehicle used to determine the value of the vehicle
being appraised, are lower. This, in turn, is used to lower the purported value of the
vehicle being appraised. This leads to consumers being offered, and receiving, less for
their vehicle than they are entitled to.

63. Progressive begins the process of making offers for loss vehicles using the comparative
appraisal methodology outlined above, and then seeks further reductions in the value of total
loss vehicles, by adding the bogus "Projected Sold Adjustment" into the comparable vehicles
in every Valuation Report.

64. A reduction in the market value of a vehicle's list price based on supposed downward price
pressure, especially in the current market, where used cars are only available at a significant
premium has no rational basis.

65. Progressive's Projected Sold Adjustments are also contrary to appraisal standards. There are
several generally recognized and acceptable methodologies for determining actual cash value,
including use of comparable vehicles.

Case 1:22-cv-00375-NT Document 120-12 Filed 01/10/25 Page 212 of 239
Case 1:22-cv-00375-NT Document 76 Filed 03/11/24 Page 9 of 13 PageID #: 1230
PageID #: 4396

66. Appraisers customarily use advertised prices to determine the value of comparable vehicles, and only make adjustments based on observed and verifiable data; reasonable appraisal standards do not permit arbitrary adjustments from the advertised price based upon undocumented and unverifiable assumptions that vehicles tend to sell below list price.

67. The impropriety and arbitrariness of Progressive's Projected Sold Adjustments are further demonstrated by the fact that Mitchell's primary competitor in providing automated valuation reports to insurance companies—CCC Intelligent Solutions—does not apply projected sold adjustments in this manner. Instead, CCC Intelligent Solutions uses list prices.

68. Plaintiffs and each member of the class ("the Class") were damaged by Progressive's failure to pay the true value of their cars by its use of the adjustments discussed above that were not proper methodologies or appraisal standards.

69. Were it not for Defendant's deceptive and improper adjustments, the Plaintiffs, and other similarly situated consumers in Maine, would have received a greater amount for their total loss vehicles from Progressive.

## CLASS ALLEGATIONS

70. The Plaintiffs hereby repeat and reallege the claims in each of the proceeding paragraphs.

71. The Defendant treated the Plaintiffs the same way it treats all consumers in Maine whose vehicles it determines to be a total loss.

72. On information and belief, the Defendant, or its agent Mitchell, maintains records containing the Valuation Reports and the financial transactions connected to each total loss vehicle for which Progressive was obliged to pay a claim, in Maine, during the applicable period, and such records would be admissible as evidence in any trial or proceeding as statements of a party opponent.

Case 1:22-cv-00375-NT   Document 120-12   Filed 01/10/25   Page 213 of 239
Case 1:22-cv-00375-NT   Document 76-1 Filed 07/01/24   Page 10 of 13   PageID #: 1231
PageID #: 4397

73. These records would show the amounts of the "Projected Sold Adjustments" that Progressive made to the values of the cars of Plaintiffs and the other class members.

74. The records would identify all potential class members by name.

75. On information and belief, the joinder of all persons who meet the class definition in a single proceeding would be impracticable.

76. The claims asserted on behalf of the Plaintiffs and the Class present the following issue of fact and law that can and should be combined into a single action:

    a. Whether the Defendant, by applying a Projected Sold Adjustment for all total loss vehicles, in Maine, during the relevant time period, has violated 24-A M.R.S. § 2436-A(1)(A) by "knowingly misrepresenting to an insured pertinent facts ................ related to the coverage at issue;"

    b. Whether the Defendant, by applying a Projected Sold Adjustment to all total loss vehicles, in Maine, during the relevant time period, has violated 24-A M.R.S. § 2436-A(1)(E) by "failing to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear;"

    c. Whether the Defendant, by applying a Projected Sold Adjustment to all total loss vehicles, in Maine, during the relevant time period, engaged in unfair or deceptive trade practices, in violation of 5 M.R.S. § 207;

    d. If the Defendant is liable, what is the amount of damages due from them to the Class;

    e. If the Defendant is liable under the Unfair Trade Practices Act, what injunctive or equitable relief to impose upon the Defendant under 5 M.R.S. § 213(1);

    f. If the Defendant is liable for conversion, what injunctive relief to impose;

    g. If the Defendant is liable for conversion, whether the Defendant acted with Malice

toward the Plaintiffs and the Class;

h.  If the Defendant is liable for conversion, and acted with malice toward the Plaintiffs and the Class, the amount of punitive damages to impose.

WHEREFORE, the Plaintiffs asks this Honorable Court to:

a.  Certify a class of persons, appoint the Plaintiffs as class representatives and their counsel as Class counsel as to all of the following Counts.

### COUNT I - 24-A M.R.S. § 2436-A – Unfair Claim Settlement Practices

77.  The Plaintiffs hereby repeat and reallege the claims in each of the proceeding paragraphs.

78.  By offering the Plaintiffs, and the Class, less than the full market value of his vehicle, by inserting Projected Sold Adjustments into its Valuation Reports, the Defendant has violated 24-A M.R.S. § 2436-A(1)(A) by "knowingly misrepresenting to an insured pertinent information related to the coverage at issue."

79.  By offering the Plaintiffs and the Class less than the full market value of his vehicle, by inserting Projected Sold Adjustments into its Valuation Reports, the Defendant has violated 24-A M.R.S. § 2436-A(1)(E) by "[w]ithout just cause, failing to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear."

WHEREFORE, the Plaintiffs asks this Honorable Court to:

a.  Find that the Defendant has violated 24-A § 2436-A;

b.  Determine the amount of damages to the Plaintiffs and the Class;

c.  Impose interest at the rated of 18% per year from the time the claim should have been paid on any damages;

Case 1:22-cv-00375-NT   Document 120-12   Filed 01/10/25   Page 215 of 239
Case 1:22-cv-00375-NT   Document 76   Filed 07/01/24   Page 12 of 13   PageID #: 1233
PageID #: 4399

    d.   Enter judgment against the Defendants; and

    e.   Award the Plaintiffs and the Class their reasonable attorneys' fees and costs.

### COUNT II – 5 M.R.S. § 205-A – Maine Unfair Trade Practices Act

80. The Plaintiffs hereby repeats and realleges the claims in each of the proceeding paragraphs.

81. The Plaintiffs and the Class purchased the auto insurance policy at question primarily for personal or family use.

82. The Defendant's actions to the Plaintiffs and the Class, as alleged in this Complaint, are unfair and deceptive trade practices prohibited by 5 M.R.S. § 207.

83. The Defendant's action toward the Plaintiffs and the Class, as alleged in this Complaint, are not authorized, permitted or required by a state or federal agency or by applicable law, rule or regulation or other regulatory approval.

84. The Plaintiffs and the Class have suffered a loss of money and/or personal property because of the Defendant's unfair and/or deceptive acts.

WHEREFORE, the Plaintiffs asks this Honorable Court to:

    a.   Find that the Defendants have violated 5 M.R.S. § 207;

    b.   Determine the amount of damages to the Plaintiffs and the Class;

    c.   Award the Plaintiffs and the Class their reasonable attorneys' fees and costs;

    d.   Enjoin the Defendant from engaging in such unfair and deceptive trade practices in the future anywhere in the State of Maine;

    e.   Enter judgment against the Defendants; and

    f.   Impose whatever other remedies the Court deems just and equitable.

Case 1:22-cv-00375-NT Document 120-12 Filed 01/10/25 Page 216 of 239
Case 1:22-cv-00375-NT Document 76-1 Filed 07/01/24 Page 13 of 13 PageID #: 1234
PageID #: 4400

Respectfully Submitted,

Dated: June 28, 2024

/s/   John Z. Steed
John Z. Steed, Esq. #5399
Island Justice
P.O. Box 771
Stonington, ME 04681
(207) 200-7077
john@islandjusticelaw.com

Scott C. Borison (MD Bar No. 22596)*
Borison Firm LLC.
1400 S. Charles St.
Baltimore MD 21230
Telephone: (301) 620-1016
scott@borisonfirm.com

Ronald I. Frederick (OH Bar No. 0063609)*
Frederick & Berler LLC
767 E. 185th Street
Cleveland, Ohio 44119
(216) 502-1055 (phone)
(216) 609-0750 (fax)
ronf@clevelandconsumerlaw.com

*Counsel for Plaintiff Matthew Thurston*

* Admitted *pro hac vice*

DEPOSITION
EXHIBIT

11
9-14-24  BM
PENGAD 800-631-6989

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

MATTHEW THURSTON, individually and on
behalf of others similarly situated,

        Plaintiff,

v.                                                    Docket No. 1:22-cv-00375-NT

PROGRESSIVE CASUALTY INSURANCE
COMPANY and UNITED FINANCIAL
CASUALTY COMPANY,

        Defendants.

## PLAINTIFF GENEVIEVE MCDONALD'S AMENDED RESPONSES AND OBJECTIONS TO DEFENDANT UNITED FINANCIAL CASUALTY COMPANY'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

NOW COMES Plaintiff Genevieve McDonald ("**Plaintiff**" or "**Ms. McDonald**"), by and

through the undersigned counsel, and hereby respectfully submits her objections and responses to

Defendant United Financial Casualty Company's ("**United Financial**") First Set of Requests for

Production of Documents.

## GENERAL OBJECTIONS

1.      Ms. McDonald objects to United Financial's First Set of Requests for Production of

Documents, Instructions, and Definitions to the extent that they place a burden on Ms. McDonald

that is broader and greater than required under the Federal Rules of Civil Procedure. Ms. McDonald

will respond to the First Set of Requests for Production of Documents in compliance with the Federal

Rules of Civil Procedure.

2.      Ms. McDonald also objects to the First Set of Requests for Production of Documents

to the extent that they seek documents that are neither relevant nor reasonably calculated to lead to

the discovery of admissible evidence.

1

3.      Ms. McDonald objects to the extent that the First Set of Requests for Production of

Documents seeks information protected by the attorney-client privilege, work product, common

interest privilege, and any and all other applicable privileges.

4.      Ms. McDonald objects to the extent that the First Set of Requests for Production of

Documents seek confidential and proprietary information. Ms. McDonald will provide such

confidential and proprietary information subject to the Protective Order.

5.      Ms. McDonald does not waive any objections to the use of her responses to the First

Set of Requests for Production of Documents in any trial or hearing in this lawsuit.

6.      Ms. McDonald incorporates these General Objections into each response to the First

Set of Requests for Production of Documents.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1**: Produce all documents constituting, evidencing,

reflecting, referring to, or relating to communications, whether written or oral, between You (or others

investigating the facts and circumstances of this action on Your behalf) and any person regarding any

of the facts or circumstances that give rise to the allegations in the Complaint.

> **RESPONSE**: **Objection.** Ms. McDonald objects to this request to the extent that it seeks
> documents protected by the attorney-client privilege, work product doctrine,
> and/or common interest privilege. Ms. McDonald further objects that the
> term "circumstances" is vague, ambiguous, and undefined. Plus, Defendants
> should have any documents between Ms. McDonald and Defendant. Subject
> to and without waiving these objections, please see attached documents.

**REQUEST FOR PRODUCTION NO. 2**: Produce all documents referenced in Your

responses to the Interrogatories or that You reviewed or relied upon in preparing Your responses to

the Interrogatories.

> **RESPONSE**: **Objection.** Ms. McDonald objects to this request to the extent that it seeks
> documents protected by the attorney-client privilege, work product doctrine,
> and/or common interest privilege. Subject to and without waiving these
> objections, please see attached documents.

**REQUEST FOR PRODUCTION NO. 3**: Produce all documents that You have received

pursuant to any subpoena issued in this Lawsuit.

> **RESPONSE**: Ms. McDonald has not receive any documents pursuant to a subpoena in this Lawsuit.

**REQUEST FOR PRODUCTION NO. 4**: Produce the insurance policy or policies You

contend is or are at issue in this Lawsuit.

> **RESPONSE**: After a reasonable search, Ms. McDonald does not have a copy of the applicable insurance policy. In addition, Defendant should have a copy of the insurance policy.

**REQUEST FOR PRODUCTION NO. 5**: Produce all documents reflecting, relating to, or

referring to the Claim.

> **RESPONSE**: **Objection.** Ms. McDonald objects to this request to the extent that it seeks documents protected by the attorney-client privilege, work product doctrine, and/or common interest privilege. Subject to and without waiving these objections, please see attached documents.

**REQUEST FOR PRODUCTION NO. 6**: Produce all documents reflecting or relating to

payments tendered by Defendant in connection with the Claim.

> **RESPONSE**: Ms. McDonald states that she conducted a reasonable search for responsive documents and does not have any responsive documents at this time.

**REQUEST FOR PRODUCTION NO. 7**: Produce all documents reflecting or relating to

any appraisals or valuations You obtained of the Vehicle, other than the valuation(s) performed by

Defendant.

> **RESPONSE**: Ms. McDonald did not obtain any appraisals or valuations of the Vehicle.

**REQUEST FOR PRODUCTION NO. 8**: Produce all documents relating to any claim You

have submitted to any insurance company for property damage to an automobile within the last six

(6) years.

> **RESPONSE**: **Objection.** Ms. McDonald objects that this request is overly broad and unduly burdensome in that it provides a 6-year time period. Ms. McDonald further objects that this request seeks irrelevant information that is not likely to lead

3

to the discovery of admissible evidence. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle and Defendants' claims adjustment and valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Ms. McDonald's prior insurance claims, if any, have absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, Defendants' defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this request is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and expense on Ms. McDonald outweighs any likely benefit. Subject to and without waiving these objections, please see documents attached. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 9**: Produce all documents that support Your allegation in Paragraph 67 of the Complaint about the Projected Sold Adjustment's supposed "impropriety and arbitrariness."

**RESPONSE**: Documents that are responsive to this request are in Defendants' possession. Ms. McDonald also refers United Financial to Mr. Thurston's response to this same request, which is incorporated herein. Ms. McDonald further responds by referring United Financial to Jason Merrit's expert report and to publicly available information. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 10**: Produce all documents that support Your allegation in Paragraph 64 of the Complaint that the Projected Sold Adjustment "has no rational basis" and "especially in the current market, where used cars are only available at a significant premium."

**RESPONSE**: Documents that are responsive to this request are in Defendants' possession. Ms. McDonald further responds by referring United Financial to Jason Merrit's expert report and to publicly available information. Ms. McDonald also refers United Financial to Mr. Thurston's response to this same request, which is incorporated herein. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

4

**REQUEST FOR PRODUCTION NO. 11**: Produce all documents that support Your allegation in Paragraph 65 of the Complaint that "Progressive's Projected Sold Adjustments are also contrary to appraisal standards" and that "[t]here are several generally recognized and acceptable methodologies for determining actual cash value."

> **RESPONSE**: Documents that are responsive to this request are in Defendants' possession. Ms. McDonald further responds by referring United Financial to Jason Merrit's expert report and to publicly available information. Ms. McDonald also refers United Financial to Mr. Thurston's response to this same request, which is incorporated herein. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 12**: Produce all documents that support Your allegation in Paragraph 66 of the Complaint that "[a]ppraisers customarily use advertised prices to determine the value of comparable vehicles, and only make adjustments based on observed and verifiable data."

> **RESPONSE**: Documents that are responsive to this request are in Defendants' possession. Ms. McDonald further responds by referring United Financial to Jason Merrit's expert report and to publicly available information. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 13**: Produce all documents that support Your allegation in Paragraph 67 that "CCC Intelligent Solutions . . . does not apply projected sold adjustments in this manner."

> **RESPONSE**: Documents that are responsive to this request are in Defendants' possession. Ms. McDonald further responds by referring United Financial to Jason Merrit's expert report and to publicly available information. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 14**: Produce all documents that support Your allegation in Paragraph 68 that Plaintiff was "damaged by Progressive's failure to pay the true value of their cars by its use of" Projected Sold Adjustments.

> **RESPONSE**: Documents that are responsive to this request are in Defendants' possession. Ms. McDonald further responds by referring United Financial to Jason Merrit's expert report and to publicly available information. Ms. McDonald

5

also refers United Financial to Mr. Thurston's response to this same request, which is incorporated herein. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 15**: Produce all documents related to Your purchase of the Vehicle, including any documents related to the advertised and purchase prices of the Vehicle, payment arrangements for the Vehicle, financing for the Vehicle, and repairs performed on the Vehicle prior to purchase.

**RESPONSE**: **Objection.** Ms. McDonald objects that this request seeks irrelevant information that is not likely to lead to the discovery of admissible evidence. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle and Defendants' claims adjustment and valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Ms. McDonald's purchase of the Vehicle has absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, United Financial's defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this request is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and expense on Ms. McDonald outweighs any likely benefit. Subject to and without waiving these objections, Ms. McDonald does not have responsive documents at this time. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 16**: Produce all documents related to any damage to the Vehicle prior to the date you filed the Claim, including any documents related to repairs performed on the Vehicle.

**RESPONSE**: **Objection.** Ms. McDonald objects that this request is overly broad and unduly burdensome in that it provides no time limitation. Ms. McDonald further objects that this request seeks irrelevant information that is not likely to lead to the discovery of admissible evidence. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle and Defendants' claims adjustment and valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Prior damage to the Vehicle, if any, have absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, Defendants' defenses to the claims, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, this lawsuit, and the WorkCenter Total Loss. In addition,

6

Ms. McDonald objects that this request is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and expense on Ms. McDonald outweighs any likely benefit. This information is also available from public sources such as CarFax. In addition to the extent that there was any prior damage that was submitted as a claim, Defendants would have this information, as they were the insurers on the Vehicle. Subject to and without waiving these objections, Ms. McDonald does not have responsive documents at this time. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 17**: Produce all documents related to the February

28, 2019, motor vehicle accident referenced in the Complaint.

**RESPONSE**: Ms. McDonald states that she conducted a reasonable search for responsive documents and does not have any responsive documents at this time. The police report should be a matter of public access that Defendant can obtain.

**REQUEST FOR PRODUCTION NO. 18**: Produce all documents reflecting or relating to

any communications between You and Defendant regarding Defendant's methodology for valuing

total-loss claims under the insurance policy which You contend is at issue in this Lawsuit, including

(but not limited to) UFCC's use of WorkCenter Total Loss, whether or not so described.

**RESPONSE**: **Objection.** Ms. McDonald objects that the phrase "whether or not so described" is vague and ambiguous. Subject to and without waiving this objection, Ms. McDonald states that documents that are responsive to this request are in Defendants' possession. Ms. McDonald also refers United Financial to Mr. Thurston's response to this same request, which is incorporated herein. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement. Further responding to this request, Ms. McDonald states that she conducted a reasonable search for responsive documents and does not have any responsive documents at this time.

**REQUEST FOR PRODUCTION NO. 19**: Produce all documents reflecting or relating to

any representations Defendant made to You regarding the terms of the insurance policy that You

contend is at issue in this Lawsuit.

**RESPONSE**: Documents that are responsive to this request are in Defendants' possession. Ms. McDonald also refers United Financial to Mr. Thurston's response to this same request, which is incorporated herein. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 20**: Produce all documents reflecting or relating to any communications between You and any independent appraiser regarding the Vehicle or the Claim.

**RESPONSE**: Ms. McDonald states that there are no responsive documents.

**REQUEST FOR PRODUCTION NO. 21**: Produce all documents reflecting or relating to any communications between You and any other person regarding WorkCenter Total Loss, whether or not so described.

**RESPONSE**: **Objection.** Ms. McDonald objects that this request seeks documents that may be protected by the attorney-client privilege, work product, and/or common interest privilege. Ms. McDonald further objects that the phrase "whether or not described" is vague and ambiguous. Subject to and without waiving these objections, Ms. McDonald states that there are no responsive documents.

**REQUEST FOR PRODUCTION NO. 22**: Produce all documents reflecting or relating to any communications between You and any member of the Purported Class related to this Lawsuit.

**RESPONSE**: Please see attached documents.

**REQUEST FOR PRODUCTION NO. 23**: Produce all documents reflecting or relating to your engagement or retention of any counsel and Your fee arrangements with any counsel You retained in connection with the settlement of Your Claim and/or to represent You in this lawsuit, including but not limited to those counsel identified in your Response to Interrogatory No. 6.

**RESPONSE**: **Objection.** Ms. McDonald objects that the phrase "with any counsel You retained in connection with the settlement of Your Claim" is vague and unambiguous. Subject to and without waiving these objections, Ms. McDonald will produce documentation of fees pursuant to a court order and hearing on attorney's fees.

**REQUEST FOR PRODUCTION NO. 24**: Produce all documents on which You intend to rely at trial or at any hearing in connection with this Lawsuit, including (but not limited to) all documents. You may use to support Your motion for class certification.

**RESPONSE**: **Objection.** Ms. McDonald objects that this request seeks documents protected by the attorney-client privilege, work product doctrine, and common interest privilege. Subject to and without waiving these objections, Ms. McDonald has yet to identify her exhibits or documents that she will use at

8

trial, any hearing in this lawsuit, or to support the motion for class certification. Ms. McDonald will produced or identify exhibits pursuant to the Federal Rules of Civil Procedure, Local Rules, and/or the Court's trial order.

**REQUEST FOR PRODUCTION NO. 25**: Produce all documents reflecting or relating to any communication between You or Your counsel and any other person regarding this Lawsuit or the allegations of the Complaint, including, without limitation, communications with any lawyers involved in any other action against Defendant, its affiliates, or any other company that insures motor vehicles.

> **RESPONSE**: **Objection.** Ms. McDonald objects that this request seeks documents protected by the attorney-client privilege, work product doctrine, and common interest privilege. Ms. McDonald further objects that this request seeks irrelevant information that is not likely to lead to the discovery of admissible evidence. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle and Defendants' claims adjustment and valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Ms. McDonald's communications with other defense counsel involving United Financial, its affiliates, or any other company that insures motor vehicles, if any, has absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, Defendants' defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this request is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and expense on Ms. McDonald outweighs any likely benefit. Subject to and without waiving these objections, please see attached documents.

**REQUEST FOR PRODUCTION NO. 26**: Produce all documents reflecting or relating to any communications between You or Your counsel and any expert or fact witness to appear on Your behalf in this Lawsuit.

> **RESPONSE**: **Objection.** Ms. McDonald objects that this request seeks documents protected by the attorney-client privilege, work product doctrine, and common interest privilege. Plaintiffs have already provided the documents and information for their expert witness, Jason Merritt, required under Fed. R. Civ. 26. Subject to and without waiving these objections, Ms. McDonald will identify her fact witnesses pursuant to the Federal Rules of Civil Procedure, Local Rules, and/or the Court's trial order. Responding further, and subject to the preceding sentence, Ms. McDonald states that there are no responsive documents.

**REQUEST FOR PRODUCTION NO. 27**: Produce all documents provided to or received

from any expert You retained or consulted in connection with this Lawsuit.

RESPONSE: **Objection.** Ms. McDonald objects that this request seeks documents
protected by the attorney-client privilege, work product doctrine, and common
interest privilege. Plaintiffs have already provided the documents and
information for their expert witness, Jason Merritt, required under Fed. R. Civ.
26.

**REQUEST FOR PRODUCTION NO. 28**: Produce all documents reflecting or relating to

any alleged damages You seek in this Lawsuit.

RESPONSE: Ms. McDonald has not determined her damages in this matter. Discovery is
ongoing, and Ms. McDonald has not received complete responses to her
discovery requests propounded on Defendants. In addition, Ms. McDonald
refers United Financial to Jason Merritt's expert report.

**REQUEST FOR PRODUCTION NO. 29**: Produce copies of all complaints that You have

filed in any civil action other than this Lawsuit.

RESPONSE: **Objection.** Ms. McDonald objects that this request is overly broad and unduly
burdensome in that it provides no time limitation. Ms. McDonald further
objects that this request seeks irrelevant information that is not likely to lead
to the discovery of admissible evidence. This case is about Defendants' specific
adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle
and Defendants' claims adjustment and valuation of the total-loss vehicle,
including, without limitation, Defendants' use of the Projected Sold
Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Ms.
McDonald's prior lawsuits, if any, have absolutely nothing to do with any of
her claims or the class claims in this lawsuit, class certification, Defendants'
defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold
Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition,
Ms. McDonald objects that this request is not proportional to the needs of the
case, as described above. The information sought is not important to resolving
this case and the burden and expense on Ms. McDonald outweighs any likely
benefit.

**REQUEST FOR PRODUCTION NO. 30**: Produce all documents reflecting or relating to

any judicial determination that You were an adequate or inadequate class representative.

RESPONSE: Ms. McDonald states that there are no responsive documents.

**REQUEST FOR PRODUCTION NO. 31**: Produce all documents reflecting or relating to any automobile insurance policy You had in place covering the Vehicle at the time leading up to, during, and after the motor vehicle accident referenced in Paragraph 7 of the Complaint.

> **RESPONSE**: **Objection.** Ms. McDonald objects that this request is overly broad and unduly burdensome in that it seeks "all documents reflecting or relating to any automobile insurance policy . . ." In addition, Ms. McDonald objects that this request seeks documents that are irrelevant and not likely to lead to the discovery of admissible evidence in that it seeks automobile insurance for the Vehicle before and after the accident. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle under the applicable insurance policy (which Defendants have) and Defendants' claims adjustment and valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Ms. McDonald's other automobile insurance, if any, has absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, Defendants' defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this request is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and expense on Ms. McDonald outweighs any likely benefit. Subject to and without waiving these objections, Ms. McDonald states that she does not have a copy of the applicable insurance policy, but Defendants should have a copy of the insurance policy.

**REQUEST FOR PRODUCTION NO. 32**: Produce all documents related to the purchase of the Vehicle, including advertisements, sales contracts, window stickers, financing agreements, warranties, service contracts, and gap insurance.

> **RESPONSE**: **Objection.** Ms. McDonald objects that this request seeks documents that are irrelevant and not likely to lead to the discovery of admissible evidence in that it seeks documents relating to the purchase of the Vehicle. This case is about Defendants' specific adjustment of Ms. McDonald' claim for coverage for her total-loss vehicle and Defendants' claims adjustment and valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Ms. McDonald's purchase of the Vehicle and documents relating to the purchase have absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, Defendants' defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this request is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and

expense on Ms. McDonald outweighs any likely benefit. Finally, this request is duplicative of Request No. 15. Subject to and without waiving these objections, Ms. McDonald does not have responsive documents at this time. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 33**: Produce all documents relating to the purchase of any other vehicles You have purchased in the last 10 years, including advertisements and sales contracts.

RESPONSE: **Objection.** Ms. McDonald objects that this request is overly broad and unduly burdensome in that it seeks documents going back 10 years. In addition, Ms. McDonald objects that this request seeks documents that are irrelevant and not likely to lead to the discovery of admissible evidence in that it seeks documents relating to the purchase of other vehicles going back 10 years. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle and Defendants' claims adjustment and valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Ms. McDonald's purchase of other vehicles and documents relating to those purchases have absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, Defendants' defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this request is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and expense on Ms. McDonald outweighs any likely benefit. Also, the term "vehicle" is vague, ambiguous, and undefined. Subject to and without waiving these objections, Ms. McDonald does not have responsive documents at this time. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 34**: Produce all documents and correspondence exchanged between You and anyone acting on Your behalf with any lienholder regarding Your Vehicle.

RESPONSE: **Objection.** Ms. McDonald objects that this request seeks documents that are irrelevant and not likely to lead to the discovery of admissible evidence in that it seeks documents relating to documents and correspondence exchanged with any lienholder on the Vehicle. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle and Defendants' claims adjustment and valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Documents

12

and correspondence with any lienholder on the Vehicle, if any, have absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, Defendants' defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this request is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and expense on Ms. McDonald outweighs any likely benefit. Subject to and without waiving these objections, Ms. McDonald does not have responsive documents at this time. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

**REQUEST FOR PRODUCTION NO. 35**: Produce all documents and correspondence exchanged between You and anyone acting on Your behalf with any gap insurance provider regarding Your Vehicle.

RESPONSE: **Objection.** Ms. McDonald objects that this request seeks documents that are irrelevant and not likely to lead to the discovery of admissible evidence in that it seeks documents relating to gap insurance. Ms. McDonald further objects that the terms "gap insurance" and "gap insurance provider" are vague, ambiguous, and undefined. Subject to and without waiving these objections, Ms. McDonald states that she had a gap insurance policy for her Vehicle. Further responding, Ms. McDonald conducted a reasonable search for the "gap insurance" policy and does not have a copy. Responding further, Ms. McDonald does not have communications with the "gap insurance provider" at this time. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement.

Respectfully submitted,

/s/ John Z. Steed
John Z. Steed, Esq. (Bar No. 5399)
**Island Justice**
P.O. Box 711 / 40 School Street
Stonington, ME 04681
Telephone: (207) 200-7077
john@islandjusticelaw.com

/s/ Scott C. Borison
Scott C. Borison (Maryland Bar No. 22596)
**Borison Firm LLC**
1400 S. Charles St.
Baltimore MD 21230
Telephone: (301) 620-1016
scott@borisonfirm.com

/s/ Ronald I. Frederick
Ronald I. Frederick (Ohio Bar No. 0063609)
Brian E. Roof (Ohio Bar No. 0071451)
**Frederick & Berler LLC**
767 E. 185th Street
Cleveland, Ohio 44119
Telephone: (216) 502-1055
ronf@clevelandconsumerlaw.com
brianr@clevelandconsumerlaw.com

*Counsel for Plaintiff Matthew Thurston*

14

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September 2024 a service copy has been sent via

electronic mail to the following:

Jeffrey S. Cashdan*
Zachary A. McEntyre*
J. Matthew Brigman*
Allison Hill White*
Allexia Bowman Arnold*
**King & Spalding LLP**
jcashdan@kslaw.com
zmcentyre@kslaw.com
mbrigman@kslaw.com
awhite@kslaw.com
abowmanarnold@kslaw.com

Julia C. Barrett*
**King & Spalding LLP**
jbarrett@kslaw.com

Thomas S. Marjerison
**Norman, Hanson & Detroy, LLC**
tmarjerison@nhdlaw.com

*Counsel for Defendants*

*Admitted pro hac vice

15

DEPOSITION
EXHIBIT
12
9-19-24 6M

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MAINE

MATTHEW THURSTON, individually and on
behalf of others similarly situated,

        Plaintiff,

v.

PROGRESSIVE CASUALTY INSURANCE
COMPANY and UNITED FINANCIAL
CASUALTY COMPANY,

        Defendants.

Docket No. 1:22-cv-00375-NT

### PLAINTIFF GENEVIEVE MCDONALD'S AMENDED RESPONSES AND OBJECTIONS TO DEFENDANT UNITED FINANCIAL CASUALTY COMPANY'S FIRST SET OF INTERROGATORIES

NOW COMES Plaintiff Genevieve McDonald ("**Plaintiff**" or "**Ms. McDonald**"), by and through the undersigned counsel, and hereby respectfully submits her objections and responses to Defendant United Financial Casualty Company's ("**United Financial**") First Set of Interrogatories.

### GENERAL OBJECTIONS

1.    Ms. McDonald objects to United Financial's First Set of Interrogatories, Instructions, and Definitions to the extent that they place a burden on Ms. McDonald that is broader and greater than required under the Federal Rules of Civil Procedure. Ms. McDonald will respond to the First Set of Interrogatories in compliance with the Federal Rules of Civil Procedure.

2.    Ms. McDonald also objects to paragraph 1 of the Instructions. United Financial does not get to dictate what objections are waived or not.

3.    Ms. McDonald also objects to the First Set of Interrogatories to the extent that they seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

1

4.      Ms. McDonald objects to the extent that the First Set of Interrogatories seek information protected by the attorney-client privilege, work product, common interest privilege, and any and all other applicable privileges.

5.      Ms. McDonald objects to the extent that the First Set of Interrogatories seek confidential and proprietary information. Ms. McDonald will provide such confidential and proprietary information subject to the Protective Order.

6.      Ms. McDonald does not waive any objections to the use of her responses to the First Set of Interrogatories in any trial or hearing in this lawsuit.

7.      Ms. McDonald incorporates these General Objections into each response to the First Set of Interrogatories.

## INTERROGATORIES

**INTERROGATORY NO. 1**: Identify all person(s) whom You have interviewed in connection with this case. If You obtained any written or oral statements from any of those persons, please identify the person(s) who provided the statement and the dates of the statement.

> **ANSWER:**      **Objection.** Ms. McDonald objects that this interrogatory seeks information protected by the work product doctrine and common interest privilege. Subject to and without waiving this objection, Ms. McDonald states none.

**INTERROGATORY NO. 2**: Identify and describe all actions You took to verify the deductions and adjustments reflected on the Mitchell Report, including but not limited to any communications with the sellers of the comparable vehicles reflected in the Mitchell Report.

> **ANSWER:**      Ms. McDonald did not have communications with the sellers of the comparable vehicles and did not verify the deductions and adjustments reflected on the Mitchell Report. In further response, this interrogatory is more appropriate for the expert witness. Ms. McDonald refers to Jason Merritt's expert report, expert testimony, and expert opinions.

2

**INTERROGATORY NO. 3**: Have You (or your attorneys) communicated with persons who may be members of the Purported Class? If so, describe each such communication, including (but not limited to) the identity of the person(s) with whom You communicated, the date of the communication(s), and the nature of the communication(s).

**ANSWER**:     Yes. Please see attached documents.

**INTERROGATORY NO. 4**: Explain in detail the procedure(s) You propose for identifying persons whose automotive total-loss claims UFCC undervalued as a result of its use of a Projected Sold Adjustment in connection with the valuation of those persons' claims.

**ANSWER**:     This is interrogatory seeks information that is in United Financial's custody and control. United Financial's representatives have testified to this topic in their depositions and declaration and admitted such information in its Answer. The interrogatory is also a legal issue that Ms. McDonald's attorneys will address in the Motion for Class Certification.

**INTERROGATORY NO. 5**: Describe in detail Your damages, how Your damages should be calculated, and how You contend the damages should be calculated for each member of the Purported Class.

**ANSWER**:     Discovery is early in this case, and Ms. McDonald has not yet determined her damages. In addition, Ms. McDonald refers United Financial to Mr. Merritt's expert report.

**INTERROGATORY NO. 6**: Identify the date on which You retained counsel in connection with the settlement of Your Claim and/or to represent You in this lawsuit.

**ANSWER**:     **Objection.** Ms. McDonald objects that this interrogatory seeks irrelevant information that is not likely to lead to the discovery of admissible evidence. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle and Defendants' claims adjustment and valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Ms. McDonald's retention of counsel has absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, United Financial's defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this interrogatory is not proportional to the needs of the case, as described above.

3

The information sought is not important to resolving this case and the burden
and expense on Ms. McDonald outweighs any likely benefit. Ms. McDonald
further objects that the interrogatory is vague and ambiguous relating to
"retained counsel in connection with the settlement of Your Claim." Subject
to and without waiving these objections, Ms. McDonald retained counsel for
this lawsuit on or about February 10, 2024.

**INTERROGATORY NO. 7**: Other than the Claim, have You ever submitted a claim to an

insurance company for property damage to an automobile? If so, provide the basis for the claim(s),

provide the date(s) on which the claim(s) was submitted, identify the insurance company to which the

claim(s) was submitted, identify the counsel representing You in connection with the claim(s) (if any)

and describe in detail how the claim was resolved.

ANSWER:     **Objection.** Ms. McDonald objects that this interrogatory is overly broad and
unduly burdensome in that it provides no time limitation. Ms. McDonald
further objects that this interrogatory seeks irrelevant information that is not
likely to lead to the discovery of admissible evidence. This case is about
Defendants' specific adjustment of Ms. McDonald's claim for coverage for her
total-loss vehicle and Defendants' claims adjustment and valuation of the total-
loss vehicle, including, without limitation, Defendants' use of the Projected
Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Ms.
McDonald's prior insurance claims, if any, have absolutely nothing to do with
any of her claims or the class claims in this lawsuit, class certification, United
Financial's defenses to the claims, this lawsuit, and Defendants' use of the
Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total
Loss. In addition, Ms. McDonald objects that this interrogatory is not
proportional to the needs of the case, as described above. The information
sought is not important to resolving this case and the burden and expense on
Ms. McDonald outweighs any likely benefit.

Subject to and without these objections and to the best of her recollection, Ms.
McDonald does not recall at this time any claims made on the Vehicle (the one
at issue). For the Vehicle (the one at issue), Defendants were the insurers and
would have all the information and documents, to the extent that there was a
claim made.

The following is the information for other claims to the best of Ms.
McDonald's recollection:
• In or around December of 2022, a Dodge RAM was involved in a single
car accident, which was a total loss. Geico was the insurer. Ms. McDonald
did not have counsel for this claim. The lien holder received full payment
with potential left over money possibly received by Ms. McDonald.

4

- In or around September of 2023, a 2019 GMC Yukon was involved in a single car accident, resulting in a damage claim. Progressive was the insurer. Ms. McDonald did not have counsel for this claim. Insurance covered the repairs to the Yukon.

- In or around February of 2024, a 2019 Dodge RAM was involved in a single car accident, resulting in a damage claim. Progressive was the insurer. Ms. McDonald did not have counsel for this claim. Insurance covered the repairs to the Dodge RAM.

In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement her response.

**INTERROGATORY NO. 8**: Identify how and when You came to learn of the law firms

Island Justice, Frederick & Berler, LLC, and Borison Firm, LLC.

**ANSWER**: **Objection.** Ms. McDonald objects that this interrogatory seeks irrelevant information that is not likely to lead to the discovery of admissible evidence. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle and Defendants' claims adjustment and valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. How and when Ms. McDonald learned of her attorneys have absolutely nothing to do with any of her claims or the class claims in this lawsuit, the Second Amended Class Action Complaint, United Financial's defenses, class certification, this lawsuit, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this interrogatory is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and expense on Ms. McDonald outweighs any likely benefit. Subject to and without waiving these objections, Ms. McDonald states that she responded to a Facebook post by Mr. Steed on or about December 29, 2023. Please see attached documents.

**INTERROGATORY NO. 9**: Identify each vehicle You have purchased in the prior ten (10)

years and for each provide the seller of the vehicle, the list price of the vehicle, and the price You

actually paid for the vehicle.

**ANSWER**: **Objection.** Ms. McDonald objects that this interrogatory is overly broad and unduly burdensome in that it provides a ten-year period. Ms. McDonald further objects that this interrogatory seeks irrelevant information that is not likely to lead to the discovery of admissible evidence. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle and Defendants' valuation of the total-loss vehicle, including,

without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Ms. McDonald's purchase of prior vehicles, if any, have absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, United Financial's defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this interrogatory is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and expense on Ms. McDonald outweighs any likely benefit. Ms. McDonald objects that the term "vehicle" is vague, ambiguous, and undefined. Subject to and without waiving these objections and to the best of her recollection, Ms. McDonald purchased the following vehicles: Toyota Tundra; Hyundai Santa Fe; GMC Acadia; Dodge RAM; 2019 GMC Yukon; and 2019 Dodge RAM. Ms. McDonald does not recall at this time any of the details of the list and purchase prices of these vehicles. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement her response.

**INTERROGATORY NO. 10**: For each vehicle identified in response to Interrogatory No.

9, list whether the vehicle was financed, leased, or purchased with cash.

**ANSWER:** Please see objections to Interrogatory No. 9. Further, whether the prior vehicles were financed, leased, or purchased with cash is even further irrelevant and not proportional to the needs of the case as described above in Ms. McDonald's Answer to Interrogatory No. 9. Subject to and without waiving these objections and to the best of her recollection, the Toyota Tundra was financed, the Hyundai Santa Fe was purchased with cash, the GMC Acadia was financed, the Dodge RAM was financed, the 2019 GMC Yukon is financed, and the 2019 Dodge RAM is financed.

**INTERROGATORY NO. 11**: Identify any damage the Vehicle sustained at any time prior

to the February 28, 2019, motor vehicle accident referenced in the Complaint, and state

whether any such damage was repaired prior to that accident.

**ANSWER:** **Objection.** Ms. McDonald objects that this interrogatory is overly broad and unduly burdensome in that it provides no time limitation. Ms. McDonald further objects that this interrogatory seeks irrelevant information that is not likely to lead to the discovery of admissible evidence. This case is about Defendants' specific adjustment of Ms. McDonald's claim for coverage for her total-loss vehicle and Defendants' valuation of the total-loss vehicle, including, without limitation, Defendants' use of the Projected Sold Adjustment, the Mitchell Report, and the WorkCenter Total Loss. Prior damages to Ms. McDonald's vehicle, if any, have absolutely nothing to do with any of her claims or the class claims in this lawsuit, class certification, United Financial's defenses to the claims, this lawsuit, and Defendants' use of the Projected Sold

Adjustment, the Mitchell Report, and the WorkCenter Total Loss. In addition, Ms. McDonald objects that this interrogatory is not proportional to the needs of the case, as described above. The information sought is not important to resolving this case and the burden and expense on Ms. McDonald outweighs any likely benefit. Subject to and without waiving these objections and to the best of her recollection, Ms. McDonald does not remember at this time any prior damage to her Vehicle. Defendants were the insurers for the Vehicle and would have the requested information. She is not stating that there was no prior damage, but that she cannot remember any at this time. Again, Defendants have the requested information. In addition, discovery is ongoing, and Ms. McDonald reserves the right to supplement her response.

As to Objections,

/s/ John Z. Steed
John Z. Steed, Esq. (Bar No. 5399)
**Island Justice**
P.O. Box 711 / 40 School Street
Stonington, ME 04681
Telephone: (207) 200-7077
john@islandjusticelaw.com

/s/ Scott C. Borison
Scott C. Borison (Maryland Bar No. 22596)
**Borison Firm LLC**
1400 S. Charles St.
Baltimore MD 21230
Telephone: (301) 620-1016
scott@borisonfirm.com

/s/ Ronald I. Frederick
Ronald I. Frederick (Ohio Bar No. 0063609)
Brian E. Roof (Ohio Bar No. 0071451)
**Frederick & Berler LLC**
767 E. 185th Street
Cleveland, Ohio 44119
Telephone: (216) 502-1055
ronf@clevelandconsumerlaw.com
brianr@clevelandconsumerlaw.com

*Counsel for Plaintiffs*

7

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September 2024 a service copy has been sent via

electronic mail to the following:

Jeffrey S. Cashdan*
Zachary A. McEntyre*
J. Matthew Brigman*
Allison Hill White*
Allexia Bowman Arnold*
**King & Spalding LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
P: (404) 572-4600
jcashdan@kslaw.com
zmcentyre@kslaw.com
mbrigman@kslaw.com
awhite@kslaw.com
abowmanarnold@kslaw.com

Julia C. Barrett*
**King & Spalding LLP**
500 W. 2nd Street, Suite 1800
Austin, Texas 78701
P: (512) 457-2000
jbarrett@kslaw.com

Thomas S. Marjerison
**Norman, Hanson & Detroy, LLC**
2 Canal Plaza
P.O. Box 4600
Portland, Maine 04112
P: (207) 774-7000
tmarjerison@nhdlaw.com

*Counsel for Defendants*

*Admitted pro hac vice