Case 1:22-cv-00375-NT    Document 120-13    Filed 01/10/25    Page 1 of 100    PageID
#: 4804
Robert Scott Thurston                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 1

1                 UNITED STATES DISTRICT COURT

2                          FOR THE

3                     DISTRICT OF MAINE

4

5

6         * * * * * * * * * * * * * *

      MATTHEW THURSTON              *

7          PLAINTIFF,              *    CIVIL ACTION NO.:

                                   *      1:22-CV-00375-NT

8                                  *

      VERSUS                       *

9                                  *

      PROGRESSIVE CASUALTY         *

10    INSURANCE COMPANY and        *

      UNITED FINANCIAL CASUALTY    *

11    COMPANY                      *

          DEFENDANT.

12        * * * * * * * * * * * * * *

13

14        The deposition of Robert Scott Thurston taken

15    in connection with the captioned cause via Zoom

16    teleconferencing from East Baton Rouge Parish, State

17    of Louisiana, pursuant to the following stipulation

18    before Melissa J. David, Certified Court Reporter,

19    reporting remotely from East Baton Rouge, State of

20    Louisiana on the 18th day of December, 2023,

21    beginning at 9:04 a.m.

22

23        Reported by:

24        Melissa J. David

25        Certified Court Reporter

Robert Scott Thurston                              December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 2

1  APPEARANCES:
2     For the Defendant:
3        ALLISON HILL WHITE
           KING AND SPALDING, LLP
4        1180 Peachtree St., NE, Ste. 1600
           Atlanta, GA 30309
5        awhite@kslaw.com
6     For the Plaintiff:
7        JOHN STEED
           ISLAND JUSTICE LAW
8        40 School St.
           Stonington, ME 04681
9        john@islandjusticelaw.com
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                 I N D E X
2
3    STIPULATION ............................4
4    EXAMINATION BY:
5    MS. WHITE ...............................6
6    MR. STEED ..............................63
7    MS. WHITE .............................64
8    CERTIFICATION PAGE  ...................68
9
10
11              E X H I B I T S
12
13   Exhibit/No.                    Page No.
14   Exhibit 1 - State Farm Dec Page ............25
15   Exhibit 2 - Thurston008 ...................27
16   Exhibit 3 - Vehicle Valuation Report .......31
17   Exhibit 4 - Volvo Purchase Screen ..........35
18   Exhibit 5 - Email from Mr. Steed to ........46
                 Progressive
19
     Exhibit 6 - Check to Scott Thurston ........55
20
     Exhibit 7 - Letter enclosing check to ......56
21           Scott Thurston
22
23
24
25

Page 4

1              S T I P U L A T I O N
2    It is hereby stipulated by and among counsel for
3    plaintiff and counsel for the defense that the
4    deposition, via videoconferencing of
5            Robert Scott Thurston
6    be taken before Melissa J. David, Certified Court
7    Reporter, by counsel for the defense for all
8    purposes, pursuant to notice and to the provisions of
9    the appropriate statutes of the Code of Civil
10   Procedure of the State of Louisiana.
11   The parties hereto waive all formalities in
12   connection with the taking of said deposition,
13   excluding the reading and signing thereof, except the
14   swearing of the witness and the reduction of the
15   questions and answers to typewriting.
16   Per Article 1443 (D) of the Louisiana Code of Civil
17   Procedure, counsel for all parties reserve all
18   objections until trial or other use of the
19   deposition.
20
21            *       *       *
22   MELISSA J. DAVID, Certified Court Reporter in and for
23   the State of Louisiana, officiated in administering
24   the oath to the above-named witness.
25

Page 5

1    THE VIDEOGRAPHER:
2        Good morning.  We are going on the
3    record at 9:04 a.m. on December 18, 2023.
4    This is Media Unit Number One of the video
5    recorded deposition of Robert Scott
6    Thurston, taken by counsel for defendant
7    in the matter of Matthew Thurston versus
8    progressive Casualty Insurance Company and
9    United Financial Casualty Company, filed
10   in the United States District Court for
11   the District of Maine, case number
12   1:22-cv-00375-NT.
13       This deposition is being conducted
14   remotely using virtual technology.  My
15   name is Jason Ely and I'm the
16   videographer.  The court reporter is Missy
17   David.  Will counsel please identify
18   themselves for the record?
19   MS. WHITE:
20       Allison White with King and Spalding
21   for the defendants.
22   MR. STEED:
23       John Steed with Island Justice for
24   Scott Thurston.
25   THE VIDEOGRAPHER:

2 (Pages 2 - 5)

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 6

1      Will the court reporter please swear
2    in the witness?
3      Robert Scott Thurston,
4    After having been duly sworn, did affirm, and
5    testified as follows:
6      - EXAMINATION -
7  BY MS. WHITE:
8  Q.  Hey, good morning.  Is it Mr. Thurston or Dr.
9    Thurston?
10  A.  Well, most people call me doctor.
11  Q.  Okay.  I'll try to call you that today.  My name
12    is Allison White.  I represent the defendants in
13    this case, Progressive Casualty Insurance
14    Company and United Financial Casualty Company.
15    If I use the term "Progressive" today throughout
16    the deposition, will you understand that I'm
17    referring to United Financial Casualty Company?
18  A.  Yes.
19  Q.  Before we get started, I want to confirm that
20    you are now represented by counsel; is that
21    right?
22  A.  Yes.
23  Q.  Okay.  And when you and I spoke on the phone, I
24    believe it was the week before last, do you
25    remember telling me that you are not represented

Page 7

1    by counsel at that time?
2  A.  Yes.
3  Q.  Okay.  When did you retain counsel?
4  A.  Last night.
5  Q.  And what is the scope of your engagement; is it
6    limited to this deposition?
7  A.  John can answer.
8      MR. STEED:
9        Yeah, I'm just going to instruct him
10      not to answer that.
11      MS. WHITE:
12        I think we can ask him the scope of
13      the engagement if it's limited to this
14      deposition, or if it goes beyond that.
15  A.  It's limited to the scope of this deposition.
16  BY MS. WHITE:
17  Q.  Okay.  Did you sign an engagement letter?
18  A.  I did.
19  Q.  What are the terms of the engagement?
20  A.  I didn't read it.
21      MR. STEED:
22        I'm going to object to that and
23      instruct him not to answer any questions
24      about the terms or scope of the
25      engagement.

Page 8

1      MS. WHITE:
2        That's not privilege, John.
3      MR. STEED:
4        I believe it is.
5      MS. WHITE:
6        You think that the terms of an
7      engagement are privileged?
8      THE WITNESS:
9        Yes.
10      MS. WHITE:
11        Okay.  Well, we'll have to go to the
12      Court on that, because --
13      MR. STEED:
14        I mean, we can.
15      MS. WHITE:
16        I've seen a number of engagement
17      letters that are not privileged and
18      currently produced in litigation.
19      MR. STEED:
20        Sure.  After a court order.
21  BY MS. WHITE:
22  Q.  All right.  So, prior to last night, Mr. Steed
23    was just your son's lawyer, correct?
24  A.  I don't know the answer to that.  I assume he
25    was the lawyer for multiple people.

Page 9

1  Q.  But he was not your lawyer before last night,
2    right?
3  A.  Correct.
4  Q.  Whose idea was it to hire a lawyer in connection
5    with this deposition?
6      MR. STEED:
7        Again, objection.  I'm going to
8      instruct him not to answer that.
9      MS. WHITE:
10        That's not privileged if I ask him
11      whose idea it was to hire a lawyer.
12      MR. STEED:
13        I think it is.
14  A.  I didn't hire anyone.
15  BY MS. WHITE:
16  Q.  What do you mean when you say you didn't hire
17    anyone?
18  A.  I didn't hire anyone.  What does the word "hire"
19    mean?
20  Q.  Do you mean that you're not paying Mr. Steed?
21  A.  Correct.
22  Q.  Okay.  When I say hire, I mean engage Mr. Steed.
23    So, is last night when you first engaged Mr.
24    Steed to act as your counsel?
25  A.  Already answered.

3 (Pages 6 - 9)

Case 1:22-cv-00375-NT   Document 120-13   Filed 01/10/25   Page 4 of 100   PageID
#: 8097
Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 10

1  MR. STEED:
2      Yeah, and I'm just going to object to
3  all of these sort of scope and timeline on
4  representation.
5  MS. WHITE:
6      Why?
7  THE WITNESS:
8      Can I state something, that I have
9  other things to do today?
10 MS. WHITE:
11     I understand that but you've been
12 subpoenaed in this case. I hope that this
13 won't take very much of your time, but the
14 more objections that we get interrupting,
15 the longer this is going to take.
16     I just want to understand, because
17 last we talked you weren't represented.
18 And I got an email about an hour ago that
19 you are represented. So, just -- I'm
20 trying to get an idea of the timeline when
21 this happened.
22 MR. STEED:
23     Again, I don't think it matters that
24 much. But I also, again, because I don't
25 think it matters that much why are we

Page 11

1  doing this. He's represented now. His
2  conversations about getting prepared are
3  privileged. Think the scope and nature of
4  representation is privileged. And can we
5  just move on to the questions? I can't
6  imagine you have more than three or four.
7  BY MS. WHITE:
8  Q. I'm going to go back to my question. Whose idea
9     was it for you to hire counsel or engage
10    counsel?
11 MR. STEED:
12     Instruct him not to answer. So, if
13 you want to call the judge, I think it'll
14 be Magistrate Wolfe (spelled
15 phonetically), probably available.
16 MS. WHITE:
17     Okay. We will do that then.
18 MADAM COURT REPORTER:
19     Do you want to go off the record,
20 counsel, both counsel would like to go off
21 the record?
22 MS. WHITE:
23     We can stay on the record.
24 MADAM COURT REPORTER:
25     Okay. Are you guys going to make

Page 12

1  that phone call right now?
2  MS. WHITE:
3      Yes.
4  MADAM COURT REPORTER:
5      Okay. Mr. Steed, I just wanted to
6  say that I'm having a little bit of
7  trouble hearing you, so if you could speak
8  up or maybe get a little closer for me.
9  I'm sorry to have bothered you.
10 MR. STEED:
11     Okay. No, I apologize.
12 MADAM COURT REPORTER:
13     Thank you.
14 MS. WHITE:
15     Okay. We're looking up Chamber's
16 phone number. I'll go ahead and start
17 with my other questions and we'll circle
18 back to that.
19 BY MS. WHITE:
20 Q. All right. So, I'm going to ask questions
21    today, and I think it's helpful to discuss some
22    ground rules just to keep things running
23    smoothly. The court reporter is taking down
24    everything we say, so it's important that we
25    don't talk over each other. And you'll also

Page 13

1  need to answer all my questions with a verbal
2  response. If you don't understand a question
3  that I ask, please let me know, and I'm happy to
4  rephrase. If you don't say otherwise, I'll
5  assume that you understand the question; is that
6  fair?
7  A. Are you addressing me?
8  Q. That was a question, yes. Is that fair?
9  A. Yes.
10 Q. We'll plan to take a short break in about an
11    hour, but if you need a break before that, just
12    let me know. Before we take a break, I would
13    just ask that you answer any question that's
14    pending. Are you taking any medications that
15    would affect your ability to understand
16    questions and respond accurately?
17 A. No.
18 Q. Could you please state and spell your name for
19    the record?
20 A. Robert Scott Thurston, R-O-B-E-R-T, S-C-O-T-T,
21    T-H-U-R-S-T-O-N.
22 Q. Any other names you've ever gone by?
23 A. No.
24 Q. What is your marital Status, Mr. Thurston -- Dr.
25    Thurston?

4 (Pages 10 - 13)

Robert Scott Thurston                                          December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 14

1    A.  Married -- married.
2    Q.  And is your spouse Joann Thurston?
3    A.  Yes.
4    Q.  How long have you been married?
5    A.  Since 1987.  Thirty-Six years.
6    Q.  Do you have any children?
7    A.  Yes.
8    Q.  How many?
9    A.  Two.
10   Q.  Is one of your children Matthew Thurston?
11   A.  Yes.
12   Q.  And he's the plaintiff in this lawsuit, correct?
13   A.  Yes.
14   Q.  What's your current address?
15   A.  2304 Fairway Drive, Baton Rouge, Louisiana
16       70809.
17   Q.  Do you own that home?
18   A.  Yes.
19   Q.  How long have you lived there?
20   A.  Since 2008.
21   Q.  Anyone else lived there with you?
22   A.  No.
23   Q.  Does your wife live there?
24   A.  Yes.
25   Q.  Anybody else?

Page 15

1    A.  Anybody else what?
2    Q.  Does anybody else live there?
3    A.  No, I just said no previously.
4    Q.  Well, you said no one else lived there, and then
5        I said, well, does your wife live there.  So,
6        I'm just trying to clarify.  No one lives there
7        other than you and your wife, correct?
8    A.  Correct.
9    Q.  Do you own any other properties?
10   A.  Yes.
11   Q.  Where?
12   A.  I own land in Arkansas.  I own houses in Maine.
13   Q.  Where do you own houses in Maine?
14   A.  35 Cairns Lane, Little Deer Isle, 363 Norumbega
15       Road, Brooksville.
16   Q.  How often are you in Maine?
17   A.  About five months a year.
18   Q.  Do you typically spend Spring and Summer in
19       Maine?
20   A.  A little bit of Spring, Summer, and some of
21       Fall.
22   Q.  Okay.  Is there a specific schedule that you
23       follow when going to Maine?
24   A.  No.
25   Q.  You said earlier that you are Dr. Thurston; is

Page 16

1        that an MD?
2    A.  Yes.
3    Q.  Where did you receive your medical degree?
4    A.  Baylor College of Medicine in Houston, Texas.
5    Q.  Are you currently employed?
6    A.  No.
7    Q.  Are you retired?
8    A.  Yes.
9    Q.  When did you retire?
10   A.  2014.
11   Q.  Before you retired, what did you do?
12   A.  I was a cardiac surgeon.
13   Q.  Where did you work?
14   A.  I worked in Baton Rouge, Louisiana.
15   Q.  Do you work in a specific practice or hospital?
16   A.  Yes.
17   Q.  What's the name of your practice?
18   A.  CVT Surgical.
19   Q.  You mentioned before that you've been deposed
20       before.  How many times have you been deposed?
21   A.  I don't know.
22   Q.  You've been deposed more than ten times?
23   A.  I don't know.
24   Q.  You've been deposed more than five times?
25   A.  I would say so.

Page 17

1    Q.  And in your depositions, what was the subject of
2        your testimony?
3    A.  They were all malpractice suits.
4    Q.  Were you a party to those actions?
5    A.  Usually not.
6    Q.  Are you testifying as an expert in those
7        actions?
8    A.  In some of them.
9    Q.  Outside of your capacity as a cardiac surgeon,
10       have you ever been deposed?
11   A.  Yes.
12   Q.  And what was the context of that deposition?
13   A.  Before I was a cardiac surgeon during my
14       residency.
15   Q.  And what sort of case were you deposed in during
16       your residency?
17   A.  Let's see.  This gang banger had robbed somebody
18       at gunpoint, and then he claimed that because he
19       had a walking cast on his lower leg, that he
20       could not have committed the armed robbery.  And
21       the lawyers wanted to know how soon after a
22       walking cast had been placed on the defendant's
23       leg could he have committed an armed robbery.
24       And my answer was about forty-five minutes from
25       then on.

5 (Pages 14 - 17)

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 18

1   Q.  Okay.  So, your testimony in that case was still
2       in your capacity as a doctor?
3   A.  Yeah, I think they convicted him, too.
4   Q.  Okay.  Have you ever been a party to a lawsuit?
5   A.  Yes.
6   Q.  How many lawsuits have you been a party to?
7   A.  I don't know exactly.  You know, we had ten
8       surgeons in our practice, the largest
9       cardiovascular surgery practice in the state by
10      far.  There was never a time when some indigent
11      person wasn't trying to extort money from us.
12      So, we always had at least one or two lawsuits
13      against the group.  I usually wasn't a party to
14      any specific one at any specific time, but
15      probably party to maybe four altogether.
16  Q.  And were all four of the lawsuits that you've
17      been a party to, all medical malpractice
18      related?
19  A.  Yes.
20  Q.  Have you ever been a class member in a class
21      action lawsuit?
22  A.  No.
23  Q.  Other than the depositions that we previously
24      discussed, have you ever testified under oath?
25  A.  Well, I've testified in open court.  I guess

Page 19

1       that's not a deposition; is that correct?
2   Q.  It's not a deposition, but, yeah, you're right.
3   A.  Yeah, I have testified in open court under oath.
4   Q.  And your testimony in open court, were those all
5       for the cases we've discussed that were either
6       malpractice related, or in your capacity as a
7       doctor?
8   A.  Yes, the ones that went to trial.
9   Q.  Okay.
10  A.  None of which we lost, by the way.
11  Q.  Have you been convicted of any crimes?
12  A.  No.
13  Q.  Have you ever filed for bankruptcy?
14  A.  No.
15  Q.  What did you do to prepare for your deposition
16      today?
17  A.  Nothing.
18  Q.  Did you discuss today's deposition with your
19      son?
20  A.  No.
21  Q.  Did you discuss the deposition with your wife?
22  A.  No.  Other than to agree on what time she was
23      supposed to be here.
24  Q.  Okay.  Did you meet with your counsel?
25  A.  No.

Page 20

1   Q.  Has anyone else other than your counsel given
2       you advice on what to say or not to say today?
3   A.  No.
4   Q.  Do you know why your son is suing Progressive in
5       this case?
6   A.  I believe because he felt they were unfair in
7       their dealings.
8   Q.  When did your son first mention that he was
9       filing a lawsuit against Progressive?
10  A.  I don't know that.
11  Q.  Did your son tell you what made him decide to
12      file a lawsuit?
13  A.  I think that he and I discussed it.  It's been a
14      couple of years that nothing has happened, so
15      I'm going to state for the record, under oath,
16      that I don't have a very good memory.  But in
17      answer to the question he and I discussed the
18      fact that we did not think the car was totaled,
19      that it could have been repaired for a
20      reasonable amount of money, and that we could
21      have retained the car for it's, you know, and
22      had what was essentially an asset for its Blue
23      Book value.  But the insurance company insisted
24      the car be totaled.  That's what I remember.  It
25      didn't seem to be fair to either one of us.

Page 21

1   Q.  Okay.  Has your son told you what he hopes to
2       recover from Progressive in this lawsuit?
3   A.  No.
4   Q.  All right.  The total lost vehicle that's at
5       issue is a 2012 Volvo XC70, correct?
6   A.  Yes.
7   Q.  Is it okay if I refer to that car as the Volvo
8       throughout the deposition?
9   A.  Okay with me.
10  Q.  Who purchased the Volvo?
11  A.  Myself and my wife.
12  Q.  Where did you purchase it?
13  A.  In Baton Rouge, Louisiana.
14  Q.  And when did you purchase the vehicle?
15  A.  It was new.  We actually went to Sweden to pick
16      it up.  I mean, we paid for it in Baton Rouge,
17      but we picked it up in Sweden in that year,
18      2012, I think.
19  Q.  Okay.  So, you paid a dealership in Baton Rouge
20      and then you traveled to Sweden to pick up the
21      car?
22  A.  Yes.
23  Q.  Okay.
24  A.  Which I highly recommend, by the way.
25  Q.  Okay.  Why did you do it that way instead of

6 (Pages 18 - 21)

Robert Scott Thurston     December 18, 2023

Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 22

1   picking up the vehicle in the U.S.?
2   A.   Because they'll send you over there for free and
3    you get to spend a week in Sweden.
4   Q.   And how did you get the car home from Sweden?
5   A.   Volvo puts it on a ship.
6   Q.   Okay.
7   A.   Sends it to Georgia. Then they put it on a
8    truck, and bring it to Baton Rouge.
9   Q.   Okay. So, it was brand new at the time you
10    purchased it, right?
11   A.   Brand new.
12   Q.   Who was on the title?
13   A.   I'm not sure. I think maybe my wife's name is
14    on the title.
15   Q.   And who is on the vehicle registration?
16   A.   I don't know. I mean, either my wife or I.
17   Q.   Was the Volvo financed?
18   A.   No.
19   Q.   What options did the Volvo have?
20   A.   Few.
21   Q.   Did you say a few or few options?
22   A.   I said few.
23   Q.   Few options, okay. Can you think of any options
24    that you added?
25   A.   No.

Page 23

1   Q.   Who primarily drove the Volvo?
2   A.   My wife.
3   Q.   At what point did your son begin driving the
4    Volvo?
5   A.   He -- We gave him the car, and he came to Baton
6    Rouge to pick it up and drove it back to Maine
7    that month of January, whatever year it was '21,
8    maybe. So, I would say in the first or second
9    week of January of that year. If that's 2021,
10    I'm not sure.
11   Q.   The total loss accident at issue in the case
12    happened in January 2022.
13   A.   It was in '22?
14   Q.   Yes, sir.
15   A.   Okay. Yeah. It's almost been two years. It's
16    been a year and ten months, okay. Eleven
17    months.
18   Q.   So, you gave him the car in January 2022?
19   A.   Right. We gave him the car, like, one week
20    before he wrecked it.
21   Q.   When you say you gave him the car, what
22    do you mean by gave?
23   A.   I gave him the car and the title, and he drove
24    it back to Maine. And, you know, with the
25    expectation that he would register the car in

Page 24

1   Maine.
2   Q.   Did your son understand that you were giving him
3    the car to keep indefinitely?
4     THE VIDEOGRAPHER:
5      Ms. White, we lost Mr. Steed. His
6     Internet connection dropped.
7     MS. WHITE:
8      Okay. Cancel the question then.
9     THE VIDEOGRAPHER:
10      Off the record, the time is 9:28.
11      (Brief pause in deposition to
12       get Mr. Steed back on the video
13       call.)
14     THE VIDEOGRAPHER:
15      Back on the record, the time is 9:30.
16   A.   Okay. The answer is yes, indefinitely.
17   BY MS. WHITE:
18   Q.   Did you sign the title over to him?
19   A.   I believe so.
20   Q.   Who has the title now?
21   A.   I believe Matthew does. Well, I don't know.
22    Maybe Progressive has it. I'm not sure what's
23    happened. I don't know who has the car either.
24   Q.   Did your son ever understand that you or your
25    wife would borrow the Volvo when you were in

Page 25

1   Maine?
2   A.   I'm sorry. I didn't hear one of those words.
3   Q.   Sorry. Did your son understand that you would
4    be driving the Volvo when you were in Maine?
5   A.   No. We have several cars in Maine.
6   Q.   What other cars do you have in Maine?
7   A.   We have a Ford Escape that we keep there all the
8    time. And then we have whatever car we drive
9    there which is normally my Buick Enclave. And
10    my mother has a car. She's 95. She doesn't
11    drive very much. That also stays in Maine.
12    That's a Honda.
13   Q.   Okay. I'm going to show you a document. Sorry.
14    It's not letting me screen share.
15   A.   That's okay. You can just tell me. I believe
16    you.
17   Q.   Okay. All right. I'm showing you a document
18    that we will mark as "Exhibit 1".
19     (Exhibit Number Exhibit 1 was
20      marked for identification
21      purposes.)
22   BY MS. WHITE:
23   Q.   Happy to zoom in so that you have a clear view
24    of it. Do you recognize this document?
25   A.   Yeah. I asked the insurance company for it for

7 (Pages 22 - 25)

Robert Scott Thurston                                                December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 26

1    this purpose so that you could have it.
2    Q.  Is this the declarations page for your State
3        Farm policy?
4    A.  It appears to be.
5    Q.  Okay.  And this declarations page says that the
6        policy period is January 21, 2022 to July 1,
7        2022, correct?
8    A.  Correct.
9    Q.  Did the prior policy expire January 21, 2022?
10   A.  Well, I don't know how the policies worked.  I
11       assume it expired on the 20th or the 21st.
12   Q.  Okay.  And this declarations page lists the 2012
13       Volvo XC70, right?
14   A.  Yes.
15   Q.  And the declarations page shows that the Volvo
16       had comprehensive and collision coverage; is
17       that right?
18   A.  Yes.
19   Q.  All right.  If we look at the very bottom of the
20       page, do you see where it says, prepared
21       February 9, 2022?
22   A.  Okay.
23   Q.  Does this mean that as of February 9, 2022, you
24       still had insurance coverage with State Farm on
25       the Volvo?

Page 27

1    A.  I don't know.  You'd have to ask Sam Daily.
2    Q.  Sam Daily being your insurance agent?
3    A.  Yes.
4    Q.  All right.  I'm going to show you another
5        document.  This one will be "Exhibit 2", and it
6        is Bates labeled Thurston008.
7            (Exhibit Number Exhibit 2 was
8             marked for identification
9             purposes.)
10   BY MS. WHITE:
11   Q.  It's just very hard to see at the bottom of the
12       page.  Do you recognize this document?
13   A.  I guess.
14   Q.  Is this a renewal notice for your State Farm
15       policy?
16   A.  Is it a renewal notice?  I guess that's what it
17       is, yes.
18   Q.  Okay.  And the policy period here is July 21,
19       2022 to January 21, 2023, correct?
20   A.  Correct.
21   Q.  And this renewal page refers to the 2012 XC70,
22       right?
23   A.  Correct.
24   Q.  If you look just above this dotted line right
25       here, do you see where it says prepared May 31,

Page 28

1    2022?
2    A.  Yes.
3    Q.  Do you understand this to mean that as of May
4        31, 2022, you still had coverage with State Farm
5        for the Volvo?
6    A.  I don't know.  I don't know.  I don't know if we
7        paid that renewal notice or not.
8    Q.  So, even if you didn't renew to have coverage in
9        July, 2022, this suggests you had coverage at
10       least until May 31, 2022, right?
11   A.  I guess so.
12   Q.  When did you find out about the accident
13       involving the Volvo?
14   A.  I guess whatever day it happened.  Matthew
15       called us.
16   Q.  And what did he tell you about the accident?
17   A.  He said that he was driving near the Brooksville
18       Elementary School, and that a lady had turned in
19       front of him.  It was wintertime.  It was icy
20       and he had to veer the car to the right, and it
21       went off the road and hit a tree.  I believe
22       that's what he told me.
23   Q.  Okay.  Did he tell you that the other driver was
24       at fault for turning in front of him?
25   A.  I know that he felt that to be the case.

Page 29

1    Q.  Do you know if your son filed a claim with the
2        other driver's insurance company?
3    A.  I do not.
4    Q.  Did your son file a claim with State Farm?
5    A.  I don't think so.
6    Q.  Why not?
7    A.  I assume that he didn't know that it was still
8        insured.  Neither did my wife and I, for that
9        matter.
10   Q.  So, you and your wife believed that the Volvo
11       was no longer insured by State Farm?
12   A.  That's what I would have said at the time, but
13       we always pay all our bills right on time, and
14       I'm just not surprised.  I didn't know the car
15       was insured by State Farm when he crashed it I
16       don't believe.
17   Q.  Did you or --
18   A.  Joann -- let me say, Allison, Joann might know
19       better because Joann takes care of all the bills
20       and all the things related to insurance.  And
21       so, I'm not the person to ask about that.  Joann
22       might have known the car was insured.
23   Q.  Okay.  Whose idea was it to file a claim with
24       Progressive?
25   A.  Matthew's.

8 (Pages 26 - 29)

Robert Scott Thurston                                        December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 30

1  Q.  Did you think that Progressive would deny
2      coverage since Volvo was not on Matthew's
3      policy?
4  A.  No. No.
5  Q.  Did you know that the Volvo was not on Matthew's
6      policy at the time of the accident?
7  A.  No.
8  Q.  Was it your understanding that he would add the
9      Volvo to his Progressive insurance policy right
10     after you gave him the car?
11 A.  He and I didn't discuss that.
12 Q.  I believe you said earlier that you disagreed
13     with Progressive's determination that the Volvo
14     was a total loss; is that right?
15 A.  Yeah. I don't have any specific knowledge of
16     the industry, but it didn't seem correct to me.
17 Q.  Did you tell Progressive that you disagreed and
18     you thought the Volvo was repairable?
19 A.  I didn't tell Progressive anything. I let
20     Matthew handle it.
21 Q.  Okay.
22 A.  But that's my recollection.
23 Q.  But you did interact with a Progressive
24     representative in some respects, correct?
25 A.  I can't really remember that. If you know that

Page 31

1      to be the case, then I'll agree.
2  Q.  We'll go through some documents in a moment that
3      may refresh your recollection on that. Did
4      Progressive provide you a copy of their
5      valuation report for the Volvo?
6  A.  I can't remember that.
7  Q.  Going to show you a document.
8  A.  All right.
9  Q.  I'm showing you a document that will mark as
10     "Exhibit 3".
11         (Exhibit Number Exhibit 3 was
12          marked for identification
13          purposes.)
14 BY MS. WHITE:
15 Q.  Do you recognize this document?
16 A.  Allison, I can't remember if I saw that document
17     or not. But I do know that in my mind, the
18     approximate value that Progressive had offered
19     was that number 12,800.
20 Q.  Okay. Did Progressive make a settlement offer
21     to you of the $12,824.37?
22 A.  Well, I don't remember them making an offer to
23     me.
24 Q.  Did you understand that at the time of the
25     accident, you were still the titled owner of the

Page 32

1      Volvo?
2  A.  No, I didn't understand that. I mean, I can't
3      remember if I actually had signed the title or
4      not, but I assume I signed the title over to
5      Matthew, so I assume that I wasn't the owner.
6  Q.  So, you disagreed with the amount that
7      Progressive was offering for the Volvo?
8  A.  Yes.
9  Q.  Okay. I want to walk through this report,
10     Progressive's valuation report, to get an
11     understanding of what it was that you disagreed
12     with. So, if you look here where it says versus
13     loss vehicle adjustments, it says base value
14     $13,231.80. Do you disagree that that is the
15     base value of a 2012 Volvo XC70?
16 A.  In January of 2022, yes.
17 Q.  Okay. And why did you disagree with that value?
18 A.  Just from looking, doing Internet search and
19     looking at Kelley Blue Book.
20 Q.  When you say Internet search, where did you
21     look?
22 A.  Oh, I don't remember. I mean, however one looks
23     up the value of a used car.
24 Q.  All right. The next line down says condition,
25     and they deducted $462.43. Do you disagree with

Page 33

1      that deduction?
2  A.  I don't know what it was for.
3  Q.  Okay. We'll get to the specifics in a moment.
4      This also shows that $55.00 was added for
5      aftermarket parts. Do you disagree with that
6      value?
7  A.  I have no idea what that means.
8  Q.  Okay. All right. I want to look at the next
9      page. It says Loss Vehicle Detail. For this
10     page and the following page, it lists all the
11     standard equipment. And my question to you --
12     I'll give you a second to scroll through and
13     zoom in if you'd like. My question is: Did the
14     Volvo have all the features that were listed
15     here under standard equipment?
16 A.  Yes.
17 Q.  Did the Volvo have any options or packages that
18     are not listed here?
19 A.  No.
20 Q.  So, it was just the base model Volvo, correct?
21 A.  As far as I remember.
22 Q.  All right. On Page Three of the report, it
23     lists three other Volvo XC70s. Do you see that?
24 A.  Yes.
25 Q.  Do you believe that these were improper

9 (Pages 30 - 33)

Robert Scott Thurston                              December 18, 2023

Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 34

1    comparable vehicles to use to value the Volvo?
2  A.  Absolutely, since they all have nearly twice as
3      many miles as the Volvo in question.
4  Q.  Okay.  If you look at comparable vehicles one
5      and two, those are Volvo XC70 Premiere Plus
6      models.  Was your Volvo a Premiere Plus?
7  A.  I don't think so.
8  Q.  And the third comparable vehicle is a Volvo XC70
9      Premiere.  Was your Volvo a Premier?
10 A.  I don't think so.  Unless you know that to be
11     the case.  I don't remember.
12 Q.  I'm going to start with Page Six which might
13     help, okay.  Here we have sub model comparison,
14     and it shows the 2012 Volvo XC70 as compared to
15     a Volvo XC70 Premiere Plus and a Volvo XC70
16     Premiere.  Do you see that?
17 A.  Yes.
18 Q.  And it shows the original MSRP for the base
19     model, the Premier Plus, and the Premier.  Do
20     you see that?
21 A.  Yes.
22 Q.  So, you think that your Volvo was the base
23     model; is that right?
24 A.  I think so.  I went to the dealership and I had
25     the fellow print out what we had paid for it.

Page 35

1  Q.  Okay.
2  A.  And somebody has that information, presumably
3      you do, too.  I don't know.
4  Q.  I do.  One moment and I'll pull it up.  Okay.
5      Can you see the document that we will mark as
6      "Exhibit 4"?
7          (Exhibit Number Exhibit 4 was
8               marked for identification
9               purposes.)
10 A.  I see that we paid $38,674.00 which is not the
11     same as the $32,000.00 you had next to the
12     standard base vehicle.  So, it's possible that
13     our vehicle had extra things added to it.
14 BY MS. WHITE:
15 Q.  Okay.  So, first I'm showing you a document
16     marked as "Exhibit 4".  What is that?
17 A.  This is a printout that was made recently in the
18     last few months from the dealership when I asked
19     them to print out whatever records they had
20     related to the transaction.
21 Q.  Okay.  And if you look over at item number six,
22     it says cash price $37,065.00?
23 A.  Correct.
24 Q.  So, Is that the price for the vehicle itself,
25     absent taxes and fees?

Page 36

1  A.  Whatever cash price means that's what it means.
2  Q.  Okay.  So, when I go back to the Valuation
3      Report, "Exhibit 3", and it shows that MSRP and
4      the base model MSRP is 32,950.
5  A.  Correct.
6  Q.  And that's about $4,000.00 or more lower than
7      the price you paid for the Volvo, right?
8  A.  Correct.
9  Q.  Do you think that you paid more than MSRP
10     because there were options, because it was a
11     different trim level?
12 A.  I don't know the answer to that.
13 Q.  All right.  I want to go back to page four of
14     the Valuation Report.  See where it says
15     Condition Adjustments?
16 A.  Yes.
17 Q.  And here it says that a typical vehicle
18     condition is a 3.00, that your Volvo is rated a
19     2.65.  Do you agree with that rating?
20 A.  All I can tell you is that for a ten-year-old or
21     eleven-year-old vehicle, the Volvo that we gave
22     Matthew was in perfect condition, not a scratch
23     on it.
24 Q.  Okay.
25 A.  So, if the typical vehicle condition is 3.0, I

Page 37

1      would rate the Volvo that we gave Matthew at
2      about 5.0.
3  Q.  All right.  So, if we look at the different
4      categories here under condition adjustments, do
5      you see where the headliner was rated a two and
6      the comments say, "some stains".  Do you agree
7      with that assessment?
8  A.  I don't know what a headliner is.
9  Q.  You don't know what the headliner of a car is?
10 A.  I don't.  Do you?
11 Q.  Like the internal roof of the car, like, you're
12     sitting in the car and you look up at the top,
13     the headliner.
14 A.  Okay.
15 Q.  Do you agree that there were some stains on the
16     headliner of the Volvo?
17 A.  I don't know the answer to that.  I don't agree
18     or disagree.  I don't know if there were stains.
19 Q.  Okay.  Do you see where the doors and interior
20     panels were rated a two, comments say "greater
21     than three gouges".  Do you agree with that
22     assessment?
23 A.  That could be the case.
24 Q.  Do you see where the body was rated a two and
25     the comments say, "crease in right rear door"?

10 (Pages 34 - 37)

Case 1:22-cv-00375-NT    Document 120-13    Filed 01/10/25    Page 11 of 100    PageID
#: 4894

Robert Scott Thurston                                      December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 38

1  A.  Yes, I see that.
2  Q.  Do you agree with that assessment?
3  A.  I'm not sure what the word crease means, but
4      even if it's true, I don't see how that would
5      take the entire body to be fair rather than
6      good.
7  Q.  So, do you think that the body should have been
8      rated a three for Good?
9  A.  Definitely.
10 Q.  All right.  And the paint, do you see where
11     that's rated a two, and the comments say
12     numerous small scratches?
13 A.  I see that.
14 Q.  Do you agree with that rating?
15 A.  No.
16     THE VIDEOGRAPHER:
17        Ms. White, Mr. Steed's lost his
18     Internet connection again it looks like.
19     MS. WHITE:
20        Okay.  Let's go off the record.
21     THE VIDEOGRAPHER:
22        Off the record.  The time is 9:52.
23        (Brief pause in testimony in an
24        effort to get Mr. Steed back on
25        the video call.)

Page 39

1      THE VIDEOGRAPHER:
2         Back on the record.  The time is
3      9:54.
4  BY MS. WHITE:
5  Q.  Okay.  We were talking about "Exhibit 3", and we
6      were going through these condition ratings.  And
7      I believe I'd asked you about the rating for the
8      paint, but that got a two, and it said numerous
9      small scratches.  Do you agree with that rating?
10 A.  No.
11 Q.  Do you agree that there were numerous small
12     scratches on the paint?
13 A.  I don't know, but it seems like an inflated
14     statement.
15 Q.  Do you think that that rating should have been a
16     three or higher?
17 A.  I don't know, Allison.
18 Q.  All right.  Just below that, the Condition
19     Ratings, there's a heading that says Aftermarket
20     Parts and OEM Equipment Adjustments.  And do you
21     see that it adds $55.00 for all weather floor
22     mats?
23 A.  Yes.
24 Q.  Do you think more should have been added for the
25     floor mats?

Page 40

1  A.  No.
2  Q.  All right.  The next page, page five.  We see
3      the specifics of the comparable vehicles that we
4      discussed a moment ago.  Do you see that?
5  A.  Okay.  I understand.
6  Q.  So, comparable vehicle one shows the list price
7      was $11,569.00, right?
8  A.  What does that mean?  Does that mean they sold
9      the car for that?
10 Q.  Is that what you understand it to mean, or do
11     you think they're showing you what the
12     asking price was?
13 A.  I don't know.  I'm asking you.
14 Q.  Okay.  So, the list price is the asking price.
15     But what did you understand that to mean?
16 A.  Okay.  The asking price.
17 Q.  Okay.  So, there are several adjustments listed
18     here, and I want to walk through each one of
19     them.  The first is the projected sold
20     adjustment.  Do you disagree with that
21     adjustment?
22 A.  I don't know what that phrase means.
23 Q.  Okay.  Let's look, the last page of the report.
24     It walks through the methodology.  And I want to
25     point you to step two.  It says, "projected sold

Page 41

1      adjustment, an adjustment to reflect consumer
2      purchasing behavior, negotiating a different
3      price than the listed price".  Based on that
4      explanation, do you disagree with the projected
5      sold adjustment?
6  A.  Can we go back up to the top again?
7  Q.  Sure.  So, going back to comparable vehicle one,
8      do you disagree with this projected sold
9      adjustment of $398.00?
10 A.  Yes.
11 Q.  Okay.  Why?
12 A.  I don't see why they would take away $398.00
13     based on the fact that they don't think I could
14     negotiate a price.
15 Q.  So, what did you understand the projected sold
16     adjustment to mean?
17 A.  Well, I just read it.  It's based on the
18     negotiation of the buyer.
19 Q.  Okay.  And do you think that you could negotiate
20     on the price of a used car?
21 A.  Yes.
22 Q.  So, if what's reflected here is the assumption
23     that you would negotiate on the price of a car,
24     that you would negotiate approximately $398.00
25     off of the price of a car, do you still disagree

Robert Scott Thurston
December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 42

1    with that adjustment?
2    A.  Oh, that's what it means?
3    Q.  Yes.  If the projected sold adjustment is trying
4        to capture how much they think you're going to
5        negotiate, or that they think could be
6        negotiated do you still disagree with them?
7    A.  No, I don't disagree.
8    Q.  Okay.  What about the vehicle configuration
9        adjustment; do you see that's negative
10       $1,264.41?
11   A.  Yes.
12   Q.  Do you disagree with the configuration
13       adjustment?
14   A.  No.
15   Q.  Okay.  What about the mileage adjustment?  They
16       added $2,364.71.  Do you disagree with that
17       adjustment?
18   A.  I don't know how that's done in the industry,
19       but I don't specifically disagree with that.
20   Q.  Okay.  And then there are two equipment
21       adjustments listed here.  The first is for a
22       climate package that this comparable vehicle
23       had, but your Volvo did not have, so they
24       deducted $295.92.  Do you disagree with that
25       adjustment?

Page 43

1    A.  No.
2    Q.  What about the blind spot information system
3        that this comparable vehicle had, but your Volvo
4        did not have?  They deducted $210.46.  Do you
5        disagree with that adjustment?
6    A.  No.
7    Q.  Okay.  I believe you said earlier that you
8        disagreed with using these comparable vehicles
9        at all because they had much higher mileage than
10       your Volvo; is that right?
11   A.  That's right.  But I didn't realize the
12       adjustment that was made.
13   Q.  Okay.  So, now that you understand that they
14       added value to that comparable vehicle to
15       account for the difference in mileage, are you
16       okay with Progressive using this comparable
17       vehicle?
18   A.  No, because I think the list price is wrong.
19   Q.  Okay.  When you say the list price is wrong, do
20       you think it was too high or too low?
21   A.  Too low.
22   Q.  Okay.  So, the person who listed this vehicle
23       should have priced it higher?
24   A.  Definitely.
25   Q.  Okay.  All right.  Looking at comparable vehicle

Page 44

1    number two, do you see that this one was listed
2    for 15,991?
3    A.  I see that.
4    Q.  Do you disagree with that list price?
5    A.  Perhaps.  I think that list prices in different
6        parts of the country, you know, can be
7        different.  I'm not sure that it's correct to
8        pull comparable vehicles from Alabama and Texas
9        when you live in a different state.
10   Q.  What state do you think Progressive should have
11       pulled comparable vehicles from?
12   A.  Maine.
13   Q.  Okay.  Did you understand that Progressive was
14       using the zip code for the Volvo as your
15       Louisiana zip code?
16   A.  I didn't understand that.
17   Q.  Do you think that Progressive should have used
18       your son's Maine zip code instead?
19   A.  It would make more sense to me.
20   Q.  Okay.  All right.  Going back to comparable
21       vehicle two.  You're not sure whether you
22       disagree with the list price, but I want to talk
23       about these particular adjustments.  So, the
24       first is the projected sold adjustment.  Do you
25       disagree with that adjustment?

Page 45

1    A.  No.
2    Q.  What about the vehicle configuration adjustment?
3    A.  No.
4    Q.  And what about the mileage adjustment?
5    A.  No.
6    Q.  Okay.  Comparable vehicle three, that one was
7        listed for $12,700.00.  Do you see that?
8    A.  Yes.
9    Q.  Do you disagree with that list price?
10   A.  Yes.
11   Q.  Do you think it should have been higher?
12   A.  Yes.
13   Q.  Okay.  And the adjustments listed here,
14       projected sold adjustment, vehicle configuration
15       adjustment, and mileage.  Do you disagree with
16       any of those adjustments?
17   A.  No.
18   Q.  Okay.  So, comparable vehicle three says over
19       here on the left under source, that it was
20       listed at Hendrick's Subaru in Hoover, Alabama.
21       Did you or your son contact that dealership to
22       inquire about this Volvo?
23   A.  I certainly don't remember doing that, but it's
24       possible that Matthew did.
25   Q.  Okay.  Did you contact Jack Ingram Motors in

Veritext Legal Solutions
800.808.4958                                                                    770.343.9696

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 46

1    Montgomery, Alabama, about comparable vehicle
2    number two?
3    A.  Not that I remember.
4    Q.  And same for comparable vehicle number one:  Did
5         you contact the owner at the phone number listed
6         here?
7    A.  Not that I remember.
8    Q.  Okay.
9    A.  But if you know that I did, I'll defer to you
10        since I'm under oath.
11   Q.  I do not know whether you did or not.
12   A.  I don't think I did.
13   Q.  Okay.  All right.  I'm going to show you another
14        document.  This one will be marked as "Exhibit
15        5".
16             (Exhibit Number Exhibit 5 was
17                  marked for identification
18                  purposes.)
19   BY MS. WHITE:
20   Q.  So, this starts as a letter from Mr. Steed to
21        Progressive.  But what I really want to ask you
22        about is Exhibit A to the letter.  So, I'm going
23        to scroll down to Exhibit A, which is some email
24        correspondence.  So, I can give you control to
25        scroll through these emails.  And my question to

Page 47

1    you after you scroll through is going to be, do
2    you recognize any of these emails?  Okay.  You
3    should have control now.
4    A.  Okay.  Just a second.  Can you scroll up for me?
5         Mine's not working.  Or scroll down.  Keep
6         going.  Okay, stop.  Okay.  Scroll down again,
7         okay.  Scroll down some more.  Okay.  Scroll
8         down some more.  Okay.  I would say that since I
9         was copied on those emails that I read them.  Is
10        that what you wanted to know?
11   Q.  Yes.  But I want to talk about them more
12        specifically.  So, I'm going to start with page
13        ending in Bates label 129.  And this is the
14        email from your son, Matthew Thurston, on
15        February 21, 2022, at 3:37 p.m.  Do you see this
16        email?
17   A.  Yes.
18   Q.  All right.  About the third paragraph down, it
19        says, "The settlement offer presented by
20        Progressive seems to be far outside of the range
21        of any other determination of value for the
22        vehicle".  Do you see that?
23   A.  Yes.
24   Q.  Did you discuss the settlement value with your
25        son before he wrote this email?

Page 48

1    A.  I think he and I talked about the fact that the
2         list prices seem to be higher than Kyle was
3         suggesting.
4    Q.  So, the list prices that you were seeing were
5         higher than the list prices reflected on the
6         valuation report?
7    A.  I think so.  I can't remember specifically, but
8         I pretty much deferred all of this to Matthew
9         just because I wanted him to have the experience
10        of dealing with lawyers.  And Matthew did the
11        research and decided what he thought was fair.
12   Q.  Okay.  So, the next paragraph says, "The three
13        vehicles presented as comparable all have
14        significantly higher mileage than my vehicle,
15        and the appraisal relies heavily on adjusting
16        the vehicle's value based on mileage".  And I
17        believe you said earlier that you disagreed with
18        the use of the comparable vehicles with higher
19        mileage?
20   A.  Well, I did, but I deferred all this to Matthew,
21        and he did all the math about cents per mile and
22        things like that.  I wasn't involved in that.
23   Q.  Okay.
24   A.  And whether -- let me state that I don't know
25        whether the adjustments made, when they added

Page 49

1    value for lower mileage, I don't know whether
2    those are fair compared to the industry wide
3    standard.
4    Q.  Okay.  I want to look at the paragraph that
5         starts with "furthermore".  It says,
6         "Furthermore, the appraisal adjusts the value of
7         the vehicle based off of trim level, but it does
8         not describe what differences and actual
9         features exist.  My vehicle has added options
10        which brought its MSRP above 37,000, about equal
11        to a Premium Plus model".  What options did your
12        Volvo have that brought its MSRP above 37,000?
13   A.  I don't know that, but I would bet you that
14        Matthew knows.
15   Q.  All right.  This last paragraph on the page
16        says, "In addition to this, Kelley Blue Book
17        states the private party value for each of these
18        vehicles below the price they were listed at".
19        Do you understand what that means, what your son
20        meant by this?
21   A.  Well, I think -- yes.
22   Q.  Okay.  What does that mean?
23   A.  I believe that Kelley Blue Book lists several
24        different prices for a vehicle.  One is the
25        price you might pay at a dealer.  One is the

13 (Pages 46 - 49)

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 50

1    price you might buy a car from a private
2    individual. Those prices are usually different.
3    Q. And so, is he saying that the Kelley Blue Book
4       value for those comparable vehicles were lower
5       than what those vehicles were listed at?
6    A. I'm not sure I understand that question.
7    Q. I'm trying to understand what that sentence
8       means, but if you're not clear on it --
9    A. I think you'll have to ask Matthew. He wrote
10      the sentence.
11   Q. Okay. Next it says, "The blue book value of my
12      vehicle, $17,641.00". Who obtained that Kelley
13      Blue Book value?
14   A. I had nothing to do with this letter, so --
15   Q. Okay.
16   A. -- it wasn't me.
17   Q. All right. And then the next paragraph that
18      says, "I was in contact with a local Baton Rouge
19      car dealer", was that referring to Matthew, or
20      were you in touch with the Baton Rouge car
21      dealer?
22   A. Matthew called.
23   Q. Okay. All right. From there, I want to look at
24      the page that ends in Bates number 128. And
25      this is an email on February 22, 2022, at 8:23

Page 51

1    a.m. from Kyle Mayer at Progressive. He says,
2    "We don't actually use KBB values to evaluate
3    the vehicle. If you wish to provide documented
4    information supporting the increase in value to
5    the car, please provide dealer comparisons
6    outlined on page seven". Did you ever submit
7    any documentation supporting the assertion of
8    value?
9    A. I don't believe so.
10   Q. And then just about that email is February 22,
11      2022, at 10:43 a.m., an email from Matthew that
12      says in the second paragraph, "In regards to
13      valuation, we will be in touch once we've had a
14      chance to consult with our attorney as I've
15      provided documented evidence to why your
16      valuation does not reflect the ACV of the
17      vehicle". Do you see that?
18   A. Yes.
19   Q. Whose idea was it to hire an attorney?
20   A. I think it was Matthew's, because I have a
21      policy that I never talk to a lawyer unless I'm
22      subpoenaed.
23   Q. Okay. And I see that on that email, J. Steed at
24      Ellen Best Law was copied. Did you understand
25      that your son had already hired a lawyer at that

Page 52

1    point?
2    A. I can't answer that.
3    Q. Did you speak with Mr. Steed before your son
4       hired him?
5    A. No, I don't think so.
6    Q. I'm going to go down to the page that ends in
7       Bates number 131. So, first, there's an email
8       from Kyle Mayer at Progressive on February 22nd
9       at 10:45 a.m. And he says, "Your mother or
10      father may need to call a shop and provide
11      verbal release". Did you understand that
12      because the vehicle was still in yours or your
13      wife's name, that you had to be the one to
14      release the car?
15   A. I believe we figured that out as all this
16      happened over the next month or so.
17   Q. Okay. And then the very next email. February
18      22, 2022, at 11:14 a.m. is from
19      Sthurston2003@yahoo.com; is that you?
20   A. Yes.
21   Q. Okay. And the second sentence says, "And notice
22      that in our evaluation of the car, we didn't
23      rely solely on KBB. We used your comparables
24      and your VINS to understand the mileage
25      adjustments and then apply them to our car".

Page 53

1    When you say "our valuation" and "we", does that
2    mean that you are involved in determining the
3    value of the Volvo?
4    A. Yeah. Like I said, Matthew and I talked about
5       it.
6    Q. The next sentence says, "Your offer is a
7       wholesale number which does not approach
8       replacement value". Why did you believe that
9       Progressive's number was a wholesale number?
10   A. I would say that based on the Kelley Blue Book,
11      which was the only numbers that I knew, it was
12      more comparable to their wholesale number that
13      was published at the time.
14   Q. Okay. Was it your understanding that
15      Progressive owed replacement value?
16   A. I had no information on that.
17   Q. All right. Let's look at the very next email.
18      This one is from February 25, 2022, at 12:36
19      p.m. and it's from Kyle Mayer at Progressive.
20      It says, "Hi, Scott. Have you spoken with
21      anyone else at Progressive about the valuation?
22      Did you end up hiring an independent appraiser?"
23      Do you see that?
24   A. Yes.
25   Q. So, between February 22nd and February 25th, had

14 (Pages 50 - 53)

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 54

1    you spoken on the phone with Kyle Mayer at
2    Progressive?
3    A.  I think that we did speak to each other.
4    Q.  And did you ask to speak with somebody else at
5        Progressive about the valuation?
6    A.  I can't remember that.  I don't think so.
7    Q.  When you talked to Kyle Mayer, did you tell him
8        that you were going to hire an independent
9        appraiser?
10   A.  I have a vague memory that perhaps he offered
11       that as a possibility, but I can't even remember
12       if I did that.
13   Q.  Do you recall talking to an independent
14       appraiser?
15   A.  I can't remember that, Allison.  I'm sorry.  But
16       I might have called somebody and asked them to
17       do it.  I know I usually should answer just yes
18       or no.  But I can't remember where the car was,
19       but it was somewhere like they had taken it to
20       Bangor, and if we found an appraiser he would
21       have to go look at the car in Bangor, and maybe
22       that was done.  I can't remember.
23   Q.  So, your recollection that an appraiser would
24       have to go to Bangor, did that come from
25       Progressive or an independent appraiser?

Page 55

1    A.  I can't remember.  I also can't remember where
2        the car was at certain times.
3    Q.  Okay.
4    A.  Do you know a good Alzheimer's unit?
5    Q.  Do you have any concerns about your memory?
6    A.  It's not too good, but my wife's is perfect.
7    Q.  Okay, great.  All right.  The very next page is
8        an email the same day, February 25, 2022, at
9        1:49 p.m.  This one is from Matthew Thurston.
10       And it says, "My attorney will be in touch with
11       Progressive".  Did Matthew tell you not to hire
12       an independent appraiser?
13   A.  I don't recall.  I don't think so.
14   Q.  I'm going to show you another document.  Give me
15       one second to pull up the next document.
16   A.  He might have told me he was going to do it.  I
17       don't know.
18   Q.  All right.  I'm showing you a document that we
19       will mark as "Exhibit 6".
20           (Exhibit Number Exhibit 6 was
21           marked for identification
22           purposes.)
23   BY MS. WHITE:
24   Q.  Do you recognize this document?
25   A.  No.

Page 56

1    Q.  Do you see that this is a check from Progressive
2        made out to you for $9,520.89?
3    A.  Yes.
4    Q.  Did you ever receive this check?
5    A.  I can't remember that.  I can go back and see if
6        I deposited that check in my checking account.
7        We just have one checking account, so I can tell
8        you if I received it and deposited it if I
9        check.  But I don't recall it.
10   Q.  Okay.  Going to show you another document.
11   A.  Why would they send me a check for $9,000.00 if
12       they said the car was worth 13,000?
13   Q.  So, I think this next document, which will mark
14       as "Exhibit 7", will answer that question.
15           (Exhibit Number Exhibit 7 was
16           marked for identification
17           purposes.)
18   A.  Okay.
19   BY MS. WHITE:
20   Q.  I will zoom in a bit and give you a moment to
21       read this.  And I'll go ahead and flag, this is
22       from King and Spalding.  That's my firm, my
23       colleague Zachary McEntyre, to John Steed.
24   A.  Okay.  I understand that.
25   Q.  Okay.  Did your son or Mr. Steed ever share this

Page 57

1    letter with you?
2    A.  Man, I would say yes.  I think I read that
3        letter.
4    Q.  Did you understand that Progressive had hired an
5        independent appraiser and was waiting on you or
6        your son to hire an appraiser?
7    A.  I don't think I understood that, and I don't
8        really remember reading this letter.
9    Q.  So, with the understanding that the check was
10       enclosed with this letter to Mr. Steed, do you
11       think that you received the check?
12   A.  I don't know.  I can check on that, Allison,
13       though.
14   Q.  Okay.
15   A.  Was this letter copied to me?
16   Q.  No, it was sent only to Mr. Steed, who
17       represented your son, who was the insured.
18   A.  Okay.  Well, if it's possible that I didn't get
19       it, I'll feel slightly better about my memory.
20   Q.  Okay.  Great.  Did you understand that you would
21       receive another $3,659.00 from Progressive if
22       you signed over the title?
23   A.  No, I don't understand what happened with the
24       title, and I don't understand who owns the car.
25   Q.  Well, that makes two of us.  So, you don't

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 58

1 recall whether you ever signed over the title to
2 Progressive?
3 A.  I never had the title after Matthew had the car
4 because the title was in the car.  I thought
5 that I had signed it over to Matthew, but I
6 can't say for sure under oath that I did that.
7 And if the title was signed over to Progressive,
8 that would have been something Matthew would
9 have done.
10 Q.  All right.
11     MS. WHITE:
12        I have an audio file that I want to
13     play, but I'm not sure whether it's going
14     to come up on the video for the court
15     reporter.  So, let's go off the record for
16     a moment and test this out.
17     THE VIDEOGRAPHER:
18        Off the record.  The time is 10:26.
19        (Whereupon, a break in testimony
20        occurred.)
21     THE VIDEOGRAPHER:
22        Back on the record.  The time is
23        10:29.
24 BY MS. WHITE:
25 Q.  All right.  I'm going to play an audio file for

Page 59

1 you.  It's been produced at PGR
2 Thurston00000097.
3        (Whereupon, audio file played
4        during the deposition at this
5        time.)
6 BY MS. WHITE:
7 Q.  Okay.  I paused it.  So, did you recognize the
8 voice on that recording?
9 A.  Yeah, that's Matthew.
10 Q.  Okay.  And did you hear Matthew say I was
11 driving somebody else's vehicle and got into an
12 accident?
13 A.  Yes.
14 Q.  So, at that point, did Matthew understand the
15 Volvo to still be yours?
16 A.  I guess legally he did.
17 Q.  So, when you say that you gave him the vehicle,
18 was it clear between the two of you that you
19 were giving him the vehicle so that he could
20 become the owner?
21 A.  It was clear.  I assume the reason he referred
22 to it that way in the phone call was that he had
23 not yet taken the title and had it notarized, or
24 whatever needs to be done in Maine.
25 Q.  Okay.  All right.  Last one.  And this is PGR

Page 60

1 Thurston00000098.  And I'm going to start at
2 nine minutes and twenty-five seconds because
3 it's a rather long recording.
4        (Whereupon, audio file was
5        played during deposition at this
6        time.)
7 BY MS. WHITE:
8 Q.  Okay.  Did you recognize one of the voices in
9 that audio recording?
10 A.  Yes.
11 Q.  Was that Matthew?
12 A.  Yes.
13 Q.  Did you hear him say, I had driven that car to
14 Maine for them?
15 A.  I heard that.
16 Q.  Was it the understanding that Matthew would
17 drive the car to Maine, and that you or your
18 wife would use it when you were in Maine next?
19 A.  Allison, all I can tell you is that was not my
20 understanding.  My understanding was that we
21 gave him the car permanently, but it's possible
22 that Matthew has a different understanding.
23 Q.  Okay.  All right.  I think we said at the end,
24 or said at the beginning --
25 A.  Let me say this:  The Volvo is not the car that

Page 61

1 we drove to Maine.  We drove our other car to
2 Maine, which was a Buick Enclave even at that
3 time.  And then we would use the Buick as our
4 car in Maine.  So, we didn't have any intention
5 of using the Volvo in Maine at any time in the
6 future.  But it's possible Matthew didn't know
7 that.  I don't know.
8 Q.  Okay.  I had some questions at the beginning of
9 this deposition for you, and Mr. Steed objected
10 to you answering those questions.
11     MR. STEED:
12        I'll withdraw the objections.
13     MS. WHITE:
14        Thank you.
15 A.  Okay.  I'll answer the question.  John called me
16 on the phone last night or the night before and
17 said he thought it would be best if he was
18 present at this deposition and that he wasn't
19 going to charge me, and I said fine.
20 BY MS. WHITE:
21 Q.  Okay.  Before last night, had you talked to Mr.
22 Steed at any other point?
23 A.  Not in any substantive way.
24 Q.  What did you discuss with Mr. Steed in the past
25 not last night?

16 (Pages 58 - 61)

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 62

1   A.   You'll have to ask John.  I don't remember.  I
2        don't know that we talked at all, but maybe we
3        did.
4   Q.   Have you had any conversations with your son
5        about this lawsuit?
6   A.   Not recently.
7   Q.   Have you had any conversations with your son in
8        the past about this lawsuit?
9   A.   At the time he was considering filing it, he
10       told me that there was some consideration of a
11       class action, but that's all the discussion we
12       had.
13  Q.   Did he tell you why he wanted to file the case
14       as a class action?
15  A.   Well, I don't know if he wanted to do that.  I
16       guess that's what he did, though; is that
17       correct?
18  Q.   Yes, this is about his class action.
19  A.   Okay.  I don't know that either one of us
20       understand the implications of that.
21  Q.   Did your son ever tell you not to cash any
22       checks from Progressive?
23  A.   Not that I recall.
24       MS. WHITE:
25            All right.  I don't have any further

Page 63

1        questions.
2        MR. STEED:
3            Okay.  I just have a very short few
4        questions, Dr. Thurston.
5            - EXAMINATION -
6   BY MR. STEED:
7   Q.   You said when Matthew came and got the car, it
8        was your sense that the car would be his after
9        that point, right?
10  A.   That's what I thought.
11  Q.   Yeah.  And then when Matthew left with the car,
12       did you feel like you'd assigned all your rights
13       in the car to him?
14  A.   I did.
15  Q.   And is that what you intended to do when you let
16       Matthew leave Louisiana with the car?
17  A.   It is.
18  Q.   And did you expect to keep any of the insurance
19       proceeds, if insurance proceeds came from the
20       car?
21  A.   No.
22  Q.   Did you expect that the insurance proceeds would
23       go to Matthew?
24  A.   Yes.
25       MR. STEED:

Page 64

1            Okay.  That's all I have.
2        THE VIDEOGRAPHER:
3            Anything further?
4        MS. WHITE:
5            Just -- just one second.
6            - EXAMINATION -
7   BY MS. WHITE:
8   Q.   What was your understanding of why you were
9        copied on communications with Progressive about
10       the Volvo?
11  A.   My understanding at that time, after a few weeks
12       had gone by, was that evidently I was either,
13       myself or my wife was the legal owner of the
14       car.  And that, for one thing, they needed to
15       contact me to find out whether they should tow
16       the car to a certain place or not, or whether
17       they should leave the car in my driveway which
18       was one possibility I think.
19  Q.   So, you understood that at the time of the loss,
20       either you or your wife were still the owners of
21       the car?
22  A.   Subsequent to the accident as the weeks went on,
23       I understood that.
24       MS. WHITE:
25            No further questions.

Page 65

1        MR. STEED:
2            I don't have anything else.
3        THE VIDEOGRAPHER:
4            This concludes the video deposition.
5        The time is 10:41.  Going off the record.
6        Deposition concluded at 10:41 a.m.

17 (Pages 62 - 65)

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 66

```
1
2        W I T N E S S   C E R T I F I C A T E
3   I ROBERT SCOTT THURSTON, have read or have had the
4   foregoing testimony read to me, and hereby certify
5   that it is a true and correct transcription of my
6   testimony with the exception of any attached changes
7   or corrections.
8
9                        _____
10                  ROBERT SCOTT THURSTON
11  TO THE WITNESS:
12      Please sign above and initial the appropriate
13  space below.
14  _____ Signed with corrections
15  _____ Signed without corrections
16
17  Date Taken:
18  12-18-23
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

Page 67

```
1            REPORTER'S PAGE
2       I, MELISSA J. DAVID, Certified Court Reporter in
3   and for the State of Louisiana, the officer, as
4   defined in Rule 28 of the Federal Rules of Civil
5   Procedure and/or Article 1434(B) of the Louisiana
6   Code of Civil Procedure, before whom this proceeding
7   was taken, do hereby state on the Record:
8       That due to the interaction in the spontaneous
9   discourse of this proceeding, dashes (--) have been
10  used to indicate pauses, changes in thought, and/or
11  talk-overs; that same is the proper method for a
12  Court Reporter's transcription of proceeding, and
13  that the dashes (--) do not indicate that words or
14  phrases have been let out of this transcript;
15      That any words and/or names which could not be
16  verified through reference material have been denoted
17  with the phrase "(spelled phonetically)."
18
19
20          MELISSA J. DAVID
                Certified Court Reporter
21
22
23
24
25
```

Page 68

```
1              REPORTER'S CERTIFICATE
2   This certification is valid only for a transcript
3   accompanied by my original signature and original
    required seal on this page.
4
5       I, Melissa J. David, Certified Court Reporter in
    and for the State of Louisiana, as the officer before
6   whom this testimony was administered, do hereby
    certify that Robert Scott Thurston,after having been
7   duly sworn by me upon authority of R.S. 37:2554, did
    testify as hereinbefore set forth in the foregoing
8   67pages;
        That this testimony was reported by me in the
9   stenomask reporting method; was prepared and
    transcribed by me or under my personal direction and
10  supervision, and is a true and correct transcript to
    the best of my ability and understanding;
11      That the foregoing transcript has been prepared
    in compliance with the transcript format guidelines
12  required by statute or by the Rules of the Louisiana
    Certified Shorthand Reporter Board; and that I am
13  informed about the complete arrangement, financial or
    otherwise, with the person or entity making
14  arrangement for deposition services; that I have
    acted in compliance with the prohibition on
15  contractual relationships, as defined by the
    Louisiana Code of Civil Procedure Article 1434 and in
16  rules and advisory opinions of the Board;
        That I have no actual knowledge of any
17  prohibited employment or contractual relationship,
    direct or indirect, between a court reporting firm
18  and any party litigant in this matter, nor is there
    any such relationship between myself and a party
19  litigant in this matter;
        That I am not of counsel, not related to counsel
20  or the parties herein, nor am I otherwise interested
    in the outcome of this matter.
21
22
23          Melissa J. David
                Certified Court Reporter
24              CCR No. 2020005
25
```

Page 69

```
1   John Z Steed, Esq.
2   john@islandjusticelaw.com
3       January 4, 2024
4   RE: Thurston, Matthew v. Progressive Casualty Insurance
        Company, Et Al.
5   12/18/2023, Robert Scott Thurston (#6351588)
6       The above-referenced transcript is available for
7   review.
8       Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-southeast@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19  If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25
```

18 (Pages 66 - 69)

Robert Scott Thurston                                December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

Page 70

1  Thurston, Matthew v. Progressive Casualty Insurance
   Company, Et Al.

2  Robert Scott Thurston (#6351588)

3        E R R A T A   S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10 PAGE_____ LINE_____ CHANGE_____

11 _____

12 REASON_____

13 PAGE_____ LINE_____ CHANGE_____

14 _____

15 REASON_____

16 PAGE_____ LINE_____ CHANGE_____

17 _____

18 REASON_____

19 PAGE_____ LINE_____ CHANGE_____

20 _____

21 REASON_____

22

23 _____    _____

24 Robert Scott Thurston          Date

25

19 (Page 70)

Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[00375 - 9:54]**                                                      Page 1

| 0 |
| --- |

**00375**  1:7 5:12
**04681**  2:8

| 1 |
| --- |

**1**  3:14 25:18,19
  26:6
**1,264.41**  42:10
**10:26**  58:18
**10:29**  58:23
**10:41**  65:5,6
**10:43**  51:11
**10:45**  52:9
**11,569.00**  40:7
**1180**  2:4
**11:14**  52:18
**12,700.00.**  45:7
**12,800**  31:19
**12,824.37**  31:21
**12-18-23**  66:18
**12/18/2023**
  69:5
**128**  50:24
**129**  47:13
**13,000**  56:12
**13,231.80.**
  32:14
**131**  52:7
**1434**  67:5
  68:15
**1443**  4:16
**15,991**  44:2
**1600**  2:4
**17,641.00**  50:12
**18**  5:3

**18th**  1:20
**1987**  14:5
**1:22**  1:7 5:12
**1:49**  55:9

| 2 |
| --- |

**2**  3:15 27:5,7
**2,364.71.**  42:16
**2.65.**  36:19
**2008**  14:20
**2012**  21:5,18
  26:12 27:21
  32:15 34:14
**2014**  16:10
**2020005**  68:24
**2021**  23:9
**2022**  23:12,18
  26:6,7,9,21,23
  27:19 28:1,4,9
  28:10 32:16
  47:15 50:25
  51:11 52:18
  53:18 55:8
**2023**  1:20 5:3
  27:19
**2024**  69:3
**20th**  26:11
**21**  23:7 26:6,9
  27:18,19 47:15
**210.46.**  43:4
**21st**  26:11
**22**  23:13 50:25
  51:10 52:18
**22nd**  52:8
  53:25

**2304**  14:15
**25**  3:14 53:18
  55:8
**25th**  53:25
**27**  3:15
**28**  67:4
**295.92.**  42:24

| 3 |
| --- |

**3**  3:16 31:10,11
  36:3 39:5
**3,659.00**  57:21
**3.0**  36:25
**3.00**  36:18
**30**  69:17
**30309**  2:4
**31**  3:16 27:25
  28:4,10
**32,000.00**  35:11
**32,950**  36:4
**35**  3:17 15:14
**363**  15:14
**37,000**  49:10,12
**37,065.00**  35:22
**37:2554**  68:7
**38,674.00**  35:10
**398.00**  41:9,12
  41:24
**3:37**  47:15

| 4 |
| --- |

**4**  3:3,17 35:6,7
  35:16 69:3
**4,000.00**  36:6
**40**  2:8

**46**  3:18
**462.43.**  32:25

| 5 |
| --- |

**5**  3:18 46:15,16
**5.0.**  37:2
**55**  3:19
**55.00**  33:4
  39:21
**56**  3:20

| 6 |
| --- |

**6**  3:5,19 55:19
  55:20
**63**  3:6
**6351588**  69:5
  70:2
**64**  3:7
**67pages**  68:8
**68**  3:8

| 7 |
| --- |

**7**  3:20 56:14,15
**70809**  14:16

| 9 |
| --- |

**9**  26:21,23
**9,000.00**  56:11
**9,520.89**  56:2
**95**  25:10
**9:04**  1:21 5:3
**9:28**  24:10
**9:30**  24:15
**9:52**  38:22
**9:54**  39:3

Robert Scott Thurston                                        December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[a.m. - asked]**                                                    Page 2

| a | | | |
|---|---|---|---|
| **a.m.** 1:21 5:3 51:1,11 52:9 52:18 65:6 | **acv** 51:16 | **affirm** 6:4 | **answered** 9:25 |
| **ability** 13:15 68:10 | **add** 30:8 | **aftermarket** 33:5 39:19 | **answering** 61:10 |
| **above** 4:24 27:24 49:10,12 51:10 66:12 69:6 | **added** 22:24 33:4 35:13 39:24 42:16 43:14 48:25 49:9 | **agent** 27:2 | **answers** 4:15 |
| | | **ago** 10:18 40:4 | **anybody** 14:25 15:1,2 |
| | **addition** 49:16 | **agree** 19:22 31:1 36:19 37:6,15,17,21 38:2,14 39:9 39:11 | **apologize** 12:11 |
| | **address** 14:14 | | **appearances** 2:1 |
| **absent** 35:25 | **addressing** 13:7 | | **appears** 26:4 |
| **absolutely** 34:2 | **adds** 39:21 | **ahead** 12:16 56:21 | **applicable** 69:8 |
| **accident** 23:11 28:12,16 30:6 31:25 59:12 64:22 | **adjusting** 48:15 | **al** 69:4 70:1 | **apply** 52:25 |
| | **adjustment** 40:20,21 41:1 41:1,5,9,16 42:1,3,9,13,15 42:17,25 43:5 43:12 44:24,25 45:2,4,14,15 | **alabama** 44:8 45:20 46:1 | **appraisal** 48:15 49:6 |
| | | **allison** 2:3 5:20 6:12 29:18 31:16 39:17 54:15 57:12 60:19 | **appraiser** 53:22 54:9,14 54:20,23,25 55:12 57:5,6 |
| **accompanied** 68:2 | | | **approach** 53:7 |
| **account** 43:15 56:6,7 | | | **appropriate** 4:9 66:12 |
| **accuracy** 69:9 | **adjustments** 32:13 36:15 37:4 39:20 40:17 42:21 44:23 45:13,16 48:25 52:25 | **allotted** 69:20 | **approximate** 31:18 |
| **accurately** 13:16 | | **altogether** 18:15 | **approximately** 41:24 |
| **acknowledg...** 69:12 | | **alzheimer's** 55:4 | **arkansas** 15:12 |
| **act** 9:24 | **adjusts** 49:6 | **amount** 20:20 32:6 | **armed** 17:20,23 |
| **acted** 68:14 | **administered** 68:6 | **answer** 7:7,10 7:23 8:24 9:8 11:12 13:1,13 17:24 20:17 24:16 36:12 37:17 52:2 54:17 56:14 61:15 | **arrangement** 68:13,14 |
| **action** 1:7 18:21 62:11,14 62:18 | | | **article** 4:16 67:5 68:15 |
| **actions** 17:4,7 | **administering** 4:23 | | **asked** 25:25 35:18 39:7 54:16 |
| **actual** 49:8 68:16 | **advice** 20:2 | | |
| **actually** 21:15 32:3 51:2 | **advisory** 68:16 | | |
| | **affect** 13:15 | | |

Case 1:22-cv-00375-NT    Document 120-13    Filed 01/10/25    Page 22 of 100    PageID
#: 4841
Robert Scott Thurston                December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

[asking - car]                                                          Page 3

**asking** 40:12,13
40:14,16
**assertion** 51:7
**assessment**
37:7,22 38:2
**asset** 20:22
**assigned** 63:12
**assume** 8:24
13:5 26:11
29:7 32:4,5
59:21
**assumption**
41:22
**atlanta** 2:4
**attached** 66:6
69:11
**attorney** 51:14
51:19 55:10
69:13
**audio** 58:12,25
59:3 60:4,9
**authority** 68:7
**available** 11:15
69:6
**awhite** 2:5

**b**

**b** 3:11 13:20
67:5
**back** 11:8
12:18 23:6,24
24:12,15 36:2
36:13 38:24
39:2 41:6,7
44:20 56:5
58:22

**banger** 17:17
**bangor** 54:20
54:21,24
**bankruptcy**
19:13
**base** 32:13,15
33:20 34:18,22
35:12 36:4
**based** 41:3,13
41:17 48:16
49:7 53:10
**bates** 27:6
47:13 50:24
52:7
**baton** 1:16,19
14:15 16:14
21:13,16,19
22:8 23:5
50:18,20
**baylor** 16:4
**beginning** 1:21
60:24 61:8
**behavior** 41:2
**believe** 6:24 8:4
20:6 24:19,21
25:15 28:21
29:16 30:12
33:25 39:7
43:7 48:17
49:23 51:9
52:15 53:8
**believed** 29:10
**best** 51:24
61:17 68:10

**bet** 49:13
**better** 29:19
57:19
**beyond** 7:14
**bills** 29:13,19
**bit** 12:6 15:20
56:20
**blind** 43:2
**blue** 20:22
32:19 49:16,23
50:3,11,13
53:10
**board** 68:12,16
**body** 37:24
38:5,7
**book** 20:23
32:19 49:16,23
50:3,11,13
53:10
**borrow** 24:25
**bothered** 12:9
**bottom** 26:19
27:11
**brand** 22:9,11
**break** 13:10,11
13:12 58:19
**brief** 24:11
38:23
**bring** 22:8
**brooksville**
15:15 28:17
**brought** 49:10
49:12
**buick** 25:9 61:2
61:3

**buy** 50:1
**buyer** 41:18

**c**

**c** 13:20 66:2,2
**cairns** 15:14
**call** 6:10,11
11:13 12:1
24:13 38:25
52:10 59:22
**called** 28:15
50:22 54:16
61:15
**cancel** 24:8
**capacity** 17:9
18:2 19:6
**captioned** 1:15
**capture** 42:4
**car** 20:18,21,24
21:7,21 22:4
23:5,18,19,21
23:23,25 24:3
24:23 25:8,10
28:20 29:14,22
30:10 32:23
37:9,11,12
40:9 41:20,23
41:25 50:1,19
50:20 51:5
52:14,22,25
54:18,21 55:2
56:12 57:24
58:3,4 60:13
60:17,21,25
61:1,4 63:7,8
63:11,13,16,20

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[car - convicted]**                                                    Page 4

64:14,16,17,21
**cardiac** 16:12
  17:9,13
**cardiovascular**
  18:9
**care** 29:19
**cars** 25:5,6
**case** 5:11 6:13
  10:12 17:15
  18:1 20:5
  23:11 28:25
  31:1 34:11
  37:23 62:13
**cases** 19:5
**cash** 35:22 36:1
  62:21
**cast** 17:19,22
**casualty** 1:9,10
  5:8,9 6:13,14
  6:17 69:4 70:1
**categories** 37:4
**cause** 1:15
**ccr** 68:24
**cents** 48:21
**certain** 55:2
  64:16
**certainly** 45:23
**certificate** 68:1
**certification**
  3:8 68:2
**certified** 1:18
  1:25 4:6,22
  67:2,20 68:5
  68:12,23

**certify** 66:4
  68:6
**chamber's**
  12:15
**chance** 51:14
**change** 70:4,7
  70:10,13,16,19
**changes** 66:6
  67:10 69:10
**charge** 61:19
**check** 3:19,20
  56:1,4,6,9,11
  57:9,11,12
**checking** 56:6,7
**checks** 62:22
**children** 14:6
  14:10
**circle** 12:17
**civil** 1:7 4:9,16
  67:4,6 68:15
**claim** 29:1,4,23
**claimed** 17:18
**clarify** 15:6
**class** 18:20,20
  62:11,14,18
**clear** 25:23
  50:8 59:18,21
**climate** 42:22
**closer** 12:8
**code** 4:9,16
  44:14,15,18
  67:6 68:15
**colleague** 56:23
**college** 16:4

**collision** 26:16
**come** 54:24
  58:14
**comments** 37:6
  37:20,25 38:11
**committed**
  17:20,23
**communicati...**
  64:9
**company** 1:10
  1:11 5:8,9 6:14
  6:14,17 20:23
  25:25 29:2
  69:4 70:1
**comparable**
  34:1,4,8 40:3,6
  41:7 42:22
  43:3,8,14,16,25
  44:8,11,20
  45:6,18 46:1,4
  48:13,18 50:4
  53:12
**comparables**
  52:23
**compared**
  34:14 49:2
**comparison**
  34:13
**comparisons**
  51:5
**complete** 68:13
**completed**
  69:17
**compliance**
  68:11,14

**comprehensive**
  26:16
**concerns** 55:5
**concluded** 65:6
**concludes** 65:4
**condition** 32:24
  36:15,18,22,25
  37:4 39:6,18
**conducted** 5:13
**configuration**
  42:8,12 45:2
  45:14
**confirm** 6:19
**connection**
  1:15 4:12 9:4
  24:6 38:18
**consideration**
  62:10
**considering**
  62:9
**consult** 51:14
**consumer** 41:1
**contact** 45:21
  45:25 46:5
  50:18 64:15
**context** 17:12
**contractual**
  68:15,17
**control** 46:24
  47:3
**conversations**
  11:2 62:4,7
**convicted** 18:3
  19:11

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[copied - disagree]**                                              Page 5

| | | | |
|---|---|---|---|
| **copied** 47:9 | **coverage** 26:16 | **december** 1:20 | **deposition** 1:14 |
| 51:24 57:15 | 26:24 28:4,8,9 | 5:3 | 4:4,12,19 5:5 |
| 64:9 | 30:2 | **decide** 20:11 | 5:13 6:16 7:6 |
| **copies** 69:14 | **crashed** 29:15 | **decided** 48:11 | 7:14,15 9:5 |
| **copy** 31:4 | **crease** 37:25 | **declarations** | 17:12 19:1,2 |
| **correct** 8:23 | 38:3 | 26:2,5,12,15 | 19:15,18,21 |
| 9:3,21 14:12 | **crimes** 19:11 | **deducted** 32:25 | 21:8 24:11 |
| 15:7,8 19:1 | **cs** 69:15 | 42:24 43:4 | 59:4 60:5 61:9 |
| 21:5 26:7,8 | **current** 14:14 | **deduction** 33:1 | 61:18 65:4,6 |
| 27:19,20,23 | **currently** 8:18 | **deer** 15:14 | 68:14 |
| 30:16,24 33:20 | 16:5 | **defendant** 1:11 | **depositions** |
| 35:23 36:5,8 | **cv** 1:7 5:12 | 2:2 5:6 | 17:1 18:23 |
| 44:7 62:17 | **cvt** 16:18 | **defendant's** | **describe** 49:8 |
| 66:5 68:10 | | 17:22 | **detail** 33:9 |
| **corrections** | **d** | **defendants** | **determination** |
| 66:7,14,15 | | 5:21 6:12 | 30:13 47:21 |
| **corresponden...** | **d** 3:1 4:16 | **defense** 4:3,7 | **determining** |
| 46:24 | **daily** 27:1,2 | **defer** 46:9 | 53:2 |
| **counsel** 4:2,3,7 | **dashes** 67:9,13 | **deferred** 48:8 | **difference** |
| 4:17 5:6,17 | **date** 66:17 | 48:20 | 43:15 |
| 6:20 7:1,3 9:24 | 70:24 | **defined** 67:4 | **differences** |
| 11:9,10,20,20 | **david** 1:18,24 | 68:15 | 49:8 |
| 19:24 20:1 | 4:6,22 5:17 | **definitely** 38:9 | **different** 36:11 |
| 68:19,19 69:14 | 67:2,20 68:5 | 43:24 | 37:3 41:2 44:5 |
| **country** 44:6 | 68:23 | **degree** 16:3 | 44:7,9 49:24 |
| **couple** 20:14 | **day** 1:20 28:14 | **denoted** 67:16 | 50:2 60:22 |
| **court** 1:1,18,25 | 55:8 | **deny** 30:1 | **direct** 68:17 |
| 4:6,22 5:10,16 | **days** 69:17 | **deponent** 69:13 | **direction** 68:9 |
| 6:1 8:12,20 | **dealer** 49:25 | **deposed** 16:19 | **disagree** 32:14 |
| 11:18,24 12:4 | 50:19,21 51:5 | 16:20,22,24 | 32:17,25 33:5 |
| 12:12,23 18:25 | **dealership** | 17:10,15 | 37:18 40:20 |
| 19:3,4 58:14 | 21:19 34:24 | **deposing** 69:13 | 41:4,8,25 42:6 |
| 67:2,12,20 | 35:18 45:21 | **deposited** 56:6 | 42:7,12,16,19 |
| 68:5,17,23 | **dealing** 48:10 | 56:8 | 42:24 43:5 |
| | **dealings** 20:7 | | 44:4,22,25 |
| | **dec** 3:14 | | |

Veritext Legal Solutions

800.808.4958                                                     770.343.9696

Robert Scott Thurston                                        December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[disagree - expire]**                                                      Page 6

45:9,15

**disagreed**
30:12,17 32:6
32:11 43:8
48:17

**discourse** 67:9

**discuss** 12:21
19:18,21 30:11
47:24 61:24

**discussed** 18:24
19:5 20:13,17
40:4

**discussion**
62:11

**district** 1:1,3
5:10,11

**doctor** 6:10
18:2 19:7

**document**
25:13,17,24
27:5,12 31:7,9
31:15,16 35:5
35:15 46:14
55:14,15,18,24
56:10,13

**documentation**
51:7

**documented**
51:3,15

**documents**
31:2

**doing** 11:1
32:18 45:23

**door** 37:25

**doors** 37:19

**dotted** 27:24

**dr** 6:8 13:24
15:25 63:4

**drive** 14:15
25:8,11 60:17

**driven** 60:13

**driver** 28:23

**driver's** 29:2

**driveway** 64:17

**driving** 23:3
25:4 28:17
59:11

**dropped** 24:6

**drove** 23:1,6,23
61:1,1

**due** 67:8

**duly** 6:4 68:7

**e**

**e** 3:1,11 13:20
66:2,2,2 70:3,3
70:3

**earlier** 15:25
30:12 43:7
48:17

**east** 1:16,19

**effort** 38:24

**either** 19:5
20:25 22:16
24:23 62:19
64:12,20

**elementary**
28:18

**eleven** 23:16
36:21

**ellen** 51:24

**else's** 59:11

**ely** 5:15

**email** 3:18
10:18 46:23
47:14,16,25
50:25 51:10,11
51:23 52:7,17
53:17 55:8

**emails** 46:25
47:2,9

**employed** 16:5

**employment**
68:17

**enclave** 25:9
61:2

**enclosed** 57:10

**enclosing** 3:20

**ends** 50:24 52:6

**engage** 9:22
11:9

**engaged** 9:23

**engagement**
7:5,13,17,19,25
8:7,16

**entire** 38:5

**entity** 68:13

**equal** 49:10

**equipment**
33:11,15 39:20
42:20

**errata** 69:11,13
69:17

**escape** 25:7

**esq** 69:1

**essentially**
20:22

**et** 69:4 70:1

**evaluate** 51:2

**evaluation**
52:22

**evidence** 51:15

**evidently** 64:12

**exactly** 18:7

**examination**
3:4 6:6 63:5
64:6

**except** 4:13

**exception** 66:6

**excluding** 4:13

**exhibit** 3:13,14
3:15,16,17,18
3:19,20 25:18
25:19,19 27:5
27:7,7 31:10
31:11,11 35:6
35:7,7,16 36:3
39:5 46:14,16
46:16,22,23
55:19,20,20
56:14,15,15

**exist** 49:9

**expect** 63:18,22

**expectation**
23:25

**experience** 48:9

**expert** 17:6

**expire** 26:9

Case 1:22-cv-00375-NT    Document 120-13    Filed 01/10/25    Page 26 of 100    PageID
#: 4549
Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[expired - h]**                                                        Page 7

| | | | |
|---|---|---|---|
| **expired** 26:11 | **felt** 20:6 28:25 | **formalities** | **going** 5:2 7:9 |
| **explanation** | **figured** 52:15 | 4:11 | 7:22 9:7 10:2 |
| 41:4 | **file** 20:12 29:4 | **format** 68:11 | 10:15 11:8,25 |
| **extort** 18:11 | 29:23 58:12,25 | **forth** 68:7 | 12:20 15:23 |
| **extra** 35:13 | 59:3 60:4 | **forty** 17:24 | 20:15 25:13 |
| | 62:13 | **found** 54:20 | 27:4 31:7 |
| **f** | **filed** 5:9 19:13 | **four** 11:6 18:15 | 34:12 39:6 |
| | 29:1 | 18:16 36:13 | 41:7 42:4 |
| **f** 66:2 | **filing** 20:9 62:9 | **free** 22:2 | 44:20 46:13,22 |
| **fact** 20:18 | **financed** 22:17 | **front** 28:19,24 | 47:1,6,12 52:6 |
| 41:13 48:1 | **financial** 1:10 | **further** 62:25 | 54:8 55:14,16 |
| **fails** 69:19 | 5:9 6:14,17 | 64:3,25 | 56:10 58:13,25 |
| **fair** 13:6,8 | 68:13 | **furthermore** | 60:1 61:19 |
| 20:25 38:5 | **find** 28:12 | 49:5,6 | 65:5 |
| 48:11 49:2 | 64:15 | **future** 61:6 | **good** 5:2 6:8 |
| **fairway** 14:15 | **fine** 61:19 | | 20:16 38:6,8 |
| **fall** 15:21 | **firm** 56:22 | **g** | 55:4,6 |
| **far** 18:10 33:21 | 68:17 | | **gouges** 37:21 |
| 47:20 | **first** 9:23 20:8 | **ga** 2:4 | **great** 55:7 |
| **farm** 3:14 26:3 | 23:8 35:15 | **gang** 17:17 | 57:20 |
| 26:24 27:14 | 40:19 42:21 | **georgia** 22:7 | **greater** 37:20 |
| 28:4 29:4,11 | 44:24 52:7 | **getting** 11:2 | **ground** 12:22 |
| 29:15 | **five** 15:17 | **give** 33:12 | **group** 18:13 |
| **father** 52:10 | 16:24 17:24 | 46:24 55:14 | **guess** 18:25 |
| **fault** 28:24 | 40:2 60:2 | 56:20 | 27:13,16 28:11 |
| **features** 33:14 | **flag** 56:21 | **given** 20:1 | 28:14 59:16 |
| 49:9 | **floor** 39:21,25 | **giving** 24:2 | 62:16 |
| **february** 26:21 | **follow** 15:23 | 59:19 | **guidelines** |
| 26:23 47:15 | **following** 1:17 | **go** 8:11 11:8,19 | 68:11 |
| 50:25 51:10 | 33:10 | 11:20 12:16 | **gunpoint** 17:18 |
| 52:8,17 53:18 | **follows** 6:5 | 31:2 36:2,13 | **guys** 11:25 |
| 53:25,25 55:8 | **ford** 25:7 | 38:20 41:6 | |
| **federal** 67:4 | **foregoing** 66:4 | 52:6 54:21,24 | **h** |
| **feel** 57:19 63:12 | 68:7,11 | 56:5,21 58:15 | |
| **fees** 35:25 | | 63:23 | **h** 3:11 13:21 |
| **fellow** 34:25 | | **goes** 7:14 | 70:3 |

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[handle - jason]**                                                          Page 8

**handle** 30:20
**happened**
   10:21 20:14
   23:12 24:23
   28:14 52:16
   57:23
**happy** 13:3
   25:23
**hard** 27:11
**heading** 39:19
**headliner** 37:5
   37:8,9,13,16
**hear** 25:2 59:10
   60:13
**heard** 60:15
**hearing** 12:7
**heavily** 48:15
**help** 34:13
**helpful** 12:21
**hendrick's**
   45:20
**hereinbefore**
   68:7
**hereto** 4:11
**hey** 6:8
**hi** 53:20
**high** 43:20
**higher** 39:16
   43:9,23 45:11
   48:2,5,14,18
**highly** 21:24
**hill** 2:3
**hire** 9:4,11,14
   9:16,18,18,22
   11:9 51:19

   54:8 55:11
   57:6
**hired** 51:25
   52:4 57:4
**hiring** 53:22
**hit** 28:21
**home** 14:17
   22:4
**honda** 25:12
**hoover** 45:20
**hope** 10:12
**hopes** 21:1
**hospital** 16:15
**hour** 10:18
   13:11
**houses** 15:12
   15:13
**houston** 16:4

**i**

**icy** 28:19
**idea** 9:4,11
   10:20 11:8
   29:23 33:7
   51:19
**identification**
   25:20 27:8
   31:12 35:8
   46:17 55:21
   56:16
**identify** 5:17
**imagine** 11:6
**implications**
   62:20
**important**
   12:24

**improper** 33:25
**increase** 51:4
**indefinitely**
   24:3,16
**independent**
   53:22 54:8,13
   54:25 55:12
   57:5
**indicate** 67:10
   67:13
**indigent** 18:10
**indirect** 68:17
**individual** 50:2
**industry** 30:16
   42:18 49:2
**inflated** 39:13
**information**
   35:2 43:2 51:4
   53:16
**informed** 68:13
**ingram** 45:25
**initial** 66:12
**inquire** 45:22
**insisted** 20:23
**instruct** 7:9,23
   9:8 11:12
**insurance** 1:10
   5:8 6:13 20:23
   25:25 26:24
   27:2 29:2,20
   30:9 63:18,19
   63:22 69:4
   70:1
**insured** 29:8,11
   29:15,22 57:17

**intended** 63:15
**intention** 61:4
**interact** 30:23
**interaction**
   67:8
**interested**
   68:20
**interior** 37:19
**internal** 37:11
**internet** 24:6
   32:18,20 38:18
**interrupting**
   10:14
**involved** 48:22
   53:2
**involving** 28:13
**island** 2:7 5:23
**islandjusticel...**
   2:9 69:2
**isle** 15:14
**issue** 21:5
   23:11
**it'll** 11:13
**item** 35:21

**j**

**j** 1:18,24 4:6,22
   51:23 67:2,20
   68:5,23
**jack** 45:25
**january** 23:7,9
   23:12,18 26:6
   26:9 27:19
   32:16 69:3
**jason** 5:15

Case 1:22-cv-00375-NT    Document 120-13    Filed 01/10/25    Page 28 of 100    PageID
#: 4860
Robert Scott Thurston
December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[joann - louisiana]**                                                    Page 9

| | | | |
|---|---|---|---|
| **joann** 14:2 29:18,18,19,21 | 40:22 42:18 44:6 46:9,11 47:10 48:24 49:1,13 54:17 55:4,17 57:12 61:6,7 62:2,15 62:19 | **leave** 63:16 64:17 | **live** 14:23 15:2 15:5 44:9 |
| **john** 2:7,9 5:23 7:7 8:2 56:23 61:15 62:1 69:1,2 | | **left** 45:19 63:11 | **lived** 14:19,21 15:4 |
| | | **leg** 17:19,23 | |
| **judge** 11:13 | | **legal** 64:13 69:23 | **lives** 15:6 |
| **july** 26:6 27:18 28:9 | **knowledge** 30:15 68:16 | **legally** 59:16 | **llp** 2:3 |
| | | **letter** 3:20 7:17 46:20,22 50:14 57:1,3,8,10,15 | **local** 50:18 |
| **justice** 2:7 5:23 | **known** 29:22 | | **long** 14:4,19 60:3 |
| **k** | **knows** 49:14 | **letters** 8:17 | **longer** 10:15 29:11 |
| **kbb** 51:2 52:23 | **kslaw.com** 2:5 | **letting** 25:14 | |
| **keep** 12:22 24:3 25:7 47:5 63:18 | **kyle** 48:2 51:1 52:8 53:19 54:1,7 | **level** 36:11 49:7 | **look** 26:19 27:24 32:12,21 33:8 34:4 35:21 37:3,12 40:23 49:4 50:23 53:17 54:21 |
| | | **limited** 7:6,13 7:15 | |
| **kelley** 32:19 49:16,23 50:3 50:12 53:10 | **l** | **line** 27:24 32:24 70:4,7 70:10,13,16,19 | |
| | **l** 4:1 | | |
| **king** 2:3 5:20 56:22 | **label** 47:13 | **list** 40:6,14 43:18,19 44:4 44:5,22 45:9 48:2,4,5 | **looking** 12:15 32:18,19 43:25 |
| | **labeled** 27:6 | | |
| **knew** 53:11 | **lady** 28:18 | | **looks** 32:22 38:18 |
| **know** 8:24 13:3 13:12 16:21,23 17:21 18:7,7 20:4,10,21 22:16 23:24 24:21,23 26:10 27:1 28:6,6,6 28:25 29:1,7 29:14,18 30:5 30:25 31:17 33:2 34:10 35:3 36:12 37:8,9,17,18 39:13,17 40:13 | **land** 15:12 | | |
| | **lane** 15:14 | **listed** 33:14,18 40:17 41:3 42:21 43:22 44:1 45:7,13 45:20 46:5 49:18 50:5 | **loss** 23:11 30:14 32:13 33:9 64:19 |
| | **largest** 18:8 | | |
| | **law** 2:7 51:24 | | **lost** 19:10 21:4 24:5 38:17 |
| | **lawsuit** 14:12 18:4,21 20:9 20:12 21:2 62:5,8 | | |
| | | **lists** 26:12 33:10,23 49:23 | **louisiana** 1:17 1:20 4:10,16 4:23 14:15 16:14 21:13 44:15 63:16 67:3,5 68:5,12 68:15 |
| | **lawsuits** 18:6 18:12,16 | **litigant** 68:18 68:19 | |
| | **lawyer** 8:23,25 9:1,4,11 51:21 51:25 | **litigation** 8:18 | |
| | | **little** 12:6,8 15:14,20 | |
| | **lawyers** 17:21 48:10 | | |

Case 1:22-cv-00375-NT    Document 120-13    Filed 01/10/25    Page 29 of 100    PageID
#: 4801
Robert Scott Thurston                                      December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

[low - msrp]                                                      Page 10

| | | | |
|---|---|---|---|
| **low** 43:20,21 | 46:17 55:21 | **mean** 8:14 9:16 | **mile** 48:21 |
| **lower** 17:19 | 56:16 | 9:19,20,22 | **mileage** 42:15 |
| 36:6 49:1 50:4 | **married** 14:1,1 | 21:16 22:16 | 43:9,15 45:4 |
| **m** | 14:4 | 23:22 26:23 | 45:15 48:14,16 |
| | **material** 67:16 | 28:3 32:2,22 | 48:19 49:1 |
| **madam** 11:18 | **math** 48:21 | 40:8,8,10,15 | 52:24 |
| 11:24 12:4,12 | **mats** 39:22,25 | 41:16 49:22 | **miles** 34:3 |
| **made** 20:11 | **matter** 5:7 29:9 | 53:2 | **mind** 31:17 |
| 35:17 43:12 | 68:18,19,20 | **means** 33:7 | **mine's** 47:5 |
| 48:25 56:2 | **matters** 10:23 | 36:1,1 38:3 | **minutes** 17:24 |
| **magistrate** | 10:25 | 40:22 42:2 | 60:2 |
| 11:14 | **matthew** 1:6 | 49:19 50:8 | **missy** 5:16 |
| **maine** 1:3 5:11 | 5:7 14:10 | **meant** 49:20 | **model** 33:20 |
| 15:12,13,16,19 | 24:21 28:14 | **media** 5:4 | 34:13,19,23 |
| 15:23 23:6,24 | 30:20 32:5 | **medical** 16:3 | 36:4 49:11 |
| 24:1 25:1,4,5,6 | 36:22 37:1 | 18:17 | **models** 34:6 |
| 25:11 44:12,18 | 45:24 47:14 | **medications** | **moment** 31:2 |
| 59:24 60:14,17 | 48:8,10,20 | 13:14 | 33:3 35:4 40:4 |
| 60:18 61:1,2,4 | 49:14 50:9,19 | **medicine** 16:4 | 56:20 58:16 |
| 61:5 | 50:22 51:11 | **meet** 19:24 | **money** 18:11 |
| **make** 11:25 | 53:4 55:9,11 | **melissa** 1:18,24 | 20:20 |
| 31:20 44:19 | 58:3,5,8 59:9 | 4:6,22 67:2,20 | **montgomery** |
| **makes** 57:25 | 59:10,14 60:11 | 68:5,23 | 46:1 |
| **making** 31:22 | 60:16,22 61:6 | **member** 18:20 | **month** 23:7 |
| 68:13 | 63:7,11,16,23 | **memory** 20:16 | 52:16 |
| **malpractice** | 69:4 70:1 | 54:10 55:5 | **months** 15:17 |
| 17:3 18:17 | **matthew's** | 57:19 | 23:16,17 35:18 |
| 19:6 | 29:25 30:2,5 | **mention** 20:8 | **morning** 5:2 |
| **man** 57:2 | 51:20 | **mentioned** | 6:8 |
| **marital** 13:24 | **mayer** 51:1 | 16:19 | **mother** 25:10 |
| **mark** 25:18 | 52:8 53:19 | **method** 67:11 | 52:9 |
| 31:9 35:5 | 54:1,7 | 68:9 | **motors** 45:25 |
| 55:19 56:13 | **mcentyre** 56:23 | **methodology** | **move** 11:5 |
| **marked** 25:20 | **md** 16:1 | 40:24 | **msrp** 34:18 |
| 27:8 31:12 | | | 36:3,4,9 49:10 |
| 35:8,16 46:14 | | | |

Case 1:22-cv-00375-NT    Document 120-13    Filed 01/10/25    Page 30 of 100    PageID
#: 4868
Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[msrp - outside]**                                                    Page 11

49:12
**multiple**  8:25

**n**

**n**  3:1 4:1 13:21
  66:2
**name**  5:15 6:11
  13:18 16:17
  22:13 52:13
**named**  4:24
**names**  13:22
  67:15
**nature**  11:3
**ne**  2:4
**near**  28:17
**nearly**  34:2
**need**  13:1,11
  52:10
**needed**  64:14
**needs**  59:24
**negative**  42:9
**negotiate**  41:14
  41:19,23,24
  42:5
**negotiated**  42:6
**negotiating**
  41:2
**negotiation**
  41:18
**neither**  29:8
**never**  18:10
  51:21 58:3
**new**  21:15 22:9
  22:11
**night**  7:4 8:22
  9:1,23 61:16

61:16,21,25
**nine**  60:2
**normally**  25:9
**norumbega**
  15:14
**notarized**
  59:23
**note**  69:10
**notice**  4:8
  27:14,16 28:7
  52:21
**nt**  1:7 5:12
**number**  5:4,11
  8:16 12:16
  25:19 27:7
  31:11,19 35:7
  35:21 44:1
  46:2,4,5,16
  50:24 52:7
  53:7,9,9,12
  55:20 56:15
**numbers**  53:11
**numerous**
  38:12 39:8,11

**o**

**o**  4:1 13:20,20
  13:21
**oath**  4:24 18:24
  19:3 20:15
  46:10 58:6
**object**  7:22
  10:2
**objected**  61:9
**objection**  9:7

**objections**  4:18
  10:14 61:12
**obtained**  50:12
**occurred**  58:20
**oem**  39:20
**offer**  31:20,22
  47:19 53:6
**offered**  31:18
  54:10
**offering**  32:7
**officer**  67:3
  68:5
**officiated**  4:23
**oh**  32:22 42:2
**okay**  6:11,23
  7:3,17 8:11
  9:22 11:17,25
  12:5,11,15
  15:22 18:1,4
  19:9,24 21:1,7
  21:9,19,23,25
  22:6,9,23
  23:15,16,21
  24:8,16 25:13
  25:15,17 26:5
  26:12,22 27:18
  28:23 29:23
  30:21 31:20
  32:9,17 33:3,8
  34:4,13 35:1,4
  35:15,21 36:2
  36:24 37:14,19
  38:20 39:5
  40:5,14,16,17
  40:23 41:11,19

42:8,15,20
43:7,13,16,19
43:22,25 44:13
44:20 45:6,13
45:18,25 46:8
46:13 47:2,4,6
47:6,7,7,8
48:12,23 49:4
49:22 50:11,15
50:23 51:23
52:17,21 53:14
55:3,7 56:10
56:18,24,25
57:14,18,20
59:7,10,25
60:8,23 61:8
61:15,21 62:19
63:3 64:1
**old**  36:20,21
**once**  51:13
**ones**  19:8
**open**  18:25
  19:3,4
**opinions**  68:16
**options**  22:19
  22:21,23,23
  33:17 36:10
  49:9,11
**order**  8:20
**original**  34:18
  68:2,2
**outcome**  68:20
**outlined**  51:6
**outside**  17:9
  47:20

Robert Scott Thurston                                                December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[overs - prices]**                                                        Page 12

| | | | |
|---|---|---|---|
| **overs**  67:11 | 51:12 | **phone**  6:23 | **possibility** |
| **owed**  53:15 | **parish**  1:16 | 12:1,16 46:5 | 54:11 64:18 |
| **own**  14:17 15:9 | **particular** | 54:1 59:22 | **possible**  35:12 |
| 15:12,12,13 | 44:23 | 61:16 | 45:24 57:18 |
| **owner**  31:25 | **parties**  4:11,17 | **phonetically** | 60:21 61:6 |
| 32:5 46:5 | 68:20 | 11:15 67:17 | **practice**  16:15 |
| 59:20 64:13 | **parts**  33:5 | **phrase**  40:22 | 16:17 18:8,9 |
| **owners**  64:20 | 39:20 44:6 | 67:17 | **premier**  34:9 |
| **owns**  57:24 | **party**  17:4 18:4 | **phrases**  67:14 | 34:19,19 |
|  | 18:6,13,15,17 | **pick**  21:15,20 | **premiere**  34:5 |
| **p** | 49:17 68:18,18 | 23:6 | 34:6,9,15,16 |
| **p**  4:1 | **past**  61:24 62:8 | **picked**  21:17 | **premium**  49:11 |
| **p.m.**  47:15 | **pause**  24:11 | **picking**  22:1 | **prepare**  19:15 |
| 53:19 55:9 | 38:23 | **place**  64:16 | **prepared**  11:2 |
| **package**  42:22 | **paused**  59:7 | **placed**  17:22 | 26:20 27:25 |
| **packages**  33:17 | **pauses**  67:10 | **plaintiff**  1:7 2:6 | 68:9,11 |
| **page**  3:8,13,14 | **pay**  29:13 | 4:3 14:12 | **present**  61:18 |
| 26:2,5,12,15,20 | 49:25 | **plan**  13:10 | **presented** |
| 27:12,21 33:9 | **paying**  9:20 | **play**  58:13,25 | 47:19 48:13 |
| 33:10,10,22 | **peachtree**  2:4 | **played**  59:3 | **presumably** |
| 34:12 36:13 | **pending**  13:14 | 60:5 | 35:2 |
| 40:2,2,23 | **people**  6:10 | **please**  5:17 6:1 | **pretty**  48:8 |
| 47:12 49:15 | 8:25 | 13:3,18 51:5 | **previously**  15:3 |
| 50:24 51:6 | **perfect**  36:22 | 66:12 | 18:23 |
| 52:6 55:7 67:1 | 55:6 | **plus**  34:5,6,15 | **price**  35:22,24 |
| 68:3 70:4,7,10 | **period**  26:6 | 34:19 49:11 | 36:1,7 40:6,12 |
| 70:13,16,19 | 27:18 | **point**  23:3 | 40:14,14,16 |
| **paid**  21:16,19 | **permanently** | 40:25 52:1 | 41:3,3,14,20,23 |
| 28:7 34:25 | 60:21 | 59:14 61:22 | 41:25 43:18,19 |
| 35:10 36:7,9 | **person**  18:11 | 63:9 | 44:4,22 45:9 |
| **paint**  38:10 | 29:21 43:22 | **policies**  26:10 | 49:18,25 50:1 |
| 39:8,12 | 68:13 | **policy**  26:3,6,9 | **priced**  43:23 |
| **panels**  37:20 | **personal**  68:9 | 27:15,18 30:3 | **prices**  44:5 |
| **paragraph** | **pgr**  59:1,25 | 30:6,9 51:21 | 48:2,4,5 49:24 |
| 47:18 48:12 |  |  | 50:2 |
| 49:4,15 50:17 |  |  |  |

Robert Scott Thurston
December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[primarily - recollection]**                                    Page 13

| | | | |
|---|---|---|---|
| **primarily** 23:1 | 55:11 56:1 | 31:13 35:9 | **ratings** 39:6,19 |
| **print** 34:25 | 57:4,21 58:2,7 | 46:18 55:22 | **read** 7:20 41:17 |
| 35:19 | 62:22 64:9 | 56:17 | 47:9 56:21 |
| **printout** 35:17 | 69:4 70:1 | **pursuant** 1:17 | 57:2 66:3,4 |
| **prior** 8:22 26:9 | **progressive's** | 4:8 | 69:9 |
| **private** 49:17 | 30:13 32:10 | **put** 22:7 | **reading** 4:13 |
| 50:1 | 53:9 | **puts** 22:5 | 57:8 |
| **privilege** 8:2 | **prohibited** | | **realize** 43:11 |
| **privileged** 8:7 | 68:17 | **q** | **really** 30:25 |
| 8:17 9:10 11:3 | **prohibition** | **question** 11:8 | 46:21 57:8 |
| 11:4 | 68:14 | 13:2,5,8,13 | **rear** 37:25 |
| **probably** 11:15 | **projected** | 20:17 24:8 | **reason** 59:21 |
| 18:15 | 40:19,25 41:4 | 33:11,13 34:3 | 69:11 70:6,9 |
| **procedure** 4:10 | 41:8,15 42:3 | 46:25 50:6 | 70:12,15,18,21 |
| 4:17 67:5,6 | 44:24 45:14 | 56:14 61:15 | **reasonable** |
| 68:15 | **proper** 67:11 | **questions** 4:15 | 20:20 |
| **proceeding** | **properties** 15:9 | 7:23 11:5 | **recall** 54:13 |
| 67:6,9,12 | **provide** 31:4 | 12:17,20 13:1 | 55:13 56:9 |
| **proceeds** 63:19 | 51:3,5 52:10 | 13:16 61:8,10 | 58:1 62:23 |
| 63:19,22 | **provided** 51:15 | 63:1,4 64:25 | **receipt** 69:18 |
| **produced** 8:18 | **provisions** 4:8 | **r** | **receive** 16:3 |
| 59:1 | **published** | **r** 13:20,20,21 | 56:4 57:21 |
| **progressive** 1:9 | 53:13 | 66:2 70:3,3 | **received** 56:8 |
| 3:18 5:8 6:13 | **pull** 35:4 44:8 | **r.s.** 68:7 | 57:11 |
| 6:15 20:4,9 | 55:15 | **range** 47:20 | **recently** 35:17 |
| 21:2 24:22 | **pulled** 44:11 | **rate** 37:1 | 62:6 |
| 29:24 30:1,9 | **purchase** 3:17 | **rated** 36:18 | **recognize** |
| 30:17,19,23 | 21:12,14 | 37:5,20,24 | 25:24 27:12 |
| 31:4,18,20 | **purchased** | 38:8,11 | 31:15 47:2 |
| 32:7 43:16 | 21:10 22:10 | **rather** 38:5 | 55:24 59:7 |
| 44:10,13,17 | **purchasing** | 60:3 | 60:8 |
| 46:21 47:20 | 41:2 | **rating** 36:19 | **recollection** |
| 51:1 52:8 | **purpose** 26:1 | 38:14 39:7,9 | 30:22 31:3 |
| 53:15,19,21 | **purposes** 4:8 | 39:15 | 54:23 |
| 54:2,5,25 | 25:21 27:9 | | |

Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[recommend - rouge]**                                                Page 14

| | | | |
|---|---|---|---|
| **recommend** 21:24 | **relationship** 68:17,18 | **reporter** 1:18 1:25 4:7,22 | **review** 69:7 |
| **record** 5:3,18 11:19,21,23 13:19 20:15 24:10,15 38:20 38:22 39:2 58:15,18,22 65:5 67:7 | **relationships** 68:15 | 5:16 6:1 11:18 11:24 12:4,12 12:23 58:15 67:2,20 68:5 68:12,23 | **right** 6:21 8:22 9:2 12:1,20 19:2 21:4 22:10 23:19 25:17 26:13,17 26:19 27:4,22 |
| | **release** 52:11 52:14 | | |
| | **relies** 48:15 | | |
| | **rely** 52:23 | **reporter's** 67:1 67:12 68:1 | 27:24 28:10,20 29:13 30:9,14 |
| **recorded** 5:5 | **remember** 6:25 20:24 30:25 31:6,16,22 32:3,22 33:21 34:11 45:23 46:3,7 48:7 54:6,11,15,18 54:22 55:1,1 56:5 57:8 62:1 | **reporting** 1:19 68:9,17 | 31:8 32:24 33:8,22 34:23 36:7,13 37:3 37:25 38:10 39:18 40:2,7 43:10,11,25 44:20 46:13 47:18 49:15 50:17,23 53:17 55:7,18 58:10 58:25 59:25 60:23 62:25 63:9 |
| **recording** 59:8 60:3,9 | | **represent** 6:12 | |
| **records** 35:19 | | **representation** 10:4 11:4 | |
| **recover** 21:2 | | **representative** 30:24 | |
| **reduction** 4:14 | | **represented** 6:20,25 10:17 10:19 11:1 57:17 | |
| **refer** 21:7 | | | |
| **reference** 67:16 | | | |
| **referenced** 69:6 | **remotely** 1:19 5:14 | | |
| **referred** 59:21 | **renew** 28:8 | **required** 68:3 68:12 | |
| **referring** 6:17 50:19 | **renewal** 27:14 27:16,21 28:7 | **research** 48:11 | **rights** 63:12 |
| **refers** 27:21 | **repairable** 30:18 | **reserve** 4:17 | **road** 15:15 28:21 |
| **reflect** 41:1 51:16 | **repaired** 20:19 | **residency** 17:14,16 | **robbed** 17:17 |
| **reflected** 41:22 48:5 | **rephrase** 13:4 | **respects** 30:24 | **robbery** 17:20 17:23 |
| **refresh** 31:3 | **replacement** 53:8,15 | **respond** 13:16 | |
| **regards** 51:12 | **report** 3:16 31:5 32:9,10 33:22 36:3,14 40:23 48:6 | **response** 13:2 | **robert** 1:14 4:5 5:5 6:3 13:20 66:3,10 68:6 69:5 70:2,24 |
| **register** 23:25 | | **retain** 7:3 | |
| **registration** 22:15 | | **retained** 20:21 | |
| | | **retire** 16:9 | |
| **related** 18:18 19:6 29:20 35:20 68:19 | **reported** 1:23 68:8 | **retired** 16:7,11 | **roof** 37:11 |
| | | **return** 69:13,17 | **rouge** 1:16,19 14:15 16:14 |

t

Case 1:22-cv-00375-NT    Document 120-13    Filed 01/10/25    Page 35 of 100    PageID
#: 4850
Robert Scott Thurston
December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[son's - taken]**                                                                    Page 16

| | | | |
|---|---|---|---|
| **son's** 8:23 44:18 | **st** 2:4,8 | 10:1,22 11:11 | **supervision** 68:10 |
| **soon** 17:21 | **stains** 37:6,15 37:18 | 12:5,10 24:5 | **supporting** 51:4,7 |
| **sorry** 12:9 25:2 25:3,13 54:15 | **standard** 33:11 33:15 35:12 49:3 | 24:12 38:24 46:20 51:23 | **supposed** 19:23 |
| **sort** 10:3 17:15 | **start** 12:16 34:12 47:12 60:1 | 52:3 56:23,25 57:10,16 61:9 | **sure** 8:20 22:13 23:10 24:22 |
| **source** 45:19 | **started** 6:19 | 61:11,22,24 63:2,6,25 65:1 | 38:3 41:7 44:7 44:21 50:6 |
| **southeast** 69:15 | **starts** 46:20 49:5 | 69:1 | 58:6,13 |
| **space** 66:13 | **state** 1:16,19 3:14 4:10,23 | **steed's** 38:17 | **surgeon** 16:12 17:9,13 |
| **spalding** 2:3 5:20 56:22 | 10:8 13:18 18:9 20:15 | **stenomask** 68:9 | **surgeons** 18:8 |
| **speak** 12:7 52:3 54:3,4 | 26:2,24 27:14 28:4 29:4,11 | **step** 40:25 | **surgery** 18:9 |
| **specific** 15:22 16:15 18:14,14 | 29:15 44:9,10 48:24 67:3,7 | **sthurston2003** 52:19 | **surgical** 16:18 |
| 30:15 | 68:5 | **stipulated** 4:2 | **surprised** 29:14 |
| **specifically** 42:19 47:12 48:7 | **statement** 39:14 | **stipulation** 1:17 3:3 | **swear** 6:1 |
| **specifics** 33:3 40:3 | **states** 1:1 5:10 49:17 | **stonington** 2:8 | **swearing** 4:14 |
| **spell** 13:18 | **status** 13:24 | **stop** 47:6 | **sweden** 21:15 21:17,20 22:3 |
| **spelled** 11:14 67:17 | **statute** 68:12 | **sub** 34:13 | 22:4 |
| **spend** 15:18 22:3 | **statutes** 4:9 | **subaru** 45:20 | **sworn** 6:4 68:7 |
| **spoke** 6:23 | **stay** 11:23 | **subject** 17:1 | **system** 43:2 |
| **spoken** 53:20 54:1 | **stays** 25:11 | **submit** 51:6 | **t** |
| **spontaneous** 67:8 | **ste** 2:4 | **subpoenaed** 10:12 51:22 | **t** 3:11 4:1,1 13:20,20,20,21 |
| **spot** 43:2 | **steed** 2:7 3:6,18 5:22,23 7:8,21 | **subsequent** 64:22 | 13:21 66:2,2,2 70:3,3 |
| **spouse** 14:2 | 8:3,13,19,22 9:6,12,20,22,24 | **substantive** 61:23 | **take** 10:13,15 13:10,12 38:5 |
| **spring** 15:18,20 | | **suggesting** 48:3 | 41:12 |
| | | **suggests** 28:9 | **taken** 1:14 4:6 5:6 54:19 |
| | | **suing** 20:4 | 59:23 66:17 |
| | | **suits** 17:3 | |
| | | **summer** 15:18 15:20 | |

Case 1:22-cv-00375-NT    Document 120-13    Filed 01/10/25    Page 36 of 100    PageID
#: 4861
Robert Scott Thurston
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.
December 18, 2023

[taken - tree]                                                              Page 17

| | | | |
|---|---|---|---|
| 67:7 | 66:4,6 68:6,8 | 67:10 | **times**  16:20,22 |
| **takes**  29:19 | 69:9,18 | **three**  11:6 | 16:24 55:2 |
| **talk**  12:25 | **texas**  16:4 44:8 | 33:22,23 37:21 | **title**  22:12,14 |
| 44:22 47:11 | **thank**  12:13 | 38:8 39:16 | 23:23 24:18,20 |
| 51:21 67:11 | 61:14 | 45:6,18 48:12 | 32:3,4 57:22 |
| **talked**  10:17 | **thereof**  4:13 | **thurston**  1:6,14 | 57:24 58:1,3,4 |
| 48:1 53:4 54:7 | **thing**  64:14 | 3:19,21 4:5 5:6 | 58:7 59:23 |
| 61:21 62:2 | **things**  10:9 | 5:7,24 6:3,8,9 | **titled**  31:25 |
| **talking**  39:5 | 12:22 29:20 | 13:20,24,25 | **today**  6:11,15 |
| 54:13 | 35:13 48:22 | 14:2,10 15:25 | 10:9 12:21 |
| **taxes**  35:25 | **think**  7:12 8:6 | 47:14 55:9 | 19:16 20:2 |
| **technology** | 9:13 10:23,25 | 63:4 66:3,10 | **today's**  19:18 |
| 5:14 | 11:3,13 12:21 | 68:6 69:4,5 | **told**  21:1 28:22 |
| **teleconferenc...** | 18:3 20:13,18 | 70:1,2,24 | 55:16 62:10 |
| 1:16 | 21:18 22:13,23 | **thurston0000...** | **top**  37:12 41:6 |
| **tell**  20:11 25:15 | 29:5 30:1 34:7 | 59:2 | **total**  21:4 23:11 |
| 28:16,23 30:17 | 34:10,22,24 | **thurston0000...** | 30:14 |
| 30:19 36:20 | 36:9 38:7 | 60:1 | **totaled**  20:18 |
| 54:7 55:11 | 39:15,24 40:11 | **thurston008** | 20:24 |
| 56:7 60:19 | 41:13,19 42:4 | 3:15 27:6 | **touch**  50:20 |
| 62:13,21 | 42:5 43:18,20 | **time**  7:1 10:13 | 51:13 55:10 |
| **telling**  6:25 | 44:5,10,17 | 18:10,14 19:22 | **tow**  64:15 |
| **ten**  16:22 18:7 | 45:11 46:12 | 22:9 24:10,15 | **transaction** |
| 23:16 36:20 | 48:1,7 49:21 | 25:8 29:12,13 | 35:20 |
| **term**  6:15 | 50:9 51:20 | 30:6 31:24 | **transcribed** |
| **terms**  7:19,24 | 52:5 54:3,6 | 38:22 39:2 | 68:9 |
| 8:6 | 55:13 56:13 | 53:13 58:18,22 | **transcript** |
| **test**  58:16 | 57:2,7,11 | 59:5 60:6 61:3 | 67:14 68:2,10 |
| **testified**  6:5 | 60:23 64:18 | 61:5 62:9 | 68:11,11 69:6 |
| 18:24,25 19:3 | **third**  34:8 | 64:11,19 65:5 | 69:20 |
| **testify**  68:7 | 47:18 | 69:19 | **transcription** |
| **testifying**  17:6 | **thirty**  14:5 | **timeframe**  69:8 | 66:5 67:12 |
| **testimony**  17:2 | **thought**  30:18 | **timeline**  10:3 | **traveled**  21:20 |
| 18:1 19:4 | 48:11 58:4 | 10:20 | **tree**  28:21 |
| 38:23 58:19 | 61:17 63:10 | | |

Case 1:22-cv-00375-NT    Document 120-13    Filed 01/10/25    Page 37 of 100    PageID
#: 4860
Robert Scott Thurston                                    December 18, 2023
Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[trial - voices]**                                                        Page 18

**trial**  4:18 19:8
**trim**  36:11 49:7
**trouble**  12:7
**truck**  22:8
**true**  38:4 66:5
  68:10
**try**  6:11
**trying**  10:20
  15:6 18:11
  42:3 50:7
**turned**  28:18
**turning**  28:24
**twenty**  60:2
**twice**  34:2
**two**  14:9 18:12
  23:15 34:5
  37:5,20,24
  38:11 39:8
  40:25 42:20
  44:1,21 46:2
  57:25 59:18
**typewriting**
  4:15
**typical**  36:17
  36:25
**typically**  15:18

**u**

**u**  4:1 13:21
**u.s.**  22:1
**under**  18:24
  19:3 20:15
  33:15 37:4
  45:19 46:10
  58:6 68:9

**understand**
  6:16 10:11,16
  13:2,5,15 24:2
  24:24 25:3
  28:3 31:24
  32:2 40:5,10
  40:15 41:15
  43:13 44:13,16
  49:19 50:6,7
  51:24 52:11,24
  56:24 57:4,20
  57:23,24 59:14
  62:20
**understanding**
  30:8 32:11
  53:14 57:9
  60:16,20,20,22
  64:8,11 68:10
**understood**
  57:7 64:19,23
**unfair**  20:6
**unit**  5:4 55:4
**united**  1:1,10
  5:9,10 6:14,17
**use**  4:18 6:15
  34:1 48:18
  51:2 60:18
  61:3
**used**  32:23
  41:20 44:17
  52:23 67:10
  69:20
**using**  5:14 43:8
  43:16 44:14
  61:5

**usually**  17:5
  18:13 50:2
  54:17

**v**

**v**  69:4 70:1
**vague**  54:10
**valid**  68:2
**valuation**  3:16
  31:5 32:10
  36:2,14 48:6
  51:13,16 53:1
  53:21 54:5
**value**  20:23
  31:18 32:13,15
  32:17,23 33:6
  34:1 43:14
  47:21,24 48:16
  49:1,6,17 50:4
  50:11,13 51:4
  51:8 53:3,8,15
**values**  51:2
**veer**  28:20
**vehicle**  3:16
  21:4,14 22:1
  22:15 32:13
  33:9 34:8
  35:12,13,24
  36:17,21,25
  40:6 41:7 42:8
  42:22 43:3,14
  43:17,22,25
  44:21 45:2,6
  45:14,18 46:1
  46:4 47:22
  48:14 49:7,9

  49:24 50:12
  51:3,17 52:12
  59:11,17,19
**vehicle's**  48:16
**vehicles**  34:1,4
  40:3 43:8 44:8
  44:11 48:13,18
  49:18 50:4,5
**verbal**  13:1
  52:11
**verified**  67:16
**verify**  69:9
**veritext**  69:14
  69:23
**veritext.com.**
  69:15
**versus**  1:8 5:7
  32:12
**video**  5:4 24:12
  38:25 58:14
  65:4
**videoconfere...**
  4:4
**videographer**
  5:1,16,25 24:4
  24:9,14 38:16
  38:21 39:1
  58:17,21 64:2
  65:3
**view**  25:23
**vins**  52:24
**virtual**  5:14
**voice**  59:8
**voices**  60:8

Thurston, Matthew v. Progressive Casualty Insurance Company, et al.

**[volvo - zoom]**                                                                          Page 19

| | | | |
|---|---|---|---|
| **volvo** 3:17 21:5 21:7,10 22:5 22:17,19 23:1 23:4 24:25 25:4 26:13,15 26:25 28:5,13 29:10 30:2,5,9 30:13,18 31:5 32:1,7,15 33:14,17,20,23 34:1,3,5,6,8,9 34:14,15,15,22 36:7,18,21 37:1,16 42:23 43:3,10 44:14 45:22 49:12 53:3 59:15 60:25 61:5 64:10 | **wanted** 12:5 17:21 47:10 48:9 62:13,15 **way** 19:10 21:24,25 59:22 61:23 **we've** 19:5 51:13 **weather** 39:21 **week** 6:24 22:3 23:9,19 **weeks** 64:11,22 **went** 19:8 21:15 28:21 34:24 64:22 **white** 2:3 3:5,7 5:19,20 6:7,12 7:11,16 8:1,5 8:10,15,21 9:9 9:15 10:5,10 11:7,16,22 12:2,14,19 24:5,7,17 25:22 27:10 31:14 35:14 38:17,19 39:4 46:19 55:23 56:19 58:11,24 59:6 60:7 61:13,20 62:24 64:4,7,24 **wholesale** 53:7 53:9,12 **wide** 49:2 | **wife** 14:23 15:5 15:7 19:21 21:11 22:16 23:2 24:25 29:8,10 60:18 64:13,20 **wife's** 22:13 52:13 55:6 **wintertime** 28:19 **wish** 51:3 **withdraw** 61:12 **witness** 4:14,24 6:2 8:8 10:7 66:11 69:8,10 69:12,19 **wolfe** 11:14 **word** 9:18 38:3 **words** 25:2 67:13,15 **work** 16:13,15 **worked** 16:14 26:10 **working** 47:5 **worth** 56:12 **wrecked** 23:20 **wrong** 43:18,19 **wrote** 47:25 50:9 | **xc70s** 33:23 |

| | | | |
|---|---|---|---|
| | | | **y** |
| | | | **yahoo.com** 52:19 **yeah** 7:9 10:2 18:3 19:2,3 23:15 25:25 30:15 53:4 59:9 63:11 **year** 15:17 21:17 23:7,9 23:16 36:20,21 **years** 14:5 20:14 23:15 |

|  |
|---|
| **z** |
| **z** 69:1 **zachary** 56:23 **zip** 44:14,15,18 **zoom** 1:15 25:23 33:13 56:20 |

| **w** |
|---|
| **w** 66:2 **waiting** 57:5 **waive** 4:11 **walk** 32:9 40:18 **walking** 17:19 17:22 **walks** 40:24 **want** 6:19 10:16 11:13,19 32:9 33:8 36:13 40:18,24 44:22 46:21 47:11 49:4 50:23 58:12 |

| **x** |
|---|
| **x** 3:1,11 **xc70** 21:5 26:13 27:21 32:15 34:5,8,14,15,15 |

```
              Federal Rules of Civil Procedure

                          Rule 30


     (e)  Review By the Witness; Changes.

     (1)  Review; Statement of Changes. On request by the

     deponent or a party before the deposition is

     completed, the deponent must be allowed 30 days

     after being notified by the officer that the

     transcript or recording is available in which:

     (A) to review the transcript or recording; and

     (B) if there are changes in form or substance, to

     sign a statement listing the changes and the

     reasons for making them.

     (2)  Changes Indicated in the Officer's Certificate.

     The officer must note in the certificate prescribed

     by Rule 30(f)(1) whether a review was requested

     and, if so, must attach any changes the deponent

     makes during the 30-day period.




     DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES

     ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

     THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

     2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES

     OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.
```

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**State Farm**

**State Farm Mutual Automobile Insurance Company**
PO Box 2358
Bloomington IL 61702-2358

59552-5-P          MUTL  VOL

| DECLARATIONS PAGE |
| --- |

NAMED INSURED
AT2
                    001832   0058
18-1930-5 P      A
THURSTON, ROBERT S & JOANN M
2304 FAIRWAY DR
BATON ROUGE LA  70809-1305

POLICY NUMBER   404 9385-A21-18

POLICY PERIOD JAN 21 2022 to JUL 21 2022
          12:01 A.M. Standard Time

AGENT

SAM DAILY
11821 COURSEY BLVD
BATON ROUGE, LA 70816-4656

PHONE: (225)292-3003

**DO NOT PAY PREMIUMS SHOWN ON THIS PAGE.**
**IF AN AMOUNT IS DUE, THEN A SEPARATE STATEMENT IS ENCLOSED.**

**YOUR CAR**

| YEAR | MAKE | MODEL | BODY STYLE | VEHICLE ID. NUMBER | CLASS |
| --- | --- | --- | --- | --- | --- |
| 2012 | VOLVO | XC70 | STA WAG | YV4952BL2C1140915 | 103060F000 |

| SYMBOLS | COVERAGE & LIMITS | PREMIUMS |
| --- | --- | --- |
| A | Liability Coverage | $329.71 |
|  | Bodily Injury Limits | |
|  | Each Person, Each Accident | |
|  | $250,000     $500,000 | |
|  | Property Damage Limit | |
|  | Each Accident | |
|  | $100,000 | |
| D | Comprehensive Coverage - $250 Deductible | $50.64 |
| G | Collision Coverage - $500 Deductible | $103.85 |
| U | Uninsured Motor Vehicle Coverage | $387.42 |
|  | Bodily Injury Limits | |
|  | Each Person, Each Accident | |
|  | $250,000     $500,000 | |

| | Total premium for JAN 21 2022 to JUL 21 2022. | $871.62 | This is not a bill |
| --- | --- | --- | --- |

**IMPORTANT MESSAGES**

New Policy Form

State Farm works hard to offer you the best combination of price, service, and protection.  The amount you pay for automobile insurance is determined by many factors such as the coverages you have, where you live, the kind of car you drive, how your car is used, who drives the car, and information from consumer reports.

You have the right to request, no more than once during a 12-month period, that your policy be re-rated using a current credit-based insurance score. Re-rating could result in a lower rate, no change in rate, or a higher rate.

**EXCEPTIONS, POLICY BOOKLET & ENDORSEMENTS (See policy booklet & individual endorsements for coverage details.)**

YOUR POLICY CONSISTS OF THIS DECLARATIONS PAGE, THE POLICY BOOKLET -
FORM 9818A, AND ANY ENDORSEMENTS THAT APPLY, INCLUDING THOSE ISSUED TO YOU
WITH ANY SUBSEQUENT RENEWAL NOTICE.
6128BU     AMENDATORY ENDORSEMENT.
6918A.1   AMENDATORY ENDORSEMENT.

Agent:     SAM DAILY
Thurston007  Telephone: (225)292-3003
See Reverse Side
Prepared   FEB 09 2022     1930-A6B

03549/03351
105-3995.2  06-2005  (b1a02fhd)
H5X0N   (o1a02bis)
(o1a02t4s)

**EXHIBIT**

**1**

State Farm Mutual Automobile Insurance Company
PO Box 2358
Bloomington IL 61702-2358


**StateFarm**

A-1930      A
THURSTON, ROBERT S & JOANN M
2304 FAIRWAY DR
BATON ROUGE LA 70809-1305

## AUTO RENEWAL

**AMOUNT DUE: $790.63**
*Payment is due by July 21, 2022*

**Your State Farm Agent**

SAM DAILY

Office: 225-292-3003

Address: 11821 COURSEY BLVD
BATON ROUGE, LA 70816-4656

*If you have a new or different car, have added any drivers, or have moved, please contact your agent.*

**Thank you for choosing State Farm.**

**Policy Number: 404 9385-A21-18**
Policy Period: July 21, 2022 to January 21, 2023

**Vehicle:**
2012 VOLVO XC70

**Principal Driver:**
MATTHEW THURSTON

CONVENIENT PAYMENT OPTION: You may use one of State Farm's alternate payment plans which divides your present premium into two separate payments.

You may pay one half of the amount due, $395.31 on JUL 21 2022.

The remaining half will be due on SEP 19 2022. We'll send you a reminder notice.

We also have available a plan to let you pay your premium in monthly installments. For details on this plan and to

determine if you qualify, please contact your State Farm agent.

This policy expires on the date due if premium is not paid.

When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon

*(continued on next page)*

Policy Number: 404 9385-A21-18
Prepared May 31, 2022
1004583

Page number 1 of 6

**Please fold and tear here**

143562  202  01-15-2018

---

Power To Pay
Your Way

 **Online**
statefarm.com/pay

 **Mobile**
Use the
State Farm mobile app

 **Call**
Automated Line: 1-800-440-0908
Your agent: 225-292-3003

 **Mail**
Send us
a check

 **Visit your**
State Farm
agent

Key code: 7677828921

 **StateFarm**

Insured: THURSTON, ROBERT S & JOANN M
Policy Number: 404 9385-A21-18

**Amount Due: $790.63**

*Please pay by July 21, 2022*
Make payment to State Farm

2209208124
State Farm Insurance Companies
P.O. Box 588002
North Metro, GA 30029-8002

| For Office Use Only | | AUTO REN | $790.63 | 0812 |
|---|---|---|---|---|
| 5-A5  A | 1930-FA6B | | | |
| APP DT 08-30-2022 | MUTL VOL | | | |

Thurston008

7003959139220200079063    518400404938511122>

EXHIBIT
2



as the same day we receive your payment, and you will not receive your check back from your financial institution.

## VEHICLE INFORMATION

**Review your policy information carefully.** If anything is incorrect, or if there are any changes to your vehicle information, please let us know right away.

| Vehicle Description | Vehicle Identification Number (VIN) | Who principally drives this vehicle? | How is this vehicle normally used? |
|---|---|---|---|
| 2012 VOLVO XC70 | YV4952BL2C1140915 | MATTHEW THURSTON, a divorced male, who will be age 32 as of July 21, 2022. | To Work, School or Pleasure. |

### Other Household Vehicle(s)

Your premium may be influenced by other State Farm policies that currently insure the following vehicle(s) in your household:

    2018 BUICK ENCLAVE
    2022 TESLA Y

The premium for this renewal was determined using an annual mileage this vehicle is expected to be driven that was developed from information we obtained or was provided by you. The national average is more than 12,000 miles driven annually according to the U.S. Department of Transportation. Please contact us if you expect your annual mileage to change over the next year.

**Premium Adjustment**

Each year, we review our medical payments and personal injury protection coverages claim experience to determine the vehicle safety discount that is applied to each make and model. In addition, we review the comprehensive, collision, bodily injury and property damage claim experience annually to determine which makes and models have earned decreases or increases from State Farm's standard

*(continued on next page)*

Policy Number: 404 9385-A21-18
Prepared May 31, 2022

Page number 2 of 6

---

# Take the hassle out of paying.

Set up AutoPay for your premium payment. It's secure and direct from your bank account, or your debit or credit card.



To sign up visit **statefarm.com/autopay** or scan this QR.

TP42 c



## VEHICLE INFORMATION *continued*

rates. If any changes result from our reviews, adjustments are reflected in the rates shown on this renewal notice.

## DRIVER INFORMATION

### Assigned Driver(s)

The following driver(s) are assigned to the vehicle(s) on this policy.

| Name | Age *as of* July 21, 2022 | Gender | Marital Status |
|------|---------------------------|--------|----------------|
| MATTHEW THURSTON | 32 | Male | Divorced |

### Other Household Driver(s)

In addition to the Principal Driver(s) and Assigned Driver(s), your premium may be influenced by the drivers shown below and other individuals permitted to drive your vehicle. This list does not extend or expand coverage beyond that contained in this automobile policy. The drivers listed below are the drivers reported to us that most frequently drive other vehicles in your household.

    ROBERT S THURSTON
    JOANN THURSTON

### Principal Driver & Assigned Drivers

For each automobile, the **Principal Driver** is the individual who most frequently drives it.
Each driver is designated as an **Assigned Driver** on the household automobile that he or she most frequently drives.

Your premium may be influenced by the information shown for these drivers.

## IMPORTANT NOTICE REGARDING YOUR PREMIUM

State Farm works hard to offer you the best combination of price, service, and protection. The amount you pay for automobile insurance is determined by many factors such as the coverages you have, where you live, the kind of car you drive, how your car is used, who drives the car, and information from consumer reports.

You have the right to request, no more than once during a 12-month period, that your policy be re-rated using a current credit-based insurance score. Re-rating could result in a lower rate, no change in rate, or a higher rate.

## COVERAGE AND LIMITS *See your policy for an explanation of these coverages.*

| A | Liability | |
|---|-----------|---|
| | Bodily Injury 250,000/500,000 | |
| | Property Damage 100,000 | $308.71 |
| D | 250 Deductible Comprehensive | $53.69 |
| G | 500 Deductible Collision | $90.40 |
| U | Uninsured Motor Vehicle | |
| | Bodily Injury 250,000/500,000 | $337.83 |
| **Amount Due** | | **$790.63** |



If any coverage you carry is changed to give broader protection with no additional premium charge, we will give you the broader protection without issuing a new policy, starting on the date we adopt the broader protection.

## DISCOUNTS *These adjustments have already been applied to your premium.*

| | |
|---|---|
| Multiple Line | ✓ |
| Multicar | ✓ |
| Antitheft | ✓ |
| Good Driving | ✓ |
| **Total Discounts** | **$339.97** |

## SURCHARGES AND DISCOUNTS

**AUTOMOBILE RATING PLAN** - Applies to private passenger cars only.

**Accident-Free Discount** - Once your policy has been in force for at least three years with no chargeable accidents, you may qualify for our Accident-Free Discount. Once you qualify, this discount applies as long as there are no chargeable accidents, and may even increase over time.

**Good Driving Discount** - Newer policyholders who do not yet qualify for our Accident-Free Discount (available after three years with no chargeable accidents) may already be receiving a Good Driving Discount. This discount continues to apply until your policy qualifies for the Accident-Free Discount as long as there are no chargeable accidents and no new drivers. If you add new drivers, they must also qualify in order for your Good Driving Discount to continue.

**Chargeable Accidents** - For new business rating, an accident is chargeable if it results in $750 or more of damage to any property. For renewal business, an accident is chargeable if State Farm pays at least $750 ($400 prior to September 15, 1999) under property damage liability and collision coverages for an at-fault accident.

**Surcharges** - If there are chargeable accidents, you may lose your Good Driving Discount or Accident-Free Discount and receive accident surcharges. But if the accident is the first to become chargeable in nine years and this policy has been in force for at least that long, the Accident-Free Discount will continue and no surcharge will apply. The surcharge for each accident depends upon the number and timing of the accidents, and each accident surcharge will remain in effect up to three years.

Surcharges will be removed if the company is given satisfactory evidence that the driver involved is no longer a member of the household or will not be driving the car in the future. If that driver is insured on another State Farm policy, his or her driving record will be considered in the rating of the other policy.

These discounts and surcharges do not apply to all coverages. For complete details, see your State Farm agent.

## ADDITIONAL INFORMATION

If any information on this renewal notice is incomplete or inaccurate, or if you want to confirm the information we have in our records, please contact your agent. For additional information regarding discounts or coverages, see your State Farm agent or visit statefarm.com®.

## Buying a new car? Remember to contact your agent!

When you buy an additional car or one that replaces a car already on your policy, you need to report the change to your agent **promptly.** Even though the dealership you purchased the car from may offer to notify your agent or insurance company, you, as the named insured, are responsible for reporting all changes to your auto policy. By contacting the agent, you can help:

- avoid any complications or lack of coverage in the event of an accident or loss,
- avoid insurance verification problems with a lienholder, the police, or the department of motor vehicles, and
- ensure that you receive any new discounts you may be entitled to.

*(continued on next page)*



Your current State Farm policy automatically provides certain coverages for a new or replacement car for up to a specified, limited number of days after you take possession of the car. Please refer to your policy for the number of days that applies in your state.

If you have any questions about coverage for a newly acquired car, please contact your State Farm agent.

*Disclaimer: This message is provided for informational purposes only and does not grant any insurance coverage. The terms and conditions of coverage are set forth in your State Farm Car Policy booklet, the most recently issued Declarations Page, and any applicable endorsements.*

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 22-5056549-01 | | UNKNOWN | SCOTT THURSTON 2304 FAIRWAY DR BATON ROUGE, LA 70809 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 01/21/2022 | 01/25/2022 | 02/17/2022 | 1014377008 | 4 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2012 | Volvo | XC70  4 Door Wagon 3.2L 6 Cyl Gas A FWD | LA 70809 | 55,374 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Twilight Bronze Metallic | WDD885, Maine | YV4952BL2C1140915 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $13,231.80 |
| Condition - | $462.43 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $55.00 |
| Refurbishment | $0.00 |
| Market Value = | $12,824.37 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Settlement Value = | $12,824.37 |

## Settlement Value:
## $12,824.37



J.D. POWER

Mitchell **WorkCenter**
**Total Loss**
© 2014 Mitchell International, Inc. All Rights Reserved

PGR_THURSTON_0000296

EXHIBIT
3

## Loss Vehicle Detail

Loss vehicle:  2012 Volvo XC70 |  4 Door Wagon | 3.2L 6 Cyl Gas A FWD

### Standard Equipment

#### Exterior

| | |
|---|---|
| 16" "CECINO" alloy wheels | Aluminum roof rails w/"XC" logo |
| Body-side protective lower cladding | Front fog lights |
| P215/65R16 all-season tires | Pwr heated mirrors w/memory, puddle lights, integrated turn signals |
| Rear fog light w/auto-off | Rear wiper/washer -inc: automatic function in reverse when front wipers on |
| Safe approach & home safe security lighting | Variable intermittent wipers |
| Volvo Sensus w/integrated 7" color display | |

#### Interior

| | |
|---|---|
| "XC" door stitching | "XC" front/rear/cargo textile floor mats |
| 40/20/40 flat-folding rear bench -inc: (3) manual-fold rear head restraints | AM/FM stereo w/CD/MP3/WMA player -inc: HD Radio, 160-watt amp, (8) speakers, USB input, iPod connection |
| Auto-dimming rearview mirror | Bluetooth |
| Central pwr door locks, fuel filler | Cross avenue aluminum inlays |
| Cruise control | Dual illuminated visor vanity mirrors |
| Dual-zone electronic climate control (ECC) w/rear seat vents | Flat-folding front passenger seat |
| Front center armrest | Front door storage pockets |
| Front reclining bucket seats w/adjustable head restraints | Front/rear reading lamps |
| Ignition immobilizer | Illuminated lockable glove box |
| Intelligent driver info system (IDIS) | Interior cabin light delay feature |
| Leather shift knob -inc: aluminum inlay | Leather-wrapped steering wheel w/illuminated cruise & audio controls -inc: aluminum inlay |
| Lockable underfloor storage in cargo area | Outside temp gauge |
| Pollen filter | Pwr driver seat w/adjustable lumbar, 3-position memory |
| Pwr windows -inc: front auto-up/down, anti-trap feature | Rear window defroster w/timer |
| Remote keyless entry | Security alarm system |
| SIRIUS satellite radio w/6-month subscription | T-Tec cloth seating surfaces w/"XC" stitching |
| Tilt/telescopic steering column | Trip computer |

#### Mechanical

| | |
|---|---|
| Front wheel drive | Front/rear skid plates |
| Front/rear stabilizer bars | MacPherson strut front suspension |
| Multi-link independent rear suspension | Pwr 4-wheel disc brakes |
| Pwr parking brake w/auto release | Pwr rack & pinion steering |

#### Safety



PGR_THURSTON_0000297

| | |
|---|---|
| 3-point seat belts -inc: pretensioners, front height adjustable anchors | 4-wheel anti-lock braking system (ABS) -inc: electronic brake distribution (EBD), hydraulic brake assist (HBA), ready alert brakes (RAB), fading brake support (FBS) |
| Anti-submarine seats | Child safety rear door locks |
| Collapsible steering column | Daytime running lights |
| Driver/front passenger dual stage airbags -inc: front passenger cutoff switch | Driver/front passenger whiplash protection seating system (WHIPS) |
| Dynamic stability & traction control (DSTC) | ISOFIX child seat attachments -inc: top tether anchors |
| Rear window deactivation | Side impact protection system (SIPS) -inc: driver/front passenger side-impact airbags, front/rear side inflatable curtains (IC) |
| Tire pressure monitoring system | |

# Loss Vehicle Base Value

Loss vehicle: 2012 Volvo XC70 |  4 Door Wagon | 3.2L 6 Cyl Gas A FWD

## Regional Comparable Vehicle Information

Search Radius used for this valuation: 350 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 113,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2NORMAL GAS A 2WD | 125,000 | 77015 | 249 miles | $11,569.00 List Price | $11,764.92 |
| 2 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2NORMAL GAS A 2WD | 82,089 | 36117 | 322 miles | $15,991.00 List Price | $14,712.02 |
| 3 | 2012 VOLVO XC70 PREMIER 4D WGN 6 3.2NORMAL GAS A 2WD | 105,350 | 35244 | 323 miles | $12,700.00 List Price | $13,218.45 |

**Base Value:    $13,231.80**

# Loss Vehicle Adjustments

Loss vehicle: 2012 Volvo XC70 |  4 Door Wagon | 3.2L 6 Cyl Gas A FWD



## Condition Adjustments

Condition Adjustment:  -$462.43          Overall Condition:  2.65-Good          Typical Vehicle Condition:  3.00

| Category | Condition | Condition $ | Comments |
|---|---|---|---|
| Interior | | | |
| DASH/CONSOLE | 3 Good | $0.00 | |
| HEADLINER | 2 Fair | -$23.12 | some stains |
| CARPET | 3 Good | $0.00 | |
| GLASS | 3 Good | $0.00 | |
| DOORS/INTERIOR PANELS | 2 Fair | -$46.24 | greater then 3 gouges |
| SEATS | 3 Good | $0.00 | |
| Exterior | | | |
| TRIM | 3 Good | $0.00 | |
| BODY | 2 Fair | -$277.46 | crease in right rear door |
| PAINT | 2 Fair | -$115.61 | numerous small scratches |
| VINYL/CONVERTIBLE TOP | Typical | $0.00 | |
| Mechanical | | | |
| ENGINE | 3 Good | $0.00 | |
| TRANSMISSION | 3 Good | $0.00 | |
| Tire | 3 Good | $0.00 | |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| INTERIOR | FLOOR MATS (ALL-WEATHER) - 2 ROWS | INSTANT QUOTE | | | $55.00 |

## Regional Comparable Vehicles

Loss vehicle:  2012 Volvo XC70 |  4 Door Wagon | 3.2L 6 Cyl Gas A FWD


Mitchell **WorkCenter**
Total Loss

PGR_THURSTON_0000299

### 1  2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2 NORMAL GAS A2WD

**List Price: $11,569.00**

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| YV4952BLXC1143836 | MBEdeG1A | 10/05/2021 | 77015 | 249 miles |

Source

DEALER WEB LISTING -
AUTOTRADER.COM
PRIVATE OWNER VIA TRED.COM
APPOINTMENT ONLY
HOUSTON TX 77015
206-471-6212

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$398.00 |
| Vehicle Configuration Adjustment | | | -$1,264.41 |
| Mileage | 55,374 | 125,000 | $2,364.71 |
| Equipment | | | |
|   CLIMATE PKG | No | Yes | -$295.92 |
|   BLIND SPOT INFORMATION SYSTEM (BLIS) | No | Yes | -$210.46 |

Total Adjustments: $195.92

**Adjusted Price: $11,764.92**

Comparable Vehicle Package Details:

**CLIMATE PKG**

Comparable Vehicle Option Details:

**BLIND SPOT INFORMATION SYSTEM (BLIS)**

### 2  2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2 NORMAL GAS A2WD

**List Price: $15,991.00**

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| YV4952BL1C1142834 | VV2231A | 11/03/2021 | 36117 | 322 miles |

Source

DEALER WEB LISTING - CARS.COM
JACK INGRAM MOTORS
235 EASTERN BLVD
MONTGOMERY AL 36117
334-277-5700

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$537.00 |
| Vehicle Configuration Adjustment | | | -$1,749.19 |
| Mileage | 55,374 | 82,089 | $1,007.21 |

Total Adjustments: -$1,278.98

**Adjusted Price: $14,712.02**

| 3 | 2012 VOLVO XC70 PREMIER 4D WGN 6 3.2 NORMAL GAS A2WD | | | | List Price: $12,700.00 |

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle | |
|---|---|---|---|---|---|
| YV4952BL9C1125148 | M76456A | 02/02/2022 | 35244 | 323 miles | |

Source

| DEALER WEB LISTING - VAST.COM | | | | | |
|---|---|---|---|---|---|
| HENDRICKSUBARU USED | Adjustments | Loss Vehicle | This Vehicle | Amount | |
| 2929 JOHN HAWKINS PARKWAY | Projected Sold Adjustment | | | -$427.00 | |
| HOOVER AL 35244 | Vehicle Configuration Adjustment | | | -$892.27 | |
| 770-232-0099 | Mileage | 55,374 | 105,350 | $1,837.72 | |
| | | | Total Adjustments: | $518.45 | |
| | | | Adjusted Price: | $13,218.45 | |

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2012 Volvo XC70 | 4 Door Wagon 3.2L 6 Cyl Gas  FWD | $32,950.00 |
| 2012 VOLVO XC70 PREMIER PLUS | 4D WGN 6 3.2 NORMAL GAS A 2WD | $37,750.00 |
| 2012 VOLVO XC70 PREMIER | 4D WGN 6 3.2 NORMAL GAS A 2WD | $35,900.00 |

Claim # 22-5056549-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 6

PGR_THURSTON_0000301

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

### Step 1 - Locate Comparable Vehicles

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

### Step 2 - Adjust Comparable Vehicles

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).
- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).
- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.
- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

### Step 3 - Calculate Base Vehicle Value

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

### Step 4 - Calculate Loss Vehicle Adjustments

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

### Step 5 - Calculate the Market Value

The Market Value is calculated by applying the loss vehicle adjustments to the base value.


Mitchell **WorkCenter**
Total Loss

PGR_THURSTON_0000302

11/9/23, 1:54 PM                                    image001.png

```
FI9D0K                     Purchase Information Screen                    ASH-FI

       Deal Number:            931600   17) Temp Tag Fee:           $        4.00
  1) Contract Date:          03/30/12   18) Service Contract:
  2) Fin Inst:                   CASH   19) GAP/Other Products:
  3) Stock Number:             VC5803   20) Taxes:                  $    3,409.98
  4) Slpr 1:                     7725
  5)  Desking WeOwes(W).:             21) Payment:                  $   38,674.48
  6) Cash Price:       $   37,065.00
  7) Rebate:                            22) Cust Name:      JOANN M THURSTON
  8) Total Net Trade:                       Make:                        VOLV
  9) Cash Down:        $    2,000.00         Model:                       XC70
     Total Down:       $    2,000.00
 10) Doc & Notary Fee:      $    115.00     Sale Subtotal:     $   35,065.00
 11) Title Fee:             $     18.50     Total Financed:    $   38,674.48
 12) License Fee:    .2000% $     74.13     Finance Charge:
 13) Recording Fee's:       $     10.00     Total Other Charges:
 14) Customer Services:                     Total of Payments: $   38,674.48
 15) Inspection Fee:        $     18.00     Deferred Price:
 16) Handling Fee:          $      8.00     Unpaid Balance:    $   38,674.48
Command:


  F1=Help    F2=Home    F3=Save    F4=Cancel
```

EXHIBIT

4

### ELLEN S. BEST, ATTORNEY AT LAW
36 MAIN STREET
P.O. BOX 386 • BLUE HILL ME 04614
TELEPHONE: 207-374-2573 • Fax: 207-374-5163

Ellen S. Best
ebest@ellenbestlaw.com

John Z. Steed
jsteed@ellenbestlaw.com

March 15, 2022

Received By A.M.

MAR 2 2 2022

CORP. CLAIMS MAIL

Progressive Corporation
6300 Wilson Mills Road
Mayfield Village, OH 44143

RE: Matthew Thurston - Claim #22-5056549-01

Dear Sir or Madam:

I am writing on behalf of my client, Matthew Thurston, to inform you that I represent him and to offer to settle potential claims under the Maine Unfair Trade Practices Act and for violation of the Unfair Settlement Practices section of the Maine Insurance Code (24-A M.R.S. § 2436-A).

Matthew is your insured, and you are obligated to pay him for the total loss on his Volvo XC70. I do not believe that is in dispute. The fair market value of that vehicle is $17,250.00, as outlined in Matthew's well-reasoned email to Kyle Mayer (copied here) dated February 21, 2022, at 3:37 p.m., enclosed, with its attachments, as Exhibit A. However, you have only offered to pay him $12,428.37—significantly less than Matthew's well-reasoned number. Because of this, he has been forced to hire counsel at a non-refundable cost of $2,500. I believe your actions in this case constitute unfair or deceptive trade practices as defined by the Unfair Trade Practices Act because you have a duty to pay him the fair market value of his vehicle but have chosen, instead, to offer significantly less than the fair market value he is entitled to receive. This has caused him financial harm in that he has had to hire an attorney and that he has been denied use of the money to which he is entitled and the use of his vehicle, something to which he is also entitled.

I can offer to settle claims under the Maine Unfair Trade Practices Act for payment of $21,750.00, which is the fair market value of the vehicle plus the $2,500.00 in legal fees he had to pay to get help with the problem, plus $2,000.00 for loss of use of a vehicle for two months.

**EXHIBIT 5**

Progressive Corporation
March 15, 2022
Page 2


I believe, for the same reasons as outlined above, that you have also violated 24-A M.R.S. § 2436-A by refusing to pay the reasonable value of the vehicle and can offer to settle both claims for the same payment of $21,750.00.


Respectfully,

John Z. Steed

JZS:mf
Enclosure

cc: Kyle Mayer

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

 Gmail

John Steed <jsteed@ellenbestlaw.com>

---

## Re: [EXTERNAL] Re: Vehicle Storage
6 messages

---

**Matthew Thurston** <thurstonmatthew@gmail.com>　　　　　　　　Tue, Feb 22, 2022 at 10:43 AM
To: Kyle Mayer <Kyle_Mayer@progressive.com>
Cc: "STHURSTON2003@YAHOO.COM" <STHURSTON2003@yahoo.com>, Nicholas Kimball <NICHOLAS_KIMBALL@progressive.com>, JSteed@ellenbestlaw.com

Kyle,

You are welcome to move the vehicle wherever you would like at your expense. If you would like to leave it on our property, use the below address. If you would prefer to have it moved to a salvage yard, that is fine too.

402 Varnumville Rd, Brooksville ME, 04617

In regards to valuation, we will be in touch once we have had a chance to consult with our attorney, as I have provided documented evidence to why your valuation does not reflect the ACV of the vehicle.

Best
Matt

> On Feb 22, 2022, at 8:23 AM, Kyle Mayer <Kyle_Mayer@progressive.com> wrote:
>
> Hello Matt,
>
> Regarding moving your vehicle, I would just like to have it moved out of the shop location and to your property of that of your parents. I'd like to do this as a courtesy to the shop so that they can free up some space.
>
> Regarding the valuation, we don't actually use KBB values to evaluate the vehicle. If you wish to provide documented information supporting the increase in value to the car, please provide dealer comparisons outlined on page 7 (Dealer listings, Same model and year, with VIN# included in the listing, mileage).
>
> Thank you,
>
> Kyle Mayer
>
> Claims Generalist
> 40 Commerce Court
> Newington, CT 06111
> Phone: 860-616-6796
> Fax: 833-905-1750
> Kyle_mayer@progressive.com
> Office Hours: Monday-Friday, 8am-5pm



> Confidentiality Notice: This e-mail, including any attachments, may contain confidential and privileged information for the sole and exclusive use of the intended recipient (s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000128

recipient (or authorized to receive information for the recipient), please contact the sender by reply e-mail and delete all copies of this message. All correspondence (including any e-mail) we receive from you may become part of your permanent claims file. If you request a reply to this e-mail, we may respond by e-mail or by phone.

**From:** Matthew Thurston <thurstonmatthew@gmail.com>
**Sent:** Monday, February 21, 2022 3:37 PM
**To:** Kyle Mayer <Kyle_Mayer@progressive.com>
**Subject:** [EXTERNAL] Re: Vehicle Storage

Hi Kyle,
Claim # 22-5056549-01

   Since I have been unable to connect with you via phone today, I am sending this email instead. In regards to the letter you emailed concerning the storage of the vehicle, you are welcome to move the vehicle wherever you would like to mitigate the storage fees. I do not believe we discussed that on Thursday 2/17 as you did not remember where the vehicle currently was located.

   In regards to the settlement offer for the vehicle,

The settlement offer presented by Progressive seems to be far outside of the range of any other determination of value for the vehicle.

   The three vehicles presented as comparable all have significantly higher mileage than my vehicle, and the appraisal relies heavily on adjusting the vehicles value based on mileage. For that adjustment the number which is used is between 3.4 and 3.8 cents/mile. There is no explanation why this number was chosen.   I compared the comparison vehicles to each other. I adjusted those vehicles values, based off of the adjustment values stated in the appraisal. I then determined how their mileage effected their list price. All of the vehicles list prices varied compared to the others at a rate of **10.22- 10.46 cents/mile.**

   **If the average of these was used, it would give an adjusted vehicle value of my vehicle at $16,542.56.  (See attached) This is WITHOUT changing your vehicle configuration adjustments.**

Furthermore, the appraisal adjusts the value of the vehicle based off of trim level, but it does not describe what differences in actual features exist. My vehicle has added options which brought its MSRP above 37,000, about equal to a premium plus model.

The comparison vehicles are also assumed to be in perfect condition, but there seems to be no way to verify this, as the listings are no longer available to the public. It seems unlikely that these vehicles are all in perfect condition. If you have these listing to share, I would appreciate seeing them.

In addition to this, Kelley Blue Book states the private party value for each of these vehicles below the price they were listed at. But for some reason the settlement claims my vehicle is worth nearly $5000 less than the private party blue book value. It seems unlikely that Kelley Blue Book would be able to do

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000129

a good job predicting that value of these comparison vehicles but it would be so wildly far off in predicting the value of my vehicle.   (See Attached)

**Blue Book Value of my vehicle 17641**

I also was in contact with a local (Baton Rouge) car dealer. He informed me that if he had my vehicle on his lot, he would put a list price on the vehicle of $17,900 and that $16,500 would be the low end of offers that he would consider. He based this valuation on the Route One valuation of the vehicle that came in at $15050, without all options selected. He explained this valuation was always less than any a dealer will sell a vehicle for.  (See attached)

**Dealer Valuation of my Vehicle $17250**

**We find no evidence that supports a vehicle value below $16,500, and that a fair market value is $17,250.**

Looking forward to hearing from you.

Best
  Matt Thurston
<image001.png>

On Feb 21, 2022, at 10:38 AM, Kyle Mayer <Kyle_Mayer@progressive.com> wrote:

Hello Matt,

Please see the attached letter regarding your vehicle.

Thank you,

Kyle Mayer

Claims Generalist
40 Commerce Court
Newington, CT 06111
Phone: 860-616-6796
Fax: 833-905-1750
Kyle_mayer@progressive.com
Office Hours: Monday-Friday, 8am-5pm

Confidentiality Notice: This e-mail, including any attachments, may contain confidential and privileged information for the sole and exclusive use of the intended recipient (s). Any review, use, distribution or disclosure by others is strictly

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000130

prohibited. If you are not the intended recipient (or authorized to receive
information for the recipient), please contact the sender by reply e-mail and delete
all copies of this message. All correspondence (including any e-mail) we receive
from you may become part of your permanent claims file. If you request a reply to
this e-mail, we may respond by e-mail or by phone.

<22-5056549_2-21-2022_Total Loss_Free-form.pdf>

---

**Kyle Mayer** <Kyle_Mayer@progressive.com>                    Tue, Feb 22, 2022 at 10:45 AM
To: Matthew Thurston <thurstonmatthew@gmail.com>
Cc: "STHURSTON2003@YAHOO.COM" <STHURSTON2003@yahoo.com>, Nicholas Kimball
<NICHOLAS_KIMBALL@progressive.com>, "JSteed@ellenbestlaw.com" <JSteed@ellenbestlaw.com>

Ok, it sounds like you will not be keeping the vehicle, is that correct? Your mother or father may need to call the shop and
provide verbal release. I will check with them.

[Quoted text hidden]

---

**Scott Thurston** <sthurston2003@yahoo.com>                    Tue, Feb 22, 2022 at 11:14 AM
To: Kyle Mayer <Kyle_Mayer@progressive.com>
Cc: Matthew Thurston <thurstonmatthew@gmail.com>, Nicholas Kimball <NICHOLAS_KIMBALL@progressive.com>,
JSteed@ellenbestlaw.com

Hello Kyle,
You have my permission to move the car.
And notice that in our valuation of the car we didn't rely solely on KBB, we used YOUR comparables and your VINs to
understand the mileage adjustments and then apply them to our car.
Your offer is a wholesale number which does not approach replacement value.
S

Scott Thurston MD
225 938 7178

On Feb 22, 2022, at 7:45 AM, Kyle Mayer <Kyle_Mayer@progressive.com> wrote:

[Quoted text hidden]

---

**Kyle Mayer** <Kyle_Mayer@progressive.com>                    Fri, Feb 25, 2022 at 12:36 PM
To: Scott Thurston <sthurston2003@yahoo.com>
Cc: Matthew Thurston <thurstonmatthew@gmail.com>, Nicholas Kimball <NICHOLAS_KIMBALL@progressive.com>,
"JSteed@ellenbestlaw.com" <JSteed@ellenbestlaw.com>

Hi Scott,

Have you spoken with anyone else at Progressive about the valuation? Did you end up hiring an independent appraiser?

[Quoted text hidden]

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000131

**Matthew Thurston** <thurstonmatthew@gmail.com>                                    Fri, Feb 25, 2022 at 1:49 PM
To: JSteed@ellenbestlaw.com, Kyle Mayer <Kyle_Mayer@progressive.com>, Nicholas Kimball
<NICHOLAS_KIMBALL@progressive.com>, Scott Thurston <sthurston2003@yahoo.com>

Kyle,

My attorney will be in touch with progressive. Thank you for your time.

Matt
[Quoted text hidden]
--
**Matt Thurston**
*Sales Agent*
*The Christopher Group, LLC*
Coastal Maine Real Estate
Cell: 207-266-8312

---

**Kyle Mayer** <Kyle_Mayer@progressive.com>                                         Fri, Feb 25, 2022 at 2:18 PM
To: Matthew Thurston <thurstonmatthew@gmail.com>, "JSteed@ellenbestlaw.com" <JSteed@ellenbestlaw.com>, Nicholas
Kimball <NICHOLAS_KIMBALL@progressive.com>, Scott Thurston <sthurston2003@yahoo.com>

Alright, thank you for the update.

[Quoted text hidden]

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000132

# Vehicle Valuation Report



Prepared For **Progressive Group of Insurance Companies** (800) 321-9843

mitchell

---

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 22-5056549-01 | | **UNKNOWN** | SCOTT THURSTON 2304 FAIRWAY DR BATON ROUGE, LA 70809 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 01/21/2022 | 01/25/2022 | 02/17/2022 | 1014377008 | 4 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2012 | Volvo | XC70 4 Door Wagon 3.2L 6 Cyl Gas A FWD | LA 70809 | 55,374 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Twilight Bronze Metallic | WDD885, Maine | YV4952BL2C1140915 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $13,231.80 |
| Condition - | $462.43 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $55.00 |
| Refurbishment | $0.00 |
| Market Value = | $12,824.37 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Settlement Value = | $12,824.37 |

# Settlement Value:
# $12,824.37

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**J.D. POWER**

Mitchell **WorkCenter** Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved

PGR_THURSTON_0000133

# Loss Vehicle Detail

Loss vehicle: 2012 Volvo XC70 | 4 Door Wagon | 3.2L 6 Cyl Gas A FWD

## Standard Equipment

### Exterior

| | |
|---|---|
| 16" "CECINO" alloy wheels | Aluminum roof rails w/"XC" logo |
| Body-side protective lower cladding | Front fog lights |
| P215/65R16 all-season tires | Pwr heated mirrors w/memory, puddle lights, integrated turn signals |
| Rear fog light w/auto-off | Rear wiper/washer -inc: automatic function in reverse when front wipers on |
| Safe approach & home safe security lighting | Variable intermittent wipers |
| Volvo Sensus w/integrated 7" color display | |

### Interior

| | |
|---|---|
| "XC" door stitching | "XC" front/rear/cargo textile floor mats |
| 40/20/40 flat-folding rear bench -inc: (3) manual-fold rear head restraints | AM/FM stereo w/CD/MP3/WMA player -inc: HD Radio, 160-watt amp, (8) speakers, USB input, iPod connection |
| Auto-dimming rearview mirror | Bluetooth |
| Central pwr door locks, fuel filler | Cross avenue aluminum inlays |
| Cruise control | Dual illuminated visor vanity mirrors |
| Dual-zone electronic climate control (ECC) w/rear seat vents | Flat-folding front passenger seat |
| Front center armrest | Front door storage pockets |
| Front reclining bucket seats w/adjustable head restraints | Front/rear reading lamps |
| Ignition immobilizer | Illuminated lockable glove box |
| Intelligent driver info system (IDIS) | Interior cabin light delay feature |
| Leather shift knob -inc: aluminum inlay | Leather-wrapped steering wheel w/illuminated cruise & audio controls -inc: aluminum inlay |
| Lockable underfloor storage in cargo area | Outside temp gauge |
| Pollen filter | Pwr driver seat w/adjustable lumbar, 3-position memory |
| Pwr windows -inc: front auto-up/down, anti-trap feature | Rear window defroster w/timer |
| Remote keyless entry | Security alarm system |
| SIRIUS satellite radio w/6-month subscription | T-Tec cloth seating surfaces w/"XC" stitching |
| Tilt/telescopic steering column | Trip computer |

### Mechanical

| | |
|---|---|
| Front wheel drive | Front/rear skid plates |
| Front/rear stabilizer bars | MacPherson strut front suspension |
| Multi-link independent rear suspension | Pwr 4-wheel disc brakes |
| Pwr parking brake w/auto release | Pwr rack & pinion steering |

### Safety

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000134

| | |
|---|---|
| 3-point seat belts -inc: pretensioners, front height adjustable anchors | 4-wheel anti-lock braking system (ABS) -inc: electronic brake distribution (EBD), hydraulic brake assist (HBA), ready alert brakes (RAB), fading brake support (FBS) |
| Anti-submarine seats | Child safety rear door locks |
| Collapsible steering column | Daytime running lights |
| Driver/front passenger dual stage airbags -inc: front passenger cutoff switch | Driver/front passenger whiplash protection seating system (WHIPS) |
| Dynamic stability & traction control (DSTC) | ISOFIX child seat attachments -inc: top tether anchors |
| Rear window deactivation | Side impact protection system (SIPS) -inc: driver/front passenger side-impact airbags, front/rear side inflatable curtains (IC) |
| Tire pressure monitoring system | |

## Loss Vehicle Base Value

Loss vehicle: 2012 Volvo XC70 | 4 Door Wagon | 3.2L 6 Cyl Gas A FWD

### Regional Comparable Vehicle Information

Search Radius used for this valuation: 350 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 113,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2NORMAL GAS A 2WD | 125,000 | 77015 | 249 miles | $11,569.00 List Price | $11,764.92 |
| 2 | 2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2NORMAL GAS A 2WD | 82,089 | 36117 | 322 miles | $15,991.00 List Price | $14,712.02 |
| 3 | 2012 VOLVO XC70 PREMIER 4D WGN 6 3.2NORMAL GAS A 2WD | 105,350 | 35244 | 323 miles | $12,700.00 List Price | $13,218.45 |

**Base Value:** **$13,231.80**

## Loss Vehicle Adjustments

Loss vehicle: 2012 Volvo XC70 | 4 Door Wagon | 3.2L 6 Cyl Gas A FWD

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

## Condition Adjustments

Condition Adjustment: -$462.43        Overall Condition: 2.65-Good        Typical Vehicle Condition: 3.00

| Category | Condition | Condition $ | Comments |
|---|---|---|---|
| **Interior** | | | |
| DASH/CONSOLE | 3 Good | $0.00 | |
| HEADLINER | 2 Fair | -$23.12 | some stains |
| CARPET | 3 Good | $0.00 | |
| GLASS | 3 Good | $0.00 | |
| DOORS/INTERIOR PANELS | 2 Fair | -$46.24 | greater then 3 gouges |
| SEATS | 3 Good | $0.00 | |
| **Exterior** | | | |
| TRIM | 3 Good | $0.00 | |
| BODY | 2 Fair | -$277.46 | crease in right rear door |
| PAINT | 2 Fair | -$115.61 | numerous small scratches |
| VINYL/CONVERTIBLE TOP | Typical | $0.00 | |
| **Mechanical** | | | |
| ENGINE | 3 Good | $0.00 | |
| TRANSMISSION | 3 Good | $0.00 | |
| Tire | 3 Good | $0.00 | |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| INTERIOR | FLOOR MATS (ALL-WEATHER) - 2 ROWS | INSTANT QUOTE | | | $55.00 |

# Regional Comparable Vehicles

Loss vehicle: 2012 Volvo XC70 | 4 Door Wagon | 3.2L 6 Cyl Gas A FWD

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

Mitchell WorkCenter
Total Loss

PGR_THURSTON_0000136

### 1  2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2 NORMAL GAS A2WD          List Price: $11,569.00

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| YV4952BLXC1143836 | MBEdeG1A | 10/05/2021 | 77015 | 249 miles |

Source

DEALER WEB LISTING -
AUTOTRADER.COM

PRIVATE OWNER VIA TRED.COM

APPOINTMENT ONLY

HOUSTON TX 77015

206-471-6212

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Projected Sold Adjustment | | | -$398.00 |
| Vehicle Configuration Adjustment | | | -$1,264.41 |
| Mileage | 55,374 | 125,000 | $2,364.71 |
| Equipment | | | |
|   CLIMATE PKG | No | Yes | -$295.92 |
|   BLIND SPOT INFORMATION SYSTEM (BLIS) | No | Yes | -$210.46 |

| | |
|---|---|
| Total Adjustments: | $195.92 |
| Adjusted Price: | $11,764.92 |

Comparable Vehicle Package Details:

**CLIMATE PKG**

Comparable Vehicle Option Details:

**BLIND SPOT INFORMATION SYSTEM (BLIS)**

### 2  2012 VOLVO XC70 PREMIER PLUS 4D WGN 6 3.2 NORMAL GAS A2WD          List Price: $15,991.00

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| YV4952BL1C1142834 | VV2231A | 11/03/2021 | 36117 | 322 miles |

Source

DEALER WEB LISTING - CARS.COM

JACK INGRAM MOTORS

235 EASTERN BLVD

MONTGOMERY AL 36117

334-277-5700

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Projected Sold Adjustment | | | -$537.00 |
| Vehicle Configuration Adjustment | | | -$1,749.19 |
| Mileage | 55,374 | 82,089 | $1,007.21 |

| | |
|---|---|
| Total Adjustments: | -$1,278.98 |
| Adjusted Price: | $14,712.02 |

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

Mitchell **WorkCenter**
Total Loss

PGR_THURSTON_0000137

**3**  **2012 VOLVO XC70 PREMIER 4D WGN 6 3.2 NORMAL GAS A2WD**          List Price: **$12,700.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| YV4952BL9C1125148 | M76456A | 02/02/2022 | 35244 | 323 miles |

Source

DEALER WEB LISTING - VAST.COM
HENDRICKSUBARU USED
2929 JOHN HAWKINS PARKWAY
HOOVER AL 35244
770-232-0099

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$427.00 |
| Vehicle Configuration Adjustment | | | -$892.27 |
| Mileage | 55,374 | 105,350 | $1,837.72 |
| | | Total Adjustments: | $518.45 |
| | | **Adjusted Price:** | **$13,218.45** |

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2012 Volvo XC70 | 4 Door Wagon 3.2L 6 Cyl Gas  FWD | $32,950.00 |
| 2012 VOLVO XC70 PREMIER PLUS | 4D WGN 6 3.2 NORMAL GAS A 2WD | $37,750.00 |
| 2012 VOLVO XC70 PREMIER | 4D WGN 6 3.2 NORMAL GAS A 2WD | $35,900.00 |

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

## Step 1 - Locate Comparable Vehicles

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

## Step 2 - Adjust Comparable Vehicles

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).
- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).
- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.
- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

## Step 3 - Calculate Base Vehicle Value

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

## Step 4 - Calculate Loss Vehicle Adjustments

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

## Step 5 - Calculate the Market Value

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

**Kelley Blue Book**
THE TRUSTED RESOURCE

## 2012 Volvo XC70
## Pricing Report

**Style**: 3.2 Wagon 4D
**Mileage**: 55,374
**KBB.com Consumer Rating**: 4.7/5

## Vehicle Highlights

Fuel Economy: City 19/Hwy 25/Comb 21 MPG

Engine: 6-Cyl, 3.2 Liter

Transmission: Automatic, 6-Spd Geartronic

Drivetrain: FWD

Country of Assembly: Sweden

Country of Origin: Sweden

EPA Class: Midsize Station Wagons

Max Seating: 5

Doors: 4

Body Style: Wagon

## Sell to Private Party



Private Party Range
**$16,503 - $18,778**
Private Party Value
**$17,641**

Valid for **ZIP code 70809** through **02/17/2022**

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

## Your Configured Options

Our pre-selected options, based on typical equipment for this car.

✓ Options that you added while configuring this car.

**Exterior Color**
✓ Beige

**Wheels and Tires**
Alloy Wheels

**Entertainment and Instrumentation**
CD/MP3 (Single Disc)

AM/FM Stereo

Sirius Satellite

Bluetooth Wireless

Volvo Sensus

**Engine**
6-Cyl, 3.2 Liter

**Transmission**
Automatic, 6-Spd Geartronic

**Drivetrain**
✓ FWD

**Braking and Traction**
ABS (4-Wheel)

Hill Descent Control

Traction Control

Stability Control

**Comfort and Convenience**
Air Conditioning

Power Windows

Power Door Locks

Cruise Control

Keyless Entry

✓ Power Liftgate Release

Alarm System

**Steering**
Power Steering

Tilt Wheel

**Seats**
Power Seat

✓ Leather

✓ Heated Seats

**Roof and Glass**
Moon Roof

**Safety and Security**
Dual Air Bags

Side Air Bags

F&R Head Curtain Air Bags

**Lighting**
Daytime Running Lights

**Exterior**
Fog Lights

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000141

# Glossary of Terms

**Kelley Blue Book® Trade-In Value** - This is the amount you can expect to receive when you trade in your car to a dealer. This value is determined based on the style, condition, mileage and options indicated.

**Trade-In Range** - The Trade-In Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week based on the style, condition, mileage and options of your vehicle when you trade it in to a dealer. However, every dealer is dierent and values are not guaranteed.

# Tip:

**It's crucial to know your car's true condition when you sell it, so that you can price it appropriately. Consider having your mechanic give you an objective report.**

**Kelley Blue Book® Private Party Value** - This is the starting point for negotiation of a used-car sale between a private buyer and seller. This is an "as is" value that does not include any warranties. The nal price depends on the car's actual condition and local market factors.

**Private Party Range** - The Private Party Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week for a vehicle with stated mileage in the selected condition and configured with your selected options, excluding taxes, title and fees when selling to a private party.

**Excellent Condition** - 3% of all cars we value. This car looks new and is in excellent mechanical condition. It has never had paint or bodywork and has an interior and body free of wear and visible defects. The car is rust-free and does not need reconditioning. Its clean engine compartment is free of fluid leaks. It also has a clean title history, has complete and verifiable service records and will pass safety and smog inspection.

**Very Good Condition** - 23% of all cars we value. This car has minor wear or visible defects on the body and interior but is in excellent mechanical condition, requiring only minimal reconditioning. It has little to no paint and bodywork and is free of rust. Its clean engine compartment is free of fluid leaks. The tires match and have 75% or more of tread. It also has a clean title history, with most service records available, and will pass safety and smog inspection.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**Good Condition** - 38% of all cars we value. This car is free of major mechanical problems but may need some reconditioning. Its paint and bodywork may require minor touch-ups, with repairable cosmetic defects, and its engine compartment may have minor leaks. There are minor body scratches or dings and minor interior blemishes, but no rust. The tires match and have 50% or more of tread. It also has a clean title history, with some service records available, and will pass safety and smog inspection.

**Fair Condition** - 18% of all cars we value. This car has some mechanical or cosmetic defects and needs servicing, but is still in safe running condition and has a clean title history. The paint, body and/or interior may need professional servicing. The tires may need replacing and there may be some repairable rust damage.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

© 1995-2022 Kelley Blue Book Co., Inc. All rights reserved.

© 2022 Kelley Blue Book Co., Inc. All rights reserved. 2/17/2022-2/17/2022 Edition for LA 70809. The specific information required to determine the value for this particular vehicle was supplied by the person generating this report. Vehicle valuations are opinions and may vary from vehicle to vehicle. Actual valuations will vary based upon market conditions, specifications, vehicle condition or other particular circumstances pertinent to this particular vehicle or the transaction or the parties to the transaction. This report is intended for the individual use of the person generating this report only and shall not be sold or transmitted to another party. Kelley Blue Book assumes no responsibility for errors or omissions. (v.2020226)

**Kelley Blue Book**
THE TRUSTED RESOURCE

## 2012 Volvo XC70
## Pricing Report

**Style**: 3.2 Wagon 4D

**Mileage**: 105,350

**KBB.com Consumer Rating**: 4.7/5

## Vehicle Highlights

Fuel Economy: City 19/Hwy 25/Comb 21 MPG

Engine: 6-Cyl, 3.2 Liter

Transmission: Automatic, 6-Spd Geartronic

Drivetrain: FWD

Country of Assembly: Sweden

Country of Origin: Sweden

EPA Class: Midsize Station Wagons

Max Seating: 5

Doors: 4

Body Style: Wagon

## Sell to Private Party



Private Party Range
**$10,815 - $13,090**
Private Party Value
**$11,953**

Valid for **ZIP code 70809** through **02/17/2022**

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

## Your Configured Options

Our pre-selected options, based on typical equipment for this car.

✓ Options that you added while configuring this car.

**Exterior Color**
✓ Beige

**Wheels and Tires**
Alloy Wheels

**Entertainment and Instrumentation**
CD/MP3 (Single Disc)

AM/FM Stereo

Sirius Satellite

Bluetooth Wireless

Volvo Sensus

**Engine**
6-Cyl, 3.2 Liter

**Transmission**
Automatic, 6-Spd Geartronic

**Drivetrain**
✓ FWD

**Braking and Traction**
ABS (4-Wheel)

Hill Descent Control

Traction Control

Stability Control

**Comfort and Convenience**
Air Conditioning

Power Windows

Power Door Locks

Cruise Control

Keyless Entry

✓ Keyless Start

✓ Power Liftgate Release

Alarm System

**Steering**
Power Steering

Tilt Wheel

**Seats**
✓ Dual Power Seats

✓ Leather

**Roof and Glass**
Moon Roof

**Safety and Security**
Dual Air Bags

Side Air Bags

F&R Head Curtain Air Bags

✓ F&R Parking Sensors

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000146

**Lighting**
Daytime Running
Lights

**Accessory Packages**
✓ Premier Plus Pkg

**Exterior**
Fog Lights

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

# Glossary of Terms

**Kelley Blue Book® Trade-In Value** - This is the amount you can expect to receive when you trade in your car to a dealer. This value is determined based on the style, condition, mileage and options indicated.

**Trade-In Range** - The Trade-In Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week based on the style, condition, mileage and options of your vehicle when you trade it in to a dealer. However, every dealer is dierent and values are not guaranteed.

## Tip:

**It's crucial to know your car's true condition when you sell it, so that you can price it appropriately. Consider having your mechanic give you an objective report.**

**Kelley Blue Book® Private Party Value** - This is the starting point for negotiation of a used-car sale between a private buyer and seller. This is an "as is" value that does not include any warranties. The nal price depends on the car's actual condition and local market factors.

**Private Party Range** - The Private Party Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week for a vehicle with stated mileage in the selected condition and configured with your selected options, excluding taxes, title and fees when selling to a private party.

**Excellent Condition** - 3% of all cars we value. This car looks new and is in excellent mechanical condition. It has never had paint or bodywork and has an interior and body free of wear and visible defects. The car is rust-free and does not need reconditioning. Its clean engine compartment is free of fluid leaks. It also has a clean title history, has complete and verifiable service records and will pass safety and smog inspection.

**Very Good Condition** - 23% of all cars we value. This car has minor wear or visible defects on the body and interior but is in excellent mechanical condition, requiring only minimal reconditioning. It has little to no paint and bodywork and is free of rust. Its clean engine compartment is free of fluid leaks. The tires match and have 75% or more of tread. It also has a clean title history, with most service records available, and will pass safety and smog inspection.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**Good Condition** - 34% of all cars we value. This car is free of major mechanical problems but may need some reconditioning. Its paint and bodywork may require minor touch-ups, with repairable cosmetic defects, and its engine compartment may have minor leaks. There are minor body scratches or dings and minor interior blemishes, but no rust. The tires match and have 50% or more of tread. It also has a clean title history, with some service records available, and will pass safety and smog inspection.

**Fair Condition** - 18% of all cars we value. This car has some mechanical or cosmetic defects and needs servicing, but is still in safe running condition and has a clean title history. The paint, body and/or interior may need professional servicing. The tires may need replacing and there may be some repairable rust damage.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

© 1995-2022 Kelley Blue Book Co., Inc. All rights reserved.

© 2022 Kelley Blue Book Co., Inc. All rights reserved. 2/17/2022-2/17/2022 Edition for LA 70809. The specific information required to determine the value for this particular vehicle was supplied by the person generating this report. Vehicle valuations are opinions and may vary from vehicle to vehicle. Actual valuations will vary based upon market conditions, specifications, vehicle condition or other particular circumstances pertinent to this particular vehicle or the transaction or the parties to the transaction. This report is intended for the individual use of the person generating this report only and shall not be sold or transmitted to another party. Kelley Blue Book assumes no responsibility for errors or omissions. (v.2020226)

**Kelley Blue Book**
THE TRUSTED RESOURCE

## 2012 Volvo XC70
## Pricing Report

**Style:** 3.2 Wagon 4D

**Mileage:** 82,089

**KBB.com Consumer Rating:** 4.7/5

## Vehicle Highlights

Fuel Economy: City 19/Hwy 25/Comb 21 MPG

Engine: 6-Cyl, 3.2 Liter

Transmission: Automatic, 6-Spd Geartronic

Drivetrain: FWD

Country of Assembly: Sweden

Country of Origin: Sweden

EPA Class: Midsize Station Wagons

Max Seating: 5

Doors: 4

Body Style: Wagon

## Sell to Private Party



Private Party Range
**$13,331 - $15,606**
Private Party Value
**$14,469**

Valid for **ZIP code 70809** through **02/17/2022**

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

## Your Configured Options

Our pre-selected options, based on typical equipment for this car.

✓ Options that you added while configuring this car.

**Exterior Color**
✓ Beige

**Wheels and Tires**
Alloy Wheels

**Entertainment and Instrumentation**
CD/MP3 (Single Disc)

AM/FM Stereo

Sirius Satellite

Bluetooth Wireless

Volvo Sensus

**Engine**
6-Cyl, 3.2 Liter

**Transmission**
Automatic, 6-Spd Geartronic

**Drivetrain**
✓ FWD

**Braking and Traction**
ABS (4-Wheel)

Hill Descent Control

Traction Control

Stability Control

**Comfort and Convenience**
Air Conditioning

Power Windows

Power Door Locks

Cruise Control

Keyless Entry

✓ Keyless Start

✓ Power Liftgate Release

Alarm System

**Steering**
Power Steering

Tilt Wheel

**Seats**
✓ Dual Power Seats

✓ Leather

**Roof and Glass**
Moon Roof

**Safety and Security**
Dual Air Bags

Side Air Bags

F&R Head Curtain Air Bags

✓ F&R Parking Sensors

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

Lighting
Daytime Running
Lights

**Accessory Packages**

✓ Premier Plus Pkg

**Exterior**
Fog Lights

PGR_THURSTON_0000153

# Glossary of Terms

**Kelley Blue Book® Trade-In Value** - This is the amount you can expect to receive when you trade in your car to a dealer. This value is determined based on the style, condition, mileage and options indicated.

**Trade-In Range** - The Trade-In Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week based on the style, condition, mileage and options of your vehicle when you trade it in to a dealer. However, every dealer is dierent and values are not guaranteed.

## Tip:

**It's crucial to know your car's true condition when you sell it, so that you can price it appropriately. Consider having your mechanic give you an objective report.**

**Kelley Blue Book® Private Party Value** - This is the starting point for negotiation of a used-car sale between a private buyer and seller. This is an "as is" value that does not include any warranties. The nal price depends on the car's actual condition and local market factors.

**Private Party Range** - The Private Party Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week for a vehicle with stated mileage in the selected condition and configured with your selected options, excluding taxes, title and fees when selling to a private party.

**Excellent Condition** - 3% of all cars we value. This car looks new and is in excellent mechanical condition. It has never had paint or bodywork and has an interior and body free of wear and visible defects. The car is rust-free and does not need reconditioning. Its clean engine compartment is free of fluid leaks. It also has a clean title history, has complete and verifiable service records and will pass safety and smog inspection.

**Very Good Condition** - 23% of all cars we value. This car has minor wear or visible defects on the body and interior but is in excellent mechanical condition, requiring only minimal reconditioning. It has little to no paint and bodywork and is free of rust. Its clean engine compartment is free of fluid leaks. The tires match and have 75% or more of tread. It also has a clean title history, with most service records available, and will pass safety and smog inspection.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**Good Condition** - 43% of all cars we value. This car is free of major mechanical problems but may need some reconditioning. Its paint and bodywork may require minor touch-ups, with repairable cosmetic defects, and its engine compartment may have minor leaks. There are minor body scratches or dings and minor interior blemishes, but no rust. The tires match and have 50% or more of tread. It also has a clean title history, with some service records available, and will pass safety and smog inspection.

**Fair Condition** - 18% of all cars we value. This car has some mechanical or cosmetic defects and needs servicing, but is still in safe running condition and has a clean title history. The paint, body and/or interior may need professional servicing. The tires may need replacing and there may be some repairable rust damage.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**© 1995-2022 Kelley Blue Book Co., Inc. All rights reserved.**

© 2022 Kelley Blue Book Co., Inc. All rights reserved. 2/17/2022-2/17/2022 Edition for LA 70809. The specific information required to determine the value for this particular vehicle was supplied by the person generating this report. Vehicle valuations are opinions and may vary from vehicle to vehicle. Actual valuations will vary based upon market conditions, specifications, vehicle condition or other particular circumstances pertinent to this particular vehicle or the transaction or the parties to the transaction. This report is intended for the individual use of the person generating this report only and shall not be sold or transmitted to another party. Kelley Blue Book assumes no responsibility for errors or omissions. (v.2020226)

PGR_THURSTON_0000156

**Kelley Blue Book**
THE TRUSTED RESOURCE

## 2012 Volvo XC70
## Pricing Report
**Style:** 3.2 Wagon 4D
**Mileage:** 125,000
**KBB.com Consumer Rating:** 4.7/5

## Vehicle Highlights

Fuel Economy: City 19/Hwy 25/Comb 21 MPG

Engine: 6-Cyl, 3.2 Liter

Transmission: Automatic, 6-Spd Geartronic

Drivetrain: FWD

Country of Assembly: Sweden

Country of Origin: Sweden

EPA Class: Midsize Station Wagons

Max Seating: 5

Doors: 4

Body Style: Wagon

## Sell to Private Party

Private Party Range
**$9,036 - $11,311**
Private Party Value
**$10,174**



Valid for **ZIP code 70809** through **02/17/2022**

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000157

## Your Configured Options

Our pre-selected options, based on typical equipment for this car.

✓ Options that you added while configuring this car.

**Exterior Color**
✓ Beige

**Wheels and Tires**
Alloy Wheels

**Entertainment and Instrumentation**
CD/MP3 (Single Disc)

AM/FM Stereo

Sirius Satellite

Bluetooth Wireless

Volvo Sensus

**Engine**
6-Cyl, 3.2 Liter

**Transmission**
Automatic, 6-Spd Geartronic

**Drivetrain**
✓ FWD

**Braking and Traction**
ABS (4-Wheel)

Hill Descent Control

Traction Control

Stability Control

**Comfort and Convenience**
Air Conditioning

Power Windows

Power Door Locks

Cruise Control

Keyless Entry

✓ Keyless Start

✓ Power Liftgate Release

Alarm System

**Steering**
Power Steering

Tilt Wheel

**Seats**
✓ Dual Power Seats

✓ Leather

✓ Heated Seats

**Roof and Glass**
Moon Roof

**Safety and Security**
Dual Air Bags

Side Air Bags

F&R Head Curtain Air Bags

✓ F&R Parking Sensors

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

PGR_THURSTON_0000158

**Lighting**
Daytime Running
Lights

**Accessory Packages**
✓ BLIS
✓ Premier Plus Pkg

**Exterior**
Fog Lights

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

# Glossary of Terms

**Kelley Blue Book® Trade-In Value** - This is the amount you can expect to receive when you trade in your car to a dealer. This value is determined based on the style, condition, mileage and options indicated.

**Trade-In Range** - The Trade-In Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week based on the style, condition, mileage and options of your vehicle when you trade it in to a dealer. However, every dealer is dierent and values are not guaranteed.

## Tip:

**It's crucial to know your car's true condition when you sell it, so that you can price it appropriately. Consider having your mechanic give you an objective report.**

**Kelley Blue Book® Private Party Value** - This is the starting point for negotiation of a used-car sale between a private buyer and seller. This is an "as is" value that does not include any warranties. The nal price depends on the car's actual condition and local market factors.

**Private Party Range** - The Private Party Range is Kelley Blue Book's estimate of what you can reasonably expect to receive this week for a vehicle with stated mileage in the selected condition and configured with your selected options, excluding taxes, title and fees when selling to a private party.

**Excellent Condition** - 3% of all cars we value. This car looks new and is in excellent mechanical condition. It has never had paint or bodywork and has an interior and body free of wear and visible defects. The car is rust-free and does not need reconditioning. Its clean engine compartment is free of fluid leaks. It also has a clean title history, has complete and verifiable service records and will pass safety and smog inspection.

**Very Good Condition** - 23% of all cars we value. This car has minor wear or visible defects on the body and interior but is in excellent mechanical condition, requiring only minimal reconditioning. It has little to no paint and bodywork and is free of rust. Its clean engine compartment is free of fluid leaks. The tires match and have 75% or more of tread. It also has a clean title history, with most service records available, and will pass safety and smog inspection.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

**Good Condition** - 32% of all cars we value. This car is free of major mechanical problems but may need some reconditioning. Its paint and bodywork may require minor touch-ups, with repairable cosmetic defects, and its engine compartment may have minor leaks. There are minor body scratches or dings and minor interior blemishes, but no rust. The tires match and have 50% or more of tread. It also has a clean title history, with some service records available, and will pass safety and smog inspection.

**Fair Condition** - 18% of all cars we value. This car has some mechanical or cosmetic defects and needs servicing, but is still in safe running condition and has a clean title history. The paint, body and/or interior may need professional servicing. The tires may need replacing and there may be some repairable rust damage.

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

© 1995-2022 Kelley Blue Book Co., Inc. All rights reserved.

© 2022 Kelley Blue Book Co., Inc. All rights reserved. 2/17/2022-2/17/2022 Edition for LA 70809. The specific information required to determine the value for this particular vehicle was supplied by the person generating this report. Vehicle valuations are opinions and may vary from vehicle to vehicle. Actual valuations will vary based upon market conditions, specifications, vehicle condition or other particular circumstances pertinent to this particular vehicle or the transaction or the parties to the transaction. This report is intended for the individual use of the person generating this report only and shall not be sold or transmitted to another party. Kelley Blue Book assumes no responsibility for errors or omissions. (v.2020226)

|   |   | List |
|---|---|---|
| 1 | YV4952BLXC1143836 | **11,569.00** |
| 2 | YV4952BL1C1142834 | **15,991.00** |
| 3 | YV4952BL9C1125148 | **12,700.00** |

|   | Difference in List Price |
|---|---|
| 1 Vs 2 | 4,443.60 |
| 1 Vs 3 | 2,009.52 |
| 2 Vs 3 | 2,434.08 |

Subject Vehicle Milage

55374

Subject vs

1
2
3

Quoted Adjusted Value

| 1 | **11,764.92** | 2364.71 |
| 2 | **14,712.02** | 1,007.21 |
| 3 | **13,218.45** | 1,837.72 |

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

| Value of Options | Miles | Adjusted Value |
|---|---|---|
| 1770.79 | 125000 | 9,798.21 |
| 1749.19 | 82,089 | 14,241.81 |
| 892.27 | 105,350 | 11,807.73 |

| Difference in Miles |
|---|
| 42,911 |
| 19,650 |
| 23,261 |

| 69626 |
|---|
| 26,715 |
| 49,976 |

| | Corrected Adjusted Value |
|---|---|
| 7205.400274 | 16,605.61 |
| 2764.660735 | 16,469.47 |
| 5171.876657 | 16,552.61 |

16542.56256

41 Pages SCANNED Tue, 22 Mar 2022 18:07:36 GMT

Ə

Dollars/ Mile

0.1035538673

0.1022656489

0.1046421048

0.103487207

|  | Offered Dollar |
|---|---|
| 7205.400274 | 0.0339630310 |
| 2764.660735 | 0.0377020400 |
| 5171.876657 | 0.0367720505 |

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

RouteOne

[illegible]

41 Pages SCANNED Tue, 22 Mar 2022 18:07:35 GMT

*PROGRESSIVE*

PAYABLE THROUGH
PNC BANK, N.A. 070
ASHLAND,OH
1-877-448-9544

VOID IF NOT PRESENTED WITHIN 90 DAYS

CLAIM NUMBER: 22-5056549
NAME: THURSTON , SCOTT

DRAFT NUMBER:
**2783590705**

56-389
—————
412

**March 15, 2023**

Thurston055

PAY EXACTLY     $\***********9,520.89

NINE THOUSAND, FIVE HUNDRED TWENTY AND 89/100 ***********************************************

PAY TO          SCOTT THURSTON
THE ORDER       2304 FAIRWAY DR
OF:             BATON ROUGE, LA 70809

United Financial Casualty Company

BY:

AUTHORIZED SIGNATURE

⑈"2783590705"⑈ ⑆041203895⑆ 4239694516⑈"

EXHIBIT
6

_____
**DO NOT WRITE OR STAMP BELOW THIS LINE**

# KING & SPALDING

King & Spalding LLP
1180 Peachtree Street N.E. Ste. 1600
Atlanta, GA 30309-3521
Tel: +1 404 572 4600
Fax: +1 404 572 5100
www.kslaw.com

Zachary A. McEntyre
Partner
Direct Dial: +1 404 572 4636
Direct Fax: +1 404 572 5100
zmcentyre@kslaw.com

March 21, 2023

**VIA U.S. MAIL**

John Z. Steed
Island Justice Law
P.O. Box 771
Stonington, Maine 04681

      Re:    Matthew Thurston

Dear Mr. Steed:

      I write to follow up on UFCC's prior demands to resolve Matthew Thurston's insurance claim via appraisal, as required by the insurance policy. As explained in my August 10, 2022 letter, UFCC hired an appraiser, and Mr. Thurston's compliance with the appraisal provision is a condition precedent to suit. It is our understanding, however, that you have not hired an appraiser. In light of UFCC's motion to dismiss Mr. Thurston's lawsuit, we invite you to reconsider your position on appraisal. Please let us know as soon as possible of your selected appraiser.

      In the meantime, I am enclosing a check for the undisputed amount of $9,520.89. This amount reflects the actual cash value of $13,179.89, minus the salvage value of $3,659.00. If Mr. Thurston wishes to retain the salvage vehicle, please let us know and UFCC can make towing arrangements. If Mr. Thurston prefers not to retain the vehicle, UFCC can issue the salvage value to him. Should Mr. Thurston wish to proceed with this option, he will need to provide UFCC with all necessary documentation to sell the salvage vehicle, including the vehicle's title.

      Sincerely,

Zachary A. McEntyre
Partner

Thurston057

EXHIBIT

7

Progressive
PO Box 2930
Clinton, IA 52733-2930



Page 1 of 1

SCOTT THURSTON
2304 FAIRWAY DR
BATON ROUGE, LA 70809

| ADVICE FOR PAYMENT 2783590705 | | |
|---|---|---|
| **Payee:**<br>SCOTT THURSTON | **Payment Date** | 03/15/2023 |
| | **Total Payment Amount** | $9,520.89 |
| | **Total Number of Invoices** | 1 |
| If you have any questions regarding this payment, please call us at 1-800-274-4499. | | |

| Details | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Claim Number:**<br>225056549 | **Name:**<br>THURSTON, SCOTT | | **Date of Loss:**<br>01/21/2022 | **Invoice Number:**<br>108934146 | **Company:**<br>United Financial Casualty Company | | | |
| **Type** | **Description** | **\*Coverage** | **Reference** | **Identifier** | | **Service Dates** | **Deductible** | **Payment Amount** |
| Total Loss | Owner Retains Salvage | COLL | N/A | 12 VOLVO XC70<br>140915 | | N/A | $1,000.00 | $9,520.89 |

| Total Payment Amount | $9,520.89 |
|---|---|

**\*Full Description of Coverage:**
COLL     -  Collision