Page 1

1               UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MAINE
2

3

      * * * * * * * * * * * * * * * * *
4                                        *

      MATTHEW THURSTON,                   *
5     individually and on behalf of      * No.
      others similarly situated,         * 1:22-cv-00375-NT
6                                        *

                  Plaintiff,             *
7     V.                                  *
                                         *
8     PROGRESSIVE CASUALTY               *
      INSURANCE COMPANY and UNITED       *
9     FINANCIAL CASUALTY COMPANY,        *
                                         *
10                Defendants.            *
                                         *
11    * * * * * * * * * * * * * * * * *

12

13    VIDEOTAPED DEPOSITION OF JACOB ECKERT,

14    Deposition taken at Norman Hanson Detroy, Two Canal

15

16    Plaza, Portland, Maine, on Monday, January 22, 2024,

17

18    commencing at 3:35 p.m.

19

20

21

22

23

24    Court Reporter:
25    Pamela J. Carle, LCR, RPR, CRR

Jacob Eckert                                            January 22, 2024
Multiple Plaintiffs v. Progressive

Page 2

APPEARANCES

For the Plaintiff:

FREDERICK & BERLER, LLC
767 East 185th Street
Cleveland, Ohio 44119
By: Ronald Ira Frederick, Esq.
    filings@clevelandconsumerlaw.com
    and
ISLAND JUSTICE
P.O. Box 771
Stonington, Maine 04681
By: John Steed, Esq. (Via telephone)
    john@islandjusticelaw.com
    and
BORISON FIRM, LLC
5830 E. Second Street #95943
Casper, WY 82609
By: Scott C. Borison, Esq. (Via telephone)
    scott@borisonfirm.com

For the Defendants:

KING & SPALDING
1180 Peachtree Street, NE, Suite 1600
Atlanta, Georgia 30309
By: Allison Hill White, Esq.
    404.572.4600
    awhite@kslaw.com

Videographer:

Leigh Doran

---

Page 3

                    I N D E X
WITNESS:        JACOB ECKERT

EXAMINATION:                         PAGE
By Mr. Frederick              6

        EXHIBITS FOR IDENTIFICATION:
ECKERT      DESCRIPTION           PAGE
        (No exhibits marked.)

---

Page 4

1   THE VIDEOGRAPHER:  Good afternoon.  We
2   are going on the record at 3:35 p.m. on Monday,
3   January 22, 2024.  Please note that the
4   microphones are sensitive and may pick up
5   whispering and private conversations.  Please mute
6   your phones at this time.  Audio and video
7   recording will continue to take place unless all
8   parties agree to go off the record.
9       This is media unit one of the video
10  recorded deposition of Jacob Eckert in the matter
11  of Matthew Thurston, et al. versus Progressive
12  Casualty Insurance Company and United Financial
13  Casualty Company, filed in the United States
14  District Court for the District of Maine, docket
15  No. 122-cv-00375-NT.
16      The location of this deposition is
17  Norman, Hanson & DeTroy, 2 Canal Plaza, Portland,
18  Maine 04112.  The my name is Leigh Doran, the
19  videographer representing Veritext, and our court
20  reporter is Pam Carle from the firm Veritext.
21      I am not authorized to administer an
22  oath, I am not related to any party in this
23  action, nor am I financially interested in the
24  outcome.  If there are any objections to
25  proceeding, please state them at the time of your

---

Page 5

1   appearance.
2       Counsel and all present, including
3   remotely, will now state their appearances and
4   affiliations for the record, beginning with the
5   noticing attorney.
6       MR. FREDERICK:  My name is Ron
7   Frederick, Frederick & Berler, LLC, Cleveland,
8   Ohio, and with me are --
9       MR. STEED:  John Steed, Island Justice,
10  Stonington, Maine.
11      MR. FREDERICK:  And although Scott
12  Borison appears to be away from the remote, he's
13  with Borison Law in Frederick, Maryland.  Scott
14  moves around a lot.  I believe right now he's in
15  Hawaii.
16      MS. WHITE:  Allison White of King &
17  Spalding for the defendants.
18      THE VIDEOGRAPHER:  And, Pam, will you
19  please swear in the witness, and then the counsel
20  may proceed.  Thank you.
21      JACOB ECKERT,
22      having been duly sworn,
23      was deposed and testified
24      as follows:
25      EXAMINATION

2 (Pages 2 - 5)

Page 6

1  BY MR. FREDERICK:
2      Q.    Mr. Eckert, you already know my name is
3  Ron Frederick, and I represent Mr. Thurston in
4  this matter.
5          Just, first, have you ever had your
6  deposition taken before?
7      A.    No.
8      Q.    Okay, so let me talk to you about a few
9  ground rules, okay?  First of all, I'll be asking
10 you a series of questions, so I'd like you to try
11 to keep your answers verbal, not using head nods
12 or uh-hums or uh-hums -- uh-hums, uh-hum, either
13 one of those, I'm sorry.
14         But know that just how I screwed it up,
15 at some point it's really likely that you will,
16 and we'll try to correct you if you don't, okay.
17 And we might miss it as well.  I've certainly done
18 that before.
19         Okay.  So yes or no is preferable.  If
20 you answer a question that I ask, I'll assume you
21 understood it as I asked it, fair enough?
22     A.    Yes.
23     Q.    Great.  If you don't understand the
24 question, or you need me to rephrase it or reask
25 it, let me know and I will do so, okay?

Page 7

1      A.    Yes.
2      Q.    The other thing that's most important
3  is I know you've been sitting here a long time, so
4  you've already seen that this is an endurance
5  contest; it's not.  If you need a break, let us
6  know and we'll take a break.
7          The only thing that I ask is that if
8  you need to take a break, just let me know, and
9  you just need to answer the question that's asked
10 if there's a -- if we're in the middle of a
11 question and answer.  Fair enough?
12     A.    Yes.
13     Q.    Perfect.  From time to time your
14 attorney might object.  Go ahead and answer the
15 question anyway, she's just preserving the record,
16 unless she specifically tells you not to.  Okay?
17     A.    Yes.
18     Q.    Okay.  Perfect.  So let's first start
19 with your full name.
20     A.    Jacob Eckert.
21     Q.    Middle initial, name?
22     A.    J. Jerome.
23     Q.    Jerome.  With a -- okay.  And where
24 were you born?
25     A.    Buffalo, New York.

Page 8

1      Q.    So you must be happy?
2      A.    (Witness shakes head.)
3      Q.    Oh, you're not, I'm sorry.  Well,
4  you're happy they did better than the Browns.
5          And when were you born?
6      A.    September 23rd, 1975.
7      Q.    Where did you go to high school?
8      A.    Alden Central High School.
9      Q.    AL --
10     A.    A-L-D-E-N.
11     Q.    And you graduated in?
12     A.    1993.
13     Q.    After high school, did you go on to
14 college?
15     A.    I did.
16     Q.    Where did you go?
17     A.    I first attended Houghton College in
18 Houghton, New York.
19     Q.    That's H-O-U --
20     A.    H-O-U-G-H-T-E-N.
21     Q.    Did you get a degree?
22     A.    I then went to Erie Community College,
23 and then I did get my degree from Buffalo State
24 College.
25     Q.    By the way, I didn't mean to be

Page 9

1  sarcastic, I had forgotten that they had lost.
2  I'm just so used to having them win.
3          Okay, and what was your degree in?
4      A.    Sociology.
5      Q.    And when was that?
6      A.    That was -- I graduated in December of
7  1998.
8      Q.    Did you go on with any further formal
9  college?
10     A.    I did not.
11     Q.    And then after college what did you do?
12     A.    I worked at Sugarloaf, which is a ski
13 resort here in Maine, for a couple of years.
14     Q.    So you moved up here?
15     A.    I did move up here, yup.
16     Q.    You were going to become a ski bum?
17     A.    Temporarily.
18     Q.    I should have done that.  How long were
19 you up at Sugarloaf?
20     A.    Two to three years.
21     Q.    And what jobs did you have, were you a
22 lift --
23     A.    No, I started as a shuttle bus driver
24 in the evening.
25     Q.    Okay.

3 (Pages 6 - 9)

Jason Eckert
January 22, 2024
Multiple Plaintiffs v. Progressive

Page 10

1    A.    And then when I left I was managing
2    their health and fitness club.
3        Q.    Did you become a ski instructor?
4        A.    I did not.
5        Q.    You did not.  I actually have.  Okay,
6    so you left there in like 2001?
7        A.    Well, from -- no, 2002.  Yeah, 2001.
8    Yeah.
9        Q.    Or 2001, 2002 season?
10       A.    Well, no, I left in 2001.  The only
11   reason I know that is I was hired by Progressive in
12   January of 2002.
13       Q.    Okay.  And were you hired in your
14   current location?
15       A.    No.  My current location I work out of
16   my home, but travel on a daily basis.
17       Q.    So where did you get hired out of?
18       A.    I was hired out of the Augusta, Maine
19   office.  That's where I started.
20       Q.    So you would go in to Augusta, Maine on
21   a regular basis and then do whatever you did?
22       A.    No.  So my training was out of Augusta,
23   Maine.  So I was there for probably -- probably two
24   months, and then after that I was sent to the
25   branch location that I was hired for, which is

Page 11

1    Bangor, Maine.
2        Q.    And so you trained like from January to
3    March or April?
4        A.    As best as I can recall.
5        Q.    Okay.
6        A.    It's a long time ago.
7        Q.    Sure, 2002.  And then you got sent to
8    Bangor, Maine?
9        A.    Yes.
10       Q.    And so you've been there since like
11   March or April of 2002?
12       A.    Yes, although we no longer have an
13   office in Bangor.
14       Q.    Right.  And when did that office close?
15       A.    I don't know exactly.  I would guess
16   probably within the last ten years.
17       Q.    Before the pandemic?
18       A.    Yes.
19       Q.    And then you were working remotely from
20   that point on?
21       A.    Correct.
22       Q.    So when you were hired into
23   Progressive, what was your position?
24       A.    It was what was called a claims
25   generalist.

Page 12

1        Q.    And what was involved in that?
2        A.    I would handle claims.
3        Q.    Okay.  Go on.
4        A.    So the aspects of the claim that I
5    would handle is I would get assigned a claim.  That
6    would involve calling the parties that were
7    involved in the claim, getting statements from
8    them, determining coverage, determining liability,
9    inspecting damaged vehicles, and handling soft
10   tissue injury claims that may have been a result of
11   the accident.
12       Q.    What about the valuations of the
13   vehicles?
14       A.    Yes.
15       Q.    So both from the collision damage
16   standpoint and total loss evaluations?
17       A.    Yes, both.
18       Q.    And are you still doing that as a
19   claims generalist?
20       A.    No.
21       Q.    What are you doing now?
22       A.    Currently my role is what's called a
23   managed repair representative.
24       Q.    Now, is that part of the concierge
25   program?

Page 13

1        A.    I don't know.  I'm not familiar with
2    the concierge program.
3        Q.    You're not?
4        A.    No.
5        Q.    First of all, when did you become a
6    managed repair representative?
7        A.    I would say probably with -- well, it's
8    a little complicated because Progressive came up
9    with that term, and I've been a managed repair
10   representative since that term has been -- since
11   they went with that model.
12       Q.    And when was that?
13       A.    I would guess ten to 12 years ago.
14       Q.    Okay, so you were a managed repair
15   representative when Mr. Thurston had his crash
16   back in 2022?
17       A.    If it was in 2022, yes.
18       Q.    It was.
19       A.    Okay.  Yes.
20       Q.    Actually, I believe it was January
21   21st, 2022.
22       A.    Yes.
23       Q.    So what are your duties as a managed
24   repair representative?
25       A.    Writing estimates, evaluating total

4 (Pages 10 - 13)

Jason Eckert                                                                  January 22, 2024
Multiple Plaintiffs v. Progressive

Page 14

1    loss vehicles, managing customer rental associated
2    with both of those, managing customer repairs
3    through shops.
4        Q.    So you write estimates for vehicles
5    that are damaged in an accident?
6        A.    Yes, sometimes.  The reason I say that
7    is under the managed repair representative umbrella
8    there's a couple different paths.  I was, for a
9    time frame, what's called a SWE representative,
10   S-W-E, and that stands -- it's just an acronym that
11   stands for shop written estimate.
12       Q.    Got it.  So that's where somebody takes
13   their car into the shop, the shop gives an
14   estimate, provides it to Progressive, and then you
15   guys make an evaluation from there without going
16   out, is that what that means?
17       A.    Yes and no.  The way that program
18   works, if the customer wants to use it, they take
19   their vehicle to the body shop, the body shop
20   writes the estimate, and then the body shop -- if
21   the customer wants to have the vehicle repaired
22   there, they schedule the customer in for repairs.
23           The estimate gets submitted to
24   Progressive.  Some of the estimates are looked at
25   by me and other SWE representatives, but not all of

Page 15

1    the estimates.
2        Q.    Okay.  So when I got hit by a
3    Progressive insured I took my car to a body shop,
4    and then I was done with it and the body shop
5    argued with whoever at Progressive was dealing
6    with it.  I got T-boned in a parking lot.  He was
7    going to run, but he didn't, smartly.
8            So that's what -- that's part of that
9    that you would be doing?
10       A.    Yes.  Except you said you're from
11   Cleveland, did you say?
12       Q.    I am from Cleveland.
13       A.    So Maine's obviously more rural, so a
14   lot of programs they have in Cleveland, we don't
15   have up here.
16       Q.    Okay.
17       A.    So earlier when you mentioned like
18   concierge program?  We don't have that here.
19       Q.    You don't have that here.
20       A.    No.
21       Q.    Got it.  Okay.  But is the managed
22   repair similar to concierge?
23       A.    I don't know, I'm not familiar with the
24   concierge program.
25       Q.    Oh, it's basically -- and I'm not sure

Page 16

1    they still do it, but you have an accident,
2    Progressive is going to take care of the claim.
3    You turn it over to Progressive, they select the
4    body shop, they manage everything, and you pick up
5    your car repaired.
6        A.    Yes, we don't have that here.
7        Q.    Okay.  So you would write estimates for
8    using the other -- I forget what it was called
9    already, but the other program here, they could go
10   there.  And then when you write estimates, if you
11   determine that -- when it's impracticable to
12   repair the vehicle, you would then deem it to be a
13   total loss?
14       A.    So, for clarity, in the SWE program I
15   wrote very little estimates, usually the shop would
16   write the estimate.  And as I said earlier, either
17   that estimate would be automatically approved and I
18   would never see that estimate, or I would get it
19   for review.
20       Q.    Got it.  Do you recall whether you went
21   out to look at Mr. Thurston's vehicle?
22       A.    I don't recall specifically looking at
23   his vehicle.  Given the fact that I'm here, I'm
24   guessing I did.
25       Q.    Fair enough.  Now, what did you do to

Page 17

1    prepare for this deposition?
2        A.    On Friday met with Allison and some
3    other individuals.
4        Q.    In person?
5        A.    No.
6        Q.    Okay.  On the phone?
7        A.    Yes.
8        Q.    For about how long?
9        A.    Just under two hours.
10       Q.    Okay.  And so when you look at a
11   vehicle and determine that the cost of repair does
12   not justify repairing, then you determine that
13   it's a total loss at this point?
14       A.    Yes.  Yes.
15       Q.    Is there more to that?
16       A.    There is.  It's based on comparison of
17   numbers.
18       Q.    Explain, please.
19       A.    Yup.  Specifically the dollar amount of
20   the estimate in relationship to the market value of
21   the vehicle.
22       Q.    Okay.  Or at some point it's been hit
23   so badly that you just go it's an obvious total
24   loss, right?
25       A.    We do have some of those.  Yes, there

5 (Pages 14 - 17)

Page 18

1    are instances in which we can deem a vehicle an
2    obvious total loss without writing an estimate.
3        Q.    Right, you just look at it and go it's
4    completely totaled, et cetera.
5            Okay, so let's go back to -- so let's
6    just go back to -- I just want to talk a little
7    bit about your pay plan.  You get paid a salary?
8        A.    I do.
9        Q.    Do you have any bonus structure other
10   than gainshare.
11       A.    No, not other than gainshare.
12       Q.    Okay.  My wife, at one point before our
13   son was born, worked at Progressive.
14       A.    Okay.
15       Q.    So that's why I know about gainshare.
16   And when she left we didn't elect to keep the 401
17   in the Progressive stock, sadly, so, because it's
18   done quite well.
19           Okay, so do you order total loss
20   evaluations, or does that come back to the claims
21   generalist now?
22       A.    I need clarification on your question.
23   What do you mean by order total loss evaluations?
24       Q.    Pull one, run a Mitchell report?
25       A.    I'm the one who runs -- the M RR is the

Page 19

1    one who runs the evaluation report.
2        Q.    And the MRR, is that the owner?
3        A.    I'm sorry, I don't understand your
4    question.
5        Q.    I was in a deposition the other day,
6    and the corporate representative described the
7    function as the file owner of Kyle Mayer in this
8    particular case?
9        A.    So a file owner is different than a
10   managed repair representative.
11       Q.    Okay.  So who would run the --
12       A.    The managed -- I'm sorry, finish the
13   question.
14       Q.    -- the Mitchell total loss report?
15       A.    The managed repair representative.
16       Q.    So you would have run the initial
17   report?
18       A.    Yes.
19       Q.    You might want to turn to Exhibit 10.
20   I'm sorry, it's 11.  And you'll notice that this
21   particular exhibit goes from Thurston -- we'll
22   just deal with the last several digits, 101
23   through 121.  Okay?
24           And I believe you're -- so if we're
25   looking at the claims processor, we'll just start

Page 20

1    at the beginning, there's an X014776 number, and
2    then there's no name assigned to this, which would
3    appear to be the first one, two, three -- four
4    entries.  Do you see that?
5        A.    Uh-hum.
6        Q.    Would that be just someone in the call
7    center?
8        A.    I assume so, but don't know for sure.
9        Q.    Okay.  And do you know what CLRU, we're
10   looking at the fourth -- third line or third
11   entry, CLRU claim, not qualified for CCU handling.
12   Do you know what that means?
13       A.    Specifically what part?
14       Q.    That particular entry.
15       A.    Right, but what part of that entry?
16       Q.    Any of it.  I understand what total
17   loss means.  What is CLRU?
18       A.    So that's the question, what does CLRU
19   mean?
20       Q.    Yes.
21       A.    Okay, yeah.  I believe that stands for
22   central loss reporting unit.
23       Q.    And then what is CCU?
24       A.    I believe central claims unit.
25       Q.    So those are for the more

Page 21

1    run-of-the-mill, easier claims to manage, is that
2    what that would tend to mean?
3        A.    That is my understanding.
4        Q.    And by the way, as a managed repair
5    representative, do you have any supervisory
6    capacity?
7        A.    Other than the body shops that I have
8    through the SWE program, no.  So no other
9    Progressive employees, if that is your question.
10       Q.    So the SWE program is preferred body
11   shops that Progressive likes to deal with around
12   here?
13       A.    Yes.  Yes.
14       Q.    Okay.  And then the next entry here
15   says XFERRED.  Do you know what XFERRED means?
16       A.    Are you talking on the last entry of
17   this page?
18       Q.    Well, next-to-the-last.  At 257, but it
19   looks -- but one says Internet, the other one has
20   the X014476.
21       A.    So are you talking about the entry
22   above where my finger is currently?
23       Q.    Yes.
24       A.    And what is the question?
25       Q.    What does XFERRED mean?

6 (Pages 18 - 21)

Page 22

1    A.    I don't know.  I believe it's
2    transferred, but I'm not sure.
3        Q.    And then the next thing is Internet,
4    and I'm not sure what that means, but it looks
5    like it gives more information about the crash.
6            And then two lines down it says --
7        A.    I'm sorry, are we on 102 now?
8        Q.    We're on 102, yes.  I just saw that you
9    switched pages, so I figured I'd appreciate you
10   pointing out the page number.
11           And than Emily Brown apparently
12   assigned this file to Kyle Mayer, is that correct?
13       A.    I don't know.
14       Q.    If we look at the assigned claim to
15   A155666 under file innervation?
16       A.    So are you looking at this one right
17   here?
18       Q.    Yeah, with Emily Brown's name.
19       A.    Yup.  So it seemed like Emily Brown
20   assigned it to whoever A155666 is.
21       Q.    Which the next line, it indicates that
22   would be Kyle Mayer, right?
23       A.    Yup.
24       Q.    Do you know Kyle Mayer?
25       A.    I do not.

Page 23

1        Q.    You don't deal with him on a regular
2    basis?
3        A.    No.
4        Q.    And so if we look at -- if we look at
5    107, it would appear that your name first shows up
6    at on the top of page 107, do you see that?
7        A.    Yes.
8        Q.    So can you explain to me what happened
9    with this entry?
10       A.    Specifically what question do you have
11   about the entry?
12       Q.    Well, just explain it to me in layman's
13   terms, because it looks like there's a fair bit of
14   code here, shorthand.
15       A.    Yeah.  Specifically what -- what do you
16   need to know, though?  I can answer anything you
17   need, I just need to know what you --
18       Q.    Vehicle IV?
19       A.    IV is insured vehicle.
20       Q.    Thank you.  It says coverage reached
21   out to FH via Teams, what does that mean?
22       A.    File handler.
23       Q.    So are you the file handler, or would
24   that have been --
25       A.    I am not the file handler.

Page 24

1        Q.    Mr. Mayer?
2        A.    I would assume so.
3        Q.    And Teams is Microsoft Teams?
4        A.    Yes.
5        Q.    Liability, no first-party coverage
6    through SWE, which is Progressive?  Or explain.
7        A.    No, you should not been putting those
8    two lines together.  Where it says no first-party
9    coverage.  It's a typo on my behalf, it's supposed
10   to be though, not through.
11       Q.    And then SWE shop Moody's Collision in
12   Bangor, Maine, correct?
13       A.    Correct.
14       Q.    And you're familiar with that crash
15   center?
16       A.    Yes.
17       Q.    That body shop?
18       A.    Yes.
19       Q.    Okay.  And then so that would mean
20   that's where the vehicle is, correct?
21       A.    Yes.
22       Q.    And then SWE estimator is Chantel?
23       A.    Correct.
24       Q.    And that's someone who works in your
25   office, or --

Page 25

1        A.    No.
2        Q.    -- in the region?
3        A.    No, that is an employee of Moody's.
4        Q.    Okay.  And then SWE estimator note in
5    journal, yes, which means there's a note in the
6    journal?
7        A.    Yes.
8        Q.    So is there any other information being
9    prepared except on these notes simultaneously?
10       A.    No, because the notes that the SWE
11   estimate puts get populated into the claim.  That's
12   how I can see it.
13       Q.    Into the claim.  Where would that show?
14       A.    That the would show up in the journal
15   notes from Claims Pro.
16       Q.    And where would those be?
17       A.    The journal notes from Claims Pro.  I
18   don't understand the question.
19       Q.    Well, this is all I have, so I'm trying
20   to figure out where Claims Pro would be.
21       MS. WHITE:  We produced the journal
22   notes for Claims Pro.  I'll have to find the Bates
23   numbers for you.
24   BY MR. FREDERICK:
25       Q.    Okay, and so this determines that

7 (Pages 22 - 25)

Jason Eckert
Multiple Plaintiffs v. Progressive

January 22, 2024

Page 26

1    Moody's produced an estimate of 8,850.34?
2        A.    Yes.
3        Q.    Which I can see was 61.1 percent of
4    value, correct?
5        A.    No.  That was 61.1 percent of estimated
6    value in Mitchell.
7        Q.    In Mitchell at Progressive or at
8    Moody's?
9        A.    It's the same Mitchell.  So Moody's
10   writes the estimate in Mitchell, which is the same
11   software program that Progressive used to write
12   their estimates.
13       Q.    But it's purely estimates off of
14   Mitchell's estimation program, correct?  Not out
15   of -- not out of Mitchell Work Center?
16       A.    Correct.  At this point Mitchell Work
17   Center has not been involved.
18       Q.    Got it.  And then the next couple of
19   them outline the damage, and you would have
20   assessed a high salvage value, correct?
21       A.    Yes, correct.
22       Q.    Based upon information in Mitchell or
23   calling around to various salvage yards?
24       A.    Neither.  We use a salvage vendor
25   called Copart.

Page 27

1        Q.    Yeah.  But I consider them to be a
2    salvage yard, too, since they run the salvage
3    auctions, right?
4        A.    Yes, but we're not calling around.
5        Q.    Okay, you just hop into their computer
6    system to get a --
7        A.    Correct.
8        Q.    -- expected value?
9        A.    Yes.
10       Q.    And then of course there are always
11   supplements to any significant crash, right?
12       A.    I wouldn't say always.  Always
13   assumes -- assumes every time.  So, no, not always.
14       Q.    But almost always?
15       A.    I would say a fair amount of time.
16       Q.    Right.  Okay.  And so now the next page
17   on 108, the first full entry it says you did a
18   valuation only, estimate and salvage value done.
19   What does that mean?
20       A.    Oh.  That means that the vehicle was
21   identified as a potential total loss, and if the
22   customer was agreeable, the vehicle would have been
23   sent to a Copart staging yard, and the vehicle
24   valuation would have been done there.
25       Q.    The vehicle valuation would have been

Page 28

1    done at Copart?
2        A.    Correct.
3        Q.    Who would have run the vehicle
4    evaluation at Copart?
5        A.    A Progressive employee.
6        Q.    So a Progressive employee would have
7    gone to Copart, ID'd the car there and then run
8    the valuation?
9        A.    Correct.
10       Q.    And would have inspected the vehicle at
11   that point?
12       A.    Yes.
13       Q.    And then there's an entry on February
14   3rd, '22 at 5:15 p.m.  Is this where the vehicle
15   wound up?  It says Copart assignment, do you see
16   that?
17       A.    I do.
18       Q.    And is this where the vehicle should
19   have been taken to?
20       A.    Well, it looks like what this is is an
21   assignment for Copart to pick up the vehicle and
22   bring it to their lot.
23       Q.    Okay.  And that assignment would have
24   been made by Mr. Mayer?
25       A.    Yes.

Page 29

1        Q.    So if we go to page 110, the last entry
2    appears to be the only one on this page involving
3    you.  What does WCTL mean?
4        A.    Work center total loss.
5        Q.    Okay.  So then is this where you
6    evaluate the vehicle's condition?
7        A.    Yes.
8        Q.    Okay.  So let's talk a little bit about
9    the valuations, or the evaluations, because you
10   evaluate the condition of the vehicle, is that
11   correct?
12       A.    Yes.
13       Q.    Okay.  Explain to me how you do that?
14       A.    We look at the condition of the --
15   sorry.
16       Q.    It's okay.  We've all done it.
17       A.    We look at the condition of the
18   interior, the exterior, the engine compartment, and
19   the tires.
20       Q.    Okay.  And are there written standards
21   as to how to evaluate these things?
22       A.    There are.
23       Q.    Where do those exist?
24       A.    Those exist in two spots that I'm aware
25   of, one is a laminated, double-sided piece of paper

8 (Pages 26 - 29)

Page 30

1 that lists it all out that a lot of MRRs will carry
2 in their vehicle.
3     The other place it lives is, I believe,
4 within Mitchell. If you hover over, it will give
5 you what -- the rating requirements.
6     Q.    So when you say you hover over, do you
7 want to give me a little background? Are you
8 looking at Mitchell on a laptop?
9     A.    Yes.
10     Q.    And there are hyperlinks that you would
11 click on for valuation somewhere?
12     A.    I would not call them hyperlinks. It's
13 a situation where if you hover your mouse over
14 something it will bring up a small description.
15 It's basically an electronic version of that
16 laminated sheet that I had told you about earlier.
17     Q.    What do you call this laminated sheet?
18     A.    I don't call it anything. I guess
19 conditioning guide would be an appropriate name for
20 it.
21     Q.    And you said you don't call it
22 anything, because you don't really use it
23 specifically anymore?
24     A.    I don't. I usually use the hover over
25 method.

Page 31

1     Q.    Or have you been doing this for so long
2 you just know?
3     A.    No, because the conditioning criteria
4 is different depending on the age of the vehicle.
5     Q.    Okay. So go ahead and explain that to
6 me, please.
7     A.    So the newer a vehicle is, the better
8 condition we would expect it to be in. The older a
9 vehicle is, the less -- less good of a condition we
10 would expect it to be in.
11     So there's a leniency in conditioning
12 for older vehicles that may not be the same for
13 newer vehicles.
14     Q.    So what you're sort of telling me is
15 that older vehicles are not expected to be in the
16 same shape as newer vehicles?
17     A.    That is correct.
18     Q.    Okay. Because they have been around,
19 they have been, for lack of a better term, beaten
20 up a little bit or had some wear and tear?
21     A.    They've been used more.
22     Q.    Right. So like you would expect to see
23 more paint chips in the hood, scratches along the
24 sides because they have been more, is that what
25 you're saying?

Page 32

1     A.    Correct.
2     Q.    And so during the course of this
3 evaluation you take photographs of all of the
4 various imperfections of a vehicle?
5     A.    No, not all of them.
6     Q.    Okay. So which one do you take
7 photographs of?
8     A.    So the rating scale for conditioning
9 is, I believe, 1 through 5. If something is a 3,
10 we're not required to document -- required to
11 document that with photographs. If something is
12 outside of a 3, then we are required to document
13 that.
14     Q.    So if it's a 4, you have to document
15 that?
16     A.    Correct.
17     Q.    How often do you document a 4 or a 5?
18     A.    As far as conditioning?
19     Q.    Yes.
20     A.    Are you looking for a percentage?
21     Q.    Yes.
22     A.    I would probably say under 10 percent.
23     Q.    Under 10 percent --
24     A.    Uh-hum.
25     Q.    -- for a 4? How often do you document

Page 33

1 4 or 5 for tires?
2     A.    Tires -- tires is not discretionary.
3 And what I mean by that is the way we do that is we
4 have a tread depth gauge that we carry with us. We
5 measure the depth of all four tires.
6     And then within Mitchell there is a
7 link where we can put in what the tread depth of
8 the tire is when it's new, and then the tread depth
9 we measured on all four tires, and then we -- it
10 calculates it for us and assigns the 1 through 5
11 rating for us.
12     Q.    So do you put in the information for
13 the original tread depth, or do you put in the
14 information for what the tires are and Mitchell
15 creates that?
16     A.    Both. So I put in what the tread depth
17 of the tire is new, and then I put in what all four
18 tires measure, and then Mitchell calculates it from
19 there.
20     Q.    And how would you know what the tread
21 depth is originally?
22     A.    You could look it up online. Most
23 passenger tires are 10 or 11/32 seconds new. A lot
24 of your truck tires can be 16/32 seconds.
25     Q.    Got it. So what is 3 within the tire

9 (Pages 30 - 33)

Page 34

1  range?
2      A.   I do not know off the top of my head
3  what percentage the 3 falls within.  I do know the
4  ratings -- you know, obviously if a tire had no
5  tread left it would be a 1.  I don't know what the
6  cutoff is to when it becomes a 2, and when the
7  cutoff is to where it becomes a 3, and so on.
8      Q.   But if they're pretty new tires they're
9  going to be a 4 or 5, right?
10     A.   That is accurate.
11     Q.   And so you noted a crease in the right
12 rear door, and scratches in the paint.  How many
13 scratches in the paint would make a vehicle a 2?
14     A.   Without looking at the guide, I don't
15 know.  Because, again, it's specific to the year of
16 the vehicle, and then also the description in the
17 guide.
18     Q.   So you plug the year, make and model
19 into the guide and it populates and sort of
20 changes the criteria for you?
21     A.   No.  Again, the guide can either be
22 done manually by me looking at the laminated sheet
23 of paper, or by hovering over the ratings within
24 Mitchell.
25     Q.   This is just like one

Page 35

1  eight-and-a-half-by-eleven sheet of paper?
2      A.   It's four.
3      Q.   It's four.
4      A.   Double-sided.
5      Q.   You said a piece of paper, I thought it
6  was one piece of paper.
7      A.   No.
8      Q.   Got it.  So to determine what kind of
9  equipment a vehicle has, you either look at a --
10 you either run the VIN and it would self-populate,
11 and you compare that with what you see?
12     A.   Yes.  You mean as far as the packages
13 and the options?
14     Q.   Yeah.
15     A.   Yes.  Some vehicles Mitchell is able to
16 preselect the packages and the options off of the
17 VIN, some vehicles it is not able to do that.
18     Q.   Right.  So like Japanese vehicles, they
19 come pretty much with packages and rarely do they
20 have any add-ons over the packages, is that what
21 you're saying?
22     A.   I can't speak to Japanese vehicles in
23 my experience with that.
24     Q.   No?
25     A.   No.

Page 36

1      Q.   When I bought them, you bought an
2  Acura, you bought an advanced package and it came
3  with this and you really didn't get anything else,
4  or, you know, it's pretty defined, where American
5  cars they're all over the place.  Does that sound
6  pretty accurate?
7      A.   No.
8      Q.   No?
9      A.   It doesn't.
10     Q.   Okay.
11     A.   No.
12     Q.   Okay.  So if we continue on from page
13 11 to -- or 110 to 111, the top line it says
14 coverages being looked into by my supervisor
15 manager, he will hold off any making offers until
16 finalize.  And then the next line it says, I
17 reached out to Baton Rouge, Louisiana claims --
18 assuming that's organization manager?
19     A.   O-R-G, yes.
20     Q.   Okay, to put me in touch with someone
21 who can tell me what else we owe on a Louisiana
22 taxes, fees, et cetera.  Waiting to hear back from
23 same, right?
24     A.   Yes.
25     Q.   So would you have made a phone call or

Page 37

1  would you have done an e-mail?  Or you don't know
2  from this?
3      A.   We don't know from this.
4      Q.   So there's another system that goes
5  along with these claim notes that has more detail?
6      A.   Not that I'm aware of.
7      Q.   So what do you call this package of
8  data?
9      A.   The ones that we've been looking at in
10 11?
11     Q.   Yes.
12     A.   These are claims notes.
13     Q.   And all the communications with other
14 people are contained in these claims notes?
15     A.   Potentially.  There is no other system
16 outside of this.  But, for example, when I say I
17 also reached out to the Baton Rouge, Louisiana
18 claims org manager to put me in touch with someone
19 who can tell me what else we owe on Louisiana total
20 losses, I could have done that via Microsoft Teams,
21 I could have done that via phone call.  Probably
22 one of those two methods, I don't remember which
23 method.
24     Q.   Okay.  But they would have been
25 documented the same way?

10 (Pages 34 - 37)

Page 38

1    A.    Well, the level of documentation is
2  that I reached out to somebody, that's it.
3    Q.    Right.  Okay, fair enough.  Do you
4  recall why you reached out to Louisiana?
5    A.    Not specifically.  I can give you a
6  generalization as to why I would have reached out
7  to them.
8    Q.    Okay, go ahead.
9    A.    Depending on the state, there's
10  different things owed in different states.  So, for
11  example, in Maine when a vehicle is a total loss,
12  on top of the value we owe five and a half percent
13  sales tax.
14        Some states do owe sales tax, some
15  states don't have sales tax.  Some states have a
16  state sales tax, some states have a county sales
17  tax, some states owe like a title fee, some states
18  don't.  So what's owed on a total loss is specific
19  by claim, by state.
20    Q.    Okay, by why did you reach out to
21  Louisiana?
22    A.    I would have reached out to Louisiana
23  to see if we -- what we owe beyond the value of the
24  vehicle, as in parenthesis there, taxes, fees,
25  et cetera.

Page 39

1    Q.    Okay.  But why did you choose to reach
2  out to Louisiana knowing that the insured was in
3  Maine?
4    A.    I don't know specifically.  I would
5  guess that this may be a Louisiana policy.
6    Q.    No, it's a Maine policy.
7    A.    Okay, so I don't know why I would have
8  reached out to a Louisiana office then.
9    Q.    I will let you know that the then owner
10  of the vehicle lived in Louisiana, which was
11  Mr. Thurston's father.
12    A.    Okay.
13    Q.    Okay.  But the testimony is that it was
14  given to Mr. Thurston, who had not yet transferred
15  title to Maine.
16    A.    Okay.
17    Q.    And then he crashed the car in Maine.
18        MS. WHITE:  Objection.
19        MR. FREDERICK:  To which part?
20        MS. WHITE:  The part where you repeated
21  your characterization of testimony.
22        MR. FREDERICK:  Well, did I get any of
23  it in not accurately?
24        MS. WHITE:  Well, the testimony is
25  inconsistent on the ownership aspect.

Page 40

1        MR. FREDERICK:  Okay.  But the accident
2  happened in Maine, we agree upon that?
3        MS. WHITE:  Yes.
4  BY MR. FREDERICK:
5    Q.    And are you familiar with policy
6  requirements as to covered vehicles?
7    A.    Can you rephrase that?
8    Q.    Sure.  Are you familiar with policy
9  provisions relating to when a vehicle is covered
10  under a policy?
11    A.    I am not.
12    Q.    You're not?
13    A.    No.
14    Q.    Do you know who would be?
15    A.    I -- no.
16    Q.    Or what category of person would be
17  familiar with that?
18    A.    My guess would be a file handler.
19    Q.    File handler.  Okay, and they would be
20  familiar with specific policy provisions?
21    A.    I don't know for sure.
22    Q.    But that's the person you would ask?
23    A.    If I had a policy question?
24    Q.    Yes.
25    A.    Yes.

Page 41

1    Q.    Okay.  Are you familiar with the
2  valuation requirements for vehicles where they're
3  considered a total loss in Louisiana?
4    A.    No.
5    Q.    Are you familiar with the fact that
6  valuations for Louisiana vehicles are required to
7  be determined by NADA or J.D. Power?
8    A.    I am not.
9    Q.    Do you know who Heidi Lacross is?
10    A.    No.  Just by name.  I've seen the name
11  before.
12    Q.    Okay.  So you know -- you know her.
13  You've not spoke -- interacted with her?
14    A.    No.
15    Q.    You don't know where she's located?
16    A.    I do not.
17    Q.    Do you know what her role is?
18    A.    I do not.
19    Q.    You don't know what her position would
20  be in the company?
21    A.    No.
22    Q.    In what context have you spoken to her?
23    A.    I have not spoken to her.
24    Q.    Oh, you just know who she is?
25    A.    I've seen -- I've seen that name before

11 (Pages 38 - 41)

Page 42

1  in claim notes, but I do not know what role she has
2  with the company, or where she works out of, or any
3  other specifics behind that.
4      Q.    Do you present -- wind up presenting
5  total loss evaluations to Progressive customers?
6      A.    I do.  Assuming I can reach them, I do.
7            Well, I say that because we're required
8  to make two attempts at doing that, and if not, it
9  falls back on the file handler.
10     Q.    Oh, okay.  So when you first run an
11 evaluation, it's your job to make two attempts to
12 reach the insured?
13     A.    Correct.
14     Q.    Or the insured or, would you also do an
15 evaluation if it's somebody who's not insured but
16 was hit by an insured?
17     A.    Yes, a claimant.
18     Q.    Both?
19     A.    Correct.  Yup, claimants and insureds.
20     Q.    Okay.  Did you receive training on how
21 to present a valuation to a customer?
22     A.    Not that I can remember.
23     Q.    When you present a valuation, do you --
24 how do you present that valuation to, let's say,
25 an insured?

Page 43

1      A.    Yup.  So I usually start off by telling
2  them that their vehicle has been deemed a total
3  loss.  I ask them if -- I tell them if you have a
4  couple of minutes, I will go through everything
5  with them.
6            I usually start by telling them that I
7  will do three things for them.  First I will go
8  over the way Progressive determines the value of
9  their vehicle, then I'll go over the actual value
10 of the vehicle with them, and then I'll tell them
11 how they move forward from here.
12     Q.    Okay, so go ahead.  So imagine that I
13 am an insured and my car had been deemed to be a
14 total loss, and you pick up the phone and call me
15 and I answer.  Let's go through that call.
16     A.    Yes.  So after explaining those three
17 things to which I did there, do you want me to
18 pick it up there?
19     Q.    No, pick it up like I just -- ring,
20 ring, and I picked up the phone and said hello.
21 How's that?
22     A.    Okay.
23     Q.    So, hello?
24     A.    So I would start by telling the
25 customer that their vehicle has been looked at,

Page 44

1  it's been deemed a total of loss.  I would ask
2  you if you have a couple of minutes, I'll go --
3      Q.    Why don't we just do the call.  So I'll
4  pick it up and say hello, and then you can do the
5  call.  So don't refer to me as "I will ask you,"
6  just, like, address me as I'm an insured and I'm
7  just going to be getting the news that my car's
8  been totaled.
9      A.    So what's your first name?
10     Q.    Ron.
11     A.    Okay.
12     Q.    It still is.
13     A.    Well, I --
14     Q.    No, it's all right.  That's fine, I'll
15 be role playing as me.
16     A.    So, go ahead, pick up the phone.
17     Q.    Hello?
18     A.    Is this Ron?
19     Q.    It is.
20     A.    Ron, my name is Jake, I'm with
21 Progressive Insurance, and I'm calling you about
22 your vehicle.  Do you have a couple of minutes?
23     Q.    Sure.
24     A.    Okay.  Your vehicle has been looked at,
25 and it's been deemed that your vehicle is a total

Page 45

1  loss.  If you have a couple of minutes, I'll go
2  through some things with you.
3      Q.    I do.
4      A.    So I'm going to do three things.  First
5  I'm going to explain to you how Progressive
6  determines the value of your vehicle, then I will
7  go over the value of your vehicle with you, and
8  then I'll tell you how you move forward from here,
9  okay?
10     Q.    Sure.
11     A.    Okay.  Everything that I'm going to go
12 over with you I'm going to e-mail to you after we
13 get off the phone, so you don't have to worry about
14 trying to listen to me and write things down
15 simultaneously, okay?
16     Q.    Okay.
17     A.    So the way Progressive determines the
18 value of a vehicle is by running what is called a
19 market survey.  And what that means is that we have
20 access to a database that is maintained by
21 J.D. Power.  The purpose of this database is to
22 keep track of vehicles that have either recently
23 sold or are still currently for sale, okay?
24     Q.    Yes.
25     A.    So into the database I start by putting

12 (Pages 42 - 45)

Page 46

1   the VIN number of your vehicle, the mileage of your
2   vehicle, the options and packages that your vehicle
3   has, and then the pre-accident condition of your
4   vehicle in regards to the interior, the exterior,
5   the engine compartment, and tread depth of the
6   tires, okay?
7        Q.   Okay.
8        A.   The last thing I put into the database
9   is the ZIP code of where you live, and that is
10  because based on your ZIP code the database will
11  then look for other same year, make, model vehicles
12  that have either recently sold or are still for
13  sale through used car dealers, okay?
14       Q.   Okay.
15       A.   All right.  So when I ran the value of
16  your vehicle, including the sales tax, it came back
17  at X, whatever that value is.
18       Q.   Just pick a number.
19       A.   Go ahead, pick a number you like.
20       Q.   $10,000.
21       A.   Okay.  So your vehicle came back,
22  including the sales tax, at $10,000.  Do you own
23  your vehicle outright, or do you make payments on
24  it?
25       Q.   I own it outright.

Page 47

1        A.   Okay.  And do you have the title to the
2   vehicle?
3        Q.   Yes.
4        A.   Okay.  So as far as moving forward,
5   what I'm going to do is let your file handler know
6   that I looked at your vehicle, that it is a total,
7   that we spoke, and they'll reach out to you
8   regarding the paperwork and the payment process.
9   Do you have any questions?
10       Q.   No.  And that's the call.
11       A.   That's the call.
12       Q.   And if you don't reach them -- it would
13  be documented in the file if you had reached the
14  person, correct?
15       A.   Correct.  It would be documented if I
16  did not reach the person as well.
17       Q.   Okay.  Thank you for that.
18       A.   You're welcome.
19       Q.   So let's just take a look at these
20  notes, and see if there are any calls in here
21  about trying to reach Mr. Thurston.  Because I'm
22  not sure how you would document that.
23       A.   Well, I will say as noted by you in
24  another face sheet note that the coverage and
25  liability -- the coverage was not in order.  I

Page 48

1   would not have made an offer to a customer who did
2   not have coverage in order.
3        Q.   You did not?
4        A.   Correct.
5        Q.   Or you would not?
6        A.   We do not, no.  Because we don't have
7   the authority to make the offer, there's no
8   coverage.
9        Q.   So you would just do the valuation and
10  transfer that on to the file handler?
11       A.   Yes.  I would let the file handler work
12  out the coverage issue, and typically they would
13  end up making the offer because coverage was not in
14  order at the time.
15       Q.   Got it.  Thank you.
16            So in this kind of situation, you would
17  be working with the file handler sometimes back
18  and forth?
19       A.   The extent of that would have been me
20  reaching out -- typically it would be me reaching
21  out to the file handler and saying, hey, this one's
22  all done, but coverage is not in order.
23       Q.   Because I believe on this particular
24  one on page 110, it looks like two entries above
25  the last one from the bottom there's a -- it says

Page 49

1   liability.  Kyle, it looks like, finalized
2   liability.  Were interviews obtained from all
3   parties.  No.  All parties notified of final
4   decision.  Claim of denial, claim or -- I don't
5   know what CC is.
6        A.   I think cc is claimant carrier.
7        Q.   Okay, fine.  Info updated, subro
8   opened, if CD -- that's covered denied?
9        A.   No.  Claimant driver, I believe.
10       Q.   AF is at fault, right?
11       A.   That's my assumption.
12       Q.   Okay.  Yes.  So does this look like
13  that they've determined that Progressive is
14  liable, does that look like that's accurate to
15  you?
16            MS. WHITE:  Objection.
17       A.   I don't know by looking at this.  This
18  note looks like Kyle has finalized liability.  It
19  doesn't say what that liability was determined to
20  be.
21  BY MR. FREDERICK:
22       Q.   The entry above that says what I need
23  to do, RS.  Do you know what that means?
24       A.   I see the entry --
25       Q.   Directly above.

13 (Pages 46 - 49)

Jacob Eckert                                                                  January 22, 2024
Multiple Plaintiffs v. Progressive

Page 50

1    A.    -- down the last line of it?
2    Q.    Yes.
3    A.    RS would probably mean recorded
4  statement.
5    Q.    Okay, CD?
6    A.    Claimant driver.
7    Q.    And then determine final liability?
8    A.    Correct.
9    Q.    Okay.  Well, but it looks like then he
10 interacts with you again, or you interact with the
11 vehicle on that same day just a little later in
12 the afternoon, correct?
13   A.    Yes.  Yup.
14   Q.    Does that appear to be your last
15 contact with the file?
16   A.    You mean page -- at the bottom of page
17 110?
18   Q.    Yes.  I'm just looking through here, I
19 want to make sure I don't miss anything.  110 and
20 top of 111.
21   A.    I don't see my rep code beyond that, so
22 that's an accurate assumption.
23   Q.    Pretty accurate you haven't touched it
24 since, because you guys have to document
25 everything, right?

Page 51

1    A.    Correct.
2    Q.    Did everything you did when you handled
3  this file or worked on this file, was it
4  consistent with Progressive policy and procedure?
5    A.    I can't speak as much towards
6  Progressive policy and procedure, I can only -- I
7  can only speak for the way that I handled claims.
8  Based on what we've reviewed in these face sheet
9  notes, this is typically the way I would handle a
10 total loss claim.
11   Q.    Do you typically handle total loss
12 claims consistent with Progressive policy and
13 procedure?
14   A.    I would assume I do, because I do not
15 receive correction from my supervisor often in
16 regards to that.
17   Q.    That doesn't necessarily mean that's
18 true.
19   A.    I'm telling you my experiences.
20   Q.    I don't -- I don't -- I don't always
21 write up my employees when they don't comply with
22 what I would like to have happen.  Probably
23 should, but I -- but I can't say that I am
24 successful at that.
25        But nobody's ever sat down with you and

Page 52

1  said we're going to have a -- put you on an
2  improvement plan?
3    A.    I've been -- I've been employed with
4  Progressive a very long time.  I can say that I
5  have been on an improvement plan at least one time
6  in that 22 years, that I can think of.  I can't
7  recall what it's for.  It's been a long time.
8    Q.    It's nothing since, let's say, 2019?
9    A.    No.
10   Q.    Okay.
11       MR. FREDERICK:  Give me a minute,
12 about.  We'll go off the record.
13       THE VIDEOGRAPHER:  The time is
14 approximately 4:45 p.m.  We're going off the
15 record.  Stand by.
16       (Recess taken.)
17       THE VIDEOGRAPHER:  The time is
18 approximately 4:57 p.m., and we're back on the
19 record.
20       MR. FREDERICK:  We have no further
21 questions.
22       THE VIDEOGRAPHER:  This concludes
23 today's deposition of Jacob Eckert.  The time is
24 approximately 4:57 p.m.  We're going off the
25 record.

Page 53

1        MR. FREDERICK:  Do you want to read?
2        MS. WHITE:  Yes.  He can sign.
3        (The deposition was concluded at 4:57 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

14 (Pages 50 - 53)

Jacob Eckert                                                January 22, 2024
Multiple Plaintiffs v. Progressive

Page 54

```
 1              CERTIFICATE
 2         I, Pamela J. Carle, Registered
 3   Professional Reporter, do hereby certify that the
 4   foregoing is a true and accurate transcript of my
 5   stenographic notes of the deposition of JACOB
 6   ECKERT, who was first duly sworn, taken at the
 7   place and on the date hereinbefore set forth, and
 8   that reading and signing of the transcript was
 9   requested.
10         I further certify that I am neither
11   attorney nor counsel for, nor related to or
12   employed by any of the parties to the action in
13   which this deposition was taken, and further that
14   I am not a relative or employee of any attorney or
15   counsel employed in this case nor am I financially
16   interested in this action.
17
18         THE FOREGOING CERTIFICATION OF THIS
19   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
     THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
     CONTROL AND/OR DIRECTION OF THE CERTIFYING
20   REPORTER.
21
22
23   _____
          Pamela J. Carle, LCR, RPR, CRR
24
25
```

Page 56

```
 1   Thurston, Matthew v. Progressive Casualty Insurance Company,
     Et Al.
 2   Jacob Eckert (#6393263)
 3        E R R A T A  S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____  _____
24   Jacob Eckert              Date
25
```

Page 55

```
 1   Allison Hill White Esq.
 2   awhite@kslaw.com
 3   February 6th, 2024
 4   RE: Thurston, Matthew v. Progressive Casualty Insurance
        Company, Et Al.
 5   1/22/2024, Jacob Eckert (#6393263)
 6      The above-referenced transcript is available for
 7   review.
 8      Within the applicable timeframe, the witness should
 9   read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   (cs-southeast@veritext.com).
16    Return completed errata within 30 days from
17   receipt of testimony.
18    If the witness fails to do so within the time
19   allotted, the transcript may be used as if signed.
20
21
22      Yours,
23      Veritext Legal Solutions
24
25
```

Page 57

```
 1   Thurston, Matthew v. Progressive Casualty Insurance Company,
     Et Al.
 2   Jacob Eckert (#6393263)
 3       ACKNOWLEDGEMENT OF DEPONENT
 4      I, Jacob Eckert, do hereby declare that I
 5   have read the foregoing transcript, I have made any
 6   corrections, additions, or changes I deemed necessary as
 7   noted above to be appended hereto, and that the same is
 8   a true, correct and complete transcript of the testimony
 9   given by me.
10
11   _____  _____
12   Jacob Eckert              Date
13   *If notary is required
14       SUBSCRIBED AND SWORN TO BEFORE ME THIS
15       _____ DAY OF _____, 20___.
16
17
18   _____
19   NOTARY PUBLIC
20
21
22
23
24
25
```

15 (Pages 54 - 57)

Jarrod Eckert
Multiple Plaintiffs v. Progressive
January 22, 2024

**[& - ahead]**                                                    Page 1

| **&** |
| --- |
| **&**   2:3,14 4:17 5:7,16 |

| **0** |
| --- |
| **00375**   1:5 4:15 |
| **04112**   4:18 |
| **04681**   2:7 |

| **1** |
| --- |
| **1**   32:9 33:10 34:5 |
| **1/22/2024**   55:5 |
| **10**   19:19 32:22 32:23 33:23 |
| **10,000**   46:20,22 |
| **101**   19:22 |
| **102**   22:7,8 |
| **10411**   54:22 |
| **107**   23:5,6 |
| **108**   27:17 |
| **11**   19:20 36:13 37:10 |
| **11/32**   33:23 |
| **110**   29:1 36:13 48:24 50:17,19 |
| **111**   36:13 50:20 |
| **1180**   2:15 |
| **12**   13:13 |
| **121**   19:23 |
| **122**   4:15 |
| **16/32**   33:24 |
| **1600**   2:15 |
| **185th**   2:4 |

| **1975**   8:6 |
| --- |
| **1993**   8:12 |
| **1998**   9:7 |
| **1:22**   1:5 |

| **2** |
| --- |
| **2**   4:17 34:6,13 |
| **20**   57:15 |
| **2001**   10:6,7,9 10:10 |
| **2002**   10:7,9,12 11:7,11 |
| **2019**   52:8 |
| **2022**   13:16,17 13:21 |
| **2024**   1:16 4:3 55:3 |
| **21st**   13:21 |
| **22**   1:16 4:3 28:14 52:6 |
| **23rd**   8:6 |
| **257**   21:18 |

| **3** |
| --- |
| **3**   32:9,12 33:25 34:3,7 |
| **30**   55:16 |
| **30309**   2:15 |
| **3:35**   1:18 4:2 |
| **3rd**   28:14 |

| **4** |
| --- |
| **4**   32:14,17,25 33:1 34:9 |
| **401**   18:16 |
| **404.572.4600** 2:16 |

| **44119**   2:4 |
| --- |
| **4:45**   52:14 |
| **4:57**   52:18,24 53:3 |

| **5** |
| --- |
| **5**   32:9,17 33:1 33:10 34:9 |
| **5830**   2:10 |
| **5:15**   28:14 |

| **6** |
| --- |
| **6**   3:3 |
| **61.1**   26:3,5 |
| **6393263**   55:5 56:2 57:2 |
| **6th**   55:3 |

| **7** |
| --- |
| **767**   2:4 |
| **771**   2:7 |

| **8** |
| --- |
| **8,850.34**   26:1 |
| **82609**   2:10 |

| **9** |
| --- |
| **95943**   2:10 |

| **a** |
| --- |
| **a155666**   22:15 22:20 |
| **able**   35:15,17 |
| **above**   21:22 48:24 49:22,25 55:6 57:7 |
| **access**   45:20 |
| **accident**   12:11 14:5 16:1 40:1 |

46:3
**accuracy**   55:9
**accurate**   34:10 36:6 49:14 50:22,23 54:4
**accurately** 39:23
**acknowledge...** 57:3
**acknowledg...** 55:12
**acronym**   14:10
**action**   4:23 54:12,16
**actual**   43:9
**actually**   10:5 13:20
**acura**   36:2
**add**   35:20
**additions**   57:6
**address**   44:6
**administer** 4:21
**advanced**   36:2
**af**   49:10
**affiliations**   5:4
**afternoon**   4:1 50:12
**age**   31:4
**ago**   11:6 13:13
**agree**   4:8 40:2
**agreeable** 27:22
**ahead**   7:14 31:5 38:8

**[ahead - branch]**

43:12 44:16
46:19
**al** 4:11 8:9 55:4
56:1 57:1
**alden** 8:8
**allison** 2:16
5:16 17:2 55:1
**allotted** 55:19
**american** 36:4
**amount** 17:19
27:15
**answer** 6:20
7:9,11,14
23:16 43:15
**answers** 6:11
**anymore** 30:23
**anyway** 7:15
**apparently**
22:11
**appear** 20:3
23:5 50:14
**appearance** 5:1
**appearances**
2:1 5:3
**appears** 5:12
29:2
**appended** 57:7
**applicable** 55:8
**apply** 54:18
**appreciate** 22:9
**appropriate**
30:19
**approved**
16:17

**approximately**
52:14,18,24
**april** 11:3,11
**argued** 15:5
**asked** 6:21 7:9
**asking** 6:9
**aspect** 39:25
**aspects** 12:4
**assessed** 26:20
**assigned** 12:5
20:2 22:12,14
22:20
**assignment**
28:15,21,23
**assigns** 33:10
**associated** 14:1
**assume** 6:20
20:8 24:2
51:14
**assumes** 27:13
27:13
**assuming** 36:18
42:6
**assumption**
49:11 50:22
**atlanta** 2:15
**attached** 55:11
**attempts** 42:8
42:11
**attended** 8:17
**attorney** 5:5
7:14 54:11,14
55:13
**auctions** 27:3

**audio** 4:6
**augusta** 10:18
10:20,22
**authority** 48:7
**authorized**
4:21
**automatically**
16:17
**available** 55:6
**aware** 29:24
37:6
**awhite** 2:17
55:2

**b**

**back** 13:16
18:5,6,20
36:22 42:9
46:16,21 48:17
52:18
**background**
30:7
**badly** 17:23
**bangor** 11:1,8
11:13 24:12
**based** 17:16
26:22 46:10
51:8
**basically** 15:25
30:15
**basis** 10:16,21
23:2
**bates** 25:22
**baton** 36:17
37:17

**beaten** 31:19
**beginning** 5:4
20:1
**behalf** 1:5 24:9
**believe** 5:14
13:20 19:24
20:21,24 22:1
30:3 32:9
48:23 49:9
**berler** 2:3 5:7
**best** 11:4
**better** 8:4 31:7
31:19
**beyond** 38:23
50:21
**bit** 18:7 23:13
29:8 31:20
**body** 14:19,19
14:20 15:3,4
16:4 21:7,10
24:17
**boned** 15:6
**bonus** 18:9
**borison** 2:9,11
5:12,13
**borisonfirm.c...**
2:11
**born** 7:24 8:5
18:13
**bottom** 48:25
50:16
**bought** 36:1,1,2
**box** 2:7
**branch** 10:25

Jason Eckert
Multiple Plaintiffs v. Progressive

January 22, 2024

[break - concierge]

Page 3

| break 7:5,6,8 | car's 44:7 | chantel 24:22 | club 10:2 |
|---|---|---|---|
| bring 28:22 | care 16:2 | characterizati... | code 23:14 46:9 |
| 30:14 | carle 1:25 4:20 | 39:21 | 46:10 50:21 |
| brown 22:11 | 54:2,23 | chips 31:23 | college 8:14,17 |
| 22:19 | carrier 49:6 | choose 39:1 | 8:22,24 9:9,11 |
| brown's 22:18 | carry 30:1 33:4 | claim 12:4,5,7 | collision 12:15 |
| browns 8:4 | cars 36:5 | 16:2 20:11 | 24:11 |
| buffalo 7:25 | case 19:8 54:15 | 22:14 25:11,13 | come 18:20 |
| 8:23 | casper 2:10 | 37:5 38:19 | 35:19 |
| bum 9:16 | casualty 1:8,9 | 42:1 49:4,4 | commencing |
| bus 9:23 | 4:12,13 55:4 | 51:10 | 1:18 |
| **c** | 56:1 57:1 | claimant 42:17 | communicati... |
| c 2:11 | category 40:16 | 49:6,9 50:6 | 37:13 |
| calculates | cc 49:5,6 | claimants | community |
| 33:10,18 | ccu 20:11,23 | 42:19 | 8:22 |
| call 20:6 30:12 | cd 49:8 50:5 | claims 11:24 | company 1:8,9 |
| 30:17,18,21 | center 20:7 | 12:2,10,19 | 4:12,13 41:20 |
| 36:25 37:7,21 | 24:15 26:15,17 | 18:20 19:25 | 42:2 55:4 56:1 |
| 43:14,15 44:3 | 29:4 | 20:24 21:1 | 57:1 |
| 44:5 47:10,11 | central 8:8 | 25:15,17,20,22 | compare 35:11 |
| called 11:24 | 20:22,24 | 36:17 37:12,14 | comparison |
| 12:22 14:9 | certainly 6:17 | 37:18 51:7,12 | 17:16 |
| 16:8 26:25 | certificate 54:1 | clarification | compartment |
| 45:18 | certification | 18:22 | 29:18 46:5 |
| calling 12:6 | 54:18 | clarity 16:14 | complete 57:8 |
| 26:23 27:4 | certify 54:3,10 | cleveland 2:4 | completed |
| 44:21 | certifying | 5:7 15:11,12 | 55:16 |
| calls 47:20 | 54:19 | 15:14 | completely |
| canal 1:14 4:17 | cetera 18:4 | clevelandcon... | 18:4 |
| capacity 21:6 | 36:22 38:25 | 2:5 | complicated |
| car 14:13 15:3 | change 56:4,7 | click 30:11 | 13:8 |
| 16:5 28:7 | 56:10,13,16,19 | close 11:14 | comply 51:21 |
| 39:17 43:13 | changes 34:20 | clru 20:9,11,17 | computer 27:5 |
| 46:13 | 55:10 57:6 | 20:18 | concierge |
| | | | 12:24 13:2 |

Jason Eckert
Multiple Plaintiffs v. Progressive
January 22, 2024

**[concierge - detail]**                                                                    Page 4

15:18,22,24
**concluded** 53:3
**concludes**
  52:22
**condition** 29:6
  29:10,14,17
  31:8,9 46:3
**conditioning**
  30:19 31:3,11
  32:8,18
**consider** 27:1
**considered**
  41:3
**consistent** 51:4
  51:12
**contact** 50:15
**contained**
  37:14
**contest** 7:5
**context** 41:22
**continue** 4:7
  36:12
**control** 54:19
**conversations**
  4:5
**copart** 26:25
  27:23 28:1,4,7
  28:15,21
**copies** 55:14
**corporate** 19:6
**correct** 6:16
  11:21 22:12
  24:12,13,20,23
  26:4,14,16,20
  26:21 27:7

28:2,9 29:11
31:17 32:1,16
42:13,19 47:14
47:15 48:4
50:8,12 51:1
57:8
**correction**
  51:15
**corrections**
  57:6
**cost** 17:11
**counsel** 5:2,19
  54:11,15 55:14
**county** 38:16
**couple** 9:13
  14:8 26:18
  43:4 44:2,22
  45:1
**course** 27:10
  32:2
**court** 1:1,24
  4:14,19
**coverage** 12:8
  23:20 24:5,9
  47:24,25 48:2
  48:8,12,13,22
**coverages**
  36:14
**covered** 40:6,9
  49:8
**crash** 13:15
  22:5 24:14
  27:11
**crashed** 39:17

**crease** 34:11
**creates** 33:15
**criteria** 31:3
  34:20
**crr** 1:25 54:23
**cs** 55:15
**current** 10:14
  10:15
**currently** 12:22
  21:22 45:23
**customer** 14:1
  14:2,18,21,22
  27:22 42:21
  43:25 48:1
**customers** 42:5
**cutoff** 34:6,7
**cv** 1:5 4:15

**d**

**d** 3:1 8:10
**daily** 10:16
**damage** 12:15
  26:19
**damaged** 12:9
  14:5
**data** 37:8
**database** 45:20
  45:21,25 46:8
  46:10
**date** 54:7 56:24
  57:12
**day** 19:5 50:11
  57:15
**days** 55:16
**deal** 19:22
  21:11 23:1

**dealers** 46:13
**dealing** 15:5
**december** 9:6
**decision** 49:4
**declare** 57:4
**deem** 16:12
  18:1
**deemed** 43:2,13
  44:1,25 57:6
**defendants**
  1:10 2:13 5:17
**defined** 36:4
**degree** 8:21,23
  9:3
**denial** 49:4
**denied** 49:8
**depending** 31:4
  38:9
**deponent** 55:13
  57:3
**deposed** 5:23
**deposing** 55:13
**deposition** 1:13
  1:14 4:10,16
  6:6 17:1 19:5
  52:23 53:3
  54:5,13
**depth** 33:4,5,7
  33:8,13,16,21
  46:5
**described** 19:6
**description** 3:7
  30:14 34:16
**detail** 37:5

Jacob Eckert
Multiple Plaintiffs v. Progressive
January 22, 2024

**[determine - expected]**                                    Page 5

**determine**
16:11 17:11,12
35:8 50:7
**determined**
41:7 49:13,19
**determines**
25:25 43:8
45:6,17
**determining**
12:8,8
**detroy** 1:14
4:17
**different** 14:8
19:9 31:4
38:10,10
**digits** 19:22
**direct** 54:19
**direction** 54:19
**directly** 49:25
**discretionary**
33:2
**district** 1:1,1
4:14,14
**docket** 4:14
**document**
32:10,11,12,14
32:17,25 47:22
50:24
**documentation**
38:1
**documented**
37:25 47:13,15
**doing** 12:18,21
15:9 31:1 42:8

**dollar** 17:19
**door** 34:12
**doran** 2:19
4:18
**double** 29:25
35:4
**driver** 9:23
49:9 50:6
**duly** 5:22 54:6
**duties** 13:23

**e**

**e** 2:10 3:1 8:10
8:20 14:10
37:1 45:12
56:3,3,3
**earlier** 15:17
16:16 30:16
**easier** 21:1
**east** 2:4
**eckert** 1:13 3:1
3:7 4:10 5:21
6:2 7:20 52:23
54:6 55:5 56:2
56:24 57:2,4
57:12
**eight** 35:1
**either** 6:12
16:16 34:21
35:9,10 45:22
46:12
**elect** 18:16
**electronic**
30:15
**eleven** 35:1

**emily** 22:11,18
22:19
**employed** 52:3
54:12,15
**employee** 25:3
28:5,6 54:14
**employees** 21:9
51:21
**endurance** 7:4
**engine** 29:18
46:5
**entries** 20:4
48:24
**entry** 20:11,14
20:15 21:14,16
21:21 23:9,11
27:17 28:13
29:1 49:22,24
**equipment**
35:9
**erie** 8:22
**errata** 55:11,13
55:16
**esq** 2:5,8,11,16
55:1
**estimate** 14:11
14:14,20,23
16:16,17,18
17:20 18:2
25:11 26:1,10
27:18
**estimated** 26:5
**estimates** 13:25
14:4,24 15:1
16:7,10,15

26:12,13
**estimation**
26:14
**estimator**
24:22 25:4
**et** 4:11 18:4
36:22 38:25
55:4 56:1 57:1
**evaluate** 29:6
29:10,21
**evaluating**
13:25
**evaluation**
14:15 19:1
28:4 32:3
42:11,15
**evaluations**
12:16 18:20,23
29:9 42:5
**evening** 9:24
**exactly** 11:15
**examination**
3:2 5:25
**example** 37:16
38:11
**except** 15:10
25:9
**exhibit** 19:19
19:21
**exhibits** 3:6,8
**exist** 29:23,24
**expect** 31:8,10
31:22
**expected** 27:8
31:15

Jason Eckert
Multiple Plaintiffs v. Progressive

January 22, 2024

**[experience - guess]**

Page 6

| | | | |
|---|---|---|---|
| **experience** 35:23 | **fh** 23:21 | **foregoing** 54:4 54:18 57:5 | **georgia** 2:15 |
| **experiences** 51:19 | **figure** 25:20 | **forget** 16:8 | **getting** 12:7 44:7 |
| **explain** 17:18 23:8,12 24:6 29:13 31:5 45:5 | **figured** 22:9 | **forgotten** 9:1 | **give** 30:4,7 38:5 52:11 |
| | **file** 19:7,9 22:12,15 23:22 23:23,25 40:18 40:19 42:9 47:5,13 48:10 48:11,17,21 50:15 51:3,3 | **formal** 9:8 | **given** 16:23 39:14 57:9 |
| **explaining** 43:16 | | **forth** 48:18 54:7 | **gives** 14:13 22:5 |
| **extent** 48:19 | | **forward** 43:11 45:8 47:4 | **go** 4:8 7:14 8:7 8:13,16 9:8 10:20 12:3 16:9 17:23 18:3,5,6 29:1 31:5 38:8 43:4 43:7,9,12,15 44:2,16 45:1,7 45:11 46:19 52:12 |
| **exterior** 29:18 46:4 | **filed** 4:13 | **four** 20:3 33:5 33:9,17 35:2,3 | |
| | **filings** 2:5 | **fourth** 20:10 | |
| **f** | **final** 49:3 50:7 | **frame** 14:9 | |
| **face** 47:24 51:8 | **finalize** 36:16 | **frederick** 2:3,5 3:3 5:6,7,11 5:13 6:1,3 25:24 39:19,22 40:1,4 49:21 52:11,20 53:1 | |
| **fact** 16:23 41:5 | **finalized** 49:1 49:18 | | |
| **fails** 55:18 | | | **goes** 19:21 37:4 |
| **fair** 6:21 7:11 16:25 23:13 27:15 38:3 | **financial** 1:9 4:12 | | **going** 4:2 9:16 14:15 15:7 16:2 34:9 44:7 45:4,5,11,12 47:5 52:1,14 52:24 |
| | **financially** 4:23 54:15 | **friday** 17:2 | |
| **falls** 34:3 42:9 | **find** 25:22 | **full** 7:19 27:17 | |
| **familiar** 13:1 15:23 24:14 40:5,8,17,20 41:1,5 | **fine** 44:14 49:7 | **function** 19:7 | |
| | **finger** 21:22 | **further** 9:8 52:20 54:10,13 | |
| | **finish** 19:12 | | **good** 4:1 31:9 |
| **far** 32:18 35:12 47:4 | **firm** 2:9 4:20 | **g** | **graduated** 8:11 9:6 |
| | **first** 6:5,9 7:18 8:17 13:5 20:3 23:5 24:5,8 27:17 42:10 43:7 44:9 45:4 54:6 | **g** 8:20 36:19 | |
| **father** 39:11 | | **gainshare** 18:10,11,15 | **great** 6:23 |
| **fault** 49:10 | | **gauge** 33:4 | **ground** 6:9 |
| **february** 28:13 55:3 | | **generalist** 11:25 12:19 18:21 | **guess** 11:15 13:13 30:18 39:5 40:18 |
| **fee** 38:17 | **fitness** 10:2 | | |
| **fees** 36:22 38:24 | **five** 38:12 | **generalization** 38:6 | |
| | **follows** 5:24 | | |

[guessing - jake]                                                          Page 7

| | | | |
|---|---|---|---|
| **guessing** 16:24 | **hereto** 57:7 | **imperfections** | 42:25 43:13 |
| **guide** 30:19 | **hey** 48:21 | 32:4 | 44:6 |
| 34:14,17,19,21 | **high** 8:7,8,13 | **important** 7:2 | **insureds** 42:19 |
| **guys** 14:15 | 26:20 | **impracticable** | **interact** 50:10 |
| 50:24 | **hill** 2:16 55:1 | 16:11 | **interacted** |
| **h** | **hired** 10:11,13 | **improvement** | 41:13 |
| | 10:17,18,25 | 52:2,5 | **interacts** 50:10 |
| **h** 8:19,20,20 | 11:22 | **including** 5:2 | **interested** 4:23 |
| 56:3 | **hit** 15:2 17:22 | 46:16,22 | 54:16 |
| **half** 35:1 38:12 | 42:16 | **inconsistent** | **interior** 29:18 |
| **handle** 12:2,5 | **hold** 36:15 | 39:25 | 46:4 |
| 51:9,11 | **home** 10:16 | **indicates** 22:21 | **internet** 21:19 |
| **handled** 51:2,7 | **hood** 31:23 | **individually** | 22:3 |
| **handler** 23:22 | **hop** 27:5 | 1:5 | **interviews** 49:2 |
| 23:23,25 40:18 | **houghton** 8:17 | **individuals** | **involve** 12:6 |
| 40:19 42:9 | 8:18 | 17:3 | **involved** 12:1,7 |
| 47:5 48:10,11 | **hours** 17:9 | **info** 49:7 | 26:17 |
| 48:17,21 | **hover** 30:4,6,13 | **information** | **involving** 29:2 |
| **handling** 12:9 | 30:24 | 22:5 25:8 | **ira** 2:5 |
| 20:11 | **hovering** 34:23 | 26:22 33:12,14 | **island** 2:6 5:9 |
| **hanson** 1:14 | **how's** 43:21 | **initial** 7:21 | **islandjusticel...** |
| 4:17 | **hum** 6:12 20:5 | 19:16 | 2:8 |
| **happen** 51:22 | 32:24 | **injury** 12:10 | **issue** 48:12 |
| **happened** 23:8 | **hums** 6:12,12 | **innervation** | **iv** 23:18,19 |
| 40:2 | 6:12 | 22:15 | **j** |
| **happy** 8:1,4 | **hyperlinks** | **inspected** 28:10 | |
| **hawaii** 5:15 | 30:10,12 | **inspecting** 12:9 | **j** 1:25 7:22 54:2 |
| **head** 6:11 8:2 | **i** | **instances** 18:1 | 54:23 |
| 34:2 | | **instructor** 10:3 | **j.d.** 41:7 45:21 |
| **health** 10:2 | **id'd** 28:7 | **insurance** 1:8 | **jacob** 1:13 3:1 |
| **hear** 36:22 | **identification** | 4:12 44:21 | 4:10 5:21 7:20 |
| **heidi** 41:9 | 3:6 | 55:4 56:1 57:1 | 52:23 54:5 |
| **hello** 43:20,23 | **identified** | **insured** 15:3 | 55:5 56:2,24 |
| 44:4,17 | 27:21 | 23:19 39:2 | 57:2,4,12 |
| **hereinbefore** | **imagine** 43:12 | 42:12,14,15,16 | **jake** 44:20 |
| 54:7 | | | |

Jacob Eckert
Multiple Plaintiffs v. Progressive

January 22, 2024

**january**  1:16 4:3 10:12 11:2 13:20
**japanese**  35:18 35:22
**jerome**  7:22,23
**job**  42:11
**jobs**  9:21
**john**  2:8,8 5:9
**journal**  25:5,6 25:14,17,21
**justice**  2:6 5:9
**justify**  17:12

**k**

**keep**  6:11 18:16 45:22
**kind**  35:8 48:16
**king**  2:14 5:16
**know**  6:2,14,25 7:3,6,8 10:11 11:15 13:1 15:23 18:15 20:8,9,12 21:15 22:1,13 22:24 23:16,17 31:2 33:20 34:2,3,4,5,15 36:4 37:1,3 39:4,7,9 40:14 40:21 41:9,12 41:12,15,17,19 41:24 42:1 47:5 49:5,17 49:23

**knowing**  39:2
**kslaw.com**  2:17 55:2
**kyle**  19:7 22:12 22:22,24 49:1 49:18

**l**

**l**  8:10
**lack**  31:19
**lacross**  41:9
**laminated**  29:25 30:16,17 34:22
**laptop**  30:8
**law**  5:13
**layman's**  23:12
**lcr**  1:25 54:23
**left**  10:1,6,10 18:16 34:5
**legal**  55:23
**leigh**  2:19 4:18
**leniency**  31:11
**level**  38:1
**liability**  12:8 24:5 47:25 49:1,2,18,19 50:7
**liable**  49:14
**lift**  9:22
**likely**  6:15
**likes**  21:11
**line**  20:10 22:21 36:13,16 50:1 56:4,7,10 56:13,16,19

**lines**  22:6 24:8
**link**  33:7
**listen**  45:14
**lists**  30:1
**little**  13:8 16:15 18:6 29:8 30:7 31:20 50:11
**live**  46:9
**lived**  39:10
**lives**  30:3
**llc**  2:3,9 5:7
**located**  41:15
**location**  4:16 10:14,15,25
**long**  7:3 9:18 11:6 17:8 31:1 52:4,7
**longer**  11:12
**look**  16:21 17:10 18:3 22:14 23:4,4 29:14,17 33:22 35:9 46:11 47:19 49:12,14
**looked**  14:24 36:14 43:25 44:24 47:6
**looking**  16:22 19:25 20:10 22:16 30:8 32:20 34:14,22 37:9 49:17 50:18
**looks**  21:19 22:4 23:13

**28:20 48:24 49:1,18 50:9**
**loss**  12:16 14:1 16:13 17:13,24 18:2,19,23 19:14 20:17,22 27:21 29:4 38:11,18 41:3 42:5 43:3,14 44:1 45:1 51:10,11
**losses**  37:20
**lost**  9:1
**lot**  5:14 15:6,14 28:22 30:1 33:23
**louisiana**  36:17 36:21 37:17,19 38:4,21,22 39:2,5,8,10 41:3,6

**m**

**m**  18:25
**made**  28:24 36:25 48:1 57:5
**mail**  37:1 45:12
**maine**  1:1,16 2:7 4:14,18 5:10 9:13 10:18,20,23 11:1,8 24:12 38:11 39:3,6 39:15,17 40:2

**[maine's - numbers]**                                                                 Page 9

maine's  15:13
maintained
  45:20
make  14:15
  34:13,18 42:8
  42:11 46:11,23
  48:7 50:19
making  36:15
  48:13
manage  16:4
  21:1
managed  12:23
  13:6,9,14,23
  14:7 15:21
  19:10,12,15
  21:4
manager  36:15
  36:18 37:18
managing  10:1
  14:1,2
manually  34:22
march  11:3,11
marked  3:8
market  17:20
  45:19
maryland  5:13
matter  4:10 6:4
matthew  1:4
  4:11 55:4 56:1
  57:1
mayer  19:7
  22:12,22,24
  24:1 28:24
mean  8:25
  18:23 20:19

21:2,25 23:21
24:19 27:19
29:3 33:3
35:12 50:3,16
51:17
means  14:16
  20:12,17 21:15
  22:4 25:5
  27:20 45:19
  49:23 54:19
measure  33:5
  33:18
measured  33:9
media  4:9
mentioned
  15:17
met  17:2
method  30:25
  37:23
methods  37:22
microphones
  4:4
microsoft  24:3
  37:20
middle  7:10,21
mileage  46:1
mill  21:1
minute  52:11
minutes  43:4
  44:2,22 45:1
mitchell  18:24
  19:14 26:6,7,9
  26:10,15,16,22
  30:4,8 33:6,14
  33:18 34:24

35:15
mitchell's
  26:14
model  13:11
  34:18 46:11
monday  1:16
  4:2
months  10:24
moody's  24:11
  25:3 26:1,8,9
mouse  30:13
move  9:15
  43:11 45:8
moved  9:14
moves  5:14
moving  47:4
mrr  19:2
mrrs  30:1
mute  4:5

**n**

n  3:1 8:10,20
nada  41:7
name  4:18 5:6
  6:2 7:19,21
  20:2 22:18
  23:5 30:19
  41:10,10,25
  44:9,20
ne  2:15
necessarily
  51:17
necessary  57:6
need  6:24 7:5,8
  7:9 18:22
  23:16,17,17

49:22
neither  26:24
  54:10
never  16:18
new  7:25 8:18
  33:8,17,23
  34:8
newer  31:7,13
  31:16
news  44:7
nobody's  51:25
nods  6:11
norman  1:14
  4:17
notary  57:13
  57:19
note  4:3 25:4,5
  47:24 49:18
  55:10
noted  34:11
  47:23 57:7
notes  25:9,10
  25:15,17,22
  37:5,12,14
  42:1 47:20
  51:9 54:5
notice  19:20
noticing  5:5
notified  49:3
nt  1:5 4:15
number  20:1
  22:10 46:1,18
  46:19
numbers  17:17
  25:23

Jacob Eckert
Multiple Plaintiffs v. Progressive
January 22, 2024

**o**

**o** 8:19,20 36:19
**oath** 4:22
**object** 7:14
**objection** 39:18
  49:16
**objections** 4:24
**obtained** 49:2
**obvious** 17:23
  18:2
**obviously**
  15:13 34:4
**offer** 48:1,7,13
**offers** 36:15
**office** 10:19
  11:13,14 24:25
  39:8
**oh** 8:3 15:25
  27:20 41:24
  42:10
**ohio** 2:4 5:8
**okay** 6:8,9,16
  6:19,25 7:16
  7:18,23 9:3,25
  10:5,13 11:5
  12:3 13:14,19
  15:2,16,21
  16:7 17:6,10
  17:22 18:5,12
  18:14,19 19:11
  19:23 20:9,21
  21:14 24:19
  25:4,25 27:5
  27:16 28:23
  29:5,8,13,16,20

31:5,18 32:6
36:10,12,20
37:24 38:3,8
38:20 39:1,7
39:12,13,16
40:1,19 41:1
41:12 42:10,20
43:12,22 44:11
44:24 45:9,11
45:15,16,23
46:6,7,13,14,21
47:1,4,17 49:7
49:12 50:5,9
52:10
**older** 31:8,12
  31:15
**one's** 48:21
**ones** 37:9
**online** 33:22
**ons** 35:20
**opened** 49:8
**options** 35:13
  35:16 46:2
**order** 18:19,23
  47:25 48:2,14
  48:22
**org** 37:18
**organization**
  36:18
**original** 33:13
**originally**
  33:21
**outcome** 4:24
**outline** 26:19

**outright** 46:23
  46:25
**outside** 32:12
  37:16
**owe** 36:21
  37:19 38:12,14
  38:17,23
**owed** 38:10,18
**own** 46:22,25
**owner** 19:2,7,9
  39:9
**ownership**
  39:25

**p**

**p.m.** 1:18 4:2
  28:14 52:14,18
  52:24 53:3
**p.o.** 2:7
**package** 36:2
  37:7
**packages** 35:12
  35:16,19,20
  46:2
**page** 3:2,7
  21:17 22:10
  23:6 27:16
  29:1,2 36:12
  48:24 50:16,16
  56:4,7,10,13,16
  56:19
**pages** 22:9
**paid** 18:7
**paint** 31:23
  34:12,13

**pam** 4:20 5:18
**pamela** 1:25
  54:2,23
**pandemic**
  11:17
**paper** 29:25
  34:23 35:1,5,6
**paperwork**
  47:8
**parenthesis**
  38:24
**parking** 15:6
**part** 12:24 15:8
  20:13,15 39:19
  39:20
**particular** 19:8
  19:21 20:14
  48:23
**parties** 4:8 12:6
  49:3,3 54:12
**party** 4:22 24:5
  24:8
**passenger**
  33:23
**paths** 14:8
**pay** 18:7
**payment** 47:8
**payments**
  46:23
**peachtree** 2:15
**people** 37:14
**percent** 26:3,5
  32:22,23 38:12
**percentage**
  32:20 34:3

**[perfect - rating]**                                                   Page 11

| | | | |
|---|---|---|---|
| **perfect**  7:13,18 | **policy**  39:5,6 | **probably**  10:23 | 51:12 52:4 |
| **person**  17:4 | 40:5,8,10,20,23 | 10:23 11:16 | 55:4 56:1 57:1 |
| 40:16,22 47:14 | 51:4,6,12 | 13:7 32:22 | **provides**  14:14 |
| 47:16 | **populate**  35:10 | 37:21 50:3 | **provisions**  40:9 |
| **phone**  17:6 | **populated** | 51:22 | 40:20 |
| 36:25 37:21 | 25:11 | **procedure**  51:4 | **public**  57:19 |
| 43:14,20 44:16 | **populates** | 51:6,13 | **pull**  18:24 |
| 45:13 | 34:19 | **proceed**  5:20 | **purely**  26:13 |
| **phones**  4:6 | **portland**  1:16 | **proceeding** | **purpose**  45:21 |
| **photographs** | 4:17 | 4:25 | **put**  33:7,12,13 |
| 32:3,7,11 | **position**  11:23 | **process**  47:8 | 33:16,17 36:20 |
| **pick**  4:4 16:4 | 41:19 | **processor** | 37:18 46:8 |
| 28:21 43:14,18 | **potential**  27:21 | 19:25 | 52:1 |
| 43:19 44:4,16 | **potentially** | **produced** | **puts**  25:11 |
| 46:18,19 | 37:15 | 25:21 26:1 | **putting**  24:7 |
| **picked**  43:20 | **power**  41:7 | **professional** | 45:25 |
| **piece**  29:25 | 45:21 | 54:3 | |
| 35:5,6 | **pre**  46:3 | **program**  12:25 | **q** |
| **place**  4:7 30:3 | **preferable**  6:19 | 13:2 14:17 | **qualified**  20:11 |
| 36:5 54:7 | **preferred** | 15:18,24 16:9 | **question**  6:20 |
| **plaintiff**  1:6 2:2 | 21:10 | 16:14 21:8,10 | 6:24 7:9,11,15 |
| **plan**  18:7 52:2 | **prepare**  17:1 | 26:11,14 | 18:22 19:4,13 |
| 52:5 | **prepared**  25:9 | **programs** | 20:18 21:9,24 |
| **playing**  44:15 | **preselect**  35:16 | 15:14 | 23:10 25:18 |
| **plaza**  1:16 4:17 | **present**  5:2 | **progressive**  1:8 | 40:23 |
| **please**  4:3,5,25 | 42:4,21,23,24 | 4:11 10:11 | **questions**  6:10 |
| 5:19 17:18 | **presenting**  42:4 | 11:23 13:8 | 47:9 52:21 |
| 31:6 | **preserving** | 14:14,24 15:3 | **quite**  18:18 |
| **plug**  34:18 | 7:15 | 15:5 16:2,3 | **r** |
| **point**  6:15 | **pretty**  34:8 | 18:13,17 21:9 | **r**  36:19 56:3,3 |
| 11:20 17:13,22 | 35:19 36:4,6 | 21:11 24:6 | **ran**  46:15 |
| 18:12 26:16 | 50:23 | 26:7,11 28:5,6 | **range**  34:1 |
| 28:11 | **private**  4:5 | 42:5 43:8 | **rarely**  35:19 |
| **pointing**  22:10 | **pro**  25:15,17,20 | 44:21 45:5,17 | **rating**  30:5 |
| | 25:22 | 49:13 51:4,6 | 32:8 33:11 |

James Eckert
Multiple Plaintiffs v. Progressive

January 22, 2024

**[ratings - salvage]**                                                                    Page 12

| | | | |
|---|---|---|---|
| **ratings** 34:4,23 | **recording** 4:7 | **report** 18:24 | 34:9,11 35:18 |
| **reach** 38:20 | **refer** 44:5 | 19:1,14,17 | 36:23 38:3 |
| 39:1 42:6,12 | **referenced** 55:6 | **reporter** 1:24 | 44:14 46:15 |
| 47:7,12,16,21 | **regarding** 47:8 | 4:20 54:3,20 | 49:10 50:25 |
| **reached** 23:20 | **regards** 46:4 | **reporting** | **ring** 43:19,20 |
| 36:17 37:17 | 51:16 | 20:22 | **role** 12:22 |
| 38:2,4,6,22 | **region** 25:2 | **represent** 6:3 | 41:17 42:1 |
| 39:8 47:13 | **registered** 54:2 | **representative** | 44:15 |
| **reaching** 48:20 | **regular** 10:21 | 12:23 13:6,10 | **ron** 5:6 6:3 |
| 48:20 | 23:1 | 13:15,24 14:7 | 44:10,18,20 |
| **read** 53:1 55:9 | **related** 4:22 | 14:9 19:6,10 | **ronald** 2:5 |
| 57:5 | 54:11 | 19:15 21:5 | **rouge** 36:17 |
| **reading** 54:8 | **relating** 40:9 | **representatives** | 37:17 |
| **really** 6:15 | **relationship** | 14:25 | **rpr** 1:25 54:23 |
| 30:22 36:3 | 17:20 | **representing** | **rr** 18:25 |
| **rear** 34:12 | **relative** 54:14 | 4:19 | **rs** 49:23 50:3 |
| **reask** 6:24 | **remember** | **reproduction** | **rules** 6:9 |
| **reason** 10:11 | 37:22 42:22 | 54:18 | **run** 15:7 18:24 |
| 14:6 55:11 | **remote** 5:12 | **requested** 54:9 | 19:11,16 21:1 |
| 56:6,9,12,15,18 | **remotely** 5:3 | **required** 32:10 | 27:2 28:3,7 |
| 56:21 | 11:19 | 32:10,12 41:6 | 35:10 42:10 |
| **recall** 11:4 | **rental** 14:1 | 42:7 57:13 | **running** 45:18 |
| 16:20,22 38:4 | **rep** 50:21 | **requirements** | **runs** 18:25 19:1 |
| 52:7 | **repair** 12:23 | 30:5 40:6 41:2 | **rural** 15:13 |
| **receipt** 55:17 | 13:6,9,14,24 | **resort** 9:13 | **s** |
| **receive** 42:20 | 14:7 15:22 | **result** 12:10 | **s** 14:10 56:3 |
| 51:15 | 16:12 17:11 | **return** 55:13,16 | **sadly** 18:17 |
| **recently** 45:22 | 19:10,15 21:4 | **review** 16:19 | **salary** 18:7 |
| 46:12 | **repaired** 14:21 | 55:7 | **sale** 45:23 |
| **recess** 52:16 | 16:5 | **reviewed** 51:8 | 46:13 |
| **record** 4:2,8 | **repairing** 17:12 | **right** 5:14 | **sales** 38:13,14 |
| 5:4 7:15 52:12 | **repairs** 14:2,22 | 11:14 17:24 | 38:15,16,16 |
| 52:15,19,25 | **repeated** 39:20 | 18:3 20:15 | 46:16,22 |
| **recorded** 4:10 | **rephrase** 6:24 | 22:16,22 27:3 | **salvage** 26:20 |
| 50:3 | 40:7 | 27:11,16 31:22 | 26:23,24 27:2 |

Veritext Legal Solutions

Jason Eckert
Multiple Plaintiffs v. Progressive
January 22, 2024

**[salvage - stenographic]**    Page 13

27:2,18
**sarcastic** 9:1
**sat** 51:25
**saw** 22:8
**saying** 31:25
35:21 48:21
**says** 21:15,19
22:6 23:20
24:8 27:17
28:15 36:13,16
48:25 49:22
**scale** 32:8
**schedule** 14:22
**school** 8:7,8,13
**scott** 2:11,11
5:11,13
**scratches** 31:23
34:12,13
**screwed** 6:14
**season** 10:9
**second** 2:10
**seconds** 33:23
33:24
**see** 16:18 20:4
23:6 25:12
26:3 28:15
31:22 35:11
38:23 47:20
49:24 50:21
**seemed** 22:19
**seen** 7:4 41:10
41:25,25
**select** 16:3
**self** 35:10

**sensitive** 4:4
**sent** 10:24 11:7
27:23 55:14
**september** 8:6
**series** 6:10
**set** 54:7
**several** 19:22
**shakes** 8:2
**shape** 31:16
**sheet** 30:16,17
34:22 35:1
47:24 51:8
55:11
**shop** 14:11,13
14:13,19,19,20
15:3,4 16:4,15
24:11,17
**shops** 14:3 21:7
21:11
**shorthand**
23:14
**show** 25:13,14
**shows** 23:5
**shuttle** 9:23
**sided** 29:25
35:4
**sides** 31:24
**sign** 53:2 55:12
**signature** 54:22
**signed** 55:19
**significant**
27:11
**signing** 54:8
**similar** 15:22

**similarly** 1:5
**simultaneously**
25:9 45:15
**sitting** 7:3
**situated** 1:5
**situation** 30:13
48:16
**ski** 9:12,16 10:3
**small** 30:14
**smartly** 15:7
**sociology** 9:4
**soft** 12:9
**software** 26:11
**sold** 45:23
46:12
**solutions** 55:23
**somebody**
14:12 38:2
42:15
**son** 18:13
**sorry** 6:13 8:3
19:3,12,20
22:7 29:15
**sort** 31:14
34:19
**sound** 36:5
**southeast** 55:15
**spalding** 2:14
5:17
**speak** 35:22
51:5,7
**specific** 34:15
38:18 40:20
**specifically**
7:16 16:22

17:19 20:13
23:10,15 30:23
38:5 39:4
**specifics** 42:3
**spoke** 41:13
47:7
**spoken** 41:22
41:23
**spots** 29:24
**staging** 27:23
**stand** 52:15
**standards**
29:20
**standpoint**
12:16
**stands** 14:10,11
20:21
**start** 7:18
19:25 43:1,6
43:24 45:25
**started** 9:23
10:19
**state** 4:25 5:3
8:23 38:9,16
38:19
**statement** 50:4
**statements**
12:7
**states** 1:1 4:13
38:10,14,15,15
38:16,17,17
**steed** 2:8 5:9,9
**stenographic**
54:5

January 22, 2024

**[stock - touched]**                                    Page 14

| | | | |
|---|---|---|---|
| **stock** 18:17 | **sworn** 5:22 | **temporarily** | 52:13,17,23 |
| **stonington** 2:7 | 54:6 57:14 | 9:17 | 55:18 |
| 5:10 | **system** 27:6 | **ten** 11:16 13:13 | **timeframe** 55:8 |
| **street** 2:4,10,15 | 37:4,15 | **tend** 21:2 | **tire** 33:8,17,25 |
| **structure** 18:9 | | **term** 13:9,10 | 34:4 |
| **submitted** | **t** | 31:19 | **tires** 29:19 33:1 |
| 14:23 | **t** 8:20 15:6 56:3 | **terms** 23:13 | 33:2,2,5,9,14 |
| **subro** 49:7 | 56:3 | **testified** 5:23 | 33:18,23,24 |
| **subscribed** | **take** 4:7 7:6,8 | **testimony** | 34:8 46:6 |
| 57:14 | 14:18 16:2 | 39:13,21,24 | **tissue** 12:10 |
| **successful** | 32:3,6 47:19 | 55:9,17 57:8 | **title** 38:17 |
| 51:24 | **taken** 1:14 6:6 | **thank** 5:20 | 39:15 47:1 |
| **sugarloaf** 9:12 | 28:19 52:16 | 23:20 47:17 | **today's** 52:23 |
| 9:19 | 54:6,13 | 48:15 | **together** 24:8 |
| **suite** 2:15 | **takes** 14:12 | **thing** 7:2,7 22:3 | **told** 30:16 |
| **supervisor** | **talk** 6:8 18:6 | 46:8 | **took** 15:3 |
| 36:14 51:15 | 29:8 | **things** 29:21 | **top** 23:6 34:2 |
| **supervisory** | **talking** 21:16 | 38:10 43:7,17 | 36:13 38:12 |
| 21:5 | 21:21 | 45:2,4,14 | 50:20 |
| **supplements** | **tax** 38:13,14,15 | **think** 49:6 52:6 | **total** 12:16 |
| 27:11 | 38:16,17 46:16 | **third** 20:10,10 | 13:25 16:13 |
| **supposed** 24:9 | 46:22 | **thought** 35:5 | 17:13,23 18:2 |
| **sure** 11:7 15:25 | **taxes** 36:22 | **three** 9:20 20:3 | 18:19,23 19:14 |
| 20:8 22:2,4 | 38:24 | 43:7,16 45:4 | 20:16 27:21 |
| 40:8,21 44:23 | **teams** 23:21 | **thurston** 1:4 | 29:4 37:19 |
| 45:10 47:22 | 24:3,3 37:20 | 4:11 6:3 13:15 | 38:11,18 41:3 |
| 50:19 | **tear** 31:20 | 19:21 39:14 | 42:5 43:2,14 |
| **survey** 45:19 | **telephone** 2:8 | 47:21 55:4 | 44:1,25 47:6 |
| **swe** 14:9,25 | 2:11 | 56:1 57:1 | 51:10,11 |
| 16:14 21:8,10 | **tell** 36:21 37:19 | **thurston's** | **totaled** 18:4 |
| 24:6,11,22 | 43:3,10 45:8 | 16:21 39:11 | 44:8 |
| 25:4,10 | **telling** 31:14 | **time** 4:6,25 7:3 | **touch** 36:20 |
| **swear** 5:19 | 43:1,6,24 | 7:13,13 11:6 | 37:18 |
| **switched** 22:9 | 51:19 | 14:9 27:13,15 | **touched** 50:23 |
| | **tells** 7:16 | 48:14 52:4,5,7 | |

**[towards - went]**

| | | | |
|---|---|---|---|
| **towards** 51:5 | **umbrella** 14:7 | 41:6 | **verify** 55:9 |
| **track** 45:22 | **under** 14:7 | **value** 17:20 | **veritext** 4:19,20 |
| **trained** 11:2 | 17:9 22:15 | 26:4,6,20 27:8 | 55:14,23 |
| **training** 10:22 | 32:22,23 40:10 | 27:18 38:12,23 | **veritext.com** |
| 42:20 | 54:19 | 43:8,9 45:6,7 | 55:15 |
| **transcript** 54:4 | **understand** | 45:18 46:15,17 | **version** 30:15 |
| 54:8,18 55:6 | 6:23 19:3 | **various** 26:23 | **versus** 4:11 |
| 55:19 57:5,8 | 20:16 25:18 | 32:4 | **video** 4:6,9 |
| **transfer** 48:10 | **understanding** | **vehicle** 14:19 | **videographer** |
| **transferred** | 21:3 | 14:21 16:12,21 | 2:18 4:1,19 |
| 22:2 39:14 | **understood** | 16:23 17:11,21 | 5:18 52:13,17 |
| **travel** 10:16 | 6:21 | 18:1 23:18,19 | 52:22 |
| **tread** 33:4,7,8 | **unit** 4:9 20:22 | 24:20 27:20,22 | **videotaped** |
| 33:13,16,20 | 20:24 | 27:23,25 28:3 | 1:13 |
| 34:5 46:5 | **united** 1:1,8 | 28:10,14,18,21 | **vin** 35:10,17 |
| **truck** 33:24 | 4:12,13 | 29:10 30:2 | 46:1 |
| **true** 51:18 54:4 | **updated** 49:7 | 31:4,7,9 32:4 | |
| 57:8 | **use** 14:18 26:24 | 34:13,16 35:9 | **w** |
| **try** 6:10,16 | 30:22,24 | 38:11,24 39:10 | |
| **trying** 25:19 | **used** 9:2 26:11 | 40:9 43:2,9,10 | **w** 14:10 |
| 45:14 47:21 | 31:21 46:13 | 43:25 44:22,24 | **waiting** 36:22 |
| **turn** 16:3 19:19 | 55:19 | 44:25 45:6,7 | **want** 18:6 |
| **two** 1:14 9:20 | **using** 6:11 16:8 | 45:18 46:1,2,2 | 19:19 30:7 |
| 10:23 17:9 | **usually** 16:15 | 46:4,16,21,23 | 43:17 50:19 |
| 20:3 22:6 24:8 | 30:24 43:1,6 | 47:2,6 50:11 | 53:1 |
| 29:24 37:22 | **v** | **vehicle's** 29:6 | **wants** 14:18,21 |
| 42:8,11 48:24 | | **vehicles** 12:9 | **way** 8:25 14:17 |
| **typically** 48:12 | **v** 1:7 55:4 56:1 | 12:13 14:1,4 | 21:4 33:3 |
| 48:20 51:9,11 | 57:1 | 31:12,13,15,16 | 37:25 43:8 |
| **typo** 24:9 | **valuation** 27:18 | 35:15,17,18,22 | 45:17 51:7,9 |
| **u** | 27:24,25 28:8 | 40:6 41:2,6 | **wctl** 29:3 |
| | 30:11 41:2 | 45:22 46:11 | **we've** 29:16 |
| **u** 8:19,20 | 42:21,23,24 | **vendor** 26:24 | 37:9 51:8 |
| **uh** 6:12,12,12 | 48:9 | **verbal** 6:11 | **wear** 31:20 |
| 6:12 20:5 | **valuations** | | **welcome** 47:18 |
| 32:24 | 12:12 29:9 | | **went** 8:22 |
| | | | 13:11 16:20 |

James Eckert
Multiple Plaintiffs v. Progressive

January 22, 2024

**[whispering - zip]**

Page 16

| | x |
|---|---|
| **whispering**  4:5 | **x**  3:1 46:17 |
| **white**  2:16 5:16 | **x014476**  21:20 |
| 5:16 25:21 | **x014776**  20:1 |
| 39:18,20,24 | **xferred**  21:15 |
| 40:3 49:16 | 21:15,25 |
| 53:2 55:1 | |
| **wife**  18:12 | **y** |
| **win**  9:2 | **yard**  27:2,23 |
| **wind**  42:4 | **yards**  26:23 |
| **witness**  3:1 | **yeah**  10:7,8 |
| 5:19 8:2 55:8 | 20:21 22:18 |
| 55:10,12,18 | 23:15 27:1 |
| **work**  10:15 | 35:14 |
| 26:15,16 29:4 | **year**  34:15,18 |
| 48:11 | 46:11 |
| **worked**  9:12 | **years**  9:13,20 |
| 18:13 51:3 | 11:16 13:13 |
| **working**  11:19 | 52:6 |
| 48:17 | **york**  7:25 8:18 |
| **works**  14:18 | **yup**  9:15 17:19 |
| 24:24 42:2 | 22:19,23 42:19 |
| **worry**  45:13 | 43:1 50:13 |
| **wound**  28:15 | |
| **write**  14:4 16:7 | **z** |
| 16:10,16 26:11 | **zip**  46:9,10 |
| 45:14 51:21 | |
| **writes**  14:20 | |
| 26:10 | |
| **writing**  13:25 | |
| 18:2 | |
| **written**  14:11 | |
| 29:20 | |
| **wrote**  16:15 | |
| **wy**  2:10 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.