```
1                IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF MAINE

3    _____

4    MATTHEW THURSTON, individually

5    and on behalf of others

6    similarly situated,

7             Plaintiff,

8         v.                                      Docket No.

9    PROGRESSIVE CASUALTY INSURANCE              1:22-cv-00375-NT

10   COMPANY and UNITED FINANCIAL

11   CASUALTY COMPANY

12            Defendants.

13   _____

14           AUDIOVISUAL DEPOSITION OF JUSTIN GREEN

15   DATE:          October 2, 2024

16   TIME:          2:07 p.m., Eastern Time

17   LOCATION:      Zoom

18   REPORTED BY:   Alyssa Turner, Remote Notary Public

19   JOB No.:       14345

20

21

22

23

24

25
```

```
 1            A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF:
 3        JOHN ZACHARY STEED, ESQUIRE (PRO HAC VICE)
 4        Island Justice Law
 5        P.O. Box 77
 6        Stonington, Maine 04681
 7        john@islandjusticelaw.com
 8        (207) 200-7077
 9
10   ON BEHALF OF DEFENDANTS:
11        ALLISON HILL WHITE, ESQUIRE
12        King & Spalding LLP
13        1180 Peachtree Street, Northeast
14        Suite 1600
15        Atlanta, Georgia 30309
16        awhite@kslaw.com
17        (404) 572-4600
18
19
20
21
22
23
24
25
```

```
 1                I N D E X
 2   EXAMINATION:                                    PAGE
 3        By Mr. Steed                                  5
 4
 5
 6              E X H I B I T S
 7   NO.        DESCRIPTION                          PAGE
 8              (None marked.)
 9
```

```
 1            P R O C E E D I N G
 2        THE REPORTER:  All right.  Good afternoon.
 3   My name is Alyssa Turner.  I am the officer of this
 4   deposition representing DepoDirect, and we are now on
 5   the record.  Today's date is October 2, 2024, and the
 6   time is currently 2:07 p.m., Eastern Time.
 7        This deposition is taking place remotely in
 8   the matter of Matthew Thurston, individually and on
 9   behalf of others similarly situated, versus
10   Progressive Casualty Insurance Company and United
11   Financial Casualty Insurance (sic) Company.
12        The docket number is 1:22-cv-00375-NT, and
13   this is the audiovisual recorded deposition of Justin
14   Green taken on behalf of the plaintiff in the United
15   States District Court for the District of Maine.
16        Absent any objection, all parties agree that
17   we may place this witness under oath and record this
18   proceeding remotely via audiovisual method.
19        At this time, will everyone appearing
20   remotely please identify yourself, starting with the
21   noticing attorney?
22        MR. STEED:  John Zachary Steed of Island
23   Justice Law for the plaintiffs.
24        MS. WHITE:  Allison White with King &
25   Spalding for the defendants.
```

```
 1        MR. GREEN:  Justin Green, Progressive
 2   Insurance adjuster.
 3        THE REPORTER:  Thank you.
 4   WHEREUPON,
 5                JUSTIN GREEN,
 6   called as a witness, and having been first duly sworn
 7   to tell the truth, the whole truth and nothing but the
 8   truth, was examined and testified as follows:
 9        THE REPORTER:  Thank you.
10        Counsel, you may now proceed with
11   questioning.
12                EXAMINATION
13   BY MR. STEED:
14        Q    Hi Justin.  I'm John.  Have you ever -- have
15   you ever done a deposition before?
16        A    No.
17        Q    So I'm going to go over a couple other
18   little ground rules, and then I'll get into asking
19   some questions about this -- about this case.
20        So I'm going to ask you questions.  You
21   understand that?
22        A    Uh-hm -- yes.
23        Q    And then the next thing I was going to say
24   is that, you know, you got to say yes or no and not --
25        A    Yes.  Yeah.  Yes.
```

1   Q   And then one favor will you do for me is
2   that if you don't understand a question, will you let
3   me know?
4   A   I will, yes.
5   Q   And then if I ask you a question and you
6   answer it, can I assume you understood it?
7   A   Yes.
8   Q   Okay. I'm going to ask just some questions
9   about your background, sort of how you ended up here
10  at Progressive. So what's your current job?
11  A   I am a managed repair rep.
12  Q   Who do you work for?
13  A   Progressive.
14  Q   And how long have you had that job?
15  A   Three years.
16  Q   What did you do before you worked as a
17  managed repair rep for Progressive?
18  A   I was a file adjuster for Progressive.
19  Q   How long did you do that?
20  A   Three years.
21  Q   And before that, what did you do for work?
22  A   I worked as a frontend store manager for
23  Rite Aid Pharmacy which then became Walgreens
24  Pharmacy.
25  Q   Do you have any other job experience in the

1   auto insurance business?
2   A   I do not.
3   Q   Okay. Oh, also, I drive by the sign for
4   Arundel all the time in Southern Maine, and I just --
5   is Arundel cool? -- because it's such a cool sounding
6   name for a town.
7   A   It's very small, very quiet. It's -- it's
8   kind of how you escape the bigger cities like
9   Biddeford and Portland. You just -- it's -- it's
10  quiet.
11  Q   Nice. Is that -- where are you from?
12  A   Arundel.
13  Q   Oh, you're from Arundel.
14  A   Yeah.
15  Q   And did you -- did you go away for school or
16  anything?
17  A   I did, yes.
18  Q   Where'd you go?
19  A   I went to New England College in Henniker,
20  New Hampshire.
21  Q   Well, I live -- I live in Stonington, Maine,
22  right now, and I'm in the house I grew up in, living
23  in it, so I like a small town in Maine.
24      Sorry, that's not a question. Objection.
25  Form.

1       So can you -- I'm going to ask you some
2   questions about your work at Progressive. So what
3   does a file adjuster do?
4   A   A file adjuster would -- would talk to
5   customers. They would review police reports. They
6   would take interviews, issue payments. They have a
7   wide -- wide amount of job responsibilities.
8   Q   Are the files you're adjusting claim files?
9   A   Yes.
10  Q   So are you part of a team dealing with
11  insurance claims, basically?
12  A   Yes.
13  Q   And then as a -- as an M -- managed --
14  what's -- what did you say? A managed --
15  A   You can call it MRR.
16  Q   As an MRR. But what is an MRR?
17  A   I would write estimates on vehicles and do
18  total losses.
19  Q   So -- but what is -- what does MRR stand
20  for?
21  A   Managed repair rep or representative.
22  Q   So besides writing estimates and doing total
23  losses, do you have other job responsibilities?
24  A   Just talking to customers occasionally and
25  the occasional payment issued. But, no, the job

1   typically is estimates, total losses, nothing else.
2   Q   What states do you work in?
3   A   I work in Maine.
4   Q   Do you ever do any estimates or total losses
5   outside of the state of Maine?
6   A   I will occasionally do some from New
7   Hampshire, but very rarely.
8   Q   Is there any difference between estimate or
9   a total loss that you do in New Hampshire versus one
10  you do in Maine, as far as --
11  A   Well --
12  Q   -- concerned?
13  A   Nope. You're -- you're good. Go ahead. As
14  far as what?
15  Q   As far as what you're supposed to do. Do
16  you have different requirements for Maine versus New
17  Hampshire?
18  A   The overall guidelines are -- are very
19  similar to the same, but each claim and each vehicle
20  is handled as an individual and differently, as you're
21  going to handle it, the -- as to what's needed for
22  that claim, so what's required based off of the facts
23  of that claim. But the overall state guidelines are
24  going to be handled the same. There are some minor
25  differences, but there -- we'd be having to get into

specifics.
Q   Oh. Did you talk to anyone to get ready for the deposition this afternoon?
A   There was a meeting, yes.
Q   When was the meeting?
A   We had one yesterday.
Q   Okay. And nothing today, though?
A   We had a real brief get together. Nothing major.
Q   Okay. Where do you -- do you work from home or do you work in an office?
A   I typically work from home, and then I do head out to our salvage yard usually once or twice a week.
Q   Okay. And in a given month, how many estimates or total losses are you assigned? How many claims are you assigned?
A   It varies. There's no way that I could give an exact number on that, as it all would depend on the volume in the state. It can fluctuate from day to day to week to week, so there's no way to be able to put an exact number on that or even an estimated number.
Q   Is it more than ten a month?
A   Do I handle more than ten claims a month? I have, yes. But, once again, that could change, you know, at any point, so -- because, for instance, if you talk to me during COVID, I handled, like, one a week. So it all depends on what situation you're talking about.
    So, typically, yes, there would be more than ten a week -- I mean ten a month.
Q   Would there be more than ten a week, do you think?
A   Typically. But I couldn't give -- again, can't give you an average, can't give you the exact number.
Q   Okay. How are you assigned -- well, how are you assigned claims to work on?
A   So we -- all our vehicles that I would look at go to a salvage yard called Copart. I go through, look at the vehicles that need to be inspected, and I assign them to myself.
Q   Who tells you which vehicles to inspect?
A   There's a list generated by Copart. As we send the vehicle to Copart, they generate the list for us. I review if that vehicle needs to be done by comparing the claim file and the Copart site. If it needs to be done, I do it. If it doesn't need to be done, we just remove it from the list.
Q   What do you mean? How do you decide if a vehicle needs to be done?
A   Sometimes -- anytime a vehicle is a total loss, it will end up eventually at our Copart yard, unless they're keeping the vehicle. Sometimes the total loss is done at a person's address, at a shop. Sometimes it's done at the Copart facility, which is where it would be taken care of by myself. So sometimes vehicles do show up at Copart that don't need to be completed, as it's already been completed.
Q   What do you mean by completed?
A   Someone's already done the total loss evaluation on it.
Q   So are any of the vehicles that show up at Copart not total losses?
A   It shouldn't be at Copart. Copart is a salvage yard, so there shouldn't be repairable vehicles there.
Q   I just have to turn off my messages here.
    So you just deal with total loss vehicles in your current position?
A   Majority, yes.
Q   What are the non total loss vehicles you deal with, then?
A   Sometimes a vehicle will show up at the Copart facility where I would write an estimate on it, and it would not be a totaled vehicle, so I would be doing a full estimate on it and getting it sent to a shop.
Q   How do you -- and -- okay. So now I'm going to walk through the process of how you estimate the value of a total loss. That's a regular part of your job, right?
A   I collect the information from the vehicle, submit it to a third party, Mitchell, and they provide me with the total loss figures.
Q   What information do you collect from the vehicle?
A   The VIN number, the mileage, if it's available. I review the options, the condition of the vehicle, that stuff.
Q   Where do you get the VIN number on a vehicle?
A   VIN number is typically going to be in the driver-side door or up by the windshield. It would be something that is usually in those two locations.
Q   So you say you collect the VIN number and submit it to Mitchell. Is there a piece of software you use?
A   The VIN is -- it's -- well, first, we would confirm that it matches up with the VIN in the claim,

1  and then we would submit that VIN in -- in the
2  Mitchell Total Loss software.
3      Q   Okay. So there's a piece of software called
4  Mitchell Total Loss that you use?
5      A   It's -- well, it's a third party that we
6  submit all the information to. Yes.
7      Q   But do they provide you with software?
8      A   Yeah. I -- I would say it's -- it's -- if
9  you want to describe it as software, yeah, it's --
10 it's a link that I click on.
11     Q   Okay. So you click on a link, and that
12 opens up a portal within a web browser?
13     A   It's just a web page that's the -- that we
14 put all the information in.
15     Q   Okay. And do you -- do you log in first?
16     A   Yeah, you have to be logged in. Yes.
17     Q   Okay. And then -- and what do you call that
18 program, again?
19     A   Mitchell -- well, it's -- I call it Mitchell
20 Total Loss. If there's an official name for it, I --
21 I can't recall what the official name is, but I call
22 it Mitchell Total Loss.
23     Q   Okay. And using Mitchell Total Loss, you
24 give it a VIN number for the vehicle?
25     A   Well, the VIN -- the VIN is already there.

1      A   Yup.
2      Q   -- input what options are there or not?
3      A   I -- I would -- the -- each vehicle only has
4  so many -- so many options that are available. I
5  would go through and click the ones that are on that
6  vehicle.
7      Q   And have you been trained in how to use this
8  Mitchell Total Loss software?
9      A   Yes.
10     Q   And so what we've talked about so far,
11 opening the software, were you trained to do that?
12     A   Yes.
13     Q   And then putting the VIN number in, was that
14 that part of your training?
15     A   Yeah. You -- confirming the VIN, yes, it
16 would be something that I would have been trained.
17     Q   Okay. And that's something you do each time
18 you do one of these total loss evaluations?
19     A   Yeah. Because if you want accuracy, you
20 need to make sure you have the right vehicle and the
21 right identification.
22     Q   Right. And you also have to follow the
23 process that you've been trained to do correctly,
24 right?
25     A   Yes. You need to follow the correct

1  I confirm that it's accurate.
2      Q   Okay. So some of it's prefilled out for you
3  on the vehicles you're supposed to examine?
4      A   Well, if you have the correct VIN, it's
5  going to generate the information on the vehicle, as
6  the VIN is, essentially, the fingerprint to the
7  vehicle. So if you have the VIN, it's going to show
8  some of the information on the vehicle, not
9  everything, but it'll show some.
10     Q   Well, what information does it give you once
11 you give it the -- what information do you get once
12 you put the VIN into the Mitchell Total Loss software?
13     A   Standard features, year of the vehicle, the
14 make of the vehicle. It won't generate anything
15 specific, but it'll give you basics.
16     Q   Then what else do you -- after you've put
17 the VIN in, it gives you this list of standard
18 features, what do you do from there?
19     A   I would go through and confirm the options
20 that are in the vehicle. So I have to go and see if
21 it has particular options in that actual vehicle that
22 I'm looking at, and then I would look at the overall
23 condition of the vehicle for any wear and tear.
24     Q   And when you say confirm options, do you do
25 something with the -- with the software to --

1  process.
2      Q   And that's what you do every time?
3      A   Yes. I do follow what I've been trained.
4      Q   Okay. And so confirming the options on the
5  vehicle, that's part of the process that you were
6  trained to do?
7      A   Yes.
8      Q   And that's what you do each time?
9      A   I do confirm the options every time, yes.
10     Q   Okay. And then you said you look at the
11 condition. So what's the process there with looking
12 at the condition?
13     A   Yup. So I -- I look at a guide that has
14 been supplied to me that I look at, if it would have
15 certain criterias to either be rated as no wear and
16 tear or the wear and tear that's acceptable for that
17 rating, and then I make sure that the rating is
18 accurate to the amount of wear and tear allowed for
19 that particular -- that particular thing that we're
20 looking at.
21     Q   Sure. You said -- what are the -- you said
22 certain criteria. What are the criteria with
23 evaluating the condition? Like what are the things
24 you're looking for or at?
25     A   I mean, it depends on the vehicle that we're

```
 1  looking at.  It can be anything from scratches to rust
 2  to missing components.  It all varies depending on
 3  what vehicle we're looking at, the age.  It's -- to be
 4  able to answer that completely, I -- I would have to
 5  have the guide with me, and I would have to have that
 6  exact vehicle that we're looking at to be able to
 7  answer that fully.
 8      Q    But for any given vehicle, the software
 9  generates a guide for what you're supposed to look for
10  and at?
11      A    There is a guide in the software, but we
12  have been supplied with one from Progressive that is
13  more comprehensive.
14      Q    So when you give the vehicle condition,
15  you're following a guide provided by Progressive?
16      A    I am, but there -- each vehicle is
17  different.  There is -- you know, sometimes there's --
18  there's going to be some deviations away from the
19  guide.  So it's -- it is a tool that is a resource to
20  use, but each claim and each vehicle is different.  So
21  to say that it's always a hundred percent to that,
22  there could be a lot of different circumstances that
23  would change that rating.
24           But the guide is a tool.  It's not, you
25  know, something that there's never any variance from.
```

```
 1  There -- there is sometimes where -- you know, there
 2  is variance from that guide.
 3      Q    How much variance?
 4      A    I can't answer that as it kind of depends on
 5  the situation.
 6      Q    So you don't know how much variance?
 7      A    Once again, depends on the situation.  I
 8  can't answer that without specifics.
 9      Q    Well, you said there was variance, and I'm
10  just wondering how frequently there's variance.
11      A    It's -- once again -- I mean, to give you an
12  exact number, I wouldn't be able to.  Every claim is
13  different.  Every claim is handled as their own.  I
14  may look at something and look at it totally different
15  than, you know, you would.  The guide is there as a
16  tool.  Everybody can interpret it differently.  So to
17  be able to say how much variance, I wouldn't be able
18  to answer that, as we could be looking at the same
19  thing and be looking at it totally differently.
20      Q    That's very postmodern.  What is -- what is
21  truth?
22           Do you have a supervisor?
23      A    Yes.
24      Q    Does your supervisor review your work?
25      A    She does review my work, yes.  Not
```

```
 1  everything that I complete, but she does review work,
 2  yes.
 3      Q    Okay.  How often does your supervisor change
 4  a vehicle valuation that you've done?
 5      A    I wouldn't be able to give you an answer on
 6  that.  I don't know how often she does.
 7      Q    Has that been something that's happened --
 8  did that happen in September at all?
 9      A    I -- I don't know.  I -- I -- honestly, I
10  can't remember.
11      Q    What about last week?  Do you remember if
12  last week your supervisor changed one of your reports?
13      A    The amount of claims that I look at
14  throughout a year, through a week, through a day, I
15  can't remember specifics as to if something has been
16  changed on it or not.
17      Q    So you said earlier you weren't sure if you
18  did more than 10 claims in a month, but now you're
19  saying you do so many, you couldn't say for sure how
20  many you do, so could you just -- so you're saying you
21  don't know if last week your supervisor changed any
22  reports because you just do so many?
23      A    What I stated earlier was -- is I'm not sure
24  an exact number for how many.  It could be more than
25  10, it could be less than 10.  It really depends on
```

```
 1  the day, the week, and the month, and even the year.
 2  As for if she changed something last week, I don't
 3  remember if she changed something.  If she did, there
 4  was probably a reason for it, but I don't know if she
 5  did or not.  I would have to have all the claims up
 6  front of me for me to go back and review and see if it
 7  was changed or not.
 8      Q    You're supposed to follow the guide, though,
 9  right?  When you're evaluating a vehicle, are you
10  supposed to follow the guide provided by Progressive?
11      A    It is a resource that we would use.  But,
12  once again, the way I follow it may be interpreted
13  differently than the way anybody else would follow it.
14  Everything is a tool.  It's useful, it has its
15  purpose, but my interpretation could be totally
16  different.
17      Q    Well, that's why I wonder about your
18  supervisor reviewing your work.  How often is your
19  supervisor's view of the guide different than yours?
20      A    I -- I feel that we -- that we've answered
21  this.  I wouldn't be able to answer that exact
22  question because I don't have specifics as to what
23  claim she's changed, how often she's done it.  Without
24  having a claim out front of me, I wouldn't be able to
25  answer if she did it and why she did it.
```

1  Q  Do you adhere to your training when you
2  evaluate vehicles for total losses?
3  A  Yes.
4  Q  How long -- how big is the guide that you
5  have from Progressive on how you are supposed to
6  evaluate the condition of a vehicle?
7  A  The exact amount of pages? I -- I don't
8  know. I mean, multiple pages.
9  Q  It's more than one?
10 A  Yes, it is more than one.
11 Q  You think it's more than two?
12 A  If we're going to go this way -- and -- it's
13 more than two. I don't know the exact. We could just
14 keep going: Two, three, four -- I don't know the
15 exact number of pages. I just know that it is more
16 than one and it's probably more than two. But I
17 suppose it would depend on if we're looking out on a
18 computer screen or if we're looking at a printout. I
19 -- I just know that it's --
20 Q  I mean, I just -- if we're playing games,
21 like, I got all day. We both got all day. I mean, I
22 just -- is it a big -- is it a detailed, comprehensive
23 guide or is it just a --
24 A  Yes. It's --
25 Q  -- big outline?

1  A  It's -- it's -- there's multiple things that
2  you're looking at in the vehicle, so there's multiple
3  pages. I mean, you got to look at the condition of
4  everything on the vehicle. So, yeah, there's going to
5  be multiple pages to this.
6  Q  Something like seats --
7  A  Uh-hm.
8  Q  -- what's the -- and I assume we're on a
9  one-to-four scale, right?
10 A  It's -- it's --
11    MS. WHITE: Objection.
12    THE WITNESS: -- typically one to three.
13 BY MR. STEED:
14 Q  Okay. So if you're evaluating the condition
15 of the seats of a vehicle, do you have specific
16 guidance on what constitutes a three and what
17 constitutes a two?
18 A  There -- there is --- there is specific
19 things to look for, but, once again, it could be --
20 it's open to interpretation. What you consider a
21 significant amount of creasing, I may say is moderate
22 creasing. So it is very much open to interpretation.
23 Q  Are you evaluated on the accuracy of your
24 total loss evaluations?
25 A  Yes. They do review my work throughout the

1  year and evaluate me on it.
2  Q  Who does that evaluation?
3  A  Multiple people. Sometimes supervisor --
4  sometimes my supervisor, sometimes other supervisors.
5  Q  Do you have any concerns that if you were
6  giving condition adjustments that were too positive to
7  vehicles that you would get evaluated negatively?
8  A  No. I evaluate the vehicles to the guide to
9  my interpretation and do it as accurately as possible.
10 Q  Has anyone ever -- have you -- in any of
11 your -- well, do you hear feedback after your
12 supervisors evaluate your work?
13 A  Yes.
14 Q  Have you ever heard from any of your
15 supervisors that you were improperly applying the
16 guidelines and evaluating vehicles either too high or
17 too low?
18 A  I can't remember specific reviews.
19 Q  You don't know if that's ever happened?
20 A  It may have, it may not have. I can't
21 remember specific reviews. They review us, and I'd
22 have to go back and review the reviews that they've
23 given me.
24 Q  But you don't remember an instance where you
25 were told that you were improperly applying

1  Progressive's guidelines to evaluating the conditions
2  of vehicles, correct?
3  A  A specific -- a specific situation or a
4  specific claim or vehicle? I do not recall a claim
5  where I have specifically been told I've done
6  something inaccurate.
7  Q  In your six years at Progressive?
8  A  I'm sure that there has been a time where
9  I've gotten feedback that was constructive, but to
10 give a specific example, I wouldn't be able to give
11 you one.
12 Q  Because you don't remember one?
13 A  Six years --
14    MR. WHITE: Objection. Asked and answered.
15    THE WITNESS: -- is a long time, but, yeah.
16 BY MR. STEED:
17 Q  So when you're applying -- well, so just --
18 just so I'm clear, so you enter the VIN number, and
19 then the Mitchell Total Loss software generates a list
20 of standard equipment for you, right?
21 A  I confirm the VIN. It's already there. I
22 confirm that it's accurate. And then from there, it
23 would give me the standard options.
24 Q  And then you check to make sure that the
25 standard options are present in the vehicle, right?

```
 1    A    I would go through and confirm that the
 2 report is accurate to the vehicle that we are looking
 3 at.
 4    Q    And then do you also look to see if there's
 5 any optional equipment?
 6    A    Yes.
 7    Q    What's optional equipment?
 8    A    It depends.  I mean, it could be, you know,
 9 are you looking for -- if you're looking -- what are
10 you looking for?  Like are you looking for specifics
11 as to what an optional equipment is?  Like what do you
12 -- what do you mean?
13    Q    I mean, just generally speaking, there's --
14 when you're looking to see if there's any optional
15 equipment --
16    A    Uh-hm.
17    Q    -- to -- what are you looking for, what
18 sorts of things?
19    A    Stuff that's not in the standard build.  So
20 it could be a sunroof, could be different wheel sizes.
21 It could be a multitude of things.  Depends on the
22 vehicle and the optional equipment that's offered for
23 that vehicle.
24    Q    And then is there -- is there a place within
25 the software to input what optional equipment there
```

```
 1 is?
 2    A    Yes.
 3    Q    So you observe what optional equipment there
 4 may be, and then using the computer software, you
 5 input the information that you observed into the
 6 computer software, right?
 7    A    Yes.  I would confirm -- if it has something
 8 that's not listed in the standard build, I would
 9 select that that option was there.
10    Q    You'd use the software to select that that
11 option was there.
12    A    I -- I suppose that that's -- yeah, I guess.
13    Q    And then what -- is the next step then
14 evaluating the condition of the vehicle?
15    A    Yeah.  Then, at that point, yeah, you would
16 confirm the condition of the vehicle.
17    Q    Okay.  And the -- what are the categories of
18 vehicle condition that you're evaluating?
19    A    You want every single category that we're
20 evaluating condition?
21    Q    Well --
22    A    Is that what you're asking?
23    Q    So I'm -- from -- so there's -- you look at
24 interior features, right?
25    A    I would look at the interior and the
```

```
 1 exterior, if we're talking about --
 2    Q    Sure.  But part of the process is looking at
 3 the interior, though, correct?
 4    A    Yes.
 5    Q    And then do you -- you evaluate -- you look
 6 at the headliner?
 7    A    Yes.
 8    Q    And then the guide you have has information
 9 about how you should rate the condition of the
10 headliner, is that correct?
11    A    There would be information on it, yes.
12    Q    And there are specific things to look for in
13 the guide you have?
14    A    Yes.
15    Q    And then applying the guide, you give a
16 condition rating for the headliner of the vehicle,
17 correct?
18    A    In -- yeah.  In -- yeah.  We would be giving
19 one for -- we would rate the headliner.  We would give
20 it a condition rating.
21    Q    Using the guide, right?
22    A    Yes.
23    Q    And then you would do the same thing with
24 the doors and interior panels, is that right?
25    A    Yes.
```

```
 1    Q    And you would use the guide to give it a
 2 condition rating, right?
 3    A    Yes.
 4    Q    And then you would look to the carpet,
 5 right?
 6    A    Yes.
 7    Q    And then you'd use the guidelines in the
 8 guide to give a condition rating to the carpet,
 9 correct?
10    A    Yes.
11    Q    And then you look at the seats, right?
12    A    Correct.
13    Q    And you -- following the guidelines in the
14 guide, you give the seats a condition rating, right?
15    A    Correct.
16    Q    And then you would look at the dash and the
17 console, is that right?
18    A    Yes.
19    Q    And then using the guidance in the guide
20 you've been provided by Progressive, you give a
21 condition rating to the dash and the console?
22    A    Yes.
23    Q    And then you do the same thing with the
24 glass, interior glass?
25    A    Yes.
```

```
 1     Q    And, again, with the glass, you observe the
 2  glass.  Then using the guide, you give a condition
 3  rating for the glass, correct?
 4     A    Yes.
 5     Q    And that's what you're trained to do for
 6  evaluating the interior, correct?
 7     A    Yes.
 8     Q    Okay.  And then with the exterior, just --
 9  so you're evaluating the body, the trim, and the
10  paint, is that right?
11     A    Correct.
12     Q    And with the body, does the guide tell you -
13  - does the guide provide guidance on how you should
14  evaluate the condition of the body of a vehicle?
15     A    The guide would provide guidance on how to
16  rate all of the things that you've listed so far.
17     Q    Okay.  And then you use the guide provided
18  by Progressive to provide those ratings, right?
19     A    Yes.
20     Q    And that's what you're trained to do?
21     A    Yes.
22     Q    And you follow -- you followed the training
23  that you provided by Progressive to do all of your
24  total loss reports, right?
25     A    I follow the training to the -- to the -- to
```

```
 1  the best of my ability with my interpretation as to
 2  what's up front of me.  Yes.
 3     Q    And then you have supervisors who regularly
 4  review your performance and provide feedback, right?
 5     A    I don't know if I would say regularly, but
 6  they do review my work and provide feedback, if
 7  needed.
 8     Q    And then after you've entered the condition
 9  ratings for everything that the guide tells you to
10  provide condition ratings for, what happens after
11  that?
12     A    I would then submit all this information to
13  Mitchell Total Loss where they would provide me with a
14  comprehensive report that shows me, you know, the
15  value of the vehicle and the comparable vehicles.
16     Q    And do you know how it arrives at those
17  numbers?
18     A    It is based off of actual cash value.  So it
19  would be based off of vehicles for sale in the area.
20     Q    And so you -- how is it based off of -- what
21  do you mean it's based off of vehicles for sale in the
22  area?
23     A    Yeah.  So Mitchell would -- would pull up
24  vehicles that are comparable vehicles, so same year,
25  make, and model, that would be for sale at dealerships
```

```
 1  in the area.  And that would be what they're basing
 2  the vehicle's value off of.
 3     Q    And then it uses the condition that you've
 4  put in for the subject vehicle to adjust for the
 5  listed -- sorry, I'm very inarticulate.
 6          How does it -- I see -- let's see.  Maybe
 7  this would be easier if you could look at, maybe, what
 8  I previously marked as Exhibit C.  Do you have that
 9  available to you?
10     A    I believe it's C.  Let me -- for bridges?
11     Q    Yes.  I -- the -- I'm just wondering what --
12     A    Yep.
13     Q    -- what is Exhibit C that you're looking at?
14  What -- can you tell me what it is?
15     A    I have a vehicle valuation report.
16     Q    Okay.  For what kind of car or what kind of
17  vehicle?
18     A    A 2020 Kia Telluride.
19     Q    Okay.  And who's the owner of the vehicle?
20     A    I have Katherine Bridges.
21     Q    Did you prepare this report?
22     A    I submitted the information to Mitchell for
23  them to create the report.
24     Q    Okay.  And then Mitchell sent it back to
25  you?
```

```
 1     A    Correct.
 2     Q    And then Progressive used this to make us an
 3  offer to Katherine Bridges about the total loss of the
 4  value of her vehicle?
 5     A    Correct.
 6     Q    Were you the person who gave her -- told her
 7  what the offer was?
 8     A    I can't remember.  I'd have to review the
 9  claim notes.
10     Q    So in this case, looking at the first page,
11  so the VIN number would have been inputted already.
12  You would have double checked to make sure it was the
13  right VIN number --
14     A    Yep.
15     Q    -- matched this vehicle, and then you would
16  have gotten this list of standard equipment and the
17  packages, probably, also, right, just from Mitchell?
18          MS. WHITE:  Objection.  Compound.
19  BY MR. STEED:
20     Q    You can still answer it.
21     A    I -- can you repeat the question, then,
22  because --
23     Q    Sure.  So after you put the VIN number in do
24  you get the list of standard equipment from Mitchell?
25     A    I would get the list of standard equipment,
```

1  and it would show me the optional equipment that I can
2  select.
3      Q    Okay.  And then with this -- there's also,
4  between pages 3 and 4 of the report -- at the end --
5  bottom of page 3, it says, Packages.  Do you see that?
6      A    Yes.
7      Q    And then at the beginning of page 4, it
8  lists that, Yes, premium package and the towing
9  package.  Do you see that?
10     A    Yes.
11     Q    So would the information about what packages
12 were included with the vehicle be included as part of
13 the VIN number?
14     A    Depends on the vehicle.  Sometimes it is,
15 sometimes it isn't.
16     Q    But you observe the vehicle and then using
17 the software, make sure that the report gets all of
18 the optional equipment and whatever packages were
19 included on the vehicle, right?
20     A    I look at the vehicle and use the resources
21 available to me to be able to submit the information
22 to Mitchell for an accurate report.
23     Q    Okay.  And that's what you're trying to do?
24     A    Yes.
25     Q    It -- so in this loss -- so the next kind of

1  page is the lost vehicle base value.  Can you explain
2  what's happening here?
3      A    In what way?
4      Q    Well, it says -- so there's a list of six
5  vehicles?
6      A    Okay.
7      Q    And then it says -- this first one is a 2020
8  Kia Telluride EX.  It says it has 56,300 miles.  It's
9  83 miles from the loss vehicle.  And the list price is
10 36,900.  Do you see all that?
11     A    Yes, I do.
12     Q    So, I mean -- so that list price of 36,300
13 -- 36,900, that's the list price the Mitchell software
14 finds for this 2020 Kia Telluride listed here, right?
15     A    It -- it would be the price that it's likely
16 up for sale for.
17     Q    Okay.  And then there's an adjusted value.
18 Do you know where --
19     A    Yes.
20     Q    -- that adjusted value comes from?
21     A    The adjusted value could be for a --
22 multiple different reasons.  It would depend on the
23 specific one that we're talking about when we're
24 talking about list -- adjusted value.  It could be
25 because of different options that the vehicle may or

1  may not have.  It could be because of a mileage
2  difference.  It could be because of a projected sold
3  amount.  It really depends on the exact vehicle that
4  we're talking about.
5      Q    Is this -- do you play a part in generating
6  these numbers?
7      A    I do not.
8      Q    Are those numbers generated by the software
9  you use?
10     A    That would be generated by Mitchell Total
11 Loss.
12     Q    And then you use it?
13     A    It would be the report that we would use,
14 yes.
15     Q    Can you change any of these numbers?
16     A    I cannot change the adjusted value, but we -
17 - it would certainly be one that -- vehicle values can
18 -- can change, but I cannot go in and just change an
19 adjusted value.
20     Q    Okay.  And then you mentioned a projected
21 sold adjustment.  What is that?
22     A    Yeah.  So the projected sold adjustment is a
23 decrease from the list price, as when a customer would
24 go in to buy a vehicle, they are going to typically
25 negotiate a lower sale price than what it is listed

1  for.
2      Q    Can you eliminate the projected sold
3  adjustment from these calculations, if you want to?
4      A    I know that we can go through and run
5  different reports, as well as do some negotiating with
6  a customer, but to just remove the projected sold
7  adjustment, I do not believe that I can just remove
8  it.  Typically, if we get to that point, we would try
9  to find another way to get a agreement on a value.
10     Q    So you don't have an option to not use the
11 PSA, right?
12     A    To just go in and remove it from the report?
13 No.  I do not have that ability, as I don't have
14 control over the reports.  They're supplied by a third
15 party.
16     Q    But you said there were other ways to change
17 the number -- the price of a vehicle, right, or the
18 total loss number?
19     A    Uh-hm.  Yes.
20     Q    And you said -- well, you talked about in
21 general that you, you know, can negotiate with
22 customers about the value of a vehicle?
23     A    It's claim specific and vehicle specific.
24 There's not a set number or a set in -- you know,
25 particular instance where I could tell you this is

exactly what we settle on. It all depends on the claim and the situations behind it.

Q   Sure. But you do negotiate with customers?
A   It has happened before.
Q   Have you been trained on what to do when a customer starts trying to negotiate the number with you?
A   If a customer does not agree on a total loss and feels their vehicle's value is worth more, I walk them through the process as to how -- what the total loss dispute process is for -- in the state of Maine. We go down all those options before just doing a straight negotiation.
Q   Okay. But once you've -- once you've gone through -- so what do you mean you go through all -- so, like, if we just start on -- do you -- so is the first step for you to explain the report and how you arrived at the number you arrived at?
A   My first step is to let them know about the value and to explain to them that this is from a third neutral party that uses data that they collect to be able to come up with a accurate value, therefore a trusted resource that we use. So that's what I explain to them first.
Q   Is that often a successful, sort of, first approach?
A   Yes.
Q   And then if that's not successful, what's the next step you're trained to do to, kind of, help?
A   It really is claim specific, but the typical total loss dispute process in the state of Maine is that the owner of the vehicle would send in Internet links to dealer listings of the same year, make, and model within the same distance that Mitchell Total Loss used for a distance away from their ZIP code.

So, for instance, if Mitchell used 75 miles, they would have to send in links to vehicles for sale at dealerships within 75 miles. And if it was 200, it'd be 200. So they would send those in. We would then take those links that they sent to us, send them to Mitchell Total Loss, and see if they can be considered to adjust the value.

Q   Are there other processes you can offer to customers if they -- there aren't a lot of comparable vehicles or they have another method of evaluating their vehicle that they want to use?
A   We can set up -- in the state of Maine, at least, we can set up one of two things. We can offer them that we can find exact-match vehicles, so there would be no adjustments for any different options. So everything on there would be the exact same build, mileage -- obviously, you can't get exact match. That's nearly impossible. But they would be exact-match options.

And we also offer dealer quotes. So, basically, we would send this to Mitchell Total Loss requesting dealer quotes. They then call dealerships and ask what they would list the vehicle for in this current condition with these options. And then they would base the value off of that.

Q   So in each instance, sort of, Mitchell is providing the report that you're using to discuss the value of the vehicle with the customer?
A   Mitchell does supply the comparable vehicles and the reports for us, but it is all based off of information that we would have to supply to them, as -- if the information that's supplied to them is not accurate, it's not going to be an accurate report or value.
Q   And how often does that happen, that a customer submits their own comparable vehicles to try to negotiate the total loss value of their vehicle?
A   I wouldn't be able to give an exact answer as to how often?
Q   Does it happen many times a month, do you think, with you?
A   Depends. Sometimes I have people submit some, sometimes I don't. It's an exact number or often. I wouldn't be able to answer that. It just -- it has happened in the past.
Q   But you don't know how many times?
A   No. I would not be able to give you a amount of times that people have submitted comparable vehicles to me.
Q   You also mentioned running different reports. What did you mean by another way to get at a different vehicle evaluation would be to run different reports?
A   That's the -- the dealer quotes and the exact match -
Q   Okay.
A   -- which I mentioned. Yeah.
Q   Do you have any training on what to say when customers question the projected sold adjustment?
A   I explain to them based -- that it is based off of how when you go to a dealership, you're typically going to negotiate the vehicle's value -- the vehicle's sale price lower than what it is listed for, and if they still have questions about it, I also direct them to the final page of the report -- that

would be able to explain things further -- which reports I also supply for them every time that I am doing a total loss. I email it over to them.
Q   What do you do if someone says, "I've never negotiated the price of the vehicle when I bought one before"?
A   I explain to them that it is based off of research that -- and data that's been collected by a neutral third party, Mitchell, and that if they still feel that their vehicle's value is too low because of, you know, either projected sold amount or just anything else, that's when I would direct them through the total loss dispute process.
Q   What kind of car do you have?
A   I have a Buick Envision.
Q   Do you buy new or used?
A   I bought it used.
Q   Did you -- where did you buy it from?
A   I bought it from -- I believe it was Key in Somersworth.
Q   Did you negotiate the price when you bought it?
A   That was a few years ago. I don't remember the exact situation behind buying it. I just -- the only thing I can remember is that I went and got it on

Christmas Eve. That's all I remember.
MR. STEED: Why don't we take a 5-, 10-minute break and then we'll come back?
MS. WHITE: Sounds good.
THE REPORTER: All right. We are going off the record. The time is currently 3:06 p.m., Eastern Time.
(Off the record.)
THE REPORTER: Okay. We are back on the record. The time is currently 3:13 p.m., Eastern Time.
BY MR. STEED:
Q   Are you honest when you communicate with customers?
A   Yes.
Q   And so we were talking earlier about when people asked if you had training on what to do, and people, you know, suggested that the number was too low on their total loss evaluation, right? And what did you say?
A   My exact answer? I -- I don't know if -- if it's read back to me, you could probably -- I don't remember the exact answer.
Q   Sure. Yeah, I'm not trying -- I'm not trying to catch you up on anything there. I'm sorry.

It's more like -- so you're -- but when people take issue with the number, you tell them that it's based on objective information, right, provided by a third party?
A   I --
MS. WHITE: Objection. Misstates his testimony.
THE WITNESS: Yeah. I explain to them that it's based off of information that is supplied to us by a trusted third party that does supply the information for us.
BY MR. STEED:
Q   And what do you tell people if they -- well, let's strike that. Actually, I have some other questions.
So do you have access to old claim files through your computer software?
A   I can go into past claims, to a certain extent, yes.
Q   What do you mean by "to a certain extent"?
A   I don't know the exact timeframe that I can get into, but, you know, like, I -- I can go back and review past claims if it's within a certain timeframe. And, no, I don't know what that timeframe is.
Q   Have you ever tried to get an old claim and

you couldn't get it because it was too old?
A   I don't ever go back and look at past claims unless there's a specific reason for it, which doesn't typically come up.
Q   Oh. When you're communicating with customers after you've given them a settlement value on the vehicle and they take issue with one of the condition adjustments, are you trained on what to say to them at all?
A   Yeah. If they have an issue with the adjustment, I explain to them why there was that adjustment in that particular case, and then I offer to email them over photos. If they still would take issue with the adjustment that was taken, I would then review it with a supervisor to make sure that I was as accurate as I could be on that.
Q   Okay. And has that happened to you before, that you -- you're in a situation where a supervisor is reviewing your assessment based on the photos?
A   Specific example? I don't know. But in the past, out of the vehicles I've written, I am -- I'm sure it has happened. But could I tell you the exact time or how many times? No, I wouldn't be able to do that.
Q   But it has happened?

1   A   I'm -- I'm sure it has. I can't say for a
2   hundred percent certain that it has, but that is the
3   process that I would follow if that is the case. I
4   have emailed people photos in the past if they've
5   questioned on conditioning.
6   Q   Okay. And then do you remember any
7   instances where your supervisor changed the condition
8   adjustment after a customer complained and you sent
9   them both the photos?
10  A   Specific claim or vehicle? No, I would not
11  be able to recall that.
12  Q   What I'm saying: Do you remember a time
13  when that's ever happened?
14  A   Once again, I'm sure it possibly has
15  happened. I mean, no one is perfect. There is the
16  possibility that it's happened, but to be able to say
17  yes or no, that I cannot a hundred percent answer if
18  it has or has not happened. It may have.
19  Q   But you don't remember a specific instance
20  where it happened?
21  A   Not a specific --
22      MS. WHITE: Objection. Asked and answered.
23      THE WITNESS: -- incident.
24      THE REPORTER: I'm sorry. Could Mr. Green
25  repeat his answer? I couldn't understand what was

1   being said.
2       THE WITNESS: My last answer?
3       THE REPORTER: Yes, sir.
4       THE WITNESS: I said a -- I believe I said a
5   specific -- I would not be able to recall a specific
6   example or something along those lines.
7       THE REPORTER: Thank you.
8       THE WITNESS: Welcome.
9   BY MR. STEED:
10  Q   You said you were working as a -- was it an
11  MMR for the last three years, you said?
12  A   Yeah, an MRR for the past three years. Yes.
13  Q   During that time, have there been any
14  changes to how the Mitchell Total Loss tool works, as
15  far as you remember?
16  A   There may have been some updates, specific
17  ones, or how they handle things on their end. I -- I
18  wouldn't be able to tell you. But have they done
19  updates? I'm sure they have.
20  Q   From your point of view, has it changed
21  significantly in any way since you started?
22  A   Significantly? I -- I guess it would depend
23  on what you consider significantly. I mean, is it the
24  same interface, for the most part? Yeah. It looks,
25  looks the same. But you may find something more

1   significant than I would. So has it? I'm sure
2   there's updates. There's always updates, as in
3   everything. But it -- it is the same program that
4   we've been using since I've been around.
5   Q   And from your end, has the process been the
6   same when you use the software?
7   A   There's always updates to the process and
8   to, you know, guidelines, because we have to be in
9   compliance with insurance and, as well as, the state
10  guidelines. But, I mean, overall, the job is fairly
11  similar to from when I started.
12  Q   Okay. And then when using the Mitchell
13  Total Loss software, the first step is to confirm or
14  input the VIN number, right?
15  A   Yes.
16  Q   Has that ever changed?
17  A   As long as I've been around, the VIN has
18  always been the first thing that we look for.
19  Q   Okay. And then do you also give the ZIP
20  code of the loss vehicle as part of the process?
21  A   That would auto generate. We do confirm --
22  look over things to make sure that it is accurate
23  before we're submitting it. But the name, the ZIP
24  code should auto populate to the owner of the vehicle.
25  Q   Okay. And then you put in the mileage. Is

1   that the next step?
2   A   We put in the mileage or an estimated
3   mileage. As each vehicle is different, sometimes we
4   have a mileage, sometimes we don't. It all depends on
5   the situation. But in order to move forward, we would
6   have to either select that there is a mileage and put
7   it in, put in the estimated mileage, or put a mileage
8   unknown.
9   Q   And then the -- then -- and has that been
10  the case the whole time you've been working as an MRR
11  and using the Mitchell Total Loss software?
12  A   I believe so.
13  Q   And then the step of reviewing the equipment
14  on the vehicle, has that always been the process since
15  you've been an MRR using the Mitchell Total Loss
16  software?
17  A   Yes.
18  Q   And then the next step of reviewing the
19  condition of the vehicle based on the guide provided
20  by Progressive, has that always been part of the
21  process of using the Mitchell Total Loss software?
22  A   It's been part of the process as long as
23  I've been around.
24  Q   Okay. And has it changed at any point, that
25  process?

1  A    If it changed before me, I wouldn't be
2  aware, but I know as long as I've been looking at
3  total losses, the -- you would have to confirm the
4  VIN, have a mileage or a estimated mileage or a
5  mileage unknown, confirm options, and condition.
6  Q    Okay.  And then after that, you submit it to
7  Mitchell?
8  A    Correct.
9  Q    And then you get a number back from Mitchell
10 with a number of comparable vehicles, right?
11 A    I would get back two reports.  One has a
12 breakdown of the value in number form, and then the
13 other one would show the comparable vehicles.
14 Q    And on your own, you don't have the ability
15 to change which comparable vehicles are chosen, is
16 that correct?
17 A    I cannot adjust the reports that they send
18 me.
19 Q    Okay.
20 A    If I was to do anything with the reports, I
21 can order new reports, but the physical reports that
22 they are sending me, I cannot make adjustments to
23 them.
24 Q    Then if you have multiple reports, who
25 decides which report to use to make the offer to the

1  customer?  Is that you?
2  A    Well, I would use the newest and most
3  accurate report that is supplied.
4  Q    When you make condition assessments, do you
5  think they accurately reflect the condition of the
6  vehicle, based on the guidelines that you have from
7  Progressive.
8  A    The adjustments that I make to conditioning
9  are going to be as accurate -- are going to be
10 accurate to the guide -- my interpretation of the
11 guide based off the training that I've been given.
12      MR. STEED:  I don't have any other
13 questions.
14      MS. WHITE:  I don't have any questions.
15      THE REPORTER:  All right.  Are we getting a
16 read and sign for Mr. Green?
17      MS. WHITE:  Yes.
18      THE REPORTER:  Okay.  And, Mr. Steed and Ms.
19 White, did you all want to order?
20      MS. WHITE:  I believe our paralegal emailed
21 you our order.
22      THE REPORTER:  Okay.
23      MR. STEED:  And I think we'll have a
24 condensed, but someone might be in touch.  It's
25 actually someone else's office that's going to handle

1  it.
2       THE REPORTER:  Okay.  So you're not ordering
3  as of right now and someone else will --
4       MR. STEED:  No.  I'll order it condensed and
5  then if someone wants to change it, they can.
6       THE REPORTER:  Okay.  Perfect.
7       All right.  We are going off the record, and
8  the time is currently 3:27 p.m., Eastern Time.
9
10      (Signature Reserved.)
11      (Whereupon, at 3:27 p.m., Eastern Time, the
12 proceeding was concluded.)

1             CERTIFICATE OF NOTARY PUBLIC
2       I, ALYSSA TURNER, A Remote Online Notary of
3  the State of TEXAS, duly authorized to administer
4  oaths, do hereby certify:
5       That I am a disinterested person herein;
6  that the witness,  JUSTIN GREEN, named in the
7  foregoing deposition, was by me duly sworn to testify
8  the truth, the whole truth, and nothing but the truth;
9  that the deposition was reported by me, ALYSSA TURNER,
10 and is a true and correct record of the testimony so
11 given.
12      IN WITNESS WHEREOF, I hereby certify this
13 transcript at my office in the County of Hunt, State
14 of Texas, this 2nd day of October, 2024.
15                              *Alyssa Turner*
16
17                              ALYSSA TURNER
18              Remote Online Notary Public in and for the
19                              State of Texas

```
 1              CERTIFICATE OF TRANSCRIBER
 2            I, KIMBERLY JONES, do hereby certify that
 3   this transcript was prepared from the digital audio
 4   recording of the foregoing proceeding, that said
 5   transcript is a true and accurate record of the
 6   proceedings to the best of my knowledge, skills, and
 7   ability; that I am neither counsel for, related to,
 8   nor employed by any of the parties to the action in
 9   which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise interested in the outcome of this action.
13
14                                  *Kim Jones*
15                                       KIMBERLY JONES
16                          CERTIFIED ELECTRONIC TRANSCRIBER
17                                       AAERT CET #1411
```

```
 1   Errata Sheet
 2
 3   NAME OF CASE: MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
 4   DATE OF DEPOSITION: 10/02/2024
 5   NAME OF WITNESS: Justin Green
 6   Reason Codes:
 7      1. To clarify the record.
 8      2. To conform to the facts.
 9      3. To correct transcription errors.
10   Page _____ Line _____ Reason _____
11   From _____ to _____
12   Page _____ Line _____ Reason _____
13   From _____ to _____
14   Page _____ Line _____ Reason _____
15   From _____ to _____
16   Page _____ Line _____ Reason _____
17   From _____ to _____
18   Page _____ Line _____ Reason _____
19   From _____ to _____
20   Page _____ Line _____ Reason _____
21   From _____ to _____
22   Page _____ Line _____ Reason _____
23   From _____ to _____
25                              _____
```