MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MAINE

 3   _____

 4   MATTHEW THURSTON,

 5   individually and on behalf of

 6   others similarly situated,

 7          Plaintiff,

 8      v.                           Docket No.

 9   PROGRESSIVE CASUALTY             1:22-cv-00375-NT

10   INSURANCE COMPANY and

11   UNITED FINANCIAL CASUALTY

12   COMPANY,

13          Defendants.

14   _____

15          AUDIOVISUAL DEPOSITION OF KYLE MAYER

16   DATE:        Wednesday January 24, 2024

17   TIME:        11:11 a.m. EST

18   LOCATION:    Zoom

19   REPORTED BY: Jennifer Damiani, Remote Notary Public

20   JOB No.:     13127

21

22

23

24

25
```

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                               Pages 2..5

```
 1          A P P E A R A N C E S
 2  ON BEHALF OF PLAINTIFF:
 3      RONALD IRA FREDRICK, ESQUIRE
 4      Fredrick & Berler, LLC
 5      767 East 185th Street
 6      Cleveland, Ohio 44119
 7      ronf@clevelandconsumerlaw.com
 8      (216) 502-1055
 9
10  ON BEHALF OF PLAINTIFF:
11      SCOTT C. BORISON, ESQUIRE
12      Borison Law Firm, LLC
13      1400 South Charles Street
14      Baltimore, Maryland 21202
15      scott@borisonfirm.com
16      (301) 620-1016
17
18  ON BEHALF OF DEFENDANTS:
19      ALLISON HILL WHITE, ESQUIRE
20      King & Spalding, LLP
21      1180 Peachtree Street Northeast, Suite 1600
22      Atlanta, Georgia 30309
23      awhite@kslaw.com
24      (404) 572-5600
25
```

```
 1              I N D E X
 2  EXAMINATION:                              PAGE
 3      By Mr. Frederick                        5
 4      By Ms. White                           80
 5      By Mr. Frederick                       83
 6      By Ms. White                           90
 7
 8          E X H I B I T S
 9          (None marked.)
10
```

```
 1          P R O C E E D I N G
 2          THE REPORTER:  Good morning.  My name is
 3  Jennifer Damiani.  I'm the officer of this deposition
 4  representing DepoDirect, Inc. 251 Little Falls Drive,
 5  Wilmington, Delaware.  And we are now on the record.
 6  Today's date is Wednesday, January 24, 2024, and the
 7  time is 11:11 a.m.
 8          This deposition is taking place remotely in
 9  the matter of Matthew Thurston, individually, and on
10  behalf of others, similarly situated versus
11  Progressive Casualty Insurance Company and United
12  Financial Casualty Company.  The case number is 1:22-
13  cv-00375-NT and this is the audiovisual recorded
14  deposition of Kyle Mayer taken on behalf of the
15  plaintiff, in the United States District Court for the
16  District of Maine.
17          Absent any objections, all parties agree
18  that we may place this witness under oath and record
19  this proceed remotely via audiovisual method.  At this
20  time, will all counsel appearing remotely please
21  identify yourself starting with the noticing attorney.
22          MR. FREDERICK:  Ronald Frederick for Mr.
23  Thurston, Fredrick & Berler, LLC, Cleveland, Ohio.
24          MR. BORISON:  Scott Borison on behalf of the
25  plaintiff as well.
```

```
 1          MS. WHITE:  Allison White with King &
 2  Spalding, for the defendants.
 3          THE REPORTER:  Thank you.
 4  WHEREUPON,
 5                  KYLE MAYER,
 6  called as a witness, and having been first duly sworn
 7  to tell the truth, the whole truth and nothing but the
 8  truth, was examined and testified as follows:
 9          THE REPORTER:  Thank you.  You may lower
10  your hand and Counsel, you may proceed.
11          MR. FREDERICK:  Yes.
12                  EXAMINATION
13  BY MR. FREDERICK:
14      Q    Mr. Mayer, my name is Ron Frederick and I
15  along with Scott Borison and John Steed, who is
16  picking his mom up from a procedure this morning
17  represent Mr. Thurston in this matter.  First, I just
18  want to go over some preliminaries.  Have you ever had
19  your deposition taken before?
20      A    I have not.
21      Q    Okay.  So let me take some time and go over
22  the ground rules, okay?
23      A    All right.
24      Q    First of all, I'll be asking a series of
25  questions and I would expect that your responses would
```

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                                      Pages 6..9

1  be verbal.  That sounds sort of funny, but it's very
2  hard for a court reporter to type uh-uhs and uh-huhs
3  and also to figure out what shoulder shrugs or head
4  nods, symbols are because but that's typically how we
5  communicate with each other, right?
6      A    I understand.
7      Q    So try to answer verbally.
8      A    I understand.
9      Q    If you do make that mistake, I'll try to
10  correct you and chances are you will, because almost
11  everybody does.  And we'll go from there.  If I ask a
12  question and you answer it, I can assume -- I'm going
13  to assume that you understood the question, how I
14  asked it.  Okay?
15      A    All right.
16      Q    If you don't understand the question or you
17  want me to rephrase it or repeat it, let me know and I
18  will do that.  Okay?
19      A    I will.
20      Q    Good.  Because I want to make sure that you
21  understand everything that I'm saying and asking.
22      A    All right.
23      Q    Good.  This is not an endurance contest, so
24  if you need a break just let me know and we'll take a
25  break.  The only caveat is that if I've asked a

1  question I want you to finish answering the question
2  first before we take a break.  Okay?
3      A    I understand.
4      Q    Good.  From time to time, your lawyer might
5  object, go ahead, and answer the question anyway,
6  unless Ms. White tells you otherwise.  Most likely
7  it'd be about privilege.  Okay?
8      A    I understand.
9      Q    Good.  First of all, are you on any
10  medications today that would inhibit your ability to
11  recall anything?
12      A    I'm not.
13      Q    Good.  Okay.  So first of all, let's just go
14  through your full name, please.
15      A    Kyle Joseph Mayer.
16      Q    And where were you born?
17      A    Hartford, Connecticut.
18      Q    And when were you born?
19      A    September 7, 1988.
20      Q    Have you lived in Hartford your whole life?
21      A    I have not.
22      Q    Okay.  So you just wound up back in the same
23  place?
24      A    Correct.
25      Q    Okay.  So where do you reside right now?

1      A    Hartford, Connecticut.
2      Q    No, the street address.
3      A    The street address?
4      Q    Yes, please.
5      A    147 Gilman Street, Hartford, Connecticut,
6  06114.
7      Q    Is Gilman with one L or two Ls?
8      A    One L.
9      Q    And how long have you lived there?
10      A    Almost two years.
11      Q    Do you own the home?
12      A    I do.
13      Q    And who do you live there with?
14      A    My wife and two children and one cat.
15      Q    I think we're all pet lovers here, so I
16  appreciate that you included the cat.
17      A    If there are any ghosts in the attic, I'm
18  not aware.
19      Q    And the cat would've gotten them anyway,
20  right?
21      A    Quite possibly, yeah.  They don't bother us
22  if there are any ghosts in the attic, but I assure you
23  there's no skeletons in any closets.
24      Q    Thank you.  Okay.  Where did you go to high
25  school?

1      A    I went to high school in West Hartford,
2  Connecticut at a high school called Conard, Conard
3  High School.
4      Q    C-O-N-A-R-D?
5      A    Correct.
6      Q    And when did you graduate?
7      A    2006.
8      Q    Did you go on to college?
9      A    I did.
10      Q    Where did you go?
11      A    Wheaton College.
12      Q    And where is that?
13      A    Wheaton, Illinois.
14      Q    Did you graduate?
15      A    I did.
16      Q    And what was your degree in?
17      A    Biology.
18      Q    Did you go to grad school?
19      A    I did not.
20      Q    Okay.  So claims adjuster is a far cry from
21  a biologist.  So can you tell me what, you know, what
22  you went on to do after college?
23      A    Well, I graduated in 2010.  It's now 2024.
24  So in the last 14 years or so since I've graduated
25  high school, I've held a number of different jobs in a

1  variety of industries.
2      Q    Okay.  Well let's start after graduated from
3  college.
4      A    Right after college, I did hold multiple
5  roles at the same time.  I was a school teacher and a
6  sports coach.
7      Q    What sport?
8      A    Lacrosse and wrestling.
9      Q    Men's lacrosse or women's lacrosse, because
10 they're very different?
11     A    Well, it was high school level, so boys
12 lacrosse and boys wrestling.
13     Q    Okay.  Did you play lacrosse?
14     A    At what time period?
15     Q    Just ever.  Like were you a lacrosse player?
16     A    Yes.  I played lacrosse in high school and I
17 did wrestling in high school as well.
18     Q    I was a lacrosse goal in college, one of my
19 more stupid endeavors.
20     A    Okay.
21     Q    Because it's very painful.
22     A    I understand.  I was a goalkeeper as well.
23     Q    Oh, were you?  Okay.
24     A    I was.
25     Q    And I'm a bit older than you, so when I did,

1  like, we had virtually no padding whatsoever.  Still
2  not a lot.
3      A    That's true.
4      Q    Unlike my son who's a hockey goalie.  Okay.
5  So how long did you teach school?
6      A    Directly after college, I taught school for
7  three years.
8      Q    And where was that?
9      A    The school, it was private school in
10 Illinois called Covenant Classical School.
11     Q    And where did you go after that job?
12     A    After that job I spent three years as a
13 municipal code enforcement officer for the Village of
14 Streamwood, Illinois.
15     Q    Municipal code officer, can you explain that
16 to me, please?  I've never heard about it.
17     A    Sure.  Well, some people colloquially call
18 it, they say I'm a -- I was a lawn cop.  I would tell
19 people to cut their grass if it got too long.  So most
20 of the time, thankfully that wasn't the case.  But for
21 example, if somebody was keeping a, you know, beat up
22 old car, a junk car on their front lawn, you know, I
23 would kindly ask them to remove it and work with them
24 to come into compliance with the municipal ordinances
25 of the village.

1      Q    So mostly about housing and upkeep and
2  things of that nature?
3      A    That is correct.
4      Q    Got it.  Okay.  And you did that for how
5  long?
6      A    Three years.
7      Q    And what did you do after that?
8      A    After that I moved to -- well, I was in
9  Illinois and I moved back to Connecticut and I was a
10 school teacher here in Hartford for one year.
11     Q    And teaching what subjects?
12     A    Science for sixth grade, seventh grade and
13 eighth grade.
14     Q    Yeah, for one year.  And that brings us to,
15 what year is that?
16     A    2018.
17     Q    Okay.  And after you left the Hartford
18 teaching, what did you do then?
19     A    I was a property manager for three years
20 prior to coming to Progressive.
21     Q    Residential or commercial property?
22     A    Residential.
23     Q    And after the property management then you
24 came to Progressive?
25     A    That is correct.

1      Q    Do you remember when that was?
2      A    My first date of work with Progressive was,
3  to the best of my knowledge, August 9, 2021.
4      Q    And where was your -- what office or area
5  did you work out of?
6      A    At the time and as of today I work out of
7  the Newington, Connecticut Claims Field Office for
8  Progressive.
9      Q    Newington?
10     A    Correct.
11     Q    Now, do you often work out of your home?
12     A    I do.
13     Q    Okay.  And let's talk about your training.
14 What kind of training did you receive to be a -- well,
15 what exactly is your title?
16     A    Claims adjuster.
17     Q    So what kind of training did you receive to
18 be a claims adjuster?
19     A    So there initially was a semi self-paced
20 course to take to become licensed as a claims adjuster
21 in the State of Connecticut.  After becoming licensed,
22 there was about one, I would say probably two or
23 three, weeks of initial training that had more to do
24 with communicating to a customer and practicing how we
25 communicate with customers on a daily basis, doing

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024

Pages 14..17

1  mock phone calls and things of that nature.
2         That was followed by about a month of area
3  specific training, which is called onboarding in which
4  we are in smaller teams with a -- with a supervisor
5  and we're handling claims at that time under their
6  guidance for approximately one month.
7     Q    Where did this training take place?
8     A    It was virtual training.
9     Q    All of it was virtual?
10    A    Correct.
11    Q    Okay.  They used to bring people into
12 Cleveland for that.  But you missed out.  So let's
13 talk about that two-week training.  What kinds of
14 things did you role play?
15    A    We role played the basic procedures of
16 acquiring information from the person that we were
17 mock calling, if you will.  Initially started with
18 more of a logistical topic such as, "Can you confirm
19 your address and date of birth?"  Obviously in claims
20 adjusting there are certain personal information or
21 bits of personal information like date of birth that
22 we just need to get used to discussing with our
23 customers, and this is over the phone.
24        So obviously part of the goal is to learn
25 how to build rapport with anyone we're speaking with

1  over the phone.  And so we were -- that is essentially
2  what we were practicing.
3     Q    Now when you say rapport, so you have to
4  build rapport with people so that they can trust you
5  and Progressive?
6     A    That's correct.
7     Q    Okay.  What other things would you role play
8  in that first couple of weeks?
9     A    We might role play answering certain
10 questions from a pretend customer, if you will, I
11 suppose a -- yeah, somebody playing the role of
12 customer.
13    Q    Okay.  Give me an example of things,
14 specific scenarios that you would role play.
15    A    So I might call somebody and perhaps they,
16 you know, they were just in a motor vehicle accident,
17 which can be quite an emotional thing.  You know, and
18 so part of my role is just to assure folks that I'm
19 there to help them.  I would say like a specific.  So,
20 I mean obviously it's been at least, you know, two and
21 a half years or so since this training, so I'm having
22 a little bit of a difficulty thinking of some specific
23 examples.
24        But I think in part of it is informing
25 people of procedures of a claim because a lot of times

1  a car accident is a bit of a chaotic situation.  And
2  so part of my role is just to kind of help put their
3  mind at ease by informing them of the procedures that
4  are going to occur in order to bring their claim to
5  resolution.
6     Q    Got it.  And then you also then broke out
7  and did area specific things in smaller teams.  Can
8  you explain that to me?
9     A    Sure.  So we would handle -- so in those two
10 weeks when we were doing role play training, it is
11 just that it's role play.  We're not handling real
12 claims, if you will.  I'm not sure, I mean, artificial
13 versus real claims.  So there are once we move into
14 the next phase, then we are handling claims and
15 employing what we've learned into day-to-day
16 responsibilities as a claims adjuster.
17    Q    And there would be a supervisor there who is
18 training and listening, and then you would talk about
19 the claim and how it was dealt with.  Is that how that
20 works?
21    A    That's correct.
22    Q    Sort of reviewing it, coaching to get the
23 Progressive way?
24    A    That's correct.
25    Q    Okay.  And was part of that training how to

1  handle either in the initial two weeks of the role
2  playing calls or later on in the smaller groups how to
3  deal with total loss claims?
4     A    Yes.
5     Q    Okay.  And what were you taught in -- first
6  of all, what part of it dealt with total loss claims,
7  either one or both?
8     A    I'm not sure what you mean by what part.
9  What part of what?
10    Q    Well, so the two-week training was all role
11 playing, correct?
12    A    That's correct.
13    Q    And then the secondary portion in the
14 smaller groups was a month.  So which portion of the
15 segment, either the two-week role playing phase or the
16 small group phase, did you deal with total loss
17 claims?
18    A    The small group phase.
19    Q    Okay.  So that wasn't dealt with initially
20 in the initial two-week onboarding process?
21    A    In the initial two-week onboarding process,
22 we're not handling actual claims, they are role play
23 claims.
24    Q    Right.  But during the first two weeks, did
25 you role play total loss claims?

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                  Pages 18..21

1    A    It's possible, but I cannot recall
2  specifically.
3      Q    Okay.  Fair enough.  So in the one month
4  small group portion, can you tell me what you were
5  taught about how you handle total loss claims?
6      A    Well, as I mentioned before, a lot of what
7  we do is just informing customers about how the
8  procedures go, how we handle total loss claims.  The
9  standard is that if a vehicle is a total loss, we
10 advise the customer based on the damages, the vehicle
11 is most likely a total loss.
12         And so the way that we handle total loss
13 claims is we pick up the vehicle from the tow yard, we
14 bring it to our facility for inspection, where the car
15 is evaluated by an appraiser.  The appraiser will
16 attempt to reach out to them to inform them of the
17 evaluation result.  If the appraiser is not successful
18 in reaching the customer, they will let me know and
19 then I will reach out to the customer.
20         More likely than not, there's paperwork that
21 needs to be filled out by the customer.  And there's
22 two different kind of types of paperwork depending on
23 if the vehicle has a lien on it or not by a lien
24 holder.  And so generally speaking, sometimes in the
25 same phone call, I would set up a method or a way for

1  the customer to fill out the necessary paperwork to
2  process their total loss claim.
3      Q    Got it.  Okay.  At the time of Mr.
4  Thurston's accident, which I believe was on January
5  21, 2022, you'd been with Progressive for about five
6  months?
7      A    I would say.  So approximately.
8      Q    Four or five.  How long had you been
9  handling total loss claims at that point?
10     A    Well, since we had our initial, that one
11 month onboarding phase that I was describing just a
12 moment ago, that's pretty much when it -- when it
13 started and then.  So I would say for at least three
14 months handling total loss claims.
15     Q    Okay.  This may sound like a silly question,
16 so forgive me.  Are there a lot of total loss claims?
17     A    Are there a lot?
18     Q    Yeah.
19     A    What are we comparing this to?
20     Q    Like I said, it might be a silly question,
21 so.
22     A    Are there a lot?  I would say total loss
23 claims are common.
24     Q    More common in Maine in the winter or
25 summer?  I know they're more people in the summer,

1  but.
2      A    I wouldn't necessarily say it's specific to
3  Maine or any other location, but I can say total loss
4  claims happen everywhere all the time.  It's common.
5      Q    Got it.  So when you talk to somebody about
6  valuation -- well, let me do something else first.
7  Does Progressive want their customers or policy
8  holders to be able to rely on what Progressive or you
9  say to them?
10     A    Can you rephrase the question please?
11     Q    Sure.  When you communicate with a policy
12 holder or you actually may wind up -- well, we'll just
13 leave it at policy holders.  Does Progressive want the
14 policy holders to be able to rely on what Progressive
15 tells them?
16     A    I would say yes.
17     Q    Does Progressive try to make its customers
18 feel confident about Progressive's policies and
19 procedures?
20     A    Yes.
21         MS. WHITE:  Objection; form.
22 BY MR. FREDERICK:
23     Q    Okay.  Does Progressive have data comparing
24 NADA values to the Mitchell WorkCenter total loss
25 program for the same vehicles?

1      A    I'm not sure.  Would you mind repeating or
2  rephrasing the question?
3      Q    Sure.  Does Progressive have data comparing
4  NADA values to the Mitchell WorkCenter total loss
5  program for the same vehicles?
6      A    I'm not sure.
7      Q    You're not sure if it does?
8      A    I will clarify.  I do not know.
9      Q    Okay.  Are you aware that vehicles in
10 Louisiana are required to use NADA valuations?
11     A    I have -- I don't know.  As an -- as a
12 claims adjuster, mostly handling claims that occur
13 within New England, I do not have familiarity with
14 Louisiana.
15     Q    So as you may recall, this vehicle was
16 valued based as if it was located in Louisiana.  Are
17 you familiar with that fact?
18     A    I am familiar with it.
19     Q    Is this the only vehicle that you've handled
20 where you had to get evaluation out of Louisiana?
21     A    To the best of my knowledge, yes.
22     Q    Okay.  So what do you recall -- oh, before I
23 go any farther.  Prior to this deposition, did you
24 meet with or talk with your lawyer?
25     A    I did.

1    Q    When was that?
2    A    I've spoken with my lawyer several times.
3    Q    Do you recall the dates?  And if you don't,
4  that's okay.
5    A    I don't recall off the top of my head.  I
6  wouldn't, yeah.
7    Q    Do you recall the most recent time you spoke
8  to someone -- one of the lawyers on the case?
9    A    I spoke briefly with the lawyer before the
10  deposition began.
11    Q    Meaning Ms. White?
12    A    That is correct.
13    Q    Okay.  Do you know how long you spent
14  preparing for the deposition with your lawyers?
15    A    Approximately one hour.
16    Q    Okay.  And did you review any documents in
17  preparation for the deposition?
18    A    I would -- yes, I would say yes.
19    Q    What documents did you review?
20    A    We reviewed a document that presented the
21  results of a search for insurance coverage of Mr.
22  Thurston's vehicle.
23    Q    Okay.  Anything else?
24    A    We reviewed the -- well, I would say
25  briefly, I think, briefly reviewed the evaluation of

1  Mr. Thurston's vehicle.
2    Q    Anything else?
3    A    Not that I can recall.
4    Q    Did you look at anything from the claim file
5  on your own?
6    A    I did not.
7    Q    Okay.  So there was an issue about coverage
8  or at some point I saw in the notes that there was
9  some question about coverage to a vehicle, correct?
10  Recall that?
11    A    That is correct.  I do recall that.
12    Q    Do you recall resolving that issue?
13    A    I believe we did resolve it.  Otherwise, we
14  would not have moved forward with an evaluation of the
15  vehicle in all likelihood.
16    Q    Okay.  So you're not disputing that the
17  vehicle was covered?
18        MS. WHITE:  Object to form.
19        MR. FREDERICK:  Go ahead and answer.
20        THE WITNESS:  Can you repeat the question
21  again, please?
22  BY MR. FREDERICK:
23    Q    Sure.  To the best of your knowledge,
24  Progressive is not disputing that this vehicle was
25  covered under Mr. Thurston's policy.

1        MS. WHITE:  Object to form.  Calls for a
2  legal conclusion.
3        THE WITNESS:  I can tell you that we did
4  move forward with coverage under Mr. Thurston's
5  policy.
6  BY MR. FREDERICK:
7    Q    And that would've been under the portion of
8  the policy relating to additional automobiles or
9  additional auto?
10    A    I would have to review the policy language
11  in order to answer that question.
12        MR. FREDERICK:  Okay.  Well, can we publish
13  Exhibit 2, please?
14        THE REPORTER:  One moment.  It's not
15  loading.
16        THE WITNESS:  Can you help me understand
17  what you mean when you say publish?  Does that mean I
18  need to --
19        MR. FREDERICK:  You can click on Exhibit 2.
20        THE WITNESS:  Okay.
21        MR. FREDERICK:  That's for the court
22  reporter to be able to --
23        THE WITNESS:  Okay.
24        MR. FREDERICK:  -- show.
25        THE WITNESS:  I see.

1        MR. FREDERICK:  She will share the screen.
2        THE REPORTER:  It's not loading.
3        THE WITNESS:  Okay.
4        MR. FREDERICK:  It's not loading?
5        THE REPORTER:  No, it's not letting me pull
6  it up.  Let me see --
7        THE WITNESS:  I do have Exhibit 2.
8        MR. FREDERICK:  Okay.
9        THE WITNESS:  Like open within the Dropbox
10  platform.
11        MR. FREDERICK:  Good.  So Allison, are you
12  fine with that, as long as he can see the exhibit?
13  Why, I mean --
14        MS. WHITE:  Were we going to -- were you
15  going to put it on the screen?
16        THE WITNESS:  I'm trying to get it.
17        MR. FREDERICK:  Well, let me see what I can
18  do here.  One second.  I might be able to do that in
19  mine.
20        THE REPORTER:  Okay.  I got it.  Exhibit 2,
21  correct?
22        MR. FREDERICK:  Yes.
23        THE REPORTER:  All right.
24        MR. FREDERICK:  And let's go to page 15.
25  And you might want to zoom in on that.  That's good.

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                    Pages 26..29

BY MR. FREDERICK:
2    Q    So if you see at the very bottom of the page
3  it says PGR_Thurston_ and then there are five leading
4  zeroes and then 15.  Do you see that Mr. Mayer?
5    A    I do see it.
6    Q    Okay.  And then you see where it says
7  general definitions?
8    A    I do see that, yes.
9    Q    Okay.  And below that, the first item says
10 additional auto.
11   A    Uh-huh.
12   Q    Would you like to read that particular
13 paragraph and tell me if that's where Mr. Thurston's
14 vehicle obtained coverage?
15   A    Sure.
16        MS. WHITE:  Object to form.  Calls for legal
17 conclusion.
18        THE WITNESS:  Should I answer the question?
19        MR. FREDERICK:  Yes.
20        THE WITNESS:  Okay.  Would you mind
21 repeating it?
22 BY MR. FREDERICK:
23   Q    Sure.
24   A    You want me to read the paragraph and then -
25 - so after you want me to read the paragraph, can you

1  repeat the question if there is one that you wanted me
2  to answer?
3    Q    Yeah, I'm trying to figure out what the
4  question was again, but I'll clarify.  Based upon --
5  okay, scratch that.
6        After reading numbered Paragraph 1, under
7  general definitions of the Maine policy, Maine is for
8  the State of Maine.
9    A    Right.
10   A    Is this paragraph where Progressive would
11 have made a determination that Mr. Thurston's vehicle
12 was covered under his existing policy?
13        MS. WHITE:  Object to form.  Calls for legal
14 conclusion.
15        THE WITNESS:  I would --
16        MR. FREDERICK:  Scott, you should mute for a
17 moment.  I think his grandchild just came in the room.
18        THE WITNESS:  I would say -- I would say a
19 review of this particular clause would be considered
20 in deciding whether or not coverage would be afforded
21 to Mr. Thurston under this claim.
22 BY MR. FREDERICK:
23   Q    Got it.  And just to be clear, as you said
24 earlier, coverage was provided for Mr. Thurston's
25 claim, correct?

1    A    That's correct.
2    Q    And would it have been your job to determine
3  whether there was coverage for that claim?
4    A    It would've been an aspect of my job, but
5  I'm not necessarily the sole decision maker in whether
6  or not to afford coverage to any particular insured.
7    Q    And at that point you were relatively new,
8  correct?
9    A    I wouldn't say I was relatively new.
10   Q    Well, you've been doing claims for four or
11 five months?
12   A    As a licensed adjuster in the State of
13 Connecticut, my understanding of any given policy is
14 the same pretty much at any time.
15   Q    Got it.  Were you consulted with -- did you
16 consult with other people to make a policy coverage
17 determination?
18   A    On this claim?
19   Q    Yes.
20   A    Yes, I did consult with others.
21   Q    And what was the conclusion that you and
22 others came up with?
23   A    The conclusion we came up with is that we
24 would afford coverage to the insured.
25   Q    And you have not been disciplined at all for

1  your policy coverage determination in this claim, have
2  you?
3        MS. WHITE:  Objection.
4        THE WITNESS:  That's correct.
5        MS. WHITE:  Facts not in evidence.
6  BY MR. FREDERICK:
7    Q    Okay.  So it's my understanding that you at
8  some point ran a total loss vehicle evaluation report;
9  is that correct?
10   A    That's not correct.
11   Q    You did not run any report?
12   A    I did not.  I'm sorry, you're referring to a
13 report for the vehicle?
14   Q    Yes.
15   A    The total -- okay.
16   Q    Evaluation report.
17   A    Right.  That's correct.  I never ran any
18 evaluation report.
19        MR. FREDERICK:  So would you publish Exhibit
20 10, please?
21        THE REPORTER:  One moment.  Can everyone see
22 that?
23        THE WITNESS:  Yes.
24        MS. WHITE:  Yes.
25 //

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024

Pages 30..33

BY MR. FREDERICK:

2     Q    Okay.  So I just showed you what's been
3  marked as Plaintiff's Exhibit 10 and the Bates numbers
4  on the bottom, the last three digits are 296.  Do you
5  see that?

6     A    I do see it.

7     Q    And the valuation report is dated February
8  17, 2022.  Do you see that?

9     A    I see it.

10    Q    And it appears to be version 4.  Can you
11 explain that to me please?

12    A    I'm not really sure.  I'm not familiar with
13 how version numbers are generated for these types of
14 reports.

15    Q    Okay.  I'll represent to you, but we're not
16 going to put these through, that there are three other
17 versions that have --

18    A    Okay.

19    Q    -- different numbers.  And I'll also
20 represent to you that at some point, and I believe
21 you'll -- if we go through the notes, you'll see it,
22 there was some question as to exactly what equipment
23 was on the vehicle.  Does that make sense?

24    A    It makes sense, but I do not recall any
25 specific equipment that was discussed at the time.

1     Q    Okay.  Mr. Thurston agrees that the
2  equipment that's on the vehicle or was on the vehicle
3  is consistent with version number 4.

4     MS. WHITE:  Objection.  Assumes facts not in
5  evidence.

6  BY MR. FREDERICK:

7     Q    So we could go through them, but my question
8  relates to, in the claims notes, would the claims
9  notes reflect when a valuation was run?

10    A    I don't know.

11    Q    Well, when you handle a claim, do you put
12 the fact that you run a total loss valuation into the
13 claim notes?

14    MS. WHITE:  Objection to the form.  He's
15 already testified he didn't run this, Ron.

16    MR. FREDERICK:  That's not my question.

17 BY MR. FREDERICK:

18    Q    My question was, do you put that into the
19 notes?

20    A    That -- I feel like that wasn't the full
21 question Mr. Frederick.

22    Q    It isn't the full question.  When you run a
23 vehicle valuation report, do you put the fact that you
24 run a report into the claim file notes?

25    A    I do not run any type of valuation reports,

1  nor have I ever.

2     Q    You don't ever run any valuation reports?

3     A    That's correct.

4     Q    Okay.  So all the claim valuation reports
5  are done before you reach out to the customer if the
6  field claims rep is unable to reach the policy holder?

7     A    That's correct.

8     Q    Okay.  So you have never run a vehicle
9  valuation report?

10    A    That's correct.

11    Q    So when you reach out and speak with
12 somebody -- when you reach out to speak with somebody
13 about the fact that their vehicle is a total loss, how
14 do you talk to them about value?

15    A    It depends on what they would like to know.

16    Q    Well, you start off by calling somebody up,
17 right?

18         We can -- we can de-publish that.  We can
19 pull it down.  Thank you.

20         So you have a phone call, right?

21    A    Uh-huh.

22    Q    And you either call them and leave a message
23 or you call them and they pick up and if you leave a
24 message, they're going to call you back.  Correct?

25    A    Often, that's the case.

1     Q    In my experience with claims reps is you
2  guys are always busy or not always, but almost always
3  busy.  So I almost always have to leave a message and
4  then --

5     A    Sure.

6     Q    -- you'll call people back.  Right?

7     A    Generally, yes.

8     Q    Because you're just not sitting there
9  waiting for my or any other policy holder's phone call
10 with bated breath, right?

11    A    I suppose that's right.

12    Q    I mean, you just got to get through your
13 claims and through your inventory and your work list.
14 Right?

15    A    Generally speaking.

16    Q    Okay.  So tell me how that call goes when
17 you would call me or anyone?

18    A    Sure.  I would say the evaluation of your
19 vehicle is complete.

20    MS. WHITE:  I'm sorry.  I wasn't there for a
21 minute.  Can you repeat that question?  Oh no, it says
22 my Internet connection is unstable.

23    MR. FREDERICK:  Can you repeat that back
24 for a moment?

25    THE WITNESS:  Yes, I can still see and hear

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                  Pages 34..37

1   you.
2           MR. FREDERICK:  Can you hear us?
3           MS. WHITE:  Okay.  You can you repeat the
4   last question?  You froze during the middle of that,
5   so I didn't hear the question and then I just heard
6   Mr. Mayer start answering.
7           MR. FREDERICK:  Sure.
8   BY MR. FREDERICK:
9       Q    So I said, okay, so tell me how that goes
10  when you would call me or anyone else.
11      A    Sure.  I would speak with them.  I would say
12  the inspection and evaluation of your vehicle is
13  complete.  I would present the evaluation figure and
14  then discuss the next steps.
15      Q    Okay.  So let's just imagine that it's just
16  you and I on -- I presume you say the same thing every
17  time or as close to the same thing as every time; is
18  that accurate?
19      A    It depends.  I'm not presenting the same
20  valuation to everybody, so I do present different
21  valuations in different claims.
22      Q    Well, the valuations are just dollars,
23  right?
24      A    Correct.
25      Q    But the process is the same, correct?

1   know, I don't understand how you got to that number.
2       A    What do you think your car is worth?
3       Q    X plus, you don't have a number.
4       A    Okay.
5       Q    Okay.
6       A    Right.  Yeah.  So is there a particular
7   reason why you believe the valuation is, you know,
8   should be X plus as opposed to just X the figure that
9   I've just presented you?
10      Q    Well, you know, based upon what I've been
11  looking at, it seems to me that the cars are selling
12  for more than that, that are the same -- similar to
13  mine.
14      A    Sure.  Tell me a little bit more about that.
15  What cars and have you been looking at and where have
16  you been looking at them?
17      Q    Well, in my neighborhood and same car, I
18  like my car, I love my car, don't love my car now.
19      A    Are you saying that the love for your car is
20  what adds value to it?  Because I'm just -- is there
21  something more specific about the vehicle itself that
22  makes it more valuable than the figure that I've just
23  presented you with?
24      A    No, I love the car because that's why I want
25  one like it, right?

1       A    Generally speaking, if we are referring to
2   the process of communicating with the customer and
3   having an over the phone conversation, yes.
4       Q    Yeah.  So let's just assume that you are --
5   and let's just assume you're having this conversation
6   with me as a insured.  Okay?
7       A    Uh-huh.
8       Q    So phone will ring and I'll pick up.
9       A    Uh-huh.
10      Q    Hello?
11      A    I would say hello, Mr. Frederick.
12      Q    Hi there.
13      A    This is Kyle with -- hi, this is Kyle with
14  Progressive.  How are you today?
15      Q    I think I'm pretty good.
16      A    Yeah.  So I'm calling because the evaluation
17  of your vehicle is complete and I wanted to discuss
18  that as well as advise of the next steps.
19      Q    Okay.
20      A    So the evaluation of your vehicle came to X
21  dollars.
22      Q    That sounds low.
23      A    Okay.  What -- why do you feel like that
24  figure is low?
25      Q    Well, I think my car is worth more and, you

1       A    Uh-huh.
2       Q    You know.
3       A    Right.  So I'm asking if there's --
4       Q    I hated it.
5       A    Right.  So what, I mean, you said you're
6   looking around in your neighborhood, like what have
7   you seen?  Tell me.  Like I'm happy to listen, you
8   know, I'm happy to consider everything.
9       Q    Sure.  So let's just, since we don't have a
10  specific value to talk about, we'll --
11      A    Sure.
12      Q    -- we'll just move on because that --
13      A    Okay.
14      Q    -- that made it difficult.  Right?
15      A    Sure.
16      Q    X plus.
17      A    I mean, I understand it.
18      Q    Sure.
19      A    We can keep going if you'd like.
20      Q    Sure.
21      A    We can move on as well.
22      Q    When you are presenting a value to a
23  customer, do you have your -- you haven't shared the
24  vehicle valuation report, you're just giving them a
25  number, correct?

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024
Pages 38..41

1     A     When I present the figure, I mean as part of
2  the process, I double check to make sure that the
3  customer has a copy of the evaluation report, because
4  they're entitled to review it.
5     Q     Okay.  Now, when you present the evaluation,
6  do you present that information to let the insured
7  know that it's a negotiation?
8     A     Do I let them know that it's a negotiation?
9     Q     Yes.
10    A     It depends.
11    Q     Upon?
12    A     It depends on what the -- what the customer
13 does with the information with which I've presented
14 them.
15    Q     So you didn't just --
16    A     Most of the time -- I'm sorry?
17    Q     I thought you were done, but.
18    A     Oh I mean, it's not unusual for people to
19 say, "Okay.  Great.  What's the next step?"
20    Q     So are you familiar with the PD Suite total
21 loss evaluation, PD Suite work center total loss
22 presenting evaluation portion of the, I mean,
23 specifically, let me -- specifically, we're talking
24 about the highway claims PD, PD Suite work center
25 total loss and a section about presenting evaluation.

1     A     I'm a little confused about what the
2  question is.
3     Q     Are you familiar with that training tool?
4     A     Familiar with the training tool?
5     Q     Yeah.  Let me ask a different question.
6     A     Okay.
7     Q     Were you trained on how to present
8  evaluation?
9     A     Yes.
10    Q     And do you recall being trained in the Work
11 Center Total Loss module that says, "When presenting
12 the value, avoid giving the impression it is a
13 negotiation."
14    A     I'm not familiar with that specific
15 verbiage.
16       MR. FREDERICK:  Okay.  Let's go to Exhibit
17 4.
18       THE REPORTER:  One moment.
19       MR. FREDERICK:  You might want to pull it up
20 on your own, Mr. Mayer.
21       THE WITNESS:  Okay.
22       MR. FREDERICK:  And it may be easier for you
23 to find it than it is for the court reporter.
24       THE WITNESS:  Okay.
25 //

1  BY MR. FREDERICK:
2     Q     Does it open up as a PDF for you?
3     A     Yes, it does.
4     Q     So you might want to just do a quick search
5  and type in 1134.  Do you know how to do a search of a
6  PDF?
7     A     I do.
8     Q     Okay.
9     A     So I'm searching for 1134?
10    Q     Yeah.
11    A     Like just the numbers 1, 1, 3, 4?
12    Q     Yes.  And does that bring up a page for you?
13    A     It does not.  There are zero instances in
14 the -- in Exhibit 4 of the numbers 1, 1, 3, 4.
15    Q     Okay.  So it wasn't sent over to you as a
16 searchable PDF, that would've made it simpler.
17    A     Oh, is it not a searchable PDF?
18    Q     Apparently it's not or else it would've come
19 up.
20    A     I mean, I can try to download it perhaps.
21    Q     Well, you can just look, it's probably --
22       MS. WHITE:  I can't even get it to download
23 or open or anything.
24       MR. FREDERICK:  Did you take the book with
25 you?

1        MS. WHITE:  No.  You didn't give me a book.
2        MR. FREDERICK:  Okay.  Well --
3        THE WITNESS:  I mean, is there a page number
4  we should look at?
5        MR. FREDERICK:  Yeah, it's 1134.  On the
6  bottom there are numbers.
7        THE WITNESS:  Okay.
8        MR. FREDERICK:  And so give you a better
9  idea.
10       THE WITNESS:  I see.
11       MR. FREDERICK:  It's approximately 25 pages
12 from the last page.  Because there are quite a number.
13       THE WITNESS:  Okay.  Yeah.  So we're looking
14 for 1134?
15       MR. FREDERICK:  The last page is 1159.  Yes.
16 So it'd be easier to go, let's say, go to 65 and see
17 what you go to if you can search on the page.
18       THE WITNESS:  No, I'm on the page -- I'm on
19 that page where I see 1134.
20       MR. FREDERICK:  Great.  Okay.  So Ms. White,
21 are you -- were you able to open it?
22       MS. WHITE:  Yes, I've got it pulled up now.
23 Is this an exhibit?
24       MR. FREDERICK:  Yes.
25       MS. WHITE:  Okay.

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                Pages 42..45

| | |
|---|---|
| 1       MR. FREDERICK: It's from Exhibit 4. | 1       THE REPORTER: We are back on the record at |
| 2       MS. WHITE: Okay. | 2   12:33 p.m. Please proceed. |
| 3   BY MR. FREDERICK: | 3       MR. FREDERICK: Sure. |
| 4     Q   Okay. And do you see where it says at the | 4   BY MR. FREDERICK: |
| 5   top heading Presenting Evaluation? | 5     Q   Mr. Mayer, we just took a short break. As |
| 6     A   I see it, yes. | 6   it relates to your position as a claims |
| 7     Q   And then below that it says, Present the | 7   representative, do you have a -- do you always |
| 8   Valuation. | 8   function as, I've heard the term file owner? |
| 9     A   I see it. | 9     A   Yeah, file owner is a Progressive internal |
| 10     Q   And do you see the bullet points as to how | 10   job title for someone who is a claims adjuster. |
| 11   to present the value? | 11     Q   So that would be somebody who works |
| 12     A   I see it. | 12   inside versus a field rep, a field adjuster? |
| 13     Q   Okay. Do you follow those guidelines? | 13     A   Yes. For -- yes, for, I think for the |
| 14     A   Generally speaking, yes. | 14   purposes of -- that you're asking. Yes. |
| 15       MR. FREDERICK: Okay. Why don't we take a | 15     Q   Okay. So you don't go out and visit with |
| 16   quick break maybe 10 minutes or so, so everybody can | 16   policy holders or claimants, you do everything -- |
| 17   go to the bathroom and then we'll reconvene in a | 17     A   That is correct. |
| 18   little bit. | 18     Q   --- on phone? |
| 19       MS. WHITE: Right. 12:25? | 19     A   That's correct. |
| 20       MR. FREDERICK: Yeah, that sounds good. | 20     Q   Okay. So I'm looking at a document that's |
| 21       MS. WHITE: Okay. | 21   marked or titled File Owner Onboarding WCTL |
| 22       MR. FREDERICK: Okay. | 22   evaluations. Are you familiar with that document? |
| 23       THE REPORTER: We are off the record at | 23     A   Not off the top of my head. |
| 24   12:15 p.m. | 24     Q   I'll just publish it real fast. It's |
| 25       (Off the record.) | 25   Exhibit 5, so you can just open that up and just tell |
| 1   me if you're familiar with it. | 1     Q   Okay. So what you're saying is that you |
| 2     A   Okay. I have -- I have that exhibit open | 2   know the talking points but not how to actually do it. |
| 3   and I'm reviewing it. | 3   Is that what you're telling me? |
| 4     Q   No, just like look at the first page, do you | 4     A   I'm telling you, I've no -- I know the |
| 5   have a familiarity with that? No. No. Let's just | 5   talking points, but I've never had to do these steps. |
| 6   deal with the one page that's published here. | 6     Q   Okay. We can take that down then. |
| 7     A   The lady looking, you know, this one? | 7     A   I understand the concepts well enough |
| 8     Q   Yeah. | 8   without having to go through these steps illustrated |
| 9     A   Okay. Am I familiar with it? The image of | 9   on that document. Like to put it in another way, I |
| 10   the woman there as well as the title File Owner | 10   suppose. |
| 11   Onboarding, I'm familiar with. But the WCTL | 11     Q   Yeah, sounds pretty much the same, but yeah, |
| 12   evaluations, I can't say that I have -- that I'm | 12   I get it. |
| 13   familiar with it. | 13     A   Yeah. |
| 14     Q   Okay. Let's go to the next page, which is | 14     Q   Okay. Are you familiar with a person |
| 15   Bates number 1019. Are you familiar with this | 15   Progressive named Hannah Hamelberg? |
| 16   particular portion of the document since it talks | 16     A   Hannah Hamelberg? |
| 17   about determining the value? | 17     Q   Yes. |
| 18     A   Only in so far as it reviews the concepts | 18     A   I can't recall knowing somebody by that |
| 19   I'm familiar with, but personally I've not actually | 19   name. |
| 20   done any of these steps before myself. | 20     Q   And let's go to Exhibit 11. We'll publish |
| 21     Q   And you've not practiced them, like being in | 21   that for a moment. And I'll represent to you that |
| 22   any of your -- | 22   this is the -- appears to be the claim notes for Mr. |
| 23     A   That's correct. | 23   Thorton's vehicle. |
| 24     Q   -- training? | 24     Q   Okay. |
| 25     A   Correct. | 25     Q   And it is Progressive Thurston 101. Do you |

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                    Pages 46..49

1  see that at the bottom?
2      A   I do.
3      Q   Okay.  Good.  Can you explain to me what
4  this document is, please?
5      A   This document looks like an excerpt of claim
6  notes.
7      Q   Well, no, it's actually -- just so you know,
8  it's actually 21 pages.  Based upon that, is it an
9  excerpt or would it appear to be --
10     A   Oh.
11     Q   -- the entire claim file?
12     A   I'm not able to tell if it's the entire
13  claim file or not.
14     Q   And how come?
15     A   Because I haven't personally reviewed the
16  claim myself recently.
17     Q   Well, when there is a claim filed -- let's
18  just talk about claim being filed by anybody, right?
19     A   Yes.
20     Q   What is in the claim file?
21     A   What is in the claim file?  All information
22  that's available, and that may be necessary to bring
23  the claim to resolution.
24     Q   Okay.  I know that wasn't the best question,
25  so let me ask it differently.  This particular

1  document are the claim notes; is that correct?
2      A   That's what it says at the top of the first
3  page.  Claim notes for 22-5056549.
4      Q   And there's a set of claim notes for every
5  claim?
6      A   For every claim that I have handled, yes.
7      Q   And you are asked to document everything
8  that you do with a file in the claim notes?
9      A   That's what I'm asked.
10     Q   So that would be, yeah, that would be
11  consistent with Progressive policy and procedures?
12     A   It would be consistent, yes.
13     Q   And are there any other places other than in
14  the claim notes that information is kept on a -- any
15  claim?  And if so, where would they be?
16     A   Sure.  So if there's any kind of external
17  document, and when I say external, I mean something
18  that isn't the claim notes itself, but if there's any
19  other information it's often in what's called an
20  electronic file folder.  For example, if we have a
21  like someone's title to a vehicle, would be scanned,
22  like obviously a title to a vehicle is a physical
23  piece of paper that would get scanned and then
24  uploaded as a PDF file and stored in the electronic
25  file folder of any particular claim.

1      Q   And then photographs of the vehicle --
2      A   Correct.  Yes.  Photographs is another
3  example of something that could be in the electronic
4  file folder.
5      Q   Estimates to repair would probably be in the
6  electronic claim folder?
7      A   Another example, yes, is estimates for
8  repairing a vehicle.
9      Q   But there would be notes about those in the
10  claim notes?
11     A   Oftentimes, yes.
12     Q   Okay.  Are there any other places that notes
13  about a claim are kept other than in the claim notes?
14     A   Not that I know of.
15     Q   I'm just asking.
16     A   I mean, it's claim notes and it's electronic
17  file folder.  That's --
18     Q   That's it.
19     A   I don't know what else kind of information
20  would be needed and where it would go.
21     Q   I don't know either.  I'm just sort of
22  asking.  Right.
23     A   Yeah.  It's all right.
24     Q   Look, I know I'm supposed to keep things in
25  certain places and I wind up finding them on my

1  dresser when they're not where they're supposed to be.
2  Right?
3      A   Right.
4      Q   Okay.  So let's take a look at these claim
5  notes real quickly.
6      THE REPORTER:  All right.
7      MR. FREDERICK:  That's all right.  He can go
8  through them and it's easier for me.
9  BY MR. FREDERICK:
10     Q   Is it easier for you to look at the screen,
11  Mr. Mayer, or --
12     A   So --
13     Q   -- at the notes on your computer?
14     A   I would prefer to look on my own computer.
15  So you're asking me -- what you're asking me is to
16  review the full claim notes.
17     Q   Right.  Each portions of them and we'll go
18  through them and you can scroll along with me.
19     A   Oh.  Oh.  Oh, okay.  All right.  I
20  understand now.  Yes.  I would prefer to scroll and so
21  forth on my own in my own computer here.
22     Q   Okay.  Got it.  So you'll note if you flip
23  to the end or you'll see that it's, what, 20 pages; is
24  that correct?
25     A   24 pages is what I'm seeing.

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                    Pages 50..53

| | |
|---|---|
| 1   Q   24? That's good. | 1   A   Okay. |
| 2       MS. WHITE: I have 21 pages. | 2   Q   -- real quickly, where it talks about |
| 3       THE WITNESS: Is this Exhibit 11? | 3   damages. |
| 4       MR. FREDERICK: Yes. | 4   A   I see. |
| 5       THE WITNESS: Okay. I'm just looking up at | 5   Q   Do you see that? |
| 6   the top. | 6   A   I do. |
| 7       MR. FREDERICK: Yeah, that's where I'd be | 7   Q   And then there are a number of notes |
| 8   looking. | 8   relating to coverage and contact information. So |
| 9       THE WITNESS: It says 9 of 24 was the page I | 9   would that have been the first time -- okay. So it |
| 10   was just on. | 10   looks like Emily Brown would've assigned the claim to |
| 11       MR. FREDERICK: 9 of 24? | 11   you; is that correct? |
| 12       THE WITNESS: Now I'm at the top. Oh. | 12   A   That's correct. |
| 13   Unless there's 24 exhibits, maybe I'm looking at -- | 13   Q   Because your employee number is A15566? Got |
| 14   maybe that number is not correct. Oh, there -- okay. | 14   it. |
| 15   There we go. All right. I'm looking in the wrong | 15   A   Correct. |
| 16   spot. I apologize. Yes, page 1 of 21. Now I see it. | 16   Q   And then would it be your job then to assign |
| 17       MR. FREDERICK: Okay. Good. | 17   once you've done the preliminary information to assign |
| 18       THE WITNESS: I was -- I was looking at the | 18   someone to look at the vehicle, or is that done |
| 19   wrong thing there. | 19   automatically? |
| 20   BY MR. FREDERICK: | 20   A   That's more so done automatically. I can |
| 21   Q   That's fine. I was an accounting major and | 21   put in a request for the vehicle to be reviewed, but I |
| 22   I couldn't add the extra one in there, so go figure. | 22   do not assign any specific person to review any |
| 23   Because I said 20, not 21. So I believe the first | 23   particular vehicle. |
| 24   time you're mentioned in these notes would be on the | 24   Q   Okay. So it looks like you're doing most of |
| 25   second page and you can go ahead -- | 25   the preliminary information -- or things and trying to |

| | |
|---|---|
| 1   determine coverage up through page 106 and a little | 1   Q   Okay. So here are some codes on, on the |
| 2   more, but at some point Jacob Eckert is assigned to | 2   next page we talk about coverage. You see that first |
| 3   look at the vehicle. Correct? That'd be on -- | 3   full entry? |
| 4       MS. WHITE: Do you want to give him a minute | 4   A   I see it, yes. |
| 5   to review the four pages? | 5   Q   And then you asked Mr. Thurston why he was |
| 6       MR. FREDERICK: Sure. | 6   driving the Volvo. And the following item, what does |
| 7       THE WITNESS: Okay. So I'm reviewing pages | 7   -- what do these codes mean? If you can tell me where |
| 8   -- the first page through 106 is what you're saying? | 8   it's the to-do 1/25/22 -- |
| 9       MR. FREDERICK: For start, we can go to 105 | 9   A   Sure. |
| 10   and we can get to 106 later. I mean, whatever you | 10   Q   -- 7:21 p.m. Eastern Standard Time. |
| 11   feel comfortable doing. | 11   A   Sure. So under to-do the number 1 there, RS |
| 12       THE WITNESS: Oh, all right. Okay. Okay. | 12   CD means recorded statement with the claimant driver. |
| 13   BY MR. FREDERICK: | 13   Number 2, CTC CC means contact the claimant carrier. |
| 14   Q   Okay. And by the way it looks -- can you | 14   PR rev means police report review. 4, code liability. |
| 15   look through this and tell me the first time you spoke | 15   So that would be -- once those first three things are |
| 16   with Mr. Thurston? | 16   completed, we should have sufficient information to |
| 17   A   Matthew Thurston or Scott Thurston? | 17   establish who is responsible or liable for the |
| 18   Q   Matthew. | 18   accident. And then number 5, the insured vehicle |
| 19   A   It looks like on page 103 toward the bottom, | 19   method of inspection. That's what MOI means. |
| 20   there's a heading of liability for January 25, 2022 at | 20   Q   Thank you. And then ultimately the car was |
| 21   5:00 p.m. Eastern Standard Time. That is when I took | 21   initially towed to Moody's, correct? No, to Snow's, |
| 22   a recorded statement with Matthew Thurston about the | 22   and then it moved to Moody's. That's towards the |
| 23   events of the accident. | 23   bottom of 105. |
| 24   Q   Where it says liability? | 24   A   I'm trying to recall. |
| 25   A   Correct. | 25   Q   What does OBC mean? |

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                    Pages 54..57

1   A   Outbound call.
2   Q   **To Union Street Towing.  Do you see that?**
3   A   I see it.
4   Q   **Used by Moody's, arranged to tow from Snow's**
5   **to Moody's.**
6   A   Right.  I see where that's written.
7   Q   **But that's fairly typical that you move a**
8   **vehicle from one place to another, like, or if it's a**
9   **total to copart or --**
10  A   Correct.  That's correct.
11  Q   **-- whoever else is dealing with the salvage,**
12  **right?  Okay.  So then would you have had a**
13  **conversation with the -- one of the body shops that**
14  **would inform you that the vehicle might be totaled?**
15  A   Would I have had a conversation?
16  Q   **Yeah.**
17  A   In one way or other, I don't know that that
18  conversation would happen directly or something --
19  when I say directly, I mean over the phone.  We could
20  be informed through email from the shop.  We could be
21  informed through a message, through other means like
22  that.
23  Q   **I'm just asking that because at the bottom**
24  **of 106 it says PD Suite -- and PD Suite I believe is**
25  **Property Damage Suite.  Would that be correct?**

1   A   As far as I know, yes.
2   Q   **And then it says, "Moody's Collision Center,**
3   **please review for total loss."**
4   A   Okay.
5   Q   **"Thank you."**
6   A   Yes, that's what I meant by sending a
7   message.  Because Moody's and Progressive both use PD
8   Suite and Moody's is one of our shops in our network.
9   They have the ability to message us through the
10  platform of PD Suite.  So that's what I was referring
11  to when we have communication from Moody's to inform
12  us of a total loss.
13      So yeah, it could be a phone call.  They
14  might tell us email, they might tell us -- or
15  frequently or most often, they would send a message
16  through the PD Suite here like Moody's has done here.
17  Q   **So when you said Moody's is a -- what did**
18  **you say, preferred --**
19  A   Network shop is what they're called.  Yeah.
20  Q   **How does that work?**
21  A   In what sense?
22  Q   **Well, what makes them a preferred body shop?**
23  A   Sure.  It means they are approved to
24  complete certain tasks without prior approval.  It's
25  almost like, you know, you go to the airport and

1   you've got some folks who are TSA pre-check.  They
2   don't have to stand in line and go through the whole
3   rigmarole of taking their shoes off, going through the
4   security line.
5       That's kind of an analogy that roughly
6   translates to things that occur at a network shop.
7   Someone taking their car to a network shop is like
8   having gone through TSA pre-check.  So those network
9   shops are pre-approved essentially by Progressive.
10  They've made certain agreements about how to handle
11  different things or different types of damages to the
12  vehicles, et cetera.
13  Q   **For example, what kind of damages?**
14  A   So if we're -- if we, I mean, I think we can
15  surmise the example of Mr. Thurston's vehicle.  You
16  know, they would be prompt, you know, this message
17  through PD Suite from Moody's.  They say, "Please
18  review for total loss.  Thank you."
19      A shop that's not in our network may not --
20  they may not have access to PD Suite or they, you
21  know, they might not just care to inform us that a
22  vehicle might be a potential total loss.  You know,
23  they might just, you know, ignore it until we call
24  them or something.
25  Q   **Right.  You're wondering where the vehicle**

1   is and it's just sitting somewhere.
2   A   Right.
3   Q   **But when you say that they can complete**
4   **certain repairs, are we talking about non-structural**
5   **repairs or some kind of structural repairs?**
6   A   No, I mean, I might've misspoken when I said
7   repairs, it was really like, so if you -- if you
8   notice where it says Moody's Collision Center, Bangor,
9   and then in parentheses it says SWE and that means
10  shop rights estimates.  So that's a common feature of
11  our network shop.  And again, with that, you know,
12  kind of analogy of the TSA pre-check, Moody's is pre-
13  approved to write estimates on our behalf and they
14  don't need to wait for a Progressive estimate before -
15  - well, their estimate is a Progressive estimate.  It
16  counts as a Progressive estimate.  So they can get
17  started on ordering parts and things sooner if the
18  vehicle of course is repairable.
19  Q   **Right.  So they just aren't approved to**
20  **start working on repairs.  Because you have to**
21  **determine that there's coverage first.  Right?**
22  A   If there's a coverage issue, that would be
23  the case.
24  Q   **Right.  I only say that because I assume you**
25  **determine coverage in every case.**

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                    Pages 58..61

1    A    In that sense --
2    Q    It may not be an issue, but you determine
3    there's coverage, it's something you verify, right?
4    A    For every claim, yes.  We do ensure that
5    coverage can be afforded.
6    Q    Yeah.  I think you guys would go out of
7    business real fast if you provided coverage for cars
8    that weren't covered very often.
9    A    Can't disagree.
10   Q    You agree on that, right?
11   A    I can't disagree with that.
12   Q    It wasn't meant to be a trick.  It's like,
13   you know.  Okay.  So at that point, once Moody's
14   suggests it might be a total, that's when Mr. Eckert
15   first gets involved and reviews the estimate, is that
16   correct?  That would be on 107.
17   A    It would appear so, yes.  Jacob Eckert first
18   gets involved after the message from Moody's.
19   Q    Okay.  Okay.  On 109, there's a entry about
20   the middle of the way down, let's go here.
21   A    Okay.
22   Q    It says contact info.  Do you see that where
23   it says -- right below, would be 1, 2, 3, 4 --
24   A    Oh yes, I do.  I see it.  I see.  Uh-huh.
25   Q    What does that mean, OBC to IO?

1    A    Outbound call to IO, that means insured
2    owner.  So that would've been Scott, Scott Thurston
3    and says, "Wants TL value before deciding OS/PRS."  So
4    that sentence means that Scott wanted the valuation
5    report or valuation figure before whether he decides
6    to -- ORS, which means owner retain salvage or PRS,
7    which means Progressive retain salvage.
8         So essentially he wants to know what the
9    valuation is before he decides whether or not he wants
10   to keep the car.
11   Q    Okay.  And then there's some other notes.
12   And then this is -- if we go to the following page
13   then in PD Suite at 110, this is where Mr. Eckert then
14   goes out to, I believe it's Moody's and looks at the
15   vehicle; is that correct?
16   A    Yes.
17   Q    Okay.  Okay.  And then the claim gets
18   evaluated until -- and there's conversation until
19   Progressive receives a letter from Mr. Steed, correct?
20   A    As far as --
21        MS. WHITE:  I'm sorry, Ron.  Where are you?
22        MR. FREDERICK:  I'm nowhere in particular.
23   It's just a summary.
24        MS. WHITE:  Well, you're going to need to
25   let him read the claim notes down to wherever it is

1    that you're talking about.
2         MR. FREDERICK:  Well, or I'm ask him if he
3    has any recollection.
4         THE WITNESS:  Yeah, no, I -- no, I think I
5    understand the question.  So I essentially, yes, the
6    claim proceeds as normal or as it usually does for any
7    other total loss claim until Mr. Steed gets involved.
8    BY MR. FREDERICK:
9    Q    And at that point it gets turned over to
10   legal and you have nothing else to do with it?
11   A    That's what I am seeing is that the
12   remainder of my involvement is a few bits of
13   correspondence between the attorney and myself.
14   Q    Okay.  And then legal would get involved
15   when a lawsuit is filed, obviously?
16   A    Yes.
17   Q    During the course of the claim, did you do
18   everything consistent with Progressive's policies and
19   procedures?
20   A    As far as I know, yes.
21   Q    Okay.  And at some point, Mr. Steed -- I'm
22   sorry, I believe Mr. Thurston provided Kelly Blue Book
23   valuations; is that correct?
24   A    I can't remember if that is the case.
25   Q    Go back.  Just one moment here.  So if you

1    look on page 112, which would be page 12 of the
2    document.
3    A    All right.
4    Q    Do you see a contact at the very bottom of
5    that about a conversation that -- or a permission
6    relating to Kelly Blue Book, KBB?
7    A    Okay.  Yes.  "Hello, Kyle.  Permission to
8    move the car" (indiscernible).  Okay.  "Using
9    comparables and advance to understand the mileage
10   adjustments and then apply them to our car, your offer
11   is a wholesale number, which is non-approach
12   replacement value."  Okay.  I see that.  Yes.
13   Q    What kind of response do -- does Progressive
14   typically have to request to value the vehicles at
15   Kelley Blue Book value?
16   A    I'm sorry, can you repeat that please?
17   Q    Sure.  What kind of response does
18   Progressive typically have to request to value the
19   vehicle at Kelley Blue Book value?
20        MS. WHITE:  Objection to form.
21        THE WITNESS:  So Progressive does not use
22   Kelley Blue Book as -- in its procedures.  We would
23   use the NADA and/or JD Power.
24   BY MR. FREDERICK:
25   Q    So it would use NADA as an alternative to JD

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                                 Pages 62..65

1  Power?
2      A    I don't know the precise relationship
3  between JD Power and NADA, but they -- as far as I
4  know, they're application wise one and the same.  So,
5  like if the NADA value is generated by the entity
6  known as JD Power, then that's -- I think that's the -
7  - that's my understanding of it anyway.
8      Q    So Progressive would pay to a customer the
9  JD Power valuation, or if they were to provide NADA
10 valuations, Progressive would pay the NADA valuation?
11     A    So not necessarily because each state as its
12 own laws and regulations about how total loss vehicles
13 are evaluated.  So those -- so it really kind of
14 depends on the context of the claim and the total loss
15 vehicle itself.
16     Q    Okay.  And what are the laws in Maine that
17 determine the valuation of a vehicle?
18     A    So it would be the "book value" would come
19 into play, would be considered as well as like market
20 value for the area where the owner of the vehicle is.
21     Q    Okay.  What do you mean by book value?
22     A    So, Kelly Blue Book and, you know, Kelly
23 Blue Book is just one type of -- or brand, if you
24 will, of book value.  NADA and JD Power is also
25 considered a book value.

1      Q    Okay.  Under Maine law, Progressive would
2  have to consider book -- one second.  I'm sorry, I
3  forgot where I was.
4      A    It's okay.
5      Q    That was my phone telling me I need to start
6  a new glucose sensor, so, which of course is still at
7  CVS, so that's not happening.  Okay.  So under Maine
8  law, would -- explain to me how NADA value would
9  relate to valuations of vehicles for total loss?
10          MS. WHITE:  Object to form.
11          THE REPORTER:  I'm sorry, Ms. White, was
12 that an objection?
13          MS. WHITE:  Yes, object to the form.
14          THE REPORTER:  Thank you.
15          MR. FREDERICK:  Go ahead.
16          THE WITNESS:  How does the book value, I
17 mean, I don't know precisely how all of -- how
18 everything is calculated to produce a valuation
19 report, but the NADA slash also known as JD Power Book
20 value, I don't know how precisely that's determined.
21 But my, you know, it seems to provide some sort of
22 reference point perhaps.
23 BY MR. FREDERICK:
24     Q    So if someone were to provide you or you
25 were provided -- let me scratch that.

1          If an insured provided a NADA valuation for
2  a vehicle with the appropriate equipment, appropriate
3  mileage, appropriate date for the date of loss, would
4  Progressive pay that amount of money for a claim?
5      A    It depends on the other factors that are
6  involved in that claim and other contextual
7  considerations.
8      Q    What other factors and contextual
9  considerations would you be speaking of?
10     A    Like as mentioned before, the local laws and
11 regulations.
12     Q    Well, when you say local, are you talking
13 about state or local?
14     A    State.
15     Q    Okay.  So --
16     A    Yes.  State is what I mean.
17     Q    Okay.
18     A    And I can provide you an example.  So in the
19 State of Massachusetts, for example, if a vehicle has
20 been purchased within the last six months and it is a
21 total loss we also consider the bill of sale price in
22 our valuation of the vehicle.  And that is a
23 particularity about Massachusetts State total losses.
24 That is not the same case in a context like Maine or
25 Connecticut, which is where I'm based out of.

1      Q    Right.  Okay.  So let's just talk about
2  Maine.
3      A    Okay.
4      Q    So what about Maine?  Would you consider
5  NADA valuations as authoritative to a claim amount,
6  you know, what would be paid to a policy holder?
7      A    By itself?
8      Q    Yes.
9      A    It would not be considered in the State of
10 Maine by itself.
11     Q    What else would you have to have?
12     A    We would have to have the comparable market
13 data for the geographic area of where the owner of the
14 vehicle maintains the vehicle at their home, basically
15 where they live.  So if the owner of the vehicle
16 lives, like in this instance Louisiana, so we
17 considered market data from Louisiana, to the best of
18 my knowledge, that's what was -- that's what happened.
19 And that's where on the evaluation report there would
20 be comparable vehicles listed.
21     Q    Right.  So what you're saying is that -- let
22 me just clarify this.  So if there's no issue as to
23 where the vehicle is garaged and you would use the
24 state in which it's garaged -- in this situation, I'll
25 just make up a hypothetical.  The policy holder is in

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                              Pages 66..69

1  Maine and the vehicle is registered in Maine and the
2  crash is in Maine, you would use NADA valuations for
3  Maine and that would be authoritative to pay that
4  amount on a claim?
5         MS. WHITE:  Object to form.  Compound.
6  BY MR. FREDERICK:
7      Q    Do you understand the question?
8      A    I'm not sure that I do.
9      Q    Okay.  I'll break it down.  So we have a
10 person that has a Progressive policy, okay?
11     A    Okay.
12     Q    And that person lives in Maine and the car
13 is titled in Maine and it's garaged in Maine, and the
14 crash occurred in Maine.
15     A    Uh-huh.
16     Q    Got it?  So based upon that, if someone
17 provided you with a NADA valuation indicating what the
18 values were for Maine on the date of the loss with the
19 mileage and all of the equipment of the vehicle
20 accurately stated, would Progressive consider that to
21 be authoritative as to the valuation?
22     A    It would be considered.  I don't think it
23 would be the entire -- I don't think the NADA
24 valuation would be the valuation for said vehicle all
25 by itself or a loan.

1      Q    Well, I would tend to agree with you because
2  there should also be some adjustments for the
3  condition, correct?
4      A    Sure.
5      Q    I mean --
6      A    Vehicle valuations are adjusted according to
7  their conditioning.
8      Q    Right.  So retail, or well, retail value in
9  the NADA report reflects something that would be,
10 we'll call it for lack of better term, frontline
11 ready, ready to be sold on the dealership's lot,
12 correct.
13     A    Okay.
14     Q    Do you agree with that?
15     A    Potentially.
16     Q    As opposed to a car they get on on trade-in
17 and have to fix it up and, you know, like deal with
18 some scratches or a dirty headliner, things of that
19 nature, correct?
20     A    I'm not entirely sure.  I think we're
21 reaching the limits of my knowledge about how vehicles
22 are evaluated.
23     Q    Well, you've looked at Mitchell valuations,
24 correct?
25     A    I've looked at the valuation reports.

1      Q    Okay.  And you noticed that they have
2  adjustments for condition?
3      A    I have noticed that.
4      Q    And that they have both deductions and adds
5  based upon the condition of the vehicle, right?
6      A    I don't -- yes and no.
7      Q    So you see more deductions than adds, right?
8      A    For conditioning.
9      Q    Yes.
10     A    It's more common to see deductions for
11 something, it's -- like if we talk about the valuation
12 of a vehicle, it's like, it's almost like we, like
13 condition wise, we almost, you know, we approach the
14 vehicle and we start at a hundred.  Right?  And then
15 if the conditioning is less than, then it gets marked
16 off accordingly.  For example --
17     Q    Correct.
18     A    -- if there's a cigarette burn on the seat
19 or something like that.
20     Q    Right.  And the owner, let's say, adds, I
21 had a -- have a very good friend who has a Prius and
22 he had just bought brand new tires and he got hit and
23 so on that the valuation gave him extra money because
24 they were brand new tires like within a week.  That
25 would make sense, right?

1      A    It's possible.
2      Q    Okay.  So in the valuation for Mr. Thorton,
3  there were adjustments for condition of the vehicle
4  for $462.43.
5         MS. WHITE:  Object to form.
6         MR. FREDERICK:  That was a statement, not a
7  question.
8  BY MR. FREDERICK:
9      Q    Although, we can go to Exhibit 10, if you
10 would prefer.  Would you prefer to see the report?
11        MS. WHITE:  Just to clear my objection, was
12 you calling him Mr. Thorton?
13 BY MR. FREDERICK:
14     Q    Oh, I'm sorry.  I apologize.  I didn't mean
15 to do that, Mr. Mayer.  That was --
16     A    Okay.
17     Q    -- my fault.
18     A    Which exhibit would you look like me to look
19 at?
20     Q    10.  10.
21     Q    Okay.  Okay.  Yes.  I see the conditioning
22 figure.
23     Q    Of 462.43?
24     A    Correct.
25     Q    And then you see an add for aftermarket

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                    Pages 70..73

1  parts of $55, correct?
2      A   I see it.
3      Q   Okay.  So if we go to page 4 of this
4  document, which by the way is Progressive Thorton 296
5  through 302.
6      A   All right.
7          MS. WHITE:  Again, I think you mean Thurston
8  and not Thorton.
9          MR. FREDERICK:  Oh, you're right.  I'm
10 sorry.  Thurston.  I have a Thorton client too, so I
11 make mistakes.
12         THE WITNESS:  Okay.
13 BY MR. FREDERICK:
14     Q   So go to page 4.  You see a couple condition
15 adjustments?
16     A   I do see that, yes.
17     Q   Okay.  And one of them is for the headliner
18 that has some stains?
19     A   I see that.
20     Q   And then doors, interior panels of greater
21 than three gouges, which apparently would be -- a
22 dealer would have to fix those and to make it ready
23 for sale at retail.  Correct?  And then we've got
24 exterior and body, it looks like a crease in the right
25 rear door, which I guess the Mitchell system estimated

1  that to be $277.46 to repair.
2      A   Okay.  I see that.
3      Q   And then paint looks like numerous small
4  scratches, $115.61.  Do you see that?
5      A   I see it.
6      Q   So, these are normal adjustments that you
7  would take from the clean -- from retail value of a
8  vehicle and adjust that downward; is that correct?
9          MS. WHITE:  Object to form.
10         THE WITNESS:  That would probably be a
11 better question for the appraiser who completed this
12 report.
13 BY MR. FREDERICK:
14     Q   Well, how many of the total loss valuations
15 have you presented to customers -- to, I mean, policy
16 holders?
17     A   Sure.  I mean, I've certainly presented
18 dozens, but I mean, yeah, if we're -- if we start at a
19 baseline value of a vehicle, which it looks like there
20 is a base value on the previous page, then the
21 deductions would come from that base value because of
22 the things noted in that comment section like the
23 stains or the gouges, et cetera.
24     Q   And this would be consistent with all
25 valuations, correct?

1      A   It's --
2          MS. WHITE:  Object to form.
3          THE WITNESS:  It's consistent --
4          MS. WHITE:  You can answer.
5          THE WITNESS:  What?
6          MS. WHITE:  You can answer.  Sorry.
7          THE WITNESS:  Oh, I mean it's consistent
8  with most of the evaluations that I've worked with
9  when customers have total lost vehicles.
10 BY MR. FREDERICK:
11     Q   Right.  There's some adjustment usually,
12 probably the only way is if somebody bought a car and
13 it got hit immediately.  Do you need to take a break?
14     A   Not necessarily.
15     Q   Okay.  Yeah, obviously if somebody drives
16 the car right off the lot and they get hit within a
17 few days, those are pretty much no adjustments.
18 Correct?
19     A   I'm sorry?
20     Q   I said if somebody buys a vehicle, it'd say
21 a brand new vehicle, and they drive it off the lot and
22 within a day or two they get hit, those are pretty --
23 there're probably aren't any adjustments because
24 there's probably no preexisting damage to it.
25         MS. WHITE:  Object to form.

1  BY MR. FREDERICK:
2      Q   Is that a fair statement?
3      A   I mean, it's unlikely.
4      Q   Right.  Maybe if their teenage kid had it
5  for a few days, it might have some damage, but
6  otherwise not likely.  So if you had an -- if you had
7  the Mitchell on demand -- I'm sorry, the Mitchell
8  vehicle valuation report and the NADA valuation, would
9  Progressive then take the condition report off of that
10 -- or condition adjustment off of that on a NADA
11 valuation to get an appropriate valuation for a
12 vehicle?
13     A   Would you mind rephrasing the question?
14     Q   Sure.  If you were presented with a NADA
15 retail valuation, would Progressive take a condition
16 adjustment off of that equal to the Mitchell valuation
17 as a tool to come up with a valuation under the NAD
18 valuation and then pay that?
19         MS. WHITE:  Object to form.
20         THE WITNESS:  So what -- just to clarify,
21 you're saying we have -- we have the NADA value, we
22 deduct the conditioning figure and then that would be
23 the settlement value?  Are you asking if that's the
24 procedure?
25 //

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                          Pages 74..77

BY MR. FREDERICK:

2  Q    Yeah.  Would that be appropriate?

3  A    Unless there were other factors to consider,
4  like I mentioned earlier with Massachusetts and the --

5  Q    We're just dealing --

6  A    -- bill of sale, et cetera.

7  Q    We're just dealing with Maine.  I just want
8  to deal with Maine.

9  A    Just dealing with Maine.  I would say yes.

10  Q    Okay.  So would that be an appropriate way
11  for Progressive to handle total loss valuations in
12  Maine?

13       MS. WHITE:  Object to form.

14       THE WITNESS:  Yes.  Given the other
15  parameters you were describing before, if this
16  hypothetical vehicle is titled and garaged in Maine.

17  BY MR. FREDERICK:

18  Q    Are you finished with that?

19  A    Yes.

20  Q    Okay.  I'm sorry, I wasn't certain.

21  A    Oh, no problem.

22       MS. WHITE:  Ron, we've been going another
23  hour, are we getting close to a stopping point for
24  you?

25       MR. FREDERICK:  So yes, and if not we can

---

1  certainly take a break for lunch.  But yeah, I think
2  I'm coming real close.  Is that fair?  And do you need
3  to take a little break now?  We can do that.

4       MS. WHITE:  That would be great, but I don't
5  want to interrupt.

6       MR. FREDERICK:  That's all you need to tell
7  me.

8       THE WITNESS:  suRE.

9       MR. FREDERICK:  Yeah, let's take 10 minutes.

10       MS. WHITE:  Okay.

11       MR. FREDERICK:  Okay.  Great.  Thank you.

12       THE REPORTER:  We are off the record at 1:36
13  p.m.

14       (Off the record.)

15       THE REPORTER:  We are back on the record at
16  1:48 p.m.  Please proceed.

17  BY MR. FREDERICK:

18  Q    Mr. Mayer, I think I only have a few more
19  questions for you.

20  A    All right.

21  Q    Can you tell me a bit more about your
22  training at Progressive?  Did you receive any training
23  materials?

24  A    What type of training materials?

25  Q    Anything that you were given?

---

1  A    Anything?

2  Q    Yeah.

3  A    I was.

4  Q    Can you tell me what you were given?

5  A    I mean, it's a variety of resources for
6  training.  Could be like an -- like a web-based
7  training, online web-based training module, for
8  example.  Like maybe some documents, but I can't
9  recall what.  It's been a while.

10  Q    Okay.  Training modules on what subjects?

11  A    Different aspects of the claim.  For
12  example, I think there's a module about bodily injury
13  recognition for the claims adjuster or something to
14  that effect.

15  Q    That's sort of peculiar to me when you said
16  bodily injury recognition.  I don't understand that.

17  A    Sure.  I mean it's like I'm -- I don't think
18  -- I'm paraphrasing the title of one of these online
19  web-based modules.  I don't know if that's the exact
20  title, but it's like basically injury triage, if
21  somebody is injured.  So recognizing how to triage
22  that information.

23  Q    As to whether it's a significant injury or
24  soft tissue or something like that?

25  A    Yeah, something like that.  I mean it's, you

---

1  know, kind of what injury -- what can you expect to
2  see as far as injuries go in your day-to-day
3  activities as a claims handler.  Sorry, I just started
4  bleeding on my hand.  It's nothing big.  Just
5  surprised.  All right.

6  Q    Triage, trying for triage, right?

7  A    I know.  Trying for the triage.  Yes.

8  Q    Okay.  So you're talking about like if
9  there's a significant accident, what kind of injuries
10  can you expect to see as opposed to a small accident,
11  is that sort of the thing you're talking about?

12  A    Right.

13  Q    Okay.  Anything else?

14  A    No.

15  Q    Any other modules or training materials?

16  A    Sure, there's other modules, but I can't
17  remember the name of them specifically.

18  Q    And then there was the total loss module,
19  correct?

20  A    I'm not sure --

21       MS. WHITE:  Object to form.

22       THE WITNESS:  Yeah, I'm not sure if there
23  was a total loss specific web-based module.

24  BY MR. FREDERICK:

25  Q    Although you don't, all you deal with as it

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                   Pages 78..81

1  relates to those is what we've already discussed,
2  right?
3      A    At the them --
4      Q    You're not activley involved in creating
5  valuations.
6      A    Correct.
7      Q    Okay.  One moment.  And then part of the
8  training was also how to make sure that policy holders
9  to develop, I think what you talked about rapport and
10 having them be comfortable with you and Progressive so
11 the things that you say at Progressive can be trusted?
12         MS. WHITE:  Object to form.
13         THE WITNESS:  I would say that building a
14 relationship based on trust is part of the reason why
15 we want to build a good rapport with our customers.
16 BY MR. FREDERICK:
17     Q    And one of the other things about it is you
18 want Progressive policy holders as a company to
19 believe that Progressive will take good care of them,
20 right?
21         MS. WHITE:  Object to form.
22         THE WITNESS:  Can you repeat the question?
23 BY MR. FREDERICK:
24     Q    Sure.  So Progressive wants its policy
25 holders as a company to believe that Progressive will

1  take good care of the policy holders?
2          MS. WHITE:  Object to form.
3  BY MR. FREDERICK:
4      Q    Correct.
5      A    I'm not sure that's the specific verbiage.
6  Actually, I'm pretty sure that's not the specific
7  verbiage.  And furthermore, I'm not really a
8  spokesperson for Progressive as a whole.
9      Q    Well, I get that.  So you're familiar with
10 the Progressive commercials?
11     A    Not the recent ones.  I don't have a
12 television.
13     Q    Okay.  You're familiar with the pitch, which
14 is "Consider us to compare and we'll save you money"?
15     A    I'm not actually.
16     Q    You're not?
17     A    No.
18     Q    Okay.  And I'll assume you haven't met Flo?
19     A    I have not.
20     Q    Okay.  Neither have I.
21         MR. FREDERICK:  I don't believe I have any
22 anything else.
23         MS. WHITE:  I have a few questions.
24 //
25 //

1                 EXAMINATION
2  BY MS. WHITE:
3      Q    Mr. Mayer, Mr. Frederick asked you several
4  questions about condition ratings and condition
5  adjustments.  Do you typically perform condition
6  ratings for vehicle?
7      A    I do not.  I do not.
8      Q    Do you calculate condition adjustments?
9      A    I'm sorry, can you repeat that please?
10     Q    Do you calculate condition adjustments?
11     A    I do not.
12     Q    Are you familiar with the WorkCenter Total
13 Loss conditioning guide?
14     A    I am not.
15     Q    You testified earlier that you handle claims
16 across New England, right?
17     A    That's correct.
18     Q    Which states do you handle claims in?
19     A    Connecticut, Rhode Island, Massachusetts,
20 Vermont, New Hampshire, and Maine.
21     Q    And do the laws of any of those states
22 require considering the NADA value in determining the
23 value of a total loss?
24     A    Yes.
25     Q    Is Maine one of those states that requires

1  consideration of the NADA value?
2      A    I don't know that they require the NAD value
3  specifically, but it's possible that the NADA value,
4  what's the word I'm looking for, is sufficient to meet
5  requirements.
6      Q    Okay.  Mr. Frederick asked you some
7  questions about coverage decisions.  Are you typically
8  the person who makes the coverage determination?
9      A    I would say I usually contribute to making
10 the coverage decision.  And --
11     Q    Do you recall -- sorry, go ahead.
12     A    No.  No.  No, go ahead.
13     Q    Do you recall who made the decision to cover
14 Mr. Thurston's claim?
15     A    Based on the notes that we reviewed earlier,
16 it does appear that my supervisor at the time approved
17 moving forward with coverage for that claim after, you
18 know, reviewing the claim, I suppose.
19     Q    Did Mr. Thurston represent to you that he
20 was the owner of the loss vehicle?
21     A    When you say Mr. Thurston, you mean Matthew
22 Thurston?  Did Matthew Thurston represent to me that
23 he was the owner?
24     Q    Yes.  Did Matthew Thurston represent that to
25 you?

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                          Pages 82..85

1    A    No.
2    Q    Do you know whether Matthew Thurston paid an
3  additional premium for the Volvo?
4    A    He did not pay any extra premium, at least
5  before the accident.  I'm not aware of any -- well,
6  I'm not aware of what happened as far as his premium
7  goes since I've handled the claim.  So in other words,
8  you know, things could have changed since I handled
9  the claim.  So I don't know what kind of premium he's
10 paying on the Volvo and I can't remember seeing
11 anything about changes in premium at the time that I
12 handled the claim.
13   Q    Do you know whether the Volvo at issue in
14 this case was covered by other insurance?
15   A    At the time, I handled the claim and I
16 researched the insurance for the vehicle.  The
17 conclusion based on the information I had at the time,
18 and based on my research, is that there was no other
19 coverage available on the vehicle.
20   Q    Mr. Frederick asked you earlier if you were
21 presented with an NADA valuation, would Progressive
22 take a condition adjustment off of that equal to the
23 Mitchell condition adjustment to come up with an NADA
24 valuation and then pay that?  Have you ever done that
25 before?

1    A    I have not.
2    Q    Have you ever seen Progressive settle a
3  claim on that basis?
4    A    On the basis of NADA value alone?
5    Q    On the basis of NADA value minus the
6  Mitchell condition adjustment.
7    A    I don't know.  I can't -- I can't recall and
8  I don't -- I don't get involved.  It's really more
9  like, yeah, I don't -- I don't know.
10   Q    Is that because typically you're not the one
11 that comes up with the valuation?
12   A    That's correct.  I'm not typically that
13 person who comes up with the valuation.
14   Q    Is it typically the managed repair
15 representative that comes up with the valuation?
16   A    Typically, yes.  By utilizing the resources
17 and tools that they have available to them.
18       MS. WHITE:  Okay.  No further questions.
19       MR. FREDERICK:  I have a few now.
20            FURTHER EXAMINATION
21 BY MR. FREDERICK:
22   Q    First of all, let's just deal with the fact
23 that if there are other coverage, there would most
24 certainly be a subrogation claim between companies
25 that might be responsible for the claim, correct?

1    A    Correct.
2    Q    And did you see in the notes anywhere any
3  indication that there was any subrogation claim
4  between any other company?
5        MS. WHITE:  Object to form.
6        THE WITNESS:  Upon review of the notes
7  today, I did not see that.
8        MR. FREDERICK:  Thank you.
9        THE WITNESS:  But I would -- I would like to
10 clarify that -- I would like to clarify my answer
11 about coverage availability for the vehicle and that
12 when I was discussing coverage that couldn't be found.
13 It was in reference to first party coverage.
14 BY MR. FREDERICK:
15   Q    Okay.  But if you were -- is there any
16 evidence that Progressive sought subrogation of this
17 claim?
18       MS. WHITE:  Object to form.
19       THE WITNESS:  I cannot recall, so I don't
20 know.
21 BY MR. FREDERICK:
22   Q    Would you like to look?  We can go back and
23 look at the claim file.  I just want to make certain
24 we're clear on that issue.  So let's go back to
25 Exhibit 11 and feel to take -- be able to take as long

1  as you need.
2    A    So what are we trying to find out here?
3    Q    If there was any evidence of any attempt to
4  subrogate this claim.
5    A    Was there any attempt to subrogate this
6  claim?
7    Q    Yeah.  And I can ask the question slightly
8  differently.  If there was a note in the file about
9  subrogation, how would it generally appear?
10   A    I'm not too sure.  I know that the word
11 subrogation would be found somewhere in the note, but
12 I don't handle subrogation, so I'm not -- I'm not
13 really sure what their -- the standards are for
14 subrogation's notes in any particular claim.
15   Q    Is it always referred to as subrogation or
16 subrogate or something with S-U-B?
17   A    Is it always?
18   Q    Yes.  Or should it be?  Or --
19   A    I'm not sure.  Right.  I mean, like I
20 mentioned, I don't know exactly what sort of standards
21 -- the folks who handle subrogation, I don't know what
22 their -- what their standards are.  I don't really get
23 involved in that.
24   Q    Okay.
25       MS. WHITE:  Ron, are you done?

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                    Pages 86..89

1          MR. FREDERICK:  No, I'm waiting for him to
2    answer the question.  I think he's still reading.
3          THE WITNESS:  Oh.
4          MR. FREDERICK:  Are you still reading?
5          MS. WHITE:  What was the question?
6    BY MR. FREDERICK:
7       Q    If you see subrogation anywhere or -- that
8    indicates they were subrogated.
9       A    Okay.  I apologize.  I thought the last
10   question was about like using the word subro, or sub,
11   or subrogation --
12      Q    I thought you were still looking and --
13      A    Sorry.
14      Q    -- I was trying to -- I was just going to
15   tell you I saw -- I did a word search and got S-U-B
16   times and they were mostly subject.
17      A    Okay.
18      Q    And content submission.  You know, I mean, I
19   could read them to you, but there's nothing in here
20   that I see that would relate to subro, or subrogation.
21   Okay?  Do you want me to go through each of them just
22   to be certain?
23      A    Yeah, I mean, I guess I just don't
24   understand why we're asking this question.
25      Q    Because your lawyer brought it up.

1          MS. WHITE:  Well, to be fair, I didn't bring
2    up subrogation.
3          MR. FREDERICK:  Well, claims of other
4    companies that would be always subrogated if there are
5    intercompany disagreements about who's providing
6    coverage.  Correct?
7          MS. WHITE:  I'd object to that assumption.
8          MR. FREDERICK:  Well, my wife used to work
9    at Progressive in subrogation, and that's all they
10   did, and everybody tried.
11         MS. WHITE:  You're getting a pretty
12   important prerequisite to subrogation.
13   BY MR. FREDERICK:
14      Q    That there's multiple parties at fault
15   potentially or liable.  So anyway, we'll move on.
16         Is it fair or do you trust as a claims
17   representative that the Progressive employee who
18   evaluates the vehicle makes the appropriate
19   adjustments for condition?
20      A    I do trust that methodology.
21      Q    Is its Progressive policy to -- or when you
22   get an NADA valuation, do you just take that valuation
23   alone?
24         MS. WHITE:  Object to form.
25   //

1    BY MR. FREDERICK:
2       Q    Or do you deduct for condition adjustments?
3       A    I'm not sure I -- that's my job role.
4       Q    Well, what happens when this occurs?
5       A    Well, I'm not -- I'm not doing anything
6    myself with conditioning.  That would be the person
7    who's physically evaluating and inspecting the
8    vehicle.
9       Q    Right.  And you expect that the Progressive
10   employee who looked at and evaluated the vehicle and
11   its condition was truthful, correct?
12      A    Correct.
13      Q    Okay.
14      A    I have no reason to think that they're not
15   being truthful.
16      Q    Right.  So it would be perfectly appropriate
17   to take the NADA value and subtract the adjustments to
18   condition, wouldn't it?
19         MS. WHITE:  Object to form.
20         THE WITNESS:  I mean, it really depends on
21   what the goal would be in that scenario.
22   BY MR. FREDERICK:
23      Q    Wouldn't the goal be to -- to give the
24   insured fair value or fair market value for the
25   vehicle?

1       A    I -- to the best of my knowledge, the policy
2    stipulates actual cash value.
3       Q    And actual cash value from a retail
4    standpoint is different than a wholesale standpoint,
5    correct?
6       A    I don't know.
7       Q    Well, have you ever traded in a car?
8       A    I have never traded in a car.
9       Q    You never traded in a car?  Okay.
10      A    I've never traded in a car and I've never
11   purchased a car with anything but cash.
12      Q    Okay.
13      A    I'm not a normal person, Mr. Frederick.  I
14   don't finance my cars.  I don't watch television.
15      Q    Well, I got that you didn't -- when you
16   didn't watch television, you were not in the majority.
17      A    Correct.
18         MR. FREDERICK:  Many of us might be better
19   off not watching TV.  Give me two minutes.  Let's just
20   go off the record real fast.
21         THE REPORTER:  We are off the record at 2:15
22   p.m.
23         (Off the record.)
24         THE REPORTER:  We are back on the record at
25   2:19 p.m.  Please proceed.

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                                Pages 90..93

1          MR. FREDERICK:  Mr. Mayer, I do not have any
2  further questions.
3          MS. WHITE:  Just one more question, I think.
4          THE WITNESS:  Okay.
5                  FURTHER EXAMINATION
6  BY MS. WHITE:
7      Q    Did you ever issue payment for this total
8  loss claim?
9      A    To the best of my knowledge, no.
10     Q    And typically, if Progressive subrogates,
11 does that process begin after payment is made?
12     A    Yes.  That would make sense, because if
13 there's nothing to recover, we're not going to ask to,
14 you know, we're not going to make any attempts to
15 recover anything if there's nothing to recover.
16     Q    I believe you said this earlier, but I
17 wanted to confirm.
18     A    Sure.
19     Q    Are you ever involved in the subrogation
20 process?
21     A    I'm not.
22         MS. WHITE:  Okay.  No further questions.
23         MR. FREDERICK:  Okay.  I've got nothing
24 else.  Might have some questions for you after we're
25 done, but nothing else.

1          THE REPORTER:  Before I read us off the
2  record, is Mr. Mayer going to read and sign?
3          MS. WHITE:  Yes.
4          THE REPORTER:  Okay.  And copy orders for
5  both counsel?
6          MS. WHITE:  Yes.  Just a digital copy.
7          MR. FREDERICK:  We're good for the moment.
8          THE REPORTER:  Okay.  This concludes the
9  deposition of Kyle Mayer.  The time is 2:21 p.m. on
10 1/24/24, and we are officially off the record.
11         (Signature Reserved.)
12         (Whereupon, at 2:21 p.m., the proceeding was
13 concluded.)

1                CERTIFICATE OF NOTARY PUBLIC
2
3          I, JENNIFER DAMIANI, A Remote Online Notary
4  of the State of Arizona, duly authorized to administer
5  oaths, do hereby certify:
6          That I am a disinterested person herein;
7  that the witness, KYLE MAYER, named in the foregoing
8  deposition, was by me duly sworn to testify the truth,
9  the whole truth, and nothing but the truth; that the
10 deposition was reported by me, JENNIFER DAMIANI, and
11 is a true and correct record of the testimony so
12 given.
13         IN WITNESS WHEREOF, I hereby certify this
14 transcript at my office in the County of Pima, State
15 of Arizona, this 24th day of January 2024.
16
17
18                    JENNIFER DAMIANI
19         Remote Online Notary Public in and for the
20                           State of Arizona

1                CERTIFICATE OF TRANSCRIBER
2
3          I, ROBERT KREB, do hereby certify that this
4  transcript was prepared from the digital audio
5  recording of the foregoing proceeding, that said
6  transcript is a true and accurate record of the
7  proceedings to the best of my knowledge, skills, and
8  ability; that I am neither counsel for, related to,
9  nor employed by any of the parties to the action in
10 which this was taken; and, further, that I am not a
11 relative or employee of any counsel or attorney
12 employed by the parties hereto, nor financially or
13 otherwise interested in the outcome of this action.
14
15                                    *Robert Kreb*
16                           ROBERT KREB

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA
MAYER, KYLE on 01/24/2024                                                    Pages 94..95

```
 1   Errata Sheet

 2

 3   NAME OF CASE: MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA

 4   DATE OF DEPOSITION: 01/24/2024

 5   NAME OF WITNESS: Kyle Mayer

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25             _____
```