```
1             IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF MAINE

3    _____

4    MATTHEW THURSTON, individually

5    and on behalf of others

6    similarly situated,

7          Plaintiff,

8       v.                                     Docket No.

9    PROGRESSIVE CASUALTY INSURANCE            1:22-cv-00375-NT

10   COMPANY and UNITED FINANCIAL

11   CASUALTY COMPANY

12          Defendants.

13   _____

14         AUDIOVISUAL DEPOSITION OF MICHAEL FRIES

15   DATE:           October 2, 2024

16   TIME:           9:19 a.m., Eastern Time

17   LOCATION:       Zoom

18   REPORTED BY:    Alyssa Turner, Remote Notary Public

19   JOB No.:        14345

20

21

22

23

24

25
```

```
 1            A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF:
 3       JOHN ZACHARY STEED, ESQUIRE (PRO HAC VICE)
 4       Island Justice Law
 5       P.O. Box 77
 6       Stonington, Maine 04681
 7       john@islandjusticelaw.com
 8       (207) 200-7077
 9
10   ON BEHALF OF DEFENDANTS:
11       ALLISON HILL WHITE, ESQUIRE
12       King & Spalding LLP
13       1180 Peachtree Street, Northeast
14       Suite 1600
15       Atlanta, Georgia 30309
16       awhite@kslaw.com
17       (404) 572-4600
18
19
20
21
22
23
24
25
```

```
 1                  I N D E X
 2   EXAMINATION:                                PAGE
 3       By Mr. Steed                              5
 4       By Ms. White                             57
 5       By Mr. Steed                             59
 6
 7               E X H I B I T S
 8   NO.         DESCRIPTION                     PAGE
 9              (None marked.)
10
```

```
 1              P R O C E E D I N G
 2        THE REPORTER:  Good morning.  My name is
 3   Alyssa Turner.  I am the officer of this deposition
 4   representing DepoDirect, and we are now on the record.
 5   Today's date is October 2nd and the -- or 2024, sorry,
 6   and the time is currently 9:19 a.m., Eastern Time.
 7        This deposition is taking place remotely in
 8   the matter of Matthew Thurston, individually and on
 9   behalf of others similarly situated, and Progressive
10   Casualty Insurance Company and United -- sorry --
11   versus Progressive Casualty Insurance Company and
12   United Financial Casualty Company.  Sorry about that.
13        The case number is 1:22-cv-00375-NT, and
14   this is the audiovisual recorded deposition of Michael
15   Fries taken on behalf of -- I'm sorry?  Oh, I'm sorry
16   -- taken on behalf of the plaintiff in the United
17   States District Court for the District of Maine.
18        Absent any objection, all parties agree that
19   we may place this witness under oath and record this
20   proceeding remotely via audiovisual method.
21        At this time, will everyone appearing
22   remotely please identify yourself, starting with the
23   noticing attorney?
24        MR. STEED:  John Zachary Steed for the
25   plaintiffs.
```

```
 1        MS. WHITE:  Allison White with King &
 2   Spalding for the defendants.
 3        MR. FRIES:  I'm Michael Fries, Progressive
 4   Insurance.
 5        THE REPORTER:  Thank you.
 6   WHEREUPON,
 7                MICHAEL FRIES,
 8   called as a witness, and having been first duly sworn
 9   to tell the truth, the whole truth and nothing but the
10   truth, was examined and testified as follows:
11        THE REPORTER:  Thank you.
12        Counsel, you may now proceed with
13   questioning.
14                 EXAMINATION
15   BY MR. STEED:
16        Q    So hi, Michael.  My name is John.  I'm a
17   lawyer for the plaintiffs in this case.  Let's see.
18   Have you ever been deposed before?
19        A    Sorry.  My video keeps kicking me -- I have
20   not.  No.
21        Q    Okay.  So just a couple of ground rules:
22   I'm going to ask you a series of questions.  Do you
23   understand that?
24        A    Yes.
25        Q    And then you have to, like, respond
```

```
 1   truthfully, right?
 2        A    Yes.
 3        Q    And if you don't understand my question,
 4   will you let me know?
 5        A    Yes.
 6        Q    And if there's some part of my question you
 7   don't understand, will you let me know?
 8        A    Yes.
 9        Q    And is it safe for me to assume that if I
10   ask you a question and you answer it, that you
11   understood it?
12        A    Yes.
13        Q    And if -- and I'll just reiterate what the
14   court reporter said.  It's important for the record to
15   -- for you to, you know, wait until I finish talking
16   to answer a question.  Do you understand that?
17        A    Yes, I do.
18        Q    Okay.  And then just as a preliminary, did
19   you do anything to get ready for this deposition?
20        A    No.  I spoke with my attorneys, but nothing
21   else.
22        Q    Okay.  When did you -- when did you talk to
23   them?
24        A    Last week.
25        Q    How long did you -- did you talk?
```

```
 1        A    Maybe an hour?
 2        Q    Okay.  So I'm going to start with some
 3   questions just about your background:  Where are you
 4   from?
 5        A    Sorry.  I am originally from Buffalo, New
 6   York, but I moved to Maine when I was a kid, and I
 7   grew up in Portland, Maine.
 8        Q    Okay.  Did you go to college?
 9        A    Yes.
10        Q    Where'd you go?
11        A    University of Maine at Orono.
12        Q    Okay.  That's where my mom went.  What did
13   you study?
14        A    I got a bachelor in business administration.
15        Q    When was that?  When did you graduate
16   college?
17        A    2001.  I'm sorry.  I'm not sure why it keeps
18   kicking me and then bringing me back.  No, it's --
19        Q    That would stress me out if I was having the
20   technology not work.  I thank you for being patient
21   with it all.  We're fine over here.
22        A    I'm good here, too.  Thank you.
23        Q    Cool.  Did you do any grad school or
24   anything?
25        A    I did not.
```

```
 1        Q    Okay.  And then where do you work now?
 2        A    Progressive Insurance.
 3        Q    How long have you worked for Progressive
 4   Insurance?
 5        A    I'm sorry, can you repeat the question?
 6        Q    Sure.  How long have you worked for
 7   Progressive Insurance?
 8        A    Since 2004.
 9        Q    What's your current job at Progressive?
10        A    I am a senior multi-line claims adjuster.
11        Q    What is -- what does that mean?
12        A    That means I handle our multi-line products,
13   which consists of boats, RVs, motorcycles, ATV's,
14   specialty products.  I do damage assessments on all
15   those products out in the field.
16        Q    The last words I heard you say were "out in
17   the field," but --
18        A    Sorry.  I think you did not hear my entire
19   response.
20        Q    Yeah.  The last I heard you say was you --
21   out in the field you do damage assessments of anything
22   but a car, it sounded like.
23        A    I will repeat.  I mean, I'm sorry about this
24   technology snafu I'm having.  I don't know what's
25   going on.
```

```
 1             I'm a senior multi-line representative,
 2   which means I am out in the field doing damage
 3   assessments on motorcycles, boats, RVs, side-by-sides,
 4   utility trailers, specialty products, in Maine.
 5             MR. STEED:  Can we just go off the record
 6   briefly?
 7             MS. WHITE:  Yes.
 8             THE REPORTER:  Yes.  We are going off the
 9   record.  The time is currently 9:25 a.m., Eastern
10   Time.
11             (Off the record.)
12             THE REPORTER:  We are back on the record.
13   The time is currently 9:29 a.m., Eastern Time.
14   BY MR. STEED:
15        Q    Michael, what's your current position at
16   Progressive?
17        A    I am currently a senior multi-line
18   representative.
19        Q    And what's -- what does that job entail?
20        A    I am in the field doing damage assessments
21   and valuations on multiple products, specialty
22   products, meaning, basically, everybody's toys:
23   Motorcycles, RVs, travel trailers, motorhomes, side-
24   by-sides, motorcycles, even some utility trailers or
25   any kind of a specialty type of trailer that requires
```

1 some different type of expertise, I guess you should
2 say. There's a small team of us that do this with
3 Progressive.
4     Q    Okay. How long have you had that job?
5     A    Since 2016.
6     Q    Do you -- since 2016 to present, do you ever
7 do just regular vehicle damage assessments on a car --
8     A    Yes, I do. Yes.
9     Q    So as part of the -- do you do -- currently,
10 do you still do car claims, as well?
11    A    Right now, I do not.
12    Q    Okay. In 2019, did you?
13    A    Yes.
14    Q    Okay. And as a senior representative, are
15 your responsibilities different than someone who isn't
16 a senior representative in the department you're in?
17 Well, let me strike that --
18    A    No.
19    Q    -- question.
20         What does the designation "senior" mean?
21 You said you were a senior claims person.
22    A    It's a title that Progressive applies to my
23 position.
24    Q    And what -- is the job different if you
25 aren't a senior representative, if you're just a -- if

1 they don't call you a senior one, what would they call
2 you? Just a claims representative?
3     A    I suppose so.
4     Q    Okay. How long have you held your current
5 title? Since 2016?
6     A    Correct.
7     Q    Okay. And before that, what did you do?
8     A    I was what is now called a managed repair
9 representative. I was an MRR at that time.
10    Q    And what does an MRR do?
11    A    Handles vehicle damage assessments,
12 inspections, handles total loss valuations, repair
13 management, repairs at collision centers. All the
14 aspects of handling the property portion of a
15 collision claim or comprehensive claim, depending on
16 what happened.
17    Q    Do you work in the state of -- sorry. Does
18 your work cover only claims from the state that
19 originate in the state of Maine?
20    A    No.
21    Q    Where else do you -- what other states do
22 you cover?
23    A    I will sometimes travel to New Hampshire.
24    Q    Do you ever work in any states besides Maine
25 or New Hampshire?

1     A    I went to Massachusetts once or twice a few
2 years ago, but -- but not really. No.
3     Q    Okay. Are the majority of the claims you
4 handle in Maine?
5     A    Yes.
6     Q    And do you ever do total loss valuations
7 still, now, for vehicles in Maine, for motor vehicles?
8     A    Right now I do not, but in the winter, I
9 probably will.
10    Q    Do you supervise any people?
11    A    No.
12    Q    Or do you participate in training any
13 people?
14    A    Not currently.
15    Q    In the past have you?
16    A    To some effect.
17    Q    What do you -- what do you mean? What have
18 -- what training have you done for --
19    A    I would call it more -- it was like a --
20 mentorships with new representatives, teaching them
21 how to do the job.
22    Q    Okay. Is there -- is there a program for
23 that?
24    A    Somewhat. We have a mentor -- a PD
25 mentorship program. We did at the time. PD meaning

1 property damage.
2     Q    So when you have a mentee, what does that
3 look like for you?
4     A    We do ride alongs together and go through a
5 workday in the field where they observe me do my work,
6 and I, in turn, observe them do their work and give
7 them feedback and input on their process.
8     Q    Can you just give me a second? Are you
9 familiar with something called a vehicle valuation
10 report from Mitchell?
11    A    Yes.
12    Q    Can you -- what's a vehicle valuation
13 report?
14    A    It is, essentially, a market survey on a
15 customer's automobile that outlines the value.
16    Q    Okay. What's -- so what do you use them
17 for?
18    A    Determining the actual cash value of a
19 vehicle that's a -- a total loss vehicle.
20    Q    And how do you -- so do you use that as part
21 of your job?
22    A    For automobile claims, yes.
23    Q    Okay. And did you receive training on how
24 to use it?
25    A    Progressive is training me to do my job.

```
 1  Yes.
 2      Q    Okay.  But, specifically, did you receive
 3  training on how to use the -- to produce a vehicle
 4  valuation report?
 5      A    Yes.
 6      Q    How do you -- what was that training?
 7      A    Like -- I'm not sure of your question.
 8      Q    Sure.  How were you trained to produce a
 9  vehicle valuation report?  What materials were
10  presented to you and how?
11           MS. WHITE:  Objection.  Compound.
12           MR. STEED:  Sure.  It's okay.  So I'm going
13  to start over.
14  BY MR. STEED:
15      Q    You said you were trained to use the -- to
16  produce a vehicle valuation report, is that correct?
17      A    Yes.
18      Q    Were you trained by a person?  Were there
19  classes that you took to get trained to produce those
20  reports?
21      A    I don't recall.  It's been quite a while
22  since we started using it, to be honest with you.
23      Q    Okay.  Were there videos that taught you how
24  to use it?
25      A    I don't recall.
```

```
 1      Q    Okay.  When you're going to produce a
 2  vehicle valuation report, what steps do you take to do
 3  that?
 4      A    I arrive at the vehicle.  I confirm the
 5  vehicle's identification number or the VIN number.  I
 6  confirm the vehicle's current mileage.  I enter these
 7  two data points into the valuation worksheet.  I then
 8  confirm the options on the vehicle.  The Mitchell
 9  program typically decodes most VIN numbers with
10  options and packages and optional equipment the
11  vehicle came equipped with.
12           I will then obtain, if available, a window
13  sticker or a manufacturer, like, build sheet to
14  compare with what Mitchell decoded and ensure
15  accuracy.  I will go through the vehicle and compare
16  and confirm options that are listed on the report and
17  on the -- in the software to confirm that it has the
18  correct options listed and that anything that may not
19  be listed in the report are accounted for.
20           Then I will do an overall condition
21  assessment of the vehicle, the exterior and the
22  interior, and the system will produce comparable
23  vehicle -- oh, we also enter the ZIP code.  The ZIP
24  code comes along with it, as the market report
25  confirms vehicles that are typically within a certain
```

```
 1  radius, mileage-wise.  So we are using the market that
 2  is local to the vehicle to confirm a value.  And the
 3  system will produce the report based on all this
 4  information that I entered.
 5      Q    So you said you use a system.  Is that a
 6  piece of computer software?
 7      A    Yes.  It's the Mitchell program that -- that
 8  you referenced earlier.
 9      Q    Okay.  What is -- what do you call it?  How
10  do you refer to it?
11      A    Mitchell WorkCenter.  Mitchell WorkCenter.
12      Q    So you have -- how do you get at the
13  Mitchell WorkCenter?  Do you use a computer or a
14  laptop or a iPad?
15      A    Yes.  It's a company issued laptop that I
16  use?  Yes.
17      Q    Okay.  And do you have to log into it?
18      A    I do.
19      Q    And does that program ever change?  Has it
20  changed over the years that you've been using it?
21      A    I don't recall.
22      Q    And you did receive training on how to use
23  it, right?
24      A    Correct.
25      Q    And do you use it consistent with your
```

```
 1  training?
 2      A    Yes.
 3      Q    And were you trained by Progressive on how
 4  to use that software?
 5      A    Yes.
 6      Q    And for the time that you've been working at
 7  Progressive, have you always used that software to do
 8  total loss evaluations?
 9      A    No.
10      Q    Do you remember when you started using that
11  software to do total loss evaluations?
12      A    I believe it was 2012, but I am not positive
13  that's accurate.
14      Q    And you said you arrive at the vehicle.  So
15  is the first step in your process to travel to
16  wherever you can find the total -- or the -- a vehicle
17  to evaluate it?
18      A    Yes.
19      Q    Not all vehicles are total losses, right?
20      A    That's correct.
21      Q    So is the Mitchell WorkStation (sic) only to
22  evaluate total losses, or is it to evaluate damage on
23  vehicles, too?
24      A    WorkCenter is to evaluate what the vehicle's
25  current actual cash value is.
```

1  Q   Okay. Do you -- with every vehicle that's
2  been damaged, do you, sort of, go through this process
3  of determining its actual cash value?
4  A   No.
5  Q   How do you decide that a vehicle needs to be
6  evaluated for total -- so, I guess -- I assume some
7  vehicles, if they're -- you don't do a total loss
8  valuation on a vehicle unless you assume it's going to
9  be a total loss, right?
10         MS. WHITE: Objection.
11 BY MR. STEED:
12 Q   You can still go ahead and answer. These
13 are going to -- I'm trying to -- trying to get at
14 something that's complicated in my mind, so we'll --
15 I'm going to ask you a few questions and get at it,
16 and then I'll ask some cleaner questions afterwards,
17 but if you could --
18         So not every vehicle is a total loss, right?
19 A   Yep.
20 Q   And you only use the Mitchell tool to
21 determine the actual cash value of a vehicle if you
22 think it's a total loss, right?
23 A   Correct.
24 Q   So what's the -- how do you decide that
25 you're going to use -- I guess -- so do you go out and

1  visit every vehicle if you're doing an assessment of
2  how much -- what the -- you know, what the damage to
3  it is?
4  A   Yes.
5  Q   And then how do you decide a vehicle needs
6  to be evaluated for a total loss versus just a partial
7  loss?
8  A   In general, if the percent of the damages
9  are starting to get up to a certain amount, meaning if
10 it -- if it's getting up to 50, 60, 70, percent, our
11 estimating software will tell us that the dollar
12 amount of the estimate is getting up towards the
13 vehicle's value. That will be the typical leading
14 indicator that you need to do an assessment to confirm
15 the vehicle is repairable -- and not --
16 Q   Okay. So --
17 A   -- a total loss.
18 Q   Got it. So when you arrive at a vehicle,
19 you start using a different piece of software, which
20 is to estimate the damage, right?
21 A   Correct.
22 Q   And can you walk me through that process,
23 how you -- how you go through estimating the damage to
24 a vehicle?
25 A   It's complicated. How -- how much --

1  Q   Like the -- like the two-minute version.
2  You look at the car, right -- so it's a car that's
3  been a -- you know, in a fender bender, someone backed
4  into the rear quarter panel. There's another vehicle.
5  And there's a taillight broken.
6  A   Okay.
7  Q   So -- so what's -- so you arrive at the
8  scene, right. Are you --
9  A   Correct.
10 Q   And the scene being where the vehicle is
11 currently, right?
12 A   Correct.
13 Q   And you have some estimating software,
14 right? So you open that up on your laptop, right?
15 A   Correct.
16 Q   And then with that you would input
17 information about the vehicle, the VIN number, and
18 that would be --
19 A   Yes.
20 Q   -- probably give you the year, the make, the
21 model, everything -- basics that you need to know,
22 right?
23 A   Correct. The estimating software decodes
24 the vehicle and brings up the part schematics for the
25 entire vehicle. And we can write an estimate from

1  those part schematics for replacing or repairing
2  damage components, whether it's -- as you put it, the
3  taillight -- if we need to replace a taillight, you
4  will plug that into your estimate, remove and replace
5  taillight, or you will plug in, remove and replace
6  rear bumper cover or the trunk lid, whatever might be
7  damaged in the back of the car. And you put together
8  any repair estimate based upon the damages you
9  observe.
10 Q   So you observe the damages, you, sort of,
11 check them off on the computer and then the computer
12 starts ballpark -- or giving you estimates of what
13 those things are going to cost, right?
14 A   Correct. The system has --
15 Q   And then the --
16 A   -- parts -- yep.
17 Q   Go ahead.
18 A   I was just going to clarify that it doesn't
19 ballpark. It gives you part numbers and part prices
20 from the manufacturer and what they're worth, or if
21 it's repair time, then you will put repair hours, and
22 the system calculates refinish times, and all that
23 gets built in the estimate then that way. Similar to
24 if you go to a body shop.
25 Q   And then as you're going through that

**Page 22**

1  software, if you're dealing with more extensive
2  damage, does it warn you at some point to move the
3  process over to evaluating for a total loss, or is
4  that something you use your discretion for?
5       A    You will use your discretion, but, again,
6  you will -- there is a tool in the software that tells
7  you what percentage of the ACV, the estimating
8  software, is estimating that you are at.  If it's a
9  dollar amount that's getting close to the value of the
10 vehicle based on the software's information, that's
11 what will typically trigger doing an evaluation.
12      Q    And once you've decided to do the total loss
13 -- once you're trying to do -- use the Mitchell
14 product to determine ECB -- is that different software
15 that you use?
16      A    It's a different program, yes, than the --
17      Q    Okay.
18      A    -- than the estimating software.
19      Q    Is the estimating software also provided by
20 Mitchell?
21      A    Yes.
22      Q    So now we're going to move over to using the
23 vehicle valuation.  So in the Mitchell software suite
24 -- well, let me strike that.
25           Is there a suite of software provided by

**Page 23**

1  specific -- what's the software you use to produce a
2  vehicle evaluation report?  What do you call it?
3       A    Mitchell WorkCenter.
4       Q    So when you open Mitchell WorkCenter to do a
5  new vehicle evaluation -- well, actually, when you
6  open Mitchell WorkCenter, what are your options?  What
7  can you ask Mitchell WorkCenter to do?
8       A    I can see my entire workload.
9       Q    Okay.  And so if you want to do a vehicle
10 valuation report, what do you do once you've opened
11 Mitchell WorkCenter?
12      A    I will go into that specific claim for the
13 vehicle, and within that vehicle's information, I can
14 click on "create total loss," and that will take me
15 into the WorkCenter valuation worksheet to start
16 building the valuation report.
17      Q    And to create the evaluation report so that
18 -- you enter the VIN number, right?
19      A    Yes.
20      Q    And you enter the mileage, is that right?
21      A    Yes.
22      Q    And that's what you're trained to do?
23      A    Yes.
24      Q    And then after you've entered the VIN number
25 and the mileage, the software decodes the VIN number

**Page 24**

1  Mitchell that you use?
2       A    I use software provided by Mitchell, yes.
3       Q    And that software provided by Mitchell has
4  different tools or different programs that you can
5  use?
6       A    Correct.
7       Q    And so one of the -- is it all under one
8  umbrella?  Do you open your Mitchell software and then
9  you can, you know, work on an -- you know, do an
10 estimate or do a vehicle valuation report, or are
11 there other options?
12           MS. WHITE:  Objection.  Compound.
13           You can still answer.
14           THE WITNESS:  No.  It's not all under one
15 umbrella.
16 BY MR. STEED:
17      Q    Okay.  So if you want to do an estimate, do
18 you open up a specific piece of software provided by
19 Mitchell?
20      A    Yes.
21      Q    And if you want to do a vehicle valuation
22 report to get actual cash value of a vehicle, is that
23 a separate piece of software?
24      A    Yes.
25      Q    Okay.  And so now I'm going to ask, sort of,

**Page 25**

1  and gives you a list of options that are on the
2  vehicle, is that correct?
3       A    Yes.
4       Q    And then do you -- you manually confirm that
5  the options that the software says the vehicle should
6  have based on the VIN number are, in fact, the options
7  that it does have?
8       A    Yes.
9       Q    And then do you note any deviations from the
10 presumed list of options?
11      A    Yes.
12      Q    And that's -- and that's what you're trained
13 to do?
14      A    Yes.
15      Q    And then you -- and then you said the next
16 step was that you look for other options to make sure
17 there aren't additional options on the vehicle that
18 aren't on the list you have, right?
19      A    Correct.
20      Q    And that would include aftermarket
21 improvements, right?
22      A    Yes.
23      Q    And that's part of your training, too,
24 right?  Is that what you're supposed to do?
25      A    Yes.

**Page 26**

1  Q    And then you said you go through the
2  vehicle.  Can you describe your process to evaluate
3  the vehicle?  I guess you go through the -- to
4  evaluate the overall condition, interior and exterior.
5  So when you do an evaluation of the exterior, what's -
6  - what is your process?
7      A    I will go around the vehicle confirming any
8  dents or rust in the body panels, any scratches or
9  significant paint issues with regards to the refinish
10 upon the vehicle, if there's clear-coat peeling or
11 paint peeling or improper prior repairs that are
12 notable and clear.  Checking out trim, meaning door
13 handles, tail lamps, headlamps, grills, moldings,
14 things that the vehicle is supposed to be equipped
15 with to confirm they're there, and if they are there,
16 if they're free of damage or if they have damage.  Go
17 through the exterior of the vehicle from -- through
18 all those different categories.
19          Same -- and then same thing for the
20 interior.  Look through carpets, seats, interior trim,
21 center console, dashboard, windshield, and go through
22 the entire vehicle, all the components, looking for
23 any damage or anything wrong with the vehicle that
24 would deviate from standard condition.
25     Q    And if you -- well, what's the purpose of

**Page 27**

1  the, like -- let's start with the exterior.  So your
2  exterior evaluation, what's the purpose of that?  Why
3  are you doing that?
4      A    Because I'm building an -- we are building
5  an ACV report, and if you have two cars you're
6  comparing side by side and one car is all beat up with
7  dents all over it, another car is in normal condition
8  with no dents, I'm sure you would agree that that car
9  with dents all over it is not desirable to you, isn't
10 it?
11     Q    Well, I'll ask the questions.  But, yes, I
12 mean, you're trying to compare the -- you're trying to
13 compare the value of the two vehicles, right?
14     A    Yes.
15     Q    So do you -- oh, go ahead.
16     A    Sorry.  Go ahead.
17     Q    So for each of those, if the car has -- do
18 you just note that a car is all dented up, or do you
19 mark each individual issue with each individual part
20 of the car as part of your evaluation?
21     A    The software has a guide that we use, and
22 the guide gives us criteria on what categories,
23 meaning body or paint -- meaning, for example, if a
24 vehicle that is a certain age has more than two panels
25 with rust, that may mean the vehicle earns a two

**Page 28**

1  rating, which is fair, instead of a good rating.
2          Things to that effect.  We will go through
3  specific criteria and rules and guidelines that are
4  built into the software.  And we -- we don't just
5  freelance is what I'm getting at.  Like there's
6  criteria that we use and there's a -- there's a method
7  to the overall methodology in what's behind the
8  software that was built that we use.
9      Q    And so does the software prompt you to say
10 how -- like just for -- with rust on body panels, is
11 there -- like does it run you -- is it through -- is
12 it a prompt system?  Does it ask you questions, or do
13 you input data about each part of the car?
14         MS. WHITE:  Objection.  Compound.
15 BY MR. STEED:
16     Q    You can go ahead and answer if you
17 understand.
18     A    I input data.
19     Q    And you input data because that's what
20 you're trained to do?
21     A    Yes.
22     Q    And then based on the data that you input,
23 the software gives a condition rating for the vehicle?
24     A    The software gives us criteria on what
25 ratings to give it.  I provide the ratings and the

**Page 29**

1  software provides the calculations based on the
2  ratings.
3      Q    So does the software give you -- I think if
4  we go through this specific vehicle valuation report,
5  maybe I can get these things a little more clearly.
6          So you evaluate the exterior, you evaluate
7  the interior.  And do you take pictures of the
8  exterior and interior, as well?
9      A    If issues exist that need to be noted, yes.
10     Q    After you've noted the interior conditions
11 and exterior conditions in the software, what are your
12 next steps for arriving at the actual cash value of
13 the vehicle with the Mitchell WorkCenter software?
14     A    Hit submit at the end of the worksheet.
15     Q    And then what happens?
16     A    Within a few moments, Mitchell sends back a
17 valuation report after -- because that -- the system
18 takes all that and locates comparable market vehicles,
19 same year, make, and model, typically.  And it will
20 provide a summary comparing the loss vehicle to each
21 market comparable vehicle making additions to the
22 value.
23         If there's options on the vehicle that I'm
24 assessing that the market comps don't have, the system
25 does a system -- well, basically, a pretty

1 comprehensive comparison of the loss vehicle to each
2 market comparable that was located and will provide a
3 value of the loss vehicle as compared to the market
4 comparable vehicle, given the mileage, given the
5 options. It will produce a report with all that data
6 in it. And then it will take an average of all of
7 those market comparable values and give us an ACV for
8 the loss vehicle.
9     Q    If you disagree with the value of a vehicle
10 that the Mitchell WorkCenter Total Loss product gives
11 you, can you make adjustments to the number?
12    A    No.
13    Q    So do you just go with the number that the
14 Mitchell WorkCenter Total Loss product gives you?
15    A    Yes.
16    Q    Do you know what the projected sold
17 adjustment is on those Mitchell WorkCenter Total Loss
18 reports?
19    A    Yes.
20    Q    What is it?
21    A    In layman's terms, it's accounting for the
22 negotiation that occurs when you buy a vehicle and
23 there's an asking price and an ultimate sale price.
24 Typically, the sale price is not the asking price.
25 Typically, it's lower. So it's accounting for that

1 date." What is that?
2     A    The date the evaluation on the vehicle was
3 completed.
4     Q    Okay. And then does every valuation report
5 get a valuation report ID?
6     A    I don't know.
7     Q    Okay. And then do you see over where on the
8 -- where, sort of, the same section we've been looking
9 at, there's a version number?
10    A    Yes.
11    Q    And what's the version number indicate?
12    A    This is the first version of this report
13 that was completed.
14    Q    Okay. So, sometimes, are there multiple
15 versions of the same report?
16    A    Yes.
17    Q    In your experience, why would there be
18 multiple versions of the same vehicle valuation
19 report?
20    A    Every claim is case by case, so it would
21 depend on the factors associated with that particular
22 claim.
23    Q    Sure. But what are some factors? Like what
24 are some things that might lead to multiple versions
25 of the same vehicle valuation report being generated?

1 market -- those market behaviors that occur between
2 retailers and consumers.
3     Q    Do you know how Mitchell calculates that?
4     A    I do not.
5     Q    If you wanted to, could you exclude a
6 projected sold adjustment from a vehicle evaluation
7 report?
8     A    No. There's no option within my end of the
9 software to include or exclude it.
10    Q    Could you look at -- do you have exhibits
11 printed out in front of you?
12    A    I can pull them up.
13    Q    Okay. So I have previously marked something
14 Exhibit A. Could you -- could you pull it up?
15    A    Okay, I have it up.
16    Q    Okay. Can you -- can you tell me what
17 Exhibit A is?
18    A    It is a market valuation report for a 2009
19 Volkswagen Passat.
20    Q    Who's the owner of the vehicle?
21    A    Genevieve McDonald.
22    Q    Okay. And when was the vehicle -- it says,
23 "loss date." What does that mean?
24    A    The date the accident occurred.
25    Q    Okay. And then there's a "valuation report

1     A    Maybe an option was missed and you went back
2 in to edit the report and account for an option that
3 the customer pointed out to you that you didn't
4 notice.
5     Q    Okay.
6     A    For example, a remote car starter was a
7 common one that was hard to notice, or you didn't have
8 the key fob, and you'd go back in and add for a remote
9 car starter, and that would create Version No. 2.
10    Q    Okay. And then how would you -- this is a -
11 - in a -- looking back through a file for someone, how
12 would you be able to tell which vehicle valuation
13 report was used to generate the settlement value or
14 the payment that was actually paid to the person for
15 the actual -- when -- you know, when they received
16 their check for the actual cash value?
17    A    Typically, read the notes.
18    Q    So I'm looking at the second page now of
19 this Exhibit A, and in the bottom, it says, Thurston
20 PGR, Thurston 8239. Do you see that page?
21    A    Yes.
22    Q    So here it's a list of standard equipment,
23 right?
24    A    Right.
25    Q    And this is the standard -- this list is

```
 1  generated by the software after you put the VIN number
 2  in, right?
 3       A    Correct.
 4       Q    And then moving on to the next page, that
 5  list of standard equipment continues, right?
 6       A    Correct.
 7       Q    And then there's also a list of optional
 8  equipment?
 9       A    Yes.
10       Q    And so, here, the optional equipment is a
11  lip spoiler and a rear-side airbags?
12       A    Yes.
13       Q    And so those would be information encoded
14  into the VIN, also?
15       A    No.  Those were items that I noted as
16  additional options that did not decode with the VIN.
17       Q    Okay.  And so -- and that's a background
18  question I forgot to ask.  So this vehicle, you
19  prepared this vehicle valuation report, right?
20       A    Yes.
21       Q    And using the Mitchell WorkCenter total lost
22  software?
23       A    Correct.
24       Q    And then, actually -- so if you could go to
25  the fourth page, there's a Condition Adjustment
```

```
 1  section?
 2       A    Yes, I see it.
 3       Q    Okay.  And so I'm going to just ask you
 4  about the exterior.  So it says, Paint 3, good, and
 5  there are no comments.  You see that?
 6       A    I do.
 7       Q    So for the software to arrive at the
 8  condition as three, what -- how does that happen?
 9       A    I had a work -- we have a worksheet that
10  Mitchell provides us with for the age of the vehicle
11  and criteria that would classify the paint being in a
12  good condition, and I would match up what I see on the
13  vehicle with what I see in the criteria.  And if it
14  meets the criteria of a three, then that's how I rate
15  it.
16       Q    And what would the criteria of a three for
17  paint on a -- you know, a car of this age be, just --
18  can you --
19       A    I don't have it memorized.
20       Q    Sure.  And then -- for the -- it says --
21  then here it's -- trim is 2, fair.  And you said,
22  Right rear bumper, large impact, and cracked.
23       A    That's what it says.  Yes.
24       Q    So the comment would have been -- you would
25  have input those words.  You would have typed that in,
```

```
 1  Right rear bumper, large impact and cracked?
 2       A    Correct.
 3       Q    And then -- so are there -- do you -- the
 4  software -- you said the software has criteria.  Do
 5  you check off criteria or do you read guidance and say
 6  if it has these -- how do you -- how does it arrive at
 7  a two?  Does the software generate the two, or do you
 8  say this is a two?
 9       A    The guide that we have provides guidance and
10  criteria for each category.  As you can see, there are
11  numbers there.  You see threes and there's twos,
12  right?
13       Q    Uh-hm.
14       A    So the software gives -- or the guide that
15  we use for the software has criteria for each
16  different rating and you're looking for matches.  So
17  in this case, the right rear bumper having a large
18  impact was part of the two rating, or a major trim
19  piece having a large impact results in the trim
20  category earning a fair or a two rating.
21       Q    And so here, for example, you know, one
22  piece of trim having a major issue results in a two,
23  right?
24       A    Correct.
25       Q    And it might be that the software would tell
```

```
 1  you that if three areas had major problems, then you
 2  should give it a one, right?
 3       A    I mean, potentially.  It depends on what the
 4  guide says and the age of the vehicle.  So that's a
 5  speculative question.
 6       Q    Sure.  But you -- the trim -- level two trim
 7  rating comes from you following guidelines provided to
 8  you by the software, right?
 9       A    Correct.
10       Q    And that's what you're trained to do, right?
11       A    Correct.
12       Q    And same thing for the body, where the body
13  condition is a two, you arrived at that -- or this
14  report arrived at that two because you followed the
15  software and you followed your training, right?
16       A    Correct.
17       Q    And the same thing for the engine condition
18  is 1, poor.  Do you see that?
19       A    I do.
20       Q    And you arrived at that condition rating
21  because you followed the guidelines and the software,
22  right?
23       A    Correct.
24       Q    And then it was.  And you followed the
25  guidelines in the software because that's how you were
```

```
 1   trained by Progressive, right?
 2       A    Correct.
 3       Q    And each of these condition ratings that we
 4   see here were the result of you following guidelines
 5   provided by the software, right?
 6       A    Correct.
 7       Q    I'm sorry, I didn't hear that.
 8       A    Correct.
 9       Q    And then based on the mileage, the VIN, the
10   condition ratings, and the options on the vehicle,
11   once you have those pieces of information, the
12   software generates the comparable vehicles, right?
13       A    Yes.
14       Q    And then the software also generates the
15   adjusted value of each of those vehicles, right?
16       A    Yes.
17       Q    And the software, also, is part of that
18   adjusted price of the vehicles, uses the projected
19   sold adjustment, right?
20       A    Yes.
21       Q    And you don't have the ability to adjust the
22   projected sold adjustment, do you?
23       A    No.
24       Q    And you don't have the ability to make
25   changes to the adjusted price of the comparable
```

```
 1       A    Yes.
 2       Q    So what are you supposed to do if someone
 3   says, That number is too low.  It should be, you know,
 4   higher?
 5       A    Ask questions.  Ask them why they think
 6   that.  Have a conversation with the customer about
 7   their vehicle.
 8       Q    What happens if you agree that the number
 9   should be higher?
10       A    Follow our dispute process and ask the
11   customer for comparable vehicles to be considered in
12   their -- in their dispute, if they're disputing the
13   value.
14       Q    Okay.  Yeah.  What's the dispute process?
15       A    I just told you.
16       Q    So if a -- a customer can present you with
17   other comparable vehicles?
18       A    We will review them.  If they are valid and
19   they are true comparables, then we will, potentially,
20   submit them to Mitchell to have Mitchell rerun the
21   report, if the case is warranted.  Again, these are
22   all case by case.  Every claim is different.
23       Q    So we use -- so how often does it happen
24   that you get a new -- well, what happens if you send a
25   comparable vehicle to Mitchell and they accept it?
```

```
 1   vehicles, do you?
 2       A    No.
 3       Q    Have you ever worked for any other insurance
 4   companies?
 5       A    No.
 6       Q    Do you -- are you part of communicating?  Do
 7   you communicate with customers?
 8       A    Yes.
 9       Q    So are you the person who sends this -- lets
10   people know what the actual cash value of their
11   vehicle is as determined by the vehicle valuation
12   report?
13       A    Most of the time.
14       Q    Are you -- do you receive any training on
15   how to communicate the settlement numbers to people?
16       A    Yes.
17       Q    What is that training?
18       A    I'm not sure what you mean.
19       Q    Well, do you ever deal with a situation --
20   do people ever tell you that the number should be
21   higher when you tell them what the settlement value,
22   as generated by the vehicle valuation report, is?
23       A    Yes.
24       Q    Are you trained on how to respond to those
25   issues?
```

```
 1   Have you -- well, has that ever happened to you, that
 2   people send you a -- say, no, here's a better
 3   comparable and you send it to Mitchell and then
 4   Mitchell gives you a different number for the
 5   settlement value of a vehicle based on customer
 6   provided comparables?
 7            MS. WHITE:  Objection.  Form.
 8   BY MR. STEED:
 9       Q    Have you ever seen that happen?
10       A    Yes.
11       Q    How often?
12       A    Are you asking for a percentage?  I don't
13   know how to answer that question.
14       Q    I mean, does it -- how -- in a -- how many
15   times a month do you think that happens?
16       A    I don't know.
17       Q    Like in your experiences, in cases you've
18   been dealing with, how many times in a month, on
19   average?
20       A    Maybe once.  Not very often.
21       Q    Okay.  How many how many claims do you go
22   through in a month?
23       A    Now or when I did auto?
24       Q    When you did auto.
25       A    Been here -- been here a long time, so it's
```

```
 1   a hard question to answer.
 2       Q   Sure.  Sure.  When you did auto, how many --
 3   what was the average month for claims?
 4       A   Maybe 150.
 5       Q   Do you -- do people ever -- do you have any
 6   training on how to respond to people if they have
 7   questions to you about the projected sold adjustment?
 8       A   Yes.
 9       Q   Do you get other policies or procedures
10   about how you're supposed to respond to, you know,
11   people questioning the projected sold adjustment?
12       A   Not that I'm aware of.
13       Q   Okay.  What are you supposed to do if
14   someone asks about the projected sold adjustment?
15       A   Explain to them what it is.
16       Q   And what is it?
17           MS. WHITE:  Objection.
18   BY MR. STEED:
19       Q   You can answer.
20       A   My understanding is it's the software's
21   accounting for the market conditions that occur when
22   consumers purchase vehicles and the -- the negotiation
23   that takes place between the asking price and the
24   ultimate sale price.
25       Q   And when people raise questions and when
```

```
 1   people ask you what is a projected sold adjustment,
 2   what are you supposed to tell them?
 3       A   We have a discussion about vehicle asking
 4   prices and what people purchase vehicles for and how
 5   those two numbers are typically never the same, and
 6   the sale price is always less than the asking price
 7   when you purchase a vehicle.  And it's the software's
 8   way of accounting for those market conditions and the
 9   value of the car.
10       Q   Other than submitting -- was there any way
11   for you to give someone more money than -- or is there
12   a way -- sorry.  Strike that.
13           Is there a way for you to offer a customer
14   more money than the settlement value generated by
15   Mitchell for a total loss vehicle?
16       A   I'm not sure I understand your question.
17       Q   Sure.  If a customer -- so if we've been
18   looking at this Exhibit A and it gives a settlement
19   value for this vehicle of $4,034.78 -- do you see
20   that?
21       A   Yes.
22       Q   So when you communicate with a client, you
23   would tell them that the settlement value of this
24   vehicle is $4,034.78, right?
25       A   Correct.
```

```
 1       Q   And you said one way that people can dispute
 2   that is to provide other comparable vehicles, and
 3   sometimes that will result in Mitchell giving a
 4   different number.  Right?
 5       A   Correct.
 6       Q   Is there any other way -- can you decide to
 7   give a person $4,500 for this vehicle that Mitchell
 8   said is worth 4034?
 9       A   Not typically without reasoning why.
10       Q   Sure.  Well, how -- if -- are there -- but
11   are there -- are there ways for you to give a customer
12   more money even though the Mitchell report says the
13   number should be something else?
14       A   Yes.
15       Q   Like what are some of those ways that you
16   can do that?
17       A   Maybe one of the condition categories was
18   potentially borderline.  Maybe you can make a
19   concession.
20       Q   And so you said make a concession.  Are you
21   -- is there a process you have to go through to make a
22   concession?
23       A   Typically involves management or supervisor
24   involvement.
25       Q   Okay.  So you would talk to a supervisor and
```

```
 1   say, Maybe we can change the condition of what -- you
 2   know, we can change the body condition and make it a
 3   three instead of a two or a four instead of a three?
 4       A   Potentially.  If it's justified.
 5       Q   Right.  And if it's justified, you'd need
 6   approval from a supervisor to do that?
 7       A   Correct.
 8       Q   So changing the condition is one way to do
 9   it.  Are there other ways to do it?
10       A   Not to my knowledge.
11       Q   Are there -- can you do -- is it possible
12   for you to do just a cash concession?  Can you just
13   say we're going to increase it by $300 and call it a
14   concession with management approval?
15       A   That's not my decision.
16       Q   Right.  But if -- is it something that can
17   be done?
18       A   Suppose.
19       Q   Well, have you seen it done?
20       A   I have.
21       Q   How often does that happen?
22       A   Not often.
23       Q   Like less than once a month?
24       A   Yes.
25       Q   So I've got some questions now about how --
```

```
 1   your access to files and how you can, you know, pull
 2   up claim files and what information is available to
 3   you.  Does that make sense?
 4       A    Yes.
 5            MR. STEED:  Actually, why don't we take a
 6   little break, maybe five minute break?  Does that work
 7   for everyone?
 8            MS. WHITE:  Yep.
 9            MR. STEED:  Okay.  Let's go off the record
10   and come back in five?
11            THE WITNESS:  Okay.
12            MR. STEED:  All right.  Sounds good.
13   Thanks.
14            THE REPORTER:  All right.  We are going off
15   the record.  The time is currently 10:25 a.m., Eastern
16   Time.
17            (Off the record.)
18            THE REPORTER:  Okay.  We are back on the
19   record.  The time is currently 10:34 a.m., Eastern
20   Time.
21   BY MR. STEED:
22       Q    I just have a few follow-up questions on the
23   -- to go back on.
24            So looking at Exhibit A, that vehicle
25   valuation report we were talking about?
```

```
 1       A    Yeah.
 2       Q    Do you regularly produce these reports?
 3       A    Currently?
 4       Q    Yeah.
 5       A    No.  No.
 6       Q    When -- back in 2019, when you were -- when
 7   you made this report, is that -- was that a regular
 8   part of your job?
 9       A    Yes.
10       Q    And when you would put the information in,
11   was it -- you know, while you were looking at it, was
12   it sort of -- when you entered the information into
13   the computer, would it immediately show up in the
14   computer system afterwards?
15       A    You're asking how soon the valuation report
16   is available?  I'm not sure what your question --
17       Q    The information you put into the -- into the
18   system, was it recorded as soon as you put it in
19   there?
20       A    I'm sorry.  I don't really understand what
21   you're asking.
22       Q    Sure.  So this report was generated by you
23   inputting data into a computer, right?
24       A    Correct.
25            MS. WHITE:  John?
```

```
 1            MR. STEED:  Yeah?
 2            MS. WHITE:  I don't mean to interrupt.  Do
 3   you want to stipulate to business records' exception?
 4            MR. STEED:  Sure.  Yeah, yeah.  I'm mostly
 5   just practicing, but, yes --
 6            MS. WHITE:  Okay.
 7            MR. STEED:  -- let's stipulate to the
 8   business records' exception.  Yeah.  Because I don't
 9   think we're going to have an issue with the records,
10   right?
11   BY MR. STEED:
12       Q    Well, from the time you started using the
13   Mitchell product, do you remember the process for
14   using it changing?
15       A    I don't recall.
16       Q    Are you saying you don't know if it ever
17   changed or you don't remember what the changes were?
18       A    Both.
19       Q    I'm going to ask you some -- some questions
20   about your access, like what information is available
21   in a claim file.
22       A    Okay.
23       Q    What information is in a claim file?
24       A    The people that were involved in the claim,
25   where the claim -- where the loss occurred, what date
```

```
 1   and time the loss was reported to us.  Vehicle
 2   information is typically in the claim file.  Sometimes
 3   we don't have the third-party information of the
 4   vehicle until we get a police report, so the police
 5   reports will ultimately become part of the file.
 6       Q    Are the vehicle valuation reports in the
 7   claim file if there was a vehicle valuation report?
 8       A    Yes.
 9       Q    How would you -- how do you access the
10   information in a claim file?
11       A    You mean, like, those documents?  The
12   evaluation report, how do I access or?
13       Q    Yeah.  For like -- how would you find a
14   valuation report inside a claim file?
15       A    I would go to the document section in the
16   claim.
17       Q    And that would be how -- what software would
18   you -- is it on a computer somewhere, like you would
19   open a folder or is it --
20       A    We have --
21       Q    -- software?
22       A    Progressive has claim software, internal
23   claim software that we use, and it would be in that
24   software.  I can -- you can view the valuation report
25   in that software, or you can navigate into the
```

**Page 50**

1  Mitchell software, as we typically do, and we can view
2  it in there, as well.
3     Q   And in the claim software, are -- can you do
4  searches of that software?  Is that a database?
5     A   Yes.
6     Q   From the claim software, could you -- could
7  you pull up, like, all the vehicle evaluation reports
8  that you handled in a specific period of time?
9     A   I don't know.
10    Q   How would you -- if you -- if there were
11 multiple vehicle valuation reports and a claim file,
12 how would you figure out which one was used to
13 determine the final settlement value of a vehicle?
14    A   It would be noted in the claim notes.
15    Q   So you'd have to look in the claim notes?
16    A   Right.  We'd have to read notes, correct.
17    Q   Can you search the notes?
18    A   You can.
19    Q   The specific words?
20    A   Don't know about words.
21    Q   Oh.  Well, you said you can search them.
22 Like how -- how do you -- how do you search the claim
23 notes?
24    A   Filter them by what type of note it is,
25 whether it's, like, a damage note or, maybe, a

**Page 51**

1  liability note or a coverage note.  Or you can filter
2  them by who the author of the note was.  Those are
3  typically the ways you search them.
4     Q   Okay.  If you were looking for, you know,
5  like this hypothetical question I had, the vehicle
6  valuation report that was actually used in a claim,
7  how long would it take you to look through the claim
8  notes to find the one that was actually used to arrive
9  at the settlement value, do you think?
10    A   Thirty seconds --
11    Q   Thirty seconds?
12    A   -- maybe.
13    Q   And for any specific piece of information
14 within a claim note, can you find it pretty quickly?
15    A   Usually.  Every claim is different, so it
16 depends on the claim file and the length of the notes
17 and how many are in there.
18    Q   You said you started using the Mitchell
19 WorkCenter Total Loss tool to do total loss claims,
20 maybe, in 2012 or so.  Before that, what did you do?
21    A   I don't recall what it was called.  We had a
22 different program or software.
23        MR. STEED:  I may be almost done.  I'm just
24 going to look through a couple more things, so don't -
25 - I can't imagine it's going to be too much longer, so

**Page 52**

1  hopefully you can go back to your day.  I'm just going
2  to double-check my notes.
3         I'm just going to, maybe, take -- if we take
4  a break for two or three minutes, I'm just going to
5  get some final stuff done.  If you all want to, you
6  know, turn off your screens anyway.
7         Can we go off the record for five minutes,
8  say, and I think I'll wrap up five minutes after that?
9         MS. WHITE:  Okay.
10        THE REPORTER:  Okay.  We are going off the
11 record.  The time is currently 10:43 a.m., Eastern
12 Time.
13        (Off the record.)
14        THE REPORTER:  All right.  We are back on
15 the record.  The time is currently 10:49 a.m., Eastern
16 Time.
17 BY MR. STEED:
18    Q   Okay.  So you've been using Mitchell
19 WorkCenter Total Loss since 2012 to do vehicle
20 valuation reports, is that correct?
21    A   To the best of my recollection.  Yes.
22    Q   And did you use it regularly in 2016?
23    A   Yes
24    Q   In 2017?
25    A   I mean, I wouldn't say regularly.  My job

**Page 53**

1  role changed in 2016.
2     Q   Okay.  Do you still have access to the
3  software today?
4     A   I do.
5     Q   Have you used it this year?
6     A   Earlier in the year, maybe, a couple times.
7  I don't remember if I've used it in 2024 or not, to be
8  honest with you.
9     Q   You said you expected to be using it this
10 winter, maybe, to do some total losses?
11    A   Correct.  Because my job role is seasonal in
12 this part of the country.  People put away their boats
13 and their motorcycles and their RVs.  So if claim
14 volume dictates, then I will be assisting with our
15 automobile damage appraising group where I would --
16 would be -- would be using it.
17    Q   Okay.  So you still do total loss claims as
18 part of your job for Progressive, right?
19    A   Correct.
20    Q   And you use the Mitchell WorkCenter Total
21 Loss software to do that, right?
22    A   Yes.
23    Q   Since 2016, do you remember any major
24 changes to how that software functions?
25    A   I do not.

```
 1    Q   Since 2016, do you remember any major
 2  changes to how you're supposed to use the software?
 3    A   I do not.
 4    Q   You said you work for Progressive, right?
 5    A   Yes.
 6    Q   What is United Financial Casualty Company?
 7    A   A subsidiary of Progressive, I -- it's my
 8  understanding.
 9    Q   Okay.  Do you work for them?
10    A   I work for Progressive.
11    Q   Are there any other tools you can use to do
12  a vehicle valuation report for a total loss claim
13  besides the Mitchell WorkCenter Total Loss?
14    A   Are you talking for automobile claims?
15    Q   Yes, for automobile claims?
16    A   No.
17    Q   And that's been the case from 2016 on,
18  correct?
19    A   Correct.
20    Q   And I'm just going to walk through the
21  process of doing a total loss evaluation again.  So
22  you -- just -- and, just, I'll ask you:  So is the
23  first step in using the Mitchell WorkCenter Total Loss
24  product to enter the VIN number into the vehicle?
25    A   Yes.
```

```
 1    Q   Or let me -- so is the first step to enter
 2  the VIN number of the vehicle into the software?
 3    A   Yes.
 4    Q   And that's what you're trained to do by
 5  Progressive?
 6    A   Yes.
 7    Q   And then the next step is to enter the
 8  mileage of the vehicle into the software?
 9    A   Yes.
10    Q   And that's what you're trained to do by
11  Progressive?
12        MS. WHITE:  Objection.  Asked and answered.
13  BY MR. STEED:
14    Q   You can still answer.
15    A   Yes.
16    Q   And then the next step is to compare the
17  features you see on the vehicle to the features the
18  software generates based on the VIN number, right?
19        MS. WHITE:  Objection.  Asked and answered.
20        THE WITNESS:  As I stated earlier in this
21  interview, yes, that's correct.
22  BY MR. STEED:
23    Q   And then the next step is to evaluate the
24  condition of the vehicle, right?
25    A   Correct.
```

```
 1    Q   And to evaluate the condition of the
 2  vehicle, you're trained to apply objective criteria
 3  provided by the software, right, to evaluate the
 4  condition of the vehicles?
 5    A   Correct.  Provided by Mitchell, the owner of
 6  the software, correct.
 7    Q   And is that what you do?
 8    A   Yes.
 9    Q   Do you ever -- do you ever deviate from your
10  training in assessing the condition of vehicles?
11    A   No.
12    Q   And is -- as far as you know, is the process
13  that you use the same as what other people use at
14  Progressive to evaluate total losses using the
15  software?
16        MS. WHITE:  Objection.
17        THE WITNESS:  Can't speak for what other
18  people do.
19  BY MR. STEED:
20    Q   Have you ever seen other people use the
21  software?
22    A   Actually witness them use it?  Yes.
23    Q   Yes.
24    A   Sure.
25    Q   Did they do anything different than you do
```

```
 1  when they used it?
 2    A   Not that I observed, no.
 3    Q   Okay.
 4        MR. STEED:  I don't have any further
 5  questions.
 6                    EXAMINATION
 7  BY MS. WHITE:
 8    Q   Mr. Fries, you said that after you input
 9  information into WorkCenter Total Loss, it comes back
10  with a report in a few moments.  Is that always the
11  case, that you get a report in a few moments?
12    A   The majority of the time, yes, but, no, not
13  always the case.
14    Q   And is it always the case that Mitchell
15  returns a comparable vehicle valuation report like the
16  type shown in Exhibit A?
17    A   No.
18    Q   Are there other types of reports that
19  Mitchell WorkCenter Total Loss can produce?
20    A   Yes.
21    Q   And what types of reports are those?
22    A   It would typically be, like, a dealer quote
23  instead of this type of report that you see in this
24  exhibit.
25    Q   Any others?
```

| | |
|---|---|
| 1  A    That's the primary one that comes to mind, 2 off the top of my head. 3  Q    When you are following the condition 4 guidelines within the Mitchell system, is there any 5 room for reasonable disagreement as to which rating to 6 apply? 7  A    Yes. 8  Q    Do you have to use your discretion in 9 determining which rating to apply? 10  A    At times, yes. 11  Q    Are there times when you are not able to 12 assess the condition of a particular aspect of a 13 vehicle? 14  A    Absolutely. 15  Q    And what are those situations where you 16 can't assess the condition of the vehicle? 17  A    Most obvious one is a complete burn.  The 18 vehicle has nothing left to it.  You can't assess the 19 interior or exterior condition, pre-loss condition, or 20 -- 21  Q    Any other -- 22  A    -- if there's a vehicle that's destroyed in 23 a collision, the really, really, really, really bad 24 ones, fatal accidents, things like that?  Sometimes 25 you simply can't get inside the vehicle.  There's no | 1 way to see inside, so -- those would be the two most 2 obvious examples I can think of. 3        MS. WHITE:  No further questions. 4              FURTHER EXAMINATION 5 BY MR. STEED: 6  Q    When you do a dealer quote, does that ever - 7 - does a dealer quote ever have a PSA involved? 8  A    Sorry.  A PSA? 9  Q    Oh, sorry.  When Mitchell, instead of a 10 comparable vehicle valuation report, gives you a 11 dealer quote valuation report, does the dealer quote 12 evaluation report ever make use of a projected sold 13 adjustment? 14        MS. WHITE:  Object to form. 15        THE WITNESS:  Not to my knowledge. 16        MR. STEED:  I don't have any other 17 questions. 18        MS. WHITE:  I don't either. 19        THE REPORTER:  All right.  Did we want a 20 read and sign for Mr. Fries? 21        MS. WHITE:  Yes.  Yes. 22        THE REPORTER:  Okay.  And Mr. Steed and Ms. 23 White, are you all ordering? 24        MR. STEED:  Yes.  Yes, please.  Just a 25 condensed. |
| 1        THE REPORTER:  Okay.  And Ms. White? 2        MS. WHITE:  I believe so, but can I put our 3 paralegal in touch with you? 4        THE REPORTER:  Yes, absolutely.  You can 5 actually -- you can contact me if you wanted to order 6 it later, or you can just contact DepoDirect.  If it's 7 easier to contact me, you can contact me.  My email is 8 in the chat. 9        MS. WHITE:  Okay. 10        THE REPORTER:  All right.  We are going off 11 the record.  The time is currently 11:01 a.m., Eastern 12 Time. 13        (Signature Reserved.) 14        (Whereupon, at 11:01 a.m., Eastern Time, the 15 proceeding was concluded.) | 1              CERTIFICATE OF NOTARY PUBLIC 2        I, ALYSSA TURNER, A Remote Online Notary of 3 the State of TEXAS, duly authorized to administer 4 oaths, do hereby certify: 5        That I am a disinterested person herein; 6 that the witness, MICHAEL FRIES, named in the 7 foregoing deposition, was by me duly sworn to testify 8 the truth, the whole truth, and nothing but the truth; 9 that the deposition was reported by me, ALYSSA TURNER, 10 and is a true and correct record of the testimony so 11 given. 12        IN WITNESS WHEREOF, I hereby certify this 13 transcript at my office in the County of Hunt, State 14 of Texas, this 2nd day of October, 2024. 15 16 17                              ALYSSA TURNER 18            Remote Online Notary Public in and for the 19                                        State of Texas |

```
 1                CERTIFICATE OF TRANSCRIBER
 2           I, KIMBERLY JONES, do hereby certify that
 3   this transcript was prepared from the digital audio
 4   recording of the foregoing proceeding, that said
 5   transcript is a true and accurate record of the
 6   proceedings to the best of my knowledge, skills, and
 7   ability; that I am neither counsel for, related to,
 8   nor employed by any of the parties to the action in
 9   which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise interested in the outcome of this action.
13
14                                   *Kim Jones*
15                                      KIMBERLY JONES
16                         CERTIFIED ELECTRONIC TRANSCRIBER
17                                      AAERT CET #1411
```

Errata Sheet

NAME OF CASE: MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE and UNITED FINANCIAL CA

DATE OF DEPOSITION: 10/02/2024

NAME OF WITNESS: Michael Fries

Reason Codes:
  1. To clarify the record.
  2. To conform to the facts.
  3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

Page _____ Line _____ Reason _____
From _____ to _____

_____