Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 1 of 15   PageID #: 4871

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

```
 1                UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF MAINE

 3     _____

 4     MATTHEW THURSTON, individually,

 5     and on behalf of others

 6     similarly situated,

 7                       Plaintiff,

 8          v.                                  Case No.

 9     PROGRESSIVE CASUALTY                     1:22-CV-00375-NT

10     INSURANCE COMPANY, et al.,

11                       Defendants.

12     _____

13          AUDIOVISUAL DEPOSITION OF MARC SPIZZIRRI

14     DATE:           November 13, 2024

15     TIME:           9:00 a.m., Eastern time

16     LOCATION:       Zoom

17     REPORTED BY:    Freya Amis, Remote Notary Public

18     JOB No.:        14492
```

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 2 of 15   PageID #: 4872

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 2

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF:
 3        SCOTT C. BORISON, ESQUIRE
 4        Borison Firm LLC
 5        1400 South Charles Street
 6        Baltimore, Maryland 21230
 7        scott@borisonfirm.com
 8        (301) 620-1016
 9
10        JOHN Z. STEED, ESQUIRE
11        Island Justice Law
12        40 School Street/P.O. Box 771
13        Stonington, Maine
14        john@islandjusticelaw.com
15        (207) 200-7077
16
17   ON BEHALF OF DEFENDANTS:
18        JAMES MATTHEW BRIGMAN, ESQUIRE
19        King & Spalding LLP
20        1180 Peachtree Street Northeast, Suite 1600
21        Atlanta, Georgia 30309
22        mbrigman@kslaw.com
23        (404) 572-3566
24
25
```

Page 3

```
 1              I N D E X
 2   EXAMINATION:                          PAGE
 3        By Mr. Borison                    5
 4
 5
 6              E X H I B I T S
 7   NO.                                   PAGE
 8
 9             (None marked.)
```

Page 4

P R O C E E D I N G

THE REPORTER: Good morning. My name is Freya Amis, and I'm the officer of this deposition representing DepoDirect, and we are now on the record. Today's date is November 13, 2024, and the time is 9:00 a.m. Eastern time.

This deposition is taking place remotely in the matter of Matthew Thurston, individually and on behalf of others similarly situated, v. Progressive Casualty Insurance Company, et al. The docket number is 1:22-CV-00375-MT (sic), and this is the audiovisual recorded deposition of Marc Spizzirri, taken on behalf of the plaintiff in the United States District Court for the District of Maine.

Absent any objection, all parties agree that we may place this witness under oath and record this proceeding remotely via audiovisual method.

At this time, will all counsel appearing remotely please identify yourself, starting with the noticing attorney, and please state who you represent?

MR. BORISON: Scott Borison on behalf of the plaintiffs.

MR. BRIGMAN: Matt Brigman on behalf of the defendants.

THE REPORTER: Thank you. I'll now swear in

Page 5

the witness.

Will you raise your right hand, please?

WHEREUPON,

MARC SPIZZIRRI,

called as a witness, and having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.

Counsel you may begin.

MR. BORISON: Thank you.

EXAMINATION

BY MR. BORISON:

Q   My name is Scott Borison. I represent the plaintiffs in this case. I'm assuming you've been deposed before. But if I'm wrong --

A   That's correct.

Q   All right. So you know the general ground rules, which is, first, if you need a break, just tell me. Second, if you don't understand a question I ask, if you could please let me know, I'd appreciate that. And additional, since you've had depositions before, I won't spend all the time going through all the normal things. But if there's a problem, just let me know, please. Okay?

A   Understood.

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 3 of 15   PageID #: 4873

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 6

1  Q   All right. So speaking of which, do you
2  know how many times you've been deposed?
3  A   Ballpark would be over 10.
4  Q   Okay. And is that in connection with being
5  an expert?
6  A   A -- a number of those are as an expert,
7  yes.
8  Q   And other than an expert, is that just you
9  were a fact witness?
10 A   A fact witness or a party to a case.
11 Q   Okay. And my understanding is you operated
12 some Ford dealerships in California?
13 A   Say that again? Operated?
14 Q   Ford dealerships in California?
15 A   No, I had more than four.
16 Q   No, I'm sorry. Ford, F-O-R-D.
17 A   Ford. Yes. Among other dealer -- other
18 manufacturers, I did -- I did have Ford dealerships,
19 yeah.
20 Q   Okay. And where was that in California?
21 A   Ford dealerships were in East Los Angeles,
22 City of Montebello, Downtown Los Angeles, Whittier,
23 California, Toyota in San Juan Capistrano, Honda and
24 Nissan in Rancho Santa Margarita, and then motorcycle
25 dealership in -- and classic car dealerships in San

Page 7

1  Juan Capistrano, California.
2  Q   Okay. And your education background, what
3  is your education?
4  A   I have a BS and a JD undergraduate,
5  University of Pittsburgh, and JD and BSL from Thomas
6  Jefferson Law -- Law School.
7  Q   In San Diego. Right?
8  A   That's correct.
9  Q   I have a lot of friends who went there. So
10 --
11 A   Oh, okay.
12 Q   All right. And I'm sorry, you said JD and
13 something.
14 A   Yeah, BSL.
15 Q   Okay.
16 A   Bachelor of science in law.
17 Q   Okay. Thank you. And do you have any
18 training in statistics?
19 A   Not formal training, no, other than, you
20 know, classes in school.
21 Q   All right. Other than classes in school,
22 have you taken any training or education courses
23 regarding statistics?
24 A   I have not.
25 Q   And what about for survey information? Have

Page 8

1  you taken any classes?
2  A   No.
3  Q   And you mentioned practical experience in
4  statistics. I believe you did. Do you have practical
5  experience dealing with statistics?
6  A   Well, define statistics for me.
7  Q   Sure. Basically, a way of analyzing data.
8  A   Yes.
9  Q   And what's that experience?
10 A   Well, just in different experiences with
11 real estate ventures, in the car business, evaluating
12 and devaluations of different businesses. Obviously,
13 you're looking at data and trying to reach
14 conclusions.
15 Q   Okay. Do you have any other understanding
16 of what statistics means besides the definition I gave
17 you?
18 A   No.
19 Q   All right. And beyond the business
20 dealings, do you have any training in conducting
21 surveys?
22 A   Informally, but no detailed training.
23 Q   How many surveys have you conducted?
24 A   I've been involved through my businesses in
25 customer surveys, many of them, and work that I did

Page 9

1  for Ford Dealers Advertising Association. I was the
2  president of that, and a lot of our decisions as it
3  relates to advertising was based on statistical
4  analysis and surveying consumers.
5  Q   All right. And for those surveys, like you
6  said, customer surveys, are those surveys that you
7  designed?
8  A   I had a corporate psychologist that was
9  resident in all my dealerships, and together we
10 designed surveys. But he's the real architect of the
11 surveys.
12 Q   And is that the same true for the Ford
13 Association surveys?
14 A   I would say that -- well, it's not the same
15 person, but yeah, that was a group. Yeah. Yes.
16 Q   But were you primarily responsible for the
17 design of any survey for the Ford Association?
18 A   No.
19 Q   Other than the customer surveys and the Ford
20 Association surveys, any other surveys?
21 A   Not that I can think of offhand.
22 Q   During your time, are you familiar with the
23 Maine used car market?
24 A   No.
25 Q   All right. Do you have any, background or

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 4 of 15   PageID #: 4874

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 10

1 experience in regards to consumer behavior?
2  A  Yes.
3  Q  And what is that?
4  A  Forty years in the car business.
5  Q  All right.  Anything else?
6  A  No.
7  Q  Now, you prepared actually a initial report
8 and then amended expert report, correct?
9  A  That's correct.
10  Q  Okay.  And I know in your report, you
11 mentioned that you've talked to other people or --
12 forgive me, what language.  I'll get to that.  I'm
13 sorry.
14     There was specific language that you used
15 that you had discussed with other people.  Did anybody
16 else help prepare the report other than you?
17  A  In writing report, no.
18  Q  Okay.  I'm sorry.  Did you say the amended?
19  A  I said no, in writing and preparing the
20 report, no one else helped me write it, but I relied
21 on information from -- that I received -- I saw on the
22 Internet, or just in the industry, but I wrote the
23 report.
24  Q  Right.  And that's why I was trying to -- I
25 wasn't trying to do a trick question, but --

Page 11

1  A  Okay.
2  Q  -- it was inartful.  So you have the
3 documents with you.  We had told that we'd probably
4 talk about the original and the amended report.  And I
5 --
6  A  I have -- I have the -- the new report.
7  Q  Okay.
8  A  And then I have part of the original report
9 with me.
10  Q  Okay.  In preparing the amended report, did
11 you review the report by Plaintiff's expert, Mr.
12 Merritt?
13  A  No, I was not familiar with the plaintiff's
14 expert when I filed the current report.
15  Q  Okay.  So you haven't looked at Mr.
16 Merritt's report at all?
17  A  Not relating to this case, no.
18  Q  Okay.  Had you looked at it relating to any
19 other case?
20     MR. BRIGMAN:  Object to the form.  I mean,
21 just to be clear, are you talking about the one that
22 has Thurston on the top?  Or are you talking about the
23 copies, the previous reports that look exactly the
24 same?
25     MR. BORISON:  Sure.  I wasn't limiting it,

Page 12

1 but we can do it that way.
2 BY MR. BORISON:
3  Q  Have you reviewed any reports of Mr. Merritt
4 in regards to insurance actual cash value reports?
5  A  I recall looking at a report for Mr. Merritt
6 involved in a different case.
7  Q  All right.  Do you recall what case that
8 was?
9  A  I don't.
10  Q  All right.  Would you have any notes that
11 would tell you what case that was?
12  A  Not in front of me.
13  Q  Okay.  But do you think there might be a
14 note somewhere where it would tell you which report
15 you looked at?
16  A  Well, it was probably my rebuttal to his
17 opinion in a report or two if he was an expert, and I
18 do remember the name.
19  Q  And we're here about -- there's a projected
20 sales adjustment.  You're familiar with that term?
21  A  I am.
22  Q  And the projected sales adjustment is
23 something that is calculated by Mitchell Software.
24  A  Is that a question?  I'm sorry.
25  Q  Yes.  Yes.  Can you tell me what you

Page 13

1 understand projected sales adjustment to be?
2  A  Right.  It's an adjustment to the list price
3 that takes into consideration the customary behavior
4 of a negotiation from list price between a seller and
5 a buyer.
6  Q  All right.  And do you know how that is
7 calculated?
8  A  No.
9     MR. BRIGMAN:  Scott, just so the record's
10 clear -- sorry, I don't mean to keep interrupting you,
11 but you're saying projected sales adjustment.  I think
12 what you might mean is the projected sold adjustment.
13 I just want to make sure we're talking about the same
14 thing so the record is clear.
15     MR. BORISON:  Thank you very much, and I
16 apologize.  You know --
17     MR. BRIGMAN:  Yeah, no problem.
18     MR. BORISON:  -- you see the acronym, and
19 you try to translate it.  You're used the acronym.  So
20 --
21     MR. BRIGMAN:  Yeah.
22     MR. BORISON:  -- thank you very much.
23 BY MR. BORISON:
24  Q  You said it takes into account the customary
25 -- I'm sorry, you said something about it takes into

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 5 of 15   PageID #: 4875

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 14

1  account the customary negotiation or what did -- I
2  apologize.
3      A   No, it's okay.  The protected sold
4  adjustment evaluates a list price and then takes into
5  consideration, to achieve a value, the customary
6  practice of customers negotiating during the
7  acquisition of a used vehicle.
8      Q   So is your understanding it focuses on the
9  customary practice of the customers negotiating?
10     A   Well, negotiation takes part between two
11 people, so between the buyer and the seller.
12     Q   All right.  But you need to know both
13 halves, right?
14     A   I'm sorry?
15     Q   You need to know both the buyer and the
16 seller's customary practice, right?
17         MR. BRIGMAN:  Object to the form.
18         THE WITNESS:  You need to know both.  Yeah,
19 make that one more clear, that question.  I'm sorry.
20 BY MR. BORISON:
21     Q   Sure.  You said that it takes into account
22 the buyer and the seller.  And I'm saying, so to
23 analyze it, you need to know about the buyer and the
24 seller's customary practices, correct?
25     A   The practice is customary in the industry,

Page 15

1  and the industry involves both consumer and seller.
2      Q   Right.  And my question is, so you need to
3  know both parts of that.  You need to know in the --
4  when you say in the industry, the consumers aren't in
5  the industry, correct?
6      A   No, that's not correct. They're buying a
7  car, so that's their -- they may be tangential
8  exposure to the industry, but without them, there is
9  no industry.
10     Q   Okay.  Do you need to know any details of
11 buyers for this analysis?
12     A   Again, I'm sorry.  That's not clear to me.
13 Any detail of a buyer's motivation, a buyer's --
14     Q   Well, it's a very general question.  We can
15 narrow it down, but I'm trying to get sort of an
16 overall view.  It's pretty simple.  You can tell me
17 yes or no.  Do you need to know about the customary
18 practices of the sellers to analyze the projected
19 sales adjust or sold adjustment?
20     A   Are you saying sellers as in all sellers in
21 the car industry or an individual seller?
22     Q   Okay.  Well, let's break it down.  Do you
23 need to know about the industry practices of the
24 sellers?
25     A   Yes.

Page 16

1      Q   And then you mentioned individual sellers.
2  Do you need to have knowledge of the customary
3  practices of individual sellers?
4      A   If you are evaluating the one singular
5  transaction, yeah.
6      Q   Okay.  And do you also need to know the
7  customary practices of the consumer in those
8  transactions?
9      A   Consumers have -- it's my opinion, as I
10 expressed in the report, that consumers have an
11 expectation of negotiation, as a in general, en masse.
12 Now there may be some individuals that don't have that
13 expectation, but we're speaking in large generalities,
14 the majority of transactions.  It's the consumers --
15 as I say in the report, it's their expectation and in
16 most cases, their desire.
17     Q   All right.  And the expectations, how did
18 you arrive at that conclusion that you have to know
19 the consumer's expectations?
20     A   Well, you kind of arrived at that
21 conclusion.  That was how you asked the question or
22 really made a statement.  What I'm saying is in the
23 industry itself, as transactions take place between
24 buyers and sellers, it is the expectation of the buyer
25 and the desire of most buyers to enter into a

Page 17

1  negotiation with the seller.
2      Q   Right.  And what's the basis for that
3  statement by you?
4      A   Well, I -- I spell a lot of it out in my
5  report, so I would direct you to that.  So it's my
6  own, observations, as I said, in 40 years in the
7  business, as well as supported by many of the things I
8  listed in my report.
9      Q   Okay.  Anything else besides those two?
10     A   So besides the entire published body of
11 information on transactions and my 40 years'
12 experience, no, I think that would be it.
13     Q   Okay.  Well, let me ask you because I
14 thought you had said that the things you were relying
15 on were in your report.  Are you saying it's broader
16 than that?
17     A   Well, I said my report and my experience.
18     Q   Okay.  When a dealer sells a car, they're
19 looking at the overall gross profit from the sale,
20 correct?
21         MR. BRIGMAN:  Object to the form.
22         THE WITNESS:  Yeah.  Which dealer?  Which
23 gross profit?  Please be more clear.
24 BY MR. BORISON:
25     Q   Well, I thought you made some analysis in

Case 1:22-cv-00375-NT    Document 120-20    Filed 01/10/25    Page 6 of 15    PageID #: 4876

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 18

1  your report about dealers in general, that they will
2  negotiate prices, correct?
3      A    That's correct.
4      Q    So what dealers were you referring to when
5  you make that statement?
6      A    The industry in general.
7      Q    Okay. So the industry in general, the
8  dealers in the industry in general, do they look to
9  determine their gross profit on the sale of a car?
10     A    In -- in every case, the dealer is looking
11 to be profitable, and I'm trying to answer your
12 question as vague as it may be. As to the specific --
13     Q    Okay. Well, let's break it down. Do you
14 know what gross profit means?
15     A    I do, yes.
16     Q    What does it mean?
17     A    It's the profit that's made on a vehicle
18 that includes inventory costs and before other
19 expenses.
20     Q    Okay. And what other expenses would be
21 involved?
22     A    Well, if you break it on an individual car
23 basis, there's general expenses like advertising,
24 rents, and other fixed expenses that ultimately
25 determine how much, if you break it down per car,

Page 19

1  profit that there is. You may have commissions that
2  come out of there that would not be part of the gross
3  profit. That would be a net profit, net sales profit
4  before the fixed expenses.
5      Q    All right. So we have the profit side of
6  the equation. What contributes to the profit side of
7  this equation?
8      A    The delta between the selling price and the
9  acquisition cost.
10     Q    Anything else?
11     A    Well, acquisition cost would be total
12 inventory cost of which could comprise a number of
13 things.
14     Q    Well, for the profit part of this equation,
15 you're explaining what you compare it to, to determine
16 the profit, right? When you say the delta between the
17 acquisition cost and the profit, correct?
18     A    The acquisition cost is more than just what
19 it costs to acquire the vehicle. It could be
20 reconditioning the vehicle. It could be detailing the
21 vehicle. It could be transportation of the vehicle.
22 It could've been a buy fee on the vehicle. So there's
23 a number of things, but -- so let's use the term
24 inventory cost.
25     Q    Okay.

Page 20

1      A    And that'll make it easier for me to follow
2  along with you here.
3      Q    Okay. So I understand the inventory cost as
4  you described, which is basically all of the different
5  expenses that might go into getting a car ready for
6  sale, all of those type things. Correct?
7      A    Correct.
8      Q    Now, on the other side of the equation, for
9  the profit from the sale, what goes into the
10 determining the profit number? For instance, the sale
11 price. Right?
12     A    Minus the inventory cost. That's the profit
13 on that particular -- that's the gross profit on that
14 particular transaction.
15     Q    Is there anything else besides the sale
16 price that goes into that equation?
17     A    Well, you said besides the sale price. We
18 also talked about inventory costs.
19     Q    No. I'm talking about the profit side. You
20 look at the sale price.
21     A    Right.
22     Q    Are there other things that contribute to
23 the gross profit besides the sale price?
24     A    Yeah, the selling price of the vehicle, is
25 going to drive the gross profit on that vehicle.

Page 21

1      Q    Well --
2      A    I -- I meant once you -- I -- you get to the
3  question you want to ask me about other things. So
4  let's just get to that, and I'll answer.
5      Q    What I'm --
6      A    I -- well, I mean, clearly, it's the delta
7  between the two is how you get a gross profit on a
8  vehicle as it relates to the sale. You --
9      Q    Are there -- let's do this.
10     A    -- something deeper, so just ask me what it
11 is, and I'll answer the question.
12     Q    Okay. So for instance, does a dealership
13 receive money in financing vehicles?
14     A    There we go. Yes, it can. Doesn't always,
15 but it can. Yes.
16     Q    Right. And then it also -- so now that we
17 have some sort of baseline, what else would contribute
18 to the profit from the sale of a particular car?
19     A    So after the negotiated price from the list
20 price to the sale price to the consumer, the dealer
21 often then has an opportunity to sell aftermarket
22 products or ancillary products in which they have the
23 potential also to make additional profit. I would
24 consider that the gross profit in the finance
25 department and not necessarily the car sale.

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 7 of 15   PageID #: 4877

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 22

1  Q   Okay. So you separate it to the finance
2  department's a separate source of revenue, correct?
3  A   That's correct.
4  Q   And the finance department would include the
5  financing itself as well as aftermarket products?
6  A   Yes.
7  Q   How about document fees? Where does that
8  fit in?
9  A   Well, it depends on the state. The --
10 because there's usually -- you know, there's
11 limitations in some state, and I'm not familiar with
12 Maine's. There's limitations on what you could
13 charge, and that fee is put in there in most cases to
14 compensate the dealer for doing the document
15 preparation. But I know there are some states that
16 have higher numbers that probably exceed what that is,
17 but I don't know Maine's at this point. So it's not
18 necessarily a profit center is my point.
19 Q   Because it's reimbursing for services?
20 A   Yeah. Well, it's a -- okay, there's
21 obviously a cost to do the DMV work and process it and
22 the title work and to go through all that. So in many
23 states, they say, okay, we're going to let you charge
24 a document preparation fee to compensate for that. So
25 depending on the state and the fee would be whether it

Page 23

1  covers the cost or maybe that could be some profit in
2  there depending on the efficiencies of the individual
3  dealer.
4  Q   Right. So earlier when we talked about
5  acquisition costs or -- inventory costs is your term,
6  right?
7  A   Correct.
8  Q   Would inventory costs include the expenses
9  of document preparation? Or would that be a separate
10 category?
11 A   Depends on the dealers. It would be proper
12 accounting either way.
13 Q   Okay. So when you talked about inventory
14 costs, were you envisioning that it would include
15 preparation of any paperwork necessary to conduct the
16 sale or to complete the sale?
17 A   Again, it would depend on the dealer, so I
18 wasn't giving you a specific. Yeah, you can ask me --
19 well, I did not. I -- I included that separately.
20 Q   All right. But let's assume for purposes of
21 this question that the inventory cost that's used by a
22 dealer includes any administrative expense relating to
23 the preparation of the documents. Okay?
24 A   Understood. Okay.
25 Q   And then once you deduct -- you would have

Page 24

1  to then look at what the sold price is plus the
2  document fee and compare those to the inventory cost,
3  correct?
4  A   Are you expensing that as part of an
5  inventory cost, the doc fee in your --
6  Q   That's why I say it's included.
7  A   Yeah.
8  Q   Whatever the cost might be, it's included
9  inventory cost for purpose of my hypothetical.
10 A   And is this -- your question is to determine
11 gross profit?
12 Q   Yes.
13 A   Yeah, depending on how you do that
14 accounting, yeah, that would be reasonable.
15 Q   Do you know whether the projected sold
16 adjustment considers document fees?
17 A   The -- the projected sold adjustment starts
18 with the list price, and the document fees are not
19 usually in the list price.
20 Q   Right. But that's something that a customer
21 has to pay to purchase a vehicle, correct?
22 A   Well, after they negotiate their discount on
23 buying the car, then there are these ancillary fees.
24 They also have to pay DMV fees. They also have to pay
25 registration fees.

Page 25

1  Q   Right.
2  A   So yes, but that's not part of the list
3  price.
4  Q   Right. But the DMV fees and sales tax,
5  that's a separate category, correct?
6  A   Separate from what?
7  Q   Separate from the purchase price, correct?
8  A   No, it's all included in the purchase price
9  on the contract. They don't get to -- you don't get
10 to waive that.
11 Q   Right. And they don't get to waive the
12 document fee, correct?
13 A   Sometimes. Sometimes they do.
14 Q   When you say sometimes they do, what's the
15 basis for that statement?
16 A   The dealer doesn't have to charge a doc fee.
17 It's not a law.
18 Q   Do you need to know --
19 A   But the DMV fees and title fees and
20 registration fees, definitely you would have to
21 charge.
22 Q   Do you need to know whether or not a dealer
23 charges document prep fees or document -- what do we
24 call them? Document prep fees or --
25 A   That's fine. Yeah.

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 8 of 15   PageID #: 4878

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 26

1  Q   Okay.
2  A   Just doc fees.
3  Q   Okay.  Just want to make sure we're talking
4  the same thing.
5  A   Yeah.  Just doc fees is -- would probably be
6  the short term for it.
7  Q   Do you need to know whether a dealer charges
8  doc prep fees in connection with the sale to determine
9  the actual cost to the consumer?
10 A   Well, the ultimate cost to the consumer
11 would be the negotiated price of the vehicle.  The --
12 and if the dealer charges a doc fee, that would be
13 part of it.  Sales tax would be part of it.
14 Registration fees would be part of it and any
15 ancillary products that the consumer may have
16 purchased.  They may have bought floormats for the
17 car.  They may have done other thing.  That would all
18 be encapsulated in the purchase price.
19 Q   Right.  But putting aside the sales tax and
20 the DMV fees, because those are set by some state
21 agency, correct?
22 A   That's correct.
23 Q   But the doc fee is set by the dealer,
24 correct?
25 A   With limitations based by the state.

Page 27

1  Q   Are you aware of any limitations based on
2  doc fees in the state of Maine?
3  A   I am not -- not familiar with the doc fees
4  in Maine, no.
5  Q   So let's assume that there's no limit on doc
6  fees in the state of Maine.  That is an amount that is
7  determined by the seller, correct?
8  A   Again, that sounds more like a statement.
9  So you're -- you are making an assumption that there
10 are no doc fee limitations in the state of Maine?
11 Q   Sure.
12 A   That -- and that a dealer can just charge
13 whatever they want for that?
14 Q   Yes.
15 A   Well, I guess that would be up to the
16 individual dealer if -- as long as the customer can
17 tolerate it.
18 Q   Do you know whether the Mitchell Software
19 alters based on which state it's applying the
20 projected sold adjustment to?
21 A   I do not.
22 Q   And if it's easier to follow along, I'm
23 going to ask you about specific paragraphs of your
24 report, the amended report.
25 A   I have it here.  Yes.

Page 28

1  Q   Okay.  All right.  So in paragraph 25, which
2  is on page 5 of your report --
3  A   Yes.
4  Q   -- I assume the vehicle was deemed.  You
5  meant the vehicles were deemed, right, since there's
6  three --
7  A   Yeah.  Right.
8  Q   Okay.
9  A   Correct.  Thanks for -- thanks for
10 correcting.  Yeah.
11 Q   No, no.  I just want to make sure I wasn't
12 missing something.  Okay?  And I'm not doing it to be
13 a wise guy.  I just want to make --
14 A   No, no.  I appreciate it.  I just -- I hate
15 -- I hate doing things like that, making those
16 mistakes, but thank you.
17 Q   I'm the king of typos, so don't think
18 another thing about it.  In fact, most of my cocounsel
19 tease me constantly.  But anyway, I always think, you
20 know, substance is more important than, you know,
21 procedural.  But anyway.
22 A   Understood.
23 Q   Let's see.  In paragraph 29, you make the
24 statement, "Software's application of PSA is
25 consistent with market conditions prevailing in the

Page 29

1  United States auto industry," correct?
2  A   That's correct.
3  Q   And so your report is focused on the entire
4  United States auto industry, correct?
5  A   That's correct.
6  Q   All right.  And you didn't make any analysis
7  of whether it's consistent with practices of Maine
8  dealers, correct?
9  A   I did not distinguish Maine dealers from the
10 industry.  I considered them as part of the total US
11 auto industry.
12 Q   Okay.  All right.  And then in paragraph 31,
13 you say that Mitchell only applies the PSA to list
14 prices and not to sold prices.  What do you mean by
15 list prices?
16 A   The advertised price that the dealer or
17 seller list the vehicle for.
18 Q   And if advertised price includes a document
19 fee, would that be part of the list price or not?
20 A   Again --
21     MR. BRIGMAN:  Object to form.
22     THE WITNESS:  -- it depends how that would
23 be structured.  So if it said list price X, then said
24 doc fee after that, I would separate those two.  But
25 if it's -- some of them -- some ads will say, you

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 9 of 15   PageID #: 4879

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 30

1  know, plus doc fee because they want to try to
2  advertise the lowest possible price they can.
3  BY MR. BORISON:
4      Q   Right.  But for purpose of the dealership,
5  if I advertise a car for $25,500, but I'm going to
6  charge $600 doc fee, if I reduce the price of that car
7  to 24,900, it's with the doc fee the consumer is
8  paying the same price, correct?
9      A   Yeah.  And the converse is true as well.  If
10 it says 25-5 plus doc fee, then it's really -- that
11 works out -- yeah, 26-1.
12     Q   Six months.  So the list price for that
13 would be 26-1, not 25,500.
14     A   That's correct.  Yeah.  We'd be a -- a
15 higher list price.
16     Q   Right.  Do you know whether projected sold
17 adjustments are still included in Mitchell Software?
18     A   I -- I can't answer that entirely.  I know
19 change -- some changes were made, but I don't know
20 what they are.
21     Q   Okay.  If we could go to paragraph 36 of
22 your report.  And this references, looks like -- the
23 second sentence, the article goes on to say 70 percent
24 of used car buyers haggled over the price.  Do you
25 know what the sample size was?

Page 31

1      A   I'd have to go back and refer to the article
2  itself.
3      Q   Okay.  And would that be your only source of
4  information if the article itself said what the sample
5  size is?
6      A   As it relates to this one particular
7  paragraph?
8      Q   Right.
9      A   Yeah.  I mean, I did not speak directly to
10 Mark Rectin to know what it is.  I'd have to read the
11 article.
12     Q   Right.  My question is, though, if you
13 needed to determine the sample size, your only source
14 of information would be looking at the article itself.
15 Is that correct?
16     A   As it relates to this particular paragraph,
17 yes.
18     Q   Absolutely.  Yeah.  That's why I narrowed it
19 to paragraph 36.
20     A   Yes.
21     Q   In paragraph 37, there's a reference to the
22 more informed customer was able to negotiate greater
23 price concession.  It's next to the last sentence on
24 that page.  Do you see that?
25     A   Yes.

Page 32

1      Q   How do we determine who's a more informed
2  customer?
3      A   I don't know.  This research made that
4  decision by talking to people on how much research
5  they did before they bought the car.
6      Q   So your reliance on this, again, if we want
7  to find out what a more important customer was, we'd
8  have to look at the article or the research that
9  you're referencing, correct?
10     A   That's correct.
11     Q   And you wouldn't have any independent basis
12 of determining what a more informed customer is.
13     A   As it relates to this paragraph, no.
14     Q   And just on the next page, the same thing,
15 the top line, it says, "Buyers typically do not accept
16 the initial value proposition."  Do you know how they
17 define typically?
18     A   Well, the top of my -- okay, I see it.
19     Q   Yeah.  Sorry.
20     A   Yeah.  Well, I know what the word typically
21 means, and I assume so did the author of this.  That
22 means that in general, most of the time, they don't
23 accept -- as I said before, customer's expectation and
24 desire is to negotiate.  This is saying the same
25 thing.

Page 33

1      Q   Okay.  And in the next paragraph, there's a
2  reference to MAX Digital.  And what is MAX Digital?
3      A   It's a website that -- and an organization
4  that counsels customers on car buying, provides
5  information for them, and it does analysis of the
6  industry on a regular basis.
7      Q   All right.  So this, references that they
8  negotiate more than $500 off the listed vehicle price,
9  correct?
10     A   That's what it says.  Yes.
11     Q   And do you know whether the listed vehicle
12 price that is referenced there includes document fees
13 or not?
14     A   It's just the listed price, it says.
15     Q   And would that include document fees?  Or is
16 that separate and apart from the list price?
17     A   It -- it depends on the ad.  I'm sorry for
18 stepping on you there.  It depends on the ad.  And
19 some dealers would include it.  Some wouldn't.
20     Q   Well, if someone --
21     A   Some states make sure that you -- it's --
22 you know, you're -- you're probably familiar with
23 there's a lot of new legislation that's coming out
24 that may be national that's relating to how dealers
25 can advertise.  If you did not -- if you included it

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 10 of 15   PageID #: 4880

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 34

1  in the list price, you didn't break it down, or if you
2  put it there and then didn't include it, it could be
3  considered misleading to the consumer.
4         So I think in most every state, and again, I
5  don't know Maine.  It may be an outlier.  Soon as
6  we're done, I'm going to find out if it has a cap on
7  the doc fee because that's --
8     Q    Let me know because we didn't find one.
9     A    Yeah.  I think it's nuts, but, yeah, I got
10 to go look at that.  So I mean, the -- the object here
11 is most of those laws are here to protect the
12 consumer.  So --
13    Q    Right.
14    A    -- it's best business practice for a dealer,
15 regardless of the laws, to try to be as clear and
16 concise as they can.  So if there's a doc fee that's
17 added onto the list price, I mean, I can build an
18 argument for both ways.
19        I think most dealers -- I mean to your
20 client's advantage, if they add it to the list price,
21 then the list price is higher, and potentially your
22 client ends up with more money.  If it's -- list price
23 is listed as a -- as document fees are listed as a
24 separate item, then it's the actual list price of the
25 car, and then that's closer to reality.

Page 35

1     Q    Right.  But you need to know that to
2  determine what the listed vehicle price or what the
3  sale price is of a vehicle, correct?
4         MR. BRIGMAN:  Object to the form.
5         THE WITNESS:  And again, we -- we're looking
6  at somebody else's work from some time ago, a couple
7  years ago.  So the -- the assumption is that they
8  looked at what the listed price was, and all my last
9  dialogue was to say that most dealers do this
10 honestly, and they would break the list price out or
11 the doc fee out.
12 BY MR. BORISON:
13    Q    In addition to the advertised price, right?
14    A    Yeah, and if they included it, it would not
15 be to their advantage in advertising.  So most of them
16 are --
17    Q    It would increase the price that the
18 consumer sees for the sale.
19    A    Right.
20    Q    Okay.  In paragraph 43, you reference
21 GoodCar.com as an industry leader.
22    A    Yes.
23    Q    Do you know how long GoodCar.com has been in
24 existence?
25    A    What I looked at with them when I used the

Page 36

1  term industry leader was how much traffic they have on
2  their website, and there's a lot of people visit them.
3  So that's why I took -- I used the term industry
4  leader.  I'm not sure how long they've been around,
5  but I can tell you currently, a lot of people look at
6  that website.
7     Q    Now in that, looks like the fifth line, it
8  says, "Many buyers falsely believe that prices are set
9  in stone."  Do you see that?
10    A    That's true.  Yes.
11    Q    So if someone falsely believes prices are
12 set in stone, they wouldn't negotiate, correct?
13    A    No.  That doesn't mean they wouldn't try to
14 negotiate.  There's -- you know, CarMax, for example,
15 tries to hold to their listed price.  They represent
16 about three percent of the industry, and they spend
17 about 300 to $400 million a year branding that they
18 don't negotiate.  So customers -- consumers see that,
19 and they think, okay, well, at least there's some
20 people that don't do it.
21    Q    Right.  And then it also states, many
22 dealers account for 20 percent gross margin in the
23 original asking price.  Is that something consistent
24 with your experience in the industry?  That's a 20
25 percent gross margin?

Page 37

1     A    On used cars, that is not -- it -- let me
2  put it this way.  It's not inconsistent with my
3  knowledge.  But every dealer does it differently,
4  depending on their individual situation and inventory
5  levels, cashflow pressures, profitability.  I mean,
6  there's a number of things that'll affect that.
7     Q    Does competition also factor in there?
8     A    Well, competition's always an issue.  Yes.
9  And dealers --
10    Q    Right.
11    A    -- since the beginning of time look at what
12 other dealers do in order to set a value.
13    Q    And so less dealers mean less competition,
14 correct?
15    A    I don't think there's a direct correlation
16 to that.  Your assumption is -- has some merit in that
17 if there's only two dealers selling a car, it would be
18 easier than if there are 20 dealers.  But that doesn't
19 mean it's less competitive because you don't know the
20 individual pricing strategies.
21    Q    Well, you know the joke about lawyers, you
22 know, the town that had just one lawyer, very low
23 work.  Another lawyer moves into town.  Suddenly
24 they're both very busy.
25    A    Exactly.  I can understand.

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 11 of 15   PageID #: 4881

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 38

1   Q   In paragraph 45, you talk about U.S. News &
2   World Report article.  Do you know who wrote that?
3   Well, you have a footnote, so go there and you'd find
4   out who the author was?
5   A   Correct.
6   Q   I know you listed a number of things, but do
7   you know who the author of that particular article
8   was?
9   A   Too long ago.  I don't remember now.
10  Q   It's okay.  All right.  You included in your
11  report market research, which is paragraph 91 to,
12  looks like, paragraph 105.  I could --
13  A   Okay.
14  Q   -- be wrong.  Now, this is your personal
15  market research, correct?
16  A   That's correct.
17  Q   Was this research ever peer reviewed?
18  A   No.
19  Q   And did you set forth in these paragraphs
20  all the parameters used by you for your market
21  research?
22  A   No.  It wasn't really intended to be a -- to
23  find the definitive response.  It was more an effort
24  to validate what my impression of the market was.
25  Q   And it's my understanding from reading the

Page 39

1   paragraphs that your research basically relied on a
2   single question.  Is that correct?
3   A   Well, it depends on which part of the survey
4   you're talking about.  But the part that was --
5   Q   I think you describe it in paragraph 92 as
6   the primary question.
7   A   Correct.
8   Q   Were there other questions besides the
9   primary question?
10  A   Not that went into making any determination
11  on this, no.
12  Q   Okay.  So it was not only the primary, it
13  was the only question.
14  A   It was the only one taken into consideration
15  here.
16  Q   Okay.  And that was whether the dealer
17  negotiated from the advertised selling price, correct?
18  A   Well, that was the focus of it.  So you're
19  going to have to be a little more specific because
20  this -- this there's multiple methodologies used in
21  collecting this data.  So as it relates to the dealers
22  at NADA, that was the primary collection, and that was
23  the focus.  There may have been other dialogue after
24  that, but this was the information we were trying to
25  get.

Page 40

1   Q   Okay.  When you asked the question whether
2   they negotiate from the advertised selling price, did
3   you take into account any other fees, such as document
4   fees, that they would be charging?
5   A   Well, the question was whether or not they
6   negotiated, not what the fees were or anything else,
7   but do you negotiate?  That's a simple -- this is a
8   practice we follow, or this is one we don't.
9   Q   Right.  And my question is, you said
10  advertised selling price, and I thought we discussed
11  advertised selling price, that it may or may not
12  include the doc fee.
13  A   Yeah, not relevant to this analysis, though.
14  The analysis is do you negotiate?
15  Q   Okay.  Now, you said there were various
16  methodologies used.  Can you tell me what
17  methodologies you used?
18  A   Yeah, it's in the report.  I mean, we talk
19  about it here.
20  Q   Well, actually, I mean, it let me know, but
21  it just says, "I employed multiple methodologies," but
22  I didn't see where it explained what those
23  methodologies were.  Did I miss that?
24  A   Look at paragraph 94, 95, 96.
25  Q   Right.  So you're saying the methodology in

Page 41

1   94 is physical questioning, correct?
2   A   Right.
3   Q   And then 95 is direct contact.  That's
4   describing what you did, but what methodology did you
5   apply to that?
6   A   Well, the -- the method of gathering
7   information was now telephonic and email.
8   Q   Okay.  And did you apply any sort of
9   analysis to the information that you obtained through
10  what you described as emails or telephone?
11  A   Be more specific for me.
12  Q   Sure.  Did you do anything -- did you just
13  accept whatever the language or whatever information
14  was provided from the dealership, or did you apply any
15  analysis to the information that you were able to
16  obtain through those methods?
17  A   This was just a compilation of information.
18  The analysis, I'll leave to you.  I gave you the data
19  that said coincidentally it was 76 percent in both
20  cases.  That was total coincidence.  So that -- that
21  was the validation of what my predisposition was as to
22  how things go in the industry.
23  Q   In paragraphs 101 to 105, you reference some
24  discussions with specific people.  Right?
25  A   Yes.

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 12 of 15   PageID #: 4882

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 42

1  Q   That was considered as part of your
2  methodology.
3  A   Yes.
4  Q   All right. So we've got a number of
5  conclusions that you set forth. No two used car
6  transactions are the same. Okay. You say countless
7  variables. Is there a list of the variables somewhere
8  that exist in determining use car value?
9  A   I think throughout this report, I do mention
10 things. A little bit later in 108, I talk about some
11 of the market variables. It says mileage, condition,
12 color, estimated reconditioning costs, auction fees,
13 transportation costs, desired profit margin, cost of
14 warranty. And again, it's a subjective standard
15 that's applied as a used car manager may look at a
16 vehicle and put a certain condition number on it, and
17 another one would have a different condition
18 evaluation of it. So it's -- there -- the -- again,
19 it's very difficult to put two of these transactions
20 in the same way. We can -- hard to identify a shared
21 experience in that case.
22 Q   Other than the ones listed in 108, are there
23 any others that come to mind?
24 A   Yeah. Could be that the valuation is, hey,
25 I have a lot of those cars in stock right now. I had

Page 43

1  a bad experience with those cars. Gas prices went up
2  this weekend. Yeah, I don't want that car now. I
3  mean so I -- the list goes on and on.
4  Q   Okay. How do you define actual cash value
5  of a car?
6  A   So actual cash value of a car has been an
7  acronym and basically a euphemism in the car business.
8  And that's the value that a dealer places on a
9  consumer's car at the time of trade-in. And they say,
10 okay. They appraise the car, and they say, "Okay.
11 This is its actual cash value." And then they use
12 that value to negotiate the overall deal with the
13 consumer. So generally, in the car business, if you
14 say ACV, that's what people's -- people are thinking.
15 Q   Do you know if that's the definition that is
16 used by Mitchell?
17 A   I'm not -- I don't know what the auto -- how
18 the insurance industry or the appraising industry
19 looks at that, no.
20 Q   In 107, you go in that basically isolating
21 2020 to 2023 as sort of a unique period of time. Is
22 that accurate? I'm summarizing, but is that --
23 A   Yeah, that's fair. It was very unique for
24 the car business in general, for probably all
25 business. Yeah.

Page 44

1  Q   The entire country. Right?
2  A   Your business was probably better.
3  Q   It introduced us to Zoom.
4  A   There you go. That's the beauty of me being
5  able to sit here now instead of flying to Maine,
6  right?
7  Q   Exactly. All right. But those conditions
8  didn't exist the -- you picked 2012 to 2019. Why did
9  you pick those dates?
10 A   Well, 2019 was prior to COVID. I don't
11 remember why I picked, like, 2012. It's a good
12 question.
13 Q   Just you wanted to do a segment prior --
14 A   Yeah, I'm --
15 Q   -- to COVID.
16 A   -- I'm guessing. There were some unique
17 factors. If you remember, it was in all the papers.
18 There was a little bit of a recession in 2009 and '10.
19 So I -- my guess is I looked at this and said, okay.
20 That's -- this is a very fair period of time that I
21 could say there's really nothing to disrupt the car
22 business.
23 Q   Right. So you wanted to exclude periods
24 that were affected by unique circumstances like COVID
25 or the recession of 2008.

Page 45

1  A   Yeah. Correct.
2  Q   I think its title is Great Recession.
3  A   Great Recession.
4  Q   Which is funny use of the term.
5  A   What's so great?
6  Q   All right. So --
7     MR. BRIGMAN: Excuse me.
8     MR. BORISON: Sorry? Okay.
9  BY MR. BORISON:
10 Q   Okay. Paragraph 109, you talk about
11 compliance with industry pricing software is limited.
12 Just out of curiosity, when you ran dealerships, did
13 you use any software for your pricing?
14 A   Yes. You know, it's a frame of reference.
15 Dealers have always looked at guides even when -- you
16 know, in the old days, it was the Blue Book or Black
17 Book and -- or NADA guide. And you got your little
18 book out, and you looked at what it was saying, and
19 they changed it every week. So you got a little --
20 you know, a little more of an update. But then --
21 yeah, or every other month, excuse me, some of them.
22 And then when software came in that you could see the
23 stuff in more real time, yeah. Every dealer that has
24 access to it would -- will look at this stuff.
25 Q   So basically, what you're saying is it might

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 13 of 15   PageID #: 4883

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 46

 1  not have been software, but there were other
 2  publications available at the time to refer to.
 3      A    Yeah.  I mean, in -- in the car business
 4  like any business, you know, you're concerned as to
 5  what the value is and what other people are doing.  So
 6  that hasn't changed.  Just the means to gather the
 7  information has changed.
 8      Q    And those valuations were accepted in -- the
 9  idea of generalized valuation was accepted in the
10  industry as a prudent practice?
11      A    Well, in the -- help me with that.  Expand
12  on that a little bit.
13      Q    Sure.  I'm just saying that it was a norm in
14  the industry to rely on those type of guides for
15  evaluation purposes.
16      A    Yes.  People referred to a book value.  Now,
17  that wasn't consistent in everybody's interpretation
18  of that, but, you know, people did rely on
19  information.  Yes.
20      Q    Right.  And the sources, I mean, like the
21  Black Book relied on dealers basically providing
22  information that was used to determine a market value
23  as opposed to Kelley Blue Book that used different
24  models, correct?
25      A    Yeah.  The -- the -- they were all based on

Page 47

 1  sales.  None of them were based on list price, for
 2  example, and they just looked at recent sales history
 3  to try to determine values.
 4      Q    Okay.  Did any of them apply a projected
 5  sold adjustment.
 6      A    To do what?  To say what the consumer should
 7  buy it for?
 8      Q    To show what the -- I think you said it was
 9  to determine the value, right?
10      A    For what the dealer should pay for the
11  vehicle or to -- and whether they're taking it in
12  trade or they're out in the market buying it.
13      Q    Okay.  So are you saying they didn't
14  contribute to the, sale price to the consumer?
15      A    One more time.  Didn't contribute what to
16  the sale price?
17      Q    That these various guides, the Black Book,
18  Kelley Blue Book, whatever ones -- you know, NADA.
19      A    Right.
20      Q    Those weren't used for the purposes of
21  determining the sale price to consumers?
22      A    Well, they were a basis in purchase price
23  for the dealer, and then the dealer's own individual
24  metrics or desires would then come up with a sale
25  price.

Page 48

 1      Q    Right.  And so to your knowledge, did any of
 2  those use any projected sold adjustments in providing
 3  the numbers?
 4      A    Yeah.  There's no correlation.
 5           MR. BRIGMAN:  Objection to form.
 6           THE WITNESS:  Yeah, that -- that -- I -- you
 7  can't --
 8           MR. BORISON:  I'm sorry.
 9           THE WITNESS:  -- draw an inference between
10  those things because it was just what they were buying
11  the car for.
12           THE REPORTER:  Was there an objection on
13  that one?  I'm sorry.  I didn't --
14           MR. BRIGMAN:  Yeah, there was objection to
15  form.  Thank you.
16           THE REPORTER:  Okay.  Perfect.
17           THE WITNESS:  Sorry.
18  BY MR. BORISON:
19      Q    I got a little distracted.  Do you mind
20  saying that again?  I apologize.
21      A    Yeah, no, no problem.  The -- that -- it's
22  just not a relevant question.  The two don't go hand
23  in hand.  We're -- you're -- the book was to figure
24  out a value in which to provide a basis of information
25  for which a dealer could then determine a reasonable

Page 49

 1  price to pay for a car that they're bringing into
 2  inventory.  So projected sold adjustment is not
 3  anywhere.  That's a remote concept from what these
 4  books did.
 5      Q    Well, projected sold adjustment affects the
 6  value calculations under Mitchell, correct?
 7      A    To a consumer in a total loss situation, not
 8  to what the list price is or to what a purchase price
 9  is.  So no, you're -- you're going to have a hard time
10  connecting those dots, at least with me.
11      Q    All right.  Well, let me just make sure I
12  understand your testimony.
13      A    Go ahead.
14      Q    The Black Book, Kelley Blue Book, those were
15  for a dealer to establish a value, an actual cash
16  value, correct?
17      A    They provided one source of information for
18  them as part of their compilation in their valuation
19  process, and it was based on historical data that was
20  not necessarily the most current and not necessarily
21  regionally adjusted.
22      Q    All right.  So you said it wasn't
23  necessarily current.  Wasn't the Black Book published
24  each month?
25      A    Yeah, that's not current.

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 14 of 15   PageID #: 4884

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 50

1  Q   Okay.  So a month is not current?
2  A   No.
3  Q   Okay.  And then you said regional
4  adjustments.  What do you mean by that?
5  A   Well, they -- at some point, they advanced
6  to -- to a point where they said, Okay.  The
7  southwest, the northeast, the southeast, but Miami is
8  in the southeast.  So is Atlanta.  They're different
9  markets for different cars.  Birmington (ph) is also a
10 completely different market --
11 Q   All right.  So --
12 A   -- entirely different market, and, you know,
13 Raleigh and Washington, DC, are both mid-Atlantic.
14 Those markets aren't even close.
15 Q   So the industry recognized that it was
16 necessary to break out regions.  Is that correct?
17     MR. BRIGMAN:  Object to the form.
18     THE WITNESS:  Well, you're -- you're asking
19 me -- I -- I didn't speak for the industry.  I'm just
20 telling you what happened.  I -- I didn't say the --
21     MR. BORISON:  Okay.  Well, let me rephrase
22 it then.
23 BY MR. BORISON:
24 Q   The industry said breaking out regional was
25 appropriate.

Page 51

1  A   That's what ultimately happened.
2  Q   Right.  And is that still true to this day?
3  A   Now you can look at each individual auction,
4  know the -- the location of the auction, and what the
5  car is sold for, but there's a lot of information it
6  doesn't tell you.  So again, it's just kind of one
7  part of the equation.
8  Q   Right.  But based on what you're saying in
9  individual auctions, that's becoming even more
10 crystallized as far as a particular area of the
11 country as opposed to other areas, correct?
12 A   No, crystallize --
13     MR. BRIGMAN:  Object to form.
14     THE WITNESS:  Crystallize is overstated.
15     MR. BRIGMAN:  Scott, do you --
16     MR. BORISON:  I'm sorry?
17     MR. BRIGMAN:  Finish your line of
18 questioning, but we haven't been going about an hour.
19 I'd like a break.
20     MR. BORISON:  Okay.  That's fine.  I'm
21 sorry.  I said anytime you need a break, just let me
22 know.
23     MR. BRIGMAN:  No problem.
24     MR. BORISON:  Why don't we take a short
25 break right now, okay?

Page 52

1      MR. BRIGMAN:  Thanks.
2      THE REPORTER:  Okay.
3      MR. BORISON:  Would you like, what, five
4  minutes?  Is that sufficient, or do you need longer?
5      MR. BRIGMAN:  Five minutes is good to me.  I
6  just need to run to the restroom.
7      MR. BORISON:  All right.  I understand
8  fully.  We're off the record.
9      THE REPORTER:  Okay.  I'll go off the
10 record.  It's 10:03 a.m. Eastern time.
11     (Off the record.)
12     THE REPORTER:  We are back on the record.
13 It is 11 a.m. Eastern Time.
14 BY MR. BORISON:
15 Q   Okay.  Like I said, time off helps because I
16 really only have a couple of questions left.  One is,
17 do you know when you prepared your amended report?  I
18 know on the cover, it says, like, November 7th.  Do
19 you know when it was actually -- is that the date it
20 was prepared?  Or is it an earlier date?
21 A   No, I did it last week sometime.  Yeah.
22 Q   And do you intend to review Mr. Merritt's
23 report to opine on that?
24 A   No.  I didn't realize it was part of this.
25 So no.

Page 53

1      MR. BORISON:  You know what?  That's all I
2  have.  Matt, obviously, if you want to ask questions.
3      MR. BRIGMAN:  I do not.
4      MR. BORISON:  And I --
5      MR. BRIGMAN:  And we'll read and sign.
6  Thank you.
7      THE REPORTER:  Sorry, you said we'll --
8  you'll read and sign?
9      MR. BRIGMAN:  Yes, ma'am.
10     THE REPORTER:  Thank you.  And then attorney
11 Borison, would you like the final transcript?
12     MR. BORISON:  Yes.  And you could do PDF,
13 but I also ask for a text version.
14     THE REPORTER:  Yeah.  And then, attorney
15 Brigman, would you like to get a copy of the final
16 transcript?
17     MR. BRIGMAN:  Yes, ma'am.  An electronic
18 copy is fine whenever you provide it to noticing
19 counsel.
20     THE REPORTER:  Okay.  Sounds good.  So we
21 have both counsel ordering, and the witness will read.
22 I will go off the record.  It is 11:02 a.m. Eastern
23 Time.
24
25     (Signature Reserved.)

Case 1:22-cv-00375-NT   Document 120-20   Filed 01/10/25   Page 15 of 15   PageID #: 4885

MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
SPIZZIRRI, MARC on 11/13/2024

Page 54

1  (Whereupon, at 11:02 a.m., the proceeding
2  was concluded.)

Page 55

1  CERTIFICATE OF NOTARY PUBLIC
2  I, FREYA AMIS, A Remote Online Notary of the
3  State of Ohio, duly authorized to administer oaths, do
4  hereby certify:
5  That I am a disinterested person herein;
6  that the witness, MARC SPIZZIRRI, named in the
7  foregoing deposition, was by me duly sworn to testify
8  the truth, the whole truth, and nothing but the truth;
9  that the deposition was reported by me, FREYA AMIS,
10  and is a true and correct record of the testimony so
11  given.
12  IN WITNESS WHEREOF, I hereby certify this
13  transcript at my office in the County of Cuyahoga,
14  State of Ohio, this 13th day of November, 2024.

17  FREYA AMIS
18  Remote Online Notary Public in and for the
19  State of Ohio

Page 56

1  CERTIFICATE OF TRANSCRIBER
2  I, CYNTHIA PARRISH, do hereby certify that
3  this transcript was prepared from the digital audio
4  recording of the foregoing proceeding, that said
5  transcript is a true and accurate record of the
6  proceedings to the best of my knowledge, skills, and
7  ability; that I am neither counsel for, related to,
8  nor employed by any of the parties to the action in
9  which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise interested in the outcome of this action.

15  CYNTHIA PARRISH

Page 57

1  Errata Sheet
2
3  NAME OF CASE: MATTHEW THURSTON vs PROGRESSIVE CASUALTY INSURANCE COMPANY, et al.
4  DATE OF DEPOSITION: 11/13/2024
5  NAME OF WITNESS: Marc Spizzirri
6  Reason Codes:
7  1. To clarify the record.
8  2. To conform to the facts.
9  3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
25  _____