Page 1

1          IN THE UNITED STATES DISTRICT COURT

2                      for the

3                  District of Maine

4       - - - - - - - - - - - - - - - X

5       MATTHEW THURSTON, et al.,        :

6              Plaintiffs,               :

7              v.                        :  Case No:

8       PROGRESSIVE CASUALTY             :  1:22-cv-00375-NT

9       INSURANCE COMPANY and UNITED     :

10      FINANCIAL CASUALTY COMPANY,      :

11             Defendants.          X

12      - - - - - - - - - - - - - -

13                          Tuesday, October 22, 2024

14              Videotaped Deposition of JASON MERRITT, a

15      witness herein, called for examination by counsel for

16      defendants in the above-entitled matter, pursuant to

17      notice, the witness being duly sworn by Desirae S.

18      Jura, a Notary Public in and for the District of

19      Columbia, held at King & Spalding, LLP, 1700

20      Pennsylvania Avenue, NW, Washington, DC, at 10:02

21      a.m., ET, Tuesday, October 22, 2024, and the

22      proceedings being taken down by Stenotype by Desirae

Jason Merritt                                                        October 22, 2024
Multiple Plaintiffs v. Progressive

Page 2

1 S. Jura, RPR, CSR, and transcribed under her
2 direction.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 3

1 APPEARANCES:
2
3 On behalf of the Plaintiffs:
4     BRIAN ROOF, ESQ.
5     Frederick & Berler, LLC
6     767 East 185th Street
7     Cleveland, Ohio 44119
8     (216) 502-1055
9     brianr@clevelandconsumerlaw.com
10
11 On behalf of the Defendants:
12     JEFFREY S. CASHDAN, ESQ.
13     DANIEL S. SANDERS III, ESQ.
14     King & Spalding LLP
15     1180 Peachtree Street, NE
16     Atlanta, Georgia 30309
17     (404) 572-4818
18     jcashdan@kslaw.com
19     dsanders@kslaw.com
20
21 Also Present:
22     ROBERT A. LEONARD, Videographer

Page 4

1           C O N T E N T S
2 WITNESS         EXAMINATION BY COUNSEL FOR
3 JASON MERRITT           DEFENDANTS
4   BY MR. CASHDAN           7
5
6       E X H I B I T S
7 MERRITT EXHIBIT NO.             PAGE
8 Exhibit 1 - Supplemental Expert Report of
9       Jason Merritt          6
10 Exhibit 2 - Expert Report of Jason Merritt   6
11 Exhibit 3 - Expert/Consultant Retention
12       Agreement, Bates commencing
13       Merritt_0001          12
14 Exhibit 4 - Email,  Invoice, Bates commencing
15       Merritt_0054          13
16 Exhibit 5 - American Society of Certified Auto
17       Appraisers packet, Bates commencing
18       Merritt_0005          35
19 Exhibit 6 - East Coast Auto Appraisers, IACP
20       Certified Actual Cash Value
21       Appraisal          103
22 Exhibit 7 - Declaration of Jason Merritt    104

Page 5

1       E X H I B I T S
2 MERRITT EXHIBIT NO.             PAGE
3 Exhibit 8 - Vehicle Valuation Report, Bates
4       commencing PGR_THURSTON_0007606   114
5 Exhibit 9 - Document, Bates
6       PGR_THURSTON_0007654       116
7 Exhibit 10 - Gopart document, Bates commencing
8       PGR_THURSTON_0007622       119
9 Exhibit 11 - Letter dated March 15, 2022, from
10       Ellen S. Best, Attorney at Law, to
11       Progressive Corporation, Bates
12       commencing PGR_THURSTON_0000126  131
13 Exhibit 12 - Vehicle Valuation Report, Bates
14       commencing PGR_THURSTON_0000251  134
15 Exhibit 13 - Vehicle Valuation Report, Bates
16       commencing PGR_THURSTON_0000448  134
17 Exhibit 14 - Vehicle Valuation Report, Bates
18       commencing PGR_THURSTON_0000286  135
19 Exhibit 15 - Vehicle Valuation Report, Bates
20       commencing PGR_THURSTON_0000296  135
21 Exhibit 16 - Vehicle Valuation Report, Bates
22       commencing PGR_THURSTON_0008147  139

2 (Pages 2 - 5)

Page 6

1         P R O C E E D I N G S
2         (Merritt Exhibit No. 1 was identified
3     for the record.)
4         (Merritt Exhibit No. 2 was identified
5     for the record.)
6         THE VIDEOGRAPHER:  We're going on the
7   record at 10:02 a.m., Eastern time.  Today's date is
8   October 22nd, 2024.  This is video file number 1 of
9   the video deposition of Jason Merritt, taken by the
10  counsel for the defendants in the matter of Matthew
11  Thornton versus Progressive Casualty Insurance
12  Company, filed in the United States District Court
13  for the District of Maine, Case Number
14  1:22-cv-00375-NT.
15        The location of the deposition is King &
16  Spalding, LLP, in Washington, DC.  My name is Robert
17  Leonard.  I'm the video specialist.  I represent
18  Veritext.  The court reporter is Desirae Jura.  She
19  also represents Veritext.
20        I am not authorized to administer the
21  oath.  I am not related to any parties in this
22  action, nor am I financially interested in the

Page 7

1   outcome.  If there is any objections to proceeding,
2   please state them at the time of your appearance.
3         Counsel and all presence will now state
4   their appearance and affirmation on the record
5   beginning with the noticing counsel.
6         MR. CASHDAN:  This is Jeff Cashdan of King
7   & Spalding for the defendants.  I am joined by my
8   colleague, Daniel Sanders, also with King & Spalding.
9         MR. ROOF:  Brian Roof with Frederick &
10  Berler on behalf of plaintiffs.
11        THE VIDEOGRAPHER:  Will the court reporter
12  please swear in the witness.
13  Whereupon,
14        JASON MERRITT,
15  having been duly sworn by the Notary Public, was
16  examined and testified as follows:
17        THE VIDEOGRAPHER:  Counsel, you may
18  proceed.
19        EXAMINATION BY COUNSEL FOR DEFENDANTS
20  BY MR. CASHDAN:
21     Q.   Can you please state your name for the
22  record?

Page 8

1      A.   Jason Merritt.
2      Q.   And, Mr. Merritt, where are you from?
3      A.   I'm in Cumberland, Maryland.
4      Q.   Okay.  Is there any reason you are not
5   able to give truthful testimony today?
6      A.   No reason.
7      Q.   Okay.  You're been deposed before; is that
8   correct?
9      A.   I have.
10     Q.   If at any point in time, you need a break,
11  just let me know.
12     A.   Thank you.
13     Q.   And if you could do me the favor of
14  letting me ask the question completely, and then I
15  will let you give whatever answer you want
16  completely, okay?
17     A.   Understood.
18     Q.   And if I ask a question, and you don't
19  understand any part of it, just let me know, okay?
20     A.   I will.
21     Q.   All right.  I'd like to hand to you what's
22  has been previously marked as Exhibit 1, which is

Page 9

1   entitled Supplemental Expert Report of Jason Merritt.
2   Do you see that?
3      A.   I do.
4      Q.   Take a moment to review it, please, and
5   just let me know if it's a true and correct copy of
6   your supplemental expert report in this matter.
7      A.   It does appear to be, yes.
8      Q.   If you go to page 10 of Exhibit 1, is that
9   your signature?
10     A.   It is.
11     Q.   And was this report completed on or about
12  October 14, 2024?
13     A.   Yes, sir, it was.
14     Q.   Okay.  I am going to hand you what's been
15  marked for identification as Exhibit 2, which is
16  entitled Expert Report of Jason Merritt.  Do you see
17  that?
18     A.   I do.
19     Q.   And is that a copy of the original expert
20  report you submitted in this matter?
21     A.   It is.
22     Q.   And if you go to page 8, is that your

3 (Pages 6 - 9)

Page 10

1 signature?

2    A.    It is my signature.

3    Q.    Was this report completed on or about June

4 27, 2024?

5    A.    Correct.

6    Q.    Okay.  What led you to create a

7 supplemental expert report in this matter?

8    A.    The original was done with one

9 complainant, and I was advised there were two

10 additional complainants and I added those in.

11    Q.    In addition -- strike that.

12        Other than adding some information, are

13 the reports any different?

14        MR. ROOF:  Objection.

15        THE WITNESS:  Without looking at each

16 word, I would say they're virtually the same.

17 BY MR. CASHDAN:

18    Q.    Was it your intention to provide

19 substantive expert opinions that are different in the

20 supplemental expert report than the original expert

21 report, other than quantifying the impact of removing

22 the PSA on some additional plaintiffs?

Page 11

1    A.    Can you state that again?

2    Q.    Sure.  My understanding is that in the

3 supplemental expert report, you added some paragraphs

4 to quantify, in your view, the impact of removing the

5 projected sold adjustment for Plaintiffs Bridges and

6 McDonald, correct?

7    A.    Correct.

8    Q.    Other than that additional information,

9 were there any substantive changes you made in the

10 supplemental expert report as compared to the

11 original expert report to add any substantive expert

12 opinions or conclusions?

13        MR. ROOF:  Objection to form.

14        THE WITNESS:  It does not appear to be.

15 BY MR. CASHDAN:

16    Q.    None that you recall; is that right?

17    A.    None that I can recall.

18    Q.    Okay.  If it's all right with you, I am

19 going to focus, then, on asking you questions about

20 Exhibit 1, the supplemental expert report, okay?

21    A.    Yes, sir.

22    Q.    Am I correct to treat the supplemental

Page 12

1 expert report as the current expert report that

2 contains all of your opinions and conclusions in this

3 matter?

4    A.    The supplemental report is the final

5 report.

6    Q.    Excuse me?

7    A.    It is the final most current, yes.

8    Q.    Okay.  I am going to now hand you what's

9 been marked for identification as Exhibit 3.

10        (Merritt Exhibit No. 3 was identified

11        for the record.)

12 BY MR. CASHDAN:

13    Q.    What is Exhibit 3?

14    A.    Exhibit 3 appears to be the agreement for

15 expert consult retention.

16    Q.    Is that the retention agreement for your

17 services in this matter?

18    A.    It appears to be, yes.

19    Q.    And it was entered into between Island

20 Justice, John Steed, counsel for the plaintiffs, and

21 you and your firm; is that right?

22    A.    That is correct.

Page 13

1    Q.    Okay.  And when was this retention

2 agreement entered into?

3    A.    It looks like we agreed on June 5th,

4 2024.

5    Q.    So you were retained in this matter

6 approximately 22 days before you finalized your

7 initial expert report, correct?

8    A.    Correct.

9    Q.    Okay.  And is that a copy of your

10 signature on page 3 of the retention agreement?

11    A.    Digital signature, yes.

12    Q.    Okay.

13        (Merritt Exhibit No. 4 was identified

14        for the record.)

15 BY MR. CASHDAN:

16    Q.    I am going to hand you what's been marked

17 for identification as Exhibit 4.  What is Exhibit 4?

18    A.    Exhibit 4 appears to be a document of an

19 invoice.

20    Q.    And is this an invoice for work performed

21 in connection with this matter through the date of

22 the invoice?

4 (Pages 10 - 13)

Jason Merritt                                              October 22, 2024
Multiple Plaintiffs v. Progressive

Page 14

1    A.    Correct.
2    Q.    Since the date of the invoice, which is
3 August 31 -- strike that.
4          This invoice is dated August 1st; is that
5 correct?
6    A.    Appears to be, yes.
7    Q.    Okay.  And does this invoice accurately
8 reflect all of the work that you performed in this
9 matter through August 1st of 2024?
10    A.    To the best of my recollection, yes.
11    Q.    Have you done additional work since August
12 1st, 2024 in this matter?
13    A.    I have.
14    Q.    What additional work have you done?
15    A.    The supplemental report.
16    Q.    Okay.  Other than your work on the
17 supplemental report, is there any other work you have
18 done since August 1st, 2024 in this matter?
19    A.    I don't believe there is, to the best of
20 my recollection.
21    Q.    And what did you do in connection with the
22 supplemental report since the date of this invoice

Page 15

1 reflected in Exhibit 4?
2    A.    Since that, I don't believe there's
3 anything other than preparation for the deposition.
4    Q.    Okay.  What I am asking is, how much --
5 what type of work did you do in connection with the
6 supplemental report that's not reflected in the
7 invoice?
8    A.    It would just be the hours to bring
9 together the supplemental report and submit it, to
10 author it and submit it.
11    Q.    And that involved doing what?
12    A.    Additional -- just like I did in the first
13 expert report is looking at the files and the motions
14 with the Mitchell reports and bringing together the
15 appraisals.
16    Q.    When you say looking at the files, what
17 files are you talking about?
18    A.    The files that were given to me by counsel
19 that contained the Auto WorkCenter for Mitchell.
20    Q.    Okay.  So valuation reports?
21    A.    Yes, valuation.
22    Q.    And those are the valuation reports for

Page 16

1 the individual plaintiffs named in the case?
2    A.    Correct.
3    Q.    Did you look at the full claim file,
4 including all the claim notes?
5    A.    I was given a file, some of it I referred
6 to in my -- at the end of my report as to what I
7 used.  The second amended class action complaint, I
8 did review that.  And that included the Mitchell
9 vehicle valuation reports and the policies.
10    Q.    I understand you had the valuation reports
11 for each of the plaintiffs.  I am wondering if you
12 had the entire claim file for each of the plaintiffs,
13 including claim notes?
14    A.    I couldn't testify I had the entire file.
15 I couldn't tell you that.  I don't know.
16    Q.    You don't know, okay.  Going back to
17 Exhibit 4, the invoice, the first entry says Case
18 Review, and you billed for two hours; is that
19 correct?
20    A.    Correct.
21    Q.    Do you bill in full hour increments?  In
22 other words, if you work a half hour or 45 minutes,

Page 17

1 how do you bill?
2    A.    I usually bill in half hour increments.  I
3 always round down.
4    Q.    Okay.  So if you work an hour and 15
5 minutes, you'll bill for an hour?
6    A.    Correct.
7    Q.    And if you work an hour and 45 minutes,
8 you'll bill for an hour-and-a-half?
9    A.    Correct.
10    Q.    Okay.  What did you do in connection with
11 the case review for which you billed two hours on May
12 28, 2024?
13    A.    That would have been looking at the
14 original, as I referred to in Exhibit B, it would be
15 the --
16    Q.    You said Exhibit B?
17    A.    Exhibit B, yes.  The second amended class
18 action.  But at that point, I reviewed the class
19 action complaint.
20    Q.    Just to be clear, when you're referring to
21 Exhibit B, are you referring to the Exhibit B to
22 Exhibit 1 of this deposition?

5 (Pages 14 - 17)

Page 18

1    A.   Correct.

2    Q.   Or Exhibit 2 of this deposition, excuse
3 me.

4    A.   Well, I could refer -- since we're
5 speaking on the first one, I'll go to the first
6 expert report which is Exhibit 2.

7    Q.   Okay.  And when you say Exhibit B, you're
8 talking about the list of materials that you reviewed
9 or relied upon?

10    A.   Correct.  And on that, I reviewed the
11 complaint, the Mitchell vehicle valuation, and policy
12 contract.

13        MR. ROOF:  We're working off of Exhibit 1,
14 right?

15        MR. CASHDAN:  Well, I am letting him
16 answer the questions.

17        THE WITNESS:  We're working off Exhibit 2
18 on this one.

19        MR. ROOF:  All right.

20 BY MR. CASHDAN:

21    Q.   So in connection with your case review
22 reflected on May 28, 2024 for which you billed two

Page 19

1 hours, you reviewed the materials listed in Exhibit B
2 to Exhibit 1 of this deposition, your initial expert
3 report, is that right?

4    A.   Correct.

5    Q.   And if I look at Exhibit 2, in that list
6 of materials, there's five things listed.  Which of
7 those did you review in connection with your case
8 review on May 2024?

9    A.   I believe the first three.

10    Q.   So the complaint, the valuation report for
11 Mr. Thurston, and the policy?

12    A.   The policy contract, yes.

13    Q.   Okay.

14        MR. ROOF:  I am going to object to that
15 question.

16 BY MR. CASHDAN:

17    Q.   And it took you two hours to review the
18 complaint, the valuation report, and the policy?

19    A.   Yes, that would be most likely talking
20 with the attorney, reviewing the materials, and would
21 have taken around two to two-and-a-half hours.

22    Q.   Did you do any independent investigation

Page 20

1 at that time relating to any of the plaintiffs'
2 claims?

3    A.   No.

4    Q.   Okay.  I noticed that this work was done
5 before you signed the retention agreement.  Am I
6 right about that?

7    A.   Correct.

8    Q.   Why were you working on this matter before
9 you signed the retention agreement?

10    A.   Again, it was a case review.  Again, there
11 was no agreement at that point.  During the case
12 review is when we agreed to work together.

13    Q.   Did you work on this matter at any time
14 prior to May 28, 2024?

15    A.   I don't believe so.

16    Q.   Okay.  The next entry is for Retention
17 Agreement/Disclosure.  Do you see that?

18    A.   I do.

19    Q.   What is that?

20    A.   That would be the conversations that we
21 had with the attorney, as well as the drafting of the
22 retention agreement.

Page 21

1    Q.   Okay.  Did you do any independent
2 investigation of any of the plaintiffs' claims at
3 that time?

4    A.   I did not.

5    Q.   Okay.  The next entry is on May 29th, and
6 it says Expert Report, an hour-and-a-half, and you
7 billed for an hour-and-a-half.  What does that entry
8 refer to?

9    A.   That would be actually drafting the
10 report.

11    Q.   So you started drafting the report before
12 you actually executed the retention agreement in this
13 matter?

14    A.   Actually, we, on the phone, agreed to the
15 retention.  We signed it on the 4th, but we agreed to
16 it around the 29th.

17    Q.   Okay.  And what did you do in connection
18 with the expert report on the 29th of May?

19    A.   That is when I began to write the report.

20    Q.   Okay.  Did you write this report from
21 scratch?

22    A.   Most of it was taken from my other expert

6 (Pages 18 - 21)

Page 22

1 reports that I've written in the past.
2    Q.    You've appeared as an expert in a number
3 of other cases against Progressive, correct?
4    A.    Correct.
5    Q.    And am I correct that your expert reports
6 in this matter substantially are the same as the
7 expert reports in those other Progressive matters?
8        MR. ROOF:  Objection, form.
9        THE WITNESS:  I would say that's a fair
10 statement.
11 BY MR. CASHDAN:
12    Q.    So what did you do for an hour-and-a-half
13 on May 29th in connection with the expert report?
14    A.    I would begin reviewing my new -- the
15 Exhibit Number 2 would be the original expert report,
16 starting to draft that, look at the case review
17 again, pull out the exhibits to use for compilation
18 of the report.
19    Q.    When you say starting to draft that, am I
20 correct that the first seven pages of your expert
21 report in this matter were largely taken from expert
22 reports you had done on other matters?

Page 23

1        MR. ROOF:  Objection to form.
2        THE WITNESS:  Without seeing it, I don't
3 know.  But most of it is pretty much the same.
4        MR. CASHDAN:  That's what I thought.
5 Thank you.
6 BY MR. CASHDAN:
7    Q.    Did you do any independent analysis of the
8 plaintiffs' claims in connection with your work on
9 the expert report on May 29th?
10    A.    As in?  Explain.
11    Q.    Sure.  Did you do any independent
12 investigation as to the validity of any of the
13 plaintiffs' claims in connection with your work on
14 the expert report on May 29th?
15    A.    I only reviewed the Mitchell reports, and
16 used those to put together the expert reports.  No
17 other investigation.
18    Q.    Okay.  On June 11th, you billed an hour
19 for expert report document review.  Do you see that?
20    A.    Correct.
21    Q.    What did you do then?
22    A.    I can't recall what that would be.

Page 24

1    Q.    Did that involve any independent analysis
2 of any of the plaintiffs' claims?
3    A.    I can't recall what that would have been.
4    Q.    Okay.  On the 18th of June, you billed an
5 hour for a Zoom meeting.  Do you see that?
6    A.    I do.
7    Q.    What was that?
8    A.    I can't recall what that is, either.
9    Q.    Okay.  On the 12th of June, you billed
10 four hours for expert report draft.  Do you see that?
11    A.    I do.
12    Q.    What was that work?
13    A.    That would have been completing the expert
14 report and finalizing it for my submission on the
15 27th.
16    Q.    Okay.  And this is the expert report
17 that's reflected in Exhibit 2 here?
18    A.    Correct.
19    Q.    Okay.  And did you do any independent
20 analysis of the plaintiffs' claims in connection with
21 any of that work for which you billed four hours on
22 June 12th?

Page 25

1    A.    I did not.
2    Q.    Okay.  On the 25th of June, you billed
3 another hour for expert report review.  Do you see
4 that?
5    A.    I do.
6    Q.    What was that work?
7    A.    I can't recall.
8    Q.    All right.  On the 26th of June, you
9 billed a half hour for expert report follow-up.  Do
10 you see that?
11    A.    I do.
12    Q.    What did you do there?
13    A.    Again, I can't recall what that would be.
14    Q.    Okay.  On the 27th, you billed
15 two-and-a-half hours for expert report follow-up.  Do
16 you see that?
17    A.    I do.
18    Q.    Do you recall what you did then?
19    A.    I do not.
20    Q.    Okay.  On July 1st, you billed two hours
21 for deposition preparation arrangements and
22 documents.  Do you see that?

7 (Pages 22 - 25)

Jason Merritt                                                    October 22, 2024
Multiple Plaintiffs v. Progressive

Page 26

1    A.   I do.
2    Q.   What did you do then?
3    A.   I was originally scheduled for a
4  deposition prior to this one.  So that would be
5  preparation for that.
6    Q.   Did you do any independent analysis of the
7  plaintiffs' claims in connection with that work?
8    A.   I did not.
9    Q.   Okay.  And on the 3rd of July, you also
10  billed half an hour for deposition preparation,
11  response to request.  Do you see that?
12    A.   I do.
13    Q.   What was that?
14    A.   I can't recall what that specifically was.
15    Q.   Did that involve any independent analysis
16  of the plaintiffs' claims?
17    A.   I don't believe so.
18    Q.   Okay.  All right.  I would like to go back
19  to Exhibit 1.  Put everything else aside.
20        I see from your expert report that you
21  list here that you are certified through two entities
22  to appraise vehicles.  Do you see that.

Page 27

1    A.   I am.
2    Q.   One of them is the Bureau of Certified
3  Auto Appraisers; is that right?
4    A.   Right.
5    Q.   And one is the American Society of
6  Certified Auto Appraisers?
7    A.   Correct.
8    Q.   Okay.  Are you certified by any entity
9  based in Maine to appraise vehicles?
10    A.   I am not.
11    Q.   Do you hold any license to appraise
12  vehicles in Maine?
13    A.   I do not.
14    Q.   Have you ever appraised a vehicle in
15  Maine?
16    A.   I can't recall if I have or not.
17    Q.   In the last ten years, have you appraised
18  a vehicle in Maine?
19    A.   I could not recall.
20    Q.   How about in the last five years, have you
21  appraised a vehicle in Maine?
22    A.   I do not recall.

Page 28

1    Q.   Have you ever been to Maine?
2    A.   I have been to Maine.
3    Q.   Where have you been?  What cities?
4    A.   I believe Boston area up into Maine.  I've
5  traveled up in Maine, but I can't recall exactly
6  where.
7    Q.   Do you remember when you were in Maine?
8    A.   I do not.
9    Q.   Have you been to Maine in the last five
10  years?
11    A.   I can not recall.
12    Q.   Tell me what the Bureau of Certified Auto
13  Appraisers is.
14    A.   Bureau of Certified Auto Appraisers is a
15  company out of the Texas area that provides a
16  certification course online for appraisals of
17  automobiles, and they offer training as well as
18  testing for certification.
19    Q.   You took an online course and got a
20  certification from the Bureau of Certified Auto
21  Appraisers, correct?
22    A.   I did.

Page 29

1    Q.   And you understand that you spent less
2  than five hours online with that course?
3        MR. ROOF:  Objection.
4        THE WITNESS:  I can't agree to that, no.
5  BY MR. CASHDAN:
6    Q.   Haven't you seen documents in other cases
7  showing that you spent less than five hours?
8        MR. ROOF:  Objection.
9        THE WITNESS:  I've seen documents that
10  said I was online with them for five hours.  But that
11  doesn't include what I've done off of that website as
12  far as studying and prep for that.
13  BY MR. CASHDAN:
14    Q.   Did you interact with a human being in
15  connection with your training with the Bureau of
16  Certified Auto Appraisers?
17    A.   As far as the training itself?  I don't
18  believe there was.  It was a representative of the
19  company that I spoke to in the training, but not as
20  part of the training.
21    Q.   When you received the training, was
22  your -- were you interacting with a human being?

8 (Pages 26 - 29)

Page 30

1    A.   No.

2    Q.   It was just a PowerPoint presentation,

3 correct?

4    A.   I can't recall exactly what it was, but

5 that sounds about right.

6    Q.   And what's your understanding of how often

7 that PowerPoint presentation is updated by the Bureau

8 of Certified Auto Appraisers?

9    A.   I don't know that.

10   Q.   Who wrote the training material?

11   A.   I do not know that, either.

12   Q.   Is the Bureau of Certified Auto Appraisers

13 sanctioned by any governmental entity?

14   A.   There's no government entity that

15 sanctions any type of appraisal certification.

16   Q.   I am just asking, is the Bureau of

17 Certified Auto Appraisers sanctioned by any

18 government entity?

19       MR. ROOF:  Objection.

20       THE WITNESS:  No.

21 BY MR. CASHDAN:

22   Q.   Is there any government entity that has

Page 31

1 indicated that it views certification from the Bureau

2 of Certified Auto Appraisers as necessary for

3 conducting appraisal work anywhere in the country?

4       MR. ROOF:  Objection.

5       THE WITNESS:  None that I know of.

6 BY MR. CASHDAN:

7    Q.   Okay.  Is the American Society of

8 Certified Auto Appraisers another internet

9 certification entity?

10   A.   It is.

11   Q.   And did you interact with any human beings

12 when you became certified from that entity?

13   A.   I did not.

14   Q.   Did you take any courses online?

15   A.   I did.

16   Q.   And did those courses online involve

17 interaction with a human being?

18   A.   They did not.

19   Q.   Who wrote the materials that you reviewed

20 online to get certified by the American Society of

21 Certified Auto Appraisers?

22   A.   I do not who wrote that.

Page 32

1    Q.   Where is the American Society of Certified

2 Auto Appraisers based?

3    A.   I believe they're in Texas as well.  I am

4 not certain, though.

5    Q.   Who wrote the materials that you reviewed

6 for the American Society of Certified Auto

7 Appraisers?

8    A.   I do not know that.

9    Q.   Has that material ever been updated?

10   A.   I do not know that.

11   Q.   When was that material first written?

12   A.   I am unsure of that as well.

13   Q.   Am I correct that you signed up for a

14 course with the American Society of Certified Auto

15 Appraisers and took that course online?

16   A.   I did.

17   Q.   And after taking that course and

18 completing the work that they asked you to do, you

19 received a certification in exchange for payment of a

20 fee?

21   A.   Yeah, the course through the American

22 Society of Certified Auto Appraisers is pretty

Page 33

1 extensive.  They go in through different chapters.

2 And I would have to read those chapters, and I would

3 have to do a narrative test and explanation of each

4 point of the chapters.  I spent a couple months on

5 that course.

6       And then at the end, you would have to do

7 additional appraisals to submit to the board, as well

8 as a final exam which was a narrative exam, also,

9 essay exam.

10   Q.   And as you're taking that course and

11 submitting those materials, you receive a

12 certification in exchange for paying a fee?

13   A.   I did.

14       MR. ROOF:  Objection.

15       THE WITNESS:  I did.

16 BY MR. CASHDAN:

17   Q.   You mentioned that you had to submit

18 materials in response to the course with the American

19 Society of Certified Auto Appraisers?

20   A.   I did.

21   Q.   Did you work hard in preparing your

22 responses?

9 (Pages 30 - 33)

Jason Merritt
Multiple Plaintiffs v. Progressive

Page 34

1      MR. ROOF: Objection.

2      THE WITNESS: Depends on what you term in

3 working hard.

4 BY MR. CASHDAN:

5    Q.   Well, do you think you worked hard?

6    A.   I believe it was extensive work.

7    Q.   Did you try to be accurate in providing

8 your responses?

9    A.   I did.

10    Q.   Did your responses get graded?

11    A.   They were.

12    Q.   And what kind of grades did you receive

13 for your responses?

14    A.   I don't know what the grade was, but I

15 received a passing grade.

16    Q.   Did you ever receive back from anyone an

17 indication of whether any of your responses were

18 correct or incorrect?

19    A.   I do not.

20    Q.   So you were told you passed, correct?

21    A.   Correct.

22    Q.   But you don't know whether some of your

Page 35

1 responses may have been erroneous?

2      MR. ROOF: Objection.

3      THE WITNESS: I do not know.

4      (Merritt Exhibit No. 5 was identified

5        for the record.)

6 BY MR. CASHDAN:

7    Q.   Let me hand you what's been marked for

8 identification as Exhibit 5.

9      Have you seen Exhibit 5 before?

10    A.   Appears to be the packet that I sent at

11 the completion of the training.

12    Q.   The material has Bates numbers

13 consecutively numbered from Merritt_0005 through

14 Merritt_0052. And the last page is a photocopy of

15 some materials, and I am not sure if it has a Bates

16 number on it. It's very small.

17      These are materials that were produced to

18 us in response to a subpoena served on you, correct?

19    A.   Correct.

20    Q.   Okay. And so tell me again what these

21 materials are?

22    A.   These are materials that I submitted to

Page 36

1 the American Society of Certified Auto Appraisers.

2    Q.   So when you were referencing earlier that

3 you answered some questions as you would go along

4 with the course, is this the material you were

5 referring to?

6    A.   Yes.

7    Q.   Okay. So if you look at the first page of

8 Exhibit 5, the title says, American Society of

9 Certified Auto Appraisers, Course One. Do you see

10 that?

11    A.   I do.

12    Q.   So are these questions and answers that

13 you provided in connection with course one?

14    A.   I believe so, yes.

15    Q.   And if you go to the third page of the

16 exhibit, which has Bates number 7, the third page has

17 your name at the bottom. Do you see that?

18    A.   It does.

19    Q.   So does that indicate that this is what

20 you submitted to the American Society of Certified

21 Auto Appraisers in connection with your online

22 course?

Page 37

1    A.   Correct.

2    Q.   Okay. And so this was -- these were your

3 efforts to answer these questions as accurately as

4 possible?

5    A.   As much as possible, yes.

6    Q.   Okay. I mean, I assume you were trying to

7 be accurate in your answers, correct?

8    A.   Correct.

9    Q.   And then the fourth page of Exhibit 5,

10 which has Bates number 0008 at the bottom, indicates

11 at the top, it's a written response to -- it refers

12 to Course Four. Do you see that?

13    A.   I do.

14    Q.   Okay. I notice that we don't have a

15 Course Two and Three. Oh, I am sorry, we do. I take

16 that back, I am sorry.

17      So these two pages, pages 008 and 009,

18 look like they relate to course four; is that

19 correct?

20    A.   It looks -- appears so, yes.

21    Q.   And at the bottom of page 009, again, it

22 has your name. This is what you submitted in

10 (Pages 34 - 37)

Jason Merritt                                                                          October 22, 2024
Multiple Plaintiffs v. Progressive

Page 38

1 response to the questions and answers for course
2 four?
3    A.    Appears to be, yes.
4    Q.    And my apologies.  The next page which has
5 Bates number 0010 at the bottom references Course
6 Three at the top.  Do you see that?
7    A.    Correct.
8    Q.    And if you go through to 0013, it has your
9 name at the bottom again?
10   A.    It does.
11   Q.    So these four pages were submitted as the
12 questions and answers on course three?
13   A.    Correct.
14   Q.    Okay.  The next page 0014 at the top
15 references Course Two.  Do you see that?
16   A.    I do.
17   Q.    And at the bottom of the page on page
18 0019, again, your name appears, which I assume is you
19 signing off on your questions and answers?
20   A.    Correct.
21   Q.    Okay.  So from the beginning of this
22 document through 0019, it looks like we have the

Page 39

1 questions and answers for courses one, two, three,
2 and four, correct?
3    A.    Correct.
4    Q.    And I apologize that they are out of
5 order.  These are the orders in which they were
6 produced to us, okay?
7    A.    Okay.
8    Q.    Starting on page 0020, there's something
9 that's entitled Certified Diminished Value Appraisal.
10 Do you see that?
11   A.    I do.
12   Q.    What is this?  Is this an actual appraisal
13 you did, or is this done just for the course?
14   A.    This was done just for the course.
15   Q.    So this was a hypothetical appraisal you
16 did to show for the course that you can do it?
17   A.    Correct.
18   Q.    Okay.  What is a diminished value
19 appraisal?
20   A.    Diminished value appraisal is when a
21 vehicle is involved in some type of accident or
22 damage that causes a lesser value of the vehicle

Page 40

1 after the damage.
2    Q.    Okay.  Does diminished value relate to the
3 issue -- the concept of depreciation?
4    A.    No, not necessarily.  It's just the
5 depreciation of the value after the accident as a
6 result of the accident.
7    Q.    Okay.  For purposes of your expert
8 opinions and conclusions in this matter, have you
9 done any analysis of the physical depreciation of any
10 of the vehicles?
11   A.    No.
12   Q.    Are you offering any opinions or
13 conclusions in this matter regarding the physical
14 depreciation of any of the plaintiffs' vehicles?
15   A.    I'm not.
16   Q.    Okay.  It looks like this certified
17 diminished value appraisal goes from page 0020
18 through 0031; is that correct?
19   A.    It appears to be, yes.
20   Q.    Okay.  Starting on 0032 is a document
21 entitled Certified Actual Cash Value Appraisal.  Do
22 you see that?

Page 41

1    A.    I do.
2    Q.    And this looks like it runs through the
3 end of the document; is that correct?
4    A.    Appears to be correct.
5    Q.    And is this an actual cash value appraisal
6 that you did, or was this something again that was
7 done hypothetically for the class?
8    A.    This was a hypothetical as well.
9    Q.    Okay.  Whose car is this being appraised?
10   A.    Actually, mine.
11   Q.    I thought it might have been.  That's why
12 I asked.
13         So this is not like a paid customer for
14 whom you're doing work?
15   A.    It is not.
16   Q.    This is just for the class?
17   A.    Correct.
18   Q.    And the point of this was to show how you
19 would go about conducting an actual cash value
20 appraisal?
21   A.    It is.
22   Q.    Okay.  And did you do an appraisal like

11 (Pages 38 - 41)

Jason Merritt
Multiple Plaintiffs v. Progressive

Page 42

1 this for any of the plaintiffs in this case?
2    A.   I did not.
3    Q.   Okay.  All right.  I'd like to go back to
4 the first page of the document, Exhibit 5.
5        So looking at the first page, it looks
6 like there's some questions and then some answers; is
7 that correct?
8    A.   Correct.
9    Q.   Okay.  Were the questions provided by the
10 American Society of Certified Auto Appraisers in
11 connection with your course?
12   A.   They were.
13   Q.   So, for example, at the end of course one,
14 you were given a list of questions and asked to
15 provide answers?
16   A.   To the best of my recollection, yes.
17   Q.   Okay.  And you would, then, take as much
18 time as you needed to submit the answers?
19   A.   Correct.
20   Q.   And were you allowed to do research, if
21 you needed to, to get the answers correct?
22   A.   Yes.

Page 43

1    Q.   And did you do that?
2    A.   Yes.
3    Q.   Okay.  Did you make an effort to answer
4 these questions as honestly and as truthfully as
5 possible?
6    A.   I did.
7    Q.   Okay.  I would like to go to question 5:
8 Using A Flawed Appraisal Report.  Do you see that?
9    A.   I do.
10   Q.   Okay.  And the question says:
11       "Question:  A client engages an appraiser
12 (Appraiser A) to appraise a property.  Appraiser A is
13 provided with a copy of an appraisal report prepared
14 by another appraiser (Appraiser B) retained by the
15 property's owner.  Appraiser A finds significant
16 errors in Appraiser B's appraisal report.  What
17 should Appraiser A do?"
18       Did I read that question correctly?
19   A.   Yes.
20   Q.   And can you please read your answer into
21 the record.
22   A.   "We independently verify the information

Page 44

1 we use on any Appraisal Report.  Appraisal Report B
2 cannot be used to establish a value and the errors or
3 the omissions of the report must be noted."
4    Q.   Is that your truthful answer to that
5 question?
6    A.   It is.
7    Q.   Okay.  And did you get any feedback from
8 the American Society of Certified Auto Appraisers as
9 to your answer?
10   A.   I did not.
11   Q.   Okay.  If you go to the third page of
12 Exhibit 5, there is a question number 21.  Do you see
13 that?
14   A.   I do.
15   Q.   It says, Range of Value.  Do you see that?
16   A.   I do.
17   Q.   And the question you were asked was:
18       "Question:  Is a range of value acceptable
19 in an appraisal?"
20       Do you see that question?
21   A.   I do.
22   Q.   What was your response?

Page 45

1    A.   I said:  "Yes, an opinion can be expressed
2 in a range if that is the purpose of the appraisal."
3    Q.   And you think that that's accurate?
4    A.   Again, it depends on the purpose of the
5 appraisal and the different range and the manners in
6 which they came to that opinion.
7    Q.   Sure.  But given all those factors, is
8 your answer truthful?
9    A.   Yes.
10   Q.   If you would go to Bates number 0010 in
11 Exhibit 5, these are -- this is the questions and
12 answers regarding course three, correct?
13   A.   Correct.
14   Q.   And again, are these questions, questions
15 that were provided by the American Society of
16 Certified Auto Appraisers?
17   A.   They were.
18   Q.   And you did your best to answer them
19 accurately and truthfully?
20   A.   I did.
21   Q.   Okay.  Question 5 says, "Defined Value."
22 Do you see that?

12 (Pages 42 - 45)

Jason Merritt
Multiple Plaintiffs v. Progressive                    October 22, 2024

Page 46

1    A.   I do.
2    Q.   Can you read aloud your answer to defined
3  value.
4    A.   "This is the monetary worth an informed
5  person would offer for an item."
6         And this is the classic car diminished
7  value exam.
8    Q.   Let's go to page 0032 of Exhibit 5.
9         MR. ROOF:  What page?
10        MR. CASHDAN:  0032.
11        THE WITNESS:  Yes.
12 BY MR. CASHDAN:
13   Q.   This is the hypothetical actual cash value
14 appraisal that you did, correct?
15   A.   Correct.
16   Q.   You tried to do this appraisal using your
17 standard methodology?
18        MR. ROOF:  Objection.
19        THE WITNESS:  Again, this is a -- you have
20 to ask me specific questions.  So I can't give you a
21 blanket answer on that.
22 BY MR. CASHDAN:

Page 47

1    Q.   Well, you have a template that you use to
2  conduct appraisals, correct?
3    A.   I do.
4    Q.   And that template reflects the usual
5  methodology that you utilize for certified actual
6  cash value appraisals, correct?
7    A.   Usually, yes.
8    Q.   And that template is consistent with what
9  you did here in Exhibit 5, correct?
10   A.   I utilized the template, yes.
11   Q.   Okay.  So Exhibit 5, the actual cash value
12 appraisal that you conducted for your car, reflects
13 the usual methodology that you use for conducting
14 actual cash value appraisals, correct?
15        MR. ROOF:  Objection.
16        THE WITNESS:  Again, usually, yes.
17 BY MR. CASHDAN:
18   Q.   Thank you.  If you go to the second page
19 of the appraisal, Bates number 0033, it looks like
20 there's a bunch of information about the condition of
21 the vehicle.  Do you see that?
22   A.   I do.

Page 48

1    Q.   Why do you have that information?
2    A.   Part of the appraisal itself.
3    Q.   And what's the purpose of examining the
4  condition of the vehicle for purposes of the
5  appraisal?
6    A.   For the condition, valuation.
7    Q.   And why is that important?
8    A.   Again, part of an appraisal is an
9  evaluation of the condition of the vehicle so it can
10 either be added to or taken from the appraisal.
11   Q.   Okay.  If you look at the bottom of page
12 0033, there's a section called History.  Do you see
13 that?
14   A.   I do.
15   Q.   And it begins by saying, "The CarFax show
16 no damage or accident history."  Do you see that?
17   A.   I do.
18   Q.   Why is that an important factor?
19   A.   That is just one of the things I used in
20 this appraisal.  Again, it doesn't mean I use it in
21 all appraisals, but in this one as a test subject, I
22 used it in this one.

Page 49

1    Q.   If a vehicle has been in multiple prior
2  accidents, would that impact the value of the
3  vehicle?
4    A.   It could.
5         MR. ROOF:  Objection to form.
6         THE WITNESS:  Not always, but it could.
7  BY MR. CASHDAN:
8    Q.   What factors go into whether it does
9  impact the condition of the vehicle?  Sorry, strike
10 that.
11        What factors go into whether prior
12 accidents affect the value of the vehicle?
13   A.   Typically, if a vehicle has been in
14 multiple accidents or has prior damage, I would look
15 at each one of those incidents to see what the
16 extent -- the extent of the damage was or the
17 greatness of the damage was.
18        If it was a very minor damage that wasn't
19 repaired or just noted as an accident, where there
20 was no damage, then that obviously would not take
21 away from the value.  If the vehicle was over ten
22 years old, over 100,000 miles, that normally does not

13 (Pages 46 - 49)

Page 50

1 diminish the value of the vehicle.
2        There's multiple factors involved in that.
3 It's not a blanket statement that an accident would
4 cause diminished value, but it does in certain.
5    Q.   You have to get the details to evaluate,
6 correct?
7    A.   Correct.
8    Q.   If there's prior unrepaired damage to a
9 vehicle, could that impact the value of the vehicle?
10   A.   Prior damage unrepaired.  It would depend
11 on what the damage is.  But if it was a noticeable
12 damage, it could be a deduction off the condition.
13 Again, depends on the damage.
14   Q.   You would have to know the individual
15 facts?
16   A.   Correct.
17   Q.   Okay.  If you go to the third page of this
18 appraisal, which is Bates number 0034 in Exhibit 5,
19 this now looks like the page where you are looking at
20 comparable vehicles, correct?
21   A.   Correct.
22   Q.   All right.  And for purposes of this

Page 51

1 analysis, you used three comparable vehicles; is that
2 correct?
3    A.   I did.
4    Q.   And you used the sales price for these
5 three vehicles?
6    A.   I did.
7    Q.   Is it okay to use the sales price?
8        MR. ROOF:  Objection to form.
9        THE WITNESS:  I used the sale price, yes.
10 BY MR. CASHDAN:
11   Q.   Did you look for the list price of those
12 vehicles?
13   A.   Again, we're messing up words.  I'll go
14 back to -- it's the list price that I used.
15   Q.   Well, I'm just looking at the actual words
16 in the document.  The words say sale price, correct?
17   A.   Correct.
18   Q.   Did you use the sale price or the list
19 price?
20   A.   No.  Again, the list price and the sale
21 price to me is the same.
22   Q.   So if a dealer lists a car for sale for

Page 52

1 $10,000 on its lot and a human being walks on the lot
2 and offers 9500 in cash and the dealer takes it,
3 what's the sales price?
4    A.   That would be the sold price would be
5 9500.  The sale price is still 10,000.
6    Q.   Okay.  So in your lingo, you think sale
7 price and list price are the same and are different
8 than sold price?
9    A.   Correct.
10   Q.   And for purposes of this document, when
11 you say sale price here, you think those were the
12 list prices of these vehicles?
13   A.   I do.
14   Q.   Okay.  Is it okay to use the sold price if
15 it's different than the list price?
16       MR. ROOF:  Objection to form.
17 BY MR. CASHDAN:
18   Q.   For purposes of a cash value appraisal?
19   A.   It would depend on the actual sale.  If
20 you have all the details of the sale, it could be
21 used.  Again, generally a car lot will put a
22 vehicle -- just for instance, the first one.  The

Page 53

1 sale price is 18,988, which is the list price that's
2 for sale on the lot at 18,988.
3        Again, a dealership -- I've testified in
4 the past that a dealership is more concerned about
5 profit margin.  So the profit margin of that vehicle,
6 if you back all the way up to where that sale price
7 is put on that vehicle, the appraiser for the
8 dealership has already done the painstaking measures
9 of appraising that vehicle and lists that vehicle for
10 sale of the price of 18,988.  He or she has taken
11 into account all the conditions, the mileage, the
12 options, and has put an actual cash value on that
13 vehicle.
14       If a person comes into the lot and offers
15 an amount to purchase that vehicle, again, the sales
16 manager looks at the profit margin, and they operate
17 off the profit margin.
18       When I was a salesperson for the
19 dealerships that I was at, I did not take into
20 account the actual cash value once it was on there.
21 I just took into account the profit margin.  So if I
22 had a customer come in and say I'll give you 18,5 for

14 (Pages 50 - 53)

Page 54

1 that Honda, I would look at that deal and I would
2 look at the profit margin on it, and I could add some
3 additional services, service contract, warranty, gap,
4 et cetera, some other type of profit-making portion
5 of the deal to bring the profit margin up.
6      So that car may have a reduction in the
7 sold price of 18,5, but there's other conditions that
8 are brought into the sale which does not change the
9 actual cash value of the vehicle itself.
10     Q.   You just listed a bunch of things that you
11 said dealerships do when they're determining the list
12 price for a vehicle, right?
13     A.   Right.
14     Q.   Does every single dealer do that every
15 single time for every single vehicle they sell?
16         MR. ROOF:  Objection.
17         THE WITNESS:  I could testify only from my
18 experience of selling vehicles for 30 or so years.
19 And selling for Timbrook, we did that with every
20 vehicle.
21 BY MR. CASHDAN:
22     Q.   That's not what I asked.  I asked whether

Page 55

1 every single dealer does that every single time for
2 every vehicle they sell?
3         MR. ROOF:  Objection.
4         THE WITNESS:  Again, I could never answer
5 that for any dealership.
6 BY MR. CASHDAN:
7      Q.   Are you able to answer that for any
8 dealership other than the ones you worked at?
9      A.   I can answer that for the dealerships that
10 I have dealt with and I have seen and I spoke with.
11 They do painstaking measures to make sure the profit
12 margin is there.
13     Q.   Okay.  How many dealerships have you
14 worked with in Maine?
15     A.   Excuse me?
16     Q.   How many dealerships have you worked with
17 in Maine?
18     A.   I have never worked for a dealership in
19 Maine.
20     Q.   Okay.  Thank you.
21         MR. ROOF:  Just for the record --
22         MR. CASHDAN:  I am sorry, counsel, you

Page 56

1 don't get to talk.  You don't get to testify.
2         MR. ROOF:  I'm not testifying, all right?
3         Merritt Exhibit 5 has been designated
4 confidential, subject to the confidentiality order.
5 So we're going to designate the entire transcript as
6 confidential at this time.
7         So I'm not testifying.  Go ahead.
8 BY MR. CASHDAN:
9      Q.   Now, going to the next page 0035, there's
10 a section that says, Why Research Valuation Guides?
11 Do you see that?
12     A.   I do.
13     Q.   Okay.  Now, that's not a question that's
14 being posed by the Society of Certified Auto
15 Appraisers, correct?
16     A.   I don't believe so.
17     Q.   That comes from your standard template
18 that you use for cash appraisals, right?
19     A.   Correct.
20     Q.   Okay.  Can you read the first two
21 sentences of that paragraph, please?
22     A.   Talking about the methodology.  And it

Page 57

1 says why would we use valuation guides.
2         "Valuation guides are a nationally
3 recognized means that both buyers and sellers, male
4 and female, can come to a reasonable agreement on the
5 fair market value of the auto in question.  It is a
6 good starting point to determine if a buyer/seller
7 should buy/sell a vehicle for more/less than what the
8 vehicle is worth or vice versa.  East Coast Auto
9 Appraisers."
10        We used multiple different resources.
11     Q.   Thank you.  And the last sentence says,
12 "If industry recognized valuation guides were not in
13 place, it would be very easy for deceptive people to
14 mislead the uneducated public of the going price,"
15 right?
16     A.   Right.
17     Q.   And do you believe that's true?
18     A.   Yes.
19     Q.   Turning to the next page, 0036, the page
20 is entitled Automotive/Insurance/Legal Terms.  Do you
21 see that?
22     A.   I do.

15 (Pages 54 - 57)

Page 58

1    Q.   And this is still part of your standard
2  appraisal document, correct?
3    A.   Without looking at it, it appears to be,
4  yes.
5    Q.   And the third term, it says, Fair Market
6  Value, and it provides a definition, correct?
7    A.   Correct.
8    Q.   What is the definition you provide for
9  fair market value?
10    A.   "Fair Market means the price that property
11  would bring in a market of willing buyers and willing
12  sellers, in the ordinary course of trade.  Market
13  value is generally established, if possible, based on
14  sales of similar property in the same locality."
15        Again, I am referring to sales.  That
16  means it could be posted for that price.
17    Q.   Where does it say you are referring to
18  sales in that paragraph?
19    A.   Excuse me?
20    Q.   In that paragraph, fair market value.  You
21  said you were referring to sales.
22    A.   Correct.

Page 59

1    Q.   Okay.  Is it your testimony that the only
2  aspect that matters for establishing fair market
3  value is the list price chosen by the seller?
4    A.   Again, this is terms that I am using in a
5  template for a -- none of this is even true.  I mean,
6  this is a made-up appraisal.  But the terminology in
7  here is being used in most of my appraisals.  But,
8  yes, fair market value means based on sales of
9  similar property.
10        So again, without taking into account all
11  the back end and everything else, I go by the listed
12  price.
13    Q.   I understand that.  The listed price is
14  chosen solely by the seller of the vehicle, correct?
15    A.   Correct.
16    Q.   And when you talk about fair market value
17  in this document, you talk about willing buyers and
18  willing sellers, correct?
19    A.   Correct.
20    Q.   Okay.  And the willing buyer doesn't set
21  the list price, does it?
22    A.   He does not.

Page 60

1    Q.   Okay.  The willing buyer decides how much
2  he or she is willing to pay for the vehicle, correct?
3    A.   Correct.
4    Q.   Okay.  So the dealer sets a price, we call
5  it the list price, correct?
6    A.   Correct.
7    Q.   You call that the sales price, you said,
8  correct?
9    A.   Correct.
10    Q.   But the willing buyer may not want to pay
11  the amount of the list price, correct?
12    A.   Correct.
13    Q.   Okay.  And if a willing buyer offers some
14  amount different than the list price and the willing
15  seller accepts that offer of a lower amount, is that
16  the value of the vehicle?
17        MR. ROOF:  Objection.
18        THE WITNESS:  Again, there's a lot taken
19  into account on that.  So, no, I don't think that
20  affects the actual cash value.
21  BY MR. CASHDAN:
22    Q.   Is there a lot taken into account when the

Page 61

1  dealer sets the list price?
2        MR. ROOF:  Objection.
3        THE WITNESS:  There is a lot taken into
4  account, yes.
5  BY MR. CASHDAN:
6    Q.   So there's a lot taken into account when
7  the list price is set, and there's a lot taken into
8  account when the sold price is established, right?
9    A.   Correct.
10    Q.   And you care a lot about knowing the
11  details for all that's taken into account for the
12  sold price, right?
13    A.   Correct.
14    Q.   Do you care about knowing what was taken
15  into account for the list price being established?
16    A.   I do.  I explained that.
17    Q.   Okay.  So when a dealer sets a list price,
18  for you to accept it for purposes of an appraisal,
19  what do you have to know about what the dealer
20  actually took into account in setting up that list
21  price?
22    A.   Repeat your question?

16 (Pages 58 - 61)

Multiple Plaintiffs v. Progressive

Page 62

1    Q.   Sure.  A dealer sets a list price.  Do you
2 accept that list price as the value of the vehicle
3 even if you don't know anything about what the dealer
4 actually took into account in establishing that list
5 price, or do you require details about how that list
6 price was established?
7        MR. ROOF: Objection to form.
8        THE WITNESS: Again, if you look at the
9 reports, there's comps.  They're using comparable
10 vehicles.  So if I see one vehicle that strays way
11 off and is a much different price than the other
12 ones, that would cause me concern.  If the prices
13 appear to be the same or close and the options are
14 way different, then I would look at the options on
15 that to see why there is a difference in price.
16        The comparables give me an idea of what's
17 in the ballpark for reasonable pricing and listing.
18 BY MR. CASHDAN:
19    Q.   But that's not what I am asking you, sir.
20 My understanding of your testimony is you do not
21 accept sold prices as the value of the vehicle
22 because you don't have specific knowledge about what

Page 63

1 was taken into account in reaching that sold price,
2 correct?
3    A.   I didn't say I don't take sold prices.  I
4 will use a sold price if I know the entire background
5 of the sale.
6    Q.   Okay.  Will you use a list price when you
7 don't know the entire background of how the list
8 price was established?
9    A.   Well, again, I do know that somewhat by
10 using -- looking at the comparables, looking at the
11 options.  Again, in each one of these reports,
12 there's options listed, there's mileage listed,
13 there's different conditions listed, there's all that
14 taken into account for that comparable price.
15        Again, I look at the prices.  If there's a
16 variation of price, then I look at the options and
17 the conditions to see why that's different.
18    Q.   So if you have all the information on
19 options and condition for a sold price, does that
20 give you enough detail?
21        MR. ROOF: Objection.
22        THE WITNESS: It does not.  It does not

Page 64

1 tell me the back end of the sale.
2 BY MR. CASHDAN:
3    Q.   And does that information tell you the
4 front end of what specific strategy a dealer was
5 using when it established the list price?
6    A.   Again, I have not run into or spoken to
7 any dealers that do not have a process of evaluating
8 their cars for sale.
9    Q.   Okay.  But do you understand that dealers
10 might have different business strategies when they
11 set list price?
12    A.   I would say every dealer has their own
13 strategy.  But at the end of the day, every dealer
14 has a strategy to place a list price on the vehicle
15 for profit as well as the actual cash value.
16 Vehicles today, you can't just put a price on a
17 vehicle and inflate it or deflate it or make up a
18 price.  With the internet, everybody looks at
19 vehicles on the internet and they pick a vehicle
20 within their price range.
21    Q.   Have you ever heard of vAuto?
22    A.   vAuto, yes, I have heard of that.

Page 65

1    Q.   That's a product that dealers use to help
2 establish a list price, correct?
3    A.   Correct.
4    Q.   Do you know that the founder of vAuto
5 estimates that dealers follow the recommendation of
6 vAuto 40 percent of the time or less?
7        MR. ROOF: Objection.
8 BY MR. CASHDAN:
9    Q.   Are you aware of that?
10    A.   No.  I mean, that has nothing to do with
11 my appraisal standards.
12    Q.   I understand that.  But that has to do
13 with whether dealers are picking the most effective
14 price, doesn't it?
15        MR. ROOF: Objection.
16        THE WITNESS: I would like to see all that
17 data.  But, again, that could possibly weigh in on
18 how I believe on it.  But, again, that does not
19 change even if 40 percent did.  That's still 40
20 percent they're using that guide, but their vehicle
21 must quantify up to that standard.
22 BY MR. CASHDAN:

17 (Pages 62 - 65)

Jason Merritt                                          October 22, 2024
Multiple Plaintiffs v. Progressive

Page 66

1    Q.   That would mean over half of the dealers
2  are not pricing at the market, wouldn't it?
3        MR. ROOF:  Objection.
4        THE WITNESS:  No, that does not mean that.
5  BY MR. CASHDAN:
6    Q.   Okay.  So what's your understanding of
7  what vAuto recommends when it sets prices?
8    A.   Again, I'm not familiar with vAuto.  I
9  don't have that.
10   Q.   Oh, you are not?  Are you familiar with
11 any technology currently being used by dealers to
12 establish list prices?
13   A.   Again, when I say familiar with, I've seen
14 them, I've looked at them.  I don't have a
15 subscription to that, so I can't get deep into the
16 program itself.  But, yes, I am familiar with a lot
17 of resources that price autos.
18   Q.   Name for me all of the products you're
19 familiar with that dealers currently use to establish
20 their list prices for vehicles.
21   A.   There's no way I could name them.
22   Q.   You can't name any of them?

Page 67

1    A.   I am familiar with vAuto, I am familiar
2  with J.D. Power.  I am familiar with Lightspeed.  A
3  lot of these are overlapping by the same company.
4  And I don't have subscriptions to any of those.
5    Q.   Okay.  How does vAuto go about
6  establishing what the list price should be for a
7  vehicle for the dealership?
8    A.   Again, I don't have that standard.
9    Q.   Is it the same for every dealer?
10       MR. ROOF:  Objection.
11       THE WITNESS:  Again, I can't testify to
12 that.  That's not even in my scope of work for
13 testifying to vAuto.
14 BY MR. CASHDAN:
15   Q.   Have you done a survey for purposes of
16 your opinions and conclusions in this matter
17 regarding how often dealers in Maine actually price
18 vehicles for sale at the market price?
19   A.   Have I done a survey in Maine.  No, I have
20 not.  I speak to dealers throughout the country and
21 they all come with a different procedure and
22 different policies to set their list price.  If that

Page 68

1  list price coincides with a market evaluation tool,
2  that is acceptable, there's nothing wrong with that.
3  As long as the vehicle meets conditions and standards
4  of that, that would be well within reason.
5    Q.   Do all dealers use a market evaluation
6  tool to set list price?
7    A.   I could never testify all dealers.
8    Q.   What percentage of dealers use a market
9  valuation tool to set list price?
10   A.   Again, I am not a mathematician, I am not
11 a specialist in that.  I do not know the percentage.
12   Q.   Okay.  How many in Maine use a market
13 evaluation tool to set this price?
14   A.   I would have no idea how many.
15   Q.   Okay.  Do different dealers have different
16 strategies for the amount of profit margin they want?
17   A.   I would say every dealer has a strategy
18 for profit margin, yes.
19   Q.   That's not what I am asking.  I am asking,
20 do all dealers want to achieve the same amount of
21 profit?
22   A.   Again, I can't testify to that.  But I

Page 69

1  would say, no, every dealer would have their own
2  profit margin.
3    Q.   They all have different business
4  strategies, right?
5    A.   Correct.
6    Q.   Okay.  Let's go back to Exhibit 1.
7        You referenced that your resume is
8  attached to Exhibit 1, correct?
9    A.   I believe it is, yes.
10   Q.   And that is Exhibit A to Exhibit 1?
11   A.   Correct.
12   Q.   Okay.  I would like to work backwards, if
13 I could.
14       So go to the last entry in your resume,
15 which I believe is the East Coast Auto Appraisers.
16 Do you see that?
17   A.   I do.
18   Q.   Okay.  And you have operated East Coast
19 Auto Appraisers since April of 2020, correct?
20   A.   I believe so.
21   Q.   That's what it says on the resume, right?
22   A.   Correct.

18 (Pages 66 - 69)

October 22, 2024

Page 70

1    Q.    Does East Coast Auto Appraisers sell cars?
2    A.    We do not.
3    Q.    Okay.  In 2024, how many vehicles did you
4  appraise as part of East Coast Auto Appraisers
5  unrelated to litigation?
6    A.    Again, since this litigation has started,
7  I have stopped advertising, I have stopped promoting
8  due to the time restraints these class action
9  lawsuits have taken from my time.  I have strictly
10 stayed within just a few classic vehicles, antique
11 vehicles.  So a small amount of private appraisals,
12 less than 20.
13   Q.    Okay.  Less than ten?
14   A.    Maybe around there.
15   Q.    Okay.  How many actual cash value
16 appraisals has East Coast Auto Appraisers done in
17 2024?
18   A.    I would say less than ten.
19   Q.    Less than five?
20   A.    I couldn't tell you.
21   Q.    Okay.  How about in 2024 -- excuse me,
22 strike that.

Page 71

1          How many actual cash value appraisals did
2  East Coast Auto Appraisers do in 2023?
3    A.    Again, I couldn't give you a number.  Less
4  than 50.
5    Q.    Less than ten?
6    A.    I couldn't -- I couldn't say.
7    Q.    How many appraisals did East Coast Auto
8  Appraisers do in 2022?
9    A.    Again, I don't recall.
10   Q.    Less than 10?
11   A.    No, I would say more than ten.
12   Q.    Would it surprise you that in the past,
13 you testified that less than five?
14   A.    Again, I can't recall.  So, I don't know.
15   Q.    Okay.  How many appraisals in 2021 did
16 East Coast Auto Appraisers do?
17   A.    Again, I do not know.
18   Q.    How many appraisals did East Coast Auto
19 Appraiser do in 2020?
20   A.    I cannot recall.
21   Q.    And between -- strike that.
22          In 2024, what percentage of income for

Page 72

1  East Coast Auto Appraisers is related to your work in
2  connection with litigation?
3    A.    Most all the income from East Coast is
4  part of litigation.
5    Q.    What percentage?
6    A.    I couldn't give you a percentage, but I
7  would say most all of it.
8    Q.    Over 90 percent?
9    A.    I would imagine.
10   Q.    Okay.  In 2023, what percentage of income
11 for East Coast Auto Appraisers has been in connection
12 with litigation?
13   A.    Again, I couldn't give you a number.
14   Q.    Over 90 percent?
15        MR. ROOF:  Objection.
16        THE WITNESS:  Again, I don't know.
17 BY MR. CASHDAN:
18   Q.    How about in 2022?
19   A.    Again, I do not know.
20   Q.    Over 90 percent?
21        MR. ROOF:  Objection.
22        THE WITNESS:  I do not know.

Page 73

1  BY MR. CASHDAN:
2    Q.    And how about 2021?
3    A.    I do not know.
4    Q.    Over 90 percent?
5        MR. ROOF:  Objection.
6        THE WITNESS:  I don't know.
7  BY MR. CASHDAN:
8    Q.    Okay.  You also have an entity called T3
9  Intelligence Services.  Do you see that?
10   A.    I do.
11   Q.    That's been in existence since 2019?
12   A.    Correct.
13   Q.    And that still is in existence?
14   A.    Yes, that is my full-time job, yes.
15   Q.    And that is providing security and private
16 investigation?
17   A.    Yes.
18   Q.    Do you sell cars through T3 Intelligence
19 Services?
20   A.    We do not.
21   Q.    Okay.
22   A.    That is why most of my time is spent with

19 (Pages 70 - 73)

Jason Merritt                                                    October 22, 2024
Multiple Plaintiffs v. Progressive

Page 74

1  that. And East Coast Auto Appraisers is not a
2  full-time job.
3      Q.   And am I correct that the majority of your
4  income comes from the work between T3 Intelligence
5  Services and East Coast Auto Appraisers?
6      A.   The majority of my finances is through T3
7  Intelligence.
8      Q.   What percentage of your income overall
9  comes from T3 Intelligence Services?
10     A.   I would say well over half, 75 percent.
11     Q.   Okay.
12     A.   East Coast is a small portion of my
13 income.
14     Q.   So 75 percent of your time is spent on
15 security and private investigation, correct?
16     A.   Approximately. I don't want to testify to
17 an exact time.
18     Q.   I understand, approximately. Thank you.
19 From August 2016 to on June 2019, you worked for an
20 entity called Timbrook Automotive, correct?
21     A.   Correct.
22     Q.   And am I correct that you worked in

Page 75

1  connection with motorcycle dealerships?
2      A.   I worked out of a motorcycle dealership,
3  but I also worked in -- there's a total of 15
4  dealerships now. I think at the time there were 13
5  vehicle dealerships, two of which were power sports.
6      Q.   Power what?
7      A.   Power sport dealers.
8      Q.   What are those?
9      A.   Motorcycles, four-wheelers.
10     Q.   Okay. Did you work in connection with
11 Timbrook Automotive in connection with selling
12 automobiles?
13     A.   I did.
14     Q.   What did you do in connection with selling
15 automobiles for Timbrook Automotive?
16     A.   Again, I worked out of the power sport
17 side. So the selling of them was sales manager. I
18 would manage the deal itself as far as the salesman
19 coming in with a customer and negotiating the sale.
20     Q.   Was it sale of a vehicle -- of an
21 automobile or the sale of a power sport?
22     A.   They were the same. We did same software

Page 76

1  management was the same at the motorcycle as well as
2  the vehicle. So I would do both.
3      Q.   Were they used or new vehicles?
4      A.   Used is what we dealt with mainly on my
5  side, and new as well.
6      Q.   And were you involved in setting the
7  pricing of these vehicles?
8      A.   Yes.
9      Q.   Okay. And what was your role in
10 connection with that?
11     A.   I was the appraiser.
12     Q.   Okay. And did you use any software to
13 assist you on that?
14     A.   We at the time had Lightspeed. So I was
15 responsible for sometimes purchasing the vehicles.
16 It could be at auction, it could be private sales, it
17 could be trade-ins. I was responsible for receiving
18 the vehicle, looking over the vehicle, pricing the
19 vehicle at the actual cash value. And I would use
20 multiple different resources.
21     Q.   And where was that entity based?
22     A.   That was in Cumberland, Maryland and

Page 77

1  Winchester, Virginia.
2      Q.   Okay. The power sport vehicles, were
3  those vehicles that are towed behind an automobile or
4  a truck or something?
5      A.   No, these are side by sides. They could
6  be -- you know they're side-by-sides, there are
7  $30,000 side-by-sides down to a four-wheeler or a
8  regular street motorcycle. Could be a Harley, could
9  be a Honda.
10     Q.   Did you sell tow hitches?
11     A.   No, we did not sell trailers or tow
12 hitches.
13     Q.   Okay. Were they used by vehicles in
14 connection with transporting any of the power
15 vehicles?
16     A.   I don't understand.
17         MR. ROOF: Objection.
18 BY MR. CASHDAN:
19     Q.   Are you familiar with tow hitches?
20     A.   Yes.
21     Q.   What are tow hitches?
22     A.   Tow hitch is a receiver part of the hitch

20 (Pages 74 - 77)

Jason Merritt
Multiple Plaintiffs v. Progressive                                    October 22, 2024

Page 78

1 to tow vehicle.
2    Q.   Goes on the back of a truck or a car?
3    A.   Correct.
4    Q.   How does it work?  It receives a trailer
5 and you put the trailer on and connect it?
6    A.   Correct.
7    Q.   Can you put two tow hitches on the back of
8 a car?
9        MR. ROOF:  Objection.
10       THE WITNESS:  Not that I know of.
11 BY MR. CASHDAN:
12   Q.   What's that?
13   A.   None that I know of.
14   Q.   It would be hard to have two trailers
15 behind a car or a truck?
16   A.   There's some trucks that have two
17 trailers, correct.
18   Q.   Have you ever seen a passenger vehicle
19 have two tow hitches?
20   A.   No.
21   Q.   Okay.  All right.  From June 2015 to
22 August 2016, you worked at an entity called Merritt's

Page 79

1 Automotive.  Do you see that?
2    A.   I did.
3    Q.   That was a family business?
4    A.   It was a family business, correct.
5    Q.   And was that for that approximately year
6 were you involved in sale of automobiles?
7    A.   I did sell vehicles.
8    Q.   Okay.  And did you set pricing on vehicles
9 at that time?
10   A.   I did.
11   Q.   And where was that based?
12   A.   In Cumberland, Maryland.
13   Q.   Where?
14   A.   Cumberland, Maryland.
15   Q.   And then from October 1987 through June
16 2015, you were employed by the Maryland State Police,
17 correct?
18   A.   I was.
19   Q.   And during that time did you sell cars?
20   A.   I was dealing with eBay and Craigslist and
21 selling vehicles online as a hobby, I guess you would
22 say, or part-time.

Page 80

1    Q.   As part of your profession for the
2 Maryland State Police, were you involved in the sale
3 of automobiles?
4    A.   We would seize vehicles through narcotics
5 and I was in charge of selling the vehicles.  But
6 they were mainly by auction.
7    Q.   Okay.  So not retail sales?
8    A.   No retail sales.
9    Q.   Okay.  Did you work for a car dealership
10 at any time while you were employed by the Maryland
11 State Police?
12   A.   As far as full-time, no.  I did some work
13 for Timbrook with their used vehicles then for
14 listing with eBay and just establishing an eBay
15 presence.
16   Q.   Just a little bit on-the-side kind of
17 work?
18   A.   Correct.
19   Q.   Okay.
20   A.   That was throughout my whole career with
21 the state police, I stayed involved with sales and
22 vehicles.

Page 81

1    Q.   I understand.  But during that time of
2 1987 through June of 2015, you were not employed by
3 any automobile dealership in any capacity, correct?
4    A.   I was not employed, but I maintained an
5 eBay presence where I sold vehicles on eBay.
6    Q.   Understood.
7        MR. CASHDAN:  Why don't we take a break.
8 Off the record.
9        THE VIDEOGRAPHER:  We're going off the
10 record at 11:11 a.m., Eastern time.
11       (Recess.)
12       THE VIDEOGRAPHER:  We are going back on
13 the record, file number 2, at 11:19 a.m., Eastern
14 time.
15 BY MR. CASHDAN:
16   Q.   I would like to turn to the second page of
17 Exhibit 1, which is your Supplemental Expert Report
18 in this matter.  And you state that an appraisal is
19 an opinion of value; is that correct?
20   A.   Correct.
21   Q.   And you agree that there is no single
22 methodology to arrive at a proper opinion as to a

21 (Pages 78 - 81)

October 22, 2024

Page 82

1  loss vehicle's actual cash value?

2      A.   I agree with that statement.

3      Q.   Am I correct that two appraisers using

4  accepted methodologies could come to different

5  conclusions of the actual cash value of the same

6  vehicle?

7      A.   There's caveats to that.  Again, it

8  depends on what the comparables would be.  It could

9  depend on the process in which the two appraisers

10 used the methodology they used, how they came upon

11 it.  There would be a variance of opinions.  I

12 believe so, yes.

13     Q.   You could have two appraisers using

14 methodologies that are appropriate that come to

15 different values for the same vehicle for actual cash

16 value, correct?

17     A.   I believe I stated in there.  If they use

18 the same -- again, it would depend on the

19 methodology.  I subscribe to and use the comparable

20 methodology is the only one I know to be sound.  And

21 the comparable methodology, if two appraisers would

22 use two different or three different comparables or

Page 83

1  -- they would come up with a different number,

2  possibly, and that would be acceptable.

3      Q.   Okay.  In the end, actual cash value is an

4  opinion of value within an acceptable range?

5          MR. ROOF:  Objection.

6  BY MR. CASHDAN:

7      Q.   Is that fair?

8      A.   Again, there's a lot involved in that.

9  But there is acceptability within a range, depending

10 on how they came upon it.  And again, it comes down

11 to, and I've mentioned in there, objectivity.

12     Q.   Are you familiar with a product licensed

13 by Mitchell International called WorkCenter Total

14 Loss?

15     A.   I am familiar with that, yes.

16     Q.   Are you familiar with how WorkCenter Total

17 Loss estimates actual cash value for the vehicle?

18     A.   I do not have the data that they use, but

19 I have the methodology that they publish at the end

20 of the report.

21     Q.   Okay.  You're familiar that WorkCenter

22 Total Loss applies a projected sold adjustment when

Page 84

1  calculating value?

2      A.   I do.

3      Q.   Okay.  What data is relied upon to

4  calculate the projected sold adjustment by WorkCenter

5  Total Loss?

6      A.   Explain what data you're looking for.  I

7  mean, what exactly do you want me to --

8      Q.   I am wondering if you know precisely what

9  data is being used?

10     A.   I do not.

11     Q.   Do you know where the data comes from?

12     A.   The data comes from different CRMs, or I

13 guess you would say the tools that dealerships use to

14 manage their inventory.

15     Q.   What do you mean by CRMs?

16     A.   I call it CRM, but it's a management tool

17 for the inventory.

18     Q.   So the projected sold adjustment is being

19 calculated using data from dealers?

20     A.   Again, I do not know exactly what data

21 they're using, but from what I've read, they receive

22 data from dealerships.

Page 85

1      Q.   Okay.  And how often -- strike that.

2          How much data do they get from

3  dealerships?

4      A.   That, I don't know.

5      Q.   Who calculates the projected sold

6  adjustment?  What entity?

7      A.   I do not know that, either.

8      Q.   How often is the projected sold adjustment

9  calculated?

10     A.   I believe every six months.

11     Q.   And how often is the data refreshed for

12 purposes of calculating projected sold adjustment?

13     A.   That, I do not know.

14     Q.   What time period for data is being used to

15 calculate the projected sold adjustment?

16     A.   I do not know that.

17     Q.   Do you know what statistical programs are

18 used to calculate the data?

19     A.   I do not.

20     Q.   With regard to comparable vehicles being

21 used by WorkCenter Total Loss, where does the program

22 get the data on the comparable vehicles?

22 (Pages 82 - 85)

Page 86

1    A.   Again, online advertisements.
2    Q.   Anywhere else?
3    A.   That, I do not know.
4    Q.   Do you know if there is any data coming
5  from dealers that is used for comparable vehicle
6  analysis?
7    A.   I do not know.
8    Q.   Who calculates the information about
9  comparable vehicles?
10    A.   I do not know.
11    Q.   What methodology is used by WorkCenter
12  Total Loss to select the comparable vehicles from
13  among the pool of potential vehicles to use?
14    A.   Without referring to the Mitchell report,
15  it starts close to the loss vehicle and works out.
16    Q.   I understand that.  But let's say there
17  were 50 vehicles that could be used as the comparable
18  in terms of geographic location.  What methodology is
19  used by WorkCenter Total Loss to select among those
20  for comparable vehicle?
21    A.   They have not supplied me with or made
22  that data, except for -- they don't have that data

Page 87

1  out there, so I don't have access to that data.
2    Q.   When you say you don't have access to that
3  data, have you asked your counsel for anything about
4  that?
5    A.   No, I have not.  I asked counsel for
6  different data sets as far as projected sold
7  adjustment, and the only data that I have received in
8  the past is that Mitchell will eliminate --
9    Q.   Let me stop you there for one second.
10    You understand there are confidentiality
11  orders for other cases, correct?
12    A.   Correct.
13    Q.   So I don't want you to disclose anything
14  that would violate the confidentiality orders.  I
15  just want to know if you have in this case, okay?
16    A.   In this case, no.
17    MR. ROOF:  I am going to object.  He can
18  answer that because it's in his report.  He was going
19  to testify to what's in his report.
20    MR. CASHDAN:  Well, if he's violating a
21  protective order in another case, he can't do that.
22  And if you're telling me that his report violates

Page 88

1  protective orders --
2    MR. ROOF:  I am not saying that at all.
3    MR. CASHDAN:  Okay.  Well, let's ask him
4  the question, okay?
5    MR. ROOF:  Well, let him answer the
6  question.
7  BY MR. CASHDAN:
8    Q.   Do you have any information in this case
9  concerning the data being used for the projected sold
10  adjustment?
11    A.   For this case, I took into account what
12  I've learned in prior cases, is that Mitchell would
13  eliminate anything that's sold at asking price or
14  above asking price, would eliminate those, and then
15  they would take the data that they received from
16  vehicles that remember sold under asking price and
17  they will use those towards the projected sold
18  amount.
19    Q.   If you could turn to page 6 of your
20  Supplemental Report, Exhibit 1.  Are you there?
21    A.   I am.
22    Q.   At the bottom, it says, "Third, it is my

Page 89

1  understanding based on conversations with counsel
2  that Mitchell does not consider all transactions."
3    Do you see that?
4    A.   I do.
5    Q.   Okay.  Which counsel did you speak with
6  about that subject?
7    A.   That was in prior cases, and that is
8  information that I've learned.
9    Q.   Did you learn any of that information
10  based on conversations with any of the lawyers in
11  this case?
12    A.   I did not.
13    Q.   You only learned that information in
14  speaking with lawyers in other cases?
15    A.   I did.
16    Q.   Okay.  Now, with regard to the information
17  you just talked about and that's in your report, you
18  said, "Mitchell does not consider transactions where
19  the vehicle sold for the advertised price."  Do you
20  see that, beginning at page 7?
21    A.   Yes.
22    Q.   Okay.  What's your understanding about

23 (Pages 86 - 89)

Jason Merritt
Multiple Plaintiffs v. Progressive

Page 90

1 whether Mitchell considers transactions where the
2 vehicle sold for the advertised price in calculating
3 the projected sold adjustment?
4    A.    Repeat that, please.
5    Q.    Sure.  Your report says, "Mitchell does
6 not consider transactions where the vehicle sold for
7 the advertised price."  Do you see that?
8    A.    I do.
9    Q.    What's your understanding of that?
10    A.    They do not take that into account when
11 they do the calculations for the projected sold
12 amount.
13    Q.    Is it your understanding that that's
14 always been the case?
15    A.    I can't say always.  I can't testify to
16 that.  I do not know.
17    Q.    What time period does that apply to?
18    A.    I do not know the time period.
19    Q.    Do you know whether that is for all
20 transactions or just for certain transactions?
21    A.    I do not know that, either.
22    Q.    Do you know whether that applies to all

Page 91

1 vehicles or just certain vehicles?
2    A.    Again, without having that data in front
3 of me, I can't testify to the specifics.
4    Q.    Have you ever had that data in front of
5 you?
6    A.    I don't believe I have.
7    Q.    Have you ever seen that data?
8    A.    I have seen the data where they take away
9 the vehicle sold at asking price or above.  But I
10 have not seen the actual data.
11    Q.    What I want to know is, have you seen data
12 that shows how often that occurs?
13    A.    I did not.
14    Q.    And do you know whether that is still the
15 case?
16    A.    I do not.
17    Q.    And you said also in your report that
18 Mitchell has never considered transactions where the
19 vehicle sold for more.  Do you see that?
20    A.    I do.
21    Q.    Tell me what you know about that.
22    A.    The data that I saw it showed that they

Page 92

1 never consider anything that is sold for more than
2 the asking price.
3    Q.    You actually saw data on that?
4    A.    I saw documents on that.
5    Q.    I thought your report said it was based on
6 conversations with counsel.
7    A.    And again, that was conversations with
8 counsel, as well as the documents that I saw with the
9 graph.
10    Q.    Okay.  And for what time period was that
11 information?
12    A.    I do not remember the time period, but I
13 believe you may have showed me the graph.  I am not
14 sure.
15    Q.    I am asking what you know.
16    A.    I can't recall.
17    Q.    Do you know whether Mitchell has ever
18 considered transactions where the vehicle sold for
19 more in particular geographies?
20    A.    I do not.
21    Q.    Do you know what time period Mitchell has
22 never considered transactions where the vehicle has

Page 93

1 sold for more?
2    A.    I do not.
3    Q.    Does that apply for all time periods?
4    A.    Again, I can't testify for all.  I do not
5 know.
6    Q.    Do you know if there are instances where
7 Mitchell excludes transactions where the vehicle sold
8 for far less than list price?
9    A.    That, I do not know.
10    Q.    Have you ever seen any data about that?
11    A.    I cannot recall.
12    Q.    Okay.  Have you done any analysis to
13 quantify the impact of data exclusion on calculations
14 of projected sold adjustments?
15    A.    I have not done any data research, other
16 than any time you eliminate vehicles that are of
17 higher value compared to vehicles of lower value it
18 would lower the price of the actual cash value.
19    Q.    And what impact would it have if you
20 excluded vehicles that were sold for far less than
21 list price?
22    A.    Again, that would be less as well.

24 (Pages 90 - 93)

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

Page 94

1    Q.    That would also reduce?

2    A.    Yes.

3    Q.    So you're saying if you excluded vehicles

4 that sold for more and vehicles that sold for less,

5 they would have the same impact on the projected sold

6 adjustment?

7    A.    No.  I'm sorry, I misunderstood your

8 question.  If it sold for more and they used those,

9 then the actual cash value would be higher.  If they

10 used vehicles that were sold for less, then obviously

11 it would lower the actual cash value.

12    Q.    Have you done any analysis of the data to

13 quantify the impact of the data exclusion decisions

14 that Mitchell might apply?

15    A.    I have not.

16    Q.    Are you able to offer an expert opinion on

17 that issue?

18    A.    I have not.

19    Q.    What methodology does Mitchell use with

20 WorkCenter Total Loss to convert condition ratings

21 into dollar amounts?

22    A.    I do not know have the data on that.  I

Page 95

1 just have the Mitchell report which discusses the

2 methodology that they use, and they use the number

3 scale to rate a vehicle and then they deduct a

4 certain amount for that.

5    Q.    Right.  What I am asking is, when you see

6 the numerical ratings and then you see the dollar

7 amount, how does Mitchell turn those ratings into a

8 dollar amount?

9    A.    I do not have that data.

10    Q.    In your expert report, you say that

11 Mitchell takes a percentage of the base value to come

12 up with a condition adjustment, right?

13    A.    Correct.

14    Q.    How do you know that?

15    A.    Again, just by doing the math.

16    Q.    When you say doing the math, you mean you

17 just created a percentage of base value to condition?

18         MR. ROOF:  Objection.

19         THE WITNESS:  No.  What I did is I

20 deducted the -- I used the base value and whatever

21 numeration value they gave for condition adjustment,

22 and I would divide that and come up with a

Page 96

1 percentage.

2    Q.    Is that how Mitchell does it?

3    A.    That, I do not know.

4    Q.    Do you know whether doing it the way you

5 did it is correct?

6    A.    I do not.

7    Q.    Are you offering an opinion in this case

8 that the way you have calculated the impact on the

9 condition adjustment from removing the PSA is

10 correct?

11    A.    I am not.

12    Q.    Do you know the correct way to do it?

13    A.    I am not saying --

14         MR. ROOF:  Objection.

15         THE WITNESS:  -- this is incorrect.  I am

16 saying this is the way I did it because it was done

17 in the Mitchell report and I used the same process.

18 BY MR. CASHDAN:

19    Q.    Well, in the Mitchell report, are you

20 saying that that's what they did, they took a

21 percentage of base value to come up with condition

22 adjustment?

Page 97

1         MR. ROOF:  Objection.

2         THE WITNESS:  Well, again, that's what I

3 used because that's what I saw their deductions were.

4 So I just used the same.

5 BY MR. CASHDAN:

6    Q.    Are you offering an opinion that, in fact,

7 the way Mitchell calculates the impact of on

8 condition adjustment is simply taking a percentage of

9 the base value?

10    A.    I am not.

11    Q.    Okay.  And are you offering any opinion or

12 conclusion in this case that you know the correct way

13 to account for the impact on condition adjustment by

14 removing the projected sold adjustment?

15    A.    I am not.

16    Q.    Okay, thank you.  Is WorkCenter Total Loss

17 the only way you can calculate actual cash value?

18         MR. ROOF:  Objection.

19         MR. CASHDAN:  What's the objection?

20         MR. ROOF:  What's -- work total loss is

21 the only way that you can calculate it, it's a vague

22 question.

25 (Pages 94 - 97)

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

Page 98

1         MR. CASHDAN:  Okay.
2    BY MR. CASHDAN:
3    Q.   You can answer.
4    A.   No, there's multiple ways.
5    Q.   What other ways are there to calculate
6    actual cash value?
7    A.   Again, my appraisal's outlined in my
8    exhibit that, you know, use multiple different
9    resources.
10   Q.   Like what?
11   A.   Comparables, different valuation tools,
12   multiple different ways.  I don't just use the
13   Mitchell report.  I don't normally have a Mitchell
14   report.
15   Q.   Are you offering any opinions or
16   conclusions in this matter as to how you can use
17   Progressive's data to identify all of the class
18   members in this case?
19   A.   Repeat that question.
20   Q.   Sure.  Are you offering any opinions or
21   conclusions in this matter as to how you can use
22   Progressive's data to identify all members of the

Page 99

1    class in this case?
2    A.   I don't have that data.
3    Q.   You're not offering an opinion on that,
4    correct?
5    A.   No.  I don't have that data, so I am not
6    offering an opinion.
7    Q.   Okay.  You reference in your expert report
8    on page 4 of Exhibit 1, your view that application of
9    the PSA is inconsistent with appraisal standards.
10   A.   Yes.
11   Q.   Are these written standards?
12   A.   Not specifically written as far as -- but,
13   again, they go through -- when I look at the PSA, I
14   look at different conditions with that as where is it
15   coming from, what's it based off of.  Again, it's a
16   projection.  It's -- there's nothing in any of the
17   training that I've had that covers any projected sold
18   amount or arbitrarily removing a value or a standard
19   of value.
20        And according to USPAP, any type of
21   assumptions or projections or anything like that
22   would be noted and taken into account.  And as far as

Page 100

1    USPAP goes, they talk about objectivity and more or
2    less the standards and ethics of an appraiser, and
3    that is to be objective and not try to weigh one side
4    or the other, to be an objective appraiser.
5    Q.   What is USPAP?
6    A.   The standards that most appraisers will
7    adhere to as far as -- it's not a governing body, but
8    it is a committee of people that get together and
9    come up with different appraisal practices and
10   ethics.
11   Q.   Is it the Uniform Standards of
12   Professional Appraisal Practice?
13   A.   Yes.
14   Q.   Are you an expert in USPAP?
15   A.   I am not.
16   Q.   Are you offering any opinions and
17   conclusions in this matter concerning USPAP?
18   A.   I am using the training that I have
19   received through USPAP to come up with that.
20   Q.   Have you been trained by USPAP?
21   A.   I went through a 15-hour course of USPAP
22   ethics and morals.

Page 101

1    Q.   Okay.  If I wanted to show the jury the
2    appraisal standards, you think the PSA is
3    inconsistent with -- is there something written I can
4    put up on the screen for them?
5    A.   There is not.  You have to put up multiple
6    documents.
7    Q.   On page 6 of your report, you mention at
8    the top "Mitchell's Position on Internet Pricing.'"
9    Do you see that?
10   A.   I do.
11   Q.   Okay.  When I turn to the last page of
12   this exhibit, which is the "Facts and Data Considered
13   by" you "in Forming" your "Opinions," I don't see the
14   position on internet pricing listed.  Did you review
15   that document for purposes of your opinions and
16   conclusions in this matter?
17   A.   That would have been a document I learned
18   through previous testimony and previous
19   investigation.
20   Q.   What I am asking is, did you specifically
21   look at that document for purposes of your report in
22   this case?

26 (Pages 98 - 101)

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

Page 102

1    A.    For this case, no.

2    Q.    Okay.  And do you have a perfect

3    recollection of everything that's contained in that

4    document?

5    A.    Not a perfect recollection, no.

6    Q.    Okay.  What is a no hassle price?

7    A.    It's the same as a no haggle.  No hassle

8    would be they list the price and they don't have any

9    other way of negotiating a price.

10    Q.    What percentage of dealers in Maine are no

11    haggle dealers?

12    A.    I do not know.

13    Q.    What percentage of dealers in the country

14    are no haggle dealers?

15    A.    I do not know.

16    Q.    Have you done any kind of study for

17    purposes of your opinions and conclusions in this

18    matter to understand the prevalence of no haggle

19    dealerships in the United States?

20    A.    I do not.

21    Q.    Do you know whether Mitchell has in any of

22    the cases you've been involved with, has offered any

Page 103

1    testimony as to the appropriate way to adjust the

2    condition adjustment entry if you were to remove the

3    PSA from a WorkCenter Total Loss valuation?

4    A.    I do not.

5    Q.    You've never come across that in all your

6    other cases?

7    A.    I have not.

8        (Merritt Exhibit No. 6 was identified

9        for the record.)

10    BY MR. CASHDAN:

11    Q.    Let me hand you what's been marked for

12    identification as Exhibit 6.  Just so I can clarify

13    for the record, we pulled this document from a public

14    docket.  It has a stamp on it from a different

15    deposition but it's Exhibit 6 in this case.  But it

16    came from a public source.

17        I want to ask you, what is Exhibit 6?

18        MR. ROOF:  Objection to the use of Exhibit

19    6.

20        THE WITNESS:  It looks like an appraisal I

21    did on a vehicle.

22    BY MR. CASHDAN:

Page 104

1    Q.    Is this a copy of a template that you

2    utilized for conducting actual cash value appraisals?

3    A.    I believe so.

4    Q.    Okay.  And by template, we mean this is

5    the usual outline you would use when you're doing

6    actual cash value appraisals, correct?

7        MR. ROOF:  Objection.

8        THE WITNESS:  Without comparing it, it is

9    a template that I use to do appraisals.  This is a

10    classic vehicle.

11    BY MR. CASHDAN:

12    Q.    This is an actual cash value appraisal,

13    correct?

14    A.    Actual cash value on a classic vehicle.

15    Q.    All right.

16        (Merritt Exhibit No. 7 was identified

17        for the record.)

18    BY MR. CASHDAN:

19    Q.    Now let me hand you what's been marked for

20    identification as Exhibit 7.

21        Is Exhibit 7 a true and correct copy of a

22    declaration you submitted in a case pending in county

Page 105

1    court in Florida?

2    A.    It appears to be, but I am not familiar

3    with it.

4    Q.    You're not familiar with the declaration

5    you signed and was submitted?

6    A.    I just can't recall it.  It appears to be

7    mine.

8    Q.    This is from the case, Querette versus

9    GEICO.

10        If you turn to the third page of Exhibit

11    7, there is an electronic signature there.  Is that

12    your electronic signature?

13    A.    Yes.

14        MR. ROOF:  Objection.

15        THE WITNESS:  Yes.

16    BY MR. CASHDAN:

17    Q.    And this was completed on or about June 8,

18    2023; is that right?

19    A.    Again, I can't recall this, but it appears

20    to be one of my documents.

21    Q.    Okay.  And am I correct that in this

22    declaration, you provide your expert view about a

27 (Pages 102 - 105)

Page 106

1 fair market valuation for a particular vehicle?
2        MR. ROOF:  Objection.  Let him read it.
3 BY MR. CASHDAN:
4    Q.   You can answer the question when you're
5 ready.
6    A.   It appears to be an expert report I wrote
7 in relation to this appraisal, I believe.
8    Q.   Looking at paragraph 4 of your
9 declaration, is it true that "The first part of our
10 industry-recognized methodology is a review of
11 nationally recognized valuation guides in determining
12 what the retail value of the vehicle is worth before
13 reviewing information from local dealers"?  Is that
14 accurate?
15    A.   It's one of the steps, one of the first
16 steps.
17    Q.   Okay.
18    A.   Again, I don't always follow each step on
19 each one.  Depends on the vehicle.
20    Q.   And the vehicle at issue here is a 2013
21 Hyundai, correct?
22    A.   Correct.

Page 107

1    Q.   And you consider that a classic car?
2    A.   No.
3    Q.   But if you go to the Exhibit 1 of your
4 declaration, it titles the document Certified Classic
5 Car Appraisal.  Do you see that?
6    A.   Tell me where that's at again.
7    Q.   Sure.  On Exhibit 1, at the top, it says
8 Certified Classic Car Appraisal.  Do you see that?
9    A.   I do.
10    Q.   Do you agree with me that a Hyundai is not
11 a classic car?
12    A.   I do agree with that.
13    Q.   This is actually just an actual cash value
14 appraisal?
15    A.   I believe it is.
16    Q.   Okay.  And am I correct that one of the
17 first things you did was review the photos of the
18 vehicle after the collision to evaluate some of the
19 condition issues?
20    A.   Yeah.  It looks like the title of it says
21 IACP Certified Classic Car, and that's obviously a
22 mistake.  But in the scope of work, I put on there

Page 108

1 fair market value actual cash value.
2    Q.   Got it.  So it looks like you had -- it
3 says you were provided with a CCC One Market
4 Valuation Report.  Do you see that?
5    A.   I do.
6    Q.   So it looks like you had a valuation
7 report from a company called CCC; correct?
8    A.   I did.
9    Q.   That's a competitor to Mitchell; is that
10 right?
11    A.   I believe so.
12    Q.   Okay.  And you had that valuation report
13 from CCC, but you did some additional work to try to
14 verify the information in the valuation report,
15 correct?
16    A.   I did.
17    Q.   And one of the things you did is you
18 looked at photos of the vehicle so you could evaluate
19 the condition of the total loss vehicle on your own,
20 correct?
21    A.   Correct.
22    Q.   And based on your review of those photos,

Page 109

1 you questioned some of the condition adjustment
2 ratings that had been applied on the valuation
3 report, correct?
4    A.   Again, I can't recall this case.  I could
5 just refer to this report that I wrote.
6        Can you ask that question again?
7    Q.   Sure.  Am I correct that after your review
8 of photos of the vehicle and other information like a
9 CarFax report, you discounted some of the adjustments
10 that were in the CCC market valuation report?
11    A.   Added, they did not include a backup
12 camera or navigation with the after-market stereo.
13    Q.   Well, for example, there were some
14 adjustments made to comparable vehicles.  And based
15 on your review of information and of the valuation
16 report, you questioned the appropriateness of some of
17 those adjustments so you added money back?
18    A.   Again, I would have to read through this
19 whole report to answer questions on it.  I can't
20 recall this report.
21    Q.   Okay.  Well, if you go to the third page
22 of the valuation report, it's the seventh page of the

28 (Pages 106 - 109)

Page 110

1  document, you see there's a paragraph that begins
2  "The CCC Report includes a $1,005 Condition
3  Adjustment to each of the Comparable Vehicles"?
4      A.  I do.
5      Q.  And you said in the third sentence, "There
6  is no itemized list of what was considered in making
7  this adjustment and there is no information on how
8  the $1,005 Condition Adjustment was calculated."
9          Do you see that?
10     A.  I do.
11     Q.  And you said, "Based on my review of the
12  photographs of the vehicle, the Loss Vehicle was in
13  excellent condition." Do you see that?
14     A.  I do.
15     Q.  And so because you couldn't confirm the
16  basis for inclusion, you excluded that adjustment
17  from your valuation, didn't you?
18         MR. ROOF:  Objection.
19         THE WITNESS:  Again, that was -- now that
20  I am reading it, that was a condition adjustment that
21  CCC uses that kind of mimics or does the same as a
22  projected sold amount.

Page 111

1  BY MR. CASHDAN:
2      Q.  Okay.  So you think this condition
3  adjustment was a projection of a sales price
4  adjustment?
5      A.  Again, I am not going to testify exact
6  wording of it, but it was the same mannerism where it
7  takes a portion of the value of each comparable.
8      Q.  Well, you say in the same paragraph,
9  "There is very little work that would be required of
10  a dealership to prepare the lost sale for vehicle,
11  which would likely be limited to a detail and an oil
12  change."
13         Do you see that?
14         MR. ROOF:  Objection, you misread it.
15         THE WITNESS:  Okay, yes.
16  BY MR. CASHDAN:
17     Q.  Is that referring to like a projected sold
18  adjustment or a condition adjustment?
19     A.  I don't think that refers to either.
20     Q.  Okay.
21     A.  I mean, if you take the whole paragraph
22  into account, I am talking about a $1,005 condition

Page 112

1  adjustment to each of the comparable vehicles.  The
2  explanation provided for the inclusion of this
3  adjustment is it sets that comparable vehicle to
4  average private condition, which the loss of -- the
5  loss vehicle is also compared to in the vehicle
6  condition section.  There is no itemized list of what
7  was considered in making this adjustment and there is
8  no information on how the $1,005 was calculated.
9          Based on my review of the photographs, at
10  this point, I am looking for reasons for that as in
11  maybe damage or something like that.  I did not see
12  anything there in the vehicle photos.
13         "The Loss Vehicle was in excellent
14  condition for a 2013 Sonata with 119,107.  Very
15  little would have been required for the dealership to
16  prepare the Loss Vehicle for sale," which would have
17  been or "likely be limited to a detail and an oil
18  change."  And, CarFax showed that it was well
19  maintained, well serviced.  So I can't confirm any
20  factual basis for the inclusion of that adjustment of
21  the $1,005 from each one of those vehicles.  So I put
22  that $1,005 back on.

Page 113

1      Q.  Okay.
2      A.  I wasn't necessarily in disagreement of
3  the condition of it.  It was a disagreement in that
4  $1,005 deduction.
5      Q.  And if you go to the prior page, you also
6  disagreed with the way that the valuation report from
7  CCC applied a deduction for mileage, correct?
8      A.  In this case, I did, yes.
9      Q.  You thought that it was too high of a
10  number and you used a different one, correct?
11     A.  Correct.  At that time I used the J.D.
12  Power and NADA.
13     Q.  So in connection with this expert report
14  in this case in Florida, you took the valuation
15  report from CCC, you conducted your own analysis, and
16  reached some different conclusions than CCC had
17  regarding the appropriateness of some of their
18  adjustments; is that correct?
19     A.  I did.
20     Q.  Okay.
21     A.  Again, this case was a totally different
22  case.  It was the first one we did with CCC, first

29 (Pages 110 - 113)

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

Page 114

1  one I was involved with in that litigation. Unlike
2  the Mitchell reports, I reviewed other Mitchell
3  reports in the past and they've shown credible and
4  good information and I've used them.
5      Q.   Okay.
6          (Merritt Exhibit No. 8 was identified
7          for the record.)
8  BY MR. CASHDAN:
9      Q.   I am going to hand you what's been marked
10 for identification as Exhibit 8.  Take a moment to
11 look through Exhibit 8 and tell me when you're ready.
12     A.   Okay.
13     Q.   What is Exhibit 8?
14     A.   It is the Mitchell Report for Katherine
15 Bridges on a 2020 Kia Telluride.
16     Q.   So this is one of the named plaintiffs,
17 correct?
18     A.   I believe so.
19     Q.   And this is her valuation report?
20     A.   Correct.
21     Q.   Okay.  And did you -- am I correct that
22 for your expert opinions in this case, you have

Page 115

1  accepted all aspects of this valuation report except
2  the projected sold adjustment and any impact
3  including it has on the valuation, correct?
4      A.   I have looked over this report and
5  everything appears to be reasonable and correct, and
6  I did accept that and just removed the PSA.
7      Q.   But you found significant errors in this
8  report through the use of a projected sold
9  adjustment?
10         MR. ROOF:  Objection.
11         THE WITNESS:  The only difference of
12 opinion I had was the PSA.
13 BY MR. CASHDAN:
14     Q.   Well, do you think the projected sold
15 adjustment is a significant error in this valuation
16 report?
17     A.   I believe it is.
18     Q.   And other than the projected sold
19 adjustment and the impact it has, you think the
20 report is perfectly appropriate?
21         MR. ROOF:  Objection.
22         THE WITNESS:  I believe the valuation

Page 116

1  report is appropriate, yes.
2  BY MR. CASHDAN:
3      Q.   And did you do any investigation to verify
4  that all of the equipment that's detailed in the
5  report was accurate for the total loss vehicle?
6      A.   As in the past, I have not seen any
7  mistakes in it.
8      Q.   Okay.
9          (Merritt Exhibit No. 9 was identified
10         for the record.)
11 BY MR. CASHDAN:
12     Q.   Let me give you what's been marked as
13 Exhibit 9.  What is Exhibit 9?
14     A.   Exhibit 9 appears to be a printout of some
15 features.
16     Q.   And this is a sticker for the vehicle
17 that's represented in Exhibit 8, correct?
18         MR. ROOF:  Objection, foundation.
19 BY MR. CASHDAN:
20     Q.   You can answer.
21     A.   This looks like it was -- I am not
22 familiar with the company that did the printout, but

Page 117

1  it looks like it matches the VIN number.
2      Q.   So it's the same VIN number in Exhibit 8
3  and Exhibit 9, correct?
4      A.   Correct.
5      Q.   And just for the record, Exhibit 9 is a
6  document the plaintiffs produced to us, bears Bates
7  number PGR_THURSTON_0007654.
8          MR. ROOF:  Objection, that's not
9  plaintiffs' exhibit Bates number.
10         MR. CASHDAN:  It's not your Bates number,
11 correct.  It's your document.  You gave it to us
12 without any Bates numbers.
13 BY MR. CASHDAN:
14     Q.   If you take a look at Exhibit 9, do you
15 see on the sticker where there are -- where there's
16 equipment that has been added to the standard
17 equipment?
18     A.   To the right side?
19     Q.   Yes, on the right side.  Is that the
20 optional equipment?
21     A.   MSRP -- yes.  The one you have
22 highlighted.

30 (Pages 114 - 117)

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

Page 118

1    Q.   That's how it was produced.
2    A.   Okay.
3    Q.   But am I correct that that box has
4 installed options that are in addition to the MSRP?
5 Do you see that?
6    A.   I do.
7    Q.   And do you see that there was a towing
8 package installed on this vehicle?
9    A.   I see there's a towing package.
10   Q.   Yes.  There's a towing package, right?
11   A.   Yes.
12   Q.   And the towing package includes a
13 self-leveling rear suspension and the tow hitch with
14 harness, do you see that?  Correct?
15   A.   Correct.
16   Q.   And in the next line, it lists the tow
17 hitch with harness, it says included.  Do you see
18 that?
19   A.   I do.
20   Q.   Do you understand that to mean there is
21 one tow hitch with harness?
22   A.   I do.

Page 119

1    Q.   Okay.
2    A.   That's two different packages that they're
3 referring to, not two different hitches.
4    Q.   Correct.  There's one tow hitch on the
5 vehicle, correct?
6    A.   Correct.
7    Q.   Okay.
8        (Merritt Exhibit No. 10 was
9        identified for the record.)
10 BY MR. CASHDAN:
11   Q.   Let me hand you what's been marked for
12 identification as Exhibit 10.  Exhibit 10 for the
13 record has the Bates numbers PGR_THURSTON_0007622
14 through 7650.
15       While you're looking through this, my
16 question for you is, you mentioned in your report
17 that you've seen some photos of the plaintiffs'
18 vehicles.  And I am wondering if you've seen these
19 photos before.
20   A.   I have seen some of these photos, yes.
21   Q.   Okay.  Let me know when you're ready and I
22 just have a specific question about one of them.

Page 120

1    A.   Yes, go ahead.
2    Q.   Okay.  Turn if you would to the Bates
3 numbered page in Exhibit 10, 7640.
4    A.   All right.
5    Q.   Are you there?
6    A.   I believe.
7    Q.   And it says Passenger Side Rear Angle.  Do
8 you see that?
9    A.   I do.
10   Q.   Okay.  Do you understand this to be a
11 photo of Ms. Bridges' car after the damage to it?
12   A.   Yes.
13   Q.   Okay.
14   A.   Very little left.
15   Q.   The car's been burned pretty
16 significantly?
17   A.   Yes.
18   Q.   Do you see a tow hitch here?
19   A.   I do.
20   Q.   How many are there?
21   A.   One.
22   Q.   So you see one tow hitch in this photo,

Page 121

1 correct?
2    A.   Correct.
3    Q.   All right.  Let's go back to Exhibit 8,
4 which is the valuation report for Ms. Bridges' car,
5 correct?
6    A.   Correct.
7    Q.   So there were how many comparable vehicles
8 used in this valuation?
9    A.   Appear to be six.
10   Q.   Okay.  And let's go to the first one which
11 is on page 7611 of Exhibit 8.
12   A.   Okay.
13   Q.   Which is the first comparable vehicle.  Do
14 you see that?
15   A.   I do.
16   Q.   And it says number 1 in the upper
17 left-hand corner?
18   A.   Yes.
19   Q.   Okay.  And you can see there's a section
20 where it says Adjustments, correct?
21   A.   I do.
22   Q.   Okay.  And there is an adjustment for a

31 (Pages 118 - 121)

Jason Merritt
Multiple Plaintiffs v. Progressive                           October 22, 2024

Page 122

1 projected sold adjustment and then a mileage
2 adjustment, correct?
3    A.   Yes.
4    Q.   And then there's an adjustment for
5 equipment, correct?
6    A.   Yes.
7    Q.   And what do you understand that equipment
8 adjustment to be?
9    A.   The equipment on the comp vehicle compared
10 to the loss vehicle.
11    Q.   And this shows all of the different places
12 where there was an adjustment for equipment, correct?
13    A.   Correct.
14    Q.   All right.  Does this page tell you
15 anything about the additional installed packages that
16 were on the comparable vehicle?
17    A.   Just goes down through those that they've
18 noted, but, no.
19    Q.   Well, in the lower left-hand place, are
20 there any spots that tell you what kind of packages
21 the comparable vehicle had?
22    A.   Talks about the premium tow package and

Page 123

1 carpeted floor mats.
2    Q.   So this comparable vehicle had a tow
3 package, correct?
4    A.   Correct.
5    Q.   It had a tow package.  Why was a tow hitch
6 with harness equipment adjustment also added?
7    A.   Again, it's not going to be two harnesses.
8 It could mean the difference between the
9 self-leveling rear suspension.  Again, that package
10 could mean self-leveling rear suspension could be the
11 difference.
12    Q.   Okay, let's go to the second comparable
13 vehicle.  Do you see the equipment adjustments made
14 for the second vehicle, comparable vehicle?
15    A.   I do.
16    Q.   It looks like one of the adjustments was
17 for towing package and another adjustment was for a
18 tow hitch with harness.  Do you see that?
19    A.   I do.
20    Q.   Does that make any sense to you?
21    A.   Yes.
22    Q.   So you think it's appropriate to make both

Page 124

1 a towing package and a tow hitch with harness
2 adjustment?
3    A.   I do.
4    Q.   Okay.
5    A.   Yeah, a tow package and a tow hitch with
6 harness could mean the tow package has the rear
7 leveling suspension which is a big option.  And then
8 it could have actually also supplied the actual hitch
9 itself.  The hitches can be unbolted and bolted back
10 so that could be two different options.
11    Q.   Doesn't the towing package come with both
12 the self-leveling rear suspension and the tow hitch
13 with harness?
14    A.   Not necessarily.
15    Q.   Well, if you look at Exhibit 9, and you
16 look at the towing package that was added onto the
17 total loss vehicle, does it indicate that the towing
18 package included both the self-leveling rear
19 suspension and the tow hitch with harness?
20    A.   Again, that is TWJ package.  So I would
21 have to look at each package to verify that.  But
22 some packages will have a tow package that will not

Page 125

1 come with the actual hitch with harness, and some
2 will.  This could have been tow package TWJ could
3 have been an all included panel that has the hitch
4 and it could have the receiver.
5        If you notice on the photos, there is just
6 the hitch.  There is no receiver in there.  This
7 could mean that the TWJ package includes the
8 self-leveling, has the actual hitch and harness, as
9 well as receiver.  Could be a full package.
10    Q.   If you look back at comparable number 2,
11 do you know which towing package they're using?
12    A.   No.  Again, they're talking about the tow
13 hitch with harness and the tow package.  That's two
14 different packages.
15    Q.   Okay.  So you're positive that they
16 haven't just added another tow hitch in?
17    A.   I have seen options like this in the past.
18 So that would not be uncommon.
19    Q.   Did you do any investigation to verify
20 that?
21    A.   Again, from my experience that's not
22 uncommon.

32 (Pages 122 - 125)

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

Page 126

1    Q.    What's not uncommon?
2    A.    To have two different packages for the
3  harness.
4    Q.    What I am asking you is, do you know
5  whether, in fact, there was no mistake made here?
6    A.    Again, from my experience in these in the
7  past, that would not cause me any alarm or any reason
8  to look any further.
9    Q.    Okay.  Let's go back to page number 4 of
10  Exhibit 8, which is Bates number 7609.  Tell me when
11  you're there.
12    A.    I am there.
13    Q.    Okay.  You see the top of this page, it's
14  completing -- explaining all of the different
15  equipment that was on the loss vehicle, correct?
16    A.    Correct.
17    Q.    And it indicates that there's a towing
18  package, correct?
19    A.    Correct.
20    Q.    And that towing package has a tow hitch
21  with harness, it says, correct?
22    A.    Correct.

Page 127

1    Q.    And do you see under the words Optional
2  Equipment, they also list a tow hitch with harness?
3    A.    I do.
4    Q.    Do you think it's appropriate to list both
5  the tow hitch with harness for the towing package and
6  an optional tow hitch with harness in the optional
7  equipment?
8    A.    I do.
9    Q.    Okay.
10    A.    That would not cause me alarm at all.
11    Q.    So you don't think there's any mistake?
12    A.    Again, from looking at this and then the
13  previous vehicles I've looked at, there could be
14  multiple towing packages.
15    Q.    What investigation did you do to determine
16  that this is accurate?
17    A.    Again, I did not have -- nothing caused
18  for alarm on this report that made me do any
19  additional investigation.
20    Q.    I am not asking if you had any cause for
21  alarm.  I am asking, did you do any investigation to
22  determine whether the equipment that was listed for

Page 128

1  the loss vehicle and the comparable vehicle was
2  accurate?
3    A.    I did not do any further investigation.
4    Q.    You keep saying further investigation.
5  Did you do any investigation to determine if the
6  equipment for the loss vehicle or the comparable
7  vehicles was accurate?
8    A.    I again reviewed all these and looked at
9  the different equipment, looked at the different
10  options that they're posting on there, and I did not
11  go any further.
12    Q.    So you read the report, and that's all you
13  did, correct?
14    A.    Again, I took into account my experience
15  and in the past and my previous experience in looking
16  at vehicles like this, and the options did not appear
17  to be anything out of the ordinary or incorrect.  So
18  I used the experience that I've had over multiple
19  years of doing appraisals, and there was nothing to
20  indicate any issues.
21    Q.    Did you look at the sticker to determine
22  if all the equipment for the loss vehicle was

Page 129

1  accurate?
2    A.    I did not.
3    Q.    Did you look up any information about the
4  comparable vehicles to determine if the equipment
5  adjustments were accurate?
6    A.    I did not.  Again, this sticker, sometimes
7  the stickers won't even indicate in full inclusivity
8  of what actual package it is.  Because, again, here
9  it's showing two different towing packages.  And when
10  you point out the one picture, it shows one hitch.
11  To most people, that would make you think that there
12  is two hitches but there is not two hitches.  It
13  could be multiple packages.
14    Q.    Did you speak to Mrs. Bridges about it?
15    A.    I did not.
16    Q.    Did you speak to the dealership about it?
17    A.    I did not.
18    Q.    Did you investigate the accuracy of the
19  mileage for any of the comparable vehicles?
20    A.    I did not.
21    Q.    Did you investigate the accuracy of the
22  list prices for any of the comparable vehicles?

33 (Pages 126 - 129)

Jason Merritt
Multiple Plaintiffs v. Progressive                                      October 22, 2024

Page 130

1    A.   Again, I did not.
2    Q.   Did you -- do you think that -- strike
3 that.
4        Did you calculate the mileage adjustment
5 using a different cents per mile amount?
6    A.   I did not.
7    Q.   You just accepted the amount that was used
8 here?
9    A.   Again, in my previous appraisals and
10 previous use of Mitchell, it has always been an
11 appropriate amount and I accepted that again in this
12 case.
13    Q.   Okay.  Did you check whether the mileage
14 for the loss vehicle was accurate?
15    A.   Again, I am not able to confirm that other
16 than the paperwork because the vehicle's a complete
17 burn.
18    Q.   What paperwork did you look at to
19 determine the mileage for the loss vehicle?
20    A.   I can't recall.
21    Q.   Did you look at any documents other than
22 the actual valuation report?

Page 131

1    A.   I looked at the photos.  They are from
2 Gopart.
3        No, they don't show the mileage so I had
4 to go off the Mitchell report for the mileage.
5    Q.   Did you run a CarFax on the damaged
6 vehicle?
7    A.   Again, CarFax would not say what the
8 current mileage would be.
9    Q.   Did you talk to Mrs. Bridges about the
10 mileage?
11    A.   Again, she would not have documentation,
12 that I would know of, and I did not speak to her.
13    Q.   Do you know if she has documentation?
14    A.   That, I do not know.
15    Q.   In your expert report of Exhibit 1 on page
16 9 -- strike that.  Sorry.
17        Okay.
18        (Merritt Exhibit No. 11 was
19         identified for the record.)
20 BY MR. CASHDAN:
21    Q.   Let me hand you what's been marked for
22 identification as Exhibit 11.

Page 132

1        Have you ever seen Exhibit 11 before?
2    A.   This does not look familiar.
3    Q.   In Exhibit 11, if you look at paragraph 2,
4 this letter says for Mr. Thurston's vehicle that,
5 "The fair market value of that vehicle is $17,250."
6 Do you see that?
7    A.   I do.
8    Q.   Okay.  Have you ever evaluated whether
9 that was accurate?
10    A.   I have not seen this document.
11    Q.   Okay.
12    A.   That I can recall.
13    Q.   If you look at your expert report on page
14 8, Exhibit 1, page 8, you offer an opinion that the
15 market value of Mr. Thurston's vehicle is $13,275.23.
16 Do you see that?
17    A.   I do.
18    Q.   Okay.  Do you have an opinion as to
19 whether this letter is accurate in claiming that the
20 market value of Mr. Thurston's vehicle is $17,250?
21        MR. ROOF:  Objection, foundation.
22 BY MR. CASHDAN:

Page 133

1    Q.   You can answer.
2        MR. ROOF:  If you don't know, you don't
3 know.
4        THE WITNESS:  I have no idea of anything
5 about this document.
6 BY MR. CASHDAN:
7    Q.   I am just asking, are you offering an
8 opinion and conclusion in this matter that
9 Mr. Thurston's vehicle's fair market value is
10 $17,250?
11        MR. ROOF:  Objection.  He didn't write it.
12        THE WITNESS:  No.  The opinion I gave is
13 in my expert report.
14 BY MR. CASHDAN:
15    Q.   I just want you to answer my question,
16 because I need to know if you are going to offer an
17 opinion on this.
18        Are you offering an opinion in this case
19 that the fair market value of Mr. Thurston's vehicle
20 is $17,250?
21        MR. ROOF:  Objection, asked and answered.
22 BY MR. CASHDAN:

34 (Pages 130 - 133)

Page 134

1    Q.   You can answer.

2    A.   I noted in my expert report what the
3  market value of $13,275.23.  I have no opinion in
4  this document.

5    Q.   When you say in this document, you mean
6  the document Exhibit 11?

7    A.   Exactly what you handed me.

8    Q.   And you have no opinion whether that's
9  accurate?

10    A.   I do not.

11    Q.   You can put some of those documents away,
12  if you want to clean up a little bit.  The only one
13  I'll go back to is Exhibit 1.

14        (Merritt Exhibit No. 12 was
15        identified for the record.)

16  BY MR. CASHDAN:

17    Q.   Let me hand you what's been marked for
18  identification as Exhibit 12.  I will give you a few
19  of them in a row and then we can look at them, okay?

20        (Merritt Exhibit No. 13 was
21        identified for the record.)

22        MR. CASHDAN:  Here is Exhibit 13.

Page 135

1        (Merritt Exhibit No. 14 was
2        identified for the record.)

3        MR. CASHDAN:  I am handing you now Exhibit
4  14.

5        (Merritt Exhibit No. 15 was
6        identified for the record.)

7        MR. CASHDAN:  Finally, Exhibit 15.

8  BY MR. CASHDAN:

9    Q.   Okay.  For the record, I will let you know
10  that Exhibit 12, 13, 14, and 15 are the four
11  different versions of the valuation reports prepared
12  for Mr. Thurston's vehicle.  Okay?

13    A.   Okay.

14    Q.   Take a moment and look through them, and
15  then I will have some questions.

16    A.   Generally looked over them.  Okay.

17    Q.   Okay.  My first question is, your expert
18  report says that you reviewed the valuation reports
19  of the plaintiffs.

20        Did you review all four of the valuation
21  reports from Mr. Thurston?

22    A.   As stated in there, I reviewed Thurston's

Page 136

1  loss vehicle using his Mitchell report.  So I would
2  only have had one of these reports.

3    Q.   Okay.  And is it only report you had
4  Exhibit 15, the last one?

5    A.   I can't recall which one I had without
6  looking through and see to match them up.

7    Q.   Okay.  I note in your expert report, you
8  have a line at the end of the paragraph on page 8
9  that the Mitchell valuation -- Mitchell's report
10  value for Thurston's loss vehicle is $12,824.37.

11    A.   That would match up.

12    Q.   Which matches up to the settlement number
13  on 15; is that right?

14    A.   That is correct.

15    Q.   And I think it doesn't match the number on
16  any of the other reports; is that right?

17    A.   It appears not to.

18    Q.   Okay.  So is Exhibit 15 the only one of
19  the valuation reports you've seen previously?

20    A.   Yes.  I do not -- I did not see the other
21  three.

22    Q.   Okay.  Do you have an opinion as to which

Page 137

1  of the valuation reports is most accurate, taking out
2  the projected sold adjustment?

3    A.   No, I don't.

4    Q.   Do you understand why the valuation
5  reports are different?

6        MR. ROOF:  Objection.

7        Go ahead and read.

8        THE WITNESS:  It appears that each one's
9  different due to, I guess -- from what I can see in
10  here, the difference is adjustments and the condition
11  adjustments as well as configuration adjustments.

12  BY MR. CASHDAN:

13    Q.   Do you have an opinion as to which of the
14  adjustments was performed accurately as compared
15  among the different valuation reports?

16        MR. ROOF:  Objection.

17        THE WITNESS:  I have no opinion on that.

18  BY MR. CASHDAN:

19    Q.   How would you figure that out?

20    A.   Again, I would look closer at it.  Again,
21  I know Volvos are difficult vehicles to run VINs on
22  to get options and different factory installed or

35 (Pages 134 - 137)

Page 138

1 dealer installed options. Volvo have -- has a
2 different VIN type of configuration that makes it a
3 little more difficult to read.
4        So there would probably be a submission by
5 the insurance company on different options that they
6 read, and then there may be some argument on some
7 condition by the client. There may have been
8 discussions over that. And that may be the changes.
9 But to testify to what the changes were, I can't
10 testify to that.
11    Q.  Did you look at the claim notes for this
12 claim to determine why these changes had been made in
13 the valuation reports?
14    A.  I did not.
15    Q.  Do you understand that that's a place you
16 could go to understand these changes?
17    A.  Again, I didn't know there was multiple
18 reports so I didn't have that.
19    Q.  Did you speak to Mr. Thurston about this?
20    A.  I did not. Again, my statement of work is
21 just the projected sold amount as well as the
22 methodology. And the Mitchell report has stayed

Page 139

1 within that.
2        (Merritt Exhibit No. 16 was
3        identified for the record.)
4 BY MR. CASHDAN:
5    Q.  I am going to hand you what's been marked
6 for identification as Exhibit 16. Have you seen
7 Exhibit 16 before?
8    A.  It is a Vehicle Valuation Report from
9 Mitchell on McDonald's 2009 Volkswagen Passat.
10    Q.  Have you seen it before?
11    A.  I have seen one before. I can't testify
12 this is actually it or not.
13    Q.  Again, did you do anything to verify the
14 equipment listed for the total loss vehicle?
15    A.  I did not.
16    Q.  Are you offering any opinion or conclusion
17 in this matter as to the accuracy of the equipment
18 listings for any of the total loss vehicles?
19    A.  Again, the Volvo which is an English
20 vehicle and the Volkswagen which is a German vehicle,
21 in some of the VIN decoders on those are difficult.
22 But I am not offering any difference of opinion.

Page 140

1    Q.  I am asking, are you offering an opinion
2 or conclusion in this matter that the Mitchell
3 valuation reports accurately set forth equipment
4 listings for all vehicles?
5    A.  Again, I have not seen any issues in the
6 past, and I accepted these in this situation as well.
7    Q.  Are you offering an opinion that they're
8 always accurate?
9    A.  No.
10    Q.  Did you do any analysis to confirm that
11 the list prices set forth in the valuation report
12 accurately reflect the actual list prices for the
13 comparable vehicles?
14    A.  I did not look those up, no.
15    Q.  Are you offering an opinion or conclusion
16 in this matter that the Mitchell valuation reports
17 always accurately reflect the list prices for
18 comparable vehicles?
19    A.  I can't offer an opinion that it is always
20 correct, but I have found them to be reliable.
21    Q.  What did you do in this instance to verify
22 the accuracy of the list prices in Exhibit 16?

Page 141

1    A.  I did not do any research on that.
2    Q.  Have you seen Mitchell valuation reports
3 before where sometimes they use both sold prices and
4 list prices?
5    A.  I believe I have.
6    Q.  Do you think it's important to remove the
7 comparable vehicles that use sold prices in that
8 instance?
9    A.  In situations like that, yes, I believe
10 that would be best to remove those.
11    Q.  And have you proposed a methodology to do
12 that here?
13        MR. ROOF:  Objection.
14        THE WITNESS:  No, I have not proposed.
15 BY MR. CASHDAN:
16    Q.  Okay. Are you offering an opinion and
17 conclusion in this matter that Mitchell uses the
18 appropriate cents per mile calculation for purposes
19 of the mileage adjustment for comparable vehicles?
20    A.  No, I am only offering an opinion on the
21 methodology in which they used the comparable
22 methodology.

36 (Pages 138 - 141)

Page 142

1   Q.   If you go to the last page of Exhibit 16,
2   have you seen this last page before?
3   A.   Yes, I have seen these.
4   Q.   And it's entitled Vehicle Valuation
5   Methodology Explanation.  Do you see that?
6   A.   I do.
7   Q.   And what do you understand this page is?
8   A.   It is a brief overview of the WorkCenter's
9   methodology that they used to come up with the
10  prices.
11  Q.   And is there a discussion here of the
12  projected sold adjustments?
13  A.   There is.
14  Q.   What does it say?
15  A.   "An adjustment to reflect consumer
16  purchasing behavior (negotiating a different price
17  than the listed price)."
18  Q.   And do you think that accurately describes
19  the projected sold adjustment, even if you disagree
20  with it?
21  A.   They're describing what they use.  So I
22  can't argue with what they're using, but that does

Page 143

1   not mean I agree with it.
2   Q.   I understand you think it's an adjustment
3   that shouldn't be made.  But does this accurately
4   describe it?
5   A.   Taken --
6        MR. ROOF:  Objection to form.
7        THE WITNESS:  -- at face value, what
8   they're saying, I accept what they're saying.
9   BY MR. CASHDAN:
10  Q.   If you go to Exhibit 1, please.  If you go
11  to the second to last page, which is the last page of
12  your resume.
13  A.   Okay.
14  Q.   And do you see that there's a place where
15  it says, "Prior Testimony (Pending currently)"; do
16  you see that?
17  A.   I do.
18  Q.   Does this list all cases in which you have
19  given testimony in the last four years?
20  A.   I believe it does.  I would have to double
21  check.  But when I submit these, I go over them and
22  try to include all of them.  I have in the past

Page 144

1   missed one or two.  Hopefully they're all on there.
2   Q.   Did you ever testify in a case in 2023
3   against American Family?
4   A.   American Family does sound familiar, so I
5   may have.
6   Q.   This was the Johnson case pending in
7   Wisconsin.  Do you recall that?
8   A.   Again, I hope that I cover these on here,
9   but I may miss more than one.
10  Q.   Well, I will just note for the record it
11  looks like you gave testimony in 2023 in that case,
12  and it's not listed.
13       What methodology are you using to make
14  sure you're listing all of the cases in which you've
15  previously testified?
16  A.   I usually go off the last one that I did.
17  So if I missed American Family, then I probably
18  missed American Family on quite a few of these that I
19  submitted so I will have to go back and double check
20  those.
21  Q.   Okay.  Do you have a file where you keep
22  all your prior testimony?

Page 145

1   A.   I do.
2   Q.   Have you gone through that file and
3   compared it to your list recently?
4   A.   I thought that I did, but obviously I
5   missed that.
6   Q.   I request that you do that.  And if
7   there's any need to update this list, if you could do
8   that, we would appreciate it.
9   A.   Absolutely.
10  Q.   Thank you.
11  A.   I don't intend to remove any or not
12  include any.  If I missed them, then I will submit
13  those.
14  Q.   Just to be clear for the record, I am not
15  suggesting you did it on purpose.  It's a lot of
16  cases.  I just want to make sure we have a full list
17  which I think we have a right to.
18  A.   For any of the counsel, I want to make
19  sure I have all that.
20  Q.   Sure.
21       I notice that there's a number of cases
22  here where you've testified previously against

October 22, 2024

Page 146

1 Progressive. Do you see that?

2    A.   I do.

3    Q.   Okay. Am I correct that, substantively,

4 the testimony you've given about Progressive in those

5 other cases is very similar to the criticism you have

6 here in this case as set forth in your expert report?

7        MR. ROOF: Objection to form. If you can

8 remember.

9        THE WITNESS: To the best of my

10 recollection, it would be similar. These are all the

11 same type of cases.

12 BY MR. CASHDAN:

13    Q.   I think you testified earlier that you

14 used the reports in the prior cases to do the report

15 in this case, right?

16        MR. ROOF: Objection.

17        THE WITNESS: I would use a portion of it,

18 yes. Not all of it.

19 BY MR. CASHDAN:

20    Q.   If I ran a red line of the report in this

21 case against the report you filed in the last

22 Progressive case, would you expect they would be very

Page 147

1 similar?

2        MR. ROOF: Objection.

3        THE WITNESS: I would expect them to be

4 similar.

5        MR. CASHDAN: All right. Let's go off the

6 record.

7        THE VIDEOGRAPHER: We're going off the

8 record at 12:29 p.m., Eastern time.

9        (Recess.)

10        THE VIDEOGRAPHER: This is video file

11 number 3. On the record at 12:38 p.m., Eastern time.

12 BY MR. CASHDAN:

13    Q.   Are you familiar with a concept called

14 replacement cost?

15        MR. ROOF: Objection.

16        MR. CASHDAN: What's the objection?

17        MR. ROOF: It's not replacement cost.

18 It's replacement value.

19        MR. CASHDAN: Okay. My question stands.

20 BY MR. CASHDAN:

21    Q.   Are you familiar with a concept called

22 replacement cost?

Page 148

1    A.   I am familiar with it.

2    Q.   Okay. Is that different than actual cash

3 value?

4        MR. ROOF: Objection.

5        THE WITNESS: Again, I am -- I can't

6 really give an opinion on that, because it could mean

7 different things to different insurance companies

8 from -- so I really can't offer an opinion on that.

9 BY MR. CASHDAN:

10    Q.   Are you offering an opinion in this case

11 about replacement cost?

12    A.   I am not.

13    Q.   Are you offering an opinion in this case

14 about replacement value?

15    A.   I am not.

16    Q.   I just wanted to clarify something. I may

17 have not asked this clearly, or if I may have covered

18 it, I apologize.

19        When you are valuing a vehicle compared to

20 a comparable vehicle, if you have mileage that's

21 wrong and it's wrong, low, could that result in

22 overvaluing a car?

Page 149

1    A.   Explain which vehicle.

2    Q.   Sure. So if you're comparing a vehicle, a

3 loss vehicle to a comparable vehicle, you make

4 adjustments for mileage, right?

5    A.   Correct.

6    Q.   Okay. If you have the wrong mileage for

7 one of the vehicles, it's for the loss vehicle, if

8 it's lower than it should be, that would result in

9 overvaluing that loss vehicle relatively to the

10 comparable vehicle, correct?

11    A.   If you had the loss vehicle with lower

12 mileage and you rated it at a higher millage?

13    Q.   For example, let's say you have a loss

14 vehicle that you -- it has 10,000 miles, okay? But

15 for purposes of your calculation you have

16 accidentally put down that it had 12,000 miles, and

17 you are comparing it to a comparable vehicle --

18    A.   Okay.

19    Q.   -- that has 15,000 miles.

20    A.   Okay.

21    Q.   The fact that you have gotten the mileage

22 wrong will have an impact on the valuation, correct?

38 (Pages 146 - 149)

Page 150

1    A.   I would say that anything that you would
2 change the value on can change the value of the
3 appraisal.  It could be up or down.
4    Q.   But the way it would go up and down is if
5 the error on mileage for the loss vehicle was you had
6 the mileage lower than it should be, that's going to
7 increase the value of the loss vehicle relative to
8 the comparable vehicle?
9    A.   Again, any time you add value or take away
10 value, it will affect it and it could lower it if you
11 had higher mileage than what you originally had.
12    Q.   Or lower mileage?
13    A.   Or lower.
14    Q.   Okay.
15    A.   The same with any of the conditions.
16 Anything changed, it could change the value at the
17 end.
18    Q.   Sure.  Do you have an understanding of the
19 methodology that Mitchell and Progressive use to rate
20 the condition of vehicles?
21    A.   I do not.
22    Q.   Do you have an opinion as to whether they

Page 151

1 have done it accurately in any of these cases?
2    A.   I've looked at many of the cases, and the
3 value they're putting on it looks reasonable and it
4 seems consistent.  And I don't have the data that
5 they use, but it appears to be reasonable.
6    Q.   So for example, looking at Exhibit 16,
7 Ms. McDonald's vehicle, if you go to the fourth page
8 of the exhibit, her carpet was rated as a 2, fair.
9 Is that accurate?
10    A.   That, I couldn't say if it was or not.
11    Q.   Okay.  Do you have any opinion as to
12 whether these particular ratings are accurate for
13 these?
14    A.   I don't know.
15    Q.   So for any of the valuation reports, do
16 you have an opinion as to whether the condition
17 ratings are accurate?
18    A.   Again, in these, I don't have access to
19 the vehicle and some of them are a few years old.
20 Some of them are burned completely.  So I don't have
21 an opinion on it.  I have not seen on my private side
22 of doing appraisals where they have varied one way or

Page 152

1 the other very much.
2    Q.   Well, for example, with regard to the
3 carpet, did you talk to Ms. McDonald about the
4 condition of her loss vehicle's carpet?
5    A.   I did not.
6    Q.   Did you ask her if all of her tires were
7 bald?
8    A.   I did not.
9    Q.   Okay.  Do you have an understanding of the
10 criteria that is used by whoever inspects the
11 vehicles for making condition ratings?
12    A.   I have spoke to adjusters.  But as far as
13 actual written data, I do not have that.  Again, when
14 you look at just this vehicle in particular on
15 Exhibit 16, it's showing that there was pretty
16 significant wear on the carpet, multiple cuts in the
17 drivers seat, had damage to the rear bumper and it's
18 broken, had rust on panels, the hood, both quarter
19 panels, obvious leak in the engine, and all four
20 tires were bald.  And they took a condition
21 adjustment of $1110, and that seemed very fair.
22    Q.   Do you know if any of that's true?

Page 153

1    A.   I do not.
2    Q.   Okay.
3    A.   I did not have access to the vehicle nor
4 did I speak to the owner.
5    Q.   Who does the inspection that leads to
6 these adjustments?  Is it somebody employed by
7 Mitchell or by Progressive?
8    A.   That, I can't answer.  My experience is
9 that it's with the insurance company.
10    Q.   Who does the training to establish the
11 criteria to be used for the condition adjustments?
12       MR. ROOF:  Objection, foundation.
13       THE WITNESS:  I don't have that
14 information.
15 BY MR. CASHDAN:
16    Q.   If you can go to page 5 of Exhibit 1 of
17 your report.  So the carryover paragraph, I am
18 looking at the last sentence which says, "For this
19 reason, while it is not necessarily invalid to use a
20 reported sale price of a comparable vehicle, it is
21 generally better to use a list price, unless the
22 appraiser is able to confirm the reported sale price

39 (Pages 150 - 153)

Page 154

1 is not the result of a special discount and does not
2 reflect the sale of ancillary items (e.g., gap
3 insurance, warranties, or service plans) relating to
4 the purchase."
5      Do you see that?
6   A.   I do.
7   Q.   Am I correct that if the appraiser was
8 able to confirm that the reported sales price is not
9 the result of a special discount and does not reflect
10 the sale of ancillary items relating to the purchase,
11 that you would agree that it's okay to use the sold
12 price in that circumstance?
13      MR. ROOF:  Objection.
14      THE WITNESS:  Just as I stated in there,
15 yes, if all that can be established and brought in,
16 then again I could use the sale price.
17 BY MR. CASHDAN:
18   Q.   Okay.  And isn't it true --
19   A.   Sold price.
20   Q.   Isn't it true that dealers report the sold
21 price to state taxing authorities?
22   A.   I --

Page 155

1      MR. ROOF:  Objection.
2      THE WITNESS:  Depends on the state, but
3 yes.
4 BY MR. CASHDAN:
5   Q.   And would those reports of sold prices
6 reflect the actual sold price not reflecting the sale
7 of ancillary items?
8   A.   No, not necessarily.
9   Q.   Why do you say that?
10   A.   Depending on which state, they will not
11 include warranties, gaps.  Some states will actually
12 include gap on the price of the vehicle.  So it's not
13 necessarily indicative of just the vehicle sale.
14   Q.   Well, isn't it true that dealers will
15 report the sold price without any ancillary items,
16 like service plans or after market floor mats or
17 something?
18   A.   Again, it depends.  It depends on the
19 state and what they require as far as the taxable
20 item in the sale.  Some of them, I know Virginia will
21 include some of that back-end sales in the price of
22 the vehicle that it's taxed on.

Page 156

1   Q.   So you're saying that sometimes when the
2 dealers report the sales price to the taxing
3 authority, it will include not just the sold price of
4 the vehicle but also some of those ancillary items?
5   A.   Correct.
6      MR. ROOF:  Objection.
7 BY MR. CASHDAN:
8   Q.   Do you know if that's the case in all
9 states?
10   A.   I cannot testify to all states.
11   Q.   What states are you aware of other than
12 Virginia where you think that might be the case?
13   A.   Again, I just know there are states that
14 will include some portions of the sale in addition to
15 the vehicle itself.  And again, you've got to take
16 into account the trade-ins and there's over-allowance
17 for trade-ins and some states will only require you
18 to pay tax on the balance of the trade-in.
19   Q.   But if I compared the list price to the
20 sold price reported by dealers to the taxing
21 authority, that would give me a good approximation,
22 wouldn't it, about whether the sold price is lower

Page 157

1 than list price?
2      MR. ROOF:  Objection.
3      THE WITNESS:  No, I would not go off of
4 that.
5 BY MR. CASHDAN:
6   Q.   Okay.  You don't think that would be
7 reliable?
8   A.   I do not.
9   Q.   What is gap insurance?
10   A.   Gap insurance is a product that you can
11 purchase that will ensure that if you have a total
12 loss and you owe, just say, $10,000 on the vehicle
13 and your vehicle, you had to add extra on the loan of
14 the vehicle because of a trade-in or something but
15 you're upside down, I guess, would be the word, that
16 would take care of -- that product would pay the
17 difference in actual cash value in the settlement for
18 the loan.
19   Q.   I want to make sure I understand what
20 you're saying.
21      So if somebody has a vehicle and they owe
22 $10,000 on the vehicle and they have a total loss,

40 (Pages 154 - 157)

Page 158

1 and they receive from the insurance company 5,000,
2 the gap insurance will cover the remaining 5,000 to
3 pay off the loan?
4      A.   Depends on the product.  But that is the
5 normal part of the gap insurance, yes.
6      Q.   Okay.
7      A.   Some of them have amounts and -- yes.
8      Q.   Okay.  Do dealerships sell gap insurance?
9      A.   Yes.
10     Q.   And are gap -- is gap insurance also
11 available from third parties that are not dealers?
12     A.   I believe so.
13     Q.   Is gap insurance generally reflected in
14 the list price of the vehicle?
15     A.   No.
16     Q.   Is gap insurance generally reflected in
17 the sold price as reported by dealers to state taxing
18 authorities?
19     A.   Again, it depends on the state.  And I am
20 not sure exactly which products, but some products
21 are on top of the sale price of the vehicle that's
22 reported for tax purposes.

Page 159

1      Q.   Okay.
2      A.   But, again, I can't testify to which
3 states.
4      Q.   It's going to vary by dealership?
5      A.   It would vary by state.
6      Q.   Okay.  Do different dealerships handle
7 differently where they record the profit from the
8 sale of gap insurance in terms of what entity among
9 the dealership's corporate family?
10     A.   Can you repeat that?
11     Q.   Sure.  Let me try to be more clear.
12          Is it the case that a dealership might
13 have one entity that sells cars and a separate
14 affiliated entity that sells gap insurance?
15     A.   Again, if you're asking all, I guess
16 anything is possible.  So, yeah, anything is
17 possible.  They could.
18     Q.   Are you familiar that there are some
19 dealerships that have an entity that sells vehicles
20 and a separate corporate entity that offers insurance
21 products?
22     A.   I am not familiar with those, but there

Page 160

1 could be.
2      Q.   Okay.
3      A.   The same with warranty and service
4 agreements.
5      Q.   So a dealership's corporate family might
6 be taking profit for different products in different
7 places?
8          MR. ROOF:  Objection.
9          THE WITNESS:  Again, I can't testify to
10 that.  I don't know, but It's possible.
11 BY MR. CASHDAN:
12     Q.   Have you done an investigation of that
13 fact?
14     A.   I have not.
15     Q.   Okay.  Have you done any investigation as
16 to whether the projected sold adjustment for any of
17 the named plaintiffs accurately predicted the sold
18 price for any of the vehicles in valuation reports?
19          MR. ROOF:  Objection.
20          THE WITNESS:  So you're asking me if I did
21 specific investigation to see if those vehicles sold
22 for that price?

Page 161

1 BY MR. CASHDAN:
2      Q.   Yes.
3      A.   I did not.  Again, there's not a lot out
4 there to give you what the actual sold price is as
5 far as the full package of the sale.  So.
6      Q.   When you say there's not a lot out there,
7 do you mean available to you or available to anyone?
8      A.   Open source or available to me.
9      Q.   Okay.  But what about available to, for
10 example, J.D. Power & Associates, do you know what
11 they have available?
12     A.   I do not know what they have available.
13     Q.   Okay.  Am I right that for each of the
14 named plaintiffs, you took the Mitchell valuation
15 report, you removed the projected sold adjustment,
16 you made an additional adjustment to condition
17 adjustment based on that, and that's the entirety of
18 what you did to come up with the new valuation?
19     A.   For the numbers, yes.
20     Q.   Do you consider that to be an appraisal?
21     A.   It's not a written appraisal, it's not a
22 certified appraisal that I do on the template.  But

41 (Pages 158 - 161)

Page 162

1  just as I would give someone an appraisal of a
2  vehicle that would stop by and I could take a look at
3  it and do some numbers on it, that would constitute
4  an appraisal as well.
5      Q.   Do you think it's an appraisal that
6  complies with USPAP requirements?
7      A.   It's not a certified appraisal, no.  It's
8  just an appraisal.
9      Q.   Did you contact any specific dealers in
10  connection with your opinions and conclusions in this
11  matter?
12      A.   In this matter, no.
13      Q.   Do you know if removing the projected sold
14  adjustment affects any of the other adjustments
15  besides condition in the valuation report?
16      MR. ROOF:  Objection.
17      THE WITNESS:  I don't have the data that
18  they use to add or subtract.  But again, I don't see
19  where that would be a difficult thing just to remove
20  the projected sold amount.
21  BY MR. CASHDAN:
22      Q.   What I am asking is when you did the

Page 163

1  valuations in your expert report, when you removed
2  the projected sold adjustment, you also made a change
3  to the condition adjustment.
4      Do you know whether the way the math is
5  set up for the WorkCenter Total Loss, you also have
6  to make changes to any of the other adjustments?
7      A.   Not that I know of.
8      Q.   Okay.
9      MR. CASHDAN:  All right.  I have no other
10  questions.  Thank you.
11      MR. ROOF:  I don't have any questions.
12      MR. CASHDAN:  All right.
13      MR. ROOF:  We'll read.
14      MR. CASHDAN:  I assume you'll read and
15  sign.
16      MR. ROOF:  Yes.
17      THE VIDEOGRAPHER:  Since there are no more
18  questions, we are going off the record at 12:56 p.m.,
19  Eastern time.  This concludes the deposition of Jason
20  Merritt.
21      THE COURT REPORTER:  Did you wish to
22  receive a copy of the transcript?

Page 164

1      MR. ROOF:  Yes, please.
2      (Whereupon, at 12:56 p.m., the instant
3  deposition ceased.)

Page 165

1          CERTIFICATE OF REPORTER
2
3  UNITED STATES OF AMERICA    ) ss:
4  DISTRICT OF COLUMBIA        )
5      I, Desirae S. Jura, RPR, the officer before whom
6  the foregoing proceedings were taken, do hereby
7  certify that the foregoing transcript is a true and
8  correct record of the proceedings; that said
9  proceedings were taken by me stenographically to the
10  best of my ability and thereafter reduced to
11  typewriting under my supervision; and that I am
12  neither counsel for, related to, nor employed by any
13  parties to this case and have no interest, financial
14  or otherwise, in its outcome.
15
16
17
18      Notary Public in and for
19      The District of Columbia
20
21
22  My commission expires:  1/31/2025

42 (Pages 162 - 165)

Page 166

1  DATE SENT:  October 23, 2024
2       ERRATA SHEET
3  DEPOSITION OF:  Jason Merritt
4       DATE:  October 22, 2024
5       CASE:  Matthew Thurston, et al v.
            Progressive Casualty, et al
6  INSTRUCTIONS:
7  1.  Please read the transcript of your
       deposition and make note of any
8      corrections or changes on this Errata
       Sheet.
9
   2.  Indicate below general reason for
10     change, such as:
            A.  To correct stenographic error.
11          B.  To clarify record.
            C.  To conform to the facts.
12
   3.  Sign the Certificate of Deponent page.
13
   4.  Within 30 days of the Date Sent, return
14     this Errata Sheet, and signed
       Certificate of Deponent, to the address
15     listed below AND to all Counsel listed
       on the Appearances page.
16
   PAGE #  LINE #  CORRECTION      REASON
17
18     _____
19     _____
20     _____
21
22          VERITEXT LEGAL SOLUTIONS
            1-800-227-8440

Page 167

1       ERRATA SHEET
2  DEPOSITION OF JASON MERRITT:
3  PAGE #  LINE #  CORRECTION      REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____

Page 168

1       CERTIFICATE OF DEPONENT
2       I hereby certify that I have read
3  and examined the foregoing transcript and:
4  (Check one of the following)
5       (  ) The same is a true and
6  accurate record of the testimony given by
7  me, and I have made no corrections to this
8  transcript.
9            -OR-
10      (  ) Any additions or
11  corrections that I feel are necessary, I
12  have listed on the attached Errata Sheet.
13      As witness my hand and signature
14  this _____ day of _____.
15
16      - - - - - - - - - - - - - -
        JASON MERRITT
17
18
19
20
21
22

43 (Pages 166 - 168)

October 22, 2024

**[& - 2013]**

Page 1

| & | | | |
|---|---|---|---|
| **&** 1:19 3:5,14 6:15 7:7,8,9 161:10 | **0036** 57:19 | **104** 4:22 | **14** 5:17 9:12 135:1,4,10 |

**&**

**&** 1:19 3:5,14
  6:15 7:7,8,9
  161:10

**0**

**0000126** 5:12
**0000251** 5:14
**0000286** 5:18
**0000296** 5:20
**0000448** 5:16
**0001** 4:13
**0005** 4:18
  35:13
**0007606** 5:4
**0007622** 5:8
  119:13
**0007654** 5:6
  117:7
**0008** 37:10
**0008147** 5:22
**0010** 38:5
  45:10
**0013** 38:8
**0014** 38:14
**0019** 38:18,22
**0020** 39:8
  40:17
**0031** 40:18
**0032** 40:20
  46:8,10
**0033** 47:19
  48:12
**0034** 50:18
**0035** 56:9

**0036** 57:19
**00375** 1:8 6:14
**0052** 35:14
**0054** 4:15
**008** 37:17
**009** 37:17,21

**1**

**1** 4:8 6:2,8 8:22
  9:8 11:20
  17:22 18:13
  19:2 26:19
  69:6,8,10
  81:17 88:20
  99:8 107:3,7
  121:16 131:15
  132:14 134:13
  143:10 153:16
  166:7
**1,005** 110:2,8
  111:22 112:8
  112:21,22
  113:4
**1-800-227-8...**
  166:22
**1/31/2025**
  165:22
**10** 5:7 9:8
  71:10 119:8,12
  119:12 120:3
**10,000** 52:1,5
  149:14 157:12
  157:22
**100,000** 49:22
**103** 4:21

**104** 4:22
**11** 5:9 131:18
  131:22 132:1,3
  134:6
**1110** 152:21
**114** 5:4
**116** 5:6
**1180** 3:15
**11870** 165:17
**119** 5:8
**119,107** 112:14
**11:11** 81:10
**11:19** 81:13
**11th** 23:18
**12** 4:13 5:13
  134:14,18
  135:10
**12,000** 149:16
**12,824.37.**
  136:10
**12:29** 147:8
**12:38** 147:11
**12:56** 163:18
  164:2
**12th** 24:9,22
**13** 4:15 5:15
  75:4 134:20,22
  135:10
**13,275.23.**
  132:15 134:3
**131** 5:12
**134** 5:14,16
**135** 5:18,20
**139** 5:22

**14** 5:17 9:12
  135:1,4,10
**15** 5:9,19 17:4
  75:3 100:21
  135:5,7,10
  136:4,13,18
**15,000** 149:19
**16** 5:21 139:2,6
  139:7 140:22
  142:1 151:6
  152:15
**17,250** 132:5,20
  133:10,20
**1700** 1:19
**18,5** 53:22 54:7
**18,988** 53:1,2
  53:10
**185th** 3:6
**18th** 24:4
**1987** 79:15
  81:2
**1:22** 1:8 6:14
**1st** 14:4,9,12,18
  25:20

**2**

**2** 4:10 6:4 9:15
  18:2,6,17 19:5
  22:15 24:17
  81:13 125:10
  132:3 151:8
  166:9
**20** 70:12
**2009** 139:9
**2013** 106:20
  112:14

**[2015 - accidents]**                                                        Page 2

**2015**  78:21
79:16 81:2
**2016**  74:19
78:22
**2019**  73:11
74:19
**2020**  69:19
71:19 114:15
**2021**  71:15
73:2
**2022**  5:9 71:8
72:18
**2023**  71:2
72:10 105:18
144:2,11
**2024**  1:13,21
6:8 9:12 10:4
13:4 14:9,12
14:18 17:12
18:22 19:8
20:14 70:3,17
70:21 71:22
166:1,4
**21**  44:12
**216**  3:8
**22**  1:13,21 13:6
166:4
**22nd**  6:8
**23**  166:1
**25th**  25:2
**26th**  25:8
**27**  10:4
**27th**  24:15
25:14

**28**  17:12 18:22
20:14
**29th**  21:5,16,18
22:13 23:9,14

**3**

**3**  4:11 12:9,10
12:13,14 13:10
147:11 166:12
**30**  54:18
166:13
**30,000**  77:7
**30309**  3:16
**31**  14:3
**35**  4:18
**3rd**  26:9

**4**

**4**  4:14 13:13,17
13:17,18 15:1
16:17 99:8
106:8 126:9
166:13
**40**  65:6,19,19
**404**  3:17
**44119**  3:7
**45**  16:22 17:7
**4th**  21:15

**5**

**5**  4:16 35:4,8,9
36:8 37:9 42:4
43:7 44:12
45:11,21 46:8
47:9,11 50:18
56:3 153:16

**5,000**  158:1,2
**50**  71:4 86:17
**502-1055**  3:8
**572-4818**  3:17
**5th**  13:3

**6**

**6**  4:9,10,19
88:19 101:7
103:8,12,15,17
103:19

**7**

**7**  4:4,22 36:16
89:20 104:16
104:20,21
105:11
**75**  74:10,14
**7609**  126:10
**7611**  121:11
**7640**  120:3
**7650**  119:14
**767**  3:6

**8**

**8**  5:3 9:22
105:17 114:6
114:10,11,13
116:17 117:2
121:3,11
126:10 132:14
132:14 136:8

**9**

**9**  5:5 116:9,13
116:13,14
117:3,5,14
124:15 131:16

**90**  72:8,14,20
73:4
**9500**  52:2,5

**a**

**a.m.**  1:21 6:7
81:10,13
**ability**  165:10
**able**  8:5 55:7
94:16 130:15
153:22 154:8
**above**  1:16
88:14 91:9
**absolutely**
145:9
**accept**  61:18
62:2,21 115:6
143:8
**acceptability**
83:9
**acceptable**
44:18 68:2
83:2,4
**accepted**  82:4
115:1 130:7,11
140:6
**accepts**  60:15
**access**  87:1,2
151:18 153:3
**accident**  39:21
40:5,6 48:16
49:19 50:3
**accidentally**
149:16
**accidents**  49:2
49:12,14

Jason Merritt
Multiple Plaintiffs v. Progressive

**[account - agreement]**

October 22, 2024

Page 3

| | | | |
|---|---|---|---|
| **account** 53:11 | 51:15 52:19 | 14:11,14 15:12 | 109:17 113:18 |
| 53:20,21 59:10 | 53:12,20 54:9 | 33:7 54:3 | 121:20 123:13 |
| 60:19,22 61:4 | 60:20 64:15 | 108:13 122:15 | 123:16 129:5 |
| 61:6,8,11,15,20 | 70:15 71:1 | 127:19 161:16 | 137:10,11,11 |
| 62:4 63:1,14 | 76:19 82:1,5 | **additions** | 137:14 142:12 |
| 88:11 90:10 | 82:15 83:3,17 | 168:10 | 149:4 153:6,11 |
| 97:13 99:22 | 91:10 93:18 | **address** 166:14 | 162:14 163:6 |
| 111:22 128:14 | 94:9,11 97:17 | **adhere** 100:7 | **administer** |
| 156:16 | 98:6 104:2,6 | **adjust** 103:1 | 6:20 |
| **accuracy** | 104:12,14 | **adjusters** | **advertised** |
| 129:18,21 | 107:13 108:1 | 152:12 | 89:19 90:2,7 |
| 139:17 140:22 | 124:8 125:1,8 | **adjustment** | **advertisements** |
| **accurate** 34:7 | 129:8 130:22 | 11:5 83:22 | 86:1 |
| 37:7 45:3 | 140:12 148:2 | 84:4,18 85:6,8 | **advertising** |
| 106:14 116:5 | 152:13 155:6 | 85:12,15 87:7 | 70:7 |
| 127:16 128:2,7 | 157:17 161:4 | 88:10 90:3 | **advised** 10:9 |
| 129:1,5 130:14 | **actually** 21:9 | 94:6 95:12,21 | **affect** 49:12 |
| 132:9,19 134:9 | 21:12,14 41:10 | 96:9,22 97:8 | 150:10 |
| 137:1 140:8 | 61:20 62:4 | 97:13,14 103:2 | **affects** 60:20 |
| 151:9,12,17 | 67:17 92:3 | 109:1 110:3,7 | 162:14 |
| 168:6 | 107:13 124:8 | 110:8,16,20 | **affiliated** |
| **accurately** 14:7 | 139:12 155:11 | 111:3,4,18,18 | 159:14 |
| 37:3 45:19 | **add** 11:11 54:2 | 112:1,3,7,20 | **affirmation** 7:4 |
| 137:14 140:3 | 150:9 157:13 | 115:2,9,15,19 | **agree** 29:4 |
| 140:12,17 | 162:18 | 121:22 122:1,2 | 81:21 82:2 |
| 142:18 143:3 | **added** 10:10 | 122:4,8,12 | 107:10,12 |
| 151:1 160:17 | 11:3 48:10 | 123:6,17 124:2 | 143:1 154:11 |
| **achieve** 68:20 | 109:11,17 | 130:4 137:2 | **agreed** 13:3 |
| **action** 6:22 | 117:16 123:6 | 141:19 142:15 | 20:12 21:14,15 |
| 16:7 17:18,19 | 124:16 125:16 | 142:19 143:2 | **agreement** 4:12 |
| 70:8 | **adding** 10:12 | 152:21 160:16 | 12:14,16 13:2 |
| **actual** 4:20 | **addition** 10:11 | 161:15,16,17 | 13:10 20:5,9 |
| 39:12 40:21 | 118:4 156:14 | 162:14 163:2,3 | 20:11,17,22 |
| 41:5,19 46:13 | **additional** | **adjustments** | 21:12 57:4 |
| 47:5,11,14 | 10:10,22 11:8 | 93:14 109:9,14 | |

**[agreements - appraisers]**                                              Page 4

**agreements**
  160:4
**ahead**  56:7
  120:1 137:7
**al**  1:5 166:5,5
**alarm**  126:7
  127:10,18,21
**allowance**
  156:16
**allowed**  42:20
**aloud**  46:2
**amended**  16:7
  17:17
**america**  165:3
**american**  4:16
  27:5 31:7,20
  32:1,6,14,21
  33:18 36:1,8
  36:20 42:10
  44:8 45:15
  144:3,4,17,18
**amount**  53:15
  60:11,14,15
  68:16,20 70:11
  88:18 90:12
  95:4,7,8 99:18
  110:22 130:5,7
  130:11 138:21
  162:20
**amounts**  94:21
  158:7
**analysis**  23:7
  24:1,20 26:6
  26:15 40:9
  51:1 86:6

93:12 94:12
  113:15 140:10
**ancillary**  154:2
  154:10 155:7
  155:15 156:4
**angle**  120:7
**answer**  8:15
  18:16 37:3
  43:3,20 44:4,9
  45:8,18 46:2
  46:21 55:4,7,9
  87:18 88:5
  98:3 106:4
  109:19 116:20
  133:1,15 134:1
  153:8
**answered**  36:3
  133:21
**answers**  36:12
  37:7 38:1,12
  38:19 39:1
  42:6,15,18,21
  45:12
**antique**  70:10
**apologies**  38:4
**apologize**  39:4
  148:18
**appear**  9:7
  11:14 62:13
  121:9 128:16
**appearance**  7:2
  7:4
**appearances**
  3:1 166:15

**appeared**  22:2
**appears**  12:14
  12:18 13:18
  14:6 35:10
  37:20 38:3,18
  40:19 41:4
  58:3 105:2,6
  105:19 106:6
  115:5 116:14
  136:17 137:8
  151:5
**application**
  99:8
**applied**  109:2
  113:7
**applies**  83:22
  90:22
**apply**  90:17
  93:3 94:14
**appraisal**  4:21
  30:15 31:3
  39:9,12,15,19
  39:20 40:17,21
  41:5,20,22
  43:8,13,16
  44:1,1,19 45:2
  45:5 46:14,16
  47:12,19 48:2
  48:5,8,10,20
  50:18 52:18
  58:2 59:6
  61:18 65:11
  81:18 99:9
  100:9,12 101:2
  103:20 104:12

106:7 107:5,8
  107:14 150:3
  161:20,21,22
  162:1,4,5,7,8
**appraisal's**
  98:7
**appraisals**
  15:15 28:16
  33:7 47:2,6,14
  48:21 56:18
  59:7 70:11,16
  71:1,7,15,18
  104:2,6,9
  128:19 130:9
  151:22
**appraise**  26:22
  27:9,11 43:12
  70:4
**appraised**
  27:14,17,21
  41:9
**appraiser**
  43:11,12,12,14
  43:14,15,16,17
  53:7 71:19
  76:11 100:2,4
  153:22 154:7
**appraisers**  4:17
  4:19 27:3,6
  28:13,14,21
  29:16 30:8,12
  30:17 31:2,8
  31:21 32:2,7
  32:15,22 33:19
  36:1,9,21

James Merritt
Multiple Plaintiffs v. Progressive                                    October 22, 2024

**[appraisers - based]**                                              Page 5

42:10 44:8
45:16 56:15
57:9 69:15,19
70:1,4,16 71:2
71:8,16 72:1
72:11 74:1,5
82:3,9,13,21
100:6
**appraising**
53:9
**appreciate**
145:8
**appropriate**
82:14 103:1
115:20 116:1
123:22 127:4
130:11 141:18
**appropriaten...**
109:16 113:17
**approximately**
13:6 74:16,18
79:5
**approximation**
156:21
**april** 69:19
**arbitrarily**
99:18
**area** 28:4,15
**argue** 142:22
**argument**
138:6
**arrangements**
25:21
**arrive** 81:22

**aside** 26:19
**asked** 32:18
41:12 42:14
44:17 54:22,22
87:3,5 133:21
148:17
**asking** 11:19
15:4 30:16
62:19 68:19,19
88:13,14,16
91:9 92:2,15
95:5 101:20
126:4 127:20
127:21 133:7
140:1 159:15
160:20 162:22
**aspect** 59:2
**aspects** 115:1
**assist** 76:13
**associates**
161:10
**assume** 37:6
38:18 163:14
**assumptions**
99:21
**atlanta** 3:16
**attached** 69:8
168:12
**attorney** 5:10
19:20 20:21
**auction** 76:16
80:6
**august** 14:3,4,9
14:11,18 74:19
78:22

**author** 15:10
**authorities**
154:21 158:18
**authority** 156:3
156:21
**authorized**
6:20
**auto** 4:16,19
15:19 27:3,6
28:12,14,20
29:16 30:8,12
30:17 31:2,8
31:21 32:2,6
32:14,22 33:19
36:1,9,21
42:10 44:8
45:16 56:14
57:5,8 69:15
69:19 70:1,4
70:16 71:2,7
71:16,18 72:1
72:11 74:1,5
**automobile**
75:21 77:3
81:3
**automobiles**
28:17 75:12,15
79:6 80:3
**automotive**
57:20 74:20
75:11,15 79:1
**autos** 66:17
**available**
158:11 161:7,7
161:8,9,11,12

**avenue** 1:20
**average** 112:4
**aware** 65:9
156:11

**b**

**b** 4:6 5:1 17:14
17:16,17,21,21
18:7 19:1
43:14 44:1
166:11
**b's** 43:16
**back** 16:16
26:18 34:16
37:16 42:3
51:14 53:6
59:11 64:1
69:6 78:2,7
81:12 109:17
112:22 121:3
124:9 125:10
126:9 134:13
144:19 155:21
**background**
63:4,7
**backup** 109:11
**backwards**
69:12
**balance** 156:18
**bald** 152:7,20
**ballpark** 62:17
**base** 95:11,17
95:20 96:21
97:9
**based** 27:9 32:2
58:13 59:8

[based - car]                                                    Page 6

76:21 79:11
89:1,10 92:5
99:15 108:22
109:14 110:11
112:9 161:17
**basis** 110:16
112:20
**bates** 4:12,14
4:17 5:3,5,7,11
5:13,15,17,19
5:21 35:12,15
36:16 37:10
38:5 45:10
47:19 50:18
117:6,9,10,12
119:13 120:2
126:10
**bears** 117:6
**began** 21:19
**beginning** 7:5
38:21 89:20
**begins** 48:15
110:1
**behalf** 3:3,11
7:10
**behavior**
142:16
**beings** 31:11
**believe** 14:19
15:2 19:9
20:15 26:17
28:4 29:18
32:3 34:6
36:14 56:16
57:17 65:18

69:9,15,20
82:12,17 85:10
91:6 92:13
104:3 106:7
107:15 108:11
114:18 115:17
115:22 120:6
141:5,9 143:20
158:12
**berler** 3:5 7:10
**best** 5:10 14:10
14:19 42:16
45:18 141:10
146:9 165:10
**better** 153:21
**big** 124:7
**bill** 16:21 17:1
17:2,5,8
**billed** 16:18
17:11 18:22
21:7 23:18
24:4,9,21 25:2
25:9,14,20
26:10
**bit** 80:16
134:12
**blanket** 46:21
50:3
**board** 33:7
**body** 100:7
**bolted** 124:9
**boston** 28:4
**bottom** 36:17
37:10,21 38:5
38:9,17 48:11

88:22
**box** 118:3
**break** 8:10 81:7
**brian** 3:4 7:9
**brianr** 3:9
**bridges** 11:5
114:15 120:11
121:4 129:14
131:9
**brief** 142:8
**bring** 15:8 54:5
58:11
**bringing** 15:14
**broken** 152:18
**brought** 54:8
154:15
**bumper** 152:17
**bunch** 47:20
54:10
**bureau** 27:2
28:12,14,20
29:15 30:7,12
30:16 31:1
**burn** 130:17
**burned** 120:15
151:20
**business** 64:10
69:3 79:3,4
**buy** 57:7
**buyer** 57:6
59:20 60:1,10
60:13
**buyers** 57:3
58:11 59:17

**c**

**c** 4:1 6:1 166:11
**calculate** 84:4
85:15,18 97:17
97:21 98:5
130:4
**calculated**
84:19 85:9
96:8 110:8
112:8
**calculates** 85:5
86:8 97:7
**calculating**
84:1 85:12
90:2
**calculation**
141:18 149:15
**calculations**
90:11 93:13
**call** 60:4,7
84:16
**called** 1:15
48:12 73:8
74:20 78:22
83:13 108:7
147:13,21
**camera** 109:12
**capacity** 81:3
**car** 41:9 46:6
47:12 51:22
52:21 54:6
78:2,8,15 80:9
107:1,5,8,11,21
120:11 121:4
148:22

Case 1:22-cv-00375-NT    Document 120-21    Filed 01/10/25    Page 50 of 171    PageID #: 4985

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

[car's - certified]

Page 7

**car's** 120:15
**care** 61:10,14
　157:16
**career** 80:20
**carfax** 48:15
　109:9 112:18
　131:5,7
**carpet** 151:8
　152:3,4,16
**carpeted** 123:1
**carryover**
　153:17
**cars** 64:8 70:1
　73:18 79:19
　159:13
**case** 1:7 6:13
　16:1,17 17:11
　18:21 19:7
　20:10,11 22:16
　42:1 87:15,16
　87:21 88:8,11
　89:11 90:14
　91:15 96:7
　97:12 98:18
　99:1 101:22
　102:1 103:15
　104:22 105:8
　109:4 113:8,14
　113:21,22
　114:22 130:12
　133:18 144:2,6
　144:11 146:6
　146:15,21,22
　148:10,13
　156:8,12

　159:12 165:13
　166:5
**cases** 22:3 29:6
　87:11 88:12
　89:7,14 102:22
　103:6 143:18
　144:14 145:16
　145:21 146:5
　146:11,14
　151:1,2
**cash** 4:20 40:21
　41:5,19 46:13
　47:6,11,14
　52:2,18 53:12
　53:20 54:9
　56:18 60:20
　64:15 70:15
　71:1 76:19
　82:1,5,15 83:3
　83:17 93:18
　94:9,11 97:17
　98:6 104:2,6
　104:12,14
　107:13 108:1
　148:2 157:17
**cashdan** 3:12
　4:4 7:6,6,20
　10:17 11:15
　12:12 13:15
　18:15,20 19:16
　22:11 23:4,6
　29:5,13 30:21
　31:6 33:16
　34:4 35:6
　46:10,12,22

　47:17 49:7
　51:10 52:17
　54:21 55:6,22
　56:8 60:21
　61:5 62:18
　64:2 65:8,22
　66:5 67:14
　72:17 73:1,7
　77:18 78:11
　81:7,15 83:6
　87:20 88:3,7
　96:18 97:5,19
　98:1,2 103:10
　103:22 104:11
　104:18 105:16
　106:3 111:1,16
　114:8 115:13
　116:2,11,19
　117:10,13
　119:10 131:20
　132:22 133:6
　133:14,22
　134:16,22
　135:3,7,8
　137:12,18
　139:4 141:15
　143:9 146:12
　146:19 147:5
　147:12,16,19
　147:20 148:9
　153:15 154:17
　155:4 156:7
　157:5 160:11
　161:1 162:21
　163:9,12,14

**casualty** 1:8,10
　6:11 166:5
**cause** 50:4
　62:12 126:7
　127:10,20
**caused** 127:17
**causes** 39:22
**caveats** 82:7
**ccc** 108:3,7,13
　109:10 110:2
　110:21 113:7
　113:15,16,22
**ceased** 164:3
**cents** 130:5
　141:18
**certain** 32:4
　50:4 90:20
　91:1 95:4
**certificate**
　165:1 166:12
　166:14 168:1
**certification**
　28:16,18,20
　30:15 31:1,9
　32:19 33:12
**certified** 4:16
　4:20 26:21
　27:2,6,8 28:12
　28:14,20 29:16
　30:8,12,17
　31:2,8,12,20,21
　32:1,6,14,22
　33:19 36:1,9
　36:20 39:9
　40:16,21 42:10

**[certified - complete]**                                    Page 8

44:8 45:16
47:5 56:14
107:4,8,21
161:22 162:7
**certify** 165:7
168:2
**cetera** 54:4
**change** 54:8
65:19 111:12
112:18 150:2,2
150:16 163:2
166:10
**changed**
150:16
**changes** 11:9
138:8,9,12,16
163:6 166:8
**chapters** 33:1,2
33:4
**charge** 80:5
**check** 130:13
143:21 144:19
168:4
**chosen** 59:3,14
**circumstance**
154:12
**cities** 28:3
**claim** 16:3,4,12
16:13 138:11
138:12
**claiming**
132:19
**claims** 20:2
21:2 23:8,13
24:2,20 26:7

26:16
**clarify** 103:12
148:16 166:11
**class** 16:7
17:17,18 41:7
41:16 70:8
98:17 99:1
**classic** 46:6
70:10 104:10
104:14 107:1,4
107:8,11,21
**clean** 134:12
**clear** 17:20
145:14 159:11
**clearly** 148:17
**cleveland** 3:7
**clevelandcon...**
3:9
**client** 43:11
138:7
**close** 62:13
86:15
**closer** 137:20
**coast** 4:19 57:8
69:15,18 70:1
70:4,16 71:2,7
71:16,18 72:1
72:3,11 74:1,5
74:12
**coincides** 68:1
**colleague** 7:8
**collision** 107:18
**columbia** 1:19
165:4,19

**come** 53:22
57:4 67:21
82:4,14 83:1
95:11,22 96:21
100:9,19 103:5
124:11 125:1
142:9 161:18
**comes** 53:14
56:17 74:4,9
83:10 84:11,12
**coming** 75:19
86:4 99:15
**commencing**
4:12,14,17 5:4
5:7,12,14,16,18
5:20,22
**commission**
165:22
**committee**
100:8
**comp** 122:9
**companies**
148:7
**company** 1:9
1:10 6:12
28:15 29:19
67:3 108:7
116:22 138:5
153:9 158:1
**comparable**
50:20 51:1
62:9 63:14
82:19,21 85:20
85:22 86:5,9
86:12,17,20

109:14 110:3
111:7 112:1,3
121:7,13
122:16,21
123:2,12,14
125:10 128:1,6
129:4,19,22
140:13,18
141:7,19,21
148:20 149:3
149:10,17
150:8 153:20
**comparables**
62:16 63:10
82:8,22 98:11
**compared**
11:10 93:17
112:5 122:9
137:14 145:3
148:19 156:19
**comparing**
104:8 149:2,17
**competitor**
108:9
**compilation**
22:17
**complainant**
10:9
**complainants**
10:10
**complaint** 16:7
17:19 18:11
19:10,18
**complete**
130:16

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

**[completed - correct]**                                                     Page 9

| | | | |
|---|---|---|---|
| **completed** 9:11 10:3 105:17 | 97:8,13 103:2 107:19 108:19 | **connect** 78:5 | **contains** 12:2 |
| **completely** 8:14,16 151:20 | 109:1 110:2,8 110:13,20 | **connection** 13:21 14:21 | **contract** 18:12 19:12 54:3 |
| **completing** 24:13 32:18 126:14 | 111:2,18,22 112:4,6,14 113:3 137:10 | 15:5 17:10 18:21 19:7 21:17 22:13 | **conversations** 20:20 89:1,10 92:6,7 |
| **completion** 35:11 | 138:7 150:20 151:16 152:4 | 23:8,13 24:20 26:7 29:15 | **convert** 94:20 |
| **complies** 162:6 | 152:11,20 153:11 161:16 | 36:13,21 42:11 72:2,11 75:1 | **copy** 9:5,19 13:9 43:13 |
| **comps** 62:9 | 162:15 163:3 | 75:10,11,14 76:10 77:14 | 104:1,21 163:22 |
| **concept** 40:3 147:13,21 | **conditions** 53:11 54:7 | 113:13 162:10 | **corner** 121:17 |
| **concern** 62:12 | 63:13,17 68:3 99:14 150:15 | **consecutively** 35:13 | **corporate** 159:9,20 160:5 |
| **concerned** 53:4 | **conduct** 47:2 | **consider** 89:2 89:18 90:6 | **corporation** 5:11 |
| **concerning** 88:9 100:17 | **conducted** 47:12 113:15 | 92:1 107:1 161:20 | **correct** 8:8 9:5 10:5 11:6,7,22 |
| **concludes** 163:19 | **conducting** 31:3 41:19 | **considered** 91:18 92:18,22 | 12:22 13:7,8 14:1,5 16:2,19 |
| **conclusion** 97:12 133:8 139:16 140:2 140:15 141:17 | 47:13 104:2 **confidential** 56:4,6 | 101:12 110:6 112:7 **considers** 90:1 | 16:20 17:6,9 18:1,10 19:4 20:7 22:3,4,5 |
| **conclusions** 11:12 12:2 40:8,13 67:16 82:5 98:16,21 100:17 101:16 102:17 113:16 162:10 | **confidentiality** 56:4 87:10,14 **configuration** 137:11 138:2 **confirm** 110:15 112:19 130:15 140:10 153:22 154:8 | **consistent** 47:8 151:4 **constitute** 162:3 **consult** 12:15 **consultant** 4:11 **consumer** 142:15 **contact** 162:9 | 22:20 23:20 24:18 27:7 28:21 30:3 32:13 34:18,20 34:21 35:18,19 37:1,7,8,19 38:7,13,20 39:2,3,17 40:18 41:3,4 |
| **condition** 47:20 48:4,6,9 49:9 50:12 63:19 94:20 95:12,17 95:21 96:9,21 | **conform** 166:11 | **contained** 15:19 102:3 | 41:17 42:7,8 42:19,21 45:12 45:13 46:14,15 |

Case 1:22-cv-00375-NT    Document 120-21    Filed 01/10/25    Page 53 of 171    PageID #4988

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

[correct - dealer]

Page 10

47:2,6,9,14
50:6,7,16,20,21
51:2,16,17
52:9 56:15,19
58:2,6,7,22
59:14,15,18,19
60:2,3,5,6,8,9
60:11,12 61:9
61:13 63:2
65:2,3 69:5,8
69:11,19,22
73:12 74:3,15
74:20,21,22
78:3,6,17 79:4
79:17 80:18
81:3,19,20
82:3,16 87:11
87:12 95:13
96:5,10,12
97:12 99:4
104:6,13,21
105:21 106:21
106:22 107:16
108:7,15,20,21
109:3,7 113:7
113:10,11,18
114:17,20,21
115:3,5 116:17
117:3,4,11
118:3,14,15
119:4,5,6
121:1,2,5,6,20
122:2,5,12,13
123:3,4 126:15
126:16,18,19

126:21,22
128:13 136:14
140:20 146:3
149:5,10,22
154:7 156:5
165:8 166:10
**correction**
166:16 167:3
**corrections**
166:8 168:7,11
**correctly** 43:18
**cost** 147:14,17
147:22 148:11
**counsel** 1:15
4:2 6:10 7:3,5
7:17,19 12:20
15:18 55:22
87:3,5 89:1,5
92:6,8 145:18
165:12 166:15
**country** 31:3
67:20 102:13
**county** 104:22
**couple** 33:4
**course** 28:16,19
29:2 32:14,15
32:17,21 33:5
33:10,18 36:4
36:9,13,22
37:12,15,18
38:1,5,12,15
39:13,14,16
42:11,13 45:12
58:12 100:21

**courses** 31:14
31:16 39:1
**court** 1:1 6:12
6:18 7:11
105:1 163:21
**cover** 144:8
158:2
**covered** 148:17
**covers** 99:17
**craigslist** 79:20
**create** 10:6
**created** 95:17
**credible** 114:3
**criteria** 152:10
153:11
**criticism** 146:5
**crm** 84:16
**crms** 84:12,15
**csr** 2:1
**cumberland**
8:3 76:22
79:12,14
**current** 12:1,7
131:8
**currently** 66:11
66:19 143:15
**customer** 41:13
53:22 75:19
**cuts** 152:16
**cv** 1:8 6:14

**d**

**d** 6:1
**damage** 39:22
40:1 48:16
49:14,16,17,18

49:20 50:8,10
50:11,12,13
112:11 120:11
152:17
**damaged** 131:5
**daniel** 3:13 7:8
**data** 65:17
83:18 84:3,6,9
84:11,12,19,20
84:22 85:2,11
85:14,18,22
86:4,22,22
87:1,3,6,7 88:9
88:15 91:2,4,7
91:8,10,11,22
92:3 93:10,13
93:15 94:12,13
94:22 95:9
98:17,22 99:2
99:5 101:12
151:4 152:13
162:17
**date** 6:7 13:21
14:2,22 166:1
166:4,13
**dated** 5:9 14:4
**day** 64:13
168:14
**days** 13:6
166:13
**dc** 1:20 6:16
**deal** 54:1,5
75:18
**dealer** 51:22
52:2 54:14

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

**[dealer - difficult]**

Page 11

55:1 60:4 61:1
61:17,19 62:1
62:3 64:4,12
64:13 67:9
68:17 69:1
138:1
**dealers** 64:7,9
65:1,5,13 66:1
66:11,19 67:17
67:20 68:5,7,8
68:15,20 75:7
84:19 86:5
102:10,11,13
102:14 106:13
154:20 155:14
156:2,20
158:11,17
162:9
**dealership** 53:3
53:4,8 55:5,8
55:18 67:7
75:2 80:9 81:3
111:10 112:15
129:16 159:4
159:12
**dealership's**
159:9 160:5
**dealerships**
53:19 54:11
55:9,13,16
75:1,4,5 84:13
84:22 85:3
102:19 158:8
159:6,19

**dealing** 79:20
**dealt** 55:10
76:4
**deceptive** 57:13
**decides** 60:1
**decisions** 94:13
**declaration**
4:22 104:22
105:4,22 106:9
107:4
**decoders**
139:21
**deduct** 95:3
**deducted** 95:20
**deduction**
50:12 113:4,7
**deductions**
97:3
**deep** 66:15
**defendants**
1:11,16 3:11
4:3 6:10 7:7,19
**defined** 45:21
46:2
**definition** 58:6
58:8
**deflate** 64:17
**depend** 50:10
52:19 82:9,18
**depending** 83:9
155:10
**depends** 34:2
45:4 50:13
82:8 106:19
155:2,18,18

158:4,19
**deponent**
166:12,14
168:1
**deposed** 8:7
**deposition** 1:14
6:9,15 15:3
17:22 18:2
19:2 25:21
26:4,10 103:15
163:19 164:3
166:3,7 167:2
**depreciation**
40:3,5,9,14
**describe** 143:4
**describes**
142:18
**describing**
142:21
**designate** 56:5
**designated**
56:3
**desirae** 1:17,22
6:18 165:5
**detail** 63:20
111:11 112:17
**detailed** 116:4
**details** 50:5
52:20 61:11
62:5
**determine** 57:6
127:15,22
128:5,21 129:4
130:19 138:12

**determining**
54:11 106:11
**difference**
62:15 115:11
123:8,11
137:10 139:22
157:17
**different** 10:13
10:19 33:1
45:5 52:7,15
57:10 60:14
62:11,14 63:13
63:17 64:10
67:21,22 68:15
68:15 69:3
76:20 82:4,15
82:22,22 83:1
84:12 87:6
98:8,11,12
99:14 100:9
103:14 113:10
113:16,21
119:2,3 122:11
124:10 125:14
126:2,14 128:9
128:9 129:9
130:5 135:11
137:5,9,15,22
138:2,5 142:16
148:2,7,7
159:6 160:6,6
**differently**
159:7
**difficult** 137:21
138:3 139:21

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

[difficult - errata]                                                              Page 12

162:19
**digital** 13:11
**diminish** 50:1
**diminished**
  39:9,18,20
  40:2,17 46:6
  50:4
**direction** 2:2
**disagree**
  142:19
**disagreed**
  113:6
**disagreement**
  113:2,3
**disclose** 87:13
**disclosure**
  20:17
**discount** 154:1
  154:9
**discounted**
  109:9
**discusses** 95:1
**discussion**
  142:11
**discussions**
  138:8
**district** 1:1,3
  1:18 6:12,13
  165:4,19
**divide** 95:22
**docket** 103:14
**document** 5:5,7
  13:18 23:19
  38:22 40:20
  41:3 42:4

51:16 52:10
58:2 59:17
101:15,17,21
102:4 103:13
107:4 110:1
117:6,11
132:10 133:5
134:4,5,6
**documentation**
  131:11,13
**documents**
  25:22 29:6,9
  92:4,8 101:6
  105:20 130:21
  134:11
**doing** 15:11
  41:14 95:15,16
  96:4 104:5
  128:19 151:22
**dollar** 94:21
  95:6,8
**double** 143:20
  144:19
**draft** 22:16,19
  24:10
**drafting** 20:21
  21:9,11
**drivers** 152:17
**dsanders** 3:19
**due** 70:8 137:9
**duly** 1:17 7:15

**e**

**e** 4:1,6 5:1 6:1,1
**e.g.** 154:2

**earlier** 36:2
  146:13
**east** 3:6 4:19
  57:8 69:15,18
  70:1,4,16 71:2
  71:7,16,18
  72:1,3,11 74:1
  74:5,12
**eastern** 6:7
  81:10,13 147:8
  147:11 163:19
**easy** 57:13
**ebay** 79:20
  80:14,14 81:5
  81:5
**effective** 65:13
**effort** 43:3
**efforts** 37:3
**either** 24:8
  30:11 48:10
  85:7 90:21
  111:19
**electronic**
  105:11,12
**eliminate** 87:8
  88:13,14 93:16
**ellen** 5:10
**email** 4:14
**employed**
  79:16 80:10
  81:2,4 153:6
  165:12
**engages** 43:11
**engine** 152:19

**english** 139:19
**ensure** 157:11
**entered** 12:19
  13:2
**entire** 16:12,14
  56:5 63:4,7
**entirety** 161:17
**entities** 26:21
**entitled** 1:16
  9:1,16 39:9
  40:21 57:20
  142:4
**entity** 27:8
  30:13,14,18,22
  31:9,12 73:8
  74:20 76:21
  78:22 85:6
  159:8,13,14,19
  159:20
**entry** 16:17
  20:16 21:5,7
  69:14 103:2
**equipment**
  116:4 117:16
  117:17,20
  122:5,7,9,12
  123:6,13
  126:15 127:2,7
  127:22 128:6,9
  128:22 129:4
  139:14,17
  140:3
**errata** 166:2,8
  166:14 167:1
  168:12

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

[erroneous - expert]                                                        Page 13

| | | | |
|---|---|---|---|
| **erroneous** 35:1 | **exactly** 28:5 | 12:9,10,13,14 | 142:1 143:10 |
| **error** 115:15 | 30:4 84:7,20 | 13:13,17,17,18 | 151:6,8 152:15 |
| 150:5 166:10 | 134:7 158:20 | 15:1 16:17 | 153:16 |
| **errors** 43:16 | **exam** 33:8,8,9 | 17:14,16,17,21 | **exhibits** 22:17 |
| 44:2 115:7 | 46:7 | 17:21,22 18:2 | **existence** 73:11 |
| **esq** 3:4,12,13 | **examination** | 18:6,7,13,17 | 73:13 |
| **essay** 33:9 | 1:15 4:2 7:19 | 19:1,2,5 22:15 | **expect** 146:22 |
| **establish** 44:2 | **examined** 7:16 | 24:17 26:19 | 147:3 |
| 65:2 66:12,19 | 168:3 | 35:4,8,9 36:8 | **experience** |
| 153:10 | **examining** 48:3 | 36:16 37:9 | 54:18 125:21 |
| **established** | **example** 42:13 | 42:4 44:12 | 126:6 128:14 |
| 58:13 61:8,15 | 109:13 149:13 | 45:11 46:8 | 128:15,18 |
| 62:6 63:8 64:5 | 151:6 152:2 | 47:9,11 50:18 | 153:8 |
| 154:15 | 161:10 | 56:3 69:6,8,10 | **expert** 4:8,10 |
| **establishing** | **excellent** | 69:10 81:17 | 4:11 9:1,6,16 |
| 59:2 62:4 67:6 | 110:13 112:13 | 88:20 98:8 | 9:19 10:7,19 |
| 80:14 | **except** 86:22 | 99:8 101:12 | 10:20,20 11:3 |
| **estimates** 65:5 | 115:1 | 103:8,12,15,17 | 11:10,11,11,20 |
| 83:17 | **exchange** 32:19 | 103:18 104:16 | 12:1,1,15 13:7 |
| **et** 1:5,21 54:4 | 33:12 | 104:20,21 | 15:13 18:6 |
| 166:5,5 | **excluded** 93:20 | 105:10 107:3,7 | 19:2 21:6,18 |
| **ethics** 100:2,10 | 94:3 110:16 | 114:6,10,11,13 | 21:22 22:2,5,7 |
| 100:22 | **excludes** 93:7 | 116:9,13,13,14 | 22:13,15,20,21 |
| **evaluate** 50:5 | **exclusion** 93:13 | 116:17 117:2,3 | 23:9,14,16,19 |
| 107:18 108:18 | 94:13 | 117:5,9,14 | 24:10,13,16 |
| **evaluated** | **excuse** 12:6 | 119:8,12,12 | 25:3,9,15 |
| 132:8 | 18:2 55:15 | 120:3 121:3,11 | 26:20 40:7 |
| **evaluating** 64:7 | 58:19 70:21 | 124:15 126:10 | 81:17 94:16 |
| **evaluation** 48:9 | **executed** 21:12 | 131:15,18,22 | 95:10 99:7 |
| 68:1,5,13 | **exhibit** 4:7,8,10 | 132:1,3,14 | 100:14 105:22 |
| **everybody** | 4:11,14,16,19 | 134:6,13,14,18 | 106:6 113:13 |
| 64:18 | 4:22 5:2,3,5,7,9 | 134:20,22 | 114:22 131:15 |
| **exact** 74:17 | 5:13,15,17,19 | 135:1,3,5,7,10 | 132:13 133:13 |
| 111:5 | 5:21 6:2,4 8:22 | 136:4,18 139:2 | 134:2 135:17 |
| | 9:8,15 11:20 | 139:6,7 140:22 | 136:7 146:6 |

Jason Merritt
Multiple Plaintiffs v. Progressive
October 22, 2024

[expert - gap]                                                                Page 14

163:1
**expires** 165:22
**explain** 23:10
84:6 149:1
**explained**
61:16
**explaining**
126:14
**explanation**
33:3 112:2
142:5
**expressed** 45:1
**extensive** 33:1
34:6
**extent** 49:16,16
**extra** 157:13

**f**

**face** 143:7
**fact** 97:6 126:5
149:21 160:13
**factor** 48:18
**factors** 45:7
49:8,11 50:2
**factory** 137:22
**facts** 50:15
101:12 166:11
**factual** 112:20
**fair** 22:9 57:5
58:5,9,10,20
59:2,8,16 83:7
106:1 108:1
132:5 133:9,19
151:8 152:21
**familiar** 66:8
66:10,13,16,19

67:1,1,2 77:19
83:12,15,16,21
105:2,4 116:22
132:2 144:4
147:13,21
148:1 159:18
159:22
**family** 79:3,4
144:3,4,17,18
159:9 160:5
**far** 29:12,17
75:18 80:12
87:6 93:8,20
99:12,22 100:7
152:12 155:19
161:5
**favor** 8:13
**features** 116:15
**fee** 32:20 33:12
**feedback** 44:7
**feel** 168:11
**female** 57:4
**figure** 137:19
**file** 6:8 16:3,5
16:12,14 81:13
144:21 145:2
147:10
**filed** 6:12
146:21
**files** 15:13,16
15:17,18
**final** 12:4,7
33:8
**finalized** 13:6

**finalizing** 24:14
**finally** 135:7
**finances** 74:6
**financial** 1:10
165:13
**financially** 6:22
**finds** 43:15
**firm** 12:21
**first** 15:12
16:17 18:5,5
19:9 22:20
32:11 36:7
42:4,5 52:22
56:20 106:9,15
107:17 113:22
113:22 121:10
121:13 135:17
**five** 19:6 27:20
28:9 29:2,7,10
70:19 71:13
**flawed** 43:8
**floor** 123:1
155:16
**florida** 105:1
113:14
**focus** 11:19
**follow** 25:9,15
65:5 106:18
**following** 168:4
**follows** 7:16
**foregoing**
165:6,7 168:3
**form** 11:13
22:8 23:1 49:5
51:8 52:16

62:7 143:6
146:7
**forming** 101:13
**forth** 140:3,11
146:6
**found** 115:7
140:20
**foundation**
116:18 132:21
153:12
**founder** 65:4
**four** 24:10,21
37:12,18 38:2
38:11 39:2
75:9 77:7
135:10,20
143:19 152:19
**fourth** 37:9
151:7
**frederick** 3:5
7:9
**front** 64:4 91:2
91:4
**full** 16:3,21
73:14 74:2
80:12 125:9
129:7 145:16
161:5
**further** 126:8
128:3,4,11

**g**

**g** 6:1
**gap** 54:3 154:2
155:12 157:9
157:10 158:2,5

Jason Merritt
Multiple Plaintiffs v. Progressive
October 22, 2024

[gap - hitch]                                                                 Page 15

158:8,10,10,13
158:16 159:8
159:14
**gaps** 155:11
**geico** 105:9
**general** 166:9
**generally** 52:21
58:13 135:16
153:21 158:13
158:16
**geographic**
86:18
**geographies**
92:19
**georgia** 3:16
**german** 139:20
**give** 8:5,15
46:20 53:22
62:16 63:20
71:3 72:6,13
116:12 134:18
148:6 156:21
161:4 162:1
**given** 15:18
16:5 42:14
45:7 143:19
146:4 168:6
**go** 9:8,22 18:5
26:18 33:1
36:3,15 38:8
41:19 42:3
43:7 44:11
45:10 46:8
47:18 49:8,11
50:17 51:13

56:7 59:11
67:5 69:6,14
99:13 107:3
109:21 113:5
120:1 121:3,10
123:12 126:9
128:11 131:4
134:13 137:7
138:16 142:1
143:10,10,21
144:16,19
147:5 150:4
151:7 153:16
157:3
**goes** 40:17 78:2
100:1 122:17
**going** 6:6 9:14
11:19 12:8
13:16 16:16
19:14 56:5,9
57:14 81:9,12
87:17,18 111:5
114:9 123:7
133:16 139:5
147:7 150:6
159:4 163:18
**good** 57:6
114:4 156:21
**gopart** 5:7
131:2
**gotten** 149:21
**governing**
100:7
**government**
30:14,18,22

**governmental**
30:13
**grade** 34:14,15
**graded** 34:10
**grades** 34:12
**graph** 92:9,13
**greatness** 49:17
**guess** 79:21
84:13 137:9
157:15 159:15
**guide** 65:20
**guides** 56:10
57:1,2,12
106:11

**h**

**h** 4:6 5:1
**haggle** 102:7
102:11,14,18
**half** 16:22 17:2
17:8 19:21
21:6,7 22:12
25:9,15 26:10
66:1 74:10
**hand** 8:21 9:14
12:8 13:16
35:7 103:11
104:19 114:9
119:11 121:17
122:19 131:21
134:17 139:5
168:13
**handed** 134:7
**handing** 135:3
**handle** 159:6

**hard** 33:21
34:3,5 78:14
**harley** 77:8
**harness** 118:14
118:17,21
123:6,18 124:1
124:6,13,19
125:1,8,13
126:3,21 127:2
127:5,6
**harnesses**
123:7
**hassle** 102:6,7
**heard** 64:21,22
**held** 1:19
**help** 65:1
**high** 113:9
**higher** 93:17
94:9 149:12
150:11
**highlighted**
117:22
**history** 48:12
48:16
**hitch** 77:22,22
118:13,17,21
119:4 120:18
120:22 123:5
123:18 124:1,5
124:8,12,19
125:1,3,6,8,13
125:16 126:20
127:2,5,6
129:10

**[hitches - installed]**

**hitches** 77:10
77:12,19,21
78:7,19 119:3
124:9 129:12
129:12
**hobby** 79:21
**hold** 27:11
**honda** 54:1
77:9
**honestly** 43:4
**hood** 152:18
**hope** 144:8
**hopefully** 144:1
**hour** 16:21,22
17:2,4,5,7,8
21:6,7 22:12
23:18 24:5
25:3,9 26:10
100:21
**hours** 15:8
16:18 17:11
19:1,17,21
24:10,21 25:15
25:20 29:2,7
29:10
**human** 29:14
29:22 31:11,17
52:1
**hypothetical**
39:15 41:8
46:13
**hypothetically**
41:7
**hyundai** 106:21
107:10

**i**

**iacp** 4:19
107:21
**idea** 62:16
68:14 133:4
**identification**
9:15 12:9
13:17 35:8
103:12 104:20
114:10 119:12
131:22 134:18
139:6
**identified** 6:2,4
12:10 13:13
35:4 103:8
104:16 114:6
116:9 119:9
131:19 134:15
134:21 135:2,6
139:3
**identify** 98:17
98:22
**iii** 3:13
**imagine** 72:9
**impact** 10:21
11:4 49:2,9
50:9 93:13,19
94:5,13 96:8
97:7,13 115:2
115:19 149:22
**important** 48:7
48:18 141:6
**incidents** 49:15
**include** 29:11
109:11 143:22

145:12 155:11
155:12,21
156:3,14
**included** 16:8
118:17 124:18
125:3
**includes** 110:2
118:12 125:7
**including** 16:4
16:13 115:3
**inclusion**
110:16 112:2
112:20
**inclusivity**
129:7
**income** 71:22
72:3,10 74:4,8
74:13
**inconsistent**
99:9 101:3
**incorrect** 34:18
96:15 128:17
**increase** 150:7
**increments**
16:21 17:2
**independent**
19:22 21:1
23:7,11 24:1
24:19 26:6,15
**independently**
43:22
**indicate** 36:19
124:17 128:20
129:7 166:9

**indicated** 31:1
**indicates** 37:10
126:17
**indication**
34:17
**indicative**
155:13
**individual** 16:1
50:14
**industry** 57:12
106:10
**inflate** 64:17
**information**
10:12 11:8
43:22 47:20
48:1 63:18
64:3 86:8 88:8
89:8,9,13,16
92:11 106:13
108:14 109:8
109:15 110:7
112:8 114:4
129:3 153:14
**informed** 46:4
**initial** 13:7
19:2
**ins** 76:17
156:16,17
**inspection**
153:5
**inspects** 152:10
**installed** 118:4
118:8 122:15
137:22 138:1

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

**[instance - know]**                                                      Page 17

| | | | |
|---|---|---|---|
| **instance** 52:22 140:21 141:8 | **investigate** 129:18,21 | **j** | **king** 1:19 3:14 6:15 7:6,8 |

**instance** 52:22
  140:21 141:8
**instances** 93:6
**instant** 164:2
**instructions**
  166:6
**insurance** 1:9
  6:11 57:20
  138:5 148:7
  153:9 154:3
  157:9,10 158:1
  158:2,5,8,10,13
  158:16 159:8
  159:14,20
**intelligence**
  73:9,18 74:4,7
  74:9
**intend** 145:11
**intention** 10:18
**interact** 29:14
  31:11
**interacting**
  29:22
**interaction**
  31:17
**interest** 165:13
**interested** 6:22
**international**
  83:13
**internet** 31:8
  64:18,19 101:8
  101:14
**invalid** 153:19
**inventory**
  84:14,17

**investigate**
  129:18,21
**investigation**
  19:22 21:2
  23:12,17 73:16
  74:15 101:19
  116:3 125:19
  127:15,19,21
  128:3,4,5
  160:12,15,21
**invoice** 4:14
  13:19,20,22
  14:2,4,7,22
  15:7 16:17
**involve** 24:1
  26:15 31:16
**involved** 15:11
  39:21 50:2
  76:6 79:6 80:2
  80:21 83:8
  102:22 114:1
**island** 12:19
**issue** 40:3
  94:17 106:20
**issues** 107:19
  128:20 140:5
**item** 46:5
  155:20
**itemized** 110:6
  112:6
**items** 154:2,10
  155:7,15 156:4

**j**

**j.d.** 67:2 113:11
  161:10
**jason** 1:14 4:3
  4:9,10,22 6:9
  7:14 8:1 9:1,16
  163:19 166:3
  167:2 168:16
**jcashdan** 3:18
**jeff** 7:6
**jeffrey** 3:12
**job** 73:14 74:2
**john** 12:20
**johnson** 144:6
**joined** 7:7
**july** 25:20 26:9
**june** 10:3 13:3
  23:18 24:4,9
  24:22 25:2,8
  74:19 78:21
  79:15 81:2
  105:17
**jura** 1:18 2:1
  6:18 165:5
**jury** 101:1
**justice** 12:20

**k**

**katherine**
  114:14
**keep** 128:4
  144:21
**kia** 114:15
**kind** 34:12
  80:16 102:16
  110:21 122:20

**king** 1:19 3:14
  6:15 7:6,8
**know** 8:11,19
  9:5 16:15,16
  23:3 30:9,11
  31:5 32:8,10
  34:14,22 35:3
  50:14 61:19
  62:3 63:4,7,9
  65:4 68:11
  71:14,17 72:16
  72:19,22 73:3
  73:6 77:6
  78:10,13 82:20
  84:8,11,20
  85:4,7,13,16,17
  86:3,4,7,10
  87:15 90:16,18
  90:19,21,22
  91:11,14,21
  92:15,17,21
  93:5,6,9 94:22
  95:14 96:3,4
  96:12 97:12
  98:8 102:12,15
  102:21 119:21
  125:11 126:4
  131:12,13,14
  133:2,3,16
  135:9 137:21
  138:17 151:14
  152:22 155:20
  156:8,13
  160:10 161:10
  161:12 162:13

**[know - looks]**                                                                Page 18

163:4,7
**knowing**  61:10
  61:14
**knowledge**
  62:22
**kslaw.com**  3:18
  3:19

**l**

**largely**  22:21
**law**  5:10
**lawsuits**  70:9
**lawyers**  89:10
  89:14
**leads**  153:5
**leak**  152:19
**learn**  89:9
**learned**  88:12
  89:8,13 101:17
**led**  10:6
**left**  120:14
  121:17 122:19
**legal**  57:20
  166:21
**leonard**  3:22
  6:17
**lesser**  39:22
**letter**  5:9 132:4
  132:19
**letting**  8:14
  18:15
**leveling**  118:13
  123:9,10 124:7
  124:12,18
  125:8

**license**  27:11
**licensed**  83:12
**lightspeed**  67:2
  76:14
**likely**  19:19
  111:11 112:17
**limited**  111:11
  112:17
**line**  118:16
  136:8 146:20
  166:16 167:3
**lingo**  52:6
**list**  18:8 19:5
  26:21 42:14
  51:11,14,18,20
  52:7,12,15
  53:1 54:11
  59:3,21 60:5
  60:11,14 61:1
  61:7,15,17,20
  62:1,2,4,5 63:6
  63:7 64:5,11
  64:14 65:2
  66:12,20 67:6
  67:22 68:1,6,9
  93:8,21 102:8
  110:6 112:6
  127:2,4 129:22
  140:11,12,17
  140:22 141:4
  143:18 145:3,7
  145:16 153:21
  156:19 157:1
  158:14

**listed**  19:1,6
  54:10 59:11,13
  63:12,12,13
  101:14 127:22
  139:14 142:17
  144:12 166:15
  166:15 168:12
**listing**  62:17
  80:14 144:14
**listings**  139:18
  140:4
**lists**  51:22 53:9
  118:16
**litigation**  70:5
  70:6 72:2,4,12
  114:1
**little**  80:16
  111:9 112:15
  120:14 134:12
  138:3
**llc**  3:5
**llp**  1:19 3:14
  6:16
**loan**  157:13,18
  158:3
**local**  106:13
**locality**  58:14
**location**  6:15
  86:18
**long**  68:3
**look**  16:3 19:5
  22:16 36:7
  37:18 48:11
  49:14 51:11
  54:1,2 62:8,14

63:15,16 99:13
  99:14 101:21
  114:11 117:14
  124:15,16,21
  125:10 126:8
  128:21 129:3
  130:18,21
  132:2,3,13
  134:19 135:14
  137:20 138:11
  140:14 152:14
  162:2
**looked**  66:14
  108:18 115:4
  127:13 128:8,9
  131:1 135:16
  151:2
**looking**  10:15
  15:13,16 17:13
  42:5 50:19
  51:15 58:3
  63:10,10 76:18
  84:6 106:8
  112:10 119:15
  127:12 128:15
  136:6 151:6
  153:18
**looks**  13:3
  37:20 38:22
  40:16 41:2
  42:5 47:19
  50:19 53:16
  64:18 103:20
  107:20 108:2,6
  116:21 117:1

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

**[looks - mcdonald's]**

Page 19

123:16 144:11
151:3
**loss** 82:1 83:14
83:17,22 84:5
85:21 86:12,15
86:19 94:20
97:16,20 103:3
108:19 110:12
112:4,5,13,16
116:5 122:10
124:17 126:15
128:1,6,22
130:14,19
136:1,10
139:14,18
149:3,7,9,11,13
150:5,7 152:4
157:12,22
163:5
**lost** 111:10
**lot** 52:1,1,21
53:2,14 60:18
60:22 61:3,6,7
61:10 66:16
67:3 83:8
145:15 161:3,6
**low** 148:21
**lower** 60:15
93:17,18 94:11
122:19 149:8
149:11 150:6
150:10,12,13
156:22

**m**

**made** 11:9 59:6
86:21 109:14
123:13 126:5
127:18 138:12
143:3 161:16
163:2 168:7
**maine** 1:3 6:13
27:9,12,15,18
27:21 28:1,2,4
28:5,7,9 55:14
55:17,19 67:17
67:19 68:12
102:10
**maintained**
81:4 112:19
**majority** 74:3,6
**make** 43:3
55:11 64:17
123:20,22
129:11 144:13
145:16,18
149:3 157:19
163:6 166:7
**makes** 138:2
**making** 54:4
110:6 112:7
152:11
**male** 57:3
**manage** 75:18
84:14
**management**
76:1 84:16
**manager** 53:16
75:17

**mannerism**
111:6
**manners** 45:5
**march** 5:9
**margin** 53:5,5
53:16,17,21
54:2,5 55:12
68:16,18 69:2
**marked** 8:22
9:15 12:9
13:16 35:7
103:11 104:19
114:9 116:12
119:11 131:21
134:17 139:5
**market** 57:5
58:5,9,10,11,12
58:20 59:2,8
59:16 66:2
67:18 68:1,5,8
68:12 106:1
108:1,3 109:10
109:12 132:5
132:15,20
133:9,19 134:3
155:16
**maryland** 8:3
76:22 79:12,14
79:16 80:2,10
**match** 136:6,11
136:15
**matches** 117:1
136:12
**material** 30:10
32:9,11 35:12

36:4
**materials** 18:8
19:1,6,20
31:19 32:5
33:11,18 35:15
35:17,21,22
**math** 95:15,16
163:4
**mathematician**
68:10
**mats** 123:1
155:16
**matter** 1:16
6:10 9:6,20
10:7 12:3,17
13:5,21 14:9
14:12,18 20:8
20:13 21:13
22:6,21 40:8
40:13 67:16
81:18 98:16,21
100:17 101:16
102:18 133:8
139:17 140:2
140:16 141:17
162:11,12
**matters** 22:7,22
59:2
**matthew** 1:5
6:10 166:5
**mcdonald** 11:6
152:3
**mcdonald's**
139:9 151:7

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

**[mean - nationally]**

Page 20

| | | | |
|---|---|---|---|
| **mean** 37:6 | 166:3 167:2 | **mislead** 57:14 | **money** 109:17 |
| 48:20 59:5 | 168:16 | **misread** 111:14 | **months** 33:4 |
| 65:10 66:1,4 | **merritt's** 78:22 | **missed** 144:1 | 85:10 |
| 84:7,15 95:16 | **messing** 51:13 | 144:17,18 | **morals** 100:22 |
| 104:4 111:21 | **methodologies** | 145:5,12 | **motions** 15:13 |
| 118:20 123:8 | 82:4,14 | **mistake** 107:22 | **motorcycle** |
| 123:10 124:6 | **methodology** | 126:5 127:11 | 75:1,2 76:1 |
| 125:7 134:5 | 46:17 47:5,13 | **mistakes** 116:7 | 77:8 |
| 143:1 148:6 | 56:22 81:22 | **misunderstood** | **motorcycles** |
| 161:7 | 82:10,19,20,21 | 94:7 | 75:9 |
| **means** 57:3 | 83:19 86:11,18 | **mitchell** 15:14 | **msrp** 117:21 |
| 58:10,16 59:8 | 94:19 95:2 | 15:19 16:8 | 118:4 |
| **measures** 53:8 | 106:10 138:22 | 18:11 23:15 | **multiple** 49:1 |
| 55:11 | 141:11,21,22 | 83:13 86:14 | 49:14 50:2 |
| **meeting** 24:5 | 142:5,9 144:13 | 87:8 88:12 | 57:10 76:20 |
| **meets** 68:3 | 150:19 | 89:2,18 90:1,5 | 98:4,8,12 |
| **members** 98:18 | **mile** 130:5 | 91:18 92:17,21 | 101:5 127:14 |
| 98:22 | 141:18 | 93:7 94:14,19 | 128:18 129:13 |
| **mention** 101:7 | **mileage** 53:11 | 95:1,7,11 96:2 | 138:17 152:16 |
| **mentioned** | 63:12 113:7 | 96:17,19 97:7 | |
| 33:17 83:11 | 122:1 129:19 | 98:13,13 | **n** |
| 119:16 | 130:4,13,19 | 102:21 108:9 | |
| **merritt** 1:14 | 131:3,4,8,10 | 114:2,2,14 | **n** 4:1,1 6:1 |
| 4:3,7,9,10,13 | 141:19 148:20 | 130:10 131:4 | **nada** 113:12 |
| 4:15,18,22 5:2 | 149:4,6,12,21 | 136:1,9 138:22 | **name** 6:16 7:21 |
| 6:2,4,9 7:14 | 150:5,6,11,12 | 139:9 140:2,16 | 36:17 37:22 |
| 8:1,2 9:1,16 | **miles** 49:22 | 141:2,17 | 38:9,18 66:18 |
| 12:10 13:13 | 149:14,16,19 | 150:19 153:7 | 66:21,22 |
| 35:4,13,14 | **millage** 149:12 | 161:14 | **named** 16:1 |
| 56:3 103:8 | **mimics** 110:21 | **mitchell's** | 114:16 160:17 |
| 104:16 114:6 | **mine** 41:10 | 101:8 136:9 | 161:14 |
| 116:9 119:8 | 105:7 | **moment** 9:4 | **narcotics** 80:4 |
| 131:18 134:14 | **minor** 49:18 | 114:10 135:14 | **narrative** 33:3 |
| 134:20 135:1,5 | **minutes** 16:22 | **monetary** 46:4 | 33:8 |
| 139:2 163:20 | 17:5,7 | | **nationally** 57:2 |
| | | | 106:11 |

Jason Merritt
Multiple Plaintiffs v. Progressive

**[navigation - ohio]**                                                Page 21

| | | | |
|---|---|---|---|
| **navigation** | **notice** 1:17 | **object** 19:14 | **objections** 7:1 |
| 109:12 | 37:14 125:5 | 87:17 | **objective** 100:3 |
| **ne** 3:15 | 145:21 | **objection** 10:14 | 100:4 |
| **necessarily** | **noticeable** | 11:13 22:8 | **objectivity** |
| 40:4 113:2 | 50:11 | 23:1 29:3,8 | 83:11 100:1 |
| 124:14 153:19 | **noticed** 20:4 | 30:19 31:4 | **obvious** 152:19 |
| 155:8,13 | **noticing** 7:5 | 33:14 34:1 | **obviously** |
| **necessary** 31:2 | **nt** 1:8 6:14 | 35:2 46:18 | 49:20 94:10 |
| 168:11 | **number** 6:8,13 | 47:15 49:5 | 107:21 145:4 |
| **need** 8:10 | 22:2,15 35:16 | 51:8 52:16 | **occurs** 91:12 |
| 133:16 145:7 | 36:16 37:10 | 54:16 55:3 | **october** 1:13,21 |
| **needed** 42:18 | 38:5 44:12 | 60:17 61:2 | 6:8 9:12 79:15 |
| 42:21 | 45:10 47:19 | 62:7 63:21 | 166:1,4 |
| **negotiating** | 50:18 71:3 | 65:7,15 66:3 | **offer** 28:17 |
| 75:19 102:9 | 72:13 81:13 | 67:10 72:15,21 | 46:5 60:15 |
| 142:16 | 83:1 95:2 | 73:5 77:17 | 94:16 132:14 |
| **neither** 165:12 | 113:10 117:1,2 | 78:9 83:5 | 133:16 140:19 |
| **never** 55:4,18 | 117:7,9,10 | 95:18 96:14 | 148:8 |
| 68:7 91:18 | 121:16 125:10 | 97:1,18,19 | **offered** 102:22 |
| 92:1,22 103:5 | 126:9,10 | 103:18 104:7 | **offering** 40:12 |
| **new** 22:14 76:3 | 136:12,15 | 105:14 106:2 | 96:7 97:6,11 |
| 76:5 161:18 | 145:21 147:11 | 110:18 111:14 | 98:15,20 99:3 |
| **normal** 158:5 | **numbered** | 115:10,21 | 99:6 100:16 |
| **normally** 49:22 | 35:13 120:3 | 116:18 117:8 | 133:7,18 |
| 98:13 | **numbers** 35:12 | 132:21 133:11 | 139:16,22 |
| **notary** 1:18 | 117:12 119:13 | 133:21 137:6 | 140:1,7,15 |
| 7:15 165:18 | 161:19 162:3 | 137:16 141:13 | 141:16,20 |
| **note** 136:7 | **numeration** | 143:6 146:7,16 | 148:10,13 |
| 144:10 166:7 | 95:21 | 147:2,15,16 | **offers** 52:2 |
| **noted** 44:3 | **numerical** 95:6 | 148:4 153:12 | 53:14 60:13 |
| 49:19 99:22 | **nw** 1:20 | 154:13 155:1 | 159:20 |
| 122:18 134:2 | | 156:6 157:2 | **officer** 165:5 |
| **notes** 16:4,13 | **o** | 160:8,19 | **oh** 37:15 66:10 |
| 138:11 | | 162:16 | **ohio** 3:7 |
| | **o** 4:1 6:1 | | |
| | **oath** 6:21 | | |

**oil** 111:11
112:17
**okay** 8:4,7,16
8:19 9:14 10:6
11:18,20 12:8
13:1,9,12 14:7
14:16 15:4,20
16:16 17:4,10
18:7 19:13
20:4,16 21:1,5
21:17,20 23:18
24:4,9,16,19
25:2,14,20
26:9,18 27:8
31:7 35:20
36:7 37:2,6,14
38:14,21 39:6
39:7,18 40:2,7
40:16,20 41:9
41:22 42:3,9
42:17 43:3,7
43:10 44:7,11
45:21 47:11
48:11 50:17
51:7 52:6,14
52:14 55:13,20
56:13,20 59:1
59:20 60:1,4
60:13 61:17
63:6 64:9 66:6
67:5 68:12,15
69:6,12,18
70:3,13,15,21
71:15 72:10
73:8,21 74:11

75:10 76:9,12
77:2,13 78:21
79:8 80:7,9,19
83:3,21 84:3
85:1 87:15
88:3,4 89:5,16
89:22 92:10
93:12 97:11,16
98:1 99:7
101:1,11 102:2
102:6 104:4
105:21 106:17
107:16 108:12
109:21 111:2
111:15,20
113:1,20 114:5
114:12,21
116:8 118:2
119:1,7,21
120:2,10,13
121:10,12,19
121:22 123:12
124:4 125:15
126:9,13 127:9
130:13 131:17
132:8,11,18
134:19 135:9
135:12,13,16
135:17 136:3,7
136:18,22
141:16 143:13
144:21 146:3
147:19 148:2
149:6,14,18,20
150:14 151:11

152:9 153:2
154:11,18
157:6 158:6,8
159:1,6 160:2
160:15 161:9
161:13 163:8
**old** 49:22
151:19
**omissions** 44:3
**once** 53:20
**one's** 137:8
**ones** 55:8 62:12
**online** 28:16,19
29:2,10 31:14
31:16,20 32:15
36:21 79:21
86:1
**open** 161:8
**operate** 53:16
**operated** 69:18
**opinion** 45:1,6
81:19,22 83:4
94:16 96:7
97:6,11 99:3,6
115:12 132:14
132:18 133:8
133:12,17,18
134:3,8 136:22
137:13,17
139:16,22
140:1,7,15,19
141:16,20
148:6,8,10,13
150:22 151:11
151:16,21

**opinions** 10:19
11:12 12:2
40:8,12 67:16
82:11 98:15,20
100:16 101:13
101:15 102:17
114:22 162:10
**option** 124:7
**optional** 117:20
127:1,6,6
**options** 53:12
62:13,14 63:11
63:12,16,19
118:4 124:10
125:17 128:10
128:16 137:22
138:1,5
**order** 39:5 56:4
87:21
**orders** 39:5
87:11,14 88:1
**ordinary** 58:12
128:17
**original** 9:19
10:8,20 11:11
17:14 22:15
**originally** 26:3
150:11
**outcome** 7:1
165:14
**outline** 104:5
**outlined** 98:7
**overall** 74:8
**overlapping**
67:3

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

[overvaluing - photographs]                                    Page 23

**overvaluing**
148:22 149:9
**overview** 142:8
**owe** 157:12,21
**own** 64:12 69:1
108:19 113:15
**owner** 43:15
153:4

**p**

**p** 6:1
**p.m.** 147:8,11
163:18 164:2
**package** 118:8
118:9,10,12
122:22 123:3,5
123:9,17 124:1
124:5,6,11,16
124:18,20,21
124:22 125:2,7
125:9,11,13
126:18,20
127:5 129:8
161:5
**packages** 119:2
122:15,20
124:22 125:14
126:2 127:14
129:9,13
**packet** 4:17
35:10
**page** 4:7 5:2
9:8,22 13:10
35:14 36:7,15
36:16 37:9,21
38:4,14,17,17

39:8 40:17
42:4,5 44:11
46:8,9 47:18
48:11 50:17,19
56:9 57:19,19
81:16 88:19
89:20 99:8
101:7,11
105:10 109:21
109:22 113:5
120:3 121:11
122:14 126:9
126:13 131:15
132:13,14
136:8 142:1,2
142:7 143:11
143:11 151:7
153:16 166:12
166:15,16
167:3
**pages** 22:20
37:17,17 38:11
**paid** 41:13
**painstaking**
53:8 55:11
**panel** 125:3
**panels** 152:18
152:19
**paperwork**
130:16,18
**paragraph**
56:21 58:18,20
106:8 110:1
111:8,21 132:3
136:8 153:17

**paragraphs**
11:3
**part** 8:19 29:20
48:2,8 58:1
70:4 72:4
77:22 79:22
80:1 106:9
158:5
**particular**
92:19 106:1
151:12 152:14
**parties** 6:21
158:11 165:13
**passat** 139:9
**passed** 34:20
**passenger**
78:18 120:7
**passing** 34:15
**past** 22:1 53:4
71:12 87:8
114:3 116:6
125:17 126:7
128:15 140:6
143:22
**pay** 60:2,10
156:18 157:16
158:3
**paying** 33:12
**payment** 32:19
**peachtree** 3:15
**pending** 104:22
143:15 144:6
**pennsylvania**
1:20

**people** 57:13
100:8 129:11
**percent** 65:6,19
65:20 72:8,14
72:20 73:4
74:10,14
**percentage**
68:8,11 71:22
72:5,6,10 74:8
95:11,17 96:1
96:21 97:8
102:10,13
**perfect** 102:2,5
**perfectly**
115:20
**performed**
13:20 14:8
137:14
**period** 85:14
90:17,18 92:10
92:12,21
**periods** 93:3
**person** 46:5
53:14
**pgr** 5:4,6,8,12
5:14,16,18,20
5:22 117:7
119:13
**phone** 21:14
**photo** 120:11
120:22
**photocopy**
35:14
**photographs**
110:12 112:9

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

**[photos - price]**

Page 24

| | | | |
|---|---|---|---|
| **photos** 107:17 | 33:4 41:18 | **practice** 100:12 | **price** 51:4,7,9 |
| 108:18,22 | 57:6 112:10 | **practices** 100:9 | 51:11,14,16,18 |
| 109:8 112:12 | 129:10 | **precisely** 84:8 | 51:19,20,21 |
| 119:17,19,20 | **police** 79:16 | **predicted** | 52:3,4,5,7,7,8 |
| 125:5 131:1 | 80:2,11,21 | 160:17 | 52:11,14,15 |
| **physical** 40:9 | **policies** 16:9 | **premium** | 53:1,1,6,10 |
| 40:13 | 67:22 | 122:22 | 54:7,12 57:14 |
| **pick** 64:19 | **policy** 18:11 | **prep** 29:12 | 58:10,16 59:3 |
| **picking** 65:13 | 19:11,12,18 | **preparation** | 59:12,13,21 |
| **picture** 129:10 | **pool** 86:13 | 15:3 25:21 | 60:4,5,7,11,14 |
| **place** 57:13 | **portion** 54:4 | 26:5,10 | 61:1,7,8,12,15 |
| 64:14 122:19 | 74:12 111:7 | **prepare** 111:10 | 61:17,21 62:1 |
| 138:15 143:14 | 146:17 | 112:16 | 62:2,5,6,11,15 |
| **places** 122:11 | **portions** | **prepared** 43:13 | 63:1,4,6,8,14 |
| 160:7 | 156:14 | 135:11 | 63:16,19 64:5 |
| **plaintiffs** 1:6 | **posed** 56:14 | **preparing** | 64:11,14,16,18 |
| 3:3 7:10 10:22 | **position** 101:8 | 33:21 | 64:20 65:2,14 |
| 11:5 12:20 | 101:14 | **presence** 7:3 | 66:17 67:6,17 |
| 16:1,11,12 | **positive** 125:15 | 80:15 81:5 | 67:18,22 68:1 |
| 20:1 21:2 23:8 | **possible** 37:4,5 | **present** 3:21 | 68:6,9,13 |
| 23:13 24:2,20 | 43:5 58:13 | **presentation** | 88:13,14,16 |
| 26:7,16 40:14 | 159:16,17 | 30:2,7 | 89:19 90:2,7 |
| 42:1 114:16 | 160:10 | **pretty** 23:3 | 91:9 92:2 93:8 |
| 117:6,9 119:17 | **possibly** 65:17 | 32:22 120:15 | 93:18,21 102:6 |
| 135:19 160:17 | 83:2 | 152:15 | 102:8,9 111:3 |
| 161:14 | **posted** 58:16 | **prevalence** | 142:16,17 |
| **plans** 154:3 | **posting** 128:10 | 102:18 | 153:20,21,22 |
| 155:16 | **potential** 86:13 | **previous** | 154:8,12,16,19 |
| **please** 7:2,12 | **power** 67:2 | 101:18,18 | 154:21 155:6 |
| 7:21 9:4 43:20 | 75:5,6,7,16,21 | 127:13 128:15 | 155:12,15,21 |
| 56:21 90:4 | 77:2,14 113:12 | 130:9,10 | 156:2,3,19,20 |
| 143:10 164:1 | 161:10 | **previously** 8:22 | 156:22 157:1 |
| 166:7 | **powerpoint** | 136:19 144:15 | 158:14,17,21 |
| **point** 8:10 | 30:2,7 | 145:22 | 160:18,22 |
| 17:18 20:11 | | | 161:4 |

James Merritt

Multiple Plaintiffs v. Progressive

October 22, 2024

**[prices - quantifying]**

Page 25

**prices** 52:12
62:12,21 63:3
63:15 66:7,12
66:20 129:22
140:11,12,17
140:22 141:3,4
141:7 142:10
155:5
**pricing** 62:17
66:2 76:7,18
79:8 101:8,14
**printout**
116:14,22
**prior** 20:14
26:4 49:1,11
49:14 50:8,10
88:12 89:7
113:5 143:15
144:22 146:14
**private** 70:11
73:15 74:15
76:16 112:4
151:21
**probably** 138:4
144:17
**procedure**
67:21
**proceed** 7:18
**proceeding** 7:1
**proceedings**
1:22 165:6,8,9
**process** 64:7
82:9 96:17
**produced**
35:17 39:6

117:6 118:1
**product** 65:1
83:12 157:10
157:16 158:4
**products** 66:18
158:20,20
159:21 160:6
**profession** 80:1
**professional**
100:12
**profit** 53:5,5,16
53:17,21 54:2
54:4,5 55:11
64:15 68:16,18
68:21 69:2
159:7 160:6
**program** 66:16
85:21
**programs**
85:17
**progressive** 1:8
5:11 6:11 22:3
22:7 146:1,4
146:22 150:19
153:7 166:5
**progressive's**
98:17,22
**projected** 11:5
83:22 84:4,18
85:5,8,12,15
87:6 88:9,17
90:3,11 93:14
94:5 97:14
99:17 110:22
111:17 115:2,8

115:14,18
122:1 137:2
138:21 142:12
142:19 160:16
161:15 162:13
162:20 163:2
**projection**
99:16 111:3
**projections**
99:21
**promoting** 70:7
**proper** 81:22
**property** 43:12
58:10,14 59:9
**property's**
43:15
**proposed**
141:11,14
**protective**
87:21 88:1
**provide** 10:18
42:15 58:8
105:22
**provided** 36:13
42:9 43:13
45:15 108:3
112:2
**provides** 28:15
58:6
**providing** 34:7
73:15
**psa** 10:22 96:9
99:9,13 101:2
103:3 115:6,12

**public** 1:18
7:15 57:14
103:13,16
165:18
**publish** 83:19
**pull** 22:17
**pulled** 103:13
**purchase** 53:15
154:4,10
157:11
**purchasing**
76:15 142:16
**purpose** 45:2,4
48:3 145:15
**purposes** 40:7
48:4 50:22
52:10,18 61:18
67:15 85:12
101:15,21
102:17 141:18
149:15 158:22
**pursuant** 1:16
**put** 23:16 26:19
52:21 53:7,12
64:16 78:5,7
101:4,5 107:22
112:21 134:11
149:16
**putting** 151:3

**q**

**quantify** 11:4
65:21 93:13
94:13
**quantifying**
10:21

Jason Merritt
Multiple Plaintiffs v. Progressive

| | | | |
|---|---|---|---|
| **quarter** 152:18 | **rated** 149:12 | 26:14 27:16,19 | 43:21 55:21 |
| **querette** 105:8 | 151:8 | 27:22 28:5,11 | 81:8,10,13 |
| **question** 8:14 | **ratings** 94:20 | 30:4 71:9,14 | 103:9,13 |
| 8:18 19:15 | 95:6,7 109:2 | 71:20 92:16 | 104:17 114:7 |
| 43:7,10,11,18 | 151:12,17 | 93:11 105:6,19 | 116:10 117:5 |
| 44:5,12,17,18 | 152:11 | 109:4,20 | 119:9,13 |
| 44:20 45:21 | **reached** 113:16 | 130:20 132:12 | 131:19 134:15 |
| 56:13 57:5 | **reaching** 63:1 | 136:5 144:7 | 134:21 135:2,6 |
| 61:22 88:4,6 | **read** 33:2 43:18 | **receive** 33:11 | 135:9 139:3 |
| 94:8 97:22 | 43:20 46:2 | 34:12,16 84:21 | 144:10 145:14 |
| 98:19 106:4 | 56:20 84:21 | 158:1 163:22 | 147:6,8,11 |
| 109:6 119:16 | 106:2 109:18 | **received** 29:21 | 159:7 163:18 |
| 119:22 133:15 | 128:12 137:7 | 32:19 34:15 | 165:8 166:11 |
| 135:17 147:19 | 138:3,6 163:13 | 87:7 88:15 | 168:6 |
| **questioned** | 163:14 166:7 | 100:19 | **red** 146:20 |
| 109:1,16 | 168:2 | **receiver** 77:22 | **reduce** 94:1 |
| **questions** 11:19 | **reading** 110:20 | 125:4,6,9 | **reduced** 165:10 |
| 18:16 36:3,12 | **ready** 106:5 | **receives** 78:4 | **reduction** 54:6 |
| 37:3 38:1,12 | 114:11 119:21 | **receiving** 76:17 | **refer** 18:4 21:8 |
| 38:19 39:1 | **really** 148:6,8 | **recently** 145:3 | 109:5 |
| 42:6,9,14 43:4 | **rear** 118:13 | **recess** 81:11 | **reference** 99:7 |
| 45:11,14,14 | 120:7 123:9,10 | 147:9 | **referenced** 69:7 |
| 46:20 109:19 | 124:6,12,18 | **recognized** | **references** 38:5 |
| 135:15 163:10 | 152:17 | 57:3,12 106:10 | 38:15 |
| 163:11,18 | **reason** 8:4,6 | 106:11 | **referencing** |
| **quite** 144:18 | 68:4 126:7 | **recollection** | 36:2 |
| **r** | 153:19 166:9 | 14:10,20 42:16 | **referred** 16:5 |
| | 166:16 167:3 | 102:3,5 146:10 | 17:14 |
| **r** 6:1 | **reasonable** | **recommendat...** | **referring** 17:20 |
| **ran** 146:20 | 57:4 62:17 | 65:5 | 17:21 36:5 |
| **range** 44:15,18 | 115:5 151:3,5 | **recommends** | 58:15,17,21 |
| 45:2,5 64:20 | **reasons** 112:10 | 66:7 | 86:14 111:17 |
| 83:4,9 | **recall** 11:16,17 | **record** 6:3,5,7 | 119:3 |
| **rate** 95:3 | 23:22 24:3,8 | 7:4,22 12:11 | **refers** 37:11 |
| 150:19 | 25:7,13,18 | 13:14 35:5 | 111:19 |

**[reflect - resources]**                                            Page 27

| | | | |
|---|---|---|---|
| **reflect** 14:8 | **remove** 103:2 | 81:17 83:20 | **reporter** 6:18 |
| 140:12,17 | 141:6,10 | 86:14 87:18,19 | 7:11 163:21 |
| 142:15 154:2,9 | 145:11 162:19 | 87:22 88:20 | 165:1 |
| 155:6 | **removed** 115:6 | 89:17 90:5 | **reports** 10:13 |
| **reflected** 15:1,6 | 161:15 163:1 | 91:17 92:5 | 15:14,20,22 |
| 18:22 24:17 | **removing** | 95:1,10 96:17 | 16:9,10 22:1,5 |
| 158:13,16 | 10:21 11:4 | 96:19 98:13,14 | 22:7,22 23:15 |
| **reflecting** | 96:9 97:14 | 99:7 101:7,21 | 23:16 62:9 |
| 155:6 | 99:18 162:13 | 106:6 108:4,7 | 63:11 114:2,3 |
| **reflects** 47:4,12 | **repaired** 49:19 | 108:12,14 | 135:11,18,21 |
| **refreshed** | **repeat** 61:22 | 109:3,5,9,10,16 | 136:2,16,19 |
| 85:11 | 90:4 98:19 | 109:19,20,22 | 137:1,5,15 |
| **regard** 85:20 | 159:10 | 110:2 113:6,13 | 138:13,18 |
| 89:16 152:2 | **replacement** | 113:15 114:14 | 140:3,16 141:2 |
| **regarding** | 147:14,17,18 | 114:19 115:1,4 | 146:14 151:15 |
| 40:13 45:12 | 147:22 148:11 | 115:8,16,20 | 155:5 160:18 |
| 67:17 113:17 | 148:14 | 116:1,5 119:16 | **represent** 6:17 |
| **regular** 77:8 | **report** 4:8,10 | 121:4 127:18 | **representative** |
| **relate** 37:18 | 5:3,13,15,17,19 | 128:12 130:22 | 29:18 |
| 40:2 | 5:21 9:1,6,11 | 131:4,15 | **represented** |
| **related** 6:21 | 9:16,20 10:3,7 | 132:13 133:13 | 116:17 |
| 72:1 165:12 | 10:20,21 11:3 | 134:2 135:18 | **represents** 6:19 |
| **relating** 20:1 | 11:10,11,20 | 136:1,3,7,9 | **request** 26:11 |
| 154:3,10 | 12:1,1,4,5 13:7 | 138:22 139:8 | 145:6 |
| **relation** 106:7 | 14:15,17,22 | 140:11 146:6 | **require** 62:5 |
| **relative** 150:7 | 15:6,9,13 16:6 | 146:14,20,21 | 155:19 156:17 |
| **relatively** 149:9 | 18:6 19:3,10 | 153:17 154:20 | **required** 111:9 |
| **reliable** 140:20 | 19:18 21:6,10 | 155:15 156:2 | 112:15 |
| 157:7 | 21:11,18,19,20 | 161:15 162:15 | **requirements** |
| **relied** 18:9 84:3 | 22:13,15,18,21 | 163:1 | 162:6 |
| **remaining** | 23:9,14,19 | **reported** | **research** 42:20 |
| 158:2 | 24:10,14,16 | 153:20,22 | 56:10 93:15 |
| **remember** 28:7 | 25:3,9,15 | 154:8 156:20 | 141:1 |
| 88:16 92:12 | 26:20 43:8,13 | 158:17,22 | **resources** |
| 146:8 | 43:16 44:1,1,3 | | 57:10 66:17 |

James Merritt
Multiple Plaintiffs v. Progressive                                    October 22, 2024

[resources - sales]                                                          Page 28

76:20 98:9
**response** 26:11
 33:18 35:18
 37:11 38:1
 44:22
**responses**
 33:22 34:8,10
 34:13,17 35:1
**responsible**
 76:15,17
**restraints** 70:8
**result** 40:6
 148:21 149:8
 154:1,9
**resume** 69:7,14
 69:21 143:12
**retail** 80:7,8
 106:12
**retained** 13:5
 43:14
**retention** 4:11
 12:15,16 13:1
 13:10 20:5,9
 20:16,22 21:12
 21:15
**return** 166:13
**review** 9:4 16:8
 16:18 17:11
 18:21 19:7,8
 19:17 20:10,12
 22:16 23:19
 25:3 101:14
 106:10 107:17
 108:22 109:7
 109:15 110:11

112:9 135:20
**reviewed** 17:18
 18:8,10 19:1
 23:15 31:19
 32:5 114:2
 128:8 135:18
 135:22
**reviewing**
 19:20 22:14
 106:13
**right** 8:21
 11:16,18 12:21
 18:14,19 19:3
 20:6 25:8
 26:18 27:3,4
 30:5 42:3
 50:22 54:12,13
 56:2,18 57:15
 57:16 61:8,12
 69:4,21 78:21
 95:5,12 104:15
 105:18 108:10
 117:18,19
 118:10 120:4
 121:3 122:14
 136:13,16
 145:17 146:15
 147:5 149:4
 161:13 163:9
 163:12
**robert** 3:22
 6:16
**role** 76:9
**roof** 3:4 7:9,9
 10:14 11:13

18:13,19 19:14
 22:8 23:1 29:3
 29:8 30:19
 31:4 33:14
 34:1 35:2 46:9
 46:18 47:15
 49:5 51:8
 52:16 54:16
 55:3,21 56:2
 60:17 61:2
 62:7 63:21
 65:7,15 66:3
 67:10 72:15,21
 73:5 77:17
 78:9 83:5
 87:17 88:2,5
 95:18 96:14
 97:1,18,20
 103:18 104:7
 105:14 106:2
 110:18 111:14
 115:10,21
 116:18 117:8
 132:21 133:2
 133:11,21
 137:6,16
 141:13 143:6
 146:7,16 147:2
 147:15,17
 148:4 153:12
 154:13 155:1
 156:6 157:2
 160:8,19
 162:16 163:11
 163:13,16

164:1
**round** 17:3
**row** 134:19
**rpr** 2:1 165:5
**run** 64:6 131:5
 137:21
**runs** 41:2
**rust** 152:18

**s**

**s** 1:17 2:1 3:12
 3:13 4:1,6 5:1
 5:10 6:1 165:5
**sale** 51:9,16,18
 51:20,22 52:5
 52:6,11,19,20
 53:1,2,6,10
 54:8 63:5 64:1
 64:8 67:18
 75:19,20,21
 79:6 80:2
 111:10 112:16
 153:20,22
 154:2,10,16
 155:6,13,20
 156:14 158:21
 159:8 161:5
**sales** 51:4,7
 52:3 53:15
 58:14,15,18,21
 59:8 60:7
 75:17 76:16
 80:7,8,21
 111:3 154:8
 155:21 156:2

**[salesman - setting]**                                                                    Page 29

| | | | |
|---|---|---|---|
| **salesman** 75:18 | **second** 16:7 | 123:13,18 | **sellers** 57:3 |
| **salesperson** | 17:17 47:18 | 126:13 127:1 | 58:12 59:18 |
| 53:18 | 81:16 87:9 | 132:6,16 136:6 | **selling** 54:18,19 |
| **sanctioned** | 123:12,14 | 136:20 137:9 | 75:11,14,17 |
| 30:13,17 | 143:11 | 142:5 143:14 | 79:21 80:5 |
| **sanctions** 30:15 | **section** 48:12 | 143:16 146:1 | **sells** 159:13,14 |
| **sanders** 3:13 | 56:10 112:6 | 154:5 160:21 | 159:19 |
| 7:8 | 121:19 | 162:18 | **sense** 123:20 |
| **saw** 91:22 92:3 | **security** 73:15 | **seeing** 23:2 | **sent** 35:10 |
| 92:4,8 97:3 | 74:15 | **seemed** 152:21 | 166:1,13 |
| **saying** 48:15 | **see** 9:2,16 | **seems** 151:4 | **sentence** 57:11 |
| 88:2 94:3 | 20:17 23:19 | **seen** 29:6,9 | 110:5 153:18 |
| 96:13,16,20 | 24:5,10 25:3 | 35:9 55:10 | **sentences** 56:21 |
| 128:4 143:8,8 | 25:10,16,22 | 66:13 78:18 | **separate** |
| 156:1 157:20 | 26:11,20,22 | 91:7,8,10,11 | 159:13,20 |
| **says** 16:17 21:6 | 36:9,17 37:12 | 93:10 116:6 | **served** 35:18 |
| 36:8 43:10 | 38:6,15 39:10 | 119:17,18,20 | **service** 54:3 |
| 44:15 45:21 | 40:22 43:8 | 125:17 132:1 | 154:3 155:16 |
| 56:10 57:1,11 | 44:12,15,20 | 132:10 136:19 | 160:3 |
| 58:5 69:21 | 45:22 47:21 | 139:6,10,11 | **serviced** 112:19 |
| 88:22 90:5 | 48:12,16 49:15 | 140:5 141:2 | **services** 12:17 |
| 107:7,20 108:3 | 56:11 57:21 | 142:2,3 151:21 | 54:3 73:9,19 |
| 118:17 120:7 | 62:10,15 63:17 | **seize** 80:4 | 74:5,9 |
| 121:16,20 | 65:16 69:16 | **select** 86:12,19 | **set** 59:20 61:7 |
| 126:21 132:4 | 73:9 79:1 89:3 | **self** 118:13 | 64:11 67:22 |
| 135:18 143:15 | 89:20 90:7 | 123:9,10 | 68:6,9,13 79:8 |
| 153:18 | 91:19 95:5,6 | 124:12,18 | 140:3,11 146:6 |
| **scale** 95:3 | 101:9,13 107:5 | 125:8 | 163:5 |
| **scheduled** 26:3 | 107:8 108:4 | **sell** 54:15 55:2 | **sets** 60:4 61:1 |
| **scope** 67:12 | 110:1,9,13 | 57:7 70:1 | 61:17 62:1 |
| 107:22 | 111:13 112:11 | 73:18 77:10,11 | 66:7 87:6 |
| **scratch** 21:21 | 117:15 118:5,7 | 79:7,19 158:8 | 112:3 |
| **screen** 101:4 | 118:9,14,17 | **seller** 57:6 59:3 | **setting** 61:20 |
| **seat** 152:17 | 120:8,18,22 | 59:14 60:15 | 76:6 |
| | 121:14,19 | | |

James Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

**[settlement - standard]**                                                     Page 30

| | | | |
|---|---|---|---|
| **settlement** | 152:16 | 88:9,13,16,17 | **spalding** 1:19 |
| 136:12 157:17 | **significantly** | 89:19 90:2,3,6 | 3:14 6:16 7:7,8 |
| **seven** 22:20 | 120:16 | 90:11 91:9,19 | **speak** 67:20 |
| **seventh** 109:22 | **signing** 38:19 | 92:1,18 93:1,7 | 89:5 129:14,16 |
| **sheet** 166:2,8 | **similar** 58:14 | 93:14,20 94:4 | 131:12 138:19 |
| 166:14 167:1 | 59:9 146:5,10 | 94:4,5,8,10 | 153:4 |
| 168:12 | 147:1,4 | 97:14 99:17 | **speaking** 18:5 |
| **show** 39:16 | **simply** 97:8 | 110:22 111:17 | 89:14 |
| 41:18 48:15 | **single** 54:14,15 | 115:2,8,14,18 | **special** 154:1,9 |
| 101:1 131:3 | 54:15 55:1,1 | 122:1 137:2 | **specialist** 6:17 |
| **showed** 91:22 | 81:21 | 138:21 141:3,7 | 68:11 |
| 92:13 112:18 | **sir** 9:13 11:21 | 142:12,19 | **specific** 46:20 |
| **showing** 29:7 | 62:19 | 154:11,19,20 | 62:22 64:4 |
| 129:9 152:15 | **situation** 140:6 | 155:5,6,15 | 119:22 160:21 |
| **shown** 114:3 | **situations** | 156:3,20,22 | 162:9 |
| **shows** 91:12 | 141:9 | 158:17 160:16 | **specifically** |
| 122:11 129:10 | **six** 85:10 121:9 | 160:17,21 | 26:14 99:12 |
| **side** 75:17 76:5 | **small** 35:16 | 161:4,15 | 101:20 |
| 77:5,6,7 80:16 | 70:11 74:12 | 162:13,20 | **specifics** 91:3 |
| 100:3 117:18 | **society** 4:16 | 163:2 | **spent** 29:1,7 |
| 117:19 120:7 | 27:5 31:7,20 | **solely** 59:14 | 33:4 73:22 |
| 151:21 | 32:1,6,14,22 | **solutions** | 74:14 |
| **sides** 77:5,6,7 | 33:19 36:1,8 | 166:21 | **spoke** 29:19 |
| **sign** 163:15 | 36:20 42:10 | **somebody** | 55:10 152:12 |
| 166:12 | 44:8 45:15 | 153:6 157:21 | **spoken** 64:6 |
| **signature** 9:9 | 56:14 | **somewhat** 63:9 | **sport** 75:7,16 |
| 10:1,2 13:10 | **software** 75:22 | **sonata** 112:14 | 75:21 77:2 |
| 13:11 105:11 | 76:12 | **sorry** 37:15,16 | **sports** 75:5 |
| 105:12 165:17 | **sold** 11:5 52:4,8 | 49:9 55:22 | **spots** 122:20 |
| 168:13 | 52:14 54:7 | 94:7 131:16 | **ss** 165:3 |
| **signed** 20:5,9 | 61:8,12 62:21 | **sound** 82:20 | **stamp** 103:14 |
| 21:15 32:13 | 63:1,3,4,19 | 144:4 | **standard** 46:17 |
| 105:5 166:14 | 81:5 83:22 | **sounds** 30:5 | 56:17 58:1 |
| **significant** | 84:4,18 85:5,8 | **source** 103:16 | 65:21 67:8 |
| 43:15 115:7,15 | 85:12,15 87:6 | 161:8 | 99:18 117:16 |

James Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

[standards - take]                                                                    Page 31

**standards**
65:11 68:3
99:9,11 100:2
100:6,11 101:2
**stands** 147:19
**started** 21:11
70:6
**starting** 22:16
22:19 39:8
40:20 57:6
**starts** 86:15
**state** 7:2,3,21
11:1 79:16
80:2,11,21
81:18 154:21
155:2,10,19
158:17,19
159:5
**stated** 82:17
135:22 154:14
**statement**
22:10 50:3
82:2 138:20
**states** 1:1 6:12
102:19 155:11
156:9,10,11,13
156:17 159:3
165:3
**statistical**
85:17
**stayed** 70:10
80:21 138:22
**steed** 12:20
**stenographic**
166:10

**stenographic...**
165:9
**stenotype** 1:22
**step** 106:18
**steps** 106:15,16
**stereo** 109:12
**sticker** 116:16
117:15 128:21
129:6
**stickers** 129:7
**stop** 87:9 162:2
**stopped** 70:7,7
**strategies**
64:10 68:16
69:4
**strategy** 64:4
64:13,14 68:17
**strays** 62:10
**street** 3:6,15
77:8
**strictly** 70:9
**strike** 10:11
14:3 49:9
70:22 71:21
85:1 130:2
131:16
**study** 102:16
**studying** 29:12
**subject** 48:21
56:4 89:6
**submission**
24:14 138:4
**submit** 15:9,10
33:7,17 42:18
143:21 145:12

**submitted** 9:20
35:22 36:20
37:22 38:11
104:22 105:5
144:19
**submitting**
33:11
**subpoena**
35:18
**subscribe**
82:19
**subscription**
66:15
**subscriptions**
67:4
**substantially**
22:6
**substantive**
10:19 11:9,11
**substantively**
146:3
**subtract**
162:18
**suggesting**
145:15
**supervision**
165:11
**supplemental**
4:8 9:1,6 10:7
10:20 11:3,10
11:20,22 12:4
14:15,17,22
15:6,9 81:17
88:20

**supplied** 86:21
124:8
**sure** 11:2 23:11
35:15 45:7
55:11 62:1
90:5 92:14
98:20 107:7
109:7 144:14
145:16,19,20
149:2 150:18
157:19 158:20
159:11
**surprise** 71:12
**survey** 67:15
67:19
**suspension**
118:13 123:9
123:10 124:7
124:12,19
**swear** 7:12
**sworn** 1:17
7:15

**t**

**t** 4:1,1,6 5:1
**t3** 73:8,18 74:4
74:6,9
**take** 9:4 31:14
37:15 42:17
49:20 53:19
63:3 81:7
88:15 90:10
91:8 111:21
114:10 117:14
135:14 150:9
156:15 157:16

[take - time]                                                                        Page 32

162:2
**taken** 1:22 6:9
  19:21 21:22
  22:21 48:10
  53:10 60:18,22
  61:3,6,7,11,14
  63:1,14 70:9
  99:22 143:5
  165:6,9
**takes** 52:2
  95:11 111:7
**talk** 56:1 59:16
  59:17 100:1
  131:9 152:3
**talked** 89:17
**talking** 15:17
  18:8 19:19
  56:22 111:22
  125:12
**talks** 122:22
**tax** 156:18
  158:22
**taxable** 155:19
**taxed** 155:22
**taxing** 154:21
  156:2,20
  158:17
**technology**
  66:11
**tell** 16:15 28:12
  35:20 64:1,3
  70:20 91:21
  107:6 114:11
  122:14,20
  126:10

**telling** 87:22
**telluride**
  114:15
**template** 47:1,4
  47:8,10 56:17
  59:5 104:1,4,9
  161:22
**ten** 27:17 49:21
  70:13,18 71:5
  71:11
**term** 34:2 58:5
**terminology**
  59:6
**terms** 57:20
  59:4 86:18
  159:8
**test** 33:3 48:21
**testified** 7:16
  53:3 71:13
  144:15 145:22
  146:13
**testify** 16:14
  54:17 56:1
  67:11 68:7,22
  74:16 87:19
  90:15 91:3
  93:4 111:5
  138:9,10
  139:11 144:2
  156:10 159:2
  160:9
**testifying** 56:2
  56:7 67:13
**testimony** 8:5
  59:1 62:20

101:18 103:1
  143:15,19
  144:11,22
  146:4 168:6
**testing** 28:18
**texas** 28:15
  32:3
**thank** 8:12 23:5
  47:18 55:20
  57:11 74:18
  97:16 145:10
  163:10
**thing** 162:19
**things** 19:6
  48:19 54:10
  107:17 108:17
  148:7
**think** 34:5 45:3
  52:6,11 60:19
  75:4 101:2
  111:2,19
  115:14,19
  123:22 127:4
  127:11 129:11
  130:2 136:15
  141:6 142:18
  143:2 145:17
  146:13 156:12
  157:6 162:5
**third** 36:15,16
  44:11 50:17
  58:5 88:22
  105:10 109:21
  110:5 158:11

**thornton** 6:11
**thought** 23:4
  41:11 92:5
  113:9 145:4
**three** 19:9
  37:15 38:6,12
  39:1 45:12
  51:1,5 82:22
  136:21
**thurston** 1:5
  5:4,6,8,12,14
  5:16,18,20,22
  19:11 117:7
  119:13 135:21
  138:19 166:5
**thurston's**
  132:4,15,20
  133:9,19
  135:12,22
  136:10
**timbrook** 54:19
  74:20 75:11,15
  80:13
**time** 6:7 7:2
  8:10 20:1,13
  21:3 42:18
  54:15 55:1
  56:6 65:6 70:8
  70:9 73:14,22
  74:2,14,17
  75:4 76:14
  79:9,19,22
  80:10,12 81:1
  81:10,14 85:14
  90:17,18 92:10

Jason Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

[time - under]

Page 33

92:12,21 93:3
93:16 113:11
147:8,11 150:9
163:19
**tires** 152:6,20
**title** 36:8
107:20
**titles** 107:4
**today** 8:5 64:16
**today's** 6:7
**together** 15:9
15:14 20:12
23:16 100:8
**told** 34:20
**took** 19:17
28:19 32:15
53:21 61:20
62:4 88:11
96:20 113:14
128:14 152:20
161:14
**tool** 68:1,6,9,13
84:16
**tools** 84:13
98:11
**top** 37:11 38:6
38:14 101:8
107:7 126:13
158:21
**total** 75:3 83:13
83:16,22 84:5
85:21 86:12,19
94:20 97:16,20
103:3 108:19
116:5 124:17

139:14,18
157:11,22
163:5
**totally** 113:21
**tow** 77:10,11
77:19,21,22
78:1,7,19
118:13,16,21
119:4 120:18
120:22 122:22
123:2,5,5,18
124:1,5,5,6,12
124:19,22
125:2,12,13,16
126:20 127:2,5
127:6
**towards** 88:17
**towed** 77:3
**towing** 118:7,9
118:10,12
123:17 124:1
124:11,16,17
125:11 126:17
126:20 127:5
127:14 129:9
**trade** 58:12
76:17 156:16
156:17,18
157:14
**trailer** 78:4,5
**trailers** 77:11
78:14,17
**trained** 100:20
**training** 28:17
29:15,17,19,20

29:21 30:10
35:11 99:17
100:18 153:10
**transactions**
89:2,18 90:1,6
90:20,20 91:18
92:18,22 93:7
**transcribed** 2:1
**transcript** 56:5
163:22 165:7
166:7 168:3,8
**transporting**
77:14
**traveled** 28:5
**treat** 11:22
**tried** 46:16
**truck** 77:4 78:2
78:15
**trucks** 78:16
**true** 9:5 57:17
59:5 104:21
106:9 152:22
154:18,20
155:14 165:7
168:5
**truthful** 8:5
44:4 45:8
**truthfully** 43:4
45:19
**try** 34:7 100:3
108:13 143:22
159:11
**trying** 37:6
**tuesday** 1:13
1:21

**turn** 81:16
88:19 95:7
101:11 105:10
120:2
**turning** 57:19
**twj** 124:20
125:2,7
**two** 10:9 16:18
17:11 18:22
19:17,21,21
25:15,20 26:21
37:15,17 38:15
39:1 56:20
75:5 78:7,14
78:16,19 82:3
82:9,13,21,22
119:2,3 123:7
124:10 125:13
126:2 129:9,12
129:12 144:1
**type** 15:5 30:15
39:21 54:4
99:20 138:2
146:11
**typewriting**
165:11
**typically** 49:13

**u**

**unbolted** 124:9
**uncommon**
125:18,22
126:1
**under** 2:1
88:16 127:1
165:11

**[understand - value]**                                                      Page 34

**understand**
8:19 16:10
29:1 59:13
64:9 65:12
74:18 77:16
81:1 86:16
87:10 102:18
118:20 120:10
122:7 137:4
138:15,16
142:7 143:2
157:19
**understanding**
11:2 30:6
62:20 66:6
89:1,22 90:9
90:13 150:18
152:9
**understood**
8:17 81:6
**uneducated**
57:14
**uniform** 100:11
**united** 1:1,9
6:12 102:19
165:3
**unrelated** 70:5
**unrepaired**
50:8,10
**unsure** 32:12
**update** 145:7
**updated** 30:7
32:9
**upper** 121:16

**upside** 157:15
**use** 22:17 44:1
47:1,13 48:20
51:7,18 52:14
56:18 57:1
63:4,6 65:1
66:19 68:5,8
68:12 76:12,19
82:17,19,22
83:18 84:13
86:13 88:17
94:19 95:2,2
98:8,12,16,21
103:18 104:5,9
115:8 130:10
141:3,7 142:21
146:17 150:19
151:5 153:19
153:21 154:11
154:16 162:18
**used** 16:7 23:16
44:2 48:19,22
51:1,4,9,14
52:21 57:10
59:7 66:11
76:3,4 77:13
80:13 82:10,10
84:9 85:14,18
85:21 86:5,11
86:17,19 88:9
94:8,10 95:20
96:17 97:3,4
113:10,11
114:4 121:8
128:18 130:7

141:21 142:9
146:14 152:10
153:11
**uses** 110:21
141:17
**using** 43:8
46:16 59:4
62:9 63:10
64:5 65:20
82:3,13 84:19
84:21 100:18
125:11 130:5
136:1 142:22
144:13
**uspap** 99:20
100:1,5,14,17
100:19,20,21
162:6
**usual** 47:4,13
104:5
**usually** 17:2
47:7,16 144:16
**utilize** 47:5
**utilized** 47:10
104:2

**v**

**v** 1:7 166:5
**vague** 97:21
**validity** 23:12
**valuation** 5:3
5:13,15,17,19
5:21 15:20,21
15:22 16:9,10
18:11 19:10,18
48:6 56:10

57:1,2,12 68:9
98:11 103:3
106:1,11 108:4
108:6,12,14
109:2,10,15,22
110:17 113:6
113:14 114:19
115:1,3,15,22
121:4,8 130:22
135:11,18,20
136:9,19 137:1
137:4,15
138:13 139:8
140:3,11,16
141:2 142:4
149:22 151:15
160:18 161:14
161:18 162:15
**valuations**
163:1
**value** 4:20 39:9
39:18,20,22
40:2,5,17,21
41:5,19 44:2
44:15,18 45:21
46:3,7,13 47:6
47:11,14 49:2
49:12,21 50:1
50:4,9 52:18
53:12,20 54:9
57:5 58:6,9,13
58:20 59:3,8
59:16 60:16,20
62:2,21 64:15
70:15 71:1

James Merritt
Multiple Plaintiffs v. Progressive

October 22, 2024

**[value - views]**

Page 35

| | | | |
|---|---|---|---|
| 76:19 81:19 | 53:5,7,9,9,13 | 142:4 148:19 | 112:1,21 |
| 82:1,5,16 83:3 | 53:15 54:9,12 | 148:20 149:1,2 | 119:18 121:7 |
| 83:4,17 84:1 | 54:15,20 55:2 | 149:3,3,7,9,10 | 127:13 128:7 |
| 93:17,17,18 | 57:7,8 59:14 | 149:11,14,17 | 128:16 129:4 |
| 94:9,11 95:11 | 60:2,16 62:2 | 150:5,7,8 | 129:19,22 |
| 95:17,20,21 | 62:10,21 64:14 | 151:7,19 | 137:21 139:18 |
| 96:21 97:9,17 | 64:17,19 65:20 | 152:14 153:3 | 140:4,13,18 |
| 98:6 99:18,19 | 67:7 68:3 75:5 | 153:20 155:12 | 141:7,19 149:7 |
| 104:2,6,12,14 | 75:20 76:2,18 | 155:13,22 | 150:20 152:11 |
| 106:12 107:13 | 76:18,19 78:1 | 156:4,15 | 159:19 160:18 |
| 108:1,1 111:7 | 78:18 82:6,15 | 157:12,13,14 | 160:21 |
| 132:5,15,20 | 83:17 86:5,15 | 157:21,22 | **verify** 43:22 |
| 133:9,19 134:3 | 86:20 89:19 | 158:14,21 | 108:14 116:3 |
| 136:10 143:7 | 90:2,6 91:9,19 | 162:2 | 124:21 125:19 |
| 147:18 148:3 | 92:18,22 93:7 | **vehicle's** 82:1 | 139:13 140:21 |
| 148:14 150:2,2 | 95:3 103:21 | 130:16 133:9 | **veritext** 6:18,19 |
| 150:7,9,10,16 | 104:10,14 | 152:4 | 166:21 |
| 151:3 157:17 | 106:1,12,19,20 | **vehicles** 26:22 | **versa** 57:8 |
| **values** 82:15 | 107:18 108:18 | 27:9,12 40:10 | **versions** 135:11 |
| **valuing** 148:19 | 108:19 109:8 | 40:14 50:20 | **versus** 6:11 |
| **variance** 82:11 | 110:12,12 | 51:1,5,12 | 105:8 |
| **variation** 63:16 | 111:10 112:3,5 | 52:12 54:18 | **vice** 57:8 |
| **varied** 151:22 | 112:5,12,13,16 | 62:10 64:16,19 | **video** 6:8,9,17 |
| **vary** 159:4,5 | 116:5,16 118:8 | 66:20 67:18 | 147:10 |
| **vauto** 64:21,22 | 119:5 121:13 | 70:3,10,11 | **videographer** |
| 65:4,6 66:7,8 | 122:9,10,16,21 | 76:3,7,15 77:2 | 3:22 6:6 7:11 |
| 67:1,5,13 | 123:2,13,14,14 | 77:3,13,15 | 7:17 81:9,12 |
| **vehicle** 5:3,13 | 124:17 126:15 | 79:7,8,21 80:4 | 147:7,10 |
| 5:15,17,19,21 | 128:1,1,6,22 | 80:5,13,22 | 163:17 |
| 16:9 18:11 | 130:14,19 | 81:5 85:20,22 | **videotaped** |
| 27:14,18,21 | 131:6 132:4,5 | 86:9,12,13,17 | 1:14 |
| 39:21,22 47:21 | 132:15,20 | 88:16 91:1,1 | **view** 11:4 99:8 |
| 48:4,9 49:1,3,9 | 133:19 135:12 | 93:16,17,20 | 105:22 |
| 49:12,13,21 | 136:1,10 139:8 | 94:3,4,10 | **views** 31:1 |
| 50:1,9,9 52:22 | 139:14,20,20 | 109:14 110:3 | |

James Merritt
Multiple Plaintiffs v. Progressive
October 22, 2024

**[vin - wrote]**                                                                    Page 36

| | | | |
|---|---|---|---|
| **vin** 117:1,2 | 102:9 103:1 | 95:19 96:15 | 80:9,12,17 |
| 138:2 139:21 | 113:6 150:4 | 97:2 103:20 | 97:20 107:22 |
| **vins** 137:21 | 151:22 163:4 | 104:8 105:15 | 108:13 111:9 |
| **violate** 87:14 | **ways** 98:4,5,12 | 110:19 111:15 | 138:20 |
| **violates** 87:22 | **wear** 152:16 | 115:11,22 | **workcenter** |
| **violating** 87:20 | **website** 29:11 | 133:4,12 137:8 | 15:19 83:13,16 |
| **virginia** 77:1 | **weigh** 65:17 | 137:17 141:14 | 83:21 84:4 |
| 155:20 156:12 | 100:3 | 143:7 146:9,17 | 85:21 86:11,19 |
| **virtually** 10:16 | **went** 100:21 | 147:3 148:5 | 94:20 97:16 |
| **volkswagen** | **wheeler** 77:7 | 153:13 154:14 | 103:3 163:5 |
| 139:9,20 | **wheelers** 75:9 | 155:2 157:3 | **workcenter's** |
| **volvo** 138:1 | **willing** 58:11 | 160:9,20 | 142:8 |
| 139:19 | 58:11 59:17,18 | 162:17 168:13 | **worked** 34:5 |
| **volvos** 137:21 | 59:20 60:1,2 | **wondering** | 55:8,14,16,18 |
| | 60:10,13,14 | 16:11 84:8 | 74:19,22 75:2 |
| **w** | **winchester** | 119:18 | 75:3,16 78:22 |
| **walks** 52:1 | 77:1 | **word** 10:16 | **working** 18:13 |
| **want** 8:15 | **wisconsin** | 157:15 | 18:17 20:8 |
| 60:10 68:16,20 | 144:7 | **wording** 111:6 | 34:3 |
| 74:16 84:7 | **wish** 163:21 | **words** 16:22 | **works** 86:15 |
| 87:13,15 91:11 | **witness** 1:15,17 | 51:13,15,16 | **worth** 46:4 |
| 103:17 133:15 | 4:2 7:12 10:15 | 127:1 | 57:8 106:12 |
| 134:12 145:16 | 11:14 18:17 | **work** 13:20 | **write** 21:19,20 |
| 145:18 157:19 | 22:9 23:2 29:4 | 14:8,11,14,16 | 133:11 |
| **wanted** 101:1 | 29:9 30:20 | 14:17 15:5 | **written** 22:1 |
| 148:16 | 31:5 33:15 | 16:22 17:4,7 | 32:11 37:11 |
| **warranties** | 34:2 35:3 | 20:4,12,13 | 99:11,12 101:3 |
| 154:3 155:11 | 46:11,19 47:16 | 23:8,13 24:12 | 152:13 161:21 |
| **warranty** 54:3 | 49:6 51:9 | 24:21 25:6 | **wrong** 68:2 |
| 160:3 | 54:17 55:4 | 26:7 31:3 | 148:21,21 |
| **washington** | 60:18 61:3 | 32:18 33:21 | 149:6,22 |
| 1:20 6:16 | 62:8 63:22 | 34:6 41:14 | **wrote** 30:10 |
| **way** 53:6 62:10 | 65:16 66:4 | 67:12 69:12 | 31:19,22 32:5 |
| 62:14 66:21 | 67:11 72:16,22 | 72:1 74:4 | 106:6 109:5 |
| 96:4,8,12,16 | 73:6 78:10 | 75:10 78:4 | |
| 97:7,12,17,21 | | | |

James Merritt
Multiple Plaintiffs v. Progressive

**[x - zoom]**

October 22, 2024

Page 37

| x |
|---|
| **x**   1:4,11 4:6 5:1 |
| **y** |
| **yeah**   32:21 |
| 107:20 124:5 |
| 159:16 |
| **year**   79:5 |
| **years**   27:17,20 |
| 28:10 49:22 |
| 54:18 128:19 |
| 143:19 151:19 |
| **z** |
| **zoom**   24:5 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT ___1___
WIT: Merritt
DATE: 10.22.24
DJura, RPR

## SUPPLEMENTAL EXPERT REPORT OF JASON MERRITT

I, Jason Merritt, pursuant to Feder Rule of Civil Procedure 26 declare as follows:

### DECLARATION

This Report is based on my personal knowledge, experience, and training and, if called to testify on the matters set forth herein, I could and would do so competently.

### INTRODUCTION

My name is Jason Merritt, and I am a professional personal-property appraiser focused on various vehicles. I have been retained by the Plaintiffs in this case. My credentials and professional experience are described in my curriculum vitae, including my prior testimony, attached to this report as **Exhibit A**.

Pertinent to this report, and as reflected in my curriculum vitae, I am the owner of East Coast Auto Appraisers, LLC. I am certified through the Bureau of Certified Auto Appraisers and the American Society of Certified Auto Appraisers, to appraise vehicles, including total-loss vehicles and total-loss vehicle claims. I have appraised over a thousand vehicles to determine their actual cash value. These appraisals include hundreds of appraisals where I was hired to determine the value of a totaled vehicle. As owner of Merritt's Automotive, LLC, I appraised vehicles daily for the purpose of determining the vehicles' actual cash value. Additionally, I have performed hundreds of appraisals for the Timbrook Automotive Organization, which includes franchise dealerships for Chevrolet, Buick, GMC, Kia, Nissan, Ford, Chrysler, Dodge, Jeep, and Honda. The purpose of these appraisals was to determine the actual cash value of vehicles offered for trade in or that were newly acquired by the Timbrook Automotive Organization.

Before entering the private sector, I served as an officer in the Maryland State Police for 28 years. During those years, I received advanced training in accident investigations. In 1998, I was assigned to the C31 Narcotics Unit of the Maryland State Police. Part of my duties in that

1

unit were acquiring and maintaining the unit's vehicles. My training and experience in investigations as a Maryland State police officer assist me in appraising and valuing vehicles, including total-loss vehicles.

## SCOPE OF WORK

I have been hired by the Plaintiffs in this case to offer opinions on the following topics:

- Description of what an appraisal is;

- Explanation of how to use the comparable methodology to appraise a vehicle's actual cash value;

- Explanation of whether Mitchell's use of a "Projected Sold Adjustment" ("PSA") to the comparable vehicles used to determine the actual cash value ("ACV") for a total-loss vehicle is appropriate when appraising that total-loss vehicle using a comparable methodology.

The facts and data that I have considered to arrive at my opinions are listed in **Exhibit B.**

## OPINIONS

### A. Overview of Using a Comparable Methodology to Determine the Pre-Loss Actual Cash Value of an Automobile.

An *appraisal* is an opinion of value. While there is no single methodology to arrive at a proper opinion as to a loss vehicle's ACV, there are generally accepted methodologies that must be followed to render a sound opinion as to ACV. One such methodology- applicable to standard motor vehicles, as opposed to, for example, antique cars or specialized vehicles, is the comparable methodology, more frequently called the "comp" methodology.

Generally, the comp methodology for determining ACV involves finding vehicles for sale, or recently sold, within a certain geographic area that are similar, or "comparable," (e.g., the vehicle's make, model, year, and geographic location) to the vehicle being valued. Typically, these comps are selected from Internet advertisements. Once the comps are chosen, differences in

2

observed and verifiable features (such as options, mileage, trim level, and condition) between the loss vehicle and the comps are documented. Normally, information concerning options, mileage, trim level, and condition are taken from the Internet advertisement for the vehicle, and these characteristics are taken at face value unless there is some specific and documented reason for questioning the accuracy of the listing. Sometimes a vehicle listing does not include options, but these options could be determined by using a VIN decoder. The point is that there must be a specific reason, grounded in evidence, for varying from the information provided in an Internet advertisement for a particular vehicle. Differences between vehicles in observed and documented characteristics result in price adjustments from the list price of the comparable vehicles.

I have reviewed the Mitchell Vehicle Valuation Reports prepared for each of the three Plaintiffs. Having reviewed the reports it, appears that Mitchell largely followed the comparable methodology, documenting all differences, if any, in mileage, options, trim level, loss vehicle condition, etc., and making monetary adjustments based on those documented differences.

When adjusting for the condition of a vehicle, the common procedure is to adjust the condition of a loss vehicle by comparing it to the normal or typical condition of similar vehicles. Ideally, you would search for comparable vehicles in nearly identical condition to the loss vehicle, but this usually isn't practical. Mitchell followed customary condition-adjustment standards by comparing the loss vehicle to normal conditions. Specifically, in the Reports, Mitchell documented an inspection of 13 components of Plaintiffs' loss vehicles. These components are assigned a numerical rating of 1 to 5. Each component is compared to a "Typical Vehicle Condition," which was assigned a numerical rating of 3.00. So, based on whether the "Overall Condition" of the loss vehicle rated above or below the typical 3.00, Mitchell adjusted the base value of the loss vehicle to reflect that it was in better or worse condition than "typical." As for the condition of the comparable vehicles, it would be improper to assume they were in anything other than typical

condition without either inspecting the vehicle or having documentation showing the comparable vehicle was in better or worse than typical condition.

Because conducting physical inspections of comparable vehicles is often impractical, appraisers usually set the condition of the comparable vehicles as "average" or "typical" and make no monetary adjustment to the comparable vehicle, which is what Mitchell did in the Comparable Vehicles section of the Report. Once the average price is established—the average of the comparable vehicles' prices, adjusted for any differences in mileage and equipment—the average price is adjusted upward or downward if the insured vehicle is in better or worse than typical condition and kept the same if it is in typical condition.

Generally, Mitchell's methodology is consistent with the comparable methodology routinely applied by appraisers and is capable of producing a correct or sound appraisal of ACV. Mitchell deviated from the comp methodology, however, by applying a PSA deduction to the Internet prices of the specific comparable vehicles advertised for sale.

### B. Mitchell's Application of a PSA is Inconsistent with Appraisal Standards and the Comparable Methodology.

As with mileage, options, and equipment, appraisers must base their opinions about a specific comparable vehicle's price on hard data rather than projections. The hard data appropriate for this is typically the Internet price of the comp. This is true for several reasons.

*First*, the Internet price is often the only data point concerning what a particular vehicle listed with a particular seller would sell for at the time of valuation. When determining ACV, the objective is to determine the value of that vehicle at a particular point in time. The Internet price listed for sale is the only evidence available for determining what a particular comparable vehicle offered for sale by a particular dealer would sell for on a particular day. Moreover, using the Internet price provides an objective criterion for determining what the comparable vehicle would

4

sell for on a particular day to a buyer purchasing a vehicle outright, without providing a trade in, financing the purchase through the dealership or buying optional GAP insurance, warranties, or service plans. These additional profit opportunities for the dealer might result in what may look like a lower sales price but does not reflect a change in the market value of that car or that the dealer would have accepted anything other than the list price had the buyer offered cash for the vehicle, without the opportunity to make up the difference or make even more profit through a trade-in vehicle, financing of the purchase, or selling warranties, service plans, GAP insurance, or other products. Buying GAP insurance or a service plan may change the amount shown for the purchase price of the vehicle itself, but it does not change the ACV of the vehicle. GAP insurance or a service plan does not add value or subtract from the value of the vehicle, and thus, they do not change the vehicle's ACV. For this reason, while it is not necessarily invalid to use a reported sale price of a comparable vehicle, it is generally better to use a list price, unless the appraiser is able to confirm the reported sale price is not the result of a special discount and does not reflect the sale of ancillary items (e.g., GAP insurance, warranties, or service plans) relating to the purchase.

*Second*, appraisal standards and the comp methodology do not permit arbitrarily deducting the advertised price of a vehicle based on projections of what that vehicle might ultimately sell for. As reflected in its name, the PSA is a projection of what a vehicle might sell for. It is not the actual sold amount. Again, unless the appraiser has all the information (e.g., front-end and back-end information) relating to a sale of comp vehicle, there is no hard data available to an appraiser to support an opinion that a particular comp would sell on a particular day for anything other than the Internet price. It would be arbitrary to assign a different sales price to any particular vehicle chosen for comparison purposes.

Using the advertised price as the price for a comparable vehicle is especially important when the advertisement comes from an Internet source. It is my understanding that Mitchell uses only

Internet listings for locating comparable vehicles. Consistent with Mitchell's "Position on Internet Pricing," my understanding of and experience with the modern used-car market is that Internet prices often reflect a no-hassle price and that dealers price their inventory competitively to move inventory and sell more vehicles. To compete in the market, the dealer offers its best price in its advertisements. This is another reason appraisers cannot assume a vehicle will sell for anything other than its advertised price.

While I do not, there are some appraisers who make a "take-price" adjustment to the Internet price of comparable vehicles. This adjustment is made only after speaking with the specific car dealership offering that particular vehicle for sale to determine whether the dealer would take anything other than the advertised price of the specific vehicle. The adjustment is specific to a particular vehicle from a particular dealer, and the recipient of the appraisal would know that dealer stated it would take a specified cash price on that day for that particular comparable vehicle. As with other adjustments, a "take-price" adjustment would be based on data specific to a comp vehicle. In my experience, it is difficult to get dealers to disclose the sold amount of vehicles, much less to provide sufficient information about the back end of the sale (trade in, financing, warranties or auxiliary products, special discounts, etc.) to put the sold amount in a useful context.

Based on my understanding of the Mitchell PSA methodology, it is not an appropriate basis for adjusting the list price. First, it is not information about the particular comp in question – no effort is made to contact the specific dealer about whether it will sell the specific comp for less than advertised at the time of the valuation. Second, no effort is made to account for the other profit centers and considerations discussed above—like trade ins, in-house financing, GAP insurance, warranties, service plans, or special discounts—that impact recorded sales amounts set forth for the vehicle itself but not the ACV. Without accounting for those factors, the data is not helpful.

*Third*, it is my understanding based on conversations with counsel that Mitchell does not

6

consider all transactions. More specifically, Mitchell does not consider transactions where the vehicle sold for the advertised price and has never considered transactions where the vehicle sold for more. Even setting aside the other problems with attempting to predict what a particular comp will ultimately sell for, I would not rely on Mitchell's PSA calculations because excluding this data slants toward lower values and is not objective.

### C. Absent the PSA Deduction, the Mitchell Methodology Provides a Sound Determination of ACV.

Overall, while it is unlikely I would have, starting from scratch, selected the exact comparable vehicles used in the report and appraisers generally do not select precisely the same vehicles to use for comparison purposes, Mitchell did follow a comparable methodology until it applied the PSA deduction, and all information necessary to provide a sound opinion on the ACV of Plaintiff's vehicle is contained in the Report. Specifically, to determine the ACV of Plaintiffs' loss vehicle using the Mitchell Valuation Reports, you add the PSA back to the adjusted price of each comparable vehicle to get a revised "Base Value," and then apply whatever adjustments, if any, were made in the reports for condition, prior damage, aftermarket parts, or refurbishment. The PSA reduces the amount shown for the ACV or Market Value.

Without the PSA, the Mitchell methodology provides a sound determination of ACV, consistent with the comp methodology commonly used by appraisers. So, the Mitchell report can be used to determine the ACV of Plaintiffs' loss vehicles (or any other loss vehicle) by simply backing out the PSA. To arrive at a sound appraisal of ACV using a Mitchell report, you would line-item out each PSA applied to a comp, recalculate the "Adjusted Price" of each comparable vehicle to which a PSA was applied, and then recalculate the average of the Adjusted Prices to arrive at a revised "Base Value." From there, the Market Value can be recalculated using that revised Base Value and the adjustments for condition, prior damage, aftermarket parts, or refurbishment already determined by Mitchell. Indeed, this proposed methodology is

7

consistent with the comp methodology.

To appraise the ACV of Plaintiff Thurston's loss vehicle using his Mitchell report, I backed out each PSA and then recalculated the Market Value. Specifically, I added $398.00 to the $11,764.92 adjusted price of the first comp, resulting in a revised adjusted price of $12,162.92. I added $537.00 to the $14,712.02 adjusted price of the second comp, resulting in a revised adjusted price of $15,249.02. I added $427.00 to the $13,218.45 adjusted price of the third comp, resulting in a revised adjusted price of $13,645.45. I then took the sum of the revised adjusted prices ($41,057.39) and divided that number by three to get a recalculated Base Value of $13,685.80. This is the amount the Base Value would have been had Mitchell not applied the PSA. Mitchell also applied a negative condition adjustment of $462.43, by applying a .03% condition adjustment percentage to the original Base Value of $13,231.80. Applying that same .03% negative condition adjustment percentage to the recalculated Base Value results in a negative condition adjustment of $410.57, which results in a Market Value of **$13,275.23** ($13,685.80 - $410.57), which is a sound appraisal of the ACV of Plaintiff Thurston's loss vehicle. The Mitchel Report's Market Value for Plaintiff Thurston's loss vehicle is $12,824.37, but when removing the PSA from the adjusted price calculation, the Market Value is $13,275.23. The difference between the two is $450.86.

To appraise the ACV of Plaintiff Bridges' loss vehicle using the Mitchell Report, I backed out each PSA and then recalculated the Market Value. Specifically, I added $830.00 to the $34,749.69 adjusted price of the first comp, resulting in a revised adjusted price of $35,579.69. I added $741.00 to the $33,725.57 adjusted price of the second comp, resulting in a revised adjusted price of $34,466.57. I added $720.00 to the $32,790.26 adjusted price of the third comp, resulting in a revised adjusted price of $33,510.26. I added $787.00 to the $34,727.70 adjusted price of the fourth comp, resulting in a revised adjusted price of $35,514.70. I added $721.00 to the $32,661.36 adjusted price of the fifth comp, resulting in a revised adjusted price of $33,382.36. I added $829.00

8

to the $33,736.19 adjusted price of the sixth comp, resulting in a revised adjusted price of $34,565.19. I then took the sum of the revised adjusted prices ($207,018.77) and divided that number by six to get a recalculated Base Value of $34,503.13. This is the amount the Base Value would have been had Mitchell not applied the PSA. Mitchell did not apply any condition adjustments to this vehicle which results in a Market Value of **$34,503.13**, which is a sound appraisal of the ACV of Plaintiff Bridges' loss vehicle. The Mitchel Report's Market Value for Plaintiff Bridges' loss vehicle is $33,731.80, but when removing the PSA from the adjusted price calculation, the Market Value is $34,503.13. The difference between the two is $771.33.

To appraise the ACV of Plaintiff McDonald's loss vehicle using the Mitchell Report, I backed out each PSA and then recalculated the Market Value. Specifically, I added $485.00 to the $5,292.05 adjusted price of the first comp, resulting in a revised adjusted price of $5,777.05. I added $445.00 to the $5,544.09 adjusted price of the second comp, resulting in a revised adjusted price of $5,989.09. I added $566.00 to the $5,269.23 adjusted price of the third comp, resulting in a revised adjusted price of $5,835.23. I added $485.00 to the $5,495.66 adjusted price of the fourth comp, resulting in a revised adjusted price of $5,980.66. I added $566.00 to the $5,442.72 adjusted price of the fifth comp, resulting in a revised adjusted price of $6,008.72. I then took the sum of the revised adjusted prices ($29,590.75) and divided that number by five to get a recalculated Base Value of $5,918.15. This is the amount the Base Value would have been had Mitchell not applied Projected Sold Adjustments. Mitchell also applied a negative condition adjustment of $1,110.38, by applying a .20% condition adjustment percentage to the original Base Value of $5,408.75. Applying that same .20% negative condition adjustment percentage to the recalculated Base Value results in a negative condition adjustment of $1,183.63, which results in a Market Value of **$4,734.52** ($5,918.15 - $1,183.63), which is a sound appraisal of the ACV of Plaintiff McDonalds loss vehicle. The Mitchel Report's Market Value for Plaintiff McDonald' loss vehicle is $4,298.37,

9

but when removing the PSA from the adjusted price calculation, the Market Value is $4.734.52.

The difference between the two is $436.15.

I hold the above opinions to a reasonable degree of professional certainty. My opinions are based upon the information available to me currently. If there is additional information obtained or confirmed, my opinion may change to account for the new information or confirmation of information.

<u>COMPENSATION</u>

I am being paid $650 per hour for my work in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Jason W. Merritt

__October 14, 2024__
Date

10

# EXHIBIT A





## Jason W. Merritt

jason@eastcoastautoappraisers.com

Resume of experience and knowledge.

**Merritt's Alignment Service**                                           January 1986-Oct 1987

Authorized Maryland State Inspections mechanic. Certified and Licensed to perform safety inspections for the state of
Maryland. Certified in passenger cars. Light duty trucks, and light duty trailers. Certified as the youngest mechanic by the
state of Maryland to perform safety inspections.

During this tenure multiple safety inspections were conducted. The Maryland State Inspection procedure is one of the most
detailed and thorough state inspection process.

**Maryland State Police**                                                 Oct 1987- June 2015

October 1987- Entered the Maryland State Police as a Cadet. Served in the Commercial Vehicle Enforcement Unit. During
this time, I was certified federally as a Level 1 Inspector for Commercial Vehicles. Level 1 inspections are the level of
inspections set forth on the Federal Motor Carrier Safety Standards and are certified at the Federal Level. At that same time,
I received Hazard Materials Certification and training. I was the first Cadet in the state of Maryland to be certified to
conduct Level 1 Inspections of commercial vehicles. I conducted accident investigations for the safety equipment of
commercial vehicles. I performed more than 1000 inspections during this tenure.

March 1990- Entered the Maryland State Police Training Academy

August 1990- Graduated the Police Academy and was certified as Police Officer by the Maryland Police Training
Commission. Was instructed and certified to conduct accident investigations. During this Academy training many hours
were dedicated to Accident Investigations.

August 1990- December 1991 Assigned to Road Patrol at the Frederick Barracks. I was assigned Road Patrol and later
certified in RADAR, VASCAR, Standardized Field Sobriety, and Criminal Investigations. Conducted traffic accident
investigations as well as Criminal Investigations and handled calls for service in Frederick County. I was nominated for the
Maryland State Police Trooper of the Year in 1990. I received a Superintendents Commendation for a criminal investigation
in Frederick County. I also received a Governors Citation.

During an accident investigation in a neighboring county, I was able to identify the make model and year of a vehicle
involved in a fatal hit and run motor vehicle accident, by recovering a small piece of trim belonging to the suspect vehicle.
That small piece of trim resulted in the conviction of the driver.

May 1992-November 1992 Easton Barrack

Assigned to the road patrol in Talbot County, MD. I was responsible for calls for service as well as Criminal Investigations.
During that time, I handled numerous high-level Criminal Investigations for multiple thefts as well as assaults and fatal
accidents.

1

November 1991-October 1995

Re-assigned to the Frederick Barrack

Assigned to Road Patrol where I again was responsible for calls for service in the County. During this time, I continued training for Criminal Investigation as well as Narcotics Investigation. I was recognized for outstanding performance in Driving While Intoxicated Arrests as well as Narcotics Arrests. I received commendations for several investigations including a homicide investigation.

Received training in Advanced Accident Investigations. I conducted numerous Advanced Accident Investigations to include multiple Motor Vehicle Accident Death Investigations.

October 1995- March 1998

Assigned to the Cumberland Barrack in Allegany County, MD

Was assigned Road Patrol and calls for service.  During this time, I was awarded the Cumberland Barrack Trooper of the Year as well as the Cumberland Optimist Law Enforcement Officer of the Year. I received a Superintendents Commination for a Criminal Investigation that resulted in an arrest of an individual that committed more than 30 Breaking and Entering's into homes in the Tri-State area. He was later sentenced to more than 20 years in prison.

March 1998- June 2015

Assigned to the Criminal Enforcement Division, Columbia, Maryland

I was assigned to the C3I Narcotics Unit. This is a multi-jurisdictional Unit that is comprised with multiple agencies and is supervised by the Maryland State Police. During this time as a Narcotics Investigator, I have received many commendations and awards for service.

I have conducted and assisted with more than 4500 investigations and conducted more than 3500 arrests. I have been the author of and assisted with more than 800 Search and Seizure Warrants.

The C3I Narcotics Unit has received numerous awards and recognitions for Outstanding Performance in Narcotics Investigations. While in this capacity I have worked with multiple agencies to include but not limited to the FBI, DEA, ATF, FDA, and Multiple Police Departments throughout Maryland, West Virginia, Virginia, California, Colorado, and Pennsylvania. I have previously been deputized federally with the DEA and the FBI on case specific investigations.

I have worked in a covert capacity for undercover investigations and I have managed more than 1000 criminal informants as well as held caseloads of more than 30 cases at a time. I have been recognized as an Expert in the Field of Narcotics in several counties in Maryland.  I also teach in the subjects of narcotics, Interview and Interrogation, Confidential Informants, as well as 4th Amendment Law.

I have been leading investigator on numerous large-scale investigations for racketeering, RICO Federal Investigations. I have conducted homicide investigations as well as crimes against persons.

I have conducted numerous investigations for trafficking of drugs in motor vehicles and received additional training in the concealment and custom production of drugs in compartments of vehicles.

I was responsible for the recovery and the inspections of vehicles that were seized. I was also responsible for the marketing and sales of those seized vehicles.


Training;

Maryland State Police

Police Academy, Yearly Training to maintain my certification as a Police Officer.

Criminal Investigations

Advanced Criminal investigations.

Narcotics Investigator

2

DEA Investigators School

Interview and Interrogation

Criminal Informants

Numerous other Narcotics Investigators Trainings throughout the country.

Mobile Forensics Certification

Drug Diversion Training

I retired from the Maryland State Police in June 2015

**June 2015-August 2016 Merritt's Automotive LLC**
I acquired and assumed a family business in the automotive industry. I was certified through the State of Maryland for automotive inspections. I was again certified by the state of Maryland and the Maryland State Police to conduct Safety Inspections for the state. I was again certified to conduct safety inspections on Passenger Vehicles including light duty trucks, and trailers. During this time, I conducted several hundred inspections.

**August 2016 – June 2019  Timbrook Automotive**
I joined the Timbrook Automotive Organization to assist and direct the opening of a motorcycle dealership in Winchester, VA. I assisted in the establishment of that business in the state of Virginia that included permitting licensing etc. I established an online presence and supervised all departments of the dealership from sales to service and marketing. I was responsible for management of employees as well as hiring. I was also responsible and assisted with the discipline of employees and customer relations.
I was the manager of the service department to include the overseeing of the mechanical work performed.
I established and conducted appraisals for the banking industry and received training through Honda USA for safety standards as well as mechanical and technological advances.
I performed many used vehicle appraisals for the Timbrook Automotive Corporation during this tenue. I conducted appraisals on motorcycles, boats, campers, trailers, classic and salvage title vehicles.

**June 2019- Present T3 Intelligence Services**
I am an owner and partner of this security and private investigation firm. I conduct investigations on criminal as well as civil.
I have been involved with the insurance industry and have been involved in active investigations with insurance fraud as well as Workman's Comp fraud.
I have conducted Accident Investigations and reviews.
I am a licensed and certified Private Detective through the Maryland State Police. I also carry a Security Firm License. I have more than 9 employees that provide security services as well as Executive Protection details. Some are full time employed and are holding security from areas in Allegany County, MD.

**April 2020- Present East Coast Auto Appraisers LLC**

Owner and operator of this business. I hold a certification through the Bureau of Certified Auto Appraisers located in Houston Texas. This certification has requirements that include training as well as experience in the fields of Total Loss, Loss of Use, Depreciation Value, Actual Cash Value and Classic Values. The certification standards include the knowledge and identification of vehicles that have been damaged through accidents or the elements.
These appraisals detail any damage to the structure of a vehicle, and I am trained and experienced in the detection of repairs or current damage to frames and subframe systems of vehicles.
I have conducted many classic and antique vehicle appraisals as well as sales.
I promote and manage this business as it is a startup business. This business is targeting the east coast and I now have appraisers in the Maryland tri-state area plans for other locations along the coast.

Current member of:
B.O.C.A.A. Bureau of Certified Auto Appraisers (Certified Auto Appraiser)
ASCAA American Society of Certified Auto Appraisers (Certified Auto Appraiser)
NADA JD Power
Appraisal Institute (National USPAP Course)
Hemmings Auto

3

**Prior Testimony** (Pending currently)

- *Volino, et al. v. Progressive Casualty Ins. Co., et al.*, No. 1:21-cv-06243-LGS
- *Drummond, et al. v. Progressive Specialty Ins. Co., et al.*, No. 21-4479
- *Freeman v. Progressive Direct Ins. Co.*, No. 1:21-cv-03798-DCC10
- *Chadwick v. State Farm Mutual Automobile Ins. Co.*, No. 4:21-cv-1164-DPM
- *Wiggins, et al. v. State Farm Mutual Automobile Ins. Co., et al.*, No. 8:21-cv-03803-DCC
- *Clippinger v. State Farm Mutual Automobile Ins. Co., et al.*, No. 2:20-cv-02482-TLP-cgc
- *Costello v. Mountain Laurel Assurance Co.*, No. 2:22-cv-0035-TAV-CRW
- *Brown, et al. v. Progressive Mountain Ins. Co., et al.*, No. 3:21-cv-00175-TCB
- *Bartee, et al. v. Progressive Advanced Ins. Co., et al.*, No. 4:22-cv-00342
- *Curran v. Progressive Direct Ins. Co.*, No. 1:22-cv-00878-RM
- *Querette v. GEICO Idemnity Co., et al.*, No. 50-2022-SC-020310
- *Vantree, et al. v. Progressive Gulf Ins. Co., et al.*, No. 4: 22-cv-00070-DMB-JMV
- *Reynolds, et al. v. Progressive Direct Ins., et al.*, No. 5:22-cv-503-RDP
- *Ambrosio, et al. v. Progressive Preferred Ins. Co.*, No. 2:22-cv-00342-PHX-SMB
- *Kroeger v. Progressive Universal Ins. Co.*, No. 4:22-cv-00104-SHL-HCA
- *Holmes, et al. v. Progressive Universal Ins. Co.*, No. 1:22-cv-00894
- *Henson, et al. v. Progressive Premier Insurance Co.*, Case No. 5:22-cv-182-M
- *Sibert v. Progressive Select Ins. Co.*, Case No. 1:22-cv-01179-LKG
- *Shaheed, Ameera & Dickerson Earl v. City Of Wilmington, Et Al C.A. No. 21-01333 CFC*
- *Koch, Dillon v. Progressive Direct Ins. Co., Case 1:23-cv-00118-JB-GJF*
- *Taxer, David et al. v. Progressive Universal & Progressive Classic Ins. Co. Case No. 3 :22-cv-01255-HZ*
- *Jones, Kierra et al. V. Palisades Ins Co. Et al., D.N.J., Case No. 2:22-cv-05156-EP-ESK*
- *Shams, Tanzim v. American Select Ins Co. Case No. 23: CV 732*
- *Watson, Melissa et al. v. Progressive Direct Ins. Co. Case No. 5:22-cv-0203-DCR*



4

**EXHIBIT B**

# <u>Facts and Data Considered by Jason Merritt in</u>
## <u>Forming His Opinions</u>

1. Second Amended Class Action Complaint
2. Mitchell Vehicle Valuation Reports for all three Plaintiffs
3. Auto Insurance Policy(ies)
4. Nada Report
5. My experience and training
6. Deposition transcripts of Kyle Mayer and John Retton
7. Photographs of Plaintiffs' total-loss vehicles

EXHIBIT ___2___
WIT: Merritt
DATE: 10·22·24
DJura, RPR

## EXPERT REPORT OF JASON MERRITT

I, Jason Merritt, pursuant to Feder Rule of Civil Procedure 26 declares as follows:

### DECLARATION

This Report is based on my personal knowledge and, if called to testify on the matters set forth herein, I could and would do so competently.

### INTRODUCTION

My name is Jason Merritt, and I am a professional personal-property appraiser who has been retained by the Plaintiff in this case. My credentials and professional experience are described in my curriculum vitae attached to this report as **Exhibit A**.

Pertinent to this report, and as reflected in my curriculum vitae, I am the owner of East Coast Auto Appraisers, LLC. I am certified through the Bureau of Certified Auto Appraisers and the American Society of Certified Auto Appraisers, to appraise vehicles, including total losses. I have appraised over a thousand vehicles to determine their actual cash value. These appraisals include hundreds of appraisals where I was hired to determine the value of a totaled vehicle. As owner of Merritt's Automotive, LLC, I appraised vehicles daily for the purpose of determining the fair market value. Additionally, I have performed hundreds of appraisals for the Timbrook Automotive Organization, which includes franchise dealerships for Chevrolet, Buick, GMC, Kia, Nissan, Ford, Chrysler, Dodge, Jeep, and Honda. The purpose of these appraisals was to determine the fair market value of vehicles offered for trade in or that were newly acquired by the Timbrook Automotive Organization.

Before entering the private sector, I served in the Maryland State Police for 28 years. During those years, I received advanced training in accident investigations. In 1998, I was assigned to the C31 Narcotics Unit of the Maryland State Police. Part of my duties in that unit were

1

for the vehicle, and these characteristics are taken at face value unless there is some specific and documented reason for questioning the accuracy of the listing. Sometimes a vehicle listing does not include options, but these could be determined using a VIN decoder. The point is that there must be a specific reason, grounded in evidence, for varying from the information provided in an Internet advertisement for a particular vehicle. Differences between vehicles in observed and documented characteristics result in price adjustments from the list price of the comparable vehicles.

I have reviewed the Mitchell Vehicle Valuation Report prepared for Plaintiff. Having reviewed the reports it also appears that Mitchell largely followed the Comparable methodology, documenting all differences, if any, in mileage, options, trim level, loss vehicle condition, etc., and making monetary adjustments based on those documented differences.

When adjusting for the condition of a vehicle, the common procedure is to adjust the condition of a loss vehicle by comparing it to the normal or typical condition of similar vehicles. Ideally, you would search for comparable vehicles in nearly identical condition to the loss vehicle, but this usually isn't practical. Mitchell followed customary condition-adjustment standards by comparing the loss vehicle to normal condition. Specifically, in the Report, Mitchell documented an inspection of 13 components of Plaintiff's loss vehicle. These components are assigned a numerical rating of 1 to 5. Each component is compared to a "Typical Vehicle Condition," which was assigned a numerical rating of 3.00. So, based on whether the "Overall Condition" of the loss vehicle rated above or below the typical 3.00, Mitchell adjusted the base value of the loss vehicle to reflect that it was in better or worse condition than "typical." As for the condition of the comparable vehicles, it would be improper to assume they were in anything other than typical

3

sell for on a particular day to a buyer purchasing a vehicle outright, without providing a trade in,

financing the purchase through the dealership or buying optional warranties or service plans. These

additional profit opportunities for the dealer might result in what may look like a lower sales price

but does not reflect a change in the market value of that car or that the dealer would have accepted

anything other than the list price had the buyer offered cash for the vehicle, without the opportunity

to make up the difference or make even more profit related to a trade-in vehicle, financing of the

purchase, or selling warranties, service plans, or other products. For this reason, while it is not

necessarily invalid to use a reported sale price of a comparable vehicle, it is generally better to use

a list price, unless the appraiser is able to confirm the reported sale price is not the result of a

special discount and does not reflect ancillary items relating to the purchase.

*Second*, appraisal standards do not permit arbitrarily deducting the advertised price of a

vehicle based on projections of what that vehicle might ultimately sell for. Again, there is no hard

data available to an appraiser to support an opinion that a particular comp would sell on a particular

day for anything other than the Internet price. It would be arbitrary to assign a different

sales price to any particular vehicle chosen for comparison purposes.

Using the advertised price as the price for a comparable vehicle is especially important

when the advertisement comes from an Internet source. It is my understanding that Mitchell uses

only Internet listings for locating comparable vehicles. Consistent with Mitchell's "Position on

Internet Pricing," my understanding of the modern used-car market is that Internet prices often

reflect a no-hassle price and that dealers price their inventory competitively to move inventory and

sell more vehicles. This is another reason appraisers cannot assume a vehicle will sell for anything

other than its advertised price.

5

rely on Mitchell's PSA calculations because excluding this data slants toward lower values and is not objective.

**C. Absent the PSA Deduction, the Mitchell Methodology Provides a Sound Determination of ACV.**

Overall, while it is unlikely I would have, starting from scratch, selected the exact comparable vehicles used in the report and appraisers generally do not select precisely the same vehicles to use for comparison purposes, Mitchell did follow a comparable methodology except for the application of the PSA deduction, and all information necessary to provide a sound opinion on the ACV of Plaintiff's vehicle is contained in the Report. Specifically, to determine the ACV of Plaintiff's loss vehicle using the Mitchell Valuation report, you add the PSA back to the adjusted price of each comparable vehicle to get a revised "Base Value," and then apply whatever adjustments, if any, were made in the reports for condition, prior damage, aftermarket parts, or refurbishment.

Absent the PSA, the Mitchell methodology provides a sound determination of ACV, consistent with the comp methodology commonly used by appraisers. So, the Mitchell report can be used to determine the ACV of Plaintiff's loss vehicle (or any other loss vehicle) by simply backing out the PSA. To arrive at a sound appraisal of ACV using a Mitchell report, you would line-item out each PSA applied to a comp, recalculate the "Adjusted Price" of each comparable vehicle to which a PSA was applied, and then recalculate the average of the Adjusted Prices to arrive at a revised "Base Value." From there, the Market Value can be recalculated using that revised Base Value and the adjustments for condition, prior damage, aftermarket parts, or refurbishment already determined by Mitchell. Indeed, this proposed methodology is consistent with the methodology.

# EXHIBIT A





## Jason W. Merritt

jason@eastcoastautoappraisers.com

Resume of experience and knowledge.

**Merritt's Alignment Service**                                                          January 1986-Oct 1987

Authorized Maryland State Inspections mechanic. Certified and Licensed to perform safety inspections for the state of Maryland. Certified in passenger cars. Light duty trucks, and light duty trailers. Certified as the youngest mechanic by the state of Maryland to perform safety inspections.

During this tenure multiple safety inspections were conducted. The Maryland State Inspection procedure is one of the most detailed and thorough state inspection process.

**Maryland State Police**                                                                      Oct 1987- June 2015

October 1987- Entered the Maryland State Police as a Cadet. Served in the Commercial Vehicle Enforcement Unit. During this time, I was certified federally as a Level 1 Inspector for Commercial Vehicles. Level 1 inspections are the level of inspections set forth on the Federal Motor Carrier Safety Standards and are certified at the Federal Level. At that same time, I received Hazard Materials Certification and training. I was the first Cadet in the state of Maryland to be certified to conduct Level 1 inspections of commercial vehicles. I conducted accident investigations for the safety equipment of commercial vehicles. I performed more than 1000 inspections during this tenure.

March 1990- Entered the Maryland State Police Training Academy

August 1990- Graduated the Police Academy and was certified as Police Officer by the Maryland Police Training Commission. Was instructed and certified to conduct accident investigations. During this Academy training many hours were dedicated to Accident Investigations.

August 1990- December 1991 Assigned to Road Patrol at the Frederick Barracks. I was assigned Road Patrol and later certified in RADAR, VASCAR, Standardized Field Sobriety, and Criminal Investigations. Conducted traffic accident investigations as well as Criminal Investigations and handled calls for service in Frederick County. I was nominated for the Maryland State Police Trooper of the Year in 1990. I received a Superintendents Commendation for a criminal investigation in Frederick County. I also received a Governors Citation.

During an accident investigation in a neighboring county, I was able to identify the make model and year of a vehicle involved in a fatal hit and run motor vehicle accident, by recovering a small piece of trim belonging to the suspect vehicle. That small piece of trim resulted in the conviction of the driver.

May 1992-November 1992 Easton Barrack

Assigned to the road patrol in Talbot County, MD. I was responsible for calls for service as well as Criminal Investigations. During that time, I handled numerous high-level Criminal Investigations for multiple thefts as well as assaults and fatal accidents.

DEA Investigators School

Interview and Interrogation

Criminal Informants

Numerous other Narcotics Investigators Trainings throughout the country.

Mobile Forensics Certification

Drug Diversion Training

I retired from the Maryland State Police in June 2015

**June 2015-August 2016 Merritt's Automotive LLC**
I acquired and assumed a family business in the automotive industry. I was certified through the State of Maryland for automotive inspections. I was again certified by the state of Maryland and the Maryland State Police to conduct Safety Inspections for the state. I was again certified to conduct safety inspections on Passenger Vehicles including light duty trucks, and trailers. During this time, I conducted several hundred inspections.

**August 2016 – June 2019   Timbrook Automotive**
I joined the Timbrook Automotive Organization to assist and direct the opening of a motorcycle dealership in Winchester, VA. I assisted in the establishment of that business in the state of Virginia that included permitting licensing etc. I established an online presence and supervised all departments of the dealership from sales to service and marketing. I was responsible for management of employees as well as hiring. I was also responsible and assisted with the discipline of employees and customer relations.
I was the manager of the service department to include the overseeing of the mechanical work performed.
I established and conducted appraisals for the banking industry and received training through Honda USA for safety standards as well as mechanical and technological advances.
I performed many used vehicle appraisals for the Timbrook Automotive Corporation during this tenue. I conducted appraisals on motorcycles, boats, campers, trailers, classic and salvage title vehicles.

**June 2019- Present T3 Intelligence Services**
I am an owner and partner of this security and private investigation firm. I conduct investigations on criminal as well as civil.
I have been involved with the insurance industry and have been involved in active investigations with Insurance fraud as well as Workman's Comp fraud.
I have conducted Accident Investigations and reviews.
I am a licensed and certified Private Detective through the Maryland State Police. I also carry a Security Firm License.
I have more than 9 employees that provide security services as well as Executive Protection details. Some are full time employed and are holding security from areas in Allegany County, MD.

**April 2020- Present East Coast Auto Appraisers LLC**

Owner and operator of this business. I hold a certification through the Bureau of Certified Auto Appraisers located in Houston Texas. This certification has requirements that include training as well as experience in the fields of Total Loss, Loss of Use, Depreciation Value, Actual Cash Value and Classic Values. The certification standards include the knowledge and identification of vehicles that have been damaged through accidents or the elements.
These appraisals detail any damage to the structure of a vehicle, and I am trained and experienced in the detection of repairs or current damage to frames and subframe systems of vehicles.
I have conducted many classic and antique vehicle appraisals as well as sales.
I promote and manage this business as it is a startup business. This business is targeting the east coast and I now have appraisers in the Maryland tri-state area plans for other locations along the coast.

Current member of:
B.O.C.A.A. Bureau of Certified Auto Appraisers (Certified Auto Appraiser)
ASCAA American Society of Certified Auto Appraisers (Certified Auto Appraiser)
NADA JD Power
Appraisal Institute (National USPAP Course)
Hemmings Auto

**EXHIBIT B**

## Facts and Data Considered by Jason Merritt in Forming His Opinions

1. Complaint
2. Mitchel Vehicle Valuation
3. Policy Contract – 9611 (09-16)
4. Nada Report
5. Deposition transcripts of Kyle Mayer and John Retton

EXHIBIT 3
WIT: Merritt
DATE: 10.22.24
DJura, RPR

## EXPERT/CONSULTANT RETENTION AGREEMENT

This Expert/Consultant Retention Agreement ("Agreement") is effective as of May 27, 2024 ("Effective Date"), by and between Island Justice, John Z. Steed, Esq. ("Law Firm"), and East Coast Auto Appraisers, LLC, for the services of Jason Merritt ("Contractor").

### A.    Scope of Retention/Exclusive Expert Consultant Services

Whereas, the Law Firm is litigating claims on behalf of insureds against Defendant in cases referred to herein as the Litigation:

- *Thurston, Matthew vs. Progressive Corporation, District of Maine*

Whereas, Contractor is a recognized authority on the used automotive market, including, *inter alia*, pricing techniques and inventory management practices.

Now, therefore, Contractor agrees to provide professional services as a litigation expert and/or consultant for the Law Firm in the Litigation. Contractor will, at the request of the Law Firm, draw upon his expertise to assist the Law Firm (and any law firms or lawyers whom the Law Firm expressly designate) in its prosecution of the Litigation of the Instant Matter.

### B.    Compensation and Submissions of Invoices

1.    In consideration for services rendered under this Agreement, the Law Firm will compensate Contractor at the following rate and terms:

      a.  Contractor shall be paid for required Work performed by Contractor at the hourly rate of $650.00.

      b.  A minimum of ten (10) hours will be billable in the Instant Matter.

      c.  No assistance from colleagues of Contractor is anticipated. Should Contractor deem assistance from a colleague necessary with regard to his Work in the Instant Matter, Contractor must obtain Law Firm's written pre-approval.

      d.  Should travel be necessary, travel expenses will be reimbursed at Business Class rates.

2.    Contractor shall submit itemized invoices for services rendered and expenses incurred to the Law Firm every thirty (30) days, starting on the 30th day after the date of this Agreement. Each invoice will set forth the amount of time Contractor has expended in the preceding month. Where appropriate, each invoice will also include a description of all expenses incurred. The Law Firm will direct payment to:

> East Coast Auto Appraisers, LLC
> 725 Park Street PMB 282
> Cumberland, MD 21502

1

Confidential – Subject to Confidentiality Order          Merritt_0001

or by bank wire to Contractor's bank account should Contractor request wire payment.

    3.  All invoices shall be directed to:

> Island Justice
> John Z. Steed, Esq
> PO Box 771
> 40 School St.
> Stonington, ME 04681
> john@islandjusticelaw.com

## C.    Pre-Approval for All Expenses

    1.    All individual expenses under this Agreement must be pre-approved by the Law Firm. The Law Firm will not be obligated to reimburse any such expenses provided under this Agreement in the absence of said pre-approval.

## D.   Confidentiality

    1.    Except as required by the Federal Rules of Civil Procedure or Evidence, or as instructed by the Court in the Litigation or otherwise authorized by the Law Firm, Contractor agrees to keep confidential all the work product he generates under this Agreement and all information the Law Firm or designated law firms or lawyers provide in connection with the Litigation. Contractor has reviewed and signed the Confidentiality Acknowledgment and Affirmation in the Instant Matter.

    2.    Unless the Law Firm elects to disclose Contractor's work or consents in writing to its disclosure, the work to be performed is confidential and protected by the work product doctrine and any other applicable legal privileges. Contractor agrees to take precautions necessary to ensure that disclosure of the materials provided is limited to those persons necessary for the performance of this engagement. To the extent that it is Contractor's practice to retain drafts or other documents that do no represent completed analysis and final conclusions, all such work should be clearly marked in a fashion to indicate that fact.

    3.    Contractor shall not disclose the fact of this retention or the nature of results of work performed to any third party without the Law Firm's prior consent, except as required by law or court order. This provision does not preclude Contractor from disclosing to other relevant parties that a conflict exists that precludes his participation in conflicting third-party assignments.

    4.    By signing this Agreement, Contractor represents and warrants that he has investigated all potential conflicts of interest related to this contemplated retention, that any such potential conflicts have been disclosed, and that, during the course of the retention, Contractor will not accept any conflicting engagement. Specifically, Contractor represents and warrants that he is not currently and does not anticipate becoming an employee of any party to the litigation or of any competitor(s) of Defendants.

2

E.    **Duration and Termination of Agreement**

    1.    This Agreement shall continue in force and effect from the Effective Date until the litigation has concluded or unless and until it is terminated by either the Law Firm or Contractor (as to his own role only) upon written notice provided within 45 days prior to the annual anniversary of the Effective Date.

    2.    The Law Firm and Contractor agree to resolve any disputes arising under this Agreement through final and binding confidential arbitration. Any such arbitration shall also be subject to the laws of a mutually acceptable arbitrator.

    3.    The parties shall not be liable to each other for any consequential, incidental, special, or punitive damages, or for direct compensatory damages in excess of the fees actually received for the performance or services hereunder.

Dated:    06/05/2024    _____
                              Contractor
                              East Coast Auto Appraisers, LLC

Dated:    06/05/2024    _____
                              John Z. Steed, Esq., Island Justice

3

**Confidential – Subject to Confidentiality Order**

# Retention Agreement Island Justice ME for Esign

Final Audit Report                                                2024-06-06

| | |
|---|---|
| Created: | 2024-06-06 |
| By: | John Steed (john@islandjusticelaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAJX8fD8fyH4da7XLITsSv8uHwNlvGMACU |

## "Retention Agreement Island Justice ME for Esign" History

📄 Document created by John Steed (john@islandjusticelaw.com)
2024-06-06 - 1:39:50 AM GMT

📧 Document emailed to Jason Merritt (jason@eastcoastautoappraisers.com) for signature
2024-06-06 - 1:39:54 AM GMT

📧 Document emailed to John Steed (john@islandjusticelaw.com) for signature
2024-06-06 - 1:39:54 AM GMT

📄 Email viewed by John Steed (john@islandjusticelaw.com)
2024-06-06 - 1:40:16 AM GMT

✍ Document e-signed by John Steed (john@islandjusticelaw.com)
Signature Date: 2024-06-06 - 1:40:41 AM GMT - Time Source: server

📄 Email viewed by Jason Merritt (jason@eastcoastautoappraisers.com)
2024-06-06 - 1:44:40 AM GMT

✍ Document e-signed by Jason Merritt (jason@eastcoastautoappraisers.com)
Signature Date: 2024-06-06 - 1:45:39 AM GMT - Time Source: server

✅ Agreement completed.
2024-06-06 - 1:45:39 AM GMT

◢ **Adobe Acrobat Sign**



EXHIBIT _____4_____
WIT: Merritt
DATE: 10·22·24
DJura, RPR

## Brian Roof

**From:**         East Coast Auto Appraisers LLC <messenger@messaging.squareup.com>
**Sent:**         Thursday, August 1, 2024 2:48 PM
**To:**           Brian Roof
**Subject:**      You received a new invoice (#0000156)

**Categories:**   Filed to Clio



### East Coast Auto Appraisers LLC

New Invoice

# $11,050.00

Due on August 31, 2024

**Pay Invoice**

**Thurston v. Progressive**
Invoice #0000156
August 1, 2024

#### Customer
Brian Roof
brianr@clevelandconsumerlaw.com
440-413-5919
767 East 185th Street
Cleveland, OH 44119

#### Date of service
June 27, 2024

Download Invoice PDF

**Confidential – Subject to Confidentiality Order**          **Merritt_0054**

## Invoice summary

| | |
|---|---|
| **05/28/2024 Case Review**<br>($650.00/hr) x 2.000 hr | **$1,300.00** |
| **05/29/2024 Retention Agreement/Disclosure** | **$650.00** |
| **05/29/2024 Expert Report**<br>($650.00/hr) x 1.500 hr | **$975.00** |
| **06/11/2024 Expert Report Document Review**<br>($650.00/hr) x 1.000 hr | **$650.00** |
| **06/18/2024 Zoom Meeting**<br>($650.00/hr) x 1.000 hr | **$650.00** |
| **06/12/2024 Expert Report Draft**<br>($650.00/hr) x 4.000 hr | **$2,600.00** |
| **06/25/2024 Expert Report Review**<br>($650.00/hr) x 1.000 hr | **$650.00** |
| **06/26/2024 Expert Report Follow Up**<br>($650.00/hr) x 0.500 hr | **$325.00** |
| **06/27/2024 Expert Report Follow Up**<br>($650.00/hr) x 2.500 hr | **$1,625.00** |

**Confidential – Subject to Confidentiality Order**      **Merritt_0055**

**07/01/2024 Deposition Preparation**     $1,300.00
**Arrangments and Documents**
($650.00/hr) x 2.000 hr

**07/03/2024 Depostion Preparation**     $325.00
**Responce to Requests**
($650.00/hr) x 0.500 hr

Subtotal     $11,050.00

**Total Due**     **$11,050.00**

**East Coast Auto Appraisers LLC**
725 Park Street
PMB 282, Cumberland, MD 21502-7982 United States
jason@eastcoastautoappraisers.com
301-804-0224

Please contact East Coast Auto Appraisers LLC about its
privacy practices.





EXHIBIT 5
WIT: Merritt
DATE: 10·22·24
DJura, RPR

# American Society of Certified Auto Appraisers

Course One

## Ethics and Standards of Appraising Exam

**1. VALUATION SERVICE DEFINED Question: What is a valuation service? Response:**

Pertaining to the aspect of property value, regardless of the type of service by appraisers, or others.

**2. THE PRIMARY INTENT OF USPAP Question: What is the primary intent of USPAP? Response:**

To promote and maintain a high level of public trust in the appraisal practice by establishing requirements for appraisers.

**3. *DON'T ACCEPT UNLESS YOU CAN APPRAISE FOR...***
**Question: I received an appraisal order that says: "If you can't appraise the property for $XXX,000, you must not accept the appraisal assignment." How should I respond to this appraisal order? Response:**

I would not be able to accept this appraisal assignment due to the fact it would not be objective at this point if I am required to establish a value at a required amount.

**4. PLAGIARISM**
**Question: Is plagiarism considered unethical or improper? Response:**

Yes, it is considered unethical. We are not allowed to be misleading on an appraisal and representing anothers' work as ours is misleading and therefore not allowed.

**5. USING A FLAWED APPRAISAL REPORT**
**Question: A client engages an appraiser (Appraiser A) to appraise a property. Appraiser A is provided with a copy of an appraisal report prepared by another appraiser (Appraiser B) retained by the property's owner. Appraiser A finds significant errors in Appraiser B's appraisal report. What should Appraiser A do? Response:**

We must independently verify the information we use on any Appraisal Report. Appraisal Report B cannot be used to establiosh a value and the errors or the omission of the report must be noted.

**6. SUPPORTED AND UNSUPPORTED CONCLUSIONS**
**Question: The Conduct section of the ETHICS RULE states, in part:**
*An appraiser must not use or rely on unsupported conclusions relating to characteristics such as race, color, religion, national origin, gender, marital status, familial status, age, receipt of public assistance income, handicap, or an unsupported conclusion that homogeneity of such characteristics is necessary to maximize value. Does this imply that relying on supported conclusions relating to characteristics such as race, color, religion...is acceptable?*
**Response:**

No it is not acceptable

**7. THINGS OF VALUE RECEIVED FOR PROCUREMENT OF AN ASSIGNMENT Question:
Are appraisers required by USPAP to disclose the payment of cash or other things of value to
clients in order to obtain assignments?
Response:**

Yes but it must be noted in the certification.

**8. REDUCING APPRAISAL FEES WHEN TRANSACTIONS FAIL TO CLOSE Question: Is it
ethical for an appraiser to offer a client a reduced fee on an appraisal if the client's loan does not
close?
Would the result be different if the client agreed to pay extra for other assignments? Response:**

Neither of these are considered as Ethical.

**9. APPRAISAL FEES AS PERCENTAGES OF VALUE CONCLUSIONS
Question: Is it acceptable for an appraisal fee to be based on a percentage of the value
conclusion?
Response:**

No, this is a violation of the ETHICS RULES

**10. PAYING FEES FOR PROCURING APPRAISAL ASSIGNMENTS**

**Question: It has come to my attention that a local appraiser is paying a home inspection firm a
$25.00 referral fee for each appraisal assignment the home inspector refers to the appraiser. Is it
unethical to accept an assignment if the appraiser paid a fee for the assignment?**

**Response:** No, you may offer referral fees but when you offer these fees and you are performing an
appraisal on one that you have paid a referral fee to, you must disclose that in your report.

**11. DISCLOSING RESULTS OF APPRAISAL ASSIGNMENTS
Question: I have been asked by my client's business associate for information relating to an
appraisal report I prepared for my client. Can I disclose the results of an appraisal assignment to
parties other than the client?
Response:** Assignment results are confidential unless the client gives permission.

**12. SAMPLE APPRAISALS AND THE ETHICS RULE
Question: I am a fee appraiser currently seeking to get on the approved list for a local mortgage
company. In order to be considered for approval, this lender requires appraisers to provide
sample appraisal reports performed within the past year. Is there a way that I can accomplish this
without violating USPAP?
Response:** Yes, it can be accomplished by obtaining permission from the client of each sample, or by
redacting all confidential information.

**13. CONTENTS OF A WORKFILE
Question: What information must be retained in an appraiser's workfile? Response:** Name of client
or intended users, True copies of written reports, Summaries of all oral reports, All other data used to
establish and support the opinions.

**14. TIME PERIOD TO RETAIN WORKFILES
Question: How long do I have to retain a workfile for an assignment? Response:** 5 years after
completion or 2 years after disposition of the case.

**Confidential – Subject to Confidentiality Order**    **Merritt_0006**

### 15. ACQUIRING KNOWLEDGE & EXPERTISE TO COMPLY WITH THE COMPETENCY RULE
**Question: How does an appraiser gain the knowledge and expertise required by the COMPETENCY RULE if he or she lacks the knowledge and experience to complete an assignment competently?**

**Response:** With the documented assistance of another appraiser that has the experience and competency to complete the assignment. As well as the personal study.

### 16. IDENTIFICATION OF THE CLIENT **Question: Who is the appraiser's client? Response:** The party or parties that employ the services whether directly or through an agent.

### 17. EFFECTIVE DATE OF THE APPRAISAL
**Question: The Standards Rules require all appraisal reports to disclose the effective date of the appraisal. Must the date be reported as a specific day, month, and year, or is it sufficient to simply provide the month and year?**
**Response:** Depends on the request. Normally a date including the day month and year. But some reports the exact date is not possible. So yes at time this is acceptable.

### 18. DATE OF VALUE
**Question: Is the effective date of the appraisal the same as the date of value? Response:** Date of the value or the date that the opinions/conclusions apply.

### 19. COMPETENCY AS OF EFFECTIVE DATE OF THE APPRAISAL
**Question: Can an appraiser prepare a retrospective appraisal, with an effective date of value as of five years ago, if that appraiser wasn't even an appraiser five years ago? Response:** Yes, as long as they are when the appraisal is completed.

### 20. CURRENT AND RETROSPECTIVE VALUE OPINION WITHIN ONE REPORT **Question: I have been asked to perform an appraisal assignment that includes providing a retrospective value as well as a current value. Can I report both value opinions within one appraisal report?**
**Response:** Yes, both can be included in one report.

### 21. RANGE OF VALUE
**Question: Is a range of value acceptable in an appraisal? Response:** Yes, an opinion can be expressed in a range if that is the purpose of the appraisal.

### 22. Question: Does USPAP require the property be inspected? Response: No it does not require a personal inspection. You note that in the Certification part of the report.


Jason Merritt

# American Society of Certified Auto Appraisers

Course Four

## Market Value Conclusions and Documentation Exam

1) What must be clearly stated at the beginning of an appraisal in order to set up the rest of the appraisal?

*must identify the problem to be solved, determine the scope of work necessary to solve the problem, and correctly complete research and analyses necessary to produce a credible appraisal. The type of value*

2) Name the three things an appraiser must be aware of when developing and appraisal.

(a) identify the client and other intended users
(b) identify the intended use of the appraiser's opinions and conclusions
(c) identify the type and definition of value, and, if the value opinion to be developed is market value, ascertain whether the value is to be the most probable price

3) In reporting the results of an automobile appraisal, the appraiser must do what?

An appraiser must communicate each analysis, opinion, and conclusion in a manner that is not misleading.

4) Name the three things a written or oral property appraisal must report.

(a) clearly and accurately set forth the appraisal in a manner that will not be misleading;
(b) contain sufficient information to enable the intended users of the appraisal to understand the report properly; and
(c) clearly and accurately disclose all assumptions, extraordinary assumptions, hypothetical conditions, and limiting conditions used in the assignment.

5) The minimum content of a summary appraisal report must contain what (11 things)?

(i) state the identity of the client and any intended users, by name or type;

(ii) state the intended use of the appraisal

(iii) summarize information sufficient to identify the property involved in the appraisal, including the physical and economic property characteristics relevant to the assignment;

(iv) state the property interest appraised;

(v) state the type and definition of value and cite the source of the definition;

(vi) state the effective date of the appraisal and the date of the report;

(vii) summarize the scope of work used to develop the appraisal;

(viii) summarize the information analyzed, the appraisal methods and techniques employed, and the reasoning that supports the analyses, opinions, and conclusions; exclusion of the sales comparison approach, cost approach, or income approach must be explained;

(x) clearly and conspicuously:
__ state all extraordinary assumptions and hypothetical conditions; and __ state that their use might have affected the assignment results; and

(xi) include a signed certification.

6) Why is it important for an appraisal to have a signed certification?

It is an integral part of the appraisal. It verifies that the appraiser takes all responsibility that all the conditions have reported.

7) Why is it important to state the appraisal method and techniques employed?

Appraisals can be substantially affected by the methods used and have an impact on the appraisal profession. Stating the methods used are needed to show the process that you established your opinion unless the comparison, cost, or income approach is used.

8) Why is it important to state the appropriate class of the property involved.

This is important to establish the value of the property.

9) Is it necessary to disclose any assistance by another individual in the appraisal? Why or why not?

Yes, if another appraiser is used in the appraisal, the additional appraiser must also be disclosed. If one appraiser certifies and signs the appraisal, then that Appraiser assumes responsibility and is certifying that the assistant is competent. It is not required to explain what significant assistance was provided, but it must be disclosed.

Jason Merritt

**Confidential – Subject to Confidentiality Order**          **Merritt_0009**

# *American Society of Certified Auto Appraisers*

Course Three

## Methodology, Classic Car, Diminished Value Exam

1) What is the objective of an Appraisal Report?

To determine the appropriate value of a vehicle as the date of the inspection. It is related to the function and purpose of the appraisal as well.

2) An appraisal is a Relative Estimate of Value. What is it relative to?

It is relative to the similarities between the subject and comparable property. It is also relative to the current market conditions.

3) What does the science of appraising require?

Must know and understand the basic principles and appraisal standards pertaining to valuation and evaluation.

4) Define Comparables.

Property that has qualities and characteristics that are significantly similar to the subject property.

5) Define Value.

This is the monetary worth an informed person would offer for an item.

6) Define Function and Purpose.

Appraisal concepts that are incorporated in terms used in appraisal function and purposes. Function explains how the property is to be used. And the Purpose is identifies what information the appraiser has been asked to provide.

7) Define Depreciation.

It is a loss in property value.

8) What documentation and paperwork should be collected at the time of a Classic Car inspection?

Title, historical documents (previous copies of titles, photos, etc)

Service or restoration receipts, photos of repairs, any tpes of paperwork for repairs, parts, or evidence of the parts that have been used. Any documents that show evidence of the listed milage.

**Confidential – Subject to Confidentiality Order**    **Merritt_0010**

9) Why is it important to collect the documentation and paperwork?

The paperwork will help establish the history of the vehicle. The history is an important point of value. The paperwork will also establish the options, features, manufacture originality.

10) When starting a classic car, what should you look for or listen for after starting the engine?

Many things to watch or look for. A few only are engine smoke, is the smoke a head related issue, rings, or just aged value seals. Engine noise, top end value rattles or lower end knock. Are there any misses in the ignition or is there just an issue with the choke, or possibly the carburetor is now needing cleaned and adjusted. Does the engine heat to the correct temperature and are there any issues with the cooling system that may be evidence of a head gasket/cracked head, etc.

11) Name five things to look for on a test-drive of a classic car.

Engine performance, Smooth acceleration.

Transmission- Shifts smoothly is an automatic. Clutch engages completely and disengages. No vibration in the flywheel.

Suspension- Vehicle tracking straight and steering tight and without excessive play. Springs, shocks operating and not making any noises or excessive travel.

Brakes- Full pedal, Pedal holds and does not Leak off pressure. Braking is smooth and vehicle does not pull to one side while braking. No vibration during braking.

Electrical- Gauges operating correctly, lights on dash noticeable and operating. Functions features working. (radio, A/C, windows etc.)

12) Name five things to look for while doing the visual inspection of the exterior of a classic car.

Body rust, or previous repairs

Fit and finish of panels.

Dents paint damage.

Doors, trunk, hood operation.

Trim fit and not missing or incorrect to the vehicle model.

13) Name five things to look for while doing the visual inspection of the interior of a classic car.

Seat material correct and intact, operational.

Carpet condition.

Seat Belt operation if equipped.

Make certain all the interior features are operational or equipped for the year make and model.

14) Name five things to look for under the hood of a classic car.

Verify that the engine is the correct engine for the vehicle. If not identify the engine to the best of ability.

Oil leaks, fluid leaks.

Belts, hoses, lines not dry rotten or worn.

Engine mounts solid

Wiring correctly managed and protected.

15) While doing a visual inspection of the exterior, what should you be looking for as far as alignment of the panels etc...?

Panels straight and the gaps are consistent from one side to the other. Doors close correctly and not touching or striking the body when closing or opening.

16) Define a Diminished Value Appraisal.

A report of the value prior to a collision, compared to the value post collision.  The amount of loss due to the collision is the Diminished Value Loss.

17) Define the two types of Diminished Value Appraisals.

Repair Related Diminished Value- Loss of value due to poor collision repairs done by a Body Repair facility.

Market Diminished Value- Inherent loss of value due to a collision. The Market Value has been reduced as result of the collision. The vehicle is not worth as much as it was prior to the collision.

18) Why does frame and structural damage affect the value of a vehicle?

This is one of the most important parts of a vehicle. It is the structure which the entire vehicle is built on. If the frame structure is compromised, the vehicle has suffered major loss of value. This is the major component that will cause a vehicle that is damaged to be a total loss.

19) If filler material is used to repair a car, why might that devalue it?

Body filler is not optimal and over time it will deteriorate causing the finish to fail. The quality of the filler is not important as much as the person mixing and applying the filler to the body.

20) What guidelines should be used to determine the pre-accident value of the vehicle.

Normally the Pre-Accident value is determined with the comparable methodology. Many details of the vehicle can be Hypothetically determined as to the condition prior to the collision.

**Confidential – Subject to Confidentiality Order**          **Merritt_0012**

21) How is the post repair value determined?

Using a formula of the repairs, parts, labor as well as making contact with more than one dealer to obtain a quote of offer from those dealers.

22) Is it acceptable to use a formula to determine post repair value?

It is acceptable to use the formula to determine the value, as well as the quotes from local dealers in the market area.

Jason Merritt

Confidential – Subject to Confidentiality Order        **Merritt_0013**

# American Society of Certified Auto Appraisers

Course Two

## Parts Terminology, Inspection & Documentation Exam

1) Explain in detail what an Auto Appraisal is.

Act or process of determining value. Independent, unbiased opinion of value.

2) What is the difference between a non-certified appraisal and a certified appraisal?

A certified Appraisal contains full description (written)

Date and location of subject.

Description of the methodology used.

Explanation of the purpose

Certification statements-

A non-certified Appraisal would be an appraisal that does not meet these standards.


3) Why is it important not to commit a substantial error in the inspection of the automobile and documentation of the findings?

This would effect the final value and the integrity of the appraisal as well as the appraisal practice.

4) Where is the Vehicle Identification Number and why is it important to document the VIN?

Most commonly on the driver's side top of dash behind the windshield. Also can be on the A-pilar of an older vehicle, as well as the drivers side door. Most commonly on the dash of later model vehicles.

The VIN is the basis of the subject to be appraised. VINs can disclose a wide variety of history as well as options, features etc.

5) Explain in detail the overall inspection of a vehicle. What should be inspected and documented in the appraisal?

**Confidential – Subject to Confidentiality Order**          **Merritt_0014**

All components of the subject. This includes but not limited to: Body, suspension, drivetrain, interior, electrical, and finish. Any issues or conditions must be noted and documented if they are going to be used to establish the value.

6) Why is it important to have a paint meter during the inspection of the vehicle.

A paint meter will assist in determining that there has been paint work or body filler used on the panels. The thickness of the readings may indicate prior damage or repairs. Some work may not be visible or determined only by sight.

7) Explain in detail the minimum level of inspection.

It is the extent of what is outlined in the Scope of Work   and it is to the degree of what is appropriate to establish a credible assignment results.

8) If a vehicle has some minor mechanical defects, has door dings, has minor interior wear, has slightly worn tires and above average mileage, what condition rating would you give it?

#4 Average

9) Describe the condition of your vehicle and give it a condition rating based on the description.

#2 Very Good

10) A Certified Pre-owned Vehicle is a vehicle that a dealer can sale with a warranty and has specific requirements to be certified. Do your own research and determine the condition class a CPO would likely fall under and explain in general when a car can be qualified as a CPO vehicle.

CPO consideration may vary between manufacturers. There are some manufacturers that require no VIN history of any damage or accidents, while others will allow minor damage history. Many manufacturers will limit the model year to only 2 years while others may CPO a vehicle that is less than 7 years old. Milage varies as well. There are some manufacturers that will CPO a vehicle with less than 50,000 miles while others may be 85,000 miles.

11) If you get an assignment to determine the replacement value of a vehicle, what are you going to look for in trying to arrive at that value? Be specific.

The cost to replace an automobile in the exact or equivalent condition and with the same components, less any depreciation due to use or deterioration. This would include cost of custom fabrication, upgrading and any modification cost to duplicate the appraised automobile.

I will look for comparable vehicles that are as close to the Loss Vehicle as possible.

**Confidential – Subject to Confidentiality Order**          **Merritt_0015**

12) What is the difference between a fair market value and a liquidation value?

Fair Market is the highest value that a vehicle can bring on the open market. May not be a time restraint in Fair Market Value.

Liquidation is a sale with limited conditions. It can also be at auction with no reserve.

13) What is a hypothetical value and when would an appraisal need to be labeled a hypothetical value appraisal?

Can be the value of a vehicle that has been disposed of or no longer available. Can be in the past. The appraisal certification will note that it is a hypothetical appraisal.

14) Explain in detail the disclosure requirements for an auto appraisal.

* In developing an appraisal, an appraiser must identify the problem to be solved, determine the scope of work necessary to solve the problem, and correctly complete research and analyses necessary to produce a credible appraisal.

* Be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal.

* Not commit a substantial error of omission or commission that significantly affects an appraisal.

* Not render appraisal services in a careless or negligent manner, such as by making a series of errors that, although individually might not significantly affect the results of an appraisal, in the aggregate affects the credibility of those results.

* Identify the client and other intended users

* Identify the intended use of the appraiser's opinions and conclusions

* Identify the effective date of the appraiser's opinions and conclusions

* Identify the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal

* In developing an appraisal, an appraiser must collect, verify, and analyze all information necessary for credible assignment results

* In reporting the results of an appraisal, an appraiser must communicate each analysis, opinion, and conclusion in a manner that is not misleading

* Each written or oral appraisal report must:

Confidential – Subject to Confidentiality Order        Merritt_0016

(a) clearly and accurately set forth the appraisal in a manner that will not misleading;

(b) contain sufficient information to enable the intended users of the appraisal to understand the report properly; and

(c) clearly and accurately disclose all assumptions, extraordinary assumptions, hypothetical conditions, and limiting conditions used in the assignment.

\* The content of a Summary Appraisal Report must be consistent with the intended use of the appraisal.

15) Why is it important to identify the characteristics of the property that are relevant to the type and definition of value and intended use of the appraisal?

This is relevant to the type and definition of the value and the intended use.

16) Why is it important in reporting the results of an appraisal, that the appraiser communicate each analysis, opinion, and conclusion in a manner that is not misleading?

Anything intentionally reported that is misleading is a violation of ethics and will affect the value as well as the integrity of the appraisal.

17) Why is it important the report reference the existence of specific work file information in support of the appraiser's opinions and conclusions?

The work file shows the reasons used for the opinion and these reasons that support the opinion may be required by courts etc. for litigation.

18) List the 11 steps of documentation of an appraisal.

*1) State the identity of the client and any intended users, by name or type;*

*2) State the intended use of the appraisal;*

*3) Describe information sufficient to identify the personal property involved in the appraisal, including the physical and economic property characteristics relevant to the assignment;*

*4) State the property interest appraised;*

*5) State the type and definition of value and cite the source of the definition;*

*6) State the effective date of the appraisal and the date of the report;*

*7) Describe the scope of work used to develop the appraisal;*

**Confidential – Subject to Confidentiality Order**    **Merritt_0017**

*8) Describe the information analyzed, the appraisal methods and techniques employed, and the reasoning that supports the analyses, opinions, and conclusions;*

*9) State the use of the property existing as of the date of value and the use of the personal property reflected in the appraisal;*

*10) Clearly and conspicuously state all extraordinary assumptions and hypothetical conditions; and that their use might have affected the assignment results; and*

*11) Include a signed certification in accordance*

19) Who should the appraisal be made available to?

The work file should be available for inspection by the client (or a client's representative, such as those engaged to complete an appraisal review), state enforcement agencies, and such third parties as may be authorized by due process of law, and a duly authorized professional peer review committee, except when such disclosure to a committee would violate applicable law or regulation.

20) Choose 20 auto parts and briefly describe the location of each part.

Air Bag Control Module- Can be found in the interior of the vehicle. May be under the driver's seat as well as in the center console area, protected from easy access.

Air Bag Driver, Steering wheel center

Air Bag Passenger, normally on the passenger side dash under the dash cover.

Anti Lock Brake Computer, Normally under the hood in the engine compartment on the driver side mounted to the fender.

Anti Lock Brake Pump. Usually mounted with the master cylinder in the engine compartment.

Axle Assembly Front. Extends from the transmission to the front wheels. Propels the drive wheels.

Axle Assembly Rear. Extends from the rear differential and powers the rear drive wheels. Brake Rotor Drum Rear. On the rear wheels. Used in conjunction with the braking system. Attached with the calipers, and pads.

Bumper Assembly Front- Attached to the front of the vehicle and the assembly is the entire bumper that may include the absorbers as well as the cover.

CD Player Radio- Compact Disc system. If factory installed int eh center of the dash accessible to the driver and possibly the passenger.

Center Pillar--- Structural. Can be referred to as the B pillar as well. On a sedan is to the left just behind the driver and front passenger shoulders. Extends from the side rockers to the roof system.

Condensor Radiator Normally next to the colling radiator on the front of the vehicle. Placed in a location that air can reach the unit to assist int eh colling of the system.

Cooling Fan- Located in the front of the engine. May have more than one and can be manually propelled by the water pump pulleys as well as electrically operated and controlled by the engine temperature.

Conv Top Motor- Normally in the far rear compartment directly behind the rear seat. Can be accessed from the interior of the vehicle or at times accessed by opening the trunk.

Fender Brackets- Deppending on the year, many newer model vehicles do not have fender brackets. The earlier model vehicles use brackets to prevent vibrations of the fenders and to assist with the mounting of the fenders.

Flywheel- This is mounter to the rear of the engine between the engine and a manual transmission. The clutch is mounted to the flywheel.

Floor Panel- Extends throughout the entire bottom of the passenger compartment of the vehicle. The seats and interior may be mounted to the floor panels/boards.

Fog Lamp- Smaller lights that are mounted to the lower portions of the front bumper.

Front Rails- Usually refers to the frame portion of the uni-body vehicle. The front rails may hold the front suspension as well as the engine cradle.

Header Panel- it is the portion of the vehicle that encloses the interior compartment from the engine compartment. The wiring runs through the header into the interior compartment.

Jason Merritt

**Confidential – Subject to Confidentiality Order**          **Merritt_0019**



CUMBERLAND, MD 21502
301-804-0224

WWW.EASTCOASTAUTOAPPRAISERS.COM

### Certified Diminished Value Appraisal

**Vehicle Owner: Williams, Richard**          **Claim# 48-44566-70092**
**Vehicle Year and Make: 2006 Mercedes Benz**     **Vehicle Model: ML350**
**VIN#: 4JGBB86E76A048890**          **Mileage: 34,092**

This report is to determine the diminished value, if any, to the **2006 Mercedes ML350** referenced above. The repairs performed on this vehicle are up to *body shop industry* standards. However, this vehicle has suffered a loss in market value as a result of the accident that took place on or around February 1, 2024.

This report, therefore, is to determine the amount of market related diminished value referenced vehicle has suffered. The **2006 Mercedes ML350** referenced above now has a recorded "accident history" with major damage. The "accident history" associated with this vehicle does, without question, devalue the vehicle. The disclosure laws in the State of Maryland make it mandatory that previous damage be disclosed, (made known), to a prospective buyer. A prospective buyer wouldn't be willing to pay as much for a vehicle that was damaged as he would for one that had never been damaged. The difference in the amount he would be willing to pay for an undamaged automobile versus the price he would be willing to pay for one that has been repaired would be considered "Diminished Value".

*The Law: … where the cost of repairs is used as an alternative method of establishing damages it is considered necessary also to submit both the value before the damage and of value thereof after repair, in order that due allowance may be made for any difference between the original value and the value after repairs.*

*Fred Frederick Motors v. Krause (277 A.2d 464) circa 1971. The Maryland Court of Special Appeals ruled, that if a "plaintiff can prove that after repairs his vehicle has a diminished market value from being injured, then he can recover in addition to the cost of repairs the diminution in market value, provided the two together do not exceed the decrease in value before the repairs." That is the calculator to prove diminished value on a car, not 17c or KBB diminished value calculators many want to use. The lost value is the actual lost value, not some formula that projects diminution of value without considering the actual vehicle at issue.*

<u>Confidential – Subject to Confidentiality Order</u>

## Diminished Value Report

**The Appraisal Methodology...**

There are several factors which affect the amount of Diminished Value, including but not limited to: the year, make and model, mileage, the overall condition of the vehicle prior to the loss, the amount of damage, the type of damage, the extent of the damage, and the damage area.

The valuation process is broken down into two parts. The first part is an industry recognized mathematical formula that breaks down the necessary repairs. These repair operations are weighted proportionally with respect to the degree by which they would affect the vehicles' integrity. The formula applies different weights to different repair procedures on your particular year, make and model vehicle. For example, structural body pulls would be weighted more heavily than would bolt on replacement panels, which would be weighted more heavily than non-structural body repairs, and so on. Dozens of such factors are considered and numerous calculations made to arrive at a base value. This number is then adjusted by a matrix modifier that takes into account the retail value and mileage of the vehicle. This breakdown is needed because different repair procedures affect the loss of value to your automobile in different ways.

The second part is an average of quotes from a number of dealers in the area that deal with car valuations on a daily basis.

It is our objective to render a non-biased opinion pertaining to the loss of value suffered without the vehicle actually being sold. We take a commonsense approach by analyzing the required repairs to determine what is different about the vehicle than prior to sustaining collision damage. We feel our method to be a fair, objective and non-biased means of calculating this type of loss. Our report addresses the extent of damage and places emphasis upon the nature of the damage. This is essential for measuring the degree to which the integrity of the vehicle has been compromised.

**Why Contact Dealers?**

**Dealers make up most of the used car market on average.**
This report is to determine the *market* loss of value your vehicle sustained as a result of this accident. The definition of market is "the business of buying and selling a specified commodity." If no dealers were contacted, then nearly 90% of the market would be left out. Before you had this accident, you had access to this market. If the Insurance Company refuses to acknowledge dealer numbers, then they are telling you that you no longer have access to nearly 90% of the market in a market related diminished value claim.

## Diminished Value Report

The following breakdown lists damages and the loss of value stated vehicle sustained as a result of this accident.

**Vehicle: 2006 Mercedes ML350**
**Mileage: 34092**
**Trans: Automatic**                          **Pre-Loss Condition: Excellent**

**Aftermarket Equipment includes:**
**No additional equipment has been installed.**

**Prior damage history: No prior damage or accident history. Clear title and vehicle history.**

**Approximate value of vehicle *immediately prior to occurrence*: $11,500 Retail Value**

### Part 1

**DAMAGE INFORMATION** (Formula Input):
**Impact Area:** Right Side Impact
**Repair Cost:** $13,272.27
**Mech/Elect Labor:** $165
**Unibody/Frame Labor**: $308
**Structural Labor: $1396**
**New Parts Replacement:** $6882
**Used Parts Replacement**:
**Aftermarket Parts Replacement:**
**Body Labor:** $2059
**Body Repair Labor:** $680
**Paint Labor: $936**

*Notes:*

*This vehicle had a clean history prior to the collision. It is a well maintained and well-kept vehicle. There are service records to indicate regular service and maintenance prior to the collision. The owner maintained a professional ceramic paint protection product on the exterior. The paint and interior of the vehicle has been well preserved and had no issues.*

*Collision: Impact to the right side of the vehicle:  Resulted in replacement to the passenger side of the SUV There was significant damage done to the A-pillar as well as the B-pillar and there was damage done to the subframe that required straightening.*

*The initial inspection of the damage by the adjuster was underestimated. Once the work began, there were 2 additional supplements that were submitted, due to the extensive damage that was discovered. The repairs to the car exceeded the amount that normally would have been considered a Total Loss.*

*The vehicle has been returned to the Body Shop on two occasions for issues with the electronics. The Air Conditioning was malfunctioning as well as the Check Engine Light that indicated a faulty ground.*

*Those conditions have since been repaired, but the vehicle being a 2006 Model year vehicle that is not in the*

*condition that it was prior to the accident, the owner is not trusting the vehicle for extended trips or drives. This was the purpose that the SUV was being utilized for.*

*There is record of Air Bag Deployment as well. This required the replacement of the Seat Belts, and tensioners. Also replaced was the Driver Air Bag, Diagnostic Unit, Rt Impact Sensors. The vehicle required the AirBag Deployment to be reset. This event is now included in Vehicle History Reports.*

*The Black paint was used to refinish the Hood, RT Fender, Bumper, Both right side Doors, as well as small insert pieces and parts. The paint was blended in area of the hood and side. The paint was done well, and a paint meter shows near factory thickness on the replacement panels. However, there is a notable difference in the paint due to the age of the original paint.*

*There are indications of the damage upon inspection. The bolts to the fenders, show that they have been adjusted and the paint indicates the adjustment. The gaps on the SUV appear factory and were aligned correctly. The repairs done to the frame are an obvious indicator of the severe damage. There are pull marks on the subframe and the pull areas of the structure.*

## Diminished Value Report

### *Part 2*

Contact was made with 2 local dealerships.

The first dealer was Timbook Nissan in Motor City, Cumberland, Maryland. This is the dealership that has maintained the vehicle since the vehicle was new. There is not Mercedes dealership in the area and the Nissan dealership is where the vehicle was maintained. The sales manager, Roger Sommers was contacted. He is familiar with the car. He stated that the car was now in his opinion worth less since the accident. He stated that he would not be able to sell the car on his lot and if he had the vehicle in his inventory, he would be more comfortable selling the car at the dealer auction and not for retail on the lot. He states that he believes the Mercedes to be worth $8800.00 if it was sold. At auction, the vehicle would be worth less than that.

The second dealership that was contacted was Thomas Subaru. They are known to sell and purchase all brands of vehicles and has an extensive inventory of used cars, trucks, and SUVs. James Wratchford is the used car manager. He stated that he was not interested in purchasing the car at this time due to the extensive damage. He stated that the vehicle does have value due to the low miles, but the damage and the CarFax report makes it difficult for him to sell on the retail lot. He estimated that the car is now worth $8000.00 retail.

The breakdown is as follows:
     Approximate value of vehicle immediately prior to occurrence: $11,500.00
     Repair Costs: $13,272.27
     Dealer *Consensus* on Value following repairs: $8400.00.

Comparable assessment of damage to this 2006 Mercedes ML 350 is considered a major collision. Although the vehicle was not considered a total loss, the damage would infer that the collision was severe and major, compared. This vehicle will remain as a clear title with no Salvage or Reconstruction branding.

## Total Diminished Value of your vehicle:
### (Average of Market Quotes):

**Value Prior to Loss: $11,500.00**                    **Market Quotes-$8400.00**

## Loss of Market Value Incurred:
# $3100.00

**Diminished Value Report**

**Expert Opinion** *(See credentials on pages 8-10)*

The Automotive Service Association (ASA), an auto industry group, contends that "your vehicle can and should be restored to pre-accident condition." The ASA outlines several steps repair facilities should take to ensure a "proper" and "quality" repair of your vehicle: Repairers should use the best refinishing and paint products and specialists; repairers should use only highly skilled welders who do repairs in accordance with the vehicle manufacturers' recommended procedures; and repairers should be able to pinpoint all damage. In short, the ASA contends the "repair should be a comprehensive reconditioning to original specifications."

Merritt_0024

### Damage Categories

**Frame and Structural**--- There is more weight put on this category than any other. *There is no greater factor in the Diminished Value of a vehicle than frame damage or structural damage. Consumers would be much less willing to buy a car that has frame damage or structural damage than they would a similar one with no frame or structural damage.* If they were to buy the car with frame or structural damage, they would require a substantial discount.

**Used Parts Replacement**---Used parts usually have some type of damage or rust on them when they arrive at the body shop. *When a prospective buyer of your vehicle knows that used parts were used in the repairs of your vehicle, they would not pay as much for it as they would for a similar vehicle that had never been in an accident.*

**Aftermarket Parts Replacement**--- If the Insurance Company uses aftermarket parts on your vehicle; it obviously will diminish the value to a prospective buyer. Aftermarket parts are lower quality parts not made at the factory where your car was built.

**New Parts Replacement**--- Most newer model vehicles now have the VIN stamped on every piece of sheet metal. When a new part is ordered from the factory, it does not have the VIN stamped on the part. *The prospective buyer of your automobile would likely pay more for a vehicle that has the original part and the original paint. (See "Expert Opinion" above).*

**Paint Labor**-- The paint equipment at even the best body shops is not of the same quality as the factory paint equipment. *(See "Expert Opinion" above 2)* Paint depth and quality are less from a body shop painted panel. *The prospective buyer will not be willing to pay as much for a vehicle when one or two parts have been re-painted and the other parts still have the factory paint.*

**Mechanical/Electrical**---If the mechanical and or electrical components of a vehicle have been damaged and repaired, the prospective buyer will be afraid there may be problems in the future. *The buyer would obviously be willing to pay more for a similar vehicle with no history of mechanical or electrical damage.*

**Body Labor**--- Although the body repair men may be excellent at what they do, they cannot duplicate the quality of work that the equipment at a manufacturing plant performs. *(See "Expert Opinion" above).* Knowing that parts were not put on at a factory but by a body repair man at a body shop will likely lower the value of the vehicle on the market.

**Body Repair Labor**--- Filler material on panels is a huge deterrent to prospective buyers. The quality of a part with filler material on it is much lower and *the prospective buyer will not pay as much for a car that has parts with filler material if a similar car has not been in an accident and has no filler material.*

## Diminished Value Report

### East Coast Auto Appraisers LLC Credentials

The staff at East Coast Auto Appraisers has over 15 years of experience in the Automobile Appraisal, and Automobile Dealer Practices.

Our Group and Consultants include: Maryland Automobile Dealer/Salesman License, Licensed Appraisers, Industry Qualified Appraisers and Certified Safety Inspectors.

Combined, we are certified in the diminished value assessments that help automobile owners collect for the loss of value their vehicle suffered.

I certify that, to the best of my knowledge and belief:

✓ The statements of fact contained in this report are true and correct.

✓ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

✓ I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

✓ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

✓ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

✓ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

✓ My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practices* when appied.

✓ I have personally inspected the information that is the subject of this report.

✓ The appraiser herein, by reason of this appraisal is not required to give testimony or attend court or any governmental hearing with reference to the property in question without prior agreement as to fee for additional services desired.

East Coast Auto Appraisers LLC valuations are based on estimate and vehicle information believed to be authentic, reliable and accurate. East Coast Auto Appraisers has used reasonable care in producing the valuations offered, however, East Coast Auto Appraisers makes no guarantees, expressed or implied, as to the final resolution of your claim and shall not be liable for any differences or damages of any type or description incurred by the use of the information.

This report was prepared by Jason W. Merritt

February 2, 2024



# Jason W. Merritt

East Coast Auto Appraisers LLC

Cumberland, Maryland 21502

301-804-0224

jason@eastcoastautoappraisers.com

**Merritt's Alignment Service**                                                                 January 1980-Oct 1987

Authorized Maryland State Inspections mechanic. Certified and Licensed to perform safety inspections for the state of Maryland. Certified in passenger cars. Light duty trucks, and light duty trailers. Certified as the youngest mechanic by the state of Maryland to perform safety inspections.

During this tenure multiple safety inspections were conducted. The Maryland State Inspection procedure is one of the most detailed and thorough state inspection process.

During this tenure I received experience and training in the mechanical aspects and systems of all motor vehicles.

**Maryland State Police**                                                                          Oct 1987- June 2015

October 1987- Entered the Maryland State Police as a Cadet. Served in the Commercial Vehicle Enforcement Unit. During this time, I was certified federally as a Level 1 Inspector for Commercial Vehicles. Level 1 inspections are the highest level of inspections set forth by the Federal Motor Carrier Safety Standards and are recognized at the State and Federal Level. At that same time, I received Hazard Materials Certification and training. I was the first Cadet in the state of Maryland to be certified to conduct Level 1 inspections of commercial vehicles. I conducted accident investigations of commercial vehicles. I performed more than 1000 inspections during this tenure.

August 1990- Graduated the Police Academy and was certified as Police Officer by the Maryland Police Training Commission. Was instructed and certified to conduct accident investigations. During this Academy training many hours were dedicated to Accident Investigations.

August 1990- March 1998 Assigned to Road Patrol throughout the state of Maryland. During that time, I handled numerous high-level Criminal Investigations for multiple thefts as well as assaults and fatal accidents.

March 1998- June 2015

Assigned to the Criminal Enforcement Division, Columbia, Maryland

I was assigned to the C3I Narcotics Unit. This is a multi-jurisdictional Unit that is comprised with multiple agencies and is supervised by the Maryland State Police. During this time as a Narcotics Investigator, I have received many commendations and awards for service.

I have conducted and assisted with more than 4500 investigations and conducted more than 3500 arrests. I have been the author of and assisted with more than 800 Search and Seizure Warrants.

The C3I Narcotics Unit has received numerous awards and recognitions for Outstanding Performance in Narcotics Investigations. While in this capacity I have worked with multiple agencies to include but not limited to the FBI, DEA, ATF, FDA, and Multiple Police Departments throughout Maryland, West Virginia, Virginia, California, Colorado, and Pennsylvania. I have previously been deputized federally with the DEA and the FBI on case specific investigations.

I have worked in a covert capacity for undercover investigations and I have managed more than 1000 criminal informants as well as held caseloads of more than 30 cases at a time. I have testified for the prosecution in many Federal cases. I have been involved in many Federal Level investigations that required testimony and litigation on the state and federal levels. I have taught in the subjects of narcotics, Interview and Interrogation, Confidential Informants, Courtroom Conduct and Testimony, as well as 4th Amendment Law.

I was responsible for the maintenance and acquisition of vehicles of the unit. I was also responsible for the development and design of vehicle equipment and undercover technology used in the vehicles.

I was submitted and verified as an Expert Witness in District and Circuit Courts in the State of Maryland. I have been a witness in numerous courts throughout the state of Maryland the Federal Court system.

I have testified in many criminal and civil cases over 30 years.

Training;

Maryland State Police

Police Academy, Yearly Training to maintain my certification as a Police Officer.

Criminal Investigations

Advanced Criminal investigations.

Narcotics Investigator

DEA Investigators School

Interview and Interrogation

Criminal Informants

Numerous other Narcotics Investigators Trainings throughout the country.

Mobile Forensics Certification

Drug Diversion Training

Accident Investigation

Advance Accident Investigation

**June 2015-August 2016 Merritt's Automotive LLC**
I acquired and assumed a family business in the automotive industry. I was certified through the State of Maryland for automotive safety inspections. I was again certified by the state of Maryland and the Maryland State Police to conduct Safety Inspections on Passenger Vehicles including light duty trucks, and trailers. During this time, I conducted several hundred Certified Safety inspections.

**August 2016 – June 2019   Timbrook Automotive**
I joined the Timbrook Automotive Organization to assist and direct the opening of a motorcycle dealership in Winchester, VA. I assisted in the establishment of that business in the state of Virginia that included permitting licensing etc. I established an online presence and supervised all departments of the dealership from sales to service and marketing. I was responsible for management of employees as well as hiring. I was also responsible and assisted with the discipline of employees and customer relations.
I was the manager of the service department to include the overseeing of the mechanical work performed. I established and conducted several hundred appraisals for the banking industry and received training through Honda USA for safety standards as well as mechanical and technological advances. The Timbrook Automotive Group is a corporation that involves more than ten dealerships and numerous manufactures. I was called upon by many of the dealerships in the organization to conduct appraisals.

**June 2019- Present T3 Intelligence Services**
I am a managing and working partner of this security and private investigation firm. I conduct investigations on all matters. Some cases are criminal, and some are civil.
I have been involved with the insurance industry and have been involved in active investigations with Insurance fraud as well as Workman's Comp fraud.
I am a licensed and certified Private Detective through the Maryland State Police. I also carry a Security Firm License.
I have more than 6 employees that provide security services as well as Executive Protection details. Some are full time employed and are holding security from areas in Allegany County, MD.
I have conducted and advised on several civil cases involving motor vehicle accidents. We also conduct investigations for Asset Recovery of motor vehicles and large vessels.

**April 2020- Present East Coast Auto Appraisers LLC**  www.eastcoastautoappraisers.com

Partnership Owner and operator of this business. I hold a certification through the Bureau of Certified Auto Appraisers located in Houston Texas. This certification has requirements that include classroom training as well as experience in the fields of Total Loss, Loss of Use, Depreciation Value, Actual Cash Value and Classic Values. The certification standards include the knowledge and identification of vehicles that have been damaged through accidents or the elements.

These appraisals detail any damage to the structure of a vehicle, and I am trained and experienced in the detection of repairs or current damage to frames and subframe systems of vehicles.

I have been able to combine my any years of mechanical experience with the investigative training to establish market values of all types of vehicles.

I have testified in multiple cases in court proceedings throughout the US. I have been accepted in courts in the US as an Expert in Actual Cash Values.

**Certifications**

Advanced Accident Investigator
Certified as a Level 4 Motor Vehicle Safety Inspector
Hazardous Material Responder/Inspector
Certified Police Officer Maryland Police Training Commission
Maryland Certified Safety Inspector for multiple classes of motor vehicles
Maryland Certified Salesman
Private Investigator
Certified Auto Appraiser





*References and Resources*:
www.nada.com, www.carfax.com, www.cars.com, and www.autolocater.com.

Vehicle valuation guides were referenced as well to verify market trends and values:
www.nada.com, www.carfax.com, and www.bumper.com.



Merritt_0031

# East Coast Auto Appraisers

CUMBERLAND, MD 21502
☎ 301-804-0224
WWW.EASTCOASTAUTOAPPRAISERS.COM

### Certified Actual Cash Value Appraisal

**Today's Date:** February 14, 2024
**Effective Date / Period:** February 2024
**Vehicle Year & Make:** 2017 Honda
**Vehicle Model:** Accord EX-L
**VIN#:** 1HGCR2F85HA015810
**Mileage:** 86,722
**Transmission:** CVT Automatic

**Client Name:** Sonya Hanekamp
**Phone:** 240-727-1623
**Owner of Vehicle:** Sonya Hanekamp
Cumberland, MD 21502

**Certified Auto Appraiser / Expert Witness:** Jason W. Merritt
**Certification #:** 991911100



**INTENDED PURPOSE:** This report is to determine the FMV / ACV of the 2017 Honda Accord EX-L referenced above on the effective date of February 14, 2024.

**APPRAISAL TYPE:** Restricted Use Appraisal.
**VALUE TYPE:** Fair Market Value / Actual Cash Value.
**APPRAISAL METHODS & TECHNIQUES USED:** Sales Comparison Approach.
**PROPERTY CLASS & USE / OWNERSHIP INTEREST:** Privately Owned / Full Ownership / Clean Title.

East Coast Auto Appraisers has conducted a certified appraisal of your **2017 Honda Accord EX-L** in order to determine the actual cash value of your vehicle. The local market value of this vehicle is Cumberland, MD 21502.

## CERTIFIED ACTUAL CASH VALUE APPRAISAL.

The vehicle is rated to be in above average condition for year, make, model, and mileage. The exterior of the vehicle is in near excellent condition. The vehicle has a recorded of Service and Maintenance. The records are complete and notes that all maintenance parts are OEM Honda Parts. The vehicle has been garage kept and well cared for.

Exterior-

The paint is listed as White Orchid Pearl. The paint and finish on the vehicle is near perfect. There are no signs of prior paint repairs or refinishing. The panels are all factory panels and there has been no body work done.

The glass shows little signs of age, with normal road chips. There is a small windshield repair that was done in the bottom of the windshield, but it is not in the view of the driver.

The wheels show no curb marks and still have the original stickers on the wheels stating that the tires are filled with Nitrogen. The tires are measured at 10/32" and are matching Goodyear tires.

The paint is in great condition and has a recent Ceramic coating completed on the finish. There is a small door ding on the passenger side rear door. It is small but noted.

The lights are all operational.

The vehicle has an option stated as a Winter Package. This comes with wheel opening trim, door edge trim and interior floor mats that are completely cover the floors.

Engine/Drivetrain

The engine bay is clean and detailed. The engine is a 2.4 inline 4-cylinder gasoline engine. This is the original engine to the vehicle. The engine shows no aftermarket or replaced parts.

The transmission is a CVT automatic transmission and is the original transmission.

There are no leaks or issues with the engine or transmission.

Interior-

The interior is tan leather seats with heated and electric. The interior shows no damage or stains. There is no signs of excessive wear. The vehicle has all factory features and there are no aftermarket or replaced parts. The gauges operate correctly. All the lights and options work correctly. The owner pointed out that Honda did have some issues with the head unit of the 2017 Accords that resulted in connection issues with the Apple CarPlay feature. This vehicle does have connection issues with the Apple CarPlay as well. The OEM carpeted florr mats are placed over the Winter Package rummer floor covers as well.

The trunk area is clean and clear of any stains or marks. The original spare tire and hardware is contained and complete.

Test Drive-

A test drive was conducted, and no issues were discovered. The vehicle idles smoothly and there is no burning of oil or fluids from the exhaust system. The exhaust is quiet and factory with no leaks. The engine is smooth at acceleration and there are no misses. No warning lights are on and the oil pressure is at the standard pressure. The steering is tight and there is no pulling or vibrations. The brakes are smooth with no vibrations or noise.

History-

The CarFax show no damage or accident history. There are two reported owners. The vehicle was originally purchased at the Bethesda Honda in Maryland around 12/2016. The vehicle was traded in right away at a Mercedes dealership where the current owner purchased the Honda in April 2017 with 1200 miles on the car. It has remained with this owner since.

The EX-L is the higher trim package, and it includes the most popular options for the Accord. The work that has been performed on the car only includes front rotors and brake pads as well as two sets of tires, and an alignment check.

**3** **comparable** representative vehicles were found near zip code: 21502

Total of (3) comparable vehicles were located within a **100+ mile radius** of stated principal garage.

**Current Local Market Value** - $17,938.00
**Condition / Options-**        (-$0.00)

**Grand Total: $17,938.00**

## Fair Market Value of your auto:
### (Formula and Market Quotes Average weighted by 2.0):

**Formula--$0.**                    **Market Quotes---$53,813.00**

# $17,938.00
### (Actual Cash Value)

## List of Comparable / Dealer Quotes
### February 2024

| Pohanka Nissan of Stafford | Pohanka Acura | Waldorf Honda |
|---|---|---|
| CarFax.com | Cars.com | CarFax.com |
| 2017 Honda Accord EX-L | 2017 Honda Accord EX-L | 2017 Honda Accord EX-L |
| Sale Price: $18,988 | Sale Price: $20,000 | Sale Price: $20,998 |
| Mileage: 71,638 | Mileage: 67,129 | Mileage: 64,111 |
| Mileage Adjustment: $17,513 | Mileage Adjustment: $18,100 | Mileage Adjustment: $18,200 |

  

**The Appraisal Methodology...**

There are several factors which affect the amount of fair market value, including but not limited to; the year, make and model, mileage, options, and the overall condition of the vehicle immediately before the action of loss has taken place.

The first part of our industry recognized methodology is that we review several nationally recognized valuation guides in determining what the fair market value of the vehicle in scope is worth before we contact local dealers and private sellers. This way we have an idea of what the current market is doing. If local dealers and private sellers are not available in the principally garaged location, then we begin contacting dealers and private sellers measuring radially outward from the principally garaged location until the minimum industry accepted standard of two (2) or more comparable or similar vehicles have been identified.

The second part is an average of *retail* quotes from a few dealers in the area that practice car valuations daily. It is our objective to render a non-biased opinion pertaining to the fair market value of the vehicle in scope. We take a commonsense approach by analyzing all accessible data, local buying trends and economics and feel our method to be a fair, objective and non-biased means of calculating this type of loss.

**Why Contact Dealers?**
The answer is obvious. **Dealers make up nearly 90% of the used car market on average.**
This report is to determine the fair *market* value of your vehicle. The definition of market is "the business of buying and selling a specified commodity." If no dealers were contacted, then nearly 90% of the market would be left out.

**Why Contact Private Sellers?**
They make up nearly the rest of the market. Private sellers have been statistically proven to take a greater loss on the fair market value of the auto needing to move it quickly. If this statement is not true, how many people have you encountered that have sold their automobile for the original asking price?

**Why Research Valuation Guides?**
Valuation guides are a nationally recognized means that both buyers and sellers, male and female, can come to a reasonable agreement on the fair market value of the auto in question. It is a good starting point to determine if a buyer/seller should buy/sell a vehicle for more/less than what it is worth or vice versa. East Coast Auto Appraisers incorporates www.nada.com, www.kbb.com, www.autotrader.com www.carfax.com, www.bumper.com, and other industry recognized valuations guides that are accessible to both paid subscribers and the occasional inquirer during our extensive research and data collection. If industry recognized valuation guides were not in place, it would be very easy for deceptive people to mislead the uneducated public of the going price.

Confidential – Subject to Confidentiality Order
Confidential – Subject to Confidentiality Order        Merritt_0035

## Automotive / Insurance / Legal Terms

**Insurance Company** – means an organization that acts as a system or business of insuring property, life, one's person, etc., against loss or harm arising in specified contingencies, as fire, accident, death, disablement, or the like, in consideration of a payment proportionate to the risk involved. A confide to the community.

**Total Loss** – a "Total Loss" means when it will cost more to repair than replace your vehicle. In insurance contracts, the destruction of property such that it is no longer useful for its intended purpose or that renders it of little or no value to the owner.

**Fair Market Value** – means the price that property would bring in a market of willing buyers and willing sellers, in the ordinary course of trade. Market value is generally established, if possible, based on sales of similar property in the same locality.

**Actual Cash Value** – means the cost to replace a vehicle with a comparable vehicle.

**Comparable Vehicle** – means a vehicle that is the same make and model, same or later, similar body style, similar options, and mileage as your vehicle and in as good or better overall condition as established by current data. To achieve comparability, and deductions or additions for options, mileage or condition can only be if they are itemized and appropriate in dollar amount. An insurer must consider information supplied by the victim when determining deductions or additions.

**Current Data** – means no older than ninety (90) days from the date of loss.

**Principally Garaged** – means the zip code where the vehicle is normally kept.

**Settlement** – means when the payment is made to you and or your lien holder.

**Lemon Law** - Lemon laws are state laws that provide recourse for purchasers of automobiles that repeatedly fail to meet quality and performance standards.

**Arbitration** – The hearing and settlement of a dispute between opposing parties by a third party who is not a judge.

**Burden of Proof** – In the law of evidence, the necessity of duty of affirmatively providing a fact or facts in dispute.

**Cause** – A suit, litigation or action – civil or criminal.

**Chambers** – Private office or room of the Honorable Judge.

**Claim** – The assertion of a right, as to money or property; the accumulation of facts which give rise to a right enforceable in court.

**Class Action** – A lawsuit brought by a representative party on behalf of a large group, all whose members have the same or similar grievance against the defendant. Used when the group is too large for it to be practical to name every member of the group or party

**Contempt of Court** – Any act calculated to embarrass, hinder, or obstruct a court in the administration of justice, or calculated to lessen its authority or dignity.

**Count** – A separate and independent claim. A civil petition or criminal indictment may contain several counts.

**Cross Examination** – The questions of a witness in a trial or in the taking or a deposition; by the party opposed to the one who produced the witness.

**Damages** – Monetary compensation awarded by a court for an injury caused by the act of another.

**Defendant** – The person against whom a civil or criminal action is brought.

**Deposition** – A form of oral testimony taken by the opposing attorney in advance of the trial with a court reporter present to record every word.

**Hearsay** – Evidence not proceeding from the personal knowledge of the witness, such as a rumor.

**Hypothetical Question** – A combination of facts and circumstances, assumed or proved, stated in such a form as to constitute a coherent state of facts upon which the opinion of an expert can be asked by way of evidence in a trial.

Confidential – Subject to Confidentiality Order

**Negligence** – A failure to do something which a reasonable man or woman, guided by ordinary considerations, would do; or the doing of something which a reasonable and prudent man or woman would not do.

**Objection** – The act of taking exception to some statement of procedure in trial. Used to call the courts attention to improper evidence or procedure.

**Plaintiff** – A person who brings an action; the party who complains or sues in a personal action and is so named on the record.

**Tort** – An injury or wrong committed, either with or without force to the person or property of another.

**Verdict** – In practice, the format and unanimous decision or finding made by a jury, reported to the court and accepted by it.

**Weight of Evidence** – The balance or preponderance of evidence; the inclination of the greater amount of credible evidence, offered in trial, to support one side of the issue rather than the other side.

Confidential – Subject to Confidentiality Order
Confidential – Subject to Confidentiality Order          Merritt_0037

# CERTIFICATION OF CREDIBILITY

I certify that, to the best of my knowledge and belief:

✓ The methods and calculations used in this report are the unbiased opinion of an experience and qualified professional and are limited only by the reported assumptions and limitations.

✓ The statements of fact contained in this report are true and correct.

✓ This report was provided at the request of an individual, company, or government agency of their own free will and was not solicited for any predetermined reason.

✓ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

✓ I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

✓ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

✓ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

✓ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

✓ My analyses, opinions, and conclusions were developed, and this report has been prepared, in close conformity with the *Uniform Standards of Professional Appraisal Practices.*

✓ I did perform a physical inspection of the vehicle that is the subject of this report.

✓ I have performed no services an appraiser or in any other capacity regarding the vehicle that is the subject of this report within the three-year period immediately preceding the acceptance of this assignment.

✓ No other party provided any service to assist in forming my professional opinion to a reasonable degree of appraisal certainty.

✓ The appraiser herein, by reason of this appraisal is not required to give testimony or attend court or any governmental hearing with reference to the property in question without prior agreement as to fee for additional services desired.

East Coast Auto Appraisers valuations are based on estimate and vehicle information believed to be authentic, reliable and accurate. East Coast Auto Appraisers has used reasonable care in producing the valuations offered, however, East Coast Auto Appraisers makes no guarantees, expressed or implied, as to the final resolution of your claim and shall not be liable for any differences or damages of any type or description incurred by the use of the information.

This report was prepared by: Jason W. Merritt
Certification No. 991911100
Reviewed by: Jason W. Merritt

Signature: *Jason W. Merritt*
Date: February 14, 2024

Confidential – Subject to Confidentiality Order

**Merritt_0038**











Confidential – Subject to Confidentiality Order
Confidential – Subject to Confidentiality Order

References:

Online resources included are as follows, www.carfax.com, www.cars.com, www.autotrader.com, and www.nada.com.

www.bumper.com VIN History
www.carfax.com VIN History
www.honda.com vehicle options and standard equipment verifications.

## J.D. POWER

6/25/2024

**J.D. POWER Used Cars/Trucks**

### Vehicle Information



| | |
|---|---|
| Vehicle: | **2012 Volvo XC70 Wagon 4D XC 3.2L I6** |
| Region: | **Southwestern** |
| Period: | **January 21, 2022** |
| VIN: | **YV4952BL2C1140915** |
| Mileage: | **55,374** |
| Base MSRP: | **$32,550** |
| Typically Equipped MSRP: | **$34,825** |
| Weight: | **3,985** |

### J.D. POWER Used Cars/Trucks Values

| | Base | Mileage Adj. | Option Adj. | Adjusted Value |
|---|---|---|---|---|
| **Monthly** | | | | |
| Trade-In | | | | |
| Rough | $6,800 | $2,675 | N/A | **$9,475** |
| Average | $8,075 | $2,675 | N/A | **$10,750** |
| Clean | $9,125 | $2,675 | N/A | **$11,800** |
| Clean Loan | $8,225 | $2,675 | N/A | **$10,900** |
| Clean Retail | $11,800 | $2,675 | N/A | **$14,475** |
| **Weekly** | | | | |
| Auction | | | | |
| Low | $5,075 | $3,725 | N/A | **$8,800** |
| Average | $7,500 | $3,725 | N/A | **$11,225** |
| High | $9,950 | $3,725 | N/A | **$13,675** |
| Trade-In | | | | |
| Rough | N/A | N/A | N/A | **N/A** |
| Average | N/A | N/A | N/A | **N/A** |
| Clean | N/A | N/A | N/A | **N/A** |
| Clean Loan | N/A | N/A | N/A | **N/A** |
| Clean Retail | N/A | N/A | N/A | **N/A** |

*The auction values displayed include typical equipment and adjustments for mileage and any of the following applicable accessories: engine size, drivetrain, and trim.

J.D. Power Used CarGuide assumes no responsibility or liability for any errors or omissions or any revisions or additions made by anyone on this report. ©2021 J.D.Power

**Merritt_0041**

## J.D. POWER

2/14/2024

J.D. POWER Used Cars/Trucks

## Vehicle Information

| | |
|---|---|
| Vehicle: | 2017 Honda Accord Sedan 4D EX-L 2.4L I4 Auto |
| Region: | Eastern |
| Period: | February 14, 2024 |
| VIN: | 1HGCR2F85HA015810 |
| Mileage: | 88,750 |
| Base MSRP: | $28,820 |
| Typically Equipped MSRP: | $29,810 |
| Weight: | 3,360 |



## J.D. POWER Used Cars/Trucks Values

| | Base | Mileage Adj. | Option Adj. | Adjusted Value |
|---|---|---|---|---|
| **Monthly** | | | | |
| Trade-In | | | | |
| Rough | $13,100 | $425 | N/A | $13,525 |
| Average | $14,400 | $425 | N/A | $14,825 |
| Clean | $15,450 | $425 | N/A | $15,875 |
| Clean Loan | $13,925 | $425 | N/A | $14,350 |
| Clean Retail | $17,325 | $425 | N/A | $17,750 |

**Confidential – Subject to Confidentiality Order**

 **Bumper**

## 2017 HONDA ACCORD

### 1HGCR2F85HA015810

Last reported mileage 1,163 in 04/2017
Created on 02/14/2024 10:10:45



⚠ To check for updates, please rerun the report or turn on monitoring. Other information about this vehicle, such as issues relating to title, theft, damage or otherwise may not have been reported to us, so you should strongly consider a vehicle inspection, test drive and formal title search to make a more informed decision concerning this vehicle before proceeding.

## Overview

| | |
|---|---|
| ✓ NO accidents found! | ✓ NO title brands found! |
| ✓ NO salvage records found! | ✓ No previous lease records on this vehicle found |
| ✓ NO theft records found! | ⚠ 4 sale listings found |
| ⚠ 1 title record reported | ✓ NO recalls found! |

## Possible Market Value

This is the market value of this vehicle when sold through a private party or dealership



| **Average market value** | Retail: | **$21,850** |
|---|---|---|
| Most common value when sold | Clean Trade-in: | **$22,900** |
| **$24,775** | Rough Trade-in: | **$20,550** |

## Vehicle Specs

### General

| Made in | | Type | |
|---|---|---|---|

### Price

| MSRP | N/A | Invoice Price | N/A |
|---|---|---|---|

### Fuel

| Fuel Type | G | Fuel Capacity | |
|---|---|---|---|
| Highway Mileage | | City Mileage | |

### Color

| Installed Color | | Color Code | |
|---|---|---|---|

Confidential – Subject to Confidentiality Order   **Merritt_0043**

**Vehicle Details**

| | |
|---|---|
| Engine | Trim |
| Steering Type | Anti Brake System |
| Gross Weight | Overall Length |
| Overall Height | Overall Width |
| Standard Seating | Optional Seating |

## ⚠ 4 Possible Sales Listings Reported

| Date | Type | Price | Mileage | Days on Market |
|---|---|---|---|---|
| 03/29/2017<br>euro motorcars bethesda | | $26,881 | 1,163 | 3 |
| 02/24/2017<br>new country motors | | $26,881 | 1,140 | 35 |
| 02/06/2017<br>euro motorcars | | $26,881 | 1,140 | 53 |
| 02/06/2017<br>new country motors | | $27,881 | 1,140 | 13 |

##  No accidents found!

PLEASE BE ADVISED: Bumper reports are based upon data available and may include historical accident records from 27 state-level agencies, including Alaska, Arizona, Connecticut, Florida, Idaho, Illinois, Iowa, Kansas, Kentucky, Maryland, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Dakota, Ohio, Rhode Island, Texas, Utah, Vermont, Washington and Wyoming, to the extent such specific data is available. Bumper may not have the complete historical records of every vehicle.

##  No salvage records found!

EXPLANATORY NOTE: If this VIN has a record in the Junk/Salvage or Insurance information then the business that submitted the VIN to NMVTIS deemed the vehicle to be either a junk, salvage, or in the case of an insurer, a total loss. The information in the DISPOSITION field in the Junk/Salvage section denotes what has happened to the VIN (i.e., vehicle) since it came into the possession of the business.

##  No theft records found!

## Ownership History

| | Condition | Date | Location | Price | Seller | Mileage | Lienholder |
|---|---|---|---|---|---|---|---|
| #1 | New | 12/2016 | Bethesda, MD | N/A | Ourisman Honda | | American Honda Finance Corp |
| #2 | Used | 04/2017 | Cumberland, MD | N/A | Euro Motorcars Bethesda | 1,163 | Chessie Cu |

##  1 Title Record Reported

Source: NMVTIS

| Title issue date | State | Status | Mileage | Code |
|---|---|---|---|---|
| 04/11/2017 | MD | Current | 1,163 | 1HGCR2F85HA015810 |

Confidential – Subject to Confidentiality Order

Merritt_0044

2

| 03/22/2017 | MD | Historical | 1,163 | 1HGCR2F85HA015810 |
| 12/01/2016 | MD | Historical | 18 | 1HGCR2F85HA015810 |

## How to Request a State Vehicle Record

### Maryland

Maryland motor vehicle record information may be requested by submitting, by mail, an MVA Request for Record found on our website at DR-057.pdf (maryland.gov).
By Mail:
MDOT MVA
6601 Ritchie Hwy NE
Glen Burnie MD 21062
Attn: Room 145 (for driving records) or Room 202 (for vehicle records)

Instructions on how to submit the application can be found on the Maryland Department of Transportation Motor Vehicle Administration's website at Driver and Vehicle Information - Reports and Documents - Pages (maryland.gov)

---

 **No title brands found!**

### The following are all possible brands applied on this vehicle

Source: NMVTIS

| | | | |
|---|---|---|---|
| ✔ Clear | ✔ Flood damage | ✔ Fire damage | ✔ Hail damage |
| ✔ Salt water damage | ✔ Vandalism | ✔ Kit | ✔ Dismantled |
| ✔ Junk | ✔ Rebuilt | ✔ Reconstructed | ✔ Salvage–Damage or Not Specified |
| ✔ Test Vehicle | ✔ Refurbished | ✔ Collision | ✔ Reserved |
| ✔ Salvage Retention | ✔ Prior Taxi | ✔ Prior Police | ✔ Original Taxi |
| ✔ Original Police | ✔ Re-manufactured | ✔ Reserved | ✔ Warranty Return |
| ✔ Antique | ✔ Classic | ✔ Agricultural Vehicle | ✔ Logging Vehicle |
| ✔ Street Rod | ✔ Vehicle Contains Reissued VIN | ✔ Replica | ✔ Totaled |
| ✔ Owner Retained | ✔ Reserved | ✔ Memorandum Copy | ✔ Reserved |
| ✔ Recovered Theft | ✔ Undisclosed Lien | ✔ Prior Owner Retained | ✔ Vehicle Non-conformity Uncorrected |
| ✔ Vehicle Non-conformity Corrected | ✔ Vehicle Safety Defect Uncorrected | ✔ Vehicle Safety Defect Corrected | ✔ VIN replaced by a new state assigned VIN |
| ✔ Gray Market | ✔ Gray Market | ✔ Manufacturer Buy Back | ✔ Former Rental |
| ✔ Salvage–Stolen | ✔ Salvage–Reasons Other Than Damage or Stolen | ✔ Disclosed Damage | ✔ Prior Non-Repairable / Repaired |
| ✔ Crushed | ✔ Inoperable Vehicle | ✔ Hazardous Substance Contaminated Vehicle | ✔ Export Only Vehicle |
| ✔ Actual | ✔ Not Actual | ✔ Not Actual - Odometer tampering verified | ✔ Exempt from Odometer Disclosure |
| ✔ Exceeds Mechanical Limits | ✔ Odometer may be Altered | ✔ Odometer Replaced | ✔ Reading at Time of Renewal |
| ✔ Odometer Discrepancy | ✔ Call Title Division | ✔ Rectify Previous Exceeds Mechanical Limits Brand | ✔ Pending Junk Automobile |
| ✔ Junk Automobile | | | |

---

## ⚠ 2 Possible Lien Records Reported

| Lien Issue Date | Issuing Authority |
|---|---|
| 12/2016 | American Honda Finance Corp |
| 04/2017 | Chessie Cu |

---

 **No impounds found!**

 **No exports found!**



 **No recalls found!**

⚠ **No likely active warranties found!**

✅ **No likely expired warranties found!**

**Are you a California Resident?** Report something missing or inaccurate by visiting: bumper.com/contact/vehicle-history-report-inquiry/

**Disclaimer:** The information contained in any report and on our website is not necessarily 100% accurate, complete or up to date, nor a substitute for your own due diligence. Our data comes from a wide variety of sources, but some municipalities and jurisdictions are slow to report and digitize their data, so we cannot guarantee or warrant full accuracy of ALL search results. This report does not contain detailed information regarding a vehicle's repair history nor information on all motor vehicles in the United States because some states are not yet providing their vehicle data to the system. Currently, the data provided by states is provided in a variety of time frames; while some states report and update data in "real-time" (as title transactions occur), other states send updates less frequently.

Information on previous, significant vehicle damage may not be included in the system if the vehicle was never determined by an insurance company to be a "total loss" or branded by a state titling agency.

A vehicle history report is NOT a substitute for an independent vehicle inspection. Before making a decision to purchase a vehicle, users are strongly encouraged to also obtain an independent vehicle inspection to ensure the vehicle does not have hidden damage.

It may not currently include commercial vehicles if those vehicles are not included in a state's primary database for title records (in some states, those vehicles are managed by a separate state agency), although these records may be added at a later time.

Brand types and definitions vary by state, but may provide useful information about the condition or prior use of the vehicle.

The information used to compile this report is aggregated from various government agencies, non-profit organizations, and industry sources. The accuracy and reliability of the information supplied depends primarily on the reporting sources, and all entities involved in compiling this report accept no liability for any errors or omissions.



**NMVTIS Disclaimer:** The National Motor Vehicle Title Information System (NMVTIS) is an electronic system that contains information on certain automobiles titled in the United States. NMVTIS is intended to serve as a reliable source of title and **brand** history for automobiles, but it does not contain detailed information regarding a vehicle's repair history.

All states, insurance companies, and junk and salvage yards are required by federal law to regularly report information to NMVTIS. However, NMVTIS does not contain information on all motor vehicles in the United States because **some states** are not yet providing their vehicle data to the system. Currently, the data provided to NMVTIS by states is provided in a variety of time frames; while some states report and update NMVTIS data in "real-time" (as title transactions occur), other states send updates less frequently, such as once every 24 hours or within a period of days.

Information on previous, significant vehicle damage may not be included in the system if the vehicle was never determined by an insurance company (or other appropriate entity) to be a "total loss" or branded by a state titling agency. Conversely, an insurance carrier may be required to report a "total loss" even if the vehicle's titling-state has not determined the vehicle to be "salvage" or "junk."

A vehicle history report is NOT a substitute for an independent vehicle inspection. Before making a decision to purchase a vehicle, consumers are **strongly encouraged to also obtain an independent vehicle inspection** to ensure the vehicle does not have hidden damage. The **Approved NMVTIS Data Providers** (look for the NMVTIS logo) can include vehicle condition data from sources other than NMVTIS.

**Consumer Access Product Disclaimer**

NMVTIS data **INCLUDES** (as available by those entities required to report to the System):

- Information from **participating** state motor vehicle titling agencies.
- Information on automobiles, buses, trucks, motorcycles, recreational vehicles, motor homes, and tractors. NMVTIS may not currently include commercial

**Confidential – Subject to Confidentiality Order**        **Merritt_0046**

4

vehicles if those vehicles are not included in a state's primary database for title records (in some states, those vehicles are managed by a separate state agency), although these records may be added at a later time.
- Information on "brands" applied to vehicles provided by participating state motor vehicle titling agencies. Brand types and definitions vary by state, but may provide useful information about the condition or prior use of the vehicle.
- Most recent odometer reading in the state's title record.
- Information from insurance companies, and auto recyclers, including junk and salvage yards, that is required by law to be reported to the system, beginning March 31, 2009. This information will include if the vehicle was determined to be a "total loss" by an insurance carrier.
- Information from junk and salvage yards receiving a "cash for clunker" vehicle traded-in under the Consumer Assistance to Recycle and Save Act of 2009 (CARS) Program.

Consumers are advised to visit **www.vehiclehistory.bja.ojp.gov** for details on how to interpret the information in the system and understand the meaning of various labels applied to vehicles by the participating state motor vehicle titling agencies.

Copyright © 2024 Bumper Inc. All Rights Reserved.

**Confidential – Subject to Confidentiality Order**          **Merritt_0047**

Jason Merritt (B286544)
Cumberland, MD
Reference Number: Jason

# C A R F A x   Vehicle History Report™

## 2017 HONDA ACCORD
## EX-L

VIN: 1HGCR2F85HA015810
SEDAN 4 DR
2.4L I4 F DOHC 16V
GASOLINE
FRONT WHEEL DRIVE

✅ No accidents or damage reported to CARFAX

🔧 **5** Service history records

👥 **2** Previous owners

🏠 Personal vehicle

🌎 Last owned in Maryland

🔢 **73,718** Last reported odometer reading

This CARFAX Vehicle History Report is based only on information supplied to CARFAX and available as of 2/14/24 at 8:53:57 AM (CST). Other information about this vehicle, including problems, may not have been reported to CARFAX. Use this report as one important tool, along with a vehicle inspection and test drive, to make a better decision about your next used car.

| C A R F A x  **Ownership History**<br>The number of owners is estimated | Owner 1 | Owner 2 |
|---|---|---|
| Year purchased | 2016 | 2017 |
| Type of owner | Personal | Personal |
| Estimated length of ownership | 1 month | 6 yrs. 10 mo. |
| Owned in the following states/provinces | Maryland | Maryland |
| Estimated miles driven per year | — | 9,859/yr |
| Last reported odometer reading | 1,163 | 73,718 |

| C A R F A x  **Title History**<br>CARFAX guarantees the information in this section | Owner 1 | Owner 2 |
|---|---|---|

**Confidential – Subject to Confidentiality Order**      **Merritt_0048**

**Damage Brands**
Salvage | Junk | Rebuilt | Fire | Flood | Hail | Lemon

✓ **Guaranteed** No Problem    ✓ **Guaranteed** No Problem

**Odometer Brands**
Not Actual Mileage | Exceeds Mechanical Limits

✓ **Guaranteed** No Problem    ✓ **Guaranteed** No Problem



**GUARANTEED** - None of these title problems were reported by a U.S. state Department of Motor Vehicles (DMV). If you find that any of these title problems were reported by a DMV and not included in this report, you may qualify.
View Terms

| **C A R F A X**  **Additional History**<br>Not all accidents / issues are reported to CARFAX | Owner 1 | Owner 2 |
|---|---|---|
| **Total Loss**<br>No total loss reported to CARFAX. | ✓ No Issues Reported | ✓ No Issues Reported |
| **Structural Damage**<br>No structural damage reported to CARFAX. | ✓ No Issues Reported | ✓ No Issues Reported |
| **Airbag Deployment**<br>No airbag deployment reported to CARFAX. | ✓ No Issues Reported | ✓ No Issues Reported |
| **Odometer Check**<br>No indication of an odometer rollback. | ✓ No Issues Indicated | ✓ No Issues Indicated |
| **Accident / Damage**<br>No accidents or damage reported to CARFAX. | ✓ No Issues Reported | ✓ No Issues Reported |
| **Manufacturer Recall**<br>No open recalls reported to CARFAX. Check with an authorized Honda dealer for any open recalls. | ✓ No Recalls Reported | ✓ No Recalls Reported |
| **Basic Warranty**<br>Original warranty estimated to have expired. | **Warranty Expired** | **Warranty Expired** |

**C A R F A X**  **Detailed History**

| 👤 **Owner 1**<br>Purchased: 2016 | | | Personal Vehicle |
|---|---|---|---|
| **Date** | **Mileage** | **Source** | **Comments** |
| 08/02/2016 | 2 | Ourisman Honda Bethesda, MD 301-656-1000 ⭐ **4.7 / 5.0** 480 Verified Reviews | 🔧 **Vehicle serviced**<br>- Pre-delivery inspection completed<br>- Nitrogen fill tires<br>- Wheel locks installed<br>- Mud flaps/splash guards installed |

Confidential – Subject to Confidentiality Order        Merritt_0049

💗 **1,008** Customer Favorites

- Exterior trim repaired
- Door edge guards installed

| | | | |
|---|---|---|---|
| 12/01/2016 | 18 | Ourisman Honda<br>Bethesda, MD<br>301-656-1000<br>⭐ **4.7 / 5.0**<br>480 Verified Reviews<br>💗 **1,008** Customer Favorites | **Vehicle sold** |
| 12/01/2016 | | Maryland<br>Motor Vehicle Dept.<br>Bethesda, MD<br>Title #48707830 | **Title or registration issued**<br>- First owner reported<br>- Titled or registered as personal vehicle<br>- Loan or lien reported |
| 12/05/2016 | | Ourisman Honda<br>Bethesda, MD<br>301-656-1000<br>⭐ **4.7 / 5.0**<br>480 Verified Reviews<br>💗 **1,008** Customer Favorites | 🛠️ **Vehicle serviced**<br>- Cargo net installed |
| 01/25/2017 | 1,109 | Euro Motorcars, Inc.<br>Bethesda, MD<br>301-986-0400<br>⭐ **4.7 / 5.0**<br>368 Verified Reviews<br>💗 **266** Customer Favorites | **Vehicle offered for sale** |
| 03/22/2017 | 1,163 | Euro Motorcars, Inc.<br>Bethesda, MD<br>301-986-0400<br>⭐ **4.7 / 5.0**<br>368 Verified Reviews<br>💗 **266** Customer Favorites | **Vehicle sold** |

👤 **Owner 2**
Purchased: 2017

🦊 CARFOX

**Low mileage!** This owner drove less than the industry average of 15,000 miles per year.

**Personal Vehicle**
9,859 mi/yr

| Date | Mileage | Source | Comments |
|---|---|---|---|
| 03/22/2017 | | Maryland<br>Motor Vehicle Dept.<br>Cumberland, MD<br>Title #48994319 | **Title or registration issued**<br>- New owner reported<br>- Loan or lien reported |



| 03/17/2020 | 45,112 | Rice Tire<br>Cumberland, MD<br>301-777-0400<br>⭐ 4.9 / 5.0<br>127 Verified Reviews<br>💜 41 Customer Favorites | **Vehicle serviced**<br>- Tire(s) balanced<br>- Alignment checked<br>- Tire(s) replaced |
|---|---|---|---|
| 05/18/2021 | | Maryland<br>Motor Vehicle Dept.<br>Cumberland, MD<br>Title #48994319 | **Registration issued or renewed** |
| 01/20/2023 | | Maryland<br>Motor Vehicle Dept.<br>Cumberland, MD<br>Title #48994319 | **Registration issued or renewed** |
| 02/09/2023 | 73,718 | Timbrook Automotive<br>Cumberland, MD<br>301-722-8300<br>⭐ 4.6 / 5.0<br>115 Verified Reviews<br>💜 637 Customer Favorites | **Vehicle serviced** |
| 03/23/2023 | | Rice Tire<br>Cumberland, MD<br>301-777-0400<br>⭐ 4.9 / 5.0<br>127 Verified Reviews<br>💜 41 Customer Favorites | **Vehicle serviced**<br>- Tire(s) replaced<br>- Tire(s) balanced |

Have Questions? Consumers, please visit our Help Center at www.carfax.com. Dealers or
Subscribers, please visit our Help Center at www.carfaxonline.com.

---

## C A R F A X  Glossary

**First Owner**
When the first owner(s) obtains a title from a Department of Motor Vehicles as proof of ownership.

**New Owner Reported**
When a vehicle is sold to a new owner, the Title must be transferred to the new owner(s) at a Department of
Motor Vehicles.

**Ownership History**
CARFAX defines an owner as an individual or business that possesses and uses a vehicle. Not all title
transactions represent changes in ownership. To provide estimated number of owners, CARFAX proprietary
technology analyzes all the events in a vehicle history. Estimated ownership is available for vehicles
manufactured after 1991 and titled solely in the US including Puerto Rico. Dealers sometimes opt to take
ownership of a vehicle and are required to in the following states: Maine, Massachusetts, New Jersey, Ohio,
Oklahoma, Pennsylvania and South Dakota. Please consider this as you review a vehicle's estimated ownership
history.

**Follow Us:**  [f] **facebook.com/CARFAX**  [🐦] **@CARFAXinc**  [C] **About CARFAX**

CARFAX DEPENDS ON ITS SOURCES FOR THE ACCURACY AND RELIABILITY OF ITS INFORMATION. THEREFORE, NO RESPONSIBILITY
IS ASSUMED BY CARFAX OR ITS AGENTS FOR ERRORS OR OMISSIONS IN THIS REPORT. CARFAX FURTHER EXPRESSLY DISCLAIMS
ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A
PARTICULAR PURPOSE.

© 2024 CARFAX, Inc., part of S&P Global. All rights reserved.
2/14/24 8:53:57 AM (CST)



Case 1:22-cv-00375-NT    Document 120-21    Filed 01/10/25    Page 162 of 171
Case 2:22-cv-00342-SMB    Document 91-1    Filed 03/06/24    Page 2 of 11
PageID #: 5047



# East Coast Auto Appraisers

CUMBERLAND, MD 21502
☎ 240-727-2681
WWW.EASTCOASTAUTOAPPRAISERS.COM

EXHIBIT ___6___
WIT: Merritt
DATE: 10·22·24
DJura, RPR

### **IACP Certified Actual Cash Value Appraisal**



**Today's Date:**
**Effective Date / Period:**
**Vehicle Year & Make: 1998 Ford Mustang**
**Vehicle Model: Cobra/SVT**
**VIN#:**
**Mileage: 47,922**
**Transmission: Manual 6 Speed**

**Client Name:**
**Owner of Vehicle:**                    **Greenspring, WV**

**Certified Auto Appraiser / Expert Witness:** Jason W. Merritt
**IACP Certification #:** 991911100



## Bureau of Certified Auto Appraisers

IACP

Certifies that Auto Appraiser

### Jason W. Merritt

has complied with the requirements of USPAP
Standard for BCAA Certification of Auto Appraisers

**991911100**
CERTIFICATE NUMBER

**05/27/2020**
EFFECTIVE DATE

**05/27/2022**
EXPIRATION DATE

Kory Bus
PRESIDENT BCAA

1

**INTENDED PURPOSE:** This report is to determine the FMV / ACV of the 1998 Ford Mustang Cobra SVT, referenced above on the effective date of [redacted].

**APPRAISAL TYPE:** Restricted Use Appraisal.
**VALUE TYPE:** Fair Market Value / Actual Cash Value.
**APPRAISAL METHODS & TECHNIQUES USED**: Sales Comparison Approach.
**PROPERTY CLASS & USE / OWNERSHIP INTEREST:** Privately Owned / Full Ownership / Clean Title.

East Coast Auto Appraisers has conducted a certified appraisal of your **1998 Ford Mustang Cobra SVT** in order to determine the actual cash value of your vehicle. The local market value of this vehicle is Cumberland, Maryland.

## IACP CERTIFIED ACTUAL CASH VALUE APPRAISAL.

The vehicle is rated to be in above average condition for year, make, and model. The exterior of the vehicle is in excellent condition. The vehicle has maintained the original condition. There is no rust apparent on the vehicle exterior. The paint is in need of detail finishing but in overall very good condition. The paint is all factory without any paint repairs apparent on any panels. There are limited marks or minor imperfections on the paint. There is no accident history whatso ever and no damage prior or current. All body panels are original and marked with VIN.

The interior is in very good condition. The leather option seats and carpets are in good condition. All original equipment and all are operational. No marks or wear is noticed or found in the interior.

All electronics were fully functional and in good condition. The dashboard and gauges are in good condition. The factory stereo system is functional. The engine and transmission were noted to be in great running condition. The transmission shifts as expected and the clutch operates normally. The engine starts and runs smooth. There are no indications of engine wear or issues. The vehicle was scanned for computer responses. There were minor normal historic codes in the system that refer to the THEFT Deterrent system. No body or electronic system codes or faults.

This vehicle is a one owner vehicle that has been well maintained and stored in a garage. It has all original paperwork as far as manuals, wheel locks and instruction from Ford. Vehicle is in complete operational condition and is a limited production vehicle. Only 1788 Mustang Cobra SVT with Black paint were produced in 1998.

This ACV is of the vehicle in the AS-IS condition at the time of appraisal. Condition adjustments were made, if any, and taken into consideration.

**3 comparable** representative vehicles were found :

Total of (3) comparable vehicles were located within a **200+ mile radius** of stated principal garage.

**Current Local Market Value -** $9600.00--
**Condition / Options-**        (+3650)

**Grand Total: $13,250.00**

=========== Comparable Breakdown ===========

Comp. Average Mileage--- 56,701
Mileage Adjustment--- 8779
Option Adjustment--- 850
List vs. Take Adjustment--- N/A
Comp. Average Adjusted Price $12,999.00

## Fair Market Value of your auto:
### (Formula and Market Quotes Average weighted by 3.0):

**Formula--$38,998.00**                                    **Market Quotes---$12,999.00**

2

Case 1:22-cv-00375-NT    Document 120-21    Filed 01/10/25    Page 164 of 171
Case 2:22-cv-00342-SMB    Document 91-1    Filed 03/06/24    Page 4 of 11
PageID #: 5049

# $13,250.00

**(Actual Cash Value)**

## List of Comparable / Dealer Quotes

TRUE Car
Fenton, MI
1998 Ford Cobra SVT
Sale Price: $15,000
Mileage: 39,786

Westbury Toyota
Westbury, NY
1998 Ford Cobra SVT
Sale Price: $9,999
Mileage: 74,159

Village Auto
Franklin, PA
1998 Ford Cobra SVT
Sale Price: $13,999
Mileage: 56,158

  

TRUE Car                    Westbury Toyota                    Village Auto

3

Case 1:22-cv-00375-NT    Document 120-21    Filed 01/10/25    Page 165 of 171
Case 2:22-cv-00342-SMB    Document 91-1    Filed 03/06/24    Page 5 of 11
PageID #: 5050

**The Appraisal Methodology…**

This is not sophisticated rocket science. What would you consider to be fair market value should you be involved in a total loss claim on your automobile? The going price in your local area or the lowest priced comparable?

There are several factors which affect the amount of fair market value, including but not limited to; the year, make and model, mileage, options, and the overall condition of the vehicle immediately before the action of loss has taken place.

The first part of our industry recognized methodology is that we review several nationally recognized valuation guides in determining what the fair market value of the vehicle in scope is worth before we contact local dealers and private sellers. This way we have an idea of what the current market is doing. If local dealers and private sellers are not available in the principally garaged location, then we begin contacting dealers and private sellers measuring radially outward from the principally garaged location until the minimum industry accepted standard of two (2) or more comparable or similar vehicles have been identified.

The second part is an average of *retail* quotes from a few dealers in the area that practice car valuations daily. It is our objective to render a non-biased opinion pertaining to the fair market value of the vehicle in scope. We take a commonsense approach by analyzing all accessible data, local buying trends and economics and feel our method to be a fair, objective and non-biased means of calculating this type of loss.

**Why Contact Dealers?**
The answer is obvious. **Dealers make up nearly 90% of the used car market on average.**
This report is to determine the fair *market* value of your vehicle. The definition of market is "the business of buying and selling a specified commodity." If no dealers were contacted, then nearly 90% of the market would be left out.

**Why Contact Private Sellers?**
They make up nearly the rest of the market. Private sellers have been statistically proven to take a greater loss on the fair market value of the auto needing to move it quickly.

**Why Research Valuation Guides?**
Valuation guides are a nationally recognized means that both buyers and sellers, male and female, can come to a reasonable agreement on the fair market value of the auto in question. It is a good starting point to determine if a buyer/seller should buy/sell a vehicle for more/less than what it is worth or vice versa. East Coast Auto Appraisers incorporates www.nada.com, www.kbb.com, www.autotrader.com and other industry recognized valuations guides that are accessible to both paid subscribers and the occasional inquirer during our extensive research and data collection. If industry recognized valuation guides were not in place, it would be very easy for deceptive people to mislead the uneducated public of the going price.

4

Case 1:22-cv-00375-NT   Document 120-21   Filed 01/10/25   Page 166 of 171
Case 2:22-cv-00342-SMB   Document 91-1   Filed 03/06/24   Page 6 of 11
PageID #: 5051

# Automotive / Insurance / Legal Terms

**Insurance Company** – means an organization that acts as a system or business of insuring property, life, one's person, etc., against loss or harm arising in specified contingencies, as fire, accident, death, disablement, or the like, in consideration of a payment proportionate to the risk involved. A confide to the community.

**Total Loss** – a "Total Loss" means when it will cost more to repair than replace your vehicle. In insurance contracts, the destruction of property such that it is no longer useful for its intended purpose or that renders it of little or no value to the owner.

**Fair Market Value** – means the price that property would bring in a market of willing buyers and willing sellers, in the ordinary course of trade. Market value is generally established, if possible, based on sales of similar property in the same locality.

**Actual Cash Value** – means the cost to replace a vehicle with a comparable vehicle.

**Comparable Vehicle** – means a vehicle that is the same make and model, same or later, similar body style, similar options, and mileage as your vehicle and in as good or better overall condition as established by current data. To achieve comparability, and deductions or additions for options, mileage or condition can only be if they are itemized and appropriate in dollar amount. An insurer must consider information supplied by the victim when determining deductions or additions.

**Current Data** – means no older than ninety (90) days from the date of loss.

**Principally Garaged** – means the zip code where the vehicle is normally kept.

**Settlement** – means when the payment is made to you and or your lien holder.

**Lemon Law** - Lemon laws are state laws that provide recourse for purchasers of automobiles that repeatedly fail to meet quality and performance standards.

**Arbitration** – The hearing and settlement of a dispute between opposing parties by a third party who is not a judge.

**Burden of Proof** – In the law of evidence, the necessity of duty of affirmatively providing a fact or facts in dispute.

**Cause** – A suit, litigation or action – civil or criminal.

**Chambers** – Private office or room of the Honorable Judge.

**Claim** – The assertion of a right, as to money or property; the accumulation of facts which give rise to a right enforceable in court.

**Class Action** – A lawsuit brought by a representative party on behalf of a large group, all whose members have the same or similar grievance against the defendant. Used when the group is too large for it to be practical to name every member of the group or party

**Contempt of Court** – Any act calculated to embarrass, hinder, or obstruct a court in the administration of justice, or calculated to lessen its authority or dignity.

**Count** – A separate and independent claim. A civil petition or criminal indictment may contain several counts.

**Cross Examination** – The questions of a witness in a trial or in the taking or a deposition; by the party opposed to the one who produced the witness.

**Damages** – Monetary compensation awarded by a court for an injury caused by the act of another.

**Defendant** – The person against whom a civil or criminal action is brought

**Deposition** – A form of oral testimony taken by the opposing attorney in advance of the trial with a court reporter present to record every word.

**Hearsay** – Evidence not proceeding from the personal knowledge of the witness, such as a rumor.

Case 1:22-cv-00375-NT   Document 120-21   Filed 01/10/25   Page 167 of 171
Case 2:22-cv-00342-SMB   Document 91-1   Filed 03/06/24   Page 7 of 11
PageID #: 5052

**Hypothetical Question** – A combination of facts and circumstances, assumed or proved, stated in such a form as to constitute a coherent state of facts upon which the opinion of an expert can be asked by way of evidence in a trial.

**Negligence** – A failure to do something which a reasonable man or woman, guided by ordinary considerations, would do; or the doing of something which a reasonable and prudent man or woman would not do.

**Objection** – The act of taking exception to some statement of procedure in trial. Used to call the courts attention to improper evidence or procedure.

**Plaintiff** – A person who brings an action; the party who complains or sues in a personal action and is so named on the record.

**Tort** – An injury or wrong committed, either with or without force to the person or property of another.

**Verdict** – In practice, the format and unanimous decision or finding made by a jury, reported to the court and accepted by it.

**Weight of Evidence** – The balance or preponderance of evidence; the inclination of the greater amount of credible evidence, offered in trial, to support one side of the issue rather than the other side.

Case 1:22-cv-00375-NT    Document 120-21    Filed 01/10/25    Page 168 of 171
Case 2:22-cv-00342-SMB    Document 91-1    Filed 03/06/24    Page 8 of 11
PageID #: 5053

# CERTIFICATION OF CREDIBILITY

I certify that, to the best of my knowledge and belief:

✓ The methods and calculations used in this report are the unbiased opinion of an experience and qualified professional and are limited only by the reported assumptions and limitations.

✓ The statements of fact contained in this report are true and correct.

✓ This report was provided at the request of an individual, company, or government agency of their own free will and was not solicited for any predetermined reason.

✓ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

✓ I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

✓ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

✓ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

✓ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

✓ My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practices and the Bureau of Certified Auto Appraisers standards.*

✓ I did perform a physical inspection of the vehicle that is the subject of this report.

✓ I have performed no services an appraiser or in any other capacity regarding the vehicle that is the subject of this report within the three-year period immediately preceding the acceptance of this assignment.

✓ No other party provided any service to assist in forming my professional opinion to a reasonable degree of appraisal certainty.

✓ The appraiser herein, by reason of this appraisal is not required to give testimony or attend court or any governmental hearing with reference to the property in question without prior agreement as to fee for additional services desired.

East Coast Auto Appraisers valuations are based on estimate and vehicle information believed to be authentic, reliable and accurate. East Coast Auto Appraisers has used reasonable care in producing the valuations offered, however, East Coast Auto Appraisers makes no guarantees, expressed or implied, as to the final resolution of your claim and shall not be liable for any differences or damages of any type or description incurred by the use of the information.

This report was prepared by Jason W. Merritt
IACP Certification No. 991911100

Signature: *Jason W. Merritt*
Date:

7

Case 1:22-cv-00375-NT    Document 120-21    Filed 01/10/25    Page 169 of 171
Case 2:22-cv-00342-SMB    Document 91-1    Filed 03/06/24    Page 9 of 11
PageID #: 5054



Side View



Rear View



Engine



Passenger Side



Passenger Interior View



Console/Dash View

8

Case 1:22-cv-00375-NT   Document 120-21   Filed 01/10/25   Page 170 of 171
Case 2:22-cv-00342-SMB   Document 91-1   Filed 03/06/24   Page 10 of 11
PageID #: 5055



Driver Side Interior



Trunk



Front End



Right Rear



Hood





SVT Wheels

9

Case 1:22-cv-00375-NT   Document 120-21   Filed 01/10/25   Page 171 of 171
Case 2:22-cv-00342-SMB   Document 91-1   Filed 03/06/24   Page 11 of 11
PageID #: 5056



VIN Identification



Computer Scan Results



SVT Identification

Undercarriage