Jason Merritt                                          October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF SOUTH CAROLINA
 3      --------------------------
        LEON DRUMMOND, et al.,      :
 4           Plaintiffs,            :
                                    :  Case Number:
 5      vs.                         :
                                    :  5:21-cv-04479-EGS
 6      PROGRESSIVE SPECIALTY       :
        INSURANCE COMPANY, et al., :
 7           Defendants.            :
        _____
 8      LYNN FREEMAN,               :
             Plaintiff,             :  Case Number:
 9                                  :  1:21-cv-03798-DCC
        PROGRESSIVE DIRECT          :
10      INSURANCE COMPANY,          :
             Defendant.             :
11      --------------------------
12          VIDEOTAPED DEPOSITION OF JASON MERRITT
13      DATE:         October 12, 2022
14      TIME:         10:01 a.m. to 2:04 p.m.
15      LOCATION:     King & Spalding, LLP
                      1700 Pennsylvania Avenue, Northwest
16                    Suite 900
                      Washington, D.C. 20006
17
18      REPORTED BY:  Felicia A. Newland, CSR
19
20
21            Veritext Legal Solutions
           1250 Eye Street, N.W., Suite 350
22              Washington, D.C. 20005
```

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 2

1          A P P E A R A N C E S
2  On behalf of Plaintiffs:
3      ALLISON HILL WHITE, ESQUIRE
4      DANIEL S. SANDERS, III, ESQUIRE
5      King & Spalding, LLP
6      1180 Peachtree Street, Northeast
7      Suite 1600
8      Atlanta, Georgia 30309
9      awhite@kslaw.com
10     dsanders@kslaw.com
11 On behalf of Defendants:
12     HANK BATES, ESQUIRE
13     Carney Bates & Pulliam
14     519 West 7th Street
15     Little Rock, Arkansas 72201
16     hbates@cbplaw.com
17 Also Present:
18     Orson Braithwaite, Videographer
19
20
21
22

Page 3

1          C O N T E N T S
2 EXAMINATION BY:                    PAGE
3   Counsel for Plaintiffs            6
4      MERRITT DEPOSITION EXHIBITS
5 NO. DESCRIPTION                     PAGE
6 1   Videotape Deposition of Jason Merritt   14
7     taken in Volino and Plotts vs.
8     Progressive Case, April 7, 2022
9 2   Rule 26(a) Expert Report of Jason      15
10    Merritt, in Freeman case, dated August
11    31, 2022, with 22.08.31 Merritt Expert
12    Report Revised Final 9/1/22
13 3  Rule 26(a) Expert Report of Jason      15
14    Merritt, in Drummond case, dated
15    September 15, 2022, 22.09.06 Merritt
16    Expert Report draft2.LL, 9/15/2022
17 4  Rule 26(a) Expert Report of Jason      19
18    Merritt, dated March 11, 2022
19 5  Vehicle Valuation Report, Bates Numbers   39
20    PGR_DRUMMOND_0000096 through 108
21 6  Vehicle Valuation Report, Bates Numbers   40
22    PGR_DRUMMOND_0000619 through 627

Page 4

1 7   Vehicle Valuation Report, Bates Numbers   41
2     PGR_DRUMMOND_0001361 through 1371
3 8   Vehicle Valuation Report, Bates Numbers   41
4     PGR_FREEMAN_0000356 through 363
5 9   Exhibit 1, Merritt to Freeman Report     61
6 10  Exhibit 1 Merritt to Drummond Report     61
7 11  Bureau of Certified Auto Appraisers,     79
8     Appraiser Status Results printout
9 12  "Make the Turn to the Professional" from   91
10    website of East Cost Auto Appraisers,
11    2022
12 13  "What Exactly is An Appraisal" from East   118
13    Coast Auto Appraisers website, 2022
14
     (*Exhibits attached to transcript.)
15
16
17
18
19
20
21
22

Page 5

1          P R O C E E D I N G S
2              * * * * * * *
3          VIDEOGRAPHER:  Good morning.  We are
4  going on the record at 10:01 a.m. on October 12,
5  2022.  Please note that the microphones are
6  sensitive, may pick up whispering and private
7  conversations.  Please mute your phones at this
8  time.  Audio and video recording will continue to
9  take place unless all parties agree to go off the
10 record.
11         This is Media Unit 1 of the
12 video-recorded deposition of Mr. Jason Merritt,
13 in the matter of Leon Drummond, et al. versus
14 Progressive Specialty Insurance Company, et al.,
15 filed in the United States District Court,
16 District of Southern South Carolina, Case Number
17 5:21-cv-04479-EGS, also in the matter of Lynn
18 Freeman versus Progress Direct Insurance Company,
19 Case Number 1:21-cv-03798-ECC.  The location of
20 this deposition is King & Spalding, LLP.
21         My name is Orson Braithwaite,
22 representing Veritext Legal Solutions, and I'm

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 6

1 the videographer. The court reporter is Felicia
2 Newland from the firm Veritext Legal Solutions.
3          Counsel will now state their
4 appearances and affiliation for the record.
5          MS. WHITE: Allison White for
6 Defendants.
7          MR. SANDERS: Daniel Sanders for the
8 Defendants.
9          MR. BATES: Hank Bates representing
10 the Plaintiff.
11          VIDEOGRAPHER: Thank you.
12          Will the court reporter please
13 swear in the witness?
14          * * * * * * *
15 Whereupon,
16          JASON MERRITT
17 was called as a witness, and having been first duly
18 sworn, was examined and testified as follows:
19      EXAMINATION BY COUNSEL FOR PLAINTIFFS
20 BY MS. WHITE:
21      Q    Good morning. My name is Allison
22 White.

Page 7

1      A    Good to meet you.
2      Q    You too.
3          I represent the Progressive
4 Defendants today in -- in both the Freeman matter
5 and the Drummond matter.
6      A    Okay.
7      Q    Will you please state your full name
8 and residence address for the record?
9      A    Yes. Jason William Merritt. I live
10 at 11406 Spring Hollow Road in Cumberland, Maryland
11 21502.
12      Q    Okay. And you've been deposed
13 before, right?
14      A    Correct.
15      Q    Okay. I just want to go over some
16 reminders. You understand that you've taken an
17 oath and it's the same as if you were testifying in
18 court, right?
19      A    I do.
20      Q    We have a court reporter who's taking
21 down everything that we say in a transcript, so
22 it's important to give verbal responses and not

Page 8

1 head nods or head shakes.
2      A    I understand.
3      Q    To make the court reporter's job
4 easier, let's try our best not to talk over each
5 other. I'll try to wait until you're done with
6 your answer before I ask another question, and if
7 you'll do the same.
8      A    Okay.
9      Q    If at any time today you don't
10 understand a question I ask you, just let me know.
11 I'm glad to rephrase.
12      A    I will.
13      Q    I'll assume that if you answered my
14 question, that you understood it. Is that fair?
15      A    Fair.
16      Q    Your attorney might object to my
17 questions, but unless he specifically instructs you
18 not to answer, you still have to answer the
19 question.
20      A    Understood.
21      Q    At any point please let me know if
22 you'd like to take a break. The only thing I'd ask

Page 9

1 is that if I have a question pending, that you
2 answer the question before we take a break.
3      A    Okay.
4      Q    Are you aware of any reason today
5 that you will not be able to answer questions
6 completely and accurately?
7      A    No.
8      Q    Are you taking any medications that
9 affect your memory?
10      A    No.
11      Q    Any medications that affect your
12 alertness?
13      A    No.
14      Q    Anything else that would prevent you
15 from testifying completely and accurately or impair
16 your ability to do so?
17      A    Nothing at all.
18      Q    Are you represented by counsel today
19 in your personal capacity?
20      A    No.
21      Q    Have you ever been arrested, charged
22 with or convicted of any crime?

3 (Pages 6 - 9)

Jason Merritt                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 10

1    A    No.
2    Q    Have you been a party in any previous
3    litigation?
4    A    I was a police officer, so yes, quite
5    a few.
6    Q    Okay.  Other than cases in which you
7    were a police officer?
8    A    No.  Personally, no.
9    Q    Okay.  Have you ever testified as an
10   expert witness in any case other than the one we're
11   in now?
12   A    No.  Civil, no.
13   Q    Okay.
14   A    Criminal, yes.
15   Q    You've testified as an expert witness
16   in a criminal context?
17   A    Correct.
18   Q    Okay.  And there what was the basis
19   of your expertise?
20   A    In the criminal side?
21   Q    Uh-huh.
22   A    Multiple different cases.  Drugs.

Page 11

1    Q    Okay.  Did any of them relate to used
2    automobiles?
3    A    No.
4    Q    Okay.  How did you prepare for your
5    deposition?
6    A    I read through materials and just my
7    life experiences of appraisals.
8    Q    And what materials did you read
9    through?
10   A    Just the appraisals and -- I think it
11   was a couple of appraisals that were given to me
12   and that's about it.
13   Q    When you say "appraisals," are you
14   referring to the Mitchell Vehicle Valuation
15   reports?
16   A    Correct.
17   Q    Okay.  Did you meet with your counsel
18   to prepare for your deposition today?
19   A    Today, no; yesterday, yes.
20   Q    Okay.  How long did you meet?
21   A    We had dinner, so about an hour and a
22   half.

Page 12

1    Q    Did you talk to anyone else to
2    prepare for your deposition?
3    A    Another attorney, Lee Lowther, just
4    by Zoom.
5    Q    Okay.  Did you review any documents
6    other than the valuation reports?
7    A    Other than my submission of my
8    expert, I went over some of that to correct some of
9    that and get that submitted.
10   Q    Any corrections to your expert
11   report?
12   A    I had him review my expert report and
13   submit it because I'm not good at writing that
14   report yet, so just some assistance with that.
15   Q    Okay.  And you're referring to the
16   Freeman and Drummond expert reports?
17   A    Yes.
18   Q    Okay.  And those are ones that were
19   already served.  Is that right?
20   A    Correct.
21   Q    Okay.  And you haven't made any
22   changes to those reports --

Page 13

1    A    No.
2    Q    -- since then?
3    Okay.  Did you review any deposition
4    transcripts?
5    A    From my last one, yes.
6    Q    For Volino?
7    A    Yes.
8    Q    Okay.  Did you review any deposition
9    transcripts from Freeman or Drummond?
10   A    No.
11   Q    Okay.  Are you or have you previously
12   been a Progressive insured?
13   A    No.
14   Q    Have you ever filed a claim against a
15   Progressive insured?
16   A    I don't believe I ever have.
17   Q    Have you ever totaled a car?
18   A    No.  Close to it, but no.
19   Q    My colleague, Jeff Cashdan, deposed
20   you a while back in the Volino case.  Do you
21   remember that?
22   A    Yes.

4 (Pages 10 - 13)

Jason Merritt                                                          October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 14

1        And I did total a car, but it
2    wasn't -- it was a police car, so . . .
3        Q    Okay.
4        MS. WHITE:  I'm going to mark Exhibit
5    1, Tab 1.
6        (Merritt Deposition Exhibit Number 1
7        marked for identification.)
8        MS. WHITE:  All right.  You can pass
9    those around.
10   BY MS. WHITE:
11       Q    And is this the transcript from your
12   deposition testimony in Volino?
13       A    It appears to be, yes.
14       Q    And is everything that you testified
15   to there true and accurate?
16       A    I mean there's -- if this is the same
17   document that I signed prior, yes.
18       Q    Okay.  This is the condensed version
19   of your deposition --
20       A    Okay.
21       Q    -- transcript.
22       A    I'm just not familiar with this exact

Page 15

1    stack of papers, but it appears to be the same.
2        Q    Okay.  And you're unaware of any
3    testimony that you gave in that case that's no
4    longer true and accurate?
5        A    No.
6        Q    Okay.
7        MS. WHITE:  I'm going to introduce
8    Tabs 2 and 3.
9        (Merritt Deposition Exhibit Numbers 2 & 3
10       marked for identification.)
11       MS. WHITE:  And that's 3.
12       MR. BATES:  Yes.
13   BY MS. WHITE:
14       Q    Okay.  If you can confirm for me that
15   the document that is marked as Defendants' Exhibit
16   2 is the report that you prepared in Freeman?
17       A    Exhibit 2?  Yes, this is.
18       Q    Okay.
19       A    Exhibit 2 is correct.
20       Q    Okay.  And the document marked as
21   Exhibit 3 is your report in Drummond?
22       A    It is, correct.

Page 16

1        Q    Okay.  And given that the reports are
2    very similar, when I talk about "your report," can
3    you understand that to mean both reports unless I
4    specify?
5        A    When we get there, I'll --
6        Q    Okay.
7        A    -- I'll let you know if I'm confused.
8        Q    Okay.  Before we get into the meat of
9    your report, I want to make sure we're clear on the
10   meaning of certain terms.
11       What does "actual cash value" or
12   "ACV" mean to you?
13       A    To me, actual cash value, or ACV,
14   means the value of the vehicle.
15       Q    Okay.  And do appraisers attempt to
16   calculate the actual cash value of vehicles?
17       A    Yes, we do.
18       Q    You define appraisal in your report,
19   meaning both reports, as an opinion of value.  Is
20   that right?
21       A    Yes.
22       Q    Why do you call it an opinion as

Page 17

1    opposed to a fact?
2        A    It is my opinion.
3        Q    So is there --
4        A    We try to come up with the most
5    factual number that we could possibly come up with,
6    but there may be variations of other people's.
7        Q    Okay.  So to appraisers, both
8    following the same appraisal methods could
9    reasonably disagree on the actual cash value of the
10   vehicle?
11       A    Could, yes.
12       Q    Okay.  How do you know if an opinion
13   of ACV is correct?
14       A    The opinion of an ACV being correct
15   would mostly be confirmed with other appraisals and
16   together come up with an agreement on the actual
17   cash value.
18       Q    Okay.  What is Mitchell
19   International?
20       A    I'm not very familiar with Mitchell
21   International, so I really couldn't tell you what
22   it is.

5 (Pages 14 - 17)

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 18

1    Q    Okay.  What is a Mitchell report?
2    A    A Mitchell report is an appraisal
3  report that I reviewed here.  The specifics of that
4  whole database I'm not familiar with, but the
5  report is a Mitchell report.
6    Q    Okay.  What is J.D. Power?
7    A    The same, it's just another resource
8  for reports and values.
9    Q    Okay.  What is the projected sold
10  adjustment, or PSA?
11    A    Projected sold adjustment?  It is an
12  valuation, I believe, that some of those reports
13  place on a vehicle.  I'm not really sure how they
14  come up with that.
15    Q    So you don't know how it's
16  calculated?
17    A    No.
18    Q    Do you know what data it relies on?
19    A    No.
20    Q    What is a take-price adjustment?
21    A    I believe that's the same thing,
22  projected.

Page 19

1    Q    Okay.  I believe you talked about
2  take-price adjustment in Volino, you talked about
3  it.  Can you --
4    A    Can you refer to --
5    Q    -- explain what it is?
6    A    -- which page?
7    Q    Well, you talked about it in your
8  Volino deposition transcript.
9        MS. WHITE:  Do we know what page?
10  BY MS. WHITE:
11    Q    Do you recall talking about the
12  take-price adjustment?
13    A    We talked about different prices, so
14  I'd prefer to know exactly what you're referring
15  to.
16    Q    Okay.  Let's look at Exhibit 4 or Tab
17  4.
18        (Merritt Deposition Exhibit Number 4
19         marked for identification.)
20  BY MS. WHITE:
21    Q    Okay.  I'm showing you a document
22  marked as Exhibit 4.  And can you confirm that's

Page 20

1  your report from the Volino case?
2    A    It appears to be, yes.
3    Q    Okay.  And I turned it to the last
4  page, the pages are not numbered, where you discuss
5  a take-price adjustment.  Can you explain what that
6  is?
7    A    I refer to, "While I do not, there
8  are some appraisers who make a take-price
9  adjustment to the Internet price of comparable
10  vehicles."  What I think I'm referring to there is
11  where appraisals refer to the price that it was
12  sold for, and that's what they actually took for
13  the vehicle as far as a selling price.
14    Q    Okay.  So you're saying a take-price
15  means the -- the sold price?
16    A    Yes, I believe that's what I'm
17  referring to.
18    Q    Okay.  A little further down in that
19  paragraph it says, "This adjustment is made only
20  after speaking with a car dealer to determine
21  whether the dealer would take anything other than
22  the advertised price of the vehicle."

Page 21

1        Do you understand the take-price
2  adjustment to mean what the dealer says they will
3  take for it?
4    A    Yes.
5    Q    Okay.  So it's not the vehicle is
6  already sold.  Is that right?
7    A    It appears to in that situation, yes.
8    Q    Okay.  What is a condition
9  adjustment?
10    A    Excuse me?
11    Q    What is a condition adjustment?
12    A    Condition adjustment could be a price
13  adjustment made in the value of the vehicle due to
14  damage to the interior, damage -- wear to the tires
15  or mechanical.
16    Q    How do you determine the dollar
17  amount of the condition adjustment?
18    A    That's where each appraiser will
19  determine on their own what the value is on that
20  adjustment.  I noticed in Mitchell, they have a
21  very good rating system for that, I believe one
22  through three.  And they use that rating system and

6 (Pages 18 - 21)

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 22

1    put a value on it.
2        Q    Okay.  How do -- when you're doing
3    appraisals, how do you determine the cost?
4        A    It depends on the exact vehicle, it
5    depends on what it needs.  If it needed tires, I
6    will look at the price of tires and deduct
7    according to that.
8        Q    Okay.  So would the condition
9    adjustment necessarily equal the cost to fix the
10   issue?
11       A    Not always.
12       Q    Okay.  How do you --
13       A    It depends on if you've got wear in
14   the seat, there's a hole in the seat, you may
15   deduct a hundred dollars.  It depends on the seat,
16   the vehicle, and how much damage.
17       Q    Okay.  So if there was a hole in the
18   seat in a Toyota Corolla, you might deduct a
19   hundred dollars?
20       A    Yes.
21       Q    Would you deduct more if there was a
22   hole in the seat of a Range Rover?

Page 23

1        A    Most likely, yes.
2        Q    Okay.
3        A    It makes sense.
4        Q    So condition in some ways is tied to
5    the value of the vehicle?
6        A    Correct.
7        Q    Okay.  In your report, your Freeman
8    and Drummond report, you used the phrase "arbitrary
9    deductions."  What does that term mean?
10       A    Where are we on that?
11       Q    Exhibits 2 and 3 of your Freeman --
12       A    Okay.
13       Q    -- and Drummond reports.
14       A    It looks like it's on page 4.
15       Q    Uh-huh.  Yes.
16       A    At the very bottom, I say, "Second,
17   appraisal standards do not permit arbitrarily
18   deducting the advertised price of a vehicle based
19   on projections of what the vehicle might ultimately
20   sell for."
21            Is that what you're referring to?
22       Q    Yes.

Page 24

1        And what do you mean by arbitrary --
2    "arbitrary deductions"?
3        A    Just without basis of, I guess,
4    evidence.
5        Q    Okay.  Could you give me a general
6    overview of your methodology and approach for
7    formulating the conclusions you reached with
8    respect to the projected sold adjustment?
9        A    Can you rephrase that again --
10       Q    Sure.
11       A    -- or repeat that again?
12       Q    Could you give me a general overview
13   of your methodology and approach for reaching the
14   conclusions you did about projected sold
15   adjustment?
16       A    Why I disagree with projected sold
17   adjustments?  Okay.
18       Q    Yes, we can start there.
19       A    When I come up with that, the reason
20   I believe the projected sold adjustments are not
21   something that I use is because there's too many
22   factors involved in it.  When I say there's too

Page 25

1    many factors involved in it, I worked in a
2    dealership also and I also did appraisals for
3    totaled vehicles and stuff like that, so when I
4    worked in the dealership, the dealerships put an --
5    an appraised value on the vehicle, what the
6    vehicle's worth on the lot.  And that's what we
7    advertise that vehicle for.
8        There's many conditions involved in
9    the sale of vehicles.  So those conditions could be
10   the sale of a warranty, the sale of service
11   agreements, the sale of tire and rim package, GAAP.
12   There's all kinds of other monetary gains in the
13   deal that will skew the price of the vehicle.
14       So when I was selling a vehicle as a
15   sales manager, if a salesman came in and it was a
16   vehicle that was listed, let's just say, for
17   $10,000, I really didn't care too much about the
18   price of the vehicle.  We looked at the profit of
19   the vehicle.  And if I can add a warranty to that
20   vehicle or if there was a trade-in that we can mark
21   down on the trade-in, I looked at the profit of
22   that vehicle.  So if that vehicle -- if I reduced

7 (Pages 22 - 25)

Jason Merritt                                October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 26

1  the price of that vehicle to 9,000, but yet sold
2  warranties and tire packages, and so on, and still
3  brought my profit back up to or above, then the
4  price of the vehicle really was insufficient to me,
5  it didn't really matter.
6      Q    So these warranties and, you know,
7  rim and tire packages, do those affect the actual
8  cash value of the vehicle?
9      A    No.
10     Q    No?
11     A    (Moving head from side to side.)
12     Q    Okay.  So can you go back and explain
13 to me what methodology or approach you used to
14 reach the conclusions you did about the projected
15 sold adjustment?
16     A    Again, just that.  I don't use
17 projected sold amount -- or projection because when
18 I do the comparables, I only use the advertised
19 price comparables, because working in a dealership,
20 that's what you put on it, the sales price.  It's
21 way too competitive now to overinflate the price of
22 a vehicle.

Page 27

1      Again, Internet has changed a lot of
2  things over the last several -- many years.  And
3  you can't overprice a vehicle and hope that you can
4  take less for it to make your money.  You have to
5  adjust -- you have to appraise it and advertise
6  exactly what you need to get out of it.
7      Q    Okay.  You talked about an example
8  of -- of adding a warranty and possibly reducing
9  the price of the vehicle.  Do you mean to say
10 that -- that doesn't reduce the actual cash value
11 of the vehicle?
12     A    No.
13     Q    Okay.  So you've reduced the price,
14 but the actual cash value has stayed the same?
15     A    Correct.
16     Q    Okay.  What data did you rely on to
17 reach your conclusions?
18     A    My own.
19     Q    Your own data?
20     A    My own -- yes, my own experience as
21 well as -- let me ask that again.  How -- what
22 exactly do you mean which data did I arrive from?

Page 28

1      Q    Do you have data that shows that
2  dealers always make the list price the market price
3  and they always sell for that?
4      A    From my own experience as well as
5  calling other dealers.
6      Q    Okay.  How many other dealers have
7  you called?
8      A    I have called multiple, depends on --
9  depending on the appraisals that I do.
10     Q    Okay.  Did you call ten other
11 dealers?  Or a hundred dealers?
12     A    I'd say between 15 to 50.
13     Q    Okay.  And what are the key
14 assumptions that are baked into your methodology?
15     A    Key assumptions in my methodology on
16 the entire appraisal or projected sale?
17     Q    Your opinion on the projected sold
18 adjustment.
19     A    Again, just talking to the dealers
20 and, again, sitting behind the desk as a sales
21 manager.  Again, I -- I -- when I would sell a
22 vehicle or I would work a deal for a client or

Page 29

1  customer or one of my salesman, the price of the
2  vehicle was the base of the sale, and all profits
3  from there determined the profitability of the
4  vehicle, but the price of the vehicle or the actual
5  cash value stayed the same.
6      Q    Okay.  So you're saying the price of
7  the vehicle that sells for is the actual cash
8  value?
9      A    No.  The advertised price was the
10 actual cash value.
11     Q    Okay.  And sometimes you may take
12 less for a vehicle --
13     A    Correct, the --
14     Q    -- less than actual cash value?
15     A    With other litigating circumstances,
16 like the warranties or whatever.
17     Q    Okay.  So are your opinions based on
18 the assumption that all dealerships function the
19 way the dealership you worked at functioned?
20     A    Yes.
21     Q    Okay.  And if you learned that not
22 all dealerships price at actual cash value, would

8 (Pages 26 - 29)

Jason Merritt                                                      October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 30

1  that change your opinion?

2    A    No.

3    Q    Why not?

4    A    Well, because that's a pretty blanket

5  statement to say all dealers.  But every dealer

6  that I've spoke to, they all talk about

7  profitability of the vehicle.

8    Q    And do they all say that they always

9  price the vehicle on its actual cash value?

10    A    Yes.

11    Q    Okay.  Do they all say that they

12  won't take anything less than actual cash value for

13  the vehicle?

14    A    Again, the whole discussion is over

15  the profitability of it.  If there is a profit

16  margin set up of $2,500 in that vehicle, again, the

17  price of that vehicle priced at $10,000 really is

18  irrelevant at that point, it's the profitability.

19  So that doesn't reduce the actual cash value of

20  that vehicle.

21    Q    Okay.  When were you first retained

22  as an expert in this matter?

Page 31

1    A    In this case, I don't know the exact

2  date.

3    Q    Who retained you?

4    A    Mr. Bates' firm.

5    Q    Okay.  What were the circumstances

6  under which you were retained to provide testimony

7  and opinions in Freeman and Drummond?

8    A    After the Volino case.

9    Q    Okay.  What was the specific

10  assignment you were given in these cases?

11    A    I looked at appraisals, did a couple

12  of appraisals and that was it.

13    Q    Okay.  You did appraisals on the

14  named plaintiffs' vehicles?

15    A    Yes.

16    Q    Okay.

17    A    I believe the ones outlined in my

18  report.

19    Q    Okay.  Have you ever been retained by

20  any of the following attorneys to consult on or

21  testify or provide a report in any other case,

22  Andrew Shamis?

Page 32

1    A    No, I don't believe.

2    Q    Scott Edelsberg?

3    A    Scott Edelsberg, I did an

4  appraisal for them.  It was just an appraisal.

5    Q    Okay.  Chris Gold?

6    A    I don't know that name.

7    Q    Ed Normand?

8    A    I don't know that name either.

9    Q    Amy Judkins?

10    A    No.

11    Q    Have you provided reports or

12  consulted on any other matters for Hank Bates and

13  Lee Lowther?

14    A    Just the Volino case and these two

15  cases.

16    Q    Okay.

17    A    And -- and Edelsberg is the only name

18  I recognize on that list.  And I did an appraisal

19  for him.  I don't believe I did any consulting or

20  anything.

21    Q    Okay.  And was the appraisal that you

22  did for him in relation to a Progressive --

Page 33

1        MR. BATES:  Let me actually -- do you

2  know if that was -- it may have been consulting

3  work, and I don't -- I'm not familiar with it, so

4  in terms of the extent that he's done -- we might

5  need to talk before he gets into that.

6        MS. WHITE:  Okay.

7        THE WITNESS:  I really can't

8  remember.

9        MR. BATES:  Because I don't want

10  to -- if he's a non-disclosed consulting expert --

11        MS. WHITE:  Okay.

12        MR. BATES:  -- or a consulting

13  witness as opposed to an expert, he shouldn't be

14  talking about it.  And I don't know -- so if you

15  want to ask more about that, can we take a break so

16  I can talk to him or --

17        MS. WHITE:  Yeah, we'll come back to

18  that.

19        MR. BATES:  -- we need to contact

20  Mr. Edelsberg and see, you know, whether we're

21  getting into consulting territory.

22        MS. WHITE:  Okay.  Sure.

9 (Pages 30 - 33)

Jason Merritt                                                           October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 34

1  BY MS. WHITE:
2      Q    What was your process for preparing
3  the reports in Freeman and Drummond?
4      A    Looking at -- I think I outlined
5  pretty much in my report just the process that I
6  took, just reviewing the valuation reports prepared
7  and coming up with my opinion there.
8      Q    Are you aware that the federal rules
9  provide that every expert report must include all
10 of the materials you relied upon in preparing your
11 report?
12     A    I do not claim to know all the
13 federal rules, no.
14     Q    Did you rely on any sources in
15 preparing your report?
16     A    The reports that I was given.
17     Q    The valuation reports?
18     A    Yes.
19     Q    Anything else?
20     A    Not that I can recall.
21     Q    But you didn't include a list in
22 either report stating what your reliance of

Page 35

1  materials were, did you?
2      A    I did not make a list, no.
3      Q    Did counsel ask you to produce your
4  reliance materials?
5      A    Not that I know of.
6      Q    Did anyone other than counsel help
7  you prepare the reports in Freeman and Drummond?
8      A    No.
9      Q    Who typed the first draft of your
10 report?
11     A    It's pretty much used off of my last
12 one that I did with Volino, and then prepared from
13 there.
14     Q    Okay.  Other than Volino and Freeman
15 and Drummond, do you have any other experience with
16 Mitchell's projected sold adjustment?
17     A    No.
18     Q    Do you have any experience appraising
19 vehicles for insurance companies?
20     A    I have done actual cash value, not
21 for insurance companies, but other accidents and
22 totaled losses and stuff like that that involved an

Page 36

1  insurance company.
2      Q    Okay.  So you performed appraisals
3  for an insured?
4      A    Yes.
5      Q    Okay.  How many of those have you
6  done?
7      A    I really don't know.
8      Q    Would you say five or a hundred?
9      A    Between there, between those two.
10     Q    Okay.  And were you asked to appraise
11 the specific vehicles at issue in Freeman and
12 Drummond?
13     A    Just the reports is what I reviewed
14 of these that were given to me.
15     Q    Okay.  You said at the beginning that
16 you did appraisals of these?
17     A    I -- what I should have said is I
18 reviewed these appraisals.
19     Q    Okay.  So are you providing your own
20 appraisal for these vehicles?
21     A    No.
22     Q    Okay.  You testified in Volino that

Page 37

1  you have no experience appraising vehicles in mass.
2  Is that still true?
3      A    Correct.  Well, let me correct that.
4  What do you mean by "mass"?
5      Q    Can you appraise 5,000 vehicles at
6  a --
7      A    No.
8      Q    -- time?
9      A    No, I cannot.
10     Q    How did you go about selecting
11 materials to consider in reaching your opinions?
12     A    The materials that were given to me,
13 I reviewed those and I looked at different prices.
14 But again some of these were historic prices, so I
15 really just relied on the information given to me
16 on those reports.
17     Q    Okay.  And Counsel gave you those
18 reports?
19     A    Yes.
20     Q    Okay.  Can you point to any authority
21 that supports your conclusions that the PSA is
22 improper?

10 (Pages 34 - 37)

Jason Merritt                                        October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 38

1    A    To any authority?  No.  I believe
2  there's some states that do not accept it or allow
3  it, but other than that, no.
4    Q    Which states?
5    A    I do not know.
6    Q    When you were retained, what was your
7  understanding of what you were being retained to do
8  so?
9    A    Come in and give an opinion on the
10 Mitchell reports and the methodology that they used
11 and the numbers that they come up with, whether I
12 agree or disagree, or how I come up with my
13 numbers.
14   Q    Okay.  Were you asked to calculate
15 the ACV of these plaintiffs' vehicles?
16   A    Yes.
17   Q    Okay.  And how did you do that?
18   A    To make it very simple, I just
19 removed the PSA from them.
20   Q    Okay.  Did you look at pictures of
21 the plaintiffs' vehicles?
22   A    I don't believe that I had

Page 39

1  pictures -- there -- I can't recall if I had
2  pictures of them or not.
3    Q    Did you attempt to perform any
4  conditioning adjustments?
5    A    No.
6    Q    Did you attempt to determine what the
7  specific comparable vehicles listed in each report
8  sold for?
9    A    I looked at the comparables.  And,
10 again, they're historic, so actually to look them
11 up, I was not able to.  Let me go through some of
12 these again to try and refresh my memory on which
13 vehicles they were exactly.
14   Q    Sure.  We can do that, the valuation
15 reports, if that would help.
16   A    That would help.
17       MS. WHITE:  Okay.  Tab 12.
18       (Merritt Deposition Exhibit Number 5
19       marked for identification.)
20 BY MS. WHITE:
21   Q    And is that the valuation report you
22 reviewed for Lee Williams that's exhibit -- I'm

Page 40

1  sorry, I should have wrote Exhibit 5.  Okay.
2  Exhibit 5 --
3    A    Okay.
4    Q    -- is that the valuation report you
5  reviewed for Plaintiff Lee Williams?
6    A    This does help refresh my memory.
7  Yes.
8    Q    Okay.
9       MS. WHITE:  Tab 13.
10       (Merritt Deposition Exhibit Number 6
11       marked for identification.)
12 BY MS. WHITE:
13   Q    All right.  I'm showing you a
14 document marked as Exhibit 6.  Is that the
15 valuation report you reviewed for Plaintiff Leon
16 Drummond?
17   A    Yes.  This is 2012 Kia Sportage.
18   Q    Okay.
19   A    Number 5 is a 2016 Toyota RAV4.
20   Q    Okay.
21   A    I do recall those.
22   Q    Okay.  Now I'm showing you Exhibit 7.

Page 41

1       (Merritt Deposition Exhibit Number 7
2       marked for identification.)
3  BY MS. WHITE:
4    Q    Is that a valuation report you
5  reviewed for Plaintiff Yeshonda Driggins?
6    A    Yes.  That is as 2007 Buick LaCrosse.
7    Q    Okay.
8    A    That did help refresh my memory.
9       (Merritt Deposition Exhibit Number 8
10       marked for identification.)
11 BY MS. WHITE:
12   Q    All right.  This is Exhibit 8.  Is
13 that the valuation report you reviewed for
14 Plaintiff Lynn Freeman?
15   A    Correct.  2020 Chevrolet Equinox.
16   Q    Okay.  And did you calculate the ACV
17 for each of these vehicles?
18   A    Yes.
19   Q    Okay.
20   A    And I did outline those in my report.
21   Q    Okay.  You don't remember whether you
22 looked at pictures of these vehicles?

11 (Pages 38 - 41)

October 12, 2022

Page 42

1    A    I don't believe I did see pictures of
2  these vehicles.
3    Q    Okay.
4    A    I went through each one of these
5  reports and I looked at the condition report that
6  was given by Mitchell.  Again, I -- I wasn't able
7  to look at these vehicles personally, but they did
8  outline all the conditions of it, including they
9  went down through all the headliner, glass.  They
10  were very detailed in their conditions and rated
11  each one on the condition of it and they made
12  adjustments to that.  And without seeing the
13  vehicle personally, the conditions looked like
14  they're very detailed.
15    Q    Okay.  Other than the Mitchell
16  Valuation Reports, did you have any evidence of
17  what the condition of these vehicles was?
18    A    No, I did not.
19    Q    Did you attempt to determine what the
20  comparable vehicles listed in each of these reports
21  sold for?
22    A    No, I did not.

Page 43

1    Q    Okay.  So you didn't call any of the
2  dealerships were these comparable vehicles were
3  listed and ask how much they were sold for?
4    A    I don't believe I did.
5    Q    Okay.
6    A    Again, the sold price doesn't mean
7  anything.
8    Q    Okay.  How would your report have
9  been different if you would have appraised these
10  vehicles by looking at them in person?
11    A    I don't know that they would have.  I
12  can't project that -- that possibility.
13    Q    What would you have done differently
14  from Mitchell if you had appraised these vehicles
15  in the first instance?
16    A    I think I've testified before that
17  I'm impressed with the Mitchell reports.  I, as an
18  appraiser, don't like them much.  It kind of puts
19  us out of work.  They detail everything very well.
20  They use a lot of comparables.  Their numbers that
21  they come up with, I believe, are very fair.
22    When I say "fair," I'm looking at the

Page 44

1  comparables because they are able to sweep large
2  databases, sometimes that I have to manually search
3  for.  Mitchell has that ability to collect that
4  database quickly.  So what could take me several
5  hours, they could do in a few keystrokes.  So I'm
6  jealousy of that.
7    Their conditions are usually put in
8  by an adjustor, is what I'm assuming, because
9  obviously the computer can't look at conditions, so
10  someone has to manually enter those.  So the
11  numbers that they put on the rating system of -- I
12  believe is very good.
13    So honestly the only thing I can see
14  that I would do differently is projected sale
15  amounts.  That really is.  That's my only, for lack
16  of a better word, beef that I have with the report.
17  The reports are done very consistent.  I think they
18  outline way more.  I mean they go down through all
19  of the equipment, list all of the equipment that
20  that vehicle is associated with then, as well as
21  the comparable vehicles.  It gets into the very
22  detail, even down to a front license plate bracket.

Page 45

1  And I can't say that I will get that detailed on
2  those --
3    Q    Okay.
4    A    -- because I don't have that
5  available to me.
6    So the Mitchell report is very
7  detailed, a very good report.  Again, from an
8  appraiser standpoint, for myself, I do not like to
9  report as far as taking away business from us.
10  But, again, very well-done report, very good
11  report.  A lot of comparables.
12    A lot of these reports -- take
13  Exhibit 5, for example, in that report they're
14  using ten comparables.  I never use ten comparables
15  just because it takes so long to get ten
16  comparables.  And to be able to research each
17  comparable to make sure that the features and
18  options are the same as my comparable.
19    So the Mitchell report is much more
20  detailed with that.  So their comparables, I rely
21  on.  I like their comparables.  Again, the only
22  issue I have with it is the -- in my opinion,

12 (Pages 42 - 45)

Page 46

1 arbitrary projected sale amount.

2     Q    Do you know how Mitchell calculates
3 the dollar amount of condition adjustments?

4     A    No.

5     Q    Do you know how Mitchell calculates
6 the dollar amount of mileage adjustments?

7     A    No.

8     Q    Do you know how Mitchell calculates
9 the dollar amount of equipment adjustments?

10     A    No.

11     Q    Do you know how Mitchell calculates
12 the dollar amount of vehicle configuration
13 adjustments?

14     A    What is a vehicle configuration?

15     Q    For example, if -- if one vehicle is
16 a V6 and one's a --

17     A    Okay.

18     Q    -- four cylinder.

19     A    No, I do not.

20     Q    If you were doing an appraisal in the
21 first instance, would you have wanted to see these
22 vehicles in person?

Page 47

1     A    If I was doing an appraisal, yes. If
2 this just happened and I was appraising a vehicle,
3 I always prefer to see it, but that's not always
4 possible.

5     Q    Okay. Do your expert reports in
6 Freeman and Drummond contain all the opinions
7 you're offering in this matter?

8     A    Yes.

9     Q    And the sum total of your opinions
10 are what?

11     A    Pretty much what I just outlined
12 right there. I -- I follow the methodology of the
13 comparable or comparison appraisals. And, again,
14 my expert opinion in this is Mitchell has put
15 together a very in-depth report, very good report.
16 And I see all the basis for their valuations.

17         And when I go through the conditions
18 on here and I see what they deduct and I see what
19 they actually change, like, floor mats, seat
20 covers, they take that into condition -- carpet and
21 floor mat and cargo, they added $163.98, so they're
22 very in-depth with all of their valuations. And I

Page 48

1 agree with them. I haven't seen anything glaring
2 that I disagree with. So the only thing I have
3 issue with is the PSA.

4     Q    Okay. You don't have any evidence of
5 how configuration or equipment or condition or
6 mileage adjustments are calculated though?

7     A    Again, I just use other comparables
8 for me. So evidence, as far as actual data whether
9 someone has said, "This is what it is worth," I
10 don't have that, no. I just go by other
11 comparables. If -- if I'm looking at a 2020
12 Chevrolet Equinox, and it's a four cylinder, and I
13 compare it to one that's a six cylinder, that's how
14 I determine.

15     Q    And I'm asking if you have any
16 evidence of what the calculations in these reports
17 are based on?

18     A    No.

19     Q    You don't.

20         But it's your opinion that the
21 Mitchell report is valid except for the projected
22 sold adjustment?

Page 49

1     A    Correct.

2     Q    Okay. Have you developed any
3 opinions in this case that are not included in your
4 report?

5     A    No.

6     Q    So your report remains an accurate
7 and complete statement of your opinions, correct?

8     A    I believe so, yes.

9     Q    How many hours did you bill in the
10 Freeman matter?

11     A    I don't recall how many hours.

12     Q    Did you bill ten hours?

13     A    Around there.

14     Q    Okay.

15     A    I don't remember the exact hours.

16     Q    Okay. What about Drummond?

17     A    About the same.

18     Q    So combined, did you bill ten hours
19 or ten hours for each?

20     A    I really can't remember. Somewhere
21 around ten combined.

22     Q    Okay. Have you executed any

13 (Pages 46 - 49)

Jason Merritt                                           October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 50

1  documents that confirmed you will abide by the
2  protective orders in these cases?
3      A    That would be like a nondisclosure?
4      Q    Similar to a nondisclosure, but a
5  document from the court that says that you won't
6  disclose this information in any --
7      A    Correct.
8      Q    -- other --
9      A    Correct.
10      Q    Okay.  What did plaintiffs' counsel
11  told you about the facts of this case?
12      A    The only thing I know about this case
13  is it's a class action lawsuit.
14      Q    Do you know what the allegations in
15  the case are?
16      A    PSA, I believe.
17      Q    Have you been asked to make any
18  assumptions about the facts or what the other
19  evidence and facts will show in this case?
20      A    No.  I've never dealt with class
21  action lawsuits before.  So unless it's a drug
22  case, I don't know much about it, so I'm not going

Page 51

1  to pretend that I do.
2      Q    Have you been asked to make any
3  assumptions about the law or the legal theory in
4  this case?
5      A    No.
6      Q    Were you asked to make any
7  assumptions about consumer negotiation behavior?
8      A    No.
9      Q    Were you asked to assume anything
10  about which laws or regulations apply in these
11  cases?
12      A    No.
13      Q    Did they ask you to assume anything
14  about Internet pricing?
15      A    No.
16      Q    What are the plaintiffs' legal
17  theories in this case?
18      A    I could not tell you.
19      Q    Do you know what causes of action
20  they're bringing?
21      A    No.
22      Q    Let's look at Exhibit 4, which is

Page 52

1  your Volino report.  And you can compare that to
2  Exhibit 3.
3      A    It's the last paper I pick up.  Go
4  ahead.
5      Q    So on page 4 of the -- I guess the
6  Drummond report --
7      A    Which was Exhibit 3?
8      Q    Uh-huh.
9      A    Page 4.  Okay.
10      Q    So you added something here that was
11  not in the Volino report.  It says, "Generally
12  Mitchell's methodology is consistent with the
13  comparable methodology routinely applied by
14  appraisers and is capable of producing a correct or
15  sound appraisal of actual cash value."
16          Do you see that?
17      A    And you're talking about page 4 of
18  Exhibit 3?  Okay.  I'm sorry.
19      Q    And that's -- maybe compare that with
20  Exhibit 4, that sentence on Exhibit 4.
21      A    I should put page numbers on this
22  one.  Okay.

Page 53

1      Q    Who added this sentence?
2      A    It would have been mine.  It's my
3  report.
4      Q    Why did you add it?
5      A    Probably because my last deposition I
6  became more decided on that, and I felt that was
7  more of an important sentence to put in here.
8      Q    Okay.
9      A    It really stood out to me the more
10  that we spoke about it in the deposition, the more
11  not just opinionated on it, but decided that I
12  became in it, I was actually able to think this out
13  a little more and more determined on that PSA.
14      Q    Okay.
15      A    When I started in this and started
16  looking at PSAs, I had seen that other appraisers
17  in the distant past did the same thing, so I -- I
18  just expected it was somewhat of a common practice
19  years ago, but watching appraisers and coming up
20  with my own appraisals, I had seen how unfair the
21  PSA was and how there was really no basis for that.
22  And the more that I started investigating it

14 (Pages 50 - 53)

Jason Merritt                                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 54

1 through this, and looking at it even closer, the
2 more determined I was of how incorrect it was.
3      Q    Okay.  What did you do to
4 investigate?
5      A    Called other dealers, spoke to other
6 dealers.  And, again, when you call dealers and
7 say, "Hey, I'm with whatever law office, do you
8 guys" -- they're not going to tell you the exact
9 pricing of their vehicles because, again, it's kind
10 of proprietary and it's kind of their own personal
11 information they don't want to share, but when you
12 are -- you have been a dealer and you can talk to
13 other dealers -- I have friends on my phone that I
14 call often who are dealers.  It may be for a
15 friend's car that I'm trying to find or whatever.
16 And then they all know that I do appraisals, so I
17 will carry on conversations.  And I'll talk about
18 PSAs.  Now, they don't know what PSA stands for,
19 but I'll talk to them about their -- their
20 standards of how they buy and sell cars.
21      Q    Okay.  So how many other car dealers
22 did you talk to?

Page 55

1      A    Oh, I've spoke to, probably over the
2 last couple of years, 20 to 30.
3      Q    Okay.  Since your Volino deposition,
4 how many have you spoken with?
5      A    I call them now regular.  If I find
6 another one, I will call regular and just say,
7 "Hey, is your advertised price the value of the
8 vehicle?"  And then I explain who I am, what I'm
9 doing.  "I'm not trying to buy your car."  I'm
10 honest with them.  "I'm trying to find the actual
11 value of that car."
12      Q    Okay.
13      A    And they'll say, "The price of
14 vehicle is what it's worth."  The last dealer I
15 spoke to, I called down south somewhere, I believe
16 it was Alabama, and I spoke to him and explained to
17 him what I was doing.  I said, "I'm just trying to
18 determine the actual cash value of the vehicle."
19          And he said, "What was the vehicle
20 listed for?"  And I told him the list price and he
21 said, "That's what the car is worth."
22          I said, "Can you look it up?"  And he

Page 56

1 goes, "I don't need to look it up, that's what we
2 sold it for."
3      Q    Okay.  So you don't know how many
4 dealers you've talked to since your Volino
5 deposition?
6      A    Multiple.
7      Q    Okay.  Have you talked to any dealers
8 in South Carolina?
9      A    No.  I -- I -- again, I can't recall
10 where I called.  I called multiple dealers.  If I
11 run into an appraisal, I'll just call them.  I'll
12 just randomly pick several.  There's been some
13 dealers I've called that some of these reports that
14 came to a cellphone number that wasn't even a
15 dealer, so I had to find the actual numbers of the
16 dealers.
17      Q    So you just said earlier that you
18 didn't call any of the dealers that were listed in
19 these reports.
20      A    I didn't -- let me rephrase that.
21 Maybe not these exact reports, other appraisals
22 that I've done since that case.

Page 57

1      Q    Okay.  So your --
2      A    I'm sorry.
3      Q    -- investigation of the projected
4 sold adjustment is based on your conversations with
5 dealers in the course of --
6      A    Correct.
7      Q    -- doing appraisals for --
8      A    Correct.  And not these specific
9 ones.
10      Q    Okay.
11          Okay.  Have you talked to any dealers
12 in Pennsylvania?
13      A    Yes.
14      Q    Okay.  Which ones?
15      A    I have spoke to a Honda dealership,
16 and I spoke to a Hyundai dealership.
17      Q    Okay.  What are the names of those
18 dealerships?
19      A    I can't recall the names of them.
20      Q    Okay.  But your opinions are based on
21 calls with unknown people at the Honda dealership
22 and the Hyundai dealership?

15 (Pages 54 - 57)

Jason Merritt                                                                October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 58

1    A    Yes.
2    Q    Okay.
3    A    Again, people, you know, I don't get
4    their name, phone number, address, because again a
5    little of them won't give me information if I'm
6    going to -- you know, if I'm telling them, "Hey,
7    I'm doing research," they don't want to be brought
8    into whatever litigation that I'm working on. And
9    I promise them that, "Hey, I'm just looking for the
10   information."
11   Q    Do you take notes on who you talk to
12   when you talk to these dealers?
13   A    Not necessarily, no.
14   Q    Okay. So your investigation and
15   research is not documented?
16   A    No.
17   Q    Okay. If you look at Exhibit 4, on
18   pages 5 and 6, although they're not numbered, but
19   the fifth and sixth page.
20   A    I won't do that again.
21   Q    On the fifth page there's some
22   discussion about the geographic area of the

Page 59

1    comparable vehicles.
2    A    Okay.
3    Q    And that's not in your reports in
4    Freeman and Drummond?
5    A    Correct.
6    Q    Okay. And why is that?
7    A    I just didn't feel it was quite that
8    important. Again, a lot of these comparables that
9    I use in this one were all very close.
10   Q    Okay.
11   A    It does not mean it's important, it's
12   just I didn't note that as much.
13   Q    Do you think the location of
14   comparable vehicles matters for the value of the
15   vehicle?
16   A    Location does matter. You know, a
17   vehicle in Washington, D.C. compared to a vehicle
18   in western Maryland are two different values, or
19   maybe conditions would be more appropriate.
20   Q    Okay. If you look back at Exhibit 3,
21   which is your Drummond report --
22   A    Okay.

Page 60

1    Q    Maybe I need you to look at Exhibit
2    2, which is your Freeman report. Yes, Exhibit 2,
3    the Freeman report. If you look at page 6.
4    A    Okay.
5    Q    Starting with, "Absent the Projected
6    Sold Adjustment," these two paragraphs here --
7    A    Okay.
8    Q    -- were not in your Volino report.
9    Who added this -- these paragraphs?
10   A    Again, these are my reports, so I
11   would have added those.
12   Q    Okay. And you wrote it?
13   A    Correct.
14   Q    Okay. Why did you add this?
15   A    The same is in both.
16   Q    Is it in your Volino report?
17   A    Oh, in the Volino compared to that?
18   Mainly because this is some of the stuff that stuck
19   out to me on this report.
20   Q    Okay. Why did it stick out?
21   A    Again, going through the deposition
22   and looking into it more of the projected sold

Page 61

1    amount adjustment really is the glaring issue that
2    I have.
3    Q    Okay.
4         MS. WHITE: Can you pull Tab 5? Tabs
5    5 and 6.
6         (Merritt Deposition Exhibit Numbers 9
7         marked for identification.).
8         MS. WHITE: I believe they're the
9    same. I think are we on Exhibit 9?
10        MR. SANDERS: I think 9.
11   BY MS. WHITE:
12   Q    Okay. I'm showing you Exhibit 9.
13   A    Okay.
14   Q    Exhibit 9 was Exhibit 1 to your
15   Freeman report.
16   A    Okay.
17   Q    I'm showing you Exhibit 10.
18        (Merritt Deposition Exhibit Number 10
19        marked for identification.)
20   BY MS. WHITE:
21   Q    Can you confirm that that is Exhibit
22   1 to your Drummond report?

16 (Pages 58 - 61)

Drummond/Freeman v. Progressive Casualty

Page 62

1    A    That is confirmed.

2    Q    Okay.  And I believe these are the

3    same.  Is that right?

4    A    It is.

5    Q    Okay.  We can just talk about Exhibit

6    9.

7    A    Okay.  Exhibit 9, we'll refer to 9

8    and 10, I believe.

9    Q    Uh-huh.  Yes.

10    A    Okay.

11    Q    You testified about your educational

12    background in Volino, right?

13    A    Yes.

14    Q    And everything you testified there is

15    still true today?

16    A    Correct.

17    Q    Have you had any additional education

18    since your testimony in Volino?

19    A    No.

20    Q    Does your experience with the State

21    police inform your opinions in this case?

22    A    Does it form my opinions?  I would

Page 63

1    say a combination of all of my experience helped me

2    form my opinions.

3    Q    Okay.

4    A    No one such thing, it would be a

5    culmination of everything.

6    Q    Okay.  And what about your experience

7    with the State police informs your opinions in this

8    case?

9    A    Being able to look at evidence and

10    data to form an opinion.

11    Q    Okay.  Have you testified as an

12    expert in any matter, including a criminal matter,

13    in the last four years?

14    A    No.

15    Q    Okay.

16    A    I've been retired for about seven

17    now, so criminal stuff would have all been prior to

18    my retirement.

19    Q    On the second page of Exhibit 9,

20    under, "Training," you list several items.  Are

21    those all connected to your work with the State

22    police?

Page 64

1    A    Yes.

2    Q    Okay.  Do you contend that any of

3    these listed trainings are relevant to your

4    opinions in this case?

5    A    "Criminal investigations, advanced

6    criminal investigations, narcotic investigations,

7    DEA investigation, interview and interrogation,

8    deal with informants, mobile forensics" --

9    Q    Where did you learn --

10    A    -- that would all be part of it, yes.

11    Q    Where did you learn those trainings

12    that relate to your opinions in this case?

13    A    Multiple places.  Some in Maryland

14    State Police, some DEA, some FBI, some -- you know,

15    almost 30-year career, so multiple different

16    trainings.

17    Q    What did you learn in those trainings

18    that supports your opinions in these cases?

19    A    Collecting evidence, talking to

20    people, conducting interviews, being able to look

21    at evidence and come up with a deduction.

22    Q    Okay.  So investigations, not just

Page 65

1    taking what you're told at face value?

2    A    Correct.

3    Q    Okay.

4    A    You know, appraisal to me is an

5    investigation.

6    Q    Okay.  Let's go back to the first

7    page of Exhibit 9 -- or actually, I'm sorry, I got

8    Merritt's Automotive and Merritt's Alignment

9    confused.

10    If you look at June 2015, it says

11    Merritt's Automotive's.

12    A    Yes.

13    Q    What did you do there?

14    A    Merritt's Alignment and Merritt's

15    Automotive is the same thing.  It's my father's

16    business he's owned for over 50 years.  When I

17    retired, to kind of clear my head of police work, I

18    started turning wrenches and taking over the family

19    business.  So what did I there was mainly Maryland

20    State inspections.  And I helped other dealerships

21    with determining values and -- actual cash values.

22    Q    So when you were at Merritt's

17 (Pages 62 - 65)

Jason Merritt                                                            October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 66

1  Automotive, you helped dealerships determine actual
2  cash value?
3      A    Yes.
4      Q    Okay.  What dealerships?
5      A    Multiple dealerships throughout the
6  area.
7      Q    Okay.
8      A    Usually used car dealerships.
9      Q    And they would call you at Merritt's
10  Automotive and ask --
11      A    Through my inspection station.  We
12  were Maryland State inspection, so my inspections
13  would help them to determine, and help us to
14  determine, the actual cash value.
15      Q    What does a safety inspection entail?
16      A    Complete inspection of all the
17  mechanical, wiring, body.  It's a comprehensive
18  check of the vehicle.
19      Q    Okay.  When you're doing a safety
20  inspection, are you looking at comparable vehicles?
21      A    No.
22      Q    Okay.  So when they called you to

Page 67

1  ask -- dealerships called you to ask about actual
2  cash value, how did that relate to the safety
3  inspection --
4      A    It depends on the dealer who was
5  calling me, to see what all it needed, what kind of
6  deductions it would need, what kind of work it
7  would need.  And then we would talk about whether
8  it's worth purchasing or trading in or buying.  I
9  also did sell vehicles at the same time, so I did
10  my own cash valuations also.
11      Q    Okay.  So you sold vehicles when you
12  were at Merritt's --
13      A    Yes.
14      Q    -- Automotive?
15      A    Yes.
16      Q    Okay.  So it was a vehicle repair and
17  sales business?
18      A    We did not have a dealers' license,
19  so it was mainly just Internet sales, stuff like
20  that, for other, like, consignments.
21      Q    How many vehicles did you sell --
22      A    I don't recall.

Page 68

1      Q    -- at Merritt --
2      A    I don't recall.
3      Q    So you said sometimes dealerships
4  would call you to figure out what was wrong with a
5  vehicle that you had done a safety inspection on?
6      A    Yes.
7      Q    Is it fair to say that they were
8  trying to get estimates for conditioning
9  adjustments?
10      A    Correct.
11      Q    Okay.  So the dealership is actually
12  determining what the value was and they were asking
13  you --
14      A    Correct.
15      Q    -- for input?
16      A    Correct.
17      Q    Okay.
18      A    Yeah, not all my inspections did I do
19  cash valuations for --
20      Q    Okay.
21      A    -- actual cash value on.
22      Q    So you weren't the one who was

Page 69

1  looking for the comparable vehicle --
2      A    Not on all --
3      Q    -- to determine the actual --
4      A    -- of the --
5      Q    -- cash value?
6      A    No.
7      Q    About how many did you determine the
8  actual cash value for?
9      A    Multiple.  I couldn't even guess how
10  many.
11      Q    Okay.  Does a safety inspection
12  require the same qualifications and training as
13  appraising?
14      A    More, more qualifications.  There's
15  multiple testing certification that go in with
16  safety inspection.
17      Q    Okay.  And did you list any of those
18  certifications as --
19      A    Just at the Maryland State -- or
20  through the Maryland State Police, but not as a
21  police officer.
22      Q    Okay.

18 (Pages 66 - 69)

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 70

1      A    Maryland State Police regulates
2  Maryland State inspection stations.
3      Q    Okay.  So when you were selling
4  vehicles for Merritt's Automotive, you said it was
5  mostly online?
6      A    Mostly consignment online, yes.
7      Q    Okay.
8      A    EBay, Facebook Marketplace, stuff
9  like that.
10     Q    So you appraise the vehicles that you
11 sold to figure out what the list price --
12     A    Correct.
13     Q    -- should be?
14     A    Correct.
15     Q    Okay.  Did you ever take less than
16 the list price for any vehicles sold?
17     A    The only time I would ever take --
18 no.  Some of them were auctions.
19     Q    Okay.
20     A    So some of them were just a guess of
21 what it may be worth.  EBay, so I would set a
22 reserve at, and that was a minimum.  So that's what

Page 71

1  I appraised the vehicle at.  If I appraised the
2  vehicle being worth 10,000, then the reserve would
3  be 10,000.
4      Q    Okay.
5      A    So many times it would go above that.
6      Q    Okay.  So you were getting above
7  actual cash value?
8      A    Correct.
9      Q    Okay.  Were those vehicles classic
10 cars or --
11     A    All kinds.
12     Q    Okay.  Let's talk about your work
13 Timbrook Automotive.  I believe you testified in
14 Volino that you assisted in opening a motorcycle
15 dealership in Winchester.
16     A    Correct.
17     Q    Is that Timbrook Honda Winchester?
18     A    It is.
19     Q    Okay.  And did it exclusively sell
20 motorcycles?
21     A    Yes.
22     Q    And what did you do there?

Page 72

1      A    I was there when they were not
2  officially open, so we -- I assisted in actually
3  setting the procedures, policies, setting up the
4  offices, the showroom.  As I comanaged the
5  Cumberland Honda Dealership also.  So myself and
6  another manager would travel back and forth to
7  Winchester and alternate going back and forth.
8      Q    Cumberland Honda?
9      A    Yes.
10     Q    Do they sell motorcycles as well?
11     A    Correct.
12     Q    Do they sell any automobiles?
13     A    No.
14     Q    Okay.  What was your title with
15 Timbrook Automotive?
16     A    Probably a lot of different titles.
17 I would say sales manager at that point.
18     Q    Okay.  It says in your CV that you
19 were the manager of the service department.
20     A    Yes.
21     Q    Was that a separate --
22     A    I did multiple things, especially

Page 73

1  when you're starting to open the store.  So I was
2  manager of the store, sales manager of the store,
3  service manager.  A little bit of everything when
4  we first began the store.
5      Q    Okay.  How long were you sales
6  manager?
7      A    About two years I was with Timbrook
8  Honda.
9      Q    Okay.  Did you appraise automobiles
10 in that role?
11     A    Yes.
12     Q    Can you tell me the circumstances of
13 how you would appraise an automobile in a
14 motorcycle dealership?
15     A    Timbrook Automotive is a large
16 automobile network, so they have -- I think they're
17 up to 15 dealerships now.  When I was there, they
18 were 12, or I can't remember the exact number, but
19 I would be called in to appraise multiple different
20 vehicles for other dealerships.
21     Q    Okay.  I believe you testified in
22 Volino that -- that you were called upon to

19 (Pages 70 - 73)

Drummond/Freeman v. Progressive Casualty

Page 74

1  appraise vehicles for Timbrook Automotive auto
2  dealerships when any vehicle that was not able to
3  be appraised or valued -- valuated by one of their
4  in-house people.
5      A    Correct.
6      Q    Is that a fair characterization?
7      A    That's a fair characterization.
8      Q    Is it fair to say that appraising
9  automobiles was not your primary role for the
10  Timbrook Automotive organization?
11      A    Correct.
12      Q    Okay.  And there were other
13  individuals who were primarily --
14      A    Yes.
15      Q    -- responsible for appraising
16  automobiles?
17      A    That's correct.
18      Q    What are the differences between a
19  motorcycle appraisal and an automobile appraisal?
20      A    Really about the same.
21      Q    Okay.  Do you know whether the
22  punitive classes in Freeman and Drummond include

Page 75

1  any total loss in their motorcycle claims?
2      A    I do not know.
3      Q    Do you know whether the Mitchell
4  System values motorcycles?
5      A    I do not know.
6      Q    What was your dealership's policy on
7  negotiation?
8      A    Be more specific in that question.
9      Q    Did you have a policy that list
10  price -- you couldn't go below list price --
11      A    No.
12      Q    -- for selling a motorcycle?
13      A    No.
14      Q    Okay.  Did your dealership ever sell
15  motorcycles below list price?
16      A    Yes.
17      Q    Okay.  You Timbrook Automotive in
18  June of 2019 to work at T3 Intelligence Services.
19  Is that right?
20      A    Correct.
21      Q    And that's -- I think you testified
22  on Volino that's a company that you started?

Page 76

1      A    Yes.
2      Q    Okay.  Are you still running that
3  company?
4      A    Yes.
5      Q    How much of your time do you spend
6  running T3 Intelligence Services?
7      A    It's pretty much split half and half.
8  I started East Coast Auto Appraisers about two
9  weeks prior to COVID shutting everything down, so
10  that obviously stunted the growth of East Coast,
11  but I -- I'm about 50/50 with my time.
12      Q    Okay.  Did you contend your work at
13  T3 Intelligence Services is relevant to your
14  testimony in this case?
15      A    No.
16      Q    What is Domestic and International
17  Security Group, LLC?
18      A    So that was the name of T3 prior.  We
19  just changed the name.
20      Q    Okay.  And did you start Domestic
21  International Security Group?
22      A    We kind of took that over and then

Page 77

1  closed it down and started the T3 name.
2      Q    And what was your role at Domestic
3  and International Security Group, LLC?
4      A    Private investigation and security
5  work.
6      Q    And at that time someone else owned
7  the company?
8      A    Uh-huh.
9      Q    Okay.
10      A    Correct.
11      Q    Okay.  Was any of your work for
12  Domestic and International Security Group, LLC
13  relevant to your opinions in this case?
14      A    No.
15      Q    What is Triton Risk Group, LLC?
16      A    That was another company that I
17  worked for with intelligence work.
18      Q    What did you do at the Fusion Center
19  Director?
20      A    Set up policies and procedures for --
21  the Fusion Center was a place that other
22  investigators and other government entities could

20 (Pages 74 - 77)

Jason Merritt
Drummond/Freeman v. Progressive Casualty    October 12, 2022

Page 78

1  call and get intelligence information from.
2      Q    Okay.  And do you contend that any of
3  your work for Triton is relevant to your --
4      A    No.
5      Q    -- opinions in this case?
6          I'd like to talk about your role at
7  East Cost Auto Appraisers, LLC.  Your CV says you
8  started that in April of 2020.  Is that right?
9      A    Correct.
10     Q    Okay.  Do you hold any state licenses
11 to conduct auto appraisals?
12     A    No.  I just have a certification
13 through the Bureau of Certified Auto Appraisers.
14     Q    Okay.  And your certification with
15 the Bureau of Certified Auto Appraisers became
16 effective May 27th of 2020.  Is that right?
17     A    Correct.
18     Q    Okay.
19     A    It has been renewed since that
20 certificate though.
21     Q    It has?
22     A    Yes.  I should have included the new

Page 79

1  certificate.
2      Q    Okay.  Let's look at -- let's look at
3  Tab 8.
4          (Merritt Deposition Exhibit Number 11
5      marked for identification.)
6          MR. BATES:  We've been going about an
7  hour, can we take a break sometime soon?
8          MS. WHITE:  Sure.  I was going to --
9          MR. BATES:  I don't want to get --
10         MS. WHITE:  Yes, just a few minutes.
11 BY MS. WHITE:
12     Q    Okay.  I'm showing you a document
13 that we marked as Exhibit 11.  Do you recognize
14 Exhibit 11 as a screenshot of the Bureau of
15 Certified Auto Appraisers website?
16     A    I'm not familiar with it, but it
17 looks like it is, yes.
18     Q    And that's your name there in the
19 search field spelled correctly?
20     A    Correct.
21     Q    Okay.  And the Bureau of Certified
22 Auto Appraisers website is showing only one Jason

Page 80

1  Merritt, whose certification expired May 27th,
2  2022, right?
3      A    I have the newest one.  I don't know
4  why they have that on there.
5      Q    Okay.  So you've renewed it, it's
6  just not reflected on their website?
7      A    Correct.
8      Q    Okay.
9      A    I renewed it back before my other one
10 expired.
11     Q    Okay.
12     A    I paid for it, so I know I did.
13     Q    Okay.
14     A    They're not cheap.
15     Q    Could you please produce that in this
16 case?
17     A    Can I?
18     Q    Yes.
19     A    Yes.  I would pull it off my phone
20 but I shut everything off.
21     Q    Thank you.
22     A    But I can pull that off.  It's like

Page 81

1  $500, so I know I paid it.
2      Q    Okay.  What does the Bureau of
3  Certified Automobile Appraisers require to certify
4  an appraiser?
5      A    There's a 40-hour course that's
6  taken.  And then after that, there is a test that
7  is given.  And to recertify again, I think it's
8  just a fee.
9      Q    Okay.  So you just take the test once
10 then you're done?
11     A    Yes.
12     Q    Okay.
13     A    Now, you can opt to take the test
14 more often if you're not proficient, but I've been
15 doing appraisals and I'm still proficient.  So I
16 was just comfortable in renewing.
17     Q    Is there any education or experience
18 required prior to taking the 40-hour course?
19     A    No.
20     Q    Okay.
21     A    Not that I can recall of, no.
22         MS. WHITE:  All right.  I think we

21 (Pages 78 - 81)

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 82

1  can take a break now.
2          VIDEOGRAPHER:  The time is 11:12 a.m.
3  This ends Unit 1.  We're off the record.
4          (Recess from 11:12 a.m. to 11:29 a.m.)
5          VIDEOGRAPHER:  The time is 11:29 a.m.
6  This begins Unit Number 2.  We're on the record.
7  BY MS. WHITE:
8      Q    Mr. Merritt, how many appraisals have
9  you conducted?
10     A    I really couldn't tell you how many
11 that I have conducted total.
12     Q    Have you conducted ten or a hundred?
13     A    Probably over a hundred.
14     Q    Okay.  What percent of your
15 appraisals are total losses?
16     A    I'd say a small portion of those.  I
17 would say less than 10 percent, but again that's
18 just a guess, because total losses are -- a lot of
19 them are actual cash value.
20     Q    Okay.  Is there a distinction
21 between --
22     A    Well, again, most of mine are actual

Page 83

1  cash value because I'm reviewing what someone else
2  compared -- or deemed a total loss.
3      Q    Okay.
4      A    If that makes sense.
5      Q    Yes.
6          So you called them actual cash value
7  appraisers.  Would that encompass total losses?
8      A    It would.
9      Q    Okay.  But not all actual cash value
10 appraisals for you are total losses?
11     A    Correct.
12     Q    Okay.
13     A    I know that's a little convoluted but
14 . . .
15     Q    Got it.
16         How would you describe your work at
17 East Coast Auto Appraisers?
18     A    Can you be a little more specific?
19     Q    What do you do on a typical day?
20     A    On a typical day, it depends on what
21 I have -- in the last few days, I've been doing
22 some five appraisals on some classic Mustangs.

Page 84

1  They take a lot more time and research.
2      Q    Okay.  How many people are employed
3  by East Coast Auto Appraisers?
4      A    Just myself.
5      Q    Who are your clients?
6      A    I have an Internet web base --
7  website, so whoever responds to that.  And that's
8  about it.
9      Q    Are your clients based in Maryland?
10     A    I've had clients in Virginia,
11 Maryland, Pennsylvania, D.C., wherever.
12     Q    Okay.  Have you ever appraised a
13 vehicle for an insurance company?
14     A    I don't believe I have.
15     Q    And you also offer your expert
16 witness testimony through East Coast Auto
17 Appraisers?
18     A    Correct.
19     Q    How many times have you been hired to
20 offer expert testimony?
21     A    Just since the Volino case, was the
22 first I've been contacted for.

Page 85

1      Q    Okay.
2      A    Again, I just started right before
3  COVID, so everything was shut down.
4      Q    Okay.  So Volino and then Freeman and
5  Drummond --
6      A    Correct.
7      Q    -- and that's it?
8          What is Asset Recovery Services?
9      A    Finding boats.  Usually for banks
10 that are declaring or repossession.  I'll find and
11 recover the asset.
12     Q    Okay.  You mentioned that right now
13 you're appraising some classic Mustangs.  Why are
14 classic cars appraised differently?
15     A    They're just harder to come up with
16 comps.  You know, a 1965 Mustang K-Code car is not
17 something you find readily available.  Again,
18 your -- the value in those cars are different than
19 the value in a standard everyday driver vehicle.
20     Q    Okay.  Is there anything about your
21 process that's different for a classic car
22 appraisal?

22 (Pages 82 - 85)

Jason Merritt                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 86

1    A    There is some different processes,
2  but the methodology stays the same.
3    Q    Okay.
4    A    If that makes sense, too.
5    Q    And what are the differences?
6    A    The differences are, again, the 1969
7  Corvette, I look a lot at ownership and
8  documentation; where a 2020 Chevrolet Equinox, you
9  don't have to look at that as much.
10    Q    Okay.
11    A    It's readily available on, you know,
12  title. You can do a title search and stuff like
13  that; where a 1965, you can't, so you have to make
14  phone calls to people that owned it prior.
15    Q    Okay.
16    A    It's just more of an investigation.
17    Q    Okay. For classic car appraisals, do
18  you consider vehicles that are the same body style,
19  but maybe a different year model?
20    A    No.
21    Q    Okay.
22    A    Some of them are very specific. Like

Page 87

1  I said, I'm doing a 1965 Mustang, a K car -- Code
2  car is much different than a C-Code, and it's not
3  worth as much as an A-Code.
4    Q    Okay.
5    A    Yeah, it's --
6    Q    What are the differences in the
7  codes? What does that mean?
8    A    Production amount. I'm looking at a
9  1965 Mustang K-Code that is Wimbledon white, they
10  made like 1,800 of them --
11    Q    Okay.
12    A    -- compared to an A-Code, they made
13  68,000.
14    Q    Okay. And are those codes based on
15  the type of engine that was in those cars?
16    A    Engine, transmission, wheel size,
17  differential size, ratios.
18    Q    Okay.
19    A    I mean, it gets into some major
20  components.
21    Q    Okay. On your website you state that
22  many insurance companies and lenders may not

Page 88

1  recognize the additional investment put into a
2  classic car, instead of going by basic Kelley Blue
3  Book Value, unless you have a certified vehicle
4  appraisal. Can you explain this?
5    A    I've seen people have come to me and
6  said, "Hey, they're only offering me $10,000 for my
7  Corvette." And then when I do an appraisal, it'll
8  come up to 15 or 20,000.
9    Q    Okay.
10    A    Because, again, a lot insurance
11  companies go by what the book show and don't take
12  into considerations maybe modifications or
13  accessories or something like that.
14    Q    Okay. Your website also says, "There
15  are many nuances involved in appraising a classic
16  car, the first of which can be defining whether or
17  not the vehicle truly can be defined as a classic."
18         How do you determine whether the
19  vehicle can be defined as a classic?
20    A    1978 four-door Oldsmobile, you know,
21  it's not a classic. I mean, it's just not
22  typically a classic. But, again, it depends on the

Page 89

1  vehicle and what's been done to it, whether it's a
2  classic vehicle or it's just a --
3    Q    What model did you say?
4    A    Like a 1978 or 1988, or something --
5  you know, it just depends on the vehicle itself.
6    Q    You said an Oldsmobile?
7    A    Yeah.
8    Q    Okay.
9    A    I guess an Oldsmobile. I'm just
10  using any type of comparable.
11    Q    Okay. So it's not necessarily the
12  age of the vehicle, it's --
13    A    No.
14    Q    -- the model?
15    A    Correct.
16    Q    Can a more recent vehicle also be
17  considered a classic?
18    A    Yes.
19    Q    Like a 1995 Mustang GT, would that
20  be --
21    A    Correct.
22    Q    -- considered a classic?

23 (Pages 86 - 89)

Jason Merritt                                                        October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 90

1    A    Depending on the Mustang.
2    Q    Okay.  Is there a year cutoff you
3  would give for a classic car?
4    A    No.
5    Q    So could a 2010 be a classic?
6    A    Depending on the vehicle if they quit
7  making it.
8    Q    Okay.
9    A    Right now the Dodge HEMIs, I think,
10  are in their last year, so in a few years they'll
11  be classic.
12    Q    Okay.
13    A    And, again, that's just my opinion,
14  it's . . .
15    Q    Okay.  And so when you're appraising
16  a classic car, you would do that a little bit
17  differently than you would --
18    A    Same methodology.
19    Q    Okay.  Still looking at comparables?
20    A    Correct.  But, again, when I do a
21  classic car, I get more into the details of the car
22  and ownership and stuff like that.

Page 91

1    Q    Okay.  And is that there Mitchell
2  makes a vehicle configuration adjustment?
3    A    I don't know what the Mitchell report
4  is on classic vehicles, so I don't --
5    Q    Okay.
6    A    I can't attest to that.
7    Q    Okay.  Let's look at what I --
8         MS. WHITE:  That's not Tab 9.  Okay.
9  What exhibit is this?
10        MR. SANDERS:  This is 12.
11        (Merritt Deposition Exhibit Number 12
12         marked for identification.)
13  BY MS. WHITE:
14    Q    Okay.  I'm showing you Exhibit 12.
15  This is not the best image.
16    A    And my website definitely needs
17  updated.
18    Q    Okay.  If you look on the second page
19  of Exhibit 12, is this -- this is your website,
20  correct?
21    A    Correct.
22    Q    Okay.

Page 92

1    A    I had it made for me.
2    Q    Okay.  And if you look under the
3  heading, "True Stated Value," it says, "A stated
4  value appraisal can help you reduce insurance
5  cost."  What do you mean by that?
6    A    What I mean by that is if I'm -- a
7  vehicle is considered to be much more valuable and
8  they're paying insurance on a -- paying for a value
9  of a vehicle much higher than what the value of the
10  vehicle actually is.
11    Q    You mean that the insured is paying a
12  premium that's --
13    A    Correct.
14    Q    -- for a value that's --
15    A    Correct.
16    Q    -- higher than what their vehicle is
17  actually worth?
18    A    In other words, they would appraise a
19  vehicle at less money than what the insurance
20  company feels it is.  It could be a motor home or
21  something like that.
22    Q    Okay.  Any automobiles that would

Page 93

1  follow under that?
2    A    Could be, yes.
3    Q    What is a stated amount policy?
4    A    Where does it refer to that at?
5    Q    It doesn't say that, I'm just asking
6  you about stated value appraisal.
7    A    I'm not familiar with it.
8    Q    So you say it can help reduce
9  insurance costs.
10    A    Correct.
11    Q    How does it help reduce insurance
12  cost?
13    A    Just by -- you're talking about that
14  "true stated value"?
15    Q    Uh-huh.
16    A    Okay.  Again, they would be insuring
17  the vehicle for much more than the value of the
18  actual vehicle.
19    Q    So if someone got a stated value
20  appraisal from you, would they take it to their
21  insurance company --
22    A    Yes.

24 (Pages 90 - 93)

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 94

1    Q    -- and say, "I want my coverage to be
2  up to X dollar amount"?
3    A    That, I don't know what they do with
4  the insurance company. I just give them the value
5  of the vehicle.
6    Q    And how does that help them reduce
7  insurance cost?
8    A    Just as I explained, if it's insured
9  for a $100,000 vehicle, but there's circumstances
10  with the vehicle that maybe it was a salvaged
11  vehicle or something like that and it's got a much
12  lower value, then they would negotiate that with
13  the insurance company.
14    Q    Okay. So the salvaged vehicle would
15  be worth less than --
16    A    Yes.
17    Q    -- one that's not salvaged?
18        Okay. Would you -- would you
19  appraise a vehicle differently if it had already
20  been totaled before?
21    A    That would be a condition, yes.
22    Q    Okay. So you would do that in the

Page 95

1  conditioning adjustments?
2    A    Correct.
3    Q    Okay. All right. You posted about
4  the green value policies on your East Coast
5  Automobile Appraisers Facebook page, right?
6    A    I don't recall.
7    Q    I think you said that many insurance
8  companies will require an appraisal before they
9  will offer a policy on a specific vehicle.
10    A    Okay.
11    Q    What do you mean by that?
12    A    What I mean by that is there are some
13  insurance companies that will not cover a certain
14  vehicle or will not cover correctly without an
15  appraisal.
16    Q    Okay.
17    A    I've had people contact me and say,
18  "Hey, I need an appraisal on my car for the
19  insurance company."
20    Q    Okay. And does the appraisal, has
21  that been used to determine the limit of the
22  liability?

Page 96

1    A    I don't know what is done at that
2  point.
3    Q    Okay.
4    A    I've just had people -- multiple
5  people contact me for appraisals for their
6  insurance company.
7    Q    Okay. Did you read any of the
8  insurance policies for the plaintiffs in this case?
9    A    No.
10    Q    Do you know what the limit of
11  liability is for all the plaintiffs in this case?
12    A    No idea.
13    Q    Do you know whether any of these
14  plaintiffs have a stated amount policy to provide a
15  specific dollar amount?
16    A    I have no clue.
17    Q    Let's assume that one of our
18  plaintiffs had a stated amount policy that says,
19  "In the event of a total loss, we will pay you up
20  to" -- say it's in Freeman, "We'll pay you up to
21  $20,000," and you're saying that you would back out
22  the PSA from her valuation report or add it back

Page 97

1  in. Is it your contention that she would be
2  entitled to more than $20,000 --
3    A    I can't --
4    Q    -- based on your --
5    A    -- assume --
6    Q    -- appraisal?
7    A    I can't assume anything -- anything
8  on that. All I can tell you is my appraisal
9  amounts.
10    Q    Okay.
11    A    And that's to back the PSA. So I --
12  as far as what happens with the insurance company,
13  I don't -- I'm not even claiming to testify to any
14  of that because I don't -- I don't know.
15    Q    How many formal appraisal reports
16  have you drafted?
17    A    I do not have a number on that.
18    Q    Is that over a hundred?
19    A    I'd say a little less than a hundred.
20    Q    Okay. How many cars have you
21  purchased in your lifetime?
22    A    Probably a hundred.

25 (Pages 94 - 97)

Jason Merritt                                          October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 98

1    Q    Are they all for personal use?
2    A    I was a little bit obsessive with
3    buying cars when I was younger.
4    Q    Okay.
5    A    I would buy them, drive them, sell
6    them. I had quite a few.
7    Q    And where did you --
8    A    Ask my wife.
9    Q    Where did you purchase those cars?
10   A    Off the street, off the Internet.
11   For a while there I was into eBay a lot and bought
12   and sold on eBay.
13   Q    Okay.
14   A    All that.
15   Q    How many vehicles have you purchased
16   at a dealership?
17   A    To give you an exact number, I
18   couldn't do it. I'd say less than 20.
19   Q    Okay. Did you pay the sticker window
20   price for all of those cars or did you negotiate?
21   A    The last one I paid the sticker
22   price.

Page 99

1    Q    When was that?
2    A    I have a 2020 Chevrolet that I traded
3    in on a 2021 Chevrolet, and both of those I paid
4    sticker price.
5    Q    And those -- was that a brand-new
6    2021?
7    A    The 2020 was used, the '21 was new.
8    Q    Okay. So you paid sticker price on
9    the new one?
10   A    On both.
11   Q    On both of them. Okay.
12       Did you try to negotiate?
13   A    I always try but . . .
14   Q    All right. Before the 2020 and the
15   2021 vehicles, did you negotiate on any other
16   vehicles that you purchased from dealerships?
17   A    My wife has bought some without my
18   approval and she has paid sticker price on them.
19   And I don't normally buy direct off dealerships
20   usually. Auctions or off the street.
21   Q    Okay. You said you bought have 20
22   vehicles at dealerships.

Page 100

1    A    Yes. And that was usually like
2    either wholesale, stuff like that.
3    Q    So you were buying a wholesale --
4    A    Yes.
5    Q    -- vehicle from a dealership?
6    A    Yep.
7    Q    Okay. How many vehicles have you
8    purchased retail from a dealership?
9    A    Only a couple.
10   Q    So just the 2020 --
11   A    Three or four.
12   Q    -- and the 2012?
13   A    Maybe three or four.
14   Q    Okay. So you've talked about two of
15   those. What about the other two, which vehicles
16   were those?
17   A    They were years ago, back in the
18   '90s, maybe early 2000s.
19   Q    Okay.
20   A    And I couldn't remember what I paid
21   for them.
22   Q    Do you think people negotiate the

Page 101

1    price of used cars?
2    A    I think people try. And again, as a
3    sales manager, you like to allow people to have a
4    say in the process. When I say "a say in the
5    process," they can negotiate in the process, but
6    again the actual cash value of that vehicle was the
7    same.
8    Q    Even if it sells for less?
9    A    Yes. Because, again, there's so many
10   other circumstances that are involved in that. It
11   could be extra parts, it could be service, it could
12   be the warranty, it could be they purchased
13   multiple vehicles off of us. Again, the actual
14   cash value stays the same.
15   Q    Okay. Do you think that people ever
16   pay less than actual cash value without any
17   warranties or any add-ons?
18   A    I can't attest to that. I don't
19   know.
20   Q    Okay. Does actual cash value mean
21   the same thing to you as market value?
22   A    Yes.

26 (Pages 98 - 101)

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 102

1    Q    Okay.  And so if someone pay less
2  than list price, you think that what they paid is
3  not the market value?
4    A    No, I still think it's actual cash
5  values what they originally put on it.
6    Q    Okay.  How do you define market
7  value?
8    A    Through the comparable methodology.
9    Q    Okay.
10    A    To me, market value and actual cash
11  value is pretty much the same.
12    Q    Okay.  Have you ever heard the
13  definition that market value is what a willing
14  buyer would pay and what a willing seller would
15  sell?
16    A    No, I'm not familiar with -- I mean
17  I've heard that before, but as far as what I take
18  into account, no.
19    Q    Okay.  So you think that market price
20  on used automobiles is the list price?
21    A    Correct.
22    Q    Okay.  And is that the case for every

Page 103

1  dealership?
2    A    I can't attest to every dealership,
3  no, I can't say that.
4    Q    Do you think that's the case for
5  private sales?
6    A    Private sales are different.  Again,
7  I put an actual cash value on a vehicle that is in
8  a dealership, because again it has been gone over
9  and it's ready for sale.  Private individuals who
10  sales vehicles with hidden issues or whatever.
11  Yeah, it's just different.
12    Q    Okay.
13    A    I will use those sometimes for actual
14  cash value, but, again, very -- I -- I try not to,
15  but there's times where I have to for comparables.
16    Q    Okay.  Do you think that dealerships,
17  generally people don't pay less than actual cash
18  value?
19    A    Generally, no.
20    Q    Okay.  Were you aware that Ms.
21  Driggins, Yeshonda Driggins, testified that she
22  paid less than asking price for her replacement

Page 104

1  vehicle?
2    A    I couldn't tell you anything that she
3  said.  Without her name being on here, I wouldn't
4  know who she is.
5    Q    Okay.  Is it your testimony that no
6  one ever negotiates for the price of a used car?
7    A    I can't say that, no.
8    Q    Okay.  What would you say -- what is
9  your opinion, that people generally don't?  That
10  people --
11    A    Oh, no, I think there's a lot of
12  negotiation going on.  I think I testified to that,
13  there's a lot of negotiation.
14    Q    Okay.
15    A    But again that doesn't skew the
16  actual cash value of the vehicle.
17    Q    Okay.  So you think that even if
18  people are paying less than list price, the actual
19  cash value is still the list price?
20    A    Correct.
21    Q    Okay.
22    A    Because, again, there's so many

Page 105

1  factors that go into that.
2    Q    Okay.  So if we had 20 vehicles and
3  they are all listed at $20,000, and every one of
4  them sells for $19,000, would you still say those
5  20 vehicles, all same year, make, and model, that
6  the actual cash value is still $20,000?
7        MR. BATES:  Object to the form of the
8  question.
9        THE WITNESS:  Yeah, I mean that seems
10  like a pretty big assumption.  So, again, without
11  knowing the details of each sale, I can't make an
12  opinion on.
13  BY MS. WHITE:
14    Q    Okay.  I'm just trying to get a
15  better understanding of what you think actual cash
16  value is.  And you're saying actual cash value is
17  not the sale price of the car -- the price for
18  which the car has already sold.
19    A    Well, again, I think I've said it
20  several times.  There's so many different
21  circumstances and so many other issues that go into
22  the sale of the vehicle.  When I place the value of

27 (Pages 102 - 105)

Jason Merritt
October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 106

1    this vehicle in the -- in the computer, that's what
2    the actual cash value is.
3          Now, if there's negotiation done on
4    that and it sold for less than that, that still
5    doesn't diminish the value of the cash value of
6    that vehicle, because again there's other
7    circumstances involved in that.  It could be the
8    warranties, it could be -- you know, as I've said,
9    there's a lot of different situations in there.  So
10   that doesn't diminish the value of the vehicle.
11        Q    Okay.  And you think that market
12   value is the same thing as actual --
13        A    Yes.
14        Q    -- cash value?
15             Okay.
16        A    To a point.
17        Q    Okay.  So in my example of 20
18   vehicles that are all the same year, make and
19   model, they all sell for $19,000, is the market
20   value than different than the actual cash value?
21             MR. BATES:  Object to the form of the
22   question.

Page 107

1             THE WITNESS:  Again, I am not going
2    to offer an opinion on that on an assumption that,
3    you know -- that I know what they sold for or what
4    the back end was on them.
5    BY MS. WHITE:
6        Q    I'm giving you a hypothetical.  So
7    I'm telling you, here's -- here are 20 vehicles,
8    they're all the same year, make and model, say
9    they're all 2020 Toyota Corollas --
10       A    Okay.
11       Q    -- there's no -- no warranties, no
12   service plans, anything like that, and every one of
13   them sold for $19,000.  Are you saying that the
14   market value is not $19,000, it's the $20,000 they
15   were listed?
16       A    Okay.  Well, then I will assume that
17   all 20 vehicles sold for 19,000, I'll assume that
18   no warranty was given, I'll assume there was no
19   back end, so I'll assume all 20 people were
20   incorrect in their valuations.  So it should have
21   been 19,000 --
22       Q    Okay.

Page 108

1        A    -- if we're assuming.
2        Q    So all -- all 20 of those vehicles
3    should have been listed at 19,000?
4        A    So we'll assume that all 20 people
5    that appraised that were wrong, if we're assuming
6    things --
7        Q    Okay.
8        A    -- yes.
9        Q    Okay.
10       A    We can assume all that, yeah.
11       Q    Okay.  So those vehicles would have
12   been listed too high in your opinion?
13       A    Correct, in assuming.
14       Q    Uh-huh.
15       A    You know, again, that's a pretty far
16   assumption, but we'll go with it.
17       Q    Okay.  Is it your opinion that
18   dealers never list above actual cash value?
19       A    It is my opinion, yes.
20       Q    Okay.  And that's based on your
21   experience at --
22       A    Correct.

Page 109

1        Q    -- Timbrook Automotive --
2        A    Now, when you say "never," I can't
3    say never, but I would say normally they will not
4    advertise above the value.
5        Q    Okay.
6        A    Normally.
7        Q    Can you walk me through your process
8    of appraising a vehicle?
9        A    Again, it depends on which vehicle.
10   If I'm just handed an appraisal report as in these,
11   I would just go through and verify the comparables,
12   verify VIN numbers.  Again, on the Mitchell report,
13   it takes out a lot of the work for me because it's
14   already done, especially if it's a historic thing
15   that I can't really go back and pull those
16   comparables up.
17            I will go through and just verify all
18   the comparables and look at them, look at the
19   numbers, look at the different valuations, and do
20   the mathematical equations on my own, which is just
21   adding the comparables, taking away the deductions,
22   adding the additions and coming up with the -- the

28 (Pages 106 - 109)

Jason Merritt                                          October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 110

1  value of the three together, or however many
2  together.
3      Q    Okay.  For the valuation reports
4  here, did you go through and verify the
5  comparables?
6      A    I just looked at the comparables.
7  Again, these are all historic, so I can't look them
8  up.
9      Q    Okay.
10     A    I thought maybe I could, but for some
11 reason it's proprietary information and you can't
12 look up historical value, yeah.
13     Q    Okay.
14     A    You can with a house, but you can't
15 with a car.
16     Q    When you're doing an appraisal for
17 one of your customers, separate from this case,
18 what's the first thing you do when you appraise a
19 vehicle?
20     A    Normally I would look at it.
21     Q    Okay.
22     A    Again, there's all kinds of different

Page 111

1  appraisals.
2      Q    You're doing an actual cash value
3  appraise of a total loss vehicle.
4      A    So it's crashed already and totaled?
5      Q    Uh-huh.
6      A    If it's available to me, I want to
7  see it.
8      Q    Okay.
9      A    I would go look at it.  Look at some
10 of the condition of it prior to the crash or try to
11 determine if it's prior to the crash.  Some damage
12 on it is hard to tell unless, you know, it's
13 obvious.  I would come up with a condition.  And,
14 again, then I would go back and start pulling
15 comparable vehicles.
16     Q    Okay.
17     A    Pretty much just what Mitchell did in
18 their report.  But, again, I would have to manually
19 search through comparables, where Mitchell has all
20 that in a few keystrokes.
21     Q    Okay.  How much time do you normally
22 spend with a vehicle while appraising it?

Page 112

1      A    Again, it depends on the vehicle.  A
2  classic vehicle, I could be several hours.  A 2020
3  Chevy Equinox, I could be 20 minutes.
4      Q    Okay.  How do you select comparable
5  vehicles?
6      A    I start on the Internet and start
7  looking to see what's available out there and
8  what -- I look at VIN numbers, decode the VINs, try
9  to find what features, the engines.  I start pretty
10 broad on the features of the vehicle.  Like a 2020
11 Equinox, I just look for 2020 Equinoxes first, and
12 then I start narrowing the scope down on features,
13 options, colors, location.  And I start narrowing
14 it down to try to get the closest best comparables.
15     Q    Okay.  Are there a minimum number of
16 comparable vehicles that you use?
17     A    According to practices, two, but I
18 like more than two.  I like to at least have three.
19     Q    Okay.
20     A    Two is hard, you know.  You want
21 to -- the more you get, the better.
22     Q    Okay.  Is there a certain radius that

Page 113

1  you apply in terms of the location in comparable
2  vehicles?
3      A    Again, it depends on the vehicle.
4      Q    How often do you disagree with
5  someone else's appraisal?
6      A    I've only done a few that were other
7  appraisers involved.
8      Q    Okay.  And did you come to the exact
9  same ACV every time?
10     A    On a few we have been within a couple
11 hundred dollars.  And there's been other ones that
12 it's been further apart.
13     Q    Okay.
14     A    I would like to think mine are right.
15     Q    Okay.  But do you think that other
16 appraisers are wrong if they're within a couple
17 hundred dollars of you?
18     A    No.  We'll look and see what their
19 differences are, we'll discuss it.  And then
20 sometimes I'll say, "Okay.  Well, you're right on
21 that.  I missed that."  And I'll adjust mine.
22     Q    Okay.

29 (Pages 110 - 113)

Jason Merritt    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 114

1    A    And then he'll see some stuff that
2    I'm right and he'll adjust it and then we'll agree
3    on a price on it.
4        Q    Okay.
5        A    Now, there are some that are just too
6    far off and then you just have to argue it and . .
7    .
8        Q    Do you handle appraisals differently
9    depending on whether it's for a lender or for a
10    customer?
11    A    No.
12    Q    How many times have you appraised a
13    vehicle for a client for a lower value than their
14    insurance company?
15    A    There has been times where that has
16    happened.  I couldn't tell you exactly how many,
17    but there has been times where that has happened.
18    Q    Okay.
19    A    I recently had somebody stop by and
20    asked me to do an appraisal and I looked at their
21    report and just looked at quick numbers and I said,
22    "I think you got a fair offer."

Page 115

1    Q    Okay.
2    A    "It's really not worth me charging
3    you money and spending time on this."
4    Q    Okay.
5    A    That has happened.  It has happened
6    quite often.
7    Q    What do you charge to do an appraisal
8    on a total loss situation?
9    A    Total loss is usually 500.
10    Q    Okay.
11    A    So if it's not -- if I don't see
12    anything really glaring -- and, quite honestly,
13    PSI, if I don't see that on there, on the reports,
14    I won't take it.
15    Q    Did you mean a projected sold
16    adjustment?
17    A    Yes, PSA.
18    Q    Okay.
19    A    I'm sorry.
20    Q    Got it.
21    A    If I don't see that on the report,
22    then I usually can't do an appraisal on it because

Page 116

1    it's not going to be worth it.
2    Q    Okay.  Have you seen projected sold
3    adjustments on reports that your clients have
4    brought to you and asked you to --
5    A    Recently I've been looking for that
6    very closely.
7    Q    Okay.
8    A    Yes, I have seen it.
9    Q    Oh, you have seen it?
10    A    Well, here I've been seeing it, yes.
11    Q    Okay.  But for your customers outside
12    of this litigation --
13    A    Actually, lately over the last few
14    months I've been mainly doing classic vehicles, so
15    I have been taking a lot of --
16    Q    Okay.
17    A    -- ACVs other than classics.
18    Q    Okay.
19    A    So boats, stuff like that.
20    Q    So have you reviewed valuation
21    reports from other insurance companies?
22    A    Yes.

Page 117

1    Q    Okay.  Have you reviewed other
2    valuation reports that were also Mitchell reports?
3    A    I know this sounds -- I can't
4    remember who the reports were.  And I can't even
5    remember or recall who the insurance companies
6    were.  As recent as about a week ago, I had someone
7    bring me a report -- I -- I -- I don't want to
8    testify who it was --
9    Q    Was it --
10    A    -- but it didn't have a PSA on it.
11    And the valuation was, I think, fair for the car.
12    Q    Was it an Auto Text Report or a CCC
13    report?
14    A    I think it was a CCC report.
15    Q    Okay.
16    A    Again, I -- I'm -- I don't want to
17    say for sure, but that does sound familiar.
18    Q    Okay.  And did you see a take-price
19    adjustment?
20    A    On that one, I did not.
21    Q    Okay.
22    A    And I can't remember what state it

30 (Pages 114 - 117)

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 118

1  came from.
2      Q    Okay.
3          MS. WHITE:  Let's pull Tab 11.
4          MR. SANDERS:  This will be 13.
5          (Merritt Deposition Exhibit Number 13
6      marked for identification.)
7  BY MS. WHITE:
8      Q    I'm showing you Exhibit 13.  Do you
9  recognize this?
10     A    It looks like it's another page off
11 my website.
12     Q    Who wrote it?
13     A    One of my developers.
14     Q    Do you agree with it?
15     A    Let me read it here real quick to
16 make sure.
17         Yes.
18     Q    Okay.  And you state that, "Other
19 factors depending on the purpose of the appraisal
20 may include an assessment of the area supply and
21 demand of the specific make and model of the
22 vehicle."  What does that mean?

Page 119

1      A    Again, well, we've seen that over the
2  last -- over this COVID, we've seen brand-new
3  vehicles sell above sticker price.  It's the
4  demand.  I mean used cars have gone up
5  significantly in price because it's just not out
6  there.  So that's what that is reference to.
7      Q    Have all used cars gone up in price?
8  Has demand for all used cars gone up?
9      A    I can't say "all," but generally,
10 yes, they've gone up.
11     Q    Okay.  Are there certain models of a
12 vehicle where the demand is higher?
13     A    Again, I would say yes, there are
14 some.
15     Q    Like what?
16     A    It's hard to find a newer used Chevy
17 Suburban right now.  They're hard to find.
18 Cadillac Escalades.  There's multiple vehicles that
19 are difficult to find right now still.
20     Q    Okay.  What do you do when you assess
21 the area of supply and demand of a specific
22 vehicle?

Page 120

1      A    Well, again, that would be in the
2  comps you'll see it's harder to find comps of like
3  a 2018 Suburban because there's just not that many
4  for sale right now.
5      Q    Okay.
6      A    And I'll see where my area has to
7  broaden, as far as my comps, so I have to spread
8  out that radius of what I'm looking for.  So that
9  tells me that it's hard to find one of those in
10 that area.
11     Q    Okay.  And does the supply and demand
12 affect the actual cash value?
13     A    Yes.
14     Q    Is the supply and demand different
15 depending on geographic location?
16     A    Now, the Internet has changed that
17 some, but yes.
18     Q    Okay.  So I guess a pickup truck
19 might not be as in demand in New York City.  Is
20 that an example of supply and demand being
21 different depending on location?
22     A    Again, I -- I would have to look at

Page 121

1  it to form any type of response to that.
2      Q    Okay.
3      A    But yeah, each vehicle is different,
4  each area is different.
5      Q    Okay.
6      A    Pickup trucks are hard to find
7  everywhere right now so . . .
8      Q    Okay.
9      A    That's why I still drive mine.
10     Q    What do you mean by "Depending on the
11 purpose of the appraisal"?
12     A    Well, again, there's actual cash
13 value appraisals, there's classic car appraisals,
14 there's just different appraisals.
15     Q    And what are the different purposes
16 of those different appraisals?
17     A    Total loss, loss of use appraisals.
18 Stuff like that.  So there's all different types of
19 appraisals.  Farm and heavy equipment, you know,
20 stuff like that.
21     Q    Okay.  Do you approach all appraisals
22 the same or is the context important?

31 (Pages 118 - 121)

Jason Merritt                                                October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 122

1    A    I keep the methodology the same. And
2  the reason I do that is because I found that it
3  works. Again, you don't know how precise or how
4  exactly perfect you are on your appraisals. You
5  know, if you're just doing an appraisal and you're
6  just giving it to the person. The only way you can
7  really establish a good appraisal is by doing the
8  comparative method. And that seems to me to be my
9  go-to. I stay with that.
10    Q    Okay. Why do you describe your
11  appraisal methodology differently on your website
12  depending on whether it's for diminished value,
13  expert witness, private owners, classic cars,
14  lenders, insurance?
15    A    Well, one thing I've got to do is
16  update my website. That was, again, prior to COVID
17  that I started that, so I've learned more about it.
18  And I need to get with my developer and go over
19  every word for word.
20    Q    Okay. Does your actual cash value
21  calculation depend on the purpose of the appraisal?
22    A    I don't think that would really have

Page 123

1  any purpose on it, no.
2    Q    Are you certified or licensed to
3  appraise vehicles in South Carolina?
4    A    No. I don't have a specific license
5  in South Carolina.
6    Q    Have you ever appraised a vehicle in
7  South Carolina?
8    A    No, I've never gone to South Carolina
9  and appraised anything.
10    Q    Are you aware of any South Carolina
11  laws governing appraisals?
12    A    No.
13    Q    Are you certified or licensed to
14  appraise vehicles in Pennsylvania?
15    A    I just have a Maryland -- I have a
16  license in Maryland, a business, and I just have
17  the certification. So if I do stuff out of state,
18  it will be virtual --
19    Q    Okay.
20    A    -- reviews or expert testimony or
21  stuff like that.
22    Q    Okay.

Page 124

1    MS. WHITE: We can go off the record.
2    VIDEOGRAPHER: The time is 12:06 p.m.
3  We are off the record.
4    (Recess from 12:06 p.m. to 12:41 p.m.)
5    VIDEOGRAPHER: The time is 12:41 p.m.
6  This begins Unit Number 3. We're on the record.
7  BY MS. WHITE:
8    Q    Mr. Merritt, I think before we took a
9  break, I asked if you ever appraised a vehicle in
10  Pennsylvania?
11    A    Yes. I don't believe I have.
12    Q    Are you certified or licensed to
13  appraise vehicles in Pennsylvania?
14    A    Again, I don't know if there are
15  certifications in Pennsylvania or not, I'm not
16  sure. I don't have any certification or anything.
17    Q    Okay. Are you aware of any
18  Pennsylvania laws governing appraisals?
19    A    I am not aware of Pennsylvania laws.
20    Q    Why did you follow a different method
21  in calculating the ACV of the Pennsylvania
22  vehicles?

Page 125

1    A    I don't think I did.
2    Q    In your Drummond report, which should
3  be Exhibit 3, I think, you averaged your ACV
4  opinion with an NADA value. Is that right?
5    A    Let me look at it again, to refresh
6  my memory.
7    Q    Page 8 of your report.
8    A    All right. Page 8, I guess the first
9  paragraph I see something about NADA.
10    Q    Uh-huh.
11    A    If I'm not mistaken -- again, I don't
12  know all of Pennsylvania's laws -- NADA is taken
13  into account with Pennsylvania law.
14    Q    Okay.
15    A    I -- I don't have anything to do with
16  that part of it.
17    Q    Okay. So you just assumed that
18  because the Mitchell valuation report averaged
19  within an NADA value, that that must be the law --
20    A    That's correct.
21    Q    -- in Pennsylvania?
22    Okay.

32 (Pages 122 - 125)

Jason Merritt                                                          October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 126

1        A    Again, because Mitchell is very
2   comprehensive in what they put in there.
3        Q    Okay.  You say in your report that
4   "Appraisal is an opinion."  Can you two appraisers
5   following the same methodology reach different
6   appraisal values for the same vehicle on the same
7   day?
8        A    I think on these Mitchell reports, we
9   would come up with the same.
10       Q    Okay.  Well, if you did -- so two
11  appraisers, setting aside the Mitchell report, if
12  you appraised the same vehicle on the same day,
13  could you reach two different numbers?
14       A    We could.
15       Q    Okay.
16       A    It would depend on your comparables.
17  And the human factor in it would be the comparison
18  of conditions.
19       Q    Condition?
20       A    Yes.
21       Q    Okay.  If you appraised a vehicle for
22  $20,000 and another appraiser applied the same

Page 127

1   methodology, but found that that same vehicle was
2   worth 19,000, is it fair to say that ACV would be
3   somewhere in the range of 19 to 20,000?
4        A    We would have to compare notes on
5   what the comparables were.
6        Q    Okay.
7        A    So I can't give you a yes or no on
8   that.  I would have to compare -- have to do the
9   comparables and we would match them up to see why
10  he came up with more or less and why I came up with
11  more.
12       Q    Okay.
13       A    Sometimes we can come up with an
14  agreement where, "Hey, maybe this comparable is not
15  that good, but my comparable is better," and then
16  together we can come up an agreed price.
17       Q    Okay.  If you didn't talk to each
18  other and you didn't agree, but you did your
19  appraisal and another appraiser did his, and he
20  came up with pretty close, but not identical
21  numbers, would it be fair to say the actual cash
22  value is somewhere in that range?

Page 128

1        A    It would have -- I can't say what it
2   would be.  It would have to be a very close range.
3        Q    Okay.  And when you say "very close
4   range" is that --
5        A    If someone came up with an appraisal
6   within 15 to $100 difference in mine, then I would
7   have no issue with that.
8        Q    Okay.  In terms of a percentage,
9   though, because I guess --
10       A    I can't really put a percentage on
11  it.
12       Q    Okay.  Because if you were $100 off
13  on a vehicle that's worth 1,500, that's different
14  than being --
15       A    That's --
16       Q    -- $100 off on a vehicle --
17       A    Correct.
18       Q    -- that's $90,000?
19       A    Correct.  You're dealing with
20  $100,000 vehicle and you're $50 off, that's really
21  good.  Yeah, it depends on the vehicle.
22       Q    Okay.  But for you, you think a range

Page 129

1   would be a hundred dollars --
2        A    Again --
3        Q    -- one way or another?
4        A    -- it depends on the vehicle.
5        Q    Okay.  So in my example with the
6   19,000 and the 20,000, you and another appraiser
7   say you have different numbers, you're a thousand
8   dollars off, if a third appraiser comes in and
9   says, "I think it's $19,500," would that be an
10  acceptable value of actual cash value?
11       A    If someone came back at 19, I came
12  back at 20, and we had an umpire came in at 19,5, I
13  would say the 19,5 would be an agreeable amount.
14       Q    Okay.
15       A    For argument's sake.  But, again, if
16  we got together and determined what the
17  comparables -- if we all used the some comparables
18  and same conditions, we should come up with the
19  same price.
20       Q    Okay.  But assuming all the math is
21  don't correctly --
22       A    Correct.

33 (Pages 126 - 129)

Jason Merritt                                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 130

1    Q    -- you maybe used slightly different
2  comparable vehicles?
3    A    Correct.  As long as the methodology
4  is the same, we should come up with the same.
5    Q    Okay.  You said that the comparable
6  methodology in your report -- the comparable
7  methodology is one of the generally acceptable
8  appraisal methods.  What are the other ones?
9    A    When I say "generally accepted,"
10  that's what most people use.  I've run into other
11  ones that just kind of pull numbers out.  I mean
12  I -- I really don't know where they get it.  I'm
13  wondering where did that come from.  Their response
14  was, "Well, I've doing this for 30 years."  So
15  that, to me, is not an acceptable.  You know, the
16  acceptable is a methodology of keeping to the
17  comparables.
18    Q    Okay.  What kind of methodology does
19  NADA apply?
20    A    I don't know.
21    Q    What do you know about Mitchell's
22  methodology?

Page 131

1    A    I remember looking at the back page
2  of -- let's see, where are the reports?  I will
3  look at Exhibit 7.  On the back page it gives a
4  methodology explanation.  And it pretty much is
5  exactly what I go by.
6    Q    Uh-huh.
7    A    The -- "Locate comparable vehicles,
8  adjust comparable vehicles, calculate base vehicle,
9  calculate loss vehicle adjustments, calculate the
10  market value."  Everything in Step 1, 2, 3, and 4
11  and 5 is exactly all with me, except for in Step 2,
12  the very first one, "Projected sold amount."
13  That -- I mean, really that's what we go by.
14    Q    Okay.  When you're doing an
15  appraisal, do you apply condition adjustments to
16  the comparable vehicles or do you wait and apply
17  that the way that Mitchell does to the lost
18  vehicle?
19    A    Again, it depends on my comparables.
20    Q    Okay.
21    A    It depends on what I can see on the
22  comparables.  And then -- well, I can't give you a

Page 132

1  general statement in that.  It would depend on the
2  comparables.
3    Q    Okay.  So what you know about
4  Mitchell's methodology, does that just come from
5  the back page of the valuation reports?
6    A    Exactly, right there.
7    Q    Okay.  Is there any other knowledge
8  you have of Mitchell's methodology?
9    A    No, not any direct knowledge.
10    Q    Any other knowledge of Mitchell's
11  methodology that you relied on?
12    A    No.  My guess is they -- they're
13  pulling their data off.  And it's Mitchell, they
14  have access.  I know Mitchell does a lot of
15  estimating for body shops and stuff like that, so I
16  think their data is they have heavy data.  You
17  know, they have a lot of resource and data, so my
18  guess is they're pulling data from those places.
19    Q    Okay.
20    A    But, again, I don't have firsthand
21  knowledge of where they get it.
22    Q    Okay.  Do you think that the

Page 133

1  projected sold adjustment is based on data?
2    A    It would have to be on data.  But,
3  again, they're pulling data off of sold vehicles
4  off, like, CRMs or LightSpeed, or their
5  maintenance.  And, again, it's not good data
6  because again -- it's when I sold a vehicle at
7  Timbrook, and it said it sold for 20,000, that's
8  all that's taking into account, it sold for 20,000.
9  So Mitchell gets the fact it sold for 20,000, it
10  doesn't know that I sold a tire wheel package or a
11  warranty with it and I reduced the price of the
12  actual cash value for that.
13        Does that make sense?
14    Q    Okay.  Well, how do you know where
15  Mitchell is pulling the data from?
16    A    I don't.
17    Q    Okay.
18    A    I don't, but I know that the data we
19  supply them is that sold amount.  You know,
20  whatever data that goes through our CRM, that's the
21  sold amount.
22    Q    When you say "CRM," what do you mean?

34 (Pages 130 - 133)

Jason Merritt                                              October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 134

1    A    There's different management tools
2    for your sales. Some is LightSpeed, some are
3    called CRM, Customer Resource Management. It's
4    just your database that you store your inventory
5    in.
6    Q    And does Timbrook Automotive provide
7    its data to Mitchell?
8    A    It's provided -- the CRM is usually
9    provided by, like, J.D. Power, Mitchell. There's
10   many manufacturers of it.
11   Q    Okay.
12   A    I don't know who manufactures it. I
13   don't know.
14   Q    Okay. And so you think that the
15   information that gets reported, like at Timbrook
16   Automotive, is part of the data --
17   A    Well, again --
18   Q    -- Mitchell is --
19   A    -- I'm only assuming that. Because,
20   again, I know Mitchell would have a hard time
21   calling millions of places and getting all that
22   data. So my guess is they have access to these

Page 135

1    CRMs.
2    Q    Okay.
3    A    Now, again, that's all assumptions.
4    Because, again, I don't know how they could
5    physically call and get that data.
6    Q    Okay. But the data could come from
7    somewhere else, right?
8    A    It could, yeah.
9    Q    Okay. Each valuation report for the
10   Drummond Plaintiffs --
11   A    Which number was that on?
12   Q    I think those were -- I think that
13   might be one --
14   A    LaCrosse?
15   Q    Yes.
16   A    Okay.
17   Q    Each valuation report for the
18   Drummond Plaintiffs shows that Mitchell also
19   included an NADA value. Is that right?
20   A    I'd have to refresh myself on that.
21   Q    I think you just skipped the page.
22   A    Let's see --

Page 136

1    Q    I'll show you. It's --
2    A    Oh, okay. Yes.
3    Q    What did you do to confirm these NADA
4    values were accurate?
5    A    I did not. Again, Mitchell pulls
6    those out. And I have not seen any that have ever
7    varied from that value on NADA.
8    Q    Okay. So you just assumed that
9    Mitchell has got it right on the NADA value that --
10   A    I have an NADA, so I can look them
11   up, but I have verified them in the past, and I've
12   no reason to doubt that.
13   Q    You've verified Mitchell reports,
14   including NADA value?
15   A    I have verified NADA values on
16   Mitchell reports.
17   Q    Okay.
18   A    If -- so, you know, so I don't do
19   them on every one of them. And this one, I can't
20   recall if I did or not.
21   Q    Okay.
22   A    But I would normally -- if you handed

Page 137

1    me a Mitchell report and it showed the NADA retail
2    value, I would accept that.
3    Q    Okay.
4    A    I mean if I had reason to look it up
5    and verify it, I could. But, again, I would -- for
6    the most part, they go by the region, they go by
7    the mileage, they go by the VIN number, so I would
8    have no reason to discount that.
9    Q    Okay. And would you check to make
10   sure that every adjustment to the NADA value was
11   accurate?
12       If they're adjusting for certain
13   equipment, would you check to make sure that
14   vehicle has that equipment?
15   A    Well, again, I know enough about
16   NADA, that when you put the VIN in, NADA decodes
17   all that.
18   Q    Okay. Would NADA take into account
19   aftermarket parts?
20   A    No.
21   Q    Okay. Do you check the NADA value to
22   make sure that any aftermarket parts are accounted

35 (Pages 134 - 137)

Jason Merritt                                                        October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 138

1  for?

2      A    Again, the only thing that would say

3  is like aluminum alloy wheels, and that was a base

4  on that vehicle so . . .

5      Q    Okay.

6      A    No.

7      Q    Do you want to look at the other

8  ones? So that one is Exhibit 7. Try Exhibits 5

9  and 6.

10     A    Okay. Okay.

11     Q    And did you check that -- if

12  any aftermarket parts were accounted for there?

13     A    No. Again, NADA, they'll give you a

14  list of different things you can check off and

15  they'll double-check that.

16     Q    Okay.

17     A    And NADA puts that value on there.

18     Q    Okay. So you're assuming that

19  Mitchell has that value for NADA right?

20     A    Correct.

21     Q    Each valuation report for the

22  Drummond Plaintiffs also shows that the lost

Page 139

1  vehicle was inspected and adjustments were made for

2  condition, right?

3      A    Yes.

4      Q    How do you know that these condition

5  adjustments are correct?

6      A    I don't.

7      Q    Did you review pictures?

8      A    No. No. I testified that I did not.

9  These are all historic, so I did not have access to

10  any of this.

11     Q    Plaintiffs' counsel didn't give you

12  the pictures of the lost vehicles that were

13  produced in this case?

14     A    I don't have pictures of anything.

15     Q    Okay. So when you calculate the ACV

16  for these vehicles, are you assuming that the

17  condition adjustments are correct?

18     A    I am. Again, I -- Mitchell does a

19  very good job of -- of outlining each one of them

20  and putting a number code on each one of them and

21  an valuation on them. I look through those, I look

22  at them, see what they've rated them as and just

Page 140

1  verified. But yes, I verify just by looking at it,

2  I can't go look at the vehicle.

3      Q    Were you aware that Mr. Williams

4  testified that he disagreed with the condition

5  ratings on his vehicle?

6      A    I don't know who Mr. Williams is.

7      Q    He's one of the Drummond Plaintiffs,

8  I believe.

9      A    Yeah, I don't know what he testified

10  to.

11     Q    Okay. What would you need to look at

12  to verify whether the condition adjustments on his

13  vehicle were proper if he's saying they're wrong?

14     A    I mean at this point I would have to

15  look at the vehicle, which it's probably been

16  crushed.

17     Q    Would you look at pictures of his

18  vehicle?

19     A    Pictures of the vehicle would help,

20  depending on what he's -- you know, again, I didn't

21  look at anything that he was saying. I don't -- I

22  don't know any of the arguments with that.

Page 141

1      Q    Okay.

2      A    I'm just looking at appraisals, so

3  what arguments they're having is pretty outside of

4  what I've been looking at.

5      Q    What have you assumed that the

6  adjustor that did this first appraisal report by

7  Mitchell, what if we assumed that the Progressive

8  adjustor just made up the condition and the vehicle

9  was essentially brand new, would that change your

10  opinion that the condition adjustment is proper?

11     A    Assuming that? Well, sure. But,

12  again, I could also assume that he was spot on.

13     Q    We discussed earlier that the dollar

14  amount of the conditioning adjustment depends on

15  the value of the vehicle, right?

16     A    Correct, is a factor in it.

17     Q    Okay. And it's your opinion that

18  Mitchell's base value is wrong because it

19  incorporates projected sold adjustment, right?

20     A    I believe that that part of the

21  condition or that part of the valuation is wrong.

22     Q    Okay. So base value is wrong if

36 (Pages 138 - 141)

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 142

1 there were PSAs applied to the comparable vehicles?
2      A    I've got to look at what they're
3 considering base value, but I think you are
4 correct.
5            No, that's in -- according to this,
6 it shows the adjusted price it takes the projected
7 sold amount, the mileage, adds or takes away from
8 the conditions or accessories and then comes up
9 with an adjusted price. So I don't know if we're
10 mixing what base means or --
11     Q    The base value means this value here
12 on the front.
13     A    Okay.
14     Q    Do you know how that's calculated?
15     A    Yes. That would be in the base
16 value.
17     Q    Okay. How is the base value
18 calculated?
19     A    It looks like it is the list price
20 minus projected sold price, minus mileage. And it
21 looks like that's it. And then the condition is
22 different and any prior damage and aftermarket

Page 143

1 parts.
2      Q    I'm talking about just to reach this
3 number.
4      A    Uh-huh.
5      Q    Do you -- do you understand how that
6 number --
7      A    Yes.
8      Q    -- is calculated?
9      A    Yes.
10     Q    How is it calculated?
11     A    I would have to refresh my memory on
12 all of the report.
13     Q    And this is Exhibit 7, the first page
14 that says "Dual source base value."
15     A    Well, it's using the comparable
16 method. And it's coming up with all of the other
17 comparables and it's coming up with that base
18 value.
19     Q    Okay. So the base value is the
20 average of all of the comparable --
21     A    Correct.
22     Q    -- vehicles that are adjusted?

Page 144

1      A    Correct.
2      Q    And then what's the next step to get
3 the base value?
4      A    Then the next step is they're either
5 putting on value or taking off value for the
6 condition.
7      Q    No, just to get to base value --
8      A    Oh.
9      Q    -- before we get to condition.
10           So we average all the comparable
11 vehicles.
12     A    Yes.
13     Q    Okay. Then what?
14     A    Then we take off the PSA, and they're
15 taking off what's outlined in each one. Each one
16 has it outlined. It will put the comparable
17 vehicle list price and then it takes off projected
18 sold amount. It either adds or takes for the
19 mileage, equipment. And then it has an adjusted
20 price on that. Then takes the adjusted price,
21 either addition to or, in this case, subtracts from
22 the list price of the vehicle. So then there's a

Page 145

1 baseline of what they're putting a value on just
2 for say Comp Number 2.
3      Q    Okay.
4      A    And then they do the same thing with
5 all their other comps and they come up with a
6 value. Then they divide it by how many comps there
7 are and that comes up with the base.
8      Q    Okay. And is that the case even in
9 Pennsylvania?
10     A    And they take into the fact also the
11 NADA.
12     Q    Okay. So it's the average of the
13 adjusted prices for all the comps, then averaged
14 with the NADA value?
15     A    Yes.
16     Q    And that's how you get the dual
17 source base value?
18     A    Yes.
19     Q    Okay. So the projected sold
20 adjustment is taking into account at the adjusted
21 price level?
22     A    Yes.

37 (Pages 142 - 145)

Jason Merritt                                              October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 146

1    Q    Okay.  Is it your opinion that
2  because the projected sold adjustment is wrong,
3  then the base value is wrong?
4    A    Correct.
5    Q    Okay.  And if Mitchell makes a
6  conditioning adjustment that's based on the base
7  value, isn't the conditioning adjustment then also
8  wrong?
9    A    No.
10   Q    Why not?
11   A    Because, again, condition is separate
12 than the base value.
13   Q    Do you know how that's calculated?
14   A    It is here on page -- on this one it
15 is page 5.  It goes through the different condition
16 adjustments and adjusts that price from that, not
17 from direct sold amount.
18   Q    So on this one, the condition
19 adjustment is $793.68?
20   A    Correct.
21   Q    How did Mitchell calculate that?
22   A    Through their valuation system.  And

Page 147

1  I don't know the exact numbers on their valuation
2  system.
3    Q    And we discussed earlier that
4  condition adjustments are tied to base value,
5  right?
6    A    Correct.
7    Q    So --
8    A    No, they're -- they're additional to
9  the -- the base value is the comparisons, and the
10 condition is either added or subtracted.
11   Q    And the dollar amount that's added or
12 subtracted, doesn't that depend on what the base
13 value is?
14   A    No.
15   Q    You don't think it does?
16   A    No.  Condition is separate.
17   Q    Okay.  Okay.  But you don't know how
18 Mitchell calculates condition?
19   A    No, I don't.
20   Q    Okay.
21   A    And, again, without seeing the
22 vehicle, I can't deny or confirm their condition

Page 148

1  valuations correct.
2    Q    Okay.
3    A    Again, I have not seen any that --
4  that I've had any glaring disagreements with, but
5  most of mine are historical.
6    Q    Let's assume that each of these
7  plaintiffs came to you before they settled their
8  claims with Progressive and they said that they
9  disagreed with the vehicle valuation report.  What
10 would you do to help them?
11   A    I would -- if the vehicle's
12 available, I would go look at the vehicle and start
13 there.
14   Q    Okay.  And you would conduct a full
15 appraisal?
16   A    Correct.  And that's the way that I
17 would prefer to have it, but again usually by the
18 time they come, the car has already been disposed
19 of.
20   Q    Okay.  So in that situation, if the
21 car has not been deposed of, would you look at the
22 car in person?

Page 149

1    A    Correct.
2    Q    If the car has been deposed of, would
3  you look at pictures?
4    A    Pictures would help, yeah.
5    Q    Okay.  And you'd probably pull
6  different comparable vehicles than Mitchell, right?
7    A    I would look at their vehicles that
8  they have as comparables, and if I still had them
9  available within the time, I would pull up the
10 comparables, yes.
11   Q    Okay.  Would you call any dealerships
12 to see if they would negotiate the sticker price of
13 any comparable vehicles?
14   A    Occasionally I would, yes.
15   Q    Okay.  In what situations would you
16 call the dealerships?
17   A    It would depend on the vehicle
18 itself.  It's all dependent on the vehicle.
19   Q    Okay.
20   A    A vehicle that I might call in might
21 be a Corvette or a Dodge Challenger or something
22 that would possibly be a little more limited or a

38 (Pages 146 - 149)

Jason Merritt                                          October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 150

1 vehicle that would be very readily available.
2       Q.    Okay.  So you would reach a
3 conclusion about actual cash value and send the
4 plaintiff your appraisal report, right?
5       A.    Correct.
6       Q.    But that's not the approach that
7 you're taking here, right?
8       A.    No.
9       Q.    Okay.
10      A.    The car's not available, the car --
11 the data is not available anymore.  Again, when
12 I've looked at the Mitchell reports, the data and
13 the conditions, I have had no reason to -- I've not
14 been given any reason to argue or disagree with
15 their valuations.  A lot of times their conditions
16 are on par for whatever I've seen.
17      And so in this condition -- or in
18 this situation here, I've just reviewed this
19 report, tried to do the best appraisal I could do,
20 which is to go over each of the comparables and
21 verify that the VIN numbers are correct.  And when
22 the VIN numbers are correct, I look and see if the

Page 151

1 packages are right.  The packages are right and
2 then come with a price.
3       Q.    What do you do to verify that the VIN
4 numbers are correct?
5       A.    Just run the VIN number and see what
6 comes up on it.
7       Q.    Okay.  What do you use to run the VIN
8 number?
9       A.    I can use just open source stuff,
10 some bumper, CARFAX, whatever.
11      Q.    Okay.  And then you -- you look at
12 what you find --
13      A.    Yes.
14      Q.    -- on the VIN code --
15      A.    Options and stuff.  Again, I've never
16 found -- I have not yet found anything that have
17 been incorrect.
18      Q.    Okay.
19      A.    I keep looking for that one little
20 thing, but I -- I haven't found them.
21      Q.    How many Mitchell reports have you
22 reviewed?

Page 152

1       A.    I would say outside of these reports
2 and anything that I've done in Volino -- actually,
3 I don't think -- I think it's Mitchell, I -- I've
4 probably seen 25 or 30 probably.
5       Q.    Okay.  And in all of those, did you
6 provide a separate appraisal report?
7       A.    No.  No.  Some of those I just didn't
8 do because it wasn't worth doing.
9       Q.    Okay.  So you agreed with them?
10      A.    Yes.
11      Q.    Okay.  Even ones that had a projected
12 sold adjustment?
13      A.    No.  Those I don't agree with.
14      Q.    Okay.  So you've seen about 25
15 Mitchell reports?
16      A.    Yes.
17      Q.    And none of them had projected sold
18 adjustments?
19      A.    I can't recall.
20      Q.    Okay.
21      A.    Some of those weren't people asking
22 me to do appraisals, they were just wanting me to

Page 153

1 look at them.
2       Q.    Okay.  In your report you state that,
3 "Appraisers must base their opinions on hard data."
4 Is that right?
5       A.    Yes.
6       Q.    What about condition adjustments,
7 aren't those subjective?
8       A.    It is.
9       Q.    So are condition adjustments based on
10 hard data?
11      A.    Not necessarily.  When I'm talking
12 about hard data, I'm referring to comparables.
13      Q.    Okay.  What factors dictate how
14 accurate an ACV opinion is?
15      A.    What factors dictate that?  Again, I
16 would go with comparables.  Again, the comparables
17 seem to be the most important thing because
18 you're -- you want to compact apples to apples.
19      Q.    If you're unable to perform a
20 conditioning assessment perhaps due to COVID and
21 you rate everything as average, does that mean that
22 an ACV opinion might be less accurate than had you

39 (Pages 150 - 153)

Jason Merritt                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 154

1  performed condition adjustments?
2      A    Sure.
3      Q    And I think you discussed with
4  Mr. Cashdan in the Volino deposition that there
5  were situations where Progressive was unable to
6  evaluate vehicle condition because of COVID, right?
7      A    Correct.  And it could be higher.
8  There's -- you know, it goes both ways.
9      Q    Just less accurate?
10     A    Yes.  But, again, you're looking
11 at -- you know, without glaring issues, then, yeah,
12 it's -- it's minor.
13     Q    Okay.  Your report also says that
14 Internet price is often the only data point
15 concerning what a particular vehicle would sell
16 for.  What's the basis for that opinion?
17     A    Again, I'm referring to the actual
18 cash value of the vehicle.  From my experience, the
19 vehicle listed for $10,000 is sold for $10,000.
20 And, again, the sale price in the CRM may say
21 $9,200, but, again, you know, what's the back end
22 on that?  So my data is that if I valued that at

Page 155

1  $10,000 as a sales manager, that's what that car is
2  worth.
3      Q    Okay.
4      A    Now, what negotiation price comes
5  after that, I can't control that, but I still know
6  what the actual cash value is.
7      Q    And your opinion says that, "Internet
8  price is the only data point concerning what a
9  particular vehicle would sell for."  Does that mean
10 that what a vehicle sells for is the data points
11 that you're interested --
12     A    Yes.
13     Q    -- in?
14     A    Yes.
15     Q    Okay.  So you want to know what the
16 vehicle sells for, not necessarily what it's listed
17 for?
18     A    No.  No.  Where's that at?  I want to
19 read the context of that.
20     Q    It's Opinion B1 in your Volino -- or
21 not Volino, your Freeman and Drummond reports.
22     A    Yeah, I've got to read what that

Page 156

1  context is.  You're talking about the transcripts?
2      Q    No.  In your report, your Volino --
3  or not Volino, Freeman and Drummond reports.
4      A    And that is which exhibit?
5      Q    Exhibits 2 and 3.  If you're looking
6  at Exhibit 2, it's page 4.
7      A    Okay.  Starting with the second
8  paragraph, "Mitchell's Application of a Projected
9  Sold Adjustments is Inconsistent With Appraisal
10 Standards and the Comparable Methodology."
11     Q    Do you see the paragraph starting
12 with "First"?
13     A    Yes.  If you go back to the paragraph
14 prior to that, I'm talking about mileage, options,
15 equipment.  And I'm saying appraisers must base
16 their opinions about a specific comparable
17 vehicle's price on hard data.  The hard data
18 appropriate for this typically the Internet price
19 of the comp.  This is true for several reasons.
20 And I start outlining the reasons.
21          The first one is, "The internet is
22 often the only data point concerning what a

Page 157

1  particular vehicle listed with a particular seller
2  would sell for at the time of valuation."
3      Q    So does that mean that what you're
4  interested in for purposes of determining ACV is
5  how much a comparable vehicle sold for?
6      A    No.  As I'm explaining here, the
7  first thing I do is look at the comparables, which
8  is the Internet price.  And I consider that as
9  being the beginning of the valuation.
10     Q    Have you seen any Mitchell reports
11 that you sold comparable vehicles, vehicles that
12 have already sold that are not listed for sale?
13     A    You say have I seen them?
14     Q    Yes.
15     A    Yes, I saw a few on there that said
16 sold.
17     Q    Is it your opinion that the sold
18 comparable vehicles are less accurate than the
19 listed comparable vehicles?
20     A    I believe that is pretty so.
21     Q    So you think sold vehicles are less
22 accurate --

40 (Pages 154 - 157)

Page 158

1    A    Yes.
2    Q    -- for determining actual cash value?
3    A    Yes.
4    Q    Okay.
5    A    Because, again, you -- you don't get
6  the full data on what the sales price was.
7    Q    Okay.
8    A    Now, if you can see their whole back
9  end of what was sold and what the profit margin
10  was, and they say, "Well, our profit margin was
11  5,000, but we ended up only taking four because
12  there were issues with the cars," then I'd say,
13  well, then, we go by the sold amount.
14    Q    Okay.
15    A    Again, I don't have that here, so my
16  best valuation of vehicle's value is what it is
17  advertised for.
18    Q    Okay.  And that statement that the
19  Internet price is often the only data point, are
20  you aware of any articles or journals supporting
21  that statement?
22    A    No.

Page 159

1    Q    What specific training qualifies you
2  to make that conclusion?
3    A    Just my own.
4    Q    Your own experience?
5    A    Yes.
6    Q    How do you define Internet price?
7    A    Well, what's listed on the internet.
8    Q    Does every vehicle only have one
9  internet price?
10    A    Normally, yes.
11    Q    Have you ever seen a vehicle's
12  Internet price be lowered over time?
13    A    I haven't tracked the prices of them,
14  but I've seen them, say, reduced and something like
15  that.  But lately that -- over the last several
16  years, that's rare.  And, again, I've seen some
17  that come with conditions; a lower price on the
18  Internet if you finance with them.
19    Q    Do all vehicles have an Internet
20  price?
21    A    When I say "Internet price," I'm just
22  referring to prices that I find on the Internet.

Page 160

1    Q    Okay.
2    A    Not necessarily labeled as Internet
3  price.  I'll go to Cars.com, I'll go to CARFAX.com,
4  I'll go to these and I go with the listed price
5  that they have on the Internet.
6    Q    Okay.  Your next opinion starting on
7  the "Second," it says that, "Appraisal standards do
8  not permit arbitrarily deducting the advertised
9  price of the vehicle based on projections of what
10  that vehicle might ultimately sell for."
11    A    Are we still on page 4?
12    Q    Yes, at the very bottom.
13    A    Okay.
14      Okay.  Yes.
15    Q    What's the basis for that opinion?
16    A    Just as I explained, you don't know
17  the back end, you don't know what the profit margin
18  is.
19    Q    What do you mean by "appraisal
20  standards"?
21    A    My appraisal standards and comps, it
22  just doesn't -- I mean by appraisal standards, I

Page 161

1  would refer to my standards.
2    Q    Who taught --
3    A    It just --
4    Q    -- you those appraisal standards?
5    A    Through my certification.
6    Q    The Bureau of Certified Auto
7  Appraisers?
8    A    Correct.
9    Q    Do they publish appraisal standards?
10    A    No.
11    Q    Are these standards written down
12  anywhere?
13    A    No.
14    Q    So appraisal standards are just word
15  of mouth --
16    A    Correct.
17    Q    -- that you learn --
18    A    Or different training.  And, again,
19  you just don't -- part of appraisal standards, you
20  just don't arbitrarily deduct stuff.  In other
21  words, any type of an appraisal standard would be
22  you would have to have some type of data to back it

41 (Pages 158 - 161)

Jason Merritt                                                October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 162

1  up.
2      Q    Okay.  Well, you would agree that
3  appraisal standards would permit deducting an
4  advertised price for a vehicle based on projections
5  of what it might sell for provided that projection
6  isn't arbitrary, right?
7      A    Well, again, my statement is
8  arbitrarily.
9      Q    Well, you stated in your Volino
10  report that take-price adjustments are a valid
11  appraisal method, right?
12     A    Where is that at?
13     Q    In your Volino report?
14     A    Which one is that?  Where is that?
15     Q    I think that's Exhibit 4.
16     A    Okay.  It's one of them.
17     Q    It's the last page.  It's unnumbered.
18  You say that, "Some appraisers may take a
19  take-price adjustment to the Internet price of
20  comparable vehicles.  This adjustment is made only
21  after speaking with the car dealer to determine
22  whether the dealer would take anything other than

Page 163

1  the advertised price of the vehicle."
2      A    Well, again, I put on there, "While I
3  do not, there are some appraisers who make
4  take-price adjustment."  And, again, that --
5  that's -- that doesn't happen very often anymore.
6      Q    Okay.  But you would agree there are
7  some appraisal standards that do permit deducting
8  an advertised price based on projections of what it
9  might sell for?
10     A    Sure.
11     Q    Okay.  But you didn't apply any
12  appraisal standards other than your own experience?
13     A    Well, again, when I said "Appraisal
14  standards do not permit arbitrarily," so, again, I
15  don't arbitrarily deduct that stuff, no.
16     Q    And you don't know how the
17  projected sold adjustment is calculated, correct?
18     A    I do not know how it is calculated.
19     Q    Okay.  But you just conclude that
20  it's arbitrary?
21     A    Yes, I do.
22     Q    Okay.  Why do you think it's

Page 164

1  arbitrary if you don't know how it's calculated?
2      A    Because, again, I -- I've called on
3  some reports that said that there was projected
4  sold amount and I called and then it sold for more.
5      Q    Okay.  When was this?
6      A    Probably a month ago I confirmed
7  that.  And I can't remember the exact report that I
8  did that on or which appraisal, but it was
9  confirmed with that.  And as well as other ones
10  I've called and said, "What is your projected sale
11  amount or what did it sell for?"  And they said,
12  "The exact advertised price."
13     Q    And you didn't call any of the
14  dealerships for any of these plaintiffs though, did
15  you?
16     A    Let me look and see if I can refresh
17  my memory on them, but I don't think I did.
18         No, I don't believe I did.
19     Q    Why not?
20     A    I wish I would have now, because I
21  think the answer would be the same, "They sold it
22  for the advertised price."

Page 165

1      Q    Okay.  And so for that reason, you
2  think that that projected sold adjustment is
3  arbitrary because these vehicles ultimately may not
4  have sold for anything other than the list price?
5      A    No, I don't think that's a -- a fair
6  statement.  I think a fair statement is that
7  everything I can show on these reports have data to
8  back it up.  The projected is exactly that, it's
9  projected, it's arbitrary.
10     Q    Even if it has data to back it up?
11     A    I would have to see what the data is,
12  because, again, even that they say projected.  So
13  it's a projection, it's not a data comparable
14  thing, it's -- it's a projected.
15     Q    Okay.
16     A    So it's not a result, it's not data
17  that says sold amount, it says projected.
18     Q    Okay.
19     A    So it's an arbitrary number.
20     Q    Okay.  So that one is arbitrary
21  because you've not seen the data, it's not based on
22  data in your opinion.  How is that different from

42 (Pages 162 - 165)

Jason Merritt                                            October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 166

1  the condition adjustment and the mileage adjustment
2  that you are relying on in this report?
3      A    The mileage adjustment is the
4  mileage.  You can compare the mileage of this
5  vehicle to another vehicle, so it's -- it's written
6  there.  The condition is the only thing that has
7  the human-type factor in it.  You may look at the
8  carpet and say it looks normal, I may look at the
9  carpet and say it looks rough.  And then I may say
10  it's about a $80 deduction and you may say it's
11  only a $50 deduction.  So there are very minor
12  differences in conditions.  But a projected sale
13  amount, to me, is a very large step --
14      Q    Okay.
15      A    -- in an arbitrary number.
16      Q    Okay.  So you're comfortable assuming
17  that the dollar amount of the mileage adjustments
18  are correct --
19      A    Yes.
20      Q    -- without knowing how those were
21  calculated or what data those were based on?
22      A    Correct.

Page 167

1      Q    But you're not comfortable with the
2  projected sold adjustment because you don't know --
3      A    No.
4      Q    -- because it's hard data?
5      A    No, because they can tell you the
6  exact numbers they're going off of and I can verify
7  that, even like through NADA and Kelley Blue Book.
8  I can come up with what the number is, like two
9  cents a mile.
10      Q    Is that what Mitchell does?
11      A    I don't know what their numbers are.
12  I'm just saying it depends on the car.  Each car
13  could be different.  You know, a car could have a
14  two-and-a-half percent mileage deduction, so there
15  is an -- there is an valuation for that.
16      Q    But you don't know how Mitchell
17  calculates its mileage adjustments?
18      A    No, I don't know for each one.  I
19  know there's a price put on each mile, but I don't
20  know what they are in this one.  I mean, I can do
21  the math on them and find it out.
22      Q    How do you know that there's a price

Page 168

1  put on each mile?
2      A    Because it's written right there how
3  much they're taking off for each mile -- or for the
4  mileage.
5      Q    Okay.  So there's a dollar amount for
6  the mileage --
7      A    Yes.
8      Q    -- adjustment?
9          Where does it say that's based on a
10  certain number of cents per miles?
11      A    It doesn't say per cent per mile.  It
12  just does the deduction per mileage.  So they're
13  taking off the mileage deductions.  So if I did the
14  math on it, I could find what that is.
15      Q    Okay.  Can you do the math on one of
16  those and figure out what that cents per mile would
17  be?
18      A    I can't do it off the top of my head.
19      Q    Do you want a calculator?
20      A    Yeah.  I can start my phone up here
21  and do it.
22      Q    Did you do these calculations when

Page 169

1  you were reviewing these valuation reports?
2      A    I can't remember if I did or not.
3          It looks like I got two cents a mile.
4      Q    Okay.  So if you --
5      A    Again, that's just quickly going off
6  my calculator.
7      Q    And which comparable vehicle did you
8  look at?
9      A    That was the '07 Buick LaCrosse.
10      Q    Comparable 2?
11      A    Comparable Number 2.
12      Q    And that was the mileage adjustment
13  that's $1,220?
14      A    Yes.
15      Q    Okay.  Now, if you apply the two
16  cents a mile to the other comparable vehicles, does
17  that all shake out?
18      A    I'll have to check them.
19          Yes, it approximately does.
20      Q    When you say "approximately" --
21      A    Well, within a couple of dollars, so
22  I didn't -- I didn't do all the -- it's like .2

43 (Pages 166 - 169)

Page 170

1 something.
2     Q    Okay.  And is that enough to you to
3 confirm that Mitchell applies a certain cents per
4 mile to calculate mileage adjustments?
5     A    Yes.
6     Q    Do you think that mileage adjustments
7 are tied at all to the value of the vehicle?
8     A    State that again.
9     Q    Do you think that the cents per mile
10 is tied at all to the value of the vehicle?
11     A    Yes.
12     Q    So while they maybe applied two cents
13 per mile there, they might not apply two cents per
14 mile for a different vehicle?
15     A    I didn't look at the other ones yet,
16 but I would say that's probably around the same.
17     Q    Okay.  You think about two -- two
18 cents per mile?
19     A    Some of them is a cent, some three
20 cents.  I've seen different.  It depends on the
21 age.
22     Q    Okay.

Page 171

1     A    It depends on the vehicle.  Different
2 conditions in it.
3     Q    Okay.  But that's enough -- the math
4 you just did is enough for you to confirm that the
5 mileage adjustment is based on a cents per mile?
6     A    Yes, because that is the vehicle,
7 that is the mileage, the comparable vehicle with
8 the comparable mileage is something that you can
9 actually but the data to.
10     Q    Okay.  And did you do that exercise
11 for any of the other comparable vehicles for any of
12 the other plaintiffs?
13     A    I most likely did, but I can't recall
14 the process.
15     Q    Okay.  And you didn't describe doing
16 that in your report --
17     A    No.
18     Q    -- did you?
19         Did you review any data underlying
20 the projected sold adjustment?
21     A    No.
22     Q    Are you offering an opinion on the

Page 172

1 reliability of the projected sold adjustment data
2 or just the arbitrary projections of a sold price
3 are improper?
4     A    Just the arbitrariness of the
5 projection.
6     Q    Okay.
7         MS. WHITE:  I think we can take a
8 break.  Do a short break, five minutes.  Off the
9 record.
10         VIDEOGRAPHER:  The time is 1:29 p.m.
11 We are off the record.
12         (Recess from 1:29 p.m. to 1:38 p.m.)
13         VIDEOGRAPHER:  Time is 1:38 p.m.
14 This begins Unit Number 4.  We are on the record.
15 BY MS. WHITE:
16     Q    Mr. Merritt, can you look at Exhibit
17 1, which is your deposition transcript from the
18 Volino case?
19     A    Okay.
20     Q    And if you would look at transcript
21 page 123.
22     A    Okay.

Page 173

1     Q    Do you see at the bottom of page 123
2 where you testified, "When you have both available,
3 the sold price would certainly be a very good
4 variable in it," referring to whether you should
5 use list price or sold price.
6     A    And I do remember that.  I remember
7 that very well.  And he was able to talk me into
8 that, and I really shouldn't have said that because
9 I really don't believe the sold price is the better
10 price.
11     Q    So at the beginning when you said
12 that all of your testimony from Volino is true and
13 accurate, you're now saying it's not?
14     A    No, I'm not saying that at all.  That
15 that is my testimony, but, again, I don't agree to
16 that.
17     Q    Okay.  So you think -- you said here,
18 "Whenever you can use the actual sold price, you
19 want to use it, correct?"  And you said, "Correct."
20     A    That --
21     Q    So now you would answer that question
22 differently?

44 (Pages 170 - 173)

Jason Merritt                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 174

1     A    I would -- I would be more specific
2  in that answer.  Again, I would refer back to the
3  classic vehicles and newer vehicles are different
4  in that.  Again, I remember specifically answering
5  that.  And I remember going over it in my
6  transcript, and it is what I said.  But if I had to
7  say that over again, I would explain that more as
8  in any time that I could get real data of what it
9  sold for, real data, I mean, as in the back end,
10  the front end, and get a real amount of that sale,
11  that would always be the best.
12     Q    Okay.
13     A    But you can't get that, very rarely
14  can you ever get that, unless I'm going into the
15  computer and looking at it.
16     Q    Okay.  So if you had -- if there were
17  warranties, anything like that, no service plans,
18  would the sold price of a vehicle be more reliable
19  than a list price?
20     A    Well, again, that's an arbitrary
21  thing again.  Because, again, I don't know what all
22  the conditions are.  So to answer that is just like

Page 175

1  I did here of just "correct," I can't say that
2  that's -- I would have to explain that more.
3     Q    Okay.  And what situation would a
4  sold price be more reliable than a list price?
5     A    In a situation where a sold price
6  would be more reliable would probably be in a
7  classic vehicle or a vehicle that maybe the -- the
8  value has started to go down in.
9     Q    Okay.  So you said earlier in this
10  case that -- that you don't think that the sold
11  comparable vehicles that Mitchell uses sometimes
12  are as reliable as the listed vehicles?
13     A    Correct.
14     Q    Do you think in Mitchell, we should
15  take out all of the sold comparable vehicles?
16     A    Again, I don't know where they're
17  getting the information, so although I don't like
18  the sold part on it, I don't know where that data
19  is coming from so I can't say take it out or leave
20  it in, I just won't use that.
21     Q    Okay.  So you would --
22     A    Personally, I wouldn't have used that

Page 176

1  comparable, but that doesn't mean it's wrong,
2  because I don't know what data they're pulling from
3  that, so I can't testify to what that data is.
4     Q    Okay.  So you -- but you don't know
5  what the data is, those sold comps are based on,
6  you would leave it in the valuation report?
7     A    I left it in these and didn't go
8  against it because I don't know.  I'm just -- I'm
9  just going with the data that I was given.
10     Q    Okay.  So because you don't have any
11  hard data to back that up, doesn't that go against
12  your appraisal standards?
13     A    Sure.  But, again, this is the hard
14  data.  This is the hard data that I'm given, so
15  that's what I'm using.
16     Q    So you were sold you need to use the
17  vehicle valuation report and you can't stray from
18  that --
19     A    I wasn't told --
20     Q    -- except for the PSA?
21     A    -- anything.  I'm sorry, I kept
22  talking.

Page 177

1         I wasn't told anything as far as
2  that, I just -- I looked and I can't find that
3  data.  It's too old, I can't go back, so I have to
4  just rely on that.
5     Q    Okay.  But you think that list prices
6  are more indicative of actual cash value than the
7  sold price?
8     A    I do.
9     Q    Okay.  And that's the opposite of
10  what you said in Volino, right?
11     A    No, I don't think that's the
12  opposite, I just did not get a chance to explain
13  that there.  I should have went further with that.
14     Q    Okay.  "So whenever you can use an
15  actual sold price, you want to use it?  Correct."
16  Correct, that's not the opposite of what you're
17  saying now?
18     A    No, I don't think --
19         MR. BATES:  Object.  I mean there's a
20  130-page depo here.
21         But go ahead.
22         THE WITNESS:  No, I don't think it's

45 (Pages 174 - 177)

Jason Merritt                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 178

1  opposite, I just think it needs more clarification.
2  BY MS. WHITE:
3      Q    Okay.
4      A    And I -- I kind of expected that to
5  come back up again because I remember reading it on
6  the original deposition.  And when I -- I can't
7  object to things that I actually said, I can just
8  correct them on the next one.
9      Q    Okay.  You say in your report that to
10  calculate the ACV for each plaintiffs to the lost
11  vehicle, you'd add back the PSA, then apply the
12  adjustments that were made for condition, prior
13  damage, aftermarket parts or refurbishments, right?
14      A    Yes.
15      Q    And you'd do this for each plaintiff?
16      A    I would just take out the PSA,
17  period.
18      Q    Would you do that for all class
19  members?
20      A    Any time there's a PSA, I would just
21  remove it, yes.
22      Q    Okay.  Yeah, so you would remove it,

Page 179

1  and then that gives you a new base value, you would
2  add back in the condition --
3      A    Yes.
4      Q    -- prior damage, aftermarket parts?
5      A    Yeah.  It actually is very simple.
6  The Mitchell report is very in-depth, very precise.
7  Again, I would just take out that PSA.
8      Q    Okay.  So if you took out the PSA,
9  you would get a new base value, right?
10      A    Sure.
11      Q    Okay.  And then you would still apply
12  the same condition adjustments, the same prior
13  damage adjustments for --
14      A    Just simply take out the PSA, yes.
15      Q    Okay.  Is it possible that an
16  appraisal contains inaccurate information, but
17  still results in a valid ACV determination?
18      MR. BATES:  Object to the form of the
19  question.
20      THE WITNESS:  You'll have to repeat
21  the question again.
22

Page 180

1  BY MS. WHITE:
2      Q    Is it possible that an appraisal
3  contains inaccurate information, but still results
4  in a valid ACV determination?
5      MR. BATES:  Object to the form of the
6  question.
7      THE WITNESS:  I really don't know how
8  to answer that because you're -- you're speaking an
9  arbitrary, you know --
10  BY MS. WHITE:
11      Q    So, for example, if someone
12  left off a zero at the end of a mileage count and
13  said this vehicle has 10,000 miles, but it really
14  has 100,000, is it possible that you should still
15  end up with a value higher than the ACV?
16      A    Sure.
17      Q    In your deposition in the Volino
18  matter, you reviewed one of the plaintiff's
19  valuation reports, and Mr. Cashdan asked you to
20  calculate what you contend was the proper ACV.
21      Do you remember that?
22      A    Who is Mr. Cashdan?

Page 181

1      Q    The lawyer that took your deposition
2  in the Volino case.
3      A    I do remember somewhat of him talking
4  about an appraisal and him wanting me to come up
5  with a quick number.
6      Q    Okay.
7      A    And I had to pull my camera -- or my
8  camera or my phone out again and turn it on again
9  and do some figuring.
10      Q    Okay.  And do you recall that you
11  concluded the proper ACV for that particular
12  plaintiff was about $600 higher?
13      A    I don't recall what it was.
14      Q    Okay.
15      MS. WHITE:  What page is that on?
16      THE WITNESS:  And I am not a math
17  expert, so calling me out at the last minute for
18  math stuff, I'm not real comfortable with but . . .
19  BY MS. WHITE:
20      Q    If you look at page 126.  Oh, no,
21  that's not it.
22      A    I think it's around page 149, if I'm

46 (Pages 178 - 181)

Jason Merritt                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 182

1  not . . .

2      Q    Yep, you're right.  Thank you.

3          So it looks like you -- you did all

4  the math for this example of this particular

5  plaintiff.  And on the top of page 154, you -- you

6  answer that, "The difference between what

7  Mr. Lukasik was paid using the current methodology

8  and the amount he would be paid if we followed your

9  recommendation as $570?"  And you said, "Yeah.

10 Roughly $600."

11     A    Okay.

12     Q    And you also saw in that deposition

13 that Progressive paid that plaintiff an additional

14 $1,000, right?

15     A    I don't know what they paid.

16     MR. BATES:  Object to the form of the

17 question.

18 BY MS. WHITE:

19     Q    Okay.  We'll find it and point you to

20 it.

21     MR. BATES:  So we --

22

Page 183

1  BY MS. WHITE:

2      Q    Okay.  So if that plaintiff was paid

3  an additional $1,000 on top of what Progressive

4  determined the ACV was, but under your calculation,

5  the ACV was only about $600 higher, would you agree

6  that that plaintiff was not paid less than actual

7  cash value?

8      MR. BATES:  Object to the form of the

9  question.

10     THE WITNESS:  Yeah, I don't -- I

11 don't know what they were paid out.  I don't have

12 any clue what they were paid out.

13 BY MS. WHITE:

14     Q    I'm asking you if -- if I tell you

15 that that plaintiff was paid $1,000 more, and you

16 conclude that the ACV was only about $600 more,

17 then is it a fair conclusion that that plaintiff

18 was not paid less than ACV?

19     MR. BATES:  Object to the form of the

20 question.  And lack of foundation.

21     THE WITNESS:  Keep answering?

22     MR. BATES:  You can answer.

Page 184

1  BY MS. WHITE:

2      Q    Yes, you can answer.

3      A    Well, my question is why were they

4  paid the extra thousand?

5      Q    In that particular case -- and I

6  thought you talked about it in that deposition --

7  that particular plaintiff complained that

8  Progressive paid him additional money.

9      MR. BATES:  Object to the form of the

10 question.  Objection to the characterization of the

11 facts.

12 BY MS. WHITE:

13     Q    The point is do you know if that same

14 situation is true for any of the plaintiffs in

15 either Freeman or Drummond?

16     A    I do not.

17     Q    Okay.  What would you mean --

18     A    Again, my -- my purview was just the

19 appraisals.  I don't know what they agreed to, I

20 don't know if they gave them an extra thousand or

21 10,000, I don't know.

22     Q    Okay.  What would you need to review

Page 185

1  to determine that?

2      A    Well, again, for my scope of work, it

3  doesn't matter.  You know, I go with the actual

4  cash value and appraisals.  Whether Progressive

5  made an assumption or a settlement, I don't -- I

6  don't know.  That's not my purview.  I -- I just do

7  the actual cash value.

8      Q    Okay.  Would you be able to calculate

9  plaintiffs' damages on a class-wide basis?

10     A    No.

11     Q    We discussed earlier that because of

12 COVID, there were situations where Progressive

13 didn't personally inspect vehicles for condition

14 and didn't apply condition adjustments.  Is it

15 possible that they were -- that were an appraiser

16 able to inspect a vehicle, the ACV determination

17 would have been different?

18     MR. BATES:  Object to the form of the

19 question.

20     THE WITNESS:  There's a lot of

21 potentials for mistake when you don't get the --

22 they could miss aftermarket equipment that could

47 (Pages 182 - 185)

Jason Merritt                                                      October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 186

1  help the client and they could -- there's --
2  there's variables both ways.
3  BY MS. WHITE:
4      Q    Let's look at Ms. Freeman's valuation
5  report, which is -- I'm not sure which exhibit it
6  is that you've got them.
7      A    What was the vehicle?
8      Q    The Equinox.
9      A    The Equinox.  It figures, the other
10 pile.
11     Q    May I didn't give it to you.
12     A    No, I have it, it's just in the other
13 pile.  Right there, Exhibit 8, 2020 Equinox.  Okay.
14     Q    All right.  So according to Mitchell,
15 the value of Ms. Freeman's vehicle was $20,531.63,
16 right?
17     A    Correct.
18     Q    And in your report, you contend that
19 the value should have been $21,611.63, right?
20     A    Okay.
21     Q    Ms. Freeman testified that she also
22 had a remote start feature that should have been

Page 187

1  taken into account as an aftermarket part.  Does
2  that affect your opinion of the value of her
3  vehicle?
4          MR. BATES:  Object to the form of the
5  question.
6          THE WITNESS:  I don't know what she
7  objected to.  I'm just going by the information
8  that I had on the report.
9  BY MS. WHITE:
10     Q    Okay.  So if her vehicle, in fact,
11 had an aftermarket part that wasn't taken into
12 account, would that change your opinion of the
13 value?
14         MR. BATES:  Object to the form of the
15 question.
16         THE WITNESS:  There would be a
17 difference in the price, yes.
18 BY MS. WHITE:
19     Q    Okay.  If Ms. Freeman had called you
20 and asked you to appraise her vehicle, would you
21 have taken the remote start feature into
22 consideration?

Page 188

1      A    I don't know.  It would depend on the
2  remote start.  Is it an aftermarket?  Is it a
3  factory?  Is it operational?  You know, there's a
4  lot of different conditions in that, so I don't
5  know.  I can't say yes or no on that.
6      Q    Okay.  How would you determine if
7  Ms. Freeman's vehicle had a remote start feature?
8      A    Well, again, it would have to be
9  looking at it, asking her more questions about it.
10 There's many aftermarkets, and there's -- I know
11 the 2020 Chevrolets, a lot of that comes standard.
12     Q    You'd like to inspect that vehicle in
13 person, right?
14     A    I always prefer to, but it's not
15 always possible.
16     Q    Okay.  Let's look at Ms. Driggins'
17 valuation report, which I believe is Exhibit 7.
18     A    That is the LaCrosse?
19     Q    Yes.
20     A    Okay.
21     Q    What do you know about the condition
22 of her vehicle?

Page 189

1      A    They give the condition adjustment of
2  $793, and overall condition is 2.46, which is fair
3  for saying the typical vehicle condition is 3, so
4  there was issues that took away value, like
5  transmission oil, the right rear wheel is missing,
6  I don't know what that means.  Multiple large dents
7  on the right side, so it had damage, it had body
8  damage.  Some carpet had some stain in it, some
9  seats had some wear.  So they put a condition
10 adjustment of about $793.
11     Q    Did you review pictures of
12 Ms. Driggins' vehicle?
13     A    No.
14     Q    Are you aware that she strongly
15 disputes Progressive's conditioning adjustments?
16     A    I do not know.
17     Q    If Progressive was wrong about the
18 condition ratings, would that change your opinion
19 of the value of her vehicle?
20     A    Again, without seeing the vehicle, I
21 can't make a determination on it.
22     Q    We can look at Mr. Williams'

48 (Pages 186 - 189)

Jason Merritt                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 190

1   valuation report, which is probably Exhibit 6.
2       A    The Toyota?  Oh, that's 5.
3       Q    No, that's Exhibit 5.
4       A    Okay.
5       Q    Did you review Mr. Williams'
6   deposition testimony?
7       A    No.
8       Q    What do you know about the condition
9   of his vehicle?
10      A    It looks like it was in pretty normal
11  condition.  They took out $281.  They rated it as
12  in good condition.  Door panels had some gouges in
13  it, the seats had some creasing and a small split
14  in it.  The carpet had some wear.  It looks like
15  mainly interior stuff, but there was some curb rash
16  on one of the wheels -- or no, that was -- yeah, on
17  the wheels.  Paint had some -- two large scratches
18  in it.  Tires were normal.  So they pulled out $281
19  in condition.
20      Q    Okay.
21      A    Which seems fair.
22      Q    So since you didn't review his

Page 191

1   deposition, you're not aware that he testified that
2   his vehicle was in pristine condition and
3   Progressive made an improper downward adjustment
4   for condition?
5       A    No, I didn't.
6       Q    Did you know that Mr. Williams
7   testified that Progressive should have added
8   aftermarket parts adjustments for his trailer
9   hitch, a rear cover, and a cargo net?
10      A    No.
11      Q    Would you have added aftermarket
12  parts adjustments for any of these?
13      A    Again, it depends on what it is.  I
14  mean if it's an Amazon add-on that's very cheap and
15  not well done and not well installed, I -- I
16  probably would not.  And one person's idea of
17  pristine is different than another person's idea,
18  especially if they own the vehicle.  They seem to
19  feel it's in much more better condition than if you
20  or I may look at it.  So I -- I really don't have
21  reason to -- to have any flags on these reports.
22  If someone ready had a glaring issue and I could

Page 192

1   see it, well, then, that might affect the price of
2   the report.
3       Q    Okay.
4       A    As -- you know, it's just common
5   sense, you know.
6       Q    Okay.  So would you want to look
7   through every valuation report for every class
8   member to determine if there are any glaring
9   issues?
10      A    No.
11      Q    And why not?
12      A    Because, again, I -- I -- you're
13  looking at a third party doing it.  If someone had
14  a complaint, well, then, that would be worth
15  looking at, but for the most part, I see a lot of
16  these and they will seem fair.
17      Q    Okay.  How would you know if someone
18  made a complaint?
19      A    Well, I don't.
20      Q    Let's say Mr. Williams came to you
21  with that vehicle valuation report and he asked you
22  for a separate appraisal, would you want to inspect

Page 193

1   the vehicle?
2       A    Yes.
3       Q    And if you reached a different
4   conclusion about conditioning, you would include
5   that in your report, right?
6       A    Yes, I would.
7       Q    If you reached a different conclusion
8   about the aftermarket parts, you'd add that to your
9   report, right?
10      A    Yes.
11      Q    So your appraisal method isn't as
12  simple as just taking a report from the insurance
13  company and removing the PSA, is it?
14      A    On a historic thing, yes, it is very
15  simple.  If it's fresh and it just happened and I
16  can go look at it, and there's complaints about
17  specific things, well, then, no, it's different.
18      Q    Okay.
19      A    But these reports were very forward
20  and easy.
21      Q    Okay.  But you didn't review pictures
22  to re-evaluate condition?

49 (Pages 190 - 193)

Page 194

1    A    No.  I was looking mainly at
2  methodology.  My scope of work is mainly
3  methodology and the P -- the projected sale price.
4        Q    Okay.  Let's look at Mr. Drummond's
5  valuation report.
6        MR. BATES:  Which exhibit?
7  BY MS. WHITE:
8        Q    That is Exhibit 6.  Right there in
9  your hand.
10       A    Oh, yeah.  Kia.  For some reason they
11  all have "Drummond" down at the bottom.
12       Q    That's the case number.
13       A    Okay.
14       MR. BATES:  That's the Bates number.
15  BY MS. WHITE:
16       Q    Okay.  So I'll represent to you that
17  Mr. Drummond testified that his vehicle should not
18  have been a total loss.  Do you have an opinion
19  based on the valuation report on whether it was
20  properly determined to be a total loss?
21       MR. BATES:  Object to the form of the
22  question.

Page 195

1        THE WITNESS:  Yeah, I don't -- I
2  don't have that.
3  BY MS. WHITE:
4        Q    So you have no way to know whether it
5  was properly determined to be a total loss?
6        A    No, I don't have -- I don't have any
7  of the estimates of the collision or none of that.
8        Q    Okay.  If a client came to you after
9  an insurance company declared their vehicle a total
10  loss and they sought a second opinion, what would
11  you do?
12       A    I would look at the -- body shop
13  report and probably contact the body shop and go
14  from there.
15       Q    Would you look at the vehicle?
16       A    Sure.  Again, this is taking that it
17  just happened.
18       Q    Okay.  Mr. Drummond also testified
19  that Progressive should not have applied equipment
20  adjustments related to navigation because his car
21  had navigation.  Did you look at pictures of
22  Mr. Drummond's vehicle to determine whether it had

Page 196

1  navigation?
2        A    No.
3        Q    If his vehicle had navigation, would
4  that change your opinion of the actual cash value?
5        A    Again, what kind of navigation?  I
6  don't know.  Was it a GPS laying on the dash or was
7  it factory installed?  You know, I don't know.
8        Q    Have you ever offered an opinion as
9  to the value of a vehicle without inspecting it in
10  person?
11       A    I have offered opinions on the
12  reports, so yes, I would say I have.
13       Q    How many vehicles have you appraised
14  without inspecting the vehicle in person?
15       A    I'd say multiple.  Some of them are
16  already gone.
17       Q    When you say "multiple," does that
18  mean two?  Does that mean a hundred?
19       A    Twenty or so.
20       Q    Okay.
21       A    And, again, I -- don't hold me to
22  that because I'm not sure on an exact number.

Page 197

1        Q    Okay.  And are those -- all 20 of
2  those, 20 or so, are those actual cash value
3  appraisals?
4        A    Most of the time, yes.
5        Q    Okay.
6        MS. WHITE:  I think those are all of
7  my questions.  Thank you.
8        MR. BATES:  I have no questions.
9        MS. WHITE:  Okay.
10       VIDEOGRAPHER:  The time is 2:04 p.m.
11  We are off the record.
12       (Whereupon, at 2:04 p.m., the videotaped
13       deposition of JASON MERRITT was
14       concluded; signature reserved.)
15
16
17
18
19
20
21
22

50 (Pages 194 - 197)

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

Page 198

CERTIFICATE OF NOTARY PUBLIC

1        CERTIFICATE OF NOTARY PUBLIC
2        I, FELICIA A. NEWLAND, CSR, the officer before
3    whom the foregoing videotaped deposition was taken,
4    do hereby certify that the witness whose testimony
5    appears in the foregoing deposition was duly sworn
6    by me; that the testimony of said witness was taken
7    by me in stenotype and thereafter reduced to
8    typewriting under my direction; that said deposition
9    is a true record of the testimony given by said
10   witness; that I am neither counsel for, related to,
11   nor employed by any of the parties to the action in
12   which this deposition was taken; and, further, that
13   I am not a relative or employee of any counsel or
14   attorney employed by the parties hereto, nor
15   financially or otherwise interested in the outcome
16   of this action.
17
18
19   _____
20       FELICIA A. NEWLAND, CSR
         Notary Public
21
     My commission expires:
22   September 15, 2024

Page 199

1        A C K N O W L E D G E M E N T  O F
2             D E P O N E N T
3
4    I, JASON MERRITT, do hereby acknowledge I have read
5    and examined the foregoing pages of testimony, and
6    the same is a true, correct and complete
7    transcription of the testimony given by me, and any
8    changes or corrections, if any, appear in the
9    attached errata sheet signed by me.
10
11
12
13
14   _____      _____
     Date                JASON MERRITT
15
16
17
18
19
20
21
22

Page 200

1    Drummond, et al. vs. Progressive Specialty Insurance
2    Company, et al.
3        JASON MERRITT
4    INSTRUCTIONS TO THE WITNESS:
5        Please read your deposition over carefully and
6    make any necessary corrections.  You should state
7    the reason in the appropriate space on the errata
8    sheet for any corrections that are made.
9        After doing so, please sign the errata sheet
10   and date it.
11       You are signing same subject to the changes you
12   have noted on the errata sheet, which will be
13   attached to your deposition.
14       It is imperative that you return the original
15   errata sheet to the deposing attorney within thirty
16   (30) days of receipt of the deposition transcript by
17   you.  If you fail to do so, the deposition
18   transcript may be deemed to be accurate and may be
19   used in court.
20
21
22

Page 201

1    Veritext Legal Solutions
     1250 Eye Street, N.W., Suite 350
2    Washington, DC 20005
     (202) 857-DEPO
3
4        E R R A T A   S H E E T
5    Case Name:  Drummond, et al. vs. Progressive
     Specialty Insurance Company, et al.
6
     Witness Name:  JASON MERRITT
7
     Deposition Date:  October 12, 2022
8
     Page No.  Line No.   Change/Reason for Change
9
10
11
12
13
14
15
16
17
18
19
20
21   _____       _____
     Signature              Date
22

51 (Pages 198 - 201)

**[& - 30]**

Page 1

| & | |
|---|---|
| **&** | 1:15 2:5,13 5:20 15:9 |

**0**

**0000096** 3:20
**0000356** 4:4
**0000619** 3:22
**0001361** 4:2
**03798** 1:9 5:19
**04479** 1:5 5:17
**07** 169:9

**1**

**1** 3:6 4:5,6 5:11
  14:5,5,6 61:14
  61:22 82:3
  131:10 172:17
**1,000** 182:14
  183:3,15
**1,220** 169:13
**1,500** 128:13
**1,800** 87:10
**10** 4:6 61:17,18
  62:8 82:17
**10,000** 25:17
  30:17 71:2,3
  88:6 154:19,19
  155:1 180:13
  184:21
**100** 128:6,12,16
**100,000** 94:9
  128:20 180:14
**108** 3:20
**10:01** 1:14 5:4
**11** 3:18 4:7 79:4
  79:13,14 118:3
**11406** 7:10

**118** 4:12
**1180** 2:6
**11:12** 82:2,4
**11:29** 82:4,5
**12** 1:13 4:9 5:4
  39:17 73:18
  91:10,11,14,19
  201:7
**123** 172:21 173:1
**1250** 1:21 201:1
**126** 181:20
**12:06** 124:2,4
**12:41** 124:4,5
**13** 4:12 40:9
  118:4,5,8
**130** 177:20
**1371** 4:2
**14** 3:6
**14754** 198:18
**149** 181:22
**15** 3:9,13,15
  28:12 73:17
  88:8 128:6
  198:22
**154** 182:5
**1600** 2:7
**163.98** 47:21
**1700** 1:15
**19** 3:17 127:3
  129:11
**19,000** 105:4
  106:19 107:13
  107:14,17,21
  108:3 127:2
  129:6
**19,5** 129:12,13
**19,500** 129:9

**1965** 85:16 86:13
  87:1,9
**1969** 86:6
**1978** 88:20 89:4
**1988** 89:4
**1995** 89:19
**1:21** 1:9 5:19
**1:29** 172:10,12
**1:38** 172:12,13

**2**

**2** 3:9 15:8,9,16
  15:17,19 23:11
  60:2,2 82:6
  131:10,11 145:2
  156:5,6 169:10
  169:11,22
**2,500** 30:16
**2.46** 189:2
**20** 55:2 98:18
  99:21 105:2,5
  106:17 107:7,17
  107:19 108:2,4
  112:3 129:12
  197:1,2
**20,000** 88:8
  96:21 97:2
  105:3,6 107:14
  126:22 127:3
  129:6 133:7,8,9
**20,531.63** 186:15
**20005** 1:22 201:2
**20006** 1:16
**2000s** 100:18
**2007** 41:6
**2010** 90:5
**2012** 40:17
  100:12

**2015** 65:10
**2016** 40:19
**2018** 120:3
**2019** 75:18
**202** 201:2
**2020** 41:15 48:11
  78:8,16 86:8
  99:2,7,14 100:10
  107:9 112:2,10
  112:11 186:13
  188:11
**2021** 99:3,6,15
**2022** 1:13 3:8,11
  3:15,18 4:11,13
  5:5 80:2 201:7
**2024** 198:22
**21** 99:7
**21,611.63** 186:19
**21502** 7:11
**22.08.31** 3:11
**22.09.06** 3:15
**25** 152:4,14
**26** 3:9,13,17
**27th** 78:16 80:1
**281** 190:11,18
**2:04** 1:14 197:10
  197:12

**3**

**3** 3:13 15:8,9,11
  15:21 23:11
  52:2,7,18 59:20
  124:6 125:3
  131:10 156:5
  189:3
**30** 55:2 64:15
  130:14 152:4
  200:16

Jason Merritt
Drummond/Freeman v. Progressive Casualty
October 12, 2022

**[30309 - acv]**                                                         Page 2

| | | | |
|---|---|---|---|
| **30309** 2:8 | **61** 4:5,6 | **abide** 50:1 | **actual** 16:11,13 |
| **31** 3:11 | **627** 3:22 | **ability** 9:16 44:3 | 16:16 17:9,16 |
| **350** 1:21 201:1 | **68,000** 87:13 | **able** 9:5 39:11 | 26:7 27:10,14 |
| **363** 4:4 | **7** | 42:6 44:1 45:16 | 29:4,7,10,14,22 |
| **39** 3:19 | | 53:12 63:9 | 30:9,12,19 35:20 |
| **4** | **7** 3:8 4:1 40:22 | 64:20 74:2 | 48:8 52:15 |
| **4** 3:17 19:16,17 | 41:1 131:3 | 173:7 185:8,16 | 55:10,18 56:15 |
| 19:18,22 23:14 | 138:8 143:13 | **absent** 60:5 | 65:21 66:1,14 |
| 51:22 52:5,9,17 | 188:17 | **accept** 38:2 | 67:1 68:21 69:3 |
| 52:20,20 58:17 | **72201** 2:15 | 137:2 | 69:8 71:7 82:19 |
| 131:10 156:6 | **79** 4:7 | **acceptable** | 82:22 83:6,9 |
| 160:11 162:15 | **793** 189:2,10 | 129:10 130:7,15 | 93:18 101:6,13 |
| 172:14 | **793.68** 146:19 | 130:16 | 101:16,20 102:4 |
| **40** 3:21 81:5,18 | **7th** 2:14 | **accepted** 130:9 | 102:10 103:7,13 |
| **41** 4:1,3 | **8** | **access** 132:14 | 103:17 104:16 |
| **5** | **8** 4:3 41:9,12 | 134:22 139:9 | 104:18 105:6,15 |
| **5** 3:19 39:18 | 79:3 125:7,8 | **accessories** | 105:16 106:2,12 |
| 40:1,2,19 45:13 | 186:13 | 88:13 142:8 | 106:20 108:18 |
| 58:18 61:4,5 | **80** 166:10 | **accidents** 35:21 | 111:2 120:12 |
| 131:11 138:8 | **857** 201:2 | **account** 102:18 | 121:12 122:20 |
| 146:15 190:2,3 | **9** | 125:13 133:8 | 127:21 129:10 |
| **5,000** 37:5 | **9** 4:5 61:6,9,10 | 137:18 145:20 | 133:12 150:3 |
| 158:11 | 61:12,14 62:6,7 | 187:1,12 | 154:17 155:6 |
| **50** 28:12 65:16 | 62:7 63:19 65:7 | **accounted** | 158:2 173:18 |
| 128:20 166:11 | 91:8 | 137:22 138:12 | 177:6,15 183:6 |
| **50/50** 76:11 | **9,000** 26:1 | **accurate** 14:15 | 185:3,7 196:4 |
| **500** 81:1 115:9 | **9,200** 154:21 | 15:4 49:6 136:4 | 197:2 |
| **519** 2:14 | **9/1/22** 3:12 | 137:11 153:14 | **acv** 16:12,13 |
| **570** 182:9 | **9/15/2022** 3:16 | 153:22 154:9 | 17:13,14 38:15 |
| **5:21** 1:5 5:17 | **90,000** 128:18 | 157:18,22 | 41:16 113:9 |
| **6** | **900** 1:16 | 173:13 200:18 | 124:21 125:3 |
| **6** 3:3,21 40:10,14 | **90s** 100:18 | **accurately** 9:6 | 127:2 139:15 |
| 58:18 60:3 61:5 | **91** 4:9 | 9:15 | 153:14,22 157:4 |
| 138:9 190:1 | **a** | **acknowledge** | 178:10 179:17 |
| 194:8 | **a.m.** 1:14 5:4 | 199:4 | 180:4,15,20 |
| **600** 181:12 | 82:2,4,4,5 | **action** 50:13,21 | 181:11 183:4,5 |
| 182:10 183:5,16 | | 51:19 198:11,16 | 183:16,18 |
| | | | 185:16 |

Jason Merritt
October 12, 2022
Drummond/Freeman v. Progressive Casualty

**[acvs - answering]**

Page 3

**acvs** 116:17
**add** 25:19 53:4
  60:14 96:22
  101:17 178:11
  179:2 191:14
  193:8
**added** 47:21
  52:10 53:1 60:9
  60:11 147:10,11
  191:7,11
**adding** 27:8
  109:21,22
**addition** 144:21
**additional** 62:17
  88:1 147:8
  182:13 183:3
  184:8
**additions** 109:22
**address** 7:8 58:4
**adds** 142:7
  144:18
**adjust** 27:5
  113:21 114:2
  131:8
**adjusted** 142:6,9
  143:22 144:19
  144:20 145:13
  145:20
**adjusting** 137:12
**adjustment**
  18:10,11,20 19:2
  19:12 20:5,9,19
  21:2,9,11,12,13
  21:17,20 22:9
  24:8,15 26:15
  28:18 35:16
  48:22 57:4 60:6
  61:1 91:2

115:16 117:19
133:1 137:10
141:10,14,19
145:20 146:2,6,7
146:19 152:12
162:19,20 163:4
163:17 165:2
166:1,1,3 167:2
168:8 169:12
171:5,20 172:1
189:1,10 191:3
**adjustments**
  24:17,20 39:4
  42:12 46:3,6,9
  46:13 48:6 68:9
  95:1 116:3
  131:9,15 139:1,5
  139:17 140:12
  146:16 147:4
  152:18 153:6,9
  154:1 156:9
  162:10 166:17
  167:17 170:4,6
  178:12 179:12
  179:13 185:14
  189:15 191:8,12
  195:20
**adjustor** 44:8
  141:6,8
**adjusts** 146:16
**advanced** 64:5
**advertise** 25:7
  27:5 109:4
**advertised** 20:22
  23:18 26:18
  29:9 55:7
  158:17 160:8
  162:4 163:1,8

164:12,22
**affect** 9:9,11
  26:7 120:12
  187:2 192:1
**affiliation** 6:4
**aftermarket**
  137:19,22
  138:12 142:22
  178:13 179:4
  185:22 187:1,11
  188:2 191:8,11
  193:8
**aftermarkets**
  188:10
**age** 89:12 170:21
**ago** 53:19 100:17
  117:6 164:6
**agree** 5:9 38:12
  48:1 114:2
  118:14 127:18
  152:13 162:2
  163:6 173:15
  183:5
**agreeable**
  129:13
**agreed** 127:16
  152:9 184:19
**agreement** 17:16
  127:14
**agreements**
  25:11
**ahead** 52:4
  177:21
**al** 1:3,6 5:13,14
  200:1,2 201:5,5
**alabama** 55:16
**alertness** 9:12

**alignment** 65:8
  65:14
**allegations**
  50:14
**allison** 2:3 6:5
  6:21
**allow** 38:2 101:3
**alloy** 138:3
**alternate** 72:7
**aluminum** 138:3
**amazon** 191:14
**amount** 21:17
  26:17 46:1,3,6,9
  46:12 61:1 87:8
  93:3 94:2 96:14
  96:15,18 129:13
  131:12 133:19
  133:21 141:14
  142:7 144:18
  146:17 147:11
  158:13 164:4,11
  165:17 166:13
  166:17 168:5
  174:10 182:8
**amounts** 44:15
  97:9
**amy** 32:9
**andrew** 31:22
**answer** 8:6,18
  8:18 9:2,5
  164:21 173:21
  174:2,22 180:8
  182:6 183:22
  184:2
**answered** 8:13
**answering** 174:4
  183:21

Jason Merritt

October 12, 2022

Drummond/Freeman v. Progressive Casualty

[anymore - asking]                                                                  Page 4

| | | | |
|---|---|---|---|
| **anymore** 150:11 | 128:5 130:8 | 74:3 84:12 | **arbitrarily** |
| 163:5 | 131:15 141:6 | 85:14 108:5 | 23:17 160:8 |
| **apart** 113:12 | 148:15 150:4,19 | 114:12 123:6,9 | 161:20 162:8 |
| **appear** 199:8 | 152:6 156:9 | 124:9 126:12,21 | 163:14,15 |
| **appearances** 6:4 | 160:7,19,21,22 | 196:13 | **arbitrariness** |
| **appears** 14:13 | 161:4,9,14,19,21 | **appraiser** 4:8 | 172:4 |
| 15:1 20:2 21:7 | 162:3,11 163:7 | 21:18 43:18 | **arbitrary** 23:8 |
| 198:5 | 163:12,13 164:8 | 45:8 81:4 | 24:1,2 46:1 |
| **apples** 153:18,18 | 176:12 179:16 | 126:22 127:19 | 162:6 163:20 |
| **application** | 180:2 181:4 | 129:6,8 185:15 | 164:1 165:3,9,19 |
| 156:8 | 192:22 193:11 | **appraisers** 4:7 | 165:20 166:15 |
| **applied** 52:13 | **appraisals** 11:7 | 4:10,13 16:15 | 172:2 174:20 |
| 126:22 142:1 | 11:10,11,13 | 17:7 20:8 52:14 | 180:9 |
| 170:12 195:19 | 17:15 20:11 | 53:16,19 76:8 | **area** 58:22 66:6 |
| **applies** 170:3 | 22:3 25:2 28:9 | 78:7,13,15 79:15 | 118:20 119:21 |
| **apply** 51:10 | 31:11,12,13 36:2 | 79:22 81:3 83:7 | 120:6,10 121:4 |
| 113:1 130:19 | 36:16,18 47:13 | 83:17 84:3,17 | **argue** 114:6 |
| 131:15,16 | 53:20 54:16 | 95:5 113:7,16 | 150:14 |
| 163:11 169:15 | 56:21 57:7 | 126:4,11 153:3 | **argument's** |
| 170:13 178:11 | 78:11 81:15 | 156:15 161:7 | 129:15 |
| 179:11 185:14 | 82:8,15 83:10,22 | 162:18 163:3 | **arguments** |
| **appraisal** 4:12 | 86:17 96:5 | **appraising** | 140:22 141:3 |
| 16:18 17:8 18:2 | 111:1 114:8 | 35:18 37:1 47:2 | **arkansas** 2:15 |
| 23:17 28:16 | 121:13,13,14,16 | 69:13 74:8,15 | **arrested** 9:21 |
| 32:4,4,18,21 | 121:17,19,21 | 85:13 88:15 | **arrive** 27:22 |
| 36:20 46:20 | 122:4 123:11 | 90:15 109:8 | **articles** 158:20 |
| 47:1 52:15 | 124:18 141:2 | 111:22 | **aside** 126:11 |
| 56:11 65:4 | 152:22 184:19 | **approach** 24:6 | **asked** 36:10 |
| 74:19,19 85:22 | 185:4 197:3 | 24:13 26:13 | 38:14 50:17 |
| 88:4,7 92:4 93:6 | **appraise** 27:5 | 121:21 150:6 | 51:2,6,9 114:20 |
| 93:20 95:8,15,18 | 36:10 37:5 | **appropriate** | 116:4 124:9 |
| 95:20 97:6,8,15 | 70:10 73:9,13,19 | 59:19 156:18 | 180:19 187:20 |
| 109:10 110:16 | 74:1 92:18 | 200:7 | 192:21 |
| 113:5 114:20 | 94:19 110:18 | **approval** 99:18 | **asking** 48:15 |
| 115:7,22 118:19 | 111:3 123:3,14 | **approximately** | 68:12 93:5 |
| 121:11 122:5,7 | 124:13 187:20 | 169:19,20 | 103:22 152:21 |
| 122:11,21 126:4 | **appraised** 25:5 | **april** 3:8 78:8 | 183:14 188:9 |
| 126:6 127:19 | 43:9,14 71:1,1 | | |

Jason Merritt
Drummond/Freeman v. Progressive Casualty

October 12, 2022

[assess - began]

Page 5

**assess** 119:20
**assessment**
   118:20 153:20
**asset** 85:8,11
**assignment**
   31:10
**assistance** 12:14
**assisted** 71:14
   72:2
**associated** 44:20
**assume** 8:13
   51:9,13 96:17
   97:5,7 107:16,17
   107:18,19 108:4
   108:10 141:12
   148:6
**assumed** 125:17
   136:8 141:5,7
**assuming** 44:8
   108:1,5,13
   129:20 134:19
   138:18 139:16
   141:11 166:16
**assumption**
   29:18 105:10
   107:2 108:16
   185:5
**assumptions**
   28:14,15 50:18
   51:3,7 135:3
**atlanta** 2:8
**attached** 4:14
   199:9 200:13
**attempt** 16:15
   39:3,6 42:19
**attest** 91:6
   101:18 103:2

**attorney** 8:16
   12:3 198:14
   200:15
**attorneys** 31:20
**auctions** 70:18
   99:20
**audio** 5:8
**august** 3:10
**authority** 37:20
   38:1
**auto** 4:7,10,13
   74:1 76:8 78:7
   78:11,13,15
   79:15,22 83:17
   84:3,16 117:12
   161:6
**automobile**
   73:13,16 74:19
   81:3 95:5
**automobiles**
   11:2 72:12 73:9
   74:9,16 92:22
   102:20
**automotive** 65:8
   65:15 66:1,10
   67:14 70:4
   71:13 72:15
   73:15 74:1,10
   75:17 109:1
   134:6,16
**automotive's**
   65:11
**available** 45:5
   85:17 86:11
   111:6 112:7
   148:12 149:9
   150:1,10,11
   173:2

**avenue** 1:15
**average** 143:20
   144:10 145:12
   153:21
**averaged** 125:3
   125:18 145:13
**aware** 9:4 34:8
   103:20 123:10
   124:17,19 140:3
   158:20 189:14
   191:1
**awhite** 2:9

**b**

**b1** 155:20
**back** 13:20 26:3
   26:12 33:17
   59:20 65:6 72:6
   72:7 80:9 96:21
   96:22 97:11
   100:17 107:4,19
   109:15 111:14
   129:11,12 131:1
   131:3 132:5
   154:21 156:13
   158:8 160:17
   161:22 165:8,10
   174:2,9 176:11
   177:3 178:5,11
   179:2
**background**
   62:12
**baked** 28:14
**banks** 85:9
**base** 29:2 84:6
   131:8 138:3
   141:18,22 142:3
   142:10,11,15,17

143:14,17,19
   144:3,7 145:7,17
   146:3,6,12 147:4
   147:9,12 153:3
   156:15 179:1,9
**based** 23:18
   29:17 48:17
   57:4,20 84:9
   87:14 97:4
   108:20 133:1
   146:6 153:9
   160:9 162:4
   163:8 165:21
   166:21 168:9
   171:5 176:5
   194:19
**baseline** 145:1
**basic** 88:2
**basis** 10:18 24:3
   47:16 53:21
   154:16 160:15
   185:9
**bates** 2:12,13
   3:19,21 4:1,3
   6:9,9 15:12 31:4
   32:12 33:1,9,12
   33:19 79:6,9
   105:7 106:21
   177:19 179:18
   180:5 182:16,21
   183:8,19,22
   184:9 185:18
   187:4,14 194:6
   194:14,14,21
   197:8
**beef** 44:16
**began** 73:4

| | | c | 187:19 |
|---|---|---|---|
| **beginning** 36:15 | **book** 88:3,11 | | **calling** 28:5 67:5 |
| 157:9 173:11 | 167:7 | **c** 2:1 3:1 5:1 87:2 | 134:21 181:17 |
| **begins** 82:6 | **bottom** 23:16 | 199:1 | **calls** 57:21 86:14 |
| 124:6 172:14 | 160:12 173:1 | **cadillac** 119:18 | **camera** 181:7,8 |
| **behalf** 2:2,11 | 194:11 | **calculate** 16:16 | **capable** 52:14 |
| **behavior** 51:7 | **bought** 98:11 | 38:14 41:16 | **capacity** 9:19 |
| **believe** 13:16 | 99:17,21 | 131:8,9,9 139:15 | **car** 13:17 14:1,2 |
| 18:12,21 19:1 | **bracket** 44:22 | 146:21 170:4 | 20:20 54:15,21 |
| 20:16 21:21 | **braithwaite** 2:18 | 178:10 180:20 | 55:9,11,21 66:8 |
| 24:20 31:17 | 5:21 | 185:8 | 85:16,21 86:17 |
| 32:1,19 38:1,22 | **brand** 99:5 | **calculated** 18:16 | 87:1,2 88:2,16 |
| 42:1 43:4,21 | 119:2 141:9 | 48:6 142:14,18 | 90:3,16,21,21 |
| 44:12 49:8 | **break** 8:22 9:2 | 143:8,10 146:13 | 95:18 104:6 |
| 50:16 55:15 | 33:15 79:7 82:1 | 163:17,18 164:1 | 105:17,18 |
| 61:8 62:2,8 | 124:9 172:8,8 | 166:21 | 110:15 117:11 |
| 71:13 73:21 | **bring** 117:7 | **calculates** 46:2,5 | 121:13 148:18 |
| 84:14 124:11 | **bringing** 51:20 | 46:8,11 147:18 | 148:21,22 149:2 |
| 140:8 141:20 | **broad** 112:10 | 167:17 | 150:10 155:1 |
| 157:20 164:18 | **broaden** 120:7 | **calculating** | 162:21 167:12 |
| 173:9 188:17 | **brought** 26:3 | 124:21 | 167:12,13 |
| **best** 8:4 91:15 | 58:7 116:4 | **calculation** | 195:20 |
| 112:14 150:19 | **buick** 41:6 169:9 | 122:21 183:4 | **car's** 150:10 |
| 158:16 174:11 | **bumper** 151:10 | **calculations** | **care** 25:17 |
| **better** 44:16 | **bureau** 4:7 | 48:16 168:22 | **career** 64:15 |
| 105:15 112:21 | 78:13,15 79:14 | **calculator** | **carefully** 200:5 |
| 127:15 173:9 | 79:21 81:2 | 168:19 169:6 | **carfax** 151:10 |
| 191:19 | 161:6 | **call** 16:22 28:10 | **carfax.com** |
| **big** 105:10 | **business** 45:9 | 43:1 54:6,14 | 160:3 |
| **bill** 49:9,12,18 | 65:16,19 67:17 | 55:5,6 56:11,18 | **cargo** 47:21 |
| **bit** 73:3 90:16 | 123:16 | 66:9 68:4 78:1 | 191:9 |
| 98:2 | **buy** 54:20 55:9 | 135:5 149:11,16 | **carney** 2:13 |
| **blanket** 30:4 | 98:5 99:19 | 149:20 164:13 | **carolina** 1:2 5:16 |
| **blue** 88:2 167:7 | **buyer** 102:14 | **called** 6:17 28:7 | 56:8 123:3,5,7,8 |
| **boats** 85:9 | **buying** 67:8 98:3 | 28:8 54:5 55:15 | 123:10 |
| 116:19 | 100:3 | 56:10,10,13 | **carpet** 47:20 |
| **body** 66:17 | | 66:22 67:1 | 166:8,9 189:8 |
| 86:18 132:15 | | 73:19,22 83:6 | 190:14 |
| 189:7 195:12,13 | | 134:3 164:2,4,10 | |

Jason Merritt                                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

**[carry - client]**                                                              Page 7

| | | | |
|---|---|---|---|
| carry 54:17 | 82:19 83:1,6,9 | certification | chevrolets |
| cars 54:20 71:10 | 101:6,14,16,20 | 69:15 78:12,14 | 188:11 |
| 85:14,18 87:15 | 102:4,10 103:7 | 80:1 123:17 | chevy 112:3 |
| 97:20 98:3,9,20 | 103:14,17 | 124:16 161:5 | 119:16 |
| 101:1 119:4,7,8 | 104:16,19 105:6 | certifications | chris 32:5 |
| 122:13 158:12 | 105:15,16 106:2 | 69:18 124:15 | circumstances |
| cars.com 160:3 | 106:5,14,20 | certified 4:7 | 29:15 31:5 |
| case 1:4,8 3:8,10 | 108:18 111:2 | 78:13,15 79:15 | 73:12 94:9 |
| 3:14 5:16,19 | 120:12 121:12 | 79:21 81:3 88:3 | 101:10 105:21 |
| 10:10 13:20 | 122:20 127:21 | 123:2,13 124:12 | 106:7 |
| 15:3 20:1 31:1,8 | 129:10 133:12 | 161:6 | city 120:19 |
| 31:21 32:14 | 150:3 154:18 | certify 81:3 | civil 10:12 |
| 49:3 50:11,12,15 | 155:6 158:2 | 198:4 | claim 13:14 |
| 50:19,22 51:4,17 | 177:6 183:7 | challenger | 34:12 |
| 56:22 62:21 | 185:4,7 196:4 | 149:21 | claiming 97:13 |
| 63:8 64:4,12 | 197:2 | chance 177:12 | claims 75:1 |
| 76:14 77:13 | cashdan 13:19 | change 30:1 | 148:8 |
| 78:5 80:16 | 154:4 180:19,22 | 47:19 141:9 | clarification |
| 84:21 96:8,11 | causes 51:19 | 187:12 189:18 | 178:1 |
| 102:22 103:4 | cbplaw.com | 196:4 201:8,8 | class 50:13,20 |
| 110:17 139:13 | 2:16 | changed 27:1 | 178:18 185:9 |
| 144:21 145:8 | ccc 117:12,14 | 76:19 120:16 | 192:7 |
| 172:18 175:10 | cellphone 56:14 | changes 12:22 | classes 74:22 |
| 181:2 184:5 | cent 168:11 | 199:8 200:11 | classic 71:9 |
| 194:12 201:5 | 170:19 | characterization | 83:22 85:13,14 |
| cases 10:6,22 | center 77:18,21 | 74:6,7 184:10 | 85:21 86:17 |
| 31:10 32:15 | cents 167:9 | charge 115:7 | 88:2,15,17,19,21 |
| 50:2 51:11 | 168:10,16 169:3 | charged 9:21 | 88:22 89:2,17,22 |
| 64:18 | 169:16 170:3,9 | charging 115:2 | 90:3,5,11,16,21 |
| cash 16:11,13,16 | 170:12,13,18,20 | cheap 80:14 | 91:4 112:2 |
| 17:9,17 26:8 | 171:5 | 191:14 | 116:14 121:13 |
| 27:10,14 29:5,7 | certain 16:10 | check 66:18 | 122:13 174:3 |
| 29:10,14,22 30:9 | 95:13 112:22 | 137:9,13,21 | 175:7 |
| 30:12,19 35:20 | 119:11 137:12 | 138:11,14,15 | classics 116:17 |
| 52:15 55:18 | 168:10 170:3 | 169:18 | clear 16:9 65:17 |
| 65:21 66:2,14 | certainly 173:3 | chevrolet 41:15 | client 28:22 |
| 67:2,10 68:19,21 | certificate 78:20 | 48:12 86:8 99:2 | 114:13 186:1 |
| 69:5,8 71:7 | 79:1 198:1 | 99:3 | 195:8 |

**[clients - conclusion]**                                                    Page 8

clients  84:5,9,10
  116:3
close  13:18 59:9
  127:20 128:2,3
closed  77:1
closely  116:6
closer  54:1
closest  112:14
clue  96:16
  183:12
coast  4:13 76:8
  76:10 83:17
  84:3,16 95:4
code  85:16 87:1
  87:2,3,9,12
  139:20 151:14
codes  87:7,14
colleague  13:19
collect  44:3
collecting  64:19
collision  195:7
colors  112:13
comanaged  72:4
combination
  63:1
combined  49:18
  49:21
come  17:4,5,16
  18:14 24:19
  33:17 38:9,11,12
  43:21 64:21
  85:15 88:5,8
  111:13 113:8
  126:9 127:13,16
  129:18 130:4,13
  132:4 135:6
  145:5 148:18
  151:2 159:17

167:8 178:5
  181:4
comes  129:8
  142:8 145:7
  151:6 155:4
  188:11
comfortable
  81:16 166:16
  167:1 181:18
coming  34:7
  53:19 109:22
  143:16,17
  175:19
commission
  198:21
common  53:18
  192:4
comp  145:2
  156:19
compact  153:18
companies  35:19
  35:21 87:22
  88:11 95:8,13
  116:21 117:5
company  1:6,10
  5:14,18 36:1
  75:22 76:3 77:7
  77:16 84:13
  92:20 93:21
  94:4,13 95:19
  96:6 97:12
  114:14 193:13
  195:9 200:2
  201:5
comparable  20:9
  39:7 42:20 43:2
  44:21 45:17,18
  47:13 52:13

59:1,14 66:20
  69:1 89:10
  102:8 111:15
  112:4,16 113:1
  127:14,15 130:2
  130:5,6 131:7,8
  131:16 142:1
  143:15,20
  144:10,16 149:6
  149:13 156:10
  156:16 157:5,11
  157:18,19
  162:20 165:13
  169:7,10,11,16
  171:7,8,11
  175:11,15 176:1
comparables
  26:18,19 39:9
  43:20 44:1
  45:11,14,14,16
  45:20,21 48:7,11
  59:8 90:19
  103:15 109:11
  109:16,18,21
  110:5,6 111:19
  112:14 126:16
  127:5,9 129:17
  129:17 130:17
  131:19,22 132:2
  143:17 149:8,10
  150:20 153:12
  153:16,16 157:7
comparative
  122:8
compare  48:13
  52:1,19 127:4,8
  166:4

compared  59:17
  60:17 83:2
  87:12
comparison
  47:13 126:17
comparisons
  147:9
competitive
  26:21
complained
  184:7
complaint
  192:14,18
complaints
  193:16
complete  49:7
  66:16 199:6
completely  9:6
  9:15
components
  87:20
comprehensive
  66:17 126:2
comps  85:16
  120:2,2,7 145:5
  145:6,13 160:21
  176:5
computer  44:9
  106:1 174:15
concerning
  154:15 155:8
  156:22
conclude  163:19
  183:16
concluded
  181:11 197:14
conclusion  150:3
  159:2 183:17

Jason Merritt                                                           October 12, 2022
Drummond/Freeman v. Progressive Casualty

**[conclusion - cost]**                                                        Page 9

193:4,7
**conclusions**   24:7
  24:14 26:14
  27:17 37:21
**condensed**   14:18
**condition**   21:8
  21:11,12,17 22:8
  23:4 42:5,11,17
  46:3 47:20 48:5
  94:21 111:10,13
  126:19 131:15
  139:2,4,17 140:4
  140:12 141:8,10
  141:21 142:21
  144:6,9 146:11
  146:15,18 147:4
  147:10,16,18,22
  150:17 153:6,9
  154:1,6 166:1,6
  178:12 179:2,12
  185:13,14
  188:21 189:1,2,3
  189:9,18 190:8
  190:11,12,19
  191:2,4,19
  193:22
**conditioning**
  39:4 68:8 95:1
  141:14 146:6,7
  153:20 189:15
  193:4
**conditions**   25:8
  25:9 42:8,10,13
  44:7,9 47:17
  59:19 126:18
  129:18 142:8
  150:13,15
  159:17 166:12

171:2 174:22
  188:4
**conduct**   78:11
  148:14
**conducted**   82:9
  82:11,12
**conducting**
  64:20
**configuration**
  46:12,14 48:5
  91:2
**confirm**   15:14
  19:22 61:21
  136:3 147:22
  170:3 171:4
**confirmed**   17:15
  50:1 62:1 164:6
  164:9
**confused**   16:7
  65:9
**connected**   63:21
**consider**   37:11
  86:18 157:8
**consideration**
  187:22
**considerations**
  88:12
**considered**
  89:17,22 92:7
**considering**
  142:3
**consignment**
  70:6
**consignments**
  67:20
**consistent**   44:17
  52:12

**consult**   31:20
**consulted**   32:12
**consulting**   32:19
  33:2,10,12,21
**consumer**   51:7
**contact**   33:19
  95:17 96:5
  195:13
**contacted**   84:22
**contain**   47:6
**contains**   179:16
  180:3
**contend**   64:2
  76:12 78:2
  180:20 186:18
**contention**   97:1
**context**   10:16
  121:22 155:19
  156:1
**continue**   5:8
**control**   155:5
**conversations**
  5:7 54:17 57:4
**convicted**   9:22
**convoluted**
  83:13
**corolla**   22:18
**corollas**   107:9
**correct**   7:14
  10:17 11:16
  12:8,20 15:19,22
  17:13,14 23:6
  27:15 29:13
  37:3,3 41:15
  49:1,7 50:7,9
  52:14 57:6,8
  59:5 60:13
  62:16 65:2

68:10,14,16
  70:12,14 71:8,16
  72:11 74:5,11,17
  75:20 77:10
  78:9,17 79:20
  80:7 83:11
  84:18 85:6
  89:15,21 90:20
  91:20,21 92:13
  92:15 93:10
  95:2 102:21
  104:20 108:13
  108:22 125:20
  128:17,19
  129:22 130:3
  138:20 139:5,17
  141:16 142:4
  143:21 144:1
  146:4,20 147:6
  148:1,16 149:1
  150:5,21,22
  151:4 154:7
  161:8,16 163:17
  166:18,22
  173:19,19 175:1
  175:13 177:15
  177:16 178:8
  186:17 199:6
**corrections**
  12:10 199:8
  200:6,8
**correctly**   79:19
  95:14 129:21
**corvette**   86:7
  88:7 149:21
**cost**   4:10 22:3,9
  78:7 92:5 93:12
  94:7

[costs - deductions]                                                                                              Page 10

**costs** 93:9
**counsel** 3:3 6:3
  6:19 9:18 11:17
  35:3,6 37:17
  50:10 139:11
  198:10,13
**count** 180:12
**couple** 11:11
  31:11 55:2
  100:9 113:10,16
  169:21
**course** 57:5 81:5
  81:18
**court** 1:1 5:15
  6:1,12 7:18,20
  8:3 50:5 200:19
**cover** 95:13,14
  191:9
**coverage** 94:1
**covers** 47:20
**covid** 76:9 85:3
  119:2 122:16
  153:20 154:6
  185:12
**crash** 111:10,11
**crashed** 111:4
**creasing** 190:13
**crime** 9:22
**criminal** 10:14
  10:16,20 63:12
  63:17 64:5,6
**crm** 133:20,22
  134:3,8 154:20
**crms** 133:4
  135:1
**crushed** 140:16
**csr** 1:18 198:2
  198:20

**culmination**
  63:5
**cumberland**
  7:10 72:5,8
**curb** 190:15
**current** 182:7
**customer** 29:1
  114:10 134:3
**customers**
  110:17 116:11
**cutoff** 90:2
**cv** 1:5,9 5:17,19
  72:18 78:7
**cylinder** 46:18
  48:12,13

**d**

**d** 5:1 199:1,2
**d.c.** 1:16,22
  59:17 84:11
**damage** 21:14
  21:14 22:16
  111:11 142:22
  178:13 179:4,13
  189:7,8
**damages** 185:9
**daniel** 2:4 6:7
**dash** 196:6
**data** 18:18 27:16
  27:19,22 28:1
  48:8 63:10
  132:13,16,16,17
  132:18 133:1,2,3
  133:5,15,18,20
  134:7,16,22
  135:5,6 150:11
  150:12 153:3,10
  153:12 154:14

154:22 155:8,10
156:17,17,22
158:6,19 161:22
165:7,10,11,13
165:16,21,22
166:21 167:4
171:9,19 172:1
174:8,9 175:18
176:2,3,5,9,11
176:14,14 177:3
**database** 18:4
  44:4 134:4
**databases** 44:2
**date** 1:13 31:2
  199:14 200:10
  201:7,21
**dated** 3:10,14,18
**day** 83:19,20
  126:7,12
**days** 83:21
  200:16
**dc** 201:2
**dcc** 1:9
**dea** 64:7,14
**deal** 25:13 28:22
  64:8
**dealer** 20:20,21
  21:2 30:5 54:12
  55:14 56:15
  67:4 162:21,22
**dealers** 28:2,5,6
  28:11,11,19 30:5
  54:5,6,6,13,14
  54:21 56:4,7,10
  56:13,16,18 57:5
  57:11 58:12
  67:18 108:18

**dealership** 25:2
  25:4 26:19
  29:19 57:15,16
  57:21,22 68:11
  71:15 72:5
  73:14 75:14
  98:16 100:5,8
  103:1,2,8
**dealership's**
  75:6
**dealerships** 25:4
  29:18,22 43:2
  57:18 65:20
  66:1,4,5,8 67:1
  68:3 73:17,20
  74:2 99:16,19,22
  103:16 149:11
  149:16 164:14
**dealing** 128:19
**dealt** 50:20
**decided** 53:6,11
**declared** 195:9
**declaring** 85:10
**decode** 112:8
**decodes** 137:16
**deduct** 22:6,15
  22:18,21 47:18
  161:20 163:15
**deducting** 23:18
  160:8 162:3
  163:7
**deduction** 64:21
  166:10,11
  167:14 168:12
**deductions** 23:9
  24:2 67:6
  109:21 168:13

Jason Merritt

Drummond/Freeman v. Progressive Casualty

October 12, 2022

| | | | |
|---|---|---|---|
| **deemed** 83:2 | 141:14 167:12 | **details** 90:21 | 64:15 72:16 |
| 200:18 | 170:20 171:1 | 105:11 | 73:19 85:18,21 |
| **defendant** 1:10 | 191:13 | **determination** | 86:1,19 87:2 |
| **defendants** 1:7 | **depo** 177:20 | 179:17 180:4 | 103:6,11 105:20 |
| 2:11 6:6,8 7:4 | 201:2 | 185:16 189:21 | 106:9,20 109:19 |
| 15:15 | **deposed** 7:12 | **determine** 20:20 | 110:22 120:14 |
| **define** 16:18 | 13:19 148:21 | 21:16,19 22:3 | 120:21 121:3,4 |
| 102:6 159:6 | 149:2 | 39:6 42:19 | 121:14,15,16,18 |
| **defined** 88:17,19 | **deposing** 200:15 | 48:14 55:18 | 124:20 126:5,13 |
| **defining** 88:16 | **deposition** 1:12 | 66:1,13,14 69:3 | 128:13 129:7 |
| **definitely** 91:16 | 3:4,6 5:12,20 | 69:7 88:18 | 130:1 134:1 |
| **definition** | 11:5,18 12:2 | 95:21 111:11 | 138:14 142:22 |
| 102:13 | 13:3,8 14:6,12 | 162:21 185:1 | 146:15 149:6 |
| **demand** 118:21 | 14:19 15:9 19:8 | 188:6 192:8 | 161:18 165:22 |
| 119:4,8,12,21 | 19:18 39:18 | 195:22 | 167:13 170:14 |
| 120:11,14,19,20 | 40:1 41:1,9 | **determined** 29:3 | 170:20 171:1 |
| **dents** 189:6 | 53:5,10 55:3 | 53:13 54:2 | 174:3 185:17 |
| **deny** 147:22 | 56:5 60:21 61:6 | 129:16 183:4 | 188:4 191:17 |
| **department** | 61:18 79:4 | 194:20 195:5 | 193:3,7,17 |
| 72:19 | 91:11 118:5 | **determining** | **differential** |
| **depend** 122:21 | 154:4 172:17 | 65:21 68:12 | 87:17 |
| 126:16 132:1 | 178:6 180:17 | 157:4 158:2 | **differently** 43:13 |
| 147:12 149:17 | 181:1 182:12 | **developed** 49:2 | 44:14 85:14 |
| 188:1 | 184:6 190:6 | **developer** | 90:17 94:19 |
| **dependent** | 191:1 197:13 | 122:18 | 114:8 122:11 |
| 149:18 | 198:3,5,8,12 | **developers** | 173:22 |
| **depending** 28:9 | 200:5,13,16,17 | 118:13 | **difficult** 119:19 |
| 90:1,6 114:9 | 201:7 | **dictate** 153:13 | **diminish** 106:5 |
| 118:19 120:15 | **depth** 47:15,22 | 153:15 | 106:10 |
| 120:21 121:10 | 179:6 | **difference** 128:6 | **diminished** |
| 122:12 140:20 | **describe** 83:16 | 182:6 187:17 | 122:12 |
| **depends** 22:4,5 | 122:10 171:15 | **differences** | **dinner** 11:21 |
| 22:13,15 28:8 | **description** 3:5 | 74:18 86:5,6 | **direct** 1:9 5:18 |
| 67:4 83:20 | **desk** 28:20 | 87:6 113:19 | 99:19 132:9 |
| 88:22 89:5 | **detail** 43:19 | 166:12 | 146:17 |
| 109:9 112:1 | 44:22 | **different** 10:22 | **direction** 198:8 |
| 113:3 128:21 | **detailed** 42:10 | 19:13 37:13 | **director** 77:19 |
| 129:4 131:19,21 | 42:14 45:1,7,20 | 43:9 59:18 | |

**disagree** 17:9
24:16 38:12
48:2 113:4
150:14
**disagreed** 140:4
148:9
**disagreements**
148:4
**disclose** 50:6
**disclosed** 33:10
**discount** 137:8
**discuss** 20:4
113:19
**discussed** 141:13
147:3 154:3
185:11
**discussion** 30:14
58:22
**disposed** 148:18
**disputes** 189:15
**distant** 53:17
**distinction** 82:20
**district** 1:1,2
5:15,16
**divide** 145:6
**document** 14:17
15:15,20 19:21
40:14 50:5
79:12
**documentation**
86:8
**documented**
58:15
**documents** 12:5
50:1
**dodge** 90:9
149:21

**doing** 22:2 46:20
47:1 55:9,17
57:7 58:7 66:19
81:15 83:21
87:1 110:16
111:2 116:14
122:5,7 130:14
131:14 152:8
171:15 192:13
200:9
**dollar** 21:16
46:3,6,9,12 94:2
96:15 141:13
147:11 166:17
168:5
**dollars** 22:15,19
113:11,17 129:1
129:8 169:21
**domestic** 76:16
76:20 77:2,12
**door** 88:20
190:12
**double** 138:15
**doubt** 136:12
**downward**
191:3
**draft** 35:9
**draft2.ll** 3:16
**drafted** 97:16
**driggins** 41:5
103:21,21
188:16 189:12
**drive** 98:5 121:9
**driver** 85:19
**drug** 50:21
**drugs** 10:22
**drummond** 1:3
3:14,20,22 4:2,6

5:13 7:5 12:16
13:9 15:21 23:8
23:13 31:7 34:3
35:7,15 36:12
40:16 47:6
49:16 52:6 59:4
59:21 61:22
74:22 85:5
125:2 135:10,18
138:22 140:7
155:21 156:3
184:15 194:11
194:17 195:18
200:1 201:5
**drummond's**
194:4 195:22
**dsanders** 2:10
**dual** 143:14
145:16
**due** 21:13
153:20
**duly** 6:17 198:5

**e**

**e** 2:1,1 3:1 5:1,1
199:1,1,1,2,2
201:4,4,4
**earlier** 56:17
141:13 147:3
175:9 185:11
**early** 100:18
**easier** 8:4
**east** 4:10,12 76:8
76:10 78:7
83:17 84:3,16
95:4
**easy** 193:20

**ebay** 70:8,21
98:11,12
**ecc** 5:19
**ed** 32:7
**edelsberg** 32:2,3
32:17 33:20
**education** 62:17
81:17
**educational**
62:11
**effective** 78:16
**egs** 1:5 5:17
**either** 32:8 34:22
100:2 144:4,18
144:21 147:10
184:15
**else's** 113:5
**employed** 84:2
198:11,14
**employee** 198:13
**encompass** 83:7
**ended** 158:11
**ends** 82:3
**engine** 87:15,16
**engines** 112:9
**entail** 66:15
**enter** 44:10
**entire** 28:16
**entities** 77:22
**entitled** 97:2
**equal** 22:9
**equations**
109:20
**equinox** 41:15
48:12 86:8
112:3,11 186:8,9
186:13

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

[equinoxes - farm]                                                      Page 13

| | | | f |
|---|---|---|---|

**equinoxes**
  112:11
**equipment**   44:19
  44:19 46:9 48:5
  121:19 137:13
  137:14 144:19
  156:15 185:22
  195:19
**errata**   199:9
  200:7,9,12,15
**escalades**   119:18
**especially**   72:22
  109:14 191:18
**esquire**   2:3,4,12
**essentially**   141:9
**establish**   122:7
**estimates**   68:8
  195:7
**estimating**
  132:15
**et**   1:3,6 5:13,14
  200:1,2 201:5,5
**evaluate**   154:6
  193:22
**event**   96:19
**everyday**   85:19
**evidence**   24:4
  42:16 48:4,8,16
  50:19 63:9
  64:19,21
**exact**   14:22 22:4
  31:1 49:15 54:8
  56:21 73:18
  98:17 113:8
  147:1 164:7,12
  167:6 196:22
**exactly**   4:12
  19:14 27:6,22

39:13 114:16
  122:4 131:5,11
  132:6 165:8
**examination**   3:2
  6:19
**examined**   6:18
  199:5
**example**   27:7
  45:13 46:15
  106:17 120:20
  129:5 180:11
  182:4
**exclusively**
  71:19
**excuse**   21:10
**executed**   49:22
**exercise**   171:10
**exhibit**   4:5,6
  14:4,6 15:9,15
  15:17,19,21
  19:16,18,22
  39:18,22 40:1,2
  40:10,14,22 41:1
  41:9,12 45:13
  51:22 52:2,7,18
  52:20,20 58:17
  59:20 60:1,2
  61:6,9,12,14,14
  61:17,18,21 62:5
  62:7 63:19 65:7
  79:4,13,14 91:9
  91:11,14,19
  118:5,8 125:3
  131:3 138:8
  143:13 156:4,6
  162:15 172:16
  186:5,13 188:17
  190:1,3 194:6,8

**exhibits**   3:4 4:14
  23:11 138:8
  156:5
**expected**   53:18
  178:4
**experience**   27:20
  28:4 35:15,18
  37:1 62:20 63:1
  63:6 81:17
  108:21 154:18
  159:4 163:12
**experiences**   11:7
**expert**   3:9,11,13
  3:16,17 10:10,15
  12:8,10,12,16
  30:22 33:10,13
  34:9 47:5,14
  63:12 84:15,20
  122:13 123:20
  181:17
**expertise**   10:19
**expired**   80:1,10
**expires**   198:21
**explain**   19:5
  20:5 26:12 55:8
  88:4 174:7
  175:2 177:12
**explained**   55:16
  94:8 160:16
**explaining**   157:6
**explanation**
  131:4
**extent**   33:4
**extra**   101:11
  184:4,20
**eye**   1:21 201:1

**f**   199:1
**face**   65:1
**facebook**   70:8
  95:5
**fact**   17:1 133:9
  145:10 187:10
**factor**   126:17
  141:16 166:7
**factors**   24:22
  25:1 105:1
  118:19 153:13
  153:15
**factory**   188:3
  196:7
**facts**   50:11,18,19
  184:11
**factual**   17:5
**fail**   200:17
**fair**   8:14,15
  43:21,22 68:7
  74:6,7,8 114:22
  117:11 127:2,21
  165:5,6 183:17
  189:2 190:21
  192:16
**familiar**   14:22
  17:20 18:4 33:3
  79:16 93:7
  102:16 117:17
**family**   65:18
**far**   20:13 45:9
  48:8 97:12
  102:17 108:15
  114:6 120:7
  177:1
**farm**   121:19

[father's - go]                                                                    Page 14

**father's** 65:15
**fbi** 64:14
**feature** 186:22
  187:21 188:7
**features** 45:17
  112:9,10,12
**federal** 34:8,13
**fee** 81:8
**feel** 59:7 191:19
**feels** 92:20
**felicia** 1:18 6:1
  198:2,20
**felt** 53:6
**field** 79:19
**fifth** 58:19,21
**figure** 68:4
  70:11 168:16
**figures** 186:9
**figuring** 181:9
**filed** 5:15 13:14
**final** 3:12
**finance** 159:18
**financially**
  198:15
**find** 54:15 55:5
  55:10 56:15
  85:10,17 112:9
  119:16,17,19
  120:2,9 121:6
  151:12 159:22
  167:21 168:14
  177:2 182:19
**finding** 85:9
**firm** 6:2 31:4
**first** 6:17 30:21
  35:9 43:15
  46:21 65:6 73:4
  84:22 88:16

110:18 112:11
125:8 131:12
141:6 143:13
156:12,21 157:7
**firsthand** 132:20
**five** 36:8 83:22
  172:8
**fix** 22:9
**flags** 191:21
**floor** 47:19,21
**follow** 47:12
  93:1 124:20
**followed** 182:8
**following** 17:8
  31:20 126:5
**follows** 6:18
**foregoing** 198:3
  198:5 199:5
**forensics** 64:8
**form** 62:22 63:2
  63:10 105:7
  106:21 121:1
  179:18 180:5
  182:16 183:8,19
  184:9 185:18
  187:4,14 194:21
**formal** 97:15
**formulating**
  24:7
**forth** 72:6,7
**forward** 193:19
**found** 122:2
  127:1 151:16,16
  151:20
**foundation**
  183:20
**four** 46:18 48:12
  63:13 88:20

100:11,13
158:11
**freeman** 1:8
  3:10 4:4,5 5:18
  7:4 12:16 13:9
  15:16 23:7,11
  31:7 34:3 35:7
  35:14 36:11
  41:14 47:6
  49:10 59:4 60:2
  60:3 61:15
  74:22 85:4
  96:20 155:21
  156:3 184:15
  186:21 187:19
**freeman's** 186:4
  186:15 188:7
**fresh** 193:15
**friend's** 54:15
**friends** 54:13
**front** 44:22
  142:12 174:10
**full** 7:7 148:14
  158:6
**function** 29:18
**functioned** 29:19
**further** 20:18
  113:12 177:13
  198:12
**fusion** 77:18,21

**g**

**g** 5:1 199:1
**gaap** 25:11
**gains** 25:12
**general** 24:5,12
  132:1

**generally** 52:11
  103:17,19 104:9
  119:9 130:7,9
**geographic**
  58:22 120:15
**georgia** 2:8
**getting** 33:21
  71:6 134:21
  175:17
**give** 7:22 24:5,12
  38:9 58:5 90:3
  94:4 98:17
  127:7 131:22
  138:13 139:11
  186:11 189:1
**given** 11:11 16:1
  31:10 34:16
  36:14 37:12,15
  42:6 81:7
  107:18 150:14
  176:9,14 198:9
  199:7
**gives** 131:3
  179:1
**giving** 107:6
  122:6
**glad** 8:11
**glaring** 48:1
  61:1 115:12
  148:4 154:11
  191:22 192:8
**glass** 42:9
**go** 5:9 7:15
  26:12 37:10
  39:11 44:18
  47:17 48:10
  52:3 65:6 69:15
  71:5 75:10

Case 1:22-cv-00375-NT    Document 120-23    Filed 01/10/25    Page 66 of 255    PageID #: 5251
Jason Merritt
Drummond/Freeman v. Progressive Casualty
October 12, 2022

[go - hyundai]                                                                    Page 15

88:11 105:1,21
108:16 109:11
109:15,17 110:4
111:9,14 122:9
122:18 124:1
131:5,13 137:6,6
137:7 140:2
148:12 150:20
153:16 156:13
158:13 160:3,3,4
160:4 175:8
176:7,11 177:3
177:21 185:3
193:16 195:13
**goes** 56:1 133:20
146:15 154:8
**going** 5:4 14:4
15:7 50:22 54:8
58:6 60:21 72:7
79:6,8 88:2
104:12 107:1
116:1 167:6
169:5 174:5,14
176:9 187:7
**gold** 32:5
**good** 5:3 6:21
7:1 12:13 21:21
44:12 45:7,10
47:15 122:7
127:15 128:21
133:5 139:19
173:3 190:12
**gouges** 190:12
**governing**
123:11 124:18
**government**
77:22

**gps** 196:6
**green** 95:4
**group** 76:17,21
77:3,12,15
**growth** 76:10
**gt** 89:19
**guess** 24:3 52:5
69:9 70:20
82:18 89:9
120:18 125:8
128:9 132:12,18
134:22
**guys** 54:8

### h

**h** 201:4
**half** 11:22 76:7,7
167:14
**hand** 194:9
**handed** 109:10
136:22
**handle** 114:8
**hank** 2:12 6:9
32:12
**happen** 163:5
**happened** 47:2
114:16,17 115:5
115:5 193:15
195:17
**happens** 97:12
**hard** 111:12
112:20 119:16
119:17 120:9
121:6 134:20
153:3,10,12
156:17,17 167:4
176:11,13,14

**harder** 85:15
120:2
**hbates** 2:16
**he'll** 114:1,2
**head** 8:1,1 26:11
65:17 168:18
**heading** 92:3
**headliner** 42:9
**heard** 102:12,17
**heavy** 121:19
132:16
**help** 35:6 39:15
39:16 40:6 41:8
66:13,13 92:4
93:8,11 94:6
140:19 148:10
149:4 186:1
**helped** 63:1
65:20 66:1
**hemis** 90:9
**hereto** 198:14
**hey** 54:7 55:7
58:6,9 88:6
95:18 127:14
**hidden** 103:10
**high** 108:12
**higher** 92:9,16
119:12 154:7
180:15 181:12
183:5
**hill** 2:3
**hired** 84:19
**historic** 37:14
39:10 109:14
110:7 139:9
193:14
**historical** 110:12
148:5

**hitch** 191:9
**hold** 78:10
196:21
**hole** 22:14,17,22
**hollow** 7:10
**home** 92:20
**honda** 57:15,21
71:17 72:5,8
73:8
**honest** 55:10
**honestly** 44:13
115:12
**hope** 27:3
**hour** 11:21 79:7
81:5,18
**hours** 44:5 49:9
49:11,12,15,18
49:19 112:2
**house** 74:4
110:14
**huh** 10:21 23:15
52:8 62:9 77:8
93:15 108:14
111:5 125:10
131:6 143:4
**human** 126:17
166:7
**hundred** 22:15
22:19 28:11
36:8 82:12,13
97:18,19,22
113:11,17 129:1
196:18
**hypothetical**
107:6
**hyundai** 57:16
57:22

Jason Merritt
Drummond/Freeman v. Progressive Casualty
October 12, 2022

**[idea - jeff]**                                                    Page 16

| i | | | |
|---|---|---|---|
| **idea** 96:12 | **individuals** | 92:4,8,19 93:9 | **inventory** 134:4 |
| 191:16,17 | 74:13 103:9 | 93:11,21 94:4,7 | **investigate** 54:4 |
| **identical** 127:20 | **inform** 62:21 | 94:13 95:7,13,19 | **investigating** |
| **identification** | **informants** 64:8 | 96:6,8 97:12 | 53:22 |
| 14:7 15:10 | **information** | 114:14 116:21 | **investigation** |
| 19:19 39:19 | 37:15 50:6 | 117:5 122:14 | 57:3 58:14 64:7 |
| 40:11 41:2,10 | 54:11 58:5,10 | 193:12 195:9 | 65:5 77:4 86:16 |
| 61:7,19 79:5 | 78:1 110:11 | 200:1 201:5 | **investigations** |
| 91:12 118:6 | 134:15 175:17 | **insured** 13:12,15 | 64:5,6,6,22 |
| **iii** 2:4 | 179:16 180:3 | 36:3 92:11 94:8 | **investigators** |
| **image** 91:15 | 187:7 | **insuring** 93:16 | 77:22 |
| **impair** 9:15 | **informs** 63:7 | **intelligence** | **investment** 88:1 |
| **imperative** | **input** 68:15 | 75:18 76:6,13 | **involved** 24:22 |
| 200:14 | **inspect** 185:13 | 77:17 78:1 | 25:1,8 35:22 |
| **important** 7:22 | 185:16 188:12 | **interested** | 88:15 101:10 |
| 53:7 59:8,11 | 192:22 | 155:11 157:4 | 106:7 113:7 |
| 121:22 153:17 | **inspected** 139:1 | 198:15 | **irrelevant** 30:18 |
| **impressed** 43:17 | **inspecting** 196:9 | **interior** 21:14 | **issue** 22:10 |
| **improper** 37:22 | 196:14 | 190:15 | 36:11 45:22 |
| 172:3 191:3 | **inspection** 66:11 | **international** | 48:3 61:1 128:7 |
| **inaccurate** | 66:12,15,16,20 | 17:19,21 76:16 | 191:22 |
| 179:16 180:3 | 67:3 68:5 69:11 | 76:21 77:3,12 | **issues** 103:10 |
| **include** 34:9,21 | 69:16 70:2 | **internet** 20:9 | 105:21 154:11 |
| 74:22 118:20 | **inspections** | 27:1 51:14 | 158:12 189:4 |
| 193:4 | 65:20 66:12 | 67:19 84:6 | 192:9 |
| **included** 49:3 | 68:18 | 98:10 112:6 | **it'll** 88:7 |
| 78:22 135:19 | **installed** 191:15 | 120:16 154:14 | **items** 63:20 |
| **including** 42:8 | 196:7 | 155:7 156:18,21 | |
| 63:12 136:14 | **instance** 43:15 | 157:8 158:19 | j |
| **inconsistent** | 46:21 | 159:6,7,9,12,18 | |
| 156:9 | **instructions** | 159:19,21,22 | **j.d.** 18:6 134:9 |
| **incorporates** | 200:4 | 160:2,5 162:19 | **jason** 1:12 3:6,9 |
| 141:19 | **instructs** 8:17 | **interrogation** | 3:13,17 5:12 |
| **incorrect** 54:2 | **insufficient** 26:4 | 64:7 | 6:16 7:9 79:22 |
| 107:20 151:17 | **insurance** 1:6,10 | **interview** 64:7 | 197:13 199:4,14 |
| **indicative** 177:6 | 5:14,18 35:19,21 | **interviews** 64:20 | 200:3 201:6 |
| | 36:1 84:13 | **introduce** 15:7 | **jealousy** 44:6 |
| | 87:22 88:10 | | **jeff** 13:19 |

Jason Merritt
Drummond/Freeman v. Progressive Casualty
October 12, 2022

**[job - listed]**                                                           Page 17

**job**  8:3 139:19
**journals**  158:20
**judkins**  32:9
**june**  65:10 75:18

**k**

**k**  85:16 87:1,9
 199:1
**keep**  122:1
 151:19 183:21
**keeping**  130:16
**kelley**  88:2 167:7
**kept**  176:21
**key**  28:13,15
**keystrokes**  44:5
 111:20
**kia**  40:17 194:10
**kind**  43:18 54:9
 54:10 65:17
 67:5,6 76:22
 130:11,18 178:4
 196:5
**kinds**  25:12
 71:11 110:22
**king**  1:15 2:5
 5:20
**know**  8:10,21
 16:7 17:12
 18:15,18 19:9,14
 26:6 31:1 32:6,8
 33:2,14,20 34:12
 35:5 36:7 38:5
 43:11 46:2,5,8
 46:11 50:12,14
 50:22 51:19
 54:16,18 56:3
 58:3,6 59:16
 64:14 65:4

74:21 75:2,3,5
80:3,12 81:1
83:13 85:16
86:11 88:20
89:5 91:3 94:3
96:1,10,13 97:14
101:19 104:4
106:8 107:3,3
108:15 111:12
112:20 117:3
121:19 122:3,5
124:14 125:12
130:12,15,20,21
132:3,14,17
133:10,14,18,19
134:12,13,20
135:4 136:18
137:15 139:4
140:6,9,20,22
142:9,14 146:13
147:1,17 154:8
154:11,21 155:5
155:15 160:16
160:17 163:16
163:18 164:1
167:2,11,13,16
167:18,19,20,22
174:21 175:16
175:18 176:2,4,8
180:7,9 182:15
183:11 184:13
184:19,20,21
185:3,6 187:6
188:1,3,5,10,21
189:6,16 190:8
191:6 192:4,5,17
195:4 196:6,7,7

**knowing**  105:11
 166:20
**knowledge**  132:7
 132:9,10,21
**kslaw.com**  2:9
 2:10

**l**

**l**  199:1
**labeled**  160:2
**lack**  44:15
 183:20
**lacrosse**  41:6
 135:14 169:9
 188:18
**large**  44:1 73:15
 166:13 189:6
 190:17
**lately**  116:13
 159:15
**law**  51:3 54:7
 125:13,19
**laws**  51:10
 123:11 124:18
 124:19 125:12
**lawsuit**  50:13
**lawsuits**  50:21
**lawyer**  181:1
**laying**  196:6
**learn**  64:9,11,17
 161:17
**learned**  29:21
 122:17
**leave**  175:19
 176:6
**lee**  12:3 32:13
 39:22 40:5

**left**  176:7 180:12
**legal**  1:21 5:22
 6:2 51:3,16
 201:1
**lender**  114:9
**lenders**  87:22
 122:14
**leon**  1:3 5:13
 40:15
**level**  145:21
**liability**  95:22
 96:11
**license**  44:22
 67:18 123:4,16
**licensed**  123:2
 123:13 124:12
**licenses**  78:10
**life**  11:7
**lifetime**  97:21
**lightspeed**  133:4
 134:2
**limit**  95:21 96:10
**limited**  149:22
**line**  201:8
**list**  28:2 32:18
 34:21 35:2
 44:19 55:20
 63:20 69:17
 70:11,16 75:9,10
 75:15 102:2,20
 104:18,19
 108:18 138:14
 142:19 144:17
 144:22 165:4
 173:5 174:19
 175:4 177:5
**listed**  25:16 39:7
 42:20 43:3

Jason Merritt
Drummond/Freeman v. Progressive Casualty
October 12, 2022

55:20 56:18
64:3 105:3
107:15 108:3,12
154:19 155:16
157:1,12,19
159:7 160:4
175:12
**litigating** 29:15
**litigation** 10:3
58:8 116:12
**little** 2:15 20:18
53:13 58:5 73:3
83:13,18 90:16
97:19 98:2
149:22 151:19
**live** 7:9
**llc** 76:17 77:3,12
77:15 78:7
**llp** 1:15 2:5 5:20
**locate** 131:7
**location** 1:15
5:19 59:13,16
112:13 113:1
120:15,21
**long** 11:20 45:15
73:5 130:3
**longer** 15:4
**look** 19:16 22:6
38:20 39:10
42:7 44:9 51:22
55:22 56:1
58:17 59:20
60:1,3 63:9
64:20 65:10
79:2,2 86:7,9
91:7,18 92:2
109:18,18,19
110:7,12,20

111:9,9 112:8,11
113:18 120:22
125:5 131:3
136:10 137:4
138:7 139:21,21
140:2,11,15,17
140:21 142:2
148:12,21 149:3
149:7 150:22
151:11 153:1
157:7 164:16
166:7,8 169:8
170:15 172:16
172:20 181:20
186:4 188:16
189:22 191:20
192:6 193:16
194:4 195:12,15
195:21
**looked** 25:18,21
31:11 37:13
39:9 41:22 42:5
42:13 110:6
114:20,21
150:12 177:2
**looking** 34:4
43:10,22 48:11
53:16 54:1 58:9
60:22 66:20
69:1 87:8 90:19
112:7 116:5
120:8 131:1
140:1 141:2,4
151:19 154:10
156:5 174:15
188:9 192:13,15
194:1

**looks** 23:14
79:17 118:10
142:19,21 166:8
166:9 169:3
182:3 190:10,14
**loss** 75:1 83:2
96:19 111:3
115:8,9 121:17
121:17 131:9
194:18,20 195:5
195:10
**losses** 35:22
82:15,18 83:7,10
**lost** 131:17
138:22 139:12
178:10
**lot** 25:6 27:1
43:20 45:11,12
59:8 72:16
82:18 84:1 86:7
88:10 98:11
104:11,13 106:9
109:13 116:15
132:14,17
150:15 185:20
188:4,11 192:15
**lower** 94:12
114:13 159:17
**lowered** 159:12
**lowther** 12:3
32:13
**lukasik** 182:7
**lynn** 1:8 5:17
41:14

**m**

**m** 199:1

**maintenance**
133:5
**major** 87:19
**making** 90:7
**management**
134:1,3
**manager** 25:15
28:21 72:6,17,19
73:2,2,3,6 101:3
155:1
**manually** 44:2
44:10 111:18
**manufacturers**
134:10
**manufactures**
134:12
**march** 3:18
**margin** 30:16
158:9,10 160:17
**mark** 14:4 25:20
**marked** 14:7
15:10,15,20
19:19,22 39:19
40:11,14 41:2,10
61:7,19 79:5,13
91:12 118:6
**market** 28:2
101:21 102:3,6
102:10,13,19
106:11,19
107:14 131:10
**marketplace**
70:8
**maryland** 7:10
59:18 64:13
65:19 66:12
69:19,20 70:1,2
84:9,11 123:15

123:16

**mass** 37:1,4

**mat** 47:21

**match** 127:9

**materials** 11:6,8
34:10 35:1,4
37:11,12

**math** 129:20
167:21 168:14
168:15 171:3
181:16,18 182:4

**mathematical**
109:20

**mats** 47:19

**matter** 5:13,17
7:4,5 26:5 30:22
47:7 49:10
59:16 63:12,12
180:18 185:3

**matters** 32:12
59:14

**mean** 14:16 16:3
16:12 21:2 23:9
24:1 27:9,22
37:4 43:6 44:18
59:11 87:7,19
88:21 92:5,6,11
95:11,12 101:20
102:16 105:9
115:15 118:22
119:4 121:10
130:11 131:13
133:22 137:4
140:14 153:21
155:9 157:3
160:19,22
167:20 174:9
176:1 177:19

184:17 191:14
196:18,18

**meaning** 16:10
16:19

**means** 16:14
20:15 142:10,11
189:6

**meat** 16:8

**mechanical**
21:15 66:17

**media** 5:11

**medications** 9:8
9:11

**meet** 7:1 11:17
11:20

**member** 192:8

**members** 178:19

**memory** 9:9
39:12 40:6 41:8
125:6 143:11
164:17

**mentioned** 85:12

**merritt** 1:12 3:4
3:6,10,11,14,15
3:18 4:5,6 5:12
6:16 7:9 14:6
15:9 19:18
39:18 40:10
41:1,9 61:6,18
68:1 79:4 80:1
82:8 91:11
118:5 124:8
172:16 197:13
199:4,14 200:3
201:6

**merritt's** 65:8,8
65:11,14,14,22
66:9 67:12 70:4

**method** 122:8
124:20 143:16
162:11 193:11

**methodology**
24:6,13 26:13
28:14,15 38:10
47:12 52:12,13
86:2 90:18
102:8 122:1,11
126:5 127:1
130:3,6,7,16,18
130:22 131:4
132:4,8,11
156:10 182:7
194:2,3

**methods** 17:8
130:8

**microphones** 5:5

**mile** 167:9,19
168:1,3,11,16
169:3,16 170:4,9
170:13,14,18
171:5

**mileage** 46:6
48:6 137:7
142:7,20 144:19
156:14 166:1,3,4
166:4,17 167:14
167:17 168:4,6
168:12,13
169:12 170:4,6
171:5,7,8 180:12

**miles** 168:10
180:13

**millions** 134:21

**mine** 53:2 82:22
113:14,21 121:9
128:6 148:5

**minimum** 70:22
112:15

**minor** 154:12
166:11

**minus** 142:20,20

**minute** 181:17

**minutes** 79:10
112:3 172:8

**missed** 113:21

**missing** 189:5

**mistake** 185:21

**mistaken** 125:11

**mitchell** 11:14
17:18,20 18:1,2
18:5 21:20
38:10 42:6,15
43:14,17 44:3
45:6,19 46:2,5,8
46:11 47:14
48:21 75:3 91:1
91:3 109:12
111:17,19 117:2
125:18 126:1,8
126:11 131:17
132:13,14 133:9
133:15 134:7,9
134:18,20
135:18 136:5,9
136:13,16 137:1
138:19 139:18
141:7 146:5,21
147:18 149:6
150:12 151:21
152:3,15 157:10
167:10,16 170:3
175:11,14 179:6
186:14

[mitchell's - numbers]                                                    Page 20

**mitchell's** 35:16
52:12 130:21
132:4,8,10
141:18 156:8
**mixing** 142:10
**mobile** 64:8
**model** 86:19
89:3,14 105:5
106:19 107:8
118:21
**models** 119:11
**modifications**
88:12
**monetary** 25:12
**money** 27:4
92:19 115:3
184:8
**month** 164:6
**months** 116:14
**morning** 5:3
6:21
**motor** 92:20
**motorcycle**
71:14 73:14
74:19 75:1,12
**motorcycles**
71:20 72:10
75:4,15
**mouth** 161:15
**moving** 26:11
**multiple** 10:22
28:8 56:6,10
64:13,15 66:5
69:9,15 72:22
73:19 96:4
101:13 119:18
189:6 196:15,17

**mustang** 85:16
87:1,9 89:19
90:1
**mustangs** 83:22
85:13
**mute** 5:7

**n**

**n** 2:1 3:1,1 5:1
199:1,1,2,2
**n.w.** 1:21 201:1
**nada** 125:4,9,12
125:19 130:19
135:19 136:3,7,9
136:10,14,15
137:1,10,16,16
137:18,21
138:13,17,19
145:11,14 167:7
**name** 5:21 6:21
7:7 32:6,8,17
58:4 76:18,19
77:1 79:18
104:3 201:5,6
**named** 31:14
**names** 57:17,19
**narcotic** 64:6
**narrowing**
112:12,13
**navigation**
195:20,21 196:1
196:3,5
**necessarily** 22:9
58:13 89:11
153:11 155:16
160:2
**necessary** 200:6

**need** 27:6 33:5
33:19 56:1 60:1
67:6,7 95:18
122:18 140:11
176:16 184:22
**needed** 22:5 67:5
**needs** 22:5 91:16
178:1
**negotiate** 94:12
98:20 99:12,15
100:22 101:5
149:12
**negotiates** 104:6
**negotiation** 51:7
75:7 104:12,13
106:3 155:4
**neither** 198:10
**net** 191:9
**network** 73:16
**never** 45:14
50:20 108:18
109:2,3 123:8
151:15
**new** 78:22 99:5,7
99:9 119:2
120:19 141:9
179:1,9
**newer** 119:16
174:3
**newest** 80:3
**newland** 1:18
6:2 198:2,20
**nods** 8:1
**non** 33:10
**nondisclosure**
50:3,4
**normal** 166:8
190:10,18

**normally** 99:19
109:3,6 110:20
111:21 136:22
159:10
**normand** 32:7
**northeast** 2:6
**northwest** 1:15
**notary** 198:1,20
**note** 5:5 59:12
**noted** 200:12
**notes** 58:11
127:4
**noticed** 21:20
**nuances** 88:15
**number** 1:4,8
5:16,19 14:6
17:5 19:18
39:18 40:10,19
41:1,9 56:14
58:4 61:18
73:18 79:4 82:6
91:11 97:17
98:17 112:15
118:5 124:6
135:11 137:7
139:20 143:3,6
145:2 151:5,8
165:19 166:15
167:8 168:10
169:11 172:14
181:5 194:12,14
196:22
**numbered** 20:4
58:18
**numbers** 3:19,21
4:1,3 15:9 38:11
38:13 43:20
44:11 52:21

Jason Merritt                                          October 12, 2022
Drummond/Freeman v. Progressive Casualty

[numbers - okay]                                              Page 21

56:15 61:6
109:12,19 112:8
114:21 126:13
127:21 129:7
130:11 147:1
150:21,22 151:4
167:6,11

**o**

**o**  3:1 5:1 199:1,1
  199:2
**oath**  7:17
**object**  8:16
  105:7 106:21
  177:19 178:7
  179:18 180:5
  182:16 183:8,19
  184:9 185:18
  187:4,14 194:21
**objected**  187:7
**objection**  184:10
**obsessive**  98:2
**obvious**  111:13
**obviously**  44:9
  76:10
**occasionally**
  149:14
**october**  1:13 5:4
  201:7
**offer**  84:15,20
  95:9 107:2
  114:22
**offered**  196:8,11
**offering**  47:7
  88:6 171:22
**office**  54:7
**officer**  10:4,7
  69:21 198:2

**offices**  72:4
**officially**  72:2
**oh**  55:1 60:17
  104:11 116:9
  136:2 144:8
  181:20 190:2
  194:10
**oil**  189:5
**okay**  7:6,12,15
  8:8 9:3 10:6,9
  10:13,18 11:1,4
  11:17,20 12:5,15
  12:18,21 13:3,8
  13:11 14:3,18,20
  15:2,6,14,18,20
  16:1,6,8,15 17:7
  17:12,18 18:1,6
  18:9 19:1,16,21
  20:3,14,18 21:5
  21:8 22:2,8,12
  22:17 23:2,7,12
  24:5,17 26:12
  27:7,13,16 28:6
  28:10,13 29:6,11
  29:17,21 30:11
  30:21 31:5,9,13
  31:16,19 32:5,16
  32:21 33:6,11,22
  35:14 36:2,5,10
  36:15,19,22
  37:17,20 38:14
  38:17,20 39:17
  40:1,3,8,18,20
  40:22 41:7,16,19
  41:21 42:3,15
  43:1,5,8 45:3
  46:17 47:5 48:4
  49:2,14,16,22

50:10 52:9,18,22
53:8,14 54:3,21
55:3,12 56:3,7
57:1,10,11,14,17
57:20 58:2,14,17
59:2,6,10,20,22
60:4,7,12,14,20
61:3,12,13,16
62:2,5,7,10 63:3
63:6,11,15 64:2
64:22 65:3,6
66:4,7,19,22
67:11,16 68:11
68:17,20 69:11
69:17,22 70:3,7
70:15,19 71:4,6
71:9,12,19 72:14
72:18 73:5,9,21
74:12,21 75:14
75:17 76:2,12,20
77:9,11 78:2,10
78:14,18 79:2,12
79:21 80:5,8,11
80:13 81:2,9,12
81:20 82:14,20
83:3,9,12 84:2
84:12 85:1,4,12
85:20 86:3,10,15
86:17,21 87:4,11
87:14,18,21 88:9
88:14 89:8,11
90:2,8,12,15,19
91:1,5,7,8,14,18
91:22 92:2,22
93:16 94:14,18
94:22 95:3,10,16
95:20 96:3,7
97:10,20 98:4,13

98:19 99:8,11,21
100:7,14,19
101:15,20 102:1
102:6,9,12,19,22
103:12,16,20
104:5,8,14,17,21
105:2,14 106:11
106:15,17
107:10,16,22
108:7,9,11,17,20
109:5 110:3,9,13
110:21 111:8,16
111:21 112:4,15
112:19,22 113:8
113:13,15,20,22
114:4,18 115:1,4
115:10,18 116:2
116:7,11,16,18
117:1,15,18,21
118:2,18 119:11
119:20 120:5,11
120:18 121:2,5,8
121:21 122:10
122:20 123:19
123:22 124:17
125:14,17,22
126:3,10,15,21
127:6,12,17
128:3,8,12,22
129:5,14,20
130:5,18 131:14
131:20 132:3,7
132:19,22
133:14,17
134:11,14 135:2
135:6,9,16 136:2
136:8,17,21
137:3,9,18,21

Case 1:22-cv-00375-NT    Document 120-23    Filed 01/10/25    Page 73 of 255    PageID
#: 5288

Jason Merritt
Drummond/Freeman v. Progressive Casualty
October 12, 2022

[okay - page]                                                                    Page 22

138:5,10,10,11
138:16,18
139:15 140:11
141:1,17,22
142:13,17
143:19 144:13
145:3,8,12,19
146:1,5 147:17
147:17,20 148:2
148:14,20 149:5
149:11,15,19
150:2,9 151:7,11
151:18 152:5,9
152:11,14,20
153:2,13 154:13
155:3,15 156:7
158:4,7,14,18
160:1,6,13,14
162:2,16 163:6
163:11,16,19,22
164:5 165:1,15
165:18,20
166:14,16 168:5
168:15 169:4,15
170:2,17,22
171:3,10,15
172:6,19,22
173:17 174:12
174:16 175:3,9
175:21 176:4,10
177:5,9,14 178:3
178:9,22 179:8
179:11,15
180:11 181:6,10
181:14 182:11
182:19 183:2
184:17,22 185:8
186:13,20

187:10,19 188:6
188:16,20 190:4
190:20 192:3,6
192:17 193:18
193:21 194:4,13
194:16 195:8,18
196:20 197:1,5,9
**old**   177:3
**oldsmobile**
88:20 89:6,9
**once**   81:9
**one's**   46:16
**ones**   12:18 31:17
57:9,14 113:11
130:8,11 138:8
152:11 164:9
170:15
**online**   70:5,6
**ons**   101:17
**open**   72:2 73:1
151:9
**opening**   71:14
**operational**
188:3
**opinion**   16:19,22
17:2,12,14 28:17
30:1 34:7 38:9
45:22 47:14
48:20 63:10
90:13 104:9
105:12 107:2
108:12,17,19
125:4 126:4
141:10,17 146:1
153:14,22
154:16 155:7,20
157:17 160:6,15
165:22 171:22

187:2,12 189:18
194:18 195:10
196:4,8
**opinionated**
53:11
**opinions**   29:17
31:7 37:11 47:6
47:9 49:3,7
57:20 62:21,22
63:2,7 64:4,12
64:18 77:13
78:5 153:3
156:16 196:11
**opposed**   17:1
33:13
**opposite**   177:9
177:12,16 178:1
**opt**   81:13
**options**   45:18
112:13 151:15
156:14
**orders**   50:2
**organization**
74:10
**original**   178:6
200:14
**originally**   102:5
**orson**   2:18 5:21
**outcome**   198:15
**outline**   41:20
42:8 44:18
**outlined**   31:17
34:4 47:11
144:15,16
**outlining**   139:19
156:20
**outside**   116:11
141:3 152:1

**overall**   189:2
**overinflate**
26:21
**overprice**   27:3
**overview**   24:6
24:12
**owned**   65:16
77:6 86:14
**owners**   122:13
**ownership**   86:7
90:22

**p**

**p**   2:1,1 5:1 194:3
199:2
**p.m.**   1:14 124:2
124:4,4,5 172:10
172:12,12,13
197:10,12
**package**   25:11
133:10
**packages**   26:2,7
151:1,1
**page**   3:2,5 19:6,9
20:4 23:14 52:5
52:9,17,21 58:19
58:21 60:3
63:19 65:7
91:18 95:5
118:10 125:7,8
131:1,3 132:5
135:21 143:13
146:14,15 156:6
160:11 162:17
172:21 173:1
177:20 181:15
181:20,22 182:5
201:8

**pages** 20:4 58:18
199:5
**paid** 80:12 81:1
98:21 99:3,8,18
100:20 102:2
103:22 182:7,8
182:13,15 183:2
183:6,11,12,15
183:18 184:4,8
**paint** 190:17
**panels** 190:12
**paper** 52:3
**papers** 15:1
**par** 150:16
**paragraph** 20:19
125:9 156:8,11
156:13
**paragraphs** 60:6
60:9
**part** 64:10
125:16 134:16
137:6 141:20,21
161:19 175:18
187:1,11 192:15
**particular**
154:15 155:9
157:1,1 181:11
182:4 184:5,7
**parties** 5:9
198:11,14
**parts** 101:11
137:19,22
138:12 143:1
178:13 179:4
191:8,12 193:8
**party** 10:2
192:13

**pass** 14:8
**pay** 96:19,20
98:19 101:16
102:1,14 103:17
**paying** 92:8,8,11
104:18
**peachtree** 2:6
**pending** 9:1
**pennsylvania**
1:15 57:12
84:11 123:14
124:10,13,15,18
124:19,21
125:13,21 145:9
**pennsylvania's**
125:12
**people** 57:21
58:3 64:20 74:4
84:2 86:14 88:5
95:17 96:4,5
100:22 101:2,3
101:15 103:17
104:9,10,18
107:19 108:4
130:10 152:21
**people's** 17:6
**percent** 82:14,17
167:14
**percentage**
128:8,10
**perfect** 122:4
**perform** 39:3
153:19
**performed** 36:2
154:1
**period** 178:17
**permit** 23:17
160:8 162:3

163:7,14
**person** 43:10
46:22 122:6
148:22 188:13
196:10,14
**person's** 191:16
191:17
**personal** 9:19
54:10 98:1
**personally** 10:8
42:7,13 175:22
185:13
**pgr** 3:20,22 4:2,4
**phone** 54:13
58:4 80:19
86:14 168:20
181:8
**phones** 5:7
**phrase** 23:8
**physically** 135:5
**pick** 5:6 52:3
56:12
**pickup** 120:18
121:6
**pictures** 38:20
39:1,2 41:22
42:1 139:7,12,14
140:17,19 149:3
149:4 189:11
193:21 195:21
**pile** 186:10,13
**place** 5:9 18:13
77:21 105:22
**places** 64:13
132:18 134:21
**plaintiff** 1:8 6:10
40:5,15 41:5,14
150:4 178:15

181:12 182:5,13
183:2,6,15,17
184:7
**plaintiff's**
180:18
**plaintiffs** 1:4 2:2
3:3 6:19 31:14
38:15,21 50:10
51:16 96:8,11,14
96:18 135:10,18
138:22 139:11
140:7 148:7
164:14 171:12
178:10 184:14
185:9
**plans** 107:12
174:17
**plate** 44:22
**please** 5:5,7 6:12
7:7 8:21 80:15
200:5,9
**plotts** 3:7
**point** 8:21 30:18
37:20 72:17
96:2 106:16
140:14 154:14
155:8 156:22
158:19 182:19
184:13
**points** 155:10
**police** 10:4,7
14:2 62:21 63:7
63:22 64:14
65:17 69:20,21
70:1
**policies** 72:3
77:20 95:4 96:8

Jason Merritt    October 12, 2022
Drummond/Freeman v. Progressive Casualty

[policy - projected]    Page 24

**policy** 75:6,9
93:3 95:9 96:14
96:18
**portion** 82:16
**possibility** 43:12
**possible** 47:4
179:15 180:2,14
185:15 188:15
**possibly** 17:5
27:8 149:22
**posted** 95:3
**potentials**
185:21
**power** 18:6
134:9
**practice** 53:18
**practices** 112:17
**precise** 122:3
179:6
**prefer** 19:14
47:3 148:17
188:14
**premium** 92:12
**prepare** 11:4,18
12:2 35:7
**prepared** 15:16
34:6 35:12
**preparing** 34:2
34:10,15
**present** 2:17
**pretend** 51:1
**pretty** 30:4 34:5
35:11 47:11
76:7 102:11
105:10 108:15
111:17 112:9
127:20 131:4
141:3 157:20

190:10
**prevent** 9:14
**previous** 10:2
**previously** 13:11
**price** 18:20 19:2
19:12 20:5,8,9
20:11,13,14,15
20:22 21:1,12
22:6 23:18
25:13,18 26:1,4
26:19,20,21 27:9
27:13 28:2,2
29:1,4,6,9,22
30:9,17 43:6
55:7,13,20 70:11
70:16 75:10,10
75:15 98:20,22
99:4,8,18 101:1
102:2,19,20
103:22 104:6,18
104:19 105:17
105:17 114:3
117:18 119:3,5,7
127:16 129:19
133:11 142:6,9
142:19,20
144:17,20,20,22
145:21 146:16
149:12 151:2
154:14,20 155:4
155:8 156:17,18
157:8 158:6,19
159:6,9,12,17,20
159:21 160:3,4,9
162:4,10,19,19
163:1,4,8 164:12
164:22 165:4
167:19,22 172:2

173:3,5,5,9,10
173:18 174:18
174:19 175:4,4,5
177:7,15 187:17
192:1 194:3
**priced** 30:17
**prices** 19:13
37:13,14 145:13
159:13,22 177:5
**pricing** 51:14
54:9
**primarily** 74:13
**primary** 74:9
**printout** 4:8
**prior** 14:17
63:17 76:9,18
81:18 86:14
111:10,11
122:16 142:22
156:14 178:12
179:4,12
**pristine** 191:2,17
**private** 5:6 77:4
103:5,6,9 122:13
**probably** 53:5
55:1 72:16
82:13 97:22
140:15 149:5
152:4,4 164:6
170:16 175:6
190:1 191:16
195:13
**procedures** 72:3
77:20
**process** 34:2,5
85:21 101:4,5,5
109:7 171:14

**processes** 86:1
**produce** 35:3
80:15
**produced** 139:13
**producing** 52:14
**production** 87:8
**professional** 4:9
**proficient** 81:14
81:15
**profit** 25:18,21
26:3 30:15
158:9,10 160:17
**profitability**
29:3 30:7,15,18
**profits** 29:2
**progress** 5:18
**progressive** 1:6
1:9 3:8 5:14 7:3
13:12,15 32:22
141:7 148:8
154:5 182:13
183:3 184:8
185:4,12 189:17
191:3,7 195:19
200:1 201:5
**progressive's**
189:15
**project** 43:12
**projected** 18:9
18:11,22 24:8,14
24:16,20 26:14
26:17 28:16,17
35:16 44:14
46:1 48:21 57:3
60:5,22 115:15
116:2 131:12
133:1 141:19
142:6,20 144:17

Jason Merritt
Drummond/Freeman v. Progressive Casualty

October 12, 2022

[projected - really]                                                      Page 25

145:19 146:2
152:11,17 156:8
163:17 164:3,10
165:2,8,9,12,14
165:17 166:12
167:2 171:20
172:1 194:3
**projection** 26:17
162:5 165:13
172:5
**projections**
23:19 160:9
162:4 163:8
172:2
**promise** 58:9
**proper** 140:13
141:10 180:20
181:11
**properly** 194:20
195:5
**proprietary**
54:10 110:11
**protective** 50:2
**provide** 31:6,21
34:9 96:14
134:6 152:6
**provided** 32:11
134:8,9 162:5
**providing** 36:19
**psa** 18:10 37:21
38:19 48:3
50:16 53:13,21
54:18 96:22
97:11 115:17
117:10 144:14
176:20 178:11
178:16,20 179:7
179:8,14 193:13

**psas** 53:16 54:18
142:1
**psi** 115:13
**public** 198:1,20
**publish** 161:9
**pull** 61:4 80:19
80:22 109:15
118:3 130:11
149:5,9 181:7
**pulled** 190:18
**pulliam** 2:13
**pulling** 111:14
132:13,18 133:3
133:15 176:2
**pulls** 136:5
**punitive** 74:22
**purchase** 98:9
**purchased** 97:21
98:15 99:16
100:8 101:12
**purchasing** 67:8
**purpose** 118:19
121:11 122:21
123:1
**purposes** 121:15
157:4
**purview** 184:18
185:6
**put** 22:1 25:4
26:20 44:7,11
47:14 52:21
53:7 88:1 102:5
103:7 126:2
128:10 137:16
144:16 163:2
167:19 168:1
189:9

**puts** 43:18
138:17
**putting** 139:20
144:5 145:1

**q**

**qualifications**
69:12,14
**qualifies** 159:1
**question** 8:6,10
8:14,19 9:1,2
75:8 105:8
106:22 173:21
179:19,21 180:6
182:17 183:9,20
184:3,10 185:19
187:5,15 194:22
**questions** 8:17
9:5 188:9 197:7
197:8
**quick** 114:21
118:15 181:5
**quickly** 44:4
169:5
**quit** 90:6
**quite** 10:4 59:7
98:6 115:6,12

**r**

**r** 2:1 5:1 201:4,4
**radius** 112:22
120:8
**randomly** 56:12
**range** 22:22
127:3,22 128:2,4
128:22
**rare** 159:16
**rarely** 174:13

**rash** 190:15
**rate** 153:21
**rated** 42:10
139:22 190:11
**rating** 21:21,22
44:11
**ratings** 140:5
189:18
**ratios** 87:17
**rav4** 40:19
**reach** 26:14
27:17 126:5,13
143:2 150:2
**reached** 24:7
193:3,7
**reaching** 24:13
37:11
**read** 11:6,8 96:7
118:15 155:19
155:22 199:4
200:5
**readily** 85:17
86:11 150:1
**reading** 178:5
**ready** 103:9
191:22
**real** 118:15
174:8,9,10
181:18
**really** 17:21
18:13 25:17
26:4,5 30:17
33:7 36:7 37:15
44:15 49:20
53:9,21 61:1
74:20 82:10
109:15 115:2,12
122:7,22 128:10

**[really - report]**                                                Page 26

128:20 130:12
131:13 173:8,9
180:7,13 191:20
**rear** 189:5 191:9
**reason** 9:4 24:19
110:11 122:2
136:12 137:4,8
150:13,14 165:1
191:21 194:10
200:7 201:8
**reasonably** 17:9
**reasons** 156:19
156:20
**recall** 19:11
34:20 39:1
40:21 49:11
56:9 57:19
67:22 68:2
81:21 95:6
117:5 136:20
152:19 171:13
181:10,13
**receipt** 200:16
**recertify** 81:7
**recess** 82:4
124:4 172:12
**recognize** 32:18
79:13 88:1
118:9
**recommendation**
182:9
**record** 5:4,10
6:4 7:8 82:3,6
124:1,3,6 172:9
172:11,14
197:11 198:9
**recorded** 5:12

**recording** 5:8
**recover** 85:11
**recovery** 85:8
**reduce** 27:10
30:19 92:4 93:8
93:11 94:6
**reduced** 25:22
27:13 133:11
159:14 198:7
**reducing** 27:8
**refer** 19:4 20:7
20:11 62:7 93:4
161:1 174:2
**reference** 119:6
**referring** 11:14
12:15 19:14
20:10,17 23:21
153:12 154:17
159:22 173:4
**reflected** 80:6
**refresh** 39:12
40:6 41:8 125:5
135:20 143:11
164:16
**refurbishments**
178:13
**region** 137:6
**regular** 55:5,6
**regulates** 70:1
**regulations**
51:10
**relate** 11:1 64:12
67:2
**related** 195:20
198:10
**relation** 32:22
**relative** 198:13

**relevant** 64:3
76:13 77:13
78:3
**reliability** 172:1
**reliable** 174:18
175:4,6,12
**reliance** 34:22
35:4
**relied** 34:10
37:15 132:11
**relies** 18:18
**rely** 27:16 34:14
45:20 177:4
**relying** 166:2
**remains** 49:6
**remember** 13:21
33:8 41:21
49:15,20 73:18
100:20 117:4,5
117:22 131:1
164:7 169:2
173:6,6 174:4,5
178:5 180:21
181:3
**reminders** 7:16
**remote** 186:22
187:21 188:2,7
**remove** 178:21
178:22
**removed** 38:19
**removing** 193:13
**renewed** 78:19
80:5,9
**renewing** 81:16
**repair** 67:16
**repeat** 24:11
179:20

**rephrase** 8:11
24:9 56:20
**replacement**
103:22
**report** 3:9,12,13
3:16,17,19,21
4:1,3,5,6 12:11
12:12,14 15:16
15:21 16:2,9,18
18:1,2,3,5,5 20:1
23:7,8 31:18,21
34:5,9,11,15,22
35:10 39:7,21
40:4,15 41:4,13
41:20 42:5 43:8
44:16 45:6,7,9
45:10,11,13,19
47:15,15 48:21
49:4,6 52:1,6,11
53:3 59:21 60:2
60:3,8,16,19
61:15,22 91:3
96:22 109:10,12
111:18 114:21
115:21 117:7,12
117:13,14 125:2
125:7,18 126:3
126:11 130:6
135:9,17 137:1
138:21 141:6
143:12 148:9
150:4,19 152:6
153:2 154:13
156:2 162:10,13
164:7 166:2
171:16 176:6,17
178:9 179:6
186:5,18 187:8

Jason Merritt
Drummond/Freeman v. Progressive Casualty

October 12, 2022

[report - salvaged]

Page 27

188:17 190:1
192:2,7,21 193:5
193:9,12 194:5
194:19 195:13
**reported** 1:18
134:15
**reporter** 6:1,12
7:20
**reporter's** 8:3
**reports** 11:15
12:6,16,22 16:1
16:3,19 18:8,12
23:13 32:11
34:3,6,16,17
35:7 36:13
37:16,18 38:10
39:15 42:5,16,20
43:17 44:17
45:12 47:5
48:16 56:13,19
56:21 59:3
60:10 97:15
110:3 115:13
116:3,21 117:2,2
117:4 126:8
131:2 132:5
136:13,16
150:12 151:21
152:1,15 155:21
156:3 157:10
164:3 165:7
169:1 180:19
191:21 193:19
196:12
**repossession**
85:10
**represent** 7:3
194:16

**represented** 9:18
**representing**
5:22 6:9
**require** 69:12
81:3 95:8
**required** 81:18
**research** 45:16
58:7,15 84:1
**reserve** 70:22
71:2
**reserved** 197:14
**residence** 7:8
**resource** 18:7
132:17 134:3
**respect** 24:8
**responds** 84:7
**response** 121:1
130:13
**responses** 7:22
**responsible**
74:15
**result** 165:16
**results** 4:8
179:17 180:3
**retail** 100:8
137:1
**retained** 30:21
31:3,6,19 38:6,7
**retired** 63:16
65:17
**retirement** 63:18
**return** 200:14
**review** 12:5,12
13:3,8 139:7
171:19 184:22
189:11 190:5,22
193:21

**reviewed** 18:3
36:13,18 37:13
39:22 40:5,15
41:5,13 116:20
117:1 150:18
151:22 180:18
**reviewing** 34:6
83:1 169:1
**reviews** 123:20
**revised** 3:12
**right** 7:13,18
12:19 14:8
16:20 21:6
40:13 41:12
47:12 62:3,12
75:19 78:8,16
80:2 81:22 85:2
85:12 90:9 95:3
95:5 99:14
113:14,20 114:2
119:17,19 120:4
121:7 125:4,8
132:6 135:7,19
136:9 138:19
139:2 141:15,19
147:5 149:6
150:4,7 151:1,1
153:4 154:6
162:6,11 168:2
177:10 178:13
179:9 182:2,14
186:13,14,16,19
188:13 189:5,7
193:5,9 194:8
**rim** 25:11 26:7
**risk** 77:15
**road** 7:10

**rock** 2:15
**role** 73:10 74:9
77:2 78:6
**rough** 166:9
**roughly** 182:10
**routinely** 52:13
**rover** 22:22
**rule** 3:9,13,17
**rules** 34:8,13
**run** 56:11
130:10 151:5,7
**running** 76:2,6

**s**

**s** 2:1,4 3:1 5:1
201:4
**safety** 66:15,19
67:2 68:5 69:11
69:16
**sake** 129:15
**sale** 25:9,10,10
25:11 28:16
29:2 44:14 46:1
103:9 105:11,17
105:22 120:4
154:20 157:12
164:10 166:12
174:10 194:3
**sales** 25:15 26:20
28:20 67:17,19
72:17 73:2,5
101:3 103:5,6,10
134:2 155:1
158:6
**salesman** 25:15
29:1
**salvaged** 94:10
94:14,17

Jason Merritt
October 12, 2022
Drummond/Freeman v. Progressive Casualty

| | | | |
|---|---|---|---|
| **sanders** 2:4 6:7,7 | **see** 33:20 42:1 | 164:11 | **shamis** 31:22 |
| 61:10 91:10 | 44:13 46:21 | **seller** 102:14 | **share** 54:11 |
| 118:4 | 47:3,16,18,18 | 157:1 | **sheet** 199:9 |
| **saw** 157:15 | 52:16 67:5 | **selling** 20:13 | 200:8,9,12,15 |
| 182:12 | 111:7 112:7 | 25:14 70:3 | **shop** 195:12,13 |
| **saying** 20:14 | 113:18 114:1 | 75:12 | **shops** 132:15 |
| 29:6 96:21 | 115:11,13,21 | **sells** 29:7 101:8 | **short** 172:8 |
| 105:16 107:13 | 117:18 120:2,6 | 105:4 155:10,16 | **show** 50:19 |
| 140:13,21 | 125:9 127:9 | **send** 150:3 | 88:11 136:1 |
| 156:15 167:12 | 131:2,21 135:22 | **sense** 23:3 83:4 | 165:7 |
| 173:13,14 | 139:22 149:12 | 86:4 133:13 | **showed** 137:1 |
| 177:17 189:3 | 150:22 151:5 | 192:5 | **showing** 19:21 |
| **says** 20:19 21:2 | 156:11 158:8 | **sensitive** 5:6 | 40:13,22 61:12 |
| 50:5 52:11 | 164:16 165:11 | **sentence** 52:20 | 61:17 79:12,22 |
| 65:10 72:18 | 173:1 192:1,15 | 53:1,7 | 91:14 118:8 |
| 78:7 88:14 92:3 | **seeing** 42:12 | **separate** 72:21 | **showroom** 72:4 |
| 96:18 129:9 | 116:10 147:21 | 110:17 146:11 | **shows** 28:1 |
| 143:14 154:13 | 189:20 | 147:16 152:6 | 135:18 138:22 |
| 155:7 160:7 | **seen** 48:1 53:16 | 192:22 | 142:6 |
| 165:17,17 | 53:20 88:5 | **september** 3:15 | **shut** 80:20 85:3 |
| **scope** 112:12 | 116:2,8,9 119:1 | 198:22 | **shutting** 76:9 |
| 185:2 194:2 | 119:2 136:6 | **served** 12:19 | **side** 10:20 26:11 |
| **scott** 32:2,3 | 148:3 150:16 | **service** 25:10 | 26:11 189:7 |
| **scratches** 190:17 | 152:4,14 157:10 | 72:19 73:3 | **sign** 200:9 |
| **screenshot** 79:14 | 157:13 159:11 | 101:11 107:12 | **signature** 197:14 |
| **search** 44:2 | 159:14,16 | 174:17 | 198:18 201:21 |
| 79:19 86:12 | 165:21 170:20 | **services** 75:18 | **signed** 14:17 |
| 111:19 | **select** 112:4 | 76:6,13 85:8 | 199:9 |
| **seat** 22:14,14,15 | **selecting** 37:10 | **set** 30:16 70:21 | **significantly** |
| 22:18,22 47:19 | **sell** 23:20 28:3 | 77:20 | 119:5 |
| **seats** 189:9 | 28:21 54:20 | **setting** 72:3,3 | **signing** 200:11 |
| 190:13 | 67:9,21 71:19 | 126:11 | **similar** 16:2 50:4 |
| **second** 23:16 | 72:10,12 75:14 | **settled** 148:7 | **simple** 38:18 |
| 63:19 91:18 | 98:5 102:15 | **settlement** 185:5 | 179:5 193:12,15 |
| 156:7 160:7 | 106:19 119:3 | **seven** 63:16 | **simply** 179:14 |
| 195:10 | 154:15 155:9 | **shake** 169:17 | **sitting** 28:20 |
| **security** 76:17 | 157:2 160:10 | **shakes** 8:1 | **situation** 21:7 |
| 76:21 77:3,4,12 | 162:5 163:9 | | 115:8 148:20 |

Jason Merritt                                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

[situation - stays]                                                             Page 29

150:18 175:3,5
184:14
**situations** 106:9
149:15 154:5
185:12
**six** 48:13
**sixth** 58:19
**size** 87:16,17
**skew** 25:13
104:15
**skipped** 135:21
**slightly** 130:1
**small** 82:16
190:13
**sold** 18:9,11
20:12,15 21:6
24:8,14,16,20
26:1,15,17 28:17
35:16 39:8
42:21 43:3,6
48:22 56:2 57:4
60:6,22 67:11
70:11,16 98:12
105:18 106:4
107:3,13,17
115:15 116:2
131:12 133:1,3,6
133:7,8,9,10,19
133:21 141:19
142:7,20 144:18
145:19 146:2,17
152:12,17
154:19 156:9
157:5,11,12,16
157:17,21 158:9
158:13 163:17
164:4,4,21 165:2
165:4,17 167:2

171:20 172:1,2
173:3,5,9,18
174:9,18 175:4,5
175:10,15,18
176:5,16 177:7
177:15
**solutions** 1:21
5:22 6:2 201:1
**somebody**
114:19
**somewhat** 53:18
181:3
**soon** 79:7
**sorry** 40:1 52:18
57:2 65:7
115:19 176:21
**sought** 195:10
**sound** 52:15
117:17
**sounds** 117:3
**source** 143:14
145:17 151:9
**sources** 34:14
**south** 1:2 5:16
55:15 56:8
123:3,5,7,8,10
**southern** 5:16
**space** 200:7
**spalding** 1:15
2:5 5:20
**speaking** 20:20
162:21 180:8
**specialty** 1:6
5:14 200:1
201:5
**specific** 31:9
36:11 39:7 57:8
75:8 83:18

86:22 95:9
96:15 118:21
119:21 123:4
156:16 159:1
174:1 193:17
**specifically** 8:17
174:4
**specifics** 18:3
**specify** 16:4
**spelled** 79:19
**spend** 76:5
111:22
**spending** 115:3
**split** 76:7 190:13
**spoke** 30:6 53:10
54:5 55:1,15,16
57:15,16
**spoken** 55:4
**sportage** 40:17
**spot** 141:12
**spread** 120:7
**spring** 7:10
**stack** 15:1
**stain** 189:8
**standard** 85:19
161:21 188:11
**standards** 23:17
54:20 156:10
160:7,20,21,22
161:1,4,9,11,14
161:19 162:3
163:7,12,14
176:12
**standpoint** 45:8
**stands** 54:18
**start** 24:18 76:20
111:14 112:6,6,9
112:12,13

148:12 156:20
168:20 186:22
187:21 188:2,7
**started** 53:15,15
53:22 65:18
75:22 76:8 77:1
78:8 85:2
122:17 175:8
**starting** 60:5
73:1 156:7,11
160:6
**state** 6:3 7:7
62:20 63:7,21
64:14 65:20
66:12 69:19,20
70:1,2 78:10
87:21 117:22
118:18 123:17
153:2 170:8
200:6
**stated** 92:3,3
93:3,6,14,19
96:14,18 162:9
**statement** 30:5
49:7 132:1
158:18,21 162:7
165:6,6
**states** 1:1 5:15
38:2,4
**stating** 34:22
**station** 66:11
**stations** 70:2
**status** 4:8
**stay** 122:9
**stayed** 27:14
29:5
**stays** 86:2
101:14

Jason Merritt                                                              October 12, 2022
Drummond/Freeman v. Progressive Casualty

[stenotype - testified]                                                        Page 30

| | | | |
|---|---|---|---|
| **stenotype** 198:7 | **subtracts** 144:21 | **tab** 14:5 19:16 | 56:7 57:11 |
| **step** 131:10,11 | **suburban** | 39:17 40:9 61:4 | 100:14 184:6 |
| 144:2,4 166:13 | 119:17 120:3 | 79:3 91:8 118:3 | **talking** 19:11 |
| **stick** 60:20 | **suite** 1:16,21 2:7 | **tabs** 15:8 61:4 | 28:19 33:14 |
| **sticker** 98:19,21 | 201:1 | **take** 5:9 8:22 9:2 | 52:17 64:19 |
| 99:4,8,18 119:3 | **sum** 47:9 | 18:20 19:2,12 | 93:13 143:2 |
| 149:12 | **supply** 118:20 | 20:5,8,14,21 | 153:11 156:1,14 |
| **stood** 53:9 | 119:21 120:11 | 21:1,3 27:4 | 176:22 181:3 |
| **stop** 114:19 | 120:14,20 | 29:11 30:12 | **taught** 161:2 |
| **store** 73:1,2,2,4 | 133:19 | 33:15 44:4 | **tell** 17:21 51:18 |
| 134:4 | **supporting** | 45:12 47:20 | 54:8 73:12 |
| **stray** 176:17 | 158:20 | 58:11 70:15,17 | 82:10 97:8 |
| **street** 1:21 2:6 | **supports** 37:21 | 79:7 81:9,13 | 104:2 111:12 |
| 2:14 98:10 | 64:18 | 82:1 84:1 88:11 | 114:16 167:5 |
| 99:20 201:1 | **sure** 16:9 18:13 | 93:20 102:17 | 183:14 |
| **strongly** 189:14 | 24:10 33:22 | 115:14 117:18 | **telling** 58:6 |
| **stuck** 60:18 | 39:14 45:17 | 137:18 144:14 | 107:7 |
| **stuff** 25:3 35:22 | 79:8 117:17 | 145:10 162:10 | **tells** 120:9 |
| 60:18 63:17 | 118:16 124:16 | 162:18,19,22 | **ten** 28:10 45:14 |
| 67:19 70:8 | 137:10,13,22 | 163:4 172:7 | 45:14,15 49:12 |
| 86:12 90:22 | 141:11 154:2 | 175:15,19 | 49:18,19,21 |
| 100:2 114:1 | 163:10 176:13 | 178:16 179:7,14 | 82:12 |
| 116:19 121:18 | 179:10 180:16 | **taken** 3:7 7:16 | **term** 23:9 |
| 121:20 123:17 | 186:5 195:16 | 81:6 125:12 | **terms** 16:10 33:4 |
| 123:21 132:15 | 196:22 | 187:1,11,21 | 113:1 128:8 |
| 151:9,15 161:20 | **swear** 6:13 | 198:3,6,12 | **territory** 33:21 |
| 163:15 181:18 | **sweep** 44:1 | **takes** 45:15 | **test** 81:6,9,13 |
| 190:15 | **sworn** 6:18 | 109:13 142:6,7 | **testified** 6:18 |
| **stunted** 76:10 | 198:5 | 144:17,18,20 | 10:9,15 14:14 |
| **style** 86:18 | **system** 21:21,22 | **talk** 8:4 12:1 | 36:22 43:16 |
| **subject** 200:11 | 44:11 75:4 | 16:2 30:6 33:5 | 62:11,14 63:11 |
| **subjective** 153:7 | 146:22 147:2 | 33:16 54:12,17 | 71:13 73:21 |
| **submission** 12:7 | | 54:19,22 58:11 | 75:21 103:21 |
| **submit** 12:13 | **t** | 58:12 62:5 67:7 | 104:12 139:8 |
| **submitted** 12:9 | **t** 3:1,1 199:1,2 | 71:12 78:6 | 140:4,9 173:2 |
| **subtracted** | 201:4,4 | 127:17 173:7 | 186:21 191:1,7 |
| 147:10,12 | **t3** 75:18 76:6,13 | **talked** 19:1,2,7 | 194:17 195:18 |
| | 76:18 77:1 | 19:13 27:7 56:4 | |

[testify - true]                                                    Page 31

| | | | |
|---|---|---|---|
| **testify** 31:21 | 75:21 81:7,22 | **timbrook** 71:13 | 83:2,7,10 96:19 |
| 97:13 117:8 | 90:9 95:7 | 71:17 72:15 | 111:3 115:8,9 |
| 176:3 | 100:22 101:2,15 | 73:7,15 74:1,10 | 121:17 194:18 |
| **testifying** 7:17 | 102:2,4,19 103:4 | 75:17 109:1 | 194:20 195:5,9 |
| 9:15 | 103:16 104:11 | 133:7 134:6,15 | **totaled** 13:17 |
| **testimony** 14:12 | 104:12,17 | **time** 1:14 5:8 8:9 | 25:3 35:22 |
| 15:3 31:6 62:18 | 105:15,19 | 37:8 67:9 70:17 | 94:20 111:4 |
| 76:14 84:16,20 | 106:11 113:14 | 76:5,11 77:6 | **toyota** 22:18 |
| 104:5 123:20 | 113:15 114:22 | 82:2,5 84:1 | 40:19 107:9 |
| 173:12,15 190:6 | 117:11,14 | 111:21 113:9 | 190:2 |
| 198:4,6,9 199:5 | 122:22 124:8 | 115:3 124:2,5 | **tracked** 159:13 |
| 199:7 | 125:1,3 126:8 | 134:20 148:18 | **trade** 25:20,21 |
| **testing** 69:15 | 128:22 129:9 | 149:9 157:2 | **traded** 99:2 |
| **text** 117:12 | 132:16,22 | 159:12 172:10 | **trading** 67:8 |
| **thank** 6:11 80:21 | 134:14 135:12 | 172:13 174:8 | **trailer** 191:8 |
| 182:2 197:7 | 135:12,21 142:3 | 178:20 197:4,10 | **training** 63:20 |
| **theories** 51:17 | 147:15 152:3,3 | **times** 71:5 84:19 | 69:12 159:1 |
| **theory** 51:3 | 154:3 157:21 | 103:15 105:20 | 161:18 |
| **thing** 8:22 18:21 | 162:15 163:22 | 114:12,15,17 | **trainings** 64:3 |
| 44:13 48:2 | 164:17,21 165:2 | 150:15 | 64:11,16,17 |
| 50:12 53:17 | 165:5,6 170:6,9 | **tire** 25:11 26:2,7 | **transcript** 4:14 |
| 63:4 65:15 | 170:17 172:7 | 133:10 | 7:21 14:11,21 |
| 101:21 106:12 | 173:17 175:10 | **tires** 21:14 22:5 | 19:8 172:17,20 |
| 109:14 110:18 | 175:14 177:5,11 | 22:6 190:18 | 174:6 200:16,18 |
| 122:15 138:2 | 177:18,22 178:1 | **title** 72:14 86:12 | **transcription** |
| 145:4 151:20 | 181:22 197:6 | 86:12 | 199:7 |
| 153:17 157:7 | **third** 129:8 | **titles** 72:16 | **transcripts** 13:4 |
| 165:14 166:6 | 192:13 | **today** 7:4 8:9 9:4 | 13:9 156:1 |
| 174:21 193:14 | **thirty** 200:15 | 9:18 11:18,19 | **transmission** |
| **things** 27:2 | **thought** 110:10 | 62:15 | 87:16 189:5 |
| 72:22 108:6 | 184:6 | **told** 50:11 55:20 | **travel** 72:6 |
| 138:14 178:7 | **thousand** 129:7 | 65:1 176:19 | **tried** 150:19 |
| 193:17 | 184:4,20 | 177:1 | **triton** 77:15 78:3 |
| **think** 11:10 | **three** 21:22 | **tools** 134:1 | **truck** 120:18 |
| 20:10 34:4 | 100:11,13 110:1 | **top** 168:18 182:5 | **trucks** 121:6 |
| 43:16 44:17 | 112:18 170:19 | 183:3 | **true** 14:15 15:4 |
| 53:12 59:13 | **tied** 23:4 147:4 | **total** 14:1 47:9 | 37:2 62:15 92:3 |
| 61:9,10 73:16 | 170:7,10 | 75:1 82:11,15,18 | 93:14 156:19 |

Jason Merritt
Drummond/Freeman v. Progressive Casualty
October 12, 2022

**[true - value]**                                                                                                Page 32

173:12 184:14
198:9 199:6
**truly**  88:17
**try**  8:4,5 17:4
39:12 99:12,13
101:2 103:14
111:10 112:8,14
138:8
**trying**  54:15
55:9,10,17 68:8
105:14
**turn**  4:9 181:8
**turned**  20:3
**turning**  65:18
**twenty**  196:19
**two**  32:14 36:9
59:18 60:6 73:7
76:8 100:14,15
112:17,18,20
126:4,10,13
167:8,14 169:3
169:15 170:12
170:13,17,17
190:17 196:18
**type**  87:15 89:10
121:1 161:21,22
166:7
**typed**  35:9
**types**  121:18
**typewriting**
198:8
**typical**  83:19,20
189:3
**typically**  88:22
156:18

**u**

**uh**  10:21 23:15
52:8 62:9 77:8
93:15 108:14
111:5 125:10
131:6 143:4
**ultimately**  23:19
160:10 165:3
**umpire**  129:12
**unable**  153:19
154:5
**unaware**  15:2
**underlying**
171:19
**understand**  7:16
8:2,10 16:3 21:1
143:5
**understanding**
38:7 105:15
**understood**  8:14
8:20
**unfair**  53:20
**unit**  5:11 82:3,6
124:6 172:14
**united**  1:1 5:15
**unknown**  57:21
**unnumbered**
162:17
**update**  122:16
**updated**  91:17
**use**  21:22 24:21
26:16,18 43:20
45:14 48:7 59:9
98:1 103:13
112:16 121:17
130:10 151:7,9
173:5,18,19
175:20 176:16

177:14,15
**uses**  175:11
**usually**  44:7
66:8 85:9 99:20
100:1 115:9,22
134:8 148:17

**v**

**v6**  46:16
**valid**  48:21
162:10 179:17
180:4
**valuable**  92:7
**valuated**  74:3
**valuation**  3:19
3:21 4:1,3 11:14
12:6 18:12 34:6
34:17 39:14,21
40:4,15 41:4,13
42:16 96:22
110:3 116:20
117:2,11 125:18
132:5 135:9,17
138:21 139:21
141:21 146:22
147:1 148:9
157:2,9 158:16
167:15 169:1
176:6,17 180:19
186:4 188:17
190:1 192:7,21
194:5,19
**valuations**  47:16
47:22 67:10
68:19 107:20
109:19 148:1
150:15

**value**  16:11,13
16:14,16,19 17:9
17:17 21:13,19
22:1 23:5 25:5
26:8 27:10,14
29:5,8,10,14,22
30:9,12,19 35:20
52:15 55:7,11,18
59:14 65:1 66:2
66:14 67:2
68:12,21 69:5,8
71:7 82:19 83:1
83:6,9 85:18,19
88:3 92:3,4,8,9
92:14 93:6,14,17
93:19 94:4,12
95:4 101:6,14,16
101:20,21 102:3
102:7,10,11,13
103:7,14,18
104:16,19 105:6
105:16,16,22
106:2,5,5,10,12
106:14,20,20
107:14 108:18
109:4 110:1,12
111:2 114:13
120:12 121:13
122:12,20 125:4
125:19 127:22
129:10,10
131:10 133:12
135:19 136:7,9
136:14 137:2,10
137:21 138:17
138:19 141:15
141:18,22 142:3
142:11,11,16,17

October 12, 2022

**[value - vin]**

143:14,18,19
144:3,5,5,7
145:1,6,14,17
146:3,7,12 147:4
147:9,13 150:3
154:18 155:6
158:2,16 170:7
170:10 175:8
177:6 179:1,9
180:15 183:7
185:4,7 186:15
186:19 187:2,13
189:4,19 196:4,9
197:2
**valued** 74:3
154:22
**values** 18:8
59:18 65:21,21
75:4 102:5
126:6 136:4,15
**variable** 173:4
**variables** 186:2
**variations** 17:6
**varied** 136:7
**vehicle** 3:19,21
4:1,3 11:14
16:14 17:10
18:13 20:13,22
21:5,13 22:4,16
23:5,18,19 25:5
25:7,13,14,16,18
25:19,20,22,22
26:1,4,8,22 27:3
27:9,11 28:22
29:2,4,4,7,12
30:7,9,13,16,17
30:20 42:13
44:20 46:12,14

46:15 47:2 55:8
55:14,18,19
59:15,17,17
66:18 67:16
68:5 69:1 71:1,2
74:2 84:13
85:19 88:3,17,19
89:1,2,5,12,16
90:6 91:2 92:7,9
92:10,16,19
93:17,18 94:5,9
94:10,11,14,19
95:9,14 100:5
101:6 103:7
104:1,16 105:22
106:1,6,10 109:8
109:9 110:19
111:3,22 112:1,2
112:10 113:3
114:13 118:22
119:12,22 121:3
123:6 124:9
126:6,12,21
127:1 128:13,16
128:20,21 129:4
131:8,9,18 133:6
137:14 138:4
139:1 140:2,5,13
140:15,18,19
141:8,15 144:17
144:22 147:22
148:9,12 149:17
149:18,20 150:1
154:6,15,18,19
155:9,10,16
157:1,5 159:8
160:9,10 162:4
163:1 166:5,5

169:7 170:7,10
170:14 171:1,6,7
174:18 175:7,7
176:17 178:11
180:13 185:16
186:7,15 187:3
187:10,20 188:7
188:12,22 189:3
189:12,19,20
190:9 191:2,18
192:21 193:1
194:17 195:9,15
195:22 196:3,9
196:14
**vehicle's** 25:6
148:11 156:17
158:16 159:11
**vehicles** 16:16
20:10 25:3,9
31:14 35:19
36:11,20 37:1,5
38:15,21 39:7,13
41:17,22 42:2,7
42:17,20 43:2,10
43:14 44:21
46:22 54:9 59:1
59:14 66:20
67:9,11,21 70:4
70:10,16 71:9
73:20 74:1
86:18 91:4
98:15 99:15,16
99:22 100:7,15
101:13 103:10
105:2,5 106:18
107:7,17 108:2
108:11 111:15
112:5,16 113:2

116:14 119:3,18
123:3,14 124:13
124:22 130:2
131:7,8,16 133:3
139:12,16 142:1
143:22 144:11
149:6,7,13
157:11,11,18,19
157:21 159:19
162:20 165:3
169:16 171:11
174:3,3 175:11
175:12,15
185:13 196:13
**verbal** 7:22
**verified** 136:11
136:13,15 140:1
**verify** 109:11,12
109:17 110:4
137:5 140:1,12
150:21 151:3
167:6
**veritext** 1:21
5:22 6:2 201:1
**version** 14:18
**versus** 5:13,18
**video** 5:8,12
**videographer**
2:18 5:3 6:1,11
82:2,5 124:2,5
172:10,13
197:10
**videotape** 3:6
**videotaped** 1:12
197:12 198:3
**vin** 109:12 112:8
137:7,16 150:21
150:22 151:3,5,7

151:14
**vins** 112:8
**virginia** 84:10
**virtual** 123:18
**volino** 3:7 13:6
13:20 14:12
19:2,8 20:1 31:8
32:14 35:12,14
36:22 52:1,11
55:3 56:4 60:8
60:16,17 62:12
62:18 71:14
73:22 75:22
84:21 85:4
152:21 154:4
155:20,21 156:2
156:3 162:9,13
172:18 173:12
177:10 180:17
181:2
**vs** 1:5 3:7 200:1
201:5

**w**

**w** 199:1
**wait** 8:5 131:16
**walk** 109:7
**want** 7:15 16:9
33:9,15 54:11
58:7 79:9 94:1
111:6 112:20
117:7,16 138:7
153:18 155:15
155:18 168:19
173:19 177:15
192:6,22
**wanted** 46:21

**wanting** 152:22
181:4
**warranties** 26:2
26:6 29:16
101:17 106:8
107:11 174:17
**warranty** 25:10
25:19 27:8
101:12 107:18
133:11
**washington** 1:16
1:22 59:17
201:2
**watching** 53:19
**way** 26:21 29:19
44:18 122:6
129:3 131:17
148:16 195:4
**ways** 23:4 154:8
186:2
**we've** 79:6 119:1
119:2
**wear** 21:14
22:13 189:9
190:14
**web** 84:6
**website** 4:10,13
79:15,22 80:6
84:7 87:21
88:14 91:16,19
118:11 122:11
122:16
**week** 117:6
**weeks** 76:9
**went** 12:8 42:4,9
177:13
**west** 2:14

**western** 59:18
**wheel** 87:16
133:10 189:5
**wheels** 138:3
190:16,17
**whispering** 5:6
**white** 2:3 6:5,5
6:20,22 14:4,8
14:10 15:7,11,13
19:9,10,20 33:6
33:11,17,22 34:1
39:17,20 40:9,12
41:3,11 61:4,8
61:11,20 79:8,10
79:11 81:22
82:7 87:9 91:8
91:13 105:13
107:5 118:3,7
124:1,7 172:7,15
178:2 180:1,10
181:15,19
182:18 183:1,13
184:1,12 186:3
187:9,18 194:7
194:15 195:3
197:6,9
**wholesale** 100:2
100:3
**wide** 185:9
**wife** 98:8 99:17
**william** 7:9
**williams** 39:22
40:5 140:3,6
189:22 190:5
191:6 192:20
**willing** 102:13
102:14

**wimbledon** 87:9
**winchester**
71:15,17 72:7
**window** 98:19
**wiring** 66:17
**wish** 164:20
**witness** 6:13,17
10:10,15 33:7,13
84:16 105:9
107:1 122:13
177:22 179:20
180:7 181:16
183:10,21
185:20 187:6,16
195:1 198:4,6,10
200:4 201:6
**wondering**
130:13
**word** 44:16
122:19,19
161:14
**words** 92:18
161:21
**work** 28:22 33:3
43:19 63:21
65:17 67:6
71:12 75:18
76:12 77:5,11,17
78:3 83:16
109:13 185:2
194:2
**worked** 25:1,4
29:19 77:17
**working** 26:19
58:8
**works** 122:3
**worth** 25:6 48:9
55:14,21 67:8

Jason Merritt                                                    October 12, 2022
Drummond/Freeman v. Progressive Casualty

**[worth - zoom]**                                                      Page 35

70:21 71:2 87:3
92:17 94:15
115:2 116:1
127:2 128:13
152:8 155:2
192:14
**wrenches**  65:18
**writing**  12:13
**written**  161:11
166:5 168:2
**wrong**  68:4
108:5 113:16
140:13 141:18
141:21,22 146:2
146:3,8 176:1
189:17
**wrote**  40:1 60:12
118:12

**x**

**x**  94:2

**y**

**yeah**  33:17 68:18
87:5 89:7
103:11 105:9
108:10 110:12
121:3 128:21
135:8 140:9
149:4 154:11
155:22 168:20
178:22 179:5
182:9 183:10
190:16 194:10
195:1
**year**  64:15 86:19
90:2,10 105:5
106:18 107:8

**years**  27:2 53:19
55:2 63:13
65:16 73:7
90:10 100:17
130:14 159:16
**yep**  100:6 182:2
**yeshonda**  41:5
103:21
**yesterday**  11:19
**york**  120:19
**younger**  98:3

**z**

**zero**  180:12
**zoom**  12:4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Jason Merritt                                           April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 1

1              UNITED STATES DISTRICT COURT FOR THE
                  SOUTHERN DISTRICT OF NEW YORK
2

3      _____ :

       DOMINICK VOLINO and           :
4      JOHN PLOTTS,                   :

                                      :
5            Plaintiff,               :

                                      :
6      v.                             : Civil Action No.
                                      :  21 Civ. 6243 (LGS)(SDA)
7      PROGRESSIVE CASUALTY           :
       INS. CO., et al.,              :

8                                     :

             Defendant.               :
9      _____ :
10

11              Thursday, April 7, 2022
12

13              Videotape deposition of JASON
14     MERRITT taken at the Law Offices of King &
15     Spalding LLP, 1700 Pennsylvania Avenue NW,
16     Suite 200, Washington, DC, beginning at 9:08
17     a.m., Eastern Standard Time, before Ryan K.
18     Black, a Registered Professional Reporter,
19     Certified Livenote Reporter and Notary Public.
20

21

22

23

24

25

EXHIBIT

1-Merritt

**Page 2**

1 A P P E A R A N C E S :
2
   CARNEY BATES & PULLIAM PLLC
3 BY: LEE LOWTHER, ESQ.
   519 West 7th Street
4 Little Rock, Arkansas 72201
   501.312.8500
5 llowther@cbplaw.com
6 Representing - Plaintiff
7
   KING & SPALDING LLP
8 BY: JEFFREY S. CASHDAN, ESQ.
      DANIEL S. SANDERS, III, ESQ.
9 1180 Peachtree Street, NE
   Suite 1600
10 Atlanta, Georgia 30309
   404.572.4600
11 jcashdan@kslaw.com
   dsanders@kslaw.com
12
   Representing - Defendant
13
14
15
16
17
18
19
20
21
22
23
24
   ALSO PRESENT:
25
   Gene Aranov - Legal Videographer

**Page 3**

1        I N D E X
2 TESTIMONY OF: JASON MERRITT        PAGE
3 By Mr. Cashdan..................................8
4
5        E X H I B I T S
6 EXHIBIT        DESCRIPTION        PAGE
7 Exhibit 1  a document titled Rule 26(a)
8        Expert Report of Jason Merritt.....11
9 Exhibit 2  the resumé of Jason Merritt........12
10 Exhibit 3  a copy of the subpoena issued to
11        Jason Merritt to testify at
12        deposition.........................14
13 Exhibit 4  a letter from Lee Lowther to Jeffrey
14        Cashdan, dated April 4, 2022.......15
15 Exhibit 5  a document titled Expert Consultant
16        Retention Agreement...............14
17 Exhibit 6  a document titled East Coast Auto
18        Appraisers - IACP Certified Actual
19        Cash Value Appraisal..............16
20 Exhibit 7  a document titled East Coast Auto
21        Appraisers IACP Certified Actual Cash
22        Value Appraisal...................17
23 Exhibit 8  a document Bates Numbered
24        Mitchell-Volino Subpoena 000218....17
25

**Page 4**

1        I N D E X (Cont'd)
2 EXHIBIT        DESCRIPTION        PAGE
3 Exhibit 9  a document Bates Numbered
4        Mitchell-Volino Subpoena 000689
5        through 000695....................18
6 Exhibit 10  a document Bates Numbered
7        Mitchell-Volino Subpoena 000729
8        through 000738....................19
9 Exhibit 11  a document Bates Numbered
10        Mitchell-Volino Subpoena 000457
11        through 000476....................20
12 Exhibit 12  a document Bates Numbered
13        Mitchell-Volino Subpoena 000603
14        through 000643....................20
15 Exhibit 13  a document Bates Numbered
16        Mitchell-Volino Subpoena 000819
17        through 000850....................21
18 Exhibit 14  a document titled 11NYCRR
19        § 216.7...........................22
20 Exhibit 15  a printout of the "About" section of
21        East Coast Auto Appraiser's
22        website...........................43
23 Exhibit 16  a printout of the "Our Services"
24        section of East Coast Auto
25        Appraiser's website...............44

**Page 5**

1        I N D E X (Cont'd)
2 EXHIBIT        DESCRIPTION        PAGE
3 Exhibit 17  a printout of the "What is An
4        Appraisal section of East Coast Auto
5        Appraiser's website...............45
6 Exhibit 18  a printout of the "Diminished Value
7        Page" section of East Coast Auto
8        Appraiser's website...............51
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Jason Merritt                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 6

1      THE VIDEOGRAPHER:  Good morning.
2  We are going on the record at 9:08 a.m.
3  on April 7th, 2022.  Please note that the
4  microphones are sensitive and may pick up
5  whispering, private conversations and cellular
6  interference.  Please turn off all cell phones,
7  or place them away from the microphones, as they
8  can interfere with the deposition audio.  Audio
9  and video recording will continue to take place
10  unless all parties agree to go off the record.
11      This is Media Unit 1 of the
12  video-recorded deposition of Jason Merritt,
13  taken by counsel for defendant in the matter of
14  Dominick Volino, et al., versus Progressive Ins.
15  Co., et al, filed in the United States District
16  Court for the Southern District of New York,
17  Case Number 21 Civ 6243 (LGS)(SDA).
18      This deposition is being held at King &
19  Spalding, located at 1700 Pennsylvania Avenue
20  Northwest, Suite 200, Washington, D.C.
21      My name is Gene Aranov, from the
22  firm Veritext Legal Solutions, and I'm the
23  videographer.  The court reporter is Ryan Black,
24  from the firm Veritext Legal Solutions.  I am
25  not authorized to administer an oath, I am not

Page 7

1  related to any party in this action, nor am I
2  financially interested in the outcome.
3      Counsel and everyone present in the
4  room and everyone attending remotely will now
5  please state their appearances and affiliations
6  for the record.  If there are any objections to
7  proceeding, please state them at the time of your
8  appearance beginning with the noticing attorney.
9      MR. CASHDAN:  Jeff Cashdan for
10  defendants.
11      THE WITNESS:  Jason Merritt.
12      MR. LOWTHER:  Lee Lowther for the
13  plaintiffs.
14      MR. CASHDAN:  And I should just note for
15  the record, with me here today is Daniel Sanders,
16  also of King & Spalding.
17      THE VIDEOGRAPHER:  Will the court
18  reporter please swear in the witness.
19          *    *    *
20  Whereupon --
21          JASON MERRITT,
22  called to testify, having been first duly sworn
23  or affirmed, was examined and testified as
24  follows:
25          *    *    *

Page 8

1      THE VIDEOGRAPHER:  Thank you.  You may
2  proceed.
3          EXAMINATION
4  BY MR. CASHDAN:
5      Q.  Good morning, sir.  Could you just state
6  your full name for the record, please?
7      A.  Yes.  Jason W. Merritt.
8      Q.  And -- and where do you live?
9      A.  I live in Cumberland, Maryland.
10      Q.  Okay.  Have you ever been deposed
11  before?
12      A.  Yes.
13      Q.  Okay.  And you understand, generally,
14  the process, then.  But let me just go over a
15  couple of ground rules, if that's okay?
16      A.  Absolutely.
17      Q.  I'm going to ask you questions today,
18  and we need you to answer orally.  We can't have
19  a nod of the head or a movement of the hand
20  instead.
21      A.  Correct.
22      Q.  You understand that?
23      A.  Understood.
24      Q.  If you don't understand my question,
25  or any part of it, would you let me know?

Page 9

1      A.  Ple -- I will.
2      Q.  And if you don't let me know that you
3  have any confusion about my question, I'm going
4  to presume that you understood it.  Is that fair?
5      A.  That's fair.
6      Q.  Okay.  This is not an endurance test.
7  If you need a break for any reason, let me know,
8  as long as a question is not pending.  Okay?
9      A.  Absolutely.
10      Q.  All right.  Did you prepare for your
11  deposition today?
12      A.  Yes.
13      Q.  How did you prepare?
14      A.  I just read over, actually, some
15  of the documents that, probably, you have in
16  exhibits.  I believe we reviewed those just this
17  morning, and they are the documents that I
18  prepared with.
19      Q.  Okay.  After the time you prepared your
20  expert report, did you do any other additional
21  work to prepare for today?
22      A.  No, I did not, really.
23      Q.  Did you meet with counsel to prepare for
24  your deposition?
25      A.  I met with counsel on Zoom, and this

3 (Pages 6 - 9)

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 10

1 morning I met him in the lobby.
2    Q.   When did you meet with counsel on Zoom?
3    A.   I believe we met -- today is Thursday.
4 I guess that would be Monday or Tuesday. I think
5 Tuesday.
6    Q.   Of this week?
7    A.   Yes.
8    Q.   Okay. And who did you meet with?
9    A.   Mr. Lowther.
10   Q.   Anyone else?
11   A.   No.
12   Q.   And how long did you meet for?
13   A.   I believe we met for about an hour.
14   Q.   Okay. And was there anything about your
15 work that you discussed that you've not otherwise
16 disclosed in your expert report?
17   A.   No.
18   Q.   Okay. Did you review any documents
19 during that meeting?
20   A.   No. I believe I only reviewed, I
21 believe, just my statement, and I believe that's
22 it.
23   Q.   And when you say your "statement," do
24 you mean the expert report you submitted?
25   A.   Yes.

Page 11

1    Q.   Okay. Did you do any preparation work
2 this morning with counsel? You mentioned you met
3 Mr. Lowther this morning.
4    A.   No.
5    Q.   So you just met him in the lobby to come
6 over to here?
7    A.   Correct.
8    Q.   Okay. Other than reviewing some of
9 the documents that you've previously produced,
10 meeting with -- an hour by Zoom with Mr. Lowther,
11 is there anything else did you to prepare for
12 your deposition since the time you completed
13 your expert report?
14   A.   No.
15   Q.   Okay. Have you ever been insured by any
16 Progressive entity?
17   A.   Not that I know of, no.
18   Q.   Okay. Have you ever filed a claim
19 against any Progressive insured or entity?
20   A.   I do not believe so.
21   Q.   Okay. Have you ever been involved in a
22 total loss of a vehicle you owned?
23   A.   No.
24        (Merritt Exhibit No. 1, a document
25 titled Rule 26(a) Expert Report of Jason Merritt,

Page 12

1 was introduced.)
2 BY MR. CASHDAN:
3    Q.   Okay. I'd like to hand you what's been
4 marked for identification as Merritt Exhibit 1.
5 Can you please state for the record what
6 Exhibit 1 is?
7    A.   That is my expert report.
8    Q.   And is Exhibit 1 a full and complete
9 copy of your expert report?
10   A.   Yes, it is.
11   Q.   Is that your signature on the last page
12 of Exhibit 1?
13   A.   Yes, sir. That is.
14   Q.   And it says it was executed on March
15 11th, 2022. Do you see that?
16   A.   Correct.
17   Q.   Is that the date you, in fact, executed
18 it?
19   A.   That is.
20        (Merritt Exhibit No. 2, the resumé of
21 Jason Merritt, was introduced.)
22 BY MR. CASHDAN:
23   Q.   Okay. Let me hand you what's been
24 marked for identification as Exhibit 2.
25   A.   Do you want me to hold onto these?

Page 13

1    Q.   Yes. Yes.
2    A.   Okay.
3    Q.   We will refer back to those.
4    A.   Okay.
5    Q.   Let me hand you Exhibit 2. What is
6 Exhibit 2?
7    A.   Exhibit 2 is my personal resumé, three
8 pages.
9    Q.   And am I correct that Exhibit 2 was
10 attached to your report as an exhibit to the
11 report?
12   A.   Yes, it would be.
13   Q.   It was -- it was, I think, labeled
14 Exhibit 1 to the report; is that right?
15   A.   Correct.
16   Q.   And is this a true and correct copy of
17 your current resumé?
18   A.   Yes, sir. That is.
19   Q.   Okay. And who prepared this document?
20   A.   I did.
21   Q.   Okay.
22   A.   Probably could have use a little bit of
23 help but --
24   Q.   Not a problem.
25        Let's go back -- well, let's not do it

4 (Pages 10 - 13)

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 14

1 yet.
2      You received a subpoena to produce
3 materials in this case. Are you aware of that?
4    A.  I am aware.
5      (Merritt Exhibit No. 3, a copy of the
6 subpoena issued to Jason Merritt to testify at
7 deposition, was introduced.)
8 BY MR. CASHDAN:
9    Q.  Let me hand you what's been marked as
10 Exhibit 3. Is Exhibit 3 a accurate copy of the
11 subpoena that you were served?
12   A.  Yes, sir. It is.
13   Q.  Okay. And am I correct that you
14 responded to that subpoena through counsel?
15   A.  Yes, I did.
16     (Merritt Exhibit No. 4, a letter from
17 Lee Lowther to Jeffrey Cashdan, dated April 4,
18 2022, was introduced.)
19 BY MR. CASHDAN:
20   Q.  Okay. I'm going to hand you what's
21 been marked as Exhibit 4. Is this a copy of the
22 written response provided by your counsel?
23   A.  It is.
24   Q.  Okay. Did you have any role in
25 preparing this written response?

Page 15

1    A.  Yes, I did.
2    Q.  Okay. What role did you have?
3    A.  My role was to answer each one of these
4 responses.
5    Q.  Okay. And am I correct that in
6 connection with responding to the subpoena you
7 produced certain materials, --
8    A.  I did.
9    Q.  -- some -- some documents; is that
10 right?
11   A.  That's correct.
12   Q.  Okay. I'm going to hand you a variety
13 of documents now just through a housekeeping
14 measure. I believe these are all the documents
15 you produced to us. We're going to go through
16 them one at a time just to make sure that's
17 correct. We're not going to cover them in detail
18 now, and then we'll come back. Is that all
19 right?
20   A.  Understood.
21     (Merritt Exhibit No. 5, a document
22 titled Expert Consultant Retention Agreement, was
23 introduced.)
24 BY MR. CASHDAN:
25   Q.  All right. Let me hand you what's been

Page 16

1 marked as Exhibit 5. What is Exhibit 5?
2    A.  This is the Expert Consultant Retention
3 Agreement. It looks like a four-page document
4 that was prepared between myself and
5 Mr. Lowther's represented law firm.
6    Q.  Okay. And you produced that in
7 connection with the response to the subpoena; is
8 that correct?
9    A.  Correct.
10     (Merritt Exhibit No. 6, a document
11 titled East Coast Auto Appraisers - IACP
12 Certified Actual Cash Value Appraisal, was
13 introduced.)
14 BY MR. CASHDAN:
15   Q.  Okay. Let me hand you Exhibit 6. What
16 is Exhibit 6?
17   A.  Exhibit 6 is one of my general templates
18 for some of the appraisals and outlines, my
19 methodology and photos and just, kind of, an
20 overview outline template of one of my
21 appraisals.
22   Q.  Okay. And that was produced in response
23 to the subpoena; is that correct?
24   A.  Correct.
25 ///

Page 17

1      (Merritt Exhibit No. 7, a document
2 titled East Coast Auto Appraisers IACP Certified
3 Actual Cash Value Appraisal, was introduced.)
4 BY MR. CASHDAN:
5    Q.  Okay. Let me hand you Exhibit 7. What
6 is Exhibit 7?
7    A.  Exhibit 7 is an example of one of the
8 appraisals that I completed in the past.
9    Q.  Okay. And that was also produced in
10 response to the subpoena; is that correct?
11   A.  Yes, sir.
12     (Merritt Exhibit No. 8, a document Bates
13 Numbered Mitchell-Volino Subpoena 000218, was
14 introduced.)
15 BY MR. CASHDAN:
16   Q.  Okay. Let me hand you what's been
17 marked as Exhibit 8. What is Exhibit 8?
18   A.  Exhibit 8 looks like a WorkCenter Total
19 Loss printout through Mitchell, talking about
20 internet pricing and internet sales.
21   Q.  This is a document you produced in
22 response to the subpoena; is that correct?
23   A.  Correct.
24     (Whereupon there was a slight
25 interruption by videographer.)

5 (Pages 14 - 17)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

---

Page 18

1       MR. CASHDAN: Excuse me?
2 BY MR. CASHDAN:
3    Q. This is a document you produced in
4 response to the subpoena; is that correct?
5    A. Yes, sir.
6    Q. Is this a document that you reviewed in
7 preparing your expert report?
8    A. Yes -- some of the material from here,
9 yes, I had read it prior to the report, yes.
10   Q. Okay.
11   A. But as far as holding that document and
12 preparing it, no, I did not.
13   Q. Okay. But did you -- had you reviewed
14 Exhibit 8 prior to the time you prepared your
15 expert report?
16   A. Some of the information, yes. But I
17 don't recall this exact document, reading it
18 prior to preparation.
19   Q. Okay.
20   A. But the contents in it I'm familiar
21 with.
22      (Merritt Exhibit No. 9, a document Bates
23 Numbered Mitchell-Volino Subpoena 000689 through
24 000695, was introduced.)
25 BY MR. CASHDAN:

---

Page 19

1    Q. Okay. Let me hand you Exhibit 9.
2       Excuse me. What is Exhibit 9?
3    A. Exhibit 9 looks like a vehicle valuation
4 report through Mitchell.
5    Q. And is it for the owner Mr. James
6 England?
7    A. Correct.
8    Q. And this is a document you produced in
9 response to the subpoena?
10   A. Correct.
11      (Merritt Exhibit No. 10, a document
12 Bates Numbered Mitchell-Volino Subpoena 000729
13 through 000738, was introduced.)
14 BY MR. CASHDAN:
15   Q. Okay. Let he me hand you Exhibit 10.
16 What is Exhibit 10?
17   A. Exhibit 10 is another Mitchell vehicle
18 valuation -- valuation report on Goodier.
19   Q. Okay. This is a document you produced
20 in response to the subpoena?
21   A. Yes, sir.
22      MR. CASHDAN: Okay. I just want to
23 clarify for the record, Lee, that we're producing
24 -- we were marking these exhibits as the files we
25 were provided.

---

Page 20

1       MR. LOWTHER: Mm-hmm.
2       MR. CASHDAN: I want to -- I'm not
3 trying to play games with the witness. Some of
4 these files contain multiple vehicle valuation
5 reports. So I'm not representing it's a single
6 document but, rather, it was a single file that
7 was produced. Does that make sense?
8       MR. LOWTHER: Okay. That's -- no,
9 that's fair. That is the way they were produced.
10      (Merritt Exhibit No. 11, a document
11 Bates Numbered Mitchell-Volino Subpoena 000457
12 through 000476, was introduced.)
13 BY MR. CASHDAN:
14   Q. Okay. This is Exhibit 11, and Exhibit
15 11 looks to be a collection of vehicle valuation
16 reports for Mr. Plotts; --
17   A. Correct.
18   Q. -- is that correct?
19   A. That is correct.
20   Q. And you produced these in response to
21 the subpoena?
22   A. Yes, sir.
23      (Merritt Exhibit No. 12, a document
24 Bates Numbered Mitchell-Volino Subpoena 000603
25 through 000643, was introduced.)

---

Page 21

1 BY MR. CASHDAN:
2    Q. Okay. Let me hand you Exhibit 12.
3 Exhibit 12 appears to be a collection of vehicle
4 valuation reports for Mr. Costa; is that correct?
5    A. That is correct.
6    Q. And you produced these in response to
7 the subpoena?
8    A. Yes, I did.
9       (Merritt Exhibit No. 13, a document
10 Bates Numbered Mitchell-Volino Subpoena 000819
11 through 000850, was introduced.)
12 BY MR. CASHDAN:
13   Q. And I'm going to hand you Exhibit 13.
14 Exhibit 13 appears to be a set of vehicle
15 valuation reports for Mr. Lukasik; is that
16 correct?
17      MR. LOWTHER: It is Lukasik.
18      MR. CASHDAN: Lukasik.
19 BY MR. CASHDAN:
20   Q. Is that correct?
21   A. That's correct.
22   Q. And did you produce those in response to
23 the subpoena?
24   A. Yes, sir. I did.
25 ///

---

6 (Pages 18 - 21)

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 22

1        (Merritt Exhibit No. 14, a document
2 titled 11NYCRR § 216.7, was introduced.)
3 BY MR. CASHDAN:
4    Q.   And let me hand you what's been marked
5 for identification as Exhibit 14, which appears
6 to be a printout of a provision of the New York
7 Codes Rules and Regulations.  Did you produce
8 this document in response to the subpoena?
9    A.   I did.
10   Q.   Okay.  Are there any documents,
11 other than the ones we've marked today, that you
12 reviewed or relied upon for purposes of preparing
13 your expert report?
14   A.   No, sir.
15   Q.   Okay.  Are there any other documents
16 that were produced by any party in this
17 litigation that you reviewed for purposes of your
18 expert opinions and conclusions in this matter?
19   A.   No, sir.
20   Q.   Okay.  All right.
21       I'd like to go back, if we could, to
22 Exhibit 5, please.
23   A.   That is the retention agreement.
24   Q.   Okay.  So is this the agreement that
25 -- where you were retained for purposes of

Page 23

1 providing services in this litigation?
2    A.   It is.
3    Q.   And it's dated February 15th, 2022; is
4 that correct?
5    A.   Correct.
6    Q.   Did you provide any work, for purposes
7 of this litigation, prior to February 15th, 2022?
8    A.   I do not believe I did.
9    Q.   Okay.  How did it come to be that you
10 were retained in this matter?  Who -- who
11 contacted you?
12   A.   The whole story back, I do work
13 for and was certified under the Bureau of
14 Certified Auto Appraisers.  And through that
15 organization is when I was told to -- if I was
16 looking for any expert witness or any consulting
17 work or any additional appraising is when I
18 called them to say, hey, I'm looking for
19 business.  COVID shut us down for a while.  So I
20 called and said, hey, we're back up; anything you
21 have available, let me know.  I received a call
22 later from Houston Auto Appraisers and said, hey,
23 can you help this attorney office out -- a law
24 firm out; they have some questions on some actual
25 cash value.

Page 24

1        So I did call, I believe Mr. Lowther
2 at the time, and just notified him that I am
3 available for any cons -- consulting.  And he
4 later did respond and asked for a resumé, and
5 then later we were contacted.
6    Q.   Okay.  Do you recall when it was that
7 you reached out to the appraisal organization,
8 which --
9    A.   No, I can't remember.
10   Q.   Okay.
11   A.   I do not recall.
12   Q.   Do you recall whether it was in 2021 or
13 2022?
14   A.   I really don't know.  It could have been
15 prior to the end of the year, but it was recent.
16   Q.   Okay.  Do you recall when you received
17 a call -- a communication from Houston Auto
18 Appraisers?
19   A.   No, I don't.
20   Q.   Do you recall what year it was?
21   A.   I -- again, pretty recent.  It could
22 have been the end of '21, beginning of '22.
23 I -- I don't recall.
24   Q.   Who from Houston Auto Appraisers
25 contacted you?

Page 25

1    A.   Mr. Dent Roy [sic].
2    Q.   Roy Dent [sic]?
3    A.   I think it's Roy Dent [sic].
4    Q.   Okay.
5    A.   Roy Dent or Bent.
6    Q.   Did you know Mr. Dent or Bent?
7    A.   I only knew him through the Bureau of
8 Certified Auto Appraisers.
9    Q.   Okay.  Does he work for the Bureau?
10   A.   I believe he's part owner of it.
11   Q.   Okay.  And he called you and -- and
12 suggested you might want to contact somebody
13 about this lawsuit?
14   A.   Correct -- not about this lawsuit.  He
15 just said that there's a firm in Alabama that is
16 looking for some consulting.
17   Q    And when you say "Alabama," did you mean
18 Arkansas?
19   A.   I -- I just remember Alabama, so --
20   Q.   Okay.
21   A.   -- I may be completely wrong on the
22 state.
23   Q.   Okay.  How long after you received a
24 call from Mr. Dent or Bent did you reach out to
25 counsel?

7 (Pages 22 - 25)

Jason Merritt
April 7, 2022

Volino, Dominick v. Progressive Casualty Insurance

Page 26

1    A.  I believe I reached out to Mr. Lowther's
2  firm pretty -- pretty quickly after I received
3  the notification from Mr. Bent.  I would say
4  within a day or two.
5    Q.  Okay.  And -- and did you speak to
6  somebody at the law firm at that time?
7    A.  I can't recall that.  I can't recall if
8  it was an email or a phone call.
9    Q.  Okay.  And did you receive a response
10  to --
11    A.   I did receive a response.  And to tell
12  you the exact timing, I cannot recall that.
13    Q.  Okay.  Can you tell me, generally, what
14  the response said?
15    A.  The response was just simply, hey,
16  we -- we do need some consultants; do you mind
17  sending your resumé.
18    Q.  Okay.  And then when you sent your
19  resumé, was it the same general resumé as is
20  Exhibit 2?
21    A.  I believe it is that exact resumé.
22    Q.  Okay.  And then how long after you sent
23  the resumé did you hear back from counsel?
24    A.  That I can't recall.  It was within
25  days, maybe within a week.

Page 27

1    Q.  Do you recall what year that was?
2    A.  Yeah.  That was -- that was in '22.
3    Q.  Okay.  And you had not yet been retained
4  at the time you sent your resumé initially,
5  correct?
6    A.  No.
7    Q.  Is that correct?
8    A.  Correct.
9    Q.  Okay.  Did you, at some point in time
10  before you were retained, have a conversation
11  with counsel regarding this case?
12    A.  That I don't recall.  As far as after I
13  sent the resumé, that I don't recall, speaking
14  about the case.
15    Q.  Okay.  Had you done any investigation
16  into the allegations of this case at the time you
17  reached out to counsel --
18    A.  No.
19    Q.  -- for the plaintiff?
20    A.  No.
21    Q.  Okay.  One thing just to clarify:
22  Because the court reporter's taking down our
23  words, it's really important that I not step on
24  your words and vice versa.  So let me finish my
25  question and then you can answer, and I'll let

Page 28

1  you finish your answer before I --
2    A.  Okay.
3    Q.  -- ask my next question.
4    A.  No problem.
5    Q.  Okay.  Do you recall the first meeting
6  you had with counsel for plaintiffs where you
7  discussed the substance of the allegations in
8  this case?
9    A.  The first I was told about this case
10  would have been a Zoom meeting, and that would be
11  probably right around the -- the February 15th
12  date.
13    Again, I'm not exactly re -- I can't
14  recall the exact date we spoke the first time
15  about it, but it was close to February.
16    Q.  Okay.  And you didn't do any work to
17  determine -- to develop your expert opinions and
18  conclusions in this matter prior to signing the
19  agreement on February 15th, --
20    A.  No.
21    Q.  -- 2022, --
22    A.  No.
23    Q.  -- correct?
24    A.  Correct.
25    Q.  Okay.  The first -- second paragraph --

Page 29

1  excuse me -- of the agreement, which is reflected
2  in Exhibit 5 begins, "Whereas the law firm is
3  litigating claims on behalf of insureds against,"
4  and it lists a number of Progressive entities.
5  Do you see that?
6    A.  Correct.  Yes.
7    Q.  What was your understanding at this
8  time about what the claims were being litigated
9  against the Progressive entities?
10    A.  The claims at that point, I believe,
11  were actual cash value -- variations in the
12  actual cash value prices.
13    Q.  Okay.  Anything else you understood at
14  that time about the allegations in the case?
15    A.  No.
16    Q.  Okay.  The next paragraph says,
17  "Whereas, contractor is a recognized authority on
18  the used automotive market, including inter alia
19  pricing techniques and inventory management
20  practices."
21    Do you see that?
22    A.  Yes, sir.
23    Q.  Do you consider yourself to be an expert
24  on the used automotive market?
25    A.  Yes.

8 (Pages 26 - 29)

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

---

Page 30

1    Q.   Do you consider yourself to be an expert
2  on the pricing techniques in the used automotive
3  market?
4    A.   I do.
5    Q.   Do you consider yourself to be an expert
6  on inventory management practices in the used
7  automotive market?
8    A.   I do.
9    Q.   Which authorities have recognized you
10 as an expert on pricing techniques in the used
11 automotive market?
12    A.   Authorities?  No courts or authorities.
13 Just through my experience and expertise.
14    Q.   Okay.  Well, the paragraph begins,
15 "whereas contractor is a recognized
16 authority ..."  Do you see that?
17    A.   Yes.
18    Q.   Which -- who's recognized you as an
19 authority on pricing techniques in the used
20 automotive market?
21    A.   Probably the Bureau of -- Bureau of
22 author -- appraisal -- the Bureau of Certified
23 Auto Appraisers is where I'm certified under, as
24 well as local dealerships, local entities that
25 I've sold vehicles for, priced vehicles for and

---

Page 31

1  done appraisals for.
2    Q.   Okay.  Any -- any other authority that's
3  recognized you as an expert on pricing techniques
4  for the used automotive market?
5    A.   Just the -- the different dealerships
6  that I've done that for; --
7    Q.   Okay.
8    A.   -- I was paid for that.
9    Q.   Okay.  And which dealerships have paid
10 you to provide expertise on pricing techniques?
11    A.   There's several local dealerships in
12 Maryland.  The Timbrook Automotive I actually
13 work for, I believe they own 13 dealerships.
14    Q.   Okay.  Anyone else?
15    A.   No.
16    Q.   Okay.  Which authorities have
17 recognized you as an expert on inventory
18 management practices in the used automotive
19 market?
20    A.   That would be that same Timbrook
21 Automotive Group.
22    Q.   Okay.  Anyone else?
23    A.   No.
24    Q.   Okay.  Looking at the -- it's the first
25 page of Exhibit 5, it states that your hourly

---

Page 32

1  rate is $650 an hour for this work; is that
2  correct?
3    A.   Correct.
4    Q.   And -- and Paragraph B.1.b. says that
5  you'll have a minimum of 10 hours billable; is
6  that correct?
7    A.   Correct.
8    Q.   How many hours have you billed to date?
9    A.   I think to date we only have five, six
10 hours.
11    Q.   Five to six hours total?
12    A.   Correct.
13    Q.   And does that include the one-hour Zoom
14 meeting to prepare for this deposition?
15    A.   Yes, it does.
16    Q.   Okay.  So is it fair -- that is -- does
17 that include transportation to come here?
18    A.   It does not include today.
19    Q.   Okay.  So would it be fair to say that
20 prior to -- strike that.
21        Would it be fair to say that up to the
22 time you prepared your expert report, you had
23 billed four to five hours?
24    A.   Total with the report and everything up
25 to today is total of about six hours maybe, so --

---

Page 33

1    Q.   What I -- what I'm trying to ask is how
2  much of those hours is up until the day of your
3  report being finished?
4    A.   To the day of report being finished, I
5  would say three to four hours.
6    Q.   Okay.  So you spent about three to four
7  hours' worth of work to get to the point where
8  you were able to finish your expert report in
9  this matter?
10    A.   Correct.
11    Q.   Okay.  Thank you.
12        And if you don't do any more work
13 in this matter, if we were to close -- close the
14 deposition right now, which we're not going to
15 unfortunately, you would still bill a total of
16 10 hours; is that right?
17    A.   According to this I can, yes.
18    Q.   And would you?
19    A.   Yes.
20    Q.   Okay.
21        THE WITNESS:  Sorry, Lee, but, yes, I
22 would.
23 BY MR. CASHDAN:
24    Q.   If you go to the next page, you see
25 at the bottom there's a paragraph that says,

---

9 (Pages 30 - 33)

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 34

1  "Confidentiality."  Do you see that?
2      A.  I do.
3      Q.  And the last sentence says,
4  "Contractor has review and signed the
5  confidentiality acknowledgement and affirmation
6  in the instant matter."  Do you see that?
7      A.  I do.
8      Q.  Have you executed a document that
9  confirms that you will abide by the protective
10 order in this case, subjecting yourself to the
11 jurisdiction of the Court for enforcement of the
12 protective order?
13     A.  That -- I would have to see that.  I'm
14 not sure if I did or not.
15         MR. CASHDAN:  Lee?
16         MR. LOWTHER:  Yes.  Yeah.  And we have
17 that in the file.
18         MR. CASHDAN:  Okay.  Can we get a copy
19 of that?
20         MR. LOWTHER:  Yes.
21         MR. CASHDAN:  Okay.  Thank you.
22         THE WITNESS:  That would be a
23 nondisclosure?
24 BY MR. CASHDAN:
25     Q.  No.  It would -- there's confidentiality

Page 35

1  obligations --
2      A.  Okay.
3      Q.  -- that you won't -- essentially, that
4  you won't disclose confidential information, but
5  there's other obligations there as well.
6      A.  Okay.  In my industry we call them
7  nondisclosures, so I didn't know if that's the
8  same.
9      Q.  It's -- it's be -- it goes a little bit
10 beyond that, yeah.
11     A.  Okay.
12     Q.  Have you ever advised a client, other
13 than in this case, adverse to Progressive?
14     A.  No.
15     Q.  Have you ever had a -- a client who
16 wanted you to provide an appraisal for an
17 insurance claim to present to Progressive?
18     A.  I would have to look through all of my
19 appraisals, but I don't pay attention to who the
20 insurance companies are.  I don't deal with the
21 insurance companies, only the client themselves.
22 So I don't -- I -- I can't recall who my clients
23 were insured by at all.
24     Q.  Okay.  I'd like to go now to Exhibit 2,
25 which is your resume.

Page 36

1          Did you attend college?
2      A.  I attended some college at Catonsville
3  Community College.  That was it.
4      Q.  Did you obtain a degree?
5      A.  No.
6      Q.  Okay.  For how many years did you attend
7  the community college?
8      A.  I attended Catonsville College only
9  while I was in the Maryland State Police Academy.
10     Q.  For how long was that?
11     A.  The Academy was six months' long.
12     Q.  Okay.
13     A.  They pack a lot of schooling in during
14 that six months.
15     Q.  Sure.
16         What was the subject matter you studied
17 at -- at the community college?
18     A.  It was all criminal law and basic law
19 enforcement.
20     Q.  Okay.  The first item on your resume is
21 Merritt's Alignment Service.  Do you see that?
22     A.  Yes, I do.
23     Q.  In connection with your work at
24 Merritt's Alignment Service, did you prepare any
25 appraisals for the valuation of vehicles?

Page 37

1      A.  Merritt's Alignment Service was my -- it
2  was a family owned business.  My father owned
3  that, was a mechanic all of his life.  So I was
4  very young when I was exposed to that, obviously,
5  it being a family business.  So we had bought and
6  sold cars my entire life, and that's pretty much
7  how we -- he made a living.  So I started
8  purchasing and selling cars probably when I was
9  the age of 12.  I snuck into auctions.
10     Q.  Did you prepare any appraisals for
11 motor vehicles in your job at Merr -- Merritt's
12 Alignment Service?
13     A.  As far as preparation of appraisals, no,
14 there would be not writ -- no written documents.
15 But I would appraise as I was purchasing all the
16 time and evaluate and set pricing and sales --
17     Q.  Okay.
18     A.  -- and so forth.
19     Q.  You spent quite a bit of time as a
20 member of the Maryland State Police Department --
21     A.  Yes, sir.
22     Q.  -- in various roles?
23     A.  Yes, sir.
24     Q.  Did you -- was -- were you responsible
25 during your time at the Maryland State Police for

10 (Pages 34 - 37)

Jason Merritt                                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 38

1  preparing appraisals for automobiles?
2     A.  Actually, it's kind of odd, yes, I did.
3  When I worked in the narcotics unit, I also
4  seized assets and vehicles from drug dealers.
5  So part of my portfolio was to evaluate and
6  appraise them for the court purposes for
7  seizures -- for asset seizures.
8     Q.  And in connection with that, did you
9  track down comparable vehicles and do condition
10 adjustments?
11    A.  No.  As far as using comparables, yes.
12       As far as tracking them down and using,
13 it -- it wasn't to the in depth that I do it on
14 an appraisal.
15    Q.  Okay.  You -- you produced to us some
16 forms of appraisals in Exhibit 6 and Exhibit 7 in
17 connection with this case.
18    A.  Correct.
19    Q.  Did you prepare any appraisals of that
20 type during your time on the Maryland State
21 Police Department?
22    A.  No.
23    Q.  Okay.  So fair to say that your main
24 job when you were with the Maryland State Police
25 Department was not to prepare appraisals of

Page 39

1  automobiles?
2     A.  Very fair.
3     Q.  Okay.  You left the -- the force in
4  2015; is that correct?
5     A.  Yes, I did.
6     Q.  And you worked at Merritt's Automotive
7  LLC; is that right?
8     A.  Correct.
9     Q.  During your time at Merritt's Automotive
10 LLC, were you involved in preparing appraisals of
11 automobiles?
12    A.  Yes, I was.
13    Q.  Did you prepare appraisals of the type
14 like Exhibits 6 and 7?
15    A.  No, I did not.
16       MR. LOWTHER:  Object to form.
17       MR. CASHDAN:  What's the objection?
18       MR. LOWTHER:  Vague.  "Of the type."
19 BY MR. CASHDAN:
20    Q.  Okay.  You can answer the question.
21    A.  Okay.  Not to that extent, but many
22 appraisals, and I did use comparables, and some
23 of them were more precise there, because they
24 were actually for sale and for customers.  But I
25 was not into the certified appraising where I had

Page 40

1  the template and was able to document it.
2     Q.  Okay.  At the time you worked at
3  Merritt's Automotive LLC, were you certified as
4  an appraiser from any independent organization?
5     A.  No.
6     Q.  Okay.  Is that also true at the time you
7  were in the Maryland State Police Department?
8     A.  Correct.
9     Q.  Okay.  In 2016 you joined the Timbrook
10 Automotive organization; is that correct?
11    A.  I did.
12    Q.  And -- and you mentioned earlier that
13 you worked at one of their dealerships, correct?
14    A.  Correct.
15    Q.  Was it a motorcycle dealership?
16    A.  I worked at the motorcycle dealership as
17 a manager, yes.
18    Q.  Okay.  And -- and in that role, were you
19 involved in the sale of automobiles?
20    A.  Yes.
21    Q.  And did you have a role appraising
22 automobiles in that role?
23    A.  That was my involvement with the other
24 automotive dealerships; was they would call me
25 for appraisals on trade-ins, purchased vehicles,

Page 41

1  all that, and any specialty vehicle.  Any vehicle
2  that was not able to be appraised or evaluated by
3  one of their in-house people I would be called.
4     Q.  And did you -- were you certified by
5  any -- any independent organization as an
6  appraiser at that time?
7     A.  No.
8     Q.  Okay.  It says you started working in
9  June 2019 for Present T3 Intelligence Services.
10 Do you see that?
11    A.  It's June 2019 through present, --
12    Q.  Excuse me.  I misread that.
13    A.  -- T3 Intelligence Service, one of my
14 companies.
15    Q.  Okay.  So -- so you still work T3
16 Intelligence Services?
17    A.  Yes.
18    Q.  And that is a security and private
19 investigation firm?
20    A.  Correct.
21    Q.  And in that job, do you do any
22 appraisals of automobiles?
23    A.  No.
24    Q.  Okay.  And it says you started working
25 in April 2020 at East Coast Auto Appraisers LLC;

11 (Pages 38 - 41)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 42

1  is that right?
2     A.  Correct.
3     Q.  And that's a company you own?
4     A.  Correct.
5     Q.  And it's in that job you do apprai --
6  appraisals of motor vehicles?
7     A.  Correct.
8     Q.  When did you obtain your certification
9  for appraisals?
10    A.  It looks like I obtained that on May
11  27th of 2020.
12    Q.  Okay.  So I wasn't sure if you had a
13  prior certification?
14    A.  No.
15    Q.  So the first time you became certified
16  as an appraiser from an independent organization
17  was May 27th, 2020?
18    A.  First time I had a certification from
19  any bureau was May 27th, 2020.
20    Q.  Okay.  And that's also -- strike that.
21       And East Coast Auto Appraisers LLC is
22  the first job you held where the purpose of the
23  job was to provide appraisers -- appraisals for
24  third parties?
25    A.  Yes.

Page 43

1     Q.  Okay.  How many people work at East
2  Coast Auto Appraisers LLC?
3     A.  Right now I have two other appraisal
4  -- appraisers.
5     Q.  Okay.  What are their names?
6     A.  Actually, three others.
7        Wes Reed, Chuck Vallance and Luke
8  Zewicker [phonetic].
9     Q.  Okay.  And what is the business of East
10  Coast Auto Appraisers, LLC?
11    A.  The business of that is auto appraising:
12  Actual cash value, diminished value, total loss,
13  loss of use, all in the vehicles.
14       (Merritt Exhibit No. 15, a printout of
15  the "About" section of East Coast Auto
16  Appraiser's website, was introduced.)
17  BY MR. CASHDAN:
18    Q.  Let me hand you what's been marked for
19  identification as Exhibit 15.
20       Take a moment to look at it and let me
21  know when you're ready.
22    A.  I am ready.
23    Q.  All right.  Is Exhibit 15 a true and
24  accurate printout of a portion of the website for
25  East Coast Auto Appraisers?

Page 44

1     A.  I believe so.
2     Q.  And if you go to the second page, this
3  is the section of the website that's entitled,
4  About Us, correct?
5     A.  Correct.
6     Q.  And it begins by saying, "East Coast
7  Auto Appraisers specializes in providing
8  independent and accurate appraisals of cars,
9  trucks, motorcycles, boats, RVs and other
10  motorized vehicles."  Do you see that?
11    A.  Yes.
12    Q.  And it says, "Owner Jason Merritt has
13  developed an array of professional skills over
14  the years which enables East Coast Auto
15  Appraisers to provide the most thorough and
16  accurate appraisals in the area."  Do you see
17  that?
18    A.  I do.
19    Q.  Now, in your view, does East Coast
20  Appraisers provide thorough and accurate
21  appraisals?
22    A.  I believe we do.
23       (Merritt Exhibit No. 16, a printout of
24  the "Our Services" section of East Coast Auto
25  Appraiser's website, was introduced.)

Page 45

1  BY MR. CASHDAN:
2     Q.  Let me hand what's been marked as
3  Exhibit 16.  Take a moment to review it and let
4  me know when you're ready.
5     A.  I am ready.
6     Q.  Do you recognize Exhibit 16 as a portion
7  of your company's website discussing the services
8  that the company provides?
9     A.  I do.
10    Q.  And there's a list of different types of
11  appraisals that runs the bottom of the first page
12  and all of the second page, correct?
13    A.  Correct.
14    Q.  And -- and does East Coast Auto
15  Appraisers provide all those different types of
16  appraisals?
17    A.  It's been a little while since I've gone
18  over my website, so I want to make sure.
19       Yes, I believe we still do.
20    Q.  Okay.  Do you personally provide all
21  those types of appraisals?
22    A.  Yes.
23       (Merritt Exhibit No. 17, a printout of
24  the "What is An Appraisal section of East Coast
25  Auto Appraiser's website, was introduced.)

12 (Pages 42 - 45)

Page 46

1  BY MR. CASHDAN:
2      Q.  Okay.  Let me hand you what's been
3  marked as Exhibit 17.  Do you recognize Exhibit
4  17?
5      A.  Yes.
6      Q.  What is Exhibit 17?
7      A.  Another excerpt from our website.
8      Q.  And this is the section on your website
9  entitled, "What Is An Appraisal," correct.
10     A.  Yes.
11     Q.  Who wrote this?
12     A.  I do not know.
13     Q.  Okay.  It begins by saying, "What
14  exactly is an appraisal."  Do you see that?
15     A.  I do.
16     Q.  And the first sentence says, "East Coast
17  Auto Appraisers follows a detailed, comprehensive
18  process when conducting an appraisal."  Do you
19  see that?
20     A.  I do.
21     Q.  And is that true?
22     A.  Yes.
23     Q.  What do you mean by a "Detailed,
24  comprehensive process for conducting appraisal"?
25     A.  Follow our methodology of each step of

Page 47

1  the appraisal.
2      Q.  What is that methodology?
3      A.  Methodology would be -- I'd have to
4  refer to my templates -- but I use a comparable.
5  I use multiple comparables.  Vehicle -- depends
6  on the vehicle that I'm appraising and the exact
7  appraisal that I'm doing as far as what my
8  methodology is.
9      Q.  What makes it comprehensive?
10     A.  Comprehensive, in my mind, would mean
11  step by step and detailed.
12     Q.  What do you mean by "detailed"?
13     A.  Down to options, mileage, color.  You
14  know, some vehicles, the value of it may not be
15  listed as far as color, but some vehicles have,
16  you know, a higher cost just because of the color
17  and the values may be more because of the color;
18  the different options in a vehicle.  I -- I take
19  time to -- to look at the vehicle's condition,
20  the -- as far as the use of the vehicle, even
21  down to minor details as far as any paint
22  repairs, any replacements of body panels.  There
23  may not be an accident history on Carfax, but I
24  can view the vehicle to see if there's been any
25  prior repairs or bodywork.  I try to make it as

Page 48

1  comprehensive as I can.
2      Q.  Do you typically see the actual vehicle?
3      A.  I typically do, yes.
4          COVID has, obviously, changed that a
5  little bit, but my preference is to actually see
6  the vehicle and have interaction with the
7  vehicle.
8      Q.  The -- the last sentence on the
9  first page that runs over to the second says,
10  "Other factors, depending on the purpose of the
11  appraisal, may include an assessment of the areas
12  of supply and demand of the specific make and
13  model of the vehicle."  Do you see that?
14     A.  Yes.
15     Q.  Do you, in fact, do a -- an assessment
16  of the areas of supply and demand of the specific
17  make and model of the vehicle in connection with
18  certain detailed and comprehensive appraisals?
19     A.  Yes, I do.
20     Q.  And how do you do that?
21     A.  Well, that could be just through
22  looking at comprehen -- or at comparables.  I'm
23  sorry.  Looking at comparables, and are there any
24  comparables in that area.  Are there any
25  available for sale in that area.  If there are,

Page 49

1  obviously, the market is heavier in that area so
2  the value may not be as much as a vehicle that is
3  more rare or more difficult to locate.
4      Q.  Can you just take one appraisal and then
5  use it for every other car you appraise?
6      A.  No.
7      Q.  Why not?
8      A.  I use it as a template, but each car is
9  different.  A 1999 Chevy pickup truck is going to
10  be completely different than a 2020 Dodge Ram.
11     Q.  Okay.  Is every 2020 Dodge Ram going to
12  be the same?
13     A.  No.
14     Q.  Why not?
15     A.  Again, different options, different
16  variables in the engine, the horsepower, the
17  drive train.  Could be the rear-end ratio could
18  be totally different.  You could have 4.10 gears
19  in the back of a -- a Dodge.  You could have
20  3.83s in the back of a Dodge, depending on what
21  you're doing with it.  You could be towing a
22  trailer.  A three -- three-quarter ton truck
23  could be many variations.  A three-quarter ton
24  truck is normally a heavier-duty vehicle -- mid
25  to heavy.  However, again, it could be four-wheel

13 (Pages 46 - 49)

Jason Merritt                                            April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 50

1 drive, it could be something used to pull a
2 trailer, or it could be something used to plow a
3 driveway with or plow a parking lot. So the uses
4 and variations in that three-quarter ton Dodge
5 20 -- 2020 vehicle could be different from
6 another one.
7     Q.  Does -- does it change over time, too,
8 in terms of how you appraise a vehicle?
9     A.  Absolutely.
10    Q.  Do you have to take into account was
11 it in what year -- what year the appraisal is
12 happening?
13    A.  Yes.
14    Q.  Does that affect the supply and demand
15 aspects of the market --
16    A.  Yes.
17    Q.  -- that you referenced?
18    A.  It does.
19    Q.  So when you say "detailed," is it your
20 practice to take into account the individualized
21 factors of each vehicle in appraising its value?
22    A.  I do.
23    Q.  Is that the best way to do an appraisal?
24    A.  I believe so.
25 ///

Page 51

1         (Merritt Exhibit No. 18, a printout of
2 the "Diminished Value Page" section of East Coast
3 Auto Appraiser's website, was introduced.)
4 BY MR. CASHDAN:
5     Q.  Let me hand you what's been marked for
6 identification as Exhibit 18.
7         Have you seen this before?
8     A.  Yes.
9     Q.  What is Exhibit 18?
10    A.  It is one of the pages from our
11 Diminished Value Page on our website.
12    Q.  Okay.  So this is another tab on
13 your -- your website -- your company's website?
14    A.  Correct.
15    Q.  Okay.  And this is providing a couple of
16 case studies for appraisals of vehicles, correct?
17    A.  Correct.
18    Q.  The first case study that's attributed
19 to Ben Z. from Hudson, New York, --
20       Do you see that one?
21    A.  I do.
22    Q.  -- involves a 1992 Toyota MR2.
23    A.  I do remember that one.
24    Q.  And it indicates that it was a total
25 loss, correct?

Page 52

1     A.  Correct.
2     Q.  And it says, "East Coast Auto did a
3 thorough analysis and, after extensive research,
4 established a comprehensive value for the car."
5 Do you see that?
6     A.  I do.
7     Q.  Why did you do a "thorough analysis"?
8     A.  The reason I did a thorough analysis is
9 because it was a very difficult vehicle.  1992
10 MR2s were very rare and very limited in the U.S.
11 in 1992.  You can find multiple 1991 Toyota MR --
12 MR2s that are the same body style.  So they
13 were offered $5,900 for the nine -- in the used
14 comparables of 1991 Toyota MR2s.  This, however,
15 was a 1992 and had a four-speed with a sunroof.
16 There was less than 15 imported in the U.S. in
17 1992, so it was a very rare car.  I tracked down,
18 did all kinds of studies through Toyota, through
19 the Toyota Collector's Association, through some
20 enthusiast groups, to track down the history of
21 the vehicle, to find out how many were still in
22 existence.  We figured less than six in
23 existence.
24    Q.  Wow.
25    A.  So it was very comprehensive.  It took

Page 53

1 me a long time.  And the $5,900 that was offered
2 for the vehicle was extremely low.
3     Q.  How long did it take you to do this
4 thorough analysis?
5     A.  About two weeks.
6     Q.  Is that longer than typical?
7     A.  Typical, yes.  Yes.
8     Q.  How long, typically, does --
9     A.  Typically a -- an average appra --
10    Q.  -- an average appraisal take?
11    A.  I'm sorry.  I did over -- average
12 appraisal will usually take me a couple days.
13    Q.  So still a significant amount of time?
14    A.  It is.
15    Q.  It's not something you can do in
16 20 minutes?
17    A.  No.
18    Q.  And in this particular instance
19 involving Ben Z's 1992 Toyota MR2, you had to
20 take into account a number of individualized
21 factors to properly value the vehicle; is that
22 right?
23    A.  I did.
24    Q.  Is that always the case?  Do you always
25 have to take individual factors into account when

14 (Pages 50 - 53)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 54

1  you value a vehicle?
2      A.  I can't say that broadly, because it
3  depends on the vehicle.
4      Q.  Well, for every vehicle, you need to
5  take into account the individual characteristics
6  of that vehicle --
7      A.  Correct.
8      Q.  -- for valuing it; is that right?
9      A.  Correct.
10     Q.  So in every instance you have to take
11 some individualized factors into account,
12 correct?
13     A.  Every appraisal.  Yes, that is safe to
14 say.
15     Q.  Okay.  You've never done an appraisal
16 where you ignored the individual characteristics
17 of the vehicle, have you?
18     A.  No.  Again, COVID made things a little
19 different.  You know, some appraisals were done
20 not into that comprehensive in depth because I
21 couldn't go to see it, and I'm not really
22 comfortable with a real comprehensive appraisal
23 without being able to be there.
24     Q.  But even during COVID, you did your best
25 to take into account the individualized factors

Page 55

1  relating to a particular vehicle for purposes of
2  appraisal, correct.
3      A.  Absolutely.
4      Q.  Okay.  Let's go ahead and turn to
5  Exhibit 6.
6          You can put these to the side.  We're
7  not going to go over those anymore.
8          What is Exhibit 6?
9      A.  Exhibit 6 is, kind of, a general actual
10 cash value template that I will start with,
11 mainly because of the -- the fonts and the way
12 the pages are set up.  And a lot of the
13 information in there is just, kind of, my
14 boilermaker template that I would start with.
15     Q.  Is this the template you currently use
16 at East Coast Auto Appraisers?
17     A.  That is probably the one that I
18 originally started with.  That is the original
19 main template, yes.
20     Q.  Okay.  You -- you currently still use
21 this as a template?
22     A.  Yes.
23     Q.  Okay.
24     A.  Again, it's the -- the way it's set up
25 with my lining and the text and all is what I

Page 56

1  use.
2      Q.  Okay.  If you go to the second page,
3  for Appraisal Type it says "Restricted Use
4  Appraisal."  Do you see that?
5      A.  I do.
6      Q.  What is a "Restricted Use Appraisal"?
7      A.  In other words, I'm using it for fair
8  market value, actual cash value.  That's --
9  that's the use of this appraisal.
10     Q.  Okay.  And the appraisal method and
11 technique used, it says Sales Comparison
12 Approach.  Do you see that?
13     A.  I do.
14     Q.  Is that the comparable vehicle approach
15 you discuss in your expert report?
16     A.  It is.
17     Q.  Okay.  It's just another name for the
18 same thing?
19     A.  Correct.
20     Q.  Are there other types of appraisal
21 methods you might use in a typical appraisal for
22 a vehicle?
23     A.  Normally, apprai -- the -- my approach
24 normally is comparison.
25     Q.  Okay.  There's a -- a paragraph that

Page 57

1  says, "IACP Certified Actual Cash Value
2  Appraisal."  Do you see that?
3      A.  I do.
4      Q.  And it begins by saying, "The vehicle is
5  rated to be in above-average condition for year,
6  make, model and mileage."  Do you see that?
7      A.  I do.
8      Q.  And then you discuss the condition of
9  the exterior, the interior and a whole host of
10 aspects of the vehicle, correct?
11     A.  Correct.
12     Q.  How do you conduct the rating of the
13 condition of the vehicle for purposes of these
14 appraisals?
15     A.  Again, that -- that first sentence
16 is kind of like a -- an evidentiary finding, I
17 guess you could say.  I would say I used all the
18 conditions below that first paragraph.  What
19 this template doesn't show is it could go into
20 multiple other paragraphs.  So my first sentence
21 is just, kind of, a -- a wrap-up of all the other
22 conditions that I bring into factor.
23     Q.  And is this just based on whatever
24 representation the customer has provided to you?
25     A.  Yes.

15 (Pages 54 - 57)

Jason Merritt                                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 58

1    Q.   What I mean is, the customer says, "my
2  vehicle is in excellent condition."  Do you just
3  take that at face value?
4    A.   Oh, no.
5    Q.   Okay.  So it's not based just on
6  whatever the customer represents to you.
7    A.   Well, when I say that, the customer
8  represents the vehicle to me, so --
9    Q.   Okay.  I was unclear, and I apologize.
10         Do you base your condition rating on the
11 customer's statements to you about the condition
12 of his or her vehicle?
13   A.   I take that into account, because
14 I actually do a history on the vehicle.  So
15 sometimes I will rely on the customer to provide
16 me historical details.  It depends on the
17 vehicle.  I believe this was -- I don't -- it
18 looks like a older vehicle.  So I will do
19 -- yeah, it looks like '65 Corvette is what the
20 template is.  So a '65 Corvette, obviously, I
21 will do a complete historical analysis.  I'll
22 even call past owners, prior owners.
23   Q.   Why?
24   A.   To get the full history of the vehicle:
25 How many owners in the past; how many people

Page 59

1  owned it; what it was used for; if it has been
2  painted in the past and wrecked in the past.  His
3  grandfather owned it, kept it in a garage.  I try
4  to verify mileage.  I try to verify options.  A
5  1965 Corvette, you translate the VIN and you
6  come up with different options, different
7  horsepowers, different drivetrains, so I try to
8  verify that if it doesn't give me that in the
9  VIN.  So -- but I will rely on some of the
10 customer's historical lineage that they can
11 give me.
12   Q.   So you'll do a whole investigation of
13 the vehicle?
14   A.   I'm a cop, so that's kind of -- I do an
15 investigative approach, as well as my comparison
16 is an investigation.
17   Q.   And you -- and you have found that that
18 is the best way, in your practice, to provide a
19 detailed and comprehensive appraisal?
20   A.   I believe it gives me a very
21 comprehensive appraisal.  May not be the best for
22 time wise, you know.  I'm probably putting a lot
23 more time in it than what someone else would do.
24 But at the end of my appraisal, I am very
25 confident and I know that number is a good

Page 60

1  number.
2    Q.   Okay.  At the -- the last sentence
3  of that paragraph we were discussing says,
4  "Condition adjustments were made, if any, and
5  taken into consideration."  Do you see that?
6    A.   Yes.
7    Q.   How do you decide how to take condition
8  adjustments into consideration in terms of dollar
9  impact?
10   A.   Dollar impact?  The conditions would
11 be -- there's a whole large amount of conditions
12 that can be taken into consideration.  What I
13 would normally do on just -- let's use the 2020
14 Dodge Ram as an example.  If it seems like
15 everything and appears that the seats are in good
16 shape, the carpet in good shape, no prior damage,
17 just the standard vehicle without any issues,
18 there's no adjustment in condition then.
19        If you go in there and there's damage
20 on the vehicle, but you see prior damage from a
21 prior accident maybe that was never reported, so
22 there's diminished there.  If you go in there
23 and there is a big thing of hair dye dumped on
24 the floor, you know, well, I take that into
25 consideration because the carpet may cost

Page 61

1  $450 to replace.  So that is a real
2  consideration.
3    Q.   And -- and how do you -- strike that.
4        Once you have evaluated the condition
5  of the vehicle comprehensively and you need to
6  decide by how much to reduce the value of the
7  vehicle because it's not in average condition,
8  what steps do you take to assign a dollar value
9  to the adjustment --
10   A.   It could be actual dollar amount of what
11 it would cost to replace that carpet.  It could
12 be that.  I will take into consideration the
13 labor and the parts, just like I did at the
14 dealership.  When I would evaluate a 2020 Dodge
15 Ram, if we brought it in, I would say, okay,
16 here's what this vehicle is worth.  It is worth
17 $20,000, just -- probably more than that, but
18 just a round number; however, it needs, this,
19 this and this, which is going to cost $1,500.
20 So that reduces the value of that vehicle by
21 $1,500.
22   Q.   Okay.  Let's say, for example, there's a
23 couple scratches in the paint.  If you were going
24 to adjust for condition based on that, would it
25 be the cost to repair the scratches or just the

16 (Pages 58 - 61)

Jason Merritt                                        April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 62

1  diminished value of the vehicle because of the
2  scratches?
3      A.  Normally it would be the -- the -- the
4  cost of the repairs.
5      Q.  Okay.  And how do you determine at any
6  given point in time the cost of the repairs?
7      A.  It depends on what the repairs are.  I
8  could look up the price and the -- the labor,
9  or I can call a body shop and ask them for
10  refinishing of this panel.
11      Q.  So sometimes you'll actually reach out
12  to body shops --
13      A.  Oh, yes.
14      Q.  -- to get the information you need to
15  make the condition adjustments for an individual
16  vehicle?
17      A.  Correct.
18      Q.  Okay.  It looks like -- in this
19  template, it indicates three comparable vehicles.
20  But, in any event, as part of your normal process
21  you look for some number of comparable vehicles,
22  correct?
23      A.  Correct.
24      Q.  This says, "Total of three compar --
25  comparable vehicles were located within a

Page 63

1  thousand-plus mile radius of stated principal
2  garage."  Do you see that?
3      A.  I do.
4      Q.  Is the thousand-mile-plus radius
5  typical?
6      A.  No.
7      Q.  Is it going to vary based on the
8  availability of comparable vehicles?
9      A.  Normally, I would never use a thousand
10  miles unless it's a very -- like the MR2.  I
11  think that MR2 I had to go nationwide to find
12  something in the U.S.  But normally I would use
13  25 to a hundred miles.
14      Q.  But -- but as I understand it, you'll
15  continue to expand that radius as necessary to
16  find comparable vehicles?
17      A.  I try not to.  Again, sometimes I'm
18  forced to on some rare vehicles.  But, like, a
19  2020 Dodge Ram, no.
20      Q.  But you'll continue to move outward from
21  wherever the vehicle is principally garaged until
22  the minimum industry-accepted standard of two or
23  more comparable vehicles has been identified,
24  correct?
25      A.  Sometimes I will have to.  If I do that,

Page 64

1  I try to limit my, maybe not mileage, but I will
2  also go with, I know this sounds crazy, but
3  terrain.  Is the vehicle -- as you know, New York
4  City, Washington, D.C., the vehicles are more
5  abused there than, say, Cumberland.
6          So if I have to go outside of Cumberland
7  and outside of a hundred mile radius, I will try
8  to find locations that are comparable to
9  Cumberland, Maryland.
10      Q.  So you'll take into account the
11  individualized factor of where the vehicle is
12  being used --
13      A.  Correct.
14      Q.  -- to find a -- an area that -- that
15  simulates the condition?
16      A.  Yes.
17      Q.  And it's going to vary based on vehicle?
18      A.  Correct.  Like I said, I -- if I'm
19  looking for a 2020 Dodge Ram, most likely, I
20  don't have to go far.  Most later-model vehicles
21  you don't have to go far.
22      Q.  But -- but if somebody contacted you
23  from New York City and they wanted an appraisal
24  of the vehicle, --
25      A.  Mm-hmm.

Page 65

1      Q.  -- you'd want to find vehicles that
2  operated in a city-like setting rather than
3  rural?
4      A.  Correct.  If someone from New York
5  City called me, I would look in New York City.
6  I probably wouldn't even go beyond New York City.
7  If I couldn't find that, then next thing I would
8  probably go to Washington, D.C., and look for
9  that.
10      Q.  If somebody had a vehicle in New York
11  City, you wouldn't go to rural Upstate New York?
12      A.  No.
13      Q.  So you have to take that individual
14  factor into account?
15      A.  Correct.
16      Q.  Okay.  And into account for purposes of
17  appraising the value of the vehicle?
18      A.  Correct.
19      Q.  Okay.  If you go down, there's a box
20  that says "Comparable Breakdown."  Do you see
21  that?
22      A.  Yes.
23      Q.  And one of the things it says, "List
24  versus Take Adjustment."
25      A.  Yes.

17 (Pages 62 - 65)

Jason Merritt                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 66

1  Q.  What is that?
2  A.  List verse Take Adjustment would be --
3  I don't normally ever use this unless I have a
4  specific antique car or older car that I will
5  call the seller, and that normally would only
6  take place when I'm dealing with private sales:
7  Facebook, eBay, any of those online places where
8  I see a 1957 Chevy Bel Air.  I saw one for sale,
9  so I just called the guy and told him what I'm
10 doing:  "I'm doing appraisals.  I saw you have a
11 '57 Chevy Bel Air for sale.  Did you sell it?
12 Yes, I sold it.  Do you mind me asking what you
13 got for it?"  Well, I was using him as a
14 comparable, and I found out that he listed
15 it for $25,000 but sold it for 26.
16 Q.  You want to get the accurate
17 information --
18 A.  Correct.
19 Q.  -- about what the market valued that
20 vehicle rather than what the seller hoped
21 to -- to get for the vehicle, correct?
22 A.  On private sales, yes.
23 Q.  Okay.  And that's why you will
24 sometimes, when you think it's appropriate, make
25 a -- an adjustment for the list price versus the

Page 67

1  actual sold price, correct?
2  A.  I think I've done that on that one
3  occasion, and that's really -- it's in the
4  template, and that's the reason I leave it in the
5  template is for that and just to show that I have
6  checked into that.
7  Q.  Okay.  Let -- let's -- going down to the
8  bottom of this template, all right, there's three
9  vehicles listed as comparables, correct?
10 A.  Correct.
11 Q.  Hypothetically, if for one of those
12 vehicles -- well, strike that.
13     I'll do it later.  I -- we'll -- when we
14 have actual dollar amounts, let me -- I'll come
15 back to that.
16     In the middle of the document it says
17 Fair -- on that page, it's "Fair Market Value of
18 Your Auto."  Do you see that?
19 A.  Correct.
20 Q.  And it says "Formula and market quotes
21 average weighted by 2.0."  Do you see that?
22 A.  Yes.
23 Q.  What does the "weighting" mean?
24 A.  That would be the "divided by," really.
25 Q.  Why is it divided by 2.0?

Page 68

1  A.  That was when there was only two
2  comparables there.  Again, this is just a
3  template.  That -- I would -- I would fix all
4  of that as I do my actual --
5  Q.  Okay.  So this is -- this is saying
6  that you take the comparables, you figure out the
7  average price of the comparables; is that right?
8  A.  The average price of the comparables
9  and then with my current lo -- the conditions,
10 whatever I move down for commissions -- or
11 conditions, mileage, adjustments, stuff like
12 that.
13 Q.  Okay.  Let's go to the next page.
14 There's a section that says, "the appraisal
15 methodology," do you see that?
16 A.  Yes, I do.
17 Q.  And the third paragraph says, "The first
18 part of our industry-recognized methodology is
19 that we review several nationally recognized
20 valuation guides in determining what the fair
21 market value of the vehicle in scope is worth
22 before we contact local dealers and private
23 sellers."  Do you see that?
24 A.  I do.
25 Q.  Which guides do you tend to consult?

Page 69

1  A.  I wrote down here on the last paragraph
2  we use NADA.  I'll use Kelley Blue Book, Auto
3  Trader, Carfax.  Bumper is a new one.  I use a
4  lot of those different ones just to see where
5  they're all falling and where they're all from at
6  that zip -- zip code, and then that's where I go
7  from there.
8  Q.  So for a particular vehicle, do all of
9  those sources of estimating value come up with
10 the precisely same dollar amount for a single
11 vehicle?
12 A.  No.
13 Q.  Does that concern you that they don't
14 have a single dollar amount for the vehicle?
15 A.  I wish they did.  That would make things
16 a lot easier, but, no, they do not.
17 Q.  Why don't they?
18 A.  I don't know what their -- I don't know
19 what their algorithms or what their -- their uses
20 are.  I don't even know where their data comes
21 from.
22 Q.  But it's your experience that all those
23 different guides for a particular vehicle on a
24 particular day at a particular time will have
25 different values?

18 (Pages 66 - 69)

Jason Merritt                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 70

1    A.  They do.
2    Q.  And your job as an appraiser is to use
3  your expertise, looking at the individualized
4  factors for that vehicle at that time, and
5  estimate the value, correct?
6    A.  I take my investigative experience and
7  I mix that with my enthusiastic following of
8  vehicles and my experience of dealing with so
9  many vehicles throughout my entire life, and
10  that's what I combine, all of that knowledge and
11  expertise with, as well as the youth of -- use of
12  all these different internet databases.
13    Q.  And, in the end, your appraisal is your
14  opinion --
15    A.  Yes.
16    Q.  -- based on those factors, correct?
17    A.  I like to think it's probably the best
18  opinion.
19    Q.  But am I correct that it's an opinion,
20  not fact?
21    A.  It is, without a doubt, an opinion.
22    Q.  Okay.  And am I correct that,
23  hypothetically, if we had all the people in your
24  office do an appraisal on the same vehicle at the
25  same time, independently, it's possible you might

Page 71

1  come up with different numbers, different values?
2    A.  I would say that is fair.  I've had
3  other appraisals [sic] call me over appraisals
4  that I've done and ask for how I determined
5  that and come up with a -- number, and we've
6  discussed that, so I've had conversations.  But,
7  yes, when you're dealing with opinions, everyone
8  has one.
9    Q.  And -- and just because multiple
10  appraisers appraising the same vehicle at
11  the same time would come up with a different
12  estimated value, it doesn't mean any one in
13  particular is wrong, does it?
14    A.  I like to think there is, yes.
15    Q.  I guess what I'm asking is, would
16  you agree with me that in appraising vehicles,
17  there's a range that might be accurate, and, if
18  you're within that range, then it's a fair and
19  reasonable appraisal?
20    A.  Within a range, yes.
21    Q.  Not a single dollar amount, but a range
22  would be appropriate?
23    A.  I would say, yes.  You -- I -- you would
24  have a hard time getting everyone to come up to a
25  single dollar amount.

Page 72

1    Q.  That's my point.
2    A.  Correct.
3    Q.  Okay.
4    A.  But within variation is reasonable.
5    Q.  And you agree with that?
6    A.  Correct.
7    Q.  You're going to experience -- in --
8  in applying the judgment necessary to appraise
9  a vehicle, using this very detailed and
10  comprehensive methodology that you apply, there
11  will be differences in the outcome and that can
12  be reasonable as long as the methodology that's
13  been used is appropriate?
14    A.  If I use the MR2 as an example, the
15  insurance company called me back and wanted to
16  argue over that -- that vehicle, and they came up
17  with the $5,900.  Again, we -- we're dealing with
18  a very small-priced vehicle.  But they wanted to
19  settle out at half price between my agreement and
20  there's, and I said, "Absolutely not.  I -- I
21  will not agree to anything other than the number
22  I came up with."  And they said, "well, how'd you
23  come up with that number?"  And I said, "Well,
24  comprehensive investigation."  And she said,
25  "Well, there's no 1992 MR2s to compare it to."

Page 73

1  I said, "Exactly."  So she said, "Well, then how
2  did you come up with your number?"  I said, "How
3  did you come up with your number?"  And we argued
4  back and forth and she came back and said, "Well,
5  I called my supervisors, they looked at it and
6  they said how about 10,000?"  I said, "No, the
7  $11,900 is where that vehicle is worth."  And
8  they came back another couple days later and
9  said, "You're right.  We're going to sign off on
10  it."
11    Q.  Sure.  But if another appraiser
12  had called you up and said, "We've done a
13  comprehensive analysis of that same vehicle and
14  we think it's actually $11,700."
15    A.  If it was $200 off, I would probably
16  agree.
17    Q.  And if somebody had called you up
18  and said, "It's actually $12,100," would your
19  reaction have been, "Well, that's wrong"?
20    A.  Again, if it's within a couple bucks
21  here or there, I will agree to it.
22    Q.  Okay.  And -- and that's true of every
23  vehicle, correct?
24        MR. LOWTHER:  Object to form.
25        THE WITNESS:  Again, a couple

19 (Pages 70 - 73)

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 74

1  dollars here or there. I'm talking only a couple
2  dollars. And to say "every vehicle," I -- I
3  can't say every vehicle.
4  BY MR. CASHDAN:
5      Q. Well, you think there are some
6  vehicles, when they're appraised by professional
7  appraisers, everyone should come up with the same
8  to-the-dollar estimate?
9      A. Oh, I don't think that's possible.
10     Q. Okay. So would you agree with me that,
11 for every vehicle, if an appropriate appraisal is
12 being done, there can be a range of values that
13 are fair and reasonable estimates of the value of
14 the vehicle?
15     A. State that again for me.
16     Q. Yes.
17        For every vehicle, if a -- if an
18 accurate appraisal has been done, the end
19 result can be a range of values for the vehicle?
20     A. Before I would say yes to that I would
21 really need to know the range of it.
22     Q. I understand that -- that -- that --
23 that the -- the range would have to be within
24 some amount that you think is appropriate, but do
25 you agree with me that the end result would be a

Page 75

1  range and not a single dollar amount?
2      A. Correct. That would be a correct
3  statement. And, again, the vehicle depend -- it
4  depends on the vehicle. A Toyota MR2 is the only
5  one I'll use as an example because it's so rare,
6  so the comparables were so difficult to come up
7  with. So if you -- if they would have come back
8  -- in my mind, when -- when you said 200, that's
9  exactly what my number was; however, on a 2020
10 Dodge, we would have to be very close. I'd say
11 $50 here or there.
12     Q. In your experience, do the NADA guide,
13 the Kelley Blue Book and other valuation guides
14 all come within $50 of valuing a vehicle?
15     A. No.
16     Q. They can be off by much more than that,
17 correct?
18     A. Correct. Yes.
19     Q. And in your view, therefore, are some of
20 those guides inaccurate?
21     A. I can't say inaccurate, because I don't
22 know what variables they're using. You know, if
23 they're using a very broad stroke of nationwide
24 prices, they're using nationwide prices. I'm
25 using specific, you know, areas of value.

Page 76

1      Q. Okay. And for -- for private sellers,
2  your view is that you have to contact them to
3  figure out how much they actually sold the
4  vehicle for versus what they listed the -- the
5  vehicle for, correct?
6      A. No. No. I don't normally do that.
7      Q. Okay. Well, go to the third page of
8  Exhibit 6, please.
9         Do you see the paragraph that says,
10 "Why Contact Private Sellers"? Do you see that?
11     A. Yes.
12     Q. And it says in the second sentence,
13 "Private sellers have been statistically proven
14 to take a greater loss on the fair market value
15 of the auto needing to move it quickly. If this
16 statement is not true, how many people have you
17 encountered that have sold their automobile for
18 the original asking price." Do you see that?
19     A. Yes.
20     Q. Is that accurate?
21     A. I would say the blanket statement is
22 accurate, but I am learning over the last year
23 that is changing significantly.
24     Q. Before the last year, was it accurate?
25     A. It was generally accurate, but, again,

Page 77

1  contacting private sellers would have been just
2  looking at their advertised prices. You know, we
3  have Facebook Marketplace, eBay and stuff like
4  that.
5      Q. So before the last year it would have
6  been generally accurate to say that private
7  sellers take a greater loss on their market value
8  of their automobile and sell the automobile for
9  less than the asking price, correct?
10     A. Correct. And there's several statements
11 that -- that I take that into account. You know,
12 they don't have warranties; they don't have
13 detailing; they don't have inspections, they
14 don't have history; they don't -- you know. So
15 private sellers will take less than market value
16 on some of them because they don't have all of
17 that.
18     Q. And they'll take less than they're
19 asking for the vehicle, correct?
20     A. Well, again, that -- I've run into some
21 where a '57 Chevy took more than ask -- asking
22 price, and occasionally you'll find some that do
23 take less, yes.
24     Q. Generally, prior to this year, that was
25 your experience, that private sellers would be

20 (Pages 74 - 77)

Page 78

1 willing to take less than the original asking
2 price?
3    A.  I honestly can't say that.
4    Q.  Well, didn't you say that in this
5 document --
6    A.  Yes.
7    Q.  -- we're looking at?
8    A.  Yes.
9    Q.  This is the document you use as a
10 template for the detailed and comprehensive
11 appraisals you performed, correct?
12    A.  Yes.  But I'm just saying you can't say
13 a general statement that all of them take less,
14 but, generally, they do.
15    Q.  Thank you.
16        Now, with regard to the research
17 valuation guides, the last paragraph on the page
18 we're looking at says that it's a good starting
19 point to determine -- strike that.
20        In the last paragraph on that page with
21 regard to research valuation guides, you say in
22 the second sentence that, "Research starting
23 guides are a good starting point to determine
24 if a buyer or seller should buy or sell a vehicle
25 more or less than what it is worth or vice

Page 79

1 versa."  Do you see that?
2    A.  Correct.
3    Q.  Why would a buyer or a seller buy or
4 sell a vehicle for more or less than it is worth?
5    A.  More or less?  Less, obviously, would be
6 conditions: Mileage, color.  You know a '20 Dodge
7 Ram, a black one, obviously, would probably be
8 worth every bit of its market value.  You throw
9 in a canary yellow one, you know, it may not be
10 as valuable.  More than?  Again, market value on
11 a 2021 Stingray right now is $110,000, when the
12 MSRP is 83.
13    Q.  So when you say, "more or less than
14 what it is worth," you're talking about what
15 it's worth --
16    A.  Referring to these --
17    Q.  -- in -- in average condition based on
18 the guides?
19    A.  When I say -- yeah.  The guides only
20 give you, like, NADA, Kelley Blue Book.  They're
21 not asking you for vehicle history, all of that.
22    Q.  And they don't actually -- strike that.
23        The guides tell you to take condition
24 into account but don't actually do it for you?
25    A.  I -- I consider them only a guide.

Page 80

1    Q.  Okay.  And -- and so when you say that
2 people would -- "buyers and sellers should buy or
3 sell a vehicle for more or less than what it is
4 worth," you don't mean what the vehicle is
5 actually worth.  You mean what the guides --
6    A.  Correct.
7    Q.  -- have suggested is the retail market
8 value?
9    A.  Correct.  When I'm talking worth, I'm
10 talking about what these different corporations,
11 through their websites, say.
12    Q.  So -- so in your experience, you have to
13 make adjustments to whatever the guide suggests
14 the value of a vehicle is based on the actual
15 individual characteristics of the vehicle?
16    A.  Correct.
17    Q.  Okay.  If you go to the next page
18 of this Document Number 6, this has some
19 definitions, correct?
20    A.  Yes.
21    Q.  And -- and the third definition is for
22 the term fair market value.  Do you see that?
23    A.  I do.
24    Q.  And can you read the last sentence out
25 loud of that section, please?  It begins "market

Page 81

1 value."
2    A.  It means that --
3    Q.  Can you read it out loud?
4    A.  You said do read it out loud?
5    Q.  Yes.  Read it out loud.
6    A.  Okay.  Market value is generally
7 established, if possible, based on sales of
8 similar property in the same locality.
9    Q.  And is that your understanding of
10 the -- the best way to establish the market value
11 of comparables in the area?
12    A.  Yes.
13    Q.  Okay.  If you can go to the last
14 -- strike that.
15        Go -- go to the third-to-last page of
16 Exhibit 6.  It's -- sorry.  Fourth-to-last page.
17 It has at the top Certification of Credibility.
18    A.  Okay.
19    Q.  Okay.  Do you see that?
20    A.  Yes.
21    Q.  All right.  What is this page?
22    A.  Again, this was part of the template,
23 and this was just a -- I guess an overview of
24 what the appraisal practices are.
25    Q.  Okay.  And the first bullet point,

21 (Pages 78 - 81)

Jason Merritt                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 82

1 checkpoint, says, "The methods and calculations
2 used in this report are the unbiased opinion of
3 an experienced and qualified professional and
4 are limited only by the reported assumptions
5 and limitations." Do you see that?
6    A. Yes.
7    Q. So this is consistent with what you said
8 earlier, that -- that the estimate of value is
9 just an opinion?
10   A. Correct.
11   Q. If you go down about, oh, three-quarters
12 of the way on the checkmarks, there's one that
13 says, "I did perform a physical inspection of
14 the vehicle that is the subject of this report."
15 Do you see that?
16   A. Yes.
17   Q. Why is it important to you that
18 you -- you certify that you performed a physical
19 inspection of the vehicle?
20   A. I don't always have that on there.
21   Q. Okay. But is it important for you to do
22 that when possible?
23   A. I try to, yes.
24   Q. Why?
25   A. Just so that I feel more comfortable

Page 83

1 with the appraisal, that I'm not missing
2 anything.
3    Q. Okay. The -- the last full paragraph
4 says, "East Coast Auto Appraisers' valuations
5 are based on estimate and vehicle information
6 believed to be authentic, reliable and accurate."
7 Do you see that?
8    A. Yes.
9    Q. What do you mean, "Based on estimate and
10 vehicle information believed to be accurate or
11 authentic"?
12   A. Appraiser valuations are based on
13 estimate and vehicle information believed to be
14 -- estimate could be different work performed
15 on the vehicle or estimates that I had that tell
16 me what needs to be done on the vehicle, as I
17 mentioned the body panels, stuff like that, any
18 type of estimates that are brought into it. And
19 then any of the vehicle information, VIN numbers,
20 mileage, past owners, any of that to be authentic
21 so it's reliable.
22   Q. Okay. The next sentence in this says,
23 "Houston Auto Appraisers has used reasonable
24 care." Do you see that?
25   A. Yeah. Again, this is a template that I

Page 84

1 purchased from Houston Auto Appraisers, so theirs
2 is still in there on some of these.
3    Q. Okay. So -- so you didn't actually
4 write this. You purchased it from another
5 entity?
6    A. Correct.
7    Q. So this entire template came from
8 Houston Auto Appraisers?
9    A. Correct.
10   Q. This was not your original work. It was
11 their work that you then adjusted for your use?
12   A. Correct. No, I -- since then I totally
13 and completely changed a lot of the stuff in
14 here. Some of their stuff is for different
15 states, so I look at different states.
16   Q. Okay.
17   A. And, again, this is a template I used
18 just because of the boilermaker template of it.
19 It just gives me kind of a base to start out in.
20   Q. Okay. You talk about estimates that
21 need to be made. Is -- one of the estimates or
22 assumptions that you have to make is that the
23 -- the dealer-sold comparable vehicles are in
24 average condition?
25   A. Yes.

Page 85

1    Q. So for purposes of making your condition
2 adjustment in your appraisal, you adjust the
3 value of the vehicle you're appraising based on
4 its condition compared to an average vehicle of
5 the same make, model and year, correct?
6    A. Correct.
7    Q. And -- and you assume that the
8 comparable vehicles being sold by dealers are
9 in average condition, correct?
10   A. Correct.
11   Q. Do you actually inspect those comparable
12 vehicles?
13   A. No.
14   Q. Why not?
15   A. As -- from my experience being in a
16 dealership, they're all reconditioned. That's
17 a term used by dealerships to make it sound
18 better than what it is. But they go through a
19 detail, cleaning, inspection and they run them
20 through the shop for mechanical inspection. So
21 the baseline for my appraisals is a dealership,
22 because they have to stand by behind the vehicle
23 itself.
24   Q. Now, let's say somebody came to
25 you after you did an appraisal and they said

22 (Pages 82 - 85)

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 86

1 that they actually talked to the dealer and one
2 of the comparables you've used, in fact, had not
3 been reconditioned and was in below-average
4 shape. Would you make an adjustment to your
5 appraisal based on that?
6    A. No.
7    Q. Why not?
8    A. Because, again, I wouldn't go off what
9 he's telling me. I would have to follow up on my
10 own.
11    Q. Well, let's say it was true. Let's say
12 you followed up on your own, hypothetically, and
13 the dealer confirmed to you, yes, we decided not
14 to recondition that vehicle; it was not in
15 average condition when it was sold; it was in
16 below-average condition. Would you make an
17 adjustment to your appraisal that had relied on
18 that vehicle as a comparable?
19    A. That's very hypothetical because I
20 -- when vehicles hit the website they are for
21 sale.
22    Q. Okay. I know it's hypothetical,
23 and I -- I'd like an answer to the question.
24    A. It's hard to answer a hypothetical
25 question like that. I would probably throw that

Page 87

1 comparable out and use another comparable.
2    Q. Okay. So if you -- you assume the
3 comparable vehicles are in average condition if
4 sold by a dealer, and you might throw it out if,
5 in fact, the dealer confirmed it was not in
6 average condition?
7    A. Correct.
8    Q. Would there be instances where you might
9 not throw it out even though the dealer confirmed
10 it was not in average condition?
11    A. No.
12    Q. Okay. But you're comfortable, for
13 purposes of your normal appraisals, assuming
14 that the dealer-sold vehicles are in average
15 condition?
16    A. Correct.
17    Q. And that's based on your experience
18 with the way dealers approach selling vehicles on
19 their lots?
20    A. Correct.
21       MR. CASHDAN: This is probably a good
22 time for a break.
23       THE VIDEOGRAPHER: We're going off the
24 record. This is the end of Media Unit Number 1.
25 The time is 10:28 a.m.

Page 88

1    (Recess taken.)
2       THE VIDEOGRAPHER: We're back on the
3 record. This is the beginning of Media Unit
4 Number 2. The time is 10:41 a.m.
5 BY MR. CASHDAN:
6    Q. I want to go back for a moment. We were
7 talking about the use of comparable vehicles and
8 assuming that they're in average condition. Do
9 you remember we talked about that?
10    A. I do.
11    Q. Have you done a survey of dealerships
12 to confirm that the majority of them recondition
13 their vehicles such that they're in average
14 condition when they're sold?
15    A. I would say my survey is working with
16 the automotive group that has 13 dealerships.
17 That would be my survey.
18    Q. Okay.
19    A. That would just be experience. And
20 normally when we would take into a vehicle and
21 we'd put it in our CRM, I guess you would call
22 it, nothing would be finalized in it until that
23 vehicle was ready. And when I say that, when
24 it's ready, when it's done the shop, when it's
25 done its detailing, then it would hit the -- the

Page 89

1 CRM as finalized. And when it hit as finalized,
2 it automatically populated to our website.
3    Q. Do you have any information about the
4 practices of any other specific dealers, other
5 than the dealers associated with Timbrook
6 Automotive?
7    A. No. I -- I have limited experience with
8 their CRMs. CRMs I'm just -- I don't know what
9 all the dealerships call it, but it could be
10 Lightspeed, it could be -- there are different
11 management softwares. And most of them I have
12 researched the CRMs that the dealerships use for
13 their software, accounting, profit and loss. And
14 I'm not talking as far as the -- the banking side
15 of it, but I'm talking the -- the inventory
16 management side, I guess you could say.
17       So I am familiar with multiple
18 platforms, and that would give me an indication
19 and give me evidence to believe that all these
20 software and platforms operate in the same way.
21    Q. But have you done any analysis with
22 hard data that any dealership that you've used
23 for purposes of comparable vehicles, other than
24 Timbrook, in fact, has reconditioned the specific
25 vehicle you're using as a comparable?

23 (Pages 86 - 89)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 90

1    A.   No.
2    Q.   No hard data, but you assume it to be
3  true based on your experience in the business?
4    A.   Correct.
5    Q.   Okay.  And that's an approach you're
6  comfortable with?
7    A.   Yes.
8    Q.   Okay.  Did you talk to somebody named
9  Michelle Lacey [phonetic] to prepare for your
10 expert opinions and conclusions in this matter?
11   A.   No.
12   Q.   Did you speak with somebody named
13 Ken Volts [phonetic] in connection with your
14 opinions?
15   A.   The only person I remember speak to is
16 Mr. Lowther.
17   Q.   Did you speak to Mr. Ken Volts?
18   A.   I don't recall him.
19   Q.   Okay.  Did you speak to Mr. Thomas
20 Gibbs?
21   A.   I don't recall him either.
22   Q.   Okay.  Did you request any specific
23 documents from counsel for purposes of preparing
24 your opinions and conclusions in this matter?
25   A.   No.

Page 91

1    Q.   We -- we marked exhibits -- through
2  Exhibit 14 the documents you reviewed and relied
3  upon.
4    A.   Yes.
5    Q.   Do you remember that?
6    A.   I do.
7    Q.   Did you ask for any of those specific
8  documents?
9    A.   No.
10   Q.   They were provided to you by counsel?
11   A.   They were provided to me.
12   Q.   Okay.  And I'm only referring to the
13 documents that -- that were not generated from
14 your own company.
15   A.   Correct.
16   Q.   Okay.  Did you review any depositions of
17 any witnesses in this case?
18   A.   No.
19   Q.   Okay.  Did you review summaries of any
20 depositions?
21   A.   I have not seen anything deposition-wise
22 from somebody else, no.
23   Q.   Has counsel provided to you in writing
24 any summaries of the case?
25   A.   I have all of these documents.  I have

Page 92

1  what I have given.  And I have synopsis of, I
2  believe, the expert report from other experts in
3  this case.
4    Q.   When were you provided that?
5    A.   Recently.
6    Q.   And -- and did you review that to
7  prepare for your deposition today?
8    A.   I reviewed them.  I can't really say
9  they were preparation for today.
10   Q.   But you re --
11   A.   I'm a little pigheaded.
12   Q.   But you reviewed them?
13   A.   Yes.
14   Q.   What did they say?
15   A.   I think they were talking more about
16 dealerships and sales.  Again, they really
17 weren't in my focus, really.
18   Q.   Okay.
19   A.   I don't want to be ignorant and say I
20 didn't review them very much, --
21   Q.   Yeah.
22   A.   -- but I -- this is what I'm -- this is
23 what I'm targeted on.
24      MR. CASHDAN:  We would request that that
25 document be produced.

Page 93

1      MR. LOWTHER:  He's referring to the
2  expert reports that we've disclosed.
3      MR. CASHDAN:  That's not what he said.
4      MR. LOWTHER:  Well, I -- I can -- I can
5  produce them again, we can talk about it off the
6  record, but there -- there's no synopsis.  It's
7  the signed reports that we produced to you, and
8  we sent to him after they were executed and
9  produced -- I mean disclosed.
10      MR. CASHDAN:  The witness's testimony is
11 clear, but, okay, we can talk about it off the
12 record.
13      THE WITNESS:  Well, I -- I'm not
14 real clear on it, because I'm not exactly sure
15 what he gave -- he gave me, because, again, I
16 didn't -- I didn't review them much.
17 BY MR. CASHDAN:
18   Q.   Okay.  Let's take a look at Exhibit 7.
19   A.   Yes.
20   Q.   Okay.  Exhibit 7 is another template
21 that you provided to us in response to the
22 subpoena, correct?
23   A.   Correct.
24   Q.   And this is a template that's used by
25 East Coast Auto Appraisers, correct?

24 (Pages 90 - 93)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 94

1    A.   Correct.
2    Q.   And it's, essentially, the same as what
3 we looked at in Exhibit 6, correct?
4    A.   Again, boilermaker-type template, yes.
5    Q.   And there aren't any material changes
6 that you're aware of, are there, as compared to
7 Exhibit 6?
8    A.   There's probably little differences in
9 it.
10   Q.   Okay.
11   A.   There's probably quite a few differences
12 in it.
13   Q.   Can you point them out to me?
14   A.   We would have to go over each page and
15 compare them.
16        On Page 1 I have client name, phone and
17 owner of vehicle.  Exhibit 6 I have the phone
18 number.  Exhibit 7 I don't.
19        On Page 2, obviously, the -- the
20 condition appraisal was different, because
21 that's specific to that vehicle.
22   Q.   Right.  But in terms of the form
23 portions, that's what I'm talking about.
24   A.   As far as the methodology and the way
25 that I went about it, yes, the same.

Page 95

1    Q.   Okay.  Thank you.
2        Taking a look at -- back at Exhibit 7 on
3 the second page, I believe there's a -- there's
4 -- strike that.
5        Exhibit 7 is a -- an example of a
6 appraisal that you actually did for a 1998 Ford
7 Mustang, correct?
8    A.   Correct.
9    Q.   Okay.  So looking at the second page,
10 there's the -- the portion below the section
11 entitled IACP Certified Actual Cash Value
12 Appraisal.  Do you see that?
13   A.   Yes, I do.
14   Q.   And there's four paragraphs that discuss
15 the condition of the vehicle, correct?
16   A.   Correct.
17   Q.   It talks about the condition of the
18 exterior in the first paragraph, correct?
19   A.   Yes.
20   Q.   And you looked at things such as whether
21 there was any apparent rust, correct?
22   A.   Correct.
23   Q.   You looked at whether there was limited
24 marks or imperfections on the paint, correct?
25   A.   Correct.

Page 96

1    Q.   The second paragraph talks about the
2 interior condition, correct?
3    A.   Correct.
4    Q.   You looked at the seats and the carpet,
5 correct?
6    A.   Yes.
7    Q.   You also looked at whether the equipment
8 was original and operational?
9    A.   Correct.
10   Q.   And whether there was any marking or
11 wear on the interior, correct?
12   A.   Correct.
13   Q.   The -- in the third paragraph you talked
14 about the electronics being fully functional and
15 in good condition, correct?
16   A.   Yes.
17   Q.   You looked at the engine and the
18 transmission, correct?
19   A.   Correct.
20   Q.   You actually started the engine and
21 confirmed it ran smoothly, correct?
22   A.   Yes.
23   Q.   You actually scanned the vehicle's
24 computer for responses to look for historical
25 codes, correct?

Page 97

1    A.   Correct.
2    Q.   You also noted that the vehicle had
3 been stored in a garage and had all its original
4 paperwork, correct?
5    A.   Correct.
6    Q.   And you took all of that and other
7 information into account to evaluate the
8 condition of this particular vehicle, correct?
9    A.   I did.
10   Q.   And these were all individual inquiries
11 that you did to evaluate the value of this
12 vehicle, correct?
13   A.   I did.
14   Q.   And, in your judgment, that kind of
15 detailed analysis of these individual factors
16 is necessary to appraiser a vehicle's value,
17 correct?
18   A.   I believe it's helpful.
19   Q.   You try to do it whenever you can,
20 right?
21   A.   I do.
22   Q.   And then you made some condition
23 adjustments based on the vehicle, correct?
24   A.   Yes.
25   Q.   And in the case of this vehicle, you

25 (Pages 94 - 97)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

---

Page 98

1 concluded that the vehicle should be worth more
2 because of its condition and the options.
3    A.  Correct.
4    Q.  Okay.  You also looked at the current
5 local market to come up with comparables as a
6 baseline for the value of this vehicle, correct?
7    A.  I did.
8    Q.  And on the second page you list three
9 comparables, correct?
10    A.  I did.
11    Q.  These were all vehicles that were sold,
12 correct?
13    A.  Correct.
14    Q.  And these vehicles were in a 200-plus
15 mile radius of where the vehicle being appraised
16 was garaged, correct?
17    A.  Correct.
18    Q.  And you think it's appropriate to use
19 vehicles in a 200-plus mile radius?
20    A.  I had to in that situation.
21    Q.  And you thought it was appropriate to in
22 that situation, right?
23    A.  I did in that one, yes.
24    Q.  Okay.  And these were all actually sold
25 vehicles, correct?

---

Page 99

1    A.  I don't know if they were sold or
2 listed.
3    Q.  Okay.  Let's say, for example, that
4 the second vehicle from Westbury Toyota had been
5 listed for sale -- strike that.
6        The second vehicle, the comparable from
7 Westbury Toyota, it says the sales price was
8 9,999.  Do you see that?
9    A.  I do.
10    Q.  Okay.  The other two vehicles one was
11 15,000 from TrueCar and one was 13,999 from
12 Village Auto, correct?
13    A.  Correct.
14    Q.  If you had found this comparable from
15 Westbury Toyota and the listed price was $50,000,
16 would you have used that as a comparable?
17    A.  I probably would have called Westbury
18 Toyota just to see why.
19    Q.  Okay.  And if they told you, "that's how
20 much we want to sell the vehicle for"?
21    A.  Then I would probably remove it.
22    Q.  Why?
23    A.  Just because it was so far out of the
24 realm.  There would be something that would make
25 me think -- but, again, I would have to talk to

---

Page 100

1 Westbury and do investigation of why.
2    Q.  Okay.  What if their listed price was
3 25,000?
4    A.  Again, I'd have to check them, because,
5 again, it -- it may not be a comparable.
6    Q.  Okay.  And is that because the price
7 might just be unrealistic?
8    A.  Or there may be something different
9 about the vehicle.
10    Q.  Well, I want you to assume,
11 hypothetically, that there's nothing different
12 about the vehicle except that the dealership
13 says, "we're hoping to get a big number on this
14 one ,so we're listing it for $25,000," would you
15 then say, okay, we'll use it as a comparable?
16    A.  I would have to -- again, each case
17 would be different.  In this case right here, if
18 I found one that was $25,000 and I called them
19 and they just said, "hey, we need to get 25,000
20 out of it," well, what that tells me, from my
21 experience, as a dealership that they got too
22 much money in it and they don't really want to
23 sell it.  They're just going to leave it sit
24 there.  So I would take them out of the
25 comparable.

---

Page 101

1    Q.  Okay.  So just because they're asking
2 for that amount doesn't mean you'll accept it as
3 a comparable without talking to them; is that
4 right?
5    A.  No.  I couldn't.
6    Q.  So you'd need to -- you'd need to reject
7 that listed price as a comparable because it's
8 just not realistic for what the market will bear?
9    A.  Correct.
10    Q.  And that's your typical approach when
11 you're trying to find comparables, correct?
12    A.  Typical, yes.
13    Q.  Okay.  Because that's the way you come
14 up with comparables that represent actual market
15 value, correct?
16    A.  Correct.
17    Q.  Okay.  Okay.  You can put that to the
18 side.
19        Before you started work on this case,
20 were you familiar with Mitchell's WorkCenter
21 Total Loss product?
22    A.  No.  I've never dealt with Mitchell's
23 Total Loss.
24    Q.  Do you know how it operates to estimate
25 vehicle value?

---

26 (Pages 98 - 101)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 102

1    A.  I do not know algorithms, so I am not
2  very familiar with how it comes up with it.
3    Q.  Do you know what data Mitchell has
4  access to for purposes of estimating value?
5    A.  My guess is they would have -- and,
6  again, guess, from most of these, they would have
7  access to the CRMs of dealerships.
8    Q.  I'm asking what you know.  Just we want
9  to --
10   A.  Okay.  If I -- if you're going with what
11 I know, I don't know.
12   Q.  Okay.  Are you -- are you familiar with
13 J.D. Power?
14   A.  Yes.
15   Q.  Do you know whether J.D. Power has any
16 role in Mitchell's WorkCenter Total Loss product?
17   A.  I do not know.
18   Q.  Okay.  What is J.D. Power?
19   A.  Again, if we're going by what I know, I
20 don't know.
21   Q.  Okay.  Do you know if J.D. Power has
22 any involvement in the business of valuing
23 automobiles generally?
24   A.  I know that when I look at NADA now, it
25 says J.D. Power, --

Page 103

1    Q.  Okay.
2    A.  -- so there is a -- a relation.
3  And I believe Mitchell's is written on the page
4  somewhere, too, so there's quite a few involved
5  in that.
6    Q.  Do you know what kind of hard data
7  Mitchell or J.D. Power have access to -- to
8  concerning sales of vehicles for use as
9  comparables in estimating vehicle value?
10   A.  No.
11   Q.  Do you know what kind of hard data
12 Mitchell or J.D. Power has access to concerning
13 the relationship between list price and actual
14 sales price for vehicles in this country?
15   A.  No.
16   Q.  Okay.  Have you ever negotiated with
17 an insurance company based on a valuation it
18 provided a customer using Mitchell's WorkCenter
19 Total Loss product?
20   A.  I have never negotiated with insurance
21 at all.
22   Q.  Okay.  Have you ever had a customer ask
23 you to look at a -- an appraisal that had been
24 performed by an insurance company using
25 Mitchell's WorkCenter Total Loss?

Page 104

1    A.  No.
2    Q.  Okay.  So this case -- it's fair to
3  say this case is the first time you've ever had
4  involved with Mitchell's WorkCenter Total Loss?
5    A.  Yes.
6    Q.  And you're not aware of any particular
7  hard data Mitchell has access to for purposes
8  of computing or estimating values used in
9  Mitchell's --
10   A.  I do not have access to any of their
11 codes or data that -- that they use, so I don't
12 know.
13   Q.  Well, did you read any depositions in
14 this case that described the data they had access
15 to?
16   A.  I read these reports that are Mitchell
17 reports, and I see the -- the comparables and
18 adjustments and stuff like that.
19   Q.  Okay.  Have you read any depositions in
20 this case from anyone for -- who works for
21 Mitchell?
22   A.  No.
23   Q.  Have you read any depositions in this
24 case from anyone who works for J.D. Power?
25   A.  No.

Page 105

1    Q.  Have you read any depositions in this
2  case from anyone who works for Progressive?
3    A.  No.
4    Q.  Have you read any testimony from anyone
5  describing the hard data that is available for
6  use in WorkCenter Total Loss's calculations?
7    A.  No.
8    Q.  Okay.  How -- strike that.
9        Your report talks about the Projected
10 Sold Adjustment that is performed by the Mitchell
11 WorkCenter Total Loss product, correct?
12   A.  Which one are you referring to there?
13   Q.  So we're talking about your report,
14 Exhibit Number 1.
15   A.  Okay.
16   Q.  And am I correct that your report talks
17 about the Projected Sold Adjustment that is
18 applied in the Mitchell product?
19   A.  Which page are we at just so I can --
20   Q.  Sure.  So if you go to the fourth
21 page of your report, there's a heading that
22 says, "Mitchell's application of a Projected
23 Sold Adjustment is inconsistent with appraisal
24 standards and the comparable methodology."
25 Do you see that?

27 (Pages 102 - 105)

Jason Merritt                                                            April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 106

1    A.  I do.
2    Q.  Okay.  Are you familiar with the
3  hard data that is available to Mitchell for
4  application of its Projected Sold Adjustment?
5    A.  No.  I do not know what their hard data
6  is.
7    Q.  Okay.  Are you familiar with the
8  methodology that Mitchell and J.D. Power use
9  to make the Projected Sold Adjustment for any
10  particular vehicle?
11    A.  I do.  That is on the last page of their
12  valuation reports, and they list their vehicle
13  valuation methodology explanation.  That is what
14  I'm familiar with.
15    Q.  Okay.  So, for example, let's take a
16  look at -- which exhibit do you have in your
17  hand?
18    A.  I have -- this one is Exhibit 9,
19  England.
20    Q.  Okay.  So Exhibit 9, the last page, tell
21  me what you're referring to.
22    A.  The very last the page, the -- the
23  heading is Vehicle Valuation Methodology
24  Explanation.
25    Q.  Okay.  And where, in particular, are you

Page 107

1  looking that talks about the Projected Sold
2  Adjustment?
3    A.  Under Step 2, Adjust Comparable
4  Vehicles.
5    Q.  Okay.
6    A.  Again, I agree with "make adjustments
7  to the price of the comparable vehicles,"
8  "comparable vehicles are identical to the loss
9  vehicle, except when itemized -- or adjustments
10  are itemized."  There's several types of
11  comparable vehicle adjustments.  I agree 100
12  percent with that.  The only issue I have is
13  Bullet Number 1, the Projected Sold Adjustment.
14    Q.  Okay.
15    A.  That's my issue.
16    Q.  And my question is, are you familiar
17  with the precise methodology that Mitchell uses
18  to make the Projected Sold Adjustment?
19    A.  No.
20    Q.  Okay.  Do you know what data Mitchell or
21  J.D. Power has access to to make the Projected
22  Sold Adjustment?
23    A.  When you're asking me what I know, no, I
24  do not know what data they have.
25    Q.  Okay.

Page 108

1    A.  I can only go off, you know, my
2  experience.
3    Q.  Which is zero with WorkCenter Total
4  Loss, correct?
5    A.  Which is what?
6    Q.  You have no experience with WorkCenter
7  Total Loss, correct?
8    A.  Works in a total --
9    Q.  WorkCenter Total Loss, the Mitchell
10  product.
11    A.  Oh, the product, no.
12    Q.  Am I correct?
13    A.  Correct.
14    Q.  Okay.  Are you offering any legal
15  opinions in this case?
16    A.  No.
17    Q.  Okay.  You don't present yourself as an
18  expert regarding the regulatory provision in
19  Exhibit 14, do you?
20    A.  I don't get into any regulatory
21  provisions at all.
22    Q.  Okay.  Why did you produce -- why did
23  you have Exhibit 14 as one of the documents that
24  you produced to us as something you had reviewed
25  or relied upon?

Page 109

1    A.  When I do my appraisals, sometimes I'll
2  look at each state's laws and I'll just include
3  that with a lot of the state laws.
4    Q.  Okay.
5    A.  So I will use that on -- I usually
6  go over it a little bit.  And depending on what
7  portion I'm working on that appraisal, I'll try
8  to make sure that my standards aren't in
9  violation of their state standards.
10    Q.  But you're not representing that you're
11  an expert with regard to Exhibit 14, are you?
12    A.  Absolutely not.
13    Q.  You're not saying you're an expert with
14  regard to this particular New York regulatory
15  provision, correct?
16    A.  Correct.
17    Q.  Okay.  And just so the record's clear,
18  we're talking about Section 216.7 of the New York
19  Code's rules and regulations of Title 11,
20  correct?
21    A.  Correct.
22    Q.  Okay.
23    A.  You're talking about that entire
24  document?
25    Q.  Yeah.  You have no expert opinions with

28 (Pages 106 - 109)

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 110

1  regard to that?
2     A.  No expert opinions.  Just a guide.
3     Q.  Got it.
4         Have you done any survey -- strike that.
5         Have you done any analysis, for purposes
6  of your expert opinions and conclusions in this
7  matter, as to how often dealers negotiate the
8  prices of used cars they offer for sale?
9     A.  State that again for me.
10    Q.  Have you done any analysis, for purposes
11 of your expert opinions and conclusions in this
12 matter, as to how often dealers are willing to
13 negotiate the prices of used vehicles they offer
14 for sale?
15    A.  My analysis of that would be sitting in
16 the seat of a sales manager, which I did.  So I
17 oversaw the sale of hundreds and hundreds of
18 vehicles.
19    Q.  Okay.
20    A.  So I set the prices on them -- did the
21 appraisals of the vehicles, set the price and
22 set the profitability of it.  And using our CRM,
23 again, that is our -- in the sales part of it,
24 that is -- our standard is the profitability.
25    Q.  Okay.  And did you look at the practices

Page 111

1  of any other dealer for purposes of rendering
2  your expert opinions and conclusions in this
3  matter?
4     A.  No.
5     Q.  Did you do a survey to inform you as to
6  how other dealers may negotiate prices on
7  used cars that they offer for sale?
8     A.  A survey of it would be my -- I have
9  made calls to dealerships for pricing.  So survey
10 specifically for expert testimony, no.  A survey
11 for my appraisers -- appraisals to see what the
12 vehicles are selling for, yes, I've done that.
13    Q.  And -- and you have written records of
14 those?
15    A.  No.
16    Q.  Okay.  So you just did it for your
17 own --
18    A.  It would be phone calls for a specific
19 appraisal.
20    Q.  And then when you got the information,
21 did you write down the information you obtained?
22    A.  No.  I would usually use that in my
23 comparables.
24    Q.  Okay.  And you did that over the course
25 of your working for East Coast Auto Appraisers?

Page 112

1     A.  As well as Timbrook and other places.
2     Q.  Okay.  And how many dealers did you talk
3  to?
4     A.  I can't recall the amount of numbers.
5  I would say less than a dozen.
6     Q.  Okay.  Do you know whether you would
7  consider it to be a statistically significant
8  number of dealers for purposes of conducting a
9  survey?
10    A.  No.
11    Q.  You don't know or it wasn't?
12    A.  I don't know.
13    Q.  Okay.  When you were employed at
14 Timbrook, did you ever experience negotiation
15 of prices on used motor vehicles?
16    A.  Did I ever negotiate prices?
17    Q.  Did you ever observe any of the Timbrook
18 Automotive Dealerships negotiating price on used
19 motor vehicles?
20    A.  Yes.
21    Q.  Okay.  How often did that happen?
22    A.  Anytime someone comes in.  The
23 negotiation normally would be a wide variety of
24 things.  It could be they would try and -- when I
25 say try, they would try, it would be a customer

Page 113

1  would come in with an offer or the -- the
2  salesman would come in with an offer.  Or it
3  could be a variation of different things:
4  Warranties, gap insurance.  A big thing was the
5  price of the -- the payments.
6     Q.  And it could just be a lower price
7  overall for the vehicle, right?
8     A.  Could be.
9     Q.  All those kinds of negotiations happen?
10    A.  You see that on TV all the time.
11    Q.  Yeah.  And sometimes, in fact, the
12 Timbrook Automotive dealership would sell a
13 vehicle for less than it had listed the price?
14    A.  If you're going to box me into that one
15 sentence, I would have to answer that with a much
16 broader sentence.
17    Q.  You're not able to answer the question
18 as I've asked it?
19    A.  No.
20    Q.  Okay.
21    A.  It -- it -- I would have to answer that
22 as -- I would have to explain that more than just
23 a yes or no or just a simple answer.
24    Q.  So you're not able to answer the
25 question I just asked with a yes or no?

29 (Pages 110 - 113)

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 114

1    A.  With a yes or no?  No.
2    Q.  You're not able to.  Okay.
3    A.  I'll give you a long answer, if you'd
4  like?
5    Q.  Sure.  Go ahead now.
6    A.  The long answer is, the negotiation
7  would be for many different parts of it.  When I
8  would sit behind the CRM or behind the computer
9  and a salesman would come in and say, okay, this
10  2020 Silverado is priced at 40.  Okay.  And so
11  we would -- I would write out all the -- the tax,
12  tags, fees, dealer prep, reconditioning, all the
13  extra fees they put in, doc fees and all that
14  stuff, and present that to the customer.  And the
15  customer would say, that -- what's the payments?
16  And there could be negotiation in the price of
17  the vehicle -- after it was over, there could be
18  an adjustment.  And I -- I -- I describe it as a
19  sliding scale.  The bottom line of our CRM will
20  show profit.  That's what it shows.  So however I
21  get to that a profit, I don't care what the price
22  is.
23      Does that make sense?  I don't care if
24  I'm getting $40,000 out of that car or if I'm
25  getting $37,000 out of that car.  I don't care

Page 115

1  what the price of the vehicle is, because he's
2  now buying a warranty, he bought a tire and wheel
3  package and he's financing it through us, which
4  is a two point bump on the financing.
5      So when I look at the profit number,
6  that's my target.  So you as the customer, if you
7  come in, I set that car at 40,000, I'm getting my
8  40,000 out of it, because I'm looking at $3,200
9  profit.
10    Q.  But isn't it true that there were times
11  that a Timbrook Automotive dealership sold a
12  vehicle where the price was lower than it was
13  listed and all those other factors didn't change;
14  they just sold it for less than the list price.
15  Isn't that true?  That happened at least one time
16  in your experience?
17    A.  Oh, if you're saying "at least one
18  time," yes.
19    Q.  Did it happen at least two times?
20    A.  Well, again, I'm not going to be
21  ridiculous here.  There -- there's, obviously,
22  times where they would sell for less than asking
23  price.
24    Q.  You just don't -- you don't know how
25  many times?

Page 116

1    A.  But there's times they would sell above.
2    Q.  There is.  There would be negotiation.
3  It would happen, right?
4    A.  Well, and, again, you know, we all
5  hear the "no haggle price," and that is -- it's
6  very true.  You know, it's very true.  The
7  internet has changed everything over the last
8  12 years, maybe, 10 years.  Everything has
9  changed so much that the pricing that I put on my
10  vehicles, I -- I would start from the back end
11  and say, okay, here's what this vehicle is worth
12  on my appraisal.
13    Q.  Yeah.
14    A.  It's worth $40,000.  Now, let's look
15  at the condition of it.  What's it need to
16  recondition it?  Okay.  It's going to need tires,
17  it's going to need a total detail, and I'd work
18  backwards from that.  So now that $40,000 vehicle
19  that has, say, a NADA price or Kelley Blue Book,
20  or -- or the dealership down the street has it
21  for 40,000, okay, that's a good starting point,
22  but now this vehicle is only worth 36,500.  And
23  then you throw in what we need to make off profit
24  of it of $3,500 so now this vehicle's worth
25  33,000.

Page 117

1    Q.  Is every dealer a "no haggle" dealer
2  today?
3    A.  I can't say every dealer, no.
4    Q.  Okay.  And how about two years ago, was
5  every dealer two years ago a "no haggle" dealer?
6    A.  I can't say every dealer today is a "no
7  haggle" dealer.
8    Q.  Okay.
9    A.  I can't say that a blanket -- I can't
10  say a blanket statement about all dealers, no.
11    Q.  Is there a way, without calling the
12  dealers, you could find out if a dealer is
13  actually selling for less than the list price?
14    A.  And I'll -- from my experience, if you
15  call another dealer or salesman and say, "what
16  did you get out of that car," they really don't
17  know until they look it up.  They can tell you
18  what the profit was.  That's what they're looking
19  at.
20      So their -- their selling price is not
21  the forefront thing.  It's -- it's not the goal
22  in that.  The goal on the dealership side is the
23  profitability of it.
24    Q.  But you use the selling price for
25  purposes of comparables, correct?

30 (Pages 114 - 117)

Jason Merritt                                               April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 118

1    A.  Correct.  And the reason I use that is
2  because that is the baseline.  That's what that
3  vehicle's worth.
4    Q.  Okay.  So if we want to use selling
5  price, are there times when the sold price is
6  less than the list price was?
7    A.  Well, sure.  I would imagine there is.
8    Q.  If you were preparing an appraisal and
9  you picked as a comparable a vehicle that was
10  listed for sale at $10,000, and two days before
11  you finalized your appraisal the vehicle sold for
12  9,500, would you make a change in the comparable
13  vehicle value based on the actual sale, or would
14  you stick with the list price you had began your
15  work with?
16    A.  No.  I'd probably stick with the
17  original price.
18    Q.  So even though you knew for a fact that
19  the vehicle had sold for less and your appraisal
20  hadn't been completed, you would value the
21  vehicle for more?
22    A.  And the reason being is because I know
23  when they sell them, again, they're not taking --
24  they're not telling me all the back end.
25    Q.  Are they telling you all the back end on

Page 119

1  any of the sales prices?
2    A.  Yes.
3    Q.  So when you use comparables for
4  appraisals, you -- you have -- in fact, you have
5  access to all of the back-end information?
6    A.  And that is the sale price.  That's
7  their back-end information.
8    Q.  Okay.  In my hypothetical, the vehicle
9  was listed for sale at 10,000, --
10    A.  Mm-hmm.
11    Q.  -- actually sold for 9,500, --
12    A.  Mm-hmm.
13    Q.  -- but you're telling me you'd use the
14  10,000 list price and not the 9,500 actual sold
15  price.  Why?
16    A.  And, again, I would probably remove that
17  comparable, or I would use the original 10,000
18  because that is what the vehicle is worth.  Just
19  because the dealer sold it for $9,500, unless he
20  tells me, hey, it was a cash deal; nothing else
21  done; he handed me $9,500, did his owe own title
22  work, his own paperwork and walked out the door.
23    Q.  When you use comparables of actual
24  sales, --
25    A.  Mm-hmm.

Page 120

1    Q.  -- do you investigate what the original
2  list price was for purposes of your comparables?
3    A.  No.
4    Q.  Why not?  Isn't that what the value of
5  the vehicle is, in your view?
6    A.  Again, yes, it depends -- each one
7  depends, though.  Every one of these depends
8  on the vehicle.  And to say I can throw out
9  everything because of one variable, I don't.
10    Q.  I understand what it depends on.  I'm
11  just trying to understand your testimony, sir.
12  You're telling me that you would use the listed
13  price, rather than an actual sold price, because
14  you think the actual list -- the list price is
15  what the vehicle is worth, not the actual sold
16  price.  And I'm asking you, when you have a
17  comparable and you have the sold price, do you
18  investigate what the list price was so you can
19  get the actual vehicle, in your view, of
20  -- actual value of the vehicle?
21    A.  I would.  I would.  I would.
22    Q.  And do you do that?
23    A.  I do, yes.
24    Q.  Okay.  So let's take a look at
25  Exhibit 7, and go to the third page.  And we've

Page 121

1  got this vehicle here from Westbury Toyota.  The
2  sale price was $9,999.  Do you see that, the
3  comparable?
4    A.  Yes.
5    Q.  Did you call the dealer to determine
6  what the listed price was for this?
7    A.  That is the listed price.
8    Q.  That's not the actual sale price?
9    A.  The sale price is what it's listed for.
10    Q.  How do you know that somebody didn't
11  negotiate a lower price?
12    A.  I don't.
13    Q.  Did you call the dealer to find out?
14    A.  No.
15    Q.  I thought you just told me that you
16  think the vehicle is worth the listed price, not
17  the sale price?
18    A.  The sale price is what it's listed for
19  sale at.
20    Q.  No.  The list -- the sale price is what
21  it actually sold for.
22    A.  No.  The -- it's for sale at that price.
23    Q.  Do you know for a fact that this vehicle
24  was for sale at that price, not actually sold at
25  that price?

31 (Pages 118 - 121)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 122

1    A.  Yes.
2    Q.  Okay.  If -- is that true of all these
3  vehicles?  You know for a --
4    A.  Yes.
5    Q.  So you know for a fact that all of these
6  vehicles were the listed price, not the sale
7  price?
8    A.  Yes.  They were all the listed price.
9    Q.  You only use the listed price?
10    A.  Yes.
11    Q.  You never use the actual sales price?
12    A.  No.
13    Q.  Okay.  And if you go to Page 5 of
14  Exhibit 7, you see it's the -- where it says
15  "fair market value"?
16    A.  And let me -- let me go back.  When you
17  say "never," no, I can't say never.  I do use
18  them in certain circumstances.
19    Q.  Okay.  Well, we'll get to that in a
20  moment.  If you go to the -- the definition of
21  fair market value, do you see that?
22    A.  Yes.
23    Q.  And it says, "Market value is generally
24  established, if possible, based on sales of
25  similar property in the same locality."  Do

Page 123

1  you see that?
2    A.  Yes.
3    Q.  And to be accurate, in your view, you'd
4  change this to "offers of sale," like "list
5  price"?
6    A.  Sales.  Again, I guess we're just
7  mincing words, really, or confusing words.  I
8  figure a vehicle for sale is the listed sale
9  price, --
10    Q.  Okay.  I understand --
11    A.  -- not the sold price.
12    Q.  I understand that the listed sale price
13  may be different than the sold price.
14    A.  Yes.
15    Q.  Which do you think is appropriate to use
16  for appraisals when you have both available to
17  you?
18    A.  When you have both available, the sold
19  price would certainly be a very good variable in
20  it.
21    Q.  It would be better than the listed
22  price, wouldn't it?
23    A.  Sure.
24    Q.  Okay.  So whenever you can use the
25  actual sold price, you want to use it, correct?

Page 124

1    A.  Correct.
2    Q.  Okay.  So just to be clear, going back
3  to Page 3 of this report, if you had the actual
4  sold price, you would use that, if available, --
5    A.  Correct.
6    Q.  -- correct, --
7    A.  Correct.
8    Q.  -- every time, if you had an actual sold
9  price?
10    A.  That is your best data if you can get
11  the sold price.
12    Q.  Okay.
13    A.  But, again, it -- it's hard to find the
14  exact sold price.
15    Q.  For you.
16    A.  Even for a dealer.
17    Q.  Well, do you know Howard it is for J.D.
18  Power to find that?
19    A.  I don't know what they're using.
20    Q.  Do you know what the J.D. Power Power
21  Information Network is?
22    A.  No.
23    Q.  Do you know whether J.D. Power collects
24  dealer information electronically based on actual
25  sales every day around this country?

Page 125

1    A.  I have no doubt.
2    Q.  Do you know whether they -- whether they
3  do?
4    A.  No, I don't know that.
5    Q.  That would be great information to have
6  for an appraisal, right?
7    A.  Sure.
8    Q.  If you had an actual database that
9  actually says --
10    A.  But, no, see, I -- I would have an issue
11  with that.  Because they're -- my CRMs, when I
12  sell a vehicle, it is not correct information on
13  what that vehicle sold.
14    Q.  What information does J.D. Power get
15  from the J.D. Power PIN Network?
16    A.  I don't know that.  I just testified
17  that I don't know what information they're
18  getting.
19    Q.  So how do you -- why do you have a
20  problem with it?
21    A.  Because you're saying they're pulling
22  this from dealers.  And if they're pulling it
23  from dealers, they're -- they have to be getting
24  into their -- their CRM or have access to the
25  Lightspeed data.  And my Lightspeed data in

32 (Pages 122 - 125)

Jason Merritt April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 126

1 every sold vehicle does not indicate the exact
2 profitability that I'm looking at. Because,
3 again, I'll slide the price of that car -- I
4 don't care what that car price is. If someone
5 comes in and we can negotiate a warranty for
6 $1,900 that I just paid $600 for, and he wants to
7 knock $500 off the car, I'll knock $500 off the
8 car. That doesn't mean the value of that car is
9 less.
10    Q. So in your world, you'd have to know
11 even more information to come up with an accurate
12 appraisal, right?
13    A. In my world, that's what I go by is the
14 sale prices, because they're listed for sale at
15 that price. And me as a dealer, when I set the
16 price of that vehicle, I know what it's worth.
17    Q. So I must have mis -- misunderstood you.
18 I thought you told me that when there's an actual
19 sale you use the sold price.
20    A. And that -- I lot of those would be
21 private individual I would use, and a lot of
22 classic and historic vehicles is where you cold
23 find that.
24    Q. You'll use the actual sold prices from
25 dealers, right?

Page 127

1    A. If I can. But, again, I -- it's very
2 rare that you can get it.
3    Q. And when you do get it, you use it,
4 correct?
5    A. Again, I have to see what that price is.
6    Q. So do you contact each individual
7 dealer?
8    A. No.
9    Q. So you use a sold price, but you don't
10 contact the dealer?
11    A. If I am given a sold price that is
12 within the parameters of I know that it was
13 actually sold for that, if someone brings in a
14 buyer's order and it shows the price of the
15 vehicle, well, then I'll use that.
16    Q. And if you're using a sale price, do you
17 also contact the dealer so you can find out what
18 conditions are associated with that sale price
19 with regard to financing and warranties?
20    A. No.
21    Q. So -- so you don't know all those
22 variables that also go into profitability with
23 regard to the sale price, correct?
24    A. Again, the sale price is all of that
25 taken into effect, all of that -- when I set a

Page 128

1 price of a vehicle, if I set this Number 3
2 vehicle, the '98 Cobra, at 13,999, I've taken
3 into consideration all the condition, all the
4 mileage, the color, the options and what that
5 vehicle's worth, period, --
6    Q. And --
7    A. -- and then we set the profitability
8 after that.
9    Q. And you're taking into account what it's
10 worth to have that customer getting service at
11 your dealership?
12    A. Correct.
13    Q. Right. That's not the val -- vehicle's
14 value, that's the value of service, correct?
15    A. No. No. I don't -- I don't take into
16 effect any -- I have to back that up. I
17 take that into effect as far as the price of the
18 vehicle.
19    Q. Well, I -- I know you don't take it into
20 account. My question is, isn't it true that for
21 a dealership, when they are listing a vehicle for
22 sale, one of the aspects is they're trying to
23 figure out a way to capture profit from services
24 that they provide to --
25    A. Well, sure. I mean, when we're -- we're

Page 129

1 talking to a customer, we're going to try to be a
2 good service source for them.
3    Q. Not just try to be a good service
4 source. You might offer them, as part of the
5 sale price, coupons for service so they come
6 in --
7    A. Yes.
8    Q. And that is part of what the sale price
9 captures, correct?
10    A. When I did my estimates, I couldn't take
11 into effect that.
12    Q. How about selling a warranty? That's
13 captured in the sales price, isn't it?
14    A. No. No. I don't do any of that. I put
15 the price of the vehicle itself and what it --
16 the vehicle is worth. Now, the -- the sales
17 manager actually has the ability to change all
18 that for profitability.
19    Q. How about financing?
20    A. That's all part of the profitability.
21    Q. That's part of the sales price, correct?
22    A. No, --
23    Q. Okay.
24    A. -- not at all.
25    Q. Not in your experience?

33 (Pages 126 - 129)

Jason Merritt                                     April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 130

1    A.  No.
2    Q.  And -- and you would rather not have
3  all of that CRM data for purposes of doing an
4  appraisal.  You think it's more accurate just to
5  use the list price?
6    A.  From my experience, yes.  Because when
7  I set that price on the lot, I've taken into
8  consideration that vehicle and what it's worth.
9  From there you work backwards on it.  And, again,
10  the profitability skewers [sic] the sold price on
11  the CRM.
12    Q.  And where a dealer is willing to
13  negotiate the list price and actually just take a
14  lower price, how do you take that into account in
15  your appraisals?
16    A.  Again, I don't run into where I find
17  that out while I'm doing the appraisals.
18    Q.  Because you don't talk to the dealer
19  about the list price?
20    A.  No.
21    Q.  Okay.  So you don't know -- when it's --
22  when you're using a comparable, you don't have
23  any idea whether that dealer is, in fact, willing
24  to negotiate the price?
25    A.  No.

Page 131

1    Q.  Am I correct?
2    A.  Correct.
3    Q.  Okay.  And that's -- that's information
4  you don't actually ask the dealer about.
5    A.  No.
6    Q.  Is that correct?
7    A.  Correct.
8    Q.  Okay.  I just want to make sure that --
9  the way you were answering, we --
10    A.  Yeah.  And, again, it -- to -- to put a
11  blanket covering over all of it, I can't answer
12  no.  I mean, I -- I have called dealers on
13  certain things.  But, again, my standard practice
14  is to take the sale prices that are listed and
15  use them as that's the value of the car.
16    Q.  Okay.
17    A.  Because, again, they -- they take into
18  -- all the other variations, because, again, they
19  -- they need a com -- they need a comparable,
20  they need -- they're putting this price on the
21  internet.  So if their price is so significantly
22  higher than, say, the other guy's price, they're
23  just going to pass over it.  They're just not
24  going to look at that vehicle.  So these dealers
25  are pricing the cars at what they need to get out

Page 132

1  of them.
2    Q.  Does the -- the Mitchell WorkCenter
3  Total Loss product, does it adjust no haggle
4  dealer prices with a Projected Sold Adjustment?
5    A.  That's somewhere in one of these.
6    I have one that is total -- WorkCenter
7  Total Loss.
8    Q.  So you're looking at Exhibit 8; is that
9  correct?
10    A.  Exhibit 8, --
11    Q.  Yep.
12    A.  -- WorkCenter Total Loss.
13    Q.  Okay.
14    A.  And in the second heading under
15  "Internet Sales," it talks about no haggle -- "No
16  hassle single-price sales policy."
17    Q.  Okay.  My question is whether you know
18  if the WorkCenter Total Loss product adjusts list
19  prices used as comparables from no hassle dealers
20  with the Projected Sold Adjustment?
21    A.  It says, "They do not apply a Projected
22  Sold Adjustment to comparable vehicles that are
23  for sale from a dealer in which we have confirmed
24  to have a no hassle single-price sales policy."
25    Q.  Okay.  And you think that's appropriate,

Page 133

1  I bet?
2    A.  Correct.
3    Q.  Okay.
4    A.  Yes.
5    Q.  And do you, when you're doing your
6  appraisals, do any confirmation as to whether the
7  dealers you're relying upon for a comparable are
8  "no hassle"?
9    A.  No.
10    Q.  So you accept their list price without
11  regard to whether they are, in fact, no hassle
12  dealers?
13    A.  Correct.
14    Q.  Okay.
15    A.  Again, a lot of dealers will put no
16  hassle -- haggle or hassle pricing or they'll
17  advertise that, but, again, that really doesn't
18  mean anything other than maybe a marketing.
19    Q.  So they might not actually be "no
20  hassle"?
21    A.  Well, no.  A lot of dealers are no
22  hassle, no haggle.
23    Q.  But some might market as if they, but
24  they may not actually do it.  Is that what you're
25  saying?

34 (Pages 130 - 133)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 134

1    A.  No.  No.  No.  I'm saying the opposite.
2    Q.  Okay.  I understand.
3    A.  I'm saying that most dealerships are no
4  haggle, and a lot of big dealerships will put
5  that on their website and some dealerships won't
6  just because they're not going to haggle over it
7  anyway.
8    Q.  Okay.  If you go to Exhibit Number 1,
9  which is your report, page -- the fifth page,
10  it's not numbered, the fifth page.
11    A.  Okay.
12    Q.  Okay.  The last sentence at the bottom
13  says, "Consistent with Mitchell's position on
14  internet pricing, my understanding of the modern
15  used car market is that internet prices often
16  reflect a no hassle price."  Do you see that?
17    A.  Correct.
18    Q.  Okay.  Have you done any analysis as to
19  how often the internet price reflects a no hassle
20  price?
21    A.  No.
22    Q.  Okay.  When you say "modern," what do
23  you mean by "modern"?
24    A.  I'd say modern is people that have CRMs,
25  people that maintain a decent inventory.  And

Page 135

1  when I say decent inventory, 25 or above cars.
2  The mom-and-pop shops are hard to get data from
3  and --
4    Q.  Okay.
5    A.  When I say modern, people that have the
6  availability to inventory and website and stuff
7  like that.
8    Q.  Okay.  And when you say, "my
9  understanding," is that based on your experience
10  that you described earlier working with Timbrook?
11    A.  That's my experience.
12    Q.  Okay.  Working at Timbrook?
13    A.  My experience overall.
14    Q.  Okay.
15    A.  And Timbrook is 13 dealerships or 14
16  dealerships, and he's acquired these dealerships
17  -- existing dealerships.  So a lot of them use
18  -- what's neat about that, in my exposure, is he
19  buys these dealerships as he goes, so they could
20  have a whole different platform at this Honda
21  dealership compared to the Chevrolet dealership.
22    Q.  Okay.
23    A.  They're not even the same model.
24  He doesn't even call them all Timbrook.  So
25  if I walk into Team One Chevrolet in Oakland,

Page 136

1  Maryland, it's totally different than, say,
2  Timbrook GMC in Cumberland.
3    Q.  Now, there -- there are some appraisers
4  who make a take-price adjustment to the internet
5  price of comparable vehicles, correct?
6    A.  I don't know who does.  I don't know.  I
7  don't deal with that.
8    Q.  Well, don't you say that on the last
9  page of your report?
10    A.  Yes.  I'm just saying there are.  I
11  don't -- I don't know them.  I just read that.
12    Q.  Yeah.  But I'm just asking the question:
13  There are some appraisers who make a take-price
14  adjustment to the internet price of comparable
15  vehicles, correct?
16    A.  Correct.
17    Q.  Okay.  And in your report, last page,
18  you say that, "This adjustment is made only after
19  speaking with a car dealer to determine whether
20  the dealer would take anything other than the
21  advertised price of the vehicle."
22    A.  Correct.
23    Q.  How do you know that?
24    A.  It's really all you can do.
25    Q.  Well, have you spoken to any of the

Page 137

1  appraisers who make a take-price adjustment to
2  understand the basis for their doing so?
3    A.  Correct.  We've spoke to others, and
4  I've talked to them in classes and stuff like
5  that, and that's --
6    Q.  Okay.  Who have you talked to?
7    A.  By name, I don't know.  Just other
8  appraisers through the Bureau of Certified Auto
9  Appraisers.
10    Q.  Okay.  So there are other appraisers you
11  know who are certified by the same organization
12  that certifies you --
13    A.  Correct.
14    Q.  -- who think it's appropriate to make an
15  adjustment to the take price on internet prices
16  of comparable vehicles?
17    A.  Again, it depends on what market you're
18  in.  It's the classic vehicles that would be
19  normally like that.
20    Q.  Okay.  And --
21    A.  Because my -- my appraisals go from a
22  1908 Ford Model A to a 2022 Stingray.
23    Q.  Are you saying that these other
24  appraisers never make such an adjustment in
25  any market other than the cla -- the classic

35 (Pages 134 - 137)

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 138

1 vehicles?
2    A.  No.  I can't say as a blanket.  I -- I
3 don't know what they're doing individually.
4    Q.  Okay.  Do you think -- strike that.
5        You describe in this paragraph of your
6 report on the last page that those adjustments
7 are specific to a particular vehicle from a
8 particular vehicle -- dealer and the recipient
9 of the -- strike that.
10       You say in this paragraph on the
11 last page of your report that the adjustment
12 is specific to a particular vehicle from a
13 particular dealer and the recipient of the
14 appraisal would know that the dealer stated it
15 would "take," I believe is missing, a spe --
16 specified price on that day for a particular
17 comparable vehicle.  Do you see that?
18   A.  Yes.
19   Q.  And you say, other -- "As with other
20 adjustments, this adjustment is based on data
21 specific to a comp vehicle chosen within the
22 total vehicle's market area."  Do you see that?
23   A.  Yes.
24   Q.  But that's not true, right?  You make
25 adjustments to the condition of the vehicle

Page 139

1 without any data about the specific comp vehicle,
2 right?
3       MR. LOWTHER:  Object to form.
4 BY MR. CASHDAN:
5   Q.  I'll restate it.
6   A.  Yeah.
7   Q.  Isn't it true you make adjustments based
8 on condition without any specific knowledge about
9 the condition of the comparable vehicles you're
10 using?
11      MR. LOWTHER:  Object to form.  Miss --
12 Misstates testimony.
13      THE WITNESS:  I'm sorry?
14      MR. LOWTHER:  You can go ahead and
15 answer.
16      MR. CASHDAN:  He's testifying.  You can
17 answer.
18      MR. LOWTHER:  No.  I was objecting.
19      THE WITNESS:  Okay.
20 BY MR. CASHDAN:
21   Q.  Okay.  You can answer.
22   A.  No.  I -- I use the comparables from
23 the dealerships because I know there's a -- an
24 industry standard with dealers in placing their
25 stuff on there.

Page 140

1   Q.  Do you inspect the condition of any
2 comparable vehicle you use?
3   A.  No.
4   Q.  Okay.  So you don't know the specific
5 condition of any comparable vehicle you use, do
6 you?
7   A.  You have to explain "condition" more.
8 There's a lot of different "conditions."
9   Q.  You don't know the condition of any
10 specific comparable vehicle that you're using, do
11 you?
12   A.  Well, sure I do.
13   Q.  No.  You're assuming it's in average
14 condition, aren't you?
15   A.  Sure.
16   Q.  You've not inspected it, have you?
17   A.  No.
18   Q.  Do you call the dealer to ask if it's
19 in --
20   A.  No.
21   Q.  So you are assuming, without specific
22 knowledge of that particular vehicle, that it's
23 in average condition, correct?
24   A.  Through the evidence, yes.
25   Q.  You say "through the evidence."  Is

Page 141

1 there any specific evidence you use about any
2 specific comparable vehicle's condition?
3   A.  Well, sure.
4   Q.  What specific information?
5   A.  Specific information:  If it's for sale,
6 it's passed inspection, it's passed detailing, I
7 see pictures of it, there's certain standards
8 dealership must have to put that vehicle on the
9 lot.
10   Q.  Do you call every dealer and confirm
11 that they have followed those standards?
12   A.  No.
13   Q.  Do you call every dealer and ask for
14 the information about their inspection of the
15 vehicle?
16   A.  No.
17   Q.  Do you call every dealer and ask for the
18 detailing information?
19   A.  No.
20   Q.  Okay.  Do you have any specific
21 knowledge about a particular vehicle --
22   A.  No.
23   Q.  -- when you list it as a comparable?
24   A.  No.
25   Q.  Okay.  You assume the dealer has done

36 (Pages 138 - 141)

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 142

1  everything it needs to to make that de -- that
2  vehicle average condition, correct?
3     A.  Correct.
4     Q.  But you don't know for sure they've done
5  it, do you?
6     A.  Well, no.  I haven't gone out there and
7  put my hand on it to inspect it, but, no --
8     Q.  But you make an adjustment for the
9  condition of the appraised vehicle assuming the
10 comparable is in average condition, correct?
11    A.  Correct.
12    Q.  Okay.  So that adjustment is not based
13 on data specific to the comparable vehicle, is
14 it?  It's based on information assumed about the
15 comparable vehicle, correct?
16    A.  I can't agree to that.
17    Q.  Okay.
18    A.  I can't agree to that.
19    Q.  In your appraisals, you will make an
20 adjustment for condition for an appraised vehicle
21 without ever inspecting the condition of any
22 comparable vehicle, correct?
23    A.  Again, to put that blanket statement
24 over it, I can't say that.  But my general
25 practice, yes.

Page 143

1     Q.  What data does Mitchell or J.D. Power
2  have regarding a particular -- strike that.
3        What data does Mitchell or J.D. Power
4  have regarding negotiation of list price for any
5  particular vehicle in this country?
6     A.  You're asking me what Mitchell has.  I
7  don't know.
8     Q.  Okay.  How about J.D. Power?  Do you
9  know?
10    A.  I don't know.
11    Q.  Okay.  So when you say that you -- you
12 think it's -- strike that.
13       I want to go to the last paragraph of
14 your -- last full paragraph of your -- of your
15 report --
16    A.  Okay.
17    Q.  -- before the compensation, okay?
18       As I understand what you're saying, and
19 tell me if -- I'm just going to try to summarize
20 it and tell me if I'm wrong.
21    A.  Okay.
22    Q.  As I understand it, you think that the
23 Mitchell methodology, generally, is fine except
24 for the use of the Projected Sold Adjustment; is
25 that right?

Page 144

1     A.  I -- I was -- to be quite honest, I was
2  impressed with what Mitchell has.
3     Q.  It -- it's a pretty --
4     A.  It's very in-depth.  It's very precise.
5  I like their condition reporting.  I like their
6  breakdown of the VIN number.  I like the -- the
7  adjustments that they do.  It's very nice how
8  it's automated and has certain things, very nice.
9        My biggest issue was the projected
10 sales, and reason being is because I've worked
11 in the dealerships.  And -- and when I worked in
12 the dealerships I saw the variation of the sale
13 price, only because of the other things brought
14 in to the sale itself.
15    Q.  Just to be clear, you said "your biggest
16 issue."  Do you have other issues with the
17 Mitchell --
18    A.  That is my issue with it.
19    Q.  Okay.
20    A.  That is my issue.
21    Q.  So your only issue is with the
22 application of the Projected Sold Adjustment?
23    A.  Yeah.  And if you -- if you took that
24 out of there and removed that, I don't like it
25 much because it eliminates a lot of our need,

Page 145

1  you know?  Now, I think there's individual basis
2  needed on a lot of stuff.  You know, I think my
3  investigation techniques are -- are different
4  than Mitchell's, but only because I'm very
5  in-depth with it and Mitchell deals off -- you
6  know, without seeing anything.  It's a computer.
7  So I like to think we're better than computers.
8  But, again, the Mitchell reports that I'm
9  reading, I can't really fight anything on it
10 other than that projected sale price.
11    Q.  And you know those Mitchell reports
12 are -- are informed by detailed inspections --
13    A.  Sure.
14    Q.  -- by human beings --
15    A.  Sure.
16    Q.  -- to do the condition adjustment?
17    A.  Absolutely.
18    Q.  So -- so that individual inspection and
19 work that you are so proud of --
20    A.  Yes.
21    Q.  -- and, rightfully so, is also done by
22 the user of the product?
23    A.  Agreed.  Agreed.  Again, you take that
24 out of there and you've got a very good product.
25    Q.  So let me -- let me make sure I

37 (Pages 142 - 145)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 146

1 understand it. And I want to use as an example,
2 just so I can -- I'm going to turn to Exhibit 13,
3 okay, Lukasik's vehicle evaluation report.
4    MR. CASHDAN: Did I get it right?
5    MR. LOWTHER: Yeah.
6    THE WITNESS: Okay.
7 BY MR. CASHDAN:
8    Q. All right. So now Exhibit 13 actually
9 has a number of different vehicle valuation
10 reports. It kind of shows the -- the -- the
11 iteration of it. I want you to turn to the
12 report that begins with the little number in the
13 corner at 844, okay?
14   A. Okay.
15   Q. And I'll represent to you that this is
16 the report that, I think it was the last one that
17 was done for Mr. Lukasik, and it re -- results in
18 a -- an estimated market value that's the highest
19 of all the prior reports. Okay?
20   A. Okay.
21   Q. So on the first page you can see that
22 this report estimated a base value of $12,648.45.
23 Do you see that?
24   A. Yes.
25   Q. And that there was a -- an upward

Page 147

1 adjustment for condition of $91.80, correct?
2    A. Correct.
3    Q. Meaning there was no downgrade and he --
4 he was bene -- he got a bene -- a bump up because
5 his car was in good condition, correct?
6    A. Correct.
7    Q. And then there was an aftermarket part
8 addition for $160. Do you see that?
9    A. Correct.
10   Q. And so the total market value estimated
11 by this report was $12,900.25, correct?
12   A. Correct.
13   Q. And then, of course, you take his
14 deductible off, and that's the amount he was
15 paid.
16   A. Sure.
17   Q. Okay. Now, if you turn to the third
18 page of this report, which is Bates Numbered 846
19 -- Mitchell-Volino Subpoena 846. Tell me when
20 you're there. 846. In the lower -- the lower --
21 the lower corner it should have a number eight
22 -- actually, right here. Right here.
23   A. Okay. 846.
24   Q. Are you there?
25   A. Yes.

Page 148

1    Q. All right. So it's the third page of
2 this vehicle valuation report we started looking
3 at, and you can see that there were four
4 comparable vehicles used, correct?
5    A. Correct.
6    Q. And three of them were list prices.
7    A. Correct.
8    Q. Okay. One of them was an actual sold
9 vehicle, correct?
10   A. Correct.
11   Q. Okay. And so for those three that were
12 list prices, if you turn to the next page, it
13 shows the actual sold vehicle, right?
14   A. Okay.
15   Q. Do you see that?
16   A. Yes.
17   Q. And then if you turn to the next page,
18 Page 848, it has the second vehicle, which was a
19 list price, correct?
20   A. Correct.
21   Q. And there was a Projected Sold
22 Adjustment made of $818 on that vehicle, right?
23   A. Correct.
24   Q. And then the next vehicle had a
25 Projected Sold Adjustment of $643, correct?

Page 149

1    A. Correct.
2    Q. And then the last -- turn the page, the
3 last vehicle had a Projected Sold Adjustment of
4 $819.
5    A. Correct.
6    Q. Okay. And if I understand what you're
7 saying in your report, if we used this valuation
8 report for Mr. Lukasik and we just deleted those
9 Projected Sold Adjustments, you think it's
10 reasonable?
11   A. Absolutely.
12   Q. Okay. So if we did that math -- I just
13 want to make sure we do it right -- that would
14 change -- the -- the -- the base value is the
15 average of the four vehicles, correct?
16   A. Correct.
17   Q. Do you have a calculator on your phone?
18   A. I have my phone off.
19   Q. All right. I'll hand you my phone.
20   A. He said to turn phones off.
21   Q. That's okay.
22      Here's a calculator. All right?
23      So the first vehicle in that report, if
24 you go back to Page 846, it has the summary.
25   A. Okay.

38 (Pages 146 - 149)

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 150

1    Q.   The first vehicle was a sold price, so
2  there's no adjustment made, right?
3    A.   Okay.
4    Q.   The second vehicle, you can turn in
5  there, it was -- it -- it was -- its adjusted
6  price after mileage was 12,856.84.  Do you see
7  that?
8    A.   Yes.
9    Q.   So you're saying add the 818 back onto
10  that, right?
11    A.   Okay.
12    Q.   So go ahead and use your calculator, --
13    A.   Mm-hmm.
14    Q.   -- and add 12,856.84 and add $818 on
15  there.  What do you get?
16    A.   13,674.84.
17    Q.   So that's Vehicle Number 2.  Okay.
18  Now go to Vehicle Number 3.  That's on the Page
19  -- the 848 page.  You can turn that page and see
20  if you can see the adjustment
21    A.   Okay.
22    Q.   Are you on Page 848?
23    A.   Yes.
24    Q.   Okay.  Do you see Vehicle Number 3?
25    A.   Yes.

Page 151

1    Q.   All right.  So you would take the
2  adjusted price and add the projected sold back
3  onto it.
4    A.   Okay.
5    Q.   So cle -- clear that out.  Yeah.  There
6  you go.
7       So that would be 10,396 --
8    A.   643 is 11,638.
9    Q.   Wait.  I think you did it wrong.  Go
10  ahead and clear that.
11       Do you see the adjusted price is
12  10,396.75?
13       Okay.  And now add the projected sold
14  number back in, and what do you get?
15    A.   11,039.75.
16    Q.   11,039.75?
17    A.   Correct.
18    Q.   Okay.  And now let's do the same thing
19  for the fourth vehicle.  The adjusted price was
20  13,093.78 -- oh, I think you have it wrong there.
21       13,093.78, and then you're going to add
22  the 819 back, correct?  And what do you get?
23    A.   13,912.78.
24    Q.   Okay.  So now let's go back to our
25  summary page, Page 846.  So we're going to add

Page 152

1  the four vehicles in -- up again now that we've
2  adjusted for projected sold, okay?
3    A.   Okay.
4    Q.   So the first vehicle is 14,246.41,
5  correct?
6    A.   Okay.
7    Q.   Plus, the second vehicle you have
8  13,674.84.  The third vehicle you're adding
9  11,039 -- oh, we've gotta start over -- nope.
10  I think.  I think -- oh, there you go.
11       Okay.  Let's start over again, because I
12  think we have to -- you cleared everything out.
13    A.   No, I didn't.
14    Q.   Okay.  And then the fourth is 13,912.78,
15  okay?
16    A.   Mm-hmm.
17    Q.   And then you divide it by four, correct?
18    A.   Mm-hmm.
19    Q.   What number do you get?
20    A.   Yeah.  That's wrong.  42,000.
21    Q.   Okay.  Let's try it again, okay?  I've
22  written down the three --
23    A.   Let me see that.
24    Q.   -- the three adjusted ones, and then you
25  have the one unadjusted one at the top.

Page 153

1    A.   The one adjusted.
2    Q.   Okay.  Four.
3    A.   That's four.
4       52,873 --
5    Q.   And then you divide that by four,
6  correct?
7    A.   -- divided by four.
8    Q.   And what do you get?
9    A.   13,218.45.
10    Q.   Okay.  So using your approach, getting
11  rid of the PSA, the base value would change, if
12  you go back to Page 844 there -- right?  You're
13  there?
14    A.   Yes.
15    Q.   Okay.  If you go back to that, the
16  base value would be changed from 12,648.45 to
17  13,218.45.
18    A.   Correct.
19    Q.   Okay.  And 13,218.45, plus -- minus the
20  base value we had before equals what?
21    A.   570.
22    Q.   Okay.  So the difference between
23  what Mr. Lukasik was paid using the current
24  methodology and the amount he would be paid if
25  we followed your recommendation is $570?

39 (Pages 150 - 153)

Jason Merritt                                                            April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 154

1    A.   Yeah.  Roughly $600.
2    Q.   Okay.  And -- and you agree that
3  the rest -- the rest of the work Mitchell did in
4  valuing Mr. Lukasik's vehicle was accurate?
5    A.   Correct.
6    Q.   So if Mr. Lukasik was paid $12,925, plus
7  the 570, minus his deductible, he's been fully
8  compensated for the actual cash value of his --
9  of his vehicle, correct?
10   A.   Plus the other 600.
11   Q.   Yes.  Is that right?  So if he -- he --
12  if -- what I'm saying is the market value of his
13  vehicle here is $12,925, correct?
14   A.   Plus the 600.
15   Q.   Plus the 600, and then minus his
16  deductible.
17   A.   Correct.
18   Q.   If he receives that amount --
19   A.   So we have thirteen five as market
20  value.
21   Q.   So if he received that amount, he would
22  be fully compensated for the actual cash value of
23  his vehicle pursuant to his policy.
24       MR. LOWTHER:  Object to form.  Calls for
25  a leg -- legal conclusion.

Page 155

1  BY MR. CASHDAN:
2    Q.   You can answer.
3    A.   Yeah.  I -- I don't know what his policy
4  is or any --
5    Q.   I'm not asking for his policy.
6    A.   -- but I'm just saying, if I -- as an
7  appraiser, --
8    Q.   Yes.
9    A.   -- I would put thirteen five on that.
10   Q.   Thirteen five as the market value,
11  and then you would -- and then we -- we would
12  subtract the deductible, right?
13   A.   Yeah.  The deductible, obviously, I
14  don't deal with.  But I'm just saying --
15   Q.   Sure.
16   A.   -- thirteen five as an appraiser is the
17  number I would come up with.
18   Q.   Okay.  So if he received $13,500, --
19   A.   He has the actual cash value.
20   Q.   Okay.  And if he received less than
21  that, he would not have received the actual cash
22  value?
23   A.   Correct.
24   Q.   But if he received more than that, he
25  would have received more than the actual cash

Page 156

1  value?
2    A.   Correct.
3    Q.   Okay.
4    A.   For this standard, yes.  For -- yes.
5    Q.   And you have no issue with this approach
6  that Mitchell is taking, other than the Projected
7  Sold Adjustment, correct?
8    A.   Yes.  From what I've seen here,
9  these examples, I like these examples.  I like --
10  you know, again, I put in there some of the
11  comparables I would have done differently.  But,
12  again, their data is very broad, so mine would be
13  a little more narrowed down.  But --
14   Q.   Okay.
15   A.   -- but from what I see here, what
16  they're coming up with, I see a $600 difference
17  in what the -- the actual cash value is.
18   Q.   And, to be precise, it was 570.
19   A.   Five hundred and, yeah, eighty, 590.
20   Q.   You're rounding up to 600?
21   A.   Yeah.  I'm just --
22   Q.   Whatever the math is, right?
23   A.   Exactly.
24   Q.   You're not offering any opinion or
25  conclusion in this matter that disagrees with any

Page 157

1  of these vehicle valuation reports other than the
2  Projected Sold Adjustment, correct?
3    A.   That was the only thing that I really --
4  again, some of these were older, so I couldn't
5  go back and do comparables on them myself.  But
6  looking at these sheets and taking them for face
7  value in the data, yes, that was my issue.
8    Q.   Okay.  Now, if -- if one of the -- the
9  owners of these vehicles came to you with one of
10  these reports and said, --
11   A.   Mm-hmm.
12   Q.   -- I think that they -- they undervalued
13  my car because the condition was wrong; they got
14  the condition wrong, what would you do to address
15  that?
16   A.   To address that I would look at the
17  condition.
18   Q.   Okay.  What if the vehicle wasn't
19  available to you anymore?
20   A.   Well, then there's really not much I can
21  do with that.
22   Q.   Okay.  How about -- you said that you
23  might take issue with some of the comparables.
24   A.   If someone gave me this report and
25  said they totally disagreed with it, I would look

40 (Pages 154 - 157)

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 158

1 through it and look at the comparables. Their
2 algorithms for their condition, where they marked
3 the numbers off the condition, I think that's
4 fair assessments. You know, the rate he rated
5 at Number 2 -- I'm looking at Page 821 --
6    Q.   Of -- of which exhibit?
7    A.   Of the same exhibit, 13. Exhibit 13.
8    Q.   Okay. Page 821?
9    A.   Yes.
10   Q.   Okay.
11   A.   The condition adjustments, I like how
12 they go through that and -- and note everything
13 and give it a number value. I like how that's
14 documented. So I would look at that for a
15 customer. If he gave me this vehicle valuation
16 report, I would start there looking at the
17 condition, compared to what they had noted.
18 Sitting in a court of law, it would be hard to
19 argue that.
20   Q.   Yeah.
21   A.   It just would be.
22       The only thing that I would think would
23 come into play would be the comparables of it.
24 you know, we'd look at the different comparables
25 and make sure they're correct and right.

Page 159

1    Q.   And as an appraiser, you're not perfect,
2 right?
3    A.   No.
4    Q.   You might think that the carpet is in
5 fair condition and the car -- the owner of the
6 car might say, no, it's in good condition, let me
7 tell you, right?
8    A.   Sure.
9    Q.   You'd have those discussions.
10   A.   Everything thinks theirs is much better
11 than what it is.
12   Q.   And -- and, in fact, if you look at the
13 reports -- so you were -- you were looking at
14 Page 821, right?
15   A.   Yes.
16   Q.   And the carpet was rated as Fair,
17 correct?
18   A.   Yes.
19   Q.   Now, if you turn to Page 846, which
20 was the last report that we were looking at
21 earlier, --
22   A.   Mm-hmm.
23   Q.   -- you can see that the carpet condition
24 has been upgraded to Good.
25   A.   Okay.

Page 160

1    Q.   You see that?
2    A.   Yes.
3    Q.   And that -- that actually helps the
4 owner of the vehicle get a higher appraisal,
5 right?
6    A.   I don't know which one they're adjusting
7 that on.
8    Q.   Same -- same vehicle. It's for the loss
9 vehicle.
10   A.   Okay. Well, there I would ask why did
11 they change it from a two to a three.
12   Q.   Right. So as we talked about, sometimes
13 there are conversations with the owner of the
14 vehicle and they might argue, "that stain is not
15 as bad as you think it is," or something of that
16 sort, right?
17   A.   Sure.
18   Q.   You've -- you've --
19   A.   Sure.
20   Q.   -- had that experience, I'm sure.
21   A.   Sure.
22   Q.   And -- and -- and do you think it's
23 appropriate for, when you're appraising a
24 vehicle -- a vehicle, to take into account the
25 perspectives of the owner of the vehicle on those

Page 161

1 issues?
2    A.   Not really.
3    Q.   Okay. So -- so would you have an issue
4 with the way Mitchell made that adjustment?
5    A.   No. Again, I don't know how that
6 adjustment was made. I don't know why it was
7 made. You know, maybe the first adjuster came in
8 and, after the crash, there was dirt or something
9 and after it was cleaned up they looked back it
10 again and it wasn't a stain. So maybe he removed
11 it. So --
12   Q.   Okay.
13   A.   -- you know, I don't know how they come
14 up with that. There could have been a reason the
15 adjuster could have seen the dirt and then it got
16 wiped up and it wasn't a stain.
17   Q.   Okay.
18   A.   So I don't want to take that into
19 account. I -- I can't say what Mitchell did to
20 change it.
21   Q.   But you're not going to offer any
22 opinion or conclusion in this case criticizing
23 these reports for any reason other than the
24 Projected Sold Adjustment, correct?
25   A.   Correct.

41 (Pages 158 - 161)

Jason Merritt                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 162

1    Q.  Okay.
2        MR. LOWTHER:  Jeff, when we get to a
3    stopping point, can we take a short break?
4        MR. CASHDAN:  This is a good time.
5        MR. LOWTHER:  This is a good time?
6    Okay.
7        MR. CASHDAN:  We can go off the record.
8        THE VIDEOGRAPHER:  We're going off the
9    record.  This is the end of Media Unit Number 2.
10   Time is 11:54 a.m.
11       (Recess taken.)
12       THE VIDEOGRAPHER:  We're back on the
13   record.  This is the beginning of Media Unit
14   Number 3.  The time is 12:08 a -- p.m.
15   BY MR. CASHDAN:
16   Q.  Mr. Merritt, you mentioned that COVID
17   presented some challenges to your appraisal
18   business, and, in particular, I'm talking more
19   about the -- the act of doing appraisals.
20       I'm assuming that one of the challenges
21   was it, maybe, limited your ability to do
22   inspections of vehicles in person; is that right?
23   A.  Correct.
24   Q.  So what did you do in those
25   circumstances in order to perform your job of

Page 163

1    conducting an appraisal when you weren't able to
2    physically, in person, inspect a vehicle?
3    A.  Honestly, I didn't do any.
4    Q.  Okay.  So you just couldn't make
5    adjustments because there were not --
6    A.  I didn't do appraisals much.
7    Q.  Okay.  So --
8    A.  It was limited to what I could do.
9    Like, diminished value and stuff like that I
10   could do.  But actual cash value and classic car
11   appraisals, I just couldn't do them.
12   Q.  So for what period of time were you just
13   unable to do the actual cash value appraisals?
14   A.  It depended on where we were in the
15   numbers and who felt comfortable with me meeting
16   with them.
17   Q.  Was there a time period, though, or was
18   it just intermittent?
19   A.  Intermittent.  It would start and stop
20   and start and stop, --
21   Q.  Okay.
22   A.  -- but over about a year.
23   Q.  So it wouldn't surprise you that
24   Progressive, as in the insurance entities,
25   similarly had issues with the ability to conduct

Page 164

1    inspections during COVID?
2    A.  Correct.
3    Q.  And, of course, they didn't have the
4    luxury of just telling their customers they
5    weren't going to do it?
6    A.  People were still crashing.
7    Q.  People were still crashing.
8        So I wonder if you could just turn to
9    Exhibit 12?
10       And, if you could, just as an example,
11   this is the -- this is the vehicle valuation
12   report for Mr. Costa.  Do you see that?
13   A.  Correct.  I do.
14   Q.  Okay.  And you can go to -- there's
15   several different vehicle valuation reports.
16   They -- they lead up to the last one, because
17   they go -- but if you -- if you can look at any
18   of them, I think what you'll see, and you can go
19   to, for example, the fourth page of this exhibit,
20   you can see that there was no con -- condition
21   adjustment made for Mr. Costa's vehicle because
22   they were unable to determine the condition
23   because of COVID.  Do you see that?
24   A.  I do.
25   Q.  And so as a result, Mr. Costa's vehicle

Page 165

1    was given a condition rating of three, which is
2    average for dealer-sold vehicles.
3    A.  Correct.
4    Q.  Do you have any issue with that approach
5    given the circumstances?
6    A.  Given the circumstances, no.  I
7    mean, you know, again, they have to do what they
8    have to do to get it done.  And average overall
9    condition of three, you know, I think that's
10   reasonable.
11   Q.  In your experience with regular
12   automobiles, and what I mean by that is
13   I'm putting aside collector items, --
14   A.  Mm-hmm.
15   Q.  -- okay, in your experience with regular
16   automobiles, do owners typically keep their used
17   vehicles in a condition that is better or worse
18   than dealer-sold used cars?
19   A.  I keep mine in great shape.  I see some
20   that are in very bad shape.  So "typical," I
21   can't give you a -- I can't give you an opinion
22   on that.
23   Q.  So it's going to vary?
24   A.  Yeah.  It's varied.
25   Q.  And so in the circumstances of, like,

42 (Pages 162 - 165)

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 166

1  Mr. Costa, where he was assumed to have a typical
2  condition, it -- it may have benefited him or it
3  may have hurt him --
4      A.  Correct.
5      Q.  -- in the valuation, correct?
6      A.  Very well could have.
7      Q.  And that would be true of anyone in that
8  circumstance?
9      A.  Correct.
10     Q.  We just don't know, based solely on this
11  report, --
12     A.  Correct.
13     Q.  -- whether he was benefited or hurt in
14  the actual cash value, correct?
15     A.  Correct.
16     Q.  It would require a little more
17  individual inquiry --
18     A.  Yes, it would.
19     Q.  -- to make that decision?
20     A.  Correct.
21     Q.  Okay.  Inquiry you haven't even
22  purported to do, correct?
23     A.  No.  No.  Not on this one, no.
24     Q.  Okay.  And you're -- you're agreeing
25  with me that I'm correct you haven't done it; is

Page 167

1  that right?
2      A.  On this -- no, I have not done any on
3  this report.
4      Q.  Okay.  If you would go back to Exhibit
5  1, I'd like to understand a bit more about the
6  process you used to write this report.  So my
7  question is, did you write every word of this
8  report yourself?
9      A.  No.  I had help writing it.
10     Q.  Who helped you?
11     A.  Mr. Lowther helped me.  I gave an
12  outline and all my opinions, and they helped
13  me to, kind of, refine it, I guess you could say.
14     Q.  When you say "they," you're talking
15  about plaintiff's counsel, Mr. Lowther?
16     A.  Correct.
17     Q.  Okay.  You provided him an outline?
18     A.  I provided him -- I -- yeah.  We talked
19  and I provided him an overview of everything that
20  I want to put in the report, and then they refine
21  it to the final product.
22     Q.  Did you provide a written outline?
23     A.  No.
24     Q.  So you provided an oral outline of what
25  you wanted to put in the report --

Page 168

1      A.  Correct.  Kind of a --
2      Q.  -- to the plaintiff's counsel; is that
3  right?
4      A.  -- a verbatim.
5      Q.  What I'm asking you is you provided an
6  oral --
7      A.  Correct.
8      Q.  -- statement to plaintiff's counsel of
9  what you wanted in the report?
10     A.  Yes.
11     Q.  And then plaintiff's counsel wrote the
12  report and you reviewed it?
13     A.  Yes.
14     Q.  And did you make any changes to what
15  they wrote?
16     A.  Yes.
17     Q.  And you sent them back to plaintiff's
18  counsel, or you made the changes yourself?
19     A.  Made the changes myself.
20     Q.  Okay.  And then did you -- did you send
21  it back for their review?
22     A.  Correct.
23     Q.  And did you make any further changes?
24     A.  I don't believe so.
25     Q.  Okay.  Was there anything that

Page 169

1  plaintiff's counsel proposed to put in that you
2  rejected as inaccurate?
3          MR. LOWTHER:  Object to form.
4          And, Mr. Merritt, I'm going to
5  caution that we are not waiving the Work
6  Product Privilege here as to any draft or to
7  any -- any communications.  So if it's not about
8  a fact that you got from counsel or an assumption
9  that we asked you to -- to consider for purposes
10  of your report, then I'd ask you to not disclose
11  it.
12         MR. CASHDAN:  Well, I'm not asking him
13  to disclose it.  I'm asking for a yes or no.  All
14  right?
15  BY MR. CASHDAN:
16     Q.  Was there anything that plaintiff's
17  counsel put in the proposed report to you that
18  you rejected as untrue, just yes or no, without
19  disclosing what it was?
20     A.  No.
21     Q.  Okay.  Was there anything that -- strike
22  that.
23         When did plaintiff's counsel first send
24  you a -- a draft report that they wrote for you
25  to review?

43 (Pages 166 - 169)

Jason Merritt                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 170

1    A.  Well, again, I -- I dictated this
2  report, and they then typed it out as I dictated
3  it and re -- responded back to me with the copy
4  and then I made the changes and gave it back.
5    Q.  All right.  So you're saying you -- you
6  didn't give them an outline.  You actually
7  dictated verbatim what's in there?
8    A.  Yes, the outline of everything I wanted
9  in there.  And we discussed it and I gave them an
10  outline of everything in here.
11    Q.  Okay.
12    A.  So this is my report.
13    Q.  I understand, but we are using words
14  without precision.  That's my fault.  What I'm
15  asking is, did you, verbatim, dictate the actual
16  words in the first draft?
17    A.  Yes.
18    Q.  Okay.  So it wasn't an outline.  It was
19  actually the words?
20    A.  Again, it depends on what you want
21  to put.  Yeah.  We -- we put actual words, but
22  then they --
23    Q.  They added more to it.
24    A.  No.  No.  No.
25    Q.  Okay.

Page 171

1    A.  Not as in content, but maybe in my
2  English and --
3    Q   Sure.  Okay.
4    A.  -- and -- and what I wanted to say in
5  there and helped me to correct the English and
6  put it in the correct re -- and the reason
7  being, I've never done an expert report, so they
8  assisted me with the actual construction of the
9  report.
10    Q.  Okay.
11    A.  The actual content of the report is
12  mine.
13    Q.  Okay.
14    A.  But I have never -- as I've testified,
15  this is my first time testifying as an expert in
16  this, so they assisted me with drafting up this
17  report.
18    Q.  Now having had a chance to review this
19  more, is there anything in here that you want to
20  amend?
21    A.  No.
22    Q.  Anything you think needs to be changed
23  in order to be accurate?
24    A.  No.
25    Q.  Okay.  Are there any opinions or

Page 172

1  conclusions you have regarding this case that are
2  not set forth in your report in Exhibit 1 here?
3    A.  No.
4    Q.  Okay.  Have you been asked to do any
5  additional work?
6    A.  No.
7    Q.  Do you have plans at this time to do any
8  additional work?
9    A.  No plans.
10    Q.  Okay.
11    A.  Been no discussion.
12    Q.  Okay.  Let's go ahead and look back at
13  Exhibit 8.
14      Did you have this document at the time
15  you prepared your expert report?
16    A.  When I did this, yes.
17    Q.  Okay.  And -- and for what purpose did
18  you use or rely on Exhibit 8 for your expert
19  opinions and conclusions?
20    A.  Mine would just be that I was
21  questioning how they come up with any of
22  these -- any of the reports, their evaluations.
23    Q.  Okay.  Did -- did -- were you curious as
24  to what kind of hard data Mitchell or J.D. Power
25  had available to estimate Projected Sold

Page 173

1  Adjustment?
2    A.  Again, I -- my curiosity is different
3  than what -- the actual information that I know.
4  Again, the information that I know that dealers
5  report on sold is exactly the data that we put in
6  the CRMs.
7    Q.  Yeah.  What I'm asking is, did you want
8  to understand how Mitchell and J.D. Power come up
9  with their Projected Sold Adjustment?
10    A.  Well, sure.
11    Q.  And did you want -- your -- your report
12  talks about how you can't assume and you have to
13  have hard data.  Were you curious whether they
14  claimed to have hard data to make those
15  adjustments?
16    A.  Curious?  Yes.  Do I know?  No, I don't
17  know.
18    Q.  Did you ask for testimony or documents
19  that would inform you on that subject?
20    A.  No.
21    Q.  Looking at this document, the first
22  sentence of the second paragraph says, and,
23  again, we're looking at Exhibit 8, --
24    A.  Okay.
25    Q.  -- "Prior to discussing the internet

44 (Pages 170 - 173)

Jason Merritt                                           April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 174

1  sales pricing and method, caution must be taken
2  when obtaining information, such as the sold
3  price, from the dealer regarding a specific
4  vehicle." Do you see that?
5     A. Yes.
6     Q. Do you agree with that?
7     A. I agree with that.
8     Q. Next sentence says, "Basing an opinion
9  solely on the dealer's verbal communication is
10 not recommended." Do you agree with that?
11    A. Totally.
12    Q. Next sentence: "This information must
13 be accurate. And unless the dealer can provide
14 actual proof, such as purchase invoice or
15 contract, which should be considered private
16 information with regards to the actual purchaser,
17 this information should be considered suspect at
18 best." Do you agree with that?
19    A. I do.
20    Q. Okay. The next section is on Internet
21 Sales. Do you see that?
22    A. I do.
23    Q. The first sentence says: "With the
24 explosion of the internet, there are two methods
25 employed by dealerships when selling new/used

Page 175

1  vehicles." Do you agree with that?
2     A. I do.
3     Q. It says, "In addition to the more
4  traditional on-the-lot sales, many dealerships
5  have internet sales departments." Do you see
6  that?
7     A. I do.
8     Q. Do agree with it?
9     A. I do.
10    Q. Next sentence: "For an internet
11 department, it is more important to move
12 inventory and sell a lot of cars than it is to
13 maximize profit on individual cars." Do you
14 agree with that?
15    A. Yes.
16    Q. Next sentence: "Therefore, the initial
17 price from an internet sales department will
18 often reflect a no hassle price." Do you agree
19 with that?
20    A. I do.
21    Q. Next sentence says, "It is important not
22 to confuse a dealer's inventory online with an
23 internet no hassle price." Do you agree with
24 that?
25    A. No. I don't agree with that.

Page 176

1     Q. Okay. Next sentence says, "Our
2  experience indicates that dealers who offer
3  the internet no hassle pricing also have
4  incorporated a no hassle single-price sales
5  policy." Is that your experience?
6     A. No.
7     Q. Okay. The remainder of the document
8  talks about how WorkCenter Total Loss functions,
9  and I presume that you don't have any expertise
10 on that issue, other than just having read the
11 reports?
12    A. I'm not going to say I don't have
13 experie -- or expertise in it 'til I know exactly
14 what you're referring to.
15    Q. Okay. Sure.
16       Is there anything in those remaining
17 paragraphs that you disagree with?
18    A. Oh, I just thought you said okay.
19    Q. Oh, I thought you were reading it.
20    A. No. I'm sorry. I thought you were
21 looking for something else.
22    Q. No. I -- I thought you said you wanted
23 to look at it before you agreed with my question.
24    A. No. We won't over each sentence
25 individually, so I thought that's what you wanted

Page 177

1  to do.
2     Q. Well, for the last three paragraphs,
3  which disc -- they discuss the way that
4  WorkCenter Total Loss operates, so I -- I wasn't
5  going to ask you if you agreed that it operates
6  that way, but go ahead --
7     A. Okay.
8     Q. -- and read the last three paragraphs
9  and tell me if there's any parts of them that you
10 disagree with.
11    A. No. I agree with that.
12    Q. Okay. You -- how much time did you
13 spend dictating the general outline of the expert
14 report for plaintiff's counsel?
15    A. I don't recall how much time that took.
16    Q. All right. You told me earlier that
17 you -- you had spent three to four hours of time
18 in your work leading to the completion of the
19 expert report?
20    A. Correct.
21    Q. How much of those three to four hours
22 were spent in the actual editing of the report?
23    A. Editing of the report was a small amount
24 of time. Me actually coming to the conclusion on
25 this report, prob -- the entire report was

45 (Pages 174 - 177)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 178

1 probably an hour of that.
2    Q.  When you say "coming to the conclusion,"
3 what do you mean?
4    A.  No.  I mean, coming to the final version
5 probably took an hour.
6    Q.  In terms of -- of -- of editing it and
7 writing it?
8    A.  Yes.
9    Q.  Okay.  So of the three to four hours, an
10 hour of it was writing and editing the report?
11    A.  Correct.
12    Q.  So of the -- two to three hours was
13 spent looking at the documents you had been
14 provided and thinking about the issues?
15    A.  Correct.
16    Q.  Okay.  That's helpful.  Thank you.
17       Turn, if you would, to Exhibit 9.
18    A.  Okay.  England.
19    Q.  All right.  This is the be -- vehicle
20 valuation report for Mr. England, correct?
21    A.  Correct.
22    Q.  Is there anything associated with this
23 report with which you take issue, other than the
24 use of the Projected Sold Adjustment?
25    A.  No.  That seemed to be the biggest

Page 179

1 issue, and, again, that was one of the COVID
2 ones.
3    Q.  When you say "that's the biggest issue,"
4 I want to know if you have any other issue with
5 this report?
6    A.  That's the issue I have with this
7 report, is the adjustment.
8    Q.  The Projected Sold Adjustment?
9    A.  Correct.
10    Q.  So you have no other issue with the
11 report other than the Projected Sold Adjustment;
12 is that correct?
13    A.  And when I say that, again, my -- I go
14 back to the methodology.  Everything that I see
15 in here follows the same methodology.  I can't
16 confirm the comparables, I can't confirm the
17 conditions, I can't do any of that.  But it's
18 following that same methodology, you know, the
19 comparables, the adjustments, the -- the base
20 value, the calculated loss vehicle adjustments
21 and the market value.  I agree with all that,
22 except for Step 2, Bullet 1, you know.  But,
23 again, the methodology is what I -- I agree with
24 on that.
25    Q.  Okay.  So you agree with the

Page 180

1 methodology, whether the actual -- strike that.
2       You agree with the methodology other
3 than the Projected Sold Adjustment?
4    A.  Correct.
5    Q.  But whether the actual dollar amount is
6 the right amount, within that right range, you
7 don't have an opinion on --
8    A.  No.
9    Q.  -- because you have -- you have to
10 actually do the appraisal, correct?
11    A.  Correct.
12    Q.  Okay.
13    A.  And that was June 22nd of 2020, so
14 documents, you know, even online, it's hard to
15 find those comparables again.
16    Q.  Okay.  But the only way you could have
17 an -- you would have an opinion about whether the
18 dollar amount is appropriate would be to do an
19 appraisal?
20    A.  Correct.
21    Q.  Okay.  And you haven't done that?
22    A.  No.
23    Q.  Let's look at Exhibit 10.  So the -- the
24 same question for this one.  I'm wondering if
25 there's any issue you have with the vehicle

Page 181

1 valuation report in Exhibit 10 other than the
2 Projected Sold Adjustment?
3    A.  No.  It appears this one, again, goes by
4 the same methodology.  They used quite a bit
5 of vehicles for comparables.  And this was not
6 a COVID one, so they -- they did all the
7 conditional things.  So, again, it follows
8 the same methodology.
9    Q.  And so you have no issue other than the
10 use of the Projected Sold Adjustment, correct?
11    A.  Correct.
12    Q.  Okay.  Now, I notice on the third page,
13 where it summarizes the Comparable Vehicle
14 Information, third page of this Exhibit 10, that,
15 for some of the comparables they have a sold
16 price and for some of them they have a list
17 price; is that correct?
18    A.  Correct.
19    Q.  And am I correct that it's your opinion
20 that they should not have used the sold price;
21 they should have found a list price to use?
22    A.  Yes.  As we discussed.
23    Q.  Okay.  So you -- so your criticism is
24 that you think you should always use list price
25 and never use sold price?

46 (Pages 178 - 181)

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 182

1    A.  As a standard, yes.
2    Q.  Okay.  And is that what you do in
3  your --
4    A.  Yes.  Again, because I -- as they even
5  stated here in the WorkCenter is it's hard to get
6  the actual sold price.
7    Q.  But if you're -- if you're able
8  to get the sold price, would you want to use it
9  instead of the list price?
10    A.  Again, if I had the -- and, again, they
11  even recommend not doing it.  They recommend
12  against it, even in this.
13    Q.  Where do they recommend against it?
14  Tell me.  You're -- you're -- when you say
15  "this," you're --
16    A.  We're looking at Exhibit 8.
17    Q.  Okay.  And where do they recommend
18  against using the sold price?
19    A.  Second paragraph down --
20    Q.  Mm-hmm.
21    A.  -- it says, "is not recommended."
22    Q.  Where does it say that?
23    A.  Second line -- third line down, starts
24  on second, "Basing an opinion solely on the
25  dealer's verbal communication is not

Page 183

1  recommended."
2    Q.  Okay.  So does that say you shouldn't
3  use the sold price, or you just shouldn't rely on
4  a dealer's oral communication of the sold price?
5    A.  Well, to me that's the same thing.
6  They're saying you can't rely on it.
7    Q.  Okay.  So you interpret this as saying
8  you should not re -- rely on sold prices?
9    A.  Correct.
10    Q.  Okay.  And what if there was another way
11  to get the information that was accurate?  Could
12  you rely on it then?
13    A.  If you had an accurate assessment of
14  the sale of the vehicle, and when I use those
15  it's usually the classics:  Antiques.  Again,
16  when I'm dealing with dealers, it's too --
17  there's too many variances and there's too many
18  different variations in the sale.
19    Q.  What -- what information does Mitchell
20  have regarding the sold price for vehicles?
21    A.  I don't know what they have.
22    Q.  Okay.  So do -- do you know if they
23  information they have is reliable?
24    A.  No.
25    Q.  You just don't know?

Page 184

1    A.  Again, I know what we provide as a
2  dealer in the CRMs.  And, again, that is not a
3  good representation of what the vehicle's worth.
4    Q.  I'm asking if you know what information
5  Mitchell has available --
6    A.  No.
7    Q.  -- on sold prices?
8    A.  No.
9    Q.  You don't know?
10    A.  No, I don't.
11    Q.  Okay.  But you think that it's a mistake
12  for them to -- for Mitchell to use the sold price
13  instead of the list price?
14    A.  I do.
15    Q.  Okay.
16    A.  I've never had Mitchell call me while I
17  was sitting at a dealership to ask me to verify
18  or even to break down the sale.
19    Q.  So going back to Exhibit 10, for those
20  vehicles on the -- looking at the third page of
21  Exhibit 10, --
22    A.  731?
23    Q.  Yes, sir.  Bates Number 731.
24    -- for those vehicles where there's a
25  sold price listed, do you think it would be

Page 185

1  appropriate to go back and look for the list
2  price for those vehicles and then recalculate the
3  base value?
4    A.  I would like to know what the list
5  prices were.
6    Q.  Well, that's not what I asked.  I know
7  you'd like to know it.  What I'm asking is do you
8  think it would be appropriate to find the list
9  prices for those vehicles and to recalculate the
10  base value?
11    A.  I do.
12    Q.  And -- and you think that should be done
13  for Mr. Goodier?
14    A.  Correct.
15    Q.  Okay.  And so that's another issue you
16  have with the report, is that -- the use of sold
17  prices instead of list prices, correct?
18    A.  Again, yes.  In these circ -- in these
19  circumstances you pointed out, yes.
20    Q.  And so it would be -- in your opinion,
21  it would be appropriate to re-do Mr. Goodier's
22  report to use list price instead of sold price?
23    A.  Correct.
24    Q.  Okay.  And do you know whether it's
25  possible to find old listings for sales of

47 (Pages 182 - 185)

Jason Merritt                                           April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 186

1  vehicles?
2     A.  It depends on which website it is.  I
3  don't think the individual dealership websites
4  you can.
5     Q.  But the dealers might have that
6  information, right?
7     A.  Correct.  You might be able to call them
8  and get it.
9     Q.  So -- so with -- with just some -- some
10 individual effort, you could probably find it,
11 correct?
12    A.  Possible.
13    Q.  Possible.
14        You'd have to -- it would vary based
15 on -- on --
16    A.  And, again, you're dealing with, you
17 know, private individuals' information at that
18 point, so they may not disclose.
19    Q.  Luckily, we have subpoena power in
20 courts, don't we?
21    A.  Sure.
22    Q.  So it would be possible -- it might be
23 possible, it's going to vary individually, --
24    A.  Absolutely.
25    Q.  -- as to whether you can get this

Page 187

1  information?
2     A.  Absolutely.
3     Q.  But you think it should be done?
4     A.  I believe so.
5     Q.  Thank you.
6        All right.  Let's look at Exhibit 11.
7  This is the valuation report for Mr. Plotts.
8  And I think -- just to be clear, I think this is
9  a collection of several valuation reports that
10 have been -- that were produced together to us.
11        And my question is, with regard to
12 Mr. Plotts, do you have any issue with his
13 valuation reports, other than the use of the
14 Projected Sold Adjustment?
15    A.  No, I do not.
16    Q.  Okay.
17    A.  Again, it follows the same methodology.
18    Q.  And you don't have an opinion as to
19 whether the dollar amount is accurate?
20    A.  No.
21    Q.  Is that correct?
22    A.  I do not.
23    Q.  I just want the record to be clear,
24 sir.
25    A.  You are correct.

Page 188

1     Q.  Thank you.  It's my fault the way I
2  asked the question.
3     A.  I'm sorry.
4     Q.  No.  You shouldn't apologize.  I asked
5  it inartfully, and I apologize for that.
6        Let's move on to Number -- Exhibit 12,
7  which we've looked at before, which is the
8  collection from Mr. Costa.  And I wonder if,
9  other than the Projected Sold Adjustment, you
10 have any other issue with his valuation reports?
11    A.  No, I do not.  And, again, in these
12 comparables that say, "listed and sold," I
13 don't -- as we just testified, I don't know where
14 Mitchell is getting that information from.
15 So they're sold valuation, I don't -- I don't
16 know where they're getting from that.  So it
17 could be legit.  You know, it could be a real
18 good breakdown of the sold price compared, you
19 know --
20    Q.  Fair enough.  So you don't -- you don't
21 have an opinion on it because you don't really
22 know where the information came from?
23    A.  Yeah.  I don't know where they're
24 getting them from.
25    Q.  And the -- the Projected Sold

Page 189

1  Adjustment, do you know if they're just making an
2  assumption about it or whether they have hard
3  data?
4     A.  No.  I'm not talking about the Predicted
5  Sold Amount.  That's not what I'm talking about.
6  I'm talking about when he lists the comparables
7  in here and has list -- list ones compared to
8  sold.
9     Q.  No.  I understood what you were saying.
10 You don't know where they get the sold price.
11    A.  Yes.
12    Q.  I'm asking a different question.
13    A.  Okay.
14    Q.  I'm asking, with regard to Projected
15 Sold Adjustment, with regard to the data that
16 they're using, do you know whether they are using
17 real hard data or just making an assumption about
18 the amount?
19    A.  Yes.  I do not know.
20    Q.  Okay.  Looking at Number 13, which
21 we've looked at before, Mr. Lukasik's collection
22 of valuation reports, as we discussed earlier,
23 one of the four vehicles used for Mr. Lukasik was
24 an actual sold vehicle.  So am I correct that you
25 think that was also wrong?

48 (Pages 186 - 189)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 190

1    A. Again, I -- I don't -- when I say that,
2  again, I gotta back up a little bit and say that
3  I don't know where that information's coming
4  from.
5    Q. Okay.
6    A. So if you know that it's a real sold and
7  there was no other variables in it, and it was,
8  literally, a cash-out-the-door, I'm handing you
9  the money and walking out the door, then I would
10 take that into consideration.
11   Q. Okay. Okay.
12   A. Okay. So I don't want to be painted
13 into that corner of saying all sold is not -- you
14 know, I can't do that.
15   Q. It just depends on the circumstances.
16   A. It depends on the circumstance, but,
17 again, it -- it -- it depends on where the data
18 is coming from.
19   Q. Okay. And so if -- if you knew where
20 the data was coming from, would you then just
21 have to confirm the individual circumstances
22 looking at that data to decide if you can use a
23 sold --
24   A. Yes.
25   Q. -- actual sold?

Page 191

1    A. Yes.
2    Q. So you -- you would have to look at the
3  individual circumstance around that transaction
4  to know whether using the sold price was
5  appropriate?
6    A. Well, as I just testified, I don't know
7  where they're getting the data, --
8    Q. I know you don't.
9    A. -- so I don't know. I -- I can't say
10 that. It -- their data may be very good on the
11 sold prices so they would have to go with that.
12 But I don't -- I don't see that, I don't know
13 that. And I know that the dealers, that's not
14 their concern. So, in other words, I don't want
15 to paint a broad stripe over all of it, other
16 than the projected sold thing is where I have the
17 difference in the methodology.
18   Q. Yeah. And my only question was do
19 you agree that, wherever the data comes from,
20 you still have to look at the individual
21 circumstances of the sale to know whether it's
22 appropriate to use the sold price or not?
23   A. Correct.
24   Q. Okay. And for Mr. Lukasik, other than
25 the Projected Sold Adjustment and the issue about

Page 192

1  sold price we just discussed, do you have any
2  other issue with his --
3    A. No.
4    Q. -- valuation?
5    MR. CASHDAN: All right. Let's take a
6  quick break.
7    MR. LOWTHER: Okay.
8    MR. CASHDAN: Off the record.
9    THE VIDEOGRAPHER: We're going off the
10 record. The time is 12:41 p.m.
11   (Recess taken.)
12   THE VIDEOGRAPHER: We're back on the
13 record. The time is 12:48 p.m.
14 BY MR. CASHDAN:
15   Q. What's the process to get certified by
16 the Bureau of Certified Auto Appraisers?
17   A. It's a 40-hour online course with a test
18 and a --
19   Q. Okay.
20   A. -- fee.
21   Q. A fee. Sure.
22   A. The fee for the certificate.
23   Q. And how -- how often -- I -- I -- I
24 notice from your bio here on Exhibit 2 that your
25 certificate expires May 27, 2022.

Page 193

1    A. I believe just two years.
2    Q. Do you have to take another course and
3  test to get recertified?
4    A. I haven't found that out yet, --
5    Q. Okay.
6    A. -- just because I'm -- I'm due here
7  soon, so I need to get on that soon. But I
8  believe it's some type of a refresher course and
9  another fee.
10   Q. Okay. And the online course teaches the
11 basics about how to conduct an appraisal?
12   A. Correct.
13   Q. And -- and do you attempt to conduct
14 appraisals pursuant to the standards set forth by
15 your certifying entity?
16   A. I do.
17   Q. Okay. And does it explain that process
18 in your 40-hour course?
19   A. Yes.
20   Q. Okay. And you mentioned there are three
21 other people who work with you; is that right?
22   A. I have three other people that are
23 certified.
24   Q. Okay.
25   A. I don't really use them yet. Again,

49 (Pages 190 - 193)

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 194

1 COVID shut us down.
2    Q.  Okay.
3    A.  So we just started back into it again.
4 So during COVID I got some more certified, so
5 we're hoping to do better.
6    Q.  Okay.  So -- and they all are certified
7 by the same organization?
8    A.  Correct.
9    Q.  Okay.  Do you know how many appraisals
10 you have done since starting the business East
11 Coast Auto Appraisers LLC?
12    A.  Actual written appraisals through East
13 Coast Auto Appraisers, probably less than 20.
14    Q.  Okay.  And that's since April 2020?
15    A.  Correct.
16    Q.  Okay.
17    A.  Again, we've been totally shut down,
18 so ...
19    Q.  And -- and during that time, were you
20 also running the T3 Intelligence Services
21 business?
22    A.  Correct.
23    Q.  What percentage of your income comes
24 from T3 Intelligence Services?
25    A.  I got a lot going on.  I got retirement.

Page 195

1 I've got that T3 Investigation Services.  I've
2 got East Coast Auto.  So percentage, East Coast
3 Auto right now, at this point, is in its infancy.
4    Q.  Okay.
5    A.  So I put more money out than in.
6    Q.  Okay.  So East Coast Auto, you said,
7 about 20 appraisals since 2020.  It's not a big
8 contributor to your income at this point in time?
9    A.  No.  No.
10    Q.  Okay.
11    A.  I can't live on that.
12    Q.  Got it.
13    A.  Hopefully soon.
14    Q.  You mentioned in your report that
15 sometimes options can be determined using a VIN
16 decoder?
17    A.  Yes.
18    Q.  For the record, explain what you mean by
19 a VIN decoder.
20    A.  A VIN decoder is any online site that
21 will actually decode the VIN to you.  You can use
22 Bumper.com, Carfax.com.  You just decode the VIN
23 number, the Vehicle Identification Number.
24    Q.  And is it your understanding that not
25 all of the options necessarily will be decoded by

Page 196

1 the VIN decoder?
2    A.  Correct.
3    Q.  So sometimes you need to actually
4 physically inspect the vehicle to be able to
5 capture all of the aspects of the vehicle that
6 might affect the value?
7    A.  There's a -- the window sticker.  It
8 will sometimes tell you also.  It depends on what
9 you have.
10    Q.  I'm talking about a used vehicle.  If
11 someone brings you a used vehicle to -- to be
12 appraised, is it your experience that a VIN
13 decoding is not, by itself, usually sufficient?
14    A.  By itself, no.  But, like I said, there
15 is other -- sometimes in the glove compartment
16 there's a sticker on the glove compartment that
17 has all the options.  So I usually to take a
18 picture of that and try and decode that also.
19 It's kind of a build tag, I guess you would call
20 it.  So there are other codes on the vehicle, as
21 well as the VIN, that can help you determine
22 options.
23    Q.  If you're trying to do a complete
24 appraisal, you won't just rely on a VIN decoder,
25 right?

Page 197

1    A.  No.  No.
2    Q.  Correct?
3    A.  Correct.
4       MR. CASHDAN:  Okay.  I have no further
5 questions.  Thank you for your time.
6       MR. LOWTHER:  All right.  We will
7 reserve ours for trial.
8       THE VIDEOGRAPHER:  Please stand by.
9       MR. CASHDAN:  Oh, wait.  I assume the
10 witness is going to read and --
11       MR. LOWTHER:  Yeah.  Yeah.  The witness
12 is going to read and sign.
13       MR. CASHDAN:  Okay.  Thank you.
14       THE VIDEOGRAPHER:  Please stand by.
15    We are off the record at 12:54 p.m., and
16 this concludes today's --
17       MR. CASHDAN:  Thank you.
18       THE WITNESS:  Thank you.  Much
19 appreciated.
20       THE VIDEOGRAPHER:  Counsel, please stand
21 by.
22    We're off the record at 12:54 p.m., and
23 this concludes today's testimony given by Jason
24 Merritt.  The total number of media units used
25 was three and will be retained by Veritext Legal

50 (Pages 194 - 197)

Jason Merritt                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 198

1  Solutions.
2       (Deposition concluded -- 12:54 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 200

1          INSTRUCTIONS TO WITNESS
2
3      Please read your deposition over carefully
4  and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8      After doing so, please sign the errata sheet
9  and date it.
10     You are signing same subject to the changes
11 you have noted on the errata sheet, which will be
12 attached to your deposition.
13     It is imperative that you return the
14 original errata sheet to the deposing attorney
15 within thirty (30) days of receipt of the
16 deposition transcript by you.  If you
17 fail to do so, the deposition transcript may be
18 deemed to be accurate and may be used in court.
19
20
21
22
23
24
25

Page 199

1          C E R T I F I C A T E
2
3      I do hereby certify that I am a Notary
4  Public in good standing, that the aforesaid
5  testimony was taken before me, pursuant to
6  notice, at the time and place indicated; that
7  said deponent was by me duly sworn to tell the
8  truth, the whole truth, and nothing but the
9  truth; that the testimony of said deponent was
10 correctly recorded in machine shorthand by me and
11 thereafter transcribed under my supervision with
12 computer-aided transcription; that the deposition
13 is a true and correct record of the testimony
14 given by the witness; and that I am neither of
15 counsel nor kin to any party in said action, nor
16 interested in the outcome thereof.
17
18     WITN                          seal this
19 21st day c
20
21
22          _____
             Notary Public
23
24
25

Page 201

1          _ _ _ _ _
2          E R R A T A
3          _ _ _ _ _
4  PAGE    LINE    CHANGE
5  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
6  Reason for
7  Change:_____
8  PAGE    LINE    CHANGE
9  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
10 Reason for
11 Change:_____
12 PAGE    LINE    CHANGE
13 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
14 Reason for
15 Change:_____
16 PAGE    LINE    CHANGE
17 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
18 Reason for
19 Change:_____
20 PAGE    LINE    CHANGE
21 _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _
22 Reason for
23 Change:_____
24
25

51 (Pages 198 - 201)

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 202

1  PAGE    LINE    CHANGE
2  ___  ___  _____
3  Reason for
4  Change:_____
5  PAGE    LINE    CHANGE
6  ___  ___  _____
7  Reason for
8  Change:_____
9  PAGE    LINE    CHANGE
10  ___  ___  _____
11  Reason for
12  Change:_____
13  PAGE    LINE    CHANGE
14  ___  ___  _____
15  Reason for
16  Change:_____
17  PAGE    LINE    CHANGE
18  ___  ___  _____
19  Reason for
20  Change:_____
21  PAGE    LINE    CHANGE
22  ___  ___  _____
23  Reason for
24  Change:_____
25

Page 203

1        ACKNOWLEDGMENT OF DEPONENT
2        I, _____, do
3  hereby certify that I have read the foregoing
4  pages __ to ____ and that the same is a
5  correct transcription of the answers given by
6  me to the questions therein propounded,
7  except for the corrections or changes in form
8  or substance, if any, noted in the attached
9  Errata Sheet.
10
11  _____    _____
12  DATE            SIGNATURE
13
14        Subscribed and sworn to before
15  me this _____ day of _____, 2022.
16
17        My commission expires:
18        _____
19
20        _____
21        Notary Public
22
23
24
25

52 (Pages 202 - 203)

Jason Merritt                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[& - 3,500]**                                                Page 1

| & | | | |
|---|---|---|---|
| **&**  1:14 2:2,7 6:18 7:16 | **11,039**  152:9 | **13,912.78.**  151:23 | 195:7 |
| | **11,039.75**  151:16 | **13,999**  99:11 128:2 | **20,000**  61:17 |
| **0** | **11,039.75.**  151:15 | **14**  3:12,16 4:18 | **200**  1:16 6:20 |
| | **11,638**  151:8 | 22:1,5 91:2 | 73:15 75:8 98:14 |
| **000218**  3:24 17:13 | **11,700**  73:14 | 108:19,23 109:11 | 98:19 |
| **000457**  4:10 20:11 | **11,900**  73:7 | 135:15 | **2015**  39:4 |
| **000476**  4:11 20:12 | **110,000**  79:11 | **14,246.41**  152:4 | **2016**  40:9 |
| **000603**  4:13 20:24 | **11516**  199:21 | **15**  3:14 4:20 43:14 | **2019**  41:9,11 |
| **000643**  4:14 20:25 | **1180**  2:9 | 43:19,23 52:16 | **2020**  41:25 42:11 |
| **000689**  4:4 18:23 | **11:54**  162:10 | **15,000**  99:11 | 42:17,19 49:10,11 |
| **000695**  4:5 18:24 | **11nycrr**  4:18 22:2 | **15th**  23:3,7 28:11 | 50:5 60:13 61:14 |
| **000729**  4:7 19:12 | **11th**  12:15 | 28:19 | 63:19 64:19 75:9 |
| **000738**  4:8 19:13 | **12**  3:9 4:12 20:23 | **16**  3:19 4:23 44:23 | 114:10 180:13 |
| **000819**  4:16 21:10 | 21:2,3 37:9 116:8 | 45:3,6 | 194:14 195:7 |
| **000850**  4:17 21:11 | 164:9 188:6 | **160**  147:8 | **2021**  24:12 79:11 |
| | **12,100**  73:18 | **1600**  2:9 | **2022**  1:11 3:14 6:3 |
| **1** | **12,648.45**  153:16 | **17**  3:22,24 5:3 | 12:15 14:18 23:3 |
| | **12,648.45.**  146:22 | 45:23 46:3,4,6 | 23:7 24:13 28:21 |
| **1**  3:7 6:11 11:24 | **12,856.84**  150:14 | **1700**  1:15 6:19 | 137:22 192:25 |
| 12:4,6,8,12 13:14 | **12,856.84.**  150:6 | **18**  4:5 5:6 51:1,6,9 | 199:19 203:15 |
| 87:24 94:16 | **12,900.25**  147:11 | **19**  4:8 | **21**  1:6 4:17 6:17 |
| 105:14 107:13 | **12,925**  154:6,13 | **1908**  137:22 | 24:22 |
| 134:8 167:5 172:2 | **12:08**  162:14 | **1957**  66:8 | **216.7**  22:2 109:18 |
| 179:22 | **12:41**  192:10 | **1965**  59:5 | **216.7....................** |
| **1,500**  61:19,21 | **12:48**  192:13 | **1991**  52:11,14 | 4:19 |
| **1,900**  126:6 | **12:54**  197:15,22 | **1992**  51:22 52:9,11 | **21st**  199:19 |
| **10**  4:6 19:11,15,16 | 198:2 | 52:15,17 53:19 | **22**  24:22 27:2 |
| 19:17 32:5 33:16 | **13**  4:15 21:9,13,14 | 72:25 | **22nd**  180:13 |
| 116:8 180:23 | 31:13 88:16 | **1998**  95:6 | **25**  63:13 135:1 |
| 181:1,14 184:19 | 135:15 146:2,8 | **1999**  49:9 | **25,000**  66:15 100:3 |
| 184:21 | 158:7,7 189:20 | | 100:14,18,19 |
| **10,000**  73:6 118:10 | **13,093.78**  151:20 | **2** | **26**  3:7 11:25 66:15 |
| 119:9,14,17 | 151:21 | | **27**  192:25 |
| **10,396**  151:7 | **13,218.45**  153:19 | **2**  3:9 12:20,24 | **27th**  42:11,17,19 |
| **10,396.75**  151:12 | **13,218.45.**  153:9 | 13:5,6,7,9 26:20 | |
| **100**  107:11 | 153:17 | 35:24 88:4 94:19 | **3** |
| **10:28**  87:25 | **13,500**  155:18 | 107:3 150:17 | |
| **10:41**  88:4 | **13,674.84.**  150:16 | 158:5 162:9 | **3**  3:10 14:5,10,10 |
| **11**  3:8 4:9 20:10 | 152:8 | 179:22 192:24 | 124:3 128:1 |
| 20:14,15 109:19 | **13,912.78**  152:14 | **2.0**  67:25 | 150:18,24 162:14 |
| 187:6 | | **2.0.**  67:21 | **3,200**  115:8 |
| | | **20**  4:11,14 50:5 | **3,500**  116:24 |
| | | 53:16 79:6 194:13 | |

Veritext Legal Solutions

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[3.83s - actual]**                                              Page 2

| | | | |
|---|---|---|---|
| **3.83s** 49:20 | **6** | **9** | 79:24 97:7 128:9 |
| **30** 200:15 | | | 128:20 130:14 |
| **30309** 2:10 | **6** 3:17 16:10,15,16 | **9** 4:3 18:22 19:1,2 | 160:24 161:19 |
| **33,000** 116:25 | 16:17 38:16 39:14 | 19:3 106:18,20 | **accounting** 89:13 |
| **36,500** 116:22 | 55:5,8,9 76:8 | 178:17 | **accurate** 14:10 |
| **37,000** 114:25 | 80:18 81:16 94:3 | **9,500** 118:12 | 43:24 44:8,16,20 |
| | 94:7,17 | 119:11,14,19,21 | 66:16 71:17 74:18 |
| **4** | **600** 126:6 154:1,10 | **9,999** 99:8 121:2 | 76:20,22,24,25 |
| | 154:14,15 156:16 | **91.80** 147:1 | 77:6 83:6,10 |
| **4** 3:13,14 14:16,17 | 156:20 | **98** 128:2 | 123:3 126:11 |
| 14:21 | **6243** 1:6 6:17 | | 130:4 154:4 |
| **4.10** 49:18 | **643** 148:25 151:8 | **a** | 171:23 174:13 |
| **40** 114:10 192:17 | **65** 58:19,20 | | 183:11,13 187:19 |
| 193:18 | **650** 32:1 | **a.m.** 1:17 6:2 | 200:18 |
| **40,000** 114:24 | | 87:25 88:4 162:10 | **acknowledgement** |
| 115:7,8 116:14,18 | **7** | **abide** 34:9 | 34:5 |
| 116:21 | | **ability** 129:17 | **acknowledgment** |
| **404.572.4600** 2:10 | **7** 1:11 3:20 17:1,5 | 162:21 163:25 | 203:1 |
| **42,000** 152:20 | 17:6,7 38:16 | **able** 33:8 40:1 | **acquired** 135:16 |
| **43** 4:22 | 39:14 93:18,20 | 41:2 54:23 113:17 | **act** 162:19 |
| **44** 4:25 | 94:18 95:2,5 | 113:24 114:2 | **action** 1:6 7:1 |
| **45** 5:5 | 120:25 122:14 | 163:1 182:7 186:7 | 199:15 |
| **450** 61:1 | **72201** 2:4 | 196:4 | **actual** 3:18,21 |
| | **731** 184:22,23 | **absolutely** 8:16 | 16:12 17:3 23:24 |
| **5** | **7th** 2:3 6:3 | 9:9 50:9 55:3 | 29:11,12 43:12 |
| | | 72:20 109:12 | 48:2 55:9 56:8 |
| **5** 3:15 15:21 16:1 | **8** | 145:17 149:11 | 57:1 61:10 67:1 |
| 16:1 22:22 29:2 | | 186:24 187:2 | 67:14 68:4 80:14 |
| 31:25 122:13 | **8** 3:3,23 17:12,17 | **abused** 64:5 | 95:11 101:14 |
| **5,900** 52:13 53:1 | 17:17,18 18:14 | **academy** 36:9,11 | 103:13 118:13 |
| 72:17 | 132:8,10 172:13 | **accept** 101:2 | 119:14,23 120:13 |
| **50** 75:11,14 | 172:18 173:23 | 133:10 | 120:14,15,19,20 |
| **50,000** 99:15 | 182:16 | **accepted** 63:22 | 121:8 122:11 |
| **500** 126:7,7 | **818** 148:22 150:9 | **access** 102:4,7 | 123:25 124:3,8,24 |
| **501.312.8500** 2:4 | 150:14 | 103:7,12 104:7,10 | 125:8 126:18,24 |
| **51** 5:8 | **819** 149:4 151:22 | 104:14 107:21 | 148:8,13 154:8,22 |
| **519** 2:3 | **821** 158:5,8 159:14 | 119:5 125:24 | 155:19,21,25 |
| **52,873** 153:4 | **83** 79:12 | **accident** 47:23 | 156:17 163:10,13 |
| **57** 66:11 77:21 | **844** 146:13 153:12 | 60:21 | 166:14 170:15,21 |
| **570** 153:21,25 | **846** 147:18,19,20 | **account** 50:10,20 | 171:8,11 173:3 |
| 154:7 156:18 | 147:23 149:24 | 53:20,25 54:5,11 | 174:14,16 177:22 |
| **590** 156:19 | 151:25 159:19 | 54:25 58:13 64:10 | |
| | **848** 148:18 150:19 | 65:14,16 77:11 | |
| | 150:22 | | |

Jason Merritt                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[actual - appraisal]                                         Page 3

180:1,5 182:6
189:24 190:25
194:12
**add** 150:9,14,14
151:2,13,21,25
**added** 170:23
**adding** 152:8
**addition** 147:8
175:3
**additional** 9:20
23:17 172:5,8
**address** 157:14,16
**adjust** 61:24 85:2
107:3 132:3
**adjusted** 84:11
150:5 151:2,11,19
152:2,24 153:1
**adjuster** 161:7,15
**adjusting** 160:6
**adjustment** 60:18
61:9 65:24 66:2
66:25 85:2 86:4
86:17 105:10,17
105:23 106:4,9
107:2,13,18,22
114:18 132:4,20
132:22 136:4,14
136:18 137:1,15
137:24 138:11,20
142:8,12,20
143:24 144:22
145:16 147:1
148:22,25 149:3
150:2,20 156:7
157:2 161:4,6,24
164:21 173:1,9
178:24 179:7,8,11
180:3 181:2,10
187:14 188:9
189:1,15 191:25

**adjustments** 38:10
60:4,8 62:15
68:11 80:13 97:23
104:18 107:6,9,11
138:6,20,25 139:7
144:7 149:9
158:11 163:5
173:15 179:19,20
**adjusts** 132:18
**administer** 6:25
**adverse** 35:13
**advertise** 133:17
**advertised** 77:2
136:21
**advised** 35:12
**affect** 50:14 196:6
**affiliations** 7:5
**affirmation** 34:5
**affirmed** 7:23
**aforesaid** 199:4
**aftermarket** 147:7
**age** 37:9
**ago** 117:4,5
**agree** 6:10 71:16
72:5,21 73:16,21
74:10,25 107:6,11
142:16,18 154:2
174:6,7,10,18
175:1,8,14,18,23
175:25 177:11
179:21,23,25
180:2 191:19
**agreed** 145:23,23
176:23 177:5
**agreeing** 166:24
**agreement** 3:16
15:22 16:3 22:23
22:24 28:19 29:1
72:19
**ahead** 55:4 114:5
139:14 150:12

151:10 172:12
177:6
**aided** 199:12
**air** 66:8,11
**al** 1:7 6:14,15
**alabama** 25:15,17
25:19
**algorithms** 69:19
102:1 158:2
**alia** 29:18
**alignment** 36:21
36:24 37:1,12
**allegations** 27:16
28:7 29:14
**amend** 171:20
**amount** 53:13
60:11 61:10 69:10
69:14 71:21,25
74:24 75:1 101:2
112:4 147:14
153:24 154:18,21
177:23 180:5,6,18
187:19 189:5,18
**amounts** 67:14
**analysis** 52:3,7,8
53:4 58:21 73:13
89:21 97:15 110:5
110:10,15 134:18
**answer** 8:18 15:3
27:25 28:1 39:20
86:23,24 113:15
113:17,21,23,24
114:3,6 131:11
139:15,17,21
155:2
**answering** 131:9
**answers** 203:5
**antique** 66:4
**antiques** 183:15
**anymore** 55:7
157:19

**anytime** 112:22
**anyway** 134:7
**apologize** 58:9
188:4,5
**apparent** 95:21
**appearance** 7:8
**appearances** 7:5
**appears** 21:3,14
22:5 60:15 181:3
**application** 105:22
106:4 144:22
**applied** 105:18
**apply** 72:10
132:21
**applying** 72:8
**appra** 53:9
**apprai** 42:5 56:23
**appraisal** 3:19,22
5:4 16:12 17:3
24:7 30:22 35:16
38:14 43:3 45:24
46:9,14,18,24 47:1
47:7 48:11 49:4
50:11,23 53:10,12
54:13,15,22 55:2
56:3,4,6,9,10,20
56:21 57:2 59:19
59:21,24 64:23
68:14 70:13,24
71:19 74:11,18
81:24 83:1 85:2
85:25 86:5,17
94:20 95:6,12
103:23 105:23
109:7 111:19
116:12 118:8,11
118:19 125:6
126:12 130:4
138:14 160:4
162:17 163:1
180:10,19 193:11

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[appraisal - automobile]                                    Page 4

| | | | |
|---|---|---|---|
| 196:24 | 83:23 84:1,8 | asked 24:4 113:18 | atlanta 2:10 |
| **appraisals** 16:18 | 93:25 111:11,25 | 113:25 169:9 | **attached** 13:10 |
| 16:21 17:8 31:1 | 136:3,13 137:1,8,9 | 172:4 185:6 188:2 | 200:12 203:8 |
| 35:19 36:25 37:10 | 137:10,24 192:16 | 188:4 | **attempt** 193:13 |
| 37:13 38:1,16,19 | 194:11,13 | **asking** 66:12 | **attend** 36:1,6 |
| 38:25 39:10,13,22 | **appraising** 23:17 | 71:15 76:18 77:9 | **attended** 36:2,8 |
| 40:25 41:22 42:6 | 39:25 40:21 43:11 | 77:19,21 78:1 | **attending** 7:4 |
| 42:9,23 44:8,16,21 | 47:6 50:21 65:17 | 79:21 101:1 102:8 | **attention** 35:19 |
| 45:11,16,21 48:18 | 71:10,16 85:3 | 107:23 115:22 | **attorney** 7:8 23:23 |
| 51:16 54:19 57:14 | 160:23 | 120:16 136:12 | 200:14 |
| 66:10 71:3,3 | **appreciated** | 143:6 155:5 168:5 | **attributed** 51:18 |
| 78:11 85:21 87:13 | 197:19 | 169:12,13 170:15 | **auctions** 37:9 |
| 109:1 110:21 | **approach** 56:12 | 173:7 184:4 185:7 | **audio** 6:8,8 |
| 111:11 119:4 | 56:14,23 59:15 | 189:12,14 | **authentic** 83:6,11 |
| 123:16 130:15,17 | 87:18 90:5 101:10 | **aspects** 50:15 | 83:20 |
| 133:6 137:21 | 153:10 156:5 | 57:10 128:22 | **author** 30:22 |
| 142:19 162:19 | 165:4 | 196:5 | **authorities** 30:9 |
| 163:6,11,13 | **appropriate** 66:24 | **assessment** 48:11 | 30:12,12 31:16 |
| 193:14 194:9,12 | 71:22 72:13 74:1 | 48:15 183:13 | **authority** 29:17 |
| 195:7 | 74:24 98:18,21 | **assessments** 158:4 | 30:16,19 31:2 |
| **appraise** 37:15 | 123:15 132:25 | **asset** 38:7 | **authorized** 6:25 |
| 38:6 49:5 50:8 | 137:14 160:23 | **assets** 38:4 | **auto** 3:17,20 4:21 |
| 72:8 | 180:18 185:1,8,21 | **assign** 61:8 | 4:24 5:4,7 16:11 |
| **appraised** 41:2 | 191:5,22 200:5 | **assisted** 171:8,16 | 17:2 23:14,22 |
| 74:6 98:15 142:9 | **april** 1:11 3:14 6:3 | **associated** 89:5 | 24:17,24 25:8 |
| 142:20 196:12 | 14:17 41:25 | 127:18 178:22 | 30:23 41:25 42:21 |
| **appraiser** 40:4 | 194:14 199:19 | **association** 52:19 | 43:2,10,11,15,25 |
| 41:6 42:16 70:2 | **aranov** 2:25 6:21 | **assume** 85:7 87:2 | 44:7,14,24 45:14 |
| 73:11 83:12 97:16 | **area** 44:16 48:24 | 90:2 100:10 | 45:25 46:17 51:3 |
| 155:7,16 159:1 | 48:25 49:1 64:14 | 141:25 173:12 | 52:2 55:16 67:18 |
| **appraiser's** 4:21 | 81:11 138:22 | 197:9 | 69:2 76:15 83:4 |
| 4:25 5:5,8 43:16 | **areas** 48:11,16 | **assumed** 142:14 | 83:23 84:1,8 |
| 44:25 45:25 51:3 | 75:25 | 166:1 | 93:25 99:12 |
| **appraisers** 3:18,21 | **argue** 72:16 | **assuming** 87:13 | 111:25 137:8 |
| 16:11 17:2 23:14 | 158:19 160:14 | 88:8 140:13,21 | 192:16 194:11,13 |
| 23:22 24:18,24 | **argued** 73:3 | 142:9 162:20 | 195:2,3,6 |
| 25:8 30:23 41:25 | **arkansas** 2:4 | **assumption** 169:8 | **automated** 144:8 |
| 42:21,23 43:2,4,10 | 25:18 | 189:2,17 | **automatically** |
| 43:25 44:7,15,20 | **array** 44:13 | **assumptions** 82:4 | 89:2 |
| 45:15 46:17 55:16 | **aside** 165:13 | 84:22 | **automobile** 76:17 |
| 71:10 74:7 83:4 | | | 77:8,8 |

Jason Merritt                                   April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[automobiles - broad]**                                      Page 5

| | | | |
|---|---|---|---|
| **automobiles** 38:1 | 150:9 151:2,14,22 | **bear** 101:8 | **biggest** 144:9,15 |
| 39:1,11 40:19,22 | 151:24 153:12,15 | **began** 118:14 | 178:25 179:3 |
| 41:22 102:23 | 157:5 161:9 | **beginning** 1:16 7:8 | **bill** 33:15 |
| 165:12,16 | 162:12 167:4 | 24:22 88:3 162:13 | **billable** 32:5 |
| **automotive** 29:18 | 168:17,21 170:3,4 | **begins** 29:2 30:14 | **billed** 32:8,23 |
| 29:24 30:2,7,11,20 | 172:12 179:14 | 44:6 46:13 57:4 | **bio** 192:24 |
| 31:4,12,18,21 39:6 | 184:19 185:1 | 80:25 146:12 | **bit** 13:22 35:9 |
| 39:9 40:3,10,24 | 190:2 192:12 | **behalf** 29:3 | 37:19 48:5 79:8 |
| 88:16 89:6 112:18 | 194:3 | **beings** 145:14 | 109:6 167:5 181:4 |
| 113:12 115:11 | **backwards** 116:18 | **bel** 66:8,11 | 190:2 |
| **availability** 63:8 | 130:9 | **believe** 9:16 10:3 | **black** 1:18 6:23 |
| 135:6 | **bad** 160:15 165:20 | 10:13,20,21,21 | 79:7 |
| **available** 23:21 | **banking** 89:14 | 11:20 15:14 23:8 | **blanket** 76:21 |
| 24:3 48:25 105:5 | **base** 58:10 84:19 | 24:1 25:10 26:1 | 117:9,10 131:11 |
| 106:3 123:16,18 | 146:22 149:14 | 26:21 29:10 31:13 | 138:2 142:23 |
| 124:4 157:19 | 153:11,16,20 | 44:1,22 45:19 | **blue** 69:2 75:13 |
| 172:25 184:5 | 179:19 185:3,10 | 50:24 58:17 59:20 | 79:20 116:19 |
| **avenue** 1:15 6:19 | **based** 57:23 58:5 | 89:19 92:2 95:3 | **boats** 44:9 |
| **average** 53:9,10 | 61:24 63:7 64:17 | 97:18 103:3 | **body** 47:22 52:12 |
| 53:11 57:5 61:7 | 70:16 79:17 80:14 | 138:15 168:24 | 62:9,12 83:17 |
| 67:21 68:7,8 | 81:7 83:5,9,12 | 187:4 193:1,8 | **bodywork** 47:25 |
| 79:17 84:24 85:4 | 85:3 86:5 87:17 | **believed** 83:6,10 | **boilermaker** 55:14 |
| 85:9 86:3,15,16 | 90:3 97:23 103:17 | 83:13 | 84:18 94:4 |
| 87:3,6,10,14 88:8 | 118:13 122:24 | **ben** 51:19 53:19 | **book** 69:2 75:13 |
| 88:13 140:13,23 | 124:24 135:9 | **bene** 147:4,4 | 79:20 116:19 |
| 142:2,10 149:15 | 138:20 139:7 | **benefited** 166:2,13 | **bottom** 33:25 |
| 165:2,8 | 142:12,14 166:10 | **bent** 25:5,6,24 | 45:11 67:8 114:19 |
| **aware** 14:3,4 94:6 | 186:14 | 26:3 | 134:12 |
| 104:6 | **baseline** 85:21 | **best** 50:23 54:24 | **bought** 37:5 115:2 |
| | 98:6 118:2 | 59:18,21 70:17 | **box** 65:19 113:14 |
| **b** | **basic** 36:18 | 81:10 124:10 | **break** 9:7 87:22 |
| | **basics** 193:11 | 174:18 | 162:3 184:18 |
| **b** 3:5 | **basing** 174:8 | **bet** 133:1 | 192:6 |
| **b.1.b.** 32:4 | 182:24 | **better** 85:18 | **breakdown** 65:20 |
| **back** 13:3,25 | **basis** 137:2 145:1 | 123:21 145:7 | 144:6 188:18 |
| 15:18 22:21 23:12 | **bates** 2:2 3:23 4:3 | 159:10 165:17 | **bring** 57:22 |
| 23:20 26:23 49:19 | 4:6,9,12,15 17:12 | 194:5 | **brings** 127:13 |
| 49:20 67:15 72:15 | 18:22 19:12 20:11 | **beyond** 35:10 65:6 | 196:11 |
| 73:4,4,8 75:7 88:2 | 20:24 21:10 | **big** 60:23 100:13 | **broad** 75:23 |
| 88:6 95:2 116:10 | 147:18 184:23 | 113:4 134:4 195:7 | 156:12 191:15 |
| 118:24,25 119:5,7 | | | |
| 122:16 124:2 | | | |
| 128:16 149:24 | | | |

Jason Merritt
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[broader - characteristics]
Page 6

broader 113:16
broadly 54:2
brought 61:15
83:18 144:13
bucks 73:20
build 196:19
bullet 81:25
107:13 179:22
bump 115:4 147:4
bumper 69:3
bumper.com
195:22
bureau 23:13 25:7
25:9 30:21,21,22
42:19 137:8
192:16
business 23:19
37:2,5 43:9,11
90:3 102:22
162:18 194:10,21
buy 78:24 79:3
80:2
buyer 78:24 79:3
buyer's 127:14
buyers 80:2
buying 115:2
buys 135:19

c

c 2:1 199:1,1
calculated 179:20
calculations 82:1
105:6
calculator 149:17
149:22 150:12
call 23:21 24:1,17
25:24 26:8 35:6
40:24 58:22 62:9
66:5 71:3 88:21
89:9 117:15 121:5
121:13 135:24
140:18 141:10,13

141:17 184:16
186:7 196:19
called 7:22 23:18
23:20 25:11 41:3
65:5 66:9 72:15
73:5,12,17 99:17
100:18 131:12
calling 117:11
calls 111:9,18
154:24
canary 79:9
capture 128:23
196:5
captured 129:13
captures 129:9
car 49:5,8 52:4,17
66:4,4 114:24,25
115:7 117:16
126:3,4,7,8,8
131:15 134:15
136:19 147:5
157:13 159:5,6
163:10
care 83:24 114:21
114:23,25 126:4
carefully 200:3
carfax 47:23 69:3
carfax.com.
195:22
carney 2:2
carpet 60:16,25
61:11 96:4 158:4
159:4,16,23
cars 37:6,8 44:8
110:8 111:7
131:25 135:1
165:18 175:12,13
case 6:17 14:3
27:11,14,16 28:8,9
29:14 34:10 35:13
38:17 51:16,18

53:24 91:17,24
92:3 97:25 100:16
100:17 101:19
104:2,3,14,20,24
105:2 108:15
161:22 172:1
cash 3:19,21 16:12
17:3 23:25 29:11
29:12 43:12 55:10
56:8 57:1 95:11
119:20 154:8,22
155:19,21,25
156:17 163:10,13
166:14 190:8
cashdan 2:8 3:3,14
7:9,9,14 8:4 12:2
12:22 14:8,17,19
15:24 16:14 17:4
17:15 18:1,2,25
19:14,22 20:2,13
21:1,12,18,19 22:3
33:23 34:15,18,21
34:24 39:17,19
43:17 45:1 46:1
51:4 74:4 87:21
88:5 92:24 93:3
93:10,17 139:4,16
139:20 146:4,7
155:1 162:4,7,15
169:12,15 192:5,8
192:14 197:4,9,13
197:17
casualty 1:7
catonsville 36:2,8
caution 169:5
174:1
cbplaw.com 2:5
cell 6:6
cellular 6:5
certain 15:7 48:18
122:18 131:13

141:7 144:8
certainly 123:19
certificate 192:22
192:25
certification 42:8
42:13,18 81:17
certified 1:19 3:18
3:21 16:12 17:2
23:13,14 25:8
30:22,23 39:25
40:3 41:4 42:15
57:1 95:11 137:8
137:11 192:15,16
193:23 194:4,6
certifies 137:12
certify 82:18
199:3 203:3
certifying 193:15
challenges 162:17
162:20
chance 171:18
change 50:7
115:13 118:12
123:4 129:17
149:14 153:11
160:11 161:20
201:4,7,8,11,12,15
201:16,19,20,23
202:1,4,5,8,9,12
202:13,16,17,20
202:21,24
changed 48:4
84:13 116:7,9
153:16 171:22
changes 94:5
168:14,18,19,23
170:4 200:10
203:7
changing 76:23
characteristics
54:5,16 80:15

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[check - compensated]                                          Page 7

| | | | |
|---|---|---|---|
| check 100:4 | client 35:12,15,21 | 129:5 155:17 | 100:5,15,25 101:3 |
| checked 67:6 | 94:16 | 158:23 161:13 | 101:7 105:24 |
| checkmarks 82:12 | clients 35:22 | 172:21 173:8 | 107:3,7,8,11 118:9 |
| checkpoint 82:1 | close 28:15 33:13 | comes 69:20 102:2 | 118:12 119:17 |
| chevrolet 135:21 | 33:13 75:10 | 112:22 126:5 | 120:17 121:3 |
| 135:25 | coast 3:17,20 4:21 | 191:19 194:23 | 130:22 131:19 |
| chevy 49:9 66:8,11 | 4:24 5:4,7 16:11 | comfortable 54:22 | 132:22 133:7 |
| 77:21 | 17:2 41:25 42:21 | 82:25 87:12 90:6 | 136:5,14 137:16 |
| chosen 138:21 | 43:2,10,15,25 44:6 | 163:15 | 138:17 139:9 |
| chuck 43:7 | 44:14,19,24 45:14 | coming 156:16 | 140:2,5,10 141:2 |
| circ 185:18 | 45:24 46:16 51:2 | 177:24 178:2,4 | 141:23 142:10,13 |
| circumstance | 52:2 55:16 83:4 | 190:3,18,20 | 142:15,22 148:4 |
| 166:8 190:16 | 93:25 111:25 | commission | 181:13 |
| 191:3 | 194:11,13 195:2,2 | 203:17 | comparables |
| circumstances | 195:6 | commissions | 38:11 39:22 47:5 |
| 122:18 162:25 | cobra 128:2 | 68:10 | 48:22,23,24 52:14 |
| 165:5,6,25 185:19 | code 69:6 | communication | 67:9 68:2,6,7,8 |
| 190:15,21 191:21 | code's 109:19 | 24:17 174:9 | 75:6 81:11 86:2 |
| city 64:4,23 65:2,5 | codes 22:7 96:25 | 182:25 183:4 | 98:5,9 101:11,14 |
| 65:5,6,11 | 104:11 196:20 | communications | 103:9 104:17 |
| civ 1:6 6:17 | cold 126:22 | 169:7 | 111:23 117:25 |
| civil 1:6 | collection 20:15 | community 36:3,7 | 119:3,23 120:2 |
| cla 137:25 | 21:3 187:9 188:8 | 36:17 | 132:19 139:22 |
| claim 11:18 35:17 | 189:21 | comp 138:21 | 156:11 157:5,23 |
| claimed 173:14 | collector 165:13 | 139:1 | 158:1,23,24 |
| claims 29:3,8,10 | collector's 52:19 | companies 35:20 | 179:16,19 180:15 |
| clarify 19:23 | collects 124:23 | 35:21 41:14 | 181:5,15 188:12 |
| 27:21 | college 36:1,2,3,7 | company 42:3 | 189:6 |
| classes 137:4 | 36:8,17 | 45:8 72:15 91:14 | compare 72:25 |
| classic 126:22 | color 47:13,15,16 | 103:17,24 | 94:15 |
| 137:18,25 163:10 | 47:17 79:6 128:4 | company's 45:7 | compared 85:4 |
| classics 183:15 | com 131:19 | 51:13 | 94:6 135:21 |
| cle 151:5 | combine 70:10 | compar 62:24 | 158:17 188:18 |
| cleaned 161:9 | come 11:5 15:18 | comparable 38:9 | 189:7 |
| cleaning 85:19 | 23:9 32:17 59:6 | 47:4 56:14 62:19 | comparison 56:11 |
| clear 93:11,14 | 67:14 69:9 71:1,5 | 62:21,25 63:8,16 | 56:24 59:15 |
| 109:17 124:2 | 71:11,24 72:23 | 63:23 64:8 65:20 | compartment |
| 144:15 151:5,10 | 73:2,3 74:7 75:6,7 | 66:14 84:23 85:8 | 196:15,16 |
| 187:8,23 | 75:14 98:5 101:13 | 85:11 86:18 87:1 | compensated |
| cleared 152:12 | 113:1,2 114:9 | 87:1,3 88:7 89:23 | 154:8,22 |
| | 115:7 126:11 | 89:25 99:6,14,16 | |

Jason Merritt                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[compensation - correct]                                    Page 8

compensation
  143:17
complete   12:8
  58:21 196:23
completed   11:12
  17:8 118:20
completely   25:21
  49:10 84:13
completion   177:18
comprehen   48:22
comprehensive
  46:17,24 47:9,10
  48:1,18 52:4,25
  54:20,22 59:19,21
  72:10,24 73:13
  78:10
comprehensively
  61:5
computer   96:24
  114:8 145:6
  199:12
computers   145:7
computing   104:8
con   164:20
concern   69:13
  191:14
concerning   103:8
  103:12
concluded   98:1
  198:2
concludes   197:16
  197:23
conclusion   154:25
  156:25 161:22
  177:24 178:2
conclusions   22:18
  28:18 90:10,24
  110:6,11 111:2
  172:1,19
condition   38:9
  47:19 57:5,8,13

58:2,10,11 60:4,7
  60:18 61:4,7,24
  62:15 64:15 79:17
  79:23 84:24 85:1
  85:4,9 86:15,16
  87:3,6,10,15 88:8
  88:14 94:20 95:15
  95:17 96:2,15
  97:8,22 98:2
  116:15 128:3
  138:25 139:8,9
  140:1,5,7,9,14,23
  141:2 142:2,9,10
  142:20,21 144:5
  145:16 147:1,5
  157:13,14,17
  158:2,3,11,17
  159:5,6,23 164:20
  164:22 165:1,9,17
  166:2
conditional   181:7
conditions   57:18
  57:22 60:10,11
  68:9,11 79:6
  127:18 140:8
  179:17
conduct   57:12
  163:25 193:11,13
conducting   46:18
  46:24 112:8 163:1
confident   59:25
confidential   35:4
confidentiality
  34:1,5,25
confirm   88:12
  141:10 179:16,16
  190:21
confirmation
  133:6
confirmed   86:13
  87:5,9 96:21

132:23
confirms   34:9
confuse   175:22
confusing   123:7
confusion   9:3
connection   15:6
  16:7 36:23 38:8
  38:17 48:17 90:13
cons   24:3
consider   29:23
  30:1,5 79:25
  112:7 169:9
consideration   60:5
  60:8,12,25 61:2,12
  128:3 130:8
  190:10
considered   174:15
  174:17
consistent   82:7
  134:13
construction
  171:8
consult   68:25
consultant   3:15
  15:22 16:2
consultants   26:16
consulting   23:16
  24:3 25:16
cont'd   4:1 5:1
contact   25:12
  68:22 76:2,10
  127:6,10,17
contacted   23:11
  24:5,25 64:22
contacting   77:1
contain   20:4
content   171:1,11
contents   18:20
continue   6:9 63:15
  63:20

contract   174:15
contractor   29:17
  30:15 34:4
contributor   195:8
conversation
  27:10
conversations   6:5
  71:6 160:13
cop   59:14
copy   3:10 12:9
  13:16 14:5,10,21
  34:18 170:3
corner   146:13
  147:21 190:13
corporations
  80:10
correct   8:21 11:7
  12:16 13:9,15,16
  14:13 15:5,11,17
  16:8,9,23,24 17:10
  17:22,23 18:4
  19:7,10 20:17,18
  20:19 21:4,5,16,20
  21:21 23:4,5
  25:14 27:5,7,8
  28:23,24 29:6
  32:2,3,6,7,12
  33:10 38:18 39:4
  39:8 40:8,10,13,14
  41:20 42:2,4,7
  44:4,5 45:12,13
  46:9 51:14,16,17
  51:25 52:1 54:7,9
  54:12 55:2 56:19
  57:10,11 62:17,22
  62:23 63:24 64:13
  64:18 65:4,15,18
  66:18,21 67:1,9,10
  67:19 70:5,16,19
  70:22 72:2,6
  73:23 75:2,2,17,18

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[correct - days]**                                          Page 9

| | | | |
|---|---|---|---|
| 76:5 77:9,10,19 | 166:20,22,25 | **course**  111:24 | 114:14,15 115:6 |
| 78:11 79:2 80:6,9 | 167:16 168:1,7,22 | 147:13 164:3 | 128:10 129:1 |
| 80:16,19 82:10 | 171:5,6 177:20 | 192:17 193:2,8,10 | 158:15 |
| 84:6,9,12 85:5,6,9 | 178:11,15,20,21 | 193:18 | **customer's**  58:11 |
| 85:10 87:7,16,20 | 179:9,12 180:4,10 | **court**  1:1 6:16,23 | 59:10 |
| 90:4 91:15 93:22 | 180:11,20 181:10 | 7:17 27:22 34:11 | **customers**  39:24 |
| 93:23,25 94:1,3 | 181:11,17,18,19 | 38:6 158:18 | 164:4 |
| 95:7,8,15,16,18,21 | 183:9 185:14,17 | 200:18 | |
| 95:22,24,25 96:2,3 | 185:23 186:7,11 | **courts**  30:12 | **d** |
| 96:5,9,11,12,15,18 | 187:21,25 189:24 | 186:20 | **d**  3:1 4:1 5:1 |
| 96:19,21,25 97:1,4 | 191:23 193:12 | **cover**  15:17 | **d.c.**  6:20 64:4 65:8 |
| 97:5,8,12,17,23 | 194:8,15,22 196:2 | **covering**  131:11 | **damage**  60:16,19 |
| 98:3,6,9,12,13,16 | 197:2,3 199:13 | **covid**  23:19 48:4 | 60:20 |
| 98:17,25 99:12,13 | 203:5 | 54:18,24 162:16 | **daniel**  2:8 7:15 |
| 101:9,11,15,16 | **corrections**  200:4 | 164:1,23 179:1 | **data**  69:20 89:22 |
| 105:11,16 108:4,7 | 200:6 203:7 | 181:6 194:1,4 | 90:2 102:3 103:6 |
| 108:12,13 109:15 | **correctly**  199:10 | **crash**  161:8 | 103:11 104:7,11 |
| 109:16,20,21 | **corvette**  58:19,20 | **crashing**  164:6,7 | 104:14 105:5 |
| 117:25 118:1 | 59:5 | **crazy**  64:2 | 106:3,5 107:20,24 |
| 123:25 124:1,5,6,7 | **cost**  47:16 60:25 | **credibility**  81:17 | 124:10 125:25,25 |
| 125:12 127:4,23 | 61:11,19,25 62:4,6 | **criminal**  36:18 | 130:3 135:2 |
| 128:12,14 129:9 | **costa**  21:4 164:12 | **criticism**  181:23 | 138:20 139:1 |
| 129:21 131:1,2,6,7 | 166:1 188:8 | **criticizing**  161:22 | 142:13 143:1,3 |
| 132:9 133:2,13 | **costa's**  164:21,25 | **crm**  88:21 89:1 | 156:12 157:7 |
| 134:17 136:5,15 | **counsel**  6:13 7:3 | 110:22 114:8,19 | 172:24 173:5,13 |
| 136:16,22 137:3 | 9:23,25 10:2 11:2 | 125:24 130:3,11 | 173:14 189:3,15 |
| 137:13 140:23 | 14:14,22 25:25 | **crms**  89:8,8,12 | 189:17 190:17,20 |
| 142:2,3,10,11,15 | 26:23 27:11,17 | 102:7 125:11 | 190:22 191:7,10 |
| 142:22 147:1,2,5,6 | 28:6 90:23 91:10 | 134:24 173:6 | 191:19 |
| 147:9,11,12 148:4 | 91:23 167:15 | 184:2 | **database**  125:8 |
| 148:5,7,9,10,19,20 | 168:2,8,11,18 | **cumberland**  8:9 | **databases**  70:12 |
| 148:23,25 149:1,5 | 169:1,8,17,23 | 64:5,6,9 136:2 | **date**  12:17 28:12 |
| 149:15,16 151:17 | 177:14 197:20 | **curiosity**  173:2 | 28:14 32:8,9 |
| 151:22 152:5,17 | 199:15 | **curious**  172:23 | 200:9 203:12 |
| 153:6,18 154:5,9 | **country**  103:14 | 173:13,16 | **dated**  3:14 14:17 |
| 154:13,17 155:23 | 124:25 143:5 | **current**  13:17 68:9 | 23:3 |
| 156:2,7 157:2 | **couple**  8:15 51:15 | 98:4 153:23 | **day**  26:4 33:2,4 |
| 158:25 159:17 | 53:12 61:23 73:8 | **currently**  55:15,20 | 69:24 124:25 |
| 161:24,25 162:23 | 73:20,25 74:1 | **customer**  57:24 | 138:16 199:19 |
| 164:2,13 165:3 | **coupons**  129:5 | 58:1,6,7,15 103:18 | 203:15 |
| 166:4,5,9,12,14,15 | | 103:22 112:25 | **days**  26:25 53:12 |
| | | | 73:8 118:10 |

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[days - different]                                    Page 10

| | | | |
|---|---|---|---|
| 200:15 | dealerships 30:24 | dent 25:1,2,3,5,6 | detail 15:17 85:19 |
| dc 1:16 | 31:5,9,11,13 40:13 | 25:24 | 116:17 |
| de 142:1 | 40:24 85:17 88:11 | department 37:20 | detailed 46:17,23 |
| deal 35:20 119:20 | 88:16 89:9,12 | 38:21,25 40:7 | 47:11,12 48:18 |
| 136:7 155:14 | 92:16 102:7 111:9 | 175:11,17 | 50:19 59:19 72:9 |
| dealer 84:23 86:1 | 112:18 134:3,4,5 | departments | 78:10 97:15 |
| 86:13 87:4,5,9,14 | 135:15,16,16,17 | 175:5 | 145:12 |
| 111:1 114:12 | 135:19 139:23 | depend 75:3 | detailing 77:13 |
| 117:1,1,3,5,5,6,7 | 144:11,12 174:25 | depended 163:14 | 88:25 141:6,18 |
| 117:12,15 119:19 | 175:4 | depending 48:10 | details 47:21 |
| 121:5,13 124:16 | dealing 66:6 70:8 | 49:20 109:6 | 58:16 |
| 124:24 126:15 | 71:7 72:17 183:16 | depends 47:5 54:3 | determine 28:17 |
| 127:7,10,17 | 186:16 | 58:16 62:7 75:4 | 62:5 78:19,23 |
| 130:12,18,23 | deals 145:5 | 120:6,7,7,10 | 121:5 136:19 |
| 131:4 132:4,23 | dealt 101:22 | 137:17 170:20 | 164:22 196:21 |
| 136:19,20 138:8 | decent 134:25 | 186:2 190:15,16 | determined 71:4 |
| 138:13,14 140:18 | 135:1 | 190:17 196:8 | 195:15 |
| 141:10,13,17,25 | decide 60:7 61:6 | deponent 199:7,9 | determining 68:20 |
| 165:2,18 174:3,13 | 190:22 | 203:1 | develop 28:17 |
| 184:2 | decided 86:13 | deposed 8:10 | developed 44:13 |
| dealer's 174:9 | decision 166:19 | deposing 200:14 | dictate 170:15 |
| 175:22 182:25 | decode 195:21,22 | deposition 1:13 | dictated 170:1,2,7 |
| 183:4 | 196:18 | 3:12 6:8,12,18 | dictating 177:13 |
| dealers 38:4 68:22 | decoded 195:25 | 9:11,24 11:12 | difference 153:22 |
| 85:8 87:18 89:4,5 | decoder 195:16,19 | 14:7 32:14 33:14 | 156:16 191:17 |
| 110:7,12 111:6 | 195:20 196:1,24 | 91:21 92:7 198:2 | differences 72:11 |
| 112:2,8 117:10,12 | decoding 196:13 | 199:12 200:3,12 | 94:8,11 |
| 125:22,23 126:25 | deductible 147:14 | 200:16,17 | different 31:5 |
| 131:12,24 132:19 | 154:7,16 155:12 | depositions 91:16 | 45:10,15 47:18 |
| 133:7,12,15,21 | 155:13 | 91:20 104:13,19 | 49:9,10,15,15,18 |
| 139:24 173:4 | deemed 200:18 | 104:23 105:1 | 50:5 54:19 59:6,6 |
| 176:2 183:16 | defendant 1:8 | depth 38:13 54:20 | 59:7 69:4,23,25 |
| 186:5 191:13 | 2:12 6:13 | 144:4 145:5 | 70:12 71:1,1,11 |
| dealership 40:15 | defendants 7:10 | describe 114:18 | 80:10 83:14 84:14 |
| 40:16 61:14 85:16 | definition 80:21 | 138:5 | 84:15 89:10 94:20 |
| 85:21 89:22 | 122:20 | described 104:14 | 100:8,11,17 113:3 |
| 100:12,21 113:12 | definitions 80:19 | 135:10 | 114:7 123:13 |
| 115:11 116:20 | degree 36:4 | describing 105:5 | 135:20 136:1 |
| 117:22 128:11,21 | deleted 149:8 | description 3:6 | 140:8 145:3 146:9 |
| 135:21,21 141:8 | demand 48:12,16 | 4:2 5:2 | 158:24 164:15 |
| 184:17 186:3 | 50:14 | | 173:2 183:18 |

Jason Merritt                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[different - estimated]**                                    Page 11

189:12
**differently** 156:11
**difficult** 49:3 52:9
  75:6
**diminished** 5:6
  43:12 51:2,11
  60:22 62:1 163:9
**dirt** 161:8,15
**disagree** 176:17
  177:10
**disagreed** 157:25
**disagrees** 156:25
**disc** 177:3
**disclose** 35:4
  169:10,13 186:18
**disclosed** 10:16
  93:2,9
**disclosing** 169:19
**discuss** 56:15 57:8
  95:14 177:3
**discussed** 10:15
  28:7 71:6 170:9
  181:22 189:22
  192:1
**discussing** 45:7
  60:3 173:25
**discussion** 172:11
**discussions** 159:9
**district** 1:1,1 6:15
  6:16
**divide** 152:17
  153:5
**divided** 67:24,25
  153:7
**doc** 114:13
**document** 3:7,15
  3:17,20,23 4:3,6,9
  4:12,15,18 11:24
  13:19 15:21 16:3
  16:10 17:1,12,21
  18:3,6,11,17,22

19:8,11,19 20:6,10
  20:23 21:9 22:1,8
  34:8 40:1 67:16
  78:5,9 80:18
  92:25 109:24
  172:14 173:21
  176:7
**documented**
  158:14
**documents** 9:15
  9:17 10:18 11:9
  15:9,13,14 22:10
  22:15 37:14 90:23
  91:2,8,13,25
  108:23 173:18
  178:13 180:14
**dodge** 49:10,11,19
  49:20 50:4 60:14
  61:14 63:19 64:19
  75:10 79:6
**doing** 47:7 49:21
  66:10,10 130:3,17
  133:5 137:2 138:3
  162:19 182:11
  200:8
**dollar** 60:8,10
  61:8,10 67:14
  69:10,14 71:21,25
  74:8 75:1 180:5
  180:18 187:19
**dollars** 74:1,2
**dominick** 1:3 6:14
**door** 119:22 190:8
  190:9
**doubt** 70:21 125:1
**downgrade** 147:3
**dozen** 112:5
**draft** 169:6,24
  170:16
**drafting** 171:16

**drive** 49:17 50:1
**drivetrains** 59:7
**driveway** 50:3
**drug** 38:4
**dsanders** 2:11
**due** 193:6
**duly** 7:22 199:7
**dumped** 60:23
**duty** 49:24
**dye** 60:23

**e**

**e** 2:1,1 3:1,5 4:1
  5:1 199:1,1 201:2
**earlier** 40:12 82:8
  135:10 159:21
  177:16 189:22
**easier** 69:16
**east** 3:17,20 4:21
  4:24 5:4,7 16:11
  17:2 41:25 42:21
  43:1,9,15,25 44:6
  44:14,19,24 45:14
  45:24 46:16 51:2
  52:2 55:16 83:4
  93:25 111:25
  194:10,12 195:2,2
  195:6
**eastern** 1:17
**ebay** 66:7 77:3
**editing** 177:22,23
  178:6,10
**effect** 127:25
  128:16,17 129:11
**effort** 186:10
**eight** 147:21
**eighty** 156:19
**either** 90:21
**electronically**
  124:24
**electronics** 96:14

**eliminates** 144:25
**email** 26:8
**employed** 112:13
  174:25
**enables** 44:14
**encountered** 76:17
**endurance** 9:6
**enforcement**
  34:11 36:19
**engine** 49:16
  96:17,20
**england** 19:6
  106:19 178:18,20
**english** 171:2,5
**enthusiast** 52:20
**enthusiastic** 70:7
**entire** 37:6 70:9
  84:7 109:23
  177:25
**entities** 29:4,9
  30:24 163:24
**entitled** 44:3 46:9
  95:11
**entity** 11:16,19
  84:5 193:15
**equals** 153:20
**equipment** 96:7
**errata** 200:6,8,11
  200:14 203:9
**esq** 2:3,8,8
**essentially** 35:3
  94:2
**establish** 81:10
**established** 52:4
  81:7 122:24
**estimate** 70:5 74:8
  82:8 83:5,9,13,14
  101:24 172:25
**estimated** 71:12
  146:18,22 147:10

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[estimates - far]                                        Page 12

| | | | |
|---|---|---|---|
| **estimates** 74:13 | 4:2,3,6,9,12,15,16 | 75:12 77:25 80:12 | **extra** 114:13 |
| 83:15,18 84:20,21 | 4:20,23 5:2,3,6 | 85:15 87:17 88:19 | **extremely** 53:2 |
| 129:10 | 11:24 12:4,6,8,12 | 89:7 90:3 100:21 | **f** |
| **estimating** 69:9 | 12:20,24 13:5,6,7 | 108:2,6 112:14 | |
| 102:4 103:9 104:8 | 13:9,10,14 14:5,10 | 115:16 117:14 | **f** 199:1 |
| **et** 1:7 6:14,15 | 14:10,16,21 15:21 | 129:25 130:6 | **face** 58:3 157:6 |
| **evaluate** 37:16 | 16:1,1,10,15,16,17 | 135:9,11,13 | **facebook** 66:7 |
| 38:5 61:14 97:7 | 17:1,5,6,7,12,17 | 160:20 165:11,15 | 77:3 |
| 97:11 | 17:17,18 18:14,22 | 176:2,5 196:12 | **fact** 12:17 48:15 |
| **evaluated** 41:2 | 19:1,2,3,11,15,16 | **experienced** 82:3 | 70:20 86:2 87:5 |
| 61:4 | 19:17 20:10,14,14 | **expert** 3:8,15 9:20 | 89:24 113:11 |
| **evaluation** 146:3 | 20:23 21:2,3,9,13 | 10:16,24 11:13,25 | 118:18 119:4 |
| **evaluations** | 21:14 22:1,5,22 | 12:7,9 15:22 16:2 | 121:23 122:5 |
| 172:22 | 26:20 29:2 31:25 | 18:7,15 22:13,18 | 130:23 133:11 |
| **event** 62:20 | 35:24 38:16,16 | 23:16 28:17 29:23 | 159:12 169:8 |
| **evidence** 89:19 | 43:14,19,23 44:23 | 30:1,5,10 31:3,17 | **factor** 57:22 64:11 |
| 140:24,25 141:1 | 45:3,6,23 46:3,3,6 | 32:22 33:8 56:15 | 65:14 |
| **evidentiary** 57:16 | 51:1,6,9 55:5,8,9 | 90:10 92:2 93:2 | **factors** 48:10 |
| **exact** 18:17 26:12 | 76:8 81:16 91:2 | 108:18 109:11,13 | 50:21 53:21,25 |
| 26:21 28:14 47:6 | 93:18,20 94:3,7,17 | 109:25 110:2,6,11 | 54:11,25 70:4,16 |
| 124:14 126:1 | 94:18 95:2,5 | 111:2,10 171:7,15 | 97:15 115:13 |
| **exactly** 28:13 | 105:14 106:16,18 | 172:15,18 177:13 | **fail** 200:17 |
| 46:14 73:1 75:9 | 106:20 108:19,23 | 177:19 | **fair** 9:4,5 20:9 |
| 93:14 156:23 | 109:11 120:25 | **expertise** 30:13 | 32:16,19,21 38:23 |
| 173:5 176:13 | 122:14 132:8,10 | 31:10 70:3,11 | 39:2 56:7 67:17 |
| **examination** 8:3 | 134:8 146:2,8 | 176:9,13 | 67:17 68:20 71:2 |
| **examined** 7:23 | 158:6,7,7 164:9,19 | **experts** 92:2 | 71:18 74:13 76:14 |
| **example** 17:7 | 167:4 172:2,13,18 | **expires** 192:25 | 80:22 104:2 |
| 60:14 61:22 72:14 | 173:23 178:17 | 203:17 | 122:15,21 158:4 |
| 75:5 95:5 99:3 | 180:23 181:1,14 | **explain** 113:22 | 159:5,16 188:20 |
| 106:15 146:1 | 182:16 184:19,21 | 140:7 193:17 | **falling** 69:5 |
| 164:10,19 | 187:6 188:6 | 195:18 | **familiar** 18:20 |
| **examples** 156:9,9 | 192:24 | **explanation** | 89:17 101:20 |
| **excellent** 58:2 | **exhibits** 9:16 | 106:13,24 | 102:2,12 106:2,7 |
| **excerpt** 46:7 | 19:24 39:14 91:1 | **explosion** 174:24 | 106:14 107:16 |
| **excuse** 18:1 19:2 | **existence** 52:22,23 | **exposed** 37:4 | **family** 37:2,5 |
| 29:1 41:12 | **existing** 135:17 | **exposure** 135:18 | **far** 18:11 27:12 |
| **executed** 12:14,17 | **expand** 63:15 | **extensive** 52:3 | 37:13 38:11,12 |
| 34:8 93:8 | **experie** 176:13 | **extent** 39:21 | 47:7,15,20,21 |
| **exhibit** 3:6,7,9,10 | **experience** 30:13 | **exterior** 57:9 | 64:20,21 89:14 |
| 3:13,15,17,20,23 | 69:22 70:6,8 72:7 | 95:18 | 94:24 99:23 |
| | | | 128:17 |

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[father - goes]**                                                  Page 13

| | | | |
|---|---|---|---|
| **father** 37:2 | 36:20 42:15,18,22 | **four** 16:3 32:23 | 188:24 191:7 |
| **fault** 170:14 188:1 | 45:11 46:16 48:9 | 33:5,6 49:25 | **gibbs** 90:20 |
| **february** 23:3,7 | 51:18 57:15,18,20 | 52:15 95:14 148:3 | **give** 59:8,11 79:20 |
| 28:11,15,19 | 68:17 81:25 95:18 | 149:15 152:1,17 | 89:18,19 114:3 |
| **fee** 192:20,21,22 | 104:3 146:21 | 153:2,3,5,7 177:17 | 158:13 165:21,21 |
| 193:9 | 149:23 150:1 | 177:21 178:9 | 170:6 |
| **feel** 82:25 | 152:4 161:7 | 189:23 | **given** 62:6 92:1 |
| **fees** 114:12,13,13 | 169:23 170:16 | **fourth** 81:16 | 127:11 165:1,5,6 |
| **felt** 163:15 | 171:15 173:21 | 105:20 151:19 | 197:23 199:14 |
| **fifth** 134:9,10 | 174:23 | 152:14 164:19 | 203:5 |
| **fight** 145:9 | **five** 32:9,11,23 | **full** 8:6 12:8 58:24 | **gives** 59:20 84:19 |
| **figure** 68:6 76:3 | 154:19 155:9,10 | 83:3 143:14 | **glove** 196:15,16 |
| 123:8 128:23 | 155:16 156:19 | **fully** 96:14 154:7 | **gmc** 136:2 |
| **figured** 52:22 | **fix** 68:3 | 154:22 | **go** 6:10 8:14 13:25 |
| **file** 20:6 34:17 | **floor** 60:24 | **functional** 96:14 | 15:15 22:21 33:24 |
| **filed** 6:15 11:18 | **focus** 92:17 | **functions** 176:8 | 35:24 44:2 54:21 |
| **files** 19:24 20:4 | **follow** 46:25 86:9 | **further** 168:23 | 55:4,7 56:2 57:19 |
| **final** 167:21 178:4 | **followed** 86:12 | 197:4 | 60:19,22 63:11 |
| **finalized** 88:22 | 141:11 153:25 | | 64:2,6,20,21 65:6 |
| 89:1,1 118:11 | **following** 70:7 | **g** | 65:8,11,19 68:13 |
| **financially** 7:2 | 179:18 | | 69:6 76:7 80:17 |
| **financing** 115:3,4 | **follows** 7:24 46:17 | **games** 20:3 | 81:13,15,15 82:11 |
| 127:19 129:19 | 179:15 181:7 | **gap** 113:4 | 85:18 86:8 88:6 |
| **find** 52:11,21 | 187:17 | **garage** 59:3 63:2 | 94:14 105:20 |
| 63:11,16 64:8,14 | **fonts** 55:11 | 97:3 | 108:1 109:6 114:5 |
| 65:1,7 77:22 | **force** 39:3 | **garaged** 63:21 | 120:25 122:13,16 |
| 101:11 117:12 | **forced** 63:18 | 98:16 | 122:20 126:13 |
| 121:13 124:13,18 | **ford** 95:6 137:22 | **gears** 49:18 | 127:22 134:8 |
| 126:23 127:17 | **forefront** 117:21 | **gene** 2:25 6:21 | 137:21 139:14 |
| 130:16 180:15 | **foregoing** 203:3 | **general** 16:17 | 143:13 149:24 |
| 185:8,25 186:10 | **form** 39:16 73:24 | 26:19 55:9 78:13 | 150:12,18 151:6,9 |
| **finding** 57:16 | 94:22 139:3,11 | 142:24 177:13 | 151:24 152:10 |
| **fine** 143:23 | 154:24 169:3 | **generally** 8:13 | 153:12,15 157:5 |
| **finish** 27:24 28:1 | 203:7 | 26:13 76:25 77:6 | 158:12 162:7 |
| 33:8 | **forms** 38:16 | 77:24 78:14 81:6 | 164:14,17,18 |
| **finished** 33:3,4 | **formula** 67:20 | 102:23 122:23 | 167:4 172:12 |
| **firm** 6:22,24 16:5 | **forth** 37:18 73:4 | 143:23 | 177:6 179:13 |
| 23:24 25:15 26:2 | 172:2 193:14 | **generated** 91:13 | 185:1 191:11 |
| 26:6 29:2 41:19 | **found** 59:17 66:14 | **georgia** 2:10 | **goal** 117:21,22 |
| **first** 7:22 28:5,9 | 99:14 100:18 | **getting** 71:24 | **goes** 35:9 135:19 |
| 28:14,25 31:24 | 181:21 193:4 | 114:24,25 115:7 | 181:3 |
| | | 125:18,23 128:10 | |
| | | 153:10 188:14,16 | |

Jason Merritt                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[going - hypothetically]                                    Page 14

going   6:2 8:17 9:3
   14:20 15:12,15,17
   21:13 33:14 49:9
   49:11 55:7 61:19
   61:23 63:7 64:17
   67:7 72:7 73:9
   87:23 100:23
   102:10,19 113:14
   115:20 116:16,17
   124:2 129:1
   131:23,24 134:6
   143:19 146:2
   151:21,25 161:21
   162:8 164:5
   165:23 169:4
   176:12 177:5
   184:19 186:23
   192:9 194:25
   197:10,12
good   6:1 8:5 59:25
   60:15,16 78:18,23
   87:21 96:15
   116:21 123:19
   129:2,3 145:24
   147:5 159:6,24
   162:4,5 184:3
   188:18 191:10
   199:4
goodier   19:18
   185:13
goodier's   185:21
gotta   152:9 190:2
grandfather   59:3
great   125:5 165:19
greater   76:14 77:7
ground   8:15
group   31:21 88:16
groups   52:20
guess   10:4 57:17
   71:15 81:23 88:21
   89:16 102:5,6

123:6 167:13
   196:19
guide   75:12 79:25
   80:13 110:2
guides   68:20,25
   69:23 75:13,20
   78:17,21,23 79:18
   79:19,23 80:5
guy   66:9
guy's   131:22

h

h   3:5
haggle   116:5
   117:1,5,7 132:3,15
   133:16,22 134:4,6
hair   60:23
half   72:19
hand   8:19 12:3,23
   13:5 14:9,20
   15:12,25 16:15
   17:5,16 19:1,15
   21:2,13 22:4
   43:18 45:2 46:2
   51:5 106:17 142:7
   149:19 199:18
handed   119:21
handing   190:8
happen   112:21
   113:9 115:19
   116:3
happened   115:15
happening   50:12
hard   71:24 86:24
   89:22 90:2 103:6
   103:11 104:7
   105:5 106:3,5
   124:13 135:2
   158:18 172:24
   173:13,14 180:14
   182:5 189:2,17

hassle   132:16,19
   132:24 133:8,11
   133:16,16,20,22
   134:16,19 175:18
   175:23 176:3,4
head   8:19
heading   105:21
   106:23 132:14
hear   26:23 116:5
heavier   49:1,24
heavy   49:25
held   6:18 42:22
help   13:23 23:23
   167:9 196:21
helped   167:10,11
   167:12 171:5
helpful   97:18
   178:16
helps   160:3
hey   23:18,20,22
   26:15 100:19
   119:20
higher   47:16
   131:22 160:4
highest   146:18
historic   126:22
historical   58:16,21
   59:10 96:24
history   47:23
   52:20 58:14,24
   77:14 79:21
hit   86:20 88:25
   89:1
hmm   20:1 64:25
   119:10,12,25
   150:13 152:16,18
   157:11 159:22
   165:14 182:20
hold   12:25
holding   18:11

honda   135:20
honest   144:1
honestly   78:3
   163:3
hoped   66:20
hopefully   195:13
hoping   100:13
   194:5
horsepower   49:16
horsepowers   59:7
host   57:9
hour   10:13 11:10
   32:1,13 178:1,5,10
   192:17 193:18
hourly   31:25
hours   32:5,8,10,11
   32:23,25 33:2,5,7
   33:16 177:17,21
   178:9,12
house   41:3
housekeeping
   15:13
houston   23:22
   24:17,24 83:23
   84:1,8
how'd   72:22
howard   124:17
hudson   51:19
human   145:14
hundred   63:13
   64:7 156:19
hundreds   110:17
   110:17
hurt   166:3,13
hypothetical
   86:19,22,24 119:8
hypothetically
   67:11 70:23 86:12
   100:11

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[iacp - issue]                                    Page 15

| i | | | |
|---|---|---|---|
| **iacp** 3:18,21 16:11 17:2 57:1 95:11 | **indicates** 51:24 62:19 176:2 | **informed** 145:12 | **intermittent** 163:18,19 |
| **idea** 130:23 | **indication** 89:18 | **initial** 175:16 | **internet** 17:20,20 70:12 116:7 |
| **identical** 107:8 | **individual** 53:25 54:5,16 62:15 | **initially** 27:4 | 131:21 132:15 |
| **identification** 12:4 12:24 22:5 43:19 51:6 195:23 | 65:13 80:15 97:10 97:15 126:21 127:6 145:1,18 | **inquiries** 97:10 | 134:14,15,19 136:4,14 137:15 |
| **identified** 63:23 | 166:17 175:13 186:3,10 190:21 | **inquiry** 166:17,21 | 173:25 174:20,24 |
| **ignorant** 92:19 | 191:3,20 | **ins** 1:7 6:14 40:25 | 175:5,10,17,23 176:3 |
| **ignored** 54:16 | **individualized** 50:20 53:20 54:11 | **inspect** 85:11 140:1 142:7 163:2 196:4 | **interpret** 183:7 |
| **iii** 2:8 | 54:25 64:11 70:3 | **inspected** 140:16 | **interruption** 17:25 |
| **imagine** 118:7 | **individually** 138:3 176:25 186:23 | **inspecting** 142:21 | **introduced** 12:1 12:21 14:7,18 |
| **impact** 60:9,10 | **individuals** 186:17 | **inspection** 82:13 82:19 85:19,20 | 15:23 16:13 17:3 17:14 18:24 19:13 |
| **imperative** 200:13 | **industry** 35:6 63:22 68:18 | 141:6,14 145:18 | 20:12,25 21:11 22:2 43:16 44:25 |
| **imperfections** 95:24 | 139:24 | **inspections** 77:13 145:12 162:22 | 45:25 51:3 |
| **important** 27:23 82:17,21 175:11 | **infancy** 195:3 | 164:1 | **inventory** 29:19 30:6 31:17 89:15 |
| 175:21 | **inform** 111:5 173:19 | **instance** 53:18 54:10 | 134:25 135:1,6 175:12,22 |
| **imported** 52:16 | **information** 18:16 35:4 55:13 62:14 | **instances** 87:8 | **investigate** 120:1 120:18 |
| **impressed** 144:2 | 66:17 83:5,10,13 83:19 89:3 97:7 | **instant** 34:6 | **investigation** 27:15 41:19 59:12 |
| **inaccurate** 75:20 75:21 169:2 | 111:20,21 119:5,7 124:21,24 125:5 | **instructions** 200:1 | 59:16 72:24 100:1 145:3 195:1 |
| **inartfully** 188:5 | 125:12,14,17 126:11 131:3 | **insurance** 35:17 35:20,21 72:15 | **investigative** 59:15 70:6 |
| **include** 32:13,17 32:18 48:11 109:2 | 141:4,5,14,18 142:14 173:3,4 | 103:17,20,24 113:4 163:24 | **invoice** 174:14 |
| **including** 29:18 | 174:2,12,16,17 181:14 183:11,19 | **insured** 11:15,19 35:23 | **involved** 11:21 39:10 40:19 103:4 |
| **income** 194:23 195:8 | 183:23 184:4 186:6,17 187:1 | **insureds** 29:3 | 104:4 |
| **inconsistent** 105:23 | 188:14,22 | **intelligence** 41:9 41:13,16 194:20 | **involvement** 40:23 102:22 |
| **incorporated** 176:4 | **information's** 190:3 | 194:24 | **involves** 51:22 |
| **independent** 40:4 41:5 42:16 44:8 | | **inter** 29:18 | **involving** 53:19 |
| **independently** 70:25 | | **interaction** 48:6 | **issue** 107:12,15 125:10 144:9,16 |
| **indicate** 126:1 | | **interested** 7:2 199:16 | |
| **indicated** 199:6 | | **interfere** 6:8 | |
| | | **interference** 6:6 | |
| | | **interior** 57:9 96:2 96:11 | |

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[issue - list]                                          Page 16

144:18,20,21
156:5 157:7,23
161:3 165:4
176:10 178:23
179:1,3,4,6,10
180:25 181:9
185:15 187:12
188:10 191:25
192:2
**issued**  3:10 14:6
**issues**  60:17
144:16 161:1
163:25 178:14
**item**  36:20
**itemized**  107:9,10
**items**  165:13
**iteration**  146:11

**j**

**j.d.**  102:13,15,18
102:21,25 103:7
103:12 104:24
106:8 107:21
124:17,20,23
125:14,15 143:1,3
143:8 172:24
173:8
**james**  19:5
**jason**  1:13 3:2,8,9
3:11 6:12 7:11,21
8:7 11:25 12:21
14:6 44:12 197:23
**jcashdan**  2:11
**jeff**  7:9 162:2
**jeffrey**  2:8 3:13
14:17
**job**  37:11 38:24
41:21 42:5,22,23
70:2 162:25
**john**  1:4
**joined**  40:9

**judgment**  72:8
97:14
**june**  41:9,11
180:13
**jurisdiction**  34:11

**k**

**k**  1:17
**keep**  165:16,19
**kelley**  69:2 75:13
79:20 116:19
**ken**  90:13,17
**kept**  59:3
**kin**  199:15
**kind**  16:19 38:2
55:9,13 57:16,21
59:14 84:19 97:14
103:6,11 146:10
167:13 168:1
172:24 196:19
**kinds**  52:18 113:9
**king**  1:14 2:7 6:18
7:16
**knew**  25:7 118:18
190:19
**knock**  126:7,7
**know**  8:25 9:2,7
11:17 23:21 24:14
25:6 35:7 43:21
45:4 46:12 47:14
47:16 54:19 59:22
59:25 60:24 64:2
64:3 69:18,18,20
74:21 75:22,22,25
77:2,11,14 79:6,9
86:22 89:8 99:1
101:24 102:1,3,8
102:11,11,15,17
102:19,20,21,24
103:6,11 104:12
106:5 107:20,23
107:24 108:1

112:6,11,12
115:24 116:4,6
117:17 118:22
121:10,23 122:3,5
124:17,19,20,23
125:2,4,16,17
126:10,16 127:12
127:21 128:19
130:21 132:17
136:6,6,11,23
137:7,11 138:3,14
139:23 140:4,9
142:4 143:7,9,10
145:1,2,6,11 155:3
156:10 158:4,24
160:6 161:5,6,7,13
161:13 165:7,9
166:10 173:3,4,16
173:17 176:13
179:4,18,22
180:14 183:21,22
183:25 184:1,4,9
185:4,6,7,24
186:17 188:13,16
188:17,19,22,23
189:1,10,16,19
190:3,6,14 191:4,6
191:8,9,12,13,21
194:9
**knowledge**  70:10
139:8 140:22
141:21
**kslaw.com**  2:11,11

**l**

**labeled**  13:13
**labor**  61:13 62:8
**lacey**  90:9
**large**  60:11
**law**  1:14 16:5
23:23 26:6 29:2
36:18,18 158:18

**laws**  109:2,3
**lawsuit**  25:13,14
**lead**  164:16
**leading**  177:18
**learning**  76:22
**leave**  67:4 100:23
**lee**  2:3 3:13 7:12
14:17 19:23 33:21
34:15
**left**  39:3
**leg**  154:25
**legal**  2:25 6:22,24
108:14 154:25
197:25
**legit**  188:17
**letter**  3:13 14:16
**lgs**  1:6 6:17
**life**  37:3,6 70:9
**lightspeed**  89:10
125:25,25
**limit**  64:1
**limitations**  82:5
**limited**  52:10 82:4
89:7 95:23 162:21
163:8
**line**  114:19 182:23
182:23 201:4,8,12
201:16,20 202:1,5
202:9,13,17,21
**lineage**  59:10
**lining**  55:25
**list**  45:10 65:23
66:2,25 98:8
103:13 106:12
115:14 117:13
118:6,14 119:14
120:2,14,14,18
121:20 123:4
130:5,13,19
132:18 133:10
141:23 143:4

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[list - market]**                                    Page 17

148:6,12,19
181:16,21,24
182:9 184:13
185:1,4,8,17,22
189:7,7
**listed**   47:15 66:14
67:9 76:4 99:2,5
99:15 100:2 101:7
113:13 115:13
118:10 119:9
120:12 121:6,7,9
121:16,18 122:6,8
122:9 123:8,12,21
126:14 131:14
184:25 188:12
**listing**   100:14
128:21
**listings**   185:25
**lists**   29:4 189:6
**literally**   190:8
**litigated**   29:8
**litigating**   29:3
**litigation**   22:17
23:1,7
**little**   2:4 13:22
35:9 45:17 48:5
54:18 92:11 94:8
109:6 146:12
156:13 166:16
190:2
**live**   8:8,9 195:11
**livenote**   1:19
**living**   37:7
**llc**   39:7,10 40:3
41:25 42:21 43:2
43:10 194:11
**llowther**   2:5
**llp**   1:15 2:7
**lo**   68:9
**lobby**   10:1 11:5

**local**   30:24,24
31:11 68:22 98:5
**locality**   81:8
122:25
**locate**   49:3
**located**   6:19 62:25
**locations**   64:8
**long**   9:8 10:12
25:23 26:22 36:10
36:11 53:1,3,8
72:12 114:3,6
**longer**   53:6
**look**   35:18 43:20
47:19 62:8,21
65:5,8 84:15
93:18 95:2 96:24
102:24 103:23
106:16 109:2
110:25 115:5
116:14 117:17
120:24 131:24
157:16,25 158:1
158:14,24 159:12
164:17 172:12
176:23 180:23
185:1 187:6 191:2
191:20
**looked**   73:5 94:3
95:20,23 96:4,7,17
98:4 161:9 188:7
189:21
**looking**   23:16,18
25:16 31:24 48:22
48:23 64:19 70:3
77:2 78:7,18 95:9
107:1 115:8
117:18 126:2
132:8 148:2 157:6
158:5,16 159:13
159:20 173:21,23
176:21 178:13

182:16 184:20
189:20 190:22
**looks**   16:3 17:18
19:3 20:15 42:10
58:18,19 62:18
**loss**   11:22 17:19
43:12,13 51:25
76:14 77:7 89:13
101:21,23 102:16
103:19,25 104:4
105:11 107:8
108:4,7,9 132:3,7
132:12,18 160:8
176:8 177:4
179:20
**loss's**   105:6
**lot**   36:13 50:3
55:12 59:22 69:4
69:16 84:13 109:3
126:20,21 130:7
133:15,21 134:4
135:17 140:8
141:9 144:25
145:2 175:4,12
194:25
**lots**   87:19
**loud**   80:25 81:3,4
81:5
**low**   53:2
**lower**   113:6
115:12 121:11
130:14 147:20,20
147:21
**lowther**   2:3 3:13
7:12,12 10:9 11:3
11:10 14:17 20:1
20:8 21:17 24:1
34:16,20 39:16,18
73:24 90:16 93:1
93:4 139:3,11,14
139:18 146:5

154:24 162:2,5
167:11,15 169:3
192:7 197:6,11
**lowther's**   16:5
26:1
**luckily**   186:19
**lukasik**   21:15,17
21:18 146:17
149:8 153:23
154:6 189:23
191:24
**lukasik's**   146:3
154:4 189:21
**luke**   43:7
**luxury**   164:4

**m**

**machine**   199:10
**main**   38:23 55:19
**maintain**   134:25
**majority**   88:12
**making**   85:1 189:1
189:17
**management**
29:19 30:6 31:18
89:11,16
**manager**   40:17
110:16 129:17
**march**   12:14
**marked**   12:4,24
14:9,21 16:1
17:17 22:4,11
43:18 45:2 46:3
51:5 91:1 158:2
**market**   29:18,24
30:3,7,11,20 31:4
31:19 49:1 50:15
56:8 66:19 67:17
67:20 68:21 76:14
77:7,15 79:8,10
80:7,22,25 81:6,10
98:5 101:8,14

Jason Merritt                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[market - motorized]                                      Page 18

122:15,21,23
133:23 134:15
137:17,25 138:22
146:18 147:10
154:12,19 155:10
179:21
**marketing** 133:18
**marketplace** 77:3
**marking** 19:24
96:10
**marks** 95:24
**maryland** 8:9
31:12 36:9 37:20
37:25 38:20,24
40:7 64:9 136:1
**material** 18:8 94:5
**materials** 14:3
15:7
**math** 149:12
156:22
**matter** 6:13 22:18
23:10 28:18 33:9
33:13 34:6 36:16
90:10,24 110:7,12
111:3 156:25
**maximize** 175:13
**mean** 10:24 25:17
46:23 47:10,12
58:1 67:23 71:12
80:4,5 83:9 93:9
101:2 126:8
128:25 131:12
133:18 134:23
165:7,12 178:3,4
195:18
**meaning** 147:3
**means** 81:2
**measure** 15:14
**mechanic** 37:3
**mechanical** 85:20

**media** 6:11 87:24
88:3 162:9,13
197:24
**meet** 9:23 10:2,8
10:12
**meeting** 10:19
11:10 28:5,10
32:14 163:15
**member** 37:20
**mentioned** 11:2
40:12 83:17
162:16 193:20
195:14
**merr** 37:11
**merritt** 1:14 3:2,8
3:9,11 6:12 7:11
7:21 8:7 11:24,25
12:4,20,21 14:5,6
14:16 15:21 16:10
17:1,12 18:22
19:11 20:10,23
21:9 22:1 43:14
44:12,23 45:23
51:1 162:16 169:4
197:24
**merritt's** 36:21,24
37:1,11 39:6,9
40:3
**met** 9:25 10:1,3,13
11:2,5
**method** 56:10
174:1
**methodology**
16:19 46:25 47:2
47:3,8 68:15,18
72:10,12 94:24
105:24 106:8,13
106:23 107:17
143:23 153:24
179:14,15,18,23
180:1,2 181:4,8

187:17 191:17
**methods** 56:21
82:1 174:24
**michelle** 90:9
**microphones** 6:4,7
**mid** 49:24
**middle** 67:16
**mile** 63:1,4 64:7
98:15,19
**mileage** 47:13
57:6 59:4 64:1
68:11 79:6 83:20
128:4 150:6
**miles** 63:10,13
**mincing** 123:7
**mind** 26:16 47:10
66:12 75:8
**mine** 156:12
165:19 171:12
172:20
**minimum** 32:5
63:22
**minor** 47:21
**minus** 153:19
154:7,15
**minutes** 53:16
126:17
**mis** 126:17
**misread** 41:12
**missing** 83:1
138:15
**misstates** 139:12
**mistake** 184:11
**misunderstood**
126:17
**mitchell** 3:24 4:4,7
4:10,13,16 17:13
17:19 18:23 19:4
19:12,17 20:11,24
21:10 102:3 103:7
103:12 104:7,16
104:21 105:10,18

106:3,8 107:17,20
108:9 132:2 143:1
143:3,6,23 144:2
144:17 145:5,8,11
147:19 154:3
156:6 161:4,19
172:24 173:8
183:19 184:5,12
184:16 188:14
**mitchell's** 101:20
101:22 102:16
103:3,18,25 104:4
104:9 105:22
134:13 145:4
**mix** 70:7
**mm** 20:1 64:25
119:10,12,25
150:13 152:16,18
157:11 159:22
165:14 182:20
**model** 48:13,17
57:6 64:20 85:5
135:23 137:22
**modern** 134:14,22
134:23,24 135:5
**mom** 135:2
**moment** 43:20
45:3 88:6 122:20
**monday** 10:4
**money** 100:22
190:9 195:5
**months** 36:11,14
**morning** 6:1 8:5
9:17 10:1 11:2,3
**motor** 37:11 42:6
112:15,19
**motorcycle** 40:15
40:16
**motorcycles** 44:9
**motorized** 44:10

Jason Merritt                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[move - okay]                                              Page 19

| | | | |
|---|---|---|---|
| **move** 63:20 68:10<br>76:15 175:11<br>188:6<br>**movement** 8:19<br>**mr2** 51:22 53:19<br>63:10,11 72:14<br>75:4<br>**mr2s** 52:10,12,14<br>72:25<br>**msrp** 79:12<br>**multiple** 20:4 47:5<br>52:11 57:20 71:9<br>89:17<br>**mustang** 95:7 | **needed** 145:2<br>**needing** 76:15<br>**needs** 61:18 83:16<br>142:1 171:22<br>**negotiate** 110:7,13<br>111:6 112:16<br>121:11 126:5<br>130:13,24<br>**negotiated** 103:16<br>103:20<br>**negotiating** 112:18<br>**negotiation** 112:14<br>112:23 114:6,16<br>116:2 143:4<br>**negotiations** 113:9<br>**neither** 199:14<br>**network** 124:21<br>125:15<br>**never** 54:15 60:21<br>63:9 101:22<br>103:20 122:11,17<br>122:17 137:24<br>171:7,14 181:25<br>184:16<br>**new** 1:1 6:16 22:6<br>51:19 64:3,23<br>65:4,5,6,10,11<br>69:3 109:14,18<br>174:25<br>**nice** 144:7,8<br>**nine** 52:13<br>**nod** 8:19<br>**nondisclosure**<br>34:23<br>**nondisclosures**<br>35:7<br>**nope** 152:9<br>**normal** 62:20<br>87:13<br>**normally** 49:24<br>56:23,24 60:13 | 62:3 63:9,12 66:3<br>66:5 76:6 88:20<br>112:23 137:19<br>**northwest** 6:20<br>**notary** 1:19 199:3<br>199:22 203:21<br>**note** 6:3 7:14<br>158:12<br>**noted** 97:2 158:17<br>200:11 203:8<br>**notice** 181:12<br>192:24 199:6<br>**noticing** 7:8<br>**notification** 26:3<br>**notified** 24:2<br>**number** 6:17 29:4<br>53:20 59:25 60:1<br>61:18 62:21 71:5<br>72:21,23 73:2,3<br>75:9 80:18 87:24<br>88:4 94:18 100:13<br>105:14 107:13<br>112:8 115:5 128:1<br>134:8 144:6 146:9<br>146:12 147:21<br>150:17,18,24<br>151:14 152:19<br>155:17 158:5,13<br>162:9,14 184:23<br>188:6 189:20<br>195:23,23 197:24<br>**numbered** 3:23<br>4:3,6,9,12,15<br>17:13 18:23 19:12<br>20:11,24 21:10<br>134:10 147:18<br>**numbers** 71:1<br>83:19 112:4 158:3<br>163:15<br>**nw** 1:15 | **o**<br>**oakland** 135:25<br>**oath** 6:25<br>**object** 39:16 73:24<br>139:3,11 154:24<br>169:3<br>**objecting** 139:18<br>**objection** 39:17<br>**objections** 7:6<br>**obligations** 35:1,5<br>**observe** 112:17<br>**obtain** 36:4 42:8<br>**obtained** 42:10<br>111:21<br>**obtaining** 174:2<br>**obviously** 37:4<br>48:4 49:1 58:20<br>79:5,7 94:19<br>115:21 155:13<br>**occasion** 67:3<br>**occasionally** 77:22<br>**odd** 38:2<br>**offer** 110:8,13<br>111:7 113:1,2<br>129:4 161:21<br>176:2<br>**offered** 52:13 53:1<br>**offering** 108:14<br>156:24<br>**offers** 123:4<br>**office** 23:23 70:24<br>**offices** 1:14<br>**official** 199:18<br>**oh** 58:4 62:13 74:9<br>82:11 108:11<br>115:17 151:20<br>152:9,10 176:18<br>176:19 197:9<br>**okay** 8:10,13,15<br>9:6,8,19 10:8,14<br>10:18 11:1,8,15,18 |

| **n** |
|---|
| **n** 2:1 3:1 4:1 5:1<br>**nada** 69:2 75:12<br>79:20 102:24<br>116:19<br>**name** 6:21 8:6<br>56:17 94:16 137:7<br>**named** 90:8,12<br>**names** 43:5<br>**narcotics** 38:3<br>**narrowed** 156:13<br>**nationally** 68:19<br>**nationwide** 63:11<br>75:23,24<br>**ne** 2:9<br>**neat** 135:18<br>**necessarily** 195:25<br>**necessary** 63:15<br>72:8 97:16 200:4<br>**need** 8:18 9:7<br>26:16 54:4 61:5<br>62:14 74:21 84:21<br>100:19 101:6,6<br>116:15,16,17,23<br>131:19,19,20,25<br>144:25 193:7<br>196:3 |

Jason Merritt                                         April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[okay - outline]                                          Page 20

11:21 12:3,23
13:2,4,19,21 14:13
14:20,24 15:2,5,12
16:6,15,22 17:5,9
17:16 18:10,13,19
19:1,15,19,22 20:8
20:14 21:2 22:10
22:15,20,24 23:9
24:6,10,16 25:4,9
25:11,20,23 26:5,9
26:13,18,22 27:3,9
27:15,21 28:2,5,16
28:25 29:13,16
30:14 31:2,7,9,14
31:16,22,24 32:16
32:19 33:6,11,20
34:18,21 35:2,6,11
35:24 36:6,12,20
37:17 38:15,23
39:3,20,21 40:2,6
40:9,18 41:8,15,24
42:12,20 43:1,5,9
45:20 46:2,13
49:11 51:12,15
54:15 55:4,20,23
56:2,10,17,25 58:5
58:9 60:2 61:15
61:22 62:5,18
65:16,19 66:23
67:7 68:5,13
70:22 72:3 73:22
74:10 76:1,7 80:1
80:17 81:6,13,18
81:19,25 82:21
83:3,22 84:3,16,20
86:22 87:2,12
88:18 90:5,8,19,22
91:12,16,19 92:18
93:11,18,20 94:10
95:1,9 98:4,24
99:3,10,19 100:2,6

100:15 101:1,13
101:17,17 102:10
102:12,18,21
103:1,16,22 104:2
104:19 105:8,15
106:2,7,15,20,25
107:5,14,20,25
108:14,17,22
109:4,17,22
110:19,25 111:16
111:24 112:2,6,13
112:21 113:20
114:2,9,10 116:11
116:16,21 117:4,8
118:4 119:8
120:24 122:2,13
122:19 123:10,24
124:2,12 129:23
130:21 131:3,8,16
132:13,17,25
133:3,14 134:2,8
134:11,12,18,22
135:4,8,12,14,22
136:17 137:6,10
137:20 138:4
139:19,21 140:4
141:20,25 142:12
142:17 143:8,11
143:16,17,21
144:19 146:3,6,13
146:14,19,20
147:17,23 148:8
148:11,14 149:6
149:12,21,25
150:3,11,17,21,24
151:4,13,18,24
152:2,3,6,11,14,15
152:21,21 153:2
153:10,15,19,22
154:2 155:18,20
156:3,14 157:8,18

157:22 158:8,10
159:25 160:10
161:3,12,17 162:1
162:6 163:4,7,21
164:14 165:15
166:21,24 167:4
167:17 168:20,25
169:21 170:11,18
170:25 171:3,10
171:13,25 172:4
172:10,12,17,23
173:24 174:20
176:1,7,15,18
177:7,12 178:9,16
178:18 179:25
180:12,16,21
181:12,23 182:2,7
182:17 183:2,7,10
183:22 184:11,15
185:15,24 187:16
189:13,20 190:5
190:11,11,12,19
191:24 192:7,19
193:5,10,17,20,24
194:2,6,9,14,16
195:4,6,10 197:4
197:13
old   185:25
older   58:18 66:4
157:4
once   61:4
ones   22:11 69:4
152:24 179:2
189:7
online   66:7 175:22
180:14 192:17
193:10 195:20
operate   89:20
operated   65:2
operates   101:24
177:4,5

operational   96:8
opinion   70:14,18
70:19,21 82:2,9
156:24 161:22
165:21 174:8
180:7,17 181:19
182:24 185:20
187:18 188:21
opinions   22:18
28:17 71:7 90:10
90:14,24 108:15
109:25 110:2,6,11
111:2 167:12
171:25 172:19
opposite   134:1
options   47:13,18
49:15 59:4,6 98:2
128:4 195:15,25
196:17,22
oral   167:24 168:6
183:4
orally   8:18
order   34:10,12
127:14 162:25
171:23
organization
23:15 24:7 40:4
40:10 41:5 42:16
137:11 194:7
original   55:18
76:18 78:1 84:10
96:8 97:3 118:17
119:17 120:1
200:14
originally   55:18
outcome   7:2 72:11
199:16
outline   16:20
167:12,17,22,24
170:6,8,10,18
177:13

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[outlines - please]                                      Page 21

outlines  16:18
outside  64:6,7
outward  63:20
overall  113:7
  135:13 165:8
oversaw  110:17
overview  16:20
  81:23 167:19
owe  119:21
owned  11:22 37:2
  37:2 59:1,3
owner  19:5 25:10
  44:12 94:17 159:5
  160:4,13,25
owners  58:22,22
  58:25 83:20 157:9
  165:16

**p**

p  2:1,1
p.m.  162:14
  192:10,13 197:15
  197:22 198:2
pack  36:13
package  115:3
page  3:2,6 4:2 5:2
  5:7 12:11 16:3
  31:25 33:24 44:2
  45:11,12 48:9
  51:2,11 56:2
  67:17 68:13 76:7
  78:17,20 80:17
  81:15,16,21 94:14
  94:16,19 95:3,9
  98:8 103:3 105:19
  105:21 106:11,20
  106:22 120:25
  122:13 124:3
  134:9,9,10 136:9
  136:17 138:6,11
  146:21 147:18
  148:1,12,17,18

149:2,24 150:18
  150:19,19,22
  151:25,25 153:12
  158:5,8 159:14,19
  164:19 181:12,14
  184:20 201:4,8,12
  201:16,20 202:1,5
  202:9,13,17,21
pages  13:8 51:10
  55:12 203:4
paid  31:8,9 126:6
  147:15 153:23,24
  154:6
paint  47:21 61:23
  95:24 191:15
painted  59:2
  190:12
panel  62:10
panels  47:22 83:17
paperwork  97:4
  119:22
paragraph  28:25
  29:16 30:14 32:4
  33:25 56:25 57:18
  60:3 68:17 69:1
  76:9 78:17,20
  83:3 95:18 96:1
  96:13 138:5,10
  143:13,14 173:22
  182:19
paragraphs  57:20
  95:14 176:17
  177:2,8
parameters
  127:12
parking  50:3
part  8:25 25:10
  38:5 62:20 68:18
  81:22 110:23
  129:4,8,20,21
  147:7

particular  53:18
  55:1 69:8,23,24,24
  71:13 97:8 104:6
  106:10,25 109:14
  138:7,8,12,13,16
  140:22 141:21
  143:2,5 162:18
parties  6:10 42:24
parts  61:13 114:7
  177:9
party  7:1 22:16
  199:15
pass  131:23
passed  141:6,6
pay  35:19
payments  113:5
  114:15
peachtree  2:9
pending  9:8
pennsylvania  1:15
  6:19
people  41:3 43:1
  58:25 70:23 76:16
  80:2 134:24,25
  135:5 164:6,7
  193:21,22
percent  107:12
percentage  194:23
  195:2
perfect  159:1
perform  82:13
  162:25
performed  78:11
  82:18 83:14
  103:24 105:10
period  128:5
  163:12,17
person  90:15
  162:22 163:2
personal  13:7

personally  45:20
perspectives
  160:25
phone  26:8 94:16
  94:17 111:18
  149:17,18,19
phones  6:6 149:20
phonetic  43:8 90:9
  90:13
photos  16:19
physical  82:13,18
physically  163:2
  196:4
pick  6:4
picked  118:9
pickup  49:9
picture  196:18
pictures  141:7
pigheaded  92:11
pin  125:15
place  6:7,9 66:6
  199:6
places  66:7 112:1
placing  139:24
plaintiff  1:5 2:6
  27:19
plaintiff's  167:15
  168:2,8,11,17
  169:1,16,23
  177:14
plaintiffs  7:13
  28:6
plans  172:7,9
platform  135:20
platforms  89:18
  89:20
play  20:3 158:23
ple  9:1
please  6:3,6 7:5,7
  7:18 8:6 12:5
  22:22 76:8 80:25

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[please - privilege]                                                Page 22

197:8,14,20 200:3
200:8
pllc  2:2
plotts  1:4 20:16
  187:7,12
plow  50:2,3
plus  63:1,4 98:14
  98:19 152:7
  153:19 154:6,10
  154:14,15
point  27:9 29:10
  33:7 62:6 72:1
  78:19,23 81:25
  94:13 115:4
  116:21 162:3
  186:18 195:3,8
pointed  185:19
police  36:9 37:20
  37:25 38:21,24
  40:7
policy  132:16,24
  154:23 155:3,5
  176:5
pop  135:2
populated  89:2
portfolio  38:5
portion  43:24 45:6
  95:10 109:7
portions  94:23
position  134:13
possible  70:25
  74:9 81:7 82:22
  122:24 185:25
  186:12,13,22,23
power  102:13,15
  102:18,21,25
  103:7,12 104:24
  106:8 107:21
  124:18,20,20,23
  125:14,15 143:1,3
  143:8 172:24

173:8 186:19
practice  50:20
  59:18 131:13
  142:25
practices  29:20
  30:6 31:18 81:24
  89:4 110:25
precise  39:23
  107:17 144:4
  156:18
precisely  69:10
precision  170:14
predicted  189:4
preference  48:5
prep  114:12
preparation  11:1
  18:18 37:13 92:9
prepare  9:10,13
  9:21,23 11:11
  32:14 36:24 37:10
  38:19,25 39:13
  90:9 92:7
prepared  9:18,19
  13:19 16:4 18:14
  32:22 172:15
preparing  14:25
  18:7,12 22:12
  38:1 39:10 90:23
  118:8
present  2:24 7:3
  35:17 41:9,11
  108:17 114:14
presented  162:17
presume  9:4 176:9
pretty  24:21 26:2
  26:2 37:6 144:3
previously  11:9
price  62:8 66:25
  67:1 68:7,8 72:19
  76:18 77:9,22
  78:2 99:7,15

100:2,6 101:7
103:13,14 107:7
110:21 112:18
113:5,6,13 114:16
114:21 115:1,12
115:14,23 116:5
116:19 117:13,20
117:24 118:5,5,6
118:14,17 119:6
119:14,15 120:2
120:13,13,14,16
120:17,18 121:2,6
121:7,8,9,11,16,17
121:18,20,22,24
121:25 122:6,7,8,9
122:11 123:5,9,11
123:12,13,19,22
123:25 124:4,9,11
124:14 126:3,4,15
126:16,19 127:5,9
127:11,14,16,18
127:23,24 128:1
128:17 129:5,8,13
129:15,21 130:5,7
130:10,13,14,19
130:24 131:20,21
131:22 132:16,24
133:10 134:16,19
134:20 136:4,5,13
136:14,21 137:1
137:15 138:16
143:4 144:13
145:10 148:19
150:1,6 151:2,11
151:19 174:3
175:17,18,23
176:4 181:16,17
181:20,21,24,25
182:6,8,9,18 183:3
183:4,20 184:12
184:13,25 185:2

185:22,22 188:18
189:10 191:4,22
192:1
priced  30:25 72:18
  114:10
prices  29:12 75:24
  75:24 77:2 110:8
  110:13,20 111:6
  112:15,16 119:1
  126:14,24 131:14
  132:4,19 134:15
  137:15 148:6,12
  183:8 184:7 185:5
  185:9,17,17
  191:11
pricing  17:20
  29:19 30:2,10,19
  31:3,10 37:16
  111:9 116:9
  131:25 133:16
  134:14 174:1
  176:3
principal  63:1
principally  63:21
printout  4:20,23
  5:3,6 17:19 22:6
  43:14,24 44:23
  45:23 51:1
prior  18:9,14,18
  23:7 24:15 28:18
  32:20 42:13 47:25
  58:22 60:16,20,21
  77:24 146:19
  173:25
private  6:5 41:18
  66:6,22 68:22
  76:1,10,13 77:1,6
  77:15,25 126:21
  174:15 186:17
privilege  169:6

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[prob - range]                                         Page 23

| | | | |
|---|---|---|---|
| **prob** 177:25 | **profitability** | 93:21 103:18 | 169:1,17 170:21 |
| **probably** 9:15 | 110:22,24 117:23 | 167:17,18,19,24 | 170:21 171:6 |
| 13:22 28:11 30:21 | 126:2 127:22 | 168:5 178:14 | 173:5 195:5 |
| 37:8 55:17 59:22 | 128:7 129:18,20 | **provides** 45:8 | **putting** 59:22 |
| 61:17 65:6,8 | 130:10 | **providing** 23:1 | 131:20 165:13 |
| 70:17 73:15 79:7 | **progressive** 1:7 | 44:7 51:15 | |
| 86:25 87:21 94:8 | 6:14 11:16,19 | **provision** 22:6 | **q** |
| 94:11 99:17,21 | 29:4,9 35:13,17 | 108:18 109:15 | |
| 118:16 119:16 | 105:2 163:24 | **provisions** 108:21 | **qualified** 82:3 |
| 178:1,5 186:10 | **projected** 105:9 | **psa** 153:11 | **quarter** 49:22,23 |
| 194:13 | 105:17,22 106:4,9 | **public** 1:19 199:4 | 50:4 |
| **problem** 13:24 | 107:1,13,18,21 | 199:22 203:21 | **quarters** 82:11 |
| 28:4 125:20 | 132:4,20,21 | **pull** 50:1 | **question** 8:24 9:3 |
| **proceed** 8:2 | 143:24 144:9,22 | **pulliam** 2:2 | 9:8 27:25 28:3 |
| **proceeding** 7:7 | 145:10 148:21,25 | **pulling** 125:21,22 | 39:20 86:23,25 |
| **process** 8:14 46:18 | 149:3,9 151:2,13 | **purchase** 174:14 | 107:16 113:17,25 |
| 46:24 62:20 167:6 | 152:2 156:6 157:2 | **purchased** 40:25 | 128:20 132:17 |
| 192:15 193:17 | 161:24 172:25 | 84:1,4 | 136:12 167:7 |
| **produce** 14:2 | 173:9 178:24 | **purchaser** 174:16 | 176:23 180:24 |
| 21:22 22:7 93:5 | 179:8,11 180:3 | **purchasing** 37:8 | 187:11 188:2 |
| 108:22 | 181:2,10 187:14 | 37:15 | 189:12 191:18 |
| **produced** 11:9 | 188:9,25 189:14 | **purported** 166:22 | **questioning** |
| 15:7,15 16:6,22 | 191:16,25 | **purpose** 42:22 | 172:21 |
| 17:9,21 18:3 19:8 | **proof** 174:14 | 48:10 172:17 | **questions** 8:17 |
| 19:19 20:7,9,20 | **properly** 53:21 | **purposes** 22:12,17 | 23:24 197:5 203:6 |
| 21:6 22:16 38:15 | **property** 81:8 | 22:25 23:6 38:6 | **quick** 192:6 |
| 92:25 93:7,9 | 122:25 | 55:1 57:13 65:16 | **quickly** 26:2 76:15 |
| 108:24 187:10 | **proposed** 169:1,17 | 85:1 87:13 89:23 | **quite** 37:19 94:11 |
| **producing** 19:23 | **propounded** 203:6 | 90:23 102:4 104:7 | 103:4 144:1 181:4 |
| **product** 101:21 | **protective** 34:9,12 | 110:5,10 111:1 | **quotes** 67:20 |
| 102:16 103:19 | **proud** 145:19 | 112:8 117:25 | |
| 105:11,18 108:10 | **proven** 76:13 | 120:2 130:3 169:9 | **r** |
| 108:11 132:3,18 | **provide** 23:6 | **pursuant** 154:23 | |
| 145:22,24 167:21 | 31:10 35:16 42:23 | 193:14 199:5 | **r** 2:1 199:1 201:2,2 |
| 169:6 | 44:15,20 45:15,20 | **put** 55:6 88:21 | **radius** 63:1,4,15 |
| **professional** 1:18 | 58:15 59:18 | 101:17 114:13 | 64:7 98:15,19 |
| 44:13 74:6 82:3 | 128:24 167:22 | 116:9 129:14 | **ram** 49:10,11 |
| **profit** 89:13 | 174:13 184:1 | 131:10 133:15 | 60:14 61:15 63:19 |
| 114:20,21 115:5,9 | **provided** 14:22 | 134:4 141:8 142:7 | 64:19 79:7 |
| 116:23 117:18 | 19:25 57:24 91:10 | 142:23 155:9 | **ran** 96:21 |
| 128:23 175:13 | 91:11,23 92:4 | 156:10 167:20,25 | **range** 71:17,18,20 |
| | | | 71:21 74:12,19,21 |
| | | | 74:23 75:1 180:6 |

Jason Merritt                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[rare - report]                                                Page 24

| | | | |
|---|---|---|---|
| **rare** 49:3 52:10,17 63:18 75:5 127:2 | 171:6 200:5 201:6 201:10,14,18,22 202:3,7,11,15,19 202:23 | **recondition** 86:14 88:12 116:16 | **regards** 174:16 |
| **rate** 32:1 | | **reconditioned** 85:16 86:3 89:24 | **registered** 1:18 |
| **rated** 57:5 158:4 159:16 | **reasonable** 71:19 72:4,12 74:13 83:23 149:10 165:10 | **reconditioning** 114:12 | **regular** 165:11,15 |
| **rating** 57:12 58:10 165:1 | | **record** 6:2,10 7:6 7:15 8:6 12:5 19:23 87:24 88:3 93:6,12 162:7,9,13 187:23 192:8,10 192:13 195:18 197:15,22 199:13 | **regulations** 22:7 109:19 |
| **ratio** 49:17 | **recalculate** 185:2 185:9 | | **regulatory** 108:18 108:20 109:14 |
| **reach** 25:24 62:11 | **recall** 18:17 24:6 24:11,12,16,20,23 26:7,7,12,24 27:1 27:12,13 28:5,14 35:22 90:18,21 112:4 177:15 | | **reject** 101:6 |
| **reached** 24:7 26:1 27:17 | | | **rejected** 169:2,18 |
| **reaction** 73:19 | | | **related** 7:1 |
| **read** 9:14 18:9 80:24 81:3,4,5 104:13,16,19,23 105:1,4 136:11 176:10 177:8 197:10,12 200:3 203:3 | | **record's** 109:17 | **relating** 55:1 |
| | **receipt** 200:15 | **recorded** 6:12 199:10 | **relation** 103:2 |
| | **receive** 26:9,11 | **recording** 6:9 | **relationship** 103:13 |
| | **received** 14:2 23:21 24:16 25:23 26:2 154:21 155:18,20,21,24 155:25 | **records** 111:13 | **reliable** 83:6,21 183:23 |
| **reading** 18:17 145:9 176:19 | | **reduce** 61:6 | **relied** 22:12 86:17 91:2 108:25 |
| **ready** 43:21,22 45:4,5 88:23,24 | | **reduces** 61:20 | **rely** 58:15 59:9 172:18 183:3,6,8 183:12 196:24 |
| **real** 54:22 61:1 93:14 188:17 189:17 190:6 | **receives** 154:18 | **reed** 43:7 | **relying** 133:7 |
| | **recertified** 193:3 | **refer** 13:3 47:4 | **remainder** 176:7 |
| | **recess** 88:1 162:11 192:11 | **referenced** 50:17 | **remaining** 176:16 |
| **realistic** 101:8 | **recipient** 138:8,13 | **referring** 79:16 91:12 93:1 105:12 106:21 176:14 | **remember** 24:9 25:19 51:23 88:9 90:15 91:5 |
| **really** 9:22 24:14 27:23 54:21 67:3 67:24 74:21 92:8 92:16,17 100:22 117:16 123:7 133:17 136:24 145:9 157:3,20 161:2 188:21 193:25 | **recognize** 45:6 46:3 | | **remotely** 7:4 |
| | **recognized** 29:17 30:9,15,18 31:3,17 68:18,19 | **refine** 167:13,20 | **remove** 99:21 119:16 |
| | **recommend** 182:11,11,13,17 | **refinishing** 62:10 | **removed** 144:24 161:10 |
| | | **reflect** 134:16 175:18 | **rendering** 111:1 |
| | **recommendation** 153:25 | **reflected** 29:1 | **repair** 61:25 |
| **realm** 99:24 | **recommended** 174:10 182:21 183:1 | **reflects** 134:19 | **repairs** 47:22,25 62:4,6,7 |
| **rear** 49:17 | | **refresher** 193:8 | **replace** 61:1,11 |
| **reason** 9:7 52:8 67:4 118:1,22 144:10 161:14,23 | | **regard** 78:16,21 109:11,14 110:1 127:19,23 133:11 187:11 189:14,15 | **replacements** 47:22 |
| | | **regarding** 27:11 108:18 143:2,4 172:1 174:3 183:20 | **report** 3:8 9:20 10:16,24 11:13,25 |

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[report - sale]**                                          Page 25

12:7,9 13:10,11,14
18:7,9,15 19:4,18
22:13 32:22,24
33:3,4,8 56:15
82:2,14 92:2
105:9,13,16,21
124:3 134:9 136:9
136:17 138:6,11
143:15 146:3,12
146:16,22 147:11
147:18 148:2
149:7,8,23 157:24
158:16 159:20
164:12 166:11
167:3,6,8,20,25
168:9,12 169:10
169:17,24 170:2
170:12 171:7,9,11
171:17 172:2,15
173:5,11 177:14
177:19,22,23,25
177:25 178:10,20
178:23 179:5,7,11
181:1 185:16,22
187:7 195:14
**reported** 60:21
82:4
**reporter** 1:18,19
6:23 7:18
**reporter's** 27:22
**reporting** 144:5
**reports** 20:5,16
21:4,15 93:2,7
104:16,17 106:12
145:8,11 146:10
146:19 157:1,10
159:13 161:23
164:15 172:22
176:11 187:9,13
188:10 189:22

**represent** 101:14
146:15
**representation**
57:24 184:3
**represented** 16:5
**representing** 2:6
2:12 20:5 109:10
**represents** 58:6,8
**request** 90:22
92:24
**require** 166:16
**research** 52:3
78:16,21,22
**researched** 89:12
**reserve** 197:7
**respond** 24:4
**responded** 14:14
170:3
**responding** 15:6
**response** 14:22,25
16:7,22 17:10,22
18:4 19:9,20
20:20 21:6,22
22:8 26:9,11,14,15
93:21
**responses** 15:4
96:24
**responsible** 37:24
**rest** 154:3,3
**restate** 139:5
**restricted** 56:3,6
**result** 74:19,25
164:25
**results** 146:17
**resume** 35:25
36:20
**resumé** 3:9 12:20
13:7,17 24:4
26:17,19,19,21,23
27:4,13

**retail** 80:7
**retained** 22:25
23:10 27:3,10
197:25
**retention** 3:16
15:22 16:2 22:23
**retirement** 194:25
**return** 200:13
**review** 10:18 34:4
45:3 68:19 91:16
91:19 92:6,20
93:16 168:21
169:25 171:18
**reviewed** 9:16
10:20 18:6,13
22:12,17 91:2
92:8,12 108:24
168:12
**reviewing** 11:8
**rid** 153:11
**ridiculous** 115:21
**right** 9:10 13:14
15:10,19,25 22:20
28:11 33:14,16
39:7 42:1 43:3,23
53:22 54:8 67:8
68:7 73:9 79:11
81:21 94:22 97:20
98:22 100:17
101:4 113:7 116:3
125:6 126:12,25
128:13 138:24
139:2 143:25
146:4,8 147:22,22
148:1,13,22
149:13,19,22
150:2,10 151:1
153:12 154:11
155:12 156:22
158:25 159:2,7,14
160:5,12,16

162:22 167:1
168:3 169:14
170:5 177:16
178:19 180:6,6
186:6 187:6 192:5
193:21 195:3
196:25 197:6
**rightfully** 145:21
**rock** 2:4
**role** 14:24 15:2,3
40:18,21,22
102:16
**roles** 37:22
**room** 7:4
**roughly** 154:1
**round** 61:18
**rounding** 156:20
**roy** 25:1,2,3,5
**rule** 3:7 11:25
**rules** 8:15 22:7
109:19
**run** 77:20 85:19
130:16
**running** 194:20
**runs** 45:11 48:9
**rural** 65:3,11
**rust** 95:21
**rvs** 44:9
**ryan** 1:17 6:23

**s**

**s** 2:1,8,8 3:5
**safe** 54:13
**sale** 39:24 40:19
48:25 66:8,11
86:21 99:5 110:8
110:14,17 111:7
118:10,13 119:6,9
121:2,8,9,17,18,19
121:20,22,24
122:6 123:4,8,8,12
126:14,14,19

Jason Merritt                                        April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[sale - shops]**                                       Page 26

| | | | |
|---|---|---|---|
| 127:16,18,23,24 | 78:18 82:1,13 | 66:8 67:18,21 | **send** 168:20 |
| 128:22 129:5,8 | 83:4,22 99:7 | 68:15,23 69:4 | 169:23 |
| 131:14 132:23 | 100:13 102:25 | 76:9,10,18 79:1 | **sending** 26:17 |
| 141:5 144:12,14 | 105:22 122:14,23 | 80:22 81:19 82:5 | **sense** 20:7 114:23 |
| 145:10 183:14,18 | 125:9 132:21 | 82:15 83:7,24 | **sensitive** 6:4 |
| 184:18 191:21 | 134:13 173:22 | 95:12 99:8,18 | **sent** 26:18,22 27:4 |
| **sales** 17:20 37:16 | 174:8,23 175:3,21 | 104:17 105:25 | 27:13 93:8 168:17 |
| 56:11 66:6,22 | 176:1 182:21 | 111:11 113:10 | **sentence** 34:3 |
| 81:7 92:16 99:7 | **scale** 114:19 | 121:2 122:14,21 | 46:16 48:8 57:15 |
| 103:8,14 110:16 | **scanned** 96:23 | 123:1 125:10 | 57:20 60:2 76:12 |
| 110:23 119:1,24 | **schooling** 36:13 | 127:5 134:16 | 78:22 80:24 83:22 |
| 122:11,24 123:6 | **scope** 68:21 | 138:17,22 141:7 | 113:15,16 134:12 |
| 124:25 129:13,16 | **scratches** 61:23,25 | 146:21,23 147:8 | 173:22 174:8,12 |
| 129:21 132:15,16 | 62:2 | 148:3,15 150:6,19 | 174:23 175:10,16 |
| 132:24 144:10 | **sda** 1:6 6:17 | 150:20,24 151:11 | 175:21 176:1,24 |
| 174:1,21 175:4,5 | **seal** 199:18 | 152:23 156:15,16 | **served** 14:11 |
| 175:17 176:4 | **seat** 110:16 | 159:23 160:1 | **service** 36:21,24 |
| 185:25 | **seats** 60:15 96:4 | 164:12,18,20,23 | 37:1,12 41:13 |
| **salesman** 113:2 | **second** 28:25 44:2 | 165:19 174:4,21 | 128:10,14 129:2,3 |
| 114:9 117:15 | 45:12 48:9 56:2 | 175:5 179:14 | 129:5 |
| **sanders** 2:8 7:15 | 76:12 78:22 95:3 | 191:12 | **services** 4:23 23:1 |
| **saw** 66:8,10 | 95:9 96:1 98:8 | **seeing** 145:6 | 41:9,16 44:24 |
| 144:12 | 99:4,6 132:14 | **seen** 51:7 91:21 | 45:7 128:23 |
| **saying** 44:6 46:13 | 148:18 150:4 | 156:8 161:15 | 194:20,24 195:1 |
| 57:4 68:5 78:12 | 152:7 173:22 | **seized** 38:4 | **set** 21:14 37:16 |
| 109:13 115:17 | 182:19,23,24 | **seizures** 38:7,7 | 55:12,24 110:20 |
| 125:21 133:25 | **section** 4:20,24 5:4 | **sell** 66:11 77:8 | 110:21,22 115:7 |
| 134:1,3 136:10 | 5:7 43:15 44:3,24 | 78:24 79:4 80:3 | 126:15 127:25 |
| 137:23 143:18 | 45:24 46:8 51:2 | 99:20 100:23 | 128:1,7 130:7 |
| 149:7 150:9 | 68:14 80:25 95:10 | 113:12 115:22 | 172:2 193:14 |
| 154:12 155:6,14 | 109:18 174:20 | 116:1 118:23 | **setting** 65:2 |
| 170:5 183:6,7 | **security** 41:18 | 125:12 175:12 | **settle** 72:19 |
| 189:9 190:13 | **see** 12:15 29:5,21 | **seller** 66:5,20 | **shape** 60:16,16 |
| **says** 12:14 29:16 | 30:16 33:24 34:1 | 78:24 79:3 | 86:4 165:19,20 |
| 32:4 33:25 34:3 | 34:6,13 36:21 | **sellers** 68:23 76:1 | **sheet** 200:6,8,11 |
| 41:8,24 44:12 | 41:10 44:10,16 | 76:10,13 77:1,7,15 | 200:14 203:9 |
| 46:16 48:9 52:2 | 46:14,19 47:24 | 77:25 80:2 | **sheets** 157:6 |
| 56:3,11 57:1 58:1 | 48:2,5,13 51:20 | **selling** 37:8 87:18 | **shop** 62:9 85:20 |
| 60:3 62:24 65:20 | 52:5 54:21 56:4 | 111:12 117:13,20 | 88:24 |
| 65:23 67:16,20 | 56:12 57:2,6 60:5 | 117:24 118:4 | **shops** 62:12 135:2 |
| 68:14,17 76:9,12 | 60:20 63:2 65:20 | 129:12 174:25 | |

Veritext Legal Solutions

Jason Merritt
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[short - started]**

Page 27

short 162:3
shorthand 199:10
show 57:19 67:5
 114:20
shows 114:20
 127:14 146:10
 148:13
shut 23:19 194:1
 194:17
sic 25:1,2,3 71:3
 130:10
side 55:6 89:14,16
 101:18 117:22
sign 73:9 197:12
 200:8
signature 12:11
 199:21 203:12
signed 34:4 93:7
significant 53:13
 112:7
significantly 76:23
 131:21
signing 28:18
 200:10
silverado 114:10
similar 81:8
 122:25
similarly 163:25
simple 113:23
simply 26:15
simulates 64:15
single 20:5,6 69:10
 69:14 71:21,25
 75:1 132:16,24
 176:4
sir 8:5 12:13 13:18
 14:12 17:11 18:5
 19:21 20:22 21:24
 22:14,19 29:22
 37:21,23 120:11
 184:23 187:24

sit 100:23 114:8
site 195:20
sitting 110:15
 158:18 184:17
situation 98:20,22
six 32:9,11,25
 36:11,14 52:22
skewers 130:10
skills 44:13
slide 126:3
sliding 114:19
slight 17:24
small 72:18
 177:23
smoothly 96:21
snuck 37:9
software 89:13,20
softwares 89:11
sold 30:25 37:6
 66:12,15 67:1
 76:3,17 84:23
 85:8 86:15 87:4
 87:14 88:14 98:11
 98:24 99:1 105:10
 105:17,23 106:4,9
 107:1,13,18,22
 115:11,14 118:5
 118:11,19 119:11
 119:14,19 120:13
 120:15,17 121:21
 121:24 123:11,13
 123:18,25 124:4,8
 124:11,14 125:13
 126:1,19,24 127:9
 127:11,13 130:10
 132:4,20,22
 143:24 144:22
 148:8,13,21,25
 149:3,9 150:1
 151:2,13 152:2
 156:7 157:2

161:24 165:2,18
 172:25 173:5,9
 174:2 178:24
 179:8,11 180:3
 181:2,10,15,20,25
 182:6,8,18 183:3,4
 183:8,20 184:7,12
 184:25 185:16,22
 187:14 188:9,12
 188:15,18,25
 189:5,8,10,15,24
 190:6,13,23,25
 191:4,11,16,22,25
 192:1
solely 166:10
 174:9 182:24
solutions 6:22,24
 198:1
somebody 25:12
 26:6 64:22 65:10
 73:17 85:24 90:8
 90:12 91:22
 121:10
soon 193:7,7
 195:13
sorry 33:21 48:23
 53:11 81:16
 139:13 176:20
 188:3
sort 160:16
sound 85:17
sounds 64:2
source 129:2,4
sources 69:9
southern 1:1 6:16
space 200:6
spalding 1:15 2:7
 6:19 7:16
spe 138:15
speak 26:5 90:12
 90:15,17,19

speaking 27:13
 136:19
specializes 44:7
specialty 41:1
specific 48:12,16
 66:4 75:25 89:4
 89:24 90:22 91:7
 94:21 111:18
 138:7,12,21 139:1
 139:8 140:4,10,21
 141:1,2,4,5,20
 142:13 174:3
specifically 111:10
specified 138:16
speed 52:15
spend 177:13
spent 33:6 37:19
 177:17,22 178:13
spoke 28:14 137:3
spoken 136:25
stain 160:14
 161:10,16
stand 85:22 197:8
 197:14,20
standard 1:17
 60:17 63:22
 110:24 131:13
 139:24 156:4
 182:1
standards 105:24
 109:8,9 141:7,11
 193:14
standing 199:4
start 55:10,14
 84:19 116:10
 152:9,11 158:16
 163:19,20
started 37:7 41:8
 41:24 55:18 96:20
 101:19 148:2
 194:3

Jason Merritt

April 7, 2022

Volino, Dominick v. Progressive Casualty Insurance

[starting - talking]

Page 28

**starting** 78:18,22
78:23 116:21
194:10
**starts** 182:23
**state** 7:5,7 8:5
12:5 25:22 36:9
37:20,25 38:20,24
40:7 74:15 109:3
109:9 110:9 200:5
**state's** 109:2
**stated** 63:1 138:14
182:5
**statement** 10:21
10:23 75:3 76:16
76:21 78:13
117:10 142:23
168:8
**statements** 58:11
77:10
**states** 1:1 6:15
31:25 84:15,15
**statistically** 76:13
112:7
**step** 27:23 46:25
47:11,11 107:3
179:22
**steps** 61:8
**stick** 118:14,16
**sticker** 196:7,16
**stingray** 79:11
137:22
**stop** 163:19,20
**stopping** 162:3
**stored** 97:3
**story** 23:12
**street** 2:3,9 116:20
**strike** 32:20 42:20
61:3 67:12 78:19
79:22 81:14 95:4
99:5 105:8 110:4
138:4,9 143:2,12

169:21 180:1
**stripe** 191:15
**stroke** 75:23
**studied** 36:16
**studies** 51:16
52:18
**study** 51:18
**stuff** 68:11 77:3
83:17 84:13,14
104:18 114:14
135:6 137:4
139:25 145:2
163:9
**style** 52:12
**subject** 36:16
82:14 173:19
200:10
**subjecting** 34:10
**submitted** 10:24
**subpoena** 3:10,24
4:4,7,10,13,16
14:2,6,11,14 15:6
16:7,23 17:10,13
17:22 18:4,23
19:9,12,20 20:11
20:21,24 21:7,10
21:23 22:8 93:22
147:19 186:19
**subscribed** 203:14
**substance** 28:7
203:8
**subtract** 155:12
**sufficient** 196:13
**suggested** 25:12
80:7
**suggests** 80:13
**suite** 1:16 2:9 6:20
**summaries** 91:19
91:24
**summarize** 143:19

**summarizes**
181:13
**summary** 149:24
151:25
**sunroof** 52:15
**supervision**
199:11
**supervisors** 73:5
**supply** 48:12,16
50:14
**sure** 15:16 34:14
36:15 42:12 45:18
73:11 93:14
105:20 109:8
114:5 118:7
123:23 125:7
128:25 131:8
140:12,15 141:3
142:4 145:13,15
145:25 147:16
149:13 155:15
158:25 159:8
160:17,19,20,21
171:3 173:10
176:15 186:21
192:21
**surprise** 163:23
**survey** 88:11,15
88:17 110:4 111:5
111:8,9,10 112:9
**suspect** 174:17
**swear** 7:18
**sworn** 7:22 199:7
203:14
**synopsis** 92:1 93:6

**t**

**t** 3:5 199:1,1 201:2
**t3** 41:9,13,15
194:20,24 195:1
**tab** 51:12

**tag** 196:19
**tags** 114:12
**take** 6:9 43:20
45:3 47:18 49:4
50:10,20 53:3,10
53:12,20,25 54:5
54:10,25 58:3,13
60:7,24 61:8,12
64:10 65:13,24
66:2,6 68:6 70:6
76:14 77:7,11,15
77:18,23 78:1,13
79:23 88:20 93:18
100:24 106:15
120:24 128:15,17
128:19 129:10
130:13,14 131:14
131:17 136:4,13
136:20 137:1,15
138:15 145:23
147:13 151:1
157:23 160:24
161:18 162:3
178:23 190:10
192:5 193:2
196:17
**taken** 1:14 6:13
60:5,12 88:1
127:25 128:2
130:7 162:11
174:1 192:11
199:5
**talk** 84:20 90:8
93:5,11 99:25
112:2 130:18
**talked** 86:1 88:9
96:13 137:4,6
160:12 167:18
**talking** 17:19 74:1
79:14 80:9,10
88:7 89:14,15

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[talking - titled]**                                    Page 29

92:15 94:23 101:3
105:13 109:18,23
129:1 162:18
167:14 189:4,5,6
196:10
**talks** 95:17 96:1
105:9,16 107:1
132:15 173:12
176:8
**target** 115:6
**targeted** 92:23
**tax** 114:11
**teaches** 193:10
**team** 135:25
**technique** 56:11
**techniques** 29:19
30:2,10,19 31:3,10
145:3
**tell** 26:11,13 79:23
83:15 106:20
117:17 143:19,20
147:19 159:7
177:9 182:14
196:8 199:7
**telling** 86:9 118:24
118:25 119:13
120:12 164:4
**tells** 100:20 119:20
**template** 16:20
40:1 49:8 55:10
55:14,15,19,21
57:19 58:20 62:19
67:4,5,8 68:3
78:10 81:22 83:25
84:7,17,18 93:20
93:24 94:4
**templates** 16:17
47:4
**tend** 68:25
**term** 80:22 85:17

**terms** 50:8 60:8
94:22 178:6
**terrain** 64:3
**test** 9:6 192:17
193:3
**testified** 7:23
125:16 171:14
188:13 191:6
**testify** 3:11 7:22
14:6
**testifying** 139:16
171:15
**testimony** 3:2
93:10 105:4
111:10 120:11
139:12 173:18
197:23 199:5,9,13
**text** 55:25
**thank** 8:1 33:11
34:21 78:15 95:1
178:16 187:5
188:1 197:5,13,17
197:18
**theirs** 84:1 159:10
**thereof** 199:16
**thing** 27:21 56:18
60:23 65:7 113:4
117:21 151:18
157:3 158:22
183:5 191:16
**things** 54:18 65:23
69:15 95:20
112:24 113:3
131:13 144:8,13
181:7
**think** 10:4 13:13
25:3 32:9 63:11
66:24 67:2 70:17
71:14 73:14 74:5
74:9,24 92:15
98:18 99:25

120:14 121:16
123:15 130:4
132:25 137:14
138:4 143:12,22
145:1,2,7 146:16
149:9 151:9,20
152:10,10,12
157:12 158:3,22
159:4 160:15,22
164:18 165:9
171:22 181:24
184:11,25 185:8
185:12 186:3
187:3,8,8 189:25
**thinking** 178:14
**thinks** 159:10
**third** 42:24 68:17
76:7 80:21 81:15
96:13 120:25
147:17 148:1
152:8 181:12,14
182:23 184:20
**thirteen** 154:19
155:9,10,16
**thirty** 200:15
**thomas** 90:19
**thorough** 44:15,20
52:3,7,8 53:4
**thought** 98:21
121:15 126:18
176:18,19,20,22
176:25
**thousand** 63:1,4,9
**three** 13:7 33:5,6
43:6 49:22,22,23
50:4 62:19,24
67:8 82:11 98:8
148:6,11 152:22
152:24 160:11
165:1,9 177:2,8,17
177:21 178:9,12

193:20,22 197:25
**throw** 79:8 86:25
87:4,9 116:23
120:8
**thursday** 1:11
10:3
**timbrook** 31:12,20
40:9 89:5,24
112:1,14,17
113:12 115:11
135:10,12,15,24
136:2
**time** 1:17 7:7 9:19
11:12 15:16 18:14
24:2 26:6 27:4,9
27:16 28:14 29:8
29:14 32:22 37:16
37:19,25 38:20
39:9 40:2,6 41:6
42:15,18 47:19
50:7 53:1,13
59:22,23 62:6
69:24 70:4,25
71:11,24 87:22,25
88:4 104:3 113:10
115:15,18 124:8
162:4,5,10,14
163:12,17 171:15
172:7,14 177:12
177:15,17,24
192:10,13 194:19
195:8 197:5 199:6
**times** 115:10,19,22
115:25 116:1
118:5
**timing** 26:12
**tire** 115:2
**tires** 116:16
**title** 109:19 119:21
**titled** 3:7,15,17,20
4:18 11:25 15:22

Veritext Legal Solutions

**[titled - uses]**                                    Page 30

16:11 17:2 22:2
**today** 7:15 8:17
  9:11,21 10:3
  22:11 32:18,25
  92:7,9 117:2,6
**today's** 197:16,23
**told** 23:15 28:9
  66:9 99:19 121:15
  126:18 177:16
**ton** 49:22,23 50:4
**top** 81:17 152:25
**total** 11:22 17:18
  32:11,24,25 33:15
  43:12 51:24 62:24
  101:21,23 102:16
  103:19,25 104:4
  105:6,11 108:3,7,8
  108:9 116:17
  132:3,6,7,12,18
  138:22 147:10
  176:8 177:4
  197:24
**totally** 49:18 84:12
  136:1 157:25
  174:11 194:17
**towing** 49:21
**toyota** 51:22 52:11
  52:14,18,19 53:19
  75:4 99:4,7,15,18
  121:1
**track** 38:9 52:20
**tracked** 52:17
**tracking** 38:12
**trade** 40:25
**trader** 69:3
**traditional** 175:4
**trailer** 49:22 50:2
**train** 49:17
**transaction** 191:3
**transcribed**
  199:11

**transcript** 200:16
  200:17
**transcription**
  199:12 203:5
**translate** 59:5
**transmission**
  96:18
**transportation**
  32:17
**trial** 197:7
**truck** 49:9,22,24
**trucks** 44:9
**true** 13:16 40:6
  43:23 46:21 73:22
  76:16 86:11 90:3
  115:10,15 116:6,6
  122:2 128:20
  138:24 139:7
  166:7 199:13
**truecar** 99:11
**truth** 199:8,8,9
**try** 47:25 59:3,4,7
  63:17 64:1,7
  82:23 97:19 109:7
  112:24,25,25
  129:1,3 143:19
  152:21 196:18
**trying** 20:3 33:1
  101:11 120:11
  128:22 196:23
**tuesday** 10:4,5
**turn** 6:6 55:4
  146:2,11 147:17
  148:12,17 149:2
  149:20 150:4,19
  159:19 164:8
  178:17
**tv** 113:10
**two** 26:4 43:3 53:5
  63:22 68:1 99:10
  115:4,19 117:4,5

118:10 160:11
  174:24 178:12
  193:1
**type** 38:20 39:13
  39:18 56:3 83:18
  94:4 193:8
**typed** 170:2
**types** 45:10,15,21
  56:20 107:10
**typical** 53:6,7
  56:21 63:5 101:10
  101:12 165:20
  166:1
**typically** 48:2,3
  53:8,9 165:16

## u

**u.s.** 52:10,16 63:12
**unable** 163:13
  164:22
**unadjusted** 152:25
**unbiased** 82:2
**unclear** 58:9
**understand** 8:13
  8:22,24 63:14
  74:22 120:10,11
  123:10,12 134:2
  137:2 143:18,22
  146:1 149:6 167:5
  170:13 173:8
**understanding**
  29:7 81:9 134:14
  135:9 195:24
**understood** 8:23
  9:4 15:20 29:13
  189:9
**undervalued**
  157:12
**unfortunately**
  33:15
**unit** 6:11 38:3
  87:24 88:3 162:9

162:13
**united** 1:1 6:15
**units** 197:24
**unrealistic** 100:7
**untrue** 169:18
**upgraded** 159:24
**upstate** 65:11
**upward** 146:25
**use** 13:22 39:22
  43:13 47:4,5,20
  49:5,8 55:15,20
  56:1,3,6,9,21
  60:13 63:9,12
  66:3 69:2,2,3 70:2
  70:11 72:14 75:5
  78:9 84:11 87:1
  88:7 89:12 98:18
  100:15 103:8
  104:11 105:6
  106:8 109:5
  111:22 117:24
  118:1,4 119:3,13
  119:17,23 120:12
  122:9,11,17
  123:15,24,25
  124:4 126:19,21
  126:24 127:3,9,15
  130:5 131:15
  135:17 139:22
  140:2,5 141:1
  143:24 146:1
  150:12 172:18
  178:24 181:10,21
  181:24,25 182:8
  183:3,14 184:12
  185:16,22 187:13
  190:22 191:22
  193:25 195:21
**user** 145:22
**uses** 50:3 69:19
  107:17

Jason Merritt                                        April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[usually - vehicles]**                                    Page 31

**usually** 53:12
109:5 111:22
183:15 196:13,17

**v**

**v** 1:6
**vague** 39:18
**val** 128:13
**vallance** 43:7
**valuable** 79:10
**valuation** 19:3,18
19:18 20:4,15
21:4,15 36:25
68:20 75:13 78:17
78:21 103:17
106:12,13,23
146:9 148:2 149:7
157:1 158:15
164:11,15 166:5
178:20 181:1
187:7,9,13 188:10
188:15 189:22
192:4
**valuations** 83:4,12
**value** 3:19,22 5:6
16:12 17:3 23:25
29:11,12 43:12,12
47:14 49:2 50:21
51:2,11 52:4
53:21 54:1 55:10
56:8,8 57:1 58:3
61:6,8,20 62:1
65:17 67:17 68:21
69:9 70:5 71:12
74:13 75:25 76:14
77:7,15 79:8,10
80:8,14,22 81:1,6
81:10 82:8 85:3
95:11 97:11,16
98:6 101:15,25
102:4 103:9
118:13,20 120:4

120:20 122:15,21
122:23 126:8
128:14,14 131:15
146:18,22 147:10
149:14 153:11,16
153:20 154:8,12
154:20,22 155:10
155:19,22 156:1
156:17 157:7
158:13 163:9,10
163:13 166:14
179:20,21 185:3
185:10 196:6
**valued** 66:19
**values** 47:17 69:25
71:1 74:12,19
104:8
**valuing** 54:8 75:14
102:22 154:4
**variable** 120:9
123:19
**variables** 49:16
75:22 127:22
190:7
**variances** 183:17
**variation** 72:4
113:3 144:12
**variations** 29:11
49:23 50:4 131:18
183:18
**varied** 165:24
**variety** 15:12
112:23
**various** 37:22
**vary** 63:7 64:17
165:23 186:14,23
**vehicle** 11:22 19:3
19:17 20:4,15
21:3,14 41:1,1
47:5,6,18,20,24
48:2,6,7,13,17

49:2,24 50:5,8,21
52:9,21 53:2,21
54:1,3,4,6,17 55:1
56:14,22 57:4,10
57:13 58:2,8,12,14
58:17,18,24 59:13
60:17,20 61:5,7,16
61:20 62:1,16
63:21 64:3,11,17
64:24 65:10,17
66:20,21 68:21
69:8,11,14,23 70:4
70:24 71:10 72:9
72:16,18 73:7,13
73:23 74:2,3,11,14
74:17,19 75:3,4,14
76:4,5 77:19
78:24 79:4,21
80:3,4,14,15 82:14
82:19 83:5,10,13
83:15,16,19 85:3,4
85:22 86:14,18
88:20,23 89:25
94:17,21 95:15
97:2,8,12,23,25
98:1,6,15 99:4,6
99:20 100:9,12
101:25 103:9
106:10,12,23
107:9,11 113:7,13
114:17 115:1,12
116:11,18,22
118:9,11,13,19,21
119:8,18 120:5,8
120:15,19,20
121:1,16,23 123:8
125:12,13 126:1
126:16 127:15
128:1,2,18,21
129:15,16 130:8
131:24 136:21

138:7,8,12,17,21
138:25 139:1
140:2,5,10,22
141:8,15,21 142:2
142:9,13,15,20,22
143:5 146:3,9
148:2,9,13,18,22
148:24 149:3,23
150:1,4,17,18,24
151:19 152:4,7,8
154:4,9,13,23
157:1,18 158:15
160:4,8,9,14,24,24
160:25 163:2
164:11,15,21,25
174:4 178:19
179:20 180:25
181:13 183:14
189:24 195:23
196:4,5,10,11,20
**vehicle's** 47:19
96:23 97:16
116:24 118:3
128:5,13 138:22
141:2 184:3
**vehicles** 30:25,25
36:25 37:11 38:4
38:9 40:25 42:6
43:13 44:10 47:14
47:15 51:16 62:19
62:21,25 63:8,16
63:18,23 64:4,20
65:1 67:9,12 70:8
70:9 71:16 74:6
84:23 85:8,12
86:20 87:3,14,18
88:7,13 89:23
98:11,14,19,25
99:10 103:8,14
107:4,7,8 110:13
110:18,21 111:12

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[vehicles - working]                                    Page 32

112:15,19 116:10
122:3,6 126:22
132:22 136:5,15
137:16,18 138:1
139:9 148:4
149:15 152:1
157:9 162:22
165:2,17 175:1
181:5 183:20
184:20,24 185:2,9
186:1 189:23
**verbal** 174:9
182:25
**verbatim** 168:4
170:7,15
**verify** 59:4,4,8
184:17
**veritext** 6:22,24
197:25
**versa** 27:24 79:1
**verse** 66:2
**version** 178:4
**versus** 6:14 65:24
66:25 76:4
**vice** 27:24 78:25
**video** 6:9,12
**videographer** 2:25
6:1,23 7:17 8:1
17:25 87:23 88:2
162:8,12 192:9,12
197:8,14,20
**videotape** 1:13
**view** 44:19 47:24
75:19 76:2 120:5
120:19 123:3
**village** 99:12
**vin** 59:5,9 83:19
144:6 195:15,19
195:20,21,22
196:1,12,21,24

**violation** 109:9
**volino** 1:3 3:24 4:4
4:7,10,13,16 6:14
17:13 18:23 19:12
20:11,24 21:10
147:19
**volts** 90:13,17

**w**

**w** 8:7
**wait** 151:9 197:9
**waiving** 169:5
**walk** 135:25
**walked** 119:22
**walking** 190:9
**want** 12:25 19:22
20:2 25:12 45:18
65:1 66:16 88:6
92:19 99:20
100:10,22 102:8
118:4 123:25
131:8 143:13
146:1,11 149:13
161:18 167:20
170:20 171:19
173:7,11 179:4
182:8 187:23
190:12 191:14
**wanted** 35:16
64:23 72:15,18
167:25 168:9
170:8 171:4
176:22,25
**wants** 126:6
**warranties** 77:12
113:4 127:19
**warranty** 115:2
126:5 129:12
**washington** 1:16
6:20 64:4 65:8
**way** 20:9 50:23
55:11,24 59:18

81:10 82:12 87:18
89:20 94:24
101:13 117:11
128:23 131:9
161:4 177:3,6
180:16 183:10
188:1
**we've** 22:11 71:5
73:12 93:2 120:25
137:3 152:1,9
188:7 189:21
194:17
**wear** 96:11
**website** 4:22,25
5:5,8 43:16,24
44:3,25 45:7,18,25
46:7,8 51:3,11,13
51:13 86:20 89:2
134:5 135:6 186:2
**websites** 80:11
186:3
**week** 10:6 26:25
**weeks** 53:5
**weighted** 67:21
**weighting** 67:23
**went** 94:25
**wes** 43:7
**west** 2:3
**westbury** 99:4,7
99:15,17 100:1
121:1
**wheel** 49:25 115:2
**whispering** 6:5
**wide** 112:23
**willing** 78:1
110:12 130:12,23
**window** 196:7
**wiped** 161:16
**wise** 59:22 91:21
**wish** 69:15

**witness** 7:11,18
20:3 23:16 33:21
34:22 73:25 93:13
139:13,19 146:6
197:10,11,18
199:14,18 200:1
**witness's** 93:10
**witnesses** 91:17
**wonder** 164:8
188:8
**wondering** 180:24
**word** 167:7
**words** 27:23,24
56:7 123:7,7
170:13,16,19,21
191:14
**work** 9:21 10:15
11:1 23:6,12,17
25:9 28:16 31:13
32:1 33:7,12
36:23 41:15 43:1
83:14 84:10,11
101:19 116:17
118:15 119:22
130:9 145:19
154:3 169:5 172:5
172:8 177:18
193:21
**workcenter** 17:18
101:20 102:16
103:18,25 104:4
105:6,11 108:3,6,9
132:2,6,12,18
176:8 177:4 182:5
**worked** 38:3 39:6
40:2,13,16 144:10
144:11
**working** 41:8,24
88:15 109:7
111:25 135:10,12

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[works - zoom]**                                                Page 33

| | |
|---|---|
| **works** 104:20,24 | 136:12 139:6 |
| 105:2 108:8 | 144:23 146:5 |
| **world** 126:10,13 | 151:5 152:20 |
| **worse** 165:17 | 154:1 155:3,13 |
| **worth** 33:7 61:16 | 156:19,21 158:20 |
| 61:16 68:21 73:7 | 165:24 167:18 |
| 78:25 79:4,8,14,15 | 170:21 173:7 |
| 80:4,5,9 98:1 | 188:23 191:18 |
| 116:11,14,22,24 | 197:11,11 |
| 118:3 119:18 | **year** 24:15,20 27:1 |
| 120:15 121:16 | 50:11,11 57:5 |
| 126:16 128:5,10 | 76:22,24 77:5,24 |
| 129:16 130:8 | 85:5 163:22 |
| 184:3 | **years** 36:6 44:14 |
| **wow** 52:24 | 116:8,8 117:4,5 |
| **wrap** 57:21 | 193:1 |
| **wrecked** 59:2 | **yellow** 79:9 |
| **writ** 37:14 | **yep** 132:11 |
| **write** 84:4 111:21 | **york** 1:1 6:16 22:6 |
| 114:11 167:6,7 | 51:19 64:3,23 |
| **writing** 91:23 | 65:4,5,6,10,11 |
| 167:9 178:7,10 | 109:14,18 |
| **written** 14:22,25 | **young** 37:4 |
| 37:14 103:3 | **youth** 70:11 |
| 111:13 152:22 | |
| 167:22 194:12 | **z** |
| **wrong** 25:21 71:13 | |
| 73:19 143:20 | **z** 51:19 |
| 151:9,20 152:20 | **z's** 53:19 |
| 157:13,14 189:25 | **zero** 108:3 |
| **wrote** 46:11 69:1 | **zewicker** 43:8 |
| 168:11,15 169:24 | **zip** 69:6,6 |
| **x** | **zoom** 9:25 10:2 |
| | 11:10 28:10 32:13 |
| **x** 3:1,5 4:1 5:1 | |
| **y** | |
| **yeah** 27:2 34:16 | |
| 35:10 58:19 79:19 | |
| 83:25 92:21 | |
| 109:25 113:11 | |
| 116:13 131:10 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

## Rule 26(a) Expert Report of Jason Merritt

I, Jason Merritt, pursuant to Federal Rule of Civil Procedure 26, declare as follows:

**I.    Declaration**

This Report is based on personal knowledge and, if called to testify on the matters set forth herein, I could and would do so competently.

**II.    Introduction**

My name is Jason Merritt, and I am a professional personal-property appraiser who has been retained by the Plaintiff in this case. My credentials and professional experience are described in my curriculum vitae enclosed with this report as Exhibit 1.

Pertinent to this report, and as reflected in my curriculum vitae, I am the owner of East Coast Auto Appraisers, LLC. I am certified through the Bureau of Certified Auto Appraisers to appraise vehicles, including total losses. I have appraised over a thousand vehicles to determine their fair market, or actual cash, value. These appraisals include hundreds of appraisals where I was hired to determine the value of a totaled vehicle. As owner of Merritt's Automotive, LLC, I appraised vehicles daily for the purpose of determining the fair market value. Additionally, I have performed hundreds of appraisals for the Timbrook Automotive Organization, which includes franchise dealerships for Chevrolet, Buick, GMC, Kia, Nissan, Ford, Chrysler, Dodge, Jeep, and Honda. The purpose of these appraisals was to determine the fair market value of vehicles offered for trade in or that were newly acquired by the Timbrook Automotive Organization.

Before entering the private sector, I served in the Maryland State Police for 28 years. During those years, I received advanced training in accident investigations. In 1998, I was assigned to the C31 Narcotics Unit of the Maryland State Police. Part of my duties in that unit were acquiring and maintaining the unit's vehicles.

1



III.    **Scope of Work**

I have been hired by the Plaintiff in this case to offer opinions on the following topics:

- Description of what an appraisal is;

- Explanation of how to use the comparable methodology to appraise a vehicle's actual cash value; and

- Explanation of whether Mitchell's use of a Projected Sold Adjustment is appropriate when appraising a vehicle using a comparable methodology.

IV.    **Opinions**

   a.  **Overview of Using a Comparable Methodology to Determine the Pre-Loss Actual Cash Value of an Automobile**

An *appraisal* is an opinion of value. While there is no single methodology to arrive at a proper opinion as to a loss vehicle's actual cash value, there are generally accepted methodologies that must be followed to render a sound opinion as to ACV. One such methodology is the comparable methodology, more frequently called the "comp" methodology.

Generally, the comp methodology for determining ACV involves finding vehicles for sale, or recently sold, within a certain geographic area that are similar, or "comparable," to the vehicle being valued. Typically, these comps are selected from Internet advertisements. Once the comps are chosen, differences in observed and verifiable features (such as options, mileage, trim level, and condition) between the loss vehicle and the comps are documented. Normally, information concerning options, mileage, trim level, and condition are taken from the Internet advertisement for the vehicle, and these characteristics are taken at face value unless there is some specific, and documented reason, for questioning the accuracy of the listing. Sometimes a vehicle listing does not include options, but these could be determined using a VIN decoder. The point is that there must be a specific reason, grounded in evidence, for varying from the information provided in an Internet advertisement for a particular vehicle. Differences between vehicles in observed and

2

documented characteristics result in price adjustments from the list price of the comparable vehicles.

I have reviewed the Vehicle Valuation Report Mitchell prepared for Plaintiff. On the last page of her report, under the header "Vehicle Valuation Methodology Explanation," Mitchell walks through the general steps of the comp methodology. Having reviewed the report it also appears that Mitchell largely followed this methodology, documenting all differences, if any, in mileage, options, trim level, condition, etc., and making monetary adjustments based on those documented differences.

When adjusting for the condition of a vehicle, the common procedure is to adjust the condition of a loss vehicle by comparing it to the normal or typical condition of similar vehicles. Ideally, you would search for comparable vehicles in nearly identical condition to the loss vehicle, but this usually isn't practical. Mitchell followed customary condition-adjustment standards. Specifically, its report documented an inspection of 13 components of Plaintiff's loss vehicle and assigned a numerical rating to each component. These were compared to a "Typical Vehicle Condition," which was assigned a numerical rating of 3.00. Based on whether the "Overall Condition" of the loss vehicle rated above or below the typical 3.00, Mitchell adjusted the base value of the loss vehicle to reflect that it was in better or worse condition than "typical." As for the condition of the comparable vehicles, it would be improper to assume they were in anything other than typical condition without either inspecting the vehicle or having documentation showing the comparable vehicle was in better or worse than typical condition. Because conducting physical inspections of comparable vehicles is often impractical, appraisers usually set their condition as "average" or "typical" and make no monetary adjustment to the comparable vehicle, which is what Mitchell did in the condition section of the report.

3

Generally, Mitchell's methodology is consistent with the comparable methodology routinely applied by appraisers and is capable of producing a correct or sound appraisal of actual cash value. Mitchell deviated from the comp methodology, however, by applying downward adjustments to the Internet prices of the specific comparable vehicles advertised for sale.

### b. Mitchell's Application of a Projected Sold Adjustment is Inconsistent with Appraisal Standards and the Comparable Methodology

As with mileage, options, and equipment, appraisers must base their opinions about a specific comparable vehicle's price on hard data. The hard data appropriate for this is typically the Internet price of the comp. This is true for several reasons.

*First*, the Internet price is often the only data point concerning what a particular vehicle listed with a particular seller would sell for at the time of valuation. When determining actual cash value, the objective is to determine the value of that vehicle at a particular point in time. The Internet price listed for sale is the only evidence available for determining what a particular comparable vehicle offered for sale by a particular dealer would sell for on a particular day. Moreover, using the Internet price provides an objective criterion for determining what the comparable vehicle would sell for on a particular day to a buyer purchasing a vehicle outright, without providing a trade in, financing the purchase, or buying optional warranties or service plans. These additional profit opportunities for the dealer might result in what may look like a lower sales price but does not reflect a change in the market value of that car or that the dealer would have accepted anything other than the list price had the buyer offered cash for the vehicle, without the opportunity to make up the difference or make even more profit related to a trade-in vehicle, financing or the purchase, or selling warranties, service plans, or other products.

*Second*, appraisal standards do not permit arbitrarily deducting the advertised price of a vehicle based on projections of what that vehicle might ultimately sell for. Again, there is no hard

data available to an appraiser to support an opinion that a particular comp would sell on a particular day for anything other than the Internet price. It would be arbitrary to assign a different sales price to any particular vehicle chosen for comparison purposes.

Using the advertised price as the price for a comparable vehicle is especially important when the advertisement comes from an Internet source. It is my understanding that Mitchell uses only Internet listings for locating comparable vehicles. Consistent with Mitchell's "Position on Internet Pricing," my understanding of the modern used-car market is that Internet prices often reflect a no-hassle price and that dealers price their inventory competitively to move inventory and sell more vehicles. This is another reason appraisers cannot assume a vehicle will sell for anything other than its advertised price.

While I do not, there are some appraisers who make a "take-price" adjustment to the Internet price of comparable vehicles. This adjustment is made only after speaking with a car dealer to determine whether the dealer would take anything other than the advertised price of the specific vehicle. The adjustment is specific to a particular vehicle from a particular dealer, and the recipient of the appraisal would know that dealer stated it would take a specified cash price on that day for that particular comparable vehicle. As with other adjustments, this adjustment is based on data specific to a comp vehicle.

Overall, while it is unlikely I would have selected the exact comparable vehicles used in the report and appraisers generally do not select precisely the same vehicles to use for comparison purposes, Mitchell did follow a comparable methodology except for the application of the Projected Sold Adjustment, and all information necessary to provide a sound opinion on the actual cash value of Plaintiff's vehicle is contained in the report. Specifically, to determine the actual cash value of Plaintiff's vehicle using her Mitchell report, you add the Projected Sold Adjustments

5

back to the adjusted price of each vehicle to get a revised "base value," and then apply whatever adjustments, if any, were made in her Mitchell report for condition, prior damage, aftermarket parts, or refurbishment.

Absent the Projected Sold Adjustment, the Mitchell methodology provides a sound determination of actual cash value, consistent with the comp methodology commonly used by appraisers. So, the Mitchell report can be used to determine the actual cash value of Plaintiff's vehicle (or any other vehicle) by simply backing out the Projected Sold Adjustment. To arrive at a sound appraisal of actual cash value using a Mitchell report, you would line-item out each Projected Sold Adjustment applied to a comp, recalculate the "Adjusted Price" of each comparable vehicle to which a Projected Sold Adjustment was applied, and then recalculate the average of the Adjusted Prices to arrive at a revised "Base Value." From there, the Market Value can be recalculated using that revised Base Value and the adjustments for condition, prior damage, aftermarket parts, or refurbishment already determined by Mitchell.

To appraise the actual cash value of Plaintiff's vehicle using her Mitchell report, I backed out each Projected Sold Adjustment and then recalculated the Market Value. Specifically, I added $1,171.00 to the $22,358.95 adjusted price of the first comp, resulting in a revised adjusted price $23,529.95. I added $1,019.00 to the $19,309.18 adjusted price of the second comp, resulting in a revised adjusted price of $20,328.18. And I added $1,050.00 to the $19,926.75 adjusted price of the third comp, resulting in a revised adjusted price of $20,976.75. I then took the sum of the revised adjusted prices ($64,834.88) and divided that number by three to get an average of $21,611.63. This $21,611.63 is the amount the Base Value of Plaintiff's vehicle would have been had Mitchell not applied Projected Sold Adjustments. Because Mitchell made no further adjustments to Plaintiff's vehicle for condition, prior damage, aftermarket parts, or refurbishment,

6

a sound appraisal of her vehicle using a Mitchell report results in an actual cash value of $21,611.63.

**V.     Prior Testimony**

- *Volino, et al. v. Progressive Casualty Ins. Co., et al.*, No. 1:21-cv-06243-LGS
  - Provided deposition testimony concerning Mitchell's valuation methodology and the application of Projected Sold Adjustments.

**VI.     Compensation**

I am being paid $650 per hour for my work in this case.

I declare under penalty of perjury that the foregoing is true and correct.

## Jason Merritt

Jason Merritt

Aug 31, 2022

Executed on

**Signature:**

**Email:**  jason@eastcoastautoappraisers.com

7

# 22.08.31 Merritt Expert Report. Revised Final

Final Audit Report                                              2022-09-01

| | |
|---|---|
| Created: | 2022-08-31 |
| By: | Dee Engelby (DENGELBY@CBPLAW.COM) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAaDSXvrJ64_KHpiY7kbrZT6SPqZ9y4-7m |

## "22.08.31 Merritt Expert Report. Revised Final" History

Document created by Dee Engelby (DENGELBY@CBPLAW.COM)
2022-08-31 - 9:20:04 PM GMT- IP address: 40.71.113.106

Document emailed to Jason Merritt (jason@eastcoastautoappraisers.com) for signature
2022-08-31 - 9:21:05 PM GMT

Email viewed by Jason Merritt (jason@eastcoastautoappraisers.com)
2022-09-01 - 0:07:54 AM GMT- IP address: 154.16.192.55

Document e-signed by Jason Merritt (jason@eastcoastautoappraisers.com)
Signature Date: 2022-09-01 - 0:08:49 AM GMT - Time Source: server- IP address: 154.16.192.55

Agreement completed.
2022-09-01 - 0:08:49 AM GMT

**Adobe Acrobat Sign**

### Rule 26(a) Expert Report of Jason Merritt

I, Jason Merritt, pursuant to Federal Rule of Civil Procedure 26, declare as follows:

**I.    Declaration**

This Report is based on personal knowledge and, if called to testify on the matters set forth herein, I could and would do so competently.

**II.    Introduction**

My name is Jason Merritt, and I am a professional personal-property appraiser who has been retained by the Plaintiff in this case. My credentials and professional experience are described in my curriculum vitae enclosed with this report as Exhibit 1.

Pertinent to this report, and as reflected in my curriculum vitae, I am the owner of East Coast Auto Appraisers, LLC. I am certified through the Bureau of Certified Auto Appraisers to appraise vehicles, including total losses. I have appraised over a thousand vehicles to determine their fair market, or actual cash, value. These appraisals include hundreds of appraisals where I was hired to determine the value of a totaled vehicle. As owner of Merritt's Automotive, LLC, I appraised vehicles daily for the purpose of determining the fair market value. Additionally, I have performed hundreds of appraisals for the Timbrook Automotive Organization, which includes franchise dealerships for Chevrolet, Buick, GMC, Kia, Nissan, Ford, Chrysler, Dodge, Jeep, and Honda. The purpose of these appraisals was to determine the fair market value of vehicles offered for trade in or that were newly acquired by the Timbrook Automotive Organization.

Before entering the private sector, I served in the Maryland State Police for 28 years. During those years, I received advanced training in accident investigations. In 1998, I was assigned to the C31 Narcotics Unit of the Maryland State Police. Part of my duties in that unit were acquiring and maintaining the unit's vehicles.

1


EXHIBIT

3- Merritt

**III.    Scope of Work**

I have been hired by the Plaintiffs in this case to offer opinions on the following topics:

- Description of what an appraisal is;
- Explanation of how to use the comparable methodology to appraise a vehicle's actual cash value; and
- Explanation of whether Mitchell's use of a Projected Sold Adjustment is appropriate when appraising a vehicle using a comparable methodology.

**IV.    Opinions**

### a. Overview of Using a Comparable Methodology to Determine the Pre-Loss Actual Cash Value of an Automobile

An *appraisal* is an opinion of value. While there is no single methodology to arrive at a proper opinion as to a loss vehicle's actual cash value, there are generally accepted methodologies that must be followed to render a sound opinion as to ACV. One such methodology is the comparable methodology, more frequently called the "comp" methodology.

Generally, the comp methodology for determining ACV involves finding vehicles for sale, or recently sold, within a certain geographic area that are similar, or "comparable," to the vehicle being valued. Typically, these comps are selected from Internet advertisements. Once the comps are chosen, differences in observed and verifiable features (such as options, mileage, trim level, and condition) between the loss vehicle and the comps are documented. Normally, information concerning options, mileage, trim level, and condition are taken from the Internet advertisement for the vehicle, and these characteristics are taken at face value unless there is some specific, and documented reason, for questioning the accuracy of the listing. Sometimes a vehicle listing does not include options, but these could be determined using a VIN decoder. The point is that there must be a specific reason, grounded in evidence, for varying from the information provided in an Internet advertisement for a particular vehicle. Differences between vehicles in observed and

2

documented characteristics result in price adjustments from the list price of the comparable vehicles.

I have reviewed the Vehicle Valuation Reports Mitchell prepared for Plaintiffs. On the last page of each report, under the header "Vehicle Valuation Methodology Explanation," Mitchell walks through the general steps of the comp methodology. Having reviewed the report it also appears that Mitchell largely followed this methodology, documenting all differences, if any, in mileage, options, trim level, condition, etc., and making monetary adjustments based on those documented differences.

When adjusting for the condition of a vehicle, the common procedure is to adjust the condition of a loss vehicle by comparing it to the normal or typical condition of similar vehicles. Ideally, you would search for comparable vehicles in nearly identical condition to the loss vehicle, but this usually isn't practical. Mitchell followed customary condition-adjustment standards. Specifically, its report documented an inspection of 13 components of each Plaintiff's loss vehicle and assigned a numerical rating to each component. These were compared to a "Typical Vehicle Condition," which was assigned a numerical rating of 3.00. Based on whether the "Overall Condition" of the loss vehicle rated above or below the typical 3.00, Mitchell adjusted the base value of the loss vehicle to reflect that it was in better or worse condition than "typical." As for the condition of the comparable vehicles, it would be improper to assume they were in anything other than typical condition without either inspecting the vehicle or having documentation showing the comparable vehicle was in better or worse than typical condition. Because conducting physical inspections of comparable vehicles is often impractical, appraisers usually set their condition as "average" or "typical" and make no monetary adjustment to the comparable vehicle, which is what Mitchell did in the condition section of the report.

3

Generally, Mitchell's methodology is consistent with the comparable methodology routinely applied by appraisers and is capable of producing a correct or sound appraisal of actual cash value. Mitchell deviated from the comp methodology, however, by applying downward adjustments to the Internet prices of the specific comparable vehicles advertised for sale.

### b. Mitchell's Application of a Projected Sold Adjustment is Inconsistent with Appraisal Standards and the Comparable Methodology

As with mileage, options, and equipment, appraisers must base their opinions about a specific comparable vehicle's price on hard data. The hard data appropriate for this is typically the Internet price of the comp. This is true for several reasons.

*First*, the Internet price is often the only data point concerning what a particular vehicle listed with a particular seller would sell for at the time of valuation. When determining actual cash value, the objective is to determine the value of that vehicle at a particular point in time. The Internet price listed for sale is the only evidence available for determining what a particular comparable vehicle offered for sale by a particular dealer would sell for on a particular day. Moreover, using the Internet price provides an objective criterion for determining what the comparable vehicle would sell for on a particular day to a buyer purchasing a vehicle outright, without providing a trade in, financing the purchase, or buying optional warranties or service plans. These additional profit opportunities for the dealer might result in what may look like a lower sales price but does not reflect a change in the market value of that car or that the dealer would have accepted anything other than the list price had the buyer offered cash for the vehicle, without the opportunity to make up the difference or make even more profit related to a trade-in vehicle, financing or the purchase, or selling warranties, service plans, or other products.

*Second*, appraisal standards do not permit arbitrarily deducting the advertised price of a vehicle based on projections of what that vehicle might ultimately sell for. Again, there is no hard

data available to an appraiser to support an opinion that a particular comp would sell on a particular day for anything other than the Internet price. It would be arbitrary to assign a different sales price to any particular vehicle chosen for comparison purposes.

Using the advertised price as the price for a comparable vehicle is especially important when the advertisement comes from an Internet source. It is my understanding that Mitchell uses only Internet listings for locating comparable vehicles. Consistent with Mitchell's "Position on Internet Pricing," my understanding of the modern used-car market is that Internet prices often reflect a no-hassle price and that dealers price their inventory competitively to move inventory and sell more vehicles. This is another reason appraisers cannot assume a vehicle will sell for anything other than its advertised price.

While I do not, there are some appraisers who make a "take-price" adjustment to the Internet price of comparable vehicles. This adjustment is made only after speaking with a car dealer to determine whether the dealer would take anything other than the advertised price of the specific vehicle. The adjustment is specific to a particular vehicle from a particular dealer, and the recipient of the appraisal would know that dealer stated it would take a specified cash price on that day for that particular comparable vehicle. As with other adjustments, this adjustment is based on data specific to a comp vehicle.

Overall, while it is unlikely I would have selected the exact comparable vehicles used in the report, and appraisers generally do not select precisely the same vehicles to use for comparison purposes, Mitchell did follow a comparable methodology except for the application of the Projected Sold Adjustment, and all information necessary to provide a sound opinion on the actual cash value of each Plaintiff's vehicle is contained in the reports. Specifically, to determine the actual cash value of each Plaintiff's vehicle using their Mitchell reports, you add the Projected

5

Sold Adjustments back to the adjusted price of each vehicle to get a revised "Base Value." That value is then averaged with the N.A.D.A. "Total Retail Value" to calculate a "Dual Source Base Value." After the Dual Source Base Value is calculated, whatever adjustments, if any, were made in the Mitchell reports for condition, prior damage, aftermarket parts, or refurbishment are factored in.

Absent the Projected Sold Adjustment, the Mitchell methodology provides a sound determination of actual cash value, consistent with the comp methodology commonly used by appraisers. So, the Mitchell report can be used to determine the actual cash value of Plaintiff's vehicle (or any other vehicle) by simply backing out the Projected Sold Adjustment. To arrive at a sound appraisal of actual cash value using a Mitchell report, you would line-item out each Projected Sold Adjustment applied to a comp, recalculate the "Adjusted Price" of each comparable vehicle to which a Projected Sold Adjustment was applied, and then recalculate the average of the Adjusted Prices to arrive at a revised "Base Value," which is then averaged with the N.A.D.A. Total Retail Value to generate a new Dual Source Base Value. From there, the Market Value can be recalculated using that revised Dual Source Base Value and the adjustments for condition, prior damage, aftermarket parts, or refurbishment already determined by Mitchell.

To appraise the actual cash value of Plaintiff Drummond's vehicle using his Mitchell report, I backed out each Projected Sold Adjustment and then recalculated the Market Value. Specifically, I added $1,223.00 to the $11,110.84 adjusted price of the first comp, resulting in a revised adjusted price of $12,333.84. I added $998.00 to the $11,817.74 adjusted price of the second comp, resulting in a revised adjusted price of $12,815.74. I added $1,078.00 to the $10,830.03 adjusted price of the third comp, resulting in a revised adjusted price of $11,908.03. I added $890.00 to the $9,924.70 adjusted price of the fourth comp, resulting in a revised adjusted

6

price of $10,814.70. I added $1,001.00 to the $10,628.01 adjusted price of the fifth comp, resulting in a revised adjusted price of $11,629.01. I added $1,117.00 to the $12,600.28 adjusted price of the sixth comp, resulting in a revised adjusted price of $13,717.28. I then took the sum of the revised adjusted prices ($73,218.60) and divided that number by six to get an average of $12,203.10, which represents the revised average base value. I then averaged that number with the Total Retail Value provided by N.A.D.A. ($12,300.00) to get an average of $12,251.55. This $12,251.55 is the amount the Dual Source Average Base Value would have been had Mitchell not applied Projected Sold Adjustments. After taking into account a negative condition adjustment of $281.90, a sound appraisal of Plaintiff Drummond's vehicle using a Mitchell report results in an actual cash value of $11,969.65.

To appraise the actual cash value of Plaintiff Lee Williams's vehicle using his Mitchell report, I backed out each projected Sold Adjustment and then recalculated the Market Value. Specifically, I did not make an adjustment to the $23,553.61 adjusted price of the first comp, as it did not have a Projected Sold Adjustment applied. I added $962.00 to the $24,730.80 adjusted price of the second comp, resulting in a revised adjusted price of $25,692.80. I added $878.00 to the $23,335.83 adjusted price of the third comp, resulting in a revised adjusted price of $24,213.83. I added $925.00 to the $24,180.82 adjusted price of the fourth comp, resulting in a revised adjusted price of $25,105.82. I added $930.00 to the $24,731.38 adjusted price of the fifth comp, resulting in a revised adjusted price of $25,661.38. I added $923.00 to the $23,937.11 adjusted price of the sixth comp, resulting in a revised adjusted price of $24,860.11. I added $998.00 to the $25,185.55 adjusted price of the seventh comp, resulting in a revised adjusted price of $26,183.55. I added $923.00 to the $24,486.82 adjusted price of the eighth comp, resulting in a revised adjusted price of $25,409.82. I added $1,258.00 to the $24,528.74 adjusted price of the ninth comp, resulting in

7

a revised adjusted price of $25,786.74. I added $908.00 to the $23,817.94 adjusted price of the tenth comp, resulting in a revised adjusted price of $24,725.94. I then took the sum of the revised adjusted prices ($251,193.60) and divided that number by ten to get an average of $25,119.36, which represents the revised average base value. I then averaged that number with the Total Retail Value provided by N.A.D.A. ($25,425.00) to get an average of $25,272.18. This $25,272.18 is the amount the Dual Source Base Value would have been had Mitchell not applied Projected Sold Adjustments. After taking into account a negative condition adjustment of $19.31, a sound appraisal of Plaintiff Williams's vehicle using a Mitchell report results in an actual cash value of $25,252.87.

To appraise the actual cash value of Plaintiff Driggins's vehicle using her Mitchell report, I backed out each Projected Sold Adjustment and then recalculated the Market Value. Specifically, I added $896.00 to the $5,227.15 adjusted price of the first comp, resulting in a revised adjusted price of $6,123.15. I added $976.00 to the $6,174.93 adjusted price of the second comp, resulting in a revised adjusted price of $7,150.93. I added $977 to the $4,923.93 adjusted price of the third comp, resulting in a revised adjusted price of $5,900.93. I added $976.00 to the $5,487.54 adjusted price of the fourth comp, resulting in a revised adjusted price of $6,463.54. I added $804.00 to the $4,022.53 adjusted price of the fifth comp, resulting in a revised adjusted price of $4,826.53. I added $839.00 to the $4,543.90 adjusted price of the sixth comp, resulting in a revised adjusted price of $5,382.90. I added $805.00 to the $4,946.67 adjusted price of the seventh comp, resulting in a revised adjusted price of $5,751.67. I then took the sum of the revised adjusted prices ($41,599.65) and divided that number by seven to get an average of $5,942.81, which represents the revised average base value. I then averaged that number with the Total Retail Value provided by N.A.D.A. ($4,975.00) to get an average of $5,458.91. This $5,458.91 is the amount the Dual

Source Base Value would have been had Mitchell not applied Projected Sold Adjustments. After taking into account a negative condition adjustment of $793.68 and a positive adjustment of $40.00 for aftermarket parts, a sound appraisal of Plaintiff Driggins's vehicle using a Mitchell report results in an actual cash value of $4,705.23.

**V.     Prior Testimony**

- *Volino, et al. v. Progressive Casualty Ins. Co., et al.*, No. 1:21-cv-06243-LGS
  - Provided deposition testimony concerning Mitchell's valuation methodology and the application of Projected Sold Adjustments.

**VI.     Compensation**

I am being paid $650 per hour for my work in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Jason Merritt (Sep 15, 2022 16:16 EDT)
_____
Jason Merritt

## Sep 15, 2022
_____
Executed on

9

# 22.09.06 - Merritt Expert Report.draft2.LL

Final Audit Report                                                    2022-09-15

| | |
|---|---|
| Created: | 2022-09-12 |
| By: | Kim Draheim (kdraheim@cbplaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAWfB3oMoV7nhmHq3J8Ex_wqTPE1Wn4zvp |

## "22.09.06 - Merritt Expert Report.draft2.LL" History

📄 Document created by Kim Draheim (kdraheim@cbplaw.com)
   2022-09-12 - 7:23:15 PM GMT- IP address: 20.127.14.14

📧 Document emailed to Jason Merritt (jason@eastcoastautoappraisers.com) for signature
   2022-09-12 - 7:24:30 PM GMT

📄 Email viewed by Jason Merritt (jason@eastcoastautoappraisers.com)
   2022-09-12 - 9:01:37 PM GMT- IP address: 154.16.192.55

✍️ Document e-signed by Jason Merritt (jason@eastcoastautoappraisers.com)
   Signature Date: 2022-09-15 - 8:16:59 PM GMT - Time Source: server- IP address: 154.16.192.55

✅ Agreement completed.
   2022-09-15 - 8:16:59 PM GMT

**Adobe Acrobat Sign**

**Rule 26(a) Expert Report of Jason Merritt**

I, Jason Merritt, pursuant to Federal Rule of Civil Procedure 26, declare as follows:

I.   **Declaration**

This Report is based on personal knowledge and, if called to testify on the matters set forth herein, I could and would do so competently.

II.   **Introduction**

My name is Jason Merritt, and I am a professional personal-property appraiser who has been retained by the Plaintiffs in this case. My credentials and professional experience are described in my curriculum vitae enclosed with this report as Exhibit 1.

Pertinent to this report, and as reflected in my curriculum vitae, I am the owner of East Coast Auto Appraisers, LLC. I am certified through the Bureau of Certified Auto Appraisers to appraise vehicles, including total losses. I have appraised over a thousand vehicles to determine their fair market, or actual cash, value. These appraisals include hundreds of appraisals where I was hired to determine the value of a totaled vehicle. As owner of Merritt's Automotive, LLC, I appraised vehicles daily for the purpose of determining the fair market value. Additionally, I have performed hundreds of appraisals for the Timbrook Automotive Organization, which includes franchise dealerships for Chevrolet, Buick, GMC, Kia, Nissan, Ford, Chrysler, Dodge, Jeep, and Honda. The purpose of these appraisals was to determine the fair market value of vehicles offered for trade in or that were newly acquired by the Timbrook Automotive Organization.

Before entering the private sector, I served in the Maryland State Police for 28 years. During those years, I received advanced training in accident investigations. In 1998, I was assigned to the C31 Narcotics Unit of the Maryland State Police. Part of my duties in that unit were acquiring and maintaining the unit's vehicles.



EXHIBIT
4-Merritt

III.    **Scope of Work**

I have been hired by the Plaintiffs in this case to offer opinions on the following topics:

- Description of what an appraisal is;

- Explanation of how to use the comparable methodology to appraise a vehicle's actual cash value; and

- Explanation of whether Mitchell's use of a Projected Sold Adjustment is appropriate when appraising a vehicle using a comparable methodology.

IV.    **Opinions**

a.    **Overview of Using a Comparable Methodology to Determine Actual Cash Value of Pre-Loss Automobile**

An *appraisal* is an opinion of value. While there is no single methodology to arrive at a proper opinion as to a loss vehicle's actual cash value, there are generally accepted methodologies that must be followed to render a sound opinion as to ACV. One such methodology is the comparable methodology, more frequently called the "comp" methodology.

Generally, the comp methodology for determining ACV involves finding vehicles for sale, or recently sold, within a certain geographic area that are similar, or "comparable," to the vehicle being valued. Typically, these comps are selected from Internet advertisements. Once the comps are chosen, differences in observed and verifiable features (such as options, mileage, trim level, condition) between the loss vehicle and the comps are documented. Normally, information concerning options, mileage, trim level, and condition are taken from the Internet advertisement for the vehicle, and these characteristics are taken at face value unless there is some specific, and documented reason, for questioning the accuracy of the listing. Sometimes a vehicle listing does not include options, but these could be determined using a VIN decoder. The point is that there must be a specific reason, grounded in evidence, for varying from the information provided in an Internet advertisement for a particular vehicle. Differences between vehicles in observed and

documented characteristics result in price adjustments from the list price of the comparable vehicles.

I have reviewed the Vehicle Valuation Report Mitchell prepared for each Plaintiff. On the last page of each report, under the header "Vehicle Valuation Methodology Explanation," Mitchell walks through the general steps of the comp methodology. Having reviewed each of the reports, it also appears that Mitchell largely followed this methodology, documenting all differences in mileage, options, trim level, condition, etc., and making monetary adjustments based on those documented differences.

When adjusting for the condition of a vehicle, the common procedure is to adjust the condition of a loss vehicle by comparing it to the normal or typical condition of similar vehicles. Ideally, you would search for comparable vehicles in nearly identical condition to the loss vehicle, but this usually isn't practical. Mitchell followed customary condition-adjustment standards. Specifically, its reports documented an inspection of 13 components of each Plaintiff's loss vehicle and assigned numerical ratings to each component. These were compared to a "Typical Vehicle Condition," which was assigned a numerical rating of 3.00. Based on whether the "Overall Condition" of the loss vehicle rated above or below the typical 3.00, Mitchell adjusted the base value of the loss vehicle to reflect that it was in better or worse condition than "typical." As for the condition of the comparable vehicles, it would be improper to assume they were in anything other than typical condition without either inspecting the vehicle or having documentation showing the comparable vehicle was in better or worse than typical condition. Because conducting physical inspections of comparable vehicles is often impractical, appraisers usually set their condition as "average" or "typical" and make no monetary adjustment to the comparable vehicle.

Mitchell deviated from the comp methodology, however, by applying downward adjustments to the Internet prices of the specific comparable vehicles advertised for sale.

### b. Mitchell's Application of a Projected Sold Adjustment is Inconsistent with Appraisal Standards and the Comparable Methodology

As with mileage, options, and equipment, appraisers must base their opinions about a specific comparable vehicle's price on hard data. The hard data appropriate for this is typically the Internet price of the comp. This is true for several reasons.

*First*, the Internet price is often the only data point concerning what a particular vehicle listed with a particular seller would sell for at the time of valuation. When determining actual cash value, the objective is to determine the value of that vehicle at a particular point in time. The Internet price listed for sale is the only evidence available for determining what a particular comparable vehicle offered for sale by a particular dealer would sell for on a particular day. Moreover, using the Internet price provides an objective criterion for determining what the comparable vehicle would sell for on a particular day to a buyer purchasing a vehicle outright, without providing a trade in, financing the purchase, or buying optional warranties or service plans. These additional profit opportunities for the dealer might result in what may look like a lower sales price but does not reflect a change in the market value of that car or that the dealer would have accepted anything other than the list price had the buyer offered cash for the vehicle, without the opportunity to make up the difference or even make even more profit related to a trading-in vehicle, financing or the purchase, or selling warranties, service plans, or other products.

*Second*, appraisal standards do not permit arbitrarily deducting the advertised price of a vehicle based on projections of what that vehicle might ultimately sell for. Again, there is no hard data available to an appraiser to support an opinion that a particular comp would sell on a particular

day for anything other than the Internet price. It would be arbitrary to assign a different sales price to any particular vehicle chosen for comparison purposes.

*Third*, one of the goals of the comp methodology is to determine the value of a vehicle in the market where the vehicle being appraised was garaged. This is because vehicles age differently based on where they are driven. For instance, a vehicle driven 20,000 miles in New York City and parked on the street is much more likely to have scratches and dents than a vehicle driven in upstate New York that is parked in a garage and has mostly highway miles.

I have reviewed Regulation 64, including its definition of a "local market area" to mean a 100-mile radius of the totaled vehicle's principal place of garage. Confining the search for comps to certain geographic boundaries is consistent with appraisal standards. Appraisers typically confine the search to a 75-mile radius of the vehicle's place of garage and expand out as necessary to find a sufficient number of comps to complete the report. Once that search is finished, it is improper to keep broadening the search for the sole purpose of lowering the ACV of the vehicle being appraised.

It is my understanding that Mitchell attempts to limit the geographical area it uses when searching for comparable vehicles to 100 miles but does not include that same limitation when searching for transactions to support the Projected Sold Adjustment. And for each Plaintiff, Mitchell relied on transactions from outside a 100-mile radius for the purpose of lowering the values of vehicles principally garaged in New York.

Using the advertised price as the price for a comparable vehicle is especially important when the advertisement comes from an Internet source. It is my understanding that Mitchell uses only Internet listings for locating comparable vehicles. Consistent with Mitchell's "Position on Internet Pricing," my understanding of the modern used-car market is that Internet prices often

reflect a no-hassle price and that dealers price their inventory competitively to move inventory and sell more vehicles. This is another reason appraisers cannot assume a vehicle will sell for anything other than its advertised price.

While I do not, there are some appraisers who make a "take-price" adjustment to the Internet price of comparable vehicles. This adjustment is made only after speaking with a car dealer to determine whether the dealer would take anything other than the advertised price of the vehicle. The adjustment is specific to a particular vehicle from a particular dealer, and the recipient of the appraisal would know that dealer stated it would a specified price on that day for that particular comparable vehicle. As with other adjustments, this adjustment is based on data specific to a comp vehicle chosen within the totaled vehicle's market area.

Overall, while I likely wouldn't have used the some of the comparable vehicles chosen, Mitchell did follow a comparable methodology except for the application of the Projected Sold Adjustment. Using Mitchell's reports, the actual cash value of each Plaintiff's totaled vehicle would be determined by adding the Projected Sold Adjustments back to the adjusted price of each vehicle to get a revised "base value," and then applying whatever adjustments, if any, were made for condition, prior damage, aftermarket parts, or refurbishment.

V.    **Compensation**

I am being paid $650 per hour for my work in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Jason Merritt

March 11, 2022
Executed on

# Vehicle Valuation Report

Prepared For Progressive Group of Insurance Companies  (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 18-5234199-01 | | COMPREHENSIVE | LEE WILLIAMS 1314 E MARKET ST MAHANOY CITY, PA 17948 +1-215-2903977 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 06/13/2018 | 06/13/2018 | 06/18/2018 | 1007896636 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2016 | Toyota | RAV4 Limited 4 Door Utility 105" WB 2.5L 4 Cyl Gas A AWD | PA 17948 | 37,877 miles |

| Ext Color | License | VIN |
|---|---|---|
| | ZSSK251, California | 2T3DFREV8GW416215 |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Dual Source Base Value = | $24,836.93 |
| Condition - | $19.31 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| Market Value = | $24,817.62 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $100.00 |
| Settlement Value = | $24,717.62 |

## Settlement Value:
## $24,717.62

**EXHIBIT**
S-Merritt

**J.D. POWER**

Mitchell WorkCenter™
Total Loss
©2018 Mitchell International, Inc. All Rights Reserved

## Loss Vehicle Detail

Loss vehicle: 2016 Toyota RAV4 | Limited 4 Door Utility 105" WB | 2.5L 4 Cyl Gas A AWD

## Standard Equipment

### Exterior

| | |
|---|---|
| Black rear bumper | Body-Colored Front Bumper w/Black Rub Strip/Fascia Accent and Metal-Look Bumper Insert |
| Body-Colored Grille w/Chrome Accents | Body-Colored Power Heated Side Mirrors w/Manual Folding and Turn Signal Indicator |
| Chrome door handles | Chrome Side Windows Trim and Black Front Windshield Trim |
| Clearcoat paint | Compact Spare Tire Mounted Inside Under Cargo |
| Deep tinted glass | Express Open/Close Sliding And Tilting Glass 1st Row Sunroof w/Sunshade |
| Fixed Rear Window w/Fixed Interval Wiper and Defroster | Front fog lamps |
| Fully Automatic Projector Beam Led Low/High Beam Daytime Running Auto High-Beam Headlamps | Fully Galvanized Steel Panels |
| Laminated Glass | LED brakelights |
| Lip spoiler | Power Liftgate Rear Cargo Access |
| Roof Rack Rails Only | Steel spare wheel |
| Tailgate/Rear Door Lock Included w/Power Door Locks | Tires: P235/55R18H AS |
| Variable intermittent wipers | Wheels: 18" Alloy ALM -inc: caps |

### Interior

| | |
|---|---|
| 2 Seatback Storage Pockets | 3 12V DC Power Outlets |
| 5 Person Seating Capacity | Air filtration |
| Analog Display | Cargo Area Concealed Storage |
| Cargo Features -inc: Cargo Tray/Organizer | Cargo Space Lights |
| Carpet Floor Trim | Compass |
| Cruise control w/steering wheel controls | Day-Night Auto-Dimming Rearview Mirror |
| Delayed Accessory Power | Distance Pacing |
| Door Mirrors | Driver And Passenger Visor Vanity Mirrors w/Driver And Passenger Auxiliary Mirror |
| Driver foot rest | Dual Zone Front Automatic Air Conditioning |
| Fade-to-off interior lighting | FOB Controls -inc: Trunk/Hatch/Tailgate |
| Front center armrest | Front Cupholder |
| Front map lights | Full Carpet Floor Covering |
| Full cloth headliner | Full Floor Console w/Covered Storage, Mini Overhead Console w/Storage and 3 12V DC Power Outlets |
| Glove box | Heated Front Sport Seats -inc: 8-way power driver w/power memory and 4-way adjustable passenger seats, 60/40 split, reclining, fold-flat second-row seats w/height-adjustable headrests and center armrest |
| HomeLink Garage Door Transmitter | HVAC -inc: Underseat Ducts |
| Instrument Panel Bin, Driver And Passenger Door Bins | Integrated Roof Antenna |
| Interior Trim -inc: Metal-Look Instrument Panel Insert, Metal-Look Door Panel Insert, Metal -Look Interior Accents and Leatherette Upholstered Dashboard | Leather steering wheel |

Mitchell WorkCenter
Total Loss

Claim # 18-5234199-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 2

| | |
|---|---|
| Leather/Metal-Look Gear Shift Knob | Leatherette Door Trim Insert |
| Manual Adjustable Front Head Restraints | Manual tilt/telescoping steering column |
| Outside temp gauge | Power 1st Row Windows w/Driver 1-Touch Up/Down |
| Power Door Locks w/Autolock Feature | Power Rear Windows and Fixed 3rd Row Windows |
| Proximity Key For Doors And Push Button Start | Radio w/Seek-Scan, Clock, Speed Compensated Volume Control, Steering Wheel Controls, Voice Activation and Radio Data System |
| Radio: Entune Premium Audio with Navigation -inc: AM/FM/CD/MP3/WMA Playback, Entune App Suite, 6 speakers, HD Radio w/iTunes tagging, HD Traffic and Weather, SiriusXM Radio w/90-day trial, 7" touch-screen w/integrated back-up camera display, auxiliary audio jack, USB port w/iPod connectivity and control, vehicle information w/customizable settings, hands-free phone capability, phone book access and music streaming via Bluetooth wireless technology | Rear cupholder |
| Remote Keyless Entry w/Integrated Key Transmitter, Illuminated Entry, Illuminated Ignition Switch and Panic Button | Remote Releases -Inc: Mechanical Fuel |
| Roll-Up Cargo Cover | Seats w/Leatherette Back Material |
| Smart Device Integration | SofTex Seat Trim |
| Split-Bench Front Facing Rear Seat | Trip computer |
| Trunk/Hatch Auto-Latch | Valet Function |

## Mechanical

| | |
|---|---|
| 15.9 Gal. Fuel Tank | 4-Wheel Disc Brakes w/4-Wheel ABS, Front Vented Discs, Brake Assist and Hill Hold Control |
| 4.071 Axle Ratio | 550CCA Maintenance-Free Battery w/Run Down Protection |
| 900# Maximum Payload | Automatic Full-Time All-Wheel Drive |
| Double Wishbone Rear Suspension w/Coil Springs | Electric Power-Assist Speed-Sensing Steering |
| Electronic transfer case | Front And Rear Anti-Roll Bars |
| Gas-pressurized shock absorbers | GVWR: 4,600 lbs |
| Permanent Locking Hubs | Single stainless steel exhaust |
| Strut Front Suspension w/Coil Springs | Towing w/Trailer Sway Control |

## Safety

| | |
|---|---|
| ABS And Driveline Traction Control | Airbag Occupancy Sensor |
| Blind Spot Sensor | Curtain 1st And 2nd Row Airbags |
| Driver Knee Airbag and Passenger Cushion Front Airbag | Dual Stage Driver And Passenger Front Airbags |
| Dual Stage Driver And Passenger Seat-Mounted Side Airbags | Electronic stability control (ESC) |
| Forward Collision and Rear Collision | Front And Rear Parking Sensors |
| Lane keeping assist | Low Tire Pressure Warning |
| Outboard Front Lap And Shoulder Safety Belts -inc: Rear Center 3 Point, Height Adjusters and Pretensioners | Rear child safety locks |
| Side impact beams | |

## Optional Equipment

| | |
|---|---|
| ALLOY WHEEL LOCKS | CARPET FLOOR MATS & CARPET CARGO MAT |
| REMOTE ENGINE STARTER | ROOF RACK CROSS BARS |

**\*DIO/PIO =** Dealer/Port Installed Options

Mitchell WorkCenter®
Total Loss

PGR_DRUMMOND_0000098

N.A.D.A Vehicle Equipment  [ 2016 TOYOTA RAV4 Utility 4D Limited AWD I4 DFREV  ]

ALUMINUM/ALLOY WHEELS                                    LUGGAGE RACK
NAVIGATION SYSTEM                                        SAFETY SENSE PKG.

## Loss Vehicle Dual Source Base Value

Loss vehicle:  2016 Toyota RAV4 Limited 4 Door Utility 105" WB 2.5L 4 Cyl Gas A AWD

Guide Valuation: N.A.D.A. Eastern  -  Retail Value                     WORKCENTER™ TOTAL LOSS

| | | | | |
|---|---|---|---|---|
| Base Value: | $25,350.00 | | Base Value: | $24,248.86 |
| Mileage Adjustment: | $0.00 | | | |
| Aluminum/Alloy Wheels: | Inclusive | | | |
| Luggage Rack: | $75.00 | | | |
| Safety Sense Pkg.: | Inclusive | | | |
| Navigation System: | Inclusive | | | |
| Total Retail Value: | $25,425.00 | | | |

Dual Source Average Base Value:                                              $24,836.93

# Loss Vehicle Base Value

Loss vehicle: 2016 Toyota RAV4 | Limited 4 Door Utility 105" WB | 2.5L 4 Cyl Gas A AWD

## Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.
Typical Mileage for this vehicle: 26,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5NORMAL GAS A AWD | 26,094 | 19064 | 74 miles | $23,984.00 Sold Price | $23,553.61 |
| 2 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5NORMAL GAS A AWD | 29,829 | 17857 | 33 miles | $25,733.00 List Price | $24,730.80 |
| 3 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5NORMAL GAS A AWD | 37,421 | 17870 | 41 miles | $23,500.00 List Price | $23,335.83 |
| 4 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5NORMAL GAS A AWD | 39,109 | 18508 | 51 miles | $24,750.00 List Price | $24,180.82 |
| 5 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5NORMAL GAS A AWD | 50,047 | 19468 | 53 miles | $23,995.00 List Price | $24,731.38 |
| 6 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5NORMAL GAS A AWD | 31,877 | 19425 | 56 miles | $24,686.00 List Price | $23,937.11 |
| 7 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5NORMAL GAS A AWD | 25,515 | 17050 | 61 miles | $26,710.00 List Price | $25,185.55 |
| 8 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5NORMAL GAS A AWD | 37,002 | 19355 | 62 miles | $24,703.00 List Price | $24,486.82 |
| 9 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5NORMAL GAS A AWD | 47,537 | 08809 | 64 miles | $24,299.00 List Price | $24,528.74 |
| 10 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5NORMAL GAS A AWD | 34,397 | 19342 | 71 miles | $24,297.00 List Price | $23,817.94 |

**Base Value:** **$24,248.86**

# Loss Vehicle Adjustments

Loss vehicle: 2016 Toyota RAV4 | Limited 4 Door Utility 105" WB | 2.5L 4 Cyl Gas A AWD

## Condition Adjustments

Condition Adjustment: -$19.31          Overall Condition:  2.97-Good          Typical Vehicle Condition:  3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| CARPET | 3 Good | |
| SEATS | 3 Good | |
| HEADLINER | 3 Good | |
| DASH/CONSOLE | 3 Good | |
| DOORS/INTERIOR PANELS | 3 Good | |
| GLASS | Typical | unable to fully condition all glass damaged from incident |
| **Exterior** | | |
| BODY | Typical | unable to fully condition all panels damage from incident |
| PAINT | Typical | unable to fully condition all panels damage from incident |
| TRIM | 2 Fair | impact rear bumper split buckled cover touched up |
| VINYL/CONVERTIBLE TOP | Typical | |
| **Mechanical** | | |
| TRANSMISSION | 3 Good | |
| ENGINE | 3 Good | |
| **Tire** | 3 Good | all tires measured at 8/32 |

Typical condition reflects a vehicle that is in ready-for-sale condition and reflects normal wear and tear for that vehicle type / age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| INTERIOR | FLOOR MATS (NON-OEM) | INSTANT QUOTE | | | $0.00 |
| INTERIOR | SEAT COVERS | INSTANT QUOTE | | | $0.00 |
| INTERIOR | STEERING WHEEL COVER | INSTANT QUOTE | | | $0.00 |

## Comparable Vehicles

Loss vehicle: 2016 Toyota RAV4 | Limited 4 Door Utility 105" WB | 2.5L 4 Cyl Gas A AWD

| 1 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5 NORMAL GAS AAWD | Sold Price:  $23,984.00 |
|---|---|---|

Mitchell **WorkCenter**
Total Loss

Claim # 18-5234199-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 6

| VIN | Stock No | | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|---|
| 2T3DFREV1GWXXXXXX | | | 03/30/2018 | 19064 | 74 miles |

| Source | | | Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|---|---|---|
| FRANCHISE SALE - J.D. POWER AND ASSOCIATES | | | Mileage | 37,877 | 26,094 | -$1,234.98 |
| | | | **Equipment** | | | |
| | | | ALLOY WHEEL LOCKS | Yes | No | $47.37 |
| | | | CARPET FLOOR MATS & CARPET CARGO MAT | Yes | No | $163.98 |
| | | | REMOTE ENGINE STARTER | Yes | No | $363.67 |
| | | | ROOF RACK CROSS BARS | Yes | No | $229.57 |
| | | | | | Total Adjustments: | -$430.39 |
| | | | | | **Adjusted Price:** | **$23,553.61** |

---

**2**  **2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5 NORMAL GAS AAWD**          List Price: **$25,733.00**

| VIN | Stock No | | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|---|
| 2T3DFREV1GW416315 | 15313A | | 05/30/2018 | 17857 | 33 miles |

| Source | | | Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|---|---|---|
| DEALER WEB LISTING - CARS.COM | | | Projected Sold Adjustment | | | -$962.00 |
| W & L SUBARU | | | Mileage | 37,877 | 29,829 | -$871.19 |
| 535 POINT TOWNSHIP DR | | | **Equipment** | | | |
| NORTHUMBERLAND PA 17857 | | | ALLOY WHEEL LOCKS | Yes | No | $48.92 |
| 570-473-3432 | | | CARPET FLOOR MATS & CARPET CARGO MAT | Yes | No | $169.36 |
| | | | REMOTE ENGINE STARTER | Yes | No | $375.60 |
| | | | ROOF RACK CROSS BARS | Yes | No | $237.11 |
| | | | | | Total Adjustments: | -$1,002.20 |
| | | | | | **Adjusted Price:** | **$24,730.80** |

---

**3**  **2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5 NORMAL GAS AAWD**          List Price: **$23,500.00**

| VIN | Stock No | | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|---|
| 2T3DFREVXGW475380 | STK475380 | | 04/18/2018 | 17870 | 41 miles |

Mitchell WorkCenter
Total Loss

Source

DEALER WEB LISTING - VAST.COM
AUBREY ALEXANDER TOYOTA
1324 N SUSQUEHANNA TRAIL
SELINSGROVE PA 17870
570-743-1171

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$878.00 |
| Mileage | 37,877 | 37,421 | -$45.08 |
| Equipment | | | |
| ALLOY WHEEL LOCKS | Yes | No | $44.68 |
| CARPET FLOOR MATS & CARPET CARGO MAT | Yes | No | $154.67 |
| REMOTE ENGINE STARTER | Yes | No | $343.02 |
| ROOF RACK CROSS BARS | Yes | No | $216.54 |
| | | Total Adjustments: | -$164.17 |
| | | **Adjusted Price:** | **$23,335.83** |

---

**4**  **2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5 NORMAL GAS AAWD**          **List Price: $24,750.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| JTMDFREV8GJ079723 | 766941A | 06/11/2018 | 18508 | 51 miles |

Source

DEALER WEB LISTING - VAST.COM
TOYOTA OF SCRANTON
3400 N MAIN AVE
SCRANTON PA 18508
570-489-7584

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$925.00 |
| Mileage | 37,877 | 39,109 | $124.87 |
| Equipment | | | |
| ALLOY WHEEL LOCKS | Yes | No | $47.05 |
| CARPET FLOOR MATS & CARPET CARGO MAT | Yes | No | $162.89 |
| REMOTE ENGINE STARTER | Yes | No | $361.26 |
| ROOF RACK CROSS BARS | Yes | No | $228.05 |
| RADIO: PREM DISPLAY AUDIO W/NAV/ENTUNE/JBL | No | Yes | -$568.30 |
| | | Total Adjustments: | -$569.18 |
| | | **Adjusted Price:** | **$24,180.82** |

Comparable Vehicle Option Details:

RADIO: PREM DISPLAY AUDIO W/NAV/ENTUNE/JBL

---

**6**  **2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5 NORMAL GAS AAWD**          **List Price: $23,995.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2T3DFREV2GW457701 | 18432A | 04/05/2018 | 19468 | 53 miles |

Mitchell WorkCenter™
Total Loss

Source

DEALER WEB LISTING -
AUTOTRADER.COM

TRI-COUNTY CHRYSLER DODGE
JEEP RAM

15 D AND L DR

LIMERICK PA 19468

610-367-2941

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$930.00 |
| Mileage | 37,877 | 50,047 | $892.62 |
| Equipment | | | |
| ALLOY WHEEL LOCKS | Yes | No | $45.55 |
| CARPET FLOOR MATS & CARPET CARGO MAT | Yes | No | $157.70 |
| REMOTE ENGINE STARTER | Yes | No | $349.73 |
| ROOF RACK CROSS BARS | Yes | No | $220.78 |
| | | Total Adjustments: | $736.38 |
| | | **Adjusted Price:** | **$24,731.38** |

---

| 6 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5 NORMAL GAS AAWD | | List Price: $24,686.00 |
|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2T3DFREV9GW415008 | C18160A | 04/29/2018 | 19425 | 56 miles |

Source

DEALER WEB LISTING - CARS.COM

LEXUS OF CHESTER SPRINGS

400 POTTSTOWN PIKE

CHESTER SPRINGS PA 19425

610-321-8000

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$923.00 |
| Mileage | 37,877 | 31,877 | -$623.07 |
| Equipment | | | |
| ALLOY WHEEL LOCKS | Yes | No | $46.93 |
| CARPET FLOOR MATS & CARPET CARGO MAT | Yes | No | $162.47 |
| REMOTE ENGINE STARTER | Yes | No | $360.32 |
| ROOF RACK CROSS BARS | Yes | No | $227.46 |
| | | Total Adjustments: | -$748.89 |
| | | **Adjusted Price:** | **$23,937.11** |

---

| 7 | 2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5 NORMAL GAS AAWD | | List Price: $26,710.00 |
|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| JTMDFREV2GJ062173 | T60647A | 06/13/2018 | 17050 | 61 miles |

Mitchell WorkCenter™
Total Loss

Source

DEALER WEB LISTING - CARS.COM
BOBBY RAHAL TOYOTA
6711 CARLISLE PIKE
MECHANICSBURG PA 17050
717-691-0500

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$998.00 |
| Mileage | 37,877 | 25,515 | -$1,389.01 |
| **Equipment** | | | |
| ALLOY WHEEL LOCKS | Yes | No | $50.78 |
| CARPET FLOOR MATS & CARPET CARGO MAT | Yes | No | $175.79 |
| REMOTE ENGINE STARTER | Yes | No | $389.87 |
| ROOF RACK CROSS BARS | Yes | No | $246.12 |
| | | Total Adjustments: | -$1,524.45 |
| | | **Adjusted Price:** | **$25,185.55** |

---

### 8  2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5 NORMAL GAS AAWD       List Price: **$24,703.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| JTMDFREV9GJ066656 | 6815291 | 06/01/2018 | 19355 | 62 miles |

Source

DEALER WEB LISTING - CARS.COM
SLOANE TOYOTA OF MALVERN
593 LANCASTER AVE
MALVERN PA 19355
866-542-8811

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$923.00 |
| Mileage | 37,877 | 37,002 | -$90.93 |
| **Equipment** | | | |
| ALLOY WHEEL LOCKS | Yes | No | $46.97 |
| CARPET FLOOR MATS & CARPET CARGO MAT | Yes | No | $162.58 |
| REMOTE ENGINE STARTER | Yes | No | $360.58 |
| ROOF RACK CROSS BARS | Yes | No | $227.62 |
| | | Total Adjustments: | -$216.18 |
| | | **Adjusted Price:** | **$24,486.82** |

---

### 9  2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5 NORMAL GAS AAWD       List Price: **$24,299.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2T3DFREV8GW435525 | GW435525 | 04/12/2018 | 08809 | 64 miles |

Source

DEALER WEB LISTING - CARS.COM
MULLER TOYOTA
2019 NJ-31
CLINTON NJ 08809
908-638-4100

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,258.00 |
| Mileage | 37,877 | 47,537 | $714.78 |
| **Equipment** | | | |
| ALLOY WHEEL LOCKS | Yes | No | $45.51 |
| CARPET FLOOR MATS & CARPET CARGO MAT | Yes | No | $157.53 |
| REMOTE ENGINE STARTER | Yes | No | $349.37 |
| ROOF RACK CROSS BARS | Yes | No | $220.55 |
| | | Total Adjustments: | $229.74 |
| | | **Adjusted Price:** | **$24,528.74** |

---

**10   2016 TOYOTA RAV4 LIMITED 4D SUV 4 2.5 NORMAL GAS AAWD**    List Price: **$24,297.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2T3DFREV8GW443253 | 32954A | 05/29/2018 | 19342 | 71 miles |

Source

DEALER WEB LISTING - CARS.COM
TEAM TOYOTA OF GLEN MILLS
1050 BALTIMORE PIKE
GLEN MILLS PA 19342
484-845-7974

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$908.00 |
| Mileage | 37,877 | 34,397 | -$355.69 |
| **Equipment** | | | |
| ALLOY WHEEL LOCKS | Yes | No | $46.19 |
| CARPET FLOOR MATS & CARPET CARGO MAT | Yes | No | $159.91 |
| REMOTE ENGINE STARTER | Yes | No | $354.65 |
| ROOF RACK CROSS BARS | Yes | No | $223.88 |
| | | Total Adjustments: | -$479.06 |
| | | **Adjusted Price:** | **$23,817.94** |

# Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2016 Toyota RAV4 Limited | 4 Door Utility 105" WB 2.5L 4 Cyl Gas  AWD | $32,910.00 |

Mitchell WorkCenter™
Total Loss

PGR_DRUMMOND_0000106

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

PGR_DRUMMOND_0000107

Any person who knowingly and with intent to defraud any insurer, self-insured, insurance licensee, person or the public files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.  Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000.

Claim # 18-5234199-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 13

PGR_DRUMMOND_0000108

PGR_DRUMMOND_0000619

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies  (800) 321-9843

 mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 21-3753767-01 | | COLLISION | LEON DRUMMOND 1324 WASHINGTON ST APT1 PO BOX 1411 EASTON, PA 18042 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 07/16/2021 | 07/17/2021 | 07/23/2021 | 1013194873 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2012 | Kia | Sportage EX 4 Door Utility 104" WB 2.4L 4 Cyl Gas A AWD | PA 18042 | 112,923 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Mineral Silver | | KNDPCCA26C7277884 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Dual Source Base Value = | $11,725.97 |
| Condition - | $281.90 |
| Prior Damage - | $0.00 |
| Aftermarket Parts - | $0.00 |
| Refurbishment - | $0.00 |
| Market Value = | $11,444.07 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| (6.000%) Tax + | $686.64 |
| Deductible - | $250.00 |
| Settlement Value = | $11,880.71 |

## Settlement Value:
## $11,880.71

**EXHIBIT**

6-Merritt

J.D. POWER

Mitchell WorkCenter™
Total Loss
© 2016 Mitchell International, Inc. All Rights Reserved

PGR_DRUMMOND_0000619

PGR_DRUMMOND_0000620

# Loss Vehicle Detail

Loss vehicle: 2012 Kia Sportage | EX 4 Door Utility 104" WB | 2.4L 4 Cyl Gas A AWD

## Standard Equipment

### Exterior

| | |
|---|---|
| 18" alloy wheels | Body-color bumpers |
| Body-color pwr mirrors w/integrated LED turn signals | Body-side molding w/fender flares |
| Chrome door handles | Fog lamps |
| LED daytime running lamps | P235/55R18 all-season tires |
| Projection headlamps | Rear privacy glass |
| Rear Spoiler | Roof rails |
| Solar glass | Temporary spare tire w/steel wheel |
| Variable intermittent front windshield wipers | Variable intermittent rear wiper |

### Interior

| | |
|---|---|
| 12V pwr outlets -inc: (2) front/(1) rear | 60/40 split-folding rear seat w/armrest -inc: adjustable headrests |
| AM/FM stereo w/CD/MP3 player -inc: auxiliary input jack, USB port, (6) speakers | Bluetooth connectivity |
| Cargo lamp | Center console w/armrest |
| Cruise control | Door scuff plates |
| Dual covered illuminated visor vanity mirrors w/visor extensions | Dual-zone climate control |
| EcoMinder indicator | Front cloth bucket seats -inc: adjustable headrests, 8-way pwr driver seat adjuster, manual passenger seat adjuster, dual pwr lumbar |
| Front/rear cupholders -inc: front/rear bottle holders | Front/rear floor mats |
| Leather-wrapped shift knob | Leather-wrapped tilt/telescopic multifunction steering wheel -inc: audio controls, cruise controls, Bluetooth controls |
| Lockable illuminated cooled glove box | Metal-grain interior accents |
| Overhead console -inc: sunglass holder, map lights | Premium audio system -inc: Bristol audio, HD Radio, amp, subwoofer |
| Pwr door locks | Pwr windows w/driver one-touch down -inc: driver auto-up w/safety control |
| Rear window defroster | Remote keyless entry w/panic, alarm -inc: escort lighting |
| Roof mounted antenna | Satellite radio |
| Trip computer | UVO infotainment system |

### Mechanical

| | |
|---|---|
| All wheel drive | Chrome grille |
| Front/rear stabilizer bars | Gas shock absorbers |
| High performance dampers | Independent MacPherson strut front suspension w/coil springs |
| Independent multi-link rear suspension w/coil springs | Pwr rack & pinion steering |
| Towing hook | Ventilated front/solid rear disc brakes |

### Safety

| | |
|---|---|
| 4-wheel anti-lock braking system | Backup camera |

Mitchell **WorkCenter**
Total Loss

PGR_DRUMMOND_0000620

PGR_DRUMMOND_0000621

| | |
|---|---|
| Brake assist | Driver & front passenger airbags -inc: passenger occupancy sensor |
| Electronic stability control w/defeat switch & traction control | Front height-adjustable 3-point seat belts w/pretensioners & force limiters |
| Front seat-mounted side airbags | Full-length side curtain airbags -inc: rollover sensor |
| Hill assist control w/downhill brake control | Lower anchors & tether for children (LATCH) |
| Rear 3-point seat belts | Rear child safety door locks |
| Side impact protection | Tire pressure monitoring system |

## Packages

**EX PREMIUM PKG**

-inc: leather seat trim, dual heated front seats, cooled driver seat, push-button start w/start key, panoramic sunroof, auto-dimming rearview mirror, HomeLink universal garage door opener, heated mirrors, rear cargo cover, supervision gauge cluster

## Optional Equipment

| | |
|---|---|
| ALL-WEATHER FLOOR MATS | CARGO COVER |
| CARGO NET | CARGO TRAY |

**\*DIO/PIO =**   Dealer/Port installed Options

## N.A.D.A./J.D. Power Vehicle Equipment  [ 2012 KIA Sportage-4 Cyl. Utility 4D EX AWD PCCA2 ]

| | |
|---|---|
| BACK UP CAMERA | COOLED FRONT SEATS |
| HEATED EXTERIOR MIRRORS | HEATED FRONT SEATS |
| LEATHER SEATS | PARKING AID |
| POWER SUNROOF | UNIV GARAGE DOOR OPENER |

# Loss Vehicle Dual Source Base Value

Loss vehicle:  2012 Kia Sportage EX 4 Door Utility 104" WB 2.4L 4 Cyl Gas A AWD

Guide Valuation: N.A.D.A./J.D. Power Eastern  -  Retail Value                    **WORKCENTER**™ TOTAL LOSS

| | | | | |
|---|---|---|---|---|
| Base Value: | $11,475.00 | | Base Value: | $11,151.93 |
| Mileage Adjustment: | $150.00 | | | |
| Leather Seats: | $200.00 | | | |
| Cooled Front Seats: | $75.00 | | | |
| Heated Exterior Mirrors: | $25.00 | | | |
| Power Sunroof: | $225.00 | | | |
| Parking Aid: | Inclusive | | | |
| Back Up Camera: | Inclusive | | | |
| Heated Front Seats: | $125.00 | | | |
| Univ Garage Door Opener: | $25.00 | | | |
| **Total Retail Value:** | **$12,300.00** | | | |

| | |
|---|---|
| Dual Source Average Base Value: | $11,725.97 |

PGR_DRUMMOND_0000621

PGR_DRUMMOND_0000622

# Loss Vehicle Base Value

Loss vehicle: **2012 Kia Sportage | EX 4 Door Utility 104" WB | 2.4L 4 Cyl Gas A AWD**

## Comparable Vehicle Information

Search Radius used for this valuation: **75 miles from loss vehicle zip/postal code.**

Typical Mileage for this vehicle: **108,000 miles**

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS A AWD | 54,937 | 08822 | 21 miles | $15,881.00 List Price | $11,110.84 |
| 2 | 2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS A AWD | 118,574 | 18360 | 21 miles | $12,956.00 List Price | $11,817.74 |
| 3 | 2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS A AWD | 85,710 | 18321 | 25 miles | $14,000.00 List Price | $10,830.03 |
| 4 | 2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS A AWD | 108,449 | 08060 | 50 miles | $11,549.00 List Price | $9,924.70 |
| 5 | 2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS A AWD | 85,649 | 19064 | 50 miles | $12,990.00 List Price | $10,628.01 |
| 6 | 2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS A AWD | 97,516 | 11373 | 71 miles | $14,500.00 List Price | $12,600.28 |

**Base Value: $11,151.93**

# Loss Vehicle Adjustments

Loss vehicle: **2012 Kia Sportage | EX 4 Door Utility 104" WB | 2.4L 4 Cyl Gas A AWD**

## Condition Adjustments

Condition Adjustment: **-$281.90**          Overall Condition: **2.81-Good**          Typical Vehicle Condition: **3.00**

| Category | Condition | Condition $ | Comments |
|---|---|---|---|
| **Interior** | | | |
| HEADLINER | 3 Good | $0.00 | |
| GLASS | 3 Good | $0.00 | |
| DOORS/INTERIOR PANELS | 2 Fair | -$53.19 | greater then 3 small gouges |
| SEATS | 3 Good | $0.00 | leather creasing 1 small split |
| CARPET | 3 Good | $0.00 | moderate wear |
| DASH/CONSOLE | 2 Fair | -$53.19 | greater then 2 small gouges |
| **Exterior** | | | |
| PAINT | 2 Fair | -$132.97 | greater then 2 large scratches |
| VINYL/CONVERTIBLE TOP | Typical | $0.00 | |
| BODY | 3 Good | $0.00 | |
| TRIM | 2 Fair | -$42.55 | greate rthen 2 small impacts 3 wheels curb rash |
| **Mechanical** | | | |
| TRANSMISSION | 3 Good | $0.00 | |
| ENGINE | 3 Good | $0.00 | |
| **Tire** | | | |
| | 3 Good | $0.00 | lf 7 lr 6 rr 6 rf 7 |


Mitchell WorkCenter
Total Loss

PGR_DRUMMOND_0000622

PGR_DRUMMOND_0000623

Typical condition reflects a vehicle that is in ready-for-sale condition and reflects normal wear and tear for that vehicle type / age.

Comments:

## Comparable Vehicles

Loss vehicle: 2012 Kia Sportage | EX 4 Door Utility 104" WB | 2.4L 4 Cyl Gas A AWD

| 1 | **2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS AAWD** | | | **List Price: $15,881.00** |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| KNDPCCA26C7309510 | Q200461 | 07/10/2021 | 08822 | 21 miles |

Source

| | Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|---|
| DEALER WEB LISTING - | Projected Sold Adjustment | | | -$1,223.00 |
| BUILDSHEET - VAST.COM | Mileage | 112,923 | 54,937 | -$3,007.58 |
| FRED BEANS KIA OF FLEMINGTON | Equipment | | | |
| 172 US-202 | NAVIGATION PKG | No | Yes | -$577.09 |
| FLEMINGTON NJ 08822 | ALL-WEATHER FLOOR MATS | Yes | No | $66.37 |
| 888-861-6844 | WHEEL LOCKS | No | Yes | -$28.86 |

| | Total Adjustments: | -$4,770.16 |
|---|---|---|
| | **Adjusted Price:** | **$11,110.84** |

Comparable Vehicle Package Details:
EX PREMIUM PKG  (CARGO COVER)

NAVIGATION PKG

Comparable Vehicle Option Details:
CARGO NET, CARGO TRAY, WHEEL LOCKS

| 2 | **2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS AAWD** | | | **List Price: $12,956.00** |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| KNDPCCA28C7291849 | SY860B | 07/07/2021 | 18360 | 21 miles |

Mitchell **WorkCenter**
Total Loss

PGR_DRUMMOND_0000623

PGR_DRUMMOND_0000624

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

ERTLE SUBARU

798 N 9TH ST

STROUDSBURG PA 18360

866-259-0330

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$998.00 |
| Mileage | 112,923 | 118,574 | $276.38 |
| **Equipment** | | | |
| NAVIGATION PKG | No | Yes | -$470.79 |
| ALL-WEATHER FLOOR MATS | Yes | No | $54.15 |
| | | Total Adjustments: | -$1,138.26 |
| | | **Adjusted Price:** | **$11,817.74** |

Comparable Vehicle Package Details:

EX PREMIUM PKG  (CARGO COVER)

NAVIGATION PKG

Comparable Vehicle Option Details:

CARGO NET, CARGO TRAY

---

**3**  **2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS AAWD**                              **List Price: $14,000.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| KNDPCCA28C7217458 | ZK9173A | 07/20/2021 | 18321 | 25 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

ABELOFF NISSAN

3259 ROUTE 611

BARTONSVILLE PA 18321

570-517-0200

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,078.00 |
| Mileage | 112,923 | 85,710 | -$1,438.23 |
| **Equipment** | | | |
| NAVIGATION PKG | No | Yes | -$508.74 |
| ALL-WEATHER FLOOR MATS | Yes | No | $58.51 |
| INTERIOR LIGHT KIT | No | Yes | -$178.07 |
| WHEEL LOCKS | No | Yes | -$25.44 |
| | | Total Adjustments: | -$3,169.97 |
| | | **Adjusted Price:** | **$10,830.03** |

Comparable Vehicle Package Details:

EX PREMIUM PKG  (CARGO COVER)

NAVIGATION PKG

Comparable Vehicle Option Details:

CARGO NET, CARGO TRAY, INTERIOR LIGHT KIT, WHEEL LOCKS

---

**4**  **2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS AAWD**                              **List Price: $11,549.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| KNDPCCA28C7294539 | C31252A | 06/16/2021 | 08060 | 50 miles |

Mitchell **WorkCenter**
Total Loss

PGR_DRUMMOND_0000624

PGR_DRUMMOND_0000625

| Source | | Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|---|---|
| DEALER WEB LISTING - BUILDSHEET - CARS.COM | | Projected Sold Adjustment | | | -$890.00 |
| CARSHOP MT. HOLLY | | Mileage | 112,923 | 108,449 | -$195.05 |
| 1971 BURLINGTON-MOUNT HOLLY RD | | **Equipment** | | | |
| MOUNT HOLLY NJ 08060 | | NAVIGATION PKG | No | Yes | -$419.64 |
| 855-383-0645 | | ALL-WEATHER FLOOR MATS | Yes | No | $48.26 |
| | | TOW HITCH | No | Yes | -$146.88 |
| | | WHEEL LOCKS | No | Yes | -$20.99 |
| | | | | Total Adjustments: | -$1,624.30 |
| | | | | **Adjusted Price:** | **$9,924.70** |

Comparable Vehicle Package Details:

EX PREMIUM PKG  (CARGO COVER)

NAVIGATION PKG

Comparable Vehicle Option Details:

CARGO NET, CARGO TRAY, TOW HITCH, WHEEL LOCKS

---

**5**  **2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS AAWD**          List Price: **$12,990.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| KNDPCCA28C7203723 | 21K960B | 06/19/2021 | 19064 | 50 miles |

| Source | | Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|---|---|
| DEALER WEB LISTING - BUILDSHEET - AUTOTRADER.COM | | Projected Sold Adjustment | | | -$1,001.00 |
| SCOTT KIA OF SPRINGFIELD | | Mileage | 112,923 | 85,649 | -$1,337.38 |
| 321 BALTIMORE PIKE | | **Equipment** | | | |
| SPRINGFIELD PA 19064 | | WHEEL LOCKS | No | Yes | -$23.61 |
| | | | | Total Adjustments: | -$2,361.99 |
| | | | | **Adjusted Price:** | **$10,628.01** |

Comparable Vehicle Package Details:

EX PREMIUM PKG  (CARGO COVER)

Comparable Vehicle Option Details:

ALL-WEATHER FLOOR MATS, CARGO NET, CARGO TRAY, WHEEL LOCKS

---

**6**  **2012 KIA SPORTAGE EX 4D SUV 4 2.4 NORMAL GAS AAWD**          List Price: **$14,500.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| KNDPCCA25C7173015 | 173015 | 04/28/2021 | 11373 | 71 miles |

Mitchell WorkCenter™
Total Loss

PGR_DRUMMOND_0000626

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
AMCOR AUTOMOTIVE,INC.
77-05 QUEENS BLVD
ELMHURST NY 11373
718-507-5500

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,117.00 |
| Mileage | 112,923 | 97,516 | -$843.32 |
| Equipment | | | |
| ALL-WEATHER FLOOR MATS | Yes | No | $60.60 |

| | | |
|---|---|---|
| | Total Adjustments: | -$1,899.72 |
| | **Adjusted Price:** | **$12,600.28** |

**Comparable Vehicle Package Details:**
EX PREMIUM PKG  (CARGO COVER)

**Comparable Vehicle Option Details:**
CARGO NET, CARGO TRAY

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2012 Kia Sportage EX | 4 Door Utility 104" WB 2.4L 4 Cyl Gas  AWD | $25,400.00 |

Mitchell WorkCenter™
Total Loss

PGR_DRUMMOND_0000626

PGR_DRUMMOND_0000627

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

Any person who knowingly and with intent to defraud any insurer, self-insured, insurance licensee, person or the public files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.  Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000.

 Mitchell **WorkCenter**
Total Loss

Claim # 21-3753767-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 9

PGR_DRUMMOND_0000627

# Vehicle Valuation Report



Prepared For  Progressive Group of Insurance Companies  (800) 321-9843

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 19-2069812-01 | | COLLISION | YESHONDA DRIGGINS 206 WATSON RD SHARON HILL, PA 19079 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 10/09/2019 | 10/09/2019 | 10/11/2019 | 1009473114 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2007 | Buick | LaCrosse CXL 4 Door Sedan 3.8L 6 Cyl Gas A FWD | PA 19079 | 135,844 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| | | 2G4WD552271117837 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Dual Source Base Value = | $5,010.83 |
| Condition - | $793.68 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $40.00 |
| Refurbishment | $0.00 |
| Market Value = | $4,257.15 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $200.00 |
| Settlement Value = | $4,257.15 |

## Settlement Value:
# $4,057.15

EXHIBIT

7-Merritt

**J.D. POWER**

Mitchell **WorkCenter**™
Total Loss
©2018 Mitchell International, Inc. All Rights Reserved

PGR_DRUMMOND_0001361

# Loss Vehicle Detail

Loss vehicle: 2007 Buick LaCrosse | CXL 4 Door Sedan | 3.8L 6 Cyl Gas A FWD

## Standard Equipment

### Exterior

| | |
|---|---|
| Daytime Running Lamps, switchable | Door handles, chrome |
| Glass, solar-ray light-tinted | Grille, chrome surround with graphite colored accents |
| Headlamps, halogen composite with Twilight Sentinel and flash-to-pass feature | License plate bracket, front (Standard only in states that require a front license plate. Available to order through SPO.) |
| Mirrors, outside power-adjustable, body-color | Moldings, body-color bodyside |
| Wipers, front intermittent, structure-less wiper blades | |

### Interior

| | |
|---|---|
| Air conditioning, dual-zone automatic climate control with individual climate settings for driver and right-front passenger and rear seat heating/cooling outlets | Air filtration system |
| Antenna, integral rear | Assist handles, front passenger and rear outboard with coat hook on left rear passenger assist handle (Front passenger assist handle not available when (CF5) power sunroof is ordered.) |
| Audio system, AM/FM stereo with CD player, seek-and-scan, digital clock, auto-tone control, speed-compensated volume, Theftlock and 6 speakers | Cargo net, trunk |
| Cruise control | Defogger, rear-window electric |
| Door locks, power programmable with lockout protection and enhanced safety | Floor mats, front and rear, stain-resistant |
| Instrumentation, with Driver Information Center and compass, 5-button includes language selection (English, Spanish and French), date, oil life monitor, odometer, driver warning messages, personalization features (door locks and interior/exterior lighting), reminder tones and analog instrumentation (speedometer, temperature, fuel, tachometer and trip odometer) | Lighting, interior with glovebox, trunk, delayed entry/exit with theater dimming, rear courtesy, front footwell and front map lights |
| Mirror, inside rearview manual day/night | OnStar, 1-year of Directions and Connections plan. Includes the innovative easy to use Turn-by-Turn Navigation services which provide voice-guided directions (where available). Also includes Automatic Notification of Air Bag Deployment, Stolen Vehicle Location Assistance, Emergency Services, Roadside Assistance, Remote Door Unlock, OnStar Vehicle Diagnostics, Hands-Free Calling, AccidentAssist, Remote Horn and Lights, Information and Convenience Services, and Driving Directions. (OnStar services require vehicle electrical system (including battery), wireless service and GPS satellite signals to be available and operating for features to function properly. OnStar acts as a link to existing emergency service providers. Stolen Vehicle Location Assistance and Remote Door Unlock success varies with conditions. OnStar Vehicle Diagnostics available on most 2004 MY and newer GM vehicle |
| Personalization features, includes driver memory, 2 specific Remote Keyless Entry FOB controls for the driver identification greeting, audio system settings, station presets, content theft, automatic door locks, activation verification, perimeter lighting, delayed locking and (UD7) Rear Parking Assist (if equipped) ((UD7) Rear Parking Assist included and only available with (PCI) Driver Confidence Package.) | QuietTuning |
| Remote keyless entry | Retained accessory power, power windows, audio system and sunroof remain operational after ignition is switched off for 10 minutes or until a door is opened |
| Seat adjuster, driver 2-way power lumbar | Seat adjuster, driver 6-way power |
| Seat trim, leather-appointed seating | Seat, rear split-folding with armrest and dual cup holders |
| Seats, front bucket, includes 6-way power driver seat adjuster, 2-way manual front passenger seat adjuster with fore/aft controls, outboard head restraints, front seatback map pockets and rear armrest with dual cup holders | Steering column, Tilt-Wheel, adjustable |
| Steering wheel, leather-wrapped with mounted cruise controls | Theft-deterrent system, content theft alarm, immobilizer |
| Theft-deterrent system, vehicle, PASS-Key III | Tire pressure monitoring system |
| Trunk release, driver and front passenger door lock buttons, push and hold 3 seconds | Visors, driver and front passenger illuminated vanity mirrors, sliding |
| Windows, power with driver express-down | |

Mitchell WorkCenter
Total Loss

PGR_DRUMMOND_0001362

## Mechanical

| | |
|---|---|
| Axle, 3.05 ratio | Battery, 600 cold-cranking amps, maintenance-free with rundown protection |
| Brakes, 4-wheel antilock, 4-wheel disc | Exhaust, stainless-steel |
| Front wheel drive | Steering, power, rack-and-pinion |
| Suspension, 4-wheel independent, Premium Ride | Tire, compact spare, includes steel wheel |
| Tires, P225/60R16 all-season, blackwall, steel-belted radial | Traction control, Enhanced Traction System (ETS), powertrain-modulated |
| Wheels, 16" (40.6 cm) 8-spoke painted aluminum | |

## Safety

Air bags, dual-stage frontal, driver and right-front passenger and head curtain side-impact, front and rear outboard seating positions with Passenger Sensing System (Head Curtain side air bags are designed to help reduce the risk of head and neck injuries to front and rear seat occupants on the near side of certain side-impact collisions. Always use safety belts and the correct child restraints for your child's age and size. Even in vehicles equipped with air bags and the Passenger Sensing System, children are safer when properly secured in a rear seat. Never place a rear- facing infant restraint in the front seat of any vehicle equipped with an active frontal air bag. See the vehicle's Owner's Manual and child safety seat instructions for more safety information.)

Door locks, child security, rear

Horn, dual-note high and low

LATCH system, (Lower Anchors and Top tethers for CHildren), for child safety seats in all rear seating positions

Safety belts, 3-point, driver and right-front passenger (Includes center position lap belt when (AV8) 6-passenger seating is ordered.)

Safety belts, 3-point, rear, all seating positions

## Optional Equipment

STEERING COLUMN, TILT AND TELESCOPIC

*DIO/PIO =   Dealer/Port Installed Options

## N.A.D.A Vehicle Equipment  [ 2007 BUICK Lacrosse Sedan 4D CXL WD5 ]

ALUMINUM/ALLOY WHEELS

# Loss Vehicle Dual Source Base Value

Loss vehicle:  2007 Buick LaCrosse CXL 4 Door Sedan 3.8L 6 Cyl Gas A FWD

| Guide Valuation: N.A.D.A. Eastern  -  Retail Value | | WORKCENTER™ TOTAL LOSS | |
|---|---|---|---|
| Base Value: | $4,800.00 | Base Value: | $5,046.66 |
| Mileage Adjustment: | $175.00 | | |
| Aluminum/Alloy Wheels: | Inclusive | | |
| Total Retail Value: | $4,975.00 | | |

| Dual Source Average Base Value: | $5,010.83 |
|---|---|

Claim # 19-2069812-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 3

## Loss Vehicle Base Value

Loss vehicle: 2007 Buick LaCrosse | CXL 4 Door Sedan | 3.8L 6 Cyl Gas A FWD

### Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.
Typical Mileage for this vehicle: 133,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---------------------|---------|----------|----------------------------|-------|----------------|
| 1 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 74,603 | 19064 | 5 miles | $7,797.00 List Price | $5,227.15 |
| 2 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 87,782 | 08030 | 8 miles | $8,488.00 List Price | $6,174.93 |
| 3 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 79,379 | 19720 | 25 miles | $8,495.00 List Price | $4,923.93 |
| 4 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 38,996 | 19047 | 28 miles | $8,487.00 List Price | $5,487.54 |
| 5 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 62,008 | 19711 | 28 miles | $6,995.00 List Price | $4,022.53 |
| 6 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 64,421 | 19555 | 54 miles | $7,295.00 List Price | $4,543.90 |
| 7 | 2007 BUICK LACROSSE CXL 4D SDN 6 3.8NORMAL GAS A 2WD | 99,945 | 07060 | 67 miles | $6,999.00 List Price | $4,946.67 |

**Base Value:** **$5,046.66**

## Loss Vehicle Adjustments

Loss vehicle: 2007 Buick LaCrosse | CXL 4 Door Sedan | 3.8L 6 Cyl Gas A FWD

## Condition Adjustments

Condition Adjustment:  -$793.68          Overall Condition:  2.46-Fair          Typical Vehicle Condition:  3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| SEATS | 2 Fair | EXTENSIVE CREASING |
| DASH/CONSOLE | 3 Good | |
| DOORS/INTERIOR PANELS | 3 Good | |
| HEADLINER | 3 Good | |
| GLASS | 3 Good | |
| CARPET | 2 Fair | MORE THAN 3 PERMANENT STAINS |
| **Exterior** | | |
| VINYL/CONVERTIBLE TOP | Typical | |
| BODY | 2 Fair | MULTIPLE LARGE DENTS RIGHT 1/4 AND RR DOOR |
| PAINT | 3 Good | |
| TRIM | 2 Fair | RR WHEEL IS MISSING |
| **Mechanical** | | |
| TRANSMISSION | 2 Fair | OIL BUILDUP |
| ENGINE | 3 Good | |
| **Tire** | 2 Fair | 2/32 RF, 6/32 RR, 4/32 LR, 7/32 LF NEW TIRE 10/32 |

Typical condition reflects a vehicle that is in ready-for-sale condition and reflects normal wear and tear for that vehicle type / age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| INTERIOR | CD PLAYER / MEDIA PLAYER | INSTANT QUOTE | | | $40.00 |

## Comparable Vehicles

Loss vehicle:  2007 Buick LaCrosse | CXL 4 Door Sedan | 3.8L 6 Cyl Gas A FWD

| 1 | **2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD** | | | | **List Price: $7,797.00** |
|---|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582071192032 | G196309A | 10/05/2019 | 19064 | 5 miles |

Mitchell WorkCenter™
Total Loss

PGR_DRUMMOND_0001365

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
PIAZZA HONDA OF SPRINGFIELD
780 BALTIMORE PIKE
SPRINGFIELD PA 19064
800-719-8045

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$896.00 |
| Mileage | 135,844 | 74,603 | -$1,354.36 |
| Equipment | | | |
| DRIVER CONFIDENCE PACKAGE | No | Yes | -$347.27 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | DRIVER CONFIDENCE PACKAGE | $27.78 |
| | | Total Adjustments: | -$2,569.85 |
| | | **Adjusted Price:** | **$5,227.15** |

Comparable Vehicle Package Details:

DRIVER CONFIDENCE PACKAGE  (SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER, STEERING COLUMN, TILT AND TELESCOPIC, STEERING WHEEL CONTROLS, MOUNTED AUDIO CONTROLS)

---

**2** | **2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD** | **List Price: $8,488.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582X71203604 | 203604B | 09/18/2019 | 08030 | 8 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
GORMLEYS AUTO CENTER
101 CRESCENT BLVD
GLOUCESTER CITY NJ 08030
877-904-7629

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$976.00 |
| Mileage | 135,844 | 87,782 | -$1,220.64 |
| Equipment | | | |
| CHROMED APPEARANCE PACKAGE | No | Yes | -$89.21 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | No | $30.24 |
| REMOTE VEHICLE STARTER SYSTEM | No | Yes | -$57.46 |
| | | Total Adjustments: | -$2,313.07 |
| | | **Adjusted Price:** | **$6,174.93** |

Comparable Vehicle Package Details:

CHROMED APPEARANCE PACKAGE

Comparable Vehicle Option Details:

REMOTE VEHICLE STARTER SYSTEM

*78,062 miles
.02 mile*

---

**3** | **2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD** | **List Price: $8,495.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582X71127706 | P0814 | 07/31/2019 | 19720 | 25 miles |

Mitchell WorkCenter
Total Loss

PGR_DRUMMOND_0001366

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
NEW CASTLE MOTORS
234 SOUTH DUPONT HIGHWAY
NEW CASTLE DE 19720
800-940-1257

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$977.00 |
| Mileage | 135,844 | 79,379 | -$1,383.46 |
| **Equipment** | | | |
| REGULAR PRODUCTION ACCESSORY, INTERIOR PROTECTION PACKAGE | No | Yes | -$43.88 |
| DRIVER CONFIDENCE PACKAGE | No | Yes | -$378.32 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | DRIVER CONFIDENCE PACKAGE | $30.27 |
| CHROMED APPEARANCE PACKAGE | No | Yes | -$89.28 |
| REMOTE VEHICLE STARTER SYSTEM | No | Yes | -$57.51 |
| SUNROOF, POWER, TILT-SLIDING | No | Yes | -$272.39 |
| REGULAR PRODUCTION ACCESSORY, SPOILER, REAR | No | Yes | -$83.23 |
| SEATS, HEATED DRIVER AND FRONT PASSENGER | No | Yes | -$89.28 |
| WHEELS, 17" (43.2 CM) 8-SPOKE CHROMED ALUMINUM | No | Yes | -$226.99 |

Total Adjustments: **-$3,571.07**
Adjusted Price: **$4,923.93**

Comparable Vehicle Package Details:

REGULAR PRODUCTION ACCESSORY, INTERIOR PROTECTION PACKAGE

DRIVER CONFIDENCE PACKAGE  (SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER, STEERING COLUMN, TILT AND TELESCOPIC, STEERING WHEEL CONTROLS, MOUNTED AUDIO CONTROLS)

CHROMED APPEARANCE PACKAGE

Comparable Vehicle Option Details:

REMOTE VEHICLE STARTER SYSTEM, SUNROOF, POWER, TILT-SLIDING, REGULAR PRODUCTION ACCESSORY, SPOILER, REAR, SEATS, HEATED DRIVER AND FRONT PASSENGER, WHEELS, 17" (43.2 CM) 8-SPOKE CHROMED ALUMINUM

---

**4    2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD**    List Price: **$8,487.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582971218692 | 119217A | 09/26/2019 | 19047 | 28 miles |

Mitchell WorkCenter™
Total Loss

PGR_DRUMMOND_0001367

Source

DEALER WEB LISTING -
BUILDSHEET - AUTOTRADER.COM
TEAM TOYOTA OF LANGHORNE
746 E LINCOLN HWY
LANGHORNE PA 19047
215-741-4200

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$976.00 |
| Mileage | 135,844 | 38,996 | -$1,947.87 |
| Equipment | | | |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | No | $30.24 |
| SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER | No | Yes | -$105.83 |

|  |  |
|---|---|
| Total Adjustments: | -$2,999.46 |
| **Adjusted Price:** | **$5,487.54** |

Comparable Vehicle Option Details.

SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER

---

**5    2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD**     List Price: **$6,995.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582071249863 | N19901A | 09/05/2019 | 19711 | 28 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
PORTER NISSAN
303 E CLEVELAND AVE
NEWARK DE 19711
302-368-6300

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$804.00 |
| Mileage | 135,844 | 62,008 | -$1,414.80 |
| Equipment | | | |
| DRIVER CONFIDENCE PACKAGE | No | Yes | -$311.54 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | DRIVER CONFIDENCE PACKAGE | $24.92 |
| REGULAR PRODUCTION ACCESSORY, INTERIOR PROTECTION PACKAGE | No | Yes | -$36.14 |
| CHROMED APPEARANCE PACKAGE | No | Yes | -$73.52 |
| SEATS, HEATED DRIVER AND FRONT PASSENGER | No | Yes | -$73.52 |
| REMOTE VEHICLE STARTER SYSTEM | No | Yes | -$47.35 |
| WHEELS, 17" (43.2 CM) 8-SPOKE CHROMED ALUMINUM | No | Yes | -$186.92 |
| XM SATELLITE RADIO. | No | Yes | -$49.60 |

|  |  |
|---|---|
| Total Adjustments: | -$2,972.47 |
| **Adjusted Price:** | **$4,022.53** |

Comparable Vehicle Package Details.



Mitchell WorkCenter
Total Loss

PGR_DRUMMOND_0001368

DRIVER CONFIDENCE PACKAGE  (SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER, STEERING COLUMN, TILT AND TELESCOPIC, STEERING WHEEL CONTROLS, MOUNTED AUDIO CONTROLS)

REGULAR PRODUCTION ACCESSORY, INTERIOR PROTECTION PACKAGE

CHROMED APPEARANCE PACKAGE

Comparable Vehicle Option Details:

SEATS, HEATED DRIVER AND FRONT PASSENGER, REMOTE VEHICLE STARTER SYSTEM, WHEELS, 17" (43.2 CM) 8-SPOKE CHROMED ALUMINUM, XM SATELLITE RADIO.

---

**6**  **2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD**    **List Price: $7,295.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582971200094 | 200094 | 08/05/2019 | 19555 | 54 miles |

| Source | Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|---|
| DEALER WEB LISTING - BUILDSHEET - VAST.COM | Projected Sold Adjustment | | | -$839.00 |
| PERRY AUTO SERVICES &AMP; SALES | Mileage | 135,844 | 64,421 | -$1,435.44 |
| 12 BELLEVUE AVE | Equipment | | | |
| SHOEMAKERSVILLE PA 19555 | DRIVER CONFIDENCE PACKAGE | No | Yes | -$324.88 |
| 610-562-7192 | STEERING COLUMN, TILT AND TELESCOPIC | Yes | DRIVER CONFIDENCE PACKAGE | $25.99 |
| | CHROMED APPEARANCE PACKAGE | No | Yes | -$76.67 |
| | REMOTE VEHICLE STARTER SYSTEM | No | Yes | -$49.38 |
| | XM SATELLITE RADIO. | No | Yes | -$51.72 |

|  |  |
|---|---|
| Total Adjustments: | -$2,751.10 |
| **Adjusted Price:** | **$4,543.90** |

Comparable Vehicle Package Details:

DRIVER CONFIDENCE PACKAGE  (SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER, STEERING COLUMN, TILT AND TELESCOPIC, STEERING WHEEL CONTROLS, MOUNTED AUDIO CONTROLS)

CHROMED APPEARANCE PACKAGE

Comparable Vehicle Option Details:

REMOTE VEHICLE STARTER SYSTEM, XM SATELLITE RADIO.

---

**7**  **2007 BUICK LACROSSE CXL 4D SDN 6 3.8 NORMAL GAS A2WD**    **List Price: $6,999.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2G4WD582171244431 | 244431-SOM118 | 09/30/2019 | 07060 | 67 miles |

Mitchell WorkCenter
Total Loss

PGR_DRUMMOND_0001369

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM

M & R AUTO SALES

505 SOMERSET STREET

NORTH PLAINFIELD NJ 07060

908-755-1400

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$805.00 |
| Mileage | 135,844 | 99,945 | -$813.46 |
| Equipment | | | |
| DRIVER CONFIDENCE PACKAGE | No | Yes | -$311.69 |
| STEERING COLUMN, TILT AND TELESCOPIC | Yes | DRIVER CONFIDENCE PACKAGE | $24.94 |
| CHROMED APPEARANCE PACKAGE | No | Yes | -$73.56 |
| SEATS, HEATED DRIVER AND FRONT PASSENGER | No | Yes | -$73.56 |

|  |  |
|---|---|
| Total Adjustments: | -$2,052.33 |
| **Adjusted Price:** | **$4,946.67** |

Comparable Vehicle Package Details:

DRIVER CONFIDENCE PACKAGE  (SEAT ADJUSTER, FRONT PASSENGER 6-WAY POWER, STEERING COLUMN, TILT AND TELESCOPIC, STEERING WHEEL CONTROLS, MOUNTED AUDIO CONTROLS)

CHROMED APPEARANCE PACKAGE

Comparable Vehicle Option Details:

SEATS, HEATED DRIVER AND FRONT PASSENGER

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2007 Buick LaCrosse CXL | 4 Door Sedan 3.8L 6 Cyl Gas  FWD | $24,840.00 |

Mitchell WorkCenter
Total Loss

PGR_DRUMMOND_0001370

## Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

Any person who knowingly and with intent to defraud any insurer, self-insured, insurance licensee, person or the public files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.  Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000.

PGR_DRUMMOND_0001371

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies  (800) 321-9843



mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 21-7033227-01 | | COLLISION | LYNN FREEMAN 500 DATE PALM CIRCLE AIKEN, SC 29803 +1-803-6711069 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 05/11/2021 | 05/11/2021 | 05/19/2021 | 1012257687 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2020 | Chevrolet | Equinox LS 4 Door Utility 107" WB 1.5L 4 Cyl Gas Turbocharged A FWD | SC 29803 | 23,122 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Summit White | | 3GNAXHEV2LS547830 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $20,531.63 |
| Condition | $0.00 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| Market Value = | $20,531.63 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $2,000.00 |
| Settlement Value = | $18,531.63 |

## Settlement Value:
# $18,531.63

**EXHIBIT**
8-Merritt

Mitchell WorkCenter
Total Loss
© 2019 Mitchell International, Inc. All Rights Reserved

**J.D. POWER**

# Loss Vehicle Detail

Loss vehicle: 2020 Chevrolet Equinox | LS 4 Door Utility 107" WB | 1.5L 4 Cyl Gas Turbocharged A FWD

## Standard Equipment

### Exterior

| | |
|---|---|
| Active aero shutters | Door handles, body-color |
| Glass, acoustic, laminated windshield | Glass, solar absorbing, light |
| Headlamp control, automatic on and off with automatic delay | Headlamp control, IntelliBeam auto high beam |
| Headlamps, halogen composite | Liftgate, rear manual |
| Mirror caps, Black | Mirrors, outside heated power-adjustable, manual-folding |
| Tire, compact spare, T135/70R16 blackwall | Tires, P225/65R17 all-season blackwall (FWD only.) |
| Trim, Black lower window | Wheel, spare, 16" (40.6 cm) steel |
| Wheels, 17" (43.2 cm) aluminum | |

### Interior

| | |
|---|---|
| 4G LTE Wi-Fi Hotspot capable (Terms and limitations apply. See onstar.com or dealer for details.) | Air conditioning, semi-automatic, single-zone |
| Antenna, roof-mounted (Black.) | Assist handle, driver |
| Assist handle, front passenger | Audio system, Chevrolet Infotainment 3 system, 7" diagonal color touchscreen, AM/FM stereo. Additional features for compatible phones include: Bluetooth audio streaming for 2 active devices, voice command pass-through to phone, Apple CarPlay and Android Auto capable. |
| Audio system feature, 6-speaker system | |
| Bluetooth for phone personal cell phone connectivity to vehicle audio system (Go to my.chevrolet.com/learn to find out which phones are compatible with the vehicle.) | Chevrolet Connected Access capable (Subject to terms. See onstar.com or dealer for details.) |
| Cruise control, electronic with set and resume speed | Defogger, rear-window electric |
| Display, driver instrument information enhanced, monochromatic | Door locks, power with lock-out protection |
| Floor mats, carpeted front | Floor mats, carpeted rear |
| Head restraints, 2-way adjustable (up/down), front | Keyless Open includes extended range Remote Keyless Entry with lock and unlock feature |
| Keyless Start, push-button | Map pocket, driver seatback |
| Map pocket, front passenger seatback | Mirror, inside rearview manual day/night |
| Noise control system, active noise cancellation | Power outlet, cargo area auxiliary, 12-volt |
| Power outlet, front auxiliary, 12-volt | Remote panic alarm |
| Seat adjuster, driver 4-way manual, fore/aft, up/down | Seat adjuster, front passenger 4-way manual |
| Seat trim, premium cloth | Seat, rear split-folding with center armrest |
| Seats, front bucket | Shift lever, chrome-trimmed |
| SiriusXM Radio delete | Speedometer, miles/kilometers |
| Steering column, tilt and telescoping | Steering wheel controls, audio, phone interface and driver information center controls |
| Steering wheel, 3-spoke, deluxe | Theft-deterrent system, unauthorized entry |
| USB charging-only ports, 2, located in the rear of the floor console | USB ports, 2, with auxiliary input jack, located in front center stack storage area |
| Visors, driver and front passenger illuminated vanity mirrors, covered | Window, power with driver Express-Up and Down |

Mitchell **WorkCenter**
Total Loss

PGR_FREEMAN_0000357

| | |
|---|---|
| Window, power with front passenger Express-Down | Windows, power, rear with express-down |

## Mechanical

| | |
|---|---|
| Axle, 3.50 final drive ratio (FWD only.) | Brake lining, high-performance, noise and dust performance |
| Brake, electronic parking | Brakes, 4-wheel antilock, 4-wheel disc 16" front and rear |
| Driver Shift Controls | Engine control, stop-start system |
| Exhaust, single outlet | Front-wheel drive |
| Fuel, gasoline, E15 | GVWR, 4464 lbs. (2025 kg) (FWD only.) |
| Mechanical jack with tools | Suspension, front MacPherson strut |
| Suspension, rear 4-link | |

## Safety

| | |
|---|---|
| Airbags, dual-stage, frontal, driver and right front passenger with Passenger Sensing System, thorax side-impact, seat mounted, driver and right front passenger, roof-rail, side front and rear outboard seating positions (Always use seat belts and child restraints. Children are safer when properly secured in a rear seat in the appropriate child restraint. See the Owner's Manual for more information.) | Automatic Emergency Braking |
| Daytime Running Lamps, separate cavity, LED | Door locks, rear child security, manual |
| Following Distance Indicator | Forward collision alert |
| Front Pedestrian Braking | Horn, dual-note |
| Lane Keep Assist with Lane Departure Warning | OnStar and Chevrolet connected services capable (Terms and limitations apply. See onstar.com or dealer for details.) |
| Rear seat reminder | Rear vision camera |
| StabiliTrak, stability control system with Traction Control | Teen Driver a configurable feature that lets you activate customizable vehicle settings associated with a key fob, to help encourage safe driving behavior. It can limit certain available vehicle features, and it prevents certain safety systems from being turned off. An in-vehicle report card gives you information on driving habits and helps you to continue to coach your new driver |
| Tire Pressure Monitor, manual learn with Tire Fill Alert (Does not apply to spare tire.) | |

## Packages

LICENSE PLATE FRONT MOUNTING PACKAGE

LS CONVENIENCE PACKAGE
includes (AG1) 8-way power driver seat adjuster, (AL9) 2-way power driver lumbar control and (AKO) deep-tinted rear glass

## Optional Equipment

| | |
|---|---|
| GLASS, DEEP-TINTED, REAR | LPO, WHEEL LOCKS |
| SEAT ADJUSTER, DRIVER 8-WAY POWER WITH 2-WAY POWER LUMBAR | |

*DIO/PIO =   Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle:  2020 Chevrolet Equinox | LS 4 Door Utility 107" WB | 1.5L 4 Cyl Gas Turbocharged A FWD

## Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 11,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2020 CHEVROLET EQUINOX LS 4D SUV 4 1.5TURBO GAS A 2WD | 11,899 | 30907 | 23 miles | $23,887.00 List Price | $22,358.95 |
| 2 | 2020 CHEVROLET EQUINOX LS 4D SUV 4 1.5TURBO GAS A 2WD | 15,084 | 29824 | 31 miles | $20,865.00 List Price | $19,309.18 |
| 3 | 2020 CHEVROLET EQUINOX LS 4D SUV 4 1.5TURBO GAS A 2WD | 18,261 | 30401 | 73 miles | $21,490.00 List Price | $19,926.75 |

**Base Value:**  **$20,531.63**

# Loss Vehicle Adjustments

Loss vehicle: 2020 Chevrolet Equinox | LS 4 Door Utility 107" WB | 1.5L 4 Cyl Gas Turbocharged A FWD

## Condition Adjustments

Condition Adjustment: $0.00          Overall Condition: 3.00-Good          Typical Vehicle Condition: 3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| HEADLINER | 3 Good | accident related |
| GLASS | 3 Good | no damage |
| CARPET | 3 Good | some non permanent soiling/staining |
| DASH/CONSOLE | 3 Good | non permanent marks/soiling, small cut/gouge |
| DOORS/INTERIOR PANELS | 3 Good | non permanent marks/soiling. 1 to 2 small cuts/gouges |
| SEATS | 3 Good | some non permanent soiling/staining, single permanent soil |
| **Exterior** | | |
| TRIM | 3 Good | minimal surface scratches |
| BODY | 3 Good | isolated ding, rt roof rail |
| VINYL/CONVERTIBLE TOP | Typical | |
| PAINT | 3 Good | isolated small scratches |
| **Mechanical** | | |
| ENGINE | 3 Good | some oil/fluid building around covers and gaskets |
| TRANSMISSION | 3 Good | some oil/fluid building around covers and gaskets |
| **Tire** | 3 Good | lf 5/32, rf 5/32, rr 6/32, lr 6/32 |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:



PGR_FREEMAN_0000359

## Comparable Vehicles

Loss vehicle: 2020 Chevrolet Equinox | LS 4 Door Utility 107" WB | 1.5L 4 Cyl Gas Turbocharged A FWD

### 2020 CHEVROLET EQUINOX LS 4D SUV 4 1.5 TURBO GAS A2WD

List Price: **$23,887.00**

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3GNAXHEV9LS675417 | CUT002541 | 05/15/2021 | 30907 | 23 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - AUTOTRADER.COM

MILTON RUBEN CHEVROLET

3516 WASHINGTON RD

AUGUSTA GA 30907

706-868-0588

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,171.00 |
| Mileage | 23,122 | 11,899 | -$1,048.05 |
| Equipment | | | |
| LICENSE PLATE FRONT MOUNTING PACKAGE | Yes | No | $34.55 |
| LS CONVENIENCE PACKAGE | Yes | No | $591.66 |
| LPO, WHEEL LOCKS | Yes | No | $64.79 |

Total Adjustments: -$1,528.05

**Adjusted Price: $22,358.95**

Mitchell **WorkCenter**
Total Loss

PGR_FREEMAN_0000360

## 2020 CHEVROLET EQUINOX LS 4D SUV 4 1.5 TURBO GAS A2WD

**List Price: $20,865.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3GNAXHEV0LS527060 | 26791 | 03/04/2021 | 29824 | 31 miles |

| Source | Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|---|
| DEALER WEB LISTING - BUILDSHEET - CARS.COM | Projected Sold Adjustment | | | -$1,019.00 |
| PENDARVIS CHEVROLET | Mileage | 23,122 | 15,084 | -$623.61 |
| 650 AUGUSTA RD | Equipment | | | |
| EDGEFIELD SC 29824 | LICENSE PLATE FRONT MOUNTING PACKAGE | Yes | No | $30.19 |
| 803-637-3137 | LPO, WHEEL LOCKS | Yes | No | $56.60 |

| | | |
|---|---|---|
| | Total Adjustments: | -$1,555.82 |
| | **Adjusted Price:** | **$19,309.18** |

**Comparable Vehicle Package Details:**

LS CONVENIENCE PACKAGE  (SEAT ADJUSTER, DRIVER 8-WAY POWER WITH 2-WAY POWER LUMBAR, GLASS, DEEP-TINTED, REAR)

---

## 2020 CHEVROLET EQUINOX LS 4D SUV 4 1.5 TURBO GAS A2WD

**List Price: $21,490.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3GNAXHEV2LS683763 | 233028B | 03/04/2021 | 30401 | 73 miles |

| Source | Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|---|
| DEALER WEB LISTING - BUILDSHEET - CARS.COM | Projected Sold Adjustment | | | -$1,050.00 |
| DANIELS CHEVROLET BUICK GMC TRUCKS | Mileage | 23,122 | 18,261 | -$342.26 |
| 365 E MAIN ST | Equipment | | | |
| SWAINSBORO GA 30401 | LPO, FLOOR LINER PACKAGE | No | Yes | -$229.28 |
| 478-237-4111 | LPO, WHEEL LOCKS | Yes | No | $58.29 |

| | | |
|---|---|---|
| | Total Adjustments: | -$1,563.25 |
| | **Adjusted Price:** | **$19,926.75** |

**Comparable Vehicle Package Details:**

LICENSE PLATE FRONT MOUNTING PACKAGE

LS CONVENIENCE PACKAGE  (SEAT ADJUSTER, DRIVER 8-WAY POWER WITH 2-WAY POWER LUMBAR, GLASS, DEEP-TINTED, REAR)

LPO, FLOOR LINER PACKAGE


Mitchell WorkCenter
Total Loss

PGR_FREEMAN_0000361

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2020 Chevrolet Equinox LS | 4 Door Utility 107" WB 1.5L 4 Cyl Gas Turbocharged  FWD | $26,300.00 |

## Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.


Mitchell **WorkCenter**
Total Loss

PGR_FREEMAN_0000362

Claim # 21-7033227-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 8

PGR_FREEMAN_0000363

# EXHIBIT 1
# MERRITT





# Jason W. Merritt

East Coast Auto Appraisers LLC

Cumberland, Maryland 21502

301-804-0224

jason@eastcoastautoappraisers.com

**Merritt's Alignment Service**                                                   January 1980-Oct 1987

Authorized Maryland State Inspections mechanic. Certified and licensed to perform safety inspections for the state of Maryland. Certified in passenger cars. Light duty trucks, and light duty trailers. Certified as the youngest mechanic by the state of Maryland to perform safety inspections.

During this tenure multiple safety inspections were conducted. The Maryland State Inspection procedure is one of the most detailed and thorough state inspection process.
During this tenure I received experience and training in the mechanical aspects and systems of all motor vehicles.

**Maryland State Police**                                                        Oct 1987- June 2015

October 1987- Entered the Maryland State Police as a Cadet. Served in the Commercial Vehicle Enforcement Unit. During this time, I was certified federally as a Level 1 Inspector for Commercial Vehicles. Level 1 inspections are the highest level of inspections set forth by the Federal Motor Carrier Safety Standards and are recognized at the State and Federal Level. At that same time, I received Hazard Materials Certification and training. I was the first Cadet in the state of Maryland to be certified to conduct Level 1 inspections of commercial vehicles. I conducted accident investigations of commercial vehicles. I performed more than 1000 inspections during this tenure.

August 1990- Graduated the Police Academy and was certified as Police Officer by the Maryland Police Training Commission. Was instructed and certified to conduct accident investigations. During this Academy training many hours were dedicated to Accident Investigations.

August 1990- March 1998 Assigned to Road Patrol throughout the state of Maryland. During that time, I handled numerous high-level Criminal Investigations for multiple thefts as well as assaults and fatal accidents.

March 1998- June 2015

Assigned to the Criminal Enforcement Division, Columbia, Maryland

I was assigned to the C3I Narcotics Unit. This is a multi-jurisdictional Unit that is comprised with multiple agencies and is supervised by the Maryland State Police. During this time as a Narcotics Investigator, I have received many commendations and awards for service.

I have conducted and assisted with more than 4500 investigations and conducted more than 3500 arrests. I have been the author of and assisted with more than 800 Search and Seizure Warrants.

The C3I Narcotics Unit has received numerous awards and recognitions for Outstanding Performance in Narcotics Investigations. While in this capacity I have worked with multiple agencies to include but not limited to the FBI, DEA, ATF, FDA, and Multiple Police Departments throughout Maryland, West Virginia, Virginia, California, Colorado, and Pennsylvania. I have previously been deputized federally with the DEA and the FBI on case specific investigations.

I have worked in a covert capacity for undercover investigations, and I have managed more than 1000 criminal informants as well as held caseloads of more than 30 cases at a time. I have testified for the prosecution in many Federal cases. I have been involved in many Federal Level investigations that required testimony and litigation on the state and federal levels. I have taught in the subjects of narcotics, Interview and Interrogation, Confidential Informants, Courtroom Conduct and Testimony, as well as 4th Amendment Law.

I was responsible for the maintenance and acquisition of vehicles of the unit. I was also responsible for the development and design of vehicle equipment and undercover technology used in the vehicles.

I was submitted and verified as an Expert Witness in District and Circuit Courts in the State of Maryland. I have been a witness in numerous courts throughout the state of Maryland the Federal Court system.

I have testified in many criminal and civil cases over 30 years.


Training;

Maryland State Police

Police Academy, Yearly Training to maintain my certification as a Police Officer.

Criminal Investigations

Advanced Criminal investigations.

Narcotics Investigator

DEA Investigators School

Interview and Interrogation

Criminal Informants

Numerous other Narcotics Investigators Trainings throughout the country.

Mobile Forensics Certification

Drug Diversion Training

Accident Investigation

Advance Accident Investigation

**June 2015-August 2016 Merritt's Automotive LLC**
I acquired and assumed a family business in the automotive industry. I was certified through the State of Maryland for automotive safety inspections. I was again certified by the state of Maryland and the Maryland State Police to conduct Safety Inspections on Passenger Vehicles including light duty trucks, and trailers. During this time, I conducted several hundred Certified Safety inspections.

**August 2016 – June 2019   Timbrook Automotive**
I joined the Timbrook Automotive Organization to assist and direct the opening of a motorcycle dealership in Winchester, VA. I assisted in the establishment of that business in the state of Virginia that included permitting licensing etc. I established an online presence and supervised all departments of the dealership from sales to service and marketing. I was responsible for management of employees as well as hiring. I was also responsible and assisted with the discipline of employees and customer relations.
I was the manager of the service department to include the overseeing of the mechanical work performed. I established and conducted several hundred appraisals for the banking industry and received training through Honda USA for safety standards as well as mechanical and technological advances. The Timbrook Automotive Group is a corporation that involves more than ten dealerships and numerous manufactures. I was called upon by many of the dealerships in the organization to conduct appraisals.

**June 2019- Present T3 Intelligence Services**
I am a managing and working partner of this security and private investigation firm. I conduct investigations on all matters. Some cases are criminal, and some are civil.
I have been involved with the insurance industry and have been involved in active investigations with Insurance fraud as well as Workman's Comp fraud.
I am a licensed and certified Private Detective through the Maryland State Police. I also carry an Armed Security Firm License.
I have more than 6 employees that provide security services as well as Executive Protection details.

I have conducted and advised on several civil cases involving motor vehicle accidents. We also conduct investigations for Asset Recovery of motor vehicles and large vessels.

**April 2020- Present East Coast Auto Appraisers LLC**  www.eastcoastautoappraisers.com

Partnership Owner and operator of this business. I hold a certification through the Bureau of Certified Auto Appraisers located in Houston Texas. This certification has requirements that include classroom training as well as experience in the fields of Total Loss, Loss of Use, Depreciation Value, Actual Cash Value and Classic Values. The certification standards include the knowledge and identification of vehicles that have been damaged through accidents or the elements.
These appraisals detail any damage to the structure of a vehicle, and I am trained and experienced in the detection of repairs or current damage to frames and subframe systems of vehicles.
I have been able to combine my any years of mechanical experience with the investigative training to establish market values of all types of vehicles. Specialty experience in Umpire callings for certified vehicle appraisals.

**Certifications**
Advanced Accident Investigator
Certified as a Level 4 Motor Vehicle Safety Inspector
Hazardous Material Responder/Inspector
Certified Police Officer Maryland Police Training Commission
Maryland Certified Safety Inspector for multiple classes of motor vehicles
Maryland Certified Salesman
Private Investigator
Certified Auto Appraiser BOCAA



# EXHIBIT 1
# MERRITT



EXHIBIT

10-Merritt



# Jason W. Merritt

East Coast Auto Appraisers LLC

Cumberland, Maryland 21502

301-804-0224

jason@eastcoastautoappraisers.com

**Merritt's Alignment Service**                                    January 1980-Oct 1987

Authorized Maryland State Inspections mechanic. Certified and licensed to perform safety inspections for the state of Maryland. Certified in passenger cars. Light duty trucks, and light duty trailers. Certified as the youngest mechanic by the state of Maryland to perform safety inspections.

During this tenure multiple safety inspections were conducted. The Maryland State Inspection procedure is one of the most detailed and thorough state inspection process.
During this tenure I received experience and training in the mechanical aspects and systems of all motor vehicles.


**Maryland State Police**                                          Oct 1987- June 2015

October 1987- Entered the Maryland State Police as a Cadet. Served in the Commercial Vehicle Enforcement Unit. During this time, I was certified federally as a Level 1 Inspector for Commercial Vehicles. Level 1 inspections are the highest level of inspections set forth by the Federal Motor Carrier Safety Standards and are recognized at the State and Federal Level. At that same time, I received Hazard Materials Certification and training. I was the first Cadet in the state of Maryland to be certified to conduct Level 1 inspections of commercial vehicles. I conducted accident investigations of commercial vehicles. I performed more than 1000 inspections during this tenure.

August 1990- Graduated the Police Academy and was certified as Police Officer by the Maryland Police Training Commission. Was instructed and certified to conduct accident investigations. During this Academy training many hours were dedicated to Accident Investigations.

August 1990- March 1998 Assigned to Road Patrol throughout the state of Maryland. During that time, I handled numerous high-level Criminal Investigations for multiple thefts as well as assaults and fatal accidents.

March 1998- June 2015

Assigned to the Criminal Enforcement Division, Columbia, Maryland

I was assigned to the C3I Narcotics Unit. This is a multi-jurisdictional Unit that is comprised with multiple agencies and is supervised by the Maryland State Police. During this time as a Narcotics Investigator, I have received many commendations and awards for service.

I have conducted and assisted with more than 4500 investigations and conducted more than 3500 arrests. I have been the author of and assisted with more than 800 Search and Seizure Warrants.

The C3I Narcotics Unit has received numerous awards and recognitions for Outstanding Performance in Narcotics Investigations. While in this capacity I have worked with multiple agencies to include but not limited to the FBI, DEA, ATF, FDA, and Multiple Police Departments throughout Maryland, West Virginia, Virginia, California, Colorado, and Pennsylvania. I have previously been deputized federally with the DEA and the FBI on case specific investigations.

I have worked in a covert capacity for undercover investigations, and I have managed more than 1000 criminal informants as well as held caseloads of more than 30 cases at a time. I have testified for the prosecution in many Federal cases. I have been involved in many Federal Level investigations that required testimony and litigation on the state and federal levels. I have taught in the subjects of narcotics, Interview and Interrogation, Confidential Informants, Courtroom Conduct and Testimony, as well as 4th Amendment Law.

I was responsible for the maintenance and acquisition of vehicles of the unit. I was also responsible for the development and design of vehicle equipment and undercover technology used in the vehicles.

I was submitted and verified as an Expert Witness in District and Circuit Courts in the State of Maryland. I have been a witness in numerous courts throughout the state of Maryland the Federal Court system.

I have testified in many criminal and civil cases over 30 years.


Training;

Maryland State Police

Police Academy, Yearly Training to maintain my certification as a Police Officer.

Criminal Investigations

Advanced Criminal investigations.

Narcotics Investigator

DEA Investigators School

Interview and Interrogation

Criminal Informants

Numerous other Narcotics Investigators Trainings throughout the country.

Mobile Forensics Certification

Drug Diversion Training

Accident Investigation

Advance Accident Investigation

**June 2015-August 2016 Merritt's Automotive LLC**
I acquired and assumed a family business in the automotive industry. I was certified through the State of Maryland for automotive safety inspections. I was again certified by the state of Maryland and the Maryland State Police to conduct Safety Inspections on Passenger Vehicles including light duty trucks, and trailers. During this time, I conducted several hundred Certified Safety inspections.

**August 2016 – June 2019   Timbrook Automotive**
I joined the Timbrook Automotive Organization to assist and direct the opening of a motorcycle dealership in Winchester, VA. I assisted in the establishment of that business in the state of Virginia that included permitting licensing etc. I established an online presence and supervised all departments of the dealership from sales to service and marketing. I was responsible for management of employees as well as hiring. I was also responsible and assisted with the discipline of employees and customer relations.
I was the manager of the service department to include the overseeing of the mechanical work performed. I established and conducted several hundred appraisals for the banking industry and received training through Honda USA for safety standards as well as mechanical and technological advances. The Timbrook Automotive Group is a corporation that involves more than ten dealerships and numerous manufactures. I was called upon by many of the dealerships in the organization to conduct appraisals.

**June 2019- Present T3 Intelligence Services**
I am a managing and working partner of this security and private investigation firm. I conduct investigations on all matters. Some cases are criminal, and some are civil.
I have been involved with the insurance industry and have been involved in active investigations with Insurance fraud as well as Workman's Comp fraud.
I am a licensed and certified Private Detective through the Maryland State Police. I also carry an Armed Security Firm License.
I have more than 6 employees that provide security services as well as Executive Protection details.

I have conducted and advised on several civil cases involving motor vehicle accidents. We also conduct investigations for Asset Recovery of motor vehicles and large vessels.

**April 2020- Present East Coast Auto Appraisers LLC**  www.eastcoastautoappraisers.com

Partnership Owner and operator of this business. I hold a certification through the Bureau of Certified Auto Appraisers located in Houston Texas. This certification has requirements that include classroom training as well as experience in the fields of Total Loss, Loss of Use, Depreciation Value, Actual Cash Value and Classic Values. The certification standards include the knowledge and identification of vehicles that have been damaged through accidents or the elements.
These appraisals detail any damage to the structure of a vehicle, and I am trained and experienced in the detection of repairs or current damage to frames and subframe systems of vehicles.
I have been able to combine my any years of mechanical experience with the investigative training to establish market values of all types of vehicles. Specialty experience in Umpire callings for certified vehicle appraisals.

**Certifications**
Advanced Accident Investigator
Certified as a Level 4 Motor Vehicle Safety Inspector
Hazardous Material Responder/Inspector
Certified Police Officer Maryland Police Training Commission
Maryland Certified Safety Inspector for multiple classes of motor vehicles
Maryland Certified Salesman
Private Investigator
Certified Auto Appraiser BOCAA



10/6/22, 5:24 PM                    Bureau of Certified Auto Appraisers - BOCAA - Become a IACP Auto Appraiser



## Appraiser Status Results

jason merritt

Search    Reset

1 to 1 of 1 total listings

| Appraiser Name | Location | IACP Certification # | Status | Expiration |
|---|---|---|---|---|
| Jason Merritt | MD | 991911100 | Active | 05/27/2022 |

« Prev | 1 | Next »



EXHIBIT

11-Merritt

0/12/22 11:32 AM    Homepage – East Coast Auto Appraisers

Dimished Value Appraisal        Farm & Heavy        Expert Witness        Asset Recovery

Private Owners        Classic Cars        Lenders        Insurance



**Whether you need an appraisal for insurance, lending, sales, or other reasons, turn to the experts at East Coast Auto Appraisers for a fast, affordable, and accurate appraisal!**

Contact Us Today!

## Make the Turn to the Professionals!

East Coast Auto Appraisers specializes in providing independent, accurate appraisals of cars, trucks, motorcycles, boats, RVs, and other motorized land and marine vehicles.

**Here are some examples of how our services can make the difference:**

EXHIBIT

12 - Merritt

## Reevaluate Total Loss

Independent, second-opinion total loss appraisals can help you get a fair insurance settlement.

## Diminished Value Reports

Our diminished value reports will help you document and recoup your vehicle's diminished value from the at-fault insurance company.

## Verify Repair Estimates

Our examination of repair estimates gives you the knowledge needed to identify fair and honest collision repair specialists.

## True Stated Value

A stated value appraisal can help you reduce insurance costs.

Turn to the Experts for Your Appraisal!
Contact Us Today!

Home

Our Services

About Us

What Is an Appraisal?

Why Use an Independent Appraiser?

Privacy Policy

**EXPERIENCE TO MAKE THE DIFFERENCE**

Our experts have over 35 years of experience in all aspects of the motor vehicle industry, and we've seen it all. We are located in Cumberland, MD, and are experienced in the major



Contact Us



east coast auto markets.
Turn to us to get the most
accurate assessment of your
vehicle, and have the
confidence to know where
you stand in any transaction!

Reach out to us today and
find out how we can help
you.

EAST COAST AUTO APPRAISERS © 2022

What Is an Appraisal? – East Coast Auto Appraisers

Dimished Value Appraisal        Farm & Heavy        Expert Witness        Asset Recovery

Private Owners        Classic Cars        Lenders        Insurance



# What Exactly Is an Appraisal?

East Coast Auto Appraisers follows a detailed, comprehensive process when conducting an appraisal. Steps include but are not limited to vehicle identification number (VIN) verification, a vehicle history report, and an assessment of the vehicle's make, model, options/features, mileage, and overall condition, which includes mechanical issues, general wear, and interior and exterior cosmetic blemishes. Other factors, depending on the purpose of the appraisal, may include an assessment of the area's supply



EXHIBIT
13 Merritt

and demand of the specific
make and model of the vehicle.

Contact Us Today! 

Home

Our Services

About Us

What Is an Appraisal?

Why Use an Independent
Appraiser?

Privacy Policy

Contact Us

**EXPERIENCE TO MAKE
THE DIFFERENCE**

Our experts have over 35
years of experience in all
aspects of the motor vehicle
industry, and we've seen it
all. We are located in
Cumberland, MD, and are
experienced in the major
east coast auto markets.
Turn to us to get the most
accurate assessment of your
vehicle, and have the
confidence to know where
you stand in any transaction!

Reach out to us today and
find out how we can help
you.





EAST COAST AUTO APPRAISERS © 2022