Jason Merritt                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3    KEDDRICK BROWN, INDIVIDUALLY,

4    AND ON BEHALF OF ALL OTHERS

5    SIMILARLY SITUATED,

6              Plaintiff           Case No.

7        vs.                       3:21-cv-00175-TCB

8    PROGRESSIVE MOUNTAIN

9    INSURANCE COMPANY,

10             Defendants

11   - - - - - - - - - - - - - - - -

12   MICHELLE BOST, INDIVIDUALLY,

13   AND ON BEHALF OF ALL OTHERS

14   SIMILARLY SITUATED,

15             Plaintiff.

16       vs.

17   PROGRESSIVE PREMIER INSURANCE

18   COMPANY OF ILLINOIS,

19             Defendants

20   - - - - - - - - - - - - - - - -

21   TAYLOR COSTELLO, INDIVIDUALLY,

Page 2

1   AND ON BEHALF OF ALL OTHERS

2   SIMILARLY SITUATED,

3              Plaintiff              Case No.

4        vs.                         2:22-CV-0035

5   MOUNTAIN LAUREL ASSURANCE COMPANY; TAB CRW

6              Defendant,

7   _____/

8              Pursuant to Notice, the videotaped

9        deposition of JASON MERRITT was taken on

10       Friday, April 14, 2023, commencing at 9:59

11       a.m., at the offices of King & Spalding, 1700

12       Pennsylvania Avenue, N.W., Washington, D.C.,

13       before David C. Corbin, a Registered

14       Professional Reporter and Notary Public.

15

16

17

18

19

20

21              REPORTED BY:  David Corbin, RPR

Jason Merritt                                                        April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                                          Page 3

1               A P P E A R A N C E S

2        ON BEHALF OF THE PLAINTIFFS:

3              CHRISTOPHER GOLD, ESQUIRE

4              Edelsberg Law

5              20900 NE 30th Avenue, Suite 417

6              Aventura, Florida  33180

7              chris@edelsberglaw.com

8        ON BEHALF OF THE DEFENDANTS:

9              JEFF CASHDAN, ESQUIRE

10             DANIEL SANDERS, ESQUIRE

11             King & Spalding

12             1180 Peachtree Street, N.E.

13             Atlanta, Georgia  30309-3521

14             jcashdan@kslaw.com

15

16    VIDEOGRAPHER:  Jonathan Perry

17

18

19

20

21

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                              Page 4

1                      I N D E X

2    Name of Witness

3    Jason Merritt

4    Examination:                                              Page

5    By Mr. Cashdan                                              7

6

7                   E X H I B I T S

8    Exhibit 1 Merritt report in Brown case            8

9    Exhibit 2 Merritt report in Costello case          8

10   Exhibit 3 Volino transcript                       10

11   Exhibit 4 Drummond and Freeman transcript          10

12   Exhibit 5 Merritt resume                          12

13   Exhibit 6 Merritt resume                          12

14   Exhibit 7 Bureau of Certified Auto Appraisers   14

15        web page

16   Exhibit 8 Web search results                     15

17   Exhibit 9 Subpoena                                75

18   Exhibit 10 Subpoena                               77

19   Exhibit 11 Mitchell valuation report in Brown   78

20   Exhibit 12 Appraisal on Silverado & Ranger       108

21

Page 5

1          IT IS HEREBY STIPULATED AND AGREED that

2     the reading and signing of this deposition are not

3     waived.

4          VIDEOGRAPHER:  We're now on the record.

5          The time is 9:59 a.m.  The date is April 14th,

6          2023.  This is media unit one of the video

7          deposition of Jason Merritt taken in the matter

8          of Keddrick Brown, individually and on behalf

9          of all other similarly situated, versus

10         Progressive Mountain Insurance Company; and

11         Michelle Bost, individually and on behalf of

12         all others similarly situated, versus

13         Progressive Premier Insurance Company of

14         Illinois.  Consolidated case number

15         3:21-CV-00175-TCB.  Case filed in the U.S.

16         District Court for the Northern District of

17         Georgia.  And also taken in the matter of

18         Taylor Costello, individually and on behalf of

19         others similarly situated, versus Mountain

20         Laurel Assurance Company.  Case 2:22-CV-0035

21         TAB CRW.  Case filed in the U.S. District Court

Page 6

1    for the Eastern District of Tennessee.  We're

2    at the offices of King and Spalding, 1700

3    Pennsylvania Avenue, Northwest, in Washington

4    D.C.  The videographer is Jonathan Perry and

5    the court reporter is Dave Corbin, both here on

6    behalf of Veritext.  And would counsel present

7    please introduce themselves and state whom they

8    represent.

9         MR. GOLD:  Good morning.  This is Chris

10   Gold from Edelsberg Law and I represent the

11   plaintiffs and the witness.

12        MR. CASHDAN:  This is Jeff Cashdan of King

13   and Spalding for the defendants.

14        MR. SANDERS:  Daniel Sanders with King and

15   Spalding for the defendants.

16        VIDEOGRAPHER:  And would the reporter

17   swear in the witness.

18              JASON MERRITT,

19   duly been sworn/affirmed to tell the truth, the

20   whole truth, and nothing but the truth, testifies as

21   follows:

Page 7

```
 1                  E X A M I N A T I O N

 2    BY MR. CASHDAN:

 3         Q.    Good morning, Mr. Merritt.  How are you?

 4         A.    Very good.  Good morning.

 5         Q.    Good to see you again.

 6         A.    Yes.

 7         Q.    Just a refresher on some of the ground

 8    rules.  I'll ask questions, please let me finish my

 9    question and then you answer and I'll let you finish

10    your answer, fair?

11         A.    Fair.

12         Q.    And the court reporter needs to pick up

13    oral answers, so please answer yes or no or whatever

14    words you want to use, but shaking of the head won't

15    be picked up, okay?

16         A.    Understood.

17         Q.    If you don't understand any question that

18    I ask, please direct your question for clarification

19    to me and not your counsel, okay?

20         A.    Okay.

21         Q.    If you need a break at any time, let me
```

Page 8

1    know, okay?

2         A.    Thank you.

3         Q.    Let me hand to you what's been marked for

4    identification as Merritt Exhibit 1, which I will

5    represent to you is the report without exhibits that

6    you provided in the Brown case.

7              (Deposition Exhibit 1 marked.)

8         Q.    Is that correct?

9         A.    That is correct.

10        Q.    Okay.  And let me hand to you what's been

11   marked for identification as Exhibit 2, what I'll

12   tell you is the report that you prepared in the

13   Costello case; is that correct?

14             (Deposition Exhibit 2 marked.)

15        A.    That is correct, sir.

16        Q.    Okay.  Am I correct that with the

17   exception of the last part of the reports that

18   calculates the math once you remove the projected

19   sold adjustment, these reports are substantively

20   identical?

21        A.    They are.

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 9

1      Q.   Okay.  I'm going to ask you questions

2   principally then using the Exhibit 1.  If there is a

3   place where there is a difference between Exhibit 1

4   and Exhibit 2, I'll try to point it out.  But if I

5   fail, would you let me know?

6      A.   I will.

7      Q.   Okay, thank you.  You've been deposed

8   before in cases concerning Progressive Insurance

9   company's use of a projected sold adjustment; is

10  that right?

11     A.   I have.

12     Q.   You've been deposed in the Volino case,

13  correct?

14     A.   That is correct.

15     Q.   You were deposed in the Freeman and the

16  Drummond cases, correct?

17     A.   That is correct.

18     Q.   Okay.  Just so the record is clear, I'm

19  not going to spend any time with it unless you want

20  to, but let me mark as Exhibit 3 a copy of the

21  Volino transcript.

Page 10

```
 1           (Deposition Exhibit 3 marked.)

 2      Q.   And let me mark as Exhibit 4 a copy of the

 3  transcript from the Drummond and Freeman cases.

 4           (Deposition Exhibit 4 marked.)

 5      Q.   Can you look at Exhibits 3 and four and

 6  when -- just scan them over real quick, let me know

 7  when you're ready?

 8      A.   I believe I'm ready.

 9      Q.   Is Exhibit 3 a true and correct copy of

10  your testimony from the Volino case?

11      A.   It's multiple pages but it appears to be

12  correct.

13      Q.   And Exhibit 4 is your testimony from the

14  Drummond and Freeman cases?

15      A.   It appears to be, yes.

16      Q.   As you sit here today -- strike that.

17  You've previously had a chance to review these

18  transcripts and to sign them as having accurately

19  transcribed your testimony, correct?

20      A.   I have, yes.

21      Q.   Okay.  And as you sit here today is there
```

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 11

1    any other -- strike that.  To the extent you may

2    have indicated any mistakes, are there any other

3    mistakes you're now aware of with regard to either

4    of these transcripts?

5         A.    Not that I'm aware.

6         Q.    And is your testimony from those cases

7    previously still accurate today?

8         A.    They are.

9         Q.    Okay.  I'm going to try not to waste your

10   time and your counsel's time and everyone else in

11   the room's time by asking you the same questions

12   over and over again that we previously asked you.

13   Is that fair.

14        A.    Understood.  It's already on record.

15        Q.    And you would agree that to the extent I

16   ask you those questions or someone asked you those

17   questions previously and the responses are in

18   Exhibit 3 or Exhibit 4, those responses would still

19   stand today?

20        A.    They do.

21        Q.    Okay.  I'm now handing you what's been

Jason Merritt                                                        April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 12

1    marked for identification as Exhibit 5.

2              (Deposition Exhibit 5 marked.)

3         Q.    And I'll represent to you that Exhibit 5

4    was an attachment to your report for the Brown case,

5    which is Exhibit 1?

6         A.    That is correct.

7         Q.    And is Exhibit 5 is true and correct copy

8    of your resume?

9         A.    It is.

10        Q.    Okay.  I'll hand you now what's been

11   marked -- strike that.  I'll hand you what's now

12   been marked for identification as Exhibit 6, which

13   was the attachment to your report in the Costello

14   case, which is Exhibit 2.  Is Exhibit 6 is true and

15   correct copy of your resume.

16             (Deposition Exhibit 6 marked.)

17        A.    It is a true and -- it is a true copy.

18   The only difference would be my updated

19   certification.

20        Q.    Well, am I correct that Exhibits 5 and

21   Exhibit 6 are precisely what you attached to your

Page 13

1    reports in the Brown and Costello cases?

2          A.    They are.

3          Q.    Okay.  And when you say updated

4    certification, if you take a look at Exhibit 5 and

5    go to the last page, there is a copy of a Bureau of

6    Certified Auto Appraisers certificate; is that

7    right?

8          A.    That is correct.

9          Q.    And the copy that you provided when you

10   provided the report in the Brown case has an

11   expiration date on the certificate of May 27th,

12   2022; is that right?

13         A.    That is correct.

14         Q.    Okay.  And are you saying that you now

15   have updated that?

16         A.    It has been updated.

17         Q.    When was it updated?

18         A.    Right around the expiration date, so right

19   around May of '22.

20         Q.    Okay.  I'm going to hand you what's been

21   marked for identification as Exhibit 7.  Take a

Page 14

```
 1   moment to look at it.

 2           (Deposition Exhibit 7 marked.)

 3       Q.   Let me know when you're ready.

 4       A.   I am ready.

 5       Q.   What is Exhibit 7?

 6       A.   Exhibit 7 looks like a copy of the web

 7   page for the Bureau of Certified Auto Appraisers.

 8       Q.   That's the organization from whom you have

 9   the certification?

10       A.   Yes, sir, it is.

11       Q.   Okay.  And do you see in the -- on the

12   left side of Exhibit 7 at the bottom there is an

13   image of a certificate?

14       A.   Correct.

15       Q.   That's the certificate that looks like the

16   one you have on your resume, correct?

17       A.   It does.

18       Q.   Okay.  And do you see above that there is

19   an appraisal status results search bar?

20       A.   I do.

21       Q.   Okay.  And do you see above it indicates
```

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 15

1   that you can search the web site for the names of

2   appraisers who are certified?

3        A.   I do.

4        Q.   Okay.  Let me hand you what's been marked

5   for identification as Exhibit 8.

6             (Deposition Exhibit 8 marked.)

7        Q.   I'll represent to you that Exhibit 8, this

8   morning at 9:07 a.m. we entered your name in that

9   search bar and these are the results.  Do you see

10  that?

11       A.   I do.

12       Q.   And it says no listings found, correct?

13       A.   That is correct.

14       Q.   And did I spell your name correctly in the

15  search bar?

16       A.   Yes.

17       Q.   Okay.  Why was your -- strike that.  Do

18  you know why no results were found when we searched

19  your name for certified appraisers on the Bureau of

20  Certified Auto Appraisers web site?

21       A.   I have dealt with that before.  I pay a

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 16

1    monthly fee plus I am currently certified.  And I do

2    not know why my name does not appear on there.  But

3    I have addressed that in the past.

4          Q.    How have you addressed that in the past?

5          A.    Phone call to Bureau of Certified

6    Appraisers.

7          Q.    And yet your name still does not appear?

8          A.    It did at one time and then it fell off

9    again.

10          Q.    But you're sure that your certification

11    from the Bureau of Certified Auto Appraisers is

12    current?

13          A.    I am certain.

14          Q.    Okay.  What is the Bureau of Certified

15    Auto Appraisers?

16          A.    There is not many training opportunities

17    out there for auto appraisers.  It is an online --

18    it's an online course.  And in the course it goes

19    over auto appraising.  And throughout that 40 hour

20    course at the end you take a test and you become

21    certified through their organization.

Jason Merritt                                                  April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                              Page 17

1        Q.    Okay.  And to be recertified are you
2    required to take another test?
3        A.    You can take another test, or if you are
4    currently appraising vehicles you can just pay for
5    the recertification.
6        Q.    So if you want to be recertified by the
7    Bureau of Certified Auto Appraisers you're not
8    required to take another test?
9        A.    No.
10       Q.    Is that correct?
11       A.    That is correct.
12       Q.    And you did not take another test?
13       A.    No, I did not.
14       Q.    Are you required -- to maintain your
15   certification by the Bureau of Certified Auto
16   Appraisers, are you required to engage in any
17   continuing education programs?
18       A.    No, you are not.
19       Q.    Have you in fact, since you obtained your
20   certification from the Bureau of Certified Auto
21   Appraisers, engaged in any continuing education

Page 18

1  programs?

2       A.   No, I have not.

3       Q.   No additional classwork?

4       A.   No.

5       Q.   Okay.  Is the Bureau of Certified Auto

6  Appraisers a profit or nonprofit organization?

7       A.   It is a profit.

8       Q.   How many members belong to the

9  organization?

10       A.   I do not know that.

11       Q.   Do you ever interact with other members of

12  the organization?

13       A.   I do refer to Bureau of Certified Auto

14  Appraisers when I have questions about appraisals or

15  networking with other appraisals or appraisers.

16       Q.   Do you have meetings with any members of

17  the organization?

18       A.   No.

19       Q.   Does the organization have any

20  conferences?

21       A.   That I do not know, but I don't believe

Page 19

1    they do.

2         Q.   You never attended one?

3         A.   No, I have not.

4         Q.   Excuse me.  Does the Bureau of Certified

5    Auto Appraisers offer continuing education?

6         A.   No.

7         Q.   There is a reference on this Exhibit 7 to

8    the IACP.  Do you see that?

9         A.   Yes.

10        Q.   What is the IACP?

11        A.   I have not looked into that so I'm not

12   sure what that is.

13        Q.   Okay.  Are you familiar with an

14   organization called the American Society of

15   Appraisers?

16        A.   I have heard of that, yes.

17        Q.   Are you a member?

18        A.   No.

19        Q.   Are you familiar with the Uniform

20   Standards of Professional Appraisal Practice?

21        A.   I am familiar with that term and I'm

Page 20

1    familiar with some of the standards.

2         Q.    You've heard it called USPAP before?

3         A.    I have heard that, yes.

4         Q.    Do you purport to conduct your appraisals

5    in compliance with USPAP standards?

6         A.    USPAP standards normally are for real

7    property and those type of appraisals.  I've reached

8    out to some of the training and there is no training

9    that is specific to auto appraising.  So I tried

10   to -- well, I use some of their standards for

11   general methodology as well as ethics.

12        Q.    What I'm asking though is when you prepare

13   appraisals do you certify that you have done so in

14   conformity with the USPAP requirements?

15        A.    No.

16        Q.    Have you ever been certified as a USPAP

17   appraisal -- appraiser?

18        A.    No.  No.

19        Q.    Have you ever been accredited as a USPAP

20   appraiser?

21        A.    I have not.

Jason Merritt                                          April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                    Page 21

 1        Q.    Is there a difference between being

 2   certified and being accredited in the appraisal

 3   world?

 4        A.    No.

 5        Q.    Okay.  Are you familiar with the USPAP

 6   standards?

 7        A.    I'm familiar with a few of those.

 8             MR. GOLD:  Just going to object to this

 9        line of questioning.  But go ahead.

10             MR. CASHDAN:  On what grounds?

11             MR. GOLD:  Relevance.  He testified --

12             MR. CASHDAN:  I got it on the record.

13        Thank you.

14             MR. GOLD:  Sure.

15        Q.    Are you familiar with -- strike that.  You

16   said you're familiar with some USPAP standards?

17        A.    I am familiar with some of the standards.

18   I am not familiar with the entire document.

19        Q.    Which standards are you familiar with?

20        A.    I can not recall which ones they are.

21        Q.    Okay.  Are you offering any opinions or

Jason Merritt                                                              April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 22

1    conclusions in this case regarding whether the

2    projected sold adjustment complies with the

3    standards set forth in the Uniform Standards of

4    Professional Appraisal Practice?

5        A.   I am offering an opinion on the PSA, or

6    projected sold adjustment, as in the methodology, in

7    the generally used methodology for appraisals.

8        Q.   I understand that, but I'm asking a

9    specific question.  Are you offering any opinions or

10   conclusions in this matter as to whether the

11   projected sold adjustment complies with the Uniform

12   Standards of Professional Appraisal Practice?

13       A.   No, I'm not.

14       Q.   Okay.  Do you know -- strike that.  Have

15   you ever taken any courses concerning the Uniform

16   Standards of Professional Appraisal Practice as they

17   might apply to automobile appraisals?

18       A.   I have attempted to but there is none.

19       Q.   I'm asking you if you've ever taken any?

20       A.   No.

21       Q.   You have not?

Brown, Keddrick v. Progressive Mountain Insurance Company

Page 23

1       A.    No.

2       Q.    Is that correct?

3       A.    That is correct.

4       Q.    Okay.  Thank you.  Have you taken and

5    passed the 15 hour USPAP course?

6       A.    No, I have not.

7       Q.    Does the Bureau of Certified Auto

8    Appraisers issue standards for appraisals?

9       A.    No, they do not issue the standards.

10       Q.    Does it -- do they issue any standards?

11       A.    No.

12       Q.    Are there any written standards on which

13    you rely for purposes of conducting appraisals?

14       A.    No.

15       Q.    And in your testimony in this case --

16    strike that.  In your opinions and conclusions in

17    this case when you discuss whether the projected

18    sold adjustment comports with appraisal standards,

19    are there any particular standards you are referring

20    to that are in writing?

21       A.    Just the generally accepted standards.

Jason Merritt                                              April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                            Page 24

1       Q.   And where would I find those generally

2   accepted standards in writing?

3       A.   I'm not sure you would find them in

4   writing.

5       Q.   Where can you turn to to find them?

6       A.   I just testified I don't know where they

7   are in writing.

8       Q.   How do you know what they are?

9       A.   Through my experience, through my training

10  through the Bureau, and through my prior appraisals.

11      Q.   When you were trained through the Bureau

12  of Certified Auto Appraisers were you given any

13  materials for courses?

14      A.   No.

15      Q.   Was there any written material you were

16  given?

17      A.   No.

18      Q.   Any handouts you were given?

19      A.   No.

20      Q.   So your training was completely oral?

21      A.   Online and oral, yes.

Jason Merritt                                                April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 25

```
 1        Q.    Okay.  And how long was that training?

 2        A.    Forty hours.

 3        Q.    Okay.  Who was your instructor for the

 4   training?

 5        A.    There was various different instructors.

 6        Q.    Who were they?

 7        A.    I don't recall who they were.

 8        Q.    Okay.  Have you communicated with any of

 9   those instructors since taking their courses?

10        A.    Yes.

11        Q.    Who?

12        A.    One was Mr. Bent, I believe.

13        Q.    B-E-N-T?

14        A.    I believe that is.

15        Q.    And where was Mr. Bent located?

16        A.    He is out of the Bureau.  I think he's in

17   Texas.

18        Q.    Okay.  Anyone else that you can recall who

19   was one of your instructors with whom you

20   communicated with since taking the course?

21        A.    I can not recall.
```

Jason Merritt                                                          April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                          Page 26

1         Q.    Okay.  Are you a member of any

2    professional appraiser organizations other than the

3    Bureau of Certified Auto Appraisers?

4         A.    No, that is it.

5         Q.    To what standard do you write your

6    personal appraisal reports?

7         A.    Explain that better, please.

8         Q.    Sure.  If -- when you're doing your

9    appraisal reports are you writing them to comply

10   with any particular published standard?

11        A.    Yes.

12        Q.    Which one?

13        A.    It is through the Bureau of Certified

14   Appraisers.

15        Q.    Okay.  Any others?

16        A.    No.

17        Q.    And does the Bureau of Certified Auto

18   Appraisers have a written standard you have to

19   comply with for writing appraisals?

20        A.    We have -- sorry.  We have templates that

21   we purchase for each, like actual cash value and

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 27

1    different appraisals, and that's the template that I

2    follow.

3         Q.    I think you said this before, but just to

4    be clear, you do not purport to be writing your

5    appraisals to conform with the Uniform Standards of

6    Professional Appraisal Practice, correct?

7         A.    Correct.

8         Q.    Okay.  How many different approaches to

9    valuation are there for appraisal purposes?

10        A.    Explain that question a little better,

11   please.

12        Q.    Sure.  Is it true that there are three

13   different approaches to valuation for purposes of an

14   appraisal?

15        A.    I don't know what those three are unless I

16   hear what you're talking about.

17        Q.    Okay.  You talk in your report about the

18   comparable market approach, correct?

19        A.    Comparable methodology, yes.

20        Q.    Are there other methodologies you can use

21   to do an appraisal?

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 28

1        A.    I imagine there would be.

2        Q.    Do you know what they are?

3        A.    Off the top of my head I can't recall.

4        Q.    Are you familiar with the cost approach to

5   valuation?

6        A.    No.

7        Q.    Are you familiar with income approach to

8   valuation?

9        A.    No.

10       Q.    Is there a difference between personal

11  property and real property?

12             MR. GOLD:  Objection.

13       Q.    You can answer.

14       A.    I'm only here for autos, so...

15       Q.    Do you know if auto is considered a

16  personal property or real property for appraisal

17  purposes?

18       A.    That would be personal property.

19       Q.    Excuse me.

20       A.    That would be personal property.

21       Q.    And do you know the difference between

Page 29

1    personal property and real property for appraisal

2    purposes?

3         A.    Real property would be homes, businesses,

4    commercial.  I do not do those.

5         Q.    What type of appraisals do you do?

6         A.    Automobiles, vehicles.

7         Q.    What type of automobiles?

8         A.    Any types of automobiles.

9         Q.    Do you do -- do you do used?

10        A.    Used, classic, antique, total loss, actual

11   cash value.

12        Q.    Do you do boats?

13        A.    Yes.

14        Q.    Motorcycles?

15        A.    Yes.

16        Q.    Do you consider yourself to be qualified

17   as an expert in boat appraisals?

18        A.    I would consider myself an expert in boat

19   appraisals, yes.

20        Q.    How about in motorcycle appraisals?

21        A.    Yes.

Jason Merritt                                            April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 30

1    Q.   Do you consider yourself an expert in

2    classic car appraisals?

3    A.   Yes.

4    Q.   How do you do a classic car appraisal?

5    A.   Classic car appraisal depends on exactly

6    what kind of appraisal I'm doing.  There is, again,

7    various ways of doing.

8    Q.   Are there resource materials you can use

9    to do classic car appraisals?

10   A.   Yes.

11   Q.   Like what?

12   A.   Mainly Internet -- Internet references,

13   Hemmings, different resources like that.

14   Q.   There is books like NADA that you can use

15   for used cars.  Are there guide books like that for

16   classic cars?

17   A.   NADA has actually the classic car

18   reference also.

19   Q.   Heard something called Hagerty.  Have you

20   ever heard of that?

21   A.   Hagerty, Hemmings.

Jason Merritt                                              April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 31

 1       Q.    What is Hagerty and Hemmings.  What are

 2   those?

 3       A.    Just another resource like NADA.

 4       Q.    Let's talk about Hagerty for example.

 5   What is Hagerty.  Hagerty's.  Is it Hagerty's or

 6   Hagerty?

 7       A.    Hagerty.

 8       Q.    Hagerty.  What is Hagerty?

 9       A.    I don't claim to be an expert in Hagerty

10   in any way, shape or form.  It's just another

11   resource that I use that will use comparative

12   methodology almost and they show previous sales,

13   they have auction sites, they have parts, they have

14   blogs.  It's just kind of a conglomerate of car

15   enthusiasts.

16       Q.    Do you use Hagerty?

17       A.    I do.

18       Q.    You said Hemming is another one?

19       A.    Yes.

20       Q.    Is Hemming like Hagerty?

21       A.    It is.

Page 32

1      Q.    Another kind of comparable vehicle value

2  site?

3      A.    Correct.

4      Q.    And are those, Hagerty and Hemming, and

5  you said NADA, those are guide books you can use for

6  classic automobiles for valuation purposes?

7      A.    I wouldn't say really guide books but I

8  would say references and resources.

9      Q.    You consider those different reference,

10  those resources, to be expert publications in the

11  field?

12      A.    I would say that I utilize all of those to

13  come up with my expert opinion.

14      Q.    And do all those different guide books you

15  mentioned, Hagerty, Hemming, NADA, always agree

16  every time they are coming up with a valuation

17  estimate for a classic vehicle?

18      A.    I can't recall.  I can't testify to that.

19      Q.    Would you be surprised if they always

20  agreed exactly to the dollar on every vehicle?

21      A.    Well, sure.

Page 33

1      Q.    It doesn't mean one is wrong or one is

2   right.  They all could be correct within a range,

3   right?

4      A.    That would depend on what you're looking

5   up and what you're entering into it.

6      Q.    If you're trying to value a classic car

7   you would expect there would be a range of

8   acceptable valuations, correct?

9      A.    As I state in my expert report, an

10  appraisal is an opinion.

11     Q.    And those opinions can all be correct as

12  long as they are within a reasonable range that you

13  would expect, correct?

14     A.    Again, you look at the different

15  parameters, and yes.

16     Q.    Okay.  So, for example, the person at

17  Hagerty putting that together could be an expert in

18  that area even if they don't agree with the value

19  that NADA comes up with?

20     A.    Again, I use those as a loose resource.

21  So they are not coming up with my appraisal numbers,

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 34

1    it's just a resource for me to use.

2          Q.    Do you typically only use resources that

3    you think are reliable?

4          A.    No, I use all types of resources to come

5    up with my own opinion.

6          Q.    You sometimes will use resources that you

7    think are unreliable?

8          A.    I will use all resources to compile my

9    opinion.

10         Q.    In your experience is Hagerty a reliable

11   resource for valuing classic cars?

12         A.    I believe it is.

13         Q.    And Hemming is a reliable resource for

14   valuing classic cars?

15         A.    I believe so.

16         Q.    Okay.  And NADA is a reliable resource for

17   valuing classic cars?

18         A.    I believe so.

19         Q.    Is actual cash value the same as fair

20   market value?

21         A.    Generally, yes.

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 35

1      Q.   Is actual cash value the same as

2    replacement value?

3           MR. GOLD:  I'm just going to object but he

4      can answer.

5      A.   I'm only doing actual cash value on this.

6      Q.   Is actual cash value the same as

7    replacement value?

8      A.   Generally, yes.

9      Q.   So actual cash value is the same as fair

10   market value and replacement value?

11     A.   Again, I can't answer that because I don't

12   know in what terms --

13          MR. GOLD:  Same objection.  Go ahead.

14     A.   There is many different ways to put in

15   replacement as well as fair market.

16     Q.   What is your understanding of the term

17   actual cash value?

18     A.   The actual value of the vehicle at the

19   time of loss.

20     Q.   What's your understanding of the term fair

21   market value?

Page 36

1        A.    Fair market would be generally about the

2    same as actual cash market.

3        Q.    Actual cash value?

4        A.    Yes.  Sorry.

5        Q.    And what's understanding of the term

6    replacement value?

7        A.    Replacement value would be to replace that

8    vehicle.  And, again, it depends on whether a newer

9    model or the same model.

10       Q.    Is actual cash value the same as

11   replacement value using your definitions?

12       A.    I just testified no, it would be

13   different.

14       Q.    What's a vin decoder?

15       A.    Vin decoder is just a resource on the

16   Internet that you would place the vin number into

17   and it will decode the vin number as to what

18   options, the year, the make, the model.  Sometimes

19   the manufacturer.

20       Q.    How many vin decoders are available?

21       A.    Numerous ones online.

Page 37

```
 1        Q.    Which one do you use?

 2        A.    It just depends on which vehicle I'm

 3   doing.

 4        Q.    You don't have a particular vin decoder

 5   that you always go to?

 6        A.    No, I don't.

 7        Q.    Have you evaluated the relative

 8   reliability of the different vin decoders in

 9   choosing which one to use?

10        A.    No.

11        Q.    Why do you use a particular vin decoder

12   for a particular appraisal?

13        A.    It just depends on which vehicle I'm doing

14   at the time.

15        Q.    Is all the information about options

16   always available by using a vin decoder?

17        A.    No.

18        Q.    I'm going to talk about pickup trucks for

19   a moment, okay.  If you're using a vin decoder for a

20   pickup truck, does it include options about the bed

21   liner?
```

Page 38

1        A.    It would depend on the vehicle.

2        Q.    Does it include information about options

3    for a bed cover?

4        A.    It would depend on the model.

5        Q.    Does a vin decoder for a pickup truck

6    include information about after-market or factory

7    auto equipment?

8        A.    Again, it would depend on the vehicle.

9        Q.    Would it include information about a speed

10   detector?

11       A.    What is a speed detector?

12       Q.    A device to detect radar guns?

13       A.    Going to say radar detector, factory

14   option radar detector.

15       Q.    So would a vin decoder for a pickup truck

16   pick up information about a built-in radar detector?

17       A.    Again, it would depend on the model.  I've

18   seen Chevrolet makes an Avalanche.  An Avalanche

19   normally comes with a hard type bed cover, which

20   would be a normal option.  A Chevrolet Silverado

21   would not come with that.  So, again, every vehicle

Page 39

```
 1   is different.

 2        Q.   Would a vin decoder for a pickup truck

 3   pick up information about whether there were fender

 4   flares on it?

 5        A.   Again, it would be a different model.

 6   There is different trim codes, there's different

 7   packages.  Say a Toyota TR-4 may have fender flares,

 8   may not.  It would depend, you would have to get

 9   deeper than the vin decoder.

10        Q.   Would a vin decoder for a pickup truck

11   pick up whether there were roll bars installed?

12        A.   Again, you would have to check the model.

13        Q.   How about oversized wheels, would that be

14   picked up?

15        A.   Sometimes it will, yes.

16        Q.   Always?

17        A.   Not always.  There is never an always.

18        Q.   Okay.  Is there a difference between a

19   value appraisal and a damage appraisal?

20        A.   Again, you would have to be more specific

21   in that question.
```

Jason Merritt                                                April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                              Page 40

1       Q.    Sure.  You mentioned that you were looking

2   at appraisals for total losses?

3       A.    Correct.

4       Q.    Do you also do sometimes appraisals for

5   vehicles where the vehicle has been damaged but is

6   not a total loss?

7       A.    Diminished value or actual body shop

8   appraisal?

9       Q.    Either one.

10      A.    No.  I do not do body shop appraisals.

11      Q.    Do you do diminished value appraisals?

12      A.    Yes.

13      Q.    Are those vehicles that have not been a

14  total loss but they have been damaged?

15      A.    Correct.

16      Q.    What's the difference in how you do those

17  appraisals between a diminished value appraisal and

18  a total loss appraisal?

19      A.    Two totally different appraisals.

20  Diminished value you're coming up with an evaluation

21  of what loss value was suffered from the accident.

Page 41

1    Total loss you're coming up with how much the

2    vehicle was worth prior to the damage.

3         Q.   Okay.  Do you use different methodologies?

4         A.   I stick for the most part with comparable

5    methodology.

6         Q.   Okay.  So you use the comparable

7    methodology for both a value of total loss appraisal

8    and a diminished value appraisal?

9         A.   I do in some circumstances, yes.

10        Q.   In what circumstances do you not?

11        A.   Again, I can't say always in everything.

12   What I normally use is comparable value.

13        Q.   Okay.  When you're valuing a total loss

14   vehicle, does the number of prior owners of the

15   vehicle have a -- play a factor in valuation?

16        A.   Again, it would depend on the vehicle and

17   the age.

18        Q.   Are there any instances where it would

19   make a difference?

20        A.   There are instances, yes.

21        Q.   Does it make the car worth more or less if

Page 42

1    there are multiple owners, prior owners?

2         A.    Again, that would depend.  If Elvis

3    Pressley owned it, may be worth more.  If multiple

4    other individuals owned it, it might be worth less.

5         Q.    Let's say you have a vehicle that had

6    three prior owners and a total loss valuation.  What

7    impact would that number of prior owners have on the

8    vehicle?

9         A.    Again, it would depend on the year, make,

10   model, mileage.

11        Q.    Why would it have an impact?

12        A.    Because if it's over ten years and

13   100,000 miles or so, normally it does not impact the

14   value.

15        Q.    I'm not talking about years and age, I'm

16   solely talking about the number of owners.  Would

17   that have an impact on the value of the vehicle?

18        A.    Again, it would depend on the year.

19        Q.    And why would that have an impact, the

20   number of owners?

21             MR. GOLD:  Objection.

Page 43

1        A.    Normally the impact would be how many

2    owners it had just because I guess of the year and

3    the mileage.

4        Q.    Why would having multiple owners have an

5    impact on the value of the vehicle?

6        A.    Just as I testified, it doesn't always.

7        Q.    But when it does, why would it have an

8    impact?

9              MR. GOLD:   Objection.

10       A.    Again, I can't project that.

11       Q.    Do you know if there are any instances

12   where having multiple owners of a vehicle would make

13   it more valuable?

14       A.    Depending on who owned it.

15       Q.    Besides who owned it, focusing solely on

16   the number of prior owners, are there any instances

17   where having multiple owners would make a vehicle

18   worth more?

19       A.    I can not recall an instance where

20   multiple owners would make the vehicle more

21   valuable.  I don't think that's a fair statement.

Jason Merritt                                                        April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 44

1      Q.   Do all cars that are listed for sale on

2   the Internet actually exist?

3      A.   Repeat that, please, I couldn't hear you.

4      Q.   Do all cars listed for sale on the

5   Internet actually exist?

6           MR. GOLD:  Objection.

7      A.   Again, you referred to all so I can not

8   agree to all.

9      Q.   Okay.  In your experience are there cars

10  that are listed for sale on the Internet that in

11  fact do not exist?

12          MR. GOLD:  Objection.

13          MR. CASHDAN:  What's the objection?

14          MR. GOLD:  Exist like physically exist, or

15      exist as if they are listed for sale are not

16      actually available for sale.

17      Q.   You can answer.

18      A.   I think that question is valid.  I need to

19  ask that question.  Are you talking about do the

20  cars actually physically exist?

21      Q.   Are you unable to answer my question as I

Page 45

1    asked it?

2         A.    I am unable to answer that question.

3         Q.    Okay.  Thank you.  Do auto dealers ever

4    exaggerate the condition issues of vehicles when

5    they place ads for them?

6         A.    Again, to put a blanket statement over

7    that, I can not say yes or no to that.  Have I seen

8    conditions different than what I believe they

9    advertised, yes.  Generally they do not.

10        Q.    Okay.  So you've seen examples where the

11   condition has been overstated by a dealer in an ad?

12        A.    I've seen conditions where they were

13   overstated and understated.

14        Q.    Okay.  How about private owners, do they

15   ever overstate the condition of their vehicle in an

16   ad?

17        A.    I have seen both, over and under.

18        Q.    Okay.  Do car values differ based on their

19   geographic locations?

20        A.    I'm sorry, repeat that again.

21        Q.    Do car values differ based on their

Page 46

1    geographic conditions?

2        A.    I believe they do, yes.

3        Q.    They do.  How so?

4        A.    Just for an example, a vehicle in

5    Washington D.C. or New York may have lower value

6    than a vehicle in the suburbs.

7        Q.    Okay.  Have you ever heard of the term a

8    laydown in the car sale business?

9        A.    No.

10        Q.    If you could turn, please, to Exhibit 1

11   which is your report in the Brown case?

12        A.    Yes, sir.

13        Q.    And if you could turn to page four of that

14   report?

15        A.    I am there.

16        Q.    All right.  There is a section that's

17   entitled "Mitchell's application of a projected sold

18   adjustment is inconsistent with appraisal standards

19   and the comparable methodology."  Do you see that?

20        A.    I do.

21        Q.    Okay.  And when you reference appraisal

Jason Merritt                                                April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 47

1    standards there, are there any written appraisal

2    standards to which you are referring?

3         A.    No, I refer back to my 40 hours of

4    training with the Bureau.

5         Q.    Okay.  Anything else?

6         A.    No.

7         Q.    Okay.  When you say with the Bureau, you

8    mean with the Bureau of Certified Auto Appraisers?

9         A.    Bureau of Certified Auto Appraisers, but,

10   yes, it is the IACP accreditation.

11        Q.    What is the IACP?

12        A.    It's the online appraisal school through

13   Bureau of Certified Appraisers.

14        Q.    But what is the IACP?

15        A.    I would have to read exactly what it is.

16   I believe it's the Independent Auto Certification

17   Program.  I would have to read what that stands for.

18        Q.    As you sit here today you don't know what

19   the IACP is?

20             MR. GOLD:  Objection.

21        A.    I can't recall exactly what it is.

James Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                           Page 48

 1              MR. CASHDAN:   What's the objection?

 2              MR. GOLD:   Misstates his testimony.

 3       Q.   Can you recall what the IACP is as you sit

 4   here today?

 5       A.   I can not recall what the acronym stands

 6   for.

 7       Q.   I guess it did misstate the testimony.

 8   But whether you can tell me what the acronym is or

 9   not, what is the IACP, what does it do?

10       A.   That is the 40 hour certification class

11   that I went through.

12       Q.   So the IACP is a class?

13       A.   As I stated, it's through the Bureau of

14   Certified Auto Appraisers.  It is the 40 hour online

15   appraisal school.

16       Q.   Is the IACP an organization?

17       A.   I believe so, yes.

18       Q.   What does it do?

19       A.   Again, that is the one that gave me the 40

20   hour class.

21       Q.   Besides giving you the 40 hour class, what

Page 49

1    does it do?

2          A.    I don't know.

3          Q.    How many members are with the IACP?

4          MR. GOLD:  Objection.

5          A.    I do not know.

6          Q.    Who runs the IACP?

7          MR. GOLD:  Objection.

8          MR. CASHDAN:  What's the objection?

9          MR. GOLD:  Foundation, relevance.

10         MR. CASHDAN:  Okay.

11         Q.    You can answer.  Tell me what -- who runs

12   the IACP from which you got your certification that

13   you're basing your opinions on?

14         A.    I got it through the Bureau of Certified

15   Appraisers, that's all I know.

16         Q.    Who runs the IACP?

17         A.    I believe Mr. Bent and the Bureau of

18   Certified Auto Appraisers.

19         Q.    Mr. Bent who you mentioned earlier?

20         A.    Correct.

21         Q.    And is he employed by the Bureau of

Jason Merritt                                          April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 50

1    Certified Auto Appraisers?

2          A.    I do not know.

3          Q.    Okay.  And does the IACP issue any written

4    standards for appraisal?

5          A.    I do not believe they do.

6          Q.    Okay.  So turning back to Exhibit 1 at

7    page four, are there any written appraisal standards

8    that you're referring to in your report?

9          A.    Again, I do not have those written

10   standards, but none that I know of.

11         Q.    Okay.  If you turn to page five of your

12   report in the Brown case.

13         A.    I'm there.

14         Q.    And by the way, am I correct where you

15   reference appraisal standards in the Costello report

16   your answers are the same, there is no written

17   standards?

18         A.    Yes.

19         Q.    Okay.  Now, on page five, the carryover

20   paragraph, there's a sentence at the end that says

21   "for this reason."  Do you see that?  At the top,

Page 51

1    sorry?

2         A.    Okay.

3         Q.    Do you see that?

4         A.    I do see that.

5         Q.    And I believe this sentence was not in

6    your prior reports.  And just so the record is

7    clear, it says "for this reason, while it is not

8    necessarily invalid to use a reported sale price as

9    a comparable vehicle, it is generally better to use

10   a list price unless the appraiser is able to confirm

11   the reported sale price is not the result of a

12   special discount and does not reflect ancillary

13   items related to the purchase."  Do you see that?

14        A.    I do.

15        Q.    Do you agree that it's not necessarily

16   invalid to use a reported sale price as a comparable

17   vehicle?

18        A.    As I just stated in here, only with those

19   other caveats.

20        Q.    Okay.  Do you agree that actual realized

21   prices in the relevant market are more reliable

Page 52

1    indicators of value than asking prices?

2         A.    Can you restate that again?

3         Q.    Do you agree that actual realized prices

4    in the relevant market are more reliable indicators

5    of value than asking prices?

6         A.    No, I don't.

7         Q.    You don't agree with that?

8         A.    No.

9         Q.    Do you know whether the American Society

10   of Appraisers has stated that?

11        A.    I -- I'm not familiar with them.  I'm not

12   familiar with them having to do anything with the

13   auto appraising.

14        Q.    Have you ever read the materials published

15   by the American Society of Appraisers entitled

16   Principals of Valuation?

17        A.    Is that auto appraising or is that --

18        Q.    Just asking if you've ever read it?

19        A.    I can not recall.

20        Q.    Okay.

21        A.    I only read auto appraising.

Page 53

1      Q.    Which treatises about auto appraising have

2   you read in the last five years?

3      A.    Repeat that, please, again.

4      Q.    Which treatises about auto appraisal have

5   you read in the last five years?

6      A.    I read multiple blogs as well as multiple,

7   Hemmings, again, my online resources.

8      Q.    Other than online resources, have you read

9   any materials about auto appraisal?

10     A.    Again, most everything is online now.

11     Q.    I'm asking other than online, have you

12  read any --

13     A.    No.

14     Q.    You mentioned blogs.  Have you read any

15  published materials regarding auto appraisal?

16     A.    Published as on a piece of paper or

17  online?

18     Q.    Published as in issued by a publisher?

19     A.    No.

20     Q.    Have you read any written course materials

21  other than what you looked at for the Bureau of

Page 54

1    Certified Auto Appraisers about auto appraisal?

2         A.    Other than them, no.

3         Q.    And you told us earlier that you have no

4    written materials from the Bureau of Certified Auto

5    Appraisers from that coursework, correct?

6         A.    I do not have them, no.

7         Q.    In fact there were none you said, correct,

8    it was all oral or online?

9         A.    Everything was online.

10        Q.    And it was oral, correct?

11        A.    Correct.

12        Q.    Do you have a copy of the -- strike that.

13   You mentioned that you took a test to be certified

14   by the Bureau of Auto Appraisers; is that right.

15   Sorry?

16        A.    That is correct.

17        Q.    Do you have a copy of your test?

18        A.    No, I do not.

19        Q.    I would like to talk for a moment about

20   projected sold adjustment, okay?

21        A.    Yes.

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 55

1      Q.   Have you reviewed any of the data that has

2  been utilized by JD Power to calculate the projected

3  sold adjustment?

4      A.   I have read some data, yes.

5      Q.   Which data have you read?

6      A.   I can't recall exactly which data I have

7  read.  But I have been provided by counsel about

8  different data sources.

9      Q.   Have you actually taken a look at the data

10 that has been used to calculate the projected sold

11 adjustment for any one of the Brown or Costello

12 cases?

13     A.   I can't recall which ones.

14     Q.   Sorry.

15     A.   I can not recall which ones.

16     Q.   Have you read any of the depositions of JD

17 Power regarding the projected sold adjustment?

18     A.   No, I have not.

19     Q.   Have you done any statistical analysis of

20 the data that JD Power has used for calculating the

21 projected sold adjustment?

Jason Merritt                                          April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 56

1        A.    Can you repeat that question?

2        Q.    Have you done any statistical analysis of

3    the data that JD Power has used for purposes of

4    calculating the projected sold adjustment?

5        A.    I would not say statistical data.  I have

6    done some research.

7        Q.    What research have you done?

8        A.    Calling dealers, talking to dealers, so

9    on.

10        Q.    Have you called the dealers about the data

11    that JD Power has used?

12        A.    No.

13        Q.    So I want to focus solely on the data that

14    JD Power is using for the projected sold adjustment?

15        A.    Okay.

16        Q.    And I'm wondering what you have done to

17    investigate that data?

18        A.    I have not done any research on JD Power's

19    data.

20        Q.    Okay.  Do you know how much data in a

21    given month JD Power collects for purposes of

Page 57

1   calculating the projected sold adjustment?

2       A.   I could not tell you that, no.

3       Q.   Where does JD Power get the data from?

4       A.   I can't tell you exactly where other than

5   different dealerships software and accounting and

6   management tools.

7       Q.   Do you know how -- strike that.  How often

8   does JD Power receive the data from dealers?

9       A.   I do not know.

10      Q.   How many dealers provide the data to JD

11  Power?

12           MR. GOLD:  Objection.

13           MR. CASHDAN:  What's the objection?

14           MR. GOLD:  He said he didn't look at the

15      data.  You're asking questions about something

16      he didn't look at.

17           MR. CASHDAN:  That's the objection?

18           MR. GOLD:  It's foundation.

19           MR. CASHDAN:  Okay.  Just say that.  You

20      don't get to coach.

21           MR. GOLD:  No, I wasn't coaching.  I

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 58

1        was --

2               MR. CASHDAN:  You were coaching.

3               MR. GOLD:  It was not my intention, sir.

4        I was just trying to provide you with a smile.

5        If that came across as coaching, I apologize.

6        I'll try to be more succinct with my

7        explanations.

8               MR. CASHDAN:  I had this problem before,

9        Mr. Gold.  I'm going to read into the record

10       the court's instructions in this case.

11       Counsel -- quote, "counsel shall not make

12       objections or statements that might suggest an

13       answer to a witness.  Counsel's statements when

14       making objections should be succinct and

15       verbally economical stating the basis of the

16       objection and nothing more."  Thank you.

17              MR. GOLD:  Thank you.

18       Q.    What was the question?

19              (Reporter read back question.)

20       A.    I do not know.

21       Q.    Have you ever spoken to any dealers who

Jason Merritt                                          April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 59

1    are based in Georgia about your opinions or

2    conclusions in this matter?

3         A.   I've spoken to many dealers so I can not

4    recall which state.

5         Q.   Can you testify today that you in fact

6    have talked to any dealers in Georgia about your

7    opinions and conclusions in this matter?

8         A.   I can not recall which states.  I've

9    probably contacted over 100 dealers.

10        Q.   For purposes of your opinions and

11   conclusions in this matter?

12        A.   Yes.

13        Q.   You don't know if any of them were in

14   Georgia?

15        A.   I can't recall.

16        Q.   Were any of them in Tennessee?

17        A.   I can't recall.

18        Q.   Do you have it written down who they were?

19        A.   Yes.

20        Q.   Where are your notes on that?

21        A.   I don't have them with me.

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                                Page 60

 1          MR. CASHDAN:  Why weren't they produced,

 2      Chris?

 3          MR. GOLD:  I don't know.  Sitting here

 4      today --

 5      Q.   Did you rely on that information --

 6          MR. GOLD:  Follow-up -- you can follow up

 7      after the deposition and work it out.

 8      Q.   You were subpoenaed in this case to

 9   produce materials that you relied upon, weren't you?

10      A.   Again --

11      Q.   Just answer my question.  Answer my

12   question.

13          MR. GOLD:  Hang on.  He has to finish his

14      testimony.

15      Q.   Answer my question.

16          MR. GOLD:  He has to finish his testimony.

17      Q.   Answer my question.  Were you subpoenaed

18   to produce documents in this case that you relied

19   upon?

20      A.   In this case, yes.  And I did not provide

21   them because I don't recall which case that I took

Jason Merritt                                           April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 61

1    those notes on.

2        Q.   I'm just going to say on the record we're

3    going to keep this deposition open at the end and

4    we're going to reserve the right to require the

5    witness to come back.  And we will seek costs if we

6    have to do that.  Because this material should have

7    been produced previously in response to subpoenas

8    and it's objectionable that it wasn't.

9        A.   My response to that is again I have

10   provided everything --

11       Q.   That wasn't a question, Mr. Merritt.

12           MR. GOLD:  Hang on, he's speaking.

13       A.   I have responded with I have provided

14   everything in this case.

15           MR. GOLD:  And we don't agree to you

16       keeping the deposition open but your statement

17       is on the record.

18       Q.   Do you have notes regarding all of the

19   dealers you spoke to for purposes of your opinions

20   and conclusions in this matter?

21       A.   In this matter, no.

Jason Merritt                                                      April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 62

1      Q.    Oh, so now you don't have the notes?

2      A.    Again, you're giving me broad --

3      Q.    I am not, sir --

4           MR. GOLD:  Objection.  Hang on, let --

5           this is the third time you've done it.  Let him

6           finish his testimony, please.

7      A.    I'm trying to not override your

8      conversation.  Please, I would ask the same.  You

9      have asked me very broad general things in multiple

10     cases.  I have taken notes in other cases.  In this

11     case I provided everything that you've requested.

12     In my general research I've taken notes in multiple

13     other appraisals.  I've talked about hundreds of

14     dealers that I've contacted.  In this case I

15     provided everything.  But have I spoke to many

16     dealers, yes.  I can't recall exactly what states

17     they have dealt with.

18     Q.    Are you done?

19     A.    I am finished.

20     Q.    Okay.  Did you speak with any dealers

21     regarding your opinions and conclusions in the Brown

Page 63

1   case?

2       A.   In the Brown case was -- no.

3       Q.   Did you speak with any dealers regarding

4   your opinions and conclusions in the Bost case,

5   which is consolidated with the Brown case?

6       A.   No, I did not.

7       Q.   Did you speak with any dealers concerning

8   your opinions and conclusions in the Costello case?

9       A.   No, I did not.

10      Q.   With regard to your opinions and

11  conclusions relating -- strike that.  Okay.  Going

12  back to Exhibit No. 1 at page six, there is a

13  paragraph that begins "based on my understanding of

14  the Mitchell PSA methodology."  Do you see that?

15      A.   I do.

16      Q.   Okay.  And if you go down there is a

17  sentence that begins third.  Do you see that?

18      A.   I do.

19      Q.   It says "third, it is my understanding

20  based on conversations with counsel that Mitchell

21  does not consider all the transactions."  Do you see

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                                Page 64

1   that?

2          A.   I do.

3          Q.   Tell me everything that counsel told you

4   about that subject?

5          A.   I can not recall everything they told me.

6          Q.   Tell me anything you recall?

7          A.   Just the exact same statement.  "It is my

8   understanding based on conversations with counsel

9   that Mitchell does not consider all the

10  transactions."

11         Q.   Okay.  What else do you recall about it?

12         A.   More specifically Mitchell does not --

13  does -- "Mitchell does used to not consider

14  transaction where the vehicle is sold for the

15  advertised price has never considered transactions

16  where the vehicle sold for more."

17         Q.   Are you just reading the next sentence?

18         A.   I did.

19         Q.   So I'm not asking you not to read the

20  sentences and just tell me what you recall on this

21  subject in your conversation with counsel.

Jason Merritt                                                            April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 65

1        A.    Again, you're asking me to recall and I
2   can't recall without referring to what I wrote.
3        Q.    So other than what's written in here, you
4   don't have any independent recollection of what
5   counsel told you?
6        A.    Sitting here right now I can not recall.
7        Q.    Did you take notes of the conversation
8   with counsel?
9        A.    Again, I have not submitted any notes so I
10  did not take notes.
11       Q.    I just want to know if you took notes on
12  this conversation?
13       A.    I just responded, no.
14       Q.    Okay.  It says here, as you just read,
15  that Mitchell does not consider transactions where
16  the vehicle sold for the advertised price.  Do you
17  see that?
18       A.    I do.
19       Q.    What do you know about that topic?
20       A.    Just what I put on there, they exclude the
21  vehicles sold for the advertised price.

Jason Merritt                                          April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                    Page 66

    1        Q.    For what period of time?

    2        A.    I don't know.

    3        Q.    For how long has that been done?

    4        A.    I don't know.

    5        Q.    Is that done for every dealers reported

    6    price?

    7        A.    I don't know.

    8        Q.    Okay.  You say it has never considered

    9    transactions where the vehicle sold for more.  Do

   10    you see that?

   11        A.    I do.

   12        Q.    Do you know why that's done?

   13        A.    No.

   14        Q.    Do you know whether there is any

   15    indication that there might be data entry problems

   16    in that same circumstance?

   17        A.    No.

   18        Q.    Are you familiar with any laws in your

   19    work with dealerships that require dealerships to

   20    sell vehicles for the list price if someone comes on

   21    the lot to buy the car?

Page 67

1        A.    A law, no.

2        Q.    Are you familiar with any laws, for

3    example in Georgia, where a dealer -- it's against

4    the law for a dealer to list a car for sale and then

5    when someone comes on the lot to buy the car for

6    that price to raise the price?

7        A.    I do not.

8        Q.    When you were working in dealerships how

9    many times did you have people come on the lot and

10   offer to buy a car for more than you listed it for

11   sale?

12       A.    That was a very rare occasion.

13       Q.    Did it happen often?

14       A.    No.

15       Q.    Okay.  Do you know if there are instances

16   where Mitchell also excludes from consideration

17   transactions where the sales price is substantially

18   lower than the list price?

19       A.    Repeat that again, sorry.

20       Q.    You can read it back.

21             (Reporter read back question.)

Page 68

```
 1        A.    No, I do not know that.

 2        Q.    Okay.  Have you done any statistical

 3   analysis as to whether the way that Mitchell handles

 4   its data causes a projected sold adjustment to

 5   systematically be higher or lower than it should be?

 6        A.    No.

 7        Q.    Okay.  You say in the last sentence on

 8   this paragraph that you "would not rely on

 9   Mitchell's PSA calculations because excluding this

10   data it slants towards lower values."  You see that?

11        A.    Yes.

12        Q.    By how much do you think it slants towards

13   lower values?

14        A.    Well, again, it's a projected and it's not

15   objective.

16        Q.    I understand that.  But you indicate that

17   you think, excluding the data that you referenced

18   above, slants towards lower values.  Do you see

19   that?

20        A.    Correct.

21        Q.    If the data had not been excluded how much
```

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 69

1    greater would the projected sold adjustment have

2    been?

3         A.   It appears that each one is a different

4    price.

5         Q.   Excuse me.

6         A.   It appears that each one is a different

7    price.

8         Q.   What do you mean by that?

9         A.   There's a different valuation put on each

10   vehicle.

11        Q.   And do you know whether the way that

12   Mitchell -- strike that.  Do you know whether the

13   way that JD Power manages the data would in some

14   instances result in a projected sold adjustment

15   being lower than it otherwise would have been?

16        A.   I don't understand the way you're --

17        Q.   Sure.  Do you know whether sometimes JD

18   Power will exclude low sales values such that the

19   projected sold adjustment is lower than it would

20   have been if that data had not been excluded?

21        A.   Again, anything is possible, yes.

Page 70

1      Q.    Do you know?

2      A.    No, I don't know.

3      Q.    Okay.  Did counsel tell you that excluding

4   the data slants towards lower values?

5      A.    No.

6      Q.    How did you come up to that conclusion?

7      A.    I've read the appraisals.

8      Q.    Okay.  But this is not about the

9   appraisals, right, this is about whether the way

10  that Mitchell manages the data results in lower

11  values than if the data had not been excluded,

12  correct?

13     A.    No, again, it's a projected.

14     Q.    Sir, I want to make sure we're clear on

15  this.  This is your third point.  Your third point

16  is that you understand that Mitchell does not

17  consider all the transactions, right?

18     A.    Correct.

19     Q.    And you say, because it doesn't consider

20  all the transactions, certain data has been excluded

21  from the PSA calculation, correct?

Jason Merritt                                                April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 71

1      A.    Correct.

2      Q.    And the PSA calculation as a result slants

3   towards lower values than the PSA calculation

4   otherwise would have been, correct?

5      A.    That's all under B which I'm talking about

6   the projected sold adjustment being inconsistent

7   with appraisal standards in the comparable

8   methodology.  So I go on for several reasons.  The

9   third reason is what we're speaking about, correct?

10     Q.    That's right, yes.  And so what I'm

11  wondering is you have indicated that you think that

12  based on your conversations with counsel that

13  Mitchell does not consider all transactions and that

14  in excluding certain transactions the PSA is going

15  to be higher than it otherwise would have been?

16     A.    Correct.

17     Q.    Okay.  And what I'm asking is what

18  analysis did you do using your expertise to come to

19  that conclusion?

20     A.    Again, the information that I received

21  from counsel I was able to look at that and come up

Page 72

1   with a fact that the PSA calculations, because of

2   excluding this data, is a lower value.

3        Q.    Did you in fact calculate the PSA

4   including and excluding the data to compare what it

5   would have been?

6        A.    I don't recall how I came up with that

7   other than looking at the data it always came up a

8   lower value.

9        Q.    I understand that if you take the PSA out

10  it affects the value.  What we're talking about now

11  is how the PSA is calculated, correct?

12       A.    Correct.

13       Q.    And it could be calculated including

14  certain data or excluding certain data, correct?

15       A.    Okay, yes.

16       Q.    Do you have the ability to calculate the

17  PSA by including the data that JD Power had

18  previously excluded?

19       A.    Again, I just deducted that every one of

20  them is lower.

21       Q.    So it's your testimony that in every

Page 73

1    instance because of the data that JD Power excluded

2    the PSA was higher.  Is that your testimony?

3         A.   Every evaluation that I've done in

4    everything I've seen with JD Power, the PSA always

5    takes away from the value of the vehicle.

6         Q.   I understand that, sir, but we're not

7    talking about that.  We're not talking about

8    comparing a valuation with or without the PSA.  What

9    you're talking about here is whether the PSA itself

10   would be different if certain data was included or

11   excluded, right?

12        A.   Correct.

13        Q.   Okay.  So this third point you're making

14   here assumes the PSA is going to be used, and the

15   question is simply whether it's being calculated

16   correctly, right?

17             MR. GOLD:  Objection.

18        A.   Again, I believe that it's projected and

19   I've never seen it higher.

20        Q.   Okay.  Let's go back to your statement,

21   okay.  It says "third, it is my understanding based

Jason Merritt                                                        April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 74

1    on conversations with counsel that Mitchell does not

2    consider all the transactions."  Do you see that?

3         A.    Okay, yes.

4         Q.    Okay.  Have you determined if Mitchell

5    considered all the transactions whether the PSA

6    would be different?

7         A.    No.

8         Q.    You don't know that, do you?

9         A.    No.

10        Q.    Okay.  So when you say at the bottom of

11   that paragraph that "I would not rely on Mitchell's

12   PSA calculations because excluding this data slants

13   towards lower values", you're not talking about

14   whether the PSA would be different if it included

15   all the transaction, you're simply talking about

16   including -- whether the PSA should be included at

17   all?

18        A.    The PSA included at all.

19        Q.    Okay.  Thank you very much.  You're not

20   offering any opinion as to whether excluding certain

21   transactions has an impact on what the PSA value is,

Page 75

1    right?

2         A.    No.

3         Q.    Is that right?

4         A.    That is correct.

5         Q.    Okay.  Thank you.

6         A.    Can we take a break so I can get some

7    water?

8              MR. CASHDAN:  Of course.  Let's go off the

9         record.

10             VIDEOGRAPHER:  Off the record at 11:05.

11             (Off the record colloquy.)

12             VIDEOGRAPHER:  On the record at 11:15.

13   BY MR. CASHDAN:

14        Q.    Mr. Merritt, let me hand you what's been

15   marked for identification as Exhibit 9.

16             (Deposition Exhibit 9 marked.)

17        Q.    And you see at the top of Exhibit 9 there

18   is a re line and it references the Brown case.  Do

19   you see that?

20        A.    I do.

21        Q.    And the first sentence says "on behalf of

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                              Page 76

1    Mr. Jason Merritt we submit the following response

2    to defendant's subpoena."  Do you see that?

3           A.    I do.

4           Q.    Have you seen Exhibit 9 before?

5           A.    Yes.

6           Q.    Okay.  And does Exhibit 9 accurately state

7    your response to the subpoena that was served on you

8    in the Brown case?

9           A.    Give me one second just to make sure.

10          Q.    Sure.  Take your time.

11          A.    It appears to be correct, yes.

12          Q.    Okay.  If you would turn to the last

13   page -- sorry, second to last page of Exhibit 9.

14   You see at the bottom there is a paragraph 12?

15          A.    I do.

16          Q.    And paragraph 12 asks for quote,

17   "documents reflecting any appraisal standards or

18   other professional standards on which you relied in

19   developing your opinions in this case."

20          A.    I do.

21          Q.    Did I read that correctly?

Jason Merritt                                                April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 77

 1       A.    Yes.

 2       Q.    And the response is, quote, "Mr. Merritt

 3  has no documents responsive to this request."

 4       A.    Correct.

 5       Q.    I read that correctly?

 6       A.    Correct.

 7       Q.    And is that response correct?

 8       A.    That is correct.

 9       Q.    Okay.  Let me now hand you what's been

10  marked for identification as Exhibit 10.

11            (Deposition Exhibit 10 marked.)

12       Q.    And is Exhibit 10 a copy of the response

13  to the subpoena directed to you in the Costello

14  case?

15       A.    That is correct.

16       Q.    Okay.  And I would like to know if

17  Exhibit 10 is an accurate response on your behalf to

18  the subpoena?

19       A.    It is.

20       Q.    If you turn to the last page of

21  Exhibit 10, do you see paragraph 12?

Jason Merritt                                              April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 78

 1        A.    I do.

 2        Q.    Paragraph 12 again asks for, quote,

 3    "documents reflecting any appraisal standards or

 4    other professional standards on which you relied in

 5    developing your opinions in this case", unquote?

 6        A.    I do.

 7        Q.    Did I read that correctly?

 8        A.    You did.

 9        Q.    And the response is, quote, "Mr. Merritt

10    has no documents responsive to this request."  You

11    see that?

12        A.    That is correct.

13        Q.    And is that answer correct?

14        A.    It is correct.

15        Q.    Thank you.  And have you produced all

16    documents that you agreed to produce in response to

17    the subpoenas in the Brown and Costello cases?

18        A.    Yes, sir, I have.

19        Q.    Okay.  Hand you now what's been marked for

20    identification as Exhibit 11.

21              (Deposition Exhibit 11 marked.)

Jason Merritt                                              April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 79

1      Q.   And I'll represent to you this is a copy

2    of the Mitchell valuation report for Mr. Brown?

3      A.   Correct.

4      Q.   Okay.  Have you seen this document before?

5      A.   I have.

6      Q.   Okay.  I would like to turn if you would

7    to the fourth page of this document.  It has the

8    Bates number 2257 at the bottom.  Are you there?

9      A.   I am there.

10      Q.   Okay.  And do you see that it lists five

11   vehicles that were used as comparable vehicles for

12   calculating the base value for this total loss?

13      A.   I do see that.

14      Q.   Okay.  Now, if you look at your report,

15   Exhibit 1, and turn to page six.

16      A.   Okay.

17      Q.   You say at the beginning of the paragraph

18   that has heading number C, you say "while it is

19   unlikely I would have starting from scratch selected

20   the exact comparable vehicles used in the report",

21   you go on to say that they are not always the same,

Jason Merritt                                                          April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 80

1    right?

2         A.    That is correct.

3         Q.    Okay.  Am I correct that part of the skill

4    of an appraiser is knowing which are the appropriate

5    vehicles to use as comparable vehicles for purposes

6    of valuing a total loss?

7         A.    That is a fair statement.

8         Q.    There is hundreds of vehicles that are out

9    in the marketplace that someone can choose as a

10   comparable and the skill of an appraiser is knowing

11   which ones to use and which ones you shouldn't use,

12   right?

13        A.    Correct.

14        Q.    Okay.  Do you know how many vehicles were

15   considered as the comparable possibility by Mitchell

16   for Mr. Brown's valuation?

17        A.    No, I do not.

18        Q.    You see here in Exhibit 11 the five that

19   were ultimately chosen, correct?

20        A.    I do.

21        Q.    Do you know which other vehicles were

1    considered as a possible comparable but not chosen?

2         A.    No, I do not.

3         Q.    Do you know whether in fact Mitchell chose

4    the best comparables?

5         A.    I do not.

6         Q.    Have you looked into that at all?

7         A.    I do not have a list of the ones that they

8    had seen.

9         Q.    Have you independently done a search for

10   vehicles that could have been comparable vehicles

11   for Mr. Brown to determine if there was some better

12   comparables?

13        A.    It's very difficult.  This total loss

14   valuation report was done in May of '21.  There is

15   really no resources out there to look up previous

16   advertised vehicles.  In other words once the

17   vehicle is sold, it's removed.  You go to Cars.com,

18   you go to Autotrader, whatever online resources, you

19   can't look up previous advertised vehicles.  So I'm

20   very limited when I do an appraisal on a vehicle

21   that's already passed.  So I'm not able to

Jason Merritt                                                                April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 82

1    independently look up comps from almost two years

2    ago.

3         Q.   And so you didn't; is that right?

4         A.   No, I was not able to do that.

5         Q.   Do you know whether Mitchell maintains in

6    its system data about all the different comparables

7    it could have chosen?

8         A.   I do not know they do, if they do or not.

9         Q.   Okay.  Did you ask plaintiff's counsel for

10   that information for purposes of preparing your

11   analysis here?

12        A.   No.

13        Q.   Okay.  So many -- is it fair to say that

14   you can't offer an expert opinion that the five

15   vehicles that were chosen as comparable vehicles for

16   purposes of Mr. Brown's valuation report were in

17   fact the best five to use?

18        A.   No, I can not testify to that.

19        Q.   Okay.  You just don't know, right?

20        A.   Yes.  Like I said, overall it is unlikely

21   only because I say it's unlikely because I can't

Page 83

1    verify whether I would have used those or not.  I

2    may have used all five.

3        Q.   You might have used these five but you

4    might have used five different ones, right?

5        A.   I may have.

6        Q.   You just don't know because you don't have

7    the information, right?

8        A.   Correct.

9        Q.   As you sit here today, am I correct that

10   you can not testify that in fact you agree that

11   Mitchell chose the five appropriate comparables from

12   the pool of possible comparables?

13       A.   There is several things I can not say.  I

14   can not say -- I don't have the data so I can't say

15   if they were objective or if they were correct.  I

16   could only go by with what they did and I ran vin

17   numbers, just to verify that the options as well as

18   the vehicle themselves appear to be good

19   comparables.

20       Q.   Sure.  But whether they are the best

21   comparables, the ones you would have used if you

Jason Merritt                                          April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 84

1    were doing the valuation at the time of the total

2    loss, you don't know?

3        A.    I do not know.

4        Q.    And you don't know -- strike that.  And

5    you were not given information about the total pool

6    of the comparables from which they selected these

7    five?

8        A.    The total pool I am not.  But, again, I

9    refer back to their methodology and explanation.

10   They carry out the comparable methodology in the

11   same fashion that I do on all of mine.  They started

12   at a small location and worked out.  And if you look

13   at these, the distance from the vehicles normally

14   where you begin -- let me back up a little bit.  You

15   go by options as well as many other things.  But one

16   of the big things is distance from the vehicle loss.

17   And these are all within an acceptable range.

18       Q.    But you don't know if there were 20 others

19   that were all sold in that range --

20       A.    I do not.  Again, these reports, the

21   methodology really falls in line with exactly how I

Jason Merritt                                              April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 85

1    do it.

2         Q.    I'm not suggesting that.  What I'm

3    suggesting is that it's possible that there were

4    other vehicles that could have also been comparables

5    and you just don't know whether they would have been

6    better choices in your opinion?

7         A.    Well, again, anything is possible, so yes.

8         Q.    You don't know?

9         A.    I don't know.

10        Q.    Now, am I correct that as I understand it,

11   and you can look back at Exhibit 1 if you need to

12   refer back, but as I understand it, what you then

13   did, you assumed these were the right comparables to

14   use and you simply backed out from the adjusted

15   value -- you added back in on the adjusted value the

16   PSA that had been deducted from the list price

17   comparables, correct?

18        A.    That is correct.

19        Q.    Okay.  Did you make any other changes to

20   any other values in the report other than to add the

21   amount of the PSA back in for the vehicles where the

Jason Merritt                                          April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 86

1    list price was used for calculating the base value?

2        A.    I did not.

3        Q.    Okay.  How does Mitchell make the

4    condition adjustment to the total loss vehicle?

5        A.    They said -- are you talking about the

6    condition of the loss vehicle compared to the

7    comparable vehicles?

8        Q.    Yes, sir.

9        A.    Yes, they -- I don't know the exact data

10   that they are using, but they will use an adjuster

11   to put a value on.  And from my research and what I

12   have seen, and again I don't see the vehicle, I

13   don't have pictures of the vehicle, but I've never

14   had any reason to have differences with the

15   condition evaluations.

16       Q.    Do you know whether any of the plaintiff's

17   themselves have had issues with their condition

18   adjustments?

19       A.    Again, a broad term, I would say there

20   probably was.

21       Q.    Do you know whether any of their issues

Page 87

1    were valid?

2         A.    I don't know.

3         Q.    Okay.  Again, you didn't make that

4    evaluation?

5         A.    I did not make that evaluation.

6         Q.    So if you go to page five of Exhibit 11,

7    which is the one with Bates number 2258.  That's the

8    page that details the condition evaluation, correct?

9         A.    Correct.

10        Q.    And so you can see for the different

11   categories of the vehicle interior, exterior and

12   mechanical and tire, there are condition assessments

13   on a scale of one to five that have been given,

14   correct?

15        A.    Correct.

16        Q.    And you don't know whether any of those

17   are correct or not, right?

18        A.    Again, I did not see the vehicle.  I was

19   able to find some pictures of the loss vehicle

20   online.  And when I looked at the loss vehicle

21   online and compared it to what I see in their

Jason Merritt                                        April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 88

1   evaluation, I would agree.

2        Q.   Okay.  And if the plaintiffs themselves

3   have disagreed with those condition assessments in

4   any of these cases, you haven't evaluated who is

5   correct?

6        A.   No.

7        Q.   Is that correct?

8        A.   That's correct.

9        Q.   Okay.  So after Progressive has done

10  inputing these ratings, that converts to some

11  dollar adjustment on the condition of the total loss

12  vehicle, correct?

13       A.   It does.

14       Q.   At the top of this page it says the

15  adjustment was $267.15 based on the ratings that

16  were put on this vehicle, right?

17       A.   Correct.

18       Q.   How is that done.  How do they -- how does

19  the methodology convert the numerical one to five

20  ratings into a dollar amount?

21       A.   I don't know their exact methodology and

Page 89

1    their data that they use.

2         Q.   What do you know about that methodology?

3         A.   I've just read through the appraisal

4    reports and they come up with their deductions.

5    And, again, I have not disagreed with the

6    deductions.

7         Q.   But what I'm asking is what is your

8    specific knowledge about how the condition ratings

9    become dollar amounts?

10         A.   I do not know that.

11         Q.   Okay.  Do you know whether the base value

12    of the comparables plays a part in the dollar amount

13    of the condition ratings?

14         A.   Repeat that again, sorry.

15         Q.   Do you know sure.  Do you know whether the

16    base values of the comparable vehicles plays a

17    factor in converting these condition ratings into a

18    dollar amount for a condition adjustment?

19         A.   I would agree, yes.

20         Q.   Okay.  How does that work?

21         A.   You'll have to explain that a little

Jason Merritt                                                            April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 90

 1    better.  I'm not understanding exactly what you're

 2    asking.

 3         Q.    Sure.  So the Progressive representative

 4    is going to inspect the vehicle and rate a

 5    condition.

 6         A.    Okay.

 7         Q.    Is that right?

 8         A.    Yes.

 9         Q.    On a scale of one to five, correct?

10         A.    One to three, yes.

11         Q.    Okay.  You think it's a scale of one to

12    three?

13         A.    I would have to look at it again.  The

14    rating system, correct.

15         Q.    Okay.  Whatever the rating system is, they

16    are going to give a numerical rating to the

17    condition of the vehicle and different aspects,

18    correct?

19         A.    Correct.

20         Q.    And then those ratings then end up

21    becoming a dollar amount?

Page 91

1        A.    Correct.

2        Q.    A condition adjustment, correct?

3        A.    It could be higher or lower, yes.

4        Q.    Okay.  When calculating that condition

5    adjustment dollar amount, do the base value dollar

6    amounts of the comparable vehicles play a role in

7    converting the numerical one, two, whatever rating,

8    into a dollar amount?

9        A.    Yes, they do.

10        Q.    What role do they play?

11        A.    They will either be an addition to the

12    value or a substraction to the value.

13        Q.    Okay.  Do you know when the system --

14    methodology using these ratings to come up with a

15    condition dollar amount, is it based on the

16    individual ratings for each condition element or is

17    it based on the overall condition?

18        A.    They take them from the individual and it

19    becomes an overall.

20        Q.    What I'm asking is if you look -- back to

21    this page five of this report.  You can see it has

1    the different condition ratings for different

2    aspects of the interior, exterior, mechanical and

3    tire.  Do you see that?

4         A.   Yes.

5         Q.   And at the top there is an overall

6    condition rating of 2.92.  Do you see that?

7         A.   Yes.

8         Q.   When the dollar amount of the condition

9    adjustment is calculated, is that based on the

10   overall condition rating or the individual condition

11   ratings?

12        A.   I don't know.

13        Q.   Okay.  And do you know how that condition

14   rating interacts with the base values of the

15   comparable vehicles to come up with the condition

16   adjustment dollar amount?

17        A.   Yes, there is -- the projected sale amount

18   is what you're talking about as far as taking into

19   account on the base value, yes.

20        Q.   What I'm asking is this.  If you go back

21   to page -- the prior page, page four of this

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 93

1    valuation report, you see there is five comparables

2    there?

3         A.    Yes.

4         Q.    Okay.  How does that 2.92 rating interact

5    with these adjusted values for the comparables to

6    come up with the condition adjustment of $267.15?

7         A.    It comes off of the value, the base value

8    of the loss vehicle.

9         Q.    Okay.  Is the condition adjustment dollar

10   amount based on the total average base value or the

11   base values for each of the individual comparable

12   vehicles?

13        A.    Base value of the loss vehicle.

14        Q.    I just want to make sure I understand your

15   testimony.  So let's go to the page four of the

16   report.  Are you there.  Sorry, page four of the

17   valuation report.  My bad.

18        A.    Okay.

19        Q.    There are five comparable vehicles listed

20   there.  Do you see that?

21        A.    Yes.

Jason Merritt                                              April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 94

1        Q.    And then there is an overall average base

2    value?

3        A.    Correct.

4        Q.    Do you see that?

5        A.    Correct.

6        Q.    When the condition adjustment amount is

7    calculated based on the overall condition rating, is

8    that done using the individual adjusted values for

9    each comparable and being added up, or is it based

10   on the total base value number?

11       A.    Total base value.

12       Q.    And what's the basis for your view with

13   regard to that?

14       A.    As it states in page six it breaks down

15   each one.

16       Q.    Okay.

17       A.    Projected sold -- just for example, number

18   two it breaks down projected sold amount, mileage,

19   the equipment, and the different appearances.  And

20   then it takes -- there is no condition adjustment on

21   those comparables.

Jason Merritt                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 95

1        Q.    Yes.  So you understand that the condition

2    adjustment is done after the base value has been

3    calculated, correct?

4        A.    Yes.

5        Q.    And what I'm asking you is when the

6    condition adjustment for the total loss vehicle is

7    calculated, is it your understanding that it's --

8    the rating is converted to a dollar amount by using

9    only the total average base value and not looking at

10   the individual values of the comparables.  Is that

11   your understanding?

12       A.    No, I don't understand what you're saying.

13       Q.    Sure, let's try again.  So, again, on

14   page -- let's go back to page five of the report.

15   Are you there?

16       A.    Yes.

17       Q.    Okay.  So the Progressive agent is going

18   to rate the condition of the vehicle on a scale of

19   one to something, correct?

20       A.    Correct.

21       Q.    Comes up -- in this example of the ratings

Page 96

1    come up with an overall condition rating of 2.92.

2    Do you see that?

3         A.   Yes.

4         Q.   Okay.  That's obviously not a dollar

5    amount?

6         A.   Correct.

7         Q.   So that has to become a dollar amount,

8    correct?

9         A.   Correct.

10        Q.   How does it become a dollar amount?

11        A.   They place figures on it.  Like I said, I

12   just testified, I don't know how they come up with

13   that dollar amount necessarily, but they give it a

14   condition rating, $267 off of the base value of the

15   loss vehicle.

16        Q.   Okay.  Do you know whether in converting

17   that rating into a dollar amount the system is

18   adjusting for condition with regard to each

19   individual comparable vehicle and then adding it up

20   for a total amount?

21        A.   No.

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 97

1        Q.   You don't know?

2        A.   No, I don't know.

3        Q.   Okay.  Do you know if the base -- strike

4   that.  Do you know if the individual adjusted values

5   for each comparable vehicle are changed would that

6   change the dollar amount of the condition

7   adjustment?

8        A.   I believe it would, yes.

9        Q.   Okay.  And how can you calculate that?

10       A.   You would have to calculate each one

11  individually.  But I don't know what their

12  calculations are.

13       Q.   Okay.  So in your -- in your report you

14  have changed the adjusted value of every comparable

15  vehicle that was based on this price by adding the

16  PSA back in, correct?

17       A.   Correct.

18       Q.   Have you changed the condition adjustment

19  based on that?

20       A.   No.  And now I understand what you're

21  trying to get at.  I left off the condition

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 98

1    adjustment in my deductions of the PSA's.  So there

2    would be a very minor difference in my pricing of 20

3    or $30.

4         Q.   How do you know it would be 20 or $30?

5         A.   I had done the calculations in the past

6    and it's a small amount.

7         Q.   How did you do the calculations?

8         A.   And I can't recall how I did the

9    calculations.

10        Q.   Are you aware of testimony in this case

11   from Mitchell that they are unable to do those very

12   calculations because they don't have the data to do

13   it if you change the base values by removing the

14   PSA's?

15        A.   No.

16        Q.   Are you aware of that.

17        A.   No, I'm not aware of it.

18        Q.   So Mitchell -- I'll represent to you that

19   Mitchell has said that in testimony in this case?

20        A.   Again, I don't doubt that.  It's

21   projected.

James Merritt                                              April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 99

1       Q.    No, no, this is not projected, this is the
2   condition adjustment.

3       A.    Okay.

4       Q.    They have said that if you change the base
5   values by adding the PSA back in.

6       A.    Okay.

7       Q.    They are unable to adjust the condition
8   adjustment to take into account the new adjusted
9   values for the comparables.

10      A.    Okay.

11      Q.    Did you know that?

12      A.    No, I'm not aware of what they are saying.

13      Q.    How are you able to do it if Mitchell is
14  not able to?

15      A.    Again, I just -- I didn't.  If you'll see,
16  I didn't do that.

17      Q.    So am I correct that when you come up with
18  a valuation in your expert report that's based on
19  just adding the PSA back in, you have not made any
20  additional adjustment that might be necessary for
21  the condition adjustment of the total loss vehicle?

Brown, Keddrick v. Progressive Mountain Insurance Company

Page 100

1    A.    I can't agree to that when you say

2    necessary.  I had just removed the PSA out with no

3    other adjustments.

4    Q.    Do you know whether if you increase the

5    values of the comparable vehicles you have to then

6    recalculate the condition adjustment that's applied

7    to the total loss vehicle?

8    A.    Are you asking me or telling me?

9    Q.    I'm asking if you know.

10    MR. GOLD:  I'm just going to object.

11    A.    No, I don't.

12    Q.    Okay.  If that has to be done, you haven't

13    done it, correct?

14    A.    I have not done it.

15    Q.    Okay.  Do you know whether any other

16    aspects of the valuation in the report have to be

17    adjusted if you change the base value of a

18    comparable vehicle by adding the PSA back in?

19    A.    No.

20    Q.    You don't know?

21    A.    No.

Page ID #: 5541                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                        Page 101

1        Q.    Okay.  Who would know the answer to that?

2        A.    I can't testify to who knows the answer.

3        Q.    Mitchell might know?

4        A.    I can't -- I mean you just said that they

5    don't know, so...

6        Q.    Well, they know if it has to be done.

7        A.    Okay.

8        Q.    I'm just telling you they said they don't

9    have the data to do it.  But do you know --

10       A.    Again, I can't imagine they would have

11   data on projected.

12       Q.    I'm not talking about projected, sir, I'm

13   talking about the condition adjustment.

14       A.    Okay.

15       Q.    You understand those are different things?

16       A.    I do.

17       Q.    Do you understand what I'm telling you is

18   an adjustment would have to be made on the dollar

19   amount of the condition adjustment if you change the

20   base value of the comparable vehicles.  Do you

21   understand that?

Page 102

1        A.    I do understand that.

2        Q.    And you haven't done that, correct?

3        A.    Again, I think it's making it much more

4   difficult.  Remove the PSA and you come up with a

5   very good evaluation.

6        Q.    But if you're using Mitchell's

7   methodology, do you agree you have to use the

8   methodology as they have determined it?

9        A.    Again --

10        Q.    For the condition adjustment?

11        A.    All of their methodology I agree with

12   100 percent except for in step two, the projected

13   sold amount.

14        Q.    So you agree with their methodology with

15   regard to how they make a condition adjustment for

16   the total loss vehicle, correct?

17        A.    I do.

18        Q.    Okay.  And so you have to do that

19   condition adjustment the way their system plans to

20   do it, correct?

21              MR. GOLD:  Objection.

Page 103

1    A.   I can't say -- I can't agree to that 100
2  percent.
3    Q.   So you think it's okay to use the Mitchell
4  methodology except to add the PSA back in and to
5  change the way they calculate the condition
6  adjustment?
7         MR. GOLD:  Objection.
8    A.   Again, I think just removing the PSA will
9  make those adjustments.
10    Q.   Do you think -- strike that.  Do you know
11  whether Mitchell has said that if you add the PSA
12  back into the values, remove the PSA adjustment, you
13  have to change the condition adjustment dollar
14  amount?
15         MR. GOLD:  Objection.
16    A.   I do understand what you are saying, but I
17  don't know what Mitchell is saying.
18    Q.   If Mitchell says you have to do that, do
19  you disagree with them?
20         MR. GOLD:  Objection.
21    A.   Again, there is an if.  I can't --

Page 104

1      Q.   I want you to assume Mitchell has said

2   that if you remove the PSA and change the base

3   values of the comparable vehicles you have to make

4   an adjustment to the dollar amount of the condition

5   adjustment?

6           MR. GOLD:  Objection.

7      Q.   I want you to assume they have said that.

8   My question is do you agree with that?

9           MR. GOLD:  Same objection.

10     A.   Again, I hate to get into a position where

11  I assume as an expert.  I just -- I hate to do that.

12     Q.   I'm asking you to do it anyway.  I know

13  you don't want to --

14     A.   You're asking me to do that.

15     Q.   I want you to assume they said that and

16  I'm asking you do you agree with Mitchell?

17          MR. GOLD:  Same objection.

18     A.   Yeah, and -- if I'm assuming and you want

19  me to agree with that, then okay.

20     Q.   So if Mitchell says that's how you should

21  do the condition adjustment if you get rid of the

Page 105

1    PSA, do you agree that's what you should do?

2              MR. GOLD:  Objection.

3         A.   Again, I don't know what their standards

4    are -- their evaluation is for that, so.

5         Q.   Let me ask you.  If you remove the PSA --

6    strike that.  For purposes of running the work

7    center total loss methodology, if you were to remove

8    the PSA from a comparable vehicle, do you think it

9    should impact the dollar amount of the condition

10   adjustment for the total loss vehicle?

11             MR. GOLD:  Objection.

12        A.   I don't -- I don't know.

13        Q.   Okay.  But you didn't do that, correct?

14        A.   I did not.  I just pulled the PSA out and

15   gave the price.

16        Q.   Okay.  And that's what you did with regard

17   to the valuation report for Mr. Brown, Ms. Bost, and

18   Ms. Costello, correct?

19        A.   All three vehicles, yes.

20        Q.   And that's what you propose to do for all

21   of them, correct?

Page 106

1      A.    Correct.

2      Q.    And -- strike that.  Am I correct with

3  regard to -- excuse me.  Strike that.  Am I correct

4  with regard to Bost and Costello, in those instances

5  you also do not know if there were other comparable

6  vehicles that you might have independently chosen to

7  use instead of the ones Mitchell used?

8      A.    I do not know that.

9      Q.    Remind me, Mr. Merritt, do you have a

10  college degree?

11      A.    No, I do not.

12      Q.    Okay.  Have you taken any -- strike that.

13  Did you attend college at all?

14      A.    Yes.

15      Q.    How many hours did you complete?

16      A.    I don't recall how many hours.

17      Q.    Okay.

18      A.    It was mainly all law enforcement.

19      Q.    Sorry.

20      A.    It was mainly all law enforcement.

21      Q.    But you didn't obtain a degree?

Page 107

```
 1        A.   No.

 2        Q.   How long were you in college?

 3        A.   Less time than it was to get a degree.  I

 4   don't know.

 5        Q.   You don't know how long you were there?

 6        A.   Less than two years.

 7        Q.   Okay.  Thank you.  Were you there less

 8   than one year?

 9        A.   No.

10        Q.   Okay.  Somewhere between one and two

11   years?

12        A.   Yes, sir.

13        Q.   Okay.  Did you take any courses in college

14   regarding appraisal work?

15        A.   No.

16        Q.   Okay.  Have you taken any courses in

17   valuation theory?

18        A.   No.

19        Q.   Have you taken any courses in valuation

20   principals?

21        A.   I did not.
```

Brown, Keddrick v. Progressive Mountain Insurance Company

Page 108

1        (Deposition Exhibit 12 marked.)

2        Q.    I'm going to hand you what's been marked

3    for identification as Exhibit 12.  Take a moment to

4    look at this and then I would like to know what it

5    is?

6        A.    Looks like it's an appraisal done on a

7    2009 Chevy Silverado.

8        Q.    Was that an appraisal that you did?

9        A.    Yes.  Sorry, there is other ones attached

10   to it also.

11       Q.    When you say other ones, what do you mean?

12       A.    A 2010 Ford ranger.  Appraisal done by

13   Eric marsh.  Two appraisals by Mr. Marsh.  And

14   appraisals done by auto bid, Ross Chandler.

15   Appraisals done on those two pickups, Chevrolet

16   pickup and a Ford Ranger.

17       Q.    Can you turn to the fifth page of

18   Exhibit 12.  At the top it says

19   automotive/insurance/legal terms.  Do you see that?

20       A.    Correct.

21       Q.    And this particular document goes on for

Page 109

1    two pages; is that right?

2         A.   Yes.

3         Q.   Is this a standard item in the appraisals

4    you perform?

5         A.   Yes.

6         Q.   Did you write this?

7         A.   No, this is part of a template.

8         Q.   And you use this template?

9         A.   I do.

10        Q.   Do you still use this template today?

11        A.   I believe so.

12        Q.   Okay.  And you see the third line down

13   there's something that says fair market value?

14        A.   I do.

15        Q.   Can you read the fair market line in full

16   for us, please?

17        A.   "Means the price the property would bring

18   in a market of willing buyers and willing sellers in

19   the ordinary course of trade.  Market value is

20   generally established if possible based on sales of

21   similar property in the same location, locality."

Page 110

1      Q.    Okay.  Thank you.  Okay.  I don't have any

2   more questions on that.  Thank you.  Put that aside.

3   Going back a moment to Exhibit 9.

4      A.    Okay.

5      Q.    Which is the response to the subpoena in

6   the Brown case.

7      A.    Okay.

8      Q.    If you turn to page two of that document,

9   it says at the top you had spent four hours as of

10  that date working on the case.  Do you see that?

11     A.    Yes.

12     Q.    Is that -- and that was as of March 13th,

13  2023, correct?

14     A.    That would be correct.

15     Q.    The date of the letter?

16     A.    Yes.

17     Q.    So is that accurate as of March 13, 2023

18  you had spent a total of four hours working on the

19  Brown case?

20     A.    That would be reasonable, yes.

21     Q.    Is it accurate?

Page 111

1      A.    Yes.

2      Q.    Okay.  And if we look at Exhibit 10, which

3  is for the Costello case, at the bottom of the first

4  page it indicates that you had spent four hours

5  working on that case as of March 31st, 2023.  Do you

6  see that?

7      A.    That is correct.

8      Q.    Is that also accurate?

9      A.    Yes, it is.

10      Q.    I'm wondering, the four hours you spent on

11  Brown and on Costello, were any of those overlapping

12  hours.  And I ask because you mention that the

13  reports are substantially the same?

14      A.    Correct.

15      Q.    Were any of the hours you spent on brown

16  also spent on Costello?

17      A.    No, I would say that they were

18  individually done.

19      Q.    Okay.  Since March 13th, 2023 how many

20  more hours have you spent on the Brown case, not

21  including your time today?

Page 112

1      A.    Exact hours, without looking, I don't

2    know.  But I reviewed the case --

3      Q.    Approximately?

4      A.    Four to five more hours.

5      Q.    Okay.  And how about on the Costello case?

6      A.    Some of that would be overlapping, so

7    between four and six hours.

8      Q.    For each case you think?

9      A.    No, between the two.

10      Q.    So a total of additional four to six hours

11    for both cases?

12      A.    I would say that's about correct.

13      Q.    Okay.  What's a Monroney label?

14      A.    Where are you referring to that at?

15      Q.    I'm just asking you a question.

16      A.    I don't recall what that is.

17      Q.    Do new cars carry a Monroney label for

18    pricing?

19      A.    I don't know what that is.

20      Q.    What do dealers base their asking price on

21    for used cars?

Page 113

```
 1        A.   I can't give a blanket response to all
 2    dealers.  I can tell you what I did as a dealer.
 3        Q.   Are you saying that what you did as a
 4    dealer may or may not be what other dealers did?
 5        A.   I can't speak for all dealers, but
 6    generally, yes.
 7        Q.   And how did you do it when you were a
 8    dealer?
 9        A.   Use a comparable methodology.
10        Q.   Okay.  For used cars?
11        A.   Yes.
12             MR. CASHDAN:  Okay.  Let's go off the
13        record.
14             VIDEOGRAPHER:  Going off the record at
15        11:54.
16             (Off the record colloquy.)
17             VIDEOGRAPHER:  On the record at 12:04.
18    BY MR. CASHDAN:
19        Q.   I would like to go back to Exhibit 1.
20        A.   Yes, sir.
21        Q.   As I understand it, your opinion is that
```

Page 114

1    the Mitchell methodology provides a sound

2    determination of actual cash value except for the

3    projected sold adjustment; is that right?

4        A.    It is my opinion, yes.

5        Q.    Let's say Mitchell decided that if you

6    remove the projected sold adjustment, the condition

7    adjustment should automatically be tripled in every

8    case.  Would that be a sound methodology in your

9    view?

10       A.    No.

11       Q.    Why not?

12       A.    Again, I'm assuming, so my assumption

13   would be that that would not be correct.

14       Q.    Why not?

15       A.    Because, again, I don't know what their

16   assumption or why they would triple it.

17       Q.    Okay.  Am I correct that your statement

18   that the Mitchell methodology provides a sound

19   determination of actual cash value except for the

20   projected sold adjustment is based on the Mitchell

21   methodology in its current form as Mitchell applies

Page 115

1    it?

2         A.    Correct.

3         Q.    So if there was a change to that

4    methodology, other than getting rid of the projected

5    sold adjustment, you would need to reconsider it

6    before you could have an opinion on its accuracy?

7         A.    No.  Again, if they just took out the

8    projected sold, then I would agree with the

9    methodology.

10        Q.    No, what I'm asking is if in addition to

11   taking out the projected sold something else about

12   the methodology was changed, would you need to

13   evaluate the methodology with that additional change

14   before you had an opinion on whether it's reliable?

15        A.    Again, that's a very broad, broad

16   question.  I mean something, it would depend on what

17   it is.

18        Q.    Okay.  If the way that they valued a

19   condition adjustment changed, would you want to know

20   what it was before you endorsed it as reliable?

21        A.    Sure, I would want to know what it was.

Jason Merritt                                                  April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

                                                              Page 116

1        Q.    Okay.

2        A.    That would be more than just taking out

3   the PSA.

4        Q.    Right.  So if in addition to taking out

5   the PSA the way that they converted the condition

6   adjustment rating into a dollar amount changed,

7   would you need to see that and evaluate it before

8   you could opine that it was a reasonable way of

9   determining actual cash value, correct?

10       A.    Correct.  I think that's fair to say.

11  With any of the changes.

12       Q.    So any way that the actual -- strike that.

13  Any way that the workcenter total loss methodology

14  was changed, other than removing the projected sold

15  adjustment, you have no opinion on whether that

16  would be accurate?

17       A.    I have no opinion.

18       Q.    Am I correct that you have not

19  independently done any appraisal of any of the

20  plaintiffs in these cases using the methodology you

21  typically use in your practice?

Page 117

1       A.   No, I have not.

2       Q.   You mentioned that you had done

3   approximately four hours of work in the Brown

4   case --

5       A.   Correct.

6       Q.   -- prior to March 13th, and 4 to 6

7   additional hours on the Brown and Costello cases

8   since then, correct?

9       A.   Correct.

10      Q.   Right.  So for the Brown case, for

11  example, you've worked about eight to ten hours on

12  that case, correct?

13      A.   Yes.

14      Q.   Okay.

15      A.   Approximately.

16      Q.   How long -- if you were going to do an

17  appraisal of a vehicle, total loss appraisal, how

18  long does that typically take you?

19      A.   Each one obviously is very different.

20  Each one is its own case.  So if I'm going with

21  averages, about four hours.

Page 118

1      Q.   Okay.  So to do one typically takes you

2  about four hours?

3      A.   And that is sitting at the desk doing the

4  appraisal, yes.  If I'm able to go to the site to

5  see the vehicle, you know, it varies.

6      Q.   Let's see you had a total loss valuation

7  where you had the ability to inspect the vehicle,

8  evaluate its condition, and you were going to look

9  for comparables and come up with an appraisal, if

10 you need to call dealers, call dealers, what would

11 that typically range?

12     A.   Again, it could take four to ten hours.

13     Q.   Okay.  Obviously there is going to be a

14 lot of variation depending on the individual

15 circumstances, right?

16     A.   Absolutely.

17     Q.   Have you ever done an appraisal for a

18 total loss vehicle in Georgia?

19     A.   I can't recall if I have or not.

20     Q.   Have you ever done an appraisal for a

21 total loss vehicle in Tennessee?

Jason Merritt                                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 119

1        A.    I can not recall.

2        Q.    Have you ever spoken to Mr. Brown?

3        A.    No.

4        Q.    Have you ever spoken to Bost?

5        A.    No.

6        Q.    Have you ever spoken to Costello?

7        A.    Have not.

8        Q.    Have you spoken to any of the other

9    purported experts in these cases?

10       A.    I have not.

11             MR. CASHDAN:  Thank you.  I have no

12        further questions.

13             MR. GOLD:  We will reserve our questions

14        for trial and we will read and sign.

15             VIDEOGRAPHER:  Okay.  Off the record at

16        12:09 p.m.  This concludes today's testimony of

17        Jason Merritt.  Total number of media used is

18        one and it will be retained by Veritext.

19             (Deposition concluded at 12:09 p.m.)

20

21

Page 120

1              DISTRICT OF COLUMBIA
2         I, David Corbin, a Notary Public in and
       for the District of Columbia, do hereby certify
3      that the within named, JASON MERRITT,
       personally appeared before me at the time and
4      place herein set according to law, was
       interrogated by counsel.

5

          I further certify that the examination was
6      recorded stenographically by me and then
       transcribed from my stenographic notes to the
7      within printed matter by means of
       computer-assisted transcription in a true and
8      accurate manner.
9         I further certify that the stipulations
       contained herein were entered into by counsel
10     in my presence.
11        I further certify that I am not of counsel
       to any of the parties, not an employee of
12     counsel, nor related to any of the parties, nor
       in any way interested in the outcome of this
13     action.
14        AS WITNESS my hand and Notorial Seal this
       19th day of April, 2023, at Washington, D.C.
15
16
17

                          David C. Corbin
18                        Notary Public
19
20   My commission expires July 14, 2023
21

Jason Merritt                                          April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

Page 121

```
 1   TO: CHRISTOPHER GOLD, ESQ.
 2   Re: Signature of Deponent Jason Merritt
 3   Date Errata due back at our offices: 30 days
 4
 5   Greetings:
 6   The deponent has reserved the right to read and sign.
     Please have the deponent review the attached PDF
 7   transcript, noting any changes or corrections on the
     attached PDF Errata.  The deponent may fill out the
 8   Errata electronically or print and fill out manually.
 9
     Once the Errata is signed by the deponent and notarized,
10   please mail it to the offices of Veritext (below).
11
     When the signed Errata is returned to us, we will seal
12   and forward to the taking attorney to file with the
     original transcript.  We will also send copies of the
13   Errata to all ordering parties.
14
     If the signed Errata is not returned within the time
15   above, the original transcript may be filed with the
     court without the signature of the deponent.
16
17
18   Please send completed Errata to:
19   Veritext Production Facility
20   20 Mansell Court
21   Suite 300
22   Roswell, GA 30076
23   (770) 343-9696
24   CS-SOUTHEAST@VERITEXT.COM
25
```

Brown, Keddrick v. Progressive Mountain Insurance Company

Page 122

1    ERRATA for ASSIGNMENT #5843831

2    I, the undersigned, do hereby certify that I have read the
     transcript of my testimony, and that

3

4    ____ There are no changes noted.

5    ____ The following changes are noted:

6

     Pursuant to Rule 30(7)(e) of the Federal Rules of Civil

7    Procedure and/or OCGA 9-11-30(e), any changes in form or
     substance which you desire to make to your testimony shall

8    be entered upon the deposition with a statement of the
     reasons given for making them.  To assist you in making any

9    such corrections, please use the form below.  If additional
     pages are necessary, please furnish same and attach.

10

11   Page _____ Line _____ Change _____

12   _____

13   Reason for change _____

14   Page _____ Line _____ Change _____

15   _____

16   Reason for change _____

17   Page _____ Line _____ Change _____

18   _____

19   Reason for change _____

20   Page _____ Line _____ Change _____

21   _____

22   Reason for change _____

23   Page _____ Line _____ Change _____

24   _____

25   Reason for change _____

Brown, Keddrick v. Progressive Mountain Insurance Company

Page 123

1   Page _____ Line _____ Change _____

2   _____

3   Reason for change _____

4   Page _____ Line _____ Change _____

5   _____

6   Reason for change _____

7   Page _____ Line _____ Change _____

8   _____

9   Reason for change _____

10  Page _____ Line _____ Change _____

11  _____

12  Reason for change _____

13  Page _____ Line _____ Change _____

14  _____

15  Reason for change _____

16  Page _____ Line _____ Change _____

17  _____

18  Reason for change _____

19

20                      _____

                        DEPONENT'S SIGNATURE

21

    Sworn to and subscribed before me this ____ day of

22  _____, _____.

23

    _____

24  NOTARY PUBLIC

25  My Commission Expires:_____

April 14, 2023

Brown, Keddrick v. Progressive Mountain Insurance Company

**[& - account]**

## &

**&**   2:11 3:11
  4:20

## 0

**00175**   1:7 5:15
**0035**   2:4 5:20

## 1

**1**   4:8 8:4,7 9:2
  9:3 12:5 46:10
  50:6 63:12
  79:15 85:11
  113:19
**10**   4:10,11,18
  77:10,11,12,17
  77:21 111:2
**100**   59:9
  102:12 103:1
**100,000**   42:13
**108**   4:20
**11**   4:19 78:20
  78:21 80:18
  87:6
**1180**   3:12
**11:05**   75:10
**11:15**   75:12
**11:54**   113:15
**12**   4:12,13,20
  76:14,16 77:21
  78:2 108:1,3
  108:18
**12:04**   113:17
**12:09**   119:16
  119:19

**13**   110:17
**13th**   110:12
  111:19 117:6
**14**   2:10 4:14
  120:20
**14th**   5:5
**15**   4:16 23:5
**1700**   2:11 6:2
**18021**   120:17
**19th**   120:14

## 2

**2**   4:9 8:11,14
  9:4 12:14
**2.92**   93:4
**2.92.**   92:6 96:1
**20**   84:18 98:2,4
  121:20
**2009**   108:7
**2010**   108:12
**2022**   13:12
**2023**   2:10 5:6
  110:13,17
  111:5,19
  120:14,20
**20900**   3:5
**21**   81:14
**22**   13:19
**2257**   79:8
**2258**   87:7
**267**   96:14
**267.15**   88:15
  93:6
**27th**   13:11
**2:22**   2:4 5:20

## 3

**3**   4:10 9:20
  10:1,5,9 11:18
**30**   98:3,4 121:3
  122:6
**300**   121:21
**30076**   121:22
**30309-3521**
  3:13
**30th**   3:5
**31st**   111:5
**33180**   3:6
**343-9696**
  121:23
**3:21**   1:7 5:15

## 4

**4**   4:11 10:2,4
  10:13 11:18
  39:7 117:6
**40**   16:19 47:3
  48:10,14,19,21
**417**   3:5

## 5

**5**   4:12 12:1,2,3
  12:7,20 13:4
**5843831**   122:1

## 6

**6**   4:13 12:12,14
  12:16,21 117:6

## 7

**7**   4:5,14 13:21
  14:2,5,6,12
  19:7 122:6

**75**   4:17
**77**   4:18
**770**   121:23
**78**   4:19

## 8

**8**   4:8,9,16 15:5
  15:6,7

## 9

**9**   4:17 75:15,16
  75:17 76:4,6
  76:13 110:3
**9-11-30**   122:7
**9:07**   15:8

## a

**a.m.**   2:11 5:5
  15:8
**ability**   72:16
  118:7
**able**   51:10
  71:21 81:21
  82:4 87:19
  99:13,14 118:4
**above**   14:18,21
  68:18 121:15
**absolutely**
  118:16
**acceptable**   33:8
  84:17
**accepted**   23:21
  24:2
**accident**   40:21
**account**   92:19
  99:8

**[accounting - appears]**                                                                Page 2

| | | | |
|---|---|---|---|
| **accounting** 57:5 | **addition** 91:11 115:10 116:4 | 114:7,20 115:5 115:19 116:6 116:15 | 92:17 93:10 94:6,18 95:8 96:5,7,10,13,17 |
| **accreditation** 47:10 | **additional** 18:3 99:20 112:10 | **adjustments** 86:18 100:3 | 96:20 97:6 98:6 101:19 |
| **accredited** 20:19 21:2 | 115:13 117:7 122:9 | 103:9 | 102:13 103:14 104:4 105:9 |
| **accuracy** 115:6 | **addressed** 16:3 | **ads** 45:5 | 116:6 |
| **accurate** 11:7 | 16:4 | **advertised** 45:9 | **amounts** 89:9 |
| 77:17 110:17 | **adjust** 99:7 | 64:15 65:16,21 | 91:6 |
| 110:21 111:8 | **adjusted** 85:14 | 81:16,19 | **analysis** 55:19 |
| 116:16 120:8 | 85:15 93:5 | **affects** 72:10 | 56:2 68:3 |
| **accurately** | 94:8 97:4,14 | **affirmed** 6:19 | 71:18 82:11 |
| 10:18 76:6 | 99:8 100:17 | **age** 41:17 42:15 | **ancillary** 51:12 |
| **acronym** 48:5,8 | **adjuster** 86:10 | **agent** 95:17 | **answer** 7:9,10 |
| **action** 120:13 | **adjusting** 96:18 | **ago** 82:2 | 7:13 28:13 |
| **actual** 26:21 | **adjustment** | **agree** 11:15 | 35:4,11 44:17 |
| 29:10 34:19 | 8:19 9:9 22:2,6 | 32:15 33:18 | 44:21 45:2 |
| 35:1,5,6,9,17 | 22:11 23:18 | 44:8 51:15,20 | 49:11 58:13 |
| 35:18 36:2,3 | 46:18 54:20 | 52:3,7 61:15 | 60:11,11,15,17 |
| 36:10 40:7 | 55:3,11,17,21 | 83:10 88:1 | 78:13 101:1,2 |
| 51:20 52:3 | 56:4,14 57:1 | 89:19 100:1 | **answers** 7:13 |
| 114:2,19 116:9 | 68:4 69:1,14 | 102:7,11,14 | 50:16 |
| 116:12 | 69:19 71:6 | 103:1 104:8,16 | **antique** 29:10 |
| **actually** 30:17 | 86:4 88:11,15 | 104:19 105:1 | **anyway** 104:12 |
| 44:2,5,16,20 | 89:18 91:2,5 | 115:8 | **apologize** 58:5 |
| 55:9 | 92:9,16 93:6,9 | **agreed** 5:1 | **appear** 16:2,7 |
| **ad** 45:11,16 | 94:6,20 95:2,6 | 32:20 78:16 | 83:18 |
| **add** 85:20 | 97:7,18 98:1 | **ahead** 21:9 | **appearances** |
| 103:4,11 | 99:2,8,20,21 | 35:13 | 94:19 |
| **added** 85:15 | 100:6 101:13 | **american** 19:14 | **appeared** 120:3 |
| 94:9 | 101:18,19 | 52:9,15 | **appears** 10:11 |
| **adding** 96:19 | 102:10,15,19 | **amount** 85:21 | 10:15 69:3,6 |
| 97:15 99:5,19 | 103:6,12,13 | 88:20 89:12,18 | 76:11 |
| 100:18 | 104:4,5,21 | 90:21 91:5,8 | |
| | 105:10 114:3,6 | 91:15 92:8,16 | |

Brown, Keddrick v. Progressive Mountain Insurance Company

**[application - automotive]** Page 3

| | | | |
|---|---|---|---|
| **application** 46:17 | 40:11,17,19 62:13 70:7,9 | **area** 33:18 | **atlanta** 3:13 |
| **applied** 100:6 | 108:13,14,15 | **aside** 110:2 | **attach** 122:9 |
| **applies** 114:21 | 109:3 | **asked** 11:12,16 | **attached** 12:21 |
| **apply** 22:17 | **appraiser** | 45:1 62:9 | 108:9 121:6,7 |
| **appraisal** 4:20 | 20:17,20 26:2 | **asking** 11:11 | **attachment** |
| 14:19 19:20 | 51:10 80:4,10 | 20:12 22:8,19 | 12:4,13 |
| 20:17 21:2 | **appraisers** 4:14 | 52:1,5,18 | **attempted** |
| 22:4,12,16 | 13:6 14:7 15:2 | 53:11 57:15 | 22:18 |
| 23:18 26:6,9 | 15:19,20 16:6 | 64:19 65:1 | **attend** 106:13 |
| 27:6,9,14,21 | 16:11,15,17 | 71:17 89:7 | **attended** 19:2 |
| 28:16 29:1 | 17:7,16,21 | 90:2 91:20 | **attorney** |
| 30:4,5,6 33:10 | 18:6,14,15 | 92:20 95:5 | 121:12 |
| 33:21 37:12 | 19:5,15 23:8 | 100:8,9 104:12 | **auction** 31:13 |
| 39:19,19 40:8 | 24:12 26:3,14 | 104:14,16 | **auto** 4:14 13:6 |
| 40:17,18 41:7 | 26:18 47:8,9 | 112:15,20 | 14:7 15:20 |
| 41:8 46:18,21 | 47:13 48:14 | 115:10 | 16:11,15,17,19 |
| 47:1,12 48:15 | 49:15,18 50:1 | **asks** 76:16 78:2 | 17:7,15,20 |
| 50:4,7,15 53:4 | 52:10,15 54:1 | **aspects** 90:17 | 18:5,13 19:5 |
| 53:9,15 54:1 | 54:5,14 | 92:2 100:16 | 20:9 23:7 |
| 71:7 76:17 | **appraising** | **assessments** | 24:12 26:3,17 |
| 78:3 81:20 | 16:19 17:4 | 87:12 88:3 | 28:15 38:7 |
| 89:3 107:14 | 20:9 52:13,17 | **assignment** | 45:3 47:8,9,16 |
| 108:6,8,12 | 52:21 53:1 | 122:1 | 48:14 49:18 |
| 116:19 117:17 | **approach** | **assist** 122:8 | 50:1 52:13,17 |
| 117:17 118:4,9 | 27:18 28:4,7 | **assisted** 120:7 | 52:21 53:1,4,9 |
| 118:17,20 | **approaches** | **assume** 104:1,7 | 53:15 54:1,1,4 |
| **appraisals** | 27:8,13 | 104:11,15 | 54:14 108:14 |
| 18:14,15 20:4 | **appropriate** | **assumed** 85:13 | **automatically** |
| 20:7,13 22:7 | 80:4 83:11 | **assumes** 73:14 | 114:7 |
| 22:17 23:8,13 | **approximately** | **assuming** | **automobile** |
| 24:10 26:19 | 112:3 117:3,15 | 104:18 114:12 | 22:17 |
| 27:1,5 29:5,17 | **april** 2:10 5:5 | **assumption** | **automobiles** |
| 29:19,20 30:2 | 120:14 | 114:12,16 | 29:6,7,8 32:6 |
| 30:9 40:2,4,10 | | **assurance** 2:5 | **automotive** |
| | | 5:20 | 108:19 |

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 127 of 238
Jason Merritt
April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

[autos - bureau]                                                    Page 4

**autos** 28:14
**autotrader**
  81:18
**available** 36:20
  37:16 44:16
**avalanche**
  38:18,18
**aventura** 3:6
**avenue** 2:12 3:5
  6:3
**average** 93:10
  94:1 95:9
**averages**
  117:21
**aware** 11:3,5
  98:10,16,17
  99:12

**b**

**b** 4:7 25:13
  71:5
**back** 47:3 50:6
  58:19 61:5
  63:12 67:20,21
  73:20 84:9,14
  85:11,12,15,21
  91:20 92:20
  95:14 97:16
  99:5,19 100:18
  103:4,12 110:3
  113:19 121:3
**backed** 85:14
**bad** 93:17
**bar** 14:19 15:9
  15:15

**bars** 39:11
**base** 79:12 86:1
  89:11,16 91:5
  92:14,19 93:7
  93:10,11,13
  94:1,10,11
  95:2,9 96:14
  97:3 98:13
  99:4 100:17
  101:20 104:2
  112:20
**based** 45:18,21
  59:1 63:13,20
  64:8 71:12
  73:21 88:15
  91:15,17 92:9
  93:10 94:7,9
  97:15,19 99:18
  109:20 114:20
**basing** 49:13
**basis** 58:15
  94:12
**bates** 79:8 87:7
**becoming**
  90:21
**bed** 37:20 38:3
  38:19
**beginning**
  79:17
**begins** 63:13,17
**behalf** 1:4,13
  2:1 3:2,8 5:8
  5:11,18 6:6
  75:21 77:17

**believe** 10:8
  18:21 25:12,14
  34:12,15,18
  45:8 46:2
  47:16 48:17
  49:17 50:5
  51:5 73:18
  97:8 109:11
**belong** 18:8
**bent** 25:12,15
  49:17,19
**best** 81:4 82:17
  83:20
**better** 26:7
  27:10 51:9
  81:11 85:6
  90:1
**bid** 108:14
**big** 84:16
**bit** 84:14
**blanket** 45:6
  113:1
**blogs** 31:14
  53:6,14
**boat** 29:17,18
**boats** 29:12
**body** 40:7,10
**books** 30:14,15
  32:5,7,14
**bost** 1:12 5:11
  63:4 105:17
  106:4 119:4
**bottom** 14:12
  74:10 76:14
  79:8 111:3

**break** 7:21 75:6
**breaks** 94:14
  94:18
**bring** 109:17
**broad** 62:2,9
  86:19 115:15
  115:15
**brown** 1:3 4:8
  4:19 5:8 8:6
  12:4 13:1,10
  46:11 50:12
  55:11 62:21
  63:2,5 75:18
  76:8 78:17
  79:2 81:11
  105:17 110:6
  110:19 111:11
  111:15,20
  117:3,7,10
  119:2
**brown's** 80:16
  82:16
**built** 38:16
**bureau** 4:14
  13:5 14:7
  15:19 16:5,11
  16:14 17:7,15
  17:20 18:5,13
  19:4 23:7
  24:10,11 25:16
  26:3,13,17
  47:4,7,8,9,13
  48:13 49:14,17
  49:21 53:21
  54:4,14

Brown, Keddrick v. Progressive Mountain Insurance Company

April 14, 2023

**[business - changes]**

Page 5

| | | | |
|---|---|---|---|
| **business** 46:8 | 45:18,21 46:8 | 62:10,10 78:17 | 15:19,20 16:1 |
| **businesses** 29:3 | 66:21 67:4,5 | 88:4 112:11 | 16:5,11,14,21 |
| **buy** 66:21 67:5 | 67:10 | 116:20 117:7 | 17:7,15,20 |
| 67:10 | **carry** 84:10 | 119:9 | 18:5,13 19:4 |
| **buyers** 109:18 | 112:17 | **cash** 26:21 | 20:16 21:2 |
| **c** | **carryover** | 29:11 34:19 | 23:7 24:12 |
| **c** 2:13 3:1 79:18 | 50:19 | 35:1,5,6,9,17 | 26:3,13,17 |
| 120:17 | **cars** 30:15,16 | 36:2,3,10 | 47:8,9,13 |
| **calculate** 55:2 | 34:11,14,17 | 114:2,19 116:9 | 48:14 49:14,18 |
| 55:10 72:3,16 | 44:1,4,9,20 | **cashdan** 3:9 | 50:1 54:1,4,13 |
| 97:9,10 103:5 | 112:17,21 | 4:5 6:12,12 7:2 | **certify** 20:13 |
| **calculated** | 113:10 | 21:10,12 44:13 | 120:2,5,9,11 |
| 72:11,13 73:15 | **cars.com** 81:17 | 48:1 49:8,10 | 122:2 |
| 92:9 94:7 95:3 | **case** 1:6 2:3 4:8 | 57:13,17,19 | **chance** 10:17 |
| 95:7 | 4:9 5:14,15,20 | 58:2,8 60:1 | **chandler** |
| **calculates** 8:18 | 5:21 8:6,13 | 75:8,13 113:12 | 108:14 |
| **calculating** | 9:12 10:10 | 113:18 119:11 | **change** 97:6 |
| 55:20 56:4 | 12:4,14 13:10 | **categories** | 98:13 99:4 |
| 57:1 79:12 | 22:1 23:15,17 | 87:11 | 100:17 101:19 |
| 86:1 91:4 | 46:11 50:12 | **causes** 68:4 | 103:5,13 104:2 |
| **calculation** | 58:10 60:8,18 | **caveats** 51:19 | 115:3,13 |
| 70:21 71:2,3 | 60:20,21 61:14 | **center** 105:7 | 122:11,13,14 |
| **calculations** | 62:11,14 63:1 | **certain** 16:13 | 122:16,17,19 |
| 68:9 72:1 | 63:2,4,5,8 | 70:20 71:14 | 122:20,22,23 |
| 74:12 97:12 | 75:18 76:8,19 | 72:14,14 73:10 | 122:25 123:1,3 |
| 98:5,7,9,12 | 77:14 78:5 | 74:20 | 123:4,6,7,9,10 |
| **call** 16:5 | 98:10,19 110:6 | **certificate** 13:6 | 123:12,13,15 |
| 118:10,10 | 110:10,19 | 13:11 14:13,15 | 123:16,18 |
| **called** 19:14 | 111:3,5,20 | **certification** | **changed** 97:5 |
| 20:2 30:19 | 112:2,5,8 | 12:19 13:4 | 97:14,18 |
| 56:10 | 114:8 117:4,10 | 14:9 16:10 | 115:12,19 |
| **calling** 56:8 | 117:12,20 | 17:15,20 47:16 | 116:6,14 |
| **car** 30:2,4,5,9 | **cases** 9:8,16 | 48:10 49:12 | **changes** 85:19 |
| 30:17 31:14 | 10:3,14 11:6 | **certified** 4:14 | 116:11 121:7 |
| 33:6 41:21 | 13:1 55:12 | 13:6 14:7 15:2 | 122:4,5,7 |

**[check - condition]**                                    Page 6

check  39:12
chevrolet  38:18
  38:20 108:15
chevy  108:7
choices  85:6
choose  80:9
choosing  37:9
chose  81:3
  83:11
chosen  80:19
  81:1 82:7,15
  106:6
chris  3:7 6:9
  60:2
christopher  3:3
  121:1
circumstance
  66:16
circumstances
  41:9,10 118:15
civil  122:6
claim  31:9
clarification
  7:18
class  48:10,12
  48:20,21
classic  29:10
  30:2,4,5,9,16
  30:17 32:6,17
  33:6 34:11,14
  34:17
classwork  18:3
clear  9:18 27:4
  51:7 70:14

coach  57:20
coaching  57:21
  58:2,5
codes  39:6
collects  56:21
college  106:10
  106:13 107:2
  107:13
colloquy  75:11
  113:16
columbia  120:1
  120:2
come  32:13
  34:4 38:21
  61:5 67:9 70:6
  71:18,21 89:4
  91:14 92:15
  93:6 96:1,12
  99:17 102:4
  118:9
comes  33:19
  38:19 66:20
  67:5 93:7
  95:21
coming  32:16
  33:21 40:20
  41:1
commencing
  2:10
commercial
  29:4
commission
  120:20 123:25
communicated
  25:8,20

company  1:9
  1:18 2:5 5:10
  5:13,20
company's  9:9
comparable
  27:18,19 32:1
  41:4,6,12
  46:19 51:9,16
  71:7 79:11,20
  80:5,10,15
  81:1,10 82:15
  84:10 86:7
  89:16 91:6
  92:15 93:11,19
  94:9 96:19
  97:5,14 100:5
  100:18 101:20
  104:3 105:8
  106:5 113:9
comparables
  81:4,12 82:6
  83:11,12,19,21
  84:6 85:4,13
  85:17 89:12
  93:1,5 94:21
  95:10 99:9
  118:9
comparative
  31:11
compare  72:4
compared  86:6
  87:21
comparing
  73:8

compile  34:8
complete
  106:15
completed
  121:18
completely
  24:20
compliance
  20:5
complies  22:2
  22:11
comply  26:9,19
comports  23:18
comps  82:1
computer
  120:7
concerning  9:8
  22:15 63:7
concluded
  119:19
concludes
  119:16
conclusion  70:6
  71:19
conclusions
  22:1,10 23:16
  59:2,7,11
  61:20 62:21
  63:4,8,11
condition  45:4
  45:11,15 86:4
  86:6,15,17
  87:8,12 88:3
  88:11 89:8,13
  89:17,18 90:5

**[condition - course]**                                                    Page 7

90:17 91:2,4
91:15,16,17
92:1,6,8,10,10
92:13,15 93:6
93:9 94:6,7,20
95:1,6,18 96:1
96:14,18 97:6
97:18,21 99:2
99:7,21 100:6
101:13,19
102:10,15,19
103:5,13 104:4
104:21 105:9
114:6 115:19
116:5 118:8
**conditions** 45:8
45:12 46:1
**conduct** 20:4
**conducting**
23:13
**conferences**
18:20
**confirm** 51:10
**conform** 27:5
**conformity**
20:14
**conglomerate**
31:14
**consider** 29:16
29:18 30:1
32:9 63:21
64:9,13 65:15
70:17,19 71:13
74:2

**consideration**
67:16
**considered**
28:15 64:15
66:8 74:5
80:15 81:1
**consolidated**
5:14 63:5
**contacted** 59:9
62:14
**contained**
120:9
**continuing**
17:17,21 19:5
**conversation**
62:8 64:21
65:7,12
**conversations**
63:20 64:8
71:12 74:1
**convert** 88:19
**converted** 95:8
116:5
**converting**
89:17 91:7
96:16
**converts** 88:10
**copies** 121:12
**copy** 9:20 10:2
10:9 12:7,15
12:17 13:5,9
14:6 54:12,17
77:12 79:1
**corbin** 2:13,21
6:5 120:2,17

**correct** 8:8,9,13
8:15,16 9:13
9:14,16,17
10:9,12,19
12:6,7,15,20
13:8,13 14:14
14:16 15:12,13
17:10,11 23:2
23:3 27:6,7,18
32:3 33:2,8,11
33:13 40:3,15
49:20 50:14
54:5,7,10,11,16
68:20 70:12,18
70:21 71:1,4,9
71:16 72:11,12
72:14 73:12
75:4 76:11
77:4,6,7,8,15
78:12,13,14
79:3 80:2,3,13
80:19 83:8,9
83:15 85:10,17
85:18 87:8,9
87:14,15,17
88:5,7,8,12,17
90:9,14,18,19
91:1,2 94:3,5
95:3,19,20
96:6,8,9 97:16
97:17 99:17
100:13 102:2
102:16,20
105:13,18,21
106:1,2,3

108:20 110:13
110:14 111:7
111:14 112:12
114:13,17
115:2 116:9,10
116:18 117:5,8
117:9,12
**corrections**
121:7 122:9
**correctly** 15:14
73:16 76:21
77:5 78:7
**cost** 28:4
**costello** 1:21
4:9 5:18 8:13
12:13 13:1
50:15 55:11
63:8 77:13
78:17 105:18
106:4 111:3,11
111:16 112:5
117:7 119:6
**costs** 61:5
**counsel** 6:6
7:19 55:7
58:11,11 63:20
64:3,8,21 65:5
65:8 70:3
71:12,21 74:1
82:9 120:4,9
120:11,12
**counsel's** 11:10
58:13
**course** 16:18,18
16:20 23:5

**[course - difference]**                                    Page 8

25:20 53:20
75:8 109:19
**courses** 22:15
24:13 25:9
107:13,16,19
**coursework**
54:5
**court** 1:1 5:16
5:21 6:5 7:12
121:15,20
**court's** 58:10
**cover** 38:3,19
**crw** 2:5 5:21
**cs** 121:24
**current** 16:12
114:21
**currently** 16:1
17:4
**cv** 1:7 2:4 5:15
5:20

**d**

**d** 4:1
**d.c.** 2:12 6:4
46:5 120:14
**damage** 39:19
41:2
**damaged** 40:5
40:14
**daniel** 3:10
6:14
**data** 55:1,4,5,6
55:8,9,20 56:3
56:5,10,13,17
56:19,20 57:3
57:8,10,15

66:15 68:4,10
68:17,21 69:13
69:20 70:4,10
70:11,20 72:2
72:4,7,14,14,17
73:1,10 74:12
82:6 83:14
86:9 89:1
98:12 101:9,11
**date** 5:5 13:11
13:18 110:10
110:15 121:3
**dave** 6:5
**david** 2:13,21
120:2,17
**day** 120:14
123:21
**days** 121:3
**dealer** 45:11
67:3,4 113:2,4
113:8
**dealers** 45:3
56:8,8,10 57:8
57:10 58:21
59:3,6,9 61:19
62:14,16,20
63:3,7 66:5
112:20 113:2,4
113:5 118:10
118:10
**dealerships**
57:5 66:19,19
67:8
**dealt** 15:21
62:17

**decided** 114:5
**decode** 36:17
**decoder** 36:14
36:15 37:4,11
37:16,19 38:5
38:15 39:2,9
39:10
**decoders** 36:20
37:8
**deducted** 72:19
85:16
**deductions**
89:4,6 98:1
**deeper** 39:9
**defendant** 2:6
**defendant's**
76:2
**defendants**
1:10,19 3:8
6:13,15
**definitions**
36:11
**degree** 106:10
106:21 107:3
**depend** 33:4
38:1,4,8,17
39:8 41:16
42:2,9,18
115:16
**depending**
43:14 118:14
**depends** 30:5
36:8 37:2,13
**deponent** 121:2
121:6,6,7,9,15

**deponent's**
123:20
**deposed** 9:7,12
9:15
**deposition** 2:9
5:2,7 8:7,14
10:1,4 12:2,16
14:2 15:6 60:7
61:3,16 75:16
77:11 78:21
108:1 119:19
122:8
**depositions**
55:16
**desire** 122:7
**desk** 118:3
**details** 87:8
**detect** 38:12
**detector** 38:10
38:11,13,14,16
**determination**
114:2,19
**determine**
81:11
**determined**
74:4 102:8
**determining**
116:9
**developing**
76:19 78:5
**device** 38:12
**differ** 45:18,21
**difference** 9:3
12:18 21:1
28:10,21 39:18

Brown, Keddrick v. Progressive Mountain Insurance Company

**[difference - exaggerate]**

Page 9

40:16 41:19
98:2
**differences**
86:14
**different** 25:5
27:1,8,13
30:13 32:9,14
33:14 35:14
36:13 37:8
39:1,5,6,6
40:19 41:3
45:8 55:8 57:5
69:3,6,9 73:10
74:6,14 82:6
83:4 87:10
90:17 92:1,1
94:19 101:15
117:19
**difficult** 81:13
102:4
**diminished**
40:7,11,17,20
41:8
**direct** 7:18
**directed** 77:13
**disagree**
103:19
**disagreed** 88:3
89:5
**discount** 51:12
**discuss** 23:17
**distance** 84:13
84:16
**district** 1:1,2
5:16,16,21 6:1

120:1,2
**document**
21:18 79:4,7
108:21 110:8
**documents**
60:18 76:17
77:3 78:3,10
78:16
**doing** 26:8 30:6
30:7 35:5 37:3
37:13 84:1
118:3
**dollar** 32:20
88:11,20 89:9
89:12,18 90:21
91:5,5,8,15
92:8,16 93:9
95:8 96:4,7,10
96:13,17 97:6
101:18 103:13
104:4 105:9
116:6
**doubt** 98:20
**drummond**
4:11 9:16 10:3
10:14
**due** 121:3
**duly** 6:19

**e**

**e** 3:1,1 4:1,7 7:1
25:13 122:6,7
**earlier** 49:19
54:3
**eastern** 6:1

**economical**
58:15
**edelsberg** 3:4
6:10
**edelsberglaw...**
3:7
**education**
17:17,21 19:5
**eight** 117:11
**either** 11:3 40:9
91:11
**electronically**
121:8
**element** 91:16
**elvis** 42:2
**employed**
49:21
**employee**
120:11
**endorsed**
115:20
**enforcement**
106:18,20
**engage** 17:16
**engaged** 17:21
**entered** 15:8
120:9 122:8
**entering** 33:5
**enthusiasts**
31:15
**entire** 21:18
**entitled** 46:17
52:15
**entry** 66:15

**equipment**
38:7 94:19
**eric** 108:13
**errata** 121:3,7
121:8,9,11,13
121:14,18
122:1
**esq** 121:1
**esquire** 3:3,9
3:10
**established**
109:20
**estimate** 32:17
**ethics** 20:11
**evaluate**
115:13 116:7
118:8
**evaluated** 37:7
88:4
**evaluation**
40:20 73:3
87:4,5,8 88:1
102:5 105:4
**evaluations**
86:15
**exact** 64:7
79:20 86:9
88:21 112:1
**exactly** 30:5
32:20 47:15,21
55:6 57:4
62:16 84:21
90:1
**exaggerate**
45:4

[examination - form]                                                    Page 10

| | | | |
|---|---|---|---|
| **examination** 4:4 120:5 | 46:10 50:6 | **extent** 11:1,15 | **field** 32:11 |
| **example** 31:4 | 63:12 75:15,16 | **exterior** 87:11 | **fifth** 108:17 |
| 33:16 46:4 | 75:17 76:4,6 | 92:2 | **figures** 96:11 |
| 67:3 94:17 | 76:13 77:10,11 | **f** | **file** 121:12 |
| 95:21 117:11 | 77:12,17,21 | **facility** 121:19 | **filed** 5:15,21 |
| **examples** 45:10 | 78:20,21 79:15 | **fact** 17:19 | 121:15 |
| **except** 102:12 | 80:18 85:11 | 44:11 54:7 | **fill** 121:7,8 |
| 103:4 114:2,19 | 87:6 108:1,3 | 59:5 72:1,3 | **find** 24:1,3,5 |
| **exception** 8:17 | 108:18 110:3 | 81:3 82:17 | 87:19 |
| **exclude** 65:20 | 111:2 113:19 | 83:10 | **finish** 7:8,9 |
| 69:18 | **exhibits** 8:5 | **factor** 41:15 | 60:13,16 62:6 |
| **excluded** 68:21 | 10:5 12:20 | 89:17 | **finished** 62:19 |
| 69:20 70:11,20 | **exist** 44:2,5,11 | **factory** 38:6,13 | **first** 75:21 |
| 72:18 73:1,11 | 44:14,14,15,20 | **fail** 9:5 | 111:3 |
| **excludes** 67:16 | **expect** 33:7,13 | **fair** 7:10,11 | **five** 50:11,19 |
| **excluding** 68:9 | **experience** 24:9 | 11:13 34:19 | 53:2,5 79:10 |
| 68:17 70:3 | 34:10 44:9 | 35:9,15,20 | 80:18 82:14,17 |
| 71:14 72:2,4 | **expert** 29:17,18 | 36:1 43:21 | 83:2,3,4,11 |
| 72:14 74:12,20 | 30:1 31:9 | 80:7 82:13 | 84:7 87:6,13 |
| **excuse** 19:4 | 32:10,13 33:9 | 109:13,15 | 88:19 90:9 |
| 28:19 69:5 | 33:17 82:14 | 116:10 | 91:21 93:1,19 |
| 106:3 | 99:18 104:11 | **falls** 84:21 | 95:14 112:4 |
| **exhibit** 4:8,9,10 | **expertise** 71:18 | **familiar** 19:13 | **flares** 39:4,7 |
| 4:11,12,13,14 | **experts** 119:9 | 19:19,21 20:1 | **florida** 3:6 |
| 4:16,17,18,19 | **expiration** | 21:5,7,15,16,17 | **focus** 56:13 |
| 4:20 8:4,7,11 | 13:11,18 | 21:18,19 28:4 | **focusing** 43:15 |
| 8:14 9:2,3,4,20 | **expires** 120:20 | 28:7 52:11,12 | **follow** 27:2 |
| 10:1,2,4,9,13 | 123:25 | 66:18 67:2 | 60:6,6 |
| 11:18,18 12:1 | **explain** 26:7 | **far** 92:18 | **following** 76:1 |
| 12:2,3,5,7,12 | 27:10 89:21 | **fashion** 84:11 | 122:5 |
| 12:14,14,16,21 | **explanation** | **federal** 122:6 | **follows** 6:21 |
| 13:4,21 14:2,5 | 84:9 | **fee** 16:1 | **ford** 108:12,16 |
| 14:6,12 15:5,6 | **explanations** | **fell** 16:8 | **form** 31:10 |
| 15:7 19:7 | 58:7 | **fender** 39:3,7 | 114:21 122:7,9 |

**[forth - hour]**

Page 11

| | | | |
|---|---|---|---|
| **forth**  22:3 | 59:6,14 67:3 | **gold**  3:3 6:9,10 | **hagerty's**  31:5 |
| **forty**  25:2 | 118:18 | 21:8,11,14 | 31:5 |
| **forward**  121:12 | **getting**  115:4 | 28:12 35:3,13 | **hand**  8:3,10 |
| **found**  15:12,18 | **give**  76:9 90:16 | 42:21 43:9 | 12:10,11 13:20 |
| **foundation** | 96:13 113:1 | 44:6,12,14 | 15:4 75:14 |
| 49:9 57:18 | **given**  24:12,16 | 47:20 48:2 | 77:9 78:19 |
| **four**  10:5 46:13 | 24:18 56:21 | 49:4,7,9 57:12 | 108:2 120:14 |
| 50:7 92:21 | 84:5 87:13 | 57:14,18,21 | **handing**  11:21 |
| 93:15,16 110:9 | 122:8 | 58:3,9,17 60:3 | **handles**  68:3 |
| 110:18 111:4 | **giving**  48:21 | 60:6,13,16 | **handouts**  24:18 |
| 111:10 112:4,7 | 62:2 | 61:12,15 62:4 | **hang**  60:13 |
| 112:10 117:3 | **go**  13:5 21:9 | 73:17 100:10 | 61:12 62:4 |
| 117:21 118:2 | 35:13 37:5 | 102:21 103:7 | **happen**  67:13 |
| 118:12 | 63:16 71:8 | 103:15,20 | **hard**  38:19 |
| **fourth**  79:7 | 73:20 75:8 | 104:6,9,17 | **hate**  104:10,11 |
| **freeman**  4:11 | 79:21 81:17,18 | 105:2,11 | **head**  7:14 28:3 |
| 9:15 10:3,14 | 83:16 84:15 | 119:13 121:1 | **heading**  79:18 |
| **friday**  2:10 | 87:6 92:20 | **good**  6:9 7:3,4 | **hear**  27:16 44:3 |
| **full**  109:15 | 93:15 95:14 | 7:4,5 83:18 | **heard**  19:16 |
| **furnish**  122:9 | 113:12,19 | 102:5 | 20:2,3 30:19 |
| **further**  119:12 | 118:4 | **greater**  69:1 | 30:20 46:7 |
| 120:5,9,11 | **goes**  16:18 | **greetings**  121:5 | **hemming**  31:18 |
| **g** | 108:21 | **ground**  7:7 | 31:20 32:4,15 |
| | **going**  9:1,19 | **grounds**  21:10 | 34:13 |
| **ga**  121:22 | 11:9 13:20 | **guess**  43:2 48:7 | **hemmings** |
| **general**  20:11 | 21:8 35:3 | **guide**  30:15 | 30:13,21 31:1 |
| 62:9,12 | 37:18 38:13 | 32:5,7,14 | 53:7 |
| **generally**  22:7 | 58:9 61:2,3,4 | **guns**  38:12 | **higher**  68:5 |
| 23:21 24:1 | 63:11 71:14 | **h** | 71:15 73:2,19 |
| 34:21 35:8 | 73:14 90:4,16 | | 91:3 |
| 36:1 45:9 51:9 | 95:17 100:10 | **h**  4:7 | **homes**  29:3 |
| 109:20 113:6 | 108:2 110:3 | **hagerty**  30:19 | **hour**  16:19 |
| **geographic** | 113:14 117:16 | 30:21 31:1,4,5 | 23:5 48:10,14 |
| 45:19 46:1 | 117:20 118:8 | 31:6,7,8,8,9,16 | 48:20,21 |
| **georgia**  1:2 | 118:13 | 31:20 32:4,15 | |
| 3:13 5:17 59:1 | | 33:17 34:10 | |

Jason Merritt
Pages on 935rritt
April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

**[hours - kind]**                                              Page 12

**hours**  25:2 47:3
  106:15,16
  110:9,18 111:4
  111:10,12,15
  111:20 112:1,4
  112:7,10 117:3
  117:7,11,21
  118:2,12
**hundreds**
  62:13 80:8

**i**

**iacp**  19:8,10
  47:10,11,14,19
  48:3,9,12,16
  49:3,6,12,16
  50:3
**identical**  8:20
**identification**
  8:4,11 12:1,12
  13:21 15:5
  75:15 77:10
  78:20 108:3
**illinois**  1:18
  5:14
**image**  14:13
**imagine**  28:1
  101:10
**impact**  42:7,11
  42:13,17,19
  43:1,5,8 74:21
  105:9
**include**  37:20
  38:2,6,9
**included**  73:10
  74:14,16,18

**including**  72:4
  72:13,17 74:16
  111:21
**income**  28:7
**inconsistent**
  46:18 71:6
**increase**  100:4
**independent**
  47:16 65:4
**independently**
  81:9 82:1
  106:6 116:19
**indicate**  68:16
**indicated**  11:2
  71:11
**indicates**  14:21
  111:4
**indication**
  66:15
**indicators**  52:1
  52:4
**individual**
  91:16,18 92:10
  93:11 94:8
  95:10 96:19
  97:4 118:14
**individually**
  1:3,12,21 5:8
  5:11,18 97:11
  111:18
**individuals**
  42:4
**information**
  37:15 38:2,6,9
  38:16 39:3

  60:5 71:20
  82:10 83:7
  84:5
**inputting**  88:10
**inspect**  90:4
  118:7
**installed**  39:11
**instance**  43:19
  73:1
**instances**  41:18
  41:20 43:11,16
  67:15 69:14
  106:4
**instructions**
  58:10
**instructor**  25:3
**instructors**
  25:5,9,19
**insurance**  1:9
  1:17 5:10,13
  9:8 108:19
**intention**  58:3
**interact**  18:11
  93:4
**interacts**  92:14
**interested**
  120:12
**interior**  87:11
  92:2
**internet**  30:12
  30:12 36:16
  44:2,5,10
**interrogated**
  120:4

**introduce**  6:7
**invalid**  51:8,16
**investigate**
  56:17
**issue**  23:8,9,10
  50:3
**issued**  53:18
**issues**  45:4
  86:17,21
**item**  109:3
**items**  51:13

**j**

**jason**  2:9 4:3
  5:7 6:18 76:1
  119:17 120:3
  121:2
**jcashdan**  3:14
**jd**  55:2,16,20
  56:3,11,14,18
  56:21 57:3,8
  57:10 69:13,17
  72:17 73:1,4
**jeff**  3:9 6:12
**jonathan**  3:16
  6:4
**july**  120:20

**k**

**keddrick**  1:3
  5:8
**keep**  61:3
**keeping**  61:16
**kind**  30:6 31:14
  32:1

Jason Merritt                                    April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

**[king - make]**                                                    Page 13

**king**  2:11 3:11
6:2,12,14
**know**  8:1 9:5
10:6 14:3
15:18 16:2
18:10,21 22:14
24:6,8 27:15
28:2,15,21
35:12 43:11
47:18 49:2,5
49:15 50:2,10
52:9 56:20
57:7,9 58:20
59:13 60:3
65:11,19 66:2
66:4,7,12,14
67:15 68:1
69:11,12,17
70:1,2 74:8
77:16 80:14,21
81:3 82:5,8,19
83:6 84:2,3,4
84:18 85:5,8,9
86:9,16,21
87:2,16 88:21
89:2,10,11,15
89:15 91:13
92:12,13 96:12
96:16 97:1,2,3
97:4,11 98:4
99:11 100:4,9
100:15,20
101:1,3,5,6,9
103:10,17
104:12 105:3

105:12 106:5,8
107:4,5 108:4
112:2,19
114:15 115:19
115:21 118:5
**knowing**  80:4
80:10
**knowledge**
89:8
**knows**  101:2
**kslaw.com**  3:14

**l**

**label**  112:13,17
**laurel**  2:5 5:20
**law**  3:4 6:10
67:1,4 106:18
106:20 120:4
**laws**  66:18 67:2
**laydown**  46:8
**left**  14:12 97:21
**legal**  108:19
**letter**  110:15
**limited**  81:20
**line**  21:9 75:18
84:21 109:12
109:15 122:11
122:14,17,20
122:23 123:1,4
123:7,10,13,16
**liner**  37:21
**list**  51:10 66:20
67:4,18 81:7
85:16 86:1
**listed**  44:1,4,10
44:15 67:10

93:19
**listings**  15:12
**lists**  79:10
**little**  27:10
84:14 89:21
**locality**  109:21
**located**  25:15
**location**  84:12
109:21
**locations**  45:19
**long**  25:1 33:12
66:3 107:2,5
117:16,18
**look**  10:5 13:4
14:1 33:14
55:9 57:14,16
71:21 79:14
81:15,19 82:1
84:12 85:11
90:13 91:20
108:4 111:2
118:8
**looked**  19:11
53:21 81:6
87:20
**looking**  33:4
40:1 72:7 95:9
112:1
**looks**  14:6,15
108:6
**loose**  33:20
**loss**  29:10
35:19 40:6,14
40:18,21 41:1
41:7,13 42:6

79:12 80:6
81:13 84:2,16
86:4,6 87:19
87:20 88:11
93:8,13 95:6
96:15 99:21
100:7 102:16
105:7,10
116:13 117:17
118:6,18,21
**losses**  40:2
**lot**  66:21 67:5,9
118:14
**low**  69:18
**lower**  46:5
67:18 68:5,10
68:13,18 69:15
69:19 70:4,10
71:3 72:2,8,20
74:13 91:3

**m**

**m**  7:1
**made**  99:19
101:18
**mail**  121:10
**maintain**  17:14
**maintains**  82:5
**make**  36:18
41:19,21 42:9
43:12,17,20
58:11 70:14
76:9 85:19
86:3 87:3,5
93:14 102:15
103:9 104:3

Brown, Keddrick v. Progressive Mountain Insurance Company

**[make - multiple]**

Page 14

122:7
**makes** 38:18
**making** 58:14
73:13 102:3
122:8,8
**management**
57:6
**manages** 69:13
70:10
**manner** 120:8
**mansell** 121:20
**manually** 121:8
**manufacturer**
36:19
**march** 110:12
110:17 111:5
111:19 117:6
**mark** 9:20 10:2
**marked** 8:3,7
8:11,14 10:1,4
12:1,2,11,12,16
13:21 14:2
15:4,6 75:15
75:16 77:10,11
78:19,21 108:1
108:2
**market** 27:18
34:20 35:10,15
35:21 36:1,2
38:6 51:21
52:4 109:13,15
109:18,19
**marketplace**
80:9

**marsh** 108:13
108:13
**material** 24:15
61:6
**materials** 24:13
30:8 52:14
53:9,15,20
54:4 60:9
**math** 8:18
**matter** 5:7,17
22:10 59:2,7
59:11 61:20,21
120:7
**mean** 33:1 47:8
69:8 101:4
108:11 115:16
**means** 109:17
120:7
**mechanical**
87:12 92:2
**media** 5:6
119:17
**meetings** 18:16
**member** 19:17
26:1
**members** 18:8
18:11,16 49:3
**mention** 111:12
**mentioned**
32:15 40:1
49:19 53:14
54:13 117:2
**merritt** 2:9 4:3
4:8,9,12,13 5:7
6:18 7:3 8:4

61:11 75:14
76:1 77:2 78:9
106:9 119:17
120:3 121:2
**methodologies**
27:20 41:3
**methodology**
20:11 22:6,7
27:19 31:12
41:5,7 46:19
63:14 71:8
84:9,10,21
88:19,21 89:2
91:14 102:7,8
102:11,14
103:4 105:7
113:9 114:1,8
114:18,21
115:4,9,12,13
116:13,20
**michelle** 1:12
5:11
**mileage** 42:10
43:3 94:18
**miles** 42:13
**mine** 84:11
**minor** 98:2
**misstate** 48:7
**misstates** 48:2
**mistakes** 11:2,3
**mitchell** 4:19
63:14,20 64:9
64:12,13 65:15
67:16 68:3
69:12 70:10,16

71:13 74:1,4
79:2 80:15
81:3 82:5
83:11 86:3
98:11,18,19
99:13 101:3
103:3,11,17,18
104:1,16,20
106:7 114:1,5
114:18,20,21
**mitchell's**
46:17 68:9
74:11 102:6
**model** 36:9,9
36:18 38:4,17
39:5,12 42:10
**moment** 14:1
37:19 54:19
108:3 110:3
**monroney**
112:13,17
**month** 56:21
**monthly** 16:1
**morning** 6:9
7:3,4 15:8
**motorcycle**
29:20
**motorcycles**
29:14
**mountain** 1:8
2:5 5:10,19
**multiple** 10:11
42:1,3 43:4,12
43:17,20 53:6
53:6 62:9,12

Jason Merritt
Brown, Keddrick v. Progressive Mountain Insurance Company

April 14, 2023

**[n - okay]**

Page 15

| n | normally 20:6 | o | okay 7:15,19 |
|---|---|---|---|
| **n** 3:1 4:1 7:1,1 | 38:19 41:12 | **o** 7:1 | 7:20 8:1,10,16 |
| 25:13 | 42:13 43:1 | **object** 21:8 | 9:1,7,18 10:21 |
| **n.e.** 3:12 | 84:13 | 35:3 100:10 | 11:9,21 12:10 |
| **n.w.** 2:12 | **northern** 1:2 | **objection** 28:12 | 13:3,14,20 |
| **nada** 30:14,17 | 5:16 | 35:13 42:21 | 14:11,18,21 |
| 31:3 32:5,15 | **northwest** 6:3 | 43:9 44:6,12 | 15:4,17 16:14 |
| 33:19 34:16 | **notarized** | 44:13 47:20 | 17:1 18:5 |
| **name** 4:2 15:8 | 121:9 | 48:1 49:4,7,8 | 19:13 21:5,21 |
| 15:14,19 16:2 | **notary** 2:14 | 57:12,13,17 | 22:14 23:4 |
| 16:7 | 120:2,18 | 58:16 62:4 | 25:1,3,8,18 |
| **named** 120:3 | 123:24 | 73:17 102:21 | 26:1,15 27:8 |
| **names** 15:1 | **noted** 122:4,5 | 103:7,15,20 | 27:17 33:16 |
| **ne** 3:5 | **notes** 59:20 | 104:6,9,17 | 34:16 37:19 |
| **necessarily** | 61:1,18 62:1 | 105:2,11 | 39:18 41:3,6 |
| 51:8,15 96:13 | 62:10,12 65:7 | **objectionable** | 41:13 44:9 |
| **necessary** | 65:9,10,11 | 61:8 | 45:3,10,14,18 |
| 99:20 100:2 | 120:6 | **objections** | 46:7,21 47:5,7 |
| 122:9 | **notice** 2:8 | 58:12,14 | 49:10 50:3,6 |
| **need** 7:21 44:18 | **noting** 121:7 | **objective** 68:15 | 50:11,19 51:2 |
| 85:11 115:5,12 | **notorial** 120:14 | 83:15 | 51:20 52:20 |
| 116:7 118:10 | **number** 5:14 | **obtain** 106:21 | 54:20 56:15,20 |
| **needs** 7:12 | 36:16,17 41:14 | **obtained** 17:19 | 57:19 62:20 |
| **networking** | 42:7,16,20 | **obviously** 96:4 | 63:11,16 64:11 |
| 18:15 | 43:16 79:8,18 | 117:19 118:13 | 65:14 66:8 |
| **never** 19:2 | 87:7 94:10,17 | **occasion** 67:12 | 67:15 68:2,7 |
| 39:17 64:15 | 119:17 | **ocga** 122:7 | 70:3,8 71:17 |
| 66:8 73:19 | **numbers** 33:21 | **offer** 19:5 | 72:15 73:13,20 |
| 86:13 | 83:17 | 67:10 82:14 | 73:21 74:3,4 |
| **new** 46:5 99:8 | **numerical** | **offering** 21:21 | 74:10,19 75:5 |
| 112:17 | 88:19 90:16 | 22:5,9 74:20 | 76:6,12 77:9 |
| **newer** 36:8 | 91:7 | **offices** 2:11 6:2 | 77:16 78:19 |
| **nonprofit** 18:6 | **numerous** | 121:3,10 | 79:4,6,10,14,16 |
| **normal** 38:20 | 36:21 | **oh** 62:1 | 80:3,14 82:9 |
| | | | 82:13,19 85:19 |

Brown, Keddrick v. Progressive Mountain Insurance Company

**[okay - pdf]**

Page 16

86:3 87:3 88:2
88:9 89:11,20
90:6,11,15
91:4,13 92:13
93:4,9,18
94:16 95:17
96:4,16 97:3,9
97:13 99:3,6
99:10 100:12
100:15 101:1,7
101:14 102:18
103:3 104:19
105:13,16
106:12,17
107:7,10,13,16
109:12 110:1,1
110:4,7 111:2
111:19 112:5
112:13 113:10
113:12 114:17
115:18 116:1
117:14 118:1
118:13 119:15
**once** 8:18 81:16
121:9
**ones** 21:20
36:21 55:13,15
80:11,11 81:7
83:4,21 106:7
108:9,11
**online** 16:17,18
24:21 36:21
47:12 48:14
53:7,8,10,11,17
54:8,9 81:18

87:20,21
**open** 61:3,16
**opine** 116:8
**opinion** 22:5
32:13 33:10
34:5,9 74:20
82:14 85:6
113:21 114:4
115:6,14
116:15,17
**opinions** 21:21
22:9 23:16
33:11 49:13
59:1,7,10
61:19 62:21
63:4,8,10
76:19 78:5
**opportunities**
16:16
**option** 38:14,20
**options** 36:18
37:15,20 38:2
83:17 84:15
**oral** 7:13 24:20
24:21 54:8,10
**ordering**
121:13
**ordinary**
109:19
**organization**
14:8 16:21
18:6,9,12,17,19
19:14 48:16
**organizations**
26:2

**original** 121:12
121:15
**outcome**
120:12
**overall** 82:20
91:17,19 92:5
92:10 94:1,7
96:1
**overlapping**
111:11 112:6
**override** 62:7
**oversized** 39:13
**overstate** 45:15
**overstated**
45:11,13
**own** 34:5
117:20
**owned** 42:3,4
43:14,15
**owners** 41:14
42:1,1,6,7,16
42:20 43:2,4
43:12,16,17,20
45:14

| **p** |
| :---: |

**p** 3:1,1
**p.m.** 119:16,19
**packages** 39:7
**page** 4:4,15
13:5 14:7
46:13 50:7,11
50:19 63:12
76:13,13 77:20
79:7,15 87:6,8
88:14 91:21

92:21,21,21
93:15,16 94:14
95:14,14
108:17 110:8
111:4 122:11
122:14,17,20
122:23 123:1,4
123:7,10,13,16
**pages** 10:11
109:1 122:9
**paper** 53:16
**paragraph**
50:20 63:13
68:8 74:11
76:14,16 77:21
78:2 79:17
**parameters**
33:15
**part** 8:17 41:4
80:3 89:12
109:7
**particular**
23:19 26:10
37:4,11,12
108:21
**parties** 120:11
120:12 121:13
**parts** 31:13
**passed** 23:5
81:21
**past** 16:3,4
98:5
**pay** 15:21 17:4
**pdf** 121:6,7

**[peachtree - progressive]** Page 17

| | | | |
|---|---|---|---|
| **peachtree** 3:12 | **plaintiff's** 82:9 | **practice** 19:20 | **principals** |
| **pennsylvania** | 86:16 | 22:4,12,16 | 52:16 107:20 |
| 2:12 6:3 | **plaintiffs** 3:2 | 27:6 116:21 | **print** 121:8 |
| **people** 67:9 | 6:11 88:2 | **precisely** 12:21 | **printed** 120:7 |
| **percent** 102:12 | 116:20 | **premier** 1:17 | **prior** 24:10 |
| 103:2 | **plans** 102:19 | 5:13 | 41:2,14 42:1,6 |
| **perform** 109:4 | **play** 41:15 91:6 | **prepare** 20:12 | 42:7 43:16 |
| **period** 66:1 | 91:10 | **prepared** 8:12 | 51:6 92:21 |
| **perry** 3:16 6:4 | **plays** 89:12,16 | **preparing** | 117:6 |
| **person** 33:16 | **please** 6:7 7:8 | 82:10 | **private** 45:14 |
| **personal** 26:6 | 7:13,18 26:7 | **presence** | **probably** 59:9 |
| 28:10,16,18,20 | 27:11 44:3 | 120:10 | 86:20 |
| 29:1 | 46:10 53:3 | **present** 6:6 | **problem** 58:8 |
| **personally** | 62:6,8 109:16 | **pressley** 42:3 | **problems** 66:15 |
| 120:3 | 121:6,10,18 | **previous** 31:12 | **procedure** |
| **phone** 16:5 | 122:9,9 | 81:15,19 | 122:7 |
| **physically** | **plus** 16:1 | **previously** | **produce** 60:9 |
| 44:14,20 | **point** 9:4 70:15 | 10:17 11:7,12 | 60:18 78:16 |
| **pick** 7:12 38:16 | 70:15 73:13 | 11:17 61:7 | **produced** 60:1 |
| 39:3,11 | **pool** 83:12 84:5 | 72:18 | 61:7 78:15 |
| **picked** 7:15 | 84:8 | **price** 51:8,10 | **production** |
| 39:14 | **position** 104:10 | 51:11,16 64:15 | 121:19 |
| **pickup** 37:18 | **possibility** | 65:16,21 66:6 | **professional** |
| 37:20 38:5,15 | 80:15 | 66:20 67:6,6 | 2:14 19:20 |
| 39:2,10 108:16 | **possible** 69:21 | 67:17,18 69:4 | 22:4,12,16 |
| **pickups** 108:15 | 81:1 83:12 | 69:7 85:16 | 26:2 27:6 |
| **pictures** 86:13 | 85:3,7 109:20 | 86:1 97:15 | 76:18 78:4 |
| 87:19 | **power** 55:2,17 | 105:15 109:17 | **profit** 18:6,7 |
| **piece** 53:16 | 55:20 56:3,11 | 112:20 | **program** 47:17 |
| **place** 9:3 36:16 | 56:14,21 57:3 | **prices** 51:21 | **programs** |
| 45:5 96:11 | 57:8,11 69:13 | 52:1,3,5 | 17:17 18:1 |
| 120:4 | 69:18 72:17 | **pricing** 98:2 | **progressive** 1:8 |
| **plaintiff** 1:6,15 | 73:1,4 | 112:18 | 1:17 5:10,13 |
| 2:3 | **power's** 56:18 | **principally** 9:2 | 9:8 88:9 90:3 |
| | | | 95:17 |

**[project - ready]**                                                    Page 18

**project** 43:10
**projected** 8:18
  9:9 22:2,6,11
  23:17 46:17
  54:20 55:2,10
  55:17,21 56:4
  56:14 57:1
  68:4,14 69:1
  69:14,19 70:13
  71:6 73:18
  92:17 94:17,18
  98:21 99:1
  101:11,12
  102:12 114:3,6
  114:20 115:4,8
  115:11 116:14
**property** 20:7
  28:11,11,16,16
  28:18,20 29:1
  29:1,3 109:17
  109:21
**propose** 105:20
**provide** 57:10
  58:4 60:20
**provided** 8:6
  13:9,10 55:7
  61:10,13 62:11
  62:15
**provides** 114:1
  114:18
**psa** 22:5 63:14
  68:9 70:21
  71:2,3,14 72:1
  72:3,9,11,17
  73:2,4,8,9,14

74:5,12,14,16
74:18,21 85:16
85:21 97:16
99:5,19 100:2
100:18 102:4
103:4,8,11,12
104:2 105:1,5
105:8,14 116:3
116:5
**psa's** 98:1,14
**public** 2:14
  120:2,18
  123:24
**publications**
  32:10
**published**
  26:10 52:14
  53:15,16,18
**publisher**
  53:18
**pulled** 105:14
**purchase** 26:21
  51:13
**purport** 20:4
  27:4
**purported**
  119:9
**purposes** 23:13
  27:9,13 28:17
  29:2 32:6 56:3
  56:21 59:10
  61:19 80:5
  82:10,16 105:6
**pursuant** 2:8
  122:6

**put** 35:14 45:6
  65:20 69:9
  86:11 88:16
  110:2
**putting** 33:17

**q**

**qualified** 29:16
**question** 7:9,17
  7:18 22:9
  27:10 39:21
  44:18,19,21
  45:2 56:1
  58:18,19 60:11
  60:12,15,17
  61:11 67:21
  73:15 104:8
  112:15 115:16
**questioning**
  21:9
**questions** 7:8
  9:1 11:11,16
  11:17 18:14
  57:15 110:2
  119:12,13
**quick** 10:6
**quote** 58:11
  76:16 77:2
  78:2,9

**r**

**r** 3:1
**radar** 38:12,13
  38:14,16
**raise** 67:6

**ran** 83:16
**range** 33:2,7,12
  84:17,19
  118:11
**ranger** 4:20
  108:12,16
**rare** 67:12
**rate** 90:4 95:18
**rating** 90:14,15
  90:16 91:7
  92:6,10,14
  93:4 94:7 95:8
  96:1,14,17
  116:6
**ratings** 88:10
  88:15,20 89:8
  89:13,17 90:20
  91:14,16 92:1
  92:11 95:21
**reached** 20:7
**read** 47:15,17
  52:14,18,21
  53:2,5,6,8,12
  53:14,20 55:4
  55:5,7,16 58:9
  58:19 64:19
  65:14 67:20,21
  70:7 76:21
  77:5 78:7 89:3
  109:15 119:14
  121:6 122:2
**reading** 5:2
  64:17
**ready** 10:7,8
  14:3,4

[real - represent]

**real**  10:6 20:6
28:11,16 29:1
29:3
**realized**  51:20
52:3
**really**  32:7
81:15 84:21
**reason**  50:21
51:7 71:9
86:14 122:13
122:16,19,22
122:25 123:3,6
123:9,12,15,18
**reasonable**
33:12 110:20
116:8
**reasons**  71:8
122:8
**recalculate**
100:6
**recall**  21:20
25:7,18,21
28:3 32:18
43:19 47:21
48:3,5 52:19
55:6,13,15
59:4,8,15,17
60:21 62:16
64:5,6,11,20
65:1,2,6 72:6
98:8 106:16
112:16 118:19
119:1
**receive**  57:8

**received**  71:20
**recertification**
17:5
**recertified**  17:1
17:6
**recollection**
65:4
**reconsider**
115:5
**record**  5:4 9:18
11:14 21:12
51:6 58:9 61:2
61:17 75:9,10
75:11,12
113:13,14,16
113:17 119:15
**recorded**  120:6
**refer**  18:13
47:3 84:9
85:12
**reference**  19:7
30:18 32:9
46:21 50:15
**referenced**
68:17
**references**
30:12 32:8
75:18
**referred**  44:7
**referring**  23:19
47:2 50:8 65:2
112:14
**reflect**  51:12
**reflecting**
76:17 78:3

**refresher**  7:7
**regard**  11:3
63:10 94:13
96:18 102:15
105:16 106:3,4
**regarding**  22:1
53:15 55:17
61:18 62:21
63:3 107:14
**registered**  2:13
**related**  51:13
120:12
**relating**  63:11
**relative**  37:7
**relevance**
21:11 49:9
**relevant**  51:21
52:4
**reliability**  37:8
**reliable**  34:3,10
34:13,16 51:21
52:4 115:14,20
**relied**  60:9,18
76:18 78:4
**rely**  23:13 60:5
68:8 74:11
**remind**  106:9
**remove**  8:18
102:4 103:12
104:2 105:5,7
114:6
**removed**  81:17
100:2
**removing**
98:13 103:8

116:14
**repeat**  44:3
45:20 53:3
56:1 67:19
89:14
**replace**  36:7
**replacement**
35:2,7,10,15
36:6,7,11
**report**  4:8,9,19
8:5,12 12:4,13
13:10 27:17
33:9 46:11,14
50:8,12,15
79:2,14,20
81:14 82:16
85:20 91:21
93:1,16,17
95:14 97:13
99:18 100:16
105:17
**reported**  2:21
51:8,11,16
66:5
**reporter**  2:14
6:5,16 7:12
58:19 67:21
**reports**  8:17,19
13:1 26:6,9
51:6 84:20
89:4 111:13
**represent**  6:8
6:10 8:5 12:3
15:7 79:1
98:18

**[representative - seen]**                                    Page 20

representative
  90:3
request   77:3
  78:10
requested
  62:11
require   61:4
  66:19
required   17:2,8
  17:14,16
requirements
  20:14
research   56:6,7
  56:18 62:12
  86:11
reserve   61:4
  119:13
reserved   121:6
resource   30:8
  31:3,11 33:20
  34:1,11,13,16
  36:15
resources
  30:13 32:8,10
  34:2,4,6,8 53:7
  53:8 81:15,18
responded
  61:13 65:13
response   61:7,9
  76:1,7 77:2,7
  77:12,17 78:9
  78:16 110:5
  113:1
responses
  11:17,18

responsive   77:3
  78:10
restate   52:2
result   51:11
  69:14 71:2
results   4:16
  14:19 15:9,18
  70:10
resume   4:12,13
  12:8,15 14:16
retained
  119:18
returned
  121:11,14
review   10:17
  121:6
reviewed   55:1
  112:2
rid   104:21
  115:4
right   9:10 13:7
  13:12,18,18
  33:2,3 46:16
  54:14 61:4
  65:6 70:9,17
  71:10 73:11,16
  75:1,3 80:1,12
  82:3,19 83:4,7
  85:13 87:17
  88:16 90:7
  109:1 114:3
  116:4 117:10
  118:15 121:6
role   91:6,10

roll   39:11
room's   11:11
ross   108:14
roswell   121:22
rpr   2:21
rule   122:6
rules   7:8 122:6
running   105:6
runs   49:6,11,16

**s**

s   3:1 4:7
sale   44:1,4,10
  44:15,16 46:8
  51:8,11,16
  67:4,11 92:17
sales   31:12
  67:17 69:18
  109:20
sanders   3:10
  6:14,14
saying   13:14
  95:12 99:12
  103:16,17
  113:3
says   15:12
  50:20 51:7
  63:19 65:14
  73:21 75:21
  88:14 103:18
  104:20 108:18
  109:13 110:9
scale   87:13
  90:9,11 95:18
scan   10:6

school   47:12
  48:15
scratch   79:19
seal   120:14
  121:11
search   4:16
  14:19 15:1,9
  15:15 81:9
searched   15:18
second   76:9,13
section   46:16
see   7:5 14:11
  14:18,21 15:9
  19:8 46:19
  50:21 51:3,4
  51:13 63:14,17
  63:21 65:17
  66:10 68:10,18
  74:2 75:17,19
  76:2,14 77:21
  78:11 79:10,13
  80:18 86:12
  87:10,18,21
  91:21 92:3,6
  93:1,20 94:4
  96:2 99:15
  108:19 109:12
  110:10 111:6
  116:7 118:5,6
seek   61:5
seen   38:18 45:7
  45:10,12,17
  73:4,19 76:4
  79:4 81:8
  86:12

[selected - stated]                                                      Page 21

| | | | |
|---|---|---|---|
| **selected**  79:19 | **sir**  8:15 14:10 | 65:21 66:9 | **speed**  38:9,11 |
| 84:6 | 46:12 58:3 | 68:4 69:1,14 | **spell**  15:14 |
| **sell**  66:20 | 62:3 70:14 | 69:19 71:6 | **spend**  9:19 |
| **sellers**  109:18 | 73:6 78:18 | 81:17 84:19 | **spent**  110:9,18 |
| **send**  121:12,18 | 86:8 101:12 | 94:17,18 | 111:4,10,15,16 |
| **sentence**  50:20 | 107:12 113:20 | 102:13 114:3,6 | 111:20 |
| 51:5 63:17 | **sit**  10:16,21 | 114:20 115:5,8 | **spoke**  61:19 |
| 64:17 68:7 | 47:18 48:3 | 115:11 116:14 | 62:15 |
| 75:21 | 83:9 | **solely**  42:16 | **spoken**  58:21 |
| **sentences**  64:20 | **site**  15:1,20 | 43:15 56:13 | 59:3 119:2,4,6 |
| **served**  76:7 | 32:2 118:4 | **sorry**  26:20 | 119:8 |
| **set**  22:3 120:4 | **sites**  31:13 | 36:4 45:20 | **stand**  11:19 |
| **several**  71:8 | **sitting**  60:3 | 51:1 54:15 | **standard**  26:5 |
| 83:13 | 65:6 118:3 | 55:14 67:19 | 26:10,18 109:3 |
| **shaking**  7:14 | **situated**  1:5,14 | 76:13 89:14 | **standards** |
| **shape**  31:10 | 2:2 5:9,12,19 | 93:16 106:19 | 19:20 20:1,5,6 |
| **shop**  40:7,10 | **six**  63:12 79:15 | 108:9 | 20:10 21:6,16 |
| **show**  31:12 | 94:14 112:7,10 | **sound**  114:1,8 | 21:17,19 22:3 |
| **side**  14:12 | **skill**  80:3,10 | 114:18 | 22:3,12,16 |
| **sign**  10:18 | **slants**  68:10,12 | **sources**  55:8 | 23:8,9,10,12,18 |
| 119:14 121:6 | 68:18 70:4 | **southeast** | 23:19,21 24:2 |
| **signature** | 71:2 74:12 | 121:24 | 27:5 46:18 |
| 120:17 121:2 | **small**  84:12 | **spalding**  2:11 | 47:1,2 50:4,7 |
| 121:15 123:20 | 98:6 | 3:11 6:2,13,15 | 50:10,15,17 |
| **signed**  121:9,11 | **smile**  58:4 | **speak**  62:20 | 71:7 76:17,18 |
| 121:14 | **society**  19:14 | 63:3,7 113:5 | 78:3,4 105:3 |
| **signing**  5:2 | 52:9,15 | **speaking**  61:12 | **stands**  47:17 |
| **silverado**  4:20 | **software**  57:5 | 71:9 | 48:5 |
| 38:20 108:7 | **sold**  8:19 9:9 | **special**  51:12 | **started**  84:11 |
| **similar**  109:21 | 22:2,6,11 | **specific**  20:9 | **starting**  79:19 |
| **similarly**  1:5,14 | 23:18 46:17 | 22:9 39:20 | **state**  6:7 33:9 |
| 2:2 5:9,12,19 | 54:20 55:3,10 | 89:8 | 59:4 76:6 |
| **simply**  73:15 | 55:17,21 56:4 | **specifically** | **stated**  48:13 |
| 74:15 85:14 | 56:14 57:1 | 64:12 | 51:18 52:10 |
| | 64:14,16 65:16 | | |

**[statement - test]**                                    Page 22

statement
  43:21 45:6
  61:16 64:7
  73:20 80:7
  114:17 122:8
statements
  58:12,13
states   1:1 59:8
  62:16 94:14
stating   58:15
statistical
  55:19 56:2,5
  68:2
status   14:19
stenographic
  120:6
stenographic...
  120:6
step   102:12
stick   41:4
stipulated   5:1
stipulations
  120:9
street   3:12
strike   10:16
  11:1 12:11
  15:17 21:15
  22:14 23:16
  54:12 57:7
  63:11 69:12
  84:4 97:3
  103:10 105:6
  106:2,3,12
  116:12

subject   64:4,21
submit   76:1
submitted   65:9
subpoena   4:17
  4:18 76:2,7
  77:13,18 110:5
subpoenaed
  60:8,17
subpoenas   61:7
  78:17
subscribed
  123:21
substance
  122:7
substantially
  67:17 111:13
substantively
  8:19
substraction
  91:12
suburbs   46:6
succinct   58:6
  58:14
suffered   40:21
suggest   58:12
suggesting   85:2
  85:3
suite   3:5
  121:21
sure   16:10
  19:12 21:14
  24:3 26:8
  27:12 32:21
  40:1 69:17
  70:14 76:9,10

83:20 89:15
90:3 93:14
95:13 115:21
surprised
  32:19
swear   6:17
sworn   6:19
  123:21
system   82:6
  90:14,15 91:13
  96:17 102:19
systematically
  68:5

**t**

t   4:7 7:1 25:13
tab   2:5 5:21
take   13:4,21
  16:20 17:2,3,8
  17:12 65:7,10
  72:9 75:6
  76:10 91:18
  99:8 107:13
  108:3 117:18
  118:12
taken   2:9 5:7
  5:17 22:15,19
  23:4 55:9
  62:10,12
  106:12 107:16
  107:19
takes   73:5
  94:20 118:1
talk   27:17 31:4
  37:18 54:19

talked   59:6
  62:13
talking   27:16
  42:15,16 44:19
  56:8 71:5
  72:10 73:7,7,9
  74:13,15 86:5
  92:18 101:12
  101:13
taylor   1:21
  5:18
tcb   1:7 5:15
tell   6:19 8:12
  48:8 49:11
  57:2,4 64:3,6
  64:20 70:3
  113:2
telling   100:8
  101:8,17
template   27:1
  109:7,8,10
templates
  26:20
ten   42:12
  117:11 118:12
tennessee   6:1
  59:16 118:21
term   19:21
  35:16,20 36:5
  46:7 86:19
terms   35:12
  108:19
test   16:20 17:2
  17:3,8,12
  54:13,17

**[testified - turn]**                                                    Page 23

**testified** 21:11
24:6 36:12
43:6 96:12
**testifies** 6:20
**testify** 32:18
59:5 82:18
83:10 101:2
**testimony**
10:10,13,19
11:6 23:15
48:2,7 60:14
60:16 62:6
72:21 73:2
93:15 98:10,19
119:16 122:2,7
**texas** 25:17
**thank** 8:2 9:7
21:13 23:4
45:3 58:16,17
74:19 75:5
78:15 107:7
110:1,2 119:11
**theory** 107:17
**things** 62:9
83:13 84:15,16
101:15
**think** 25:16
27:3 34:3,7
43:21 44:18
68:12,17 71:11
90:11 102:3
103:3,8,10
105:8 112:8
116:10

**third** 62:5
63:17,19 70:15
70:15 71:9
73:13,21
109:12
**three** 27:12,15
42:6 90:10,12
105:19
**time** 5:5 7:21
9:19 11:10,10
11:11 16:8
32:16 35:19
37:14 62:5
66:1 76:10
84:1 107:3
111:21 120:3
121:14
**times** 67:9
**tire** 87:12 92:3
**today** 10:16,21
11:7,19 47:18
48:4 59:5 60:4
83:9 109:10
111:21
**today's** 119:16
**together** 33:17
**told** 54:3 64:3,5
65:5
**took** 54:13
60:21 65:11
115:7
**tools** 57:6
**top** 28:3 50:21
75:17 88:14
92:5 108:18

110:9
**topic** 65:19
**total** 29:10 40:2
40:6,14,18
41:1,7,13 42:6
79:12 80:6
81:13 84:1,5,8
86:4 88:11
93:10 94:10,11
95:6,9 96:20
99:21 100:7
102:16 105:7
105:10 110:18
112:10 116:13
117:17 118:6
118:18,21
119:17
**totally** 40:19
**towards** 68:10
68:12,18 70:4
71:3 74:13
**toyota** 39:7
**tr** 39:7
**trade** 109:19
**trained** 24:11
**training** 16:16
20:8,8 24:9,20
25:1,4 47:4
**transaction**
64:14 74:15
**transactions**
63:21 64:10,15
65:15 66:9
67:17 70:17,20
71:13,14 74:2

74:5,21
**transcribed**
10:19 120:6
**transcript** 4:10
4:11 9:21 10:3
121:7,12,15
122:2
**transcription**
120:7
**transcripts**
10:18 11:4
**treatises** 53:1,4
**trial** 119:14
**tried** 20:9
**trim** 39:6
**triple** 114:16
**tripled** 114:7
**truck** 37:20
38:5,15 39:2
39:10
**trucks** 37:18
**true** 10:9 12:7
12:14,17,17
27:12 120:7
**truth** 6:19,20
6:20
**try** 9:4 11:9
58:6 95:13
**trying** 33:6
58:4 62:7
97:21
**turn** 24:5 46:10
46:13 50:11
76:12 77:20
79:6,15 108:17

**[turn - values]**                                                                                    Page 24

110:8
**turning** 50:6
**two** 40:19 82:1
  91:7 94:18
  102:12 107:6
  107:10 108:13
  108:15 109:1
  110:8 112:9
**type** 20:7 29:5
  29:7 38:19
**types** 29:8 34:4
**typically** 34:2
  116:21 117:18
  118:1,11

**u**

**u.s.** 5:15,21
**ultimately**
  80:19
**unable** 44:21
  45:2 98:11
  99:7
**under** 45:17
  71:5
**undersigned**
  122:2
**understand**
  7:17 22:8
  68:16 69:16
  70:16 72:9
  73:6 85:10,12
  93:14 95:1,12
  97:20 101:15
  101:17,21
  102:1 103:16
  113:21

**understanding**
  35:16,20 36:5
  63:13,19 64:8
  73:21 90:1
  95:7,11
**understated**
  45:13
**understood**
  7:16 11:14
**uniform** 19:19
  22:3,11,15
  27:5
**unit** 5:6
**united** 1:1
**unquote** 78:5
**unreliable** 34:7
**updated** 12:18
  13:3,15,16,17
**use** 7:14 9:9
  20:10 27:20
  30:8,14 31:11
  31:11,16 32:5
  33:20 34:1,2,4
  34:6,8 37:1,9
  37:11 41:3,6
  41:12 51:8,9
  51:16 80:5,11
  80:11 82:17
  85:14 86:10
  89:1 102:7
  103:3 106:7
  109:8,10 113:9
  116:21 122:9
**used** 22:7 29:9
  29:10 30:15

55:10,20 56:3
56:11 64:13
73:14 79:11,20
83:1,2,3,4,21
86:1 106:7
112:21 113:10
119:17
**using** 9:2 36:11
  37:16,19 56:14
  71:18 86:10
  91:14 94:8
  95:8 102:6
  116:20
**uspap** 20:2,5,6
  20:14,16,19
  21:5,16 23:5
**utilize** 32:12
**utilized** 55:2

**v**

**valid** 44:18
  87:1
**valuable** 43:13
  43:21
**valuation** 4:19
  27:9,13 28:5,8
  32:6,16 41:15
  42:6 52:16
  69:9 73:8 79:2
  80:16 81:14
  82:16 84:1
  93:1,17 99:18
  100:16 105:17
  107:17,19
  118:6

**valuations** 33:8
**value** 26:21
  29:11 32:1
  33:6,18 34:19
  34:20 35:1,2,5
  35:6,7,9,10,10
  35:17,18,21
  36:3,6,7,10,11
  39:19 40:7,11
  40:17,20,21
  41:7,8,12
  42:14,17 43:5
  46:5 52:1,5
  72:2,8,10 73:5
  74:21 79:12
  85:15,15 86:1
  86:11 89:11
  91:5,12,12
  92:19 93:7,7
  93:10,13 94:2
  94:10,11 95:2
  95:9 96:14
  97:14 100:17
  101:20 109:13
  109:19 114:2
  114:19 116:9
**valued** 115:18
**values** 45:18,21
  68:10,13,18
  69:18 70:4,11
  71:3 74:13
  85:20 89:16
  92:14 93:5,11
  94:8 95:10
  97:4 98:13

Brown, Keddrick v. Progressive Mountain Insurance Company

[values - wrote]                                                            Page 25

99:5,9 100:5
103:12 104:3
**valuing**   34:11
34:14,17 41:13
80:6
**variation**
118:14
**varies**   118:5
**various**   25:5
30:7
**vehicle**   32:1,17
32:20 35:18
36:8 37:2,13
38:1,8,21 40:5
41:2,14,15,16
42:5,8,17 43:5
43:12,17,20
45:15 46:4,6
51:9,17 64:14
64:16 65:16
66:9 69:10
73:5 81:17,20
83:18 84:16
86:4,6,12,13
87:11,18,19,20
88:12,16 90:4
90:17 93:8,13
95:6,18 96:15
96:19 97:5,15
99:21 100:7,18
102:16 105:8
105:10 117:17
118:5,7,18,21
**vehicles**   17:4
29:6 40:5,13

45:4 65:21
66:20 79:11,11
79:20 80:5,5,8
80:14,21 81:10
81:10,16,19
82:15,15 84:13
85:4,21 86:7
89:16 91:6
92:15 93:12,19
100:5 101:20
104:3 105:19
106:6
**verbally**   58:15
**verify**   83:1,17
**veritext**   6:6
119:18 121:10
121:19
**veritext.com**
121:24
**versus**   5:9,12
5:19
**video**   5:6
**videographer**
3:16 5:4 6:4,16
75:10,12
113:14,17
119:15
**videotaped**   2:8
**view**   94:12
114:9
**vin**   36:14,15,16
36:17,20 37:4
37:8,11,16,19
38:5,15 39:2,9
39:10 83:16

**volino**   4:10
9:12,21 10:10
**vs**   1:7,16 2:4

**w**

**waived**   5:3
**want**   7:14 9:19
17:6 56:13
65:11 70:14
93:14 104:1,7
104:13,15,18
115:19,21
**washington**
2:12 6:3 46:5
120:14
**waste**   11:9
**water**   75:7
**way**   31:10
50:14 68:3
69:11,13,16
70:9 102:19
103:5 115:18
116:5,8,12,13
120:12
**ways**   30:7
35:14
**web**   4:15,16
14:6 15:1,20
**went**   48:11
**wheels**   39:13
**willing**   109:18
109:18
**witness**   4:2
6:11,17 58:13
61:5 120:14

**wondering**
56:16 71:11
111:10
**words**   7:14
81:16
**work**   60:7
66:19 89:20
105:6 107:14
117:3
**workcenter**
116:13
**worked**   84:12
117:11
**working**   67:8
110:10,18
111:5
**world**   21:3
**worth**   41:2,21
42:3,4 43:18
**write**   26:5
109:6
**writing**   23:20
24:2,4,7 26:9
26:19 27:4
**written**   23:12
24:15 26:18
47:1 50:3,7,9
50:16 53:20
54:4 59:18
65:3
**wrong**   33:1
**wrote**   65:2

Jason Merritt                                            April 14, 2023
Brown, Keddrick v. Progressive Mountain Insurance Company

**[x - york]**                                          Page 26

| x |
|---|
| **x**   4:1,7 7:1 |
| **y** |
| **yeah**   104:18 |
| **year**   36:18 42:9 |
|   42:18 43:2 |
|   107:8 |
| **years**   42:12,15 |
|   53:2,5 82:1 |
|   107:6,11 |
| **york**   46:5 |

Georgia Code

Title 9, Chapter 11

Article 5, Section 9-11-30

(e) Review by witness; changes; signing.
If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer
shall indicate in the certificate prescribed by
paragraph (1) of subsection (f) of this Code
section whether any review was requested and, if
so, shall append any changes made by the deponent
during the period allowed. If the deposition is not
reviewed and signed by the witness within 30 days
of its submission to him or her, the officer shall
sign it and state on the record that the deposition
was not reviewed and signed by the deponent within
30 days. The deposition may then be used as fully
as though signed unless, on a motion to suppress
under paragraph (4) of subsection (d) of Code

Section 9-11-32, the court holds that the reasons
given for the refusal to sign require rejection of
the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

### Rule 26(a) Expert Report of Jason Merritt

I, Jason Merritt, pursuant to Federal Rule of Civil Procedure 26, declare as follows:

### I.    Declaration

This Report is based on personal knowledge and, if called to testify on the matters set forth herein, I could and would do so competently.

### II.    Introduction

My name is Jason Merritt, and I am a professional personal-property appraiser who has been retained by the Plaintiffs in this case. My credentials and professional experience are described in my curriculum vitae enclosed with this report as Exhibit 1.

Pertinent to this report, and as reflected in my curriculum vitae, I am the owner of East Coast Auto Appraisers, LLC. I am certified through the Bureau of Certified Auto Appraisers to appraise vehicles, including total losses. I have appraised over a thousand vehicles to determine their fair market, or actual cash, value. These appraisals include hundreds of appraisals where I was hired to determine the value of a totaled vehicle. As owner of Merritt's Automotive, LLC, I appraised vehicles daily for the purpose of determining the fair market value. Additionally, I have performed hundreds of appraisals for the Timbrook Automotive Organization, which includes franchise dealerships for Chevrolet, Buick, GMC, Kia, Nissan, Ford, Chrysler, Dodge, Jeep, and Honda. The purpose of these appraisals was to determine the fair market value of vehicles offered for trade in or that were newly acquired by the Timbrook Automotive Organization.

Before entering the private sector, I served in the Maryland State Police for 28 years. During those years, I received advanced training in accident investigations. In 1998, I was assigned to the C31 Narcotics Unit of the Maryland State Police. Part of my duties in that unit were acquiring and maintaining the unit's vehicles.

1



III.   **Scope of Work**

I have been hired by the Plaintiffs in this case to offer opinions on the following topics:

- Description of what an appraisal is;

- Explanation of how to use the comparable methodology to appraise a vehicle's actual cash value; and

- Explanation of whether Mitchell's use of a Projected Sold Adjustment ("PSA") is appropriate when appraising a vehicle using a comparable methodology.

IV.   **Opinions**

      **A. Overview of Using a Comparable Methodology to Determine the Pre-Loss Actual Cash Value of an Automobile.**

An *appraisal* is an opinion of value. While there is no single methodology to arrive at a proper opinion as to a loss vehicle's actual cash value ("ACV"), there are generally accepted methodologies that must be followed to render a sound opinion as to ACV. One such methodology—applicable to standard motor vehicles, as opposed to, for example, antique cars or specialized vehicles—is the comparable methodology, more frequently called the "comp" methodology.

Generally, the comp methodology for determining ACV involves finding vehicles for sale, or recently sold, within a certain geographic area that are similar, or "comparable," to the vehicle being valued. Typically, these comps are selected from Internet advertisements. Once the comps are chosen, differences in observed and verifiable features (such as options, mileage, trim level, and condition) between the loss vehicle and the comps are documented. Normally, information concerning options, mileage, trim level, and condition are taken from the Internet advertisement for the vehicle, and these characteristics are taken at face value unless there is some specific and documented reason for questioning the accuracy of the listing. Sometimes a vehicle listing does not include options, but these could be determined using a VIN decoder. The point is that there

2

must be a specific reason, grounded in evidence, for varying from the information provided in an Internet advertisement for a particular vehicle. Differences between vehicles in observed and documented characteristics result in price adjustments from the list price of the comparable vehicles.

I have reviewed the Vehicle Valuation Report Mitchell prepared for each Plaintiff. On the last page of the reports, under the header "Vehicle Valuation Methodology Explanation," Mitchell walks through the general steps of the comp methodology. Having reviewed the reports it also appears that Mitchell largely followed this methodology, documenting all differences, if any, in mileage, options, trim level, condition, etc., and making monetary adjustments based on those documented differences.

When adjusting for the condition of a vehicle, the common procedure is to adjust the condition of a loss vehicle by comparing it to the normal or typical condition of similar vehicles. Ideally, you would search for comparable vehicles in nearly identical condition to the loss vehicle, but this usually isn't practical. Mitchell followed customary condition-adjustment standards. Specifically, in each of the Reports, Mitchell documented an inspection of 13 components of each Plaintiff's loss vehicle and assigned a numerical rating to each component. These were compared to a "Typical Vehicle Condition," which was assigned a numerical rating of 3.00. Based on whether the "Overall Condition" of the loss vehicle rated above or below the typical 3.00, Mitchell adjusted the base value of the loss vehicle to reflect that it was in better or worse condition than "typical." As for the condition of the comparable vehicles, it would be improper to assume they were in anything other than typical condition without either inspecting the vehicle or having documentation showing the comparable vehicle was in better or worse than typical condition. Because conducting physical inspections of comparable vehicles is often impractical, appraisers

3

usually set the condition of the comparable vehicles as "average" or "typical" and make no monetary adjustment to the comparable vehicle, which is what Mitchell did in the Comparable Vehicles section of the reports. Once the average price is established—the average of the comparable vehicles' prices, adjusted for any differences in mileage and equipment—the average price is adjusted upward or downward if the insured vehicle is in better or worse than typical condition, and kept the same if it is in typical condition.

Generally, Mitchell's methodology is consistent with the comparable methodology routinely applied by appraisers and is capable of producing a correct or sound appraisal of ACV. Mitchell deviated from the comp methodology, however, by applying downward adjustments to the Internet prices of the specific comparable vehicles advertised for sale.

### B. Mitchell's Application of a Projected Sold Adjustment is Inconsistent with Appraisal Standards and the Comparable Methodology.

As with mileage, options, and equipment, appraisers must base their opinions about a specific comparable vehicle's price on hard data. The hard data appropriate for this is typically the Internet price of the comp. This is true for several reasons.

*First*, the Internet price is often the only data point concerning what a particular vehicle listed with a particular seller would sell for at the time of valuation. When determining ACV, the objective is to determine the value of that vehicle at a particular point in time. The Internet price listed for sale is the only evidence available for determining what a particular comparable vehicle offered for sale by a particular dealer would sell for on a particular day. Moreover, using the Internet price provides an objective criterion for determining what the comparable vehicle would sell for on a particular day to a buyer purchasing a vehicle outright, without providing a trade in, financing the purchase through the dealership, or buying optional warranties or service plans. These additional profit opportunities for the dealer might result in what may look like a lower sales

4

price but does not reflect a change in the market value of that car or that the dealer would have accepted anything other than the list price had the buyer offered cash for the vehicle, without the opportunity to make up the difference or make even more profit related to a trade-in vehicle, financing of the purchase, or selling warranties, service plans, or other products. For this reason, while it is not necessarily invalid to use a reported sale price as a comparable vehicle, it is generally better to use a list price, unless the appraiser is able to confirm the reported sale price is not the result of a special discount and does not reflect ancillary items relating to the purchase.

*Second*, appraisal standards do not permit arbitrarily deducting the advertised price of a vehicle based on projections of what that vehicle might ultimately sell for. Again, there is no hard data available to an appraiser to support an opinion that a particular comp would sell on a particular day for anything other than the Internet price. It would be arbitrary to assign a different sales price to any particular vehicle chosen for comparison purposes.

Using the advertised price as the price for a comparable vehicle is especially important when the advertisement comes from an Internet source. It is my understanding that Mitchell uses only Internet listings for locating comparable vehicles. Consistent with Mitchell's "Position on Internet Pricing," my understanding of the modern used-car market is that Internet prices often reflect a no-hassle price and that dealers price their inventory competitively to move inventory and sell more vehicles. This is another reason appraisers cannot assume a vehicle will sell for anything other than its advertised price.

While I do not, there are some appraisers who make a "take-price" adjustment to the Internet price of comparable vehicles. This adjustment is made only after speaking with the specific car dealership offering that particular vehicle for sale to determine whether the dealer would take anything other than the advertised price of the specific vehicle. The adjustment is

specific to a particular vehicle from a particular dealer, and the recipient of the appraisal would know that dealer stated it would take a specified cash price on that day for that particular comparable vehicle. As with other adjustments, this adjustment is based on data specific to a comp vehicle.

Based on my understanding of the Mitchell PSA methodology, it is not an appropriate basis for adjusting the list price. First, it is not information about the particular comp in question – no effort is made to contact the specific dealer about whether it will sell the specific comp for less than advertised at the time of the valuation. Second, no effort is made to account for the other profit centers and considerations discussed above—like trade ins, in-house financing, warranties, service plans, special discounts—that impact recorded sales amounts but not ACV. Without accounting for those factors, the data is not helpful. Third, it is my understanding based on conversations with counsel that Mitchell does not consider all the transactions. More specifically, Mitchell does used to not consider transactions where the vehicle sold for the advertised price and has never considered transactions where the vehicle sold for more. Even setting aside the other problems with attempting to predict what a particular comp will ultimately sell for, I would not rely on Mitchell's PSA calculations because excluding this data slants toward lower values and is not objective.

C.    **Absent the PSA Deduction, the Mitchell methodology provides a sound determination of ACV.**

Overall, while it is unlikely I would have, starting from scratch, selected the exact comparable vehicles used in the report and appraisers generally do not select precisely the same vehicles to use for comparison purposes, Mitchell did follow a comparable methodology except for the application of the PSA deduction, and all information necessary to provide a sound opinion on the ACV of Plaintiff's vehicle is contained in the report. Specifically, to determine the ACV of

Plaintiff's vehicle using the Mitchell Valuation report, you add the Projected Sold Adjustment back to the adjusted price of each comparable vehicle to get a revised "Base Value," and then apply whatever adjustments, if any, were made in the reports for condition, prior damage, aftermarket parts, or refurbishment.

Absent the Projected Sold Adjustment, the Mitchell methodology provides a sound determination of ACV, consistent with the comp methodology commonly used by appraisers. So, the Mitchell report can be used to determine the ACV of Plaintiffs' vehicles (or any other loss vehicle) by simply backing out the Projected Sold Adjustment. To arrive at a sound appraisal of ACV using a Mitchell report, you would line-item out each Projected Sold Adjustment applied to a comp, recalculate the "Adjusted Price" of each comparable vehicle to which a Projected Sold Adjustment was applied, and then recalculate the average of the Adjusted Prices to arrive at a revised "Base Value." From there, the Market Value can be recalculated using that revised Base Value and the adjustments for condition, prior damage, aftermarket parts, or refurbishment already determined by Mitchell.

To appraise the ACV of Plaintiff Brown's loss vehicle using his Mitchell report, I backed out each Projected Sold Adjustment and then recalculated the Market Value. Specifically, I added $762.00 to the $14,096.14 adjusted price of the first comp, resulting in a revised adjusted price of $14,858.14. I added $725.00 to the adjusted $14,149.47 adjusted price of the second comp, resulting in a revised adjusted price of $14,874.47. I added $722.00 to the $12,125.69 price of the third comp, resulting in a revised adjusted price of $12,847.69. And, I added $1,113.00 to the $11,500.79 adjusted price of the fourth comp, resulting in a revised adjusted price of $12,613.79. I then took the sum of the revised adjusted prices ($55,194.09) and dividing that number by four to get a recalculated Base Value of $13,798.52. This is the amount the Base Value would have

7

been had Mitchell not applied Projected Sold Adjustments. Applying the further adjustments to Plaintiff Brown's vehicle for condition as reflected on page 1 of the report, a sound appraisal of his vehicle using a Mitchell report results in an actual cash value of Market Value of $13,571.81, which is a sound appraisal of the ACV of Plaintiff Brown's loss vehicle.

Using this same process for Plaintiff Bost, I added $884.00 to the $8,746.17 adjusted price of the first comp, resulting in a revised adjusted price of $9,630.17. I added $751.00 to the adjusted $7,694.91 adjusted price of the second comp, resulting in a revised adjusted price of $8,445.91. I added $464.00 to the $4,557.01 price of the third comp, resulting in a revised adjusted price of $5,021.01. I then took the sum of the revised adjusted prices ($23,097.09) and dividing that number by three to get a recalculated Base Value of $7,699.03. This is the amount the Base Value would have been had Mitchell not applied Projected Sold Adjustments. Applying the further adjustments to Plaintiff Bost's vehicle for condition and aftermarket parts as reflected on page 1 of the report, a sound appraisal of his vehicle using a Mitchell report results in an actual cash value of Market Value of $7,610.48, which is a sound appraisal of the ACV of Plaintiff Bost's loss vehicle.

## V.    Prior Testimony

- *Volino, et al. v. Progressive Casualty Ins. Co., et al.*, No. 1:21-cv-06243-LGS
- *Drummond, et al. v. Progressive Specialty Ins. Co., et al.*, No. 21-4479
- *Freeman v. Progressive Direct Ins. Co.*, No. 1:21-cv-03798-DCC
- *Chadwick v. State Farm Mutual Automobile Ins. Co.*, No. 4:21-cv-1164-DPM

## VI.    Compensation

I am being paid $650 per hour for my work in this case.

I declare under penalty of perjury that the foregoing is true and correct.

8

Jason Merritt (Feb 17, 2023 10:10 EST)

Jason Merritt

Feb 17, 2023

Executed on

# 23.02.16 - Merritt Expert Report.Final

Final Audit Report                                                         2023-02-17

| | |
|---|---|
| Created: | 2023-02-17 |
| By: | Kim Draheim (kdraheim@cbplaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAbfnPKKguyaL-ahgA8XrwnhpuWyucMXpm |

## "23.02.16 - Merritt Expert Report.Final" History

🔴 Document created by Kim Draheim (kdraheim@cbplaw.com)
2023-02-17 - 2:05:28 PM GMT- IP address: 20.127.14.14

📧 Document emailed to Jason Merritt (jason@eastcoastautoappraisers.com) for signature
2023-02-17 - 2:07:08 PM GMT

🔴 Email viewed by Jason Merritt (jason@eastcoastautoappraisers.com)
2023-02-17 - 2:43:19 PM GMT- IP address: 104.28.78.236

🖊 Document e-signed by Jason Merritt (jason@eastcoastautoappraisers.com)
Signature Date: 2023-02-17 - 3:10:19 PM GMT - Time Source: server- IP address: 140.248.0.184

✅ Agreement completed.
2023-02-17 - 3:10:19 PM GMT

📕 **Adobe Acrobat Sign**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

TAYLOR COSTELLO, individually and on
behalf of others similarly situated,

          Plaintiff,

      v.

MOUNTAIN LAUREL ASSURANCE
COMPANY,

          Defendant.

Case No.: 2:22-cv-0035-TAV-CRW

### Rule 26(a) Expert Report of Jason Merritt

I, Jason Merritt, pursuant to Federal Rule of Civil Procedure 26, declare as follows:

**I.**    **Declaration**

This Report is based on personal knowledge and, if called to testify on the matters set forth herein, I could and would do so competently.

**II.**    **Introduction**

My name is Jason Merritt, and I am a professional personal-property appraiser who has been retained by the Plaintiff in this case. My credentials and professional experience are described in my curriculum vitae enclosed with this report as **Exhibit 1**.

Pertinent to this report, and as reflected in my curriculum vitae, I am the owner of East Coast Auto Appraisers, LLC. I am certified through the Bureau of Certified Auto Appraisers to appraise vehicles, including total losses. I have appraised over a thousand vehicles to determine their fair market, or actual cash, value. These appraisals include hundreds of appraisals where I was hired to determine the value of a totaled vehicle. As owner of Merritt's Automotive, LLC, I appraised vehicles daily for the purpose of determining the fair market value. Additionally, I have



performed hundreds of appraisals for the Timbrook Automotive Organization, which includes franchise dealerships for Chevrolet, Buick, GMC, Kia, Nissan, Ford, Chrysler, Dodge, Jeep, and Honda. The purpose of these appraisals was to determine the fair market value of vehicles offered for trade in or that were newly acquired by the Timbrook Automotive Organization.

Before entering the private sector, I served in the Maryland State Police for 28 years. During those years, I received advanced training in accident investigations. In 1998, I was assigned to the C31 Narcotics Unit of the Maryland State Police. Part of my duties in that unit were acquiring and maintaining the unit's vehicles.

## III.    Scope of Work

I have been hired by the Plaintiff in this case to offer opinions on the following topics:

- Description of what an appraisal is;
- Explanation of how to use the comparable methodology to appraise a vehicle's actual cash value; and
- Explanation of whether Mitchell's use of a Projected Sold Adjustment ("PSA") is appropriate when appraising a vehicle using a comparable methodology.

## IV.    Opinions

### A. Overview of Using a Comparable Methodology to Determine the Pre-Loss Actual Cash Value of an Automobile.

An *appraisal* is an opinion of value. While there is no single methodology to arrive at a proper opinion as to a loss vehicle's actual cash value ("ACV"), there are generally accepted methodologies that must be followed to render a sound opinion as to ACV. One such methodology—applicable to standard motor vehicles, as opposed to, for example, antique cars or specialized vehicles—is the comparable methodology, more frequently called the "comp" methodology.

Generally, the comp methodology for determining ACV involves finding vehicles for sale, or recently sold, within a certain geographic area that are similar, or "comparable," to the vehicle being valued. Typically, these comps are selected from Internet advertisements. Once the comps are chosen, differences in observed and verifiable features (such as options, mileage, trim level, and condition) between the loss vehicle and the comps are documented. Normally, information concerning options, mileage, trim level, and condition are taken from the Internet advertisement for the vehicle, and these characteristics are taken at face value unless there is some specific and documented reason for questioning the accuracy of the listing. Sometimes a vehicle listing does not include options, but these could be determined using a VIN decoder. The point is that there must be a specific reason, grounded in evidence, for varying from the information provided in an Internet advertisement for a particular vehicle. Differences between vehicles in observed and documented characteristics result in price adjustments from the list price of the comparable vehicles.

I have reviewed the Vehicle Valuation Report Mitchell prepared for the Plaintiff. On the last page of the report, under the header "Vehicle Valuation Methodology Explanation," Mitchell walks through the general steps of the comp methodology. Having reviewed the report it also appears that Mitchell largely followed this methodology, documenting all differences, if any, in mileage, options, trim level, condition, etc., and making monetary adjustments based on those documented differences.

When adjusting for the condition of a vehicle, the common procedure is to adjust the condition of a loss vehicle by comparing it to the normal or typical condition of similar vehicles. Ideally, you would search for comparable vehicles in nearly identical condition to the loss vehicle, but this usually isn't practical. Mitchell followed customary condition-adjustment standards.

3

Specifically, in the Report, Mitchell documented an inspection of 10 components of the Plaintiff's loss vehicle and assigned a numerical rating to each component. These were compared to a "Typical Vehicle Condition," which was assigned a numerical rating of 3.00. Because 9 of the 10 components of Plaintiff's vehicle was also assigned a 3.0 rating, no adjustments were made; because 1 of the 10 components was assigned a 1.0 rating, the overall vehicle rating was determined to be 2.9, with a negative adjustment of $294.44. As for the condition of the comparable vehicles, it would be improper to assume they were in anything other than typical condition without either inspecting the vehicle or having documentation showing the comparable vehicle was in better or worse than typical condition. Because conducting physical inspections of comparable vehicles is often impractical, appraisers usually set the condition of the comparable vehicles as "average" or "typical" and make no monetary adjustment to the comparable vehicle, which is what Mitchell did in the Comparable Vehicles section of the reports. Once the average price is established—the average of the comparable vehicles' prices, adjusted for any differences in mileage and equipment—the average price is adjusted upward or downward if the insured vehicle is in better or worse than typical condition, and kept the same if it is in typical condition.

Generally, Mitchell's methodology is consistent with the comparable methodology routinely applied by appraisers and is capable of producing a correct or sound appraisal of ACV. Mitchell deviated from the comp methodology, however, by applying downward adjustments to the Internet prices of the specific comparable vehicles advertised for sale.

### B. Mitchell's Application of a Projected Sold Adjustment is Inconsistent with Appraisal Standards and the Comparable Methodology.

As with mileage, options, and equipment, appraisers must base their opinions about a specific comparable vehicle's price on hard data. The hard data appropriate for this is typically the Internet price of the comp. This is true for several reasons.

4

*First*, the Internet price is often the only data point concerning what a particular vehicle listed with a particular seller would sell for at the time of valuation. When determining ACV, the objective is to determine the value of that vehicle at a particular point in time. The Internet price listed for sale is the only evidence available for determining what a particular comparable vehicle offered for sale by a particular dealer would sell for on a particular day. Moreover, using the Internet price provides an objective criterion for determining what the comparable vehicle would sell for on a particular day to a buyer purchasing a vehicle outright, without providing a trade in, financing the purchase through the dealership, or buying optional warranties or service plans. These additional profit opportunities for the dealer might result in what may look like a lower sales price but does not reflect a change in the market value of that car or that the dealer would have accepted anything other than the list price had the buyer offered cash for the vehicle, without the opportunity to make up the difference or make even more profit related to a trade-in vehicle, financing of the purchase, or selling warranties, service plans, or other products. For this reason, while it is not necessarily invalid to use a reported sale price of a comparable vehicle, it is generally better to use a list price, unless the appraiser is able to confirm the reported sale price is not the result of a special discount and does not reflect ancillary items relating to the purchase.

*Second*, appraisal standards do not permit arbitrarily deducting the advertised price of a vehicle based on projections of what that vehicle might ultimately sell for. Again, there is no hard data available to an appraiser to support an opinion that a particular comp would sell on a particular day for anything other than the Internet price. It would be arbitrary to assign a different sales price to any particular vehicle chosen for comparison purposes.

Using the advertised price as the price for a comparable vehicle is especially important when the advertisement comes from an Internet source. It is my understanding that Mitchell uses

5

only Internet listings for locating comparable vehicles. Consistent with Mitchell's "Position on Internet Pricing," my understanding of the modern used-car market is that Internet prices often reflect a no-hassle price and that dealers price their inventory competitively to move inventory and sell more vehicles. This is another reason appraisers cannot assume a vehicle will sell for anything other than its advertised price.

While I do not, there are some appraisers who make a "take-price" adjustment to the Internet price of comparable vehicles. This adjustment is made only after speaking with the specific car dealership offering that particular vehicle for sale to determine whether the dealer would take anything other than the advertised price of the specific vehicle. The adjustment is specific to a particular vehicle from a particular dealer, and the recipient of the appraisal would know that dealer stated it would take a specified cash price on that day for that particular comparable vehicle. As with other adjustments, a "take-price" adjustment would be based on data specific to a comp vehicle.

Based on my understanding of the Mitchell PSA methodology, it is not an appropriate basis for adjusting the list price. First, it is not information about the particular comp in question – no effort is made to contact the specific dealer about whether it will sell the specific comp for less than advertised at the time of the valuation. Second, no effort is made to account for the other profit centers and considerations discussed above—like trade ins, in-house financing, warranties, service plans, special discounts—that impact recorded sales amounts but not ACV. Without accounting for those factors, the data is not helpful. Third, it is my understanding based on conversations with counsel that Mitchell does not consider all the transactions. More specifically, Mitchell used to not consider transactions where the vehicle sold for the advertised price and has never considered transactions where the vehicle sold for more. Even setting aside the other

6

problems with attempting to predict what a particular comp will ultimately sell for, I would not rely on Mitchell's PSA calculations because excluding this data slants toward lower values and is not objective.

**C.    Absent the PSA Deduction, the Mitchell methodology provides a sound determination of ACV.**

Overall, while it is unlikely I would have, starting from scratch, selected the exact comparable vehicles used in the report and appraisers generally do not select precisely the same vehicles to use for comparison purposes, Mitchell did follow a comparable methodology except for the application of the PSA deduction, and all information necessary to provide a sound opinion on the ACV of Plaintiff's vehicle is contained in the report. Specifically, to determine the ACV of Plaintiff's vehicle using the Mitchell Valuation report, you add the Projected Sold Adjustment back to the adjusted price of each comparable vehicle to get a revised "Base Value," and then apply whatever adjustments, if any, were made in the reports for condition, prior damage, aftermarket parts, or refurbishment.

Absent the Projected Sold Adjustment, the Mitchell methodology provides a sound determination of ACV, consistent with the comp methodology commonly used by appraisers. So, the Mitchell report can be used to determine the ACV of Plaintiff's vehicle (or any other loss vehicle) by simply backing out the Projected Sold Adjustment. To arrive at a sound appraisal of ACV using a Mitchell report, you would line-item out each Projected Sold Adjustment applied to a comp, recalculate the "Adjusted Price" of each comparable vehicle to which a Projected Sold Adjustment was applied, and then recalculate the average of the Adjusted Prices to arrive at a revised "Base Value." From there, the Market Value can be recalculated using that revised Base Value and the adjustments for condition, prior damage, aftermarket parts, or refurbishment already determined by Mitchell.

7

To appraise the ACV of Plaintiff Costello's loss vehicle using his Mitchell report, I backed out each Projected Sold Adjustment and then recalculated the Market Value.[1] Specifically, I added $697.00 to the $14,010.63 adjusted price of the third comp, resulting in a revised adjusted price of $14,707.63. I added $680.00 to the $14,621.79 adjusted price of the fourth comp, resulting in a revised adjusted price of $15,301.79. I added $623.00 to the $13,561.91 adjusted price of the fifth comp, resulting in a revised adjusted price of $14,184.91. I added $681.00 to the $13,893.46 adjusted price of the sixth comp, resulting in a revised adjusted price of $14,574.46. And, I added $720.00 to the $14,042.51 adjusted list price of the seventh comp, resulting in a revised adjusted price $14,762.51. I then took the sum of the adjusted prices, revised as to five of the seven comps, ($102,071.98) and divided that number by seven to get a recalculated Base Value of $14,581.71. This is the amount the Base Value would have been had Mitchell not applied Projected Sold Adjustments. Applying the further adjustments to Plaintiff's vehicle for condition as reflected on page 1 of the report, a sound appraisal of this vehicle using a Mitchell report results in a Market Value of $14,287.27, which is a sound appraisal of the ACV of Plaintiff Costello's loss vehicle.

## V.    Prior Testimony

- *Volino, et al. v. Progressive Casualty Ins. Co., et al.*, No. 1:21-cv-06243-LGS
- *Drummond, et al. v. Progressive Specialty Ins. Co., et al.*, No. 21-4479
- *Freeman v. Progressive Direct Ins. Co.*, No. 1:21-cv-03798-DCC
- *Chadwick v. State Farm Mutual Automobile Ins. Co.*, No. 4:21-cv-1164-DPM

## VI.    Compensation

I am being paid $650 per hour for my work in this case.

I declare under penalty of perjury that the foregoing is true and correct.

---

[1] Mitchell did not apply a PSA to the first two comparable vehicles in Costello's Report.

Executed on: Mar 9, 2023

Jason Merritt (Mar 9, 2023 08:09 HST)

Jason Merritt

# Costello v Mountain Laurel Merritt Expert Report - FINAL

Final Audit Report                                                        2023-03-09

| | |
|---|---|
| Created: | 2023-03-09 |
| By: | Kim Draheim (kdraheim@cbplaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAA9u_MEZVhXJzjXdHF5Deb4DcJPm_oeI8 |

## "Costello v Mountain Laurel Merritt Expert Report - FINAL" History

Document created by Kim Draheim (kdraheim@cbplaw.com)
2023-03-09 - 5:59:55 PM GMT- IP address: 20.127.14.14

Document emailed to Jason Merritt (jason@eastcoastautoappraisers.com) for signature
2023-03-09 - 6:00:34 PM GMT

Email viewed by Jason Merritt (jason@eastcoastautoappraisers.com)
2023-03-09 - 6:09:27 PM GMT- IP address: 181.41.206.150

Document e-signed by Jason Merritt (jason@eastcoastautoappraisers.com)
Signature Date: 2023-03-09 - 6:09:47 PM GMT - Time Source: server- IP address: 181.41.206.150

Agreement completed.
2023-03-09 - 6:09:47 PM GMT

Adobe Acrobat Sign

# EXHIBIT 1
# MERRITT



# Jason W. Merritt

East Coast Auto Appraisers LLC

Cumberland, Maryland 21502

301-804-0224

jason@eastcoastautoappraisers.com



**Merritt's Alignment Service**                                      January 1980-Oct 1987

Authorized Maryland State Inspections mechanic. Certified and licensed to perform safety inspections for the state of Maryland. Certified in passenger cars. Light duty trucks, and light duty trailers. Certified as the youngest mechanic by the state of Maryland to perform safety inspections.

During this tenure multiple safety inspections were conducted. The Maryland State Inspection procedure is one of the most detailed and thorough state inspection process.
During this tenure I received experience and training in the mechanical aspects and systems of all motor vehicles.

**Maryland State Police**                                          Oct 1987- June 2015

October 1987- Entered the Maryland State Police as a Cadet. Served in the Commercial Vehicle Enforcement Unit. During this time, I was certified federally as a Level 1 Inspector for Commercial Vehicles. Level 1 inspections are the highest level of inspections set forth by the Federal Motor Carrier Safety Standards and are recognized at the State and Federal Level. At that same time, I received Hazard Materials Certification and training. I was the first Cadet in the state of Maryland to be certified to conduct Level 1 inspections of commercial vehicles. I conducted accident investigations of commercial vehicles. I performed more than 1000 inspections during this tenure.

August 1990- Graduated the Police Academy and was certified as Police Officer by the Maryland Police Training Commission. Was instructed and certified to conduct accident investigations. During this Academy training many hours were dedicated to Accident Investigations.

August 1990- March 1998 Assigned to Road Patrol throughout the state of Maryland. During that time, I handled numerous high-level Criminal Investigations for multiple thefts as well as assaults and fatal accidents.

March 1998- June 2015

Assigned to the Criminal Enforcement Division, Columbia, Maryland

I was assigned to the C3I Narcotics Unit. This is a multi-jurisdictional Unit that is comprised with multiple agencies and is supervised by the Maryland State Police. During this time as a Narcotics Investigator, I have received many commendations and awards for service.

I have conducted and assisted with more than 4500 investigations and conducted more than 3500 arrests. I have been the author of and assisted with more than 800 Search and Seizure Warrants.

The C3I Narcotics Unit has received numerous awards and recognitions for Outstanding Performance in Narcotics Investigations. While in this capacity I have worked with multiple agencies to include but not limited to the FBI, DEA, ATF, FDA, and Multiple Police Departments throughout Maryland, West Virginia, Virginia, California, Colorado, and Pennsylvania. I have previously been deputized federally with the DEA and the FBI on case specific investigations.

I have worked in a covert capacity for undercover investigations, and I have managed more than 1000 criminal informants as well as held caseloads of more than 30 cases at a time. I have testified for the prosecution in many Federal cases. I have been involved in many Federal Level investigations that required testimony and litigation on the state and federal levels. I have taught in the subjects of narcotics, Interview and Interrogation, Confidential Informants, Courtroom Conduct and Testimony, as well as 4th Amendment Law.

I was responsible for the maintenance and acquisition of vehicles of the unit. I was also responsible for the development and design of vehicle equipment and undercover technology used in the vehicles.

I was submitted and verified as an Expert Witness in District and Circuit Courts in the State of Maryland. I have been a witness in numerous courts throughout the state of Maryland the Federal Court system.

I have testified in many criminal and civil cases over 30 years.

Training;

Maryland State Police

Police Academy, Yearly Training to maintain my certification as a Police Officer.

Criminal Investigations

Advanced Criminal investigations.

Narcotics Investigator

DEA Investigators School

Interview and Interrogation

Criminal Informants

Numerous other Narcotics Investigators Trainings throughout the country.

Mobile Forensics Certification

Drug Diversion Training

Accident Investigation

Advance Accident Investigation

**June 2015-August 2016 Merritt's Automotive LLC**
I acquired and assumed a family business in the automotive industry. I was certified through the State of Maryland for automotive safety inspections. I was again certified by the state of Maryland and the Maryland State Police to conduct Safety Inspections on Passenger Vehicles including light duty trucks, and trailers. During this time, I conducted several hundred Certified Safety inspections.

**August 2016 – June 2019   Timbrook Automotive**
I joined the Timbrook Automotive Organization to assist and direct the opening of a motorcycle dealership in Winchester, VA. I assisted in the establishment of that business in the state of Virginia that included permitting licensing etc. I established an online presence and supervised all departments of the dealership from sales to service and marketing. I was responsible for management of employees as well as hiring. I was also responsible and assisted with the discipline of employees and customer relations.
I was the manager of the service department to include the overseeing of the mechanical work performed. I established and conducted several hundred appraisals for the banking industry and received training through Honda USA for safety standards as well as mechanical and technological advances. The Timbrook Automotive Group is a corporation that involves more than ten dealerships and numerous manufactures. I was called upon by many of the dealerships in the organization to conduct appraisals.

**June 2019- Present T3 Intelligence Services**
I am a managing and working partner of this security and private investigation firm. I conduct investigations on all matters. Some cases are criminal, and some are civil.
I have been involved with the insurance industry and have been involved in active investigations with Insurance fraud as well as Workman's Comp fraud.
I am a licensed and certified Private Detective through the Maryland State Police. I also carry an Armed Security Firm License.
I have more than 6 employees that provide security services as well as Executive Protection details.

I have conducted and advised on several civil cases involving motor vehicle accidents. We also conduct investigations for Asset Recovery of motor vehicles and large vessels.

**April 2020- Present East Coast Auto Appraisers LLC**  www.eastcoastautoappraisers.com

Partnership Owner and operator of this business. I hold a certification through the Bureau of Certified Auto Appraisers located in Houston Texas. This certification has requirements that include classroom training as well as experience in the fields of Total Loss, Loss of Use, Depreciation Value, Actual Cash Value and Classic Values. The certification standards include the knowledge and identification of vehicles that have been damaged through accidents or the elements.
These appraisals detail any damage to the structure of a vehicle, and I am trained and experienced in the detection of repairs or current damage to frames and subframe systems of vehicles.
I have been able to combine my any years of mechanical experience with the investigative training to establish market values of all types of vehicles. Specialty experience in Umpire callings for certified vehicle appraisals.

**Certifications**
Advanced Accident Investigator
Certified as a Level 4 Motor Vehicle Safety Inspector
Hazardous Material Responder/Inspector
Certified Police Officer Maryland Police Training Commission
Maryland Certified Safety Inspector for multiple classes of motor vehicles
Maryland Certified Salesman
Private Investigator
Certified Auto Appraiser BOCAA



# EXHIBIT 1
# MERRITT





# Jason W. Merritt

East Coast Auto Appraisers LLC

Cumberland, Maryland 21502

301-804-0224

jason@eastcoastautoappraisers.com

**Merritt's Alignment Service**                                    January 1980-Oct 1987

Authorized Maryland State Inspections mechanic. Certified and licensed to perform safety inspections for the state of Maryland. Certified in passenger cars. Light duty trucks, and light duty trailers. Certified as the youngest mechanic by the state of Maryland to perform safety inspections.

During this tenure multiple safety inspections were conducted. The Maryland State Inspection procedure is one of the most detailed and thorough state inspection process.
During this tenure I received experience and training in the mechanical aspects and systems of all motor vehicles.

**Maryland State Police**                                    Oct 1987- June 2015

October 1987- Entered the Maryland State Police as a Cadet. Served in the Commercial Vehicle Enforcement Unit. During this time, I was certified federally as a Level 1 Inspector for Commercial Vehicles. Level 1 inspections are the highest level of inspections set forth by the Federal Motor Carrier Safety Standards and are recognized at the State and Federal Level. At that same time, I received Hazard Materials Certification and training. I was the first Cadet in the state of Maryland to be certified to conduct Level 1 inspections of commercial vehicles. I conducted accident investigations of commercial vehicles. I performed more than 1000 inspections during this tenure.

August 1990- Graduated the Police Academy and was certified as Police Officer by the Maryland Police Training Commission. Was instructed and certified to conduct accident investigations. During this Academy training many hours were dedicated to Accident Investigations.

August 1990- March 1998 Assigned to Road Patrol throughout the state of Maryland. During that time, I handled numerous high-level Criminal Investigations for multiple thefts as well as assaults and fatal accidents.

March 1998- June 2015

Assigned to the Criminal Enforcement Division, Columbia, Maryland

I was assigned to the C3I Narcotics Unit. This is a multi-jurisdictional Unit that is comprised with multiple agencies and is supervised by the Maryland State Police. During this time as a Narcotics Investigator, I have received many commendations and awards for service.

I have conducted and assisted with more than 4500 investigations and conducted more than 3500 arrests. I have been the author of and assisted with more than 800 Search and Seizure Warrants.

The C3I Narcotics Unit has received numerous awards and recognitions for Outstanding Performance in Narcotics Investigations. While in this capacity I have worked with multiple agencies to include but not limited to the FBI, DEA, ATF, FDA, and Multiple Police Departments throughout Maryland, West Virginia, Virginia, California, Colorado, and Pennsylvania. I have previously been deputized federally with the DEA and the FBI on case specific investigations.

I have worked in a covert capacity for undercover investigations, and I have managed more than 1000 criminal informants as well as held caseloads of more than 30 cases at a time. I have testified for the prosecution in many Federal cases. I have been involved in many Federal Level investigations that required testimony and litigation on the state and federal levels. I have taught in the subjects of narcotics, Interview and Interrogation, Confidential Informants, Courtroom Conduct and Testimony, as well as 4th Amendment Law.

I was responsible for the maintenance and acquisition of vehicles of the unit. I was also responsible for the development and design of vehicle equipment and undercover technology used in the vehicles.

I was submitted and verified as an Expert Witness in District and Circuit Courts in the State of Maryland. I have been a witness in numerous courts throughout the state of Maryland the Federal Court system.

I have testified in many criminal and civil cases over 30 years.


Training;

Maryland State Police

Police Academy, Yearly Training to maintain my certification as a Police Officer.

Criminal Investigations

Advanced Criminal investigations.

Narcotics Investigator

DEA Investigators School

Interview and Interrogation

Criminal Informants

Numerous other Narcotics Investigators Trainings throughout the country.

Mobile Forensics Certification

Drug Diversion Training

Accident Investigation

Advance Accident Investigation

**June 2015-August 2016 Merritt's Automotive LLC**
I acquired and assumed a family business in the automotive industry. I was certified through the State of Maryland for automotive safety inspections. I was again certified by the state of Maryland and the Maryland State Police to conduct Safety Inspections on Passenger Vehicles including light duty trucks, and trailers. During this time, I conducted several hundred Certified Safety inspections.

**August 2016 – June 2019  Timbrook Automotive**
I joined the Timbrook Automotive Organization to assist and direct the opening of a motorcycle dealership in Winchester, VA. I assisted in the establishment of that business in the state of Virginia that included permitting licensing etc. I established an online presence and supervised all departments of the dealership from sales to service and marketing. I was responsible for management of employees as well as hiring. I was also responsible and assisted with the discipline of employees and customer relations.
I was the manager of the service department to include the overseeing of the mechanical work performed. I established and conducted several hundred appraisals for the banking industry and received training through Honda USA for safety standards as well as mechanical and technological advances. The Timbrook Automotive Group is a corporation that involves more than ten dealerships and numerous manufactures. I was called upon by many of the dealerships in the organization to conduct appraisals.

**June 2019- Present T3 Intelligence Services**
I am a managing and working partner of this security and private investigation firm. I conduct investigations on all matters. Some cases are criminal, and some are civil.
I have been involved with the insurance industry and have been involved in active investigations with Insurance fraud as well as Workman's Comp fraud.
I am a licensed and certified Private Detective through the Maryland State Police. I also carry an Armed Security Firm License.
I have more than 6 employees that provide security services as well as Executive Protection details.

I have conducted and advised on several civil cases involving motor vehicle accidents. We also conduct investigations for Asset Recovery of motor vehicles and large vessels.

**April 2020- Present East Coast Auto Appraisers LLC**  www.eastcoastautoappraisers.com

Partnership Owner and operator of this business. I hold a certification through the Bureau of Certified Auto Appraisers located in Houston Texas. This certification has requirements that include classroom training as well as experience in the fields of Total Loss, Loss of Use, Depreciation Value, Actual Cash Value and Classic Values. The certification standards include the knowledge and identification of vehicles that have been damaged through accidents or the elements.
These appraisals detail any damage to the structure of a vehicle, and I am trained and experienced in the detection of repairs or current damage to frames and subframe systems of vehicles.
I have been able to combine my any years of mechanical experience with the investigative training to establish market values of all types of vehicles. Specialty experience in Umpire callings for certified vehicle appraisals.

**Certifications**
Advanced Accident Investigator
Certified as a Level 4 Motor Vehicle Safety Inspector
Hazardous Material Responder/Inspector
Certified Police Officer Maryland Police Training Commission
Maryland Certified Safety Inspector for multiple classes of motor vehicles
Maryland Certified Salesman
Private Investigator
Certified Auto Appraiser BOCAA





**RETURNING STUDENTS**

**Do you need to verify IACP certification status on an individual before entrusting them with a certified auto appraisal?**

This feature allows you to verify current status of certification for an individual certified by the Bureau of Certified Auto Appraisers - IACP. You need to know their full name in order to perform the search.

Alternatively, you may enter the certification number below. This number can be found on the wall certificate produced by the appraiser. The search will return the certification number, a name, current status and an expiration date for that individual.

BOCAA strives to maintain accurate, reliable, and current information on certification. However, inadvertent mistakes may exist in our database. If you discover an apparent mistake or discrepancy, please contact the Independent Appraisers Certification Program department immediately at 1-877-424-8560.

**Search by first name, last name or IACP certification number.**

# Appraiser Status Results

[ Search ]

BOCAA strongly suggests that the certification identity be verified with a government issued photo identification card, such as a driver's license.



## Bureau of Certified Auto Appraisers - #1 Online Auto Appraisal School Obtain 40-Hour IACP Accreditation

- Become an IACP Certified Auto Appraiser in 40 Hours.
- Start your own Independent Auto Appraisal Business and start making money.
- Minimum startup costs – Cell Phone, Laptop Computer, Printer, and Website.
- Potentially earn $150K+ income working part-time – set your own hours.
- Retained by Attorneys, Insurance Companies, Corporations and Private Individuals.
- Provide your clients with the most accepted auto appraisal reports in the industry.
- Testify confidently at Depositions, Mediations, Bench and Jury Trials.
- Learn Law for Appraisers, Insurance Adjusters, and Expert Witnesses.
- Diminished Value, Total Loss, Classic Car Appraisals and more.
- Banks & Credit Unions are now requiring IACP Certified Auto Appraisals.
- Complete IRS Form 8283 for Non-Cash Charitable Donation Appraisals of $5,000+
- Declare Damaged Vehicles to be Repairable or Total Loss.
- Comply with BOCAA & USPAP Standards when appraising for profit.
- Secure login access to NADA, AuctionNet, Manufactured Homes, and other valuation guides.
- Employment opportunities and appraisal assignments – (For members only)

## How to become an IACP Certified Auto Appraiser?

- Register today to begin your new career as an IACP  Certified Auto Appraiser and enjoy the wealth of benefits and prestige that the professional auto appraisal industry has to offer.
- The online IACP  Certification Exam fee is $550.00 with a two-year recertification renewal.
- The IACP  Membership fee is $25.00 per month, recurring monthly and is optional. You do not have to be a member to take the exam. (Tools & Employment Opportunities from insurance companies, attorneys, banks & credit unions)
- No refunds will be issued once the payment process has commenced. No refunds will be provided once the test has been downloaded. No refunds will be issued should a student fail any part of the examination as indicated below.
- A maximum of two (2) attempts will be honored before re-payment of the course exam fee applies. We strongly recommend that you study the material presented to you as you will be tested on that material.
- Once the student has passed the exam, an eye test with 20/20 or 20/40 with corrected vision must be provided to the Bureau along with the $100.00 Wall Certificate Fee in order for you to receive the official Certificate.

## Join Today!

The Bureau of Certified Auto Appraisers administers the IACP Certified Auto Appraiser Certification Course and Final Exam.

Start your own independent auto appraisal business today. IACP Certified Auto Appraisers are in demand. The Bureau of Certified Auto Appraisers holds the key to opening the door to this demand. BOCAA.org is the leading online auto appraisal course producer of men and women who have successfully started their own third-party appraisal company after obtaining IACP certification.

Credit Unions, Banks, Courts, Insurance Companies, Attorneys, Corporations, CPA's, Government Agencies, and vehicle owners are now requiring IACP Certification.

IACP Certification is preferred for Legal and Certified appraisals such as: Personal Property Valuation, Insurance Claims, Total Loss, Damage Estimates, Stolen Vehicles, Bank Loans, Pre-Purchase Inspections, Court Ordered Appraisals, Actual Cash Value, GAP Total Loss, Divorce Appraisals, Estate Appraisals, Probate Appraisals, Investment Appraisals, Manufactures Defects, Consumer Protection Lawsuits, Class Action Lawsuits, Criminal and Civil Lawsuits.

Job Listings                    Certification Courses


EXHIBIT
7

Looking for your next appraisal assignment? Members can access employment opportunities throughout the United States, Hawaii, Puerto Rico, USVI and the Cayman Islands. Are you an employer requiring an IACP Certified Auto Appraiser on an appraisal? Contact us for more details today!

MORE

IACP Certified Auto Appraiser Course and Texas Insurance Adjuster Pre-Licensing Course.

Each Online 40-hour Certification course can be completed from the comfort of your own home.



The Bureau of Certified Auto Appraisers (www.BOCAA.org) is a National Professional Appraisal Credentialing Organization (NPACO) as recognized by the IRS & US Department of Treasury. Sections §1.170A-17(b) and 170(f)(11)(E), as added by the Jobs Act and amended by section 1219 of the Pension Protection Act of 2006. Public Law 109-280 (120 Stat. 780) (PPA) for written examination, testing, education and experience requirements for the qualification of IACP Certified Auto Appraisers Worldwide.

© 2023 - All Rights Reserved - Bureau of Certified Auto Appraisers - Privacy Policy

4/14/23, 9:07 AM
Case 1:22-cv-00375-NT   Document 120-24   Filed 01/10/25   Page 183 of 238
Bureau of Certified Auto Appraisers - BOCAA - Become a IACP Auto Appraiser
PageID #: 5623



## Appraiser Status Results

jason merritt

[ Search ]  [ Reset ]

| Appraiser Name | Location | IACP Certification # | Status | Expiration |
|---|---|---|---|---|

No listings found.

« Prev | 0 | Next »





March 13, 2023

*Via E-Mail*

Matthew Brigman
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
MBrigman@KSLAW.com

      Re:   *Brown, et al. v. Progressive Mountain Insurance Company, et al.*
             N.D. Ga. Case No. 3:21-cv-00175-TCB

Matt:

On behalf of Mr. Jason Merritt, we submit the following response to Defendants'
subpoena.

**1. Your complete work-file pertaining to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from
disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, other than the
materials produced with or identified in Mr. Merritt's expert report, there are no further
documents responsive to this Request.

**2. All documents sufficient to show the amount of time You dedicated (whether billed or
unbilled) for Your assignment and services pertaining to this Case.**

Mr. Merritt objects to this Request as outside the scope of discovery under Federal Rule
of Civil Procedure 26 and as seeking documents protected by the attorney-client privilege. Mr.

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com

**EXHIBIT**
*9*

Merritt will not produce documents responsive to this Request but will disclose that, thus far, he

has dedicated 4 hours for his assignment and services pertaining to this Case.

**3. Any judicial ruling on the admissibility of Your expert testimony issued in the last five (5) years.**

Mr. Merritt has no responsive documents within his custody, possession, or control and

does not believe responsive documents exist.

**4. All documents setting forth or describing the nature and scope of Your assignment and services pertaining to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from

disclosure by Federal Rule of Civil Procedure 26 and the attorney work product doctrine. Mr.

Merritt has been retained as an expert in this case and all work he has performed has been

pursuant to a retention agreement. On that basis, any document he has created or exchanged with

counsel in this litigation could be construed as "setting forth or describing the nature and scope

of Your assignment and services pertaining to this Case." On the basis of this objection, Mr.

Merritt is withholding draft reports and emails with Plaintiff's counsel that do not meet any of

Rule 26(b)(4)(c)'s exceptions. Subject to these objections, Mr. Merritt's retention agreement in

this case will be produced in response to this request.

**5. All documents setting forth or describing any limitation(s) on the nature and scope of your assignment and services pertaining to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from

disclosure by Federal Rule of Civil Procedure 26 and the attorney work product doctrine. Mr.

Merritt has been retained as an expert in this case and all work he has performed has been

pursuant to a retention agreement. On that basis, any document he has created or exchanged with

counsel in this litigation could be construed as "setting forth or describing any limitation(s) on

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com

the nature and scope of your assignment and services pertaining to this Case." On the basis of this objection, Mr. Merritt is withholding draft reports and emails with Plaintiff's counsel that do not meet any of Rule 26(b)(4)(c)'s exceptions. Subject to these objections, Mr. Merritt's retention agreement in this case will be produced in response to this request.

**6. All written retainer(s), fee agreement(s), or engagement letter(s) regarding your assignment and services pertaining to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26(b)(4)(c). Mr. Merritt has been retained as an expert in this case and all work he has performed has been pursuant to a retention agreement. On the basis of this objection, Mr. Merritt is withholding emails with Plaintiff's counsel that do not meet any of Rule 26(b)(4)(c)'s exceptions. Subject to these objections, Mr. Merritt's retention agreement in this case will be produced in response to this request.

**7. All documents, communications, correspondence, materials, publications, or other information which You considered or relied upon in forming the opinions disclosed in Your Report.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, Plaintiff is producing a copy of WCTL's Position on Internet Pricing, Bates stamped "Mitchell-Drummond Subpoena 000214-Confidential." Other than this document and the materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**8. All documents created or generated by You or at Your direction in connection with Your Report, including notes, work papers, and summaries.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, other than the

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com

materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**9. All communications with any third-party other than Plaintiff's counsel relating to Your Report and to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, other than the materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**10. All documents relating to Your communications with any third-party other than Plaintiff's counsel relating to Your Report and to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, other than the materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**11. All documents setting forth the opinions and conclusions contained in Your Report or that you intend to give at trial in this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, other than the materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**12. Documents reflecting any appraisal standards or other professional standards on which you relied in developing your opinions in this case.**

Mr. Merritt has no documents responsive to this request.

Best regards,

Hank Bates

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com

cc:    Counsel of Record for the Parties (via email)

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com



March 31, 2023

*Via E-Mail*

Matthew Brigman
KING & SPALDING LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309
MBrigman@KSLAW.com

      Re:   *Costello v. Mountain Laurel Assurance Company*
            E.D. Tenn. Case No. 2:22-cv-00035-TAV-CRW

Matt:

On behalf of Mr. Jason Merritt, we submit the following response to Defendant's subpoena.

**1. Your complete work-file pertaining to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, other than the materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**2. All documents sufficient to show the amount of time You dedicated (whether billed or unbilled) for Your assignment and services pertaining to this Case.**

Mr. Merritt objects to this Request as outside the scope of discovery under Federal Rule of Civil Procedure 26 and as seeking documents protected by the attorney-client privilege. Mr. Merritt will not produce documents responsive to this Request but will disclose that, thus far, he has dedicated 4 hours for his assignment and services pertaining to this Case.

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com



EXHIBIT
10

**3. Any judicial ruling on the admissibility of Your expert testimony issued in the last five (5) years.**

Mr. Merritt is producing herewith a copy of Docket No. 208 in *Volino, et al. v. Progressive Cas. Ins. Co.*, *et al.*, Case No. 21 Civ. 6243 (LGS).

**4. All documents setting forth or describing the nature and scope of Your assignment and services pertaining to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26 and the attorney work product doctrine. Mr. Merritt has been retained as an expert in this case and all work he has performed has been pursuant to a retention agreement. On that basis, any document he has created or exchanged with counsel in this litigation could be construed as "setting forth or describing the nature and scope of Your assignment and services pertaining to this Case." On the basis of this objection, Mr. Merritt is withholding draft reports and emails with Plaintiff's counsel that do not meet any of Rule 26(b)(4)(c)'s exceptions. Subject to these objections, Mr. Merritt's retention agreement in this case is being produced contemporaneously with this response.

**5. All documents setting forth or describing any limitation(s) on the nature and scope of your assignment and services pertaining to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26 and the attorney work product doctrine. Mr. Merritt has been retained as an expert in this case and all work he has performed has been pursuant to a retention agreement. On that basis, any document he has created or exchanged with counsel in this litigation could be construed as "setting forth or describing any limitation(s) on the nature and scope of your assignment and services pertaining to this Case." On the basis of this objection, Mr. Merritt is withholding draft reports and emails with Plaintiff's counsel that do

519 W. 7th St.   |   Little Rock, AR 72201
p. 501-312-8500   |   f. 501-312-8505   |   tf. 888-551-9944
www.cbplaw.com

not meet any of Rule 26(b)(4)(c)'s exceptions. Subject to these objections, Mr. Merritt's retention agreement in this case is being produced contemporaneously with this response.

**6. All written retainer(s), fee agreement(s), or engagement letter(s) regarding your assignment and services pertaining to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26(b)(4)(c). Mr. Merritt has been retained as an expert in this case and all work he has performed has been pursuant to a retention agreement. On the basis of this objection, Mr. Merritt is withholding emails with Plaintiff's counsel that do not meet any of Rule 26(b)(4)(c)'s exceptions. Subject to these objections, Mr. Merritt's retention agreement in this case is being produced contemporaneously with this response.

**7. All documents, communications, correspondence, materials, publications, or other information which You considered or relied upon in forming the opinions disclosed in Your Report.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, Plaintiff is producing a copy of WCTL's Position on Internet Pricing, Bates stamped "Mitchell-Drummond Subpoena 000214-Confidential." Other than this document and the materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**8. All documents created or generated by You or at Your direction in connection with Your Report, including notes, work papers, and summaries.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, other than the materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**9. All communications with any third-party other than Plaintiff's counsel relating to Your Report and to this Case.**

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, other than the materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**10. All documents relating to Your communications with any third-party other than Plaintiff's counsel relating to Your Report and to this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, other than the materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**11. All documents setting forth the opinions and conclusions contained in Your Report or that you intend to give at trial in this Case.**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26. Subject to this objection, other than the materials produced with or identified in Mr. Merritt's expert report, there are no further documents responsive to this Request.

**12. Documents reflecting any appraisal standards or other professional standards on which you relied in developing your opinions in this case.**

Mr. Merritt has no documents responsive to this request.

Best regards,

Lee Lowther

cc:    Counsel of Record for the Parties (via email)

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 21-6433242-01 | | COLLISION | KEDDRICK BROWN 156 COLDWATER WAY GRIFFIN, GA 30224 +1-404-3334244 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 05/10/2021 | 05/12/2021 | 05/24/2021 | 1012279828 | 2 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2014 | Dodge | Charger R/T 4 Door Sedan 5.7L 8 Cyl Gas A RWD | GA 30224 | 131,303 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Bright White Clearcoat | | 2C3CDXCT8EH227637 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $15,426.86 |
| Condition - | $267.15 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| Market Value = | $15,159.71 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $500.00 |
| Settlement Value = | $14,659.71 |

# Settlement Value:

# $14,659.71



J.D. POWER

Mitchell WorkCenter
Total Loss
© 2016 Mitchell International, Inc. All Rights Reserved

# Loss Vehicle Detail

Loss vehicle: 2014 Dodge Charger | R/T 4 Door Sedan | 5.7L 8 Cyl Gas A RWD

## Standard Equipment

### Exterior

| | |
|---|---|
| Black Side Windows Trim | Body-colored door handles |
| Body-colored front bumper | Body-Colored Power Heated Side Mirrors w/Manual Folding |
| Body-Colored Rear Bumper | Chrome grille |
| Clearcoat paint | Compact Spare Tire Mounted Inside Under Cargo |
| Fixed Rear Window w/Defroster | Front fog lamps |
| Fully Automatic Projector Beam High Intensity Low Beam Daytime Running Headlamps w/Delay-Off | Galvanized Steel/Aluminum Panels |
| Laminated Glass | LED brakelights |
| Light tinted glass | Perimeter/Approach Lights |
| Speed sensitive variable intermittent wipers | Steel spare wheel |
| Tires: P235/55R18 BSW AS Performance | Trunk Rear Cargo Access |
| Wheels: 18" x 7.5" Aluminum | |

### Interior

| | |
|---|---|
| 2 Seatback Storage Pockets | 276w Regular Amplifier |
| 3 12V DC Power Outlets | 4-Way Passenger Seat -inc: Manual Recline and Fore/Aft Movement |
| 6 Performance Speakers | 60-40 Folding Bench Front Facing Fold Forward Seatback Cloth Rear Seat |
| 8-Way Power Driver Seat -inc: Power Recline, Height Adjustment, Fore/Aft Movement, Cushion Tilt and Power 4-Way Lumbar Support | Air filtration |
| Analog Display | Audio jack input for mobile devices |
| Cargo net | Cargo Space Lights |
| Carpet Floor Trim and Carpet Trunk Lid/Rear Cargo Door Trim | Cloth Bucket Front Seats w/Power 4-Way Driver Lumbar |
| Compass | Cruise control w/steering wheel controls |
| Day-Night Auto-Dimming Rearview Mirror | Delayed Accessory Power |
| Digital Signal Processor | Driver And Passenger Heated-Cushion, Driver And Passenger Heated-Seatback |
| Driver And Passenger Visor Vanity Mirrors w/Driver And Passenger Illumination, Driver And Passenger Auxiliary Mirror | Driver foot rest |
| Dual Zone Front Automatic Air Conditioning | Fade-to-off interior lighting |
| FOB Controls -inc: Trunk/Hatch/Tailgate and Remote Engine Start | Front And Rear Map Lights |
| Front Center Armrest and Rear Center Armrest w/Storage | Front Cupholder |
| Full Carpet Floor Covering -inc: Carpet Front And Rear Floor Mats | Full cloth headliner |
| Full Floor Console w/Covered Storage, Mini Overhead Console w/Storage and 3 12V DC Power Outlets | Gauges -inc: Speedometer, Odometer, Oil Pressure, Engine Coolant Temp, Tachometer, Oil Temperature, Transmission Fluid Temp, Engine Hour Meter, Trip Odometer and Trip Computer |
| HomeLink Garage Door Transmitter | HVAC -inc: Underseat Ducts and Console Ducts |
| Illuminated locking glove box | Instrument Panel Bin, Driver / Passenger And Rear Door Bins |


Mitchell **WorkCenter**
Total Loss

PGR_BROWN_0002255

Interior Trim -inc: Aluminum Instrument Panel Insert, Aluminum Console Insert and Chrome Interior Accents

Leather gear shift knob

Leather/Metal-Look Steering Wheel

Manual tilt/telescoping steering column

Manual Type Adjustable Front Head Restraints and Fixed Rear Head Restraints

Outside temp gauge

Power 1st Row Windows w/Driver And Passenger 1-Touch Up/Down

Power Door Locks w/Autolock Feature

Power Rear Windows

Proximity Key For Doors And Ignition

Radio w/Seek-Scan, Clock, Speed Compensated Volume Control, Steering Wheel Controls, Voice Activation and Radio Data System

Radio: Uconnect 8.4 CD/DVD/MP3

Rear cupholder

Redundant Digital Speedometer

Remote Keyless Entry w/Integrated Key Transmitter, 4 Door Curb/Courtesy, Illuminated Entry and Panic Button

Remote Releases -inc: Power Trunk/Hatch and Power Fuel

Remote USB port

Sentry Key Engine Immobilizer

Sirius satellite radio

Systems Monitor

Trip computer

Uconnect w/Bluetooth Wireless Phone Connectivity

Valet Function

Vinyl Door Trim Insert

Voice Recorder

Window Grid Antenna

Wireless Streaming

### Mechanical

160 amp alternator

19.5 Gal. Fuel Tank

2.65 axle ratio

4-Wheel Disc Brakes w/4-Wheel ABS, Front And Rear Vented Discs, Brake Assist and Hill Hold Control

5300# GVWR

730CCA Maintenance-Free Battery w/Run Down Protection

Dual Stainless Steel Exhaust w/Chrome Tailpipe Finisher

Electro-Hydraulic Power Assist Steering

Front And Rear Anti-Roll Bars

Gas-pressurized shock absorbers

Multi-link rear suspension w/coil springs

Rear-wheel drive

Short And Long Arm Front Suspension w/Coil Springs

Sport tuned suspension

Transmission w/Autostick Sequential Shift Control

### Safety

ABS And Driveline Traction Control

Airbag Occupancy Sensor

Curtain 1st And 2nd Row Airbags

Driver knee airbag

Dual Stage Driver And Passenger Front Airbags

Dual Stage Driver And Passenger Seat-Mounted Side Airbags

Electronic stability control (ESC)

Outboard Front Lap And Shoulder Safety Belts -inc: Rear Center 3 Point, Height Adjusters and Pretensioners

Rear child safety locks

Side impact beams

Tire Specific Low Tire Pressure Warning

## Packages

**BEATS AUDIO GROUP**
-inc: 10 Beats Premium Speakers w/Subwoofer, 552 Watt Amplifier

**BLACKTOP PACKAGE**
-inc: Tires: 245/45R20 BSW AS Performance, 215mm Rear Axle, Beats Audio Group, 10 Beats Premium Speakers w/Subwoofer, 552 Watt Amplifier, Wheels: 20" x 8.0" Painted Aluminum, Rear Bodycolor Spoiler, Gloss Black Grille w/Black Honeycomb, 3.06 Rear Axle Ratio, Sport Mode 2, High Speed Engine Controller, Steering Wheel Mounted Shift Control


Mitchell **WorkCenter**
Total Loss

Claim # 21-6433242-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 3

PGR_BROWN_0002256

## Optional Equipment

REAR BODYCOLOR SPOILER

*DIO/PIO = Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle:  2014 Dodge Charger |  R/T 4 Door Sedan | 5.7L 8 Cyl Gas A RWD

## Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 83,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2014 DODGE CHARGER R/T 4D SDN 8 5.7NORMAL GAS A 2WD | 93,247 | 31904 | 62 miles | $17,331.00 Sold Price | $14,882.42 |
| 2 | 2014 DODGE CHARGER R/T 4D SDN 8 5.7NORMAL GAS A 2WD | 98,760 | 30024 | 61 miles | $17,999.00 List Price | $15,494.59 |
| 3 | 2014 DODGE CHARGER R/T 4D SDN 8 5.7NORMAL GAS A 2WD | 105,476 | 30102 | 67 miles | $15,995.00 List Price | $13,756.00 |
| 4 | 2014 DODGE CHARGER R/T 4D SDN 8 5.7NORMAL GAS A 2WD | 80,947 | 30041 | 70 miles | $19,345.00 List Price | $14,132.21 |
| 5 | 2014 DODGE CHARGER R/T 4D SDN 8 5.7NORMAL GAS A 2WD | 112,459 | 36801 | 75 miles | $19,995.00 List Price | $18,869.08 |

**Base Value:** **$15,426.86**

# Loss Vehicle Adjustments

Loss vehicle:  2014 Dodge Charger | R/T 4 Door Sedan | 5.7L 8 Cyl Gas A RWD

Mitchell **WorkCenter**
Total Loss

PGR_BROWN_0002257

## Condition Adjustments

Condition Adjustment:  -$267.15          Overall Condition:  2.92-Good          Typical Vehicle Condition:  3.00

| Category | Condition | Comments |
|---|---|---|
| Interior | | |
| DOORS/INTERIOR PANELS | 3 Good | |
| HEADLINER | 3 Good | |
| DASH/CONSOLE | 3 Good | |
| CARPET | 3 Good | |
| GLASS | 3 Good | |
| SEATS | 3 Good | |
| Exterior | | |
| BODY | 3 Good | 1 small dent/crease |
| VINYL/CONVERTIBLE TOP | Typical | |
| PAINT | 3 Good | |
| TRIM | 2 Fair | major trim missing damaged, Single Large Impact, |
| Mechanical | | |
| ENGINE | 3 Good | |
| TRANSMISSION | 3 Good | |
| Tire | 2 Fair | |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## Comparable Vehicles

Loss vehicle:  2014 Dodge Charger | R/T 4 Door Sedan | 5.7L 8 Cyl Gas A RWD


Mitchell **WorkCenter**
Total Loss

PGR_BROWN_0002258

## 1 | 2014 DODGE CHARGER R/T 4D SDN 8 5.7 NORMAL GAS A2WD

**Sold Price: $17,331.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle | |
|---|---|---|---|---|---|
| 2C3CDXCT7EHXXXXXX | | 04/14/2021 | 31904 | 62 miles | |

| Source | Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|---|
| DEALER SALE - BUILDSHEET - J.D. POWER | Mileage | 131,303 | 93,247 | -$2,448.58 |
| | Equipment | | | |

| | | |
|---|---|---|
| | Total Adjustments: | -$2,448.58 |
| | **Adjusted Price:** | **$14,882.42** |

Comparable Vehicle Package Details

BLACKTOP PACKAGE  (REAR BODYCOLOR SPOILER)


## 2 | 2014 DODGE CHARGER R/T 4D SDN 8 5.7 NORMAL GAS A2WD

**List Price: $17,999.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle | |
|---|---|---|---|---|---|
| 2C3CDXCT6EH370246 | | 04/26/2021 | 30024 | 61 miles | |

| Source | Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|---|
| DEALER WEB LISTING - BUILDSHEET - VAST.COM | Projected Sold Adjustment | | | -$1,004.00 |
| SOBH AUTOMOTIVE | Mileage | 131,303 | 98,760 | -$2,001.98 |
| 3973 LAWRENCEVILLE-SUWANEE RD | Equipment | | | |
| SUWANEE GA 30024 | BLACKTOP PACKAGE | Yes | No | $1,000.36 |
| 770-605-8689 | 20" BLACK SPORT APPEARANCE GROUP | No | Yes | -$498.79 |

| | | |
|---|---|---|
| | Total Adjustments: | -$2,504.41 |
| | **Adjusted Price:** | **$15,494.59** |

Comparable Vehicle Package Details

20" BLACK SPORT APPEARANCE GROUP

PGR_BROWN_0002259

### 3  2014 DODGE CHARGER R/T 4D SDN 8 5.7 NORMAL GAS A2WD

**List Price: $15,995.00**

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2C3CDXCT3EH226363 | F1927 | 05/19/2021 | 30102 | 67 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
CHEROKEE AUTO SALES
6508 GA-92
ACWORTH GA 30102
770-928-2635

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$892.00 |
| Mileage | 131,303 | 105,476 | -$1,347.00 |
| Equipment | | | |

| | |
|---|---|
| Total Adjustments: | -$2,239.00 |
| **Adjusted Price:** | **$13,756.00** |

Comparable Vehicle Package Details.

BLACKTOP PACKAGE  (REAR BODYCOLOR SPOILER)

### 4  2014 DODGE CHARGER R/T 4D SDN 8 5.7 NORMAL GAS A2WD

**List Price: $19,345.00**

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2C3CDXCT7EH159220 | EH159220 | 05/12/2021 | 30041 | 70 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
AUTOWORLD OF GEORGIA
4600 BROWNS BRIDGE RD SUITE A
CUMMING GA 30041
470-239-7777

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,079.00 |
| Mileage | 131,303 | 80,947 | -$3,537.78 |
| Equipment | | | |
| BLACKTOP PACKAGE | Yes | No | $1,075.17 |
| WHEELS & TUNES GROUP | No | Yes | -$1,015.28 |
| NAVIGATION/REAR BACK-UP CAMERA GROUP | No | Yes | -$655.90 |

| | |
|---|---|
| Total Adjustments: | -$5,212.79 |
| **Adjusted Price:** | **$14,132.21** |

Comparable Vehicle Package Details.

WHEELS & TUNES GROUP  (REAR BODYCOLOR SPOILER)

NAVIGATION/REAR BACK-UP CAMERA GROUP

Mitchell **WorkCenter**
Total Loss

PGR_BROWN_0002260

**5**  **2014 DODGE CHARGER R/T 4D SDN 8 5.7 NORMAL GAS A2WD**    **List Price: $19,995.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| 2C3CDXCT2EH180573 | 220410P | 04/30/2021 | 36801 | 75 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - AUTOTRADER.COM

GILS AUTO SALES

1430 GATEWAY DR

OPELIKA AL 36801

334-246-0988

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Projected Sold Adjustment | | | -$1,115.00 |
| Mileage | 131,303 | 112,459 | -$1,122.23 |
| Equipment | | | |
| BLACKTOP PACKAGE | Yes | No | $1,111.31 |

Total Adjustments: -$1,125.92
Adjusted Price: $18,869.08

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|-----------------------|---------------|---------------|
| 2014 Dodge Charger R/T | 4 Door Sedan 5.7L 8 Cyl Gas  RWD | $30,495.00 |

Mitchell **WorkCenter**
Total Loss

PGR_BROWN_0002261

## Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

### Step 1 - Locate Comparable Vehicles

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

### Step 2 - Adjust Comparable Vehicles

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

### Step 3 - Calculate Base Vehicle Value

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

### Step 4 - Calculate Loss Vehicle Adjustments

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

### Step 5 - Calculate the Market Value

The Market Value is calculated by applying the loss vehicle adjustments to the base value.


Mitchell **WorkCenter**
Total Loss

Claim # 21-6433242-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 9

PGR_BROWN_0002262

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 202 of 238
8:21-cv-03803-DCC    Date Filed 11/08/22    Entry Number 49-1    Page 2 of 38
PageID #: 5642



# East Coast Auto Appraisers

CUMBERLAND, MD 21502
☎ 301-804-0224
WWW.EASTCOASTAUTOAPPRAISERS.COM

### IACP Certified Actual Cash Value Appraisal

**Today's Date: September 17, 2022**
**Effective Date: February 23, 2021**
**Vehicle Year & Make: 2009 Chevrolet**
**Vehicle Model: Silverado C1500 LT EXT Cab**
**VIN#: 1GCEC29J99Z270860**
**Mileage: 182,293**
**Transmission: Automatic**

**Owner of Vehicle: Wiggins**
**Claim: 40-16T1-58F01**

**Certified Auto Appraiser / Expert Witness:** Jason W. Merritt
**IACP Certification #:** 991911100



Bureau of Certified Auto Appraisers

Certifies that Auto Appraiser

**Jason W. Merritt**

has complied with the requirements of USPAP
Standard for BCAA Certification of Auto Appraisers

991911100
CERTIFICATE NUMBER

06/01/2022
EFFECTIVE DATE

06/01/2024
EXPIRATION DATE

PRESIDENT BCAA



**EXHIBIT**

1

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 203 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 3 of 38
PageID #: 5643

**INTENDED PURPOSE:** This report is to determine the Actual Cash Value of the 2009 Chevrolet C1500, referenced above on the effective loss date of June 26, 2017.

**APPRAISAL TYPE:** Restricted Use Appraisal.
**VALUE TYPE:** Fair Market Value / Actual Cash Value.
**APPRAISAL METHODS & TECHNIQUES USED**: Sales Comparison Approach. Historic
**PROPERTY CLASS & USE / OWNERSHIP INTEREST:** Privately Owned / Full Ownership / Clean Title.

East Coast Auto Appraisers has conducted a certified appraisal of your **2009 Chevrolet C1500 Silverado,** in order to determine the actual cash value of your vehicle. The local market value of this vehicle is Goose Creek, South Carolina during December 2021.

### IACP CERTIFIED ACTUAL CASH VALUE APPRAISAL.

This appraisal is being conducted utilizing information, data that is from March 02, 2021. Sources for this information were provided by the client as well as online sources that are still available.

I was provided with a "AudaTex AutoSource" report dated March 02, 2021. That report was used as a reference for the vehicle details, condition, mileage, and for comparable vehicles.

This Appraiser was not able to view/inspect the Loss Vehicle. There were no pictures of the vehicle prior to or following the date of loss. The appraisal was completed with the sole use of the provided AudaTex Autosource Valuation that was provided to this Appraiser.

According to the report:
The vehicle is rated to be in average to above average condition for year, make, mileage, and model. There was a credit or addition of value rated at $600 for the condition.

This vehicle had no service issues or prior salvage history prior to the Date of Loss, February 23, 2021.

The 2009 Chevrolet Silverado C1500 2WD lists the standard options for the LT Models.

The Date of Loss for this vehicle was noted as being February 23, 2021, so historic value data is difficult to recover. This report indicates that there was a total of 4 vehicles used as comparable vehicles in the submitted evaluation. The comparable vehicles provided in the report were used for this Appraisal.

The Comps utilized by AudaExplore are in the Goose Creek, SC market area. Each "Comp Vehicle" has been compared to the "Loss Vehicle" for features, options, etc. A monetary value has been determined for each option that is on the "Loss Vehicle" compared to the options on the "Comp Vehicle". Those values were added to or taken away from the Loss Vehicle

This ACV is of the vehicle in the AS-IS condition at the time of appraisal. Condition adjustments were made, if any, and taken into consideration.

**4 comparable** representative vehicles were provided for comparisons:

Total of (4) comparable vehicles were located within a **100+ mile radius** of stated principal garage.

| | |
|---|---|
| **Current Local Market Value -** | $12,746.75-- |
| **Condition Ajustment** | (+$600) |

======================================

**Grand Total: $13,346.75**

2

Case 1:22-cv-00375-NT   Document 120-24   Filed 01/10/25   Page 204 of 238
8:21-cv-03803-DCC   Date Filed 11/04/22   Entry Number 49-1   Page 4 of 38
PageID #: 5644

## Fair Market Value of your auto:
### (Formula and Market Quotes Average weighted by 4.0):

Formula--$50,987.00

Market Quotes---$12,746.75

# $13,346.75
### (Actual Cash Value)

## List of Comparable / Dealer Quotes
### February/March 2021

**#1  Right Choice Automotive**
  Charleston, SC
  VIN: 1GCEC29J99Z190460
  Miles: 132,968
  Price: $12,990.00
  Option Adjustment + $300
  Mileage Adjustment - $985
  TOTAL: $12,305.00

**#2 Prince Automotive Group**
  Valdosta, GA
  VIN: 1GCEC29019Z159078
  Miles: 133,578
  Price: $13,372.00
  Option Adjustment - $50
  Mileage Adjustment - $975
  Total: $12,350.00

**#3 Bender Chevrolet**
  Atlanta, GA
  VIN: 2GCEC29J591117515
  Miles: 73,100
  Price: $14,995.00
  Option Adjustment: + $300
  Mileage Adjustment - $2185
  Total: $13,110.00

**#4 Fairfield Motors**
  Hattiesburg, MS
  VIN: 1GCEC29J39Z136748
  Miles: 161,256
  Option Adjustment: + $150
  Mileage Adjustment - $420
  TOTAL: $13,225.00

3

Case 1:22-cv-00375-NT   Document 120-24   Filed 01/10/25   Page 205 of 238
8:21-cv-03803-DCC   Date Filed 11/07/22   Entry Number 49-1   Page 5 of 98
PageID #: 5645

**The Appraisal Methodology…**

There are several factors which affect the amount of fair market value, including but not limited to; the year, make and model, mileage, options, and the overall condition of the vehicle immediately before the action of loss has taken place.

The first part of our industry recognized methodology is that we review several nationally recognized valuation guides in determining what the fair market value of the vehicle in scope is worth before we contact local dealers and private sellers. This way we have an idea of what the current market is doing. If local dealers and private sellers are not available in the principally garaged location, then we begin contacting dealers and private sellers measuring radially outward from the principally garaged location until the minimum industry accepted standard of two (2) or more comparable or similar vehicles have been identified.

The second part is an average of *retail* quotes from a few dealers in the area that practice car valuations daily. It is our objective to render a non-biased opinion pertaining to the fair market value of the vehicle in scope. We take a commonsense approach by analyzing all accessible data, local buying trends and economics and feel our method to be a fair, objective and non-biased means of calculating this type of loss.

**Why Contact Dealers?**
**Dealers make up nearly 90% of the used car market on average.**
This report is to determine the fair *market* value of your vehicle. The definition of market is "the business of buying and selling a specified commodity." If no dealers were contacted, then nearly 90% of the market would be left out.

**Why Contact Private Sellers?**
They make up the rest of the market. Private sellers have been statistically proven to take a greater loss on the fair market value of the auto needing to move it quickly.

**Why Research Valuation Guides?**
Valuation guides are a nationally recognized means that both buyers and sellers, male and female, can come to a reasonable agreement on the fair market value of the auto in question. It is a good starting point to determine if a buyer/seller should buy/sell a vehicle for more/less than what it is worth or vice versa. East Coast Auto Appraisers incorporates www.nada.com, www.kbb.com, www.autotrader.com and many other industry recognized valuations guides that are accessible to both paid subscribers and the occasional inquirer during our extensive research and data collection. If industry recognized valuation guides were not in place, it would be very easy for deceptive people to mislead the uneducated public of the going price.

4

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 206 of 238
8:21-cv-03803-DCC    Date Filed 11/05/21    Entry Number 49-1    Page 6 of 38
PageID #: 5646

# **Automotive / Insurance / Legal Terms**

**Insurance Company** – means an organization that acts as a system or business of insuring property, life, one's person, etc., against loss or harm arising in specified contingencies, as fire, accident, death, disablement, or the like, in consideration of a payment proportionate to the risk involved. A confide to the community.

**Total Loss** – a "Total Loss" means when it will cost more to repair than replace your vehicle. In insurance contracts, the destruction of property such that it is no longer useful for its intended purpose or that renders it of little or no value to the owner.

**Fair Market Value** – means the price that property would bring in a market of willing buyers and willing sellers, in the ordinary course of trade. Market value is generally established, if possible, based on sales of similar property in the same locality.

**Actual Cash Value** – means the cost to replace a vehicle with a comparable vehicle.

**Comparable Vehicle** – means a vehicle that is the same make and model, same or later, similar body style, similar options, and mileage as your vehicle and in as good or better overall condition as established by current data. To achieve comparability, and deductions or additions for options, mileage or condition can only be if they are itemized and appropriate in dollar amount. An insurer must consider information supplied by the victim when determining deductions or additions.

**Current Data** – means no older than ninety (90) days from the date of loss.

**Principally Garaged** – means the zip code where the vehicle is normally kept.

**Settlement** – means when the payment is made to you and or your lien holder.

**Lemon Law -** Lemon laws are state laws that provide recourse for purchasers of automobiles that repeatedly fail to meet quality and performance standards.

**Arbitration** – The hearing and settlement of a dispute between opposing parties by a third party who is not a judge.

**Burden of Proof** – In the law of evidence, the necessity of duty of affirmatively providing a fact or facts in dispute.

**Cause** – A suit, litigation or action – civil or criminal.

**Chambers** – Private office or room of the Honorable Judge.

**Claim** – The assertion of a right, as to money or property; the accumulation of facts which give rise to a right enforceable in court.

**Class Action** – A lawsuit brought by a representative party on behalf of a large group, all whose members have the same or similar grievance against the defendant. Used when the group is too large for it to be practical to name every member of the group or party

**Contempt of Court** – Any act calculated to embarrass, hinder, or obstruct a court in the administration of justice, or calculated to lessen its authority or dignity.

**Count** – A separate and independent claim. A civil petition or criminal indictment may contain several counts.

**Cross Examination** – The questions of a witness in a trial or in the taking or a deposition; by the party opposed to the one who produced the witness.

**Damages** – Monetary compensation awarded by a court for an injury caused by the act of another.

**Defendant** – The person against whom a civil or criminal action is brought

**Deposition** – A form of oral testimony taken by the opposing attorney in advance of the trial with a court reporter present to record every word.

**Hearsay** – Evidence not proceeding from the personal knowledge of the witness, such as a rumor.

5

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 207 of 238
8:21-cv-03803-DCC    Date Filed 11/08/22    Entry Number 49-1    Page 7 of 38
PageID #: 5647

**Hypothetical Question** – A combination of facts and circumstances, assumed or proved, stated in such a form as to constitute a coherent state of facts upon which the opinion of an expert can be asked by way of evidence in a trial.

**Negligence** – A failure to do something which a reasonable man or woman, guided by ordinary considerations, would do; or the doing of something which a reasonable and prudent man or woman would not do.

**Objection** – The act of taking exception to some statement of procedure in trial. Used to call the courts attention to improper evidence or procedure.

**Plaintiff** – A person who brings an action; the party who complains or sues in a personal action and is so named on the record.

**Tort** – An injury or wrong committed, either with or without force to the person or property of another.

**Verdict** – In practice, the format and unanimous decision or finding made by a jury, reported to the court and accepted by it.

**Weight of Evidence** – The balance or preponderance of evidence; the inclination of the greater amount of credible evidence, offered in trial, to support one side of the issue rather than the other side.

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 208 of 238
8:21-cv-03803-DCC    Date Filed 11/06/23    Entry Number 49-1    Page 8 of 38
PageID #: 5648

# CERTIFICATION OF CREDIBILITY

I certify that, to the best of my knowledge and belief:

- ✓ The methods and calculations used in this report are the unbiased opinion of an experience and qualified professional and are limited only by the reported assumptions and limitations.

- ✓ The statements of fact contained in this report are true and correct.

- ✓ This report was provided at the request of an individual, company, or government agency of their own free will and was not solicited for any predetermined reason.

- ✓ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- ✓ I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- ✓ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- ✓ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- ✓ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- ✓ My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practices and the Bureau of Certified Auto Appraisers standards.*

- ✓ I have performed no services as an appraiser or in any other capacity regarding the vehicle that is the subject of this report within the three-year period immediately preceding the acceptance of this assignment.

- ✓ No other party provided any service to assist in forming my professional opinion to a reasonable degree of appraisal certainty.

- ✓ The appraiser herein, by reason of this appraisal is not required to give testimony or attend court or any governmental hearing with reference to the property in question without prior agreement as to fee for additional services desired.

East Coast Auto Appraisers valuations are based on estimate and vehicle information believed to be authentic, reliable and accurate. East Coast Auto Appraisers has used reasonable care in producing the valuations offered, however, East Coast Auto Appraisers makes no guarantees, expressed or implied, as to the final resolution of your claim and shall not be liable for any differences or damages of any type or description incurred by the use of the information.

This report was prepared by Jason W. Merritt
IACP Certification No. 991911100

Signature:

Date:  September 18, 2022

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 209 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 9 of 38
PageID #: 5649



# East Coast Auto Appraisers

CUMBERLAND, MD 21502
☎ 301-804-0224
WWW.EASTCOASTAUTOAPPRAISERS.COM

### IACP Certified Actual Cash Value Appraisal

**Today's Date: September 17, 2022**
**Effective Date: May 19, 2021**
**Vehicle Year & Make: 2010 Ford**
**Vehicle Model: Ranger XLT Ext Cab 2WD**
**VIN#: 1FTKR4EE7APA03402**
**Mileage: 140,273 TMU**
**Transmission: Automatic**

**Owner of Vehicle: Cobb, Billy**
**Claim: 40-20B8-21M01**

**Certified Auto Appraiser / Expert Witness:** Jason W. Merritt
**IACP Certification #:** 991911100



Bureau of Certified Auto Appraisers

Certifies that Auto Appraiser

Jason W. Merritt

has complied with the requirements of USPAP
Standard for BCAA Certification of Auto Appraisers

991911100
CERTIFICATE NUMBER

06/01/2022
EFFECTIVE DATE

06/01/2024
EXPIRATION DATE

PRESIDENT BCAA

1

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 210 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 10 of 38
PageID #: 5650

**INTENDED PURPOSE:** This report is to determine the Actual Cash Value of the 2010 Ford Ranger, referenced above on the effective loss date of May 19, 2021.

**APPRAISAL TYPE:** Restricted Use Appraisal.
**VALUE TYPE:** Fair Market Value / Actual Cash Value.
**APPRAISAL METHODS & TECHNIQUES USED:** Sales Comparison Approach. Historic
**PROPERTY CLASS & USE / OWNERSHIP INTEREST:** Privately Owned / Full Ownership / Clean Title.

East Coast Auto Appraisers has conducted a certified appraisal of your **2010 Ford Ranger XLT,** in order to determine the actual cash value of your vehicle. The local market value of this vehicle is Westminster, South Carolina during May/June 2021.

### IACP CERTIFIED ACTUAL CASH VALUE APPRAISAL.

This appraisal is being conducted utilizing information/data that is from June 03, 2021. Sources for this information were provided by the client as well as online sources available.

I was provided with a "AudaTex AutoSource" report dated March 02, 2021. That report was used as a reference for the vehicle details, condition, mileage, and for comparable vehicles.

This Appraiser was not able to view/inspect the Loss Vehicle. There were no pictures of the vehicle prior to the date of loss. The appraisal was completed with the sole use of the provided AudaTex Autosource Valuation that was provided to this Appraiser.

According to the report:
The vehicle is rated to be in average to above average condition for year, make, mileage, and model. There was a credit or addition of value rated at $350 for the condition.

It is noted that the truck is reported as "True Mileage Unknown". There are no notations as to the reason that makes the mileage unknown. No mileage adjustments were conducted with the "Comp Vehicles" by AudaTex.

This vehicle had no service issues or prior salvage history prior to the Date of Loss, May 19, 2021.

The Date of Loss for this vehicle was noted as being May 19, 2021, so historic value data is difficult to recover. This report indicates that there were 2 vehicles used as comparable vehicles in the evaluation. The comparable vehicles provided in the report were used for this Appraisal.

The comparables utilized by AudaExplore are in the Westminster, SC market area. Each "Comp Vehicle" has been compared to the "Loss Vehicle" for features, options, etc. A monetary value has been determined for each option that is on the "Loss Vehicle" compared to the options on the "Comp Vehicle". Those values were added to or taken away from the Loss Vehicle.

Note: I was able to contact Fairway Ford in Greenville, SC. This is the listing dealer of "Comp Vehicle" #1. It was confirmed that the "Comp Vehicle" did in fact sell for the Advertised price of $11,996.00.

This ACV is of the vehicle in the AS-IS condition at the time of appraisal. Condition adjustments were made, if any, and taken into consideration.

2

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 211 of 238
8:21-cv-03803-DCC    Date Filed 11/04/24    Entry Number 49-1    Page 11 of 38
PageID #: 5651

**2** **comparable** representative vehicles were provided for comparisons:

Total of (2) comparable vehicles were located within a **100+ mile radius** of stated principal garage.

**Current Local Market Value -**     $12,593.00--
**Condition Adjustment-**          (+$350)
====================================

       **Grand Total: $12,943.00**

### Fair Market Value of your auto:
**(Formula and Market Quotes Average weighted by 2.0):**

**Formula--$25,186.00**                                   **Market Quotes---$12,593.00**

# $12,943.00
**(Actual Cash Value)**

### List of Comparable / Dealer Quotes
**May/June 2021**

#1  *Fairway Ford*          #2 *Harry Auto and Trailer Sales*
   *Greenville, SC*            *Loris, SC*
   *VIN: 1FTKR4EE7APA10253*   *VIN: 1GCEC29019Z159078*
   *Price: $11,996.00*        *Price: $12,990.00*
   *Option Adjustment + $125*   *Option Adjustment - $75*

   *TOTAL: $12,101.00*       *Total: $13,065.00*

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 212 of 238
8:21-cv-03803-DCC    Date Filed 11/07/23    Entry Number 49-1    Page 12 of 36
PageID #: 5652

**The Appraisal Methodology…**

There are several factors which affect the amount of fair market value, including but not limited to; the year, make and model, mileage, options, and the overall condition of the vehicle immediately before the action of loss has taken place.

The first part of our industry recognized methodology is that we review several nationally recognized valuation guides in determining what the fair market value of the vehicle in scope is worth before we contact local dealers and private sellers. This way we have an idea of what the current market is doing. If local dealers and private sellers are not available in the principally garaged location, then we begin contacting dealers and private sellers measuring radially outward from the principally garaged location until the minimum industry accepted standard of two (2) or more comparable or similar vehicles have been identified.

The second part is an average of *retail* quotes from a few dealers in the area that practice car valuations daily. It is our objective to render a non-biased opinion pertaining to the fair market value of the vehicle in scope. We take a commonsense approach by analyzing all accessible data, local buying trends and economics and feel our method to be a fair, objective and non-biased means of calculating this type of loss.

**Why Contact Dealers?**
**Dealers make up nearly 90% of the used car market on average.**
This report is to determine the fair *market* value of your vehicle. The definition of market is "the business of buying and selling a specified commodity." If no dealers were contacted, then nearly 90% of the market would be left out.

**Why Contact Private Sellers?**
They make up the rest of the market. Private sellers have been statistically proven to take a greater loss on the fair market value of the auto needing to move it quickly.

**Why Research Valuation Guides?**
Valuation guides are a nationally recognized means that both buyers and sellers, male and female, can come to a reasonable agreement on the fair market value of the auto in question. It is a good starting point to determine if a buyer/seller should buy/sell a vehicle for more/less than what it is worth or vice versa. East Coast Auto Appraisers incorporates www.nada.com, www.kbb.com, www.autotrader.com and many other industry recognized valuations guides that are accessible to both paid subscribers and the occasional inquirer during our extensive research and data collection. If industry recognized valuation guides were not in place, it would be very easy for deceptive people to mislead the uneducated public of the going price.

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 213 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 13 of 38
PageID #: 5653

# Automotive / Insurance / Legal Terms

**Insurance Company** – means an organization that acts as a system or business of insuring property, life, one's person, etc., against loss or harm arising in specified contingencies, as fire, accident, death, disablement, or the like, in consideration of a payment proportionate to the risk involved. A confide to the community.

**Total Loss** – a "Total Loss" means when it will cost more to repair than replace your vehicle. In insurance contracts, the destruction of property such that it is no longer useful for its intended purpose or that renders it of little or no value to the owner.

**Fair Market Value** – means the price that property would bring in a market of willing buyers and willing sellers, in the ordinary course of trade. Market value is generally established, if possible, based on sales of similar property in the same locality.

**Actual Cash Value** – means the cost to replace a vehicle with a comparable vehicle.

**Comparable Vehicle** – means a vehicle that is the same make and model, same or later, similar body style, similar options, and mileage as your vehicle and in as good or better overall condition as established by current data. To achieve comparability, and deductions or additions for options, mileage or condition can only be if they are itemized and appropriate in dollar amount. An insurer must consider information supplied by the victim when determining deductions or additions.

**Current Data** – means no older than ninety (90) days from the date of loss.

**Principally Garaged** – means the zip code where the vehicle is normally kept.

**Settlement** – means when the payment is made to you and or your lien holder.

**Lemon Law** - Lemon laws are state laws that provide recourse for purchasers of automobiles that repeatedly fail to meet quality and performance standards.

**Arbitration** – The hearing and settlement of a dispute between opposing parties by a third party who is not a judge.

**Burden of Proof** – In the law of evidence, the necessity of duty of affirmatively providing a fact or facts in dispute.

**Cause** – A suit, litigation or action – civil or criminal.

**Chambers** – Private office or room of the Honorable Judge.

**Claim** – The assertion of a right, as to money or property; the accumulation of facts which give rise to a right enforceable in court.

**Class Action** – A lawsuit brought by a representative party on behalf of a large group, all whose members have the same or similar grievance against the defendant. Used when the group is too large for it to be practical to name every member of the group or party

**Contempt of Court** – Any act calculated to embarrass, hinder, or obstruct a court in the administration of justice, or calculated to lessen its authority or dignity.

**Count** – A separate and independent claim. A civil petition or criminal indictment may contain several counts.

**Cross Examination** – The questions of a witness in a trial or in the taking or a deposition; by the party opposed to the one who produced the witness.

**Damages** – Monetary compensation awarded by a court for an injury caused by the act of another.

**Defendant** – The person against whom a civil or criminal action is brought

**Deposition** – A form of oral testimony taken by the opposing attorney in advance of the trial with a court reporter present to record every word.

**Hearsay** – Evidence not proceeding from the personal knowledge of the witness, such as a rumor.

5

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 214 of 238
8:21-cv-03803-DCC    Date Filed 11/01/22    Entry Number 49-1    Page 14 of 38
PageID #: 5654

**Hypothetical Question** – A combination of facts and circumstances, assumed or proved, stated in such a form as to constitute a coherent state of facts upon which the opinion of an expert can be asked by way of evidence in a trial.

**Negligence** – A failure to do something which a reasonable man or woman, guided by ordinary considerations, would do; or the doing of something which a reasonable and prudent man or woman would not do.

**Objection** – The act of taking exception to some statement of procedure in trial. Used to call the courts attention to improper evidence or procedure.

**Plaintiff** – A person who brings an action; the party who complains or sues in a personal action and is so named on the record.

**Tort** – An injury or wrong committed, either with or without force to the person or property of another.

**Verdict** – In practice, the format and unanimous decision or finding made by a jury, reported to the court and accepted by it.

**Weight of Evidence** – The balance or preponderance of evidence; the inclination of the greater amount of credible evidence, offered in trial, to support one side of the issue rather than the other side.

Case 1:22-cv-00375-NT   Document 120-24   Filed 01/10/25   Page 215 of 238
8:21-cv-03803-DCC   Date Filed 11/04/22   Entry Number 49-1   Page 15 of 38
PageID #: 3655

# CERTIFICATION OF CREDIBILITY

I certify that, to the best of my knowledge and belief:

- ✓ The methods and calculations used in this report are the unbiased opinion of an experience and qualified professional and are limited only by the reported assumptions and limitations.

- ✓ The statements of fact contained in this report are true and correct.

- ✓ This report was provided at the request of an individual, company, or government agency of their own free will and was not solicited for any predetermined reason.

- ✓ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- ✓ I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- ✓ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- ✓ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- ✓ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- ✓ My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practices and the Bureau of Certified Auto Appraisers standards.*

- ✓ I have performed no services as an appraiser or in any other capacity regarding the vehicle that is the subject of this report within the three-year period immediately preceding the acceptance of this assignment.

- ✓ No other party provided any service to assist in forming my professional opinion to a reasonable degree of appraisal certainty.

- ✓ The appraiser herein, by reason of this appraisal is not required to give testimony or attend court or any governmental hearing with reference to the property in question without prior agreement as to fee for additional services desired.

East Coast Auto Appraisers valuations are based on estimate and vehicle information believed to be authentic, reliable and accurate. East Coast Auto Appraisers has used reasonable care in producing the valuations offered, however, East Coast Auto Appraisers makes no guarantees, expressed or implied, as to the final resolution of your claim and shall not be liable for any differences or damages of any type or description incurred by the use of the information.

This report was prepared by Jason W. Merritt
IACP Certification No. 991911100

Signature:

Date:  September 18, 2022

7

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 216 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 16 of 38
PageID #: 5656



Side View, Left



Side View, Right



Rear, Left



Rear, Right



Passenger Side Interior View

Rear Tailgate

Case 1:22-cv-00375-NT Document 120-24 Filed 01/10/25 Page 217 of 238
8:21-cv-03803-DCC Date Filed 11/04/24 Entry Number 49-1 Page 17 of 38
PageID #: 5657



Instrument Cluster



Passenger Side Front View



VIN

Front View

Case 1:22-cv-00375-NT   Document 120-24   Filed 01/10/25   Page 218 of 238
8:21-cv-03803-DCC   Date Filed 11/07/23   Entry Number 49-1   Page 18 of 38
PageID #: 5658

## `International Vehicle Appraisers Network
## Vehicle Valueation Appraisal
Requested by  - Melissa Quintana
Claim #  SF 40-16T1-58F

**Eric C. Marsh**                                     575 Paulownia Drive
(704) 855-3699                                      China Grove, NC 28023
Cell 704-267-9383                                  ecmarsh@CTC.net

---

On 07 Septenber 2022  I personally  reviewed all available documentation of the vehicle described below
for the purpose of providing a fairmarket valuation of the vehicle.

**Vehicle Year and Make**:  2009 Chevrolet Silverado 1500 LT1
**VIN:**  1GCEC29J99Z270860                **DOA Mileage**   182,293   reported
**Color:**  Black                          **Date of inspection mileage**   N/A   indicated

**Owner:**  Kristopher Wiggins
**Address:**  1306 Belle Grove Circle, Hanahan, SC  29410
**Tel:**  843-603-1573

### FEATURES
Chevrolet  5.3 Ltr V8, automatic, PS, PB, Pw, Pdls, A/C sound system w/satellite, alarm system,  towing
package

### COMMENTS

 Mr. Wiggins purchased this Chevrolet used  in July 2019 as the third owner and it subsequently was
involved in an accident on 23 February 2021. The Chevrolet was involved in an accident with a Ford
commercial van.  Per the Carfax report, this was  the second reported accident on the Chevrolet with the
first being left side damage in 27 February 2012.

Records indicate the vehicle received regular maintenance.

It was reported that this accident included  structural damage  and the vehicle was declared a  total loss.
The repair estimate dated 26 February 2021 reflected an estimated repair of $10,597.50  This drove the
total loss declaration. A review of all available documentation showed the Chevrolet was processed
through Copart on or about 29 March 2021.

On the day of this accident the Chevrolet, displaying greater  than average mileage and in  good condition,
had a market value of $9,500 ( after a $2,000 diminished value from the first reported accident).  These
are popular utility vehicles and a few are currently available in the  Carolinas marketplace.

**Pre-accidentValue**: $9,500

---

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 219 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 19 of 38
PageID #: 5659

The conclusions of this report are based on:
  1) Appraisal Experience: Over 20 years of experience evaluating/appraising vehicles
  2) Paper trail – Dealer sales order & Body shop workorder
  3) Market Knowledge/Research
  4) Personal review of the vehicle associated documentation
Comparables are on file
I hereby state that I have no financial interest or any ownership in any firm engaged in the purchase, sale, insurance or transport of motorized vehicles nor in any firm engaged in repair or restoration work on motorized vehicles. I further state that I have received no compensation for this appraisal, from any source, other than my fee of $275. Therefore, I have no actual or potential conflict of interest in providing this appraisal.

**Signed** _Eric C. March_    **Eric C. Marsh**

# Credentials

1) Provider of professional appraisals for over twenty years.
2) Senior Certified Appraiser in the International Vehicle Appraisers Network ( Nationwide Organization)
3) Appraisals accepted by every insurance company as well as banks, credit unions, IRS and Courts of Law (Expert Witness), etc.
4) Antique Automobile Club of America (AACA) Senior Master Judge #01 with over 475 National Judging Credits.
5) Served as the AACA National Asst Chairman for Judge's Training.
6) Served on the Automotive Committee of the NC Transportation Museum 2010 - 2015.
7) Served as the AACA Assistant Chief Judge at six National Meets in 2004-2011 and Chief Judges in Asheville, NC 2006 and Cleveland, TN 2008.
8) Instructor of Continuing Judges Training for AACA since 1998
9) Member of the AACA National Awards Committee since 1998
10) Served on the National Board of Directors for the AACA Library and Research Center 2003-06.
11) Served on the Nation al Board of Directors for AACA 2010-2012.
12) Southeastern Division Chairman for National Activities AACA 2000-2001
13) Consultant on vehicle authenticity to film, TV, etc. production firms.
14) Former drag car race driver in NHRA
15) Seminar moderator on Chrysler products at the AACA Annual Convention in Philadelphia since 1995.
16) Founding president of the Mid-Carolinas Antique Drivers Region, AACA.
17) Member of Board of Directors of the North Carolina Region, AACA 2005 - 2009
18) Speaker on Insurance and Appraisals for all automobile related clubs.
19) Supplier and consultant to auto manufacturers and suppliers 1990 - 1999.
20) NC License number 17147886

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 220 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 20 of 38
PageID #: 5660

2009 Chevrolet
of
Kristopher Wiggins



## NOTICE

Pictures taken of the above vehicle may be used in advertising my services. No mention will be made of the owner, address or (if different) location of the vehicle nor will the pictures be sold or sent to any other commercial web site

3

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 221 of 238
8:21-cv-03803-DCC    Date Filed 11/07/22    Entry Number 49-1    Page 21 of 38
PageID #: 5561

## `International Vehicle Appraisers Network
## Vehicle Valueation Appraisal
Requested by  - Melissa Quintana
Claim # SF 40-20B8-21M

**Eric C. Marsh**
(704) 855-3699
Cell 704-267-9383

575 Paulownia Drive
China Grove, NC 28023
ecmarsh@CTC.net

On 07 Septenber 2022  I personally  reviewed all available documentation of the vehicle described below
for the purpose of providing a fairmarket valuation of the vehicle.

**Vehicle Year and Make**: 2010 Ford Ranger XLT
**VIN:** 1FTKR4EE7APA03402
**Color:** Dark Shadow

**DOA Mileage**  140,273  reported
**Date of inspection mileage**  N/A  indicated

**Owner:** Billy Paul Cobb
**Address:**  219 Dickson Street, Westminster, SC  29693
**Tel:**  706-834-4249

### FEATURES
Ford  4.0 Ltr V6, automatic, PS, PB, Pw, Pdls, A/C sound syste, bedliner, towing package, anti-theft
system, bedliner, step bumper

### COMMENTS

 Mr. Cobb purchased this Ford used  in October 2018 as the fourth owner and it subsequently was
involved in an accident on 19 May 2021. The Ford was involved in an accident where it left the road and
struck an embankment.

Records indicate that the Foord was in good condition with visible wear to the rear tires.

It was reported that extensive structural damage has been identified and the vehicle was deemed an
obvious total loss in the repair estimate date 03 June 2021  A review of all available images suggest that
the vehicle sustained extensive damage to all sides.

On the day of this accident the Ford, displaying less than average mileage and in good condition, had a
market value of $10,000.  These are popular utility vehicles and a few are currently available in the
Carolinas marketplace.

**Pre-accidentValue**: $10,000

1
.

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 222 of 238
8:21-cv-03803-DCC    Date Filed 11/07/23    Entry Number 49-1    Page 22 of 38
PageID #: 5662

The conclusions of this report are based on:

    1) Appraisal Experience: Over 20 years of experience evaluating/appraising vehicles
    2) Paper trail – Dealer sales order & Body shop workorder
    3) Market Knowledge/Research
    4) Personal review of the vehicle associated documentation

Comparables are on file

I hereby state that I have no financial interest or any ownership in any firm engaged in the purchase, sale, insurance or transport of motorized vehicles nor in any firm engaged in repair or restoration work on motorized vehicles. I further state that I have received no compensation for this appraisal, from any source, other than my fee of $275. Therefore, I have no actual or potential conflict of interest in providing this appraisal.

        **Signed** _Eric C. Marsh_ **Eric C. Marsh**

# Credentials

1) Provider of professional appraisals for over twenty years.
2) Senior Certified Appraiser in the International Vehicle Appraisers Network ( Nationwide Organization)
3) Appraisals accepted by every insurance company as well as banks, credit unions, IRS and Courts of Law (Expert Witness), etc.
4) Antique Automobile Club of America (AACA) Senior Master Judge #01 with over 475 National Judging Credits.
5) Served as the AACA National Asst Chairman for Judge's Training.
6) Served on the Automotive Committee of the NC Transportation Museum 2010 - 2015.
7) Served as the AACA Assistant Chief Judge at six National Meets in 2004-2011 and Chief Judges in Asheville, NC 2006 and Cleveland, TN 2008.
8) Instructor of Continuing Judges Training for AACA since 1998
9) Member of the AACA National Awards Committee since 1998
10) Served on the National Board of Directors for the AACA Library and Research Center 2003-06.
11) Served on the Nation al Board of Directors for AACA 2010-2012.
12) Southeastern Division Chairman for National Activities AACA 2000-2001
13) Consultant on vehicle authenticity to film, TV, etc. production firms.
14) Former drag car race driver in NHRA
15) Seminar moderator on Chrysler products at the AACA Annual Convention in Philadelphia since 1995.
16) Founding president of the Mid-Carolinas Antique Drivers Region, AACA.
17) Member of Board of Directors of the North Carolina Region, AACA 2005 - 2009
18) Speaker on Insurance and Appraisals for all automobile related clubs.
19) Supplier and consultant to auto manufacturers and suppliers 1990 - 1999.
20) NC License number 17147886

Case 1:22-cv-00375-NT   Document 120-24   Filed 01/10/25   Page 223 of 238
8:21-cv-03803-DCC   Date Filed 11/04/24   Entry Number 49-1   Page 23 of 38
PageID #: 5663

## 2010 Ford Ranger
### of
### Billy Paul Cobb



### NOTICE

Pictures taken of the above vehicle may be used in advertising my services. No mention will be made of the owner, address or (if different) location of the vehicle nor will the pictures be sold or sent to any other commercial web site

3

Case 1:22-cv-00375-NT   Document 120-24   Filed 01/10/25   Page 224 of 238
8:21-cv-03803-DCC   Date Filed 11/09/22   Entry Number 49-1   Page 24 of 38
PageID #: 5664

 AUTO BID®

A division of ClaimSolution Inc.

| | | | |
|---|---|---|---|
| Prepared for | CLAIMSOLUTION UMPIRE AUTOBID | Date | 09/15/2022 |
| Adjuster | R. CHANDLER | ACV | $14,203.27 |
| Requested by | ROSS CHANDLER | Aftermarket Parts | $0.00 |
| Appraiser File No | B234530 | Refurbishment | $0.00 |
| Claim No | 40-16T1-58F01 | Prior Damage | $0.00 |
| Auto Bid ID | B236203 | | |

Final ACV **$14,203.27**

## Vehicle Detail

| | | | |
|---|---|---|---|
| Year | 2009 | VIN | 1GCEC29J99Z270860 |
| Make | CHEVROLET | Mileage | 182,293 |
| Model | SILVERADO 1500 LT RWD SHORTBED | Loss Date | 02/23/2021 |
| Style/Body | 4 DOOR CAB; EXTENDED | Market Area (Tax Rate) | HANAHAN, SC |
| Transmission | AUTOMATIC | Claimant/Owner | KRISTOPHER WIGGINS |
| Engine | V8, 5.3L | | |

## Condition

| | | | |
|---|---|---|---|
| Drivetrain | AVERAGE | Interior | AVERAGE |
| Tire | BELOW AVERAGE | Exterior | AVERAGE |
| Condition Note | LEVEL 3 AVERAGE CONDITION 1/2 TON RWD SILVERADO WITH NO EGREGIOUS ATYPICAL MALADIES INSIDE OR OUT, AND MEASURABLY LOWER TREAD TIRES. | | |

## Equipment List

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 225 of 238
8:21-cv-03803-DCC    Date Filed 11/04/23    Entry Number 49-1    Page 25 of 38
PageID #: 5665

20" ALLOY WHEELS CODE: S83, BLACK GRANITE METALLIC CODE: 58U, POWER PACK PLUS, INC: (LY5) VORTEC 5.3L V8 SFI ENGINE/(G80) HEAVY-DUTY AUTOMATIC LOCKING REAR DIFFERENTIAL/(Z82) TRAILERING PACKAGE AND (N56) 4-17" X 7.5" 6-LUG CUSTOM ALUMINUM WHEELS(UPGRADEABLE) CODE: PDU, EXTERIOR PLUS PACKAGE, INC: (AP3) REMOTE VEHICLE STARTER SYSTEM/(UG1) UNIVERSAL HOME REMOTE/(A60) LOCKING TAILGATE/(PPA) EZ-LIFT TAILGATE AND (T96) FOG LAMPS/(DD8) INSIDE REARVIEW AUTO-DIMMING MIRROR/(DL3) OUTSIDE HEATED POWER-ADJUSTABLE POWER-FOLDING AND DRIVER-SIDE AUTO-DIMMING MIRRORS CODE: PDD, SEATS FRONT BUCKET INC:  6-WAY (AG1) POWER DRIVER AND (AG2) FRONT PASSENGER SEAT ADJUSTERS/(D07) FLOOR CONSOLE/FRONT PASSENGER MANUAL RECLINE/FRONT PASSENGER MANUAL LUMBAR/ADJUSTABLE OUTBOARD HEAD RESTRAINTS AND STORAGE POCKETS CODE: A95, AM/FM STEREO WITH MP3 COMPATIBLE CD PLAYER SEEK-AND-SCAN/DIGITAL CLOCK/AUTO-TONE CONTROL/RADIO DATA SYSTEM (RDS)/SPEED-COMPENSATED VOLUME AND THEFTLOCK, XM SAT. RADIO, CHROME BUMPERS, SOLAR RAY DEEP TINTED GLASS, BLACK DOOR HANDLES, CHROME GRILLE SURROUND, DUAL HALOGEN COMPOSITE HEADLAMPS WITH AUTOMATIC EXTERIOR LAMP CONTROL AND FLASH-TO-PASS FEATURE, MIRRORS OUTSIDE HEATED POWER-ADJUSTABLE BLACK MANUAL-FOLDING, BODY COLORED SIDE MOLDINGS, SPARE TIRE W/STEEL WHEEL, 20" ALLOY WHEELS, INTERMITTENT WIPERS, SINGLE ZONE AC W/ CLIMATE CONTROL, CRUISE CONTROL, POWER DOOR LOCKS W/ REMOTE KEYLESS ENTRY, DRIVER INFORMATION CENTER, COLOR KEYED CARPETING, MIRROR INSIDE REARVIEW AUTO DAY/NIGHT, 2 AUX POWER OUTLETS, REMOTE VEHICLE STARTER PREP PACKAGE, PREMIUM CLOTH SEAT TRIM, SEAT REAR 60/40 FOLDING BENCH, FRONT BUCKET SEATS W/CENTER CONSOLE, LEATHER WRAPPED STEERING WHEEL, POWER WINDOWS, 145 AMP ALTERNATOR, 600 CC AMP BATTERY, BRAKES 4-WHEEL ANTILOCK FRONT DISC/REAR DRUM, ALUMINIZED STAINLESS STEEL EXHAUST, POWER RACK AND PINION STEERING, SUSPENSION PACKAGE HANDLING/TRAILERING HEAVY-DUTY INCLUDES 46 MM PISTON MONOTUBE SHOCKS AND 34MM FRONT STABILIZER BAR, FRONT INDEPENDENT COIL OVER SUSPENSION, DUAL FRONTAL AIRBAGS W/PSS, DAYTIME RUNNING LAMPS, ONSTAR, STABILITRAK, TILT STEERING COLUMN, TPMS

## Comments

ALL COMPS VISUALLY INSPECTED INSIDE AND OUT ON A LIVE OPEN MARKET TO ENSURE ACCURACY REGARDING CONDITION AND OPTIONS. MANUFACTURER BUILD SHEET ANALYSIS PERFORMED ON ALL VINS TO ENSURE ACCURACY WITH ANY AND ALL RPO CODES. LIMTED RESALE OF NON W/T EXTENDED CABS IN LOCAL AREA, DEFERRED TO A COUPLE CREW CAB COMPS TO REMAIN IN LOCAL MARKET AND THESE COMPS ALL HAD NUMEROUS SIMILARITIES IN CONFIGURATION AND OPTIONS ASIDE FROM CAB SIZE.

|  | Comp Vehicle One | Comp Vehicle Two | Comp Vehicle Three |
|---|---|---|---|
| Dealer/Owner | QLD AUTO INC. | FAYETTEVILLE AUTO MALL | MATTHEWS USED CARS |
| Contact | (813) 822-3472 | (910) 672-6632 | (762) 795-0038 |
| Address | TAMPA, FL | FAYETTEVILLE, NC | CRAWFORD, GA |
| Distance | 374 MI | 161 MI | 194 MI |
| License Plate |  |  |  |
| Stock Number |  |  |  |
| VIN | 1GCEC29019Z256216 | 3GCEC23J69G201326 | 3GCEC23JX9G255728 |
| Year | 2009 | 2009 | 2009 |
| Make | CHEVROLET | CHEVROLET | CHEVROLET |
| Model | SILVERADO 1500 LT RWD SHORTBED | SILVERADO 1500 LT RWD SHORTBED | SILVERADO 1500 LT RWD SHORTBED |
| Style | 4 DOOR CAB; EXTENDED | 4 DOOR CAB; CREW | 4 DOOR CAB; CREW |
| Engine | V8, 5.3L | V8, 5.3L | V8, 5.3L |
| Mileage | 129,691 | 134,222 | 143,839 |
| Drivetrain |  |  |  |
| Condition | AVERAGE | AVERAGE | AVERAGE |

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 226 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 26 of 38
PageID #: 5666

| | | | |
|---|---|---|---|
| Tire Condition | AVERAGE | AVERAGE | AVERAGE |
| Interior Condition | AVERAGE | AVERAGE | AVERAGE |
| Exterior Condition | AVERAGE | AVERAGE | AVERAGE |
| Exterior Color | SILVER BIRCH METALLIC | IMPERIAL BLUE METALLIC | DEEP RUBY METALLIC |
| Equipment List | LEVEL 3 AVERAGE CONDITION INSIDE AND OUT WITH NO ATYPICAL WEAR VISIBLE | CLEAN LEVEL 3 CONDITION 1/2 TON SILVERADO WITH UP CLOSE IMPERFECTIONS ONLY | LEVEL 3 CLEAN/AVG CONDITION 1/2 TON SILVERADO RWD WITH ONLY UP CLOSE MALADIES AND MILD ONES AT THAT |
| | UP CLOSE IMPERFECTIONS ONLY FROM MINOR PAINT CHIPS TO INTERIOR MILD DRIVER TYPE WEAR | NO ATYPICAL VISIBLE MALADIES INSIDE AND OUT | MINOR SEAT STAINS AND SMALL SPLIT |
| | NOTHING EGREGIOUS | THE INTERIOR DISPLAYS NORMAL DRIVER TYPE MILD TRIM WEAR ONLY | MILD INTERIOR TRIM |
| | A/M 18" ALLOY WHEELS | A/M NERF BARS | NOTHING EGREGIOUS |
| | INTERIOR PLUS PACKAGE | POWER PACK PLUS | THE EXTERIOR IS GOOD WITH ONLY MIMNOR UP CLOSE IMPERFECTIONS AND NOTHING ATYPICAL |
| | INC:(AG1) DRIVER 6-WAY POWER SEAT ADJUSTER/ (UK3) STEERING WHEEL-MOUNTED AUDIO CONTROLS AND (UPF) BLUETOOTH FOR PHONE/(CJ2) DUAL-ZONE AUTOMATIC AIR CONDITIONING CODE: PCM | INC: (LY5) VORTEC 5.3L V8 SFI ENGINE/(G80) HEAVY-DUTY AUTOMATIC LOCKING REAR DIFFERENTIAL/(Z82) TRAILERING PACKAGE AND (N56) 4-17" X 7.5" 6-LUG CUSTOM ALUMINUM WHEELS (UPGRADEABLE) CODE: PDU | A/M SOFT TONNEAU COVER |
| | EXTERIOR PLUS PACKAGE | AM/FM STEREO WITH MP3 COMPATIBLE CD PLAYER SEEK-AND-SCAN/DIGITAL CLOCK/AUTO-TONE CONTROL/RADIO DATA SYSTEM (RDS)/SPEED-COMPENSATED VOLUME AND THEFTLOCK | DIFFERENTIAL HEAVY-DUTY AUTOMATIC LOCKING REAR CODE: G80 |
| | INC: (AP3) REMOTE VEHICLE STARTER SYSTEM/(UG1) UNIVERSAL HOME REMOTE/ (A60) LOCKING TAILGATE/ (PPA) EZ-LIFT TAILGATE AND (T96) FOG LAMPS/(DD8) INSIDE REARVIEW AUTO-DIMMING MIRROR/(DL3) OUTSIDE HEATED POWER-ADJUSTABLE POWER-FOLDING AND DRIVER-SIDE AUTO-DIMMING MIRRORS CODE: PDD | XM SAT. RADIO | TEXAS EDITION |

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 227 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 27 of 38
PageID #: 5667

| | | INC: (LY5) VORTEC 5.3L V8 SFI ENGINE/(S83) 4 - 20" X 8.5" (50.8 CM X 21.6 CM) CHROME-CLAD ALUMINUM WHEELS/(DL8) OUTSIDE HEATED POWER-ADJUSTABLE CHROME-CAPPED MANUAL-FOLDING MIRRORS/(Z82) TRAILERING PACKAGE/(A60) LOCKING TAILGATE/(PPA) EZ-LIFT TAILGATE/BODYSIDE MOLDINGS WITH CHROME ACCENTS/CHROME DOOR HANDLES/BRUSHED SILL PLATES AND TEXAS EMBLEM BADGING CODE: PDA |
|---|---|---|
| POWER PACK PLUS | CHROME BUMPERS | |
| INC: (LY5) VORTEC 5.3L V8 SFI ENGINE/(G80) HEAVY-DUTY AUTOMATIC LOCKING REAR DIFFERENTIAL/(Z82) TRAILERING PACKAGE AND (N56) 4-17" X 7.5" 6-LUG CUSTOM ALUMINUM WHEELS (UPGRADEABLE) CODE: PDU | SOLAR RAY DEEP TINTED GLASS | AM/FM STEREO WITH MP3 COMPATIBLE CD PLAYER SEEK-AND-SCAN/DIGITAL CLOCK/AUTO-TONE CONTROL/RADIO DATA SYSTEM (RDS)/SPEED-COMPENSATED VOLUME AND THEFTLOCK |
| SAFETY PACKAGE | BLACK DOOR HANDLES | XM SAT. RADIO |
| INC: (JF4) ADJUSTABLE POWER PEDALS/(ASF) HEAD CURTAIN SIDE-IMPACT AIR BAGS AND (UD7) REAR PARKING ASSIST/ (49) REAR-WINDOW DEFOGGER CODE: PCW | CHROME GRILLE SURROUND | CHROME BUMPERS |
| AM/FM STEREO WITH MP3 COMPATIBLE CD PLAYER SEEK-AND-SCAN/DIGITAL CLOCK/AUTO-TONE CONTROL/RADIO DATA SYSTEM (RDS)/SPEED-COMPENSATED VOLUME AND THEFTLOCK | DUAL HALOGEN COMPOSITE HEADLAMPS WITH AUTOMATIC EXTERIOR LAMP CONTROL AND FLASH-TO-PASS FEATURE | SOLAR RAY DEEP TINTED GLASS |
| XM SAT. RADIO | MIRRORS OUTSIDE HEATED POWER-ADJUSTABLE BLACK MANUAL-FOLDING | CHROME DOOR HANDLES |
| CHROME BUMPERS | BODY COLORED SIDE MOLDINGS | CHROME GRILLE SURROUND |
| SOLAR RAY DEEP TINTED GLASS | SPARE TIRE W/STEEL WHEEL | DUAL HALOGEN COMPOSITE HEADLAMPS WITH AUTOMATIC EXTERIOR LAMP CONTROL AND FLASH-TO-PASS FEATURE |
| BLACK DOOR HANDLES | 17" ALLOY WHEELS | MIRRORS OUTSIDE HEATED POWER-ADJUSTABLE BLACK MANUAL-FOLDING |

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 228 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 28 of 38
PageID #: 5668

| | | |
|---|---|---|
| CHROME GRILLE SURROUND | INTERMITTENT WIPERS | BODY COLORED SIDE MOLDINGS |
| DUAL HALOGEN COMPOSITE HEADLAMPS WITH AUTOMATIC EXTERIOR LAMP CONTROL AND FLASH-TO-PASS FEATURE | SINGLE ZONE AC W/ CLIMATE CONTROL | SPARE TIRE W/STEEL WHEEL |
| MIRRORS OUTSIDE HEATED POWER-ADJUSTABLE BLACK MANUAL-FOLDING | CRUISE CONTROL | 20" ALLOY WHEELS |
| BODY COLORED SIDE MOLDINGS | POWER DOOR LOCKS W/ REMOTE KEYLESS ENTRY | INTERMITTENT WIPERS |
| SPARE TIRE W/STEEL WHEEL | DRIVER INFORMATION CENTER | SINGLE ZONE AC W/ CLIMATE CONTROL |
| 18" A/M ALLOY WHEELS | COLOR KEYED CARPETING | CRUISE CONTROL |
| INTERMITTENT WIPERS | MIRROR INSIDE REARVIEW MANUAL DAY/NIGHT | POWER DOOR LOCKS W/ REMOTE KEYLESS ENTRY |
| DUAL ZONE AC W/ CLIMATE CONTROL | 2 AUX POWER OUTLETS | DRIVER INFORMATION CENTER |
| CRUISE CONTROL | REMOTE VEHICLE STARTER PREP PACKAGE | COLOR KEYED CARPETING |
| POWER DOOR LOCKS W/ REMOTE KEYLESS ENTRY | PREMIUM CLOTH SEAT TRIM | MIRROR INSIDE REARVIEW MANUAL DAY/NIGHT |
| DRIVER INFORMATION CENTER | SEAT REAR 60/40 FOLDING BENCH | 2 AUX POWER OUTLETS |
| COLOR KEYED CARPETING | SEATS FRONT 40/20/40 SPLIT-BENCH 3-PASSENGER DRIVER AND FRONT PASSENGER MANUAL RECLINING CENTER FOLD-DOWN ARMREST WITH STORAGE/LOCKABLE STORAGE COMPARTMENT IN SEAT CUSHION | REMOTE VEHICLE STARTER PREP PACKAGE |
| MIRROR INSIDE REARVIEW AUTO DAY/NIGHT | LEATHER WRAPPED STEERING WHEEL | PREMIUM CLOTH SEAT TRIM |
| 2 AUX POWER OUTLETS | POWER WINDOWS | SEAT REAR 60/40 FOLDING BENCH |
| REMOTE VEHICLE STARTER PREP PACKAGE | 145 AMP ALTERNATOR | SEATS FRONT 40/20/40 SPLIT-BENCH 3-PASSENGER DRIVER AND FRONT PASSENGER MANUAL RECLINING CENTER FOLD-DOWN ARMREST WITH STORAGE/LOCKABLE STORAGE COMPARTMENT IN SEAT CUSHION |
| PREMIUM CLOTH SEAT TRIM | 600 CC AMP BATTERY | LEATHER WRAPPED STEERING WHEEL |
| SEAT REAR 60/40 FOLDING BENCH | BRAKES 4-WHEEL ANTILOCK FRONT DISC/REAR DRUM | POWER WINDOWS |

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 229 of 238
8:21-cv-03803-DCC    Date Filed 11/03/22    Entry Number 49-1    Page 29 of 38
PageID #: 5669

| | | |
|---|---|---|
| SEATS FRONT 40/20/40 SPLIT-BENCH 3-PASSENGER DRIVER AND FRONT PASSENGER MANUAL RECLINING CENTER FOLD-DOWN ARMREST WITH STORAGE/LOCKABLE STORAGE COMPARTMENT IN SEAT CUSHION | ALUMINIZED STAINLESS STEEL EXHAUST | 145 AMP ALTERNATOR |
| LEATHER WRAPPED STEERING WHEEL | POWER RACK AND PINION STEERING | 600 CC AMP BATTERY |
| POWER WINDOWS | SUSPENSION PACKAGE HANDLING/TRAILERING HEAVY-DUTY INCLUDES 46 MM PISTON MONOTUBE SHOCKS AND 34MM FRONT STABILIZER BAR | BRAKES 4-WHEEL ANTILOCK FRONT DISC/REAR DRUM |
| 145 AMP ALTERNATOR | FRONT INDEPENDENT COIL OVER SUSPENSION | ALUMINIZED STAINLESS STEEL EXHAUST |
| 600 CC AMP BATTERY | DUAL FRONTAL AIRBAGS W/PSS | POWER RACK AND PINION STEERING |
| BRAKES 4-WHEEL ANTILOCK FRONT DISC/REAR DRUM | DAYTIME RUNNING LAMPS | SUSPENSION PACKAGE HANDLING/TRAILERING HEAVY-DUTY INCLUDES 46 MM PISTON MONOTUBE SHOCKS AND 34MM FRONT STABILIZER BAR |
| ALUMINIZED STAINLESS STEEL EXHAUST | ONSTAR | FRONT INDEPENDENT COIL OVER SUSPENSION |
| POWER RACK AND PINION STEERING | STABILITRAK | DUAL FRONTAL AIRBAGS W/PSS |
| SUSPENSION PACKAGE HANDLING/TRAILERING HEAVY-DUTY INCLUDES 46 MM PISTON MONOTUBE SHOCKS AND 34MM FRONT STABILIZER BAR | TILT STEERING COLUMN | DAYTIME RUNNING LAMPS |
| FRONT INDEPENDENT COIL OVER SUSPENSION | TPMS | ONSTAR |
| DUAL FRONTAL AIRBAGS W/PSS | | STABILITRAK |
| DAYTIME RUNNING LAMPS | | TILT STEERING COLUMN |
| ONSTAR | | TPMS |
| STABILITRAK | | |
| TILT STEERING COLUMN | | |
| TPMS | | |
| **Total Price** $12,999.00 | **$14,999.00** | **$18,200.00** |

| | Comp Vehicle One | Comp Vehicle Two | Comp Vehicle Three |
|---|---|---|---|
| Equipment Adjustment | $875.00 | -$260.00 | -$725.00 |

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 230 of 238
8:21-cv-03803-DCC    Date Filed 11/07/23    Entry Number 49-1    Page 30 of 38
PageID #: 5676

| | | |
|---|---|---|
| TIRE CONDITION (BELOW AVERAGE): -$125.00 | TIRE CONDITION (BELOW AVERAGE): -$125.00 | TIRE CONDITION (BELOW AVERAGE): -$125.00 |
| 20" ALLOY WHEELS CODE: S83: $300.00 | 20" ALLOY WHEELS CODE: S83: $300.00 | 20" ALLOY WHEELS CODE: S83: $300.00 |
| BLACK GRANITE METALLIC CODE: 58U: $50.00 | BLACK GRANITE METALLIC CODE: 58U: $50.00 | BLACK GRANITE METALLIC CODE: 58U: $50.00 |
| SEATS FRONT BUCKET INC: 6-WAY (AG1) POWER DRIVER AND (AG2) FRONT PASSENGER SEAT ADJUSTERS/(D07) FLOOR CONSOLE/FRONT PASSENGER MANUAL RECLINE/FRONT PASSENGER MANUAL LUMBAR/ADJUSTABLE OUTBOARD HEAD RESTRAINTS AND STORAGE POCKETS CODE: A95: $350.00 | EXTERIOR PLUS PACKAGE: $165.00 | POWER PACK PLUS: $375.00 |
| A/M 18" ALLOY WHEELS: -$150.00 | SEATS FRONT BUCKET INC: 6-WAY (AG1) POWER DRIVER AND (AG2) FRONT PASSENGER SEAT ADJUSTERS/(D07) FLOOR CONSOLE/FRONT PASSENGER MANUAL RECLINE/FRONT PASSENGER MANUAL LUMBAR/ADJUSTABLE OUTBOARD HEAD RESTRAINTS AND STORAGE POCKETS CODE: A95: $350.00 | EXTERIOR PLUS PACKAGE: $165.00 |
| SAFETY PACKAGE: -$175.00 | STYLE (4 DOOR CAB; CREW): -$1,525.00 | SEATS FRONT BUCKET INC: 6-WAY (AG1) POWER DRIVER AND (AG2) FRONT PASSENGER SEAT ADJUSTERS/(D07) FLOOR CONSOLE/FRONT PASSENGER MANUAL RECLINE/FRONT PASSENGER MANUAL LUMBAR/ADJUSTABLE OUTBOARD HEAD RESTRAINTS AND STORAGE POCKETS CODE: A95: $350.00 |
| NADA DATE OF LOSS ADJUSTMENT: $625.00 | A/M NERF BARS: -$100.00 | STYLE (4 DOOR CAB; CREW): -$1,525.00 |
| | NADA DATE OF LOSS ADJUSTMENT: $625.00 | A/M SOFT TONNEAU COVER: -$250.00 |
| | | DIFFERENTIAL HEAVY-DUTY AUTOMATIC LOCKING REAR CODE: G80: -$75.00 |
| | | TEXAS EDITION: -$615.00 |

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 231 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 31 of 38
PageID #: 5671

| | | NADA DATE OF LOSS ADJUSTMENT: $625.00 |
|---|---|---|
| Adjustment cents per mile | -$1,315.05 | -$1,201.78 | -$961.35 |
| Adjustment price | $12,558.95 | $13,537.22 | $16,513.65 |

## Autobid Comments

## Carfax Title History Report

| | |
|---|---|
| Year | 2009 |
| Make | CHEVROLET |
| Model | SILVERADO C1500 LT |
| Last Odometer Reading | N/A |
| Title History | OUT OF OPERATION, TITLE BRAND TOTAL LOSS, ACCIDENT |

**AUTO BID – Certified Vehicle Valuation**

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 232 of 238
8:21-cv-03803-DCC    Date Filed 11/03/22    Entry Number 49-1    Page 32 of 38
PageID #: 5672

 **AUTO BID®**

A division of ClaimSolution Inc.

| | | | |
|---|---|---|---|
| Prepared for | CLAIMSOLUTION UMPIRE AUTOBID | Date | 09/16/2022 |
| Adjuster | R. CHANDLER | ACV | $12,844.09 |
| Requested by | ROSS CHANDLER | Aftermarket Parts | $0.00 |
| Appraiser File No | B234536 | Refurbishment | $0.00 |
| Claim No | 40-20B8-21M | Prior Damage | $0.00 |
| Auto Bid ID | B236432 | | |
| | | Final ACV | **$12,844.09** |

## Vehicle Detail

| | | | |
|---|---|---|---|
| Year | 2010 | VIN | 1FTKR4EE3APA28197 |
| Make | FORD | Mileage | 140,273 |
| Model | RANGER XLT RWD SHORTBED | Loss Date | 05/19/2021 |
| Style/Body | 4 DOOR CAB; SUPER CAB | Market Area (Tax Rate) | WESTMINSTER, SC |
| Transmission | AUTOMATIC | Claimant/Owner | BILLY PAUL COBB |
| Engine | V6, 4.0L; SOHC | | |

## Condition

| | | | |
|---|---|---|---|
| Drivetrain | AVERAGE | Interior | AVERAGE |
| Tire | AVERAGE | Exterior | AVERAGE |
| Condition Note | CLEAN LEVEL 3 CONDITION RANGER WITH NO VISIBLE ATYPICAL MALADIES INSIDE OR OUT | | |

## Equipment List

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 233 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 33 of 38
PageID #: 5673

BED LINER, SLIDING REAR WINDOW CODE: 433, BLACK STEP BAR CODE: 18P, AM/FM STEREO W/IN-DASH 6-DISC CD CHANGER, -INC: MP3 & SATELLITE RADIO CAPABILITY/AUDIO INPUT JACK CODE: 58B, AM/FM STEREO W/CD/MP3 PLAYER -INC: CLOCK/SATELLITE RADIO CAPABILITY/AUDIO INPUT JACK, SIRIUS SATELLITE RADIO, 15" 7-SPOKE SILVER-PAINTED STEEL WHEELS, BI-COLOR TAIL LAMPS, BLACK DOOR HANDLES, BLACK PWR SIDE MIRRORS, BODY-COLOR FRONT/REAR STEP BUMPER -INC: BODY-COLOR PAINTED FACE BAR W/BLACK LOWER FRONT VALANCE, CHROMED H-BAR GRILLE, FOG LAMPS, FRONT/REAR STONE GUARDS, MINI SPARE TIRE, QUICK-RELEASE TAILGATE W/BLACK HANDLE, RAISED "POWER DOME" HOOD, SOLAR TINTED GLASS, VARIABLE-INTERMITTENT WINDSHIELD WIPERS, 12-VOLT AUX PWR POINT, AIR CONDITIONING, BLACK-FACED GAUGE CLUSTER W/BLACK TRIM RINGS, COLOR-KEYED CARPETED FLOOR COVERING & FRONT FLOOR MATS, CUP HOLDERS, DOME LIGHT, DRIVER/PASSENGER A-PILLAR-MOUNTED GRAB HANDLES, GAUGES, GLOVE BOX, HIGH SERIES RANGER DOOR TRIM PANELS, MANUAL DAY/NIGHT REARVIEW MIRROR, MEDIUM DARK FLINT CLOTH 60/40 SPLIT BENCH SEAT, PWR DOOR LOCKS, PWR WINDOWS, REAR JUMP SEATS, REMOTE KEYLESS ENTRY, SECURILOCK ANTI-THEFT SYSTEM, SMOKERS PKG -INC: LIGHTER, ASH TRAY, SUN VISORS, TILT BLACK LEATHER-WRAPPED 4-SPOKE STEERING WHEEL W/SPEED CONTROL, 4) CARGO BOX TIE-DOWN HOOKS, 100,000 MILE TUNE-UP INTERVAL, 115-AMP ALTERNATOR, 2-STAGE MULTI-LEAF REAR SUSPENSION (2009), 3.55 AXLE RATIO, 4.0L SOHC V6 ENGINE, 4760# GVWR, 1190# MAXIMUM PAYLOAD, 58-AMP (540 CCA) BATTERY, 6' PICKUP BOX, CLASS III TRAILER TOW, FRONT STABILIZER BAR, INDEPENDENT SHORT/LONG A ARM FRONT SUSPENSION -INC: COIL SPRING, PWR FRONT/REAR DISC BRAKES, PWR RACK & PINION STEERING, REAR WHEEL DRIVE, SKID PLATES, TUNED GAS SHOCK ABSORBERS, 4-WHEEL ANTI-LOCK BRAKE SYSTEM (ABS), CENTER FRONT LAP BELT, DRIVER & FRONT PASSENGER DUAL-STAGE AIRBAGS -INC: FRONT PASSENGER SENSING SYSTEM, FRONT SAFETY BELTS, ROLL STABILITY CONTROL (RSC) W/ADVANCETRAC, SIDE SEAT AIRBAGS, TIRE PRESSURE MONITORING SYSTEM (TPMS)

## Comments

ALL COMPS VISUALLY INSPECTE ON LIVE OPEN MARKET WITH NADA DAGTE OF LOSS ADJUSTMENT APPLIED AND MANUFACTURER BUILD SHEET ANALYSIS PERFORMED ON ALL VEHICLES INCLUDING LOSS.

| | Comp Vehicle One | Comp Vehicle Two | Comp Vehicle Three |
|---|---|---|---|
| Dealer/Owner | CAROLINA DIRECT AUTO SALES | BYERLY FORD | BUCHANON CHEVROLET |
| Contact | (336) 477-2218 | 502) 890-0059 | 717) 447-5430 |
| Address | MOCKSVILLE, NC | 40216 | WAYNESBORO, PA |
| Distance | 170 MI | 287 MI | 469 MI |
| License Plate | | | |
| Stock Number | | | |
| VIN | 1FTKR4EE3APA10993 | 1FTKR4EE9APA12649 | 1FTKR4EE9APA03000 |
| Year | 2010 | 2010 | 2010 |
| Make | FORD | FORD | FORD |
| Model | RANGER XLT RWD SHORTBED | RANGER XLT RWD SHORTBED | RANGER XLT RWD SHORTBED |
| Style | 4 DOOR CAB; SUPER CAB | 4 DOOR CAB; SUPER CAB | 4 DOOR CAB; SUPER CAB |
| Engine | V6, 4.0L; SOHC | V6, 4.0L; SOHC | V6, 4.0L; SOHC |
| Mileage | 94,398 | 113,984 | 105,400 |
| Drivetrain Condition | AVERAGE | AVERAGE | AVERAGE |
| Tire Condition | AVERAGE | AVERAGE | AVERAGE |
| Interior Condition | AVERAGE | AVERAGE | AVERAGE |
| Exterior Condition | AVERAGE | AVERAGE | AVERAGE |

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 234 of 238
8:21-cv-03803-DCC    Date Filed 11/03/23    Entry Number 49-1    Page 34 of 38
PageID #: 5674

| Exterior Color Equipment List | | |
|---|---|---|
| LEVEL 3 AVERAGE/CLEAN CONDITION RANGER XLT RWD WITH NO VISIBLE ATYPICAL EGREGIOUS WEAR | LEVEL 3 AVERAGE/CLEAN CONDITION RANGER XLT RWD WITH NO VISIBLE ATYPICAL EGREGIOUS WEAR | LEVEL 3 AVERAGE CONDITION RANGER XLT RWD WITH NO ATYPICAL EGREGIOUS MALADIES AND TYPICAL DRIVER TYPE WEAR OF AGE |
| UP CLOSE MILD IMPERFECTIONS INSIDE AND OUT ONLY | UP CLOSE MILD IMPERFECTIONS INSIDE AND OUT ONLY | AUTOMATIC |
| NO RUST ROT OR PRIOR DAMAGES | NO RUST ROT OR PRIOR DAMAGES | AM/FM STEREO W/IN-DASH 6-DISC CD CHANGER |
| INTERIOR HAS SOME MILD TRIM WEAR AND CARPET WEAR BUT OTHERWSIE IS CLEAN | INTERIOR HAS SOME MILD TRIM WEAR AND CARPET WEAR BUT OTHERWSIE IS CLEAN | -INC: MP3 & SATELLITE RADIO CAPABILITY/AUDIO INPUT JACK CODE: 58B |
| AUTOMATIC | AUTOMATIC | SLIDING REAR WINDOW CODE: 433 |
| A/M POWDERCOATED STEELIES | TOW PKG | AM/FM STEREO W/CD/MP3 PLAYER -INC: CLOCK/SATELLITE RADIO CAPABILITY/AUDIO INPUT JACK |
| BED LINER | A/M TOOL BOX | SIRIUS SATELLITE RADIO |
| TOW PKG | BED LINER | 15" 7-SPOKE SILVER-PAINTED STEEL WHEELS |
| BLACK STEP BAR CODE: 18P | AM/FM STEREO W/IN-DASH 6-DISC CD CHANGER | BI-COLOR TAIL LAMPS |
| A/M AMFM CD PLAYER W/AUX/SAT | -INC: MP3 & SATELLITE RADIO CAPABILITY/AUDIO INPUT JACK CODE: 58B | BLACK DOOR HANDLES |
| BI-COLOR TAIL LAMPS | SLIDING REAR WINDOW CODE: 433 | BLACK PWR SIDE MIRRORS |
| BLACK DOOR HANDLES | 15" 5-SPOKE ALUMINUM WHEELS CODE: 648 | BODY-COLOR FRONT/REAR STEP BUMPER -INC: BODY-COLOR PAINTED FACE BAR W/BLACK LOWER FRONT VALANCE |
| BLACK PWR SIDE MIRRORS | AM/FM STEREO W/CD/MP3 PLAYER -INC: CLOCK/SATELLITE RADIO CAPABILITY/AUDIO INPUT JACK | CHROMED H-BAR GRILLE |
| BODY-COLOR FRONT/REAR STEP BUMPER -INC: BODY-COLOR PAINTED FACE BAR W/BLACK LOWER FRONT VALANCE | SIRIUS SATELLITE RADIO | FOG LAMPS |
| CHROMED H-BAR GRILLE | BI-COLOR TAIL LAMPS | FRONT/REAR STONE GUARDS |
| FOG LAMPS | BLACK DOOR HANDLES | MINI SPARE TIRE |

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 235 of 238
8:21-cv-03803-DCC    Date Filed 11/04/21    Entry Number 49-1    Page 35 of 38
PageID #: 5675

| | | |
|---|---|---|
| FRONT/REAR STONE GUARDS | BLACK PWR SIDE MIRRORS | QUICK-RELEASE TAILGATE W/BLACK HANDLE |
| MINI SPARE TIRE | BODY-COLOR FRONT/REAR STEP BUMPER -INC: BODY-COLOR PAINTED FACE BAR W/BLACK LOWER FRONT VALANCE | RAISED "POWER DOME" HOOD |
| QUICK-RELEASE TAILGATE W/BLACK HANDLE | CHROMED H-BAR GRILLE | SOLAR TINTED GLASS |
| RAISED "POWER DOME" HOOD | FOG LAMPS | VARIABLE-INTERMITTENT WINDSHIELD WIPERS |
| REAR WINDOW FIXED GLASS | FRONT/REAR STONE GUARDS | 12-VOLT AUX PWR POINT |
| SOLAR TINTED GLASS | MINI SPARE TIRE | AIR CONDITIONING |
| VARIABLE-INTERMITTENT WINDSHIELD WIPERS | QUICK-RELEASE TAILGATE W/BLACK HANDLE | BLACK-FACED GAUGE CLUSTER W/BLACK TRIM RINGS |
| 12-VOLT AUX PWR POINT | RAISED "POWER DOME" HOOD | COLOR-KEYED CARPETED FLOOR COVERING & FRONT FLOOR MATS |
| AIR CONDITIONING | SOLAR TINTED GLASS | CUP HOLDERS |
| BLACK-FACED GAUGE CLUSTER W/BLACK TRIM RINGS | VARIABLE-INTERMITTENT WINDSHIELD WIPERS | DOME LIGHT |
| COLOR-KEYED CARPETED FLOOR COVERING & FRONT FLOOR MATS | 12-VOLT AUX PWR POINT | DRIVER/PASSENGER A-PILLAR-MOUNTED GRAB HANDLES |
| CUP HOLDERS | AIR CONDITIONING | GAUGES |
| DOME LIGHT | BLACK-FACED GAUGE CLUSTER W/BLACK TRIM RINGS | GLOVE BOX |
| DRIVER/PASSENGER A-PILLAR-MOUNTED GRAB HANDLES | COLOR-KEYED CARPETED FLOOR COVERING & FRONT FLOOR MATS | HIGH SERIES RANGER DOOR TRIM PANELS |
| GAUGES | CUP HOLDERS | MANUAL DAY/NIGHT REARVIEW MIRROR |
| GLOVE BOX | DOME LIGHT | MEDIUM DARK FLINT CLOTH 60/40 SPLIT BENCH SEAT |
| HIGH SERIES RANGER DOOR TRIM PANELS | DRIVER/PASSENGER A-PILLAR-MOUNTED GRAB HANDLES | PWR DOOR LOCKS |
| MANUAL DAY/NIGHT REARVIEW MIRROR | GAUGES | PWR WINDOWS |
| MEDIUM DARK FLINT CLOTH 60/40 SPLIT BENCH SEAT | GLOVE BOX | REAR JUMP SEATS |
| PWR DOOR LOCKS | HIGH SERIES RANGER DOOR TRIM PANELS | REMOTE KEYLESS ENTRY |
| PWR WINDOWS | MANUAL DAY/NIGHT REARVIEW MIRROR | SECURILOCK ANTI-THEFT SYSTEM |
| REAR JUMP SEATS | MEDIUM DARK FLINT CLOTH 60/40 SPLIT BENCH SEAT | SMOKERS PKG -INC: LIGHTER |

Case 1:22-cv-00375-NT Document 120-24 Filed 01/10/25 Page 236 of 238
8:21-cv-03803-DCC Date Filed 11/02/23 Entry Number 49-1 Page 36 of 38
PageID #: 5676

| | | |
|---|---|---|
| REMOTE KEYLESS ENTRY | PWR DOOR LOCKS | ASH TRAY |
| SECURILOCK ANTI-THEFT SYSTEM | PWR WINDOWS | SUN VISORS |
| SMOKERS PKG -INC: LIGHTER | REAR JUMP SEATS | TILT BLACK LEATHER-WRAPPED 4-SPOKE STEERING WHEEL W/SPEED CONTROL |
| ASH TRAY | REMOTE KEYLESS ENTRY | 4) CARGO BOX TIE-DOWN HOOKS |
| SUN VISORS | SECURILOCK ANTI-THEFT SYSTEM | $100.00 |
| TILT BLACK LEATHER-WRAPPED 4-SPOKE STEERING WHEEL W/SPEED CONTROL | SMOKERS PKG -INC: LIGHTER | 000 MILE TUNE-UP INTERVAL |
| 4) CARGO BOX TIE-DOWN HOOKS | ASH TRAY | 115-AMP ALTERNATOR |
| 100 | SUN VISORS | 2-STAGE MULTI-LEAF REAR SUSPENSION (2009) |
| 000 MILE TUNE-UP INTERVAL | TILT BLACK LEATHER-WRAPPED 4-SPOKE STEERING WHEEL W/SPEED CONTROL | 3.55 AXLE RATIO |
| 115-AMP ALTERNATOR | 4) CARGO BOX TIE-DOWN HOOKS | 4.0L SOHC V6 ENGINE |
| 2-STAGE MULTI-LEAF REAR SUSPENSION (2009) | 100 | 4760# GVWR |
| 3.55 AXLE RATIO | 000 MILE TUNE-UP INTERVAL | 1190# MAXIMUM PAYLOAD |
| 4.0L SOHC V6 ENGINE | 115-AMP ALTERNATOR | 58-AMP (540 CCA) BATTERY |
| 4760# GVWR | 2-STAGE MULTI-LEAF REAR SUSPENSION (2009) | 6' PICKUP BOX |
| 1190# MAXIMUM PAYLOAD | 3.55 AXLE RATIO | CLASS III TRAILER TOW |
| 58-AMP (540 CCA) BATTERY | 4.0L SOHC V6 ENGINE | FRONT STABILIZER BAR |
| 6' PICKUP BOX | 4760# GVWR | INDEPENDENT SHORT/LONG A ARM FRONT SUSPENSION -INC: COIL SPRING |
| CLASS III TRAILER TOW | 1190# MAXIMUM PAYLOAD | PWR FRONT/REAR DISC BRAKES |
| FRONT STABILIZER BAR | 58-AMP (540 CCA) BATTERY | PWR RACK & PINION STEERING |
| INDEPENDENT SHORT/LONG A ARM FRONT SUSPENSION -INC: COIL SPRING | 6' PICKUP BOX | REAR WHEEL DRIVE |
| PWR FRONT/REAR DISC BRAKES | CLASS III TRAILER TOW | SKID PLATES |
| PWR RACK & PINION STEERING | FRONT STABILIZER BAR | TUNED GAS SHOCK ABSORBERS |

Case 1:22-cv-00375-NT    Document 120-24    Filed 01/10/25    Page 237 of 238
8:21-cv-03803-DCC    Date Filed 11/04/22    Entry Number 49-1    Page 37 of 38
PageID #: 5677

| REAR WHEEL DRIVE | INDEPENDENT SHORT/LONG A ARM FRONT SUSPENSION - INC: COIL SPRING | 4-WHEEL ANTI-LOCK BRAKE SYSTEM (ABS) |
| --- | --- | --- |
| SKID PLATES | PWR FRONT/REAR DISC BRAKES | CENTER FRONT LAP BELT |
| TUNED GAS SHOCK ABSORBERS | PWR RACK & PINION STEERING | DRIVER & FRONT PASSENGER DUAL-STAGE AIRBAGS -INC: FRONT PASSENGER SENSING SYSTEM |
| 4-WHEEL ANTI-LOCK BRAKE SYSTEM (ABS) | REAR WHEEL DRIVE | FRONT SAFETY BELTS |
| CENTER FRONT LAP BELT | SKID PLATES | ROLL STABILITY CONTROL (RSC) W/ADVANCETRAC |
| DRIVER & FRONT PASSENGER DUAL-STAGE AIRBAGS -INC: FRONT PASSENGER SENSING SYSTEM | TUNED GAS SHOCK ABSORBERS | SIDE SEAT AIRBAGS |
| FRONT SAFETY BELTS | 4-WHEEL ANTI-LOCK BRAKE SYSTEM (ABS) | TIRE PRESSURE MONITORING SYSTEM (TPMS) |
| ROLL STABILITY CONTROL (RSC) W/ADVANCETRAC | CENTER FRONT LAP BELT | |
| SIDE SEAT AIRBAGS | DRIVER & FRONT PASSENGER DUAL-STAGE AIRBAGS -INC: FRONT PASSENGER SENSING SYSTEM | |
| TIRE PRESSURE MONITORING SYSTEM (TPMS) | FRONT SAFETY BELTS | |
| | ROLL STABILITY CONTROL (RSC) W/ADVANCETRAC | |
| | SIDE SEAT AIRBAGS | |
| | TIRE PRESSURE MONITORING SYSTEM (TPMS) | |
| **Total Price** **$13,770.00** | **$13,000.00** | **$12,103.00** |

| | Comp Vehicle One | Comp Vehicle Two | Comp Vehicle Three |
| --- | --- | --- | --- |
| Equipment Adjustment | $550.00 | $400.00 | $850.00 |
| | SLIDING REAR WINDOW CODE: 433: $25.00 | BLACK STEP BAR CODE: 18P: $50.00 | BED LINER: $75.00 |
| | AM/FM STEREO W/IN-DASH 6-DISC CD CHANGER: $50.00 | TOW PKG: -$200.00 | BLACK STEP BAR CODE: 18P: $50.00 |
| | TOW PKG: -$200.00 | A/M TOOL BOX: -$75.00 | NADA DATE OF LOSS ADJUSTMENT: $725.00 |
| | A/M AMFM CD PLAYER W/AUX/SAT: -$50.00 | 15" 5-SPOKE ALUMINUM WHEELS CODE: 648: -$100.00 | |
| | NADA DATE OF LOSS ADJUSTMENT: $725.00 | NADA DATE OF LOSS ADJUSTMENT: $725.00 | |
| Adjustment cents per mile | -$917.50 | -$525.78 | -$697.46 |
| Adjustment price | $13,402.50 | $12,874.22 | $12,255.54 |

Case 1:22-cv-00375-NT   Document 120-24   Filed 01/10/25   Page 238 of 238
8:21-cv-03803-DCC   Date Filed 11/04/22   Entry Number 49-1   Page 38 of 38
PageID #: 5678

**Autobid Comments**

**Carfax Title History Report**

|  |  |
|---|---|
| Year | 2010 |
| Make | FORD |
| Model | RANGER SUPER CAB |
| Last Odometer Reading | 139,097 |
| Title History | NO NEGATIVE ITEMS. |

**AUTO BID – Certified Vehicle Valuation**