Page 1

1          UNITED STATES DISTRICT COURT FOR THE
               SOUTHERN DISTRICT OF NEW YORK

2

     _____
3                                  :
     DOMINICK VOLINO and    :
4    JOHN PLOTTS,           :
                            :
5        Plaintiff,         :
                            :
6    v.                     : Civil Action No.
                            :  21 Civ. 6243 (LGS)(SDA)
7    PROGRESSIVE CASUALTY   :
     INS. CO., et al.,      :
8                           :
         Defendant.         :
9    _____:

10

11              Thursday, April 7, 2022

12

13          Videotape deposition of JASON
14   MERRITT taken at the Law Offices of King &
15   Spalding LLP, 1700 Pennsylvania Avenue NW,
16   Suite 200, Washington, DC, beginning at 9:08
17   a.m., Eastern Standard Time, before Ryan K.
18   Black, a Registered Professional Reporter,
19   Certified Livenote Reporter and Notary Public.

20

21

22

23

24

25

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 2

 1   A P P E A R A N C E S:

 2

     CARNEY BATES & PULLIAM PLLC
 3   BY:  LEE LOWTHER, ESQ.
     519 West 7th Street
 4   Little Rock, Arkansas  72201
     501.312.8500
 5   llowther@cbplaw.com
 6   Representing - Plaintiff

 7

     KING & SPALDING LLP
 8   BY:  JEFFREY S. CASHDAN, ESQ.
          DANIEL S. SANDERS, III, ESQ.
 9   1180 Peachtree Street, NE
     Suite 1600
10   Atlanta, Georgia  30309
     404.572.4600
11   jcashdan@kslaw.com
     dsanders@kslaw.com
12
     Representing - Defendant
13

14

15

16

17

18

19

20

21

22

23

24

     ALSO PRESENT:

25

       Gene Aranov - Legal Videographer

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                              Page 3

1                      I N D E X

2    TESTIMONY OF:  JASON MERRITT                PAGE

3    By Mr. Cashdan.................................8

4

5                    E X H I B I T S

6    EXHIBIT          DESCRIPTION                PAGE

7    Exhibit 1   a document titled Rule 26(a)

8                Expert Report of Jason Merritt.....11

9    Exhibit 2   the resumé of Jason Merritt........12

10   Exhibit 3   a copy of the subpoena issued to

11               Jason Merritt to testify at

12               deposition........................14

13   Exhibit 4   a letter from Lee Lowther to Jeffrey

14               Cashdan, dated April 4, 2022.......15

15   Exhibit 5   a document titled Expert Consultant

16               Retention Agreement...............14

17   Exhibit 6   a document titled East Coast Auto

18               Appraisers - IACP Certified Actual

19               Cash Value Appraisal..............16

20   Exhibit 7   a document titled East Coast Auto

21               Appraisers IACP Certified Actual Cash

22               Value Appraisal...................17

23   Exhibit 8   a document Bates Numbered

24               Mitchell-Volino Subpoena 000218....17

25

James Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 4

1              I N D E X (Cont'd)

2    EXHIBIT          DESCRIPTION              PAGE

3    Exhibit 9   a document Bates Numbered

4                Mitchell-Volino Subpoena 000689

5                through 000695....................18

6    Exhibit 10  a document Bates Numbered

7                Mitchell-Volino Subpoena 000729

8                through 000738....................19

9    Exhibit 11  a document Bates Numbered

10               Mitchell-Volino Subpoena 000457

11               through 000476....................20

12   Exhibit 12  a document Bates Numbered

13               Mitchell-Volino Subpoena 000603

14               through 000643....................20

15   Exhibit 13  a document Bates Numbered

16               Mitchell-Volino Subpoena 000819

17               through 000850....................21

18   Exhibit 14  a document titled 11NYCRR

19               § 216.7...........................22

20   Exhibit 15  a printout of the "About" section of

21               East Coast Auto Appraiser's

22               website...........................43

23   Exhibit 16  a printout of the "Our Services"

24               section of East Coast Auto

25               Appraiser's website...............44

Jason Merritt                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                              Page 5

1                    I N D E X (Cont'd)

2    EXHIBIT              DESCRIPTION                    PAGE

3    Exhibit 17  a printout of the "What is An

4                Appraisal section of East Coast Auto

5                Appraiser's website.................45

6    Exhibit 18  a printout of the "Diminished Value

7                Page" section of East Coast Auto

8                Appraiser's website.................51

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1          THE VIDEOGRAPHER:  Good morning.

2    We are going on the record at 9:08 a.m.

3    on April 7th, 2022.  Please note that the

4    microphones are sensitive and may pick up

5    whispering, private conversations and cellular

6    interference.  Please turn off all cell phones,

7    or place them away from the microphones, as they

8    can interfere with the deposition audio.  Audio

9    and video recording will continue to take place

10   unless all parties agree to go off the record.

11          This is Media Unit 1 of the

12   video-recorded deposition of Jason Merritt,

13   taken by counsel for defendant in the matter of

14   Dominick Volino, et al., versus Progressive Ins.

15   Co., et al, filed in the United States District

16   Court for the Southern District of New York,

17   Case Number 21 Civ 6243 (LGS)(SDA).

18          This deposition is being held at King &

19   Spalding, located at 1700 Pennsylvania Avenue

20   Northwest, Suite 200, Washington, D.C.

21          My name is Gene Aranov, from the

22   firm Veritext Legal Solutions, and I'm the

23   videographer.  The court reporter is Ryan Black,

24   from the firm Veritext Legal Solutions.  I am

25   not authorized to administer an oath, I am not

Page 7

1  related to any party in this action, nor am I

2  financially interested in the outcome.

3          Counsel and everyone present in the

4  room and everyone attending remotely will now

5  please state their appearances and affiliations

6  for the record.  If there are any objections to

7  proceeding, please state them at the time of your

8  appearance beginning with the noticing attorney.

9          MR. CASHDAN:  Jeff Cashdan for

10  defendants.

11          THE WITNESS:  Jason Merritt.

12          MR. LOWTHER:  Lee Lowther for the

13  plaintiffs.

14          MR. CASHDAN:  And I should just note for

15  the record, with me here today is Daniel Sanders,

16  also of King & Spalding.

17          THE VIDEOGRAPHER:  Will the court

18  reporter please swear in the witness.

19                    *     *     *

20  Whereupon --

21                    JASON MERRITT,

22  called to testify, having been first duly sworn

23  or affirmed, was examined and testified as

24  follows:

25                    *     *     *

                                                          Page 8

1           THE VIDEOGRAPHER:  Thank you.  You may

2    proceed.

3                        EXAMINATION

4    BY MR. CASHDAN:

5        Q.   Good morning, sir.  Could you just state

6    your full name for the record, please?

7        A.   Yes.  Jason W. Merritt.

8        Q.   And -- and where do you live?

9        A.   I live in Cumberland, Maryland.

10       Q.   Okay.  Have you ever been deposed

11   before?

12       A.   Yes.

13       Q.   Okay.  And you understand, generally,

14   the process, then.  But let me just go over a

15   couple of ground rules, if that's okay?

16       A.   Absolutely.

17       Q.   I'm going to ask you questions today,

18   and we need you to answer orally.  We can't have

19   a nod of the head or a movement of the hand

20   instead.

21       A.   Correct.

22       Q.   You understand that?

23       A.   Understood.

24       Q.   If you don't understand my question,

25   or any part of it, would you let me know?

Jason Merritt                                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                              Page 9

1        A.    Ple -- I will.

2        Q.    And if you don't let me know that you

3    have any confusion about my question, I'm going

4    to presume that you understood it.  Is that fair?

5        A.    That's fair.

6        Q.    Okay.  This is not an endurance test.

7    If you need a break for any reason, let me know,

8    as long as a question is not pending.  Okay?

9        A.    Absolutely.

10       Q.    All right.  Did you prepare for your

11   deposition today?

12       A.    Yes.

13       Q.    How did you prepare?

14       A.    I just read over, actually, some

15   of the documents that, probably, you have in

16   exhibits.  I believe we reviewed those just this

17   morning, and they are the documents that I

18   prepared with.

19       Q.    Okay.  After the time you prepared your

20   expert report, did you do any other additional

21   work to prepare for today?

22       A.    No, I did not, really.

23       Q.    Did you meet with counsel to prepare for

24   your deposition?

25       A.    I met with counsel on Zoom, and this

James Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 10

1    morning I met him in the lobby.

2         Q.    When did you meet with counsel on Zoom?

3         A.    I believe we met -- today is Thursday.

4    I guess that would be Monday or Tuesday.  I think

5    Tuesday.

6         Q.    Of this week?

7         A.    Yes.

8         Q.    Okay.  And who did you meet with?

9         A.    Mr. Lowther.

10        Q.    Anyone else?

11        A.    No.

12        Q.    And how long did you meet for?

13        A.    I believe we met for about an hour.

14        Q.    Okay.  And was there anything about your

15   work that you discussed that you've not otherwise

16   disclosed in your expert report?

17        A.    No.

18        Q.    Okay.  Did you review any documents

19   during that meeting?

20        A.    No.  I believe I only reviewed, I

21   believe, just my statement, and I believe that's

22   it.

23        Q.    And when you say your "statement," do

24   you mean the expert report you submitted?

25        A.    Yes.

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                        Page 11

1       Q.   Okay.  Did you do any preparation work

2   this morning with counsel?  You mentioned you met

3   Mr. Lowther this morning.

4       A.   No.

5       Q.   So you just met him in the lobby to come

6   over to here?

7       A.   Correct.

8       Q.   Okay.  Other than reviewing some of

9   the documents that you've previously produced,

10  meeting with -- an hour by Zoom with Mr. Lowther,

11  is there anything else did you to prepare for

12  your deposition since the time you completed

13  your expert report?

14      A.   No.

15      Q.   Okay.  Have you ever been insured by any

16  Progressive entity?

17      A.   Not that I know of, no.

18      Q.   Okay.  Have you ever filed a claim

19  against any Progressive insured or entity?

20      A.   I do not believe so.

21      Q.   Okay.  Have you ever been involved in a

22  total loss of a vehicle you owned?

23      A.   No.

24           (Merritt Exhibit No. 1, a document

25  titled Rule 26(a) Expert Report of Jason Merritt,

Jason Merritt                                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                              Page 12

 1    was introduced.)

 2    BY MR. CASHDAN:

 3         Q.   Okay.  I'd like to hand you what's been

 4    marked for identification as Merritt Exhibit 1.

 5    Can you please state for the record what

 6    Exhibit 1 is?

 7         A.   That is my expert report.

 8         Q.   And is Exhibit 1 a full and complete

 9    copy of your expert report?

10         A.   Yes, it is.

11         Q.   Is that your signature on the last page

12    of Exhibit 1?

13         A.   Yes, sir.  That is.

14         Q.   And it says it was executed on March

15    11th, 2022.  Do you see that?

16         A.   Correct.

17         Q.   Is that the date you, in fact, executed

18    it?

19         A.   That is.

20              (Merritt Exhibit No. 2, the resumé of

21    Jason Merritt, was introduced.)

22    BY MR. CASHDAN:

23         Q.   Okay.  Let me hand you what's been

24    marked for identification as Exhibit 2.

25         A.   Do you want me to hold onto these?

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 13

1        Q.   Yes.  Yes.

2        A.   Okay.

3        Q.   We will refer back to those.

4        A.   Okay.

5        Q.   Let me hand you Exhibit 2.  What is

6    Exhibit 2?

7        A.   Exhibit 2 is my personal resumé, three

8    pages.

9        Q.   And am I correct that Exhibit 2 was

10   attached to your report as an exhibit to the

11   report?

12       A.   Yes, it would be.

13       Q.   It was -- it was, I think, labeled

14   Exhibit 1 to the report; is that right?

15       A.   Correct.

16       Q.   And is this a true and correct copy of

17   your current resumé?

18       A.   Yes, sir.  That is.

19       Q.   Okay.  And who prepared this document?

20       A.   I did.

21       Q.   Okay.

22       A.   Probably could have use a little bit of

23   help but --

24       Q.   Not a problem.

25            Let's go back -- well, let's not do it

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 14

1   yet.

2          You received a subpoena to produce

3   materials in this case.  Are you aware of that?

4      A.   I am aware.

5          (Merritt Exhibit No. 3, a copy of the

6   subpoena issued to Jason Merritt to testify at

7   deposition, was introduced.)

8   BY MR. CASHDAN:

9      Q.   Let me hand you what's been marked as

10  Exhibit 3.  Is Exhibit 3 a accurate copy of the

11  subpoena that you were served?

12     A.   Yes, sir.  It is.

13     Q.   Okay.  And am I correct that you

14  responded to that subpoena through counsel?

15     A.   Yes, I did.

16         (Merritt Exhibit No. 4, a letter from

17  Lee Lowther to Jeffrey Cashdan, dated April 4,

18  2022, was introduced.)

19  BY MR. CASHDAN:

20     Q.   Okay.  I'm going to hand you what's

21  been marked as Exhibit 4.  Is this a copy of the

22  written response provided by your counsel?

23     A.   It is.

24     Q.   Okay.  Did you have any role in

25  preparing this written response?

Page 15

1      A.   Yes, I did.

2      Q.   Okay.  What role did you have?

3      A.   My role was to answer each one of these

4  responses.

5      Q.   Okay.  And am I correct that in

6  connection with responding to the subpoena you

7  produced certain materials, --

8      A.   I did.

9      Q.   -- some -- some documents; is that

10  right?

11      A.   That's correct.

12      Q.   Okay.  I'm going to hand you a variety

13  of documents now just through a housekeeping

14  measure.  I believe these are all the documents

15  you produced to us.  We're going to go through

16  them one at a time just to make sure that's

17  correct.  We're not going to cover them in detail

18  now, and then we'll come back.  Is that all

19  right?

20      A.   Understood.

21          (Merritt Exhibit No. 5, a document

22  titled Expert Consultant Retention Agreement, was

23  introduced.)

24  BY MR. CASHDAN:

25      Q.   All right.  Let me hand you what's been

Jason Merritt                                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 16

1    marked as Exhibit 5.  What is Exhibit 5?

2        A.   This is the Expert Consultant Retention

3    Agreement.  It looks like a four-page document

4    that was prepared between myself and

5    Mr. Lowther's represented law firm.

6        Q.   Okay.  And you produced that in

7    connection with the response to the subpoena; is

8    that correct?

9        A.   Correct.

10           (Merritt Exhibit No. 6, a document

11   titled East Coast Auto Appraisers - IACP

12   Certified Actual Cash Value Appraisal, was

13   introduced.)

14   BY MR. CASHDAN:

15       Q.   Okay.  Let me hand you Exhibit 6.  What

16   is Exhibit 6?

17       A.   Exhibit 6 is one of my general templates

18   for some of the appraisals and outlines, my

19   methodology and photos and just, kind of, an

20   overview outline template of one of my

21   appraisals.

22       Q.   Okay.  And that was produced in response

23   to the subpoena; is that correct?

24       A.   Correct.

25   ///

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 17

```
 1              (Merritt Exhibit No. 7, a document
 2      titled East Coast Auto Appraisers IACP Certified
 3      Actual Cash Value Appraisal, was introduced.)
 4      BY MR. CASHDAN:
 5          Q.   Okay.  Let me hand you Exhibit 7.  What
 6      is Exhibit 7?
 7          A.   Exhibit 7 is an example of one of the
 8      appraisals that I completed in the past.
 9          Q.   Okay.  And that was also produced in
10      response to the subpoena; is that correct?
11          A.   Yes, sir.
12              (Merritt Exhibit No. 8, a document Bates
13      Numbered Mitchell-Volino Subpoena 000218, was
14      introduced.)
15      BY MR. CASHDAN:
16          Q.   Okay.  Let me hand you what's been
17      marked as Exhibit 8.  What is Exhibit 8?
18          A.   Exhibit 8 looks like a WorkCenter Total
19      Loss printout through Mitchell, talking about
20      internet pricing and internet sales.
21          Q.   This is a document you produced in
22      response to the subpoena; is that correct?
23          A.   Correct.
24              (Whereupon there was a slight
25      interruption by videographer.)
```

Jason Merritt                                                        April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 18

1          MR. CASHDAN:   Excuse me?

2    BY MR. CASHDAN:

3       Q.   This is a document you produced in

4    response to the subpoena; is that correct?

5       A.   Yes, sir.

6       Q.   Is this a document that you reviewed in

7    preparing your expert report?

8       A.   Yes -- some of the material from here,

9    yes, I had read it prior to the report, yes.

10      Q.   Okay.

11      A.   But as far as holding that document and

12   preparing it, no, I did not.

13      Q.   Okay.  But did you -- had you reviewed

14   Exhibit 8 prior to the time you prepared your

15   expert report?

16      A.   Some of the information, yes.  But I

17   don't recall this exact document, reading it

18   prior to preparation.

19      Q.   Okay.

20      A.   But the contents in it I'm familiar

21   with.

22          (Merritt Exhibit No. 9, a document Bates

23   Numbered Mitchell-Volino Subpoena 000689 through

24   000695, was introduced.)

25   BY MR. CASHDAN:

Page 19

1      Q.   Okay.  Let me hand you Exhibit 9.

2           Excuse me.  What is Exhibit 9?

3      A.   Exhibit 9 looks like a vehicle valuation

4   report through Mitchell.

5      Q.   And is it for the owner Mr. James

6   England?

7      A.   Correct.

8      Q.   And this is a document you produced in

9   response to the subpoena?

10      A.   Correct.

11           (Merritt Exhibit No. 10, a document

12   Bates Numbered Mitchell-Volino Subpoena 000729

13   through 000738, was introduced.)

14   BY MR. CASHDAN:

15      Q.   Okay.  Let he me hand you Exhibit 10.

16   What is Exhibit 10?

17      A.   Exhibit 10 is another Mitchell vehicle

18   valuation -- valuation report on Goodier.

19      Q.   Okay.  This is a document you produced

20   in response to the subpoena?

21      A.   Yes, sir.

22           MR. CASHDAN:  Okay.  I just want to

23   clarify for the record, Lee, that we're producing

24   -- we were marking these exhibits as the files we

25   were provided.

Jason Merritt                                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                                    Page 20

     1              MR. LOWTHER:  Mm-hmm.

     2              MR. CASHDAN:  I want to -- I'm not

     3     trying to play games with the witness.  Some of

     4     these files contain multiple vehicle valuation

     5     reports.  So I'm not representing it's a single

     6     document but, rather, it was a single file that

     7     was produced.  Does that make sense?

     8              MR. LOWTHER:  Okay.  That's -- no,

     9     that's fair.  That is the way they were produced.

    10              (Merritt Exhibit No. 11, a document

    11     Bates Numbered Mitchell-Volino Subpoena 000457

    12     through 000476, was introduced.)

    13     BY MR. CASHDAN:

    14        Q.    Okay.  This is Exhibit 11, and Exhibit

    15     11 looks to be a collection of vehicle valuation

    16     reports for Mr. Plotts; --

    17        A.    Correct.

    18        Q.    -- is that correct?

    19        A.    That is correct.

    20        Q.    And you produced these in response to

    21     the subpoena?

    22        A.    Yes, sir.

    23              (Merritt Exhibit No. 12, a document

    24     Bates Numbered Mitchell-Volino Subpoena 000603

    25     through 000643, was introduced.)

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                        Page 21

 1    BY MR. CASHDAN:

 2         Q.    Okay.  Let me hand you Exhibit 12.

 3    Exhibit 12 appears to be a collection of vehicle

 4    valuation reports for Mr. Costa; is that correct?

 5         A.    That is correct.

 6         Q.    And you produced these in response to

 7    the subpoena?

 8         A.    Yes, I did.

 9              (Merritt Exhibit No. 13, a document

10    Bates Numbered Mitchell-Volino Subpoena 000819

11    through 000850, was introduced.)

12    BY MR. CASHDAN:

13         Q.    And I'm going to hand you Exhibit 13.

14    Exhibit 13 appears to be a set of vehicle

15    valuation reports for Mr. Lukasik; is that

16    correct?

17              MR. LOWTHER:  It is Lukasik.

18              MR. CASHDAN:  Lukasik.

19    BY MR. CASHDAN:

20         Q.    Is that correct?

21         A.    That's correct.

22         Q.    And did you produce those in response to

23    the subpoena?

24         A.    Yes, sir.  I did.

25    ///

Page 22

```
 1              (Merritt Exhibit No. 14, a document

 2       titled 11NYCRR § 216.7, was introduced.)

 3       BY MR. CASHDAN:

 4          Q.    And let me hand you what's been marked

 5       for identification as Exhibit 14, which appears

 6       to be a printout of a provision of the New York

 7       Codes Rules and Regulations.  Did you produce

 8       this document in response to the subpoena?

 9          A.    I did.

10          Q.    Okay.  Are there any documents,

11       other than the ones we've marked today, that you

12       reviewed or relied upon for purposes of preparing

13       your expert report?

14          A.    No, sir.

15          Q.    Okay.  Are there any other documents

16       that were produced by any party in this

17       litigation that you reviewed for purposes of your

18       expert opinions and conclusions in this matter?

19          A.    No, sir.

20          Q.    Okay.  All right.

21              I'd like to go back, if we could, to

22       Exhibit 5, please.

23          A.    That is the retention agreement.

24          Q.    Okay.  So is this the agreement that

25       -- where you were retained for purposes of
```

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 23

1   providing services in this litigation?

2        A.    It is.

3        Q.    And it's dated February 15th, 2022; is

4   that correct?

5        A.    Correct.

6        Q.    Did you provide any work, for purposes

7   of this litigation, prior to February 15th, 2022?

8        A.    I do not believe I did.

9        Q.    Okay.  How did it come to be that you

10  were retained in this matter?  Who -- who

11  contacted you?

12       A.    The whole story back, I do work

13  for and was certified under the Bureau of

14  Certified Auto Appraisers.  And through that

15  organization is when I was told to -- if I was

16  looking for any expert witness or any consulting

17  work or any additional appraising is when I

18  called them to say, hey, I'm looking for

19  business.  COVID shut us down for a while.  So I

20  called and said, hey, we're back up; anything you

21  have available, let me know.  I received a call

22  later from Houston Auto Appraisers and said, hey,

23  can you help this attorney office out -- a law

24  firm out; they have some questions on some actual

25  cash value.

Page 24

1          So I did call, I believe Mr. Lowther

2      at the time, and just notified him that I am

3      available for any cons -- consulting.  And he

4      later did respond and asked for a resumé, and

5      then later we were contacted.

6          Q.   Okay.  Do you recall when it was that

7      you reached out to the appraisal organization,

8      which --

9          A.   No, I can't remember.

10         Q.   Okay.

11         A.   I do not recall.

12         Q.   Do you recall whether it was in 2021 or

13     2022?

14         A.   I really don't know.  It could have been

15     prior to the end of the year, but it was recent.

16         Q.   Okay.  Do you recall when you received

17     a call -- a communication from Houston Auto

18     Appraisers?

19         A.   No, I don't.

20         Q.   Do you recall what year it was?

21         A.   I -- again, pretty recent.  It could

22     have been the end of '21, beginning of '22.

23     I -- I don't recall.

24         Q.   Who from Houston Auto Appraisers

25     contacted you?

Jason Merritt                                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 25

 1       A.    Mr. Dent Roy [sic].

 2       Q.    Roy Dent [sic]?

 3       A.    I think it's Roy Dent [sic].

 4       Q.    Okay.

 5       A.    Roy Dent or Bent.

 6       Q.    Did you know Mr. Dent or Bent?

 7       A.    I only knew him through the Bureau of

 8   Certified Auto Appraisers.

 9       Q.    Okay.  Does he work for the Bureau?

10       A.    I believe he's part owner of it.

11       Q.    Okay.  And he called you and -- and

12   suggested you might want to contact somebody

13   about this lawsuit?

14       A.    Correct -- not about this lawsuit.  He

15   just said that there's a firm in Alabama that is

16   looking for some consulting.

17       Q    And when you say "Alabama," did you mean

18   Arkansas?

19       A.    I -- I just remember Alabama, so --

20       Q.    Okay.

21       A.    -- I may be completely wrong on the

22   state.

23       Q.    Okay.  How long after you received a

24   call from Mr. Dent or Bent did you reach out to

25   counsel?

Page 26

1      A.    I believe I reached out to Mr. Lowther's

2   firm pretty -- pretty quickly after I received

3   the notification from Mr. Bent.  I would say

4   within a day or two.

5      Q.    Okay.  And -- and did you speak to

6   somebody at the law firm at that time?

7      A.    I can't recall that.  I can't recall if

8   it was an email or a phone call.

9      Q.    Okay.  And did you receive a response

10  to --

11     A.    I did receive a response.  And to tell

12  you the exact timing, I cannot recall that.

13     Q.    Okay.  Can you tell me, generally, what

14  the response said?

15     A.    The response was just simply, hey,

16  we -- we do need some consultants; do you mind

17  sending your resumé.

18     Q.    Okay.  And then when you sent your

19  resumé, was it the same general resumé as is

20  Exhibit 2?

21     A.    I believe it is that exact resumé.

22     Q.    Okay.  And then how long after you sent

23  the resumé did you hear back from counsel?

24     A.    That I can't recall.  It was within

25  days, maybe within a week.

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                        Page 27

1          Q.   Do you recall what year that was?

2          A.   Yeah.   That was -- that was in '22.

3          Q.   Okay.   And you had not yet been retained

4     at the time you sent your resumé initially,

5     correct?

6          A.   No.

7          Q.   Is that correct?

8          A.   Correct.

9          Q.   Okay.   Did you, at some point in time

10    before you were retained, have a conversation

11    with counsel regarding this case?

12         A.   That I don't recall.   As far as after I

13    sent the resumé, that I don't recall, speaking

14    about the case.

15         Q.   Okay.   Had you done any investigation

16    into the allegations of this case at the time you

17    reached out to counsel --

18         A.   No.

19         Q.   -- for the plaintiff?

20         A.   No.

21         Q.   Okay.   One thing just to clarify:

22    Because the court reporter's taking down our

23    words, it's really important that I not step on

24    your words and vice versa.   So let me finish my

25    question and then you can answer, and I'll let

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 28

1   you finish your answer before I --

2        A.   Okay.

3        Q.   -- ask my next question.

4        A.   No problem.

5        Q.   Okay.  Do you recall the first meeting

6   you had with counsel for plaintiffs where you

7   discussed the substance of the allegations in

8   this case?

9        A.   The first I was told about this case

10  would have been a Zoom meeting, and that would be

11  probably right around the -- the February 15th

12  date.

13            Again, I'm not exactly re -- I can't

14  recall the exact date we spoke the first time

15  about it, but it was close to February.

16       Q.   Okay.  And you didn't do any work to

17  determine -- to develop your expert opinions and

18  conclusions in this matter prior to signing the

19  agreement on February 15th, --

20       A.   No.

21       Q.   -- 2022, --

22       A.   No.

23       Q.   -- correct?

24       A.   Correct.

25       Q.   Okay.  The first -- second paragraph --

Page 29

1    excuse me -- of the agreement, which is reflected

2    in Exhibit 5 begins, "Whereas the law firm is

3    litigating claims on behalf of insureds against,"

4    and it lists a number of Progressive entities.

5    Do you see that?

6          A.    Correct.  Yes.

7          Q.    What was your understanding at this

8    time about what the claims were being litigated

9    against the Progressive entities?

10         A.    The claims at that point, I believe,

11   were actual cash value -- variations in the

12   actual cash value prices.

13         Q.    Okay.  Anything else you understood at

14   that time about the allegations in the case?

15         A.    No.

16         Q.    Okay.  The next paragraph says,

17   "Whereas, contractor is a recognized authority on

18   the used automotive market, including inter alia

19   pricing techniques and inventory management

20   practices."

21              Do you see that?

22         A.    Yes, sir.

23         Q.    Do you consider yourself to be an expert

24   on the used automotive market?

25         A.    Yes.

Page 30

```
 1        Q.   Do you consider yourself to be an expert

 2   on the pricing techniques in the used automotive

 3   market?

 4        A.   I do.

 5        Q.   Do you consider yourself to be an expert

 6   on inventory management practices in the used

 7   automotive market?

 8        A.   I do.

 9        Q.   Which authorities have recognized you

10   as an expert on pricing techniques in the used

11   automotive market?

12        A.   Authorities?  No courts or authorities.

13   Just through my experience and expertise.

14        Q.   Okay.  Well, the paragraph begins,

15   "whereas contractor is a recognized

16   authority ..."  Do you see that?

17        A.   Yes.

18        Q.   Which -- who's recognized you as an

19   authority on pricing techniques in the used

20   automotive market?

21        A.   Probably the Bureau of -- Bureau of

22   author -- appraisal -- the Bureau of Certified

23   Auto Appraisers is where I'm certified under, as

24   well as local dealerships, local entities that

25   I've sold vehicles for, priced vehicles for and
```

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 31

1  done appraisals for.

2      Q.   Okay.  Any -- any other authority that's

3  recognized you as an expert on pricing techniques

4  for the used automotive market?

5      A.   Just the -- the different dealerships

6  that I've done that for; --

7      Q.   Okay.

8      A.   -- I was paid for that.

9      Q.   Okay.  And which dealerships have paid

10 you to provide expertise on pricing techniques?

11     A.   There's several local dealerships in

12 Maryland.  The Timbrook Automotive I actually

13 work for, I believe they own 13 dealerships.

14     Q.   Okay.  Anyone else?

15     A.   No.

16     Q.   Okay.  Which authorities have

17 recognized you as an expert on inventory

18 management practices in the used automotive

19 market?

20     A.   That would be that same Timbrook

21 Automotive Group.

22     Q.   Okay.  Anyone else?

23     A.   No.

24     Q.   Okay.  Looking at the -- it's the first

25 page of Exhibit 5, it states that your hourly

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 32

1    rate is $650 an hour for this work; is that
2    correct?
3         A.    Correct.
4         Q.    And -- and Paragraph B.1.b. says that
5    you'll have a minimum of 10 hours billable; is
6    that correct?
7         A.    Correct.
8         Q.    How many hours have you billed to date?
9         A.    I think to date we only have five, six
10   hours.
11        Q.    Five to six hours total?
12        A.    Correct.
13        Q.    And does that include the one-hour Zoom
14   meeting to prepare for this deposition?
15        A.    Yes, it does.
16        Q.    Okay.  So is it fair -- that is -- does
17   that include transportation to come here?
18        A.    It does not include today.
19        Q.    Okay.  So would it be fair to say that
20   prior to -- strike that.
21             Would it be fair to say that up to the
22   time you prepared your expert report, you had
23   billed four to five hours?
24        A.    Total with the report and everything up
25   to today is total of about six hours maybe, so --

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 33

1      Q.    What I -- what I'm trying to ask is how

2   much of those hours is up until the day of your

3   report being finished?

4      A.    To the day of report being finished, I

5   would say three to four hours.

6      Q.    Okay.   So you spent about three to four

7   hours' worth of work to get to the point where

8   you were able to finish your expert report in

9   this matter?

10     A.    Correct.

11     Q.    Okay.   Thank you.

12          And if you don't do any more work

13  in this matter, if we were to close -- close the

14  deposition right now, which we're not going to

15  unfortunately, you would still bill a total of

16  10 hours; is that right?

17     A.    According to this I can, yes.

18     Q.    And would you?

19     A.    Yes.

20     Q.    Okay.

21          THE WITNESS:   Sorry, Lee, but, yes, I

22  would.

23  BY MR. CASHDAN:

24     Q.    If you go to the next page, you see

25  at the bottom there's a paragraph that says,

Page 34

1    "Confidentiality."  Do you see that?

2        A.    I do.

3        Q.    And the last sentence says,

4    "Contractor has review and signed the

5    confidentiality acknowledgement and affirmation

6    in the instant matter."  Do you see that?

7        A.    I do.

8        Q.    Have you executed a document that

9    confirms that you will abide by the protective

10   order in this case, subjecting yourself to the

11   jurisdiction of the Court for enforcement of the

12   protective order?

13       A.    That -- I would have to see that.  I'm

14   not sure if I did or not.

15            MR. CASHDAN:  Lee?

16            MR. LOWTHER:  Yes.  Yeah.  And we have

17   that in the file.

18            MR. CASHDAN:  Okay.  Can we get a copy

19   of that?

20            MR. LOWTHER:  Yes.

21            MR. CASHDAN:  Okay.  Thank you.

22            THE WITNESS:  That would be a

23   nondisclosure?

24   BY MR. CASHDAN:

25       Q.    No.  It would -- there's confidentiality

Volino, Dominick v. Progressive Casualty Insurance

Page 35

1    obligations --

2        A.    Okay.

3        Q.    -- that you won't -- essentially, that

4    you won't disclose confidential information, but

5    there's other obligations there as well.

6        A.    Okay.  In my industry we call them

7    nondisclosures, so I didn't know if that's the

8    same.

9        Q.    It's -- it's be -- it goes a little bit

10   beyond that, yeah.

11       A.    Okay.

12       Q.    Have you ever advised a client, other

13   than in this case, adverse to Progressive?

14       A.    No.

15       Q.    Have you ever had a -- a client who

16   wanted you to provide an appraisal for an

17   insurance claim to present to Progressive?

18       A.    I would have to look through all of my

19   appraisals, but I don't pay attention to who the

20   insurance companies are.  I don't deal with the

21   insurance companies, only the client themselves.

22   So I don't -- I -- I can't recall who my clients

23   were insured by at all.

24       Q.    Okay.  I'd like to go now to Exhibit 2,

25   which is your resume.

Page 36

```
 1              Did you attend college?

 2      A.    I attended some college at Catonsville

 3  Community College.  That was it.

 4      Q.    Did you obtain a degree?

 5      A.    No.

 6      Q.    Okay.  For how many years did you attend

 7  the community college?

 8      A.    I attended Catonsville College only

 9  while I was in the Maryland State Police Academy.

10      Q.    For how long was that?

11      A.    The Academy was six months' long.

12      Q.    Okay.

13      A.    They pack a lot of schooling in during

14  that six months.

15      Q.    Sure.

16              What was the subject matter you studied

17  at -- at the community college?

18      A.    It was all criminal law and basic law

19  enforcement.

20      Q.    Okay.  The first item on your resume is

21  Merritt's Alignment Service.  Do you see that?

22      A.    Yes, I do.

23      Q.    In connection with your work at

24  Merritt's Alignment Service, did you prepare any

25  appraisals for the valuation of vehicles?
```

Jason Merritt                                                     April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 37

```
 1      A.   Merritt's Alignment Service was my -- it
 2  was a family owned business.  My father owned
 3  that, was a mechanic all of his life.  So I was
 4  very young when I was exposed to that, obviously,
 5  it being a family business.  So we had bought and
 6  sold cars my entire life, and that's pretty much
 7  how we -- he made a living.  So I started
 8  purchasing and selling cars probably when I was
 9  the age of 12.  I snuck into auctions.
10      Q.   Did you prepare any appraisals for
11  motor vehicles in your job at Merr -- Merritt's
12  Alignment Service?
13      A.   As far as preparation of appraisals, no,
14  there would be not writ -- no written documents.
15  But I would appraise as I was purchasing all the
16  time and evaluate and set pricing and sales --
17      Q.   Okay.
18      A.   -- and so forth.
19      Q.   You spent quite a bit of time as a
20  member of the Maryland State Police Department --
21      A.   Yes, sir.
22      Q.   -- in various roles?
23      A.   Yes, sir.
24      Q.   Did you -- was -- were you responsible
25  during your time at the Maryland State Police for
```

Jason Merritt                                         April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 38

1  preparing appraisals for automobiles?

2      A.   Actually, it's kind of odd, yes, I did.

3  When I worked in the narcotics unit, I also

4  seized assets and vehicles from drug dealers.

5  So part of my portfolio was to evaluate and

6  appraise them for the court purposes for

7  seizures -- for asset seizures.

8      Q.   And in connection with that, did you

9  track down comparable vehicles and do condition

10 adjustments?

11     A.   No.  As far as using comparables, yes.

12          As far as tracking them down and using,

13 it -- it wasn't to the in depth that I do it on

14 an appraisal.

15     Q.   Okay.  You -- you produced to us some

16 forms of appraisals in Exhibit 6 and Exhibit 7 in

17 connection with this case.

18     A.   Correct.

19     Q.   Did you prepare any appraisals of that

20 type during your time on the Maryland State

21 Police Department?

22     A.   No.

23     Q.   Okay.  So fair to say that your main

24 job when you were with the Maryland State Police

25 Department was not to prepare appraisals of

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 39

1  automobiles?

2      A.   Very fair.

3      Q.   Okay.  You left the -- the force in

4  2015; is that correct?

5      A.   Yes, I did.

6      Q.   And you worked at Merritt's Automotive

7  LLC; is that right?

8      A.   Correct.

9      Q.   During your time at Merritt's Automotive

10 LLC, were you involved in preparing appraisals of

11 automobiles?

12     A.   Yes, I was.

13     Q.   Did you prepare appraisals of the type

14 like Exhibits 6 and 7?

15     A.   No, I did not.

16         MR. LOWTHER:  Object to form.

17         MR. CASHDAN:  What's the objection?

18         MR. LOWTHER:  Vague.  "Of the type."

19 BY MR. CASHDAN:

20     Q.   Okay.  You can answer the question.

21     A.   Okay.  Not to that extent, but many

22 appraisals, and I did use comparables, and some

23 of them were more precise there, because they

24 were actually for sale and for customers.  But I

25 was not into the certified appraising where I had

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 40

1   the template and was able to document it.

2       Q.    Okay.  At the time you worked at

3   Merritt's Automotive LLC, were you certified as

4   an appraiser from any independent organization?

5       A.    No.

6       Q.    Okay.  Is that also true at the time you

7   were in the Maryland State Police Department?

8       A.    Correct.

9       Q.    Okay.  In 2016 you joined the Timbrook

10  Automotive organization; is that correct?

11      A.    I did.

12      Q.    And -- and you mentioned earlier that

13  you worked at one of their dealerships, correct?

14      A.    Correct.

15      Q.    Was it a motorcycle dealership?

16      A.    I worked at the motorcycle dealership as

17  a manager, yes.

18      Q.    Okay.  And -- and in that role, were you

19  involved in the sale of automobiles?

20      A.    Yes.

21      Q.    And did you have a role appraising

22  automobiles in that role?

23      A.    That was my involvement with the other

24  automotive dealerships; was they would call me

25  for appraisals on trade-ins, purchased vehicles,

Page 41

1    all that, and any specialty vehicle.  Any vehicle

2    that was not able to be appraised or evaluated by

3    one of their in-house people I would be called.

4         Q.   And did you -- were you certified by

5    any -- any independent organization as an

6    appraiser at that time?

7         A.   No.

8         Q.   Okay.  It says you started working in

9    June 2019 for Present T3 Intelligence Services.

10   Do you see that?

11        A.   It's June 2019 through present, --

12        Q.   Excuse me.  I misread that.

13        A.   -- T3 Intelligence Service, one of my

14   companies.

15        Q.   Okay.  So -- so you still work T3

16   Intelligence Services?

17        A.   Yes.

18        Q.   And that is a security and private

19   investigation firm?

20        A.   Correct.

21        Q.   And in that job, do you do any

22   appraisals of automobiles?

23        A    No.

24        Q.   Okay.  And it says you started working

25   in April 2020 at East Coast Auto Appraisers LLC;

Jason Merritt                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 42

1    is that right?

2         A.    Correct.

3         Q.    And that's a company you own?

4         A.    Correct.

5         Q.    And it's in that job you do apprai --

6    appraisals of motor vehicles?

7         A.    Correct.

8         Q.    When did you obtain your certification

9    for appraisals?

10        A.    It looks like I obtained that on May

11   27th of 2020.

12        Q.    Okay.  So I wasn't sure if you had a

13   prior certification?

14        A.    No.

15        Q.    So the first time you became certified

16   as an appraiser from an independent organization

17   was May 27th, 2020?

18        A.    First time I had a certification from

19   any bureau was May 27th, 2020.

20        Q.    Okay.  And that's also -- strike that.

21             And East Coast Auto Appraisers LLC is

22   the first job you held where the purpose of the

23   job was to provide appraisers -- appraisals for

24   third parties?

25        A.    Yes.

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 43

1      Q.   Okay.  How many people work at East

2   Coast Auto Appraisers LLC?

3      A.   Right now I have two other appraisal

4   -- appraisers.

5      Q.   Okay.  What are their names?

6      A.   Actually, three others.

7           Wes Reed, Chuck Vallance and Luke

8   Zewicker [phonetic].

9      Q.   Okay.  And what is the business of East

10   Coast Auto Appraisers, LLC?

11      A.   The business of that is auto appraising:

12   Actual cash value, diminished value, total loss,

13   loss of use, all in the vehicles.

14           (Merritt Exhibit No. 15, a printout of

15   the "About" section of East Coast Auto

16   Appraiser's website, was introduced.)

17   BY MR. CASHDAN:

18      Q.   Let me hand you what's been marked for

19   identification as Exhibit 15.

20           Take a moment to look at it and let me

21   know when you're ready.

22      A.   I am ready.

23      Q.   All right.  Is Exhibit 15 a true and

24   accurate printout of a portion of the website for

25   East Coast Auto Appraisers?

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 44

 1        A.    I believe so.

 2        Q.    And if you go to the second page, this

 3    is the section of the website that's entitled,

 4    About Us, correct?

 5        A.    Correct.

 6        Q.    And it begins by saying, "East Coast

 7    Auto Appraisers specializes in providing

 8    independent and accurate appraisals of cars,

 9    trucks, motorcycles, boats, RVs and other

10    motorized vehicles."  Do you see that?

11        A.    Yes.

12        Q.    And it says, "Owner Jason Merritt has

13    developed an array of professional skills over

14    the years which enables East Coast Auto

15    Appraisers to provide the most thorough and

16    accurate appraisals in the area."  Do you see

17    that?

18        A.    I do.

19        Q.    Now, in your view, does East Coast

20    Appraisers provide thorough and accurate

21    appraisals?

22        A.    I believe we do.

23              (Merritt Exhibit No. 16, a printout of

24    the "Our Services" section of East Coast Auto

25    Appraiser's website, was introduced.)

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 45

1    BY MR. CASHDAN:

2        Q.    Let me hand what's been marked as

3    Exhibit 16.  Take a moment to review it and let

4    me know when you're ready.

5        A.    I am ready.

6        Q.    Do you recognize Exhibit 16 as a portion

7    of your company's website discussing the services

8    that the company provides?

9        A.    I do.

10       Q.    And there's a list of different types of

11   appraisals that runs the bottom of the first page

12   and all of the second page, correct?

13       A.    Correct.

14       Q.    And -- and does East Coast Auto

15   Appraisers provide all those different types of

16   appraisals?

17       A.    It's been a little while since I've gone

18   over my website, so I want to make sure.

19             Yes, I believe we still do.

20       Q.    Okay.  Do you personally provide all

21   those types of appraisals?

22       A.    Yes.

23             (Merritt Exhibit No. 17, a printout of

24   the "What is An Appraisal section of East Coast

25   Auto Appraiser's website, was introduced.)

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 46

1   BY MR. CASHDAN:

2       Q.    Okay.  Let me hand you what's been

3   marked as Exhibit 17.  Do you recognize Exhibit

4   17?

5       A.    Yes.

6       Q.    What is Exhibit 17?

7       A.    Another excerpt from our website.

8       Q.    And this is the section on your website

9   entitled, "What Is An Appraisal," correct.

10      A.    Yes.

11      Q.    Who wrote this?

12      A.    I do not know.

13      Q.    Okay.  It begins by saying, "What

14  exactly is an appraisal."  Do you see that?

15      A.    I do.

16      Q.    And the first sentence says, "East Coast

17  Auto Appraisers follows a detailed, comprehensive

18  process when conducting an appraisal."  Do you

19  see that?

20      A.    I do.

21      Q.    And is that true?

22      A.    Yes.

23      Q.    What do you mean by a "Detailed,

24  comprehensive process for conducting appraisal"?

25      A.    Follow our methodology of each step of

1   the appraisal.

2        Q.    What is that methodology?

3        A.    Methodology would be -- I'd have to

4   refer to my templates -- but I use a comparable.

5   I use multiple comparables.  Vehicle -- depends

6   on the vehicle that I'm appraising and the exact

7   appraisal that I'm doing as far as what my

8   methodology is.

9        Q.    What makes it comprehensive?

10       A.    Comprehensive, in my mind, would mean

11  step by step and detailed.

12       Q.    What do you mean by "detailed"?

13       A.    Down to options, mileage, color.  You

14  know, some vehicles, the value of it may not be

15  listed as far as color, but some vehicles have,

16  you know, a higher cost just because of the color

17  and the values may be more because of the color;

18  the different options in a vehicle.  I -- I take

19  time to -- to look at the vehicle's condition,

20  the -- as far as the use of the vehicle, even

21  down to minor details as far as any paint

22  repairs, any replacements of body panels.  There

23  may not be an accident history on Carfax, but I

24  can view the vehicle to see if there's been any

25  prior repairs or bodywork.  I try to make it as

Jason Merritt                                            April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 48

 1   comprehensive as I can.

 2        Q.   Do you typically see the actual vehicle?

 3        A.   I typically do, yes.

 4             COVID has, obviously, changed that a

 5   little bit, but my preference is to actually see

 6   the vehicle and have interaction with the

 7   vehicle.

 8        Q.   The -- the last sentence on the

 9   first page that runs over to the second says,

10   "Other factors, depending on the purpose of the

11   appraisal, may include an assessment of the areas

12   of supply and demand of the specific make and

13   model of the vehicle."  Do you see that?

14        A.   Yes.

15        Q.   Do you, in fact, do a -- an assessment

16   of the areas of supply and demand of the specific

17   make and model of the vehicle in connection with

18   certain detailed and comprehensive appraisals?

19        A.   Yes, I do.

20        Q.   And how do you do that?

21        A.   Well, that could be just through

22   looking at comprehen -- or at comparables.  I'm

23   sorry.  Looking at comparables, and are there any

24   comparables in that area.  Are there any

25   available for sale in that area.  If there are,

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 49

1   obviously, the market is heavier in that area so

2   the value may not be as much as a vehicle that is

3   more rare or more difficult to locate.

4        Q.   Can you just take one appraisal and then

5   use it for every other car you appraise?

6        A.   No.

7        Q.   Why not?

8        A.   I use it as a template, but each car is

9   different.  A 1999 Chevy pickup truck is going to

10  be completely different than a 2020 Dodge Ram.

11       Q.   Okay.  Is every 2020 Dodge Ram going to

12  be the same?

13       A.   No.

14       Q.   Why not?

15       A.   Again, different options, different

16  variables in the engine, the horsepower, the

17  drive train.  Could be the rear-end ratio could

18  be totally different.  You could have 4.10 gears

19  in the back of a -- a Dodge.  You could have

20  3.83s in the back of a Dodge, depending on what

21  you're doing with it.  You could be towing a

22  trailer.  A three -- three-quarter ton truck

23  could be many variations.  A three-quarter ton

24  truck is normally a heavier-duty vehicle -- mid

25  to heavy.  However, again, it could be four-wheel

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 50

```
 1   drive, it could be something used to pull a
 2   trailer, or it could be something used to plow a
 3   driveway with or plow a parking lot.  So the uses
 4   and variations in that three-quarter ton Dodge
 5   20 -- 2020 vehicle could be different from
 6   another one.
 7        Q.   Does -- does it change over time, too,
 8   in terms of how you appraise a vehicle?
 9        A.   Absolutely.
10        Q.   Do you have to take into account was
11   it in what year -- what year the appraisal is
12   happening?
13        A.   Yes.
14        Q.   Does that affect the supply and demand
15   aspects of the market --
16        A.   Yes.
17        Q.   -- that you referenced?
18        A.   It does.
19        Q.   So when you say "detailed," is it your
20   practice to take into account the individualized
21   factors of each vehicle in appraising its value?
22        A.   I do.
23        Q.   Is that the best way to do an appraisal?
24        A.   I believe so.
25   ///
```

Jason Merritt                                                            April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                                    Page 51

     1              (Merritt Exhibit No. 18, a printout of
     2       the "Diminished Value Page" section of East Coast
     3       Auto Appraiser's website, was introduced.)
     4       BY MR. CASHDAN:
     5          Q.    Let me hand you what's been marked for
     6       identification as Exhibit 18.
     7              Have you seen this before?
     8          A.    Yes.
     9          Q.    What is Exhibit 18?
    10          A.    It is one of the pages from our
    11       Diminished Value Page on our website.
    12          Q.    Okay.  So this is another tab on
    13       your -- your website -- your company's website?
    14          A.    Correct.
    15          Q.    Okay.  And this is providing a couple of
    16       case studies for appraisals of vehicles, correct?
    17          A.    Correct.
    18          Q.    The first case study that's attributed
    19       to Ben Z. from Hudson, New York, --
    20              Do you see that one?
    21          A.    I do.
    22          Q.    -- involves a 1992 Toyota MR2.
    23          A.    I do remember that one.
    24          Q.    And it indicates that it was a total
    25       loss, correct?

Jason Merritt                                                     April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 52

1       A.    Correct.

2       Q.    And it says, "East Coast Auto did a

3    thorough analysis and, after extensive research,

4    established a comprehensive value for the car."

5    Do you see that?

6       A.    I do.

7       Q.    Why did you do a "thorough analysis"?

8       A.    The reason I did a thorough analysis is

9    because it was a very difficult vehicle.  1992

10   MR2s were very rare and very limited in the U.S.

11   in 1992.  You can find multiple 1991 Toyota MR --

12   MR2s that are the same body style.  So they

13   were offered $5,900 for the nine -- in the used

14   comparables of 1991 Toyota MR2s.  This, however,

15   was a 1992 and had a four-speed with a sunroof.

16   There was less than 15 imported in the U.S. in

17   1992, so it was a very rare car.  I tracked down,

18   did all kinds of studies through Toyota, through

19   the Toyota Collector's Association, through some

20   enthusiast groups, to track down the history of

21   the vehicle, to find out how many were still in

22   existence.  We figured less than six in

23   existence.

24      Q.    Wow.

25      A.    So it was very comprehensive.  It took

Jason Merritt                                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 53

1    me a long time.  And the $5,900 that was offered
2    for the vehicle was extremely low.
3         Q.   How long did it take you to do this
4    thorough analysis?
5         A.   About two weeks.
6         Q.   Is that longer than typical?
7         A.   Typical, yes.  Yes.
8         Q.   How long, typically, does --
9         A.   Typically a -- an average appra --
10        Q.   -- an average appraisal take?
11        A.   I'm sorry.  I did over -- average
12   appraisal will usually take me a couple days.
13        Q.   So still a significant amount of time?
14        A.   It is.
15        Q.   It's not something you can do in
16   20 minutes?
17        A.   No.
18        Q.   And in this particular instance
19   involving Ben Z's 1992 Toyota MR2, you had to
20   take into account a number of individualized
21   factors to properly value the vehicle; is that
22   right?
23        A.   I did.
24        Q.   Is that always the case?  Do you always
25   have to take individual factors into account when

Page 54

```
 1   you value a vehicle?
 2        A.   I can't say that broadly, because it
 3   depends on the vehicle.
 4        Q.   Well, for every vehicle, you need to
 5   take into account the individual characteristics
 6   of that vehicle --
 7        A.   Correct.
 8        Q.   -- for valuing it; is that right?
 9        A.   Correct.
10        Q.   So in every instance you have to take
11   some individualized factors into account,
12   correct?
13        A.   Every appraisal.  Yes, that is safe to
14   say.
15        Q.   Okay.  You've never done an appraisal
16   where you ignored the individual characteristics
17   of the vehicle, have you?
18        A.   No.  Again, COVID made things a little
19   different.  You know, some appraisals were done
20   not into that comprehensive in depth because I
21   couldn't go to see it, and I'm not really
22   comfortable with a real comprehensive appraisal
23   without being able to be there.
24        Q.   But even during COVID, you did your best
25   to take into account the individualized factors
```

Jason Merritt                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 55

1    relating to a particular vehicle for purposes of

2    appraisal, correct.

3         A.    Absolutely.

4         Q.    Okay.  Let's go ahead and turn to

5    Exhibit 6.

6              You can put these to the side.  We're

7    not going to go over those anymore.

8              What is Exhibit 6?

9         A.    Exhibit 6 is, kind of, a general actual

10   cash value template that I will start with,

11   mainly because of the -- the fonts and the way

12   the pages are set up.  And a lot of the

13   information in there is just, kind of, my

14   boilermaker template that I would start with.

15        Q.    Is this the template you currently use

16   at East Coast Auto Appraisers?

17        A.     That is probably the one that I

18   originally started with.  That is the original

19   main template, yes.

20        Q.    Okay.  You -- you currently still use

21   this as a template?

22        A.    Yes.

23        Q.    Okay.

24        A.    Again, it's the -- the way it's set up

25   with my lining and the text and all is what I

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 56

1   use.

2        Q.    Okay.  If you go to the second page,

3   for Appraisal Type it says "Restricted Use

4   Appraisal."  Do you see that?

5        A.    I do.

6        Q.    What is a "Restricted Use Appraisal"?

7        A.    In other words, I'm using it for fair

8   market value, actual cash value.  That's --

9   that's the use of this appraisal.

10        Q.    Okay.  And the appraisal method and

11   technique used, it says Sales Comparison

12   Approach.  Do you see that?

13        A.    I do.

14        Q.    Is that the comparable vehicle approach

15   you discuss in your expert report?

16        A.    It is.

17        Q.    Okay.  It's just another name for the

18   same thing?

19        A.    Correct.

20        Q.    Are there other types of appraisal

21   methods you might use in a typical appraisal for

22   a vehicle?

23        A.    Normally, apprai -- the -- my approach

24   normally is comparison.

25        Q.    Okay.  There's a -- a paragraph that

Jacob Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 57

1    says, "IACP Certified Actual Cash Value

2    Appraisal."  Do you see that?

3        A.    I do.

4        Q.    And it begins by saying, "The vehicle is

5    rated to be in above-average condition for year,

6    make, model and mileage."  Do you see that?

7        A.    I do.

8        Q.    And then you discuss the condition of

9    the exterior, the interior and a whole host of

10   aspects of the vehicle, correct?

11       A.    Correct.

12       Q.    How do you conduct the rating of the

13   condition of the vehicle for purposes of these

14   appraisals?

15       A.    Again, that -- that first sentence

16   is kind of like a -- an evidentiary finding, I

17   guess you could say.  I would say I used all the

18   conditions below that first paragraph.  What

19   this template doesn't show is it could go into

20   multiple other paragraphs.  So my first sentence

21   is just, kind of, a -- a wrap-up of all the other

22   conditions that I bring into factor.

23       Q.    And is this just based on whatever

24   representation the customer has provided to you?

25       A.    Yes.

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 58

1        Q.   What I mean is, the customer says, "my

2    vehicle is in excellent condition."  Do you just

3    take that at face value?

4        A.   Oh, no.

5        Q.   Okay.  So it's not based just on

6    whatever the customer represents to you.

7        A.   Well, when I say that, the customer

8    represents the vehicle to me, so --

9        Q.   Okay.  I was unclear, and I apologize.

10            Do you base your condition rating on the

11   customer's statements to you about the condition

12   of his or her vehicle?

13       A.   I take that into account, because

14   I actually do a history on the vehicle.  So

15   sometimes I will rely on the customer to provide

16   me historical details.  It depends on the

17   vehicle.  I believe this was -- I don't -- it

18   looks like a older vehicle.  So I will do

19   -- yeah, it looks like '65 Corvette is what the

20   template is.  So a '65 Corvette, obviously, I

21   will do a complete historical analysis.  I'll

22   even call past owners, prior owners.

23       Q.   Why?

24       A.   To get the full history of the vehicle:

25   How many owners in the past; how many people

Page 59

1   owned it; what it was used for; if it has been

2   painted in the past and wrecked in the past.  His

3   grandfather owned it, kept it in a garage.  I try

4   to verify mileage.  I try to verify options.  A

5   1965 Corvette, you translate the VIN and you

6   come up with different options, different

7   horsepowers, different drivetrains, so I try to

8   verify that if it doesn't give me that in the

9   VIN.  So -- but I will rely on some of the

10  customer's historical lineage that they can

11  give me.

12      Q.   So you'll do a whole investigation of

13  the vehicle?

14      A.   I'm a cop, so that's kind of -- I do an

15  investigative approach, as well as my comparison

16  is an investigation.

17      Q.   And you -- and you have found that that

18  is the best way, in your practice, to provide a

19  detailed and comprehensive appraisal?

20      A.   I believe it gives me a very

21  comprehensive appraisal.  May not be the best for

22  time wise, you know.  I'm probably putting a lot

23  more time in it than what someone else would do.

24  But at the end of my appraisal, I am very

25  confident and I know that number is a good

Jacob Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 60

1    number.

2        Q.    Okay.  At the -- the last sentence

3    of that paragraph we were discussing says,

4    "Condition adjustments were made, if any, and

5    taken into consideration."  Do you see that?

6        A.    Yes.

7        Q.    How do you decide how to take condition

8    adjustments into consideration in terms of dollar

9    impact?

10       A.    Dollar impact?  The conditions would

11   be -- there's a whole large amount of conditions

12   that can be taken into consideration.  What I

13   would normally do on just -- let's use the 2020

14   Dodge Ram as an example.  If it seems like

15   everything and appears that the seats are in good

16   shape, the carpet in good shape, no prior damage,

17   just the standard vehicle without any issues,

18   there's no adjustment in condition then.

19           If you go in there and there's damage

20   on the vehicle, but you see prior damage from a

21   prior accident maybe that was never reported, so

22   there's diminished there.  If you go in there

23   and there is a big thing of hair dye dumped on

24   the floor, you know, well, I take that into

25   consideration because the carpet may cost

Page 61

1    $450 to replace.  So that is a real

2    consideration.

3        Q.    And -- and how do you -- strike that.

4              Once you have evaluated the condition

5    of the vehicle comprehensively and you need to

6    decide by how much to reduce the value of the

7    vehicle because it's not in average condition,

8    what steps do you take to assign a dollar value

9    to the adjustment --

10       A.    It could be actual dollar amount of what

11   it would cost to replace that carpet.  It could

12   be that.  I will take into consideration the

13   labor and the parts, just like I did at the

14   dealership.  When I would evaluate a 2020 Dodge

15   Ram, if we brought it in, I would say, okay,

16   here's what this vehicle is worth.  It is worth

17   $20,000, just -- probably more than that, but

18   just a round number; however, it needs, this,

19   this and this, which is going to cost $1,500.

20   So that reduces the value of that vehicle by

21   $1,500.

22       Q.    Okay.  Let's say, for example, there's a

23   couple scratches in the paint.  If you were going

24   to adjust for condition based on that, would it

25   be the cost to repair the scratches or just the

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 62

1    diminished value of the vehicle because of the

2    scratches?

3        A.    Normally it would be the -- the -- the

4    cost of the repairs.

5        Q.    Okay.  And how do you determine at any

6    given point in time the cost of the repairs?

7        A.    It depends on what the repairs are.  I

8    could look up the price and the -- the labor,

9    or I can call a body shop and ask them for

10   refinishing of this panel.

11       Q.    So sometimes you'll actually reach out

12   to body shops --

13       A.    Oh, yes.

14       Q.    -- to get the information you need to

15   make the condition adjustments for an individual

16   vehicle?

17       A.    Correct.

18       Q.    Okay.  It looks like -- in this

19   template, it indicates three comparable vehicles.

20   But, in any event, as part of your normal process

21   you look for some number of comparable vehicles,

22   correct?

23       A.    Correct.

24       Q.    This says, "Total of three compar --

25   comparable vehicles were located within a

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 63

1   thousand-plus mile radius of stated principal

2   garage."  Do you see that?

3        A.   I do.

4        Q.   Is the thousand-mile-plus radius

5   typical?

6        A.   No.

7        Q.   Is it going to vary based on the

8   availability of comparable vehicles?

9        A.   Normally, I would never use a thousand

10  miles unless it's a very -- like the MR2.  I

11  think that MR2 I had to go nationwide to find

12  something in the U.S.  But normally I would use

13  25 to a hundred miles.

14       Q.   But -- but as I understand it, you'll

15  continue to expand that radius as necessary to

16  find comparable vehicles?

17       A.   I try not to.  Again, sometimes I'm

18  forced to on some rare vehicles.  But, like, a

19  2020 Dodge Ram, no.

20       Q.   But you'll continue to move outward from

21  wherever the vehicle is principally garaged until

22  the minimum industry-accepted standard of two or

23  more comparable vehicles has been identified,

24  correct?

25       A.   Sometimes I will have to.  If I do that,

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 64

1   I try to limit my, maybe not mileage, but I will
2   also go with, I know this sounds crazy, but
3   terrain.  Is the vehicle -- as you know, New York
4   City, Washington, D.C., the vehicles are more
5   abused there than, say, Cumberland.
6           So if I have to go outside of Cumberland
7   and outside of a hundred mile radius, I will try
8   to find locations that are comparable to
9   Cumberland, Maryland.
10      Q.   So you'll take into account the
11  individualized factor of where the vehicle is
12  being used --
13      A.   Correct.
14      Q.   -- to find a -- an area that -- that
15  simulates the condition?
16      A.   Yes.
17      Q.   And it's going to vary based on vehicle?
18      A.   Correct.  Like I said, I -- if I'm
19  looking for a 2020 Dodge Ram, most likely, I
20  don't have to go far.  Most later-model vehicles
21  you don't have to go far.
22      Q.   But -- but if somebody contacted you
23  from New York City and they wanted an appraisal
24  of the vehicle, --
25      A.   Mm-hmm.

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 65

1      Q.    -- you'd want to find vehicles that

2    operated in a city-like setting rather than

3    rural?

4      A.    Correct.  If someone from New York

5    City called me, I would look in New York City.

6    I probably wouldn't even go beyond New York City.

7    If I couldn't find that, then next thing I would

8    probably go to Washington, D.C., and look for

9    that.

10     Q.    If somebody had a vehicle in New York

11   City, you wouldn't go to rural Upstate New York?

12     A.    No.

13     Q.    So you have to take that individual

14   factor into account?

15     A.    Correct.

16     Q.    Okay.  And into account for purposes of

17   appraising the value of the vehicle?

18     A.    Correct.

19     Q.    Okay.  If you go down, there's a box

20   that says "Comparable Breakdown."  Do you see

21   that?

22     A.    Yes.

23     Q.    And one of the things it says, "List

24   versus Take Adjustment."

25     A.    Yes.

Page 66

```
 1        Q.    What is that?
 2        A.    List verse Take Adjustment would be --
 3   I don't normally ever use this unless I have a
 4   specific antique car or older car that I will
 5   call the seller, and that normally would only
 6   take place when I'm dealing with private sales:
 7   Facebook, eBay, any of those online places where
 8   I see a 1957 Chevy Bel Air.  I saw one for sale,
 9   so I just called the guy and told him what I'm
10   doing:  "I'm doing appraisals.  I saw you have a
11   '57 Chevy Bel Air for sale.  Did you sell it?
12   Yes, I sold it.  Do you mind me asking what you
13   got for it?"  Well, I was using him as a
14   comparable, and I found out that he listed
15   it for $25,000 but sold it for 26.
16        Q.    You want to get the accurate
17   information --
18        A.    Correct.
19        Q.    -- about what the market valued that
20   vehicle rather than what the seller hoped
21   to -- to get for the vehicle, correct?
22        A.    On private sales, yes.
23        Q.    Okay.  And that's why you will
24   sometimes, when you think it's appropriate, make
25   a -- an adjustment for the list price versus the
```

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 67

1    actual sold price, correct?

2         A.   I think I've done that on that one

3    occasion, and that's really -- it's in the

4    template, and that's the reason I leave it in the

5    template is for that and just to show that I have

6    checked into that.

7         Q.   Okay.  Let -- let's -- going down to the

8    bottom of this template, all right, there's three

9    vehicles listed as comparables, correct?

10        A.   Correct.

11        Q.   Hypothetically, if for one of those

12   vehicles -- well, strike that.

13             I'll do it later.  I -- we'll -- when we

14   have actual dollar amounts, let me -- I'll come

15   back to that.

16             In the middle of the document it says

17   Fair -- on that page, it's "Fair Market Value of

18   Your Auto."  Do you see that?

19        A.   Correct.

20        Q.   And it says "Formula and market quotes

21   average weighted by 2.0."  Do you see that?

22        A.   Yes.

23        Q.   What does the "weighting" mean?

24        A.   That would be the "divided by," really.

25        Q.   Why is it divided by 2.0?

Jason Merritt                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 68

1        A.    That was when there was only two

2    comparables there.  Again, this is just a

3    template.  That -- I would -- I would fix all

4    of that as I do my actual --

5        Q.    Okay.  So this is -- this is saying

6    that you take the comparables, you figure out the

7    average price of the comparables; is that right?

8        A.    The average price of the comparables

9    and then with my current lo -- the conditions,

10   whatever I move down for commissions -- or

11   conditions, mileage, adjustments, stuff like

12   that.

13       Q.    Okay.  Let's go to the next page.

14   There's a section that says, "the appraisal

15   methodology," do you see that?

16       A.    Yes, I do.

17       Q.    And the third paragraph says, "The first

18   part of our industry-recognized methodology is

19   that we review several nationally recognized

20   valuation guides in determining what the fair

21   market value of the vehicle in scope is worth

22   before we contact local dealers and private

23   sellers."  Do you see that?

24       A.    I do.

25       Q.    Which guides do you tend to consult?

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 69

1       A.    I wrote down here on the last paragraph

2    we use NADA.  I'll use Kelley Blue Book, Auto

3    Trader, Carfax.  Bumper is a new one.  I use a

4    lot of those different ones just to see where

5    they're all falling and where they're all at from

6    that zip -- zip code, and then that's where I go

7    from there.

8       Q.    So for a particular vehicle, do all of

9    those sources of estimating value come up with

10   the precisely same dollar amount for a single

11   vehicle?

12      A.    No.

13      Q.    Does that concern you that they don't

14   have a single dollar amount for the vehicle?

15      A.    I wish they did.  That would make things

16   a lot easier, but, no, they do not.

17      Q.    Why don't they?

18      A.    I don't know what their -- I don't know

19   what their algorithms or what their -- their uses

20   are.  I don't even know where their data comes

21   from.

22      Q.    But it's your experience that all those

23   different guides for a particular vehicle on a

24   particular day at a particular time will have

25   different values?

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 70

1      A.    They do.

2      Q.    And your job as an appraiser is to use

3  your expertise, looking at the individualized

4  factors for that vehicle at that time, and

5  estimate the value, correct?

6      A.    I take my investigative experience and

7  I mix that with my enthusiastic following of

8  vehicles and my experience of dealing with so

9  many vehicles throughout my entire life, and

10  that's what I combine, all of that knowledge and

11  expertise with, as well as the youth of -- use of

12  all these different internet databases.

13      Q.    And, in the end, your appraisal is your

14  opinion --

15      A.    Yes.

16      Q.    -- based on those factors, correct?

17      A.    I like to think it's probably the best

18  opinion.

19      Q.    But am I correct that it's an opinion,

20  not fact?

21      A.    It is, without a doubt, an opinion.

22      Q.    Okay.  And am I correct that,

23  hypothetically, if we had all the people in your

24  office do an appraisal on the same vehicle at the

25  same time, independently, it's possible you might

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 71

1    come up with different numbers, different values?

2         A.    I would say that is fair.  I've had

3    other appraisals [sic] call me over appraisals

4    that I've done and ask for how I determined

5    that and come up with a -- a number, and we've

6    discussed that, so I've had conversations.  But,

7    yes, when you're dealing with opinions, everyone

8    has one.

9         Q.    And -- and just because multiple

10   appraisers appraising the same vehicle at

11   the same time would come up with a different

12   estimated value, it doesn't mean any one in

13   particular is wrong, does it?

14        A.    I like to think there is, yes.

15        Q.    I guess what I'm asking is, would

16   you agree with me that in appraising vehicles,

17   there's a range that might be accurate, and, if

18   you're within that range, then it's a fair and

19   reasonable appraisal?

20        A.    Within a range, yes.

21        Q.    Not a single dollar amount, but a range

22   would be appropriate?

23        A.    I would say, yes.  You -- I -- you would

24   have a hard time getting everyone to come up to a

25   single dollar amount.

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 72

1        Q.    That's my point.

2        A.    Correct.

3        Q.    Okay.

4        A.    But within variation is reasonable.

5        Q.    And you agree with that?

6        A.    Correct.

7        Q.    You're going to experience -- in --

8    in applying the judgment necessary to appraise

9    a vehicle, using this very detailed and

10   comprehensive methodology that you apply, there

11   will be differences in the outcome and that can

12   be reasonable as long as the methodology that's

13   been used is appropriate?

14       A.    If I use the MR2 as an example, the

15   insurance company called me back and wanted to

16   argue over that -- that vehicle, and they came up

17   with the $5,900.  Again, we -- we're dealing with

18   a very small-priced vehicle.  But they wanted to

19   settle out at half price between my agreement and

20   there's, and I said, "Absolutely not.  I -- I

21   will not agree to anything other than the number

22   I came up with."  And they said, "well, how'd you

23   come up with that number?"  And I said, "Well,

24   comprehensive investigation."  And she said,

25   "Well, there's no 1992 MR2s to compare it to."

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 73

1    I said, "Exactly."  So she said, "Well, then how

2    did you come up with your number?"  I said, "How

3    did you come up with your number?"  And we argued

4    back and forth and she came back and said, "Well,

5    I called my supervisors, they looked at it and

6    they said how about 10,000?"  I said, "No, the

7    $11,900 is where that vehicle is worth."  And

8    they came back another couple days later and

9    said, "You're right.  We're going to sign off on

10   it."

11        Q.   Sure.  But if another appraiser

12   had called you up and said, "We've done a

13   comprehensive analysis of that same vehicle and

14   we think it's actually $11,700."

15        A.   If it was $200 off, I would probably

16   agree.

17        Q.   And if somebody had called you up

18   and said, "It's actually $12,100," would your

19   reaction have been, "Well, that's wrong"?

20        A.   Again, if it's within a couple bucks

21   here or there, I will agree to it.

22        Q.   Okay.  And -- and that's true of every

23   vehicle, correct?

24             MR. LOWTHER:  Object to form.

25             THE WITNESS:  Again, a couple

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 74

1    dollars here or there.  I'm talking only a couple

2    dollars.  And to say "every vehicle," I -- I

3    can't say every vehicle.

4    BY MR. CASHDAN:

5        Q.   Well, you think there are some

6    vehicles, when they're appraised by professional

7    appraisers, everyone should come up with the same

8    to-the-dollar estimate?

9        A.   Oh, I don't think that's possible.

10       Q.   Okay.  So would you agree with me that,

11   for every vehicle, if an appropriate appraisal is

12   being done, there can be a range of values that

13   are fair and reasonable estimates of the value of

14   the vehicle?

15       A.   State that again for me.

16       Q.   Yes.

17            For every vehicle, if a -- if an

18   accurate appraisal has been done, the end

19   result can be a range of values for the vehicle?

20       A.   Before I would say yes to that I would

21   really need to know the range of it.

22       Q.   I understand that -- that -- that --

23   that the -- the range would have to be within

24   some amount that you think is appropriate, but do

25   you agree with me that the end result would be a

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 75

1   range and not a single dollar amount?

2       A.   Correct.  That would be a correct

3   statement.  And, again, the vehicle depend -- it

4   depends on the vehicle.  A Toyota MR2 is the only

5   one I'll use as an example because it's so rare,

6   so the comparables were so difficult to come up

7   with.  So if you -- if they would have come back

8   -- in my mind, when -- when you said 200, that's

9   exactly what my number was; however, on a 2020

10  Dodge, we would have to be very close.  I'd say

11  $50 here or there.

12      Q.   In your experience, do the NADA guide,

13  the Kelley Blue Book and other valuation guides

14  all come within $50 of valuing a vehicle?

15      A.   No.

16      Q.   They can be off by much more than that,

17  correct?

18      A.   Correct.  Yes.

19      Q.   And in your view, therefore, are some of

20  those guides inaccurate?

21      A.   I can't say inaccurate, because I don't

22  know what variables they're using.  You know, if

23  they're using a very broad stroke of nationwide

24  prices, they're using nationwide prices.  I'm

25  using specific, you know, areas of value.

Jason Merritt                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 76

1       Q.   Okay.  And for -- for private sellers,
2    your view is that you have to contact them to
3    figure out how much they actually sold the
4    vehicle for versus what they listed the -- the
5    vehicle for, correct?
6       A.   No.  No.  I don't normally do that.
7       Q.   Okay.  Well, go to the third page of
8    Exhibit 6, please.
9            Do you see the paragraph that says,
10   "Why Contact Private Sellers"?  Do you see that?
11      A.   Yes.
12      Q.   And it says in the second sentence,
13   "Private sellers have been statistically proven
14   to take a greater loss on the fair market value
15   of the auto needing to move it quickly.  If this
16   statement is not true, how many people have you
17   encountered that have sold their automobile for
18   the original asking price."  Do you see that?
19      A.   Yes.
20      Q.   Is that accurate?
21      A.   I would say the blanket statement is
22   accurate, but I am learning over the last year
23   that is changing significantly.
24      Q.   Before the last year, was it accurate?
25      A.   It was generally accurate, but, again,

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 77

 1  contacting private sellers would have been just

 2  looking at their advertised prices.  You know, we

 3  have Facebook Marketplace, eBay and stuff like

 4  that.

 5      Q.   So before the last year it would have

 6  been generally accurate to say that private

 7  sellers take a greater loss on their market value

 8  of their automobile and sell the automobile for

 9  less than the asking price, correct?

10      A.   Correct.  And there's several statements

11  that -- that I take that into account.  You know,

12  they don't have warranties; they don't have

13  detailing; they don't have inspections, they

14  don't have history; they don't -- you know.  So

15  private sellers will take less than market value

16  on some of them because they don't have all of

17  that.

18      Q.   And they'll take less than they're

19  asking for the vehicle, correct?

20      A.   Well, again, that -- I've run into some

21  where a '57 Chevy took more than ask -- asking

22  price, and occasionally you'll find some that do

23  take less, yes.

24      Q.   Generally, prior to this year, that was

25  your experience, that private sellers would be

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 78

1   willing to take less than the original asking

2   price?

3        A.   I honestly can't say that.

4        Q.   Well, didn't you say that in this

5   document --

6        A.   Yes.

7        Q.   -- we're looking at?

8        A.   Yes.

9        Q.   This is the document you use as a

10  template for the detailed and comprehensive

11  appraisals you performed, correct?

12       A.   Yes.  But I'm just saying you can't say

13  a general statement that all of them take less,

14  but, generally, they do.

15       Q.   Thank you.

16            Now, with regard to the research

17  valuation guides, the last paragraph on the page

18  we're looking at says that it's a good starting

19  point to determine -- strike that.

20            In the last paragraph on that page with

21  regard to research valuation guides, you say in

22  the second sentence that, "Research starting

23  guides are a good starting point to determine

24  if a buyer or seller should buy or sell a vehicle

25  more or less than what it is worth or vice

Jason Merritt                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 79

1    versa."  Do you see that?

2        A.    Correct.

3        Q.    Why would a buyer or a seller buy or

4    sell a vehicle for more or less than it is worth?

5        A.    More or less?  Less, obviously, would be

6    conditions: Mileage, color.  You know a '20 Dodge

7    Ram, a black one, obviously, would probably be

8    worth every bit of its market value.  You throw

9    in a canary yellow one, you know, it may not be

10   as valuable.  More than?  Again, market value on

11   a 2021 Stingray right now is $110,000, when the

12   MSRP is 83.

13       Q.    So when you say, "more or less than

14   what it is worth," you're talking about what

15   it's worth --

16       A.    Referring to these --

17       Q.    -- in -- in average condition based on

18   the guides?

19       A.    When I say -- yeah.  The guides only

20   give you, like, NADA, Kelley Blue Book.  They're

21   not asking you for vehicle history, all of that.

22       Q.    And they don't actually -- strike that.

23            The guides tell you to take condition

24   into account but don't actually do it for you?

25       A.    I -- I consider them only a guide.

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 80

1      Q.   Okay.  And -- and so when you say that

2   people would -- "buyers and sellers should buy or

3   sell a vehicle for more or less than what it is

4   worth," you don't mean what the vehicle is

5   actually worth.  You mean what the guides --

6      A.   Correct.

7      Q.   -- have suggested is the retail market

8   value?

9      A.   Correct.  When I'm talking worth, I'm

10   talking about what these different corporations,

11   through their websites, say.

12     Q.   So -- so in your experience, you have to

13   make adjustments to whatever the guide suggests

14   the value of a vehicle is based on the actual

15   individual characteristics of the vehicle?

16     A.   Correct.

17     Q.   Okay.  If you go to the next page

18   of this Document Number 6, this has some

19   definitions, correct?

20     A.   Yes.

21     Q.   And -- and the third definition is for

22   the term fair market value.  Do you see that?

23     A.   I do.

24     Q.   And can you read the last sentence out

25   loud of that section, please?  It begins "market

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 81

1   value."

2       A.   It means that --

3       Q.   Can you read it out loud?

4       A.   You said do read it out loud?

5       Q.   Yes.  Read it out loud.

6       A.   Okay.  Market value is generally

7   established, if possible, based on sales of

8   similar property in the same locality.

9       Q.   And is that your understanding of

10  the -- the best way to establish the market value

11  of comparables in the area?

12      A.   Yes.

13      Q.   Okay.  If you can go to the last

14  -- strike that.

15           Go -- go to the third-to-last page of

16  Exhibit 6.  It's -- sorry.  Fourth-to-last page.

17  It has at the top Certification of Credibility.

18      A.   Okay.

19      Q.   Okay.  Do you see that?

20      A.   Yes.

21      Q.   All right.  What is this page?

22      A.   Again, this was part of the template,

23  and this was just a -- I guess an overview of

24  what the appraisal practices are.

25      Q.   Okay.  And the first bullet point,

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 82

1    checkpoint, says, "The methods and calculations
2    used in this report are the unbiased opinion of
3    an experienced and qualified professional and
4    are limited only by the reported assumptions
5    and limitations."  Do you see that?
6         A.   Yes.
7         Q.   So this is consistent with what you said
8    earlier, that -- that the estimate of value is
9    just an opinion?
10        A.   Correct.
11        Q.   If you go down about, oh, three-quarters
12   of the way on the checkmarks, there's one that
13   says, "I did perform a physical inspection of
14   the vehicle that is the subject of this report."
15   Do you see that?
16        A.   Yes.
17        Q.   Why is it important to you that
18   you -- you certify that you performed a physical
19   inspection of the vehicle?
20        A.   I don't always have that on there.
21        Q.   Okay.  But is it important for you to do
22   that when possible?
23        A.   I try to, yes.
24        Q.   Why?
25        A.   Just so that I feel more comfortable

Jason Merritt    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 83

1    with the appraisal, that I'm not missing

2    anything.

3        Q.    Okay.  The -- the last full paragraph

4    says, "East Coast Auto Appraisers' valuations

5    are based on estimate and vehicle information

6    believed to be authentic, reliable and accurate."

7    Do you see that?

8        A.    Yes.

9        Q.    What do you mean, "Based on estimate and

10   vehicle information believed to be accurate or

11   authentic"?

12       A.    Appraiser valuations are based on

13   estimate and vehicle information believed to be

14   -- estimate could be different work performed

15   on the vehicle or estimates that I had that tell

16   me what needs to be done on the vehicle, as I

17   mentioned the body panels, stuff like that, any

18   type of estimates that are brought into it.  And

19   then any of the vehicle information, VIN numbers,

20   mileage, past owners, any of that to be authentic

21   so it's reliable.

22       Q.    Okay.  The next sentence in this says,

23   "Houston Auto Appraisers has used reasonable

24   care."  Do you see that?

25       A.    Yeah.  Again, this is a template that I

Page 84

1    purchased from Houston Auto Appraisers, so theirs

2    is still in there on some of these.

3        Q.   Okay.  So -- so you didn't actually

4    write this.  You purchased it from another

5    entity?

6        A.   Correct.

7        Q.   So this entire template came from

8    Houston Auto Appraisers?

9        A.   Correct.

10       Q.   This was not your original work.  It was

11   their work that you then adjusted for your use?

12       A.   Correct.  No, I -- since then I totally

13   and completely changed a lot of the stuff in

14   here.  Some of their stuff is for different

15   states, so I look at different states.

16       Q.   Okay.

17       A.   And, again, this is a template I used

18   just because of the boilermaker template of it.

19   It just gives me kind of a base to start out in.

20       Q.   Okay.  You talk about estimates that

21   need to be made.  Is -- one of the estimates or

22   assumptions that you have to make is that the

23   -- the dealer-sold comparable vehicles are in

24   average condition?

25       A.   Yes.

Page 85

1      Q.   So for purposes of making your condition

2    adjustment in your appraisal, you adjust the

3    value of the vehicle you're appraising based on

4    its condition compared to an average vehicle of

5    the same make, model and year, correct?

6      A.   Correct.

7      Q.   And -- and you assume that the

8    comparable vehicles being sold by dealers are

9    in average condition, correct?

10     A.   Correct.

11     Q.   Do you actually inspect those comparable

12   vehicles?

13     A.   No.

14     Q.   Why not?

15     A.   As -- from my experience being in a

16   dealership, they're all reconditioned.  That's

17   a term used by dealerships to make it sound

18   better than what it is.  But they go through a

19   detail, cleaning, inspection and they run them

20   through the shop for mechanical inspection.  So

21   the baseline for my appraisals is a dealership,

22   because they have to stand by behind the vehicle

23   itself.

24     Q.   Now, let's say somebody came to

25   you after you did an appraisal and they said

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 86

1   that they actually talked to the dealer and one

2   of the comparables you've used, in fact, had not

3   been reconditioned and was in below-average

4   shape.  Would you make an adjustment to your

5   appraisal based on that?

6       A.   No.

7       Q.   Why not?

8       A.   Because, again, I wouldn't go off what

9   he's telling me.  I would have to follow up on my

10  own.

11      Q.   Well, let's say it was true.  Let's say

12  you followed up on your own, hypothetically, and

13  the dealer confirmed to you, yes, we decided not

14  to recondition that vehicle; it was not in

15  average condition when it was sold; it was in

16  below-average condition.  Would you make an

17  adjustment to your appraisal that had relied on

18  that vehicle as a comparable?

19      A.   That's very hypothetical because I

20  -- when vehicles hit the website they are for

21  sale.

22      Q.   Okay.  I know it's hypothetical,

23  and I -- I'd like an answer to the question.

24      A.   It's hard to answer a hypothetical

25  question like that.  I would probably throw that

Page 87

1   comparable out and use another comparable.

2       Q.   Okay.  So if you -- you assume the

3   comparable vehicles are in average condition if

4   sold by a dealer, and you might throw it out if,

5   in fact, the dealer confirmed it was not in

6   average condition?

7       A.   Correct.

8       Q.   Would there be instances where you might

9   not throw it out even though the dealer confirmed

10  it was not in average condition?

11      A.   No.

12      Q.   Okay.  But you're comfortable, for

13  purposes of your normal appraisals, assuming

14  that the dealer-sold vehicles are in average

15  condition?

16      A.   Correct.

17      Q.   And that's based on your experience

18  with the way dealers approach selling vehicles on

19  their lots?

20      A.   Correct.

21           MR. CASHDAN:  This is probably a good

22  time for a break.

23           THE VIDEOGRAPHER:  We're going off the

24  record.  This is the end of Media Unit Number 1.

25  The time is 10:28 a.m.

Page 88

```
 1              (Recess taken.)

 2              THE VIDEOGRAPHER:  We're back on the

 3     record.  This is the beginning of Media Unit

 4     Number 2.  The time is 10:41 a.m.

 5     BY MR. CASHDAN:

 6         Q.   I want to go back for a moment.  We were

 7     talking about the use of comparable vehicles and

 8     assuming that they're in average condition.  Do

 9     you remember we talked about that?

10         A.   I do.

11         Q.   Have you done a survey of dealerships

12     to confirm that the majority of them recondition

13     their vehicles such that they're in average

14     condition when they're sold?

15         A.   I would say my survey is working with

16     the automotive group that has 13 dealerships.

17     That would be my survey.

18         Q.   Okay.

19         A.   That would just be experience.  And

20     normally when we would take into a vehicle and

21     we'd put it in our CRM, I guess you would call

22     it, nothing would be finalized in it until that

23     vehicle was ready.  And when I say that, when

24     it's ready, when it's done the shop, when it's

25     done its detailing, then it would hit the -- the
```

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 89

1   CRM as finalized.  And when it hit as finalized,
2   it automatically populated to our website.
3        Q.   Do you have any information about the
4   practices of any other specific dealers, other
5   than the dealers associated with Timbrook
6   Automotive?
7        A.   No.  I -- I have limited experience with
8   their CRMs.  CRMs I'm just -- I don't know what
9   all the dealerships call it, but it could be
10  Lightspeed, it could be -- there are different
11  management softwares.  And most of them I have
12  researched the CRMs that the dealerships use for
13  their software, accounting, profit and loss.  And
14  I'm not talking as far as the -- the banking side
15  of it, but I'm talking the -- the inventory
16  management side, I guess you could say.
17            So I am familiar with multiple
18  platforms, and that would give me an indication
19  and give me evidence to believe that all these
20  software and platforms operate in the same way.
21       Q.   But have you done any analysis with
22  hard data that any dealership that you've used
23  for purposes of comparable vehicles, other than
24  Timbrook, in fact, has reconditioned the specific
25  vehicle you're using as a comparable?

Page 90

```
 1        A.    No.
 2        Q.    No hard data, but you assume it to be
 3   true based on your experience in the business?
 4        A.    Correct.
 5        Q.    Okay.  And that's an approach you're
 6   comfortable with?
 7        A.    Yes.
 8        Q.    Okay.  Did you talk to somebody named
 9   Michelle Lacey [phonetic] to prepare for your
10   expert opinions and conclusions in this matter?
11        A.    No.
12        Q.    Did you speak with somebody named
13   Ken Volts [phonetic] in connection with your
14   opinions?
15        A.    The only person I remember speak to is
16   Mr. Lowther.
17        Q.    Did you speak to Mr. Ken Volts?
18        A.    I don't recall him.
19        Q.    Okay.  Did you speak to Mr. Thomas
20   Gibbs?
21        A.    I don't recall him either.
22        Q.    Okay.  Did you request any specific
23   documents from counsel for purposes of preparing
24   your opinions and conclusions in this matter?
25        A.    No.
```

Page 91

```
 1        Q.   We -- we marked exhibits -- through
 2   Exhibit 14 the documents you reviewed and relied
 3   upon.
 4        A.   Yes.
 5        Q.   Do you remember that?
 6        A.   I do.
 7        Q.   Did you ask for any of those specific
 8   documents?
 9        A.   No.
10        Q.   They were provided to you by counsel?
11        A.   They were provided to me.
12        Q.   Okay.  And I'm only referring to the
13   documents that -- that were not generated from
14   your own company.
15        A.   Correct.
16        Q.   Okay.  Did you review any depositions of
17   any witnesses in this case?
18        A.   No.
19        Q.   Okay.  Did you review summaries of any
20   depositions?
21        A.   I have not seen anything deposition-wise
22   from somebody else, no.
23        Q.   Has counsel provided to you in writing
24   any summaries of the case?
25        A.   I have all of these documents.  I have
```

Jason Merritt                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 92

1   what I have given.  And I have synopsis of, I
2   believe, the expert report from other experts in
3   this case.
4        Q.   When were you provided that?
5        A.   Recently.
6        Q.   And -- and did you review that to
7   prepare for your deposition today?
8        A.   I reviewed them.  I can't really say
9   they were preparation for today.
10       Q.   But you re --
11       A.   I'm a little pigheaded.
12       Q.   But you reviewed them?
13       A.   Yes.
14       Q.   What did they say?
15       A.   I think they were talking more about
16  dealerships and sales.  Again, they really
17  weren't in my focus, really.
18       Q.   Okay.
19       A.   I don't want to be ignorant and say I
20  didn't review them very much, --
21       Q.   Yeah.
22       A.   -- but I -- this is what I'm -- this is
23  what I'm targeted on.
24            MR. CASHDAN:  We would request that that
25  document be produced.

Jason Merritt                                                     April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 93

 1              MR. LOWTHER:  He's referring to the
 2    expert reports that we've disclosed.
 3              MR. CASHDAN:  That's not what he said.
 4              MR. LOWTHER:  Well, I -- I can -- I can
 5    produce them again, we can talk about it off the
 6    record, but there -- there's no synopsis.  It's
 7    the signed reports that we produced to you, and
 8    we sent to him after they were executed and
 9    produced -- I mean disclosed.
10              MR. CASHDAN:  The witness's testimony is
11    clear, but, okay, we can talk about it off the
12    record.
13              THE WITNESS:  Well, I -- I'm not
14    real clear on it, because I'm not exactly sure
15    what he gave -- he gave me, because, again, I
16    didn't -- I didn't review them much.
17    BY MR. CASHDAN:
18         Q.   Okay.  Let's take a look at Exhibit 7.
19         A.   Yes.
20         Q.   Okay.  Exhibit 7 is another template
21    that you provided to us in response to the
22    subpoena, correct?
23         A.   Correct.
24         Q.   And this is a template that's used by
25    East Coast Auto Appraisers, correct?

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 94

1        A.    Correct.

2        Q.    And it's, essentially, the same as what

3   we looked at in Exhibit 6, correct?

4        A.    Again, boilermaker-type template, yes.

5        Q.    And there aren't any material changes

6   that you're aware of, are there, as compared to

7   Exhibit 6?

8        A.    There's probably little differences in

9   it.

10       Q.    Okay.

11       A.    There's probably quite a few differences

12  in it.

13       Q.    Can you point them out to me?

14       A.    We would have to go over each page and

15  compare them.

16             On Page 1 I have client name, phone and

17  owner of vehicle.  Exhibit 6 I have the phone

18  number.  Exhibit 7 I don't.

19             On Page 2, obviously, the -- the

20  condition appraisal was different, because

21  that's specific to that vehicle.

22       Q.    Right.  But in terms of the form

23  portions, that's what I'm talking about.

24       A.    As far as the methodology and the way

25  that I went about it, yes, the same.

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 95

1       Q.   Okay.  Thank you.

2            Taking a look at -- back at Exhibit 7 on

3    the second page, I believe there's a -- there's

4    -- strike that.

5            Exhibit 7 is a -- an example of a

6    appraisal that you actually did for a 1998 Ford

7    Mustang, correct?

8       A.   Correct.

9       Q.   Okay.  So looking at the second page,

10   there's the -- the portion below the section

11   entitled IACP Certified Actual Cash Value

12   Appraisal.  Do you see that?

13      A.   Yes, I do.

14      Q.   And there's four paragraphs that discuss

15   the condition of the vehicle, correct?

16      A.   Correct.

17      Q.   It talks about the condition of the

18   exterior in the first paragraph, correct?

19      A.   Yes.

20      Q.   And you looked at things such as whether

21   there was any apparent rust, correct?

22      A.   Correct.

23      Q.   You looked at whether there was limited

24   marks or imperfections on the paint, correct?

25      A.   Correct.

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 96

1      Q.   The second paragraph talks about the
2  interior condition, correct?
3      A.   Correct.
4      Q.   You looked at the seats and the carpet,
5  correct?
6      A.   Yes.
7      Q.   You also looked at whether the equipment
8  was original and operational?
9      A.   Correct.
10     Q.   And whether there was any marking or
11 wear on the interior, correct?
12     A.   Correct.
13     Q.   The -- in the third paragraph you talked
14 about the electronics being fully functional and
15 in good condition, correct?
16     A.   Yes.
17     Q.   You looked at the engine and the
18 transmission, correct?
19     A.   Correct.
20     Q.   You actually started the engine and
21 confirmed it ran smoothly, correct?
22     A.   Yes.
23     Q.   You actually scanned the vehicle's
24 computer for responses to look for historical
25 codes, correct?

Page 97

1      A.    Correct.

2      Q.    You also noted that the vehicle had

3   been stored in a garage and had all its original

4   paperwork, correct?

5      A.    Correct.

6      Q.    And you took all of that and other

7   information into account to evaluate the

8   condition of this particular vehicle, correct?

9      A.    I did.

10     Q.    And these were all individual inquiries

11  that you did to evaluate the value of this

12  vehicle, correct?

13     A.    I did.

14     Q.    And, in your judgment, that kind of

15  detailed analysis of these individual factors

16  is necessary to appraiser a vehicle's value,

17  correct?

18     A.    I believe it's helpful.

19     Q.    You try to do it whenever you can,

20  right?

21     A.    I do.

22     Q.    And then you made some condition

23  adjustments based on the vehicle, correct?

24     A.    Yes.

25     Q.    And in the case of this vehicle, you

Jason Merritt                                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 98

1    concluded that the vehicle should be worth more

2    because of its condition and the options.

3         A.    Correct.

4         Q.    Okay.  You also looked at the current

5    local market to come up with comparables as a

6    baseline for the value of this vehicle, correct?

7         A.    I did.

8         Q.    And on the second page you list three

9    comparables, correct?

10        A.    I did.

11        Q.    These were all vehicles that were sold,

12   correct?

13        A.    Correct.

14        Q.    And these vehicles were in a 200-plus

15   mile radius of where the vehicle being appraised

16   was garaged, correct?

17        A.    Correct.

18        Q.    And you think it's appropriate to use

19   vehicles in a 200-plus mile radius?

20        A.    I had to in that situation.

21        Q.    And you thought it was appropriate to in

22   that situation, right?

23        A.    I did in that one, yes.

24        Q.    Okay.  And these were all actually sold

25   vehicles, correct?

Jason Merritt                                        April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 99

 1      A.   I don't know if they were sold or

 2   listed.

 3      Q.   Okay.  Let's say, for example, that

 4   the second vehicle from Westbury Toyota had been

 5   listed for sale -- strike that.

 6           The second vehicle, the comparable from

 7   Westbury Toyota, it says the sales price was

 8   9,999.  Do you see that?

 9      A.   I do.

10      Q.   Okay.  The other two vehicles one was

11   15,000 from TrueCar and one was 13,999 from

12   Village Auto, correct?

13      A.   Correct.

14      Q.   If you had found this comparable from

15   Westbury Toyota and the listed price was $50,000,

16   would you have used that as a comparable?

17      A.   I probably would have called Westbury

18   Toyota just to see why.

19      Q.   Okay.  And if they told you, "that's how

20   much we want to sell the vehicle for"?

21      A.   Then I would probably remove it.

22      Q.   Why?

23      A.   Just because it was so far out of the

24   realm.  There would be something that would make

25   me think -- but, again, I would have to talk to

Volino, Dominick v. Progressive Casualty Insurance

April 7, 2022

Page 100

1  Westbury and do investigation of why.

2      Q.    Okay.   What if their listed price was

3  25,000?

4      A.    Again, I'd have to check them, because,

5  again, it -- it may not be a comparable.

6      Q.    Okay.   And is that because the price

7  might just be unrealistic?

8      A.    Or there may be something different

9  about the vehicle.

10      Q.    Well, I want you to assume,

11  hypothetically, that there's nothing different

12  about the vehicle except that the dealership

13  says, "we're hoping to get a big number on this

14  one ,so we're listing it for $25,000," would you

15  then say, okay, we'll use it as a comparable?

16      A.    I would have to -- again, each case

17  would be different.   In this case right here, if

18  I found one that was $25,000 and I called them

19  and they just said, "hey, we need to get 25,000

20  out of it," well, what that tells me, from my

21  experience, as a dealership that they got too

22  much money in it and they don't really want to

23  sell it.   They're just going to leave it sit

24  there.   So I would take them out of the

25  comparable.

Jason Merritt
Page 101 of 403                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 101

1      Q.   Okay.  So just because they're asking
2  for that amount doesn't mean you'll accept it as
3  a comparable without talking to them; is that
4  right?
5      A.   No.  I couldn't.
6      Q.   So you'd need to -- you'd need to reject
7  that listed price as a comparable because it's
8  just not realistic for what the market will bear?
9      A.   Correct.
10     Q.   And that's your typical approach when
11 you're trying to find comparables, correct?
12     A.   Typical, yes.
13     Q.   Okay.  Because that's the way you come
14 up with comparables that represent actual market
15 value, correct?
16     A.   Correct.
17     Q.   Okay.  Okay.  You can put that to the
18 side.
19          Before you started work on this case,
20 were you familiar with Mitchell's WorkCenter
21 Total Loss product?
22     A.   No.  I've never dealt with Mitchell's
23 Total Loss.
24     Q.   Do you know how it operates to estimate
25 vehicle value?

Volino, Dominick v. Progressive Casualty Insurance                                    April 7, 2022

Page 102

1        A.    I do not know algorithms, so I am not

2    very familiar with how it comes up with it.

3        Q.    Do you know what data Mitchell has

4    access to for purposes of estimating value?

5        A.    My guess is they would have -- and,

6    again, guess, from most of these, they would have

7    access to the CRMs of dealerships.

8        Q.    I'm asking what you know.  Just we want

9    to --

10       A.    Okay.  If I -- if you're going with what

11   I know, I don't know.

12       Q.    Okay.  Are you -- are you familiar with

13   J.D. Power?

14       A.    Yes.

15       Q.    Do you know whether J.D. Power has any

16   role in Mitchell's WorkCenter Total Loss product?

17       A.    I do not know.

18       Q.    Okay.  What is J.D. Power?

19       A.    Again, if we're going by what I know, I

20   don't know.

21       Q.    Okay.  Do you know if J.D. Power has

22   any involvement in the business of valuing

23   automobiles generally?

24       A.    I know that when I look at NADA now, it

25   says J.D. Power, --

Volino, Dominick v. Progressive Casualty Insurance
April 7, 2022

Page 103

1        Q.    Okay.

2        A.    -- so there is a -- a relation.

3   And I believe Mitchell's is written on the page

4   somewhere, too, so there's quite a few involved

5   in that.

6        Q.    Do you know what kind of hard data

7   Mitchell or J.D. Power have access to -- to

8   concerning sales of vehicles for use as

9   comparables in estimating vehicle value?

10       A.    No.

11       Q.    Do you know what kind of hard data

12  Mitchell or J.D. Power has access to concerning

13  the relationship between list price and actual

14  sales price for vehicles in this country?

15       A.    No.

16       Q.    Okay.  Have you ever negotiated with

17  an insurance company based on a valuation it

18  provided a customer using Mitchell's WorkCenter

19  Total Loss product?

20       A.    I have never negotiated with insurance

21  at all.

22       Q.    Okay.  Have you ever had a customer ask

23  you to look at a -- an appraisal that had been

24  performed by an insurance company using

25  Mitchell's WorkCenter Total Loss?

Page 104

1      A.   No.

2      Q.   Okay.  So this case -- it's fair to

3  say this case is the first time you've ever had

4  involved with Mitchell's WorkCenter Total Loss?

5      A.   Yes.

6      Q.   And you're not aware of any particular

7  hard data Mitchell has access to for purposes

8  of computing or estimating values used in

9  Mitchell's --

10     A.   I do not have access to any of their

11 codes or data that -- that they use, so I don't

12 know.

13     Q.   Well, did you read any depositions in

14 this case that described the data they had access

15 to?

16     A.   I read these reports that are Mitchell

17 reports, and I see the -- the comparables and

18 adjustments and stuff like that.

19     Q.   Okay.  Have you read any depositions in

20 this case from anyone for -- who works for

21 Mitchell?

22     A.   No.

23     Q.   Have you read any depositions in this

24 case from anyone who works for J.D. Power?

25     A.   No.

Jason Merritt                                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 105

1       Q.   Have you read any depositions in this

2  case from anyone who works for Progressive?

3       A.   No.

4       Q.   Have you read any testimony from anyone

5  describing the hard data that is available for

6  use in WorkCenter Total Loss's calculations?

7       A.   No.

8       Q.   Okay.  How -- strike that.

9            Your report talks about the Projected

10  Sold Adjustment that is performed by the Mitchell

11  WorkCenter Total Loss product, correct?

12       A.   Which one are you referring to there?

13       Q.   So we're talking about your report,

14  Exhibit Number 1.

15       A.   Okay.

16       Q.   And am I correct that your report talks

17  about the Projected Sold Adjustment that is

18  applied in the Mitchell product?

19       A.   Which page are we at just so I can --

20       Q.   Sure.  So if you go to the fourth

21  page of your report, there's a heading that

22  says, "Mitchell's application of a Projected

23  Sold Adjustment is inconsistent with appraisal

24  standards and the comparable methodology."

25  Do you see that?

Page 106

1      A.    I do.

2      Q.    Okay.  Are you familiar with the

3   hard data that is available to Mitchell for

4   application of its Projected Sold Adjustment?

5      A.    No.  I do not know what their hard data

6   is.

7      Q.    Okay.  Are you familiar with the

8   methodology that Mitchell and J.D. Power use

9   to make the Projected Sold Adjustment for any

10  particular vehicle?

11     A.    I do.  That is on the last page of their

12  valuation reports, and they list their vehicle

13  valuation methodology explanation.  That is what

14  I'm familiar with.

15     Q.    Okay.  So, for example, let's take a

16  look at -- which exhibit do you have in your

17  hand?

18     A.    I have -- this one is Exhibit 9,

19  England.

20     Q.    Okay.  So Exhibit 9, the last page, tell

21  me what you're referring to.

22     A.    The very last the page, the -- the

23  heading is Vehicle Valuation Methodology

24  Explanation.

25     Q.    Okay.  And where, in particular, are you

April 7, 2022

Volino, Dominick v. Progressive Casualty Insurance

Page 107

1   looking that talks about the Projected Sold

2   Adjustment?

3       A.   Under Step 2, Adjust Comparable

4   Vehicles.

5       Q.   Okay.

6       A.   Again, I agree with "make adjustments

7   to the price of the comparable vehicles,"

8   "comparable vehicles are identical to the loss

9   vehicle, except when itemized -- or adjustments

10  are itemized."  There's several types of

11  comparable vehicle adjustments.  I agree 100

12  percent with that.  The only issue I have is

13  Bullet Number 1, the Projected Sold Adjustment.

14      Q.   Okay.

15      A.   That's my issue.

16      Q.   And my question is, are you familiar

17  with the precise methodology that Mitchell uses

18  to make the Projected Sold Adjustment?

19      A.   No.

20      Q.   Okay.  Do you know what data Mitchell or

21  J.D. Power has access to to make the Projected

22  Sold Adjustment?

23      A.   When you're asking me what I know, no, I

24  do not know what data they have.

25      Q.   Okay.

Page 108

1      A.   I can only go off, you know, my

2   experience.

3      Q.   Which is zero with WorkCenter Total

4   Loss, correct?

5      A.   Which is what?

6      Q.   You have no experience with WorkCenter

7   Total Loss, correct?

8      A.   Works in a total --

9      Q.   WorkCenter Total Loss, the Mitchell

10   product.

11      A.   Oh, the product, no.

12      Q.   Am I correct?

13      A.   Correct.

14      Q.   Okay.  Are you offering any legal

15   opinions in this case?

16      A.   No.

17      Q.   Okay.  You don't present yourself as an

18   expert regarding the regulatory provision in

19   Exhibit 14, do you?

20      A.   I don't get into any regulatory

21   provisions at all.

22      Q.   Okay.  Why did you produce -- why did

23   you have Exhibit 14 as one of the documents that

24   you produced to us as something you had reviewed

25   or relied upon?

Page 109

1      A.    When I do my appraisals, sometimes I'll

2   look at each state's laws and I'll just include

3   that with a lot of the state laws.

4      Q.    Okay.

5      A.    So I will use that on -- I usually

6   go over it a little bit.  And depending on what

7   portion I'm working on that appraisal, I'll try

8   to make sure that my standards aren't in

9   violation of their state standards.

10     Q.    But you're not representing that you're

11  an expert with regard to Exhibit 14, are you?

12     A.    Absolutely not.

13     Q.    You're not saying you're an expert with

14  regard to this particular New York regulatory

15  provision, correct?

16     A.    Correct.

17     Q.    Okay.  And just so the record's clear,

18  we're talking about Section 216.7 of the New York

19  Code's rules and regulations of Title 11,

20  correct?

21     A.    Correct.

22     Q.    Okay.

23     A.    You're talking about that entire

24  document?

25     Q.    Yeah.  You have no expert opinions with

Jason Merritt                                        April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 110

1   regard to that?

2        A.   No expert opinions.  Just a guide.

3        Q.   Got it.

4             Have you done any survey -- strike that.

5             Have you done any analysis, for purposes

6   of your expert opinions and conclusions in this

7   matter, as to how often dealers negotiate the

8   prices of used cars they offer for sale?

9        A.   State that again for me.

10       Q.   Have you done any analysis, for purposes

11  of your expert opinions and conclusions in this

12  matter, as to how often dealers are willing to

13  negotiate the prices of used vehicles they offer

14  for sale?

15       A.   My analysis of that would be sitting in

16  the seat of a sales manager, which I did.  So I

17  oversaw the sale of hundreds and hundreds of

18  vehicles.

19       Q.   Okay.

20       A.   So I set the prices on them -- did the

21  appraisals of the vehicles, set the price and

22  set the profitability of it.  And using our CRM,

23  again, that is our -- in the sales part of it,

24  that is -- our standard is the profitability.

25       Q.   Okay.  And did you look at the practices

April 7, 2022

Volino, Dominick v. Progressive Casualty Insurance

Page 111

1    of any other dealer for purposes of rendering

2    your expert opinions and conclusions in this

3    matter?

4        A.    No.

5        Q.    Did you do a survey to inform you as to

6    how often other dealers may negotiate prices on

7    used cars that they offer for sale?

8        A.    A survey of it would be my -- I have

9    made calls to dealerships for pricing.  So survey

10   specifically for expert testimony, no.  A survey

11   for my appraisers -- appraisals to see what the

12   vehicles are selling for, yes, I've done that.

13       Q.    And -- and you have written records of

14   those?

15       A.    No.

16       Q.    Okay.  So you just did it for your

17   own --

18       A.    It would be phone calls for a specific

19   appraisal.

20       Q.    And then when you got the information,

21   did you write down the information you obtained?

22       A.    No.  I would usually use that in my

23   comparables.

24       Q.    Okay.  And you did that over the course

25   of your working for East Coast Auto Appraisers?

Jason Merritt                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                    Page 112

1         A.    As well as Timbrook and other places.

2         Q.    Okay.  And how many dealers did you talk

3    to?

4         A.    I can't recall the amount of numbers.

5    I would say less than a dozen.

6         Q.    Okay.  Do you know whether you would

7    consider it to be a statistically significant

8    number of dealers for purposes of conducting a

9    survey?

10        A.    No.

11        Q.    You don't know or it wasn't?

12        A.    I don't know.

13        Q.    Okay.  When you were employed at

14   Timbrook, did you ever experience negotiation

15   of prices on used motor vehicles?

16        A.    Did I ever negotiate prices?

17        Q.    Did you ever observe any of the Timbrook

18   Automotive Dealerships negotiating price on used

19   motor vehicles?

20        A.    Yes.

21        Q.    Okay.  How often did that happen?

22        A.    Anytime someone comes in.  The

23   negotiation normally would be a wide variety of

24   things.  It could be they would try and -- when I

25   say try, they would try, it would be a customer

April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 113

1  would come in with an offer or the -- the

2  salesman would come in with an offer.  Or it

3  could be a variation of different things:

4  Warranties, gap insurance.  A big thing was the

5  price of the -- the payments.

6      Q.   And it could just be a lower price

7  overall for the vehicle, right?

8      A.   Could be.

9      Q.   All those kinds of negotiations happen?

10     A.   You see that on TV all the time.

11     Q.   Yeah.  And sometimes, in fact, the

12 Timbrook Automotive dealership would sell a

13 vehicle for less than it had listed the price?

14     A.   If you're going to box me into that one

15 sentence, I would have to answer that with a much

16 broader sentence.

17     Q.   You're not able to answer the question

18 as I've asked it?

19     A.   No.

20     Q.   Okay.

21     A.   It -- it -- I would have to answer that

22 as -- I would have to explain that more than just

23 a yes or no or just a simple answer.

24     Q.   So you're not able to answer the

25 question I just asked with a yes or no?

Page 114

1      A.    With a yes or no?  No.

2      Q.    You're not able to.  Okay.

3      A.    I'll give you a long answer, if you'd

4   like?

5      Q.    Sure.  Go ahead now.

6      A.    The long answer is, the negotiation

7   would be for many different parts of it.  When I

8   would sit behind the CRM or behind the computer

9   and a salesman would come in and say, okay, this

10  2020 Silverado is priced at 40.  Okay.  And so

11  we would -- I would write out all the -- the tax,

12  tags, fees, dealer prep, reconditioning, all the

13  extra fees they put in, doc fees and all that

14  stuff, and present that to the customer.  And the

15  customer would say, that -- what's the payments?

16  And there could be negotiation in the price of

17  the vehicle -- after it was over, there could be

18  an adjustment.  And I -- I -- I describe it as a

19  sliding scale.  The bottom line of our CRM will

20  show profit.  That's what it shows.  So however I

21  get to that a profit, I don't care what the price

22  is.

23         Does that make sense?  I don't care if

24  I'm getting $40,000 out of that car or if I'm

25  getting $37,000 out of that car.  I don't care

Page 115

1    what the price of the vehicle is, because he's

2    now buying a warranty, he bought a tire and wheel

3    package and he's financing it through us, which

4    is a two point bump on the financing.

5            So when I look at the profit number,

6    that's my target.  So you as the customer, if you

7    come in, I set that car at 40,000, I'm getting my

8    40,000 out of it, because I'm looking at $3,200

9    profit.

10    Q.    But isn't it true that there were times

11    that a Timbrook Automotive dealership sold a

12    vehicle where the price was lower than it was

13    listed and all those other factors didn't change;

14    they just sold it for less than the list price.

15    Isn't that true?  That happened at least one time

16    in your experience?

17    A.    Oh, if you're saying "at least one

18    time," yes.

19    Q.    Did it happen at least two times?

20    A.    Well, again, I'm not going to be

21    ridiculous here.  There -- there's, obviously,

22    times where they would sell for less than asking

23    price.

24    Q.    You just don't -- you don't know how

25    many times?

Page 116

1       A.   But there's times they would sell above.

2       Q.   There is.  There would be negotiation.

3  It would happen, right?

4       A.   Well, and, again, you know, we all

5  hear the "no haggle price," and that is -- it's

6  very true.  You know, it's very true.  The

7  internet has changed everything over the last

8  12 years, maybe, 10 years.  Everything has

9  changed so much that the pricing that I put on my

10  vehicles, I -- I would start from the back end

11  and say, okay, here's what this vehicle is worth

12  on my appraisal.

13       Q.   Yeah.

14       A.   It's worth $40,000.  Now, let's look

15  at the condition of it.  What's it need to

16  recondition it?  Okay.  It's going to need tires,

17  it's going to need a total detail, and I'd work

18  backwards from that.  So now that $40,000 vehicle

19  that has, say, a NADA price or Kelley Blue Book,

20  or -- or the dealership down the street has it

21  for 40,000, okay, that's a good starting point,

22  but now this vehicle is only worth 36,500.  And

23  then you throw in what we need to make off profit

24  of it of $3,500 so now this vehicle's worth

25  33,000.

Page 117

```
1        Q.    Is every dealer a "no haggle" dealer

2   today?

3        A.    I can't say every dealer, no.

4        Q.    Okay.  And how about two years ago, was

5   every dealer two years ago a "no haggle" dealer?

6        A.    I can't say every dealer today is a "no

7   haggle" dealer.

8        Q.    Okay.

9        A.    I can't say that a blanket -- I can't

10  say a blanket statement about all dealers, no.

11       Q.    Is there a way, without calling the

12  dealers, you could find out if a dealer is

13  actually selling for less than the list price?

14       A.    And I'll -- from my experience, if you

15  call another dealer or salesman and say, "what

16  did you get out of that car," they really don't

17  know until they look it up.  They can tell you

18  what the profit was.  That's what they're looking

19  at.

20             So their -- their selling price is not

21  the forefront thing.  It's -- it's not the goal

22  in that.  The goal on the dealership side is the

23  profitability of it.

24       Q.    But you use the selling price for

25  purposes of comparables, correct?
```

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 118

1        A.    Correct.  And the reason I use that is
2   because that is the baseline.  That's what that
3   vehicle's worth.
4        Q.    Okay.  So if we want to use selling
5   price, are there times when the sold price is
6   less than the list price was?
7        A.    Well, sure.  I would imagine there is.
8        Q.    If you were preparing an appraisal and
9   you picked as a comparable a vehicle that was
10  listed for sale at $10,000, and two days before
11  you finalized your appraisal the vehicle sold for
12  9,500, would you make a change in the comparable
13  vehicle value based on the actual sale, or would
14  you stick with the list price you had began your
15  work with?
16       A.    No.  I'd probably stick with the
17  original price.
18       Q.    So even though you knew for a fact that
19  the vehicle had sold for less and your appraisal
20  hadn't been completed, you would value the
21  vehicle for more?
22       A.    And the reason being is because I know
23  when they sell them, again, they're not taking --
24  they're not telling me all the back end.
25       Q.    Are they telling you all the back end on

Volino, Dominick v. Progressive Casualty Insurance

Page 119

1   any of the sales prices?

2       A.   Yes.

3       Q.   So when you use comparables for

4   appraisals, you -- you have -- in fact, you have

5   access to all of the back-end information?

6       A.   And that is the sale price.  That's

7   their back-end information.

8       Q.   Okay.  In my hypothetical, the vehicle

9   was listed for sale at 10,000, --

10      A.   Mm-hmm.

11      Q.   -- actually sold for 9,500, --

12      A.   Mm-hmm.

13      Q.   -- but you're telling me you'd use the

14  10,000 list price and not the 9,500 actual sold

15  price.  Why?

16      A.   And, again, I would probably remove that

17  comparable, or I would use the original 10,000

18  because that is what the vehicle is worth.  Just

19  because the dealer sold it for $9,500, unless he

20  tells me, hey, it was a cash deal; nothing else

21  done; he handed me $9,500, did his owe own title

22  work, his own paperwork and walked out the door.

23      Q.   When you use comparables of actual

24  sales, --

25      A.   Mm-hmm.

April 7, 2022

Volino, Dominick v. Progressive Casualty Insurance

Page 120

```
 1        Q.   -- do you investigate what the original
 2   list price was for purposes of your comparables?
 3        A.   No.
 4        Q.   Why not?  Isn't that what the value of
 5   the vehicle is, in your view?
 6        A.   Again, yes, it depends -- each one
 7   depends, though.  Every one of these depends
 8   on the vehicle.  And to say I can throw out
 9   everything because of one variable, I don't.
10        Q.   I understand what it depends on.  I'm
11   just trying to understand your testimony, sir.
12   You're telling me that you would use the listed
13   price, rather than an actual sold price, because
14   you think the actual list -- the list price is
15   what the vehicle is worth, not the actual sold
16   price.  And I'm asking you, when you have a
17   comparable and you have the sold price, do you
18   investigate what the list price was so you can
19   get the actual vehicle, in your view, of
20   -- actual value of the vehicle?
21        A.   I would.  I would.  I would.
22        Q.   And do you do that?
23        A.   I do, yes.
24        Q.   Okay.  So let's take a look at
25   Exhibit 7, and go to the third page.  And we've
```

Page 121

1   got this vehicle here from Westbury Toyota.  The

2   sale price was $9,999.  Do you see that, the

3   comparable?

4        A.   Yes.

5        Q.   Did you call the dealer to determine

6   what the listed price was for this?

7        A.   That is the listed price.

8        Q.   That's not the actual sale price?

9        A.   The sale price is what it's listed for.

10       Q.   How do you know that somebody didn't

11  negotiate a lower price?

12       A.   I don't.

13       Q.   Did you call the dealer to find out?

14       A.   No.

15       Q.   I thought you just told me that you

16  think the vehicle is worth the listed price, not

17  the sale price?

18       A.   The sale price is what it's listed for

19  sale at.

20       Q.   No.  The list -- the sale price is what

21  it actually sold for.

22       A.   No.  The -- it's for sale at that price.

23       Q.   Do you know for a fact that this vehicle

24  was for sale at that price, not actually sold at

25  that price?

Page 122

1       A.   Yes.

2       Q.   Okay.  If -- is that true of all these

3   vehicles?  You know for a --

4       A.   Yes.

5       Q.   So you know for a fact that all of these

6   vehicles were the listed price, not the sale

7   price?

8       A.   Yes.  They were all the listed price.

9       Q.   You only use the listed price?

10      A.   Yes.

11      Q.   You never use the actual sales price?

12      A.   No.

13      Q.   Okay.  And if you go to Page 5 of

14  Exhibit 7, you see it's the -- where it says

15  "fair market value"?

16      A.   And let me -- let me go back.  When you

17  say "never," no, I can't say never.  I do use

18  them in certain circumstances.

19      Q.   Okay.  Well, we'll get to that in a

20  moment.  If you go to the -- the definition of

21  fair market value, do you see that?

22      A.   Yes.

23      Q.   And it says, "Market value is generally

24  established, if possible, based on sales of

25  similar property in the same locality."  Do

Volino, Dominick v. Progressive Casualty Insurance

Page 123

1  you see that?

2      A.    Yes.

3      Q.    And to be accurate, in your view, you'd

4  change this to "offers of sale," like "list

5  price"?

6      A.    Sales.  Again, I guess we're just

7  mincing words, really, or confusing words.  I

8  figure a vehicle for sale is the listed sale

9  price, --

10      Q.    Okay.  I understand --

11      A.    -- not the sold price.

12      Q.    I understand that the listed sale price

13  may be different than the sold price.

14      A.    Yes.

15      Q.    Which do you think is appropriate to use

16  for appraisals when you have both available to

17  you?

18      A.    When you have both available, the sold

19  price would certainly be a very good variable in

20  it.

21      Q.    It would be better than the listed

22  price, wouldn't it?

23      A.    Sure.

24      Q.    Okay.  So whenever you can use the

25  actual sold price, you want to use it, correct?

Page 124

```
 1        A.    Correct.

 2        Q.    Okay.  So just to be clear, going back

 3   to Page 3 of this report, if you had the actual

 4   sold price, you would use that, if available, --

 5        A.    Correct.

 6        Q.    -- correct, --

 7        A.    Correct.

 8        Q.    -- every time, if you had an actual sold

 9   price?

10        A.    That is your best data if you can get

11   the sold price.

12        Q.    Okay.

13        A.    But, again, it -- it's hard to find the

14   exact sold price.

15        Q.    For you.

16        A.    Even for a dealer.

17        Q.    Well, do you know Howard it is for J.D.

18   Power to find that?

19        A.    I don't know what they're using.

20        Q.    Do you know what the J.D. Power Power

21   Information Network is?

22        A     No.

23        Q.    Do you know whether J.D. Power collects

24   dealer information electronically based on actual

25   sales every day around this country?
```

Page 125

 1       A.    I have no doubt.

 2       Q.    Do you know whether they -- whether they

 3   do?

 4       A.    No, I don't know that.

 5       Q.    That would be great information to have

 6   for an appraisal, right?

 7       A.    Sure.

 8       Q.    If you had an actual database that

 9   actually says --

10       A.    But, no, see, I -- I would have an issue

11   with that.  Because they're -- my CRMs, when I

12   sell a vehicle, it is not correct information on

13   what that vehicle sold.

14       Q.    What information does J.D. Power get

15   from the J.D. Power PIN Network?

16       A.    I don't know that.  I just testified

17   that I don't know what information they're

18   getting.

19       Q    So how do you -- why do you have a

20   problem with it?

21       A.    Because you're saying they're pulling

22   this from dealers.  And if they're pulling it

23   from dealers, they're -- they have to be getting

24   into their -- their CRM or have access to the

25   Lightspeed data.  And my Lightspeed data in

Page 126

1  every sold vehicle does not indicate the exact

2  profitability that I'm looking at.  Because,

3  again, I'll slide the price of that car -- I

4  don't care what that car price is.  If someone

5  comes in and we can negotiate a warranty for

6  $1,900 that I just paid $600 for, and he wants to

7  knock $500 off the car, I'll knock $500 off the

8  car.  That doesn't mean the value of that car is

9  less.

10      Q.   So in your world, you'd have to know

11  even more information to come up with an accurate

12  appraisal, right?

13      A.    In my world, that's what I go by is the

14  sale prices, because they're listed for sale at

15  that price.  And me as a dealer, when I set the

16  price of that vehicle, I know what it's worth.

17      Q.   So I must have mis -- misunderstood you.

18  I thought you told me that when there's an actual

19  sale you use the sold price.

20      A.    And that -- I lot of those would be

21  private individual I would use, and a lot of

22  classic and historic vehicles is where you cold

23  find that.

24      Q.   You'll use the actual sold prices from

25  dealers, right?

Page 127

1      A.   If I can.  But, again, I -- it's very
2  rare that you can get it.
3      Q.   And when you do get it, you use it,
4  correct?
5      A.   Again, I have to see what that price is.
6      Q.   So do you contact each individual
7  dealer?
8      A.   No.
9      Q.   So you use a sold price, but you don't
10  contact the dealer?
11      A.   If I am given a sold price that is
12  within the parameters of I know that it was
13  actually sold for that, if someone brings in a
14  buyer's order and it shows the price of the
15  vehicle, well, then I'll use that.
16      Q.   And if you're using a sale price, do you
17  also contact the dealer so you can find out what
18  conditions are associated with that sale price
19  with regard to financing and warranties?
20      A.   No.
21      Q.   So -- so you don't know all those
22  variables that also go into profitability with
23  regard to the sale price, correct?
24      A.   Again, the sale price is all of that
25  taken into effect, all of that -- when I set a

Volino, Dominick v. Progressive Casualty Insurance

Page 128

1    price of a vehicle, if I set this Number 3

2    vehicle, the '98 Cobra, at 13,999, I've taken

3    into consideration all the condition, all the

4    mileage, the color, the options and what that

5    vehicle's worth, period, --

6         Q.   And --

7         A.   -- and then we set the profitability

8    after that.

9         Q.   And you're taking into account what it's

10   worth to have that customer getting service at

11   your dealership?

12        A.   Correct.

13        Q    Right.  That's not the val -- vehicle's

14   value, that's the value of service, correct?

15        A.   No.  No.  I don't -- I don't take into

16   effect any -- I have to back that up.  I don't

17   take that into effect as far as the price of the

18   vehicle.

19        Q.   Well, I -- I know you don't take it into

20   account.  My question is, isn't it true that for

21   a dealership, when they are listing a vehicle for

22   sale, one of the aspects is they're trying to

23   figure out a way to capture profit from services

24   that they provide to --

25        A.   Well, sure.  I mean, when we're -- we're

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 129

1    talking to a customer, we're going to try to be a
2    good service source for them.
3        Q.   Not just try to be a good service
4    source.  You might offer them, as part of the
5    sale price, coupons for service so they come
6    in --
7        A.   Yes.
8        Q.   And that is part of what the sale price
9    captures, correct?
10       A.   When I did my estimates, I couldn't take
11   into effect that.
12       Q.   How about selling a warranty?  That's
13   captured in the sales price, isn't it?
14       A.   No.  No.  I don't do any of that.  I put
15   the price of the vehicle itself and what it --
16   the vehicle is worth.  Now, the -- the sales
17   manager actually has the ability to change all
18   that for profitability.
19       Q.   How about financing?
20       A.   That's all part of the profitability.
21       Q.   That's part of the sales price, correct?
22       A.   No, --
23       Q.   Okay.
24       A.   -- not at all.
25       Q.   Not in your experience?

Page 130

1     A.    No.

2     Q.    And -- and you would rather not have

3   all of that CRM data for purposes of doing an

4   appraisal.  You think it's more accurate just to

5   use the list price?

6     A.    From my experience, yes.  Because when

7   I set that price on the lot, I've taken into

8   consideration that vehicle and what it's worth.

9   From there you work backwards on it.  And, again,

10  the profitability skewers [sic] the sold price on

11  the CRM.

12    Q.    And where a dealer is willing to

13  negotiate the list price and actually just take a

14  lower price, how do you take that into account in

15  your appraisals?

16    A.    Again, I don't run into where I find

17  that out while I'm doing the appraisals.

18    Q.    Because you don't talk to the dealer

19  about the list price?

20    A.    No.

21    Q.    Okay.  So you don't know -- when it's --

22  when you're using a comparable, you don't have

23  any idea whether that dealer is, in fact, willing

24  to negotiate the price?

25    A.    No.

Page 131

1      Q.   Am I correct?

2      A.   Correct.

3      Q.   Okay.  And that's -- that's information

4   you don't actually ask the dealer about.

5      A.   No.

6      Q.   Is that correct?

7      A.   Correct.

8      Q.   Okay.  I just want to make sure that --

9   the way you were answering, we --

10      A.   Yeah.  And, again, it -- to -- to put a

11   blanket covering over all of it, I can't answer

12   no.  I mean, I -- I have called dealers on

13   certain things.  But, again, my standard practice

14   is to take the sale prices that are listed and

15   use them as that's the value of the car.

16      Q.   Okay.

17      A.   Because, again, they -- they take into

18   -- all the other variations, because, again, they

19   -- they need a com -- they need a comparable,

20   they need -- they're putting this price on the

21   internet.  So if their price is so significantly

22   higher than, say, the other guy's price, they're

23   just going to pass over it.  They're just not

24   going to look at that vehicle.  So these dealers

25   are pricing the cars at what they need to get out

Page 132

1   of them.

2       Q.   Does the -- the Mitchell WorkCenter

3   Total Loss product, does it adjust no haggle

4   dealer prices with a Projected Sold Adjustment?

5       A.   That's somewhere in one of these.

6            I have one that is total -- WorkCenter

7   Total Loss.

8       Q.   So you're looking at Exhibit 8; is that

9   correct?

10      A.   Exhibit 8, --

11      Q.   Yep.

12      A.   -- WorkCenter Total Loss.

13      Q.   Okay.

14      A.   And in the second heading under

15  "Internet Sales," it talks about no haggle -- "No

16  hassle single-price sales policy."

17      Q.   Okay.  My question is whether you know

18  if the WorkCenter Total Loss product adjusts list

19  prices used as comparables from no hassle dealers

20  with the Projected Sold Adjustment?

21      A.   It says, "They do not apply a Projected

22  Sold Adjustment to comparable vehicles that are

23  for sale from a dealer in which we have confirmed

24  to have a no hassle single-price sales policy."

25      Q.   Okay.  And you think that's appropriate,

Volino, Dominick v. Progressive Casualty Insurance

Page 133

```
 1    I bet?
 2         A.    Correct.
 3         Q.    Okay.
 4         A.    Yes.
 5         Q.    And do you, when you're doing your
 6    appraisals, do any confirmation as to whether the
 7    dealers you're relying upon for a comparable are
 8    "no hassle"?
 9         A.    No.
10         Q.    So you accept their list price without
11    regard to whether they are, in fact, no hassle
12    dealers?
13         A.    Correct.
14         Q.    Okay.
15         A.    Again, a lot of dealers will put no
16    hassle -- haggle or hassle pricing or they'll
17    advertise that, but, again, that really doesn't
18    mean anything other than maybe a marketing.
19         Q.    So they might not actually be "no
20    hassle"?
21         A.    Well, no.  A lot of dealers are no
22    hassle, no haggle.
23         Q.    But some might market as if they, but
24    they may not actually do it.  Is that what you're
25    saying?
```

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 134 of 403
Jason Merritt
Page 134 of 5312                                      April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 134

1      A.   No.  No.  No.  I'm saying the opposite.

2      Q.   Okay.  I understand.

3      A.   I'm saying that most dealerships are no

4   haggle, and a lot of big dealerships will put

5   that on their website and some dealerships won't

6   just because they're not going to haggle over it

7   anyway.

8      Q.   Okay.  If you go to Exhibit Number 1,

9   which is your report, page -- the fifth page,

10  it's not numbered, the fifth page.

11     A.   Okay.

12     Q.   Okay.  The last sentence at the bottom

13  says, "Consistent with Mitchell's position on

14  internet pricing, my understanding of the modern

15  used car market is that internet prices often

16  reflect a no hassle price."  Do you see that?

17     A.   Correct.

18     Q.   Okay.  Have you done any analysis as to

19  how often the internet price reflects a no hassle

20  price?

21     A.   No.

22     Q.   Okay.  When you say "modern," what do

23  you mean by "modern"?

24     A.   I'd say modern is people that have CRMs,

25  people that maintain a decent inventory.  And

Jason Merritt
Page 135 of 403                                        April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 135

1    when I say decent inventory, 25 or above cars.
2    The mom-and-pop shops are hard to get data from
3    and --
4         Q.   Okay.
5         A.   When I say modern, people that have the
6    availability to inventory and website and stuff
7    like that.
8         Q.   Okay.  And when you say, "my
9    understanding," is that based on your experience
10   that you described earlier working with Timbrook?
11        A.   That's my experience.
12        Q.   Okay.  Working at Timbrook?
13        A.   My experience overall.
14        Q.   Okay.
15        A.   And Timbrook is 13 dealerships or 14
16   dealerships, and he's acquired these dealerships
17   -- existing dealerships.  So a lot of them use
18   -- what's neat about that, in my exposure, is he
19   buys these dealerships as he goes, so they could
20   have a whole different platform at this Honda
21   dealership compared to the Chevrolet dealership.
22        Q.   Okay.
23        A.   They're not even the same model.
24   He doesn't even call them all Timbrook.  So
25   if I walk into Team One Chevrolet in Oakland,

Jason Merritt

Volino, Dominick v. Progressive Casualty Insurance

April 7, 2022

Page 136

1    Maryland, it's totally different than, say,

2    Timbrook GMC in Cumberland.

3         Q.   Now, there -- there are some appraisers

4    who make a take-price adjustment to the internet

5    price of comparable vehicles, correct?

6         A.   I don't know who does.  I don't know.  I

7    don't deal with that.

8         Q.   Well, don't you say that on the last

9    page of your report?

10        A.   Yes.  I'm just saying there are.  I

11   don't -- I don't know them.  I just read that.

12        Q.   Yeah.  But I'm just asking the question:

13   There are some appraisers who make a take-price

14   adjustment to the internet price of comparable

15   vehicles, correct?

16        A.   Correct.

17        Q.   Okay.  And in your report, last page,

18   you say that, "This adjustment is made only after

19   speaking with a car dealer to determine whether

20   the dealer would take anything other than the

21   advertised price of the vehicle."

22        A.   Correct.

23        Q.   How do you know that?

24        A.   It's really all you can do.

25        Q.   Well, have you spoken to any of the

Page 137

```
1   appraisers who make a take-price adjustment to
2   understand the basis for their doing so?
3       A.   Correct.  We've spoke to others, and
4   I've talked to them in classes and stuff like
5   that, and that's --
6       Q.   Okay.  Who have you talked to?
7       A.   By name, I don't know.  Just other
8   appraisers through the Bureau of Certified Auto
9   Appraisers.
10      Q.   Okay.  So there are other appraisers you
11  know who are certified by the same organization
12  that certifies you --
13      A.   Correct.
14      Q.   -- who think it's appropriate to make an
15  adjustment to the take price on internet prices
16  of comparable vehicles?
17      A.   Again, it depends on what market you're
18  in.  It's the classic vehicles that would be
19  normally like that.
20      Q.   Okay.  And --
21      A.   Because my -- my appraisals go from a
22  1908 Ford Model A to a 2022 Stingray.
23      Q.   Are you saying that these other
24  appraisers never make such an adjustment in
25  any market other than the cla -- the classic
```

Page 138

1  vehicles?

2       A.    No.   I can't say as a blanket.   I -- I

3  don't know what they're doing individually.

4       Q.    Okay.   Do you think -- strike that.

5            You describe in this paragraph of your

6  report on the last page that those adjustments

7  are specific to a particular vehicle from a

8  particular vehicle -- dealer and the recipient

9  of the -- strike that.

10            You say in this paragraph on the

11  last page of your report that the adjustment

12  is specific to a particular vehicle from a

13  particular dealer and the recipient of the

14  appraisal would know that the dealer stated it

15  would "take," I believe is missing, a spe --

16  specified price on that day for a particular

17  comparable vehicle.   Do you see that?

18       A.    Yes.

19       Q.    And you say, other -- "As with other

20  adjustments, this adjustment is based on data

21  specific to a comp vehicle chosen within the

22  total vehicle's market area."   Do you see that?

23       A.    Yes.

24       Q.    But that's not true, right?   You make

25  adjustments to the condition of the vehicle

Page 139

```
1  without any data about the specific comp vehicle,
2  right?
3           MR. LOWTHER:  Object to form.
4  BY MR. CASHDAN:
5       Q.   I'll restate it.
6       A.   Yeah.
7       Q.   Isn't it true you make adjustments based
8  on condition without any specific knowledge about
9  the condition of the comparable vehicles you're
10 using?
11          MR. LOWTHER:  Object to form.  Miss --
12 Misstates testimony.
13          THE WITNESS:  I'm sorry?
14          MR. LOWTHER:  You can go ahead and
15 answer.
16          MR. CASHDAN:  He's testifying.  You can
17 answer.
18          MR. LOWTHER:  No.  I was objecting.
19          THE WITNESS:  Okay.
20 BY MR. CASHDAN:
21      Q.   Okay.  You can answer.
22      A.   No.  I -- I use the comparables from
23 the dealerships because I know there's a -- an
24 industry standard with dealers in placing their
25 stuff on there.
```

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 140

1        Q.   Do you inspect the condition of any

2   comparable vehicle you use?

3        A.   No.

4        Q.   Okay.  So you don't know the specific

5   condition of any comparable vehicle you use, do

6   you?

7        A.   You have to explain "condition" more.

8   There's a lot of different "conditions."

9        Q.   You don't know the condition of any

10  specific comparable vehicle that you're using, do

11  you?

12       A.   Well, sure I do.

13       Q.   No.  You're assuming it's in average

14  condition, aren't you?

15       A.   Sure.

16       Q.   You've not inspected it, have you?

17       A.   No.

18       Q.   Do you call the dealer to ask if it's

19  in --

20       A.   No.

21       Q.   So you are assuming, without specific

22  knowledge of that particular vehicle, that it's

23  in average condition, correct?

24       A.   Through the evidence, yes.

25       Q.   You say "through the evidence."  Is

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 141 of 403
Jason Merritt
Page 141 of 403
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 141

1    there any specific evidence you use about any

2    specific comparable vehicle's condition?

3         A.   Well, sure.

4         Q.   What specific information?

5         A.   Specific information:  If it's for sale,

6    it's passed inspection, it's passed detailing, I

7    see pictures of it, there's certain standards

8    dealership must have to put that vehicle on the

9    lot.

10        Q.   Do you call every dealer and confirm

11   that they have followed those standards?

12        A.   No.

13        Q.   Do you call every dealer and ask for

14   the information about their inspection of the

15   vehicle?

16        A.   No.

17        Q.   Do you call every dealer and ask for the

18   detailing information?

19        A.   No.

20        Q.   Okay.  Do you have any specific

21   knowledge about a particular vehicle --

22        A.   No.

23        Q.   -- when you list it as a comparable?

24        A.   No.

25        Q.   Okay.  You assume the dealer has done

Jason Merritt
Page 142 of 403
Volino, Dominick v. Progressive Casualty Insurance
April 7, 2022

Page 142

1   everything it needs to to make that de -- that

2   vehicle average condition, correct?

3        A.   Correct.

4        Q.   But you don't know for sure they've done

5   it, do you?

6        A.   Well, no.  I haven't gone out there and

7   put my hand on it to inspect it, but, no --

8        Q.   But you make an adjustment for the

9   condition of the appraised vehicle assuming the

10  comparable is in average condition, correct?

11       A.   Correct.

12       Q.   Okay.  So that adjustment is not based

13  on data specific to the comparable vehicle, is

14  it?  It's based on information assumed about the

15  comparable vehicle, correct?

16       A.   I can't agree to that.

17       Q.   Okay.

18       A.   I can't agree to that.

19       Q.   In your appraisals, you will make an

20  adjustment for condition for an appraised vehicle

21  without ever inspecting the condition of any

22  comparable vehicle, correct?

23       A.   Again, to put that blanket statement

24  over it, I can't say that.  But my general

25  practice, yes.

Volino, Dominick v. Progressive Casualty Insurance

Page 143

1      Q.   What data does Mitchell or J.D. Power
2   have regarding a particular -- strike that.
3           What data does Mitchell or J.D. Power
4   have regarding negotiation of list price for any
5   particular vehicle in this country?
6      A.   You're asking me what Mitchell has.  I
7   don't know.
8      Q.   Okay.  How about J.D. Power?  Do you
9   know?
10     A.   I don't know.
11     Q.   Okay.  So when you say that you -- you
12  think it's -- strike that.
13          I want to go to the last paragraph of
14  your -- last full paragraph of your -- of your
15  report --
16     A.   Okay.
17     Q.   -- before the compensation, okay?
18          As I understand what you're saying, and
19  tell me if -- I'm just going to try to summarize
20  it and tell me if I'm wrong.
21     A.   Okay.
22     Q.   As I understand it, you think that the
23  Mitchell methodology, generally, is fine except
24  for the use of the Projected Sold Adjustment; is
25  that right?

Volino, Dominick v. Progressive Casualty Insurance

Page 144

1      A.   I -- I was -- to be quite honest, I was

2   impressed with what Mitchell has.

3      Q.   It -- it's a pretty --

4      A.   It's very in-depth.  It's very precise.

5   I like their condition reporting.  I like their

6   breakdown of the VIN number.  I like the -- the

7   adjustments that they do.  It's very nice how

8   it's automated and has certain things, very nice.

9           My biggest issue was the projected

10   sales, and reason being is because I've worked

11   in the dealerships.  And -- and when I worked in

12   the dealerships I saw the variation of the sale

13   price, only because of the other things brought

14   in to the sale itself.

15      Q.   Just to be clear, you said "your biggest

16   issue."  Do you have other issues with the

17   Mitchell --

18      A.   That is my issue with it.

19      Q.   Okay.

20      A.   That is my issue.

21      Q.   So your only issue is with the

22   application of the Projected Sold Adjustment?

23      A.   Yeah.  And if you -- if you took that

24   out of there and removed that, I don't like it

25   much because it eliminates a lot of our need,

Page 145

```
 1   you know?  Now, I think there's individual basis
 2   needed on a lot of stuff.  You know, I think my
 3   investigation techniques are -- are different
 4   than Mitchell's, but only because I'm very
 5   in-depth with it and Mitchell deals off -- you
 6   know, without seeing anything.  It's a computer.
 7   So I like to think we're better than computers.
 8   But, again, the Mitchell reports that I'm
 9   reading, I can't really fight anything on it
10   other than that projected sale price.
11        Q.   And you know those Mitchell reports
12   are -- are informed by detailed inspections --
13        A.   Sure.
14        Q.   -- by human beings --
15        A.   Sure.
16        Q.   -- to do the condition adjustment?
17        A.   Absolutely.
18        Q.   So -- so that individual inspection and
19   work that you are so proud of --
20        A.   Yes.
21        Q.   -- and, rightfully so, is also done by
22   the user of the product?
23        A.   Agreed.  Agreed.  Again, you take that
24   out of there and you've got a very good product.
25        Q.   So let me -- let me make sure I
```

Page 146

1    understand it.  And I want to use as an example,

2    just so I can -- I'm going to turn to Exhibit 13,

3    okay, Lukasik's vehicle evaluation report.

4            MR. CASHDAN:  Did I get it right?

5            MR. LOWTHER:  Yeah.

6            THE WITNESS:  Okay.

7    BY MR. CASHDAN:

8        Q.   All right.  So now Exhibit 13 actually

9    has a number of different vehicle valuation

10   reports.  It kind of shows the -- the -- the

11   iteration of it.  I want you to turn to the

12   report that begins with the little number in the

13   corner at 844, okay?

14       A.   Okay.

15       Q.   And I'll represent to you that this is

16   the report that, I think it was the last one that

17   was done for Mr. Lukasik, and it re -- results in

18   a -- an estimated market value that's the highest

19   of all the prior reports.  Okay?

20       A.   Okay.

21       Q.   So on the first page you can see that

22   this report estimated a base value of $12,648.45.

23   Do you see that?

24       A.   Yes.

25       Q.   And that there was a -- an upward

Page 147

1   adjustment for condition of $91.80, correct?

2        A.    Correct.

3        Q.    Meaning there was no downgrade and he --

4   he was bene -- he got a bene -- a bump up because

5   his car was in good condition, correct?

6        A.    Correct.

7        Q.    And then there was an aftermarket part

8   addition for $160.  Do you see that?

9        A.    Correct.

10       Q.    And so the total market value estimated

11  by this report was $12,900.25, correct?

12       A.    Correct.

13       Q.    And then, of course, you take his

14  deductible off, and that's the amount he was

15  paid.

16       A.    Sure.

17       Q.    Okay.  Now, if you turn to the third

18  page of this report, which is Bates Numbered 846

19  -- Mitchell-Volino Subpoena 846.  Tell me when

20  you're there.  846.  In the lower -- the lower --

21  the lower corner it should have a number eight

22  -- actually, right here.  Right here.

23       A.    Okay.  846.

24       Q.    Are you there?

25       A.    Yes.

Volino, Dominick v. Progressive Casualty Insurance

Page 148

1      Q.   All right.  So it's the third page of

2   this vehicle valuation report we started looking

3   at, and you can see that there were four

4   comparable vehicles used, correct?

5      A.   Correct.

6      Q.   And three of them were list prices.

7      A.   Correct.

8      Q.   Okay.  One of them was an actual sold

9   vehicle, correct?

10     A.   Correct.

11     Q.   Okay.  And so for those three that were

12  list prices, if you turn to the next page, it

13  shows the actual sold vehicle, right?

14     A.   Okay.

15     Q.   Do you see that?

16     A.   Yes.

17     Q.   And then if you turn to the next page,

18  Page 848, it has the second vehicle, which was a

19  list price, correct?

20     A.   Correct.

21     Q.   And there was a Projected Sold

22  Adjustment made of $818 on that vehicle, right?

23     A.   Correct.

24     Q.   And then the next vehicle had a

25  Projected Sold Adjustment of $643, correct?

Page 149

```
 1        A.    Correct.
 2        Q.    And then the last -- turn the page, the
 3   last vehicle had a Projected Sold Adjustment of
 4   $819.
 5        A.    Correct.
 6        Q.    Okay.  And if I understand what you're
 7   saying in your report, if we used this valuation
 8   report for Mr. Lukasik and we just deleted those
 9   Projected Sold Adjustments, you think it's
10   reasonable?
11        A.    Absolutely.
12        Q.    Okay.  So if we did that math -- I just
13   want to make sure we do it right -- that would
14   change -- the -- the -- the base value is the
15   average of the four vehicles, correct?
16        A.    Correct.
17        Q.    Do you have a calculator on your phone?
18        A.    I have my phone off.
19        Q.    All right.  I'll hand you my phone.
20        A.    He said to turn phones off.
21        Q.    That's okay.
22              Here's a calculator.  All right?
23              So the first vehicle in that report, if
24   you go back to Page 846, it has the summary.
25        A.    Okay.
```

Volino, Dominick v. Progressive Casualty Insurance

Page 150

1      Q.    The first vehicle was a sold price, so

2   there's no adjustment made, right?

3      A.    Okay.

4      Q.    The second vehicle, you can turn in

5   there, it was -- it -- it was -- its adjusted

6   price after mileage was 12,856.84.  Do you see

7   that?

8      A.    Yes.

9      Q.    So you're saying add the 818 back onto

10   that, right?

11      A.    Okay.

12      Q.    So go ahead and use your calculator, --

13      A.    Mm-hmm.

14      Q.    -- and add 12,856.84 and add $818 on

15   there.  What do you get?

16      A.    13,674.84.

17      Q.    So that's Vehicle Number 2.  Okay.

18   Now go to Vehicle Number 3.  That's on the Page

19   -- the 848 page.  You can turn that page and see

20   if you can see the adjustment

21      A.    Okay.

22      Q.    Are you on Page 848?

23      A.    Yes.

24      Q.    Okay.  Do you see Vehicle Number 3?

25      A.    Yes.

Page 151

1        Q.    All right.   So you would take the

2    adjusted price and add the projected sold back

3    onto it.

4        A.    Okay.

5        Q.    So cle -- clear that out.   Yeah.   There

6    you go.

7              So that would be 10,396 --

8        A.    643 is 11,638.

9        Q.    Wait.   I think you did it wrong.   Go

10   ahead and clear that.

11             Do you see the adjusted price is

12   10,396.75?

13             Okay.   And now add the projected sold

14   number back in, and what do you get?

15       A.    11,039.75.

16       Q.    11,039.75?

17       A.    Correct.

18       Q.    Okay.   And now let's do the same thing

19   for the fourth vehicle.   The adjusted price was

20   13,093.78 -- oh, I think you have it wrong there.

21             13,093.78, and then you're going to add

22   the 819 back, correct?   And what do you get?

23       A.    13,912.78.

24       Q.    Okay.   So now let's go back to our

25   summary page, Page 846.   So we're going to add

Jason Merritt                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 152

```
 1   the four vehicles in -- up again now that we've
 2   adjusted for projected sold, okay?
 3        A.   Okay.
 4        Q.   So the first vehicle is 14,246.41,
 5   correct?
 6        A.   Okay.
 7        Q.   Plus, the second vehicle you have
 8   13,674.84.  The third vehicle you're adding
 9   11,039 -- oh, we've gotta start over -- nope.
10   I think.  I think -- oh, there you go.
11        Okay.  Let's start over again, because I
12   think we have to -- you cleared everything out.
13        A.   No, I didn't.
14        Q.   Okay.  And then the fourth is 13,912.78,
15   okay?
16        A.   Mm-hmm.
17        Q.   And then you divide it by four, correct?
18        A.   Mm-hmm.
19        Q.   What number do you get?
20        A.   Yeah.  That's wrong.  42,000.
21        Q.   Okay.  Let's try it again, okay?  I've
22   written down the three --
23        A.   Let me see that.
24        Q.   -- the three adjusted ones, and then you
25   have the one unadjusted one at the top.
```

Page 153

1      A.    The one adjusted.

2      Q.    Okay.  Four.

3      A.    That's four.

4            52,873 --

5      Q.    And then you divide that by four,

6   correct?

7      A.    -- divided by four.

8      Q.    And what do you get?

9      A.    13,218.45.

10     Q.    Okay.  So using your approach, getting

11  rid of the PSA, the base value would change, if

12  you go back to Page 844 there -- right?  You're

13  there?

14     A.    Yes.

15     Q.    Okay.  If you go back to that, the

16  base value would be changed from 12,648.45 to

17  13,218.45.

18     A.    Correct.

19     Q.    Okay.  And 13,218.45, plus -- minus the

20  base value we had before equals what?

21     A.    570.

22     Q.    Okay.  So the difference between

23  what Mr. Lukasik was paid using the current

24  methodology and the amount he would be paid if

25  we followed your recommendation is $570?

Page 154

```
 1        A.   Yeah.  Roughly $600.
 2        Q.   Okay.  And -- and you agree that
 3   the rest -- the rest of the work Mitchell did in
 4   valuing Mr. Lukasik's vehicle was accurate?
 5        A.   Correct.
 6        Q.   So if Mr. Lukasik was paid $12,925, plus
 7   the 570, minus his deductible, he's been fully
 8   compensated for the actual cash value of his --
 9   of his vehicle, correct?
10        A.   Plus the other 600.
11        Q.   Yes.  Is that right?  So if he -- he --
12   if -- what I'm saying is the market value of his
13   vehicle here is $12,925, correct?
14        A.   Plus the 600.
15        Q.   Plus the 600, and then minus his
16   deductible.
17        A.   Correct.
18        Q.   If he receives that amount --
19        A.   So we have thirteen five as market
20   value.
21        Q.   So if he received that amount, he would
22   be fully compensated for the actual cash value of
23   his vehicle pursuant to his policy.
24             MR. LOWTHER:  Object to form.  Calls for
25   a leg -- legal conclusion.
```

Page 155

1    BY MR. CASHDAN:

2        Q.    You can answer.

3        A.    Yeah.  I -- I don't know what his policy

4    is or any --

5        Q.    I'm not asking for his policy.

6        A.    -- but I'm just saying, if I -- as an

7    appraiser, --

8        Q.    Yes.

9        A.    -- I would put thirteen five on that.

10       Q.    Thirteen five as the market value,

11   and then you would -- and then we -- we would

12   subtract the deductible, right?

13       A.    Yeah.  The deductible, obviously, I

14   don't deal with.  But I'm just saying --

15       Q.    Sure.

16       A.    -- thirteen five as an appraiser is the

17   number I would come up with.

18       Q.    Okay.  So if he received $13,500, --

19       A.    He has the actual cash value.

20       Q.    Okay.  And if he received less than

21   that, he would not have received the actual cash

22   value?

23       A.    Correct.

24       Q.    But if he received more than that, he

25   would have received more than the actual cash

Jason Merritt                                        April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 156

1   value?

2        A.   Correct.

3        Q.   Okay.

4        A.   For this standard, yes.  For -- yes.

5        Q.   And you have no issue with this approach

6   that Mitchell is taking, other than the Projected

7   Sold Adjustment, correct?

8        A.   Yes.  From what I've seen here,

9   these examples, I like these examples.  I like --

10  you know, again, I put in there some of the

11  comparables I would have done differently.  But,

12  again, their data is very broad, so mine would be

13  a little more narrowed down.  But --

14       Q.   Okay.

15       A.   -- but from what I see here, what

16  they're coming up with, I see a $600 difference

17  in what the -- the actual cash value is.

18       Q.   And, to be precise, it was 570.

19       A.   Five hundred and, yeah, eighty, 590.

20       Q.   You're rounding up to 600?

21       A.   Yeah.  I'm just --

22       Q.   Whatever the math is, right?

23       A.   Exactly.

24       Q.   You're not offering any opinion or

25  conclusion in this matter that disagrees with any

Page 157

1  of these vehicle valuation reports other than the

2  Projected Sold Adjustment, correct?

3       A.   That was the only thing that I really --

4  again, some of these were older, so I couldn't

5  go back and do comparables on them myself.  But

6  looking at these sheets and taking them for face

7  value in the data, yes, that was my issue.

8       Q.   Okay.  Now, if -- if one of the -- the

9  owners of these vehicles came to you with one of

10  these reports and said, --

11      A.   Mm-hmm.

12      Q.   -- I think that they -- they undervalued

13  my car because the condition was wrong; they got

14  the condition wrong, what would you do to address

15  that?

16      A.   To address that I would look at the

17  condition.

18      Q.   Okay.  What if the vehicle wasn't

19  available to you anymore?

20      A.   Well, then there's really not much I can

21  do with that.

22      Q.   Okay.  How about -- you said that you

23  might take issue with some of the comparables.

24      A.   If someone gave me this report and

25  said they totally disagreed with it, I would look

Volino, Dominick v. Progressive Casualty Insurance                April 7, 2022

Page 158

```
1    through it and look at the comparables.  Their
2    algorithms for their condition, where they marked
3    the numbers off the condition, I think that's
4    fair assessments.  You know, the carpet he rated
5    at Number 2 -- I'm looking at Page 821 --
6         Q.   Of -- of which exhibit?
7         A.   Of the same exhibit, 13.  Exhibit 13.
8         Q.   Okay.  Page 821?
9         A.   Yes.
10        Q.   Okay.
11        A.   The condition adjustments, I like how
12   they go through that and -- and note everything
13   and give it a number value.  I like how that's
14   documented.  So I would look at that for a
15   customer.  If he gave me this vehicle valuation
16   report, I would start there looking at the
17   condition, compared to what they had noted.
18   Sitting in a court of law, it would be hard to
19   argue that.
20        Q.   Yeah.
21        A.   It just would be.
22             The only thing that I would think would
23   come into play would be the comparables of it.
24   you know, we'd look at the different comparables
25   and make sure they're correct and right.
```

Volino, Dominick v. Progressive Casualty Insurance

Page 159

```
 1      Q.   And as an appraiser, you're not perfect,
 2  right?
 3      A.   No.
 4      Q.   You might think that the carpet is in
 5  fair condition and the car -- the owner of the
 6  car might say, no, it's in good condition, let me
 7  tell you, right?
 8      A.   Sure.
 9      Q.   You'd have those discussions.
10      A.   Everything thinks theirs is much better
11  than what it is.
12      Q.   And -- and, in fact, if you look at the
13  reports -- so you were -- you were looking at
14  Page 821, right?
15      A.   Yes.
16      Q.   And the carpet was rated as Fair,
17  correct?
18      A.   Yes.
19      Q.   Now, if you turn to Page 846, which
20  was the last report that we were looking at
21  earlier, --
22      A.   Mm-hmm.
23      Q.   -- you can see that the carpet condition
24  has been upgraded to Good.
25      A.   Okay.
```

Page 160

1       Q.   You see that?

2       A.   Yes.

3       Q.   And that -- that actually helps the

4   owner of the vehicle get a higher appraisal,

5   right?

6       A.   I don't know which one they're adjusting

7   that on.

8       Q.   Same -- same vehicle.  It's for the loss

9   vehicle.

10      A.   Okay.  Well, there I would ask why did

11  they change it from a two to a three.

12      Q.   Right.  So as we talked about, sometimes

13  there are conversations with the owner of the

14  vehicle and they might argue, "that stain is not

15  as bad as you think it is," or something of that

16  sort, right?

17      A.   Sure.

18      Q.   You've -- you've --

19      A.   Sure.

20      Q.   -- had that experience, I'm sure.

21      A.   Sure.

22      Q.   And -- and -- and do you think it's

23  appropriate for, when you're appraising a

24  vehicle -- a vehicle, to take into account the

25  perspectives of the owner of the vehicle on those

Page 161

1    issues?

2         A.    Not really.

3         Q.    Okay.  So -- so would you have an issue

4    with the way Mitchell made that adjustment?

5         A.    No.  Again, I don't know how that

6    adjustment was made.  I don't know why it was

7    made.  You know, maybe the first adjuster came in

8    and, after the crash, there was dirt or something

9    and after it was cleaned up they looked back it

10   again and it wasn't a stain.  So maybe he removed

11   it.  So --

12        Q.    Okay.

13        A.    -- you know, I don't know how they come

14   up with that.  There could have been a reason the

15   adjuster could have seen the dirt and then it got

16   wiped up and it wasn't a stain.

17        Q.    Okay.

18        A.    So I don't want to take that into

19   account.  I -- I can't say what Mitchell did to

20   change it.

21        Q.    But you're not going to offer any

22   opinion or conclusion in this case criticizing

23   these reports for any reason other than the

24   Projected Sold Adjustment, correct?

25        A.    Correct.

Page 162

1        Q.   Okay.
2             MR. LOWTHER:  Jeff, when we get to a
3    stopping point, can we take a short break?
4             MR. CASHDAN:  This is a good time.
5             MR. LOWTHER:  This is a good time?
6    Okay.
7             MR. CASHDAN:  We can go off the record.
8             THE VIDEOGRAPHER:  We're going off the
9    record.  This is the end of Media Unit Number 2.
10   Time is 11:54 a.m.
11            (Recess taken.)
12            THE VIDEOGRAPHER:  We're back on the
13   record.  This is the beginning of Media Unit
14   Number 3.  The time is 12:08 a -- p.m.
15   BY MR. CASHDAN:
16       Q.   Mr. Merritt, you mentioned that COVID
17   presented some challenges to your appraisal
18   business, and, in particular, I'm talking more
19   about the -- the act of doing appraisals.
20            I'm assuming that one of the challenges
21   was it, maybe, limited your ability to do
22   inspections of vehicles in person; is that right?
23       A.   Correct.
24       Q.   So what did you do in those
25   circumstances in order to perform your job of

Page 163

1    conducting an appraisal when you weren't able to

2    physically, in person, inspect a vehicle?

3        A.    Honestly, I didn't do any.

4        Q.    Okay.  So you just couldn't make

5    adjustments because there were not --

6        A.    I didn't do appraisals much.

7        Q.    Okay.  So --

8        A.    It was limited to what I could do.

9    Like, diminished value and stuff like that I

10   could do.  But actual cash value and classic car

11   appraisals, I just couldn't do them.

12       Q.    So for what period of time were you just

13   unable to do the actual cash value appraisals?

14       A.    It depended on where we were in the

15   numbers and who felt comfortable with me meeting

16   with them.

17       Q.    Was there a time period, though, or was

18   it just intermittent?

19       A.    Intermittent.  It would start and stop

20   and start and stop, --

21       Q.    Okay.

22       A.    -- but over about a year.

23       Q.    So it wouldn't surprise you that

24   Progressive, as in the insurance entities,

25   similarly had issues with the ability to conduct

Volino, Dominick v. Progressive Casualty Insurance

Page 164

1  inspections during COVID?

2      A.   Correct.

3      Q.   And, of course, they didn't have the

4  luxury of just telling their customers they

5  weren't going to do it?

6      A.   People were still crashing.

7      Q.   People were still crashing.

8           So I wonder if you could just turn to

9  Exhibit 12?

10          And, if you could, just as an example,

11  this is the -- this is the vehicle valuation

12  report for Mr. Costa.  Do you see that?

13     A.   Correct.  I do.

14     Q.   Okay.  And you can go to -- there's

15  several different vehicle valuation reports.

16  They -- they lead up to the last one, because

17  they go -- but if you -- if you can look at any

18  of them, I think what you'll see, and you can go

19  to, for example, the fourth page of this exhibit,

20  you can see that there was no con -- condition

21  adjustment made for Mr. Costa's vehicle because

22  they were unable to determine the condition

23  because of COVID.  Do you see that?

24     A.   I do.

25     Q.   And so as a result, Mr. Costa's vehicle

Page 165

```
 1   was given a condition rating of three, which is
 2   average for dealer-sold vehicles.
 3       A.   Correct.
 4       Q.   Do you have any issue with that approach
 5   given the circumstances?
 6       A.   Given the circumstances, no.  I
 7   mean, you know, again, they have to do what they
 8   have to do to get it done.  And average overall
 9   condition of three, you know, I think that's
10   reasonable.
11       Q.   In your experience with regular
12   automobiles, and what I mean by that is
13   I'm putting aside collector items, --
14       A.   Mm-hmm.
15       Q.   -- okay, in your experience with regular
16   automobiles, do owners typically keep their used
17   vehicles in a condition that is better or worse
18   than dealer-sold used cars?
19       A.   I keep mine in great shape.  I see some
20   that are in very bad shape.  So "typical," I
21   can't give you a -- I can't give you an opinion
22   on that.
23       Q.   So it's going to vary?
24       A.   Yeah.  It's varied.
25       Q.   And so in the circumstances of, like,
```

Volino, Dominick v. Progressive Casualty Insurance                    April 7, 2022

Page 166

1    Mr. Costa, where he was assumed to have a typical

2    condition, it -- it may have benefited him or it

3    may have hurt him --

4         A.   Correct.

5         Q.   -- in the valuation, correct?

6         A.   Very well could have.

7         Q.   And that would be true of anyone in that

8    circumstance?

9         A.   Correct.

10        Q.   We just don't know, based solely on this

11   report, --

12        A.   Correct.

13        Q.   -- whether he was benefited or hurt in

14   the actual cash value, correct?

15        A.   Correct.

16        Q.   It would require a little more

17   individual inquiry --

18        A.   Yes, it would.

19        Q.   -- to make that decision?

20        A.   Correct.

21        Q.   Okay.  Inquiry you haven't even

22   purported to do, correct?

23        A.   No.  No.  Not on this one, no.

24        Q.   Okay.  And you're -- you're agreeing

25   with me that I'm correct you haven't done it; is

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 167

1    that right?

2        A.   On this -- no, I have not done any on

3    this report.

4        Q.   Okay.  If you would go back to Exhibit

5    1, I'd like to understand a bit more about the

6    process you used to write this report.  So my

7    question is, did you write every word of this

8    report yourself?

9        A.   No.  I had help writing it.

10        Q.   Who helped you?

11        A.   Mr. Lowther helped me.  I gave an

12    outline and all my opinions, and they helped

13    me to, kind of, refine it, I guess you could say.

14        Q.   When you say "they," you're talking

15    about plaintiff's counsel, Mr. Lowther?

16        A.   Correct.

17        Q.   Okay.  You provided him an outline?

18        A.   I provided him -- I -- yeah.  We talked

19    and I provided him an overview of everything that

20    I want to put in the report, and then they refine

21    it to the final product.

22        Q.   Did you provide a written outline?

23        A.   No.

24        Q.   So you provided an oral outline of what

25    you wanted to put in the report --

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 168 of 403
Jason Merritt
Page 168 m 368 ett                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 168

1       A.    Correct.  Kind of a --

2       Q.    -- to the plaintiff's counsel; is that

3  right?

4       A.    -- a verbatim.

5       Q.    What I'm asking you is you provided an

6  oral --

7       A.    Correct.

8       Q.    -- statement to plaintiff's counsel of

9  what you wanted in the report?

10      A.    Yes.

11      Q.    And then plaintiff's counsel wrote the

12  report and you reviewed it?

13      A.    Yes.

14      Q.    And did you make any changes to what

15  they wrote?

16      A.    Yes.

17      Q.    And you sent them back to plaintiff's

18  counsel, or you made the changes yourself?

19      A.    Made the changes myself.

20      Q.    Okay.  And then did you -- did you send

21  it back for their review?

22      A.    Correct.

23      Q.    And did you make any further changes?

24      A.    I don't believe so.

25      Q.    Okay.  Was there anything that

                                                        Page 169

1    plaintiff's counsel proposed to put in that you

2    rejected as inaccurate?

3              MR. LOWTHER:  Object to form.

4              And, Mr. Merritt, I'm going to

5    caution that we are not waiving the Work

6    Product Privilege here as to any draft or to

7    any -- any communications.  So if it's not about

8    a fact that you got from counsel or an assumption

9    that we asked you to -- to consider for purposes

10   of your report, then I'd ask you to not disclose

11   it.

12             MR. CASHDAN:  Well, I'm not asking him

13   to disclose it.  I'm asking for a yes or no.  All

14   right?

15   BY MR. CASHDAN:

16        Q.   Was there anything that plaintiff's

17   counsel put in the proposed report to you that

18   you rejected as untrue, just yes or no, without

19   disclosing what it was?

20        A.   No.

21        Q.   Okay.  Was there anything that -- strike

22   that.

23             When did plaintiff's counsel first send

24   you a -- a draft report that they wrote for you

25   to review?

Volino, Dominick v. Progressive Casualty Insurance    April 7, 2022

Page 170

1        A.    Well, again, I -- I dictated this

2    report, and they then typed it out as I dictated

3    it and re -- responded back to me with the copy

4    and then I made the changes and gave it back.

5        Q.    All right.  So you're saying you -- you

6    didn't give them an outline.  You actually

7    dictated verbatim what's in there?

8        A.    Yes, the outline of everything I wanted

9    in there.  And we discussed it and I gave them an

10    outline of everything in here.

11        Q.    Okay.

12        A.    So this is my report.

13        Q.    I understand, but we are using words

14    without precision.  That's my fault.  What I'm

15    asking is, did you, verbatim, dictate the actual

16    words in the first draft?

17        A.    Yes.

18        Q.    Okay.  So it wasn't an outline.  It was

19    actually the words?

20        A.    Again, it depends on what you want

21    to put.  Yeah.  We -- we put actual words, but

22    then they --

23        Q.    They added more to it.

24        A.    No.  No.  No.

25        Q.    Okay.

Page 171

1      A.    Not as in content, but maybe in my

2   English and --

3      Q    Sure.   Okay.

4      A.    -- and -- and what I wanted to say in

5   there and helped me to correct the English and

6   put it in the correct re -- and the reason

7   being, I've never done an expert report, so they

8   assisted me with the actual construction of the

9   report.

10      Q.    Okay.

11      A.    The actual content of the report is

12   mine.

13      Q.    Okay.

14      A.    But I have never -- as I've testified,

15   this is my first time testifying as an expert in

16   this, so they assisted me with drafting up this

17   report.

18      Q.    Now having had a chance to review this

19   more, is there anything in here that you want to

20   amend?

21      A.    No.

22      Q.    Anything you think needs to be changed

23   in order to be accurate?

24      A.    No.

25      Q.    Okay.   Are there any opinions or

Jason Merritt
Page 172 of 403                                                 April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 172

1    conclusions you have regarding this case that are

2    not set forth in your report in Exhibit 1 here?

3        A.    No.

4        Q.    Okay.  Have you been asked to do any

5    additional work?

6        A.    No.

7        Q.    Do you have plans at this time to do any

8    additional work?

9        A.    No plans.

10        Q.    Okay.

11        A.    Been no discussion.

12        Q.    Okay.  Let's go ahead and look back at

13    Exhibit 8.

14            Did you have this document at the time

15    you prepared your expert report?

16        A.    When I did this, yes.

17        Q.    Okay.  And -- and for what purpose did

18    you use or rely on Exhibit 8 for your expert

19    opinions and conclusions?

20        A.    Mine would just be that I was

21    questioning how they come up with any of

22    these -- any of the reports, their evaluations.

23        Q.    Okay.  Did -- did -- were you curious as

24    to what kind of hard data Mitchell or J.D. Power

25    had available to estimate Projected Sold

Page 173

1    Adjustment?

2         A.    Again, I -- my curiosity is different

3    than what -- the actual information that I know.

4    Again, the information that I know that dealers

5    report on sold is exactly the data that we put in

6    the CRMs.

7         Q.    Yeah.  What I'm asking is, did you want

8    to understand how Mitchell and J.D. Power come up

9    with their Projected Sold Adjustment?

10        A.    Well, sure.

11        Q.    And did you want -- your -- your report

12   talks about how you can't assume and you have to

13   have hard data.  Were you curious whether they

14   claimed to have hard data to make those

15   adjustments?

16        A.    Curious?  Yes.  Do I know?  No, I don't

17   know.

18        Q.    Did you ask for testimony or documents

19   that would inform you on that subject?

20        A.    No.

21        Q.    Looking at this document, the first

22   sentence of the second paragraph says, and,

23   again, we're looking at Exhibit 8, --

24        A.    Okay.

25        Q.    -- "Prior to discussing the internet

Page 174

1    sales pricing and method, caution must be taken

2    when obtaining information, such as the sold

3    price, from the dealer regarding a specific

4    vehicle."  Do you see that?

5         A.    Yes.

6         Q.    Do you agree with that?

7         A.    I agree with that.

8         Q.    Next sentence says, "Basing an opinion

9    solely on the dealer's verbal communication is

10   not recommended."  Do you agree with that?

11        A.    Totally.

12        Q.    Next sentence: "This information must

13   be accurate.  And unless the dealer can provide

14   actual proof, such as purchase invoice or

15   contract, which should be considered private

16   information with regards to the actual purchaser,

17   this information should be considered suspect at

18   best."  Do you agree with that?

19        A.    I do.

20        Q.    Okay.  The next section is on Internet

21   Sales.  Do you see that?

22        A.    I do.

23        Q.    The first sentence says:  "With the

24   explosion of the internet, there are two methods

25   employed by dealerships when selling new/used

Volino, Dominick v. Progressive Casualty Insurance

Page 175

1    vehicles."   Do you agree with that?

2        A.   I do.

3        Q.   It says, "In addition to the more

4    traditional on-the-lot sales, many dealerships

5    have internet sales departments."  Do you see

6    that?

7        A.   I do.

8        Q.   Do agree with it?

9        A.   I do.

10       Q.   Next sentence:  "For an internet

11   department, it is more important to move

12   inventory and sell a lot of cars than it is to

13   maximize profit on individual cars."  Do you

14   agree with that?

15       A.   Yes.

16       Q.   Next sentence:  "Therefore, the initial

17   price from an internet sales department will

18   often reflect a no hassle price."  Do you agree

19   with that?

20       A.   I do.

21       Q.   Next sentence says, "It is important not

22   to confuse a dealer's inventory online with an

23   internet no hassle price."  Do you agree with

24   that?

25       A.   No.  I don't agree with that.

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 176 of 403
Jason Merritt
Page 176 of 403                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                      Page 176

 1      Q.   Okay.  Next sentence says, "Our
 2   experience indicates that dealers who offer
 3   the internet no hassle pricing also have
 4   incorporated a no hassle single-price sales
 5   policy."  Is that your experience?
 6      A.   No.
 7      Q.   Okay.  The remainder of the document
 8   talks about how WorkCenter Total Loss functions,
 9   and I presume that you don't have any expertise
10   on that issue, other than just having read the
11   reports?
12      A.   I'm not going to say I don't have
13   experie -- or expertise in it 'til I know exactly
14   what you're referring to.
15      Q.   Okay.  Sure.
16           Is there anything in those remaining
17   paragraphs that you disagree with?
18      A.   Oh, I just thought you said okay.
19      Q.   Oh, I thought you were reading it.
20      A.   No.  I'm sorry.  I thought you were
21   looking for something else.
22      Q.   No.  I -- I thought you said you wanted
23   to look at it before you agreed with my question.
24      A.   No.  We won't over each sentence
25   individually, so I thought that's what you wanted

Page 177

1   to do.

2        Q.   Well, for the last three paragraphs,

3   which disc -- they discuss the way that

4   WorkCenter Total Loss operates, so I -- I wasn't

5   going to ask you if you agreed that it operates

6   that way, but go ahead --

7        A.   Okay.

8        Q.   -- and read the last three paragraphs

9   and tell me if there's any parts of them that you

10  disagree with.

11       A.   No.  I agree with that.

12       Q.   Okay.  You -- how much time did you

13  spend dictating the general outline of the expert

14  report for plaintiff's counsel?

15       A.   I don't recall how much time that took.

16       Q.   All right.  You told me earlier that

17  you -- you had spent three to four hours of time

18  in your work leading to the completion of the

19  expert report?

20       A.   Correct.

21       Q.   How much of those three to four hours

22  were spent in the actual editing of the report?

23       A.   Editing of the report was a small amount

24  of time.  Me actually coming to the conclusion on

25  this report, prob -- the entire report was

Page 178

1    probably an hour of that.

2        Q.    When you say "coming to the conclusion,"

3    what do you mean?

4        A.    No.  I mean, coming to the final version

5    probably took an hour.

6        Q.    In terms of -- of -- of editing it and

7    writing it?

8        A.    Yes.

9        Q.    Okay.  So of the three to four hours, an

10   hour of it was writing and editing the report?

11       A.    Correct.

12       Q.    So of the -- two to three hours was

13   spent looking at the documents you had been

14   provided and thinking about the issues?

15       A.    Correct.

16       Q.    Okay.  That's helpful.  Thank you.

17             Turn, if you would, to Exhibit 9.

18       A.    Okay.  England.

19       Q.    All right.  This is the be -- vehicle

20   valuation report for Mr. England, correct?

21       A.    Correct.

22       Q.    Is there anything associated with this

23   report with which you take issue, other than the

24   use of the Projected Sold Adjustment?

25       A.    No.  That seemed to be the biggest

Page 179

1    issue, and, again, that was one of the COVID

2    ones.

3        Q.   When you say "that's the biggest issue,"

4    I want to know if you have any other issue with

5    this report?

6        A.   That's the issue I have with this

7    report, is the adjustment.

8        Q.   The Projected Sold Adjustment?

9        A.   Correct.

10       Q.   So you have no other issue with the

11   report other than the Projected Sold Adjustment;

12   is that correct?

13       A.   And when I say that, again, my -- I go

14   back to the methodology.  Everything that I see

15   in here follows the same methodology.  I can't

16   confirm the comparables, I can't confirm the

17   conditions, I can't do any of that.  But it's

18   following that same methodology, you know, the

19   comparables, the adjustments, the -- the base

20   value, the calculated loss vehicle adjustments

21   and the market value.  I agree with all that,

22   except for Step 2, Bullet 1, you know.  But,

23   again, the methodology is what I -- I agree with

24   on that.

25       Q.   Okay.  So you agree with the

Page 180

1    methodology, whether the actual -- strike that.

2           You agree with the methodology other

3    than the Projected Sold Adjustment?

4       A.    Correct.

5       Q.    But whether the actual dollar amount is

6    the right amount, within that right range, you

7    don't have an opinion on --

8       A.    No.

9       Q.    -- because you have -- you have to

10   actually do the appraisal, correct?

11      A.    Correct.

12      Q.    Okay.

13      A.    And that was June 22nd of 2020, so

14   documents, you know, even online, it's hard to

15   find those comparables again.

16      Q.    Okay.  But the only way you could have

17   an -- you would have an opinion about whether the

18   dollar amount is appropriate would be to do an

19   appraisal?

20      A.    Correct.

21      Q.    Okay.  And you haven't done that?

22      A.    No.

23      Q.    Let's look at Exhibit 10.  So the -- the

24   same question for this one.  I'm wondering if

25   there's any issue you have with the vehicle

Volino, Dominick v. Progressive Casualty Insurance

Page 181

1   valuation report in Exhibit 10 other than the

2   Projected Sold Adjustment?

3        A.    No.    It appears this one, again, goes by

4   the same methodology.    They used quite a bit

5   of vehicles for comparables.    And this was not

6   a COVID one, so they -- they did all the

7   conditional things.    So, again, it follows

8   the same methodology.

9        Q.    And so you have no issue other than the

10  use of the Projected Sold Adjustment, correct?

11       A.    Correct.

12       Q.    Okay.    Now, I notice on the third page,

13  where it summarizes the Comparable Vehicle

14  Information, third page of this Exhibit 10, that,

15  for some of the comparables they have a sold

16  price and for some of them they have a list

17  price; is that correct?

18       A.    Correct.

19       Q.    And am I correct that it's your opinion

20  that they should not have used the sold price;

21  they should have found a list price to use?

22       A.    Yes.    As we discussed.

23       Q.    Okay.    So you -- so your criticism is

24  that you think you should always use list price

25  and never use sold price?

Page 182

1       A.    As a standard, yes.

2       Q.    Okay.  And is that what you do in

3    your --

4       A.    Yes.  Again, because I -- as they even

5    stated here in the WorkCenter is it's hard to get

6    the actual sold price.

7       Q.    Okay.  But if you're -- if you're able

8    to get the sold price, would you want to use it

9    instead of the list price?

10      A.    Again, if I had the -- and, again, they

11   even recommend not doing it.  They recommend

12   against it, even in this.

13      Q.    Where do they recommend against it?

14   Tell me.  You're -- you're -- when you say

15   "this," you're --

16      A.    We're looking at Exhibit 8.

17      Q.    Okay.  And where do they recommend

18   against using the sold price?

19      A.    Second paragraph down --

20      Q.    Mm-hmm.

21      A.    -- it says, "is not recommended."

22      Q.    Where does it say that?

23      A.    Second line -- third line down, starts

24   on second, "Basing an opinion solely on the

25   dealer's verbal communication is not

Page 183

1    recommended."

2        Q.    Okay.  So does that say you shouldn't

3    use the sold price, or you just shouldn't rely on

4    a dealer's oral communication of the sold price?

5        A.    Well, to me that's the same thing.

6    They're saying you can't rely on it.

7        Q.    Okay.  So you interpret this as saying

8    you should not re -- rely on sold prices?

9        A.    Correct.

10       Q.    Okay.  And what if there was another way

11   to get the information that was accurate?  Could

12   you rely on it then?

13       A.    If you had an accurate assessment of

14   the sale of the vehicle, and when I use those

15   it's usually the classics:  Antiques.  Again,

16   when I'm dealing with dealers, it's too --

17   there's too many variances and there's too many

18   different variations in the sale.

19       Q.    What -- what information does Mitchell

20   have regarding the sold price for vehicles?

21       A.    I don't know what they have.

22       Q.    Okay.  So do -- do you know if they

23   information they have is reliable?

24       A.    No.

25       Q.    You just don't know?

                                              Page 184

1        A.    Again, I know what we provide as a

2    dealer in the CRMs.  And, again, that is not a

3    good representation of what the vehicle's worth.

4        Q.    I'm asking if you know what information

5    Mitchell has available --

6        A.    No.

7        Q.    -- on sold prices?

8        A.    No.

9        Q.    You don't know?

10       A.    No, I don't.

11       Q.    Okay.  But you think that it's a mistake

12   for them to -- for Mitchell to use the sold price

13   instead of the list price?

14       A.    I do.

15       Q.    Okay.

16       A.    I've never had Mitchell call me while I

17   was sitting at a dealership to ask me to verify

18   or even to break down the sale.

19       Q.    So going back to Exhibit 10, for those

20   vehicles on the -- looking at the third page of

21   Exhibit 10, --

22       A.    731?

23       Q.    Yes, sir.  Bates Number 731.

24             -- for those vehicles where there's a

25   sold price listed, do you think it would be

Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 185

1   appropriate to go back and look for the list
2   price for those vehicles and then recalculate the
3   base value?
4       A.   I would like to know what the list
5   prices were.
6       Q.   Well, that's not what I asked.  I know
7   you'd like to know it.  What I'm asking is do you
8   think it would be appropriate to find the list
9   prices for those vehicles and to recalculate the
10  base value?
11      A.   I do.
12      Q.   And -- and you think that should be done
13  for Mr. Goodier?
14      A.   Correct.
15      Q.   Okay.  And so that's another issue you
16  have with the report, is that -- the use of sold
17  prices instead of list prices, correct?
18      A.   Again, yes.  In these circ -- in these
19  circumstances you pointed out, yes.
20      Q.   And so it would be -- in your opinion,
21  it would be appropriate to re-do Mr. Goodier's
22  report to use list price instead of sold price?
23      A.   Correct.
24      Q.   Okay.  And do you know whether it's
25  possible to find old listings for sales of

Jason Merritt                                April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 186

1   vehicles?

2        A.   It depends on which website it is.  I

3   don't think the individual dealership websites

4   you can.

5        Q.   But the dealers might have that

6   information, right?

7        A.   Correct.  You might be able to call them

8   and get it.

9        Q.   So -- so with -- with just some -- some

10  individual effort, you could probably find it,

11  correct?

12       A.   Possible.

13       Q.   Possible.

14            You'd have to -- it would vary based

15  on -- on --

16       A.   And, again, you're dealing with, you

17  know, private individuals' information at that

18  point, so they may not disclose.

19       Q.   Luckily, we have subpoena power in

20  courts, don't we?

21       A.   Sure.

22       Q.   So it would be possible -- it might be

23  possible, it's going to vary individually, --

24       A.   Absolutely.

25       Q.   -- as to whether you can get this

Page 187

1    information?

2         A.    Absolutely.

3         Q.    But you think it should be done?

4         A.    I believe so.

5         Q.    Thank you.

6               All right.  Let's look at Exhibit 11.

7    This is the valuation report for Mr. Plotts.

8    And I think -- just to be clear, I think this is

9    a collection of several valuation reports that

10   have been -- that were produced together to us.

11              And my question is, with regard to

12   Mr. Plotts, do you have any issue with his

13   valuation reports, other than the use of the

14   Projected Sold Adjustment?

15        A.    No, I do not.

16        Q.    Okay.

17        A.    Again, it follows the same methodology.

18        Q.    And you don't have an opinion as to

19   whether the dollar amount is accurate?

20        A.    No.

21        Q.    Is that correct?

22        A.    I do not.

23        Q.    I just want the record to be clear,

24   sir.

25        A.    You are correct.

Page 188

1     Q.   Thank you.  It's my fault the way I

2  asked the question.

3     A.   I'm sorry.

4     Q.   No.  You shouldn't apologize.  I asked

5  it inartfully, and I apologize for that.

6          Let's move on to Number -- Exhibit 12,

7  which we've looked at before, which is the

8  collection from Mr. Costa.  And I wonder if,

9  other than the Projected Sold Adjustment, you

10  have any other issue with his valuation reports?

11     A.   No, I do not.  And, again, in these

12  comparables that say, "listed and sold," I

13  don't -- as we just testified, I don't know where

14  Mitchell is getting that information from.

15  So they're sold valuation, I don't -- I don't

16  know where they're getting from that.  So it

17  could be legit.  You know, it could be a real

18  good breakdown of the sold price compared, you

19  know --

20     Q.   Fair enough.  So you don't -- you don't

21  have an opinion on it because you don't really

22  know where the information came from?

23     A.   Yeah.  I don't know where they're

24  getting them from.

25     Q.   And the -- the Projected Sold

Page 189

1  Adjustment, do you know if they're just making an

2  assumption about it or whether they have hard

3  data?

4       A.   No.   I'm not talking about the Predicted

5  Sold Amount.   That's not what I'm talking about.

6  I'm talking about when he lists the comparables

7  in here and has list -- list ones compared to

8  sold.

9       Q.   No.   I understood what you were saying.

10  You don't know where they get the sold price.

11       A.   Yes.

12       Q.   I'm asking a different question.

13       A.   Okay.

14       Q.   I'm asking, with regard to Projected

15  Sold Adjustment, with regard to the data that

16  they're using, do you know whether they are using

17  real hard data or just making an assumption about

18  the amount?

19       A.   Yes.   I do not know.

20       Q.   Okay.   Looking at Number 13, which

21  we've looked at before, Mr. Lukasik's collection

22  of valuation reports, as we discussed earlier,

23  one of the four vehicles used for Mr. Lukasik was

24  an actual sold vehicle.   So am I correct that you

25  think that was also wrong?

Jason Merritt
Page 190 of 403
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 190

1      A.   Again, I -- I don't -- when I say that,
2  again, I gotta back up a little bit and say that
3  I don't know where that information's coming
4  from.
5      Q.   Okay.
6      A.   So if you know that it's a real sold and
7  there was no other variables in it, and it was,
8  literally, a cash-out-the-door, I'm handing you
9  the money and walking out the door, then I would
10  take that into consideration.
11      Q.   Okay.  Okay.
12      A.   Okay.  So I don't want to be painted
13  into that corner of saying all sold is not -- you
14  know, I can't do that.
15      Q.   It just depends on the circumstances.
16      A.   It depends on the circumstance, but,
17  again, it -- it -- it depends on where the data
18  is coming from.
19      Q.   Okay.  And so if -- if you knew where
20  the data was coming from, would you then just
21  have to confirm the individual circumstances
22  looking at that data to decide if you can use a
23  sold --
24      A.   Yes.
25      Q.   -- actual sold?

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 191 of 403
Jason Merritt
Page 191 of 3889
Volino, Dominick v. Progressive Casualty Insurance

April 7, 2022

Page 191

1      A.    Yes.

2      Q.    So you -- you would have to look at the

3    individual circumstance around that transaction

4    to know whether using the sold price was

5    appropriate?

6      A.    Well, as I just testified, I don't know

7    where they're getting the data, --

8      Q.    I know you don't.

9      A.    -- so I don't know.  I -- I can't say

10   that.  It -- their data may be very good on the

11   sold prices so they would have to go with that.

12   But I don't -- I don't see that, I don't know

13   that.  And I know that the dealers, that's not

14   their concern.  So, in other words, I don't want

15   to paint a broad stripe over all of it, other

16   than the projected sold thing is where I have the

17   difference in the methodology.

18      Q.    Yeah.  And my only question was do

19   you agree that, wherever the data comes from,

20   you still have to look at the individual

21   circumstances of the sale to know whether it's

22   appropriate to use the sold price or not?

23      A.    Correct.

24      Q.    Okay.  And for Mr. Lukasik, other than

25   the Projected Sold Adjustment and the issue about

Jason Merritt                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                        Page 192

1    sold price we just discussed, do you have any
2    other issue with his --
3         A.   No.
4         Q.   -- valuation?
5              MR. CASHDAN:  All right.  Let's take a
6    quick break.
7              MR. LOWTHER:  Okay.
8              MR. CASHDAN:  Off the record.
9              THE VIDEOGRAPHER:  We're going off the
10   record.  The time is 12:41 p.m.
11             (Recess taken.)
12             THE VIDEOGRAPHER:  We're back on the
13   record.  The time is 12:48 p.m.
14   BY MR. CASHDAN:
15        Q.   What's the process to get certified by
16   the Bureau of Certified Auto Appraisers?
17        A.   It's a 40-hour online course with a test
18   and a --
19        Q.   Okay.
20        A.   -- fee.
21        Q.   A fee.  Sure.
22        A.   The fee for the certificate.
23        Q.   And how -- how often -- I -- I -- I
24   notice from your bio here on Exhibit 2 that your
25   certificate expires May 27, 2022.

Page 193

```
 1        A.    I believe just two years.

 2        Q.    Do you have to take another course and

 3   test to get recertified?

 4        A.    I haven't found that out yet, --

 5        Q.    Okay.

 6        A.    -- just because I'm -- I'm due here

 7   soon, so I need to get on that soon.  But I

 8   believe it's some type of a refresher course and

 9   another fee.

10        Q.    Okay.  And the online course teaches the

11   basics about how to conduct an appraisal?

12        A.    Correct.

13        Q.    And -- and do you attempt to conduct

14   appraisals pursuant to the standards set forth by

15   your certifying entity?

16        A.    I do.

17        Q.    Okay.  And does it explain that process

18   in your 40-hour course?

19        A.    Yes.

20        Q.    Okay.  And you mentioned there are three

21   other people who work with you; is that right?

22        A.    I have three other people that are

23   certified.

24        Q.    Okay.

25        A.    I don't really use them yet.  Again,
```

Volino, Dominick v. Progressive Casualty Insurance

Page 194

1    COVID shut us down.

2        Q.   Okay.

3        A.   So we just started back into it again.

4    So during COVID I got some more certified, so

5    we're hoping to do better.

6        Q.   Okay.  So -- and they all are certified

7    by the same organization?

8        A.   Correct.

9        Q.   Okay.  Do you know how many appraisals

10   you have done since starting the business East

11   Coast Auto Appraisers LLC?

12       A.   Actual written appraisals through East

13   Coast Auto Appraisers, probably less than 20.

14       Q.   Okay.  And that's since April 2020?

15       A.   Correct.

16       Q.   Okay.

17       A.   Again, we've been totally shut down,

18   so ...

19       Q.   And -- and during that time, were you

20   also running the T3 Intelligence Services

21   business?

22       A.   Correct.

23       Q.   What percentage of your income comes

24   from T3 Intelligence Services?

25       A.   I got a lot going on.  I got retirement.

Volino, Dominick v. Progressive Casualty Insurance

Page 195

1    I've got that T3 Investigation Services.  I've

2    got East Coast Auto.  So percentage, East Coast

3    Auto right now, at this point, is in its infancy.

4        Q.    Okay.

5        A.    So I put more money out than in.

6        Q.    Okay.  So East Coast Auto, you said,

7    about 20 appraisals since 2020.  It's not a big

8    contributor to your income at this point in time?

9        A.    No.  No.

10       Q.    Okay.

11       A.    I can't live on that.

12       Q.    Got it.

13       A.    Hopefully soon.

14       Q.    You mentioned in your report that

15   sometimes options can be determined using a VIN

16   decoder?

17       A.    Yes.

18       Q.    For the record, explain what you mean by

19   a VIN decoder.

20       A.    A VIN decoder is any online site that

21   will actually decode the VIN to you.  You can use

22   Bumper.com, Carfax.com.  You just decode the VIN

23   number, the Vehicle Identification Number.

24       Q.    And is it your understanding that not

25   all of the options necessarily will be decoded by

Page 196

1    the VIN decoder?

2         A.    Correct.

3         Q.    So sometimes you need to actually

4    physically inspect the vehicle to be able to

5    capture all of the aspects of the vehicle that

6    might affect the value?

7         A.    There's a -- the window sticker.  It

8    will sometimes tell you also.  It depends on what

9    you have.

10        Q.    I'm talking about a used vehicle.  If

11   someone brings you a used vehicle to -- to be

12   appraised, is it your experience that a VIN

13   decoding is not, by itself, usually sufficient?

14        A.    By itself, no.  But, like I said, there

15   is other -- sometimes in the glove compartment

16   there's a sticker on the glove compartment that

17   has all the options.  So I usually to take a

18   picture of that and try and decode that also.

19   It's kind of a build tag, I guess you would call

20   it.  So there are other codes on the vehicle, as

21   well as the VIN, that can help you determine

22   options.

23        Q.    If you're trying to do a complete

24   appraisal, you won't just rely on a VIN decoder,

25   right?

Jason Merritt                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 197

```
 1        A.    No.   No.

 2        Q.    Correct?

 3        A.    Correct.

 4             MR. CASHDAN:  Okay.  I have no further

 5   questions.  Thank you for your time.

 6             MR. LOWTHER:  All right.  We will

 7   reserve ours for trial.

 8             THE VIDEOGRAPHER:  Please stand by.

 9             MR. CASHDAN:  Oh, wait.  I assume the

10   witness is going to read and --

11             MR. LOWTHER:  Yeah.  Yeah.  The witness

12   is going to read and sign.

13             MR. CASHDAN:  Okay.  Thank you.

14             THE VIDEOGRAPHER:  Please stand by.

15             We are off the record at 12:54 p.m., and

16   this concludes today's --

17             MR. CASHDAN:  Thank you.

18             THE WITNESS:  Thank you.  Much

19   appreciated.

20             THE VIDEOGRAPHER:  Counsel, please stand

21   by.

22             We're off the record at 12:54 p.m., and

23   this concludes today's testimony given by Jason

24   Merritt.  The total number of media units used

25   was three and will be retained by Veritext Legal
```

April 7, 2022

Volino, Dominick v. Progressive Casualty Insurance

                                        Page 198

1    Solutions.

2            (Deposition concluded -- 12:54 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 199

```
 1                    C E R T I F I C A T E

 2

 3          I do hereby certify that I am a Notary

 4     Public in good standing, that the aforesaid

 5     testimony was taken before me, pursuant to

 6     notice, at the time and place indicated; that

 7     said deponent was by me duly sworn to tell the

 8     truth, the whole truth, and nothing but the

 9     truth; that the testimony of said deponent was

10     correctly recorded in machine shorthand by me and

11     thereafter transcribed under my supervision with

12     computer-aided transcription; that the deposition

13     is a true and correct record of the testimony

14     given by the witness; and that I am neither of

15     counsel nor kin to any party in said action, nor

16     interested in the outcome thereof.

17

18          WITNESS my hand and official seal this

19     21st day of April, 2022.

20

21

                 _____

22                      Notary Public

23

24

25
```

Jason Merritt                                          April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 200

1                    INSTRUCTIONS TO WITNESS

2

3         Please read your deposition over carefully

4    and make any necessary corrections.

5    You should state the reason in the appropriate

6    space on the errata sheet for any corrections

7    that are made.

8         After doing so, please sign the errata sheet

9    and date it.

10        You are signing same subject to the changes

11   you have noted on the errata sheet, which will be

12   attached to your deposition.

13        It is imperative that you return the

14   original errata sheet to the deposing attorney

15   within thirty (30) days of receipt of the

16   deposition transcript by you.  If you

17   fail to do so, the deposition transcript may be

18   deemed to be accurate and may be used in court.

19

20

21

22

23

24

25

Page 201

1                          _ _ _ _ _

2                        E R R A T A

3                          _ _ _ _ _

4    PAGE        LINE        CHANGE

5    _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

6    Reason for

7    Change:_____

8    PAGE        LINE        CHANGE

9    _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10   Reason for

11   Change:_____

12   PAGE        LINE        CHANGE

13   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

14   Reason for

15   Change:_____

16   PAGE        LINE        CHANGE

17   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

18   Reason for

19   Change:_____

20   PAGE        LINE        CHANGE

21   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

22   Reason for

23   Change:_____

24

25

Jason Merritt                                   April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 202

```
 1   PAGE       LINE       CHANGE

 2   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

 3   Reason for

 4   Change:_____

 5   PAGE       LINE       CHANGE

 6   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

 7   Reason for

 8   Change:_____

 9   PAGE       LINE       CHANGE

10   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

11   Reason for

12   Change:_____

13   PAGE       LINE       CHANGE

14   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

15   Reason for

16   Change:_____

17   PAGE       LINE       CHANGE

18   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

19   Reason for

20   Change:_____

21   PAGE       LINE       CHANGE

22   _ _ _      _ _ _      _ _ _ _ _ _ _ _ _ _ _ _ _ _

23   Reason for

24   Change:_____

25
```

Jason Merritt                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

                                                    Page 203

1                  ACKNOWLEDGMENT OF DEPONENT

2                  I, _____, do

3      hereby certify that I have read the foregoing

4      pages __ to ____ and that the same is a

5      correct transcription of the answers given by

6      me to the questions therein propounded,

7      except for the corrections or changes in form

8      or substance, if any, noted in the attached

9      Errata Sheet.

10

11     _____        _____

12     DATE                SIGNATURE

13

14                  Subscribed and sworn to before

15     me this _____ day of _____, 2022.

16

17                  My commission expires:

18                  _____

19

20                  _____

21                  Notary Public

22

23

24

25

Jason Merritt

Volino, Dominick v. Progressive Casualty Insurance

April 7, 2022

**[& - 3,500]**

Page 1

| & | | | |
|---|---|---|---|
| **&**   1:14 2:2,7 6:18 7:16 | **11,039**   152:9 | **13,912.78.**   151:23 | 195:7 |

**0**

| | **11,039.75**   151:16 | **13,999**   99:11 128:2 | **20,000**   61:17 |
|---|---|---|---|
| **000218**   3:24 17:13 | **11,039.75.**   151:15 | **14**   3:12,16 4:18 | **200**   1:16 6:20 |
| **000457**   4:10 20:11 | **11,638**   151:8 | 22:1,5 91:2 | 73:15 75:8 98:14 |
| **000476**   4:11 20:12 | **11,700**   73:14 | 108:19,23 109:11 | 98:19 |
| **000603**   4:13 20:24 | **11,900**   73:7 | 135:15 | **2015**   39:4 |
| **000643**   4:14 20:25 | **110,000**   79:11 | **14,246.41**   152:4 | **2016**   40:9 |
| **000689**   4:4 18:23 | **11516**   199:21 | **15**   3:14 4:20 43:14 | **2019**   41:9,11 |
| **000695**   4:5 18:24 | **1180**   2:9 | 43:19,23 52:16 | **2020**   41:25 42:11 |
| **000729**   4:7 19:12 | **11:54**   162:10 | **15,000**   99:11 | 42:17,19 49:10,11 |
| **000738**   4:8 19:13 | **11nycrr**   4:18 22:2 | **15th**   23:3,7 28:11 | 50:5 60:13 61:14 |
| **000819**   4:16 21:10 | **11th**   12:15 | 28:19 | 63:19 64:19 75:9 |
| **000850**   4:17 21:11 | **12**   3:9 4:12 20:23 | **16**   3:19 4:23 44:23 | 114:10 180:13 |

**1**

| | 21:2,3 37:9 116:8 | 45:3,6 | 194:14 195:7 |
|---|---|---|---|
| **1**   3:7 6:11 11:24 | 164:9 188:6 | **160**   147:8 | **2021**   24:12 79:11 |
| 12:4,6,8,12 13:14 | **12,100**   73:18 | **1600**   2:9 | **2022**   1:11 3:14 6:3 |
| 87:24 94:16 | **12,648.45**   153:16 | **17**   3:22,24 5:3 | 12:15 14:18 23:3 |
| 105:14 107:13 | **12,648.45.**   146:22 | 45:23 46:3,4,6 | 23:7 24:13 28:21 |
| 134:8 167:5 172:2 | **12,856.84**   150:14 | **1700**   1:15 6:19 | 137:22 192:25 |
| 179:22 | **12,856.84.**   150:6 | **18**   4:5 5:6 51:1,6,9 | 199:19 203:15 |
| **1,500**   61:19,21 | **12,900.25**   147:11 | **19**   4:8 | **21**   1:6 4:17 6:17 |
| **1,900**   126:6 | **12,925**   154:6,13 | **1908**   137:22 | 24:22 |
| **10**   4:6 19:11,15,16 | **12:08**   162:14 | **1957**   66:8 | **216.7**   22:2 109:18 |
| 19:17 32:5 33:16 | **12:41**   192:10 | **1965**   59:5 | **216.7.....................** |
| 116:8 180:23 | **12:48**   192:13 | **1991**   52:11,14 | 4:19 |
| 181:1,14 184:19 | **12:54**   197:15,22 | **1992**   51:22 52:9,11 | **21st**   199:19 |
| 184:21 | 198:2 | 52:15,17 53:19 | **22**   24:22 27:2 |
| **10,000**   73:6 118:10 | **13**   4:15 21:9,13,14 | 72:25 | **22nd**   180:13 |
| 119:9,14,17 | 31:13 88:16 | **1998**   95:6 | **25**   63:13 135:1 |
| **10,396**   151:7 | 135:15 146:2,8 | **1999**   49:9 | **25,000**   66:15 100:3 |
| **10,396.75**   151:12 | 158:7,7 189:20 | | 100:14,18,19 |

**2**

| **100**   107:11 | **13,093.78**   151:20 | | **26**   3:7 11:25 66:15 |
|---|---|---|---|
| **10:28**   87:25 | 151:21 | **2**   3:9 12:20,24 | **27**   192:25 |
| **10:41**   88:4 | **13,218.45**   153:19 | 13:5,6,7,9 26:20 | **27th**   42:11,17,19 |
| **11**   3:8 4:9 20:10 | **13,218.45.**   153:9 | 35:24 88:4 94:19 | |

**3**

| 20:14,15 109:19 | 153:17 | 107:3 150:17 | **3**   3:10 14:5,10,10 |
|---|---|---|---|
| 187:6 | **13,500**   155:18 | 158:5 162:9 | 124:3 128:1 |
| | **13,674.84.**   150:16 | 179:22 192:24 | 150:18,24 162:14 |
| | 152:8 | **2.0**   67:25 | **3,200**   115:8 |
| | **13,912.78**   152:14 | **2.0.**   67:21 | **3,500**   116:24 |
| | | **20**   4:11,14 50:5 | |
| | | 53:16 79:6 194:13 | |

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 205 of 403
Jason Sarratt
Pages m nsg8itt
Volino, Dominick v. Progressive Casualty Insurance

April 7, 2022

**[3.83s - actual]**

| | | | |
|---|---|---|---|
| **3.83s** 49:20 | **6** | **9** | 79:24 97:7 128:9 |
| **30** 200:15 | | | 128:20 130:14 |
| **30309** 2:10 | **6** 3:17 16:10,15,16 | **9** 4:3 18:22 19:1,2 | 160:24 161:19 |
| **33,000** 116:25 | 16:17 38:16 39:14 | 19:3 106:18,20 | **accounting** 89:13 |
| **36,500** 116:22 | 55:5,8,9 76:8 | 178:17 | **accurate** 14:10 |
| **37,000** 114:25 | 80:18 81:16 94:3 | **9,500** 118:12 | 43:24 44:8,16,20 |
| **4** | 94:7,17 | 119:11,14,19,21 | 66:16 71:17 74:18 |
| | **600** 126:6 154:1,10 | **9,999** 99:8 121:2 | 76:20,22,24,25 |
| **4** 3:13,14 14:16,17 | 154:14,15 156:16 | **91.80** 147:1 | 77:6 83:6,10 |
| 14:21 | 156:20 | **98** 128:2 | 123:3 126:11 |
| **4.10** 49:18 | **6243** 1:6 6:17 | **a** | 130:4 154:4 |
| **40** 114:10 192:17 | **643** 148:25 151:8 | | 171:23 174:13 |
| 193:18 | **65** 58:19,20 | **a.m.** 1:17 6:2 | 183:11,13 187:19 |
| **40,000** 114:24 | **650** 32:1 | 87:25 88:4 162:10 | 200:18 |
| 115:7,8 116:14,18 | **7** | **abide** 34:9 | **acknowledgement** |
| 116:21 | | **ability** 129:17 | 34:5 |
| **404.572.4600** 2:10 | **7** 1:11 3:20 17:1,5 | 162:21 163:25 | **acknowledgment** |
| **42,000** 152:20 | 17:6,7 38:16 | **able** 33:8 40:1 | 203:1 |
| **43** 4:22 | 39:14 93:18,20 | 41:2 54:23 113:17 | **acquired** 135:16 |
| **44** 4:25 | 94:18 95:2,5 | 113:24 114:2 | **act** 162:19 |
| **45** 5:5 | 120:25 122:14 | 163:1 182:7 186:7 | **action** 1:6 7:1 |
| **450** 61:1 | **72201** 2:4 | 196:4 | 199:15 |
| **5** | **731** 184:22,23 | **absolutely** 8:16 | **actual** 3:18,21 |
| | **7th** 2:3 6:3 | 9:9 50:9 55:3 | 16:12 17:3 23:24 |
| **5** 3:15 15:21 16:1 | **8** | 72:20 109:12 | 29:11,12 43:12 |
| 16:1 22:22 29:2 | | 145:17 149:11 | 48:2 55:9 56:8 |
| 31:25 122:13 | **8** 3:3,23 17:12,17 | 186:24 187:2 | 57:1 61:10 67:1 |
| **5,900** 52:13 53:1 | 17:17,18 18:14 | **abused** 64:5 | 67:14 68:4 80:14 |
| 72:17 | 132:8,10 172:13 | **academy** 36:9,11 | 95:11 101:14 |
| **50** 75:11,14 | 172:18 173:23 | **accept** 101:2 | 103:13 118:13 |
| **50,000** 99:15 | 182:16 | 133:10 | 119:14,23 120:13 |
| **500** 126:7,7 | **818** 148:22 150:9 | **accepted** 63:22 | 120:14,15,19,20 |
| **501.312.8500** 2:4 | 150:14 | **access** 102:4,7 | 121:8 122:11 |
| **51** 5:8 | **819** 149:4 151:22 | 103:7,12 104:7,10 | 123:25 124:3,8,24 |
| **519** 2:3 | **821** 158:5,8 159:14 | 104:14 107:21 | 125:8 126:18,24 |
| **52,873** 153:4 | **83** 79:12 | 119:5 125:24 | 148:8,13 154:8,22 |
| **57** 66:11 77:21 | **844** 146:13 153:12 | **accident** 47:23 | 155:19,21,25 |
| **570** 153:21,25 | **846** 147:18,19,20 | 60:21 | 156:17 163:10,13 |
| 154:7 156:18 | 147:23 149:24 | **account** 50:10,20 | 166:14 170:15,21 |
| **590** 156:19 | 151:25 159:19 | 53:20,25 54:5,11 | 171:8,11 173:3 |
| | **848** 148:18 150:19 | 54:25 58:13 64:10 | 174:14,16 177:22 |
| | 150:22 | 65:14,16 77:11 | |

Jason Merritt
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[actual - appraisal]

Page 3

180:1,5 182:6
189:24 190:25
194:12
**add** 150:9,14,14
151:2,13,21,25
**added** 170:23
**adding** 152:8
**addition** 147:8
175:3
**additional** 9:20
23:17 172:5,8
**address** 157:14,16
**adjust** 61:24 85:2
107:3 132:3
**adjusted** 84:11
150:5 151:2,11,19
152:2,24 153:1
**adjuster** 161:7,15
**adjusting** 160:6
**adjustment** 60:18
61:9 65:24 66:2
66:25 85:2 86:4
86:17 105:10,17
105:23 106:4,9
107:2,13,18,22
114:18 132:4,20
132:22 136:4,14
136:18 137:1,15
137:24 138:11,20
142:8,12,20
143:24 144:22
145:16 147:1
148:22,25 149:3
150:2,20 156:7
157:2 161:4,6,24
164:21 173:1,9
178:24 179:7,8,11
180:3 181:2,10
187:14 188:9
189:1,15 191:25

**adjustments** 38:10
60:4,8 62:15
68:11 80:13 97:23
104:18 107:6,9,11
138:6,20,25 139:7
144:7 149:9
158:11 163:5
173:15 179:19,20
**adjusts** 132:18
**administer** 6:25
**adverse** 35:13
**advertise** 133:17
**advertised** 77:2
136:21
**advised** 35:12
**affect** 50:14 196:6
**affiliations** 7:5
**affirmation** 34:5
**affirmed** 7:23
**aforesaid** 199:4
**aftermarket** 147:7
**age** 37:9
**ago** 117:4,5
**agree** 6:10 71:16
72:5,21 73:16,21
74:10,25 107:6,11
142:16,18 154:2
174:6,7,10,18
175:1,8,14,18,23
175:25 177:11
179:21,23,25
180:2 191:19
**agreed** 145:23,23
176:23 177:5
**agreeing** 166:24
**agreement** 3:16
15:22 16:3 22:23
22:24 28:19 29:1
72:19
**ahead** 55:4 114:5
139:14 150:12

151:10 172:12
177:6
**aided** 199:12
**air** 66:8,11
**al** 1:7 6:14,15
**alabama** 25:15,17
25:19
**algorithms** 69:19
102:1 158:2
**alia** 29:18
**alignment** 36:21
36:24 37:1,12
**allegations** 27:16
28:7 29:14
**amend** 171:20
**amount** 53:13
60:11 61:10 69:10
69:14 71:21,25
74:24 75:1 101:2
112:4 147:14
153:24 154:18,21
177:23 180:5,6,18
187:19 189:5,18
**amounts** 67:14
**analysis** 52:3,7,8
53:4 58:21 73:13
89:21 97:15 110:5
110:10,15 134:18
**answer** 8:18 15:3
27:25 28:1 39:20
86:23,24 113:15
113:17,21,23,24
114:3,6 131:11
139:15,17,21
155:2
**answering** 131:9
**answers** 203:5
**antique** 66:4
**antiques** 183:15
**anymore** 55:7
157:19

**anytime** 112:22
**anyway** 134:7
**apologize** 58:9
188:4,5
**apparent** 95:21
**appearance** 7:8
**appearances** 7:5
**appears** 21:3,14
22:5 60:15 181:3
**application** 105:22
106:4 144:22
**applied** 105:18
**apply** 72:10
132:21
**applying** 72:8
**appra** 53:9
**apprai** 42:5 56:23
**appraisal** 3:19,22
5:4 16:12 17:3
24:7 30:22 35:16
38:14 43:3 45:24
46:9,14,18,24 47:1
47:7 48:11 49:4
50:11,23 53:10,12
54:13,15,22 55:2
56:3,4,6,9,10,20
56:21 57:2 59:19
59:21,24 64:23
68:14 70:13,24
71:19 74:11,18
81:24 83:1 85:2
85:25 86:5,17
94:20 95:6,12
103:23 105:23
109:7 111:19
116:12 118:8,11
118:19 125:6
126:12 130:4
138:14 160:4
162:17 163:1
180:10,19 193:11

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 207 of 403
Jason Merritt
Page 2635
Volino, Dominick v. Progressive Casualty Insurance

April 7, 2022

[appraisal - automobile]

Page 4

196:24
**appraisals** 16:18
16:21 17:8 31:1
35:19 36:25 37:10
37:13 38:1,16,19
38:25 39:10,13,22
40:25 41:22 42:6
42:9,23 44:8,16,21
45:11,16,21 48:18
51:16 54:19 57:14
66:10 71:3,3
78:11 85:21 87:13
109:1 110:21
111:11 119:4
123:16 130:15,17
133:6 137:21
142:19 162:19
163:6,11,13
193:14 194:9,12
195:7
**appraise** 37:15
38:6 49:5 50:8
72:8
**appraised** 41:2
74:6 98:15 142:9
142:20 196:12
**appraiser** 40:4
41:6 42:16 70:2
73:11 83:12 97:16
155:7,16 159:1
**appraiser's** 4:21
4:25 5:5,8 43:16
44:25 45:25 51:3
**appraisers** 3:18,21
16:11 17:2 23:14
23:22 24:18,24
25:8 30:23 41:25
42:21,23 43:2,4,10
43:25 44:7,15,20
45:15 46:17 55:16
71:10 74:7 83:4

83:23 84:1,8
93:25 111:11,25
136:3,13 137:1,8,9
137:10,24 192:16
194:11,13
**appraising** 23:17
39:25 40:21 43:11
47:6 50:21 65:17
71:10,16 85:3
160:23
**appreciated**
197:19
**approach** 56:12
56:14,23 59:15
87:18 90:5 101:10
153:10 156:5
165:4
**appropriate** 66:24
71:22 72:13 74:11
74:24 98:18,21
123:15 132:25
137:14 160:23
180:18 185:1,8,21
191:5,22 200:5
**april** 1:11 3:14 6:3
14:17 41:25
194:14 199:19
**aranov** 2:25 6:21
**area** 44:16 48:24
48:25 49:1 64:14
81:11 138:22
**areas** 48:11,16
75:25
**argue** 72:16
158:19 160:14
**argued** 73:3
**arkansas** 2:4
25:18
**array** 44:13
**aside** 165:13

**asked** 24:4 113:18
113:25 169:9
172:4 185:6 188:2
188:4
**asking** 66:12
71:15 76:18 77:9
77:19,21 78:1
79:21 101:1 102:8
107:23 115:22
120:16 136:12
143:6 155:5 168:5
169:12,13 170:15
173:7 184:4 185:7
189:12,14
**aspects** 50:15
57:10 128:22
196:5
**assessment** 48:11
48:15 183:13
**assessments** 158:4
**asset** 38:7
**assets** 38:4
**assign** 61:8
**assisted** 171:8,16
**associated** 89:5
127:18 178:22
**association** 52:19
**assume** 85:7 87:2
90:2 100:10
141:25 173:12
197:9
**assumed** 142:14
166:1
**assuming** 87:13
88:8 140:13,21
142:9 162:20
**assumption** 169:8
189:2,17
**assumptions** 82:4
84:22

**atlanta** 2:10
**attached** 13:10
200:12 203:8
**attempt** 193:13
**attend** 36:1,6
**attended** 36:2,8
**attending** 7:4
**attention** 35:19
**attorney** 7:8 23:23
200:14
**attributed** 51:18
**auctions** 37:9
**audio** 6:8,8
**authentic** 83:6,11
83:20
**author** 30:22
**authorities** 30:9
30:12,12 31:16
**authority** 29:17
30:16,19 31:2
**authorized** 6:25
**auto** 3:17,20 4:21
4:24 5:4,7 16:11
17:2 23:14,22
24:17,24 25:8
30:23 41:25 42:21
43:2,10,11,15,25
44:7,14,24 45:14
45:25 46:17 51:3
52:2 55:16 67:18
69:2 76:15 83:4
83:23 84:1,8
93:25 99:12
111:25 137:8
192:16 194:11,13
195:2,3,6
**automated** 144:8
**automatically**
89:2
**automobile** 76:17
77:8,8

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 208 of 403
Jason Merritt
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

Page 338

[automobiles - broad]                                                         Page 5

**automobiles** 38:1
39:1,11 40:19,22
41:22 102:23
165:12,16
**automotive** 29:18
29:24 30:2,7,11,20
31:4,12,18,21 39:6
39:9 40:3,10,24
88:16 89:6 112:18
113:12 115:11
**availability** 63:8
135:6
**available** 23:21
24:3 48:25 105:5
106:3 123:16,18
124:4 157:19
172:25 184:5
**avenue** 1:15 6:19
**average** 53:9,10
53:11 57:5 61:7
67:21 68:7,8
79:17 84:24 85:4
85:9 86:3,15,16
87:3,6,10,14 88:8
88:13 140:13,23
142:2,10 149:15
165:2,8
**aware** 14:3,4 94:6
104:6

**b**

**b** 3:5
**b.1.b.** 32:4
**back** 13:3,25
15:18 22:21 23:12
23:20 26:23 49:19
49:20 67:15 72:15
73:4,4,8 75:7 88:2
88:6 95:2 116:10
118:24,25 119:5,7
122:16 124:2
128:16 149:24

150:9 151:2,14,22
151:24 153:12,15
157:5 161:9
162:12 167:4
168:17,21 170:3,4
172:12 179:14
184:19 185:1
190:2 192:12
194:3
**backwards** 116:18
130:9
**bad** 160:15 165:20
**banking** 89:14
**base** 58:10 84:19
146:22 149:14
153:11,16,20
179:19 185:3,10
**based** 57:23 58:5
61:24 63:7 64:17
70:16 79:17 80:14
81:7 83:5,9,12
85:3 86:5 87:17
90:3 97:23 103:17
118:13 122:24
124:24 135:9
138:20 139:7
142:12,14 166:10
186:14
**baseline** 85:21
98:6 118:2
**basic** 36:18
**basics** 193:11
**basing** 174:8
182:24
**basis** 137:2 145:1
**bates** 2:2 3:23 4:3
4:6,9,12,15 17:12
18:22 19:12 20:11
20:24 21:10
147:18 184:23

**bear** 101:8
**began** 118:14
**beginning** 1:16 7:8
24:22 88:3 162:13
**begins** 29:2 30:14
44:6 46:13 57:4
80:25 146:12
**behalf** 29:3
**beings** 145:14
**bel** 66:8,11
**believe** 9:16 10:3
10:13,20,21,21
11:20 15:14 23:8
24:1 25:10 26:1
26:21 29:10 31:13
44:1,22 45:19
50:24 58:17 59:20
89:19 92:2 95:3
97:18 103:3
138:15 168:24
187:4 193:1,8
**believed** 83:6,10
83:13
**ben** 51:19 53:19
**bene** 147:4,4
**benefited** 166:2,13
**bent** 25:5,6,24
26:3
**best** 50:23 54:24
59:18,21 70:17
81:10 124:10
174:18
**bet** 133:1
**better** 85:18
123:21 145:7
159:10 165:17
194:5
**beyond** 35:10 65:6
**big** 60:23 100:13
113:4 134:4 195:7

**biggest** 144:9,15
178:25 179:3
**bill** 33:15
**billable** 32:5
**billed** 32:8,23
**bio** 192:24
**bit** 13:22 35:9
37:19 48:5 79:8
109:6 167:5 181:4
190:2
**black** 1:18 6:23
79:7
**blanket** 76:21
117:9,10 131:11
138:2 142:23
**blue** 69:2 75:13
79:20 116:19
**boats** 44:9
**body** 47:22 52:12
62:9,12 83:17
**bodywork** 47:25
**boilermaker** 55:14
84:18 94:4
**book** 69:2 75:13
79:20 116:19
**bottom** 33:25
45:11 67:8 114:19
134:12
**bought** 37:5 115:2
**box** 65:19 113:14
**break** 9:7 87:22
162:3 184:18
192:6
**breakdown** 65:20
144:6 188:18
**bring** 57:22
**brings** 127:13
196:11
**broad** 75:23
156:12 191:15

**broader** 113:16
**broadly** 54:2
**brought** 61:15
  83:18 144:13
**bucks** 73:20
**build** 196:19
**bullet** 81:25
  107:13 179:22
**bump** 115:4 147:4
**bumper** 69:3
**bumper.com**
  195:22
**bureau** 23:13 25:7
  25:9 30:21,21,22
  42:19 137:8
  192:16
**business** 23:19
  37:2,5 43:9,11
  90:3 102:22
  162:18 194:10,21
**buy** 78:24 79:3
  80:2
**buyer** 78:24 79:3
**buyer's** 127:14
**buyers** 80:2
**buying** 115:2
**buys** 135:19

**c**

**c** 2:1 199:1,1
**calculated** 179:20
**calculations** 82:1
  105:6
**calculator** 149:17
  149:22 150:12
**call** 23:21 24:1,17
  25:24 26:8 35:6
  40:24 58:22 62:9
  66:5 71:3 88:21
  89:9 117:15 121:5
  121:13 135:24
  140:18 141:10,13

141:17 184:16
  186:7 196:19
**called** 7:22 23:18
  23:20 25:11 41:3
  65:5 66:9 72:15
  73:5,12,17 99:17
  100:18 131:12
**calling** 117:11
**calls** 111:9,18
  154:24
**canary** 79:9
**capture** 128:23
  196:5
**captured** 129:13
**captures** 129:9
**car** 49:5,8 52:4,17
  66:4,4 114:24,25
  115:7 117:16
  126:3,4,7,8,8
  131:15 134:15
  136:19 147:5
  157:13 159:5,6
  163:10
**care** 83:24 114:21
  114:23,25 126:4
**carefully** 200:3
**carfax** 47:23 69:3
**carfax.com.**
  195:22
**carney** 2:2
**carpet** 60:16,25
  61:11 96:4 158:4
  159:4,16,23
**cars** 37:6,8 44:8
  110:8 111:7
  131:25 135:1
  165:18 175:12,13
**case** 6:17 14:3
  27:11,14,16 28:8,9
  29:14 34:10 35:13
  38:17 51:16,18

53:24 91:17,24
  92:3 97:25 100:16
  100:17 101:19
  104:2,3,14,20,24
  105:2 108:15
  161:22 172:1
**cash** 3:19,21 16:12
  17:3 23:25 29:11
  29:12 43:12 55:10
  56:8 57:1 95:11
  119:20 154:8,22
  155:19,21,25
  156:17 163:10,13
  166:14 190:8
**cashdan** 2:8 3:3,14
  7:9,9,14 8:4 12:2
  12:22 14:8,17,19
  15:24 16:14 17:4
  17:15 18:1,2,25
  19:14,22 20:2,13
  21:1,12,18,19 22:3
  33:23 34:15,18,21
  34:24 39:17,19
  43:17 45:1 46:1
  51:4 74:4 87:21
  88:5 92:24 93:3
  93:10,17 139:4,16
  139:20 146:4,7
  155:1 162:4,7,15
  169:12,15 192:5,8
  192:14 197:4,9,13
  197:17
**casualty** 1:7
**catonsville** 36:2,8
**caution** 169:5
  174:1
**cbplaw.com** 2:5
**cell** 6:6
**cellular** 6:5
**certain** 15:7 48:18
  122:18 131:13

141:7 144:8
**certainly** 123:19
**certificate** 192:22
  192:25
**certification** 42:8
  42:13,18 81:17
**certified** 1:19 3:18
  3:21 16:12 17:2
  23:13,14 25:8
  30:22,23 39:25
  40:3 41:4 42:15
  57:1 95:11 137:8
  137:11 192:15,16
  193:23 194:4,6
**certifies** 137:12
**certify** 82:18
  199:3 203:3
**certifying** 193:15
**challenges** 162:17
  162:20
**chance** 171:18
**change** 50:7
  115:13 118:12
  123:4 129:17
  149:14 153:11
  160:11 161:20
  201:4,7,8,11,12,15
  201:16,19,20,23
  202:1,4,5,8,9,12
  202:13,16,17,20
  202:21,24
**changed** 48:4
  84:13 116:7,9
  153:16 171:22
**changes** 94:5
  168:14,18,19,23
  170:4 200:10
  203:7
**changing** 76:23
**characteristics**
  54:5,16 80:15

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 210 of 403
PageID #: 5883
Jason Moskovitz
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[check - compensated]
Page 7

**check** 100:4
**checked** 67:6
**checkmarks** 82:12
**checkpoint** 82:1
**chevrolet** 135:21
135:25
**chevy** 49:9 66:8,11
77:21
**chosen** 138:21
**chuck** 43:7
**circ** 185:18
**circumstance**
166:8 190:16
191:3
**circumstances**
122:18 162:25
165:5,6,25 185:19
190:15,21 191:21
**city** 64:4,23 65:2,5
65:5,6,11
**civ** 1:6 6:17
**civil** 1:6
**cla** 137:25
**claim** 11:18 35:17
**claimed** 173:14
**claims** 29:3,8,10
**clarify** 19:23
27:21
**classes** 137:4
**classic** 126:22
137:18,25 163:10
**classics** 183:15
**cle** 151:5
**cleaned** 161:9
**cleaning** 85:19
**clear** 93:11,14
109:17 124:2
144:15 151:5,10
187:8,23
**cleared** 152:12

**client** 35:12,15,21
94:16
**clients** 35:22
**close** 28:15 33:13
33:13 75:10
**coast** 3:17,20 4:21
4:24 5:4,7 16:11
17:2 41:25 42:21
43:2,10,15,25 44:6
44:14,19,24 45:14
45:24 46:16 51:2
52:2 55:16 83:4
93:25 111:25
194:11,13 195:2,2
195:6
**cobra** 128:2
**code** 69:6
**code's** 109:19
**codes** 22:7 96:25
104:11 196:20
**cold** 126:22
**collection** 20:15
21:3 187:9 188:8
189:21
**collector** 165:13
**collector's** 52:19
**collects** 124:23
**college** 36:1,2,3,7
36:8,17
**color** 47:13,15,16
47:17 79:6 128:4
**com** 131:19
**combine** 70:10
**come** 11:5 15:18
23:9 32:17 59:6
67:14 69:9 71:1,5
71:11,24 72:23
73:2,3 74:7 75:6,7
75:14 98:5 101:13
113:1,2 114:9
115:7 126:11

129:5 155:17
158:23 161:13
172:21 173:8
**comes** 69:20 102:2
112:22 126:5
191:19 194:23
**comfortable** 54:22
82:25 87:12 90:6
163:15
**coming** 156:16
177:24 178:2,4
190:3,18,20
**commission**
203:17
**commissions**
68:10
**communication**
24:17 174:9
182:25 183:4
**communications**
169:7
**community** 36:3,7
36:17
**comp** 138:21
139:1
**companies** 35:20
35:21 41:14
**company** 42:3
45:8 72:15 91:14
103:17,24
**company's** 45:7
51:13
**compar** 62:24
**comparable** 38:9
47:4 56:14 62:19
62:21,25 63:8,16
63:23 64:8 65:20
66:14 84:23 85:8
85:11 86:18 87:1
87:1,3 88:7 89:23
89:25 99:6,14,16

100:5,15,25 101:3
101:7 105:24
107:3,7,8,11 118:9
118:12 119:17
120:17 121:3
130:22 131:19
132:22 133:7
136:5,14 137:16
138:17 139:9
140:2,5,10 141:2
141:23 142:10,13
142:15,22 148:4
181:13
**comparables**
38:11 39:22 47:5
48:22,23,24 52:14
67:9 68:2,6,7,8
75:6 81:11 86:2
98:5,9 101:11,14
103:9 104:17
111:23 117:25
119:3,23 120:2
132:19 139:22
156:11 157:5,23
158:1,23,24
179:16,19 180:15
181:5,15 188:12
189:6
**compare** 72:25
94:15
**compared** 85:4
94:6 135:21
158:17 188:18
189:7
**comparison** 56:11
56:24 59:15
**compartment**
196:15,16
**compensated**
154:8,22

April 7, 2022

[compensation - correct]

**compensation**
143:17
**complete**  12:8
58:21 196:23
**completed**  11:12
17:8 118:20
**completely**  25:21
49:10 84:13
**completion**  177:18
**comprehen**  48:22
**comprehensive**
46:17,24 47:9,10
48:1,18 52:4,25
54:20,22 59:19,21
72:10,24 73:13
78:10
**comprehensively**
61:5
**computer**  96:24
114:8 145:6
199:12
**computers**  145:7
**computing**  104:8
**con**  164:20
**concern**  69:13
191:14
**concerning**  103:8
103:12
**concluded**  98:1
198:2
**concludes**  197:16
197:23
**conclusion**  154:25
156:25 161:22
177:24 178:2
**conclusions**  22:18
28:18 90:10,24
110:6,11 111:2
172:1,19
**condition**  38:9
47:19 57:5,8,13

58:2,10,11 60:4,7
60:18 61:4,7,24
62:15 64:15 79:17
79:23 84:24 85:1
85:4,9 86:15,16
87:3,6,10,15 88:8
88:14 94:20 95:15
95:17 96:2,15
97:8,22 98:2
116:15 128:3
138:25 139:8,9
140:1,5,7,9,14,23
141:2 142:2,9,10
142:20,21 144:5
145:16 147:1,5
157:13,14,17
158:2,3,11,17
159:5,6,23 164:20
164:22 165:1,9,17
166:2
**conditional**  181:7
**conditions**  57:18
57:22 60:10,11
68:9,11 79:6
127:18 140:8
179:17
**conduct**  57:12
163:25 193:11,13
**conducting**  46:18
46:24 112:8 163:1
**confident**  59:25
**confidential**  35:4
**confidentiality**
34:1,5,25
**confirm**  88:12
141:10 179:16,16
190:21
**confirmation**
133:6
**confirmed**  86:13
87:5,9 96:21

132:23
**confirms**  34:9
**confuse**  175:22
**confusing**  123:7
**confusion**  9:3
**connection**  15:6
16:7 36:23 38:8
38:17 48:17 90:13
**cons**  24:3
**consider**  29:23
30:1,5 79:25
112:7 169:9
**consideration**  60:5
60:8,12,25 61:2,12
128:3 130:8
190:10
**considered**  174:15
174:17
**consistent**  82:7
134:13
**construction**
171:8
**consult**  68:25
**consultant**  3:15
15:22 16:2
**consultants**  26:16
**consulting**  23:16
24:3 25:12
**cont'd**  4:1 5:1
**contact**  25:12
68:22 76:2,10
127:6,10,17
**contacted**  23:11
24:5,25 64:22
**contacting**  77:1
**contain**  20:4
**content**  171:1,11
**contents**  18:20
**continue**  6:9 63:15
63:20

**contract**  174:15
**contractor**  29:17
30:15 34:4
**contributor**  195:8
**conversation**
27:10
**conversations**  6:5
71:6 160:13
**cop**  59:14
**copy**  3:10 12:9
13:16 14:5,10,21
34:18 170:3
**corner**  146:13
147:21 190:13
**corporations**
80:10
**correct**  8:21 11:7
12:16 13:9,15,16
14:13 15:5,11,17
16:8,9,23,24 17:10
17:22,23 18:4
19:7,10 20:17,18
20:19 21:4,5,16,20
21:21 23:4,5
25:14 27:5,7,8
28:23,24 29:6
32:2,3,6,7,12
33:10 38:18 39:4
39:8 40:8,10,13,14
41:20 42:2,4,7
44:4,5 45:12,13
46:9 51:14,16,17
51:25 52:1 54:7,9
54:12 55:2 56:19
57:10,11 62:17,22
62:23 63:24 64:13
64:18 65:4,15,18
66:18,21 67:1,9,10
67:19 70:5,16,19
70:22 72:2,6
73:23 75:2,2,17,18

Case 1:22-cv-00375-NT     Document 120-25     Filed 01/10/25     Page 212 of 403
Jason Merritt
Page ID #: 5890
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[correct - days]

Page 9

76:5 77:9,10,19
78:11 79:2 80:6,9
80:16,19 82:10
84:6,9,12 85:5,6,9
85:10 87:7,16,20
90:4 91:15 93:22
93:23,25 94:1,3
95:7,8,15,16,18,21
95:22,24,25 96:2,3
96:5,9,11,12,15,18
96:19,21,25 97:1,4
97:5,8,12,17,23
98:3,6,9,12,13,16
98:17,25 99:12,13
101:9,11,15,16
105:11,16 108:4,7
108:12,13 109:15
109:16,20,21
117:25 118:1
123:25 124:1,5,6,7
125:12 127:4,23
128:12,14 129:9
129:21 131:1,2,6,7
132:9 133:2,13
134:17 136:5,15
136:16,22 137:3
137:13 140:23
142:2,3,10,11,15
142:22 147:1,2,5,6
147:9,11,12 148:4
148:5,7,9,10,19,20
148:23,25 149:1,5
149:15,16 151:17
151:22 152:5,17
153:6,18 154:5,9
154:13,17 155:23
156:2,7 157:2
158:25 159:17
161:24,25 162:23
164:2,13 165:3
166:4,5,9,12,14,15

166:20,22,25
167:16 168:1,7,22
171:5,6 177:20
178:11,15,20,21
179:9,12 180:4,10
180:11,20 181:10
181:11,17,18,19
183:9 185:14,17
185:23 186:7,11
187:21,25 189:24
191:23 193:12
194:8,15,22 196:2
197:2,3 199:13
203:5
**corrections** 200:4
200:6 203:7
**correctly** 199:10
**corvette** 58:19,20
59:5
**cost** 47:16 60:25
61:11,19,25 62:4,6
**costa** 21:4 164:12
166:1 188:8
**costa's** 164:21,25
**counsel** 6:13 7:3
9:23,25 10:2 11:2
14:14,22 25:25
26:23 27:11,17
28:6 90:23 91:10
91:23 167:15
168:2,8,11,18
169:1,8,17,23
177:14 197:20
199:15
**country** 103:14
124:25 143:5
**couple** 8:15 51:15
53:12 61:23 73:8
73:20,25 74:1
**coupons** 129:5

**course** 111:24
147:13 164:3
192:17 193:2,8,10
193:18
**court** 1:1 6:16,23
7:17 27:22 34:11
38:6 158:18
200:18
**courts** 30:12
186:20
**cover** 15:17
**covering** 131:11
**covid** 23:19 48:4
54:18,24 162:16
164:1,23 179:1
181:6 194:1,4
**crash** 161:8
**crashing** 164:6,7
**crazy** 64:2
**credibility** 81:17
**criminal** 36:18
**criticism** 181:23
**criticizing** 161:22
**crm** 88:21 89:1
110:22 114:8,19
125:24 130:3,11
**crms** 89:8,8,12
102:7 125:11
134:24 173:6
184:2
**cumberland** 8:9
64:5,6,9 136:2
**curiosity** 173:2
**curious** 172:23
173:13,16
**current** 13:17 68:9
98:4 153:23
**currently** 55:15,20
**customer** 57:24
58:1,6,7,15 103:3
103:22 112:25

114:14,15 115:6
128:10 129:1
158:15
**customer's** 58:11
59:10
**customers** 39:24
164:4

| d |
| --- |

**d** 3:1 4:1 5:1
**d.c.** 6:20 64:4 65:8
**damage** 60:16,19
60:20
**daniel** 2:8 7:15
**data** 69:20 89:22
90:2 102:3 103:6
103:11 104:7,11
104:14 105:5
106:3,5 107:20,24
124:10 125:25,25
130:3 135:2
138:20 139:1
142:13 143:1,3
156:12 157:7
172:24 173:5,13
173:14 189:3,15
189:17 190:17,20
190:22 191:7,10
191:19
**database** 125:8
**databases** 70:12
**date** 12:17 28:12
28:14 32:8,9
200:9 203:12
**dated** 3:14 14:17
23:3
**day** 26:4 33:2,4
69:24 124:25
138:16 199:19
203:15
**days** 26:25 53:12
73:8 118:10

Volino, Dominick v. Progressive Casualty Insurance

200:15
dc 1:16
de 142:1
deal 35:20 119:20
  136:7 155:14
dealer 84:23 86:1
  86:13 87:4,5,9,14
  111:1 114:12
  117:1,1,3,5,5,6,7
  117:12,15 119:19
  121:5,13 124:16
  124:24 126:15
  127:7,10,17
  130:12,18,23
  131:4 132:4,23
  136:19,20 138:8
  138:13,14 140:18
  141:10,13,17,25
  165:2,18 174:3,13
  184:2
dealer's 174:9
  175:22 182:25
  183:4
dealers 38:4 68:22
  85:8 87:18 89:4,5
  110:7,12 111:6
  112:2,8 117:10,12
  125:22,23 126:25
  131:12,24 132:19
  133:7,12,15,21
  139:24 173:4
  176:2 183:16
  186:5 191:13
dealership 40:15
  40:16 61:14 85:16
  85:21 89:22
  100:12,21 113:12
  115:11 116:20
  117:22 128:11,21
  135:21,21 141:8
  184:17 186:3

dealerships 30:24
  31:5,9,11,13 40:13
  40:24 85:17 88:11
  88:16 89:9,12
  92:16 102:7 111:9
  112:18 134:3,4,5
  135:15,16,16,17
  135:19 139:23
  144:11,12 174:25
  175:4
dealing 66:6 70:8
  71:7 72:17 183:16
  186:16
deals 145:5
dealt 101:22
decent 134:25
  135:1
decide 60:7 61:6
  190:22
decided 86:13
decision 166:19
decode 195:21,22
  196:18
decoded 195:25
decoder 195:16,19
  195:20 196:1,24
decoding 196:13
deductible 147:14
  154:7,16 155:12
  155:13
deemed 200:18
defendant 1:8
  2:12 6:13
defendants 7:10
definition 80:21
  122:20
definitions 80:19
degree 36:4
deleted 149:8
demand 48:12,16
  50:14

dent 25:1,2,3,5,6
  25:24
department 37:20
  38:21,25 40:7
  175:11,17
departments
  175:5
depend 75:3
depended 163:14
depending 48:10
  49:20 109:6
depends 47:5 54:3
  58:16 62:7 75:4
  120:6,7,7,10
  137:17 170:20
  186:2 190:15,16
  190:17 196:8
deponent 199:7,9
  203:1
deposed 8:10
deposing 200:14
deposition 1:13
  3:12 6:8,12,18
  9:11,24 11:12
  14:7 32:14 33:14
  91:21 92:7 198:2
  199:12 200:3,12
  200:16,17
depositions 91:16
  91:20 104:13,19
  104:23 105:1
depth 38:13 54:20
  144:4 145:5
describe 114:18
  138:5
described 104:14
  135:10
describing 105:5
description 3:6
  4:2 5:2

detail 15:17 85:19
  116:17
detailed 46:17,23
  47:11,12 48:18
  50:19 59:19 72:9
  78:10 97:15
  145:12
detailing 77:13
  88:25 141:6,18
details 47:21
  58:16
determine 28:17
  62:5 78:19,23
  121:5 136:19
  164:22 196:21
determined 71:4
  195:15
determining 68:20
develop 28:17
developed 44:13
dictate 170:15
dictated 170:1,2,7
dictating 177:13
difference 153:22
  156:16 191:17
differences 72:11
  94:8,11
different 31:5
  45:10,15 47:18
  49:9,10,15,15,18
  50:5 54:19 59:6,6
  59:7 69:4,23,25
  70:12 71:1,1,11
  80:10 83:14 84:14
  84:15 89:10 94:20
  100:8,11,17 113:3
  114:7 123:13
  135:20 136:1
  140:8 145:3 146:9
  158:24 164:15
  173:2 183:18

Jason Merritt                                                              April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[different - estimated]**                                                   Page 11

189:12
**differently** 156:11
**difficult** 49:3 52:9
  75:6
**diminished** 5:6
  43:12 51:2,11
  60:22 62:1 163:9
**dirt** 161:8,15
**disagree** 176:17
  177:10
**disagreed** 157:25
**disagrees** 156:25
**disc** 177:3
**disclose** 35:4
  169:10,13 186:18
**disclosed** 10:16
  93:2,9
**disclosing** 169:19
**discuss** 56:15 57:8
  95:14 177:3
**discussed** 10:15
  28:7 71:6 170:9
  181:22 189:22
  192:1
**discussing** 45:7
  60:3 173:25
**discussion** 172:11
**discussions** 159:9
**district** 1:1,1 6:15
  6:16
**divide** 152:17
  153:5
**divided** 67:24,25
  153:7
**doc** 114:13
**document** 3:7,15
  3:17,20,23 4:3,6,9
  4:12,15,18 11:24
  13:19 15:21 16:3
  16:10 17:1,12,21
  18:3,6,11,17,22

19:8,11,19 20:6,10
20:23 21:9 22:1,8
34:8 40:1 67:16
78:5,9 80:18
92:25 109:24
172:14 173:21
176:7
**documented**
  158:14
**documents** 9:15
  9:17 10:18 11:9
  15:9,13,14 22:10
  22:15 37:14 90:23
  91:2,8,13,25
  108:23 173:18
  178:13 180:14
**dodge** 49:10,11,19
  49:20 50:4 60:14
  61:14 63:19 64:19
  75:10 79:6
**doing** 47:7 49:21
  66:10,10 130:3,17
  133:5 137:2 138:3
  162:19 182:11
  200:8
**dollar** 60:8,10
  61:8,10 67:14
  69:10,14 71:21,25
  74:8 75:1 180:5
  180:18 187:19
**dollars** 74:1,2
**dominick** 1:3 6:14
**door** 119:22 190:8
  190:9
**doubt** 70:21 125:1
**downgrade** 147:3
**dozen** 112:5
**draft** 169:6,24
  170:16
**drafting** 171:16

**drive** 49:17 50:1
**drivetrains** 59:7
**driveway** 50:3
**drug** 38:4
**dsanders** 2:11
**due** 193:6
**duly** 7:22 199:7
**dumped** 60:23
**duty** 49:24
**dye** 60:23

**e**

**e** 2:1,1 3:1,5 4:1
  5:1 199:1,1 201:2
**earlier** 40:12 82:8
  135:10 159:21
  177:16 189:22
**easier** 69:16
**east** 3:17,20 4:21
  4:24 5:4,7 16:11
  17:2 41:25 42:21
  43:1,9,15,25 44:6
  44:14,19,24 45:14
  45:24 46:16 51:2
  52:2 55:16 83:4
  93:25 111:25
  194:10,12 195:2,2
  195:6
**eastern** 1:17
**ebay** 66:7 77:3
**editing** 177:22,23
  178:6,10
**effect** 127:25
  128:16,17 129:11
**effort** 186:10
**eight** 147:21
**eighty** 156:19
**either** 90:21
**electronically**
  124:24
**electronics** 96:14

**eliminates** 144:25
**email** 26:8
**employed** 112:13
  174:25
**enables** 44:14
**encountered** 76:17
**endurance** 9:6
**enforcement**
  34:11 36:19
**engine** 49:16
  96:17,20
**england** 19:6
  106:19 178:18,20
**english** 171:2,5
**enthusiast** 52:20
**enthusiastic** 70:7
**entire** 37:6 70:9
  84:7 109:23
  177:25
**entities** 29:4,9
  30:24 163:24
**entitled** 44:3 46:9
  95:11
**entity** 11:16,19
  84:5 193:15
**equals** 153:20
**equipment** 96:7
**errata** 200:6,8,11
  200:14 203:9
**esq** 2:3,8,8
**essentially** 35:3
  94:2
**establish** 81:10
**established** 52:4
  81:7 122:24
**estimate** 70:5 74:8
  82:8 83:5,9,13,14
  101:24 172:25
**estimated** 71:12
  146:18,22 147:10

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 215 of 403
Jason Merritt
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[estimates - far]                                                                 Page 12

| | | | |
|---|---|---|---|
| **estimates** 74:13 | 4:2,3,6,9,12,15,18 | 75:12 77:25 80:12 | **extra** 114:13 |
| 83:15,18 84:20,21 | 4:20,23 5:2,3,6 | 85:15 87:17 88:19 | **extremely** 53:2 |
| 129:10 | 11:24 12:4,6,8,12 | 89:7 90:3 100:21 | **f** |
| **estimating** 69:9 | 12:20,24 13:5,6,7 | 108:2,6 112:14 | **f** 199:1 |
| 102:4 103:9 104:8 | 13:9,10,14 14:5,10 | 115:16 117:14 | **face** 58:3 157:6 |
| **et** 1:7 6:14,15 | 14:10,16,21 15:21 | 129:25 130:6 | **facebook** 66:7 |
| **evaluate** 37:16 | 16:1,1,10,15,16,17 | 135:9,11,13 | 77:3 |
| 38:5 61:14 97:7 | 17:1,5,6,7,12,17 | 160:20 165:11,15 | **fact** 12:17 48:15 |
| 97:11 | 17:17,18 18:14,22 | 176:2,5 196:12 | 70:20 86:2 87:5 |
| **evaluated** 41:2 | 19:1,2,3,11,15,16 | **experienced** 82:3 | 89:24 113:11 |
| 61:4 | 19:17 20:10,14,14 | **expert** 3:8,15 9:20 | 118:18 119:4 |
| **evaluation** 146:3 | 20:23 21:2,3,9,13 | 10:16,24 11:13,25 | 121:23 122:5 |
| **evaluations** | 21:14 22:1,5,22 | 12:7,9 15:22 16:2 | 130:23 133:11 |
| 172:22 | 26:20 29:2 31:25 | 18:7,15 22:13,18 | 159:12 169:8 |
| **event** 62:20 | 35:24 38:16,16 | 23:16 28:17 29:23 | **factor** 57:22 64:11 |
| **evidence** 89:19 | 43:14,19,23 44:23 | 30:1,5,10 31:3,17 | 65:14 |
| 140:24,25 141:1 | 45:3,6,23 46:3,3,6 | 32:22 33:8 56:15 | **factors** 48:10 |
| **evidentiary** 57:16 | 51:1,6,9 55:5,8,9 | 90:10 92:2 93:2 | 50:21 53:21,25 |
| **exact** 18:17 26:12 | 76:8 81:16 91:2 | 108:18 109:11,13 | 54:11,25 70:4,16 |
| 26:21 28:14 47:6 | 93:18,20 94:3,7,17 | 109:25 110:2,6,11 | 97:15 115:13 |
| 124:14 126:1 | 94:18 95:2,5 | 111:2,10 171:7,15 | **fail** 200:17 |
| **exactly** 28:13 | 105:14 106:16,18 | 172:15,18 177:13 | **fair** 9:4,5 20:9 |
| 46:14 73:1 75:9 | 106:20 108:19,23 | 177:19 | 32:16,19,21 38:23 |
| 93:14 156:23 | 109:11 120:25 | **expertise** 30:13 | 39:2 56:7 67:17 |
| 173:5 176:13 | 122:14 132:8,10 | 31:10 70:3,11 | 67:17 68:20 71:2 |
| **examination** 8:3 | 134:8 146:2,8 | 176:9,13 | 71:18 74:13 76:14 |
| **examined** 7:23 | 158:6,7,7 164:9,19 | **experts** 92:2 | 80:22 104:2 |
| **example** 17:7 | 167:4 172:2,13,18 | **expires** 192:25 | 122:15,21 158:4 |
| 60:14 61:22 72:14 | 173:23 178:17 | 203:17 | 159:5,16 188:20 |
| 75:5 95:5 99:3 | 180:23 181:1,14 | **explain** 113:22 | **falling** 69:5 |
| 106:15 146:1 | 182:16 184:19,21 | 140:7 193:17 | **familiar** 18:20 |
| 164:10,19 | 187:6 188:6 | 195:18 | 89:17 101:20 |
| **examples** 156:9,9 | 192:24 | **explanation** | 102:2,12 106:2,7 |
| **excellent** 58:2 | **exhibits** 9:16 | 106:13,24 | 106:14 107:16 |
| **excerpt** 46:7 | 19:24 39:14 91:1 | **explosion** 174:24 | **family** 37:2,5 |
| **excuse** 18:1 19:2 | **existence** 52:22,23 | **exposed** 37:4 | **far** 18:11 27:12 |
| 29:1 41:12 | **existing** 135:17 | **exposure** 135:18 | 37:13 38:11,12 |
| **executed** 12:14,17 | **expand** 63:15 | **extensive** 52:3 | 47:7,15,20,21 |
| 34:8 93:8 | **experie** 176:13 | **extent** 39:21 | 64:20,21 89:14 |
| **exhibit** 3:6,7,9,10 | **experience** 30:13 | **exterior** 57:9 | 94:24 99:23 |
| 3:13,15,17,20,23 | 69:22 70:6,8 72:7 | 95:18 | 128:17 |

**[father - goes]**

**father** 37:2
**fault** 170:14 188:1
**february** 23:3,7
28:11,15,19
**fee** 192:20,21,22
193:9
**feel** 82:25
**fees** 114:12,13,13
**felt** 163:15
**fifth** 134:9,10
**fight** 145:9
**figure** 68:6 76:3
123:8 128:23
**figured** 52:22
**file** 20:6 34:17
**filed** 6:15 11:18
**files** 19:24 20:4
**final** 167:21 178:4
**finalized** 88:22
89:1,1 118:11
**financially** 7:2
**financing** 115:3,4
127:19 129:19
**find** 52:11,21
63:11,16 64:8,14
65:1,7 77:22
101:11 117:12
121:13 124:13,18
126:23 127:17
130:16 180:15
185:8,25 186:10
**finding** 57:16
**fine** 143:23
**finish** 27:24 28:1
33:8
**finished** 33:3,4
**firm** 6:22,24 16:5
23:24 25:15 26:2
26:6 29:2 41:19
**first** 7:22 28:5,9
28:14,25 31:24

36:20 42:15,18,22
45:11 46:16 48:9
51:18 57:15,18,20
68:17 81:25 95:18
104:3 146:21
149:23 150:1
152:4 161:7
169:23 170:16
171:15 173:21
174:23
**five** 32:9,11,23
154:19 155:9,10
155:16 156:19
**fix** 68:3
**floor** 60:24
**focus** 92:17
**follow** 46:25 86:9
**followed** 86:12
141:11 153:25
**following** 70:7
179:18
**follows** 7:24 46:17
179:15 181:7
187:17
**fonts** 55:11
**force** 39:3
**forced** 63:18
**ford** 95:6 137:22
**forefront** 177:21
**foregoing** 203:3
**form** 39:16 73:24
94:22 139:3,11
154:24 169:3
203:7
**forms** 38:16
**formula** 67:20
**forth** 37:18 73:4
172:2 193:14
**found** 59:17 66:14
99:14 100:18
181:21 193:4

**four** 16:3 32:23
33:5,6 49:25
52:15 95:14 148:3
149:15 152:1,17
153:2,3,5,7 177:17
177:21 178:9
189:23
**fourth** 81:16
105:20 151:19
152:14 164:19
**full** 8:6 12:8 58:24
83:3 143:14
**fully** 96:14 154:7
154:22
**functional** 96:14
**functions** 176:8
**further** 168:23
197:4

**g**

**games** 20:3
**gap** 113:4
**garage** 59:3 63:2
97:3
**garaged** 63:21
98:16
**gears** 49:18
**gene** 2:25 6:21
**general** 16:17
26:19 55:9 78:13
142:24 177:13
**generally** 8:13
26:13 76:25 77:6
77:24 78:14 81:6
102:23 122:23
143:23
**generated** 91:13
**georgia** 2:10
**getting** 71:24
114:24,25 115:7
125:18,23 128:10
153:10 188:14,16

188:24 191:7
**gibbs** 90:20
**give** 59:8,11 79:20
89:18,19 114:3
158:13 165:21,21
170:6
**given** 62:6 92:1
127:11 165:1,5,6
197:23 199:14
203:5
**gives** 59:20 84:19
**glove** 196:15,16
**gmc** 136:2
**go** 6:10 8:14 13:25
15:15 22:21 33:24
35:24 44:2 54:21
55:4,7 56:2 57:19
60:19,22 63:11
64:2,6,20,21 65:6
65:8,11,19 68:13
69:6 76:7 80:17
81:13,15,15 82:11
85:18 86:8 88:6
94:14 105:20
108:1 109:6 114:5
120:25 122:13,16
122:20 126:13
127:22 134:8
137:21 139:14
143:13 149:24
150:12,18 151:6,9
151:24 152:10
153:12,15 157:5
158:12 162:7
164:14,17,18
167:4 172:12
177:6 179:13
185:1 191:11
**goal** 117:21,22
**goes** 35:9 135:19
181:3

**going** 6:2 8:17 9:3
14:20 15:12,15,17
21:13 33:14 49:9
49:11 55:7 61:19
61:23 63:7 64:17
67:7 72:7 73:9
87:23 100:23
102:10,19 113:14
115:20 116:16,17
124:2 129:1
131:23,24 134:6
143:19 146:2
151:21,25 161:21
162:8 164:5
165:23 169:4
176:12 177:5
184:19 186:23
192:9 194:25
197:10,12
**good** 6:1 8:5 59:25
60:15,16 78:18,23
87:21 96:15
116:21 123:19
129:2,3 145:24
147:5 159:6,24
162:4,5 184:3
188:18 191:10
199:4
**goodier** 19:18
185:13
**goodier's** 185:21
**gotta** 152:9 190:2
**grandfather** 59:3
**great** 125:5 165:19
**greater** 76:14 77:7
**ground** 8:15
**group** 31:21 88:16
**groups** 52:20
**guess** 10:4 57:17
71:15 81:23 88:21
89:16 102:5,6

123:6 167:13
196:19
**guide** 75:12 79:25
80:13 110:2
**guides** 68:20,25
69:23 75:13,20
78:17,21,23 79:18
79:19,23 80:5
**guy** 66:9
**guy's** 131:22

## h

**h** 3:5
**haggle** 116:5
117:1,5,7 132:3,15
133:16,22 134:4,6
**hair** 60:23
**half** 72:19
**hand** 8:19 12:3,23
13:5 14:9,20
15:12,25 16:15
17:5,16 19:1,15
21:2,13 22:4
43:18 45:2 46:2
51:5 106:17 142:7
149:19 199:18
**handed** 119:21
**handing** 190:8
**happen** 112:21
113:9 115:19
116:3
**happened** 115:15
**happening** 50:12
**hard** 71:24 86:24
89:22 90:2 103:6
103:11 104:7
105:5 106:3,5
124:13 135:2
158:18 172:24
173:13,14 180:14
182:5 189:2,17

**hassle** 132:16,19
132:24 133:8,11
133:16,16,20,22
134:16,19 175:18
175:23 176:3,4
**head** 8:19
**heading** 105:21
106:23 132:14
**hear** 26:23 116:5
**heavier** 49:1,24
**heavy** 49:25
**held** 6:18 42:22
**help** 13:23 23:23
167:9 196:21
**helped** 167:10,11
167:12 171:5
**helpful** 97:18
178:16
**helps** 160:3
**hey** 23:18,20,22
26:15 100:19
119:20
**higher** 47:16
131:22 160:4
**highest** 146:18
**historic** 126:22
**historical** 58:16,21
59:10 96:24
**history** 47:23
52:20 58:14,24
77:14 79:21
**hit** 86:20 88:25
89:1
**hmm** 20:1 64:25
119:10,12,25
150:13 152:16,18
157:11 159:22
165:14 182:20
**hold** 12:25
**holding** 18:11

**honda** 135:20
**honest** 144:1
**honestly** 78:3
163:3
**hoped** 66:20
**hopefully** 195:13
**hoping** 100:13
194:5
**horsepower** 49:16
**horsepowers** 59:7
**host** 57:9
**hour** 10:13 11:10
32:1,13 178:1,5,10
192:17 193:18
**hourly** 31:25
**hours** 32:5,8,10,11
32:23,25 33:2,5,7
33:16 177:17,21
178:9,12
**house** 41:3
**housekeeping**
15:13
**houston** 23:22
24:17,24 83:23
84:1,8
**how'd** 72:22
**howard** 124:17
**hudson** 51:19
**human** 145:14
**hundred** 63:13
64:7 156:19
**hundreds** 110:17
110:17
**hurt** 166:3,13
**hypothetical**
86:19,22,24 119:8
**hypothetically**
67:11 70:23 86:12
100:11

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 218 of 403
PageID #: 5896
Jason Merritt                                                    April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[iacp - issue]                                                  Page 15

**i**

**iacp** 3:18,21 16:11 17:2 57:1 95:11
**idea** 130:23
**identical** 107:8
**identification** 12:4 12:24 22:5 43:19 51:6 195:23
**identified** 63:23
**ignorant** 92:19
**ignored** 54:16
**iii** 2:8
**imagine** 118:7
**impact** 60:9,10
**imperative** 200:13
**imperfections** 95:24
**important** 27:23 82:17,21 175:11 175:21
**imported** 52:16
**impressed** 144:2
**inaccurate** 75:20 75:21 169:2
**inartfully** 188:5
**include** 32:13,17 32:18 48:11 109:2
**including** 29:18
**income** 194:23 195:8
**inconsistent** 105:23
**incorporated** 176:4
**independent** 40:4 41:5 42:16 44:8
**independently** 70:25
**indicate** 126:1
**indicated** 199:6

**indicates** 51:24 62:19 176:2
**indication** 89:18
**individual** 53:25 54:5,16 62:15 65:13 80:15 97:10 97:15 126:21 127:6 145:1,18 166:17 175:13 186:3,10 190:21 191:3,20
**individualized** 50:20 53:20 54:11 54:25 64:11 70:3
**individually** 138:3 176:25 186:23
**individuals** 186:17
**industry** 35:6 63:22 68:18 139:24
**infancy** 195:3
**inform** 111:5 173:19
**information** 18:16 35:4 55:13 62:14 66:17 83:5,10,13 83:19 89:3 97:7 111:20,21 119:5,7 124:21,24 125:5 125:12,14,17 126:11 131:3 141:4,5,14,18 142:14 173:3,4 174:2,12,16,17 181:14 183:11,19 183:23 184:4 186:6,17 187:1 188:14,22
**information's** 190:3

**informed** 145:12
**initial** 175:16
**initially** 27:4
**inquiries** 97:10
**inquiry** 166:17,21
**ins** 1:7 6:14 40:25
**inspect** 85:11 140:1 142:7 163:2 196:4
**inspected** 140:16
**inspecting** 142:21
**inspection** 82:13 82:19 85:19,20 141:6,14 145:18
**inspections** 77:13 145:12 162:22 164:1
**instance** 53:18 54:10
**instances** 87:8
**instant** 34:6
**instructions** 200:1
**insurance** 35:17 35:20,21 72:15 103:17,20,24 113:4 163:24
**insured** 11:15,19 35:23
**insureds** 29:3
**intelligence** 41:9 41:13,16 194:20 194:24
**inter** 29:18
**interaction** 48:6
**interested** 7:2 199:16
**interfere** 6:8
**interference** 6:6
**interior** 57:9 96:2 96:11

**intermittent** 163:18,19
**internet** 17:20,20 70:12 116:7 131:21 132:15 134:14,15,19 136:4,14 137:15 173:25 174:20,24 175:5,10,17,23 176:3
**interpret** 183:7
**interruption** 17:25
**introduced** 12:1 12:21 14:7,18 15:23 16:13 17:3 17:14 18:24 19:13 20:12,25 21:11 22:2 43:16 44:25 45:25 51:3
**inventory** 29:19 30:6 31:17 89:15 134:25 135:1,6 175:12,22
**investigate** 120:1 120:18
**investigation** 27:15 41:19 59:12 59:16 72:24 100:1 145:3 195:1
**investigative** 59:15 70:6
**invoice** 174:14
**involved** 11:21 39:10 40:19 103:4 104:4
**involvement** 40:23 102:22
**involves** 51:22
**involving** 53:19
**issue** 107:12,15 125:10 144:9,16

Volino, Dominick v. Progressive Casualty Insurance

144:18,20,21
156:5 157:7,23
161:3 165:4
176:10 178:23
179:1,3,4,6,10
180:25 181:9
185:15 187:12
188:10 191:25
192:2
**issued**   3:10 14:6
**issues**   60:17
144:16 161:1
163:25 178:14
**item**   36:20
**itemized**   107:9,10
**items**   165:13
**iteration**   146:11

**j**

**j.d.**   102:13,15,18
102:21,25 103:7
103:12 104:24
106:8 107:21
124:17,20,23
125:14,15 143:1,3
143:8 172:24
173:8
**james**   19:5
**jason**   1:13 3:2,8,9
3:11 6:12 7:11,21
8:7 11:25 12:21
14:6 44:12 197:23
**jcashdan**   2:11
**jeff**   7:9 162:2
**jeffrey**   2:8 3:13
14:17
**job**   37:11 38:24
41:21 42:5,22,23
70:2 162:25
**john**   1:4
**joined**   40:9

**judgment**   72:8
97:14
**june**   41:9,11
180:13
**jurisdiction**   34:11

**k**

**k**   1:17
**keep**   165:16,19
**kelley**   69:2 75:13
79:20 116:19
**ken**   90:13,17
**kept**   59:3
**kin**   199:15
**kind**   16:19 38:2
55:9,13 57:16,21
59:14 84:19 97:14
103:6,11 146:10
167:13 168:1
172:24 196:19
**kinds**   52:18 113:9
**king**   1:14 2:7 6:18
7:16
**knew**   25:7 118:18
190:19
**knock**   126:7,7
**know**   8:25 9:2,7
11:17 23:21 24:14
25:6 35:7 43:21
45:4 46:12 47:14
47:16 54:19 59:22
59:25 60:24 64:2
64:3 69:18,18,20
74:21 75:22,22,25
77:2,11,14 79:6,9
86:22 89:8 99:1
101:24 102:1,3,8
102:11,11,15,17
102:19,20,21,24
103:6,11 104:12
106:5 107:20,23
107:24 108:1

112:6,11,12
115:24 116:4,6
117:17 118:22
121:10,23 122:3,5
124:17,19,20,23
125:2,4,16,17
126:10,16 127:12
127:21 128:19
130:21 132:17
136:6,6,11,23
137:7,11 138:3,14
139:23 140:4,9
142:4 143:7,9,10
145:1,2,6,11 155:3
156:10 158:4,24
160:6 161:5,6,7,13
161:13 165:7,9
166:10 173:3,4,16
173:17 176:13
179:4,18,22
180:14 183:21,22
183:25 184:1,4,9
185:4,6,7,24
186:17 188:13,16
188:17,19,22,23
189:1,10,16,19
190:3,6,14 191:4,6
191:8,9,12,13,21
194:9
**knowledge**   70:10
139:8 140:22
141:21
**kslaw.com**   2:11,11

**l**

**labeled**   13:13
**labor**   61:13 62:8
**lacey**   90:9
**large**   60:11
**law**   1:14 16:5
23:23 26:6 29:2
36:18,18 158:18

**laws**   109:2,3
**lawsuit**   25:13,14
**lead**   164:16
**leading**   177:18
**learning**   76:22
**leave**   67:4 100:23
**lee**   2:3 3:13 7:12
14:17 19:23 33:21
34:15
**left**   39:3
**leg**   154:25
**legal**   2:25 6:22,24
108:14 154:25
197:25
**legit**   188:17
**letter**   3:13 14:16
**lgs**   1:6 6:17
**life**   37:3,6 70:9
**lightspeed**   89:10
125:25,25
**limit**   64:1
**limitations**   82:5
**limited**   52:10 82:4
89:7 95:23 162:21
163:8
**line**   114:19 182:23
182:23 201:4,8,12
201:16,20 202:1,5
202:9,13,17,21
**lineage**   59:10
**lining**   55:25
**list**   45:10 65:23
66:2,25 98:8
103:13 106:12
115:14 117:13
118:6,14 119:14
120:2,14,14,18
121:20 123:4
130:5,13,19
132:18 133:10
141:23 143:4

Volino, Dominick v. Progressive Casualty Insurance

148:6,12,19
181:16,21,24
182:9 184:13
185:1,4,8,17,22
189:7,7
**listed** 47:15 66:14
67:9 76:4 99:2,5
99:15 100:2 101:7
113:13 115:13
118:10 119:9
120:12 121:6,7,9
121:16,18 122:6,8
122:9 123:8,12,21
126:14 131:14
184:25 188:12
**listing** 100:14
128:21
**listings** 185:25
**lists** 29:4 189:6
**literally** 190:8
**litigated** 29:8
**litigating** 29:3
**litigation** 22:17
23:1,7
**little** 2:4 13:22
35:9 45:17 48:5
54:18 92:11 94:8
109:6 146:12
156:13 166:16
190:2
**live** 8:8,9 195:11
**livenote** 1:19
**living** 37:7
**llc** 39:7,10 40:3
41:25 42:21 43:2
43:10 194:11
**llowther** 2:5
**llp** 1:15 2:7
**lo** 68:9
**lobby** 10:1 11:5

**local** 30:24,24
31:11 68:22 98:5
**locality** 81:8
122:25
**locate** 49:3
**located** 6:19 62:25
**locations** 64:8
**long** 9:8 10:12
25:23 26:22 36:10
36:11 53:1,3,8
72:12 114:3,6
**longer** 53:6
**look** 35:18 43:20
47:19 62:8,21
65:5,8 84:15
93:18 95:2 96:24
102:24 103:23
106:16 109:2
110:25 115:5
116:14 117:17
120:24 131:24
157:16,25 158:1
158:14,24 159:12
164:17 172:12
176:23 180:23
185:1 187:6 191:2
191:20
**looked** 73:5 94:3
95:20,23 96:4,7,17
98:4 161:9 188:7
189:21
**looking** 23:16,18
25:16 31:24 48:22
48:23 64:19 70:3
77:2 78:7,18 95:9
107:1 115:8
117:18 126:2
132:8 148:2 157:6
158:5,16 159:13
159:20 173:21,23
176:21 178:13

**local** 182:16 184:20
189:20 190:22
**looks** 16:3 17:18
19:3 20:15 42:10
58:18,19 62:18
**loss** 11:22 17:19
43:12,13 51:25
76:14 77:7 89:13
101:21,23 102:16
103:19,25 104:4
105:11 107:8
108:4,7,9 132:3,7
132:12,18 160:8
176:8 177:4
179:20
**loss's** 105:6
**lot** 36:13 50:3
55:12 59:22 69:4
69:16 84:13 109:3
126:20,21 130:7
133:15,21 134:4
135:17 140:8
141:9 144:25
145:2 175:4,12
194:25
**lots** 87:19
**loud** 80:25 81:3,4
81:5
**low** 53:2
**lower** 113:6
115:12 121:11
130:14 147:20,20
147:21
**lowther** 2:3 3:13
7:12,12 10:9 11:3
11:10 14:17 20:1
20:8 21:17 24:1
34:16,20 39:16,18
73:24 90:16 93:1
93:4 139:3,11,14
139:18 146:5

154:24 162:2,5
167:11,15 169:3
192:7 197:6,11
**lowther's** 16:5
26:1
**luckily** 186:19
**lukasik** 21:15,17
21:18 146:17
149:8 153:23
154:6 189:23
191:24
**lukasik's** 146:3
154:4 189:21
**luke** 43:7
**luxury** 164:4

**m**

**machine** 199:10
**main** 38:23 55:19
**maintain** 134:25
**majority** 88:12
**making** 85:1 189:1
189:17
**management**
29:19 30:6 31:18
89:11,16
**manager** 40:17
110:16 129:17
**march** 12:14
**marked** 12:4,24
14:9,21 16:1
17:17 22:4,11
43:18 45:2 46:3
51:5 91:1 158:2
**market** 29:18,24
30:3,7,11,20 31:4
31:19 49:1 50:15
56:8 66:19 67:17
67:20 68:21 76:14
77:7,15 79:8,10
80:7,22,25 81:6,10
98:5 101:8,14

Case 1:22-cv-00375-NT     Document 120-25     Filed 01/10/25     Page 221 of 403
Jason Merritt
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[market - motorized]

Page 18

122:15,21,23
133:23 134:15
137:17,25 138:22
146:18 147:10
154:12,19 155:10
179:21
**marketing** 133:18
**marketplace** 77:3
**marking** 19:24
96:10
**marks** 95:24
**maryland** 8:9
31:12 36:9 37:20
37:25 38:20,24
40:7 64:9 136:1
**material** 18:8 94:5
**materials** 14:3
15:7
**math** 149:12
156:22
**matter** 6:13 22:18
23:10 28:18 33:9
33:13 34:6 36:16
90:10,24 110:7,12
111:3 156:25
**maximize** 175:13
**mean** 10:24 25:17
46:23 47:10,12
58:1 67:23 71:12
80:4,5 83:9 93:9
101:2 126:8
128:25 131:12
133:18 134:23
165:7,12 178:3,4
195:18
**meaning** 147:3
**means** 81:2
**measure** 15:14
**mechanic** 37:3
**mechanical** 85:20

**media** 6:11 87:24
88:3 162:9,13
197:24
**meet** 9:23 10:2,8
10:12
**meeting** 10:19
11:10 28:5,10
32:14 163:15
**member** 37:20
**mentioned** 11:2
40:12 83:17
162:16 193:20
195:14
**merr** 37:11
**merritt** 1:14 3:2,8
3:9,11 6:12 7:11
7:21 8:7 11:24,25
12:4,20,21 14:5,6
14:16 15:21 16:10
17:1,12 18:22
19:11 20:10,23
21:9 22:1 43:14
44:12,23 45:23
51:1 162:16 169:4
197:24
**merritt's** 36:21,24
37:1,11 39:6,9
40:3
**met** 9:25 10:1,3,13
11:2,5
**method** 56:10
174:1
**methodology**
16:19 46:25 47:2
47:3,8 68:15,18
72:10,12 94:24
105:24 106:8,13
106:23 107:17
143:23 153:24
179:14,15,18,23
180:1,2 181:4,8

187:17 191:17
**methods** 56:21
82:1 174:24
**michelle** 90:9
**microphones** 6:4,7
**mid** 49:24
**middle** 67:16
**mile** 63:1,4 64:7
98:15,19
**mileage** 47:13
57:6 59:4 64:1
68:11 79:6 83:20
128:4 150:6
**miles** 63:10,13
**mincing** 123:7
**mind** 26:16 47:10
66:12 75:8
**mine** 156:12
165:19 171:12
172:20
**minimum** 32:5
63:22
**minor** 47:21
**minus** 153:19
154:7,15
**minutes** 53:16
**mis** 126:17
**misread** 41:12
**missing** 83:1
138:15
**misstates** 139:12
**mistake** 184:11
**misunderstood**
126:17
**mitchell** 3:24 4:4,7
4:10,13,16 17:13
17:19 18:23 19:4
19:12,17 20:11,24
21:10 102:3 103:7
103:12 104:7,16
104:21 105:10,18

106:3,8 107:17,20
108:9 132:2 143:1
143:3,6,23 144:2
144:17 145:5,8,11
147:19 154:3
156:6 161:4,19
172:24 173:8
183:19 184:5,12
184:16 188:14
**mitchell's** 101:20
101:22 102:16
103:3,18,25 104:4
104:9 105:22
134:13 145:4
**mix** 70:7
**mm** 20:1 64:25
119:10,12,25
150:13 152:16,18
157:11 159:22
165:14 182:20
**model** 48:13,17
57:6 64:20 85:5
135:23 137:22
**modern** 134:14,22
134:23,24 135:5
**mom** 135:2
**moment** 43:20
45:3 88:6 122:20
**monday** 10:4
**money** 100:22
190:9 195:5
**months** 36:11,14
**morning** 6:1 8:5
9:17 10:1 11:2,3
**motor** 37:11 42:6
112:15,19
**motorcycle** 40:15
40:16
**motorcycles** 44:9
**motorized** 44:10

**[move - okay]**                                                                 Page 19

**move**  63:20 68:10 76:15 175:11 188:6
**movement**  8:19
**mr2**  51:22 53:19 63:10,11 72:14 75:4
**mr2s**  52:10,12,14 72:25
**msrp**  79:12
**multiple**  20:4 47:5 52:11 57:20 71:9 89:17
**mustang**  95:7

**n**

**n**  2:1 3:1 4:1 5:1
**nada**  69:2 75:12 79:20 102:24 116:19
**name**  6:21 8:6 56:17 94:16 137:7
**named**  90:8,12
**names**  43:5
**narcotics**  38:3
**narrowed**  156:13
**nationally**  68:19
**nationwide**  63:11 75:23,24
**ne**  2:9
**neat**  135:18
**necessarily**  195:25
**necessary**  63:15 72:8 97:16 200:4
**need**  8:18 9:7 26:16 54:4 61:5 62:14 74:21 84:21 100:19 101:6,6 116:15,16,17,23 131:19,19,20,25 144:25 193:7 196:3

**needed**  145:2
**needing**  76:15
**needs**  61:18 83:16 142:1 171:22
**negotiate**  110:7,13 111:6 112:16 121:11 126:5 130:13,24
**negotiated**  103:16 103:20
**negotiating**  112:18
**negotiation**  112:14 112:23 114:6,16 116:2 143:4
**negotiations**  113:9
**neither**  199:14
**network**  124:21 125:15
**never**  54:15 60:21 63:9 101:22 103:20 122:11,17 122:17 137:24 171:7,14 181:25 184:16
**new**  1:1 6:16 22:6 51:19 64:3,23 65:4,5,6,10,11 69:3 109:14,18 174:25
**nice**  144:7,8
**nine**  52:13
**nod**  8:19
**nondisclosure**  34:23
**nondisclosures**  35:7
**nope**  152:9
**normal**  62:20 87:13
**normally**  49:24 56:23,24 60:13

62:3 63:9,12 66:3 66:5 76:6 88:20 112:23 137:19
**northwest**  6:20
**notary**  1:19 199:3 199:22 203:21
**note**  6:3 7:14 158:12
**noted**  97:2 158:17 200:11 203:8
**notice**  181:12 192:24 199:6
**noticing**  7:8
**notification**  26:3
**notified**  24:2
**number**  6:17 29:4 53:20 59:25 60:1 61:18 62:21 71:5 72:21,23 73:2,3 75:9 80:18 87:24 88:4 94:18 100:13 105:14 107:13 112:8 115:5 128:1 134:8 144:6 146:9 146:12 147:21 150:17,18,24 151:14 152:19 155:17 158:5,13 162:9,14 184:23 188:6 189:20 195:23,23 197:24
**numbered**  3:23 4:3,6,9,12,15 17:13 18:23 19:12 20:11,24 21:10 134:10 147:18
**numbers**  71:1 83:19 112:4 158:3 163:15
**nw**  1:15

**o**

**oakland**  135:25
**oath**  6:25
**object**  39:16 73:24 139:3,11 154:24 169:3
**objecting**  139:18
**objection**  39:17
**objections**  7:6
**obligations**  35:1,5
**observe**  112:17
**obtain**  36:4 42:8
**obtained**  42:10 111:21
**obtaining**  174:2
**obviously**  37:4 48:4 49:1 58:20 79:5,7 94:19 115:21 155:13
**occasion**  67:3
**occasionally**  77:22
**odd**  38:2
**offer**  110:8,13 111:7 113:1,2 129:4 161:21 176:2
**offered**  52:13 53:1
**offering**  108:14 156:24
**offers**  123:4
**office**  23:23 70:24
**offices**  1:14
**official**  199:18
**oh**  58:4 62:13 74:9 82:11 108:11 115:17 151:20 152:9,10 176:18 176:19 197:9
**okay**  8:10,13,15 9:6,8,19 10:8,14 10:18 11:1,8,15,18

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 223 of 403
Jason Merritt
Pages 20 - 20
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

[okay - outline]
Page 20

11:21 12:3,23
13:2,4,19,21 14:13
14:20,24 15:2,5,12
16:6,15,22 17:5,9
17:16 18:10,13,19
19:1,15,19,22 20:8
20:14 21:2 22:10
22:15,20,24 23:9
24:6,10,16 25:4,9
25:11,20,23 26:5,9
26:13,18,22 27:3,9
27:15,21 28:2,5,16
28:25 29:13,16
30:14 31:2,7,9,14
31:16,22,24 32:16
32:19 33:6,11,20
34:18,21 35:2,6,11
35:24 36:6,12,20
37:17 38:15,23
39:3,20,21 40:2,6
40:9,18 41:8,15,24
42:12,20 43:1,5,9
45:20 46:2,13
49:11 51:12,15
54:15 55:4,20,23
56:2,10,17,25 58:5
58:9 60:2 61:15
61:22 62:5,18
65:16,19 66:23
67:7 68:5,13
70:22 72:3 73:22
74:10 76:1,7 80:1
80:17 81:6,13,18
81:19,25 82:21
83:3,22 84:3,16,20
86:22 87:2,12
88:18 90:5,8,19,22
91:12,16,19 92:18
93:11,18,20 94:10
95:1,9 98:4,24
99:3,10,19 100:2,6

100:15 101:1,13
101:17,17 102:10
102:12,18,21
103:1,16,22 104:2
104:19 105:8,15
106:2,7,15,20,25
107:5,14,20,25
108:14,17,22
109:4,17,22
110:19,25 111:16
111:24 112:2,6,13
112:21 113:20
114:2,9,10 116:11
116:16,21 117:4,8
118:4 119:8
120:24 122:2,13
122:19 123:10,24
124:2,12 129:23
130:21 131:3,8,16
132:13,17,25
133:3,14 134:2,8
134:11,12,18,22
135:4,8,12,14,22
136:17 137:6,10
137:20 138:4
139:19,21 140:4
141:20,25 142:12
142:17 143:8,11
143:16,17,21
144:19 146:3,6,13
146:14,19,20
147:17,23 148:8
148:11,14 149:6
149:12,21,25
150:3,11,17,21,24
151:4,13,18,24
152:2,3,6,11,14,15
152:21,21 153:2
153:10,15,19,22
154:2 155:18,20
156:3,14 157:8,18

157:22 158:8,10
159:25 160:10
161:3,12,17 162:1
162:6 163:4,7,21
164:14 165:15
166:21,24 167:4
167:17 168:20,25
169:21 170:11,18
170:25 171:3,10
171:13,25 172:4
172:10,12,17,23
173:24 174:20
176:1,7,15,18
177:7,12 178:9,16
178:18 179:25
180:12,16,21
181:12,23 182:2,7
182:17 183:2,7,10
183:22 184:11,15
185:15,24 187:16
189:13,20 190:5
190:11,11,12,19
191:24 192:7,19
193:5,10,17,20,24
194:2,6,9,14,16
195:4,6,10 197:4
197:13
old    185:25
older    58:18 66:4
  157:4
once    61:4
ones    22:11 69:4
  152:24 179:2
  189:7
online    66:7 175:22
  180:14 192:17
  193:10 195:20
operate    89:20
operated    65:2
operates    101:24
  177:4,5

operational    96:8
opinion    70:14,18
  70:19,21 82:2,9
  156:24 161:22
  165:21 174:8
  180:7,17 181:19
  182:24 185:20
  187:18 188:21
opinions    22:18
  28:17 71:7 90:10
  90:14,24 108:15
  109:25 110:2,6,11
  111:2 167:12
  171:15 172:19
opposite    134:1
options    47:13,18
  49:15 59:4,6 98:2
  128:4 195:15,25
  196:17,22
oral    167:24 168:6
  183:4
orally    8:18
order    34:10,12
  127:14 162:25
  171:23
organization
  23:15 24:7 40:4
  40:10 41:5 42:16
  137:11 194:7
original    55:18
  76:18 78:1 84:10
  96:8 97:3 118:17
  119:17 120:1
  200:14
originally    55:18
outcome    7:2 72:11
  199:16
outline    16:20
  167:12,17,22,24
  170:6,8,10,18
  177:13

Volino, Dominick v. Progressive Casualty Insurance

[outlines - please]    Page 21

**outlines** 16:18
**outside** 64:6,7
**outward** 63:20
**overall** 113:7
  135:13 165:8
**oversaw** 110:17
**overview** 16:20
  81:23 167:19
**owe** 119:21
**owned** 11:22 37:2
  37:2 59:1,3
**owner** 19:5 25:10
  44:12 94:17 159:5
  160:4,13,25
**owners** 58:22,22
  58:25 83:20 157:9
  165:16

**p**

**p** 2:1,1
**p.m.** 162:14
  192:10,13 197:15
  197:22 198:2
**pack** 36:13
**package** 115:3
**page** 3:2,6 4:2 5:2
  5:7 12:11 16:3
  31:25 33:24 44:2
  45:11,12 48:9
  51:2,11 56:2
  67:17 68:13 76:7
  78:17,20 80:17
  81:15,16,21 94:14
  94:16,19 95:3,9
  98:8 103:3 105:19
  105:21 106:11,20
  106:22 120:25
  122:13 124:3
  134:9,9,10 136:9
  136:17 138:6,11
  146:21 147:18
  148:1,12,17,18

149:2,24 150:18
  150:19,19,22
  151:25,25 153:12
  158:5,8 159:14,19
  164:19 181:12,14
  184:20 201:4,8,12
  201:16,20 202:1,5
  202:9,13,17,21
**pages** 13:8 51:10
  55:12 203:4
**paid** 31:8,9 126:6
  147:15 153:23,24
  154:6
**paint** 47:21 61:23
  95:24 191:15
**painted** 59:2
  190:12
**panel** 62:10
**panels** 47:22 83:17
**paperwork** 97:4
  119:22
**paragraph** 28:25
  29:16 30:14 32:4
  33:25 56:25 57:18
  60:3 68:17 69:1
  76:9 78:17,20
  83:3 95:18 96:1
  96:13 138:5,10
  143:13,14 173:22
  182:19
**paragraphs** 57:20
  95:14 176:17
  177:2,8
**parameters**
  127:12
**parking** 50:3
**part** 8:25 25:10
  38:5 62:20 68:18
  81:22 110:23
  129:4,8,20,21
  147:7

**particular** 53:18
  55:1 69:8,23,24,24
  71:13 97:8 104:6
  106:10,25 109:14
  138:7,8,12,13,16
  140:22 141:21
  143:2,5 162:18
**parties** 6:10 42:24
**parts** 61:13 114:7
  177:9
**party** 7:1 22:16
  199:15
**pass** 131:23
**passed** 141:6,6
**pay** 35:19
**payments** 113:5
  114:15
**peachtree** 2:9
**pending** 9:8
**pennsylvania** 1:15
  6:19
**people** 41:3 43:1
  58:25 70:23 76:16
  80:2 134:24,25
  135:5 164:6,7
  193:21,22
**percent** 107:12
**percentage** 194:23
  195:2
**perfect** 159:1
**perform** 82:13
  162:25
**performed** 78:11
  82:18 83:14
  103:24 105:10
**period** 128:5
  163:12,17
**person** 90:15
  162:22 163:2
**personal** 13:7

**personally** 45:20
**perspectives**
  160:25
**phone** 26:8 94:16
  94:17 111:18
  149:17,18,19
**phones** 6:6 149:20
**phonetic** 43:8 90:9
  90:13
**photos** 16:19
**physical** 82:13,18
**physically** 163:2
  196:4
**pick** 6:4
**picked** 118:9
**pickup** 49:9
**picture** 196:18
**pictures** 141:7
**pigheaded** 92:11
**pin** 125:15
**place** 6:7,9 66:6
  199:6
**places** 66:7 112:1
**placing** 139:24
**plaintiff** 1:5 2:6
  27:19
**plaintiff's** 167:15
  168:2,8,11,17
  169:1,16,23
  177:14
**plaintiffs** 7:13
  28:6
**plans** 172:7,9
**platform** 135:20
**platforms** 89:18
  89:20
**play** 20:3 158:23
**ple** 9:1
**please** 6:3,6 7:5,7
  7:18 8:6 12:5
  22:22 76:8 80:25

Volino, Dominick v. Progressive Casualty Insurance

[please - privilege]

197:8,14,20 200:3
200:8
**pllc** 2:2
**plotts** 1:4 20:16
187:7,12
**plow** 50:2,3
**plus** 63:1,4 98:14
98:19 152:7
153:19 154:6,10
154:14,15
**point** 27:9 29:10
33:7 62:6 72:1
78:19,23 81:25
94:13 115:4
116:21 162:3
186:18 195:3,8
**pointed** 185:19
**police** 36:9 37:20
37:25 38:21,24
40:7
**policy** 132:16,24
154:23 155:3,5
176:5
**pop** 135:2
**populated** 89:2
**portfolio** 38:5
**portion** 43:24 45:6
95:10 109:7
**portions** 94:23
**position** 134:13
**possible** 70:25
74:9 81:7 82:22
122:24 185:25
186:12,13,22,23
**power** 102:13,15
102:18,21,25
103:7,12 104:24
106:8 107:21
124:18,20,20,23
125:14,15 143:1,3
143:8 172:24

**practice** 50:20
59:18 131:13
142:25
**practices** 29:20
30:6 31:18 81:24
89:4 110:25
**precise** 39:23
107:17 144:4
156:18
**precisely** 69:10
**precision** 170:14
**predicted** 189:4
**preference** 48:5
**prep** 114:12
**preparation** 11:1
18:18 37:13 92:9
**prepare** 9:10,13
9:21,23 11:11
32:14 36:24 37:10
38:19,25 39:13
90:9 92:7
**prepared** 9:18,19
13:19 16:4 18:14
32:22 172:15
**preparing** 14:25
18:7,12 22:12
38:1 39:10 90:23
118:8
**present** 2:24 7:3
35:17 41:9,11
108:17 114:14
**presented** 162:17
**presume** 9:4 176:9
**pretty** 24:21 26:2
26:2 37:6 144:3
**previously** 11:9
**price** 62:8 66:25
67:1 68:7,8 72:19
76:18 77:9,22
78:2 99:7,15

100:2,6 101:7
103:13,14 107:7
110:21 112:18
113:5,6,13 114:16
114:21 115:1,12
115:14,23 116:5
116:19 117:13,20
117:24 118:5,5,6
118:14,17 119:6
119:14,15 120:2
120:13,13,14,16
120:17,18 121:2,6
121:7,8,9,11,16,17
121:18,20,22,24
121:25 122:6,7,8,9
122:11 123:5,9,11
123:12,13,19,22
123:25 124:4,9,11
124:14 126:3,4,15
126:16,19 127:5,9
127:11,14,16,18
127:23,24 128:1
128:17 129:5,8,13
129:15,21 130:5,7
130:10,13,14,19
130:24 131:20,21
131:22 132:16,24
133:10 134:16,19
134:20 136:4,5,13
136:14,21 137:1
137:15 138:16
143:4 144:13
145:10 148:19
150:1,6 151:2,11
151:19 174:3
175:17,18,23
176:4 181:16,17
181:20,21,24,25
182:6,8,9,18 183:3
183:4,20 184:12
184:13,25 185:2

185:22,22 188:18
189:10 191:4,22
192:1
**priced** 30:25 72:18
114:10
**prices** 29:12 75:24
75:24 77:2 110:8
110:13,20 111:6
112:15,16 119:1
126:14,24 131:14
132:4,19 134:15
137:15 148:6,12
183:8 184:7 185:5
185:9,17,17
191:11
**pricing** 17:20
29:19 30:2,10,19
31:3,10 37:16
111:9 116:9
131:25 133:16
134:14 174:1
176:3
**principal** 63:1
**principally** 63:21
**printout** 4:20,23
5:3,6 17:19 22:6
43:14,24 44:23
45:23 51:1
**prior** 18:9,14,18
23:7 24:15 28:18
32:20 42:13 47:25
58:22 60:16,20,21
77:24 146:19
173:25
**private** 6:5 41:18
66:6,22 68:22
76:1,10,13 77:1,6
77:15,25 126:21
174:15 186:17
**privilege** 169:6

Volino, Dominick v. Progressive Casualty Insurance

| | | | |
|---|---|---|---|
| **prob** 177:25 | **profitability** | 93:21 103:18 | 169:1,17 170:21 |
| **probably** 9:15 | 110:22,24 117:23 | 167:17,18,19,24 | 170:21 171:6 |
| 13:22 28:11 30:21 | 126:2 127:22 | 168:5 178:14 | 173:5 195:5 |
| 37:8 55:17 59:22 | 128:7 129:18,20 | **provides** 45:8 | **putting** 59:22 |
| 61:17 65:6,8 | 130:10 | **providing** 23:1 | 131:20 165:13 |
| 70:17 73:15 79:7 | **progressive** 1:7 | 44:7 51:15 | |
| 86:25 87:21 94:8 | 6:14 11:16,19 | **provision** 22:6 | **q** |
| 94:11 99:17,21 | 29:4,9 35:13,17 | 108:18 109:15 | **qualified** 82:3 |
| 118:16 119:16 | 105:2 163:24 | **provisions** 108:21 | **quarter** 49:22,23 |
| 178:1,5 186:10 | **projected** 105:9 | **psa** 153:11 | 50:4 |
| 194:13 | 105:17,22 106:4,9 | **public** 1:19 199:4 | **quarters** 82:11 |
| **problem** 13:24 | 107:1,13,18,21 | 199:22 203:21 | **question** 8:24 9:3 |
| 28:4 125:20 | 132:4,20,21 | **pull** 50:1 | 9:8 27:25 28:3 |
| **proceed** 8:2 | 143:24 144:9,22 | **pulliam** 2:2 | 39:20 86:23,25 |
| **proceeding** 7:7 | 145:10 148:21,25 | **pulling** 125:21,22 | 107:16 113:17,25 |
| **process** 8:14 46:18 | 149:3,9 151:2,13 | **purchase** 174:14 | 128:20 132:17 |
| 46:24 62:20 167:6 | 152:2 156:6 157:2 | **purchased** 40:25 | 136:12 167:7 |
| 192:15 193:17 | 161:24 172:25 | 84:1,4 | 176:23 180:24 |
| **produce** 14:2 | 173:9 178:24 | **purchaser** 174:16 | 187:11 188:2 |
| 21:22 22:7 93:5 | 179:8,11 180:3 | **purchasing** 37:8 | 189:12 191:18 |
| 108:22 | 181:2,10 187:14 | 37:15 | **questioning** |
| **produced** 11:9 | 188:9,25 189:14 | **purported** 166:22 | 172:21 |
| 15:7,15 16:6,22 | 191:16,25 | **purpose** 42:22 | **questions** 8:17 |
| 17:9,21 18:3 19:8 | **proof** 174:14 | 48:10 172:17 | 23:24 197:5 203:6 |
| 19:19 20:7,9,20 | **properly** 53:21 | **purposes** 22:12,17 | **quick** 192:6 |
| 21:6 22:16 38:15 | **property** 81:8 | 22:25 23:6 38:6 | **quickly** 26:2 76:15 |
| 92:25 93:7,9 | 122:25 | 55:1 57:13 65:16 | **quite** 37:19 94:11 |
| 108:24 187:10 | **proposed** 169:1,17 | 85:1 87:13 89:23 | 103:4 144:1 181:4 |
| **producing** 19:23 | **propounded** 203:6 | 90:23 102:4 104:7 | **quotes** 67:20 |
| **product** 101:21 | **protective** 34:9,12 | 110:5,10 111:1 | |
| 102:16 103:19 | **proud** 145:19 | 112:8 117:25 | **r** |
| 105:11,18 108:10 | **proven** 76:13 | 120:2 130:3 169:9 | **r** 2:1 199:1 201:2,2 |
| 108:11 132:3,18 | **provide** 23:6 | **pursuant** 154:23 | **radius** 63:1,4,15 |
| 145:22,24 167:21 | 31:10 35:16 42:23 | 193:14 199:5 | 64:7 98:15,19 |
| 169:6 | 44:15,20 45:15,20 | **put** 55:6 88:21 | **ram** 49:10,11 |
| **professional** 1:18 | 58:15 59:18 | 101:17 114:13 | 60:14 61:15 63:19 |
| 44:13 74:6 82:3 | 128:24 167:22 | 116:9 129:14 | 64:19 79:7 |
| **profit** 89:13 | 174:13 184:1 | 131:10 133:15 | **ran** 96:21 |
| 114:20,21 115:5,9 | **provided** 14:22 | 134:4 141:8 142:7 | **range** 71:17,18,20 |
| 116:23 117:18 | 19:25 57:24 91:10 | 142:23 155:9 | 71:21 74:12,19,21 |
| 128:23 175:13 | 91:11,23 92:4 | 156:10 167:20,25 | 74:23 75:1 180:6 |

Jason Morritt

April 7, 2022

Volino, Dominick v. Progressive Casualty Insurance

**[rare - report]**                                                     Page 24

| | | | |
|---|---|---|---|
| **rare** 49:3 52:10,17 63:18 75:5 127:2 | 171:6 200:5 201:6 201:10,14,18,22 202:3,7,11,15,19 | **recondition** 86:14 88:12 116:16 | **regards** 174:16 |
| **rate** 32:1 | 202:23 | **reconditioned** 85:16 86:3 89:24 | **registered** 1:18 |
| **rated** 57:5 158:4 159:16 | **reasonable** 71:19 72:4,12 74:13 | **reconditioning** 114:12 | **regular** 165:11,15 |
| **rating** 57:12 58:10 165:1 | 83:23 149:10 165:10 | **record** 6:2,10 7:6 7:15 8:6 12:5 | **regulations** 22:7 109:19 |
| **ratio** 49:17 | **recalculate** 185:2 185:9 | 19:23 87:24 88:3 93:6,12 162:7,9,13 | **regulatory** 108:18 108:20 109:14 |
| **reach** 25:24 62:11 | **recall** 18:17 24:6 24:11,12,16,20,23 | 187:23 192:8,10 192:13 195:18 | **reject** 101:6 |
| **reached** 24:7 26:1 27:17 | 26:7,7,12,24 27:1 27:12,13 28:5,14 | 197:15,22 199:13 | **rejected** 169:2,18 |
| **reaction** 73:19 | 35:22 90:18,21 | **record's** 109:17 | **related** 7:1 |
| **read** 9:14 18:9 80:24 81:3,4,5 104:13,16,19,23 | 112:4 177:15 | **recorded** 6:12 199:10 | **relating** 55:1 |
| 105:1,4 136:11 176:10 177:8 | **receipt** 200:15 | **recording** 6:9 | **relation** 103:2 |
| 197:10,12 200:3 203:3 | **receive** 26:9,11 | **records** 111:13 | **relationship** 103:13 |
| **reading** 18:17 145:9 176:19 | **received** 14:2 23:21 24:16 25:23 | **reduce** 61:6 | **reliable** 83:6,21 183:23 |
| **ready** 43:21,22 45:4,5 88:23,24 | 26:2 154:21 155:18,20,21,24 | **reduces** 61:20 | **relied** 22:12 86:17 91:2 108:25 |
| **real** 54:22 61:1 93:14 188:17 | 155:25 | **reed** 43:7 | **rely** 58:15 59:9 |
| 189:17 190:6 | **receives** 154:18 | **refer** 13:3 47:4 | 172:18 183:3,6,8 183:12 196:24 |
| **realistic** 101:8 | **recertified** 193:3 | **referenced** 50:17 | **relying** 133:7 |
| **really** 9:22 24:14 27:23 54:21 67:3 | **recess** 88:1 162:11 192:11 | **referring** 79:16 91:12 93:1 105:12 | **remainder** 176:7 |
| 67:24 74:21 92:8 92:16,17 100:22 | **recipient** 138:8,13 | 106:21 176:14 | **remaining** 176:16 |
| 117:16 123:7 133:17 136:24 | **recognize** 45:6 46:3 | **refine** 167:13,20 | **remember** 24:9 25:19 51:23 88:9 |
| 145:9 157:3,20 161:2 188:21 | **recognized** 29:17 30:9,15,18 31:3,17 | **refinishing** 62:10 | 90:15 91:5 |
| 193:25 | 68:18,19 | **reflect** 134:16 175:18 | **remotely** 7:4 |
| **realm** 99:24 | **recommend** 182:11,11,13,17 | **reflected** 29:1 | **remove** 99:21 119:16 |
| **rear** 49:17 | **recommendation** 153:25 | **reflects** 134:19 | **removed** 144:24 161:10 |
| **reason** 9:7 52:8 67:4 118:1,22 | **recommended** 174:10 182:21 | **refresher** 193:8 | **rendering** 111:1 |
| 144:10 161:14,23 | 183:1 | **regard** 78:16,21 109:11,14 110:1 | **repair** 61:25 |
| | | 127:19,23 133:11 | **repairs** 47:22,25 62:4,6,7 |
| | | 187:11 189:14,15 | **replace** 61:1,11 |
| | | **regarding** 27:11 108:18 143:2,4 | **replacements** 47:22 |
| | | 172:1 174:3 183:20 | **report** 3:8 9:20 10:16,24 11:13,25 |

Case 1:22-cv-00375-NT    Document 120-25    Filed 01/10/25    Page 228 of 403
Jason Merritt
Volino, Dominick v. Progressive Casualty Insurance

Page 25

**[report - sale]**

12:7,9 13:10,11,14
  18:7,9,15 19:4,18
  22:13 32:22,24
  33:3,4,8 56:15
  82:2,14 92:2
  105:9,13,16,21
  124:3 134:9 136:9
  136:17 138:6,11
  143:15 146:3,12
  146:16,22 147:11
  147:18 148:2
  149:7,8,23 157:24
  158:16 159:20
  164:12 166:11
  167:3,6,8,20,25
  168:9,12 169:10
  169:17,24 170:2
  170:12 171:7,9,11
  171:17 172:2,15
  173:5,11 177:14
  177:19,22,23,25
  177:25 178:10,20
  178:23 179:5,7,11
  181:1 185:16,22
  187:7 195:14
**reported**  60:21
  82:4
**reporter**  1:18,19
  6:23 7:18
**reporter's**  27:22
**reporting**  144:5
**reports**  20:5,16
  21:4,15 93:2,7
  104:16,17 106:12
  145:8,11 146:10
  146:19 157:1,10
  159:13 161:23
  164:15 172:22
  176:11 187:9,13
  188:10 189:22

**represent**  101:14
  146:15
**representation**
  57:24 184:3
**represented**  16:5
**representing**  2:6
  2:12 20:5 109:10
**represents**  58:6,8
**request**  90:22
  92:24
**require**  166:16
**research**  52:3
  78:16,21,22
**researched**  89:12
**reserve**  197:7
**respond**  24:4
**responded**  14:14
  170:3
**responding**  15:6
**response**  14:22,25
  16:7,22 17:10,22
  18:4 19:9,20
  20:20 21:6,22
  22:8 26:9,11,14,15
  93:21
**responses**  15:4
  96:24
**responsible**  37:24
**rest**  154:3,3
**restate**  139:5
**restricted**  56:3,6
**result**  74:19,25
  164:25
**results**  146:17
**resume**  35:25
  36:20
**resumé**  3:9 12:20
  13:7,17 24:4
  26:17,19,19,21,23
  27:4,13

**retail**  80:7
**retained**  22:25
  23:10 27:3,10
  197:25
**retention**  3:16
  15:22 16:2 22:23
**retirement**  194:25
**return**  200:13
**review**  10:18 34:4
  45:3 68:19 91:16
  91:19 92:6,20
  93:16 168:21
  169:25 171:18
**reviewed**  9:16
  10:20 18:6,13
  22:12,17 91:2
  92:8,12 108:24
  168:12
**reviewing**  11:8
**rid**  153:11
**ridiculous**  115:21
**right**  9:10 13:14
  15:10,19,25 22:20
  28:11 33:14,16
  39:7 42:1 43:3,23
  53:22 54:8 67:8
  68:7 73:9 79:11
  81:21 94:22 97:20
  98:22 100:17
  101:4 113:7 116:3
  125:6 126:12,25
  128:13 138:24
  139:2 143:25
  146:4,8 147:22,22
  148:1,13,22
  149:13,19,22
  150:2,10 151:1
  153:12 154:11
  155:12 156:22
  158:25 159:2,7,14
  160:5,12,16

162:22 167:1
  168:3 169:14
  170:5 177:16
  178:19 180:6,6
  186:6 187:6 192:5
  193:21 195:3
  196:25 197:6
**rightfully**  145:21
**rock**  2:4
**role**  14:24 15:2,3
  40:18,21,22
  102:16
**roles**  37:22
**room**  7:4
**roughly**  154:1
**round**  61:18
**rounding**  156:20
**roy**  25:1,2,3,5
**rule**  3:7 11:25
**rules**  8:15 22:7
  109:19
**run**  77:20 85:19
  130:16
**running**  194:20
**runs**  45:11 48:9
**rural**  65:3,11
**rust**  95:21
**rvs**  44:9
**ryan**  1:17 6:23

**s**

**s**  2:1,8,8 3:5
**safe**  54:13
**sale**  39:24 40:19
  48:25 66:8,11
  86:21 99:5 110:8
  110:14,17 111:7
  118:10,13 119:6,9
  121:2,8,9,17,18,19
  121:20,22,24
  122:6 123:4,8,8,12
  126:14,14,19

Volino, Dominick v. Progressive Casualty Insurance

127:16,18,23,24
128:22 129:5,8
131:14 132:23
141:5 144:12,14
145:10 183:14,18
184:18 191:21
**sales** 17:20 37:16
56:11 66:6,22
81:7 92:16 99:7
103:8,14 110:16
110:23 119:1,24
122:11,24 123:6
124:25 129:13,16
129:21 132:15,16
132:24 144:10
174:1,21 175:4,5
175:17 176:4
185:25
**salesman** 113:2
114:9 117:15
**sanders** 2:8 7:15
**saw** 66:8,10
144:12
**saying** 44:6 46:13
57:4 68:5 78:12
109:13 115:17
125:21 133:25
134:1,3 136:10
137:23 143:18
149:7 150:9
154:12 155:6,14
170:5 183:6,7
189:9 190:13
**says** 12:14 29:16
32:4 33:25 34:3
41:8,24 44:12
46:16 48:9 52:2
56:3,11 57:1 58:1
60:3 62:24 65:20
65:23 67:16,20
68:14,17 76:9,12

78:18 82:1,13
83:4,22 99:7
100:13 102:25
105:22 122:14,23
125:9 132:21
134:13 173:22
174:8,23 175:3,21
176:1 182:21
**scale** 114:19
**scanned** 96:23
**schooling** 36:13
**scope** 68:21
**scratches** 61:23,25
62:2
**sda** 1:6 6:17
**seal** 199:18
**seat** 110:16
**seats** 60:15 96:4
**second** 28:25 44:2
45:12 48:9 56:2
76:12 78:22 95:3
95:9 96:1 98:8
99:4,6 132:14
148:18 150:4
152:7 173:22
182:19,23,24
**section** 4:20,24 5:4
5:7 43:15 44:3,24
45:24 46:8 51:2
68:14 80:25 95:10
109:18 174:20
**security** 41:18
**see** 12:15 29:5,21
30:16 33:24 34:1
34:6,13 36:21
41:10 44:10,16
46:14,19 47:24
48:2,5,13 51:20
52:5 54:21 56:4
56:12 57:2,6 60:5
60:20 63:2 65:20

66:8 67:18,21
68:15,23 69:4
76:9,10,18 79:1
80:22 81:19 82:5
82:15 83:7,24
95:12 99:8,18
104:17 105:25
111:11 113:10
121:2 122:14,21
123:1 125:10
127:5 134:16
138:17,22 141:7
146:21,23 147:8
148:3,15 150:6,19
150:20,24 151:11
152:23 156:15,16
159:23 160:1
164:12,18,20,23
165:19 174:4,21
175:5 179:14
191:12
**seeing** 145:6
**seen** 51:7 91:21
156:8 161:15
**seized** 38:4
**seizures** 38:7,7
**sell** 66:11 77:8
78:24 79:4 80:3
99:20 100:23
113:12 115:22
116:1 118:23
125:12 175:12
**seller** 66:5,20
78:24 79:3
**sellers** 68:23 76:1
76:10,13 77:1,7,15
77:25 80:2
**selling** 37:8 87:18
111:12 117:13,20
117:24 118:4
129:12 174:25

**send** 168:20
169:23
**sending** 26:17
**sense** 20:7 114:23
**sensitive** 6:4
**sent** 26:18,22 27:4
27:13 93:8 168:17
**sentence** 34:3
46:16 48:8 57:15
57:20 60:2 76:12
78:22 80:24 83:22
113:15,16 134:12
173:22 174:8,12
174:23 175:10,16
175:21 176:1,24
**served** 14:11
**service** 36:21,24
37:1,12 41:13
128:10,14 129:2,3
129:5
**services** 4:23 23:1
41:9,16 44:24
45:7 128:23
194:20,24 195:1
**set** 21:14 37:16
55:12,24 110:20
110:21,22 115:7
126:15 127:25
128:1,7 130:7
172:2 193:14
**setting** 65:2
**settle** 72:19
**shape** 60:16,16
86:4 165:19,20
**sheet** 200:6,8,11
200:14 203:9
**sheets** 157:6
**shop** 62:9 85:20
88:24
**shops** 62:12 135:2

**[short - started]**

**short** 162:3
**shorthand** 199:10
**show** 57:19 67:5
  114:20
**shows** 114:20
  127:14 146:10
  148:13
**shut** 23:19 194:1
  194:17
**sic** 25:1,2,3 71:3
  130:10
**side** 55:6 89:14,16
  101:18 117:22
**sign** 73:9 197:12
  200:8
**signature** 12:11
  199:21 203:12
**signed** 34:4 93:7
**significant** 53:13
  112:7
**significantly** 76:23
  131:21
**signing** 28:18
  200:10
**silverado** 114:10
**similar** 81:8
  122:25
**similarly** 163:25
**simple** 113:23
**simply** 26:15
**simulates** 64:15
**single** 20:5,6 69:10
  69:14 71:21,25
  75:1 132:16,24
  176:4
**sir** 8:5 12:13 13:18
  14:12 17:11 18:5
  19:21 20:22 21:24
  22:14,19 29:22
  37:21,23 120:11
  184:23 187:24

**sit** 100:23 114:8
**site** 195:20
**sitting** 110:15
  158:18 184:17
**situation** 98:20,22
**six** 32:9,11,25
  36:11,14 52:22
**skewers** 130:10
**skills** 44:13
**slide** 126:3
**sliding** 114:19
**slight** 17:24
**small** 72:18
  177:23
**smoothly** 96:21
**snuck** 37:9
**software** 89:13,20
**softwares** 89:11
**sold** 30:25 37:6
  66:12,15 67:1
  76:3,17 84:23
  85:8 86:15 87:4
  87:14 88:14 98:11
  98:24 99:1 105:10
  105:17,23 106:4,9
  107:1,13,18,22
  115:11,14 118:5
  118:11,19 119:11
  119:14,19 120:13
  120:15,17 121:21
  121:24 123:11,13
  123:18,25 124:4,8
  124:11,14 125:13
  126:1,19,24 127:9
  127:11,13 130:10
  132:4,20,22
  143:24 144:22
  148:8,13,21,25
  149:3,9 150:1
  151:2,13 152:2
  156:7 157:2

161:24 165:2,18
172:25 173:5,9
174:2 178:24
179:8,11 180:3
181:2,10,15,20,25
182:6,8,18 183:3,4
183:8,20 184:7,12
184:25 185:16,22
187:14 188:9,12
188:15,18,25
189:5,8,10,15,24
190:6,13,23,25
191:4,11,16,22,25
192:1
**solely** 166:10
  174:9 182:24
**solutions** 6:22,24
  198:1
**somebody** 25:12
  26:6 64:22 65:10
  73:17 85:24 90:8
  90:12 91:22
  121:10
**soon** 193:7,7
  195:13
**sorry** 33:21 48:23
  53:11 81:16
  139:13 176:20
  188:3
**sort** 160:16
**sound** 85:17
**sounds** 64:2
**source** 129:2,4
**sources** 69:9
**southern** 1:1 6:16
**space** 200:6
**spalding** 1:15 2:7
  6:19 7:16
**spe** 138:15
**speak** 26:5 90:12
  90:15,17,19

**speaking** 27:13
  136:19
**specializes** 44:7
**specialty** 41:1
**specific** 48:12,16
  66:4 75:25 89:4
  89:24 90:22 91:7
  94:21 111:18
  138:7,12,21 139:1
  139:8 140:4,10,21
  141:1,2,4,5,20
  142:13 174:3
**specifically** 111:10
**specified** 138:16
**speed** 52:15
**spend** 177:13
**spent** 33:6 37:19
  177:17,22 178:13
**spoke** 28:14 137:3
**spoken** 136:25
**stain** 160:14
  161:10,16
**stand** 85:22 197:8
  197:14,20
**standard** 1:17
  60:17 63:22
  110:24 131:13
  139:24 156:4
  182:1
**standards** 105:24
  109:8,9 141:7,11
  193:14
**standing** 199:4
**start** 55:10,14
  84:19 116:10
  152:9,11 158:16
  163:19,20
**started** 37:7 41:8
  41:24 55:18 96:20
  101:19 148:2
  194:3

**[starting - talking]**    Page 28

starting 78:18,22
  78:23 116:21
  194:10
starts 182:23
state 7:5,7 8:5
  12:5 25:22 36:9
  37:20,25 38:20,24
  40:7 74:15 109:3
  109:9 110:9 200:5
state's 109:2
stated 63:1 138:14
  182:5
statement 10:21
  10:23 75:3 76:16
  76:21 78:13
  117:10 142:23
  168:8
statements 58:11
  77:10
states 1:1 6:15
  31:25 84:15,15
statistically 76:13
  112:7
step 27:23 46:25
  47:11,11 107:3
  179:22
steps 61:8
stick 118:14,16
sticker 196:7,16
stingray 79:11
  137:22
stop 163:19,20
stopping 162:3
stored 97:3
story 23:12
street 2:3,9 116:20
strike 32:20 42:20
  61:3 67:12 78:19
  79:22 81:14 95:4
  99:5 105:8 110:4
  138:4,9 143:2,12

169:21 180:1
stripe 191:15
stroke 75:23
studied 36:16
studies 51:16
  52:18
study 51:18
stuff 68:11 77:3
  83:17 84:13,14
  104:18 114:14
  135:6 137:4
  139:25 145:2
  163:9
style 52:12
subject 36:16
  82:14 173:19
  200:10
subjecting 34:10
submitted 10:24
subpoena 3:10,24
  4:4,7,10,13,16
  14:2,6,11,14 15:6
  16:7,23 17:10,13
  17:22 18:4,23
  19:9,12,20 20:11
  20:21,24 21:7,10
  21:23 22:8 93:22
  147:19 186:19
subscribed 203:14
substance 28:7
  203:8
subtract 155:12
sufficient 196:13
suggested 25:12
  80:7
suggests 80:13
suite 1:16 2:9 6:20
summaries 91:19
  91:24
summarize 143:19

summarizes
  181:13
summary 149:24
  151:25
sunroof 52:15
supervision
  199:11
supervisors 73:5
supply 48:12,16
  50:14
sure 15:16 34:14
  36:15 42:12 45:18
  73:11 93:14
  105:20 109:8
  114:5 118:7
  123:23 125:7
  128:25 131:8
  140:12,15 141:3
  142:4 145:13,15
  145:25 147:16
  149:13 155:15
  158:25 159:8
  160:17,19,20,21
  171:3 173:10
  176:15 186:21
  192:21
surprise 163:23
survey 88:11,15
  88:17 110:4 111:5
  111:8,9,10 112:9
suspect 174:17
swear 7:18
sworn 7:22 199:7
  203:14
synopsis 92:1 93:6

**t**

t 3:5 199:1,1 201:2
t3 41:9,13,15
  194:20,24 195:1
tab 51:12

tag 196:19
tags 114:12
take 6:9 43:20
  45:3 47:18 49:4
  50:10,20 53:3,10
  53:12,20,25 54:5
  54:10,25 58:3,13
  60:7,24 61:8,12
  64:10 65:13,24
  66:2,6 68:6 70:6
  76:14 77:7,11,15
  77:18,23 78:1,13
  79:23 88:20 93:18
  100:24 106:15
  120:24 128:15,17
  128:19 129:10
  130:13,14 131:14
  131:17 136:4,13
  136:20 137:1,15
  138:15 145:23
  147:13 151:1
  157:23 160:24
  161:18 162:3
  178:23 190:10
  192:5 193:2
  196:17
taken 1:14 6:13
  60:5,12 88:1
  127:25 128:2
  130:7 162:11
  174:1 192:11
  199:5
talk 84:20 90:8
  93:5,11 99:25
  112:2 130:18
talked 86:1 88:9
  96:13 137:4,6
  160:12 167:18
talking 17:19 74:1
  79:14 80:9,10
  88:7 89:14,15

**[talking - titled]**                                                   Page 29

92:15 94:23 101:3
105:13 109:18,23
129:1 162:18
167:14 189:4,5,6
196:10
**talks** 95:17 96:1
105:9,16 107:1
132:15 173:12
176:8
**target** 115:6
**targeted** 92:23
**tax** 114:11
**teaches** 193:10
**team** 135:25
**technique** 56:11
**techniques** 29:19
30:2,10,19 31:3,10
145:3
**tell** 26:11,13 79:23
83:15 106:20
117:17 143:19,20
147:19 159:7
177:9 182:14
196:8 199:7
**telling** 86:9 118:24
118:25 119:13
120:12 164:4
**tells** 100:20 119:20
**template** 16:20
40:1 49:8 55:10
55:14,15,19,21
57:19 58:20 62:19
67:4,5,8 68:3
78:10 81:22 83:25
84:7,17,18 93:20
93:24 94:4
**templates** 16:17
47:4
**tend** 68:25
**term** 80:22 85:17

**terms** 50:8 60:8
94:22 178:6
**terrain** 64:3
**test** 9:6 192:17
193:3
**testified** 7:23
125:16 171:14
188:13 191:6
**testify** 3:11 7:22
14:6
**testifying** 139:16
171:15
**testimony** 3:2
93:10 105:4
111:10 120:11
139:12 173:18
197:23 199:5,9,13
**text** 55:25
**thank** 8:1 33:11
34:21 78:15 95:1
178:16 187:5
188:1 197:5,13,17
197:18
**theirs** 84:1 159:10
**thereof** 199:16
**thing** 27:21 56:18
60:23 65:7 113:4
117:21 151:18
157:3 158:22
183:5 191:16
**things** 54:18 65:23
69:15 95:20
112:24 113:3
131:13 144:8,13
181:7
**think** 10:4 13:13
25:3 32:9 63:11
66:24 67:2 70:17
71:14 73:14 74:5
74:9,24 92:15
98:18 99:25

120:14 121:16
123:15 130:4
132:25 137:14
138:4 143:12,22
145:1,2,7 146:16
149:9 151:9,20
152:10,10,12
157:12 158:3,22
159:4 160:15,22
164:18 165:9
171:22 181:24
184:11,25 185:8
185:12 186:3
187:3,8,8 189:25
**thinking** 178:14
**thinks** 159:10
**third** 42:24 68:17
76:7 80:21 81:15
96:13 120:25
147:17 148:1
152:8 181:12,14
182:23 184:20
**thirteen** 154:19
155:9,10,16
**thirty** 200:15
**thomas** 90:19
**thorough** 44:15,20
52:3,7,8 53:4
**thought** 98:21
121:15 126:18
176:18,19,20,22
176:25
**thousand** 63:1,4,9
**three** 13:7 33:5,6
43:6 49:22,22,23
50:4 62:19,24
67:8 82:11 98:8
148:6,11 152:22
152:24 160:11
165:1,9 177:2,8,17
177:21 178:9,12

193:20,22 197:25
**throw** 79:8 86:25
87:4,9 116:23
120:8
**thursday** 1:11
10:3
**timbrook** 31:12,20
40:9 89:5,24
112:1,14,17
113:12 115:11
135:10,12,15,24
136:2
**time** 1:17 7:7 9:19
11:12 15:16 18:14
24:2 26:6 27:4,9
27:16 28:14 29:8
29:14 32:22 37:16
37:19,25 38:20
39:9 40:2,6 41:6
42:15,18 47:19
50:7 53:1,13
59:22,23 62:6
69:24 70:4,25
71:11,24 87:22,25
88:4 104:3 113:10
115:15,18 124:8
162:4,5,10,14
163:12,17 171:15
172:7,14 177:12
177:15,17,24
192:10,13 194:19
195:8 197:5 199:6
**times** 115:10,19,22
115:25 116:1
118:5
**timing** 26:12
**tire** 115:2
**tires** 116:16
**title** 109:19 119:21
**titled** 3:7,15,17,20
4:18 11:25 15:22

[titled - uses]                                                Page 30

16:11 17:2 22:2
today   7:15 8:17
  9:11,21 10:3
  22:11 32:18,25
  92:7,9 117:2,6
today's   197:16,23
told   23:15 28:9
  66:9 99:19 121:15
  126:18 177:16
ton   49:22,23 50:4
top   81:17 152:25
total   11:22 17:18
  32:11,24,25 33:15
  43:12 51:24 62:24
  101:21,23 102:16
  103:19,25 104:4
  105:6,11 108:3,7,8
  108:9 116:17
  132:3,6,7,12,18
  138:22 147:10
  176:8 177:4
  197:24
totally   49:18 84:12
  136:1 157:25
  174:11 194:17
towing   49:21
toyota   51:22 52:11
  52:14,18,19 53:19
  75:4 99:4,7,15,18
  121:1
track   38:9 52:20
tracked   52:17
tracking   38:12
trade   40:25
trader   69:3
traditional   175:4
trailer   49:22 50:2
train   49:17
transaction   191:3
transcribed
  199:11

transcript   200:16
  200:17
transcription
  199:12 203:5
translate   59:5
transmission
  96:18
transportation
  32:17
trial   197:7
truck   49:9,22,24
trucks   44:9
true   13:16 40:6
  43:23 46:21 73:22
  76:16 86:11 90:3
  115:10,15 116:6,6
  122:2 128:20
  138:24 139:7
  166:7 199:13
truecar   99:11
truth   199:8,8,9
try   47:25 59:3,4,7
  63:17 64:1,7
  82:23 97:19 109:7
  112:24,25,25
  129:1,3 143:19
  152:21 196:18
trying   20:3 33:1
  101:11 120:11
  128:22 196:23
tuesday   10:4,5
turn   6:6 55:4
  146:2,11 147:17
  148:12,17 149:2
  149:20 150:4,19
  159:19 164:8
  178:17
tv   113:10
two   26:4 43:3 53:5
  63:22 68:1 99:10
  115:4,19 117:4,5

118:10 160:11
  174:24 178:12
  193:1
type   38:20 39:13
  39:18 56:3 83:18
  94:4 193:8
typed   170:2
types   45:10,15,21
  56:20 107:10
typical   53:6,7
  56:21 63:5 101:10
  101:12 165:20
  166:1
typically   48:2,3
  53:8,9 165:16

## u

u.s.   52:10,16 63:12
unable   163:13
  164:22
unadjusted   152:25
unbiased   82:2
unclear   58:9
understand   8:13
  8:22,24 63:14
  74:22 120:10,11
  123:10,12 134:2
  137:2 143:18,22
  146:1 149:6 167:5
  170:13 173:8
understanding
  29:7 81:9 134:14
  135:9 195:24
understood   8:23
  9:4 15:20 29:13
  189:9
undervalued
  157:12
unfortunately
  33:15
unit   6:11 38:3
  87:24 88:3 162:9

162:13
united   1:1 6:15
units   197:24
unrealistic   100:7
untrue   169:18
upgraded   159:24
upstate   65:11
upward   146:25
use   13:22 39:22
  43:13 47:4,5,20
  49:5,8 55:15,20
  56:1,3,6,9,21
  60:13 63:9,12
  66:3 69:2,2,3 70:2
  70:11 72:14 75:5
  78:9 84:11 87:1
  88:7 89:12 98:18
  100:15 103:8
  104:11 105:6
  106:8 109:5
  111:22 117:24
  118:1,4 119:3,13
  119:17,23 120:12
  122:9,11,17
  123:15,24,25
  124:4 126:19,21
  126:24 127:3,9,15
  130:5 131:15
  135:17 139:22
  140:2,5 141:1
  143:24 146:1
  150:12 172:18
  178:24 181:10,21
  181:24,25 182:8
  183:3,14 184:12
  185:16,22 187:13
  190:22 191:22
  193:25 195:21
user   145:22
uses   50:3 69:19
  107:17

[usually - vehicles]                                                      Page 31

**usually** 53:12
109:5 111:22
183:15 196:13,17

**v**

**v** 1:6
**vague** 39:18
**val** 128:13
**vallance** 43:7
**valuable** 79:10
**valuation** 19:3,18
19:18 20:4,15
21:4,15 36:25
68:20 75:13 78:17
78:21 103:17
106:12,13,23
146:9 148:2 149:7
157:1 158:15
164:11,15 166:5
178:20 181:1
187:7,9,13 188:10
188:15 189:22
192:4
**valuations** 83:4,12
**value** 3:19,22 5:6
16:12 17:3 23:25
29:11,12 43:12,12
47:14 49:2 50:21
51:2,11 52:4
53:21 54:1 55:10
56:8,8 57:1 58:3
61:6,8,20 62:1
65:17 67:17 68:21
69:9 70:5 71:12
74:13 75:25 76:14
77:7,15 79:8,10
80:8,14,22 81:1,6
81:10 82:8 85:3
95:11 97:11,16
98:6 101:15,25
102:4 103:9
118:13,20 120:4

120:20 122:15,21
122:23 126:8
128:14,14 131:15
146:18,22 147:10
149:14 153:11,16
153:20 154:8,12
154:20,22 155:10
155:19,22 156:1
156:17 157:7
158:13 163:9,10
163:13 166:14
179:20,21 185:3
185:10 196:6
**valued** 66:19
**values** 47:17 69:25
71:1 74:12,19
104:8
**valuing** 54:8 75:14
102:22 154:4
**variable** 120:9
123:19
**variables** 49:16
75:22 127:22
190:7
**variances** 183:17
**variation** 72:4
113:3 144:12
**variations** 29:11
49:23 50:4 131:18
183:18
**varied** 165:24
**variety** 15:12
112:23
**various** 37:22
**vary** 63:7 64:17
165:23 186:14,23
**vehicle** 11:22 19:3
19:17 20:4,15
21:3,14 41:1,1
47:5,6,18,20,24
48:2,6,7,13,17

49:2,24 50:5,8,21
52:9,21 53:2,21
54:1,3,4,6,17 55:1
56:14,22 57:4,10
57:13 58:2,8,12,14
58:17,18,24 59:13
60:17,20 61:5,7,16
61:20 62:1,16
63:21 64:3,11,17
64:24 65:10,17
66:20,21 68:21
69:8,11,14,23 70:4
70:24 71:10 72:9
72:16,18 73:7,13
73:23 74:2,3,11,14
74:17,19 75:3,4,14
76:4,5 77:19
78:24 79:4,21
80:3,4,14,15 82:14
82:19 83:5,10,13
83:15,16,19 85:3,4
85:22 86:14,18
88:20,23 89:25
94:17,21 95:15
97:2,8,12,23,25
98:1,6,15 99:4,6
99:20 100:9,12
101:25 103:9
106:10,12,23
107:9,11 113:7,13
114:17 115:1,12
116:11,18,22
118:9,11,13,19,21
119:8,18 120:5,8
120:15,19,20
121:1,16,23 123:8
125:12,13 126:1
126:16 127:15
128:1,2,18,21
129:15,16 130:8
131:24 136:21

138:7,8,12,17,21
138:25 139:1
140:2,5,10,22
141:8,15,21 142:2
142:9,13,15,20,22
143:5 146:3,9
148:2,9,13,18,22
148:24 149:3,23
150:1,4,17,18,24
151:19 152:4,7,8
154:4,9,13,23
157:1,18 158:15
160:4,8,9,14,24,24
160:25 163:2
164:11,15,21,25
174:4 178:19
179:20 180:25
181:13 183:14
189:24 195:23
196:4,5,10,11,20
**vehicle's** 47:19
96:23 97:16
116:24 118:3
128:5,13 138:22
141:2 184:3
**vehicles** 30:25,25
36:25 37:11 38:4
38:9 40:25 42:6
43:13 44:10 47:14
47:15 51:16 62:19
62:21,25 63:8,16
63:18,23 64:4,20
65:1 67:9,12 70:8
70:9 71:16 74:6
84:23 85:8,12
86:20 87:3,14,18
88:7,13 89:23
98:11,14,19,25
99:10 103:8,14
107:4,7,8 110:13
110:18,21 111:12

Jason Moskitt
Pagel D #: 3013
April 7, 2022
Volino, Dominick v. Progressive Casualty Insurance

**[vehicles - working]**                                                    Page 32

112:15,19 116:10
122:3,6 126:22
132:22 136:5,15
137:16,18 138:1
139:9 148:4
149:15 152:1
157:9 162:22
165:2,17 175:1
181:5 183:20
184:20,24 185:2,9
186:1 189:23
**verbal** 174:9
182:25
**verbatim** 168:4
170:7,15
**verify** 59:4,4,8
184:17
**veritext** 6:22,24
197:25
**versa** 27:24 79:1
**verse** 66:2
**version** 178:4
**versus** 6:14 65:24
66:25 76:4
**vice** 27:24 78:25
**video** 6:9,12
**videographer** 2:25
6:1,23 7:17 8:1
17:25 87:23 88:2
162:8,12 192:9,12
197:8,14,20
**videotape** 1:13
**view** 44:19 47:24
75:19 76:2 120:5
120:19 123:3
**village** 99:12
**vin** 59:5,9 83:19
144:6 195:15,19
195:20,21,22
196:1,12,21,24

**violation** 109:9
**volino** 1:3 3:24 4:4
4:7,10,13,16 6:14
17:13 18:23 19:12
20:11,24 21:10
147:19
**volts** 90:13,17

**w**

**w** 8:7
**wait** 151:9 197:9
**waiving** 169:5
**walk** 135:25
**walked** 119:22
**walking** 190:9
**want** 12:25 19:22
20:2 25:12 45:18
65:1 66:16 88:6
92:19 99:20
100:10,22 102:8
118:4 123:25
131:8 143:13
146:1,11 149:13
161:18 167:20
170:20 171:19
173:7,11 179:4
182:8 187:23
190:12 191:14
**wanted** 35:16
64:23 72:15,18
167:25 168:9
170:8 171:4
176:22,25
**wants** 126:6
**warranties** 77:12
113:4 127:19
**warranty** 115:2
126:5 129:12
**washington** 1:16
6:20 64:4 65:8
**way** 20:9 50:23
55:11,24 59:18

81:10 82:12 87:18
89:20 94:24
101:13 117:11
128:23 131:9
161:4 177:3,6
180:16 183:10
188:1
**we've** 22:11 71:5
73:12 93:2 120:25
137:3 152:1,9
188:7 189:21
194:17
**wear** 96:11
**website** 4:22,25
5:5,8 43:16,24
44:3,25 45:7,18,25
46:7,8 51:3,11,13
51:13 86:20 89:2
134:5 135:6 186:2
**websites** 80:11
186:3
**week** 10:6 26:25
**weeks** 53:5
**weighted** 67:21
**weighting** 67:23
**went** 94:25
**wes** 43:7
**west** 2:3
**westbury** 99:4,7
99:15,17 100:1
121:1
**wheel** 49:25 115:2
**whispering** 6:5
**wide** 112:23
**willing** 78:1
110:12 130:12,23
**window** 196:7
**wiped** 161:16
**wise** 59:22 91:21
**wish** 69:15

**witness** 7:11,18
20:3 23:16 33:21
34:22 73:25 93:13
139:13,19 146:6
197:10,11,18
199:14,18 200:1
**witness's** 93:10
**witnesses** 91:17
**wonder** 164:8
188:8
**wondering** 180:24
**word** 167:7
**words** 27:23,24
56:7 123:7,7
170:13,16,19,21
191:14
**work** 9:21 10:15
11:1 23:6,12,17
25:9 28:16 31:13
32:1 33:7,12
36:23 41:15 43:1
83:14 84:10,11
101:19 116:17
118:15 119:22
130:9 145:19
154:3 169:5 172:5
172:8 177:18
193:21
**workcenter** 17:18
101:20 102:16
103:18,25 104:4
105:6,11 108:3,6,9
132:2,6,12,18
176:8 177:4 182:5
**worked** 38:3 39:6
40:2,13,16 144:10
144:11
**working** 41:8,24
88:15 109:7
111:25 135:10,12

Jason Merritt

April 7, 2022

Volino, Dominick v. Progressive Casualty Insurance

**[works - zoom]** Page 33

| | |
|---|---|
| **works** 104:20,24 | 136:12 139:6 |
| 105:2 108:8 | 144:23 146:5 |
| **world** 126:10,13 | 151:5 152:20 |
| **worse** 165:17 | 154:1 155:3,13 |
| **worth** 33:7 61:16 | 156:19,21 158:20 |
| 61:16 68:21 73:7 | 165:24 167:18 |
| 78:25 79:4,8,14,15 | 170:21 173:7 |
| 80:4,5,9 98:1 | 188:23 191:18 |
| 116:11,14,22,24 | 197:11,11 |
| 118:3 119:18 | **year** 24:15,20 27:1 |
| 120:15 121:16 | 50:11,11 57:5 |
| 126:16 128:5,10 | 76:22,24 77:5,24 |
| 129:16 130:8 | 85:5 163:22 |
| 184:3 | **years** 36:6 44:14 |
| **wow** 52:24 | 116:8,8 117:4,5 |
| **wrap** 57:21 | 193:1 |
| **wrecked** 59:2 | **yellow** 79:9 |
| **writ** 37:14 | **yep** 132:11 |
| **write** 84:4 111:21 | **york** 1:1 6:16 22:6 |
| 114:11 167:6,7 | 51:19 64:3,23 |
| **writing** 91:23 | 65:4,5,6,10,11 |
| 167:9 178:7,10 | 109:14,18 |
| **written** 14:22,25 | **young** 37:4 |
| 37:14 103:3 | **youth** 70:11 |
| 111:13 152:22 | |
| 167:22 194:12 | **z** |
| **wrong** 25:21 71:13 | **z** 51:19 |
| 73:19 143:20 | **z's** 53:19 |
| 151:9,20 152:20 | **zero** 108:3 |
| 157:13,14 189:25 | **zewicker** 43:8 |
| **wrote** 46:11 69:1 | **zip** 69:6,6 |
| 168:11,15 169:24 | **zoom** 9:25 10:2 |
| **x** | 11:10 28:10 32:13 |
| **x** 3:1,5 4:1 5:1 | |
| **y** | |
| **yeah** 27:2 34:16 | |
| 35:10 58:19 79:19 | |
| 83:25 92:21 | |
| 109:25 113:11 | |
| 116:13 131:10 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.



### Rule 26(a) Expert Report of Jason Merritt

I, Jason Merritt, pursuant to Federal Rule of Civil Procedure 26, declare as follows:

### I.    Declaration

This Report is based on personal knowledge and, if called to testify on the matters set forth herein, I could and would do so competently.

### II.    Introduction

My name is Jason Merritt, and I am a professional personal-property appraiser who has been retained by the Plaintiffs in this case. My credentials and professional experience are described in my curriculum vitae enclosed with this report as Exhibit 1.

Pertinent to this report, and as reflected in my curriculum vitae, I am the owner of East Coast Auto Appraisers, LLC. I am certified through the Bureau of Certified Auto Appraisers to appraise vehicles, including total losses. I have appraised over a thousand vehicles to determine their fair market, or actual cash, value. These appraisals include hundreds of appraisals where I was hired to determine the value of a totaled vehicle. As owner of Merritt's Automotive, LLC, I appraised vehicles daily for the purpose of determining the fair market value. Additionally, I have performed hundreds of appraisals for the Timbrook Automotive Organization, which includes franchise dealerships for Chevrolet, Buick, GMC, Kia, Nissan, Ford, Chrysler, Dodge, Jeep, and Honda. The purpose of these appraisals was to determine the fair market value of vehicles offered for trade in or that were newly acquired by the Timbrook Automotive Organization.

Before entering the private sector, I served in the Maryland State Police for 28 years. During those years, I received advanced training in accident investigations. In 1998, I was assigned to the C31 Narcotics Unit of the Maryland State Police. Part of my duties in that unit were acquiring and maintaining the unit's vehicles.

III.    **Scope of Work**

I have been hired by the Plaintiffs in this case to offer opinions on the following topics:

- Description of what an appraisal is;
- Explanation of how to use the comparable methodology to appraise a vehicle's actual cash value; and
- Explanation of whether Mitchell's use of a Projected Sold Adjustment is appropriate when appraising a vehicle using a comparable methodology.

IV.    **Opinions**

a. **Overview of Using a Comparable Methodology to Determine Actual Cash Value of Pre-Loss Automobile**

An *appraisal* is an opinion of value. While there is no single methodology to arrive at a proper opinion as to a loss vehicle's actual cash value, there are generally accepted methodologies that must be followed to render a sound opinion as to ACV. One such methodology is the comparable methodology, more frequently called the "comp" methodology.

Generally, the comp methodology for determining ACV involves finding vehicles for sale, or recently sold, within a certain geographic area that are similar, or "comparable," to the vehicle being valued. Typically, these comps are selected from Internet advertisements. Once the comps are chosen, differences in observed and verifiable features (such as options, mileage, trim level, condition) between the loss vehicle and the comps are documented. Normally, information concerning options, mileage, trim level, and condition are taken from the Internet advertisement for the vehicle, and these characteristics are taken at face value unless there is some specific, and documented reason, for questioning the accuracy of the listing. Sometimes a vehicle listing does not include options, but these could be determined using a VIN decoder. The point is that there must be a specific reason, grounded in evidence, for varying from the information provided in an Internet advertisement for a particular vehicle. Differences between vehicles in observed and

documented characteristics result in price adjustments from the list price of the comparable vehicles.

I have reviewed the Vehicle Valuation Report Mitchell prepared for each Plaintiff. On the last page of each report, under the header "Vehicle Valuation Methodology Explanation," Mitchell walks through the general steps of the comp methodology. Having reviewed each of the reports, it also appears that Mitchell largely followed this methodology, documenting all differences in mileage, options, trim level, condition, etc., and making monetary adjustments based on those documented differences.

When adjusting for the condition of a vehicle, the common procedure is to adjust the condition of a loss vehicle by comparing it to the normal or typical condition of similar vehicles. Ideally, you would search for comparable vehicles in nearly identical condition to the loss vehicle, but this usually isn't practical. Mitchell followed customary condition-adjustment standards. Specifically, its reports documented an inspection of 13 components of each Plaintiff's loss vehicle and assigned numerical ratings to each component. These were compared to a "Typical Vehicle Condition," which was assigned a numerical rating of 3.00. Based on whether the "Overall Condition" of the loss vehicle rated above or below the typical 3.00, Mitchell adjusted the base value of the loss vehicle to reflect that it was in better or worse condition than "typical." As for the condition of the comparable vehicles, it would be improper to assume they were in anything other than typical condition without either inspecting the vehicle or having documentation showing the comparable vehicle was in better or worse than typical condition. Because conducting physical inspections of comparable vehicles is often impractical, appraisers usually set their condition as "average" or "typical" and make no monetary adjustment to the comparable vehicle.

Mitchell deviated from the comp methodology, however, by applying downward adjustments to the Internet prices of the specific comparable vehicles advertised for sale.

### b. Mitchell's Application of a Projected Sold Adjustment is Inconsistent with Appraisal Standards and the Comparable Methodology

As with mileage, options, and equipment, appraisers must base their opinions about a specific comparable vehicle's price on hard data. The hard data appropriate for this is typically the Internet price of the comp. This is true for several reasons.

*First*, the Internet price is often the only data point concerning what a particular vehicle listed with a particular seller would sell for at the time of valuation. When determining actual cash value, the objective is to determine the value of that vehicle at a particular point in time. The Internet price listed for sale is the only evidence available for determining what a particular comparable vehicle offered for sale by a particular dealer would sell for on a particular day. Moreover, using the Internet price provides an objective criterion for determining what the comparable vehicle would sell for on a particular day to a buyer purchasing a vehicle outright, without providing a trade in, financing the purchase, or buying optional warranties or service plans. These additional profit opportunities for the dealer might result in what may look like a lower sales price but does not reflect a change in the market value of that car or that the dealer would have accepted anything other than the list price had the buyer offered cash for the vehicle, without the opportunity to make up the difference or even make even more profit related to a trading-in vehicle, financing or the purchase, or selling warranties, service plans, or other products.

*Second*, appraisal standards do not permit arbitrarily deducting the advertised price of a vehicle based on projections of what that vehicle might ultimately sell for. Again, there is no hard data available to an appraiser to support an opinion that a particular comp would sell on a particular

day for anything other than the Internet price. It would be arbitrary to assign a different sales price to any particular vehicle chosen for comparison purposes.

*Third*, one of the goals of the comp methodology is to determine the value of a vehicle in the market where the vehicle being appraised was garaged. This is because vehicles age differently based on where they are driven. For instance, a vehicle driven 20,000 miles in New York City and parked on the street is much more likely to have scratches and dents than a vehicle driven in upstate New York that is parked in a garage and has mostly highway miles.

I have reviewed Regulation 64, including its definition of a "local market area" to mean a 100-mile radius of the totaled vehicle's principal place of garage. Confining the search for comps to certain geographic boundaries is consistent with appraisal standards. Appraisers typically confine the search to a 75-mile radius of the vehicle's place of garage and expand out as necessary to find a sufficient number of comps to complete the report. Once that search is finished, it is improper to keep broadening the search for the sole purpose of lowering the ACV of the vehicle being appraised.

It is my understanding that Mitchell attempts to limit the geographical area it uses when searching for comparable vehicles to 100 miles but does not include that same limitation when searching for transactions to support the Projected Sold Adjustment. And for each Plaintiff, Mitchell relied on transactions from outside a 100-mile radius for the purpose of lowering the values of vehicles principally garaged in New York.

Using the advertised price as the price for a comparable vehicle is especially important when the advertisement comes from an Internet source. It is my understanding that Mitchell uses only Internet listings for locating comparable vehicles. Consistent with Mitchell's "Position on Internet Pricing," my understanding of the modern used-car market is that Internet prices often

reflect a no-hassle price and that dealers price their inventory competitively to move inventory and sell more vehicles. This is another reason appraisers cannot assume a vehicle will sell for anything other than its advertised price.

While I do not, there are some appraisers who make a "take-price" adjustment to the Internet price of comparable vehicles. This adjustment is made only after speaking with a car dealer to determine whether the dealer would take anything other than the advertised price of the vehicle. The adjustment is specific to a particular vehicle from a particular dealer, and the recipient of the appraisal would know that dealer stated it would a specified price on that day for that particular comparable vehicle. As with other adjustments, this adjustment is based on data specific to a comp vehicle chosen within the totaled vehicle's market area.

Overall, while I likely wouldn't have used the some of the comparable vehicles chosen, Mitchell did follow a comparable methodology except for the application of the Projected Sold Adjustment. Using Mitchell's reports, the actual cash value of each Plaintiff's totaled vehicle would be determined by adding the Projected Sold Adjustments back to the adjusted price of each vehicle to get a revised "base value," and then applying whatever adjustments, if any, were made for condition, prior damage, aftermarket parts, or refurbishment.

## V.    Compensation

I am being paid $650 per hour for my work in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Jason Merritt

March 11, 2022
Executed on



# Jason W. Merritt

East Coast Auto Appraisers LLC

Cumberland, Maryland 21502

301-804-0224

jason@eastcoastautoappraisers.com

**Merritt's Alignment Service**                                   January 1980-Oct 1987

Authorized Maryland State Inspections mechanic. Certified and licensed to perform safety inspections for the state of Maryland. Certified in passenger cars. Light duty trucks, and light duty trailers. Certified as the youngest mechanic by the state of Maryland to perform safety inspections.

During this tenure multiple safety inspections were conducted. The Maryland State Inspection procedure is one of the most detailed and thorough state inspection process.
During this tenure I received experience and training in the mechanical aspects and systems of all motor vehicles.


**Maryland State Police**                                        Oct 1987- June 2015

October 1987- Entered the Maryland State Police as a Cadet. Served in the Commercial Vehicle Enforcement Unit. During this time, I was certified federally as a Level 1 Inspector for Commercial Vehicles. Level 1 inspections are the highest level of inspections set forth by the Federal Motor Carrier Safety Standards and are recognized at the State and Federal Level. At that same time, I received Hazard Materials Certification and training. I was the first Cadet in the state of Maryland to be certified to conduct Level 1 inspections of commercial vehicles. I conducted accident investigations of commercial vehicles. I performed more than 1000 inspections during this tenure.

August 1990- Graduated the Police Academy and was certified as Police Officer by the Maryland Police Training Commission. Was instructed and certified to conduct accident investigations. During this Academy training many hours were dedicated to Accident Investigations.

August 1990- March 1998 Assigned to Road Patrol throughout the state of Maryland. During that time, I handled numerous high-level Criminal Investigations for multiple thefts as well as assaults and fatal accidents.

March 1998- June 2015

Assigned to the Criminal Enforcement Division, Columbia, Maryland

I was assigned to the C3I Narcotics Unit. This is a multi-jurisdictional Unit that is comprised with multiple agencies and is supervised by the Maryland State Police. During this time as a Narcotics Investigator, I have received many commendations and awards for service.

I have conducted and assisted with more than 4500 investigations and conducted more than 3500 arrests. I have been the author of and assisted with more than 800 Search and Seizure Warrants.

The C3I Narcotics Unit has received numerous awards and recognitions for Outstanding Performance in Narcotics Investigations. While in this capacity I have worked with multiple agencies to include but not limited to the FBI, DEA, ATF, FDA, and Multiple Police Departments throughout Maryland, West Virginia, Virginia, California, Colorado, and Pennsylvania. I have previously been deputized federally with the DEA and the FBI on case specific investigations.

I have worked in a covert capacity for undercover investigations, and I have managed more than 1000 criminal informants as well as held caseloads of more than 30 cases at a time. I have testified for the prosecution in many Federal cases. I have been involved in many Federal Level investigations that required testimony and litigation on the state and federal levels. I have taught in the subjects of narcotics, Interview and Interrogation, Confidential Informants, Courtroom Conduct and Testimony, as well as 4th Amendment Law.



I was responsible for the maintenance and acquisition of vehicles of the unit. I was also responsible for the development and design of vehicle equipment and undercover technology used in the vehicles.

I was submitted and verified as an Expert Witness in District and Circuit Courts in the State of Maryland. I have been a witness in numerous courts throughout the state of Maryland the Federal Court system.

I have testified in many criminal and civil cases over 30 years.

Training;

Maryland State Police

Police Academy, Yearly Training to maintain my certification as a Police Officer.

Criminal Investigations

Advanced Criminal investigations.

Narcotics Investigator

DEA Investigators School

Interview and Interrogation

Criminal Informants

Numerous other Narcotics Investigators Trainings throughout the country.

Mobile Forensics Certification

Drug Diversion Training

Accident Investigation

Advance Accident Investigation

**June 2015-August 2016 Merritt's Automotive LLC**
I acquired and assumed a family business in the automotive industry. I was certified through the State of Maryland for automotive safety inspections. I was again certified by the state of Maryland and the Maryland State Police to conduct Safety Inspections on Passenger Vehicles including light duty trucks, and trailers. During this time, I conducted several hundred Certified Safety inspections.

**August 2016 – June 2019  Timbrook Automotive**
I joined the Timbrook Automotive Organization to assist and direct the opening of a motorcycle dealership in Winchester, VA. I assisted in the establishment of that business in the state of Virginia that included permitting licensing etc. I established an online presence and supervised all departments of the dealership from sales to service and marketing. I was responsible for management of employees as well as hiring. I was also responsible and assisted with the discipline of employees and customer relations.
I was the manager of the service department to include the overseeing of the mechanical work performed. I established and conducted several hundred appraisals for the banking industry and received training through Honda USA for safety standards as well as mechanical and technological advances. The Timbrook Automotive Group is a corporation that involves more than ten dealerships and numerous manufactures. I was called upon by many of the dealerships in the organization to conduct appraisals.

**June 2019- Present T3 Intelligence Services**
I am a managing and working partner of this security and private investigation firm. I conduct investigations on all matters. Some cases are criminal, and some are civil.
I have been involved with the insurance industry and have been involved in active investigations with Insurance fraud as well as Workman's Comp fraud.
I am a licensed and certified Private Detective through the Maryland State Police. I also carry an Armed Security Firm License.
I have more than 6 employees that provide security services as well as Executive Protection details.

I have conducted and advised on several civil cases involving motor vehicle accidents. We also conduct investigations for Asset Recovery of motor vehicles and large vessels.

**April 2020- Present East Coast Auto Appraisers LLC** www.eastcoastautoappraisers.com

Partnership Owner and operator of this business. I hold a certification through the Bureau of Certified Auto Appraisers located in Houston Texas. This certification has requirements that include classroom training as well as experience in the fields of Total Loss, Loss of Use, Depreciation Value, Actual Cash Value and Classic Values. The certification standards include the knowledge and identification of vehicles that have been damaged through accidents or the elements.
These appraisals detail any damage to the structure of a vehicle, and I am trained and experienced in the detection of repairs or current damage to frames and subframe systems of vehicles.
I have been able to combine my any years of mechanical experience with the investigative training to establish market values of all types of vehicles. Specialty experience in Umpire callings for certified vehicle appraisals.

**Certifications**
Advanced Accident Investigator
Certified as a Level 4 Motor Vehicle Safety Inspector
Hazardous Material Responder/Inspector
Certified Police Officer Maryland Police Training Commission
Maryland Certified Safety Inspector for multiple classes of motor vehicles
Maryland Certified Salesman
Private Investigator
Certified Auto Appraiser BOCAA



AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York



DOMINICK VOLINO and JOHN PLOTTS

*Plaintiff*

v.

PROGRESSIVE CASUALTY INS. CO., et al.

*Defendant*

)
)
)
)
)
)

Civil Action No.    21 Civ. 6243 (LGS) (SDA)

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                          Jason Merritt

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: King & Spalding, LLP<br>1700 Pennsylvania Avenue, NW, Suite 900<br>Washington, D.C. 20006-4707 | Date and Time:<br><br>04/07/2022 9:00 am |
|---|---|

The deposition will be recorded by this method:    Stenography and Videography

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     04/04/2022

        *CLERK OF COURT*

                                              OR

_____        /s/ Jeffrey S. Cashdan
    *Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    **Defs. Progressive**
**Cas. Ins. Co.; Progressive Adv. Ins. Co.; Progressive Specialty Ins. Co.**   , who issues or requests this subpoena, are:
Jeffrey S. Cashdan, King & Spalding LLP, 1180 Peachtree St., N.E., Ste 1600, Atlanta, GA 30309
(404) 572-4600; jcashdan@kslaw.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 21 Civ. 6243 (LGS) (SDA)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/13) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).



**CARNEY**
**BATES &**
**PULLIAM**
PLLC

April 04, 2022

*Via E-Mail*

Jeffrey S. Cashdan
KING & SPALDING LLP
1180 Peachtree Street
Atlanta, GA 30309
jcashdan@kslaw.com

RE: *Volino et al. v. Progressive Casualty Ins. Co., et al.*, No. 1:21-cv-06243-LGS

Jeff:

On behalf of Jason Merritt, we submit the following response to Defendants' subpoena.

**REQUEST FOR PRODUCTION 1:**

All appraisals You performed in the last 5 years.

**RESPONSE:**

Mr. Merritt objects to this request because it is overly broad, unduly burdensome, and seeking every appraisal he has performed is not proportional to the needs of the case. Moreover, many of Mr. Merritt's appraisals are performed for dealerships, using their systems and software, and he does not have custody or control over those appraisals. Subject to these objections, Mr. Merritt is producing contemporaneously with this response his form template for appraisals and an exemplar appraisal.

**REQUEST FOR PRODUCTION 2:**

All materials You relied upon in drafting the Report.

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com



EXHIBIT

Merritt 4
4/7/22 KB

**RESPONSE:**

Mr. Merritt is producing responsive documents contemporaneously with this response.

**REQUEST FOR PRODUCTION 3:**

Any expert reports You have issued in the last five years.

**RESPONSE:**

No documents exist responsive to this request.

**REQUEST FOR PRODUCTION 4:**

Any judicial ruling on the admissibility of Your testimony issued in the last five years.

**RESPONSE:**

No documents responsive to this request exist.

**REQUEST FOR PRODUCTION 5:**

All documents reflecting or relating to any written agreement between You and Plaintiffs' counsel in this action.

**RESPONSE:**

Mr. Merritt objects to this request to the extent it seeks documents that are protected from disclosure by Federal Rule of Civil Procedure 26(b)(4)(c). Mr. Merritt has been retained as an expert in this case and all work he has performed has been pursuant to a retention agreement. On that basis, any document he has created in this litigation could be construed as "reflecting or relating" to his written agreement with Plaintiffs' counsel. On the basis of this objection, Mr. Merritt is withholding emails with Plaintiffs' counsel that do not meet any of Rule 26(b)(4)(c)'s exceptions. Subject to these objections, Mr. Merritt's retention agreement in this case is being produced contemporaneously with this response.

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com

**REQUEST FOR PRODUCTION 6:**

All publications relating to the automobile industry authored by You in the last 10 years.

**RESPONSE:**

No documents responsive to this request exist.

Best regards,

Lee Lowther

cc: Counsel of Record for the Parties (via email)

519 W. 7th St.  |  Little Rock, AR 72201
p. 501-312-8500  |  f. 501-312-8505  |  tf. 888-551-9944
www.cbplaw.com

## EXPERT/CONSULTANT RETENTION AGREEMENT

This Expert/Consultant Retention Agreement ("Agreement") is effective as of February 15, 2022 ("Effective Date"), by and between Carney Bates & Pulliam, PLLC ("Law Firm"), and East Coast Auto Appraisers, LLC, for the services of Jason Merritt ("Contractor").

**A.    Scope of Retention/Exclusive Expert Consultant Services**

Whereas, the Law Firm is litigating claims on behalf of insureds against Defendants Progressive Casualty Insurance Company ("Progressive Casualty"); Progressive Advanced Insurance Company ("Progressive Advanced"); Progressive Max Insurance Company ("Progressive Max"); and Progressive Specialty Insurance Company, ("Progressive Specialty") (collectively "Defendants" or "Progressive"), in a case referred to herein as the Litigation: *Volino, et. al. v. Progressive Casualty Ins. Co., et al.*, No. 1:21-cv-06243-LGS ("Instant Matter").

Whereas, Contractor is a recognized authority on the used automotive market, including, *inter alia*, pricing techniques and inventory management practices.

Now, therefore, Contractor agrees to provide professional services as a litigation expert and/or consultant for the Law Firm in the Litigation. Contractor will, at the request of the Law Firm, draw upon his expertise to assist the Law Firm (and any law firms or lawyers whom the Law Firm expressly designate) in its prosecution of the Litigation of the Instant Matter.

**B.    Compensation and Submission of Invoices**

1.    In consideration for services rendered under this Agreement, the Law Firm will compensate Contractor at the following rate and terms:

    a. Contractor shall be paid for required Work performed by Contractor at the hourly rate of $650.00.

    b. A minimum of ten (10) hours will be billable in the Instant Matter.

    c. No assistance from colleagues of Contractor is anticipated. Should Contractor deem assistance from a colleague necessary with regard to his Work in the Instant Matter, Contractor must obtain Law Firm's written pre-approval.

1


EXHIBIT
Merritt 5
4/7/22 DB

        d. Should travel be necessary, travel expenses will be reimbursed at Business Class rates.

2.    Contractor shall submit itemized invoices for services rendered and expenses incurred to the Law Firm every thirty (30) days, starting on the 30th day after the date of this Agreement.  Each invoice will set forth the amount of time Contractor has expended in the preceding month.  Where appropriate, each invoice will also include a description of all expenses incurred. The Law Firm will direct payment to:

> East Coast Auto Appraisers, LLC
> 725 Park Str
> PMB 282
> Cumberland, MD 21502

or by bank wire to Contractor's bank account should Contractor request wire payment.

3.    All invoices shall be directed to:

> Hank Bates
> Carney Bates & Pulliam, PLLC
> 519 W. 7th Street
> Little Rock, AR 72201
> hbates@cbplaw.com

## C.   Pre-Approval for All Expenses

1.    All individual expenses under this Agreement must be pre-approved by the Law Firm.  The Law Firm will not be obliged to reimburse any such expense provided under this Agreement in the absence of said pre-approval.

## D.   Confidentiality

1.    Except as required by the Federal Rules of Civil Procedure or Evidence, or as instructed by the Court in the Litigation or otherwise authorized by the Law Firm, Contractor agrees to keep confidential all the work product he generates under this Agreement and all information the Law Firm or designated law firms or lawyers provide in connection with the Litigation.  Contractor has reviewed and signed the Confidentiality Acknowledgement and Affirmation in the Instant Matter.

2.    Unless the Law Firm elects to disclose Contractor's work or consents
in writing to its disclosure, the work to be performed is confidential and protected
by the work product doctrine and any other applicable legal privileges. Contractor
agrees to take precautions necessary to ensure that disclosure of the materials
provided is limited to those persons necessary for the performance of this
engagement. To the extent that it is Contractor's practice to retain drafts or other
documents that do not represent completed analysis and final conclusions, all such
work should be clearly marked in a fashion to indicate that fact.

3.    Contractor shall not disclose the fact of this retention or the nature or
results of work performed to any third party without the Law Firm's prior consent,
except as required by law or court order. This provision does not preclude
Contractor from disclosing to other relevant parties that a conflict exists that
precludes his participation in conflicting third-party assignments.

4.    By signing this Agreement, Contractor represents and warrants that he
has investigated all potential conflicts of interest related to this contemplated
retention, that any such potential conflicts have been disclosed, and that, during the
course of the retention, Contractor will not accept any conflicting engagement.
Specifically, Contractor represents and warrants that he is not currently and does
not anticipate becoming an employee of any party to the litigation or of any
competitor(s) of Defendants.

E.    **Duration and Termination of Agreement**

1.    This Agreement shall continue in force and effect from the Effective
Date until the Litigation has concluded or unless and until it is terminated by either
the Law Firm or Contractor (as to his own role only) upon written notice provided
within 45 days prior to the annual anniversary of the Effective Date.

2.    The Law Firm and Contractor agree to resolve any disputes arising
under this Agreement through final and binding confidential arbitration. Any such
arbitration shall also be subject to the laws of the State of Arkansas, and will take
place in Little Rock, Arkansas; San Francisco, California; or New York,
New York, before a mutually acceptable arbitrator.

3.    The parties shall not be liable to each other for any consequential,
incidental, special, or punitive damages, or for direct compensatory damages in
excess of the fees actually received for the performance of services hereunder.

3

Dated: 02/15/2022

Contractor
East Coast Auto Appraisers, LLC

Dated: _____

Hank Bates
Carney Bates & Pulliam, PLLC

4

# East Coast Auto Appraisers

CUMBERLAND, MD 21502
☎240-727-2681
WWW.EASTCOASTAUTOAPPRAISERS.COM

### IACP Certified Actual Cash Value Appraisal

**Today's Date:**
**Effective Date / Period:**
**Vehicle Year & Make:**
**Vehicle Model:**
**VIN#:**
**Mileage:**
**Transmission:**

**Client Name:**
**Phone:**
**Owner of Vehicle:**

**Certified Auto Appraiser / Expert Witness:** Jason W. Merritt
**IACP Certification #:** 997911001



EXHIBIT

PENGAD 800-631-6989

Merritt 6
4/7/22 KB

**INTENDED PURPOSE:** This report is to determine the FMV / ACV of the Vehicle Year, Make & Model referenced above on the effective date of Date of Inspection.

**APPRAISAL TYPE:** Restricted Use Appraisal.
**VALUE TYPE:** Fair Market Value / Actual Cash Value.
**APPRAISAL METHODS & TECHNIQUES USED**: Sales Comparison Approach.
**PROPERTY CLASS & USE / OWNERSHIP INTEREST:** Privately Owned / Full Ownership / Clean Title.

East Coast Auto Appraisers has conducted a certified appraisal of your 1965 Chevrolet Corvette in order to determine the actual cash value of your vehicle. The local market value of this vehicle is Martinez, California.

**IACP CERTIFIED ACTUAL CASH VALUE APPRAISAL.** The vehicle is rated to be in above average condition for year, make, model, and mileage. The exterior of the vehicle is in near excellent condition. The vehicle has undergone a complete and professional frame off restoration. The paint is in good condition, though there are some minor chips on the right headlight, hood, and trunk. The interior was in good condition. The seats and carpets are in good condition. All electronics were fully functional and in good condition. The dashboard and gauges are in good condition. The engine and transmission were noted to be in excellent running condition and mechanically sound. The wheels and tires were in good condition.. This ACV is of the vehicle in the AS-IS condition at the time of appraisal. Condition adjustments were made, if any, and taken into consideration.

**3** **comparable** representative vehicles were found near zip code: 21502

Total of (3) comparable vehicles were located within a **1,000+ mile radius** of stated principal garage.

**Current Local Market Value -** $100,000.00
**Condition / Options-**             (-$0.00)
==================================

**Grand Total:** $100,000.00

============= Comparable Breakdown =============

**Comp. Average Mileage---** TMU
**Mileage Adjustment---** N/A
**Option Adjustment---** N/A
**List vs. Take Adjustment---** N/A
**Comp. Average Adjusted Price** $99,998.33



**Fair Market Value of your auto:**
**(Formula and Market Quotes Average weighted by 2.0):**

Formula--$XXXXX                                                          **Market Quotes---$XXXXX**

# $XXXXXX
**(Actual Cash Value)**

## List of Comparable / Dealer Quotes
**July 2019**

Classics.Autotrader.com
Classic Car Deals
1965 Chevrolet Corvette
Sale Price: $XXXXX
Mileage: TMU

Classics.Autotrader.com
Alexander Automotive
1965 Chevrolet Corvette
Sale Price: $XXXXX
Mileage: 97,435

Classics.Autotrader.com
Gateway Classic Cars
1965 Chevrolet Corvette
Sale Price: $XXXXX
Mileage: 5,405

### The Appraisal Methodology...

This is not sophisticated rocket science. What would you consider to be fair market value should you be involved in a total loss claim on your automobile? The going price in your local area or the lowest priced comparable?

There are several factors which affect the amount of fair market value, including but not limited to; the year, make and model, mileage, options, and the overall condition of the vehicle immediately before the action of loss has taken place.

The first part of our industry recognized methodology is that we review several nationally recognized valuation guides in determining what the fair market value of the vehicle in scope is worth before we contact local dealers and private sellers. This way we have an idea of what the current market is doing. If local dealers and private sellers are not available in the principally garaged location, then we begin contacting dealers and private sellers measuring radially outward from the principally garaged location until the minimum industry accepted standard of two (2) or more comparable or similar vehicles have been identified.

The second part is an average of *retail* quotes from a few dealers in the area that practice car valuations daily. It is our objective to render a non-biased opinion pertaining to the fair market value of the vehicle in scope. We take a commonsense approach by analyzing all accessible data, local buying trends and economics and feel our method to be a fair, objective and non-biased means of calculating this type of loss.

### Why Contact Dealers?
The answer is obvious. **Dealers make up nearly 90% of the used car market on average.**
This report is to determine the fair *market* value of your vehicle. The definition of market is "the business of buying and selling a specified commodity." If no dealers were contacted, then nearly 90% of the market would be left out.

### Why Contact Private Sellers?
They make up nearly the rest of the market. Private sellers have been statistically proven to take a greater loss on the fair market value of the auto needing to move it quickly. If this statement is not true, how many people have you encountered that have sold their automobile for the original asking price?

### Why Research Valuation Guides?
Valuation guides are a nationally recognized means that both buyers and sellers, male and female, can come to a reasonable agreement on the fair market value of the auto in question. It is a good starting point to determine if a buyer/seller should buy/sell a vehicle for more/less than what it is worth or vice versa. East Coast Auto Appraisers incorporates www.nada.com, www.kbb.com, www.autotrader.com and other industry recognized valuations guides that are accessible to both paid subscribers and the occasional inquirer during our extensive research and data collection. If industry recognized valuation guides were not in place, it would be very easy for deceptive people to mislead the uneducated public of the going price.

# Automotive / Insurance / Legal Terms

**Insurance Company** – means an organization that acts as a system or business of insuring property, life, one's person, etc., against loss or harm arising in specified contingencies, as fire, accident, death, disablement, or the like, in consideration of a payment proportionate to the risk involved. A confide to the community.

**Total Loss** – a "Total Loss" means when it will cost more to repair than replace your vehicle. In insurance contracts, the destruction of property such that it is no longer useful for its intended purpose or that renders it of little or no value to the owner.

**Fair Market Value** – means the price that property would bring in a market of willing buyers and willing sellers, in the ordinary course of trade. Market value is generally established, if possible, based on sales of similar property in the same locality.

**Actual Cash Value** – means the cost to replace a vehicle with a comparable vehicle.

**Comparable Vehicle** – means a vehicle that is the same make and model, same or later, similar body style, similar options, and mileage as your vehicle and in as good or better overall condition as established by current data. To achieve comparability, and deductions or additions for options, mileage or condition can only be if they are itemized and appropriate in dollar amount. An insurer must consider information supplied by the victim when determining deductions or additions.

**Current Data** – means no older than ninety (90) days from the date of loss.

**Principally Garaged** – means the zip code where the vehicle is normally kept.

**Settlement** – means when the payment is made to you and or your lien holder.

**Maryland Lemon Law** - Lemon laws are state laws that provide recourse for purchasers of automobiles that repeatedly fail to meet quality and performance standards.

**Arbitration** – The hearing and settlement of a dispute between opposing parties by a third party who is not a judge.

**Burden of Proof** – In the law of evidence, the necessity of duty of affirmatively providing a fact or facts in dispute.

**Cause** – A suit, litigation or action – civil or criminal.

**Chambers** – Private office or room of the Honorable Judge.

**Claim** – The assertion of a right, as to money or property; the accumulation of facts which give rise to a right enforceable in court.

**Class Action** – A lawsuit brought by a representative party on behalf of a large group, all whose members have the same or similar grievance against the defendant. Used when the group is too large for it to be practical to name every member of the group or party

**Contempt of Court** – Any act calculated to embarrass, hinder, or obstruct a court in the administration of justice, or calculated to lessen its authority or dignity.

**Count** – A separate and independent claim. A civil petition or criminal indictment may contain several counts.

**Cross Examination** – The questions of a witness in a trial or in the taking or a deposition; by the party opposed to the one who produced the witness.

**Damages** – Monetary compensation awarded by a court for an injury caused by the act of another.

**Defendant** – The person against whom a civil or criminal action is brought

**Deposition** – A form of oral testimony taken by the opposing attorney in advance of the trial with a court reporter present to record every word.

**Hearsay** – Evidence not proceeding from the personal knowledge of the witness, such as a rumor.

**Hypothetical Question** – A combination of facts and circumstances, assumed or proved, stated in such a form as to constitute a coherent state of facts upon which the opinion of an expert can be asked by way of evidence in a trial.

**Negligence** – A failure to do something which a reasonable man or woman, guided by ordinary considerations, would do; or the doing of something which a reasonable and prudent man or woman would not do.

**Objection** – The act of taking exception to some statement of procedure in trial. Used to call the courts attention to improper evidence or procedure.

**Plaintiff** – A person who brings an action; the party who complains or sues in a personal action and is so named on the record.

**Tort** – An injury or wrong committed, either with or without force to the person or property of another.

**Verdict** – In practice, the format and unanimous decision or finding made by a jury, reported to the court and accepted by it.

**Weight of Evidence** – The balance or preponderance of evidence; the inclination of the greater amount of credible evidence, offered in trial, to support one side of the issue rather than the other side.

# CERTIFICATION OF CREDIBILITY

I certify that, to the best of my knowledge and belief:

- ✓ The methods and calculations used in this report are the unbiased opinion of an experience and qualified professional and are limited only by the reported assumptions and limitations.

- ✓ The statements of fact contained in this report are true and correct.

- ✓ This report was provided at the request of an individual, company, or government agency of their own free will and was not solicited for any predetermined reason.

- ✓ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- ✓ I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- ✓ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- ✓ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- ✓ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- ✓ My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practices and the Bureau of Certified Auto Appraisers standards.*

- ✓ I did perform a physical inspection of the vehicle that is the subject of this report.

- ✓ I have performed no services an appraiser or in any other capacity regarding the vehicle that is the subject of this report within the three-year period immediately preceding the acceptance of this assignment.

- ✓ No other party provided any service to assist in forming my professional opinion to a reasonable degree of appraisal certainty.

- ✓ The appraiser herein, by reason of this appraisal is not required to give testimony or attend court or any governmental hearing with reference to the property in question without prior agreement as to fee for additional services desired.

East Coast Auto Appraisers valuations are based on estimate and vehicle information believed to be authentic, reliable and accurate. Houston Auto Appraisers has used reasonable care in producing the valuations offered, however, East Coast Auto Appraisers makes no guarantees, expressed or implied, as to the final resolution of your claim and shall not be liable for any differences or damages of any type or description incurred by the use of the information.

This report was prepared by: Jason W. Merritt
IACP Certification No. XX
Reviewed by: Jason W. Merritt

Signature: *Jason W. Merritt*
Date:  November 13, 2019

| Side View | Rear View |
|---|---|
| Engine | Engine Badging |
| Passenger Interior View | Console/Dash View |

| | |
|---|---|
| Driver Inner Door | Passenger Inner Door |
| Driver Gauge Cluster | Mileage – 84,955 |
| Rear Interior View – Driver | Rear Interior View – Passenger |

| | |
|---|---|
| Paint Chips | Small Crack in Paint |
| Wheel & Tire | Badging |



# East Coast Auto Appraisers

CUMBERLAND, MD 21502
☎ 240-727-2681
WWW.EASTCOASTAUTOAPPRAISERS.COM

### IACP Certified Actual Cash Value Appraisal



**Today's Date:**
**Effective Date / Period:**
**Vehicle Year & Make:** 1998 Ford Mustang
**Vehicle Model:** Cobra/SVT
**VIN#:**
**Mileage:** 47,922
**Transmission:** Manual 6 Speed

**Client Name:**
**Owner of Vehicle:**                Greenspring, WV

**Certified Auto Appraiser / Expert Witness:** Jason W. Merritt
**IACP Certification #:** 991911100



*Bureau of Certified Auto Appraisers*

Certifies that Auto Appraiser

**Jason W. Merritt**

has complied with the requirements of USPAP
Standard for BCAA Certification of Auto Appraisers

991911100
CERTIFICATE NUMBER

05/27/2020
EFFECTIVE DATE

05/27/2022
EXPIRATION DATE

PRESIDENT BCAA

1

**INTENDED PURPOSE:** This report is to determine the FMV / ACV of the 1998 Ford Mustang Cobra SVT, referenced above on the effective date of ███████████.

**APPRAISAL TYPE:** Restricted Use Appraisal.
**VALUE TYPE:** Fair Market Value / Actual Cash Value.
**APPRAISAL METHODS & TECHNIQUES USED**: Sales Comparison Approach.
**PROPERTY CLASS & USE / OWNERSHIP INTEREST:** Privately Owned / Full Ownership / Clean Title.

East Coast Auto Appraisers has conducted a certified appraisal of your **1998 Ford Mustang Cobra SVT** in order to determine the actual cash value of your vehicle. The local market value of this vehicle is Cumberland, Maryland.

### IACP CERTIFIED ACTUAL CASH VALUE APPRAISAL.

The vehicle is rated to be in above average condition for year, make, and model. The exterior of the vehicle is in excellent condition. The vehicle has maintained the original condition. There is no rust apparent on the vehicle exterior. The paint is in need of detail finishing but in overall very good condition. The paint is all factory without any paint repairs apparent on any panels. There are limited marks or minor imperfections on the paint. There is no accident history whatso ever and no damage prior or current. All body panels are original and marked with VIN.

The interior is in very good condition. The leather option seats and carpets are in good condition. All original equipment and all are operational. No marks or wear is noticed or found in the interior.

All electronics were fully functional and in good condition. The dashboard and gauges are in good condition. The factory stereo system is functional. The engine and transmission were noted to be in great running condition. The transmission shifts as expected and the clutch operates normally. The engine starts and runs smooth. There are no indications of engine wear or issues. The vehicle was scanned for computer responses. There were minor normal historic codes in the system that refer to the THEFT Deterrent system. No body or electronic system codes or faults.
This vehicle is a one owner vehicle that has been well maintained and stored in a garage. It has all original paperwork as far as manuals, wheel locks and instruction from Ford. Vehicle is in complete operational condition and is a limited production vehicle. Only 1788 Mustang Cobra SVT with Black paint were produced in 1998.

This ACV is of the vehicle in the AS-IS condition at the time of appraisal. Condition adjustments were made, if any, and taken into consideration.

**3** **comparable** representative vehicles were found :

Total of (3) comparable vehicles were located within a **200+ mile radius** of stated principal garage.

**Current Local Market Value -** $9600.00--
**Condition / Options-**          (+3650)
==================================

**Grand Total: $13,250.00**

=========== Comparable Breakdown ===========

Comp. Average Mileage--- 56,701
Mileage Adjustment--- 8779
Option Adjustment--- 850
List vs. Take Adjustment--- N/A
Comp. Average Adjusted Price $12,999.00

### Fair Market Value of your auto:
#### (Formula and Market Quotes Average weighted by 3.0):

Formula--$38,998.00                                    Market Quotes---$12,999.00

2

# $13,250.00

**(Actual Cash Value)**

## List of Comparable / Dealer Quotes

TRUE Car
Fenton, MI
1998 Ford Cobra SVT
Sale Price: $15,000
Mileage: 39,786

Westbury Toyota
Westbury, NY
1998 Ford Cobra SVT
Sale Price: $9,999
Mileage: 74,159

Village Auto
Franklin, PA
1998 Ford Cobra SVT
Sale Price: $13,999
Mileage: 56,158





TRUE Car        Westbury Toyota        Village Auto

**The Appraisal Methodology…**

This is not sophisticated rocket science. What would you consider to be fair market value should you be involved in a total loss claim on your automobile? The going price in your local area or the lowest priced comparable?

There are several factors which affect the amount of fair market value, including but not limited to; the year, make and model, mileage, options, and the overall condition of the vehicle immediately before the action of loss has taken place.

The first part of our industry recognized methodology is that we review several nationally recognized valuation guides in determining what the fair market value of the vehicle in scope is worth before we contact local dealers and private sellers. This way we have an idea of what the current market is doing. If local dealers and private sellers are not available in the principally garaged location, then we begin contacting dealers and private sellers measuring radially outward from the principally garaged location until the minimum industry accepted standard of two (2) or more comparable or similar vehicles have been identified.

The second part is an average of *retail* quotes from a few dealers in the area that practice car valuations daily. It is our objective to render a non-biased opinion pertaining to the fair market value of the vehicle in scope. We take a commonsense approach by analyzing all accessible data, local buying trends and economics and feel our method to be a fair, objective and non-biased means of calculating this type of loss.

**Why Contact Dealers?**
The answer is obvious. **Dealers make up nearly 90% of the used car market on average.**
This report is to determine the fair *market* value of your vehicle. The definition of market is "the business of buying and selling a specified commodity." If no dealers were contacted, then nearly 90% of the market would be left out.

**Why Contact Private Sellers?**
They make up nearly the rest of the market. Private sellers have been statistically proven to take a greater loss on the fair market value of the auto needing to move it quickly.

**Why Research Valuation Guides?**
Valuation guides are a nationally recognized means that both buyers and sellers, male and female, can come to a reasonable agreement on the fair market value of the auto in question. It is a good starting point to determine if a buyer/seller should buy/sell a vehicle for more/less than what it is worth or vice versa. East Coast Auto Appraisers incorporates www.nada.com, www.kbb.com, www.autotrader.com and other industry recognized valuations guides that are accessible to both paid subscribers and the occasional inquirer during our extensive research and data collection. If industry recognized valuation guides were not in place, it would be very easy for deceptive people to mislead the uneducated public of the going price.

4

# Automotive / Insurance / Legal Terms

**Insurance Company** – means an organization that acts as a system or business of insuring property, life, one's person, etc., against loss or harm arising in specified contingencies, as fire, accident, death, disablement, or the like, in consideration of a payment proportionate to the risk involved. A confide to the community.

**Total Loss** – a "Total Loss" means when it will cost more to repair than replace your vehicle. In insurance contracts, the destruction of property such that it is no longer useful for its intended purpose or that renders it of little or no value to the owner.

**Fair Market Value** – means the price that property would bring in a market of willing buyers and willing sellers, in the ordinary course of trade. Market value is generally established, if possible, based on sales of similar property in the same locality.

**Actual Cash Value** – means the cost to replace a vehicle with a comparable vehicle.

**Comparable Vehicle** – means a vehicle that is the same make and model, same or later, similar body style, similar options, and mileage as your vehicle and in as good or better overall condition as established by current data. To achieve comparability, and deductions or additions for options, mileage or condition can only be if they are itemized and appropriate in dollar amount. An insurer must consider information supplied by the victim when determining deductions or additions.

**Current Data** – means no older than ninety (90) days from the date of loss.

**Principally Garaged** – means the zip code where the vehicle is normally kept.

**Settlement** – means when the payment is made to you and or your lien holder.

**Lemon Law** - Lemon laws are state laws that provide recourse for purchasers of automobiles that repeatedly fail to meet quality and performance standards.

**Arbitration** – The hearing and settlement of a dispute between opposing parties by a third party who is not a judge.

**Burden of Proof** – In the law of evidence, the necessity of duty of affirmatively providing a fact or facts in dispute.

**Cause** – A suit, litigation or action – civil or criminal.

**Chambers** – Private office or room of the Honorable Judge.

**Claim** – The assertion of a right, as to money or property; the accumulation of facts which give rise to a right enforceable in court.

**Class Action** – A lawsuit brought by a representative party on behalf of a large group, all whose members have the same or similar grievance against the defendant. Used when the group is too large for it to be practical to name every member of the group or party

**Contempt of Court** – Any act calculated to embarrass, hinder, or obstruct a court in the administration of justice, or calculated to lessen its authority or dignity.

**Count** – A separate and independent claim. A civil petition or criminal indictment may contain several counts.

**Cross Examination** – The questions of a witness in a trial or in the taking or a deposition; by the party opposed to the one who produced the witness.

**Damages** – Monetary compensation awarded by a court for an injury caused by the act of another.

**Defendant** – The person against whom a civil or criminal action is brought

**Deposition** – A form of oral testimony taken by the opposing attorney in advance of the trial with a court reporter present to record every word.

**Hearsay** – Evidence not proceeding from the personal knowledge of the witness, such as a rumor.

5

**Hypothetical Question** – A combination of facts and circumstances, assumed or proved, stated in such a form as to constitute a coherent state of facts upon which the opinion of an expert can be asked by way of evidence in a trial.

**Negligence** – A failure to do something which a reasonable man or woman, guided by ordinary considerations, would do; or the doing of something which a reasonable and prudent man or woman would not do.

**Objection** – The act of taking exception to some statement of procedure in trial. Used to call the courts attention to improper evidence or procedure.

**Plaintiff** – A person who brings an action; the party who complains or sues in a personal action and is so named on the record.

**Tort** – An injury or wrong committed, either with or without force to the person or property of another.

**Verdict** – In practice, the format and unanimous decision or finding made by a jury, reported to the court and accepted by it.

**Weight of Evidence** – The balance or preponderance of evidence; the inclination of the greater amount of credible evidence, offered in trial, to support one side of the issue rather than the other side.



6

## CERTIFICATION OF CREDIBILITY

I certify that, to the best of my knowledge and belief:

- ✓ The methods and calculations used in this report are the unbiased opinion of an experience and qualified professional and are limited only by the reported assumptions and limitations.

- ✓ The statements of fact contained in this report are true and correct.

- ✓ This report was provided at the request of an individual, company, or government agency of their own free will and was not solicited for any predetermined reason.

- ✓ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- ✓ I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- ✓ I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- ✓ My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- ✓ My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- ✓ My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practices and the Bureau of Certified Auto Appraisers standards.*

- ✓ I did perform a physical inspection of the vehicle that is the subject of this report.

- ✓ I have performed no services an appraiser or in any other capacity regarding the vehicle that is the subject of this report within the three-year period immediately preceding the acceptance of this assignment.

- ✓ No other party provided any service to assist in forming my professional opinion to a reasonable degree of appraisal certainty.

- ✓ The appraiser herein, by reason of this appraisal is not required to give testimony or attend court or any governmental hearing with reference to the property in question without prior agreement as to fee for additional services desired.

East Coast Auto Appraisers valuations are based on estimate and vehicle information believed to be authentic, reliable and accurate. East Coast Auto Appraisers has used reasonable care in producing the valuations offered, however, East Coast Auto Appraisers makes no guarantees, expressed or implied, as to the final resolution of your claim and shall not be liable for any differences or damages of any type or description incurred by the use of the information.

This report was prepared by Jason W. Merritt
IACP Certification No. 991911100

Signature: *Jason W. Merritt*
Date: ▮▮▮▮▮▮▮

7



Side View



Rear View



Engine



Passenger Side



Passenger Interior View



Console/Dash View



Driver Side Interior



Trunk



Front End



Right Rear



Hood



SVT Wheels



VIN Identification



SVT Identification



Computer Scan Results



Undercarriage

**WorkCenter Total Loss**



### WCTL Position on Internet Pricing:

In addition to the detailed methodology explanation regarding the projected sold adjustment, please see the information below.

Prior to discussing the internet sales pricing and method, caution must be taken when obtaining information (such as the sold price) from the Dealer regarding a specific vehicle. Basing an opinion solely on the Dealers verbal communication is not recommended. This information must be accurate and unless the Dealer can provide actual proof such as purchase invoice or contract (which should be considered private information with regards to the actual purchaser) this information should be considered suspect at best.

### Internet Sales

With the explosion of the internet there are two methods employed by Dealerships when selling new / used vehicles. In addition to the more traditional on-the-lot sales, many dealerships have internet sales departments. For an Internet department, it is more important to move inventory and sell a lot of cars than it is to maximize profit on individual cars. Therefore, the initial price from an Internet sales department will often reflect a no-hassle price. It is important not to confuse a Dealers inventory on-line with an internet-no hassle price. Our experience indicates that Dealers who offer the internet no-hassle pricing also have incorporated a no-hassle single price sales policy.

WCTL does not apply a projected sold adjustment to comparable vehicles that are for sale from a Dealer in which we have confirmed to have a no-hassle single price sales policy. For those internet sales departments that do not have an overall no-hassle single price sales policy and are willing to negotiate those vehicle will have a projected sold adjustment applied. There is no difference in these vehicles listed on-line and the vehicles for sale on-the-lot. It comes down to the Dealers overall pricing policy.

With that said, on occasion a Comparable Vehicle listed as Available with the Projected Sold Adjustment applied has actually sold at the time the valuation report was completed. It is very common that the recent sold price and the list price less the projected sold adjustment will not be exactly the same. (It could be higher or lower) The projected sold methodology employed by WorkCentre Total Loss measures and captures the average negotiating behavior of sellers of vehicles similar to the loss vehicle. This is done by using an average ratio between the list price and sale price of records where the system only has vehicles listed for sale. That same average ratio (depending on the updated records) is applied to all of the available comparable vehicles listed in the report. Appling an average maintains consistency when measuring and applying the projected sold adjustment.

When a comparable vehicle is identified as being sold, that does not automatically imply that the customer (valuation recipient) would have received the same exact sold price. In addition, the other comparable vehicles listed in the report could have sold for a lower or higher price than projected. The key is that the projected sold measures the average negotiating behavior using an average of at least 30 list/sold vehicles which have different list and sold prices.

Confidential © Mitchell International, Inc.
**WorkCenter Total Loss**



# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 20-6755641-02 | | LIABILITY | JAMES ENGLAND 120 WEST MAIN STREET APT 3 JOHNSTOWN, NY 12095 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 06/20/2020 | 06/20/2020 | 06/22/2020 | 1010339900 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2005 | Honda | Pilot LX 4 Door Utility 106" WB 3.5L 6 Cyl Gas A AWD | NY 12095 | 159,703 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Nighthawk Black Pearl | JNP7195, New York | 2HKYF18115H572662 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $3,299.84 |
| Condition | $0.00 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| Market Value = | $3,299.84 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Settlement Value = | $3,299.84 |

## Settlement Value:
## $3,299.84



**J.D. POWER**

Mitchell **WorkCenter**
**Total Loss**
© 2018 Mitchell International, Inc. All Rights Reserved

CONFIDENTIAL

Mitchell-Volino Subpoena 000689

# Loss Vehicle Detail

Loss vehicle: 2005 Honda Pilot | LX 4 Door Utility 106" WB | 3.5L 6 Cyl Gas A AWD

## Standard Equipment

### Exterior

| | |
|---|---|
| Black body side moldings | Black rear roofline spoiler |
| Body-color front/rear bumpers | Front mud guards |
| Intermittent rear window wiper/washer | Multi-reflector halogen headlamps |
| Pwr mirrors | Variable intermittent windshield wipers |

### Interior

| | |
|---|---|
| (4) auxiliary pwr outlets | (7) beverage holders |
| 2nd & 3rd row 60/40 split flat folding seats | 2nd/3rd row grab handles w/integrated map lights |
| AM/FM stereo w/CD player-inc: (4) speakers | Cargo area light |
| Cargo area tie-down anchors/hooks | Coin box |
| Cruise control | Door courtesy lights |
| Front bucket seats w/manual driver seat adjustment | Front map lights |
| Front/rear air conditioning w/micron air-filtration system | Front/rear floor mats |
| Head restraints at all seating positions | Illuminated driver & front passenger visor vanity mirrors |
| Immobilizer theft-deterrent system | Indicator lights-inc: low fuel, low oil pressure, door/tailgate open, passenger air bag shut-off |
| Integrated glass antenna | Multi-functional center console w/cell phone cradle |
| Pwr door locks | Pwr windows w/auto-up/down driver window |
| Rear seat heater ducts | Rear under-floor storage compartment |
| Rear window defroster w/timer | Remote fuel filler door release |
| Remote keyless entry | Sliding sunvisor extensions |
| Sunglasses storage compartment | Tilt steering wheel |
| Tire pressure monitoring system | |

### Mechanical

| | |
|---|---|
| 16" x 6.5" styled steel wheels | 20.4 gallon fuel tank |
| Anti-lock braking system (ABS) w/electronic brake distribution (EBD) | Direct ignition system |
| Front/rear stabilizer bars | Fully-automatic Variable Torque Management (VTM-4) all-wheel drive system |
| MacPherson strut front suspension | Multi-link rear suspension w/trailing arms |
| P235/70SR16 all-season tires | Pwr ventilated front/solid rear disc brakes |
| Variable pwr rack & pinion steering | |

### Safety

| | |
|---|---|
| 2nd & 3rd row 3-point seatbelts | 2nd row lower anchors & tether for children (LATCH) |
| 3rd row child seat tether anchors | 5-mph impact-absorbing bumpers |

Childproof rear door locks

Driver/front passenger dual-stage airbags (SRS)

Driver/front passenger side-impact airbags w/occupant position detection system (OPDS)    Front 3-point seatbelts-inc: automatic tensioning system, adjustable anchors

Side-impact door beams

## Loss Vehicle Base Value

Loss vehicle:  2005 Honda Pilot | LX 4 Door Utility 106" WB | 3.5L 6 Cyl Gas A AWD

### Regional Comparable Vehicle Information

Search Radius used for this valuation: **200 miles from loss vehicle zip/postal code.**

Typical Mileage for this vehicle: **147,000 miles**

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2005 HONDA PILOT LX 4D SUV 6 3.5NORMAL GAS A AWD | 184,169 | 18706 | 150 miles | $4,575.00 List Price | $4,296.50 |
| 2 | 2005 HONDA PILOT LX 4D SUV 6 3.5NORMAL GAS A AWD | 147,908 | 03237 | 153 miles | $2,995.00 List Price | $2,564.04 |
| 3 | 2005 HONDA PILOT LX 4D SUV 6 3.5NORMAL GAS A AWD | 171,949 | 11570 | 169 miles | $3,200.00 List Price | $2,915.81 |
| 4 | 2005 HONDA PILOT LX 4D SUV 6 3.5NORMAL GAS A AWD | 242,042 | 18020 | 172 miles | $3,295.00 List Price | $3,423.01 |

**Base Value:**    **$3,299.84**

## Loss Vehicle Adjustments

Loss vehicle:  2005 Honda Pilot | LX 4 Door Utility 106" WB | 3.5L 6 Cyl Gas A AWD



## Condition Adjustments

Condition Adjustment: $0.00          Overall Condition:  3.00-Good          Typical Vehicle Condition:  3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| DASH/CONSOLE | Typical | UNABLE TO ASSESS |
| GLASS | Typical | UNABLE TO ASSESS |
| CARPET | Typical | UNABLE TO ASSESS |
| HEADLINER | Typical | UNABLE TO ASSESS |
| SEATS | Typical | UNABLE TO ASSESS |
| DOORS/INTERIOR PANELS | Typical | UNABLE TO ASSESS |
| **Exterior** | | |
| PAINT | Typical | UNABLE TO ASSESS |
| TRIM | 3 Good | CLEAR COAT PEELING ON THE FRONT COVER |
| BODY | 3 Good | SURFACE RUST ON THE L QUARTER PANEL |
| VINYL/CONVERTIBLE TOP | Typical | |
| **Mechanical** | | |
| ENGINE | Typical | UNABLE TO ASSESS |
| TRANSMISSION | Typical | UNABLE TO ASSESS |
| Tire | Typical | UNABLE TO ASSESS |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## Regional Comparable Vehicles

Loss vehicle:  2005 Honda Pilot | LX 4 Door Utility 106" WB | 3.5L 6 Cyl Gas A AWD

Claim # 20-6755641-02 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 4
Mitchell-Volino Subpoena 000692

## 1 2005 HONDA PILOT LX 4D SUV 6 3.5 NORMAL GAS AAWD — List Price: $4,575.00

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2HKYF18145H544824 | 171 | 05/25/2020 | 18706 | 150 miles |

Source

DEALER WEB LISTING - VAST.COM
WYOMING VALLEY AUTO SALES
197 W END ROAD
WILKES BARRE PA 18706
570-825-7577

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$535.00 |
| Mileage | 159,703 | 184,169 | $256.50 |
| Total Adjustments: | | | -$278.50 |
| **Adjusted Price:** | | | **$4,296.50** |

## 2 2005 HONDA PILOT LX 4D SUV 6 3.5 NORMAL GAS AAWD — List Price: $2,995.00

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2HKYF18195H505968 | P505968 | 06/14/2020 | 03237 | 153 miles |

Source

DEALER WEB LISTING - VAST.COM
ONESTOP AUTO SHOP
136 NH ROUTE 106 UNIT 2B
GILMANTON NH 03237
603-784-9013

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$350.00 |
| Mileage | 159,703 | 147,908 | -$80.96 |
| Total Adjustments: | | | -$430.96 |
| **Adjusted Price:** | | | **$2,564.04** |

**3**   **2005 HONDA PILOT LX 4D SUV 6 3.5 NORMAL GAS AAWD**     **List Price: $3,200.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2HKYF18125H568040 | H568040 | 05/16/2020 | 11570 | 169 miles |

Source

DEALER WEB LISTING - VAST.COM
AUTOS UNDER 3000
4420 AUSTIN BOULEVARD
ISLAND PARK NY 11570
516-851-2905

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$374.00 |
| Mileage | 159,703 | 171,949 | $89.81 |
| | | Total Adjustments: | -$284.19 |
| | | **Adjusted Price:** | **$2,915.81** |

---

**4**   **2005 HONDA PILOT LX 4D SUV 6 3.5 NORMAL GAS AAWD**     **List Price: $3,295.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2HKYF18155H524890 | S4494T | 06/07/2020 | 18020 | 172 miles |

Source

DEALER WEB LISTING -
AUTOTRADER.COM
STAR AUTO MALL
3730 NAZARETH PIKE
BETHLEHEM PA 18020
610-419-3222

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$385.00 |
| Mileage | 159,703 | 242.042 | $513.01 |
| | | Total Adjustments: | $128.01 |
| | | **Adjusted Price:** | **$3,423.01** |

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2005 Honda Pilot LX | 4 Door Utility 106" WB 3.5L 6 Cyl Gas  AWD | $27,550.00 |

This valuation was prepared in accordance with 11 NYCRR 216.7(c)(iii)(v)



Mitchell **WorkCenter**™
**Total Loss**
CONFIDENTIAL

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

### Step 1 - Locate Comparable Vehicles

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

### Step 2 - Adjust Comparable Vehicles

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

### Step 3 - Calculate Base Vehicle Value

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

### Step 4 - Calculate Loss Vehicle Adjustments

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

### Step 5 - Calculate the Market Value

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

# Vehicle Valuation Report

**mitchell**

Prepared For **Progressive Group of Insurance Companies**   (800) 321-9843

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 18-3835313-01 | | COLLISION | ZACHARY GOODIER 5704 STONE RD LOCKPORT, NY 14094 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 06/18/2018 | 06/18/2018 | 06/21/2018 | 1007907917 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2013 | Hyundai | Sonata GLS 4 Door Sedan 2.4L 4 Cyl Gas A FWD | NY 14094 | 48,317 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Shimmering White | | 5NPEB4AC3DH588663 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $10,343.74 |
| Condition + | $218.25 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| Market Value = | $10,561.99 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $500.00 |
| Settlement Value = | $10,061.99 |

## Settlement Value:
# $10,061.99

EXHIBIT
PENGAD 800-631-6989
Merritt 10
4/7/22

**J.D. POWER**

Mitchell **WorkCenter**
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

# Loss Vehicle Detail

Loss vehicle: 2013 Hyundai Sonata | GLS 4 Door Sedan | 2.4L 4 Cyl Gas A FWD

## Standard Equipment

### Exterior

| | |
|---|---|
| 16" alloy wheels | Body-color door handles |
| Body-color grille | Body-color heated pwr mirrors w/timer |
| Chrome window trim | Compact T125/80D16 spare tire |
| P205/65R16 all-season tires | Projector-lens headlights |
| Solar control glass | Speed-sensitive variable intermittent windshield wipers |

### Interior

| | |
|---|---|
| (2) center console mounted 12-volt pwr outlets | (3) assist grips |
| (4) door bottle holders | 104-watt AM/FM stereo w/CD/MP3 player -inc: (6) speakers, iPod/USB/aux inputs |
| Active ECO system | Air conditioning -inc: cabin air filter |
| Cloth door trim | Cloth seating surfaces |
| Cruise control | Door sill scuff plates |
| Dual sunvisors w/illuminated vanity mirrors | Dual tier console w/armrest, storage, (2) cupholders |
| Front bucket seats w/active head restraints | Full floor carpeting |
| Indicators -inc: PRND, cruise control, turn signal/hazard, high beam, ESC/TCS, ECO | Instrumentation -inc: speedometer, tachometer, coolant temp, fuel level, odometer, trip odometer, digital clock |
| Integrated Bluetooth w/phonebook transfer | Lighting -inc: dome, front map lights, ignition, glovebox, cargo |
| Locking glovebox | Map pockets |
| Metalgrain interior accents | Pwr door locks |
| Pwr windows w/driver auto up/down, pinch protection | Rear center armrest w/(2) cupholders |
| Rear coat hanger | Rear window defroster |
| Remote fuel/hood/trunk release | Remote keyless entry system w/security alarm |
| Seatback pockets | Shark fin style antenna |
| SiriusXM satellite radio w/90-day subscription | Tilt/telescopic steering wheel -inc: audio/Bluetooth/cruise controls |
| Trip computer | Warning chimes -inc: key-in-ignition w/door ajar, seatbelt |

### Mechanical

| | |
|---|---|
| 110-amp alternator | 4-wheel disc brakes |
| Dual continuously variable valve timing (DCVVT) | Front wheel drive |
| Front/rear stabilizer bars | Independent multi-link rear suspension w/gas shocks |
| MacPherson strut front suspension w/gas shocks | |

### Safety

| | |
|---|---|
| 3-point seatbelts for all seating positions | 4-wheel anti-lock brakes (ABS) -inc: electronic brake-force distribution (EBD), brake assist |
| Blue Link telematics system | Body-side reinforcements |

| Childproof rear door locks | Daytime running lamps |
| Driver/front passenger advanced airbags | Driver/front passenger seat-mounted side-impact airbags |
| Emergency internal trunk release | Energy-absorbing steering column |
| Front seat belt pretensioners & force limiters | Front/rear crumple zones |
| Front/rear side-curtain airbags | Hood buckling creases & safety stops |
| Lower anchors & upper tether anchors (LATCH) | Occupant classification system (OCS) |
| Shift interlock system | Tire Pressure Monitoring System (TPMS) |
| Traction control system (TCS) w/electronic stability control (ESC) | |

## Packages

POPULAR EQUIPMENT PKG

-inc: front fog lights, pwr driver's seat, pwr driver lumbar support, heated front seats, auto headlight control, chrome interior door handles, leatherette door trim

### Optional Equipment

ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK

*DIO/PIO =    Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle:  2013 Hyundai Sonata | GLS 4 Door Sedan | 2.4L 4 Cyl Gas A FWD

## Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.
Typical Mileage for this vehicle: 66,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4NORMAL GAS A 2WD | 36,947 | 14228 | 10 miles | $10,200.00 Sold Price | $10,355.42 |
| 2 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4NORMAL GAS A 2WD | 47,848 | 14226 | 14 miles | $9,350.00 Sold Price | $9,733.87 |
| 3 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4NORMAL GAS A 2WD | 17,936 | 14226 | 14 miles | $10,716.00 Sold Price | $10,492.23 |
| 4 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4NORMAL GAS A 2WD | 52,174 | 14075 | 33 miles | $10,000.00 Sold Price | $10,586.19 |
| 5 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4NORMAL GAS A 2WD | 51,314 | 14094 | 0 miles | $11,751.00 List Price | $11,057.17 |
| 6 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4NORMAL GAS A 2WD | 61,253 | 14068 | 10 miles | $10,361.00 List Price | $10,445.40 |
| 7 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4NORMAL GAS A 2WD | 48,313 | 14559 | 44 miles | $10,371.00 List Price | $9,626.96 |
| 8 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4NORMAL GAS A 2WD | 30,724 | 14625 | 60 miles | $11,790.00 List Price | $10,526.61 |
| 9 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4NORMAL GAS A 2WD | 57,242 | 14580 | 63 miles | $10,991.00 List Price | $10,914.99 |
| 10 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4NORMAL GAS A 2WD | 65,405 | 14564 | 66 miles | $9,300.00 List Price | $9,698.60 |

**Base Value:**     **$10,343.74**

# Loss Vehicle Adjustments

Loss vehicle: 2013 Hyundai Sonata | GLS 4 Door Sedan | 2.4L 4 Cyl Gas A FWD

## Condition Adjustments

Condition Adjustment: $218.25          Overall Condition: 3.16-Good          Typical Vehicle Condition: 3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| CARPET | 3 Good | STAIN IN DRIVERS AREA |
| DASH/CONSOLE | 3 Good | SMALL CUT ON GLOVE BOX DOOR AREA |
| DOORS/INTERIOR PANELS | 3 Good | PERMANENT MARKS ON DRIVERS DOOR |
| SEATS | 3 Good | STAIN ON DRIVERS SEAT |
| GLASS | 3 Good | NO DAMAGE |
| HEADLINER | 3 Good | NO DAMAGE |
| **Exterior** | | |
| BODY | 4 Very Good | DING ON RF DOOR |
| TRIM | 3 Good | SMALL IMPACT TO REAR BUMPER |
| VINYL/CONVERTIBLE TOP | Typical | |
| PAINT | 3 Good | MULTIPLE SMALL SCRATCHES ON BOTH SIDES |
| **Mechanical** | | |
| ENGINE | 3 Good | FLUID BUILD UP AROUND GASKETS |
| TRANSMISSION | 3 Good | FLUID BUILD UP ON TOP |
| Tire | 2 Fair | 3,9,8,2 |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

# Comparable Vehicles

Loss vehicle: 2013 Hyundai Sonata | GLS 4 Door Sedan | 2.4L 4 Cyl Gas A FWD

## 1  2013 HYUNDAI SONATA GLS 4D SDN 4 2.4 NORMAL GAS A2WD          Sold Price: $10,200.00

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|-----------|--------------|-----------------|----------------------------|
| 5NPEB4AC3DHXXXXXX | | 04/14/2018 | 14228 | 10 miles |

Source

FRANCHISE SALE - J.D. POWER
AND ASSOCIATES

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Mileage | 48,317 | 36,947 | -$330.41 |
| Equipment | | | |
| POPULAR EQUIPMENT PKG | Yes | No | $352.23 |
| ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK | Yes | No | $133.60 |
| | | Total Adjustments: | $155.42 |
| | | **Adjusted Price:** | **$10,355.42** |

## 2  2013 HYUNDAI SONATA GLS 4D SDN 4 2.4 NORMAL GAS A2WD          Sold Price: $9,350.00

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|-----------|--------------|-----------------|----------------------------|
| 5NPEB4AC2DHXXXXXX | | 04/07/2018 | 14226 | 14 miles |

Source

FRANCHISE SALE - J.D. POWER
AND ASSOCIATES

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Mileage | 48,317 | 47,848 | -$12.49 |
| Equipment | | | |
| POPULAR EQUIPMENT PKG | Yes | No | $322.87 |
| ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK | Yes | No | $122.47 |
| CARPETED FLOOR MATS | No | Yes | -$48.98 |
| | | Total Adjustments: | $383.87 |
| | | **Adjusted Price:** | **$9,733.87** |

Comparative Vehicle Option Details

CARPETED FLOOR MATS

## 3 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4 NORMAL GAS A2WD

**Sold Price: $10,716.00**

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5NPEB4AC2DHXXXXXX | | 05/31/2018 | 14226 | 14 miles |

Source:

FRANCHISE SALE - J.D. POWER
AND ASSOCIATES

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Mileage | 48,317 | 17,936 | -$734.17 |
| Equipment | | | |
| POPULAR EQUIPMENT PKG | Yes | No | $370.04 |
| ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK | Yes | No | $140.36 |

Total Adjustments: -$223.77
**Adjusted Price: $10,492.23**

## 4 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4 NORMAL GAS A2WD

**Sold Price: $10,000.00**

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5NPEB4AC4DHXXXXXX | | 04/04/2018 | 14075 | 33 miles |

Source:

FRANCHISE SALE - J.D. POWER
AND ASSOCIATES

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Mileage | 48,317 | 52,174 | $109.89 |
| Equipment | | | |
| POPULAR EQUIPMENT PKG | Yes | No | $345.32 |
| ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK | Yes | No | $130.98 |

Total Adjustments: $586.19
**Adjusted Price: $10,586.19**

| 5 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4 NORMAL GAS A2WD | | | | List Price: **$11,751.00** |

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5NPEB4AC0DH630951 | HLV180756A | 06/15/2018 | 14094 | 0 miles |

Source

DEALER WEB LISTING - CARS.COM
WEST HERR HONDA
6120 S TRANSIT RD
LOCKPORT NY 14094
716-625-4300

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$928.00 |
| Mileage | 48,317 | 51,314 | $92.41 |
| Equipment | | | |
| ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK | Yes | No | $141.76 |

Total Adjustments: -$693.83
**Adjusted Price:** **$11,057.17**

Comparable Vehicle Package Details

POPULAR EQUIPMENT PKG

---

| 6 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4 NORMAL GAS A2WD | | | | List Price: **$10,361.00** |

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5NPEB4AC5DH769201 | FAS181144A | 05/16/2018 | 14068 | 10 miles |

Source

DEALER WEB LISTING - CARS.COM
WEST HERR USED CARS OF
AMHERST
3375 MILLERSPORT HWY
GETZVILLE NY 14068
716-932-4500

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$818.00 |
| Mileage | 48,317 | 61,253 | $447.87 |
| Equipment | | | |
| POPULAR EQUIPMENT PKG | Yes | No | $329.54 |
| ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK | Yes | No | $124.99 |

Total Adjustments: $84.40
**Adjusted Price:** **$10,445.40**

## 7 · 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4 NORMAL GAS A2WD

**List Price: $10,371.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5NPEB4AC1DH725714 | W18134A | 05/13/2018 | 14559 | 44 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
MAZDA OF WEST RIDGE
4692 W RIDGE RD
SPENCERPORT NY 14559
585-352-5995

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$819.00 |
| Mileage | 48,317 | 48,313 | -$0.11 |
| Equipment | | | |
| ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK | Yes | No | $125.11 |
| CARPETED FLOOR MATS | No | Yes | -$50.04 |

Total Adjustments: -$744.04
**Adjusted Price: $9,626.96**

Comparable Vehicle Package Details:
POPULAR EQUIPMENT PKG

Comparable Vehicle Option Details:
CARPETED FLOOR MATS

## 8 · 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4 NORMAL GAS A2WD

**List Price: $11,790.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5NPEB4AC6DH687171 | UM901 | 04/06/2018 | 14625 | 60 miles |

Source

DEALER WEB LISTING - CARS.COM
IDE MAZDA
871 PANORAMA TRAIL S
ROCHESTER NY 14625
585-381-1841

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$727.00 |
| Mileage | 48,317 | 30,724 | -$536.39 |

Total Adjustments: -$1,263.39
**Adjusted Price: $10,526.61**

Comparable Vehicle Package Details:
POPULAR EQUIPMENT PKG

Comparable Vehicle Option Details:
ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK

## 9 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4 NORMAL GAS A2WD

**List Price: $10,991.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5NPEB4AC6DH727796 | 24678HWA | 06/18/2018 | 14580 | 63 miles |

**Source**

DEALER WEB LISTING - VAST.COM
PIEHLER BUICK GMC
755 RIDGE ROAD
WEBSTER NY 14580
585-671-7900

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$868.00 |
| Mileage | 48,317 | 57,242 | $309.83 |
| Equipment | | | |
| POPULAR EQUIPMENT PKG | Yes | No | $349.57 |
| ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK | Yes | No | $132.59 |

Total Adjustments: -$76.01
**Adjusted Price: $10,914.99**

## 10 | 2013 HYUNDAI SONATA GLS 4D SDN 4 2.4 NORMAL GAS A2WD

**List Price: $9,300.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5NPEB4AC0DH601207 | 46525A | 04/06/2018 | 14564 | 66 miles |

**Source**

DEALER WEB LISTING - CARS.COM
VAN BORTEL SUBARU
6327 STATE ROUTE 96
VICTOR NY 14564
585-924-5230

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$574.00 |
| Mileage | 48,317 | 65,405 | $556.98 |
| Equipment | | | |
| POPULAR EQUIPMENT PKG | Yes | No | $301.33 |
| ELECTROCHROMIC REARVIEW MIRROR W/COMPASS & HOMELINK | Yes | No | $114.29 |

Total Adjustments: $398.60
**Adjusted Price: $9,698.60**

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2013 Hyundai Sonata GLS | 4 Door Sedan 2.4L 4 Cyl Gas  FWD | $20,995.00 |

## Valuation Notes

PREPARED BY RON GOODWIN, 6699 TRANSIT RD WILLIAMSVILLE NY 14221, 716-810-1500.

## Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 20-6910695-01 | | COLLISION | JOHN PLOTTS 55 PHELPS ST LYONS, NY 14489 +1-315-8718953 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 09/22/2020 | 09/23/2020 | 09/28/2020 | 1010708138 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2013 | Chrysler | 300 300C 4 Door Sedan 3.6L 6 Cyl Gas A AWD | NY 14489 | 119,255 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Gloss Black | | 2C3CCAKG8DH617463 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $12,285.35 |
| Condition - | $922.30 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| Market Value = | $11,363.05 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $1,000.00 |
| Settlement Value = | $10,363.05 |

## Settlement Value:
# $10,363.05

**EXHIBIT**
merritt 11
1/7/22

**J.D. POWER**

Mitchell **WorkCenter**™
**Total Loss**
© 2018 Mitchell International, Inc. All Rights Reserved.

CONFIDENTIAL

Mitchell-Volino Subpoena 000457

# Loss Vehicle Detail

Loss vehicle: 2013 Chrysler 300 | 300C 4 Door Sedan | 3.6L 6 Cyl Gas A AWD

## Standard Equipment

Exterior

| | |
|---|---|
| 19" x 7.5" polished aluminum wheels | Auto headlamps |
| Bi-function halogen projector headlamps | Bright door handles |
| Chrome headlamp bezels | Compact spare tire |
| Front fog lamps | Liquid chrome bar grille w/bright surround |
| Lower bodyside cladding | P235/55R19 all-season performance BSW tires |
| Pwr heated multifunction manual folding chrome exterior mirrors -inc: auto-dimming driver side exterior mirror, reverse tilt-down function, mirror memory | Variable intermittent windshield wipers |

Interior

| | |
|---|---|
| (6) premium speakers | 12V center console pwr outlet |
| 276-watt amplifier | 4-way pwr driver & front passenger lumbar |
| 60/40 folding rear bench seat | Air filtering |
| Analog clock | Aux audio input |
| Bluetooth streaming audio | Cargo net |
| Compass | Customer defined display monitor |
| Door sill scuff pads | Driver & passenger lower LED lamps |
| Dual sun visors w/illuminated vanity mirrors | Dual zone air conditioning w/automatic temperature control |
| Floor carpet | Front & rear floor mats |
| Front & rear LED map pocket lights | Front reading/map lights |
| Full length floor console | Garmin navigation system |
| Glove box lamp | Heated front seats |
| Heated rear seats | Heated steering wheel |
| Heated/cooled front console cupholder | Humidity sensor |
| Illuminated front cup holders | Illuminated rear assist handles |
| Illuminated rear cupholders | Keyless Go |
| Leather-wrapped shift knob | Lux leather-trimmed bucket seats |
| Outside temperature display | Passenger assist handles |
| Pwr adjustable pedals w/memory | Pwr backlit sunshade |
| Pwr driver & front passenger seats -inc: driver seat memory | Pwr front windows w/1-touch up/down |
| Pwr tilt/telescoping steering column | Pwr trunk release |
| Radio memory | Rear reading/courtesy lamps |
| Rear window defroster | Rearview auto-dimming mirror w/microphone |
| Remote fuel door release | Remote proximity keyless entry |

| | |
|---|---|
| Remote start | Remote USB port |
| Security alarm | Sentry Key theft deterrent system |
| SIRIUS satellite radio -inc: 1-year SIRIUS satellite radio service | SiriusXM traffic -inc: 1-year SiriusXM traffic service |
| SiriusXM Travel Link -inc: 1-year SiriusXM Travel Link service | Speed control |
| Speed sensitive pwr locks | Steering wheel audio controls |
| Trunk lamp | Trunk mat |
| Uconnect touch 8.4N -inc: AM/FM stereo w/CD/DVD/MP3 player, 8.4" touch screen display, Garmin GPS navigation *N/A in HI, St Thomas, Dominican Republic or US Virgin Islands* | Uconnect voice command w/Bluetooth |
| Universal garage door opener | Ventilated front seats |
| Window-integrated antenna | Wood/leather-wrapped steering wheel |

## Mechanical

| | |
|---|---|
| 180-amp alternator | 4-wheel anti-lock performance disc brakes |
| 4-wheel independent AWD suspension | 730-amp maintenance-free battery |
| Active transfer case w/front axle disconnect | All-wheel drive |
| Dual rear exhaust w/bright tips | Engine Oil Cooler |
| Pwr rack & pinion steering | Tip start |

## Safety

| | |
|---|---|
| Advanced multi-stage front airbags | All-speed traction control |
| Daytime running lamps | Driver knee airbag |
| Dual note horn | Electronic stability control |
| Front & rear side curtain airbags | Front seat supplemental side airbags |
| Hill start assist | Inside emergency trunk lid release |
| ParkView rear back-up camera | Rain brake support |
| Reactive head restraints | Ready alert braking |
| Rear door child safety locks | Tire pressure monitoring display |

## Packages

BEATS AUDIO GROUP
-inc: (10) Beats premium speakers w/subwoofer, 552-watt amp

LIGHT GROUP
-inc: adaptive bi-Xenon HID headlamps, auto high beam headlamp control, auto headlamp leveling system, rear fog lamps

## Optional Equipment

DUAL-PANE PANORAMIC SUNROOF                          SAFETYTEC

*DIO/PIO = Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle: 2013 Chrysler 300 | 300C 4 Door Sedan | 3.6L 6 Cyl Gas A AWD

## Comparable Vehicle Information

Search Radius used for this valuation: 100 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 77,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2013 CHRYSLER 300 300C 4D SDN 6 3.6NORMAL GAS A AWD | 106,642 | 13204 | 42 miles | $12,950.00 List Price | $11,627.69 |
| 2 | 2013 CHRYSLER 300 300C 4D SDN 8 5.7NORMAL GAS A AWD | 134,153 | 13901 | 86 miles | $11,000.00 List Price | $11,533.43 |
| 3 | 2013 CHRYSLER 300 300C 4D SDN 8 5.7NORMAL GAS A 2WD | 113,238 | 14213 | 96 miles | $14,995.00 List Price | $13,694.94 |

**Base Value:**    **$12,285.35**

# Loss Vehicle Adjustments

Loss vehicle: 2013 Chrysler 300 | 300C 4 Door Sedan | 3.6L 6 Cyl Gas A AWD

### Condition Adjustments

Condition Adjustment: -$922.30         Overall Condition: 2.67-Good         Typical Vehicle Condition: 3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| DOORS/INTERIOR PANELS | 3 Good | some permaneent marks all doors |
| DASH/CONSOLE | 3 Good | some permanent and non permanent marks dash and console |
| HEADLINER | 2 Fair | soiled does not need replacing |
| GLASS | 3 Good | no damage |
| CARPET | 2 Fair | more then 1 permanent mark all carpet |
| SEATS | 3 Good | moderate soiling  all seats |
| **Exterior** | | |
| VINYL/CONVERTIBLE TOP | Typical | |
| PAINT | Typical | unable to access due to dirt |
| TRIM | 3 Good | surface scrapes front bumper smal impact two wheels |
| BODY | 2 Fair | penetrating rust roof |
| **Mechanical** | | |
| TRANSMISSION | 3 Good | oxidation found |
| ENGINE | 3 Good | oxidation on engine |
| Tire | 2 Fair | lf4,rf4,rr4,lr5 32nds remain |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:



# Comparable Vehicles

Loss vehicle: 2013 Chrysler 300 | 300C 4 Door Sedan | 3.6L 6 Cyl Gas A AWD

| 1 | 2013 CHRYSLER 300 300C 4D SDN 6 3.6 NORMAL GAS AAWD | | | List Price: $12,950.00 |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2C3CCAKG3DH513785 | CNY791 | 09/07/2020 | 13204 | 42 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM

CNY DRIVES

1335 EIRE BOULEVARD WEST

SYRACUSE NY 13204

315-727-5069

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$801.00 |
| Mileage | 119,255 | 106,642 | -$521.31 |
| | | Total Adjustments: | -$1,322.31 |
| | | Adjusted Price: | $11,627.69 |

Comparable Vehicle Package Details:

BEATS AUDIO GROUP

LIGHT GROUP

Comparable Vehicle Option Details:

DUAL-PANE PANORAMIC SUNROOF, SAFETYTEC

### 2  2013 CHRYSLER 300 300C 4D SDN 8 5.7 NORMAL GAS AAWD

**List Price: $11,000.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2C3CCAKT7DH665520 | 665520 | 08/19/2020 | 13901 | 86 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
EAST COAST MOTORS
69 CASTLE CREEK RD
BINGHAMTON NY 13901
607-797-0579

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$680.00 |
| Vehicle Configuration Adjustment | | | -$498.96 |
| Mileage | 119,255 | 134,153 | $360.05 |
| Equipment | | | |
|    BEATS AUDIO GROUP | Yes | No | $254.85 |
|    LIGHT GROUP | Yes | No | $203.62 |
|    DUAL-PANE PANORAMIC SUNROOF | Yes | No | $382.90 |
|    SAFETYTEC | Yes | No | $510.97 |

Total Adjustments: $533.43
**Adjusted Price: $11,533.43**

### 3  2013 CHRYSLER 300 300C 4D SDN 8 5.7 NORMAL GAS A2WD

**List Price: $14,995.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2C3CCAET8DH690342 | 20224 | 08/31/2020 | 14213 | 96 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM
RIVER FRONT AUTO SALES
1379 NIAGARA STREET
BUFFALO NY 14213
716-886-1626

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$927.00 |
| Vehicle Configuration Adjustment | | | $276.71 |
| Mileage | 119,255 | 113,238 | -$293.63 |
| Equipment | | | |
|    BEATS AUDIO GROUP | Yes | Yes | $5.75 |
|    LIGHT GROUP | Yes | Yes | $4.60 |
|    20" X 8.0" POLISHED ALUMINUM WHEELS | No | Yes | -$366.49 |

Total Adjustments: -$1,300.06
**Adjusted Price: $13,694.94**

Comparable Vehicle Package Details:

BEATS AUDIO GROUP

LIGHT GROUP

Comparable Vehicle Option Details:

DUAL-PANE PANORAMIC SUNROOF, SAFETYTEC, 20" X 8.0" POLISHED ALUMINUM WHEELS



Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2013 Chrysler 300 300C | 4 Door Sedan 3.6L 6 Cyl Gas  AWD | $38,345.00 |
| 2013 CHRYSLER 300 300C | 4D SDN 8 5.7 NORMAL GAS A AWD | $40,545.00 |
| 2013 CHRYSLER 300 300C | 4D SDN 8 5.7 NORMAL GAS A 2WD | $38,195.00 |

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

### Step 1 - Locate Comparable Vehicles

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

### Step 2 - Adjust Comparable Vehicles

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

### Step 3 - Calculate Base Vehicle Value

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

### Step 4 - Calculate Loss Vehicle Adjustments

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

### Step 5 - Calculate the Market Value

The Market Value is calculated by applying the loss vehicle adjustments to the base value.



# NICB© Activity Report

PREPARED FOR:
Progressive Group of Insurance Companies
(800) 321-9843

## Claim Summary:20-6910695-01

| | | | |
|---|---|---|---|
| Insurance Carrier: | Progressive Group of Insurance Companies | Version #: | 1 |
| Claim Suffix-ID: | 20-6910695-01 | Coverage Type of Loss: | COLLISION |
| Policy Number: | | Loss Date: | 09/22/2020 |
| Owner: | PLOTTS,JOHN | Settlement Offer Date: | |
| | +1-315-8718953 | Reported Date: | 09/23/2020 |
| Valuation Report ID: | 1010708138 | Valuation Report Date: | 09/28/2020 11:11:45 |

## Valuation Summary:2013 Chrysler 300 C

| | | | |
|---|---|---|---|
| Loss Vehicle: | 2013 Chrysler 300 C 4 Door Sedan 3.6L 6 Cyl Gas Injected 8 Speed Auto Trans AWD | License Plate: | ,, Exp. |
| VIN: | 2C3CCAKG8DH617463 | | |
| Mileage: | 119,255 | Exterior Color: | Gloss Black |

Equipment:

**Exterior**

| | |
|---|---|
| 19" x 7.5" polished aluminum wheels | Auto headlamps |
| Bi-function halogen projector headlamps | Bright door handles |
| Chrome headlamp bezels | Compact spare tire |
| Front fog lamps | Liquid chrome bar grille w/bright surround |
| Lower bodyside cladding | P235/55R19 all-season performance BSW tires |
| Pwr heated multifunction manual folding chrome exterior mirrors -inc: auto-dimming driver side exterior mirror, reverse tilt-down function, mirror memory | Variable intermittent windshield wipers |

**Interior**

| | |
|---|---|
| (6) premium speakers | 12V center console pwr outlet |
| 276-watt amplifier | 4-way pwr driver & front passenger lumbar |
| 60/40 folding rear bench seat | Air filtering |
| Analog clock | Aux audio input |
| Bluetooth streaming audio | Cargo net |
| Compass | Customer defined display monitor |
| Door sill scuff pads | Driver & passenger lower LED lamps |
| Dual sun visors w/illuminated vanity mirrors | Dual zone air conditioning w/automatic temperature control |
| Floor carpet | Front & rear floor mats |
| Front & rear LED map pocket lights | Front reading/map lights |
| Full length floor console | Garmin navigation system |
| Glove box lamp | Heated front seats |
| Heated rear seats | Heated steering wheel |
| Heated/cooled front console cupholder | Humidity sensor |
| Illuminated front cup holders | Illuminated rear assist handles |
| Illuminated rear cupholders | Keyless Go |
| Leather-wrapped shift knob | Lux leather-trimmed bucket seats |

CONFIDENTIAL

| | |
|---|---|
| Outside temperature display | Passenger assist handles |
| Pwr adjustable pedals w/memory | Pwr backlit sunshade |
| Pwr driver & front passenger seats -inc: driver seat memory | Pwr front windows w/1-touch up/down |
| Pwr tilt/telescoping steering column | Pwr trunk release |
| Radio memory | Rear reading/courtesy lamps |
| Rear window defroster | Rearview auto-dimming mirror w/microphone |
| Remote fuel door release | Remote proximity keyless entry |
| Remote start | Remote USB port |
| Security alarm | Sentry Key theft deterrent system |
| SIRIUS satellite radio -inc: 1-year SIRIUS satellite radio service | SiriusXM traffic -inc: 1-year SiriusXM traffic service |
| SiriusXM Travel Link -inc: 1-year SiriusXM Travel Link service | Speed control |
| Speed sensitive pwr locks | Steering wheel audio controls |
| Trunk lamp | Trunk mat |
| Uconnect touch 8.4N -inc: AM/FM stereo w/CD/DVD/MP3 player, 8.4" touch screen display, Garmin GPS navigation *N/A in HI, St Thomas, Dominican Republic or US Virgin Islands* | Uconnect voice command w/Bluetooth |
| Universal garage door opener | Ventilated front seats |
| Window-integrated antenna | Wood/leather-wrapped steering wheel |

**Mechanical**

| | |
|---|---|
| 180-amp alternator | 4-wheel anti-lock performance disc brakes |
| 4-wheel independent AWD suspension | 730-amp maintenance-free battery |
| Active transfer case w/front axle disconnect | All-wheel drive |
| Dual rear exhaust w/bright tips | Engine Oil Cooler |
| Pwr rack & pinion steering | Tip start |

**Safety**

| | |
|---|---|
| Advanced multi-stage front airbags | All-speed traction control |
| Daytime running lamps | Driver knee airbag |
| Dual note horn | Electronic stability control |
| Front & rear side curtain airbags | Front seat supplemental side airbags |
| Hill start assist | Inside emergency trunk lid release |
| ParkView rear back-up camera | Rain brake support |
| Reactive head restraints | Ready alert braking |
| Rear door child safety locks | Tire pressure monitoring display |

## NICB© Activity Reported: 4

| Insurance Carrier | Phone Number | Claim Number | Date of Loss | Activity Reported | Mileage | ISO Report Date |
|---|---|---|---|---|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY | | 036632546010107 4-06 | 09/22/2020 | Valuation | 119,254 | 09/24/2020 |
| GOVERNMENT EMPLOYEES INSURANCE COMPANY | 00000000000 | 036632546010107 4-06 | 09/22/2020 | Estimate | | 09/24/2020 |
| GEICO GENERAL INSURANCE COMPANY | 8008486502 | 036632546010107 4 | 09/22/2020 | Property and Casualty | | |
| PROGRESSIVE CASUALTY INSURANCE COMPANY | 5185985362 | 0120206910695 | 09/22/2020 | Property and Casualty | | |

CONFIDENTIAL

Mitchell-Volino Subpoena 000466



## Vehicle History Report
**AutoCheck, a Part of Experian**

## Vehicle Description

| | |
|---|---|
| Claim # : | 20-6910695-01 |
| Version # : | 1 |
| VIN : | 2C3CCAKG8DH617463 |
| Year/Make/Model : | 2013 Chrysler 300 C |
| Body : | Sedan 4D |
| Engine : | 3.6L V6 MPI |
| Country : | Canada |
| Class : | Mid Range Car - Premium |
| Last Odometer : | 113,104 |

## Detailed Vehicle History

| Date | City and State | Odometer Reading | Source | Category | Type | Lease/Lien |
|---|---|---|---|---|---|---|
| 07/13/2013 | HAMBURG,NY | | Motor Vehicle Dept. | DMV Record Adjustment | REGISTRATION EVENT/RENEWAL | |
| 10/29/2013 | NY | 209 | Motor Vehicle Dept. | Title | TITLE | Y |
| 11/26/2014 | HAMBURG,NY | | Motor Vehicle Dept. | DMV Record Adjustment | REGISTRATION EVENT/RENEWAL | |
| 04/09/2015 | ERIE COUNTY,NY | | State Agency Case #35682695 | Accident Data | COLLISION WITH ANOTHER VEHICLE | |
| 06/08/2015 | NY | 33,385 | Auto Auction | Odometer Reading | REPORTED AT AUTO AUCTION | |
| 07/20/2015 | NY | 33,385 | Auto Auction | Fleet | AUCTION ANNOUNCED AS FLEET/LEASE | |
| 11/19/2015 | WEBSTER,NY | 37,187 | Service Contract Company | Service Data | SERVICE CONTRACT ISSUED | |
| 11/19/2015 | WEBSTER,NY | | Motor Vehicle Dept. | DMV Record Adjustment | REGISTRATION EVENT/RENEWAL | |
| 12/04/2015 | WEBSTER,NY | 37,187 | Motor Vehicle Dept. | Title | TITLE | Y |
| 09/02/2016 | WEBSTER,NY | | Motor Vehicle Dept. | DMV Record Adjustment | REGISTRATION EVENT/RENEWAL | |
| 09/04/2018 | WEBSTER,NY | | Motor Vehicle Dept. | DMV Record Adjustment | REGISTRATION EVENT/RENEWAL | |
| 07/16/2019 | | | Manufacturer | Open Recall | MANUFACTURER RECALL | |
| 03/05/2020 | LYONS,NY | | Motor Vehicle Dept. | DMV Record Adjustment | REGISTRATION EVENT/RENEWAL | |
| 03/24/2020 | LYONS,NY | 113,104 | Motor Vehicle Dept. | Title | TITLE | Y |

## Score

| | |
|---|---|
| Owner Count : | 3 |
| Age : | 7 |
| Score : | 69 |

CONFIDENTIAL

Mitchell-Volino Subpoena 000467



Vehicle History Report
**AutoCheck, a Part of Experian**

**Score Range :**      76-85

**Positive Factor :**

**Negative Factor :**      Accident

AutoCheck vehicle history reports include the AutoCheck Score, a tool that enables you to quickly and easily understand a vehicle's past, compare it to other vehicles, and lower the risk of buying vehicles with undetected problems. Your vehicle's history can have an effect on your vehicle's AutoCheck Score. The Score is rated on a scale of 1 to 100, where a higher score equals less risk. Think of the AutoCheck Score as a rating summarizing the longer list of report data. It's also important to remember to look at a vehicle's score in conjunction with the Score Range. An AutoCheck score higher than the score range means that the car is a lower risk compared to other similar cars of the same make and model, while a score lower than the score range means the car is a higher risk compared to other similar cars of the same make and model.

CONFIDENTIAL

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843



mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 20-6910695-01 | | COLLISION | JOHN PLOTTS 55 PHELPS ST LYONS, NY 14489 +1-315-8718953 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 09/22/2020 | 09/23/2020 | 09/28/2020 | 1010708409 | 2 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2013 | Chrysler | 300 300C 4 Door Sedan 3.6L 6 Cyl Gas A AWD | NY 14489 | 119,255 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Phantom Black Tri-Coat Pearl | | 2C3CCAKG8DH617463 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $12,285.35 |
| Condition - | $922.30 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| **Market Value =** | **$11,363.05** |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $1,000.00 |
| **Settlement Value =** | **$10,363.05** |

## Settlement Value:
# $10,363.05

**J.D. POWER**

Mitchell **WorkCenter**
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

CONFIDENTIAL

Mitchell-Volino Subpoena 000469

# Loss Vehicle Detail

Loss vehicle: 2013 Chrysler 300 | 300C 4 Door Sedan | 3.6L 6 Cyl Gas A AWD

## Standard Equipment

### Exterior

| | |
|---|---|
| 19" x 7.5" polished aluminum wheels | Auto headlamps |
| Bi-function halogen projector headlamps | Bright door handles |
| Chrome headlamp bezels | Compact spare tire |
| Front fog lamps | Liquid chrome bar grille w/bright surround |
| Lower bodyside cladding | P235/55R19 all-season performance BSW tires |
| Pwr heated multifunction manual folding chrome exterior mirrors -inc: auto-dimming driver side exterior mirror, reverse tilt-down function, mirror memory | Variable intermittent windshield wipers |

### Interior

| | |
|---|---|
| (6) premium speakers | 12V center console pwr outlet |
| 276-watt amplifier | 4-way pwr driver & front passenger lumbar |
| 60/40 folding rear bench seat | Air filtering |
| Analog clock | Aux audio input |
| Bluetooth streaming audio | Cargo net |
| Compass | Customer defined display monitor |
| Door sill scuff pads | Driver & passenger lower LED lamps |
| Dual sun visors w/illuminated vanity mirrors | Dual zone air conditioning w/automatic temperature control |
| Floor carpet | Front & rear floor mats |
| Front & rear LED map pocket lights | Front reading/map lights |
| Full length floor console | Garmin navigation system |
| Glove box lamp | Heated front seats |
| Heated rear seats | Heated steenng wheel |
| Heated/cooled front console cupholder | Humidity sensor |
| Illuminated front cup holders | Illuminated rear assist handles |
| Illuminated rear cupholders | Keyless Go |
| Leather-wrapped shift knob | Lux leather-trimmed bucket seats |
| Outside temperature display | Passenger assist handles |
| Pwr adjustable pedals w/memory | Pwr backlit sunshade |
| Pwr driver & front passenger seats -inc: driver seat memory | Pwr front windows w/1-touch up/down |
| Pwr tilt/telescoping steering column | Pwr trunk release |
| Radio memory | Rear reading/courtesy lamps |
| Rear window defroster | Rearview auto-dimming mirror w/microphone |
| Remote fuel door release | Remote proximity keyless entry |



Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

| | |
|---|---|
| Remote start | Remote USB port |
| Security alarm | Sentry Key theft deterrent system |
| SIRIUS satellite radio -inc: 1-year SIRIUS satellite radio service | SiriusXM traffic -inc: 1-year SiriusXM traffic service |
| SiriusXM Travel Link -inc: 1-year SiriusXM Travel Link service | Speed control |
| Speed sensitive pwr locks | Steering wheel audio controls |
| Trunk lamp | Trunk mat |
| Uconnect touch 8.4N -inc: AM/FM stereo w/CD/DVD/MP3 player, 8.4" touch screen display, Garmin GPS navigation *N/A in HI, St Thomas, Dominican Republic or US Virgin Islands* | Uconnect voice command w/Bluetooth |
| Universal garage door opener | Ventilated front seats |
| Window-integrated antenna | Wood/leather-wrapped steering wheel |

## Mechanical

| | |
|---|---|
| 180-amp alternator | 4-wheel anti-lock performance disc brakes |
| 4-wheel independent AWD suspension | 730-amp maintenance-free battery |
| Active transfer case w/front axle disconnect | All-wheel drive |
| Dual rear exhaust w/bright tips | Engine Oil Cooler |
| Pwr rack & pinion steering | Tip start |

## Safety

| | |
|---|---|
| Advanced multi-stage front airbags | All-speed traction control |
| Daytime running lamps | Driver knee airbag |
| Dual note horn | Electronic stability control |
| Front & rear side curtain airbags | Front seat supplemental side airbags |
| Hill start assist | Inside emergency trunk lid release |
| ParkView rear back-up camera | Rain brake support |
| Reactive head restraints | Ready alert braking |
| Rear door child safety locks | Tire pressure monitoring display |

## Packages

**BEATS AUDIO GROUP**
-inc: (10) Beats premium speakers w/subwoofer, 552-watt amp

**LIGHT GROUP**
-inc: adaptive bi-Xenon HID headlamps, auto high beam headlamp control, auto headlamp leveling system, rear fog lamps

## Optional Equipment

DUAL-PANE PANORAMIC SUNROOF                    SAFETYTEC

**\*DIO/PIO =**  Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle:  2013 Chrysler 300 | 300C 4 Door Sedan | 3.6L 6 Cyl Gas A AWD

## Comparable Vehicle Information

Search Radius used for this valuation: **100 miles from loss vehicle zip/postal code.**

Typical Mileage for this vehicle: **77,000 miles**

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2013 CHRYSLER 300 300C 4D SDN 6 3.6NORMAL GAS A AWD | 106,642 | 13204 | 42 miles | $12,950.00 List Price | $11,627.69 |
| 2 | 2013 CHRYSLER 300 300C 4D SDN 8 5.7NORMAL GAS A AWD | 134,153 | 13901 | 86 miles | $11,000.00 List Price | $11,533.43 |
| 3 | 2013 CHRYSLER 300 300C 4D SDN 8 5.7NORMAL GAS A 2WD | 113,238 | 14213 | 96 miles | $14,995.00 List Price | $13,694.94 |

**Base Value:** **$12,285.35**

# Loss Vehicle Adjustments

Loss vehicle: **2013 Chrysler 300 | 300C 4 Door Sedan | 3.6L 6 Cyl Gas A AWD**

### Condition Adjustments

Condition Adjustment: **-$922.30**    Overall Condition: **2.67-Good**    Typical Vehicle Condition: **3.00**

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| CARPET | 2 Fair | more then 1 permanent mark all carpet |
| DASH/CONSOLE | 3 Good | some permanent and non permanent marks dash and console |
| HEADLINER | 2 Fair | soiled does not need replacing |
| DOORS/INTERIOR PANELS | 3 Good | some permaneent marks all doors |
| GLASS | 3 Good | no damage |
| SEATS | 3 Good | moderate soiling all seats |
| **Exterior** | | |
| BODY | 2 Fair | penetrating rust roof |
| TRIM | 3 Good | surface scrapes front bumper smal impact two wheels |
| PAINT | Typical | unable to access due to dirt |
| VINYL/CONVERTIBLE TOP | Typical | |
| **Mechanical** | | |
| ENGINE | 3 Good | oxidation on engine |
| TRANSMISSION | 3 Good | oxidation found |
| Tire | 2 Fair | lf4,rf4,rr4,lr5 32nds remain |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:



## Comparable Vehicles

Loss vehicle: 2013 Chrysler 300 | 300C 4 Door Sedan | 3.6L 6 Cyl Gas A AWD

| 1 | 2013 CHRYSLER 300 300C 4D SDN 6 3.6 NORMAL GAS AAWD | | | List Price: $12,950.00 |
|---|---|---|---|---|

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2C3CCAKG3DH513785 | CNY791 | 09/07/2020 | 13204 | 42 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM
CNY DRIVES
1335 EIRE BOULEVARD WEST
SYRACUSE NY 13204
315-727-5069

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$801.00 |
| Mileage | 119,255 | 106,642 | -$521.31 |
| | | Total Adjustments: | -$1,322.31 |
| | | Adjusted Price: | $11,627.69 |

Comparable Vehicle Package Details
BEATS AUDIO GROUP

LIGHT GROUP

Comparable Vehicle Option Details
DUAL-PANE PANORAMIC SUNROOF, SAFETYTEC

## 2 · 2013 CHRYSLER 300 300C 4D SDN 8 5.7 NORMAL GAS AAWD

**List Price: $11,000.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2C3CCAKT7DH665520 | 665520 | 08/19/2020 | 13901 | 86 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
EAST COAST MOTORS
69 CASTLE CREEK RD
BINGHAMTON NY 13901
607-797-0579

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$680.00 |
| Vehicle Configuration Adjustment | | | -$498.96 |
| Mileage | 119,255 | 134,153 | $360.05 |
| Equipment | | | |
| BEATS AUDIO GROUP | Yes | No | $254.85 |
| LIGHT GROUP | Yes | No | $203.62 |
| DUAL-PANE PANORAMIC SUNROOF | Yes | No | $382.90 |
| SAFETYTEC | Yes | No | $510.97 |

Total Adjustments: $533.43
**Adjusted Price: $11,533.43**

## 3 · 2013 CHRYSLER 300 300C 4D SDN 8 5.7 NORMAL GAS A2WD

**List Price: $14,995.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 2C3CCAET8DH690342 | 20224 | 08/31/2020 | 14213 | 96 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM
RIVER FRONT AUTO SALES
1379 NIAGARA STREET
BUFFALO NY 14213
716-886-1626

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$927.00 |
| Vehicle Configuration Adjustment | | | $276.71 |
| Mileage | 119,255 | 113,238 | -$293.63 |
| Equipment | | | |
| BEATS AUDIO GROUP | Yes | Yes | $5.75 |
| LIGHT GROUP | Yes | Yes | $4.60 |
| 20" X 8.0" POLISHED ALUMINUM WHEELS | No | Yes | -$366.49 |

Total Adjustments: -$1,300.06
**Adjusted Price: $13,694.94**

Comparable Vehicle Package Details:

BEATS AUDIO GROUP

LIGHT GROUP

Comparable Vehicle Option Details:

DUAL-PANE PANORAMIC SUNROOF, SAFETYTEC, 20" X 8.0" POLISHED ALUMINUM WHEELS

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2013 Chrysler 300 300C | 4 Door Sedan 3.6L 6 Cyl Gas  AWD | $38,345.00 |
| 2013 CHRYSLER 300 300C | 4D SDN 8 5.7 NORMAL GAS A AWD | $40,545.00 |
| 2013 CHRYSLER 300 300C | 4D SDN 8 5.7 NORMAL GAS A 2WD | $38,195.00 |

Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment – an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.



Mitchell **WorkCenter**™
Total Loss
CONFIDENTIAL

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 20-5840648-01 | | COLLISION | LORENZO COSTA 580 NORTH BROOME AVE LINDENHURST, NY 11757 +1-631-4491720 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 05/28/2020 | 06/01/2020 | 06/03/2020 | 1010278001 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2012 | Ram | 3500 ST 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged A 4WD | NY 11757 | 183,342 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Bright Silver Metallic | | 3C63DRGL5CG343920 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $17,571.21 |
| Condition | $0.00 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $350.00 |
| Refurbishment | $0.00 |
| Market Value = | $17,921.21 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $1,000.00 |
| Settlement Value = | $16,921.21 |

## Settlement Value:
# $16,921.21

EXHIBIT
PENGAD 800-631-6989
Merritt 12
4/7/22 KB

**J.D. POWER**

Mitchell **WorkCenter**
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

# Loss Vehicle Detail

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Standard Equipment

### Exterior

| | |
|---|---|
| 17" steel spare wheel | 17" x 6.0" argent steel wheels (N/A w/AR9 Single Rear Wheel Group) |
| Auto headlamps | Black door handles |
| Black front bumper | Black grille |
| Black pwr trailer tow mirrors -inc: supplemental signals, courtesy lamps, heated glass | Black rear bumper |
| Body-color headlamp filler panel | Box & rear fender lamps |
| Cab clearance lamps | Cargo lamp |
| Center wheel hubs | Dual rear wheels |
| Front air dam | Front license plate bracket |
| Full-size spare tire | Locking tailgate |
| LT235/80R17E all-season BSW tires (N/A w/AR9 Single Rear Wheel Group) | Quad headlamps |
| Tinted glass windows | Variable-speed intermittent windshield wipers |
| Winch-type spare tire carrier | |

### Interior

| | |
|---|---|
| (6) speakers | 120-MPH primary speedometer |
| 12V auxiliary pwr outlet | 2nd row in-floor storage bins |
| Air conditioning | Audio input jack |
| Black instrument panel bezel | Black vinyl floor covering |
| Driver/passenger assist handles | Fixed long mast antenna |
| HD vinyl 40/20/40 split-bench seat | Instrument cluster w/display screen |
| Mini floor console | Pwr accessory delay |
| Pwr locks | Pwr windows w/front one-touch up/down |
| Rear dome lamp | Rear folding bench seat |
| Rear underseat compartment storage | Sentry key theft-deterrent system |
| Speed control | Tilt steering column |
| Uconnect 130 -inc: AM/FM stereo w/CD/MP3 player | Vehicle info center |

### Mechanical

| | |
|---|---|
| 11.5" dual rear wheel axle ring gear diameter | 12200# GVWR |
| 160-amp alternator | 3.42 rear axle ratio |
| 7-pin trailer wiring harness | 730-amp maintenance-free battery |
| 8' pickup box | Anti-spin rear axle differential |
| Class IV receiver hitch | Diesel exhaust brake |

| | |
|---|---|
| Electronically-controlled throttle | Four wheel drive |
| Front stabilizer bar | HD engine cooling |
| HD front shock absorbers | HD rear shock absorbers |
| Manual shift-on-the-fly transfer case | Pwr 4-wheel anti-lock disc brakes |
| Pwr steering | Tow hooks |
| Trailer tow wiring -inc: 4-pin connector | |

Safety

| | |
|---|---|
| Advanced multistage front airbags | Child safety door locks |
| Dual-note horn | Front height-adjustable shoulder belts |
| Front/rear side curtain airbags | Supplemental front seat side airbags |
| Supplemental side airbags | |

## Packages

CHROME APPEARANCE GROUP
-inc: 17" x 6.0" steel wheels, bright wheel skins, bright front/rear bumpers, bright grille (w/AR9 Single Rear Wheel Group-inc: 17" x 8.0" chrome-clad steel wheels)

MAX TOW PKG
-inc: dual trans oil cooler

POPULAR EQUIPMENT GROUP
-inc: cloth 40/20/40 split bench seat, carpeted floor covering, front/rear floor mats, SIRIUS satellite radio w/1-year service, remote keyless entry

PROTECTION GROUP
-inc: transfer case skid plate shield

## Optional Equipment

UCONNECT VOICE COMMAND W/BLUETOOTH

*DIO/PIO = Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 105,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2012 RAM 3500 ST CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 134,146 | 08691 | 71 miles | $22,129.00 List Price | $18,966.48 |
| 2 | 2012 RAM 3500 LARAMIE LONGHORN CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 97,001 | 06810 | 48 miles | $28,938.00 List Price | $17,572.62 |
| 3 | 2012 RAM 3500 BIG HORN CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 74,596 | 07727 | 54 miles | $26,995.00 List Price | $16,174.52 |

| | |
|---|---|
| Base Value: | $17,571.21 |

# Loss Vehicle Adjustments

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Condition Adjustments

Condition Adjustment: $0.00          Overall Condition: 3.00-Good          Typical Vehicle Condition: 3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| DOORS/INTERIOR PANELS | Typical | unable to determine covid19 |
| DASH/CONSOLE | Typical | unable to determine covid19 |
| CARPET | Typical | unable to determine covid19 |
| SEATS | Typical | unable to determine covid19 |
| GLASS | Typical | unable to determine. covid19 |
| HEADLINER | Typical | unable to determine covid19 |
| **Exterior** | | |
| PAINT | Typical | unable to determine covid19 |
| VINYL/CONVERTIBLE TOP | Typical | N/A |
| BODY | Typical | unable to determine covid19 |
| TRIM | Typical | unable to determine covid19 |
| **Mechanical** | | |
| TRANSMISSION | Typical | unable to determine due to covid19 |
| ENGINE | Typical | unable to determine due to covid19 |
| Tire | Typical | unable to calculate due to covid19 |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| EXTERIOR | AFTERMARKET WHEELS | INSTANT QUOTE | | | $185.00 |
| INTERIOR | WINDOW TINT- CREW CAB | INSTANT QUOTE | | | $30.00 |
| EXTERIOR | TOOL BOX (FULL-SIZE TRUCKS) | INSTANT QUOTE | | | $135.00 |

# Comparable Vehicles

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD



Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

## 1    2012 RAM 3500 ST CREW CAB PKP 6 6.7 TURBO DIESEL A4WD

**List Price: $22,129.00**

| VIN | Stock No |
|---|---|
| 3C63D3CL1CG328169 | B0291S |

| Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|
| 06/01/2020 | 08691 | 71 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM

ROUTE 130 CHRYSLER DODGE
JEEP RAM

1153 US ROUTE 130

ROBBINSVILLE NJ 08691

609-686-2200

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,022.00 |
| Mileage | 183,342 | 134,146 | -$2,384.63 |
| Equipment | | | |
| MAX TOW PKG | Yes | No | $320.11 |
| PROTECTION GROUP | Yes | No | $23.03 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$62.18 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $181.92 |
| SPRAY-IN BEDLINER | No | Yes | -$218.77 |

|  | |
|---|---|
| Total Adjustments: | -$3,162.52 |
| **Adjusted Price:** | **$18,966.48** |

Comparable Vehicle Package Details

CHROME APPEARANCE GROUP

POPULAR EQUIPMENT GROUP

HD SNOW PLOW PREP GROUP

Comparable Vehicle Option Details

SPRAY-IN BEDLINER

## 2 | 2012 RAM 3500 LARAMIE LONGHORN CREW CAB PKP 6 6.7 TURBO DIESEL A4WD

**List Price: $28,938.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3C63D3FL9CG186407 | D2329 | 05/24/2020 | 06810 | 48 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - AUTOTRADER.COM
DANBURY CHRYSLER DODGE JEEP
RAM FIAT
100A FEDERAL RD
DANBURY CT 06810
203-825-5940

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,336.00 |
| Vehicle Configuration Adjustment | | | -$5,491.20 |
| Mileage | 183,342 | 97,001 | -$5,167.28 |
| Equipment | | | |
| CHROME APPEARANCE GROUP | Yes | No | $335.33 |
| MAX TOW PKG | Yes | No | $335.33 |
| POPULAR EQUIPMENT GROUP | Yes | No | $313.62 |
| PROTECTION GROUP | Yes | No | $24.12 |
| COLD WEATHER GROUP | No | Yes | -$42.04 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$63.07 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $190.57 |
| PWR SUNROOF | No | Yes | -$464.76 |

**Total Adjustments:** -$11,365.38
**Adjusted Price:** $17,572.62

**Comparable Vehicle Package Details**

COLD WEATHER GROUP

HD SNOW PLOW PREP GROUP

**Comparable Vehicle Option Details**

PWR SUNROOF

| 3 | **2012 RAM 3500 BIG HORN CREW CAB PKP 6 6.7 TURBO DIESEL A4WD** | | | **List Price: $26,995.00** |

| VIN | Stock No. | Listing Date | Z/P/Postal Code | Distance from Loss-Vehicle |
|---|---|---|---|---|
| 3C63D3HL4CG160990 | 21459 | 05/05/2020 | 07727 | 54 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

AUTOMOTIVE AVENUES

5011 STATE ROUTE 33 # 34

WALL TOWNSHIP NJ 07727

732-919-0707

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,247.00 |
| Vehicle Configuration Adjustment | | | -$1,632.30 |
| Mileage | 183,342 | 74,596 | -$7,264.77 |
| **Equipment** | | | |
| CHROME APPEARANCE GROUP | Yes | No | $365.74 |
| MAX TOW PKG | Yes | No | $365.74 |
| POPULAR EQUIPMENT GROUP | Yes | No | $342.06 |
| PROTECTION GROUP | Yes | No | $26.31 |
| 2FZ BIG HORN CUSTOMER PREFERRED ORDER SELECTION PKG | No | Yes | -$591.07 |
| LUXURY GROUP | No | Yes | -$229.13 |
| TECHNOLOGY GROUP | No | Yes | -$257.79 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$70.29 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $207.85 |
| UCONNECT 430 | No | Yes | -$416.63 |
| PARKVIEW REAR BACK-UP CAMERA | No | Yes | -$104.15 |
| PWR ADJUSTABLE PEDALS | No | Yes | -$65.09 |
| SPRAY-IN BEDLINER | No | Yes | -$249.96 |

|  | | **Total Adjustments:** | -$10,820.48 |
|---|---|---|---|
|  | | **Adjusted Price:** | **$16,174.52** |

Comparable Vehicle Package Details

2FZ BIG HORN CUSTOMER PREFERRED ORDER SELECTION PKG

LUXURY GROUP

TECHNOLOGY GROUP

HD SNOW PLOW PREP GROUP

Comparable Vehicle Option Details

UCONNECT 430, PARKVIEW REAR BACK-UP CAMERA, PWR ADJUSTABLE PEDALS, SPRAY-IN BEDLINER

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2012 Ram 3500 ST | 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged 4WD | $45,828.00 |
| 2012 RAM 3500 LARAMIE LONGHORN | CREW CAB PKP 6 6.7 TURBO DIESEL A 4WD | $59,093.00 |
| 2012 RAM 3500 BIG HORN | CREW CAB PKP 6 6.7 TURBO DIESEL A 4WD | $49,443.00 |

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).
- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).
- Mileage Adjustment – an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.
- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

   Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

   Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

   Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

   Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 20-5840648-01 | | COLLISION | LORENZO COSTA 580 NORTH BROOME AVE LINDENHURST, NY 11757 +1-631-4491720 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 05/28/2020 | 06/01/2020 | 06/03/2020 | 1010279182 | 2 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2012 | Ram | 3500 ST 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged A 4WD | NY 11757 | 183,342 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Bright Silver Metallic | | 3C63DRGL5CG343920 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $17,571.21 |
| Condition | $0.00 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $520.00 |
| Refurbishment | $0.00 |
| Market Value = | $18,091.21 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $1,000.00 |
| Settlement Value = | $17,091.21 |

## Settlement Value:
# $17,091.21

**J.D. POWER**

CONFIDENTIAL

Mitchell **WorkCenter**
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

Mitchell-Volino Subpoena 000617

# Loss Vehicle Detail

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Standard Equipment

### Exterior

| | |
|---|---|
| 17" steel spare wheel | 17" x 6.0" argent steel wheels (N/A w/AR9 Single Rear Wheel Group) |
| Auto headlamps | Black door handles |
| Black front bumper | Black grille |
| Black pwr trailer tow mirrors -inc: supplemental signals, courtesy lamps, heated glass | Black rear bumper |
| Body-color headlamp filler panel | Box & rear fender lamps |
| Cab clearance lamps | Cargo lamp |
| Center wheel hubs | Dual rear wheels |
| Front air dam | Front license plate bracket |
| Full-size spare tire | Locking tailgate |
| LT235/80R17E all-season BSW tires (N/A w/AR9 Single Rear Wheel Group) | Quad headlamps |
| Tinted glass windows | Variable-speed intermittent windshield wipers |
| Winch-type spare tire carrier | |

### Interior

| | |
|---|---|
| (6) speakers | 120-MPH primary speedometer |
| 12V auxiliary pwr outlet | 2nd row in-floor storage bins |
| Air conditioning | Audio input jack |
| Black instrument panel bezel | Black vinyl floor covering |
| Driver/passenger assist handles | Fixed long mast antenna |
| HD vinyl 40/20/40 split-bench seat | Instrument cluster w/display screen |
| Mini floor console | Pwr accessory delay |
| Pwr locks | Pwr windows w/front one-touch up/down |
| Rear dome lamp | Rear folding bench seat |
| Rear underseat compartment storage | Sentry key theft-deterrent system |
| Speed control | Tilt steering column |
| Uconnect 130 -inc: AM/FM stereo w/CD/MP3 player | Vehicle info center |

### Mechanical

| | |
|---|---|
| 11.5" dual rear wheel axle ring gear diameter | 12200# GVWR |
| 160-amp alternator | 3.42 rear axle ratio |
| 7-pin trailer wiring harness | 730-amp maintenance-free battery |
| 8' pickup box | Anti-spin rear axle differential |
| Class IV receiver hitch | Diesel exhaust brake |



Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

| | |
|---|---|
| Electronically-controlled throttle | Four wheel drive |
| Front stabilizer bar | HD engine cooling |
| HD front shock absorbers | HD rear shock absorbers |
| Manual shift-on-the-fly transfer case | Pwr 4-wheel anti-lock disc brakes |
| Pwr steering | Tow hooks |
| Trailer tow wiring -inc: 4-pin connector | |

Safety

| | |
|---|---|
| Advanced multistage front airbags | Child safety door locks |
| Dual-note horn | Front height-adjustable shoulder belts |
| Front/rear side curtain airbags | Supplemental front seat side airbags |
| Supplemental side airbags | |

## Packages

CHROME APPEARANCE GROUP
-inc: 17" x 6.0" steel wheels, bright wheel skins, bright front/rear bumpers, bright grille (w/AR9 Single Rear Wheel Group-inc: 17" x 8.0" chrome-clad steel wheels)

MAX TOW PKG
-inc: dual trans oil cooler

POPULAR EQUIPMENT GROUP
-inc: cloth 40/20/40 split bench seat, carpeted floor covering, front/rear floor mats, SIRIUS satellite radio w/1-year service, remote keyless entry

PROTECTION GROUP
-inc: transfer case skid plate shield

## Optional Equipment

UCONNECT VOICE COMMAND W/BLUETOOTH

*DIO/PIO =   Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 105,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2012 RAM 3500 ST CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 134,146 | 08691 | 71 miles | $22,129.00 List Price | $18,966.48 |
| 2 | 2012 RAM 3500 LARAMIE LONGHORN CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 97,001 | 06810 | 48 miles | $28,938.00 List Price | $17,572.62 |
| 3 | 2012 RAM 3500 BIG HORN CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 74,596 | 07727 | 54 miles | $26,995.00 List Price | $16,174.52 |

**Base Value:**    **$17,571.21**

# Loss Vehicle Adjustments

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Condition Adjustments

Condition Adjustment: $0.00          Overall Condition: 3.00-Good          Typical Vehicle Condition: 3.00

| Category | Condition | Comments |
|---|---|---|
| Interior | | |
| DASH/CONSOLE | Typical | unable to determine covid19 |
| SEATS | Typical | unable to determine covid19 |
| GLASS | Typical | unable to determine. covid19 |
| DOORS/INTERIOR PANELS | Typical | unable to determine covid19 |
| CARPET | Typical | unable to determine covid19 |
| HEADLINER | Typical | unable to determine covid19 |
| Exterior | | |
| PAINT | Typical | unable to determine covid19 |
| VINYL/CONVERTIBLE TOP | Typical | N/A |
| TRIM | Typical | unable to determine covid19 |
| BODY | Typical | unable to determine covid19 |
| Mechanical | | |
| TRANSMISSION | Typical | unable to determine due to covid19 |
| ENGINE | Typical | unable to determine due to covid19 |
| Tire | Typical | unable to calculate due to covid19 |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| BODY | OEM Integrated Trailer Brake Coontroller w/Display $230 (per fax) | MANUAL | | | $140.00 |
| EXTERIOR | AFTERMARKET WHEELS | INSTANT QUOTE | | | $185.00 |
| INTERIOR | WINDOW TINT- CREW CAB | INSTANT QUOTE | | | $30.00 |
| BODY | OEM 6-Speed Automatic 68RFE Transmission $500 (per fax) | MANUAL | | | $0.00 |
| EXTERIOR | TOOL BOX (FULL-SIZE TRUCKS) | INSTANT QUOTE | | | $135.00 |
| BODY | OEM 4.10 Rear Axle Ratio $50 (per fax) | MANUAL | | | $30.00 |

# Comparable Vehicles


Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

Claim # 20-5840648-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 4
Mitchell-Volino Subpoena 000620

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

| 1 | 2012 RAM 3500 ST CREW CAB PKP 6 6.7 TURBO DIESEL A4WD | | List Price: $22,129.00 |
|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3C63D3CL1CG328169 | B0291S | 06/01/2020 | 08691 | 71 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM

ROUTE 130 CHRYSLER DODGE
JEEP RAM

1153 US ROUTE 130

ROBBINSVILLE NJ 08691

609-686-2200

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,022.00 |
| Mileage | 183,342 | 134,146 | -$2,384.63 |
| Equipment | | | |
| MAX TOW PKG | Yes | No | $320.11 |
| PROTECTION GROUP | Yes | No | $23.03 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$62.18 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $181.92 |
| SPRAY-IN BEDLINER | No | Yes | -$218.77 |

Total Adjustments: -$3,162.52
**Adjusted Price: $18,966.48**

Comparable Vehicle Package Details

CHROME APPEARANCE GROUP

POPULAR EQUIPMENT GROUP

HD SNOW PLOW PREP GROUP

Comparable Vehicle Option Details

SPRAY-IN BEDLINER

| 2 | 2012 RAM 3500 LARAMIE LONGHORN CREW CAB PKP 6 6.7 TURBO DIESEL A4WD | | | List Price: **$28,938.00** |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3C63D3FL9CG186407 | D2329 | 05/24/2020 | 06810 | 48 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - AUTOTRADER.COM

DANBURY CHRYSLER DODGE JEEP
RAM FIAT

100A FEDERAL RD

DANBURY CT 06810

203-825-5940

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,336.00 |
| Vehicle Configuration Adjustment | | | -$5,491.20 |
| Mileage | 183,342 | 97,001 | -$5,167.28 |
| Equipment | | | |
| CHROME APPEARANCE GROUP | Yes | No | $335.33 |
| MAX TOW PKG | Yes | No | $335.33 |
| POPULAR EQUIPMENT GROUP | Yes | No | $313.62 |
| PROTECTION GROUP | Yes | No | $24.12 |
| COLD WEATHER GROUP | No | Yes | -$42.04 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$63.07 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $190.57 |
| PWR SUNROOF | No | Yes | -$464.76 |

|  | | Total Adjustments: | -$11,365.38 |
|---|---|---|---|
|  | | **Adjusted Price:** | **$17,572.62** |

Comparable Vehicle Package Details

COLD WEATHER GROUP

HD SNOW PLOW PREP GROUP

Comparable Vehicle Option Details

PWR SUNROOF

## 3  2012 RAM 3500 BIG HORN CREW CAB PKP 6 6.7 TURBO DIESEL A4WD                List Price: $26,995.00

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance From Loss Vehicle |
|---|---|---|---|---|
| 3C63D3HL4CG160990 | 21459 | 05/05/2020 | 07727 | 54 miles |

Source:

DEALER WEB LISTING –
BUILDSHEET - CARS.COM
AUTOMOTIVE AVENUES
5011 STATE ROUTE 33 # 34
WALL TOWNSHIP NJ 07727
732-919-0707

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,247.00 |
| Vehicle Configuration Adjustment | | | -$1,632.30 |
| Mileage | 183,342 | 74,596 | -$7,264.77 |
| Equipment | | | |
| CHROME APPEARANCE GROUP | Yes | No | $365.74 |
| MAX TOW PKG | Yes | No | $365.74 |
| POPULAR EQUIPMENT GROUP | Yes | No | $342.06 |
| PROTECTION GROUP | Yes | No | $26.31 |
| 2FZ BIG HORN CUSTOMER PREFERRED ORDER SELECTION PKG | No | Yes | -$591.07 |
| LUXURY GROUP | No | Yes | -$229.13 |
| TECHNOLOGY GROUP | No | Yes | -$257.79 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$70.29 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $207.85 |
| UCONNECT 430 | No | Yes | -$416.63 |
| PARKVIEW REAR BACK-UP CAMERA | No | Yes | -$104.15 |
| PWR ADJUSTABLE PEDALS | No | Yes | -$65.09 |
| SPRAY-IN BEDLINER | No | Yes | -$249.96 |

**Total Adjustments:** -$10,820.48
**Adjusted Price:** $16,174.52

Comparable Vehicle Package Details

2FZ BIG HORN CUSTOMER PREFERRED ORDER SELECTION PKG

LUXURY GROUP

TECHNOLOGY GROUP

HD SNOW PLOW PREP GROUP

Comparable Vehicle Option Details

UCONNECT 430, PARKVIEW REAR BACK-UP CAMERA, PWR ADJUSTABLE PEDALS, SPRAY-IN BEDLINER

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2012 Ram 3500 ST | 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged 4WD | $45,828.00 |
| 2012 RAM 3500 LARAMIE LONGHORN | CREW CAB PKP 6 6.7 TURBO DIESEL A 4WD | $59,093.00 |
| 2012 RAM 3500 BIG HORN | CREW CAB PKP 6 6.7 TURBO DIESEL A 4WD | $49,443.00 |

## Valuation Notes

Research Performed By:
Total Loss Service Center

OEM 6-Speed Automatic 68RFE Transmission $500 (per fax) - Associated value taken into consideration with: 2012 Ram 3500 ST 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged A 4WD

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 20-5840648-01 | | COLLISION | LORENZO COSTA 580 NORTH BROOME AVE LINDENHURST, NY 11757 +1-631-4491720 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 05/28/2020 | 06/01/2020 | 06/18/2020 | 1010328870 | 3 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2012 | Ram | 3500 ST 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged A 4WD | NY 11757 | 183,342 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Bright Silver Metallic | | 3C63DRGL5CG343920 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $17,571.21 |
| Condition | $0.00 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $1,905.00 |
| Refurbishment | $0.00 |
| Market Value = | $19,476.21 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $1,000.00 |
| Settlement Value = | $18,476.21 |

## Settlement Value:
# $18,476.21

# Loss Vehicle Detail

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Standard Equipment

### Exterior

| | |
|---|---|
| 17" steel spare wheel | 17" x 6.0" argent steel wheels (N/A w/AR9 Single Rear Wheel Group) |
| Auto headlamps | Black door handles |
| Black front bumper | Black grille |
| Black pwr trailer tow mirrors -inc: supplemental signals, courtesy lamps, heated glass | Black rear bumper |
| Body-color headlamp filler panel | Box & rear fender lamps |
| Cab clearance lamps | Cargo lamp |
| Center wheel hubs | Dual rear wheels |
| Front air dam | Front license plate bracket |
| Full-size spare tire | Locking tailgate |
| LT235/80R17E all-season BSW tires (N/A w/AR9 Single Rear Wheel Group) | Quad headlamps |
| Tinted glass windows | Variable-speed intermittent windshield wipers |
| Winch-type spare tire carrier | |

### Interior

| | |
|---|---|
| (6) speakers | 120-MPH primary speedometer |
| 12V auxiliary pwr outlet | 2nd row in-floor storage bins |
| Air conditioning | Audio input jack |
| Black instrument panel bezel | Black vinyl floor covering |
| Driver/passenger assist handles | Fixed long mast antenna |
| HD vinyl 40/20/40 split-bench seat | Instrument cluster w/display screen |
| Mini floor console | Pwr accessory delay |
| Pwr locks | Pwr windows w/front one-touch up/down |
| Rear dome lamp | Rear folding bench seat |
| Rear underseat compartment storage | Sentry key theft-deterrent system |
| Speed control | Tilt steering column |
| Uconnect 130 -inc: AM/FM stereo w/CD/MP3 player | Vehicle info center |

### Mechanical

| | |
|---|---|
| 11.5" dual rear wheel axle ring gear diameter | 12200# GVWR |
| 160-amp alternator | 3.42 rear axle ratio |
| 7-pin trailer wiring harness | 730-amp maintenance-free battery |
| 8' pickup box | Anti-spin rear axle differential |
| Class IV receiver hitch | Diesel exhaust brake |



| | |
|---|---|
| Electronically-controlled throttle | Four wheel drive |
| Front stabilizer bar | HD engine cooling |
| HD front shock absorbers | HD rear shock absorbers |
| Manual shift-on-the-fly transfer case | Pwr 4-wheel anti-lock disc brakes |
| Pwr steering | Tow hooks |
| Trailer tow wiring -inc: 4-pin connector | |

Safety

| | |
|---|---|
| Advanced multistage front airbags | Child safety door locks |
| Dual-note horn | Front height-adjustable shoulder belts |
| Front/rear side curtain airbags | Supplemental front seat side airbags |
| Supplemental side airbags | |

## Packages

CHROME APPEARANCE GROUP
-inc: 17" x 8.0" steel wheels, bright wheel skins, bright front/rear bumpers, bright grille (w/AR9 Single Rear Wheel Group-inc: 17" x 8.0" chrome-clad steel wheels)

MAX TOW PKG
-inc: dual trans oil cooler

POPULAR EQUIPMENT GROUP
-inc: cloth 40/20/40 split bench seat, carpeted floor covering, front/rear floor mats, SIRIUS satellite radio w/1-year service, remote keyless entry

PROTECTION GROUP
-inc: transfer case skid plate shield

## Optional Equipment

UCONNECT VOICE COMMAND W/BLUETOOTH

*DIO/PIO =   Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle:  2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.
Typical Mileage for this vehicle: 105,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2012 RAM 3500 ST CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 134,146 | 08691 | 71 miles | $22,129.00 List Price | $18,966.48 |
| 2 | 2012 RAM 3500 LARAMIE LONGHORN CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 97,001 | 06810 | 48 miles | $28,938.00 List Price | $17,572.62 |
| 3 | 2012 RAM 3500 BIG HORN CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 74,596 | 07727 | 54 miles | $26,995.00 List Price | $16,174.52 |

**Base Value:**    **$17,571.21**



Claim # 20-5840648-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 3
Mitchell-Volino Subpoena 000628

## Loss Vehicle Adjustments

Loss vehicle:  2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

### Condition Adjustments

Condition Adjustment:  $0.00          Overall Condition:    3.00-Good          Typical Vehicle Condition:  3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| DOORS/INTERIOR PANELS | Typical | unable to determine covid19 |
| DASH/CONSOLE | Typical | unable to determine covid19 |
| HEADLINER | Typical | unable to determine covid19 |
| SEATS | Typical | unable to determine covid19 |
| CARPET | Typical | unable to determine covid19 |
| GLASS | Typical | unable to determine. covid19 |
| **Exterior** | | |
| PAINT | Typical | unable to determine covid19 |
| TRIM | Typical | unable to determine covid19 |
| VINYL/CONVERTIBLE TOP | Typical | N/A |
| BODY | Typical | unable to determine covid19 |
| **Mechanical** | | |
| ENGINE | Typical | unable to determine due to covid19 |
| TRANSMISSION | Typical | unable to determine due to covid19 |
| Tire | Typical | unable to calculate due to covid19 |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

### After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| BODY | OEM Integrated Trailer Brake Coontroller w/Display $230 (per fax) | MANUAL | | | $140.00 |
| INTERIOR | AMPLIFIER | INSTANT QUOTE | | | $80.00 |
| EXTERIOR | AFTERMARKET WHEELS | INSTANT QUOTE | | | $185.00 |
| EXTERIOR | BILLET GRILLE | INSTANT QUOTE | | | $50.00 |
| INTERIOR | DIGITAL MEDIA RECEIVER | INSTANT QUOTE | | | $220.00 |
| MECHANICAL | COMMON MAINTENANCE: SUSPENSION / SHOCKS / STRUTS | INSTANT QUOTE | | | $0.00 |
| MECHANICAL | LIFT KIT - FULL-SIZE VEHICLE (1-4 INCH) | INSTANT QUOTE | | | $675.00 |
| EXTERIOR | FOUR NEW TIRES (0-90 DAYS / 0 - 3000 MILES) | INSTANT QUOTE | | | $250.00 |
| BODY | OEM 6-Speed Automatic 68RFE Transmission $500 (per fax) | MANUAL | | | $0.00 |
| BODY | OEM 4.10 Rear Axle Ratio $50 (per fax) | MANUAL | | | $30.00 |
| EXTERIOR | GRAPHICS (CUSTOM / BUSINESS) | INSTANT QUOTE | | | $0.00 |
| INTERIOR | SUBWOOFERS (PAIR) | INSTANT QUOTE | | | $110.00 |
| INTERIOR | WINDOW TINT- CREW CAB | INSTANT QUOTE | | | $30.00 |
| EXTERIOR | TOOL BOX (FULL-SIZE TRUCKS) | INSTANT QUOTE | | | $135.00 |


Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

# Comparable Vehicles

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

| 1 | 2012 RAM 3500 ST CREW CAB PKP 6 6.7 TURBO DIESEL A4WD | | | List Price: $22,129.00 |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3C63D3CL1CG328169 | B0291S | 06/01/2020 | 08691 | 71 miles |

Source

DEALER WEB LISTING - BUILDSHEET - VAST.COM

ROUTE 130 CHRYSLER DODGE JEEP RAM

1153 US ROUTE 130

ROBBINSVILLE NJ 08691

609-686-2200

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,022.00 |
| Mileage | 183,342 | 134,146 | -$2,384.63 |
| Equipment | | | |
| MAX TOW PKG | Yes | No | $320.11 |
| PROTECTION GROUP | Yes | No | $23.03 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$62.18 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $181.92 |
| SPRAY-IN BEDLINER | No | Yes | -$218.77 |
| | | Total Adjustments: | -$3,162.52 |
| | | **Adjusted Price:** | **$18,966.48** |

Comparable Vehicle Package Details

CHROME APPEARANCE GROUP

POPULAR EQUIPMENT GROUP

HD SNOW PLOW PREP GROUP

Comparable Vehicle Options Details

SPRAY-IN BEDLINER

## 2   2012 RAM 3500 LARAMIE LONGHORN CREW CAB PKP 6 6.7 TURBO DIESEL A4WD    List Price: $28,938.00

| VIN | Stock No. | | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|---|
| 3C63D3FL9CG186407 | D2329 | | 05/24/2020 | 06810 | 48 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - AUTOTRADER.COM
DANBURY CHRYSLER DODGE JEEP
RAM FIAT
100A FEDERAL RD
DANBURY CT 06810
203-825-5940

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,336.00 |
| Vehicle Configuration Adjustment | | | -$5,491.20 |
| Mileage | 183,342 | 97,001 | -$5,167.28 |
| Equipment | | | |
|   CHROME APPEARANCE GROUP | Yes | No | $335.33 |
|   MAX TOW PKG | Yes | No | $335.33 |
|   POPULAR EQUIPMENT GROUP | Yes | No | $313.62 |
|   PROTECTION GROUP | Yes | No | $24.12 |
|   COLD WEATHER GROUP | No | Yes | -$42.04 |
|   HD SNOW PLOW PREP GROUP | No | Yes | -$63.07 |
|   UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $190.57 |
|   PWR SUNROOF | No | Yes | -$464.76 |

| | |
|---|---|
| Total Adjustments: | -$11,365.38 |
| **Adjusted Price:** | **$17,572.62** |

**Comparable Vehicle Package Details**
COLD WEATHER GROUP

HD SNOW PLOW PREP GROUP

**Comparable Vehicle Option Details**
PWR SUNROOF

**3** | **2012 RAM 3500 BIG HORN CREW CAB PKP 6 6.7 TURBO DIESEL A4WD** | **List Price: $26,995.00**

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3C63D3HL4CG160990 | 21459 | 05/05/2020 | 07727 | 54 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM

AUTOMOTIVE AVENUES

5011 STATE ROUTE 33 # 34

WALL TOWNSHIP NJ 07727

732-919-0707

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,247.00 |
| Vehicle Configuration Adjustment | | | -$1,632.30 |
| Mileage | 183,342 | 74,596 | -$7,264.77 |
| Equipment | | | |
| CHROME APPEARANCE GROUP | Yes | No | $365.74 |
| MAX TOW PKG | Yes | No | $365.74 |
| POPULAR EQUIPMENT GROUP | Yes | No | $342.06 |
| PROTECTION GROUP | Yes | No | $26.31 |
| 2FZ BIG HORN CUSTOMER PREFERRED ORDER SELECTION PKG | No | Yes | -$591.07 |
| LUXURY GROUP | No | Yes | -$229.13 |
| TECHNOLOGY GROUP | No | Yes | -$257.79 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$70.29 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $207.85 |
| UCONNECT 430 | No | Yes | -$416.63 |
| PARKVIEW REAR BACK-UP CAMERA | No | Yes | -$104.15 |
| PWR ADJUSTABLE PEDALS | No | Yes | -$65.09 |
| SPRAY-IN BEDLINER | No | Yes | -$249.96 |

Total Adjustments: -$10,820.48
**Adjusted Price: $16,174.52**

Comparable Vehicle Package Details:

2FZ BIG HORN CUSTOMER PREFERRED ORDER SELECTION PKG

LUXURY GROUP

TECHNOLOGY GROUP

HD SNOW PLOW PREP GROUP

Comparable Vehicle Option Details:

UCONNECT 430, PARKVIEW REAR BACK-UP CAMERA, PWR ADJUSTABLE PEDALS, SPRAY-IN BEDLINER

Claim # 20-5840648-01 | © 2018 Mitchell International, Inc. All Rights Reserved. | Page 7
Mitchell-Volino Subpoena 000632

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2012 Ram 3500 ST | 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged 4WD | $45,828.00 |
| 2012 RAM 3500 LARAMIE LONGHORN | CREW CAB PKP 6 6.7 TURBO DIESEL A 4WD | $59,093.00 |
| 2012 RAM 3500 BIG HORN | CREW CAB PKP 6 6.7 TURBO DIESEL A 4WD | $49,443.00 |

## Valuation Notes

Research Performed By:
Total Loss Service Center

OEM 6-Speed Automatic 68RFE Transmission $500 (per fax) – Associated value taken into consideration with: 2012 Ram 3500 ST 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged A 4WD

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).
- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).
- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.
- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 20-5840648-01 | | COLLISION | LORENZO COSTA 580 NORTH BROOME AVE LINDENHURST, NY 11757 +1-631-4491720 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 05/28/2020 | 06/01/2020 | 06/24/2020 | 1010349715 | 4 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2012 | Ram | 3500 ST 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged A 4WD | NY 11757 | 183,342 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Bright Silver Metallic | | 3C63DRGL5CG343920 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $17,571.21 |
| Condition | $0.00 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $1,580.00 |
| Refurbishment | $0.00 |
| Market Value = | $19,151.21 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $1,000.00 |
| Settlement Value = | $18,151.21 |

## Settlement Value:
# $18,151.21

**J.D. POWER**

Mitchell **WorkCenter**
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

CONFIDENTIAL                    Mitchell-Volino Subpoena 000635

# Loss Vehicle Detail

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Standard Equipment

### Exterior

| | |
|---|---|
| 17" steel spare wheel | 17" x 6.0" argent steel wheels (N/A w/AR9 Single Rear Wheel Group) |
| Auto headlamps | Black door handles |
| Black front bumper | Black grille |
| Black pwr trailer tow mirrors -inc: supplemental signals, courtesy lamps, heated glass | Black rear bumper |
| Body-color headlamp filler panel | Box & rear fender lamps |
| Cab clearance lamps | Cargo lamp |
| Center wheel hubs | Dual rear wheels |
| Front air dam | Front license plate bracket |
| Full-size spare tire | Locking tailgate |
| LT235/80R17E all-season BSW tires (N/A w/AR9 Single Rear Wheel Group) | Quad headlamps |
| Tinted glass windows | Variable-speed intermittent windshield wipers |
| Winch-type spare tire carrier | |

### Interior

| | |
|---|---|
| (6) speakers | 120-MPH primary speedometer |
| 12V auxiliary pwr outlet | 2nd row in-floor storage bins |
| Air conditioning | Audio input jack |
| Black instrument panel bezel | Black vinyl floor covering |
| Driver/passenger assist handles | Fixed long mast antenna |
| HD vinyl 40/20/40 split-bench seat | Instrument cluster w/display screen |
| Mini floor console | Pwr accessory delay |
| Pwr locks | Pwr windows w/front one-touch up/down |
| Rear dome lamp | Rear folding bench seat |
| Rear underseat compartment storage | Sentry key theft-deterrent system |
| Speed control | Tilt steering column |
| Uconnect 130 -inc: AM/FM stereo w/CD/MP3 player | Vehicle info center |

### Mechanical

| | |
|---|---|
| 11.5" dual rear wheel axle ring gear diameter | 12200# GVWR |
| 160-amp alternator | 3.42 rear axle ratio |
| 7-pin trailer wiring harness | 730-amp maintenance-free battery |
| 8' pickup box | Anti-spin rear axle differential |
| Class IV receiver hitch | Diesel exhaust brake |



Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

| | |
|---|---|
| Electronically-controlled throttle | Four wheel drive |
| Front stabilizer bar | HD engine cooling |
| HD front shock absorbers | HD rear shock absorbers |
| Manual shift-on-the-fly transfer case | Pwr 4-wheel anti-lock disc brakes |
| Pwr steering | Tow hooks |
| Trailer tow wiring -inc: 4-pin connector | |

Safety

| | |
|---|---|
| Advanced multistage front airbags | Child safety door locks |
| Dual-note horn | Front height-adjustable shoulder belts |
| Front/rear side curtain airbags | Supplemental front seat side airbags |
| Supplemental side airbags | |

## Packages

CHROME APPEARANCE GROUP
-inc: 17" x 8.0" steel wheels, bright wheel skins, bright front/rear bumpers, bright grille (w/AR9 Single Rear Wheel Group-inc: 17" x 8.0" chrome-clad steel wheels)

MAX TOW PKG
-inc: dual trans oil cooler

POPULAR EQUIPMENT GROUP
-inc: cloth 40/20/40 split bench seat, carpeted floor covering, front/rear floor mats, SIRIUS satellite radio w/1-year service, remote keyless entry

PROTECTION GROUP
-inc: transfer case skid plate shield

## Optional Equipment

UCONNECT VOICE COMMAND W/BLUETOOTH

*DIO/PIO =   Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle:  2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 105,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2012 RAM 3500 ST CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 134,146 | 08691 | 71 miles | $22,129.00 List Price | $18,966.48 |
| 2 | 2012 RAM 3500 LARAMIE LONGHORN CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 97,001 | 06810 | 48 miles | $28,938.00 List Price | $17,572.62 |
| 3 | 2012 RAM 3500 BIG HORN CREW CAB PKP 6 6.7TURBO DIESEL A 4WD | 74,596 | 07727 | 54 miles | $26,995.00 List Price | $16,174.52 |

Base Value:   **$17,571.21**



# Loss Vehicle Adjustments

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

## Condition Adjustments

Condition Adjustment: $0.00          Overall Condition:  3.00-Good          Typical Vehicle Condition:  3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| DOORS/INTERIOR PANELS | Typical | unable to determine covid19 |
| HEADLINER | Typical | unable to determine covid19 |
| CARPET | Typical | unable to determine covid19 |
| GLASS | Typical | unable to determine. covid19 |
| DASH/CONSOLE | Typical | unable to determine covid19 |
| SEATS | Typical | unable to determine covid19 |
| **Exterior** | | |
| PAINT | Typical | unable to determine covid19 |
| TRIM | Typical | unable to determine covid19 |
| VINYL/CONVERTIBLE TOP | Typical | N/A |
| BODY | Typical | unable to determine covid19 |
| **Mechanical** | | |
| ENGINE | Typical | unable to determine due to covid19 |
| TRANSMISSION | Typical | unable to determine due to covid19 |
| Tire | Typical | unable to calculate due to covid19 |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| EXTERIOR | AFTERMARKET WHEELS | INSTANT QUOTE | | | $185.00 |
| EXTERIOR | BILLET GRILLE | INSTANT QUOTE | | | $50.00 |
| BODY | OEM Integrated Trailer Brake Coontroller w/Display $230 (per fax) | MANUAL | | | $140.00 |
| INTERIOR | DIGITAL MEDIA RECEIVER | INSTANT QUOTE | | | $220.00 |
| MECHANICAL | COMMON MAINTENANCE: SUSPENSION / SHOCKS / STRUTS | INSTANT QUOTE | | | $0.00 |
| MECHANICAL | LIFT KIT - FULL-SIZE VEHICLE (1-4 INCH) | INSTANT QUOTE | | | $675.00 |
| BODY | OEM 4.10 Rear Axle Ratio $50 (per fax) | MANUAL | | | $30.00 |
| EXTERIOR | FOUR NEW TIRES (0-90 DAYS / 0 - 3000 MILES) | INSTANT QUOTE | | | $250.00 |
| EXTERIOR | GRAPHICS (CUSTOM / BUSINESS) | INSTANT QUOTE | | | $0.00 |
| BODY | OEM 6-Speed Automatic 68RFE Transmission $500 (per fax) | MANUAL | | | $0.00 |
| INTERIOR | WINDOW TINT- CREW CAB | INSTANT QUOTE | | | $30.00 |



# Comparable Vehicles

Loss vehicle: 2012 Ram 3500 | ST 4 Door Crew Cab 8 Foot Bed | 6.7L 6 Cyl Diesel Turbocharged A 4WD

| 1 | 2012 RAM 3500 ST CREW CAB PKP 6 6.7 TURBO DIESEL A4WD | | | List Price: $22,129.00 |
|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3C63D3CL1CG328169 | B0291S | 06/01/2020 | 08691 | 71 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - VAST.COM
ROUTE 130 CHRYSLER DODGE
JEEP RAM
1153 US ROUTE 130
ROBBINSVILLE NJ 08691
609-686-2200

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,022.00 |
| Mileage | 183,342 | 134,146 | -$2,384.63 |
| Equipment | | | |
| MAX TOW PKG | Yes | No | $320.11 |
| PROTECTION GROUP | Yes | No | $23.03 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$62.18 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $181.92 |
| SPRAY-IN BEDLINER | No | Yes | -$218.77 |

Total Adjustments: -$3,162.52
**Adjusted Price: $18,966.48**

Comparable Vehicle Package Details
CHROME APPEARANCE GROUP

POPULAR EQUIPMENT GROUP

HD SNOW PLOW PREP GROUP

Comparable Vehicle Option Details
SPRAY-IN BEDLINER



| 2 | 2012 RAM 3500 LARAMIE LONGHORN CREW CAB PKP 6 6.7 TURBO DIESEL A4WD | | | List Price: **$28,938.00** |

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3C63D3FL9CG186407 | D2329 | 05/24/2020 | 06810 | 48 miles |

Source:

DEALER WEB LISTING -
BUILDSHEET - AUTOTRADER.COM

DANBURY CHRYSLER DODGE JEEP
RAM FIAT

100A FEDERAL RD

DANBURY CT 06810

203-825-5940

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,336.00 |
| Vehicle Configuration Adjustment | | | -$5,491.20 |
| Mileage | 183,342 | 97,001 | -$5,167.28 |
| Equipment | | | |
| CHROME APPEARANCE GROUP | Yes | No | $335.33 |
| MAX TOW PKG | Yes | No | $335.33 |
| POPULAR EQUIPMENT GROUP | Yes | No | $313.62 |
| PROTECTION GROUP | Yes | No | $24.12 |
| COLD WEATHER GROUP | No | Yes | -$42.04 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$63.07 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $190.57 |
| PWR SUNROOF | No | Yes | -$464.76 |

Total Adjustments: -$11,365.38
**Adjusted Price: $17,572.62**

Comparable Vehicle Package Details:

COLD WEATHER GROUP

HD SNOW PLOW PREP GROUP

Comparable Vehicle Option Details:

PWR SUNROOF

### 3 | 2012 RAM 3500 BIG HORN CREW CAB PKP 6 6.7 TURBO DIESEL A4WD    List Price: $26,995.00

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 3C63D3HL4CG160990 | 21459 | 05/05/2020 | 07727 | 54 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
AUTOMOTIVE AVENUES
5011 STATE ROUTE 33 # 34
WALL TOWNSHIP NJ 07727
732-919-0707

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$1,247.00 |
| Vehicle Configuration Adjustment | | | -$1,632.30 |
| Mileage | 183,342 | 74,596 | -$7,264.77 |
| Equipment | | | |
| CHROME APPEARANCE GROUP | Yes | No | $365.74 |
| MAX TOW PKG | Yes | No | $365.74 |
| POPULAR EQUIPMENT GROUP | Yes | No | $342.06 |
| PROTECTION GROUP | Yes | No | $26.31 |
| 2FZ BIG HORN CUSTOMER PREFERRED ORDER SELECTION PKG | No | Yes | -$591.07 |
| LUXURY GROUP | No | Yes | -$229.13 |
| TECHNOLOGY GROUP | No | Yes | -$257.79 |
| HD SNOW PLOW PREP GROUP | No | Yes | -$70.29 |
| UCONNECT VOICE COMMAND W/BLUETOOTH | Yes | No | $207.85 |
| UCONNECT 430 | No | Yes | -$416.63 |
| PARKVIEW REAR BACK-UP CAMERA | No | Yes | -$104.15 |
| PWR ADJUSTABLE PEDALS | No | Yes | -$65.09 |
| SPRAY-IN BEDLINER | No | Yes | -$249.96 |

|  | Total Adjustments: | -$10,820.48 |
|---|---|---|
|  | **Adjusted Price:** | **$16,174.52** |

Comparable Vehicle Package Details.

2FZ BIG HORN CUSTOMER PREFERRED ORDER SELECTION PKG

LUXURY GROUP

TECHNOLOGY GROUP

HD SNOW PLOW PREP GROUP

Comparable Vehicle Option Details.

UCONNECT 430, PARKVIEW REAR BACK-UP CAMERA, PWR ADJUSTABLE PEDALS, SPRAY-IN BEDLINER



## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2012 Ram 3500 ST | 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged 4WD | $45,828.00 |
| 2012 RAM 3500 LARAMIE LONGHORN | CREW CAB PKP 6 6.7 TURBO DIESEL A 4WD | $59,093.00 |
| 2012 RAM 3500 BIG HORN | CREW CAB PKP 6 6.7 TURBO DIESEL A 4WD | $49,443.00 |

## Valuation Notes

Research Performed By:
Total Loss Service Center

OEM 6-Speed Automatic 68RFE Transmission $500 (per fax) - Associated value taken into consideration with: 2012 Ram 3500 ST 4 Door Crew Cab 8 Foot Bed 6.7L 6 Cyl Diesel Turbocharged A 4WD

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Vehicle Configuration Adjustment- an adjustment for differences in configuration between the comparable vehicle and the loss vehicle (e.g. differences in trim).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 19-5312925-01 | | COLLISION | KEVIN LUKASIK 20 REED LN CLIFTON PARK, NY 12065 +1-518-2809963 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 02/27/2019 | 02/27/2019 | 03/01/2019 | 1008698060 | 1 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2013 | Hyundai | Santa Fe Sport 2.0T 4 Door Utility 106" WB 2.0L 4 Cyl Gas Turbocharged A AWD | NY 12065 | 90,597 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Cabo Bronze | HXE2722, New York | 5XYZUDLA8DG042052 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $12,648.45 |
| Condition - | $1,238.66 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $160.00 |
| Refurbishment | $0.00 |
| Market Value = | $11,569.79 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $250.00 |
| Settlement Value = | $11,319.79 |

## Settlement Value:
# $11,319.79

EXHIBIT

Merritt + 13
4/7/22

PENGAD 800-631-6989

**J.D. POWER**

Mitchell **WorkCenter**
Total Loss
© 2018 Mitchell International, Inc. All Rights Reserved.

# Loss Vehicle Detail

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

## Standard Equipment

### Exterior

| | |
|---|---|
| 19" hyper silver alloy wheels | Body-color exterior pwr mirrors |
| Body-color rear spoiler -inc: LED brake lights | Chrome accent door handles |
| Chrome accent front grille | Chrome twin-tip exhaust |
| LED headlight accents | Rear privacy glass |
| Solar glass front windows | Windshield wiper de-icer |

### Interior

| | |
|---|---|
| Active ECO system | Air conditioning w/cabin air filter |
| AM/FM/SiriusXM audio system w/CD/MP3 player -inc: (6) speakers, aux/USB/iPod jacks | Blue Link telematics system |
| Bluetooth hands-free phone system | Cruise control |
| Electroluminescent gauge cluster w/color LCD trip computer | Front bucket seats |
| Front sunvisors -inc: illuminated vanity mirrors, visor extension | Proximity key entry w/push button start |
| Pwr door & tailgate locks | Pwr windows w/driver auto-up/down |
| Remote keyless entry system w/alarm | Stain-resistant cloth seating surfaces |
| Tilt/telescopic steering wheel -inc: audio & cruise controls | |

### Mechanical

| | |
|---|---|
| All wheel drive w/driver-selectable lock | Front/rear ventilated disc brakes |
| MacPherson strut front suspension -inc: gas filled dampers, stabilizer bar | Multi-link rear suspension -inc: gas filled dampers, stabilizer bar |
| Pwr rack & pinion steering -inc: driver selectable steering mode (DSSM) | Trailer prep pkg -inc: trailer pre-wiring |

### Safety

| | |
|---|---|
| 4-wheel anti-lock brakes (ABS) -inc: electronic brake force distribution (EBD), brake assist | Downhill brake control |
| Driver & front passenger advanced airbags w/occupant classification system | Driver's knee airbag |
| Electronic stability control (ESC) w/traction control system (TCS) | Front side-impact airbags |
| Front/rear side curtain airbags w/rollover sensors | Hill-start assist control |
| Lower anchors & upper tether anchors (LATCH) | Tire pressure monitoring system |

## Optional Equipment

| | |
|---|---|
| CARGO COVER/SCREEN | CARPETED FLOOR MATS |

*DIO/PIO =   Dealer/Port Installed Options

# Loss Vehicle Base Value

Loss vehicle: 2013 Hyundai Santa Fe Sport |  2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD



Mitchell **WorkCenter**
Total Loss

CONFIDENTIAL

## Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 77,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 29,170 | 12143 | 25 miles | $17,930.00 Sold Price | $14,246.41 |
| 2 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 84,461 | 12304 | 8 miles | $14,000.00 List Price | $12,856.84 |
| 3 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 115,000 | 12304 | 8 miles | $10,995.00 List Price | $10,396.75 |
| 4 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 89,857 | 01060 | 70 miles | $14,008.00 List Price | $13,093.78 |

**Base Value:** **$12,648.45**

# Loss Vehicle Adjustments

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

## Condition Adjustments

Condition Adjustment: -$1,238.66        Overall Condition: 2.57-Good        Typical Vehicle Condition: 3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| CARPET | 2 Fair | 2 perm stains drv, 1 rear lt side |
| DOORS/INTERIOR PANELS | 2 Fair | missing drv carpet floor mat, small cut to lt rera door. |
| HEADLINER | 2 Fair | 3 perm marks in fabric will not detail |
| GLASS | 3 Good | no damage |
| DASH/CONSOLE | 3 Good | small cuts and knicks in dash and glove door, perm soil cntr |
| SEATS | 2 Fair | signif bolster wear to drv seat |
| **Exterior** | | |
| TRIM | 3 Good | small curb impact rt rear wheel |
| PAINT | 3 Good | normal stone chips to hood |
| VINYL/CONVERTIBLE TOP | Typical | |
| BODY | 3 Good | small isolated ding drv door above handle |
| **Mechanical** | | |
| ENGINE | 2 Fair | some fluid building around valve covers, missing engine covr |
| TRANSMISSION | 3 Good | some fluid building on pan in engine bay |
| **Tire** | 3 Good | 8, 9, 4, 4, 32s avg together is good |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:


Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

interior - if drv carpet mat obtained rating would be a 3 - good
engine - if engine cover is put back with vehicle rating would change to a 3 - good

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|----------|-------------|-----------------|---------------|-------------|-------------------|
| MECHANICAL | INTAKE (COLD AIR) | INSTANT QUOTE | | | $160.00 |
| INTERIOR | FLOOR MATS (NON-OEM) | INSTANT QUOTE | | | $0.00 |

# Comparable Vehicles

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

| 1 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD | Sold Price: $17,930.00 |
|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| 5XYZUDLA6DGXXXXXX | | 12/04/2018 | 12143 | 25 miles |

**Source**

DEALER SALE - BUILDSHEET – J.D. POWER

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Mileage | 90,597 | 29,170 | -$3,650.10 |
| Equipment | | | |
| WHEEL LOCKS | No | Yes | -$33.49 |

|  |  |
|--|--|
| Total Adjustments: | -$3,683.59 |
| **Adjusted Price:** | **$14,246.41** |

Comparable Vehicle Option Details

CARGO COVER/SCREEN, CARPETED FLOOR MATS, WHEEL LOCKS



Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

| 2 | **2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD** | | | **List Price: $14,000.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| 5XYZUDLA2DG001383 | 29580 | 02/17/2019 | 12304 | 8 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
METRO FORD
3601 STATE ST
SCHENECTADY NY 12304
518-429-7484

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Projected Sold Adjustment | | | -$818.00 |
| Mileage | 90,597 | 84,461 | -$325.16 |
| | | Total Adjustments: | -$1,143.16 |
| | | **Adjusted Price:** | **$12,856.84** |

Comparable Vehicle Option Details

CARGO COVER/SCREEN, CARPETED FLOOR MATS

---

| 3 | **2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD** | | | **List Price: $10,995.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| 5XYZUDLA9DG023994 | 18340 | 12/26/2018 | 12304 | 8 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
HORNING AUTO SALES
3821 STATE ST
SCHENECTADY NY 12304
518-344-7616

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Projected Sold Adjustment | | | -$643.00 |
| Mileage | 90,597 | 115,000 | $853.23 |
| Equipment | | | |
| LEATHER & PREMIUM EQUIPMENT PKG | No | Yes | -$861.20 |
| CARGO COVER/SCREEN | Yes | No | $52.72 |
| | | Total Adjustments: | -$598.25 |
| | | **Adjusted Price:** | **$10,396.75** |

Comparable Vehicle Package Details

LEATHER & PREMIUM EQUIPMENT PKG  (AUTO-DIMMING MIRROR W/HOMELINK & COMPASS)

Comparable Vehicle Option Details

CARPETED FLOOR MATS



CONFIDENTIAL

### 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD — List Price: $14,008.00

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA9DG032601 | H3865A | 02/19/2019 | 01060 | 70 miles |

**Source:**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
COUNTRY HYUNDAI
347 KING ST
NORTHAMPTON MA 01060
413-774-3122

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$819.00 |
| Mileage | 90,597 | 89,857 | -$39.23 |
| Equipment | | | |
| CARGO COVER/SCREEN | Yes | No | $67.17 |
| AUTO-DIMMING MIRROR W/HOMELINK & COMPASS | No | Yes | -$123.16 |

| | |
|---|---|
| Total Adjustments: | -$914.22 |
| **Adjusted Price:** | **$13,093.78** |

**Comparable Vehicle Option Details**

CARPETED FLOOR MATS, AUTO-DIMMING MIRROR W/HOMELINK & COMPASS

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2013 Hyundai Santa Fe Sport 2.0T | 4 Door Utility 106" WB 2.0L 4 Cyl Gas Turbocharged  AWD | $29,450.00 |

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843



mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 19-5312925-01 | | COLLISION | KEVIN LUKASIK 20 REED LN CLIFTON PARK, NY 12065 +1-518-2809963 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 02/27/2019 | 02/27/2019 | 03/07/2019 | 1008716904 | 2 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2013 | Hyundai | Santa Fe Sport 2.0T 4 Door Utility 106" WB 2.0L 4 Cyl Gas Turbocharged A AWD | NY 12065 | 90,597 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Cabo Bronze | HXE2722, New York | 5XYZUDLA8DG042052 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $12,648.45 |
| Condition - | $386.64 |
| Prior Damage - | $0.00 |
| Aftermarket Parts - | $0.00 |
| Refurbishment - | $0.00 |
| **Market Value =** | **$12,261.81** |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $250.00 |
| **Settlement Value =** | **$12,011.81** |

## Settlement Value:
# $12,011.81

## Loss Vehicle Detail

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

### Standard Equipment

#### Exterior

| | |
|---|---|
| 19" hyper silver alloy wheels | Body-color exterior pwr mirrors |
| Body-color rear spoiler -inc: LED brake lights | Chrome accent door handles |
| Chrome accent front grille | Chrome twin-tip exhaust |
| LED headlight accents | Rear privacy glass |
| Solar glass front windows | Windshield wiper de-icer |

#### Interior

| | |
|---|---|
| Active ECO system | Air conditioning w/cabin air filter |
| AM/FM/SiriusXM audio system w/CD/MP3 player -inc: (6) speakers, aux/USB/iPod jacks | Blue Link telematics system |
| Bluetooth hands-free phone system | Cruise control |
| Electroluminescent gauge cluster w/color LCD trip computer | Front bucket seats |
| Front sunvisors -inc: illuminated vanity mirrors, visor extension | Proximity key entry w/push button start |
| Pwr door & tailgate locks | Pwr windows w/driver auto-up/down |
| Remote keyless entry system w/alarm | Stain-resistant cloth seating surfaces |
| Tilt/telescopic steering wheel -inc: audio & cruise controls | |

#### Mechanical

| | |
|---|---|
| All wheel drive w/driver-selectable lock | Front/rear ventilated disc brakes |
| MacPherson strut front suspension -inc: gas filled dampers, stabilizer bar | Multi-link rear suspension -inc: gas filled dampers, stabilizer bar |
| Pwr rack & pinion steering -inc: driver selectable steering mode (DSSM) | Trailer prep pkg -inc: trailer pre-wiring |

#### Safety

| | |
|---|---|
| 4-wheel anti-lock brakes (ABS) -inc: electronic brake force distribution (EBD), brake assist | Downhill brake control |
| Driver & front passenger advanced airbags w/occupant classification system | Driver's knee airbag |
| Electronic stability control (ESC) w/traction control system (TCS) | Front side-impact airbags |
| Front/rear side curtain airbags w/rollover sensors | Hill-start assist control |
| Lower anchors & upper tether anchors (LATCH) | Tire pressure monitoring system |

### Optional Equipment

| | |
|---|---|
| CARGO COVER/SCREEN | CARPETED FLOOR MATS |
| *DIO/PIO =   Dealer/Port Installed Options | |

## Loss Vehicle Base Value

Loss vehicle: 2013 Hyundai Santa Fe Sport |  2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD



Mitchell WorkCenter
Total Loss
CONFIDENTIAL

## Comparable Vehicle Information

Search Radius used for this valuation: **75 miles from loss vehicle zip/postal code.**

Typical Mileage for this vehicle: **77,000 miles**

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 29,170 | 12143 | 25 miles | $17,930.00 Sold Price | $14,246.41 |
| 2 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 84,461 | 12304 | 8 miles | $14,000.00 List Price | $12,856.84 |
| 3 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 115,000 | 12304 | 8 miles | $10,995.00 List Price | $10,396.75 |
| 4 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 89,857 | 01060 | 70 miles | $14,008.00 List Price | $13,093.78 |

**Base Value:** **$12,648.45**

# Loss Vehicle Adjustments

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

## Condition Adjustments

Condition Adjustment:  -$386.64        Overall Condition:  2.87-Good        Typical Vehicle Condition:  3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| SEATS | 2 Fair | signif bolster wear to drv seat |
| DASH/CONSOLE | 3 Good | small cuts and knicks in dash and glove door, perm soil cntr |
| CARPET | 3 Good | 2 perm stains drv, 1 rear lt side |
| GLASS | 3 Good | no damage |
| DOORS/INTERIOR PANELS | 3 Good | missing drv carpet floor mat, small cut to lt rera door. |
| HEADLINER | 2 Fair | 3 perm marks in fabric will not detail |
| **Exterior** | | |
| PAINT | 3 Good | normal stone chips to hood |
| TRIM | 3 Good | small curb impact rt rear wheel |
| VINYL/CONVERTIBLE TOP | Typical | |
| BODY | 4 Very Good | small isolated ding drv door above handle |
| **Mechanical** | | |
| TRANSMISSION | 3 Good | some fluid building on pan in engine bay |
| ENGINE | 2 Fair | some fluid building around valve covers, missing engine covr |
| **Tire** | 3 Good | 8, 9, 4, 4, 32s avg together is good |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:



interior - if drv carpet mat obtained rating would be a 3 - good *** update *** part returned updated to 3
engine - if engine cover is put back with vehicle rating would change to a 3 - good *** update *** part returned updated to 3

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| INTERIOR | FLOOR MATS (NON-OEM) | INSTANT QUOTE | | | $0.00 |

## Comparable Vehicles

Loss vehicle:  2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

| 1 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD | | | | | Sold Price: **$17,930.00** |
|---|---|---|---|---|---|---|

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA6DGXXXXXX | | 12/04/2018 | 12143 | 25 miles |

Source

DEALER SALE - BUILDSHEET - J.D. POWER

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Mileage | 90,597 | 29,170 | -$3,650.10 |
| Equipment | | | |
| WHEEL LOCKS | No | Yes | -$33.49 |
| | | Total Adjustments: | -$3,683.59 |
| | | **Adjusted Price:** | **$14,246.41** |

Comparable Vehicle Option Details

CARGO COVER/SCREEN, CARPETED FLOOR MATS, WHEEL LOCKS

## 2  2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD — List Price: $14,000.00

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA2DG001383 | 29580 | 02/17/2019 | 12304 | 8 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
METRO FORD
3601 STATE ST
SCHENECTADY NY 12304
518-429-7484

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$818.00 |
| Mileage | 90,597 | 84,461 | -$325.16 |
| | | Total Adjustments: | -$1,143.16 |
| | | **Adjusted Price:** | **$12,856.84** |

Comparable Vehicle Option Details

CARGO COVER/SCREEN, CARPETED FLOOR MATS

## 3  2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD — List Price: $10,995.00

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA9DG023994 | 18340 | 12/26/2018 | 12304 | 8 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
HORNING AUTO SALES
3821 STATE ST
SCHENECTADY NY 12304
518-344-7616

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$643.00 |
| Mileage | 90,597 | 115,000 | $853.23 |
| **Equipment** | | | |
| LEATHER & PREMIUM EQUIPMENT PKG | No | Yes | -$861.20 |
| CARGO COVER/SCREEN | Yes | No | $52.72 |
| | | Total Adjustments: | -$598.25 |
| | | **Adjusted Price:** | **$10,396.75** |

Comparable Vehicle Package Details

LEATHER & PREMIUM EQUIPMENT PKG  (AUTO-DIMMING MIRROR W/HOMELINK & COMPASS)

Comparable Vehicle Option Details

CARPETED FLOOR MATS

| 4 | **2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD** | | | | **List Price: $14,008.00** |
|---|---|---|---|---|---|

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA9DG032601 | H3865A | 02/19/2019 | 01060 | 70 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
COUNTRY HYUNDAI
347 KING ST
NORTHAMPTON MA 01060
413-774-3122

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$819.00 |
| Mileage | 90,597 | 89,857 | -$39.23 |
| Equipment | | | |
| CARGO COVER/SCREEN | Yes | No | $67.17 |
| AUTO-DIMMING MIRROR W/HOMELINK & COMPASS | No | Yes | -$123.16 |

|  | Total Adjustments: | -$914.22 |
|---|---|---|
|  | **Adjusted Price:** | **$13,093.78** |

Comparable Vehicle Option Details:

CARPETED FLOOR MATS, AUTO-DIMMING MIRROR W/HOMELINK & COMPASS

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2013 Hyundai Santa Fe Sport 2.0T | 4 Door Utility 106" WB 2.0L 4 Cyl Gas Turbocharged  AWD | $29,450.00 |

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 19-5312925-01 | | COLLISION | KEVIN LUKASIK 20 REED LN CLIFTON PARK, NY 12065 +1-518-2809963 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 02/27/2019 | 02/27/2019 | 03/07/2019 | 1008716954 | 3 |

### Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2013 | Hyundai | Santa Fe Sport 2.0T 4 Door Utility 106" WB 2.0L 4 Cyl Gas Turbocharged A AWD | NY 12065 | 90,597 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Cabo Bronze | HXE2722, New York | 5XYZUDLA8DG042052 | No |

### Valuation Summary

#### Loss Vehicle Adjustments

Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $12,648.45 |
| Condition + | $91.80 |
| Prior Damage | $0.00 |
| Aftermarket Parts | $0.00 |
| Refurbishment | $0.00 |
| Market Value = | $12,740.25 |

#### Settlement Adjustments

Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $250.00 |
| Settlement Value = | $12,490.25 |

## Settlement Value:
# $12,490.25

## Loss Vehicle Detail

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

### Standard Equipment

Exterior

| | |
|---|---|
| 19" hyper silver alloy wheels | Body-color exterior pwr mirrors |
| Body-color rear spoiler -inc: LED brake lights | Chrome accent door handles |
| Chrome accent front grille | Chrome twin-tip exhaust |
| LED headlight accents | Rear privacy glass |
| Solar glass front windows | Windshield wiper de-icer |

Interior

| | |
|---|---|
| Active ECO system | Air conditioning w/cabin air filter |
| AM/FM/SiriusXM audio system w/CD/MP3 player -inc: (6) speakers, aux/USB/iPod jacks | Blue Link telematics system |
| Bluetooth hands-free phone system | Cruise control |
| Electroluminescent gauge cluster w/color LCD trip computer | Front bucket seats |
| Front sunvisors -inc: illuminated vanity mirrors, visor extension | Proximity key entry w/push button start |
| Pwr door & tailgate locks | Pwr windows w/driver auto-up/down |
| Remote keyless entry system w/alarm | Stain-resistant cloth seating surfaces |
| Tilt/telescopic steering wheel -inc: audio & cruise controls | |

Mechanical

| | |
|---|---|
| All wheel drive w/driver-selectable lock | Front/rear ventilated disc brakes |
| MacPherson strut front suspension -inc: gas filled dampers, stabilizer bar | Multi-link rear suspension -inc: gas filled dampers, stabilizer bar |
| Pwr rack & pinion steering -inc: driver selectable steering mode (DSSM) | Trailer prep pkg -inc: trailer pre-wiring |

Safety

| | |
|---|---|
| 4-wheel anti-lock brakes (ABS) -inc: electronic brake force distribution (EBD), brake assist | Downhill brake control |
| Driver & front passenger advanced airbags w/occupant classification system | Driver's knee airbag |
| Electronic stability control (ESC) w/traction control system (TCS) | Front side-impact airbags |
| Front/rear side curtain airbags w/rollover sensors | Hill-start assist control |
| Lower anchors & upper tether anchors (LATCH) | Tire pressure monitoring system |

### Optional Equipment

CARGO COVER/SCREEN

CARPETED FLOOR MATS

*DIO/PIO =  Dealer/Port Installed Options

## Loss Vehicle Base Value

Loss vehicle: 2013 Hyundai Santa Fe Sport |  2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD



## Comparable Vehicle Information

Search Radius used for this valuation: **75 miles** from loss vehicle zip/postal code.

Typical Mileage for this vehicle: **77,000 miles**

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 29,170 | 12143 | 25 miles | $17,930.00 Sold Price | $14,246.41 |
| 2 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 84,461 | 12304 | 8 miles | $14,000.00 List Price | $12,856.84 |
| 3 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 115,000 | 12304 | 8 miles | $10,995.00 List Price | $10,396.75 |
| 4 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 89,857 | 01060 | 70 miles | $14,008.00 List Price | $13,093.78 |

**Base Value:** **$12,648.45**

# Loss Vehicle Adjustments

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

## Condition Adjustments

Condition Adjustment: **$91.80**        Overall Condition: **3.05-Good**        Typical Vehicle Condition: **3.00**

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| DOORS/INTERIOR PANELS | 3 Good | missing drv carpet floor mat, small cut to lt rera door. |
| SEATS | 2 Fair | signif bolster wear to drv seat |
| DASH/CONSOLE | 3 Good | small cuts and knicks in dash and glove door, perm soil cntr |
| CARPET | 3 Good | 2 perm stains drv, 1 rear lt side |
| GLASS | 3 Good | no damage |
| HEADLINER | 2 Fair | 3 perm marks in fabric will not detail |
| **Exterior** | | |
| BODY | 4 Very Good | small isolated ding drv door above handle |
| VINYL/CONVERTIBLE TOP | Typical | |
| TRIM | 3 Good | small curb impact rt rear wheel |
| PAINT | 3 Good | normal stone chips to hood |
| **Mechanical** | | |
| ENGINE | 3 Good | some fluid building around valve covers, missing engine covr |
| TRANSMISSION | 3 Good | some fluid building on pan in engine bay |
| **Tire** | 3 Good | 8, 9, 4, 4, 32s avg together is good |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:


Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

interior - if drv carpet mat obtained rating would be a 3 - good *** update *** part returned updated to 3
engine - if engine cover is put back with vehicle rating would change to a 3 - good *** update *** part returned updated to 3

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|---|---|---|---|---|---|
| INTERIOR | FLOOR MATS (NON-OEM) | INSTANT QUOTE | | | $0.00 |

## Comparable Vehicles

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

| 1 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD | | Sold Price: $17,930.00 |
|---|---|---|---|

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA6DGXXXXXX | | 12/04/2018 | 12143 | 25 miles |

Source

DEALER SALE - BUILDSHEET - J.D. POWER

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Mileage | 90,597 | 29,170 | -$3,650.10 |
| Equipment | | | |
| WHEEL LOCKS | No | Yes | -$33.49 |

|  |  |
|---|---|
| Total Adjustments: | -$3,683.59 |
| **Adjusted Price:** | **$14,246.41** |

Comparable Vehicle Option Details

CARGO COVER/SCREEN, CARPETED FLOOR MATS, WHEEL LOCKS

## 2    2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD    List Price: $14,000.00

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA2DG001383 | 29580 | 02/17/2019 | 12304 | 8 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
METRO FORD
3601 STATE ST
SCHENECTADY NY 12304
518-429-7484

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$818.00 |
| Mileage | 90,597 | 84,461 | -$325.16 |
| | | **Total Adjustments:** | -$1,143.16 |
| | | **Adjusted Price:** | **$12,856.84** |

Comparable Vehicle Option Details

CARGO COVER/SCREEN, CARPETED FLOOR MATS

## 3    2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD    List Price: $10,995.00

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA9DG023994 | 18340 | 12/26/2018 | 12304 | 8 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
HORNING AUTO SALES
3821 STATE ST
SCHENECTADY NY 12304
518-344-7616

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$643.00 |
| Mileage | 90,597 | 115,000 | $853.23 |
| Equipment | | | |
| LEATHER & PREMIUM EQUIPMENT PKG | No | Yes | -$861.20 |
| CARGO COVER/SCREEN | Yes | No | $52.72 |
| | | **Total Adjustments:** | -$598.25 |
| | | **Adjusted Price:** | **$10,396.75** |

Comparable Vehicle Package Details

LEATHER & PREMIUM EQUIPMENT PKG  (AUTO-DIMMING MIRROR W/HOMELINK & COMPASS)

Comparable Vehicle Option Details

CARPETED FLOOR MATS



| 4 | **2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD** | | **List Price: $14,008.00** |

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|----------|--------------|-----------------|----------------------------|
| 5XYZUDLA9DG032601 | H3865A | 02/19/2019 | 01060 | 70 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
COUNTRY HYUNDAI
347 KING ST
NORTHAMPTON MA 01060
413-774-3122

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|-------------|--------------|--------------|--------|
| Projected Sold Adjustment | | | -$819.00 |
| Mileage | 90,597 | 89,857 | -$39.23 |
| Equipment | | | |
| CARGO COVER/SCREEN | Yes | No | $67.17 |
| AUTO-DIMMING MIRROR W/HOMELINK & COMPASS | No | Yes | -$123.16 |

|  | Total Adjustments: | -$914.22 |
|--|--------------------|----------|
|  | **Adjusted Price:** | **$13,093.78** |

Comparable Vehicle Option Details

CARPETED FLOOR MATS, AUTO-DIMMING MIRROR W/HOMELINK & COMPASS

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|-----------------------|---------------|---------------|
| 2013 Hyundai Santa Fe Sport 2.0T | 4 Door Utility 106" WB 2.0L 4 Cyl Gas Turbocharged  AWD | $29,450.00 |

Mitchell **WorkCenter**
Total Loss
CONFIDENTIAL

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment – an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

# Vehicle Valuation Report

Prepared For  Progressive Group of Insurance Companies   (800) 321-9843


mitchell

## Claim Information

| Claim Number | Policy Number | Loss Type | Owner |
|---|---|---|---|
| 19-5312925-01 | | COLLISION | KEVIN LUKASIK 20 REED LN CLIFTON PARK, NY 12065 +1-518-2809963 |

| Loss Date | Reported Date | Valuation Report Date | Valuation Report ID | Version Number |
|---|---|---|---|---|
| 02/27/2019 | 02/27/2019 | 03/18/2019 | 1008749308 | 4 |

## Vehicle Information

| Year | Make | Model | Location | Mileage |
|---|---|---|---|---|
| 2013 | Hyundai | Santa Fe Sport 2.0T 4 Door Utility 106" WB 2.0L 4 Cyl Gas Turbocharged A AWD | NY 12065 | 90,597 miles |

| Ext Color | License | VIN | Title History |
|---|---|---|---|
| Cabo Bronze | HXE2722, New York | 5XYZUDLA8DG042052 | No |

## Valuation Summary

### Loss Vehicle Adjustments
Adjustments specific to your vehicle

| | |
|---|---|
| Base Value = | $12,648.45 |
| Condition + | $91.80 |
| Prior Damage | $0.00 |
| Aftermarket Parts + | $160.00 |
| Refurbishment | $0.00 |
| Market Value = | $12,900.25 |

### Settlement Adjustments
Adjustments specific to your policy

| | |
|---|---|
| Deductible - | $250.00 |
| Settlement Value = | $12,650.25 |

## Settlement Value:
# $12,650.25

## Loss Vehicle Detail

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

### Standard Equipment

Exterior

| | |
|---|---|
| 19" hyper silver alloy wheels | Body-color exterior pwr mirrors |
| Body-color rear spoiler -inc: LED brake lights | Chrome accent door handles |
| Chrome accent front grille | Chrome twin-tip exhaust |
| LED headlight accents | Rear privacy glass |
| Solar glass front windows | Windshield wiper de-icer |

Interior

| | |
|---|---|
| Active ECO system | Air conditioning w/cabin air filter |
| AM/FM/SiriusXM audio system w/CD/MP3 player -inc: (6) speakers, aux/USB/iPod jacks | Blue Link telematics system |
| Bluetooth hands-free phone system | Cruise control |
| Electroluminescent gauge cluster w/color LCD trip computer | Front bucket seats |
| Front sunvisors -inc: illuminated vanity mirrors, visor extension | Proximity key entry w/push button start |
| Pwr door & tailgate locks | Pwr windows w/driver auto-up/down |
| Remote keyless entry system w/alarm | Stain-resistant cloth seating surfaces |
| Tilt/telescopic steering wheel -inc: audio & cruise controls | |

Mechanical

| | |
|---|---|
| All wheel drive w/driver-selectable lock | Front/rear ventilated disc brakes |
| MacPherson strut front suspension -inc: gas filled dampers, stabilizer bar | Multi-link rear suspension -inc: gas filled dampers, stabilizer bar |
| Pwr rack & pinion steering -inc: driver selectable steering mode (DSSM) | Trailer prep pkg -inc: trailer pre-wiring |

Safety

| | |
|---|---|
| 4-wheel anti-lock brakes (ABS) -inc: electronic brake force distribution (EBD); brake assist | Downhill brake control |
| Driver & front passenger advanced airbags w/occupant classification system | Driver's knee airbag |
| Electronic stability control (ESC) w/traction control system (TCS) | Front side-impact airbags |
| Front/rear side curtain airbags w/rollover sensors | Hill-start assist control |
| Lower anchors & upper tether anchors (LATCH) | Tire pressure monitoring system |

### Optional Equipment

CARGO COVER/SCREEN                                    CARPETED FLOOR MATS

*DIO/PIO = Dealer/Port Installed Options

## Loss Vehicle Base Value

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD



## Comparable Vehicle Information

Search Radius used for this valuation: 75 miles from loss vehicle zip/postal code.

Typical Mileage for this vehicle: 77,000 miles

| # | Vehicle Description | Mileage | Location | Distance From Loss Vehicle | Price | Adjusted Value |
|---|---|---|---|---|---|---|
| 1 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 29,170 | 12143 | 25 miles | $17,930.00 Sold Price | $14,246.41 |
| 2 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 84,461 | 12304 | 8 miles | $14,000.00 List Price | $12,856.84 |
| 3 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 115,000 | 12304 | 8 miles | $10,995.00 List Price | $10,396.75 |
| 4 | 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2TURBO GAS A AWD | 89,857 | 01060 | 70 miles | $14,008.00 List Price | $13,093.78 |

**Base Value:** **$12,648.45**

## Loss Vehicle Adjustments

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

### Condition Adjustments

Condition Adjustment: $91.80          Overall Condition: 3.05-Good          Typical Vehicle Condition: 3.00

| Category | Condition | Comments |
|---|---|---|
| **Interior** | | |
| DOORS/INTERIOR PANELS | 3 Good | missing drv carpet floor mat, small cut to lt rera door. |
| CARPET | 3 Good | 2 perm stains drv, 1 rear lt side |
| SEATS | 2 Fair | signif bolster wear to drv seat |
| HEADLINER | 2 Fair | 3 perm marks in fabric will not detail |
| GLASS | 3 Good | no damage |
| DASH/CONSOLE | 3 Good | small cuts and knicks in dash and glove door, perm soil cntr |
| **Exterior** | | |
| VINYL/CONVERTIBLE TOP | Typical | |
| PAINT | 3 Good | normal stone chips to hood |
| TRIM | 3 Good | small curb impact rt rear wheel |
| BODY | 4 Very Good | small isolated ding drv door above handle |
| **Mechanical** | | |
| ENGINE | 3 Good | some fluid building around valve covers, missing engine covr |
| TRANSMISSION | 3 Good | some fluid building on pan in engine bay |
| **Tire** | 3 Good | 8, 9, 4, 4, 32s avg together is good |

Typical Vehicle Condition reflects a condition similar to the same year, make and model. Amount of wear and tear/ damage consistent with its age.

Comments:



interior - if drv carpet mat obtained rating would be a 3 - good *** update *** part returned updated to 3
engine - if engine cover is put back with vehicle rating would change to a 3 - good *** update *** part returned updated to 3

## After Market Parts and OEM Equipment Adjustments

| Category | Description | Adjustment Type | Purchase Date | Amount Paid | Adjustment Amount |
|----------|-------------|-----------------|---------------|-------------|-------------------|
| MECHANICAL | INTAKE (COLD AIR) | INSTANT QUOTE | | | $160.00 |
| INTERIOR | FLOOR MATS (NON-OEM) | INSTANT QUOTE | | | $0.00 |

# Comparable Vehicles

Loss vehicle: 2013 Hyundai Santa Fe Sport | 2.0T 4 Door Utility 106" WB | 2.0L 4 Cyl Gas Turbocharged A AWD

| 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD | | | | Sold Price: $17,930.00 |
|---|---|---|---|---|

| VIN | Stock No. | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|-----|-----------|--------------|-----------------|----------------------------|
| 5XYZUDLA6DGXXXXXX | | 12/04/2018 | 12143 | 25 miles |

| Source | | Adjustments | Loss Vehicle | This Vehicle | Amount |
|--------|--|-------------|--------------|--------------|--------|
| DEALER SALE - BUILDSHEET - J.D. POWER | | Mileage | 90,597 | 29,170 | -$3,650.10 |
| | | Equipment | | | |
| | | WHEEL LOCKS | No | Yes | -$33.49 |

| | Total Adjustments: | -$3,683.59 |
|---|---|---|
| | **Adjusted Price:** | **$14,246.41** |

Comparable Vehicle Option Details
CARGO COVER/SCREEN, CARPETED FLOOR MATS, WHEEL LOCKS

**2**   **2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD**     **List Price: $14,000.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA2DG001383 | 29580 | 02/17/2019 | 12304 | 8 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
METRO FORD
3601 STATE ST
SCHENECTADY NY 12304
518-429-7484

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$818.00 |
| Mileage | 90,597 | 84,461 | -$325.16 |
| | | Total Adjustments: | -$1,143.16 |
| | | **Adjusted Price:** | **$12,856.84** |

Comparable Vehicle Option Details:

CARGO COVER/SCREEN, CARPETED FLOOR MATS

---

**3**   **2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD**     **List Price: $10,995.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA9DG023994 | 18340 | 12/26/2018 | 12304 | 8 miles |

Source

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
HORNING AUTO SALES
3821 STATE ST
SCHENECTADY NY 12304
518-344-7616

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$643.00 |
| Mileage | 90,597 | 115,000 | $853.23 |
| Equipment | | | |
| LEATHER & PREMIUM EQUIPMENT PKG | No | Yes | -$861.20 |
| CARGO COVER/SCREEN | Yes | No | $52.72 |
| | | Total Adjustments: | -$598.25 |
| | | **Adjusted Price:** | **$10,396.75** |

Comparable Vehicle Package Details:

LEATHER & PREMIUM EQUIPMENT PKG  (AUTO-DIMMING MIRROR W/HOMELINK & COMPASS)

Comparable Vehicle Option Details:

CARPETED FLOOR MATS



## 2013 HYUNDAI SANTA FE 2.0T 4D SUV 4 2 TURBO GAS AAWD

**List Price: $14,008.00**

| VIN | Stock No | Listing Date | ZIP/Postal Code | Distance from Loss Vehicle |
|---|---|---|---|---|
| 5XYZUDLA9DG032601 | H3865A | 02/19/2019 | 01060 | 70 miles |

**Source**

DEALER WEB LISTING -
BUILDSHEET - CARS.COM
COUNTRY HYUNDAI
347 KING ST
NORTHAMPTON MA 01060
413-774-3122

| Adjustments | Loss Vehicle | This Vehicle | Amount |
|---|---|---|---|
| Projected Sold Adjustment | | | -$819.00 |
| Mileage | 90,597 | 89,857 | -$39.23 |
| Equipment | | | |
| CARGO COVER/SCREEN | Yes | No | $67.17 |
| AUTO-DIMMING MIRROR W/HOMELINK & COMPASS | No | Yes | -$123.16 |

| | |
|---|---|
| Total Adjustments: | -$914.22 |
| **Adjusted Price:** | **$13,093.78** |

Comparable Vehicle Option Details:

CARPETED FLOOR MATS, AUTO-DIMMING MIRROR W/HOMELINK & COMPASS

## Sub-Model Comparison

| Sub-Model Description | Configuration | Original MSRP |
|---|---|---|
| 2013 Hyundai Santa Fe Sport 2.0T | 4 Door Utility 106" WB 2.0L 4 Cyl Gas Turbocharged  AWD | $29,450.00 |

# Vehicle Valuation Methodology Explanation

WorkCenter Total Loss was designed and built in conjunction with J.D. Powers, experts in data analysis and vehicle pricing and a highly trusted name among consumers. With years of experience in vehicle pricing, J.D Power is a credible, third-party expert whose name provides consumer recognition and confidence. WCTL provides a consistent methodology across all vehicles and it includes valid comparable vehicles that most closely resemble the totaled vehicle and are similar to the vehicles a consumer would find in their own research.

WorkCenter Total Loss produces accurate and easy-to-understand vehicle valuations via this five step process:

**Step 1 - Locate Comparable Vehicles**

Locate vehicles that are the closest match to the loss vehicle in the same market area. WorkCenter Total Loss utilizes consumer-based vehicle sources along with inventory directly from Dealerships. When available WCTL also provides sold vehicle records from sources such as J.D. Powers.

**Step 2 - Adjust Comparable Vehicles**

Make adjustments to the prices of the comparable vehicles. The comparable vehicles are identical to the loss vehicle except where adjustments are itemized. There are several types of comparable vehicle adjustments

- Projected Sold Adjustment - an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price).

- Mileage Adjustment - an adjustment for differences in mileage between the comparable vehicle and the loss vehicle.

- Equipment- adjustments for differences in equipment between the comparable vehicle (e.g. equipment packages and options) and the loss vehicle.

**Step 3 - Calculate Base Vehicle Value**

The base vehicle value is calculated by averaging the adjusted prices of the comparable vehicles.

**Step 4 - Calculate Loss Vehicle Adjustments**

There are four types of loss vehicle adjustments:

- Condition Adjustment:

  Adjustments to account for the condition of the loss vehicle prior to the loss.

- Prior Damage Adjustment:

  Adjustments to account for any prior damage present on the loss vehicle prior to the loss.

- After Market Part Adjustment:

  Adjustments to account for any after market parts present on the loss vehicle prior to the loss.

- Refurbishment Adjustment:

  Adjustments to account for any refurbishment performed on the loss vehicle prior to the loss.

**Step 5 - Calculate the Market Value**

The Market Value is calculated by applying the loss vehicle adjustments to the base value.

## *11 NYCRR § 216.7*

This document reflects those changes received from the   NY Bill Drafting Commission through July 26, 2019

*NY - New York Codes, Rules and Regulations  >  TITLE 11. INSURANCE DEPARTMENT  >  CHAPTER IX. UNFAIR TRADE PRACTICES  >  PART 216. (REGULATION 64) UNFAIR CLAIMS SETTLEMENT PRACTICES AND CLAIM COST CONTROL MEASURES*

## § 216.7 Standards for prompt, fair and equitable settlement of motor vehicle physical damage claims

This section is applicable to claims arising under motor vehicle collision and comprehensive coverages. The provisions of this Part shall continue to be applicable to these claims, except to the extent that such provisions are inconsistent with the specific provisions of this section. The sections of this Part that do not apply at all to motor vehicle physical damage claims are sections 216.2(b)-(d), 216.6(c), (h), and 216.9 of this Part.

**(a)**The following shall govern the construction of the terms used in this section:

**(1)**Agreed price shall mean the amount agreed to by the insurer and the insured, or their representatives, as the reasonable cost to repair damages to the motor vehicle resulting from the loss, without considering any deductible or other deductions.

**(2)**Designated representative (DR) shall mean an insured's broker of record or an insured's intended repair shop designated by the insured to represent the insured shop in negotiations with the insurer in an attempt to settle the claim. Such designated representative may legally act on the insured's behalf. If the designated representative is the insured's intended repair shop, such repair shop, if located within New York State, must be registered pursuant to the provisions of the Motor Vehicle Repair Shop Registration Act (article 12-A, Vehicle and Traffic Law), and may only represent the insured in negotiation of the amount necessary to repair the insured's damaged vehicle. The designation form must contain the repairer's registration number.

**(3)**Motor vehicle shall have the meaning ascribed in *section 311 of the Vehicle and Traffic Law*.

**(4)**Substantially similar vehicle shall mean a vehicle of the same make, model, year and condition, including all major options of the insured vehicle. Mileage must not exceed that of the insured vehicle by more than 4,000 miles or 10 percent of the mileage on the vehicle at the date of loss, whichever is greater.

**(5)**Business day shall mean a day other than Saturday, Sunday or a New York State legal holiday.

**(6)**Crash part means a part of a motor vehicle, which:

**(i)**is made of sheet metal, plastic, fiberglass or similar material, including a door, fender, panel, bumper, hood, floor or trunk lid, but not including windows or hubcaps; and

**(ii)**constitutes or provides support for the motor vehicle's exterior.

**(7)**Original equipment manufacturer or OEM means a motor vehicle manufacturer or distributor that produces or markets, under its own name, crash parts for use in motor vehicles that it manufactures or distributes under its own name.

**(8)**Non-original equipment manufacturer or non-OEM means a manufacturer or distributor (including any entity supplying the required warranty other than a manufacturer) that produces or



11 NYCRR § 216.7

markets, under its own name, crash parts for use in motor vehicles that it does not manufacture or distribute.

**(9)**Waste material means material defined as a liquid toxic waste or liquid hazardous waste material under federal or New York State environmental laws or regulations.

**(10)**Local market area shall mean a 100 mile radius, limited to within the United States, of the place of principal garagement of the insured's motor vehicle.

**(b) Adjustment of partial losses.**

**(1)**If, upon notification of a loss, the insurer intends to exercise its right to inspect damages prior to repair, it shall have six business days following receipt of notice of claim to inspect the insured's damaged motor vehicle, which is available for inspection, during normal business hours at a place and time reasonably convenient to the insured. In addition, negotiations shall commence and a good faith offer of settlement, sufficient to repair the vehicle to its condition immediately prior to the loss, shall be made within the aforesaid six-day period to the designated representative, and it may also be made to the insured. If there is no designated representative, the offer shall be made to the insured within the six-day period.

**(2)**Before negotiating a loss with the insured's designated representative, the insurer must receive written proof of such designation, properly executed and signed by the insured. The designated representative form shall be accepted by the insurer or its representative when it is offered by either the designated representative or the insured. Prior to negotiating a loss with a repair shop, the insurer shall ascertain the repair shop registration number and the currency of the registration. The insurer shall not knowingly negotiate a loss with an unregistered repair shop.

**(3)**The person inspecting the damaged vehicle on behalf of the insurer must be licensed or authorized, under article 21 of the Insurance Law, to negotiate the loss with the insured or the insured's designated representative. At the time of initial inspection, the person chosen by the insurer to inspect damages must attempt to enter into negotiations, involving the extent of damages, manner of repair and number of hours to repair the damaged vehicle, with the designated representative or, if no designated representative, the insured, in accordance with the following procedures:

**(i)**at the time of inspection, the insurer shall furnish a copy of its estimate, which at a minimum, must indicate the extent of known damages and manner of repair; or

**(ii)**if the insurer utilizes electronic data processing equipment to generate its repair estimate the insurer shall furnish, at the time of inspection, its estimate or a copy of its worksheet, which at a minimum, must indicate the extent of known damages and manner of repair or, in the alternative, such insurer may hand-deliver to the insured's designated representative or, if no designated representative, the insured, no later than 24 hours following the inspection, a copy of the insurer's detailed written estimate of the cost of repairing the damages resulting from the loss, specifying all appropriate deductions.

Within the aforesaid six-business-day period, the insured's designated representative or, if no designated representative, the insured shall, in all events, receive from the insurer a copy of the insurer's detailed written estimate of the cost of repairing the damages resulting from the loss, specifying all appropriate deductions.

**(4)**The insurer's repair estimate shall include, as a separate line item, the reasonable cost for proper disposal of waste material generated by painting the motor vehicle or crash part, in the following manner (or using another method that is acceptable to the superintendent as functionally equivalent):

**(i)**the cost per paint hour shall be calculated by dividing the repair shop's annual disposal fees for such waste material, after adjusting for reclaiming or recycling by the repair shop, by the number of hours expended annually to paint vehicles;

Jake Windley

11 NYCRR § 216.7

(ii)the reasonable cost for proper disposal of the waste material shall be calculated by multiplying the number of hours estimated to paint the vehicle by the cost by paint hour;

(iii)presentation of the manifest and invoice documenting a repair shop's disposal of and disposal cost for hazardous waste may be required by an insurer as a condition for this separate line itemization, and the failure of the repair shop to provide such documentation shall relieve the insurer from any consideration or inclusion of such disposal cost on an itemized basis within the repair estimate;

(iv)the reasonable cost shall not exceed the prevailing cost for such disposal in the geographic area of such repair; and

(v)a new repair shop may use the prevailing cost for disposal of hazardous waste in its geographic area during its first year in business.

(5)If the insurer's repair estimate is based upon the use of any non-OEM crash part:

(i)the estimate shall specify the non-OEM or non-OEM supplier;

(ii)the insurer shall not, without consent of the insured or the insured's designated representative, specify non-OEM crash parts from more than three different suppliers for any one repair;

(iii)the crash part shall equal or exceed the comparable OEM crash part in terms of fit, form, finish, quality and performance;

(iv)the crash part must be warranted by the non-OEM at least to the extent and duration as the comparable OEM crash part;

(v)the insurer shall specify only certified crash parts, in regard to any part that has been duly certified by a qualified certifying entity acceptable to the superintendent;

(vi)if the crash part has not been certified by a qualified certifying entity acceptable to the superintendent, the non-OEM must issue a written warranty, for at least the period of the insured's ownership of the vehicle, that the crash part equals or exceeds the comparable OEM crash part in terms of fit, form, finish, quality and performance; and

(vii)the insurer shall cause the damaged vehicle to be restored to its pre-loss condition consistent with the non-OEM warranty, at no additional cost to the insured and within a reasonable time, if the non-OEM fails to honor its warranty required in subparagraph (iv) or (vi) of this paragraph.

(6)In determining whether a certifying entity is qualified and acceptable for purposes of paragraph (5) of this subdivision, the superintendent shall consider the extent to which the entity:

(i)has adopted written standards containing conditions to be fulfilled by a manufacturer of crash parts;

(ii)tests, or contracts with an independent testing organization that tests, crash parts, using suitable equipment and techniques;

(iii)administers its certification program in a nondiscriminatory manner regarding any manufacturer or supplier of non-OEM crash parts;

(iv)provides a system to determine that certified non-OEM crash parts continue to conform with standards prescribed in subparagraph (5)(iii) of this subdivision and, failing to so conform, to decertify and advise crash part users of withdrawals of certification for any such part;

(v)provides mechanisms for quickly receiving inquiries and promptly resolving disputes that arise under the program in regard to consumers, insurers or repair shops;

11 NYCRR § 216.7

**(vi)** provides a means of identifying each certified non-OEM crash part and provides a system of security that guards against misuse of the identification;

**(vii)** provides updated lists of certified non-OEM crash parts on at least a quarterly basis; and

**(viii)** provides the superintendent with an annual report, and such other reports as the superintendent may require, highlighting any significant developments, problems or changes relating to certification procedures or requirements.

**(7)** Negotiations must be conducted in good faith, with the basic goal of promptly arriving at an agreed price with the insured or the insured's designated representative. If the insured's intended repair shop is not a designated representative of the insured, the insurer may also reach an agreement with that repair shop on the cost to repair the damaged vehicle, but that agreement shall not be binding upon the insured or the designated representative. Early in negotiations, the insurer must inform the insured's designated representative or, if there is no designated representative, the insured of all deductions that will be made from the agreed price. If an insurer shall require a proof of loss, its offer shall be communicated to the insured via a proof of loss. The insurer shall also communicate the offer to the designated representative.

**(8)** If the insurer fails to inspect the damaged motor vehicle during the aforementioned six-business-day period, it shall forfeit its right to inspect the damaged vehicle prior to repairs. Unless the insured or designated representative shall permit an inspection after the six-day period, negotiations shall be limited to labor and the price of parts and shall not, unless objective evidence to the contrary is provided by the insurer, involve disputes as to the existence of damage or the chosen manner of repair. For the above forfeiture-of-inspection provision to apply, the damaged vehicle must be available for inspection during normal business hours for the entire aforementioned six-business-day period.

**(9)** If a second inspection of the vehicle is required by the insurer in order to evaluate open items on the original estimate, or hidden damage discovered upon commencement of repairs, such inspection shall be performed within two business days following the date of notice of additional or hidden damage from either the insured or the DR. When repairs are sublet by the original repairer, thereby necessitating a reinspection at a location other than the original repairer's location, such reinspection must take place within four business days' notice, from either the insured or the DR, of additional or hidden damage. At the time of the subsequent inspection, the insurer shall furnish a copy of the insurer's detailed written estimate of the cost of repairing the damages resulting from the loss, specifying all appropriate deductions.

**(10)** If upon notification of a loss, the insurer, because of the minor amount of the loss as reported by the insured, requests an estimate of repairs from the insured in lieu of a physical inspection, such a request must be made within three business days of the notice of claim. The insured must receive notification that, upon receipt of the estimate, the insurer may for good reasons (e.g., estimate far exceeded original advice to insurer) elect to inspect the vehicle. Such inspection must be made within four business days following the receipt of the estimate at the claim processing office of the insurer. Such inspection shall be subject to the provisions of this section, except that the six-business-day forfeiture-of-inspection period specified in paragraph (8) of this subdivision shall become applicable after the four business days. A good faith offer of settlement sufficient to repair the vehicle to its condition immediately prior to the loss, must be made to the designated representative and, it may also be made to the insured within three business days of the receipt of the inspection and/or estimate. If there is no designated representative, the offer shall be made to the insured within the three-day period. If the insurer does not perform its own physical inspection, it is nevertheless bound by all the applicable requirements of this Part.

**(11)** Deductions for betterment and/or depreciation are permitted only for parts normally subject to repair and replacement during the useful life of the insured motor vehicle. Deductions for betterment and/or depreciation shall be limited to the lesser of:

11 NYCRR § 216.7

(i)an amount equal to the proportion that the expired life of the part, to be repaired or replaced, bears to the normal useful life of that part; or

(ii)the amount by which the resale value of the motor vehicle is increased by the repair or replacement. Calculations for betterment, depreciation and normal useful life must be included in the insurer's claim file.

(12)Deductions for previous damage or prior condition of the motor vehicle must be measurable, discernible, itemized and specified as to dollar amount, and such deductions must be detailed in the claim file. Such deductions shall be limited to the amount by which the resale value of the motor vehicle is increased by the elimination of the previous damage or the correction of the prior condition.

(13)Estimates of repairs prepared by insurers or their representatives shall contain the following information at a minimum: identity of policyholder and/or owner/claimant; owner/claimant's address and telephone number; identity of insurer, including name, address, license number and telephone number of adjuster; year, make, model, body style, mileage, VIN, license number, color and condition of the damaged vehicle. The estimate must also contain the claim number, the date of accident and the date the vehicle was inspected. Each item of damage must be detailed as to the paint, parts and labor hours it will require to repair that particular item. If the appraisal is made at a repair shop, the registration number of the shop must be included on the estimate form.

(14)

(i)If after negotiations an agreed price cannot be reached, the insurer must furnish the insured with a prescribed Notice of Rights letter (NYS APD 1), contained in section 216.12 of this Part. The requirement of this subparagraph shall not be applicable to a claim solely involving window glass.

(ii)The insurer must furnish the insured or the designated representative, at the express request of either, with the name and address of a New York State registered motor vehicle repairer, properly equipped to complete the repairs on the damaged motor vehicle (back-up shop), at a location reasonably convenient to the insured, who will repair the damaged motor vehicle at the insurer's estimated cost of repair. A location reasonably convenient to the insured shall mean: in Nassau, Suffolk and Westchester Counties and cities with 100,000 or more population, 10 miles--and in all other areas of the State, 25 miles--from the place where the motor vehicle is principally garaged; or the location of the insured's repair facility. This mileage limitation shall not apply when a repair facility properly equipped to complete the repairs is not available within the above geographical area. In such a case a properly equipped facility must be selected at a location as close as possible to the above definition of reasonably convenient to the insured. The insurer must furnish the insured, upon request, with a statement from the back-up shop that it will repair the vehicle in a manner consistent with the insurer's estimate for the amount estimated by the insurer to repair the damaged motor vehicle.

(15)If the insured's motor vehicle is repaired at a repair shop recommended by the insurer, for a sum estimated by the insurer as the reasonable cost to repair the vehicle, the insurer:

(i)shall select a repair shop that issues written guarantees that any work performed in repairing damaged motor vehicles meets generally accepted standards for safe and proper repairs;

(ii)shall cause the damaged vehicle to be restored to its condition prior to the loss, at no additional cost to the insured and within a reasonable time, if the repair shop it recommended does not repair the damaged motor vehicle in accordance with generally accepted standards for safe and proper repair; and

(iii)shall retain in its claim file a signed *section 2610 of the Insurance Law* Disclosure Statement (NYS APD 1-a), contained in section 216.12 of this Part, or other written documentation that the insured requested recommendation of a repair facility. If the insured has verbally requested

a recommendation of a repair facility prior to the issuance of the prescribed Notice of Rights form, the requirement for written proof of referral shall be satisfied by a notation in the claim files as to the date of such request and the identity of the person to whom such request was made. The requirement of this subparagraph shall not be applicable to a claim solely involving window glass.

**(16)  Salvage vehicle branding.**

**(i)**This paragraph shall be applicable to claims involving vehicles that are eight model years or newer on the date of the loss.

**(ii)**If the insurer determines that the cost to repair a damaged vehicle exceeds seventy-five percent of the vehicle's actual cash value and if the insurer does not take possession of the vehicle for disposition as salvage, the insurer shall require the vehicle owner to provide the title to the insurer. The insurer may withhold the entire claim payment, but must withhold at least fifty percent of its claim payment, after application of any deductible, until receipt of the title. The vehicle owner shall be advised by the insurer that the title is being requested in order to comply with subdivision (c) of Section 20.20 of the Regulations of the Commissioner of Motor Vehicles and that the title will be branded as "REBUILT SALVAGE" and will be returned to the owner by the Department of Motor Vehicles.

**(iii)**As soon as reasonably practicable, but no later than ten business days after receipt of the title from the vehicle owner, the insurer shall forward the title to the New York State Department of Motor Vehicles, Title Bureau, Empire State Plaza, Albany, NY 12228.

**(iv)**For the purpose of determining the vehicle's actual cash value pursuant to this paragraph, an insurer shall use the methods prescribed in subparagraph (c)(1)(i) or (iii) of this section; the value of repair parts shall be determined by using the current published retail cost of the original equipment manufacturer parts or the actual retail cost of the repair parts included on the insurer's repair estimate; and the labor cost shall be computed based upon hourly labor rate and time allocations that are consistent with the insurer's repair estimates in the community where the repairs are performed.

**(17)**The insurer must mail or hand-deliver its payment to the insured or the designated representative within five business days after the insured has accepted the insurer's offer, or three business days after the receipt of a completed proof of loss.

**(18)**The insured shall have the right to receive the proceeds of any settlement in accordance with policy provisions. However, if the insured agrees and this agreement is documented in the claim file, the insurer may make the check or draft payable to the insured and the lienholder and/or the insured's designated repairer. An insurer may not condition payment of a loss upon repair of the automobile or receipt of a completed Certification of Automobile Repairs.

**(19)**The following additional standards shall be applicable to the settlement of private passenger automobile physical damage claims:

**(i)**Subsequent to payment of the claim, the insurer, in accordance with the provisions of *section 3411(i) of the Insurance Law*, may request that the automobile be made available for inspection, whether or not the automobile is repaired. The inspection shall be conducted at a time and place reasonably convenient to the insured. The inspection report shall be retained in the insurer's claim file.

**(ii)**An insurer shall request submission of a Certification of Automobile Repairs (NYS APD 2), as contained in section 216.12 of this Part, signed and certified by the insured and the automobile repairer, under penalties of perjury, stating whether all items allowed by the insurer have been repaired and, if not, that repairs were made in accordance with the repairer's invoice. This form, together with a postage-paid return envelope, shall be given to the insured

11 NYCRR § 216.7

or the insured's designated representative by the insurer during the course of negotiation of the settlement amount.

**(iii)**The provisions of *section 3411(i) of the Insurance Law*, with respect to certification and repair invoices, do not apply where the amount of damage to the insured automobile is less than the deductible applicable to the policy.

**(20)**Pursuant to the requirements of *section 3411(l) of the Insurance Law*, whenever an insurer discovers any evidence of overcharging, improper repairs or adjustments, or any other wrongdoing by a motor vehicle repair shop, including its failure to permit an inspection of the repaired automobile, to sign the Certification of Automobile Repairs or to provide the insured with an itemized invoice, such evidence shall be forwarded, within 30 days, to:

New York State Department of Motor Vehicles

Division of Vehicle Safety

Governor Nelson A. Rockefeller Empire State Plaza

Albany, NY 12228 The insurer shall thereafter cooperate fully with the Department of Motor Vehicles in its investigation.

**(c)**Adjustment of total losses. (1) If the insurer elects to make a cash settlement, its minimum offer, subject to applicable deductions, must be one of the following:

**(i)**The average of the retail values for a substantially similar vehicle as listed in two valuation manuals current at the date of loss and approved by this department. Manuals approved for use are--The Redbook, published by National Market Reports Inc., and The N.A.D.A. Official Used Car Guide, published by the National Automobile Dealers Used Car Guide Company. The use of other manuals may be approved by this department upon demonstration of need and suitability. If it is evident that an option has not been considered in either or both of the above valuation manuals, the insurer shall consider the value, if any, of such option in arriving at the vehicle's value and shall utilize the best available method to value such option. The insurer may deduct documented, reasonable dealer preparation charges, up to $ 100, from the average of the retail values. The insurer shall provide to the insured, no later than the date of payment of the claim, a detailed copy of its calculation of the insured vehicle's total loss value, including the valuation of options which are not considered in the base price of the vehicle.

**(ii)**A quotation for a substantially similar vehicle, obtained by the insurer from a qualified dealer located reasonably convenient to the insured. A reasonable location shall be within 25 miles of the place of principal garagement of the motor vehicle. The substantially similar available vehicle must remain available for purchase by the insured for a period of three calendar days subsequent to receipt of notice of its availability by the insured, and the insured must be able to purchase the substantially similar vehicle at the quoted dealer for the insurer's cash offer plus applicable deductions. The insurer must maintain in its claim file the dealer's name and location, the vehicle identification number, the dealer stock number, the mileage and the major options for the substantially similar vehicle which was the basis of its quote. The notice to the insured of the availability of a substantially similar vehicle must be sent by certified mail, return receipt requested, or be a sound-recorded conversation reflecting the date of notice. The three calendar days commence on the date the insured acknowledges receipt of notice. The insured need not purchase the vehicle used as the basis of the insurer's quotation, since the quotation merely serves as a basis for the insurer's offer. The foregoing period is satisfied at the point an insured physically verifies the existence of the substantially similar available vehicle used as the basis of the insurer's quotation. Should the insurer's research of substantially similar vehicles determine that the retail values contained in the valuation manuals, prescribed in subparagraph (i) of this paragraph, are inadequate to purchase a substantially similar vehicle, the insurer's offer should be the amount determined by such research.

11 NYCRR § 216.7

**(iii)**A quotation obtained from a computerized database, approved by the superintendent, that produces statistically valid fair market values for a substantially similar vehicle, within the local market area that meets all the following minimum criteria:

   **(a)**it shall produce values for at least eighty-five percent of all makes and models of private passenger automobiles, as defined in section 67.1(a) of this Title, for the last 15 model years, and shall take into account the values of all major options for such vehicles;

   **(b)**it shall rely upon values derived from licensed dealers, which have minimum sales of 100 motor vehicles per year in the local market area for all vehicles of seven model years or less of age, and be based upon the physical inventory of vehicles sold within the 90 days prior to the loss and vehicles which are available; and

   **(c)**it shall monitor the average retail price of private passenger automobiles when there is insufficient data or inventory available from licensed dealers to ensure statistically valid local market area values.

**(iv)**If the method used in subparagraph (i), (ii) or (iii) of this paragraph would result in a settlement offer greater than the purchase price plus the cost of substantiated improvements paid by the insured for a vehicle purchased within the 180 calendar days prior to date of loss, the insurer's offer of settlement may be limited to the purchase price, plus the cost of any substantiated improvements, less the deductible. This method of settlement shall not be applicable to motor vehicles acquired by the insured through a private sale or as a gift. A private sale is one in which the seller does not engage in the sale of motor vehicles as an occupation.

**(v)**If it is not possible to value the damaged motor vehicle by using an alternative method as described in subparagraph (i), (ii), (iii) or (iv) of this paragraph, the insurer shall determine the retail value by the best available method and shall explain to the insured how its offer was calculated.

   **(2)**If the insurer elects to replace the vehicle, the replacement vehicle must be an immediately available, substantially similar vehicle that is both furnished and paid for by the insurer, subject to the deductible if any.

   **(3)**A private passenger automobile of the current model year means a current model year automobile that has not been superseded in the marketplace by an officially introduced succeeding model, or an automobile of the previous model year purchased new within 90 days prior to the date of loss. If the insured vehicle is a private passenger automobile of the current model year, the insurer shall pay to the insured the reasonable purchase price to the insured on the date of loss of a new identical vehicle, less any applicable deductible and an allowance for depreciation in accordance with the schedule below, except where the utilization of this method of settlement would result in a lower claim payment as compared with the utilization of the methods described in subparagraphs (1) (i), (ii) and (iii) of this subdivision.

DEPRECIATION SCHEDULE

| Purchase price | Depreciation per mile |
|---|---|
| Up to $ 10,000 | $15 |
| $ 10,001 to $ 15,000 | .20 |
| $ 15,001 to $ 20,000 | .25 |
| $ 20,001 to $ 25,000 | .30 |
| $ 25,001 to $ 30,000 | .37 |
| $ 30,001 to $ 35,000 | .45 |
| More than $ 35,000 | .53 |

   **(4)**Right of recourse. If, within 35 calendar days after mailing of the claim payment, the insured notifies the insurer in writing that the insured cannot purchase a comparable vehicle for the market value, as determined under the provisions of subparagraph (1)(i), (ii), (iii) or (v) or

11 NYCRR § 216.7

paragraph (3) of this subdivision, the insurer shall reopen its claim file and shall offer, in its discretion and subject to applicable deductions, one of the following options to the insured:

(i)the insurer shall identify and offer for settlement an amount sufficient to purchase a substantially similar vehicle, as provided in subparagraph (1)(ii) of this subdivision; or

(ii)the insurer shall pay the insured the difference between the amount of its claim payment and the cost of a substantially similar vehicle, as provided in subparagraph (1)(ii) of this subdivision, located by the insured, or the insurer, upon consent of the insured, may purchase that vehicle for the insured.

(5)The insurer shall not be required to take action under paragraph (4) of this subdivision if its documentation to the insured at the time of its final offer included written notification of the availability of a substantially similar vehicle, as provided in subparagraph (1)(ii) of this subdivision, which shall have been available for at least three calendar days subsequent to the insured's receipt of that offer. The documentation shall include the vehicle identification number, the stock number or order number.

(6)If the insurer in the process of adjusting a total loss makes a deduction for the salvage value of the insured vehicle, the insurer must furnish the insured, upon the insured's request, with the name and address of a licensed or certified salvage dealer or dismantler who will purchase the salvage for the amount deducted with no additional charges to the insured by the salvage dealer or dismantler.

(7)All applicable provisions of subdivision (b) of this section ("adjustment of partial losses") also shall apply to the adjustment of total losses, except that the insurer shall be allowed an additional five business days to comply with the requirements of paragraph (1) of subdivision (b) of this section. In the case of an unrecovered theft loss, except as provided in section 216.8 of this Part, the insurer shall make its offer for the total loss no later than the 25th calendar day following the notice of loss, if the insured has provided all information that has been requested by the insurer that is necessary to value the claim. If the insured has not provided such information by the 25th calendar day following the notice of loss, the insurer shall make its offer no later than the 5th business day following receipt of such information.

(8)This subdivision does not prohibit an insurer from issuing a stated value policy insuring against physical damage, where the amount of damages to be paid in the event of a total loss is a specified dollar amount.

(9)The superintendent shall review the operation and efficacy of the total loss provisions of this subdivision at least every five years.

(d)Unreasonable delay.

(1)Unless clear justification exists, no more than 20 percent of a representative sample of the physical damage claims selected by Department of Financial Services' examiners at any office or offices of the insurer shall have a payment period in excess of 30 calendar days. A payment period is the period between the date of receipt of notice of loss by the insurer and:

(i)the date the settlement check is mailed; or

(ii)the date on which the damaged motor vehicle is replaced by the insurer.

If an insurer is in violation of this overall standard, then each such claim in excess of 30 calendar days may be treated as a separate violation.

(2)If any element of a physical damage claim remains unresolved more than 30 calendar days from the date of receipt of notice by the insurer, the insurer shall provide the insured with a written explanation of the specific reasons for delay in the claim settlement. Unless the matter is in litigation, an updated letter of explanation shall be sent every 30 calendar days thereafter until all elements of the claim are either honored or rejected.

11 NYCRR § 216.7

**(3)**Any letter of explanation or rejection of any element of a claim shall contain the identity and claims processing address of the insurer, the insured's policy number, the claim number and the following statement, prominently set forth:

"Should you wish to take this matter up with the New York State Department of Financial Services, you may file with the Department either on its website at: *HTTP://WWW.DFS.NY.GOV/CONSUMER/FILEACOMPLAINT.HTM* or you may write to or visit the Consumer Assistance Unit, Financial Frauds and Consumer Protection Division, New York State Department of Financial Services, at: One State Street, New York, NY 10004; One Commerce Plaza, Albany, NY 12257; 1399 Franklin Avenue, Garden City, NY 11530; or Walter J. Mahoney Office Building, 65 Court Street, Buffalo, NY 14202."

**(e)**Repair estimates. If an insurer requires that its insured obtain an estimate or estimates of vehicle damage, the reasonable cost, if any, of such estimates shall be borne by the insurer.

**(f)**Loss of use. In the event of the theft of the entire vehicle, it shall be the duty of the insurer at the time of notification of loss to advise the insured of his right under the policy to be reimbursed for transportation expenses. Such notification must be confirmed in writing immediately after receipt of notice of theft. All conditions and benefits related to this coverage as stated in the policy must be contained in the notification to the insured.

**(g) Subrogation agreements.**

**(1)**Where an insured has received payment under a physical damage coverage that is subject to a deductible, the insured shall share, pro rata, with the insurer any net recovery received by the insurer from third parties. Within 30 calendar days of such recovery, the insurer must mail or hand-deliver to the insured its payment for the insured's pro rata share of the recovery.

**(2)**Net recovery shall be the total recovery less the insurer's allocated loss adjustment expenses attributable to such recovery. The formula for computing net recovery and the insured's share of recovery of the deductible may be stated as follows:

**(i)**TOTAL RECOVERY - ALLOCATED LOSS ADJUSTMENT EXPENSES = NET RECOVERY

**(ii)**DEDUCTIBLE/TOTAL LOSS x NET RECOVERY = INSURED'S SHARE OF NET RECOVERY

Application of Formula: Assume a loss of $ 500 subject to a $ 100 deductible with $ 50 in allocated loss adjustment expenses:

**(a)**if there is full recovery of $ 500:

computation of net recovery: $ 500 - $ 50 = $ 450 computation of insured's share of recovery: $ 100/$ 500 x $ 450 = $ 90

**(b)**If there is a partial recovery of $ 300:

computation of net recovery: $ 300 - $ 50 = $ 250 computation of insured's share of recovery: $ 100/$ 500 x $ 250 = $ 50

**(3)**Unless the insurer returns its insured's full deductible, it shall attempt to effect full recovery in clear liability cases and shall not enter into any intercompany agreements that provide for the acceptance of lesser amounts on a formula basis.

**(4)**If an insurer has paid a physical damage claim that is subject to a deductible and it has elected to pursue its subrogation claim, the insurer shall promptly attempt to effect recovery. If a dispute arises between two or more insurers regarding the subrogation recovery, and the insurers are unable to resolve it, the insurer seeking recovery shall submit the dispute to binding arbitration or a court action shall be commenced no later than 180 calendar days following the payment of the claim to its insured.

11 NYCRR § 216.7

**(5)** If an insurer has paid a physical damage claim that is subject to a deductible and it is pursuing its subrogation claim, the insurer shall notify its insured in writing of the status of its claim 120 calendar days after the date of the claim payment to its insured. An updated status letter shall be sent every 120 calendar days thereafter until the claim is either honored or rejected.

**(6)** If an insurer has paid a physical damage claim that is subject to a deductible and it elects not to pursue its subrogation claim where the possibility of recovery exists, the insurer shall so notify its insured in writing within 60 calendar days after it has paid the claim, except that the notification shall be given at least 30 days prior to the running of any applicable statute of limitations or period required for notice of claim. If an insurer does not notify its insured within the time periods prescribed above and the statute of limitations or period required for notice of claim has expired, the insurer shall forthwith remit to its insured the full amount of the insured's deductible.

**(h)** Referral of insured to the "at fault" party. There shall be no attempt to discourage an insured from filing a physical damage claim nor shall an insurer encourage its insured to assert a claim against a third party in lieu of filing a physical damage claim under the insured's policy.

## Statutory Authority

**Section statutory authority:**

Vehicle & Traffic Law, § T3A12-A. Section statutory authority: *Vehicle & Traffic Law, § 311*. Section statutory authority: Insurance Law, § T5A21. Section statutory authority: *Insurance Law, § 2610*. Section statutory authority: *Insurance Law, § 3411*

**Statutory authority:**

*Insurance Law, §§ 201, 301, 305(a), 2601, 2610, 3411, 3412*

## History

Repealed and added 216.7 on 5/12/82; amended 216.7 on 9/04/84; amended 216.7 on 12/31/84; amended 216.7(a) on 5/01/93; added 216.7(a)(10) on 11/08/95; amended 216.7(b) on 5/01/93; added 216.7(b)(16) on 9/15/99; amended 216.7(b)(16) on 4/23/97; renumbered 216.7(b)(16) to be (17) on 9/15/99; amended 216.7(b)(17) on 4/23/97; renumbered 216.7(b)(17) to be (18) on 9/15/99; amended 216.7(b)(18) on 4/23/97; renumbered 216.7(b)(18) to be (19) on 9/15/99; renumbered 216.7(b)(19) to be (20) on 9/15/99; amended 216.7(c) on 11/08/95; amended 216.7(c)(7) on 4/23/97; amended 216.7(d)(3) on 2/04/98; amended 216.7(d)(3) on 3/05/03; amended 216.7(d)(3) on 6/18/03; amended 216.7(d) on 2/27/13; amended 216.7(d) (effective 04, 01, 13) on 3/20/13; amended 216.7(d)(3) on 2/01/17. Added Part 194 on 2/01/17.

NEW YORK CODES, RULES AND REGULATIONS

End of Document



EXHIBIT
Myritt 15
4/1/22

Dimished Value Appraisal        Farm & Heavy        Expert Witness        Asset Recovery

Private Owners        Classic Cars        Lenders        Insurance

# About East Coast Auto Appraisers













East Coast Auto Appraisers specializes in providing independent and accurate appraisals of cars, trucks, motorcycles, boats, RVs, and other motorized vehicles. Owner Jason Merritt has developed an array of professional skills over the years, which enables East Coast Auto Appraisers to provide the most thorough and accurate appraisals in the area.

Jason has two decades of experience as a state police officer and has conducted thousands of car crash investigations. In addition, in his role as a Maryland state vehicle inspector, he performed thousands of vehicle inspections. Based in Cumberland, Maryland, Jason also has vast experience in body work and auto sales. All his experiences make Jason a well-rounded, knowledgeable appraiser who won't miss small details that could make a big difference in an appraisal.

Contact Us Today!



*Jason Merritt and Family*





Home

Our Services

About Us

What Is an Appraisal?

Why Use an Independent
Appraiser?

Privacy Policy

Contact Us

**EXPERIENCE TO MAKE
THE DIFFERENCE**

Our experts have over 35
years of experience in all
aspects of the motor vehicle
industry, and we've seen it
all. We are located in
Cumberland, MD, and are
experienced in the major
east coast auto markets.
Turn to us to get the most
accurate assessment of your
vehicle, and have the
confidence to know where
you stand in any transaction!

East Coast Auto Appraisers

Reach out to us today and find out how we can help you.

EAST COAST AUTO APPRAISERS © 2022

Dimished Value Appraisal     Farm & Heavy     Expert Witness     Asset Recovery

Private Owners     Classic Cars     Lenders     Insurance

# Get the Complete Rundown of All the Appraisal-Related Services We Provide to the eastern United States:







- Standard Auto Appraisals
- Classic Car Appraisals



3/22/22, 3:05 PM                                      Our Services - East Coast Auto Appraisers

- Motor Home Appraisals (RVs)
- Motorcycle Appraisals
- Large Truck Appraisals
- Boat Appraisals
- Misc. Land and Marine Vehicle Appraisals
- Bank Loan Appraisals
- Pre-Purchase Inspections
- Insurance Policy Appraisals
- Gap Insurance Appraisals
- Lease Turn-in Appraisals
- Bankruptcy Appraisals
- Consumer Protection
- Mechanics Liens
- Loss of Use Appraisals
- Actual Cash Value Appraisals
- Diminished Value Appraisals
- Fair Market Value Appraisals
- Property Damage/Collision Estimates
- Total Loss/Stolen Vehicle Appraisals
- Standard Presumptive Value Appraisals
- Post-Repair Inspections
- Undisclosed Damage Inspections
- Bonded Title Appraisals/Surety Bonds
- Charitable Donation Appraisals for IRS Tax Form 8283
- Business Asset Appraisals
- Extended Warranty Inspections



3/22/22, 3:05 PM                                             Our Services - East Coast Auto Appraisers

Contact Us Today!



Home

Our Services

About Us

What Is an Appraisal?

Why Use an Independent
Appraiser?

Privacy Policy

Contact Us

### EXPERIENCE TO MAKE
### THE DIFFERENCE

Our experts have over 35
years of experience in all
aspects of the motor vehicle
industry, and we've seen it
all. We are located in
Cumberland, MD, and are
experienced in the major
east coast auto markets.
Turn to us to get the most
accurate assessment of your
vehicle, and have the
confidence to know where
you stand in any transaction!

Reach out to us today and
find out how we can help
you.

EAST COAST AUTO APPRAISERS © 2022

# EXHIBIT G

Memorandum of Law in Support of
Defendants' Motion to Exclude the Report and
Testimony of Jason Merritt

3/22/22, 3:04 PM                                    What is an Appraisal? – East Coast Auto Appraisers



Dimished Value Appraisal        Farm & Heavy        Expert Witness        Asset Recovery

Private Owners        Classic Cars        Lenders        Insurance



# What Exactly Is an Appraisal?

East Coast Auto Appraisers follows a detailed, comprehensive process when conducting an appraisal. Steps include but are not limited to vehicle identification number (VIN) verification, a vehicle history report, and an assessment of the vehicle's make, model, options/features, mileage, and overall condition, which includes mechanical issues, general wear, and interior and exterior cosmetic blemishes. Other factors, depending on the purpose of the appraisal, may include an assessment of the area's supply

3/22/22, 3:04 PM                          What Is an Appraisal? – East Coast Auto Appraisers

and demand of the specific make and model of the vehicle.

## Contact Us Today!



Home

Our Services

About Us

What Is an Appraisal?

Why Use an Independent Appraiser?

Privacy Policy

Contact Us

### EXPERIENCE TO MAKE THE DIFFERENCE

Our experts have over 35 years of experience in all aspects of the motor vehicle industry, and we've seen it all. We are located in Cumberland, MD, and are experienced in the major east coast auto markets. Turn to us to get the most accurate assessment of your vehicle, and have the confidence to know where you stand in any transaction!

Reach out to us today and find out how we can help you.

EAST COAST AUTO APPRAISERS © 2022

Dimished Value Appraisal    Farm & Heavy    Expert Witness    Asset Recovery

Private Owners    Classic Cars    Lenders    Insurance

# Diminished Value Appraisals

When you have been involved in an accident and your vehicle has been repaired—even back to its pre-accident conditions—your vehicle has a diminished value.

*A diminished value appraisal will provide you with a report of the difference in market value of the vehicle before and after the accident and repairs.*



## – CASE STUDY –

Ben Z. Hudson, NY



**INCIDENT**
1992 Toyota MR2 involved in an accident

**INSURANCE**
Total loss, offer of $5,900

**EAST COAST ACTION**
East Coast Auto Appraisers did a thorough

## – CASE STUDY –

Dave L. Cumberland, MD



**INCIDENT**
2010 Dodge Challenger struck while driving. Thorough repair by body shop.

**INSURANCE**
Covered repairs for $5,000. There were some new

3/22/22, 3:08 PM    Diminished Value Appraisal - East Coast Auto Appraisers

Simply put, thousands of dollars are at stake. An accurate, third-party diminished value report can give you the evidence you need to help you recoup the lost value of your vehicle when filing a claim against the at-fault driver's insurance company.

An auto accident and subsequent repairs can be stressful enough. Let East Coast Auto Appraisers ease your mind by providing you with an accurate, third-party diminished value report that you can use to help recover lost market value from the at-fault insurance company.

analysis and after extensive research established a comprehensive value for the car. East Coast then presented my revised case to the insurance company.

**RESULT**
**The insurance company settled with me and I received $11,900 for the car. This allowed me to recover my investment and move to another vehicle.**

**CLIENT REPORT**
*Thanks to East Coast Auto Appraisers! They went the extra mile and helped me to recover thousands in lost value!*

issues with the car and it was decided to trade. After the accident, the value of the car plummeted and the trade did not come close to the loan payoff. The insurance company said it had done all it could to help.

**EAST COAST ACTION**
Several appraisers I contacted said it wasn't worth getting a diminished value appraisal. Then I called East Coast and Jason came to my house and did a thorough appraisal.

**RESULT**
**The insurance company paid me an additional $2,750,**

3/22/22, 3:08 PM                    Diminished Value Appraisal - East Coast Auto Appraisers

**allowing me to complete the pay off and trade on a newer car.**

### CLIENT REPORT

*When other companies wouldn't come through, East Coast Auto Appraisers did. Thank you for a job well done!*

Home

Our Services

About Us

What Is an Appraisal?

Why Use an Independent Appraiser?

Privacy Policy

Contact Us





EXPERIENCE TO MAKE THE DIFFERENCE

Our experts have over 35 years of experience in all aspects of the motor vehicle industry, and we've seen it all. We are located in Cumberland, MD, and are experienced in the major east coast auto markets. Turn to us to get the most accurate assessment of your vehicle, and have the confidence to know where you stand in any transaction!

Reach out to us today and find out how we can help you.

EAST COAST AUTO APPRAISERS © 2022