## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| MATTHEW THURSTON, KATHERINE BRIDGES, and GENEVIEVE MCDONALD, individually and on behalf of others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Docket No. 1:22-cv-00375-NT |
| PROGRESSIVE CASUALTY INSURANCE COMPANY and UNITED FINANCIAL CASUALTY COMPANY, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before me is Defendants Progressive Casualty Insurance Company and United Financial Casualty Company's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (ECF No. 121). For the reasons stated below, the motion is **GRANTED**.

## BACKGROUND[1]

Plaintiffs Matthew Thurston, Katherine Bridges, and Genevieve McDonald (the "**Plaintiffs**") had automobile insurance through Defendants Progressive

---

[1]    I recite the facts based on the record before me and in the light most favorable to the Plaintiffs as the nonmoving parties on summary judgment. *See Dixon-Tribou v. McDonough*, 86 F.4th 453, 455 (1st Cir. 2023). Where I have recited a fact not admitted in the parties' statement of material facts, I have done so consistent with its record support and in the light most favorable to the Plaintiffs. *See id.*; D. Me. Local R. ("**L.R.**") 56. Quite relevantly for this motion, I note that I "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." L.R. 56(f). And although I have "no independent duty to search or consider any

Casualty Insurance Company ("**Progressive**") and United Financial Casualty Company ("**UFCC**") (together, the "**Defendants**").[2] Pls.' Declarations Pages (ECF No. 94-1). From 2019 to 2023, each Plaintiff was in a serious car accident and filed a claim with the Defendants. Pls.' Resp. to Defs.' Reqs. to Strike ("**SMF**") ¶¶ 5, 11, 17–20, 26–27; Bridges Dep. 44:14–45:10 (ECF No. 120-11). Each of their vehicles was deemed a "total loss." SMF ¶¶ 13, 26; McDonald Dep. 45:2–45:7, 48:14–45:20 (ECF No. 120-12).

The Defendants had issued a Maine Auto Policy (the "**Policy**") to each of the Plaintiffs, which promised to pay the Plaintiffs the "actual cash value" ("**Actual Cash Value**") of their total loss vehicles. SMF ¶ 1; Policy (ECF No. 120-9). The Policy defined Actual Cash Value as "replacement cost at the time the loss occurs, less the value of its physical depreciation as determined by standard business practices." SMF ¶ 1; Policy at 19. The Policy allowed the Defendants to calculate Actual Cash Value by using "estimating, appraisal, or injury evaluation systems to assist . . . in determining the amount of damages, expenses, or loss payable." Policy 24. These "systems may be developed by [the Defendants] or a third party and may include computer software, databases, and specialized technology." Policy 24. This case

---

part of the record not specifically referenced in a statement of facts," *id.*, at times, I did venture beyond the statements of facts into the record to identify basic background facts.

[2]    As explained below, I need not resolve the Defendants' argument that Progressive Casualty Insurance Company ("**Progressive**") is not a proper party in this case. *See* Defs.' Mot. for Summ. J. ("**Defs.' Mot.**") 19–20 (ECF No. 121). Accordingly, I refer to Progressive and United Financial Casualty Company ("**UFCC**") as "the Defendants" throughout this order.

concerns the Projected Sold Adjustment ("**PSA**"), which is one component of the Defendants' Actual Cash Value calculations.

In October of 2022, Plaintiff Matthew Thurston filed a class action complaint in state court alleging that the Defendants had underpaid him and others similarly situated for claims on their vehicles. First Am. Class Action Compl. ("**First Am. Compl.**") (ECF No. 1-2). Thurston's first amended complaint asserted three claims under Maine law: Unfair Claim Settlement Practices (Count I), Unfair Trade Practices Act (Count II), and Conversion (Count III). First Am. Compl. ¶¶ 55–67. The Defendants removed the matter to this Court and filed a motion to dismiss or, in the alternative, to compel appraisal and stay the proceedings. Notice of Removal (ECF No. 1); Defs.' Mot. to Dismiss or, in the Alternative, to Compel Appraisal and Stay the Proceedings (ECF No. 12).

In June of 2023, I granted the Defendants' motion to dismiss the conversion claim (Count III) but denied the motion as to the claims for Unfair Claims Settlement Practices (Count I) and Unfair Trade Practices (Count II). *Thurston v. Progressive Cas. Ins. Co.*, No. 1:22-cv-00375-NT, 2023 WL 4083232, at *6–10 (D. Me. June 20, 2023). I also denied the Defendants' request to stay these proceedings and compel appraisal. *Id.* at *6. Accordingly, the case proceeded to discovery.

In February of 2024, Thurston moved for class certification under Federal Rule of Civil Procedure 23. Mot. for Class Certification (ECF No. 47). The same day, Thurston also moved to amend his complaint to add additional plaintiffs Katherine Bridges and Genevieve McDonald. Mot. to Amend Pl.'s First Am. Class Action Compl.

(ECF No. 48). Separately, Bridges and McDonald filed a motion to intervene under Federal Rule of Civil Procedure 24. Genevieve McDonald and Katherine Bridges' Mot. to Intervene Under Fed. R. Civ. P. 24(a) or Fed. R. Civ. P. 24(b) (ECF No. 54). The Magistrate Judge denied Thurston's late attempt to amend because he failed to show good cause under Federal Rule of Civil Procedure 16(b). Order on Mot. to Amend and Mot. to Intervene 2–3 (ECF No. 73). The Magistrate Judge granted McDonald and Bridges' motion to intervene under Federal Rule of Civil Procedure 24(b), and permitted Thurston, McDonald, and Bridges to file a single amended complaint, which they did days later. Order on Mot. to Amend and Mot. to Intervene 3–6 & n.2; Second Am. Class Action Compl. ("**Second Am. Compl.**") (ECF No. 76).

The Magistrate Judge then held a status conference with the parties to adjust deadlines. Minute Entry (ECF No. 78). The conference resulted in an extension of certain discovery deadlines, termination of the pending motion for class certification, and a new deadline set for the now-three Plaintiffs to file an amended motion for class certification. Order (ECF No. 80). In September of 2024, the Plaintiffs filed their amended motion for class certification. Pls.' Am. Mot. for Class Certification (ECF No. 89).

In December of 2024, the Defendants filed notice pursuant to Local Rule 56(h) that they intended to move for summary judgment, and the parties jointly notified the Court of their intention to file *Daubert/Kumho* motions to exclude each other's expert witnesses. Joint Mot. to Amend the Schedule and Notice Pursuant to Local Rule 56(h) (ECF No. 98). From there, the Plaintiffs filed a motion to strike the

amended declaration of Philip Kroell (which the Defendants offered with their opposition to the Plaintiffs' amended motion for class certification) (ECF No. 103), a motion to exclude the expert testimony of David Kinney (ECF No. 110), a motion to exclude the expert testimony of Dr. Jonathan Walker (ECF No. 112), and a motion to exclude the expert testimony of Marc Spizzirri (ECF No. 113). The Defendants filed a motion to exclude the expert report and testimony of Jason Merritt (ECF No. 109), and a motion for summary judgment (ECF No. 121). In this order I address the motion for summary judgment, as my resolution of that motion makes it unnecessary to resolve the others.[3]

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it could affect the outcome of the case." *Beijing Abace Biology Co., Ltd. v. Zhang*, 122 F.4th 448, 452 (1st Cir. 2024). "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point

---

[3]    In a recent summary judgment decision, the First Circuit approved and adopted the district court's approach of accepting arguendo that the non-moving party's expert testimony would be admissible over objection, since even with that testimony, summary judgment for the movant was warranted. *Hoover v. Hyatt Hotels Corp.*, 99 F.4th 45, 59 (1st Cir. 2024). This approach was acceptable, in part because it favored the nonmovant. *Id.* I have adopted a similar approach here. When evidence subject to one of the pending motions to exclude was cited in a statement of fact relevant to my analysis, I assumed without deciding that the Plaintiffs, as the summary judgment nonmovants, would prevail on their motion (or their opposition to the Defendants' motion). This means I assumed that the Plaintiffs would succeed in excluding the amended declaration of Philip Kroell, the expert testimony of David Kinney, the expert testimony of Dr. Jonathan Walker, and the expert testimony of Marc Spizzirri. I further assumed that the Plaintiffs would succeed in opposing the Defendants' efforts to exclude the expert report and testimony of Jason Merritt, so I considered his expert report and testimony as part of the summary judgment record. Consistent with *Hoover*, this approach makes sense here, because the Plaintiffs cannot defeat summary judgment even if their expert evidence is admitted and the Defendants' challenged evidence is excluded.

in favor of the nonmoving party.' " *Id.* (quoting *Rivera-Muriente v. Agosto-Alicea*, 959 F.2d 349, 352 (1st Cir. 1992)). At the summary judgment stage, I do not "weigh the evidence and determine the truth of the matter," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), but instead view the evidence in the light most favorable to the nonmoving party and determine whether the record presents a genuine issue for trial. *Sevelitte v. Guardian Life Ins. Co. of Am.*, 123 F.4th 53, 59 (1st Cir. 2024).

The party moving for summary judgment "bears the initial responsibility" of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden may be met by pointing to "evidence that negates an essential element of the non-moving party's claim," or "using evidentiary materials already on file [to] demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial." *Ocasio-Hernández v. Fortuño-Burset*, 777 F.3d 1, 4–5 (1st Cir. 2015) (internal quotations and citation omitted). If the moving party meets its burden, "the non-moving party must come armed with some evidence to show that a reasonable jury could find for them." *Guldseth v. Fam. Med. Assocs. LLC*, 45 F.4th 526, 534 (1st Cir. 2022). A non-moving party's "failure to produce any evidentiary proof concerning one of the essential elements of his claim is grounds for summary judgment." *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 226 (1st Cir. 2013). By the summary judgment phase of litigation, non-moving parties must have amassed sufficient evidence from which a reasonable jury could find in their favor on each element required to prove their claims.

Under this District's Local Rules, this evidence must be set forth in a supporting statement of material facts with specific record citations. D. Me. Local R. ("**L.R.**") 56(f). Motions for summary judgment "must be supported by a separate, short, and concise statement of material facts." L.R. 56(b)(1). The statement of material facts is a crucial document in our summary judgment practice. Indeed, "[t]he Court has no independent duty to search or consider any part of the record not specifically referenced in a statement of facts." L.R. 56(f). The responsibility lies with the parties to set forth the facts they view as undisputed and material for purposes of resolving the summary judgment motion. L.R. 56(b)(1), (c). Equally important, each statement of fact must be supported by a specific record citation. L.R. 56(b)(1), (c), (f). This requirement has teeth because "[t]he Court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." L.R. 56(f). And relatedly, "[f]acts in a supporting or opposing statement of material facts, if supported by record citations, will be deemed admitted unless properly controverted." L.R. 56(g)(1). The record evidence submitted with motions for summary judgment can be quite vast. Our Local Rule 56 requires the parties to corral this evidence into a statement of material facts supported by specific record citations. Parties ignore this requirement at their peril.

## DISCUSSION

I now turn to the Defendants' summary judgment arguments. The Defendants first argue that the Plaintiffs' claims fail because they did not put forward evidence of underpayment, which means they have not established Article III standing. The

7

Defendants next assert that even if the Plaintiffs have standing, they have not generated sufficient evidence to support their claims.

## I.    Standing[4]

Article III of the United States Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' " *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2). To justify their proper place in federal court, plaintiffs must show three things: (1) injury; (2) causation; and (3) redressability. *Id.*

The Defendants assert that the Plaintiffs cannot show any injury because their expert witness, Jason Merritt, did not appraise the Plaintiffs' totaled vehicles or otherwise provide an independent assessment of their values. Defs.' Mot. for Summ. J. ("**Defs.' Mot.**") 9 (ECF No. 121); *see also* Defs.' Reply in Supp. of Mot. for Summ. J. 2–4 (ECF No. 139). But this argument misses the point. The Plaintiffs' only challenge to the Defendants' valuation is the application of the PSA. Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. ("**Pls.' Opp'n**") 6 (ECF No. 132). And the Plaintiffs' Vehicle Valuation Reports support their assertion that the application of the PSA caused monetary injury. Thurston Valuation Report (ECF No. 120-10 at #4021–4022); Bridges Valuation Report (ECF No. 120-11 at #4152–4159); McDonald Valuation Report (ECF No. 120-12 at #4283–4286) (collectively, the "**Valuation Reports**"). If the Defendants had not applied the PSA, each Plaintiff would have been paid more

---

[4]    The Defendants frame their arguments on the lack of evidence of underpayment in terms of both Article III standing and the failure to meet an essential element of each of the asserted claims. Defs.' Mot. 7–10. I address Article III standing in this section, and the merits of the Plaintiffs' claims below.

for their totaled vehicle. This satisfies Article III's injury requirement. *See TransUnion LLC*, 594 U.S. at 425 (explaining that "monetary harm[ ]" is one of "[t]he most obvious" Article III injuries); *see also Jama v. State Farm Mut. Auto. Ins. Co.*, 113 F.4th 924, 937 (9th Cir. 2024), *cert. denied sub nom. State Farm Auto Ins. v. Jama*, No. 24-933, 2025 WL 1678989 (U.S. June 16, 2025) (finding insurance company's application of a "negotiation adjustment" that lowered the dollar amount plaintiffs received was "'a classic pocketbook injury sufficient to give a plaintiff standing'") (quoting *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023)). Because I conclude that the Plaintiffs have met the threshold requirements for standing, I proceed to the merits.

## II.    Merits

The Plaintiffs claim the Defendants violated Maine's Unfair Claim Settlement Practices Act, 24-A M.R.S. § 2436-A ("**UCSPA**"), and the Maine Unfair Trade Practices Act, 5 M.R.S. § 207 ("**UTPA**") by failing to pay the Actual Cash Value for their totaled vehicles as the Policy promised. Second Am. Compl. ¶¶ 77–84. As the Plaintiffs themselves note, their theory of the case is straightforward: "Defendants systematically underpaid Plaintiffs' total-loss claims by applying an unsound PSA that automatically reduced the [Actual Cash Value] they owed Plaintiffs under their policies." Pls.' Opp'n 2. The Plaintiffs' success or failure on defeating the Defendants' motion for summary judgment thus largely hinges on whether they have supported their assertion that the PSA is unsound—and accordingly, that by applying it the Plaintiffs did not get Actual Cash Value for their totaled vehicles—with citations to "record material properly considered on summary judgment." L.R. 56(f).

The Defendants contend that the Plaintiffs have not generated sufficient evidence to support essential elements on either the UCSPA or the UTPA claim. Defs.' Mot. 11–16. They further claim that the only evidence that the Plaintiffs marshal to attack the PSA methodology—Merritt's testimony and expert report—is both irrelevant and unsupported by the record. Def.'s Mot. 11–13. Because the Plaintiffs must show a genuine dispute on the unsoundness of the PSA methodology, I begin by assessing the facts in support of that claim.

### A.      Identifying the Relevant Facts

The only coherent overview of the valuation process, including the use of the PSA, in the statement of facts is based on the Defendants' amended declaration from Philip Kroell. *See* SMF ¶¶ 35–41. At the Plaintiffs' request, however, I am not considering those facts. *See supra* n.3. That leaves me with the Plaintiffs' Valuation Reports, which provide an explanation of the overall process of determining the Actual Cash Value of a total loss vehicle. These Valuation Reports were prepared by Mitchell International, Inc. ("**Mitchell International**") using "WorkCenter Total Loss" ("**WCTL**") software and they describe a five-step process to reach the Actual Cash Value.[5] Valuation Reports. First, the WCTL software "locate[s] vehicles that are the closest match to the loss vehicle in the same market area." McDonald Valuation Report at #4287. Second, the WCTL software "make[s] adjustments to the prices of the comparable vehicles." McDonald Valuation Report at #4287. These adjustments include the PSA, as well as adjustments based on differences in mileage

---

[5]      There are some differences among the Valuation Reports, which I note where relevant.

and equipment between the loss vehicle and comparable vehicle. McDonald Valuation Report at #4287. Third, the WCTL software calculates the "base vehicle value" for the loss vehicle "by averaging the adjusted prices of the comparable vehicles." McDonald Valuation Report at #4287. Fourth, the WCTL software calculates "loss vehicle adjustments" to account for the condition of, prior damage to, after-market parts present on, and refurbishment performed on the loss vehicle. McDonald Valuation Report at #4287. Fifth and finally, the software calculates the "Market Value" by "applying the loss vehicle adjustments to the base value." McDonald Valuation Report at #4287.

As for the PSA specifically, the Thurston and McDonald Valuation Reports provide a general description of the PSA as "an adjustment to reflect consumer purchasing behavior (negotiating a different price than the list price)." SMF ¶ 44. The Bridges Valuation Report provides:

> Projected Sold Adjustment – where the comparable vehicle is listed for sale, this adjustment reflects the fact that consumers typically negotiate a purchase price less than the list price. (There is no projected sold adjustment where the comparable vehicle has actual sold data, or where a vehicle is listed for sale at a "no haggle" dealership).

SMF ¶ 43; Bridges Valuation Report at #4159. The Defendants admit that the application of the PSA "invariably" results in "a downward adjustment in the value of the comparable vehicles." Second Am. Compl. ¶ 57; Defs.' Answer to Pls.' Second Am. Compl. ¶ 57 (ECF No. 83).

The statement of material facts—with the Kroell Amended Declaration off the table—offers virtually nothing to explain how the PSA is calculated. Citing their

expert, Jason Merritt, the Plaintiffs make the (conclusory and circular) claim that "[t]he PSA is a deduction that intentionally and arbitrarily reduces the true [Actual Cash Value] of their insureds' vehicles through a software created PSA." SMF ¶ 70. But there is nothing in the statement of material facts that explains exactly what the PSA is, or how Mitchell International's WCTL software arrives at the PSA and applies it. I find myself in the strange position of having to consult the arguments made by other parties in similar cases to understand the likely import of some of the Plaintiffs' facts. *See, e.g., Brown v. Progressive Mountain Ins. Co.*, 716 F. Supp. 3d 1349 (N.D. Ga. 2024); *Volino v. Progressive Casualty Ins. Co.*, 21 Civ. 6243 (LGS), 2024 WL 1251185 (S.D.N.Y. Mar. 22, 2024).

The Plaintiffs claim that "[t]he PSA does not include in its calculation comp vehicles that sold at or above the asking price." SMF ¶ 71. According to the Plaintiffs, this discarding of at-or-above sold price data means that the PSA "intentionally and arbitrarily always reduces the true [Actual Cash Value]" of insureds' vehicles. Pls.' Opp'n 10. In support of SMF ¶ 71, the Plaintiffs point to Merritt's deposition testimony and expert report, as well as facts recited in summary judgment orders in other cases, which the Plaintiffs describe as "a matter of public record." *See* SMF ¶ 71.

The Defendants deny SMF ¶ 71 and request to strike it. I ultimately agree with the Defendants that SMF ¶ 71 lacks admissible record support and should be struck.

### 1.    Merritt Expert Report and Testimony[6]

The Plaintiffs first look to their one designated expert, Merritt, who is "a personal-property appraiser focused on various vehicles." Suppl. Expert Report of Jason Merritt ("**Merritt Report**") 1 (ECF No. 104-3). They maintain that Merritt may testify as to how the PSA works, and specifically that the PSA excludes comp vehicles that sold at or above the asking price from its calculation, based on documents he saw and conversations he had with counsel in prior cases. SMF ¶ 71; *see* Merritt Report 6–7; Merritt Dep. 88:8–89:15, 91:4–92:9 (ECF No. 120-21). Merritt's Report states that his understanding of this purported aspect of the PSA comes from "conversations with counsel." Merritt Report 6. In his deposition, Merritt reported that counsel in other cases showed him documents about how the PSA was calculated. Merritt Dep. 88:19–89:15, 92:3–92:9.[7] None of these documents are in the record in this case, nor are they listed in Merritt's Report. Merritt Report 16; *see* Fed. R. Civ. P. 26(a)(2)(B)(ii) (expert's written report "must contain . . . the facts or data considered by the witness in forming them."). Further, in his deposition, Merritt did not know what timeframe this claimed exclusion practice was in effect, or whether it

---

[6]    The Defendants filed a motion to exclude Merritt's expert report and testimony entirely. Defs.' Mot. to Exclude the Report and Testimony of Jason Merritt (ECF No. 109). I am not resolving that larger question here. Instead, I am resolving the narrower question of whether Merritt's report and testimony, if admitted, would support SMF ¶ 71. *See generally Hoover*, 99 F.4th at 59.

[7]    In his deposition, Merritt was asked about a claim in his report that "Mitchell [International] does not consider transactions where the vehicle sold for the advertised price." Merritt Dep. 90:5–90:7 (ECF No. 120-21). When asked whether he had seen the data to support that claim, he responded, confusingly, "I have seen the data where they take away the vehicle sold at asking price or above. But I have not seen the actual data." Merritt Dep. 91:8–91:10. When asked about a claim in his report that Mitchell International had never considered transactions where the vehicle sold for more, he responded: "I saw documents on that. . . . And again, that was conversations with counsel, as well as the documents that I saw with the graph." Merritt Dep. 92:4–92:9.

was for all transactions and vehicles or just some. Merritt Dep. 90:5–91:3, 91:14–91:16. His understanding of WCTL's methodology is based on the description at the end of the Valuation Reports. Merritt Dep. 83:12–83:20 ("I do not have the data that they use, but I have the methodology that they publish at the end of the report."). The Valuation Reports do contain the overall methodology of arriving at Actual Cash Value, but as noted above, the Valuation Reports do not contain any explanation of how Mitchell International or the WCTL software arrives at the PSA.

The Plaintiffs maintain that Merritt's Report and testimony are admissible under Federal Rule of Evidence 703 to show that the WCTL software discards at-or-above list price vehicles from the PSA. SMF ¶ 71. According to Rule 703:

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703.[8] Expert witnesses may testify "in the form of an opinion or otherwise." Fed. R. Evid. 702. Rule 703 only applies to opinion testimony. *See* 29 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence § 6273, n.8 (2d ed.). The statement in SMF ¶ 71—"[t]he PSA does not include in its

---

[8]    The rest of Rule 703 reads: "[b]ut if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Civ. P. 703. This does not help the Plaintiffs either. Crucially, it applies only to opinion testimony. Moreover, the Advisory Committee Notes to the rule explain that if "otherwise inadmissible information is admitted under this balancing test, the trial judge must give a limiting instruction upon request, informing the jury that the underlying information must not be used for substantive purposes." Fed. R. Evid. 703 advisory committee's note to 2000 amendments. The Plaintiffs have not provided any of the underlying information in the record.

calculation comp vehicles that sold at or above the asking price"—is not an opinion, it is a fact. But Merritt's only source of information for this fact is hearsay (things he was told and documents he was shown by counsel in other cases). And an expert may not simply transmit hearsay to a jury. 29 Federal Practice and Procedure: Evidence § 6273. ("Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury. In such a case, Rule 703 is simply inapplicable and the usual rules regulating the admissibility of evidence control."). Nor is this a situation where Merritt is simply summarizing admissible evidence and then basing his opinion on it. Here, the underlying evidence is not in the record at all. *Cf. United States v. Harenberg*, 732 F.2d 1507, 1513–14 (10th Cir. 1984) (finding no error where trial court allowed expert witness to use a summary of admissible evidence in offering his opinion); *Brown v. Progressive Mountain Ins. Co.*, No. 3:21-cv-175-TCB, 2024 WL 3565314, at *5–6 (N.D. Ga. July 26, 2024) (admitting plaintiffs' expert's analysis based on a spreadsheet produced by defendants in discovery and provided to expert by plaintiffs' counsel), *amended on reconsideration*, 2024 WL 4164164 (N.D. Ga. Sept. 11, 2024). Instead, the Plaintiffs rely on Merritt to get the evidence into the record in the first place. The Defendants are correct that the Merritt Report and testimony are not admissible to support SMF ¶ 71.

## 2. Court Orders in Other Cases

In further support of SMF ¶ 71, the Plaintiffs next cite a footnote in the background section of an order in a similar case. SMF ¶ 71 (citing *Costello v. Mountain Laurel Assurance Co.*, No. 2:22-CV-35, 2024 WL 239849, at *2 n.8 (E.D.

Tenn. Jan. 22, 2024)). According to the Plaintiffs, in that footnote the *Costello* court explains the PSA's rejection of vehicles above list price, and in a previous era, rejection of vehicles both at and above list price. SMF ¶ 71; *Costello*, 2024 WL 239849, at *2 n.8.[9] Where the *Costello* order states that the WCTL discards as outliers any comp vehicle whose sale price is equal to or above list price, that assertion is supported by a citation to a (sealed) document in the record. *Id.*; Sealed Document, *Costello v. Mountain Laurel Assurance Co.*, No. 2:22-CV-35, ECF No. 145 (Nov. 16, 2023). According to the Plaintiffs, how the PSA works is thus "a matter of public record." SMF ¶ 71. Not so.

Federal Rule of Evidence 201 permits judicial notice of adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Under Rule 201, it would be uncontroversial to, for example, take judicial notice of the fact that a particular filing was made in another case. *See, e.g., Simmons v. Trans Express Inc.*, 16 F.4th 357, 360 (2d Cir. 2021) (taking judicial notice of the summons and judgment sheet in the plaintiff's prior small claims action). But it would violate this rule to take judicial notice of a factual finding from a separate— even if similar—case, particularly where the fact is disputed in the current litigation. *See PNC Bank, Nat'l Ass'n v. 2013 Travis Oak Creek*, L.P., 136 F.4th 568, 574–575

---

[9]    By my read, it is not at all clear that the *Costello* court was referring to the PSA in the cited footnote. Instead, this description seemingly refers to step one of the valuation process, when vehicles that are the closest match to the loss vehicle are first identified. *See Costello v. Mountain Laurel Assurance Co.*, No. 2:22-cv-35, 2024 WL 239849, at *2 & n.8 (E.D. Tenn. Jan. 22, 2024). However, later in the decision, the *Costello* court makes a similar statement about the PSA excluding from its dataset all transactions where a vehicle sold at or above its list price. *Costello*, 2024 WL 239849, at *3.

(5th Cir. 2025) (explaining that "factual findings from separate, but related, cases" are not "public records" under Rule 201); *see also* 21B Kenneth W. Graham, Jr. & Daniel D. Blinka, Federal Practice and Procedure, § 5104 (2d ed.). The Plaintiffs' asserted facts about what the PSA does or does not do are contested in this litigation. And the Plaintiffs cannot substitute another court's interpretation of the record before that court in one action for record evidence in their own action.

In sum, SMF ¶ 71 is not supported by admissible evidence. Accordingly, the Plaintiffs have not generated a genuine dispute about whether the PSA excludes from its calculation comp vehicles that sold at or above the asking price.

The Plaintiffs' additional asserted facts based on Merritt's Report meet a similar fate. For example, the Plaintiffs maintain that sale prices are less reliable than list prices, because "additional profit opportunities for the dealer"—such as Guaranteed Asset Protection insurance, warranties, or service plans—"might result in what may look like a lower sales price but does not reflect a change in the market value of that car." SMF ¶ 83. And the Plaintiffs then assert that the Mitchell International PSA does not account for these potential dealer profit opportunities. SMF ¶ 84. But again, the Plaintiffs have the same problem: they have not pointed to any admissible evidence that this is how the PSA works. Merritt is not an expert on Mitchell International's methodology, and he is basing his statements on what counsel told him or on documents shown to him that he has not provided with his report. On this record, I simply do not know how the PSA is calculated or whether it takes into account these additional profit opportunities.

It does not appear that the Plaintiffs conducted any of their own discovery on how the WCTL software works, and I cannot import facts and legal theories from other cases to fill the gaps. But I will take the admissible information I do have and analyze whether the Plaintiffs have generated a genuine dispute of material fact with respect to the claims at issue in this case.

### B.    Applying the Legal Standard for UCSPA and UTPA Claims to the Relevant Facts

#### 1.    UCSPA

The UCSPA provides a cause of action to persons injured by their insurer's actions, including by "[k]nowingly misrepresenting to an insured pertinent facts or policy provisions relating to coverage at issue," and "[w]ithout just cause, failing to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear." 24-A M.R.S. § 2436-A(1)(A), (E). The Defendants maintain that the Plaintiffs failed to create a genuine dispute as to whether the Defendants made a knowing misrepresentation or acted without just cause under the UCSPA.

As I observed in an earlier order, " '[t]o establish a knowing misrepresentation, a plaintiff must provide evidence demonstrating something more than a mere dispute between the insurer and insured as to the meaning of certain policy language.' " *Thurston*, 2023 WL 4083232, at *6 (quoting *Curtis v. Allstate Ins. Co.*, 2002 ME 9, ¶ 24, 787 A.2d 760). "[T]o survive summary judgment the plaintiff must generate an issue of fact that the insurer knew the policy said and meant one thing but told the insured something else." *Curtis*, 2002 ME 9, ¶ 24, 787 A.2d 767.

18

The Plaintiffs point to the Defendants' admission that when applied, the PSA always lowers the Actual Cash Value of comparable vehicles. Pls.' Opp'n 14. The Thurston and McDonald Valuation Reports describe the PSA as "an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)."[10] SMF ¶ 44. But in order to find that this description is a misrepresentation, the fact-finder would need some evidence that the PSA does not actually reflect consumer behavior. Because without it, there is no (admissible) evidence that the PSA did something contrary to what the Policy, Valuation Reports, or anyone associated with the Defendants represented.[11] This is where the Plaintiffs' failure to support Merritt's assertion that the PSA does not include vehicles that sold at or above asking price comes home to roost. *See, e.g.,* Pls.' Opp'n 11. With that evidence, there might be a genuine dispute as to whether the Defendants told the Plaintiffs the PSA did one thing, while knowing it actually did something else. *See Curtis*, 2002 ME 9, ¶ 24, 787 A.2d 767. But without it, the Plaintiffs have failed to counter the

---

[10]    As noted above, the description of the PSA in the Bridges Valuation Report specifically states that the PSA "reflects the fact that consumers typically negotiate a purchase price *less* than the list price." SMF ¶ 43 (emphasis added). I rely primarily on the explanation of the PSA in the Thurston and McDonald Valuation Reports because it is more favorable to the Plaintiffs' theory of the case, and therefore consistent with my obligation to view the evidence in the light most favorable to the Plaintiffs as the nonmoving party. *See Sevelitte v. Guardian Life Ins. Co. of Am.*, 123 F.4th 53, 59 (1st Cir. 2024).

[11]    Nor am I persuaded that the Defendants' failure to provide details about how Mitchell International's WCTL software calculates the PSA or to disclose that it uses one of many available methods of appraisal meets the "misrepresentation" standard. *See* Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. ("**Pls.' Opp'n**") 14–15 (ECF No. 132). Even more so, given that the Policy allows the Defendants to "use estimating, appraisal, or injury evaluation systems to assist . . . in determining the amount of damages, expenses, or loss payable," and that these "systems may be developed by [the Defendants] or a third party and may include computer software, databases, and specialized technology." Policy 24.

Defendants' showing "that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), on the UCSPA claim.

The Plaintiffs next present a laundry list of additional "pertinent facts" they claim are knowing misrepresentations. Pls.' Opp'n 13. There are several problems with this list. First, the Plaintiffs offer the list without any analysis as to how each purported misrepresentation is a violation of the UCSPA. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Second, there are problems with the record support for many of these items. Rather than cite a paragraph in the statement of material facts to support each claim, the Plaintiffs cobble together pieces of record evidence (in one instance, from an expert whose testimony they have sought to exclude).[12] For one fact they offer no citation other than to point to an earlier section of their opposition brief. And when I drill down to the cited material supporting the fact, the material often either does not support the fact at all or it does not support it to the extent the Plaintiffs claim it does.[13] Finally, most of the claimed

---

[12]    Page thirteen of the Plaintiffs' opposition is a study in how not to litigate a summary judgment motion. On this single page, I count multiple violations of Local Rule 56. In addition, the Plaintiffs cite the Kinney deposition to support two of their facts, even though they moved to exclude his expert testimony. *See* Pls.' Opp'n 13; Pls.' *Daubert/Kumho* Mot. to Exclude the Proffered Expert Testimony of David Kinney (ECF No. 110).

[13]    For example, the Plaintiffs claim that the Defendants knowingly misrepresented "that there are issues as to whether the PSA considers factors such as the race or sex of the purchaser of the used vehicle and their impact on the sold price and the PSA." Pls.' Opp'n 13. There is nothing in the statement of material facts about this asserted misrepresentation. Instead, the Plaintiffs support this assertion in their brief with a citation to the deposition of the Defendants' expert Kinney, in which he says he does not know if the PSA takes this sort of information into account. Pls.' Opp'n 13 (citing Kinney Dep. 113:2–114:1 (ECF No. 120-18)).

"pertinent facts" require me to have some understanding of how the PSA is calculated to assess whether they are in fact misrepresentations.[14] But, as discussed above, the record is devoid of evidence about how the PSA is calculated, and without it there is no way to determine that these are not accurate representations. The UCSPA requires the Plaintiffs to identify an assertion by the Defendants pertinent to coverage and provide evidence that the assertion was not accurate. They have not done so here. The Plaintiffs have failed to point to any record evidence that the Defendants misrepresented any "pertinent facts or policy provisions" having to do with the PSA. *See* 24-A M.R.S. § 2436-A(1)(A).

The next basis for the Plaintiffs' UCSPA claim is that the Defendants "[w]ithout just cause, fail[ed] to effectuate prompt, fair and equitable settlement of claims submitted in which liability ha[d] become reasonably clear." 24-A M.R.S. § 2436-A(1)(E). In this context, "an insurer acts without just cause if it refuses to settle claims without a reasonable basis to contest liability, the amount of any damages or the extent of any injuries claimed." *Id.* at § 2436-A(2). Here, the Plaintiffs

---

[14]    For example, the Plaintiffs claim that the Defendants knowingly misrepresented:
- "the true meaning and intent of the PSA";
- "that the PSA is an objective adjustment to consumer purchasing behavior (negotiating a different price than the listed price)";
- that "Internet prices often reflect a no-hassle price and that dealers price their inventory competitively to move inventory and sell more vehicles" and "[t]o compete in the market, the dealer offers its best price in its advertisements";
- the "application of the PSA complies with the comp methodology and appraisal standards";
- "that the PSA is not just an estimate and projection";
- that the Defendants "use big data, which is not always accurate or reliable to determine the PSA";
- "that the PSA does not include in its calculation comp vehicles that are sold at or above the asking price."

Pls.' Opp'n 13 (internal quotations omitted).

simply rehash their 24-A M.R.S. § 2436-A(1)(A) misrepresentation arguments, namely, that the PSA was an inappropriate deduction. *See* Pls.' Opp'n 15–16. But, again, in order to conclude that the Defendants failed to effectuate a fair and equitable settlement "without just cause," there would need to be some basis from which to conclude that the PSA actually did not reflect consumer behavior or was otherwise inappropriate. With no record evidence to support that claim, the UCSPA claim fails as a matter of law.

### 2. UTPA

The UTPA provides a cause of action to persons who "suffer[ ] any loss of money or property" due to "unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S. §§ 207, 213. "[T]o be unfair an act must cause, or be likely to cause, substantial injury that is not reasonably avoidable by consumers, and the harm is not outweighed by a countervailing benefit to consumers or competition." *MacCormack v. Brower*, 2008 ME 86, ¶ 5 n.2, 948 A.2d 1259. And "[a]n act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances." *State v. Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d 200. "Material" in this context means " 'information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.' " *Id.* (quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (1984)).

The Defendants argue that the Plaintiffs cannot show that the Defendants engaged in any "deceptive act" or that the Plaintiffs relied on any such act or statement. Defs.' Mot. 16–17. The Plaintiffs counter that the Defendants did not

address the "unfair" aspect of their UTPA claim and assert that reliance is not a UTPA requirement, though even if it was, they satisfied it. Pls.' Opp'n 16–18. I agree that the Defendants focused on the "deceptive," rather than "unfair" part of the Plaintiffs' UTPA claim, but in the end the reliance issue is dispositive.

The case law cited by the parties makes clear that reliance is an element of an UTPA claim. *See Weinschenk*, 2005 ME 28, ¶ 27, 868 A.2d 200; *Sanford v. Nat'l Ass'n for the Self-Employed, Inc.*, 264 F.R.D. 11, 16 (D. Me. 2010). The Plaintiffs' reliance argument is limited to a single sentence with a citation to SMF ¶ 80. Pls.' Opp'n 18 ("Even if [reliance] is an element, Plaintiffs satisfy it."). The cited statement of material fact, which the Defendants admit, reads: "[t]he PSA is just an estimate and projection." SMF ¶ 80. I do not see how this fact supports the Plaintiffs' reliance on the Defendants' conduct or representations. In any event, the Policy informs insureds that the Defendants may "use estimating, appraisal, or injury evaluation systems to assist . . . in determining the amount of damages, expenses, or loss payable." Policy 24. On this record, the Defendants have shown an absence of evidence on the required element of reliance, and the Plaintiffs have not countered that showing.[15] The Plaintiffs' UTPA claim fails as a matter of law.

---

[15]    As noted above on the Unfair Claim Settlement Practices Act claim, this is another place where the Plaintiffs' failure to point to admissible evidence that the PSA did not actually reflect consumer behavior presents an insurmountable hurdle. Because with such evidence, the Plaintiffs may have been able to avoid summary judgment on their UTPA claim, in that there could be a genuine issue of material fact on whether the Plaintiffs reasonably relied on the representations in the Policy and Valuation Reports and were then injured by the Defendants' failure to deliver what the Policy and Valuation Reports had promised.

In summary, for both the UCSPA and UTPA claims, the Defendants are entitled to summary judgment because they have demonstrated a lack of evidence to support the Plaintiffs' claims, and the Plaintiffs have not responded by pointing to specific (admissible) facts that show there is a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324. Because I am granting the Defendants' motion for summary judgment, I need not decide the Plaintiffs' Amended Motion for Class Certification (ECF No. 89), Plaintiffs' Motion to Strike Philip Kroell's Amended Declaration (ECF No. 103), Plaintiffs' *Daubert/Kumho* Motion to Exclude the Proffered Expert Testimony of David Kinney (ECF No. 110), Plaintiffs' Motion to Exclude the Testimony of Dr. Walker (ECF No. 112), Plaintiffs' *Daubert/Kumho* Motion to Exclude the Proffered Expert Testimony of Marc Spizzirri (ECF No. 113), or the Defendants' Motion to Exclude the Report and Testimony of Jason Merritt (ECF No. 109).[16]

## III.  **Final Thoughts**

I acknowledge that this outcome is different from the outcomes in several cases with similar facts and legal theories. But what sets those cases apart from this one is that by the summary judgment stage, the plaintiffs in those cases had amassed admissible evidence that the PSA did not actually reflect consumer behavior and in fact defied the market. In other words, that the defendant insurers had failed to pay the promised Actual Cash Value.

---

[16]    Likewise, I need not address the Defendants' additional summary judgment arguments about Plaintiff Thurston specifically or whether Progressive is a proper party. *See* Defs.' Mot. 18–20.

For example, in *Brown v. Progressive Mountain Insurance Company*, 716 F. Supp. 3d 1349 (N.D. Ga. 2024), the record included underlying data from J.D. Power about how the PSA was calculated, and part of the *Brown* plaintiffs' theory of liability was that Progressive inappropriately "exclude[d] certain data and factors" from the PSA calculation. *Id.* at 1355. In their summary judgment briefing, "the parties disagree[d] over the propriety of excluding certain numbers and what the numbers mean for purposes of the PSA." *Id.* at 1355–56.

In addition, the *Brown* plaintiffs not only had the benefit of Merritt's expert testimony on appraisal standards generally and his conclusion that excising the PSA from the WCTL valuation led to accurate Actual Cash Value, but they also had the opinions of several other complementary experts as well. These included an expert on used car market valuation in the internet era (Kirk Felix), an expert on statistics who analyzed a set of list price data and sold price data of used vehicles to see how often they aligned (Jeffrey Martin), and another expert on statistics to opine that the data supporting the PSA was unsound (Michelle Lacey). *See id.* at 1356; *Brown*, 2024 WL 3565314, at *3–6 (admitting opinion of expert Lacey); *Brown v. Progressive Mountain Ins. Co.*, No. 3:21-cv-175-TCB, 2023 WL 9193005, at *2–6 (N.D. Ga. Sept. 20, 2023) (admitting opinions of experts Martin and Felix); Expert Report of Jeffrey Martin (Ex. A. to Defs.' Mot. to Exclude the Report & Testimony of Pls.' Expert Jeffrey Martin), Case No. 3:21-cv-00175-LMM (ECF No. 75-2); Expert Report of Kirk Felix (Ex. B to Defs.' Mot. to Exclude the Report & Testimony of Pls.' Expert Kirk Felix), Case No. 3:21-cv-00175-LMM (ECF No. 76-3); Lacey Report (Ex. B to Defs.' Mot. to

25

Exclude Portions of the Report & Testimony of Dr. Michelle Lacey), Case No. 3:21-cv-00175-LMM (ECF No. 143-2). That is to say, the *Brown* plaintiffs were able to point to admissible record evidence that created a genuine dispute about whether the Defendants had actually paid insureds their promised Actual Cash Value when they applied the PSA as part of their valuation process.[17] The Plaintiffs here have not made any comparable showing.

## CONCLUSION

For the reasons stated above, I **GRANT** the Defendants' motion for summary judgment (ECF No. 121).


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 30th day of July, 2025.

---

[17]     *See also Volino v. Progressive Casualty Ins. Co.*, 21 Civ. 6243 (LGS), 2024 WL 1251185, at *2, 9 (S.D.N.Y. Mar. 22, 2024) (denying summary judgment in part where record contained evidence of how the PSA was calculated and what data it used, evidence "that the median used car in New York sells for a greater percentage of its advertised price than as represented by the PSAs," and testimony from "[s]everal industry experts . . . that the PSAs are in conflict with actual market pricing"); *Chadwick v. State Farm Mut. Auto. Ins. Co.*, No. 4:21-cv-1161-DPM, 2024 WL 1156944, at *1–2 (E.D. Ark. Mar. 18, 2024) (denying summary judgment on breach of contract claim where insurer applied a nine percent "typical negotiation adjustment" to comp vehicles, policy did not define the term "actual cash value," and court admitted Merritt and Felix expert testimony on appraising vehicles and "how the used car industry prices and sells cars," respectively); *Volino v. Progressive Cas. Ins. Co.*, No. 21 Civ. 6243 (LGS), 2023 WL 2532836, at *4–5 (S.D.N.Y. Mar. 16, 2023) (denying motions to exclude Merritt's expert testimony as well as two separate experts' testimony on "how car dealers price used cars.").